

U.S. Department of Justice

United States Attorney
Eastern District of New York

EAG:NS
F. #2019R00029

271 Cadman Plaza East
Brooklyn, New York 11201

July 12, 2019

<u>By Hand and ECF</u>

The Honorable Ann M. Donnelly
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Robert Sylvester Kelly
                 <u>Criminal Docket No. 19-286 (S-1) (AMD) (E.D.N.Y.)</u>

Dear Judge Donnelly:

      The government respectfully submits this letter in support of pretrial detention of the defendant Robert Sylvester Kelly.  For the reasons set forth herein, the Court should order that the defendant be detained pending his removal to the Eastern District of New York and trial because he cannot overcome the presumption that there is no combination of conditions that would reasonably assure his continued appearance in this case or protect the safety of the community were he to be released.

      As set forth below, the charges in this case are extremely serious:  the defendant is charged as the leader of a racketeering enterprise engaged in a pattern of racketeering activity spanning two decades involving the sexual exploitation of children, coercing and transporting women and girls to engage in illegal sexual activity, kidnapping and forced labor.  If convicted on all counts, the defendant faces the prospect of spending decades in prison.  Given the strength of the evidence in the case and the substantial prison sentence that the defendant faces, the defendant poses a significant flight risk.  As his past interactions with the criminal justice system have failed to deter the defendant from continuing to engage in serious criminal activity, the defendant is also a danger to the community.  Finally, as set forth below, the defendant's release also presents a serious risk that he will attempt to obstruct justice and threaten and intimidate potential witnesses.

I. <u>Factual Background</u>

    A.    <u>The Eastern District of New York Indictment</u>

On July 10, 2019, a grand jury in the Eastern District of New York returned a five-count superseding indictment (the "Indictment")[1] charging the defendant with racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963, involving eleven racketeering acts (Count One); two counts of Mann Act transportation to engage in illegal sexual activity, in violation of 18 U.S.C. § 2421(a) (Counts Two and Four), and two counts of Mann Act coercion and enticement to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(a) (Counts Three and Five).

As charged by the grand jury, for over two decades, the defendant was the leader of a racketeering enterprise (the "Enterprise") comprised of individuals who served as managers, bodyguards, drivers, personal assistants and runners for the defendant, as well as members of his entourage. Along with promoting the defendant's music and the "R. Kelly" brand, the Enterprise recruited women and girls to engage in illegal sexual activity with the defendant, often transporting victims throughout the United States for this purpose. This sexual activity was often filmed and photographed by the defendant, including sexually explicit depictions of minors constituting child pornography.

As alleged in the Indictment, the defendant promulgated numerous rules that many of his sexual partners were required to follow, including that the women and girls were to call him "Daddy;" they were not permitted to leave their rooms to eat or visit the bathroom without receiving his permission; they were required to wear baggy clothing when not accompanying Kelly to an event; and they were directed to keep their heads down and not to look at other men. Kelly also isolated the women and girls from their friends and family, and made them dependent on him for their financial well-being. The defendant also maintained his leadership and control of the Enterprise by demanding absolute commitment from its members, not tolerating dissent and obtaining sensitive information about members and associates of the Enterprise in order to maintain control over them.

The crimes charged in the Indictment took place throughout the United States, including in New York, Connecticut, Illinois and California. The racketeering acts and substantive crimes charged in the Indictment relate to five different victims, identified in the Indictment as Jane Doe #1 through Jane Doe #5. Detailed below is a proffer of certain facts related to the five identified victims. <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

---

[1] The grand jury returned the original indictment on June 20, 2019. The Indictment adds a criminal forfeiture allegation to the original indictment.

2

1. <u>Jane Doe #1</u>

The defendant met Jane Doe #1 in or about 1999, when she was 16 years old, after another member of the Enterprise approached her at a fast food restaurant and informed her the defendant wished to speak with her. Thereafter, while Jane Doe #1 was a minor under 18 years old, the defendant filmed their sexual intercourse on multiple occasions, thereby creating child pornography, using materials that had been mailed, shipped and transported in interstate and foreign commerce.

