

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG/NS/MCM
F. #2019R0029

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 21, 2020

<u>By Hand and ECF</u>

The Honorable Ann M. Donnelly
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Robert Sylvester Kelly
             <u>Criminal Docket No. 19-286 (S-2) (AMD)</u>

Dear Judge Donnelly:

      The government submits this reply brief in response to the defendant's response to the government's motion in limine to preclude disclosure/memorandum in support of the defendant's motion for discovery dated January 9, 2020.  (<u>See</u> Ltr. of Steven A. Greenberg to the Court, dated Jan. 9, 2020 (Docket Entry No. 36) ("Def.'s Ltr.")).  In his response, the defendant asks this Court, in its discretion, to order the government to provide early disclosure of the identities of Jane Doe #2 and Jane Doe #3 because he claims there is no risk that he will seek to, or has the opportunity to, intimidate or otherwise influence these individuals.  To the contrary, there continues to be a serious risk that the defendant will obstruct, attempt to obstruct, threaten, intimidate or attempt to threaten or intimidate one or more prospective witnesses.  As explained in further detail below, not only has the defendant engaged in longstanding conduct aimed at preventing potential witnesses from providing damaging evidence against him, he has also recently used various methods to communicate secretly with individuals despite safeguards currently in place to monitor the defendant's communications while incarcerated.  As such, the defendant continues to have the means to obstruct these proceedings and the Court should deny defense counsel's request for early disclosure of the identities of Jane Doe #2 and Jane Doe #3.

I.      <u>The Defendant Has Consistently Engaged in Past Obstructive Conduct</u>

      The defendant first asks this Court to order early disclosure of the identities of Jane Doe #2 and Jane Doe #3 because he suggests, albeit incorrectly, that he would not

obstruct these proceedings or intimidate witnesses. In so doing, the defendant asks this Court to ignore the strong evidence of the defendant's past obstructive conduct. As the Court is aware, the defendant has been charged, together with others, with obstruction of justice, in violation of 18 U.S.C. § 1519, in an indictment in the Northern District of Illinois ("NDIL"). (United States v. Kelly, 19-CR-567, Indictment, Count Five ¶¶ 1-11, filed July 11, 2019). As alleged in the NDIL indictment, such obstructive conduct included, but was not limited to, the defendant and others paying several hundreds of thousands of dollars to victims and witnesses to "ensure they would not cooperate with law enforcement and would conceal and cover up evidence, including videos, relating to [the defendant's] sexual contact and sexual acts with minors," and to provide false information to police. (See, e.g., id. ¶¶ 6-10). Significantly, the NDIL indictment also alleges that the defendant persuaded multiple individuals to provide false testimony before the Cook County grand jury, which was investigating the defendant's sexual relationship with a minor. (See, e.g., id. ¶ 7). The NDIL indictment further alleges that the defendant caused witnesses to leave the country to prevent them from testifying and also used threats and violence to prevent witnesses from cooperating with law enforcement. (See, e.g., id. ¶¶ 8, 9). While the defendant has not yet been convicted of obstruction in the Northern District of Illinois, a grand jury has determined that there is probable cause to believe that the defendant engaged in obstruction when faced with serious criminal charges of a nature similar to those currently charged in both the NDIL indictment and the indictment currently pending in the Eastern District of New York ("EDNY").

Moreover, evidence of the defendant's past obstructive conduct is not limited to the charges in the NDIL indictment. As the government has previously explained (see, e.g., Gov't July 12, 2019 Detention Memo (Docket Entry No. 5), at 8-9; Oct. 2, 2019 Gov't Opp. To Def. Bond Mot. (Docket Entry No. 28), at 4-5; Dec. 20, 2019 Mot. in Limine to Preclude Disclosure (Docket Entry No. 34), at 6), the defendant has engaged in witness intimidation involving victims identified in the EDNY indictment, including Jane Doe #6. With respect to the threatening letter sent to Jane Doe #6,[1] the defendant denies writing this letter, relying on his difficulties with reading and writing.[2] (Def. Br. at 2). This denial, however, is unconvincing. Among other things, the letter states:

> Please advise Ms. [Jane Doe #6's last name], your client to
> abandon this heartless effort to try to destroy my musical legacy

---

[1] The defendant refers to Jane Doe #5 in his response when discussing the threatening letter sent to this victim's attorney. Jane Doe #5 is now Jane Doe #6 in the second superseding indictment and is referred to herein as Jane Doe #6.

