**LAW OFFICE OF THOMAS A. FARINELLA, P.C.**   260 Madison Avenue, 8th Fl.
New York, NY 10016
Tel: (917) 319-8579
Fax: (646) 349-3209
www.lawtaf.com

**Thomas A. Farinella**
tf@lawtaf.com

March 26, 2020

**BY ELECTRONIC FILING**
Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   United States v. Robert Kelly, 19-286 (S-1)(AMD)

Dear Judge Donnelly:

This firm represents Robert Kelly in this matter. Mr. Kelly remains incarcerated pursuant to a permanent order of detention entered by Judge Harry D. Leinenweber on July 16, 2019 in the Northern District of Illinois, and pursuant to a permanent order entered on August 2, 2019 by Magistrate Judge Steven L. Tiscione – that was affirmed by your Honor on the grounds that he posed a risk of flight and the a danger to the community.

### Defendant Robert Kelly' Motion for Bond[1]

We are respectfully moving for a bail hearing and order granting release.[2] Robert Kelly, a pretrial defendant currently detained at the Chicago MCC, is within the group of people the Centers for Disease Control and Prevention ("CDC") has categorized as most-at-risk for contracting COVID-19, a dangerous illness spreading rapidly across the world. The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The health risk to Mr. Kelly, because of his age and because of the multiple surgeries he has undergone -including a recent surgery while incarcerated - coupled with the conditions at the MCC as described below, necessitates his temporary release on bail until this pandemic has ended.

If released, Mr. Kelly would reside at the Roosevelt Collections Loft apartment complex in Chicago, which is in close proximity to the ILND courthouse. He could be placed on home incarceration/electronic monitoring, where he could freely meet with his lawyers for long blocks

---

[1] In further support, Mr. Kelly ask that this Court to again consider the arguments made in his previously filed Motion for Release. Dkt. 25.

[2] Mr. Kelly will also be moving for release in the Northern District of Illinois ("NDIL"). He is asking that court to await this Court's ruling. Much of this motion is incorporated from a motion circulated by the Federal Defender Services for the NDIL.

of uninterrupted time to review the evidence in this case and to prepare for trial.  At present, it is beyond difficult for him to meet with his lawyers because of the corona virus outbreak.  Meetings are severely limited and require his attorneys to place their own health at risk.  The current medical emergency could cause the trial in this case to be unnecessarily delayed as a result.

### Factual Background

#### *Changed Circumstances: COVID-19 Outbreak*

As of March 15, 2020, the new strain of coronavirus which causes COVID-19 has infected more than 350,000 people, leading to at least 15,187 deaths worldwide.[3] On March 11, 2020, the World Health Organization ("WHO") officially classified COVID-19 as a pandemic.[4]  President Trump declared a national emergency on March 13, 2020.[5] Governor Cuomo issued a disaster proclamation for the State of New York on March 7, 2020.[6] The Governor has implemented state of emergency directives entitled, "NY State on PAUSE."[7]

The CDC has issued guidance that individuals at higher risk of contracting COVID-19,— including adults over 60 years old and people with underlying medical conditions, take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[8] With confirmed cases in Chicago that indicate community spread, every necessary action must be taken to protect vulnerable populations and the community at large.

#### *Conditions of Confinement and Spread of Coronavirus*

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[9] Inmates cycle in and out of the BOP's pretrial facilities from all over the country and the world, and people who work in these facilities leave and return daily, without screening.  Incarcerated persons have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[10] Many who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19.  *Id*. Additionally, older individuals are at increased risk for coronavirus; in 2016, 11% of the 1.45 million people in state and federal prisons were over the age of 55.[11] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations;" "may also be less able to participate in proactive measures

