# GREENBERG TRIAL LAWYERS
**ATTORNEYS AT LAW**　　　　　　　　　　　　　　　　53 WEST JACKSON BOULEVARD, SUITE 1260
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　CHICAGO, ILLINOIS  60604
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(312) 879-9500
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Fax: (312) 650-8244
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Steve@GreenbergCD.com

March 31, 2020

**BY ELECTRONIC FILING**

Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

　　Re:　**United States v. Robert Kelly, 19-286 (S-1)(AMD)**

Dear Judge Donnelly:

　We respectfully submit this letter in reply to the government's opposition to Mr. Kelly's emergency motion for release based upon the CODVID-19 pandemic. Notwithstanding the government's position that Mr. Kelly has access to the phone and email, the Court should also take into account that Mr. Kelly is presumed innocent, Mr. Kelly has a constitutional right to counsel, and an unalienable right to be able to prepare for trial with his counsel.

　For the reasons set forth below, the Motion should be granted.

I.  **The Court May Grant Temporary Relief Pursuant to 18 U.S.C. § 3142(i)[1]**

This Court may grant temporary relief pursuant to 18 U.S.C. § 3142(i), which states as follows:

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

II. **Release Is Warranted Under For A "Compelling Reason"**

The government appears to wholly overlook the fact that this pandemic is unlike virtually any other that the United States has ever confronted. It has now become clear that is not unique to age, it can strike at the healthy, and it is deadly. The only possible protection from it is "social distancing." and time. It is a health crisis that calls for everything to be seen through a different lens.

A jail is the antithesis of a safe environment. It is closely confined and heavily – populated largely by those who have little respect for others. Hygiene is the exception. Showers are taken by inmates, at best, 2-3 times per week; meals are served in cramped "day" rooms; and "social distancing" is impossible. To suggest that the jail is a safe environment against this disease is foolish, as well as baseless.

The purported protective measures being taken by the BOP, and cited by the government, are and will be completely inadequate. First, the idea that, just because more soap has become available, the conditions have miraculously become sanitary, is nonsensical. The inmate still has no protection from those things he must touch. For example, the faucet to turn the water off after he washes his hands, the cell door he must open to re-enter his cell, the trays he must touch to eat, and the people he must be around. Regardless of how long he spends in his cell alone, in order just to function he must continually interact with guards who do not yet even know whether they have been infected.

Secondly, to believe that, under the current circumstances, there is any way that Mr. Kelly can prepare for trial, or that his counsel can so prepare, is likewise preposterous. Mr. Kelly concedes that, at this point, the trial date is merely aspirational, but he would love to be in a position to proceed to trial, if at all possible, in July, as is currently scheduled -or soon thereafter as possible. To do so, he and his counsel must prepare. To believe that they can prepare for the trial by way of a series of recorded phone calls is entirely unrealistic. There are presently approximately 80 inmates on Mr. Kelly's floor and just two telephones. As part of the response to crisis, the BOP has increased each inmate's minutes to 500 per month. That means that, on Mr. Kelly's deck, there are 40,000 telephone minutes per month. If the inmates are out of their cells 18 hours perday, that represents 1080 minutes each day, or approximately just over 32,000 minutes a month. The point of this is that Mr. Kelly is competing with numerous other detainees to use those telephones to communicate. Those other detainees similarly are people who need to communicate with family, friends, and their lawyers. In addition, *when* Mr. Kelly can call is

---

[1] As this Court knows, Mr. Kelly has previously sought release. *See* the prior bond memoranda and docket entries addressing the prior court hearings. (ECF Docket Entry Nos. 13, 15, 25). The Covid pandemic discussed herein is an additional reason.

subject to the chaos of waiting in a long line. And that "solution" presupposes that counsel is available whenever Mr. Kelly reaches the front of the line. There is no way, even if the calls were not recorded, that Mr. Kelly could adequately communicate with his lawyers.[2] Beyond that, counsel has been advised that the MCC Chicago is now requiring the inmates to remain within their cells for the majority of each day.

