

U.S. Department of Justice

United States Attorney
Eastern District of New York

EAG/MCM/NS  
F. #2019R00029

271 Cadman Plaza East  
Brooklyn, New York 11201

May 4, 2020

By Email and ECF

The Honorable Ann M. Donnelly  
United States District Judge  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    United States v. Robert Sylvester Kelly  
             Criminal Docket No. 19-286 (S-3) (AMD)

Dear Judge Donnelly:

      Pursuant to the Court's May 1, 2020 Order, the government respectfully submits this letter in opposition to defendant Robert Kelly's "Third Motion for Bond because of Covid" (the "Motion"), based largely on the defendant's claims that he has a "legitimate health risk"—namely, his recent diagnosis of prediabetes—which purportedly places him at a higher risk of serious complications if he contracts COVID-19. (See ECF Dkt. No. 63 ("Mot.") at 1). The defendant further claims that this Court should revisit its prior rulings denying release, particularly in light of the pandemic, because there are facts demonstrating that he is neither a flight risk nor a danger to the community. (Id. at 1, 2-6). As set forth in more detail below, notwithstanding his recent diagnosis, the defendant has failed to provide a compelling reason warranting his temporary release. Moreover, the defendant likewise fails to rebut the presumption that the defendant poses a flight risk and a danger to the community. Accordingly, the defendant's motion should be denied.

I.      Relevant Background

      A.    The Permanent Order of Detention

      On August 2, 2019, after holding a detention hearing, the Honorable Steven Tiscione, Magistrate Judge in the Eastern District of New York ("EDNY"), entered a permanent order of detention against the defendant pending his trial. (See, e.g., ECF Dkt. No. 18 (minute entry reflecting denial of bail after detention hearing); ECF Dkt. No. 19

(Order of Detention)). During the hearing, Judge Tiscione found that, given (1) the nature of the charges against the defendant, which at that time spanned from 1997 to 2018, and included allegations of sexual abuse of minors, coercion of minors, and child pornography; (2) the defendant's history of similar allegations; (3) the defendant's opportunity to flee given his access to financial resources; (4) the defendant's incentive to flee given the seriousness of the charges in this district and the Northern District of Illinois ("NDIL"); (5) the defendant's potential obstruction in his prior trial and the strong possibility of witness tampering if he were released; and (6) the fact that certain of the alleged crimes took place while the defendant was on bail during his previous trial, "the defendant cannot be relied upon to comply with the conditions of release." (Sept. 30, 2019 Det. Hrg. Tr. at 15-16). Judge Tiscione therefore concluded that "no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community" and ordered the defendant "to be detained pending trial." (Id. at 16). On October 2, 2019, after reviewing briefing on the issue and holding oral argument, this Court affirmed the order of detention. (See Oct. 2, 2019 Minute Entry (reflecting this Court's denial of the defendant's motion for release after discussion with the parties)).

### B. The Court's Denials of the Defendant's Motions for Temporary Release

On April 7, 2020, the Court denied the defendant's March 26, 2020 emergency bail motion, finding, inter alia, that the defendant (1) "ha[d] not demonstrated that he is within the group of people the Centers for Disease Control and Prevention [("CDC")] has categorized as most at-risk for contracting COVID-19;" and (2) continues to pose a risk of flight and a danger to the community, "particularly to prospective witnesses." (ECF Dkt. No. 53 ("Apr. 7, 2020 Order") at 2-4 (internal quotation marks omitted)). The Court further noted that the defendant is "fifty-three years old, twelve years younger than the cohort of 'older adults' defined by the CDC as at high risk for severe illness from COVID-19." (Apr. 7, 2020 Order at 2-3). And, he suffers from no medical condition "that places him at higher risk of severe illness." (Id. at 3). Finally, the Court did not find that the protective measures put in place by the Bureau of Prisons ("BOP") sufficiently interfered with the defendant's ability to prepare for his defense with counsel to warrant his release. (Id.)

On April 21, 2020, the Court denied the defendant's renewed emergency motion for release, finding, inter alia, that the defendant (1) "is not uniquely at risk for contracting severe illness from COVID-19"; and (2) "the risks associated with the defendant's release have not changed." (ECF Dkt. No. 61 ("Apr. 21, 2020 Order") at 1-2). Specifically, the Court found that the defendant continued to pose a risk of flight because, among other things, "he is now facing serious charges in multiple federal and state jurisdictions[,]" and that "the risk that the defendant would try to obstruct justice or intimidate prospective witnesses has not dissipated," so he therefore poses a risk to the public. (Id. at 2-3). The Court further emphasized that the conditions suggested by the defendant to mitigate his risk of flight and obstruction are inadequate because they can be easily circumvented by the defendant and "they cannot ensure that a defendant with a history, incentive and opportunity to interfere with potential witnesses will not do so." (Id. at 3).

