EAG/NS/MCM
F. #2019R00029

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

ROBERT SYLVESTER KELLY,
   also known as "R. Kelly,"

              Defendant.

- - - - - - - - - - - - - - - - - -X

Cr. No. 19-286 (S-3) (AMD)

THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY

                                      RICHARD P. DONOGHUE
                                      UNITED STATES ATTORNEY
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201

Elizabeth A. Geddes
Nadia I. Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in this case. For the reasons set forth below, the government respectfully requests that (1) the identities of all prospective jurors, including their names, addresses and places of employment, not be revealed to either party or their attorneys; and (2) from the time each juror is empaneled until the conclusion of the trial, the jurors eat lunch together and be accompanied in and out of the courthouse by members of the United States Marshals Service each day so that they do not mingle in the courthouse with the public or any potential trial spectator. These measures are necessary to safeguard the jurors and the fair administration of justice. Moreover, these precautions will not deprive the defendant of meaningful jury selection, diminish the presumption of innocence or cause any prejudice.

BACKGROUND

I. The Charged Crimes

The defendant will be tried on the charges described in a third superseding indictment (the "Indictment"), which was returned on March 12, 2020. The Indictment charges one count of racketeering, in violation of 18 U.S.C. § 1962(c), involving fourteen racketeering acts (Count One); three counts of Mann Act transportation to engage in illegal sexual activity, in violation of 18 U.S.C. § 2421(a) (Counts Two, Six and Eight), three counts of Mann Act coercion and enticement to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(a) (Counts Three, Seven and Nine), one count of Mann Act coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b) (Count Four), and one count of Mann Act transportation of a minor, in violation of 18 U.S.C. § 2423(a) (Count Five). The

racketeering acts and substantive crimes charged in the Indictment relate to six different victims, identified in the Indictment as Jane Doe #1 through Jane Doe #6.

As charged by the grand jury, for over two decades, the defendant was the leader of a racketeering enterprise (the "Enterprise") comprised of individuals who served as managers, bodyguards, drivers, personal assistants and runners for the defendant, as well as members of his entourage.  Along with promoting the defendant's music and the "R. Kelly" brand, the Enterprise recruited women and girls to engage in illegal sexual activity with the defendant, often transporting victims throughout the United States for this purpose.  This sexual activity was often filmed and photographed by the defendant, including sexually explicit depictions of minors constituting child pornography.

As alleged in the Indictment, the defendant promulgated numerous rules that many of his sexual partners were required to follow, including that the women and girls were to call him "Daddy;" they were not permitted to leave their rooms to eat or visit the bathroom without receiving his permission; they were required to wear baggy clothing when not accompanying the defendant to an event; and they were directed to keep their heads down and not to look at other men.  The defendant also isolated the women and girls from their friends and family, and made them dependent on him for their financial well-being.  The defendant also maintained his leadership and control of the Enterprise by demanding absolute commitment from its members, not tolerating dissent and obtaining sensitive information about members and associates of the Enterprise in order to maintain control over them.

