# LEONARDMEYER

MIKE LEONARD
MLEONARD@LEONARDMEYERLLP.COM
O 312.380.6559

**BY ELECTRONIC FILING**

Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Robert Kelly*, Case No. 19-286 (S-1)(AMD)

Dear Judge Donnelly:

We respectfully submit this letter as the Response on behalf of Mr. Kelly in opposition to the Government's Motion for an Anonymous Jury, and for certain restrictions on Mr. Kelly's *voir dire* rights. As further set forth below, the Government's Motion should be denied.

**The Government's Request for an Anonymous Jury**

The "impaneling of an anonymous jury presents the 'possibility of unfair prejudice to the defendant and the danger of encroaching on the presumption of innocence.'" *United States v. Ashburn*, 2014 WL 5800280, No. 13-CR-0303 (E.D. N.Y. Nov. 7, 2014) (*quoting United States v. Tutino,* 883 F.2d 1125, 1132 ($2^d$ Cir. 1989)). Thus, the "empanelment of an anonymous jury is a **drastic measure**, and is one that should be taken only in limited circumstances." *United States v. Mustafa*, 7 F.Supp. 3d 334, 335 (S.D.N.Y. 2014 (emphasis added) (*citing United States v. Vario*, 934 F.2d 236, 239 (2d Cir. 1991), and *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir. 1985). In the present case, the circumstances presented do not support the imposition of such a drastic measure.

Indeed, in *Mustafa* (*supra*), the court denied the government's motion to empanel an anonymous jury, and to impose certain "protective measures" for the jurors, even though the charges in that case were far more serious than those presented in the present case. In that case, the defendant was charged with "acts involving material support of terrorists and terrorist organizations," as well as "hostage taking." *Id.* at 336, 337-338. As the starting point for its analysis, the *Mustafa* court first noted that the "principle that a shield of innocence surrounds a defendant extends back to ancient times." *Id.* at 335 (*citing Coffin v. United States,* 156 U.S. 432, 453-454 (1895)). Thus, the *Mustafa* court emphasized that "[a]ny practice that may impact that shield of innocence

requires close scrutiny in light of reason, principle and common sense." *Id.* (emphasis added) (citations omitted).

In denying the government's motion, the *Mustafa* court held that the quire serious charges against the defendant were not, "in and of themselves . . . an insufficient basis upon which to grant an anonymous jury." *Id.* at 338. Moreover, the *Mustafa* court rejected the government's argument that the fact the case might garner "significant media attention" was a sufficient basis to empanel an anonymous jury because that occurred in "any number of cases" tried in the Southern District each year. *Id.* Finally, the *Mustafa* court held that the government had failed to appropriately establish that "*this defendant* or *this case* presents a situation in which a jury faces real or threatened violence." *Id.* Accordingly, in denying the government's motion, the *Mustafa* court credited the defendant's argument that the empanelment of an anonymous jury "would poison the atmosphere of the case and serve to bolster the government's case by creating the impression that the defendant is dangerous and guilty, and that the jurors themselves are likely targets." *Id.*

The court's decision in *Mustafa* is on all fours with the circumstances presented in Mr. Kelly's case. First, clearly the racketeering and related charges pending against Mr. Kelly are far *less serious* that the terrorist and kidnapping charges that the defendant faced in *Mustafa*. Likewise, just as in *Mustafa*, the fact that this case may attract "significant media attention" is nothing out of the ordinary. More importantly, that media attention does not serve to establish in any way whatsoever that *this defendant*, Mr. Kelly, or *this case* will subject the jurors to any sort of "real or threatened violence." *Mustafa*, *supra*, at 338. Indeed, that this case will attract media attention is wholly irrelevant to that issue.

