**LAW OFFICE OF THOMAS A. FARINELLA, P.C.**  260 Madison Avenue, 8th Fl.
New York, NY 10016
Tel: (917) 319-8579
Fax: (646) 349-3209
www.lawtaf.com

**Thomas A. Farinella**
tf@lawtaf.com

July 1, 2021

**BY ECF**

The Honorable Ann M. Donnelly
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   United States v. Robert Kelly
      Criminal Docket No. 19-286 (S-3)(AMD)

Dear Judge Donnelly:

We respectfully submit this letter as, Robert S. Kelly's ("Mr. Kelly") Emergency Motion for Temporary Release and/or accommodations for preparation of his defense for his trial now scheduled to begin on August 9, 2021.

Mr. Kelly made three prior applications for bond and appealed the District Court's denial for temporary release. Despite the Second Circuit's denial of Mr. Kelly's appeal, the Court stated, in their decision that "we assume that adequate opportunity for consultation with counsel will be assured as a matter of trial administration by the judges who will preside over the two trials." This application is being filed to ensure that the Second Circuit's assumption hold true as well as to ensure that Mr. Kelly's constitutional right to counsel and constitutional right to a fair trial are adhered to in this case.

**I.   BACKGROUND**

Since his arrival on June 22, 2021, to the Metropolitan Detention Center ("MDC"), Mr. Kelly has not been permitted to meet and confer with counsel in person and will not be able to do so until July 6, 2021, and after he tests negative for COVID-19. It is undisputed that he is illiterate which makes in-person meetings essential so he can prepare for August 9, 2021, jury trial.

Since December 2020 while at the MCC, Mr. Kelly was granted the opportunity to attend FaceTime calls with his attorneys. The calls were scheduled on Monday, Wednesday and Friday from 1:30 pm to 3:30 pm CST.  The FaceTime calls permitted a line of communication but ultimately proved to not be very effective. The calls were constantly interrupted, a camera was placed both in front of Mr. Kelly and behind him and Mr. Kelly's illiteracy created an impossible situation.  A request was made to the MDC for an accommodation of Mr. Kelly's disability, to no avail.  This Court granted Mr. Kelly's request to view the discovery material in prison.[1]

On August 8, 2019, a stipulation and protective order was entered regarding the discovery materials. [ECF 132] In order for Mr. Kelly to be able to assist his counsel, the Court allowed for one single copy to be given to Mr. Kelly along with a number of CDs.  As of the date of this motion, after several requests by Mr. Kelly, the lead attorney at the time, has not produced anything for Mr. Kelly's review. Although Mr. Kelly has literacy issues, he indicated that he would rather struggle through it then not have it at all.

Given the current circumstances that exist; Mr. Kelly in the Special Housing Unity ("SHU"), the lack of meaningful communications with Mr. Kelly while he is in prison and Mr. Kelly's inability to assist in his defense, the only assurance that Mr. Kelly will be prepared for his trial in August is if he is granted immediate pre-trial release.

**II.     The Lack of Ability To Communicate With Mr. Kelly**

Phone calls between inmates and their lawyers are an essential part of preparing an inmate for trial. Due to the fact that Mr. Kelly is in the SHU, access to him via phone has remained difficult and impractical when it comes to discussing certain legal strategies in order to properly prepare for trial. There is little preparation that can be done when Mr. Kelly calls counsel from a shower and has to talk through a slit in the door.  These barbaric conditions fundamentally prevent Mr. Kelly from being able to assist his counsel in his own defense.  Meanwhile, every time Mr. Kelly speaks, everything he says is heard throughout the SHU due to the acoustics and echo heard reverberating throughout the SHU prison walls.  Again, not an appropriate environment to strategize with Mr. Kelly for his trial.

Immediately upon learning of Mr. Kelly's transfer counsel reached out to the MDC and scheduled a call.  On June 23, 2021, Mr. Kelly placed a legal call at 7:30 AM. The conversation

---

[1] The Court has appointed *Curcio* Counsel.  The Court wants *Curcio* counsel to meet with Mr. Kelly face-to-face and that will take place on or before July 12, 2021.  Additionally, it appears that there are scheduling issues with other counsel.

was brief and there was no legal substance discussed regarding Mr. Kelly's case due to the detention conditions that exist. At present, Mr. Kelly is forced to make phone calls from a shower in a desperate effort to obtain privacy which is unacceptable. Clearly, a shower, is not an appropriate place to have any meaningful conversations with one's lawyers. A few additional legal calls were placed, but unfortunately they were met with the same difficulties. Mr. Kelly continues to inform counsel of the challenging conditions he is currently placed in which unequivocally thwart his ability to properly assist his counsel in his own defense. Frankly, to believe that Mr. Kelly is able to assist in his own defense under these circumstances is beyond preposterous.

