EAG/NS/MCM
F. # 2019R00029

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ROBERT SYLVESTER KELLY,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 19–CR-286 (S-3)

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTION IN LIMINE TO
ADMIT CERTAIN UNCHARGED ACTS

JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201

Elizabeth Geddes
Nadia Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 1

I.  ALLEGED RACKTEERING ACTS ............................................................................ 5

    A.  Bribery related to Jane Doe #1 ........................................................................ 5

    B.  Jane Doe #2 ...................................................................................................... 5

    C.  Jane Doe #3 ...................................................................................................... 6

    D.  Jane Doe #4 ...................................................................................................... 6

    E.  Jane Doe #5 ...................................................................................................... 7

    F.  Jane Doe #6 ...................................................................................................... 8

II.  Overview of the Government's Evidence of the Defendants' Other Acts ...................... 10

    A.  Sexual Abuse of Jane Doe #1, a Minor ......................................................... 10

    B.  Sexual Abuse of Jane Doe #7, a Minor ......................................................... 11

    C.  Sexual Abuse of Jane Doe #8, a Minor ......................................................... 11

    D.  Sexual Abuse of Jane Doe #9, a Minor ......................................................... 12

    E.  Sexual Abuse of Jane Doe #10, a Minor ....................................................... 12

    F.  Exposure of Jane Does #11 and #12 to A Sexually Transmitted Disease ................. 14

    G.  Sexual Abuse of Jane Doe #13, a Minor ....................................................... 15

    H.  Sexual Abuse of John Doe #1, a Minor ......................................................... 15

    I.  Unlawful Imprisonment of Jane Doe #14 ...................................................... 16

    J.  Threats toward Employee #1 and Hush Payments towards Jane Doe #15 ................. 16

    K.  Physical and Psychological Abuse of Jane Doe #16 and Jane Doe #17 ..................... 18

    L.  Physical and Psychological Abuse of Jane Doe #18 .................................... 18

    M.  Threats toward Jane Doe #6 and Others ....................................................... 20

    N.  Threats to Jane Doe #19 ................................................................................. 25

O. Bribery of Cook County Clerk ................................................................. 25

P. The Existence of Kelly's Prior Criminal Case in Cook County, Illinois ................... 26

Q. Kelly's Efforts to Obtain Child Pornography ........................................... 27

R. Audio Recordings of Physical Abuse and Threats ....................................... 28

ARGUMENT ............................................................................... 30

I. Evidence of Other Acts Is Admissible to Establish the Racketeering Enterprise and Its Means and Methods ..................................................................... 30

A. Legal Standard .................................................................... 30

B. Analysis ......................................................................... 32

II. Certain Evidence of Other Acts is Directly Relevant to and Inextricably Intertwined with the Evidence of the Charged Crimes ............................................... 34

A. Legal Standard .................................................................... 34

B. Analysis ......................................................................... 36

III. Evidence of the Defendants' Other Acts Is Also Admissible Pursuant to Federal Rule of Evidence 404(b) ...................................................................... 38

A. Legal Standard .................................................................... 39

B. Analysis ......................................................................... 41

C. The Probative Value of the "Other Crimes" Evidence Far Outweighs Any Prejudicial Effect ............................................................................ 42

IV. Evidence of the Defendant's Sexual Assault of  other victims Is also Admissible under Rule 413 ........................................................................... 43

1. The Defendant is Charged with Sexual Assault ................................... 48

2. Evidence of Other Sexual Assaults Are Admissible Under Rule 413 ................. 49

V. THE VICTIMS IDENTIFIED IN THE OTHER ACTS EVIDENCE DESCRIBED ABOVE SHOULD BE PERMITTED TO TESTIFY USING, AND BE REFERRED TO BY, THEIR FIRST NAME ONLY OR PSEUDONYMS at trial ................................... 50

CONCLUSION ............................................................................. 52

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its motion in limine to admit at trial evidence of certain acts by the defendant Robert Kelly. Specifically, the government seeks to admit evidence of uncharged (i) sexual abuse of minors; (ii) unlawful imprisonment; (iii) hush payments; (iv) use of physical and psychological harm to obtain sexual and other services; (v) threatening conduct; (vi) physical abuse; and (vii) bribery.  As demonstrated below, the evidence of these acts is admissible as evidence of the charged racketeering offense.  In addition, certain of the evidence of these other acts is directly relevant to and inextricably intertwined with the evidence of the charged crimes.  In the alternative, evidence of these other acts is also admissible under Rules 404(b) and 413 of the Federal Rules of Evidence.

## STATEMENT OF FACTS

On June 20, 2019, a grand jury in the Eastern District of New York (the "EDNY grand jury") returned a five-count indictment charging the defendant Robert Sylvester Kelly with racketeering, in violation of Title 18, United States Code, Section 1962(c), among other crimes.  On July 10, 2019, the EDNY grand jury returned a superseding indictment, adding a forfeiture allegation.  On December 5, 2019, the EDNY grand jury returned a superseding indictment, adding an additional predicate racketeering act to the racketeering offense.  On March 12, 2020, the EDNY grand jury returned a third superseding indictment (the "Indictment"), removing one predicate racketeering act (former racketeering act eight), adding three other racketeering acts, and adding four substantive counts.

Count One of the Indictment, charging racketeering, alleges an enterprise consisting of the defendant Robert Sylvester Kelly, also known as "R. Kelly," and individuals who served as managers, bodyguards, drivers, personal assistants and runners for Kelly, as well as members of Kelly's entourage (the "Enterprise"). (Ind. ¶ 1). The Indictment further alleges that the Enterprise "constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the [E]nterprise," and that the Enterprise engaged in, and its activities affected, interstate and foreign commerce. (Id.). The purposes of the Enterprise were to promote R. Kelly's music and the R. Kelly brand, to recruit women and girls to engage in illegal sexual activity with Kelly and to produce pornography, including child pornography. (Id. ¶ 2). By promoting R. Kelly's music and the R. Kelly brand, the members of the Enterprise expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise. (Id.).

In connection with the Enterprise, Kelly and other members of the Enterprise traveled throughout the United States and abroad to perform at concert venues, to promote the R. Kelly brand and to recruit women and girls to engage in illegal sexual activity with Kelly. (Id. ¶ 3). When Kelly attended and performed at concerts and other events, Kelly and/or members of the Enterprise on Kelly's behalf invited women and girls backstage and to other events following Kelly's live performances. (Id. ¶ 4). These women and girls were often offered wristbands that signified that they were authorized to attend an event. (Id.). There, Kelly relied upon members of the Enterprise to ensure that only those authorized to attend were allowed at the event and to manage the flow of women and girls who were directly interacting with Kelly. (Id.). When Kelly identified a woman or girl who he wished

2

to see again, he either gave his contact information to the woman or girl or obtained her contact information or relied upon members of the Enterprise to do so.  (Id. ¶ 5).  Following these events, Kelly communicated with certain of these women and girls by telephone, including through the use of traditional telephone calls, text messages, iMessages and FaceTime.  (Id.).  As part of this communication, Kelly often requested that the women and girls provide him with photographs of themselves.  (Id.).

Kelly and other members of the Enterprise also arranged for the women and girls to travel to see Kelly on occasion, including at concerts throughout the United States and related events.  (Id. ¶ 6).  To facilitate their travel, Kelly directed the women and girls to contact a member of the Enterprise, who then arranged travel for the women and girls.  (Id.).  When the women and girls arrived at the lodging, which was typically selected by a member of the Enterprise, a member of the Enterprise usually provided them with instructions.  (Id.).  In addition, members of the Enterprise took steps to ensure that the women and girls did not interact with other women and girls whom Kelly planned to see.  Members of the Enterprise then arranged for the women and girls to attend his concerts and positioned them such that Kelly could see them during his concerts.  (Id.).

Kelly promulgated numerous rules that many of his sexual partners were required to follow, including the following:

- The women and girls were not permitted to leave their room without receiving permission from Kelly, including to eat or go to the bathroom;

- The women and girls were required to wear baggy clothing when they were not accompanying Kelly to an event or unless otherwise instructed by Kelly;

3

- The women and girls were not permitted to look at other men and instead were told to keep their heads down; and

- The women and girls were required to call Kelly "Daddy."

(<u>Id.</u> ¶ 7).

Among the means and methods by which Kelly and his associates participated in the conduct of the affairs of the Enterprise were the following:

- Committing, attempting and aiding and abetting the commission of crimes and conspiring to commit crimes, including but not limited to engaging in sexual activity with girls under 18 years old, engaging in and facilitating sexual activity without disclosing a sexually transmitted disease Kelly had contracted, producing child pornography, bribery, extortion, coercion and blackmail;

- Demanding absolute commitment to Kelly and not tolerating dissent;

- Obtaining sensitive information about sexual partners and members and associates of the Enterprise to maintain control over them;

- Creating embarrassing and degrading videos of sexual partners to maintain control over them;

- Recruiting and grooming sexual partners for Kelly; and

- Isolating women and girls from friends and family and making them dependent on Kelly for their financial wellbeing.

(<u>Id.</u> ¶ 9).

I.      ALLEGED RACKTEERING ACTS

       The indictment alleges racketeering acts related to six women identified as Jane Doe #1 through Jane Doe #6 in the Indictment.  The alleged conduct is described below.

       A.      Bribery related to Jane Doe #1

       Racketeering Act One alleges that Kelly, together with others, engaged in bribery in violation of Illinois law.  In or about 1994, Kelly caused an enterprise member to pay $500 to get a state employee to create a state identification card for Jane Doe #1, then 15 years old, so that Kelly and Jane Doe #1 could get married and Jane Doe #1 could not be forced to testify against him (given the spousal privilege).  Records from Cook County in Illinois show that on August 30, 1994, an application was granted for Kelly and Jane Doe #1 to be married and that they were in fact married on August 31, 1994.  The marriage application and record, marriage license, and certification of marriage all state that Jane Doe #1 was 18 at the time, when in fact she was 15 years old.

       B.      Jane Doe #2

       Racketeering Act Two alleges that Kelly, together with others, enticed and coerced Jane Doe #2, a minor, to engage in sexually explicit conduct and then visually recorded such conduct.  The defendant met Jane Doe #2 in or about 1999, when she was 16 years old, after another member of the Enterprise approached her at a fast-food restaurant and informed her the defendant wished to speak with her.  Thereafter, while Jane Doe #2 was a minor under 18 years old, the defendant filmed their sexual intercourse on multiple occasions, thereby creating child pornography, using materials that had been mailed, shipped and transported in interstate and foreign commerce.

