EAG/NIS/MCM
F. # 2019R00029

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

ROBERT SYLVESTER KELLY,
    also known as "R. Kelly,"

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 19-CR-286 (S-3) (AMD)

<u>MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION IN
LIMINE TO ADMIT CERTAIN EVIDENCE AND PRECLUDE OTHER EVIDENCE
AND ARGUMENTS AT TRIAL</u>

JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201

Elizabeth A. Geddes
Nadia I. Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
   (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motions in limine in advance of trial in this matter, currently scheduled to commence on August 18, 2021.  Specifically, the government seeks (A) to admit (1) certain text messages of, and relating to, the individual identified in the indictment as Jane Doe #5, (2) an electronic note written by Jane Doe #5 (recording statements of the defendant), and (3) newspaper articles written more than 20 years ago; and (B) to preclude the introduction of certain arguments and evidence at trial, including evidence of, cross-examination and/or argument regarding (1) the victims' involvement in other sexual behavior, pursuant to Federal Rule of Evidence 412, (2) certain religious practices of a witness, (3) prior psychological histories of certain witnesses, (4) certain actions of the parents of minor victims, (5) prior good acts of the defendant, and (6) a certain witness's subsequent employment as an exotic dancer several years after her encounter with the defendant.  For the reasons set forth below, the Court should grant the government's motions.

## BACKGROUND

On March 12, 2020, a grand jury in the Eastern District of New York returned a nine-count third superseding indictment (the "Indictment"), charging the defendant with racketeering (18 U.S.C. §§ 1962(c) and 1963), and alleging 14 racketeering acts, including bribery, sexual exploitation of a child, kidnapping, transportation of minors and other individuals for the purpose of engaging in illegal sexual activity, illegal coercion and enticement of individuals and forced labor, as well as violations of the Mann Act, related to the transportation of individuals, including a minor, for the purpose of engaging in illegal sexual activity, and illegal coercion and enticement of individuals, including a minor, in

1

violation of 18 U.S.C. §§ 2421(a), 2422(a) and (b), and 2423(a).  The defendant's alleged

victims are identified sequentially in the Indictment as "Jane Doe #1" through "Jane Doe

#6."  Additionally, in the government's motion to admit other acts evidence, the government

identified additional potential witnesses as Jane Doe #7 through Jane Doe #20 and John Doe

#1 and John Doe #2 (collectively, the "Victims"), and will refer to those witnesses by those

designations herein.

## ARGUMENT

I.      Evidence and Argument Regarding Sexual Behavior of the
        Victims with Anyone Other Than the Defendant or Other Persons
        at His Direction and/or Any Purported Sexual Predispositions of the
        Victims Is Inadmissible Under Federal Rule of Evidence 412

For the reasons described below, the defendant should be precluded from

eliciting on cross examination or otherwise introducing evidence or making arguments as to

the sexual behavior of the Victims with individuals other than the defendant or others at his

direction.

A.      Legal Standard

Federal Rule of Evidence 412 expressly provides that, in a criminal proceeding

involving sexual misconduct, "evidence offered to prove that a victim engaged in other

sexual behavior" or "evidence offered to prove a victim's sexual predisposition" is not

admissible, except in three narrow circumstances. Fed. R. Evid. 412(a).  Rule 412 "aims to

safeguard the alleged victim against the invasion of privacy, potential embarrassment and

sexual stereotyping that is associated with public disclosure of intimate sexual details" and to

"encourage[ ] victims of sexual misconduct to institute and to participate in legal proceedings

against alleged offenders."  Fed. R. Evid. 412 advisory committee note.  The provisions of

Rule 412 apply in a "civil or criminal proceeding involving alleged sexual misconduct."
Fed. R. Evid. 412(a).  See, e.g., United States v. Alvarez, 601 Fed. Appx. 16, at *5 (2d Cir.
Feb. 3, 2015) (applying Rule 412 to exclude evidence of other sexual behavior by an alleged
victim of violations of Title 18, United States Code, Section 2422); United States v. Elbert,
561 F.3d 771, 776 (8th Cir. 2009) (applying Rule 412 to a violation of Title 18, United States
Code, Section 1591 involving minor victims); United States v. Rivera, No. 13-CR-149
(KAM), 2015 U.S. Dist. LEXIS 54326, at *13 (E.D.N.Y. Apr. 24, 2015) (applying Rule 412
to exclude evidence of other sexual behavior by alleged victims of violations of Title 18,
United States Code, Sections 1591 and 2422); United States v. Graham, No. 12-CR-311,
2013 WL 321568, at *1 (W.D.N.Y. Jan. 28, 2013) (applying Rule 412 to preclude evidence
of sex trafficking victims' prostitution both prior to and following the defendant's conduct).

Rule 412 imposes clear limits on a defendant's ability to introduce evidence
that a victim engaged in other sexual behavior or has a propensity to engage in sexual acts.
In the context of criminal cases, the Rule prescribes very limited exceptions to this
inadmissibility:

> The court may admit the following evidence in a criminal case:
> (A) evidence of specific instances of a victim's sexual behavior,
> if offered to prove that someone other than the defendant was
> the source of semen, injury, or other physical evidence;
> (B) evidence of specific instances of a victim's sexual behavior
> with respect to the person accused of the sexual misconduct, if
> offered by the defendant to prove consent or if offered by the
> prosecutor; and (C) evidence whose exclusion would violate the
> defendant's constitutional rights.

Fed. R. Evid. 412(b).  If a defendant intends to introduce evidence of a victim's other sexual
behavior or alleged sexual predisposition under one of these exceptions, the rule requires the
filing of a sealed motion no less than fourteen days before trial that "specifically describes

the evidence and states the purpose for which it is to be offered," with notice to the victim or her representative.  Fed. R. Evid. 412(c)(1).  Failure to do so without good cause should result in automatic exclusion.  United States v. Romone, 218 F.3d 1229, 1235-36 (10th Cir. 2000).

As Judge Posner has explained, the policy rationale behind the general bar against such evidence encourages victims of sex offenses to come forward:  "If admissible, such evidence would deter many victims of sexual abuse from testifying . . . ."  United States v. Cephus, 684 F.3d 703, 708 (7th Cir. 2012) (Posner, J.) (finding that evidence of victim's prior prostitution was irrelevant to charge of sex trafficking); see Fed. R. Evid. 412 advisory committee note ("Rule 412 has been revised . . . to expand the protection afforded alleged victims of sexual misconduct."); see also 18 U.S.C. § 3771(a)(8) ("A crime victim has . . . [t]he right to be treated with fairness and with respect for the victim's dignity and privacy.").

B.    Application

As noted above, when a defendant intends to assert that a victim's sexual behavior other than with him (or in this case, others at his direction), Rule 412 requires that the defendant file notice fourteen days in advance of trial.  The defendant has not provided the required notice and the government respectfully submits that there would be no basis to do so here.  Here, any evidence of a victim's sexual behavior with anyone other than the defendant or other persons at the defendant's direction, as well as evidence of any purported "sexual predisposition," would be wholly irrelevant to the charges against the defendant.[1] The exclusion of evidence on these topics is thus appropriate under Rule 412.

