734

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,     :     19-CR-286(AMD)

        Plaintiff,     :

   -against-     :     United States Courthouse
                 Brooklyn, New York

ROBERT SYLVESTER KELLY,     :

                     August 23, 2021
        Defendant.     :     9:30 o'clock a.m.

- - - - - - - - - - - - - X

REDACTED TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:


For the Government:          JACQUELYN M. KASULIS
                             Acting United States Attorney
                             BY: ELIZABETH GEDDES
                                 NADIA SHIHATA
                                 MARIA E. CRUZ MELENDEZ
                             Assistant United States Attorneys
                             271 Cadman Plaza East
                             Brooklyn, New York


For the Defendant:           DEVEREAUX L. CANNICK, ESQ.
                             NICOLE BLANK BECKER, ESQ.
                             THOMAS FARINELLA, ESQ.
                             CALVIN HAROLD SCHOLAR, ESQ.


Court Reporter:              Charleane M. Heading
                             225 Cadman Plaza East
                             Brooklyn, New York
                             (718) 613-2643

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

735

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Good morning, everybody.

3          Before we bring out the witness, I want to see the

4     lawyers at the side.  I guess it would just be Mr. Solomon and

5     whoever submitted the letter yesterday, with the court

6     reporter.

7          (Continued on next page.)



SEALED BY ORDER OF THE COURT







SEALED BY ORDER OF THE COURT                    739

CMH        OCR        RMR        CRR        FCRR



SEALED BY ORDER OF THE COURT

741

1          (In open court.)

2          THE COURT:  All right.  Are we ready for the

3    witness?  Let's do it.

4          MS. CRUZ MELENDEZ:  Yes, Judge, we are.

5          (Witness resumes the stand.)

6          THE COURT:  All right.  Mr. Smith is here.

7          Let's get the jury, if we could.

8          (Jury enters.)

9          THE COURT:  All right.  Good morning, ladies and

10   gentlemen.  I hope you all enjoyed your weekend.  We're ready

11   to continue with the direct examination of Mr. Smith.

12          Go ahead, Ms. Cruz Melendez.

13          THE CLERK:  The witness is reminded he is still

14   under oath.

15          THE WITNESS:  Yes.

16          (The witness, DEMETRIUS SMITH, previously sworn,

17   resumed.)

18          (Continued on next page.)

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (Continued)

2    BY MS. CRUZ MELENDEZ:

3    Q    Good morning, Mr. Smith.

4    A    Good morning.

5    Q    Is your microphone on?

6              THE COURT:  Maybe Ms. Greene can take a look at it.

7              (Pause.)

8              THE COURT:  All right.  I think the microphone

9    works.

10   Q    Mr. Smith, when we broke on Friday, you were explaining

11   that once you arrived at the hotel with Aaliyah, the defendant

12   and others, there was a, an officiant or a preacher there.  Do

13   you recall that testimony?

14   A    Yes, ma'am.

15   Q    I want to get there but I want to back up for a moment.

16   Okay?

17   A    Okay.

18   Q    Do you recall testifying that after leaving the

19   defendant's apartment when you went to Chicago, you went to

20   the Sheraton Hotel?

21   A    I think so, yes.

22   Q    Sitting here today, do you recall everyone who was at the

23   Sheraton when you arrived?

24   A    Do I recall everyone?

25   Q    Yes.

Smith - direct - Cruz Melendez                    743

1    A    I know it was me, I know it was Robert, I know it was

2    Aaliyah, I know it was Tyree, the preacher.

3    Q    I'm talking about when you first arrived after leaving

4    and flying to Chicago, so before the marriage license.

5    A    Before the marriage license?

6    Q    Yes.  Who was in the hotel?

7    A    Derrel McDavid, Aaliyah, that was it.

8    Q    Was Robert there?

9    A    Yes.

10   Q    The defendant?

11   A    Robert was with me.

12   Q    Now, you also previously testified with respect to your

13   suggesting to the group that you could get an ID from the

14   welfare office if you paid some cash.  Do you recall

15   testifying to that?

16   A    Yes, ma'am.

17   Q    Do you recall here today as you sit here who was there

18   for that conversation?

19   A    Derell McDavid, myself, I think Robert was with us.  I'm

20   not sure if Robert was there but --

21   Q    Do you need your memory refreshed?

22   A    Not really, no.  Maybe he was there.  If I said, you

23   know, maybe he was there.  I don't remember precisely each

24   time but I'm pretty sure he was there.

25   Q    Is your testimony here today that you're not sure whether

CMH        OCR        RMR        CRR        FCRR

1   or not the defendant was there for that conversation?

2           MR. CANNICK:  Objection.

3           THE COURT:  Overruled.

4   A    The conversation of the, of the money?  I'm not sure if

5   Robert was there.

6           MS. CRUZ MELENDEZ:  I'd like to show the witness

7   3500DS1-4 to refresh his recollection.

8           MR. CANNICK:  Your Honor, objection.

9           THE COURT:  Overruled.

10          (Pause.)

11  A    I did say yes but as I sit and remember, you know, I'm

12  not sure.  I'm pretty sure he was there with me so I guess I

13  could say yes.

14  Q    So your answer is yes --

15  A    Yes.

16  Q    The defendant was there?

17          MR. CANNICK:  Objection.

18          THE COURT:  Sustained as to that.

19          MS. CRUZ MELENDEZ:  Your Honor, may we have a brief

20  sidebar?

21          THE COURT:  No.  Let's keep going.

22  Q    Do you recall what, if anything, the defendant said in

23  response to your suggestion to obtain an ID for $500 or so?

24  A    I don't remember Robert saying anything about it.  When

25  it comes to Robert and Aaliyah, that was something that was

Smith - direct - Cruz Melendez                    745

1  happening --

2          MS. CRUZ MELENDEZ:  Objection as nonresponsive.

3          THE COURT:  Well, there's no question to you right

4  now.  Wait until Ms. Cruz Melendez puts a new question to you.

5          Go ahead.

6          MS. CRUZ MELENDEZ:  Your Honor, the witness has

7  testified that he doesn't recall what the defendant said.  I'd

8  like to refresh his recollection with 3500DS1-3.

9          THE COURT:  All right.  Go ahead.

10         (Pause.)

11 Q    What, if anything, did the defendant say?

12 A    I don't see anywhere it said Robert said anything.

13         THE COURT:  The question is having looked at that,

14 does that refresh your recollection as to what, if anything,

15 Mr. Kelly said at the time Ms. Cruz Melendez is talking about.

16 A    Yes, I don't remember Robert -- if I said that, I don't

17 remember Robert telling me that.

18         THE COURT:  All right.

19 A    I don't remember that.  I just don't remember.  I don't

20 even remember if I told you that.  It might have been written

21 down incorrectly to me because I don't remember Robert having

22 anything to say about the $500.

23         THE COURT:  All right.  Next.

24 A    I talked to Derrel McDavid about the money.

25         THE COURT:  Wait until there's a question.  All

Smith - direct - Cruz Melendez                746

1    right?

2         Next question.

3    Q    So going back to the hotel room after obtaining the

4    marriage license, what happened once you all arrived there?

5    A    Well, they had, it was supposed to be set up, a ceremony

6    set up with the preacher and the --

7              THE COURT:  Keep your voice up.

8    A    -- with the preacher and that was pretty much it.  The

9    purpose of going back was to, was to get them married.

10   Q    And did a marriage ceremony occur?

11   A    Yes, it did.

12   Q    And did the defendant and Aaliyah exchange vows?

13   A    Yes, they did.

14   Q    How was the defendant dressed for the ceremony?

15   A    I don't remember.

16   Q    And what about Aaliyah?

17   A    I don't remember, you know, I don't remember.

18             THE COURT:  Do you remember whether they dressed up

19   like wedding clothes?

20             THE WITNESS:  No.  No.

21             THE COURT:  What kind of clothes were they --

22             THE WITNESS:  Just casual clothing.

23             THE COURT:  Casual clothing?

24             THE WITNESS:  Everyday clothing.

25             THE COURT:  Next question.

Smith - direct - Cruz Melendez                    747

1   Q    Did the defendant and Aaliyah exchange rings?

2   A    I don't remember.  I don't remember.

3   Q    So what happened after the ceremony?

4   A    We went back to the concert.

5   Q    And how soon after the ceremony did you leave for the

6   concert?

7   A    Maybe about an hour or so maybe.  We spent about an hour

8   or so.

9   Q    Prior to leaving the hotel to go back to the concert, did

10  the defendant spend any time alone with Aaliyah?

11  A    A few minutes, yes.  Not that much time.

12  Q    Now, while you were at the hotel before moving, before

13  leaving for the concert, did you have any interactions with

14  Aaliyah?

15  A    No.

16  Q    When you say you went back to the concert, who were you

17  saying went back to the concert?

18  A    Me, Robert and Tyree.

19  Q    And did Aaliyah go with you?

20  A    No.

21  Q    So what happened after you landed back to where the

22  concert was?

23  A    We went back to -- we went to the show.

24  Q    So did the defendant have a performance that evening?

25  A    Yes.

1   Q    And did he, in fact, perform?

2   A    Yes.

3   Q    What, if anything, happened after the performance?

4   A    We prepared for the next show.

5   Q    Immediately after the performance, what happened?

6   A    Well, before each performance, there's a meet and greet.

7   Q    And was there a meet and greet?

8   A    Yes.

9   Q    And did the defendant go to that meet and greet?

10  A    Yes.

11  Q    And were there female guests at that meet and greet?

12  A    Yes.

13  Q    And did the defendant interact with those female guests?

14  A    Yes.  It's a meet and greet.

15         MS. CRUZ MELENDEZ:  One moment, Your Honor.

16         THE COURT:  Sure.

17         (Pause.)

18         MS. CRUZ MELENDEZ:  Nothing further, Your Honor.

19         THE COURT:  All right.  Cross-examination?

20         MR. CANNICK:  Yes.

21         THE COURT:  Mr. Smith, defense counsel is going to

22  ask you some questions.  Just do your best to answer the

23  question that he's asking you.

24         THE WITNESS:  Yes, ma'am.

25         THE COURT:  Thank you.

1

2   CROSS-EXAMINATION

3   BY MR. CANNICK:

4   Q    Good morning, sir.

5   A    Good morning.

6   Q    Now, I think you testified, you told us last week that at

7   some point, that Robert told you that Aaliyah might be

8   pregnant.

9   A    Robert said, if I remember --

10  Q    My question is did you tell us that last week that there

11  came a time where Robert told you that Aaliyah might be

12  pregnant?

13  A    Thought she was pregnant, yes.

14  Q    And you told us that you assumed that the baby was

15  Robert's.  Do you recall telling us that last week?

16  A    I don't remember saying anything like that.

17  Q    You didn't -- you never saw a baby, am I correct?

18  A    No.  No, it's the assumption of Aaliyah being pregnant.

19  To my knowledge, Aaliyah was never pregnant.

20  Q    Thank you.

21       Now, you at some point pled guilty to bribery?

22  A    To -- no.

23  Q    No?  Okay.  And you wrote a book?

24  A    Yes.

25  Q    And in that book, you embellished a bit to make the book

Smith - cross - Cannick                750

1    a little juicy, am I correct?

2    A    I wrote it to the best of my ability to how I thought.  I

3    was sitting inside a cell.  I was locked up in prison.

4    Q    And you wanted sales, is that correct?

5    A    I beg your pardon?

6    Q    You wanted the book to sell, is that correct?

7    A    When I started writing the book, it wasn't about selling.

8    It was about releasing things inside myself.

9              THE COURT:  When did you write the book?

10             THE WITNESS:  I wrote the book in two thousand -- I

11   released it in 2011.  Once I got out of prison, I got out in

12   2010, in May, after that, I began to find people to help me

13   develop it.  It was just a manuscript and there was a lot of

14   thoughts that I had inside of myself regarding my

15   relationship, my life.  It's about my life.

16             THE COURT:  Right.

17             Sorry, Mr. Cannick.  Go ahead.

18   Q    And you told, in fact, you told the government that

19   everything in the book, the things that were in the book, a

20   couple of the things weren't true, am I correct?

21   A    I never told anybody that.

22   Q    You never told anyone that?

23   A    No.  The things in the book is the truth to my knowledge,

24   to the best of my knowledge.

25   Q    Okay.  Now, Robert never had anything to do with you

1  bribing anyone to get a marriage license, am I correct?

2  A    No, he didn't.

3  Q    Now, I want to go back a little bit.  You mentioned that

4  Aaliyah and her mother would come to the studio so Robert

5  could work with Aaliyah?

6  A    Yes.

7  Q    And Robert had a friendly relationship with Aaliyah's

8  mother, am I correct?

9  A    Robert was close with the whole family.

10 Q    Okay.  And he spent a lot of time with Aaliyah's mother,

11 am I correct?

12 A    Just his mother?  No.  He spent -- when they were there,

13 they were together, Aaliyah and her mother.

14 Q    Aaliyah and her mother?

15 A    Yes, with Robert and his nephew, you know, her uncle.

16 Q    And Barry Hankerson was Aaliyah's uncle?

17 A    Yes.

18 Q    And there came a point in time when Robert fired Barry?

19 A    Yes.

20 Q    And that was after, Robert fired Barry after he and

21 Aaliyah got married, am I correct?

22 A    Yes.

23 Q    Now, I want to go back a little bit.  You told us about

24 your meeting Robert and the relationship that you had with

25 him.

Smith - cross - Cannick                    752

1          How old was Robert when you met him initially?

2    A    Robert was, I think, 16 or 17, 16 at the time.  He had

3    just made 17 in January.  I met Robert like in December,

4    October or December -- October of that year and then he turned

5    17 that January.

6    Q    And how old were you, sir?

7    A    I was 24, I think, 24, something like that.

8    Q    And you were a singer at that point in time?

9    A    Yes.

10   Q    Is that correct?

11   A    Yes.

12   Q    And you were trying to get into the industry as well?

13   A    Yes.

14   Q    And when you heard Robert after -- when you met Robert,

15   you heard him singing?

16   A    Yes.

17   Q    And you were impressed with his talent, am I correct?

18   A    Yes.

19              MS. CRUZ MELENDEZ:  Objection.

20              THE COURT:  Overruled.

21   Q    I'm sorry.  You said yes?

22   A    Yes.

23   Q    And you were even more, more impressed with his writing

24   skills as an artist, am I correct?

25   A    Correct.

Smith - cross - Cannick                753

1   Q    And eventually, Robert signed a contract with Jive

2   Record?

3   A    Eventually, yes.

4   Q    And Jive Record started promoting Robert, am I correct?

5   A    Correct.

6   Q    And the image that Jive Record promoted was that Robert

7   was a sex symbol, am I correct?

8   A    Yes.

9   Q    In fact, didn't they dress him up and open his shirt,

10  chest, and let his chest be shown?

11  A    Did they do that?

12  Q    Well, they had someone who was connected with them to

13  make him up in a certain way, am I correct, and to dress him

14  in a certain way?

15           MS. CRUZ MELENDEZ:  Objection.

16           THE COURT:  Sustained as to relevance.

17           MR. CANNICK:  Your Honor, I think the government

18  went into this.

19           THE COURT:  How he was dressed at his concerts?

20           MR. CANNICK:  No, but they went into him and the

21  record label and promotion.

22           THE COURT:  This is not relevant.  Let's move on to

23  something that's relevant.

24  Q    The record company promoted Robert?

25  A    Yes.

Smith - cross - Cannick                   754

1   Q     And they sent him on the road?

2   A     Yes.

3   Q     And when you're promoting someone, you want to promote a

4   particular image, am I correct?

5   A     Yes.

6   Q     Now, when you initially met Robert, he was singing on the

7   streets?

8   A     I didn't see him.  I met Robert at Kenwood Academy.  He

9   was singing on a talent show.

10  Q     Right, but there came a time that you and he were

11  together and you would go on the subways and you'd sing, am I

12  correct?

13  A     Yes.

14  Q     And you would help him in terms of the structure in

15  making sure that he had monies and you moved him from place to

16  place, am I correct?

17  A     Yes.

18  Q     And you got a percentage of that, am I correct?

19  A     I can say yes.

20  Q     And Robert would give you a percentage and he would take

21  the rest to his mom, right?

22  A     Correct.

23  Q     You knew his family, right?

24  A     Yes.

25  Q     You knew that his mother was a single parent?

1   A    Yes.

2   Q    And you knew that he was taking care of the rent with

3   that singing, am I correct?

4   A    Yes.  He helped his mother, yes.

5   Q    Now, Robert also played semi-pro basketball, am I

6   correct?

7   A    I'm not aware of that.  I think, yes, he played

8   basketball.  Semi-pro was after me.  I noticed he played ball

9   with someone and that was after I left.

10  Q    After you left?  Oh, okay.

11              Now, and the times that you were with Robert, what

12  were the songs that he had written?

13              THE COURT:  Sustained.

14              MR. CANNICK:  Can I have a second, please,

15  Your Honor?

16              THE COURT:  Sure.

17              (Pause.)

18              MR. CANNICK:  Your Honor, may we have a sidebar?

19              THE COURT:  A brief one.

20              MR. CANNICK:  Very brief.

21              (Continued on next page.)

22

23

24

25

```
                          Sidebar                          756
```

1            (The following occurred at sidebar.)

2            MR. CANNICK:  Your Honor, the government asked him

3    about the songs that he wrote.

4            THE COURT:  About songs that he wrote?  I don't

5    remember.

6            MR. CANNICK:  It's there.

7            THE COURT:  I want this witness off the stand and I

8    want irrelevant things -- it's just gone on too long.

9            Do you care if he asks about the songs?  Go ahead.

10   Fine.

11           MR. CANNICK:  Okay.

12           (Sidebar ends.)

13           (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Smith - redirect - Cruz Melendez                757

1   BY MR. CANNICK:

2   Q    Robert wrote a number of hit songs, am I correct?

3   A    Yes.  Yes, he did.

4   Q    And he produced a number of hit songs, am I correct?

5   A    That's correct.

6   Q    And you wrote for a number of A-rated entertainers, am I

7   correct?

8   A    Correct.

9   Q    And produced them as well, am I correct?

10  A    Correct.

11  Q    Thank you.

12          MR. CANNICK:  Nothing further, Your Honor.

13          THE COURT:  All right.  Any redirect?

14          MS. CRUZ MELENDEZ:  Briefly, Your Honor.

15          THE COURT:  Okay.

16  REDIRECT EXAMINATION

17  BY MS. CRUZ MELENDEZ:

18  Q    Mr. Smith, but for the defendant telling you that Aaliyah

19  was pregnant, would you have arranged tickets to go to Chicago

20  to that Sheraton hotel?

21          MR. CANNICK:  Objection.

22          THE COURT:  Overruled.

23  A    Will you repeat that, please?

24  Q    If the defendant hadn't asked you to arrange tickets to

25  go to Chicago because he thought that Aaliyah was pregnant,

1   would you have arranged tickets to go to Chicago on that date?

2   A    That wasn't in the schedule?

3   Q    Right.  If the defendant hadn't asked you to bring him to

4   that Sheraton Hotel, would you all have been gathered in that

5   Sheraton Hotel?

6   A    No.

7   Q    When you discussed with the group about getting an ID

8   from the welfare office, from an employee there for $500, you

9   talked about that with the group, and isn't it true that the

10  defendant was there, correct?

11              MR. CANNICK:  Objection.

12              THE COURT:  Overruled.

13  A    Can you repeat that again?

14  Q    When you spoke to the group, as you testified on direct

15  examination, when you spoke to the group about acquiring a

16  state ID from the welfare office for Aaliyah for money, the

17  defendant was there, right?

18  A    I'm pretty sure.  I think so but I'm not, I'm just not

19  positive.  Even if I said it before, I'm just not positive.  I

20  just don't see that in my head right now.

21  Q    Is it your testimony here today --

22  A    I'm saying it is my testimony.

23  Q    -- that the defendant may not have been there?

24  A    When I went and talked about money, I went and talked to

25  Derrel and I went and talked to Derrel about this not

1   happening and that's what I went to do.

2   Q    Mr. Smith, my question to you --

3   A    I don't remember if Robert was there.  If I said he was

4   before, I'm not changing that story to change the story.  I'm

5   just going back and I'm just trying -- I don't see it in my

6   head Robert next to me.  It was so confusing to me at this

7   time when this thing happened because it was like an overnight

8   thing.  It was nothing we saw coming or that -- you know, when

9   it happened, it was like, wow, it was like they wanted to do

10  something and I was against it but at the same time, I wanted

11  to make it happen.  That shouldn't have happened.  That was

12  wrong and that's the bottom line to that.

13            MR. CANNICK:  Your Honor --

14  A    Aaliyah should be left alone.  I shouldn't be talking

15  about Aaliyah.

16            MR. CANNICK:  Your Honor, Your Honor --

17            THE COURT:  Mr. Smith, please, don't freestyle.

18  Okay?  Let the prosecutor ask you any more questions that she

19  might have.

20  Q    Mr. Smith, you said that you thought that getting the ID

21  so that Aaliyah could be married to the defendant was wrong,

22  correct?

23  A    Yes.

24  Q    Why did you help the defendant?

25  A    I been with Robert since '84.  It's just like my brother,

1  if something happened to my brother, you know, if he did

2  something wrong.  I'm biding the time.  I didn't think that

3  that would happen.  There were no --

4          MR. CANNICK:  Your Honor.  I'm going to object to

5  this --

6          THE COURT:  I think the witness has answered this

7  question.  Any more questions?

8  Q    Mr. Smith, it's fair to say that you want to protect the

9  defendant, correct?

10         MR. CANNICK:  Objection.

11         THE COURT:  Overruled.

12 A    No, it's not.  No, it's not.  Not at this point, no.  I

13 mean, Robert --

14         THE COURT:  Okay.

15         MR. CANNICK:  Objection.

16         THE COURT:  That's the answer.

17 A    No, I'm not -- I'm not making --

18         THE COURT:  Any more questions?

19         MS. CRUZ MELENDEZ:  Nothing further, Your Honor.

20         THE COURT:  Any recross?

21         MR. CANNICK:  One question.

22 RECROSS-EXAMINATION

23 BY MR. CANNICK:

24 Q    Mr. Smith, you were asked by the government that had

25 Robert not told you what he did about Aaliyah possibly being

1    pregnant, that you would not have purchased tickets.  Do you

2    remember the government asked you that a short while ago?

3    A    Uh-huh.

4    Q    Well, according to your testimony on Friday, Robert

5    didn't tell you about Aaliyah possibly being pregnant until

6    you guys were on the train --

7    A    Yes.

8    Q    On the plane, right?

9    A    Yes.

10         MR. CANNICK:  Thank you.

11         THE COURT:  That was two questions.

12         MR. CANNICK:  Sorry.

13         THE COURT:  Do you have anything else?

14         MS. CRUZ MELENDEZ:  One question.

15   REDIRECT EXAMINATION

16   BY MS. CRUZ MELENDEZ:

17   Q    Did the defendant tell you that he was in trouble and

18   asked you to arrange those tickets, is that correct?

19   A    No, it's not.  He said Aaliyah is in trouble.

20   Q    Right.  Sorry.  That Aaliyah was in trouble and asked you

21   to arrange those tickets, correct?

22   A    He said we got to get home.

23         THE COURT:  Okay.

24         MS. CRUZ MELENDEZ:  Nothing else.

25         THE COURT:  Thank you so much.  You can step out.

CMH       OCR       RMR       CRR       FCRR

762

1          (Witness excused.)

2          THE COURT:  Are you ready to call your next witness?

3          MS. GEDDES:  We are not, Your Honor, but we are

4     working feverishly on it.

5          THE COURT:  Okay.  So maybe we'll take an unexpected

6     break.

7          All right.  So we're going to break for 15 minutes

8     or so.  Please don't talk about the case and we'll see you

9     back here in 15 minutes.

10         (Jury exits.)

11         THE COURT:  Okay.  Everybody can sit down.

12         I said 15 minutes.  Am I going to be a liar?

13         MS. GEDDES:  I hope not, Judge.

14         THE COURT:  Okay.

15         MS. GEDDES:  The cross was much shorter than we

16    anticipated but we're working on getting her here.

17         THE COURT:  Okay.  So we'll be in recess.  I take it

18    you expect this next witness to take most of the day?

19         MS. GEDDES:  Yes, Your Honor.

20         THE COURT:  Okay.  All right.  So we'll be back at

21    10:30.

22         MS. GEDDES:  Thank you.

23         THE COURT:  Great.

24         (Recess taken.)

25         (Continued on next page.)

Proceedings                                          763

1           THE COURTROOM DEPUTY:  All rise.

2           THE COURT:  Hi.  Everybody can sit down.

3           MS. GEDDES:  All right.  We're ready.

4           THE COURT:  Okay.

5           (Defendant enters the courtroom.)

6           THE COURT:  All right I'm told the witness is

7   available.  So let's get the jurors.

8           Oh, where's Mr. Scholar?

9           MR. FARINELLA:  He stepped out.

10          THE COURT:  Well, I don't -- I don't need detail, I

11  just didn't realize he wasn't here.  Well, it happens every

12  once in a while with lots of lawyers, so I think it's okay.

13          (Pause in the proceedings.)

14          THE COURTROOM DEPUTY:  All rise.

15          (Jury enters the courtroom.)

16          THE COURTROOM DEPUTY:  You may be seated.

17          THE COURT:  Okay.  We're ready to resume.

18          Are you ready to call your next witness?

19          MS. GEDDES:  Yes, Your Honor, the government calls

20  Jane.

21          Your Honor, may we speak to you very briefly at

22  sidebar?

23          THE COURT:  Do we need the court reporter?

24          MS. GEDDES:  I don't think so.

25          THE COURT:  Okay.

Proceedings                                              764

1            MS. GEDDES:  No.

2            (Discussion was had off the record.)

3            THE COURTROOM DEPUTY:  Please stand and raise your

4     right hand.

5            (Witness takes the witness stand.)

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JANE - DIRECT - GEDDES                765

1          **JANE, called as a witness, having been first duly**

2    **sworn/affirmed, was examined and testified as follows:**

3          THE WITNESS:  I do.

4          THE COURTROOM DEPUTY:  Please state your name for

5    the record.

6          THE WITNESS:  Jane.

7          THE COURTROOM DEPUTY:  You may be seated.

8          THE COURT:  All right, let's just make sure the

9    microphone -- okay.  I want to make sure it's working.

10         Okay, so first thing, speak into the microphone.

11         The second thing is that our court reporters take

12   down everything that you say.  So it's important not to speak

13   too quickly or to speak over whichever lawyer is asking you

14   questions.  If there something that you don't understand or

15   you want to have repeated, just say so.  And I'll have the

16   lawyer rephrase the question.  Okay?

17         THE WITNESS:  Thank you.

18         THE COURT:  All right, go ahead.

19         MS. GEDDES:  Go ahead you can take off your mask.

20   DIRECT EXAMINATION

21   BY MS. GEDDES:

22   Q    Good morning.

23   A    Good morning.

24   Q    I'm showing the witness only what's been marked for

25   identification as Government Exhibit 75.

JANE - DIRECT - GEDDES                     766

1        Do you recognize what's shown in Government

2   Exhibit 75?

3   A    I do.

4   Q    Who is that?

5   A    That is me.

6              MS. GEDDES:  The government offers Government

7   Exhibit 75.

8              THE COURT:  Any objection?

9              MR. CANNICK:  May I *voir dire*.

10             THE COURT:  Sure.

11             But you have to use your microphone.

12             MR. CANNICK:  Ma'am, do you have a recollection as

13  to when this picture was taken?

14             THE WITNESS:  This picture was taken -- this is my

15  driver's license.

16             MR. CANNICK:  Okay, thank you.

17             THE COURT:  So no objection?

18             MR. CANNICK:  No objection.

19             THE COURT:  Okay, it's in evidence.

20             MS. GEDDES:  May I publish?

21             THE COURT:  Yes.

22             (Government Exhibit 75, was received in evidence.)

23             (Exhibit published.)

24  BY MS. GEDDES:

25  Q    And I'm now showing the witness only what's been marked

JANE - DIRECT - GEDDES                    767

1  for identification as Government Exhibit 75A.

2          I'm sorry, 75B.

3          Do you see what's shown in 75B?

4  A    I do.

5  Q    Is the name written under -- does 75B include the same

6  photograph that was just published in Government Exhibit 75?

7  A    It does.

8  Q    And underneath your photograph, is that your true name

9  and nickname?

10  A    It is.

11          MS. GEDDES:  The government offers 75B, and would

12  ask that the 75B be published to the jury only.

13          THE COURT:  Okay.

14          (Exhibit published.)

15          THE COURT:  I forgot to ask if there's an objection.

16          MR. CANNICK:  No objection, Your Honor.

17          THE COURT:  Okay.

18  BY MS. GEDDES:

19  Q    How old are you today?

20  A    I'm 23.

21  Q    I'm showing the witness what's in evidence as Government

22  Exhibit 1.  Everyone can see Government Exhibit 1.  Thank you.

23          (Exhibit published.)

24  Q    Do you recognize the individual in Government Exhibit 1?

25  A    I do.

JANE - DIRECT - GEDDES                         768

1   Q     Do you personally know that individual?

2   A     I do.

3   Q     Who is that?

4   A     That is Robert Kelly, the defendant.

5   Q     Do you see him in the courtroom today?

6   A     I do not.

7              THE COURT:  Can you take a closer look?  Do you see

8   him?

9              THE WITNESS:  No.

10             I'm sorry, I don't have my glasses, but is it

11  possible for the defendant to stand up?

12             THE COURT:  Could the defendant remove --

13             MR. CANNICK:  No, no.

14             THE COURT:  He can't remove his mask?

15  A     Yes, I see the defendant.

16  Q     Can you point to him and describe an article of his

17  clothing?

18  A     He has a suit on.

19             THE COURT:  What color shirt does he have on?

20             THE WITNESS:  A black suit.

21             THE COURT:  All right, indicating the defendant.

22  Q     How old were you when you met the defendant?

23  A     I was 17 years old.

24  Q     What year was that?

25  A     It was 2015.

LINDA D. DANELCZYK, RPR, CSR, CCR

JANE - DIRECT - GEDDES                    769

1    Q     Have you had sexual contact with the defendant?

2    A     I have.

3    Q     When did you first have sexual contact with the

4    defendant?

5    A     When I was 17 years old.

6    Q     And did you continue to have sexual contact with him for

7    a period of time?

8    A     I did.

9    Q     How long were you with the defendant?

10   A     For five years.

11   Q     I want to direct your attention to April 8th of --

12   April 18th of 2015.

13             Do you remember that day?

14   A     I do.

15   Q     Where, if any, where did you go to evening?

16   A     I went to a festival with my parents.

17   Q     Who was the headliner at that festival?

18   A     The defendant.

19   Q     And was he performing under the name R. Kelly?

20   A     He was.

21   Q     In what city was the concert?

22   A     It was in Orlando, Florida.

23   Q     Did you live in Orlando then?

24   A     I did.

25             THE COURT:  Can you keep your voice up?  I want just

JANE - DIRECT - GEDDES                          770

1    to make sure you are speaking into the microphone.

2              THE WITNESS:  Sorry.

3              THE COURT:  That's okay.

4    A    I did.

5    Q    And how old were you at the time of that concert?

6    A    I was 17.

7    Q    When is your birthday?

8    A    December 30th, 1997.

9    Q    In April of 2015, when you met the defendant, were you

10   still in high school?

11   A    I was.

12   Q    What year were you?

13   A    I was a junior in high school.

14   Q    And what was the name of the high school that you then

15   attended?

16   A    Freedom High School.

17   Q    And that was in Orlando?

18   A    Yes.

19   Q    Do you remember in what section you were seated at the

20   festival where you first saw the defendant?

21   A    I was in the C section.

22   Q    And what if anything happened --

23             MR. CANNICK:  I'm sorry, I didn't hear what section.

24             THE COURT:  What section were you in?

25             THE WITNESS:  A C section.

LINDA D. DANELCZYK, RPR, CSR, CCR

JANE - DIRECT - GEDDES                771

1   BY MS. GEDDES:

2   Q    A C section?

3   A    Yes.

4   Q    What, if anything, happened while you were in the C

5   section?

6   A    There were people from his entourage who were giving out

7   wrist bands.

8   Q    And did you receive one of those wrist bands?

9   A    I did.

10  Q    What did the wrist band allow to you?

11  A    No, the wrist band allowed you to go to the pit and also

12  the meet-and-greet after the show.

13  Q    Did you then go to the pit?

14  A    I did.

15  Q    And where was the pit located in connection with the

16  stage?

17  A    It was in front of the A section.  Directly in front of

18  where the talent would have performed, the defendant.

19  Q    And by "talent" you're referring to the defendant?

20  A    Yes, I am.

21  Q    What, if anything -- did you then go to the pit?

22  A    I did, yes.

23  Q    What, if anything, did you notice about the defendant

24  while you were in the pit?

25  A    He performed majority of his songs to me and he did show

LINDA D. DANELCZYK, RPR, CSR, CCR

1    me a lot of attention.

2    Q    I'm showing the witness only what's been marked for

3    identification as Government Exhibit 248A.

