1006

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,    :   19-CR-286(AMD)
4
            Plaintiff,        :
5                                United States Courthouse
         -against-            :   Brooklyn, New York
6
ROBERT SYLVESTER KELLY,       :
7                                August 24, 2021
            Defendant.        :   9:30 o'clock a.m.
8
     - - - - - - - - - - - - - X
9

10            REDACTED TRANSCRIPT OF TRIAL
         BEFORE THE HONORABLE ANN M. DONNELLY
11       UNITED STATES DISTRICT JUDGE, and a jury.

12
APPEARANCES:
13

14  For the Government:        JACQUELYN M. KASULIS
                               Acting United States Attorney
15                             BY: ELIZABETH GEDDES
                                   NADIA SHIHATA
16                                 MARIA E. CRUZ MELENDEZ
                               Assistant United States Attorneys
17                             271 Cadman Plaza East
                               Brooklyn, New York
18

19  For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                               NICOLE BLANK BECKER, ESQ.
20                             THOMAS FARINELLA, ESQ.
                               CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:            Charleane M. Heading
                               225 Cadman Plaza East
23                             Brooklyn, New York
                               (718) 613-2643
24
Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

1007

1      (In open court; outside the presence of the jury.)

2           THE COURT:  So I just want to make sure.  Does the

3    defense, do you guys have binders of the exhibits?  Yes?

4           MR. CANNICK:  We printed, we printed them.

5           THE COURT:  Right.  But did you -- I mean you

6    provided me with these binders.  Does the defense have that?

7           MR. CANNICK:  No, we don't have that binder.  We

8    generally get it in most trials but we don't have it.

9           THE COURT:  I just want to make sure that you have

10   the exhibits for the particular witness so we don't have to

11   take a pause.  Do you have the exhibits for this witness?

12          MS. GEDDES:  Last night, I advised the defense

13   counsel, I advised Mister -- I'm sorry.

14          THE COURT:  That's all right.

15          MS. GEDDES:  Last night, I advised Mr. Farinella of

16   the particular exhibits that I was using with this witness so

17   they do have the, they know the particular exhibits that we're

18   going to use and they have electronic copies of everything and

19   I think there's only four or five exhibits.

20          THE COURT:  All right.

21          MS. GEDDES:  And, of course, we gave the defense

22   electronic copies of every single exhibit that we are using in

23   this trial.

24          THE COURT:  Well, I take it it's the 3500 material

25   and the discovery as well?

1008

1      MS. GEDDES:  And it's also provided in discovery.

2      THE COURT:  All right.

3      MS. GEDDES:  Your Honor, may we approach briefly

4   whenever you're ready?

5      THE COURT:  Sure.

6      (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25













```
                         Sidebar                      1015
```

1              THE COURT:  All right.  We're going to be in recess

2      for -- I know you want some time to talk to Mr. Kelly.

3              MR. CANNICK:  Yes.

4              THE COURT:  You need some time to talk to your

5      witness.  We'll start at 10, 5 minutes past ten.

6              MR. CANNICK:  Thank you, Your Honor.

7              THE COURT:  Mr. Cannick, would you like that sidebar

8      sealed?

9              MR. CANNICK:  Yes, Your Honor.

10             (Recess taken.)

11             (In open court; outside the presence of the jury.)

12             THE COURT:  If I can see everybody at side bar.

13             (The following occurred at sidebar.)

14     ████████████████████████████████████████████████████████

15     ████████████████████████████████████████████████████

16     ████████████████████████████████████████████████████████

17     ███

18     █████████████████████

19     ██████████████████████████████

20     ██████████████████████████

21     ████████████████████████████████

22     ███

23     ████████████████████████████████████████

24     ███

25     ████████████████████████████████████████████████████



```
          CMH      OCR      RMR      CRR      FCRR
```



SEALED BY ORDER OF THE COURT

1017



10          (In open court; sidebar ends.)

11          THE COURT:  All right.  I think we're ready for the

12   witness.

13          I just want to clarify I think it's the case that

14   this witness is being referred to as "Jane" and nothing else.

15          Am I correct about that?

16          MS. GEDDES:  That's correct, Your Honor.  For this

17   trial, she has been called as "Jane" and she will not be

18   referred to in any other manner in this case.

19          THE COURT:  Okay.  Great.  Let's get the witness.

20          MS. BLANK BECKER:  Judge, I apologize.  Maybe we can

21   approach.

22          THE COURT:  Do we need the court reporter?

23          MS. BLANK BECKER:  Yes.

24          THE COURT:  Okay.

25          (Continued on next page.)



SEALED BY ORDER OF THE COURT

1019

1        (In open court; outside the presence of the jury.)

2        THE COURT:  Let's get the witness, please.

3        MS. BLANK BECKER:  Judge, can that be sealed, that

4    conversation?

5        THE COURT:  It already is.

6        (Witness resumes the stand.)

7        THE COURT:  All right.  Let's get the jury, please.

8        (Jury enters.)

9        THE COURT:  All right.  Good morning, ladies and

10   gentlemen.

11       Let me just first apologize for the delay.  It's

12   nobody's fault.  Sometimes we have matters that we have to

13   discuss and I think it's easier to do it without you in the

14   room rather than having you wait while we hammer things out at

15   the side so that's the reason for that, but we are ready to

16   continue with the direct examination.

17       Go ahead.

18       MS. GEDDES:  May I proceed, Your Honor?

19       THE COURT:  Yes.

20       THE CLERK:  The witness is reminded that she's still

21   under oath.

22       THE WITNESS:  Yes.  Thank you.

23       (The witness, JANE, previously sworn, resumed.)

24       (Continued on next page.)

25

1    DIRECT EXAMINATION (Continued)

2    BY MS. GEDDES:

3    Q    Yesterday, you testified about some of the defendant's

4    assistants who helped out with his female guests including

5    yourself, is that correct?

6    A    Yes.

7    Q    Can you describe some of the matters in which some of the

8    defendant's female or assistants who assisted his female

9    guests would do?

10   A    They would basically -- well, everything was at his

11   discretion but for the most part, any type of, any time we

12   needed food or toiletries or we just couldn't get in touch

13   with the defendant, you would reach out to them.

14   Q    And when you say that it was at his discretion, what do

15   you mean?

16   A    Meaning that he would tell us when we could text him and

17   when we could not.  The only time we couldn't is when there

18   was an emergency, we couldn't get in touch with him.

19   Q    I'm sorry.  When you say, "The only time we couldn't,"

20   what did you mean by that?

21   A    Meaning if it was an emergency and we could not get in

22   touch with him, meaning he wasn't answering his phones.

23   Q    And what would happen in that event?  What would you do

24   then?

25   A    I would just say, Can you please get in touch with

Jane - direct - Geddes                          1021

1   Mr. Kelly?

2   Q    And you would then reach out to his assistants?

3   A    Yes.

4   Q    I want to make sure I understand.  When you said the only

5   time you would do a certain thing, what were you describing?

6   A    Just in case it was, like, an emergency, like, let's say

7   as an example, if my cycle came on and I needed tampons or I

8   needed to get in touch with him about something very important

9   and he wasn't answering his phones.

10  Q    And what would you do in that event?

11  A    I would say, Can you let Mr. Kelly know to check his

12  phones.

13  Q    And if it wasn't an emergency, what contact would you

14  have with the defendant's assistants?

15  A    None.

16  Q    And, ultimately, who paid those assistants?

17  A    The defendant.

18  Q    And who was ultimately in charge of them?

19  A    The defendant.

20  Q    Yesterday, you testified about a video that you made and

21  this was the one where you testified about eating feces, is

22  that correct?

23  A    Correct.

24  Q    And you testified that when you showed it to the

25  defendant, he wasn't satisfied with it.

Jane - direct - Geddes                              1022

1  A    Correct.

2  Q    Where were you when you showed it to the defendant?

3  A    He was actually in the studio and he had taken it with

4  him and he had came back and he had said that he had watched

5  it and that I wasn't into it enough and that I would have to

6  redo it, not at that moment because it had been an hour after

7  and I had already changed and cleaned up, but he did express

8  that I would have to do it again.  We just never got around to

9  it.

10 Q    And was there another time when the defendant asked you

11 to do it?

12 A    He did not and I did not remind him.

13 Q    And just to be clear, when you said that he took it and

14 looked at it, what were you referring to?

15 A    The video.

16 Q    You testified yesterday about video recordings that the

17 defendant made using his iPad.  Can you explain the time, just

18 the frequency with which the defendant made those videos when

19 you were 17?

20 A    It was very frequent.

21 Q    And can you explain when the defendant would make a video

22 and when he would not make a video of the times where you

23 engaged in sexual contact with the defendant?

24 A    For the most part, any time we were going to a hotel or

25 on the tour bus, he would make sure that he had his backpacks

CMH      OCR      RMR      CRR      FCRR

Jane - direct - Geddes                              1023

1   with him, however, the only times that he really would not

2   record is maybe if it was after basketball or if we were in a

3   studio that his legal could pay for, like, moments that were

4   very quick, like inside the studio, booths, like, he really

5   wouldn't record those times.

6   Q    And on other occasions, was he regularly recording you in

7   engaging in sexual activity with the defendant?

8   A    Yes, he was.

9   Q    Did you ever -- was there ever an occasion where the

10  defendant showed you videos that he made of you, including

11  when you were 17, years later?

12  A    Yes, there was.

13  Q    Can you describe that?

14  A    I do recall a few years later, he had showed me a video

15  of me when I was 17 because I recall I had the same exact

16  hairstyle that I had when had I met him at the show and he had

17  said, you know, Look at how tiny you used to be.

18           MR. CANNICK:  Objection.

19           THE COURT:  Are these the defendant's statements?

20           MS. GEDDES:  Yes.

21           MR. CANNICK:  It's not responsive.

22           THE COURT:  Overruled.  And turn on your microphone.

23  I don't want to miss an objection if you make it.

24           MR. CANNICK:  Thank you.

25  Q    I'm sorry.  Can you describe what the defendant said when

Jane - direct - Geddes                    1024

1    he was showing you a video?

2    A    Yes.  He was basically gloating and complimenting how

3    small I used to be.

4    Q    And when you saw the video, when did you -- how old were

5    you -- I'm sorry.  Withdrawn.

6              When you saw the video, how old were you, how old

7    did you think you were in the video itself?

8    A    Oh, I know that I was 17 because my parents had paid for

9    that hairstyle before I had met him.

10   Q    And I think you said that it was a hairstyle that you

11   wore close in time to the show.

12   A    Yes.

13   Q    Was that the show where you first met the defendant?

14   A    Yes, it was.

15   Q    When, if ever, did the defendant ask you to make a video

16   recording of you saying something negative about yourself?

17   A    There were a few times where the defendant would do so

18   after chastising.

19   Q    Can you describe the videos that the defendant told you

20   to make?

21   A    Yes.  Usually after he would chastise me, in the midst of

22   me still crying, he would usually record me and he would tell

23   me to walk back and forth and say that I was stupid and that I

24   was dumb and that I was so sorry, daddy.

25   Q    And on how many occasions did the defendant tell you to

Jane - direct - Geddes                1025

1   make videos such as that?

2   A    It was not that he would make me make videos like that.

3   It was usually after a chastising, if he was turned on, in

4   that moment, he would personally pull out --

5              MR. CANNICK:  Objection.

6              THE COURT:  Overruled.

7   A    -- an iPad and record it himself.

8   Q    And whose idea was it for you to say what you were saying

9   on the video?

10  A    The defendant.

11             MS. GEDDES:  One moment.

12             (Pause.)

13  Q    Without saying who, were you aware of whether the

14  defendant asked other women to make similar videos?

15  A    Yes, I was.

16  Q    And how did you become aware of that?

17  A    The defendant would show me other videos of women also

18  crying and saying very similar things about themselves.

19  Q    And I'm showing what's in evidence as Government

20  Exhibit 76.

21             Was that one, was that one of the women who you saw

22  in a video saying something negative about herself?

23  A    Yes.

24  Q    Over the course of your five years with the defendant,

25  what, if any, restrictions did he put on your having contact

Jane - direct - Geddes                    1026

1    with members of your family?

2    A    Eventually, I could not talk to them at all because they

3    just would want to know of my well-being which was something

4    that he really did not want me to disclose.

5    Q    What, if anything, did the defendant advise you to share

6    with your family?

7    A    He only told me to talk to them about how I had been and

8    things pertaining to, like, nails, hair, the city that we were

9    in, however, any personal questions pertaining to, like, abuse

10   or other girlfriends, he would tell me to hang up immediately.

11   Q    And are you referring to personal questions about abuse

12   and other girlfriends of the defendant's?

13   A    Yes.

14   Q    When you did speak with your family, where was the

15   defendant?

16   A    He was usually present.

17   Q    And did you also communicate by text message with your

18   family members?

19   A    Yes, I did.

20   Q    And when you sent those text messages, where was the

21   defendant?

22   A    The defendant would tell me exactly what to say.

23   Q    And when the defendant wasn't around, would you call and

24   text message your parents?

25   A    No, only if he had me to.

1  Q    Why wouldn't you do that without the defendant?

2  A    Because I would have gotten in trouble for doing so.

3  Q    What, if anything, did the defendant do or say that made

4  you think that the defendant would find out about that?

5  A    Usually he would basically talk badly about all of our

6  parents and if we were not angry enough, he would then get

7  upset and say that we were not loyal to him and make us feel

8  bad.

9  Q    Was there anything that the defendant did that made you

10 think that he would find out if you violated one of his rules

11 and reached out to your family?

12 A    Yes.

13 Q    What did he say?

14 A    He had expressed that he had engineers who knew how to

15 get inside the phones and go to the cloud and see who we have

16 been talking to.

17 Q    Now, to your knowledge, did the defendant ever do that or

18 did the defendant's engineers ever do that?

19 A    I don't know.

20 Q    When you say the defendant had engineers, what do you

21 mean by engineers?

22 A    His studio engineers.  They did a lot of stuff pertaining

23 to, like, his gadgets and stuff along with his, like, studio

24 time.

25 Q    And when you say gadgets, what are you referring to?

1   A    His, like, iPads and phones and stuff.

2   Q    Did you learn the names of the defendant's engineers?

3   A    Yes.

4   Q    What are their names?

5   A    Ian and Abel.

6   Q    How did you learn their names?

7   A    From the defendant.

8   Q    Were you introduced to either Ian or Abel?

9   A    Never.

10  Q    Were you in Ian or Abel's presence?

11  A    Yes, I had been in their presence a few times.

12         MS. GEDDES:  I'm showing the witness only what's

13  been marked for identification as Government Exhibit 49.

14  Q    What is shown in 49?

15  A    That is one of his engineers, however, I don't, I don't

16  know their names.  The only time I had seen them was in studio

17  sessions and their back was towards us so we never saw their

18  faces.

19  Q    Okay.  I'm sorry, do you know -- how many engineers did

20  the defendant have that you know of?

21  A    It was two and they were Caucasian so I do know that this

22  is one of them.

23  Q    Okay.  But you don't know his name?

24  A    Yes, I don't know his name.

25         MS. GEDDES:  The government offers 49.

1            THE COURT:  Any objection?

2            MR. CANNICK:  Yes.

3            You just testified that you never saw his face.

4            THE COURT:  Do you want to voir dire this witness?

5            MR. CANNICK:  Yes, Your Honor.

6            THE COURT:  Okay.

7    VOIR DIRE EXAMINATION

8    BY MR. CANNICK:

9    Q    You just testified that you never saw the face of the

10   engineers, am I correct?

11   A    I was not allowed to look at men, yes.

12   Q    That's not my question.  My question is you just

13   testified and told the jury that you never saw their faces, am

14   I correct?

15   A    I would see the side views, yes.

16   Q    And you testified and told the jury a short while ago

17   that the only thing you could see were their backs, am I

18   correct?

19   A    There were times where they would bring the defendant

20   coffees so I would see their face just very briefly.

21   Q    So what you told the jury a short while ago --

22            THE COURT:  Do you want to voir dire on whether she

23   recognizes him.  Let's not do cross right now.

24            MR. CANNICK:  I'm anxious.

25            THE WITNESS:  I know that -- if you're asking me do

Jane - voir dire - Cannick                    1030

1    I know if this is, I do.

2            MR. CANNICK:  There's no question.

3            THE COURT:  Just let him put a question to you.

4    Q    You testified that you don't know the names of the

5    individuals?

6    A    I do not.

7    Q    And you testified that your recognition of this person --

8    A    Well, sorry.  I actually do know the names of them.  I

9    just said it.  Ian and Abel.

10           THE COURT:  Do you know which one is Ian and which

11   one is Abel?

12           THE WITNESS:  No.  That I do not know.

13           MR. CANNICK:  Objection, Judge.

14           THE COURT:  Are you still objecting?

15           MR. CANNICK:  Yes.

16           THE COURT:  I just want to make sure that I

17   understand.

18           Do you recognize this person?

19           THE WITNESS:  Yes, I do.

20           THE COURT:  And how do you recognize the person?

21           THE WITNESS:  Because he would bring the defendant

22   coffees, however, if I saw him, it was a very quick glimpse.

23   It was not because I was trying to look at him.

24           THE COURT:  Okay.  But the question is is this one

25   of the people that you saw --

1          THE WITNESS:  Yes, it is.

2          THE COURT:  -- at the defendant's recording studio?

3          THE WITNESS:  Yes, it is.

4          THE COURT:  Do you have any further questions

5    regarding this exhibit?

6          MS. GEDDES:  Just that we offer it.  No, Your Honor.

7          THE COURT:  Over the defense objection, it's

8    admitted.

9          (Government Exhibit 49 so marked ).

10         MS. GEDDES:  May we publish?

11         THE COURT:  Yes.

12         MS. GEDDES:  And I'm now showing the witness only

13   what's been marked for identification as Government

14   Exhibit 50.

15   DIRECT EXAMINATION (Continued)

16   BY MS. GEDDES:

17   Q    Do you recognize Government Exhibit 50?

18   A    I do, yes.

19   Q    What is that?

20   A    That is one of his engineers.

21   Q    And, again, did you have an opportunity to see this

22   particular person?

23   A    Yes, I did.

24   Q    And where did you see this person?

25   A    Usually in the control room.

Jane - direct - Geddes                    1032

1    Q    And when you say control room, what are you referring to?

2    A    The studio.

3    Q    And is that where the defendant's engineers worked?

4    A    Yes.

5    Q    And do you know this individual's name?

6    A    I do not know him by their names.  They would usually

7    work together side by side so when he would say Ian or Abel --

8         MR. CANNICK:  Objection.  This is not responsive.

9         THE COURT:  Overruled.

10        MR. CANNICK:  She doesn't know his name.

11        THE COURT:  Overruled.

12   Q    Please continue.

13   A    They worked together so usually they would do 16 hours so

14   whether he called them Ian or Abel, I wouldn't know the

15   difference between the two, but I was able to see them.

16        MS. GEDDES:  The government offers Government

17   Exhibit 50.

18        MR. CANNICK:  Same objection, Your Honor.

19        THE COURT:  Overruled.

20        (Government Exhibit 50 so marked.)

21        THE COURT:  Mr. Cannick, I know I sound like a

22   broken record.  I can't hear you if you don't turn on your

23   microphone.  Thanks.

24        MS. GEDDES:  May I publish?  Thank you.

25   Q    What, if anything, negative did the defendant say about

1    your parents?

2    A    He would say that they, that we were basically worthless

3    and that we did not mean anything to them.

4    Q    And when you say he would say that we were worthless to

5    them, who is the "them" in that sentence?

6    A    Me and the other girls.

7    Q    Okay.  And who did the defendant say you were worthless

8    to?

9    A    He would say it to us.

10   Q    But who was he saying believed that you were worthless?

11   A    Our parents.

12   Q    What else did the defendant say negative about your

13   parents?

14   A    He would basically say that they had sold us to him and

15   that they, that they had basically given us to him and that

16   they did not care for us and that we were in a better

17   situation with him.

18   Q    When you said that the defendant said that your parents

19   had sold you to him, what did he say about that?  How did he

20   explain that?

21   A    He had confided in me that the previous manager under the

22   name of Mace had given my parents a few bricks and, in return

23   for me.

24   Q    And when you say "bricks," what are you referring to?

25   A    Narcotics.

Jane - direct - Geddes                              1034

1   Q     And who provided this information to you?

2   A     The defendant.

3   Q     Do you remember approximately when the defendant said

4   that to you?

5   A     This was years later, around the time when a majority of

6   the things had come out about cults and multiple women.

7   Q     Fair to say that was several years after you had been

8   staying with the defendant?

9   A     Yes.

10         MS. GEDDES:  I'm showing the witness only what's

11  been marked for identification as Government Exhibit 68.

12  Q     Do you recognize the individual shown in Government

13  Exhibit 68?

14  A     I do, yes.

15  Q     Who is that?

16  A     This is Nephew.

17  Q     And when did you first meet Nephew or did you meet

18  Nephew?

19  A     Yes, I did.

20  Q     When did you first meet him?

21  A     I don't recall initially when I first met him.

22  Q     Who introduced Nephew to you?

23  A     The defendant.

24         MS. GEDDES:  The government offers Government

25  Exhibit 68.

Jane - direct - Geddes                    1035

1    THE COURT:  Any objection?

2    MR. CANNICK:  No objection.

3    THE COURT:  Okay.  That's in evidence.

4    (Government Exhibit 68 so marked.)

5    MS. GEDDES:  May I publish?

6    THE COURT:  Yes.

7  Q    Now, you said that you knew this individual shown in

8  Government Exhibit 68 as Nephew.  Who referred to this person

9  as Nephew?

10 A    The defendant.

11 Q    Without saying it, do you know this individual -- is that

12 a real name, Nephew?

13 A    No, that's just what the defendant called him.

14 Q    Do you know this individual's true name?

15 A    I do not, no.

16 Q    And other than Nephew, do you know any other names for

17 him?

18 A    No, that's the only name the defendant would call him.

19 Q    Do you remember what led to your meet, the defendant

20 introducing you to Nephew?

21 A    He had been expressing someone that he wanted me to meet

22 under the name Nephew, however, the first time that I do

23 recall being with him was a punishment.

24 Q    Before you describe what the punishment is, do you

25 remember what led to the punishment?

1  A    Yes.  I had been pairing off which was one of his rules

2  that I had broken.

3  Q    And when you say "pairing off," what do you mean by that?

4  A    Meaning that me -- even though me and the other girls all

5  lived together and spent a majority of our time together,

6  there was specific things that even we cannot talk about

7  together, like, unless it was like things that he would

8  consider innocent like hair, nails, TV shows.  If there was

9  anything outside of that, we would get in trouble for

10 discussing it.

11 Q    So, for example, what would be a type of thing that you

12 understood you were not supposed to discuss with the other

13 women living with the defendant?

14 A    Anything about my family, anything about my previous life

15 before I had met him or anything that I was doing beforehand

16 and also, like, our personal relationship.

17 Q    And when you say "our personal relationship," whose

18 relationship are you referring to?

19 A    Me and the defendant.

20 Q    So you said that you had been pairing off.  How did the

21 defendant learn -- had you, in fact, been pairing off, to use

22 your word?

23 A    Yes.

24 Q    And how did the defendant learn about that?

25 A    Because I had told him.

Jane - direct - Geddes                    1037

1   Q    What led you to tell the defendant about that?

2   A    I recall that we were at a hotel and he was with his

3   assistant Diana and he had been boasting to her and, you know,

4   telling her how happy I had made him and I felt very guilty

5   knowing that I had paired off prior to him coming, telling me

6   to come down to the pool.

7   Q    And you said, "to come down to the pool."  Where were

8   you?

9   A    We were at a hotel.

10  Q    And were you in the pool area of that hotel?

11  A    Yes.  He was sitting, like, at a cabana.

12  Q    And who else was with him?

13  A    Diana.

14  Q    What happened when you went down to the pool area?

15  A    He had told -- he had expressed to Diana, like, his

16  affection for me and how he basically wanted to spend the rest

17  of his life with me.

18  Q    What did you do?

19  A    I was happy but I felt guilty inside.

20  Q    So what, if anything, did you tell the defendant?

21  A    I just went along with what he said but afterwards, he

22  did tell me to go back up.

23  Q    To go back up to where?

24  A    To my hotel room.

25  Q    What happened?

Jane - direct - Geddes                1038

1  A    When I did get back up to my hotel room, I did tell him

2  that there was something that I had been keeping from him and

3  when I told him, he immediately told me to go back to the tour

4  bus.

5  Q    And where was the tour bus parked?

6  A    It was outside of the hotel.

7  Q    Now, when you were in the hotel room and you told the

8  defendant there was something you had been keeping from him,

9  did you tell him what it was that you had been keeping from

10 him?

11 A    I believe I told him along the lines of, that I had been

12 pairing off and that I had been speaking of things with Joy

13 and Nicq that I shouldn't have and before I got the chance to

14 go any further, he just told me to get my stuff and go back to

15 the tour bus.

16 Q    And when you said he told you to get your stuff, what did

17 you understand the defendant wanted you to do?

18 A    Like, basically, I was, it was I wasn't going to be, as a

19 punishment, I wasn't going to be allowed to stay in the hotel.

20 Q    So were you packing up all your belongings?

21 A    Yes.

22 Q    Where was the tour bus parked at the time?

23 A    It was usually -- the tour bus was usually parked on the

24 side or the back of the hotels.

25 Q    Did you, in fact, then go to the tour bus?

Jane - direct - Geddes                    1039

1   A    I did, yes.

2   Q    Who, if anyone, else was on the tour bus when you got

3   back there?

4   A    Me, Joy and Nicq.

5   Q    And, again, just to be clear, Joy and Nicq, were those

6   the women living with the defendant at the time?

7   A    Yes, they were.

8   Q    What happened when you got back to the tour bus?

9   A    He basically had said that he already knew exactly what

10  we had did and for us to puke which we all did.

11  Q    And what do you mean by "for us to puke"?

12  A    Usually when he said that, we knew that we would have to

13  be honest and not leave out any little detail.

14  Q    And what is it that you were being honest -- were you

15  then, in fact, honest with the defendant?

16  A    Yes, we were.

17  Q    What was it that you were being honest with the defendant

18  about?

19  A    Basically, we had a conversation and we had discussed our

20  personal relationships with him, basically, like, making each

21  other upset.  All of us had basically said, Oh, I'm closer to

22  him because of X, Y, Z or I'm closer to him because we do this

23  or we do that, and that's not something we were ever supposed

24  to share with one another, what we did personally with the

25  defendant.

1   Q    And when you say "we," who, again, are you referring to?

2   A    Me, Joy and Nicq.

3   Q    Now, you said that the defendant told you to sort of tell

4   him everything?

5   A    Uh-huh.

6   Q    And used the word "puke."  Did you each of you then do

7   that?

