1234

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2
  - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,     :   19-CR-286(AMD)
4
          Plaintiff,          :
5                                 United States Courthouse
      -against-                :  Brooklyn, New York
6
ROBERT SYLVESTER KELLY,       :
7                                 August 25, 2021
          Defendant.          :   9:30 o'clock a.m.
8
  - - - - - - - - - - - - - X
9

10              REDACTED TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ANN M. DONNELLY
11         UNITED STATES DISTRICT JUDGE, and a jury.

12
APPEARANCES:
13

14  For the Government:        JACQUELYN M. KASULIS
                              Acting United States Attorney
15                            BY: ELIZABETH GEDDES
                                  NADIA SHIHATA
16                                MARIA E. CRUZ MELENDEZ
                              Assistant United States Attorneys
17                            271 Cadman Plaza East
                              Brooklyn, New York
18

19  For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                              NICOLE BLANK BECKER, ESQ.
20                            THOMAS FARINELLA, ESQ.
                              CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:            Charleane M. Heading
                              225 Cadman Plaza East
23                            Brooklyn, New York
                              (718) 613-2643
24
Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

CMH      OCR      RMR      CRR      FCRR

1235

```
1              (In open court; outside the presence of the jury.)
2              THE COURT:  Let me first just ask the parties did
3    you come to some agreement about the lady in Florida with the
4    aged mother about doing that by video?
5              MS. GEDDES:  We did not.
6              THE COURT:  Did you discuss it?
7              MS. GEDDES:  We did.
8              THE COURT:  All right.  Mr. Farinella, is this your
9    issue?
10             MR. FARINELLA:  Yes, Your Honor.
11             THE COURT:  You can take your mask off.  If you want
12   to stay seated, you can do that too.
13             What's your objection to having this witness testify
14   by video?
15             MR. FARINELLA:  We would like to have Ms. Jones
16   present in court, Your Honor.
17             THE COURT:  I know you would like to but what's the
18   basis of your objection?
19             MR. FARINELLA:  Well, there seems to be some
20   apprehension by Ms. Jones.
21             THE COURT:  Who's Ms. Jones?
22             MS. GEDDES:  So there's two witnesses who can
23   testify in this regard.  There's Kim Jones who's in Chicago.
24             THE COURT:  Okay.
25             MS. GEDDES:  And there's also Susan Loggans in a
```

1236

1  different location and she's the woman who I think you

2  referenced with the elderly mother.

3           THE COURT:  So you don't need both of them?

4           MS. GEDDES:  I think I can do with just one of them.

5           THE COURT:  And what's the objection to the Chicago

6  witness coming?

7           MS. GEDDES:  She has advised that she's not.

8           THE COURT:  She's not coming?  All right.  Is there

9  a reason why?  Do I have to sign a material witness warrant?

10          MS. GEDDES:  I'm prepared to present to you a

11 material witness warrant if the defense will not stipulate to

12 her appearing by video.

13          THE COURT:  But what's the theory you're objecting

14 to it?  Why?

15          MR. FARINELLA:  Your Honor --

16          THE COURT:  Just speak into the microphone if you

17 could.

18          MR. FARINELLA:  So --

19          THE COURT:  Do you have a constitutional objection

20 to it or is it just you'd rather have her in person here?  I

21 mean, is there any --

22          MR. FARINELLA:  There's a constitutional objection,

23 Your Honor.  I believe she will be the witness, she's one of

24 the witnesses in the chain of custody with regard to the DNA

25 sample that was presented.

1237

1    THE COURT:  Okay.  But, I mean, there's no reason

2  why you can't do this by video.  You're still able to question

3  her.  She's not, I mean she's not in person in the court but

4  she's, I mean, she's testifying and is subject to

5  confrontation and the only difference is she'll be on a screen

6  as opposed to, you know, flying in here and sitting on the

7  stand.  So I just don't understand the nature of your

8  objection.  That's all.  Unless you're just, I mean -- well,

9  why?  Why can't you agree to this?

10    Also, I have to say the chain of custody issue is

11  really more weight than admissibility.  I mean, the witness'

12  testimony is this is her shirt and this is what she did with

13  it.  It's marginally relevant what happened to it afterwards

14  because, I mean, it's not like it's a fungible item like money

15  or something that you can confuse with something else.  It's

16  relevant to what happened afterward.

17    If you have a theory that whatever forensic evidence

18  is on there got there some other way, which I can't even begin

19  to imagine what that would be, but you can surely, I mean --

20    Ms. Becker, just let me finish.  I'll give you the

21  chance to consult but I think it's hard to listen to two

22  people at once.

23    MS. BLANK BECKER:  Sorry, Judge.

24    THE COURT:  First of all, you'll be able to

25  cross-examine her.  You'll also be able to cross-examine the

1  forensic expert about the extent to which the chain of custody

2  affects either the existence or whose DNA it is. I presume

3  that's what the witness is going to testify.

4  So the traditional reasons for chain of custody like

5  narcotics or something like that really are different here.

6  I'm not saying that you're not entitled to explore the chain

7  of custody but I think it's worth thinking about, I mean, what

8  you are going to argue from that.

9  So you can certainly challenge the witness which I

10 think you did about the T-shirt, but the critical part about

11 the T-shirt is really the witness who's testifying about the

12 T-shirt, where she got it, what she did with it, and then she

13 hands it over to somebody. So then what we're really talking

14 about is just a chain that doesn't seem to me, I mean it's

15 been a while since I've thought about this, but I'm not sure

16 that there's going to be anybody who's going to testify that

17 having it be in some other place is going to create DNA or

18 affect whatever the forensic evidence is.

19 So I'm just, you know, I guess if we can get this

20 person and she's not unavailable.

21 MS. GEDDES: She's not unavailable.

22 THE COURT: So, and it's certainly been done in

23 other cases certainly during COVID times. I mean, I know

24 Judge Rakoff did it, I know Judge Preska did it in the

25 Donziger case, and it doesn't deprive you of your right to

1  confrontation so that's why I just don't understand why you

2  won't agree to it.  You don't have to.  It just seems kind of

3  silly to me.

4       MR. FARINELLA:  Your Honor, I appreciate the

5  Court's, you know, weighing in on this and I will certainly,

6  if I just may contemplate this for a moment.

7       THE COURT:  Sure, and talk to your colleagues about

8  it.  Maybe I'm missing something.  We're going to be here for

9  awhile and why we can't just move things along.  I think you

10  also want to think about the jurors' time too.

11       I think if there are ways that we can make things

12  more efficient without any detriment to Mr. Kelly's rights

13  which, in my view, this wouldn't be, that's really all to the

14  good.  So why don't you think about it.

15       Anything else before we bring the witness in and

16  bring the jury in?

17       MR. FARINELLA:  Thank you, Your Honor, by the way.

18       THE COURT:  Sure.

19       MS. GEDDES:  I would ask Your Honor reconsider your

20  ruling earlier and admit Government Exhibit 241.  It remains

21  our position that it has been sufficiently authenticated and

22  any challenges go to weight and not admissibility and that

23  perhaps that may affect whether we're able to reach an

24  agreement here because I don't believe that the -- I think the

25  evidence should be admissible regardless of whether this

1240

1    particular witness testifies.

2            THE COURT:  Well, I mean, what is your position on

3    that, Mr. Farinella?  I really think that's true.  I think the

4    question is, the critical issue is what the witness said about

5    the particular item of evidence and, you know, you challenged

6    her credibility.  So anything that comes afterwards really

7    does go to weight, not admissibility.

8            MR. FARINELLA:  And I understand that, Your Honor.

9            THE COURT:  Okay.

10           MR. FARINELLA:  I understand that.

11           THE COURT:  All right.  Good.  Then it is in

12   evidence.  And maybe that will affect, affect how you work

13   this next part out.  Okay?  Because there may be additional

14   things you want to ask that witness anyway.  Okay?

15           MR. FARINELLA:  Correct.

16           THE COURT:  Great.

17           (Government Exhibit 241 so marked.)

18           THE COURT:  Let's bring the witness in and then

19   we'll get the jury.

20           (The witness, JANE, previously sworn, resumes the

21   stand.)

22           (Jury enters.)

23           THE COURT:  Good morning, everybody.

24           THE JURY:  Good morning.

25           THE COURT:  I hope you had a good night.

Jane - cross - Cannick                    1241

1        We are ready to continue with the cross-examination

2   of the witness by Mr. Cannick.

3           THE CLERK:  The witness is reminded she's still

4   under oath.

5           THE WITNESS:  Yes, ma'am.

6   CROSS-EXAMINATION (Continued)

7   BY MR. CANNICK:

8   Q    Good morning.

9   A    Good morning.

10  Q    Now, after we recessed last night and until this morning,

11  have you had an opportunity to speak with any members from the

12  government?

13  A    No, I have not.

14  Q    Okay.  Now, you and your father were shopping a book deal

15  concerning your allegations here, am I correct?

16  A    Correct.

17  Q    And the person that you were working with was Stacy

18  Brown?

19  A    I don't believe I met before with Stacy Brown.

20  Q    You don't believe you met with Stacy Brown before?

21  A    No, I never met with him.

22  Q    You know who Stacy Brown is, right?

23  A    Yes, I do.

24  Q    Your father met with him?

25  A    I don't know.

1  Q    You had an agent?

2  A    I did, yes.

3  Q    What's your agents's name?

4  A    I actually don't remember her name but she is a young

5  woman from LA.

6          THE COURT:  Just make sure you keep your voice up.

7  Okay?

8  Q    You know the name Charlene?

9  A    Yes.  Yes, sir.

10 Q    And she was your agent, am I correct?

11 A    Yes, sir.

12 Q    When was it that you started shopping this book with

13 Stacy Brown?

14 A    I don't remember.

15 Q    Was it in 2019?

16 A    I don't remember.

17         MR. CANNICK:  Your Honor, I'm just going to show her

18 something electronically to see if it will refresh her

19 recollection.

20         THE COURT:  Of course.

21 Q    I'm going to show you this and you can look at the top to

22 the bottom and see if it refreshes your recollection as to

23 when it was that you were trying to shop this book deal.

24         (Pause.)

25 A    Okay.

Jane - cross - Cannick                    1243

1   Q     Does it refresh your recollection?

2   A     It does, yes.

3   Q     It was sometime before February 5, 2020, am I correct?

4   A     The date on that says February 5, 2020.

5   Q     Right.  Well on this, by the time you had received this,

6   he was sending you back a draft manuscript, am I correct?

7   A     I don't recall.

8   Q     Look at this document.

9         (Pause.)

10  Q     Having looked at that, does it refresh your recollection

11  that by February 5, 2020, you had already started receiving

12  draft manuscript proposals?

13  A     Yes.

14  Q     Now, yesterday, we spoke about your mother asking you to

15  take photos of Robert and yourself where she could possibly

16  exploit him on a future date.  Do you remember us talking

17  about that?

18  A     Yes, I do.

19  Q     Now, there came a point in time that you stopped taking

20  the pictures and doing things to possibly exploit Robert

21  because you felt as though you were betraying his trust,

22  correct?

23  A     Yes.

24  Q     Now, yesterday, we offered Defense Exhibit S into

25  evidence.  I want you to read them to the jury and can you

1   read them loud and slowly.

2   A    Yes.  All of them?

3   Q    Yes.

4   A    "Pops, you didn't tell Mommy that you used to FaceTime

5   and call Rob" --

6   Q    Let me stop you there.

7        When you said "Pops," who are you referring to?

8   A    My father.

9   Q    Go ahead, please.

10  A    "Pops, you tell Mommy that you used to FaceTime and call

11  Rob and have hour long conversations happy and jolly and never

12  upset.  You didn't even tell Mommy all the things you had me

13  trying to do to blackmail Robert.  It's a shame because both

14  of you were very happy but y'all started listening to the

15  █████████ and joined them."

16  Q    Let's stop there.

17       Who are the █████████ you're referring to?

18  A    Joy's parents.

19  Q    Joy, one of Robert's live-in girlfriends?

20  A    Yes.

21  Q    Okay.

22  A    "They found other exes and out of curiosity, told them

23  what to do and what to say."

24       There's an arrow pointing up but I really can't make

25  out what it's saying.

Jane - cross - Cannick                1245

1      "You are literally taking illegal actions when you

2   know you've done wrong as parents.  What really makes me angry

3   is that all of you could still be in my life but your actions

4   and choices show that's not what you care about.  All I have

5   to say is this and" -- "All I have to say is this.  If and

6   when you want to be in my life, you will be, and if you don't

7   want" -- "and if you don't, you won't, but no matter what you

8   do, I will forever be deeply in love with Robert and I will

9   forever spend my life with him and continue to create

10   beautiful moments and memories.  I'm not going to sacrifice or

11   ruin my happiness just to appease you guys.  Y'all have

12   depressed yourselves, stressed yourselves out, aged yourselves

13   and made yourselves so miserable chasing a idea that you have

14   covered up will never come to life.  You think I'm happy that

15   y'all aren't in my life, no, but I would not allow y'all to

16   think you can talk to me whenever you want while doing

17   interviews bashing Robert.  I love this man.  And, Ma, I pray

18   you would never let another person bash Pops without standing

19   up for him and vice versa because that is true genuine love."

20      The next letter says:  "I am hurt and devastated.  I

21   cannot see my family because of you guys.  You guys have put

22   me in this position and then you're angry when I don't reach

23   out."

24      The next letter:  "Ma and Pops, not only am I

25   devastated but I'm crushed from everything that you two have

CMH      OCR      RMR      CRR      FCRR

Jane - cross - Cannick                    1246

1  done and how you decided to go about this.  None of this

2  should be happening and you all could have put a stop to this

3  but you" -- "but you know you decided to join in to get some

4  money.  If you are working with him and making money in any

5  kind of way, you will be okay with me being with Robert and

6  that's the sad part, that you need money to be happy from me.

7          "Both of you knew where the studio was and for

8  nearly five years, I can count how many times you've tried to

9  see me in one hand.  None of you did interviews for free.

10  Both of you took money and you don't need money to be a caring

11  parent and if someone paid you right now to do an interview,

12  you'd do it.  All that you've done and all that you're still

13  doing, where has it got you.  Definitely not closer to me nor

14  have I wanted to see you guys because of it and I still don't

15  want to.  I'm still living my life happy with Robert while you

16  two are making yourselves more miserable every day.  You don't

17  even have to.

18          "Ma, when I was 17, you were telling me to take as

19  many pictures and videos with this man so you could blackmail

20  him and use it against him in the future.  Exactly what you

21  are trying to do now.  You knew his past and you tried to use

22  it against him by making me the bait.  You continued to try

23  and push me on to this man.  You really made me feel like a

24  hoe and a prostitute by saying those words to me and I went

25  along because I was trying to please you but you don't know

Jane - cross - Cannick                    1247

1    how terrible you've made me feel as a mother.  You've dropped

2    me off at 3 in the morning and didn't care if I was with you

3    or not.  You wanted me to be alone with him and you know that.

4            "You have text very threatening things saying, Since

5    you're fucking my daughter, you need to send $10,000 to this

6    bank account every month.  You've threatened me and him

7    personally.  You said we need to send you a food check and buy

8    this since" -- "and buy this which is not how you act or

9    things you say as a mother or parent.  I don't know if you

10   know but I'm sure you do by now but I come" -- "I came to

11   Florida to ████."

12   Q    Who's ████?

13   A    ████ is my brother.

14   Q    Go ahead.

15   A    "And confide in him and I was totally heartbroken.  All

16   of the things you have said and told him that isn't even true.

17   The reason I don't and can't see y'all, ████ or even ████" --

18            MS. GEDDES:  One moment.

19            MR. CANNICK:  Your Honor, may we approach the

20   witness and let the witness --

21            THE COURT:  I beg your pardon?

22            MR. CANNICK:  May we approach the witness, the

23   government and I?

24            THE COURT:  Sure.

25            (Pause.)

1          MR. CANNICK:  Thank you.

2    Q    You can continue, please.

3    A    -- "because of y'all and everything y'all have caused.

4    You guys didn't tell my brother that y'all were texting Rob,

5    that I'm grown.  I can do what I want and make my own

6    choices."

7          The next letter says:  "I've thought about what you

8    said and I do want to fix us.  I just do not want to delete my

9    entire e-mail so hopefully we can figure out another way to

10   build trust.  The more I think of it, the more I realize I

11   have to delete.  It's not that I have anything to hide because

12   I don't.  So if you do not feel comfortable with that, then we

13   need to figure something else out.  So I'm sorry if I'm not

14   the woman you want to marry or do anything with because I'm

15   choosing to disagree, but I am not angry.  I am okay with my

16   choice.  We just need to talk about what this means and where

17   we stand because of this."

18   Q    Now, that's a letter you wrote to Robert?

19   A    Yes.

20   Q    Read the next one.

21   A    The next one says:  "I really just need a moment to

22   gather myself.  I came back because I wanted to fix this but

23   now we are stuck again."

24   Q    Let me stop you there.

25          That's a letter to Robert as well?

1    A    Yes.

2    Q    And when you said, "I came back," what are you talking

3    about?

4    A    The defendant convinced me to come back.

5    Q    You were away, am I correct?  You were away from Robert?

6    A    For less than 24 hours.

7    Q    No, that's not my question.  My question is were you away

8    from him?

9    A    Yes, I was.

10   Q    And you were away from him and you went where?

11   A    Back to the defendant.

12   Q    No.  You were in Florida, were you not?

13   A    These two letters could be different times.

14   Q    No.  My question is when you left Robert for 24 hours as

15   you said and you said he convinced to come back, you went to

16   Florida, is that correct?

17   A    I left the defendant multiple times.

18   Q    That's not my question.  My question is when you left him

19   the 24 hour period that you just spoke about, you were in

20   Florida, right?

21   A    These two letters are not the same --

22            THE COURT:  So why don't --

23   A    -- time period.

24            THE COURT:  Why don't you refer her if there's more

25   than one time.  Do you have a particular time in mind?

1           THE WITNESS:  Yes.

2           THE COURT:  Just let me finish.

3           Do you have a particular time in mind that you want

4    to direct the witness to?

5           MR. CANNICK:  Yes.

6    Q    The letter that you just read where you said that you

7    could fix this, that you want to fix this --

8           THE COURT:  Are those dated, by the way?

9           MR. CANNICK:  No.

10          THE COURT:  Okay.

11   A    I don't know which argument this was after.

12   Q    But the bottom line is that there was an argument, you

13   left Robert and went home, am I correct?

14   A    Only on one occasion, yes.

15   Q    I didn't ask you how many occasions.  I asked you whether

16   or not you left Robert and went home.

17   A    Yes.

18   Q    And home was with your family, am I correct?

19   A    Yes.

20   Q    Okay.  Go to the next letter.

21   A    "I can tell this is going to be awhile before anything

22   gets resolved and I just don't care anymore.  I'm so done.

23   I'm not happy and I'm tired of running in circles, not being

24   good enough, not noticing what you want me to.  Every other

25   day, something is going wrong and I'm doing something wrong

Jane - cross - Cannick                1251

1   and I'm tired of going through that.  I don't want that kind

2   of relationship."

3   Q    Now, you were apart from Robert when you wrote that

4   letter?

5   A    Pardon me?

6   Q    Were you apart?  Were you separated from Robert when you

7   wrote that letter?

8   A    I was not.

9   Q    Okay.  You were in the same household when you wrote that

10  letter?

11  A    I was, yes.

12  Q    And you were expressing to him that you were tired of the

13  relationship, didn't want the relationship, am I correct?

14  A    I did, yes.

15  Q    And did you leave?

16  A    I don't recall.

17  Q    Now, I'm going to ask you to look at Defense T for

18  identification.  May I have the other document?

19       Do you recognize that document?

20  A    Yes, I do.

21  Q    What do you recognize that document to be?

22  A    A screenshot from my Snapchat account.

23       MR. CANNICK:  Okay.  Your Honor, I'm going to offer

24  Defense T into evidence but I will want to redact certain

25  information from it.

Jane - cross - Cannick                1252

1           THE COURT:  Okay.  Was this something we looked at

2    yesterday?

3           MR. CANNICK:  No, I don't think so.

4           MS. GEDDES:  I believe it is.

5           MR. CANNICK:  It is?  Okay.

6           THE COURT:  Any objection?

7           MS. GEDDES:  No, Your Honor.

8           THE COURT:  Let's make sure we get that redacted.

9    That's in evidence.

10          MR. CANNICK:  Thank you.  I'll redact it before I

11   ask her to read.

12          (Defense Exhibit T so marked.)

13          (Pause.)

14   Q    I ask you to read this, please.

15   A    "Baby, I never been" --

16   Q    Could you read it louder and slower.

17   A    Okay.

18          "Baby, I ain't never been held against my will.

19   Wrong person.  You need to stop reading the tabloids."

20   Q    You sent that, you posted that, am I correct?

21   A    I sent this to someone personally.

22   Q    Do you recall the date that you sent this?

23   A    Yes, that was immediately after I had left the defendant

24   in October.

25   Q    Thank you.

Jane - cross - Cannick                      1253

1          Now, you testified and spoke to us yesterday about a

2    situation when you were in Las Vegas.

3          Do you remember telling us about that?

4    A    Yes, I do.

5    Q    And I think you testified and told us that you were

6    staying at the Mandalay Bay?

7    A    Yes, I was.

8    Q    And there came a point in time when you sent your mother

9    a text saying that you were, everyone was having fun and you

10   were in the room.  Do you remember that text?

11   A    I do, yes.

12   Q    Now, Mandalay Bay had a 21 age requirement for the casino

13   area, am I correct?

14   A    Yes.

15   Q    And, basically, you were traveling with Robert at that

16   time, am I correct?

17   A    Yes.

18   Q    So he was, he was the adult that was a part of that and

19   responsible for your well-being, am I correct?

20   A    Correct.

21   Q    Now, you testified and told us about a situation where

22   you told Robert that you were 17 and he sent you back home, am

23   I correct?

24   A    Yes, he did.

25   Q    In fact, he sent you back home the very next morning, am

Jane - cross - Cannick                    1254

1    I correct?

2    A    Yes, he did.

3    Q    Now, and you went back down to Florida and you spoke with

4    your mother, am I correct?

5    A    Yes, I did.

6    Q    And your father, am I correct?

7    A    Yes.

8    Q    And you said that they executed a document giving someone

9    else guardianship over you, am I correct?

10   A    Correct.

11   Q    And as you sit here today, do you recall the name of the

12   person that they gave guardianship to?

13   A    Yes, I do.

14   Q    What's the person's name?

15        MS. GEDDES:  Objection.

16   Q    She gave someone guardianship, right?

17   A    Yes, she did.

18   Q    And before giving guardianship to this person, they never

19   had any conversation with this person, am I correct?

20   A    No.

21   Q    Okay.  They never FaceTimed this person, am I correct?

22   A    No, they did not.

23   Q    They never gave this person any details of their

24   expectations of them with regard to you, am I correct?

25   A    No.

Jane - cross - Cannick                    1255

1    Q    There was no interface whatsoever between your parents

2    and this person that they gave guardianship to, am I correct?

3    A    No.

4    Q    I'm not correct?

5    A    No, to my knowledge, no, I don't know.

6    Q    Now, you testified and told us that Robert had a rule,

7    Robert, according to you, you've had to, when you travel with

8    him on the tour bus, you had to knock on the door before you

9    came out of the bathroom.  Do you remember telling us that?

10   A    That is correct.

11   Q    And that was the tour bus, am I correct?

12   A    Yes, that is correct.

13   Q    And that bus -- withdrawn.

14        Were you the only person who had to knock on the

15   door before coming out of the bathroom?

16   A    Every girlfriend had to knock.

17   Q    Well, everybody had to knock, am I correct?

18        THE COURT:  I'm sorry.  Did you say to go in or to

19   come out of the bathroom?

20        MR. CANNICK:  To come out.

21        THE COURT:  I see, okay.

22   A    Yes.

23   Q    Everyone had to knock because the rule was put in place

24   because there's a microwave on the bus, am I correct?

25   A    There's a microwave on the bus.

Jane - cross - Cannick                    1256

1   Q    There's a refrigerator on the bus, right?

2   A    Yes.

3   Q    And people would walk around with hot food and the door

4   would swing out, am I correct?

5   A    Yes.

6   Q    So that policy was for safety, am I correct?

7   A    It was not for safety.

8   Q    It was not for safety.  Now, you testified and told the

9   jury yesterday that there was someone, one of Robert's

10  girlfriends, according to you, that he dragged by the hair.

11  Do you remember telling us that?

12  A    Yes.

13  Q    Who was that girlfriend?

14  A    Nicq.

15  Q    Now, do you recall at dinners when -- withdrawn.

16          When you were home with Robert and the girlfriends,

17  you would often eat dinner together, am I correct?

18  A    Yes.

19  Q    And Robert would play the piano while the girlfriends

20  ate, am I correct?

21  A    Not that I can recall.

22  Q    The --

23  A    Are you saying every single time or one particular time?

24  Q    He would play the piano when you would have dinner, when

25  you ate?

Jane - cross - Cannick                    1257

1    A    No, he would not.

2    Q    He never did that?

3    A    Once.

4    Q    Once he did that?

5    A    Yes.

6    Q    Do you recall who was there that one time?

7    A    I recall the defendant playing the piano for just me and

8    him.

9    Q    Just you and him?

10   A    Yes.

11   Q    Now, you've wanted to be his primary girlfriend, am I

12   correct?

13   A    I did not.

14   Q    You did not?  You never told him that?

15   A    The defendant put me on a pedestal.

16   Q    Oh, so yesterday, he didn't put you on a pedestal but

17   today, he put you on a pedestal?

18              MS. GEDDES:  Objection.

19              THE COURT:  Overruled.

20   A    I can't stop what someone else does.

21   Q    And you -- I had to catch myself.

22              Now, you testified and told us yesterday --

23   withdrawn.

24              When you were living with Robert, he had you handle

25   his checking accounts, checking books, am I correct?

Jane - cross - Cannick                    1258

1   A    He had an accountant.

2   Q    That's not my question.  My question is did you handle

3   his checking books, his personal checking?

4   A    No.

5   Q    Did Robert give you $5,000 a month in your Chase account?

6   A    It wasn't -- can you rephrase that because I'm not

7   understanding?

8   Q    Did you receive $5,000 a month from Robert when you were

9   living with him being deposited in your Chase account?

10  A    Yes.

11  Q    And Robert also took care of your Uber and Lyft account,

12  am I correct?

13  A    Yes.

14  Q    And now, did you testify, told the jury that Robert

15  prevented you from going to work?

16  A    Yes, he did.

17  Q    What job did you want to work?

18  A    I told him that I wanted to work any job.

19  Q    What skills did you have?

20  A    I had never worked a job before.

21  Q    And you asked your brother to help you get a job, am I

22  correct?

23  A    I don't recall that.

24  Q    Isn't it a fact that you asked ███ to get you a job

25  paying around $28 per month?

Jane - cross - Cannick                    1259

1   A    No, I don't remember.

2   Q    And isn't it a fact that ███ responded to you and told

3   you --

4             THE COURT:  Can I see the parties at the side bar.

5   We don't need the court reporter.

6             (Discussion off the record.)

7             MR. CANNICK:  May I continue, Your Honor?

8             THE COURT:  Yes, go ahead.

9             MR. CANNICK:  While we look for that, I'll move on

10  to something else.

11            THE COURT:  Okay.

12  Q    Now, you testified and told the jury yesterday that

13  Mr. Kelly did not celebrate holidays.  Do you remember telling

14  us that?

15            THE CLERK:  The jurors can't hear you.

16  Q    Do you remember telling us yesterday about Mr. Kelly not

17  celebrating the holidays?

18  A    I believe I said they were delayed but yes.

19  Q    Well, do you recall a text exchange between you and one

20  of your friends and the friend asked you what did Mr. Kelly

21  get you for Christmas?

22  A    I believe that is something I could have talked about,

23  yes.

24  Q    And do you remember telling your friend that you got a

25  lot of clothes, shoes, heels, sneakers, the new Jordans that

CMH      OCR      RMR      CRR      FCRR

1  dropped on Christmas too and a big ass new iPad, iPad Pro?

2  A    Yes, I do.

3  Q    Those were Christmas gifts, am I correct?

4  A    Yes, they were.

5  Q    Now, I'm going to ask -- I asked you yesterday about

6  trips to the beach with Mr. Kelly.  Remember me asking you

7  that?

8  A    Yes.

9  Q    You said you didn't go?

10  A    No, we did go.

11  Q    You did go?

12        MR. CANNICK:  Your Honor, I'm going to ask this be

13  marked as Defense Exhibit X for identification.

14        THE COURT:  Sure.

15  Q    I'm showing you what's been marked as Defense Exhibit X

16  for identification.

17        Do you recognize it?

18  A    Yes, I do.

19  Q    What do you recognize it to be?

20  A    It is me and the defendant.

21  Q    Where?

22  A    At a beach up north that I had found.

23  Q    You found this beach?

24  A    Yes, I did.

25  Q    And you mentioned to him that you wanted to go?

Jane - cross - Cannick                    1261

1    A    After months, yes, I did.

2    Q    Well, my question is did you tell him that you found a

3    beach and you wanted to go to the beach?

4    A    I did, yes.

5    Q    And he took you to the beach?

6    A    Yes.

7              MR. CANNICK:  Your Honor, may we publish to the

8    jury?

9              THE COURT:  Sure.

10             MR. CANNICK:  I'm going to ask that this be marked

11   Defense W for identification.

12   Q    Do you recognize it?

13   A    Yes, I do.

14   Q    What do you recognize it to be?

15   A    Me and the defendant.

16   Q    In the picture?

17   A    Yes.

18             MR. CANNICK:  I'm going to offer it as Defense

19   Exhibit W.

20             MS. GEDDES:  No objection.

21             THE COURT:  All right.  That's in evidence.

22             (Defense Exhibit W so marked.)

