1469

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,    :    19-CR-286(AMD)
4
          Plaintiff,          :
5
                              :    United States Courthouse
     -against-                :    Brooklyn, New York
6
ROBERT SYLVESTER KELLY,       :
7
                              :    August 26, 2021
          Defendant.          :    9:30 o'clock a.m.
8
     - - - - - - - - - - - - - X
9

10                    TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE ANN M. DONNELLY
11          UNITED STATES DISTRICT JUDGE, and a jury.

12
APPEARANCES:
13

14  For the Government:          JACQUELYN M. KASULIS
                                 Acting United States Attorney
15                               BY: ELIZABETH GEDDES
                                     NADIA SHIHATA
16                                   MARIA E. CRUZ MELENDEZ
                                 Assistant United States Attorneys
17                               271 Cadman Plaza East
                                 Brooklyn, New York
18

19  For the Defendant:           DEVEREAUX L. CANNICK, ESQ.
                                 NICOLE BLANK BECKER, ESQ.
20                               THOMAS FARINELLA, ESQ.
                                 CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:              Charleane M. Heading
                                 225 Cadman Plaza East
23                               Brooklyn, New York
                                 (718) 613-2643
24
Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

1470

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Okay.  I know we'll get the witness in

3    just a minute.

4          I got these motions in limine at some ungodly hour

5    and I'm prepared to rule on them.  If the government wants to

6    be heard at all, we can just take care of it.  I don't know

7    which one of you wants to address them.

8          MS. CRUZ MELENDEZ:  Yes, Your Honor.

9          Defense counsel is attempting to ask Your Honor to

10   reverse the very clear rulings that Your Honor made during the

11   pretrial conference with respect to both John Doe No. 1 and

12   Jane Doe No. 8.  That's how they were referred to in our

13   motion with respect to the other acts.

14         Your Honor specifically noted that for both of these

15   victims, the evidence was clear direct evidence of the means

16   and methods of the enterprise and that with respect to the

17   actual conduct, it was no more inflammatory than the conduct

18   that's been charged in the case.

19         So the government would ask that Your Honor not

20   reverse the very clear ruling that you made at the pretrial

21   conference.

22         THE COURT:  Mr. Scholar, is there anything else that

23   you want to supplement your letter with?

24         MR. SCHOLAR:  Your Honor, would it be possible to

25   have turn off the mic to the public area?  Is it possible to

CMH        OCR        RMR        CRR        FCRR

1471

1  have it turned off?

2      THE COURT:  I mean, I read your submission which was

3  quite thorough.  I don't know if there's anything you want to

4  add to it.

5      MR. SCHOLAR:  Well, just with respect to --

6      THE COURT:  Are you saying that because it's a

7  sealed letter?

8      MR. SCHOLAR:  Yes, Judge, and also what I'm about to

9  go into should not be publicly divulged.

10     THE COURT:  I see.  So why don't we come over to the

11 side with Ms. Cruz Melendez with the court reporter and you

12 tell me what it is.

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                    1472
```

1              (The following occurred at sidebar.)

2              THE COURT:  Just make sure the court reporter can

3      hear you.

4              MR. SCHOLAR:  Okay.

5              It's just that based upon the review of the 3500, it

6      appeared that what was being alleged in the forcible rape,

7      that, it's not what the theory of case was within the

8      indictment and it wasn't what the government opened on and it

9      hasn't been a theory that's been developed through the direct

10     examination of the witnesses.

11             THE COURT:  I'm not sure that I -- so we're talking

12     about Jane Doe No. 8.

13             MR. SCHOLAR:  Yes.

14             THE COURT:  I'm not sure I read it that way.

15             In my view, it's relevant, A, because according to

16     the 3500 material, she told him that she was 17 and there's

17     been cross-examination and part of the defense is that he

18     wasn't aware that people were 17 or they weren't 17, so it's

19     certainly relevant to that.  And I think, as I ruled in my

20     pretrial ruling, it's relevant to the means and methods of the

21     enterprise because of the sort of pattern of conduct that

22     happened at these concerts.  So I'm not going to change that

23     ruling.

24             MR. SCHOLAR:  Yes.

25             THE COURT:  And we might as well discuss John Doe

```
                          Sidebar                        1473
```

1   No. 1.

2          MR. SCHOLAR:  Yes.

3          MS. CRUZ MELENDEZ:  Can I note one thing for the

4   record with respect to Jane Doe No. 8?

5          THE COURT:  Surely.

6          MS. CRUZ MELENDEZ:  As Your Honor knows, we charged

7   with respect to Jane Doe No. 3 an assault while Jane Doe No. 3

8   was unconscious and unable to, unable to consent as well as

9   force which Mr. Kelly, with respect to Jane Doe No. 4 and with

10   respect to Jane Doe No. 5, used threatening methods in order

11   to engage in sexual conduct attacking them.

12          So with respect to the manner in which the sexual

13   contact happened with Jane Doe No. 8, we would state that it's

14   no more inflammatory than the other charges in the case.

15          THE COURT:  I mean it is true that there's a

16   certain -- the testimony of the two victims that testified so

17   far, there is certainly a coercive aspect to their claims and

18   so, like I said, I did not really -- I mean, I read it as

19   nonconsensual.  I didn't read it as -- well, to me, it's not

20   really very different from everything else.  The only

21   difference is, as you point out in your submission, is that

22   she only met him one time but to me, that doesn't really

23   change the relevance of the evidence.

24          So I am going to deny your application and you can

25   have an exception to that ruling.

