


**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG/NS/MCM
F. #2019R00029

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 14, 2021

By ECF

Honorable Ann M. Donnelly
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Robert Sylvester Kelly
Criminal Docket No. 19-286 (S-3) (AMD)

Dear Judge Donnelly:

The government respectfully submits this letter in further support of its motion to admit one video recording and one audio recording, both of which show the defendant physically and verbally abusing and threatening females. For the reasons set forth below and in the government's motion to admit other acts evidence (Gov't Mot. to Admit Certain Uncharged Acts, dated July 23, 2021 (ECF Docket No. 133) ("Gov't Mot."), at 28-30), the recordings should be admitted at trial.

Background

As set forth in the government's motion to admit certain uncharged acts, the government seeks to introduce excerpts of two recordings recovered pursuant to a search warrant at a storage facility used by the defendant. The recorded excerpts show (1) the type of physical and psychological abuse the defendant employed to exert and maintain control over women and girls with whom he was engaged in sexual relationships; and (2) his regular use of audio and video recordings to maintain control of females and protect the charged enterprise.

Government Exhibit 484, a video recording, shows the defendant entering a room with two women in it and accusing one of the women of lying. The defendant can then be heard beginning to physically assault the woman. He also directly threatens her, "If you lie to me, I'm gonna fuck you up." (The actually assault is not captured on the video tape as

they are then out of the view of the camera.) Notably, the video appears to have been taken by a stationary camera mounted somewhere overhead in the room. (The government has not identified either of the females depicted in Government Exhibit 484, but the recording makes clear that the defendant is upset about a sexual act that occurred between the two females, strongly suggesting that the defendant is in a sexual relationship with one or more of the females.). A transcript of the recording is enclosed as Exhibit A.

In Government Exhibit 485, an hour-long audio recording, the defendant, along with enterprise member George Kelly, also known as "Uncle Bug" and "June Bug," who has been identified by multiple witnesses at trial, confronted Jane Doe #20, a woman whose identity is known to the government, about her purportedly stealing a Rolex watch from the defendant's residence.[1] (The government seeks to admit approximately 28 minutes of the audio recording.) At the beginning of the recording, the defendant told Jane Doe #20 that he had "cameras everywhere" and said, "You know how I am with cameras." He then explained that he had cameras in "my studio, my van and my garage of course." When a male in the room (believed to be George Kelly, whom the defendant introduced to Jane Doe #20 earlier in the recording by saying "this is my uncle Bug") added, "Bus," the defendant then made clear that he also had cameras on the bus. During the recording, the defendant also told Jane Doe #20 that his engineers had downloaded the videos that purportedly showed her stealing from the defendant.

In the recording, Jane Doe #20 ultimately admitted to taking the watch, a t-shirt, earrings and "porno tapes." When she admitted that she took the tapes, the defendant asked her what she intended to do with them and she said that she only intended to "watch them." After Jane Doe #20 admitted to taking the items, the defendant berated, threatened and physically assaulted her.[2] He also imposed punishment on her. He accused her of hiding her face during a video recording he had made of her and told her that she was going to have

---

[1] The CD sleeve containing the recording is dated 2008 and in context the recording appears to have been made on that date. While the defendant does not identify Jane Doe #20 by her first and last name, he does use her first name and comments that they have been together for 10 years. Jane Doe #20 met the defendant when she was 18 years old and a senior in high school, in approximately 1999, and therefore the 2008 date appears accurate. Moreover, the recording appears to have been made in the recording studio at the defendant's Olympia Fields residence (based on his direction to Jane Doe #20 to go to the garage and other comments made throughout the recording), a recording studio the defendant used between approximately 2004 and 2011.

[2] The government served a trial subpoena on Jane Doe #20 to testify as a witness at trial and planned to call her to testify tomorrow. However, after the government played the audio recording for Jane Doe #20 and Jane Doe #20 traveled to New York to prepare for her testimony, she started to have panic attacks and appeared to have an emotional breakdown. For the sake of her mental health, the government advised Jane Doe #20 that it would not call her as a witness at the trial.

to remake the video and "do what the fuck I tell you to do and you're gonna do it fuckin' right." At the end of the recording, the defendant directed Jane Doe #20 to go to his garage and stay there until he directed her to come out. He told her that she could not make any calls other than to him and the studio. The defendant also made several admissions during the recording, including that he and Jane Doe #20 had been together for 10 years and that he "raised her." At the very end of the recording, after several minutes of silence, the defendant's engineers can be overheard saying that they would have "strip searched her." Thus, in context, the recording appears to have been made in the recording studio itself and with the knowledge of the defendant's engineers. As noted above, the defendant also said on the recording that his engineers downloaded the video tape that purportedly showed Jane Doe #20 stealing a watch.