2. <u>Jane Doe #2</u>

In or about and between 2003 and 2004, Jane Doe #3 met Kelly at a mall outside the state of Illinois when she was in her early 20s and working as a radio station intern. The defendant thereafter invited Jane Doe #2 to travel to Chicago, Illinois purportedly to conduct an interview of him. Following her arrival in Chicago, Jane Doe #3 was directed to a recording studio. Once there, she was escorted to a bedroom within the studio by one of the defendant's associates, who also took and searched her suitcase. Later, while in the room, another associate made a copy of Jane Doe #2's driver's license, directed her to sign what she believed to be a nondisclosure agreement, and advised her not to talk to anyone and to keep her head down. Jane Doe #3 ultimately spent approximately three days in the bedroom, which was locked, without sustenance. After a member of the Enterprise provided her with food and a drink, she became tired and dizzy. She woke up some time thereafter to the defendant with her in the bedroom in circumstances that made clear he had sexually assaulted her while she was unconscious.

3. <u>Jane Doe #3</u>

In or about May 2009, when Jane Doe #3 was 16 years old and the defendant was in his early 40s, the defendant began a sexual relationship with Jane Doe #3 in violation of Illinois law, which ultimately lasted for a period of months. During this time period, on multiple occasions, the defendant produced sexually explicit photographs and videos of Jane Doe #3 engaging in sexual intercourse and sexual contact with the defendant and others at his direction.

In the course of their relationship, the defendant also engaged in a scheme, plan and pattern intended to cause Jane Doe #3 to believe that, if she did not perform certain sexual acts on him and others at his direction, she or her family members would suffer serious harm. The defendant engaged in a pattern of both physical and psychological abuse when Jane Doe #3 disobeyed his sexual directives, including slapping, choking, and isolating her in rooms for days at a time with no access to food, which caused Jane Doe #3 to believe such punishments would occur if she did not acquiesce and perform sexual acts she did not want to perform. In addition, the defendant caused Jane Doe #3 to write and sign letters and other documents containing false information that, if released, could cause reputational harm to both her and her close family members as an additional means to exert control over her.

3

4. <u>Jane Doe #4</u>

In or about 2015, Jane Doe #4, a minor and aspiring music artist, met the defendant after attending one of his concerts. Thereafter, at the defendant's suggestion, Jane Doe #4 began travelling on a consistent basis with the defendant while he was on tour, at the defendant's direction, purportedly to learn about the music business, including to various locations in Connecticut and California while Jane Doe #4 was under 18 years old. In July 2015, while Jane Doe #4 was a minor, the defendant persuaded, induced and coerced her to travel to Connecticut to engage in sexual activity with the defendant, in violation of Connecticut law. In October 2015, while Jane Doe #4 was a minor, he persuaded, induced and coerced Jane Doe #4 to travel to California to engage in sexual activity with the defendant, in violation of California law.

5. <u>Jane Doe #5</u>

Jane Doe #5 met the defendant following an R. Kelly concert that she attended when she was 19 years old, at which time the defendant provided Jane Doe #5 with his phone number. Thereafter the two communicated by telephone. In May 2017, the defendant directed Jane Doe #5 to contact an assistant to arrange for travel to and accommodations in New York to attend an R. Kelly concert in Long Island, New York. Following the concert, Jane Doe #5 returned to her hotel room. In the early morning hours, the defendant unexpectedly arrived at Jane Doe #5's room and loudly announced his presence. Ultimately, at the defendant's direction, the encounter became sexual in nature and the two engaged in intercourse. The defendant did not use a condom. Prior to the intercourse, the defendant did not divulge to Jane Doe #5 that he had contracted an infectious venereal disease, in violation of New York law. Notably, during the encounter in the hotel room, the defendant told Jane Doe #5, in sum and substance, that if she was really 15 or 16 years old, she could tell him, suggesting he would have preferred for Jane Doe #5 to be younger.