[2] The defendant's writing limitations do not shield him from direct association with this letter as, on its face, other associates of his were involved in mailing the letter and screen shots from the defendant's iPhone were sent with the letter. His literacy difficulties, of course, do not mean that the defendant is incapable of directing others to draft a threatening letter on his behalf or of being informed of and approving its specific contents.

2

>for selfish, personal enrichment.  If she persists in court action she will be subjected to public opinion during the discovery process.  For example, my law team is prepared to request the production of the medical test results proving the origin of her STD claim, as well as 10 personal male witnesses testifying under oath about her sex life in support of her claim and complete records of her text/face time message exchanges, which will be reviewed to match and be authenticated by the recipient to insure there are no omissions or deletions.
>
>If Ms. [Jane Doe #6's last name] really cares about her own reputation she should cease her participation and association with the organizers of this negative campaign.  Counter actions are in the developmental stages and due to be released soon.

The letter also enclosed photographs and screen shots of text message exchanges between the defendant and Jane Doe #6 taken using the defendant's iPhone.  The photographs include a close-up photograph of Jane Doe #6's face and the top portion of her exposed breasts, including a partial portion of her nipple area and a photograph of Jane Doe #6 kneeling on a bed, which includes a partial portion of her exposed buttocks, along with the text, "I assure you this would not be considered a Sunday go-to-meeting dress.  The next two pictures have been cropped for the sake of not exposing her extremities to the world, yet!!!  I'm a singer, not a doctor, so how does [Jane Doe #6] justify her transmissions of these types of pictures."  The import of the letter is thus crystal clear – it was sent to harass and intimidate Jane Doe #6 into dropping her lawsuit by threatening public exposure of compromising nude photographs of her.

  While the defendant shrugs off this threatening letter as inconsequential, it is part of a consistent pattern of the defendant's attempts to prevent individuals from providing incriminating information about him to law enforcement or during legal proceedings.  As early as 1994, the defendant took steps to prevent law enforcement from discovering and investigating his crimes.  As alleged in the EDNY indictment, in August 1994, the defendant and others bribed a government employee to create false identification for Jane Doe #1.  Witnesses have advised the government that the defendant engaged in this bribery scheme to obtain a marriage license so he could quickly and secretly marry Jane Doe #1 to avoid criminal charges for engaging in a sexual relationship with Jane Doe #1, who was a minor at the time.  Specifically, the defendant believed that his marriage to Jane Doe #1 would prevent her from being able to testify against him in the event he were prosecuted for his criminal sexual relationship with her.

  In the years that followed, the defendant continued to take preemptive measures in an effort to ensure that potential witnesses could not credibly testify against him.  Such efforts include instructing individuals to create statements containing falsehoods or embarrassing information that could be used to discredit or intimidate an individual at a later

3

time if the individual decided to speak publicly about the defendant's conduct or provide information to law enforcement.

One such individual with whom the defendant began a sexual relationship when she was 17 years old, has advised that the defendant directed her to regularly draft letters or make other recorded statements containing falsehoods that the defendant could later use to discredit her if the need arose. According to the woman, this routine continued through recent years. The letters typically contained false "admissions" about various things including her purportedly stealing from the defendant and committing other supposed crimes involving dishonesty. Moreover, the letters often included false information that would be embarrassing if disclosed. The defendant made clear that the letters would be used by him for his "protection," i.e., only if the woman turned against him.

In addition to securing these letters as a contingency plan from the woman (and others), the defendant consistently and painstakingly directed the woman as to how to characterize their relationship—including with regard to the age at which they began engaging in sex—in the media. Supporting this woman's claim, the government has viewed video footage of the defendant rehearsing exactly what he wanted the woman to say in response to questions about the origin of their relationship for the purpose of having her mimic the answers. At the time of this video, this woman had not yet been contacted by law enforcement; however, there is strong reason to believe, given the nature of their relationship, that the defendant understood that this individual could be called as a witness, and, at a minimum, had information relevant to the government's investigation.