---

[3] Coronavirus Map: Tracking the Spread of the Outbreak, The New York Times (March 12, 2020), at https://nyti.ms/2U4kmud (updating regularly).
[4] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020), at https://bit.ly/2W8dwpS.
[5] Live updates: President Trump declares a national emergency in response to coronavirus, Washington Post (March 13, 2020), at https://www.washingtonpost.com/world/2020/03/13/coronavirus-latest-news/
[6] https://www.nytimes.com/2020/03/07/nyregion/coronavirus-new-york-queens.html
[7] NY on PAUSE.
[8] People at Risk for Serious Illness from COVID-19, CDC (March 12, 2020), at https://bit.ly/2vgUt1P.
[9] Joseph A. Bick (2007).  Infection Control in Jails and Prisons.  Clinical Infectious Diseases 45(8):1047-1055, at https://doi.org/10.1086/521910.
[10] Laura M. Maruschak, et al. (2015), Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12.  NCJ 248491.  Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.
[11] Aging Prison Populations Drive Up Costs, Pew Charitable Trust, (February 18, 2018), at https://www.pewtrusts.org/en/research-and-analysis/articles/2018/02/20/aging-prison-populations-drive-up-costs.

to keep themselves safe;" and "infection control is challenging in these settings."[12] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[13] Recent outbreaks of mumps in facilities in Texas and New Jersey have demonstrated how quickly institutions can be overrun with disease, especially when the viruses have long incubation times, because inmates and guards cannot maintain sufficient space to practice social distancing, and may have contact with high numbers of other people in the facilities.[14]

It is reported that, as of March 23, 2020, the BO P is still moving inmates from facility to facility, allowing for cross contamination, despite the federal government's guidance to stay inside and many States stay-in-place orders. It is further reported that inmates came into their facilities, with no explanation given[15].

In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[16] Recognizing the threat to the institutions and the public at large, courts and officials have begun taking measures to reduce the risk. United States Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[17] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[18]

In Brooklyn, District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[19] Officials in Cuyahoga County, Ohio have released hundreds of inmates out of concern they might contract the

---

[12] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.
[13] Prisons and Jails are Vulnerable to COVID-19 Outbreaks, The Verge (Mar. 7, 2020), at https://bit.ly/2TNcNZY; Health Care Behind Bars Is Already Abysmal. Are Prison Officials Prepared for the Coronavirus?, Mother Jones (March 4, 2020), at https://www.motherjones.com/crime-justice/2020/03/health-care-behind-bars-is-already-abysmal-are-prison-officials-prepared-for-the-coronavirus/.
[14] 300 inmates in Texas' Harris County jail are quarantined over a mumps outbreak, CNN Health (June 13, 2019), at https://www.cnn.com/2019/06/13/health/mumps-texas-harris-county-jail/index.html; 6 inmates at a New Jersey jail came down with the mumps. The entire facility is now quarantined, CNN Health, (June 13, 2019), at https://www.cnn.com/2019/06/12/us/mumps-jersey-bergen-county-jail-trnd/index.html.
[15] Despite coronavirus warnings, federal Bureau of Prisons still transporting inmates: Sources (Mar. 23, 2020) at https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416
[16] Rhea Mahbubani, Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials, Business Insider (Feb. 21, 2020) at https://bit.ly/2vSzSRT.
[17] Jennifer Hansler and Kylie Atwood, Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak, CNN (Mar. 10, 2020), at https://cnn.it/2W4OpV7.
[18] Claudia Lauer and Colleen Long, US Prisons, Jails On Alert for Spread of Coronavirus, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.
[19] Sarah Lustbader, Coronavirus: Sentenced to COVID-19, The Daily Appeal (Mar. 12, 2020), at https://theappeal.org/sentenced-to-covid-19/.

coronavirus if it spreads throughout the jail.[20] The Kent County Jail in Michigan has begun working with judges to review cases to determine which inmates might be eligible for release, either by having their bonds changed or having sentences reduced.[21] A Sacramento County judge entered an order authorizing the sheriff's office to release inmates with 30 days or less remaining on their sentences.