      Further, it is unquestionable that Mr. Kelly cannot adequately prepare for his upcoming trial because his counsel cannot (and should not be forced to) to visit with Mr. Kelly during this global crisis. Counsel should not have to endanger their own health. The government's suggestion that visiting is still routine is simply wrong. Counsel was able to arrange a visit to go over the Second Superseding Indictment with Mr. Kelly because of the time constraints with a potential arraignment. Otherwise, visits by attorneys are extraordinarily limited and require that they be scheduled well in advance. Mr. Kelly's counsel would be competing with all of the other attorneys who need to visit their clients. In this regard, Mr. Kelly is not a priority for the facility because each of the inmates have the same right to access counsel.

      This is not a request to open the doors and allow all inmates out, this is a specific request concerning a specific inmate. This inmate would reside at the Roosevelt Collection, which is a large apartment complex where he could easily be monitored. Both GPS and electronic monitoring would reveal his every move and ensure that he remained within his unit. Moreover, the pandemic would ensure that he would remain within his unit because that is the safe and healthy thing to do. Obviously, if he were to violate that condition, theCourt would have no choice other than to re-incarcerate him, likely into an environment that will be even more unhealthy and dangerous at that point.

      Still, this argument is not unique to Mr. Kelly, and was relied upon by a court in the EDNY:

> [s]ince the March 6 hearing, the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent. Although there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop. *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://doi.org/10.1086/521910 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"); *see also* Claudia Lauer & Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, Associated Press (Mar. 7, 2020). The magnitude of this risk has grown exponentially since the March 6 hearing before this Court; at the end of the day on March 6, New York State had 44 confirmed cases of COVID-19, *see* Andrew Cuomo (@NYGovCuomo), Twitter (Mar. 6, 2020, 4:51 PM), https://twitter.com/NYGovCuomo/status/1236046668220567553, but by the end of the day on March 18, that number had climbed to 2,382, *see* Mitch Smith, *et al.*, *Tracking Every Coronavirus Case in the U.S.: Full Map*, N.Y. Times, Mar. 18, 2020, https://www.nytimes.com/interactive/2020/us/coronavirus-us-

---

[2] No 3-way calling is permitted, meaning that, at best,Mr. Kelly could only speak to one attorney at a time.

cases.html. Though the BOP has admirably put transmission mitigation measures in place, *see* Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp, in the event of an outbreak at the Metropolitan Correctional Center ("MCC") (where the Defendant is currently being detained), substantial medical and security challenges would almost certainly arise. A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis. *See, e.g.*, *United States v. Raihan*, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12–19 (E.D.N.Y. Mar. 12, 2020) (deciding to continue a criminal defendant on pretrial release rather than order him remanded to the Metropolitan Detention Center due, in part, to the Magistrate Judge's recognition of the fact that "[t]he more people we crowd into that facility, the more we're increasing the risk to the community").

Taken together, these changed circumstances necessitate a reconsideration of the Defendant's bail conditions. The question of whether the Defendant had met his burden to establish by clear and convincing evidence that he did not pose a danger to the community was a close one at the March 6 hearing. Indeed, Defense counsel presented ample evidence at that hearing that aside from the arrest from which the alleged violation of supervised release arises, the Defendant does not have a violent background: no prior convictions involved violent conduct or gun charges. *See* March 6 Hr'g Tr. at 16:18–17:14. In light of the changed circumstances discussed above, the weight of the evidence now clearly and convincingly tips in the Defendant's favor. Accordingly, based on the evidence and arguments presented at the March 6 hearing coupled with the reasons stated above, the Court concludes that the Defendant has now established by clear and convincing evidence that he does not pose a danger to the community.