2

II.     Discussion

In the Motion, the defendant argues that this Court's previous ruling denying the defendant's motion for release "unfairly skews things against Mr. Kelly, completely failing to recognize any of the facts that show, even more so now in the current quarantine environment, that he is neither a serious risk of flight nor a danger to the community." (Mot. at 1). In defense of this position, however, the defendant sets forth the wrong legal standard, asserting: "The question is whether there are any conditions that would permit release" (Mot. at 5). The Motion, however, requests temporary release as a result of the COVID-19 pandemic. The actual question before this Court, therefore, is whether the defendant has presented a compelling reason to grant such temporary release under 18 U.S.C. § 3142(i). As set forth below in greater detail, the answer to that question is no.

To the extent the defendant also seeks reconsideration of the Court's prior findings that the defendant poses a risk of flight and a danger to the community with respect to the detention determination made prior to, and irrespective of, the COVID-19 pandemic, the legal standard asserted by the defendant remains incorrect. The defendant is, of course, afforded a presumption of innocence with respect to the charges in this case. With respect to pretrial detention, however, the nature of the charges in this case result in a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). As such, the question before this Court is whether the defendant has successfully rebutted this statutory presumption. He has not. Even if the defendant were to provide sufficient evidence to rebut this presumption—which he has not—the question this Court must consider, in turn, is whether the government has met its respective burdens of demonstrating that the defendant presents a risk of flight and a danger to the community. As set forth below, the government has met its burden in this regard. Accordingly, this Court should again deny the defendant's motion for release.

A. <u>The Defendant Has Not Offered A Compelling Reason for Temporary Release</u>

As this Court is aware, the defendant has been detained pursuant to a permanent order of detention pending trial. The defendant now moves for temporary release from custody due to the current COVID-19 pandemic. (Mot. at 1). The defendant's motion should be denied.

Under the Bail Reform Act, 18 U.S.C. § 3142(i), a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Notably, "[t]his provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." <u>United States v. Hamilton</u>, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (citations omitted).

3

In support of his third request for temporary release, the defendant relies on his recent diagnosis of prediabetes as a basis for this Court to grant him temporary release. The defendant alleges that this condition, coupled with other purported medical "issues" and the fact that he is incarcerated, places him at a "much higher risk for serious complications" if he were to become infected with COVID-19. (Mot. at 1). The defendant, however, has provided insufficient grounds for this Court to conclude that he is in the category of individuals who would have a heightened risk of severe complications from COVID-19, and his motion should be denied.

The CDC has advised that "[d]iabetes, including type 1, type 2, or gestational may put people at higher risk of severe illness from COVID-19."[1] See "Groups at Higher Risk for Severe Illness," available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#diabetes (last visited on May 4, 2020).

---

[1] Although the CDC has listed diabetes as a condition comorbid with COVID-19, not all individuals diagnosed with diabetes will suffer severe illness or complications from contracting the virus. Notably, in discussing why individuals with diabetes may be at higher risk for severe illness from COVID-19, the CDC has explained that "[p]eople with diabetes whose blood sugar levels are often higher than their target are more likely to have diabetes-related health problems. Those health problems can make it harder to overcome COVID-19." See "Diabetes," available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#diabetes (last visited on May 4, 2020). To mitigate this possibility, the CDC recommends that those with diabetes continue to take their medication, eat properly and monitor their blood sugar levels, especially if they become sick. Id. Accordingly, those individuals whose diabetes is well-managed, and who do not suffer from diabetes-related health problems, may reduce their risk for severe complications from COVID-19. Accordingly, a diabetes diagnosis, in and of itself, may not warrant release. Indeed, in cases involving serious charges, many courts, including courts in this district, have denied defendants' requests for release based on COVID-19, even where the defendant was diagnosed with a condition listed as a risk factor for severe illness from COVID-19. See, e.g., United States v. Amato, No. 19-CR-442 (ILG), ECF No. 237 (E.D.N.Y. Mar. 20, 2020) (ruling that Court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 61-year old with asthma); Hamilton, No. 19-CR-54 (NGG), 2020 WL 1323036, at *2 (denying defendant's request for release due to the COVID-19 pandemic based on defendant's "advanced age and medical conditions," where defendant was charged with two counts of murder while engaged in narcotics); United States v. Bradley, 19-CR-632 (GBD), ECF No. 25 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); United States v. Rivera, 20-CR-6 (JSR), Order (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); United States v. White, 19-CR-536 (KC), Order (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough).

4

Notwithstanding the defendant's claims that "he is likely diabetic," the defendant has not been diagnosed with diabetes; he has been diagnosed as prediabetic (see Ex. 1 at 1 (May 1, 2020 evaluation note stating the defendant "is pre-diabetic")), which carries a meaningful distinction.² See, e.g., United States v. Deutsch, Memorandum & Order, 18-CR-502 (FB), Dkt. No. 59, at 2-3 & n.6 (E.D.N.Y. Apr. 7, 2020) (recognizing key distinction between diagnosis of diabetes versus diagnosis of prediabetes, noting that "[a]ccording to the CDC, nearly 1 in 3 Americans have prediabetes," and denying defendant's motion for temporary release). While diabetes has been linked as a risk factor for severe complications associated with COVID-19, the CDC has not similarly listed prediabetes as a risk factor, see "People Who Are at Higher Risk for Severe Illness," available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 4, 2020), as it does not carry all of the same symptoms and health risks as diabetes and is a significantly more common condition.