II.      <u>Media Coverage</u>

The government anticipates that trial in this matter is likely to attract significant media coverage given the defendant's celebrity status as a well-known singer and performer and the popularity of the docuseries "Surviving R. Kelly," the first installment of which aired on the Lifetime television network in January 2019 and is currently available on Netflix, which explores allegations that the defendant engaged in abusive sexual relationships with minor females and adult women.[1] Indeed, this case and the defendant's other criminal cases have already garnered significant and widespread media attention. For example, upon the defendant's arrest on federal charges in July 2019, numerous print, internet and television sources, both in the New York City metropolitan area and throughout the United States, published stories. <u>See</u> Rick Rojas, Mihir Zaveri & Michael Gold, "*U.S. Prosecutors File New Charges, Including Child Pornography, Against R. Kelly*," N.Y. Times (July 12, 2019); Blake Alsup, John Annese & Rocco Parascandola, "*R. Kelly arrested in Chicago on New York sex crimes charges*," N.Y. Daily News (July 12, 2019); Larry Celona & Ben Feuerherd, "*R. Kelly Arrested by Homeland Security and NYPD on Federal Sex Crime Charges in Chicago*," N.Y. Post (July 11, 2019); Jason Meisner, Madeline Buckley & Megan Crepeau, "*R. Kelly Hit with Federal Indictments in New York, Chicago; Faces New Racketeering, Sex Crime Charges, Allegations He Paid to Recover Sex Tapes and Cover Up Conduct*," Chicago Tribune (July 12, 2019); Antonia Noori Farzan & Deanna Paul, "*R. Kelly Committed Decades of Sex Crimes, Made Girls Call Him 'Daddy,' Feds Say in Indictments*," Wash. Post (July 12, 2019); Athlea Legaspi & Daniel Kreps, "*R. Kelly Arrested on Federal

---

[1] "Surviving R. Kelly, Part II: The Reckoning" aired on the Lifetime television network in January 2020.

3

*Sex Trafficking Charges,*" Rolling Stone (July 12, 2019); Nicole Chavez, "*R. Kelly Paid Thousands of Dollars to Recover Missing Sex Tapes and Paid Victims to Lie, Prosecutors Say,*" CNN (July 13, 2019); Edmund Demarche & Bradford Betz, "*R. Kelly Arrested on Child Pornography, Charged with Racketeering and Sex-Related Crimes,*" Fox News (July 11, 2019); Bobby Allyn & Anastasia Tsioulcas, "*R. Kelly Arrested on Federal Charges, Including Child Pornography and Kidnapping,*" NPR (July 12, 2019); Charlie De Mar, "*R. Kelly Charges: Singer Faces Two Federal Indictments: Child Porn, Enticement, and Obstruction Charges in Chicago; Sex Trafficking Case in New York,*" CBS (July 12, 2019); Tiffany Diane Tso, "*R. Kelly Arrested on Federal Child Pornography Charges,*" Refinery29 (July 12, 2019); "*R. Kelly Arrested in Chicago on Federal Child Pornography Charges, Faces NYC Indictment Also,*" NBC (July 12, 2019); "*R. Kelly Arrested on Child Porn, Sex Trafficking Charges,*" TMZ (July 12, 2019); "*R. Kelly Arrested on Federal Sex Trafficking Charges,*" BBC News (July 12, 2019); Kenzie Bryant, "*R. Kelly's Publicist is Confronted Hours After Singers' Arrest,*" Vanity Fair (July 12, 2019); Halle Kiefer, "*R. Kelly Arrested on Federal Sex-Trafficking Charges,*" Vulture (July 11, 2019). Since then, these news outlets have continued to publish articles and air media accounts. In addition, numerous other celebrities have made public comments about the defendant and the charges he faces in interviews and on social media. See, e.g., Jimmy Kimmel Live (ABC television broadcast Mar. 7, 2019); The Late Show with Stephen Colbert (CBS television broadcast Mar. 7, 2019); The Wendy Williams Show (CBS television broadcast July 15, 2019); The Today Show (NBC television broadcast July 12, 2019); Saturday Night Live (NBC television broadcast Mar. 10, 2019); John Legend (@johnlegend) Twitter (Jan. 7, 2019, 10:11 PM), *available at* https://twitter.com/johnlegend/status/1082474724276334592; Chrissy Teigen