Furthermore, just as in *Mustafa*, the Government has failed to legitimately establish that Mr. Kelly is any threat to the "judicial process," including by way of witness tampering. The history of the numerous currently pending cases against Mr. Kelly makes this very point. As has been pointed out to this Court in several prior motions, the Judge in the currently pending Illinois State court case allowed Mr. Kelly to be free on bond. Mr. Kelly remained on bond as a result of that Order for months, and prior to being taken into custody for the currently pending case in the Northern District of Illinois ("NDIL"). There has never been any contention by anyone, let alone any evidence brought forward by way of a proffer or otherwise, that Mr. Kelly ever did anything to attempt to impede the judicial process in the pending Illinois State Court case after being released on bond.

In addition, during the pendency of the present case and the NDIL case, Mr. Kelly has similarly not attempted to do anything to interfere with the "judicial process," including contacting or attempting to improperly contact or influence witnesses - either by himself or through others. In fact, the Government in the present case, as well as in the NDIL case allowed - and did not object to - Mr. Kelly having in-person visits, email communications, and correspondence, with one of the alleged "victims" in the present case while he has been in custody in the NDIL. Perhaps the Government's motivation was that Mr. Kelly would do something, anything, to allow it to claim that Mr. Kelly had attempted to influence the "judicial process" in the present

case. In any event, Mr. Kelly never did. Similarly, despite the Government's repeated assertions to this Court that Mr. Kelly has both financial resources, and a purported network of supporters and enablers outside the walls of the Chicago MCC and across the country, tellingly there has never been any proof presented by the Government in this case (or in the NDIL case) that those unidentified persons have ever made any attempts to improperly influence the judicial process in the present case.[1]

Finally, if Mr. Kelly continues to remain in custody during the trial of this case, he will be in custody in the Eastern District. He will have no ability whatsoever to attempt to improperly influence the judicial process in this case.

For all of those reasons, the Government's Motion to empanel an anonymous jury should be denied.[2]

### The Government's Proposed Restrictions On Mr. Kelly's *Voir Dire* Rights

This Court should also reject the Government's request to limit Mr. Kelly's attorneys' ability to conduct a fair, thorough, and meaningful *voir dire* in this case. To that end, the Government requests that potential jurors' names, specific residential addresses, and the identity of their employers remain unknown and secret. *Voir dire* is one of the most critical phases of the trial. To unduly limit it in the manner suggested by the Government will fundamentally deny Mr. Kelly and his counsel the opportunity to fully and meaningfully probe the potential biases of the *venire*. *See, e.g., United States v. Dinkins*, 691 F.3d 358, 372 (2d Cir. 2012) ("a court's action withholding certain biographical information from the parties may affect a defendant's constitutional right to trial by an impartial jury, by hindering the defendant's ability to conduct an informed voir dire examination and to challenge effectively the seating of individual jurors")

First, with respect to the names of the jurors. Mr. Kelly and his counsel agree that those names need *not* be disclosed publicly or be made part of the record during the pendency of the case.

---

[1] Incredibly, if anything, it has been the Government's own witnesses who have attempted to improperly influence the judicial process by tainting the potential jury pool. By way of example, it has been reported that one of the Government's "victims" apparently recently took to social media to falsely make it appear as if supporters of Mr. Kelly had set her car on fire – when in fact she apparently set the car ablaze herself or had the car set ablaze. Imagine the outcry from the Government in this case if Mr. Kelly or one of his own witnesses engaged in similar conduct. Mr. Kelly's counsel is unaware of any police report even being filed in connection with that fire, let alone any investigation into that bizarre occurrence by the prosecutors or investigators for the United States Attorneys' Office for the Eastern District of New York. Apparently, what is good for the goose is *not* necessarily good for the gander in the present case.

[2] To the extent this Court grants the Government's Motion to empanel and anonymous jury, it should provide the following admonition to the jurors: "It is a common practice followed in many cases in the Federal court to keep the names and identities of the jurors I confidence. This is in no way unusual. It is a procedure being following in this case." *See United States v. Rivera*, 2015 WL 630242, at *9, No. 13-CR-149 (E.D.N.Y. Feb. 13, 2015). Additionally, if this Court's grants the Government's Motion to empanel and anonymous jury, it should also grant Mr. Kelly additional preemptory strikes. *See United States v. Herron*, 2 F.Supp.3d 391, 399 (E.D.N.Y. March 3, 2014).