In an effort to continue to prepare for trial, counsel requested FaceTime or a Zoom call be made available. Counsel was told that FaceTime and Zoom calls are not available for Mr. Kelly. Although FaceTime and Zoom calls don't necessarily remove the issues counsel is having in communicating with their client, it is better than nothing.[2]

Even this Court seemed to acknowledge the difficulty of using a video conference to communicate with Mr. Kelly verses being in-person, at the *Curcio* Hearing (the "June 17 Hearing"), when addressing the fact that Mr. Kelly was present via video instead of in-person, this Court stated, "... but recognizing that I think it's very difficult for Mr. Kelly to have communications by video ..." (see Hrg. Tr. at p. 52). This Court went on to say, when referring to the importance of an independent attorney meeting face-to-face with Mr. Kelly if he so chose, "I think it's an important enough subject that I want to make sure that [Mr. Kelly] has absolute clarity on what the issues are and what the potential conflicts may be." (see Hrg. Tr. at p. 52). This supports the defense's argument that it is close to impossible to legitimately prepare for a trial only having access to their client via phone and/or video especially when the client has literacy issues.

Pre-trial release of Mr. Kelly is appropriate due to the COVID-19 restrictions at the MDC. Understandably, the COVID-19 pandemic has necessitated the Federal Bureau of Prisons (BOP) to adhere to certain protocols to avoid transmission or spread of this deadly disease. The requirements imposed by the MDC/BOP regarding quarantine and visitation have undoubtedly created unforeseen delays and a heightened feeling of unrest when it comes to preparing for Mr. Kelly's trial. Understanding that certain COVID-19 quarantine restrictions are required to be followed by the MDC, such restrictions have impeded counsel's ability to have any meaningful conversations or face-to-face conversations with Mr. Kelly. Both are necessary in order to review the hundreds of thousands of pages of material which dates back for decades. Without the ability to sit down face-to-face for long extended periods of time and review strategy and the like, preparing for Mr. Kelly's trial is an impossible task.

Per the MDC, Mr. Kelly must quarantine every time he leaves the MDC and returns. Since Mr. Kelly has been ordered to appear in-person for the continuation of the *Curcio* Hearing, date to

---

[2] There is a call scheduled for 1:30 pm EST on Friday July 2, 2021.

3

be determined, Mr. Kelly is presumed to have to quarantine after he goes to Court. Again, leaving no direct access to Mr. Kelly and/or his counsel.

Mr. Kelly is set to start trial in approximately one (1) month. At the moment he is awaiting the completion of a *Curcio* Hearing and a motion to withdraw by two or Mr. Kelly's defense counsel after being terminated by the client, and given the fact that the *Curcio* Hearing may not be completed until late July 2021, coupled with the quarantine restrictions that continue to create impossible situations for counsel to engage the client for purposes of his assistance in his own defense, a motion for pre-trial release and/or accommodations for Mr. Kelly is certainly ripe. This request is crucial to guarantee Mr. Kelly's Constitutional rights are protected. In the event pre-trial release is not possible, given the conditions in place and the time lost, the trial date proceeding on August 9, 2021, is at risk.

### III.    Request for Mr. Kelly's Temporary Release Under 18 U.S.C. § 3142(i)

#### A. The Right to Access Counsel and Assist in Mr. Kelly's Defense

This court has the authority to grant Mr. Kelly temporary relief pursuant 18 U.S.C. § 3142(i). The language of 18 U.S.C. § 3142(i) that the court "may . . . permit" the detainee's temporary release "to the extent that the judicial officer determines such release to be necessary" underscores the discretionary nature of relief under the subsection. The statute goes on to say, "The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." *United States v. Chandler*, 2020 U.S. Dist. LEXIS 56240, *5, 2020 WL 1528120.