C.    <u>Jane Doe #3</u>

Racketeering Acts Three and Four allege that Kelly, together with others, unlawfully imprisoned and sexually assaulted Jane Doe #3 without her consent.  In or about and between 2003 and 2004, Jane Doe #3 met Kelly at a mall outside the state of Illinois when she was in her early 20s and working as a radio station intern.  The defendant thereafter invited Jane Doe #3 to travel to Chicago, Illinois, purportedly to conduct an interview of him.  Following her arrival in Chicago, Jane Doe #3 was directed to a recording studio.  Once there, she was escorted to a room within the studio by one of the defendant's associates, who also took and searched her suitcase.  Later, while in the room, another associate made a copy of Jane Doe #3's driver's license, directed her to sign what she believed to be a nondisclosure agreement, and advised her not to talk to anyone and to keep her head down. Jane Doe #3 ultimately spent approximately three days in the room, which was locked, without sustenance.  After a member of the Enterprise provided her with food and a drink, she became tired and dizzy.  She woke up some time thereafter to the defendant with her in the bedroom in circumstances made it apparent that he had sexually assaulted her while she was unconscious.

D.    <u>Jane Doe #4</u>

Racketeering Acts Five through Seven allege that Kelly, together with others, enticed Jane Doe #4, a minor, to engage in illegal sexual activity, made a visual recording of such sexual activity and used force and threats of force to obtain sexual services from the minor.  In or about May 2009, when Jane Doe #4 was 16 years old and the defendant was in his early 40s, the defendant began a sexual relationship with Jane Doe #4 in violation of Illinois law, which ultimately lasted for a period of months.  During this time period, on

6

multiple occasions, the defendant produced sexually explicit photographs and videos of Jane Doe #4 engaging in sexual intercourse and sexual contact with the defendant and others at his direction.

In the course of their relationship, the defendant also engaged in a scheme, plan and pattern intended to cause Jane Doe #4 to believe that, if she did not perform certain sexual acts on him and others at his direction, she or her family members would suffer serious harm. The defendant engaged in a pattern of both physical and psychological abuse when Jane Doe #4 disobeyed his sexual directives, including slapping, choking, and isolating her in rooms for days at a time with no access to food, which caused Jane Doe #4 to believe such punishments would occur if she did not acquiesce and perform sexual acts she did not want to perform. In addition, the defendant caused Jane Doe #4 to write and sign letters and other documents containing false information that, if released, could cause reputational harm to both her and her close family members as an additional means to exert control over her.

In January 2010, Jane Doe #4 left Kelly and retained Lawyer #1, an individual whose identity is known to the government, to represent her. On behalf of Jane Doe #4, Lawyer #1 thereafter negotiated a financial settlement with Kelly, in exchange for which Jane Doe #4 agreed to not further discuss her relationship with Kelly.

E.    <u>Jane Doe #5</u>

Racketeering Acts Eight through Eleven allege that Kelly, together with others, enticed Jane Doe #5, a minor, to engage in illegal sexual activity, made a visual recording of such sexual activity and used force and threats of force to obtain sexual services from the minor. (Counts Two through Five charge the defendant with standalone crimes involving certain of that conduct as to Jane Doe #5.) In or about 2015, Jane Doe #5, a minor

7

and aspiring music artist, met the defendant after attending one of his concerts.  Thereafter, at the defendant's suggestion, Jane Doe #5 began traveling on a consistent basis with the defendant while he was on tour, at the defendant's direction, purportedly to learn about the music business, including to various locations in California while Jane Doe #5 was under 18 years old.

In or about April and May 2015, while in California, the defendant engaged in sexual activity with Jane Doe #5, without divulging to her that he had contracted an infectious venereal disease, namely herpes, in violation of California law.  In October 2015, while Jane Doe #5 was a minor, he persuaded, induced and coerced Jane Doe #5 to travel to California to engage in sexual activity with the defendant, in violation of California law.

As with Jane Doe #4, the defendant engaged in a pattern of both physical and psychological abuse when Jane Doe #5 disobeyed his directives, including spanking and isolating her in rooms for days at a time with no access to food, which caused Jane Doe #5 to believe such punishments would occur if she did not acquiesce and perform sexual acts she did not want to perform.  As a result of Kelly's course of coercive conduct, the defendant was able to successfully coerce Jane Doe #5 into engaging in sexual activity with numerous other women at Kelly's direction and on occasion with another man, identified below as John Doe #2.  In addition, the defendant caused Jane Doe #5 to write and sign letters and other documents containing false information that, if released, could cause reputational harm to both her and her close family members as an additional means to exert control over her.

F.    Jane Doe #6

Racketeering Acts Twelve through Fourteen allege that Kelly, together with others, enticed Jane Doe #6 to engage in illegal sexual activity and used force and threats of

8

force to obtain sexual services from Jane Doe #6.  (Counts Six through Nine charge the

defendant with standalone crimes involving certain of that conduct as to Jane Doe #6.)  Jane

Doe #6 met the defendant following an R. Kelly concert that she attended when she was 19

years old, at which time the defendant provided Jane Doe #6 with his telephone number.

Thereafter the two communicated by telephone.  In May 2017, at the defendant's direction,

Jane Doe #6 contacted another member of the Enterprise, one of the defendant's assistants, to

arrange travel to and accommodations in New York to attend an R. Kelly concert in Long

Island, New York.  Following the concert, Jane Doe #6 returned to her hotel room.  In the

early morning hours, the defendant unexpectedly arrived at Jane Doe #6's room and loudly

announced his presence.  Ultimately, at the defendant's direction, the encounter became

sexual in nature and the two engaged in intercourse.  The defendant did not use a condom.

Prior to the intercourse, the defendant did not divulge to Jane Doe #6 that he had contracted

herpes, an infectious venereal disease, in violation of New York law.  Notably, during the

encounter in the hotel room, the defendant told Jane Doe #6, in sum and substance, that if she

was really 15 or 16 years old, she could tell him, suggesting he would have preferred for Jane

Doe #6 to be younger.

Thereafter, the defendant arranged and paid for Jane Doe #6 to travel to

various locations throughout the United States to see him, including in January 2018 to Los

Angeles, California.  During this trip, Jane Doe #6 went to a recording studio in Los Angeles

to see the defendant.  Once at the studio, Jane Doe #6 waited for many hours in a room,

without sustenance, for the defendant to arrive.  After briefly seeing him, the defendant did

not show up again until the following day.  After he arrived the following day, the defendant

took Jane Doe #6 into a smaller area/room and instructed Jane Doe #6 to take off her

clothing.  Jane Doe #6 noticed a gun in the room, which the defendant moved to a piece of furniture nearby.  He then proceeded to ask Jane Doe #6 a series of questions, warning her there would be consequences if she lied.  Given the surrounding circumstances, Jane Doe #6 believed she was not free to leave the room.  Thereafter, the defendant directed Jane Doe #6 to give him oral sex in the room.  (When agents executed a search warrant at the defendant's residence on July 11, 2019, they found a holster and ammunition.)

The defendant arranged for Jane Doe #6 to travel a final time to see him in February 2018 in New York City.  While in New York, the defendant engaged in sexual activity with Jane Doe #6, again without divulging to her that he had contracted an infectious venereal disease, in violation of New York law.  Jane Doe #6 stopped seeing the defendant following this trip and ultimately learned that she had contracted an infectious venereal disease during the course of her relationship with the defendant.  Medical records confirm that the defendant had an infectious venereal disease during the course of his sexual activity with Jane Doe #6.

II.     OVERVIEW OF THE GOVERNMENT'S EVIDENCE OF THE DEFENDANTS' OTHER ACTS

A.     Sexual Abuse of Jane Doe #1, a Minor

As described above, Kelly is charged in Racketeering Act One with bribery of a state employee to create a state identification card for Jane Doe #1, then 15 years old, so that Kelly and Jane Doe #1 could get married and Jane Doe #1 could not be forced to testify against him (given the spousal privilege).  The government seeks to introduce evidence regarding Kelly's sexual abuse of Jane Doe #1 to prove his motive for engaging in this racketeering act.

When Kelly met Jane Doe #1, she was a minor and the niece of his manager at the time. At the time, Jane Doe #1 was a promising young singer and Kelly thereafter began to write and produce music for Jane Doe #1. While Jane Doe #1 was still a minor, Kelly began a sexual relationship with her and, in August 1994, when Jane Doe #1 was 15 years old, Kelly believed Jane Doe #1 had become pregnant. As a result, in an effort to shield himself from criminal charges related to his illegal sexual relationship with Jane Doe #1, Kelly arranged to secretly marry her to prevent her from being compelled to testify against him in the future. Given Jane Doe #1's age, the bribery charged in Racketeering Act One was necessary to effectuate the marriage.

B.     Sexual Abuse of Jane Doe #7, a Minor

In or about 1991, when she was approximately 15 years old, Jane Doe #7, an individual whose identity is known to the government, met Kelly at his apartment in Chicago, Illinois. Jane Doe #7 had been invited by a female acquaintance, who was also a minor, to come to Kelly's apartment with her. Two other minor females also came to the apartment with them. While at the apartment, Kelly initiated and engaged in sexual intercourse with Jane Doe #7. Jane Doe #7 also saw Kelly engaged in sexual encounters with other minors she went to Kelly's apartment with.

Jane Doe #7 later became employed by Kelly as, among other things, a back-up dancer. During the course of her time with Kelly, Jane Doe #7 observed Kelly engaged in sexual contact with Jane Doe #1, a minor.

C.     Sexual Abuse of Jane Doe #8, a Minor

In or about September 1994, Jane Doe #8, a 17-year-old girl and an individual whose identity is known to the government, attended a concert in Florida where Kelly

performed.  After the concert, members of the Enterprise directed Jane Doe #8 and a friend

of hers to go backstage to meet Kelly and Jane Doe #8 obtained Kelly's autograph.  While

Jane Doe #8 was backstage, Kelly, who was not wearing a condom, vaginally penetrated her

with his penis, in violation of Florida law.  A pamphlet signed by Kelly containing a

reference to Jane Doe #8 and a room number corroborates Jane Doe #8's encounter with

Kelly.

D.     Sexual Abuse of Jane Doe #9, a Minor

In or about 1995, Kelly met Jane Doe #9, a 17-year-old girl and an individual

whose identity is known to the government, at a Florida mall and thereafter commenced a

sexual relationship with her, in violation of Florida law.  On one occasion, Jane Doe #9

laughed at a joke by one of Kelly's associates and Kelly immediately summoned her outside

and slapped her across the face for having done so.  During their relationship, Jane Doe #9

contracted herpes and disclosed her diagnosis to Kelly, who did not admit to having herpes.

At the time of her diagnosis, Jane Doe #9 was only sexually active with Kelly.

E.     Sexual Abuse of Jane Doe #10, a Minor

In or about July 2001, Jane Doe #10, an individual whose identity is known to

the government who was then 16 years old, attended an R. Kelly concert.  Prior to the

concert, a member of the Enterprise gave Jane Doe #10 and her friend backstage passes so

they could meet Kelly following the concert.  After the concert, Jane Doe #10 and her friend

met Kelly backstage and took a photo with him.  As they were leaving, another member of

the Enterprise told Jane Doe #10 that Kelly wanted to see her again and provided her with a

piece of paper with Kelly's cell phone number and his hotel room number on it, and advised

Jane Doe #10 to call the phone number in an hour.  Thereafter, Jane Doe #10 called the

number and Kelly invited her to come to his hotel room.  Jane Doe #10 subsequently went to the hotel room with her friend.  When they arrived, Kelly was there with multiple other people.  Kelly subsequently took Jane Doe #10 to the bathroom, closed the door and immediately exposed himself, signaling that he wanted Jane Doe #10 to give him oral sex, which she did.  Jane Doe #10 and her friend subsequently left.  The next morning, Jane Doe #10 returned to Kelly's hotel room and the two engaged in sexual contact.