---

[1]    The racketeering acts and counts of the Indictment related to the defendant's exposure of certain victims to herpes does not alter this conclusion.  As set forth in the

In addition, even assuming <u>arguendo</u> that evidence of a victim's unrelated sexual activity or predisposition is relevant (it is not), any probative value would be marginal at best and substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, and embarrassing the victim, and it should thus be excluded pursuant to Rule 403.  <u>See</u> Fed. R. Evid. 403; <u>United States v. One Feather</u>, 702 F.2d 736, 739 (8th Cir. 1983) ("The policy of Rule 412, to guard against unwarranted intrusion into the victim's private life, may be taken into account in determining the amount of unfair prejudice under Rule 403.").

Accordingly, the Court should preclude the defendant from (1) introducing evidence regarding the victims engaging in sexual acts or contact with anyone other than the defendant or other persons at the defendant's direction, or having any type of "sexual predisposition" or (2) otherwise referencing such inadmissible evidence during <u>voir dire</u>, opening statements, cross-examination, and closing arguments.

II.    **The Court Should Preclude the Defendant from Cross-Examining Regarding Religious Beliefs or Experiences Pursuant to Federal Rule of Evidence 610**

The government anticipates that a previous long-time friend and former manager of the defendant, an individual hereinafter referred to as Witness #1 and whose identity is known to the government and the defendant, will testify pursuant to a subpoena and judicial grant of immunity about the events surrounding the bribery charged in Racketeering Act One of the Indictment, which occurred in or about August 1994.  The

---

government's proposed jury instructions, those charges do not require that the government prove that any such victim contracted herpes from the defendant, as the criminal conduct at issue is the exposure of victims to the disease in the circumstances alleged, and not any resultant contraction of the disease.  As a result, any defense argument that a victim contracted the disease from another sexual partner is irrelevant to the charged offenses.

government respectfully requests that the defendant be precluded from cross-examining Witness #1 about a religious experience described in a book Witness #1 published in 2011. In the book, Witness #1 detailed various experiences in his life, as well as experiences connected to his years-long friendship and working relationship with the defendant. Throughout the book, Witness #1 discussed his faith as a Christian, expressed his commitment to God and wrote about times in his life in which he felt either further or closer to God based on his own conduct, including with respect to the defendant.  In describing one incident involving the defendant approximately two or more years after the charged bribery scheme in Racketeering Act One, Witness #1 discussed having a significant spiritual experience with the defendant.  Specifically, Witness #1 wrote that while dining in the restaurant area of an athletic training facility with the defendant after a work-out session (Witness #1 was sitting at a separate table acting as a form of security while the defendant sat with female friends), the defendant made eye contact with Witness #1, sat up from his table and asked Witness #1 to follow him into the men's bathroom.  There, the defendant began to cry and stated in a remorseful voice that he (the defendant) felt "the spirit of the Lord on me."  They both began to "praise God" and then both began "speaking in tongues" and praise dancing, and when Witness #1 heard "another voice" coming from the defendant, Witness #1 questioned whether he had heard the "voice" of the "Holy Spirit speaking through Rob [a reference to the defendant] or the devil" during this encounter because the defendant sounded "demonic".[2]

---

[2]     "Speaking in tongues," also known as "glossolalia", is a practice or religious experience in which people produce "utterances approximating words and speech, usually produced during states of intense religious experience" where "[s]peakers and witnesses may interpret the phenomenon as possession by a supernatural entity, conversation with divine

Witness #1's religious beliefs and practices, including the religious experience described above, have no bearing on his credibility or any other relevant matter under the circumstances of this case.  Indeed, cross-examination on these beliefs in order to impugn Witness #1's credibility is precluded under Rule 610 of the Federal Rules of Evidence ("Rule 610").  See Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility").  "'[T]he purpose of the rule is to guard against the prejudice which may result from disclosure of a witness's faith.'"  United States v. Kalaydjian, 784 F. 2d 53, 56 (2d Cir. 1986) (quoting United States v. Sampol, 636 F.2d 621, 666 (D.C. Cir. 1980)).

Moreover, the prohibition under Rule 610 prevents cross-examination of not only the religious belief itself, but certain conduct resulting from religious beliefs.  See, e.g., Kalaydjian, 784 F. 2d at 56 (rejecting defendant's "attempt to distinguish between cross-examining a witness regarding his religious beliefs, and cross-examining him regarding conduct that is significant only because of the witness's religious beliefs" in finding that district court's exclusion of cross-examination on decision by witness of Muslim faith to affirm rather than swear an oath before testifying was proper under Rule 610).  As the Second Circuit has explained, there is "no difference between challenging a witness's credibility by cross-examining him regarding his religious beliefs, and challenging the

---

beings, or the channeling of a divine proclamation or inspiration."  See https://www.britannica.com/topic/glossolalia.  Glossolalia, as well as praise dancing, is practiced in various religions, including Pentecostal and charismatic Christianity, a form of Christianity that emphasizes the work of the Holy Spirit, spiritual gifts, and modern-day miracles as an everyday part of a believer's life.  See id.; see also https://www.britannica.com/topic/Charismatic-Christian-church; https://www.britannica.com/topic/Christianity/joy-in-human-existence#ref67500.

witness's credibility by cross-examining him regarding an act that is meaningful only when considered in relation to the firmness of the witness's religious beliefs." Id. at 57. Moreover, the religious experience described above took place approximately two or more years after the events surrounding the bribery scheme and occurred decades before Witness #1's upcoming anticipated testimony, and thus, has no bearing on Witness #1's testimony regarding the defendant's sexual relationship with Jane Doe #1 or the bribery scheme charged in the Indictment. It is thus irrelevant to the charges in this case. "[E]xtensive questioning on the collateral issue of [a government witness's] religious beliefs might . . . confuse[] the jury and distract[] its attention from the principal task of determining whether [the defendant had committed the charged crimes]." Id. at 56. Cross-examination on this matter is also barred by Rule 403, which prohibits the introduction of evidence where the risk of unfair prejudice, confusing the issues, or misleading the jury substantially outweighs any probative value. Accordingly, the government respectfully requests that the defendant be precluded from cross-examining Witness #1 regarding his religious beliefs or the religious experience described above.