4            Do you recognize 248A?

5    A    I do.

6    Q    What is that?

7    A    This is a picture of the defendant grabbing my hand.

8            MS. GEDDES:  Government offers 248A?

9            THE COURT:  Any objection?

10           Was this at that concert you're talking about?

11           THE WITNESS:  Yes, ma'am.

12           MR. CANNICK:  Yes, Your Honor, I do object.

13           THE COURT:  Overruled.

14           MS. GEDDES:  May we publish?

15           THE COURT:  Yes.

16           (Exhibit published.)

17   Q    Whose hand is this right here (indicating)?

18   A    That is my hand with two wrist bands.

19   Q    And were those the wrist bands that you received from a

20   member of the defendant's entourage that allowed you to go to

21   the pit?

22           MR. CANNICK:  Objection to the leading.

23           THE COURT:  Overruled.

24   Q    And whose hand is this right here (indicating) where my

25   pen is pointing?

JANE - DIRECT - GEDDES                 773

1  A    That was the defendant's.

2  Q    Now did the defendant stay on stage continuously during

3  that show?

4  A    He did not.

5  Q    What happened?

6  A    I believe he had breaks, and there was also another point

7  of the show where he performed on another stage.

8  Q    During the show, what, if any, additional contact did you

9  have with other associates of the defendant?

10 A    When he performed his second set at a stage that was

11 further in the middle of the crowd, someone from his entourage

12 did come to me and they gave me a sheet of paper and said

13 "Don't tell anyone."

14 Q    Did you take a look at the sheet of paper?

15 A    I did.

16 Q    What was on the sheet of paper?

17 A    It was the defendant's name and a phone number.

18 Q    What was listed -- when you said the defendant's name,

19 what did it say?

20 A    It said "Rob" and it had a number.

21 Q    Do you remember the telephone number that was written on

22 that piece of paper?

23 A    I do.

24 Q    What was it?

25 A    It was (312)925-0880.

LINDA D. DANELCZYK, RPR, CSR, CCR

1  Q    What happened after the defendant finished performing at

2  the show?

3  A    After the show, it was a meet-and-greet.  However, I was

4  dressed -- I wasn't dressed up for the show, so I did not go

5  to the meet-and-greet.  I found my parents after.

6  Q    And I'm showing the witness only what's been marked for

7  identification as Government Exhibit 245A.

8         Do you recognize what's shown in 245A?

9  A    I do.

10 Q    What is shown in 245A?

11 A    It is a picture of me with a pair of black panties.

12 Q    And when was this photograph taken?

13 A    This was the initial date in April at the same show.

14 Q    Who took the photo?

15 A    I took the photo.

16        MS. GEDDES:  Government offers 245A.

17        THE COURT:  Any objection?

18        MR. CANNICK:  None.

19        THE COURT:  All right, that's in evidence.

20        And you can publish it.

21        (Government Exhibit 245A, was received in evidence.)

22        (Exhibit published.)

23 Q    And does this photo reflect what you were wearing to the

24 concert that the evening?

25 A    It does.

JANE - DIRECT - GEDDES                    775

1   Q     And you testified that you're holding a pair of black
2   panties.
3             Where did you receive those from?
4   A     From the defendant.
5   Q     When did you receive those?
6   A     He gave them to me while performing.
7   Q     And was the defendant performing as part of the tour?
8   A     He was.
9   Q     Do you know the name of the tour that the defendant was
10  performing?
11  A     It was his Black Panties Tour.
12  Q     Now you testified that the during the show, you were
13  given a piece of paper with the defendant's name and telephone
14  number on it.
15            What, if anything, did you do with that piece of
16  paper?
17  A     I gave the paper to my mom.
18  Q     And what, if anything, else did you do with the phone
19  number on that piece of paper?
20  A     I did text the number.
21  Q     Did you receive a response from the defendant?
22  A     Initially no because I hadn't entered the proper number.
23  Q     You later learned that you had entered an incorrect
24  number?
25  A     Yes.

JANE - DIRECT - GEDDES                          776

1    Q    I want to step back a moment.

2         You testified that you were in high school at that

3    time, in your junior year.  What your interests in high

4    school?

5    A    Music and I did a lot of sports.

6    Q    What, if any, music related after school activities did

7    you participate in?

8    A    I was taking three choir classes at the time.  And I was

9    a part of Patriot Singers, which was basically a group of our

10   best singers, and you had to audition to be a part of it.  And

11   it was very selective.  And that is something that I took

12   after school.  It was mandatory.

13   Q    How many days a week did Patriot Singers meet?

14   A    Monday through Friday.

15   Q    Every day?

16   A    Every single day, yes.

17   Q    And did you also take any music -- did you take any

18   music-related courses in high school?

19   A    I did, yes.

20   Q    What type of courses did you take?

21   A    I took varsity, and I also took a class called -- I don't

22   actually remember the specific name of it, but it was a class

23   dedicated to a small group of our students who were working to

24   get scholarships for performance.

25   Q    At that time --

JANE - DIRECT - GEDDES                777

1          Are you okay?

2          At that time, had you earned any money singing?

3    A    I had.

4    Q    How had you earned money?

5    A    Outside of my school I was a performer and I did shows

6    and I would write music.  So usually I would get gigs.

7    Q    And you were paid for some of those gigs?

8    A    I was.

9    Q    What type of music did you want to pursue back then?

10   A    R&B.

11   Q    And what type of music did the defendant perform?

12   A    R&B.

13   Q    You also testified that one of your interests in high

14   school were sports.

15         What types of sports did you participate in?

16   A    I participated in track and weightlifting.

17   Q    I want to turn back to when one of the defendant's

18   associates gave you the defendant's phone number.

19         Were you then interested in the defendant

20   romantically?

21   A    I was not.

22   Q    You testified, though, that you did try to contact him by

23   sending him a text message.

24   A    I did.

25   Q    Why did you try to reach out to the defendant?

1   A    Because he was a musician as well, and I felt that any

2   critique would be good critique.

3   Q    Critique of your own musical skills?

4   A    Yes.

5   Q    How did you eventually get in touch with the defendant?

6   A    I eventually had a FaceTime with him, because I didn't

7   know if it was necessarily just someone from his entourage who

8   was trying to take advantage of me.  And when I did FaceTime

9   him, it was, in fact, him.

10  Q    Now at the time when you FaceTimed him, and just for the

11  record can you explain what you mean by "FaceTime"?

12  A    FaceTime is a visual phone call.

13  Q    Okay.  So was it a way for you to see the caller that

14  you're talking to?

15  A    Yes.

16  Q    Now at the time when you first FaceTimed with the

17  defendant, did you learn whether or not either of your

18  parents, if any, had had any contact with the defendant?

19  A    At that time I did not.

20  Q    How were you able to get the defendant's phone number?

21  A    Well, when I realized that I didn't have the right

22  number, I did -- I happened to be on my mom's phone for

23  something, and I did see she had been texting the defendant.

24  Q    All right.  So did you learn that your mom had, in fact,

25  been communicating with the defendant by text message?

JANE - DIRECT - GEDDES                    779

1   A    I did.

2   Q    And did you have a chance to look at some of those text

3   messages?

4   A    I did.

5   Q    Who was the defendant -- who was your mom purporting to

6   be when she was communicating with the defendant?

7   A    My mother was acting as me.

8   Q    Now you said that you did eventually start communicating

9   with the defendant.  I think you testified that you FaceTimed

10  him.

11  A    Yes.

12  Q    Do you recall what telephone you were using to

13  communicate with the defendant?

14  A    I was using an iPod that I had gifted to my mother.

15  Because at the time I had an android.

16  Q    And did the iPod allow you to do FaceTimeing?

17  A    It did.

18  Q    And did you use another telephone to also text message

19  and communicate with the defendant?

20  A    I did.

21  Q    What phone is that?

22  A    That is the phone that I had at 17 years old.  It was an

23  android.

24       MS. GEDDES:  I'm showing the witness what's been

25  marked for identification as Government Exhibit 233.

JANE - DIRECT - GEDDES                    780

1           May I approach, Your Honor?

2           THE COURT:  Yes.

3           (Counsel approaches the witness.)

4   BY MS. GEDDES:

5   Q    Do you recognize Government Exhibit 233?

6   A    I do.

7   Q    What is it?

8   A    It is my phone from high school.

9   Q    And is that the phone that you were using to communicate

10  with the defendant or one of the phones were you using?

11  A    It was.

12          MS. GEDDES:  Government Exhibit offers 233.

13          MR. CANNICK:  No objection.

14          THE COURT:  All right, that's in evidence.

15          (Government Exhibit 233, was received in evidence.)

16  Q    Now before you met with the government or first met with

17  the government, when did you last see that phone that's in

18  evidence as Government Exhibit 233?

19  A    The last time I saw that phone was in Florida.  Before I

20  left my family.

21  Q    Okay.  Do you remember when that was?

22  A    It was probably June or July.

23  Q    Of what year?

24  A    2015.

25  Q    And did you use the phone after you left it in Florida

JANE - DIRECT - GEDDES                781

1  with your family?

2  A    I did not.

3         THE COURT:  Just wait until the lawyer finishes

4  asking the question before you answer.  That way it's easier

5  for the court reporter, okay?  That's all right.  Go ahead.

6  Q    You said that you saw some of the messages that your mom

7  had been exchanging with the defendant.

8         What did you understand at that time that your mom

9  had told the defendant when she was communicating with him by

10 acting as?

11 A    To my knowledge she did tell him that I was a musician.

12 And that I was an artist.  And she did send him videos of me

13 on YouTube of me performing live.

14 Q    And when you started to communicate with the defendant,

15 what, if anything, did you and the defendant discuss over the

16 phone and in text messages?

17 A    Initially he said -- I did tell him that I was a

18 musician, and he said that I could come and audition.

19 Q    What, if anything, did you tell the defendant about your

20 age?

21 A    I told the defendant that I was 18.

22 Q    Were you, in fact, 17?

23 A    I was.

24 Q    You mentioned that the defendant told you that you could

25 audition; is that correct?

JANE - DIRECT - GEDDES                    782

1   A    That is correct.

2   Q    Did you arrange -- was the place arranged and a time

3   arranged for you to have an audition with the defendant?

4   A    Yes, it was.

5   Q    Where was that supposed to take place?

6   A    At the Dolphin Hotel.

7   Q    Where is the Dolphin Hotel?

8   A    It's on Disney's property in Kissimmee.

9   Q    Is that near Orlando where you live?

10  A    Yes.

11  Q    And whose idea was it to meet at the Dolphin Hotel?

12  A    It was the defendant's.

13  Q    Where did you next see the defendant?

14  A    At the Dolphin Hotel.

15  Q    I'm showing the witness only what's been marked for

16  identification as Government Exhibit 518A, E and G.

17       This is 518A.

18       518E.

19       And 518G.

20       Do you recognize what's been shown in those three

21  exhibits?

22  A    I do.

23  Q    What is that?

24  A    That is the hotel that Mr. -- the defendant had asked me

25  to meet him at.

JANE - DIRECT - GEDDES                783

1    Q    And are those fair and accurate photos of the hotel and

2    how it appeared when you met him there?

3    A    It is, yes.

4         MS. GEDDES:  The Government Exhibit offers 518A, E

5    and G.

6         MR. CANNICK:  No objection.

7         THE COURT:  All right those are in evidence.

8         (Government Exhibit 518A, E and G, were received in

9    evidence.)

10        (Exhibit published.)

11   BY MS. GEDDES:

12   Q    I'm going to put 518E on the screen.

13        Now do you recall how long it was between the

14   festival where you first saw the defendant and when you went

15   to the Dolphin Hotel for an audition with the defendant?

16   A    It was possibly a few days.  He did say that he usually

17   stayed there after for a few days.

18   Q    And when you say "he," who are you referring to?

19   A    The defendant.

20   Q    Do you remember what you did before you went to the

21   Dolphin Hotel that day?

22   A    I was at school.

23   Q    And where did you go after school?

24   A    I -- after Patriot Singers, I didn't go to any sports

25   activities, I went to my friend Malak's house and I got

LINDA D. DANELCZYK, RPR, CSR, CCR

1    dressed.

2            MR. CANNICK:  Can I have that read back?

3            THE COURT:  Whose house?

4            THE WITNESS:  Malak.  She's a friend of mine that I

5    attended high school with.

6            THE COURT:  Okay.

7            MR. CANNICK:  Could I have the entire answer read?

8            THE COURT:  Sure.

9    (Whereupon, the record was read.)

10            THE COURT:  What was the name again?

11            THE WITNESS:  Malak.

12            THE COURT:  Malak?

13            MS. GEDDES:  M-A-L-A-K.

14            THE WITNESS:  Yes.

15            THE COURT:  Go ahead.

16            MR. CANNICK:  Thank you.

17    BY MS. GEDDES:

18    Q    You testified that you were at your friend's house and

19    then you got dressed.

20            Did you then go to the Dolphin Hotel?

21    A    I did.

22    Q    Who, if anyone, came with you to the Dolphin Hotel?

23    A    No one.

24    Q    Who, if anyone, knew that you were going to meet the

25    defendant at the hotel that day?

1   A    My family.

2   Q    Do you remember what you wore when you went to meet the

3   defendant that day?

4   A    Yes, I do.  I wore black kid me heels and a pair of

5   skinny jeans, dark blue, and a crop top that had mesh at the

6   top.

7            MR. CANNICK:  I'm sorry, I didn't get the top.

8            THE COURT:  It had mesh on the top.

9            MR. CANNICK:  Okay, thank you.

10  BY MS. GEDDES:

11  Q    I'm showing the witness only what's been marked for

12  identification 247A.  For the witness only.

13            Do you recognize what's shown in 247A?

14  A    I do.

15  Q    What is that?

16  A    That is me prior to meeting the defendant.

17  Q    And who took that took photograph?

18  A    I took at that picture.

19  Q    And did you take it the day that you were going to the

20  Dolphin Hotel to meet the defendant?

21  A    I did.

22            MS. GEDDES:  Government offers 247A.

23            MR. CANNICK:  No objection.

24            THE COURT:  Okay, that's in evidence.

25            (Government Exhibit 247A, was received in evidence.)

JANE - DIRECT - GEDDES                    786

1           (Exhibit published.)

2  Q    Now, you testified you went to the Dolphin Hotel to meet

3  the defendant.

4           Where did you first see him at the Dolphin Hotel?

5  A    When I drove there, he told me that it would be a black

6  sprinter out front of the hotel and to get inside.

7  Q    Did you see the black sprinter when you arrived?

8  A    I did.

9  Q    And when you say "black sprinter," what are you referring

10 to?

11 A    A Mercedes-Benz black sprinter van.

12 Q    And who, if anyone -- did you then go inside the

13 sprinter?

14 A    I did.

15 Q    Who, if anyone, was inside the sprinter when you went

16 there?

17 A    The defendant.

18 Q    Anyone else that you saw?

19 A    No.

20 Q    Where was the sprinter van parked?

21 A    It was parked in the front of the hotel.

22 Q    Was it parked in the parking lot or in another location?

23 A    No, it was parked directly in the roundabout.

24 Q    In front of the Dolphin Hotel?

25 A    Yes.

JANE - DIRECT - GEDDES                787

1  Q    What happened when you went inside the sprinter?

2  A    When I got inside the sprinter, me and the defendant

3  talked.

4  Q    Do you remember what you talked about that day?

5  A    We, of course, talked about me auditioning.  And he had

6  asked me a few questions.

7  Q    Do you remember what he asked you?

8  A    Yes.

9  Q    What did he ask you?

10 A    He had asked me to sit on his lap.

11 Q    How did you respond when the defendant asked you to sit

12 on his lap?

13 A    I asked him if he was sure.

14 Q    What did the defendant say?

15 A    He said he is.

16 Q    Did you then sit on the defendant's lap?

17 A    I did.

18 Q    What else, if anything, did he ask you when you were

19 inside the sprinter?

20 A    He then asked me for a kiss.

21 Q    How did you respond to that?

22 A    I didn't necessarily want to, and so he said "Just a

23 small pop kiss."

24 Q    Now you used the term "pop kiss".  Was that your word or

25 his word?

JANE - DIRECT - GEDDES                    788

1    A    His word.

2    Q    What did you do?

3    A    I did kiss -- I said "Are you sure?"

4    Q    And what happened?

5    A    And then he said, Yes, and then I gave him a pop kiss.

6    Q    Now what do you mean by a "pop kiss"?

7    A    Meaning that, in his terms, it didn't need to have any

8    tongue, it was just an innocent pop kiss.

9    Q    Approximately how long did you stay in the sprinter with

10   the defendant?

11   A    Not long, probably about five to seven minutes.

12   Q    And what, if anything, did you do after you were in the

13   sprinter?

14   A    Someone knocked on the outside of the sprinter and it was

15   time for us to go upstairs.

16   Q    Did you see who knocked on the sprinter van?

17   A    I did not.  Because their back was turned.

18   Q    So what did you do when there was a knock and you were

19   told that it was okay to go upstairs or time to go upstairs?

20   A    I just followed the defendant up.

21   Q    Where did you go next?

22   A    To the hotel room.

23   Q    And was that a hotel room inside the Dolphin?

24   A    It was, yes.

25   Q    Was anyone else inside of the hotel room when you went

1    there?

2    A    No.

3    Q    You testified a minute ago that someone knocked and said

4    it was time to go.

5              What did you understand that individual to mean by

6    that?

7                 MR. CANNICK:  Objection.

8                 THE COURT:  Overruled.

9    A    It just meant that the keys were ready and that we could

10   go up stairs.

11   Q    The keys for the hotel room?

12   A    Yes.

13   Q    What, if anything, happened once you were inside the

14   hotel room at the Dolphin Hotel?

15   A    When we were upstairs, the defendant took his cigar out

16   of his mouth and he had expressed to me that before I can an

17   audition that he needed to cum.

18   Q    And by "cum," what do you mean?

19   A    He needed to ejaculate.

20   Q    What, if anything, was the defendant carrying when you

21   went into the hotel room?

22   A    He had a backpack.

23   Q    And what, if anything -- did you bring your phone with

24   you to the Dolphin Hotel?

25   A    I did, yes.

JANE - DIRECT - GEDDES                    790

1   Q    What, if anything, did you do with your phone once you

2   were in the hotel room?

3   A    When I got upstairs, he told me to turn my phone off

4   because people sometimes try to record him.

5   Q    Did you turn you phone off?

6   A    I did, yes.

7   Q    You said that the defendant said he needed to ejaculate.

8        How did you respond to that?

9   A    I was against it.

10  Q    What did you say to him?

11  A    I told him I did not come to please him and that I was

12  coming for an audition.

13  Q    What did he say?

14  A    And he continued to persist and told me to just -- I

15  didn't have to do anything, just to take off my clothes.

16  Q    How did you respond to that?

17  A    I then took off my clothes.

18  Q    What happened after that?

19  A    He then asked me -- he persisted to have sex, and I told

20  him that I hadn't shaved.

21  Q    I'm sorry, when you said he persisted to have sex, what

22  do you mean?

23  A    Like he persisted to continuously try and peer pressure

24  me to have sex with him.

25  Q    And you testified that you said you hadn't shaved?

JANE - DIRECT - GEDDES                      791

1   A    Yes.

2   Q    How did the defendant respond to that?

3   A    He said "Even better."

4   Q    What, if anything, else did you say?

5   A    I told him that I -- he persisted again and I told him

6   that I was sweaty from sports, even though I hadn't attended

7   sports, and his response to that was that there was a shower

8   in the room.

9   Q    What did you do?

10  A    I continued to deny and decline, and so he then told me

11  to just walk back and forth.  And asked if he could give me

12  oral sex and...

13  Q    You said that he asked you to walk back and forth.

14  A    Uh-huh.

15  Q    What did you understand the defendant to mean by that?

16  A    I just thought that that would be better than having sex

17  with the defendant.

18              MR. CANNICK:  Objection.

19              THE COURT:  Overruled.

20  Q    Did you then walk back and forth for the defendant?

21  A    I did, yes.

22  Q    What, if anything, were you wearing at that time?

23  A    I just had on panties and the bra that I had on.

24  Q    And you mentioned that the defendant's also asked you

25  about oral sex.

1   A    He did.

2   Q    Do you remember the words, in effect, that the defendant

3   used?

4   A    Yes.

5   Q    What did he say?

6   A    After that he said, before I could sing that he needed to

7   cum again, and that he -- if I couldn't have sex with him to

8   at least just let him lick my butt.

9   Q    And what, if anything, did he promise in return?

10  A    To allow me to audition and to take care of me for life.

11  Q    He said that if he -- if you agreed to that, that he

12  would take care of you for the rest of your life, or for your

13  life?

14  A    Yes, he did.

15  Q    What did you say?

16  A    I didn't necessarily care for that, I just wanted to

17  sing.

18  Q    So what happened after that?

19  A    After that, he then laid down, and I got on top of him

20  backwards, and he did lick my butt.  And he had his backpack

21  besides him and a few iPads that he had taken out.

22  Q    You mentioned that the defendant had some iPads.  What,

23  if anything, did you notice about the iPads then?

24  A    I didn't notice anything because I was backwards, so I

25  couldn't necessarily see what was visible on them.

JANE - DIRECT - GEDDES                              793

1    Q     But you saw defendant remove an iPad or two?

2    A     Yes, I did.

3    Q     What happened next?

4    A     There was a knock on the door.

5    Q     What, if anything, did the defendant do when you heard

6    that knock on the door?

7    A     He got up and he went to the door and he saw that it was

8    officers at the door, and he then told me to go to the

9    washroom and put my close on.  And he asked me if I was 18.

10   And I said, "Yes."

11   Q     What was the defendant's demeanor when he saw the

12   officers at the hotel room door?

13   A     He was very anxious and scared.

14             MR. CANNICK:  Objection.

15             THE COURT:  Overruled.

16             What led you to the conclusion that he was anxious

17   and scared?

18             THE WITNESS:  Because after he looked through the

19   peephole, he made me go into the restroom immediately and told

20   me to get dressed.  And he said, "Are you 18?"  And I said,

21   "Yes."  And he said, "Don't lie to me."  And I said, "Yes."

22             THE COURT:  Next question.

23   Q     Did you then go to the restroom and get dressed?

24   A     I did, yes.

25   Q     And then did you -- what did the defendant do?

JANE - DIRECT - GEDDES                    794

1  A    He opened the door and he spoke to them.  And he was more

2  relaxed.

3  Q    And what, if anything, did you do when the officers were

4  at the door and speaking with the defendant?

5  A    Once I came out of the restroom, I then saw them and they

6  had spoken to me and said that they had been looking for me

7  because my parents could not get in touch with me.

8  Q    How did you respond?

9  A    I told them that I had put my phone in airplane mode.

10  And as I said that, I was turning on my phone.

11          And I then had to call my parents in front of them

12  and let them know that I was okay.  And I also had to show

13  them my ID.

14  Q    And what, if anything, did you say about your age?

15  A    I did say that I was 18.

16  Q    What, if anything, else did the officers say during that

17  encounter?

18  A    Basically after they did check my ID, they left and they

19  had given the defendant a card and said any time he was in

20  Orlando and needed security to let them know.

21  Q    Now you said that you showed the officers your

22  identification, your ID.

23          Did you show them your true identification?

24  A    Yes, it was my driver's license.

25  Q    And based on your identification, how old were you -- how

JANE - DIRECT - GEDDES                                795

1   old did it show that you were?

2   A     Seventeen years old.

3   Q     Did the officers then leave?

4   A     They did, yes.

5   Q     What happened after the officers left?

6   A     The defendant wanted to proceed because he still needed

7   to cum.

8   Q     And by "cum," do you mean ejaculate?

9   A     Yes, I do.

10  Q     What happened then?

11  A     We persisted, and then he made me get back on top of him

12  backwards, and then he ejaculated.

13  Q     What happened after the defendant ejaculated.

14  A     After he ejaculated, I was able to put back on my clothes

15  and he did allow me to sing.

16  Q     What did you sing for the defendant?

17  A     I sung "Momma Knows Best" by Jessie Jay, which was a

18  ballad.

19  Q     How, if at all, did the defendant react after you sang

20  for him?

21  A     He seemed very impressed and he said that I had a great

22  voice and that I had a lot of potential.

23  Q     What, if any, future plans did you make with the

24  defendant that evening?

25  A     He did say that he would like to see me again and teach

1  me a few techniques.

2  Q    You testified earlier that when you saw the defendant

3  perform at that concert in Orlando, he was performing as part

4  of a tour.

5            Did you learn what types of venues the defendant was

6  performing at as part of that tour?

7  A    Yes.  It was stadium shows and a lot of outdoor

8  festivals.

9  Q    And where were those shows?

10  A    In multiple cities and states.

11  Q    Throughout the country?

12  A    Yes.

13  Q    Now at either the Dolphin Hotel where you first met the

14  defendant or in the few days thereafter, what, if any, plans

15  did you make with the defendant?

16  A    He had to leave, and that once he left he would want me

17  to come out to the next city that he was in.

18  Q    And did you continue to communicate with him by phone?

19  A    I did, yes.

20  Q    How?

21  A    Via text message and phone calls.

22  Q    After you met with the defendant at the Dolphin Hotel,

23  did you mother continue to text the defendant pretending to be

24  you, as far as you know at least?

25  A    She did not, no.

JANE - DIRECT - GEDDES                    797

1   Q    Now in the few days after you met the defendant, do you
2   recall sending the defendant a video?
3   A    I do.
4   Q    What video did you send to the defendant?
5   A    The defendant had asked me to send a more -- a video of
6   my singing in my underwear and bra.
7   Q    And did you do that?
8   A    I did, yes.
9   Q    Did you -- what, if any, other videos did you send the
10  defendant?
11  A    I sent him videos of me dancing, singing, and more videos
12  of me performing.
13  Q    Did you send the defendant any professional videos of
14  you?
15  A    I did, yes.
16  Q    What did you send him?
17  A    I sent him my unreleased single that my parents had paid
18  for and I had asked him for his input.  And his opinion.
19  Q    What was the name of the unreleased single that you had
20  sent to him?
21  A    The single was called "Liar Liar".
22  Q    And why did you send it to the defendant?
23  A    Well, it was going to be my first single release, and I
24  had just got back the final edit and I genuinely wanted his
25  input.

JANE - DIRECT - GEDDES                    798

1   Q    And who had -- you said you performed on that video; is

2   that correct?

3   A    It was more like a music video, so it was like me and

4   friends from high school.  It was shot professionally.

5   Q    And how did the defendant respond to that video after you

6   sent it to him?

7   A    He liked it.  He said that he did like it and that it was

8   cute and that it wasn't, you know, too grown or too sexy and

9   that he liked it.

10  Q    Now you said that the defendant proposed seeing you again

11  at another stop on his tour; is that right?

12  A    He did, yes.

13  Q    Did the defendant explain to you how you would get to the

14  next stop on his tour?

15  A    Yes.

16  Q    What did he tell you?

17  A    He had given me a number and he told me specifically what

18  to text to that number.

19  Q    And what were you -- what did he tell to you text to that

20  particular number?

21  A    He told me to say, "Mr. Kelly said to get me to whatever

22  city that he was in at that time."

23  Q    Do you recall the first state that you traveled to to see

24  the defendant?

25  A    I do not.

JANE - DIRECT - GEDDES                    799

1   Q    I'm showing the witness only what's been marked for

2   identification as Government Exhibit 233C.

3            Does reviewing 233C refresh your recollection as to

4   where you first traveled to see the defendant?

5   A    It does, yes.

6   Q    Where did you -- what state did you travel to?

7   A    I traveled to California.

8   Q    And what city in California?

9   A    Los Angeles.

10  Q    Now, approximately when did you take this trip?

11  A    I took this trip on the 28th of April.

12  Q    And was that in 2015?

13  A    Yes.

14  Q    Were you still finishing your junior year in high school

15  when you took this trip?

16  A    Yes, I was.

17  Q    Did you take more trips to see the defendant on this

18  tour?

19  A    I did, yes.

20  Q    While you were still in your junior year of high school,

21  generally speaking, what days would you travel to see the

22  defendant?

23  A    He would -- I would usually travel the weekend, but

24  sometimes it would go over and lead into Monday.

25  Q    And would you miss days of school as a result of this?

JANE - DIRECT - GEDDES                    800

1  A    Yes, I would.

2  Q    You testified that the defendant told you to send a text

3  message to someone to arrange travel.

4         Who do you understand you were senting a text

5  message to?

6  A    It was an assistant.

7  Q    An assistant who worked for the defendant?

8  A    Yes.

9  Q    Did you learn her name?

10  A    Her name was Cheryl Mack.

11  Q    I'm showing the witness only what's been marked for

12  identification as Government Exhibit 38.

13         Do you recognize Government Exhibit 38?

14  A    I do, yes.

15  Q    What is Government Exhibit 38?

16  A    That was his assistant in the year 2015.

17  Q    What was her name?

18  A    Cheryl Mack.

19         MS. GEDDES:  Government offers Government

20  Exhibit 38.

21         THE COURT:  Any objection?

22         MR. CANNICK:  None.

23         THE COURT:  I just don't recall, did you offer the

24  other exhibit as well.

25         MS. GEDDES:  I'm about to.

1              THE COURT:  Do you object?

2              MR. CANNICK:  No.

3              THE COURT:  Okay.  That's in evidence also.

4              (Government Exhibit 233C, was received in evidence.)

5              (Government Exhibit 38, was received in evidence.)

6              MS. GEDDES:  Thank you.

7    Q    So what, if any, information did you provide to Cheryl

8    Mack when you first sent her a text message asking to arraign

9    your travel?

10   A    I said to her the city that I was currently departing

11   from, and I sent her my birthdate.

12   Q    And who did you understand would pay for your travel to

13   Los Angeles to see the defendant?

14   A    The defendant.

15   Q    You testified that you provided your name and your

16   birthdate, correct?

17   A    Yes, I did.

18   Q    Did you provide your true birthday?

19   A    Yes, I did.

20   Q    Showing that you were 17 years old?

21   A    Yes, I did.

22             MS. GEDDES:  Your Honor, may we publish to the jury

23   only Government Exhibit 233C, which is now in evidence.

24             THE COURT:  Yes.

25             (Exhibit published.)

JANE - DIRECT - GEDDES                     802

1   Q    Generally speaking, what is shown in 233C?

2   A    It is me letting her know what city I am leaving from,

3   which is Orlando.  And then me sending her my birthday stating

4   12/30/1997.

5   Q    Are these text messages that you exchanged with Cheryl

6   Mack?

7   A    Yes, it is.

8   Q    And what are the dates of these text messages?

9   A    It is April the 28th, 2015.

10  Q    Without reading your name in line 6802, can you read that

11  first line where my pen is pointing (indicating)?

12  A    Yes.

13          Mr. Kelly said to get me to LA, an early flight.  My

14  name is Jane.  I'm in Orlando, Florida currently.

15  Q    And did Cheryl Mack then arrange for you to travel from

16  Orlando, Florida to Los Angeles the following day?

17  A    Yes, she did.

18          MS. GEDDES:  I'm showing the witness what's been

19  marked for identification as Government Exhibit 217.

20          Do you recognize 217?

21  A    I do.

22          (Continued on the following page.)

23

24

25

Jane - direct - Geddes                    803

1    (Continuing.)

2              MS. GEDDES:  The Government offers 217, if there's

3    no objection.

4              MR. CANNICK:  No objection.  I just want to make

5    sure.

6              (Pause.)

7              MR. CANNICK:  Okay, thank you.

8              THE COURT:  All right, that's in evidence.

9              (Government's Exhibit 217 was received in evidence.)

10             MS. GEDDES:  May we publish to the jury only?

11             THE COURT:  Yes.

12             (Exhibit published to the jury only.)

13   BY MS. GEDDES:

14   Q    What is Government Exhibit 217?

15   A    It is a flight ticket from Orlando to LA.

16   Q    And is this for a flight on April 29th of 2015?

17   A    It is, yes.

18   Q    And is this for yourself?

19   A    Yes.

20   Q    And was this ticket booked by the defendant's assistant,

21   Cheryl Mack?

22   A    Yes, it was.

23   Q    Did you see the defendant while -- when you arrived in

24   LA, like during that trip?

25   A    I did, yes.

Jane - direct - Geddes                    804

1   Q     Now, do you remember where you first saw him during the

2   trip?

3   A     No.

4   Q     So, even if you don't remember where you first saw him,

5   where do you recall seeing him while you were in LA?

6   A     In the hotel and at his shows.

7   Q     Did you attend his show in LA while you were there?

8   A     I did, yes.

9   Q     And you said you also saw him at the hotel.

10  A     Yes.

11  Q     What happened at the hotel room where you saw the

12  defendant?

13  A     He did express that he wanted to teach me a few

14  techniques, however, he needed to ejaculate again before doing

15  anything.

16  Q     And when you say that he said that he wanted to teach you

17  a few techniques, what type of techniques did you understand

18  him to be referring to?

19  A     Music -- musical techniques to help me better myself.

20  Q     As a singer?

21  A     Yes.

22  Q     What happened after he said that?

23  A     After he said that, he -- we did the same thing, and he

24  did, in fact, give me a few techniques.

25  Q     And when you said you "did the same thing," what are you

SAM      OCR      RMR      CRR      RPR

Jane - direct - Geddes                    805

1   referring to?