8   A    Yes, we did.

9   Q    What happened after that?

10  A    Afterwards, he told all of us to go to the back on the

11  bed and to take off all our clothes and he began to chastise

12  us.

13  Q    And you said he told you to go to the back on the bed.

14  Where was the bed?  Were you still on the tour bus?

15  A    Uh-huh.

16  Q    Where was the bed?

17  A    The bed is all the way in the back of the tour bus and he

18  made all of us lay down naked side by side.

19  Q    You, Joy and Nicq?

20  A    Yes.

21  Q    What happened?

22  A    He then began to hit all of us about 15 times.

23  Q    What did he do -- what did he use to hit each of you?

24  A    He used his open palm.

25  Q    And where on your body did he hit you?

Jane - direct - Geddes                    1041

1  A    He hit us on our butt and on our legs.

2  Q    And when you say that he hit you 15 times, do you mean

3  that he hit each of you 15 times?

4  A    Yes.

5  Q    What happened after that?

6  A    After that, he then separated us and he continued to hit

7  me more.

8  Q    Where did he -- how did he separate you?

9  A    He told Joy to go to the front of the bus and Nicq to go

10 to the bunk bedroom and I stayed in the back and he continued

11 to hit me more.

12 Q    Was there a separate room on the bus with bunk beds?

13 A    Yes.  There's two doors.  So when you first walk onto the

14 tour bus, it's, like, the living and kitchen area and then

15 there's a middle room that has bunk beds that are usually for,

16 like, if you're traveling with multiple guests and beyond that

17 door is a master bedroom that no one was allowed in.

18 Q    And which of those rooms were you in?

19 A    The master all the way in the back.

20 Q    And is that where he, the defendant had initially hit

21 each you, Joy and Nicq?

22 A    Yes.

23 Q    And when the defendant was hitting you after he separated

24 you from Joy and Nicq, how was he hitting you?

25 A    He was just hitting me all over because he was

Jane - direct - Geddes                    1042

1    frustrated.  He said that I was the closest to him.

2              MR. CANNICK:  Objection.

3              THE COURT:  Overruled.

4    Q    What did he say?

5    A    He said that I was the closest to him and I should have

6    known better.

7    Q    And what was he using to hit you then?

8    A    Just open palm, just slapping me and hitting me all over.

9    Q    What happened after that?

10   A    He then said that I would have to make up for it and that

11   he was going to think of a punishment and he left off the bus.

12   Q    Whose term, who used the term "punishment"?

13   A    The defendant.

14   Q    Did you eventually learn what that punishment was?

15   A    Yes, I did.

16   Q    When did you learn?

17   A    He told me that I would -- he came back on the tour bus

18   and said that I would be meeting with somebody by the name of

19   Nephew.

20   Q    And was that the individual shown in Government

21   Exhibit 68?

22   A    Yes, it was.

23   Q    Where, if anywhere, did the defendant tell you to go?

24   A    He told me to get my things together and he gave me the

25   key to our room and he told me to go up to the room and

Jane - direct - Geddes                    1043

1   freshen up and put on something skimpy and let him know when I

2   was ready.

3   Q    What did you do?

4   A    I did exactly what I was told.

5   Q    Now, at the time when you were carrying out what the

6   defendant told you to do, what, if anything, had the defendant

7   told you about Nephew?

8   A    He had mentioned Nephew a few times and he had expressed

9   to me that Nephew was a person that he had been grooming also

10  since he was young.

11  Q    Do you remember the words that the defendant used?

12  A    Yes, he said that he had been grooming Nephew since he

13  was young like me.

14  Q    What happened next?

15  A    I then went up to the hotel room and I had freshened up

16  and put on something skimpy and the defendant knocked the same

17  knock that he usually does.  I opened the door and I then went

18  into the master bedroom which had a door and he stayed in the

19  living room area.  And then in about 15 minutes, he came into

20  the master bedroom and he told me that Nephew will be coming

21  in here and to basically be into it just like I am with him

22  and to, to be into it and not to, like, act any type of way.

23  Q    Now, you said that the defendant knocked on the door the

24  way he did.  What did you mean by that?

25  A    The defendant had a specific knock and that's how we knew

Jane - direct - Geddes                          1044

1    it was him every time so we would know to open the door.

2    Q    What was the knock?

3    A    (Indicating.)

4    Q    When you answered --

5              THE COURT:  Do you want to describe that for the

6    record?

7              MS. GEDDES:  I can try.  Let the record reflect that

8    the witness just did a knock of four separate knocks in a

9    little bit of a rhythm.

10   Q    Is that correct?

11   A    Yes.

12             THE COURT:  I think it was six.

13   Q    Do you want to do it again?

14   A    Five?  (Indicating.)

15   Q    Five.  Sorry about that.

16             MS. GEDDES:  Let the record reflect that there were

17   approximately five knocks.

18   Q    Is that right?

19   A    Yes.

20   Q    And was anyone with the defendant when he first entered

21   the room?

22   A    Any time we open a door, we know to stand behind it so

23   just in case he is with people, they can't see us, so I

24   wouldn't be seen.

25   Q    Okay.  So when you opened the door, did you see anybody

1   else?

2   A     No.

3   Q     Did you, in fact, go into the bedroom as the defendant

4   directed?

5   A     Yes, I did.

6   Q     What happened after that?

7   A     He then came in with an iPad and he told me to get into

8   it, that this was my punishment.  And shortly after, Nephew

9   had followed behind him naked.

10  Q     And when you said that the defendant told you to get into

11  it, what did he mean by that?

12  A     Meaning, like, not to embarrass him.

13  Q     Not to embarrass who?

14  A     The defendant.

15  Q     What did you understand that the defendant wanted you to

16  do with Nephew?

17  A     He wanted me to please Nephew the same way that I would

18  please him.

19  Q     And how did he want you to please Nephew?

20  A     By basically being into it and giving him, like, oral sex

21  and vaginal penetration.

22  Q     What happened -- did Nephew then come into the room?

23  A     Uh-huh.

24  Q     And what happened?  You said he was naked?

25  A     Yes.

Jane - direct - Geddes                           1046

Q     Where was the defendant when Nephew came into the room?

A     He was already in the room and he was also naked and he

had his iPad in his hand and then he had propped it up and he

had begin to instruct both me and Nephew what to do.

          (Continued on next page.)

1   DIRECT EXAMINATION (Continued)

2   BY MS. GEDDES:

3   Q     And what, if anything, did you notice about the iPad?

4   A     It was recording.

5   Q     What did the defendant instruct you and Nephew to do?

6   A     He had instructed us exactly -- he had basically talked

7   us through every single thing to do.

8           So if he wanted me to give Nephew oral sex, he would

9   say that.  And if he wanted Nephew to give me oral sex, he

10  would say that.

11  Q     And by "oral sex," do you mean that he wanted your mouth

12  on Nephew's penis; is that correct?

13  A     Yes.

14  Q     And when he wanted Nephew to give you oral sex, do you

15  mean that he wanted Nephew's mouth on your vagina?

16  A     Yes.

17  Q     Did both of those things happen between you and Nephew?

18  A     Yes.

19  Q     And did you want to have sexual contact with Nephew?

20  A     Never.

21  Q     Why did you?

22  A     It was a punishment.

23  Q     What did you think would happen if you did not have sex

24  with Nephew -- have sexual activity with Nephew at the

25  defendant's direction?

JANE - DIRECT - GEDDES                    1048

1   A    I would probably be left somewhere for a long time.

2        MR. CANNICK:  Objection.

3        THE COURT:  Sustained.

4   Q    Was that the only time that you saw Nephew?

5   A    No, there were a few occasions that the defendant had

6   made us get intimate.

7   Q    And when you say there are a few occasions the defendant

8   had made you be intimate, who are you referring to?

9   A    Me and Nephew.

10  Q    And by "intimate," do you mean that you had, at the

11  defendant's direction, sexual contact with Nephew?

12  A    Yes.

13  Q    Do you recall a time where you had sexual contact with

14  Nephew at the defendant's direction in the presence of

15  somebody else or when someone else was around beside the

16  defendant?

17  A    Yes.

18  Q    What happened?

19  A    There was an encounter once where the defendant had told

20  me, after he had cum, that he had been going back and forth

21  from room to room having vaginal penetration between me and

22  Joy with Nephew.

23  Q    And do you remember where that took place?

24  A    I do not remember specifically where that took place.  It

25  was either at the studio or the Trump.

JANE - DIRECT - GEDDES                    1049

1   Q    Were both of those places in Chicago?

2   A    Yes.

3   Q    When you say "the Trump," what are you referring to?

4   A    I stayed in the master room and Joy stayed in the rocking

5   chair room.

6   Q    And I'm sorry, is "the Trump" a residence?

7   A    Yes.

8   Q    And is that a building where the defendant lived for a

9   period of time?

10  A    Yes.

11  Q    And did you also live with the defendant there?

12  A    Yes, I did.

13  Q    And you stated that on -- the defendant told you what

14  happened after the fact; is that correct?

15  A    Yes.

16  Q    When that happened, did you know that Joy was in the --

17  whether it was the studio or the Trump -- at the same time as

18  you?

19  A    No, he just coming in the room every ten minutes.

20  Q    And who was it who had come in the room every ten

21  minutes?

22  A    The defendant and Nephew.

23  Q    And what would happen when the defendant and Nephew came

24  into the room?

25  A    We would have intercourse.

JANE - DIRECT - GEDDES                    1050

1    Q     Who would have -- who would have intercourse?

2    A     All three of us.

3    Q     And, again, did you want to be having intercourse with

4    Nephew?

5    A     No, I did not.

6    Q     And, again, why did you have intercourse with Nephew?

7    A     Because it was a punishment.

8    Q     Based on your prior experiences with the defendant, what,

9    if anything, did you think would happen if you didn't have

10   intercourse with Nephew at the defendant's direction?

11   A     I would --

12                MR. CANNICK:  Objection.

13                THE COURT:  I'll sustain it as to form.

14                The question is:  Why did you do it if you didn't

15   want to?

16   A     Because I would have gotten chastised regardless, so it

17   wouldn't have made a difference.

18   Q     And you testified about two different times when you had

19   sexual contact with Nephew at the defendant's direction.

20                Were there other times as well?

21   A     Oh, yes.

22   Q     You testified yesterday that there was a time when you

23   were living with the defendant and multiple women.  Over time,

24   did some of those women leave the defendant?

25   A     Yes, they did.

1   Q    And as of July of 2019, who, if anyone, was still

2   spending time with the defendant?

3   A    I don't necessarily recall the exact timeline of when

4   everyone left, however, in 2019, I believe it might have been

5   just me, Joy, and Nicq, or Meek could have possibly left

6   already by then.

7   Q    Was there a time when Meek did in fact leave the

8   defendant?

9   A    Yes, there was.

10  Q    And the individual you testified earlier yesterday about

11  who you called Vee, did she too leave the defendant?

12  A    Yes, she did.

13  Q    And Juice, did she too leave the defendant?

14  A    Yes, she did.

15  Q    Over the course of the time, the five years that you

16  spent with the defendant, did the defendant continue to

17  chastise you?

18  A    Yes, he did.

19          MS. GEDDES:  I'm showing the witness what's been

20  marked for identification as Government Exhibit 457, 458, 459,

21  and 460.

22          May I approach, Your Honor?

23          THE COURT:  Yes.

24          (Counsel approaches the witness.)

25  Q    Do you recognize the exhibits that I just showed you, 457

1  through 460?

2  A    Yes, I do.

3  Q    Generally speaking, what are they?

4  A    They are letters that I had written to the defendant

5  usually times when I didn't have a phone.

6  Q    And why would you write letters to the defendant on those

7  occasions?

8  A    If I had messed up or did something or broke a rule, I

9  would usually have to write letters.

10 Q    And who were you writing letters to?

11 A    To the defendant.

12            MS. GEDDES:  The government offers 457 through 460.

13            THE COURT:  Any objection?

14            MR. CANNICK:  None.

15            THE COURT:  Those are in evidence.

16            (Government Exhibits 457 through 460, were received

17 in evidence.)

18            (Exhibit published.)

19 Q    I want to begin with Government Exhibit 457.

20            This is two sides.  We're going to start at the

21 first side.

22            Can you read -- is this your handwriting?

23 A    Yes, that is.

24 Q    Can you read what you wrote in Government Exhibit 457?

25 A    At this point this isn't about making me better.  Your

1    pride -- sorry, and ego is involved and you can't forgive me

2    unless I suck up to you, or beg or plea or hug all over you to

3    forgive me.  When really as long as I'm trying you should be

4    thankful.  As long as I'm still apologizing and accepting my

5    chastising you should be happy because I have to be happy when

6    you don't want to poke me or go out with me.  I don't mind

7    accepting my chastising, but I'm not going to get spankings

8    over and over again because my apology isn't up to your -- to

9    your standards or doesn't feel your ego or -- doesn't feed

10   your ego because that's not what it's about.  As long as I'm

11   apologizing and --

12   Q    Turning 457 over.

13   A    -- accepting my chastising, that's all that matters.  I

14   don't want you to -- I don't want you to be able to say I'm

15   the reason nothing is being done because I'm not.  I accepted

16   my spanking, you walked out.  So this cycle isn't happening

17   because of me.  So you can go let Joy go get her passport.

18   You have the charger for your laptop.  Joy can check it for

19   you.  She has a email so she'll know how to work it.  I don't

20   want to be why everything is at a halt.

21        Do you mind moving it up a little bit?

22   Q    One moment.

23   A    I'm just really tired of arguing over stupid things that

24   don't even matter.  Things that if this was someone else you

25   won't even question it, yet everything with me is a problem.

JANE - DIRECT - GEDDES                    1054

1   And I am desperate to make us work, but I just don't know what

2   else to do to fix this.

3   Q    Now do you remember writing this specific letter?

4   A    I don't remember what had transpired, but I do remember

5   writing this letter, yes.

6   Q    How regularly did you write letters similar to this one?

7   A    Almost every two to three days.

8   Q    And looking back to the first side that you read, when

9   you said, "As long as I'm still apologizing and accepting my

10  chastising you should be happy."

11          What were you referring to in that?

12  A    Meaning that sometimes when I would apologize, if it

13  didn't like stroke his ego enough, an apology wouldn't suffice

14  enough at all times.

15  Q    And what did you mean by "chastising"?

16  A    Meaning like a spanking.

17  Q    And on the back of this, you referenced "Joy".

18          Is that the Joy who you previously testified about

19  and identified in a photo?

20  A    Yes.

21  Q    I'm now putting Government Exhibit 458, which is in

22  evidence, on the screen.

23          Can you read that to the jury, if you can see it?

24  A    I don't mind getting chastised but I'm not going to get a

25  spanking, apologize and then go through it all over again

1    because my apology isn't good enough or I don't beg you to

2    forgive me.  If Joy said I'm going to make a call in here or

3    step out?  And she said step out -- you wouldn't have asked

4    her why you would -- you wouldn't have asked her why.  You

5    wouldn't have got upset or anything yet me, everything I say

6    or do is always blown up and it's stupid stuff, doesn't even

7    matter and then when my apology isn't up to your standards the

8    cycle starts all over again.

9    Q    And there's an arrow, and I'm going to turn it over.

10   A    This isn't teaching, and I'm just tired of this same

11   cycle every time I may not hug you or beg you to forgive me,

12   but an apology is an apology.  And I don't know what more you

13   want from me.  I've apologized now.  We've had to go through

14   this all over again because you still feel some type of way

15   when it's not about either of our personal feelings.  It's

16   about me trying.

17   Q    Now the top of that second page that you read, you wrote

18   "that isn't teaching."

19   A    Yes.

20   Q    Had anyone used the word "teaching"?

21   A    The defendant saw chastising as teaching.

22   Q    How did you know that?

23   A    He would say that.

24   Q    And what is it that you understood the defendant meant by

25   that?

JANE - DIRECT - GEDDES                    1056

1    A    It was to help me.  The chastises were to help me.

2    Q    To help you do what?

3    A    Remember the way to act and be.

4    Q    According to whom?

5    A    The defendant.

6    Q    I'm now showing you what's in evidence as Government

7    Exhibit 49 and -- 459, I'm sorry.

8              What is on this -- what is shown on this front page?

9    A    A book.

10   Q    And if I flip it over?  Is there writing there?

11   A    Yes, there is.

12   Q    Do you remember -- and just to be clear, each of the

13   letters, 457 through 456 -- 460, you testified that those were

14   letters written by you, correct?

15   A    Yes, they are.

16   Q    Do you remember why you were writing on a book cover?

17   A    Because I had no paper.  And sometimes if I didn't have

18   paper and I was left somewhere, he would say to figure it out.

19   So I would just have to write on anything I could find.

20   Q    Can you read what you wrote in Government Exhibit 459?

21   A    I said:  The things you get angry over you wouldn't even

22   care about if it was someone else.  If Joy said she had to

23   make a call and you wanted her to do so in or out of the room,

24   you would say which do you think and she said out.  You would

25   say okay.  Then and drop it and leave it alone, yet with me, a

JANE - DIRECT - GEDDES                    1057

1  million extra questions that don't even matter.  I'm not

2  happy.  I'm not being fulfilled sexually and on top of that

3  I'm getting spankings nearly everyday.  This isn't what I want

4  my life to be, and I know you don't want this either.

5  Q    When you said in here "that I'm getting spankings nearly

6  everyday," what are you referring to?

7  A    The defendant was hitting me every day.

8  Q    And finally, I'm showing you what's in evidence as

9  Government Exhibit 460.  And I'm just going to start by just

10  holding it up.

11            What is it that you notice about 460?

12  A    The paper is torn.

13  Q    In half?

14  A    Yes.

15  Q    All right.  Just so the jury can see.

16            All right.  And then I'm going to put these two

17  pieces of 460 back.

18            Can you read that, please?

19  A    Yes.  The main issue is the things we argue over I don't

20  mind and will never mind being chastised because I've lied or

21  did something wrong.  I'm tired of you nitpicking stupid non

22  for profit reasons to start an argument.  This started because

23  you asked me where I thought I should have the call, which is

24  so stupid, then it led to you asking me why which is when I

25  lied, and I got a spanking and apologized.  Then you came in

1    here and wanted to argue because you thought I text you

2    because Joy text you.  I don't want to be with anyone that is

3    on edge looking for something to argue about.  Because that's

4    exactly what it feels like.  And if you argue with me and

5    nitpick everything I do because I lay or sit the closest to

6    you then I don't want this.  I mess up enough too much on my

7    own for you to --

8    Q    I'm going to turn it over.

9    A    -- want to argue even more on top of everything.  Because

10   whether I choose to feed your ego or not, whether I have a

11   little bit of remorse or overflowing with remorse an apology

12   is an apology and I don't want to be with anyone that has a

13   problem or challenges me on everything I do.  At this point

14   it's just nitpicking and too many arguments over dumb stuff.

15   And if you nitpick because I lay with you or I'm the closest

16   to you I don't want it.  I don't want any of this, that means

17   you're starting arguments purposely because I'm the closest to

18   you, or because I want to be the closest to you.  I mess up

19   enough on my own so for you to do this continuously on top of

20   me messing up, is just too much.  And I don't want it for you

21   at all if this is what I have to go through.

22   Q    Now, to be clear, I think on the first page of this you

23   wrote that:  "I will never mind being chastised because I've

24   lied."

25   A    Uh-huh.

JANE - DIRECT - GEDDES                    1059

1   Q     But as you sit here today, do you mind being chastised?

2   A     No.

3   Q     Did you want to be hit by the defendant?

4   A     No.

5   Q     So fair to say you do mind being chastised?

6              MR. CANNICK:  Objection.

7              THE COURT:  Overruled.

8              The question is today you wrote -- the question is

9   today -- well, you ask the question.

10  Q     Today, do you still feel the same way that you -- or do

11  you still feel the way -- maybe you never felt this -- but do

12  you feel the way that you wrote here where you said I don't

13  want to -- or I don't mind be being chastised?

14  A     No.

15             MR. CANNICK:  Objection.

16             THE COURT:  Overruled.

17  Q     How do you feel now?

18  A     I feel that I never deserved any of that.

19  Q     And did you want to be chastised then?

20  A     I did not.

21  Q     Now, yesterday you testified about certain letters that

22  the defendant told you to write containing falsehoods.

23             Do you recall that testimony?

24  A     I do.

25  Q     And you also testified about apology letters that the

LINDA D. DANELCZYK, RPR, CSR, CCR

1    defendant would have you write when you were in a room at the

2    defendant's direction.

3              Do you recall that?

4    A    Yes.

5    Q    The letters that you just read, shown in Government

6    Exhibit 457 to 460, which -- how would you describe those

7    letters, what were those?

8    A    Well, these letters would not be acceptable, so basically

9    what I was saying in these letters is that I would be

10   chastised, and then I would write this letter and he would not

11   accept it, and then I would be chastised again.

12   Q    Now, is this an example of one of the letters that you

13   said you wrote that contained falsehood and embarrassing

14   information?

15   A    What do you mean?

16   Q    Yesterday you testified about letters that you wrote

17   where you would admit to stealing something from the

18   defendant.

19   A    This is not -- these are strictly apology letters after

20   he had felt I had done something wrong.

21   Q    Okay.  So this is a different -- there were two types of

22   letters that the defendant had you write; is that correct?

23   A    Yes.

24   Q    Are you familiar with the Docuseries "Surviving R.

25   Kelly"?

1   A    I am familiar with it.

2   Q    Were you still living with the defendant at the time that

3   it was aired?

4   A    I was, yes.

5   Q    At the time that it was aired, what, if anything, did the

6   defendant say about it?

7   A    He did let us know ahead of time that there was a

8   documentary coming out about him and that everything was

9   false.  And he told us about a few of the women whom were a

10  part of it and that he had his attorneys send cease and desist

11  to Lifetime.

12  Q    And when you said "he told us," who do you mean by that?

13  A    Me and Joy.

14  Q    And were you the two individuals still living with the

15  defendant at the time the Docuseries came out?

16  A    Yes.

17  Q    What, if anything, did the defendant tell you to do if

18  the Docuseries came up while you were watching television?

19  A    We were to immediately change the channel.

20  Q    And while you were with the defendant, did you watch the

21  Docuseries?

22  A    Never.

23  Q    Did you and the defendant discuss making any public

24  statements following at that Docuseries?

25  A    No.  He had -- he had expressed to us that if there ever

JANE - DIRECT - GEDDES                    1062

1   came a time for us to speak and stand up, would we, and we

2   said, "Yes."

3   Q    Did he explain what he wanted you to do?

4   A    No.  He never said that we would actually be publicly

5   speaking.

6   Q    What, if anything, did you do to prepare for a

7   hypothetical time when you would make a public appearance?

8   A    Weeks prior to that, he had began telling us and making

9   us answer questions.

10  Q    And just to be clear, who is the "he" in that statement?

11  A    The defendant.

12  Q    And who is the "us"?

13  A    Me and Joy.

14  Q    When you say he had you answer questions, what do you

15  mean?

16  A    He would have us -- when he was around us, he would ask

17  us questions.  And when we were alone, he would tell us to

18  write down questions and write down our answers towards them.

19  And any answers that we stumbled upon or didn't know the

20  answer to, the right answer, to write it down so that when we

21  would see him we would go over it and he would give us the

22  proper answer.

23  Q    And was the proper answer always the truthful answer?

24  A    No, it was not.

25  Q    Did you eventually make a public appearance?

1  A    We did, yes.

2  Q    What did you make a public appearance on?

3  A    Gayle King.

4  Q    Where was that filmed?

5  A    At Trump Towers on the hotel sides.

6  Q    And at the time that you made the appearance on Gayle

7  King, where were you living?

8  A    At Trump Towers, on the residential side.

9  Q    So fair to say there were two parts of Trump Towers?

10 A    Yes.

11 Q    One side was the residence, and one side was the hotel

12 side?

13 A    Yes.

14 Q    Where was the defendant -- let me back up.

15      Who is Gayle King?

16 A    I don't know too much about her, I just believe that

17 she's a news anchor.

18 Q    And was it a TV appearance or a radio appearance or

19 something else?

20 A    It was a TV.

21 Q    And so it was filmed?

22 A    Yes.

23 Q    And where was the defendant -- who participated in the

24 Gayle King appearance?

25 A    The defendant, me and Joy.

JANE - DIRECT - GEDDES                              1064

1    Q    And when -- were you, in fact, interviewed by Gayle King?

2    A    Yes, we were.

3    Q    And when you say "we," who are you referring to?

4    A    Me and Joy.

5    Q    Were the two of you interviewed together?

6    A    Yes, we were.

7    Q    Where was the defendant while you and Joy were

8    interviewed by Gayle King?

9    A    He was also present in the hotel room.

10   Q    Were you truthful when you spoke to Gayle King?

11   A    I was not.

12   Q    What, if anything, did the defendant do during that

13   appearance during the time when you and Joy were being

14   interviewed by Gayle King?

15   A    He did a coughing, he usually does, which everyone knows

16   to let us know --

17            MR. CANNICK:  Objection.

18   A    -- he was near.

19            THE COURT:  Sustain as to the everyone knows part.

20            But he did a cough?

21   A    There's a very similar cough that he does.

22   Q    So what cough?

23            What did you understand he meant by that cough?

24   A    He was just letting us know that he was in the room with

25   us.

JANE - DIRECT - GEDDES                1065

1  Q    And what did you believe was the purpose of the defendant

2  letting you know he was in the room with you?

3          THE COURT:  Sustained.

4          That means don't answer.  Sorry.  That's all right.

5  Q    I want to direct your attention to the summer of 2019.

6          Did there come a time in the summer of '19 when you

7  stopped living with the defendant for a period of time?

8  A    Yes, there was.

9  Q    And during that period of time, did you decide to leave

10 the defendant permanently?

11 A    Yes, I did.

12 Q    Approximately when did that happen?

13 A    October 2019.

14 Q    And when you did that, did you move out of the Trump

15 Towers where you had been living?

16 A    I had, yes.

17 Q    At some point did you agree to meet with the government?

18 A    I did, yes.

19 Q    Do you remember when that first happened?

20 A    I believe that was in January of 2020.

21 Q    You testified yesterday that when you first saw the

22 defendant at that concert, or when you first saw the defendant

23 at the Dolphin Hotel you auditioned for him.

24          Do you recall that?

25 A    Yes, I do.

LINDA D. DANELCZYK, RPR, CSR, CCR

1  Q    And you testified that the defendant said he was going to

2  help you; fair to say?

3  A    Yes.

4  Q    What, if any, steps did the defendant take over the next

5  five years to further your musical aspirations?

6  A    None.

7  Q    While you were with the defendant, while you were still

8  living with the defendant, would you have described to others

9  your time with the defendant as abusive?