23             MR. CANNICK:  May we publish?

24             THE COURT:  Yes.

25             (Continued on next page.)

JANE - CROSS - CANNICK                    1262

1          MR. CANNICK:  Your Honor, may we have a minute or

2    two to just figure out something?

3          THE COURT:  Sure.

4          (Pause in the proceedings.)

5    BY MR. CANNICK:

6    Q    I'm going to show you --

7          THE COURT:  Put on your microphone.

8    Q    -- what's been marked as Defense U for identification,

9    and ask you to take a look at these pages and let me know if

10   you recognize them.

11         You don't need to read them, just see if you

12   recognize them.

13   A    Yes, I do recognize this.

14   Q    What do you recognize it to be?

15   A    This is my handwriting, if that's what you're asking me.

16   Q    Well, is it something you wrote?

17   A    Yes.

18         MR. CANNICK:  I'm going to offer it Defense U for

19   identification into evidence.

20         THE COURT:  Any objection?

21         MS. GEDDES:  I just want to see what it is.

22         No objection.

23         MR. CANNICK:  I'll spare the reading this time.

24         THE COURT:  Okay.

25         (Defense Exhibit U, was received in evidence.)

JANE - CROSS - CANNICK                1263

1   BY MR. CANNICK:

2   Q    Let me show you what's been marked as Defense Exhibit Y

3   for identification.

4        Do you recognize it?

5   A    Yes, I do.

6   Q    What do you recognize it to be?

7   A    My handwriting.

8   Q    Well, is it a letter that you wrote?

9   A    Yes.

10       MR. CANNICK:  I offer this Defense Exhibit Y into

11  evidence.

12       No objection?

13       MS. GEDDES:  No objection.  Sorry.

14       THE COURT:  Okay, it's in evidence.

15       (Defense Exhibit Y, was received in evidence.)

16  Q    I'm going to ask to you read, again, loudly and slowly.

17       I'll sit while she reads.

18       THE COURT:  How long will it be?

19       MR. CANNICK:  It depends how long it takes her to

20  read it.

21       THE COURT:  It's in evidence any way.

22       Can I just see counsel?  I don't need the court

23  reporter.  One second.

24  (Discussion was had off the record.)

25       THE COURT:  All right, the lawyer wants you to read

JANE - CROSS - CANNICK                    1264

1   to document.  Okay?  All right.

2   A     Brother, the reason I haven't been texting you -- been

3   texting or calling you is because of a few reasons.

4         Number one is because I had to take my time and

5   really think about everything ma and pops has done do try and

6   ruin happiness.

7         Number two I came at that Florida to see you because

8   I want to give us a chance as brother and sister to see if I

9   could trust you and confide in you.  Seeing as though I

10  can't -- seeing as though I can't do that with ma and pops, on

11  top of all of that, I really had missed you.  But none of that

12  means anything if you are going to act like them.  And try to

13  talk me out of being happy, because that is exactly what I am

14  with Robert.  And no matter what that you should be respected,

15  even if someone doesn't like it.

16        Sorry.  And no matter what, that should be

17  respected, even if someone doesn't like it.  You have idea

18  what pop -- ma and pops tried to do to Robert in the

19  beginning.  They literally used me to lure him in so that they

20  could blackmail him and do all the shit that they're doing

21  right now.  And the reason I know this is because I was

22  getting ready --

23              MR. CANNICK:  Could you slow down a little.

24              MS. GEDDES:  Objection.

25              THE COURT:  Why don't you let me manage that part,

JANE - CROSS - CANNICK                    1265

1    okay?  Sorry.

2            Okay, keep reading, but don't go too fast.

3            THE WITNESS:   Okay.

4    A    And I'm going to back up a little bit.

5            They literally used me to lure him in so they could

6    blackmail him and do all of the shit that they're doing right

7    now.  And the reason is because I was getting ready to go

8    along with their BS as well.

9            But the only reason I was going to do it is because

10   I liked him and thought he was interesting.  But once I came

11   across him -- but once I came around him and got to know him,

12   my friendship and love for him became genuine because he

13   showed me nothing but love -- excuse me and respect.

14           He's a real person, he's fun, and he was nothing but

15   respectful when he came to meet ma and pops and even you.  But

16   unfortunately, ma and pops never changed their minds or heart

17   about what -- about what it is that they wanted from him,

18   because ma continued to nag me about sleeping with him and

19   trying to get me to take as many pictures and videos as I

20   could of him and me because she said to me that she wanted to

21   use those pictures and videos to blackmail him in case he

22   didn't want to do what they asked him -- what they asked of

23   him.

24           Ma and pops even told me in the beginning to lie

25   about my age.  Because they said if he knows that I'm 17, he

1  wouldn't even mess with me at all.  So I lied and said I was

2  18.  As a matter of fact, ma told me to go to his hotel room

3  wearing something tight and sexy, something that made me look

4  grown, and she wanted me to be all over him sexually and

5  stuff.

6          But honestly when I got there, I felt stupid when I

7  walked in the room because he wasn't even coming on to me.  So

8  I started switching up the plan and telling him about myself.

9  We talked about music, and I told him that I sing but nothing

10  serious, because even though ma and pops want that for me, I

11  wasn't a hundred percent sure that that's what I wanted for

12  me.

13          However, while we were talking, someone started

14  banging on the door and when Rob looked through the peephole,

15  he said it was four policemen outside the door.  Then he let

16  them in, and they asked me my name and how old I was.  I gave

17  them my name and I lied and told them I was 18.

18          The reason I did that is because ma and pops had

19  already told me to tell Robert I was 18, and which I did, so I

20  would have sounded stupid telling the police I was 17 right in

21  front of Rob.

22          So they told me my mom and dad was looking for me

23  and was worried for me.  And I knew right away that was a lie

24  because they're the ones that told me to go to his room.  They

25  also told the police on speaker phone I was 18 and old enough

JANE - CROSS - CANNICK                    1267

1    to make my own decisions, which is why the police left and

2    there was no problem.

3           That's another reason I know they were trying to set

4    him up but offer the police -- but after the police came in

5    the room and saw that there wasn't any wrongdoings going on,

6    ma and pops realized that their plan pretty much didn't work.

7    So obviously they decided to back off of their plan at that

8    time.  Brother, I'm telling you the truth.  I cannot make this

9    up.

10          Then later on after I started getting to know him,

11   and what I mean by that is becoming friends, I admit I started

12   developing feelings for him and went from being excited to be

13   around R. Kelly, the celebrity, to falling in love with Robert

14   the person.

15          And even though I wanted to have sex with him and

16   actually hinted towards that a few times, I backed up from it

17   because he was not showing the same interest.  And I told ma

18   that on several occasions, but she just kept on pushing me,

19   just trying to make me have some type of sexual relationship

20   with him.

21          And the more that happened, the more I started

22   feeling like a hoe.  Because I started realizing that my own

23   parents were just using me and my vagina to get money from R.

24   Kelly.

25          And when it finally hit me hard, it broke my heart

1    into pieces and I decided that day while I was in Chicago to

2    tell him the truth.  Even though I was scared that he might

3    not want to be around me again, it was something I knew I had

4    to do, because I felt really nasty on the inside.

5              I also realized that at that moment is that I am

6    nothing like ma and pops.  So I told him I was 17 and how my

7    parents convinced me to tell him I was 18.  He was not mad

8    about it.  For one, because we hadn't done anything sexually.

9              But he did tell me I had to go home right away, and

10   I cried so bad.  And the only reason he was able to calm me

11   down is by telling me that the only way I could possibly be

12   there in Chicago is that my parents were up here with me where

13   they signed some kind of consent saying that it's okay for me

14   to be here.

15             So long story short, brother, I told ma and pops

16   that.  And they didn't even hesitate, they took me to Florida

17   Education Department to get me pulled out of school and

18   enrolled on to online school.

19             They then took me to the county's clerk office, got

20   the consent form signed and notarized by the state of Florida

21   which said they give their parental rights away for me to be

22   in Chicago.  And I remember being mad and happy at the same

23   time.

24             And the reason I was mad is because I was saying to

25   myself what kind of parents would sign their 17-year-old

JANE - CROSS - CANNICK                1269

1    daughter away to be in Chicago by herself to be with someone

2    that they never met or even got to know.  And the reason I was

3    happy was because honestly by this time, even though Rob

4    didn't know it, but I had fallen in love with him and I wanted

5    to be around him for that reason.

6            And seeing what ma and pops had done to me having a

7    clear understanding of them trying to use me and for their own

8    financial gain, I wanted to be far away from them as possible.

9    Because all ma would do every time I talked on the phone is

10   threaten me curse me out.  She would tell me that they were

11   going to destroy R. Kelly's career through social media, talk

12   shows, or whatever they could do if I didn't start sending

13   them money.

14           And at first I didn't tell Robert stuff in fear that

15   he would send me back home, because I knew he would not want

16   to deal with all of that.  Pops actually started asking R to

17   use his lighting company to do his shows, but Rob told him he

18   already had a lighting company that he had been using for 20

19   years and they already knew his show.  And pops didn't like

20   that at all.

21           Then ma and pops came to me and tried to get me to

22   convince Robert to team up with them and put his name and logo

23   on a dildo that had a Bluetooth and would play his music while

24   people had sex.

25           And I told them I was not going to talk to him about

JANE - CROSS - CANNICK                    1270

1   that because I was uncomfortable having that kind of convo

2   with him, and besides I thought it was a ridiculous idea.

3           So they decided to bring dildos to his show.  After

4   his show was over, ma and pops was back stage with R. Kelly,

5   and ma pulled a dildo out in front of me and everybody trying

6   to get Rob to sign a letter of consent about being in business

7   with them.

8           And out of respect for them, because they were my

9   parents, he took the paper but did not sign it.  And later on

10  told them he didn't feel comfortable being a part of something

11  like that.  And that's another thing that they did not like.

12          And I remember ma telling Robert and me that she

13  didn't care if we had sex or whatever because I'm grown and

14  can do whatever I want.  And by this time I'm 18.  She said

15  just let her be a driver, and that didn't happen at that time.

16          I had been to multiple shows and living in Chicago,

17  but at the same time I was continued -- continuing to be

18  threatened by ma because she was not getting any money from

19  Robert or me.

20          I told her several times while I was even 18 that we

21  were not even doing anything sexually, and she would just get

22  really angry with me when I would tell her that.  She got so

23  angry that I don't even think she realized that she was

24  texting all of those threats and what she would do.  But she

25  even text Rob:  Since you're fucking my daughter, you need to

JANE - CROSS - CANNICK                1271

1  send $20,000 to this bank account and then $10,000 every month

2  after.

3        Brother, I don't need to say anything else at this

4  point except after they realized that they were not going to

5  get any money out of him or me, that's when they started

6  teaming up with the ████████ and started telling all of these

7  lies on social media about R. Kelly.

8        They started digging in his past, finding old

9  girlfriends that are mad that things didn't work out between

10  R. Kelly and them playing the concerned parents role asking --

11  acting like their daughter is missing, held captive in sex

12  cults and all of the other lies.

13        They started promising all of these broke-ass

14  females from his past that they were going to get money with

15  deals, reality shows and basically be famous if they came

16  forth and said something bad about R. Kelly.  They would even

17  coach them on what to say.

18        But I have never been any of those things.  As a

19  matter of fact, since I have been with him, it has the total

20  opposite.  For the last time, I'm happy with Robert, I'm happy

21  with R. Kelly, or whatever else you want to call him and I

22  wouldn't trade him for the world.

23        Now people can believe that or not, because I

24  honestly don't care what the hell they believe at this point

25  because I'm totally over it.

JANE - CROSS - CANNICK                    1272

1   Q     Thank you.

2         Now, during that time that you stayed with Robert

3   and the other girlfriends, were there wellness checks by the

4   police?

5   A     Yes, there was.

6   Q     Wellness checks in Chicago?

7   A     Yes.

8   Q     Wellness checks in Atlanta?

9   A     Yes.

10  Q     And wellness checks, that's where someone from law

11  enforcement comes, they speak to you privately, and they

12  either take action or they leave; am I correct?

13  A     It was never private.  But, yes, you're correct.

14  Q     And you had also wellness check done by Homeland

15  Security; am I correct?

16  A     I don't remember.

17             MR. CANNICK:  I have nothing further.

18             THE COURT:  Okay.

19             Redirect examination?

20             MS. GEDDES:  Yes.

21             MR. CANNICK:  I do have one.  I offer --

22             THE COURT:  Go ahead.

23             MR. CANNICK:  No, this was something the Court I

24  think reserving a ruling with respect to the videos, H and I,

25  I'm going to offer them into evidence at this time.

JANE - CROSS - CANNICK                    1273

1              MS. GEDDES:  The audios?

2              MR. CANNICK:  Yes, the audio.  And videos as well.

3              THE COURT:  Do you have an objection?

4              MS. GEDDES:  As long as I can redirect on it, it's

5      fine.

6              THE COURT:  I thought she admitted that she made the

7      statements, that's why I'm not sure why they would come into

8      evidence but...

9              MR. CANNICK:  I think we would have -- I don't want

10     to continue discussing it.

11             THE COURT:  Okay.  Me either.

12             Let me reserve on it.  I don't think it has to come

13     in at the moment.

14             MR. CANNICK:  All right.

15             MS. GEDDES:  Your Honor, can we have a sidebar for

16     just two minutes to discuss something about redirect?

17             THE COURT:  Sure.  Let's have the court reporter.

18     (Continued on the next page.)

19     (Sidebar conference.)

20

21

22

23

24

25

```
                           SIDEBAR                      1274
```

 1          (The following occurred at sidebar.)

 2          MS. GEDDES:  I just wanted to flag three things for

 3    the Court that I believe either you have already ruled on, or

 4    the defense definitely opened the door for us.

 5          First, on cross-examination, defense counsel asked:

 6    Did your parents tell you to tell him that you were 18 years

 7    old?  Yes or no?  No, they did not.

 8          I think she needs to be able to explain why she said

 9    she was 18 and what -- and so it's going to open the door to

10    his past, which I believe defense counsel has now done.

11          MR. CANNICK:  No.

12          THE COURT:  Hold on.  Hold on.

13          When you say "open the door to his past," there are

14    certain references in the -- I can't remember which --

15          MR. CANNICK:  Yes.

16          THE COURT:  -- so many, but there's certainly a

17    reference that the parents were exploiting whatever his past

18    was.

19          I think it's -- as I ruled before, I think it is

20    relevant to explain why she told him she was 18.  I don't

21    think you can dispute that.  I think where we might part

22    company, or where you part company, is exactly what you're

23    going to ask.  And that's what I would like to know.

24          MS. GEDDES:  I'm only going to ask:  Why did you

25    tell the defendant that you were 18 and not 17?

```
                          SIDEBAR                    1275
```

1          THE COURT:  And what she is going to say?

2          MS. GEDDES:  She is going to say:  Because she was

3    aware of his past involving child porn.

4          THE COURT:  Child porn?

5          MS. GEDDES:  I asked her in preparation for this,

6    and that's what she said.

7          THE COURT:  Okay.

8          MS. GEDDES:  Maybe she won't say that.

9          MR. CANNICK:  No.  I'm sorry.

10         THE COURT:  Are you doing my job again?  I must not

11   be so good at this.

12         MR. CANNICK:  You are.

13         THE COURT:  All right.  She can't say "child porn,"

14   even though that's what she said is the truth.

15         You can lead her -- well, that's not really so

16   suitable either.  I think -- is this something you're planning

17   to do at the beginning?  How long is the redirect going to be?

18         MS. GEDDES:  Not that long.

19         It will go through the break.  I would be very

20   surprised if it did not.

21         THE COURT:  It's just how she's going to answer the

22   question.  Child porn is a loaded -- even if it's true,

23   it's -- it's one of the reasons why I excluded that other

24   evidence, for a variety of reasons.

25         But if you want to take a minute, and I guess the

SIDEBAR                                      1276

1  two of you can walk over to her and say:  The answer to the

2  question would be -- what did we say yesterday?

3            MR. CANNICK:  Yes.  Well, before I answer that,

4  could I suggest this to the Court?

5            The reason why she's been telling the jury all the

6  while that she told him that she was 17, is because her

7  parents told her to say she was 17.  I think that's the

8  answer.  This other stuff is gratuitous.

9            MS. GEDDES:  But that's not her answer.  Her answer

10 to you was "No".  That's not why.

11           THE COURT:  Well, people can have more than one

12 reason for doing something, and I'm trying to think of how to

13 do this.

14           I think there has been -- there has been reference

15 to this court proceeding, and maybe that's the way to refer to

16 it.

17           MR. CANNICK:  I don't have a problem with that.

18           THE COURT:  And if you both talk -- you go stand

19 next to her so it doesn't look like you're coaching her, that

20 she was aware of the prior court proceeding that he had.

21           MS. GEDDES:  Involving a minor?

22           MR. CANNICK:  No.

23           THE COURT:  I think -- no.  She was aware of a prior

24 court proceeding that he had.  Let's leave it there.

25           MS. GEDDES:  Okay.  We talked earlier about that the

SIDEBAR                    1277

1   letters he introduced where the defendant -- where the witness

2   wrote the defendant in jail.

3              THE COURT:  Right.

4              MS. GEDDES:  I am going to ask her about those, and

5   it is going to open the door to the fact he was in jail.  I

6   believe Your Honor already ruled on that.

7              MR. CANNICK:  Why can't you say that you were --

8   because when I asked the questions about it, I asked:  You

9   guys were apart, you were separated?

10             THE COURT:  Well, A, I think it's come in sort of

11  obliquely already, because she talked about visitation.

12             MR. CANNICK:  Right.

13             THE COURT:  And B -- well, the government has

14  represented that the defendant told her to write nice letters

15  because his mail was being read.

16             MR. CANNICK:  Okay.

17             THE COURT:  And that's -- so I'm going to permit

18  that.

19             MS. GEDDES:  And then finally on cross, she was

20  asked about monetizing on her time with R. Kelly on a book

21  deal that she had.  I plan to ask her how her life has been

22  since she left him, and I anticipate that she's going to tell

23  him that it was pretty awful, because she has been harassed

24  excessively.

25             MR. CANNICK:  What does that have to do with

SIDEBAR                          1278

1   monetizing?

2           MS. GEDDES:  Because --

3           MR. CANNICK:  I can get into what her life has been

4   like, but I stayed away from that.

5           THE COURT:  You know, I think it is probably an

6   argument that's best left for summation as a general matter,

7   what benefit people have coming and talking about relating

8   things like that rather than, otherwise he's going to get up

9   and talk about -- as I say, I am assuming that there are a

10  number of public appearances, and so -- which I think that it

11  doesn't -- I'm going to deny it.  That's going to --

12          MS. GEDDES:  Okay.

13          MR. CANNICK:  We have videos of her twerking to the

14  floor and back.

15          THE COURT:  You need to get yourself here into 2021

16  with the rest of us, okay?

17          All right.  And we're -- I think we're the same age.

18          (End of sidebar conference.)

19          (Continued on the next page.)

20

21

22

23

24

25

1           (In open court; Jury present.)

2           THE COURT:  All right, redirect examination?

3           MS. GEDDES:  Yes, Your Honor.

4   REDIRECT EXAMINATION

5   BY MS. GEDDES:

6   Q    On cross-examination, defense counsel asked you about the

7   reasons that you told the defendant that you were 18 years old

8   rather than your true age of 17.

9           Why did you tell defendant that you were 18 and not

10  17?

11  A    I had told the defendant I was 18 because of a previous

12  court proceeding.

13  Q    And not one of yours, correct?

14  A    No, the defendant's.

15  Q    On cross-examination, you were asked about a document

16  that you testified about on direct where your parents

17  authorized another individual to act as your guardian while

18  you were still 17.

19          Do you recall those questions on both direct and

20  cross?

21  A    Yes, I do.

22  Q    And on direct, you identified that individual who is

23  named as your guardian in those documents as Juice's mother,

24  correct?

25  A    Yes, that is correct.

LINDA D. DANELCZYK, RPR, CSR, CCR

JANE - REDIRECT - GEDDES                    1280

1  Q    How did you know Juice's mother?

2  A    She -- the defendant had told me about her, and she -- he

3  would allow her to be around us.

4  Q    And aside from the defendant, did you have any other

5  means of knowing Juice's mom?

6  A    I did not, no.

7  Q    And about how about parents, did your parents have any

8  other means of knowing Juice's mom?

9  A    They did not, no.

10 Q    On cross-examination, you were shown a variety of

11 letters, handwritten letters.  There was Defense Exhibit N and

12 O, and I think S and T.  I'm going to show you in a moment.

13         Do you recall those letters?

14 A    Yes.

15 Q    And they were letters to -- purportedly to family

16 members; is that correct?

17 A    Correct.

18 Q    Did you send any of those letters?

19 A    My family never saw those letters.

20 Q    And what was the purpose of writing those letters?

21 A    The defendant would have other girlfriends make me write

22 those letters.  And he said that they would go to his

23 attorneys and they would never see the light of day.

24 Q    And whose idea was the content of those letters?

25 A    It was to protect the defendant.

LINDA D. DANELCZYK, RPR, CSR, CCR

JANE - REDIRECT - GEDDES                    1281

1      MR. CANNICK:  Objection.

2      THE COURT:  Well, the question is who -- whose idea

3  was it to write those letters?

4      THE WITNESS:  It was the defendant.

5  Q    And who provided -- who told you -- who, if anyone, told

6  you what to write in those letters?

7  A    The defendant would tell me exactly what to say.

8  Q    And you testified earlier about the reason for it.

9      What was the reason for it?

10 A    It was to protect the defendant.

11 Q    And to protect him from what?

12     MR. CANNICK:  Objection.

13     THE COURT:  Overruled.

14 A    Again, previous court proceedings, a previous attorney

15 had told him to make sure every girlfriend was writing letters

16 to protect the defendant.

17 Q    Fair to say it was to protect him from --

18     MR. CANNICK:  This is leading, Your Honor.

19     THE COURT:  It's overruled.

20 Q    Fair to say it was to protect him in a trial like this on

21 very serious charges?

22 A    Yes.

23     MR. CANNICK:  Objection.

24     THE COURT:  Overruled.

25 Q    And I'm showing the witness what's been marked for

1    identification as Government Exhibit 315 and 316.

2              May I approach, Your Honor?

3              THE COURT:  Yes.

4              (Counsel approaches the witness.)

5    Q    Do you recognize what was shown in Government Exhibit 315

6    and 316?

7    A    Yes, I do.

8    Q    Just generally speaking, what are those?

9    A    Those are statements that the defendant made me write.

10   Q    And are they typewritten statements?

11   A    Yes, they are.

12   Q    And whose idea was the content in these statements?

13   A    The defendant.

14             MS. GEDDES:  Government offers 315 and 316.

15             THE COURT:  Any objection?

16             MR. CANNICK:  May I see them.

17             THE COURT:  Sure.

18             MR. CANNICK:  No objection, Your Honor.

19             THE COURT:  Okay.  That's in evidence.

20             (Government Exhibit 315 and 316, were received in

21   evidence.)

22   Q    And I'm not going to have you read out each of these as

23   they're somewhat lengthy, but is some of the content that was

24   in those handwritten letters that you previously read during

25   your cross-examination also repeated in these typewritten

JANE - REDIRECT - GEDDES                      1283

1   letters?

2   A    Yes.

3   Q    And at the time -- and in those letters, both that you

4   read on cross-examination and in Government Exhibit 315 and

5   316, there is conversation about what, if anything, you and

6   your mom did prior to meeting the defendant in Jacksonville.

7         Do you recall what was -- do you recall what was in

8   those letters about that?

9   A    I do, yes.

10  Q    And was that true what you wrote there?

11  A    It was fabricated.

12  Q    And, again, whose idea -- whose idea was it to fabricate

13  that?

14  A    The defendant's.

15  Q    And I'm showing the witness only what's been marked for

16  identification as Government Exhibit 456 and 461.

17         May I approach?

18         THE COURT:  Yes.

19         (Counsel approaches the witness.)

20  Q    Do you recognize what's shown in 456 and 461?

21  A    Yes, I do.

22  Q    And just generally speaking, what are those?

23  A    Those are letters to exploit me, to protect me.

24         THE COURT:  I'll sustain just to that part.

25         Those are letters just -- are those letters similar

JANE - REDIRECT - GEDDES                    1284

1    to the other ones you've described?

2              THE WITNESS:  Yes.  They were to --

3              MR. CANNICK:  Your Honor.

4              THE COURT:  Yes?  All right, I don't know what

5    you're objecting to.  She hasn't said anything.

6              All right, next question.  Those are letters similar

7    to the ones before.

8              Go ahead.

9    Q    And who wrote these letters?

10   A    I did.

11   Q    Whose idea was the content?

12   A    The defendant's.

13             MS. GEDDES:  Government offers 456 and 461.

14             MR. CANNICK:  No objection.

15             THE COURT:  Okay, those are in evidence.

16             (Government Exhibit 456 and 461, were received in

17   evidence.)

18   Q    I want to -- may I publish, Your Honor?

19             THE COURT:  Yes.

20             MS. GEDDES:  To the jury only please.

21             (Exhibit published.)

22   Q    Could you please, without reading --

23             Is that your name signed at the bottom?

24   A    Yes, it is.

25   Q    Okay.  So please don't read your name, but could you read

JANE - REDIRECT - GEDDES                    1285

1  the content of what you wrote in this one-page letter?
2  A    Yes.
3          Robert, I wanted you but you only wanted me to be
4  friends and -- I'm sorry.
5          Robert, I wanted you but you only wanted me to be
6  friends.  You only wanted to help me learn and watch me grow.
7  I wanted more.  I wanted you to make me feel good.  I
8  desperately wanted you to want me how I crave you.
9          I started to make threats to you and I'm sorry.  If
10 you don't bring me back that dick, then I'm going to tell
11 everyone you raped me.  I'm going to tell everyone you've been
12 raping me since I've been a minor.
13         I know that saying that could only -- could not only
14 jeopardize your image but ruin everything you have.  But I
15 want you and I won't stop until I have you.
16         I know you don't want me to -- I know you don't want
17 to have sex with me, but I yearn to feel your dick inside of
18 me.  You're not trying to seduce me, and that makes me want
19 you even more.
20         I knew you'd never want to have sex with me, so I
21 came up with stuff to say so you'd have no choice but to fuck
22 me.  I'll tell everyone you raped me.  I'll tell everyone you
23 hit me and was fucking a minor.  I'll make up lies and say you
24 tied me down and fucked me as I cried out.  Even though we
25 both know you didn't, I just wish you wanted to fuck me as bad

1   as I wanted fuck you.  I'm sorry I couldn't accept just being

2   friends.

3   Q    Anything in that letter that you just wrote accurate?

4   A    No.  Aside from where I say abuse, but everything else is

5   not true.

6   Q    And is this an example of one of the letters that the

7   defendant had you and other females who were living with him

8   write to protect himself?

9   A    Yes.

10           MS. GEDDES:  I'd like to publish for the witness --

11  not for the witness only -- I want to publish for the jury

12  only what's in evidence now as Government Exhibit 456.

13           THE COURT:  Okay.

14           (Exhibit published.)

15  Q    Again, without reading --

16           At the bottom, whose name is that?

17  A    Mine.

18  Q    So without reading your name -- without reading your

19  name --

20           And just to be clear, is that both your first and

21  your last name on there?

22  A    Yes, it is.

23  Q    And that's your signature?

24  A    Yes, it is.

25  Q    All right, so without reading your name -- we'll cover up

JANE - REDIRECT - GEDDES                    1287

1    just to make sure, thank you -- can you please read what's

2    written in Government Exhibit 456?

3    A    Robert, I also did something bogus just in case you

4    caught me stealing and let me go.  I decided I would spank

5    myself really hard until I had bruises on me and was going to

6    blackmail you and said you did it to protect myself.

7             And I don't want to be thinking like that because

8    that's exactly what my mom and dad is doing to you right now.

9    I hope one day you do forgive me.

10   Q    Did you ever spank yourself?

11   A    Never.

12   Q    On cross-examination -- and just to be clear, fair to say

13   this is another letter that the defendant asked you to write

14   for his protection in the future?

15   A    Yes, it is.

16   Q    On cross-examination, you were asked whether you took any

17   pictures of bruises that you had and whether you sent those to

18   any family member.

19             Do you recall those questions?

20   A    I do, yes.

21   Q    Did you take any pictures of bruises that you had?

22   A    I did, yes.

23   Q    What did you do with those photographs -- what did you do

24   with them?

25   A    At the time I had sent them to my email from my email.

1    Q    So you sent them to yourself?

2    A    Yes.

3    Q    Why did you do that?

4    A    Because the defendant had already been like checking my

5    phone and had my password.

6    Q    And so what about that made you send yourself those

7    photographs?

8    A    He didn't know anything about apps and emails, so I

9    figured if I had sent it to my email, that was one place he

10   wouldn't know.

11   Q    So was it a manner in which you would be able to keep

12   those photographs?

13   A    Yes, it was.

14   Q    Now, did there come a time when either the defendant or

15   someone else did go through your emails?

16   A    Yes, it was.

17   Q    Who went through your emails?

18   A    He had Juice go through my phone.

19   Q    How did that come about?

20   A    I had gotten in trouble, and he had her throughly check

21   my phone while he was in the studio.

22   Q    And do you recall what, if anything, Juice did after she

23   checked your phone?

24   A    Yes.

25   Q    What did she do?

JANE - REDIRECT - GEDDES                    1289

1    A    She had told the defendant that I had sent pictures to

2    myself.  And he took that phone and I never saw it again.

3    Q    And have you had an opportunity to see whether or not --

4    do you still have the email account on which you -- from which

5    you sent those -- to which you sent those photographs?