```
                          Sidebar                        1474
```

1              MR. SCHOLAR:  Yes.

2              THE COURT:  And then with respect to John Doe No. 1

3      who's John Doe --

4              MS. CRUZ MELENDEZ:  John Doe No. 1.

5              THE COURT:  -- John Doe No. 1, first of all, again,

6      the sexual contact with him is also relevant to means and

7      methods.  He is, I believe, under 18 --

8              MS. CRUZ MELENDEZ:  That's correct, 16, 17.

9              THE COURT:  -- when he first met the defendant and

10     that the, while the gender of the victim is different, the

11     nature of the conduct is not appreciably different.

12             I will also say I read the 3500 material and I, I

13     noted that there was a, some descriptions in there of the way

14     the defendant is alleged to have spoken to, I think,

15     Ms. Joycelyn Savage directing her to have sex with John Doe

16     No. 1 in a way that's consistent with the way other witnesses

17     have described the way he treated, treated these young women,

18     and so I think that's relevant for that purpose too.

19             MR. SCHOLAR:  Well, Judge, we drew that distinction

20     in our motion, just that we were seeking to preclude him from

21     testifying as to the more salacious claims, salacious facts,

22     some testimony about a dildo, some, some testimony he would

23     offer about some relations with Mr. Kelly that have nothing to

24     do with the charges themselves.

25             THE COURT:  Well, they do, in my view, and I will

Sidebar                                                        1475

1   say without, I mean this sincerely, I think we've crossed the

2   salacious bridge quite some time ago.  That's the nature of

3   these cases and particularly one that's alleged to have

4   occurred the way this case has.

5           I mean, one of the things which happened

6   appropriately so in the opening statement was, you know, how

7   could this be an enterprise and this conduct to me is

8   demonstrative of the existence of an enterprise and the

9   continuation of it.

10          So, you have an exception to that ruling too.

11          MR. SCHOLAR:  All right.  And number three?

12          THE COURT:  You don't object to that, do you?

13          MS. CRUZ MELENDEZ:  Your Honor, the government is

14   because --

15          THE COURT:  The famous people?

16          MS. CRUZ MELENDEZ:  The names of the famous people

17   don't have relevance to the issue that they're trying to

18   raise.

19          To the extent they want to question whether or not

20   celebrities were present, we're more than fine with that

21   aspect of it, but from the government's perspective, the only

22   purpose of raising specific celebrities names is to gain favor

23   with the jury.

24          THE COURT:  Well, I, again, haven't really followed

25   this case but I'm going to go out on a limb here and say that

Sidebar                                    1476

1   those famous people probably are trying to get as far away

2   from him as they can right now.  So I would be careful about

3   that.

4          MR. SCHOLAR:  Definitely.  Definitely.

5          THE COURT:  But it's fine to mention that there

6   were, you know, stars there and it's certainly relevant as to

7   the extra security.

8          Then what's the relevance of the song titles?

9          MR. SCHOLAR:  Well, it's just a matter of these are

10  songs that he's writing while he's in the studio.

11         THE COURT:  Right.

12         MR. SCHOLAR:  Sometimes 24 hour sessions and in

13  order to, for the witness to know what we're talking about,

14  the song titles are necessary in order to ask the witness so

15  that he knows what songs we're talking about.

16         THE COURT:  Who are we talking about?  Not an agent.

17         MR. SCHOLAR:  No, not an agent.  I believe he wrote

18  "I believe I can fly" and certainly some other songs, but in

19  case it comes up, we'd want to be able to ask him about it,

20  certainly about writing certain songs.

21         THE COURT:  If he needs to be oriented as to place

22  and time, that's fine.  I mean --

23         MS. CRUZ MELENDEZ:  Can we --

24         THE COURT:  Do I think it's totally relevant?  Not

25  particularly.  Do I think it also offsets in any way, shape or

Sidebar                                          1477

1   form what the other testimony is?  No.  But I mean I don't

2   really see the relevance.  We'll see what happens when it

3   comes up.  To me, it's not a huge deal one way or the other.

4            MR. SCHOLAR:  And as far as the celebrities, just

5   say when it comes up?

6            THE COURT:  You can ask, I think that's fine, when

7   it comes up.  If it's somebody famous, you are going to have

8   extra security for that.

9            MR. SCHOLAR:  Definitely.

10            THE COURT:  That's perfectly fine.  So win two.

11   Lose two.

12            MR. SCHOLAR:  I'll take it.

13            (End of sidebar.)

14            (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1478

1      (In open court.)

2      THE COURT:  Mr. Scholar, I think in view of the

3   rulings, it doesn't have to be sealed, am I correct?

4      MR. SCHOLAR:  No, Judge.

5      THE COURT:  Okay.  So it doesn't have to be sealed?

6      MR. SCHOLAR:  No.

7      THE COURT:  Okay.  Great.

8      Just to recap, I'm denying the motions in limine

9   with respect to the testimony of Jane Doe --

10      MS. CRUZ MELENDEZ:  No. 8.

11      THE COURT:  -- No. 8 and John Doe --

12      MS. CRUZ MELENDEZ:  No. 1.

13      THE COURT:  -- No. 1.

14      I'm granting the application to permit questioning

15   regarding various people who visited the location and with

16   respect to the songs that were being worked on, I'm not a

17   hundred percent sure I see the relevance but if it's necessary

18   to orient a witness as to place or time, that's fine.  I don't

19   think we have anything else that we have to do.

20      So how much -- I'm sorry.  I lost my place a little

21   bit.  Are we still on direct?

22      MS. GEDDES:  We are.

23      THE COURT:  You said you have about a half hour

24   left?

25      MS. GEDDES:  Forty-five minutes.

1479

1          THE COURT:  And, Mr., Farinella, are you doing the

2   cross of this witness?

3          MR. FARINELLA:  Yes, Your Honor, I am.

4          THE COURT:  Do you have an idea of how long you

5   might take with him?

6          MR. FARINELLA:  I'm not certain, Your Honor, but --

7          THE COURT:  A day?

8          MR. FARINELLA:  No, it's not a day, Your Honor.

9          THE COURT:  All right.

10         MR. FARINELLA:  A few hours perhaps.

11         THE COURT:  A few hours?  Okay.

12         MR. FARINELLA:  If that.  I don't know.

13         THE COURT:  You don't want me to tie you down.

14         All right.  As we're continuing in the direct, be

15  thinking of, you know, being efficient is all I ask.  Okay?

16         MR. FARINELLA:  Yes, Your Honor, I understand.

17         THE COURT:  Anything else anybody wants to put on

18  the record?

19         MR. CANNICK:  Your Honor, just to alert the Court --

20         THE COURT:  Into the microphone if you don't mind.

21         MR. CANNICK:  Just to alert the Court, we do

22  anticipate another motion in limine as it relates to John Doe,

23  I think John Doe 1 and we'll make that argument before he

24  testifies.

25         THE COURT:  Are you going to leave me in suspense?

1480

1   When is he testifying?

2          MS. CRUZ MELENDEZ:  He's scheduled to testify today,

3   Your Honor.

4          THE COURT:  Okay.  So you know what, I'll just have

5   to wait.

6          So let's get the witness and then we'll get the

7   jury.

8          (The witness, THOMAS ARNOLD, previously sworn,

9   resumed the stand.)

10          THE COURT:  Okay.  The witness is here.  Let's get

11  the jury, please.

12          (Jury enters the courtroom.)

13          THE CLERK:  You may be seated.

14          THE COURT:  Good morning, everybody.

15          THE JURY:  Good morning.

16          THE COURT:  First of all, let me apologize for the

17  delay.  This was another one of those legal issues that we had

18  to resolve but I think it's going to move things along a

19  little bit which is one of my goals here.

20          We are ready to continue with the direct examination

21  of the witness.

22          THE CLERK:  The witness is reminded he's still under

23  oath.

24          THE WITNESS:  Yes.

25

1    DIRECT EXAMINATION

2    BY MS. GEDDES:

3    Q    Good morning.

4    A    Good morning.

5    Q    Yesterday, before we ended, you testified about the time

6    that you worked at Chicago Trax and then the Chocolate Factory

7    at 865 North Larrabee and in your testimony, you referenced a

8    room on that floor plan called, that referred to Rockland

9    Records.  Do you recall that?

10   A    Yes.

11              THE COURT:  Is your microphone on?

12              THE WITNESS:  There it is.  Power cycle.

13              THE COURT:  All right.  Go ahead.

14   Q    What is Rockland Records?

15   A    It was a record label and production company that

16   Mr. Kelly had or has.  I don't know.

17              MS. GEDDES:  And I am showing the witness only

18   what's been marked for identification as Government

19   Exhibit 525(u).

20   Q    Do you recognize what's shown in 525(u)?

21   A    Yes.

22   Q    What is in 525(u)?

23   A    It is the gated entrance to 865 Larrabee.

24              MS. GEDDES:  And, again, the government offers

25   525(u).

Arnold - direct - Geddes                     1482

1       THE COURT:  Any objection?

2       MR. FARINELLA:  No objection.

3       THE COURT:  Okay.  It's in evidence.  You can

4   display it.

5       (Government Exhibit 525(u) so marked.)

6   Q    This barbed wire fence, from where to where did that

7   extend?

8   A    To the end of the property which would have been the

9   north-most side of the parking lot along Larrabee.  It

10  extended down to the, connect to the buildings, actually to

11  the adjoining structure.

12  Q    And in order to get into the parking lot for Chicago Trax

13  and then the Chocolate Factory on Larrabee, did an individual

14  need to enter through this entrance?

15  A    Yes, that's correct.

16  Q    And in order to leave Chicago Trax and the Chocolate

17  Factory on Larrabee, did an individual need to go out this

18  entrance?

19  A    Yes, that's correct.

20      MS. GEDDES:  I'm showing the witness what's in

21  evidence as Government Exhibit 502(a).

22  Q    Do you recognize 502(a)?

23  A    Yes.

24  Q    What is that?

25  A    It's the gates to the house in Olympia Fields at 1 Maros

1    Lane.

2            MS. GEDDES:  And if you could show the witness only

3    what's been marked for identification and 502(b).

4    Q    What's 502(b), if you recognize it?

5    A    Yeah, it's part of the fence that runs along the property

6    line of 1 Maros Lane.

7    Q    And 502(c), do you recognize that?

8    A    Yes.  That's the view of the same house when you pass,

9    once you're inside the gates to the property.

10   Q    And whose house is that?

11   A    That's Mr. Kelly's.

12           MS. GEDDES:  The government offers 502(b) and (c).

13           THE COURT:  Any objection?

14           MR. FARINELLA:  No objection.

15           THE COURT:  Okay.  That's in evidence and you can

16   display it.

17           (Government Exhibit 502(b) and 502(c) so marked.)

18   Q    So I'm showing 502(b) first.  There appears to be a court

19   of some kind.  What is that?

20   A    I can't tell from the photo but depending on the time

21   frame, it's either a tennis court or a basketball court.

22   Q    So during the time period you were there, it was used for

23   two different purposes, is that correct?

24   A    Correct.

25   Q    And just to be clear, that court is on the defendant's

1   property?

2   A    Yes, that's correct.

3   Q    Can you describe the different structures that are on the

4   defendant's property at 1 Maros Lane in Olympia Fields?

5   A    Sure.  There was the main house.  To the right side if

6   you're facing the house was a large garage.  It had three bay

7   doors, I believe, if I remember correctly.  There would have

8   been a pathway from the garage towards what was the tennis

9   court/basketball court and there was sort of a gazebo

10  structure there that at one point in time was also closed in

11  to make sort of a small, like a cabin.

12          From the garage and between the garage and the house

13  would be a pathway that went back to the side entrance of the

14  house, that went into the basement.  There's a yard to that

15  side.  That would have been either empty or had a tent or had

16  ultimate, a larger tent.

17  Q    You talked about the enclosed gazebo.  Was there a name

18  that people who worked at the defendant's residence referred

19  to?

20  A    I believe it was called the cabin at one point in time.

21  Q    And you mentioned the garage with the three bays.  Was

22  that an attached or detached garage?

23  A    It was detached.

24  Q    Can you describe -- did you have an opportunity to go

25  inside that detached garage?

Arnold - direct - Geddes                    1485

1   A    Yes.

2   Q    Can you describe what was inside the garage?

3   A    Excuse me.  As far as I remember, there was always a

4   basketball or, I'm sorry, a boxing ring inside the garage.  It

5   was always used as a gym when I worked at that property.

6   Q    The area inside the detached garage was used as a gym, is

7   that correct?

8   A    That's correct.

9   Q    Can you describe the basketball ring?

10  A    I'm sorry?

11  Q    I'm sorry.  Can you describe the boxing ring?

12  A    Yes.  It was a regulation sized, to my knowledge full

13  sized boxing ring with the ropes around the outside.

14  Q    You testified that it was elevated.  How was it elevated?

15  A    I mean it was, it was -- I'm not exactly sure of the

16  construction of a boxing ring, but it's probably two and a

17  half, three feet above the ground and it's springy so there's

18  some sort of spring mechanism underneath it with ropes around

19  the top of it, just as you would see it as a boxing ring on

20  television.

21  Q    Are you aware of whether an individual could crawl

22  underneath the boxing ring?

23  A    It would have a curtain around the outside.

24          THE COURT:  We're having trouble with that mic

25  again.

Arnold - direct - Geddes                    1486

1           (Pause.)

2   A    There was a curtain around the bottom of the ring.  It

3   would have been open underneath and we used a lot for storage

4   as I recall.

5   Q    You also described that there were tent, there was a

6   tent.  Where was the tent situated?

7   A    On the side of the property, so between where the garage

8   would stand and the house would be a path that went back to

9   the side of the house.  There would have been a patio, not

10  originally, it would have been just a big open yard, but at

11  some point in time while we were at that address, the patio

12  was built and the tent was put on there and then a bigger

13  tent, like a kind of, a very large tent was put on there

14  ultimately.

15  Q    And was that tent there on a semi-permanent basis or was

16  it just used for parties?

17  A    Maybe the original tent that was there was more of a

18  temporary structure but this was a permanently installed tent

19  at one point in time.

20  Q    Can you -- you mentioned that there was a, I think you

21  said there was a side entrance to the basement.  Is that

22  correct?

23  A    That's correct.

24  Q    And what was inside the basement?

25  A    That was the entrance to the studio at the house.

CMH        OCR        RMR        CRR        FCRR

Arnold - direct - Geddes                         1487

1  Q    Can you describe the layout of the studio?

2  A    Sure.

3         So when you came in from downstairs, there would be

4  an entry into, like, what was a reception area, a desk there,

5  a bathroom and then a closet.  The basement was renovated to

6  make a kitchen down there as well and there was a proper

7  reception desk but, otherwise, it was, like, a little closet

8  turned into an office when we first started there and that

9  would be where you could control the gate.  People would come

10 in there and then you would walk down a hallway to a room, to

11 kind of an opening where the actual studio was.

12        So it was -- so when you come into reception, the

13 wall you're looking at is the backside of the actual studio

14 and you would walk around it.  There would be a vocal booth

15 much smaller than the ones that were at Larrabee and then

16 there would be a large control room which would be the next

17 room down.  And double doors there that sectioned off the rest

18 of the house which previously, which originally was storage

19 through there.

20 Q    Was there a name for that first studio that you

21 described?

22 A    I believe we called it Music I.

23 Q    What, if anything else, was located in that basement

24 area?

25 A    So there would be -- when you go through those double

Arnold - direct - Geddes                    1488

1    doors, there would be stairs that led up to the first floor of
2    the house and a long hallway where there would be a door to
3    what would be underneath the aquarium.  There was a big
4    aquarium upstairs.  So there would be a storage room
5    underneath the aquarium there.  Then there was, originally,
6    when we went to Olympia Fields, two sort of rooms used for
7    storage.  I think may have been a classroom at one point in
8    time for his family.  I'm not entirely sure what it was used
9    for originally.  We ultimately turned those rooms into one
10   more studio.
11   Q    And can you describe the interior of that studio?
12   A    Yes.  It had logs on the wall and it was called the Cabin
13   Studio.
14   Q    Why was it -- and was there anything across from that
15   Cabin Studio?
16   A    No, across still would have been the hallway, I think.
17   Q    What, if anything else, was located in that basement
18   area?
19   A    Then there would have been another door.  So as we, as he
20   was developing the basement for studio space, that kind of
21   moved the storage further and further.  So there was another
22   storage room right there after you passed through and then on
23   the left side would have been where the studio storage would
24   have been, where there would have been some technical
25   equipment and amplifiers and things like that.  Then past

Arnold - direct - Geddes                    1489

1    that, you would be, was storage and then it turned into a

2    theater room.  And then you would be at the other side of the

3    house.

4    Q    When you say a theater room, what are you referring to?

5    A    It was an actual, like, movie theater with raised seats

6    not unlike this, these chairs here.

7    Q    And did you also have an opportunity to go inside the

8    main house apart from the basement area?

9    A    Yes.

10   Q    Can you describe the -- how many floors was the main

11   house?

12   A    The basement and two floors above ground.

13   Q    Can you describe that first floor above the basement?

14   A    Sure.

15         If you were to come in the main front door of the

16   house, there was an entryway with an office room just to the

17   right as you come in and a bathroom to the left.  Then you

18   walked into a grand living room two stories high with big

19   windows on the back wall that were kind of curved.

20         Off the living room would be a kitchen to the left.

21   Once you got into the living room, to the right was a huge

22   projection TV, like, movie theater-size projection screen.  If

23   you go, you can go into the kitchen and then off the back of

24   the kitchen was a sun room.  Instead of walking into the

25   living room, you walked down the hallway, there would be a

Arnold - direct - Geddes                        1490

1    dining room that was later converted into, like, a lounge
2    which would sit across from the kitchen.  And then there would
3    be the servants' entrance at that far side of the house which
4    would be where the dumpsters were kept.
5            And then, sorry, that part.  If you walked in the
6    door and you turned to the right instead of coming into the
7    living room, there would be a long hallway that curved around
8    with a huge aquarium that had sharks and fish in it, big fish.
9    And then to the right as you come around the corner would be
10   the swimming pool area.
11           Then next to the swimming pool was a billiard room
12   and a game room.  So past the swimming pool, you go to the
13   game room.  It was a very large room again with windows that
14   are kind of curved on one side.  And then a bathroom that was
15   accessible through, like, a small little room that at one
16   point in time, I believe, had mirrors on it.  It was kind of
17   like a dance room, a bar, like a dancers' bar.
18   Q    How were the game room and the dancers' studio that you
19   just described connected if at all?
20   A    There was a door from the game room that entered into
21   that room and the bathroom was in that, was connected to that
22   room.
23   Q    So there was the game room/billiard room, and then that
24   was connected to the room with the mirror along the walls, and
25   then there was a bathroom connected to that, is that correct?

CMH        OCR        RMR        CRR        FCRR

1  A    Correct.

2         There was also a bathroom on the backside of that

3  which was meant for the pool, that was only accessible from

4  the pool.  And from the game room, you can go from one door to

5  go to the pool area.

6  Q    And the defendant's residence in Olympia Fields, what is

7  the neighborhood there like?

8  A    It was fairly large houses.  None as big as his house

9  was, but pretty big-sized houses.  It was a pretty large

10 neighborhood.

11 Q    And the defendant's residence, was it set back from the

12 main road?

13 A    Yes.  So it was a normal neighborhood street and then you

14 would go down this lane where there was only one house on each

15 side and there would be the gate and you would go inside it.

16 I think it was probably the size of, you know, a few lots in

17 size.  I don't know the actual acreage of the property, but it

18 was a decent drive from the gate to back to the house.

19 Q    When you started working at the defendant's studio within

20 Olympia Fields, how, if at all, did your responsibilities

21 change?

22 A    The runs were a lot further having to drive to -- in the

23 City of Chicago, things were a lot closer.  Out there, we

24 would go to the mall which was in Orland Park or to

25 restaurants which were further away.  Going to get petty cash

Arnold - direct - Geddes                    1492

1   and cashing checks, the bank was in the city and Bass

2   Productions' office was in Oak Park so I would have to drive

3   to Oak Park so I did a lot of that.  The concept -- the job

4   was pretty much the same.  Just that there was a lot more

5   driving.

6           There was only the one studio to start so there

7   wasn't as many, as much production going on.  Once we had the

8   second studio built, the first studio was used a lot for

9   production and people writing music while he could use his

10  other studio for his primary recording.

11  Q    When you were working at the defendant's studio in

12  Olympia Fields, what, if anything, protocols did you follow

13  for transport -- I think you said that -- did you continue to

14  transport some of the defendant's personal guests?

15  A    I did sometimes, yes.

16  Q    And when you were working -- so now I want to talk about

17  the time when you were in Olympia Fields.  I won't continue to

18  say "Olympia Fields."  I'll make clear if I ask you a question

19  about your time at the Chocolate Factory on Larrabee.

20          So when you were in Olympia Fields, how would you

21  transport guests when you were there?

22  A    It would be the same as before.

23  Q    Whose vehicle would you use, your own or somebody else's?

24  A    No, we always had a runner van or else there would be an

25  Excursion that security had so we could use the security, the

Arnold - direct - Geddes                    1493

1   runners or myself would be able to use those vehicles for

2   transporting.

3   Q    And are you aware of what other vehicles the defendant

4   had at Olympia Fields?

5   A    Yes.

6   Q    What type of cars did he have?

7   A    He had a lot of cars over a long period of time.  He had

8   a Maybach, Mercedes-Benz Maybach.  He had Lamborghini at one

9   point.  A Mercedes-Benz SLR, I think it was called.  He had a

10  couple of Jeeps at one point.  There was a Chrysler 300 car.

11  Q    Do you remember what color the Chrysler 300 was?

12  A    It was black and red.  I think black across the bottom

13  and red across the top, if I remember correctly.

14  Q    And what -- you mentioned that he -- and by the way, were

15  there other cars in addition to the cars that you just

16  described?

17  A    Yes.  There would have been a couple of Excursions, a

18  black one, and then at one point in time, we had one that was

19  red and brown.  And then the runner would have a minivan.  So

20  there would be a red van.  I think there was a brown van at

21  one point in time too.  And he had a, for a brief time, he had

22  a Rolls-Royce.

23  Q    You mentioned that there were a couple of Excursions.  Is

24  that correct?

25  A    Yes.

Arnold - direct - Geddes                    1494

1    Q     What do you mean by an Excursion?

2    A     It's the large Ford SUVs, I guess, that were made at that

3    time.

4    Q     Did you ever use the defendant's cars that you just

5    described aside from the Excursion and the minivan to

6    transport guests?

7    A     Yes.  I may have used -- I used the Maybach to take

8    people to places before.

9    Q     And by "people," who are you referring to?

10   A     Your question was about guests.  I've used the Maybach to

11   taking guests.

12   Q     Including female guests?

13   A     That's correct.

14   Q     When one of the defendant's personal guests arrived at

15   the Chocolate Factory, again, in Olympia Fields, what was the

16   protocol for letting them in?

17   A     If the person arrived to the gate and used the call box

18   or called from a cell phone, it would be the same process.

19   We'd either receive instructions as to what to do with the

20   person, to let them in or where they wanted to go, or we would

21   have to call and get instructions.

22   Q     Who would you call?

23   A     I would call Rob or I would call someone that I knew that

24   was with Rob.

25   Q     And who, again, are some of the individuals that you

Arnold - direct - Geddes                    1495

1    might call then if you wanted to get in touch with Rob, the

2    defendant?

3    A    I'm sorry.  One more thing.  If Rob was in the studio or

4    around, we'd run a note to him.  The same as in the studio.

5    We'd let him know that someone was at the gate.

6              I'm sorry.  Could you repeat your question?

7    Q    Sure.

8              Who are some of the individuals that you would call

9    to get in touch with the defendant if you weren't able to get

10   in touch directly with the defendant?

11   A    The same individuals that would have been before that,

12   either June Bug or Donnie who was his music director or

13   anybody that I knew was with him, a security guard, someone

14   that can just have a phone to pass to him.  So it didn't

15   really matter.  As long as I know I could get ahold of him, I

16   could call anybody who could hand the phone to him.

17   Q    Now, you saw earlier that gate and I think you referenced

18   as well the gate that was in front of the property.

19              How did an individual get into the gate?  What had

20   to happen?

21   A    So there was a button in reception that could open the

22   gate.

23   Q    And that was the reception in the studio itself?

24   A    So as soon as you come down the basement stairs, there's

25   that opening area that was receiving people.  There was a desk

Arnold - direct - Geddes                    1496

1    there and then the button would be there to open up the gate.

2    Q    And was there any security situated near the gate?

3    A    Depending on the time frame, there was one point in time

4    a guardhouse on the property where somebody would be situated.

5    Otherwise, there would be somebody sitting in an Excursion,

6    but there was frequent times where there was nobody there and

7    there was a security camera in reception so you could actually

8    see the gate clearly on the security camera.

9    Q    And when you said that there were times when there was an

10   Excursion there, was anyone inside that Excursion?

11   A    Oftentimes there would be a single security person and

12   two security persons sitting in that Excursion.

13   Q    So once you learned where a guest was to be escorted to,

14   what, if anything, would you have the guest do before the

15   guest was escorted to that particular location?

16   A    There was a large period of time when we were having

17   people sign confidentiality agreements.

18   Q    What did you understand to be in this confidentiality

19   agreement?

20        Did you have an opportunity to read the agreements?

21   A    Yes.

22   Q    What did you understand that they said?

23   A    The agreement said that the person was not to film, take

24   photographs or talk about anything that they had seen or had

25   experienced or been around at the, at the time at the studio.

1    Q    And what, if anything, would a guest, did a guest provide

2    upon signing, when they were presented with this

3    confidentiality agreement?

4    A    We would have photocopied a driver's license as we did,

5    the same process we did in the city or we'd take a Polaroid of

6    them and staple it to the actual confidentiality agreement.

7    Q    And what was the purpose -- what did you understand the

8    purpose to be of taking -- I'm assuming you take a Polaroid

9    person of the individual signing the picture, is that right?

10   A    Yes, a Polaroid of the person.

11   Q    What was the purpose of taking a Polaroid picture of the

12   person signing the agreement?

13   A    To connect the person as to who is that signed it so you

14   can know who that person was.

15   Q    And you said that at times, you also make copies of an

16   individual's driver's license, is that right?

17   A    That's correct.

18   Q    Where would those copies be made?

19   A    There was a photocopier in the reception area and there

20   was one at one point in the guardhouse that was used for when

21   people came in and people would check in at the guardhouse.

22   Q    Now, you testified earlier that you started working at

23   the Chocolate Factory at Olympia Fields after you left

24   865 North Larrabee, is that correct?

25   A    My employment was continuous but, yes, the studio itself

1  started at -- once it left Chicago, it started.

2  Q    And did you continue working at the Chocolate Factory at

3  Olympia Fields through the time when the defendant left

4  Olympia Fields?

5  A    Yes, I was.  Yes, I was.

6  Q    And so you were there the entire time that the Chocolate

7  Factory was located at Olympia Fields, is that correct?

8  A    Sorry.  There was a brief period of time in 2008 when I

9  was not employed but aside from that time, yes, the whole time

10  I was employed by him, I worked there.

11  Q    During the time, so minus the short period in 2008,

12  during that time, was there ever a time when a guest had to

13  provide their identification twice?

14  A    Not that I'm aware of.

15  Q    Okay.  So you testified earlier that there was a, I think

16  you said that there was a photocopier machine in that guard

17  shack, is that correct?

18  A    Yes.

19  Q    And there was also a photocopy machine in the studio

20  itself, is that right?

21  A    Yes.

22  Q    Fair to say that the guest would sign one confidentiality

23  agreement?

24  A    Yes.  Anybody that came in either had signed that at the

25  gate or else would have done it in reception at the time we

Arnold - direct - Geddes                          1499

1   were collecting confidentiality agreements.

2   Q    And they also would have only provided their

3   identification or had a Polaroid picture taken once, correct?

4   A    Correct.

5   Q    Now, for guests -- did all guests sign confidentiality

6   agreements and provide either a driver's license or have their

7   picture taken using a Polaroid camera?

8   A    I can't be certain it was a hundred percent, but that was

9   the policy, to always try to get it during that time frame.

10  Q    How about when guests came on a regular basis to the

11  Chocolate Factory, did they sign each time they came?

12  A    Not necessarily.  There were certainly times where we

13  would know that they had already signed one, either they -- it

14  doesn't matter what -- they would have been there before or

15  whatever, and I'm sure, I know I didn't make somebody sign

16  something because I knew there was already one and I knew

17  somebody did the same thing especially when it was busy.

18  Q    Beside, again, referring to the time in Olympia Fields,

19  beside escorting a guest to a particular location within

20  Olympia Fields, what, if any, interaction would you have with

21  the defendant's personal guests?

22  A    I may receive a phone call either from reception or else

23  to a cell phone that I had asking to speak to Mr. Kelly would

24  be the most common call.

25            (Continue on next page.)

                     Arnold - direct - Geddes                    1500

1   EXAMINATION CONTINUES

2   BY MS. GEDDES:

3   Q    And who would -- who would be -- who called you?

4   A    Anybody who was a guest that was in -- that was there

5   would call me or was -- anybody that was trying to reach

6   Mr. Kelly would call either the reception phone or would call

7   my cell phone.

8   Q    What other interaction would you have -- did you have

9   with the defendant's guests?

10  A    If they could have been delivering food or escorting

11  somebody or giving someone a ride.

12  Q    Did you receive guests from individuals who wanted to

13  move around the -- did you receive calls from guests who

14  wanted to move around the studio?

15  A    Yeah, I would have received a call if someone asked to be

16  taken to a specific place.

17  Q    Such as where?

18  A    To, say, from the lounge to the studio could be one

19  place.  Can you take me to the studio?

20  Q    If you were -- when you received a call like that, what

21  did you do?

22  A    If I had been previously told to expect the call, I would

23  already know to -- to take the person or how to, action.  If I

24  hadn't, then I'd have to ask for permission or find Mr. Kelly

25  to ask what to do.

Arnold - direct - Geddes                    1501

1    Q    And who would you -- who did you ask permission from?

2    A    I'd either call Rob or someone I knew that was with him,

3    could get to him, so I could speak to him.

4    Q    When a guest was ready to leave Olympia Fields, what

5    happened?

6    A    They would either just leave or, I'd get a phone call or

7    we'd get instructions to escort somebody.

8    Q    And can you describe the telephone -- the type of

9    telephone call that you would receive from guests who wanted

10   to leave?

11   A    It would either be someone -- where somebody would call

12   to ask to speak to Mr. Kelly, and then he would give us

13   instructions as to what to do next.  Those instructions could

14   be to escort them to their vehicle or to give them a ride

15   somewhere.

16        Or else, somebody may call and say:  Can I get a

17   ride to someplace?  And if we had gotten instructions, we

18   would take the person where they were supposed to go, or else

19   I'd have to reach out and find out from him or someone who was

20   near him to find out where to -- what to do with the request.

21   Q    Were there times that you were not able to reach the

22   defendant after you received a request from a guest to leave?

23   A    I can't be for sure, but there was often times when I was

24   unable to -- to reach him when there was a phone call.

25   Q    And what, if anything, would you do if you had not

SAM      OCR      RMR      CRR      RPR

Arnold - direct - Geddes                    1502

1   received permission -- if you were not able to contact the

2   defendant?

3   A    Continue to keep trying to reach him until I did.

4   Q    And what would the guest do as you tried to reach the

5   defendant?

6   A    Would wait to hear back from me, or else would call back

7   to see if there had been an update.  And then as soon as I

8   would -- until I could -- and I'd say, we're still trying to

9   reach him.

10  Q    Now, in the time that you spent at The Chocolate Factory

11  in Olympia Fields when you were there, did you see guests

12  freely roaming around the Olympia Fields, the defendant's

13  residence at Olympia Fields?

14  A    From time to time people would walk, like walk into the

15  room that you'd be in or if we'd be outside someone would walk

16  out of a car or walk out of the house to a car, that did

17  happen.

18  Q    On a regular basis?

19  A    Semi-regular.  We would -- I just remember that we'd

20  always scatter as soon as somebody, like, stepped out of the

21  house, we'd leave to get out the way.

22  Q    And who are you referring to, what do you mean you would

23  scatter?

24  A    So -- so, if it was a female guest we'd just clear out,

25  like, that's the best way I could describe it, just like

SAM      OCR      RMR      CRR      RPR

1  actually just clearing out, just like leaving the area.

2  Q     Why is that?

3  A     That was what we were instructed to do is just to --

4  to -- to leave if we were in the area where they were coming

5  through.

6  Q     So, you testified that you did see individuals in -- in

7  the area, itself, but would you describe -- would you describe

8  the guests's time -- when guests were at Olympia Fields, were

9  they able to roam freely?

10 A     Generally, no, people would ask for permission to go from

11 place to place.

12 Q     And when you say "people," who are you referring to?

13 A     Guests would -- guests would call to ask to move from

14 place to place or we would get notification when somebody was

15 going to need to be moved.

16 Q     And, again, who were you receiving notification from?

17 A     Directly or indirectly from Rob.

18 Q     Did you -- I think you testified earlier that you worked

19 at Olympia Fields or you worked at The Chocolate Factory at

20 Olympia Fields for the entire time that the defendant had that

21 studio, is that correct?

22 A     Yes, that's correct.

23 Q     Were you there when the defendant no longer was at

24 Olympia Fields?

25 A     Yes, I still worked for him for an additional, at least a

Arnold - direct - Geddes                    1504

1    year, I think, after -- or around a year after we left Olympia

2    Fields.

3    Q    What, if any, studio did the defendant use after he was

4    not at Olympia Fields?

5    A    There was a studio on Ohio Street, just off the

6    interstate in downtown Chicago.

7    Q    And do you recall when the defendant stopped working at

8    Olympia Fields or stopped using the studio at Olympia Fields?

9    A    Yeah, I don't know officially, but I think it was in

10   mid -- midway through 2010.

11            MS. GEDDES:  I am showing the witness what's in

12   evidence as Government Exhibit 505(a).

13            (Exhibit published.)

14   BY MS. GEDDES:

15   Q    Do you recognize 505(a)?

16   A    Not necessarily, no.

17   Q    Okay.  And 505(c)?

18            (Exhibit published.)

19   A    Yes.

20   Q    What is 505(c)?

21   A    Sorry, that's the entrance to the building off of Ohio

22   that the studio was located in.

23   Q    And 505(b)?

24            (Exhibit published.)

25   A    Yep, same entrance.  It didn't have the name on it at the

SAM     OCR     RMR     CRR     RPR

Arnold - direct - Geddes                    1505

1  time, I don't believe.  I believe that was added later.

2  Q    But that was the --

3  A    That's the entrance.

4  Q    And that was the entrance to the building where the

5  studio the defendant was using on Ohio Street was located?

6  A    Correct.

7  Q    You testified earlier, I believe, that you also held a

8  position as a road manager.

9           Is that correct?

10 A    Yes.

11 Q    When did you serve as the road manager?

12 A    When we would travel for tour between 2006-ish, 2006 I

13 think was the first summer -- 2006 until the last tour we did,

14 which was in 2011.

15 Q    Do you recall which tours you accompanied the defendant

16 on?

17 A    Yes.  The Light It Up tour.  The Double Up tour, Ladies

18 Make Some Noise tour, and Love Letter tour.

19 Q    And did you also go on the Best of Both Worlds tour?

20 A    I did, yes.

21 Q    Were you serving as the road manager for each of those

22 tours?

23 A    Not on the Best of Both Worlds tour.

24 Q    But on the other tours that you just described?

25 A    I believe so, yes.

Arnold - direct - Geddes                          1506

1   Q    What were your duties and responsibilities when you were

2   acting as the road manager, in effect?

3   A    To make sure that the buses were stocked, that the

4   drivers were where they needed to be, that we were able to get

5   to our destinations.

6        There was other people that we would coordinate

7   scheduling with, make sure that the hotels -- we were checking

8   hotels, got all the room keys for the hotels that were needed.

9   Arranging some travel for people coming in and out, coming in

10  to see a show.

11       And also, if there was an SUV, making sure that we

12  had an SUV available.  If there was one that was following us,

13  that that person knew where to be for each -- the driver of

14  the SUV knew where we were going to be.

15       There would often be basketball played before every

16  show and often an after-party or appearance after the concert

17  and coordinated to make sure everybody was where they needed

18  to be.

19  Q    How did you travel when you were on tour with the

20  defendant?

21  A    On a -- on a separate bus.

22  Q    How many buses traveled along with the defendant when he

23  was on tour?

24  A    It varied on the tour, but it could be anywhere between

25  three and six.

Arnold - direct - Geddes                    1507

1    Q    When you were on tour with the defendant, what, if

2    anything, did you do to connect the defendant to women that he

3    didn't previously know?

4              MR. FARINELLA:  Objection.

5              THE COURT:  Overruled.

6    A    There -- there would be instances where I would be told

7    to hand a small piece of paper with his phone number on it to

8    somebody, or I may have been given instruction -- or I may

9    have been given instructions to either escort somebody to

10   either -- to either the backstage area or to a hotel or to a

11   vehicle.

12   Q    You said there may be instances when you might give out a

13   piece of paper.

14              On how regular of a basis did you give out pieces of

15   paper with the defendant's number?

16   A    It was infrequent for me to do that in the concert

17   setting.  Sometimes maybe in the after-party at a club or

18   after-party in the venue would be more common for me to -- to

19   be asked to do that.

20              If we were traveling or if we went to a mall or

21   something, it might be possible he would ask me to -- to hand

22   a number to somebody as well.

23   Q    Again, you said it might be possible for you to hand out

24   a number.

25              How regularly did you distribute the defendant's

1    number when you were on tour with him at any of the different

2    venues that you just described?

3    A    It -- it -- it would be asked of me to do so fairly

4    regularly.

5    Q    And who asked you to do that?

6    A    Rob would ask me to.

7    Q    What were the different types of venues where you would

8    distribute the defendant's telephone number?

9    A    It could be at the mall -- the mall, the after-party.

10   Q    How about when you were at restaurants with the

11   defendant?

12   A    I -- I can't think of a specific instance, but there

13   could -- there could certainly have been times when I was

14   asked to hand a number off at a restaurant.

15   Q    You testified that you would distribute a piece of paper.

16        Who created that piece of paper?

17   A    Myself or somebody else from the entourage or one of the

18   runners or engineers, we'd print up -- either use a computer

19   to type up the number on a bunch of slips of paper and cut

20   them up, or else we would tear sheets of paper up and write

21   the number on it by hand.