An excerpt of the threats made by the defendant on the recording is set forth below and the full transcript of the recording is enclosed as Exhibit B.

> There's only one way you're gonna get rid of this. For me to trust your ass again. You're gonna do the fuck I tell you to do. When you made the fuckin tape for me and I looked at that shit, you was hiding your fucking face all over that shit because you didn't want to be seen. I told you to fucking trust me. And here it is I can't fucking trust you. You're the one who's fucking untrustworthy. I'm a loyal man. Shut the fuck up. You're gonna do that shit for me for fuckin' free. And you ain't gonna hide your fucking face on me. You're gonna do what the fuck I tell you to do and you're gonna do it fuckin right. Then I'm gonna gain my fuckin trust back with your ass. If I even detect you trying to hide on that shit, I'm gonna blow this shit the fuck up. Do you hear this shit I'm telling you. I fucking raised your ass. I raised you. … [UI] fucking murdered for doing shit like this. Shut up. Shut the fuck up. You're gonna do this shit fucking right. You're gonna gain my fucking trust because you fucking owe me that, you hear me. You fucking understand me? …. You gonna do what the fuck I tell you to do to gain my mother fucking trust. You better not ever in my mother fucking life take from me again or I will be in Florida and something will happen to you. You understand what I'm telling you. …
>
> Now you go to that fucking garage. You chill there until you hear from me. You understand me. You take your fuckin phone. You don't call no mother fucking body. And I will know if you did. You can go in the closet. You can go wherever you gonna go, but I'm gonna know if you did. You come over here for something to eat. Or you call to me. And that's the fuck it. Until I tell you can go back in that

> room. Okay? Do you hear me? … Go to the garage right the fuck now. When I come and get you this time, you better be fucking like you're supposed to fuckin' be. And you know you held back on that tape, now don't you? … You're not going to do that no more. You bet the fuck not. Go to the fucking garage. Hear me? … You're not gonna tape until I tell you. When I tell you, I don't give a fuck if you're coming out of your sleep. You better be fucking ready. Do you understand? I better feel like you asked me to do. … You make no fucking calls except the studio or me.

Also on the recording, the defendant expressly threatened Jane Doe #20 that he would "be in Florida and something [would] happen to her" if she stole from him again and commented that people get "murdered" for doing what she did. Finally, Kelly is overheard directing the woman to "go in the closet" and to go to the "garage" and stay there until he gives her further instructions and instructing her that she would need to re-record something at his direction. Notably, the recording demonstrates in the defendant's own words precisely how the defendant isolated and confined one of his girlfriends in a room using threats, physical and psychological abuse, notwithstanding the presence of a phone and ability to make calls ("You make no fucking calls except to the studio or me.")

During the final pretrial conference, the Court held that the two recordings described above would be admissible, explaining:

> The next category of evidence has to do with audio recordings that depict the defendant yelling and physically assaulting women and those are clearly admissible as direct evidence of the methods used to perpetuate the enterprise and it is direct evidence of the defendant participating in it. It's not more inflammatory than the charged offenses. In fact, it is evidence of the charged offenses and so that is admissible.

Transcript of August 3, 2021 Final Pretrial Conference at 34-35. The Court's ruling remains a sound one. As further set forth below, the recordings clearly demonstrate the means and methods of the charged enterprise, the defendant's participation in the enterprise, and the participation of other individuals – including those employed by the defendant – in the enterprise. The recordings also serve to powerfully corroborate the testimony of various witnesses at trial, who have been brutally cross-examined by the defendant and who the defendant has argued – and will undoubtedly continue to argue – are lying and unworthy of belief. The jury should be permitted to see direct evidence of the charged crimes contained in these recordings, which consist of the defendant's own words and actions and which include the defendant berating, threatening, directing, and confining one of his girlfriends in the same manner that other witnesses testified that he did to them.

## DISCUSSION

As the Court previously found, the two recordings the government seeks to admit are direct evidence of the means and methods used to perpetuate the enterprise and direct evidence of the defendant's participation in the enterprise, including the defendant's use of threats and physical abuse to maintain control over his girlfriends. In addition, the recordings also include evidence of the participation of others in the charged enterprise, including George Kelly and certain of the defendant's engineers. In his opening statement, the defendant has argued that no enterprise existed and that no one else participated in any such enterprise. The defendant's cross-examinations make clear that he intends to continue to press these arguments during his closing argument. Direct proof, via a recording that includes the defendant's own words, of the participation of others in the enterprise is certainly relevant, highly probative of a contested issue of fact, and should be admitted.