Thereafter, the defendant arranged for Jane Doe #5 to travel to various locations throughout the United States to see him, including in January 2018 to Los Angeles, California. During this trip, Jane Doe #5 went to a recording studio in Los Angeles to see the defendant. Once at the studio, Jane Doe #5 waited for many hours in a room, without sustenance, for the defendant to arrive. After briefly seeing him, the defendant did not show up again until the following day. After he arrived the following day, the defendant took Jane Doe #5 into a smaller area/room and instructed Jane Doe #5 to take off her clothing. Jane Doe #5 noticed a gun in the room, which the defendant moved to a piece of furniture nearby. He then proceeded to ask Jane Doe #5 a series of questions, warning her there would be consequences if she lied. Given the surrounding circumstances, Jane Doe #5 believed she was not free to leave the room. Thereafter, the defendant directed Jane Doe #5 to give him oral sex in the room. (When agents executed a search warrant at the defendant's residence on July 11, 2019, they found a holster and ammunition.)

The defendant arranged for Jane Doe #5 to travel a final time to see him in February 2018 in New York City. While in New York, the defendant engaged in sexual

4

activity with Jane Doe #5, again without divulging to her that he had contracted an infectious venereal disease, in violation of New York law. Jane Doe #5 stopped seeing the defendant following this trip and ultimately learned that she had contracted an infectious venereal disease during the course of her relationship with the defendant. Medical records confirm that the defendant had an infectious venereal disease during the course of his sexual activity with Jane Doe #5.

      B.      The Northern District of Illinois Indictment

On July 11, 2019, a grand jury in the Northern District of Illinois ("NDIL") returned a 13-count indictment charging the defendant with producing and receiving child pornography, and enticing minors to engage in criminal sexual activity. The charges involve the defendant engaging in sex acts with five minors in the late 1990s and early 2000s (all of whom are different from the Jane Doe victims identified in the Indictment) and recording some of the abuse on multiple videos. As a result, the defendant has been charged with federal crimes involving a total of ten victims in two indictments. The NDIL indictment also charges the defendant with conspiring to intimidate victims and conceal evidence in an effort to obstruct law enforcement, including with respect to an investigation in the 2000s that resulted in the defendant's 2008 trial in Cook County, Illinois on state child pornography charges, of which he was acquitted. Specifically, the NDIL indictment charges that, in 2001, the defendant and another individual began paying an acquaintance hundreds of thousands of dollars to collect the videos of child pornography for the purpose of concealing and covering up their existence. When the acquaintance later planned to hold a news conference to publicly announce that he had recovered the videos, the defendant and others paid him approximately $170,000 in exchange for agreeing to cancel the event. The defendant and another individual also agreed to pay one of the minors and another person for their efforts to return the videos, but only after they took polygraph examinations to confirm that they had returned all copies in their possession.

II.      Argument

      A.      Applicable Law

            1.      The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405. In addition, a court may order detention if there is "a serious risk that the [defendant] will . . . attempt to obstruct justice, or . . . threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). A finding of a risk of obstruction of justice must be supported by a preponderance of the evidence. United States v. Madoff,

586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of evidence standard applies to determination of both risk of flight and risk of obstruction of justice).

The Bail Reform Act lists four factors a court should consider in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, including the defendant's "character . . . [and] financial resources," (3) the seriousness of the danger posed by the defendant's release and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g). Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Additionally, where, as here, there is probable cause to believe that the defendant committed offenses involving minor victims under 18 U.S.C. §§ 2242, 2251, and 2423,[2] it shall be presumed, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(E). Indeed, "the presence of an indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e)." United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985).

---

[2] See, e.g., Racketeering Acts One, Four, Six, Seven, and Eight of Count One of the Indictment. See United States v. Marino, 731 F. Supp. 2d 323, 326 (S.D.N.Y. 2010) (predicate acts alleged as part of a pattern of racketeering activity can trigger rebuttable presumption of dangerousness to community).

        2.        Elaborate Bail Packages Are Insufficient to Protect the Community Against Dangerous Defendants

The Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants. See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail package secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail package secured with real property, home detention, restricted visitation and telephone calls, and electronic monitoring); United States v. Colombo, 777 F.2d 96, 97, 100 (2d Cir. 1985) (rejecting $500,000 bail package secured by real property). The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals. In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted). See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in the Eastern District of New York have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring. See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

III.    Discussion

As set forth below, each of the § 3142(g) factors demonstrates (1) by clear and convincing evidence that the defendant is a danger to the community; and (2) by a preponderance of the evidence that the defendant's release poses a both a risk of flight and a

7

risk of obstruction of justice. The defendant cannot overcome the statutory presumption in favor of detention in this case and should be detained pending trial.