The investigation has also revealed that several other of the defendant's intimate partners were similarly required by him to write and sign letters containing certain information—including falsehoods—that could be used to embarrass and discredit them in the future. Moreover, as previously discussed, the defendant has directed individuals, namely potential witnesses against him, to pick a side, and strongly suggested that choosing the wrong side—i.e., not his side—would result in harm to them or their families. (See Oct. 2, 2019 Gov't Opp. To Def. Bond Mot., at 5).

The defendant's assertion that he has no history of obstruction is thus belied by his vast history of both preemptively and reactively engaging in conduct aimed at corruptly influencing potential witnesses.

II.  The Defendant Has Means to Obstruct Even While Incarcerated

The defendant's assertion that he "simply has no means or method by which to engage in any obstructive conduct" because his mail and telephone calls are monitored (Def.'s Ltr. at 2) is abjectly false. Indeed, knowing that his telephone calls and mail may be monitored, the defendant has taken deliberate steps on multiple occasions to bypass these safeguards.

4

In November 2019, the defendant, in contravention of prison regulations, used an intermediary to smuggle a letter a third party wrote to him into the detention center where he is currently housed. The letter was marked "Legal" – in an attempt to avoid inspection of the correspondence – and was provided to the defendant during a legal visit by an attorney who is not one of the defendant's attorneys of record in this case (the "Attorney") during a visit with the Attorney. Again, it is clear, despite the defendant's claims to the contrary, that he has methods of passing messages between himself and his confederates with no evidence of visits or telephone calls between them.

In addition to the defendant's use of written messages to surreptitiously correspond with individuals while incarcerated, the defendant has also made telephone calls using an unmonitored line while incarcerated. The government's investigation has revealed that, on at least one occasion, the defendant used a prison staff member's telephone to contact a third party. While the staff member purportedly gave the defendant permission to use the telephone, the call was not recorded and obviously circumvented the protocols in place to ensure monitoring of the defendant's communications.

These incidents demonstrate that the defendant has sought out, and likely will continue to seek out, clandestine means of communication. It also demonstrates that the defendant has, at his disposal, individuals willing to assist him in bypassing the traditional methods used to monitor the defendant's communications while incarcerated. In these circumstances, the defendant's attempt to paint himself as being completely isolated from the outside world and unable to communicate without monitoring such that obstructive conduct would be impossible is simply not credible.

Given the defendant's previous successful attempts at corruptly influencing statements of potential witnesses, coupled with his recent covert communications, it can hardly be said that the defendant poses no risk to witnesses because he is incarcerated. Simply put, the defendant's past behavior reveals that if given the opportunity to influence a potential witness, the defendant will take it, and his incarceration may not be enough to prevent such conduct. Delaying disclosure of the identities of Jane Doe #2 and Jane Doe #3 will thus help to ensure the integrity of these proceedings. See United States v. Cannone, 528 F.2d 296, 301 (2d Cir. 1975) (stating that "in some instances, the concealment of the identity of government witnesses is appropriate").

Finally, the defendant has provided no compelling reason as to why early disclosure is warranted in this case. As the government discussed more fully in its motion, the defendant's assertion that the Jane Does' identity is helpful for trial preparation is not a sufficient basis for early disclosure; rather, the Court should use its discretion to prevent potential witness intimidation. See, e.g., United States v. Sindone, No. 01-CR-517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14. 2002) (denying defendant's request for a bill of particulars that would identify an alleged co-conspirator and alleged victim(s) "so that [the defendant] can investigate whether the events charged in the indictment took place" because "temptations of perjury, subornation and intimidation are ever present").

III.    Conclusion

        For the foregoing reasons, and those set forth in the government's December 20, 2019 motion in limine, the government respectfully submits that the Court should not require the government to disclose the identities of Jane Doe #2 and Jane Doe #3 at this time.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/
Elizabeth Geddes
Nadia Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
(718) 254-6430/6295/6408

cc: All Defense Counsel of Record (by ECF)