Facilities in the U.S. have already begun to show signs of COVID-19 infections. On March 13, 2020, the Harris County Juvenile Court in Houston announced that the court wing will be fully closed to all until further notice, after officials reported that a person who had been in the court may have tested positive for coronavirus.[22] On March 14, 2020, an employee at a correctional facility in Pennsylvania also tested positive for Covid-19. Thirty-four inmates and staffers there are now in quarantine.[23] On March 12, 2020, a staffer at the Monroe Correctional Complex in Washington State tested positive for coronavirus.[24] A New York Department of Corrections investigator died of the coronavirus on Sunday, March 15, 2020.[25] The former chief medical officer of the New York City jail system put the threat in stark terms: "We should recall that we have 5,000 jails and prisons full of people with high rates of health problems, and where health services are often inadequate and disconnected from the community systems directing the coronavirus response….Coronavirus in these settings will dramatically increase the epidemic curve, not flatten it, and disproportionately for people of color."[26]

In a letter to the White House dated March 24, 2020[27], (attached hereto) nine advocacy groups on both sides of the political spectrum, including the American Civil Liberties Union and The Leadership Conference on Civil and Human Rights, urged President Trump to use his clemency power to commute the federal sentences of people eligible for compassionate release and other inmates at high-risk from the virus. The letter reads, in part: "The public health concerns presented by coronavirus in confined spaces creates an urgent need to ensure the health of staff and those incarcerated, particularly those who are elderly and those with chronic health conditions." A bipartisan group of 14 senators, led by Illinois Democrat Dick Durbin and Iowa Republican Chuck Grassley, is also calling for similar action from the Trump administration. In a

---

[20] Ohio jail releases hundreds of inmates due to coronavirus concerns, Nexstar Media Wire (March 16, 2020), at https://kfor.com/health/coronavirus/ohio-jail-releases-hundreds-of-inmates-due-to-coronavirus-concerns/.

[21] Jail inmates get stepped-up screenings, possible early release, as pandemic grows, ABC 13 (March 13, 2020), at https://www.wzzm13.com/article/news/health/coronavirus/kent-county-jail-staff-prepares-for-coronavirus/69-03136848-bef8-4ddf-819f-788d7bf6eb3a,

[22] Harris County Juvenile Justice Center closed until further notice, officials say, Click 2 Houston (march 13, 2020), at https://www.click2houston.com/news/local/2020/03/13/harris-county-juvenile-justice-center-closed-until-further-notice-officials-say/.

[23] Coronavirus Update: 34 George W. Hill Correctional Facility Employees, Inmates Being Self-Quarantined After Employee Tests Positive For COVID-19, CBS Philly (March 14, 2020), at https://philadelphia.cbslocal.com/2020/03/14/george-w-hill-correctional-facility-employee-tests-positive-for-covid-19/.

[24] Staffer at Monroe state prison tests positive for coronavirus, DOC says, Seattle Times (March 13, 2020), at https://www.seattletimes.com/seattle-news/staffer-at-monroe-state-prison-tests-positive-for-coronavirus-doc-says/.

[25] Kira Lerner, New York Department Of Corrections Investigator Dies From Covid-19, The Appeal (March 16, 2020), at https://theappeal.org/covid-19-coronavirus-new-york-department-of-corrections-death/.

[26] Dr. Amanda Klonsky, An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues, NY Times (March 16, 2020), at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

[27] Commute Federal Prison Sentences for Populations Most Vulnerable to Coronavirus Letter. (Mar. 24, 2020) at https://www.justiceactionnetwork.org/presidential-clemency-coalition-letter-covid-response?rq=coalition%20letter%20presidential%20clemency

letter to Attorney General William Barr and BOP Director Michael Carvajal, the lawmakers urge the Justice Department and the BOP to use their authority under the First Step Act to release or transfer to home confinement vulnerable inmates. "Conditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease," they wrote. "For these reasons, it is important that consistent with the law and taking into account public safety and health concerns, that the most vulnerable inmates are released or transferred to home confinement, if possible."[28]

As if all of the above were not reason enough for some type of protective, yet restrictive pre-trial release for this Defendant, on March 19, 2020, Tim Lloyd, a former associate warden and 20-year veteran of the BOP ,stated that while the BOP has plans in place, it would be a disaster if an inmate or staff member were to contract the coronavirus. If inmates feel that they aren't getting proper treatment, there is "definitely" the possibility of a riot, he said. "That could get ugly pretty quick," he explained.[29]