Even if the Court were to conclude that changed circumstances did not compel reconsideration of the Defendant's bond conditions, a separate statutory ground advanced by the Defendant would require his release here. 18 U.S.C. § 3142(i) provides that, where a detention order has been issued, "a judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." The Government does not challenge the application of this provision—indeed, it does not address it at all in opposing the Defendant's motion, *see generally* Dkt. No. 2791—and the Court thus concludes that it applies here.

The text of Section 3142(i) provides that the Court may temporarily release a detained defendant to the custody of an "appropriate person" where a "compelling reason" necessitates such release. Compelling reasons may exist where release is necessary for the preparation of the defendant's defense, *see* 18 U.S.C. § 3142(i), or where the defendant's serious medical conditions warrant release, *see, e.g.*, *United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (explaining that a defendant who is denied bail "retains the ability to request[,] ... in extraordinary circumstances, ... temporary release under § 3142(i)" should future developments with respect to his medical conditions so warrant); *see also United States v. Birbragher*, No. 07-cr-1023-(LRR), 2008 WL 1883504, at *2

(N.D. Iowa Apr. 25, 2008) (describing *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993), and *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002), as cases in which courts found "compelling reason" to temporarily release defendants due to the defendants' serious medical issues).[2] Furthermore, case law suggests that family members may constitute "appropriate persons" where the defendant is released to relatives and placed under house arrest. *See Cordero Caraballo*, 185 F. Supp. 2d at 145 (releasing the defendant, who the court would have detained on dangerousness grounds, to the custody of his mother and grandmother on 24-hour house arrest due to his severe injuries). "A defendant has the burden of showing that temporary release is 'necessary ...' under Section 3142(i)." *See United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011).

The Court concludes that the Defendant has met his burden by demonstrating at least one compelling reason that also necessitates his release under this provision. Namely, the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i). *See id.* (providing that the Court "may ... permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent [it] determines such release to be necessary for preparation of the person's defense"). The spread of COVID-19 throughout New York State—and the country—has compelled the BOP to suspend all visits—including legal visits, except as allowed on a case-by-case basis—until further notice. *See* Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp (explaining that "legal visits will be suspended for 30 days" nationwide and that "case-by-case accommodation will be accomplished at the local level"). This suspension impacts the Defendant's ability to prepare his defenses to the alleged violation of supervised release in advance of the merits hearing scheduled for March 25, 2020.

See *United States of Am., v. Dante Stephens,*, No. 15-CR-95 (AJN), 2020 WL 1295155, at *2–3 (S.D.N.Y. Mar. 19, 2020); see also

- *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho March 16, 2020) (extending surrender date in light of COVID-19);
- *United States v. Curry*, 19-cr-3839-GPC (S.D. Cal. March 27, 2020) (same);
- *United States v. Blecka*, No. 19-cr-311-WHA (N.D. Cal. March 27, 2020) (same);
- *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. March 23, 2020) (order sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis");
- *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, Dkt. No. 1061 (C.D. Cal. March 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i));
- *United States v. Jaffee*, No. 19-cr-88 (D.D.C. March 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current

- COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement");
- *United States v. Harris*, No. 19-cr-356 (D.D.C. March 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.");
- *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. March 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19");
- *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. March 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail.");
- *In re Request to Commute or Suspend County Jail Sentences*, Dckt. No. 084230 (N.J. March 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19);
- *United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. March 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic");
- *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. March 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility");
- *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. March 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic");
- *Basank v. Decker*, No. 20-cv-2518 (S.D.N.Y. March 26, 2020) ("[t]he nature of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); and
- *Coronel v. Decker*, 20-cv-2472-AJN, Dckt. No. 26 (March 27, 2020) (granting TRO and releasing from immigration detention facility in light of COVID-19).

Conclusion

The COVID-19 pandemic is real. Jails are especially susceptible. Mr. Kelly is among the most vulnerable. He asks the Court to grant the request for bond given the current circumstances so he can prepare for trial with his counsel.

Respectfully submitted,

Dated: March 31, 2020

/s/ Steve Greenberg
/s/ Tom Farinella