To bolster his claim, the defendant asserts that he also suffers from "high blood pressure and cholesterol issues," and that he is overweight, which he asserts places him at a greater risk for both diabetes and complications from COVID-19. (Mot. at 2). As a preliminary matter, the defendant has not been diagnosed with hypertension; nor has he been prescribed any medication to treat high blood pressure.³ A review of the defendant's medical

---

² The government will file Exhibit 1, which consists of relevant excerpts from the defendant's medical records during his custody at MCC Chicago, under seal via a separate ECF docket entry.

³ According to the defendant's medical records during his custody at MCC Chicago, his blood pressure readings have not required intervention or follow-up. (See, e.g., Ex. 1 at 19 (December 6, 2019 record noting blood pressure reading of 121/85 and indicating "[b]lood pressure taken and not high so not referred to medical staff for evaluation")). While the defendant had a recent blood pressure reading of 150/95 on April 7, 2020, the defendant was being evaluated for a "panic attack" where he was visibly upset at the time. (See Ex. 1 at 8, 15). Other blood pressure readings between July 15, 2019 and January 15, 2020 reflect significantly lower readings, e.g., 125/82; 125/75; 132/92; 121/85; 122/74. (See Ex. 1 at 14-15).
In any event, even if the defendant were diagnosed with hypertension, this would not necessarily warrant release. While hypertension has also been listed as a co-morbid condition for those affected by COVID-19, nearly half of the United States population has hypertension, and whether that linkage constitutes causation or instead correlation with elderly or otherwise at-risk populations is still unclear. See, e.g., Karina Zaiets & Padilla, Ramon, "Coronavirus, diabetes, obesity and other underlying conditions: Which patients are most at risk?" USA Today, available at https://www.usatoday.com/in-depth/news/2020/04/15/coronavirus-risk-90-patients-had-underlying-conditions/2962721001/ (last visited on May 4, 2020) (noting that "[t]here is not enough evidence to suggest a link between COVID-19, hypertension and cardiovascular diseases. Age might be the primary factor. Older people are more likely to suffer from diabetes,

5

records from MCC Chicago also reflects that the defendant has previously denied having a history of hypertension. (Ex. 1 at 17). Moreover, while the defendant's recent laboratory tests indicate elevated cholesterol levels, the defendant has provided no evidence that these levels place him at risk for complications from COVID-19 were he to contract the virus. In fact, the defendant's medical records reveal that, as of May 1, 2020, the defendant "is currently not on any chronic care meds" and does not suffer from any "chronic disease issues." (Ex. 1 at 1).

The defendant's contention that MCC Chicago is "not taking any medical action to mitigate any of these conditions," and thus increasing his risk (Mot. at 2), is without merit. To the contrary, the defendant has been regularly evaluated and treated by medical personnel at MCC Chicago for various issues since his incarceration. Indeed, since the beginning of this year, the defendant has been seen by Clinical Director Brij Mohan, M.D., almost monthly (specifically, on January 21, 2020; February 10, 2020; March 31, 2020; and May 1, 2020), and by nurse practitioners on five occasions (January 17, 2020; March 19, 2020; March 26, 2020; April 7, 2020; and April 29, 2020). The defendant has also been seen multiple times by registered nurses this year as well.

With respect to the defendant's reported issues, consistent with standard recommendations, see, e.g., "Prediabetes," available at https://www.mayoclinic.org/diseases-conditions/prediabetes/symptoms-causes/syc-20355278 (last visited May 4, 2020) (noting that prediabetes does not inevitably lead to diabetes and may be managed or cured through healthy lifestyle changes), medical personnel treating the defendant have advised him to manage his prediabetes, elevated cholesterol levels and weight with dietary changes and exercise. For example, on April 29, 2020, during a recent medical appointment, the nurse practitioner "[d]iscussed ways to reduce cholesterol including smaller portions, especially simple carbs such as chips, sweets from commissary and to increase activity" with the defendant. (Ex. 1 at 5). Moreover, the defendant was counseled regarding exercises he could engage in "even though he's restricted to [his] cell [during the] CoVid19 lockdown." (Id.). The nurse practitioner also "[d]iscussed ways to calm [the defendant's] mind, [and] breathing exercises" with the defendant. (Id.).