4

(@chrissyteigen) Twitter (Jan. 7, 2019, 11:11 AM), *available at* https://twitter.com/chrissyteigen/status/1082308767323086848; Jada Pinkett Smith (@jadapsmith) Twitter (Jan. 6, 2019, 2:49 PM), *available at* https://twitter.com/jadapsmith/status/1082001202919858176; Kerry Washington (@kerrywashington) Twitter (Jan. 3, 2019, 9:35 PM), *available at* https://twitter.com/kerrywashington/status/1081016180545126400; Meek Mill (@meekmill) Twitter (Jan. 5, 2019, 5:37 PM), *available at* https://twitter.com/MeekMill/status/1081681017277202432; Lady Gaga (@ladygaga) Twitter (Jan. 10, 2019, 12:43 AM), *available at* https://twitter.com/ladygaga/status/1083237788663697408; Watch What Happens With Andy Cohen (Bravo television broadcast July 7, 2019); Nick Cannon (@NickCannon) TWITTER (Jan. 8, 2019, 3:37 PM) https://twitter.com/NickCannon/status/1082738111245774848.

## ARGUMENT

I.      Legal Standard

The Second Circuit has repeatedly upheld the use of anonymous juries where there is reason to believe that the jury needs protection, and reasonable precautions have been taken to minimize any adverse effects on the juror's opinion of the defendant. See, e.g., United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); United States v. Pica, 692 F.3d 79, 81 (2d Cir. 2012); United States v. Quinones, 511 F.3d 289, 291 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251,

5

1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

        The Second Circuit has adopted a two-step process for district courts to follow in connection with empaneling an anonymous jury. A district court should first determine whether there is strong reason to believe that the jury needs protection. If there is, the court should then take reasonable precautions to minimize any prejudice that might arise from an anonymous jury. See Paccione, 949 F.2d at 1192. Importantly, "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendant[] and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." Aulicino, 44 F.3d at 1116. Thus, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Paccione, 949 F.2d at 1192.

        Courts in this circuit have considered various factors to determine whether there is reason to believe the jury's safety and impartiality needs protection: (1) the dangerousness of the defendant, (2) whether the defendant or his associates have engaged in past attempts to interfere with the judicial process, (3) whether the defendant has access to the means to harm the jury, and (4) whether the trial is likely to attract media attention and publicity. See United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (Garaufis, J.) (citing Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132-33 (2d Cir. 1989)). Notably, all of these factors need not be present; "anonymity is

6

appropriate when some combination of these factors is present." United States v. Ashburn, 13-CR-0303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014) (internal quotation marks omitted).

With respect to a defendant's past attempts to tamper with the judicial process, courts look for evidence of previous intimidation, bribing, or violence toward witnesses or jurors. See, e.g., Aulicino, 44 F.3d at 1116 (noting defendants had an associate threaten a witness's life and offer $50,000 for the witness's silence); Paccione, 949 F.2d at 1192-93 (noting government witness had received anonymous, middle-of-the-night phone calls advising him to "remember[] nothing" and a defendant had threatened others with a baseball bat and pistol); Vario, 943 F.2d at 240 (noting co-conspirator had approached grand jury witness). When a defendant is under pretrial detention, whether he has means to harm the jury often hinges on the extent of his connections outside of prison. See, e.g., Wilson, 493 F. Supp. 2d at 400 (granting a motion for an anonymous jury in part because defendant was "a member of the Stapleton Crew and . . . this organization has other members and associates who are currently, and will be, at large at the time of the trial."). Finally, whether the trial is likely to attract media attention may be illustrated by the nature and degree of pretrial publicity. See, e.g., Paccione, 949 F.2d at 1193 (noting the case had already been "front-page news"); Vario, 943 F.2d at 240 (citing a single New York Newsday cover story).

Two procedures adequately protect a defendant's right to an unbiased jury during the use of an anonymous jury. First, the court should "conduct a voir dire designed to uncover bias as to issues in the case[ ] and as to the defendant himself." Paccione, 949 F.2d at 1192. Second, to reduce the possibility that the jury will infer that the defendant is dangerous, the court should give the jurors "a plausible and nonprejudicial reason for not

7

disclosing their identities or for taking other security measures." Paccione, 949 F.2d at 1192; see also Aulicino, 44 F.3d at 1116. In many cases, courts instruct the jury that the additional safeguards are to protect against intrusion by the media. See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1191-92; Thomas, 757 F.2d at 1363.