**Judge Donnelly**
**July 29, 2020**

However, at a minimum, the names of the potential jurors must be made available to Mr. Kelly's counsel and the Government. Mr. Kelly and his counsel are *not* requesting that those names be made available to Mr. Kelly as well – even though there is no legitimate reason not to do so. Mr. Kelly and his counsel will live with such a limitation. *See United States v. Napout*, 963 F.3d 163 (2d Cir. 2020) (holding that the trial court "protected the appellant's [defendant's] rights by ensuring that the jury **was not anonymous with respect to any of the parties. While the jurors' identities were kept from the public, the appellants and their counsel (and the government too) were provided with the names of the prospective jurors during selection and were free to investigate any of them for potential bias")** (emphasis added).

To keep the names from the attorneys for the parties would not only run afoul of the Second Circuit's precedent in *Napout*, it also completely ignores the reality of the modern world, and the reality of jury selection in the modern world. Mr. Kelly's counsel is not asking for the names of the potential jurors in order to make guesses and rely upon biases and prejudices about jurors' nationality or ethnicity. We now live in a digital world. The amount of information readily and publicly available, including on social media and/or readily available through extraordinarily basic "Google" searches (run by even such technology novices as Mr. Kelly's defense counsel), provides tremendous insight into the thought processes and actual and potential biases of potential jurors – not to mention insight into what they have read, heard, or posted about Mr. Kelly or this case. Without the names of the potential jurors, it is impossible to engage in such basic jury selection activities. Indeed, it would be tantamount to malpractice, or in a criminal case ineffective assistance, for an attorney to fail or refuse to engage in the above-referenced simple steps to research potential jurors. Indeed, those simple steps also serve as a check on the veracity of the responses provided by potential jurors on jury questionnaires and during *voir dire*. Without the names of the potential jurors, however, none of that is possible. *See, e.g., United States v. Teman*, 2020 WL 3034034 at *39 (S.D.N.Y. June 5, 2020) ("a juror's dishonesty undermines a defendant's right to a fair trial," and may serve as a basis to exclude a juror during jury selection, and/or as a basis for a motion for a new trial); *see also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984)).[3] The direct result upon Mr. Kelly of the granting of the Government's Motion will be the empaneling of a jury in violation of his Constitutional right to an impartial jury as guaranteed by the Sixth Amendment.

Recently, the trial court in the Roger Stone federal criminal prosecution in the District of Columbia recognized the importance, even basicness, of social media research during the jury selection process. *See United States v. Stone*, 2020 WL 1892360 at *5 (D.C. April 16, 2020), No. 19-0018. In that case, defendant brought a post-trial motion seeking a new trial based upon, *inter alia*, false statements or non-disclosures by potential jurors (who ended up serving on the jury) during the *voir dire* process. In denying that motion, the *Stone* court held that defendant and his

---

[3] The Supreme Court in *McDonough*, *supra*, found that "[D]emonstrated bias in the responses to questions on voir dire may result in a juror being excused for cause . . . [T]he necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *Id.* at 464 U.S. 554. Of course, if Mr. Kelly's counsel is denied the names of the potential jurors, and thus the ability to fully and effectively scrutinize and challenge their *voir dire* responses, then counsel cannot make the appropriate objections for exclusion.

counsel could have (and thus should have) researched the potential jurors on social media at that time - i.e., during the *voir dire* process. As the court in *Stone* noted:

> At the time of the trial, though, **the defense made a strategic choice not to look for social media information. None of the seven lawyers or the two jury consultants on the defense team performed the rudimentary Googling that located this set of Facebook and Twitter posts**: not during the two months they were in possession of the entire set of jury questionnaires with the jurors' names on them; not during the four to five days before trial when they knew the exact order in which the members of the jury panel would be questioned and seated as jurors; not during the two days of jury selection; and not overnight after the twelve jurors and two alternates had been picked and instructed to return the next morning to be sworn.

*Id.* at *5 (emphasis added).