Further the Court held, "the right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system. *United States v. Chandler*, No. 1:19-CR-867 (PAC), 2020 WL 1528120, at *2 (S.D.N.Y. Mar. 31, 2020) (*citing Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*, 954 F.3d118, 134 (2d Cir. 2020); *United States v. Salerno*, 481 U.S. 739, 755, (1987)("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.")). These seemingly simple thoughts, that an individual is presumed innocent; that an individual should not be incarcerated until he has his day in court; and that, no matter how damning the allegations against a defendant appear, he is entitled to a fair fight with adequate preparation - should be considered by this Court in determining the release of Mr. Kelly from prison prior to his scheduled jury trial date.

Failure to release Mr. Kelly will inevitably lead to a reduction of his constitutionally mandated right to access counsel and to assist in his defense during what the Supreme Court has found to be the most critical period of a case proceeding - the time between arraignment and the beginning of a trial. *Powell* v. *State of Alabama,* 287 U.S. 45,57 (1932).

The Bail Reform Act included a provision that would allow a judicial officer to permit the temporary release of a detainee if the judicial officer determines the release "to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S .C.A. 1342(i). Several federal courts have discussed the burden incarceration has on a defendant's ability to assist in their defense. The court in *U.S* v. *Vitta* reasoned that a defendant released on bail is available 24 hours a day to assist in their trial preparation, track down evidentiary leads, and provide key factual details in drafting motions and negotiations. *U.S* v. *Vitta,* 653 F. Supp. 320, 337 (E.D.N.Y. 1986); *see also Barker* v. *Wingo,* 407 U.S. 514, 533 (1972). Not to mention, the defendant may be the only person that is able to identify, explain, and help his attorneys to understand the evidence and his defense. *Id.* The court in *Vitta* went on to note that the quality of the detainee's legal defense is likely to diminish dramatically the longer he or she is incarcerated. *Vitta,* 653 F. Supp. at 337.

Temporary release with stringent conditions is not uncommon which is demonstrated in *US v. Avenatti*, where the District Court determined conditions for release of a defendant who was detained because he violated the conditions of bail that were set at his arraignment, after he was subsequently found guilty of multiple felonies. Additionally, the Court released the Defendant so he could meet with his counsel and prepare for the two impeding trials and doing so under the current conditions would have made that impossible.

The Court clearly stated, "this Order does not withdraw, is not in derogation of, and does not conflict with this Court's prior finding, and the Ninth Circuit's affirmance of this Court's finding, that there is probable cause to believe that defendant committed state and federal crimes while on pretrial release, that defendant is a danger to the community, and that defendant failed to rebut the presumption that no conditions or combination of conditions will assure the safety of the community. *See United States v. Avenatti*, C.A. No. 20-50017 (9th Cir. Mar. 6, 2020).[3] The request

---

[3] The following conditions were included, *inter alia*, a. Defendant shall participate in the Location Monitoring Program and abide by all requirements of the program, under the direction of Pretrial Services, which shall include a location monitoring bracelet. Defendant must pay all of the costs of the Location Monitoring Program based upon his ability to pay as determined by Pretrial Services and will be financially responsible for any lost or damaged equipment; b. Defendant shall not possess, use, or access any digital devices that offer or allow internet access. Defendant may, however, possess and use a non-internet connected telephone, approved by Pretrial Services, to communicate with his attorneys, family, friends, and for other basic living needs during the 90-day term of his temporary release; c. Although defendant may not possess, use, or access any internet-enabled digital devices, this Order does not preclude defendant's legal counsel from emailing legal documents to defendant's third-party custodian, Jay Manheimer, so that defendant's

for release is the only option left that would ensure Mr. Kelly would be ready for trial. Unlike Avenatti, Mr. Kelly has not been found guilty of multiple felonies which sentence could carry a significant amount of time but like, Mr. Kelly, has multiple cases that contain an enormous number of documents which requires hours of in-person consultation. Avenatti, a lawyer, has experience in litigation and even with meeting with his lawyers has complained about the difficulty of preparing for trial while detained. Turning to Mr. Kelly, significant time has been lost because of his transfer, he has significant learning disabilities and given the complex nature of the case needs to review and discuss the discovery with his counsel which cannot be met now or even after his quarantine ends.

Although prior to this motion Mr. Kelly has been denied pre-trial release on at least three occasions, due to the fact that counsel at the time failed to show this Court "compelling reasons" for pre-trial release, this motion is riddled with "compelling reasons" given the current circumstances. The Court has consistently found that "no condition or combination of conditions will reasonably assure [Mr. Kelly's] appearance as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). (ECF No. 68.) Since the last bond argument, on May 15, 2020, there have been a number of significant changes in Mr. Kelly's circumstances.