Thereafter, Jane Doe #10 communicated with Kelly by phone and, through another member of the Enterprise, Kelly made arrangements and paid for Jane Doe #10 to travel to Chicago to see him.  In or about December 2001, while Jane Doe #10 was 16 years old, Jane Doe #10 travelled to Chicago to Kelly's recording studio.  Upon her arrival, an employee directed Jane Doe #10 to an office where Kelly was.  Kelly immediately told Jane Doe #10 to pull down her pants and turn around.  Jane Doe #10 did not initially comply with Kelly's direction.  In response, Kelly became angry and yelled at her.  Jane Doe #10 felt intimidated and did as Kelly directed.  Thereafter, Kelly asked Jane Doe #10 for her ID and she showed it to him.  Kelly thereafter directed Jane Doe #10 to give him oral sex, which she did.  In April 2003, when Jane Doe #10 was no longer a minor, Jane Doe #10 saw Kelly again and engaged in sexual intercourse with him.

In or about 2004, based on information she received from another individual, Jane Doe #10 became concerned that Kelly may have videotaped their sexual encounter in his hotel room when she was 16 years old and that such a videotape had been disseminated.  In an effort to learn whether such a videotape existed, Jane Doe #10 contacted Lawyer #1, who had represented individuals who had sued Kelly previously.  Thereafter, Jane Doe #10 engaged the services of Lawyer #1.  Kelly ultimately reached a financial settlement with Jane

Doe #10 in which he paid a substantial sum to Jane Doe #10 and Lawyer #1.  The settlement agreement included a nondisclosure provision, which purportedly would prevent Jane Doe #10 from reporting Kelly's conduct to law enforcement.[1]

F.    Exposure of Jane Does #11 and #12 to A Sexually Transmitted Disease

Jane Doe #11, an individual whose identity is known to the government, met Kelly when she was an adult and had a consensual sexual relationship with Kelly beginning in 2001.   Prior to engaging in sexual activity with Kelly, Jane Doe #11 tried to ask Kelly whether he had any sexually transmitted diseases and he demurred; Kelly did not wear a condom while engaging in sexual activity with Jane Doe #11.  Jane Doe #11 later learned that she had contracted herpes and believed she had contracted it from Kelly.  In or about 2003, Jane Doe #11 retained Lawyer #1 and reached a $250,000 settlement with Kelly.  Jane Doe #11 advised that her friend, Jane Doe #12 - who is now deceased - also reached a $250,000 settlement with Kelly based on a similar claim.  As part of the settlement, Jane Doe

---

[1]    But see Quinio v. Alaa, 344 F. Supp. 3d 464, 476 (E.D.N.Y. 2018) ("Courts throughout the country have found that the public policy interest at stake[,] the reporting of possible crimes to the authorities[,] is one of the highest order and is indisputably well defined and dominant in the jurisprudence of contract law.") (internal quotation marks omitted); see also Branzburg v. Hayes, 408 U.S. 665, 696–97 (1972) (stating that "it is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy" and concluding that "[i]t is apparent ... that concealment of crime and agreements to do so are not looked upon with favor"); Lachman v. Sperry–Sun Well Surveying Co., 457 F.2d 850, 853 (10th Cir. 1972) ("It is public policy in Oklahoma and everywhere to encourage the disclosure of criminal activity"); Cosby v. American Media, Inc., 197 F. Supp. 3d 735, 742 (E.D. Pa. 2016) (settlement agreement unenforceable as being against public policy "to the extent that [it] purports to prevent its signatories [alleged victims of sexual assault] from voluntarily disclosing information about crimes to law enforcement authorities").

#11 believed that she was not permitted to disclose to anyone, including law enforcement, her claims about Kelly.

G.     Sexual Abuse of Jane Doe #13, a Minor

In March 2006, Kelly met Jane Doe #13, a 15-year-old girl and an individual whose identity is known to the government, at a concert and arranged to meet her the following day.  Upon meeting her, Kelly asked her whether she was a "virgin" and thereafter commenced a sexual relationship with her.  Kelly arranged for a member of the Enterprise – one of his bus drivers – to drive Jane Doe #13 several hours within Florida and otherwise arranged for her air travel to Kelly's residence in Chicago, Illinois.  Telephone records, emails and bank records corroborate Kelly's relationship with Jane Doe #13 beginning when she was 15 years old.

H.     Sexual Abuse of John Doe #1, a Minor

In or about December 2006, Kelly met John Doe #1, a 17-year-old boy and an individual whose identity is known to the government, at a local McDonalds and invited him to attend a party at his residence in Chicago, Illinois.  John Doe #1, along with his mother and stepfather, attended the party.  When Kelly saw John Doe #1 with his family members, Kelly advised him to come without them to the next gathering.  Thereafter, Kelly invited John Doe #1 into his studio under the guise of helping and mentoring John Doe #1 with his musical aspirations.  Kelly also asked John Doe #1 what he was willing to do to succeed in the music business and clarified that he wanted John Doe #1 to engage in sexual contact with Kelly.  With that backdrop, Kelly then engaged in sexual contact with John Doe #1, in violation of Illinois law.  John Doe #1 thereafter introduced Kelly to, among others, John Doe #2, a close male friend who was then 16 or 17 years old and whose identity is known to

15

the government, and Kelly sought to establish a sexual relationship with John Doe #2.

(Several years later, Kelly started a sexual relationship with John Doe #2 and required his

girlfriends, including Jane Doe #5, to have sex with John Doe #2 upon his command and

often filmed those encounters.  Kelly sometimes paid John Doe #2 after sexual encounters

with him.)  Kelly also directed John Doe #1 and others to engage in sexual contact with each

other and filmed those encounters.  Telephone records corroborate Kelly's relationship with

John Doe #1 and John Doe #2, beginning when both were 17 years old.   John Doe #1 also

introduced Kelly to girlfriends of John Doe #1.

     I.    <u>Unlawful Imprisonment of Jane Doe #14</u>

     In 2008, Kelly met Jane Doe #14, a woman in her 20s whose identity is known

to the government, and arranged for her to travel to Kelly's residence in Chicago, Illinois,

where they began a sexual relationship.  During her last trip to Chicago to see Kelly, she was

left in a room for a long period of time and she became worried.  She told a member of the

Enterprise – an individual on Kelly's "security" team – that she wanted to leave and that

individual said they would figure it out (but did not allow her to leave just then).  The

following morning, she overheard Kelly yelling and sounds of a physical assault.  Jane Doe

#14 again contacted Kelly's security team, but this time said that she was going to call the

police if not permitted to leave.  Only then did a member of Kelly's security team come to

the room where she was staying, escort her out of the room and take her to the airport.

     J.    <u>Threats toward Employee #1 and Hush Payments towards Jane Doe #15</u>

     In 2009, Kelly met Jane Doe #15, an aspiring singer who was 17 years old and

whose identity is known to the government, through a talent manager who – years later –

became an employee of Kelly, identified herein as Employee #1.  Kelly paid for Jane Doe

#15's lodging at a hotel nearby his residence in Olympia Fields, Illinois, purportedly so that Kelly could mentor and assist her with her music career and Jane Doe #15 could use the studio at his residence to record music.  Jane Doe #15 ceased her relationship with Kelly when she was 18 years old, went to the hospital where she confided to a nurse that Kelly had sexually abused her, filed a police report and retained an attorney, Lawyer #1, to represent her in a possible lawsuit against Kelly.  Kelly thereafter told Employee #1, in sum and substance, that Jane Doe #15 was attempting to sue Kelly for engaging in a sexual relationship with her, that Employee #1 needed to decide whether she was on "Team Kelly" or "Team [Jane Doe #15]" and that Employee #1, who was based in Atlanta at the time, needed to travel to Chicago immediately.  At Kelly's direction, Employee #1 traveled to Chicago, where Kelly told Employee #1, in substance, "you have to be careful in these situations because people end up going missing," a comment Employee #1 construed as a threat to her and her family.  Shortly thereafter, a member of the Enterprise – one of Kelly's employees – told Employee #1 that she had to go to downtown Chicago with him but did not provide any information regarding precisely where they were going or for what purpose. Upon their arrival in downtown Chicago, Employee #1 was dropped off at Kelly's lawyer's office, where the lawyer presented her with a prepared typewritten affidavit to sign. Employee #1 did not read the affidavit in full but saw that it said, inter alia and in substance, that she did not see Kelly have sex with Jane Doe #15, provide Jane Doe #15 with alcohol or slap Jane Doe #15.  Employee #1 reported that she signed the affidavit without carefully reading it because she feared that harm would come to her or her family if she did not.  Bank records show that Kelly paid Lawyer #1 and that Lawyer #1 then paid nearly $400,000 to Jane Doe #15.  Jane Doe #15 has repeatedly declined to meet with law enforcement.

17

K.    <u>Physical and Psychological Abuse of Jane Doe #16 and Jane Doe #17</u>

In or about 2001, Kelly met Jane Doe #16, who was then 16 or 17 years old and whose identity is known to the government, and commenced a multi-year sexual relationship with Jane Doe #16.  In or about May 2009, Kelly met Jane Doe #17, who was then 17 years old and whose identity is known to the government, and commenced a multi-year sexual relationship with Kelly.  Both women remained with Kelly until at least in or about 2017.  Kelly regularly spanked Jane Doe #16 and Jane Doe #17 when he perceived that they had violated one of his rules.  He also directed Jane Doe #16 and Jane Doe #17 to write numerous letters containing falsehoods and embarrassing allegations for Kelly to use at his discretion if and when the need arose.  In addition, witnesses saw Kelly subject Jane Doe #17 to particularly extreme punishment, which included loss of her cellular telephone, violent assaults and deprivation of food and the ability to leave her room.  Jane Doe #16 and Jane Doe #17 also engaged in sex with Kelly and John Doe #2, an individual otherwise unknown to either of them, at Kelly's direction, which interactions were often filmed.  The government recovered various letters written by Jane Doe #16 and Jane Doe #17, including certain ones that appear to contain falsehoods.

L.    <u>Physical and Psychological Abuse of Jane Doe #18</u>

In or about 2016, Jane Doe #18, whose identity is known to the government, met Kelly at one of his concerts when she was approximately 20 years old after one of Kelly's associates approached her and told Jane Doe #18 that Kelly wanted to meet her.  In or about 2016, Jane Doe #18, started a sexual relationship with Kelly.  Kelly regularly punished Jane Doe #18 in various ways when she violated his rules.  For example, Kelly violently spanked, hit and kicked Jane Doe #18 on multiple occasions.  At times, Kelly also

instructed Jane Doe #18 to text Kelly that she liked being spanked after administering the spankings as punishment.  In addition to the spankings, Kelly ordered Jane Doe #18 to walk back and forth in high heels for long stretches of time, repeating as she walked what he deemed she had done wrong, as a punishment.  At a concert in November 2017, Kelly became enraged with Jane Doe #18 because he suspected she had been communicating with another man and grabbed Jane Doe #18 and broke her necklace, cutting her neck.  Kelly then made her go back to the hotel where she was staying and write a note stating that she had attacked Kelly.  Kelly dictated to her what he wanted her to write in the note.  When she finished the note, Kelly directed Jane Doe #18 to give him the note for his future use.