III.    The Defendant Should Not Be Permitted to Reference Prior Psychological Histories



A.      <u>Relevant Facts</u>

1.   ████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████████████████

████████████████████████████████

███████████████████████████████

████████████████████████████████

██████████████████████████

2.   ████████████████████

██████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████████████████

_____

████████████████████████████████
████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

      B.    <u>Analysis</u>

███████████████████████████████████

██████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████

██████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████



IV.    **The Defendant Should Be Precluded from Making Legally Irrelevant and Prejudicial Arguments Regarding the Parents of Certain Victims**

Certain racketeering acts and substantive counts allege that the defendant coerced minors, including the individuals identified in the Indictment as Jane Doe #1, Jane Doe #2 and Jane Doe #5, to engage in sexual activity prior to their being old enough to legally consent to such sexual activity.  To prove these offenses, the government expects to present evidence showing that Jane Doe #1 (at approximately 15 years old), Jane Doe #4 (at 16 years old) and Jane Doe #5 (at 17 years old) spent a substantial amount of time with the defendant (despite having not completed high school) and that the defendant may try to deflect the blame for his criminal conduct by offering evidence that the parents of Jane Doe #1, Jane Doe #4 and Jane Doe #5 knew or should have known about their daughters' sexual relationships with the defendant.  The defendant may further assert that to the extent the parents of Jane Doe #1, Jane Doe #2 and Jane Doe #5 knew or should have known about their respective sexual relationships with the defendant, the parents thereby consented to such relationships.  Even assuming _arguendo_ that there was evidence to support such claims,

the evidence would have no legal bearing as to the offenses with which the defendant is charged.  Indeed, consent by either the parents or the underaged victims is not a defense to such charges.

Accordingly, the defendant should not be permitted to elicit testimony from the government's witnesses (including Jane Doe #4 and Jane Doe #5) during cross examination, introduce evidence or argue that the parents of the women and girls who the defendant coerced to engage in sexual activity were aware of, consented to or were otherwise responsible for such activity.[4]  Such arguments are legally irrelevant and would only serve as a distraction to the jury.  Cf. Fed. R. Evid. 402 (irrelevant evidence is not admissible); Fed. R. Evid. 403 (evidence is not admissible where the risk of unfair prejudice substantially outweighs any probative value of such evidence).

Similarly, the defendant should not be permitted to introduce evidence of any schemes by the parents of the victims to profit or otherwise extort the defendant on account of the defendant's relationships with their daughters.[5]  Specifically, Jane Doe #5 has advised that her parents proposed certain business ventures with the defendant (whereby they stood

---

[4]     For the same reasons, the government respectfully requests that the defendant be precluded from eliciting during cross-examination, presenting evidence or making arguments at trial deflecting blame onto the parents of the minor victim-witnesses discussed in the government's motion regarding certain uncharged conduct it intends to present at trial, including the victim-witness identified in that motion as Jane Doe #7, Jane Doe #8, Jane Doe #9, Jane Doe #10, Jane Doe #11, Jane Doe #13, Jane Doe #16, Jane Doe #17, Jane Doe #18, Jane Doe #20 and John Doe #1.  See Gov't Mem. of Law in Supp. of the Gov't Mot. In Limine to Admit Certain Uncharged Acts, dated July 23, 2021.

[5]     The government does not intend to call the parents of Jane Doe #5 to testify in its case-in-chief.  Should the government call any of the parents as a witness, the defendant should be permitted to cross-examine those witnesses about such conduct (given that it could be relevant to their truthfulness).

to profit if the defendant agreed to such business ventures) and while she was still 17 years

old, encouraged her to take photographs of the defendant, which could later be used against

the defendant given, in part, her status as a minor.  As discussed above, the actions of Jane

Doe #5's parents have no legal bearing on the defendant's guilt as to the alleged crimes

involving Jane Doe #5.  Accordingly, the government respectfully submits that the defendant

should not be permitted to elicit any testimony or otherwise introduce evidence regarding

any of the parents' involvement in business ventures or other means to profit from the

defendant.  <u>Cf.</u> Fed. R. Evid. 401, 403.

V.      <u>The Defendant Should Be Precluded from Offering Evidence of Prior Good Conduct</u>

The government moves <u>in limine</u> to preclude the admission of any evidence or

argument at trial by the defendant regarding prior good conduct, including but not limited to,

evidence of the defendant's awards or honors received in connection with his career as an

entertainer.  Any evidence on these topics is totally irrelevant under Federal Rule of

Evidence 401 and should thus be excluded under Federal Rule of Evidence 402.  In the

alternative, the Court should exclude the evidence under Federal Rule of Evidence 403

because such evidence is likely to confuse the issues, mislead the jury, and result in unfair

prejudice to the government.

A.      <u>Evidence of the Defendant's Prior Good Conduct is Irrelevant</u>

Federal Rule of Evidence 401 defines "relevant evidence" as evidence having

"any tendency to make a fact more or less probable than it would be without the evidence;

and (b) the fact is of consequence in determining the action."  Federal Rule of Evidence 402,

in turn, provides, in pertinent part, that "[r]elevant evidence is admissible" unless otherwise

provided for by the U.S. Constitution, a federal statute, the Federal Rules of Evidence, or

"other rules prescribed by the Supreme Court."  Rule 402 further provides that: "Irrelevant evidence is not admissible."  Evidence of prior good conduct, such as the defendant's awards or honors, involvement in the community or other charitable works, is totally irrelevant to any of the issues at trial.  Any such evidence or argument regarding such topics should thus be excluded as irrelevant.

      B.    Evidence of Prior Good Conduct is Unduly Prejudicial

      In the alternative, the defendant should not be permitted to introduce evidence of prior good conduct, such as the type outlined above, under Federal Rule of Evidence 403 because such evidence is highly likely to confuse the issues, mislead the jury, and could result in substantial unfair prejudice to the government.

      Federal Rule of Evidence 403 provides that the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'"  United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)); see generally 2-403 Weinstein's Federal Evidence § 403.04[1][b] at 403-37 (2017) ("Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case.  Prejudice is also unfair if the evidence was designed to elicit a response from the jurors that is not justified by the evidence."); id. 403.04[1][c] (observing that evidence that appeals to the jury's sympathies may be unfairly prejudicial).

14

Assuming <u>arguendo</u> that any prior good conduct would be relevant, it should be excluded under Rule 403. For example, the admission of any evidence of prior good conduct of the sort described above would present a substantial risk of confusing the jury. The jurors could lose sight of the issues that they are being asked to decide, <u>i.e.</u>, whether the defendant committed the essential elements of the charged offenses. In addition, the introduction of such evidence could improperly invite jury nullification. If presented with evidence about the defendant's personal history of musical accolades, there is a significant possibility that the jurors will let sympathetic feelings for the defendant interfere with their duty to apply the law to the facts, which could result in substantial unfair prejudice to the government.

## VI. The Court Should Preclude The Defendant From Admitting Evidence or Cross-Examining Jane Doe #8's Employment as an Exotic Dancer

The government also respectfully requests that the Court preclude the defendant from cross-examining one of the government's witnesses regarding her employment as an exotic dancer. As the government set forth in its motion regarding evidence of uncharged conduct that it intends to elicit at trial (<u>see</u> Gov't's Mem. of Law in Supp. of the Gov't's Mot. <u>In Limine</u> to Admit Certain Uncharged Acts, dated July 23, 2021), Jane Doe #8, an individual whose identity is known to the government and the defendant, is expected to testify that she met the defendant in September 1994 when she was 17 years old after a concert at which he performed. After the concert, Jane Doe #8 was escorted backstage by associates of the defendant, where the defendant had sexual intercourse with her. Years later, Jane Doe #8, who is a trained dancer, became employed as an exotic dancer for a period of time. In addition, in connection with her employment as an exotic dancer,

Jane Doe #8 was a plaintiff in a class action lawsuit which sought back pay as a result of claimed labor law violations.