2   A    Oral sex, he needed to ejaculate before anything.

3   Q    Did he give you oral sex?

4           MR. CANNICK:  Objection.

5           THE COURT:  Overruled.

6   A    I don't remember.  I believe -- well, like eating my

7   butt, yes.

8   Q    Are you saying you don't remember where specifically he

9   gave you oral sex on, on what part of your body?

10  A    No, I thought you were asking like vaginally, but yes, he

11  did give me oral sex.

12          MR. CANNICK:  Your Honor, may we approach briefly,

13  very briefly?

14          THE COURT:  Sure.  Do you need the court reporter?

15          MR. CANNICK:  Hopefully, not.

16          THE COURT:  Well, let's have her come over just in

17  case.

18          MR. CANNICK:  Okay.

19          (Sidebar held outside the hearing of the jury.)

20

21          (Continued on the following page.)

22

23

24

25

```
                            Sidebar                      806
```

1          (The following sidebar took place outside the
2    hearing of the jury.)
3          MR. CANNICK:  Your Honor, I don't understand, I'm
4    objecting to questions that I think are leading.
5          This is a very crucial witness, I think we should be
6    getting her testimony, and the Court is overruling those
7    objections.  I don't want to continue to object if you're
8    going to overrule them, but I just need to know the rationale.
9          THE COURT:  Well, my general policy is I don't look
10   back on rulings, but I will surely explain it to you.
11         She said that the same thing happened this time as
12   had happened before, and the follow-up was somewhat leading,
13   but it was based on her answer that the same thing had
14   happened before, which she had described earlier.  So, while
15   it was technically leading, it wasn't leading in a way that
16   was unfair.
17         That's the basis for my ruling.
18         And I don't, as a practical matter, I don't
19   understand you to be doing this either, it's that every
20   technical violation requires some kind of a curative
21   instruction.  This witness is pretty much describing things
22   that happened.  If there is real leading going on, I will
23   sustain it, as I think I've done before, but I think a little
24   bit of leading to move it along when it's already been
25   established what she was talking about is not a problem.

```
                        Sidebar                    807
```

1          So, that's what I'm doing.

2          MR. CANNICK:  The last question was not the one that

3   I was really bothered by in terms of the Court's ruling, it

4   was the question before that.

5          I just think that there's some crucial things, in

6   terms of --

7          THE COURT:  What was this topic?

8          MR. CANNICK:  I'm old, Judge, I don't remember the

9   topic.

10          THE COURT:  Not as old as I am, and I remember the

11   topic.  It was describing the nature of the sexual contact,

12   and that's specifically why I didn't sustain the objection

13   because she said the same thing happened in this instance as

14   happened in Florida.  And so that, to me, is not the kind of

15   thing that requires any kind of a curative instruction.

16          MR. CANNICK:  I wouldn't want one.

17          THE COURT:  All right.  So, that's the basis for the

18   rulings.  So, why don't we move on.

19          MS. GEDDES:  Okay, just one note along this line.

20          The witness was with the defendant for five years.

21   I would like to be able to lead, at least in part, so that

22   we're not here until the end of time.

23          MR. CANNICK:  Just so that we're clear, I don't have

24   any problems with setting time, leading to set time, but it's

25   just when it comes to details --

```
                         Sidebar                        808

  1          MS. GEDDES:  That's fine.

  2          THE COURT:  I think we're all on the same page.

  3   Obviously, what color was the car, what street did you drive

  4   on, those kinds of things do not do.

  5          MR. CANNICK:  Are we going to get through this

  6   witness today, in terms of your direct?

  7          MS. GEDDES:  I sure hope so.

  8          MR. CANNICK:  Okay, all right.

  9          Okay, thank you, Your Honor.

 10          (Sidebar concluded.)

 11

 12

 13          (Continued on the following page.)

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Jane - direct - Geddes                    809

1           (In open court - jury present.)

2           THE COURT:  Okay, next question, please.

3    EXAMINATION CONTINUING

4    BY MS. GEDDES:

5    Q    While you're with the defendant in Los Angeles, what, if

6    anything, else did the defendant describe to you?

7    A    Pertaining to what?

8    Q    Do you recall the nature of your communication with the

9    defendant while you were with him in Los Angeles, aside from

10   the sexual contact that you just described?

11   A    Yes.

12   Q    What were they about?

13   A    Musical conversations.

14   Q    And -- go ahead.

15   A    In which he was, like, teaching me techniques.

16   Q    And what, if any, guidelines did the defendant describe

17   to you about the time that you might spend with the defendant?

18   A    I don't understand what you're asking me.

19           MS. GEDDES:  I'd like to show the witness only

20   what's been marked for identification as 233(d).

21   BY MS. GEDDES:

22   Q    Does reading 233(d) refresh your recollection about other

23   topics that the defendant raised while you were with him in

24   Los Angeles?

25   A    It does, yes.

                SAM    OCR    RMR    CRR    RPR

Jane - direct - Geddes                          810

1  Q     What do you recall the defendant telling you?

2  A     He had mentioned rules.

3  Q     And what did you understand -- what are you referring to

4  by rule?

5  A     It was a protocol that he went by and rules that I would

6  have to abide by while in his presence.

7  Q     What, if any, rules do you recall the defendant telling

8  you?

9  A     Based off of this piece of evidence, my wardrobe and how

10 I dressed.

11 Q     And what did you understand the defendant to be telling

12 you about your wardrobe?

13 A     I had worn black tights and a brown shirt, and he did not

14 like that.

15         MR. CANNICK:  Objection.

16         THE COURT:  Overruled.

17         What makes you say that?

18         THE WITNESS:  Because he had asked me to change, and

19 that was the beginning of the very first rule that he had

20 addressed me about.

21 BY MS. GEDDES:

22 Q     What did he want you to change into, did he describe the

23 type of clothes that he preferred you to be wearing?

24 A     Something that didn't -- that loose and baggy preferably.

25 Q     What, if any, other rules do you recall the defendant

Jane - direct - Geddes                         811

1   sharing with you on that first trip to California?

2   A    I don't recall any.

3   Q    While you were in the -- while you were at -- while you

4   were in the hotel room that you were staying, was the

5   defendant always with you?

6   A    No, he was not.

7   Q    What, if anything, did you do when the defendant was not

8   with you in the hotel room?

9   A    I would just wait in the hotel room.

10  Q    Why did you stay in the hotel room?

11  A    He -- he had expressed to me to let him know any time I

12  did leave or where I was going.

13  Q    What, if anything, did you understand the defendant

14  wanted you to call him?

15  A    He wanted me to call him "Daddy."

16          MS. GEDDES:  The Government -- showing the witness,

17  again, what's been marked for identification as 233(d), which

18  you were just previously looking at.

19  BY MS. GEDDES:

20  Q    Do you recognize what that is?

21  A    Yes, I do.

22  Q    Generally, what is it?

23  A    This is a conversation between me and my mother.

24  Q    And what is the date of that conversation?

25  A    April the 29th, 2015.

Jane - direct - Geddes                    812

1   Q    And, generally speaking, what are you guys talking about?

2   A    I'm telling her that he is talking about rules and that

3   he told me to change.

4              MS. GEDDES:  The Government offers 233(d).

5              THE COURT:  Any objection?

6              MR. CANNICK:  No.

7              THE COURT:  Okay, that will be in evidence.

8              (Government's Exhibit 233(d) was received in

9   evidence.)

10             MS. GEDDES:  May we publish?

11             THE COURT:  Yes.

12             (Exhibit published.)

13  BY MS. GEDDES:

14  Q    All right, and where my pen is (indicating), is that

15  where you were telling your mom that the defendant was talking

16  about the rules?

17  A    Yes.

18             MS. GEDDES:  I'm showing the witness only what's

19  been marked for identification as 233(e).

20  Q    Do you recognize what's shown in 233(e)?

21  A    I do, yes.

22  Q    Generally speaking, what are those?

23  A    This is a conversation between me and my mother.

24  Q    And what is the date of that conversation?

25  A    April the 29th, 2015.

Jane - direct - Geddes                      813

1   Q    And are these text messages between your mother and you?

2   A    Yes, they are.

3   Q    And what are you discussing with your mother in those

4   text communications?

5   A    I am expressing to her that he has me in sweats.

6        MS. GEDDES:  The Government offers 233 -- one

7   question.

8   BY MS. GEDDES:

9   Q    Who are you referring to when you say "he" has you in

10  sweats?

11  A    The defendant.

12       MS. GEDDES:  The Government offers 233(e).

13       THE COURT:  Any objection?

14       MR. CANNICK:  No.

15       THE COURT:  Okay, that's in evidence.

16       (Government's Exhibit 233(e) was received in

17  evidence.)

18       MS. GEDDES:  May we publish?

19       THE COURT:  Yes.

20       (Exhibit published.)

21  BY MS. GEDDES:

22  Q    And can you read the text message where my pen is

23  pointing?

24  A    Yes.  "But he got me in sweats."

25  Q    And who wrote that text message?

SAM     OCR     RMR     CRR     RPR

1   A    I sent that text message to my mother.

2   Q    About the defendant?

3   A    Yes.

4   Q    And now, can you read the message at the bottom?

5   A    "He ain't like my tights showing my figure."

6   Q    And, again, who are you referring to?

7   A    The defendant.

8   Q    Do you recall what, if anything, the defendant told you

9   about the value of your trip to Los Angeles?

10  A    No.

11          MS. GEDDES:  I am showing the witness only what's

12  been marked for identification as 233(f).

13  BY MS. GEDDES:

14  Q    Generally, what is shown in 233(f)?

15  A    It is, basically, me texting my mother about a

16  conversation that I had with the defendant.

17  Q    And what is the date of these text messages sent to your

18  mom?

19  A    May the 1st, 2015.

20          MS. GEDDES:  The Government offers -- the Government

21  offers 233(f).

22          MR. CANNICK:  No objection.

23          THE COURT:  All right, in evidence.

24          (Government's Exhibit 233(f) was received in

25  evidence.)

SAM    OCR    RMR    CRR    RPR

Jane - direct - Geddes                     815

1           MS. GEDDES:  May we publish?

2           THE COURT:  Yes.

3           (Exhibit published.)

4    BY MS. GEDDES:

5    Q    Can you just read the text message at the bottom, please?

6    A    He just text me, he said although he isn't with me, this

7    wasn't a waste of a trip.  He said I -- he said I should take

8    this time to try and ease my mind and soak in everything he's

9    been telling me, so when I actually go into this industry I'll

10   have a mature frame already.

11   Q    And the "he"s in that text message, who are you referring

12   to?

13   A    The defendant.

14   Q    And when you reference "this industry," what industry are

15   you referring to?

16   A    The music industry.

17   Q    And finally, when you said "although he isn't with me,

18   this wasn't a waste of a trip," what trip are you referring

19   to?

20   A    Me going out to LA.

21   Q    Now, you initially flew to Los Angeles.

22           Did you stay in Los Angeles or did you visit other

23   cities during that trip?

24   A    I ended up getting stuck out there and going to multiple

25   cities with the defendant.

SAM     OCR     RMR     CRR     RPR

1   Q    How did you travel from city to city with the defendant?

2   A    He had his assistant book flights and the entire

3   itinerary.

4   Q    Do you know how the defendant traveled between cities?

5   A    He did express that he did not fly because of his fear,

6   and that he traveled by tour bus.

7   Q    Do you remember where you went after Los Angeles?

8   A    I do not.

9        MS. GEDDES:  I'm showing the witness what's been

10  marked for identification as 233(q).

11  BY MS. GEDDES:

12  Q    Do you recognize 233(q)?

13  A    I do, yes.

14  Q    What is shown there?

15  A    It's a conversation between me and his assistant, Cheryl,

16  and I'm telling her exactly what the defendant told me to say.

17  Q    Which is what?

18  A    That Mr. Kelly said to get me to Stockton, California.

19  Q    And what is the date -- are those text messages between

20  you and Cheryl Mack?

21  A    Yes.

22  Q    What are the dates of those text messages?

23  A    May 1st, 2015.

24       MS. GEDDES:  The Government offers 233(q).

25       THE COURT:  Any objection?

1              MR. CANNICK:  None.

2              THE COURT:  All right, that's in evidence.

3              (Government's Exhibit 233(q) was received in

4    evidence.)

5    BY MS. GEDDES:

6    Q    After reviewing 233(q), do you recall where you went

7    after Los Angeles?

8    A    To Stockton, California.

9    Q    And who made those travel reservations for you?

10   A    His assistant, Cheryl.

11   Q    Now, do you remember where you stayed in Stockton?

12   A    I do not.

13             MS. GEDDES:  I am showing you what's been marked for

14   identification as 233(r).

15   Q    What is 233(r)?

16   A    It is Cheryl sending me my itinerary of where I would be

17   staying.

18   Q    In Stockton, California?

19   A    Yes.

20             MS. GEDDES:  The Government offers 233(r).

21             THE COURT:  Any objection?

22             MR. CANNICK:  No.

23             THE COURT:  That's in evidence.

24             (Government's Exhibit 233(r) was received in

25   evidence.)

Jane - direct - Geddes                    818