10 A    Yes, I would have.

11 Q    Would you have publicly said that, though?

12 A    At that time that I was with him, no.

13 Q    Would you now?

14 A    Yes.

15 Q    When did you start to do that?

16 A    It took me until January of 2020.

17 Q    After you had spent some time away from the defendant?

18 A    Yes.

19 Q    Have you had any contact with the defendant since January

20 of 2020?

21 A    I have not.

22          MS. GEDDES:  One moment.

23          (Pause in the proceedings.)

24          MS. GEDDES:  Nothing further, Your Honor.

25          THE COURT:  All right, I think this might be a good

Proceedings                                    1067

1    time -- unless you want to start, Mr. Cannick, I think this

2    might be a good time for a break.

3              MR. CANNICK:  Let's have a break.

4              THE COURT:  Okay.  So just 15 minutes or so.

5              Please don't talk about the case.

6              THE COURTROOM DEPUTY:  All rise.

7              (Jury exits the courtroom.)

8              THE COURT:  And the witness can step down.

9              (The witness steps down.)

10             THE COURT:  All right, everybody can have a seat.

11             Can I see counsel at the side for a minute, please?

12             (Continued on the next page.)

13             (Sidebar conference.)

14

15

16

17

18

19

20

21

22

23

24

25





Proceedings                          1070

1      (A recess was taken at 11:16 a.m.)

2      (In open court; Jury not present.)

3      THE COURTROOM DEPUTY:  All rise.

4      THE COURT:  Everyone can sit down.

5      All right, just before we begin, I think a couple of

6  the jurors are -- just want some clarity on the days that

7  we're taking off, and Donna has helpfully put together a list.

8      So we'll be off this Friday.  But I think -- am I

9  correct that the jurors have asked to work on the 3rd?

10     THE COURTROOM DEPUTY:  Yes.

11     THE COURT:  So just given how short we're going to

12 be week -- the next week, we will be working on September 3rd,

13 which is a Friday.

14     Then we'll be off obviously for Labor Day and for

15 the 7th and 8th, for Rosh Hashanah.

16     Then we'll be working the 9th and the 10th.

17     Then the following week, Thursday is Yom Kippur, so

18 we'll be off then, but we will be working on Friday.

19     But on the 15th, I think we'll probably end a little

20 early in case anybody, you know, has a dinner or something to

21 go to.  So we'll probably finish around 4 that day.

22     So I'm going to give the jury that schedule just

23 before you start your cross, Mr. Cannick.  Or I can do it at

24 lunch, too.  Maybe I'll do that.  All right.

25     MS. GEDDES:  Just you can do it.

Proceedings                                1071

1            (Pause in the proceedings.)

2            THE COURT:  Can I see the parties at the side for

3    one small thing?

4            (Continued on the next page.)

5            (Sidebar conference.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                              Sidebar                    1072
```

1              (The following occurred at sidebar.)

2          THE COURT:  I'm slightly concerned about, not only

3     is it relevant to you, Mr. Cannick, I think that Ms. Becker is

4     conflicted out of.

5              MS. GEDDES:  That's correct?

6          THE COURT:  I just don't know if you recall that --

7          MR. CANNICK:  I'll remind her.

8          THE COURT:  -- just in terms of if she is giving you

9     any input or feedback, but it is --

10         MR. CANNICK:  I understand.

11         THE COURT:  But I did make a ruling.  I think it's

12    before you joined.

13         MR. CANNICK:  No.  She's not giving me any advise or

14    any information about the witness.  Mr. Kelly is -- is using

15    her as a conduit, but other than that, she's just passing

16    messages.

17         THE COURT:  Okay, it just occurred to me that I

18    think you should be extra careful about it.

19         MR. CANNICK:  Sure.  I'll remind her right now.

20         THE COURT:  Thank you.

21             (End of sidebar conference.)

22             (Continued on the next page.)

23

24

25

JANE - CROSS - CANNICK                1073

1           (In open court; Jury not present.)

2           THE COURT:  All right, let's get the jurors.

3           (The witness resumes the stand.)

4           THE COURTROOM DEPUTY:  All rise.

5           (Jury enters the courtroom.)

6           THE COURTROOM DEPUTY:  You may be seated.

7           THE COURT:  Okay, everybody, we are ready to

8   continue with the cross-examination by Mr. Cannick.

9           Before we break for lunch, I'll go over our schedule

10  calendar-wise with you all.

11          So go ahead, Mr. Cannick.

12          MR. CANNICK:  Thank you.

13          THE COURTROOM DEPUTY:  The witness is reminded she's

14  still under oath.

15          THE WITNESS:  Yes, ma'am.

16  CROSS-EXAMINATION

17  BY MR. CANNICK:

18  Q    How far did you go in school?

19  A    Pardon me?

20  Q    How far did you go in school?

21          THE COURT:  I think your microphone might not be

22  working.  Okay.

23  BY MR. CANNICK:

24  Q    How far did you go in school?

25  A    High school.

JANE - CROSS - CANNICK                    1074

1  Q    How far in high school?

2  A    A high school diploma.

3  Q    You graduated?

4  A    I did, yes.

5  Q    And when was it that you graduated?

6  A    I graduated in 2016.

7  Q    2016?

8        Was there a graduation ceremony?

9  A    Yes, there was.

10 Q    What was the date of that graduation ceremony?

11 A    I do not recall.

12 Q    Did you attend?

13 A    I did, yes.

14 Q    Do you remember what time of the year it was?

15 A    I do not recall.

16 Q    Do you remember whether it was in January of 2016?

17 A    No, I believe it would have been later.

18 Q    Later?

19        Now before coming in and starting your testimony

20 yesterday, you had met with the government and gone over the

21 questions that they asked of you; am I correct?

22 A    Um, yes, I did.

23 Q    And how many times have you met with the government to

24 discuss your testimony prior to coming and giving testimony

25 here?

JANE - CROSS - CANNICK                    1075

1  A    I don't know.

2  Q    Well, more than five?

3  A    About, yes.

4  Q    And when was the last time you spoke with them about your

5  testimony?

6  A    Today.

7  Q    And what time today?

8  A    Before we began.

9  Q    Before you started this morning?

10 A    Uh-huh.

11 Q    And what about last night?

12 A    You asked me the last time.

13 Q    No, I'm asking you a new question.

14          What about last night, did you discuss your

15 testimony with them last night?

16 A    Um, not that I can recall, no.

17 Q    Did you have any meetings with them last night?

18 A    After -- after, no.

19 Q    And before yesterday, when was the last time you met with

20 them to discuss your testimony?

21 A    The day before I had come here.

22 Q    And do you recall what the day before was?

23 A    It was the day before yesterday.

24 Q    What was that day?

25 A    What is today's date?  Thursday?  Wednesday?

JANE - CROSS - CANNICK                    1076

1          THE COURT:  Today's Tuesday.

2   Q    You're looking to the government for an answer?

3   A    Sunday.  Sorry, Sunday.

4   Q    Sunday.

5          And what time did you start your meeting with them

6   on Sunday?

7   A    Probably around 11 a.m.

8   Q    And what time did you end on Sunday?

9   A    Probably around 6 p.m.

10  Q    So about seven hours on Sunday?

11  A    Yes.

12  Q    And before Sunday, when had you met with them before

13  Sunday?

14  A    Saturday.

15  Q    And how much time did you spend with them on Saturday?

16  A    About the same period.

17  Q    And before Saturday, when was the last time you spent

18  time with them?

19  A    About a week earlier.

20  Q    In that week, you met with them one day or two days?

21  A    About two days, yes.

22  Q    And the same amount of time?

23  A    Yes.

24  Q    And when you met with them, you went over documents; am I

25  correct?

JANE - CROSS - CANNICK                    1077

1  A    I did, yes.

2  Q    And they shared with you information about prior

3  interviews you had given; am I correct?

4  A    Yes.

5  Q    And they also shared with you these photographs that you

6  testified about here; am I correct?

7  A    Yes, they did.

8  Q    And they also shared with you other exhibits that they

9  had that they were questioning you about; am I correct?

10 A    Yes.

11 Q    Now also, you made a number of social media postings

12 about the facts of this case; am I correct?

13 A    It's been limited but, yes.

14 Q    I beg your pardon?

15 A    It's been limited but, yes.

16 Q    When you say "limited," how many?

17 A    Less than five.

18 Q    Less than five?

19        When was your last posting?

20 A    I do not recall.

21 Q    And you've monetized those postings; am I correct?

22 A    No, not all of them.

23 Q    I didn't ask you about all of them.  I said, my question

24 was:  Have you monetized them?

25        MS. GEDDES:  Objection.

JANE - CROSS - CANNICK                1078

1    THE COURT:  Well, why don't you -- when you say
2    "monetize," do you mean was she paid for them?
3    BY MR. CANNICK:
4    Q    You've written about the monetization of content; am I
5    correct?  You researched that, correct?
6    A    Yes.
7    Q    So you know what I meant; am I correct?
8    A    I do, yes.
9    Q    Now, I want to go to your testimony yesterday and today.
10        You just testified and told this jury about years of
11   abuse.
12        Do you remember telling us about that?
13   A    Yes.
14   Q    Okay.  When did this abuse begin?
15   A    In 2015.
16   Q    And you met with Mr. Kelly in 2000 -- you met him in
17   2015; am I correct?
18   A    Yes, I did.
19   Q    And according to you, you met with -- you met him as of
20   April 18th, 2015; am I correct?
21   A    I don't remember the specific date of the show, but, yes,
22   it was in April.
23   Q    Okay.  And you testified that there came a point in time
24   that you started living with him in 2015; am I correct?
25   A    Yes, that is true.

JANE - CROSS - CANNICK                    1079

1    Q    When was that day?

2    A    That is when school had ended and summer had begun I

3    begun living in Chicago.

4    Q    And the abuse started right then?

5    A    No.

6    Q    Did the abuse start a month later?

7    A    The abuse started, yeah, about a few months later.

8    Q    Okay, so it started a few months later.  And what was

9    the -- what was the nature of the abuse in a few months

10   later -- withdrawn.

11           When was it that school ended?

12   A    I don't recall.

13           MR. CANNICK:  Your Honor, may I approach the

14   witness --

15           THE COURT:  Sure.

16           MR. CANNICK:  -- to show her something see if it

17   refreshes her recollection?

18           MS. GEDDES:  Can you show us what you're showing?

19           MR. CANNICK:  (Proffering.)

20           (Counsel approaches the witness.)

21   BY MR. CANNICK:

22   Q    I want you to look at this document and see if it

23   refreshes your recollection as to when the school year ended

24   in 2015.

25           Look at the portion that's highlighted in yellow.

JANE - CROSS - CANNICK                    1080

1    A     Yes.

2    Q     May I have it back?

3    A     (Proffering.)

4    Q     After having looked at that document, does it refresh

5    your recollection as to when the school year ended in 2015?

6    A     It does.

7    Q     When did it end?

8    A     Beginning of June.

9    Q     Beg your pardon?

10   A     June.

11   Q     June what?

12   A     3rd.

13   Q     June 3rd?

14         And based on your testimony then, you moved to

15   Chicago with Mr. Kelly sometime after June 3rd, 2015?

16   A     I'm sorry, I should rephrase that.

17         I actually had left school probably about a week and

18   a half earlier.  I had turned in all of my work.

19   Q     So you left school prior to June 3rd, 2015?

20   A     Yes, that is accurate.

21   Q     And about -- you said the abuse started about two months

22   after that; am I correct?

23   A     Yes.

24   Q     And so that would be some time in August; am I correct?

25   A     That is the first time he hit me open palm, yes.

JANE - CROSS - CANNICK                    1081

1   Q    My question -- and if you don't understand my question,

2   please let me know.  My question is:  The abuse started some

3   time after August?

4           THE COURT:  Can I just clarify?  I'm so sorry,

5   Mr. Cannick.

6           When you said "abuse," are you referring to

7   something in particular?  A physical abuse?

8           MR. CANNICK:  Well, what I asked is that she

9   testified about a number of abuse during the time she spent

10  with him.

11          THE COURT:  I just think it might being good to

12  define what you mean by "abuse".

13  BY MR. CANNICK:

14  Q    What do you define abuse as being?

15          THE COURT:  Well, why don't you direct her to the

16  particular thing you want her to speak about.

17          I just think abuse is a broad -- all I'm saying is

18  if you can break it down.  Abuse is a broad term.

19  BY MR. CANNICK:

20  Q    When you said that my client abused you for the first

21  time, what was the nature of that abuse?

22  A    What time are you referring to?

23  Q    I'm asking you.  You said that my client abused you two

24  months after you started living with him.  I'm asking you

25  what's the nature of that abuse?

1   A    Okay.  There was a time that he did slap me open palm.

2   So that would possibly be the beginning of it, which is when I

3   told him my age, at the end of summer.

4   Q    The end of the summer.

5              And when he slapped you, he sent you home the next

6   day; am I correct?

7   A    Yes, he did.

8   Q    And the slap is sort of at you, according to you.

9              Now, when you went home, you were with your parents;

10  am I correct?

11  A    Yes, I was.

12  Q    You were with your family; am I correct?

13  A    Yes, I was.

14  Q    And you came back?

15  A    Yes, I did.

16  Q    When you were with your parents, did you tell them that

17  he slapped you?

18  A    I did not, no.

19  Q    Now, you testified and told us that you met Mr. Kelly in

20  April of 2015.

21             Now -- and you told him that you were 18 years old;

22  am I correct?

23  A    Yes.

24  Q    Now your parents told you to tell him that you were 18

25  years old; am I correct?

JANE - CROSS - CANNICK                    1083

1    A    No.

2    Q    Your parents did not tell you to tell him --

3              THE COURT:  I'm overruling the objection.

4    Q    My question is:  Did your parents tell you to tell him

5    that you were 18 years old?  Yes or no?

6    A    No, they did not.

7    Q    Now you testified and told us that when you went to this

8    concert and that you were in the B section?

9    A    The C section.

10   Q    The C section?  You weren't in the B section?

11   A    When we got there, they were together.  So people in the

12   C section could sit in the B section.

13   Q    I'm asking where were you?

14   A    The B section.

15   Q    B or C?

16   A    I was in the B section with my parents, but we had bought

17   tickets for the C section.

18   Q    And there came a point in time that you said that somehow

19   you got up to the -- to the pit.

20   A    Correct, yes.

21   Q    And prior -- at some point, either before the show or

22   while you were there, it was suggested to you by your mother

23   that you get Mr. Kelly's attention; am I correct?

24   A    I don't recall that.

25   Q    Now -- and when you got to be in the pit, you testified

JANE - CROSS - CANNICK                    1084

1   and told us yesterday that at some point Mr. Kelly grabbed

2   your hand or held your hand?

3   A    Yes, he did.

4   Q    Now, you were reaching your hand up to him; am I correct?

5   A    Correct.

6   Q    And you weren't the only one doing that, there were a

7   number of fans trying to reach him and get his attention; am I

8   correct?

9   A    Absolutely, yes.

10  Q    And he touched a number of hands as he performed a song;

11  am I correct?

12  A    Not actually true.  He only touched about ten people.

13  Q    Ten is not a number?

14          MS. GEDDES:  Objection.

15          THE COURT:  Sustained.

16  Q    So he touched more than your hand; am I correct?

17  A    Yes.

18  Q    Now, you testified and told us that he performed the show

19  pretty much to you?

20  A    Yes.

21  Q    Were you standing alone?

22  A    I was not.

23  Q    You're around other people; am I correct?

24  A    I was, yes.

25  Q    There are other fans at the show; am I correct?

JANE - CROSS - CANNICK                        1085

1    A     Yes, there was.

2    Q     They were right around you; am I correct?

3    A     Yes, they were.

4    Q     There were people who were in the back of you; am I

5    correct?

6    A     Yes, there were.

7    Q     Because you were in the pit; am I correct?

8    A     Yes, I was.

9    Q     And there were people behind you; am I correct?

10   A     Yes, there was.

11   Q     Immediately behind you; am I correct?

12   A     No.

13   Q     There weren't people sitting or standing behind where you

14   were?

15   A     Oh, yes.  In the pit, yes.

16   Q     Now there were people on the side, the right side of you?

17   A     Yes.

18   Q     And the left side of you?

19   A     Uh-huh.

20   Q     And in the pit there were people bunched around trying to

21   get attention and dancing; am I correct?

22   A     Not many people were in the pit.

23   Q     Speaking of dancing, you eventually got up on the stage;

24   am I correct?

25   A     I never got on the stage.

1    Q    You never get on the stage?

2    A    I never did, no.

3    Q    You didn't go on the stage and twerk on the speaker?

4    A    I sat on the speaker.  I didn't go on the stage.

5    Q    So you sat on the speaker?

6    A    Yes, I was on the speaker.

7    Q    Speaker was on the floor?

8    A    Yes.

9    Q    You danced on the speaker?

10   A    Yes.

11   Q    You twerked on the speaker?

12   A    I danced on the speaker.

13   Q    What dance did you do?

14            MS. GEDDES:  Objection.

15            THE COURT:  Overall do you remember what kind of

16   dance you did?

17   A    I danced just like everyone else.

18   Q    Do you know what a "twerk" is?

19   A    Yes, I do.

20   Q    Did you twerk?

21            MS. GEDDES:  Objection.

22   A    I was just moving my body just like everyone else.

23   Q    When you were moving your body like everyone else, you

24   were twerking; weren't you?

25            MS. GEDDES:  Objection.

JANE - CROSS - CANNICK                    1087

1              THE COURT:  Sustained.

2    A    Yes, I was.

3    Q    Okay.

4              THE COURT:  I sustained the objection, but...

5              THE WITNESS:  Oh, I'm sorry.

6              THE COURT:  It's all right.

7    BY MR. CANNICK:

8    Q    Now you testified that there came a point in time that

9    you got Mr. Kelly's number somehow.

10   A    His entourage gave it to me, yes.

11   Q    If my question asks a yes or no, please just give me a

12   yes or no.

13   A    Okay, sorry.

14   Q    And after you got his number, you told your parents; am I

15   correct?

16   A    Yes.

17   Q    And at some point you told your parents, in particular

18   your mother, that you think that Mr. Kelly was looking at you

19   and you think he likes you.

20   A    I don't recall.

21   Q    Now after you got his number, you made an effort to reach

22   out to him; am I correct?

23   A    I did, yes.

24   Q    And there was no response to your effort?

25   A    Yes.

JANE - CROSS - CANNICK                          1088

1    Q    And basically there came a point in time that your mother

2    reached out to him; am I correct?

3    A    Yes.

4    Q    And your mother started texting him?

5    A    Yes, she did.

6    Q    And your mother started pretending that she was you; am I

7    correct?

8    A    Yes, she did.

9    Q    And she -- he asked your mother how old you were?  How

10   old she was, pretending to be you?

11   A    I don't know.

12              (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Jane - cross - Cannick                    1089

1   EXAMINATION CONTINUES

2   BY MR. CANNICK:

3   Q    You read those messages between Mr. Kelly and your mother

4   pretending to be you, am I correct?

5   A    I didn't read all of them, no.

6   Q    Now, did you read one where he asked your mother for a

7   picture?

8   A    I just saw pictures, yes.  That's, basically, all I saw.

9   Q    And she sent him pictures of you, am I correct?

10  A    Yes, she did.

11  Q    Pretending to be you, am I correct?

12  A    Yes, she did.

13  Q    And one of the things that were sent was a video of you

14  dancing in your underwear, am I correct, singing and dancing

15  in your underwear, am I correct?

16  A    That's not true.

17  Q    That's not true?

18  A    Yes.

19  Q    Didn't send a picture of you singing and dancing in your

20  underwear?

21        MS. GEDDES:  Objection.

22  A    My mother?  No.

23  Q    You did.

24  A    Oh, me.  At a later -- at a later date, yes.

25  Q    How long did your mother keep up this texting to Robert

Jane - cross - Cannick                      1090

1    pretending to be you?

2    A    It was only probably about two days.

3    Q    Do you know how many texts were exchanged in that time?

4    A    I do not, no.

5    Q    Now, you didn't have to be 18 or older -- audition for

6    a -- for being a singer, am I correct?

7    A    No.

8    Q    Now, your parents were really invested in your music

9    career?

10   A    Yes, they did support me.

11   Q    Well, they did more than support you, they encouraged

12   you, am I correct?

13   A    Yes, they did.

14   Q    In fact, they put great pressure on you, am I correct?

15   A    I think they just supported me.

16   Q    Well, isn't it a fact that they beat you so that you

17   could --

18              MS. GEDDES:  Objection.

19              THE COURT:  Overruled.

20   BY MR. CANNICK:

21   Q    Isn't it a fact that they beat you in order to make you

22   practice your music?

23   A    Yes.

24   Q    That beating started when you were in Baltimore, am I

25   correct?

SAM     OCR     RMR     CRR     RPR

Jane - cross - Cannick                    1091

1          MS. GEDDES:  Objection.

2          THE COURT:  Could I see counsel at the side, please,

3   with the court reporter?

4          (Sidebar held outside the hearing of the jury.)

5

6

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    1092

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          THE COURT:  I just want to clarify where we're going

4     here.

5          I think I know, but I ruled pretrial that even if

6     the parents had pushed her into a relationship with him, that

7     that is, obviously, not a defense.  I mean they are what they

8     are, but I think that I'm right that the focus on the parents

9     right now is to support your theory that they and she

10    conspired to get money out of him?

11         MR. CANNICK:  Get money out of him, yeah.

12         THE COURT:  Extort him?

13         MR. CANNICK:  Yes.

14         THE COURT:  I don't know, I'm sure you have a good

15    faith basis for that, I'm not questioning that, but --

16         MR. CANNICK:  Basically, Your Honor, is that she had

17    no interest in music at this time, none.  The prosecutors

18    opened up yesterday saying that she was only interested in

19    pursuing her music and Mr. Kelly wanted sex.

20    ████████████████████████████████████████████████████

21    ████████████████████████████████████████████████

22    █████████████████████████████████████████████████████

23    ██████████████████████████████████████████████

24         THE COURT:  But I precluded inquiry into that.

25         MR. CANNICK:  Right, I'm not asking that.

Sidebar                                                          1093

1        THE COURT:  Right.

2        MR. CANNICK:  I'm trying to be very careful in

3   asking it in such a way to show that, basically, her parents

4   put great pressure on her and they were really invested in the

5   music career and really interested to try to get her together

6   with him.

7        THE COURT:  I don't think there's anything wrong --

8   I mean, first of all, the jurors are going to have a natural

9   curiosity about where the parents were, but I am going to give

10  them an instruction at the end that even if the parents didn't

11  have a problem with this, that they can't consent for a

12  17-year-old.

13       So, I mean there is going to be some kind of an

14  instruction about the limit to which they can consider the

15  parents' involvement.

16       MR. CANNICK:  I understand that.

17       THE COURT:  But I don't know, I am guessing -- I

18  want to give you some latitude here and I am doing that, but I

19  just want to make sure we are not crossing over into what I've

20  precluded.

21       So, I think you need to get to the point where you

22  say there is an extortion, which that's legitimate.

23       Whether her parents were abusive to her, I don't

24  think is consistent -- just let me finish -- is consistent

25  with that and I am not sure how relevant it is.

SAM      OCR      RMR      CRR      RPR

Sidebar                                          1094

1          Let me just hear from the prosecutor, and then I'll

2     hear from you.

3          MS. GEDDES:  First of all, the witness has now

4     established that she was, in fact, beaten by her parents.

5     That's now out there.  There is no basis to go further back

6     into her childhood and make her relive any abuse that she

7     suffered by her parents in front of everybody today.

8          This is not a trial of the witness's parents, and

9     that is what they're making this out to be.

10          You can go forward with your extortion theory in a

11     different way without -- I mean she lived in Baltimore years

12     earlier.  It's just not relevant when the abuse began or what,

13     frankly, the nature of the abuse is.

14          THE COURT:  I don't see that you're going into an

15     exploration of her childhood, are you?

16          MR. CANNICK:  Far from that.

17          MS. GEDDES:  But when did she --

18          THE COURT:  But let me just finish.

19          MS. GEDDES:  Sorry.

20          THE COURT:  Calm down.

21          If you have evidence that, and I am saying this

22     because you have to say you have a good faith basis that they

23     wanted to get money out of him, that's certainly an

24     appropriate area, but only to the extent that she's aware of

25     it.

SAM      OCR      RMR      CRR      RPR

```
                        Sidebar                        1095
```

1           And so, if there is some evidence that she's aware

2    of what her parents' motives are, that's fine.  But I think

3    there's been enough about whether her parents beat her.  I

4    mean I thought she testified that she was in the choir and all

5    these other things.

6           Are you saying that that wasn't her own choice?

7           MR. CANNICK:  No.

8           THE COURT:  She was in two choirs.

9           MR. CANNICK:  Right.

10          THE COURT:  And what's the basis for that?  Is that

11   in the materials?

12          I haven't read all the materials.

13          MS. GEDDES:  What is in the materials is that her

14   parents put pressure on her to succeed in the music world.

15          There's nothing in there saying that she didn't want

16   to do Patriot Singers or the other activities that they did.

17          But I still don't think we need to go any further

18   into any physical abuse that the witness -- that the vic --

19          THE COURT:  I mean to the extent that it's relevant,

20   I don't know, it seems marginally relevant, at best, to this

21   extortion business unless you are saying they forced her into

22   it, which I don't take that to be your argument.

23          MR. CANNICK:  No.

24          THE COURT:  I take it your argument is that they

25   are, basically, stage parents that don't really care about