6    A    I don't remember that email in 2015.

7

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jane - redirect - Geddes                    1290

1   EXAMINATION CONTINUES

2   BY MS. GEDDES:

3   Q    Did you tell the for the Government about an e-mail

4   address that you believed you had in 2015?

5   A    Yes, I did.

6   Q    And did you tell the Government that, perhaps, they could

7   find those photographs?

8            MR. CANNICK:  Objection.

9            THE COURT:  Overruled.

10  A    Yes, I did.

11  Q    You were asked on cross-examination about the name that

12  you called the defendant.

13           Do you recall those questions?

14  A    Yes, I do.

15  Q    When you first started spending time with the defendant,

16  what did the defendant ask you to call him?

17  A    Strictly, "Daddy."

18  Q    And when, if ever, did you start calling him by another

19  name?

20  A    Probably when I was about 19, I started calling him Papa

21  Bear.

22  Q    Can you call him Papa Bear when you were 17?

23  A    Never.

24  Q    You were asked on cross-examination about your first trip

25  to see the defendant and whether or not there was a concert in

Jane - redirect - Geddes                    1291

1    Los Angeles during that first trip.

2            Do you recall those questions?

3    A    I do, yes.

4    Q    And you recall you were shown a document that purported

5    to show the different venues where the defendant performed; do

6    you remember that?

7    A    Yes.

8    Q    Now, do you remember the first time that you saw the

9    defendant outside of your home state of Florida?

10   A    It was on the west coast, not exactly the city, no.

11   Q    Okay.

12           MS. GEDDES:  And I am showing the witness what's in

13   evidence as Government Exhibit 217.

14   BY MS. GEDDES:

15   Q    And in 217 that's an American Airlines boarding pass that

16   you previously testified about, do you recall that?

17   A    Yes, I do.

18   Q    And --

19           MS. GEDDES:  Actually, can we show -- this is in

20   evidence, but I don't want to show the public, just the jury,

21   please.

22           (Exhibit published to the jury.)

23   BY MS. GEDDES:

24   Q    And this was for travel on April 29th of 2015, correct?

25   A    Yes, it was.

Jane - redirect - Geddes                    1292

1    Q    And why did you go to Los Angeles?

2    A    The defendant had told me to text his assistant saying

3    that Mr. Kelly said to get me to LA.

4    Q    And the defendant paid for that?

5    A    Yes, he did.

6    Q    And when you got to Los Angeles, did you see the

7    defendant?

8    A    I did.

9    Q    Any doubt in your mind that you saw the defendant in

10   Los Angeles on that first trip?

11   A    No.

12   Q    You were asked about a -- whether there was a concert on

13   that first trip.

14         Does it -- did you have sexual contact with the

15   defendant even when he didn't have a concert?

16   A    Yes, I would.

17   Q    Does the fact of the defendant having a concert have any

18   impact whatsoever on whether or not you might have sexual

19   contact with him?

20   A    No, it did not.

21   Q    And during that trip, that first trip to Los Angeles,

22   that's when the defendant told you about the rules for the

23   first time, correct?

24   A    Yes.

25   Q    And that's when the defendant told you that you should be

Jane - redirect - Geddes                    1293

1   wearing sweats for the first time; correct?

2   A    Yes.

3   Q    And that's when the defendant told you that even though

4   you -- that the trip wasn't a wasted trip because it gave you

5   an opportunity to "soak it all in," do you recall that?

6   A    Yes, I do.

7   Q    And that all happened in Los Angeles?

8   A    Yes, it did.

9   Q    Now, you were asked about the first time that you had

10  sexual intercourse with the defendant.

11            What do you remember about the location, and I'm not

12  talking about the city, what do you remember about the

13  location where you and the defendant first had sexual

14  intercourse?

15  A    I do recall that it was in the west coast and I remember

16  that the room was a suite that had a kitchenette and it had a

17  fireplace.

18  Q    And you have a clear memory of that?

19  A    Yes, I do.

20  Q    And what do you remember about whether or not you had had

21  sexual contact by the time you went to the Mandalay Bay in Las

22  Vegas?

23  A    I -- can you rephrase that?

24  Q    Sorry, yes.

25            What do you remember about -- do you remember

Jane - redirect - Geddes                    1294

1   whether you had had sexual intercourse with the defendant by

2   the time you went to Las Vegas and stayed at the Mandalay Bay?

3   A    Yes, I do.

4   Q    Had you had sexual intercourse with the defendant by that

5   time?

6   A    Yes, I had.

7   Q    So, do you know that you had sexual intercourse with the

8   defendant prior to when you went to Vegas?

9   A    Yes, I do.

10  Q    How do you know that?

11  A    Because of the fireplace, that was the first time.  And I

12  just remember that fireplace vividly 'cause I've never been in

13  a hotel room with one.

14  Q    And when you went to Las Vegas, do you remember what

15  happened in the hotel room in Las Vegas?

16  A    I do, yes.

17  Q    Did you have sexual intercourse with the defendant there?

18  A    I did, yes.

19  Q    Was it memorable in some form?

20  A    Yes.

21  Q    Why?

22  A    Because he wouldn't let Juice leave.

23  Q    It was in front of her?

24  A    Yes.

25  Q    On cross-examination you were asked whether you told the

Jane - redirect - Geddes                    1295

1  Government that the defendant told you that you weren't

2  pulling your weight as far as your music career was concerned.

3          Do you recall those questions?

4  A    I do.

5  Q    Do you remember the defendant saying you weren't pulling

6  your weight as far as your music career?

7  A    No.

8  Q    You were also asked about whether your mother had told

9  you to take as many photographs as you possibly could of you

10 and the defendant together and to include crazy-face ones

11 kissing because she felt you felt that your mother wanted to

12 exploit Mr. Kelly to the media and to take advantage of his

13 finances.

14         Do you recall those questions?

15 A    I do, yes.

16 Q    And when you were asked that question, you told defense

17 counsel that that wasn't true.

18         Can you explain what you meant by that?

19 A    My mother had asked me to send her pictures of me and the

20 defendant; however, the defendant had added on to exploit him.

21 Q    So, when your mom asked you to take photographs of you

22 and the defendant, she never told you that it was for the

23 purpose of exploiting the defendant, did she?

24         MR. CANNICK:  Objection.

25 A    Correct.

Jane - redirect - Geddes                    1296

1          THE COURT:  Overruled.

2   A    That is true.

3   Q    And who gave you the idea that it was for the purpose of

4   exploiting the defendant?

5   A    The defendant.

6   Q    And by the way, you did take certain photographs of

7   yourself and the defendant together, correct?

8   A    Yes, I did.

9   Q    And you testified about some of those photographs on

10  direct examination, right?

11  A    Yes, I did.

12  Q    Did you ever provide those to the media?

13  A    Some of them, yes.

14  Q    Did you provide them to the media back in 2015 when you

15  took them?

16  A    Never.

17  Q    2016?

18  A    Never.

19  Q    To your knowledge, did your parents provide them to the

20  media in 2015?

21  A    Never.

22  Q    2016?

23  A    Never.

24  Q    And when you said you provided some to the media, what

25  are you referring to?

SAM     OCR     RMR     CRR     RPR

Jane - redirect - Geddes                    1297

1  A    I'm referring to when the defendant was no longer

2  residing at Trump Towers.

3  Q    So, fast toward to 2020?

4  A    2019.

5  Q    2019?

6  A    Yes.

7  Q    And why did you provide them to the media?

8  A    I don't recall why actually, but I believe it was for

9  different reasons.

10  Q    When you provided it to the media, were you still with,

11  not physically with, but were you still with the defendant?

12  A    I was, yes.

13  Q    And was it -- was it, in part, to show that the defendant

14  wasn't a bad guy?

15          THE COURT:  Well, don't lead the witness.

16  A    It was, yes, it was.

17          THE COURT:  Just rephrase it.

18          THE WITNESS:  I'm sorry.

19  BY MS. GEDDES:

20  Q    Can you explain some -- I know you said that there were

21  different reasons that you provided them to the media.

22  A    Yes.

23  Q    Can you explain some of those reasons that you provided

24  it to the media?

25  A    Well, it was -- it was for a documentary that was a

Jane - redirect - Geddes                    1298

1  friend of the defendant's and he had publicized them from that

2  documentary.

3  Q    And when you said "he," who are you referring to?

4  A    The friend of the defendant.

5  Q    And did the defendant -- what, if anything, did the

6  defendant say about --

7  A    The documentary was in favor of the defendant.

8  Q    And whose idea was the documentary?

9  A    The defendant's friend.

10 Q    And what, if anything, did the defendant -- the

11 defendant, himself, think of the idea of the documentary?

12          MR. CANNICK:  Objection.

13          THE COURT:  Sustained.  I mean you won; sustained.

14 BY MS. GEDDES:

15 Q    What, if anything, did the defendant say to you about the

16 documentary?

17 A    It -- he didn't say anything about the documentary, but

18 his friend did say that it was --

19          THE COURT:  Okay, no.

20          THE WITNESS:  I'm sorry.

21          THE COURT:  That's all right.

22          Next question.

23          THE WITNESS:  Okay.

24 Q    On cross-examination you were asked about certain

25 activities of Juice and Nicq.

Jane - redirect - Geddes                 1299

1          Do you recall some of those questions?

2   A    Yes.

3   Q    You were asked whether Nicq had a car, Juice had a job;

4   do you remember that?

5   A    Yes, I do.

6   Q    Were you allowed to discuss Juice's personal life with

7   Juice?

8   A    No.

9   Q    And how about Nicq?

10  A    No.

11  Q    Do you really have any idea whether Nicq had a car?

12  A    No.

13  Q    Whether Juice had a job?

14  A    No.

15  Q    Did you have a job?

16  A    No, I did not.

17  Q    Did you have a car?

18  A    No, I did not.

19  Q    And on cross-examination you were asked about the fact

20  that you didn't have a job; and counsel asked you, I believe,

21  whether you, at times, tried to get a job.

22          Do you recall those questions?

23  A    Yes, I do.

24  Q    I want to direct your attention to the fall, the summer

25  and fall of 2019.

SAM     OCR     RMR     CRR     RPR

Jane - redirect - Geddes                    1300

1      Did you take any steps to try to get a job then?

2  A    Yes, I did.

3  Q    And did you have discussions with the defendant about

4  trying to get a job?

5  A    Yes, I did.

6  Q    What types of jobs did you try to get during the spring

7  of -- I'm sorry, the summer of 2019 and the fall of 2019?

8  A    Any job that was hiring.

9  Q    And can you just say, like, what types of jobs you were

10 looking at?

11 A    Retail, corporate, office; those are a few.

12 Q    And what, if anything, did the defendant say about your

13 getting a job?

14 A    He said that it would have to be right.

15 Q    And did he explain what he meant by it being "right"?

16 A    We already knew what that meant.

17 Q    What did you understand that the defendant meant?

18 A    Meaning that the job -- no men could be working at that

19 job in order for us to get hired there.

20 Q    Were you able to find a job where you didn't interact

21 with men?

22 A    No, we were not.

23 Q    And by the way, when you say "we," who are you referring

24 to?

25 A    Me and Joy.

Jane - redirect - Geddes                1301

1   Q    Did you try and get a job on your own?

2   A    I don't remember.

3   Q    Okay, but you said "we."  I just want to understand.

4        What was Joy's role in getting a job?

5   A    Oh, no, we -- we had to get a job where we were hired

6   together.  That was also what he said.

7   Q    And by "he," referring to the defendant?

8   A    Yes.

9   Q    So, you had to find a job where both you and Joy could

10  work together and you couldn't interact with men, is that

11  correct?

12  A    Yes.

13  Q    On cross-examination you were asked about a time when you

14  left the defendant and went to Florida and then returned back

15  to the defendant.

16        Do you recall those questions and your answers?

17  A    I do, yes.

18  Q    And do you remember who you went to see when you went to

19  Florida?

20  A    Yes, I do.

21  Q    Who did you went to see, not by name, but by relation?

22  A    Oh, my brother.

23  Q    And do you remember how you got to Florida?

24  A    Yes, my brother had paid for the flight.

25  Q    And do you remember when you arrived in Florida,

SAM     OCR     RMR     CRR     RPR

Jane - redirect - Geddes                    1302

1    approximately what time of day or night?

2    A    Yeah, it was definitely evening/noon time.  It probably

3    had to be about any time after 5:00 p.m.

4    Q    Okay.  And do you remember what you did that night in

5    Florida?

6    A    Yes, I do.

7    Q    What did you do?

8    A    My brother had invited me out to like a hookah lounge to

9    try and make me feel comfortable -- better.

10   Q    And did you then go to the hookah lounge?

11   A    Yes, I did.

12   Q    And did you then -- where did you go after that?

13   A    I went back to my brother's apartment.

14   Q    And what did you do when you went back?

15   A    I -- the defendant had booked me a flight for the next

16   morning.

17   Q    Do you remember what time you left?

18   A    Immediately -- oh, actually, I believe I left that same

19   night.

20   Q    So, approximately how long were you in Florida?

21   A    For less than twenty-four hours.

22   Q    On cross-examination you were asked about how you dressed

23   when you met the defendant at the Dolphin Hotel.

24        Do you recall that?

25   A    Yes, I do.

SAM    OCR    RMR    CRR    RPR

Jane - redirect - Geddes                    1303

1  Q    And you read certain letters and you were asked about

2  whether it was true that it was your mom's idea how to dress

3  that day.

4        Do you recall that?

5  A    Yes, I do.

6  Q    And how your mom wanted you to look all grown.

7        Do you recall that?

8  A    Yes, I do.

9        MS. GEDDES:  I am showing the witness what's been

10 marked for identification as Government Exhibit 233(a).

11       May I approach, Your Honor?

12       THE COURT:  Yes.

13 BY MS. GEDDES:

14 Q    Generally speaking, do you recognize, without -- do you

15 recognize what's shown in 233(a)?

16 A    I'll have to see it.

17       MS. GEDDES:  Okay, hold on.

18 Q    I am going to direct your attention -- I am going to put

19 it --

20       MS. GEDDES:  Can I show the witness only on the

21 ELMO, please?

22       THE COURT:  Yes.

23 Q    And there is a part that is highlighted.

24       Can you take a moment and read that, please?

25 A    Yes.

SAM    OCR    RMR    CRR    RPR

Jane - redirect - Geddes                              1304

1   Q     To yourself.

2   A     Yes, I can.

3   Q     What is that, just generally speaking?

4   A     It is a message from my mother.

5   Q     And what is the date of that message?

6   A     April the 21st, 2015.

7   Q     And do you remember what you were doing that day?

8   A     Yes.

9   Q     What were you doing?

10  A     I was going to audition for the defendant.

11  Q     At the Dolphin Hotel?

12  A     Yes, I was.

13  Q     Does that -- can you read the text message that's

14  highlighted from your mother on April 21st of 2015?

15              THE COURT:  I don't think it's in evidence yet.

16              MS. GEDDES:  I don't want to offer the entire thing

17  in evidence.

18  BY MS. GEDDES:

19  Q     Does that -- do you remember what your mom told you that

20  day?

21  A     Yes, I do.

22  Q     What did your mom tell you that day?

23  A     She, basically, told me that -- that not to look too

24  grown.

25  Q     And that was for your audition with the defendant?

SAM      OCR      RMR      CRR      RPR

Jane - redirect - Geddes                    1305

1    A    Yes.

2    Q    On cross-examination yesterday you were asked about

3    certain typewritten letters that you said you wrote and sent

4    the defendant.

5         Do you recall those?

6    A    Yes, I do.

7         MS. GEDDES:  And I am just going to put them on the

8    screen for the witness only.  It was Defense Exhibit Q and

9    Defense Exhibit R.

10   BY MS. GEDDES:

11   Q    Do you remember those letters?

12   A    Yes, I do.

13   Q    And why did you write those letters?

14   A    The defendant was no longer living at Trump Towers and he

15   had told us to write him letters.

16   Q    And what, if anything, did the defendant tell you to

17   write in those letters?

18   A    He would tell us specific things that we talked about

19   because it was checked, but they were mostly to uplift his

20   spirits.

21   Q    And when you said --

22        MS. GEDDES:  And, Your Honor, may I lead here?

23        THE COURT:  Yes.

24   BY MS. GEDDES:

25   Q    The reason why you -- the defendant told you that

SAM      OCR      RMR      CRR      RPR

Jane - redirect - Geddes                    1306

1   specific things would be checked was because the defendant was

2   incarcerated, correct?

3   A    Yes, that is true.  I believe --

4              THE COURT:  Woops, your --

5              THE WITNESS:  This is dying.

6              THE COURT:  Oh.

7              (Pause.)

8   BY MS. GEDDES:

9   Q    And you said that certain things would be checked.

10             What did you mean by that?

11  A    Meaning that, I guess, the officers in the mailroom would

12  read all the letters before they got to him.

13  Q    And at the time when you wrote those letters, the

14  defendant was under a federal indictment, correct?

15  A    Correct.

16  Q    And there were certain victims named in that indictment,

17  correct?

18             MR. CANNICK:  Objection.

19             THE COURT:  Overruled.

20  A    Correct.

21  Q    And I'm sorry, just to be clear, you said that there

22  were -- who was in the mailroom?

23  A    The police officers at the jail would read over every

24  piece of mail.

25  Q    Okay.  And at the time I just asked you about this

Jane - redirect - Geddes                    1307

1    federal indictment and the fact that there were certain

2    victims named in that.

3              Were you one of those victims named?

4    A    I was, yes.

5    Q    And at the time you weren't cooperating with the

6    Government, correct?

7              MR. CANNICK:  Objection.

8              THE COURT:  Can I just see the parties at the side,

9    please?

10             (Sidebar held outside the hearing of the jury.)

11

12             (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                      Sidebar                    1308
```

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          THE COURT:  I thought everybody was Jane Doe in the

4     indictment?

5          MS. GEDDES:  She was Jane Doe Number 5.  I'm sorry,

6     so I don't mean that she was named by first and last name.

7          THE COURT:  I see.

8          MS. GEDDES:  But she -- based on the conduct, she

9     understood and had been informed that she was one of the

10    victims in the case, and both the defendant and she were aware

11    of the microscope that was on their relationship.

12         THE COURT:  What's your objection?

13         MR. CANNICK:  How is this -- how is this -- this is

14    beyond the scope of the cross-examination.  I asked nothing

15    about the content of the indictment.

16         THE COURT:  That's kind of not a thing, beyond the

17    scope of the cross.

18         She is asking about why she wrote the letters, not

19    about -- and this is relevant.

20         MR. CANNICK:  But --

21         THE COURT:  I take it that, at least as I understand

22    it, correct me if I'm wrong, that the point is to, and I think

23    you've done it already, the point is to bring out the fact

24    that he was incarcerated at the time --

25         Was this in Chicago, by the way?

```
                          Sidebar                          1309
```

1        MS. GEDDES:  He was incarcerated in Chicago, yes.

2        THE COURT:  -- he was incarcerated at the time, that

3    he had advised her that the mail was checked, and that's why

4    she wrote the letters.

5        MR. CANNICK:  So, what does this other stuff have to

6    do with that?

7        MS. GEDDES:  I can explain.

8        THE COURT:  Judge.

9        MR. CANNICK:  I never want your job.

10       MS. GEDDES:  Defense counsel introduced these

11   letters to show what a rosy picture of the life between the

12   defendant and the victim, the witness.

13       And, in fact, it wasn't so rosy.  And one of the

14   reasons that she was painting this very rosy picture is that

15   she had been named as a victim, both the defendant and the

16   witness understood that their relationship was under a

17   microscope and that prison officials were reading their mail

18   and it was potentially going to us, the Government.

19       THE COURT:  Here is my question about that:

20       I do think it's relevant that she is not cooperative

21   at that time.

22       Was she cooperative at the time?

23       MS. GEDDES:  No.

24       THE COURT:  That part is relevant.  I think you can

25   bring that out.