22   Q    And how regularly were those pieces of paper created?

23   A    As far as I can remember, we always had those or somebody

24   always had those on hand.

25   Q    Who carried the pieces of paper?

Arnold - direct - Geddes                    1509

1    A    Any -- anybody who was -- a lot of people carried the

2    paper.

3    Q    And by "a lot of people," what -- what roles did those

4    people serve in who were carrying the pieces of paper?

5    A    All of us that were in his traveling party.  Not -- not

6    necessarily all of us, that's an overstatement, most of us in

7    the traveling party.  So, myself or another assistant, a

8    runner would have some, other people that were traveling.

9    Even sometimes -- even sometimes probably, I think, Donnie

10   might have had someone on him, too.

11   Q    Who was Donnie again?

12   A    The music director.

13   Q    And who identified a particular female to give one of

14   these pieces of paper with the defendant's number?

15   A    I would only give it out at direction from -- from Rob.

16   Q    Did you always receive directions directly from Rob or

17   did you sometimes receive them from other people as well?

18   A    Yes, I could have received it indirectly, but from

19   someone who I knew was speaking to him.

20   Q    Speaking on behalf of the defendant?

21   A    That's correct, speaking on behalf.

22   Q    Now, you testified earlier that it was infrequent that

23   you would distribute the defendant's number at concerts.

24        Is that right?

25   A    That's correct.

1  Q    Were you aware of whether other individuals distributed

2  the defendant's number to individuals, to females at concerts?

3  A    Yes, I believe there were.

4  Q    And why is it that you believe that?

5  A    Because I would give those sheets of paper to -- to other

6  people that were traveling with us.

7  Q    Now, and when you say -- who did you give those sheets of

8  paper to?

9  A    To -- to anybody else that was in the traveling party,

10 any of the guys that were playing -- some of the guys who

11 played basketball with him had numbers.  Some of the --

12 anybody -- anybody that was around some people -- some of the

13 friends that might have flown into town would have some

14 numbers as well.

15 Q    And, again, you're referring to pieces of paper with the

16 defendant's number on it, correct?

17 A    Pieces of paper with Rob's number on it, yes.

18 Q    You testified that it was infrequent that you would

19 distribute it at concerts.

20       Why is that?

21 A    Usually while he was performing or while he was in

22 concert was my downtime, so I could -- it's either take a nap,

23 sleep on the bus.  I'd make sure his dressing room was cleaned

24 up and ready to go, that the food was swapped out, that if he

25 needed a special meal that it had been picked up.

Arnold - direct - Geddes                    1511

1         And I didn't have any responsibilities for the
2  actual performance, so that was my time to get away and rest.
3  Q    All right.  So, fair to say you just weren't in the
4  location where the numbers were being distributed?
5  A    That's correct.
6  Q    You testified that you -- there were three to four
7  buses -- I don't know, how many buses would you say would
8  travel at a time?
9  A    Depending on the tour, three to six or eight could be on
10 the tour.
11 Q    Who else traveled on these buses that were going on the
12 defendant's tour?
13 A    There would be a bus for the band.  If there was dancers,
14 the dancers would have their own bus.  There were some tours
15 where security had their own bus.  Then there would be a crew
16 bus, the bus that the traveling party would have.  And
17 sometimes there would be a bus for female guests.
18 Q    Female guests of whom?
19 A    Of Mr. Kelly.
20 Q    Are you aware of who traveled on the bus that the
21 defendant traveled on?
22 A    Sometimes, depending on the tour, it could have been the
23 family -- his family could have been on the bus with him.  He
24 may have been traveling with a guest.  He may have been
25 traveling by himself.

Arnold - direct - Geddes                        1512

1    Q    While you were working for the defendant, were you

2    provided with a cellular telephone for work?

3    A    Yes, I was.

4    Q    Do you recall that telephone number?

5    A    Yes.  Yes, I do.

6    Q    What is it?

7    A    (312) 213-9348.

8    Q    Other than you, who, if anyone, else used that phone?

9    A    Rob would use the phone.  And it's -- and I probably have

10   handed it over to another runner to use from time to time, but

11   primarily it would be my phone or Rob that would use it.

12   Q    Why would Rob use your cellular phone?

13   A    If I received a phone call that was for him, I would take

14   and give him the phone.  And I wouldn't necessarily get it

15   back right away, maybe for some time before I get it.

16        But it was his phone for me to carry around and take

17   calls.  I didn't take personal calls on that phone, it was

18   always only for my job that I had that phone.

19   Q    Now, going back to your time when you were not on tour

20   and you were working at The Chocolate Factory at Olympia

21   Fields, where in Olympia Fields were the defendant's female

22   guests escorted to, which different areas?

23   A    Depending on the timeframe while we were there, into the

24   studio.  There would have been a lounge down there or into one

25   of the studio rooms or one of the vocal booths, the live

1   rooms.  There was other rooms used.  The poolroom, somebody

2   could have been put in the poolroom.  Someone could have been

3   put in the game room where the pool table was.  There was a

4   theater, somebody could be put down into the theater.  The

5   garage would be a place where the basketball -- I'm sorry, the

6   boxing ring was, some people could go into the garage.

7   Q    Where were the defendant's -- where were the tour buses

8   when the defendant was not on tour?

9   A    We always had one, almost always had one bus.  It would

10  either park in the driveway in front of the garage or on the

11  long drive to the gate.

12          And sometimes when we would get, especially towards

13  the last couple of tours, we could have three or four tour

14  buses inside the -- the gate before we'd be ready to leave to

15  depart for the tour.

16  Q    Who, if anyone, spent time on that tour bus while it was

17  parked at Olympia Fields?

18  A    That would -- Rob would often sleep on the tour bus.  And

19  sometimes there would be female guests on the bus as well.

20  Q    Now, on how regular of a basis did the defendant have

21  female guests arriving at The Chocolate Factory and Olympia

22  Fields?

23  A    I'm sorry, could you repeat the question?

24  Q    How regularly did the defendant have female guests coming

25  to Olympia Fields?

Arnold - direct - Geddes                          1514

1   A    All -- all the time.

2   Q    And was there one guest there at a time or more than one

3   guest there at a time?

4   A    There was frequently more -- more than one guest.  There

5   could be just one.  There could be quite a few.  There were a

6   lot of people coming and going.

7   Q    And were there some individuals who stayed at the

8   defendant's house in Olympia Fields or on its property for

9   days at a time?

10  A    Yes.

11  Q    Did you become familiar with some of the individuals who

12  came on a regular basis to Olympia Fields?

13  A    We'd become, yeah, with the names, with some of the names

14  for sure.

15  Q    Who are some of the individuals, just first names,

16  please, who are some of the individuals that you recall

17  spending time, female, spending time at Olympia Fields on a

18  regular basis?

19  A    Kathy, Ebony, Mary Jane, Rebecca, Tamika, Keva, that --

20  I'm sure there's more.  I'm sure -- I'm sure there's more.  If

21  you want me to keep thinking, I can.

22          THE COURT:  I'm sorry, could I just ask, what

23  timeframe are we talking about here?

24          Generally, in what years?

25          THE WITNESS:  So, 2004 till 2011.

SAM       OCR       RMR       CRR       RPR

Arnold - direct - Geddes                    1515

1       THE COURT:  2011, okay.

2       I'm sorry, go ahead.

3   BY MS. GEDDES:

4   Q    The individuals that you just named, did you become aware

5   of whether those were true names or not true names?

6   A    In some instances where I would book, maybe had booked a

7   flight for somebody, I could know what their first name was --

8   would be, but sometimes it seemed like it -- the same name was

9   used for multiple people.

10  Q    While you were working for the defendant, did you become

11  aware of the different roles that the defendant employed

12  people to fulfill?

13  A    Yes.

14  Q    What are the different buckets of jobs that the defendant

15  employed people to do?

16  A    There was -- so, music director, engineer, assistant

17  engineer, receptionist, runner, assistant, personal assistant,

18  housekeeper, nanny.  There was a guy who took care -- a fish

19  guy who took care of the fish tank.  Security, female security

20  and male security, personal trainer, bus drivers, a driver for

21  some of the vehicles.

22  Q    Now, for some of those jobs like runner and assistant,

23  you used the singular.

24       Was there just one runner and one assistant or was

25  there more than one runner and more than one assistant?

SAM     OCR     RMR     CRR     RPR

Arnold - direct - Geddes                    1516

1   A    Yeah, there was -- there was more than one runner.  There

2   would frequently be a couple of assistants, but there could be

3   times that there was a single person who was the assistant.

4            MS. GEDDES:  I'm showing what's in evidence as

5   Government Exhibit 12.

6            (Exhibit published.)

7   BY MS. GEDDES:

8   Q    Do you recognize Government Exhibit 12?

9   A    Yes.

10  Q    Who is that?

11  A    Derrel McDavid.

12  Q    What did he do for the defendant?

13  A    Derrel was Rob's business manager.

14           MS. GEDDES:  I'm showing what's in evidence as

15  Government Exhibit 4.

16           (Exhibit published.)

17  Q    Do you recognize that individual?

18  A    Yes.

19  Q    Who is that?

20  A    That's June Bug.

21  Q    What did June Bug do for the defendant?

22  A    He was his -- he's his uncle and he was an assistant.

23  Q    And do you know is June Bug a true name or a nickname?

24  A    No, his name is George K.

25  Q    George Kelly?

Arnold - direct - Geddes                    1517

1   A     Yes, George Kelly.

2           MS. GEDDES:  I'm showing what's in evidence as

3   Government Exhibit 3.

4           (Exhibit published.)

5   BY MS. GEDDES:

6   Q     Do you recognize who's shown in Government Exhibit 3?

7   A     Yes.

8   Q     Who is that?

9   A     June Brown.

10  Q     What, if anything, did June Brown do for the defendant?

11  A     He was part of the management team, and he was an

12  assistant.  Over the -- over the course of the time in which I

13  worked for Mr. Kelly, he had different jobs.

14  Q     And by the way, June Bug, over what period of time did he

15  serve as an assistant for the defendant?

16  A     I'm not sure exactly when he started, but he was working

17  for Mr. Kelly when I started working directly for him in Bass

18  Productions in 2004.  I believe he might have left from time

19  to time over the course of the duration, but I would say 2009,

20  2010 was when he stopped working for him when I was still

21  working for Bass Productions.

22          MS. GEDDES:  I'm showing what's in evidence as

23  Government Exhibit 32.

24          (Exhibit published.)

25  BY MS. GEDDES:

SAM      OCR      RMR      CRR      RPR

Arnold - direct - Geddes                               1518

1    Q    Do you recognize that individual?

2    A    Yes.

3    Q    Who is it?

4    A    Donnie Lyle.

5    Q    Is this the individual you testified earlier served as

6    the musical director?

7    A    That's correct.

8    Q    And did you also sometimes, I think you said this

9    earlier, that you reached out to Donnie Lyle to get

10   instructions from the defendant, is that correct?

11   A    Yes.

12   Q    Or he reached out to you?

13   A    Yes, or he would have called me or I would call him.

14            MS. GEDDES:  I'm showing the witness what's in

15   evidence as Government Exhibit 9.

16            (Exhibit published.)

17   BY MS. GEDDES:

18   Q    Do you recognize that?

19   A    Yes.

20   Q    Who is that?

21   A    His name is Bubba.

22   Q    What, if anything, did he do for the defendant?

23   A    Played basketball.

24            MS. GEDDES:  I am showing the witness only what's

25   been marked for identification as Government Exhibit 18.

SAM      OCR      RMR      CRR      RPR

Arnold - direct - Geddes                    1519

1              THE COURT:  Let me just ask, Mr. Farinella, do you

2      have any objection to that, Government Exhibit 18?

3              MR. FARINELLA:  No, Your Honor.  No, Your Honor.

4              THE COURT:  Okay.

5              MS. GEDDES:  Can I have one moment?

6              THE COURT:  Sure, sure.

7              (Pause.)

8              MS. GEDDES:  It's my understanding that counsel has

9      no objection to admitting the following exhibits and I would,

10     therefore, offer them.

11             Government Exhibit 18, 21, 19, 23, 16, 15, 36, 24,

12     25, 28, 27, 30, 26, 29.

13             THE COURT:  All right, no objection, is that right,

14     Mr. Farinella?

15             MR. FARINELLA:  That is correct, Your Honor.

16             THE COURT:  Okay, great, those are all in evidence.

17             (Government's Exhibits 15, 16, 18, 19, 21, 23, 24,

18     25, 26, 27, 28, 29, 30 and 36 were received in evidence.)

19             MS. GEDDES:  Thank you.

20             So, I am now showing what's in evidence as

21     Government Exhibit 18.

22             (Exhibit published.)

23     BY MS. GEDDES:

24     Q    Do you recognize that individual?

25     A    I do.

Arnold - direct - Geddes                    1520

1    Q    Who is that?

2    A    I can't remember his name.

3    Q    What, if anything, did he do for the defendant?

4    A    Security, if I remember the correct person, but I can't

5    remember his name right now.

6              MS. GEDDES:   Government Exhibit 21 in evidence.

7              (Exhibit published.)

8    BY MS. GEDDES:

9    Q    Do you recognize that individual?

10   A    I do.

11   Q    Who is it?

12   A    His name was Baldy.

13   Q    What, if anything, did he do for the defendant?

14   A    He was a friend of the defendant.

15             MS. GEDDES:   Government Exhibit 19.

16             (Exhibit published.)

17   Q    Do you recognize that individual?

18   A    Yes.

19   Q    Who is it?

20   A    His name is Hardy.

21   Q    What, if anything, did he do for the defendant?

22   A    He was Rob's security.

23             MS. GEDDES:   And Government Exhibit 22.

24             (Exhibit published.)

25   Q    Do you recognize that individual?

Arnold - direct - Geddes                    1521

1   A    I do.

2   Q    Who is it?

3   A    Her name is Candy.

4   Q    Is that her true name or a nickname?

5   A    I believe that was her true name.

6   Q    And what, if anything, did Candy do for the defendant?

7   A    She was security.

8   Q    And when you identified the individuals who served as

9   security, what do you mean by that, what did they do for the

10  defendant?

11  A    They would either be the person that was sitting at the

12  gate in the call box at the house monitoring the gate, or when

13  we traveled would be part of the entourage and security,

14  performing the role of security in public.

15          MS. GEDDES:  I am showing Government Exhibit 8.

16          (Exhibit published.)

17  BY MS. GEDDES:

18  Q    Do you recognize that individual?

19  A    I do.

20  Q    Who is it?

21  A    His name is Blackie.

22  Q    What did he -- if anything, did he do for the defendant?

23  A    He was related to Mr. Kelly, and I don't know exactly

24  other than just being around in that -- in that capacity what

25  his role was.

SAM      OCR      RMR      CRR      RPR

Arnold - direct - Geddes                    1522

1    Q    How regularly was he around?

2    A    Infrequently, but around.  Like, perhaps, when we were

3    traveling.

4    Q    Traveling on tour?

5    A    Or video performances, but he was -- he was at the studio

6    in Chicago as well.

7    Q    Which studio, by the way?

8    A    Chicago Trax and Chocolate Factory.

9    Q    Government Exhibit 23, do you recognize that individual?

10            (Exhibit published.)

11   A    I do.

12   Q    Who is it?

13   A    Big John.

14   Q    What did Big John do for the defendant?

15   A    He was security.

16   Q    Over what time period?

17   A    When I started at Chicago Trax in 1998 until, I'd say,

18   sometime in 2000 maybe '7.

19   Q    And when you started at Chicago Trax in 1998, was Big

20   John performing security for defendant?

21   A    To my recollection, yes.

22            MS. GEDDES:  Government Exhibit 16.

23            (Exhibit published.)

24   BY MS. GEDDES:

25   Q    Do you recognize that individual?

SAM     OCR     RMR     CRR     RPR

1   A     I do.

2   Q     Who is it?

3   A     Joe Allen.

4   Q     What did Joe Allen do for the defendant, if anything?

5   A     He was a bus driver.

6              MS. GEDDES:  Government Exhibit 15.

7              (Exhibit published.)

8   BY MS. GEDDES:

9   Q     Do you recognize that individual?

10  A     I do.

11  Q     Who is it?

12  A     Terry Allen.

13  Q     What, if anything, did Terry Allen do for the defendant?

14  A     He was a bus driver.

15  Q     And when the defendant's bus drivers were or when you

16  were not on tour, what, if anything, did the defendant's bus

17  drivers do?

18  A     They would continue to -- to drive the bus.  The bus was

19  frequently with us, regularly with us, even when we were at

20  the house in Olympia Fields or just -- or sometimes we'd do

21  trips to the gym or movies and the bus driver would always be

22  with us.

23              So, the -- they would change in shifts, where one

24  bus driver would be driving at one point and another one would

25  come in.  There was always a bus driver around.

Arnold - direct - Geddes                    1524

1           MS. GEDDES:  Government Exhibit 36.

2           (Exhibit published.)

3   BY MS. GEDDES:

4   Q    Do you recognize that individual?

5   A    I do.

6   Q    Who is it?

7   A    Diana Copeland.

8   Q    What, if anything, did Diana Copeland do for the

9   defendant?

10  A    She was an assistant.

11          MS. GEDDES:  Government Exhibit 49.

12          (Exhibit published.)

13  Q    Who is that?

14  A    That's Ian Mereness.

15  Q    What, if anything, did he do for the defendant?

16  A    He was his audio engineer.

17  Q    Over what time period?

18  A    The entire time I worked at Chicago Trax to the time I

19  left base productions.

20  Q    So 1997 to 2011?

21  A    1998 to 2011.

22  Q    Government Exhibit 50.

23          (Exhibit published.)

24  A    Yes.

25  Q    Who is that?

                         Arnold - direct - Geddes              1525

1    A    Abel Garibaldi.

2    Q    What did he do for the defendant?

3    A    He was also an audio engineer.

4    Q    Over what time period?

5    A    I don't know when he started, but off and on -- sometime

6    in the '90s or early 2000s all the way to when I left in 2011.

7              MS. GEDDES:  Government Exhibit 24.

8              (Exhibit published.)

9    BY MS. GEDDES:

10   Q    Do you recognize that individual?

11   A    I think so.

12   Q    Who is it?

13   A    I think that's Jeff, but I can't remember Jeff's last

14   name.

15   Q    Okay.

16             MS. GEDDES:  Government Exhibit 25.

17   Q    What do you think that individual did for the defendant?

18   A    No, he was an assistant engineer and an engineer.

19   Q    Government Exhibit 25.

20             (Exhibit published.)

21   A    Yes.

22   Q    Who is that?

23   A    Ryan Sailsbery I think was his last name.

24   Q    What, if anything, did he do for the defendant?

25   A    He was a runner.

                    SAM    OCR    RMR    CRR    RPR

Arnold - direct - Geddes                          1526

1    Q    Over what time period?

2    A    2004 to I -- maybe 2008, maybe less, maybe it's 2007.

3    I'm not sure.

4              MS. GEDDES:  Government Exhibit 28.

5              (Exhibit published.)

6    BY MS. GEDDES:

7    Q    Do you recognize that individual?

8    A    I don't.

9    Q    Government Exhibit 27.

10             (Exhibit published.)

11   A    Yes.

12   Q    Who is that?

13   A    Nate Wheeler.

14   Q    What, if anything, did he do for the defendant?

15   A    He was an assistant engineer.

16   Q    Over what time period?

17   A    2001, perhaps, till maybe 2005, 2006.

18   Q    Now, earlier you testified that Ian Mereness and Abel

19   Garibaldi worked through the time that you were at Olympia

20   Fields.

21   A    Uh-hum.

22   Q    Do you know whether they continued to work for the

23   defendant?

24   A    After I left?

25   Q    Yes.

SAM     OCR     RMR     CRR     RPR

Arnold - direct - Geddes                    1527

1    A    I believe they did.

2    Q    Okay.  So, you're not saying that they left in 2011, just

3    that you left in 2011?

4    A    That's correct, I left in 2011.

5              MR. FARINELLA:  Objection, Your Honor.

6              THE COURT:  Overruled.

7    BY MS. GEDDES:

8    Q    Government Exhibit 34.

9              (Exhibit published.)

10   A    Yes.

11   Q    Who is that?

12   A    Anthony.

13   Q    What, if anything, did Anthony do for the defendant?

14   A    He was a runner.

15   Q    Over what time period?

16   A    I don't know when he started, 2005 or 2006 to maybe --

17   maybe around 2009.

18             MS. GEDDES:  And lastly, Government Exhibit 26.

19             (Exhibit published.)

20   Q    Do you recognize that individual?

21   A    I'm sorry, I misread -- I misnamed somebody earlier on.

22        This is Jeff, and Jeff's last name is Meeks.

23   Q    And what did Jeff Meeks do for the defendant?

24   A    He was an audio engineer.

25   Q    All right, so when you identified Government Exhibit 24,

Arnold - direct - Geddes                    1528

1   is that the individual you previously identified as Jeff?

2              (Exhibit published.)

3   A    That's correct, that's -- I know who that is.

4   Q    Who is that?

5   A    That's Blake.

6   Q    Do you know Blake's last name?

7   A    I think it's either -- it's *KHAY-FIN* or *KHAFF-IN* --

8   Chaffin.

9   Q    What did Blake do for the defendant?

10  A    Well, he was an assistant engineer and an engineer and a

11  technician.

12  Q    Over what time period?

13  A    '98, when I started, until before we left -- before

14  Chicago Trax became The Chocolate Factory.  So, probably 2003.

15  Q    And do you recall the hairstyle that he had when he was

16  working at Chicago Trax/The Chocolate Factory?

17  A    Blake's hairstyle?

18  Q    Yes.

19  A    No, I don't.

20  Q    Do you remember if it was short or long?

21             MR. FARINELLA:  Objection.  He said he doesn't know

22  the hairstyle.

23  A    I don't recall.

24  Q    Okay.

25             THE COURT:  Overruled.

1          MS. GEDDES:  I am showing Government Exhibit 523(a)

2   through (c).

3          With the consent of the defendant, the Government

4   offers 523(a) through (c).

5          THE COURT:  Any objection?

6          MR. FARINELLA:  No, Your Honor.

7          THE COURT:  Okay, it's in evidence.

8          (Government's Exhibit 523(a) through 523(c) was

9   received in evidence.)

10          MS. GEDDES:  I'm showing what's in evidence as

11   Government's Exhibit 523(a).

12   BY MS. GEDDES:

13   Q     Do you recognize that?

14   A     I believe that's the basketball gym in Markham.

15   Q     And 523(b)?

16   A     That's the interior of the gym in Markham.

17   Q     And finally, 523(c)?

18   A     The opposite view of the same gym.

19   Q     And where is Markham?

20   A     It's a suburb of Chicago, south westside of Chicago.

21   Q     And what, if anything, did you do with the defendant at

22   that gym in Markham that is shown in Government Exhibit 523(a)

23   through (c)?

24   A     He frequently played basketball there in the evenings, so

25   would travel to and from either the studio or from wherever to

1  go there to play basketball.

2  Q    What were your responsibilities with respect to

3  basketball?

4  A    Some -- sometimes it was my job to reach out to all the

5  people that were playing to make sure they were gonna be

6  there.

7          I would also coordinate the timing to make sure

8  everybody knew where to go.

9          I may also -- I would have also maybe driven people

10 to and from the gym or escorted guests into the gym and out.

11 Q    How far is the basketball gym in Markham to the

12 defendant's residence in Olympia Fields?

13 A    Fifteen minutes.

14 Q    By car?

15 A    By car.

16 Q    And who played basketball with the defendant?

17 A    There's -- there was a lot of people that played

18 basketball, and it rotated over many years.

19 Q    How would -- how would a team be set each night or each

20 time you played, the defendant played basketball?

21 A    I think as long as we had three people on each side, they

22 would play some sort of pickup game, but generally tried to do

23 five-on-five.

24 Q    And who would find the players for the basketball game?

25 A    Either I had a list of people to reach out to or one of

1    the guys that he played basketball with would call some

2    people.

3           It -- for the -- for the better part of the time

4    which I worked for Rob, June Bug also was responsible for

5    coordinating the basketball.

6    Q    How regularly did you coordinate basketball games for the

7    defendant?

8    A    I -- I didn't coordinate it all the time.  When I was

9    responsible for coordinating it, it would be nightly.

10   Q    Are you familiar with the Avenues Mall?

11   A    Yes.

12   Q    Where is the Avenues Mall located?

13   A    In Jacksonville.

14   Q    Florida?

15   A    Yes, Jacksonville, Florida.

16   Q    What, if anything, do you recall happening at the Avenues

17   Mall involving the defendant and a female guest?

18   A    The Avenues Mall is the mall in Jacksonville we went to

19   every time we were in town.  There was a store called Belk, I

20   think, that we parked on that side where Belk was, and there

21   would be -- guests would come in and out.  We could pull up

22   there so that the guests could go in there and go shopping, or

23   else somebody could arrive to the mall to be escorted onto the

24   bus or into the mall.

25   Q    Do you have a specific memory of an incident that

Arnold - direct - Geddes                          1532

1   happened at the Avenues Mall involving a specific female

2   guest?

3   A    There was a guest that lived in Jacksonville that was a

4   frequent visitor or traveler that came to shows or stuff.

5   Q    What was her name?

6   A    That was -- that's Alexia or Alexis.

7   Q    And you said that she was a frequent traveler.

8        What do you mean by that?

9   A    Meaning that we would -- she would be in Jacksonville.

10  She'd always be at the Jacksonville show, or else I may have

11  to -- I may have booked a flight for her to another venue or

12  else she came to Chicago.  She had been a guest in Chicago.

13  Q    Now, was one of your responsibilities during the time

14  that you worked for the defendant to arrange travel for the

15  defendant's female guests?

16  A    Yes.

17  Q    How would you do that?

18  A    At one point we had a travel management company that we

19  would book all flights through.  When we stopped booking

20  travel through them, I would book the flights on Orbitz.

21  Q    What was the name of the travel company that you used?

22  A    Preferred Travel.

23  Q    And over what time period did you arrange travel for of

24  the defendant's female guests?

25  A    I -- I don't know when it started for sure, but I

SAM     OCR     RMR     CRR     RPR

Arnold - direct - Geddes                    1533

1   probably arranged some travel while we were still at The

2   Chocolate Factory in Chicago.  So, probably around 2003, 2004.

3   Q    And did you continue to arrange travel?

4   A    Yes, off and on until 2011.

5   Q    When you stopped working for the defendant?

6   A    That's correct.

7   Q    What, if anything, would you request -- how would you --

8   how would it come to be that you were arranging travel for a

9   particular female guest?

10  A    By direction of Mr. Kelly or someone that I knew that the

11  directions came directly from him through.  So, directly or

12  indirectly from Mr. Kelly.

13  Q    What, if anything, did the defendant say that would cause

14  you to arrange travel?

15  A    He would -- he would tell me to book travel for a certain

16  person, or else I would ask.  I'd say, so and so-called to ask

17  for flights, and he would say book travel for them.

18  Q    So, did you receive communications from some of the

19  defendant's female guests looking for you to arrange travel

20  for them?

21  A    There was times in which I was asked.  Primarily, the

22  direction came from Rob to book travel for somebody.

23  Q    What, if any, information did the defendant provide when

24  he wanted you to book travel for him?

25  A    He would give me either their number to contact them or

Arnold - direct - Geddes                          1534

1    tell them that -- to expect a phone call.

2    Q    And when you arranged travel for a female guest, what, if

3    any, information would you get from that guest?

4    A    In order to book travel, I would need their name as it

5    appears on their ID and date of birth.

6    Q    Do you recall an occasion where the defendant had

7    appendicitis?

8    A    I do.

9    Q    In what city were you when that happened?

10   A    Miami.

11   Q    Do you recall why you were in Miami?

12   A    There was -- it was a Superbowl.

13   Q    Do you remember what Superbowl it was?

14   A    I do.  It was the Bears and the Colts, so it was 2000

15   and -- 2005.

16   Q    All right.  Was it the Superbowl when the Colts played

17   the Bears?

18   A    That's correct.

19   Q    Fair to say -- you look unsure, but you tell me, are you

20   sure of the date that the Superbowl occurred?

21   A    Unsure of the date, sure of the teams that participated.

22   Q    And where did the Superbowl -- where was the Superbowl

23   held?

24   A    In Miami.

25   Q    And when the defendant had appendicitis, where, if

Arnold - direct - Geddes                    1535

1   anywhere, did he go?

2   A    There was a hospital in Miami that we went to.  I don't

3   remember the name of the hospital.

4   Q    All right.  But it was in Miami, he didn't return to

5   Chicago, is that correct?

6   A    Correct, the hospital was in Miami.

7   Q    Did you travel outside of the United States with the

8   defendant?

9   A    I did.

10  Q    Where did you travel to?

11  A    We went to South Africa and Nigeria.  We went to Angola,

12  Ethiopia, Uganda, we did a European tour where we went to

13  Switzerland, Amsterdam, France, Germany, and the UK.  And the

14  last trip I took was to Gabon.

15  Q    You testified that you traveled to South Africa.

16            Do you recall when you traveled to South Africa with

17  the defendant?

18  A    We went twice.  The first time in 2009, I believe, June

19  or July.  And then for the World Cup opening ceremonies in

20  2010.

21  Q    Do you recall how long the trip to South Africa in 2009

22  was?

23  A    I'm not sure.  I believe it was two weeks.

24

25            (Continued on the following page.)

SAM     OCR     RMR     CRR     RPR

Arnold - direct - Geddes                    1536

1    DIRECT EXAMINATION

2    BY MS. GEDDES:

3    Q    Do you recall whether the defendant had a personal lawyer

4    when you were working for him?

5    A    Yes.

6    Q    What was his name?

7    A    Eddie Genson.

8    Q    Have you been to his office?

9    A    Yes.

10   Q    Where was his office located?

11   A    In Chicago, in downtown Chicago.

12   Q    Who, if anyone, have you brought to the defendant's

13   personal lawyer's office in downtown Chicago?

14   A    I brought Rob there, I brought Derrel McDavid there.  I

15   believe I brought June Brown there.  We made some frequent

16   trips there.  I'm not entirely sure everybody I would have

17   brought there.

18   Q    Fair to say there may be others that you brought to that

19   office?

20   A    Yes.

21   Q    During the time period that you worked for the defendant,

22   did you always receive the paycheck that you believed you were

23   owed?

24   A    No.

25   Q    What happened?

Arnold - direct - Geddes                    1537

1  A     Sometimes I would be fined, so money would be taken off

2  my check for errors I made or mistakes.

3  Q     Who did you understand what determined if you were fined

4  on a particular occasion?

5  A     Could you repeat the question.

6  Q     Who did you understand decided if you were going to be

7  fined on a particular occasion?

8  A     Rob.

9  Q     On how many occasions were you fined?

10  A     I'm not sure.  It was quite a few especially towards the

11  end of my tenure.

12  Q     When you say you were fined, what do you mean?

13  A     So maybe just a hundred or $200 for some mistakes towards

14  the end of my -- and in fact, the reason I ultimately left, I

15  was -- I received a paycheck that tax had been taken out but

16  the dollar amount on the check was zero dollars.

17  Q     Do you recall some of the reasons -- did you learn the

18  reasons why you'd been fined, were you told those?

19  A     Yes.

20  Q     Do you recall some of the reasons that you were told that

21  you had been fined?

22  A     For not getting -- not getting his lunch, I was fined for

23  sleeping through a call, he tried to reach out to me several

24  times and I didn't answer.  I was fined for buying a sweatband

25  for a guest.

Arnold - direct - Geddes                    1538

1    Q    What happened with the sweatband?

2    A    We were -- I was escorting a guest to the bathroom and

3    the guest asked to get a wristband, a sweatband from the shop

4    and it was right outside the merch shop so I purchased the

5    sweatband, I believe it was five or $10, didn't even think

6    anything about it, and then I got fined for that 'cause I

7    didn't ask if it was okay to purchase the wristband.

8    Q    What type of guest was it who you purchased a five to

9    10-dollar sweatband for?

10   A    It was a personal guest.

11   Q    Female?

12   A    Female, yes.

13   Q    Were there other reasons that you were told you'd been

14   fined?

15   A    I was fined for not getting the correct tour guide in

16   Disney, that was the last fine that I received.  We were all

17   fined because someone ate his donuts once.  We all had to

18   purchase donuts.  It's -- it's -- there's other menial --

19   other menial things, and it could be mistakes like not getting

20   us to a video shoot on time or not having the correct

21   destination escorts too, so it would also be not just based on

22   job performance stuff as well, but fines.

23   Q    All right.  But it sounds -- are you drawing a

24   distinction where there were some fines when it was related to

25   your job performance for the defendant and sometimes where it

Arnold - direct - Geddes                    1539

1  seemed more menial than that?

2  A    That's correct.

3  Q    Do you recall other -- any other -- do you recall being

4  fined for purported infractions related to the defendant's

5  female guests, aside from the one that you just described

6  involving the sweatband?

7  A    I can't recall a specific instance, but I'm sure I was.

8  Q    When did you stop working for the defendant?

9  A    October 2011.

10 Q    And why did you stop working for the defendant?

11 A    We had a very busy day of driving, we went to two after

12 parties on two different sides of Florida in the same night

13 and on the way back to the hotel after both club appearances I

14 had -- I insisted that I needed to ride in the car and

15 somebody else was going to have to drive because I was going

16 to fall asleep, and I was woken up on the side of road as the

17 person that was driving they fell asleep and almost drove off

18 the road.  We got back to the hotel to put everybody into the

19 hotel room and my wife called me before I go to sleep and said

20 we received a paycheck and it was for zero dollars.  And my --

21 that I had been fined for my whole week's paycheck, but Uncle

22 Sam received their money.

23        I realized at that moment that my wife wasn't happy,

24 I wasn't happy and Rob wasn't happy and so therefore there was

25 no point for me to continue working for him anymore.

Arnold - direct - Geddes                    1540

1   Q    You said that you had been fined and I think you

2   testified earlier that -- well, did you learn why you had been

3   fined on that final paycheck?

4   A    Yes.  I was instructed to get Walt Disney set up for him

5   with a hotel room and a tour guide and to have the whole

6   experience set up.  It was --

7   Q    When you said that you were instructed to have the whole

8   experience set up for him, who is the "him" in that sentence?

9   A    Rob asked me to set up the tour guide and the hotel.  It

10  was very last minute.  I chose to get the hotel room set up

11  first, hotel room and rooms set up for everybody, and once

12  that was confirmed and I knew I could actually get the hotel

13  rooms, I was paying in cash and I wasn't sure if that would be

14  allowed or not; it was.  I was able to get the room secured.

15  I called up to ask for a tour guide to escort us around for

16  the -- for the park and there was nobody that was available,

17  and so they had to ask for someone to volunteer to either

18  leave their current assignment or come in off hours to

19  actually tour -- to escort him --

20  Q    Let me stop you for a moment.  What, if any,

21  understanding did you have regarding the qualifications for a

22  tour guide?

23  A    It needed to be a woman.

24  Q    Why is that?

25  A    His request was that it always be a female tour guide.

Arnold - direct - Geddes                    1541

1    Q    Who is the "his" in that sentence?

2    A    Rob.

3    Q    Who did you understand was going to be accompanying the

4    defendant on this tour at Disney?

5    A    It would have been Rob, some security, myself, there

6    could have been other members of the traveling party, and

7    female guests.

8    Q    Were you able to find a female to serve as a tour guide

9    for the defendant?

10   A    In this instance I was not.

11   Q    What did you do?

12   A    He was on his way to Disney so I took the first person I

13   could get, it was a gentleman who was there to greet us as the

14   bus pulled up.  I did not notify Mr. Kelly that this person

15   was -- that there was going to be a guy, and we pulled up, he

16   realized it was a gentleman and we canceled the VIP

17   experience.

18   Q    So was there a tour that day?  Did the defendant go on a

19   tour that day?

20   A    No, we did not.

21   Q    And what was the consequence for having secured a male

22   tour guide instead of a female tour guide?

23   A    For not having the correct tour guide and not

24   communicating it, was a week's pay.

25   Q    How much was a week's pay at that time?

Arnold - direct - Geddes                    1542

1   A    I believe it was 1500.

2              MS. GEDDES:  One moment.

3              Nothing further.

4              THE COURT:  I know it's a little early for our

5   morning break, but I think it makes sense to take the break

6   now.  So we'll be in recess for about 10 minutes.

7              Please don't talk about the case at all, but enjoy

8   the break.  I'll see you in a few minutes.

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury exits courtroom.)

11             THE COURT:  Everybody can have a seat and the

12  witness can step out.  We'll see you in a few minutes.

13             (Witness steps down.)

14             THE COURT:  Anything before we break?  All right,

15  see you in a few minutes.

16             (Recess.)

17             (In open court; jury not present.)

18             THE COURTROOM DEPUTY:  All rise.

19             THE COURT:  I think we should probably get the

20  witness.

21             MS. SHIHATA:  Your Honor, there is one matter I

22  wanted to just make your Honor aware of.  The witness

23  following this witness is a witness who will have a lawyer

24  present --

25             THE COURT:  Okay.

Proceedings                                    1543

1          MS. SHIHATA:  -- and so we may just need like a tiny
2    short break to logistically work that out.
3          THE COURT:  That's fine.
4          I have another question for you, I take it you have
5    a number of experts; is that correct?
6          MS. GEDDES:  We have three experts, three more
7    experts.
8          THE COURT:  One will be the DNA.
9          MS. GEDDES:  Yes, then --
10         THE COURT:  What's just the general area of
11   expertise of the other two --
12         MS. GEDDES:  The other --
13         THE COURT:  -- so I can be thinking about it.
14         MS. GEDDES:  Yes.  One will testify about trauma
15   bonding and some of the experiences -- some of how the
16   experiences the witnesses' testified might affect somebody,
17   and another will testify about herpes.
18         THE COURT:  All right, thanks so much.  Go ahead.
19         MR. CANNICK:  May we inquire who is the witness who
20   has the attorney.
21         THE COURT:  Can you stop trying to drive me insane
22   and turn on your microphone.
23         MR. CANNICK:  May we inquire as who the witness --
24         MS. SHIHATA:  Certain of the victim witnesses --
25         THE COURT:  Is this John Doe Number One?

Proceedings                                          1544

1          MS. SHIHATA:  No.  This is -- yes, she'll be

2    testifying as Stephanie, which is her first name only.

3          MR. CANNICK:  Okay.

4          THE COURT:  All right.

5          MS. CRUZ MELENDEZ:  The victim witness who will be

6    testifying as Addie will also have a lawyer present.

7          THE COURT:  Okay.

8          MR. CANNICK:  Are there any pending charges or any

9    *Giglio* materials that we missed?

10         MS. SHIHATA:  It's unrelated to criminal charges.

11   It's because they are victims and we made a request to the

12   Court to allow them since the courtroom is not how it's

13   usually configured for the pandemic to allow them to have

14   their attorneys present given the nature of the testimony and

15   so forth.

16         MR. CANNICK:  I just wanted to make sure I wasn't

17   missing anything.

18         THE COURT:  You never are.  All right, thanks so

19   much.

20         Let's get the jury please.  Thanks.

21         (Jury enters courtroom.)

22         THE COURTROOM DEPUTY:  You may be seated.

23         THE COURT:  All right, everybody we're ready to

24   continue with the cross-examination of the witness.

25         Go ahead, Mr. Farinella.

GEORGETTE K. BETTS, RPR, FCRR, CCR

1          MR. FARINELLA:  Thank you, your Honor.

2          THE COURTROOM DEPUTY:  The witness is reminded he is

3    still under oath.

4          THE WITNESS:  Yes.

5    CROSS EXAMINATION

6    BY MR. FARINELLA:

7    Q    Good morning --

8    A    Good morning.

9    Q    -- Mr. Arnold.

10         So let's start back to your education.  Isn't it a

11   fact that you said that you went -- essentially received a

12   certificate for engineering from a university in Arizona,

13   correct?

14   A    It wasn't a university it was like a, almost like a trade

15   school just specifically for audio engineering and studios and

16   for live sound.

17   Q    Okay.  And so as a result of that experience you were

18   then -- you I guess offered or received an internship at

19   Chicago Trax, right?

20   A    I applied for the internship.

21   Q    And at the time Chicago Trax had no relation to

22   Mr. Kelly, correct?

23   A    R. Kelly was a customer, booked studio time at Chicago

24   Trax.

25   Q    But they were separate and distinct?

1  A    Yes.

2  Q    Chicago Trax didn't advertise that you can get this

3  internship with us and work with R. Kelly or anything like

4  that, right?

5  A    That's correct.

6  Q    All right.  So when -- when you were intern -- when did

7  your internship end?

8  A    It was a four-month internship.  I started picking up

9  phone shifts, answering calls for Chicago Trax within the

10  first month or so just to make money.  Before I was hired on

11  as the assistant to the chief engineer, probably about four,

12  five months into my time at Chicago Trax.

13  Q    And so when you were eventually hired, who were you hired