Government Exhibit 484 should also be admitted to show one of the techniques that the defendant used to control females. Specifically, his installation of a camera overhead allowed him to track the activities of the females in that room and then accuse one of lying to him. At trial, witnesses have testified that they believed the defendant recorded their activities even when they were not present. Finally, the fact that the defendant made and then kept these recordings in a storage facility for a period of years is probative of the lengths to which the defendant would go to maintain control over females in his life.

The recordings are also admissible to rebut testimony elicited by the defendant on cross-examination and arguments that defendant has already made and will continue to make regarding both the government's witnesses and the nature of the proof in this case. For example, in an apparent attempt to support an argument that the government's witnesses are lying about abuse inflicted on them by the defendant, the defendant elicited testimony from former employee Diana Copeland about the purported respect afforded by the defendant towards females and attempted to paint the defendant as a generous and loving boyfriend. For example, during cross examination of Diana Copeland, defense counsel elicited that the defendant stood up when females, including his girlfriends, entered a room and opened doors for females:

> Q Okay. But when his girlfriends came into the room he stood up; am I correct?
> A That's correct.
> Q In fact, when you came into the room he stood up; am I correct?
> A That's correct.
> Q And, in fact, he would stand up anytime a female came into the room; am I correct?
> A That's correct.
> Q And he would open the door for any female; am I correct?
> A That's correct.
> Q It wasn't just his girlfriends; am I correct?
> A That's correct.
> Q Now, and he hired personal assistants to make sure that the needs and the wants of his girlfriends were attended to; am I correct?

A That is correct.

(T. 3224 - 25).

Defense counsel further elicited testimony from Ms. Copeland that the defendant showered his girlfriends and female guests with gifts, fancy parties, rooftop dinners, and purportedly directed his assistants to wait on them hand and foot, and had never seen the defendant treat his girlfriends badly, confine them to any rooms, physically try to stop them from leaving or abuse them in any way. (T. 3217-18, 3241-42, 3244, 3246-47).[3]

---

[3] Indeed, during Ms. Copeland's cross-examination, defense counsel elicited the following to suggest the defendant never confined <u>any</u> of his girlfriends <u>anywhere or treated any of them badly</u>, a contention the recordings the government seeks to admit directly refute:

> Q Now, in the 15 years that you worked with Mr. Kelly, did you ever see him try to stop or prevent any one of his girlfriends from leaving him?
> A No.
> Q Have you ever saw him lock any of his girlfriends in a room?
> A Never.
> Q Has he ever asked you to do such a thing?
> A Never.
> Q Have you ever heard him ask any of his staff to do such a thing?
> A Never.
> Q Did you ever see Mr. Kelly deny any of his girlfriends water?
> A Never.
> Q Did you ever hear him ask anyone else to deny them water?
> A No.
> Q Did he ever ask you to deny the water?
> A No.
> Q What about food, have you ever seen him deny them food?
> A No.
> Q In fact, they had Uber accounts for the girlfriends?
> A They did.
> Q They had menus all across the place to order food; am I correct?
> A Yes.
> Q And they had runners available to them to go and get food; am I correct?
> A That's correct.
> Q And they had personal assistants to also assist them

Indeed, through his cross-examination of Ms. Copeland and other witnesses, it is apparent that the defendant intends to argue that any confinement of female guests and girlfriends at various locations was either incidental, for security purposes, or that no one – except perhaps Ms. Copeland herself – was permitted to roam freely in the defendant's spaces. (See, e.g., T. 3231, 3236).

Similarly, defense counsel elicited testimony from Suzette Mayweather that she never saw the defendant physically abuse any female, let alone the ones who testified at this trial.

> Q In fact, you've never seen Mr. Kelly hit anyone.
> A I have not.
> Q Now, how long did you work with him?
> A From October 2015 until early February 2017.

(T. 2080 (emphasis added)). Through his questioning, defense counsel further attempted to argue that any use of terms describing anything the defendant said or did as "directing" or "instructing" Ms. Copeland or others to do anything was simply the government's characterization of the defendant's words and actions, and not based on actual reality. (T. 3232-33).