    A.    <u>The Nature and Circumstances of the Charged Crimes</u>

As set forth above, the defendant is charged with serious crimes, including leading a racketeering enterprise that he created and used for decades to sexually abuse and exploit women and girls for his own sexual gratification, including through the use of kidnapping and forced labor. The pattern of racketeering activity charged includes the defendant's commission of 11 predicate acts against five different victims over two decades. Moreover, his status as the leader of the Enterprise cannot be overstated and accentuates the already serious nature of the criminal conduct at issue. The Enterprise and the defendant's status within it allowed the defendant to serially engage in criminal conduct with impunity, including against minor victims. See 18 U.S.C. § 3142(g)(1) (enumerating "whether the offense . . . involves a minor victim" as a factor in bail applications).

The seriousness of the charged crimes (and the attendant risk of flight)[3] is also reflected in the penalties the defendant faces, which include up to 20 years' imprisonment on Count One, up to 20 years' imprisonment on each of Counts Three and Five, and ten years' imprisonment on each of Counts Two and Four.

    B.    <u>The History and Characteristics of the Defendant and Seriousness of the Danger Posed by the Defendant's Release, and the Risk of Obstruction of Justice</u>

While the defendant has no criminal convictions, he has been charged with sexual offenses involving children in the past and is currently charged in Cook County, Illinois with various offenses involving sexual misconduct. Moreover, as alleged in the NDIL indictment, the defendant's acquittal on state charges involving child exploitation in 2008 may well have been the result of his own obstructive conduct, which included persuading multiple individuals to testify falsely before a Cook County grand jury. Emboldened by his fame and the lack of any real consequences for his conduct for so long, the defendant repeatedly and flagrantly used his resources and the Enterprise at his disposal to continue committing serious crimes involving both minor and adult victims.

In addition, as set forth above, the defendant's conduct with respect to several of the Jane Doe victims demonstrates a willingness to intimidate potential witnesses to avoid criminal liability. For example, the defendant caused Jane Doe #3 to write and sign documents containing false information that, if released, could cause reputational harm to both her and her family members. Similarly, following a civil lawsuit filed on behalf of Jane Doe #5 against the defendant, a lawyer for Jane Doe #5 received a typewritten letter in 2018

---

[3] See <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight).

8

purportedly signed by the defendant.  Enclosed with the letter were two pieces of paper that contained images and typewritten text.  Among the images were photographs of Jane Doe #5 that had been apparently cropped to not disclose certain body parts.  Beneath those photos was text including "I assure you this would not be considered a Sunday go-to-meeting dress.  The next two pictures have been cropped for the sake of not exposing her extremities to the world, yet!!!"  Based on the content of the letter and photographs, it is reasonable to conclude that the letter was sent at the defendant's direction, advising Jane Doe #5 of his intent to maintain compromising photographs of her in an attempt to convince Jane Doe #5 to abandon her lawsuit.  This type of conduct is strong evidence that the defendant, or members of his Enterprise, is likely to attempt witness tampering or other obstructive conduct if released, a factor which is also relevant to an assessment of the seriousness of the danger posed by the defendant's release.

      C.    <u>The Strength of the Evidence</u>

The evidence of the defendant's guilt of the crimes charged in the Indictment is strong.  The government will prove the charged crimes at trial through, among other evidence, the testimony of victims and other witnesses, including insider-witnesses previously employed by the Enterprise, medical records, phone records, text messages, cell site records, photographs, and other documentary evidence.  Moreover, the witness testimony at trial will reveal a distinctive pattern and modus operandi, including from witnesses victimized by the defendant at different times who do not know each other, further buttressing the strength of the evidence against the defendant.  The government's evidence is therefore exceedingly strong and clearly favors detention.

IV.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully submits that the defendant should be detained pending his removal to the Eastern District of New York and trial.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

By:    /s/
Elizabeth Geddes
Nadia Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
(718) 254-7000