### *Specific Conditions at the MCC*

The MCC is a large pretrial detention facility, housing approximately 700 people. The majority of those detained are housed in small two-man cells with a shared toilet and sink, with dayrooms where the inmates spend the majority of their time. Individuals eat meals and have recreation in groups of 70 or more. As the BOP itself has recognized, "the population density of prisons creates a risk of infection and transmission for inmates and staff."[30] Although the BOP has indicated that it will "implement nationwide modified operations to maximize social distancing and limit group gatherings in our facilities," the small physical footprint of the MCC makes it unclear whether such distancing efforts will be effective.

The risk posed by the logistics is further complicated by the BOP's lack of direction in the early weeks of the coronavirus outbreak. The MCC did not appear to have met some of the most basic recommendations of the CDC for preventing the spread of the coronavirus. Up until Friday, March 13, 2020, visitors were still allowed into the facility.[31] Prior to that date, the facility had no protocol for screening visitors. The MCC only recently posted basic signage advising people who are not feeling well or who are knowingly exposed to the virus not to enter, and it is so unobtrusive that multiple Staff Attorneys from the Federal Defender's Office failed to even notice it. No questions were asked of individuals attempting to visit inmates; there is no inquiry into whether a person has travelled recently or is experiencing any symptoms consistent with the virus. Give the incubation period for the virus, it is unclear what the effect of those lax procedures will be in the future.

Regarding current conditions inside the facility, per the observation of multiple Staff Attorneys prior to the cessation of visits, MCC staff are not wearing face masks, and only a few

---

[28] As COVID-19 Spreads, Calls Grow To Protect Inmates In Federal Prisons (Mar. 24, 2020) at https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons.

[29] **Error! Main Document Only.**Fearing Outbreaks and Riots, Nation's Prison and Jail Wardens Scramble to Respond to Coronavirus Threat. (Mar. 19, 2020) at https://abcnews.go.com/Health/fearing-outbreaks-riots-nations-prison-jail-wardens-scramble/story?id=69676840.

[30] AP Exclusive: Visits to Federal Inmates Halted Over Virus, Associated Press, See https://www.nytimes.com/aponline/2020/03/13/us/politics/ap-us-virus-outbreak-federal-prisons.html

[31] Federal Bureau of Prisons COVID-19 Action Plan, Federal Bureau of Prisons (March 13, 2020) https://www.bop.gov/resources/news/20200313_covid-19.jsp.

officers are wearing gloves. The BOP's overview of the COVID-19 response concedes that it assessed Personal Protective Equipment (PPE) stores and is in the process of obtaining bulk purchases and exploring alternate supply chain options - which is indicative of a current lack of sufficient PPE. While the facility does have hand sanitizer available on the visiting floor, the single large bottle has a sign that states, "STAFF ONLY" on it. The single dispenser next to the restroom appears to be non-alcohol-based sanitizer because it is the same dispenser that was in place prior to the coronavirus outbreak, and detention facilities consider alcohol-based sanitizer to be contraband.[32] The CDC has indicated non-alcohol-based sanitizer may not be effective in stopping the spread of the virus.[33] Additionally, the visitor's bathroom on the entry level floor of the MCC frequently has no soap or paper towels available, which makes it difficult for individuals entering the facility to adequately clean their hands before visiting.

It is also unclear the extent to which inmates will have access to the same basic preventative measures being taken by the public today. For instance, it is unclear whether the BOP will allow inmates access to the type of hand sanitizer recommended by the CDC, free of charge. Nor is it clear whether inmates will have access to sufficient quantities of soap, free of charge. Per the public commissary list, inmates must buy bars of soap.[34] Only those inmates who have money for commissary will be able to purchase antibacterial soap. Emails from the Executive Director of Chicago's Federal Defender Program inquiring about protocols related to any enhanced sanitization within the facility, availability of personal hygiene products, or more frequent laundry have not been answered, other than to refer attorneys to the BOP website for updates.