In addition, on May 1, 2020, during an approximately 45-minute visit with Dr. Mohan, the defendant was "[c]ounseled to do regular room exercises, loose [sic] weight, take multivitamins & B-12 vitamin for nerve health." (Ex. 1 at 1). Moreover, Dr. Mohan noted that he would "check labs again- once [the defendant] start[s] regular exercise & loose [sic] weight." (Id.). While the defendant complained that "[h]e can't exercise in the small room" and "[h]e can't have the diet he needs or wants," Dr. Mohan further counseled the defendant to [a]void sweets & fatty food[,]" "[e]xplained about [the] National Menu[,]" and stated that he would "provide [the defendant with a] Calorie count chart so that he can consume a 2000 Kcal diet everyday per chart." (Id.). The defendant's medical records further note that the "Food Services Manager [was] notified to provide National Menu calorie chart" to the

---

obesity and high blood pressure, risk factors for heart disease. Their immune systems are more susceptible to infection.").

6

defendant as discussed. (Id.). In addition to counseling the defendant on steps he can take to treat his condition and mitigate the risks of further exacerbating it, Dr. Mohan specifically noted that additional laboratory tests would be ordered at the end of June to monitor his progress after implementing lifestyle changes. (See Ex. 1 at 3).

The defendant's assertion, therefore, that the medical staff members at MCC Chicago are not addressing his specific medical concerns (see id.) is disingenuous, at best, and the Court should disregard it. Nor should the Court place any weight on the defendant's unsupported, non-medical opinion that "[i]t only makes sense that . . . he is likely diabetic" because of the MCC's alleged lack of mitigation (Mot. at 2), given Dr. Mohan's current treatment plan.[4] The defendant's prediabetes, therefore, does not present a compelling reason for release. See, e.g., Deutsch, Memorandum & Order, 18-CR-502 (FB), Dkt. No. 59, at 2-3 (denying pretrial release motion based on defendant's prediabetes, which was being treated with the drug Metformin, where defendant "does not have Type 1 or Type 2 diabetes, he does not suffer from any pre-existing respiratory issues, he is young, and his medical condition appears well managed throughout his pretrial detention").

The defendant also fails to put forth any other compelling medical basis for granting his motion. As this Court has recently explained, "[t]he defendant is fifty-three years old, twelve years younger than the cohort of "older adults" defined by the CDC as at high risk for severe illness from COVID-19." (Apr. 7, 2020 Order). In fact, the defendant has conceded that his age does not create a compelling reason for release. See United States v. Robert Kelly, 19-CR-567, Dkt. No. 107 at 3 (N.D. Il.) (acknowledging in his emergency motion for bond that he "is not within the highest risk age group"). Moreover, consistent with other courts in this circuit, the defendant's generalized claims regarding his fear of COVID-19 in a jail setting (Mot. at 1-2) are insufficient to warrant his release. See, e.g., United States v. Mattei, 19-CR-283 (WFK) (E.D.N.Y. Apr. 16, 2020), ECF Dkt. No. 22 at 7-8 (denying bail motion for defendant who posed flight risk and danger to public noting that defendant "fail[ed] to allege any unique factors or circumstances warranting his temporary release beyond general concerns and risks of the COVID-19 pandemic" and finding that "general concerns and risks related to the COVID-19 pandemic do not constitute a 'compelling reason' warranting release under 18 U.S.C. § 3142(i)"); United States v. Scorcia, No. 19-CR-442 (ILG), ECF No. 254 (E.D.N.Y. Mar. 27, 2020) (ruling that court had already determined 54-year-old defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic where defendant cited poor health and other generalized reasons as basis for release); (See Gov't. Opp. To Def. Renewed Emerg. Mot., Dkt. No. 56 ("Gov't. Opp. II") at 6-7 (citing multiple cases)).

As the Court is aware, the BOP has implemented national measures to mitigate the spread of COVID-19 within prisons. See Federal Bureau of Prisons COVID-19 Action

---

[4] The defendant's assertion that his medical diagnosis was intentionally withheld from him (Mot. at 1-2) appears completely unfounded, particularly given the medical staff's consistent evaluation and follow-up with the defendant regarding various medical needs.

7

Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited May 4, 2020); (see also Gov't. Opp. to Emerg. Mot. at 2-3 (discussing COVID-19 mitigation efforts instituted by the BOP and at MCC Chicago); Gov't. Opp. II at 4-6 (same)). These measures remain in place and MCC Chicago continues to do what it can to identify infected inmates and separate these inmates from inmates who have not contracted the virus. To that end, the government has been advised that MCC Chicago recently received a rapid test machine and has started to perform mass testing on Units 21 and 23, which are open dormitory units without cells (and not where the defendant is housed). According to legal counsel at MCC Chicago, as a result of the mass testing of these dormitory units where the lack of cells makes social distancing more difficult, as of May 1, 2020, 102 inmates (and 25 staff members) in total have tested positive at MCC Chicago, and all of these inmates have been isolated from other inmates until they have been cleared by medical staff under CDC guidelines. Ninety-four of the 102 inmates who tested positive were asymptomatic. Legal counsel at MCC Chicago has provided the government with the total number of inmates who have tested positive to date. This figure, however, does not account for inmates who have since recovered. According to legal counsel at MCC Chicago, the BOP's website accounts for such recoveries and reflects the net number of inmates currently infected with the virus. As of May 4, 2020, the BOP website indicates that MCC Chicago currently has 97 inmates with COVID-19. In any event, despite expected growth in positive cases, MCC Chicago has reported no deaths as a result of COVID-19 infections, and there is no evidence that the medical staff has been unable to adequately handle the medical needs of inmates who contract the virus.