II.  There is Strong Reason to Believe that the Jury's Impartiality Needs Protection in This Case

Applying the standards and considering the factors set forth above, the interests of justice would best be served in this case by protecting the identities of the jurors.

A.  The Charges Are Serious

As the government has described in detail in previous filings, the defendant is charged with serious crimes, including leading a racketeering enterprise that he created and used for decades to sexually abuse and exploit women and girls for his own sexual gratification, including through the use of bribery, kidnapping and forced labor. The pattern of racketeering activity charged includes the defendant's commission of 14 predicate acts against six different victims over three decades. Moreover, his status as the leader of the Enterprise cannot be overstated and accentuates the already serious nature of the criminal conduct at issue. The Enterprise and the defendant's status within it allowed the defendant to serially engage in criminal conduct with impunity, including against minor victims.

The seriousness of the charged crimes is also reflected in the penalties the defendant faces, which include a mandatory minimum of 10 years' imprisonment and up to life on Counts Four and Five, up to 20 years' imprisonment on Count One, up to 20 years' imprisonment on each of Counts Three, Seven and Nine, and ten years' imprisonment on each of Counts Two, Six and Eight. The gravity of a defendant's situation "create[s]

8

significant incentives to threaten jurors" or otherwise seek to influence them through bribery and other means. United States v. Gotti, No. 02-CR-743 (RCC), 2004 WL 2274712, *2 (S.D.N.Y. Oct. 7, 2004) (empaneling anonymous jury). This factor thus weighs heavily in favor of empaneling an anonymous jury in this case.

  B.  The Defendant Has the Ability to
    <u>Interfere with the Judicial Process, Himself or through Associates</u>

The defendant and his associates have previously attempted to obstruct justice, a factor that weighs heavily in support of anonymity. As set forth more fully in the government's detention memoranda dated July 12, 2019, October 2, 2019, and April 17, 2020, and during prior bail hearings, the defendant, together with others on his behalf, has a history of obstructive conduct, including the following.

- In connection with his trial in state court in 2008, the defendant persuaded multiple individuals to testify falsely before a Cook County grand jury. Indeed, the indictment the defendant faces in the Northern District of Illinois ("NDIL") charges him with conspiring to intimidate victims and conceal evidence in an effort to obstruct law enforcement, including with respect to an investigation in the 2000s that resulted in the defendant's 2008 state court trial on child pornography charges, of which he was acquitted. Specifically, the NDIL indictment charges that, in 2001, the defendant and another individual began paying an acquaintance hundreds of thousands of dollars to collect videos of child pornography for the purpose of concealing and covering up their existence. When the acquaintance later planned to hold a news conference to publicly announce that he had recovered the videos, the defendant and others paid him approximately $170,000 in exchange for agreeing to cancel the event. The defendant and another individual also agreed to pay two persons for their efforts to return the videos, but only after they took polygraph examinations to confirm that they had returned all copies in their possession.

- Following a civil lawsuit filed on behalf of Jane Doe #6 against the defendant, a lawyer for Jane Doe #6 received a typewritten letter in 2018 purportedly signed by the defendant. Enclosed with the letter were two pieces of paper that contained images and typewritten text.

9

> Among the images were photographs of Jane Doe #6 that had been apparently cropped to not disclose certain body parts. Beneath those photographs was text including "I assure you this would not be considered a Sunday go-to-meeting dress. The next two pictures have been cropped for the sake of not exposing her extremities to the world, yet!!!" Based on the content of the letter and photographs, it is reasonable to conclude that the letter was sent at the defendant's direction and/or for his benefit, advising Jane Doe #6 of his intent to maintain compromising photographs of her in an attempt to convince Jane Doe #6 to abandon her lawsuit.

- The defendant has told multiple individuals, including one as recently as 2018, that they needed to select a side: his side or the other side, and implicitly threatened that selecting the other side could result in physical harm to that person or that person's family.