The reality and relevance of the modern digital world to jury selection as reflected by the court in Stone has been acknowledged by various other courts. *See, e.g.., United States v. Krug*, 2019 WL 3162091, No. 1:15-CR-00157 (W.D.N.Y. July 16, 2019) (social media posts by potential jurors can serve as the basis to strike jurors *even before* the start of the in-court jury selection process); United States v. Nix, 251 F.Supp.3d 555, 565 (W.D.N.Y. 2017) ("the Court acknowledges that the efforts undertaken by <u>all parties</u> to investigate the backgrounds of prospective jurors in this case may be relevant to the Court's consideration of the post-trial motions") (emphasis in original).

For all of those reasons, the Government's request to deny the names of the potential jurors to the attorneys for the parties should be denied.

The Government's request that Mr. Kelly and his counsel be denied the names of the actual employers for whom potential jurors work should similarly be denied. Again, Mr. Kelly and his counsel *agree* that such information can be kept secret to the public during the pendency of the trial, and even be denied to Mr. Kelly. However, there is no reason that Mr. Kelly's counsel (and counsel for the Government) should be denied that information. Such a limitation ignores the reality that companies have corporate cultures that may influence the thought processes and biases of potential jurors. There may be a big difference in the actual or potential biases of jurors who choose to work for a company that supports "Black Lives Matter" versus a juror who chooses to work for a company that actively opposes such a movement – regardless of how that juror self-reports (or does not report) his biases on a juror questionnaire or during *voir dire*. Moreover, armed with knowledge of a potential juror's actual company affiliation, jury research can be appropriately conducted on publicly available information. For example, knowing that hypothetical potential juror "Sarah Jones" works for the hypothetical "Acme Company" goes a long way towards narrowing down whether certain social media and other posts were made by *the Sarah Jones* who is part of the *venire* from thousands of other individuals known as Sarah Jones. In addition, the *Sarah Jones* may be affiliated with publicly available posts tied to or disseminated by the Acme Company – ranging from posts reflecting opposition to Mr. Kelly to

posts that reflect the potential for the acceptance of biases by the potential juror, such as funding for the rights of those subjected to alleged sexual abuse or opposition to such things as the Black Lives Matter movement.

Finally, the Government's request that Mr. Kelly and his counsel be denied the actual residential addresses of potential jurors should similarly be denied. As an initial matter, one's actual address provides relevant insight into a potential juror's economic status, the racial make-up of his/her neighborhood, as well as insight into his/her actual or potential viewpoints and biases. Indeed, even the Government in this case would be hard-pressed to refuse to acknowledge that it might be relevant, in terms of assessing the actual or potential biases of potential juror, to know that an individual lives on the same street as a facility that serves the needs of those subjected to sexual abuse, or on the same portion of a street that has historically sought to limit the presence of minorities. All that aside, the actual address of a potential juror serves as yet another tool in narrowing down whether certain social media and other posts were made by *the hypothetical Sarah Jones* who is part of the *venire* from thousands of other individuals known as Sarah Jones.

At a minimum, this Court should require the disclosure of the specific, particular *neighborhood* in which each potential juror resides, if not that individual's specific address. *See, e.g., United States v. Wong,* 40 F.3d 1347, 1377 (2d Cir. 1994) (requiring disclosure of information about potential jurors' neighborhoods); *United States v. Ashburn*, 2014 WL 5800280, at *16, No. 13-CR-0303 (E.D. N.Y. Nov. 7, 2014) (allowing defense counsel to be provided with information about the potential jurors' neighborhoods); *Dinkins*, *supra* (providing neighborhood and zip code information).

Wherefore, Mr. Kelly, by and through his counsel of record, respectfully requests that this deny the Government's Motion for the impaneling of an anonymous jury. In the event that this Court grants that Motion, Mr. Kelly respectfully requests that this Court provide all counsel with juror information consistent with the positions articulated above.

Sincerely,

Michael I. Leonard
MIL: bp
cc: All Counsel of Record (via ECF filing)