The Government primarily objected to pre-trial release in their responses to the defense's previous motions for bond stating that Mr. Kelly is a flight risk and a risk to the public and risk to the public's safety. The case of *United States v. Thornton*, 787 F.2d 594, 594 (6th Cir. 1986) suggests that a district court can temporarily release a detainee pursuant to § 3142(i)(4), even after a prior order holding that the detainee was a flight risk or a risk to public safety. Additionally, the court in *United States v. Stephens*, No. 15-cr-0095, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) held that 18 U.S.C. § 3142(i)(4) constitutes a "separate statutory ground" for post-conviction release, and that Defendant's inability to communicate regularly and effectively with counsel in light of the BOP's visitation policies satisfied requirements for release under § 3142(i)).

---

third-party custodian can print them for defendant to review. Defendant may also access and use an internet-enabled digital device while in the presence of defendant's legal counsel, solely for the purpose of preparing his defense in this case and in the two pending prosecutions in the Southern District of New York ("SDNY"), *United States v. Avenatti*, No. 1:19-cr-373-PGG (SDNY), and *United States v. Avenatti*, No. 1:19-cr-374-JMF (SDNY); d. Defendant shall avoid all contact (except in the presence of counsel), directly or indirectly, with any person who the government has identified as victim or potential witness in this prosecution and investigation, except for Christine Avenatti Carlin. Defendant, however, shall not engage in any substantive discussions with Ms. Carlin regarding this prosecution and investigation (except in the presence of counsel): e. Defendant shall comply with all court orders, including, but not limited to, any conditions of release in *United States v. Avenatti*, No. 1:19-cr-373-PGG (SDNY), and *United States v. Avenatti*, No. 1:19-cr-374-JMF (SDNY); and f. Defendant shall surrender all passports and travel documents to Pretrial Services within 24 hours of his release (to the extent he has not already done so), sign a Declaration re Passport and Other Travel Documents (Form CR-37), and shall not apply for a passport or other travel document during the pendency of this case.

These rulings speak directly to the case at bar due to the fact that Mr. Kelly needs to prepare his defense for his upcoming EDNY case. The present jury trial date was planned without knowing that a *Curcio* Hearing was going to take place and not be completed until a few weeks or days before Mr. Kelly's jury trial is scheduled to begin, *inter alia*. Given the numerous hindrances that have occurred in counsel having access to their client, it is nearly impossible to expect the defense to be prepared while Mr. Kelly remains in custody.

Moreover, attorney-client communication is an essential component of the meaningful access to courts guaranteed under the Constitution. *See Drehe r v. Sielaff,* 636 F.2d 1141, 1143 (7th Cir. 1980) (internal citations omitted) *and Glisson v. Sangamon Cty. Sheriff 's Dept. ,* 408 F. Supp. 2d 609 , 623 (C.D. Ill. 2006) *(citing May v. Sheahan ,* 226 F.3d 876 , 878 , 883 (7th Cir. 2000) (hospitalized pretrial detainee with AIDS stated claim for violation of his constitutional right of access to the court's because of hospital detention policies that prevented him from attending court, filing motions-including to reduce his bond-and meeting with counsel; court found that "the opportunity to communicate privately with an attorney is an important part of that meaningful access" to courts under the 14th amendment). If a lawyer is unable to go to the jail because of the virus (e.g., is under mandatory quarantine because she or someone she is close to is exhibiting symptoms associated with the virus or has been exposed to someone who has tested positive) he can only communicate with his client by phone.

The question is whether there are any conditions that would permit release. Here, conditions can easily be fashioned to ensure Mr. Kelly's return. Pursuant to 18 U.S.C. § 3142(i) the defendant is prepared to:

(1) Execute a bond co-signed by a Financially Responsible Person.
(2) Be placed under 24-hour home confinement to be enforced by location monitoring technology to be determined by Pretrial Services. Mr. Kelly would only leave the residence for necessary medical services. All other leave from the residence would be submitted through defense counsel for the court's approval.
(3) Mr. Kelly would not be released from MDC until all conditions are met, including the availability of location monitoring equipment.
(4) A review by this Court not to exceed 15 days, at which time the need for continued release under the "compelling reason" that release was ordered can be revisited by the Court.
(5) When home visits are scheduled by Pretrial Services, Mr. Kelly will comply with Pretrial Services' requests to remove all cohabitants of the residence prior to the visit.[4]

---

[4] See a full list of the Avenatti conditions at footnote 3.