On other occasions, Kelly slapped Jane Doe #18 because he believed she was looking at or talking to other men in violation of his rules.  In addition, during their relationship, Jane Doe #18 signed a non-disclosure agreement and, at Kelly's direction, wrote letters in which she wrote embarrassing falsehoods, and witnessed others write similar letters.  The government recovered various letters written by Jane Doe #18, including certain ones that contain falsehoods, which were dictated to her by Kelly so that he could use the letters against her at a later date.  Kelly also directed Jane Doe #18 to make recordings of herself engaged in compromising and disparaging acts and making certain statements at his instruction, and to provide those recordings to him.  The contents of those recordings, which would cause Jane Doe #18 embarrassment and reputational harm if disseminated to others, were thus available for Kelly's use at a time of his choosing.  At Kelly's direction, Jane Doe #18 also engaged in sex with Kelly and others, including Jane Doe #5 and John Doe #2, an individual otherwise unknown to her, which Kelly regularly recorded.

19

M.    Threats toward Jane Doe #6 and Others

In or about the fall of 2018 continuing through January 2020, Kelly and other members of the Enterprise, including Donnell Russell, Russell's mother, and an individual working on Kelly's behalf, used coercive tactics to attempt to convince Jane Doe #6 to abandon a civil lawsuit she had filed against Kelly and to stop speaking publicly about Kelly. They did so by conveying to Jane Doe #6 that they had maintained compromising photographs of her, which could be released at any time, and then releasing certain such photographs publicly via a Facebook page called "Surviving Lies" and during interviews Russell conducted on YouTube.[2]  Specifically, following the filing of a civil lawsuit on behalf of Jane Doe #6 against Kelly, in November 2018, the lawyer who filed the lawsuit for Jane Doe #6 received a typewritten letter signed by Kelly.  Enclosed with the letter were portions of the civil complaint filed on behalf of Jane Doe #6 with the following stamp affixed: "I DO NOT ACCEPT THIS OFFER TO CONTRACT AND I DO NOT CONSENT TO THESE PROCEEDINGS," with Kelly's handwritten signature and a State of Illinois Notary stamp and signature for Russell's mother, an individual whose identity is known to the government, and two pieces of paper that contained images and typewritten text.  Among the images were text message exchanges between Kelly and Jane Doe #6, as well as photographs of Jane Doe #6 that were apparently cropped to not disclose certain body parts, but which nonetheless included portions of Jane Doe #6's exposed buttocks and breast.

---

[2]      On or about August 13, 2020, Donnell Russell was arraigned on a complaint charging him with stalking of Jane Doe #6 and an immediate family member of Jane Doe #6, in violation of 18 U.S.C. 2261A(2)(B), for this conduct.  On October 8, 2020, a grand jury in the Eastern District of New York returned an indictment charging Russell with the same offense.

Beneath those photographs was text including "I assure you this would not be considered a Sunday go-to-meeting dress.  The next two pictures have been cropped for the sake of not exposing her extremities to the world, yet!!!"  As described further below, in recorded statements live-streamed over YouTube in late January 2019, Donnell Russell stated that he wrote the commentary that accompanied the photographs, that Kelly had signed the letter, and that he had participated in sending these documents "to the lawyer."

Notably, a judicially-authorized search of Kelly's Apple iPhone seized at the time of his federal arrest revealed that, on the morning of October 26, 2018, Kelly sent the photographs of Jane Doe #6 and text message exchanges between Jane Doe #6 and Kelly that were included in the November 2018 mailing to Donnell Russell's mother via MMS messages.  Later that same day, Russell's mother sent a text message to Kelly that said, "Question: Do you have a way of sending me one more picture showing her phone number at the top? I'm going to print it and include it, along with the other 3 and include them in the letter to her attorney. Do you agree that she should really know her client??? ☺"  Kelly thereafter responded with a text message stating, inter alia, "I'm going to get you more."

United States Postal Service ("USPS") records indicate that the mailing described above was sent by certified mail from Chicago, Illinois, on November 20, 2018, and received at the lawyer's address in Brooklyn, New York on November 26, 2018.  USPS records for the certified mail return receipt associated with the mailing indicate that the destination address for the return receipt was 219 N. Justine Street, Chicago, Illinois 60607-1403 – the address of a warehouse rented and used as, inter alia, a recording studio by Kelly at the time.

21

In November and December 2018, Donnell Russell was in telephone and email communication with an individual, whose identity is known to the government, who offered to work on Kelly's behalf including as a behind-the-scenes publicist for Kelly (the "Publicist"). Among other things, in early December 2018, Russell sent emails to the Publicist including, among other things, the same photographs of Jane Doe #6 described above. On December 4, 2018, using the alias "Colon Dunn," and the email address colondunn@yahoo.com, Russell sent an email with the subject line "The Survivors Exposed" to various individuals employed by A&E Networks, which owns Lifetime Entertainment Services. Lifetime produced a documentary series featuring various of Kelly's accusers entitled "Surviving R. Kelly," which aired on the Lifetime TV network in early January 2019. On the evening of December 4, 2018, Lifetime was to hold a private screening of a portion of the documentary at a theater in Manhattan, however, the screening was interrupted by a gun threat that was communicated by telephone to the theater. The December 4, 2018 email from "Colon Dunn" attached a PDF (the "Survivors PDF") that included photographs and purported derogatory information related to various of Kelly's accusers who appear in the Surviving R. Kelly documentary series, including Jane Doe #4 and Jane Doe #6, including the same photographs of Jane Doe #6's partially exposed breast and buttocks that were sent to Jane Doe #6's lawyer in November 2018. That same day, Russell forwarded this email to the Publicist.

Jane Doe #6 and her mother traveled to New York City to attend the December 4, 2018 "Surviving R. Kelly" premiere. The premiere was interrupted and police arrived and evacuated the theater where it was being held. Jane Doe #6 later learned that a threat had been made to the theater, which resulted in the evacuation. Thereafter, Jane Doe

#6 returned to her hotel and encountered the Publicist.  The Publicist told Jane Doe #6 that she worked for Kelly and they needed to talk.  Ultimately, Jane Doe #6 and her mother agreed to meet with the Publicist at a nearby restaurant.  At the meeting, the Publicist was accompanied by a male individual with a gun on his person that Jane Doe #6 believed to be the Publicist's "bodyguard."[3]  During the meeting, the Publicist showed Jane Doe #6 nude photographs of Jane Doe #6 and suggested that Kelly would release the photographs publicly if Jane Doe #6 continued to speak about Kelly.  Jane Doe #6 recognized the photographs as photographs that had been taken by Kelly during her relationship with him.

On December 21, 2018, Russell sent a series of text messages to Jane Doe #6 and her mother, which included the text "Just a sample.  We will seek criminal charges. You've been warned," followed by photographs of portions of the Survivors PDF, including the same photographs of Jane Doe #6 included in the November 2018 mailing to Jane Doe #6's lawyer.  Thereafter, inter alia, Russell sent Jane Doe #6 and her mother text messages stating, "Publishing soon" and "[T]his is Colon.  My investigation will be done soon enough."  On January 3, 2019, Russell sent another text message stating, "Pull the plug or you will be exposed."

---

[3]     Records from Spirit Airlines indicate that the Publicist traveled from Florida to LaGuardia airport with her cousin, Michael Williams, on the morning of December 4, 2018. Notably, on August 11, 2020, Williams was arrested on a complaint charging him with witness intimidation and arson for setting fire to a car parked in the driveway of Jane Doe #5's residence at the time.  Williams was subsequently indicted by a grand jury in the Eastern District of New York on the same charges and thereafter pleaded guilty to arson. During a search of the hotel room Williams was staying in at the time of his arrest, law enforcement agents recovered a loaded 9mm Hi-Point handgun with an obliterated serial number in a black holster.

On January 7, 2019, at 02:42:01 UTC,[4] Russell – using the "Colon Dunn" alias – created a Facebook page called "Surviving Lies."  Facebook deactivated the Surviving Lies Facebook page on January 7, 2019, at 20:44:17 UTC after posts targeting Jane Doe #6 and another of Kelly's accusers were posted on the page by Russell.  Those postings included photographs of text message exchanges between Jane Doe #6 and Kelly and photographs of Jane Doe #6 included in the November 2018 mailing to Jane Doe #6's lawyer.  Following Facebook's deactivation of the page, Facebook issued a statement indicating that the page violated Facebook's Community Standards and had been removed, adding "We do not tolerate bullying or sharing other's private contact information and take action on content that violates our policies as soon as we're aware."

On January 25, 2020, Russell appeared in a video interview live-streamed on YouTube.  During the interview, Russell introduced himself as Kelly's "advisor, consultant [and] friend" and indicated that he had known Kelly for "going on 30 years now."  Thereafter, during the interview, Russell discussed Jane Doe #6 and the lawsuit she had filed, holding up copies of items that had been sent to Jane Doe #6's lawyer, including the photographs of Jane Doe #6 described above.  While holding up one of the pages with photographs of Jane Doe #6 to the camera, Russell stated "That's my commentary at the bottom."  On January 26, 2020, Russell appeared in another video interview live-streamed on YouTube.  During the interview, Russell again held up copies of items that had been sent to Jane Doe #6's lawyer, including the photographs of Jane Doe #6 described above.  While

---

[4]      In January 2019, UTC time was five hours ahead of Eastern Time and six hours ahead of Central time.

holding up these items, Russell stated: "we sent" these documents "to the lawyer."  Russell further stated "these are the pictures of her [Jane Doe #6] that we sent.  These are the texts messages of her that we sent."  Referring to a document in the mailing, Russell stated that Kelly "signed it."[5]

N.     <u>Threats to Jane Doe #19</u>

In or about November 2018, Kelly summoned Jane Doe #19, a former girlfriend of Kelly and whose identity is known to the government, to travel interstate to Chicago, Illinois.  Once in Chicago, Kelly made Jane Doe #19 provide her driver's license to an assistant to photocopy and sign a non-disclosure agreement.  Kelly also told Jane Doe #19 that she needed to decide which team she was on, "Team Kellz" or the other one, and that she had a beautiful family and she did not want to be "handled," a comment that Jane Doe #19 construed as a threat.  Finally, during that encounter, Kelly had Jane Doe #19 write a text message to Kelly containing falsehoods.