Jane Doe #8's employment as an exotic dancer, and the subsequent lawsuit, are not relevant to the facts about which she is expected to testify at trial, namely that – years earlier – the defendant engaged in sexual intercourse with her backstage after a concert while she was a minor.  Cross-examination on these topics does not have "any tendency to make a fact more or less probable than it would be without the evidence" nor is "the fact . . . of consequence in determining the action" at issue at trial.  Fed. R. Evid. 401.  In addition, even assuming arguendo that evidence regarding her subsequent employment as an exotic dancer or the civil suit seeking back pay for wages earned as an exotic dancer were somehow relevant—which they are not—any probative value would be marginal at best and substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, and embarrassing the victim-witness, and it should thus be excluded pursuant to Rule 403.  See Fed. R. Evid. 403.    Indeed, the only reason to cross-examine the witness on this issue would be an attempt to inflame any potential unfounded biases held by the jurors with respect to employment as an exotic dancer.  See, e.g., 2-403 Weinstein's Federal Evidence § 403.04[1][b] at 403-37 (2017) ("Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case.    Prejudice is also unfair if the evidence was designed to elicit a response from the jurors that is not justified by the evidence.").  Accordingly, the government respectfully requests that the Court preclude the defendant from admitting evidence relating to her prior employment as an exotic dancer or cross examination of Jane Doe #8 on this topic.

VII.    Certain Text Messages by Jane Doe #5 and
        <u>Relating to Jane Doe #5 Should Be Admitted</u>

At trial, the government seeks to admit certain text messages as recorded recollections, prior consistent statements, excited utterances and present sense impressions. First, the government seeks to admit certain text messages written by Jane Doe #5 between April 2015 and December 2015, when Jane Doe #5 was 17 years old and could not legally consent to sexual activity in Florida or California. Second, the government seeks to admit certain text messages written by Jane Doe #5 and employees and associates of the defendant about several occasions where Jane Doe #5 and other women with whom the defendant was living, including the individuals identified in the government's motion to admit uncharged acts as Jane Doe #16, Jane Doe #17 and Jane Doe #18, were subjected to "punishment" by the defendant, including physical abuse, withholding of food and isolation.

A.      <u>The Text Messages the Government Seeks to Admit</u>

1.      <u>Text Messages of Jane Doe #5</u>

The government is in possession of a cellular telephone that Jane Doe #5 used from the time that Jane Doe #5 first interacted with the defendant, at a concert on April 18, 2015, through June 21, 2015, when Jane Doe #5 left her telephone in Florida and began to travel with the defendant full-time. In text messages found on the telephone, Jane Doe #5 recounted to her mother various interactions that she had had with the defendant. For example, shortly after Jane Doe #5 met the defendant and played some of her own music for the defendant, she recounted to her mother, in text messages, how the defendant was impressed by her musical talent and indicated that he was going to help her make it in the music business. Two of those text messages are below.

17

- He [referring to the defendant] liked both . he said the videos nice for it just just be us doing everything . he also like my writing . remember i sung it for him live so he already knew . with the beat he could understand it better he said he likes how it has that radio ready sound that anyone could relate to . he said its nice and cute , not too young or grown but that sound that'll never go out of style

- Yeah that's why he [referring to the defendant] called me lmao . he said he wanna go in the studio I think he really wanna sign me under him tbh

Thereafter, the defendant invited Jane Doe #5 to travel from her home in Florida to visit him in California, where he was then performing.  At the defendant's instruction, in text messages, on April 28, 2015, Jane Doe #5 contacted one of the defendant's assistants, provided her birthday (showing that she was just 17 years old) and requested that the assistant arrange her travel to California.

On April 29, 2015, at the defendant's expense, Jane Doe #5 flew to California to see the defendant.  In text messages, Jane Doe #5 communicated with the defendant's assistant and her mother about the particular hotels where she was staying and the cities to which she traveled.  During that first trip to California, Jane Doe #5 also recounted to her mother some of her interactions with the defendant, including those quoted below:

- Be talking bout rules .

- But he [referring to the defendant] got me In Sweats .

- He [referring to the defendant] ain't like my tights showing my figure

- He [referring to the defendant] just texted me . he said although he isn't with me this wasn't a waste of a trip , he said I should you this time to try and ease my mind and

18

> soak in everything he's been telling me so when I actually
> go into this industry I'll have a mature frame already .

- Everyone having fun and Kelz [referring to the defendant] said "do not leave that room"

At trial, Jane Doe #5 will explain that during that first trip, the defendant advised her of certain rules she would need to follow ("Be talking bout rules"), including his direction that she wear sweats rather than form fitting clothing ("he got me In Sweats" and "ain't like my tights showing my figure") and that she should wait in the room for him ("Kelz said 'do not leave that room'").

The government is also in possession of text messages written by Jane Doe #5 to two friends, identified herein as "Friend #1 and "Friend #2". Those text messages span October 2015 to January 2016 and include messages to Friend #1 wherein Jane Doe #5, at the age of 17 years old, describes that the defendant ejaculated inside of her and that she believed she was pregnant, that the defendant wanted her to have an abortion because she was 17 years old – and not 18 years old -- the age of consent in certain states, including California where she and the defendant then were --  and she feared having to get an abortion.[6]  Jane Doe #5 also describes in the messages how the defendant reviews the messages on her telephone and did not want her to speak with her high school friends, including Friend #1.  In messages to Friend #2, which messages were recovered from an iCloud account used by Friend #2 and are further detailed below, Jane Doe #5 describes how the defendant had confined her to her room in December 2015.

---

[6]     Jane Doe #5 later learned that she was not in fact pregnant at this time.

2.      Employees' Text Messages about Jane Doe #5 and Other Women

The government obtained forensic images of two telephones used by two former employees of the defendant, respectively, identified herein as Employee #1 and Employee #2, allowed the government to make forensic images of their telephones.  A review of the text messages on those telephones shows that the employees exchanged text messages with each other and others, describing how – during the time periods relevant to the charges in the Indictment – the defendant confined Jane Doe #5 to a room, withheld food from her and physically abused her.  The text messages also describe how the defendant physically abused women other than Jane Doe #5.  In these text messages, Employee #1 and Employee #2 refer to Jane Doe #5 as "Niece" or "N," after the defendant introduced Employee #1 and Employee #2 to Jane Doe #5 as Jane Doe #5's "aunties."  Certain of these text messages are described below and the full text messages – along with the government's proposed redactions - are enclosed as Exhibit A.

a.      November 4, 2015 Physical Abuse of Jane Doe #5

Text messages between Employee #1 and Employee #2 show that Employee #2 witnessed the defendant physically abusing Jane Doe #5.  Employee #2 will testify, consistent with the text messages, that she witnessed the defendant arguing with Jane Doe #5 and then, after the defendant asked her to leave the room, she heard what sounded like the defendant hitting Jane Doe #5 with his hand.  Specifically, in a text message on November 4, 2015, Employee #2 sent a text message to Employee #1, "Rob got on Niece [referring to Jane Doe #5] about lying & already.... just that quick she has lied AGAIN!!�������

But this time, was not just a literature ⬛⬛⬛⬛⬛⬛⬛⬛ I'll tell you & [another employee of the defendant, Employee #3] later We're at the studio & I can't talk".  Later that day, she wrote, "I didn't hear the hand...but I heard what was about to take place so when he [the defendant] asked me to leave I told him I had to use the restroom he told me to tell Donnie [another employee of the defendant] to show me where..,so by the time I was back in the area I heard the after fact..cries/future consequences[.]"  Employee #1 responded, "Oh wow" and "Do you think he used a belt[?]" to which Employee #2 wrote, "Hand."