```
 1   BY MS. GEDDES:
 2   Q    Where were you going to be staying, where were you going
 3   to be staying in Stockton?
 4   A    At the Residence Inn.
 5   Q    Now, do you remember what you did once you arrived in
 6   Stockton, California?
 7   A    I do not.
 8   Q    Why were you in Stockton, California?
 9   A    I was there for -- to see the defendant for a show that
10   he had.
11   Q    And did you go to the show in Stockton, California?
12   A    I did, yes.
13   Q    I am showing you what's been marked for identification as
14   Government Exhibit 220.
15              MS. GEDDES:  The witness only.
16   BY MS. GEDDES:
17   Q    Do you recognize 220?
18   A    Yes, I do.
19   Q    What is that?
20   A    That is a ticket stub of the show that I went to in
21   California, Stockton.
22   Q    And is that also dated May 1st of 2015?
23   A    It is, yes.
24              MS. GEDDES:  The Government offers 220.
25              MR. CANNICK:  No objection.
```

SAM      OCR      RMR      CRR      RPR

Jane - direct - Geddes                   819

1          THE COURT:  Okay, that's in evidence.

2          (Government's Exhibit 220 was received in evidence.)

3   BY MS. GEDDES:

4   Q     Now, after the concerts, do you recall seeing the

5   defendant that evening?

6   A     I do, yes.

7   Q     And do you remember what your hotel room looked like

8   where you stayed in Stockton?

9   A     Yes, I do.  I remember that the room was a suite that had

10  a fireplace in it.

11  Q     And what, if anything, do you recall happening -- did you

12  see the defendant at the hotel room?

13  A     I did, yes.

14  Q     In Stockton, California?

15  A     I did, yes.

16  Q     What do you recall happening in the hotel room in

17  Stockton, California?

18  A     This was the first time that we had -- I had vaginal

19  penetration with the defendant.

20  Q     And by "vaginal penetration," what do you mean?

21  A     We had sexual intercourse.

22  Q     Was the defendant's penis inside your vagina?

23  A     Yes, it was.

24  Q     And prior or what, if any, type of contraception did the

25  defendant use, to your knowledge?

SAM     OCR     RMR     CRR     RPR

Jane - direct - Geddes                              820

1   A    He used none.

2   Q    And what, if anything, did the defendant tell you about

3   any sexually-transmitted diseases that he had?

4   A    He never mentioned anything of that nature to me.

5   Q    Now, how is it that you recall that was the first time

6   that you had sexual intercourse with the defendant?

7   A    I remember because the room that we were in, it had a

8   kitchenette in it and it had a fireplace, and I had never been

9   in a room that had a fireplace before in a suite.

10  Q    Do you recall what city you traveled to after Stockton,

11  California?

12  A    I believe I went to Las Vegas.

13  Q    And I am showing you Government Exhibit 253(a).

14       Do you recognize 253(a)?

15  A    I do.

16  Q    What is that?

17  A    It is a -- my flight confirmation to Sacramento.

18  Q    And does it show -- so, I'm sorry.

19       Can you say what the flight travel plan was there?

20  A    Yeah, it was me departing and going to Las Vegas, yes.

21  Q    So, leaving Sacramento and going to Las Vegas?

22  A    Yes.

23  Q    And who arranged this travel for you?

24  A    The defendant's assistant.

25  Q    Was that Cheryl Mack?

Jane - direct - Geddes                821

1   A    Yes, it was.

2              MS. GEDDES:  The Government offers 253(a) and asks

3   that it be published to the jury only, please.

4              MR. CANNICK:  No objection.

5              THE COURT:  Okay, that's in evidence.

6              (Government's Exhibit 253(a) was received in

7   evidence.)

8              (Exhibit published to the jury only.)

9   BY MS. GEDDES:

10  Q    Now, do you remember the hotel that you were staying in

11  when you got to Las Vegas?

12  A    Yes, I do.

13  Q    What hotel was that?

14  A    I was staying at Mandalay Bay.

15  Q    And do you recall what you did that first evening on

16  May 2nd of 2015, when you arrived in Las Vegas?

17  A    Yes, I did want -- I wanted to go shopping and get food.

18  Q    And did you try to go shopping?

19  A    I did, yes.

20  Q    What did you do?

21  A    I believe I had text his assistant asking where the

22  nearest mall was.

23  Q    And when you say "his assistant," who are you referring

24  to?

25  A    Cheryl.

1    Q    The defendant's assistant?

2    A    Yes.

3    Q    And how did the defendant's assistant respond when you

4    asked for the nearest mall?

5    A    She asked me had I let him know that I was leaving my

6    room.

7    Q    And by letting "him" know, what "him" are you referring

8    to?

9    A    The defendant.

10   Q    How did you respond?

11   A    I told her no, I hadn't.

12   Q    Do you recall how the defendant's assistant responded

13   when you said you had not told the defendant that you planned

14   to go shopping?

15   A    I do not.

16   Q    All right.  I want to start by showing you Government

17   Exhibit 233(i).

18           Do you recognize 233(i)?

19   A    Yes, I do.

20   Q    What is that?

21   A    This is a text message that I sent to my mother.

22   Q    On what date?

23   A    May the 3rd, 2015.

24           MS. GEDDES:  The Government offers 233(i).

25           MR. CANNICK:  No objection.

1            THE COURT:  That's in evidence.

2            (Government's Exhibit 233(i) was received in

3    evidence.)

4            MS. GEDDES:  Can we publish, please?

5            THE COURT:  Yes.

6            (Exhibit published.)

7    BY MS. GEDDES:

8    Q    Can you read the text message that you sent to your mom?

9    A    Yes.  It says, "Everyone having fun and Kel said do not

10   leave that room."

11   Q    Who's Kel?

12   A    The defendant.

13   Q    Is that a nickname for the defendant?

14   A    Yes.

15   Q    I'm showing -- and what are you referring to when you

16   said "Kel said do not leave that room"?

17   A    My hotel room, meaning I could not leave.

18   Q    And who told you you couldn't leave?

19   A    The defendant.

20           MS. GEDDES:  I am showing the witness only what's

21   been marked for identification as 233(j).

22           I'm sorry, I'm showing the witness only what's been

23   marked as 233(g).

24   BY MS. GEDDES:

25   Q    Do you recognize 233(g)?

1  A    Yes.

2  Q    What is shown in 233(g)?

3  A    This is a conversation between me and his assistant,

4  Cheryl.

5  Q    And what is the conversation about?

6  A    Me wanting to go to the mall.

7  Q    Is this the conversation you were just describing a

8  moment ago?

9  A    Yes, it is.

10         MS. GEDDES:  The Government offers 233(g).

11         MR. CANNICK:  No objection.

12         THE COURT:  That's in evidence.

13         (Government's Exhibit 233(g) was received in

14  evidence.)

15         MS. GEDDES:  May we publish?

16         THE COURT:  Yes.

17         (Exhibit published.)

18  BY MS. GEDDES:

19  Q    Can you read to the jury the text in -- corresponding to

20  this entry 5837?

21  A    It says -- read the text before it or after it?

22  Q    You can just read that first text 5837.  Right over here

23  (indicating.)

24  A    It says, "Trying to figure it out.  Mr. Kelly -- is

25  Mr. Kelly OK with you going out of your room?  It's very

Jane - direct - Geddes                          825

1    hectic out."

2    Q    Now, who wrote that text message?

3    A    His assistant.

4    Q    Which assistant?

5    A    Cheryl.

6    Q    Cheryl Mack?

7    A    Yes.

8    Q    And how did you respond in the next text message, can you

9    read that out loud?

10   A    I said, "I didn't ask him and if you can't get it, it's

11   fine.  I'll just chill inside because the taxi lines are

12   hectic.  Thank you for the help."

13   Q    And is there a response from Ms. Mack?

14   A    Yes.

15   Q    What does she say?

16   A    She says, "Oh, OK, yeah, we will need to make sure it's

17   OK.  It's very, very hectic.  I can get McDonald's to you no

18   problem."

19   Q    And when Cheryl Mack wrote, "we will need to make sure

20   it's okay," what did you understand her to mean by that?

21   A    She would have needed to make sure with the defendant

22   before I could leave my room.

23   Q    Who, if anyone, else do you recall meeting when you were

24   in Las Vegas?

25   A    I remember meeting a young woman who he said was a friend

SAM      OCR      RMR      CRR      RPR

Jane - direct - Geddes                          826

1   of his.

2   Q     Do you remember her nickname?

3   A     Yes, Juice.

4   Q     Where did you meet Juice?

5   A     I met Juice in my -- in Las Vegas.

6   Q     And do you remember where in Las Vegas?

7   A     Yes.  I believe I was -- he had told me to come down to

8   the lobby and that is when I initially met her, she was

9   already down there.

10  Q     And what, if anything, did you and Juice do together when

11  you met her?

12  A     We went shopping.

13  Q     And do you recall what you did the night before you went

14  shopping?

15  A     Yes, we went to his show together.

16  Q     And who are you referring to when you say "we" there?

17  A     Defendant.

18  Q     I'm sorry, but who went to the show together?

19  A     Me and Juice.

20  Q     And what, if anything, did Juice say to you when you went

21  to the concert together?

22  A     When she had come to knock on my room door, she saw my

23  outfit and she had asked me if I really wanted to wear that

24  and if I felt I needed to change.

25  Q     And what did you understand her to be telling you?

SAM     OCR     RMR     CRR     RPR

Jane - direct - Geddes                               827

1   A    To change my wardrobe of what I had on.

2   Q    Did you understand what she would have preferred you to

3   have worn or what she --

4            MR. CANNICK:  Objection.

5            THE COURT:  Sustained.  Sustained.

6            MS. GEDDES:  I am showing the witness what's been

7   marked for identification as Government Exhibit 221.

8   BY MS. GEDDES:

9   Q    Do you recognize 221?

10  A    Yes, I do.

11  Q    What is that?

12  A    This is a ticket stub from his show in Las Vegas.

13  Q    Is that the concert that you attended with Juice?

14  A    Yes, it is.

15           MS. GEDDES:  The Government offers 221.

16           MR. CANNICK:  No objection.

17           THE COURT:  Okay, that's in evidence.

18           (Government's Exhibit 221 was received in evidence.)

19  BY MS. GEDDES:

20  Q    Now, you said that the following day you went shopping

21  with Juice.

22           Do you recall where you went shopping?

23  A    It was a mall in the hotel, so we didn't go far.

24  Q    And who, if anyone, did you see while you went shopping?

25  A    We actually ended up meeting up with the defendant while

Jane - direct - Geddes                     828

1    shopping.

2    Q    And what did you do after shopping?

3    A    I then went back to my hotel room.

4    Q    Who, if anyone, was in the hotel room when you went back

5    there?

6    A    Juice came back to my hotel room with me.

7    Q    And at some point was there anyone else in your hotel

8    room?

9    A    Yes, the defendant then came hours later.

10   Q    And what happened when the defendant came into your

11   hotel?

12   A    I had been texting him asking if Juice could leave

13   because she was just sleeping and if she could go back to her

14   own hotel room, and he --

15   Q    How did the defendant respond?

16   A    He actually said that he wanted to come and he wanted to

17   have sex.

18   Q    And what did you do?

19   A    I told him I -- I declined because Juice was still in the

20   room and I told him it was something I was not comfortable

21   with.

22   Q    And so, where were you and the defendant in the room?

23   A    We were on the side of the bed, and Juice was sitting a

24   couch sleeping.

25   Q    And so, what happened next?

1   A    He told me it wasn't that big of a deal and that she was

2   sleep and that it would, basically, be fast.

3   Q    What happened?

4   A    And then we had vaginal intercourse.

5   Q    And what, if anything, did Juice do while you were

6   engaged in sexual activity with the defendant?

7   A    She had her back towards us and she didn't do anything.

8   Q    What happened after that?

9   A    After he had cum, he said:  See, I told you.  And then he

10  called Juice's name and told her to go to her hotel room and

11  she left.

12  Q    And Juice then left the hotel room?

13  A    Yes.

14  Q    And that trip to California that you just described, was

15  that all while you were 17 years old?

16  A    Yes, it was.

17  Q    While you were in your junior year of high school, did

18  you see the defendant again in Florida?

19  A    Yes, I did.

20  Q    Where did you see him, where in Florida?

21  A    I saw him in Jacksonville.

22  Q    Why were you in Jacksonville?

23  A    I was actually in Key West because I had a show that was

24  not far from there.

25  Q    And by "show," what do you mean?

Jane - direct - Geddes                     830

1   A    I had my own performance that I was doing for a breast

2   cancer awareness.

3   Q    What did you do -- so, how did you end up meeting the

4   defendant in Jacksonville?

5   A    My show actually ended a lot earlier than anticipated and

6   because he was in Jacksonville, I did want to surprise him and

7   tell him how well my show went.

8   Q    Who, if anyone, were you with?

9   A    I was with my mother.

10  Q    By the way, what, if anything, did the defendant ask you

11  to do at your show?

12  A    He told me to send him pictures and videos of me

13  performing.

14       MS. GEDDES:  I am showing the witness only what's

15  been marked for identification as 233(m).

16  BY MS. GEDDES:

17  Q    Do you recognize 233(m)?

18  A    Yes, I do.

19  Q    What is that?

20  A    It is a conversation between me and my mother.

21  Q    And what are you talking about?

22  A    I'm, basically, saying he had wanted someone to record my

23  show and that he said good luck.

24  Q    And when you say "he," who are you referring to?

25  A    The defendant.

SAM     OCR     RMR     CRR     RPR

1   Q     And what was the date of this conversation?

2   A     May 8th, 2015.

3              MS. GEDDES:  The Government offers 233(m).

4              MR. CANNICK:  No objection.

5              THE COURT:  That's in evidence.

6              (Government's Exhibit 233(m) was received in

7   evidence.)

8              MS. GEDDES:  And may we publish?

9              THE COURT:  Yes.

10             (Exhibit published.)

11  BY MS. GEDDES:

12  Q     Can you read that last text message on the bottom, and

13  first let the jury know who wrote that text message?

14  A     I wrote that text message.  And it says, "Just was asking

15  how my day went and he can't wait to see me and good luck

16  tonight.  He wants someone to record it, so I can send it to

17  him and stuff like that."

18  Q     And, again, who are you referring to in that text

19  message?

20  A     The defendant.

21  Q     You may have already said this, but who were you with

22  when you were in Jacksonville initially?

23  A     I was with my mother.

24  Q     And do you remember where in Jacksonville you and your

25  mom went?

Jane - direct - Geddes                    832

1    A    I remember that he was staying at the Omni.

2    Q    Is that a hotel?

3    A    Yes.

4    Q    What happened when you went to the Omni?  Did you then go

5    to the Omni?

6    A    We did.

7    Q    What happened there?

8    A    We got there after his show had ended, and I believe all

9    the hotels were booked up at that time, and we did see the

10   defendant.

11   Q    And what, if any, communications did you have with the

12   defendant's assistant that day?

13   A    She had expressed to us that all the hotels were booked,

14   and so she was going to give me and my mother her hotel room

15   and book at a further location.

16          MS. GEDDES:  I am showing the witness what's been

17   marked for identification as 233(n).

18   BY MS. GEDDES:

19   Q    Do you recognize 233(n)?

20   A    Yes, I do.

21   Q    What is that?

22   A    It is a text message between me and Cheryl, his

23   assistant.

24   Q    And what are the dates -- what is the date of this

25   communication, this conversation?

SAM      OCR      RMR      CRR      RPR

1   A     May the 8th, 2015.

2             MS. GEDDES:  The Government offers 233(n).

3             MR. CANNICK:  No objection.

4             THE COURT:  Okay, in evidence.

5             (Government's Exhibit 233(n) was received in

6   evidence.)

7   BY MS. GEDDES:

8   Q     Did you, in fact, get a hotel room that night in

9   Jacksonville?

10  A     We did, yes.

11  Q     How many hotel rooms did you and your mom get?

12  A     I told his assistant that me and my mother only needed

13  one room.

14  Q     How did the defendant's assistant respond?

15  A     She responded by saying that she would get us multiple

16  rooms.

17  Q     And where did you end up staying that night?

18  A     I ended up staying in the defendant's hotel room.

19  Q     Do you recall what, if anything, happened between you and

20  the defendant that evening?

21  A     Yes, we were intimate.

22  Q     And by "intimate," what do you mean?

23  A     We had vaginal penetration.

24  Q     You testified earlier about a trip to Los Angeles;

25  Stockton, California; and Las Vegas.

Jane - direct - Geddes                834

1        Did you travel again to see the defendant after that

2   trip?

3   A    I believe so, yes.

4   Q    How would you get to those locations?

5   A    His assistant would book the entire itinerary.

6   Q    And what type of travel was it?

7   A    Flight.

8   Q    Who did you understand, ultimately, was paying for that

9   travel?

10  A    The defendant.

11  Q    Now, do you remember all the dates and locations that you

12  traveled to meet the defendant in the spring of 2015?

13  A    I do not, no.

14  Q    All right.  I want to direct your attention to May 15th

15  of 2015.

16        Do you recall where you traveled in or around that

17  day?

18  A    No.

19        MS. GEDDES:  I am showing the witness what's been

20  marked for identification as 233(s).

21  BY MS. GEDDES:

22  Q    What is 233(s)?  Do you recognize that?

23  A    It is a conversation between me and Cheryl, his

24  assistant.

25  Q    And what is the date of that conversation?

Jane - direct - Geddes                    835

1    A     May the 15th.

2              MS. GEDDES:  The Government offers 233(s).

3              THE COURT:  Any objection?

4              MR. CANNICK:  None.

5              THE COURT:  Okay, that's in evidence.

6              (Government's Exhibit 233(s) was received in

7    evidence.)

8    BY MS. GEDDES:

9    Q     Where were you -- where were you arranging to or where

10   were you hoping to go on or around May 15th of 2015?

11   A     Yeah, he had told me to tell her to get me to Atlanta.

12   Q     And by "he," who are you referring to?

13   A     The defendant.

14   Q     And can you read that top text message?

15   A     "Mr. Kelly said to get me to Atlanta, Georgia, on

16   Monday."

17   Q     And then I want to direct your attention to May 21st of

18   2015.

19             Do you recall where, if anywhere, you traveled in or

20   around that day?

21   A     I do not.

22   Q     I'm showing you what's been marked for identification as

23   Government Exhibit 233(t).

24             Do you recognize what's shown in 233(t)?

25   A     I do.

Jane - direct - Geddes                      836

1   Q     Generally speaking, what are those, what is it?

2   A     It is a text conversation between me and his assistant

3   Cheryl.

4   Q     And what is the date of that text communication?

5   A     May the 20th, 2015.

6   Q     And what are you and Cheryl discussing in those text

7   messages?

8   A     That he had wanted me to get to San Diego.

9   Q     And by "he," who are you referring to?

10  A     The defendant.

11           MS. GEDDES:  The Government offers 233(t).

12           MR. CANNICK:  No objection.

13           THE COURT:  That's in evidence.

14           (Government's Exhibit 233(t) was received in

15  evidence.)

16  BY MS. GEDDES:

17  Q     Can you just read for the jury that top text message?

18  A     "Mr. Kelly said to get me to San Diego tomorrow morning."

19  Q     And who wrote that text message?

20  A     I sent that text message.

21  Q     To Cheryl Mack?

22  A     I did, yes.

23  Q     Did Cheryl Mack then arrange travel for you to get to San

24  Diego?

25  A     Yes.

SAM      OCR      RMR      CRR      RPR

Jane - direct - Geddes                    837

1  Q    What, if any, sexual contact did you have with the

2  defendant during that trip to California?

3  A    We had vaginal penetration.

4  Q    During that trip in California, what, if any,

5  contraception did the defendant use?

6  A    None.

7  Q    And prior to you having sexual contact with the

8  defendant, what, if anything, did he tell you about any

9  sexually-transmitted diseases that he had?

10 A    He never expressed anything of that nature.

11 Q    You testified earlier that you were finishing or you were

12 in your junior year of high school when you took those trips?

13 A    Yes.

14 Q    When the school year ended, what, if anything, did you do

15 for that summer?

16 A    I was in Chicago with the defendant.

17 Q    And at the time, where was the defendant living?

18 A    In Chicago.

19 Q    Now, you testified earlier about a telephone number that

20 you got for the defendant on April 18th, 2015.

21       Was that the only telephone of his that you

22 communicated with?

23 A    No, he had multiple phone numbers.

24 Q    Do you recall the other telephone numbers that the

25 defendant had?

Jane - direct - Geddes                    838

1    A    I do not know them by heart, no.

2    Q    Do you know how many other telephones the defendant had?

3    A    Yes, he had four numbers.  And initially he said that I

4    would receive all of them when I earned his trust.

5    Q    Did you eventually receive those telephone numbers?

6    A    I did, yes.

7    Q    You said that you were with the defendant in Chicago.

8         Where would you stay in Chicago that summer?

9    A    In 2015, I would stay in hotels and I would stay at the

10   studio on Ohio Street.

11   Q    Do you remember which hotels you stayed in?

12   A    I stayed in -- majority of them were downtown.  The

13   Intercontinental, The W.

14   Q    In downtown Chicago?

15   A    Yes.

16   Q    You also mentioned that you stayed at the studio.

17        What type of studio was that?

18   A    It was a business, and in the studio he had one room that

19   had a master bedroom in it.

20   Q    And where was the studio located?

21   A    It was located in a business office on the top floor.

22   Q    Do you recall the street that it was on?

23        You may have already said.

24   A    Ohio Street.

25   Q    And was that in downtown Chicago?

SAM     OCR     RMR     CRR     RPR

1   A    It was, yes.

2   Q    Was there a bathroom inside the defendant's studio on

3   Ohio Street?

4   A    There was not.

5   Q    If you wanted to use a bathroom, where would you go?

6   A    I would have to get in touch with him before I could go

7   to the one that was for the public.

8   Q    And where was that located?

9   A    It was outside of his studio on the sixth floor.

10  Q    Now, was the defendant's studio also on the sixth floor?

11  A    It was, yes.

12          MS. GEDDES:  I'm showing the witness what's been

13  marked for identification as 505(c) and 505(b), as in boy.

14  BY MS. GEDDES:

15  Q    Do you recognize 505(c)?

16  A    Yes, I do.

17  Q    What is that?

18  A    This is the business office in which he had a studio

19  on -- in one of the business suites.

20  Q    And I am showing you what's been marked for

21  identification as 505(b) as in boy.

22          Do you recognize that?

23  A    Yes, that is the main entrance.

24          MS. GEDDES:  The Government offers 505(b) and (c).

25          MR. CANNICK:  No objection.

1           THE COURT:  That's in evidence.

2           (Government's Exhibits 505(b) and 505(c) were

3    received in evidence.)

4    BY MS. GEDDES:

5    Q    And I am showing 505(c).

6           (Exhibit published.)

7    Q    Do you recall -- you said that the defendant was on the

8    sixth floor.  Is that -- which floor is that in the building?

9    A    So, just on the sixth floor when you go upstairs his unit

10   was to the right.  It was the first right that you make.

11   Q    And was that the top floor?

12   A    Yes, it was.

13   Q    Now, when you started spending time in the studio on Ohio

14   Street, what, if any, rules did you learn that the defendant

15   wanted you to follow while you were in that studio?

16   A    I could not leave a room without calling him or an

17   assistant and asking.

18   Q    And how did you learn that rule?

19   A    He had told me not to leave the room without calling him

20   or getting in touch with his assistant.

21   Q    And I asked you earlier about where the bathroom was

22   located.

23   A    Yes.

24   Q    What if -- were you always able to get in touch with the

25   defendant when you needed to use a bathroom?

Jane - direct - Geddes                              841

1    A    No.

2    Q    What would you do if you weren't able to get in contact

3    with the defendant?

4    A    I had to urinate in a cup.

5    Q    Where were the cups?

6    A    They would get cups, like extra large cups, from the gas

7    station, and in the master bedroom there was tissue paper and

8    baby wipes.

9    Q    Now, other than in Chicago, where did you regularly see

10   the defendant during those summer months after your junior year?

11   A    Can you repeat the question?

12   Q    Yes.  During the summer after your junior year, you

13   testified that you would see the defendant in Chicago.

14   A    Uh-hum.

15   Q    Were there any other cities where you regularly saw the

16   defendant that summer?

17   A    Atlanta.

18   Q    And where in Atlanta would you see the defendant?

19   A    I would see him in hotels, and he had expressed to me

20   that he had a home in Atlanta, Georgia.

21   Q    Did you go to that home in Atlanta, Georgia?

22   A    I did, yes.

23        MS. GEDDES:  I am showing the witness what's been

24   marked for identification as Government Exhibit 506.

25            (Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

Jane - direct - Geddes                    842

1   BY MS. GEDDES:   (Continuing)

2   Q     Do you recognize 506?

3   A     Yes, I do.

4   Q     What is that?

5   A     This is the big house in Atlanta.

6   Q     And when you say the big house, what are you referring

7   to?

8   A     That's just what the defendant called it.

9   Q     Is that the defendant's home that you just mentioned?

10  A     Yes, it is.

11        MS. GEDDES:   The government offers 506.

12        MR. CANNICK:   No objection.

13        THE COURT:   That's in evidence.

14        (Government Exhibit 506 so marked.)

15  Q     And I'm now showing you 504.

16        MS. GEDDES:   May we publish 506?  I'm sorry.  I did

17  it too quickly.

18        THE COURT:   Yes.

19        MS. GEDDES:   And I'm now showing what's been marked

20  for identification as 504.

21  Q     Do you recognize Government Exhibit 504?

22  A     Yes, I do.

23  Q     What is that?

24  A     This is the guest house.

25  Q     And what is the guest house?

Jane - direct - Geddes                    843

1    A    At the time, this is where the other woman whom he were

2    in a relationship with lived.

3    Q    All right.  Where is the guest house located, what city?

4    A    It's also in Atlanta, Georgia.  It's about 15 minutes

5    from the big house.

6    Q    And have you been to the guest house?

7    A    I have, yes.

8             MS. GEDDES:  The government offers 504.

9             THE COURT:  Any objection?

10            MR. CANNICK:  None.

11            THE COURT:  That's in evidence.  You can publish.

12            (Government Exhibit 504 so marked.)

13   Q    Now, when you visited the defendant in Atlanta over the

14   summer of, in 2015, where do you remember staying?

15   A    I would stay at hotels, I would stay at the big house and

16   I would stay at the guest house.

17   Q    All right.  And are those, the big house and the guest

18   house are the two houses that were just shown?

19   A    Yes.

20   Q    Initially when the defendant was on tour and you were

21   traveling with him, how would you travel?

22   A    By flight.

23   Q    And would you attend each of the defendant's concerts

24   that you were present for?

25   A    I would, yes.

Jane - direct - Geddes                                   844

1    Q    Over the summer of 2015, did you continue to have sexual

2    contact with the defendant?

3    A    I did, yes.

4    Q    Where did you have sexual contact with him?  In what

5    different locations?

6    A    We would be intimate on the Sprinter, at the big house,

7    the guest house, in hotels, wherever he wanted to.

8    Q    And when you said Sprinter, what are you referring to?

9    A    The Sprinter van.

10   Q    And when did the defendant -- when were you and the

11   defendant on the Sprinter van together?

12   A    Every day it was our form of transportation.

13   Q    And you also mentioned the big house and the guest house.

14   Were those the two locations in Atlanta?

15   A    Yes.

16   Q    How about when you were in Chicago, where, if anywhere,

17   would you have sexual contact with the defendant in Chicago?

18   A    At hotels and at the studio.

19   Q    The studio that you previously identified on Ohio street?

20   A    Yes.

21   Q    How often would you have sexual contact with the

22   defendant during that summer of 2015?

23   A    We had sex almost every day.

24   Q    And during the course of your time with the defendant,

25   what, if anything, did you ever notice that the defendant was

1  doing while you were engaged in sexual contact with him?

2  A    He would basically control exactly every single time we

3  were intimate.

4  Q    And what do you mean by that he would control it?

5  A    Meaning that he would say everything specifically and I

6  would have to follow exactly what he said.

7  Q    Can you give an example of that?

8  A    An example would be if he told me to walk or crawl back

9  and forth and that is what I would have to do until he gave

10 the next notion.

11 Q    When, if ever, did the defendant make recordings of you?

12        MR. CANNICK:  Objection.

13        THE COURT:  Overruled.

14 A    Almost immediately after meeting him.

15 Q    And by making recordings of you, what was he recording

16 you doing?

17 A    He would record us intimately.

18 Q    And by intimately, what are you referring to?

19 A    Every time we had sex, he would record it.

20 Q    What did he use to record that?

21 A    He used the iPads that he had.

22 Q    And where did the defendant -- did you see where the

23 defendant kept these iPads?

24 A    He would keep them in a backpack.

25 Q    How do you know -- how did you learn that the defendant

Jane - direct - Geddes                    846

1    was making recordings of you?

2    A    When we would be intimate, he would just remove an iPad

3    from his backpack and he would prop it on something and the

4    camera would be facing us so that he could see everything and

5    that is usually how every sexual encounter went with him.

6    Q    And were you able to see at times what was being

7    recorded?

8    A    Every time I could see what was being recorded.

9    Q    And by the way, you mentioned that the defendant used

10   iPads to record you.  Were those Apple iPads?

11   A    Yes, they are.

12   Q    And do you recall the first time that you noticed that

13   the defendant was recording you engaged in sexual contact with

14   him?

15   A    Yes.

16   Q    When do you recall that happening?

17   A    It was when I was 17 years old.

18   Q    And what specifically do you recall the defendant

19   recording?  What were you doing that the defendant recorded?

20   A    I recall that he had made me crawl back and forth and

21   then he had begin to give him oral head and then after that,

22   we had vaginal penetration.

23   Q    And when you say oral head, what specifically do you

24   mean?

25   A    I had gave him oral sex.

Jane - direct - Geddes                                    847

1    Q    And was that with your mouth on his penis?

2    A    Yes, it was.

3    Q    And did you say that was one of the things that you saw

4    the defendant recording?

5    A    Yes, it was.

6    Q    With his Apple iPad?

7    A    Yes, it was.

8    Q    How old were you when the defendant recorded that?

9    A    I was 17 years old.

10   Q    And you also said that the defendant recorded you having

11   sexual intercourse with the defendant, is that right?

12   A    Yes.

13   Q    With the Apple iPad?

14   A    Yes.

15   Q    How old were you?

16   A    I was 17 years old.

17   Q    When you had sexual contact with the defendant, did he

18   ejaculate?

19   A    Yes, he would.

20   Q    Where would he ejaculate?

21   A    He would ejaculate on my face, on my chest, on my butt

22   and eventually he began ejaculating inside of me at 17.

23   Q    When he ejaculated on your face, what would you do?

24   A    I would usually wash it off however there were times

25   where he would make me leave it on my face.

Jane - direct - Geddes                    848

1    Q    What, if anything, do you remember about a time when he

2    had you leave, not allow you, or you didn't wash it, your face

3    immediately?

4    A    There was --

5                 MR. CANNICK:  Objection.

6                 THE COURT:  Overruled.

7    A    There was a time where he did ejaculate on my face and he

8    told me not to wash it off and to let it harden and I do

9    recall him having his wardrobe stylist come in and have an

10   entire conversation with her while I had his hardened semen on

11   my face and I recall them laughing and I felt very much

12   humiliated and I got up and I went to the washroom and washed

13   it off of my face.

14   Q    Do you know his stylist's name?

15   A    Kash Howard.

16                MS. GEDDES:  I'm showing the witness only what's

17   been marked for identification as Government Exhibit 68 -- I'm

18   sorry -- 86.

19   Q    Do you recognize 86?

20   A    Yes, I do.

21   Q    Who is that?

22   A    That is his wardrobe stylist.

23   Q    Is that Kash Howard?

24   A    Yes, it is.

25                MS. GEDDES:  The government offers 86.

1          MR. CANNICK:  No objection.

2          THE COURT:  It's in evidence.  You can publish it.

3          (Government Exhibit 86 so marked.)

4    Q     Now, you testified earlier about times where the

5    defendant recorded you engaged in sexual contact.  Where would

6    these recordings take place?

7    A     They would take place anywhere that he wanted to have sex

8    so if we were in the Sprinter, if we were in a hotel room, if

9    we were in Atlanta or Chicago in the studio, wherever we were.

10   Q     And did the defendant record you engaged in sexual

11   contact using his iPad in Chicago?

12   A     Yes, he did.

13   Q     While you were 17?

14   A     Yes, he did.

15   Q     And how about in Atlanta?

16   A     Yes, he did.

17   Q     While you were 17?

18   A     Yes, he did.

19   Q     Did you ever see what was on the recordings that the

20   defendant made?

21   A     I had only seen what he would show me or what he would,

22   when he would prop the camera up when I could see us.

23   Q     What, if anything, do you recall about when the defendant

24   would show you recordings that had been made of you?

25   A     He would only allow me to see about 5 to 10 seconds if he

Jane - direct - Geddes                          850

1    was playing it back and it was of me and him and he would

2    boast or compliment how good we looked.

3    Q    Do you recall how old you were when the recordings were

4    made that the defendant showed you and boasted about?

5    A    Yes.  I was 17 years old.

6    Q    During the summer of 2015, did there come a time when you

7    traveled to Connecticut?

8    A    Yes, there was.

9    Q    Why did you go to Connecticut?

10   A    I believe he had a couple shows that he had missed and

11   had to make up for.

12   Q    Where were the shows, what type of venue?

13   A    I believe they were casinos, areas and stadiums and

14   festivals.

15   Q    Okay.  And, I'm sorry, you said a casino.  What do you

16   mean by that?

17   A    Well, like previously the show in Las Vegas, that was at

18   a casino.

19   Q    Okay.  Do you recall the specific venue for the show in

20   Connecticut that you went to in the summer of 2015?

21   A    I do not.

22   Q    Okay.  And do you recall whether or not you had sexual

23   contact with the defendant when you traveled with him to

24   Connecticut in the summer of 2015?

25   A    We were intimate.

Jane - direct - Geddes                    851

1    Q    By intimate, what do you mean?

2    A    We had vaginal penetration.

3    Q    Did you ever contract a sexually transmitted disease?

4    A    I did.

5    Q    How old were you when that happened?

6    A    I was 17.

7    Q    What, if any, symptoms did you first notice?

8    A    I was -- every single time we would have vaginal

9    penetration, I was, I would have discomfort in my pelvis and

10   in my lower abdomen and I had expressed it to him.

11   Q    To the defendant?

12   A    Yes, I did.

13   Q    How did he respond?

14   A    Initially, he would joke and say that it was just because

15   he was too big size wise and then he would try and comfort me

16   and he would give me warm washcloths to place on my stomach

17   and he would try to massage my stomach.

18   Q    Did your symptoms subside?

19   A    They did not.

20   Q    What did you do?

21   A    They got worse actually and I got to the point where I

22   couldn't physically even walk.

23   Q    What did you do?

24   A    I had to make a doctor's appointment which he had Juice

25   book.

Jane - direct - Geddes                           852

1    Q    You mentioned Juice.  Are you referring to the woman you

2    met in Las Vegas?

3    A    Yes.

4    Q    And when you said he had Juice book, who were you

5    referring to, the "he" in that sentence?

6    A    The defendant.

7    Q    Did you then meet with that doctor?

8    A    I did, yes.

9    Q    What, if anything, did the doctor diagnose you with?

10   A    She said that I had contracted an STD, herpes.

11   Q    Did she tell you what type of herpes you had?

12   A    Vaginal herpes.

13   Q    What, if any, medications did she prescribe for you?

14   A    She had given me -- she had given me a few prescriptions

15   actually and I had told her that I wanted the most expensive

16   one to alleviate the pain as quick as possible.

17   Q    Did you get those prescriptions filled?

18   A    Yes, Juice was with me.

19   Q    Where did you go?

20   A    We went to Walgreens.

21   Q    In downtown -- where?

22   A    In downtown Chicago.

23   Q    And, I'm sorry, where was the doctor located?

24   A    Downtown Chicago.

25   Q    How did you feel once you learned that you had contracted

Jane - direct - Geddes                              853

1    herpes?

2    A    I was devastated.

3    Q    What, if any, conversations did you have with the

4    defendant after you learned that you had contracted herpes?

5    A    I had told him and he was agitated and said that I could

6    have gotten that from anyone.

7    Q    What did you say?

8    A    I told him that I had only been intimate with him.

9    Q    What, if anything, did the defendant then say about

10   whether he had previously been diagnosed with an STD or a

11   sexually transmitted disease?

12   A    He never did.

13         MR. CANNICK:  I'm sorry.  I didn't hear.

14         THE WITNESS:  He never did.

15         MR. CANNICK:  Thank you.

16   Q    You said you felt devastated.  Can you explain why you

17   felt that way?

18   A    I felt that this man had purposely given me something

19   that he knew he had, a situation that he could have

20   controlled.

21   Q    Did the medication make your symptoms subside?

22   A    It did.

23   Q    After you initially received medication, what, if any,

24   future symptoms of that STD did you feel?

25   A    In the future, any time I had an outbreak, I would only

1  get prescriptions from him and his doctor.

2  Q    Did you, in fact, have additional outbreaks?

3  A    I did, yes, very seldom.

4  Q    You said that you would get prescriptions from him.  Who

5  are you referring to?

6  A    The defendant.

7  Q    Do you recall what you were given?

8  A    They were the blue, the same blue pills that the female

9  doctor had initially given me.

10  Q    Do you remember what, if anything, the defendant said

11  when you had outbreaks after you were initially diagnosed?

12  A    Any time that I ask him, he would usually make it like a

13  joke, like, Oh, I take one, you take one, just take one,

14  everyone has it, like it's no big deal.

15  Q    What, if anything, would he say about parts of your body

16  when you had an outbreak?

17  A    We just wouldn't be intimate.

18  Q    You said that you seldomly had outbreaks?

19  A    Yes.

20  Q    In the beginning, how regular, how often did you have

21  outbreaks?

22  A    In the beginning, the very first outbreak that I ever had

23  was very intense and every single time we tried to be intimate

24  after that --

25            MR. CANNICK:  Objection.  Not responsive.

Jane - direct - Geddes                    855

1          THE COURT:  Overruled.

2    A    Every time we tried to be intimate after that, I would

3    continuously get an outbreak from him and he had expressed to

4    me, he said I think your pussy is broken.

5    Q    And after that, did you continue to have outbreaks as

6    well?

7    A    I had to give it time to be able to be intimate with him,

8    but after about a month, everything had gone away.

9    Q    And did you have outbreaks though after that initial

10   time?

11   A    Yes, I did.

12   Q    You testified earlier about a few rules that the

13   defendant told you during that first trip to California.  Do

14   you remember that testimony?

15   A    Yes, I do.

16   Q    Once you had spent a couple of months with the defendant,

17   did you become aware of additional rules set by the defendant?

18   A    Yes, I did.

19   Q    How did you become aware of those other rules?

20   A    He had expressed them to me and other people around him

21   had expressed them to me.

22   Q    Like who?

23   A    His assistants, people like Juice.

24   Q    What were some of the rules that you learned about?

25   A    My wardrobe.  I basically was only in sweats or oversized

Jane - direct - Geddes                        856

1   clothing.  I couldn't leave my hotel room without getting in

2   touch with him or asking an assistant.  And --

3   Q    How, if at all, did the defendant want you to respond

4   when you entered a room?

5   A    He wanted me to call him daddy and immediately give him a

6   kiss.

7   Q    What, if anything, did the defendant tell you about your

8   communications with your friends once you were spending time

9   with the defendant?

10  A    He, he was not a big fan of it and he, he didn't

11  necessarily want me talking to them about him or us.

12  Q    Back when you were 17 years old and spending time with

13  the defendant, did you have social media back then?

14  A    I did.

15  Q    What types of social media did you have when you were

16  17 years old?

17  A    I had social media on Facebook, Instagram, Snapchat and

18  Twitter.

19  Q    What is Snapchat?

20  A    Snapchat is a picture and chat app where you can accept

21  your friend, your friends and family and you can send them

22  pictures and text messages that deletes after it is opened

23  forever.

24  Q    And do you remember -- without saying it, do you remember

25  your user name for your Snapchat account?

Jane - direct - Geddes                              857

1    A    Yes, I do.

2              MS. GEDDES:  I'm showing the witness only what's

3    been marked for identification as Government Exhibit 949.

4    Q    Do you recognize Government Exhibit 949?

5    A    Yes, I do.

6    Q    What is that?

7    A    It is my Snapchat handle.

8              MS. GEDDES:  And can we publish this only to the

9    jury, please?  Actually, I'm sorry.  The government offers

10   949.

11             MR. CANNICK:  No objection.

12             THE COURT:  Okay.  That's published only to the

13   jury?

14             MS. GEDDES:  Yes, please.

15             (Government Exhibit 949 so marked.)

16   Q    What, if anything, did the defendant tell you about your

17   use of social media at the age of 17?

18   A    How once I had moved to Chicago, he had told me to delete

19   all my social media.

20   Q    What, if any, explanation did he provide to you?

21   A    He just said that he didn't want me having social media.

22             MS. GEDDES:  I'm showing the witness only what's

23   been marked for identification as Government Exhibit 325.

24   Q    Do you recognize what's shown in Government Exhibit 325?

25   A    Yes, I do.

1   Q    Generally speaking, what is that?

2   A    This is basically something that I had been writing since

3   I was 17 years old and it basically expresses how I need to

4   act, think and be when around the defendant.

5   Q    And what made you think that you had to act, think and be

6   around the defendant in the way that is reflected in 325?

7   A    Well, these are all things that he would say to me and I

8   would write them down to remember.

9        MS. GEDDES:  The government offers Government

10  Exhibit 325.

11       MR. CANNICK:  No objection.

12       THE COURT:  All right.  That's in evidence.

13       (Government Exhibit 325 so marked.)

14       MS. GEDDES:  May we publish?

15       THE COURT:  Yes.

16  Q    Can you read what's shown in 325 that you wrote that you

17  were just referring to?

18  A    Yes.

19       It says:  Do not be goofy, extra, or act young when

20  told something in private or around others.  Do not play games

21  when on phone with daddy.  Just say I love you before I hang

22  up.  Continue to do what I always do around other when I am

23  alone with daddy.  Example:  Bless you daddy if he belches.

24  Trust daddy and do whatever he says, whatever he says, with no

25  rebuttal, disrespect or rebellion.  Remember how I acted in

1    the beginning, bubbly and like a child, pure and with no

2    negative intentions, and remember to stay true to who I am,

3    humble, happy, innocent and beautiful to daddy reminding him

4    of his mother and child.  Tell daddy everything so he will not

5    have to wonder and figure out what is going on with me.

6    Q    When it says "daddy" in this note, who are you referring

7    to?

8    A    The defendant.

9         MS. GEDDES:  I'm showing the witness only what's

10   been marked for identification as Government Exhibit 331.

11   Q    Do you recognize what's shown in 331?

12   A    I do, yes.

13   Q    What is that?

14   A    This is one of many notes that I would write that the

15   defendant would tell me so that I could remember these things.

16        MS. GEDDES:  The government offers 331.

17        MR. CANNICK:  No objection.

18        THE COURT:  That's in evidence.

19        (Government Exhibit 331 so marked.)

20        MS. GEDDES:  May we publish?

21        THE COURT:  Yes.

22   Q    Can you read what's shown in 331?

23   A    It says:  Remember to say I will not lie or mess up at

24   all today.  Find a positive quote to say to daddy every day.

25   If I lie, own up, say I'm sorry and take it back right away.

Jane - direct - Geddes                    860

1   Do not contemplate.  Be strong and be honest.  Do not be

2   angry, prideful, selfish or rebellious.  Say --

3   Q     Number one?

4   A     Yes.

5               Say one thing I am thankful for every day to get rid

6   of negative thinking.  Tell daddy one thing that I appreciate

7   about him and continue to lift him up.  Stop defending myself.

8   Anything daddy says is to help me.  Thank him and be happy and

9   fix the problem.  Write every day even if it's a simple

10  sentence or just to write a thought down.

11  Q     Now, you testified earlier that when you met the

12  defendant, you told him that you were 18 when you were, in

13  fact, 17?

14  A     Yes.

15  Q     Did there come a time when you told the defendant your

16  true age?

17  A     Yes, there did come a time.

18  Q     How old were you when you told the defendant your true

19  age?

20  A     I was still 17.

21  Q     What, if anything, prompted you to tell him?

22  A     Summer ended and I had to go back to school for my senior

23  year in high school.

24  Q     In what city were you when you told the defendant?

25  A     I was in Chicago.

Jane - direct - Geddes                    861

1  Q    Do you remember where in Chicago you were, where in

2  Chicago you were when you told the defendant your true age?

3  A    Yes, we were in Lincoln Park.

4  Q    Who was there?

5  A    The defendant and Juice were present and, of course, the

6  driver.

7  Q    You said were you in Lincoln Park?

8  A    Yes.

9  Q    Is that in downtown Chicago?

10 A    It is, yes.

11 Q    What happened?

12 A    I remember he had his old school car at the time and we

13 had got Al's Beef and we sat and ate hotdogs in the park and I

14 had to let him know that I was 17 and I was very scared and

15 when I told him, he slapped me in my face with an open palm an

16 then he walked away.

17 Q    And at the time, what, if anything, did you have with

18 you?

19 A    I believe I just had my phone.

20 Q    What did you do?

21 A    I then walked away because he had walked away and he had

22 never hit me ever before.

23 Q    And what happened?

24 A    He then came back to the park to try and find me for a

25 few hours and I would see the Sprinter circling and I was

CMH        OCR        RMR        CRR        FCRR

1  trying to avoid him, however, it was getting really late and I

2  was still in a city that was not my own.

3  Q    Did you eventually meet up with the defendant?

4  A    I did.  He eventually saw me and called me to come with

5  him and get back in the Sprinter and so I did.

6  Q    Who, if anyone, was in the Sprinter when you got back on?

7  A    Juice was on the Sprinter.

8  Q    And what happened when you got back on the Sprinter?

9  A    He gave me a kiss and he said that we would figure this

10 out and him and Juice laughed and he had expressed, he had

11 made a comment saying that he thought that I was going to tell

12 him something ten times worse.

13 Q    What did you do then?

14 A    He said that I hadn't needed to get on a flight

15 immediately back to Florida and that he would speak with his

16 attorneys to figure out everything.

17 Q    Did you, in fact, return to Florida?

18 A    I did immediately on the next flight.

19 Q    How long did you stay in Florida?

20 A    Not long.  Probably about a week.

21 Q    And what did you do when you were in Florida?

22 A    He had told me exactly what to do and exactly what his

23 attorneys had said which was that I would need to be

24 homeschooled and living with him in Chicago.

25 Q    And what, if anything, did you do after he told you that?

Jane - direct - Geddes                    863

1   A    Both he and I convinced my parents to allow me to be

2   homeschooled and be in Chicago so that I could learn more

3   musically.

4   Q    And when you say both he and I convinced your parents,

5   what, if any, conversations did the defendant have with your

6   family?

7   A    He had told them that --

8              MR. CANNICK:  Objection.

9              THE COURT:  Was it in your presence?

10             THE WITNESS:  Pardon me?

11             THE COURT:  Were you there when he told them

12  whatever it is he told them?

13             THE WITNESS:  At a later date, yes, I was.

14             THE COURT:  Okay.  You can only talk about

15  conversations that you actually heard him say things.  All

16  right?

17             THE WITNESS:  Okay.

18             THE COURT:  So the objection to that is sustained.

19             THE WITNESS:  Okay.

20  Q    Were you able to convince -- were your parents convinced

21  that you could move to Chicago?

22             MR. CANNICK:  Objection.

23  A    Yes, they were.

24             THE COURT:  Overruled.

25             THE WITNESS:  Sorry.

Jane - direct - Geddes                    864

1        THE COURT:  That's all right.

2        Overruled.

3   Q    What, if anything, did you do to prepare for moving to

4   Chicago?

5   A    I had packed a few suitcases and my mom had given the

6   defendant a long list of the things that I would need for

7   school and they took the steps to get me enrolled into home

8   schooling.

9   Q    And do you recall the name of the school where you are

10  homeschooled?

11  A    It was still for my county which was Orange County.  It

12  was Florida virtual online.

13  Q    And you're using the term "homeschool"?

14  A    Yes.

15  Q    But how would you communicate with your teachers doing

16  homeschooling?

17  A    Via a laptop that the defendant had to purchase.

18  Q    Were you in the presence of any of your teachers?

19  A    Not physically, no, but virtually, yes.

20  Q    What, if anything, did --

21       MS. GEDDES:  Actually, I'm going to show the witness

22  only what's marked for identification as Government

23  Exhibit 475A.

24  Q    Do you recognize what's shown in 475?

25  A    Yes, I do.

1   Q     475A.  I'm sorry.

2           What is shown in 475A?

3   A     This is a letter that he had told me that his attorneys

4   had needed --

5           MR. CANNICK:  Objection.

6           THE COURT:  Overruled.

7   A     And it's basically saying that I would be --

8           THE COURT:  Don't read it into evidence.

9           THE WITNESS:  Sorry.

10          THE COURT:  That's all right.

11  A     It's just a letter from my mother giving consent.

12  Q     For you to do what?

13  A     For me to be in Chicago under a woman that he had known.

14  Q     And you used "he" a couple of times in that sentence.

15  Who is the "he" that you're referring to?

16  A     The defendant.

17  Q     And were you -- what was the date that this letter was

18  prepared?

19  A     September 19, 2015.

20  Q     How old were you then?

21  A     I was still 17.

22          MS. GEDDES:  The government offers 475A.

23          THE COURT:  Any objection?

24          MR. CANNICK:  No.

25          THE COURT:  All right.  That's in evidence.

1          (Government Exhibit 475A so marked.)

2  Q     And I'd like to publish only to the jury and without

3  reading the names, either yours or anyone else's, can you

4  please read what is shown in 475A?

5  A     It says, We the parents of me give consent for me to stay

6  with --

7  Q     Another person?

8  A     Yes, until 12/30/2015, December 30, 2015.  At that time,

9  she will be under her care.

10  Q     And who, if anyone, signed that letter?

11  A     My mother.

12  Q     And what happened on December 30th of 2015?

13  A     I was then -- it is my birthday.

14  Q     How old were you turning that day?

15  A     Eighteen.

16          MS. GEDDES:  I'm now showing the witness only what's

17  been marked for identification as -- I'm showing the witness

18  only what's been marked for identification as Government

19  Exhibit 476A.

20  Q     Do you recognize what's shown in Government Exhibit 476A?

21  A     Yes, I do.

22  Q     What is that?

23  A     This is a proper formal letter of what the previous

24  letter was.

25  Q     The one that you just read in 475A?

Jane - direct - Geddes                867

1   A    Yes.

2   Q    And were you present for any of this letter when it was

3   made?

4   A    Yes, I was.  It had to be notarized.

5   Q    And were you -- where was it notarized?

6   A    The Orange County clerk.

7   Q    In Florida?

8   A    Yes.

9   Q    And were you present for that?

10  A    Yes, I was.

11           MS. GEDDES:  The government offers 476A.

12           THE COURT:  Any objection?

13           MR. CANNICK:  No objection.

14           THE COURT:  All right.  That's in evidence.

15           (Government Exhibit 476A so marked.)

16           MS. GEDDES:  And may I just publish it to the jury

17  briefly?

18           THE COURT:  Yes.

19  Q    Now, in both 475A and 476A, there's an individual listed

20  as who would be caring for you.  Is that correct?

21  A    Yes.

22  Q    Do you know that individual's daughter?

23  A    Yes, I do.

24  Q    Who was that individual's daughter?

25  A    Juice.

1    Q    The one that defendant introduced to you in Las Vegas?

2    A    Yes.

3    Q    What, if anything, did you do with the documents shown in

4    475A and 476A?

5    A    The defendant needed them for his attorneys.

6    Q    How did you know that?

7    A    He had expressed to me that he needed it.

8    Q    So what did you do?

9    A    I had given them to him when I had returned back to

10   Chicago.

11   Q    So did you, in fact, then return to Chicago?

12   A    I did, yes.

13   Q    And how did you get back to Chicago?

14   A    His assistant had booked my travel.

15   Q    And who paid for that?

16   A    The defendant.

17   Q    Now, when you returned -- do you remember, by the way,

18   approximately when you went back to Chicago?

19   A    I do not.

20                (Continued on next page.)

21

22

23

24

25

JANE - DIRECT - GEDDES                869

1   DIRECT EXAMINATION (Continued)

2   BY MS. GEDDES:

3   Q    You testified earlier that you told the defendant that

4   you were in fact 17 because you had to get back for your

5   senior year; is that right?

6   A    Yes.

7   Q    And when did your senior year begin?

8   A    I don't remember the exact month that it happened in

9   because I had been already late because I had stayed in

10  Chicago.  However, I did attend school for a week before I was

11  pulled out of school.

12  Q    Okay.  Do you know just approximately then, what season

13  does school start?

14  A    Fall.

15  Q    Okay.  And do you remember what season it was when you

16  returned to Chicago?

17  A    Um, possibly September.

18  Q    Okay.  Of 2015?

19  A    Yes.

20  Q    And how old were you then?

21  A    Still 17.

22  Q    Did you stay in Chicago when you returned to Chicago?

23  A    Um, we did go to Chicago and also Atlanta.

24  Q    And did you go on tour with the defendant?

25  A    I did, yes.

JANE - DIRECT - GEDDES                    870

1   Q    Do you remember the name of that tour?

2   A    It was his, I believe, Buffet Tour?

3   Q    And when you say that you went on tour with the

4   defendant, what does that mean or what do you mean by that?

5   A    By this time, because I was living with the defendant, we

6   were -- he had expressed to me that he wanted me to be closer

7   to him and we had traveled via tour bus.

8   Q    And so previously you testified that you would fly from

9   city to city to see the defendant; is that correct?

10  A    Yes.

11  Q    Was this a change now that you would travel by tour bus

12  from city to city?

13  A    Yes.

14  Q    What would you do when you arrived at a particular stop

15  on the tour?

16  A    Do you mean like a pit stop or?

17  Q    A stop for a show.  Would you attend the show?

18  A    Sometimes I would.  Sometimes I would not, no.

19  Q    And what would you do if you weren't attending a show?

20  A    I would stay on the tour bus, or I would see him before

21  or after his show back stage.

22  Q    And by "him," who are you referring to?

23  A    The defendant.

24  Q    You mentioned that you were on a tour bus.

25       Who, if anyone else, was on the tour bus with you?

JANE - DIRECT - GEDDES                871

1   A    For the most part it was me and him.  However, sometimes

2   Juice would be on the tour bus.

3   Q    And who drove the tour bus?

4   A    His driver of the tour bus at the time.

5   Q    Did you learn his driver's name?

6   A    Yes.

7   Q    How did you learn the diver's name?

8   A    From the defendant.

9   Q    Were you introduced to the driver?

10  A    I was not, no.

11  Q    What was the driver's name that the defendant -- how did

12  the defendant refer to the driver?

13  A    As Top Gun.

14  Q    I'm showing the witness only what's marked for

15  identification as Government Exhibit 17.

16            Do you recognize what's shown in 17?

17  A    Yes, I do.

18  Q    What is that?

19  A    That is his tour bus driver.

20  Q    Top Gun?

21  A    Yes, it is.

22            MS. GEDDES:  The government offers Government

23  Exhibit 17.

24            MR. CANNICK:  No objection.

25            THE COURT:  That's in evidence.  You can publish.

LINDA D. DANELCZYK, RPR, CSR, CCR

JANE - DIRECT - GEDDES                     872

1          MS. GEDDES:  Thank you.

2          (Government Exhibit 17, was received in evidence.)

3          (Exhibit published.)

4     BY MS. GEDDES:

5     Q    Now, was there a bathroom on the tour bus?

6     A    Yes, there were two.

7     Q    Could you use them?

8     A    Yes, I could.

9     Q    What, if anything, would you do after you used the toilet

10    on the tour bus?

11    A    I would have to knock before I could leave the washroom.

12    Q    And by "knock," what do you mean?

13    A    I would have to knock on the door until he would say

14    "come on," before I could leave the restroom.

15    Q    So you were inside the bathroom when you were knocking?

16    A    Yes.

17    Q    When you said "he," who are you referring to?

18    A    The defendant.

19    Q    What, if any, sexual contact did you have with the

20    defendant while you were traveling on that tour bus on the

21    tour when you were 17 years old?

22    A    We would have oral sex and vaginal penetration.

23    Q    Were those encounters ever recorded?

24    A    Yes, they were.

25    Q    Who recorded them?