```
                          Sidebar                        1096
```

1    their child's welfare and have turned sort of a blind eye to

2    what's happened to her, but I don't know how helpful that is

3    to your case.  But that's not my point.

4            MR. CANNICK:  Right.

5            THE COURT:  But if you have evidence that there is a

6    line of inquiry that she conspired with her parents to get

7    money out of him, perfectly fine.

8            MR. CANNICK:  Yes, we do.

9            THE COURT:  Let's go to that and stay away from --

10           MR. CANNICK:  Okay.

11           THE COURT:  -- her childhood.  Okay?

12           MS. GEDDES:  So, are we moving past any question --

13           THE COURT:  Why don't you let me -- stay in your

14   lane, I'll take care of it.

15           MR. CANNICK:  Absolutely, because I am not going to

16   listen to you.

17           (Sidebar concluded.)

18

19           (Continued on the following page.)

20

21

22

23

24

25

Jane - cross - Cannick                    1097

1      (In open court - jury present.)

2           THE COURT:  All right, let's move on.

3           MR. CANNICK:  Thank you.

4   EXAMINATION CONTINUING

5   BY MR. CANNICK:

6   Q    Now, you testified yesterday about some black panty that

7   you got at the show, am I correct?

8   A    Yes.

9   Q    And you testified and told us that Mr. Kelly gave it to

10  you?

11  A    Yes, he did.

12  Q    Okay.  This is when you were in the pit?

13  A    Yes.

14  Q    You weren't the only person that received the black panty

15  that night, am I correct?

16  A    No, I was not.

17  Q    And, in fact, the next day you went on social media about

18  it, am I correct?

19  A    I did, yes.

20  Q    And what did you put on social media about it?

21  A    I believe I made a post pertaining to the black panties

22  that he had given me.

23  Q    What did you say about the black panty?

24  A    I don't remember verbatim.

25           MR. CANNICK:  I am going to ask that I be allowed to

Jane - cross - Cannick                    1098

1   approach, Your Honor?

2           THE COURT:  Sure.

3           MS. GEDDES:  Your Honor, may I see it as well?

4   BY MR. CANNICK:

5   Q    Is that a public post that you referenced?

6   A    Yes.

7   Q    You made that?

8   A    Yes, I did.

9   Q    And you made that -- that's the post that you made

10  pertaining to the black panty?

11  A    Yes.

12  Q    Receiving the black panty?

13  A    Yes.

14          MR. CANNICK:  Your Honor, I am going to offer that

15  as a defense exhibit.

16          THE COURT:  Any objection?

17          MS. GEDDES:  None.

18          THE COURT:  Okay, that's in evidence.

19          MR. CANNICK:  I think this is N.

20          (Defense Exhibit N was received in evidence.)

21          MR. CANNICK:  And we are going to ask that it be

22  published, Your Honor, to the jury.

23          (Exhibit published to the jury only.)

24          THE COURT:  Is this jury only?

25          MR. CANNICK:  Yes, Your Honor.

1           THE COURT:  Okay.

2           (Pause.)

3           MR. CANNICK:  Thank you, Your Honor.

4    BY MR. CANNICK:

5    Q    Now, in April 2015 you were a member of the Patriot

6    Singers, you said?

7    A    Yes, I was.

8    Q    And how long had you been with that group?

9    A    I had been with that group the entire year.  You had to

10   audition.

11   Q    Okay.  And you testified yesterday about losing a

12   scholarship that you had received or scholarships you had

13   received for college.

14           Where were those scholarships, what schools?

15   A    No, no, no, I think you misunderstood me.

16           By me getting homeschooled, I could no longer be --

17   I could no longer be eligible to get those scholarships.

18   Q    So, you were never offered a scholarship?

19   A    No, but we were studying to.

20   Q    Now, when you -- in April of 2015 you were taking a break

21   from music, am I correct?

22   A    I don't recall.

23   Q    You don't recall whether or not -- you don't recall

24   whether or not you were taking a break from music?

25           MS. GEDDES:  Objection.

Jane - cross - Cannick                    1100

1                THE COURT:  Overruled.

2    A    I -- I actually was -- I don't think so.  No, I had just

3    actually shot a release single.

4    Q    And what was the name of that single?

5    A    It was called Liar Liar.

6    Q    And it was released at that time?

7    A    No, it was unreleased.  I believe we had just got back

8    the finalized edits.

9    Q    And when was it that you got back the finalized edit?

10   A    I believe it was in April.

11   Q    Was it before the concert or after the concert?

12   A    I believe it could have been before.

13   Q    Okay.

14               Well, when you met with the Government, didn't you

15   tell them that as of April 15th, around the time of this

16   concert, that you had taken a break from music?

17   A    As in break --

18   Q    Don't look at them, please.

19   A    I'm not.

20   Q    Answer my question.

21   A    No.

22   Q    Did you tell the Government during your meetings with

23   them that around April, the time of the concert, that you had

24   taken a break from music?

25   A    By break, I had been transitioning; yes.

Jane - cross - Cannick                    1101

1   Q    And when you say "transitioning," what do you mean?

2   A    Meaning that prior to April I had been doing shows making

3   income from doing cover songs, and I was transitioning into

4   releasing my own music.  So, I was taking a break.

5   Q    So, that's what you call taking a break?

6   A    Yes.

7              MR. CANNICK:  Your Honor, may we approach?

8              THE COURT:  Yes.

9              With the court reporter?

10             MR. CANNICK:  Yes, Your Honor.

11             (Sidebar held outside the hearing of the jury.)

12

13             (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

```
                          Sidebar                    1102
```

1           (The following sidebar took place outside the

2   hearing of the jury.)

3           THE COURT:  So, just before we begin, please don't

4   give instructions to the witness, I'll take care of that, if

5   you need it.

6           MR. CANNICK:  Okay.

7           THE COURT:  What is it you want?

8           MR. CANNICK:  Your Honor, in her 302 she clearly

9   stated that she was taking a break from music at around the

10  time that she had met Mr. Kelly.

11          THE COURT:  Right.

12          MR. CANNICK:  She was no longer interested in music

13  because of the pressure that her parents had put upon her, and

14  she's clearly lying about it now.  And when I -- I don't

15  want --

16          THE COURT:  You haven't shown her the statement.

17          MR. CANNICK:  I am going to show it to her.

18          THE COURT:  Okay.

19          MR. CANNICK:  I am going to show it to her.

20          THE COURT:  I thought you forgot.

21          MR. CANNICK:  No, I just have someone who is

22  retrieving it for me, but I think this is opening the door to

23  get in the fact that she -- why she's taking a break.  I don't

24  want to get into it, but she just has to own up to it.

25          THE COURT:  First of all, you were kind of opening

```
                          Sidebar                        1103
```

1    the door, not her.  But I think it's okay to ask her if her

2    parents were pressuring her.  That's fine.

3            MR. CANNICK:  Okay.

4            THE COURT:  We're just not going down the road into

5    when you were six --

6            MR. CANNICK:  I don't want to do that.

7            THE COURT:  -- and all those things.

8            So it's fine, we're talking about the time around

9    when it started, that's fine.

10           MR. CANNICK:  Okay.

11           THE COURT:  And obviously, just general rule, we are

12   not having, and I am not suggesting you would do this, but I

13   did preclude inquiry into a number of areas, which I'm sure

14   you remember, but anything around the area you can show her

15   the --

16           MR. CANNICK:  Okay.

17           THE COURT:  -- I don't need to tell you how to do

18   that, sorry.

19           (Sidebar concluded.)

20

21

22

23           (Continued on the following page.)

24

25

```
         SAM     OCR     RMR     CRR     RPR
```

Jane - cross - Cannick                    1104

1          (In open court - jury present.)

2          THE COURT:  Whenever you're ready, Mr. Cannick.

3          MR. CANNICK:  Okay, thank you.

4   EXAMINATION CONTINUES

5   BY MR. CANNICK:

6   Q    Now, your parents proposed a number of business deals

7   with Mr. Kelly, am I correct?

8   A    Yes, they did.

9   Q    And one of the business deals that they proposed to

10  Mr. Kelly was to endorse a bluetooth dildo, am I correct?

11  A    That is correct, yes.

12  Q    And, in fact, they made a number of efforts to try to get

13  him to do this, am I correct?

14  A    Yes.

15  Q    And the feature of this dildo was in use, it would sing

16  Mr. Kelly's music, correct?

17  A    Correct, yes.

18  Q    And it was your mother who was pretty much promoting

19  this, am I correct?

20  A    I don't remember which one of them it was.

21  Q    And Mr. Kelly refused, am I correct?

22  A    No, he actually told them to give him a proper proposal.

23  Q    Did they give him a proper proposal?

24  A    I don't know.

25  Q    At your graduation, didn't your mother approach Mr. Kelly

1   again about endorsing this bluetooth dildo and he refused?

2   A    No, at graduation that's when he told them to send him a

3   proper proposal.

4   Q    And it's your testimony here today under oath that he

5   never rejected this proposal?

6              MS. GEDDES:  Objection.

7              THE COURT:  Overruled.

8              Do you recall whether he rejected the proposal?

9              THE WITNESS:  In their face, no.

10  BY MR. CANNICK:

11  Q    Do you recall him ever rejecting the proposal?

12  A    He did confide in me later, yes.

13  Q    What was that?

14  A    He just said that it was not something that he could ever

15  do.

16  Q    Not something he could ever do, right?

17  A    Correct.

18             MS. GEDDES:  Objection.

19             THE COURT:  Overruled.

20             That's what he said?

21             THE WITNESS:  Uh-hum.

22             THE COURT:  All right, next question.

23  BY MR. CANNICK:

24  Q    They also tried to get him to fund a food truck, am I

25  correct?

Jane - cross - Cannick                    1106

1    A    I believe so, yes.

2    Q    And he declined that one as well, am I correct?

3    A    Yes.

4    Q    And your father tried to get him to let him operate

5    Mr. Kelly's lighting show for his concerts, am I correct?

6    A    Yes, he did.

7    Q    And Mr. Kelly declined that, am I correct?

8    A    Yes, he did.

9    Q    Then your mother tried to get a job working for

10   Mr. Kelly, am I correct?

11   A    I actually told her to do that.

12   Q    Okay.  But the answer to my question would be yes?

13   A    I asked her to do that, yes.

14   Q    No, I didn't ask --

15              THE COURT:  Let me.

16              Just do your best just to answer the question that

17   Mr. Cannick is asking you.

18              THE WITNESS:  Okay.

19              THE COURT:  Okay.

20              THE WITNESS:  Okay.

21              THE COURT:  Put the question again, Mr. Cannick,

22   please.

23              THE WITNESS:  Yes.

24              THE COURT:  Oh, the answer is yes; okay.

25              MS. GEDDES:  I think she was --

1          THE WITNESS:  I was asking to repeat --

2          MS. GEDDES:  -- asking him to repeat the question.

3          MR. CANNICK:  Could you read it back for me?

4          THE COURT:  Yes.  And I would just appreciate if

5    everyone would let me do my part of the job, I think I got it.

6    Okay?

7          All right, if you can read it back, that would be

8    fine.

9          (Question read.)

10   A    I would have to say that wasn't true.

11   Q    Well, your mother didn't try to get a job with Mr. Kelly

12   as an assistant?

13   A    I told her to do that.

14   Q    Your mother didn't try to get a job with Mr. Kelly as an

15   assistant?

16   A    Herself, no.  I told her to do that.

17          THE COURT:  But then did she do it?

18          THE WITNESS:  Yes, she did.

19          THE COURT:  Okay.

20   BY MR. CANNICK:

21   Q    Your mother didn't try to get a job with Mr. Kelly as his

22   driver?

23   A    Yes, she did.

24   Q    Did she get the job?

25   A    No, she did not.

Jane - cross - Cannick                    1108

1   Q    Now, at some point your mother told you to take pictures

2   and information regarding Mr. Kelly so it could be used, those

3   items could be used for potential blackmail, am I correct?

4   A    No.

5   Q    I'm not correct?

6   A    That is not true.

7   Q    And that is your testimony under oath here?

8   A    Yes.

9         (Pause.)

10        THE COURT:  Just tell the Government what you're

11  referring to, if you don't mind.

12        MR. CANNICK:  ███-2, page 2.

13        MS. GEDDES:  Thank you.

14  BY MR. CANNICK:

15  Q    Now, isn't it a fact -- isn't it a fact that you told the

16  Government in a meeting on January 9th, 2020 that before you

17  met Mr. Kelly you were taking a break from music and enjoying

18  life?

19  A    Yes, I was transitioning; yes.

20  Q    Now, you testified and told us yesterday that there was a

21  meeting that you had with Mr. Kelly at the Dolphin Hotel?

22  A    Yes.

23  Q    And you testified and told us the manner that you were

24  dressed when you went to that meeting, am I correct?

25  A    Pardon me?

Jane - cross - Cannick                1109

1  Q     You testified and told us yesterday about the attire that

2  you wore at that meeting, am I correct?

3  A     Yes.

4  Q     And there was a photograph of you in evidence that you

5  identified as the outfit that you wore on that day, am I

6  correct?

7  A     Yes.

8  Q     Now, when you met with the agent in this interview that

9  you had with them, you told them that you were dressed in

10 baggy clothes, am I correct?

11                THE COURT:  What kind of clothes?

12                MR. CANNICK:  Baggy.

13                THE COURT:  Okay.

14 A     To meet him?

15 Q     Isn't it a fact that when you met with the agents -- when

16 I say the agents, the Government?

17 A     Okay.

18 Q     Isn't it a fact that you told them that when you met with

19 Mr. Kelly on the date that you went to the Dolphin Hotel, that

20 you were dressed in sweat clothes?

21 A     No.

22 Q     And you're as absolute about that as anything else you've

23 testified to?

24 A     Yes.

25                MS. GEDDES:  Objection.

SAM      OCR      RMR      CRR      RPR

Jane - cross - Cannick                    1110

1          THE COURT:  Overruled.

2    BY MR. CANNICK:

3    Q    Now, and isn't it a fact that you told the Government in

4    your meeting with them that you had just gotten out of a

5    weightlifting class and you were sweating?

6    A    No, I told that to the defendant.

7    Q    Okay.

8          Now, when you had the meetings with the Government,

9    you were advised by the agents that they were government

10   officials, am I correct?

11   A    Yes, I was.

12   Q    And they advised you that making a false statement to a

13   government official is a crime, am I correct?

14   A    Yes, they did.

15   Q    And they told you the consequences of making that

16   statement, making a false statement?

17   A    No.

18   Q    But you know what a crime is, correct?

19   A    I do, yes.

20         MR. CANNICK:  Too many pieces of paper, Your Honor,

21   may I just have a moment to retrieve it?

22         THE COURT:  Yes.

23         (Pause.)

24   BY MR. CANNICK:

25   Q    Now, I asked you earlier about your mother seeking

SAM     OCR     RMR     CRR     RPR

1    employment with Mr. Kelly and you told me that it was -- that

2    was your suggestion.

3            Do you remember telling me that?

4    A    Yes, it was.

5    Q    Now, when you met with the Government did you tell them

6    that your mother suggested that she could be employed by

7    Mr. Kelly?

8    A    I don't remember.

9    Q    I'm going to show you this document and see if it

10   refreshes your recollection.

11           MR. CANNICK:  May I approach, Your Honor?

12           THE COURT:  Yes.

13   BY MR. CANNICK:

14   Q    Just direct your attention to the upper, to the upper

15   portion.

16   A    Okay.  Which part?

17   Q    Let me have that.

18   A    Sorry; the front or the back?

19   Q    This top paragraph.

20   A    Yes.

21   Q    Have you read the document?

22   A    Yes, I did.  Yes.

23   Q    Did that refresh -- did it refresh your recollection that

24   it was your mother who suggested that she get a job with

25   Mr. Kelly?

Jane - cross - Cannick                    1112

1    A    They could have did that inaccurately.

2    Q    I didn't ask you that, whether or not what they could

3    have done.

4    A    Yeah.

5    Q    What I'm asking you is did the document refresh your

6    recollection that it was your mother who asked -- who

7    suggested she get a job?

8    A    No, I still did suggest those jobs to my mother.

9    Q    So, after having read that --

10   A    Yes.

11   Q    -- it does not refresh your recollection?

12   A    No.

13   Q    But you read the document and you saw it there, am I

14   correct?

15   A    Yes, uh-hum.

16              (Pause.)

17              MR. CANNICK:  Your Honor, I am going to move to

18   another area.

19              THE COURT:  Okay.

20              MR. CANNICK:  I'm done with the 302's.

21   BY MR. CANNICK:

22   Q    Now, you testified there came a point in time that you're

23   at the Dolphin Hotel and that, according to you, my client,

24   Mr. Kelly, asked you to perform certain sexual function --

25   behavior on you?

1    A    Yes, he did.

2    Q    Okay.  And you testified that there came a point in time

3    that he actually did and then police came, am I correct?

4    A    Yes, that is true.

5    Q    And when the police came, you were still in the room, am

6    I correct?

7    A    I was in the restroom.

8    Q    But when the police were there, you were in the room, am

9    I correct?

10   A    Yes, I was.

11   Q    And you spoke to them, correct?

12   A    Yes, I did.

13   Q    They asked you your age?

14   A    They did, yes.

15   Q    You told them 18?

16   A    I did, yes.

17   Q    They asked you for identification?

18   A    I did, yes.

19   Q    You gave them identification, am I correct?

20   A    Yes, I did.

21   Q    They studied the identification?

22   A    Uh-hum.

23   Q    Is that a yes?

24   A    Yes.  Sorry, yes.

25   Q    And after they finished studying the identification, they

Jane - cross - Cannick                    1114

1    had you call your parents, am I correct?

2    A    Yes, I did.

3    Q    And you put the phone on speaker?

4    A    Yes, I did.

5    Q    And you spoke to your parents, am I correct?

6    A    I did; yes.

7    Q    Now, and your parents spoke to you in the presence of the

8    officers?

9    A    Yes.

10   Q    And they never asked you to come downstairs, am I

11   correct?

12   A    No, they did not.

13   Q    You didn't tell Mr. Kelly that, well, you know what,

14   enough of this, I'm going with the officers?

15   A    No, I did not.

16   Q    You didn't tell the officers that Mr. Kelly violated you,

17   am I correct?

18   A    I had not, no.

19   Q    In fact, according to you, you stayed in the room and

20   continued the sexual encounter with Mr. Kelly, am I correct?

21   A    I did, yes.

22   Q    And according to you, you stayed in the room and

23   continued the sexual encounter after the officers had left, am

24   I correct?

25   A    Yes, I did.

Jane - cross - Cannick                    1115

1   Q     And then according to you, you didn't want this to

2   happen, am I correct?

3   A     I did not want this to happen, no.

4   Q     And you felt violated, am I correct?

5   A     I did, yes.

6   Q     In fact, you were outraged, am I correct?

7   A     Yes, I was.

8   Q     But according to you, he came back into town and you got

9   back with him within a couple of days, am I correct?

10  A     No, he had flown me out to the city he was in.

11  Q     Well, isn't it your testimony that he stayed in town and

12  while he was in town you and he got back together sexually?

13  A     No, I think you misunderstood me.

14  Q     Don't tell me what I'm misunderstanding.

15          MS. GEDDES:  Objection.

16  Q     Okay?

17          MR. CANNICK:  It's either yes or no, Your Honor.

18          THE COURT:  I haven't said a word.

19          MR. CANNICK:  Okay.  I'm sorry.

20  BY MR. CANNICK:

21  Q     Didn't you testify yesterday that he was -- he was in

22  Orlando for a few other days and you and he got back together

23  a couple more times?

24  A     No, that's not what I said yesterday.

25  Q     Okay.

SAM      OCR      RMR      CRR      RPR

Jane - cross - Cannick                    1116

1           And so, after you felt so violated and outraged, you

2    flew out to meet him?

3    A    Under the impression he would teach me techniques.

4    Q    No --

5                THE COURT:  Just answer the question.

6                THE WITNESS:  Okay.

7                THE COURT:  You don't have to explain.  If there's

8    something that needs explaining, the Government can ask you on

9    redirect.

10               THE WITNESS:  Okay.

11               THE COURT:  So, what is the answer to Mr. Cannick's

12   question?

13               THE WITNESS:  Okay.  Can you reask it?

14   BY MR. CANNICK:

15   Q    After being violated, outraged and devastated, you flew

16   out to meet him, am I correct?

17   A    I did, yes.

18   Q    And how shortly after, was it, you were violated,

19   outraged and devastated, that you went out to meet him?

20   A    How soon?

21   Q    Yes.

22   A    Probable -- most likely, the next weekend.

23   Q    Did your parents go with you?

24   A    They did not.

25   Q    Did your -- do you have an older brother?

1   A    I do, yes.

2   Q    Did he go out with you?

3   A    He did not.

4   Q    Did a chaperone go out with you?

5   A    No, I had no chaperone.

6   Q    Do you have an older sister?

7   A    I do, yes.

8   Q    Did the older sister go out with you?

9   A    She did not, no.

10  Q    You went out by yourself, am I correct?

11  A    I did, yes.

12  Q    Did you tell your parents about the violation that

13  Mr. Kelly supposedly committed upon you before going out to

14  meet up with him?

15          MS. GEDDES:  Objection.

16          THE COURT:  Overruled.

17  A    Absolutely not.

18  Q    Did you tell anybody?

19  A    No one.

20  Q    Now, when you went out the first time, where did you go?

21  A    I believe we were on the west coast in LA.

22  Q    And you took time off from school?

23  A    I tried to go on the weekend.

24  Q    My question is did you take time away from school on this

25  trip?

1    A    I believe it was the weekend.

2    Q    Didn't you testify yesterday that that trip occurred on

3    the 21st of -- well, you tell me, what was the date of the

4    trip?

5    A    I don't -- I don't actually remember the date for

6    meeting, I would need the evidence.

7    Q    And where were you on that trip?

8    A    California.

9    Q    And you testified and told us yesterday that you were

10   flown out there by Mr. Kelly?

11   A    His assistant.

12   Q    Yes or no, ma'am.

13   A    Yes.

14   Q    Okay.  And you were shown a ticket yesterday for the

15   trip?

16   A    Yes.

17   Q    Where specifically did you fly?

18   A    To California.

19   Q    Does April 28th sound familiar, of 2015?

20   A    That does sound familiar, yes.

21   Q    Do you remember what day of the week April 15th [sic] was

22   in 2015 --

23            MS. GEDDES:  Objection.

24   Q    -- April 28th was in 2015?

25            THE COURT:  You're not objecting to that, are you?

1           MS. GEDDES:  No.

2           THE COURT:  Okay.

3    A    I don't know.

4           MR. CANNICK:  Your Honor, may I approach?

5           THE COURT:  Yes.

6    BY MR. CANNICK:

7    Q    I'll ask you to look at this and see if it refreshes your

8    recollection.

9           That's a calendar, right?

10   A    Yes.

11   Q    The calendar is for April 2015, am I correct?

12   A    Yes.

13   Q    What date is -- what day is April 28th?

14   A    It is on a Tuesday.

15   Q    That was a school day, was it not?

16   A    Yes, it was.

17   Q    Did you have school the following day?

18   A    I did, yes.

19   Q    Did you have school the following day?

20   A    I did, yes.

21   Q    So, the answer to my question earlier about whether or

22   not you took time away from school to go, the answer would be

23   yes, am I correct?

24   A    Yes, that is true.

25   Q    And you went with your parents' permission, am I correct?

Jane - cross - Cannick                              1120

1   A    Yes, I did.

2   Q    How long did you stay out on that trip?

3   A    I don't remember, but it was definitely days.

4   Q    Didn't you testify yesterday that you got stuck out

5   there?

6   A    Yes.

7   Q    And when you say "stuck," what do you mean?

8   A    Meaning that, like, if it was in the middle of a school

9   week, I wouldn't be returning until Sunday or Monday.

10  Q    Well, didn't you go to another concert on May 1st?

11  A    Yes, I did.

12  Q    Where was that concert?

13  A    I don't recall.

14  Q    And that concert was on the west coast, was it not?

15  A    I don't recall, I'm sorry.

16  Q    Does Stockton, California, sound correct?

17  A    Yes, that does.

18  Q    And you didn't fly home on -- in between going to the

19  west coast on the 28th of April and May 1st, did you?

20  A    I don't know.

21  Q    May 1st was a weekend, am I correct?

22  A    I don't --

23  Q    Let me show you this and see if it refreshes your

24  recollection.

25  A    Thank you.  Yes, May 1st is a Friday.

Jane - cross - Cannick                    1121

1    Q    So, you didn't fly back home after flying out on
2    April 28th, am I correct?
3    A    No.
4    Q    I'm not correct?
5    A    Oh, no, you are correct; sorry.
6    Q    And you said you went to Stockton, California?
7    A    Yes.
8    Q    And that was for a show, am I correct?
9    A    Yes.
10   Q    And you stayed at that show.
11            What was the next show that you then went to?
12   A    After California, I believe it was Las Vegas.
13   Q    And you didn't go back to the east coast, back to
14   Orlando, am I correct?
15   A    I don't know.
16   Q    You don't know whether or not you went back to your home
17   between then -- what was the show, the date of the show in Las
18   Vegas?
19   A    I don't recall the -- that's what I'm saying, I don't
20   recall the date of the show in Las Vegas.
21
22            (Continued on the following page.)
23
24
25

SAM     OCR     RMR     CRR     RPR

Jane - cross - Cannick                    1122

1    BY MR. CANNICK:  (Continuing)

2    Q    Now, I'm going to show you this document and see if it

3    refreshes your recollection as to the date of the concert in

4    Las Vegas.

5              (Pause.)

6    A    May 3rd.

7    Q    May 3rd was the date?

8    A    Yes.  2015.

9    Q    And you didn't fly back from Stockton to Orlando in

10   between the May 3rd and May 1st date, did you?

11   A    I don't think so.

12   Q    And what day of the week was May 3rd?

13   A    Oh, I don't know.  I'm sorry.

14             MS. GEDDES:  Your Honor, we'll stipulate that it was

15   a Sunday.

16             THE COURT:  Okay.  Thanks.

17   Q    And the next concert that you attended with Mr. Kelly was

18   where?

19   A    I don't know.

20   Q    Now, when was it that you actually left school to just

21   continue to fly around and go to these shows?

22   A    It was about the ending of May.

23   Q    Ending of May?

24   A    Yes.

25   Q    And before you left school to just fly around

Jane - cross - Cannick                    1123

1  consistently, how many shows had you attended before doing it

2  pretty much on a regular basis?

3  A    I guess whatever tours, shows he had did between April to

4  May.

5  Q    And it didn't matter if it was a school day or not, am I

6  correct?

7  A    It did matter, yes, actually.

8  Q    How so?

9  A    I would have to make up a lot of work when I would go

10 back to school, like I had to stay after school and make up

11 work.

12 Q    So you would make up attendance, right?

13 A    No.

14 Q    Either you're there or not there?

15 A    Yes.

16 Q    Now, and these shows that you are going around the

17 country with Mr. Kelly and his ensemble, your parents went

18 with you, am I correct?

19 A    No, they did not.

20 Q    No siblings, am I correct?

21 A    No.

22 Q    No chaperone, am I correct?

23 A    No.

24 Q    And the meeting that you had with Mr. Kelly at the

25 Dolphin Hotel, that was an audition, am I correct?

Jane - cross - Cannick                    1124

1    A    Yes, it was.

2    Q    Your parents didn't go with you to that audition, am I

3    correct?

4    A    No, they did not.

5    Q    You went there in skinny jeans, you said?

6    A    Yes, sir.

7    Q    Some type of cropped --

8    A    A crop top.

9    Q    Crop top?

10   A    The top was mesh, yes.

11   Q    Mesh?  And you went there, according to you, to audition

12   to see how he would evaluate your singing ability, am I

13   correct?

14   A    Yes, sir.

15   Q    And that was important to you, am I correct?

16   A    Very important.

17   Q    And that was important to your mother, am I correct?

18   A    Yes.

19   Q    And you testified and told us that there came a point in

20   time during your meeting, your initial meeting with Mr. Kelly

21   in the Sprinter van that he asked you for a kiss?

22   A    Yes, he did.

23   Q    Now, when he asked you for a kiss at that point in time,

24   this is before you went upstairs, am I correct?

25   A    Correct.

Jane - cross - Cannick                     1125

1   Q     And you got out of the van, am I correct?

2   A     Yes, we did.

3   Q     And how did you get to the Dolphin Hotel?

4   A     I had a car that my parents had given me.

5   Q     And when you got out of the van, you didn't go to your

6   car, turn it on and say, I'm getting the hell out of here,

7   correct?

8   A     No, they made me park my car.

9   Q     They didn't withhold your car; you could have had your

10  car again, am I correct?

11  A     They had the ticket.

12  Q     Right.  But you could easily go and get them, give them

13  the ticket to get your car?

14  A     I'm saying his entourage had the ticket.

15  Q     All right.  And your testifying, telling us that because

16  his entourage had the ticket, you couldn't get your car?

17  A     Yeah, no, it was a thing that went up, that you needed to

18  scan the ticket to get your car out of the parking.

19  Q     And so because of that, you had to go upstairs?

20  A     No, I didn't have to go upstairs because of that.

21  Q     Okay.  You could have gotten home, am I correct?

22  A     Yes.

23  Q     Now, you testified and told us that after you got

24  upstairs, Mr. Kelly asked you to relieve him, am I correct?

25  A     He did, yes.

1  Q    And he said that he needed to be relieved before he could

2  listen to you audition, am I correct?

3  A    That is true.

4  Q    And isn't it a fact when you met with the government, you

5  told them that, well, in one of the interviews, you told them

6  that Mr. Kelly basically was masturbating while you sang?

7  A    While what?

8  Q    While you were singing.

9  A    No, that's not -- I don't think you understood what I

10  said accurately.

11  Q    No.  My question -- it was nothing you told me, ma'am.

12  A    Okay.

13  Q    My question is isn't it a fact that when you met with the

14  government, you told them that Mr. Kelly was masturbating

15  while you sang?

16  A    I never said that, no.

17  Q    Never said that, right?

18  A    No, not that I recall.

19  Q    You never said it?

20  A    I don't recall saying that.

21  Q    Now, when you were meeting with the government, there was

22  someone in the room taking notes, am I correct?

23  A    I believe so, yes.

24  Q    There was more than one person in the room, am I correct?

25  A    Uh-huh.  Yes.

1   Q    And they were taking notes, multiple people were taking

2   notes of what you were saying, am I correct?

3   A    Yes.

4   Q    You saw them actually writing down as you were speaking,

5   am I correct?

6   A    Yes.

7   Q    Now, and you told us that Mr. Kelly made these entreaties

8   of you and you rejected him, am I correct?

9   A    I did, yes.

10  Q    And there came a point in time that he told that he would

11  take care of you for the rest of your life if you allowed him

12  to, to have sexual pleasure with you, am I correct?

13  A    He did, yes.

14  Q    And you never went home and told your parents any of

15  this, am I correct?

16  A    Never.

17  Q    And when your parents called up at the room -- well, when

18  you called your parents from the room, you had them on

19  speaker, you didn't tell them anything about this at all, am I

20  correct?

21  A    Of course not.

22  Q    And you testified that he had video, iPads out during

23  this encounter?

24  A    Yes.

25  Q    Okay.  And they were on?

1   A    Yes.

2   Q    And he was recording what was going on, am I correct?

3   A    No.  No.  No.  At that point, he was watching something

4   and I could not see what it was.  I just saw him pull out an

5   iPad.

6   Q    You just saw him pull out an iPad?

7   A    Yes.

8   Q    And you told the government about that during those many

9   meetings?

10  A    I believe so, yes.

11  Q    And your single is called, "Liar Liar," am I correct?

12            MS. GEDDES:  Objection.

13            THE COURT:  Overruled.

14  A    Yes.

15  Q    You testified earlier about the fact that there were a

16  number of women living with Mr. Kelly?

17  A    Yes.

18  Q    And I think you testified that there came a point in time

19  that some of them had left?

20  A    Yes.

21  Q    Now, a number of them lived there off and on, am I

22  correct?

23  A    No.

24  Q    I'm not correct?

25  A    You're not correct.

Jane - cross - Cannick                    1129

1  Q    Didn't Juice live there off and on?

2  A    No, Juice was with him twenty, like, almost every hour

3  out of the day.

4  Q    Juice didn't have a job?

5  A    No, Juice did not.

6  Q    Juice had a car, right?

7  A    No, Juice did not.

8  Q    And Juice -- when was it that she left, according to you?

9  A    I don't remember the, like when she left.  I just

10  remember the order of which girls left.  So I don't know if

11  that's helpful.

12  Q    And what about --

13          MR. CANNICK:  May I speak to the government?

14          THE COURT:  Sure.

15          (Pause.)

16  Q    I'm showing you what's been admitted into evidence as

17  Government Exhibit 76.

18          Did that person live in the house?

19  A    I don't know.

20  Q    Do you know who that person is?

21  A    I do, yes.

22  Q    Did you see this person in the house?

23  A    Yes, I would.

24          THE COURT:  Just to be clear, are we talking about

25  the house in Atlanta?

Jane - cross - Cannick                1130

1          MR. CANNICK:  Either house.

2          THE COURT:  Oh, okay.

3          THE WITNESS:  In Atlanta?

4          MR. CANNICK:  Either house.

5          THE COURT:  Did you see that person in -- this is my

6    fault.  I'm confused about where the houses are.  Atlanta and

7    Chicago, correct?

8          MR. CANNICK:  Yes.

9          THE COURT:  Okay, so --

10   A    Yes, I did.

11   Q    Now I'm confused?

12   A    You asked did I see her at the house.  Yes, I did, in

13   Chicago and both Atlanta.

14   Q    And was she living at the house in Chicago?

15   A    I, I don't know.

16   Q    Was she living at the house in Atlanta?

17   A    I don't know.

18   Q    When you saw her at the house in Atlanta, was it for one

19   day?

20   A    Usually he -- it was at his discretion.

21   Q    Don't tell me about --

22   A    I would only see her when he would want me to.

23   Q    When he would want you to.  Did you have dinners --

24   withdrawn.

25          The women who lived with Mr. Kelly, you would all

Jane - cross - Cannick                    1131

1  eat together from time to time, am I correct?

2  A    Yes.

3  Q    You would go to movies together, am I correct?

4  A    Seldom, yes.

5  Q    Did you go bowling together?

6  A    I don't recall going bowling.

7  Q    Did you go to picnics together?

8  A    We would go to parks.

9  Q    You would play volleyball together?

10  A    I don't recall that.

11  Q    You would have dinner together?

12  A    Yes.

13  Q    And that would be at all of the houses, am I correct?

14  A    Yes.

15  Q    And, basically, you functioned as family, am I correct?

16  A    I wouldn't call it a family, no.

17  Q    You wouldn't call it a family now but back then, you

18  operated as a family, correct?

19  A    Controlled, yes.

20  Q    Ma'am, you were there, am I correct?

21  A    I was.

22  Q    You stayed there, am I correct?

23  A    I did, yes.

24  Q    And you ate with them, am I correct?

25  A    I did.

Jane - cross - Cannick                    1132

1    Q    You went to the movies with them, am I correct?

2    A    Yes.

3    Q    Now, you testified yesterday about my client not

4    celebrating Christmas.  Do you remember telling us about that?

5    A    All holidays.

6    Q    All holidays.  Do you recall my, Mr. Kelly taking --

7    withdrawn.

8         Do you recall Mr. Kelly renting a house in

9    California for a Christmas holiday?

10   A    Yes, I do.

11   Q    Do you recall Mr. Kelly taking videos of all of you

12   during the Christmas holiday?

13   A    I do.

14   Q    Do you recall Mr. Kelly giving gifts on Christmas?

15   A    I do, yes.

16   Q    Do you recall Mr. Kelly specifically giving each of you,

17   at minimum, $10,000 to go and buy gifts for each other?

18   A    I do.

19   Q    So he's not -- he doesn't celebrate Christmas, no

20   holidays, in fact?

21   A    No.  What I said was they were delayed.

22   Q    My question is you testified and told us earlier that he

23   didn't celebrate any holidays and my question to you is --

24   A    That's not true.  I said the holidays were delayed and

25   that if he was not celebrating, I could have went home to my

1    family.

2    Q    You wanted to get that out, right?

3              MS. GEDDES:  Objection.

4              THE COURT:  Sustained.

5              Is this a good time to break?

6              MR. CANNICK:  A very good time.

7              THE COURT:  All right.  Ladies and gentlemen, we are

8    going to break.  Just before we do, I told you that I would,

9    and I'm not taking credit for this schedule, Ms. Greene did

10   this, but I just want to go over the days that -- anyway.

11   I'll stop.

12             So we are going to work through Thursday this week,

13   we'll be off on Friday.  Next week, we initially were going to

14   be off on the 3rd but because the following week, we have so

15   many days off, we're going to work on the 3rd, on Friday

16   the 3rd.  Then next week, we have Labor Day and two days of

17   Rosh Hashanah.  So we will not be working the 6th, 7th or the

18   8th, but we'll be back on the 9th or the 10th.  Then the last

19   week in September, Yom Kippur is on the 16th which is a

20   Thursday and we'll break a little bit early on the 15th in

21   case, you know, people have a dinner to go or something, but

22   we will be working on the 17th as well.

23             So if you have questions about that, why don't you

24   direct them to Ms. Greene.  All right?  I'm trying to make the

25   best use of the time we have and I think we're on schedule but

1134

1    now we're going to break for lunch.

2         Please don't talk about the case at all but enjoy

3    your lunches and I'll see you at 2:15.

4         (Jury exits.)

5         THE COURT:  All right.  The witness can step out.

6    We'll see you this afternoon.

7         Is there anything that we have to do before --

8    everybody can sit down -- before we break for lunch?

9         MR. CANNICK:  Nothing from us, Your Honor.

10        THE COURT:  Okay.

11        MS. GEDDES:  No, Your Honor.

12        THE COURT:  All right.  Thank you so much.  Have a

13   good lunch, everyone.

14        (Luncheon recess.)

15

16

17

18

19

20

21

22

23

24

25

1135

1                            AFTERNOON SESSION

2              (In open court; outside the presence of the jury.)

3              THE COURT:  I do want to put on the record you now

4    have binders that are just duplicates of exhibits that you've

5    already turned over but now they are organized by witness, I

6    assume, or just --

7              MS. GEDDES:  No, they're organized in the same

8    fashion that we previously had provided to the defendants in

9    electronic form.

10             THE COURT:  Okay.

11             MS. GEDDES:  But they're --

12             THE COURT:  They're all in nice binders?

13             MS. GEDDES:  Yes.

14             THE COURT:  Thank you so much.

15             Are we ready to get the witness?

16             MS. GEDDES:  Yes.

17             (The witness, JANE, resumes the stand.)

18             THE COURT:  And let's get the jury, please.

19             (Jury enters.)

20             THE COURT:  All right.  Ladies and gentlemen, I hope

21   your lunch was a good one.  We are ready to continue with the

22   cross-examination of the witness.

23             MR. CANNICK:  Thank you, Your Honor.

24             THE CLERK:  The witness is reminded she's still

25   under oath.

1          THE WITNESS:  Yes.

2    CROSS-EXAMINATION (Continued)

3    BY MR. CANNICK:

4    Q    You testified and told us earlier that there were some of

5    the live-in girlfriends of Mr. Kelly that left the

6    relationship.  Do you remember telling us about that?

7    A    Yes.

8    Q    Was someone by the name of Summer one of the --

9          THE CLERK:  The jurors can't hear you.

10   Q    Was someone by the name of Summer one of those

11   individuals?

12   A    I don't know her.

13   Q    Do you know someone by the name of Sara?

14   A    Who?

15   Q    Sara?

16   A    Sara?

17   Q    Yes.

18   A    No.

19   Q    Do you know someone by the name of, I don't want to call

20   names.  You mentioned someone by the name of Nicq?

21   A    Yes.

22   Q    She left the relationship at some point?

23   A    Yes.

24   Q    Didn't she come and go?

25   A    No.

Jane - cross - Cannick                    1137

1   Q    You left the relationship a couple of times as well, am I

2   correct?

3   A    Yes.

4   Q    And when you left the relationship, you went down to

5   Florida, am I correct?

6   A    Once.

7   Q    And you were with your family, am I correct?

8   A    Yes.

9   Q    Do you remember when that was?

10  A    I don't.

11  Q    And in the relationship, you had, provided by Mr. Kelly,

12  shopping sprees?

13  A    Yes.

14  Q    Visits to the spas?

15  A    Yes.

16  Q    Nail salons?

17  A    Yes.

18  Q    Uber account?

19  A    Yes.

20  Q    Lyft account?

21  A    Yes.

22  Q    Telephone?

23  A    Yes.

24  Q    IPad?

25  A    Yes.

Jane - cross - Cannick                    1138

1  Q    And then, of course, you had the services of the

2  assistants who Mr. Kelly engaged to provide services to you

3  and the other guests, his girlfriends?

4  A    Yes.

5  Q    And those people, their responsibility was to make sure

6  that you were serviced in terms of getting the things that you

7  requested of them, am I correct?

8  A    Yes.

9  Q    And sometimes that would include providing transportation

10 service as well, am I correct?

11 A    Yes.

12 Q    Now, I asked you earlier this morning that during your

13 interview with the government, whether or not you told the

14 government that your mother told you to take as many pictures

15 as you possibly could of you and Mr. Kelly together and to

16 include the crazy face ones kissing because she felt, you felt

17 that your mother wanted to exploit Mr. Kelly to the media and

18 take advantage of his finances.

19             MS. GEDDES:  Objection as to form.

20             THE COURT:  Yes, as to form.

21             Why don't you break it down?

22 Q    Isn't it a fact that you told the government during one

23 of your sessions with them that your mother told you to take

24 as many pictures of you and Mr. Kelly together?

25 A    Yes.

1   Q    And isn't it also a fact that you told the government

2   that she said to you, requested of you to include the crazy

3   face ones kissing, isn't that a fact?

4   A    I don't recall that, no.

5   Q    Well, I'm going to show you this document and see if it

6   refreshes your recollection.

7            MS. GEDDES:  What number?

8            MR. CANNICK:  Four, page 6.

9   Q    Directing your attention to the highlighted portion at

10  the bottom.

11           (Pause.)

12  A    Okay.

13  Q    Have you reviewed it?

14  A    Yes.

15  Q    Did it refresh your recollection --

16  A    It does.

17  Q    -- that your mother wanted you to take these pictures, as

18  many of them as possible, including the ones that you were

19  kissing?

20  A    Yes, I still don't --

21  Q    I didn't ask you what you think.  I asked you does it --

22  A    I still don't recall it.

23  Q    You don't recall it?

24  A    Yeah, no.

25  Q    But you were at the meeting with the government, correct?

Jane - cross - Cannick                    1140

1    A    I was, yes.

2    Q    And you testified earlier they took notes, am I correct?

3    A    Yes.

4    Q    You saw them writing, am I correct?

5    A    Yes, I did.

6    Q    And now, I asked you earlier whether you met with the

7    government in preparation of giving testimony to the jury, do

8    you remember me asking you that?

9    A    Yes.

10   Q    And you told me that you did a number of times.  Am I

11   correct?

12   A    Yes, sir.

13   Q    During that prep session, did the government and you go

14   over questions that you were likely to be asked on

15   cross-examination?

16   A    We did, yes.

17   Q    You did?  So the government prepped you for questions

18   that they thought you were going to be asked in

19   cross-examination, am I correct?

20   A    Yes.

21   Q    And this was one of the questions, am I correct?

22   A    Yes.

23   Q    And the government showed you this document, am I

24   correct?

25   A    No, I never saw any documents.

Jane - cross - Cannick                    1141

1   Q    But this is one of the questions?

2   A    Yes.

3   Q    Now, at that meeting, didn't you tell the government that

4   you felt that your mother wanted this to be done so that she

5   could exploit Mr. Kelly to the media?

6   A    I don't recall that.

7   Q    That's in the document you just read, am I correct?

8   A    It is, yes.

9   Q    And she wanted to exploit him because, according to you,

10  because you were only 17?

11  A    That's what's said in the document, yes.

12  Q    And, basically, you were the only person in that room

13  giving information to the government, correct?

14          MS. GEDDES:  Objection.

15          THE COURT:  Sustained.

16  Q    On the date that you were there being briefed by the

17  government, the dates, you were the only person giving the

18  government information about this incident, am I correct?

19          MS. GEDDES:  Objection.

20          THE COURT:  Overruled.

21          There was no other witness in there with you, was

22  there?

23          THE WITNESS:  No.

24  Q    So they were getting the information from you?

25  A    Correct.

1    Q    And now you testified earlier this morning and you told

2    us that when you were at those meetings, you saw documents, am

3    I correct?

4    A    Yes.

5    Q    And you're telling us now that this is not one of the

6    documents you saw?

7    A    I never saw any notes that were taken.

8    Q    No, not notes.

9    A    I've never seen any documents like that before.

10   Q    Now, I want to go back.  I asked you earlier this morning

11   about your dress when you went to the Dolphin to the audition

12   by Mr. Kelly and you told us that you wore skinny jeans and

13   the mesh blouse or crop top.

14   A    Yes.

15   Q    And I asked you isn't it a fact that you were just

16   coming, going there from your weightlifting class and you were

17   sweaty?

18   A    That is not true.

19   Q    Okay.  Now, again, you were debriefed by the government,

20   am I correct?

21   A    I was, yes.

22   Q    And you were the only person giving the government

23   information at the time you were in the room about your

24   visiting with Mr. Kelly to audition at the Dolphin, am I

25   correct?

Jane - cross - Cannick                    1143

1    A    Correct.

2    Q    Isn't it a fact that you told Mr. Kelly that -- that you

3    told the government, sorry, that the date you first met with

4    Mr. Kelly at the Dolphin, it was after school; that's what you

5    told them, right?

6    A    It was, yes.

7    Q    And you went on to tell them that you had been, you had

8    been weightlifting and was sweaty?

9    A    That was not accurate.

10   Q    You didn't tell them that?

11   A    What, what are you asking me?  Can you rephrase it?

12   Q    Didn't you tell the government that on the date that you

13   went to visit Mr. Kelly at the Dolphin hotel, you had been

14   weightlifting at school and you were sweaty?

15   A    I don't recall.

16   Q    Directing your attention to the bottom portion, the

17   highlighted portion, see if that refreshes your recollection.

18        (Pause.)

19   A    Yeah, I'm sorry, I don't recall.

20   Q    So let me ask you when you were there and being

21   debriefed, was anyone at this table taking notes from you,

22   taking the notes?

23   A    I don't remember.

24   Q    But they were all in the room, right?

25   A    Yes.

CMH      OCR      RMR      CRR      FCRR

Jane - cross - Cannick                      1144

1    Q    Okay.  Now, you testified before the grand jury in this

2    case, am I correct?

3    A    Pardon?

4    Q    You testified before the grand jury in connection with

5    this case, am I correct?

6    A    Correct.

7    Q    And you were sworn then, am I correct?

8    A    I was, yes.

9    Q    You were sworn to tell the truth just like you were here,

10   you were sworn when you came here, am I correct?

11   A    Correct, yes.

12   Q    Do you remember telling the grand jury:  He continuously

13   asked me over and over again to be intimate with him, I told

14   him that I just left school and I had gotten out of

15   weightlifting practice?

16   A    I do recall saying that, yes.

17   Q    So in the grand jury, you swore that you had just gotten

18   out of weightlifting class, am I correct?  Yes or no.  Am I

19   correct?

20            MS. GEDDES:  Objection.

21            THE COURT:  The objection is sustained.  Go ahead

22   but that objection is sustained.

23            Do you want to talk at the sidebar?

24            MR. CANNICK:  Yes.  Yes.

25            (Continued on next page.)