```
                        Sidebar                        1310
```

1           But you've brought out that she's one of the people

2    that's named in the indictment --

3               MS. GEDDES:  I don't have -- I'm sorry to interrupt.

4               THE COURT:  Nobody is really sorry to interrupt.

5               MR. CANNICK:  I guess that's why you do it, right?

6               THE COURT:  I know.

7               MS. GEDDES:  I was only going to say that that was

8    my last question on this particular thing.

9               THE COURT:  All right.

10              MS. GEDDES:  I am going to ask about the letter

11   separately, but just the content.

12              THE COURT:  Okay, let's move along then.

13              MR. CANNICK:  How much longer?

14              MS. GEDDES:  I don't have that much more, for real.

15              MR. CANNICK:  Yeah, okay.

16              Are we going to take a break before --

17              THE COURT:  Would you like to?

18              MR. CANNICK:  Yes.

19              THE COURT:  How much more do you think you have?

20              I don't want anybody to be uncomfortable.

21              MS. GEDDES:  Maybe 15 minutes.

22              THE COURT:  Let's take our morning break now, I think.

23              MR. CANNICK:  Okay.

24              MS. GEDDES:  All right.

25              (Sidebar concluded.)

Jane - redirect - Geddes                    1311

1          (In open court - jury present.)

2          THE COURT:  All right, I think what we are going to

3    do is take our morning break now, just so people have a chance

4    to stretch their legs and the like.

5          We will be back here in ten minutes.  Please don't

6    talk about the case at all, and I will see you in a few

7    minutes.

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury exits.)

10          THE COURT:  All right, everybody can sit down.

11          You can take the witness out.

12          (Witness stepped down and exited the courtroom.)

13          THE COURT:  Maybe this is dangerous to say, but it

14    seems quite clear that we will finish this witness before

15    lunch.

16          Do you have your next person ready to go, or is that

17    the video person?  No?

18          MS. CRUZ MELENDEZ:  He's here, yes.

19          THE COURT:  Okay.

20          All right, so we will be back here in about ten

21    minutes.

22          (Judge ANN M. DONNELLY exited the courtroom.)

23          (Defendant exited the courtroom.)

24          (Recess taken.)

25          (Defendant entered the courtroom.)

Jane - redirect - Geddes                1312

1          THE COURTROOM DEPUTY:  All rise.

2          (Judge ANN M. DONNELLY entered the courtroom.)

3          THE COURT:  Are you ready to get the witness?

4          MS. GEDDES:  Yes.

5          MR. SCHOLAR:  Your Honor, Mr. Cannick, he stepped

6   outside just for a moment.

7          THE COURT:  Oh, all right, I didn't see him over

8   there, I didn't notice that.

9          Well, I think we can get the witness and we will

10  just wait until he gets back before we bring in the jury.

11         (Pause.)

12         (Witness entered and resumed the stand.)

13         THE COURT:  All right, Mr. Cannick is here.

14         Let's get the jury, please.

15         (Pause.)

16         THE COURTROOM DEPUTY:  All rise.

17         (Jury enters.)

18         THE COURTROOM DEPUTY:  You may be seated.

19         THE COURT:  All right, welcome back, everybody.

20  We're ready to continue with the redirect examination.

21         Go ahead, Ms. Geddes.

22         MS. GEDDES:  Thank you.

23  EXAMINATION CONTINUES

24  BY MS. GEDDES:

25  Q    Before the break we were talking about a federal

SAM     OCR     RMR     CRR     RPR

Jane - redirect - Geddes                              1313

1   indictment in which named you, not by name, but by an alias as

2   a victim.

3           Do you recall those questions?

4   A    I do.

5   Q    At the time of the indictment and at the time that you

6   wrote those letters to the defendant in Defendant's Exhibits Q

7   and R, were you cooperative with the Government at that time?

8   A    I was not.

9   Q    In Government Exhibit -- excuse me, in Defense Exhibit Q,

10  which is in evidence.

11          MS. GEDDES:  And may we publish to the jury, please?

12          (Exhibit published to the jury only.)

13  BY MS. GEDDES:

14  Q    That highlighted part reads:  When we carved our initials

15  into that table.

16          Do you recall what you were referring to when you

17  wrote "when we carved our initials into that table"?

18  A    Yes, I do.

19  Q    What were you referring to, specifically in that

20  statement?

21  A    A incident that had happened in 2015 where the defendant

22  had carved our initials at a -- on a table at the Hyatt.

23  Q    And where was the Hyatt located?

24  A    In Atlanta, Georgia.

25  Q    And do you remember what happened right before the time

SAM      OCR      RMR      CRR      RPR

Jane - redirect - Geddes                    1314

1    when the defendant carved your initials into that table at the

2    Hyatt?

3    A    Yes.

4    Q    What happened?

5    A    We had -- he had planned a picnic.

6    Q    And had you been with the defendant in the immediate days

7    prior to then?

8    A    Yes, I had.

9    Q    Where had you been?

10   A    I believe the big house.

11              MR. CANNICK:  Objection; "I believe."

12              THE COURT:  Well, do you know where you were or not?

13              Don't forget about your microphone.

14              THE WITNESS:  Yes, it was Atlanta, Georgia, at that

15   hotel and the big house.

16              THE COURT:  Okay.

17   BY MS. GEDDES:

18   Q    And when you wrote this letter to the defendant, you knew

19   that one of the rules that the defendant had was to remain

20   positive; correct?

21   A    Yes, it was.

22   Q    And, in fact, Government Exhibit 331, which is in

23   evidence, can you read just that second point?

24   A    Find a positive quote to say to Daddy every day.

25   Q    And were the letters that you wrote an example of

Jane - redirect - Geddes                    1315

1   positive things that you were sharing with the defendant?

2   A    Yes, they were.

3   Q    On cross-examination you were asked about two audio

4   recordings, and you listened to those recordings, correct?

5   A    Yes, I did.

6   Q    Was that part of that same documentary supporting the

7   defendant?

8   A    Yes, it was.

9   Q    On cross-examination defense counsel -- and just to be

10  clear, that documentary, that was the one made by the

11  defendant's friend?

12  A    Yes, it was.

13  Q    Defense counsel on cross-examination showed you Defense

14  Exhibit U.

15          MS. GEDDES:  Which I am showing the witness only.

16  BY MS. GEDDES:

17  Q    Do you recognize Defense Exhibit U?

18  A    Yes.

19  Q    And on cross the defense counsel showed it to you, but

20  this one wasn't read to the jury, correct?

21  A    Correct.

22  Q    Do you remember the circumstances under which you wrote

23  this letter?

24          THE COURT:  I'm sorry, is this in evidence or not?

25          MS. GEDDES:  It is in evidence.

Jane - redirect - Geddes                    1316

1        THE COURT:  Okay.

2   A    Yes, I do.

3        THE COURT:  Can it go to the jury?

4        MS. GEDDES:  It can go to the jury, yes.

5        THE COURT:  Can it go public?

6        MS. GEDDES:  This can go public, yes, at least this

7   page of it can.

8        (Exhibit published.)

9   BY MS. GEDDES:

10  Q    What were the circumstances under which you wrote this

11  letter?

12  A    The defendant had told me what to say in this letter.

13  Q    And referring to both this letter and the other

14  handwritten letters that you've testified about when I've been

15  just asking you questions today, who did you give those

16  letters to?

17  A    The defendant.

18  Q    And Defense Exhibit U, I am going to refer to page 2.

19       MS. GEDDES:  This is also in evidence.  This is

20  already in evidence and we can publish this as well, not just

21  to the jury.

22       (Exhibit published.)

23  Q    Where it says:  At the age of 17 I never had sex with

24  Robert Kelly; is that accurate?

25  A    That is not accurate.

Jane - redirect - Geddes                    1317

1  Q    Whose idea was it to write that?

2  A    The defendant's.

3  Q    Defense counsel on cross-examination showed you certain

4  reports that had been prepared by agents with the Department

5  of Homeland Security.

6            Do you recall those reports?

7  A    Yes.

8  Q    Prior to your cross-examination by defense counsel, had

9  you seen any of those reports?

10 A    Never.

11 Q    And did you ever have an opportunity to review those

12 reports for accuracy?

13 A    Never.

14 Q    On cross-examination defense counsel asked you about all

15 sorts of things that your parents did.

16            Do you recall those questions?

17 A    Yes.

18 Q    Who exposed you to a sexually-transmitted disease without

19 your consent, your parents --

20            MR. CANNICK:  Objection.

21 Q    -- or the defendant?

22            THE COURT:  Overruled.

23 A    The defendant.

24 Q    Who had sexual contact with you, including sexual

25 intercourse with you, when you were 17 years old, your parents

1    or the defendant?

2    A    The defendant.

3    Q    Who made you write letters containing false confessions,

4    your parents or the defendant?

5    A    The defendant.

6    Q    Who made you film videos of you engaging in degrading

7    conduct, including smearing and eating feces, your parents or

8    the defendant?

9    A    The defendant.

10   Q    Who gave you spankings every two to three days, your

11   parents or the defendant?

12   A    The defendant.

13   Q    Whose idea was it to call those spankings chastisements,

14   your parents or the defendant?

15   A    The defendant.

16   Q    Who made you stay in a room or on a tour bus for days at

17   a time as punishment, your parents or the defendant?

18   A    The defendant.

19   Q    Who directed you to have sexual contact with other

20   females at his discretion, your parents or the defendant?

21   A    The defendant.

22   Q    Who directed you to have contact with Nephew, a man you

23   had never even met, at his discretion, your parents or the

24   defendant?

25   A    The defendant.

Jane - recross - Cannick                    1319

1        MS. GEDDES:  Nothing further, Your Honor.

2        THE COURT:  Okay.

3        Any recross examination?

4        MR. CANNICK:  Yes.

5        Do you need a moment?

6        THE COURT:  I've got this.  She's ready to go.

7        MR. CANNICK:  I didn't want to just jump right in,

8    Your Honor.

9    RECROSS-EXAMINATION

10   BY MR. CANNICK:

11   Q    You were asked on redirect as to why you told Mr. Kelly

12   that you were 18.

13        It was your parents who told you to tell Mr. Kelly

14   that you were 18, am I correct?

15   A    That is not correct.

16   Q    And when you told that to the Government in your

17   interview, you're saying that was a mistake?

18   A    That was not accurate.

19   Q    That was not accurate.

20        Which one of these people who are sitting at this

21   table here (indicating) were in the room at the time taking

22   notes?

23        MS. GEDDES:  Objection.

24        THE COURT:  Overruled.  I feel like we went over

25   this before, but do you remember?

Jane - recross - Cannick                    1320

1           At any particular time or just ever?

2           MR. CANNICK:  Yes.

3           THE COURT:  Okay.

4           Do you remember which of the people at the table was

5    in the room when you met with them?

6           THE WITNESS:  They were all present at different

7    times.

8    BY MR. CANNICK:

9    Q    And they were taking notes, am I correct?

10   A    Correct.

11   Q    Now, the Government asked you when you wrote the letter

12   to Mr. Kelly when he was in jail, you wrote letters that were

13   positive and uplifting to him, am I correct?

14   A    Yes.

15   Q    And at that time you weren't seeking a book deal, were

16   you?

17   A    I was not.

18   Q    Okay.  Now, you are?

19   A    I am not.

20   Q    Well, the visit to Stacy Brown was not about a book deal?

21           MS. GEDDES:  Objection.

22           THE COURT:  Overruled.

23   A    You said now.  As of today's date?

24   Q    When you -- you -- after you started cooperating with the

25   Government, you sought a book deal, am I correct?

1    A    Correct.

2    Q    Now, are you aware -- I want to go back to the letter

3    that you sent to your brother.

4    A    I never sent that letter to my brother.

5    Q    The letter you wrote to your brother.

6         In that letter you said that:  Ma continued to nag

7    me about sleeping with him and trying to get to take as many

8    pictures and videos as I could of him and me because she said

9    to me that she wanted to use those pictures and videos to

10   blackmail him in case he didn't want to do what they asked him

11   to do.

12        In your interview with the Government, you told the

13   Government, did you not, that mother -- that your mother had

14   asked you to take as many pictures of you and Mr. Kelly

15   together to include the crazy-face ones kissing because she

16   felt that her mother wanted to exploit him to the media since

17   she was 17 years old at the time; that's what you told the

18   Government during those meetings, am I correct?

19   A    That was not accurate.

20   Q    It's written in the document, am I correct?

21   A    Correct.

22   Q    Okay.  And when you -- when you were interviewed, being

23   interviewed by the Government, they told you to tell the

24   truth, am I correct?

25   A    Yes, they did.

Jane - recross - Cannick                    1322

1   Q     And, again, they told you that if you were to make a

2   false statement to a government official, that's -- that's a

3   crime?

4   A     I don't recall that.

5   Q     Are you aware of that?

6   A     Yes, I am.

7   Q     Now, you also told your brother in that letter about the

8   police officers coming to the door at the Dolphin Hotel.

9         You remember discussing that in the letter, am I

10  correct?

11  A     It was written in the letter, yes.

12  Q     And that's part of the same thing you told the Government

13  during your interview with -- by them of you, am I correct?

14  A     I don't remember.

15  Q     And do you remember writing in the letter that they

16  didn't even hesitate to take you out of the Florida Education

17  Department?

18  A     That was not accurate.

19  Q     I didn't ask you if that was accurate, I asked do you

20  recall that being in the letter that you wrote?

21  A     Yes, that is in that letter.

22  Q     And that's the same thing you told the Government, am I

23  correct?

24  A     I don't recall telling them that.

25  Q     And, of course, if the Government wrote that down in

Jane - recross - Cannick                    1323

1    their paperwork, they made a mistake?

2    A    I don't know.

3    Q    Now, in the letter that you wrote to -- the letter that

4    you wrote directly to your brother, you referenced your father

5    trying to get Mr. Kelly to give him a lighting job, the job of

6    being his light man.

7         Do you remember talking about that in the letter?

8    A    Yes, I do.

9    Q    Now, that's the same thing you told the Government, am I

10   correct, when you spoke with them?

11   A    That is correct.

12   Q    And you would agree with me that at that time you're

13   fully in cooperation with the Government, am I correct?

14   A    If there is a time stamp or a date.

15   Q    Well, when you were sitting down being interviewed by the

16   Government, you were going to the Government and cooperating

17   with them, am I correct?

18   A    Correct.

19   Q    And you would agree with me that Mr. Kelly was not in

20   that room, right?

21   A    He was not.

22   Q    Right, he was in jail?

23   A    (No response.)

24   Q    Am I correct?

25   A    Yes, you are.

1    Q    So, he wasn't there to tell you what to say, am I

2    correct?

3    A    That is true.

4    Q    You -- that came out of your mouth on your own volition,

5    am I correct?

6              MS. GEDDES:  Objection to tone.

7              THE COURT:  Objection to what?

8              MS. GEDDES:  Tone.

9              THE COURT:  No, overruled.

10   A    I don't recall.

11   Q    You don't recall that that came out of your own mouth of

12   your own volition?

13             MS. GEDDES:  Objection.

14             THE COURT:  Well, I have kind of lost the thread of

15   what we're talking about.

16             Do you recall making the statement that Mr. Cannick

17   is asking you about?

18             THE WITNESS:  Can you repeat the statement?

19   BY MR. CANNICK:

20   Q    Do you recall sitting with the Government and giving them

21   your account as to what you said Mr. Kelly subjected you to?

22   A    Can you rephrase the question?

23   Q    You sat down with the Government, am I correct?

24   A    Yes, I did.

25   Q    You told them what you said to this jury, am I correct?

Jane - recross - Cannick                    1325

1   A    What is the question that you're asking me?

2   Q    Give me the answer to the question that I'm asking you.

3        My question is:  You had a meeting with the

4   Government?

5   A    Yes, I did.

6   Q    You made an allegation, am I correct?

7   A    Well, what was the allegation?

8        THE COURT:  Just answer his question.

9        MR. CANNICK:  Oh, Jesus.

10       THE COURT:  Mr. Cannick, calm down.

11       THE WITNESS:  I don't understand.

12       THE COURT:  Well, he just wants -- answer his

13  question.

14       You had a meeting with the Government, you told them

15  certain things.  Correct so far?

16       THE WITNESS:  Yes, I did.

17       THE COURT:  Okay, go ahead, Mr. Cannick.

18  BY MR. CANNICK:

19  Q    Mr. Kelly wasn't there, am I correct?

20  A    No, he was not.

21  Q    The things they wrote down on the paper came from you, am

22  I correct?

23  A    Yes.

24  Q    Not from Mr. Kelly?

25  A    No.

SAM    OCR    RMR    CRR    RPR

Jane - redirect - Geddes                    1326

1    Q    And the things you told them are the very same things

2    that you told your brother in this letter?

3    A    That is not true.

4             MR. CANNICK:  Nothing further, Your Honor.

5             THE COURT:  Okay, any redirect?

6             MS. GEDDES:  Very briefly, Your Honor.

7             THE COURT:  Everybody says that; go ahead.

8             MS. GEDDES:  I mean it.

9    REDIRECT EXAMINATION

10   BY MS. GEDDES:

11   Q    On recross examination you were asked about what happened

12   when the officers or what you said happened when the officers

13   showed up at the hotel.

14            Did officers show up at the Dolphin Hotel?

15            MR. CANNICK:  Your Honor, that's beyond the scope.

16   That's not what I asked.  I asked her what's in the document,

17   not what happened.

18            THE COURT:  I have to agree.  I do think this is

19   well-worn ground that he showed us.  If there's something

20   specific and --

21            MS. GEDDES:  Yes.

22            THE COURT:  -- you want to ask that, that's fine.

23   BY MS. GEDDES:

24   Q    In the letter to your brother, which is -- one page of it

25   is in evidence as Defense Exhibit P, it said:  Once I got

SAM     OCR     RMR     CRR     RPR

1    there after about 30 minutes, they planned and called the

2    police.

3              What part, if any, in that statement is untrue?

4    A    "They planned."

5    Q    The rest of it is true, though, right?

6    A    Correct.

7    Q    It's just the case they didn't plan it, correct?

8    A    Correct.

9              MS. GEDDES:  Nothing further.

10             THE COURT:  Anything else, Mr. Cannick?

11             MR. CANNICK:  Your Honor, before this witness goes,

12   I just offer I, think it's Defense Exhibit I and H -- H and I,

13   and I ask it to be played for the jury.

14             THE COURT:  Any objection?

15             MS. GEDDES:  No.

16             THE COURT:  Do we have to play it now?

17             I think we have another witness that's available.

18             MR. CANNICK:  Okay, we can play it after the witness

19   leaves.

20             THE COURT:  Well, you are not going to have any more

21   questions for this witness about that, right you?

22             MS. GEDDES:  I am not.

23             THE COURT:  How long is it?

24             MR. CANNICK:  About a minute.

25             THE COURT:  Oh, if it's that short, you can play it.

Jane - redirect - Geddes                    1328

1          MR. CANNICK:  It's probably a little longer.  Give

2    us five.

3          THE COURT:  Five; all right, go ahead.

4          MS. GEDDES:  Your Honor, can the witness be excused?

5          THE COURT:  Yes.

6          (Witness was excused and exited the courtroom.)

7

8          (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1329

1     THE COURT:  It's just audio, correct?

2     MR. CANNICK:  It's a video.

3     THE COURT:  I thought we were just playing audio.

4     MS. GEDDES:  There's no reason, in the government's

5  view, there's no reason to play the video.

6     MR. CANNICK:  She saw video and audio.

7     THE COURT:  Can I ask a question over at the side?

8  We don't need the reporter.

9     (Discussion off the record.)

10    THE COURT:  All right.  I think under the

11 circumstances, let's just play the audio.

12    (Audio played.)  (Audio stopped.)

13    THE COURT:  Okay.  All done?

14    MR. SCHOLAR:  No, there's a second video.

15    (Audio played.)  (Audio stopped.)

16    MR. CANNICK:  Thank you, Your Honor.

17    THE COURT:  All right.  Are you ready to call -- I

18 think we have somebody appearing by video.  No?  Who's the

19 next witness?

20    MS. CRUZ MELENDEZ:  Your Honor, the government

21 called Keith Williams to the stand.

22    THE CLERK:  Please stand and raise your right hand.

23    (The witness, KEITH WILLIAMS, is duly sworn/affirmed

24 by clerk.)

25    THE CLERK:  Please state your name for the record.

1330

1     THE WITNESS:  Keith Williams.

2     THE CLERK:  Thank you.  Please have a seat.

3     THE COURT:  Okay.  Mr. Williams, you can take your

4  mask off and I just want to give you a couple of instructions

5  before we begin.

6     THE WITNESS:  Sure.

7     THE COURT:  Our court reporters take down everything

8  that you say so it's important that you not speak too quickly

9  or talk over any of the lawyers that are questioning you.  It

10 just makes their job a lot harder.  So I'm going to ask you to

11 speak up also into the microphone.

12    If there's a question that you don't understand or

13 want to have clarified, let me know and I'll have our lawyers

14 do that for you and just do your best to answer the specific

15 question that you're being asked.  Okay?

16    THE WITNESS:  Yes, Your Honor.

17    THE COURT:  Okay.  Go ahead.  Is that on?  Just tap

18 it.

19    Okay.  Go ahead, Ms. Cruz Melendez.

20    MS. CRUZ MELENDEZ:  Thank you.

21    (Continued on next page.)

22

23

24

25

1  DIRECT EXAMINATION

2  BY MS. CRUZ MELENDEZ:

3  Q    Mr. Williams, are you employed?

4  A    Yes.

5  Q    And how are you employed?

6  A    I'm a pastor.

7          MR. CANNICK:  I'm sorry.  I couldn't hear.

8  A    Yes.

9  Q    And how are you employed?

10  A    I'm a pastor.

11          THE COURT:  Just move the microphone a little closer

12  to you.  Great.  Thank you.

13  Q    How long have you been a pastor?

14  A    It will be 14 years in November.

15  Q    Do you do anything else for work?

16  A    I buy and sell a few cars.

17  Q    Where did you grow up?

18  A    Robert Taylor, Englewood and South Shore.

19  Q    Where is that?

20  A    South side of Chicago.

21  Q    Chicago, Illinois?

22  A    Yes.

23  Q    And how far did you go in school?

24  A    Four -- I attended college four years and not quite with

25  a completion of a degree.

1    Q    Did you do any other schooling?

2    A    Yes.

3    Q    What kind of schooling?

4    A    A number of training for pastoring, theology and that

5    kind of stuff.

6    Q    Approximately when did you start attending college?

7    A    I graduated high school in '81 so directly after that.

8    Q    And did you graduate from college?

9    A    I did four years with not quite completing.

10   Q    Okay.  While attending college, did you work at all?

11   A    Yes.

12   Q    And where did you work?

13   A    I worked a number of jobs.  I worked, I worked UPS, post

14   office, you know, intervals of several months, First National

15   Bank of Chicago.  Many times these jobs were simultaneous.

16   Q    When you worked for UPS, what did you do there?

17   A    I worked in the dispatch office.

18   Q    And approximately when did you work, approximately how

19   long did you work for UPS?

20   A    Several months.

21   Q    You testified earlier that you currently work as a

22   pastor.  Prior to being a pastor, did you work in any other

23   fields?

24   A    Yes.

25   Q    And what field did you work in?

Williams - direct - Cruz Melendez                    1333

1   A    In the mortgage business.

2   Q    And how long did you work in the mortgage business?

3   A    A number of years, about, many years.  I think over

4   20 years.

5   Q    And approximately when did you first start working in the

6   mortgage industry?

7   A    Dates running together for me but it was a few years

8   after high school.

9   Q    When you worked in the mortgage industry, were you

10  employed by the businesses or did you have your own business?

11  A    The majority of it -- I worked for other people for a

12  number of years and then I, I did have my own business.

13  Q    I'm showing you what's been marked for identification

14  purposes as Government's Exhibit 7, just the witness.

15       Do you see that there, sir, on the screen?

16  A    No.

17  Q    Do you now see Government's Exhibit 7 on the screen

18  before you?

19  A    Yes.

20  Q    Do you recognize that?

21  A    Yes.

22  Q    And generally speaking, what is that?

23  A    It's a picture of myself.

24  Q    And approximately when, just generally, was this

25  photograph taken?

Williams - direct - Cruz Melendez                1334

1   A    I would guess maybe '88.

2   Q    And is this photograph a fair and accurate representation

3   of you in the late '80s?

4   A    Yes.

5           MS. CRUZ MELENDEZ:  The government offers Government

6   Exhibit 7 into evidence.

7           MR. CANNICK:  No objection.

8           THE COURT:  Okay.  That's in evidence.

9           MS. CRUZ MELENDEZ:  Can we publish to the jury and

10  the public, please.

11  Q    Are you familiar with an individual named Robert Kelly

12  also known as R. Kelly?

13  A    Yes.

14  Q    And how do you know Robert Kelly?

15  A    We, we've been friends for a long time.

16          THE COURT:  I'm having a little trouble hearing you.

17  Can you just speak into the microphone?

18          THE WITNESS:  Yes.  We've been friends for a long

19  time.

20          THE COURT:  Okay.

21  Q    And approximately how old were you at the time when you

22  met Robert Kelly?

23  A    Early 20s.  It could have been earlier.

24  Q    I'm showing the witness and the public and the jury

25  what's in evidence as Government's Exhibit 1.

Williams - direct - Cruz Melendez                1335

1          Do you recognize the individual in Government's

2   Exhibit 1?

3   A     Yes.

4   Q     And who is it?

5   A     Robert Kelly.

6   Q     Do you -- I'd like you to take a moment and look around

7   the courtroom and tell me whether or not you see Robert Kelly

8   in the courtroom today.

9   A     Yes.

10  Q     Can you point him out and identify him by identifying a

11  piece of clothing that he's wearing?

12  A     It's a taupe or caramel colored shirt, it looks like,

13  from here.

14          THE COURT:  Indicating the defendant.

15          THE WITNESS:  I'm sorry?

16          THE COURT:  No.  I just said you were pointing out

17  the defendant.

18          THE WITNESS:  Yes.

19          THE COURT:  All right.  Go ahead.

20  Q     And under what circumstances did you meet the defendant?

21  A     There's a person who grew up who was in my church.  He

22  introduced the two of us.

23  Q     At some point, did you become familiar with the

24  defendant's occupation?

25  A     You know, yes.

CMH      OCR      RMR      CRR      FCRR

1   Q    Okay.  And what did the defendant do as an occupation?

2   A    He was a musician, singer, songwriter.

3   Q    And was he working as a singer when you first got to know

4   the defendant?

5   A    No, he was -- I mean, he sang but he was not

6   professionally at that time.  I met him before he got signed.

7   Q    Okay.  And at some point, did he start singing

8   professionally?

9   A    Yes.

10  Q    How would you describe your relationship with the

11  defendant?

12  A    Friends.

13  Q    Okay.  And how often would you see the defendant?

14  A    This is sort of -- I mean, I worked a lot so it would be

15  a few times a month.

16  Q    Did you ever visit the defendant's home?

17  A    Yes.

18       MS. CRUZ MELENDEZ:  I'm showing just the witness

19  what's been marked as Government's Exhibit 501A and 501B.

20  Q    Before I do that, actually, you mentioned that you had

21  previously visited the defendant at his home.  Do you recall

22  where he lived?

23  A    Well, he owned a home at 1010 George Street.

24       MS. CRUZ MELENDEZ:  So I'm showing just the witness

25  501A and 501B.

1  Q    Do you see that there on your screen?

2  A    Yes.

3  Q    I'm going to show you 501B.  Do you recognize these?

4  A    Yes.

5  Q    And what do you recognize them to be?

6  A    1010 George Street.

7  Q    Where the defendant lived?

8  A    Yes.

9         MS. CRUZ MELENDEZ:  The government offers Government

10  Exhibit 501A and 501B into evidence.

11         THE COURT:  Any objection?

12         MR. CANNICK:  No, no objection.

13         THE COURT:  All right.  Those are in evidence.

14         MS. CRUZ MELENDEZ:  If I can publish to the jury and

15  to the public, please.

16  Q    So Government's Exhibit 501A and 501B, you testified that

17  that's 1010 George Street where the defendant lived?

18  A    Yes.

19  Q    Okay.  And was that in Chicago, Illinois?

20  A    Yes.

21  Q    Do you recall the time frame when the defendant lived

22  there?

23  A    No.

24  Q    Was it when you, the early days when you met the

25  defendant?

Williams - direct - Cruz Melendez                1338

1  A    Yes.  Well, I'm -- the early days, he didn't own a home.

2  Q    At some point when you knew the defendant, did he own the

3  home at 1010 George Street?

4  A    Yes.

5  Q    And did you also visit the defendant at any studios?

6  A    Yes.

7  Q    Do you recall where the studio was?

8  A    No.

9  Q    Was it in Chicago?

10 A    Yes.

11 Q    Do you recall the general area?

12 A    It was west of the loop of Chicago loop or west of

13 North Michigan Avenue and, you know, it was between Halstead

14 and it was north, the Near North Side of Chicago.

15 Q    Now, during your friendship with the defendant, at any

16 point, did you travel with the defendant?

17 A    Yes.

18 Q    On how many occasions did you travel with the defendant?

19 A    I think just a couple.

20 Q    And when you traveled with the defendant, what mode of

21 transportation did you use?

22 A    I traveled with him on a bus once I remember for sure

23 and --

24 Q    What kind of bus?

25 A    It was a tour bus.

Williams - direct - Cruz Melendez                1339

1    Q     And did you travel outside of the state with the

2    defendant?

3    A     Yes.

4    Q     Generally speaking, do you recall where you went on the

5    tour bus with the defendant?

6    A     Yes.  The only -- I think the only time that I was on the

7    tour bus with them was when we went to Louisiana.

8    Q     Now, during the time period that you were friends with

9    the defendant, did you have an opportunity to meet people in

10   the defendant's inner circle?

11   A     Yes.

12   Q     Who do you recall meeting?

13   A     I met a number of people.

14   Q     Any names that you recall meeting?

15   A     Gerald.

16   Q     You said Gerald.  Do you know Gerald's full name?

17   A     Yes, Gerald Jones.

18   Q     And did Gerald have any nicknames?

19   A     Yes.

20   Q     Anyone else?

21   A     I met --

22   Q     I'm sorry.  What was Gerald Jones' nickname?

23   A     Blackie.

24   Q     Anyone else?

25   A     Yes.  I met, I mean I met Derrel McDavid.

Williams - direct - Cruz Melendez                1340

1   Q    And who did you know Derrel McDavid to be?

2   A    He was the accountant.

3   Q    Whose accountant?

4   A    Robert's accountant.

5   Q    And just going back to Gerald, the individual you said

6   who was nicknamed Blackie, who was he to the defendant?

7   A    I, I believe he's a blood relative.

8   Q    Do you know when kind of relative?

9   A    Not really but they're pretty close, I think maybe first

10  cousins or something.

11  Q    And anyone else?

12  A    I met June and I don't know his last name.  I met a

13  number of people.

14  Q    Are you familiar with an individual named Barry

15  Hankerson?

16  A    Yes.

17  Q    And who is Barry Hankerson?

18  A    Barry is Robert's manager.

19          MS. CRUZ MELENDEZ:  I'm showing the witness only

20  what's been marked for identification purposes as government's

21  Exhibit 8.

22  Q    Do you recognize that individual?

23  A    Yes.

24  Q    And who is it?

25  A    Gerald Jones.

Williams - direct - Cruz Melendez                    1341

1           THE COURT:  Gerald Jones?

2    Q    Sir, I'm having trouble hearing you.

3    A    Gerald Jones.

4           THE COURT:  So much better.  Thanks.

5    Q    And Gerald Jones, that's the individual you said was

6    nicknamed Blackie?

7    A    Yes.

8    Q    Is this a fair and accurate representation of Gerald

9    Jones also known as Blackie?

10   A    Yes.

11          MS. CRUZ MELENDEZ:  The government offers Government

12   Exhibit 8 into evidence.

13          THE COURT:  Any objection?

14          MR. CANNICK:  No.

15          THE COURT:  All right.  That's in evidence.  You can

16   publish.

17          (Government Exhibit 8 so marked.)

18   Q    You also testified that you were familiar with an

19   individual from your friendship with the defendant named

20   Derrel McDavid.

21          MS. CRUZ MELENDEZ:  I'm showing just -- I'm showing

22   the witness and the public what's in evidence as government's

23   Exhibit 12.

24   Q    Do you recognize that individual?

25   A    Yes.

Williams - direct - Cruz Melendez                    1342

1    Q    And who is that?

2    A    Derrel McDavid.

3    Q    Are you familiar with an individual named Aaliyah?

4    A    Yes.

5    Q    Who is Aaliyah?

6    A    She's the entertainer who died a tragic death.

7    Q    And what, if any, relationship did she have with the

8    defendant?

9    A    I'm told that they were married.  Matter of fact, they

10   were married.

11              MR. CANNICK:  I'm going to object.

12              THE COURT:  How do you know they were married?

13              THE WITNESS:  It was referenced in the public, it

14   was in the media.

15              THE COURT:  All right.  Is that the only way you

16   know about it?  Were you there when they got married?

17              THE WITNESS:  No.

18              THE COURT:  All right.  Next question.

19   Q    Are you familiar with -- you testified that your familiar

20   with an individual named Barry Hankerson?

21   A    Yes.

22   Q    And what, if any, connection did Barry Hankerson have to

23   Aaliyah?

24   A    I believe that they were blood relatives.

25              MR. CANNICK:  I'm going to object.  If he knows for

Williams - direct - Cruz Melendez                    1343

1    a fact, he can testify.

2              THE COURT:  Do you know if they were?  Sometimes

3    people say "I believe" and they actually know.

4              THE WITNESS:  I don't know.

5              THE COURT:  Next question.

6    Q    You previously testified that you had a mortgage

7    business, correct?

8    A    Yes.

9    Q    Can you just explain generally to the jurors what that

10   entails, just very generally?

11   A    If somebody needed a mortgage, they would come and we

12   would take their information and broker it to an institution

13   that would fund their mortgage.

14   Q    Mortgages for houses, real estate?

15   A    Real estate.

16   Q    Things of that nature?

17   A    Yes.

18   Q    And did you have -- when you had your own business, did

19   you have an office?

20   A    Yes.

21   Q    Did the defendant ever visit you at that office?

22   A    Yes.  It was, to my knowledge, maybe once or twice maybe.

23   Q    So I want to talk about an incident in which the

24   defendant visited you at your office.

25   A    Yes.

1  Q    Okay.  If you could explain to the jurors what happened

2  when the defendant visited you there.

3  A    He indicated, I believe, that he wanted to get, he was

4  going to get married.

5  Q    When you say "he indicated," what do you mean?

6  A    Robert.

7  Q    The defendant?

8  A    Yes.

9  Q    So just to be clear, the defendant visited you at your

10 office?

11 A    Yes.

12 Q    And he indicated to you that he wanted to be married,

13 correct?

14 A    Yes.

15 Q    At the time, did you know who he wanted to be, who he

16 wanted to marry?

17 A    The -- Aaliyah.

18 Q    Now, who, if anyone, else was with the defendant when he

19 came to your office to say he wanted to get married to

20 Aaliyah?

21 A    There were a number of people.

22 Q    Do you recall any of the names of the people who were

23 there?

24 A    In my office, not necessarily in, where we were.

25 Q    Correct, in your office.

1   A    I think it was June and Demetrius.

2   Q    Do you know Demetrius' last name?

3   A    No.

4   Q    And you also mentioned June was there.  Correct?

5   A    It could have been some others.  I just don't.

6   Q    Okay.  Do you recall what, if any, relationship June had

7   to the defendant?

8   A    I think he was, like, an assistant.

9   Q    What did the defendant say to you after he told you he

10  needed to, he wanted to get married to Aaliyah?

11  A    He asked if I knew a minister.

12  Q    And what did you say?

13  A    Yes.

14  Q    You said yes, you knew a minister?

15  A    Yes.

16  Q    And did you provide him with any names of ministers?

17  A    Yes.

18  Q    Whose name did you provide?

19  A    Nathan Edmond.

20  Q    And how did you know Nathan Edmond?

21  A    He was also involved in real estate and he was a tax

22  buyer sort of person and he was involved in real estate in

23  general.

24  Q    Was he a minister?

25  A    Yes.

Williams - direct - Cruz Melendez                    1346

1    Q    And how did you know that?

2    A    I knew him from real estate and we were friends.

3    Q    I'm showing just the witness what's been marked as, for

4    identification purposes as Government's Exhibit 89.

5         Do you see that there, sir?

6    A    Yes.

7    Q    Generally speaking, what's in Government's Exhibit 89?

8    A    A picture of Nathan Edmond.

9    Q    And is that a fair and accurate representation of Nathan

10   Edmond?

11   A    Yes.

12        MS. CRUZ MELENDEZ:  The government offers

13   Government's Exhibit 89.

14        THE COURT:  Any objection?

15        MR. CANNICK:  No.

16        THE COURT:  All right.  That's in evidence.  You can

17   publish it.

18        (Government Exhibit 89 so marked.)

19   Q    So you mentioned that this meeting with the defendant

20   happened at your office.  Do you recall where your office was

21   located?

22   A    9730 Southwestern in Evergreen Park, Illinois.

23   Q    Is that near Chicago?

24   A    Yes.

25   Q    How close is it to Chicago?

1    A    One side of the, the west side of Western is Evergreen

2    Park and the east side of Western is Chicago.

3    Q    So is it like a suburb of Chicago?

4    A    Yes.

5    Q    So you testified that you recommended Nathan Edmond to

6    the defendant.

7    A    Yes.

8    Q    Who, if anyone, reached out to Nathan Edmond once you

9    recommended him to the defendant?

10   A    I'm not sure.  I'm not sure but I may have called him.  I

11   just don't remember.

12   Q    When you say you may have called him, what do you mean,

13   you may have called Nathan Edmond?

14   A    Yes.

15   Q    Did Nathan Edmond ultimately agree to officiate the

16   wedding?

17   A    Yes.

18   Q    Did the defendant say when he intended to marry Aaliyah?

19   A    Not specifically.

20   Q    Did you get an impression as to the time frame as to when

21   it was to happen?

22   A    My assumption was that it was going to be soon.

23   Q    So, Mr. Williams, I want to turn your attention for a

24   moment.  Have you ever been convicted for a crime?

25   A    Yes.

1    Q    And what crime were you convicted of?

2    A    One count of bank fraud and one count of perjury.

3    Q    And approximately when was this?

4    A    This was approximately early 2000 and maybe '1 or '2.

5    Q    And generally speaking, what were the circumstances that

6    led to your conviction?

7    A    There was a transaction that went through my office and I

8    benefited from it and I got indicted.  It was a '95

9    transaction and I went to trial and I lost.

10   Q    Were you sentenced as a result of your conviction?

11   A    Yes.

12   Q    And what was your sentence?

13   A    Twenty-four months.

14   Q    And did you serve this sentence?

15   A    No.

16   Q    What did you serve?

17   A    I went, ended up -- the judge gave me an option of going

18   to boot camp even though I was too old and it ended up being

19   seven months.

20   Q    And you served those seven months at boot camp?

21   A    Yes.

22   Q    Now, turning back to your interactions with the

23   defendant, at any point did you work for the defendant?

24   A    No.

25   Q    Did you and the defendant ever discuss the prospects of

1   you working for him?

2   A    Yes.

3   Q    What did you discuss?

4   A    Robert -- when I got in trouble, Robert offered to give

5   me a job.  He described it as being in the point system.

6   Q    And what did you understand that to mean?

7   A    One of his managers.

8   Q    Now, you had previously mentioned -- you had previously

9   mentioned that Barry Hankerson was his manager, correct?

10  A    Yes.

11  Q    And you mentioned that the defendant had offered you a

12  job as a manager?

13  A    Yes.

14  Q    Did you understand you would be replacing Barry

15  Hankerson?

16  A    I did not.  I just don't remember the time frame.  I did

17  not.

18            MS. CRUZ MELENDEZ:  Nothing further.

19            THE COURT:  Any cross-examination?

20            MR. CANNICK:  Just maybe one or two questions.

21            THE COURT:  Okay.

22            MR. CANNICK:  Good afternoon.

23            THE COURT:  Is your microphone on?

24            MR. CANNICK:  I think it's on.

25            THE COURT:  Okay.  Let's give it a shot.