14  by?

15  A    The chief engineer.

16  Q    At Chicago Trax?

17  A    At Chicago Trax.

18  Q    Do you remember his name?

19  A    Yes, it was Chris Steinmetz.

20  Q    And so how long was it before you transitioned from

21  Chicago Trax to working for Mr. Kelly?

22  A    So that would have been around 19 -- January 1999,

23  December 1999 was when I started working at Chicago Trax as

24  the assistant to the head engineer.  I started working

25  directly for Bass Productions in 2003.

Arnold - cross - Mr. Farinella          1547

1   Q     So it was in about I believe you said March of 2003 that

2   you exclusively worked for Mr. Kelly?

3   A     That's correct.

4   Q     And the entity's name that you were working for or hired

5   by I should say?

6   A     Yes.  Bass Productions.

7             THE COURTROOM DEPUTY:  Sorry, they can't hear you in

8   overflow, Mr. Farinella, your mic.

9             THE COURT:  It might just be where you have the mic

10  positioned.

11            MR. FARINELLA:  I don't know if I can get it closer

12  to my mouth.

13            THE COURT:  Just slow down a little bit too.

14            MR. FARINELLA:  Yes, I'm a fast talker.  So is that

15  better?  No.

16            THE COURT:  I think so.

17            MR. FARINELLA:  I don't know why --

18            THE COURT:  I mean, the other option, if you like,

19  is just to use the standing mic if you're not a walker.

20            MR. FARINELLA:  I'm not a walker, no.

21            THE COURT:  You might just want to use the

22  microphone, it might be better.  Let's see if that's a little

23  easier.

24            MR. FARINELLA:  I apologize, your Honor, I will

25  try --

1          THE COURT:  That's okay, whatever works, take your

2   time.

3          MR. FARINELLA:  Is that better?

4          THE COURT:  That's good.

5          MR. FARINELLA:  All right.  So I'm going to sit here

6   like this.  All right.  I will do my best.  Thank you, your

7   Honor.

8   Q    So in 2003, when you were hired by Mr. Kelly, isn't it

9   true that you were hired by his manager?

10  A    I was hired by Derrel McDavid.

11  Q    And what -- and you had testified yesterday that your

12  initial duties were -- were errands and assisting with the --

13  assisting the engineers at the studio, right?

14         THE COURT:  I think we lost you again.

15         MR. FARINELLA:  How is that?

16         THE COURT:  That's perfect.

17         MR. FARINELLA:  How is that?  Is that better?

18         THE COURT:  Good, good, good.

19         MR. FARINELLA:  If you could please repeat the

20  question back.

21         (Record read.)

22  A    Yes.  In addition to that getting petty cash and

23  answering phones and making sure that there was a runner and

24  phone person staffed.  And managed the building for any, if

25  there was any maintenance that needed to be done on the

Arnold - cross - Mr. Farinella                    1549

1  facility.

2  Q    And both yesterday and today you mentioned the term

3  "runner," right?

4  A    Yes.

5  Q    And you said these runners would go out and get food for

6  people, correct?

7  A    Yes.

8  Q    And isn't it a fact that the runners or personal

9  assistants are commonplace in the entertainment industry, or

10 more specifically the music industry?

11 A    In the studio industry there would always be an intern or

12 runner available at a studio, a recording studio.  I can know

13 that from other studios that I worked at.  I've only ever

14 worked for one celebrity so I can't speak on what it's like

15 for other celebrities.

16 Q    But it didn't seem uncommon, correct?

17         MS. GEDDES:  Objection.

18         THE COURT:  Overruled.

19         Do you have any basis for claiming -- or for stating

20 whether it's common or not?

21         THE WITNESS:  No.

22         THE COURT:  Next question.

23 BY MR. FARINELLA:

24 Q    So you had testified yesterday that if someone came to

25 the studio or the gate you notified Mr. Kelly, correct?

Arnold - cross - Mr. Farinella                1550

1    A    Did you say I would notify Mr. Kelly?  I couldn't hear
2    you.
3    Q    Yes.
4    A    Yes, I would notify Mr. Kelly.
5    Q    And this is -- this was during the time period where
6    Mr. Kelly had already achieved some success, correct?
7    A    Yes.
8    Q    And Mr. Kelly achieved some level of notoriety, right?
9    A    Yes.
10   Q    And so it started to become overwhelming in terms of the
11   general public wanting access to Mr. Kelly, right?
12                MS. GEDDES:  Objection.
13                THE COURT:  Sustained as to form.
14                Did his increasing success have any effect on the
15   nature of the work that you did, and if you can't answer the
16   question just you can say that.
17                THE WITNESS:  Yeah, I don't know.
18   Q    Well, you would agree that it affected Mr. Kelly's public
19   exposure more so than when he wasn't as popular, right?
20   A    As long as I've known him he's been famous, hugely
21   famous.
22   Q    So when you say famous, you mean he's known both
23   nationally and internationally, correct?
24   A    Yes.
25   Q    And as someone who is working for someone who's famous,

GEORGETTE K. BETTS, RPR, FCRR, CCR

Arnold - cross - Mr. Farinella          1551

1  your job duties become a little more difficult because of that

2  fame, correct?

3  A    I don't know if I would say they're more difficult.  They

4  were -- to me they always were difficult, it was always the

5  same.

6  Q    So when you would meet someone at the gate did you think

7  it was unusual?

8  A    No, it was common.

9  Q    Right.  So it made sense to you that somebody of

10 Mr. Kelly's fame had basic security measures in place, right?

11 I mean --

12            MS. GEDDES:  Objection.

13            THE COURT:  Overruled.

14            Did that make sense to you?

15            THE WITNESS:  To -- to expect that there would be

16 security in place or a separation between the celebrity and

17 the public seems logical to me.

18 Q    Isn't it a fact that Mr. Kelly worked long hours at the

19 studio?

20 A    Yes.

21 Q    Okay.  And yesterday and I believe even today you said

22 one of your job responsibilities was to ensure that the

23 refrigerator in the studio and the refrigerator in the tour

24 bus was stocked, right?

25 A    Not just specifically the refrigerator, all -- like any

Arnold - cross - Mr. Farinella          1552

1  supplies were required to be stocked for the bus which would

2  include food.

3  Q    So is it fair to say that while you were employed by

4  Mr. Kelly fulfilling this responsibility, those -- that

5  responsibility was always taken care of, correct?

6  A    I can't speak for all the time.  When it was my

7  responsibility to purchase supplies or to do an inventory of

8  supplies at Chicago Trax, yes, I would make sure that all the

9  supplies were purchased and food was on that list of supplies.

10 Q    And so when it was yours -- at any given point in time of

11 your employment when it was your specific responsibility to

12 ensure that the bus and -- the tour bus and the studio that

13 food was replaced you went and did that, right?

14 A    I myself would or the task would be assigned to another

15 assistant or runner or somebody else that was working --

16 Q    Right, but you made sure that got done, correct?

17 A    Yes.

18 Q    Okay.  And isn't it a fact that you can't remember a time

19 when that wasn't done, right?

20        THE COURT:  What, food getting stocked?

21 Q    Ensuring that the refrigerators on the bus and the studio

22 were properly stocked?

23 A    Yeah, I -- I wasn't there all the time, I can't speak to

24 when I wasn't around.

25 Q    Well, isn't it true you had a number of interviews with

Arnold - cross - Mr. Farinella                1553

1    the government regarding this case, right?

2    A    Yes.

3    Q    Okay.  In one of those interviews you said that you also

4    worked very long hours, right?

5    A    I did work long hours, yes.

6    Q    And I'm assuming that those long hours were at the

7    studio, correct?

8    A    In the Chicago Trax days and the Chocolate Factory days

9    on Larrabee it would have been in the studio.  Most of the

10   time then was started out 9 to 5, so normal business hours,

11   but still would voluntarily be there very late for the Chicago

12   Trax days.  The Chocolate Factory days quite frequently were

13   12-hour shifts often without weekends off.  The Chocolate

14   Factory after that became a lot more 24-hour shifts.

15   Q    So -- thank you.  So going back to Mr. Kelly and the

16   success he had in the music business, it's also true that

17   Mr. Kelly would have people in the music business who were

18   just as famous as him come to the studios, correct?

19   A    There was instances where other celebrities came to the

20   study, yes.

21   Q    Do you remember those instances?

22   A    A few of them, yes.

23   Q    And can you please tell me who -- or tell us who those

24   people were?

25   A    Sure.  Over the duration of the time I worked with him or

Arnold - cross - Mr. Farinella                    1554

1  just a specific time?

2  Q    Well, when you were working at the studio, so over the

3  course of your time with Mr. Kelly is sufficient.

4  A    Okay.  Jay-Z and Puff Daddy came in.

5  Q    We'll go one at time.  When Jay-Z or Puff Daddy came in,

6  did they have a security team?

7  A    Yes.

8  Q    Did they have a lot of people with them?

9  A    Yes.

10  Q    So it wasn't three or four people, right, it's more like

11  10, 12, 15, 20 people, correct?

12  A    I -- I'm not sure.  More than three people I would say

13  would be safe to say.

14  Q    More than five people?

15  A    Yes, in both of these instances, yes.

16  Q    Ten, up to 10 people maybe?

17  A    Not necessarily, but I can't be a hundred percent sure.

18  Q    How many vehicles did they pull up in?

19  A    I don't recall for sure.

20  Q    So would they travel in a -- do you recall if they

21  traveled in vans or Suburbans or limousines or --

22  A    Yeah.

23  Q    Do you recall the mode of travel that they used?

24  A    For Puff Daddy I remember it being like a turtle top type

25  van, like a black van that pulled into the gate.  There may

1   have been an additional SUV, but I don't recall for sure.

2   Q    And so when they pulled up -- forgive me one second.

3   Let's do this.  Let's go back to the government's exhibit.  So

4   I'm going to refer you to Government Exhibit -- I'm referring

5   you to what has been admitted as Government Exhibit 525.

6             Do you remember seeing this?

7   A    Yes.

8   Q    And you said that this is where guests would come?

9   A    Yes, that's the entrance to the parking lot at the studio

10  on Larrabee.

11  Q    When guests would come, in this particular instance Jay-Z

12  or Puff Daddy's, I guess how would you say it, entourage, if

13  you will, they would come through this gate, right?

14  A    Correct, into the studio.

15  Q    How would -- where would the cars be?

16  A    Oftentimes pulled -- the main vehicle that had somebody

17  would pull up right up to the front right by the main door

18  where that -- on the other picture there was a light up sign

19  that said Trax, that's where somebody would pull up unless

20  Mr. Kelly's car was already parked there, then they would park

21  in the parking lot.  There was parking spots along the side of

22  the building, all along -- well, you can see there's quite a

23  lot of spots inside the lot.

24  Q    Right.  So wouldn't it be the ordinary course that they

25  would actually park in that lot, right?

Arnold - cross - Mr. Farinella                1556

1  A    Yes.  But there also could be -- there'd also be cars

2  parked on the street possibly.  If there was a large amounts

3  of vehicles.  I wouldn't know.

4  Q    Sure.  On a whole it was likely that Jay-Z or Puff Daddy,

5  their main vehicle or vehicles would be in the lot, right?

6  A    Correct.

7  Q    And so you see that the lot there has some barbed wire at

8  the top, right?

9  A    Yes.

10 Q    So there's a need for a secured lot there, right?

11 A    Yes.

12 Q    And so going back to the secured lot, when Puff Daddy and

13 Jay-Z weren't there with their vehicles and people, the studio

14 was also in a, what you would say, a rough neighborhood,

15 correct?

16 A    Yes.

17 Q    So that was also there to ensure that the studio was

18 protected because it had millions of dollars in recording

19 equipment and things of that nature in there, right?

20 A    At the time the studio was built it was -- it was a

21 difficult --

22 Q    Right.  So in your mind that was a totally reasonable

23 security measure, right?

24       MS. GEDDES:  Objection.

25       THE COURT:  Well, first of all, you always have to

Arnold - cross - Mr. Farinella                1557

1   let the witness finish his answer.  I don't know, did you

2   think -- what are we talking about as a reasonable security

3   measure, having barbed wire?

4           MR. FARINELLA:  Yes.

5           THE COURT:  Any question about that?

6           THE WITNESS:  I never thought it was strange.

7   BY MR. FARINELLA:

8   Q    Did you think it was unreasonable that guests could come

9   and park in a secured lot?

10  A    No.

11  Q    So we were on Jay-Z and Puff Daddy, who is the next

12  person that you remember coming to the studio?

13  A    Shaquille O'Neal.

14  Q    What was that like?

15  A    He came with -- it was a smaller group, he had an

16  assistant and he came with another -- another Chicago rapper

17  named Twista who had a few people with him.  There was

18  probably another --

19  Q    You said -- I'm sorry, Twista?

20  A    Yes.

21  Q    And he was a rapper?

22  A    Yes.

23  Q    So Shaquille O'Neal and Twista.  How many people with

24  Shaquille O'Neal, about five?

25  A    That sounds about right.  Though I'm not sure and tell

Arnold - cross - Mr. Farinella                1558

1   you whether they actually came to work with Mr. Kelly or

2   whether they came to work at Chicago Trax but that was another

3   celebrity that came through.

4   Q    And Twista, how many people did Twista have?

5   A    I don't recall, it could have been another four or five

6   people too.

7   Q    Although it may not seem Mr. O'Neal needs security, did

8   he have security with him?

9   A    He probably had one individual with him.

10  Q    What about Twista?

11  A    Probably had one individual also.

12  Q    So do you recall the cars that they arrived in?

13  A    I don't in this scenario, no.

14  Q    But it was probably likely they parked in the secured

15  lot, right?

16  A    They would have parked in the lot.

17  Q    And they were -- they probably arrived in something like

18  you had described Mr. Kelly driving a Maybach or maybe a

19  Suburban, something along those lines?

20         MS. GEDDES:  Objection.

21         THE COURT:  Sustained as to form.

22         Do you have any recollection of the kind of vehicles

23  that these various people would arrive in when they came to

24  the studio?

25         THE WITNESS:  I'm fine to answer generally that it

Arnold - cross - Mr. Farinella          1559

1  would be probably a rental vehicle or like a limousine service

2  a car service.

3          THE COURT:  Okay, next question.

4  BY MR. FARINELLA:

5  Q    And so do you recall anyone else other than Jay-Z, Puff

6  Daddy, Twista and Shaquille O'Neal?

7  A    Yeah, I'm sure -- well, over the long time which I worked

8  for him, Whitney Houston was a -- had come into work in the

9  studio with him as well.

10  Q    Right.  So Whitney Houston arrived at the studio and she

11  had security detail, correct?

12  A    Yeah, like one or two people were with her.

13  Q    She arrived in a vehicle that was probably parked in the

14  secured lot, right?

15  A    Yes.  Yeah, actually that might have been at Olympia

16  Fields that she actually came by, but yes --

17  Q    Okay.  Same thing though, I mean, right?

18  A    Yes.

19          THE COURT:  I'm sorry, can I just ask, is it fair to

20  say that whenever somebody would come to visit or to record

21  and the person was famous, is it fair to say that they brought

22  other people with them?

23          THE WITNESS:  Yes.

24          THE COURT:  All right.  Can you just give an

25  estimate, whoever the person is, what the range of people they

Arnold - cross - Mr. Farinella            1560

1   would bring with them was?

2          THE WITNESS:  Sure, sure.  It could be as small as

3   two people because they brought one security guard or

4   assistant or their own engineer.  And there was instances

5   where there would be a community, you know, 10, 15 people.

6   Not just necessarily celebrities to the caliber of Mr. Kelly,

7   but local celebrities as well could bring an entourage.  It

8   always varied.

9          But I would just like to say that, depending on the

10  circumstances if someone is there for an appearance there

11  would be more and if someone's there just to do a recording

12  session, there could be less.

13         THE COURT:  I see.

14         THE WITNESS:  That would be the distinction.

15         THE COURT:  Okay.  Next question.

16         MR. FARINELLA:  Thank you, your Honor.

17  Q    With that being said, I know that you had mentioned some

18  job titles, but these celebrities would bring -- or they could

19  bring sometimes a hairstylist, right?  Or a manager, right?  A

20  personal assistant that did there wardrobe, right?

21  A    Yes, yes.

22  Q    And personal assistants that went and did the same

23  activities that runners do for Mr. Kelly, right?

24  A    Yes.

25  Q    Like get food and get coffee, right?

GEORGETTE K. BETTS, RPR, FCRR, CCR

1  A    Not necessarily, we would have done that, yes --

2  Q    Okay.

3            THE COURT:  Let him finish the answer.  Let him

4  finish the answer.

5  A    We'd have done that as a mechanism of the studio.  It

6  would be -- the expectation would be there would be somebody

7  at a studio that would always be able to take care of getting

8  food and things like that.

9  Q    So there was a definite need to ensure that there was a

10  runner that could fulfill those responsibilities, right?

11  A    We always had somebody at Chicago Trax and at the

12  Chocolate Factory.

13  Q    And I think you had said that there was a distinction

14  between a planned event versus an unplanned event, right?  Or

15  no event planned, right?

16  A    I'm sorry, in terms of?

17  Q    So let me rephrase.  So I think you had said that the

18  range of people that would be at the studio varied as to

19  whether it was a planned event where that -- or a planned

20  appearance I believe you said, I'm sorry, right?  So if

21  Whitney Houston is coming to sing as an appearance, it would

22  draw many, many people outside of the inner circle of the

23  person, right?

24  A    Correct.  And in an instance where someone is coming into

25  record a simple vocal, the entourage or the traveling party

1   could be very, very minimal.

2   Q    But that person would have their own people and it would

3   be -- generally it's more than one, right?

4   A    Yes, I would say so.

5   Q    And so with that being said, when they arrived didn't --

6   didn't -- I think you -- I believe you said that you would

7   notify Mr. Kelly when these guests arrived, right?

8   A    I would be notified if somebody was to be -- if we're to

9   expect somebody to open the gate for somebody we'd be notified

10  of who they were, but any time anybody was coming and if it

11  was a scheduled booking when it was Chicago Trax as the

12  studio -- when I was the studio manager I would know who was

13  expected to come that day.

14  Q    And there might be even, you know, some tendency for that

15  information to get out and maybe it could draw a crowd, right,

16  outside the studio just wanting to see the person?

17  A    Yeah, I would say that if -- if it was published that a

18  celebrity was going to be at our recording studio, it would

19  have drawn a crowd in some instances.

20  Q    So if --

21       THE COURT:  Can I just ask you if you remember that

22  happening?

23       THE WITNESS:  I do.

24       THE COURT:  Okay.  Go ahead.

25  Q    And so was that something that was common?

Arnold - cross - Mr. Farinella                1563

1   A    Was it common for it to be publicized that somebody was

2   going to be at the studio?

3   Q    Yes.

4   A    It happened -- it happened frequently, but it wasn't -- I

5   would say it was common.

6   Q    So there on any given occasion there could be anywhere

7   from 10 to a hundred people, you know, unexpected, right?

8           THE COURT:  Where?

9           MR. FARINELLA:  Let me rephrase.

10          THE COURT:  Okay.

11  Q    So let me follow up.  So that's what you meant by a

12  planned appearance, right, a scheduled appearance coming to

13  the studio to record, right?

14  A    The public was more I would say there would be a larger

15  group of people appearing for a publicized appearance or --

16  yeah, but a scheduled appearance would be common for an artist

17  to know that the artist is coming, but in terms of it being

18  open and there to be public knowledge would be the difference

19  between whether there would be a larger security detail in

20  terms of entourage or people that were with him, would

21  determine the nature -- I would say that the nature of the

22  reason for them being at the studio would determine how many

23  other people were there for the event.

24  Q    Right.

25  A    I'm sorry, if that made --

Arnold - cross - Mr. Farinella                1564

1  Q    I'm following.  So I think what you're saying -- or even

2  the degree their celebrity, right, so would affect that as

3  well?

4             MS. GEDDES:  Objection.

5             THE COURT:  Sustained as to form.

6  Q    So the degree of celebrity meaning, if when Whitney

7  Houston came she necessarily wasn't as -- you know, as famous

8  as Michael Jackson or Prince, right?

9             THE COURT:  I'm going to sustain.  I mean, that's a

10  matter of taste.

11             MR. FARINELLA:  Well, your Honor --

12             THE COURT:  So let's put a different question to the

13  witness.

14  Q    So there are more famous people who would come to the

15  studio and they generally had larger, larger people -- I'm

16  sorry, a larger entourage, right?

17             MS. GEDDES:  Objection.

18             THE COURT:  Is that true -- I think the difficulty

19  is defining who is more famous.  But let's ask this, is it

20  fair to say that certain people had larger groups with them

21  than others?

22             THE WITNESS:  Absolutely.

23             THE COURT:  Next question.

24  BY MR. FARINELLA:

25  Q    What about if they -- if they perform a certain genre of

Arnold - cross - Mr. Farinella                1565

1    music, did that affect the amount of people that traveled with

2    them or not?

3                MS. GEDDES:  Objection.

4                THE COURT:  Are you able to say that?

5                THE WITNESS:  Yeah, I'm not sure that actually the

6    genre of music makes the difference.

7    Q    Okay, thank you.

8                So when they arrived, they would see you first,

9    right?  You'd be the first face that they would -- or the

10   first person they would encounter?

11               MS. GEDDES:  Objection just as to the form.

12   Q    Isn't it true that you were the first person to greet the

13   guests when they arrived -- when they came actually inside the

14   studio?

15   A    I, myself, was not -- I am not necessarily the first

16   person.  If I was the person responsible for opening the gate

17   or in the reception, serving that duty I would be the first

18   person that they would see.

19   Q    So that job responsibility, it's fair to say, rotated as

20   to who was -- rotated as to who was working during a given

21   time period the person was there, right?

22   A    Correct.

23   Q    And so somebody, you know, a famous person or any --

24   let's just say anybody that's a professional guest of

25   Mr. Kelly's arrives, they're greeted by somebody initially,

1    correct?

2    A    Correct.

3    Q    And so after that they're taken to the music lounge,

4    correct?

5    A    To the lounge or the studio to wherever they need to be.

6    Q    Right.  And they are escorted because many of these

7    people don't know where they -- where to go within the studio,

8    correct?

9    A    Yeah, they would not have been to the building or know

10   which room they were to be recording in.

11   Q    They would need -- and that goes for professional or not

12   professional, right.  If Mr. Kelly was just having a regular

13   guest come and they weren't familiar with the studio, he

14   wouldn't want them wandering around the studio aimlessly,

15   right?

16           MS. GEDDES:  Objection.

17           THE COURT:  Overruled.  Is that one of the reasons?

18           THE WITNESS:  Repeat the question, please.

19   Q    Whether it was a professional guest or a personal guest,

20   they arrived to the studio, I believe you said they don't know

21   where to go or where anything is, right?

22   A    Yes.

23   Q    So they would generally -- they generally they need an

24   escort to get to and from wherever they're going, correct?

25   A    Correct.          (Continued on the next page.)

1      MR. FARINELLA:  Is that better?

2      THE COURT:  You're doing fine.  We can hear you.

3  BY MR. FARINELLA:  (Continuing)

4  Q    Okay.  Mr. Arnold.  I'm showing you what has been entered

5  as Government Exhibit 235.  Do you remember this from

6  yesterday?

7  A    Yes.

8  Q    I'm going to turn it over and direct your attention to

9  the center here or the right side of the diagram.  Right?  So

10  here is labeled Music I studio area, right?

11  A    Yes.

12  Q    And I believe you said yesterday that this is Mr. Kelly's

13  main studio where he recorded, right?

14  A    Yes.

15  Q    And so with that being said, if you go to the back of the

16  wall or over to the next area, it's called the control room,

17  Music I control room, right?

18  A    Yes.

19  Q    And now what I don't think you said yesterday is that

20  aren't these two rooms connected?

21  A    There's a, a window between the two rooms but you can't

22  pass directly from the control room into the studio area

23  without going out to the hallways on either side.

24  Q    No, but so as an engineer, where would you sit?

25  A    The engineer would sit in the Music I control room where

1    the words are actually written.

2    Q    Okay.  And would there be anybody else in the control

3    room other than the engineer?

4    A    Yes.  There could be -- there would be -- where that

5    square is below it, that would be sort of an island that has

6    lots of gear in it.

7    Q    So right there?  (Indicating)

8    A    Yes.

9         On the other side -- if you just move your pen a

10   little further down -- there would be a couch back there and

11   there would be some chairs, there would be keyboards and

12   equipment on top of the console and people would be able to

13   work there to perform and they, and work from there as well.

14   Q    Okay.  So just to be clear, so at any given time, when

15   Mr. Kelly is in the studio recording, Music I, is it safe to

16   say there would be more, more than three people in the control

17   room?

18   A    There could be times where there's more than three.

19   Q    Okay.  More than five?

20   A    There could be.

21   Q    And they all serve specific functions, right?

22   A    In regards to there being more than five people?

23   Q    Well, let me rephrase.

24        You said earlier that there's a box here where they

25   may be, they may be accessed.  In order for this to function,

1  a control room in conjunction with the recording studio, you

2  mean other engineers than the main engineer, right?

3  A    It's quite common there would be one engineer and an

4  assistant engineer, correct.

5  Q    And let's just say somebody that Mr. Kelly was

6  collaborating with, were they, on any given occasion, where

7  would they be, they would be in Music I with him?

8  A    They could be in the control room with him to do the work

9  or else, if they were recording the vocals or a band or choir

10 or larger group, they would be in the Music I studio area, the

11 live room.

12 Q    And isn't it accurate and fair to say that if there was

13 collaboration, if Mr. Kelly was collaborating, that person who

14 came to collaborate with Mr. Kelly would also have people with

15 him or her?

16 A    That's fair to say.

17 Q    And assistants and runners or, you know, managers, those

18 types of people, right?

19 A    They could.

20 Q    They search specific functions for the person that was

21 there?

22 A    I, I don't know for sure.

23 Q    I'm saying on most, on most occasions where the artist

24 was collaborating with Mr. Kelly.  If they were there working,

25 they got, they had people there who assisted them in their

Arnold - cross - Farinella            1570

1  work, correct?

2  A    I can't speak to what everybody would be there for.  What

3  I can say is that when I traveled with Mr. Kelly, and if I was

4  in the studio, it would be because I was functioning as part

5  of his, his team, people that were working for him.  My

6  perception would be that when other artists came and brought

7  people, they would be a part of their team as well though I

8  don't know their jobs or their specific roles.

9  Q    Thank you.

10        Music I, the studio area, it seems to be a large

11  area, right?

12  A    The Music I studio area?

13  Q    Right.

14  A    Yes.

15  Q    And the Music I studio area had obviously in there a

16  microphone, correct?

17  A    Yes, it had many.

18  Q    How many would you say there were?

19  A    There was jacks on the wall to plug in microphones.  You

20  could have 30, 40 if needed.

21  Q    Was there anything else in Music I?

22  A    Sure.  There would be -- there was often a grand piano in

23  there, like a rolling baffles, these tall absorbent structures

24  that could go behind the person to isolate the sound.  It was

25  very common to have it set up as a vocal area with the baffles

Arnold - cross - Farinella                1571

1    behind and then a microphone in front.  Maybe there would be a

2    couple of chairs, a stool, maybe some other microphones and

3    other gear in there.

4    Q    Okay.  So Mister -- and Mr. Kelly -- I'm sorry.

5         Mr. Kelly played the piano obviously, right?

6    A    Yes.

7    Q    And there were occasions when there were people that were

8    working with Mr. Kelly that played the piano and Mr. Kelly

9    sang, right?

10   A    Yes.

11   Q    And so just to be clear, by the way, the two rooms, you

12   said there's a window, right?

13   A    Yes.

14   Q    Okay.  Are you familiar with what an IFB mic is?

15   A    No.

16   Q    Okay.  So there's a microphone in the control room and,

17   so that the engineer can communicate to the person in Music I,

18   right?

19   A    Correct.

20   Q    So they can go back and forth, correct?

21   A    Correct.

22   Q    And they can communicate?

23   A    Yes.

24   Q    Now, this was a recording studio, obviously, right?

25   A    Yes.

Arnold - cross - Farinella          1572

1  Q    And with a recording studio while you were recording

2  music, the only way to do it is to have absolute silence,

3  correct?

4  A    That would be the preference.

5  Q    Right.  So these rooms were soundproofed for that

6  purpose?

7  A    Correct.

8  Q    Now, in the event Mr. Kelly is working in Music I in the

9  studio area, Mr. Kelly would have to use -- and he needed to

10 use the restroom, he would have to get to, have to leave the

11 studio and go to the back to the restrooms, right?

12 A    Correct.

13 Q    So was it the same for Studio II?

14             THE COURT:  I hear the question.

15 Q    I said am I, when Mr. Kelly was working in Studio I, he

16 was doing -- I'll say he was doing so for long hours and that

17 the restroom that he used was the one behind him?

18             MS. GEDDES:  Objection.

19             THE COURT:  I'll sustain the objection to the form.

20             I think the witness already testified about the

21 restroom, right?

22             THE WITNESS:  I'm not --

23             THE COURT:  Put another question to the witness.

24             MR. FARINELLA:  I'm sorry.  You didn't hear me about

25 the second studio.  I apologize.

1    THE COURT:  That's okay.

2  Q    Okay.  So the question was next to Music I is another

3  studio, right?

4  A    Uh-huh.

5  Q    And the same goes for Music II, that you can have an

6  engineer and you have, you can have the performer inside the

7  studio, right?

8  A    Yes, the concept is the same.  It's set up exactly the

9  same.

10  Q    Okay.  And as I had just asked you the question about

11  each studio being soundproofed, it is, you are able to have,

12  you know, work be done in Studio II while there's also someone

13  in Studio I, right?

14  A    Correct.

15  Q    So they can go back and forth while, you know, at the

16  same time?

17  A    I'm sorry.  Is the -- sorry.  Ask the question again.  I

18  just misunderstood you.  Sorry.

19  Q    So you have two studios next to each other, correct?

20  A    Uh-huh.

21  Q    At any given time, they can both be utilized at the same

22  time, correct?

23  A    Yes.

24  Q    Which would generate people being also in Studio II if

25  that's happening on a particular day, right?

1    A    Yes.

2    Q    And that would mean somebody in the engineering, in the

3    control room and somebody in the studio, right?

4    A    Yes.

5    Q    Or even more than one person?

6    A    Yes.

7    Q    Okay.  And so is it fair to say as an engineer that if

8    Mr. Kelly was in Studio I performing and somebody either

9    walked into the control room, right, and walked into the

10   window, it could be distracting?

11   A    I would think so.

12   Q    Okay.  And the same goes that if Mr. Kelly is working in

13   Studio I and someone just randomly pops in to the studio or

14   goes into that door by accident, right, while Mr. Kelly is in

15   session, that certainly could be distracting?

16   A    Yes, it would be disruptive.

17   Q    And in this type, you know -- when you're recording like

18   that, it could be that there's, you know, a good session

19   happening and it could be interrupted, right?

20   A    Might, sure.

21   Q    And so it makes sense that when people who were coming to

22   the studio that didn't know where things were were escorted by

23   people, right?

24   A    Yes, everybody, when they came into the studio.

25   Q    Okay.  And it could be, and you just said that -- and the

1   reason for that is because it was an active, it was an active

2   business place, an active studio where things were really

3   happening, right?

4   A    That could be one of the reasons, yes.

5   Q    People were working?

6   A    Yes.

7   Q    And so wasn't it also true that any guest that was being

8   transported to and from -- withdrawn.

9            Privacy was important to Mr. Kelly, correct?

10           MS. GEDDES:  Objection.

11           THE COURT:  Overruled -- well, I'll sustain it as to

12   form.

13   Q    So while you worked for Mr. Kelly, isn't it a fact that

14   you understood that privacy was important to Mr. Kelly?

15   A    A level of -- I can't think of necessarily the right word

16   but I'll say control in terms of there were times in which he

17   would want to be private, for sure.  There were also times

18   where he wanted to be public, where he openly wanted to be out

19   and available for people to see.  So in those times in which

20   he wanted to be private, I could certainly say that would be

21   important to him.

22   Q    And isn't it true that was the same for other celebrities

23   that came to the studio; they wanted their privacy, right?

24           MS. GEDDES:  Objection.

25           THE COURT:  Sustained.

Arnold - cross - Farinella                1576

1   Q     So there was a policy that you talked about with

2   Mr. Kelly that was initiated by his former manager, something

3   known as signing confidentiality agreements, right?

4   A     Yes.

5   Q     And didn't you tell the government that the reason why --

6   I'm sorry.  It was Mr. McDavid, his manager's idea and his

7   lawyer, Mr. Genson's idea and that Mr. Kelly knew nothing

8   about those confidentiality agreements?

9           THE COURT:  Sustained.

10  Q     Did Mr. Kelly -- to your knowledge, did Mr. Kelly know

11  that Genson and McDavid instituted the policy of

12  confidentiality agreements?

13  A     I don't know who formally instigated it.

14  Q     Okay.  So you had said, you testified earlier that there

15  had been a number of occasions or there had been at least one

16  occasion that you sat down and spoke to the government with

17  regard to this matter, right?

18  A     I'm sorry.  About the confidentiality agreements?

19  Q     There was at least one time where you sat down with the

20  government and talked to them about this, this case, right?

21  A     Yes.

22  Q     Okay.  So I'm going to show you what, to see if I can

23  refresh your recollection as to what you told the government.

24  A     Okay.

25  Q     Okay?

Arnold - cross - Farinella                1577

1      MS. GEDDES:  What are you showing him?

2      THE COURT:  Just give her the exhibit number on the

3  bottom.

4      MR. FARINELLA:  3500TA-T-2.

5      THE COURT:  And why are you showing him this?

6      MR. FARINELLA:  I'm asking to refresh his

7  recollection that that's what he told the government.

8      THE COURT:  Regarding what?

9      MR. FARINELLA:  Well, I had asked him about whether

10  or not Mr. McDavid and Mr. Genson --

11      THE COURT:  Oh, I see.  Sure.  Show it to him.

12      MR. FARINELLA:  May I approach, Your Honor?

13      THE COURT:  Yes.  Go ahead.

14  Q    So can you read the line here that starts with "Arnold"

15  to yourself and to the end of the paragraph.

16      (Pause.)

17  Q    Does that refresh your recollection as to what you told

18  the government?

19  A    It's a paraphrase as opposed to a quote, but I believe

20  what I said, if I remember correctly, was that it was

21  instituted at the time in which --

22  Q    That's not the question --

23      THE COURT:  Let him finish.

24  A    I'm sorry.  I was just thinking.  I apologize.

25      It is safe to say that my belief is that it

Arnold - cross - Farinella                  1578

1   originated from Derrel McDavid and Ed Genson for the process

2   to take place at the studio.  I believe that's accurate.

3   Q    Okay.  And in this agreement, I think you said it

4   included provisions like the person that was there as a guest

5   could not take photographs, right?

6   A    Yes.

7   Q    They could not record, right?

8   A    Correct.

9   Q    Okay.  And other maybe provisions along those lines,

10  right?

11  A    Yes.

12  Q    Okay.  So it is safe to say that if a guest that was

13  there for the first time saw somebody that they recognized in

14  the public eye, a celebrity, that they might be inclined to

15  take pictures of that person?

16           MS. GEDDES:  Objection.

17           THE COURT:  Sustained as to form.

18           I mean I take it one of the reasons that you had

19  these rules was to keep people from photographing people or

20  approaching them, is that right?

21           THE WITNESS:  Yes, and taking materials or recording

22  audio, music, and things like that.

23  Q    So this particular policy was there or implemented, as

24  you just stated, to protect Mr. Kelly's or Mr. Kelly's

25  professional guests' intellectual property, right?

1  A    It would be to protect anything that happened at the

2  Chocolate Factory.

3  Q    Well, I think you also told the government that --

4  withdrawn.  Okay.

5         So that wasn't an unusual policy that was

6  implemented then, right?

7         THE COURT:  Do you know whether it's a usual policy

8  to have nondisclosure agreements for people that arrive at the

9  studio?

10         THE WITNESS:  I can't speak to other studios.

11         THE COURT:  Okay.  Next question.

12  Q    Now, you talked about transporting guests, right?

13  A    Yes.

14  Q    Okay.  And that when you did that, you turned the

15  rearview mirror up, right?

16  A    Correct.

17  Q    And so that too, wasn't that a policy to ensure the

18  guests' privacy?

19  A    Yes.

20  Q    And you also said that you would turn on the radio to a

21  reasonable volume not loud and making sure it wasn't loud,

22  right?

23  A    Yes.

24  Q    Now, so going back to the confidentiality agreements,

25  isn't it a fact that these were used, like you said, to

1   protect the music and also Mr. Kelly's privacy, right?

2   A    I believe I said it was to protect all things that

3   happened within the, that person's time at the studio or at

4   the Chocolate Factory, anything that occurred there.

5   Q    So isn't it a fact that you didn't believe these

6   confidentiality agreements were being used to cover up

7   criminal activity, did you?

8           THE COURT:  Sustained.

9   Q    As a matter of fact, didn't you tell the government that

10  the confidentiality agreements were in place because there

11  were people or were implemented, this policy was implemented

12  because people were always, quote, unquote, "thirsty," seeking

13  different angles to sue Mr. Kelly, correct?

14  A    I -- in the context, I don't understand using the quote

15  of the word "thirsty," but people eager to sue Mr. Kelly at

16  the time of being in, at Larrabee Street, that was my belief.

17  Q    Right.  And so that, any type of thing could lead to a

18  potential lawsuit, right?

19          THE COURT:  Could I see the parties at the side with

20  the court reporter for just a moment, please.

21          (Continued on next page.)

22

23

24

25

Sidebar                                                        1581

1          (The following occurred at sidebar.)

2          THE COURT:  I would tread very carefully in this

3   regard because you are going to open the door to some of the

4   things that people are accusing him about.  If you're just

5   trying to say that people are doing useless lawsuits which is

6   where I feel this is going, I would not do that, I think that

7   is extremely unwise, because at the time that we're talking

8   about, you've got the criminal case going on in Chicago and if

9   you start trying to leave the impression that he's just beset

10  by people that are suing him to get a buck out of him, you

11  really are -- it's just not a good idea.  It is not a good

12  idea.  I think I would move on to something else and then when

13  you, then when we take the lunch break, talk to your

14  colleagues about it but this is going into a place that you

15  are going to regret.

16          Isn't that what you're trying to show?

17          MR. FARINELLA:  Absolutely not.

18          THE COURT:  What --

19          MR. FARINELLA:  I want to know what he thinks.

20          THE COURT:  But who cares what he thinks?

21          MR. FARINELLA:  Well, my --

22          THE COURT:  Let me finish.  It doesn't matter --

23          MR. FARINELLA:  Well --

24          THE COURT:  -- because's it's what the jury thinks.

25  So what a witness' personal opinion about what -- first of

Sidebar                                     1582

1    all, he's not a lawyer.  He did not draft the confidentiality

2    agreements.  I mean, I suppose if he you wanted to go into why

3    they were instituted, the person that you would speak to is

4    the person who drafted them.  This is a guy who's like a

5    studio engineer.

6              MR. FARINELLA:  But they're trying to use him to

7    cooperate that he was assisting in criminal activity.  So it's

8    essential to know because at him, as a member --

9              THE COURT:  Right.

10             MR. FARINELLA:  -- of the enterprise cannot

11   knowingly, knowingly assist.  If he has no idea what's going

12   on behind the scenes, that's, that goes to what he knew versus

13   what he didn't know and what he thought.

14             THE COURT:  You still have to do this within the

15   bounds of rules of evidence and the rules of just general

16   trial advocacy and whether or not -- I mean, I'm not going to

17   have a whole conversation here about the purpose of this

18   witness, whether he's a member of the enterprise or not, but

19   he's certainly part of the day-to-day operations of the

20   defendant's business, but that doesn't mean that you can ask

21   him what he thinks about all kinds of things.  We'd never ask

22   him, even the government didn't ask him whether he thought

23   Mr. Kelly was committing a crime.  It's totally improper.

24             MR. FARINELLA:  Your Honor, I'm faced with the fact

25   that the government is saying that Mr. Kelly used surrogates

GEORGETTE K. BETTS, RPR, FCRR, CCR