The recordings the government seeks to admit prove just the opposite and in so doing, support the testimony of the government's witnesses, including, Jerhonda Pace, Jane, Anna, and Faith all of whom testified about the defendant's ability to control, confine, and physical abuse them. The defendant vigorously cross-examined each of these witnesses and clearly intends to argue that they are all lying about the defendant's behavior towards them. The recordings show the defendant – in his own words and in his own actions – employing the very same means and methods on other girlfriends, including the defendant clearly threatening, instructing and directing one of his girlfriends to remain in a room, to take her phone with her, but demanding that she not call anyone but the defendant and threatening that he will find out if she does. (GX 485 ("Now you go to that fucking garage. You chill there until you hear from me. You understand me? You take your fuckin

---

> with getting food, water, drinks, shopping, anything of those things; am I correct?
> A That is correct.
> Q You did not see anyone in Mr. Kelly's employment do any of those things in terms of denying women food, water, drinks?
> A No.
> Q Never saw anyone locked in a room?
> A Never.

T. 3246-47.

phone. You don't call no mother fucking body. And I will know if you did. You can go in the closet. You can go wherever you gonna go, but I'm gonna know if you did. You come over here for something to eat. Or you call to me. And that's the fuck it. Until I tell you can go back in that room. Okay? Do you hear me? … Go to the garage right the fuck now. […] Go to the fucking garage. Hear me? […] You make no fucking calls except the studio or me.")) Notably, during his cross-examinations, the defendant has argued that the fact that certain witnesses were not locked in rooms or had their phones meant that they were free to come and go as they pleased and he will certainly continue to make such arguments to the jury.[4] (See, e.g., T. 570.) In these circumstances, the government should be permitted to present powerful evidence from the defendant's own mouth to corroborate witness testimony in this regard of precisely how the defendant's exertion of control worked even when a door was not locked and a girlfriend had access to a phone.[5]

Finally, the probative value of these recordings cannot be overstated. The recordings the government seeks to admit consist of the defendant's own statements and actions – in his own words and in his own voice. They thus provide unassailable proof that the defendant had no compunction raising his hands to females, overtly threatening them, and directing them to stay in locations and not leave until he said otherwise. Such evidence is palpably and powerfully different than witness testimony, which can be challenged on the basis of memory, perception and credibility. Unlike witness testimony, the recordings contain the defendant's own words and actions, irrefutably rebutting the defendant's argument that he was always respectful towards women, that he treated his girlfriends and female guests well and that he never physically or psychologically abused anyone. They also directly refute the defendant's arguments that no racketeering enterprise existed and that the defendant's employees and associates were not members of any such enterprise. Enterprise member George Kelly is present and participates in the defendant's interactions with Jane Doe #20 on one recording, where the defendant himself also describes the involvement of his engineers and where the recording makes clear at its conclusion that the engineers were

---

[4] See, e.g., T. 570 (cross-examination of Anthony Navarro):

> Q You never received any calls at the front desk that said that they wanted to leave and they weren't allowed to, correct?
> A There's been times where there's people that wanted to leave and they -- they couldn't 'cause either they couldn't get a ride or we couldn't get ahold of Rob.
> Q Okay. These -- these -- these people, they had cell phones as well, correct?

[5] Moreover, that the women in these recordings are not testifying at trial does not alter the conclusion that the videos contain direct evidence of the means and methods of the enterprise, or the defendant's and others' participation in the enterprise, or that the videos powerfully corroborate the testimony of other witnesses.

present when the recording was made as well, suggesting they would have "strip-searched" Jane Doe #20. Such evidence is particularly probative where, as here, the defendant appears to argue that the presence of his engineers in the studio "24 hours a day" prevented him from engaging in any abuse of his female guests and girlfriends at that location.[6] In a case where the very existence of the enterprise – let alone its membership – is being vigorously challenged by the defendant, there is no proper basis to exclude such clearly relevant and highly probative evidence.

## CONCLUSION

For the reasons set forth above and in its initial memorandum, the government respectfully submits its motion should be granted.

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By: /s/
Elizabeth A. Geddes
Nadia I. Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (AMD) (by ECF)
Defense Counsel (by ECF)

---

6 See, e.g., T. 3209 (cross-examination of Diana Copeland):

> Q At the time that you worked with him --
> A Actually he had engineers the entire time I was working there.
> Q Do you know the shifts of those engineers?
> A I do not know their shifts.
> Q Okay. But do you recall them working pretty much 24 hours a day?
> A 24 hours, yeah. There was always somebody there, but --
> Q And they would be there because oftentimes he would have an inspiration or decide to go to the studio and he would either work -- need to work on his music; am I correct?
> A Correct.