It is unclear whether testing has actually been done at facilities in Illinois, whether of inmates or staff. It is not clear whether the MCC has any testing for COVID-19 available, or when, if ever, it will have tests. Further, the medical ward at the MCC is limited. Studies have estimated that 15-20% of individuals who test positive for the virus require hospitalization.[35] In the case of an outbreak in the facility, the medical ward could be quickly overwhelmed. The protocol for transporting infected individuals to area hospitals is also not clear. The lack of transparency from the BOP is alarming and should not inure to its benefit. Until the BOP provides information otherwise, this Court should not assume that appropriate measures are in place.

Furthermore, despite the ban on visits, members of the community will still be introduced into the facility, as new prisoners will continue to be admitted to the MCC. As additional people are arrested who have been out in the community while the coronavirus spreads -if they are not symptomatic -they will be brought into the MCC and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions. The BOP's action plan states only that individuals will be screened for "risk factors" and symptoms; only those who are both symptomatic and have exposure risk factors will be tested for the virus. Those who are asymptomatic but assessed to have risk factors will be quarantined, although it is not clear where or how the inmates will be quarantined, given the limited space constraints.[36]

---

[32] How can prisons contain coronavirus when Purell is a contraband?, ABA Journal (March 13, 2020), at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.
[33] See https://www.cdc.gov/handwashing/show-me-the-science-hand-sanitizer.html.
[34] MCC Commissary List, at https://www.bop.gov/locations/institutions/ccc/CCC_commlists040318.pdf.
[35] Wu Z, McGoogan JM. Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72 314 Cases From the Chinese Center for Disease Control and Prevention.  JAMA.  Published online February 24, 2020.  See https://jamanetwork.com/journals/jama/fullarticle/2762130.
[36] The MCC reports that it already has some number of inmates showing flu symptoms "quarantined."

On March 12, 2020, Magistrate Judge Orenstein in the Eastern District of New York denied a remand application for an individual alleged to have violated the terms of pretrial release, holding that increasing the population of the MDC could present a "danger to the community"—the staff and inmates inside the jail—by potentially bringing the virus into the facility. *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020). Such action recognizes that individuals who are out in the larger community and susceptible to community spread may not immediately show symptoms but may still carry the virus. Under the BOP's plan, those individuals would enter the MCC undetected.

Even after the BOP announced that visits are suspended, it is not clear that the MCC is taking enhanced steps to ensure that guards do not bring the virus into the facility. The BOP directive issued on March 13, 2020 indicates that the protocol for "enhanced health screening of staff" will be implemented in areas with "sustained community transmission."[37] Such "sustained community transmission" is determined by the CDC website; where the State is rated "yes" for community transmission, the enhanced protocols will be applied. The enhanced protocols consist of asking for self-reports and temperature checks, and individuals with symptoms will be "encouraged" to stay home. Only those with symptoms and "risk factors" will be not allowed to return to work for the quarantine period. Given the nationwide shortage of tests, it does not appear that guards with symptoms, or even risk factors, will be tested.[38] However, the CDC has acknowledged that transmission of the virus can occur before an individual becomes symptomatic.[39] Therefore, guards who show no symptoms may transmit the virus from the community to the MCC even before they become sick.

If staff become sick and are not able to report to work, their absences may further affect the functioning of the facility. The sequestration measures taken in 2013 resulted in cuts to staffing levels, and the MCC has never fully restored its staff capacity to pre-sequestration levels.[40] Staff Attorneys are routinely told by MCC staff that they are pulling overtime shifts in order to maintain the appropriate staffing levels. In the past year, educators and counsellors have been recruited to fill in at the MCC front desk and accompany attorneys up to the visiting room. When sufficient staff are not available to run the institution, the building is put on lockdown. Should staff members show symptoms and be forced to stay home from work, their absences will also negatively affect the MCC's ability to function properly.