Finally, for the reasons set forth in detail below, the defendant's continued insistence that conditions such as electronic monitoring, home confinement and restricted computer use may be put in place to monitor the defendant lends no weight to the question before this Court with respect to his temporary release, i.e., whether the defendant has offered a compelling reason for this Court to release him given the pandemic. The defendant has failed to do so. Accordingly, this Court should deny the defendant's motion.

> B. The Defendant Has Failed to Rebut the Presumption that He Poses a Flight Risk and a Danger to the Community, and That No Combination of Conditions Can Assure His Compliance and the Safety of the Community if Released

As this Court is aware, "[o]n August 2, 2019, the Honorable Steven Tiscione ordered that the defendant be detained pending his trial (ECF Nos. 18 and 19), which [this Court] affirmed on October 2, 2019." (Apr. 7, 2020 Order at 1). As outlined above, in entering the permanent order of detention, after making several findings regarding the defendant's risk of flight and danger to the community, Judge Tiscione found, and this Court later affirmed, that "no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community." (Sept. 30, 2019 Det. Hrg. Tr. at 15-16); (see also Oct. 2, 2019 Minute Entry (reflecting this Court's denial of the defendant's motion for release after discussion with the parties); Apr. 7, 2020 Order at 1).

On April 7, 2020, in considering the defendant's emergency motion for temporary release, this Court reasoned, in part: "The defendant is currently in custody because of the risks that he will flee or attempt to obstruct, threaten or intimidate prospective witnesses. The defendant has not explained how those risks have changed." (April 7, 2020 Order at 3). The Court further stated that the defendant has not demonstrated a "change in circumstances that would alter the Court's conclusion that he is a flight risk and that he poses danger to the community, particularly to prospective witnesses." (Id. at 3-4).

More recently, on April 21, 2020, this Court further found that "the risks associated with the defendant's release have not changed . . ." and "[t]he defendant continues to downplay the risk that he might flee, citing his attendance record in connection with the 2002 state criminal charges against him." (Apr. 21, 2020 Order at 2). The Court further emphasized that the defendant currently has a significant incentive to flee given that "he is now facing serious charges in multiple federal and state jurisdictions" and that, "even aside from the risk of flight, the risk that the defendant would try to obstruct justice or intimidate prospective witnesses has not dissipated, and poses a danger to the community." (Id. at 2).

Under the guise of seeking relief because of the COVID-19 pandemic, the defendant attempts to relitigate for the fifth time Judge Tiscione's and this Court's findings that the defendant is a flight risk and poses a danger to the community, warranting detention.[5] Taking issue with the Court's most recent April 21, 2020 decision in particular, the defendant asserts that "[t]he ruling does not appear to consider whether there are any set of conditions which could reasonably assure the court that he would appear and would not be a danger to the community." (Mot. at 1). The defendant wholly ignores that, where, as here, there is probable cause to believe that the defendant committed offenses involving minor victims under 18 U.S.C. §§ 2251, 2421, 2422 and 2423,[6] it shall be presumed, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(E). Moreover, "the presence of an indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e)." United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985).

To rebut this statutory presumption, the defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). To determine whether the presumptions of dangerousness and flight are rebutted by a defendant, the Court must

---

[5] As the Court is aware, the defendant has also been remanded pending trial of his case in the NDIL.

[6] Specifically, Count One, Racketeering Acts Two, Five, Seven, Eight, Nine and Ten, and Counts Two, Three, Four and Five, are all qualifying crimes involving a minor which subject the defendant to a rebuttal presumption 18 U.S.C. § 3142(e)(3)(E).

9

consider: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history and past conduct; and (4) the nature and seriousness of the danger to the community or to an individual that would be posed by release.  18 U.S.C. § 3142(g).  Once a defendant has met his burden of production relating to danger to the community and risk of flight, the presumption in favor of detention does not disappear entirely but remains a factor for the court to consider, and the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of evidence that the defendant presents a risk of flight or a serious risk of obstruction.  See, e.g., Mercedes, 254 F.3d at 436; United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of evidence standard applies to determination of both risk of flight and risk of obstruction of justice).