C.  The Media Coverage of this Case
    Will Expose Jurors to Extraordinary Pressure

Since the defendant's arrest, the case has garnered significant attention from both national and local media sources, which can only be expected to increase during trial. As detailed above, the defendant's initial indictment and federal arrest received widespread coverage in print and internet outlets, as well as the on national and local television news programs. This factor weighs heavily in support of empaneling an anonymous jury.

The expected media attention may put significant pressure on jurors to reach a verdict based on considerations other than the evidence presented at trial, for example to either avoid the notoriety associated with the defendant or to seek out fame. Notably, courts have ordered anonymous juries in cases with substantial media coverage, even where neither the defendant nor his associates had any documented history of jury tampering. See Kadir, 718 F.3d at 121 (affirming court's decision to empanel an anonymous jury where defendants were charged with violent crime and there was extensive media coverage of the case (citing United States v. Wong, 40 F.3d 1347, 1377 (2d Cir. 1994)); see also United States v.

Shiomos, 864 F.2d 16, 17 (3d Cir. 1988) (affirming decision to sequester jury in trial of judge accused of extortion on ground that trial would generate "significant amounts of publicity" that would interfere with the jury's ability to remain impartial).

In Barnes, the Second Circuit upheld the empaneling of an anonymous jury and noted that "in a case that generated as much pretrial publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities." 604 F.2d at 141. The government respectfully submits that, under the circumstances of this case, this factor weighs very heavily in favor of the empaneling of an anonymous jury.[2]

D. The Defendant Is Likely To Be Perceived As Dangerous

Based on the evidence to be presented at trial, the defendant is likely to be perceived by the jurors as capable of inflicting violence. Multiple witnesses will testify that the defendant physically and violently assaulted them when they broke one of the defendant's "rules" and that they witnessed the defendant physical assault others as well for similar transgressions. In these circumstances, the fact that jurors are aware that their identities are publicly known may subtly and unconsciously impair their impartiality.

In Thomas, the Second Circuit found that the protection of jurors is vital to the function of the criminal justice system and further articulated the importance of using jury

---

[2] The case has also garnered significant attention from various individuals on social media, including apparent fans of the defendant and his music. Some social media postings have sought to intimidate, threaten and denigrate individuals perceived to be cooperating with the government's investigation or potential witnesses at trial. Whether or not such efforts are connected to the defendant, it is likely that similar efforts will be made to influence jurors on social media in the event that the jury is not anonymous.

11

anonymity as a mechanism to ensure a jury's fair and impartial verdict free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict.

757 F.2d at 1364. See also Barnes, 604 F.2d at 140-41 (affirming district court's use of an anonymous, sequestered jury because it "comported with its obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality").

\*\*\*

For all of these reasons, an anonymous and partially sequestered jury is warranted in this case.

III. An Anonymous Jury Will Not Prejudice the Defendant

Once a district court determines that there is strong reason to believe that the jury needs protection, it may empanel an anonymous jury provided it takes reasonable precautions to minimize any potential prejudice to the defendant. See, e.g., United States v. Bellomo, 263 F. Supp. 2d 557, 559 (E.D.N.Y. 2003) (granting motion for anonymous jury and noting the requirement "that a balance be struck between the government's interest in the judicial process and the defendant's interest in preserving and safeguarding the presumption of innocence"); Thai, 29 F.3d at 801; Amuso, 21 F.3d at 1264-65; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 239; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717-18; Thomas, 757 F.2d at 1365. A defendant has two legitimate concerns that are potentially affected by a decision to empanel an anonymous jury: (a) the right to make informed choices

12

during the jury selection process, and (b) the right to be tried by jurors who are not prejudiced by reason of their anonymity. Both of these concerns can be readily addressed.