In sum, Mr. Kelly is being denied his Sixth Amendment right to access to counsel. "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell, supra,* 418 U.S., at 555-556 (1974). A court should not "unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts." *Id.* Therefore, restrictions imposed by the District Court should not dwarf Mr. Kelly's Sixth Amendment right to have access to his counsel and to be able to prepare for his trial. Mr. Kelly maintains his innocence. He moves for temporary pre-trial release under 18 U.S.C. § 3142(i), which permits a court to order the temporary release of a detainee when "necessary for preparation of the person's defense or for another compelling reason."

The defense would be remiss if counsel failed to address an obvious stumbling block in Mr. Kelly's ability to assist counsel in his own defense. It is undisputed that Mr. Kelly cannot read or write. Therefore, unlike most defendants, he cannot spend hours reading and reviewing the documents that are relevant to his case; he cannot make notes about those documents in order to share those thoughts at a later time with his counsel; he cannot meaningfully communicate in writing with his lawyers; he cannot refer to a dictionary/internet to look up legalese; he cannot effectively use the law library in prison; and he cannot meet face-to face with his lawyers who can answer, explain and obtain his feedback about the discovery materials.

On February 4, 2021, this Court ordered that Mr. Kelly the ability to "possess in a jail facility compact discs and a single paper copy of the protected 3500 Material and may review such material outside the presence of defense counsel or staff assisting such counsel." (ECF No. 90 at 1-2.). As a result of that order, Mr. Kelly requested of lead counsel numerous times to furnish him with his copy of the discovery/3500 material. The request fell on deaf ears. Not only did Mr. Kelly not receive a "single paper copy" from Mr. Greenberg, of which he could have tried to struggle through, and has a right to have, Mr. Kelly never received the "compact discs" either. Mr. Kelly has not received a single piece of paper that is part of his discovery. All of his legal notes and paperwork are still at the MCC, he was not permitted to travel with anything.

Mr. Kelly has essentially been cut out of the discovery and trial preparation process. Moreover, because of the pandemic and the visiting hours for attorneys at the MDC, his overall communications with counsel in assisting in his own defense have been cut out. Now, both Mr. Kelly and counsel await what has amounted to sporadic and unpredictable times for a phone call. Given these types of limitations it would be impractical to believe that Mr. Kelly will be able to assist counsel in fighting for his life. This is particularly troublesome as the means of those limited communications do not even possess the safeguards of confidentiality that are necessary to engage in meaningful attorney-client conversation. As stated above, when counsel had FaceTime visits with Mr. Kelly at the MCC, a camera was placed, in clear view, both behind and in front of Mr. Kelly as he spoke to counsel. This has caused all sorts of a lack of confidence when it comes to attorney-client confidentiality. It was as though the attorney-client relationship had been

completely ignored. It is just another stumbling block in the pursuit of Justice for Mr. Kelly that cannot be untold.

There is no denying that this is an extraordinary time, and that the issues that ordinarily affect bail determination have to be viewed differently, and more liberally. This is the time, if ever there was a time, where pre-trial release should be granted based on the litany of "compelling reasons" presented to this Court by the defense, now is that time.

**B. The COVID-19 Required Restrictions at The MDC Thwart Both Mr. Kelly and Counsel From Preparing For an August Jury Trial Date**

Not only is Mr. Kelly's Constitutional right to assist his counsel in his defense being violated, but due to the COVID-19 pandemic, the required preventative measures for avoidance of the contraction or spread of the disease per the BOP creates additional hurdles and setbacks when it comes to counsel's ability to prepare for a trial that is slated to begin in approximately one month.

The COVID-19 virus is a potential life-threatening disease that inmates continue to need to be protected from contracting or spreading. As of June 25, 2021, (BOP) had 54 federal inmates and 135 BOP staff who have confirmed positive test results for COVID-19 nationwide.[5] There have been 240 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease.[6] Although the number of BOP inmates contracting the disease has certainly lessened since the height of the pandemic (Per the BOP, 44,333 inmates and 6,878 staff contracted the deadly disease),[7] safeguards to prevent the spread of COVID-19, which are to be adhered to meticulously, are still very much in place at the MDC.