O.     <u>Bribery of Cook County Clerk</u>

In February 2019, following the release of the Surviving R. Kelly docuseries, the commencement of multiple investigations by law enforcement authorities, and the filing of criminal charges earlier that month in Cook County, Illinois, one then member of Kelly's

---

[5]     Russell's statements during these YouTube interviews are admissible at trial because they constitute a portion of the very conduct constituting the ongoing interstate stalking of Jane Doe #6 and her mother.   In addition, the statements are admissible as statements against Russell's penal interest under Fed. R. Evid. 804(b)(3) and as statements in furtherance of the racketeering conspiracy and a conspiracy to commit interstate stalking of Jane Doe #6 and her mother, in violation of 18 U.S.C. §§ 371 and 2261A(2), under Fed. R. Evid. 801(d)(2)(E). The statements are clearly relevant and the danger of unfair prejudice does not outweigh their probative value.

inner circle, who billed himself as Kelly's crisis manager (the "Crisis Manager"), told Kelly

that he had "two people" who "know a lot" and told Kelly to "figure out what you can do for

them," suggesting these individuals were open to being bribed.  In response, Kelly stated,

"What you do, man, is write something on a piece of paper and give me what I should tip the

bailiff.  What I should tip the, uh, the valet.  Like when my uncle come up here and say 'Rob,

the valet guy, he parked the car over there.'  I say, 'So what should I give him?'  He say,

'Well, 20, 30, 30 dollars.'  I gave him 30 dollars.  So what I'm saying is I don't know that

number."  Later in the same conversation, the Crisis Manager told Kelly that he had paid a

clerk in Cook County $2,500 and procured a "burner" telephone for the clerk in order to

obtain information about Kelly's legal trouble, stating "That's done . . . You don't know

nothing."  Kelly responded, "Exactly."  A recording of this conversation was recovered

pursuant to a judicially-authorized search of Kelly's phone.

      P.    <u>The Existence of Kelly's Prior Criminal Case in Cook County, Illinois</u>

        The government seeks to introduce limited evidence regarding the existence of

Kelly's prior criminal case in Cook County, Illinois, and an attempt to influence the jury in

that case.  Specifically, in June 2002, Kelly was charged in Cook County, Illinois, with child

pornography offenses related to a videotape of a female engaged in sexual activity.  After

multiple delays, jury selection began in or about May 2008.  In or about May 2008, John Doe

#1 alerted Kelly that he had access to a juror and Kelly told John Doe #1 to come to his

residence.  When John Doe #1 came to his residence, he advised Kelly – in front of Kelly's

attorneys – about the juror and Kelly's attorneys advised against contacting the juror.

Shortly thereafter, Kelly, outside the presence of his attorneys, specifically requested that

John Doe #1 make contact with the juror and tell the juror that Kelly was a "good guy."  The case ultimately went to trial in June of 2008 and Kelly was acquitted on all charges.

The government seeks to introduce evidence of the existence and general nature of the case – including the nature of the charge, its duration and Kelly's acquittal – through a certified (and redacted) copy of the case summary/docket sheet for the case and limited testimony from witnesses to explain, provide context for, and situate testimony regarding other events and matters, including the information from John Doe #1 described above, as well as Kelly and the Enterprise's use of certain protocols, including the timing of the collection of identification documents from victims and others (in some circumstances) and the use of nondisclosure and settlement agreements.

Q.   Kelly's Efforts to Obtain Child Pornography

Jane Doe #5 is expected to testify that, during the course of her relationship with Kelly, Kelly directed her to obtain child pornography involving boys for him.  At Kelly's direction, Jane Doe #5 searched the internet for pornography involving younger-looking males and screen-recorded such pornography for Kelly's use.  Jane Doe #5 believed the pornography that she found on the internet and downloaded for Kelly actually involved individuals who were 18 or older given the websites on which she found the videos.  A judicially-authorized search of digital media recovered from Kelly's residence corroborates Jane Doe #5's account.  The following videos were recovered from the device:

- IMG_0002.MP4: Video from "TwinksBare.com" titled "Amateur Bareback Twinks Fucking Raw," which shows two young males initially wearing children's underwear and kissing. They then expose their genitalia and perform oral sex on each other and engage in anal sex and masturbation, including on and against a child's bunk bed. During the video, a scrolling graphic on top indicates that the video was uploaded to WWW.XVIDEOS.COM. The video is approximately 10 minutes long

and appears to have been captured on a "screen recording" on the device using the app "RECGO" on May 26, 2019. File information for the video on the device also indicates that the file was created on the device on May 26, 2019.

- IMG_0096.MP4: Video from "Asian-Slave-Boy.com" showing a young Asian male tied to a bed with underwear on, while a man caresses his body. In the video, the man exposes and thereafter touches the male's genitalia.  According to the file information for the video on the device, the file appears to have been created on the device on June 22, 2019.

- IMG_0042.MP4: Video from "FAMDICK.com" showing man on a sofa with a young male. Initially, the young male is fully clothed in what appear to be pajamas while the man is in underwear and an undershirt. Eventually, the man exposes the male's buttocks, has the male give him oral sex, and engages in anal sex with the male. The file information for the video on the device indicates that the file was created on the device on June 12, 2019.

The government has been unable to confirm the identity or ages of the individuals appearing in these videos.

R.     Audio Recordings of Physical Abuse and Threats

Finally, the government seeks to introduce excerpts of two audio recordings recovered pursuant to a search warrant, both of which show the physical and psychological abuse Kelly employed to maintain control over women and girls with whom he was engaged in sexual relationships and Kelly's regular use of audio and video recordings to maintain control.

One video recording shows two women in a room laying in a bed and engaging in casual conversation.  At some point in the recording, Kelly enters the room, accuses one of the women of lying and begins to physically assault the woman.  Notably, the video appears to have been taken by a stationary camera mounted somewhere in the room.

In the other recording, Kelly berates, threatens and physically assaults Jane Doe #20, a woman whose identity is known to the government who commenced a sexual relationship with Kelly when she was 18 years old and who Kelly believed stole from him:

> There's only one way you're gonna get rid of this.  For me to trust your ass again.  You're gonna do the fuck I tell you to do.  When you made the fuckin tape for me and I looked at that shit, you was hiding your fucking face all over that shit because you didn't want to be seen.  I told you to fucking trust me.  And here it is I can't fucking trust you.  You're the one who's fucking untrustworthy.   I'm a loyal man.  Shut the fuck up.  You're gonna do that shit for me for fuckin' free.  And you ain't gonna hide your fucking face on me.  You're gonna do what the fuck I tell you to do and you're gonna do it fuckin right.  Then I'm gonna gain my fuckin trust back with your ass.  If I even detect you trying to hide on that shit, I'm gonna blow this shit the fuck up.  Do you hear this shit I'm telling you.  I fucking raised your ass.  I raised you.   … [UI] fucking murdered for doing shit like this.  Shut up.  Shut the fuck up.  You're gonna do this shit fucking right.  You're gonna gain my fucking trust because you fucking owe me that, you hear me.  You fucking understand me?  …. You gonna do what the fuck I tell you to do to gain my moth]er fucking trust.  You better not ever in my mother fucking life take from me again or I will be in Florida and something will happen to you.  You understand what I'm telling you. …
>
> Now you go to that fucking garage.  You chill there until you hear from me.  You understand me.  You take your fuckin phone.  You don't call no mother fucking body. And I will know if you did.  You can go in the closet.  You can go wherever you gonna go, but I'm gonna know if you did.  You come over here for something to eat.  Or you call to me.  And that's the fuck it.  Until I tell you can go back in that room.  Okay?  Do you hear me? … Go to the garage right the fuck now.  When I come and get you this time, you better be fucking like you're supposed to fuckin' be.  And you know you held back on that tape, now don't you? … You're not going to do that no more.  You bet the fuck not.  Go to the fucking garage.  Hear me? … You're not gonna tape until I tell you.  When I tell you, I don't give a fuck if you're coming out of your sleep.  You better be fucking ready.  Do you

> understand?  I better feel like you asked me to do. … You make
> no fucking calls except the studio or me.

During the recording transcribed in part above, Kelly is overheard physically assaulting Jane

Doe #20, who Kelly claims he "raised" after he accuses her and she admits stealing from

him.  Also on the recording, he expressly threatened her that he would "be in Florida and

something [would] happen to her" if she stole from him again and commented that people

get "murdered" for doing what she did.  Finally, Kelly is overheard directing the woman to

"go in the closet" and to go to the "garage" and stay there until he gives her further

instructions and instructing her that she would need to re-record something at his direction.

## ARGUMENT

The government moves <u>in limine</u> for the admission of evidence pertaining to

the acts set forth above.  First, the evidence of these acts is admissible as direct evidence of

the charged racketeering offense.  Second, evidence of many of these other acts is directly

relevant to and inextricably intertwined with the evidence of the charged crimes.  In the

alternative, evidence of the defendants' bad acts is also admissible under Rules 404(b) and

413 of the Federal Rules of Evidence.

## I.   EVIDENCE OF OTHER ACTS IS ADMISSIBLE TO ESTABLISH THE RACKETEERING ENTERPRISE AND ITS MEANS AND METHODS

### A.   Legal Standard

A racketeering offense is not simply the commission of two or more predicate

acts, because, as the Second Circuit has explained, "it is neither the enterprise standing alone

nor the pattern of racketeering activity by itself which RICO criminalizes, but [r]ather, the

combination of these two elements[.]"  <u>United States v. Pizzonia</u>, 577 F.3d 455, 463 (2d Cir.

2009) (citation and internal quotation marks omitted).  In addition, it is well-settled that, "to

demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved

but, rather, the relationship that they bear to each other or to some external organizing

principle that indicates whether they manifest the continuity required to prove a pattern[.]"

Id. at 465 (emphasis added; citation and internal quotation marks omitted).  Put another way,

"a RICO pattern may not be established without some showing that the racketeering acts are

interrelated and that there is continuity or a threat of continuity; . . . racketeering acts that are

not widely separated in time or space may nonetheless, given other evidence of the threat of

continuity, constitute a RICO pattern."  United States v. Indelicato, 865 F.2d 1370, 1381 (2d.

Cir. 1989).

        As a result, the Second Circuit has repeatedly held that evidence of "other" or

"uncharged" crimes is admissible to establish the existence of the enterprise and its means

and methods.  For example, in United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003), the

Second Circuit held: "It is well settled that in prosecutions for racketeering offenses, the

government may introduce evidence of uncharged offenses to establish the existence of the

criminal enterprise."  Id. (upholding district court's admission of sixteen uncharged

robberies).  Moreover, crimes committed in furtherance of the racketeering enterprise – even

where not alleged as racketeering acts – do not fall within the ambit of Rule 404(b).  See

United States v. Coiro, 922 F.2d 1008, 1017 (2d Cir. 1991) (continuity established where a

corrupt attorney's bribery of public officials and money laundering spanning approximately

four months was part of a long term drug enterprise that engaged in other unlawful activities

that was likely to continue "absent outside intervention"); United States v. DiNome, 954 F.2d

839, 843 (2d Cir. 1992) (evidence of uncharged murders admissible to prove relationship and

continuity of RICO enterprise's illegal activities); United States v. Diaz, 176 F.3d 52, 79 (2d

Cir. 1999) (admission of evidence that members of the Latin Kings Street gang, the RICO enterprise, committed uncharged drug trafficking and crimes of violence on behalf of the Latin Kings "to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering by each defendant-appellant").