> b.  December 10, 2015 Isolation of Jane Doe #5

Text messages between Employee #1 and Employee #2 show that on December 10, 2015, Employee #2 saw the defendant require Jane Doe #5 to stay in the back room of the studio (219 Justine Street in Chicago) for a period of time and that he only permitted her to come out to eat and use the bathroom.  Below are some of the text messages where they discuss how Jane Doe #5 was confined to the back room of the studio.

Employee #1:  Where is she [referring to Jane Doe 5]?  What are you
Employee #2:  She's in the back room I'm still in the front
Employee #1:  So, he's had her in there all day? Has she come out to use the restroom or eat?
Employee #1:  Where's R [the defendant]?  Where's Niece [Jane Doe #5]?
Employee #2:  She came out to go to the restroom & eat They are still in the room next to the studio

> c.  December 27 to December 28, 2015 Confinement of Jane Doe #5

Text messages between Employee #1 and Employee #2 show that Employee #1 saw that the defendant confined Jane Doe #5 to a room for more than 24 hours on or about and between December 27, 2015 and December 28, 2015.  On or about December 28, 2015, at approximately 7:30 p.m., Employee #1 described to Employee #2 in text messages,

"Niece [referring to Jane Doe #5] has been confined to the room since around around 6pm....
& he [the defendant] has [Jane Doe #16], [referring to other girlfriends of the defendant,
including Jane Doe #17] are upstairs.... but he's gone home."  When Employee #2 asked,
"6pm yesterday?" Employee #1 responded, "Yes, yesterday actually maybe around 8p[.]"

That same day, as referenced above, Jane Doe #5 herself sent a series of text
messages to Friend #2, explaining that the defendant had in fact confined her to her room and
the reasons for the confinement.  These text messages are shown below and were recovered
during a search of Friend #2's iCloud account.

- I jus[t] felt to rebel so I [did] , and then I was like can I
take a shower , can I take a shower . And he [the
defendant] was like no your gonna stay in this room until
you tell me why you…

- First of all I never had a attitude , you always think
someone made .

- And then I kept calling and texting him [the defendant]
over and over .

The government intends to argue that the text messages sent by Jane Doe #5 convey that the
defendant confined Jane Doe #5 to her room – without permission to even leave for a shower
– as punishment because the defendant perceived Jane Doe #5 to have an attitude and that the
confinement was going to continue for as long as the defendant mandated.

        a.     <u>January 2, 2016 Withholding of Food as to Jane Doe #5</u>

Text messages between Employee #1 and Employee #2 show that Employee
#2 observed that Jane Doe #5 went almost three days without eating and, in context, that the
defendant was the reason for her not eating.  Specifically, on Saturday, January 2, 2016,
Employee #2 told Employee #1 in a text message, "Niece [referring to Jane Doe #5] has

eaten since Thursday... We sat at Red Robin's for hours & he didn't even feed her...smdh I just gave her some chips/queso...cold queso […]" and clarified in a subsequent text message that she meant "has <u>not</u> eaten since Thursday." The government intends to argue that the withholding of food on or about January 2, 2016 is an example of the control the defendant had over Jane Doe #5 and that the control exerted by the defendant over Jane Doe #5 extended to dictating when she was permitted to eat.

  b. <u>January 4, 2016 Physical Abuse</u>

   Text messages between Employee #1 and Employee #2 show that on January 3, 2016, the defendant held a birthday party for Jane Doe #16, one of his then-girlfriends, and, as observed by Employee #2, the defendant thereafter physically abused one or more of the women living with him. Specifically, in the early morning of January 4, 2016, Employee #2 sent a text message to Employee #1 stating, "I'm convinced Rob [the defendant] is going to BEAT [Jane Doe #17]" asap but I'll have to tell you later so do NOT call me right now[.]" That evening, Employee #2 wrote a text message to Employee #1, "Rob [the defendant] talked to me about last night . . . He talked about the girls dancing/tweaking and touching in each other…he doesn't like that unless he orders it…And he told [Jane Doe #16's mother] he was going to get on [Jane Doe #16] & the other girls & she better not come up those stairs to intervene[.] It was loud & thumping up there!!!!"

  c. <u>May 7 to 10, 2015 Confinement of Jane Doe #5</u>

   Text messages between Employee #1 and Employee #2 show that Employee #2 observed that the defendant confined Jane Doe #5 to the defendant's tour bus between May 7, 2015 and May 10, 2015. The text messages also reference a prior occasion, observed by Employee #2, where the defendant confined another girlfriend, Jane Doe #16, to the

studio for two days.  Specifically, on the early morning of Tuesday, May 10, 2015, Employee

#1 and Employee #2 exchanged the following text messages:

|  |  |
|---|---|
| Employee #1: | […] ALSO, N [referring to "Niece," <u>i.e.</u>, Jane Doe #5] is still on the bus since Saturday . He [referring to the defendant] has [referring to other girlfriends of the defendant, including Jane Doe #16] with him. We're headed to the gym... […] |
| Employee #2: | Wow!! N [Jane Doe #5] must have done something & is now punished again... Is the bus rolling with y'all? That means TopGun [the defendant's bus driver] has to stay up & with the bus |
| Employee #1: | Idk.. [I don't know] We're on here [the bus] now but she's [Jane Doe #5] in the back.. No, I stayed with her Sunday night from around 930p-930am..she was in the back & it was peaceful..I didn't even hear her move at all...no restroom or nothing..... I got much needed sleep...then [Jane Doe #16] went to the bus for a few hours.... We just left the bus...she's still there...something is STRANGE!! |
| Employee #2: | Is she [Jane Doe #5] getting food?! |
| Employee #2: | It was strange for [Jane Doe #16] to be left at the studio for the 2days she didn't move around... We'll never know or figure out what the real deal is around that camp if we don't witness it with our our eyes/ears... |
| Employee #1: | 12 hours? I slept at least 9 of the 12 I showered & changed clothes b4 I went out there.. […] It is inhumane. He's [the defendant] in the back [of the bus] We just walking in about 20 mins ago […] |

d.      May 16 to 17, 2016 Confinement of Jane Doe #5

Text messages show that Employee #1 observed that the defendant confined Jane Doe #5 to the tour bus on or about May 16, 2016 and May 17, 2016.  Specifically, on the morning of May 16, 2016, Employee #1 wrote to Employee #2, "Fucking tour bus with N [referring to Jane Doe #5] ...I got to the studio about 30 mins ago...so, I relieved [name of another Employee, Employee #4] from the tour bus so she could leave"  That evening, Jane Doe #16, the other girlfriend of the defendant, sent a text message to Employee #1, saying, "Mr Kelly [the defendant] said to come to the bus to pick [Jane Doe #5] up".  On May 17, 2016, at approximately 9:55 p.m., Employee #1 wrote to another employee of the defendant, Employee #4:

> When she [Jane Doe #5] gets to Florida, she needs to RUN & NEVER look back. She's should be living the fun life of and 18 year old high school senior. She was on the bus again. I relieved [Employee #4] on the bus when i got here yesterday morning around 7am and [a girlfriend of the defendant] relieved me around 10am then he had me to pick her up from the bus around 7 pm and she's been in the back room... she looked ruff..eyes puffy & etc... she was left here last night

e.      Physical Abuse by the Defendant

In a text message on January 16, 2017, Employee #2 sent a text message to the defendant, explaining, "[Jane Doe #18] woke me up crying saying you took her phone, saw pictures and messages to other guys and jumped on her. She showed me her face where she said you slapped her and she pulled down her pants showing me bruises on her butt saying you spanked her..."

f. <u>Witness #2's texts with the Defendant about Jane Doe #5</u>

The government also anticipates that another witness, identified herein as Witness #2, will testify at trial regarding her relationship with the defendant.  Among other things, the government anticipates that Witness #2 will testify regarding events in which she saw a girl who looked like a child in June and July of 2015 with the defendant.  During these instances in which Witness #2 saw the defendant with the girl—who Witness #2 learned the following year was Jane Doe #5—the girl (Jane Doe #5) was sitting on the defendant's lap and, on one of those occasions, Jane Doe #5 was playing with the defendant's ear and the defendant was rubbing Jane Doe #5's buttock.  Jane Doe #5 was under the age of 18 during June and July 2015.  During the course of their relationship, Witness #2 maintained contact with the defendant, including via text message.  In some of the text messages exchanged between the defendant and Witness #2, the defendant tells Witness #2 where he is and where she should meet him while she was visiting the defendant, including on the dates in which she saw the girl she later came to realize was Jane Doe #5.

In addition to the text messages related to when Witness #2 saw Jane Doe #5, the defendant also texted Witness #2 about having rules that he expected his girlfriends to follow.  On March 14, 2016, during one text exchange with Witness #2, the defendant wrote that he did not think Witness #2 was "strong enough to be in his world" and when she asked why, the defendant responded: "Because my world is being its huge and it comes with many rules".

B.     Applicable Law

1.     Relevance

The text messages that the government seeks to admit are highly probative of the defendant's coercion of Jane Doe #5 to travel to California for the purpose of sexual activity, despite that Jane Doe #5 was not old enough to consent to such sexual activity and despite that the defendant did not obtain Jane Doe #5's consent to expose her to the sexually transmitted disease he knew he had.  Significantly, many of the text messages were sent prior to Jane Doe #5's eighteenth birthday at the end of 2015 and the nature of those messages will strongly corroborate Jane Doe #5's testimony that the defendant engaged in sexual activity with her on the first occasion they met in Florida (after the April 18, 2015 concert) and virtually every day after that, including during trips to California.

The text messages are also highly probative of the defendant's commission of the forced labor offense and its ties to the racketeering enterprise.  Specifically, the messages make clear that various forms of coercion used by the defendant to obtain labor and services from Jane Doe #5, and his employees' and associates' roles in the coercion.  These forms of coercion included isolation and withholding of food, and punishment, including confinement and physical abuse, when the defendant decided that Jane Doe #5 had violated one of the defendant's "rules."  The defendant's physical abuse of other women – often in front of Jane Doe #5 – is also probative of the racketeering and forced labor offenses, and Jane Doe #5's understanding of the consequences that would follow if she did not obey the defendant's directives.

In addition, the text messages exchanged between Jane Doe #5 and Friend #1 and between the defendant and Witness #2 during the instances when she saw Jane Doe #5

are relevant because they are probative of the defendant's sexual relationship with Jane Doe #5 while she was under the age of 18 and corroborate Witness #2's recollection of her sightings of Jane Doe #5 in the company of the defendant in a manner consistent with an intimate relationship.  In addition, the defendant's text message to Witness #2 advising her that his "world" "comes with many rules" and she was not "strong enough" are probative of the racketeering and forced labor offenses, particularly the expectations that the defendant had for individuals with whom he had relationships and the fact that he believed the rules were onerous in nature given his statement that Witness #2 could not handle them.

2.    The Text Messages Are Not Barred by the Hearsay Rules

Under the Federal Rules of Evidence (the "Rules"), hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Written assertions, including electronic communications such as text messages, are considered "statements" under this definition.  See Fed. R. Evid. 801(a) ("'Statement' means a person's . . . written assertion . . . .") See also, e.g., United States v. Rolle, 631 Fed. App'x 17, 20 (2d Cir. 2015) (affirming district court's conclusion that defendant's text messages were inadmissible hearsay because they were out-of-court statements offered for the truth of the matter asserted and there was not an applicable hearsay exception).  Hearsay, of course, is not admissible unless otherwise provided by a federal statute, a federal rule of evidence, or other rule prescribed by the Supreme Court. Fed. R. Evid. 802.  The Rules set forth both certain exclusions from this hearsay definition, Fed. R. Evid. 801, and various exceptions, see, e.g., Fed. R. Evid. 803, 804.  In addition, to the extent

that the texts discussed above were written by the defendant, they are non-hearsay and admissible for their truth.  Fed. R. Evid. 801(d)(2)(A).

### a.    Excited Utterances

An excited utterance is a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2).  "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability."  United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998).  "[T]he excited utterance exception is based on the psychological impact of the event itself, and permits admission of a broader range of hearsay statements—i.e., those that 'relate to' the event." United States v. Jones, 299 F.3d 103, 112 n.3 (citations and emphasis omitted).  "For a statement to qualify as an excited utterance, (i) there must have been a startling event; and (ii) the declarant must have made the statement 'during the period of excitement, and in reaction to that event.'"  United States v. Cooper, No. 19-cr-159 (ARR), 2019 WL 5394622, at *3 (E.D.N.Y. Oct. 22, 2019) (quoting Mejia-Valez, 855 F. Supp. at 614).  "An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)."  Tocco, 135 F.3d at 127 (citing United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990)).  "Rather, the analysis turns on whether the declarant remained in a state of excitement when he spoke."  Cooper, 2019 WL 5394622, at *3 (citing Tocco, 135 F.3d at 128).  "Several factors may be considered in determining whether a speaker was under the stress of excitement, including: the nature of the event, [t]he time that lapsed between the startling event and the statement, the physical and psychological distance of the speaker from the startling event, and the appearance or demeanor of the speaker, as well as his behavior or

condition."  Zalewski v. City of New York, No. 13-CV-7015 (ARR) (PK), 2019 WL

8324447, at *2 (E.D.N.Y. Dec. 18, 2019) (citing Christopher B. Mueller and Laird C.