```
                        Proceedings                873
```

1    A     The defendant.

2    Q     With what?

3    A     His iPads.

4           THE COURT:  Ms. Geddes, it's almost 1:00.  This

5    would be a good time to stop.

6           MS. GEDDES:  Yes, Judge.

7           THE COURT:  Okay.

8           Ladies and gentlemen, we're going to break for

9    lunch.  Please don't talk about the case at all.  But we'll be

10   back here at 2:15.  And enjoy your lunches.

11          THE COURTROOM DEPUTY:  All rise.

12          (Jury exits the courtroom.)

13          THE COURT:  Everybody can have a seat.

14          Let's take the witness.  We'll see you after lunch.

15          (The witness steps down.)

16          THE COURT:  All right, anything before we break for

17   lunch?

18          MS. GEDDES:  Nothing from the government.

19          THE COURT:  I know this is probably a pointless

20   question, but do you know about how much more you have with

21   the witness?

22          MS. GEDDES:  I think we're about halfway through.

23          THE COURT:  Okay.

24          I also just want to advise the parties that we'll

25   take both days of Rosh Hashanah.

Proceedings                                    874

1        The question then is, although I think the jurors

2   have really arranged their schedules around this Friday off,

3   so I think we'll still stick with the plan of when there's not

4   a holiday during the week, we'll take that Friday.  All right?

5        MS. GEDDES:  I'm sorry, I did have one thing to

6   raise.  I'm sorry.

7        THE COURT:  Sure.  Which is a way from a get-away.

8   Go ahead.

9        MS. GEDDES:  This witness, there are two questions

10  that I would ask her that a truthful answer would call for her

11  to reference the defendant's prior trial and the nature of

12  those charges.

13       The first, which I haven't asked her yet, which was:

14  Why did you tell the defendant that you were 18 when you were,

15  in fact, 17?

16       Her answer is that she was aware of the fact that he

17  had previously been charged with sexual exploitation of a

18  minor.

19       In addition, when we return, I anticipate that this

20  witness is going to testify about letters that the defendant

21  had her write, including numerous falsehoods and embarrassing

22  mentions, and she will testify that the -- one of the reasons

23  that the defendant explained that she was doing this was that

24  it could protect him and so, you know, the past was not

25  repeated and he will reference conversations with his

1    attorneys.

2          I would ask that she -- I don't know how much of

3    this would come out, but I asked that she be permitted to

4    testify truthfully in response to these questions, and that we

5    not limit her answers.

6          THE COURT:  Well, I think I made a ruling, a similar

7    ruling.  I don't think you actually ever asked the question

8    with a prior witness.  And I think we had come to sort of an

9    agreement.  But that, Mr. Cannick, I don't know in your views

10   have changed on that.

11         MR. CANNICK:  I don't think it has, Your Honor, but

12   I will certainly discuss with my team.

13         The other thing, Your Honor --

14         THE COURT:  Into the microphone, please.

15         MR. CANNICK:  I might have issue with the verbiage

16   that the government intends on eliciting in terms of sexual

17   exploitation of a minor.  Frankly, I don't know what the

18   specific charges were.

19         THE COURT:  I don't think -- I think Ms. Geddes

20   maybe was just speaking generally.  I think -- I mean you can

21   either do it by leading the witness a little bit through that

22   or, or just refer general generally that he had this prior,

23   however, you plan to refer to it without calling it sexual

24   exploitation of a minor.

25         MS. GEDDES:  I think that's what he's actually

1   charged with, but she is not going to say that at all.

2           THE COURT:  All right.

3           So after lunch, why don't you just give us a heads

4   up about what that might be and then -- like I say, I think

5   this is the same ruling I made the last time, so I don't think

6   much has changed.  But let us know after the break.

7           MS. GEDDES:  I will.

8           THE COURT:  All right.  Thanks everybody.

9           (Luncheon recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                            877

1                    A F T E R N O O N   S E S S I O N

2               (In open court; Jury not present.)

3               THE COURTROOM DEPUTY:  All rise.

4               THE COURT:  Everybody can have a seat.

5               (Defendant enters the courtroom.)

6               THE COURT:  Are we ready for the witness?

7               Oh, I know we were going to -- did you all figure

8       out what it is?

9               MS. GEDDES:  We haven't, but let me just tell the

10      defendant.

11              THE COURT:  Okay.

12              (Discussion was had off the record.)

13              THE COURT:  Okay, so we've resolved whatever -- it

14      wasn't even a dispute.  You're both on the same page about how

15      the witness is going to describe this?

16              MS. GEDDES:  I think so.  I just want to ask counsel

17      one more thing.

18              (Discussion was had off the record.)

19              THE COURT:  I'm assuming you've worked this out.

20              MR. CANNICK:  We're fine.

21              THE COURT:  All right.  If you need me, let me know.

22      All right, let's get the witness and then let's get the jury.

23              MS. GEDDES:  Oh, Your Honor, we may use a board on

24      that easel, if that's okay with the Court?

25              THE COURT:  I don't -- well, not my problem I guess,

Proceedings                          878

1    but I don't understand how you're going to use it.

2              Who can see it?

3              MS. GEDDES:  We're hoping the jury.

4              THE COURT:  But it's facing here.  Oh, okay.

5              Let's get the jury.

6              (Jury enters the courtroom.)

7              MS. GEDDES:  Your Honor, can we approach for just

8    one small matter?

9              THE COURT:  With the court reporter?

10             MS. GEDDES:  Yes, please.

11             THE COURTROOM DEPUTY:  All rise.

12             (Jury enters the courtroom.)

13             THE COURTROOM DEPUTY:  You may be seated.

14             (Continued on the next page.)

15             (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                      879

1              (The following occurred at sidebar.)

2              MS. GEDDES:  Your Honor, I just received an email

3    conveyed by our officers that the court reporter -- or the

4    court sketch -- not court sketchers, sketch artist wanted to

5    know if she should be blurring the faces of the individuals

6    who are testifying under pseudonyms.

7              We would support that -- we would support that they

8    be blurred just to further protect their identities, although

9    I'll be candid those...

10             MR. CANNICK:  You can't tell from the sketches

11   anyway.

12             MS. GEDDES:  I don't disagree with you any how --

13             MR. CANNICK:  Sketching looks like Mickey Mouse or

14   Minnie Mouse.

15             THE COURT:  You realize that sometimes these

16   transcripts get released.

17             I'm not going to weigh in on that.  First of all, I

18   don't think that -- at least it's my hope that nobody can tell

19   who you are from those sketches, so I think that's not that

20   big a deal.

21             MS. GEDDES:  Thank you, Judge.

22             (End of sidebar conference.)

23             (Continued on the next page.)

24

25
```

JANE - DIRECT - GEDDES                    880

1           (In open court; Jury present.)

2           (The witness resumes the stand.)

3           THE COURT:  Good afternoon, ladies and gentlemen, I

4    hope that you had a good lunch.  We're ready to resume with

5    the direct examination of the witness.

6           Go ahead.

7           THE COURTROOM DEPUTY:  The witness is reminded that

8    she's still under oath.

9    DIRECT EXAMINATION (Continued)

10   BY MS. GEDDES:

11   Q    When you first started living with the defendant in --

12   after you moved back to Chicago in 2015, who, if anyone, from

13   high school did you stay in touch with?

14   A    I stayed in touch with Malak and a friend of my named

15   Mia.

16   Q    How did you stay in touch with them?

17   A    Via text message and through Snapchat.

18           THE COURT:  I want to ask you to keep your voice up

19   a little bit.

20           MR. CANNICK:  Your Honor, can I have that answer

21   read back.

22           THE COURT:  Sure.

23           (Whereupon, the record was read.)

24   BY MS. GEDDES:

25   Q    Now do you remember what, if anything, the defendant did

1  on October 2nd of 2015?

2  A    No.

3  Q    I'm showing the witness what's been marked for

4  identification as Government Exhibit 205A.

5         I'm showing the witness what's marked for

6  identification as Government Exhibit 205A.

7         Do you recognize what's shown in 205A?

8  A    Yes, I do.

9  Q    Does that refresh your recollection as to what happened

10 on October 2nd of 2015?

11 A    Yes.

12 Q    What happened that day?

13 A    I had expressed to a friend of mine that he had nutted --

14 ejaculated inside of me.

15 Q    And when you say "he," who are you referring to?

16 A    The defendant.

17 Q    And you -- did you tell your friend this because this, in

18 fact, had happened on that day?

19 A    Yes, it did.

20 Q    And when -- do you recall where you were in early October

21 of 2015?

22 A    I do not, no.

23 Q    What, if anything, do you recall happening on

24 October 4th, two days later of that same year?

25 A    I do not recall.

JANE - DIRECT - GEDDES                882

1  Q    I'm showing the witness only what's marked for

2  identification as Government Exhibit 205D.

3            And, actually, may I approach, Your Honor?

4            THE COURT:  Yes.

5            (Counsel approaches the witness.)

6            THE COURT:  All right, I thought you wanted a

7  sidebar.

8            MS. GEDDES:  Oh, no.

9  Q    Does looking at 205D refresh your recollection as to

10  what, if anything, happened on October 5th of 2015 or

11  October 4th of 2015?

12  A    Yes.

13  Q    What happened?

14  A    I had a conversation between a friend and it was

15  describing how an abortion, the procedure for an abortion.

16  Q    Why were you having that conversation with your friend?

17  A    Because he had ejaculated inside of me.

18  Q    And what, if anything, were you concerned about?

19  A    Pregnancy because we had not used protection ever.

20  Q    Do you recall having a conversation with the defendant

21  about what he would do if you were, in fact, pregnant?

22  A    I do.

23  Q    How did the defendant react?

24  A    He did in fact say that he would want me to get an

25  abortion because he wanted me to keep my body tight.

LINDA D. DANELCZYK, RPR, CSR, CCR

JANE - DIRECT - GEDDES                883

1   Q    And how, if at all, was -- how, if at all, did the
2   defendant say your age was a factor in that decision?
3   A    My age was a factor.
4   Q    What did he say?
5   A    He said that if I was any other age, it wouldn't make a
6   difference.
7   Q    And how old were you then?
8   A    I was 17.
9   Q    How did you feel when you believed that you might be
10  pregnant and might have to get an abortion?
11  A    I was scared.
12          MS. GEDDES:  The government offers 205A and 205D.
13          THE COURT:  Any objection?
14          MR. CANNICK:  No, Your Honor.
15          THE COURT:  Okay.
16          (Government Exhibits 205A and 205D, were received in
17  evidence.)
18  Q    And just to be clear, do you recall who you were talking
19  about this with?
20  A    It was either Mia or Malak.
21          MS. GEDDES:  May I publish 205A?
22          THE COURT:  Yes, jury only?
23          MS. GEDDES:  Jury only, please.
24          (Exhibit published.)
25  Q    And there is several blurbs here.

JANE - DIRECT - GEDDES                    884

1          Who wrote what's reflected there?

2     A    I wrote those messages.

3     Q    And what is the date on which these were sent?

4     A    October 3rd, 2015.

5     Q    And can you read what's written here, where my pen is

6     pointed?

7     A    I said, you know, he nutted in me before his show today.

8     Q    And, again, you're referring to the defendant?

9     A    Yes, I was.

10    Q    And what did you mean by the term "nutted"?

11    A    He had ejaculated inside of me.

12    Q    And how about, what did you mean by "his show"?

13    A    Before his performance.

14    Q    And, again, for the jury only, may I publish 205D?

15              THE COURT:  Yes.

16              (Exhibit published.)

17    Q    Where I'm putting my pen -- well, let me start with.

18              On the first page, who sent those text messages?

19    A    I sent those text messages.

20    Q    And on what date?

21    A    October 5th, 2015.

22    Q    And where my pen is, what does it say?

23    A    It says, "I'm going to kill myself."

24    Q    And what did you send after that?

25    A    The procedure of how a abortion is done.

1  Q    Were those photographs of that?

2  A    Yes, it was.

3  Q    And I'm now turning to the fourth page of 205D.

4       Can you -- again, who wrote these -- who sent these

5  text messages on this page, page 4 of 205D?

6  A    I did.

7  Q    Can you read what you wrote where my pen is pointed?

8  A    Yes.  I said, "I can't go through with this."

9  Q    What were you referring to?

10 A    An abortion.

11 Q    And now where my pen is pointed, can you read that?

12 A    He nutted in me today.

13 Q    And now just for the record, who are you referring to by

14 "he," in that sentence?

15 A    The defendant.

16 Q    And how about here, can you read that, where my pen is

17 pointed?

18 A    But he said we need to look into that abortion stuff

19 because he wants to keep my body right and tight.

20 Q    And I'm now turning to the eighth page of 205D.

21      Can you read where my pen is pointed?

22 A    Now if I was 18.

23 Q    And below that?

24 A    He wouldn't care about the baby, speaking that I'm 17.

25 Q    What did you mean by that?

1    A    He had expressed to me had it been any other age, that he

2    would have wanted to start a family.

3    Q    And, again, just for the record, who wrote these text

4    messages shown on page 8?

5    A    I sent these messages.

6    Q    And there are -- I'm showing you page 6 of that.  There

7    are some text messages in gray and some in blue.

8         What does the gray indicate regarding who sent

9    those?

10   A    Me.

11   Q    And how about the blue?

12   A    That is whom I was speaking to.

13   Q    And I want to direct your attention on page 5.

14        Do you see where my pen is pointed?

15   A    Yes.

16   Q    What does that say?

17   A    It says, "Tell Mia."

18   Q    Does that refresh your recollection as to who you were

19   talking to in this text message?

20   A    Yes.

21   Q    Who was it?

22   A    Malak.

23   Q    And how do you know that?

24   A    Because I told her to tell Mia.

25   Q    And one line up there it says "like FR."

JANE - DIRECT - GEDDES                887

1              What did you mean by that?

2    A    Like for real.

3    Q    FR stands for "for real"?

4    A    Yes.

5    Q    And above there you also reference a plan B pill.

6              What did you mean by a plan B pill?

7    A    That is a pill that you take immediately after someone

8    has ejaculated inside of you.

9    Q    Now were you -- did you ultimately learn whether or not

10   you were pregnant in October of 2015?

11   A    I was not.

12   Q    You testified earlier about the defendant wanting you to

13   limit communications about him and you with your friends.

14             Do you recall that testimony?

15   A    Yes, I do.

16   Q    Why were you able to communicate with your friend about

17   what was going on between you and the defendant in those text

18   messages?

19   A    I would delete the text messages out of my phone, and I

20   had told both of them never to text me unless I was to text

21   them first.

22   Q    And why did you do that?

23   A    Because I knew that the defendant was very controlling

24   about who I spoke to and what I spoke about.

25   Q    Were there certain times when the defendant spent more

LINDA D. DANELCZYK, RPR, CSR, CCR

1   time away from you?

2   A    Yes.

3   Q    Where would that occur?

4   A    It would just depend on the city that we were in and his

5   schedule.

6   Q    And were there any cities that you recall where the

7   defendant was less likely to be around you and more likely to

8   be somewhere else?

9   A    Not necessarily, no, if I was with him.

10  Q    Okay.  In those text messages where you referenced plan

11  B, what did you understand the purpose of a plan B pill to be?

12  A    It would kill whatever possibility of life.

13  Q    And was the purpose so that you wouldn't continue to be

14  pregnant?

15  A    Yes.

16  Q    Now in those text messages, do you recall your testimony

17  earlier today about those trips to California?

18  A    I do.

19  Q    And while you were 17, did you take additional trips to

20  California with the defendant?

21  A    Yes, I did.

22  Q    And do you remember where you traveled to?

23  A    I do not.

24  Q    Do you remember what the purpose of your travel was for?

25  A    He had shows.

JANE - DIRECT - GEDDES                    889

1   Q    And while you were traveling in California to see the

2   defendant or to accompany the defendant while he performed at

3   his shows, do you recall whether or not any of your sexual

4   contact with the defendant was recorded?

5   A    Yes, it was.

6   Q    What was it recorded with?

7   A    An iPad that was in his possession at all times.

8   Q    And that was when you were 17?

9   A    Yes.

10  Q    What, if anything, do you recall sending your friends on

11  October 19th of 2015?

12  A    I don't recall.

13  Q    I'm showing the witness what's been marked for

14  identification as Government Exhibit 205F.

15       Do you recognize what's shown in 205F?

16  A    I do.

17  Q    Does that refresh your recollection as to what, if

18  anything, you sent to your friends on October 19th of 2015?

19  A    I do, yes.

20  Q    What did you send your friends?

21  A    I sent them pictures of me and the defendant.

22  Q    Why did you do that?

23  A    Because I just needed someone else to have proof just in

24  case anything happened.

25  Q    And you say you were concerned in case something

1    happened.

2              Do you remember what type of phone you had back

3    then?

4    A    At this time I had an iPhone that the defendant had paid

5    for.

6    Q    Do you remember when you got that iPhone?

7    A    When I left to be home schooled earlier that year.

8    Q    And what, if anything, did the defendant say about that

9    iPhone?

10   A    He made me put a pass code on it but he was to know the

11   pass code at all times.

12   Q    Do you still have that iPhone?

13   A    I do not.

14   Q    Why not?

15   A    The defendant broke it.

16   Q    And I want to direct -- well, the government offers 205F.

17             THE COURT:  Any objection?

18             MR. CANNICK:  May I see it?

19             (Pause in the proceedings.)

20             MR. CANNICK:  No objection.

21             THE COURT:  Okay.

22             (Government Exhibit 205F, was received in evidence.)

23             MS. GEDDES:  May I publish?

24             THE COURT:  Yes.

25             (Exhibit published.)

1   Q     Whose writing is in gray?

2   A     Me.

3   Q     And right here where my pen is, what did you write?

4   A     I said "keep these."

5   Q     What are you referring to?

6   A     The photographs that I sent.

7   Q     Now where my pen is pointed, that first photograph on

8   205F, what is that?

9   A     That is the defendant.

10  Q     Where did -- who took that picture?

11  A     I took that picture.

12  Q     Where did you take it?

13  A     He was actually shooting the cover art for his Buffet

14  Tour album, cover art.

15  Q     And the Buffet Tour was the one that you were on when you

16  returned to live with the defendant after you started home

17  schooling; is that right?

18  A     Yes.

19  Q     And turning to page 2 where my pen is pointing, what is

20  that a photograph of?

21  A     That is a photograph that the defendant took of me and

22  him.

23  Q     Do you recall where you were?

24  A     Yes, we were in the fitting room at the studio that he

25  was shooting his cover album.

1    Q    And I'm sorry, what was the room that you were in?

2    A    It was a fitting room where you would change.

3    Q    And is that you on the right?

4    A    Yes, it is.

5    Q    How old are you?

6    A    I was 17 years old.

7    Q    And how about where my pen is pointing here and here, who

8    are in those photos?

9    A    That is me and the defendant.

10   Q    Was that taken in the same location?

11   A    Yes, it was.

12   Q    And how about this one, where my pen is pointed?

13   A    Yes, that is me and the defendant.

14   Q    Same place?

15   A    Yes.

16   Q    And finally I'm going to turn to the last page.

17             Where my pen is pointed, who is that a photograph

18   of?

19   A    Me and the defendant.

20   Q    Do you remember where that was taken?

21   A    It was the same day.

22   Q    He appears to be in different clothing, how's that?

23   A    Oh, no, he had changed his outfits.

24   Q    And was that as part of the shoot that was going on?

25   A    Yeah, he had multiple looks.

JANE - DIRECT - GEDDES                    893

1  Q    Now do you recall where you were on November 14th of 2015

2  and where you were going?

3  A    I do not.

4  Q    The government -- I'm showing you what's been marked for

5  identification as 205I.

6         Can you take a look at that, and let us know if that

7  refreshes your recollection as to where you had been and where

8  you were going?

9  A    Yes.

10 Q    Where had you been?

11 A    I had been to LA and Vegas.

12 Q    Do you know -- do you recall why you were in Los Angeles

13 and Las Vegas?

14 A    Yes, he had shows.

15 Q    And where were you going?

16 A    Back to Chicago.

17 Q    And can you take another look at that?

18 A    Yeah.  We were in Chicago, sorry.

19 Q    Where were you going?

20 A    To New York.

21 Q    When were you scheduled to leave for New York?

22 A    The next day.

23 Q    And what is the date of these?

24 A    November 14th, 2015.

25 Q    The government offers 205I.

JANE - DIRECT - GEDDES                               894

1          MR. CANNICK:  No objection.

2          THE COURT:  Okay, those are in evidence.

3          (Government Exhibit 205I, was received in evidence.)

4    Q    By the way, did you wear glasses back then?

5    A    I did.

6    Q    What types of glasses?  Can you describe the glasses that

7    you wore?

8    A    I had a few large frames, and I had a few small

9    rectangular-sized frames.

10

11          (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    EXAMINATION CONTINUES

2    BY MS. GEDDES:

3    Q    Was the defendant aware of your friend Malak, who you

4    exchanged those text messages with?

5              MR. CANNICK:  Objection.

6    A    He was.

7              THE COURT:  Are you objecting?

8              MR. CANNICK:  Yes.

9              THE COURT:  Oh, can you do it so I can hear you?

10   Thanks.

11             The objection is overruled.

12   Q    Was the defendant aware of your friend Malak?

13   A    He was.

14   Q    What, if anything, did you tell him about your friend

15   Malak?

16   A    I had told him that she was my cousin.

17   Q    Why did you tell the defendant -- was Malak your cousin?

18   A    She is not.

19   Q    Why did you tell the defendant that she was your cousin?

20   A    I felt that if I told him that she was a family member

21   that he would allow me to stay in communication with her.

22   Q    And I am showing you what's been marked for

23   identification as 205(j).

24             Do you recognize what's shown in 205(j)?

25   A    Yes, I do.

1   Q     What is that?

2   A     It's a video from my best friend Mia.

3   Q     And how did you react when you received that video?

4   A     I was anxious.

5   Q     How had you received the video?

6   A     Through text message.

7   Q     And what about receiving the video made you anxious?

8   A     Because the defendant had the passwords to my phone and

9   he would check my phone and he didn't really allow me to talk

10  to them.

11  Q     And what, if anything -- how did you respond to your

12  friend after you received that video?

13  A     I told her that she couldn't do that.

14  Q     And why did you tell your friend that she couldn't do

15  that?

16  A     Because he checks my phone.

17          MS. GEDDES:  The Government offers 205(j).

18          MR. CANNICK:  No objection.

19          THE COURT:  Okay.

20          (Government's Exhibit 205(j) was received in

21  evidence.)

22          MS. GEDDES:  Can we publish this, please?

23          THE COURT:  Go ahead.

24          Jury only?

25          MS. GEDDES:  Yes, jury only, please.

1              (Exhibit published to the jury only.)

2    BY MS. GEDDES:

3    Q    I want to direct your attention to this (indicating),

4    where my pen is pointed.

5              What is shown there?

6    A    It's a video of my friend Mia.

7    Q    And where my pen is now pointed, what is there?

8    A    It is a text message from me.

9    Q    And what did you say in your text message, can you read

10   it?

11   A    You know y'all can't do that because he check my phone.

12   Q    And when you saw "y'all can't do that," who were you

13   referring to, who was the you in that?

14   A    Malak and Mia.

15   Q    And were those your friends from high school?

16   A    Yes.

17   Q    And when you said "he check my phone," who was the "he"

18   in that sentence?

19   A    The defendant.

20   Q    And turning to the second page, can you read this blue

21   entry (indicating) where my pen is pointed?

22   A    What he gonna say if he see the video?

23   Q    And how did you respond right below?

24   A    He's gonna be like, why is that your BF when you said you

25   be texting your cousin.

1    Q    Who did you mean by BF there, what did you mean by BF?

2    A    Best friend.

3    Q    And what were you -- what were you saying in this

4    particular text message?

5    A    Meaning that he only allowed me to talk to Malak because

6    I had told her [sic] that she was family; however, Mia, he did

7    not want me communicating with her.

8    Q    And can you read --

9         MS. GEDDES:  I turned the page to page 3.

10   Q    Can you read the response on page 3?

11   A    I just don't want to have to block your number cause he

12   think I'm being immature, that's why I deleted apps and

13   everyone's number because I gotta show some age now that I'm

14   with a 48-year-old.  So doing so has made me grow out of a lot

15   of young habits.  Just don't want to ruin the one shot I have

16   at being able to talk to you.

17   Q    And when you referenced a 48-year-old, who were you

18   referring to?

19   A    The defendant.

20   Q    And finally, I am showing you what's been marked for

21   identification as 205(m).

22        Do you recognize what's shown in 205(m)?

23   A    Yes, I do.

24   Q    And I am going to turn the page to page 2.  Can you take

25   a look at that for a moment?

1    A    Yes, I do.

2    Q    Generally speaking, what is shown in this particular

3    exhibit?

4    A    Basically, me texting and saying that certain things that

5    they can't do because it would get me caught up.

6    Q    And what is it that you didn't want your friends to do?

7    A    They couldn't text me or reach out to me, like, without

8    me doing so first.

9    Q    And when you said it would get you caught up, what did

10   you mean by that?

11   A    Meaning, like, I would get into a alt -- it would cause a

12   altercation between me and the defendant.

13   Q    And turning to page 1, can you tell what the dates of

14   these communications were?

15   A    January 8th, 2016.

16        MS. GEDDES:  The Government offers 205(m).

17        THE COURT:  Any objection?

18        MR. CANNICK:  No.

19        THE COURT:  All right, that comes into evidence.

20        (Government's Exhibit 205(m) was received in

21   evidence.)

22        MS. GEDDES:  And just, I am turning to page 2.

23        THE COURT:  Is this just for the jury?

24        MS. GEDDES:  Yes, just for the jury.

25        THE COURT:  Make sure you let me know.

1          MS. GEDDES:  I'm sorry, yes.

2          (Exhibit published to the jury only.)

3     BY MS. GEDDES:

4     Q     Can you read what you wrote -- is the gray text messages

5     that you sent?

6     A     Yes.

7     Q     Can you read what you wrote there?

8     A     Texting you will get me caught up.

9     Q     And where my text message -- or, I'm sorry, where my pen

10    is pointing now (indicating), what does that say?

11    A     You gotta learn how to use code, Baby Girl.

12    Q     That's what Baby G is?

13    A     Yes.

14    Q     And what did you mean by that?

15    A     Meaning that there was a specific way that she would be

16    able to talk to me; and if it wasn't, like, everyday stuff,

17    then she couldn't text me.

18    Q     And by "everyday stuff," what are you referring to?

19    A     Like, if it wasn't just her saying, you know:  How are

20    you; or, how are your nails; or, how is your hair?  If it

21    wasn't, what he would call it, innocent stuff, then I wasn't

22    able to talk to them about anything personal.

23    Q     And who are you referring to when you said "he"?

24    A     The defendant.

25    Q     You testified earlier that had the -- you were concerned

1  because if the defendant had learned about these text

2  communications, there would be an altercation.

3              What did you mean by that?

4  A    In 2015 the defendant had introduced me into what he

5  called chastising.

6  Q    And what are chastising or what do you mean by

7  chastising?

8  A    Spankings.

9  Q    We'll talk about that in a moment.

10             Now, in the beginning of the time that you spent

11  with the defendant, what, if anything, did the defendant tell

12  you about other females in his life?

13  A    The defendant did tell me that he had multiple women and

14  girlfriends.

15  Q    How did you react to that?

16  A    I was okay with that.

17  Q    What, if anything, did you eventually learn about his

18  relationships with those other females?

19  A    I had learned that they were actually all living

20  together.

21  Q    How did you learn?

22  A    I had learned from the defendant.

23  Q    In what way?

24  A    When we were in Atlanta and anywhere that we would be, I

25  had -- at the studio and in Atlanta, he had a guest house in

1   which they all lived there.

2   Q    And by "they," who are you generally referring to?

3   A    Um --

4   Q    Are you referring to the other females that you just

5   mentioned?

6   A    Yes.

7   Q    Do you recall when you learned that the defendant was

8   living with other females?

9   A    I do, yes.

10   Q    When was it?

11   A    It was in Atlanta.

12   Q    And approximately how long had you been spending time

13   with the defendant at the time that you learned that he was

14   living with other females?

15   A    It was in 2015.

16   Q    Do you remember how long it was, though, that you had

17   been with the defendant?

18   A    Probably about four or five months.

19   Q    And how old were you there?

20   A    I was 17.

21   Q    And by then, were you still having sexual contact with

22   the defendant?

23   A    I was, yes.

24   Q    Without using any full names, who did you learn was

25   living with the defendant at that time?

Jane - direct - Geddes                     903

1    A    Nicq, Juice, Joy, and Vee.

2         MS. GEDDES:  I'm showing the witness only what's

3    been marked for identification as Government Exhibit 69(b).

4    Q    Do you recognize 69(b)?

5    A    Yes, I do.

6    Q    What is 69(b)?

7    A    This is Nicq.

8         MS. GEDDES:  The Government offers 69(b).

9         MR. CANNICK:  No objection.

10        THE COURT:  Okay, that's in evidence.

11        (Government's Exhibit 69(b) was received in

12   evidence.)

13        MS. GEDDES:  May I publish?

14        THE COURT:  To the jury only?

15        MS. GEDDES:  No, you can publish.

16        (Exhibit published.)

17        MS. GEDDES:  And I am showing the witness only

18   what's now been marked for identification as 69(c).

19   BY MS. GEDDES:

20   Q    And before I do, do you know Nicq's first and last name?

21   A    I do.

22   Q    I'm showing the witness only what's been marked for

23   identification as 69(c).

24        On top, is that the same photograph that was just

25   shown in 69(b)?

Jane - direct - Geddes                    904

1   A     It is, yes.

2   Q     And below, there is a name.  Is that the name that you

3   know to be the first and last name of Nicq?

4   A     It is, yes.

5         MS. GEDDES:  The Government offers 69(c) and would

6   ask that the Court publish it to the jury only.

7         MR. CANNICK:  No objection.

8         THE COURT:  Okay.

9         (Government's Exhibit 69(c) was received in

10  evidence.)

11        (Exhibit published to the jury only.)

12  BY MS. GEDDES:

13  Q     I am showing the witness only what's been marked for

14  identification as 52(b), as in boy.