```
                          Sidebar                        1145
```

1           (The following occurred at sidebar.)

2           THE COURT:  I don't think there's an inconsistency.

3    I think the testimony on direct was that's what she told the

4    defendant.  I don't think she said that that's what actually

5    happened.  That's my recollection.

6           MR. CANNICK:  You're probably right, Your Honor.

7           THE COURT:  Well, it's a rare occasion.  So I don't,

8    I think that's the confusion and why the witness might be,

9    but --

10          MR. CANNICK:  Okay.  Okay.

11          MS. GEDDES:  That's my recollection.

12          THE COURT:  Is that correct?

13          MS. GEDDES:  Yes, Your Honor.

14          MR. CANNICK:  I stand corrected.

15          THE COURT:  Well, I just, I was explaining why I was

16   sustaining the objection.

17          MR. CANNICK:  Sure, and I appreciate it.

18          THE COURT:  I'm sure you do.

19          (End of sidebar.)

20          (Continued on next page.)

21

22

23

24

25

Jane - cross - Cannick                1146

1   BY MR. CANNICK:

2   Q    Now, you testified yesterday and told the jury that

3   although you had sexual encounters with Mr. Kelly, the first

4   time there was actual intercourse was at a trip in Stockton?

5   A    Yes.

6   Q    Now, when you met with the government to discuss this

7   case, that was back in 2019.  Am I correct?

8   A    Yes.

9   Q    And that was closer in time to the --

10  A    Sorry.  What year did you say?

11  Q    2019 when you first met with the government.

12  A    No, I believe -- no, I don't think.

13  Q    Was it in January of 2020?

14  A    Yes.

15  Q    So that was closer in time to the allegation than today,

16  am I correct?

17  A    Can you rephrase that?

18  Q    When you first spoke with the government about this

19  supposed intercourse, that was in 2020?

20  A    Yes.

21  Q    And the incident according to you occurred in 2015?

22  A    Correct.

23  Q    Okay.  And today, we're in actually 2021, right?

24  A    Correct.

25  Q    Now, when you spoke with the government, didn't you tell

1  them that the first time you had intercourse or penetration,

2  it was in Los Angeles?

3  A     I don't recall.

4            (Continued on next page.)

1    CROSS-EXAMINATION (Continued)

2    BY MR. CANNICK:

3    Q    Well, let's refresh your recollection.

4         (Counsel approaches the witness.)

5    Q    You've reviewed it?

6    A    Yes, I did.

7    Q    Isn't it a fact that the first time you had, according to

8    you from what you told the government, that you told the

9    government the first time you had actual intercourse with

10   Mr. Kelly it was in Los Angeles?

11   A    The location is not accurate.

12   Q    My question to you, ma'am, isn't it a fact that you told

13   the government that the first time that you had sexual

14   intercourse with Mr. Kelly was in Las Vegas?

15   A    No, I did not say Las Vegas.

16   Q    Okay.  And, again, if the government -- they were these

17   same people in the room; am I correct?

18   A    Correct.

19   Q    And they were taking notes; am I correct?

20   A    Yes, sir.

21   Q    What's what in the document; am I correct?

22   A    Yes, sir.

23        THE COURT:  I'm sorry, is it Las Vegas or Los

24   Angeles?

25        MR. CANNICK:  Los Angeles.

JANE - CROSS - MR. CANNICK                1149

1          THE COURT:  Okay.

2    Q    Now before coming in here and giving testimony to this

3    jury, you and the government went over where this first time

4    occasion of having intercourse with Mr. Kelly occurred; am I

5    correct?

6    A    Correct.

7    Q    You discussed that and went over Stockton versus Los

8    Angeles; am I correct?

9    A    That is correct.

10   Q    Because somewhere someone realized that it didn't add up;

11   am I correct?

12   A    No.

13         MS. GEDDES:  Objection.

14         THE COURT:  I'm just going is to sustain the

15   objection to the last thing last about adding up.

16         MR. CANNICK:  Okay.

17   Q    Isn't it a fact that Mr. Kelly was not in Los Angeles

18   until October of 2015?

19   A    I don't recall.

20   Q    Let's see if this refreshes you.

21         (Counsel approaches the witness.)

22   Q    I'm going to ask you to -- direct your attention to these

23   three pages that I'm handing to you and see if at that

24   refreshes your recollection?

25         MS. GEDDES:  What are you showing her?

LINDA D. DANELCZYK, RPR, CSR, CCR

1            MR. CANNICK:  His concert calendar.

2            MS. GEDDES:  May I see it?

3            MR. CANNICK:  I gave it to you.

4            MS. GEDDES:  I don't have it.

5            (Pause in the proceedings.)

6            MS. GEDDES:  Your Honor, may we have a brief

7    sidebar?

8            THE COURT:  No.

9            It is true that you can use anything to refresh

10   recollection, but just show the government what you're...

11           MR. CANNICK:  I did.

12           THE COURT:  Okay.

13           (Counsel approaches the witness.)

14   BY MR. CANNICK:

15   Q    Again, looking at these three pages, see if it refreshes

16   your recollection as to when Mr. Kelly first appeared in Los

17   Angeles in 2015.

18   A    Okay.

19   Q    You've read it?

20   A    Yes.

21   Q    Does it refresh your recollection as to when that --

22   withdrawn.

23           Does it refresh your recollection that the first

24   time Mr. Kelly appeared in Los Angeles in 2015 was in the

25   month of October?

JANE - CROSS - MR. CANNICK                    1151

1   A    Yes, that is true.

2   Q    Now yesterday and today you told us about the police

3   coming to the door when you and Mr. Kelly were in the Dolphin

4   Hotel, and you told us about the fact that you were on top of

5   him and according to you he was licking your butt.

6           And do you recall telling the government, in one of

7   those sessions, that when you met Mr. Kelly -- when you met up

8   with Mr. Kelly at the Dolphin Hotel in Florida in his room, he

9   masturbated in front of you while you were singing?

10  A    I don't recall that.

11  Q    See if this refreshes your recollection.

12  A    Which part?

13  Q    Right there (indicating).

14          Having read that, does that refresh your

15  recollection that you told the government that Mr. Kelly

16  masturbated while you were singing?

17  A    It is not.

18  Q    It does not?

19          But you -- it's in the document; am I correct?

20  A    Correct.

21  Q    And you saw them talking notes; am I correct?

22  A    Correct.

23  Q    You were the only person telling them about this

24  incident; am I correct?

25  A    Correct.

1  Q    Now, you testified and told the jury earlier that

2  Mr. Kelly did absolutely zero to help you further your musical

3  career.

4           Do you remember telling us that?

5  A    Correct.

6  Q    Now when you met with the government, you told them that

7  there was a time that Kelly would provide you 35 minutes to an

8  hour of music-related interests.

9           Do you remember telling them that?

10 A    I did, yes.

11 Q    And then you went on to tell the government that

12 practicing was hard for you, practicing music was hard for

13 you?

14 A    I don't recall saying that.

15           (Counsel approaches the witness.)

16 Q    You looked over it?

17 A    Yes.

18 Q    Does it refresh your recollection that you told the

19 government that practicing music was hard for you?

20 A    No, I don't recall.

21 Q    Okay.  But it's in the document; am I correct?

22 A    Correct.

23           MS. GEDDES:  Objection.

24           THE COURT:  Overruled.

25 Q    Now, do you recall telling the government further that

JANE - CROSS - MR. CANNICK                1153

1  Kelly told you that you were not pulling your weight as far as

2  your music career is concerned?

3  A    I don't recall that.

4           (Counsel approaches the witness.)

5  Q    Bottom portion right there (indicating).

6           You read it?

7  A    Yes, sir.

8  Q    Does it refresh your recollection that you told the

9  government that Kelly told you that you weren't pulling your

10 weight as far as your music career was concerned?

11 A    I don't recall that.

12 Q    But it's in the document, right?

13 A    Yes, it is.

14 Q    Now, you testified and told us earlier before lunch that

15 Kelly did not celebrate holidays.

16          Do you remember telling us that?

17 A    I said the holidays were celebrated delayed.

18 Q    Well, yesterday when you testified, you told us that he

19 did not celebrate holidays.

20          Do you remember telling us that?

21          MS. GEDDES:  Objection.

22          THE COURT:  Overruled.

23          Did you say that yesterday?

24          THE WITNESS:  I recall saying that they were

25 delayed.

JANE - CROSS - MR. CANNICK                1154

BY MR. CANNICK:

1

2  Q    You do recall being asked this question and giving this

3  answer.  Page 935.

4          "QUESTION:  What, if anything, do you recall

5  happening on December 28th of 2015?

6          "ANSWER:  Me and the defendant had gotten into an

7  argument.

8          "QUESTION:  And do you recall the nature of the

9  argument?

10         "ANSWER:  Yes, I do.

11         "QUESTION:  What was it about?

12         "ANSWER:  He had expressed to me that he didn't

13 celebrate holidays because he no longer had his family."

14         Were you asked those questions and give that answer?

15 A    Yes, correct.

16 Q    Okay.  Now, in that answer you didn't say it was delayed;

17 am I correct?

18 A    In that answer I said "he".

19 Q    And when you say "he," you were talking about Mr. Kelly;

20 am I correct?

21 A    Yes.

22 Q    And you told the jury that Mr. Kelly no longer celebrated

23 holidays, correct?

24 A    That's exactly what he told me.

25 Q    My question to you:  Is that not what you told the jury?

JANE - CROSS - MR. CANNICK                    1155

1   A    Can you rephrase it?

2   Q    Isn't it a fact that you told the jury yesterday that he

3   expressed to me that he didn't celebrate holidays because he

4   no longer had his family?

5   A    That he expressed to me, yes.

6   Q    And he -- you told the jury this under oath yesterday,

7   right?

8   A    Yes.

9   Q    Now Mr. Kelly celebrated family -- celebrated Father's

10  Day?

11              MS. GEDDES:  Objection.

12              THE COURT:  Overruled.

13  A    Yes.

14  Q    He celebrated Thanksgiving?

15  A    Yes.

16  Q    4th of July?

17  A    Yes.

18  Q    New Years?

19  A    Not that I can recall.

20  Q    Christmas?

21  A    Yes.

22  Q    Christmas -- huge Christmas tree every year, right?

23  A    Yes.

24  Q    Okay.  In fact, 40 feet?

25  A    Not every year.

JANE - CROSS - MR. CANNICK                    1156

1  Q    Not every year.

2       You've seen it, right?

3  A    Yes.

4  Q    And he gave out substantial gifts?

5  A    Correct.

6  Q    And some of -- some of the girlfriends went home for

7  Christmas; am I correct?

8  A    I never recall that.

9  Q    The picture that I showed you earlier today, didn't that

10 person go home one Christmas?

11 A    I don't recall that.

12 Q    Now Mr. Kelly would videotape Christmas holidays and

13 celebrations; am I correct?

14 A    Yes.

15 Q    In fact, he would videotape almost everything; am I

16 correct?

17 A    He would, yes.

18 Q    Trips to the beach?

19 A    Yes.

20 Q    Playing around the house?

21 A    Yes.

22 Q    He would just use his iPad or camera to videotape most

23 things; am I correct?

24 A    Can you rephrase that?

25 Q    He would use his camera or iPad to video on a daily basis

1   nonsexual events?

2   A    That is not true.

3   Q    At the times that you guys would hang out, he would

4   videotape; am I correct?

5   A    Correct, yes.

6   Q    How often would you hang out?

7   A    I would be with the defendant every day.

8   Q    No, my question, I said "hang out."

9        Are you going out or are you around the house?

10  A    Around the house.

11  Q    And he would videotape you around the house; am I

12  correct?

13  A    Correct.

14  Q    And he videotaped everyone around the house; am I

15  correct?

16  A    Correct.

17  Q    Now, you testified and told us yesterday that when you'd

18  go to the gym to watch Mr. Kelly play basketball, you could

19  not watch any other man.

20       Do you remember telling us that?

21  A    Yes.

22  Q    How could you watch him without watching other men?

23  A    I do not know, sir.

24  Q    But you said you did it, right?

25  A    I did, yes.

1    Q    But you don't know how you did it?

2    A    I actually stopped going to basketball.

3    Q    No, not that's not my question.  My question is:  Do you

4    know how you did it?

5         You said you did, and I'm just asking how did you do

6    it?

7    A    I would usually look by his shoes, and then when I would

8    find his shoes, I would look at him.

9    Q    What kind of shoes was he wearing?

10   A    He would usually -- we would pack his basketball bags, so

11   we would usually know.

12   Q    Beg your pardon?

13   A    We would pack his basketball bags, so we would usually

14   know what he was wearing.

15   Q    What kind of shoes was he wearing?

16   A    Workout shoes.

17   Q    Nikes?

18   A    Yeah.

19   Q    Air Force 1s?

20   A    No.

21   Q    Not Air Force 1s.  Okay.

22        And his shoes were different from every other person

23   on the court?

24   A    Correct.

25   Q    What color was his shoes?

1  A    What night are you referring to?

2  Q    Any night.

3  A    I mean his bags were packed every single day, so...  Any

4  night it could have been a different pair of shoes.  He had

5  over thousands.

6  Q    Okay.  So the colors that he would generally wear would

7  be white and black?

8            MS. GEDDES:  Objection.

9            THE COURT:  I don't understand the relevance of it.

10            MR. CANNICK:  They brought this up on direct

11  yesterday, so I'm just trying to explore her ability to see

12  the defendant, my client, without --

13            THE COURT:  Looking at other people?

14            MR. CANNICK:  Yes.  And looking at other people.

15            THE COURT:  All right.

16            Are we talking about just at basketball games?

17            MR. CANNICK:  That's what they asked.

18            THE COURT:  I'm just am asking you.

19            MR. CANNICK:  Yes, just at basketball games.

20            THE COURT:  Did you look at other men at basketball

21  games?

22            THE WITNESS:  I did, yes.

23  BY MR. CANNICK:

24  Q    Now you testified earlier and told us that at this

25  encounter at the Dolphin, Mr. Kelly recorded you?

JANE - CROSS - MR. CANNICK                1160

1   A     I never said that, no.

2   Q     You said he took out a camera.

3   A     At the Dolphin Hotel?

4   Q     Yes.

5   A     I said he took out an iPad.

6   Q     Did he record you?

7   A     I said I never saw what was -- what he did with the iPad.

8   Q     So you don't know if he recorded you or not?

9   A     I don't.

10  Q     When you spoke with the government one time, you told the

11  government that he recorded you every time except at the

12  Dolphin.

13        Do you remember telling them that?

14  A     I don't.

15        (Counsel approaches the witness.)

16  Q     Directing your attention to the bottom portion.

17        Isn't it a fact that when you met with the

18  government, you told the government that Mr. Kelly recorded

19  you every time except at the Dolphin?

20  A     I don't recall that.

21  Q     But it's in the document?

22  A     Yes, it is.

23  Q     And in the grand jury, you told the grand jury that he

24  recorded you every time you had sex with him.

25        Do you remember telling the grand jury that?

JANE - CROSS - MR. CANNICK                1161

1    A    I don't recall, I'm sorry.

2            MR. CANNICK:  Page 26.

3            (Counsel approaches the witness.)

4            MR. CANNICK:  I'm going to withdraw that question.

5            THE COURT:  Okay.

6    BY MR. CANNICK:

7    Q    Now, going back to the year Mr. Kelly told you he would

8    help you with your music, isn't it a fact that when you were

9    interviewed by the government regarding this issue, you told

10   the government that Mr. Kelly told you that you were lazy and

11   needed to concentrate on your music more?

12   A    I don't recall that.

13           (Counsel approaches the witness.)

14   Q    You read it?

15   A    Yes, sir.

16   Q    Isn't it a fact that when you were debriefed by the

17   government, you told them Mr. Kelly said you were lazy and you

18   needed to concentrate on your music more?

19   A    No, that's not accurate.

20   Q    But that's in the document, right?

21   A    Yes, sir.

22   Q    And you were the person imparting the information to the

23   government, correct?

24   A    Yes, sir.

25   Q    Now the government asked you about calling Mr. Kelly

JANE - CROSS - MR. CANNICK                    1162

1   "daddy".

2           Do you remember telling them that?

3   A    Yes, sir.

4   Q    Now, you said that Mr. Kelly asked you to call him

5   "daddy" the first time you met; am I correct?

6   A    I don't recall saying the first time we met.

7   Q    When was it that he first asked you to call him daddy?

8   A    I don't recall, but it was immediately.

9   Q    What's -- immediate is not the first time?

10  A    No, not the first time.

11  Q    Second time?

12  A    Yeah, I don't recall when, but I do know that it was

13  immediate.  I'm sorry.

14  Q    So you called him other names as well; am I correct?

15  A    Not after, no.  After he expressed that name, no.

16  Q    Well, didn't you call him "bear"?

17  A    Years later, yes.

18  Q    In fact, you would write him, up until 2019, calling him

19  "bear"; am I correct?

20  A    That is not true.

21  Q    Didn't you call him -- didn't you also call him "poppa

22  bear"?

23  A    Yes, I did.

24  Q    And you called him that up until 2019; am I correct?

25  A    Not from 2015, if that's what you're asking.

JANE - CROSS - MR. CANNICK                    1163

1    Q    No, what I'm asking you is what I just asked?

2             MS. GEDDES:  Objection.

3             THE COURT:  Overruled.

4    Q    Didn't you call him "poppa bear" up until 2019?

5    A    I did, yes.

6    Q    And he called you "momma bear"; am I correct?

7    A    That is true.

8    Q    And he had nicknames for the other girlfriends as well;

9    am I correct?

10   A    I never heard them.

11   Q    Well, isn't it a fact that you told the government that

12   he would call the other girls "cookie"?

13   A    I never said that.

14   Q    Never said it?

15   A    Never.

16             (Counsel approaches the witness.)

17   Q    Asking you to direct your attention to the last three

18   lines.

19             Isn't it a fact that when you met with the

20   government, you told the government that Mr. Kelly would call

21   the other girlfriends "cookie"?

22   A    That is not accurate.

23   Q    It's in the document, right?

24   A    Correct.

25   Q    And you're saying the government made all these errors;

1   am I correct?

2           MS. GEDDES:  Objection.

3           THE COURT:  Overruled.

4   A    I just said that is not accurate.

5   Q    If you didn't say it and it's in the document, then the

6   government must have made a mistake, correct?

7   A    Correct.

8   Q    It's multiple mistakes, as far as you're concerned,

9   correct?

10          MS. GEDDES:  Objection.

11          THE COURT:  Sustained.

12  Q    Now, you testified and told the jury that there came a

13  point in time that you learned that you had herpes.

14          Do you remember telling the government that?

15  A    Correct.

16  Q    And you told the government that it was my client who

17  gave you the herpes; am I correct?

18  A    That is correct.

19  Q    Okay.  Now, during the course of time that you stayed

20  that you were with Mr. Kelly, family members came to visit

21  you; am I correct?

22  A    That is true.

23  Q    And how often would they come visit you?

24  A    Seldom.

25  Q    And they would have their cameras with them, their

JANE - CROSS - MR. CANNICK                    1165

1   phones; am I correct?

2   A    Not that I can recall.

3   Q    Well, wasn't there a time that your sister was at the

4   studio taking videos and pictures?

5   A    Yes.

6   Q    And how long was she there?

7   A    I believe she was in Chicago for less than 72 hours.

8   Q    Now you testified yesterday and told us that there were

9   some photographs that you took of my client or took them --

10  taken by both of you or him, but these photographs were at a

11  cover shoot, I think you had said.

12  A    Correct, yes.

13  Q    And these are photographs basically of Mr. Kelly dressed

14  in certain wardrobes preparing for a cover?

15  A    Correct, yes.

16  Q    And you testified and told us that you sent those to your

17  girlfriend just in case; am I correct?

18  A    Correct.

19  Q    Just in case of what?

20  A    Just in case the defendant had broken my phone or

21  anything.

22  Q    Now the ones that you -- you testified and told us

23  earlier that you got a chastisement, and in that chastisement

24  you sustained a beating from my client; am I correct?

25  A    Which chastising are you referring to?

JANE - CROSS - MR. CANNICK                1166

1   Q    There was one where you supposedly sustained broken skin?

2        Do you remember telling us about that?

3   A    Correct, yes.

4   Q    Okay.  And you testified and told us about one where you

5   were beaten with a closed hand?

6   A    Those were not chastisings.

7   Q    Those were what?

8   A    Those were physical abuse.

9   Q    Physical abuse, all right.

10       And that physical abuse, you sustained a beating; am

11  I correct?

12  A    Correct.

13  Q    And you were beaten about the face?

14  A    He would slap me in my face.

15  Q    You were beaten about the face?

16  A    Yes.

17  Q    You were beaten about the body?

18  A    Yes.

19  Q    You were beaten all over; am I correct?

20  A    Yes, sir.

21  Q    You had the camera; am I correct?

22  A    Not that I can recall.

23  Q    You had her camera on your phone?

24  A    Yes, sir.

25  Q    Did you take any pictures of those and send them, of your

JANE - CROSS - MR. CANNICK                    1167

1   beatings, of the injuries, and send them to any family member?

2   A    I actually did take pictures of bruises, yes.

3   Q    My question to you is:  Did you take them and send them

4   to a family member, just in case?

5   A    No, sir.

6   Q    Did you send them to this very same friend, just in case?

7   A    Not that I can recall.

8   Q    So the picture that you sent, was a picture of Mr. Kelly

9   narrowly attired for a cover sheet, and you sent that to a

10  friend just in case?

11  A    Correct.

12  Q    Now Mr. Kelly put you on a pedestal; did he not?

13  A    No, he did not.

14  Q    Well, isn't it a fact that you told government during one

15  of those interviews that Mr. Kelly put you on a pedestal?

16  A    I do not recall.

17             (Counsel approaches the witness.)

18  Q    Look at the highlighted portion of this and see if that

19  refreshes your recollection.

20             You've read it?

21  A    I do.

22  Q    Does that refresh your recollection that you told the

23  government that Mr. Kelly put you on a pedestal?

24  A    It does.

25  Q    He put you on a pedestal; am I correct?

1  A    No, he did not.

2  Q    That's in the document; am I correct?

3  A    That is true, yes.

4  Q    That's what you told the government; am I correct?

5  A    That is what is in the document.

6  Q    But you were the only one conveying the information to

7  the government; am I correct?

8  A    Correct.

9  Q    Now you testified and told us earlier about a situation

10 where you drove from a show in Key West you said?

11 A    Yes.

12 Q    Up to Daytona?

13       Up to Jacksonville?

14 A    Yes.

15 Q    How long -- how did you get there?

16 A    By car.

17 Q    How long was the drive, would you say?

18 A    I don't recall, but I do know it was a few hours.

19 Q    A few hours?

20 A    Yes.

21 Q    Now, what was the name of the venue that he performed?

22 A    It was an outside event and it was for a breast cancer

23 awareness event.

24 Q    But it wasn't in the street, it had a name?

25 A    I don't recall the name of the show.

JANE - CROSS - MR. CANNICK                    1169

1    Q    And who else was on the show?

2    A    I believe there were other people that had different

3    times.

4    Q    And what was your time?

5    A    I believe my time was around 8:30, 8.

6    Q    8:30, 8?

7    A    Yes.

8    Q    How long did you perform?

9    A    I didn't perform long because the show had actually ended

10   early.

11   Q    Were you still performing at 9:00?

12   A    I don't remember.

13   Q    But you know you got on at 8:30?

14   A    Yes, around 8 p.m.

15   Q    Do you remember -- well, was it 8 or 8:30?

16   A    I said 8 or 8:30, yes.

17   Q    8 or 8:30?  Which one was it?

18              MS. GEDDES:  Objection.

19              THE COURT:  Do you remember what time?

20              THE WITNESS:  I don't remember.

21   Q    And do you remember how many songs you did?

22   A    I believe I did about two to three songs.

23   Q    Okay.  And then did you stay around after that?

24   A    No, it ended early.

25   Q    Are you aware that the trip by car from Jacksonville to

JANE - CROSS - MR. CANNICK                1170

1   Key West is about eight hours?

2   A    No, I'm not aware of that.

3   Q    You said it took you guys a couple of hours to get there.

4   A    Yes, I could have the location wrong.  I apologize.

5   Q    Now during your time from July to the end of August, how

6   many times did your parents visit you at Mr. Kelly's?

7              THE COURT:  What year?

8   Q    2015.

9   A    Between July and August?

10  Q    July and the end of August, how many times did your

11  parents visit you at Mr. Kelly's?

12  A    I believe once.

13  Q    And from the end of August until the end of 2015, how

14  many times?

15  A    I don't know.

16  Q    Now would it be fair to say that you were in constant

17  communications with your family from the time that you moved

18  to Mr. Kelly's until the end of 2015?

19  A    Yes.

20  Q    And you had video contacts with them?

21             Facebook contacts, I'm sorry.

22  A    Facebook?

23  Q    Yes.

24  A    No.

25  Q    Text?

1   A    Text, yes.

2   Q    Phone calls?

3   A    Yes.

4   Q    And then you'd have visits by your sister from time to

5   time?

6   A    My sister visited once.

7   Q    Once?  Okay.

8        And there came a point in time that the contact was

9   not as regular; am I correct?

10  A    Correct.

11       (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MR. CANNICK:

3   Q    And you made that decision to cut back the contact, am I

4   correct?

5   A    No, I did not make that decision.

6   Q    Do you recall speaking on a YouTube chat where you and

7   your father spoke about it and you said it was your decision

8   not to make contact as frequently?

9   A    I do not recall that.

10  Q    Do you recall making a video, a YouTube video, with your

11  father about communicating during the time you were with

12  Mr. Kelly?

13  A    A YouTube video, no, I do not.

14  Q    Or any type of social media forum where you and your

15  father spoke about the contacts between you and the family

16  when you were with Mr. Kelly?

17  A    I do not recall that.

18          MR. CANNICK:  Your Honor, may we approach?

19          THE COURT:  Sure.

20          (Sidebar held outside the hearing of the jury.)

21

22          (Continued on the following page.)

23

24

25