```
                        Sidebar                    1350
```

1  CROSS-EXAMINATION

2  BY MR. CANNICK:

3  Q    Mr. Williams, do you recall occasions when Robert would

4  call you crying?

5  A    Yes.

6             MS. CRUZ MELENDEZ:  Objection, Your Honor.

7             THE COURT:  Sustained.

8             MR. CANNICK:  May we have a brief sidebar,

9  Your Honor?

10             THE COURT:  Yes.

11             (The following occurred at sidebar.)

12             THE COURT:  Talk about beyond the scope of the

13  direct.

14             MR. CANNICK:  This is not.  Your Honor, in the

15  direct examination by the people --

16             THE COURT:  The government.

17             MR. CANNICK:  Yes, by the government, there was

18  inquiry as to knowledge about the wedding that Robert planned

19  for himself and Aaliyah.

20             THE COURT:  Right.

21             MR. CANNICK:  And in the statement --

22             THE COURT:  Oh, that can't come in.  That's, that's

23  hearsay.

24             MR. CANNICK:  No.  This is from Robert to him.

25             THE COURT:  Kelly called Williams crying sometimes

```
                        Sidebar                            1351
```

1   and Kelly stated that he married her to protect her from her

2   mother.  That is rank hearsay.  Sorry.

3            MR. CANNICK:  I'm not offering it for the truth of

4   the matter, Your Honor.

5            THE COURT:  Yes, you are.

6            MR. CANNICK:  No, I'm not.

7            THE COURT:  What are you offering it for?

8            MR. CANNICK:  That this is what he said.

9            THE COURT:  That's hearsay.

10           MR. CANNICK:  My exception.

11           THE COURT:  Nice try.  Do you have any further

12  questions?

13           MR. CANNICK:  No.  I don't think so.  I always like

14  to end on a high note, Your Honor, so I have to find a high

15  not.

16           THE COURT:  Okay.  Nothing hearsay though.

17           (End of sidebar conference.)

18           (Continued on next page.)

19

20

21

22

23

24

25

1   BY MR. CANNICK:

2   Q    You testified earlier that Barry Hankerson was

3   Mr. Kelly's manager.

4   A    Yes.

5   Q    Okay.  And Barry Hankerson, I think you testified, might

6   have been related to Aaliyah?

7   A    It was my understanding, yes.

8   Q    And near the time that -- withdrawn.

9        Barry Hankerson was eventually terminated by

10  Mr. Kelly, am I correct?

11  A    Yes.

12  Q    And Barry Hankerson had a fearsome reputation, am I

13  correct?

14  A    Yes.

15       MR. CANNICK:  Thank you.

16       THE COURT:  All right.

17       MR. CANNICK:  Nothing further.

18       THE COURT:  Any redirect?

19       MS. CRUZ MELENDEZ:  No, Your Honor.

20       THE COURT:  All right.  Thank you, Mr. Williams.

21  You can step down.

22       (Witness excused.)

23       THE COURT:  All right.  We are just at the lunch

24  break so I think we'll break for lunch at 2:15.

25       Don't talk about the case or anything else about the

Williams - cross - Cannick                1353

1  witnesses or anything like that, but do have a good lunch and

2  we'll see you at 2:15.

3          (Jury exits.)

4          THE COURT:  All right.  So what's the -- do you have

5  other witnesses for this afternoon?  Any of them video?

6          MS. GEDDES:  Yes.

7          THE COURT:  Which one, the one we talked about this

8  morning?

9          MS. GEDDES:  No.  Veronica Jackson.  She'll be

10  testifying about the 241, the T-shirt.

11          THE COURT:  Okay.  And anybody after that?

12          MS. GEDDES:  We have two additional witnesses.

13          THE COURT:  All right.

14          MR. CANNICK:  Who are they?

15          MS. GEDDES:  They are -- I'll let you know.  Malak

16  and Arnold.

17          THE COURT:  So the government has given the names of

18  the witnesses to the defense.  Anything else that we have to

19  do before we break for lunch?

20          MS. GEDDES:  Not from the government.

21          THE COURT:  I just need to see the parties at the

22  side without the reporter just a second just on scheduling.

23          (Discussion off the record.)

24          THE COURT:  I think we're good.  Have a good lunch,

25  everyone.                    (Luncheon recess.)

Williams - cross - Cannick                    1354

1          A F T E R N O O N   S E S S I O N

2          (Time noted:  2:25 p.m.)

3          (In open court; Jury not present.)

4          THE COURTROOM DEPUTY:  All rise.

5          THE COURT:  Everybody can have a seat.

6          Just before we start, I need to see the parties on

7     the side with the court reporter.

8          All right, can I see the lawyers at the side for a

9     minute please?

10          (Continued on the next page.)

11          (Sidebar conference.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Williams - cross - Cannick                    1355

Williams - cross - Cannick                    1356





PROCEEDINGS                          1358

1            (In open court; Jury not present.)

2            THE COURT:  So I know we have our witness on video,

3    and I think we need our jurors, unless there's -- well,

4    there's not anything else, I'm sure, because the witness is

5    here.

6            All right, so let's get the jury.

7            THE COURTROOM DEPUTY:  All rise.

8    (Jury enters the courtroom.)

9            THE COURTROOM DEPUTY:  You may be seated.

10           THE COURT:  All right, I hope you had a good lunch

11   everyone.

12           We are ready to proceed with the next witness, who's

13   going to be testifying remotely.

14           Go ahead, Ms. Geddes.

15           MS. GEDDES:  The government calls Veronica Jackson.

16           THE COURTROOM DEPUTY:  Ms. Jackson, can you please

17   stand and raise your right hand.

18           THE WITNESS:  Should I stand?

19           (Witness takes the witness stand.)

20           (Continued on next page.)

21

22

23

24

25

PROCEEDINGS                                            1359

1          **VERONICA JACKSON, called as a witness, having been**

2  **first duly sworn/affirmed, was examined and testified as**

3  **follows:**

4                THE WITNESS:  Yes.

5                THE COURTROOM DEPUTY:  Please state your name for

6  the record.

7                THE WITNESS:  Veronica Jackson.

8                THE COURTROOM DEPUTY:  Thank you.  You may be

9  seated.

10                THE COURT:  All right.  Ms. Jackson, can you hear

11  me?

12                THE WITNESS:  Yes, I can.

13                THE COURT:  Okay, just a few instructions.

14           We have court reporters that take down everything

15  that you say.  So just take your time, don't speak too

16  quickly, and let whichever lawyer is finished -- let whichever

17  lawyer is asking questions, let them finish the question

18  before you answer so we're not stepping all over each other.

19           And then the final thing is if there's a question

20  that you need to have repeated or clarified, just let me know,

21  okay?

22                THE WITNESS:  Okay.

23                THE COURT:  Okay, great.

24           Go ahead, Ms. Geddes.

25                MS. GEDDES:  Thank you.

JACKSON - DIRECT - GEDDES                1360

1   DIRECT EXAMINATION

2   BY MS. GEDDES:

3   Q    Good afternoon.

4        Where do you work?

5   A    Illinois State Police Forensic Science Center at Chicago.

6   Q    And what is your title at the Forensic Science Center in

7   Chicago?

8   A    I am a forensic scientist in the biology section.

9   Q    How long have you worked as a forensic scientist in the

10  biology section?

11  A    Thirteen years.

12  Q    What is the forensic biology section responsible for

13  doing?

14  A    We examine evidence for the presence of biological

15  substances such as blood, semen and urine -- I'm sorry, blood

16  semen and saliva.  We testify in court when necessary, and

17  document our results.

18  Q    And is the Forensic Science Center in Chicago an

19  accredited lab?

20  A    Yes.

21  Q    By whom is it accredited?

22  A    It is accredited by ANAB, which is the -- it's a long

23  name -- American National Standards Institute.  American

24  Society of Quality.  National Accreditation, sorry, Board.

25  ANAB.

JACKSON - DIRECT - GEDDES                1361

1  Q    Okay.  And just generally, what is involved in the

2  accreditation process?

3  A    The accreditation board, they come to our lab.  They make

4  sure we're operating under certain guidelines.

5          They check things like our documentation of

6  equipment maintenance.  Analysts.  Case files.  And case --

7  chemical storage.  Things like that.

8  Q    Can you tell the jury about your educational background?

9  A    I have a bachelor's degree in biology from the -- from

10  Northern Illinois University.

11  Q    And have you received any training or additional

12  education to perform your job as a forensic scientist in the

13  Forensic biology unit?

14  A    Yes.  The Illinois State Police has a forensics program,

15  training program, for biology.

16  Q    How long is that program?

17  A    That's a year.

18  Q    And did you participate in that program?

19  A    Yes.

20  Q    As a forensic scientist, have you had occasion to analyze

21  evidence for the presence of biological fluids?

22  A    Yes.

23  Q    Approximately how many times have you conducted such

24  tests?

25  A    Thousands of times.

JACKSON - DIRECT - GEDDES                    1362

1   Q    Did you say "thousands"?

2   A    Thousands of times, yes.  Thousands.

3   Q    And have you previously testified as an expert in court

4   regarding the analysis of evidence for biological fluids?

5   A    Yes.

6   Q    Approximately how many times?

7   A    Eighteen.

8            MS. GEDDES:  Your Honor, pursuant to Federal Rule of

9   Evidence Rule 702, I'd like to offer Ms. Jackson as an expert

10  in the field of forensic biology.

11           THE COURT:  Any objection?

12           MR. CANNICK:  None.

13           THE COURT:  Okay.  The witness will be an expert.

14           Ladies and gentlemen, I'll talk to you a little bit

15  about what that means more in my final instructions.

16           But generally, when someone possesses expertise in

17  an area that most of us don't understand, a person is

18  permitted to testify as an expert witness.

19           Go ahead.

20           MS. GEDDES:  Thank you.

21  BY MS. GEDDES:

22  Q    Can you explain to the jury the process for analyzing a

23  piece of evidence for the presence of biological fluids?

24  A    Which biological fluid?  Or just general or?

25  Q    Why don't you talk about the process for looking for the

LINDA D. DANELCZYK, RPR, CSR, CCR

JACKSON - DIRECT - GEDDES                    1363

1    presence of saliva and semen?

2    A    Okay.

3         So for saliva and semen, we use an alternative light

4    source to look for stains on the evidence.  And when I find

5    those stains, I take samples of those stains and use tests.

6         THE COURT:  Can you just --

7         THE WITNESS:  Sorry.

8         THE COURT:  That's okay, I interrupted you.

9    Q    Can you describe the particular tests that you use to

10   determine whether saliva is present on a particular piece of

11   evidence?

12   A    The tests that indicates the presence of saliva is our

13   Phadebas test.

14   Q    Just for the benefit of the court reporter, is that

15   P-H-A-D-E-B-A-S?

16   A    Yes.

17   Q    What is the Phadebas test?

18   A    It is a color change test that indicates the presence of

19   saliva.  It tests for the protein amylase that is high

20   concentrations usually in saliva.

21   Q    And can you describe the tests that are used to determine

22   whether semen is present on a particular piece of evidence?

23   A    We usually use three types of tests.

24        There's an acid phosphatase test, which is a

25   presumptive test.  It indicates the presence of semen by --

JACKSON - DIRECT - GEDDES                    1364

1   with a color change that approximates a protein that is

2   present in semen is present.

3            Then there's a p30 test, which is another protein

4   that is present in high concentrations in semen.

5            So it is also a presumptive test, meaning that it is

6   similar to a pregnancy test or a pregnancy strip.  So when

7   that's positive, it indicates the presence of semen.

8            Then we have a confirmatory test, which is a

9   microscopic search for sperm.  And that is, again, a

10  confirmatory test under a microscope.

11  Q    And can you explain what you are looking for in the

12  microscopic test?

13  A    Some sperm cells.

14  Q    So is it fair to say that you put the sample underneath a

15  microscope and you look for the presence of sperm?

16  A    Yes.

17  Q    And in this case, were you asked to analyze a particular

18  piece of evidence for the presence of biological substances?

19  A    Yes.

20  Q    What substances were you looking for?

21  A    Saliva and semen.

22            MS. GEDDES:  Your Honor, may I approach?

23            THE COURT:  Yes.

24  Q    I'm showing the witness what's in evidence as Government

25  Exhibit 241.

1              (Counsel approaches the witness.)

2    A    Oh.

3    Q    Do you recognize this shirt that I'm showing you?

4    A    I don't see it right now.

5         I do.  I do.

6    Q    And --

7    A    Yes.  That is my initials and the date of my analysis.

8    Q    So fair to say you recognize Government Exhibit 241,

9    which I just showed you, based on your initials that you saw

10   on that manila tag?

11   A    Yes.

12   Q    Now did you prepare notes in connection with your

13   analysis of Government Exhibit 241?

14   A    Yes.

15   Q    And do you have a copy of your report and the associated

16   notes in front of you?

17   A    Yes.

18   Q    And would reviewing that report and those notes assist

19   you in your testimony today?

20   A    Yes.

21             MS. GEDDES:  The witness is referring to what's been

22   marked for identification as Government Exhibit 3500-VJ-6.

23             And with the Court's permission, I'd like

24   Ms. Jackson to be able to refer to her notes to assist her

25   with her testimony today.

JACKSON - DIRECT - GEDDES                1366

1      THE COURT:  Any objection?

2      MR. CANNICK:  As if it's used to refresh her

3  recollection.

4      THE COURT:  Wait.  You don't object to her

5  refreshing her recollection?

6      MR. CANNICK:  No.

7      THE COURT:  All right.  Go ahead.

8      MS. GEDDES:  Thank you.

9  BY MS. GEDDES:

10  Q    When did Forensic Science Center receive Government

11  Exhibit 241, the blue T-shirt that I just showed you?

12  A    It was received in the lab February 13, 2019.

13  Q    What was the condition of Government Exhibit 241 when you

14  received it?

15  A    It was in a sealed condition.

16  Q    And when did you receive it?

17  A    I received it on March 8th.

18  Q    Is March 8th the day that you prepared your report?

19  A    That is the day that I prepared my report.

20      I don't have my custody, my list of custody of the

21  shirt, so I don't know the exact date that I received it.

22  Q    Can I direct your attention to page -- I'm sorry, the

23  fourth page of what's in front of you?  And it's identified as

24  page 2 of 4.

25      Do you see at that page in front of you?

LINDA D. DANELCZYK, RPR, CSR, CCR

JACKSON - DIRECT - GEDDES                    1367

1  A     Yes.

2          My start date.

3  Q     And what, if anything -- what, if anything, does

4  reviewing that tell you about the date on which you received

5  this piece of evidence Government Exhibit 241?

6  A     So I did start it on February 15, 2019.

7  Q     So fair to say that you had received it on or before

8  February 15th of 2019?

9  A     Yes.

10 Q     What did you initially do with Government Exhibit 241

11 when you received it?

12 A     When I received it, I made sure that it came to me in a

13 sealed condition, and it had initials and dates on it from our

14 laboratory.  And then I opened the package and looked at the

15 evidence.

16 Q     And when you say you looked at the evidence, what were

17 you looking for?

18 A     Just looking to see if there were notable stains.

19 Looking at the manufacturer's tags and the size.  And just

20 seeing if it was damaged in any way.

21 Q     And when you say you looked at it, you're referring to

22 just using your naked eye to look at that?

23 A     Yes.

24 Q     What did you do after that?

25 A     After that, I looked at it using the alternative light

JACKSON - DIRECT - GEDDES                    1368

1   source.

2   Q    What is an alternative light source?

3   A    It is a source, a UV light, that shows stains that can't

4   be seen with the naked eye.

5   Q    What, if anything, did your review of Government

6   Exhibit 241 with an alternative light source show you?

7   A    It showed stains on the shirt.  And there were stains by

8   the neck area that I chose to analyze.

9          And there were additional stains as well, but I did

10  not analyze at this time.

11  Q    Now you said that there were stains that you did analyze

12  that were by the neck area.

13         On which side of the T-shirt did you identify those

14  stains?

15  A    The inside neck area.  Neckline.

16  Q    All right.  And I'm showing -- I'm showing the witness

17  what's been marked for identification as Government

18  Exhibit 241B, as in boy.

19  A    Yes.

20  Q    Do you see 241B?

21  A    Yes.

22  Q    Do you recognize that?

23  A    Yes.

24  Q    What is that?

25  A    Those are my markings of the fluorescent stains that I

LINDA D. DANELCZYK, RPR, CSR, CCR

1   observed on the shirt.

2   Q    And is that a photograph of the T-shirt with your

3   markings on it?

4   A    Yes.

5        MS. GEDDES:  The government offers 241B.

6        THE COURT:  Any objection?

7        MR. CANNICK:  No.

8        THE COURT:  Okay, that's in evidence.

9        (Government Exhibit 241B, was received in evidence.)

10       MS. GEDDES:  May we publish?

11       THE COURT:  Yes.

12       (Exhibit published.)

13  Q    Now, Ms. Jackson, do you have a copy in the notes that

14  you brought with you in what's been identified as 3500-VJ-6 of

15  that photograph?

16  A    Yes.

17  Q    All right.  So even though you can't see my screen, you

18  can see it in front of you; is that correct?

19  A    Correct.

20  Q    All right.  So there is an area that appears to be

21  identified with the number 1, a 2, and a 3.

22       Do you see that?

23  A    Yes.

24  Q    All right.  What, if anything, did you name those three

25  areas?

1   A    1 is Q1 stain.

2            2 is Q2 stain.

3            And 3 is Q3 stain.

4   Q    Okay.  And where the black lines are next to 1, 2 and 3,

5   is it inside those lines where the alternative light source

6   revealed the presence of some type of stain?

7   A    Right.  Right.  Florescence, yes.

8   Q    And again just to be clear, this is on the inside of the

9   T-shirt, not the exterior of the T-shirt, correct?

10  A    Correct.

11  Q    Did you conduct a test to determine whether there was

12  saliva present on any of the stains that you identified using

13  the alternative light source?

14  A    Yes, on all three stains.

15  Q    And did you use that same Phadebas test that you

16  testified about earlier?

17  A    Yes.

18  Q    What did you conclude based on conducting the Phadebas

19  test?

20  A    Q1 was inconclusive.

21           Q2 was negative.

22           And Q3 was inconclusive as well.

23  Q    Now just to be clear, there's a portion on 241B, the

24  photograph that has your markings, next to the 2.

25           Is that the area that you identified as Q2?

JACKSON - DIRECT - GEDDES                    1371

1    A    Yes.

2    Q    And you said the other two areas where the 1 is and where

3    the 3 is, they were inconclusive; is that correct?

4    A    Yes.

5    Q    What do you mean -- what do you mean by saying that the

6    tests were inconclusive for the presence of saliva?

7    A    Every day that we run the Phadebas test, we run a

8    positive control and a negative control to make sure the test

9    is working properly.

10            And the positive control, the color change is a dark

11   blue.  Because it's a positive control, you want it to be to

12   need to see saliva or -- so that you know what's going to be

13   positive.

14            So if I do a test stain and the color, there's a

15   color change but it's not as deep and dark as that positive,

16   we call that inconclusive.

17   Q    And what, if anything, are you able to conclude regarding

18   whether or not there was saliva present on that T-shirt?  Or

19   in area?

20   A    There was --

21   Q    I'm sorry, let me be clear.

22            I'm asking about whether -- what you were able to

23   conclude about the presence of saliva on the areas marked as

24   Q1 and Q3?

25   A    It was inconclusive, but that there was a color change.

1  So based on that, if that was our only test we would run, it

2  would go forward to DNA.

3          So it would go to further analysis for DNA.  If it

4  was negative and there was no color change, it would not.

5  Q    Now as you sit here today, can you say whether or not

6  there was saliva present in Q1 -- on Q1 or Q3?

7  A    I can say that it was indicated there.  It was

8  inconclusive.  Right, it's inconclusive.

9  Q    So you can't --

10  A    But there was a color change.

11  Q    So you can't say for sure one way or the other; is that

12  correct?

13  A    Correct.

14  Q    Okay.  Now did you also conduct an examination of

15  Government Exhibit 241 for the presence of semen?

16  A    Yes.

17  Q    And of the three tests that you described earlier

18  relating to the presence of semen, which of those did you

19  conduct?

20  A    I conducted all three tests on all -- on two of the

21  samples.

22          And then only one of the tests on Q2.

23  Q    Okay.  And so beginning with Q2, which is, again, is that

24  the area where -- next to where the 2 is?

25  A    It is.

JACKSON - DIRECT - GEDDES                    1373

1   Q    What did you conclude about Q2, whether or not it showed

2   if there was semen present there?

3   A    No semen was indicated from that stain.

4   Q    And how many tests did you say you performed with respect

5   to Q1 and Q3?

6   A    I performed all three tests on Q1 and Q3.

7   Q    And based on your performing those three tests, what did

8   you conclude?

9   A    That semen was identified on Q1 and Q3.

10  Q    And you testified earlier that the microscopic analysis

11  is a confirmatory test; is that correct?

12  A    Yes.

13  Q    And did you, in fact, review samples from Q1 and Q3 under

14  a microscope?

15  A    Yes.

16  Q    What did you see under the microscope on Q1 and Q3?

17  A    I saw sperm cells for Q1 and Q3.  For those samples.

18  Q    And when you say "sperm," are you referring to sperm and

19  semen?

20  A    Yes.

21         MR. CANNICK:  Objection.

22         THE COURT:  Overruled.

23  Q    What, if anything, were you able to conclude about the

24  quantity of semen on Q1 and Q3?

25  A    On Q1, the microscopic rating was plus three.

1              And for Q3, the microscopic rating was plus four.

2    Q    Now what are the available -- what is the range of

3    results that can be found as a microscopic rating?

4    A    There's the lowest which is -- well, negative.  Then

5    trace.  And the highest is plus four.

6    Q    What, if anything -- how can you -- is there any way in

7    which you can describe what a rating of plus four equates to

8    in terms of how much semen was present?

9    A    So trace would be if -- when I'm looking at a slide and I

10   take the stain, the sample that I put on there, trace would be

11   finding at least one sperm cell, and it's hard to find.  But

12   semen is identified.

13             Plus four -- plus three is looking all over and

14   finding -- finding sperm heads all over.

15             And then four is in all the fields that I look in of

16   the sample, I'm finding many sperms.  So it's easy to find.

17   They're everywhere.  Every time I move my microscope, I can

18   see them.

19   Q    And.

20   A    It's not hard to find.

21   Q    -- when you say "sperm heads," what do you mean by that?

22   A    Sperm cells.  Spermatozoa.

23   Q    Just what do you refer by the "head"?  Is there a head

24   and a tail?

25   A    It's the sperm -- sperm cells, sorry.  Sperm cell.  It's

JACKSON - DIRECT - GEDDES                    1375

1   the sperm cell.  It's the sperm.  So I see the sperm.

2   Q    What did you do once you had determined that semen was

3   present on the areas you marked as Q1 and Q3?

4   A    Just photographs of the shirt and the stains, and samples

5   to go forward for DNA analysis.

6   Q    And in Government Exhibit 241, which is now in evidence,

7   there are some cut holes in the T-shirt.

8        Are those holes cut from where you cut the samples

9   for Q1 and Q3?

10  A    Yes.  Yes, for testing and then for further to send to

11  DNA, yes.

12  Q    Now did you conduct the DNA analysis on the sperm that

13  you identified on Government Exhibit 241?

14  A    No.

15       MS. GEDDES:  No further questions.

16       THE COURT:  Okay.

17       Cross-examination?

18       MR. CANNICK:  None, Your Honor.

19       THE COURT:  Okay, all right.

20       Thank you so much.  You are excused.

21       THE WITNESS:  Okay, thank you.

22       THE COURT:  Thanks a lot.

23       THE WITNESS:  Okay, bye.

24       THE COURT:  Okay.  Are you ready to call your next

25  witness?        (Continued on the following page.)

Proceedings                                    1376

1   (Continuing.)

2          MS. SHIHATA:  Yes, the Government calls Malak

3   Benabdallah.

4          THE COURT:  Give us just a second, I think we've got

5   to move some stuff here.

6          (Pause.)

7          THE COURT:  Okay, you can get the witness.

8          (The witness entered and took the stand.)

9          THE COURTROOM DEPUTY:  Please raise your right hand.

10         Do you solemnly swear or affirm that the testimony

11  you are about to give will be the truth, the whole truth, and

12  nothing but the truth?

13         THE WITNESS:  Yes, ma'am.

14         (Witness sworn.)

15         THE COURTROOM DEPUTY:  Please state your name for

16  the record.

17         THE WITNESS:  Malak Benabdallah.

18         THE COURTROOM DEPUTY:  Have a seat, please.

19         THE COURT:  Okay, just a few ground rules before we

20  start.

21         You can take your mask off.  The lawyers are going

22  to ask you questions and our court reporter takes down

23  everything that you say.  So, you've got to speak into the

24  microphone so everybody can hear you.  And the second thing

25  is, you can't speak too quickly.  Okay?

1            THE WITNESS:  Okay.

2            THE COURT:  And then you can also, just don't speak

3     over whichever lawyer is asking you questions.

4            THE WITNESS:  Okay.

5            THE COURT:  And then if there is a question that one

6     of the lawyers asks that you don't understand or you want to

7     have repeated, just let me know and I will have them rephrase

8     it.

9            And then finally, just do your best to answer only

10    the question that you're being asked.

11           Okay?

12           THE WITNESS:  Okay.

13           THE COURT:  Okay.  Go ahead.

14

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Benabdallah - direct - Shihata                1378

1   **MALAK BENABDALLAH** ,

2        called as a witness by the Government, having been duly

3        sworn/affirmed by the Courtroom Deputy, was examined and

4        testified as follows:

5   DIRECT EXAMINATION

6   BY MS. SHIHATA:

7   Q    Good afternoon.

8             Did you receive a subpoena to testify hear today?

9             THE COURT:  I don't think the microphone is on.

10            MR. CANNICK:  I didn't hear.

11  Q    Did you receive a subpoena to testify here today?

12  A    Yes.

13  Q    Do you want to be here today?

14  A    No, not really.

15  Q    How old are you?

16  A    Twenty-two.

17  Q    What city -- in what city did you go to high school?

18  A    Orlando.

19  Q    Did you grow up in Orlando?

20  A    No.

21  Q    When did you move to Orlando?

22  A    In 2014.

23  Q    And approximately what time of year did you move to

24  Orlando in 2014?

25  A    Around September.

Benabdallah - direct - Shihata                    1379

1   Q    And did you start that school year there?

2   A    Yes.

3   Q    What school year were you entering in September 2014?

4   A    My sophomore year of high school.

5   Q    Where did you go to high school?

6   A    Freedom High School.

7   Q    Did you graduate from Freedom High School?

8   A    Yes.

9   Q    What year did you graduate?

10  A    2017.

11  Q    I am showing you what's in evidence as Government

12  Exhibit 75.

13             (Exhibit published.)

14  Q    Do you see that photo?

15  A    Yes.

16  Q    Without seeing this person's name, do you recognize the

17  person in this photograph?

18  A    Yes.

19             MS. SHIHATA:  I am now showing the witness and the

20  jury only what's in evidence as Government Exhibit 75(a).

21  BY MS. SHIHATA:

22  Q    Is this the same photograph I just showed you in

23  Government Exhibit 75?

24  A    Yes.

25  Q    And is this the true name you know this individual by?

Benabdallah - direct - Shihata                1380

1    A    Yes.

2          MS. SHIHATA:  I am showing the witness only what's

3    been marked for identification as Government Exhibit 75(c).

4    Q    Is this the same photograph in the two exhibits I just

5    showed you with the name Jane in quotation marks underneath?

6    A    Yes.

7          MS. SHIHATA:  I move to admit Government

8    Exhibit 75(c).

9          MR. CANNICK:  No objection.

10          THE COURT:  Okay, that's in evidence.

11          (Government's Exhibit 75(c) was received in

12    evidence.)

13          (Exhibit published.)

14    BY MS. SHIHATA:

15    Q    And for the purposes of your testimony here today, we are

16    going to refer to this individual as Jane.  Okay?

17    A    Okay.

18    Q    Now, directing your attention to your sophomore year in

19    high school, so the year you entered school in September 2014.

20          Who were your closes friends that year?

21    A    Jane and my friend Mia.

22    Q    And is Mia a nickname?

23    A    Yes.

24    Q    What is Mia's full name?

25    A    Jamia.

1  Q     What's her last name?

2  A     Coates.

3  Q     Now, were you, Jane and Mia all the same age?

4  A     No.  Jane was a year older than us.

5  Q     And when you started your sophomore year of high school,

6  how old were you?

7  A     I was 15.

8  Q     And was Jane in the same grade as you or a different

9  grade?

10 A     No, she was a year above Mia and I.

11 Q     So, was she a junior when you were a sophomore?

12 A     Yes.

13 Q     Now, what types of things did you, Jane and Jamia, or

14 Mia, do when you hung out together in high school?

15 A     We -- we hung out all the time.  We had lunch together.

16 And we used to hang out outside of school sometimes.

17 Q     When you hung out outside of school, what types of things

18 did you do?

19 A     We would just, like, go to each other's houses or get

20 food together or, like, do things like that, like watch movies

21 and stuff.

22 Q     Now, what, if any, extra-curricular activities do you

23 recall Jane doing while she was in high school with you?

24 A     She used to sing.  She was like in a club called the

25 Patriot Singers.

Benabdallah - direct - Shihata                    1382

1   Q    And what, if any, performances did Jane do for her

2   singing?

3   A    She did a lot of performances, like, in front of

4   audiences and stuff.  It was like a hobby of hers.

5   Q    Now, did you stay -- did you and Jane stay in touch

6   throughout your high school years?

7   A    No.

8   Q    What happened or why didn't you stay in touch throughout

9   your high school years?

10  A    She left and just kinda stopped contact after a while.

11  Q    Around when did Jane leave?

12  A    It was May of my sophomore year.

13  Q    Okay.  And so you started your sophomore year in

14  September of 2014, is that right?

15  A    Yeah.

16  Q    And so, May would have been May of 2015?

17  A    Yes, sorry.

18  Q    That's okay.

19        And when you say Jane left, what do you mean by

20  that?

21  A    She -- she left.  She went to go meet with R. Kelly and

22  she was gone for a while.

23  Q    Now, after Jane initially left, did you and Jane stay in

24  contact with each other?

25  A    Yeah.

SAM     OCR     RMR     CRR     RPR

Benabdallah - direct - Shihata                1383

1  Q    And initially, how were you in contact with her?

2  A    We had, like, over-the-phone contact.

3  Q    And what types of communications over the phone did you

4  have?

5  A    Like texts and calls and like Facetime calls.

6  Q    And initially, about how often did you communicate with

7  Jane after she left?

8  A    We communicated often, but it just gradually lessened

9  over time.

10 Q    At some point did your communications with Jane stop

11 completely?

12 A    Yes.

13 Q    Around when was that?

14 A    It was around after she turned 18.

15 Q    And do you recall approximately when Jane's birthday was?

16 A    Yeah, December 30th of -- she turned 18 when I was --

17 when I was -- my sophomore year.

18 Q    Now, do you recall what phone number you had -- you used

19 back in 2015, what cell phone you used?

20 A    That I used?

21 Q    Yes.

22 A    Yes.

23 Q    And do you still use that number today?

24 A    Yes, I do.

25           MS. SHIHATA:  I'm showing the witness only what's

SAM     OCR     RMR     CRR     RPR

Benabdallah - direct - Shihata                    1384

1   been marked for identification as Government Exhibit 936.

2   BY MS. SHIHATA:

3   Q     Without saying what this phone number is, do you

4   recognize this phone number?

5   A     Yes.

6   Q     And what is this, without reading it, what is this phone

7   number?

8   A     It's my phone number.

9   Q     And is this your cell phone number?

10  A     Yes.

11  Q     And is this the same cell phone number you've had since

12  2015?

13  A     Yes.

14  Q     And including 2015?

15  A     Yes.

16          MS. SHIHATA:  I would like to offer Government

17  Exhibit 936 for the jury only.

18          THE COURT:  Any objection?

19          MR. CANNICK:  No objection.

20          THE COURT:  Okay.

21          (Government's Exhibit 936 was received in evidence.)

22          MS. SHIHATA:  And may we publish it for the jury

23  only, please?

24          THE COURT:  Yes.

25          (Exhibit published to the jury only.)

Benabdallah - direct - Shihata                    1385

1    BY MS. SHIHATA:

2    Q    Now, do you recall what number or numbers Jane used when

3    you communicated with her in or around 2015?

4    A    Not off the top of my head.

5    Q    Did you communicate with Jane on multiple numbers in

6    2015?

7    A    Yes.

8            MS. SHIHATA:  I'm showing the witness only what's

9    been marked for identification as Government Exhibit 204.

10   BY MS. SHIHATA:

11   Q    Do you recognize Government Exhibit 204?

12   A    Yes.

13   Q    And what do you recognize it to be?

14   A    The contact that I had for Jane.

15   Q    And is this a screenshot of the contact on your cell

16   phone?

17   A    Yes.

18           MS. SHIHATA:  I move to admit Government

19   Exhibit 204.

20           MR. CANNICK:  No objection.

21           THE COURT:  Okay, that's in evidence.

22           (Government's Exhibit 204 was received in evidence.)

23           MS. SHIHATA:  And may I publish it to the jury only,

24   please?

25           (Exhibit published to the jury only.)

Benabdallah - direct - Shihata                1386

BY MS. SHIHATA:

Q    At the top here (indicating), is that Jane's true name?

A    Yes.

Q    And can you read out what number is listed here?

A    (708) 769-0779.

            MS. SHIHATA:  May I approach, Your Honor?

            THE COURT:  Yes.

Q    I am about to show you what's been marked for

identification as Government Exhibit 205(a) through -- 205(a)

through 205(m).

            Prior to your testimony here today, did you have a

chance to look at what I just handed you?

A    Yes.

Q    And generally speaking, what are those exhibits?

A    They are my text messages with her.

Q    With Jane?

A    With Jane, yeah.

Q    And are those text messages from 2015 and early 2016?

A    Yes.

            MS. SHIHATA:  Your Honor, some of these texts are

already in evidence, but I'd like to offer all of 205(a)

through (m).

            THE COURT:  Any objection?

            MR. CANNICK:  No objection.

            THE COURT:  Okay, those are in evidence and you can

            SAM      OCR      RMR      CRR      RPR

Benabdallah - direct - Shihata              1387

1    publish them publicly?

2              Do you want them just for the jury, or how do you

3    want them?

4              MS. SHIHATA:  I think I will determine that

5    depending on the page.

6              THE COURT:  With each page?

7              MS. SHIHATA:  Yes.

8              THE COURT:  Okay.

9              MS. SHIHATA:  May I just approach to retrieve?

10             THE COURT:  Sure.

11             (Government's Exhibit 205(a) through 205(m) was

12   received in evidence.)

13   BY MS. SHIHATA:

14   Q    Now, I am showing -- I am showing you Government

15   Exhibit 205(a).

16             MS. SHIHATA:  And this can be for everyone.

17             (Exhibit published.)

18   Q    And focusing first on the number up top, the number

19   (407) 360-4738, what is that?

20   A    That's a phone number that Jane was using at that time.

21   Q    Okay.  And the date of this -- this series of text

22   messages is October 3rd, 2015; correct?

23   A    Yes.

24   Q    Now, the texts that are in gray here, are those your

25   texts or Jane's texts?

Benabdallah - direct - Shihata                1388

1   A    Jane's.

2   Q    And directing your attention to the second text -- well,

3   actually, withdrawn.

4        At the time of these texts, had Jane already left

5   Orlando?

6   A    Yes.

7   Q    And had you spoken to her before she left?

8   A    Before she left?

9   Q    Before she left Orlando, had you spoken to her?

10  A    No.

11  Q    Well --

12  A    Well, yeah, I mean, before she left I was still in

13  contact with her.

14  Q    Right, right.

15       And did you have an understanding -- I think you

16  testified earlier, do you have an understanding of where Jane

17  went when she left?

18  A    Yeah.

19  Q    Where did she go?

20  A    I don't know exactly where she went, but I just know that

21  she was with R. Kelly.

22  Q    And, now, directing your attention to the second text on

23  Government Exhibit 205(a) where it states:  "You know he

24  nutted in me before his show today."

25       You received that text from Jane?

Benabdallah - direct - Shihata                1389

1    A    Yes.

2    Q    And who did you understand Jane was referring to when she

3    said "he nutted in me before his show today"?

4    A    R. Kelly.

5    Q    And what did you understand the term "nutted in me" to

6    mean?

7    A    Like, ejaculation.

8    Q    I'm showing you what's in evidence as 205(b).

9         Again, is this texts with the same telephone number

10   (407) 260-4738 that Jane was using at the time?

11        (Exhibit published.)

12   A    Yes.

13   Q    And the texts in gray are from Jane?

14   A    Yes.

15   Q    I'm showing you what's in evidence as Government's

16   Exhibit 205(c).

17        (Exhibit published.)

18   BY MS. SHIHATA:

19   Q    Are these, again, texts with Jane at that same number?

20   A    Yes.

21   Q    And the gray texts are from Jane?

22   A    Yes.

23   Q    Now, I'm directing your attention to the portion where

24   there's emojis of some baby bottles and then it says:

25        "Fr tho.  Yall gonna b the God mommas.  I just hope

Benabdallah - direct - Shihata                1390

1   we get married."

2           Do you see that?

3   A    I do.

4   Q    What did you understand Jane to be referring to at that

5   time?

6   A    Her being pregnant.

7   Q    And had you, apart from these text messages, had you

8   spoken to Jane on the phone about her concern that she may

9   have been pregnant?

10  A    Yes.

11  Q    And what, if anything, did she tell you at that time?

12          MR. CANNICK:  Objection.

13          THE COURT:  Overruled.

14  BY MS. SHIHATA:

15  Q    You can answer.

16  A    She said that she was, like, scared and that, like, she

17  was scared to have an abortion.  And just, like, her being

18  afraid.

19  Q    I'm showing you --

20          MS. SHIHATA:  I am showing the jury only what's in

21  evidence as Government Exhibits 205(d).

22  BY MS. SHIHATA:

23  Q    Are these text messages with Jane again?

24  A    Yes.

25  Q    And are these from October 5th, 2015?

SAM      OCR      RMR      CRR      RPR