```
                        Sidebar                    1583
```

1   to drop people off, right?

2          THE COURT:  Right.

3          MR. FARINELLA:  They have to establish those people

4   knew they were assisting Mr. Kelly in a criminal enterprise.

5          THE COURT:  They do not.  They do not have to do

6   that.  So all I'm going to suggest is that you move on to

7   something that's less troublesome than this and I'm really

8   doing this to help you out because if I let you go --

9          MR. FARINELLA:  I have no further questions in

10  regard to that matter.

11         THE COURT:  Okay.  All right.

12         MR. FARINELLA:  So I wasn't planning on going onto

13  that drag strip, maybe a ramp to it, but not on it.

14         THE COURT:  You were heading over the cliff there.

15         So what I would say is that if you think that there

16  is some productive reason to do it, consult with your

17  co-counsel and then let me, you can do that at the lunch hour,

18  but I think that we should probably -- you can certainly ask

19  him about stuff that he did or things that he has knowledge

20  of, but his opinion about things, his, his, I mean no lawyer

21  would be permitted to do that and I wouldn't let the

22  government do it.  So that's my ruling.

23         All right.  Let's keep going.

24         (End of sidebar.)

25         (Continued on next page.)

1          THE COURT:  All right.  Go ahead.

2          MR. FARINELLA:  Thank you, Your Honor.

3     BY MR. FARINELLA:

4     Q    Okay.  So let's go now to Olympia Fields.  Let's move

5     from the studio in Chicago to Olympia Fields.

6               Many of the same things -- withdrawn.

7               So the government showed you a picture of a gate,

8     right, at Olympia Fields when you first go in?

9     A    Yes.

10    Q    When you first arrive?

11    A    Yes.

12    Q    And you said at that gate was, a security person was

13    stationed, right?

14    A    Yes.  If a security person wasn't sitting out there, we

15    would be monitoring it from the camera in the reception area.

16    Q    Okay.  And so the same policy applied at Olympia Fields

17    as the studio where if a guest came to Olympia Fields, that

18    they would be escorted, right?

19    A    Yes.

20    Q    And then they would also I believe you said sign a

21    confidentiality agreement, right, either at the front gate or

22    when they got to the studio?

23    A    Yes.  As the course of time at Olympia Fields -- it was

24    much more enforced early on at Olympia Fields than later on

25    but early, when we first started having a studio there at

1    Olympia Fields, we would follow the exact same process as

2    Chocolate Factory downtown.

3    Q    Okay.  And the process was that when a guest arrived,

4    they would obviously sign this agreement that they were

5    presented, would you either take a Polaroid or driver's

6    license or did you do both?

7    A    It's possible we did both at some point, but to my

8    recollection, we did one or the other.  More likely, we were

9    doing the driver's licenses -- I don't recall when it would

10   switch between one or the other or why we stopped taking

11   driver's licenses or when we did Polaroids but I remember we

12   did quite a lot of Polaroids and photos to attach to the

13   confidentiality agreement.

14   Q    Okay.  So if the person didn't have a driver's license

15   with them, would Polaroid be a method that was utilized?

16   A    Yes.  Potentially, yes.

17   Q    Okay.  And, again, the purpose was to ensure that

18   Mr. Kelly's privacy and safety were protected while that guest

19   was at the property, right?

20   A    The purpose of the Polaroid was to attach it to the

21   confidentiality agreement to identify who was the person that

22   had signed the agreement.

23   Q    So if somebody came as a guest and burned down Olympia

24   Fields, you would know who it was, right?

25   A    Not, not necessarily.

Arnold - cross - Farinella                1586

1  Q    You had either a photo ID, not identification, but a

2  picture of her or him, right?

3  A    We would have a photograph of people that had come in and

4  signed the agreements.

5  Q    And then the other reason why you took the driver's

6  license was to ensure that the person who signed the agreement

7  was, in fact, that person on the driver's license?

8  A    Yes.

9  Q    And there was a period of time when Mr. Kelly's family

10 was living in Olympia Fields as well, right?

11 A    Yes.

12 Q    Okay.  And Mr. Kelly -- withdrawn.  I'm getting ahead of

13 myself.

14       Mr. Kelly was married at the time, partially married

15 during the time that you worked for him, correct?

16 A    Yes.

17 Q    Okay.  And he also had small children, correct?

18 A    Yes, he had children.

19 Q    And this is while he --

20       THE COURT:  I'm so sorry.  I think one of the jurors

21 is having trouble hearing, is that correct?

22       THE JUROR:  No.

23       THE COURT:  I thought you were signaling to me.

24       THE JUROR:  I am.  Okay.  Donna will come to you.

25       (Pause.)