### **The Bail Reform Act Requires Robert Kelly's Release**

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States Marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The circumstances that existed when Mr. Kelly was ordered detained have now drastically changed. There is a pandemic that poses a direct risk to Mr. Kelly (and other detainees) that is far greater if he continues to be detained during this

---

[37] *Id.* at "Screening for Staff."
[38] A BOP COVID-19 Overview, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/overview.jsp#bop_emergency_response (stating that an employee at FMC Lexington, a medical center that necessarily houses inmates with health conditions, was exposed to an individual who tested positive for COVID-19 and was self-quarantined).
[39] How COVID-19 Spreads, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.
[40] Memorandum: Sequestration and Safety Actions Regarding the Bureau of Prisons Institutions, Dept. of Justice (March 22, 2013) https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/sequestration-safety-actions.pdf.

public health crisis. Mr. Kelly is vulnerable because of his age and because of his prior medical conditions.

As an initial matter, the Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (*quoting* S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before trial). One charged with a crime is, after all, presumed innocent. *Stack v. Boyle*, 342 U.S. 1, 4 (1951). A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing the Due Process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

The courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. As Judge Weinstein held, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"); *see also United States v. Adams*, No. 6:19-mj-00087-MK, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions); *United States v. Johnston*, No. 17-00046 (RMM) 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Kelly would yield, relative to the heightened health risks posed *to him* during this pandemic, similar to the balance it struck in the Adams case above, which had similar allegations. *See United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).

In addition, continued detention is *not* necessary to ensure the primary goals of pretrial detention—appearance in court and community safety. Statistics demonstrate that nearly everyone on pretrial release in the federal system appears in court and does not re-offend. In 2019, fully 99% of released federal defendants nationwide appeared for court, and over 98% did not commit new offenses while on bond.[41]

---

[41] *See* AO Table H-15, at http://jnet.ao.dcn/sites/default/files/pdf/H15_Ending12312019.pdf (showing a



Moreover, this near-perfect compliance rate is seen equally in federal districts with very high release rates (~70%), and those with very low release rates (~24%).[42] The below chart reflects the data:

### Conditions of Release Are Available That Allow Robert Kelly To Be Treated Humanely While Also Ameliorating Any Danger To The Community

From Mr. Kelly's perspective, his life—not only his liberty—is on the line, creating a powerful incentive to abide by any release conditions this Court may impose and changing the calculus that initially led to the denial of bail in this case.

Critically, during this temporary release, Mr. Kelly will not be left to his own devices, but will be supported and monitored by Pretrial Services. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release.[43] In the NDIL, the Office of Pretrial Services reports that, in Fiscal Year 2019, the

---

nationwide failure to appear rate of 1.1% and a re-arrest rate of 1.8% in 2019).

[42] The six federal districts with the lowest release rates (average 24.37%) have an average failure to appear rate of 1.78%, while the six districts with the highest release rates (average 69.08%) have an even lower failure to appear rate of 0.42%. *See* AO Table H-15; Table H-14A, at https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf. The six districts with the lowest release rates have an average re-arrest rate of 1.10%, while the six districts with the highest release rates have an average re-arrest rate of 0.91%. See Table H-15. (The districts with the lowest release rates are D. Utah, E.D. Oklahoma, W.D. Arkansas, S.D. Texas, E.D. Tennessee, and S.D. California; the districts with the highest release rates are D. Guam, D. Northern Mariana Islands, W.D. Washington, D. Connecticut, D. Maine, and D. Hawaii. See Table H-14A.)

[43] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary (September 2018) at

failure to appear rate was only 0.4%, and only 3.2% of supervisees reoffended. The elderly and chronically ill, no matter what crime they are accused of, pose a lower risk of violating supervision, particularly during a global pandemic, during which even leaving the house will endanger their lives.

## Conclusion

Mr. Kelly is among the vulnerable population at heightened risk of getting extremely sick from this illness. For all of the above reasons, he should be granted release on bond.

Respectfully submitted,

/s/Thomas A. Farinella
/s/Steve Greenberg
/s/Mike Leonard
/s/Doug Anton

*Counsel for the Defendant*

cc:   Richard P. Donoghue, United States Attorney (via ECF)
      AUSA Elizabeth Geddes, (via ECF)
      Clerk of Court (AMD) (by ECF)
      All counsel of Record (by ECF)

---

https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.