To date, the defendant has failed to rebut this presumption.  Indeed, none of the facts underlying Judge Tiscione's or this Court findings, which all weigh in favor of the defendant's continued incarceration, have changed, and the defendant simply recycles arguments previously made, considered and rejected by the Court in this regard.  Indeed, to the extent there are changed circumstances since entry of the permanent order of detention, such changes have only further tipped the scale in favor of detention.  Significantly, not only has the grand jury's issuance of a third superseding indictment added additional qualifying racketeering acts and counts involving minors that subject the defendant to a rebuttable presumption under 18 U.S.C. § 3142(e)(3)(E), but the additional charges alleging violations of 18 U.S.C. § 2422(b) (Count Four) and 18 U.S.C. § 2423(a) (Count Five), each subject the defendant to a ten-year mandatory-minimum sentence if convicted.

While the defendant again urges this Court to give significant weight to his prior appearance at proceedings related to his 2008 trial in Cook County (Mot. at 3), this Court has already considered—and rejected—this argument.  (See, e.g., Apr. 21, 2020 Order (stating that the defendant's "attendance record from a decades-old proceeding provides insufficient assurance that he would not attempt to flee if he were released")).  Defendant's assertion that he was as "much at risk of going to jail during those proceedings and still he showed up" defies logic where, as here, there is probable cause to believe—as evidenced by the Indictment issued by a grand jury sitting in the NDIL—that the defendant took steps to prevent his conviction by paying witnesses hundreds of thousands of dollars to prevent them from cooperating with the government or provide false testimony.  (See, e.g., Gov't. Reply Re. Mot. in Lim. to Preclude Disclosure, Dkt. No. 37 at 1-2 (providing details regarding allegations in obstruction charges against defendant in NDIL indictment); Gov't. Opp. II at 2 (discussing obstruction charges in NDIL indictment)).  The defendant's claim also falls flat given that, unlike with his previous trial in Cook County, he now faces multiple ten-year mandatory minimum sentences in this jurisdiction if convicted at trial.

Moreover, the defendant's continued insistence that he would be unable to flee because "it is virtually impossible during this pandemic to fly anywhere[,]" and he "could not just walk through an airport undetected, or sit on an airplane unnoticed . . . ." and "does

not have a passport" (Mot. at 3), is, as a preliminary matter, untrue,[7] but also completely disregards the myriad other ways the defendant could flee. As a preliminary matter, if released to his home in Chicago, the defendant would already be outside of the jurisdiction of the EDNY. Despite the defendant's failure to acknowledge this obvious fact, he could, of course, leave his home on foot, by car or public transport, heading in any direction for an indeterminate amount of time before being apprehended by law enforcement. Notably, given the current prevalence of individuals wearing masks and other face coverings when outside because of the pandemic, the defendant could easily conceal his face in a manner that would not be deemed at all unusual, thereby going unrecognized. Defendant's assertion that "GPS or electronic monitoring" "would ensure against any risk" of flight (Mot. at 3) is unavailing given that the defendant could remove or otherwise alter the electronic monitoring bracelet. Although its removal would alert Pretrial Services, law enforcement's response would not, even under the best of circumstances, be instantaneous. The defendant may, therefore, be able to evade law enforcement for some time before being found. (See, e.g., Apr. 21, 2020 Order at 3 (noting that "judicial system's oversight capabilities are curtailed" given the pandemic)); see also, e.g., United States v. Millan, 4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted) (discussing potential ineffectiveness of electronic monitoring); United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) (same); (see also Gov't Opp. II at 2-3 (discussing the futility of conditions such as electronic monitoring in this case and citing cases).

In addition, the defendant's repeated proclamations that he has no financial resources available to him and that there are no individuals willing to assist him monetarily or otherwise (Mot. at 3) is contradicted by past and recent events. In addition to the defendant's continued access to his own financial resources in the form of royalties (see, e.g., Gov't. Opp. II at 3 (noting that "[i]n the first quarter of 2020 alone, the defendant received over $200,000 in royalty proceeds")), because of his notoriety, other individuals—acquaintances and strangers alike—continue to express their interest in providing financial support to the defendant. For example, after the defendant's arrest by Cook County in Illinois on multiple charges related to sexual abuse of minors, some fans offered to pay the defendant's $100,000 bail, believing that the defendant—who had not yet posted bail and remained incarcerated for multiple days—was unable to pay. See, e.g., "R. Kelly Investigation: Female Fans Are Trying to Pay the Singer's Bail," available at https://www.independent.co.uk/arts-entertainment/music/news/r-kelly-investigation-update-female-fans-bail-pay-money-how-much-women-a8796526.html (last visited May 4, 2020) (reporting that female fans were offering to pay the defendant's bail and "[t]he offers were

---

[7] While the Department of State has issued a Level 4 advisory that individuals avoid travel, and airline travel has been significantly reduced due to the pandemic, it is certainly not impossible, as the defendant contends, for individuals to travel by air. For example, the Transportation Security Administration reported that on May 3, 2020, 170,254 travelers were screened for airline travel. See "TSA Checkpoint Travel Numbers for 2020 and 2019," available at https://www.tsa.gov/coronavirus/passenger-throughput (last visited on May 4, 2020).

reported by Chicago Tribune reporter Will Lee, who said on Twitter: "A court clerk just told me their office was receiving calls from female R Kelly fans wanting to know how to post bail for him. The love is real, I guess.").