> A. An Anonymous Jury Will Not Burden the Defendant's Ability To Make Informed Choices During Jury Selection

Although a defendant has the right to a meaningful voir dire of potential jurors, see Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981), the decision as to the questions to be asked in voir dire largely rests within the informed discretion of the trial judge. See United States v. Silva, 715 F.2d 43, 50 (2d Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed); United States v. Barnes, 604 F.2d 121, 137-40 (2d Cir. 1979) (noting that "as long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal").

The information that will be kept from the parties and counsel if this motion is granted – namely, the names, addresses and places of employment of prospective jurors – is not crucial to the jury selection process. In selecting jurors, the parties will learn, among other things, the geographic area where prospective jurors reside, the general nature of their employment, their age and the level of their formal education. Indeed, the parties have already submitted a joint proposed jury questionnaire that will ensure that the parties will learn far more about potential jurors than in the usual jury selection process that occurs at trials in this District. See ECF No. 54. The names of prospective jurors, to the extent they provide information about ethnicity, are not needed for a meaningful voir dire. See Georgia

13

v. McCollum, 505 U.S. 42 (1992) (rule articulated in Batson, prohibiting use of peremptory challenges in racially discriminatory manner, applies to defendant).

   B.  An Instruction Will Diminish the Risk of Prejudice to the Defendant

   Numerous courts have recognized that, where anonymity is necessary, the Court can instruct the jury as to why anonymity is appropriate in a neutral manner that minimizes any risk of prejudice to the defendant. Although the due process clause of the Fifth Amendment protects the presumption of innocence, "there is no per se rule that it may not be burdened." Thomas, 757 F.2d at 1364; see also United States v. Scarfo, 850 F.2d 1015, 1026 (3d Cir. 1988). Here, the burden is slight compared to the interests in safeguarding the integrity of the judicial process and can be minimized through a proper jury instruction.

   Most commonly, courts have explained to jurors that their privacy and their identities require protection from the media and the public. See, e.g., Memorandum & Order, United States v. Basciano, 03-CR-929 (E.D.N.Y. Nov. 17, 2005) at 5 (Docket No. 354); United States v. Amato, 306 Fed. Appx. 630, 2009 WL 59165, at *3 (2d Cir. Jan. 12, 2009) (summary order); Thai, 29 F.3d at 801; Amuso, 21 F.3d at 1265; Tutino, 883 F.2d at 1133. In some cases, the court has explained the jury's partial anonymity by telling prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the personal questions asked in voir dire. Either of those examples would provide a credible explanation to prospective jurors in this case. Indeed, the intense media scrutiny expected to surround the trial is, in fact, a basis for the instant motion.

   As for partial sequestration, the government proposes that the jurors be told that they are being escorted in and out of the courthouse to protect their privacy and in order

14

to ensure a timely start to each day of trial.  This practice has been routinely followed in this District in recent years, and should be followed here as well.  See, e.g., United States v. Dervishaj, 2015 WL 13842838, at *5 (E.D.N.Y. Mar. 19, 2015); United States v. Basciano, 05-CR-060 & 03-CR-929 (NGG); United States v. Stone, 05-CR-401 (ILG); United States v. McGriff, 04-CR-966 (FB); United States v. Wilson, 04-CR-1016 (NGG); United States v. Aguilar, 01-CR-1367 (RJD); United States v. Nelson, 94-CR-823 (DGT); United States v. Orena, 93-CR-1366 (ERK); United States v. Malpeso, 93-CR-1365 (RJD); United States v. Cutolo, 93-CR-1230 (EHN); United States v. Thai, 91-CR-838 (CBA).

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the venire and petit juries in this case be anonymous and partially sequestered.

Dated:     Brooklyn, New York
           July 8, 2020

                                          Respectfully submitted,

                                          RICHARD P. DONOGHUE
                                          United States Attorney
                                          Eastern District of New York

By:     /s/
        Elizabeth Geddes
        Nadia Shihata
        Maria Cruz Melendez
        Assistant United States Attorneys
        (718) 254-6430/6295/6408

cc:   All counsel (by ECF)