As of January 22, 2021, the CDC recommended the combination of getting vaccinated and following other CDC recommendations for protection [that] offers the best protection from COVID-19 at the present time.[8] The CDC stresses the importance of wearing masks or cloth coverings … to help reduce the chances of being exposed to the virus or spreading it to others.[9] The CDC also explains the importance of social distancing within the BOP in order to stop the spread of infection.[10]

Per the Federal BOP, inmates with no prior history of COVID-19 (Mr. Kelly) should be tested prior to [a] transfer, and, if negative, placed in Release/Transfer Quarantine.[11] On June 22, 2021, it was presumed this step was taken by the Metropolitan Correctional Center ("MCC")

---

[5] *See* https://www.bop.gov/coronavirus/.
[6] *Id*. See footnote 3.
[7] *Id*. See footnote 3.
[8] *See* https://www.bop.gov/foia/docs/covid19_vaccine_guidance_01222021_v9.pdf
[9] *Id. See* footnote 1.
[10] *See* https://www.bop.gov/coronavirus/covid19_status.jsp
[11] *Id*. *See* footnote 3.

9

prison in Chicago, Illinois but it was revealed that Mr. Kelly was not tested prior to the transfer to the MDC in Brooklyn, New York.

Next, the BOP requires that person (Mr. Kelly) to be housed separately from inmates in Exposure or Intake Quarantine.[12] Once Mr. Kelly arrived at the MDC, he was immediately placed in the SHU, a tiny cell usually about 6 feet by 9 feet in size. Another inmate was placed in that same cell with Mr. Kelly. That inmate entered Mr. Kelly's cell without wearing a mask. That inmate has never worn a mask while at the MDC (MDC does not require masks worn in the cell). These facts are very concerning given the importance the BOP and the CDC have placed on wearing masks and social distancing. Mr. Kelly's cell, which is barely big enough for one inmate, has two inmates bunking together who did not get transferred to the MDC together, who are not able to social distance within their cell and are not required to wear masks.

It is well known that the stark reality of placing an inmate in the SHU [13] causes "a slew of mental health issues."[14] Including, but not limited to, hallucinations, anxiety, panic attacks, memory deficiencies, concentration issues, paranoia and impulse control.[15] Based on Mr. Kelly's placement in the SHU, he is experiencing a number of these mental health issues. It does not help that Mr. Kelly was erroneously placed in the SHU for seventy plus days when he was first incarcerated at the MCC, and still has nightmares to this day about his experiences in the SHU. Inmates placed in the SHU, whether for punishment or "protection," are subjected to virtually the same conditions as those confined in the SHU due to disciplinary infractions. The mental anguish alone that Mr. Kelly is experiencing from being placed in SHU, again thwarts counsel's ability to involve Mr. Kelly in assisting in his own defense.

Mr. Kelly's mental state plays a large role in his ability to assist his counsel in his defense. The appropriate mind frame necessary at this crucial time in his case to assist counsel in his defense cannot be accomplished given Mr. Kelly's current situation at the MDC. Even social distancing cannot take place in his cell, which simply heightens the risk of Mr. Kelly contracting a disease. This is just another insurmountable hurdle that Mr. Kelly faces if he remains in the MDC.

During other bond hearings, several of the CDC guidelines were cited as reasoning for why Mr. Kelly did not deserve a bond, nor to be released under any circumstances. Since the previous bond motions, the CDC has broadened their guidelines when it comes to who is the most vulnerable to contracting COVID-19. In June 2021, the CDC indicated that adults of *any age* with

---

[12] *Id. See* footnote 1.

[13] It should be noted that Mr. Kelly was placed in the SHU without his request/consent. There is a different area at the MDC where other (most) inmates who are transferred there are held. Certainly, the area they are housed in is larger than 6 feet by 9 feet in size.

[14] *See* https://www.psychologytoday.com/us/blog/modern-minds/201806/what-really-happens-inside- prisoner- isolation-cells

[15] *Id. See* footnote 6.

certain medical conditions can be more likely to get severely ill from COVID-19.[16] This eliminates the prior representations by the CDC that the group of people who were previously categorized as most-at-risk for contracting COVID-19 and getting severely ill from it were "older adults" approximately 65 years old and up.[17] Now, under the current CDC guidelines, Mr. Kelly, at the age of fifty-four, with certain medical conditions contracted since he has been imprisoned, would be more likely to get severely ill from COVID-19, then perhaps a man of similar age and stature without the same medical conditions that Mr. Kelly continues to suffer from.