> B.   Analysis

First, as described below, each of the above-described uncharged acts are integral to proving the existence and nature of the Enterprise charged in this case. Specifically, such evidence is admissible as proof of, inter alia, the activities, purpose and means of the Enterprise; the defendant's role in the Enterprise; and proof that the alleged predicate racketeering acts constitute a "pattern of racketeering activity."

The other acts evidence the government seeks to admit – Kelly's sexual abuse of minors, Kelly's use of physical harm and threats of physical harm on his victims, the unlawful imprisonment of women, the use of extortionate and coercive tactics to exert and maintain control over his victims and employees and bribery – all are evidence of the existence of the Enterprise, its purposes, means and methods, the pattern of racketeering and specifically the relatedness of the racketeering acts and the threat of their continuity.  For example, Kelly's abuse of Jane Doe #1, Jane Doe #7, Jane Doe #8, Jane Doe #9, Jane Doe #10, Jane Doe #13 and John Doe #1, all minors at the time the abuse and attempted abuse began, is evidence that his abuse of Jane Doe #2, Jane Doe #4 and Jane Doe #5, also minors, were not isolated events and were part of a larger pattern.  Kelly's direction to Jane Doe #5 to obtain child pornography for his use also demonstrates Kelly's motive and intent with respect to the charged minor victims, Jane Doe #1, Jane Doe #7, Jane Doe #8, Jane Doe #9, Jane Doe #10, Jane Doe #13 and John Doe #1 (as well as his control over Jane Doe #5).

Tactics to unlawfully imprison women and girls to ensure their availability for Kelly at Kelly's demand (such as the uncharged act involving Jane Doe #14 and the alleged racketeering act involving Jane Doe #3) are evidence of the Enterprise itself and its means and methods.

Similarly, Kelly's physical and psychological abuse of Jane Doe #16, Jane Doe #17, Jane Doe #18 and Jane Doe #20  and threats toward Employee #1, Jane Doe #19 and Jane Doe #20 all tend to show that the similar abuse of Jane Doe #4, Jane Doe #5 and Jane Doe #6 was part of an overarching pattern employed by Kelly and members of the Enterprise.  Along with the threats to expose embarrassing photographs of Jane Doe #6, it is also evidence of the means and methods of the Enterprise, that is, the use of physical assaults and threats of physical, psychological and reputational harm – including coercion, extortion, and blackmail – in an attempt to obtain total control over both victims and employees and ensure their strict adherence to Kelly's demands and to maintain and promote Kelly's stature in the music industry, and the continued operation of the Enterprise.  The threats against Jane Doe #6 are also an example of the Enterprise's use of the pornography facilitated and created by the Enterprise (the creation of which is one of the charged purposes of the Enterprise) to coerce and blackmail victims and others, and not simply for Kelly's sexual gratification. Given that multiple witnesses will testify regarding Kelly's filming of them in the nude and while engaged in sexual encounters (as well as other compromising and embarrassing situations) at his direction, the existence of such videos within the defendant's possession and under his control resulted in an ever-present fear and threat that such compromising material could be disseminated to others or more broadly released.  Like the notes and letters containing embarrassing information, including falsehoods, that the defendant directed many

of his victims to write, the defendant's creation and retention of such material allowed for its use to control, coerce, extort, and blackmail victims, including as a means to ensure their silence.  Similarly, payments to women and girls in exchange for their silence was also part of the means and methods of the Enterprise; as described above, Kelly and members of his inner circle negotiated financial settlements with multiple women and girls, including Jane Doe #4, Jane Doe #10, Jane Doe #11, Jane Doe #12 and Jane Doe #15, in exchange for their silence, thereby helping to ensure the continued existence of the Enterprise.  Finally, evidence of the discussion between the defendant and the Crisis Manager regarding bribery is probative of the required continuity component and tends to show the horizontal relatedness of the bribery charged in Racketeering Act One.  See United States v. Alkins, 925 F.2d 541, 551-53 (2d Cir. 1991) (the requisite continuity may be established against a defendant through evidence of uncharged crimes by other members of the enterprise not charged in the indictment).

II.   **CERTAIN EVIDENCE OF OTHER ACTS IS DIRECTLY RELEVANT TO AND INEXTRICABLY INTERTWINED WITH THE EVIDENCE OF THE CHARGED CRIMES**

For the following reasons, certain evidence of other acts is also direct evidence of, and inextricably intertwined with, the evidence of the charged offenses and thus admissible to complete the story of the charged crimes.

A.   Legal Standard

It is well settled that "'evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of

the crime on trial.'"  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting

United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); see also United States v.

Towne, 870 F.2d 880, 886 (2d. Cir. 1989) (same).

   The Second Circuit has repeatedly upheld the admission of uncharged act

evidence as direct evidence of the charged crimes where such evidence provides necessary

background or context for the charged crimes.  See United States v. Gonzalez, 110 F.3d 936,

941-42 (2d Cir. 1997) (uncharged burglary admissible in trial for felon in possession of a

firearm because, inter alia, it provided "crucial background evidence that gave coherence to

the basic sequence of events that occurred on the night" of defendants' arrest); United States

v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be

admitted "to provide the jury with the complete story of the crimes charged by demonstrating

the context of certain events relevant to the charged offense"); United States v. Langford,

990 F.2d 65 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts

committed prior to the time charged in the indictment to prove the existence of the alleged

conspiracy as well as to show its background and history."); United States v. Pitre, 960 F.2d

1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the

background of the conspiracy charged, to complete the story of the crimes charged, and to

help explain to the jury how the illegal relationship between participants in the crime

developed.").  In this respect, "trial court[s] may admit evidence that does not directly

establish an element of the offense charged, in order to provide background for the events

alleged in the indictment.  Background evidence may be admitted to show, for example, the

circumstances surrounding the events or to furnish an explanation of the understanding or

intent with which certain acts were performed." United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).

B.    Analysis

Evidence of certain of the other acts described above are so intricately intertwined that they are "necessary to complete the story of the crime on trial[.]"  Carboni, 204 F.3d 44.  First, evidence regarding Kelly's illegal sexual relationship with Jane Doe #1, a minor he believed he had impregnated, is necessary to establish his motive, intent and plan, among other things, for engaging in the bribery conduct charged in Racketeering Act One.

Jane Doe #9's testimony that she advised Kelly that she had contracted herpes from Kelly and Jane Doe #11 and Jane Doe #12's lawsuits against Kelly as a result of their contention that he exposed them to herpes, all constitute evidence of Kelly's knowledge that he had herpes, an incurable sexually transmitted disease, and could transmit it to others, both elements that the government will need to prove at trial to establish Racketeering Acts Eight, Twelve and Fourteen and Counts Six through Eight.  Additionally, Jane Doe #5 heard and saw Kelly inflict physical assaults on Jane Doe #16, Jane Doe #17 and Jane Doe #18 and evidence of such assaults therefore helps to explain, in part, how the defendant maintained control over Jane Doe #5.  Similarly, Kelly's and other Enterprise members' efforts to threaten Jane Doe #6 and her mother with the exposure of embarrassing photographs of her is evidence of Kelly's regular recording of his interactions with Jane Doe #6 (as she will testify) and is part of Kelly's attempts at maintaining control over Jane Doe #6, as well as the existence of the Enterprise and the lengths to which Kelly and other Enterprise members went to protect the Enterprise.  Kelly's threats toward Employee #1 also help to explain her evolving relationship with Kelly and how Kelly maintained control over Enterprise members.

Limited evidence regarding the existence of Kelly's prior Cook County criminal case, the nature of the charged crimes (sexual exploitation of a minor), the case's duration (approximately six years), and his ultimate acquittal after trial is also inextricably intertwined with evidence of the charges crimes and evidence regarding the existence, and evolving means and methods of, the Enterprise.  For example, the government expects that certain witnesses will testify about changes in the protocols used by certain employees in an effort to protect the Enterprise following the initiation of the prior criminal case and during its lengthy pendency.  It is also inextricably intertwined with Kelly and other members of the Enterprise's use of certain methods, including the collection of identification documents and the use of nondisclosure agreements and settlement agreements, as well as threats, coercion and extortion, to prevent women and girls from reporting his conduct to law enforcement authorities.  Additionally, evidence related to the facts underlying the charge, including the fact that a video of the defendant engaging in sexual activity with a minor was widely and publicly disseminated, is relevant to the defendant's knowledge and intent with respect to the charged crimes to show that the defendant understood the consequences of his actions when he filmed underage girls, including Jane Doe #4 and Jane Doe #5 (i.e., that such videos could be disseminated) and that his purpose of having sex with these minor victims was, at least in part, for the purpose of producing such a visual depiction and not by accident or mistake.

In addition, the nature of the charges is relevant background to explaining why the defendant told many of his victims that he would be giving certain items, including some of the letters containing falsehoods, to his lawyers for safe-keeping.  The fact of the charges is also relevant background to explain why John Doe #1 told the defendant that he had access to a juror, a fact that the government should be permitted to front by eliciting on direct

examination, rather than waiting for the defendant to elicit as impeachment material on cross examination.

The nature of the charges and the fact of the defendant's acquittal are also necessary background to explain why many victims of his abuse initially failed to report to law enforcement the abuse.  A failure to report is a common theme among victims of sexual and domestic abuse, and particularly so in scenarios as here where the abuser - the defendant - is a prominent public figure with an active fan base.  Indeed, a victim's failure to report will likely be raised by the defendant during cross-examination in support of an argument that the victims' testimony with respect to Kelly's conduct is fabricated.  But the failure to report - and instead seek a civil settlement or simply to remain silent - is readily explained by the fact that the defendant was once charged with sexually exploiting a minor, there was a video widely believed to feature the defendant with a minor and the jury acquitted him.  Thus the 2008 charges and the acquittal are necessary background to help explain why some of his victims long opted against reporting his conduct.  Nor is the probative value substantially outweighed by the risk of unfair prejudice, given that he is charged with the same type of charges here and the fact of his acquittal in the prior Cook County case will be introduced at trial.  See Fed. R. Evid. 403.

III.   EVIDENCE OF THE DEFENDANTS' OTHER ACTS IS ALSO ADMISSIBLE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)

In the alternative, the government seeks to admit evidence of the other acts described above pursuant to Federal Rule of Evidence 404(b).

A.    <u>Legal Standard</u>

Evidence of uncharged crimes or "other acts" may also be admitted pursuant to Rule 404(b) for permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  Fed. R. Evid. 404(b)(2); <u>see</u> <u>United States v. Ortiz</u>, 857 F.2d 900, 903 (2d Cir. 1988).  Rule 404(b) evidence is only admissible if, under Rule 403, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice or by considerations of judicial economy such as the needless presentation of cumulative evidence.  <u>Id.</u>

The Second Circuit has established a three-prong test for the admission of "other crimes" evidence under Rule 404(b).  First, a trial court must determine that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity.  <u>See</u> <u>United States v. Pitre</u>, 960 F.2d 1112, 1119 (2d Cir. 1992); <u>United States v. Mickens</u>, 926 F.2d 1323, 1328 (2d Cir. 1991).  Second, the trial court must determine that the evidence is relevant under Rules 401 and 402 of the Federal Rules of Evidence and that its probative value is substantially outweighed by the danger of unfair prejudice.  <u>See</u> <u>Pitre</u>, 960 F.2d at 1119; <u>Mickens</u>, 926 F.2d at 1328.  Third, the court must provide an appropriate limiting instruction to the jury, if one is requested.  <u>See</u> <u>Pitre</u>, 960 F.2d at 1119.