Kirkpatrick, Federal Evidence § 8.68, 589–96 (2013)).

>   b.   Present Sense Impressions

A present sense impression is any statement "describing or explaining an event

or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid.

803(1).  These statements are "considered to be trustworthy because the contemporaneity of

the event and its description limits the possibility for intentional deception or failure of

memory."  United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002) (citing United States v.

Brewer, 36 F.3d 266, 272 (2d Cir. 1994)).  "By its own terms, application of Rule 803(1) has

three distinct requirements: i) the statement must describe or explain the event perceived; ii)

the declarant must have in fact perceived the event described; and iii) the description must be

'substantially contemporaneous' with the event in question."  United States v. Mejia-Valez,

855 F. Supp. 607, 613 (E.D.N.Y. 1994) (internal citations omitted).

>   c.   Recorded Recollections

A "record concerning a matter about which a witness once had knowledge but

now has insufficient recollection to enable the witness to testify fully and accurately, shown

to have been made or adopted by the witness when the matter was fresh in the witness'

memory and to reflect that knowledge correctly" is also a recognized exception to the rule

against hearsay.  United States v. Rommy, 506 F.3d 108, 138 (2d Cir. 2007) (citing Fed. R.

Evid. 803(5)).  "For a statement to come within this rule, a proponent must show that (1) the

witness's memory of the events detailed in the record was sufficiently impaired; (2) the

witness prepared or adopted the record at or near the time of the events reported; and (3) at

that time, the record correctly reflected the witness's knowledge of the reported events." Id. (citing Parker v. Reda, 327 F.3d 211, 213 (2d Cir. 2003)).  "If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party." Fed. R. Evid. 803(5).

### d.     Declarant-Witness's Prior Consistent Statement

Where a declarant testifies and is subject to cross-examination, a declarant-witness's prior statement is not considered hearsay when it "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."  Fed. R. Evid. 801(d)(1)(B).  The Advisory Committee amended this Rule in 2014 to expand the reasons for which prior consistent statements may be offered.  See Fed. R. Evid. 801(d)(1)(B)(ii) (effective Dec. 1, 2014).  Before the amendment, substantive use of prior consistent statements that were probative to rehabilitate the declarant's credibility were only admissible to rebut charges of recent fabrication, improper influence, or improper motive.  See Fed. R. Evid. 801(d)(1)(B) (Apr. 26, 2011, eff. Dec. 1, 2011).  "The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency or faulty memory."  Fed. R. Evid. 801(d)(1)(B) advisory committee's note to 2014 amendment.  As statements that are not hearsay, "[prior consistent] statements are—subject to the usual prerequisites such as relevance—admissible as proof of the substance of the statement." United States v. Flores, 945 F.3d 687, 705 (2d Cir. 2019).

Where a prior consistent statement is offered for substantive purposes under Rule 801(d)(1)(B)(i), a proponent must establish by a preponderance of the evidence three elements: "(1) that the prior consistent statement is consistent with the witness's in-court testimony; (2) that the prior consistent statement is being offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive; and (3) that the prior consistent statement was made prior to the time that the supposed motive to falsify arose." Phoenix Assocs. III v. Stone, 60 F.3d 95, 103 (2d Cir. 1995) (internal quotations and citations omitted). While there is no established test to determine the admissibility of prior consistent statements under Rule 801(d)(1)(B)(ii), the Second Circuit has upheld district court findings that prior consistent statements are admissible non-hearsay under subsection (ii) when introduced to rebut "defendants' attacks on [the declarant's] credibility and memory," Flores, 945 F.3d at 706, or "to rebut [defense counsel's] charge of inconsistency and to rehabilitate [the declarant's] credibility by placing the alleged discrepancies in context." United States v. Purcell, 967 F.3d 159, 197 (2d Cir. 2020).

Rule 801(d)(1) applies to a witness who is *subject* to cross-examination and "does not restrict admissibility to statements of one who has already been cross-examined." Flores, 945 F.3d at 706 (upholding trial court's admission of prior consistent statements where "the government sought permission to introduce the notes and reports of [the declarant] during his direct testimony" and "it was clear that he would be subject to cross-examination") (citing United States v. O'Connor, 650 F.3d 839, 862–63 (2d Cir. 2011) (upholding trial court's admission of prior consistent statements before declarant testified where the defendants "had begun their attacks on the credibility of [the declarant's] expected testimony in their opening statements" and "it was clear" the declarant would testify and

32

"could be cross-examined by the defense about the statement"), <u>cert denied</u>, 565 U.S. 1148 (2012)); <u>Purcell</u>, 967 F.3d at 197 (upholding admission of a witness's testimony recounting the declarant's statements to rebut charge of declarant's inconsistency).

       e.    <u>Analysis</u>

        The government anticipates that Jane Doe #5, Employee #1, Employee #2, Employee #4 and Witness #2 will all testify as witnesses for the government and therefore will be subject to cross-examination by the defendant.  While the government anticipates that the witnesses will generally recall much of the conduct described in the text messages above, they do not recall each episode and the timing and details of each episode, and  will testify that their text messages about this conduct were accurate at the time they sent them.  To the extent that the witness recalls the content of a particular episode, the texts messages as to that particular episode should be admitted as prior consistent statements to rehabilitate the witness.  To the extent that the witness does not recall the content of a particular episode, the text messages as to that episode should be admitted as prior recorded recollections. Moreover, many of the text messages above should be admitted as excited utterances or present sense impressions as the messages were written either while or shortly after the witnesses perceived the particular events described in the text messages.  And to the extent that the messages or partial messages do not qualify under one of those exceptions, the government submits that they will be admitted not for their truth, but as background information to give context to other texts that are admissible under these exceptions.  <u>United States v. Pedroza</u>, 750 F.2d 187, 200 (2d Cir. 1984) ("When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events,

providing explanation for such matters as the understanding or intent with which certain acts were performed.").  Accordingly, there is no hearsay bar to their admission.

VIII.   <u>The Court Should Admit an Electronic Note Written by Jane Doe #5</u>

The government seeks to admit an electronic note saved on a cellular telephone seized from the defendant's home upon the defendant's arrest in July 2019, at which time he was living with Jane Doe #5.  The note appears to have been drafted on August 30, 2018, when Jane Doe #5 was 20 years old and after she had been living with the defendant for more than two years.  In the note, Jane Doe #5 wrote:

- Do not be goofy, extra, or act young when I told something in private or around others
- Do not play games when on the phone with daddy, just say I love you before I hang up.
- Continue to do what I always do around other when I am alone with daddy (ex: bless you when daddy belches)
- Trust daddy and do what ever he says, whenever he says, with no rebuttal , disrespect or rebellion.
- Remember how I acted in the beginning bubbly and like a child, pure and with no negative intentions and remember to stay true to who I am .. humble, happy, innocent and beautiful to daddy .. reminding him of his mother and a child.
- Tell daddy everythinggggggg so he will not have to wonder and figure out what is going on with me!!!!!!