15        Do you recognize what's shown in 52(b)?

16  A     I do.

17  Q     Who is that?

18  A     That's Juice.

19        MS. GEDDES:  The Government offers 52(b).

20        MR. CANNICK:  No objection.

21        THE COURT:  In evidence.

22        (Government's Exhibit 52(b) was received in

23  evidence.)

24        MS. GEDDES:  May I publish?

25        THE COURT:  Yes.

SAM      OCR      RMR      CRR      RPR

Jane - direct - Geddes                905

1              (Exhibit published.)

2              MS. GEDDES:  And I am now showing the witness only

3    what's been marked for identification as 52(c).

4    BY MS. GEDDES:

5    Q    And before I do, do you know the first and last name of

6    Juice?

7    A    I do.

8    Q    I am showing you 52(c).  On top, is that the same

9    photograph shown in 52(b)?

10   A    It is.

11   Q    And below that, is that the first and last name that you

12   know of Juice, who is shown in 52(b) and (c)?

13   A    It is.

14             MS. GEDDES:  The Government offers 52(c) and asks

15   that it be published to the jury only.

16             THE COURT:  Any objection?

17             MR. CANNICK:  No.

18             (Government's Exhibit 52(c) was received in

19   evidence.)

20             (Exhibit published to the jury only.)

21             MS. GEDDES:  I'm showing the witness only what's

22   been marked for identification as Government Exhibit 72.

23   Q    Do you recognize 72?

24   A    I do.

25   Q    Who is 72?

Jane - direct - Geddes                    906

```
1   A    Vee.
2           MS. GEDDES:  Government offers 72.
3           MR. CANNICK:  No objection.
4           THE COURT:  That's in evidence.
5           (Government's Exhibit 72 was received in evidence.)
6           MS. GEDDES:  May we publish?
7           THE COURT:  Yes.
8           (Exhibit published.)
9           MS. GEDDES:  And I am showing the witness only
10  what's been marked for identification as Government
11  Exhibit 78.
12  BY MS. GEDDES:
13  Q    Do you recognize 78?
14  A    I do.
15  Q    Who is that?
16  A    Joy.
17  Q    And do you know --
18          MS. GEDDES:  The Government offers 78.
19          THE COURT:  Any objection?
20          MR. CANNICK:  No objection.
21          THE COURT:  Okay, that's in evidence.
22          (Government's Exhibit 78 was received in evidence.)
23          MS. GEDDES:  May I publish?
24          THE COURT:  Is that to go to everybody?
25          MS. GEDDES:  Yes.
```

1          THE COURT:  Okay.

2          (Exhibit published.)

3    BY MS. GEDDES:

4    Q    And do you know Joy's first and last name?

5    A    I do.

6          MS. GEDDES:  I am showing the witness only what's

7    been marked for identification as 78(a).

8    Q    And where my pen is (indicating), is that the same

9    photograph that was just shown in Government Exhibit 78?

10   A    It is.

11   Q    And below that, is that the first and last name of Joy?

12   A    Yes.

13         MS. GEDDES:  The Government offers 78(a) and asks

14   that it be published to the jury only.

15         MR. CANNICK:  No objection.

16         THE COURT:  Okay, that's in.

17         (Government's Exhibit 78(a) was received in

18   evidence.)

19         (Exhibit published to the jury only.)

20   BY MS. GEDDES:

21   Q    Now, you testified earlier that you found out that the

22   defendant was living with multiple females about four to five

23   months in?

24   A    Yes.

25   Q    How old were you when that happened?

1  A    I was 17.

2  Q    And so, when you say four to five months, do you mean

3  four to five months from when you started -- when you met the

4  defendant?

5          MR. CANNICK:  Objection.

6  BY MS. GEDDES:

7  Q    What did you mean by four to five months?

8  A    Well, I had initially met all of them from time to time.

9  However, I did not know that they were his girlfriends that he

10 was living with.

11 Q    When did you learn, though, that he was living with them

12 in relation to when you first met the defendant?

13 A    About four to five months after meeting him.

14 Q    Now, did you continue to spend time with the defendant

15 after you learned that he was living with these other females?

16 A    I did.

17 Q    What, if any, rules did the defendant set with respect to

18 how you should interact with these other females?

19 A    He told me to listen to whatever they said because it

20 was, basically, coming from him.

21 Q    And how much, if any, information did you understand you

22 should be sharing with these individuals, these women that he

23 was living with?

24 A    I could not share any of my personal information with

25 them.

1   Q    And how did you know that?

2   A    The defendant had told me not to.

3   Q    Now, through your testimony today you've testified about

4   certain rules that the defendant wanted you to follow.

5            What, if anything, would happen if you did not

6   follow one of those rules?

7   A    I would be chastised.

8   Q    And what do you mean, again, by chastising?

9   A    Meaning that he would spank me.

10  Q    Who used the word chastising?

11  A    The defendant.

12  Q    Were there other -- were there other things that might

13  happen if you didn't follow one of the defendant's rules?

14  A    Yes.

15  Q    What?

16  A    Sometimes, occasionally I would be left in a room or my

17  phone would be taken, or sometimes I would receive a

18  punishment if it was a drastic rule that I had broken.

19  Q    I want to start with chastisement or spankings.

20           Do you recall the first time that the defendant

21  spanked you?

22  A    I do.

23  Q    Where do you recall that happening?

24  A    It was in Atlanta, Georgia.

25  Q    How old were you?

SAM      OCR      RMR      CRR      RPR

1    A    I was 17.

2    Q    And what do you remember happening?

3    A    I remember him saying that he has protocols and rules

4    that need to be followed and that a chastising was only to

5    help me be better and remember the small things, just in case

6    I was not remembering the things to do.

7    Q    And did he -- did you know what the defendant meant when

8    he used the word chastising?

9    A    No, I did not.

10   Q    How did you learn?

11   A    I asked him what it was.

12   Q    What did he say?

13   A    He said that it was just a spanking to help me remember.

14   Q    And I think you testified that it was in Atlanta the

15   first time that the defendant spanked you, is that correct?

16   A    Yes.

17   Q    Where in Atlanta were you?

18   A    We were in a hotel.  I believe the Hyatt.

19   Q    And what, if anything, do you remember about that

20   particular hotel room?

21   A    I remember that we were in a room and the number was 407,

22   and I thought that it was so bizarre because my area code for

23   my cell phone number was 407.

24   Q    So, that was the number of the hotel room?

25   A    Yes.

1    Q    Now, do you recall what prompted, what rule -- or do you

2    recall what prompted the defendant to tell you about these

3    chastisements and to spank you that day in Room 407 in

4    Atlanta?

5    A    I had did something that he didn't like and he said that

6    it was time to teach me about the protocols and chastisings.

7    Q    As you sit here today, do you know what it was that you

8    did that the defendant did not like?

9    A    I do not recall.

10   Q    Can you describe specifically what the defendant did when

11   he spanked you?

12   A    He did make my take off my underwear.  I was wearing a

13   dress, and he did spank me three times, open palm.

14   Q    And how were you positioned when he spanked you?

15   A    I was facing the left and I was standing up and my butt

16   was facing his left palm.

17   Q    How often did the defendant spank you during the time

18   that you spent with him?

19   A    I would get chastises nearly every two to three days.

20   Q    And when you say chastise, what are you referring to?

21   A    Spankings.

22   Q    You testified that that first time the defendant spanked

23   you three times.

24        Did the number of spankings change from a particular

25   incident to another incident?

1    A     Yes, they did.

2    Q     How, if at all, would you know how many spankings the

3    defendant was going to give you?

4    A     He would always tell me beforehand and to prepare.

5    Q     What would he do?

6    A     He would tell me how many spankings I would have to take,

7    and he would just tell me to just be ready.

8    Q     Other than spankings, did the defendant ever physically

9    hurt you?

10   A     Yes, he did.

11   Q     Do you recall the first time that that happened?

12   A     The first time that that happened was probably in

13   Atlanta, Georgia.

14   Q     And let me back up one moment regarding your testimony

15   about the spankings.

16          You testified the first time that you had taken off

17   your underwear, is that correct?

18   A     Yes.

19   Q     Were those spankings that happened subsequently by the

20   defendant, did you always have your underwear off?

21   A     Yes.

22   Q     Can you describe to the jury how hard the defendant would

23   spank you?

24   A     Yes, he would leave bruises and sometimes, like, it would

25   make my skin tear.

1  Q    How did it make you feel?

2  A    Terrible.

3  Q    Did it hurt?

4  A    It would, yes.

5  Q    Before I interrupted you, you were about to test -- you

6  were about to testify about the first time that you remember

7  the defendant physically hurting you, other than these

8  spankings, and I think you testified that you were in Atlanta.

9        Do you recall what started that particular incident?

10 A    He had received a text message.

11 Q    Did you see the text message?

12 A    He showed me, yes.

13 Q    Who did the defendant tell you the text message was from?

14 A    He said that it was from a man by the name of Devyne.

15 Q    And did you see the text message, itself?

16 A    I did, yes.

17 Q    What was the text message?

18 A    It was my name and a rat emoji.

19 Q    At the time that that text message or that you saw that

20 text message, did you know who Devyne was?

21 A    I did not.

22 Q    What happened after the defendant received that text

23 message?

24 A    He had taken my phone and asked me who had I been talking

25 to.

Jane - direct - Geddes                              914

1    Q    And backing up one moment.

2         You testified that this happened in Atlanta.  Do you

3    recall how old you were?

4    A    I was 17.

5    Q    What, if anything, did the defendant say when he took

6    your phone?

7    A    He said that I had 30 seconds to be honest and to puke,

8    and if I left out any small detail that it would go up in that

9    room.

10   Q    Now, when you said he told you that you had 30 seconds to

11   be honest and to puke, what did you mean by that?

12   A    Meaning, like, to tell him whom I had been talking to and

13   to be completely honest with him.

14   Q    And when you said that you had 30 seconds to do that or

15   it would go up in that room, what do you mean by that?

16   A    Meaning that there would be no chastising, meaning that

17   it would really be a physical altercation.

18   Q    How did you respond?

19   A    I was honest, but I did leave out details, and he did

20   begin to physically hit me.

21   Q    What were you honest -- what did you tell the defendant?

22   A    I told him that I had been talking to Mia.

23   Q    Who is Mia again?

24   A    Mia is my -- she was my best friend at the time.

25   Q    You said that you left out details.

Jane - direct - Geddes                    915

1          What did you -- what do you recall leaving out?

2    A    I told him -- I had left out that we had been intimate

3    and that I had expressed that to Mia.

4    Q    I'm sorry, so what did you not tell the defendant?

5    A    I did not tell him that we were being intimate.

6    Q    That who was being intimate?

7    A    Me and the defendant.

8    Q    Okay.  Who had you told that you and the defendant were

9    intimate?

10   A    I had told my best friend Mia.

11   Q    Okay.  And did you leave out the part, the fact that you

12   had told Mia that you and the defendant had been intimate?

13   A    Yes, I did.

14   Q    How did the defendant respond?

15   A    He began to hit me.

16   Q    What happened after that?

17   A    He continuously began to hit me, and in between it he

18   would ask me:  Are you ready to be honest?  And I would say:

19   I don't know what you're talking about.  And he would continue

20   to hit me.

21   Q    How was he hitting you?

22   A    He was hitting me with an open palm and with a closed

23   palm.

24   Q    Where on your body was he hitting you?

25               MR. CANNICK:  Objection to the leading.

                          Jane - direct - Geddes                    916

1              THE COURT:  Well, where was he hitting you is not
2   leading.
3              MR. CANNICK:  On your body is.
4              THE COURT:  Well, it's not.  Overruled.
5   A    He hit me all over.  He would hit me in my face and my
6   arms, on my butt, on my -- all over my body.
7   Q    What happened?
8   A    I continued to not be honest with him, and then he went
9   in his closet and grabbed one of his Air Force 1 shoes.
10  Q    What, if anything, did he do with one of his shoes?
11  A    He continued to hit me until I finally broke.
12  Q    What did he use to hit you then?
13  A    An Air Force 1, size 12.
14  Q    Do you remember where on your body he hit you?
15  A    He hit me all over.
16  Q    With the shoe?
17  A    Yes.
18  Q    How, if at all, did you react when the defendant was
19  hitting you with his shoe?
20  A    I was running from him in our master bedroom in Atlanta.
21  I remember we have -- we were in the restroom and somehow we
22  ended all the way in the master bedroom, and I was trying to
23  run from him and fight back, but I'm literally no match.
24  Q    How tall are you?
25  A    I'm 4-11.

                    SAM      OCR      RMR      CRR      RPR

Jane - direct - Geddes                    917

1  Q    Do you remember how much you weighed back then in 2015?

2  A    I was about 98 pounds.

3  Q    How tall is the defendant?

4  A    He is 6 foot.

5  Q    How did that -- how did that end, what happened?

6  A    After that he -- I -- I admitted to everything and I did

7  tell him that I had told Mia that we had been intimate.  And

8  he told me how we would fix it, and then he told Juice to come

9  in the bedroom and he told her to:  Run your sister a bath

10 water.

11 Q    Now, you said that the defendant said how you would fix

12 it.

13        What did the defendant say to do?

14 A    He then told me to text Mia, and he told me exactly what

15 to say to Mia in the text message.

16 Q    Did you do that?

17 A    I did, yes.

18 Q    You said that Juice then ran a bath for you, is that

19 correct?

20 A    Yes.

21 Q    Where did that happen?

22 A    It happened in our master bedroom.

23 Q    And when you say your master bedroom, what are you

24 referring to, what residence, what house?

25 A    At the big house.

1   Q     In Atlanta?

2   A     Yes.

3   Q     Do you know where Juice was when the defendant was

4   assaulting you?

5   A     I do not, no.

6   Q     Do you know where the defendant went when -- did Juice,

7   in fact, run you a bath?

8   A     Yes, she did.

9   Q     Do you know where the defendant went when Juice came and

10  ran you a bath?

11  A     No, I do not.

12  Q     Did you eventually meet an individual named Devyne?

13  A     Years later, yes.

14  Q     Do you remember approximately when you met him?

15  A     I met him, I believe, in the year of 2020.

16  Q     What, if anything, did Devyne show you?

17  A     Devyne had showed me that same text, which was the last

18  text that he had sent the defendant.

19  Q     And what was in the text?

20  A     It was my name with a rat emoji.

21  Q     You testified that at times the defendant had you stay in

22  a room, is that right?

23  A     Yes.

24  Q     Do you remember the first time that the defendant had you

25  stay in a room?

1   A    It was in 2015.

2   Q    What happened?

3   A    It was in the previous evidence that you had showed where

4   he said that I could not leave the room.

5   Q    Can you describe what location that was?

6   A    I do not recall, but I do know that we were on the west

7   coast.

8   Q    Okay.  Do you remember what prompted him to tell you that

9   you couldn't leave that room?

10  A    No, I just -- he had expressed that it was a rule of his.

11  Q    Okay, so let me back up.

12           I think you testified earlier that one of the

13  ways -- if you broke a rule, one thing that the defendant

14  sometimes did was had you stay in a room.  Is that correct?

15  A    Yes, yes.

16  Q    Did there come a time when the defendant, in fact, made

17  you stay in a room because you had broken a rule?

18  A    Yes.

19  Q    Do you remember the first time that that happened?

20  A    Yes.

21  Q    Where did that happen?

22  A    That happened in Chicago.

23  Q    Where in Chicago?

24  A    At the studio on Ohio Street.

25  Q    And do you remember what led to that?

1  A    Yes.

2  Q    What happened?

3  A    I had gone shopping with Juice and she had tried to

4  convince me to get sweats in a size large and I had got them

5  in an extra small, and he had told -- told me that anything

6  that came from her was coming from him, and I didn't listen to

7  her.

8  Q    And when you said -- when you said he had told you that

9  anything that came from her was coming from him, who is the

10 "him" in that sentence?

11 A    The defendant.

12 Q    And who is the "her" in that sentence?

13 A    Juice.

14 Q    Do you recall whether or not you -- what size sweats you

15 bought that day?

16 A    I did buy extra small from Hollister.

17 Q    What is Hollister?

18 A    Hollister is a clothing store for, like, a lot of teen --

19 teens.

20 Q    What happened, do you remember where you went after you

21 went shopping that day?

22 A    Yes, we went back to the studio.

23 Q    The studio on Ohio Street?

24 A    Yes.

25 Q    What happened when you got back to the studio?

1    A    I had tried on my clothes, like I usually do after I was

2    done shopping, and I tried on my sweats and she --

3    Q    Who, if anyone, was present for when you tried on your

4    sweats?

5    A    Him and Juice were present.

6    Q    The defendant and Juice?

7    A    Yes.

8    Q    What happened?

9    A    He had saw the sweats on me and he wasn't happy, and he

10   then said:  Didn't Juice tell me to get a size large.  And I

11   said:  Yes.

12   Q    You said the defendant wasn't happy.  What made you

13   believe the defendant wasn't happy?

14   A    Because I had went against -- against what Juice had told

15   me to do.

16   Q    What, if anything, did the defendant do or say, though,

17   that made you think he wasn't happy?

18   A    He -- he did, in fact, leave me in that room.

19   Q    When you say he did, in fact, leave you in that room,

20   what are you talking about?

21   A    I was in the Five Star at the time and he, basically,

22   felt that I -- I felt like I didn't do anything wrong and so,

23   as a punishment, he said I could not leave out of the room

24   until I admitted to what I had done.

25   Q    You mentioned the Five Star.

Jane - direct - Geddes                    922

1          What do you mean by the Five Star?

2   A    The Five Star was a room inside of his Ohio Street

3   studio, which he would have parties in on the weekend.

4   Q    And when you were showing -- when you were trying on the

5   clothes that you had purchased in front of the defendant and

6   Juice, where in the studio were you?

7   A    We were in the Five Star.

8   Q    And how did the defendant express to you that he wanted

9   you to stay in the Five Star room?

10  A    He told me that I cannot leave out of this room until I

11  admit what I should have done.

12  Q    What did you -- what happened then?

13  A    I didn't leave outside of the room for about three to

14  four days.

15  Q    What -- where was the defendant when you were in the

16  room?

17  A    I don't know.

18  Q    Did you see him?

19  A    What do you mean?

20  Q    While you were in the room for three to four days, what,

21  if any, contact did you have with the defendant?

22  A    Oh, he would come in and he would check on me and ask me

23  was I ready to be honest, and I would express that I didn't

24  have anything to be honest about, and he would leave again.

25  Q    What, if anything, did you understand the defendant

Jane - direct - Geddes                    923

1   wanted you to do while you were in that Five Star room at the

2   Ohio Street studio?

3   A    He wanted me to admit that I should have listened to

4   Juice and that I should have gotten the sweats in a size

5   large.

6   Q    What, if anything, did you eat while you were in the

7   room?

8   A    Food was brought to me, and I would know because they

9   would knock on the door.

10  Q    And when you say "they would knock on the door," what

11  specifically did you hear?

12  A    I would just hear a knock on the door.

13  Q    And what, if anything, would you do when you heard a

14  knock on the door?

15  A    The defendant would always tell me any time I heard a

16  knock, to wait 30 seconds before opening the door to give

17  whoever it was time to leave.

18

19              (Continued on the following page.)

20

21

22

23

24

25

Jane - direct - Geddes                924

1    BY MS. GEDDES:   (Continuing)

2    Q    So as you sit here today, do you know who brought you

3    food while you were in the five star room for three to

4    four days?

5    A    I do not.

6    Q    Did there come a time -- well, you testified that you

7    were in there for three to four days.  What, if anything,

8    happened that allowed you finally to leave that room?

9    A    I had admitted that I was wrong and that I should have

10   listened to Juice.

11   Q    How did you admit that you were wrong?

12   A    I had physically told him when he had came in the room.

13   Q    How did he respond once you told him that you were wrong?

14   A    He was happy and --

15           MR. CANNICK:  Objection.

16           THE COURT:  Well, when you say he was happy, how did

17   you know that?

18           THE WITNESS:  Because afterwards, I immediately left

19   the room and he let me go into the studio with him.

20   Q    Now to be clear, the room where you were staying for the

21   three to four days, was there a lock on the door?

22   A    There is not.

23   Q    And what, if anything, did you think would happen if you

24   did walk out of the room?

25   A    I would get in trouble even more.

1    Q    And what did you think -- what do you mean by that?

2    A    I didn't know what would happen but I just knew that I

3    would probably get in even more trouble if I did choose to

4    leave out of that room.

5    Q    You testified earlier about a time in which the defendant

6    used his shoe to hit you.  Do you recall that?

7    A    Yes, I do.

8    Q    Aside from spankings, did you ever see the defendant

9    physically hit or assault another of those females that were

10   living with him?

11   A    Yes, I have.

12   Q    What did you see?  Personally, what did you see?

13   A    I have seen him slap his other living girlfriends, open

14   palm, I have seen him drag them by their hair, I have seen him

15   punch them in their face and all over their bodies, and I have

16   also seen him hit them with objects.

17   Q    What objects have you seen the defendant hit them with?

18   A    I've seen the defendant also use shoes and also once I

19   did see him use a cord of some sort.

20   Q    How did that make you feel?

21   A    I felt like I needed to listen even more because that

22   could also happen to me.

23              (Continued on next page.)

24

25

926

1              THE COURT:  Ms. Geddes, just whenever you're ready,

2     if it's a good time to break, I just want to give the jurors

3     their afternoon break.

4              MS. GEDDES:  We can take a break right now.

5              THE COURT:  Okay.

6              So, folks, we'll break for 15 minutes or so.  Please

7     don't talk about the case at all but we'll see you in a few

8     minutes.

9              (Jury exits.)

10             THE COURT:  All right.  Everybody can sit down.

11             All right.  Anything before we break?

12             MR. CANNICK:  Your Honor, just relating to the

13    government eliciting testimony --

14             THE COURT:  I can't hear you.

15             MR. CANNICK:  As it relates to the government

16    eliciting testimony regarding Mr. Kelly's prior criminal

17    proceeding --

18             THE COURT:  Right.

19             MR. CANNICK:  -- I would just, we will consent to

20    the government actually asking him about it being a prior

21    proceeding, a prior court proceeding.

22             THE COURT:  I mean, I can't remember what my, I'm

23    going to have to go back and look at what my ruling was at the

24    time that you didn't take advantage of it but I think it

25    should be the same ruling.  I mean the reasoning is the same.

927

1          MR. CANNICK:  Well, I think your ruling was with

2     another witness and at that time, you indicated that the door

3     was opened, there's going to be a door opening with respect to

4     this witness, and it wasn't elicited at that time and the

5     government did not go back on redirect and ask the witness

6     anything about it.

7          THE COURT:  I think she tried and I sustained the

8     objection because it was beyond the scope.  That's my

9     recollection.

10         MS. GEDDES:  I know.

11         THE COURT:  Well, if you call it a prior proceeding,

12    I mean, the point is in addition to -- it's not just because I

13    made the ruling with respect to another witness.  It's because

14    it's relevant to establish why she did what she did.  So I'll

15    permit it for that purpose but you can refer to it as a prior

16    proceeding.

17         MS. GEDDES:  But I think, Your Honor, you previously

18    had advised and there's already been testimony in the record

19    about a prior court proceeding.  Here, the witness, I think,

20    needs to explain that the reason why she was not truthful

21    about her age was because the defendant was on trial for a

22    crime involving a minor.

23         THE COURT:  Well, you can call it -- you can say, I

24    don't think you'll have a problem, that there was testimony,

25    that there was a trial, and you can say that the subject was

1   his -- what did we agree on before?  You don't have to say

2   it's a criminal trial.  I mean, it's just not necessary.

3            MS. GEDDES:  A trial.

4            THE COURT:  It's a trial involving conduct with a

5   minor.

6            MR. CANNICK:  I would object to that, Your Honor.  I

7   think that if there's a question asked where in order for the

8   witness to, I guess, give what she thinks is the rationale for

9   her saying that she was 18, well, there was a prior court

10  proceeding.

11           THE COURT:  That's what I just said.

12           MR. CANNICK:  Right, but not regarding a minor.

13           THE COURT:  No.  No.  We are -- no.  I mean the

14  whole reason why -- just the fact that it's a prior proceeding

15  doesn't really say a whole lot, but that's what her concern

16  was, that it was because she was also a minor.  Otherwise, it

17  doesn't matter.  It doesn't make any sense.

18           MR. CANNICK:  Judge --

19           THE COURT:  I mean, do you plan to cross-examine her

20  about it like you did the last witness about why she lied to

21  him about how old she was?

22           MR. CANNICK:  I didn't focus on that with this.

23           THE COURT:  I understand.

24           MR. CANNICK:  As I recall from the, from the 302s,

25  she's saying that it was her parents who told her to tell him

1    that he was, that she was 18, nothing to do with her.  It

2    wasn't her thought.  It was her parents' thought, her mother's

3    thought.

4                THE COURT:  Well, let's do this.  You know, you can

5    do the examination with her and just in an excess of caution,

6    I'll do what I did the last time.  If you question her about

7    that and the door is opened, I'll permit the government to

8    bring out some more information about that and it will be

9    really just the same thing.

10               So you can continue the examination when you do your

11   cross.  If you challenge her on that as you did the last

12   witness, then I'll let the government ask what they're going

13   to ask.

14               MR. CANNICK:  Very well.

15               MS. GEDDES:  So, Your Honor, I may go back and let

16   the witness know what I previously told them.

17               THE COURT:  All right.

18               MS. GEDDES:  But with respect to when she, when I

19   asked her about what, if anything, the defendant said about

20   the reason for the letters, she will answer that the defendant

21   told her that it was because his attorneys told him to do it,

22   I assume she had that statement.

23               THE COURT:  She already said that.

24               MS. GEDDES:  No, I hadn't asked this witness.

25               THE COURT:  But she did say something about talking

1    to lawyers, didn't she?

2              MS. GEDDES:  She did.

3              THE COURT:  I think it's fine that he's talking to

4    lawyers.  I don't understand counsel to be objecting to that.

5    The discrete objection is referring to the prior criminal

6    proceedings which I did preclude inquiry on and I permitted it

7    the last time because the defense quite clearly opened the

8    door to it.  It's a fair point that he hasn't really opened

9    the door on this one because he hasn't had a chance to ask her

10   any questions.  So let's do it the same way we did it the last

11   time.  And if you need to confer with the witness just to

12   straighten that out, go ahead and do it.

13             All right.  See you in a few minutes.

14             (Recess taken.)

15             THE COURT:  All right.  Do we have everybody we need

16   to have?  Okay.  Let's get the jury.

17             (Jury enters.)

18             THE COURT:  All right.  Are we ready to resume the

19   direct examination?  Go ahead.

20             MS. GEDDES:  Thank you.

21             THE CLERK:  The witness is reminded she's still

22   under oath.

23             THE WITNESS:  Yes, thank you.

24             (Continued on next page.)

25

1   BY MS. GEDDES:

2   Q    You testified before we broke about a time when the

3   defendant told you to stay in a room in the Ohio Street

4   studio.  Other than the Ohio Street studio, were there other

5   occasions where the defendant made you stay for periods of

6   time?

7   A    Yes.

8   Q    What other locations do you recall the defendant made you

9   stay for periods of time as a result of violating one of the

10  defendant's rules in his eyes?

11  A    Aside from that studio, the studio that he later had, and

12  the Atlanta house, the tour bus.

13  Q    You mentioned a studio that the defendant later had.  Do

14  you remember where that studio was?

15  A    It was Justine Street.

16  Q    The studio was located on Justine Street?

17  A    Yes.

18  Q    In what city?

19  A    Chicago.

20  Q    You also mentioned a tour bus.  Do you remember a time

21  when the defendant told you to stay on the tour bus?

22  A    Yes, I do.

23  Q    Do you remember where you were located, where the tour

24  bus was at that time?

25  A    Atlanta, Georgia.

Jane - direct - Geddes                    932

1  Q    And do you recall what led to the defendant telling you

2  that you needed to stay on the tour bus?

3  A    I had broken one of his rules and I did not admit to

4  breaking one of the rules.

5  Q    Do you remember the particular rule that you broke that

6  day?

7  A    I do not.

8  Q    Do you remember approximately when it was that you were,

9  the defendant had you stay on the tour bus in Atlanta?

10 A    It was for about three days.

11 Q    And do you remember approximately when either in terms of

12 your age or in terms of time frame this happened?

13 A    I believe that this happened in 2016 or '17.  I don't

14 recall.

15 Q    And what, if anything, did you do while you were on the

16 tour bus?

17 A    There wasn't nothing, much that I could do but just wait

18 for him to come on.

19 Q    And what, if anything, did you understand the defendant

20 wanted you to do while you were on the tour bus?

21        MR. CANNICK:  Objection.

22        THE COURT:  Well, did he tell you what you were

23 supposed to do while you were on the tour bus?

24        THE WITNESS:  It was just a punishment to not be

25 around him.

1           THE COURT:  Okay.  Next question.

2    Q     Do you recall whether you had food that time in Atlanta

3    when you were on the tour bus for -- how long did you say it

4    was?

5    A     About three days.

6    Q     Do you recall whether or not you had food while you were

7    on the tour bus for about three days?

8    A     I did, yes.

9    Q     And how did you receive the food?

10   A     There was a fridge and a microwave and occasionally, if

11   he ate, they would bring it and leave it underneath the

12   curtain.

13   Q     And when you say curtain, what are you referring to?

14   A     The tour bus, there was a curtain in the front where no

15   one could see inside of the back of the tour bus.

16   Q     And you said that they would bring it to you.  Did you

17   see who was bringing you food?

18   A     Never.

19   Q     How would you know that the food was ready or that there

20   was food for you?

21   A     Because I would hear them put it underneath the curtain

22   and then I would hear the tour bus door shut and lock.

23   Q     And just to be clear again, was the tour bus locked from

24   the inside?

25   A     I don't know.  I've never tried to open it.  It's always

1   been unlocked getting on or off for me.

2   Q    Okay.  But when you were on the tour bus that day for a

3   period of time, you didn't try to open it, is that what you're

4   saying?

5   A    Yes, I did not.

6   Q    Now, to your knowledge, were any of the other females who

7   were living with the defendant at that time ever subjected to

8   the same punishment where they had to stay in a room or a

9   location for a period of days on account of the defendant

10  believing they had violated a rule?

11  A    Yes.

12  Q    How did you know that?

13  A    Because they would not be around for a few days and we

14  would just know not to ask.

15  Q    Not to ask whom?

16  A    Him, like where were they.

17  Q    And, again, "him," who are you referring to?

18  A    The defendant.

19  Q    Do you recall what happened on December 28th of 2015?

20  A    I do not.

21       MS. GEDDES:  I'm showing the witness only what's

22  been marked for identification as 935B.

23  Q    Do you recognize what's shown in 935B?

24  A    I do, yes.

25  Q    Does that refresh your recollection as to what, if

1  anything, happened on December 28th of 2015?

2  A    It does, yes.

3  Q    And that day, December 28th, how old were you?

4  A    What year is this, 2015?

5  Q    Yes.

6  A    I was 17.

7  Q    And when were you turning 18?

8  A    December 30th.

9  Q    What, if anything, do you recall happening on

10 December 28th of 2015?

11 A    Me and the defendant had gotten into a argument.

12 Q    And do you recall the nature of the argument?

13 A    Yes, I do.

14 Q    What was it about?

15 A    He had expressed to me that he didn't celebrate holidays

16 because he no longer had his family and I felt if he did not

17 want to celebrate the holidays, I could have been home with my

18 family celebrating.

19 Q    Did you tell the defendant that?

20 A    I did, yes.

21 Q    How did the defendant respond?

22 A    He was upset with me.

23 Q    What, if anything, did the defendant do or say towards

24 you?

25 A    He did make me leave -- stay in the room.

Jane - direct - Geddes                    936

1   Q    Do you recall what room you were in?

2   A    This was at the studio.

3   Q    Where was the studio?

4   A    On Justine.

5   Q    And was that in downtown Chicago?

6   A    Yes.

7   Q    And Government Exhibit 935B, generally speaking, what are

8   those?  What is that?

9   A    It is a text message of what I sent my best friend at the

10  time.

11  Q    On what date?

12  A    December 29th.

13          MS. GEDDES:  The government offers 935B.

14          THE COURT:  Any objection?

15          MR. CANNICK:  No.  No.

16          THE COURT:  All right.  That's in evidence.

17          (Government Exhibit 935B so marked.)

18          MS. GEDDES:  May I publish, please?

19          THE COURT:  Yes.  Is this jury only or --

20          MS. GEDDES:  No, it can go beyond the jury.

21  Q    Can you -- starting from the bottom, can you read the

22  text messages starting from the bottom and moving up -- and

23  just to be clear, who wrote these text messages?

24  A    I sent these text messages.

25  Q    Okay.  Can you read what's shown on 935B beginning where

1    my pen is pointing?

2    A    Yes.

3         "I just felt to rebel so I did, and then I was like

4    can I take a shower, can I take a shower.  And he was like no,

5    you're gonna stay in the room until you tell me why you."

6    Q    And there are three dots after that.  What does that

7    represent?

8    A    There was more to the text message.

9    Q    Just not shown on this particular --

10   A    Yes.

11   Q    And reading above that, what did you write?

12   A    "First of all, I never had a attitude.  You always think

13   someone mad."

14   Q    And above that?

15   A    "And then I kept calling and texting him over and over."

16   Q    And above that?

17   A    "And he was like no, you text me why you had a attitude

18   first."