```
                          Sidebar                        1173
```

1          (The following sidebar took place outside the
2     hearing of the jury.)
3          MR. CANNICK:  I just want to give the Government an
4     opportunity to see the video that we are about to show.  I'm
5     sure they've seen it.
6          MS. GEDDES:  It's a documentary, correct?  I think
7     that's part of the confusion, for what it's worth.
8          MR. CANNICK:  Yes, well, I don't know.  I just saw
9     it and we just took it.  But it's one with her and her dad
10    talking about --
11         MS. GEDDES:  Yes.
12         MR. CANNICK:  They're familiar with it.
13         Do you need a copy of it?
14         MS. GEDDES:  No, I know what it is, but my only
15    issue is I would like the witness to hear it herself and not
16    play it for the entire jury because it may refresh her
17    recollection, which I suspect it will.
18         THE COURT:  That is probably the way to do it.
19         May I make a suggestion about this?
20         MR. CANNICK:  Sure.
21         THE COURT:  Maybe we want to come back to it and
22    then at the break you can play it for her?
23         MR. CANNICK:  Okay.
24         THE COURT:  And then I don't want to break -- I mean
25    we can take the break now if you want, but then --

```
                          Sidebar                         1174
```

1          MR. CANNICK:  Yea, maybe we took it now.

2          THE COURT:  Well, the only thing is that I worry

3   about then is jurors, then they have two whole hours.

4          MR. CANNICK:  What time is it now?

5          THE COURT:  It's 3:15.

6          MR. CANNICK:  Okay, well, then I am going to go over

7   some letters with her now.

8          MS. GEDDES:  Okay.

9          THE COURT:  I don't want to knock you off your --

10          MR. CANNICK:  I wanted to end a certain way, but,

11   you know, I'm always deference -- I always defer to the Court.

12          THE COURT:  Well, I think really it's in everybody's

13   interest not to have jurors sitting for two straight hours,

14   that's the only reason.

15          MR. CANNICK:  Okay.

16          THE COURT:  As riveting...

17          MR. CANNICK:  Don't poke fun, Judge.

18          THE COURT:  I'm not poking fun.

19          (Sidebar concluded.)

20

21          (Continued on the following page.)

22

23

24

25

Jane - cross - Cannick                    1175

1          (In open court - jury present.)

2          MR. CANNICK:  Your Honor, based on our sidebar, I

3   will come back to that.

4          THE COURT:  Okay.

5   EXAMINATION CONTINUES

6   BY MR. CANNICK:

7   Q    There was a time, going back to the trip to Jacksonville,

8   when you got to Jacksonville, you and your mother --

9   withdrawn.

10         You and your mother had traveled up to Jacksonville

11  together by car, am I correct?

12  A    Correct.

13  Q    And you got there early morning hours?

14  A    It was after his show had ended, yes.

15  Q    And you wanted a bed, you needed a place to stay, am I

16  correct?

17  A    Yes.

18  Q    And you were offered two bedrooms by Mr. Kelly's

19  assistant, am I correct?

20  A    Correct, yes.

21  Q    And your mother said that she would go and stay

22  elsewhere, am I correct?

23  A    That is not correct.

24  Q    It's not correct, okay.

25         Where did your mother stay that night?

SAM     OCR     RMR     CRR     RPR

Jane - cross - Cannick                1176

```
 1   A    I believe she had taken his assistant's room, and his
 2   assistant went to a different hotel.
 3   Q    Isn't it a fact that she refused the room?
 4   A    No, she did not.  She had been driving and did, in fact,
 5   want a room.
 6   Q    Isn't it a fact that you told the Government during your
 7   interview with them that your mother refused the room and
 8   wanted her own room?
 9   A    That is not accurate.
10   Q    So, again, the Government made another mistake?
11             MS. GEDDES:  Objection.
12             THE COURT:  Sustained.
13   BY MR. CANNICK:
14   Q    Showing you this document, and I direct your attention to
15   the second paragraph.
16             (Pause.)
17   A    Sir.
18   Q    Yes, just a second.
19             Isn't it a fact that your mother was offered a room,
20   but refused it?
21   A    That's not accurate.
22   Q    It's in the document, right?
23   A    Yes, sir.
24   Q    And, according to you, the document is wrong?
25   A    Yes, sir.
```

Jane - cross - Cannick                    1177

1    Q    You wrote about that incident, am I correct?

2    A    What are you referring to?

3    Q    You made some notes about that incident, the trip up to

4    Jacksonville, am I correct, with your mom?

5    A    What type of notes are you referring to?

6              MS. GEDDES:  What are you showing?  What is this?

7              (Pause.)

8              MR. CANNICK:  Your Honor, I am going to ask that

9    this be marked Defense O.

10             THE COURT:  Okay.

11   BY MR. CANNICK:

12   Q    I show you what's been marked Defense O for

13   identification.  Do you recognize it?

14   A    I do.

15   Q    Your handwriting?

16   A    This is.

17   Q    You wrote it?

18   A    Yes, I did.

19             MR. CANNICK:  Your Honor, I am going to offer it

20   into evidence as Defense Exhibit O.

21             THE COURT:  Any objection?

22             MS. GEDDES:  As long as you give the witness an

23   opportunity to explain it, no objection.

24             THE COURT:  All right, well, she will explain it.

25   If Mr. Cannick doesn't give her the opportunity, I'm sure you

1     will.

2            All right, that's in as Defense O.

3            (Defense Exhibit O was received in evidence.)

4     BY MR. CANNICK:

5     Q    I am going to show you another, P.  I'm going to show you

6     what's been marked as Defense P for identification.

7            Let me know if you recognize it.

8            (Pause.)

9     Q    Is this your handwriting?

10    A    Yes, sir.

11    Q    You wrote it?

12    A    Yes, sir, I did.

13           MR. CANNICK:  I'm offering it into evidence as

14    Defense Exhibit P.

15           MS. GEDDES:  I've never seen it.  One moment, Judge.

16           MR. CANNICK:  Got it from you.

17           MS. GEDDES:  Well, I have no idea what Defense P is.

18           (Pause.)

19           MS. GEDDES:  Do you have the whole document?

20           MR. CANNICK:  No.

21           MS. GEDDES:  I object on that ground then.

22           MR. CANNICK:  Then we'll put the whole document in.

23           Do we have the whole document?

24           MS. GEDDES:  I don't think this is the whole

25    document.

Jane - cross - Cannick                    1179

1          MR. CANNICK:  That's how we got it.

2          MS. GEDDES:  You may have gotten it that way.

3          Your Honor, may we have a brief sidebar on this or I

4  could do it orally?

5          THE COURT:  Let's do it at the sidebar.

6          (Sidebar held outside the hearing of the jury.)

7

8          (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                      1180
```

1            (The following sidebar took place outside the

2  hearing of the jury.)

3            MS. GEDDES:  So, defense counsel has provided me

4  pages of certain letters.  I don't care if they go into

5  evidence, but I want the entirety of the letter in evidence so

6  there's context to what this is, and this is not the entirety

7  of --

8            MR. CANNICK:  We can do that.

9            THE COURT:  Okay.

10           MR. CANNICK:  We can do that.

11           MS. GEDDES:  Okay.

12           MR. CANNICK:  I won't put it in now.

13           MS. GEDDES:  Okay.

14           MR. CANNICK:  I'll get the entire document and come

15  back to it.  I'll move on to another document.

16           THE COURT:  You can take yes for an answer.

17           Do you have like a little teeny thing you can do

18  until 3:30, or do you want to break now?

19           MR. CANNICK:  We can do this teeny thing until 3:30.

20           THE COURT:  Okay.

21           (Sidebar concluded.)

22

23           (Continued on the following page.)

24

25

```
              SAM     OCR     RMR     CRR     RPR
```

1            (In open court - jury present.)

2            MR. CANNICK:  Your Honor, I am going do show the

3    witness a two-page document as Defense for identification Q.