```
                    Benabdallah - direct - Shihata              1391
```

1   A    Yes.

2   Q    And where it's -- the first text where it says "Moe,"

3   what does that mean?

4   A    Like dude.

5   Q    Is that a slang term you and Jane --

6   A    Yes.

7   Q    -- and Mia used?

8   A    Yes.

9   Q    And what did you understand this series of texts to be

10  about?

11  A    About her being afraid to get the abortion.

12  Q    And what, if any, understanding did you have regarding

13  who Jane believed had made her pregnant?

14  A    She knew that --

15          MR. CANNICK:  Objection.

16          THE COURT:  Sustained.

17  A    That --

18          THE COURT:  That's okay.

19          THE WITNESS:  Oh.

20          THE COURT:  That's okay, it's fine.  Whenever I say

21  "sustained," you don't answer.  Okay?

22          THE WITNESS:  Okay.

23          THE COURT:  Go ahead.

24  BY MS. SHIHATA:

25  Q    Showing you what's in evidence as Government

Benabdallah - direct - Shihata                    1392

1      Exhibit 205(e).

2              Is this additional texts with -- with Jane?

3      A    Yes.

4      Q    And were these texts again about her belief that she

5      might be pregnant?

6      A    Yes.

7      Q    And when she wrote to you, "He was mad when I brought it

8      up," who did you understand her to be referring to?

9      A    To R. Kelly.

10     Q    Now, when you were texting with Jane in 2015, did she

11     ever send you photographs?

12     A    Yes.

13     Q    And what kinds of photographs did she send you?

14     A    Photos of herself and with R. Kelly.

15              THE COURT:  Okay, you are really cutting out there.

16              THE WITNESS:  Okay.

17     A    Photos of herself and with R. Kelly.

18     Q    And what, if anything, did she ask you to do with these

19     photographs?

20     A    She asked me to keep the photographs safe for her.

21     Q    And what did you do after you got the photographs?

22     A    I screenshotted them and I saved them on my phone.

23     Q    I am showing you what's in evidence as Government Exhibit

24     205(f).

25              Are these, again, texts with Jane?

SAM      OCR      RMR      CRR      RPR

Benabdallah - direct - Shihata                    1393

1   A    Yes.

2   Q    And this is dated October 19th, 2015?

3   A    Yes.

4   Q    And the gray is from Jane?

5   A    Yes.

6   Q    And is the blue your texts?

7   A    Yes.

8   Q    And can you read -- read the first two texts?

9   A    "New."  "Keep these."

10  Q    And following that, did Jane send you a series of

11  photographs?

12  A    Yes.

13  Q    And I just showed you the last page, page 8, of

14  Government Exhibit 205(f).

15       Does the text I'm pointing to here (indicating),

16  that it says, "save these"?

17  A    Yes.

18  Q    What did you understand her to be referring to?

19  A    For me to save the photos.

20  Q    Now, in your communications with Jane in 2015, I think --

21  sorry, withdrawn.

22       You testified earlier you had communicated with Jane

23  using multiple numbers, is that right?

24  A    Yes.

25  Q    Meaning Jane used different numbers, is that right?

Benabdallah - direct - Shihata                1394

1   A     Yes.

2   Q     And did you have any understanding of why her numbers

3   were changing?

4            MR. CANNICK:  Objection.

5            THE COURT:  Sustained.

6   BY MS. SHIHATA:

7   Q     What, if anything -- excuse me, just one moment.

8            (Pause.)

9   Q     What, if anything, did Jane tell you about why her

10  numbers were changing?

11           MR. CANNICK:  Objection.

12           THE COURT:  Sustained.

13  Q     Showing you what's in evidence as Government

14  Exhibit 205(g).

15           Are these, again, texts with Jane?

16  A     Yes.

17  Q     And your texts are in blue and Jane's texts are in gray?

18  A     Yes.

19  Q     Can you read what you asked Jane that I'm pointing to

20  here (indicating)?

21  A     "Oh I see, you bee recording your own music or no."

22  Q     Why did you text Jane that?

23  A     I texted her that because to my understanding she was

24  meeting with R. Kelly to, like, advance her music career.

25  Q     And when was it that you gained that understanding?

1  A    When she first left.

2  Q    Before she left?

3  A    Yeah.

4  Q    And can you now read her response to that question from

5  you?

6  A    She said:  No, but he has me singing seductive songs,

7  kind of like --

8  Q    I'm sorry, just read --

9  A    Word for word?

10  Q    Yes, word for word.

11  A    Okay.

12      "Nah.  But he be having me singing and shit.

13  Seductive songs.  Kinda like Aaliyah and shit.  And he gave me

14  songs to learn so when I do get into the studio I just ace it.

15  But I'm gonna sleep.  Love you."

16  Q    Now, you testified earlier that your communications with

17  Jane gradually began to subside, is that right?

18  A    Correct.

19  Q    And what, if any, concerns did you have at that point?

20      MR. CANNICK:  Object as to relevance.

21      THE COURT:  Sustained as to form.

22  BY MS. SHIHATA:

23  Q    When your communications gradually subsided, did you

24  still try to communicate with Jane?

25  A    I did.

Benabdallah - direct - Shihata                1396

1  Q    I'm showing you what's in evidence as Government's
2  Exhibit 205(h).
3           Are these all texts from you to Jane?
4  A    Yes.
5  Q    And I'll start with the first one on October 29, 2015.
6           Does it state:  "Hey boo, I hope you doing okay.
7  Hit me when you can love"?
8  A    Yes.
9  Q    And then did you text Jane again on November 2nd, 2015:
10 "Baby, hit me whenever you can, okay, I'm worried about you
11 hoe"?
12 A    Yes.
13 Q    And by the way, was that -- hoe, was that just a term you
14 and your friends used in high school?
15 A    Yeah, I wasn't insulting her or anything.
16 Q    And no response to those two texts, correct?
17 A    Correct.
18 Q    And then you followed that up with a text on
19 November 6th, 2015?
20 A    Uh-hum, yes.
21 Q    Saying "you need to answer me"?
22 A    Yes.
23 Q    And then again November 8, 2015, what did you write
24 there?  Could you read what you wrote?
25 A    I said:  I really hope you're doing okay.  I'll be mad as

SAM    OCR    RMR    CRR    RPR

1  shit if you don't say happy birthday, but I know you're

2  probably busy.  Just call me when you can, me and Mia are

3  worried about you babes, I love you so much.

4  Q    And November 8th, does that day have any significance to

5  you?

6  A    That's my birthday.

7  Q    And the Mia referred to here, who is that?

8  A    Jamia Coates.

9  Q    And then, again, no response to that text?

10  A    Correct.

11  Q    And then on November 11th, 2015, did you write Jane a

12  text again saying, "Baby, we so worried about you"?

13  A    Yes.

14  Q    With some crying emojis?

15  A    Yes.

16  Q    Why were you concerned?

17          MR. CANNICK:  Objection.

18          THE COURT:  Overruled.

19  A    I was concerned because I wasn't hearing from her and I

20  was concerned for her safety and her whereabouts.

21  Q    And prior to Jane leaving Orlando, was she someone you

22  had been in communication with daily?

23  A    Yes.

24  Q    Was she one of your best friends?

25  A    Yes.

Benabdallah - direct - Shihata                1398

1    Q    Now, I am showing you Government Exhibit 205(h) again.

2         That last text from you is from November 11th, 2015,

3    right?

4    A    Yes.

5    Q    I'm now showing you what's in evidence as Government

6    Exhibit 205(i).

7         Are these texts from Jane?

8    A    Yes, ma'am.

9    Q    And is the first text -- are these all texts from

10   November 14th, 2015?

11   A    Yes.

12   Q    And was that the next time you recall hearing from her?

13   A    Yes.  Yes.

14   Q    I'm showing you what's in evidence as Government

15   Exhibit 205(j).

16        Again, are these texts between you and Jane?

17   A    Yes.

18   Q    And your texts are in blue and Jane's are in gray?

19   A    Yes.

20   Q    Now, there's a photo where I'm pointing.  Do you know

21   what this is?

22   A    It's a video.

23   Q    And do you see someone's face on the video?

24   A    Yeah, that's Jamia.

25   Q    And do you recall what this video was that you sent Jane?

Benabdallah - direct - Shihata                    1399

1   A    Yeah, it was a video of Jamia and I in the lunchroom

2   where Jane and us used to hang out.

3   Q    And why did you send that to Jane?

4   A    Oh, it was just to say hello and kind of remind her of

5   things that we used to do.

6   Q    And then LMAOOO, what does that mean?

7   A    Just like laughing my ass off.

8   Q    All right, and then is there a response from Jane that

9   I'm pointing to here (indicating)?

10  A    Yes.

11  Q    And what does that say?

12  A    It says:  You know yall can't do that, cause he checks my

13  phone.

14  Q    Who did you understand her to be referring to when she

15  said he checks my phone?

16  A    I understand her to be referring to R. Kelly.

17

18              (Continued on the following page.)

19

20

21

22

23

24

25

                 SAM     OCR     RMR     CRR     RPR

Benabdallah - direct - Shihata                1400

1    BY MS. SHIHATA:  (Continuing)

2    Q    I'm turning to the second page of the exhibit.

3         Is that your response saying, "What the video"?

4    A    Yes, ma'am.

5    Q    And do you then say, "What he gonna say if he sees the

6    video"?

7    A    Yes.

8    Q    Why were you asking that?

9         MR. CANNICK:  Objection.

10        THE COURT:  Overruled.

11   A    I'm sorry.  Can you repeat it?

12   Q    Sure.  What made you ask that in the text message?

13   A    Oh, because I was wondering why I shouldn't send her a

14   video.

15   Q    And how did she respond?  What did she write?

16   A    She said:  "He's gonna be like why is that your best

17   friend when you said you'd be texting your cousin."

18   Q    And who did you understand Jane to be referring to when

19   she used the term "your cousin"?

20   A    Myself.

21   Q    Are you and Jane cousins?

22   A    No, we're not.

23   Q    And what, if anything, did you understand her to mean by

24   this text?

25   A    That to R. Kelly's knowledge, I am her cousin and Jamia

Benabdallah - direct - Shihata                1401

1   is her best friend.

2   Q    And that's -- was that something had you discussed with

3   Jane before?

4   A    Yes.

5   Q    And you respond:  "Oh, I see"?

6   A    Yes, ma'am.

7   Q    And then there's a response from Jane?

8   A    Yes.

9   Q    And I think the full response is on the next page.  I'll

10  just turn to that.

11          Can you read out what's written there?

12  A    "I just don't want to have to block your number cause he

13  thinks I'm being immature.  That's why I deleted apps and

14  everyone's number cause I gotta show some age now that I'm

15  with a 48year old.  So doing" -- "so doing so has made me grow

16  out of a lot of young habits.  Just don't want to ruin the one

17  shot I have at being able to talk to you.  I love you."

18  Q    And what did you understand Jane to mean when she said

19  she didn't want to ruin the one shot she had of being able to

20  talk to you?

21          MR. CANNICK:  Objection.

22          THE COURT:  Overruled.

23  A    I understood that I guess it was hard for her to be able

24  to have communication with us and if I didn't uphold the fact

25  that I'm her cousin and Mia's her friend and we're not

Benabdallah - direct - Shihata                1402

1    supposed to knew each other it would ruin her chance to be

2    able to speak with me.

3    Q    I'm showing you what's in evidence as Government

4    Exhibit 205K.  Are these, again, texts between you and Jane?

5    These ones are from December 28, 2015.

6    A    Yes.

7    Q    And the gray is Jane and the blue is you?

8    A    Yes.

9    Q    And Jane asked you how your Christmas was?

10   A    Yes.

11   Q    And indicating her birthday is in two days?

12   A    Yes.

13   Q    And did you then ask her what she got for Christmas using

14   a term "from ya hubby"?

15   A    Yes.  Yes, ma'am.

16   Q    Who are you referring to?

17   A    I was referring to R. Kelly.

18   Q    And did she then tell you the gifts she had gotten from

19   him?

20   A    Yes.

21   Q    I'm showing you what's in evidence as Government

22   Exhibit 205M.  Are these again texts between you and Jane?

23   A    Yes.

24   Q    And the blue is you and the gray is Jane?

25   A    Yes.

Benabdallah - direct - Shihata                    1403

1          MS. SHIHATA:  Actually, I'm sorry.  Can we show this

2    to the jury only, please.

3    Q    Now, I'd like to direct your attention to the text from

4    January 8, 2016 at 11:18 a.m.

5          Are those texts in blue from you to Jane?

6    A    Yes.

7    Q    And what I'm pointing to here, those two letters, is that

8    an abbreviation for Jane's name?

9    A    Yes, it is.

10   Q    And when you wrote "Mia always be like," abbreviation for

11   Jane's name, "texted me and I be salty," what were you

12   referring to there?

13   A    I was saying that Mia always tells me that Jane texts her

14   and she hasn't been texting me and that I feel upset because

15   of it.

16   Q    And did Jane then respond to your text?

17   A    Yes.

18   Q    And she wrote:  "Miss you too.  And cause you don't know

19   how to play stuff yet"?

20   A    Yes, "don't know how to play stuff yet," yes.

21   Q    And then it continues here?

22   A    Yes.

23   Q    And among the things she wrote was texting, "You will get

24   me caught up"?

25   A    Yes.

Benabdallah - direct - Shihata                    1404

1  Q    "Just like now.  If I was with him and you mentioned

2  Mia's name, that would start some shit.  You gotta learn how

3  to use code Baby G"?

4  A    Yes.

5  Q    "Baby G," what does that mean?

6  A    Baby girl.

7  Q    And the "him" in these texts, who did you understand that

8  to be referring to?

9  A    To R. Kelly.

10  Q    And did you respond to these texts, to her texts in blue

11  here?

12  A    Yes.

13  Q    And among the things you wrote was, "How would that start

14  shit, don't he know we all friends?"

15  A    Uh-huh.

16  Q    Is that a yes?

17  A    Yes.

18  Q    And did you write -- what did you write below that?

19  A    I said, "Even though you're my cuzzo doesn't mean we

20  can't associate with the same people."  Laughing emoji.

21  Q    And what were you conveying in these texts?

22  A    I was still confused about why I had to hide the fact

23  that I knew Jamia.

24  Q    And is this, what I'm pointing to here, this text from

25  January 8, 2016, is that a response from Jane?

1    A    Yes.

2    Q    And where it says in here, "He thinks y'all don't know

3    each other and he don't want me texting her because he knows

4    she's my BFF and thinks I will tell you everything I see, this

5    what I mean you don't know how to put two and two together"?

6    A    Yes.

7    Q    And then you responded, "You never told me he don't know

8    we all know each other"?

9    A    Yes.

10    Q    And after receiving these texts, were you confused?

11    A    Yes.

12    Q    Why were you confused?

13    A    I was confused because like I said, I just didn't

14    understand why I had to hide the fact that her and I and Jamia

15    were all friends.

16          THE COURT:  Ms. Shihata, I have gone about

17    15 minutes over our afternoon break and I'd like to give our

18    jurors a little bit of a break.  Is this a good stopping

19    point?

20          MS. SHIHATA:  Sure.

21          THE COURT:  Sorry about that.

22          All right.  We're just going to be in recess for

23    about ten minutes.  Please don't talk about the case and I'll

24    see you in a few minutes.

25          (Jury exits.)

1406

```
1              THE COURT:  Okay.  Everybody can sit down and you
2    can take the witness out.
3              We'll see you in just a few minutes.
4              (Witness excused.)
5              THE COURT:  I'm going to ask my standard, do you
6    know about how much longer you have?
7              MS. SHIHATA:  10 or 15 minutes.
8              THE COURT:  And Mr. Cannick, is this your witness?
9              MR. CANNICK:  I'm sorry?
10             THE COURT:  Is this your witness?
11             MR. CANNICK:  Yes.
12             THE COURT:  Do you know about ballpark what you've
13   got?
14             MR. CANNICK:  No more than 15 minutes.
15             THE COURT:  Okay.  So we'll maybe have time for
16   another witness.
17             MS. SHIHATA:  Yes.
18             THE COURT:  Okay.  Great.  All right.  So I'll see
19   you in about ten minutes.
20             (Recess taken.)
21             (In open court; outside the presence of the jury.)
22             THE COURT:  All right.  Let's get the witness back.
23             (Witness resumes the stand.)
24             THE COURT:  And let's get the jury, please.
25             (Jury enters.)
```

Benabdallah - direct - Shihata                1407

1      THE COURT:  All right.  Folks, we're ready to resume

2   with the direct examination of the witness.

3      Go ahead.

4      THE CLERK:  The witness is reminded that she's still

5   under oath.

6      THE WITNESS:  Yes.  Okay.

7   BY MS. SHIHATA:

8   Q   Now, before the break, you were testifying about various

9   text message exchanges between you and Jane, correct?

10  A   Yes.

11  Q   From 2015 and early 2016, correct?

12  A   Yes.

13  Q   And what kind of phone did you have at that time, what

14  brand of phone?

15  A   An iPhone.

16  Q   Is that an Apple product?

17  A   Yes, it is.

18  Q   Now, you testified earlier that in addition to text

19  message communications with Jane, you also communicated with

20  her by phone call and FaceTime in 2015 and 2016, right?

21  A   Yes.

22  Q   And can you explain, what is FaceTime?

23  A   It's like a video chat.

24  Q   And in any of your FaceTimes with Jane in 2015 or 2016,

25  was R. Kelly present for any of those?

Benabdallah - direct - Shihata                    1408

1  A    No.

2  Q    Have you ever met R. Kelly?

3  A    No.

4  Q    Are you familiar with the name Juice?

5  A    Yeah.

6  Q    What, if anything, did Jane tell you about Juice?

7            MR. CANNICK:  Objection.

8            THE COURT:  Overruled.

9  A    She told me that she was somebody that was there with her

10 through all her time with R. Kelly.

11 Q    Did she tell you anything else?

12 A    Yeah, she said that, like, in the beginning, when she

13 first went, that Juice, like, was supposed to, like, teach her

14 how to please her and him.

15 Q    Now, you testified earlier that at some point, Jane sent

16 you photographs and asked you to save them, is that right?

17 A    Yes.

18           MS. SHIHATA:  I'm going to show the witness only

19 what's been marked for identification as Government

20 Exhibit 254A through K.

21           THE COURT:  Okay.

22           MS. SHIHATA:  May we approach, Your Honor?

23           MR. CANNICK:  We don't have any objection to them

24 being turned into evidence.

25           THE COURT:  Turn on your microphone for me.

1           You have no objection?

2           MR. CANNICK:  No objection.

3           THE COURT:  They're in evidence.

4           (Government Exhibits 254(a) through 254(k) so

5   marked.)

6   Q    And I'm just going to show you --

7           MS. SHIHATA:  May I approach, Your Honor?  I want to

8   make sure she knows what I've got.

9           THE COURT:  Sure.

10  Q    Just take a look at them.

11          (Pause.)

12  Q    Are these photographs you received from Jane on your cell

13  phone?

14  A    Yes.

15  Q    And what, if anything, did you do with the photographs

16  after you received them?

17  A    I had saved them on my phone.

18  Q    And did you save them anywhere else?

19  A    No, they're on my phone.

20  Q    All right.  I'm showing you 254(a).  Who's in this photo?

21  A    Jane.

22  Q    I'm showing 254(b), 254(c), 254(d), 254(e), 254(f),

23  254(g), 254(h), 254(i), 254(j) and 254(k).

24          Now, other than saving these photographs, did Jane

25  ask you to do anything else with them?

Benabdallah - direct - Shihata            1410

1   A    She just wanted me to keep them safe for her in case she

2   needed them in the future.

3   Q    And what did you understand her to mean by that?

4        MR. CANNICK:  Objection.

5        THE COURT:  Sustained.

6   Q    Did you receive texts and phone calls from Jane from

7   different phone numbers?

8   A    Yes.

9   Q    In 2015 and 2016?

10  A    Yes.

11  Q    Now, when you received phone calls or FaceTime calls from

12  Jane, as a general matter, around what time of day would you

13  receive those calls?

14  A    Generally later at night or early in the morning.

15  Q    And what do you mean by that, later at night or early in

16  the morning?

17  A    Like, I really wouldn't talk to her throughout the day.

18  It would be, just be like at one time of the day, either early

19  or really late.

20  Q    Now, after you lost contact or after the -- I think you

21  testified earlier the communications with Jane at some point

22  stopped, is that right?

23  A    Yes.

24  Q    And after your communications with Jane stopped -- or let

25  me ask you this.

Benabdallah - direct - Shihata                1411

1    How old, around how old were you when your
2    communications with Jane stopped?
3    A    I was, like, 16.
4    Q    And after your communications with Jane stopped, did you
5    make any reports to law enforcement about Jane?
6    A    No.
7    Q    And why didn't you do that?
8    A    Honestly, I just didn't really want to get involved in
9    what she was doing.
10   Q    And why didn't you want to get involved?
11        MR. CANNICK:  Objection.
12        THE COURT:  Overruled.
13   Q    You can answer.
14        THE COURT:  Actually, can I just see the lawyers at
15   the side with the court reporter for just a second.
16        (Continued on next page.)
17
18
19
20
21
22
23
24
25