```
 1              THE COURT:  I think what we'll do now is take our
 2    lunch break and we will be back at 2:15.
 3              Please don't talk about the case, don't look
 4    anything up, but have a great, have a great lunch.
 5              (Jury exits.)
 6              THE COURT:  All right.  Everybody can sit down.  The
 7    jurors needed a break.
 8              You can take the witness out.
 9              (Witness steps down.)
10              THE COURT:  Mr. Farinella, do you have a sense of
11    how much longer you are going to be with this witness?
12              MR. FARINELLA:  Not much longer, Your Honor.
13              THE COURT:  To me, not much longer means something
14    different, I think, than what that means to the lawyers.
15              MR. FARINELLA:  Yes, well --
16              THE COURT:  To me, not much longer means less than
17    ten minutes.  That's my favorite number.
18              MR. FARINELLA:  It could be ten minutes.  It could
19    be an hour.
20              THE COURT:  Well, that's not at all helpful.  Let's
21    try to make it closer to the ten minutes.  All right?
22              MR. FARINELLA:  Yes.
23              THE COURT:  All right.  We'll break for lunch.
24              Anything else we have to put on the record?
25              All right.  Thanks so much.      (Luncheon recess.)
```

1      **AFTERNOON SESSION**

2                (In open court - jury not present.)

3           THE COURTROOM DEPUTY:  All rise.

4           (Judge ANN M. DONNELLY entered the courtroom.)

5           THE COURT:  Everybody can sit down.

6           (Defendant entered the courtroom.)

7           MS. GEDDES:  Your Honor, should we bring in the

8      witness?

9           THE COURT:  In just a minute.  I just wanted to

10     clarify what we discussed at the sidebar regarding certain

11     questions that were posed to the witness.  I just want to make

12     sure that counsel understands the reason for my concern.

13          The first rule is, and I think it is sort of a

14     general rule that I believe everybody understands, is that

15     questions to witnesses about whether they think certain things

16     are criminal are just not proper questions.  Really, in any

17     case.

18          But the other concern that I had, which I just

19     wanted to make sure I expressed clearly, was that questions

20     regarding, which seemed to me were directed at showing that

21     the defendant was -- that there were sort of, I guess for lack

22     of a better word, kind of nuisance lawsuits that were filed on

23     a regular basis against the defendant, I expressed to counsel

24     that I think that is an extremely risky path to go down,

25     given, I believe at around this time, the defendant was

Proceedings                              1589

1  charged in Chicago with the crime that we already discussed.

2  And it was my concern that questions along those lines would

3  open the door in a way that counsel really didn't intend for

4  it to do.

5            So, that was the reason for the discussion.

6            Are we ready for the witness?

7            I think we are.  Let's get the witness.

8            And if we could get the jury, too.

9            (Witness entered and resumed the stand.)

10           (Pause.)

11           THE COURTROOM DEPUTY:  All rise.

12           (Jury enters.)

13           THE COURTROOM DEPUTY:  You may be seated.

14           THE COURT:  All right, everybody, back from lunch.

15  We are ready to resume with the cross-examination of the

16  witness.

17           Go ahead, Mr. Farinella.

18           THE COURTROOM DEPUTY:  The witness is reminded he is

19  still under oath.

20           THE WITNESS:  Yes.

21

22           (Continued on the following page.)

23

24

25

1   **THOMAS ARNOLD**,

2        called as a witness by the Government, having been

3        previously duly sworn/affirmed by the Courtroom Deputy,

4        was examined and testified further as follows:

5   CROSS-EXAMINATION

6   BY MR. FARINELLA:

7   Q     Good afternoon, Mr. Arnold.

8   A     Good afternoon.

9   Q     Just to go back to something we talked about earlier with

10  regard to the visit when Jay-Z came to the studio.

11        Wasn't the studio shut down, essentially?

12  A     I -- I don't recall that it was shut down.  There may

13  have been other -- I believe it was while it was still Chicago

14  Trax, so I believe there may have been other artists

15  performing in other studios.  So, I wouldn't say that the

16  whole studio was shut down.

17  Q     So, it wasn't -- it wasn't exclusive just for Jay-Z's

18  appearance and he would be the only person there?

19  A     The -- Chicago Trax had, like, four total, like, actual

20  studios in it around that time, so there could have been, and

21  I don't know for sure whether there were or not, other people

22  performing in other studios.

23        The studio that -- the actual studio room that he'd

24  have been using would have been restricted just for his

25  session.

Arnold - cross - Farinella                1591

1   Q    So, you don't recall if specifically the entire building

2   was shut down and there was -- there was no movement around

3   while he was -- he was visiting the studio?

4           MS. GEDDES:  Objection.

5           THE COURT:  I'll sustain it as to form.

6           I also think your microphone might be out again.

7   Now I can hear, all right.

8           MR. FARINELLA:  How's that?

9           THE COURT:  Better.

10          MR. FARINELLA:  Sorry.

11          THE COURT:  So, that objection is sustained.

12  BY MR. FARINELLA:

13  Q    So, based upon your recollection, when he visited the

14  studio it wasn't shut down completely where there was no

15  movement within -- inside the studio during the time he was

16  there?

17  A    I -- I don't recall a time where the whole building was

18  shut down for a particular artist when it was Chicago Trax any

19  time.

20  Q    Thank you.

21          Now, did there ever come -- now, isn't it -- isn't

22  it true that you -- you, along with Donnie Lyle, hired and

23  fired many of the runners, right?

24  A    Yes.  Yes, as well as the engineers would also be helping

25  to hire, and training, and could fire as well.

Arnold - cross - Farinella                1592

1    Q    And you also had the -- the authority to -- to fine any

2    one of these employees if you felt it was necessary to do so,

3    correct?

4    A    I -- I did not -- I would not have ever fined somebody on

5    my own authority.

6    Q    So, when you and Donnie Lyle would be interviewing a new

7    potential employee, it was a rather rigorous process, right?

8    A    It was -- it was formalized process.  We would meet --

9    either somebody would come into the studio and we'd meet

10   there; or else, I know at the Olympia Fields time I would meet

11   somebody at Panera Bread to actually conduct an interview with

12   them.

13   Q    And you did that because of the fact of what Mr. Kelly

14   did for a living and the circumstances surrounding this --

15   this new person that you were relatively unfamiliar with,

16   correct?

17   A    Yeah -- yes.

18   Q    So, again, for Mr. Kelly's privacy and safety, right?

19   A    Not entirely, but that would enter into it, that would be

20   factors.

21   Q    And so, did -- did Donnie always assist you in the

22   interview process?

23   A    No, I would imagine he could have led the process as well

24   at some point.  Engineers could have led the process.  I could

25   have assisted the engineers with the process as well.

Arnold - cross - Farinella                1593

1   Q    But isn't it true that you screened the new employees

2   because they were going to have access to the studio, right?

3   A    Not -- not all of them, but it was one of my

4   responsibilities was to be a part of the hiring process and

5   the training process.  But I wasn't exclusively hiring people

6   to work at the studio.

7   Q    And during the interview process, wasn't it typical to

8   explain to these new, especially potential runners, what their

9   responsibilities were going to entail?

10  A    Yes.

11  Q    And you also explained the job duties to the runners and

12  engineers, right?

13  A    The runners, yes.  I didn't hire the engineers as -- at

14  The Chocolate Factory.

15       At Chicago Trax I would hire engineers to do a

16  specific job, assign them to a session, but the -- the

17  employees that became engineers employed by Chicago Trax that

18  were freelancers -- sorry, to be clear, I did hire freelance

19  engineers -- would have been promoted from being interns at

20  the studio.

21       So, they would have already come into an internship,

22  earned their rights to be an engineer, and then as the studio

23  manager I would hire them for a particular session.

24  Q    Okay.

25       And so, in the event that you were going to hire a

1    new employee, you explained to them that as part of the hiring

2    process, them being hired, that they would have to simply sign

3    what's known as a non-disclosure agreement, not to discuss,

4    you know, the workings of the studio, right?

5    A    I don't recall that being part of, like, an interview

6    process, but upon being -- upon starting the first day at --

7    at The Chocolate Factory in Larrabee, I'm sure they would have

8    been -- I'm sure I would have asked them to sign a

9    Confidentiality Agreement.

10   Q    And, again, that was to protect Mr. Kelly's privacy,

11   safety and, like you said, the other -- the other recordings

12   and things of that nature, right?

13   A    At that point in time it would have been more of an

14   inherent part of the process where you wouldn't think anything

15   about it.  It would just be part of what your routine was.

16          But the initial reason for the confidentiality form

17   would be to protect, so that anything that happens within the

18   Chocolate Factory would stay protected.

19   Q    So, you had said -- let's go back to the Superbowl.

20          You had indicated with relative certainty that the

21   Superbowl between the Indianapolis Colts and Chicago Bears was

22   in 2005, right?

23   A    I -- I'm fairly confident on the date, but the Superbowl

24   that we were down in Miami for was the Bears and the Colts.

25   Q    Okay.

1           And, in fact, would you be surprised to learn it was

2     actually 2007?

3     A    No, I wouldn't be surprised.

4     Q    So, let's talk about the time that you -- you had said

5     that you assisted Mr. Kelly as a tour manager, right?

6     A    A road manager.

7     Q    Okay, but -- okay.  But you did go with Mr. Kelly on

8     several tours, right?

9     A    Yes.

10    Q    And was the South Africa -- I believe you had testified

11    that you had went on really what was the European tour and

12    also South Africa, right?

13    A    I did go to Europe for the tour, and we did go to South

14    Africa twice.

15    Q    Okay.  So, were they separate or were they -- were

16    they -- was it one tour or were they two separate tours?

17    A    I wouldn't have said -- no, no, they weren't.  They were

18    all -- yeah, I'm sorry.  Rephrase the question.  Repeat the

19    question.

20    Q    So, if it was one tour, Mr. Kelly would have been out of

21    the country for a relative period of time, right?

22    A    Yes.

23    Q    And do you -- do you have an estimate, six months, a

24    year, four months, some sort of understanding of time with

25    regard to how long the tour took?

1    A    When we went to Europe, it was about a month in, I

2    believe it was, April of 2011.

3          A separate time we went to South Africa, on two

4    separation occasions.  They weren't part of the same tour.

5    Q    And so, during the time that you worked with Mr. Kelly,

6    did you ever keep, like, your own personal datebook where you

7    tracked the dates as to where you were and when?

8    A    No, not that I recall.

9    Q    So, let's talk about the World Cup event that you

10   attended with Mr. Kelly.

11         You recall that event, right?

12   A    Yes.

13   Q    And you recall that it was where it was?

14   A    The World Cup was in South Africa.

15   Q    And that event was where Mr. Kelly performed, right?

16   A    Yes.

17   Q    Okay.  And he -- he performed to a crowd of about 90,000

18   people, right?

19              MS. GEDDES:  Objection.

20              THE COURT:  I don't really see the relevance of

21   this, so I'll sustain the objection.

22   BY MR. FARINELLA:

23   Q    Well, you were, obviously, there because Mr. Kelly was

24   performing, correct?

25   A    Yes.