In addition, as the defendant's counsel is well aware, acquaintances and fans of the defendant have used social media to try to secure funds for Kelly's benefit. Indeed, one of the defendant's attorneys, Douglas Anton, has himself appeared by telephone on at least two occasions on one such individual's YouTube channel, and during these appearances Mr. Anton either advised those wanting to send money for the defendant's defense to do so to his attention, or participated while requests for donations for the defendant's defense were made by the host and others. See "Doug Anton R.Kelly Lawyer. Follows me on Facebook and he came on my FB Live and Talked About Kellz!" available at https://www.youtube.com/watch?v=PkA-20Zj194 (at approximately minute 3:35 of the video, Mr. Anton participates by telephone; at approximately minute 15:45, Mr. Anton advises that, while he is not requesting donations, those who wish to donate may send funds to his office); "Up@Night with DJ TYSON. Time Stamp 47:00 Doug Calls In and Dana Calls Doug and Lies To Kellz Lawyer," available at https://www.youtube.com/watch?v=PgWplwkiRM8 (host and fans request donations be directed care of Mr. Anton and Mr. Anton calls in to participate beginning at approximately minute 48:18). Each of these videos received almost 5,000 and 4,000 "views," respectively. While the potential donations referred to in these videos were described as being for the purpose of the defendant's defense (and would presumably not be provided to the defendant), this nevertheless demonstrates that others, on the defendant's behalf, can use social media to rally others—even strangers—to provide financial support for the defendant if necessary. As previously proffered by the government, given the defendant's history of maintaining funds in bank accounts bearing the names of other individuals (see, e.g., Gov't. Opp. to Def. Mot. to Reconsider, Dkt. Nos. 27, 28 at 3 (stating that the government's investigation has revealed that earlier this year, the defendant re-directed royalties to the bank account of a childhood friend)), the defendant's claim that his ability to secure resources to flee is an impossibility is simply not credible.

Putting aside the defendant's ability to physically abscond, he has also failed to rebut the presumption that he poses a danger to the public, by, among other things, intimidating or unlawfully persuading witnesses. "The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present." United States v. Sindone, No. 01-CR-517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14. 2002). Even if this Court instructed the defendant to refrain from contacting potential witnesses directly or indirectly, there would be little ability for the government to adequately police the defendant's compliance with such an order while on release. As this Court has recognized, there would be no ability for the government to prevent the defendant from receiving visitors, or using a concealed cellular telephone or computer to contact individuals with the goal of interfering with witnesses himself, or directing others to interfere with witnesses on his behalf. (See, e.g., Apr. 21, 2020 Order at 3 (reasoning that the defendant's proffered conditions of release "cannot stop a defendant from using an unauthorized telephone or digital device to contact potential witnesses, or from inducing someone else to do so")). The

defendant, in essence, absurdly suggests that this Court must first wait for the defendant to attempt to commit obstruction in this case before his detention is warranted (Mot. at 4). This is clearly not required under 18 U.S.C. § 3142(e)(3), which, given the charges in this case, presumes, subject to rebuttal, that the defendant is a danger to the community—a presumption, which the defendant has failed to rebut. To provide the defendant with the opportunity to interfere with witnesses based on his recommended wait-and-see approach, which (wrongly) "assume[s] that any witness that Mr. Kelly would attempt to intimidate would immediate[ly] call" law enforcement (Mot. at 5), flies in the face of the purposes of 18 U.S.C. § 3142(e)(3)(E), and turns a blind eye to the very nature of witness intimidation or unlawful persuasion. It also ignores the defendant's history of obstruction of justice and committing other serious crimes while on pretrial release on his state case. (See, e.g., Gov't. Opp. at 2-3 (discussing five crimes, including obstruction of justice conspiracy, conspiracy to receive child pornography, receiving child pornography, kidnapping and violations of the Mann Act, that the defendant is alleged to have committed while awaiting trial in Cook County based on crimes charged in the EDNY and the NDIL indictments)). While the defendant is presumed innocent, the law does not require the Court to ignore serious charges returned by a duly-constituted grand jury in making its pretrial detention determination. See, e.g., Contreras, 776 F.2d at 55 (stating that indictment issued by a grand jury conclusively establishes probable cause for the purpose of triggering the rebuttable presumptions set forth in 18 U.S.C. § 3142(e)).

       The defendant's proposed conditions, namely, home confinement, restricted internet and cellular telephone use, and electronic monitoring, are insufficient to rebut the presumption that no set of conditions will adequately secure the defendant's appearance and protect the public. See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); (see also Gov't. Opp. II at 3 (discussing courts' detention of defendants charged with serious crimes notwithstanding the availability of conditions such as home confinement and electronic monitoring)).