The CDC broadened their list of potential medical conditions that could make a person more likely to get severely ill and/or cause death from contracting COVID-19.[18] Included in that list of potential medical conditions that increase the risk of getting COVID-19 is diabetes and Chronic lung disease, including Chronic obstructive pulmonary disease.

While incarcerated, Mr. Kelly was diagnosed with both type 2 diabetes and Tuberculosis (TB), a disease that causes bacteria to attack the lungs.[19] Unfortunately for Mr. Kelly, his type 2 diabetes was never treated properly at the MCC. Months would go by without a nurse performing a blood sugar reading. Per proper health standards, with type 2 diabetes, a person should take a blood sugar reading at least once a day.[20] Due to Mr. Kelly's new diagnosis of type 2 diabetes, Mr. Kelly was told by the doctor at the MCC that he should start eating healthier. On July 10, 2020, the doctor from the MCC ordered that Mr. Kelly was to receive what's known as a "Heart & Healthy Diet" meal. Mr. Kelly never received one "Heart & Healthy Diet" meal.

Past history of tuberculosis is an important risk factor of COPD and tuberculosis is also common in COPD patients.[21] Development of chronic airflow obstruction may be related to common risk factors or tuberculosis associated lung damages.[22] At the MCC, Mr. Kelly was given a proper round of medication to combat his TB, but Mr. Kelly remains vigilant in wanting to understand and be informed about his TB diagnosis because although the TB germs become inactive, they remain alive in the body and can become active later.[23]

Even if there is a question about whether Mr. Kelly's diagnosis would lead him to be high-risk or not, the trial courts have generally *not* required that a detainee actually be classified as high-risk as a prerequisite to granting release from detention. Under §3142(i), the question is whether

---

[16] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical- conditions.html.

[17] *See* "Coronavirus Disease 2019 People Who Are At Higher Risk," *available at* https://www.cdc.gov/ coronavirus/2019-ncov/need-exh·a-precautions/people-at-higher-risk.html.

[18] *Id*. See footnote 1.

[19] *See* https://www.cdc.gov/tb/publications/faqs/qa_introduction.htm.

[20] *See* https://onlinelibrary.wiley.com/doi/full/10.1111/crj.12621.

[21] *See* footnote 16.

[22] *See* footnote 16.

[23] *See* https://www.cdc.gov/tb/publications/faqs/pdfs/qa.pdf.

release is necessary for the preparation of the person's defense [or for another compelling reason]. Accordingly, this Court does not even need to reach the issue of how the COVID-19 pandemic is personally affecting Mr. Kelly's health in order to determine that release from custody is appropriate.

Notably, while incarcerated at the MCC, Mr. Kelly begged counsel for an outside evaluation for both his mental and physical state, from his days in the SHU and since he contracted two very serious diseases. In January of 2021, both Mr. Leonard and Mr. Greenberg promised Mr. Kelly that they would have those services provided for him, with the understanding at the time that they would have to be via FaceTime. Mr. Leonard, specifically, took on the role of committing to making those visits happen for Mr. Kelly. After several reminders to Mr. Leonard by both Mr. Kelly and co-counsel, unfortunately for Mr. Kelly's well-being, neither Mr. Leonard, nor the lead attorney Mr. Greenberg followed through with the clients' important requests, which left Mr. Kelly in the dark about both his mental and physical state.

The extraordinary burdens imposed by the coronavirus pandemic restrictions, in conjunction with Mr. Kelly's right to assist in preparing for his own defense, certainly constitute "compelling reasons" that would permit this Court to order the temporary release of Mr. Kelly pursuant to 18 U.S.C. § 3142(i). ("[T]he obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason alone under 18 U.S.C. § 3142(i)").

The circumstances as they exist now will continue to exist into the foreseeable future. The climate of the case as it stands now makes it impossible for not only Mr. Kelly to assist in his defense, but for his attorneys to appropriately prepare for his very quickly approaching jury trial. Mr. Kelly has received no assistance given the fact that he is illiterate and has difficulty reading and writing.

### IV.  CONCLUSION

For the foregoing reasons, Mr. Kelly respectfully submits that he should be released to prepare his defense for the impending trial now scheduled to begin on August 9, 2021.

>Respectfully submitted,
>
>By: ____/s/_____
>Thomas A. Farinella
>Nicole Blank Becker
>*Counsel for Robert S. Kelly*