While the government "must explain in detail the purposes for which the evidence is sought to be admitted," <u>United States v. Levy</u>,731 F.2d 997, 1002 (2d Cir. 1984) (internal citation omitted), the Second Circuit has emphasized that Federal Rule of Evidence 404(b) is a rule of broad reach and liberal application.  <u>Id.</u> ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove

propensity, it is admissible.").  To the extent that evidence of an uncharged crime is offered to prove knowledge or intent (i.e., state of mind), the law requires that the other act and the charged conduct be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated by the proponent of the evidence," else it would not be relevant.  United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994) (quoting United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987) (internal quotation marks omitted)); see also United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (prior arrest for small amount of cocaine base street-level distribution sufficiently similar to prove knowledge and intent for charged crime of possession of large amount of powder cocaine in residence); United States v. Araujo, 79 F.3d 7, 8 (2d Cir. 1996) (explaining similarity rule for knowledge and intent proof is "simply a rule of relevance").

Finally, additional bases for admitting other acts evidence under Rule 404(b) include "corroborat[ing] crucial prosecution testimony" if the corroboration is "direct and the matter corroborated is significant," United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted), and, where cross-examination into a government witness's bad acts for impeachment purposes is anticipated, allowing the government to elicit the witness's testimony about such acts on direct examination so as to avoid the appearance that the government is concealing such purported impeachment evidence from the jury, see, e.g., United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).

Here, the government offers evidence of the defendant's participation in uncharged acts not to show propensity but rather, as explained below, as evidence of the defendant's knowledge, intent and common scheme or plan, as well as his modus operandi.

B.    Analysis

Evidence of the defendant's sexual abuse of Jane Doe #1, Jane Doe #7, Jane Doe #8, Jane Doe #9, Jane Doe #10, Jane Doe #13 and John Doe #1, all minors, should be admitted for the proper purpose of establishing a common scheme or plan used by the defendant, as well as his modus operandi.  In United States v. Larson, 112 F.3d 600, 603 (2d Cir. 1997), the Second Circuit affirmed the defendant's conviction for sexual molestation of a minor, in which the district court permitted the introduction of testimony related to uncharged sexual conduct where the defendant had used similar methods of enticing his victims with, among other methods, sporting equipment and alcohol because such evidence demonstrated a common scheme or plan.  Similarly, here, the defendant used two separate common schemes to recruit his victims.  Sometimes, he relied upon a member of his inner circle to select the victim (upon Kelly's direction) such as how he identified Jane Doe #9 and Jane Doe #13, and Jane Doe #5 and Jane Doe #6.  Other times, the defendant lured minors to his orbit by promising to mentor them in the music world, such as how he lured John Doe #1 and Jane Doe #5, or – in the case of Jane Doe #1 – by in fact writing and producing music for her.  See United States v. Baker, 82 F.3d 273, 276 (8th Cir. 1996) (finding district court properly admitted 404(b) evidence of a "remarkably similar series of prior actions" showing the defendant's common plan or scheme).  This evidence, along with the evidence regarding Kelly's direction to Jane Doe #5 to obtain child pornography for his use and the nature of his prior criminal case in Cook County, Illinois (as described above), is also admissible to prove the defendant's motive to carry out the alleged crimes, and his knowledge and intent (i.e., state of mind) in doing so, all permissible uses of other acts evidence.

C.   The Probative Value of the "Other Crimes" Evidence Far Outweighs Any
Prejudicial Effect

Finally, the probative value of the other acts evidence is not substantially

outweighed by its prejudicial effect.  Evidence of other crimes is admissible when offered for

a proper purpose through various types of evidence, including witness testimony, so long as

the evidence "'[does] not involve conduct any more sensational or disturbing than the

crime[] with which [the defendant has been] charged.'"  Pitre, 960 F.2d at 1120 (quoting

United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)). Where the uncharged

crimes are similar in nature to the charged crimes, Rule 404(b) evidence is admissible under

the Rule 403 balancing test.  See United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999)

(upholding admissibility of evidence that the defendant, a police officer charged with

engaging in excessive use of force with an arrestee, choked another arrestee on the basis that

"the evidence did not involve conduct more inflammatory than the charged crime, and the

district court gave a careful limiting instruction"); Paulino, 445 F.3d at 223 (prior cocaine

convictions admissible as proof that the defendant was aware that substance in his closet was

cocaine; observing that evidence admissible pursuant to Rule 404(b) should not be excluded

on grounds of unfair prejudice where the evidence does not "involve conduct more

inflammatory than the charged crime[s]").

As noted above, the evidence relating to the other criminal acts listed above

will come primarily from the testimony of victim witnesses and, with respect to the threats

against Jane Doe #6, documentary evidence.  Accordingly, the quality of the evidence is no

more prejudicial than that offered with regard to the other charged crimes. More importantly,

the uncharged criminal acts are either similar in nature or less sensational than the charged

42

crimes.  In any event, any potential prejudice to the defendant can be effectively mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.  See, e.g., United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991); United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006) (the law presumes that juries follow limiting instructions).

IV.     EVIDENCE OF THE DEFENDANT'S SEXUAL ASSAULT OF
        OTHER VICTIMS IS ALSO ADMISSIBLE UNDER RULE 413

        A.      Legal Standard

                In a sexual assault case, the admissibility of evidence of a prior sexual assault offense is governed by Rule 413.[6]  The rule provides that in "a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault.  The evidence may be considered on any matter to which it is relevant."  Fed. R. Evid. 413(a).  Rule 413(d) defines "sexual assault" as:

> a crime under federal law or under state law (as "state" is
> defined in 18 U.S.C. § 513) involving: (1) any conduct
> prohibited by 18 U.S.C. chapter 109A; (2) contact, without
> consent, between any part of the defendant's body — or an
> object — and another person's genitals or anus; (3) contact,
> without consent, between the defendant's genitals or anus and
> any part of another person's body; (4) deriving sexual pleasure
> or gratification from inflicting death, bodily injury, or physical

---

        [6]     Rule 413's sister-rule, Rule 414, allows evidence of a defendant's commission of a prior offense of child molestation in a criminal case where the defendant is accused of child molestation.  Rule 415 provides that the evidence covered by Rules 413 and 414 is admissible in civil cases.  The principles governing admission of evidence under these rules is the same.  See, e.g., United States v. Barnason, No. 10 Civ. 3335, 2012 WL 426438, at *8 (S.D.N.Y. Feb. 10, 2012) (noting that "[t]here is a dearth of case law in this Circuit concerning how district courts should apply Fed. R. Evid. 415," and relying on cases interpreting Rule 413 to admit under Rule 415 uncharged acts of sexual assault in a civil case).

> pain on another person; (5) an attempt or conspiracy to engage
> in conduct described in subparagraphs (1)–(4).

Fed. R. Evid. 413(d).

Rule 413 stands as an exception to the general rule barring "the admission of evidence for the purpose of showing a defendant's propensity to commit bad acts."  Fed. R. Evid. 404(a).  Put differently, Rule 413 permits other acts evidence precisely for the purpose of showing a defendant's propensity to engage in the kinds of acts with which he is charged. "Congress enacted [Rules 413-415] because these types of cases [referring to sexual assault cases] often raise questions regarding the victim's credibility and a defendant's prior conduct can be especially probative," and the rules are "'based on the premise that evidence of other sexual assaults is highly relevant to <u>prove propensity</u> to commit like crimes.'"  <u>United States v. Batton</u>, 602 F.3d 1191, 1196 (10th Cir. 2010) (quoting <u>United States v. Enjady</u>, 134 F.3d 1427, 1431 (10th Cir. 1998)); (emphasis added); <u>see also</u> <u>United States v. Davis</u>, 624 F.3d 508, 512 (2d Cir. 2010) (Rules 413 and 414 are an express "exception to the usual proscription against admission of prior crimes to prove the character of a person in order to show action in conformity therewith."); <u>United States v. Seymour</u>, 468 F.3d 378, 384-85 (6th Cir. 2006) ("Rules 413 and 414, enacted in 1995, were designed to 'protect the public from crimes of sexual violence' by permitting 'in sexual assault and child molestation cases . . . evidence that the defendant has committed offenses of the same type on other occasions.'" (quoting 140 Cong. Rec. H8968, H8991 (daily ed. Aug. 21, 1994) (statement of Rep. Molinari)).  These rules apply not just to prior convictions, but even to evidence of uncharged offenses.  <u>See</u> <u>Johnson v. Elk Lake Sch. Dist.</u> ("<u>Elk Lake</u>"), 283 F.3d 138, 151-52 (3d Cir. 2002).

Rule 413 was designed to "supersede in sex offense cases the restrictive aspects of Federal Rule of Evidence 404(b)" and to create a presumption that "evidence admissible pursuant to the proposed rules is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects."  140 Cong. Rec. H968, H8991-92 (1994) (remarks of principal House sponsor, Rep. Molinari); see also 140 Cong. Rec. S12990; David J. Karp, Evidence of Propensity and Probability in Sex Offense Cases and Other Cases, 70 Chi. Kent. L. Rev. 15, 19 (1994). Furthermore, Congress recognized and intended that this approach would make the admission of similar crimes evidence in federal sex offense cases the norm, and its exclusion the exception, even in instances where there is a substantial lapse in time between the charged conduct and the prior acts.  The legislative sponsors noted:

> The practical effect of the new rules is to put evidence of uncharged offenses in sexual assault and child molestation cases on the same footing as other types of relevant evidence that are not subject to a special exclusionary rule.  The presumption is in favor of admission.  The underlying legislative judgment is that the evidence admissible pursuant to the proposed rules is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects.
>
> In line with this judgment, the rules do not impose arbitrary or artificial restrictions on the admissibility of evidence.  Evidence of offenses for which the defendant has not previously been prosecuted or convicted will be admissible, as well as evidence of prior convictions.  No time limit is imposed on the uncharged offenses ... as a practical matter, evidence of other sex offenses by the defendant is often probative and properly admitted, notwithstanding substantial lapses of time in relation to the charged offense or offenses.

140 Cong. Rec. H8992 (1994) (Statements of Rep. Molinari and Senator Dole) (emphasis added); see also 137 Cong. Rec. S3212, S338-3242 (1991); Karp, 70 Chi. Kent L. Rev. at 19.