The government intends to argue that in context, Jane Doe #5 wrote the note to recount instructions given by the defendant as to how she should act around him.  Among the instructions was one to "do what ever he [the defendant] says, whenever he says, with no rebuttal , disrespect or rebellion.."  The note is thus highly probative of the defendant's commission of the alleged forced labor offense as to Jane Doe #5, as part of which the defendant used physical force, threats of physical force, physical restraint and threats of physical restraint and other means of psychological coercion to cause Jane Doe #5 to engage

in sexual activity not just with the defendant (to which Jane Doe #5 consented), but also sexual activity with many other women and a man.  The sexual activity with the others was always at the defendant's direction and in the defendant's presence and often filmed for the defendant's use, resulting in Jane Doe #5's forced labor in the creation of pornography.  Nor is there a hearsay bar.  Jane Doe #5 will testify that the defendant provided the instructions set forth in the note (Jane Doe #5's testimony as to the defendant's statements are, of course, admissible as a statement of a party opponent (Fed. R. Evid. 801(d)(2)(A)) and the government does not intend to offer the contents of the note itself for their truth (but instead as a recording of the statements made by the defendant).

IX.    The Court Should Admit Certain Newspaper Articles As
       Ancient Documents Under Federal Rule of Evidence 803(16)

       The government seeks to admit certain newspaper articles as ancient documents pursuant to Federal Rule of Evidence 803(16).  Specifically, the government seeks to admit newspaper articles from 1994 showing that the defendant performed in Macon, Georgia, on August 30, 1994; Albany, Georgia on August 31, 1994 and Miami, Florida on September 2, 1994.

       A.    Relevant Evidence

       At trial, the government anticipates that Witness #1will testify that one summer in the 1990s, at a concert where the defendant was performing, the defendant advised him that Jane Doe #1, who was then 15 years old, was pregnant and that the defendant intended to marry her so that he would not go to jail.  According to Witness #1, Witness #1 and the defendant hastily made arrangements to fly to Chicago that same night so that the defendant could marry Jane Doe #1.  Because Jane Doe #1 was not legally old

enough to get married, the defendant caused Witness #1 to bribe a state employee to provide a fraudulent identification document for Jane Doe #1, purporting to show she was 18 years old (when in fact she was 15 years old).  Following the ceremony, the defendant and Witness #1 returned to the defendant's concert tour.

Records from Cook County, Illinois show that on August 30, 1994, an application was granted for the defendant and Jane Doe #1 to be married.  The certificate indicates that they were married on August 31, 1994.  The address listed on the certificate for the ceremony was 6501 North Mannheim Road, Rosemont, Illinois, the address of a Sheraton hotel located near O'Hare airport in Chicago.

The newspaper articles the government seeks to admit reflect that the defendant performed at a venue in Macon, Georgia on Tuesday, August 30, 1994 to a very small crowd and on Wednesday, August 31, 1994 at a venue in Albany, Georgia, and that Witness #1 was in fact the defendant's tour manager on August 31, 1994.  In light of the defendant's performances, the government intends to argue that the defendant and Witness #1 flew to Chicago on or about the evening of August 29, 1994, obtained the fraudulent identification document for Jane Doe #1 and the marriage certificate on August 30, 1994, were married on August 30, 1994 (but recorded it as a day after the certificate was issued, on August 31, 1994) at the Sheraton hotel and flew to Georgia in time to perform at the venue in Macon that night.

The government also anticipates that Jane Doe #8 will testify that when she was 17 years old (going into her senior year of high school) and not legally able to consent to sexual conduct, the defendant vaginally penetrated her with his penis.  The woman will explain that she met the defendant at a concert promoted by Budweiser in Miami, Florida, at

which Jane Doe #1 was scheduled to perform with the defendant and others, but that Jane Doe #1 did not ultimately perform.  The woman will further testify that the defendant vaginally penetrated her after she went backstage to get an autograph from the defendant. The newspaper articles that the government seeks to admit show that the defendant was scheduled to perform in Miami on September 2, 1994, at the launch of a "BudFest" tour, that the concert was sponsored by Budweiser and that Jane Doe #1 had been cut from the tour in light of her being just 15 years old.

  B. <u>Legal Analysis</u>

   The articles the government seeks to admit are relevant.  See Fed. R. Evid. 401 (stating evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action").  The articles regarding the Albany and Macon performances corroborate the testimony of Witness #1 and provide detail and context about the manner in which the defendant married Jane Doe #1.  Specifically, the articles show that, as Witness #1 will testify, Witness #1 was with the defendant on that tour (and specifically on August 31, 1994) and that the defendant and Witness #1 stayed in Chicago for just a night before they had to return to the tour.  Similarly, the articles reflecting that the defendant was scheduled to perform in Miami, Florida, on September 2, 1994, and that Jane Doe #1 had been excluded from the tour are relevant in that they corroborate the witness's testimony and make clear that the concert (and thus the vaginal penetration) occurred on September 2, 1994, when the witness was still under the legal age to consent to such sexual contact in Florida.

   Moreover,  the articles do not constitute inadmissible hearsay.  Rule 803(16) of the Federal Rules of Evidence excludes from the hearsay rule, "[a] statement in a

document that was prepared before January 1, 1998, and whose authenticity is established." Rule 902(6) provides that newspaper articles are self-authenticating.  See In re Davis New York Venture Fund Fee Litigation, 2019 WL 11272913, at *3, n.4 (S.D.N.Y. July 2, 2019) ("This Wall Street Journal article is admissible as an ancient document produced prior to 1998 for which authenticity is established.") (citing Fed. R. Evid. 803(16) and 902(6)). Accordingly, because the articles the government seeks to admit were prepared more than 20 years ago, they are excepted from the general bar on hearsay.  See, e.g., United States v. Stelmokas, 100 F.3d 302, 312 (3d Cir. 1996).

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motions in their entirety.

The government also requests that the Court permit the government to file both a sealed and a redacted public version of this motion.  The redacted version will redact certain content from the publicly-filed version of this motion that details medical and other private matters of certain witnesses.  See United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (privacy interests of third parties may be compelling reason justifying sealing).

Dated:    Brooklyn, New York
          July 23, 2021

                                    Respectfully submitted,

                                    JACQUELYN M. KASULIS
                                    Acting United States Attorney

                         By:        _____/s/_____
                                    Elizabeth A. Geddes
                                    Nadia I. Shihata
                                    Maria Cruz Melendez
                                    Assistant United States Attorneys
                                    (718) 254-7000

cc: All defense counsel of record (by ECF)