19   Q    In those text messages, when you refer to "he," who are

20   you referring to?

21   A    The defendant.

22   Q    And in that first text message that you read, the one on

23   the bottom where my pen is pointing, where it says, "And he

24   was like no you're gonna stay in the room until you tell me

25   why," and then it continues, what did you mean by that?

Jane - direct - Geddes                                938

1   A    I had expressed to him that I had a attitude because if

2   he didn't want to celebrate Christmas, I could have been home.

3   Q    What did you mean by saying that, "He was like no, your

4   gonna stay in the room"?

5   A    Meaning that I could not leave the room until I apologize

6   for having the attitude.

7   Q    Do you remember what room within the Justine Street

8   studio you were in?

9   A    The control room.

10  Q    What, if anything, did you understand that -- what, if

11  anything, did you do while you were in that room?

12  A    There was nothing in that room for me to do.  There was

13  only a TV in that room.

14  Q    What, if any, communication did you have with the

15  defendant?

16  A    I, I did have my phone, however, he was ignoring all the

17  calls and texts that I had until I had admitted why I had

18  attitude.

19  Q    How would you -- did you eventually admit that you had an

20  attitude?

21  A    I did, yes.

22  Q    Did you believe you, in fact, had an attitude?

23  A    I did not, no.

24  Q    How did you admit to the defendant that you had an

25  attitude, how would you convey that to the defendant?

1   A    I would have to have been really remorseful and I would

2   have had to have fed his ego.

3   Q    Specifically, what would you have done to convey that to

4   the defendant?

5   A    I would have to have said exactly what he wanted to hear.

6   Q    Who did you say that to?

7   A    To the defendant.

8   Q    To his face?

9   A    Yes.

10  Q    Did you ever write letters?

11  A    Yes, I did.

12  Q    What letters would you write?

13  A    I would write many letters.

14  Q    When you were in a room as a result of violating a rule,

15  would you ever write letters to the defendant?

16  A    Yes, I would, if I did not have my phone, yes.

17  Q    Were there times when you were in a room without your

18  phone?

19  A    Yes.

20  Q    Why would you be in a room without your phone?

21  A    Because he would take it as a punishment.

22  Q    What would you write in the letters?

23  A    It would have to be an apology for a rule that I had

24  broken.

25  Q    What, if anything, would you do with the letter that you

1   wrote?

2   A    I would have to give it to him and he, he would basically

3   read it.

4   Q    How would you give it to the defendant?

5   A    I would just give him the sheet of paper and sometimes he

6   would make me read it in front of him or he would leave with

7   it and then come back at another time.

8   Q    Do you recall an occasion where your first letter was not

9   sufficient?

10  A    Yes, I do.

11  Q    What happened?

12  A    If it was attitude in the letter, then I would still be

13  stuck in the room and I would have to rewrite the letter.

14  Q    Who determined if there was attitude in the letter?

15  A    The defendant.

16       MS. GEDDES:  I'm showing -- may I approach,

17  Your Honor?

18       THE COURT:  Yes.

19       MS. GEDDES:  I'm showing the witness what's been

20  marked for identification as Government Exhibit 926.

21       (Pause.)

22  Q    Do you recognize what's shown in Government Exhibit 926?

23  A    Yes, I do.

24  Q    Generally speaking, what are they?

25  A    That is pictures of the studio on 209 North Justine

1  Street.

2  Q    Now, do you recognize the time frame from which these

3  photos were taken?

4  A    Yes, I do.

5  Q    When were they approximately taken?  When do they appear

6  to show, what time period?

7  A    They -- we had already left the studio.

8  Q    And what year was that?

9  A    2019.

10  Q    And just to be clear, where was the Justine Street

11  studio?

12  A    209 North Justine Street, Chicago, Illinois.

13  Q    And are the photographs contained in Government

14  Exhibit 926 fair and accurate photos of how that studio

15  appeared at times when you were there?

16  A    No.  Some are.  Not all.

17  Q    Have you seen though the studio look the way that it

18  looks in these photos?

19  A    Yes, I have.

20         MS. GEDDES:  The government offers 926.

21         MR. CANNICK:  Objection.

22         THE COURT:  Well, I think you've got to specify

23  which ones are fair and accurate representations and which

24  ones aren't.  At least that's the way I understand the

25  witness' testimony.

Jane - direct - Geddes                942

1          MS. GEDDES:  Let me --

2          THE COURT:  Is that your objection?

3          MR. CANNICK:  Yes, Your Honor.

4          MS. GEDDES:  Sorry.  I didn't hear your objection.

5          THE COURT:  It's not just me.

6          Why don't you take the exhibit to her and have her

7    show you which ones are not fair and accurate representations.

8    That might be the fastest way.

9          MS. GEDDES:  I can do that.  Let me just ask one

10   preliminary question.

11         THE COURT:  Okay.

12   Q    You said that there were certain things that were

13   different in these photos than some of the time you were in

14   the Justine Street studio?

15   A    Yes.

16   Q    What was different generally?

17   A    The bedrooms, they actually all had beds in them in which

18   he had his workers remove them.

19   Q    Okay.  Aside from the type of furniture in there, are

20   these photos --

21   A    Everything else is accurate.

22   Q    So the structure is the same --

23   A    Yes.

24   Q    -- as it was when you were there?

25   A    Yes.

CMH      OCR      RMR      CRR      FCRR

1  Q    Is it fair to say that there are just some photos where

2  the furniture is a little bit different?

3  A    Yes.

4  Q    All right.

5          MS. GEDDES:  May I approach?

6          THE COURT:  Well, with that proviso, if that's the

7  only difference, do you object to the photos going in?

8          MR. CANNICK:  Yes.

9          THE COURT:  Okay.  I guess you can now go through

10  them all.

11          MS. GEDDES:  All right.  There are different page

12  numbers so I'll refer to the page numbers.

13          THE COURT:  Why don't you give them to the witness.

14  Just go through and tell us which one is different.

15          THE WITNESS:  Okay.  So this is the master bedroom

16  that was renovated and it did not look like this initially.

17          THE COURT:  Didn't look like this, what?

18          THE WITNESS:  Meaning that -- this was a bedroom

19  that we had gotten renovated.

20          THE COURT:  Right.

21          THE WITNESS:  So this is what it looked like.

22          THE COURT:  So that's correct, right?

23          THE WITNESS:  Yes.

24          THE COURT:  Just go through the ones that are not --

25          MR. CANNICK:  Are they numbered?

Jane - direct - Geddes                    944

1          THE COURT:  Yes, they are numbered.

2          So when you get to one that doesn't fairly and

3   accurately represent the way it looked, tell us what number it

4   is and why it's not a fair and accurate representation.

5          THE WITNESS:  Okay.

6          (Pause.)

7          THE WITNESS:  016 is not accurate.  There was a

8   bedroom in this room.

9          THE COURT:  So there it's missing furniture?

10         THE WITNESS:  Yes.

11         THE COURT:  All right.  So that's 16.

12         THE WITNESS:  018 is also missing furniture.

13         THE COURT:  Okay.

14         THE WITNESS:  019 is the same picture of 018, just a

15  different angle.

16         THE COURT:  And when you say it's missing furniture,

17  what kind of furniture is it missing?

18         THE WITNESS:  It was bunk beds in that room.

19         THE COURT:  All right.

20         THE WITNESS:  And 020 is missing furniture.

21  Q    And what furniture is missing from that one?

22  A    A bedroom.

23         THE COURT:  Meaning bedroom furniture?

24         THE WITNESS:  Yes.  A master bed was in there.

25         And also 025 is missing furniture.  There was a bed

Jane - voir dire - Cannick                945

1   in there as well.

2   Q    Aside from that, are those fair and accurate photographs

3   of how the studio on Justine Street appeared?

4   A    Yes.

5   Q    And the photographs shown on pages 16, 18, 19, 20 and 25,

6   are those fair and accurate photographs of the room themselves

7   with the fact just that the furniture is different?

8   A    Yes.

9        MS. GEDDES:  The government offers Government

10  Exhibit 926.

11       THE COURT:  Any objection?

12       MR. CANNICK:  I just want to see them.

13       THE COURT:  Well, you have copies of them, don't

14  you?

15       MR. CANNICK:  No.

16       MS. GEDDES:  Here.

17       MR. CANNICK:  Thanks.

18       (Pause.)

19       MR. CANNICK:  Just one question of voir dire?

20       THE COURT:  Sure.

21  VOIR DIRE EXAMINATION

22  BY MR. CANNICK:

23  Q    When were these pictures taken?

24  A    These pictures were taken after we had already left the

25  studio.

1   Q    When you said "we," who are you talking about?

2   A    Me, the defendant and Joy.

3   Q    Do you have an approximately if --

4        THE COURT:  It's very hard to hear you.

5   Q    Do you have an approximation as to what year that was?

6   A    2019, meaning even though he had the studio, he was

7   behind in bills so we had --

8   Q    That's not what I'm asking you.  I asked you specifically

9   was this in 2019.

10       THE COURT:  She answered it.  She said it was in

11  2019.  All right.  Any more questions?

12       MR. CANNICK:  No, I'm good.

13       THE COURT:  Any objection?

14       MR. CANNICK:  No objection.

15       THE COURT:  All right.  They're in evidence.

16       (Government Exhibit 926 so marked.)

17       MS. GEDDES:  I'm showing the witness -- I'm showing

18  everyone what's in evidence as Government Exhibit 926.

19  DIRECT EXAMINATION (Continued)

20  BY MS. GEDDES:

21  Q    I'm going to show you page 29.

22       Do you recognize what's shown on Government Exhibit,

23  on 29?

24  A    Yes.

25  Q    What is that?

1  A    This is a control room.

2  Q    And at the time on December 28th of 2015 where the

3  defendant told you to stay in a room for a period of days,

4  where were you told to stay?

5  A    In the control room.

6  Q    And what, if anything, was in the control room when you

7  were there in 2015?

8  A    It looked very similar to this and it had two different

9  chairs which were more like day chairs and a black couch in

10 there.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JANE - DIRECT - GEDDES                          948

1   DIRECT EXAMINATION (Continued)

2   BY MS. GEDDES:

3   Q     And if I turn the page to page 31 of that same exhibit,

4   can you see what's shown there?

5   A     Yes.

6   Q     What is that?

7   A     That is the black couch that was put in that studio in

8   2015.

9   Q     Okay.  And is that just another angle from within the

10  control room?

11  A     Yes, it is.

12  Q     Before lunch, I believe, you testified that the defendant

13  told you to delete your social media accounts.

14          Do you recall that testimony?

15  A     Yes, I do.

16  Q     Did you follow that rule.

17  A     I did not.

18  Q     At any point did the defendant learn that you had not

19  deleted your social media account?

20  A     Yes.

21  Q     How did the defendant learn?

22  A     There was once I was actually on Snapchat and he had

23  walked into the room.

24  Q     Where were you when this happened?

25  A     The control room.

1   Q      The same control room that I just showed you?

2   A      Yes.

3   Q      In the studio on Justine Street?

4   A      Yes.

5   Q      What -- what, if anything, were you doing when the

6   defendant entered the room?

7   A      I believe that I was making a video.  I was in the middle

8   of working out.

9   Q      Do you remember how old you were when this happened?

10  A      I was 17.

11  Q      And you said you were making a video.

12  A      Uh-huh.

13  Q      Can you explain what you were making a video of?

14  A      It was just a selfie video of myself in which I had

15  planned to send to my immediate friends.

16  Q      And what application were you using?

17  A      Snapchat.

18  Q      How did the defendant respond when he came into the room?

19  A      He was very angry.  And he ended up taking my phone and

20  breaking it.

21  Q      What, if anything, did the defendant say?

22  A      He asked me who was I talking to and had I been talking

23  to guys.

24  Q      How did you respond?

25  A      I told him I had not been talking to anyone.

1  Q    What did the defendant do?

2  A    He then took the phone and broke it.

3  Q    Did you see him break it?

4  A    Yes, I did.

5  Q    How did the defendant break your phone?

6  A    He slammed it.

7  Q    On what?

8  A    On the ground.

9  Q    Do you remember what type of phone you had?

10 A    It was an iPhone.

11 Q    And after the defendant slammed the phone to the ground,

12 what did you or what happened?

13 A    After that he had left me in the room.

14 Q    And when you say he left you in the room, what do you

15 mean by that?

16 A    Meaning that I had to stay in the room until he came back

17 whenever he cooled down.

18 Q    How did you know -- why did you believe you had to stay

19 in the room?

20 A    Because it was a rule of his.

21 Q    But what, if anything, did he do to convey to you that

22 you needed to stay in the room?

23 A    He told me that I could not leave the room.

24 Q    What, if any -- where did the defendant then go?

25 A    I don't know.

JANE - DIRECT - GEDDES                        951

1    Q    Did he stay in the room?

2    A    No, he left.

3    Q    What did you do while you were inside the room?

4    A    I wrote a letter apologizing.

5    Q    Do you remember what you wrote in the letter, generally

6    speaking?

7    A    I was very remorseful because he eventually forgave me.

8    Q    How, if at all, were you able to give the defendant the

9    letter that you wrote?

10   A    When he would come into the room, I would give him the

11   sheet of paper.

12   Q    And what, if any -- do you remember how the defendant

13   responded?

14   A    He would take it, and if it was to his liking, he would

15   come back in.  And he would then chastise me and I would be

16   forgiven.

17   Q    And when you say chastise, that he chastised you, what,

18   again, do you mean by that?

19   A    Meaning that I was spanked.

20   Q    By whom?

21   A    By the defendant.

22   Q    And what did he use to spank you?

23   A    His open palm.

24   Q    On what part of your body?

25   A    On my legs and my butt.

JANE - DIRECT - GEDDES                952

1    Q    And were you clothed when he spanked you?

2    A    I was not.

3    Q    Now you mentioned earlier that the defendant told you

4    that -- the defendant didn't want you to talk about your --

5    him or him and you with others.

6              Do you recall that testimony?

7    A    Yes, I do.

8    Q    Did you always follow that rule?

9    A    I did not.

10   Q    Was there ever a time when the defendant learned that you

11   had not followed that rule?

12   A    Yes.

13   Q    What happened?

14   A    It would usually result in me getting chastised.

15   Q    Do you remember a particular instance where the defendant

16   learned that you had been talking about personal business?

17   A    In Atlanta, yes.

18   Q    What happened?

19   A    That is the incident that I already expressed.

20   Q    Oh, the one you testified earlier about involving Mia?

21   A    Yes.

22   Q    You testified earlier about an individual named Juice.

23   Do you recall that this morning?

24   A    Yes, I do.

25   Q    At the time when you met Juice, what did you -- who did

1  you understand Juice to be?

2  A    He had expressed to me that Juice was a home girl of his

3  that was in town from Chicago.

4  Q    And did you later learn that Juice had a different

5  relationship with the defendant?

6  A    Yes, I did.

7  Q    What did you learn?

8  A    That she was actually a live-in girlfriend of the

9  defendant.

10  Q    And what, if anything, did -- what, if any, instructions

11  did Juice give to you?

12  A    Juice would basically tell me -- she would try to tell me

13  what to wear or how to dress, or not to talk to men, or just

14  to like ignore specific situations.

15  Q    And what, if anything, did you think about the

16  instructions that you were receiving from Juice?

17  A    Initially I didn't know that they were coming from him,

18  so I didn't care.

19  Q    Do you recall having any conversations with other people

20  about that?

21  A    Yes, I do.

22  Q    Who do you remember telling?

23  A    I had expressed to my family.

24  Q    What did you express to your family?

25  A    That I did not like Juice, and because she was like

LINDA D. DANELCZYK, RPR, CSR, CCR

1    trying to tell me everything to do.

2    Q    And at any point did the defendant learn about that?

3    A    Yes, he did.

4    Q    How did the defendant learn?

5    A    He happened to check my phone and he saw it.

6    Q    What did he see?

7    A    He saw that I had text my parents and I had expressed

8    that Juice was basically acting like a PO and that I didn't

9    like her and...

10   Q    What do you mean by "a PO"?

11   A    Meaning that every little detail she would be trying to

12   like tell me, no, you can't do this, you can't do this or you

13   can't do that or you can't just leave out.  And I thought that

14   it was very bizarre for her, another women to be telling me

15   what I could and could not be doing.

16   Q    And when you say "PO," what does "PO" stand for.

17   A    Like a police officer.

18   Q    What did the defendant do, if anything, when he saw that

19   you had been communicating about Juice with your family?

20   A    He immediately made me text them and apologize and say

21   that everything was on good terms between me and Juice.

22   Q    And did you do that?

23   A    I did, yes.

24   Q    What, if anything, else happened?

25   A    After that, I never mentioned Juice to them again.

1  Q    You testified earlier about a sexual contact that you had

2  with the defendant including while you were 17.

3        Were you also -- did you also have sexual contact

4  with other women in the defendant's presence?

5  A    Yes, I did.

6  Q    Whose idea was it for you to have sexual contact with

7  others in the presence of the defendant?

8  A    It was the defendant's choice.

9  Q    At the defendant's direction, did you have sexual

10  contact --

11        MR. CANNICK:  Objection.

12        THE COURT:  I haven't heard the question yet.

13        MS. GEDDES:  May I continue?

14        THE COURT:  Well, don't lead, if that's what you're

15  starting to do.

16        MS. GEDDES:  All right.

17  Q    How many people did you have sexual contact with at the

18  same time?

19  A    Every setting was different.  It was whatever the

20  defendant wanted.  However, there were times where it was

21  everybody and girlfriend, meaning there were times where it

22  could possibly just be a woman that he knew in Chicago for a

23  weekend.

24  Q    But fair to say it was more than one?

25  A    Yes.

JANE - DIRECT - GEDDES                    956

1   Q    Now who would choose which female you would have the

2   sexual encounter with on a particular occasion?

3   A    The defendant.

4   Q    I'm showing what's in evidence as Government Exhibit 52B.

5        Who is that again?

6   A    That's Juice.

7   Q    Did you ever have any sexual encounters with Juice?

8   A    I did, yes.

9   Q    Whose idea was that?

10  A    The defendant's.

11  Q    Do you recall how old you were when you first had a

12  sexual encounter with Juice?

13  A    I was 17.

14  Q    I'm showing the witness what's in evidence as Government

15  Exhibit 69B.  Who is that?

16  A    Nicq.

17  Q    Did you ever have a sexual encounter with defendant --

18  with Nicq?

19  A    I did, yes.

20  Q    Whose idea was that?

21  A    The defendant's.

22  Q    I'm showing what's in evidence as Government Exhibit 72.

23  Who is that?

24  A    V.

25  Q    Did you ever have a sexual encounter with V?

1   A    I did, yes.

2   Q    Whose idea was that?

3   A    The defendant's.

4   Q    And I'm showing what's in evidence as Government

5   Exhibit 78.  Who is that?

6   A    Joy.

7   Q    Did you ever have a sexual encounter with her?

8   A    I did, yes.

9   Q    Whose idea was that?

10  A    The defendant's.

11  Q    I'm showing the witness only what's been marked for

12  identification as Government Exhibit 76.

13          Without saying that individual's name, do you

14  recognize who that is?

15  A    I do, yes.

16  Q    And how did you meet that individual?

17  A    Through the defendant.

18  Q    What, if any, sexual contact did you have with that

19  individual?

20  A    Um, ah, we were intimate, yes.

21  Q    Whose idea was that?

22  A    It was the defendant's.

23          MS. GEDDES:  The government offers Government

24  Exhibit 76.

25          THE COURT:  Any objection?

1           MR. CANNICK:  No.

2           THE COURT:  All right, that's in evidence.

3           Is that for the jury or for?

4           MS. GEDDES:  Yes, you can publish it.

5           (Government Exhibit 76, was received in evidence.)

6           (Exhibit published.)

7  Q    And I'm showing the witness only what's been marked for

8  identification as Government Exhibit 77.

9           Do you recognize Government Exhibit 77?

10 A    I do, yes.

11 Q    Without saying her name, how did you meet her?

12 A    Through the defendant.

13 Q    And what, if anything -- what, if any, sexual contact did

14 you have with that individual?

15 A    We were intimate.

16 Q    Whose idea was that?

17 A    The defendant's.

18          MS. GEDDES:  The government offers Government

19 Exhibit 77.

20          MR. CANNICK:  No objection.

21          THE COURT:  Okay, that's in evidence.

22          (Government Exhibit 77, was received in evidence.)

23          MS. GEDDES:  May I publish?

24          (Exhibit published.)

25 Q    Now you just testified about sexual contact that you had

JANE - DIRECT - GEDDES                     959

1   with a number of females.

2            Was the defendant present when you had sexual

3   contact with those individuals?

4   A    Every time.

5   Q    Was there ever a time when he wasn't present?

6   A    Never.

7   Q    Who, if any, of the defendant's employees did he ask you

8   to have sexual contact with?

9            MR. CANNICK:  Objection, Your Honor.

10            THE COURT:  Overruled.

11  A    A few, actually.

12  Q    Do you remember their names?

13  A    Leelee and Cassandra, I believe.

14  Q    I'm sorry?

15            MR. CANNICK:  I object to the last response.

16            THE COURT:  Overruled.

17  Q    I'm showing the witness what's been marked for

18  identification as Government Exhibit 41.  The witness only.

19            Do you recognize Government Exhibit 41?

20  A    I do.

21  Q    Who is that?

22  A    That is Cassandra.

23  Q    Is that the Cassandra that you just mentioned the

24  defendant had you have sexual contact with?

25  A    Yes, it is.

JANE - DIRECT - GEDDES                         960

1              MS. GEDDES:  Government offers Government

2    Exhibit 41.

3              THE COURT:  Any objection?

4              MR. CANNICK:  No.

5              THE COURT:  Okay, that's in evidence.

6              (Government Exhibit 41, was received in evidence.)

7              (Exhibit published.)

8    Q    And I'm now showing what's been marked for identification

9    to just the witness only, Government Exhibit 42.

10             What's shown in Government Exhibit 42, do you

11   recognize?

12   A    Yes, I do.

13   Q    Who is that?

14   A    That is Leelee.

15   Q    And is Leelee the -- is the individual you identified as

16   Leelee the same Leelee that you just testified the defendant

17   had you have a sexual encounter with?

18   A    Yes, she is.

19             MS. GEDDES:  Government offers Government

20   Exhibit 42.

21             THE COURT:  Any objection?

22             MR. CANNICK:  None.

23             THE COURT:  Okay, that's in evidence.

24             (Government Exhibit 42, was received in evidence.)

25             (Exhibit published.)

JANE - DIRECT - GEDDES                961

1   Q    Aside from the women who you just identified, were there

2   other women or other females with whom the defendant directed

3   you to have a sexual encounter with?

4   A    Yes.

5   Q    Do you know the names of those individuals?  Without

6   saying them, do you know their names?

7   A    Yes.

8              THE COURT:  Hold on just one second.

9              All right, does anybody on the jury need a break?

10             THE JUROR:  No, no, can I talk to you at the side?

11             THE COURT:  Oh.  Well, I don't need you to address

12   it here, no.

13             Can you wait for a few minutes or do you have to

14   talk to her now?

15             We're going to take a five-minute break.  Please

16   don't talk about the case and -- and you can address whatever

17   issue you have with Ms. Greene, all right?

18             THE COURTROOM DEPUTY:  All rise.

19             (Jury exits the courtroom.)

20             THE COURT:  All right, the witness can step down.

21             (A recess was taken at 4:32 p.m.)

22             THE COURT:  Let's bring them back if we're all done.

23             One of the jurors says he can't see the pictures,

24   so.

25             MS. GEDDES:  I'll keep them on for a longer period

LINDA D. DANELCZYK, RPR, CSR, CCR

Proceedings                                  962

1    of time.  I can show them again.

2          THE COURT:  All right.  And I'll give them an

3    instruction that they'll be able to see them when they're

4    deliberating as well.

5          I do have -- I know you don't want me to ask this

6    question, but do you have any idea how long your direct will

7    be?

8          MS. GEDDES:  It's going to be the rest of the day,

9    but I'm hoping that I will be finished or very near finished.

10          THE COURT:  Okay.  All right.

11          Everybody can sit down.  Sorry.

12          Should we get the witness?

13          Let's get the witness back, yes.

14          (Pause in the proceedings.)

15          (The witness resumes the stand.)

16          THE COURT:  All right, let's get the jury, please.

17          THE COURTROOM DEPUTY:  All rise.

18          (Jury enters the courtroom.).

19          THE COURTROOM DEPUTY:  You may be seated.

20          MS. GEDDES:  May I proceed?

21          THE COURT:  Yes, go ahead.

22          THE COURTROOM DEPUTY:  The witness is reminded she

23    is still under oath.

24          THE COURT:  Before you do proceed, I just want to

25    remind you:  You know, there are lots of pieces of evidence

Proceedings                                      963

1  coming in, and I've asked the Assistant United States

2  Attorneys to make sure that it's up for a long enough time for

3  you to take a look at it.

4          But also you don't have to commit any of these

5  things to memory.  In your final deliberations, you'll have

6  access to all of the evidence during your deliberations.

7          So with that, you can go ahead.

8          MS. GEDDES:  Your Honor, may I briefly just show the

9  photos that I previously put on the ELMO?

10          THE COURT:  Let's continue, and then we'll -- you

11  know what, go ahead and show them, that's fine.

12          MS. GEDDES:  Okay, I'll file be brief.

13          This is Government Exhibit 78.

14          (Exhibit published.)

15          MS. GEDDES:  52B.

16          (Exhibit published.)

17          MS. GEDDES:  69B.

18          (Exhibit published.)

19          MS. GEDDES:  72.

20          (Exhibit published.)

21          MS. GEDDES:  76.

22          (Exhibit published.)

23          MS. GEDDES:  77.

24          (Exhibit published.)

25          MS. GEDDES:  41.

JANE - DIRECT - GEDDES                964

1              (Exhibit published.)

2              MS. GEDDES:  And 42.

3              (Exhibit published.)

4    DIRECT EXAMINATION (Continued)

5    BY MS. GEDDES:

6    Q    All right, you testified that in addition to the females

7    that I just placed on the screen for the jury, that there

8    were -- in addition, that other females that defendant asked

9    you to have sexual contact or told you to have sexual contact

10   with; is that correct?

11   A    Yes.

12   Q    And do you recall some of the names of those additional

13   individuals?

14   A    Not all of them but, yes, a few.

15   Q    Who do you remember?

16   A    There was a girl by the name of Chrissy.  There was

17   another woman by the name of Auntie April.  And those are the

18   only two names that I know.

19   Q    And where there additional individuals -- additional

20   females who the defendant directed you to have sex with you

21   whose names you do not currently remember?

22   A    Yes.

23   Q    Did you always know the names of the individuals who you

24   had sexual contact with at the defendant's direction?

25   A    No.

1        MR. CANNICK:  Objection.

2        THE COURT:  I didn't hear.  I'm sorry, Mr. Cannick.

3        MR. CANNICK:  Objection to the characterization of

4   that question.  Direction.

5        THE COURT:  Overruled.

6   Q    How frequently did you have sexual encounters with

7   females?

8   A    Whenever the defendant wanted it.  So it could be every

9   day back to back or it could be every two days or...

10  Q    During those sexual encounters who, if anyone, was in

11  charge?

12  A    The defendant was always in charge.

13  Q    And why do you say that?

14  A    Because he told everyone exactly what to do.

15  Q    Who would he tell what to do?

16  A    Me and the other women.

17  Q    What types of things would he say, or what types of

18  things would he tell you or the other females to do?

19  A    He would orchestrate everything.  So, again, if he wanted

20  one person to walk while someone was giving him oral head,

21  then that's what it would be.  If he wanted to have vaginal

22  penetration while making the other person would walk or crawl,

23  then that's what it would be.

24  Q    Were any of these sexual encounters recorded?

25  A    Yes, they were.

1    Q    Who recorded them?

2    A    The defendant.

3    Q    With what were these encounters recorded?

4    A    With an iPad.

5    Q    And, again, how old were you when these sexual encounters

6    with other females began?

7    A    I was 17.

8    Q    Did you want any of these sexual encounters with other

9    women?

10   A    Never.

11   Q    Why did you do it?

12   A    Because he would force me to do so.

13   Q    How so?

14   A    Sometimes it will be a punishment, and other times it

15   would -- I would be -- he would tell me to come to the room

16   and he would already be in the middle of an act.

17   Q    Were there times when you resisted having a sexual

18   encounter with a female?

19   A    Yes, there were.

20   Q    What, if anything, happened when you resisted?

21   A    He would usually tell me to wait in another room until he

22   was done, and I as usually chastised.

23   Q    And where would you -- where would the defendant tell to

24   you wait?

25   A    Um, if, um, we were in a hotel, then I would have to wait

JANE - DIRECT - GEDDES                    967

1   in the restroom, or if we were -- regardless of where we were,

2   I would usually have to wait in a restroom or another room

3   that was near where he was having intercourse.

4   Q     And you said that after that you would see the defendant?

5   A     Yeah, I would have to wait until he was done.

6   Q     And what do you mean again by the defendant would

7   chastise you?

8   A     Meaning that he would spank me.

9   Q     And why did you understand the defendant was spanking

10  you?

11  A     Because he wanted me to perform the specific way and I

12  did not do so.

13  Q     And what specifically did he want you to perform?

14  A     He wanted me to be intimate with other women.

15  Q     You testified that there were a recording made.  Were

16  those video recordings?

17  A     Yes, they were.

18  Q     Did you ever see any of those video recordings?

19  A     Yes, I did.

20  Q     In what context would you see video recordings of sexual

21  encounters between you and other females?

22  A     If you wanted to play it back and show you, he would, but

23  it would usually be us in the middle of having intercourse or

24  oral sex.

25  Q     And what would happen in the middle of that?

LINDA D. DANELCZYK, RPR, CSR, CCR

1  A     He would just be playing back what we had just done.

2  Q     For what reason or why did you understand he was doing

3  that?

4  A     To have you to like brag and boast about it.

5  Q     Who chose the women who you had those sexual encounters

6  with?

7  A     The defendant.

8  Q     You testified earlier that you were home schooled or

9  you -- for your senior year of high school; is that right?

10  A     Yes.

11  Q     Did you graduate?

12  A     I did, yes.

13  Q     And after you graduated high school, did you consider

14  attending college?

15  A     At that time, no, I did not.

16  Q     Why not?

17  A     Because I had already forfeited all of my scholarships.

18  Q     What do you mean by that?

19  A     I was no longer taking vocal classes or Patriot Singers,

20  so there was really no other scholarships that I had been

21  pursuing.

22  Q     You testified that earlier that you were with the

23  defendant for part of the Black Panties Tour as well as the

24  Buffet Tour.

25          Did you accompany the defendant on any other tours?

1   A    Yes, he had an After Party Tour.

2   Q    Do you remember when that was?

3   A    I do not remember the year that it started, no.

4   Q    When the defendant was not on tour, where would you

5   usually spend your time, in that city or cities?

6   A    Atlanta in Georgia.

7   Q    When you were in Chicago, where would you spend your

8   nights?

9   A    The studio.

10  Q    Which studio?

11  A    In the beginning of 2015, the Ohio, and later the Justine

12  Street studio.

13  Q    And is the Justine Street studio the studio where the

14  photos in Government Exhibit 926 were of?

15  A    Yes.

16  Q    Over the time that you were with the defendant, who, if

17  anyone else, stayed at the Justine Street studio?

18  A    All of his other live-in girlfriends.

19  Q    And where in this studio would they stay?

20  A    Everyone had their own place.

21  Q    And by "place," where was it?  What do you mean?

22  A    Well, I mean usually Juice and V had a room.  Nicq was

23  usually in the master bedroom or the bunk bedroom.  Joy was

24  usually in the living room.  And me and the defendant were

25  usually in a downstairs living room on the couch.

1   Q     Now you testified earlier that some of the photos in 926

2   were different than how you remembered them because there was

3   furniture missing; is that right?

4   A     That is correct.

5   Q     And what type of furniture was missing?

6   A     The majority of bedrooms were taken out of the studio.

7   Q     And were those the bedrooms where Juice and Joy, Nicq and

8   V and you and the defendant slept?

9   A     Yes, it was.

10  Q     What, if any, rules did the defendant have for the manner

11  in which you interacted with men other than the defendant?

12  A     We can not talk to any men at all.

13  Q     When you were in an elevator, what would you do?

14  A     We would have to turn around.

15  Q     And when you say "we," who are you referring to?

16  A     All of his live-in girlfriends.

17  Q     Including Juice and Joy and Meek and V?

18  A     Yes.

19                 (Continued on the following page.)

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MS. GEDDES:

3   Q    And why did you understand that you should turn around

4   when you entered an elevator?

5   A    Because we were not allowed to look at men.

6   Q    Who told you that?

7   A    The defendant.

8   Q    And when you say turned around in an elevator, what were

9   you facing?

10  A    I would have to face the corner.

11  Q    How about when you went to a nail salon, what, if any,

12  restrictions were there -- did the defendant have for you when

13  you went to a nail salon?

14  A    If there was a man working, then I would not be able to

15  go into the establishment.

16  Q    What would you do?

17  A    I would have to leave out and call him immediately and

18  let him know that there was a man working.

19  Q    What, if anything, did the defendant typically carry with

20  him?