4            THE COURT:  Q?

5            MR. CANNICK:  Yes.

6            THE COURT:  Okay.

7    EXAMINATION CONTINUES

8    BY MR. CANNICK:

9    Q    Do you recognize the document?

10   A    I do, yes.

11   Q    It's a document you prepared?

12   A    This is, yes.

13           MR. CANNICK:  Your Honor, I am offering it as

14   Defense Exhibit Q.

15           THE COURT:  Any objection?

16           MS. GEDDES:  Yes, Your Honor.

17           THE COURT:  You object?

18           MS. GEDDES:  Yes.

19           THE COURT:  Can I see it?

20           This is what we are going to do now, I think.  Let's

21   take a break.  It is time for your afternoon break anyway.  I

22   have to discuss a few matters with the lawyers, so this one

23   might be 20 minutes, but please don't talk about the case and

24   I will see you after the break.

25           THE COURTROOM DEPUTY:  All rise.

1           (Jury exits.)

2           THE COURT:  Everybody can have a seat, and the

3    witness can step down.

4           (Witness steps down and exits the courtroom.)

5           THE COURT:  Can I see that document that you are

6    objecting to?

7           Oh, I forgot I sent the witness out, didn't I?

8           Well, let's first talk about this Defendant's Q.

9           This is a letter that was written when?

10          MS. GEDDES:  While the defendant was incarcerated.

11          THE COURT:  And it's a letter that the witness

12   wrote?

13          MS. GEDDES:  Yes.

14          THE COURT:  And what's the basis of your objection?

15          MS. GEDDES:  The basis is that, number one, I'm not

16   sure why it's relevant, but if it does get admitted the

17   Government wants to inquire the circumstances under which she

18   wrote this letter.  And the circumstances are that the

19   defendant had been incarcerated for a period of time and the

20   defendant had instructed the witness that she was only to

21   provide -- you know, talk about happy things and just stay

22   positive.

23          And it's not -- she's not going to be able to

24   explain that without also explaining the fact that he had been

25   incarcerated for a period of time.

Jane - cross - Cannick                    1183

1           THE COURT:  Well, I think that's all right with you,

2    isn't it, Mr. Cannick?

3           MR. CANNICK:  No, it's not a problem.

4           THE COURT:  Just turn on your microphone.

5           So with that proviso, it's admissible.  I mean it is

6    admissible evidence.

7           MS. GEDDES:  I'm also sure not sure how it's

8    relevant regardless.

9           THE COURT:  Well, it's relevant to the witness'

10   description of their relationship and you can redirect on it,

11   but it does open the door that he is incarcerated.

12          MR. CANNICK:  I think the world knows that, Your

13   Honor.

14          THE COURT:  Well, I don't know what the world knows,

15   but I had taken steps to make sure that the jury didn't find

16   out about it, particularly during the course of jury selection

17   where we were very careful to make sure that that wasn't

18   apparent.

19          So, I am just saying it is not something that I take

20   lightly, but if it is something -- and I am not saying that

21   you do either, but if it is -- I don't even know why we're

22   having this conversation.  Obviously, you know that it opens

23   the door and you're fine with it.

24          MR. CANNICK:  Your Honor, the only thing I would

25   like to say --

Jane - cross - Cannick                    1184

1          THE COURT:  Yes.

2          MR. CANNICK:  -- is that the Government could ask

3     the question of the witness the very same way they asked the

4     earlier question.

5          There came a point the time you and defendant,

6     they're going to call him the defendant, you and the defendant

7     were separated.  During this time you and the defendant were

8     separated, right?

9          And at some point you guys spoke and he asked you to

10    only write letters that are complimentary, flowering and

11    glory.

12         You don't have to go there unless you want to go

13    there.

14         THE COURT:  Well, I assume that goes for almost any

15    question that anybody asks, but there is certainly a

16    significant difference between somebody who is just like in

17    another town and somebody who is incarcerated.

18         But I don't really understand you to be making that

19    objection, so I think the circumstances under which these

20    letters are written, if you are introducing them, the

21    circumstances of them are relevant.  And one of the

22    circumstances -- and I take it this is at a point where she is

23    still connected to him and so she still cares about him.  I

24    think that is relevant.

25         So, I will permit you to introduce it and I will

1    permit the Government to ask the witness questions about it on

2    redirect examination.

3              MS. GEDDES:  Your Honor, could you instruct, or

4    could I, but fine if Your Honor does it, but instruct the

5    witness on redirect she is permitted to reference the fact

6    that the defendant is in jail because I had instructed her

7    previously not to mention that.

8              THE COURT:  Well, I don't think Mr. Cannick will

9    object if I have you tell her that.  I prefer to have the

10   parties --

11             MS. GEDDES:  Okay.

12             THE COURT:  -- talk to their own witnesses.

13             You don't have a problem with that, do you?

14             MR. CANNICK:  Well, I think there's a way to get

15   around this without mentioning the jail factor.

16             THE COURT:  Oh, we're back to that now; okay.

17             MR. CANNICK:  Yes, because I mean the Government did

18   it before without mentioning the fact that he's in jail.

19             I think that the very same approach works here as

20   well.

21             THE COURT:  I don't understand.

22             So, the relevance of this, as I understand it, you

23   are putting it in to show that she is expressing affection for

24   him and concern, correct so far?

25             MR. CANNICK:  Right.

1          THE COURT:  The Government responds that he

2     instructed her to write letters this way --

3          MS. GEDDES:  And --

4          MR. CANNICK:  But why --

5          THE COURT:  So, again, just let me finish.

6          I mean if he's incarcerated, I guess it goes to her

7     motive to be sending him cheerful letters.

8          MS. GEDDES:  In addition, though, the defendant was

9     well aware that all of his mail was being monitored by prison

10    officials and he instructed this witness, and other people

11    communicating with him, that under no circumstances were they

12    to write anything negative in a letter because it would be

13    caught.

14         And so, the fact that he was in jail and was very

15    cognizant of prison officials reviewing this is absolutely

16    relevant and goes to why it would be this letter versus a very

17    different letter.

18         THE COURT:  Are there other letters that are written

19    before he was incarcerated that contain similar expressions of

20    affection?

21         MR. CANNICK:  I'd have to check, Your Honor.

22         THE COURT:  And maybe you just want to go with one

23    of those instead.  Otherwise, I do think if she was given

24    certain instructions given the fact that prison officials are

25    going to be looking at the letters, that is another factor to

1  consider.

2        I am going to suggest that you take a look.  I am

3  not as familiar by any stretch of the imagination as you all

4  are by what the evidence is, so there may be something else

5  that is written when he's not incarcerated.

6        The other question that I have, though, how do you

7  want to do this thing with showing the witness the clip that

8  you want to show her?

9        MR. CANNICK:  Mr. Scholar will show her.

10        THE COURT:  But does it have to be on the record?

11        MR. CANNICK:  I think the Government just, they have

12  no objection, but it's just a situation, and I don't want to

13  speak for the Government, but they would like her to view it

14  before we offer it.

15        THE COURT:  Right, because they don't want the jury

16  to see it if it doesn't come in.

17        MR. CANNICK:  Right.

18        THE COURT:  So, I don't need to be here, do I?

19        MR. CANNICK:  I don't think so.

20        MS. GEDDES:  No.

21        THE COURT:  All right.  So, make whatever

22  arrangements you want to make.  Well, I guess we have to make

23  a finding, though, that she either recognizes it or she

24  doesn't.

25        Let's bring her in and you can ask her those

1    questions.

2           (Pause.)

3           (Witness enters and resumes the stand.)

4           THE COURT:  All right, Mr. Scholar, can you just let

5    us know what piece of evidence you are showing the witness?

6           MR. SCHOLAR:  Yes, Judge.  We had marked these as

7    Defendant's Exhibit H and I.

8           THE COURT:  H and I?

9           MR. SCHOLAR:  Yes, Judge.  I'm sorry.

10          THE COURT:  That's all right.

11          MR. SCHOLAR:  H and I.

12          THE COURT:  And I think Mr. Scholar is going to show

13   you just on your -- does the witness have a monitor?  Yes.

14          MR. SCHOLAR:  If it's okay, I can just bring the

15   laptop over.

16          THE COURT:  Okay, that's fine, too.

17          MS. GEDDES:  I just want to make clear that there

18   are no names mentioned in the clip that you are going to play.

19          THE COURT:  She is just going to watch it.

20          MS. GEDDES:  But if it's going to be broadcast.

21          THE COURT:  I don't think it is going to be

22   broadcast.

23          MR. SCHOLAR:  I have headphones as well.

24          THE COURT:  Maybe we will turn the microphone off.

25          THE WITNESS:  Okay.

1          THE COURT:  This is simply to have the witness, as I

2     understand it, look at it and see -- well, I don't remember

3     what the question was, but so if you want to show it to her,

4     that's fine.

5          MS. GEDDES:  Okay.  Just to be clear, so the witness

6     understands too, that this is not being broadcast outside of

7     this room right here?

8          THE COURT:  No.

9          Did you turn off the microphone?

10          THE WITNESS:  Yes, ma'am, I did.

11          THE COURT:  Okay.

12          MR. SCHOLAR:  I can go ahead, Judge?

13          THE COURT:  Yes, go right ahead.

14          (Video played for witness only.)

15          MR. CANNICK:  May I, Your Honor?

16          THE COURT:  Oh, yes.

17          Turn on your microphone, if you don't mind.

18     EXAMINATION CONTINUES

19     BY MR. CANNICK:

20     Q     You recognize your voice in that audio?

21     A     Yes, sir, I do.

22     Q     Do you recognize the conversation?

23     A     I do.

24          THE COURT:  All right.  So, now can we take our

25     break?

1           Am I needing to rule on something?

2           MS. GEDDES:  I honestly can't remember what the

3    initial question was.

4           MR. CANNICK:  I think the Government was fine with

5    it, they just wanted to make sure that she would be able to

6    recognize it.

7           THE COURT:  Okay.  All right, so, is this something

8    you are moving into evidence?

9           MR. CANNICK:  Yes.

10          THE COURT:  All right, I couldn't hear it, but I am

11   assuming you all know what it is, so --

12          MS. GEDDES:  Your Honor, I am just not sure why this

13   is admissible into evidence.

14          It may be if there's a prior inconsistent statement,

15   but I'm not sure that there is a prior inconsistent statement

16   because I don't recall what the specific question is that led

17   to Mr. Cannick asking about this recording.

18          THE COURT:  Let me just go back.

19          (Pause.)

20          THE COURT:  Okay, sorry, what piece of evidence is

21   this, P?  Q?

22          (Pause.)

23          MR. CANNICK:  Yes, but, Your Honor, if you could

24   excuse the witness, then maybe I could explain it.

25          THE COURT:  Okay.  Okay, let's take the witness out.

Jane - cross - Cannick                    1191

1          (Witness steps down and exits the courtroom.)

2          MR. CANNICK:  Your Honor, before we got here and we

3     skipped because --

4          THE COURT:  Yes.

5          MR. CANNICK:  -- before we got here I'd asked the

6     witness about the frequency in contacts with her parents and

7     whether or not she, of her own volition, chose not to reach

8     her parents during that particular segment.

9          And throughout her direct testimony she was saying

10    that it was my client who prevented her.  And in this tape

11    it's clearly showing the inconsistency because she's,

12    basically, saying that no one stopped me, I did it myself.

13         THE COURT:  Okay.  Well, I didn't hear that, I'm

14    sorry, but you don't have any objection to that, do you?

15         MS. GEDDES:  I would just like him to ask the direct

16    question, and then if she says something inconsistent, then

17    you can introduce it.

18         MR. CANNICK:  I think she's been saying it all the

19    while.

20         THE COURT:  Well, I think the gravamen of her

21    testimony on direct was, and I think even on cross, was that

22    she was kept from seeing her family.  This is the opposite, it

23    sounds like to me.

24         MR. CANNICK:  It is.

25         THE COURT:  And so, I just think that the question

1   then is -- well, I think it is certainly an inconsistent

2   statement.  I think you still have to do the:  Did you have an

3   opportunity to hear that and ask her -- you know how to do

4   this part.

5           MR. CANNICK:  Foundational questions, yes.

6           THE COURT:  This is intro cross.

7           MS. GEDDES:  Right, but can we have her and give her

8   an opportunity to explain the statement?

9           We don't have copies of any of the defendant's

10  exhibits --

11          THE COURT:  Why not?

12          MS. GEDDES:  -- and it's going to be difficult for

13  me to even redirect on it because I don't have copies of it.

14          THE COURT:  All right.

15          MR. CANNICK:  Your Honor --

16          THE COURT:  Hold on a second.

17          Well, if you are introducing it into evidence, I

18  mean I don't think he has to show you his entire cross

19  beforehand, but it probably would be --

20          MR. CANNICK:  Your Honor, this is on -- all over

21  YouTube.  And I am confident, I am absolutely confident the

22  Government is keenly familiar with this because it's just

23  there, and I'm sure they have seen everything that she's put

24  out.

25          THE COURT:  I do think you said that you had seen

1    it.

2              MR. CANNICK:  Yes.

3              MS. GEDDES:  I actually am not sure I have heard

4    that particular clip, but what I would like are copies of that

5    so that I have the actual recordings that are introduced into

6    evidence and copies of any other documents that are going to

7    be introduced into evidence.

8              I am not asking for their entire cross, just the

9    exhibits that they're planning to admit.  The same way that

10   we, obviously, provided all of our exhibits.

11             THE COURT:  I think that is a reasonable request.

12             MR. CANNICK:  Voilá.

13             THE COURT:  Let's take a break, okay?

14             MR. CANNICK:  I need one.

15             THE COURT:  Okay.

16             So, just so we're clear and so we sew this one up,

17   it's admissible as a prior inconsistent statement.  I think

18   everybody agrees about that.

19             You want to be able to ask her about the context,

20   you can do it on redirect, which doesn't seem like we are

21   going to get to today.

22             Is that right, Mr. Cannick?

23             MR. CANNICK:  I think that's about right, Your

24   Honor.

25             THE COURT:  Okay.

Jane - cross - Cannick                    1194

1           MR. CANNICK:  But there's a possibility.

2           (Defendant exits the courtroom.)

3           (Judge ANN M. DONNELLY exited the courtroom.)

4           (Recess taken.)

5

6           (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1195

1    (In open court; outside the presence of the jury.)

2    THE COURT:  Everybody can have a seat.

3    All right.  Shall we get the witness?

4    MS. GEDDES:  May I ask one thing?

5    THE COURT:  Let's wait for the defendant.

6    (Defendant present.)

7    THE COURT:  You wanted to raise something.

8    MS. GEDDES:  Under Rule 613(b), before the defendant

9    is permitted to offer evidence of a prior inconsistent

10   statement, it states that the witness must be given an

11   opportunity to explain or deny the statement and the adverse

12   party is given an opportunity to examine the witness.

13   So the government asks that before the statement is

14   admitted, that the witness be able to explain or deny the

15   statement.

16   THE COURT:  Well, I don't know that that has to

17   happen on cross-examination.  You mean before?

18   MS. GEDDES:  It says prior to its admission into

19   evidence.  It's Rule 613(b).

20   THE COURT:  It's admissible only if the witness is

21   given an opportunity to explain or deny the statement and an

22   adverse party is given an opportunity to examine the witness

23   about it.

24   I don't know that -- I mean, maybe I'm revealing my

25   ignorance, but I don't know that the defendant has to do that

1196

1  on cross.  I just think she just has to be given an

2  opportunity to explain it which I'm going to give you.

3       Am I wrong about that?  I mean, I've been at this a

4  little while but I don't, maybe I just have forgotten but I

5  think if there's an inconsistency which counsel has identified

6  which, to me, sounds like an inconsistency, he's shown, out of

7  the presence of the jury, has shown her or had her listen to

8  whatever the statement is and then it is an -- she just needs

9  to be given an opportunity to explain it.

10       MS. GEDDES:  Right.

11       THE COURT:  I'm not sure that he has to give her

12  that opportunity.

13       MS. GEDDES:  But he is going to admit -- he's

14  admitting the evidence now.

15       THE COURT:  Well, I'm not going to admit it until

16  the end.  Isn't this how it works?

17       MS. GEDDES:  I thought he was going to play it now.

18       MR. CANNICK:  Yes.

19       THE COURT:  I'm having a senior moment.  I don't

20  think it's -- it's not in evidence.  He's confronting her with

21  it which this one just happens to be unusual because it's a

22  tape recorded statement that the jury will hear, but if he

23  confronts her with another inconsistent statement, the

24  statement comes in, I think -- I mean, it sort of doesn't

25  matter because the jury is not going to hear it until you've

1197

1 │ had the opportunity to do all of those things.

2 │        MS. GEDDES:  If that's the case, then there's not a

3 │ problem but my understanding is that he was going to play it

4 │ now.  If that's not the case --

5 │        MR. CANNICK:  That was my intention, Your Honor.

6 │        THE COURT:  But it's still not in evidence.  I mean

7 │ it's just like anything else.  It's like -- this has been

8 │ happening basically with everything that counsel has shown

9 │ her.  He's shown her a statement.  He said isn't it true that

10 │ you said X.

11 │        Now, what you could do, I think maybe what you're

12 │ asking me to do is say, Isn't it true that you said X at a

13 │ prior occasion without playing it, and maybe that's the way to

14 │ do it.

15 │        MS. GEDDES:  But I really just want her to be given

16 │ an opportunity before it's played for the jury and --

17 │        THE COURT:  I think this is a lot of --

18 │        MR. CANNICK:  I'm trying to unplug.

19 │        THE COURT:  -- drama over nothing, quite frankly.

20 │        I think perhaps the way to do it is to ask her, you

21 │ know, at the break, you were played, isn't it true that you

22 │ said X without playing the thing.  I mean, is it -- it is true

23 │ when you're doing prior inconsistent statements, you don't

24 │ read the whole thing into evidence.  I think the difficulty

25 │ that everybody is having is just the form that it's taking.

1198

1     MR. CANNICK:  Right, and because it's on audio, but

2  everything that she said she said in this tape, she was

3  confronted with through cross-examination.

4     THE COURT:  I can't hear you.  I'm so sorry.  I'm

5  not doing that to torture you.  I really can't hear you.

6     MR. CANNICK:  No lunch.

7     Everything that she said during the audio, she was

8  confronted on cross-examination about that she gave a prior

9  inconsistent statement and she even gave, it doesn't matter

10 she gave prior, she gave inconsistent statement with that on

11 her direct exam as well but we confronted her about it on

12 cross-examination and now we want to show the jury a prior

13 inconsistent statement.

14    THE COURT:  But I don't think she's been asked about

15 the statement yet.  You just played it for her now.

16    MR. CANNICK:  But she was asked about --

17    THE COURT:  Let's do this because I think we're

18 taking up too much time with this.  Let's start asking her --

19 and I'm at a little bit of a disadvantage just because I

20 didn't hear what it was.  Ask her the classic, Did you have an

21 opportunity to listen to, whatever, H and I.

22    MR. CANNICK:  Okay.

23    THE COURT:  Isn't it true that you said X.

24    MR. CANNICK:  I have to find my notes of it.  I know

25 what you want.

1199

```
 1            THE COURT:  Yes, just do it the regular old way and
 2   then you don't play it.  If it's an inconsistency and she
 3   denies it, then it comes into evidence, I think, once you've
 4   had a chance to explain it.
 5            MR. CANNICK:  Okay.
 6            MS. GEDDES:  Okay.
 7            THE COURT:  I feel like I'm in evidence class again.
 8            MS. GEDDES:  Are we ready to bring --
 9            THE COURT:  Let's start getting the jury -- well,
10   let's wait until she gets in here.
11            (Witness resumes the stand.)
12            THE COURT:  Let's get the jury, please.
13            So just to be clear, we're talking about extrinsic
14   evidence, that's what the rule applies.  So that's whether I
15   actually admit it into evidence.  He can still
16   cross-examination her about it as impeachment.
17            MR. CANNICK:  Right.
18            THE COURT:  I feel somewhat better.
19            (Jury enters.)
20            THE COURT:  All right, ladies and gentlemen.  I
21   apologize for the delay.  That one's on me.  We were trying to
22   resolve an issue here but I think it moved things along a
23   little bit.
24            All right.  Mr. Cannick, go ahead.
25            MR. CANNICK:  Yes.
```

Jane - cross - Cannick                    1200

1    BY MR. CANNICK:   (Continuing)

2    Q    Now, you testified earlier on direct examination that you

3    were on the Gayle King show?

4    A    Pardon me?

5    Q    You testified earlier on direct examination that you were

6    on the Gayle King show, the documentary?

7            THE COURT:  Gayle King he's saying.

8    A    Yes.

9    Q    And on that show, you stated that your parents told you

10   to lie, am I correct?

11   A    I did, yes.

12   Q    And at that time that you gave that interview, you said

13   Robert was in the apartment?

14   A    It was a hotel, yes.

15   Q    And his lawyer was there as well, am I correct?

16   A    I don't recall.

17   Q    You don't recall Mr. Greenberg being there?

18   A    No.

19   Q    Do you recall his manager being there?

20   A    No, I believe he had his spokesperson.

21   Q    Do you recall that person's name?

22   A    No, but he did have dreads.

23            THE COURT:  I didn't hear you.

24            THE WITNESS:  He had dreads like -- (indicating).

25   Q    I want to go back to -- when you and Robert  would go out

1    and all of the girlfriends, he would open a door for you?

2    A    Yes.

3    Q    He would -- you and the others would not even move until

4    he got around to the other side of the car to open a door for

5    everyone, am I correct?

6    A    What do you mean?  What vehicle are you referring to?

7    Q    Any vehicle.  He would open a door if he was in the

8    vehicle with you?

9    A    Yes.

10   Q    Okay.  And when you came into the room, when women came

11   into the room, he would stand?

12   A    He was what?

13   Q    He would stand up when women came into the room?

14   A    He would?

15   Q    He would stand up when women came into the room?

16   A    Can you rephrase the question?  I don't understand what

17   you're asking.

18   Q    Okay.  I'm going to show you what's in evidence as

19   Defense Exhibit O.

20              You wrote that you told us earlier?

21   A    Yes.

22   Q    Could you read the highlighted portion, the portion

23   highlighted in yellow?

24   A    Both sections or just the first?

25   Q    The first section.

1    A    Okay.

2         My mother drove me to R. Kelly show in Jacksonville

3    at 10 or 11 p.m., four hours from our current location,

4    knowing we wouldn't arrive until about 2 or 3 a.m. well after

5    the show was over at the age of 17.

6    Q    I'm going to ask you to look at what's been admitted no

7    evidence as Defense Exhibit P and ask you to read from the

8    highlighted portion from the top all the way down.

9         MS. GEDDES:  I don't think P is in evidence yet.

10   Q    P is something you wrote?

11   A    Yes, sir, it is.

12        MR. CANNICK:  Your Honor, I'm offering.

13        THE COURT:  Any objection?

14        MS. GEDDES:  No, Your Honor.

15        THE COURT:  Okay.  That's in evidence.

16        (Defense Exhibit P so marked.)

17   Q    Can you read from where the yellow highlight begins?

18   A    She also be sending him pictures of me in crop tops and

19   tight clothes pretending to be me.  I had no idea she had

20   already been texting him acting like me but once I found out,

21   I continued to just go along so they wouldn't be upset with

22   me.  My parents told me to tell him I sing and dance so I sent

23   him a video of me doing both.  They told me what to wear which

24   ended up being a crop top and tights.  They watched me as I

25   made the video and said nothing about it.

Jane - cross - Cannick                    1203

1      I first met R. Kelly -- the first time I met

2  R. Kelly, I told my parents where I was, the hotel I'd be in

3  and once I got there, after about 30 minutes, they planned to

4  call the police.  The police asked me my age.  I told them I

5  was 18.  They checked my ID and saw nothing.

6  Q    Okay.  Could you read the last paragraph a little slower,

7  please?

8  A    Yes.

9      The first time I met R. Kelly, I told my parents

10  where I was, the hotel I'd be in and once I got there, after

11  about 30 minutes, they planned to call the police.  The police

12  asked me my age.  I told them I was 18.  They checked my ID

13  and saw nothing.

14  Q    Now, I'm going to show you what's been marked as Defense

15  Q for identification.

16      Do you recognize it?

17  A    One second.

18      (Pause.)

19  A    Yes, I do.

20  Q    That's something you prepared, am I correct?

21  A    Correct.

22  Q    There's some handwritten notes on the side of it, am I

23  correct?

24  A    Yes.

25  Q    You wrote those, am I correct?

CMH      OCR      RMR      CRR      FCRR

Jane - cross - Cannick                1204

1   A    One second.

2             (Pause.)

3   A    Yes, I did.

4             MR. CANNICK:  I'm offering it, Your Honor, Defense

5   Exhibit.

6             THE COURT:  Any objection?

7             MS. GEDDES:  May I see?

8             MR. CANNICK:  I'm going to change the marking on

9   this, Your Honor, to R.

10            THE COURT:  R?  Okay.

11            MS. GEDDES:  So you are going to remark this as R?

12            MR. CANNICK:  Yes.

13            MS. GEDDES:  No objection.

14            THE COURT:  Okay.

15            (Defense Exhibit R so marked.)

16  Q    I want you to slowly read -- well, I'll, first, ask a few

17  questions.

18  A    Okay.

19  Q    That's a letter you wrote to whom?

20  A    I wrote this to the defendant.

21  Q    Could you speak a little bit louder, please?

22  A    To the defendant.

23  Q    And you wrote this letter to him after you had separated

24  from him as you explained this morning, am I correct?

25  A    Yes.

Jane - cross - Cannick                    1205

1   Q     And what is it that you call him at the beginning of this

2   salutation at the beginning?

3   A     "Hey, Bear."

4   Q     And could you read it for us?

5   A     The entire thing or what's just highlighted?

6   Q     Read the entire thing.  Read it slowly.

7   A     Okay.

8         Hey Bear, so because of the circumstances that we're

9   under, it's hard for me to do anything without talking about

10  you yet still supporting you.  I know you personally don't

11  want to speak about our private life and neither do I.  So

12  because of that, I would have to support you privately and not

13  publicly but right now, I am still attached to you but in

14  order for me to have my own name, image, brand and businesses,

15  I would just have to be just me, not Jane, the girlfriend.

16  Luckily --

17              MS. GEDDES:  Judge --

18              THE COURT:  All right.  Go ahead.

19              MR. CANNICK:  May I approach the witness?

20              THE COURT:  Yes.

21              (Pause.)

22              MR. CANNICK:  She can continue, Your Honor?

23              THE COURT:  Yes.

24  A     Luckily, we talked about this act the last visitation.

25  Nothing changes.  You have your reasoning and I have my

CMH      OCR      RMR      CRR      FCRR

1    reasonings.  We left on a good note as friends who support one

2    another and will always love -- and I will always love and

3    support you, Bear.  And you know me.  I'm going to still check

4    people from time to time because I still love you but for the

5    most part, I just wanted to let you know because I know things

6    don't always go the way we plan it.