```
                          Sidebar                        1412
```

1            (The following occurred at sidebar.)

2            THE COURT:  What's she's going to say?

3            MS. SHIHATA:  She was scared to get involved.

4            MR. CANNICK:  What's the relevance of that?

5            THE COURT:  I think she just didn't want to get

6    involved.

7            MS. SHIHATA:  But it's left with the impression that

8    the last thing she said was I didn't want to get involved in

9    what she was doing.  I think that leaves a misleading

10   impression to the jury.

11           MR. CANNICK:  You asked the question.

12           MS. SHIHATA:  And I had a follow up.

13           THE COURT:  Thank you, Your Honor.  She did.

14           MR. CANNICK:  Judge, you're beating me mercilessly.

15           THE COURT:  I just did not know or should have

16   known, should have asked her to answer.  The fact that she was

17   scared, maybe she's scared of him?

18           MS. SHIHATA:  Well, she was scared.  He was a high

19   profile person.  She was scared of him.

20           THE COURT:  She can say she didn't want to get

21   involved because of the high profile nature.  That's basically

22   the whole --

23           MR. CANNICK:  Your Honor, I don't see the relevance

24   of her state of mind at all but if you are going to allow it,

25   I think, this is certainly not trying to step into their shoes

1   but I think that --

2          THE COURT:  Let's leave it alone.  It's not, it's

3   really not relevant that she was scared, it really isn't and

4   it's prejudicial.  So let's not -- let's take a long view.

5   It's all good.  I'll just tell you to move on to something

6   else and it will look like I kept you from doing it.

7          (End of sidebar.)

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BENABDALLAH - CROSS -  CANNICK                1414

1          THE COURT:  All right, I think it's best to move on

2   to something else.

3          MS. SHIHATA:  One moment, Your Honor.

4          THE COURT:  Sure.

5          (Pause in the proceedings.)

6          MS. SHIHATA:  No further questions.

7          THE COURT:  Okay.

8          Cross-examination?

9          MR. CANNICK:  Very briefly, Your Honor.

10  CROSS-EXAMINATION

11  BY MR. CANNICK:

12  Q    The text messages that you received from Jane --

13         THE COURT:  Your microphone?  Is it on?

14         MR. CANNICK:  Yes.

15         THE COURT:  Okay.

16  Q    The text messages that you received from Jane, you don't

17  know the truth of it at all, correct?

18         You don't know if they were true or not?

19  A    I don't know.

20  Q    Right.  I mean you received them, you know that what she

21  was telling you was the actual truth, right?

22  A    I don't know.

23  Q    You just received it from her and you responded?

24  A    Yes.

25  Q    Now you were asked a short while ago about what time you

BENABDALLAH - CROSS - CANNICK                1415

1   would get calls from -- or communication from Jane, and you

2   mentioned that it would be either early in the morning or late

3   at night.

4           Do you remember telling us that?

5   A   Yes, I do.

6   Q   Now you were -- you in school at that time am I correct?

7   A   Yes.

8   Q   And you were -- your school hours were during the middle

9   of the day, am I correct, to late afternoon?

10  A   Correct.

11  Q   So when you were available, that could be very early in

12  the morning or late at night; am I correct?

13  A   No.

14  Q   Well, what time would you get home from school?

15  A   Well, I have my phone on me all day.  If somebody's

16  wanting to communicate with me, I'll -- I'll communicate with

17  them.  Especially if it was her.

18  Q   But you knew that she would sleep, go to bed, basically

19  during the day; am I correct?

20          MS. SHIHATA:  Objection.

21          THE COURT:  Sustained.

22  Q   There was a text between you and her that was read a

23  short while ago, and at the bottom of that text it says "I'm

24  sleeping."  Remember seeing that?

25  A   She said she was sleeping?

BENABDALLAH - CROSS - CANNICK                    1416

1   Q    Or someone said "I'm going to bed."

2   A    Yes.

3   Q    You remember seeing that, right?

4   A    I don't remember which one exactly.

5   Q    But you remember seeing it?

6              MS. SHIHATA:  Objection.

7              THE COURT:  Did you see that text?

8              THE WITNESS:  I believe so.

9   BY MR. CANNICK:

10  Q    Can we show her the text messages again?

11             I'm going to show you what's been admitted into

12  evidence as 205J.

13             Can you read the bottom of that?

14  A    LOL.  I'm just watching TV.  About to sleep.

15  Q    What time is that?

16  A    It's not -- it's not listed what time.

17  Q    What time is that?

18  A    3:14 p.m.

19             MR. CANNICK:  Thank you.

20             Nothing further, Your Honor?

21             THE COURT:  Okay.  Any redirect?

22             MS. SHIHATA:  No, Your Honor.

23             THE COURT:  All right.

24             Thank you so much.  You can step down.

25             (The witness steps down.)

LINDA D. DANELCZYK, RPR, CSR, CCR

Proceedings                                        1417

1      THE COURT:  Are you ready to call your next witness?

2      MS. GEDDES:  Yes, Your Honor.

3      The government calls Tom Arnold.

4      THE COURTROOM DEPUTY:  Please raise your right hand.

5      (Witness takes the witness stand.)

6      (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    1418

1        **THOMAS ARNOLD, called as a witness, having been**

2   **first duly sworn/affirmed, was examined and testified as**

3   **follows:**

4                THE WITNESS:  I do.

5                THE COURTROOM DEPUTY:  Please state your name for

6   the record.

7                THE WITNESS:  Thomas Arnold.

8                THE COURTROOM DEPUTY:  Thank you.  You may be

9   seated.

10               THE COURT:  Hold on for just one second, Mr. Arnold.

11               Okay, Mr. Arnold, you can take your mask off.

12               All right.  The lawyers are going to ask you some

13   questions.  Couple of things I want you to keep in mind.

14               The first is I'd like you to speak slowly and make

15   sure you use the microphone.  I want to make sure the jurors

16   can hear you, and I want to make sure the court reporter can

17   take down everything that you say.

18               And because I don't want to make their job too

19   difficult, I'm also going to ask you to let whichever lawyer

20   is questioning, finish the question before you start

21   answering.  That way we're not talking over one another.

22               If there's a question that you want to have repeated

23   or that you don't understand, let me know and I'll have the

24   lawyer rephrase it.

25               And just do your best to answer the specific

LINDA D. DANELCZYK, RPR, CSR, CCR

ARNOLD - DIRECT - GEDDES                    1419

1    question that you're being asked, okay?

2              THE WITNESS:  Yes, ma'am.

3              THE COURT:  Okay.  Go ahead.

4              MS. GEDDES:  Thank you.

5    DIRECT EXAMINATION

6    BY MS. GEDDES:

7    Q    How far did you go in school?

8    A    I attended the University of Nebraska at Omaha for a few

9    years.

10             Then I graduated and went to a school called The

11   Conservatory Recording of Recording Arts and Sciences, which

12   is an audio engineering school.

13             THE COURT:  Okay.  Pull the microphone a little bit

14   closer to you, and just slow down a little bit, all right?

15             THE WITNESS:  Okay.

16             Should I repeat the whole thing again?

17             THE COURT:  That's okay.  Go ahead.

18   Q    Did you finish the program at that Conservatory of

19   Recording Arts and Sciences?

20   A    Yes, I did.

21   Q    How long was that program?

22   A    It was a four-month program.

23   Q    And were you awarded any type of certificate or degree?

24   A    Yes, it was a certificate.

25   Q    In what?

ARNOLD - DIRECT - GEDDES                           1420

1   A     Audio engineering.

2   Q     When did you receive that certificate?

3   A     August of 1998.

4   Q     And as part of that program, were you required to

5   participate in an internship?

6   A     Yes, a formal internship.

7   Q     Did you, in fact, do an internship?

8   A     I did, yes.

9   Q     In what city did you do the internship?

10  A     In Chicago.

11  Q     And where was it?

12  A     It was at Chicago Trax Recording.

13  Q     And is that a recording studio?

14  A     Yes.

15  Q     When did you begin at Chicago Trax?

16  A     September of 1998.

17  Q     Now do you recall the address where Chicago Trax was

18  located?

19  A     I do.

20  Q     What was it?  What is it?

21  A     865 North Larrabee.

22  Q     When you started at Chicago Trax in September of 1998,

23  were there any artists who used that recording studio on a

24  long-term basis?

25  A     Yes.  There was a band called Ministry and R. Kelly.

ARNOLD - DIRECT - GEDDES                    1421

1    Q    Do you see R. Kelly in the courtroom today?

2    A    Yes, I do.

3    Q    Can you please point to him and describe an article of

4    his clothing?

5    A    Yes.  He's wearing a brown shirt.

6              THE COURT:  Indicating the defendant.

7    Q    Now, when you started at Chicago Trax, were you working

8    for the defendant?

9    A    No, I worked for Chicago Trax.

10   Q    Did you eventually start to work for the defendant?

11   A    I did some odd jobs.  Maybe some runs, some errands of

12   taking a car down some place from time to time for money, but

13   otherwise I worked for Chicago Trax exclusively.

14   Q    Did there come a time where you did work for the

15   defendant exclusively?

16   A    Yes.

17   Q    How did that come about?

18   A    Chicago Trax went out of business, and then I came to

19   work for a short period of time with a new studio called the

20   Chocolate Factory.

21   Q    Now was the Chocolate Factory located in the same

22   building where Chicago Trax had been?

23   A    That's correct.

24   Q    At 865 North Larrabee?

25   A    That's correct.

ARNOLD - DIRECT - GEDDES                    1422

1  Q    Do you recall when it was that you started working

2  exclusively for the defendant at the Chocolate Factory?

3  A    I'd say March of 2003.

4  Q    Now for how long did you work for the defendant?

5  A    Until 2008.  And then -- so 'til January of 2008.  Went

6  back again in May of 2008 'til October of 2011.

7  Q    So fair to say you worked from 2003 until 2011 with a

8  couple month break in 2008?

9  A    Yes.

10 Q    By the way, the Chocolate Factory where you worked for

11 the defendant, was that the same actual recording studios that

12 were in Chicago Trax?

13 A    Yes, the studios -- studio rooms, the building had

14 similar names.  Some of the gear would have been removed

15 because it belonged to Chicago Trax.

16 Q    All right.  But same building, same studio; fair to say?

17 A    Fair to say.

18 Q    When you started working for the defendant exclusively at

19 the Chocolate Factory on Larrabee, what were your

20 responsibilities?

21       What did you do?

22 A    I was the studio manager.  I looked after the building

23 for any sort of maintenance repairs, anything to be done with

24 the building.  And the studio manager's job would be to help

25 staff.  The phone position.  Make sure there was runners.

ARNOLD - DIRECT - GEDDES                    1423

1   Provide petty cash for supplies that were needed.  And to help

2   out the engineers, the assistant engineers that came to need

3   assistance with documentation or anything they needed help

4   with.

5   Q    You mentioned that you looked after the building.

6             Is that the recording studio on North Larrabee?

7   A    Yeah, it was a 20,000-square-foot building that had

8   multiple rooms in it.  And so there would be some needs to

9   maintain.  Hire maintenance people and repairs, stuff like

10  that.  So I would be responsible for that.

11  Q    You also said that there was a phone position.

12            What did you mean by that?

13  A    There would be a reception area.  There would always be

14  someone to answer the phone or kind to monitor the gate,

15  anybody came into the building.  Pass phone calls, messages,

16  if somebody was to call.

17  Q    Now were you responsible for answering the phones?

18  A    Sometimes.

19  Q    Were there other individuals who also answered phones at

20  the Chocolate Factory when it was on North Larrabee?

21  A    Yes.  There would be a phone position as well.

22  Q    You used the term "runner," what do you mean by that?

23  A    It was the term we called the -- sort of a paid

24  internship position, a person's entry level trying to become

25  an assistant engineer or just, you know, a job in the studio.

ARNOLD - DIRECT - GEDDES                    1424

1          The job would be to go and go and get food for

2    people.  Go buy supplies.  Anything that's required.

3    Q    Now you testified earlier that you served as the studio

4    manager; is that correct?

5    A    Yes.

6    Q    Did you have any additional titles while you were working

7    for the defendant?

8    A    Not at the Chocolate Factory, but later on, I was also a

9    road manager.

10   Q    And what do you mean by "road manager"?

11   A    When we traveled for tours or for appearances or things

12   like that, I would be responsible for maybe -- I would be

13   responsible for coordinating the buses are stocked, the

14   supplies.  If there was a destination for us all to go to, I

15   would know exactly where we're going to and communicate to all

16   the traveling party.

17         If we had a hotel, I would advance to pick up the

18   room keys at the hotel.

19   Q    Now you said that you didn't hold this position until

20   after the Chocolate Factory at North Larrabee; is that

21   correct?

22   A    After the building in North Larrabee was -- well, the

23   building was ultimately torn down and the studio, the

24   Chocolate Factory, moved to Olympia Fields, I started

25   traveling around that same time for the first time.

ARNOLD - DIRECT - GEDDES                    1425

1   Q    All right.  So you testified that when you started

2   working for the defendant, you were at the recording studio

3   that was called the Chocolate Factory at 865 North Larrabee.

4            What happened to that building?

5   A    It was demolished.  The building, as I recall, was in

6   bankruptcy, the people that owned the building, and it was

7   sold.  So we had to move the studio out of there.  And then

8   they ultimately demolished building.

9   Q    When was the Chocolate Factory moved out of 865 North

10  Larrabee?  Approximately?

11  A    Um, I'd say 2004.  It could be -- could be -- yeah, I

12  would say early 2004.

13  Q    Fair to say you don't remember the exact date?

14  A    No, not the exact date.

15  Q    Okay.  And when the Chocolate Factory was not at 865

16  North Larrabee, I think you mentioned Olympia Fields.

17           What is Olympia Fields?  What were you referring to?

18  A    Olympia Fields is a suburb of Chicago where Mr. Kelly had

19  a home.  A studio.

20  Q    And was the recording studio at the defendant's home in

21  Olympia Fields?

22  A    Yes.  At that time the Chocolate Factory moved to Olympia

23  Fields, there was one studio in the basement.

24  Q    And what was the name of the recording studio when it was

25  at the Olympia Fields?

ARNOLD - DIRECT - GEDDES                    1426

1   A    We called it the Chocolate Factory.

2   Q    All right.  So when I refer to the Chocolate Factory at

3   865 North Larrabee, I will be referring to that one.  And then

4   I'll make clear when I'm referring to the Chocolate Factory at

5   Olympia Fields.  All right?

6   A    Yes.

7   Q    What, if any, responsibilities did you have with respect

8   to the defendant's personal life?

9   A    At sometimes -- at what time?

10  Q    Well, let's start when you were working at the Chocolate

11  Factory at 865 North Larrabee.

12             MR. CANNICK:  Objection.

13             THE COURT:  Overruled.

14  A    Um, there would be -- if people came to the studio, if I

15  received a phone call.  If somebody came to the gate, I would

16  be responsible to make sure I notified Mr. Kelly that somebody

17  was here at gate for him.

18             I would be instructed to what actions are required

19  on that.

20             Stock food for his lounge.  Stock food for the bus.

21  You know, go on runs.  Maybe perhaps like to go to buy

22  supplies in the store or something.  Or maybe even go to the

23  office to pick up a check or petty cash or something for

24  personal.

25  Q    All right.  Was one of your responsibilities to go on

1  runs to transport individuals?

2  A    Yes, that could be asked.

3  Q    Was it asked?

4  A    Yes.  Yes.

5  Q    And who were the individuals that you were transporting?

6  A    It could be -- it could be a guest.  It could be someone

7  that was there to play basketball.  A musician.  It could be a

8  variety of people, but whoever was required to get a ride.

9  Q    And on a day-to-day basis, who were you transporting?

10  A    Primarily it would be guests.

11  Q    And when you say "guests," what are you referring to?

12  A    The females that had come to the studio or, um, that were

13  coming to see Mr. Kelly.

14  Q    Okay.  So these were guests of the defendant's?

15  A    Yes.

16  Q    Between where and where would you transport the

17  defendant's female guests?

18  A    It could be from anywhere from -- at 865 Larrabee, it

19  would be much less likely that I would go somewhere to pick

20  somebody up.  It was much more likely that somebody came to

21  the studio.

22        But I could -- I could have picked somebody up at a

23  home or a business and brought them to the studio.  It could

24  have been picking somebody up at the gym, at -- you know, a

25  place where he was playing basketball, bringing to and from

ARNOLD - DIRECT - GEDDES                    1428

1    the studio.

2    Q    How would you know that you were wanted to bring a guest

3    from one place to another place?

4    A    Sorry, can you repeat the question?

5    Q    Yes.

6              Who, if anyone, would tell you to pick up somebody

7    somewhere?

8    A    I would either get -- I would get it directly from Rob or

9    somebody from -- somebody that would be near him would call

10   and tell me that it needed to be done.

11             And if there was -- if there was music to go, I

12   would go do it, otherwise I might be told to pass the

13   information on to somebody else to make -- to make the run.

14   Q    And when you say that you could hear from someone who was

15   close to him, what do you mean by that?

16   A    They would be with him.  Like someone that I know that

17   would be with him and get the instructions directly from him.

18   Q    And by "with him," do you mean someone who was physically

19   with him?

20   A    Primarily.  Primarily.

21             It could be somebody that can get a hold of him if I

22   couldn't get a hold of him by calling his phone.

23             That was -- it was much more me reaching out to him

24   directly after 865 North Larrabee.

25             At 865 North Larrabee, I would get mainly phone

LINDA D. DANELCZYK, RPR, CSR, CCR

ARNOLD - DIRECT - GEDDES                              1429

1  calls, if that makes sense.

2  Q    Who did you receive inbound phone calls from?

3  A    It could be from Mr. Kelly or from somebody who was

4  traveling with him or was able to get a hold of him.

5  Q    And who were some of the individuals when you were at 865

6  North Larrabee who would communicate messages to you from the

7  defendant?  So when you weren't talking to the defendant

8  directly?

9  A    It could be one of recording engineers.  I received calls

10  from them.  I would receive the information from his music

11  director.  One of his assistants at the time.

12  Q    And just to be clear, I want to talk about messages that

13  you would receive related to the defendant's personal guests.

14        Would you receive messages from the defendant's

15  musical director related to the defendant's personal guests?

16  A    I may get a -- yes.  Sorry, yes.

17  Q    Who was the defendant's musical director?

18  A    It was Donnie Lyle.

19  Q    And you also mentioned that sometimes you would receive

20  messages from the defendant's assistants.

21        Were those messages related to his personal guests

22  at times?

23  A    At times, yes.

24  Q    Who was the defendant's -- who are you referring to when

25  you said the "defendant's assistant"?

1      And, again, I'm talking about the time when you were

2  working at 865 North Larrabee for the defendant?

3  A    Um, so June Brown.  Um, there was a guy named John Levy,

4  who was his security, assistant security.  Sometimes it would

5  be the same person, you know.

6      Sorry, sometimes the security person would deliver

7  the same message, but generally it would come from like June

8  Brown or from -- yeah, I mean.  I can't think of another name

9  right now, sorry.

10 Q    Okay.  What, if any, protocols did you follow when you

11 were transporting the defendant's guests?

12 A    If -- I'm sorry, transporting them?

13 Q    When you were driving one of the defendant's female

14 guests what, if anything, would you do?

15 A    Oh.  You would open the door for them to let them into

16 the car.  And you would turn your rearview mirror up.  And

17 turn on the radio to a reasonable volume, not too loud.

18 Q    And when you say that you would "turn the rearview mirror

19 up," by "you," are you referring to you, Tom Arnold?

20 A    If I was driving, I would turn the rearview mirror up

21 myself.

22 Q    And by turning the rearview mirror up, could you see out

23 the review window?

24 A    No.

25 Q    Why would you turn the rearview mirror up?

1  A    To avoid accidental or eye contact.

2  Q    Eye contact with whom?

3  A    Whoever would be in the vehicle.

4  Q    Who would be in the vehicle that you were trying to avoid

5  eye contact with?

6  A    It was a guest.

7  Q    Any guest?

8  A    Yes.

9  Q    And why did you turn up the rearview mirror?

10  A    That would be the instructions that I was given when I

11  started.  Or the instructions I would pass on to other

12  runners.  Just the protocol was to always follow the steps.

13  Q    And when you said those were the instructions that you

14  were given when you started, who gave you those instructions?

15  A    Initially probably whoever was the first runner to pass

16  the job on to me, or first person to ask me to go on a run,

17  pick up somebody.

18  Q    And just to be clear, when you were trying to avoid

19  contact with the defendant's guests, are you referring to

20  defendant's female guests?

21  A    Yes.  Female guests.

22  Q    If there was a male guest, would you need to turn up the

23  rearview mirror?

24  A    I probably would not -- I would not have turned up the

25  rearview mirror.

ARNOLD - DIRECT - GEDDES                    1432

1  Q    When one of the defendant's female guests arrived at the

2  Chocolate Factory on North Larrabee, what was the routine for

3  letting that person in?

4  A    Oftentimes we would have gotten instructions before

5  someone arrived as to what to do.  But if we hadn't received

6  instructions, we would call Mr. Kelly or call someone that

7  could get an answer to let us know how to act with the person

8  when they arrived.

9  Q    What type of instructions would you have already received

10 from Mr. Kelly or would you get once the guests arrived by

11 reaching out to Mr. Kelly?

12 A    To open the gate for the person and take them up to a

13 particular location in the studio.

14 Q    Who would decide where in the studio to take a guest?

15 A    Rob would.

16 Q    The defendant?

17 A    Yes.

18 Q    And when a -- one of the defendant's female guests

19 arrived at the Chocolate Factory on North Larrabee, what, if

20 anything, would you do before bringing the guest to a

21 particular location within the studio?

22 A    Depending on the timeframe over the course of the time in

23 which we were at that studio, there was a time at which

24 confidentiality agreements were required.

25 Q    What do you mean by "confidentiality agreements"?

ARNOLD - DIRECT - GEDDES                    1433

1  A    There was a document that people were required to sign

2  when they visited the studio.

3  Q    And what did you understand to be in this document that

4  you're calling the "confidentiality agreement"?

5  A    It said not to -- while you're here, you're not going to

6  record anything or take photographs or share information about

7  your experience at the studio.

8  Q    And you said there was a time when guests were required

9  to sign these confidentiality agreements.

10          So that wasn't in place for the entire time that you

11  were working for the defendant at 865 North Larrabee; is that

12  correct?

13  A    That's correct.

14  Q    Now what, if anything, would a guest provide to you or

15  another employee at the Chocolate Factory when it was on North

16  Larrabee in addition to signing the confidentiality agreement?

17  A    We would either take a Polaroid of the person, take the

18  photo of the person and take the Polaroid and staple it to the

19  agreement, or else we would photocopy a driver's license and

20  attach it to the agreement.

21  Q    And how would you know to take a Polaroid versus to get a

22  driver's license?

23  A    It kind of depends on the timing.

24          It started out asking for driver's licenses, if I

25  remember correctly when we first started the process.  I don't

ARNOLD - DIRECT - GEDDES                              1434

1   know whether -- I don't know when it would switch back and

2   forth, but I know that there was instances where there would

3   be a party or a function at the studio, and we would take

4   Polaroids instead of taking driver's license.

5              And I can't -- I don't remember the specific.

6   Q    I'm sorry, I didn't mean to cut you off.

7              What did you say?

8   A    I don't remember specifically a time that was a formal

9   switch from one to the other.

10  Q    What did you understand the purpose to be by obtaining a

11  driver's license?

12             MR. CANNICK:  Objection.

13             THE COURT:  Overruled.

14  Q    What do you understand the purpose to be for -- you can

15  answer the question.  I'll repeat it, though.

16             What did you understand the purpose to be for

17  obtaining a driver's license from a guest?

18  A    To verify that the name on the driver's license matches

19  the signature on the -- or the name of the person that's

20  signing the agreement.

21  Q    Now during the timeframe that you were having guests sign

22  confidentiality agreements, was that always the case?  Were

23  guests always required to sign confidentiality agreements

24  during that particular time period where you were having

25  guests do it?

ARNOLD - DIRECT - GEDDES                    1435

1   A     Prior to the policy of starting to do it, no one would

2   have done it.  Once the policy had started, the whole rest of

3   the time we were at 865 Larrabee, we would have asked people

4   to sign confidentiality agreements.

5                  (Continued on the following page.)

Arnold - direct - Geddes                    1436

1   EXAMINATION CONTINUES

2   BY MS. GEDDES:

3   Q    And I'm just asking, did you always follow that policy?

4   A    Not necessarily.

5   Q    You said that you would -- you testified earlier that

6   when a guest arrived at 865 North Larrabee you would determine

7   from speaking with the defendant where to bring a particular

8   guest.

9         Do you recall that?

10  A    Yes.

11  Q    Once a guest was brought or escorted to a particular

12  location within 865 North Larrabee, what, if any, interaction

13  would you have with the defendant's female guests?

14  A    In many instances, none whatsoever.

15  Q    Why not?

16  A    That -- there -- if -- if there wasn't -- if I -- I would

17  head back down to reception where I would be sitting waiting

18  for the next call.  And if there was no calls or

19  communication, that would be that until -- unless the phone

20  rang.

21  Q    And did the defendant's guests -- I'm sorry, when you

22  said unless the phone rang --

23  A    Yeah.

24  Q    -- what phone are you referring to?

25  A    There was a main phone in reception that had multiple

1  phone lines so people could call in.

2  Q    And did the defendant's female guesses sometimes call

3  that phone at the front desk reception area?

4  A    Yes.

5  Q    And what are some of the reasons that the defendant's

6  guests would call that front desk area?

7  A    Primarily to either ask us to go get food or to ask to

8  speak to Mr. Kelly.

9  Q    And what would you do when a guest called to -- for food?

10 A    There was always petty cash at reception for -- for the

11 runner to be able to go get the food when the food order came

12 through.

13 Q    And how about when a guest wanted to speak with the

14 defendant?

15 A    You would -- you'd write a message on a sheet of paper to

16 say what phone line the person was on, and you'd run the

17 message to Mr. Kelly.

18 Q    Aside from phone calls from the defendant's female guests

19 looking for the defendant or looking for food, what other

20 reasons would you receive phone calls for?

21 A    Hard to say.  The -- mostly -- well, I don't -- I

22 don't -- it could have been anything.

23         People could have asked to be given a ride home;

24 asked to move to another room, I suppose; but primarily, would

25 be to -- to speak to Mr. Kelly.  And then we would get --

Arnold - direct - Geddes                    1438

1    following -- he would speak to the person or then we'd get

2    another phone call back or get instructions as to what to do

3    with the person.

4    Q    So, I want to talk about when you received a phone call

5    from a female guest of the defendant who was ready to leave.

6              What, if anything, would you do when you received

7    such a phone call?

8    A    If we received notification ahead of time that -- to

9    prepare for expecting a call to take that person home, that

10   would be the action we'd take.  Otherwise, we'd have to go and

11   get ahold of Mr. Kelly to ask if it's okay to leave and take

12   them home.

13   Q    All right, so, let's take your first scenario first.

14             Do you mean that on occasion the defendant would

15   have already told you that it was okay, that you were -- you

16   should expect someone to call and ask to go to a particular

17   place?

18   A    Yeah, directly or indirectly.

19   Q    And when you say "directly or indirectly," what do you

20   mean?

21   A    Either -- either Rob would call to say when the person

22   calls, take them home; or -- or somebody who was with him or

23   nearby could have passed the message along from him to us at

24   the studio saying Rob says it's okay to take that person.

25   Q    And when you say someone who was with him, are you

SAM      OCR      RMR      CRR      RPR

Arnold - direct - Geddes                    1439

1   referring to the individuals that you talked about earlier,

2   such as the defendant's musical director or his assistant?

3   A    Yes, or -- or -- or the studio engineer.

4   Q    Now, I now want to talk about the second scenario you

5   proposed where a -- one of the defendants' female guests

6   called wanting to leave, but you had not already received

7   instruction from the defendant, prior instruction from the

8   defendant.

9        What would you do in that event?

10  A    Try to call his phone or run a message to him to let him

11  know that the person had called and asked to leave.  He would

12  give us instructions.

13  Q    And when you say called "his" phone and "he" would give

14  you instructions, who is the "he" and the "his" in those two

15  sentences?

16  A    Sure.  We would try to call Rob to get permission and

17  instructions.

18  Q    And if you couldn't reach Rob, what would you do?

19  A    We'd -- we'd call somebody else that may be able to get

20  ahold of him, one of the other individuals that I mentioned

21  before.  If he was in the studio, we'd just wait until we were

22  able to get into the studio to pass him a message to let him

23  know.

24  Q    While you were working at -- for the defendant at 865

25  North Larrabee, would you receive phone calls from the

Arnold - direct - Geddes                    1440

1   defendant's guests who were inside of the 865 North Larrabee

2   looking to go to the bathroom?

3   A    Yeah, we would have.

4   Q    What, if anything, would you do when you received such a

5   phone call?

6   A    That's the same process.  If we'd been given previous

7   instructions to escort somebody for anything they called for,

8   we would action it; or, if not, we would pass the message on

9   or reach out to him to find out.

10  Q    And just to be clear, when you said that if you received

11  prior instructions, you would action it.

12          Do you mean you would go ahead and do what the

13  person asked?

14  A    Yes.

15  Q    And if you hadn't received prior instructions, who would

16  you call?

17  A    We'd either run a message to the studio to ask Rob, or

18  else call his phone if he wasn't there.

19  Q    And what was your purpose in reaching out to the

20  defendant?

21  A    To pass the message along from the guest or -- or pass

22  along their request.

23  Q    To go to the bathroom, correct?

24  A    If -- if that was the request, we would -- we would call

25  and pass the message along to find out the action.