```
                    Arnold - cross - Farinella          1597
```

1    Q    And so, best -- based upon your recollection, were there

2    a lot of people at that event?

3              MS. GEDDES:  Objection.

4              THE COURT:  Overruled.

5              Were there a lot of people at the event?

6              THE WITNESS:  There was a lot of people at the World

7    Cup.

8              THE COURT:  All right, next question.

9    BY MR. FARINELLA:

10   Q    So, at that -- during -- with that being the case,

11   Mr. Kelly needed more security than he would normally need,

12   right, because of the potential crowd?

13   A    We brought quite a bit of security.  There was a large

14   amount of security that was provided, as well, once we were

15   there.

16            I'm sorry, correction.  I don't know who -- who it

17   was provided by, but we had a large amount of security while

18   we were there.

19   Q    And did there ever come a time where there was a

20   situation where -- where Mr. Kelly and the people that were

21   traveling with him were overtaken by -- by a crowd and he was

22   forced to remain in one place for an extended period of time?

23            MS. GEDDES:  Objection.

24            THE COURT:  Sustained.

25   Q    Did there ever come a time when Mr. Kelly's safety or

Arnold - cross - Farinella                    1598

1    security came into question during that trip?

2              MS. GEDDES:  Objection.

3              THE COURT:  Did that ever happen?

4              THE WITNESS:  Not that I recall during the World

5    Cup.

6    BY MR. FARINELLA:

7    Q    Did it happen on another occasion?

8    A    In another occasion where we were traveling?

9    Q    Yes.

10   A    Yes.

11   Q    Do you know how many times it happened?

12   A    I -- I wouldn't be able to give an accurate number, but

13   it happened every now and then where we'd be someplace and it

14   could -- it could -- a dangerous situation could have started

15   to occur.

16   Q    And so, when you were -- when you -- you had testified

17   before, before lunch, that you were -- you, essentially, quit

18   after this -- this situation that happened with Disneyland or

19   Disney World.

20             I don't remember which park it was specifically, but

21   that that was your tipping point, right?

22   A    It was the -- it was the events that followed after

23   Disney World where we had the -- to go to multiple club dates,

24   and I was fatigued and tired and that's where I found out that

25   the -- that -- that my check had been fined, and that was when

SAM    OCR    RMR    CRR    RPR

Arnold - cross - Farinella                    1599

1    I quit.

2    Q    And so, did there ever come a time when, going back to

3    the South African tour, where you were instructed to mail an

4    expensive painting back to the United States on behalf of

5    Mr. Kelly to the studio?

6             MS. GEDDES:  Objection.

7             THE COURT:  Again, I don't really see the relevance

8    of it, but you can answer.

9             Go ahead, you can answer it.

10   A    Not -- not in South Africa, no.

11   Q    Somewhere else?

12   A    Yes.

13   Q    Where was that?

14   A    I think it was in Ethiopia that there was a picture that

15   he wanted to purchase as we were leaving to go to the airport.

16   Q    And didn't he, in fact, purchase it?

17   A    Yes, after we -- yes.

18   Q    Okay.  And it was approximately around $30,000 or

19   something, right?

20   A    I don't recall the dollar amount, but it was -- it was

21   expensive.

22   Q    And so, you were tasked with the responsibility of

23   ensuring that painting got back to Mr. Kelly's home here in

24   the United States, right?

25   A    Yes.

1   Q    And did that painting ever make it back to Mr. Kelly's

2   home in the United States?

3   A    After I was no longer employed.  After I had left working

4   for Mr. Kelly, I was told by other people that continued to

5   work for him that it did, ultimately, arrive.

6   Q    But do you have any personal knowledge that it returned?

7   A    Only what I was told.

8   Q    And so, there did come a time where was -- there was --

9   that this incident occurred that, you know, it's obvious that

10  Mr. Kelly was upset about that, right?

11            THE COURT:  Upset about what?

12  BY MR. FARINELLA:

13  Q    Well, he was upset that the painting never arrived

14  after -- after purchasing it, right?

15  A    There was -- I've had conversation with him where he was

16  upset that the painting had not arrived.

17  Q    Okay.  And so, with that being said -- and there was a

18  fine that was associated with that, right?

19  A    I don't recall.  There may have been.

20  Q    And wasn't that in or around the time that you left

21  working for Mr. Kelly?

22  A    It would have been -- it would have been a few months

23  prior to -- no, in or around the time, possibly.  It was

24  within the same year.

25  Q    And so, wasn't that the issue that ultimately led to

1   your -- to your leaving Mr. Kelly's employment?

2   A    The fining for the picture?

3   Q    Yes.

4   A    The -- not -- not specifically.

5   Q    But it weighed heavily in your decision, right?

6   A    The fining did, yes.

7   Q    And so, when the Government showed you numerous pictures

8   of people that -- that you had described for them, these are

9   people -- many of the photos they showed you were people that

10  you actually hired, right?

11  A    I -- I'd have to look at it again to make sure, but I

12  don't think I hired very many, maybe only a couple of those

13  people.

14          MR. FARINELLA:  Your Honor, may I have one moment?

15          THE COURT:  Sure.

16          (Pause.)

17  BY MR. FARINELLA:

18  Q    Mr. Larrabee -- I'm sorry, Mr. Arnold, did there ever

19  come a time when Limp Bizkit performed at one of the studios

20  on the roof?

21  A    Yes.

22  Q    And during that performance, there was a long line of

23  women or women and men, but I mean there was a majority of

24  women wanting to see that show?

25  A    I don't know the demographic.  There was a lot of people

SAM      OCR      RMR      CRR      RPR

Arnold - cross - Farinella                1602

1    in the parking lot and on the streets of Larrabee to -- to see

2    that performance.

3    Q    And that was something that happened regularly at the

4    studio, right, other artists performing and creating crowds?

5    A    That is the only instance of somebody performing on the

6    rooftop to a large crowd.

7    Q    And just to go back to yesterday, you talked about a

8    black room, right?

9    A    (No response.)

10   Q    Was there a black room at one of the studios?

11   A    I -- I don't recall a black room.

12   Q    Okay.

13          MR. FARINELLA:  Sorry, Your Honor.

14          THE COURT:  That's okay.

15   BY MR. FARINELLA:

16   Q    When an artist was performing, in particular Mr. Kelly,

17   in regular studio session, it was expensive to do a session,

18   right?  I mean it cost -- let me rephrase.

19          The studio sessions were an expensive cost that

20   Mr. Kelly had to endure while recording, right?

21   A    At Chicago Trax?

22   Q    Yes.

23   A    Yeah, it would be a daily, a weekly, a monthly or hourly

24   charge.  So, it would be significant and the clock always

25   ticked.

1  Q    And so, there would be occasions where Mr. Kelly would be

2  there for hours, even, you know, almost days, because of

3  that -- that reason, right?

4  A    I'm not sure exactly all of his reasoning, but -- but

5  yes, he would be there many hours quite often.

6  Q    And I think you had testified earlier that you had picked

7  up not only women, but you also transported Mr. Kelly's

8  friends, right?

9  A    Yes.

10 Q    Okay.  And you had -- you had said that the instances in

11 which Mr. Kelly played basketball, you took his friends back

12 and forth from wherever they were to the basketball court,

13 right, to the gym?

14 A    Potentially, I could have driven them or they could have

15 followed.

16 Q    And did there ever come a time when you picked up

17 Mr. Kelly's friend Keith Calbert?

18 A    Yes.

19 Q    And you did that regularly, right, or frequently?

20 A    I don't know of the frequency, but I'm sure I did it

21 several times.

22 Q    And you also took Mr. Kelly to and from where he had to

23 go at times, right?

24 A    Yes.

25 Q    And so, is it fair to say that during some of these

SAM    OCR    RMR    CRR    RPR

1  basketball events that his friends would be there and

2  Mr. Kelly was working or tied up on work matters and they

3  would have to wait for long periods of time?

4  A    I'm sorry, could you repeat the question?

5  Q    Is it fair to say that during some of these basketball

6  games that were arranged or coordinated, if Mr. Kelly got

7  caught up with work and he was delayed, his friends, or the

8  people that were playing or intending to play with Mr. Kelly,

9  would be there for long periods of time?

10  A    Yes, waiting for him.

11  Q    Until he finished doing what he had to do, right?

12  A    Yes.

13  Q    And just a couple more questions.

14       You had talked about a tent that was -- became a

15  permanent fixture at the Olympia Fields property, right?

16  A    Yes.

17  Q    And, so, that tent was used for large events, correct?

18  A    Yes.

19  Q    And so, that was -- but -- and there were many of these

20  large events that occurred at Olympia Fields, right?

21  A    Yes.

22  Q    And that would include shows or -- or things of that

23  nature, and there would be many people on the property?

24  A    Yes.

25  Q    Okay.  Let's go back quickly to just when you picked up

1  guests, male or female, in particular, you said female, you

2  would -- you would put up the rearview mirror, right?

3  A     Yes.

4  Q     And I think you said that you would pick up male guests,

5  but with regard to the rearview mirror, you would only place

6  it upright for female guests, right?

7  A     To my recollection, yes.

8  Q     So, you also testified that you drove the Sprinter,

9  right?

10 A     No, I never drove a Sprinter.

11 Q     You never -- you never picked female guests up in the

12 Sprinter?

13 A     Just to clarify my reasoning, I'm considering the

14 Sprinter to be a type of -- a specific type of van.  And when

15 I worked for Mr. Kelly, we did not have a Sprinter van.

16 Q     Did you have large vans?

17 A     Well, a minivan, yes.

18 Q     Yes.  And that minivan, did you use to pick up female

19 guests?

20 A     I would have, yes.

21 Q     And would you use that minivan to transport his male

22 friends to the basketball games and things like that?

23 A     We could have, yes.  I could have.

24 Q     So, before we broke for lunch I had asked you about

25 security.

Arnold - cross - Farinella                 1606

1    And there did come a point in time when Mr. Kelly

2   was residing at Olympia Fields with his wife and children,

3   young children, right?

4   A    Yes.

5   Q    And do you recall the ages of his children that were

6   living there while you were working there?

7        MS. GEDDES:  Objection.  I think he needs to specify

8   a timeframe.

9        THE COURT:  Do you want to direct him to a

10  particular time?

11       MR. FARINELLA:  Excuse me, Your Honor.

12       (Pause.)

13  BY MR. FARINELLA:

14  Q    So, Mr. Kelly moved to Olympia Fields around what time?

15  A    He had the house built, I would be taking a guess that it

16  was probably in the late '90s that he had the house built.  I

17  don't know for sure.

18  Q    And when did it become -- do you -- do you recall the

19  year it became a studio?

20  A    Before -- before Chicago -- I'm sorry, before the

21  building at 865 Larrabee was torn down and the studio was

22  still, The Chocolate Factory was still at that address, there

23  was a studio built at his house.

24       So, there was one there before we actually moved The

25  Chocolate Factory out there.  But The Chocolate Factory, I

Arnold - cross - Farinella          1607

1    believe, moved out there in 2004.

2    Q    Okay.  And, so, did Mr. Kelly have children when he moved

3    out there in 2004?

4    A    Yes.

5    Q    And how old were they?

6    A    I don't know their ages, but they were all young.  I

7    would say all under -- under ten years old.  I don't know the

8    varying ages, but I think his son was very young, maybe even

9    just still an infant.

10            I could be wrong, I don't know the ages.

11   Q    So, given what Mr. Kelly did for a living and the fact

12   that he had young children, weren't the security measures in

13   place also in place to protect his wife and children as well

14   and to maintain their privacy as well?

15            MS. GEDDES:  Objection.

16            THE COURT:  I'll sustain as to form.

17            MR. FARINELLA:  I know, I --

18   BY MR. FARINELLA:

19   Q    The security measures in place during that period of time

20   when Mr. Kelly's wife and children resided there, was also to

21   ensure that his -- his family, the family's privacy was

22   maintained?

23            MS. GEDDES:  Objection.

24            THE COURT:  Do you have any knowledge about that?

25            THE WITNESS:  I don't remember a specific instance

1   where I can say, yes, this was a policy.  But it was

2   understood that people didn't go into the house and we stayed

3   in the studio.

4           That's as clear as I could say that I --

5   BY MR. FARINELLA:

6   Q   Right, but also, though, the security measures were for

7   the -- for his wife, and his wife and children's safety as

8   well, right?

9           MS. GEDDES:  Objection.

10          THE COURT:  Do you have any knowledge about that one

11  way or the other?

12          THE WITNESS:  I -- I -- not -- no.  Sorry.

13  BY MR. FARINELLA:

14  Q   And to the best of your knowledge, isn't it a fact that

15  Mr. Kelly never held anyone against their will?

16          MS. GEDDES:  Objection.

17          THE COURT:  Sustained.

18          MR. FARINELLA:  I'm sorry, Your Honor, just one more

19  second.

20          THE COURT:  That's okay.

21          (Pause.)

22          MR. FARINELLA:  One last question.

23  BY MR. FARINELLA:

24  Q   You had said that you arranged travel, correct?

25  A   Yes.

1    Q    And didn't there come a time when that -- the travel

2    arrangements were not exclusively your responsibility?

3    A    There were other people that arranged travel as well.

4    Q    Okay, so you weren't the only -- that wasn't your only --

5    that responsibility wasn't only delegated to you, right?

6    A    Correct.

7    Q    And so, again, you had testified just before that you

8    don't recall ever fining any particular employee?

9    A    Not at my own -- not at my own decision.

10   Q    So, when you worked for Mr. Kelly were there occasions

11   where Mr. Kelly would be in the studio all day and all night

12   to ensure that he -- he would get a song right or to his

13   liking?

14           MS. GEDDES:  Objection.

15           THE COURT:  Sustained as to form.

16   BY MR. FARINELLA:

17   Q    When you worked for Mr. Kelly did he ever stay in the

18   studio for more than twelve hours, maybe even a day or two, to

19   ensure that he -- that his --

20           THE COURT:  I am just going to stop you because the

21   question -- he can't answer what the reason, what his

22   particular reasons for being there.  But you can surely ask

23   him if he spent any particular amount of time there.

24   Q    To the best, to the best of your knowledge, were there

25   ever occasions where Mr. Kelly was in the studio for days

1   straight trying to get a song right?

2           MS. GEDDES:  Objection.

3           THE COURT:  Again, the question is okay up to the

4   trying to get the song right.

5   BY MR. FARINELLA:

6   Q    Again, to the best of your knowledge, were there ever

7   occasions where Mr. Kelly was in the studio for days straight?

8   A    Yes.

9           MR. FARINELLA:  Thank you, Your Honor.  Nothing

10  further.

11          THE COURT:  Okay, any redirect?

12          MS. GEDDES:  Very briefly.

13  REDIRECT EXAMINATION

14  BY MS. GEDDES:

15  Q    On cross-examination you were asked whether the

16  defendant's wife and children were at the Olympia Fields

17  house.

18          Do you recall that?

19  A    Yes.

20  Q    While the defendant's wife and children were there, were

21  there also female guests who were present?

22          MR. FARINELLA:  Objection.

23          THE COURT:  Overruled.

24  A    There may have been, yes.

25  Q    And you testified on cross-examination that while the

Arnold - redirect - Geddes                    1611

1    defendant's wife and children were present, you would confine

2    yourself to the studio; is that correct?

3    A    Yes.

4    Q    And were there also female guests in the studio?

5    A    I'm not -- I'm not sure.  There -- there -- there could

6    have been, but I don't -- I can't say for sure.  Not all the

7    time.  Sorry.

8    Q    I'm not asking about all the time.

9              I'm asking at some of the time when the defendant's

10   wife and children were in the house, were there also female

11   guests in the studio area?

12   A    There were instances, yes.

13   Q    You were asked on cross-examination about the defendant

14   incurring fees for time in which he was at Chicago Trax using

15   the recording studio.

16             Do you recall that?

17   A    If I said fees, I miss -- the normal charges, the charges

18   for the studio time, yes.

19   Q    My mistake.

20   A    Yeah.

21   Q    But he was charged for the time he was in the studio,

22   right?

23   A    Yes.

24   Q    He wasn't charged for the time when he wasn't using the

25   recording studio, but was at Chicago Trax, was he?

1   A    Well, there -- he would have that studio all the time.

2   So, whether he was in the studio working or elsewhere, he

3   would pay to have that studio still be his studio.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REDIRECT EXAMINATION

2    BY MS. GEDDES:

3    Q    All right.  So he was already just paying the -- whatever

4    the cost of the studio is, he paid whether he used it or he

5    didn't use it, is that what you're saying?

6    A    So when it was Chicago Trax, yes, we would bill him every

7    single month for the studio time.

8    Q    But not only the studio time that he used, he was paying

9    to have the studio time on reserve; is that correct?

10   A    For that studio.  He would book additional studios in the

11   building as well and pay for that, that could be a separate

12   payment, so that could be a separate billing set up.  But for

13   his main studio when it was Chicago Trax before -- when it

14   was -- yes, I'm sorry, yes, it would be billed monthly.

15   Q    On cross-examination you were asked whether you trained

16   new employees who started working for the defendant; is that

17   correct?

18            MR. FARINELLA:  Objection.

19            THE COURT:  Overruled.

20   Q    Was part of their training that the employees needed to

21   fulfill the defendant's instructions?

22   A    Yes.

23   Q    You were also asked about the interviews that you

24   conducted at Panera, do you recall that?

25   A    Yes.

ARNOLD - REDIRECT - GEDDES                1614

1  Q    Fair to say that's a common practice, to interview

2  employees before they started working at a new job?

3  A    Yes.

4  Q    And by the way, once the 865 -- once Chicago Trax was no

5  longer Chicago Trax and it became the Chocolate Factory on

6  North Larrabee, was the defendant billed at all for his time

7  in studio?

8  A    No.

9  Q    It was just his studio, correct?

10  A    Yes.

11  Q    On cross-examination you were asked extensively about

12  times when certain celebrities were present at the studio, you

13  recall those questions?

14  A    Yes.

15  Q    Did female guests stay in their assigned location even

16  when female -- even when celebrities weren't at Chicago Trax?

17  A    They -- it would have been same as normal, where either

18  we would have gotten a phone call to request for people to

19  move around if there was a need for it, or would have gotten

20  instructions to move people around if it was warranted.

21  Q    So fair to say the presence of a celebrity in the studio

22  didn't affect the protocols that you operated under with

23  respect to the defendant's female guests?

24  A    It may have changed logistics on where you would walk

25  through, but the broader concept of receiving phone calls and

GEORGETTE K. BETTS, RPR, FCRR, CCR

1   moving people around stayed the same.

2   Q    Just to be clear, the broader concept was that the

3   defendant needed to authorize movement around the studio,

4   correct?

5   A    Yes.

6   Q    You were also asked about whether your responsibilities

7   including stocking the refrigerator.  When female guests

8   wanted food, you would not provide them food from the

9   refrigerator, would you?

10  A    They would call to ask for us to go pick up food for

11  them.

12  Q    And you would go to locations outside of the studio,

13  correct?

14  A    Yes.

15           MS. GEDDES:  One moment.  Nothing further.

16           THE COURT:  Any recross, Mr. Farinella?

17           MR. FARINELLA:  Your Honor, just one moment.

18           THE COURT:  Sure.

19           MR. FARINELLA:  Nothing further, your Honor.

20           THE COURT:  Thank you so much.  You can step down.

21           (Whereupon the witness was excused.)

22           THE COURT:  Are you ready to call your next witness?

23           MS. SHIHATA:  Yes, your Honor.  Can we just have a

24  two-minute break?

25           THE COURT:  Oh, yes.  I'm wondering -- I always like

1616

1  to give your break at 3:30, so you know we've got some -- so

2  we don't have too long a time sitting here, but I think we

3  have to make a couple of arrangements, so I'm going to give it

4  to you now.

5          Ten minutes.  Please, don't talk about the case.

6  Thanks so much.

7          THE COURTROOM DEPUTY:  All rise.

8          (Jury exits courtroom.)

9          THE COURT:  All right.  Everybody can have a seat.

10 Anything quickly that we need to resolve before the next

11 witness?

12         MS. GEDDES:  I don't believe so.

13         THE COURT:  Okay.  Anything from the defense?

14         MR. SCHOLAR:  No, your Honor.

15         THE COURT:  Okay, great, thanks so much.

16         (Recess.)

17         (In open court; jury not present.)

18         THE COURTROOM DEPUTY:  All rise.

19         THE COURT:  Everybody can have a seat.

20         MS. SHIHATA:  Can we get the witness and the lawyer?

21         THE COURT:  Yes.

22         Ms. Shihata, that would be by the first name,

23 correct?

24         MS. SHIHATA:  Correct.

25         THE COURT:  I think we are ready for the jury.

1617

1        MS. SHIHATA:  Yes, your Honor.

2        THE COURTROOM DEPUTY:  All rise.

3        (Jury enters courtroom.)

4        THE COURTROOM DEPUTY:  You may be seated.

5        THE COURT:  Okay, everybody we are ready to continue

6    with the government's case.

7        Will you call your next witness, please.

8        MS. SHIHATA:  The government calls Stephanie.

9        THE COURTROOM DEPUTY:  Stephanie, please stand and

10   raise your right hand.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephanie - direct - Shihata                1618

1          (Witness sworn.)

2          THE WITNESS:  I do.

3          **STEPHANIE**, called as a witness, having been first

4    duly sworn/affirmed, was examined and testified as follows:

5          THE COURTROOM DEPUTY:  Thank you.  You may be

6    seated.

7          THE COURT:  Just a couple of things before we start.

8    Our court reporter takes down everyone's testimony so it's

9    important that you not speak too quickly and that we make sure

10   that you're speaking into the microphone.

11         And it's also important not to talk over whichever

12   lawyer is asking you questions.  It just makes it harder for

13   the court reporter.

14         If there's a question that isn't clear or you want

15   to have repeated, let me know and I'll have the lawyer

16   rephrase it.

17         And, finally, just do your best to answer only the

18   question that you're being asked, okay?

19         THE WITNESS:  Thank you.

20         THE COURT:  You can take your mask off.

21         Go ahead, Ms. Shihata.

22         MS. SHIHATA:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MS. SHIHATA:

25   Q    I'm showing the witness only what's been marked for

Stephanie - direct - Shihata                    1619

1   identification as Government Exhibit 57.

2          Do you recognize the person in this photograph?

3   A    Yes, that's me.

4          THE COURT:  I think we have a mic -- pull it a

5   little closer to you.  I'm just not sure it's on.

6          THE WITNESS:  It is.

7          THE COURT:  Perfect.

8   A    Yes, that's me.

9          MS. SHIHATA:  I'd offer Government Exhibit 57.

10          THE COURT:  Any objection?

11          MR. FARINELLA:  No objection, your Honor.

12          THE COURT:  That's in evidence.

13          (Government Exhibit 57 so marked.)

14   Q    I'm showing the witness only what's been marked for

15   identification as Government Exhibit 57A.

16          Is this the same photograph of you that I just

17   showed you with your full name -- with your first and last

18   name underneath?

19   A    Yes, my maiden name, yes.

20          MS. SHIHATA:  I would offer Government Exhibit 57A

21   and to be published to the jury only, your Honor.

22          THE COURT:  Any objection?

23          I'm going to assume no, Mr. Farinella?

24          MR. FARINELLA:  No, your Honor.

25          THE COURT:  Okay.

Stephanie - direct - Shihata                    1620

1          (Government Exhibit 57A so marked.)

2          MS. SHIHATA:  If we can publish it to the jury only.

3          THE COURT:  Jury only.

4          (Exhibit published.)

5   Q    Now, how old are you?

6   A    Thirty-nine.

7   Q    And when were you born?

8   A    October 16th, 1981.

9   Q    Where did you grow up?

10  A    In Chicago, Illinois.

11  Q    And how far did you go in school?

12  A    I finished a few years of college.

13  Q    Where did you go to high school?

14  A    I went to two high schools:  I went to Oak Park and River

15  Forest High School, and I also went to The Chicago Academy for

16  the Arts.

17  Q    Which of those two high schools did you graduate from?

18  A    The latter.

19  Q    Chicago Academy of the Arts?

20  A    Yes.

21  Q    Approximately when did you graduate from high school?

22  A    Around June of 1999.

23  Q    And what kind of high school is The Chicago Academy of

24  the Arts?

25  A    It's a traditional high school for the first half of the

1   day and the second half is there to specializing in whatever

2   art you're studying, so like dance, theater, singing, things

3   like that.

4   Q    What were you studying at the time?

5   A    I was studying theater at the time.

6   Q    And you mentioned that you did a few years of college

7   after high school?

8   A    I did.

9   Q    In what city did you do that?

10  A    I did one year at DePaul in Chicago and then a couple of

11  years in Florida.

12  Q    Are you currently employed?

13  A    Yes.

14  Q    And what kind of work do you do?

15  A    I work in the food and beverage industry.

16  Q    And are you married?

17  A    I am.

18  Q    Did you have kids?

19  A    I do.

20  Q    Do you now live in a state other than Illinois?

21  A    Yes.

22  Q    Are you familiar with a singer known as R. Kelly?

23  A    I am.

24  Q    Have you ever met R. Kelly in person?

25  A    Yes, I have.

1   Q     Do you see R. Kelly in the courtroom here today?

2   A     Yes, I do.

3   Q     Can you please point him out and identify him by an item

4   of clothing he's wearing.

5   A     He's there in the blue suit with a white mask on his

6   face.

7         THE COURT:  Indicating the defendant.

8   Q     Now, how old were you when you first saw the defendant in

9   person?

10  A     I was 16-years old at the time.

11  Q     And where did you first see the defendant in person?

12  A     At a place called the Rock 'N Roll McDonald's in downtown

13  Chicago.

14  Q     I'm showing the witness what's in evidence as Government

15  Exhibit 520.

16        Do you recognize the location in this photograph?

17  A     Yes.  That's the restaurant I just made reference to,

18  Rock 'N Roll McDonald's.

19  Q     Now who, if anyone, were you at the

20  Rock 'N Roll McDonald's with the day you first saw the

21  defendant?

22  A     I was there with my boyfriend, his best friend and the

23  girl that the best friend was dating, so it was like a double

24  date.

25  Q     And the boyfriend that you were there with at the time,

1    where did you know him from?

2    A    From my first high school, OPRF.

3    Q    He went to that high school with you?

4    A    Yes, he did.

5    Q    And where did you see the defendant at the

6    Rock 'N Roll McDonald's?

7    A    I was standing at the register alone and he was seated at

8    the booth closest to the register.

9    Q    And what happened?

10   A    A man came up to me and he asked my age.  I told him I

11   was 16.  He said -- asked me if I knew R. Kelly, I said I did

12   and he kind of gestured towards him and he said that R. Kelly

13   wants you to call him and he gave me a handwritten note with a

14   phone number on it.

15   Q    And you said the man gestured towards him, who was the

16   "him" that the man gestured towards?

17   A    To R. Kelly.

18   Q    And did you see the defendant after the man pointed over

19   to him?

20   A    Yes, I saw him.

21   Q    What was the defendant doing?

22   A    Looking at me.

23   Q    What, if anything, did the man who approached you give

24   you?

25   A    He gave me a phone number and said it was Robert Kelly's

1   phone number.

2   Q     And how did he give you the phone number?

3   A     He handed it to me on a piece of paper.

4   Q     Do you recall how the number was written?

5   A     No.

6   Q     What, if anything, did you do after receiving the piece

7   of paper with the defendant's phone number on it?

8   A     I talked to my boyfriend and friends about it and then

9   threw away the phone number.

10  Q     Why did you throw away the phone number?

11  A     Because I didn't intend to call him.

12  Q     Did you actually meet the defendant at a later time?

13  A     I did.

14  Q     Around when was that?

15  A     A year later, the summer of 1999.

16  Q     How old were you then?

17  A     Seventeen.

18  Q     I'm showing the witness only what's been marked --

19  actually I'm sorry, one moment.

20          Going back to the day you saw the defendant at the

21  Rock 'N Roll McDonald's?

22  A     Yes.

23  Q     How old were you then?

24  A     Sixteen.

25  Q     I'm showing the witness only what's been marked for

Stephanie - direct - Shihata                    1625

1    identification as Government Exhibit 244.  And before I ask

2    you a question about that, do you remember approximately what

3    time of year it was when you were at the

4    Rock 'N Roll McDonald's and saw the defendant?

5    A    It was summertime.

6    Q    And what year?

7    A    Of 1998.

8    Q    I'm showing you what's been marked for identification as

9    Government Exhibit 244.

10            Do you recognize this?

11   A    Yes, that's me in the same summer of 1998.

12   Q    That's a photo of you from the summer of 1998?

13   A    Yes.

14            MS. SHIHATA:  I move admit Government Exhibit 244.

15            MR. FARINELLA:  No objection.

16            THE COURT:  Okay, that's in evidence.  You can

17   display it.

18            (Government Exhibit 244 so marked.)

19            MS. SHIHATA:  Thank you.

20            THE COURT:  You want that jury only?

21            MS. SHIHATA:  Jury only, please.

22            (Exhibit published.)

23   Q    All right.  I think you had just testified that you

24   actually met the defendant approximately a year later; is that

25   right?

1    A    Yes.

2    Q    And how old were you then?

3    A    Seventeen.

4    Q    And what time of year was it that you met him?

5    A    It was the summer of 1999.

6    Q    And was that near the time of your high school

7    graduation?

8    A    Yes.

9    Q    I'm showing the witness only what's been marked for

10   identification as Government Exhibit 243.

11            Do you recognize this photo?

12   A    Yes, that's me on the day of my graduation in 1999.

13   Q    The day of your high school graduation?

14   A    Yes.

15            MS. SHIHATA:  The government moves to admit 243.

16            THE COURT:  Any objection?

17            MR. FARINELLA:  No objection, your Honor.

18            THE COURT:  That will be just for jury only.

19            MS. SHIHATA:  Yes, your Honor.  Thank you.

20            (Government Exhibit 243 so marked.)

21            (Exhibit published.)

22   Q    Now the summer after your high school graduation, where,

23   if anywhere, were you working that summer?

24   A    I worked at a hotel in downtown Chicago.

25   Q    What did you do at that hotel?

Stephanie - direct - Shihata                    1627

1    A    I worked in the coffee shop, I was a barista.

2    Q    Do you recall what your shift was when you worked there?

3    A    I had to open the barista station at 5 a.m.  So I'd have

4    to be there at five and I think it ended around two.

5    Q    And that summer, 1999, where were you living?

6    A    I lived in two places, part time in Oak Park, which is

7    just outside of the city, and then also part time in the city

8    with my friends in an apartment.

9    Q    When you lived part time in Oak Park, who was that with?

10   A    With my aunt.

11   Q    And when you lived in the city, who was that with?

12   A    With two friends of mine that I went to high school with,

13   named Katherine and Jessie.

14   Q    And was the apartment with your friends closer to your

15   summer job?

16   A    Yes.

17   Q    You mentioned you were living in that apartment with two

18   friends one of whom was named Katherine; is that right?

19   A    That's correct.

20   Q    Without saying it, do you know Katherine's full name?

21   A    I do.

22   Q    I'm showing the witness only what's been marked for

23   identification as Government Exhibit 952.

24          Do you recognize that name?

25   A    Yes, that's her full name.

GEORGETTE K. BETTS, RPR, FCRR, CCR

1   Q    Katherine's full name?

2   A    Yes.

3              MS. SHIHATA:  I move to admit Government Exhibit 952

4   to the jury only.

5              THE COURT:  Any objection?

6              MR. FARINELLA:  No objection, your Honor.

7              THE COURT:  That will be in evidence just for the

8   jury.

9              (Government Exhibit 952 so marked.)

10             (Exhibit published.)

11  Q    Did you and Katherine go to the same high school?

12  A    We did.

13  Q    And was that at The Chicago Academy of the Arts?

14  A    That's correct.

15  Q    What, if any, career aspirations did Katherine have at

16  that time?

17  A    Katherine was a singer.

18  Q    And did she want to pursue that as a career?

19  A    Yes, she did.

20  Q    How did you end up meeting the defendant in the summer of

21  1999?

22  A    When I was at work at the hotel a co-worker came in and

23  told us that R. Kelly was having an event at the Nike store,

24  which was just around the corner from the hotel that I worked

25  at.

1   Q     And after you learned that information, what, if

2   anything, did you do?

3   A     I decided I would go over to see if he would remember me

4   in order to ask him if he would listen to my friend sing.

5   Q     And which friend was that?

6   A     Katherine.

7   Q     Do you recall where that Nike store was located?

8   A     It's on Michigan Avenue in downtown Chicago.

9   Q     Is Michigan Avenue in Chicago also known as The

10  Magnificent Mile?

11  A     Yes.

12  Q     What, if anything, did you do once you had this

13  information?

14  A     I walked over to the store in order to see him or meet

15  him and as I arrived he was coming out so --

16  Q     When you say "he" are you referring to the defendant?

17  A     Yeah, Mr. Kelly was coming out of the store as I was

18  walking in, so it was the perfect opportunity to get his

19  attention and so I did.

20  Q     What happened then?

21  A     I asked him if he remembered me and he said, yeah, and

22  something, you know, kind of very quickly, it was just like,

23  yeah.  And I said I wanted to ask you a question and he said,

24  yeah, walk with me to my car and we can talk and I said okay

25  so I --

1    Q    Did you walk with the defendant to his car?

2    A    I did.

3    Q    And what happened then?

4    A    I asked if he would meet my friend Katherine, who had a

5    great voice, and I thought that maybe he could help her with

6    her career.

7    Q    And where did that conversation happen?

8    A    It took place in his car.  I was sitting in the passenger

9    seat at that point.

10   Q    So I think you indicated you saw the defendant as he was

11   walking out of the Nike store?

12   A    Yes, then his car was very close by so we were quickly to

13   the car and the conversation occurred in the car.

14   Q    Did he invite you in the car?

15   A    He did.

16   Q    And how, if at all, did the defendant respond when you

17   told him about listening to your friend sing?

18   A    He said, yeah, he thought we could arrange that, but he'd

19   like to get to know me and he also said that he likes to

20   cuddle and would I be okay with that, to which I said yes.

21   Q    What happened next?

22   A    He gave me a phone number and said to call him, and so I

23   did.

24   Q    Did you see the defendant again after that?

25   A    I did.  I met him at the studio, at his studio.

1   Q    Now approximately how long after you met the defendant at

2   the Nike store did you see him again?

3   A    Within a week or two.

4   Q    And what was going on in your life at the time?

5   A    Um, that was definitely the hardest time of my life.  I

6   had a very low self esteem.  I had already been through sexual

7   trauma and abuse within my family, by my first boss, by men on

8   the street.  It was the hardest time of my life.  I was very

9   vulnerable.

10  Q    Okay.

11            MR. FARINELLA:  Objection, your Honor.

12            THE COURT:  Overruled.

13  Q    Now you said you went to the studio; is that right?

14  A    Yes.

15  Q    Do you recall where the studio was located?

16  A    Yes, it was just off of Chicago Avenue and right in

17  Cabrini-Green, right on the edge of Cabrini-Green.

18  Q    Is Cabrini-Green a neighborhood in Chicago?

19  A    Yes.

20  Q    Do you recall around what time of day it was that you

21  went to the studio?

22  A    It was the afternoon.

23  Q    What happened when you got -- well, withdrawn.  How was

24  it that you ended up going to the studio that day?

25  A    What do you mean?

1  Q    Had you communicated with the defendant prior to going to

2  the studio that day?

3  A    Yes.  So I spoke with him, he told me where to meet him

4  and I arrived on a bus, walked off the bus and over to the

5  studio.

6  Q    And how did you get into the studio?

7  A    There was a buzzer, like an intercom outside and so

8  someone that worked there let me in.

9  Q    And after you were let in, where, if anywhere, did you

10  go?

11  A    I was brought up to the second floor to a waiting room or

12  like a lounge room.

13  Q    And can you describe -- well, first, who brought you up

14  to that room?

15  A    An employee.

16  Q    And can you describe the room you were taken to?

17  A    Yeah.  It was a room at the end of a hallway.  There were

18  two sofas in it and there was a bathroom attached to that same

19  room.

20  Q    What floor of the studio was it on?

21  A    Second floor.

22  Q    What, if anything, did the employee who took you to that

23  room tell you once you got there?

24  A    To stay here and wait for him.

25  Q    And by "him" who are you referring to?

Stephanie - direct - Shihata                    1633

1    A    Robert Kelly.

2    Q    Did the employee then leave?

3    A    Yes.

4    Q    And were you alone in that room?

5    A    I was.

6    Q    How long did you stay in the room waiting for the

7    defendant?

8    A    I waited there for a few hours.

9    Q    And after a few hours, what happened?

10   A    He arrived, he came in and sat down next to me.

11   Q    The defendant?

12   A    Yes.

13   Q    And what do you recall happening next?

14   A    He came and sat down right next to me and laid his head

15   on my shoulder and said he was sorry that he took so long and

16   I said it was fine and there was a little bit of chitchat and

17   we had sex that day.

18   Q    How old were you at the time?

19   A    Seventeen.

20   Q    And who initiated the sexual intercourse that day?

21   A    He did.

22   Q    Apart from having sex with the defendant that day, did he

23   say anything -- do you recall anything about the conversation

24   or chitchat you had with him that day?

25   A    He said that he wanted me to call him daddy.

Stephanie - direct - Shihata                    1634

1    Q    Did you continue to see the defendant after that day?

2    A    I did.

3    Q    For about how long?

4    A    For about six months.

5    Q    And about -- during those approximately six months, about

6    how often did you and the defendant see each other?

7    A    About six to eight times per month.

8    Q    And where, generally, did you mostly see the defendant?

9    A    Mostly it was at the studio in that same room that I just

10   described.

11   Q    So the same studio as the one you went to the first time?

12   A    Yes.

13   Q    I'm going to show you what's in evidence as Government

14   Exhibit 525(u).

15        Do you recognize this?

16   A    Yes, that's the exterior of the studio.

17   Q    And you testified earlier about a call box to enter, do

18   you see that in this photograph?

19   A    Yes, it's -- yes, I do.

20   Q    And is it where I'm pointing my pen --

21   A    Yes.

22   Q    -- towards the middle left of the photo?

23   A    Yes.

24   Q    I'm showing you what's in evidence as Government

25   Exhibit 525P.

1          Do you recognize this?

2    A    Yes, I do.

3    Q    What is this?

4    A    That's the room that I waited in.

5    Q    And is this the room where you generally regularly saw

6    the defendant?

7    A    Yes.

8    Q    I'm showing you what's in evidence as 525K, is this just

9    another photograph of that room?

10   A    Yes.

11   Q    And you mentioned the room had a bathroom attached; is

12   that right?

13   A    Yes.

14   Q    I'm showing you what's in evidence as Government

15   Exhibit 525J.

16          Do you recognize this?

17   A    Yeah, that's the restroom.

18   Q    Now in the course of the approximately six months that

19   you saw the defendant, what were the different ways you got to

20   the studio?

21   A    Public transportation, also I was picked up at times by

22   an employee of his --

23   Q    And -- sorry.

24   A    -- there might have been a taxi here and there.

25   Q    And when you would leave the studio, what were the

1    different methods you would use to leave?

2    A    I'd get dropped off by an employee of his or at certain

3    points later in the relationship I had a car I could drive.

4    Q    And you mentioned sometimes you were picked up or dropped

5    off by an employee.  What type, if any, what type of employee

6    do you recall picking up or dropping you off sometimes?

7    A    I assumed it was a security person or a driver.

8    Q    And what led you to that conclusion?

9    A    Because that's the capacity in which I would see them

10   around either like with him when we were walking around or

11   driving us around.

12   Q    And do you remember any particular security employees the

13   defendant had working for him at the time you saw him?

14   A    I do remember one that I saw almost every time, I don't

15   remember his name.

16   Q    And do you remember what he looks like?

17   A    I do remember what he looks like.

18   Q    Can you describe him?

19   A    Yes, he was a black man, either short hair or bald.  Very

20   friendly, friendly face.

21   Q    I'm showing the witness what's in evidence as Government

22   Exhibit 23.  Do you recognize this individual?

23   A    Yes, that's the man that I'm referring to.

24   Q    Now, over the course of the approximately six months that

25   you saw the defendant, what were your interactions with him

Stephanie - direct - Shihata                    1637

1  like?

2  A    It would vary.  He was one of two ways.  He was either

3  very nice and charming, jovial, or he was very controlling,

4  intimidating.  He'd raise his voice at me and he could, you

5  know, put the fear of God in me very quickly.

6  Q    And you mentioned there were two sides, what, if

7  anything, in your experience would cause the defendant to go

8  from one side to the other?

9  A    It was hard to know what would do it but like, for

10 example, there was a time where that security, the driver, the

11 person that you just showed me the picture of, he wasn't there

12 and he had been like every single time, yeah, every single

13 time we hung out this man was there.  He'd either pick me up

14 or he'd be in the car with us or whatever and at one point he

15 wasn't there and I said, oh, where is the guy, he's always

16 here.  And it's just like casual and he immediately is, like,

17 what the fuck did you just say?  Don't ever fucking ask about

18 another man to me.  Like, mind your own business, don't ever

19 ask no stupid ass questions like that and terrified me.  I

20 didn't know that that would set him off.  So it was times like

21 that.

22 Q    Now during the approximately six months that you saw the

23 defendant, how often did the defendant have sex with you?

24 A    Every time.

25 Q    Every time you saw each other?

Stephanie - direct - Shihata                1638

1    A    Yes.

2    Q    And what was sex with the defendant like?

3    A    It was humiliating.  He would be very specific in how he

4    wanted me to be.  He would put me in positions that he wanted

5    me to be in.  He would tell me that he wanted me -- he'd tell

6    me to get undressed and then he would position my body in a

7    way and he would then say, all right, I'm going to go and when

8    I come back I want you to be just like this.  So I would just

9    be completely naked with my butt in the air and just like

10   waiting there for him to come have his way.

11   Q    And how long would you have to wait sometimes?

12   A    Sometimes hours.

13   Q    And what, if anything, happened when the defendant

14   returned and you weren't in the position he had told you to be

15   in?

16   A    He would become very angry with me, yelling at me, what

17   the fuck, I told you to do it like this.  Um, and he'd be very

18   disappointed and angry.  He would often ejaculate on my face.

19   He orchestrated the sounds that I would make.

20              (Continued on the next page.)

21

22

23

24

25

1    BY MS. SHIHATA:   (Continuing)

2    Q    What do you mean by that?

3    A    He would want me to moan.  Like if I made a sound, he

4    would say no, don't do it like that, make this kind of sound.

5    Q    Now, you mentioned he would often ejaculate in your face.

6    How did that make you feel?

7    A    Disgusted, less than.

8    Q    Less than?  Now, you testified earlier that when you

9    first met the defendant, you told him about your friend

10   Katherine and that she was a singer.

11   A    Yes.

12   Q    Did the defendant ever meet your friend Katherine?

13   A    He did.

14   Q    And how did that come about?

15   A    I asked him if he would meet with her.  He said that

16   would be fine and to bring her to the studio.

17   Q    And about how long had you been seeing the defendant at

18   that point?

19   A    It was pretty early on, I would say within the first

20   month or two.

21   Q    And after you had that conversation with the defendant,

22   who, if anyone, did you take to the studio?

23   A    I brought Katherine with me and my mom came with us as

24   well.

25   Q    Why did your mom come with you to the studio?

1  A    My mom came with us because she had seen a ring that

2  Mr. Kelly gave me and it looked like an engagement ring but it

3  wasn't an engagement ring.  He didn't propose marriage to me

4  or anything like that, but she thought that that was

5  inappropriate and she wanted to see what the dynamic was

6  between him and I.

7  Q    And when your mom noticed that ring, what, if anything,

8  did you tell your mom about the circumstances of how you got

9  that ring?

10 A    I just said that he had given it to me and that we were

11 friends and it really wasn't a big deal.  I didn't want her to

12 know what was going on between him and I.

13 Q    And had you and the defendant had sex at that point?

14 A    Yes.

15 Q    And did you keep that from your mom?

16 A    Yes, I did.

17 Q    Now, turning back to the day that you, Katherine and your

18 mom went to the defendant's studio, what happened at the

19 studio after you, Katherine and your mom arrived?

20 A    We were brought up to a music room, a room in which he

21 records music, and she performed in that room.  My mom and I

22 sat and watched.

23 Q    When you say "she," who are you referring to?

24 A    Katherine.

25 Q    And when you say she performed, what did she do?

Stephanie - direct - Shihata                    1641

1    A    She sang a song for him.

2    Q    For the defendant?

3    A    Yes, for Mr. Kelly.

4    Q    And how, if at all, did the defendant react?

5    A    He said that she, she could sing, and then we were

6    quickly dismissed because he wasn't thrilled about my mom

7    being with us.

8    Q    So about how long were you in the studio on that occasion

9    if you recall?

10   A    About an hour, maybe even less.

11   Q    Do you recall seeing any of the defendant's associates

12   that day at the studio when you, your mom and Katherine were

13   there?

14   A    I don't remember.

15   Q    Other than the security individual that you identified

16   earlier, do you recall meeting any of the other, any other

17   people associated with the defendant?

18   A    Yes.

19   Q    Who do you recall meeting?

20   A    There were two rappers that were around pretty often.

21   Q    And what were their names?

22   A    Boo and Gotti.

23   Q    And I'm also -- I'm going to show you what's in evidence

24   as Government Exhibit 8.

25            Do you recognize this person?

1    A    I do.

2    Q    Who is that?

3    A    That is Blackie.  He was introduced to me as Robert's

4    cousin/manager.

5    Q    And who introduced you to him?

6    A    Mr. Kelly did.

7    Q    Do you recall whether your friend Katherine ever met

8    Blackie?

9    A    She did meet him.

10   Q    Do you recall where she first met him?

11   A    I believe it was at the studio but I'm not positive.

12   Q    Other than the audition or the singing of the song that

13   Katherine did for the defendant, did the defendant have any

14   other involvement regarding Katherine and her music?

15   A    No.

16   Q    Now, at some point after you met the defendant, did you

17   and the defendant talk about your age?

18   A    Yes.

19   Q    And about how long after you met him at the Nike store

20   was that?

21   A    It was either the first or second time that we got

22   together at the studio.

23   Q    And how old were you at the time?

24   A    Seventeen.

25   Q    And what do you recall about that conversation with the

Stephanie - direct - Shihata                    1643

1  defendant?

2  A    I remember him asking me my age and me answering and

3  being a little nervous because I thought the age was 18, you

4  know, to be a consenting adult, but when I said I was 17, he

5  said it was fine.

6  Q    Did there come a time when the defendant videotaped you

7  engaging in sexual contact with him?

8  A    Yes.

9  Q    The first time this happened, how old were you?

10  A    I was 17.

11  Q    And was this after the conversation you had with the

12  defendant about your age?

13  A    Yes.

14  Q    How did it come about that the defendant videotaped you

15  at 17 engaging in sexual contact with him?

16  A    I -- we had set a time for me to meet him at the studio.

17  And so I was up in that same room and he called me in the room

18  and said that he was on his way to pick me up and that he

19  wanted to make a video of us having sex and that he would be

20  there shortly and I said okay.

21  Q    And when he asked you that, what was going through your

22  head?

23  A    Well, he didn't ask me.  He told me he would be there to

24  pick me up in order to do that and I was really scared and I

25  really didn't want to do it but I said okay right before I

Stephanie - direct - Shihata                1644

1   hung up.  So right after I hung up, I called my friend

2   Katherine and I said he just called me and said he wants to

3   record us having sex and she said get out of there.

4           MR. CANNICK:  Objection, Your Honor.

5           THE COURT:  Sustained.

6   Q    What, if anything, did you do after you called your

7   friend Katherine?

8   A    I did as he asked.

9   Q    Why?

10  A    Because I felt like I didn't have a choice.

11  Q    Did the defendant -- did you see the defendant after you

12  concluded that phone call with him?

13  A    Yes.  He showed up at the studio in a white van and I got

14  in and we drove to a house in Lincoln Park.

15  Q    And whose house did you understand that to be?

16  A    I understood it to be his home, Mr. Kelly's home.

17  Q    And do you recall anything about the name of the street

18  that house was on?

19  A    I believe it started with G.

20          MS. SHIHATA:  I'm showing the witness what's in

21  evidence as Government Exhibit 501(b).

22  Q    Do you recognize this photograph?

23  A    Yes, that's the home that we went to.

24  Q    What happened when you and the defendant arrived at his

25  home near Lincoln Park?

1  A    He -- we went inside and he quickly got a video camera

2  and he directed me on where to come in.  There is -- so when

3  you walk in, there's, like, a little walkway there and then

4  you come -- he wanted me to come around that and he was

5  filming as I came into the frame and he instructed me to

6  undress and told me to go over to the sofa.

7  Q    And did you do as he directed?

8  A    I did.

9  Q    You said he had a video camera with him, is that right?

10 A    Yes.

11 Q    Where did you see the video camera?

12 A    He was holding it.  It was a large video camera.

13 Q    And do you recall what type of video camera it was?

14 A    Yes, it's an old video camera that you'd have to put,

15 like, a VHS cassette tape into in order to record.

16 Q    What happened after -- you testified he was directing you

17 to take off your clothes and how to come into the frame, is

18 that right?

19 A    Yes.

20 Q    And where did he ask you to go?

21 A    Over to the sofa.

22 Q    And what happened after you went to the sofa?

23 A    He came up from behind me and started having sex with me.

24 Q    What, if anything, or where, if anywhere, was the video

25 camera at that time?

Stephanie - direct - Shihata                    1646

1   A   It was on, in front of me.

2   Q   I'm sorry.  Could you just repeat that?

3   A   It was in front of me.

4   Q   And was the defendant still holding the video camera?

5   A   No, he had placed it down on the table.

6   Q   And at that point, had you, were you completely naked?

7   A   Yes.

8   Q   And was the video camera facing you?

9   A   Yes.

10  Q   And was it recording?

11  A   Yes, it was.

12  Q   And where was the defendant at that time?

13  A   He was behind me.

14  Q   And what was he doing behind you?

15  A   Penetrating me.

16  Q   Vaginally?

17  A   Yes.

18  Q   What, if anything, happened next?

19  A   He said that he wanted to get a dildo and wanted me to

20  put it in my mouth as he had sex with me.  And so he went and

21  got it and I did as he, as he asked.

22  Q   And when you say "got it," are you referring to a dildo?

23  A   Yes.

24  Q   And after he got the dildo, what did he do with it?

25  A   He put it in my mouth and then continued having sex with

1    me.

2    Q    From behind?

3    A    Yes.

4    Q    And where was the video camera at that point?

5    A    It was right in front of me.

6    Q    And was it still recording?

7    A    Yes, it was.

8    Q    And you testified this was a VHS video camera?

9    A    Yes.

10   Q    While the camera was recording you, was it facing you and

11   your private areas?

12   A    Yes, it was.

13   Q    Do you recall anything else about the house you were in

14   that day?

15   A    I only remember that it was a very wide open house and

16   that there was a huge fish tank in the same room with me and

17   that was it.

18   Q    Other than the room where the filming happened, did you

19   go anywhere else in the house that day?

20   A    No.

21   Q    Now, you mentioned that you had met two rappers

22   affiliated with the defendant named Boo and Gotti, is that

23   right?

24   A    Yes.

25   Q    And did you meet them during your time with the

1   defendant?

2   A      Yes.

3   Q      Now, in what context did you meet them if you recall?

4   A      I just met them because they were around a lot too.

5   Q      Did there come a time where you had a meal at a

6   restaurant with the defendant, Boo and Gotti?

7   A      Yes.

8   Q      And where did that take place?

9   A      At Houstons in Chicago.

10  Q      Is Houstons the name of a restaurant?

11  A      Yes.

12  Q      And during that meal, were you permitted to speak to Boo

13  and Gotti?

14  A      No.

15  Q      Why not?

16  A      I wasn't meant to speak to any other man besides

17  Mr. Kelly.

18  Q      According to who?

19  A      Mr. Kelly.

20  Q      Did you hear the defendant speak to Boo and Gotti during

21  that meal?

22  A      I did.

23  Q      And do you recall anything the defendant said to them

24  during that meal?

25  A      He mentioned that he likes young girls and that people

1   make such a big deal of it but it really isn't a big deal

2   because even, look at Jerry Lee Lewis, he's a genius and I'm a

3   genius and we should be allowed to do whatever we want because

4   of what we give to this world.

5            MR. CANNICK:  Objection.

6            THE COURT:  I'm sorry.  Did you object?

7            MR. CANNICK:  Yes, Your Honor.

8            THE COURT:  Overruled.

9   Q    And did you know who the defendant was referring to when

10  he said Jerry Lee Lewis?

11  A    Yes, I did.

12  Q    Who was that?

13  A    An old singer who married a 12 year old, I think, or

14  something like that.

15  Q    How did the topic or how did that topic come up during

16  the meal?

17  A    That was the strangest part was that there was no,

18  nothing that the other guys said to lead to that.  It just

19  kind of came out of the blue.  Unless there was something said

20  that I didn't hear, it just came out of the blue.

21  Q    After the meal at Houstons restaurant in Chicago that

22  day, what, if anything, did the defendant ask you to do?

23  A    He asked me if I knew who Sharon Stone is and I said yes

24  and he asked me if I knew how she dresses, I said yes, and he

25  said that he had $300 and if he gave that to me, could I go

1    buy clothes in order to dress like her and I said that I

2    could.  So he took me over to the Water Tower and let me shop

3    for a time.

4    Q    And what is the Water Tower?

5    A    It's a, it is a tall building in Chicago, downtown

6    Chicago, that has a lot of different shops inside like

7    Nordstrom or Marshall Field's.

8    Q    And you mentioned Sharon Stone.  Who is that?

9    A    She's an actress.

10   Q    Now, you said, you testified the defendant -- did the

11   defendant take you to the Water Tower?

12   A    Yes.

13   Q    And what, if anything, did you do after the defendant

14   took you there?

15   A    So he dropped me off and let me go inside and shop for

16   myself and I did and I got the clothes and I wore them, I left

17   the stores in the clothes, and he wasn't there yet so I

18   decided that I would sneak and have a cigarette.  He didn't

19   know that I smoked cigarettes.  So I decided I'd have a

20   cigarette while I waited for him.

21         And he arrived without me noticing and he became

22   very angry when he saw me with a cigarette.  He came out of

23   the car and was, like:  What the fuck are you doing?

24         MR. CANNICK:  Objection, Your Honor.

25         THE COURT:  Overruled.

1   Q    You can continue.

2   A    Don't ever fucking smoke that shit.  What's wrong with

3   you?  Don't ever do that shit, especially not in front of me.

4              He was yelling at the top of his lungs and he was

5   standing right over me and I was very surprised that he was

6   just yelling so freely out in the public like that.

7   Q    How did that make you feel?

8   A    Terrified.

9   Q    During your time with the defendant, did you ever see him

10  play basketball?

11  A    Yes.

12  Q    And where would you see him play basketball?

13  A    There was one time where we went to a gym near downtown

14  Chicago, just outside of downtown Chicago.

15  Q    And what, if any, instructions did the defendant give you

16  regarding basketball games?

17  A    So we went, when we went inside, he showed me where to

18  sit and told me sit there, don't move, and so I did.  I

19  watched him play and then he came and collected me when it was

20  time to leave.

21  Q    And what happened next?

22  A    We got into an SUV with two people in the front driving

23  the car and a person in the passenger seat and then he and I

24  were sitting directly behind the front seats and he asked me

25  to perform oral sex on him and so I did.

Stephanie - direct - Shihata                    1652

1   Q     And what, if anything, happened while you were doing

2   that?

3   A     So that was really disgusting because he had just played

4   basketball for an hour and, and so I was really ashamed while

5   I was doing it so I was trying, you know, to do it quietly and

6   get it done and he asked me, he stopped me and said that I

7   need to make noises while I was performing oral sex on him

8   because, obviously, he wanted the people in the car to know

9   and even the person in the passenger seat looked back and saw

10  me doing that.

11  Q     You said you were ashamed.  Why were you ashamed?

12  A     Because it's disgusting and it's something that should be

13  done in private.

14  Q     Did you want to be doing that in public?

15  A     No.

16  Q     Did there come a time when you traveled to Florida to see

17  the defendant?

18  A     Yes.

19  Q     Around when was that?

20  A     It was around my birthday which is October 16th.  It

21  would have been a little bit before or a little bit after.

22  I'm not sure.

23  Q     And where in Florida did you travel to?

24  A     Orlando.

25  Q     And how did that trip come about?

1   A    Mr. Kelly asked me to meet him there and so an employee

2   of his arranged for me to go there and he said I could bring

3   my friend Katherine and so I did.

4   Q    And you said this was close in time to your birthday,

5   either a little bit before or a little bit after, you can't

6   remember which, is that right?

7   A    That's correct.

8   Q    And was that your 18th birthday?

9   A    Yes.

10  Q    Now, what, if any, understanding did you have about what

11  the defendant was doing in Orlando at the time?

12  A    I understood that he was making music there.

13  Q    Recording music?

14  A    Yes.

15  Q    And before your trip, what, if anything, did the

16  defendant tell you about coming to see him?

17  A    Nothing, just to come down, we would have a good time.

18  Q    And how long was the trip supposed to last?

19  A    It was just for a long weekend.

20  Q    And you mentioned your friend Katherine.  Did she go with

21  you on the trip?

22  A    She did.

23  Q    And did the two of you travel from Chicago to Orlando?

24  A    Yes.

25  Q    Who, if anyone -- sorry.

1           Who made your travel arrangements?

2    A    One of Mr. Kelly's employees did.

3    Q    And was that for both you and Katherine?

4    A    Yes.

5    Q    And who paid for your travel?

6    A    Mr. Kelly did.

7    Q    For you and Katherine?

8    A    That's correct.

9    Q    And had you ever been to Orlando before?

10   A    I had been once when I was around nine years old.

11   Q    Did you know your way around Orlando?

12   A    Not at all.

13   Q    After you and Katherine flew to Orlando and landed at the

14   airport, what happened?

15   A    We were picked up and brought to a home that was

16   furnished but no one seemed to live there.  It seemed to be

17   like what an Airbnb would be now.

18   Q    Fair to say Airbnb didn't exist back then?

19   A    Yes.

20   Q    And was it like a rental property?

21   A    It seemed that way.

22   Q    And do you recall anything about where the house was

23   situated?

24   A    I remember it being in a cul-de-sac.

25   Q    What happened after you and Katherine got to the house?

Stephanie - direct - Shihata                1655

1   A    Nothing.  We were there for a long time, for a few days,

2   and we were not contacted by him.  I started to think maybe

3   that he had forgotten that I was even there.  We just sat in

4   the house alone.

5   Q    Did you leave the house at all?

6   A    No.

7   Q    Why not?

8   A    We weren't allowed to.  We didn't have a car, we didn't

9   have anyone to take us anywhere or do anything.

10  Q    Now, did there come a point when you saw the defendant on

11  that trip to Orlando?

12  A    Yes.  On the last day that I was there towards the end of

13  the day, he showed up.

14  Q    And what happened when the defendant showed up?

15  A    He picked me up in a sports car and we drove to the

16  studio that he was recording at.

17  Q    And when you say "we," who are you referring to?

18  A    He and I.

19  Q    The defendant and you?

20  A    Yes.

21  Q    And was there anyone else in the car?

22  A    Not that I recall.

23  Q    Do you recall whether your friend Katherine went to the

24  studio as well?

25  A    I don't remember.

1   Q     Now, what happened when you got to the studio in Orlando?

2   A     Mr. Kelly told me that he wanted to record me giving him

3   oral sex there at the studio.

4   Q     And what happened next?

5   A     And so I did.  He had a different video camera that day

6   and I performed oral sex on him while he held the camera.

7   Q     And how is this video camera different from the one at

8   the house in Lincoln Park?

9   A     It was more of a handheld camera, a smaller one.

10  Q     And how was he holding it during this encounter?

11  A     He just held it out like that -- (indicating) -- facing

12  us.

13  Q     And what part of your bodies was it facing?

14  A     My profile.

15  Q     Was it --

16  A     I mean --

17  Q     -- the top of your body, bottom, middle?

18  A     My face because I was performing oral sex on him so my

19  face and possibly my breasts.

20  Q     And where was your face at the time?

21  A     In his lap.

22  Q     And were you -- was his penis in your mouth?

23  A     Yes.

24  Q     How did that make you feel?

25  A     Just humiliated.

1  Q    Did you want to be recorded that day?

2  A    No, I didn't.

3  Q    Do you recall whether you saw any of the other

4  defendant's employees or associates on your trip to Orlando?

5  A    I feel like I did see Blackie there but I can't be

6  specific as far as where I saw him.

7  Q    After that encounter where the defendant filmed you

8  having, giving him oral sex, did you see the defendant again

9  on that trip?

10 A    Just afterwards, we, he drove me back to the house and I

11 was crying in the car and I remember him not really knowing

12 how to deal with that and that was the end of that trip.

13 Q    Did you and Katherine return to Chicago from Orlando?

14 A    We did.

15 Q    And upon your return to Chicago, how were you feeling

16 about your time with the defendant?

17 A    I didn't want to be seeing him anymore.  I felt used and

18 humiliated and degraded and I just didn't want to be abused

19 anymore.

20 Q    Did you see the defendant again after your return to

21 Chicago?

22 A    I did.  I saw him at least once or twice after that.

23 Q    And why did you see him again after you returned to

24 Chicago?

25 A    Well, he had had these sex tapes of me and I wanted to

Stephanie - direct - Shihata                    1658

1    stay in good standings with him because I wanted to see if I

2    could get those from him.

3    Q    And did you discuss that with him?

4    A    Yeah.  I remember calling him and asking him if I could

5    meet with him and get the videotapes or even just destroy them

6    together and he gave me hope that we could.  So he said

7    something like:  Yeah, you know, we might be able to do that,

8    why don't you come down to the studio.  And at that point, I

9    knew that he didn't have any intentions of destroying the

10   tapes and that I would never see them again and that was the

11   last time that I spoke to him.

12   Q    Did you ever get the tapes from the defendant?

13   A    No, I didn't.

14   Q    Did you ever see him destroy the tapes?

15   A    No, I didn't.

16   Q    Since the last time you spoke to him and discussed those

17   tapes, have you spoken to the defendant since then?

18   A    No.

19   Q    Have you seen the defendant since then other than here

20   today in court?

21   A    No.

22   Q    And in relation to that trip to Orlando, approximately

23   when was your last communication with the defendant?

24   A    I would say either November or December of 1999.

25   Q    And you went to Orlando around your birthday, is that

1   right?

2   A      Yes.

3   Q      And when was that again?

4   A      Mid October.

5              MS. SHIHATA:  One moment, Your Honor.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephanie - direct - Shihata                    1660

1    (Continuing.)

2            MS. SHIHATA:  Nothing further, Your Honor.

3            THE COURT:  Okay, cross-examination?

4            MR. FARINELLA:  Your Honor, Ms. Becker is going to

5    take the cross-examination.

6            MR. CANNICK:  Your Honor, is it possible to get

7    three to five minutes?

8            THE COURT:  Well, it would never be three to five

9    minutes, but I will hold you to the five minutes.

10           We'll take a five-minute break --

11           MR. CANNICK:  Thank you.

12           THE COURT:  -- and expect the lawyers to be back in

13   the courtroom in five minutes.

14           So, all right, thanks so much, folks.  Don't talk

15   about the case.

16           THE COURTROOM DEPUTY:  All rise.

17           (Jury exits.)

18           THE COURT:  Okay, I am not leaving, so I want to

19   start in five minutes.  The witness can step out.

20           I won't listen to your conversation, but I am

21   staying here.

22           MR. CANNICK:  It will be fine, Judge.

23           THE COURT:  All right.

24           (Witness steps down and exits the courtroom.)

25           (Recess taken.)

SAM      OCR      RMR      CRR      RPR

1              (In open court - jury not present.)

2              THE COURT:  All right, let's get the defendant.

3              MS. GEDDES:  Your Honor, I'm assuming that we are

4    not going to get to our next witness today.  And so, she has a

5    flight to catch, which we would have had her delay it, but we

6    are going to send her home, if that's okay.

7              THE COURT:  That's fine.

8              MS. GEDDES:  Thank you.

9              (Defendant entered the courtroom.)

10             (Witness entered and resumed the stand).

11             THE COURT:  Go and get the jury, please.

12             (Pause.)

13             THE COURTROOM DEPUTY:  All rise.

14             (Jury enters.)

15             THE COURTROOM DEPUTY:  You may be seated.

16             THE COURT:  All right, I understand they tried to

17   lock you out, but I think you got in.

18             All right, so we are ready to continue with the

19   cross-examination.  Go ahead.

20             MS. BLANK BECKER:  Thank you, Judge.

21             THE COURTROOM DEPUTY:  The witness is reminded that

22   she's still under oath.

23   CROSS-EXAMINATION

24   BY MS. BLANK BECKER:

25   Q    Stephanie, you spoke with the Government prior to

Stephanie - cross - Blank Becker                1662

1  testifying today, correct?

2  A    Yes.

3  Q    In fact, you spoke with them today, is that true?

4  A    Briefly, yes.

5  Q    You spoke to them more in depth yesterday?

6  A    Yes.

7  Q    And you sort of went over your testimony, is that fair to

8  say?

9  A    We talked about the questions that would be asked.

10 Q    Well, you didn't talk for just, like, five or ten

11 minutes, right?

12 A    Correct.

13 Q    You went over what you had told them back in 2019, right?

14 A    I'm sorry, can you repeat that?

15 Q    Sure.

16       You reviewed with the Government what you said to

17 them back in 2019, correct?

18 A    Yes.

19 Q    Okay.  And back in 2019 when you initially talked to the

20 Government, you and/or your lawyer are the ones who contacted

21 the Government, is that correct?

22 A    Yes.

23 Q    You hired a lawyer, correct?

24 A    Yes.

25 Q    In fact, and I apologize, let me be more specific.

SAM     OCR     RMR     CRR     RPR

Stephanie - cross - Blank Becker                    1663

1           You hired a lawyer for a civil suit, correct?

2    A    No, not correct.

3    Q    Okay.  So, you don't have an outstanding civil suit

4    regarding this case?

5    A    No, I do not.

6    Q    And you don't have discussion -- you didn't have

7    discussions about a civil suit after you testify?

8    A    No.

9    Q    Okay.  You have a lawyer who's in court with you today,

10   correct?

11   A    Yes.

12   Q    Ms. Gloria Allred, is that correct?

13   A    Yes, it is.

14   Q    Can you just point to that person for us, please?

15   A    She's right there (indicating).

16   Q    Thank you.

17        MS. BLANK BECKER:  The record will reflect that she

18   did indicate Ms. Allred.

19   BY MS. BLANK BECKER:

20   Q    And the purposes -- purpose of Ms. Allred is simply to,

21   what, be here for moral support?

22        MS. SHIHATA:  Objection.

23        THE COURT:  Sustained.

24   Q    Why did you bring a lawyer with you?

25        MS. SHIHATA:  Objection.

Stephanie - cross - Blank Becker                    1664

1          THE COURT:  Can I see the parties at the side?

2          MS. BLANK BECKER:  Sure.

3          (Sidebar held outside the hearing of the jury.)

4

5          (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