       In any event, as the Court has recognized, the government has proffered evidence that the defendant has demonstrated a clear pattern of interfering with potential witnesses in the past, and has also engaged in behavior reflecting his ability and willingness to engage in obstructive activity in the future. (See, e.g., Jan. 29, 2019 Order, Dkt. No. 38, at 3-4 (stating that the "[t]he Government advance[d] detailed and substantive reasons to deny the defendant's motion, including his history of obstruction, intimidation and witness tampering (ECF No. 37 at 1-4), his attempts to continue these efforts while incarcerated (id. at 4-5), and the nature and scope of the charged crimes (ECF No. 34 at 5-6)[,]" and citing examples); see also generally Gov't. Reply Re. Mot. in Lim. to Preclude Disclosure, Dkt. No. 37).

       The defendant's claims that "he never did a single obstructive thing" related to these proceedings, including with respect to certain of the Jane Does, or that "the idea that Mr. Kelly would now obstruct anyone is folly" (Mot. at 4), are contradicted by, inter alia, the

evidence proffered by the government regarding the defendant's decades-long preemptive tactics aimed at discrediting potential witnesses in future cases against him (see, e.g., Det. Memo. at 8; Gov't. Opp. to Mot. to Reconsider, Dkt. Nos. 27, 28 at 4-5; Gov't. Mot. in Lim., Dkt. 34, at 6; Gov't. Reply Re. Mot. in Lim. to Preclude Disclosure, Dkt. No. 37 at 3-4); his previous intimidation of Jane Doe No. 6 (formerly Jane Doe No. 5) as a result of her commencing a lawsuit against the defendant (see, e.g., Det. Memo. at 8-9; Gov't. Opp. to Mot. to Reconsider, Dkt. Nos. 27, 28 at 4; Gov't. Mot. in Lim., Dkt. 34, at 6; Gov't. Reply Re. Mot. in Lim. to Preclude Disclosure, Dkt. No. 37 at 1-3); and the defendant's (at times successful) attempts to circumvent the restrictive conditions placed on him aimed at monitoring his activities while he has been incarcerated on the instant charges (see, e.g., Gov't. Reply Re. Mot. in Lim. to Preclude Disclosure, Dkt. No. 37 at 4-5).[8] Indeed, given the defendant's willingness to bypass the strict conditions placed upon him while he is incarcerated, it is more than reasonable for this Court to find that there is a serious risk that the defendant will find ways to elude the conditions placed upon him while at home without any direct supervision.

Finally, the defendant's suggestion that there is parity between his circumstances and those of his co-defendants charged in the NDIL indictment (Mot. at 4)—where, as here, the defendant is facing, among other things, prosecution for serious crimes in four separate jurisdictions, numerous charges related to the sexual assault and exploitation of minors, and is subject to multiple mandatory minimum sentences if convicted of certain charges in the EDNY and the NDIL, respectively—lacks all merit . Moreover, the NDIL court's determination regarding the defendant's co-defendants' bond, should have no bearing on this Court's findings regarding the defendant's request for temporary release. Here, the government has and continues to object to the defendant's release, and this Court has made repeated findings that the defendant's detention is warranted. The defendant's thin assurances that he will not attempt to flee or obstruct the proceedings, holds little weight given the defendant's history, the nature of the charges and in light of the statutory presumption—which he has continuously failed to rebut. Accordingly, this Court should find, as it has previously done, that the defendant poses a risk of flight and a danger to the community and deny the defendant's motion for release. See, e.g., Hamilton, No. 19-CR-54 (NGG), 2020 WL 1323036, at *2 (denying defendant's motion for release due to the COVID-19 pandemic notwithstanding defendant's "advanced age and medical conditions," where the defendant had not "met his burden to rebut the presumption of danger to the community that attaches based on" the charged acts of violence).

---

[8] The government has not repeated all of the arguments and proffered facts previously set forth in this regard here and instead incorporates by reference its July 12, 2019 detention memorandum; its October 2, 2019 response to the defendant's motion for bail; its December 20, 2019 motion in limine to preclude disclosure; its January 21, 2020 reply in response to the motion in limine to preclude disclosure; its March 27, 2020 opposition to the defendant's emergency motion for bail; and its April 17, 2020 opposition to the defendant's renewed motion for bail.

Even if the defendant's proposed conditions are sufficient to rebut the statutory presumption—which they are not—the defendant's detention is still warranted because, for the reasons articulated above, the government has met its burden of persuasion by a preponderance of evidence that the defendant presents a risk of flight, and by clear and convincing evidence that the defendant presents a danger to the community. Accordingly, this Court should again find that the defendant poses a risk of flight and a danger to the community, and that no condition or combination of conditions can assure the defendant's compliance or safety of the public.

III. Conclusion

For the reasons stated herein and in the government's prior submissions related to the defendant's detention and history of obstruction, the defendant's third emergency motion for release should be denied.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/
Elizabeth Geddes
Nadia Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
(718) 254-6430/6295/6408

cc: Defense Counsel (by ECF)
     Clerk of Court (AMD) (by ECF)