Evidence of a defendant's prior sexual assault is admissible under Rule 413 where "(1) the defendant is currently accused of an offense of sexual assault; (2) the proffered prior acts evidence is 'of the defendant's commission of another offense . . . of sexual assault,' Fed. R. Evid. 413(a); and (3) the proffered evidence is relevant." Batton, 602 F.3d at 1196 (citing United States v. Guardia, 135 F.3d 1326, 1328 (10th Cir. 1998)); see also Elk Lake, 283 F.3d at 144-56; United States v. Prawdzik, 2008 U.S. Dist. LEXIS 65499, *3-5 (E.D. Pa. Aug. 25, 2008).  With respect to the last prong, it is generally accepted that a defendant with a propensity to commit sexual acts similar to those charged is more likely to have committed the charged act and therefore such evidence is relevant and in conformity with the standards set out in Rules 401 and 402.  Doe v. Glanzer, 232 F.3d 1258, 1268 (9th Cir. 2000); see also Fed. R. Evid. 401 (stating that evidence is relevant if it has a tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); Fed. R. Evid. 402 (stating that only relevant evidence is admissible at trial).

Even where the evidence is determined to be relevant, however, a Rule 403 balancing is appropriate when deciding whether to admit such evidence.  United States v. Awadallah, 436 F.3d 125, 131 (2d Cir. 2006) ("so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice," a Rule 403 determination "will be disturbed only if it is arbitrary or irrational"); United States v. Davis, 624 F.3d 508, 512 (2d Cir. 2010); United States v. Schaffer, 851 F.3d 166, 180 (2d Cir. 2017).  See also United States v. Vickers, 708 Fed. Appx. 732, 736 (2d Cir. 2017).  The Third Circuit's decision in Elk Lake is particularly instructive with regard to the Rule 403 analysis that must take place in this context. The court instructed as follows:

Having concluded that Rule 403 is applicable to Rules 413-15, we now turn to the manner in which the balancing inquiry ought to be performed.  Relying on the legislative history, a number of courts and commentators have concluded that Rule 403 should be applied to Rules 413-15 with a thumb on the scale in favor of admissibility.  See United States v. Larson, 112 F.3d 600, 604 (2d Cir. 1997) ("With respect to the Rule 403 balancing . . . the sponsors [of Rules 413-15] stated that 'the presumption is that the evidence admissible pursuant to these rules is typically relevant and probative, and that its probative value is not outweighed by any risk of prejudice.'") (quoting 140 Cong. Rec. S12,990 (daily ed. Sept. 20,  1994) (Statement of Sen. Dole)); see also United States v. LeCompte, 131 F.3d 767, 769 (8th Cir. 1997) (noting the "strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible").  Indeed, in his speech that is referenced as part of the "authoritative" legislative history of Rules 413-15, David Karp observed that there is "an underlying legislative judgment . . . that the sort of evidence that is admissible pursuant to proposed Rules 413-15 is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse considerations."  Evidence of Propensity, 70 Chi.-Kent L. Rev. at 19.

In our view, this characterization of the role of Rule 403 is overly simplified.  It makes sense when the past act sought to be introduced under Rules 413-15 is demonstrated with specificity, see Enjady, 134 F.3d at 1433 (identifying "how clearly the prior act has been proved" as a factor to be considered in assessing the probative value of evidence of past sexual assaults), and is sufficiently similar to the type of sexual assault allegedly committed by the defendant.  See United States v. Guardia, 135 F.3d 1326, 1331 (10th Cir. 1998) (noting that "the similarity of the prior acts" to the acts at issue in the case is a factor to be considered in determining their probative value).  In these archetypal cases, where the propensity inference that can be drawn from the past act evidence is greatest, Congress surely intended for the probative value of the evidence to outweigh its prejudicial effect, and, conversely, did not want Rule 403 factors such as undue delay, waste of time, confusion of the issues, etc., to justify exclusion.  See, e.g., 140 C.R. 15,209 (1994) (Statement of Rep. Kyl) (recognizing as the archetypal case one in which "there is a clear pattern of conduct by an accused who has been convicted of similar conduct").

In other cases, however, where the past act is not substantially similar to the act for which the defendant is being tried, and/or where the past act cannot be demonstrated with sufficient specificity, the propensity inference provided by the past act is weaker, and no presumption in favor of admissibility is warranted.  Where a past act cannot be shown with reasonable certainty, its probative value is reduced and it may prejudice the defendant unfairly, confuse the issues, mislead the jury, and result in undue delay and wasted time -- all reasons for excluding evidence under Rule 403.  The same can be said of evidence of past acts that are dissimilar to the act for which the defendant is being tried; in particular, the introduction of dissimilar past acts runs the risk of confusing the issues in the trial and wasting valuable time.  Also relevant to the Rule 403 balancing analysis are the additional factors recognized by the Tenth Circuit in Guardia: "the closeness in time of the prior acts to the charged acts, the frequency of the prior acts, the presence or lack of intervening events, and the need for evidence beyond the testimony of the defendant and alleged victim."  135 F.3d at 1330 (internal citations omitted).

Elk Lake, 283 F.3d at 155-56.

      B.      <u>Analysis</u>

      1.      <u>The Defendant is Charged with Sexual Assault</u>

Kelly is currently charged with multiple types of sexual assault.  First, Racketeering Act Four in Count One of the Indictment alleges that Kelly sexually assaulted Jane Doe #3 by engaging in sexual contact without her consent.  See Fed. R. Evid. 413(d)(2) (definition of "sexual assault" includes state law violations involving "contact, without consent, between any part of the defendant's body — or an object — and another person's genitals or anus").  Second, Racketeering Acts Six, Eleven and Thirteen – involving Jane Doe #4, Jane Doe #5 and Jane Doe #6 – allege that the defendant caused them to engage in sexual contact with them by placing them in fear of, <u>inter</u> <u>alia</u>, physical injury, conduct that qualifies as "sexual assault."  See Fed. R. Evid. 413(d)(1) (defining sexual assault to include

state and federal law violations involving "any conduct prohibited by 18 U.S.C. chapter

109A"); 18 U.S.C. 2241 (Chapter 109A includes "caus[ing] another person to engage in a

sexual act . . . by placing that other person in fear that any person will be subjected to death,

serious bodily injury"); 2242(1) (Chapter 109A includes "caus[ing] another person to engage

in a sexual act by threatening or placing that other person in fear (other than by threatening

or placing that other person in fear that any person will be subjected to death, serious bodily

injury, or kidnapping)")

     2.   <u>Evidence of Other Sexual Assaults Are Admissible Under Rule 413</u>

     Because Kelly has been accused of sexual assaults, evidence of other sexual

assaults is plainly admissible under Rule 413.  Specifically, the government intends to

introduce evidence of Kelly's use of physical and psychological coercion as to Jane Doe #17,

Jane Doe #18 and Jane Doe #20 to show Kelly's propensity to carry out such conduct and

therefore as evidence supporting the charged sexual assaults of Jane Doe #4, Jane Doe #5

and Jane Doe #6.

     Nor is evidence of the prior sexual assaults barred by Rule 403.  While the

evidence of the defendant's sexual assaults of Jane Doe #17, Jane Doe #18 and Jane Doe #20

is prejudicial in the sense that it tends to support the government's case, Rule 403 excludes

only evidence where threatened prejudice is both "unfair" and it "substantially" outweighs

the probative nature of the evidence.  See <u>Davis</u>, 624 F.3d at 512 (noting that even "highly

prejudicial" is not necessarily "unfairly prejudicial").  Indeed, the Second Circuit has

instructed courts to apply Rule 403 "less stringently" to evidence proffered under Rule 413.

<u>Barnason</u>, 2012 WL 426438, at *3 (citing <u>Larson</u>, 112 F.3d at 604).  Specifically, the Second

Circuit has noted, "[w]ith respect to the Rule 403 balancing[,] . . . the sponsors [of Rules

49

413-415] stated that '[t]he presumption is that the evidence admissible pursuant to these rules is typically relevant and probative, and that its probative value is not outweighed by any risk of prejudice.'" Larson, 112 F.3d at 604 (quoting 140 Cong. Rec. S12,990 (daily ed. Sept. 20, 1994) (Statement of Sen. Dole)).

Consequently, where, as here, evidence is offered under Rule 413, courts apply Rule 403 with a "thumb on the scale in favor of admissibility." Johnson, 283 F.3d at 155; see also Davis, 624 F.3d at 512 (noting that sexual propensity evidence may be "highly prejudicial" but not necessarily "unfairly prejudicial" and affirming admission of such evidence under Rule 414); Barnason, 2012 WL 426438, at *5 (applying presumption that the probative value of evidence of past sexual assaults is not outweighed by the risk of unfair prejudice). Moreover, it is insufficient for the defendant to allege that the evidence may lead jurors to find the defendant liable not for his abuse of Jane Doe #4, Jane Doe #5 or Jane Doe #6, but of Jane Doe #17, Jane Doe #18 or Jane Doe #20. Such a danger is one that all propensity evidence presents and yet Congress expressly overruled the prior rule that previously excluded it. See United States v. LeCompte, 131 F.3d 767, 769 (8th Cir. 1997) (noting the "strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible" and holding that the district court abused its discretion in excluding under Rule 403 evidence of defendant's prior uncharged sex offenses).

V.    THE VICTIMS IDENTIFIED IN THE OTHER ACTS EVIDENCE DESCRIBED ABOVE SHOULD BE PERMITTED TO TESTIFY USING, AND BE REFERRED TO BY, THEIR FIRST NAME ONLY OR PSEUDONYMS AT TRIAL

For the reasons stated in its first motion in limine filed on July 10, 2021, see ECF No. 121 (which is incorporated herein by reference), the government respectfully submits that the victim-witnesses identified above, namely Jane Doe #8, Jane Doe #10, Jane

Doe #11, Jane Doe #13, Jane Doe #15, Jane Doe #16, Jane Doe #17, Jane Doe #18 and Jane Doe #20 and John Doe #1 and John Doe #2 (the "Victim-Witnesses"), should be permitted to testify using their first names only or pseudonyms and/or should be referred to in this manner by other witnesses and the parties at trial.  As described above, testimony related to these witnesses will consist of highly sensitive and personal testimony concerning their medical history and illegal sexual abuse and contact by the defendant, some of which occurred while most of them were minors.  The limited protections requested by the government for the Victim-Witnesses' personal identifiers are reasonable, necessary and appropriate to protect their safety and well-being, avoid harassment of the Victim-Witnesses by the press and others, and prevent undue embarrassment and other adverse consequences, such as retaliation by the defendant's supporters, need for relocation, or loss of employment.

CONCLUSION

For the reasons set forth above, the government's motion in limine should be

granted.

Dated:    Brooklyn, New York
          July 23, 2021

                                      Respectfully submitted,


                                      JACQUELYN M. KASULIS
                                      ACTING UNITED STATES ATTORNEY
                                      Eastern District of New York
                                      271-A Cadman Plaza East
                                      Brooklyn, New York 11201


                             By:    __/s/_____
                                      Elizabeth Geddes
                                      Nadia Shihata
                                      Maria Cruz Melendez
                                      Assistant United States Attorneys
                                      (718) 254-7000

cc:    Clerk of Court (AMD) (by ECF)
       All defense counsel of record (by ECF)