21  A    He carried a backpack.

22          MR. CANNICK:  Objection.

23          THE COURT:  Overruled.

24  BY MS. GEDDES:

25  Q    Did he carry it himself or did someone carry it on his

1    behalf?

2    A     It was both.

3    Q     Who would carry -- when someone else was carrying it, who

4    would carry it?

5    A     Sometimes he would give it to me and any of his other

6    live-in girlfriends, and sometimes he would give it to his

7    assistants.

8    Q     Which of his assistants might he give it to?

9    A     His Uncle Bug.

10   Q     Did you ever have an opportunity to look inside his

11   backpack?

12   A     Yes.

13   Q     What did you see in it?

14   A     Usually it was only iPads, a white tee, maybe like

15   basketball shorts, and usually a dildo.

16   Q     How many iPads did you see in the defendant's backpack at

17   once?

18   A     It depend on how many could fit in that backpack, but

19   usually anywhere from four to six.

20   Q     Did you ever attend basketball games with the defendant?

21   A     Yes, I did.

22   Q     What did you do during those basketball games?

23   A     I would sit with the other live-in girlfriends on the

24   side.

25   Q     Who, if anyone else, would you sit with, other than the

1    live-in girlfriends?

2    A    An assistant.

3    Q    And what would you do during the basketball games?

4    A    We would just have to watch the defendant play, and only

5    him.

6    Q    And what do you mean by watch only him?

7    A    Like, if we ended up looking at another man, we would get

8    a chastising for it.

9    Q    And what do you mean by chastising?

10   A    A spanking.

11   Q    How often did you watch the defendant play basketball?

12   A    Nearly every night.

13   Q    Where did you watch him play basketball?

14   A    Usually his old school or churches would open up their

15   basketballs at nighttime for him.

16   Q    How would you travel around Chicago when you were in

17   Chicago?

18   A    He had two Sprinter vans and any time I needed to take a

19   taxi.

20   Q    Who would travel on the Sprinter van?

21   A    Me, the defendant, the driver, whichever assistant was

22   there for the time being; and if it was everyone, then it

23   would be me, him, and also his live-in girlfriends.

24   Q    Where would you go in the Sprinter van?

25   A    We would usually just only go to parks or park outside of

1    the cigar bar or just to get food.

2    Q    When he went to the cigar bar, what would you do?

3    A    We would have to stay on the Sprinter until he got back

4    on.

5    Q    What would the defendant do?

6    A    He would get off and go smoke cigars.

7    Q    And who was the "we" in that sentence when you said we

8    would have to stay on the Sprinter van?

9    A    Me and his other girlfriends.

10   Q    Was there a bathroom on the Sprinter van?

11   A    No, there was not.

12   Q    What would you do if you needed to use a bathroom while

13   you were on the Sprinter van?

14   A    All of us would have to turn around and let the other

15   person go behind a seat.

16   Q    Why not walk outside and find a bathroom?

17   A    Because we weren't allowed to get off the Sprinter.

18   Q    Who told you that you weren't allowed to get off the

19   Sprinter?

20   A    The defendant.

21   Q    And, again, when you say "us," who are you referring to?

22   A    Me and his other girlfriends.

23   Q    You testified that there were also some of the

24   defendant's assistants who were sometimes on the Sprinter van,

25   is that right?

1   A    Yes.

2   Q    Were there times when an assistant needed to use a

3   bathroom?

4   A    Yes.

5   Q    What would the assistant do?

6   A    An assistant could get off.

7   Q    And use the bathroom outside the Sprinter van?

8   A    Yes.

9   Q    You said that you would go to the bathroom in the

10  Sprinter van.

11           How would you do that?

12  A    They usually had gas station, like, extra large cups, and

13  they need to keep towels and tissue paper on the Sprinter.

14  Q    When the defendant returned to the Sprinter van after

15  some time away, how would you -- how, if at all, would you act

16  when he returned?

17  A    Everyone would have to get up and greet him and kiss him

18  immediately.

19  Q    Were there times when you saw other of his live-in

20  girlfriends break one of defendant's rules?

21  A    Yes.

22  Q    What, if anything, would you do?

23  A    I would have to report it.

24  Q    Report it to whom?

25  A    The defendant.

1   Q     Why would you do that?

2   A     Because that was a rule.  If you didn't, you would also

3   get chastised for not letting him know.

4   Q     And how did you know about that rule?

5   A     Because I had witnessed it.

6   Q     What do you mean?

7   A     I had seen it happen to a few of the other girls.

8   Q     What have you seen happen?

9   A     Meaning when one of them did not let him know, he -- he

10  had began to chastise them.

11  Q     And, again, what do you mean by chastising?

12  A     Spanking.

13  Q     While you were living with the defendant, did the

14  defendant employ other people to fulfill certain roles for

15  him?

16  A     Yes, he did.

17  Q     What roles did he employ people to do?

18  A     He had personal doctors, he had accountants, attorneys,

19  assistants for his live-in girlfriends and for himself

20  personally; and he had security.  Of course, he had the tour

21  driver.

22  Q     Did you -- you testified earlier about Top Gun.  Who was

23  Top Gun again?

24  A     That was his tour bus driver.

25  Q     And were there other individuals who drove the

1   defendant's Sprinters or tour buses?

2   A    Yes, for the most part.  Tour bus, no; Sprinter, yes.

3   Usually it was his security or his, like, entourage or

4   sometimes family members.

5   Q    Were you ever -- oh, you also mentioned that the

6   defendant had his assistants that helped him, in particular.

7        Who were they?

8   A    His assistant were usually male assistants; and for the

9   girls, it was a female assistant.

10  Q    And the male assistants that the defendant had, did you

11  learn any of their names?

12  A    Yes, I did.

13  Q    Who were some of the male assistants?

14  A    His Uncle Bug and a person, June Bug.

15  Q    And I'm showing you what's been marked for identification

16  as Government Exhibit 3.

17        MS. GEDDES:  I think this one is actually in

18  evidence.

19  Q    Do you recognize Government Exhibit 3?

20  A    Yes.

21  Q    Who is that?

22  A    That is June Bug.

23  Q    And was that one of defendant's assistants?

24  A    Yes.

25        MS. GEDDES:  Can you put government 3 on there,

1  please?

2  BY MS. GEDDES:

3  Q    And I am now showing you what's in evidence as Government

4  Exhibit 4.

5          Do you recognize Government Exhibit 4?

6  A    Yes.

7  Q    Who is that?

8  A    That's Uncle Bug.

9  Q    And what role did Uncle Bug serve for the defendant?

10  A    He was his personal assistant.

11         MS. GEDDES:  Can you put government 4?  Thank you.

12  Q    You also mentioned that the defendant had assistants for

13  his female guests.

14          Were you one of those female guests?

15  A    Yes.

16  Q    Do you know the names of his assistants for his female

17  guests?

18  A    Yes.

19  Q    Who were they?

20  A    Cheryl, Diana, the twins, LeLe, Asante and Cassandra.

21  Q    Do you know Cheryl's last name?

22  A    Cheryl Mack.

23         MS. GEDDES:  Can you put Government Exhibit 38,

24  which is in evidence?

25  BY MS. GEDDES:

SAM     OCR     RMR     CRR     RPR

1    Q    Again, putting Government Exhibit 38 on the screen.

2         Who is that?

3    A    That is Cheryl.

4    Q    And you also mentioned the twins.

5         Do you know the twins's name?

6    A    Suzette and Alesiette, I believe.

7    Q    And what did they do for the defendant?

8    A    They were assistants for the -- the girls, his

9    girlfriends.

10   Q    And I am showing you what's been marked for

11   identification.

12         MS. GEDDES:  I'm showing the witness only what's

13   been marked for identification as Government Exhibit 39.

14   BY MS. GEDDES:

15   Q    Who is that?

16   A    That's Suzette.

17         MS. GEDDES:  The Government offers 39.

18         THE COURT:  Any objection?

19         MR. CANNICK:  No objection.

20         THE COURT:  Okay, that's in evidence.

21         (Government's Exhibit 39 was received in evidence.)

22         THE WITNESS:  Well, actually I think that is the

23   other twin.  I'm sorry, they're twins.

24         THE COURT:  So, you're not sure which one it is?

25         THE WITNESS:  They're identical twins.

SAM     OCR     RMR     CRR     RPR

```
                      Jane - direct - Geddes              980
```

 1              THE COURT:  All right, so that's one of the twins,

 2    is that right?

 3              THE WITNESS:  Yes.

 4              THE COURT:  All right.

 5    BY MS. GEDDES:

 6    Q    And I am showing you Government Exhibit --

 7              MS. GEDDES:  I am showing the witness only what's

 8    marked for identification as Government Exhibit 40.

 9    Q    Do you recognize Government Exhibit 40?

10    A    Yes, this is Suzette.

11    Q    And who is she?

12    A    An assistant.

13    Q    Was she one of the twins?

14    A    Yes.

15    Q    And you testified earlier that these were assistants for

16    his female guests.

17              Who employed these assistants?

18    A    The defendant.

19    Q    And who did these assistants work for?

20    A    His female guests.

21    Q    Who did they take direction from?

22    A    The defendant and from his girlfriends.

23              MS. GEDDES:  The Government offers Government

24    Exhibit 40.

25              THE COURT:  Any objection?

1          MR. CANNICK:  No.

2          THE COURT:  All right, that's in evidence.

3          (Government's Exhibit 40 was received in evidence.)

4          MS. GEDDES:  I am showing the witness only what's

5   been marked for identification as Government Exhibit 36.

6   BY MS. GEDDES:

7   Q    Who is shown in Government Exhibit 36?

8   A    That's Diana.

9   Q    And what did Diana do?

10  A    She was an assistant for his girlfriends.

11         MS. GEDDES:  The Government offers Government

12  Exhibit 36.

13         MR. CANNICK:  No objection.

14         THE COURT:  Okay, that's in evidence.

15         (Government's Exhibit 36 was received in evidence.)

16  Q    And I am showing you what's been --

17         MS. GEDDES:  Showing the witness only what's been

18  marked for identification as Government Exhibit 74.

19  BY MS. GEDDES:

20  Q    Do you recognize what's shown in 74?

21  A    Yes.

22  Q    What is that?

23  A    That is Asante.

24  Q    What did Asante do?

25  A    She was training to be an assistant for his live-in

1    girlfriends.

2    Q    And who did she work for?

3    A    The defendant.

4         MS. GEDDES:  The Government offers Government

5    Exhibit 74.

6         THE COURT:  Any objection?

7         MR. CANNICK:  No.

8         THE COURT:  All right, that's in evidence.

9         (Government's Exhibit 74 was received in evidence.)

10        MS. GEDDES:  And I am showing the witness, I am

11   showing everyone, what's in evidence as Government

12   Exhibits 41.

13        (Exhibit published.)

14   BY MS. GEDDES:

15   Q    Who is that again?

16   A    That is Cassandra.

17   Q    What did she do for the defendant?

18   A    She was an assistant to him and his live-in girlfriends.

19   Q    And Government Exhibit 42, which is in evidence already,

20   who is that?

21   A    That is LeLe.

22   Q    What did she do?

23   A    She was an assistant for the defendant and his live-in

24   girlfriends.

25   Q    You testified that the defendant also employed people as

1  security.

2          Did you -- do you know some of the individuals who

3  served as security for the defendant?

4  A    His security was always men, but I do know of one who was

5  a female.

6  Q    Now, do you know the names of any of the men who served

7  as security for the defendant?

8  A    No, I do not.

9  Q    You testified that there was also a female, is that

10 right?

11 A    Yes, there was.

12 Q    Do you know the name of that individual?

13 A    Her name was Candy.

14          MS. GEDDES:  I am showing the witness only what's

15 been marked for identification as Government Exhibit 22.

16          One moment.

17          (Pause.)

18 BY MS. GEDDES:

19 Q    Do you recognize the individual shown in Government

20 Exhibit 22?

21 A    Yes.

22 Q    Who is that?

23 A    That is Candy.

24 Q    What did Candy do for the defendant?

25 A    She was security.

Jane - direct - Geddes                    984

1          MS. GEDDES:  The Government offers Government

2    Exhibit 22.

3          MR. CANNICK:  No objection.

4          THE COURT:  That's in evidence and you can publish.

5          (Government's Exhibit 22 was received in evidence.)

6          (Exhibit published.)

7          MS. GEDDES:  I am showing the witness only what's

8    been marked for identification as Government Exhibit 5.

9    BY MS. GEDDES:

10   Q     Do you recognize Government Exhibit 5?

11   A     My screen is black.

12         MS. GEDDES:  I'm sorry, can I show the witness only

13   what's been marked for identification as Government Exhibit 5?

14   A     Yes, I do.

15   Q     Who is that?

16   A     I believe that is a family member of the defendant.

17   Q     What, if anything, did he do for the defendant?

18   A     He played basketball with the defendant and he did act

19   as, like, an assistant.

20   Q     Do you know his name?

21   A     I believe it was Van.

22         MS. GEDDES:  The Government offers Government

23   Exhibit 5.

24         MR. CANNICK:  Your Honor, my only objection is does

25   she know or not?  She's saying I believe.

SAM      OCR      RMR      CRR      RPR

1           THE COURT:  I can't hear you, I'm so sorry.

2           MR. CANNICK:  My only objection is either she knows

3    this person or she doesn't.  She believes.

4           THE COURT:  Oh, okay.

5           When you say you believe you know him, do you know

6    the person?

7           THE WITNESS:  Yes, I do.

8           THE COURT:  Okay.

9           THE WITNESS:  I do.

10          THE COURT:  Anything else?

11          MR. CANNICK:  What's his name?

12          THE WITNESS:  I don't know if he went by Van or

13   Vance.

14          MR. CANNICK:  Okay, no objection, Your Honor.

15          THE COURT:  That's in evidence.

16          (Government's Exhibit 5 was received in evidence.)

17          MS. GEDDES:  Thank you.

18   BY MS. GEDDES:

19   Q    Was there a time when you did, in fact, become pregnant

20   while you were with the defendant?

21   A    There was.

22   Q    Do you remember when that was?

23   A    It was in 2017.

24   Q    Did you have the baby?

25   A    I did not.

1    Q    What happened?

2    A    The defendant made me get an abortion.

3    Q    What, if anything, did he tell you?

4    A    He had expressed that he still wanted me to keep my body

5    tight and that he wanted to start a family when he had got rid

6    of the rest of the girls.

7    Q    Did you, ultimately, get an abortion?

8    A    I did.

9    Q    Who arranged that appointment?

10   A    The defendant and his assistant, Diana.

11   Q    And who took you to that appointment?

12   A    Diana.

13   Q    Did you want to have an abortion?

14   A    I did not.

15             MS. GEDDES:  I am showing the witness only what's

16   been marked for identification as Government Exhibit 481.

17             Your Honor, may I approach?

18             THE COURT:  Yes.

19             (Pause.)

20   BY MS. GEDDES:

21   Q    Did you recognize what was shown in Government

22   Exhibit 481?

23   A    Yes.

24             MR. CANNICK:  Our screen is blank.

25             THE COURT:  That's because she was only showing her.

```
                    Jane - direct - Geddes                    987
```

1              MS. GEDDES:  Government Exhibit 481.  (Displaying.)

2    BY MS. GEDDES:

3    Q    What is that?

4    A    It is a conversation between me and the defendant.

5    Q    And do you know approximately when that took place?

6    A    I didn't look at the date, I'm sorry.

7    Q    Do you remember what was going on when that took place?

8    A    Yes, I was pregnant.

9    Q    And was that before you had the abortion?

10   A    That was immediately after we had -- I had let him know

11   that I was pregnant.

12   Q    And did this contain statements from the defendant?

13   A    Yes, it does.

14             MS. GEDDES:  The Government offers 481.

15             THE COURT:  Any objection?

16             MR. CANNICK:  Can I see it?

17             MS. GEDDES:  You should have 481.

18             THE COURT:  That is a question I have, do you guys

19   have a binder of the Government's exhibits?

20             MR. CANNICK:  Yes.

21             THE COURT:  Okay.

22             (Pause.)

23             MR. CANNICK:  No objection.

24             THE COURT:  All right, that's in evidence.

25             (Government's Exhibit 481 was received in evidence.)

Jane - direct - Geddes                988

```
1              Do you want this jury only?
2              MS. GEDDES:  No, you can publish this.
3              THE COURT:  Okay.
4              (Exhibit published.)
5   BY MS. GEDDES:
6   Q    I want to direct -- and if you want me to bring it to you
7   because the type is small, this one right here (indicating) --
8   where my pen is pointing, can you tell who wrote that
9   particular text message?
10  A    The defendant.
11  Q    Can you read that?
12  A    He said:  I'm not going to lie, I was happy to know that
13  as well.  I really was, bear, but I also was kind of thrown
14  back the way you reacted to my reaction.  I don't care what's
15  going on in our life, I need to be trusted by you a million
16  percent, that way when I say something -- that way when I say
17  something you don't have to hesitate, you do it and you go
18  with it.  And when you do that, I don't know -- I just know
19  who you are to me.  I know you were young, but that is no
20  excuse to disobey me or not do what I tell you to do.  You
21  have some issues in that area of not doing what I tell you all
22  when you get in trouble, you shut down and be hard-headed, you
23  cut me off while I'm talking.  Now, you didn't used to do --
24  now you used to didn't do any of that.  Believe me, God know,
25  I want the same things you want, but God also knows my heart
```

SAM      OCR      RMR      CRR      RPR

1  and it's never going to happen until you grow up and start to

2  show me you are going to do what you are supposed to do

3  because I go through too much to have to deal with -- because

4  I go through too much to have to deal with you not giving me

5  the information that I told you over and over to give me.

6  When you know you're young and there's a lot of things you

7  don't know, so when you argue back at me it shows me that you

8  will rebel on me and it shows me that you're not humble as you

9  used to be.  You are young, therefore, you have no sayso yet.

10 Accept that, own it, and be glad that you have someone to make

11 the decisions and be thankful that all he wants, all those

12 things with you.

13        So, make sure your motive is right before doing

14 something like that.  Make sure you want to do it because

15 you're old enough, wise enough, and strong enough, not just

16 because you want to be bonded with me because I want to groom

17 you and be bonded with you one million percent before that.

18        And it's absolutely nothing wrong with it if you

19 know you're going to do what you're supposed to do and get it

20 together or you should have no problem being patient and

21 waiting.

22        That's all I'm going to say -- way -- now, other

23 than that, I love you, I'm in love with you, and I will never

24 change my mind about me and you and us, now get some sleep.

25 Q    And who wrote that?

Jane - direct - Geddes                          990

1   A    The defendant.

2   Q    During your time with the defendant, did he ever mention

3   his marriage to Aaliyah to you?

4   A    He did, yes.

5   Q    On one occasion or more than one occasion?

6   A    On more than one occasion.

7   Q    I want to direct your attention to a conversation that

8   you had in front of others about Aaliyah.

9        Do you recall where that took place?

10  A    Yes, I do.

11  Q    Where was it?

12  A    It was at a park.

13  Q    Who else was present for that conversation?

14  A    The rest of his girlfriends.

15  Q    And how did the defendant's marriage to Aaliyah come up?

16  A    The defendant said that we could ask him anything.

17  Q    What, if anything, was asked with respect to Aaliyah and

18  his marriage to her?

19       MR. CANNICK:  Objection.

20       THE COURT:  Overruled.

21  A    We asked many questions.  All of us took turns, and,

22  basically, we asked him about that situation and why they,

23  basically, got married.

24  Q    What, if anything, did the defendant say?

25       MR. CANNICK:  Objection.

SAM      OCR      RMR      CRR      RPR

1            THE COURT:  Overruled.  It's a statement of the

2    defendant.

3            Go ahead.

4    A    The defendant had expressed to all of us that Aaliyah was

5    pregnant and that they needed a certificate for her to be

6    married in order for her to possibly get an abortion.

7    Q    What, if anything, else did the defendant say about

8    Aaliyah?

9    A    He had expressed that because she was a minor, that in

10   order for her to get an abortion outside of her parents, the

11   only people that could go with her was a spouse, and that was

12   their reasoning for getting married.

13   Q    What, if anything, did the defendant say about a phone

14   that Aaliyah had?

15   A    He said that he had given her money and a bat phone.

16   Q    What did you understand the defendant to mean by a bat

17   phone?

18   A    A burner phone.

19   Q    Why did you understand that to be the case?

20   A    He said that he had given her a bat phone just in case it

21   was, basically, 9-1-1, an emergency and she had no way of

22   getting in touch with him, and that was the only time to use

23   that phone.

24   Q    Did you have any other conversations with the defendant

25   about the use of a burner phone?

1  A    Yes.

2  Q    What were those?

3  A    When I had went back to Florida to get homeschooled, he

4  also had gave me money just in case I needed to get a bat

5  phone.

6  Q    And when you said "he," who are you referring to?

7  A    The defendant.

8  Q    During the time that you spent with the defendant, what,

9  if anything, did he ask you to write for him?

10  A    He would make us write letters.

11  Q    And when you say "us," who are you referring to?

12  A    Me and the rest of his girlfriends.

13  Q    How did you learn that the defendant wanted you to write

14  letters?

15  A    He had come in and he had told us it was time for us to

16  write letters, and the other girls automatically knew what

17  that meant.  And he had, like, basically told them to help me.

18  Q    Did the defendant tell you why he wanted you to write

19  this letter?

20  A    Yes.

21  Q    What did he say?

22  A    He said because of his past, his previous attorney had

23  made --

24          MR. CANNICK:  Objection.

25          THE COURT:  Overruled.

Jane - direct - Geddes                         993

1          Do you want to lead through this, please?

2          Let me just see the parties over at the side.

3

4          (Continued on the following page.)

```
                         Sidebar                          994

 1              (The following occurred at sidebar.)

 2              THE COURT:  Is this what we just talked about?

 3              MS. GEDDES:  It is.  I provided Your Honor's ruling

 4    but she's not going to say anything other than --

 5              MR. CANNICK:  Other than?

 6              MS. GEDDES:  His --

 7              THE COURT:  Because of his past.

 8              MS. GEDDES:  -- his attorneys told him to do it

 9    because of his past.  She's not mentioning what his past is.

10              MR. CANNICK:  Okay.  All right.

11              THE COURT:  All right.

12              (Sidebar ends.)

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1    BY MS. GEDDES:   (Continuing)

2    Q    You testified that defendant told you that the, he wanted

3    you to write these letters because of something his attorneys

4    had said, is that correct?

5    A    Yes.

6    Q    Did he tell you what he wanted to be included in this

7    letter?

8    A    Yes, he did.

9    Q    What did he say?

10   A    He said that these were basically letters that would

11   never see the day of light and that they were to basically

12   exploit us to protect him.

13   Q    And what, if anything, did the defendant want you to

14   include in the letters themselves?

15   A    He wanted us to include letters saying that we had stolen

16   money from him, that we had stolen watches from him, that we

17   had been molested by family members, that we had been abused

18   and neglected by family members and so forth.

19   Q    Had you, in fact, stolen any money from the defendant?

20   A    I had not.

21   Q    And had you been molested by any family members?

22   A    I had not.

23   Q    Whose idea was the particular content of a letter?

24   A    It was the defendant's.

25   Q    From what perspective would you write the letter?

                        Jane - direct - Geddes                    996

1  A    We would write the letters in past tense in the sense

2  that since we had already left and were trying to get back to

3  him.

4  Q    Can you give an example of the type of letter that you

5  might write?  And, actually, let me back up one minute.

6          Did you write one letter or more than one letter?

7  A    We wrote multiple letters, about four to five each.

8  Q    Can you give an example of the type of letter you had

9  written at the request of the defendant?

10 A    It would say, I'm sorry that I stole $30,000 from you, I

11 hope that you can forgive me, please let me back into your

12 life, things pertaining to that.

13 Q    Who, if anyone, was present when you would write these

14 letters?

15 A    The defendant and his live-in girlfriends.

16 Q    And how often would you write these letters?

17 A    We would write these letters every year.

18 Q    And did you say you would write four to five each year?

19 A    Yes.

20 Q    What would you do once you wrote one of these letters?

21 A    He would have Juice go over them to make sure that they

22 weren't too similar.

23 Q    And what happened after that?

24 A    Juice will also make sure that our signatures matched and

25 if it didn't, we would have to rewrite it.

1   Q    What did you understand Juice to be confirming matched?

2   A    She would make us get our IDs and she would look at the

3   signatures on our ID and at the end of the letter and if it

4   didn't match, we would have to rewrite the letter by hand.

5   Q    What would you do once the letter had been approved?

6   A    The defendant would take them and he said that he would

7   give them to his attorneys.

8   Q    Did you ever see those letters again?

9   A    I would never see those again.

10  Q    You testified earlier about a video recording that the

11  defendant made of sexual encounters with you and others.  Is

12  that right?

13  A    Yes.

14  Q    Were there other video recordings that the defendant had

15  you make?

16  A    Yes, there were.

17  Q    What?

18  A    He would sometimes make me make videos as punishments.

19  Q    Can you describe some of the videos that you made as

20  punishment?  And, actually, before you do, what do you mean by

21  punishment?

22  A    Meaning that even after I was chastised, if I broke a

23  rule and it was very severe, then on top of me being

24  chastised, I would have a punishment.

25  Q    And by chastised, what do you mean?

1    A    A spanking.

2    Q    What are some of the recordings?

3         Did that happen on one occasion or more than one

4    occasion?

5    A    More than one occasion.

6    Q    Can you describe the recordings that the defendant made

7    you make as punishment?

8    A    Yes.  There was an incident where after he had chastised

9    me over 15 times, he had pulled out an iPad and he told me to

10   make a video saying that my father had molested me while I was

11   still crying from him chastising me.

12   Q    And, again, just to be clear, whose idea was the content

13   on this video?

14   A    The defendant.

15   Q    Was any of what you said true?

16   A    No, it was not.

17   Q    Why did you make the video?

18   A    Because the defendant made me.

19   Q    Were there other videos that the defendant had you make?

20   A    Yes, there was.

21   Q    Can you describe those?

22   A    There was another incident in, where the defendant had

23   told Juice to get a new iPad and for me to record myself

24   eating feces.

25   Q    How did that come about?

1   A    It was a punishment and the defendant had came to me and

2   he said, I don't know what punishment I'm going to give you

3   just yet, and then a few hours later, he came back and told me

4   what it would be.

5   Q    And what did he tell you to do?

6   A    He told me exactly what to do in the video.  He told me

7   to smear it in my face and what to exactly say and to, like,

8   put it in my mouth and act like I liked, enjoyed that.

9   Q    And what was it that he wanted you to smear on your face?

10  A    Feces.

11  Q    Did you do it?

12  A    I did, yes.

13  Q    Why did you do it?

14  A    Because it was a punishment.

15  Q    Did you want to be doing that?

16  A    I did not.

17  Q    Where did you do that?

18  A    I did that at the Justine Street studio in Chicago.

19  Q    What did you do with the video after -- who made the

20  video?

21  A    I made the video on the iPad.

22  Q    What did you do with the video after you made it?

23  A    The defendant took the iPad and watched the video.

24  Q    How did he respond?

25  A    He said that I wasn't into it enough and that I would

Jane - direct - Geddes                          1000

1   have to redo it.

2   Q    Did you redo it?

3   A    I did not.

4            MS. GEDDES:  I'm showing the witness -- sorry.  I'm

5   showing everyone what's in evidence as Government Exhibit 926

6   and this is page 26.

7   Q    What is shown on page 26?

8   A    This is the first small studio room in which me and the

9   defendant would sleep in here at times.

10  Q    And is there anything through this door area?

11  A    Yes, it's a hallway.

12  Q    One moment.

13           THE COURT:  If you can find a convenient, you know,

14  we have a few more minutes, but if you can find a convenient

15  time to break.

16           MS. GEDDES:  I'm showing page 4 of Government

17  Exhibit 926.

18  Q    What is shown in 926?

19  A    The studio on 219 North Justine Street.

20  Q    And where my pen is pointing, what is located in that

21  area?

22  A    To the left is the restroom in where the defendant made

23  me make the video.

24  Q    And what, if anything, did the defendant say about other

25  similar videos?

1   A     He had said that other girls had did the same thing.

2   Q     And who did you understand the defendant to mean when he

3   referred to other girls?

4   A     Nicq.

5   Q     Did you ever see any of those videos?

6   A     Never.

7   Q     Were there other videos that the defendant asked you to

8   make?

9   A     Not that I can recall.

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. GEDDES:  Your Honor, this is an okay stopping

2   point.

3          THE COURT:  Okay.

4          So ladies and gentlemen, I'm going to excuse you for

5   the night.  I'll see you tomorrow, same time, 9:30.  Please

6   don't read anything about the case, don't speak to anybody

7   about the case, but have a good night.

8          I'll see you tomorrow.

9          (Jury exits.)

10          THE COURT:  All right.  And the witness can step

11   out.  We'll see you tomorrow.

12          THE WITNESS:  Okay.

13          (Witness steps down.)

14          THE COURT:  All right.  Do you have a sense, I don't

15   know why I ask, to try to put hope over experience, but do you

16   know how much longer about?

17          MS. GEDDES:  I would --

18          THE COURT:  I'm not rushing you.  I'm trying to get

19   an idea of our schedule.

20          MS. GEDDES:  About an hour.

21          THE COURT:  Anything else before we break for the

22   day?

23          MS. GEDDES:  Not from the government.

24          THE COURT:  Anything from the defense?

25          MR. CANNICK:  Nothing.

Jane - direct - Geddes                              1003

1        THE COURT:  All right.  Thank you so much.  I'll see

2   you tomorrow.

3        I'm sorry.  There is one other thing.  I just want

4   to make sure, if the defense has a binder of the evidence, do

5   they know what you're planning to introduce each day?

6        MS. GEDDES:  Not each day, but there -- we have

7   provided copies of each of the marked exhibits.

8        THE COURT:  I just think so we can avoid having, you

9   know, people asking to look at things, if you can just let

10  them know what additional things you are going to introduce

11  just so they can have it at the ready just so it doesn't waste

12  time.  Okay?

13       MS. GEDDES:  Thank you, Judge.

14       THE COURT:  Thank you.

15       (Matter adjourned to August 24, 2021 at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1004

1                       I N D E X

2   WITNESSES:

3       DEMETRIUS SMITH

4           DIRECT EXAMINATION (CONTINUED)              742

5           BY MS. CRUZ MELENDEZ

6           CROSS-EXAMINATION BY MR. CANNICK           749

7           REDIRECT EXAMINATION BY MS. CRUZ MELENDEZ  757

8           RECROSS-EXAMINATION BY MR. CANNICK         760

9           REDIRECT EXAMINATION BY MS. CRUZ MELENDEZ  761

10      JANE

11          DIRECT EXAMINATION BY MS. GEDDES           765

12          VOIR DIRE EXAMINATION BY MR. CANNICK       945

13          DIRECT EXAMINATION (CONTINUED) BY          946

14          MS. GEDDES

15

16                       EXHIBITS:

17

18          Government Exhibit 75               766
            Government Exhibit 75(b)            767
19          Government Exhibit 245A             774
            Government Exhibit 233              780
20          Government Exhibit 518A, E and G    783
            Government Exhibit 247A             785
21          Government Exhibit 233C             801
            Government Exhibit 38               801
22          Government's Exhibit 217            803
            Government's Exhibit 233(d)         812
23          Government's Exhibit 233(e)         813
            Government's Exhibit 233(f)         814
24          Government's Exhibit 233(q)         817
            Government's Exhibit 233(r)         817
25          Government's Exhibit 220            819
            Government's Exhibit 253(a)         821

1005

1

INDEX - EXHIBITS (CONTINUED)

2

3           Government's Exhibit 233(i)          823
            Government's Exhibit 233(g)          824
4           Government's Exhibit 221             827
            Government's Exhibit 233(m)          831
5           Government's Exhibit 233(n)          833
            Government's Exhibit 233(s)          835
6           Government's Exhibit 233(t)          836
            Government's Exhibits 505(b) and     840
7           505(c)
            Government Exhibit 506               842
8           Government Exhibit 504               843
            Government Exhibit 86                849
9           Government Exhibit 949               857
            Government Exhibit 325               858
10          Government Exhibit 331               859
            Government Exhibit 475A              866
11          Government Exhibit 476A              867
            Government Exhibit 17                872
12          Government Exhibits 205A and 205D    883
            Government Exhibit 205F              890
13          Government Exhibit 205I              894
            Government's Exhibit 205(j)          896
14          Government's Exhibit 205(m)          899
            Government's Exhibit 69(b)           903
15          Government's Exhibit 69(c)           904
            Government's Exhibit 52(b)           904
16          Government's Exhibit 52(c)           905
            Government's Exhibit 72              906
17          Government's Exhibit 78              906
            Government's Exhibit 78(a)           907
18          Government Exhibit 935B              936
            Government Exhibit 926               946
19          Government Exhibit 76                958
            Government Exhibit 77                958
20          Government Exhibit 41                960
            Government Exhibit 42                960
21          Government's Exhibit 39              979
            Government's Exhibit 40              981
22          Government's Exhibit 36              981
            Government's Exhibit 74              982
23          Government's Exhibit 22              984
            Government's Exhibit 5               985
24          Government's Exhibit 481             987

25

                        *     *     *