7              I love you and I wish I was in Chicago but it's

8    going to stay this way until you give everyone a clear

9    understanding in our household or not.  I would have thought

10   after your first visitation, that would have been the first

11   thing you fix, but apparently not which is also fine but just

12   know I am always here.  I have no bad feelings, Bear.  At the

13   end of the day, you know my word and more importantly, I know

14   my word and I just don't want to be in an environment where

15   there is no clear understanding something you have the power

16   to fix.  I can only tell you I can't force you to do anything

17   and vice versa, but I will definitely continue to write you

18   and send you pictures, Bear.

19             I love you so much and just know everything from

20   this point out is all politics.  No matter what, I will always

21   be respectful of myself and you and you will never, ever see

22   me doing anything to hurt you, Bear.  I just want to make you

23   proud and I want to make you happy for me more than anything.

24   Me and cookie miss you so much and I wish I could see you at

25   visitation.

1    Q    Now, this letter was written by you to Mr. Kelly months

2    after you had separated from him, am I correct?

3    A    Not months after, no, that is not accurate.

4    Q    When was it written?

5    A    It had to have been immediately after I left him.

6    Q    And you said you left in October of 2019?

7    A    Yes.

8    Q    And when you said immediately, you're talking the next

9    day?

10   A    No, meaning that it would have happened within those

11   months because by January, I had no more communication with

12   him.

13   Q    Now, before October of '19, there was a separation

14   between the two of you, am I correct?

15   A    That is correct.

16         THE COURT:  I'm sorry.  The jurors are indicating

17   they can't hear you.  I'm sorry, Mr. Cannick.

18         MR. CANNICK:  I'll move it closer.

19         THE COURT:  I don't think it's on.

20         MR. CANNICK:  It's on.  I think it's the battery.

21         THE COURT:  Let's see if we can get it fixed.

22         (Pause.)

23   Q    You now you testified that you don't have a recollection

24   as to the date that you sent that letter?

25   A    Yeah, I don't.

1  Q    I'm going to show you something to see if it refreshes

2  your recollection.

3            Do you see the date on that document?

4  A    I do.

5  Q    Does that refresh your recollection as to the date you

6  sent this letter to Mr. Kelly?

7  A    I don't recall sending that from that location.

8  Q    This is your handwriting?

9  A    Yes, that is my handwriting, correct.

10  Q    And that handwriting is on the envelope, am I correct?

11  A    Yes, sir.

12  Q    Now, that's an envelope addressed to Mr. Kelly?

13  A    Yes, sir.

14  Q    And the date on that envelope is December 2, 2019?

15  A    Yes, sir.

16            MR. CANNICK:  Your Honor, may I approach and see if

17  the witness has Q?

18            THE COURT:  Yes.

19  Q    Do you have any documents here?

20  A    No.

21            (Continued on next page.)

22

23

24

25

JANE - CROSS - CANNICK                    1209

1        MR. CANNICK:  Your Honor, I think this was

2   previously marked, but if not, Defense Q for identification.

3        THE COURT:  Okay.

4   CROSS-EXAMINATION (Continued)

5   BY MR. CANNICK:

6   Q    Could you look at Q and see -- for identification and see

7   if you recognize it?  The front portion, please.

8   A    Oh, sorry.

9        Yes, I do.

10  Q    Is that something that you prepared?

11  A    Yes, sir, it is.

12       MR. CANNICK:  I offer this Defense Q.

13       THE COURT:  Any objection?

14       MS. GEDDES:  No, Your Honor.

15       THE COURT:  Okay, that's in evidence.

16       (Defense Exhibit Q, was received in evidence.)

17  BY MR. CANNICK:

18  Q    Could you read it to the jury slowly please and loud?

19  A    Where would you like me to stop?

20  Q    Stop at the end of the first page.

21  A    Bear you remember Bambi?

22  Q    You have to read it louder, please.

23  A    Bear you remember Bambi.

24       Oh Bambi I won't lie.

25       If I weren't in this spiderweb of mine.

1        If grandfather never had seven wives.

2        Then darling you would be the love of my life.

3        Oh Bambi it's my design.

4        To run the jungle I must be a lion.

5        Or be a cheetah but neither is fine.

6        Don't wanna hurt my dear love of my life.

7        Bambi, Bambi.

8        My dear, my dear, my dear.

9        Bambi, Bambi.

10       My dear, my dear.

11       My dear, I want you here.

12       Bambi don't get too near for there's lions, beware.

13       We use to love that song, I just keep thinking of

14   all of our memories, when you first recorded me devouring

15   McDonald's LOL!  And when we first met and when we first went

16   to the big house and I said I wanna be where you want to be

17   and how I use to happily wait for you to come home from

18   meetings!  When you use to buy like $500 worth of Red Lobster

19   laid out all over the piano room.  I remember you played the

20   piano and it was just me and you, when we carved our initials

21   into that table and when you used to stop for me and call.

22   Q    Read the other side.

23   A    You call me on FaceTime.  I wish things could have stayed

24   exactly like that.  But it's okay poppa bear everything

25   happens for a reason and I know we will get out of this.

JANE - CROSS - CANNICK                    1211

1          I no leave you Jamais Jamais, Jamais Jamais!

2          Can't wait for us to listen to Caribbean music

3    again, and I'm going to learn that boxing dance you do.

4    Q    Stop there.

5          When did you send this to Mr. Kelly?

6    A    I don't recall when.

7    Q    This was after the separation between the two of you; am

8    I correct?

9    A    I believe that these were when I was with the defendant.

10   Q    Beg your pardon?

11   A    I believe that was written when I was with the defendant.

12   Q    Okay.  Where were you at the time when you wrote that?

13   A    I believe Trump Towers.

14   Q    And he was not there; am I correct?

15   A    No, he was not.

16   Q    Okay.  And this was -- you were asked earlier this

17   morning by the government about viewing the -- the Lifetime

18   documentary.

19          Remember the government asking you that?

20   A    Correct, yes.

21   Q    And this was written after the Lifetime documentary; am I

22   correct?

23   A    I don't believe that is accurate.

24   Q    Do you know what year the Lifetime documentary was

25   written?  Was shown?

1  A    No, I'm sorry, I didn't keep up with it.

2  Q    Okay, but you can say categorically that that was written

3  before the Lifetime document?

4              MS. GEDDES:  Objection.

5              THE COURT:  Overruled.

6              I think your jacket might be obscuring your

7  microphone.

8              All right.  And it's just harder to hear you.

9  That's all.

10             MR. CANNICK:  I'm sorry, could I have that last

11 question and answer?

12             (Whereupon, the record was read.)

13 Q    Documentary.

14 A    Which one are you referring to, because there was a few.

15 Q    You said which one?

16             THE COURT:  I wonder if it's better to just direct

17 her to a date, Mr. Cannick.

18             THE WITNESS:  Yes.

19 BY MR. CANNICK:

20 Q    You mentioned this morning on direct examination that

21 you -- you were asked specifically about a Lifetime

22 documentary.

23             Do you remember that?

24 A    Yes, sir, I do.

25 Q    And I'm asking you, did you write that letter before or

JANE - CROSS - CANNICK                    1213

1   after the Lifetime documentary?

2   A    I don't recall when the Lifetime documentary came out.

3   There were multiple.

4   Q    Multiple on Lifetime?

5   A    Yes.

6   Q    Okay.  Now the -- but the letter that you read just a

7   short while ago, that letter was written, you said, after

8   October 2019; am I correct?

9   A    I said that?

10             MS. GEDDES:  Are you referring to?

11             MR. CANNICK:  Is it Q?

12             MS. GEDDES:  Defense Q?

13             MR. CANNICK:  No, not Q, R.

14   BY MR. CANNICK:

15   Q    I showed you an envelope.

16   A    Right.

17   Q    And this was a letter from the envelope; am I correct?

18   A    Correct.

19   Q    And that envelope had December 2nd, 2019, on the back; am

20   I correct?

21   A    Yes.

22   Q    And it's your testimony to us that you don't recall when

23   the documentary -- what is it, "Surviving R. Kelly"?

24   A    The defendant was still at Trump Towers when that was

25   released.

JANE - CROSS - CANNICK                    1214

1    Q    And my question now --

2    A    Those letters were written when he was no longer there.

3    Q    There's no question before you right now.

4         Now, going back to during the break you listened to

5    an audio recording.  Remember that?

6    A    Yes, sir.

7    Q    And in that audio recording, you spoke about

8    communication with your family; am I correct?

9    A    Yes, I did.

10   Q    And, in fact, you said that:

11        I understand and I respect that completely, but I

12   feel like for me where it was hard was so hard for me and why

13   I continued to not have communication with my family is

14   because this Lifetime documentary stuff just happened within

15   the last two years.  And then I've known -- I knew where these

16   last two years -- I'm sorry, I'm just trying to get -- within

17   the last -- I'm going to start again, Your Honor.

18        I continued to not have communication with my family

19   is because this Lifetime documentary stuff just happened

20   within the last two years.  And then I've known these last two

21   years you hear, Oh my God, this is happening.  Oh my God, that

22   is happening.  I just feel like now how can you be so

23   oblivious to the years that I was okay and just now, Oh my

24   God, I need to know where my daughter is at?  She's this.

25   She's that.  I need to make sure she's okay.

JANE - CROSS - CANNICK                    1215

1          I've been okay for three years prior.  That's where
2   I drew my line because at that time -- at that point, I was an
3   adult.  At that point, I felt like I was okay, so believe -- I
4   was okay, so to believe something like that so extreme, so
5   bizarre, so outrageous, I just couldn't even fathom my
6   parents -- my parents believing something as bizarre as that.
7   I really couldn't.
8          That's what was said by you in that audio?
9   A    Yes, sir.
10  Q    And this audio was made when?
11  A    I believe that audio -- I actually don't recall when that
12  audio was made, sorry.
13  Q    Do you have an approximate as to when that audio was
14  made?
15  A    It could have been anywhere from October to January.
16  Q    Of what year?
17  A    October of 2019 to January of 2020.
18  Q    And you were speaking with your father in that, correct?
19  A    Yes.
20  Q    And then you go on to say:  Things didn't go right.  My
21  communication slowed down because at that point I was an
22  adult.
23          You said further:  I would call you guys four, five
24  times -- four or five months at a time, and when I would call
25  you guys, you guys would be yelling.  You guys would be

1   cursing me out.  Mommy would be yelling at the top of her

2   lungs, and so what I do, I would say I'm going to give you

3   about four to five months, and hopefully you just miss me so

4   much that you just want to talk to me and open your arms.  And

5   eventually it got there.

6           Further said:  That you're not checking in every

7   day.

8   A    What was that last thing?  I'm sorry.

9   Q    You said, so let me ask you this:  Before graduation, I

10  was not even checking in every day.

11          Then you go on to say:  Now maybe like once a week,

12  every two weeks or so, I would call y'all.

13          You go on to say:  Robert would ask me to call you

14  guys.  And no matter what city we were in, he would say, Is

15  this your father's number?  Or is this your mother's number?

16  And I was -- and it would say "Call me," and I would say that

17  is my father's number.

18          He was like, you need to call him.  And I would say,

19  I'm not going to call him.  Because at this point the only

20  thing I get is bickering every time I pick up the phone.  So

21  if I can avoid it, if I can enjoy myself in this nice little

22  penthouse while we're in New York for the weekend, I'm going

23  to enjoy my weekend.

24          It was very suffocating because I was an adult, and

25  at the end of the day, period, I am not obligated to answer

1  anyone going to know that you are my father.  But I'm not

2  obligated.

3          Then you go on to say:  Anyone who thinks that I'm

4  brainwashed and not know a smart -- I'll try again.  Anyone

5  who thinks that I'm brainwashed and not know smart enough to

6  make my own decisions, I just feel like that determines how,

7  you know, their mentality.

8          Rob, our conversation that I had with him in

9  Chicago, you know he inspired me and told me, Bear, just do

10  what you want.  Do what makes you happy.  He told me to

11  continue to pursue my dreams, pursue whatever I wanted to

12  pursue.  And that's really all I want to do.

13          When you were mentioning "bear" there, you were

14  mentioning Mr. Kelly; am I correct?

15  A    Yes.

16  Q    And that's what you said that he told you at the last

17  conversation you had?

18          MS. GEDDES:  Objection.

19          THE COURT:  I didn't hear the last part.

20  Q    That's what you said and he told you at the last

21  conversation you had with him?

22          THE COURT:  Is that true?

23          The objection is overruled.

24  A    What do you mean by that last question?

25  Q    You testified -- you said here, in your conversation to

JANE - CROSS - CANNICK                    1218

1   your dad, that that was the last thing that Robert said to you

2   when you guys spoke in Chicago the last time.

3   A    That was not true.

4   Q    So that wasn't true, you told a lie?

5   A    Yes.

6   Q    Robert wasn't around then; am I correct?

7   A    He was not, no.

8   Q    And you posted this on social media?

9   A    I did not, no.

10  Q    Do you know who posted on social media?

11  A    It was a friend of the defendant's.

12  Q    A friend of the -- of Robert?

13  A    Yes.

14  Q    Okay.  But the defendant -- Robert was with you and your

15  dad when you made this tape?

16  A    Yes.

17  Q    This was a tape that you and your dad made; am I correct?

18  A    No, this is not.

19  Q    You and your dad participated in it?

20  A    Yes.

21  Q    And you had a back and forth exchange; am I correct?

22  A    It was an interview, yes.

23  Q    And you said:  All women that have been associated with

24  Robert, I feel like, this is me personally, once they saw him,

25  they saw him as a celebrity, not as a human being.  They

1  didn't not meet him at church.  They were infatuated with him,

2  with that celebrity, and because of that, I feel like a lot of

3  them just baited him because of that.

4          Because of who he was.  Because of the life that he

5  had.  Because of the life that he could provide.  And a lot of

6  them talk about how badly they were treated.  But they don't

7  talk about the shopping sprees, the hair, the nail salon.  And

8  the great times that you had at dinner and you were spending

9  money and splurging.

10          You were as happy, because one thing, Robert, he's

11  very giving.  He has a very giving heart, and there's no way

12  whatsoever that he has a reason to keep you kidnapped or tie

13  you up or hold you against your will.

14          That's what you said in that interview, right?

15  A    I did say that.

16  Q    Okay.  Now you also wrote a letter to your father...

17          I'm going to show you what's been marked as Defense

18  Exhibit S for identification.

19          May I speak with the government?

20          THE COURT:  Sure.

21          (Pause in the proceedings.)

22          MR. CANNICK:  Your Honor, for the record, Defense

23  Exhibit -- Defense S for identification.  They're multiple

24  letters in a pack.

25          THE COURT:  Okay.

1    BY MR. CANNICK:

2    Q    Can you look through those, please.

3
              (Continued on the following page.)
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2         THE WITNESS:  Excuse me, you said all of these were

3    to my father?

4         MR. CANNICK:  Just read through them and see if you

5    recognize them.

6         THE WITNESS:  Okay.

7         (Pause.)

8         MS. GEDDES:  Your Honor, can we have a moment at

9    sidebar while the witness is reading?

10        THE COURT:  Sure.

11        (Sidebar held outside the hearing of the jury.)

12

13        (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                      1222
```

 1           (The following sidebar took place outside the

 2    hearing of the jury.)

 3           THE COURT:  First of all, we've got to help you out

 4    with your microphone.  I am not trying to throw you off your

 5    game or anything, but the thing is the court reporter can't

 6    hear you when it goes off and I can't always hear you.

 7           And so, I'll talk to Donna to see if we can get

 8    something that works a little better.

 9           MR. CANNICK:  Okay.

10           THE COURT:  But I know it's annoying to constantly

11    be told "We can't hear you," and I am not trying to do that.

12           MR. CANNICK:  I know, Judge.

13           THE COURT:  So, this is a text message from the

14    witness, and to whom is it written?

15           MR. CANNICK:  I have to find out from her.  We just

16    found it.

17           MS. GEDDES:  I think that it is a post, potentially

18    written by her.  It may well have been written by her.

19           My only objection is I don't think she ever

20    testified that she was held against her will.

21           Wrong person.  You need to stop.

22           And by introducing it, it suggests that this is like

23    some big gotcha moment.  She never -- she just never said she

24    was held against her will.

25           THE COURT:  It is clearly relevant.  The only thing

Sidebar                                          1223

1    I am concerned about is I really don't want her, can we --

2            MR. CANNICK:  Get her name out?

3            THE COURT:  -- take the name out?  Yes.

4            MR. CANNICK:  Right.

5            MS. GEDDES:  But if defense counsel said:  You

6    weren't held against your will?

7            She would say:  No, I wasn't held against my will.

8            MR. CANNICK:  No, but I --

9            THE COURT:  Okay, but the tenor of that --

10           MR. CANNICK:  Yes.

11           THE COURT:  -- the tenor of the case is that, I mean

12   I am assuming the theory of the Government's case is that she

13   did not feel free to leave, whether it's psychological control

14   or -- and I mean I am assuming your expert is going to talk

15   about the features of young people in these situations and I

16   am assuming your expert could explain what this is, but he is

17   entitled to put it in.

18           But can we please, I really would like, can you

19   cover that?

20           MR. CANNICK:  Yes.  I won't even introduce it today,

21   because I am about to ask you for a favor.  I am worn out.

22           THE COURT:  I know, that's fine.

23           (Sidebar concluded.)

24

25           (Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

Proceedings                                            1224

1          (In open court - jury present.)

2          THE COURT:  Okay.

3          Ladies and gentlemen, we have another little issue

4    that we have to resolve and I think, given the time, it

5    probably makes sense for us to break today.  We are still on a

6    good path, don't be concerned.

7          So, we will stop for the day.  Please don't talk

8    about this case at all.  Don't read anything that might be

9    reported on it or watch anything or look on social media or

10   look up the case at all.

11         But do have a good and restful night, and I will see

12   you tomorrow at the same time.

13         All right, have a great night.

14         THE COURTROOM DEPUTY:  All rise.

15         (Jury exits.)

16         MR. CANNICK:  May I get the document back?

17         THE COURT:  Sure.

18         MR. CANNICK:  Thanks.

19         THE COURT:  And you can take the witness.  We'll see

20   you tomorrow.

21         (Witness steps down and exits the courtroom.)

22         THE COURT:  All right, I think you are going to make

23   those adjustments to that exhibit.

24         MR. CANNICK:  Yes.

25         THE COURT:  And then, as I ask everyone every night,

Proceedings                                      1225

1    do you have a feeling of how much longer you might be?

2           MR. CANNICK:  I am hopeful that we'll finish with

3    this witness right near the break point.

4           THE COURT:  Okay.  And then I know will you'll have

5    some redirect.

6           Just a general reminder, Judge Donnelly's trial

7    advocacy class, we don't have to go over all the points that

8    were made on direct examination, but I am just throwing that

9    out there as a general tip.

10          MR. CANNICK:  Okay.

11          THE COURT:  But I assume you will have some,

12   certainly.

13          MS. GEDDES:  Yes.

14          THE COURT:  Which is fine.

15          And then, do you have a sense of whether you have

16   longer witnesses tomorrow or shorter witnesses?

17          MS. GEDDES:  We definitely have shorter witnesses

18   than the one that's currently on the stand.

19          THE COURT:  Okay.

20          MS. GEDDES:  We will take a look at our schedule and

21   determine who it makes sense to call tomorrow.

22          THE COURT:  Okay.

23          Also, and I think I said this before, just to the

24   extent, and I really don't like to put people on the spot

25   about this, but just to the extent that there's no dispute

Proceedings                                    1226

1    about certain pieces of physical evidence, if there are things

2    that you can agree on before so we can move things along a

3    little more quickly, I think that's to everybody's benefit.

4            I understand that you may have other things on your

5    mind than sitting down and figuring out what evidence you

6    agree on, but if you can do that, that would probably speed

7    things up a little bit.

8            Anything else that we have to talk about today?

9            MS. GEDDES:  Your Honor, if we might, could we just

10   have a brief sidebar to address an unrelated issue to today's

11   witness?

12           THE COURT:  Yes.

13           (Sidebar held outside the hearing of the jury.)

14

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                      1227
```

1             (The following sidebar took place outside the

2    hearing of the jury.)

3             MS. GEDDES:  The Government, as I've indicated to

4    counsel and to the Court, intends to call a witness from the

5    Loggans law firm where --

6             THE COURT:  Right.

7             MS. GEDDES:  -- Ms. Pace initially provided that

8    cell phone and the T-shirt to further establish the chain of

9    custody.

10            The two witnesses who are available to do that are

11   insisting that they cannot travel to New York because of the

12   pandemic.

13            I am prepared --

14            THE COURT:  Doesn't one of them have like a

15   hundred-year-old mother?

16            I don't know where I read that.

17            MS. GEDDES:  Oh, yes, you saw that e-mail that was

18   sent to me.

19            THE COURT:  Yes.

20            MS. GEDDES:  Yes.

21            So, to the extent that counsel -- my understanding

22   from, at least initially, from defense counsel is that they

23   were not going to agree to allow this particular witness to

24   testify by video and we are prepared to seek other avenues.

25            However, I do think that it would probably be easier

Sidebar                                                    1228

1    to simply have her testify by video.

2           The reason why we need to address it now is that

3    it's my understanding that she is traveling internationally on

4    the 28th and I don't want to lose her before she leaves.

5           MR. CANNICK:  Your Honor, could you give us

6    another -- I can't make a decision.

7           If you give me an opportunity, maybe we can, if the

8    marshals hold him for about five or ten minutes, we can have

9    some discussions to see whether or not we can --

10          MS. GEDDES:  Because if not, I am going to prepare,

11   I have prepared a material witness warrant, which I am going

12   to ask Your Honor to sign because I have to do it before the

13   28th.

14          THE COURT:  I guess it's too late to do a Rule 15.

15          MS. GEDDES:  I think realistically -- I don't

16   think -- I think, honestly, it would be better just to have

17   her testify by video.

18          THE COURT:  Video.

19          MR. CANNICK:  Of course.

20          MS. GEDDES:  And it's effectively the same thing.

21          THE COURT:  I mean just in terms of, you'll have

22   your conversation.

23          Do you want me to ask them to hold him?

24          MR. CANNICK:  Yes, please.

25          (Discussion off the record.)  (Sidebar concluded.)

Proceedings                                        1229

1           (In open court - jury not present.)

2           THE COURT:  All right, we have just been having just

3    really scheduling questions.

4           You know, I know that there are some witnesses who

5    may be traveling here from other places.  Since we have the

6    Delta variant and the situation in New York has become more

7    difficult, I know there is some concern about witnesses that

8    might have to travel.

9           Having done this a few times by video, it is

10   actually somewhat more efficient.  And if the parties can

11   agree on witnesses who may not be the key to the case, let's

12   say, that having them testify by video, I think that's really

13   to everybody's benefit.

14          I know there is one witness who is reluctant to fly

15   in from Florida, which I think we all agree is quite a

16   hotspot, and that that person has obligations to an elderly

17   person that make the person unwilling to travel.

18          I am going to encourage the parties to try to agree

19   upon that.  I don't think there is any benefit to forcing the

20   person to come up here.  I don't know what the person's

21   vaccination status is, and I really am reluctant to subject

22   the people in the courtroom and the jurors to somebody who is

23   coming from a hotspot and we don't know what their vaccination

24   status is.

25          Like I said, I don't think this is the key to the

Proceedings                                              1230

1    case.  I think this is a tangential witness.  It's possibly a

2    witness that you could stipulate to.  And so, I am going to

3    just suggest that you do that.

4            How many witnesses are we talking about that are in

5    this position of --

6            MS. GEDDES:  There are two witnesses who are in this

7    position.

8            There are a few additional witnesses whose testimony

9    will be very, very short and it will be great if we could

10   either reach a stipulation or allow them to testify by video,

11   just to save everybody the trouble of having to fly to

12   New York for seven minutes of testimony.

13           THE COURT:  Well, and I don't know what the

14   witnesses are testifying about.  I think everybody should be

15   mindful of the fact that we've got jurors here that are giving

16   up, as jurors do in every case, but if there is a way to not,

17   I mean I don't know who the witness is, but if it's somebody

18   who is going to testify about business records or something,

19   that is a waste of time.  That is something that you should

20   really be able to stipulate.

21           I can't force you to stipulate to it, but I don't

22   think it's in anybody's interest to have a bunch of boring

23   witnesses come on that you are really not disputing.

24           So, I am going to direct the parties to make their

25   best efforts to come to some kind of an accommodation, either

Proceedings                                    1231

1   by stipulation or by video.

2          And we are in a little bit of unchartered territory

3   here in terms of what the Court can order under these, with

4   the health, with the pandemic like this, but I really don't

5   see why you wouldn't agree to that.  I don't know why you

6   would want to bring somebody in here from a hotspot, who we

7   don't know what their vaccination status is and all of that.

8          So, does anybody else need to be heard on this?

9          MS. GEDDES:  The Government does not.

10          THE COURT:  Okay.

11          This happens in trials all the time, and you seem to

12   have been getting along pretty well and it just seems to be a

13   reasonable accommodation.

14          So, I think that's all.

15          MR. CANNICK:  Your Honor, I would just ask if we be

16   given an opportunity that the marshals accommodate us that we

17   be given five minutes that we can start discussions.

18          THE COURT:  Yes, I think they've agreed graciously

19   to do that.

20          I do want to thank the marshals for their help and

21   hard work during the course of this trial.

22          All right, so, yes, and so thanks for doing that.

23          And, yes, you can certainly do that.

24          Anything else?

25          MR. CANNICK:  No.

Proceedings                                        1232

1          THE COURT:  Okay, thank you so much.

2          (Judge ANN M. DONNELLY exited the courtroom.)

3          (Defendant exited the courtroom.)

4

5     (Matter adjourned to August 25, 2021 at 9:30 a.m.)

6

7                      ooo0ooo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1233

```
 1                    I N D E X
 2  WITNESSES:
 3
 4   JANE
 5        DIRECT EXAMINATION (Cont'd) BY MS. GEDDES      1020
 6        VOIR DIRE EXAMINATION BY MR. CANNICK           1029
 7        DIRECT EXAMINATION (Cont'd) BY MS. GEDDES      1031
 8        CROSS-EXAMINATION  BY MR. CANNICK              1073
 9
10
11                      EXHIBITS:
12
13        Government Exhibit 49              1031
          Government Exhibit 50              1032
14        Government Exhibit 68              1035
          Government Exhibits 457 through    1052
15        460
16
          Defense Exhibit N                 1098
17        Defense Exhibit O                 1178
          Defense Exhibit P                 1202
18        Defense Exhibit R                 1204
          Defense Exhibit Q                 1209
19
20
21                  *    *    *    *
22
23
24
25
```

CMH        OCR        RMR        CRR        FCRR