```
                    Arnold - direct - Geddes              1441
```

1  Q    And just to be clear, though, on occasion that was the

2  request, correct?

3  A    Yes.

4           MS. GEDDES:  And showing the witness only what's

5  been marked for identification as Government Exhibit 235.  And

6  this is one side, and I am going to flip it over so you can

7  see the other side as well.

8           THE WITNESS:  All right.

9  BY MS. GEDDES:

10  Q    Do you recognize what is shown in Government Exhibit 235?

11  A    Yes, it's the floor plan for Chicago Trax at 865 North

12  Larrabee.

13  Q    And is this also the floor plan for when The Chocolate

14  Factory was at 865 North Larrabee?

15  A    Yeah, the structure of the building is the same.

16  Q    And did you provide this to the Government?

17  A    Yes.

18           MS. GEDDES:  The Government offers 235.

19           MR. FARINELLA:  No objection.

20           THE COURT:  Okay, that will be in evidence.

21           (Government's Exhibit 235 was received in evidence.)

22           THE COURT:  Do you want to publish it?

23           MS. GEDDES:  Yes, please.  I am going to start with

24  the first side.

25           (Exhibit published.)

Arnold - direct - Geddes                    1442

1   BY MS. GEDDES:

2   Q    I would like you to describe for the jury what is shown

3   in Government Exhibit 235, and I am going to start by putting

4   my pen on something which is upside down (indicating) but if

5   you can reads it upside down, it says "main entrance."

6            What is that?

7   A    Yes.  This is the first floor of the building, and that

8   would be the main -- as it's labeled, the main entrance into

9   the studio.

10  Q    And --

11  A    The building.

12  Q    -- you've talked about the reception area where some of

13  the guests would call to make some of the requests that you

14  have just discussed.

15           There is a section called "reception" where my pen

16  is now (indicating) sort of right next to the main entrance.

17           Is that where that was located?

18  A    That's correct.

19  Q    And where in Government Exhibit 235 would you spend your

20  time when you were in, you know, a stationary spot at 865

21  North Larrabee?

22  A    Just the next room over from your pen is what was my

23  office.  So, I'd either be in reception or in that office.

24  Q    And by "that office," you mean where my pen is pointed

25  (indicating), right to the left of the reception area?

Arnold - direct - Geddes                              1443

1  A    Yes.

2  Q    And if I continue to move my pen to the left of where

3  your office was, what is that (indicating)?

4  A    That's the engineers' office.

5  Q    And by the way, when you are referring to the engineers,

6  are you referring to a particular engineer?

7  A    The audio engineers.

8  Q    All right.  And during the time that you were working for

9  the defendant, were there the same engineers or did they

10 change over time?

11 A    They changed over time.  It was a few people that were

12 there the duration, but there was quite a few more people at

13 the 865 Larrabee location.

14 Q    Who were the engineers who were at 865 North Larrabee

15 that continued to work as engineers for the defendant over the

16 duration that you worked for the defendant?

17 A    So, Ian, Ian Mereness, and Abel Garibaldi were engineers

18 for a long time.

19        There was -- I'm trying to think who else.  There

20 was a guy named Jeff.

21 Q    Do you remember Jeff's last name?

22 A    I don't.  He was there for most of the time -- for quite

23 a long time at The Chocolate Factory in Olympia Fields.

24 Q    And I think you testified that in addition there were

25 other engineers who were there for shorter periods of time, is

Arnold - direct - Geddes                           1444

1  that correct?

2  A    Yes.

3  Q    All right.

4         Across from the reception area where I have my pen

5  (indicating), do you recall what was located there?

6  A    That was the office of the owner of Chicago Trax, and it

7  remained sort of a office or lounge in The Chocolate Factory

8  time.

9  Q    And when you're referring to the owner of Chicago Trax,

10  who was that?

11  A    His name was Reid Hyams.

12  Q    Now, once the defendant took over Chicago Trax, then

13  Chicago Trax became The Chocolate Factory, did Reid Hyams stay

14  at 865 North Larrabee?

15  A    No.

16  Q    So, once it became The Chocolate Factory at 865 North

17  Larrabee, what was this room that was once Reid Hyams' office,

18  what was that used for?

19  A    There -- I -- it was used for a variety of different

20  lounges.  Security may have -- security would have used it as

21  a lounge at times.  It may have been -- we may have put guests

22  in there from time to time.

23         It was used for a variety of different purposes, I

24  think.  I think.  I think his uncle, June Bug, had that as his

25  lounge at one point in time as well.

SAM     OCR     RMR     CRR     RPR

Arnold - direct - Geddes                           1445

1   Q    And then, on this floor plan there is, like, an open area

2   right there (indicating).

3         What does that indicate?

4   A    That's -- there's a hallway that passes through there

5   where your pen was where it says Chicago Trax, that would be

6   the hallway.

7   Q    And then up through here (indicating)?

8   A    That's the entrance, that's the entrance to the office.

9   Q    Was it an open entrance?

10  A    No, there had been a door.

11  Q    Okay.  So, even though it's not shown there, there was a

12  door that would shut, is that correct?

13  A    Correct.

14  Q    And then how about right next to Reid Hyams's old office,

15  what is that?

16  A    It would have been a storage room, and I believe it was a

17  security lounge as well.  There was quite a few -- I think

18  actually Big John, John Levy, actually had that as his -- his

19  lounge at one point.

20  Q    All right.  And just to be clear, I should have asked

21  this at the beginning.

22        Is this -- does this part of Government Exhibit 235,

23  does this show the first floor of 865 North Larrabee?

24  A    Yes, this is the first floor.

25  Q    And are there other -- you talked earlier about that you

1  would or other runners would escort some of the defendant's

2  female guests to a particular location within 865 North

3  Larrabee.

4         On the first floor, you've already talked about one

5  location being Reid Hyams's old office that would serve as a

6  lounge for the defendant's guests.

7         Were there any other areas on the first floor that

8  you recall being used as a location where you would bring the

9  defendant's female guests?

10 A    In the section marked Rockland Records, at some point

11 towards the end of the period we were at 865 North Larrabee,

12 that would have been used for guests as well.

13 Q    And so I want to make sure that I'm showing the right

14 area.

15        Is that where my pen is pointed (indicating) where

16 it says "Rockland Records Production Office Area," is that

17 what you're referring to?

18 A    Yes, it would have been at the -- it would have been a

19 production area, but also -- also been used as a lounge at

20 some point.

21 Q    And now, was that an enclosed space with a door or was

22 that an open area?

23 A    That -- that, as it's drawn, is all open, but there would

24 have been a door into that large open room.

25 Q    All right.  So, in fact, it was an enclosed area with a

Arnold - direct - Geddes                    1447

1   door, is that correct?

2   A    Yes, there would have been a door into that room.

3   Q    Okay.  On the first floor, were there any other locations

4   where the defendant's female guests might have been escorted

5   to?

6   A    Not that I'm aware of.

7   Q    Okay.

8            MS. GEDDES:  I am now going to turn to the second

9   side.  Just to be consistent -- actually, I'll put it

10  right-side up.

11           (Exhibit published.)

12  BY MS. GEDDES:

13  Q    Are there locations on the second floor where the

14  defendant's female guests might be escorted to?

15  A    Yes.

16  Q    Can you describe where they are on this diagram or on

17  this floor plan?

18  A    The one called -- the room called Music 1 Control Room,

19  would have been the primary recording studio where Rob would

20  be recording.  That would be where the engineers would be.

21  So, they -- we may bring a guest to that room.

22  Q    And are you referring to where my pen is pointed

23  (indicating), it says Music 1 Control Room?

24  A    Yes.

25  Q    And is that an enclosed location with a door or is it an

SAM     OCR     RMR     CRR     RPR

Arnold - direct - Geddes                    1448

1    open space?

2    A    Yes, there's two doors to that room, one on each side

3    towards the back of the room.

4    Q    And both of those doors can shut?

5    A    Yes.

6    Q    Okay.

7              Are there any other locations on this page of this

8    Government exhibit where the defendant's female guests may

9    have been escorted to?

10   A    Yes.  Yes, the Music 1 Studio Area.

11   Q    Is that right here (indicating) where my pen is pointed?

12   A    It is.

13   Q    And it says Music 1 Studio Area?

14   A    It is.

15   Q    And, again, is that an enclosed space?

16   A    Yes.

17   Q    And by enclosed space, I mean there was a door that could

18   be shut for privacy?

19   A    Yep, there's doors on both sides of that room.

20   Q    All right.

21             What other locations on this second floor might one

22   of the defendant's female guests be escorted to?

23   A    Yes, moving to the top of the page, Music 1 Lounge would

24   have been his -- his -- his main lounge.

25   Q    And when you say "his," who are you referring to?

Arnold - direct - Geddes                    1449

1    A    Mr. Kelly's.

2    Q    And you said it was the defendant's main lounge.

3         Would that also be a location where you would bring

4    one of the defendant's female guests?

5    A    Yes.

6    Q    All right.  There's also an area next to that called

7    Music 1 Office.

8         What, if anything, was that used for?

9    A    It was -- it was his office, so there had been a desk,

10   phone and, you know, office equipment in that room.

11   Q    And, again, just for the record, when you say "his," are

12   you referring to the defendant?

13   A    I am.

14   Q    Were the defendant's female guests ever escorted to that

15   Music 1 Office?

16   A    I don't know.

17   Q    You don't?

18   A    I don't know.

19   Q    Do you recall that ever happening?

20   A    I can't -- I don't -- I don't know whether it happened or

21   not.

22   Q    Okay.

23   A    If -- if it did, it was certainly with less frequency.

24   Music 1 Lounge would have been more the -- I'm sorry, I don't

25   recall for sure.

SAM      OCR      RMR      CRR      RPR

1    Q    Okay.

2         Are there other areas on this second floor where the

3    defendant's -- female guests of the defendant might be

4    escorted to?

5    A    Yes.  Both the Capricorn Room and Capricorn Studio Area.

6    Q    All right, and so is there something called the Capricorn

7    Control Room that's labeled -- there is a Capricorn Lounge and

8    there is a Capricorn Studio Area.

9         When you mentioned the Capricorn Studio Area, are

10   you referring to the one that's labeled Capricorn Studio Area?

11   A    Yes, where your pen is.

12   Q    And, again, is that an enclosed location where the doors

13   can be shut for privacy?

14   A    Yes, there's one door into that room.

15   Q    And you also said the Capricorn Room.  What were you

16   referring to when you said that?

17   A    The Capricorn Control Room.

18   Q    And is that where my pen is pointed now (indicating)?

19   A    Yes.

20   Q    And was there a means to shut the doors there also for

21   privacy?

22   A    Yes, there was one door to that room.

23   Q    Aside from the rooms that you have identified on this

24   second floor, were there other locations where defendant's

25   female guests might be escorted to?

Arnold - direct - Geddes                    1451

1    A    Not that I'm aware of.

2    Q    Okay.  Now, you testified earlier about certain rooms

3    that were called a lounge area.

4              What do you mean by lounge?

5    A    The room would have a couch, television, a stereo in it

6    for, like a -- in the Chicago Trax days would be meant for a

7    place for the artists to -- to separate out or have somebody

8    waiting to go into the studio before they would be recording.

9    Q    Okay.

10   A    So, the same concept at The Chocolate Factory as well,

11   there would be a room for someone to stay in.

12   Q    Now, of the rooms that you've just identified, and I'll

13   start with on the first page of Government Exhibit 235, and

14   I'm going to put my pen on the location that you identified

15   across from the reception area as Reid Hyams' old office.

16             Was there a bathroom attached to that lounge or that

17   office space?

18   A    No.

19   Q    And you also talked about this space that's labeled

20   Rockland Records Production Office Area.

21             Was there a bathroom attached to that space?

22   A    Yes.

23   Q    Where is the bathroom?

24   A    Just to the left of your pen, it says "restroom."

25   Q    Okay.  Where my pen is pointed there (indicating)?

1    A    Yes.

2    Q    And now, if I turn that exhibit over, in Music 1 Control

3    Room -- which I believe you said was one area where you might

4    escort a female guest, is that correct?

5    A    Yes.

6    Q    -- is there a bathroom attached to that room?

7    A    No.

8    Q    And how about the Music 1 Lounge, is there a bathroom

9    attached to that?

10   A    Yes.

11   Q    And where is that?

12   A    Just to the right where it's labeled "restroom," behind

13   the kitchen.

14   Q    And by the way, is there a means to get from the Music 1

15   Lounge to the Music 1 Office without walking out of that door?

16   A    I recall there being a door between the two lounges, but

17   it's not shown on the drawing.

18   Q    Okay.

19   A    But there was a door between the two lounges.

20   Q    So, you could go directly from the Music 1 Lounge to the

21   Music 1 Office?

22   A    Yes.

23   Q    All right.  And then in the Capricorn Studio Area, is

24   there a bathroom attached to that room?

25   A    No.

1  Q    And then how about the Capricorn Control Room, is there a

2  bathroom attached to that?

3  A    No.

4  Q    Do you recall whether there were any full bathrooms

5  within Chicago Trax, meaning that there was both a toilet, as

6  well as a bath or a shower?

7  A    Yes, there were two.

8  Q    Where are they?

9  A    The -- the bathroom connected to the Music 1 Lounge.

10 Q    Is that where my pen is pointed (indicating) where it

11 says "restroom"?

12 A    Yes.

13 Q    That was a full bathroom?

14 A    Yes.

15 Q    Meaning it had a bath or a shower?

16 A    A shower, yes.

17 Q    A shower?

18 A    A shower.

19 Q    And you said there was another one as well.  Where was

20 that?

21 A    Yes.  It's labeled "restroom" right below, where it says

22 Machine Room Capricorn.

23 Q    And is that where my pen is pointed here (indicating)?

24 A    Yes.

25 Q    And, again, that's a full bathroom?

Arnold - direct - Geddes                    1454

1   A    Yes, shower, toilet and sink.

2   Q    And is that full bathroom connected to any particular

3   room?

4   A    There is an open doorway that did not have a door

5   directly in front of the entrance to that bathroom, but that

6   could have -- it would have been associated with the Capricorn

7   Room, though it's not connected to the Capricorn Room.

8   Q    Okay.  So, meaning you couldn't get directly from the

9   Capricorn Room to the bathroom, you'd have to go out into a

10  hallway?

11  A    Yes.

12  Q    Okay.

13            MS. GEDDES:  And I'm now showing the witness what's

14  been marked for identification as Government Exhibit 525(a)

15  through (t).

16            And may I approach, Your Honor?

17            THE COURT:  Yes.

18  BY MS. GEDDES:

19  Q    Can you take a look at those?

20  A    Yes.  I'll look at it.

21  Q    Yes.

22  A    (Witness complies.)

23  Q    And prior to today, did you have an opportunity to look

24  at these?

25  A    Yes.

Arnold - direct - Geddes                1455

1    Q    Do you recognize, generally speaking, what they are?

2    A    Yes, I do.

3    Q    What are they?

4    A    These are photos from 865 North Larrabee.

5         MS. GEDDES:  The Government offers -- the Government

6    offers 525(a) through (t).

7         THE COURT:  Any objection?

8         MR. FARINELLA:  No objection, Your Honor.

9         THE COURT:  Okay, those are in evidence.

10        (Government's Exhibit 525(a) through 525(t) was

11   received in evidence.)

12        THE COURT:  You can display them.

13        MS. GEDDES:  All right, I'll take those back.

14        All right, briefly, we can publish this, please, to

15   everyone.

16        (Exhibit published.)

17   BY MS. GEDDES:

18   Q    I am showing you 525(a).

19        Do you recognize 525(a)?

20   A    Yes, it is a bathroom in the studio.

21   Q    And as you look at it right now, can you tell which

22   bathroom that one is?

23   A    Not definitively from this photo.

24   Q    Okay.  525(b).

25        (Exhibit published.)

SAM      OCR      RMR      CRR      RPR

Arnold - direct - Geddes                    1456

1   A    That's the call box to the gate to the entrance to the

2   parking lot to the building at 865 Larrabee.

3   Q    Now, up at the sign it says, "Chicago Trax 865 North

4   Larrabee."

5            Was -- did that sign change over time?

6   A    I feel like we had a sign at one point that said

7   Chocolate Factory, and the address on it with an arrow.

8   Q    Aside from the sign change, is this how the gate area and

9   call box was set up through the time that you worked for the

10  defendant at 865 North Larrabee?

11  A    Yes.

12  Q    And if a guest wanted to or if anyone was arriving at

13  Chicago Trax, what is that call box used for?

14  A    It dials directly into the reception area at the studio.

15  Q    And from the reception area, is there a means to open up

16  the gate?

17  A    There would be a button.

18  Q    That you could press?

19  A    That you could press and open the gate.

20  Q    525(c).  What is that?

21           (Exhibit published.)

22  A    That is the live room of the Capricorn Room.

23  Q    And 525(d).

24           (Exhibit published.)

25  A    Yes, the same room, just a different view.

Arnold - direct - Geddes                          1457

1   Q     And it looks like there's a set of stairs and in here it

2   looks like there's a separate area where my pen is pointed

3   (indicating) up the stairs.

4              What is in there?

5   A     It would be an isolation booth, a vocal booth.

6   Q     And then is this remaining area the control room?

7   A     This would all be the --

8   Q     The live room?

9   A     -- live room.

10  Q     Do you recognize 525(e)?

11             (Exhibit published.)

12  A     Yes, this is -- this is the Music 1 Office.

13  Q     And do you recall what's through that (indicating)

14  doorway?

15  A     The hallway outside -- the hallway that runs the length

16  of the second floor.

17  Q     And then 525(f), what is that area?

18             (Exhibit published.)

19  A     This is another view of the -- of the office.

20  Q     And the doorway in 525(f), where does that go?

21  A     That would go into the Music 1 Lounge.

22  Q     And you testified earlier that in looking in that floor

23  plan there was a means to get from the Music 1 Office to the

24  Music 1 Lounge, although it wasn't reflected on the floor

25  plan.

1           Do you recall that?

2    A    Yes.

3    Q    Is that the doorway where you can get between the two?

4    A    Correct.

5    Q    525(g).

6           (Exhibit published.)

7    A    That's same room, different view.

8    Q    And which doorway does that go to?

9    A    I believe that's the same door we just saw that goes into

10   Music 1 Lounge.

11   Q    How about 525(h)?

12          (Exhibit published.)

13   A    Different view, same door, but you can see that it's --

14   that's clearly the office because you can see the desk.

15   Q    So, in this room is the office, the Music 1 Office?

16   A    Yes.

17   Q    And then there's that same doorway.  And what is -- what

18   can you see through to the next room?

19   A    That's a refrigerator.

20   Q    And inside the room with the refrigerator, what was that

21   called again?

22   A    The Music 1 Lounge.

23   Q    525(i), what is that?

24          (Exhibit published.)

25   A    This would be that same refrigerator and this would be

Arnold - direct - Geddes                    1459

1    Music 1 Lounge.

2    Q    And then through that door, what was through that door

3    where my pen is pointed (indicating)?

4    A    That would be the Music 1 Office.

5    Q    All right, so is this just sort of facing the opposite

6    direction from the prior photograph?

7    A    That's correct.

8    Q    And 525(j).

9         (Exhibit published.)

10   A    That looks to be inside the same room looking into the

11   bathroom that's connected to the Music 1 Lounge.

12   Q    And just to -- to be clear on the record, when you say

13   the same room, what is this room again?

14   A    Music 1 Lounge.

15   Q    And that's the bathroom?

16   A    The bathroom connected to it.

17   Q    Now, was that one of the two full bathrooms that you

18   identified earlier?

19   A    It is, yes.

20   Q    525(k), do you recognize that?

21        (Exhibit published.)

22   A    Yeah, I believe this would still be in that same room,

23   the Music 1 Lounge.

24   Q    This is just another area showing a couch?

25   A    Yeah, another side of the room.   (Continued on next page.)

1    BY MS. GEDDES:   (Continuing)

2    Q    525(l)?

3    A    This could be the, I believe this is the bathroom, a view

4    of the bathroom from inside the Music 1 Lounge.

5    Q    And that's the full bathroom?

6    A    Yes.

7    Q    525(m)?

8    A    I think that's actually the kitchen space.  That's the

9    kitchen in the hallway so behind that wall would be that

10   bathroom in the Music 1 Lounge.  This would be a kitchen in

11   the main hallway.

12   Q    And this is on the second floor of the Chocolate Factory?

13   A    Yes.

14   Q    And so I just want to -- can you point out where that

15   kitchen area is?

16        I'm putting, for the record I'm putting 235 back up.

17   That's the second page of that.

18   A    It's located between Music 1 Lounge and Music 2 Lounge.

19   There's a small section called kitchen right there in the

20   middle.

21   Q    And that's the kitchen that we just saw?

22   A    Yes.

23   Q    And 525(n), what is that?

24   A    This is a different kitchen.  There was a -- the one we

25   saw before was a partial kitchen.  This was a full kitchen

Arnold - direct - Geddes                                1461

1    with refrigerator and stove.

2    Q    And just putting Government Exhibit 235 back on, is the

3    kitchen indicated on this floor plan?

4    A    Yes, it's just below where it says elevator and just to

5    the right of the Capricorn Studio area.

6    Q    Where it says kitchen?

7    A    Yes.

8    Q    And that's the full kitchen shown in 525(n)?

9    A    In the picture you just showed me.

10   Q    And then 525(o), do you recognize that?

11   A    That's another view of the same kitchen.

12   Q    That full kitchen?

13   A    Correct.

14   Q    525(p), do you recognize that?

15   A    That looks like we're back in the Music 1 Lounge again.

16   Q    And --

17   A    That's the door to the Music 1 office.

18   Q    And you answered my question before I asked it.  Where my

19   pen is pointing, that door, that goes to the Music 1 office?

20   A    Yes.

21   Q    Okay.  525(q), do you recognize that?

22   A    Yes.

23   Q    What is that?

24   A    That's the main entrance to the studio building.

25   Q    And to get to that entrance, do you have to go through

Arnold - direct - Geddes                              1462

1  the gate with the call box first?

2  A    That's correct.

3  Q    And there's a sign here lit up that says "Trax."  During

4  the time that you worked at the Chocolate Factory at 865

5  North Larrabee, did that sign change?

6  A    I believe it was taken down at some point in time, I

7  believe.  When Chicago Trax left the building, went out of

8  business, I believe that sign went at that time.  I don't

9  believe it was always there after that.

10 Q    Other than the sign, is 525(q), does that accurately

11 reflect how the Chocolate Factory appeared when you were

12 working there even while it was the Chocolate Factory?

13 A    Yes.

14 Q    This is 525(r).  What is shown there?

15 A    This is the view of the building from Larrabee Street.

16 Q    And can you show where my pen is pointed, does that say,

17 does that say 865 Larrabee, the address?

18 A    Yes, that would be the address.

19 Q    And the entrance that was shown in 525(q) that I've just

20 put on the screen, where is that on 525(r)?

21 A    The gate is on the left side of the screen so you can

22 vaguely see the light of the Trax sign in the photo.  It would

23 be back where it begins.

24 Q    So that sort of red area right there past that

25 entranceway?

CMH     OCR     RMR     CRR     FCRR

Arnold - direct - Geddes                                  1463

1    A    Yes.

2    Q    And by the way, that entranceway, is that the main

3    entranceway that you identified on 235 where it says Main

4    Entrance?

5    A    That's correct.

6    Q    And then this is Government Exhibit 525(s).  Do you

7    recognize that?

8    A    I believe that's the bathroom in the Capricorn Studio

9    area.

10   Q    And is that that second full bathroom that you testified

11   earlier about?

12   A    Yes, I believe it is.

13   Q    And there's a shower shown here?

14   A    Yes.

15   Q    And finally, 525(t), what is shown in 525(t)?

16   A    This is a room that was called Sky View.  It's a space

17   between the two studios.  Excuse me.  The ceilings of the

18   studio were actually hung from the ceiling of the building so

19   that there could be complete isolation and the two studios sat

20   side by side.  This would sit above a section on the floor

21   plan called machine room just in the space that was set

22   between the two hung ceilings.

23   Q    And just so that the jury can have a better understanding

24   of what you're describing, I'm putting this second page of

25   Government Exhibit 235.

Arnold - direct - Geddes                    1464

1      You referenced two studios.  Which two studios are

2  you referring to?

3  A    Music 1 control room and Music 2 control room.

4  Q    And so my pen, I think, right now is pointed to the

5  Music 1 control room, is that correct?

6  A    Correct.

7  Q    And then on the other side, it's where my pen is now

8  pointed, to the right of that, it's the Music 2 control room,

9  is that right?

10  A    That's correct.

11  Q    And between them appears to be something called the

12  machine room.  Is that the machine room you were just

13  referring to?

14  A    The room -- yes, that's the room I was referring to.

15  Q    And what's above the machine room?

16  A    Is the room called Sky View.

17  Q    And that's the one shown in 525(t)?

18  A    Correct.

19  Q    You testified that in 2004, you stopped working at

20  865 North Larrabee and you started to work at the Chocolate

21  Factory located in Olympia Fields, is that right?

22  A    Yes, I believe that is right.

23  Q    And can you describe the outside of -- and that was where

24  the defendant was living, right?

25  A    The studio moved to his home in Olympia Fields.

Arnold - direct - Geddes                    1465

1   Q    Okay.  And --

2              MR. FARINELLA:  Objection, Your Honor.

3              THE COURT:  Did somebody say something?

4              MR. FARINELLA:  Yes, Your Honor.  Objection.  I

5   don't think he answered the question.

6              THE COURT:  He was starting to.  You want to read it

7   back?  Let's just put the question to him again.  It says he

8   answered.

9              MS. GEDDES:  Your Honor, I'm prepared to proceed but

10  it is 5:30.

11             THE COURT:  I was giving you your last minute but we

12  can stop here.

13             MS. GEDDES:  Thank you.

14             THE COURT:  So we're finished for the day.  We'll

15  see you tomorrow at 9:30.

16             Just because I repeat this all the time doesn't make

17  it any less important.  Please don't read any accounts of this

18  case whatsoever, don't talk to anybody about it, but do have a

19  good restful evening and I'll see you tomorrow.  Thanks so

20  much.

21             (Jury exits.)

22             THE COURT:  Okay.  Everybody can sit and then the

23  witness is excused.

24             We'll see you tomorrow morning.  Okay?

25             THE WITNESS:  Yes, ma'am.

Arnold - direct - Geddes                    1466

1              (Witness excused.)

2              THE COURT:  All right.  Anything before we finish

3     for the night?

4              MS. GEDDES:  Yes, just briefly.  I want to know if

5     the defense had reached a conclusion as to Ms. Jones'

6     testimony because, otherwise, we need to proceed a different

7     route.

8              THE COURT:  What do you mean?  Well, no, I think --

9     that's right.

10             You are going to agree to do that by video, right?

11             MR. FARINELLA:  Yes, Your Honor.

12             THE COURT:  Okay.  Great.  Perfect.

13             MS. GEDDES:  Thank you.

14             MR. CANNICK:  Do we know who's coming tomorrow?

15             THE COURT:  Talk amongst yourselves.

16             MS. GEDDES:  We will.

17             (Matter adjourned to August 25, 2021 at 9:30 a.m.)

18

19

20

21

22

23

24

25

1467

1        I N D E X

2

3    WITNESSES:

4

5       JANE

6          CROSS-EXAMINATION (Cont'd) BY MR. CANNICK    1241

7          REDIRECT EXAMINATION  BY MS. GEDDES          1279

8          RECROSS-EXAMINATION BY MR. CANNICK           1319

9          REDIRECT EXAMINATION BY MS. GEDDES           1326

10      KEITH WILLIAMS

11         DIRECT EXAMINATION BY MS. CRUZ MELENDEZ      1331

12         CROSS-EXAMINATION BY MR. CANNICK             1350

13      VERONICA JACKSON

14         DIRECT EXAMINATION BY MS. GEDDES             1360

15      MALAK BENABDALLAH

16         DIRECT EXAMINATION BY MS. SHIHATA            1378

17         CROSS-EXAMINATION BY MR. CANNICK             1414

18      THOMAS ARNOLD

19         DIRECT EXAMINATION  BY MS. GEDDES            1419

20

21

22

23

24

25

1468

INDEX - EXHIBITS:

Government Exhibit 241                              1240
Government Exhibit 7                                1334
Government Exhibit 8                                1341
Government Exhibit 89                               1346
Government Exhibit 241B                             1369
Government's Exhibit 75(c)                          1380
Government's Exhibit 936                            1384
Government's Exhibit 204                            1385
Government's Exhibit 205(b), 205(c),               1387
205(e), 205(g), 205(h), 205(k)
Government's Exhibit 235                            1441
Government Exhibit 501(a) and 501(b)               1337
Government's Exhibit 525(a) through                1455
525(t)


Defense Exhibit T                                  1252
Defense Exhibit X                                  1260
Defense Exhibit W                                  1261
Defense Exhibit U                                  1262
Defense Exhibit Y                                  1263
Government Exhibit 315 and 316                      1282
Government Exhibit 456 and 461                      1284

*      *      *