```
                            Sidebar                          1665
```

 1              (The following sidebar took place outside the

 2     hearing of the jury.)

 3              THE COURT:  What's the basis of your objection?

 4              MS. SHIHATA:  Your Honor, she has a right to have a

 5     lawyer present in the courtroom.

 6              The suggestion that there's something untoward about

 7     that, and given that we had to change the configuration of the

 8     courtroom for COVID, it's particularly an unfair suggestion

 9     because normally the lawyer would be sitting in the gallery,

10     like anyone else.  And now, it's -- it's -- the questioning is

11     making it seem as though there's something untoward about it

12     and something special about it because other people are not

13     allowed into the courtroom because of the pandemic.

14              THE COURT:  I always think it is sort of amusing

15     that lawyers, who are representing people, make it seem like

16     there's something wrong with someone else having a lawyer to

17     represent them.

18              What is the purpose of your question?

19              MS. BLANK BECKER:  So, my understanding is that

20     there was a civil suit.  Tell me --

21              MS. SHIHATA:  That understanding is absolutely

22     wrong.

23              MS. BLANK BECKER:  Great -- I mean not great, but --

24              MS. SHIHATA:  I can tell you why she has a lawyer.

25              She didn't know how to navigate the legal system

1  when she wanted to come forward and contact us.

2          THE COURT:  Well, she can answer that, if you wanted

3  to do that on redirect.

4          MS. SHIHATA:  I plan to.

5          THE COURT:  It sounds like you have your answer.

6          MS. BLANK BECKER:  Yes.  I am taking this over right

7  now, and I'm dealing with the info I got.

8          THE COURT:  That's fine, understood.

9          MS. BLANK BECKER:  Thank you.

10          (Sidebar concluded.)

11

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court - jury present.)

2                    THE COURT:  All right, next question.

3                    MS. BLANK BECKER:  Thank you, Judge.

4     EXAMINATION CONTINUING

5     BY MS. BLANK BECKER:

6     Q     Stephanie, you actually have a lawyer because you didn't

7     quite know how to navigate the system, is that correct?

8     A     No.

9     Q     Okay.

10                   So, when you spoke to the Government back in 2019,

11    you had your lawyer on the phone with you, is that correct?

12    A     I don't recall.

13    Q     What year did you hire your lawyer?

14    A     I guess it would have been around 2019.

15    Q     Okay, and if the paperwork, I know it was a while ago,

16    but if the paperwork from your interview with the Government

17    in 2019 indicates that Ms. Allred was present as well, would

18    that be correct?

19    A     Probably, yes.

20    Q     Okay.  After the 2019 discussion -- excuse me, interview

21    with the Government -- well, actually, I should ask you:

22                   In the interview with the Government, that was over

23    the phone, is that correct?

24    A     Yes.

25    Q     All right, during COVID times?

Stephanie - cross - Blank Becker                    1668

1    A     Correct.

2    Q     Got it.

3          And was it one of those times where you could see

4    each other, like it was a Facetime or a Zoom-type thing?

5    A     Yes.

6    Q     All right.  So, you were able to see that all the United

7    States assistant attorneys who are here today, you could see

8    them when you guys were having the interview, is that correct?

9    A     No, that's not correct.  I -- I recognize a couple of

10   faces that were on that call.

11   Q     All right.  So, if in that interview the Government has

12   listed that the individuals who are seated today, and perhaps

13   not the detective, but the rest of the government, you don't

14   remember them being there, these three (indicating) -- sorry,

15   I should be more specific.

16             THE COURT:  She just said she couldn't see

17   everybody.  Next question.

18   BY MS. BLANK BECKER:

19   Q     Do you know how many people were there?

20   A     I don't.

21   Q     Fair to say, more than two?

22   A     Yes.

23   Q     And more than four?

24   A     Probably.

25   Q     When you had a chance to speak with them then, you had

SAM     OCR     RMR     CRR     RPR

1    plenty of time to sort of tell them everything that you

2    remember, correct?

3    A    Yes.

4    Q    And you used that time, they didn't rush you through your

5    story, you know, what you remembered happening, did they?

6    A    No.

7    Q    All right.  So, when you were able to tell them what

8    happened, they wanted details, right?

9    A    Yes, as I could remember.

10   Q    Sure.  To the best of your recollection, they wanted you

11   to tell them exactly what happened when, how and where, fair

12   enough?

13   A    Yes.

14   Q    Okay, and you did the best that you could with that,

15   correct?

16   A    Yes.

17   Q    Did you ever say to the Government when you were speaking

18   to them back in April of 2019 that you had your own car and

19   you used your own car to go and see Mr. Kelly?

20   A    There were times during our relationship that I did have

21   a car.

22   Q    You actually saw Mr. Kelly not one time, not twice, but

23   several, several, several times, correct?

24   A    Yes.

25   Q    All right.  And the majority of the time was you going to

1  him, correct?

2  A    Yes.

3  Q    All right.  And when you would go to him, whether it

4  was -- I think you indicated earlier sometimes you would get

5  rides, is that correct?

6  A    Uh-hum.

7  Q    You've got to just say yes or no, sorry.

8  A    Yes.

9  Q    And so, you would make the decision that it was time, if

10 he called you, you would go there; is that fair to say?

11 A    Yes.

12 Q    And vice versa, correct?

13 A    Meaning what?

14 Q    Sure.  Would he ever call you and ask you if you wanted

15 to come and see him?

16 A    That's mostly how it was.

17 Q    Okay.  So, but there were times you called him as well, I

18 take it, correct?

19 A    Not really, he initiated all the contact.

20 Q    All right.  You had a choice to pick up the phone or not,

21 right?

22 A    Yes, of course.

23 Q    Okay.  And you chose to pick it up every time he called?

24 A    Yes.

25 Q    And not only did you choose to pick up the phone every

1  time he called, but you chose to figure out a way to get over

2  there to see him, is that true?

3  A    Yes.

4  Q    All right.  And my understanding from what you said

5  earlier is that -- that you were actually, I think the words

6  were, humiliated and scared based on your relationship and

7  things that happened with you and Mr. Kelly, right?

8  A    Yes.

9  Q    Okay.  And that was after the first time there was some

10 sexual interaction, is that correct?

11 A    Can you clarify the question, please?

12 Q    Sure.

13      You indicated that you felt humiliated and scared of

14 Mr. Kelly, correct?

15 A    Yes, at times.

16 Q    At times.

17      So, there were other times when he treated you like

18 you were his girlfriend, right?

19 A    Yes.

20 Q    The times when you felt humiliated and scared, that had

21 to do with sexual interactions with you and Mr. Kelly,

22 correct?

23 A    To a point.

24 Q    Okay.  Well, there was --

25 A    Also, there were times when he would scold me when we

Stephanie - cross - Blank Becker                    1672

1    were not having sex or yell at me or humiliate me at times

2    that we were not having sex.  So, it wasn't only during sex.

3    Q    Okay.  And fair enough, you didn't like that, is that

4    true?

5    A    Of course, not.

6    Q    But he never physically touched you, correct -- let me --

7    physically abused you, correct?

8    A    No, he never hit me.

9    Q    Never hit you?

10   A    No.

11   Q    Never smacked you?

12   A    No.

13   Q    Never hit your butt like a spanking-type thing?

14          MS. SHIHATA:  Objection.

15          THE COURT:  Overruled.

16          Did that ever happen?

17   A    Unless sexually that happened.

18   Q    Okay.  You wouldn't chock it up to, like, physical abuse,

19   that was maybe something sexual that would occur?

20   A    Correct.

21   Q    Got it.

22          All right, because if any of those things were

23   happening you certainly would, I don't know, maybe call the

24   police or something like that, is that true?

25   A    I don't know what I would have done in that state of

1  mind.

2  Q    Okay.  But from what you recall, none of that ever

3  occurred in your relationship, correct?

4  A    Yes.

5  Q    And you never saw Mr. Kelly do physical things to anybody

6  else while you were around him, correct?

7  A    Correct.

8  Q    Now, you indicated at some point you recalled, I'm going

9  to take you back to the beginning, you said at some point a

10  co-worker had told you that Mr. Kelly was having an event at

11  Nike, correct?

12  A    Yes.

13  Q    It wasn't an event, was it, Stephanie?

14  A    I don't know what it was, just that he was there.

15  Q    Okay.

16        So, someone told you R. Kelly is going to be at Nike

17  on Chicago Street in Illinois, correct?

18  A    Yes.

19  Q    Or Michigan Street, I apologize, Michigan Avenue?

20  A    Michigan Avenue.

21  Q    Yes, okay.  So, when you heard that, you remembered this

22  is the same person I met, like, a year ago or saw at the

23  McDonald's, correct?

24  A    Correct.

25  Q    You were at McDonald's with your boyfriend, correct?

Stephanie - cross - Blank Becker                1674

1   A    Yes.

2   Q    And there were some other people there, too, right, it

3   wasn't just you and your boyfriend?

4   A    Correct.

5   Q    Who else?  There were two other people?

6   A    Yes.

7   Q    Got it.

8           All right, and at some point you talked about how

9   someone came up to you and gave you Mr. Kelly's phone number,

10  correct?

11  A    Correct.

12  Q    All right.  And you took the number?

13  A    I did.

14  Q    And your boyfriend was standing there with you?

15  A    He was in the restaurant.  He wasn't standing with me at

16  the register at that moment.

17  Q    So, he left you at that point?

18  A    I left him at the table and I went to order.

19  Q    Got it.  So, it was at that point that someone approached

20  you?

21  A    Correct.

22  Q    All right.  And you took the phone number, correct?

23  A    Yes.

24  Q    Okay.  Now, you didn't use the phone number; you didn't

25  call, right?

SAM     OCR     RMR     CRR     RPR

Stephanie - cross - Blank Becker                    1675

1   A    Correct.

2   Q    You heard he was over at Nike, correct?

3   A    Yes.

4   Q    This is a year later, right?

5   A    Uh-hum, yes.

6   Q    Thank you.

7         And you go to the Nike store because you want to see

8   if he'll help your friend's career, right?

9   A    Correct.

10  Q    You didn't think to call your friend Katherine and say:

11  Hey, I heard Mr. Kelly is going to be or R. Kelly's going to

12  be over at the Nike store, I think you should get over there;

13  no?

14  A    No.

15  Q    Right.  So, you went there by yourself, correct?

16  A    Correct.

17  Q    And, in fact, when you got there, you saw there was a

18  whole bunch of people trying to get at Mr. Kelly; do you

19  remember that?

20  A    No.

21  Q    Okay.  I think you actually testified something to the

22  effect of when you left the Nike store, you were able to

23  approach right up to him as you -- as he was exiting.

24         Is that correct?

25  A    Correct.

1   Q   Okay, you didn't see all of his security guards with him?

2   A   I mean there were people around.

3   Q   Okay.  But you had the ability to kind of get up in

4   there, is that correct?

5   A   Yes.

6   Q   All right.  And not only did you have the ability to get

7   up in there, but you were like face-to-face with him, correct?

8   A   Correct.

9   Q   All right.  And you were so close to him that you guys

10  even were having a conversation there, correct?

11  A   Yes.

12  Q   Okay.  And you even said to Mr. Kelly, something to the

13  effect of, I have a friend who knows how to sing and, perhaps,

14  she could sing for you, correct?

15  A   Yes.

16  Q   All right.  And this whole conversation is happening,

17  this whole conversation is happening as you are walking down

18  the street with him to his car?

19  A   It began as we were walking.  I asked him about my friend

20  at -- after I was already in the car.

21  Q   So, you didn't have the conversation about your friend

22  until you were in his car?

23  A   Correct.

24  Q   So, you guys just walked and didn't talk at all until you

25  jumped into the car?

1  A    It was small talk.  He was parked very close -- close by.

2  Q    So, he -- so, I think you said you got in his car in the

3  passenger seat, right?

4  A    Yes.

5  Q    Okay.  So, according to you, and what you remember,

6  Mr. Kelly is at Nike, there's all these people around him, but

7  you could make your way to him, and he jumped into a car by

8  himself as the driver, correct?

9  A    He was sitting in the driver's seat, yes.

10  Q    Okay.  And then you got in as the passenger?

11  A    Correct.

12  Q    No one else in the car, right?

13  A    Not that I can recall.

14  Q    Okay.  Now, remember how I asked you questions earlier

15  about telling the Government, having enough time to tell them

16  back in April about your recollection of what happened?

17  A    Yes.

18  Q    You never mentioned anything about getting in a car with

19  Mr. Kelly, did you?

20  A    I don't remember.

21  Q    You never mentioned anything about walking with Mr. Kelly

22  so that it was small talk and then getting into the car,

23  correct?

24  A    I don't remember.

25  Q    And you never mentioned anything about when you were in

1   the car, that's when you guys discussed your friend Katherine?

2   A    I feel like I did say that --

3   Q    Okay.

4   A    -- but I'm not positive, if you're saying that I didn't.

5   Q    Would it help refresh your memory if you had a chance to

6   look at the report?

7   A    Sure.

8          MS. BLANK BECKER:  Judge, may I approach?

9          THE COURT:  Yes.

10         MS. BLANK BECKER:  Sorry, Judge, if I could just

11   have one moment, paperwork, it's everywhere.

12         Sorry, Judge.

13         THE COURT:  Are you showing her 3500-S22, page 2?

14         MS. BLANK BECKER:  I am searching for it now, Judge,

15   thank you.

16         I apologize, Judge.  May I approach?

17         THE COURT:  Yes.  Just tell the Government exactly

18   what you're showing the witness.

19         MS. BLANK BECKER:  Yes, I will, Judge; thank you.

20         (Pause.)

21         MS. BLANK BECKER:  May I approach, Judge?

22         THE COURT:  Yes.

23         MS. BLANK BECKER:  Thank you.

24         Just read it to yourself.

25         THE WITNESS:  Okay.

1              (Pause.)

2              THE WITNESS:  It doesn't mention the car.

3              THE COURT:  Just so I'm clear, is this 3500-S2-1 or

4    S2-2?

5              MS. BLANK BECKER:  1, Judge.

6              THE COURT:  Okay.

7              MS. BLANK BECKER:  May I approach, Judge?

8              THE COURT:  Yes.

9    BY MS. BLANK BECKER:

10   Q     Did that help refresh your memory?

11   A     Yes.

12   Q     And now, did you say anything to the Government in April

13   of 2019 about getting in a vehicle with Mr. Kelly?

14   A     It doesn't seem that I did.

15   Q     You actually indicated that after you met Mr. Kelly, you

16   ended up going to see him at the studio about a week later, is

17   that correct?

18   A     Yes.

19   Q     All right, and you did that because you had exchanged

20   phone numbers, is that correct, when you met him?

21   A     We had spoken -- we'd spoken over the phone and I -- we

22   arranged a time to meet at the studio.

23   Q     Okay.  So, when was it that you gave him your number or

24   he gave you his number?

25   A     He gave me his number to call him.

1   Q      When was that, when did that happen?

2   A      In the car.

3   Q      In the car.

4          And then your testimony is that you spoke for, like,

5   a week with him, is that correct?

6   A      Uh-hum -- yes.

7   Q      And then you showed up at the studio?

8   A      Correct.

9   Q      Okay.  You knew where that studio was, correct?

10  A      He told me where it was, yes.

11  Q      Okay.  Well, you're from Chicago, correct?

12  A      Yes, I am.

13  Q      Okay.  And in Chicago Mr. Kelly is known as, like, a

14  celebrity from Chicago, Illinois; is that correct?

15  A      Yes.

16  Q      All right.  And it's very common for people to know where

17  he has his studios, is that true?

18              MS. SHIHATA:  Objection.

19              THE COURT:  Sustained.

20              MS. BLANK BECKER:  Thank you.

21  BY MS. BLANK BECKER:

22  Q      You had an idea of where his studios were located,

23  correct?

24  A      No.

25  Q      So, during this conversation of you talking with him

1   walking to the car, he also gave you the address for where you

2   were to go?

3   A    No, after we spoke on the phone was when he told me where

4   the studio was and where I could meet him there.

5   Q    Okay, and I take it you were excited that you were going

6   to go there because you were going to be able to talk to him

7   about your friend Katherine, right?

8   A    Yes.

9   Q    In fact, you brought Katherine with you because this

10  might be the opportunity where she could sing for him?

11  A    No.

12  Q    You went by yourself?

13  A    Correct, as he requested.

14  Q    What about you, didn't you want Katherine to go with you?

15  A    Yes, of course.

16  Q    But you didn't feel intimidated or scared to go by

17  yourself, correct?

18  A    No.

19  Q    You drove over there, correct?

20  A    No, I didn't have a driver's license at the time.

21  Q    How old were you?

22  A    Seventeen.

23  Q    Thank you.  So, someone got you -- strike that.

24       Did you have your mom drive you?

25  A    No.

Stephanie - cross - Blank Becker                1682

1   Q     Who drove you?

2   A     Public transportation.

3   Q     I apologize, I think did you say you took the bus?

4   A     Yes.

5             THE COURT:  She did.  Next question.

6             MS. BLANK BECKER:  Thank you.

7   BY MS. BLANK BECKER:

8   Q     And once you got to the studio, I think you indicated

9   that you had to go into the studio and you had to talk with

10  whomever was at the front desk, fair to say?

11  A     Yes.

12  Q     All right.  And you supplied that person with your ID,

13  correct?

14  A     I don't recall that.

15  Q     Do you remember them taking -- someone who was there

16  taking a picture of you?

17  A     No, I don't remember that either.

18  Q     Do you remember if you spoke to a male or a female?

19  A     I believe it was a male, but I'm not positive.

20  Q     So, you don't remember a lot about when you first got

21  there, is that correct?

22  A     I remember some things, but I'm answering your questions

23  honestly.

24  Q     Okay.  So -- so, you -- you would have brought your ID

25  with you, is that correct?

Stephanie - cross - Blank Becker                    1683

1  A    I wouldn't have had reason to.  I didn't have a driver's

2  license, so I don't know why I would bring my ID with me, but

3  I might have.

4  Q    Okay.  You just can't remember if they asked you for it

5  when you got there, correct?

6  A    I don't remember anyone asking me for my ID at any point.

7  Q    Okay.  Well, in Illinois the age of consent is 17,

8  correct?

9  A    Yes.

10 Q    Okay.  I believe that you had indicated at some point

11 when you got there at the studio that first time someone took

12 you to a room --

13 A    Yes.

14 Q    -- correct?

15 A    Yes.

16 Q    Okay, and I think the Government showed you some pictures

17 and you indicated in one of the pictures, yep, that's the room

18 I was in; correct?

19 A    Yes.

20 Q    Okay.  The Government showed you those pictures before

21 you came in here today, correct?

22 A    Yes.

23 Q    And so you saw the room that they showed you today,

24 you've seen that picture before, correct?

25 A    Yes, I saw it yesterday.

Stephanie - cross - Blank Becker                1684

1    Q    Okay.  And are you suggesting that that room and the

2    furniture with the couch, that was the same as it was back

3    when you were there in, what was it, 2000 and --

4              MS. SHIHATA:  Objection.

5              THE COURT:  I think it was 1999.

6              MS. BLANK BECKER:  Thank you.  You're right.  Thank

7    you, Judge.

8    BY MS. BLANK BECKER:

9    Q    Back in 1999?

10             MS. SHIHATA:  I am going to object, Judge, I

11   think --

12             THE COURT:  Well, are you asking her was the

13   furniture the same?

14             MS. BLANK BECKER:  Yes, Judge.

15             THE COURT:  All right.

16             Do you recall what the furniture looked like when

17   you were there in 1999?  Was it the same as in those pictures?

18             THE WITNESS:  I don't remember.

19   BY MS. BLANK BECKER:

20   Q    It was a long time ago, right?

21   A    Yes, it was.

22   Q    So, you agreed with the Government when they showed you

23   the picture and said, this is the room you were in?

24             MS. SHIHATA:  Objection.

25             THE COURT:  Sustained as to form.

SAM     OCR     RMR     CRR     RPR

Stephanie - cross - Blank Becker                    1685

1   BY MS. BLANK BECKER:

2   Q    You had an opportunity to tell the Government, I have no

3   idea if that's the room or not it was so long ago, right?

4   A    I had the opportunity --

5            MS. SHIHATA:  Objection.

6   A    -- yes.

7   Q    But you didn't say that when you were talking about the

8   room, correct, you said, that's the room; correct?

9   A    Yes.

10  Q    Got it.

11           I believe you also indicated that you had to wait a

12  long time before you got to see Mr. Kelly, is that correct?

13  A    Yes.

14  Q    Okay.  Now, the room that you were in, I believe you

15  already indicated had a bathroom attached, correct?

16  A    Yes.

17  Q    All right.  It also had a door to go into the room and

18  out of the room, fair enough?

19  A    Yes.

20  Q    And that room -- excuse me, that door had a lock?

21  A    Yes.

22  Q    How do you know that?

23  A    Well, most doors have a little lock on the inside.

24  Q    Okay, so you don't know for sure, but you're assuming

25  it's a regular door lock, correct?

SAM     OCR     RMR     CRR     RPR

1  A    Well, I remember him locking the door from the inside

2  when we were having sex in it.

3  Q    You remember him locking the door from the inside.

4         Which time was that that you had sex that you

5  remember that?

6  A    A time when we had sex, I don't -- I don't know the date.

7  Q    Okay, so every time if you -- strike that.

8         How many times would you say that you had sex in

9  that room?

10  A    More than 15 times.

11  Q    Okay.  So, all 15 times, is that when he would -- you

12  guys would go in and he would lock the door?

13  A    I don't remember if he locked the door every single time.

14  Q    The Government asked you about whether there was -- the

15  door was locked or not before you came in here today, correct?

16  A    I don't recall them asking me that.

17  Q    You never mentioned anything about a locked door when you

18  spoke to the Government in 2019, April, did you?

19  A    I don't recall.

20  Q    Would it help refresh your memory to look at the report?

21  A    No.

22  Q    When you were waiting and, what was it, hours that you

23  were waiting for Mr. Kelly?

24  A    Yes.

25  Q    Okay.  It's fair to say that you could have chosen to get

1   up and leave, correct?

2   A    When I was brought to the room, the person said to wait

3   here for him, to not leave the room.

4   Q    Okay.  Just like in a classroom and the teacher's

5   talking, you're not supposed to leave, but if you have to go

6   the bathroom, you could kind of raise your hand and go; fair

7   enough?

8           MS. SHIHATA:  Objection.

9           THE COURT:  Sustained as to form.

10          MS. BLANK BECKER:  Thank you, Judge.

11  BY MS. BLANK BECKER:

12  Q    You had the ability, let's say, to get up and walk out

13  the door, if you wanted to; fair enough?

14  A    Yes.

15  Q    You chose not to, true?

16  A    Correct.

17  Q    And you chose to stay there for, I think you said, a

18  couple hours?

19  A    Correct.

20  Q    And eventually, Mr. Kelly came to the room, correct?

21  A    Yes.

22

23           (Continued on the following page.)

24

25

STEPHANIE - CROSS - BLANK BECKER                1688

1    CROSS-EXAMINATION

2    BY MS. BLANK BECKER:

3    Q    Got it.  And you indicated that Mr. Kelly, I believe you

4    said something about, put his head on your lap?

5    A    Shoulder.

6    Q    Sorry, shoulder.  Okay.

7            And this was the first time that you guys had

8    actually been alone, true?

9    A    Besides in the car, yes.

10   Q    I apologize, right, in the car.

11           And there was some small talk that occurred?

12   A    Yes.

13   Q    And you went to see Mr. Kelly for the purposes of your

14   friend Katherine, right?

15   A    Yes.

16   Q    So while you were in this room, did you -- do you

17   remember talking to him about Katherine?

18   A    Not at that time, no.

19   Q    In fact, Katherine didn't even come up that time when you

20   met him -- excuse me, when you were with him alone in the room

21   at the studio for the first time?

22   A    I don't remember if we talked about Katherine at that

23   time.

24   Q    Instead, you guys, I believe you indicated you were

25   intimate, correct?

STEPHANIE - CROSS - BLANK BECKER          1689

1   A    Yes.

2   Q    And you were intimate because you wanted to be intimate,

3   or no?

4   A    We were intimate because I wanted to do what I needed to

5   do in order for him to hear my friend to sing.

6   Q    Okay.  I appreciate the honesty.

7            So you would have --

8            MS. SHIHATA:  Objection.

9            THE COURT:  Please don't make comments like that.

10  Next question.

11           MS. BLANK BECKER:  Thank you, Judge.

12  Q    So at that point when you're in that room and Mr. Kelly

13  shows up, you were at a point where you would have done what

14  you had to do because you wanted to sort of make sure he hears

15  about your girlfriend; is that correct?  When I say

16  girlfriend, I just mean your friend.

17  A    I understand, but I don't understand the question, can

18  you rephrase it please.

19  Q    Okay, sure.  In do -- when you said you were going to do

20  what you had to do, that included having sexual relations with

21  Mr. Kelly, correct?

22  A    Yes.

23  Q    All right.  So then eventually after the sexual relations

24  I believe that you indicated you eventually left, true?

25  A    Yes.

STEPHANIE - CROSS - BLANK BECKER                1690

1   Q    Okay.  And you were able to just walk out the door and

2   leave, correct?

3   A    Yes.

4   Q    You were taking public transportation back home?

5   A    I believe so.

6   Q    So you can sort of hop on the bus, for lack of better

7   words, at any time when the schedule shows the bus is coming,

8   correct?

9   A    Yes.

10  Q    Okay.  And you ultimately you went home to your

11  residence, correct?

12  A    Uh-huh, yes.

13  Q    You never had to stay overnight with Mr. Kelly, correct?

14  A    Correct.

15  Q    You were always able to go home?

16  A    That's correct.

17  Q    Remember earlier when I said, you know, I wasn't sure

18  where your head was and you corrected me and you said your

19  head -- excuse me, his head was on your shoulder in that room?

20  A    Yes.

21  Q    Do you remember telling the government that your head --

22  that he actually put his head on your lap?

23  A    No, I don't remember that.

24  Q    Okay.  Would it help refresh your memory if you had a

25  chance to look at the report?

STEPHANIE - CROSS - BLANK BECKER                    1691

1   A    No.

2   Q    So when you left Mr. Kelly's you -- how quickly did you

3   see him again?

4   A    Probably within a week of that first time.

5   Q    And the second time you saw him was at the studio as

6   well, correct?

7   A    Yes.

8   Q    In fact, it was rare that you went anywhere with

9   Mr. Kelly like in public, true?

10  A    Most times it was at the studio, correct.

11  Q    And most times at the studio, if not every time, you guys

12  engaged in some kind of sexual relations?

13  A    Correct.

14  Q    You spoke specifically of one instance that you recalled

15  when you were at Houston's for dinner, do you remember that?

16  A    I do.

17  Q    You indicated that there were two other rappers that were

18  there, I believe it was Boo and Meek?

19  A    Boo and Gotti.

20  Q    Oh, yes, Gotti.  I believe you indicated you were

21  introduced to them, that's how you knew their name, correct?

22  A    Yes.

23  Q    And then after that you were told you couldn't talk to

24  them?

25  A    I wouldn't say I was introduced to them.  I was within

1  earshot and heard him referring to them and that's how I knew

2  their names, but, yes, I was told not to talk to them.

3  Q    So you guys are one of those big round tables at

4  Houston's?

5  A    It was a square table.

6  Q    Got it.  A square table at Houston's?

7  A    Yes.

8  Q    Four of you?

9  A    Correct.

10 Q    And you what, did you have to, like, look down and not

11 look at them the whole time?

12 A    No, I didn't say that.

13 Q    Okay.  You could look, but you couldn't speak?

14 A    Correct.

15 Q    And you told the government all about Houston's when you

16 spoke to them in April of 2019, right?

17 A    I did.

18 Q    So if -- maybe they just -- is it possible, strike that.

19       Where in -- strike that.

20       You don't -- strike that.

21       The first time when you spoke with the government

22 back in April, are you saying that you told them about

23 Houston's or sometime you told them about Houston's, a

24 different time?

25 A    I believe I told them the first time, but I'm not

STEPHANIE - CROSS - BLANK BECKER                    1693

1    positive.

2  Q    So if the report doesn't have anything about that --

3              MS. SHIHATA:  Objection.

4              THE COURT:  Well, sustained.

5              Can I see the parties at the side for a minute with

6    the court reporter.

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1694

1

2              (The following occurred at sidebar.)

3              THE COURT:  I could be wrong, but it says it in the

4      report.

5              MS. BLANK BECKER:  Well, my --

6              THE COURT:  I know, I know, but I'm just trying to

7      tell you.

8              MS. BLANK BECKER:  I will move on.  Yes, thank you,

9      Judge.

10             THE COURT:  All right.

11             (End of sidebar conference.)

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2           THE COURT:  Next question.

3           MS. BLANK BECKER:  Thank you, Judge.  Thank you.

4    Q    Stephanie, you talked about the fact that you know that

5    Mr. Kelly videotaped you a couple of times fair to say?

6    A    Yes.

7    Q    All right.  And ultimately you knew that because you

8    could see the recording was on, is that fair to say?

9    A    Yes.

10   Q    And you were not too happy that he was videoing you; is

11   that correct?

12   A    Correct.

13   Q    That wasn't something that you were interested in; is

14   that correct?

15   A    Correct.

16   Q    Even though you didn't like it, after the first time you

17   did it again, correct?

18   A    Correct.

19   Q    And then after the second time you did it again, correct?

20   A    Um, no, I'm not sure if there was more than two tapes

21   made.

22   Q    Okay.  And you're not sure because you never saw the

23   tapes, correct?

24   A    That's correct.

25   Q    And you were concerned that there might be some tapes out

STEPHANIE - CROSS - BLANK BECKER                1696

1   there of you, correct?

2   A    Yes.

3   Q    And because of that you discussed the possibility of

4   suing Mr. Kelly, correct?

5   A    No, that's not correct.

6   Q    So the fact that there were videos out there and you

7   didn't know if any of them were with you, you didn't do

8   anything about that?

9   A    I didn't know what to do about it.

10  Q    You didn't know that you could call a lawyer?

11        MS. SHIHATA:  Objection.

12        THE COURT:  Sustained.

13  Q    So you didn't do anything about the videos, correct?

14  A    Correct.  Besides what I already testified to and what --

15  speaking with him and asking him to destroy them.

16  Q    Got it.  I think if I remember correctly, when you had

17  that conversation he had asked you -- or you had spoke that

18  you were going to come to the studio and maybe do it together,

19  is that what you said?

20  A    That's not exactly what I said.

21  Q    Okay.  What was supposed to happen in that phone call?  I

22  believe you said it was the last phone call you had with him.

23  A    He said that that might be a possibility and for me to

24  come to the studio, but I knew him at that point and knew that

25  he would -- had no intentions of destroying the tapes.

STEPHANIE - CROSS - BLANK BECKER                1697

1   Q    And you knew him at that point you said, right?

2   A    I know he didn't have any intention of destroying the

3   tapes.

4   Q    That was your impression then or your impression now?

5   A    Then and now.

6   Q    So you didn't want to try to go to the studio and maybe

7   the tapes were there and you could destroy them?

8   A    No, I didn't want to be around him anymore.

9   Q    You wouldn't do whatever you had to do to get those

10  videos?

11              MS. SHIHATA:  Objection.

12              THE COURT:  Sustained as to form.

13  Q    The videos, that was sort of the straw that broke the

14  camel's back, is that fair to say?

15  A    No.

16  Q    The last conversation you had with Mr. Kelly, that was

17  about the videos, correct?

18  A    Correct.

19  Q    And he offered for you to come to the studio to discuss

20  and/or get rid of videos, correct?

21  A    Correct.

22  Q    And that's when your relationship ended, correct?

23  A    Correct.

24  Q    You talked -- excuse me, you testified about the fact

25  that Mr. Kelly at some point gave you some money so that you

STEPHANIE - CROSS - BLANK BECKER                1698

1   could go shopping at the Water Tower, correct?

2   A    Yes.

3   Q    In fact, I think you even said that Mr. Kelly dropped you

4   off and he waited for you, correct?

5   A    He dropped me off, I don't know that he waited for me.

6   Q    Okay.  Well, when you were done, Mr. Kelly came and

7   picked you up; is that correct?

8   A    Correct.

9   Q    So have you ever heard of any runners that worked -- I

10  should withdraw that.

11       When you were at the studio, did you ever see anyone

12  that would kind of do the errands and so forth for Mr. Kelly?

13  A    Not specifically an errand person, no.

14  Q    Are you familiar with the term a runner?

15  A    Not unless you're talking about someone who is jogging.

16  Q    Got it.

17       Now, when you didn't have a car, I know you said you

18  took some public transportation, were there other times when

19  somebody would come pick you up from your house that worked

20  for Mr. Kelly?

21  A    Yes.

22  Q    And that happened on more than one occasion, correct?

23  A    I'm not sure.

24  Q    So the individual who came to pick you up, do you

25  remember who that was?

STEPHANIE - CROSS - BLANK BECKER                    1699

1    A    The guy, the bald guy that I saw a picture of earlier.

2    Q    And he only came and picked you up one time?

3    A    At least once.

4    Q    So when you went to the Water Tower you're saying it

5    wasn't him or anybody else that drove you there, correct?

6    A    Um, I know that Mr. Kelly was in the car and Boo and

7    Gotti were there.  I don't remember who drove.

8    Q    Oh, Boo and Gotti were in the car as well?

9    A    They were at the lunch, I'm not sure if they were in the

10   car.

11   Q    You told us about a time that you had to give oral to

12   Mr. Kelly in the back of a car, correct?

13   A    Yes.

14   Q    And I believe you indicated that there was someone in the

15   front seat, is that true?

16   A    Yes.

17   Q    And you didn't ask that person for help, correct?

18   A    No.

19   Q    Did you have a cell phone with you?

20   A    I don't recall.

21   Q    How about when you went to the Water Tower shopping, did

22   you have a cell phone with you?

23   A    I don't recall.

24   Q    So were there times where you just would go out and not

25   bring your cell phone with you?

STEPHANIE - CROSS - BLANK BECKER          1700

1  A    I don't remember if I had a cell phone at that time yet.

2  Q    So every time that you would communicate with Mr. Kelly

3  it would be from your house phone?

4  A    I don't recall.

5  Q    With regards to oral in the back seat, if I recall

6  correctly the words that you used is you felt ashamed; is that

7  correct?

8  A    Yes.

9  Q    Okay.  That was like belittling, is that fair to say, for

10  him to do that while people were around?

11  A    Yes.

12  Q    Yet you went to Orlando for a long weekend to see him

13  after that, correct?

14  A    Correct.

15  Q    In fact, you went to Orlando I think you said with

16  Katherine, correct?

17  A    Yes.

18  Q    And Katherine, she wasn't there to sing for Mr. Kelly,

19  was she?

20  A    No.

21  Q    She was actually dating Blackie, the individual that they

22  showed you -- the government had showed you in one of those

23  pictures, correct?

24  A    Correct.

25  Q    So you went down to Orlando, she came with you and

1  Blackie was down there as well, correct?

2  A    I believe so, yes.

3  Q    You indicated that you sat at the home there for, was it,

4  days before you saw Mr. Kelly?

5  A    Correct.

6  Q    How about Blackie, do you remember when he came by?

7  A    I don't honestly remember.

8  Q    Okay.  It's possible, you just don't remember?

9  A    Yes.

10  Q    Okay.  Fair enough.

11        There is public transportation in Orlando too,

12  correct?

13  A    I have no idea.

14  Q    Okay.  'Cause you didn't try to call anyone to get you to

15  go to the grocery or go to the mall, true?

16  A    No, I did not.

17  Q    There is phones in that house, correct?

18  A    I don't know.

19  Q    Never looked for a phone?

20  A    I don't recall whether or not I looked for a phone.

21  Q    You never thought maybe you would call your parents or

22  call someone to help you get out of the house?

23  A    No.

24  Q    So my understanding is a long weekend, does that mean

25  Thursday, Friday, Saturday, Sunday?  What is a long weekend,

STEPHANIE - CROSS - BLANK BECKER          1702

1   do you remember?

2   A    I don't remember exactly which dates they were.

3   Q    But according to you, you didn't see Mr. Kelly until the

4   last day, correct?

5   A    Correct.

6   Q    You had to wait for him again?

7   A    Yes.

8   Q    And you decided to wait for him?

9   A    I didn't have a choice.  I was in a house that I didn't

10  know, in a place that I didn't know, and no one there to help

11  me so I waited.

12  Q    Stephanie, did you have a choice when you got on the

13  plane to go down to Orlando?

14  A    Yes.

15  Q    Did you have a choice when you got off the plane and went

16  to Mr. Kelly's like an R&B -- a B&B home, did you have a

17  choice to do that?

18  A    Yes.

19          MS. BLANK BECKER:  Sorry, Judge, can I just have a

20  moment, please.

21          THE COURT:  Yes.

22          MS. BLANK BECKER:  Thank you, Judge.

23          THE COURT:  Do you have any more questions for this

24  witness?

25          MS. BLANK BECKER:  Just like two, Judge.

STEPHANIE - CROSS - BLANK BECKER                1703

1          THE COURT:  Okay.

2          MS. BLANK BECKER:  Could I still?

3          THE COURT:  Yes, go ahead.

4          MS. BLANK BECKER:  Thank you.

5   Q    The videos that you were talking about, you were not able

6   to supply any of that to the government, correct?

7   A    No, they're not in my possession.

8   Q    Nor any pictures of you and Mr. Kelly together, you

9   couldn't supply that?

10  A    No, we didn't take pictures together.

11  Q    And so for the entire six to eight months you guys were

12  together, never took a picture?

13  A    Correct.

14  Q    Never went out in public other than that Houston's you

15  indicated?

16  A    No, that's not true.  We did go to places together.

17  Q    And you consented to having sexual relations with him

18  every time, correct?

19  A    Yes.

20          MS. BLANK BECKER:  Thank you.  I don't have any

21  additional questions, Judge.  Thank you.

22          THE COURT:  Any redirect?

23          MS. SHIHATA:  Very briefly.

24          THE COURT:  Okay.

25

1    REDIRECT EXAMINATION

2    BY MS. SHIHATA:

3    Q    On cross-examination you were asked some questions about

4    that first time or the time you went from where you were

5    working at the hotel as a barista to the Nike store when you

6    heard that the defendant was there.

7           Do you recall those questions?

8    A    I do.

9    Q    You were asked questions about how Katherine didn't go

10   with you or you didn't call Katherine.

11          Do you recall those questions?

12   A    I do.

13   Q    The hotel where you worked, how close was it to the Nike

14   store?

15   A    About 50 meters away.

16   Q    So right there?

17   A    Right around the corner.

18   Q    And did Katherine work nearby?

19   A    No, she did not.

20   Q    Now you were also asked some questions about the last

21   phone call you had with the defendant about destroying --

22   asking him to get rid of the videotapes.

23          Do you recall those questions?

24   A    I do.

25   Q    Was that phone call the first time you had talked to the

1  defendant about wanting to either get those videotapes or

2  destroy them?

3  A    No, that was not the first time.

4  Q    And how many times had you talked to him about that

5  before that phone call?

6  A    Twice before.

7  Q    And were those times in person?

8  A    Yes.

9  Q    And did the defendant destroy the tapes when you asked

10  him those times?

11  A    No, he did not.

12  Q    Did he give them back to you?

13  A    No, he did not.

14  Q    Did you conclude from that that going over there would

15  make no difference whatsoever?

16  A    Yes, I did.

17  Q    You were also asked some questions about the incident in

18  the car where the defendant told you to give him oral sex with

19  people in the front seat.

20          Do you remember those questions?

21  A    I do.

22  Q    The people in the front seat, who did they work for?

23  A    They worked for Mr. Kelly.

24  Q    Before today, have you ever spoken publicly about your

25  experience with the defendant?

STEPHANIE - REDIRECT - SHIHATA                1706

1   A    No, I have never done that.

2   Q    Sitting here today, do you ever intend to do so again

3   other than in this courtroom?

4   A    No.

5   Q    You were asked some questions about having a lawyer

6   represent you.  Why did you get a lawyer?

7   A    Because I wanted to understand my rights and what I

8   needed to do for this case.

9   Q    What do you mean by that?

10  A    Just my responsibilities as it came to this case.

11  Q    You were asked a question about you or your lawyer

12  contacting the government about what happened to you; is that

13  right?

14  A    Yes.

15  Q    Before you hired a lawyer or got a lawyer, did you know

16  how to get in touch with the government?

17  A    Not at all.

18  Q    You were asked some questions about certain details of

19  things that happened in 1999 on cross-examination.

20  A    Yes.

21  Q    Do you have a perfect memory of everything that occurred

22  with the defendant in 1999?

23  A    Not a hundred percent perfect, clear memory, no.

24  Q    Are there certain things that stick out in your mind?

25  A    Absolutely.

STEPHANIE - RECROSS - BLANK BECKER          1707

1  Q     Certain things that you'll never forget?

2  A     Absolutely.

3             MS. BLANK BECKER:  Objection.  Leading.

4             THE COURT:  Overruled.

5  Q     Why won't you ever forget those things?

6  A     Because that was the lowest time of my life.  I've never

7  been treated like that before or since.  He humiliated me, he

8  degraded me, he scared me.  I'll never forget the way he

9  treated me.

10             MS. SHIHATA:  Nothing further.

11             THE COURT:  Any recross?

12             MS. BLANK BECKER:  Thank you.

13  RECROSS EXAMINATION

14  BY MS. BLANK BECKER:

15  Q     Just briefly, Stephanie, do you need a moment?

16             THE COURT:  Well, your microphone is not working.

17  I'll take care of anybody needing a moment.

18             MS. BLANK BECKER:  Thank you, Judge.

19  Q     Stephanie, the first time you guys had some sexual

20  relations you indicated you were 17, correct?

21  A     Yes.

22  Q     Did you call 911?

23  A     Why would I do that?

24  Q     You indicated that you didn't -- strike that.  You

25  indicated that -- in direct you were asked a question about

STEPHANIE - RECROSS - BLANK BECKER          1708

1  whether or not you spoke publicly before and you said you

2  never have, correct?

3  A    Correct.

4  Q    Meanwhile, you've seen person after person after person

5  on TV or social media talking about what they claimed

6  happened, correct?

7              MS. SHIHATA:  Objection.

8              THE COURT:  Have you seen any -- I don't know about

9  the person after person business, but have you seen anything

10 on social media or television about it?

11             THE WITNESS:  I purposely did not watch any videos

12 or shows in regards to the abuse that he inflicted on other

13 people because I didn't want to remember what happened to me.

14             THE COURT:  Any more questions?

15             MS. BLANK BECKER:  Thank you, Judge.

16 Q    Just lastly.  You indicated that you had a lawyer because

17 you didn't know how to contact the government, correct?

18 A    I contacted a lawyer because I wanted to understand my

19 rights and I wanted the lawyer to help me to get to the right

20 people in order to let them know what happened to me.

21 Q    Did you not want to understand your rights back when this

22 occurred?

23             MS. SHIHATA:  Objection.

24             THE COURT:  Sustained.

25 Q    You waited all of this time before you wanted to find out

STEPHANIE - RECROSS - BLANK BECKER          1709

1   about your rights?

2           MS. SHIHATA:  Objection.

3           THE COURT:  Sustained.

4           MS. BLANK BECKER:  Thank you.  I don't have any

5   additional questions.  Thank you, Judge.

6           MS. SHIHATA:  Nothing further.

7           THE COURT:  Okay.  Thank you so much.  You can step

8   down.

9           THE WITNESS:  Thank you, your Honor.

10          (Whereupon, the witness was excused.)

11          THE COURT:  Okay, ladies and gentlemen, I do

12  apologize for going just a few minutes late but I thought it

13  was important to finish that witness.

14          I'm going to excuse you for the evening.  Please

15  don't talk about the case, don't read anything about the case

16  or any accounts having to do with it, but I hope you have a

17  good night.

18          And oh, wait, tomorrow is Friday, right?  So it is

19  going to be obviously a long weekend -- I have lost all

20  bearings here -- so we won't meet tomorrow, but I will see you

21  on Monday morning and because we're going to be apart for all

22  this time and you won't hear me yammering on about what you're

23  not supposed to do, I do want to take the time to list all of

24  those things because they are important.

25          Don't talk about the case with anyone at all in any

1  way, shape or form.  Do not look anything up on the internet

2  about the case.  Don't watch or read any accounts about the

3  case.  Report to me or to -- any effort by any person to

4  contact you to speak about the case or to influence you or

5  another juror improperly.

6          Have a great weekend, stay healthy.  I'll see you on

7  Monday.

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury exits courtroom.)

10         THE COURT:  All right.  Everybody can sit down, I'm

11  sorry.

12         You're going to let them know who you're going to

13  call next week, correct?

14         MS. GEDDES:  Yes, judge.

15         MS. SHIHATA:  Yes.

16         THE COURT:  And then, I'm not asking for it, but you

17  said that you had an additional motion *in limine*.

18         MR. CANNICK:  We'll work on it over the weekend,

19  your Honor.

20         THE COURT:  I see.  So it will be a written motion?

21         MR. CANNICK:  Yes.

22         THE COURT:  Great.  I take it that it will relate to

23  one of the witnesses --

24         MS. GEDDES:  On Monday.

25         THE COURT:  -- on Monday.

1711

1      Anything else that we need to discuss?

2            MS. SHIHATA:  Yes, just very briefly.  In relation

3   to the examination of the witness that just got off the stand,

4   I believe your Honor sustained an objection where she had

5   responded talking about a phone call that she made to her

6   friend.

7            THE COURT:  Right.

8            MS. SHIHATA:  And I just wanted to make clear that

9   the only -- there were two parts to her answer and that the

10  only part that is in fact stricken is the part about what her

11  friend said to her on the call.

12           THE COURT:  That's correct, that's correct.  Just

13  when the friends told her to get out of there.

14           MS. SHIHATA:  Thank you, your Honor.

15           THE COURT:  Yes.  All right.

16           Anything else?

17           MR. CANNICK:  No, your Honor.

18           THE COURT:  All right.  See you on Monday.

19           MR. CANNICK:  Have a good weekend.

20

21           (Whereupon, the trial adjourned at 5:40 p.m. to

22  resume Monday, August 30, 2021 at 9:30 a.m.)

23

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR

1712

```
1                    I N D E X

2    WITNESSES:

3

4        THOMAS ARNOLD

5            DIRECT EXAMINATION (CONT'D) BY MS. GEDDES    1481

6            CROSS EXAMINATION BY MR. FARINELLA           1545

7            REDIRECT EXAMINATION BY MS. GEDDES           1610

8        STEPHANIE

9            DIRECT EXAMINATION BY MS. SHIHATA            1618

10           CROSS-EXAMINATION BY MS. BLANK BECKER        1661

11           REDIRECT EXAMINATION BY MS. SHIHATA          1704

12           RECROSS EXAMINATION BY MS. BLANK BECKER      1707

13

14                        EXHIBITS:

15

16           Government Exhibit 525(u)                    1482
             Government's Exhibits 15, 16, 18,            1519
17           19, 21, 23, 24, 25, 26, 27, 28, 29
             and 30
18           Government's Exhibit 523(a), 523(b)          1529
             and 523(c)
19           Government Exhibit 57                        1619
             Government Exhibit 57A                       1620
20           Government Exhibit 244                       1625
             Government Exhibit 243                       1626
21           Government Exhibit 502(b)                    1482
             Government Exhibit 952                       1628
22

23

24                    *      *      *

25
```