1713

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,    :   19-CR-286(AMD)
4
          Plaintiff,         :
5                                United States Courthouse
       -against-             :   Brooklyn, New York
6
ROBERT SYLVESTER KELLY,      :
7                                August 30, 2021
          Defendant.         :   9:30 a.m.
8
   - - - - - - - - - - - - - X
9

10                  TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE ANN M. DONNELLY
11          UNITED STATES DISTRICT JUDGE, and a jury.

12
APPEARANCES:
13

14  For the Government:        JACQUELYN M. KASULIS
                               Acting United States Attorney
15                             BY: ELIZABETH GEDDES
                                   NADIA SHIHATA
16                                 MARIA E. CRUZ MELENDEZ
                               Assistant United States Attorneys
17                             271 Cadman Plaza East
                               Brooklyn, New York
18

19  For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                               NICOLE BLANK BECKER, ESQ.
20                             THOMAS FARINELLA, ESQ.
                               CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:            Andronikh M. Barna
                               225 Cadman Plaza East
23                             Brooklyn, New York
                               (718) 613- 2178
24
Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

*Proceedings*                                                    1714

1          (In open court; jury not present.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Hi.  Everybody can have a seat.

4          (Defendant enters the courtroom.)

5          THE COURT:  All right.  Can I just see the parties

6    at the side on that application from this weekend with the

7    court reporter?

8          (Sealed Sidebar.)

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



*Sealed Sidebar*                                                1715

1          (Sealed Sidebar conference held on the record out of

2     the hearing of the jury.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25











*Sealed Sidebar*                                                    1720

7    (Discussion held off the record.)

8    (Sealed Sidebar end.)

9    (Continued on following page.)

*Proceedings*                                              1721

 1              (In open court; jury not present.)

 2          THE COURT:  All right.  Are we ready for the jurors?

 3   Do we have a witness?  We don't, do we?

 4          MS. CRUZ MELENDEZ:  We do, Your Honor.  We don't

 5   have a witness currently on the stand.

 6          THE COURT:  Okay.

 7          MS. CRUZ MELENDEZ:  I thought you were asking if we

 8   had a witness here and ready.

 9          THE COURT:  That's what I meant.  I couldn't

10   remember how we finished on Friday, but now I do.

11          All right.  Let's get our jurors.

12          THE COURT:  Which witness is testifying?

13          MS. CRUZ MELENDEZ:  Addie, Your Honor.

14          THE COURT:  Do you know which binder that's in

15   alphabetically?

16          MS. MACK:  One.

17          SPECIAL AGENT CHABOT:  May I get the witness?

18          THE COURT:  You may as well start bringing her in,

19   yes.

20          THE COURTROOM DEPUTY:  All rise.

21          (Jury enters.)

22          THE COURTROOM DEPUTY:  You may be seated.

23          THE COURT:  All right.  Good morning, everybody.  I

24   hope you had a good weekend.  We are ready to begin.

25          I just want to see counsel for a minute off the

*Proceedings* 1722

1   record about scheduling.

2          (Discussion held off the record.)

3          THE COURT:  Okay.  Before we start, I know last week

4   I told you we would be working Friday.  We are only going to

5   be working until one o'clock.  I think we are moving along at

6   a good pace, but we are going to stop at one o'clock on

7   Friday, just if that figures into your plans at all.

8          All right.  The Government has another witness.

9          Are you ready to call?

10         MS. CRUZ MELENDEZ:  Yes, Your Honor.  The Government

11   calls Addie to the stand.

12         (Witness takes the stand.)

13         THE COURTROOM DEPUTY:  Please stand and raise your

14   right hand.

15         (Witness sworn.)

16         THE COURTROOM DEPUTY:  Thank you.  You may be

17   seated.  You can take off your mask.

18         THE COURT:  All right.  Good morning.

19         THE WITNESS:  Good morning.

20         THE COURT:  Let's just make sure the microphone is

21   working.

22         Is it on?

23         THE WITNESS:  Hello?

24         THE COURTROOM DEPUTY:  On the top.

25         THE WITNESS:  Hello?

*Proceedings*                                                                  1723

1          THE COURT:  Now it's on, great.

2          Just a couple things before we begin.

3          Our court reporter takes down everything that

4    everybody says, and so I'm going to ask you to speak slowly

5    just to make the court reporter's job a little easier; and,

6    for the same reason, don't talk over whichever lawyer is

7    asking you questions.  Just wait until they're finished with

8    the question and then give your answer.

9          If there is a question that you don't understand or

10   you would like to have repeated, let me know, and I will have

11   the lawyer rephrase it, okay?

12         THE WITNESS:  Okay.

13         THE COURT:  And then, finally, just do your best to

14   answer only the question that you are being asked, okay?

15         THE WITNESS:  Okay.

16         THE COURT:  Go ahead, Ms. Cruz Melendez.

17         MS. CRUZ MELENDEZ:  Thank you, Your Honor.

18         (Continued on next page.)

19

20

21

22

23

24

25

1   **ADDIE**,

2           called as a witness, having been first duly

3           sworn/affirmed, was examined and testified as

4           follows:

5   DIRECT EXAMINATION

6   BY MS. CRUZ MELENDEZ:

7   Q    Good morning.

8   A    Good morning.

9           MS. CRUZ MELENDEZ:  I'm showing just the witness

10  what's been marked for identification purposes as Government's

11  Exhibit 56.

12  Q    Do you see that there?

13  A    Yes.

14  Q    Do you recognize that?

15  A    Yes.

16  Q    And what is it?

17  A    A picture of me.

18  Q    And approximately how old were you in this photograph?

19  A    In my teens, probably around 17, 18.

20          MS. CRUZ MELENDEZ:  Your Honor, the Government

21  offers Government's Exhibit 56.

22          THE COURT:  I'm going to remind the witness just

23  keep your voice up.

24          THE WITNESS:  Okay.

25          THE COURT:  That's better.  Great.

1           MR. CANNICK:  No objection, Your Honor.

2           THE COURT:  In evidence.

3           (Government's Exhibit 56 received in evidence.)

4           MS. CRUZ MELENDEZ:  Your Honor, both permission to

5    publish to the jury and to the public.

6           THE COURT:  Sure.

7           (The above-referred to exhibit was published.)

8           MS. CRUZ MELENDEZ:  I'm now showing just the witness

9    what's been marked for identification purposes as Government's

10   Exhibit 56A.

11   BY MS. CRUZ MELENDEZ:

12   Q    Do you see Government's Exhibit 56A there?

13   A    Yes.

14   Q    And is that the same photograph that was pictured in

15   Government's Exhibit 56?

16   A    Yes.

17   Q    And is that your true name listed at the bottom of

18   Government's Exhibit 56A?

19   A    Yes.

20          MS. CRUZ MELENDEZ:  The Government moves to admit.

21          MR. CANNICK:  No objection.

22          THE COURT:  Okay.  That's in evidence.

23          (Government's Exhibit 56A received in evidence.)

24          THE COURT:  Mr. Cannick, do you mind turning on your

25   microphone?

1           MS. CRUZ MELENDEZ:  Your Honor, we ask that it be

2    published just to the jury.

3           THE COURT:  Okay.

4           (The above-referred to exhibit was published.)

5           MS. CRUZ MELENDEZ:  I'm now showing the witness only

6    Government's Exhibit 56B.

7    BY MS. CRUZ MELENDEZ:

8    Q    Is that the same picture as in Government's Exhibit 56

9    and 56A?

10   A    Yes.

11   Q    Okay.  Is that your nickname, Addie, listed underneath

12   there?

13   A    Yes.

14          MS. CRUZ MELENDEZ:  The Government moves to admit

15   Government's Exhibit 56B.

16          MR. CANNICK:  No objection.

17          THE COURT:  That's in evidence.

18          (Government's Exhibit 56B received in evidence.)

19          MS. CRUZ MELENDEZ:  We ask that it be published to

20   both the jury and the public, please.

21          (The above-referred to exhibit was published.)

22   BY MS. CRUZ MELENDEZ:

23   Q    Addie, where did you grow up?

24   A    I grew up in the Bronx.

25   Q    Anywhere else?

1   A      Also grew up in Florida -- in Miami, Florida --
2   Homestead.
3   Q      What kind of hobbies did you have growing up?
4   A      I had hobbies in dancing, singing, acting; and I also
5   liked to write poems, songs.
6   Q      What types of dance did you enjoy doing?
7   A      Ballet, modern, jazz, breakdancing.
8   Q      Did you graduate from high school?
9   A      Yes.
10  Q      After graduating from high school, what, if any,
11  schooling did you have?
12  A      I got my AA degree from New World School of the Arts.
13  Q      What's an AA degree?
14  A      It's an associate of the arts.
15  Q      What kind of schools is New World School of the Arts?
16  A      It's a conservatory school.
17  Q      Can you explain -- please explain to the jurors what a
18  conservatory school is.
19  A      It's a school where you go for either dance theater,
20  music, performing arts.
21  Q      And what did you study while you were at the
22  conservatory?
23  A      I studied dance theater.
24  Q      Did you graduate from the conservatory?
25  A      Yes.

1  Q     Now, you've testified that growing up you enjoyed

2  dancing, singing, and acting, and that you went to a

3  conservatory for studying performing arts.

4        Were you interested in pursuing dance or other

5  performing arts as a profession growing up?

6  A     Yes.

7  Q     And did you, in fact, pursue dancing or singing and

8  acting professionally?

9  A     Yes, I did.

10 Q     And in what ways?

11 A     The performances, shows, went on auditions, did a couple

12 of writings music-wise as well.

13 Q     Did you book any jobs as a dancer or singer or actor?

14 A     Yes, I did.

15 Q     What kinds of jobs?

16 A     I booked some jobs with -- performances.  One, like,

17 Lyricist Lounge, which was an opening act.  Another one was

18 production work as -- written "Law & Order" here in New York

19 as well.

20 Q     In addition to your degree from the conservatory, do you

21 have any other degrees?

22 A     Yes, I do.

23 Q     And what kind of degree do you have?

24 A     I have a degree in business.

25 Q     What kind of degree in business?

1   A    Mostly general international business law.

2   Q    And are you employed?

3   A    I'm self-employed.

4   Q    And how are you self-employed?

5   A    I run two businesses.

6   Q    What kind of businesses?

7   A    One is in multimedia production and business development.

8   The other one is a car business.

9   Q    Are you familiar with an individual named Robert Kelly,

10  also known as R. Kelly?

11  A    Yes.

12  Q    And I'm showing you what's in evidence as Government's

13  Exhibit 1.

14          Do you recognize the individual in Government's

15  Exhibit 1?

16  A    Yes.

17  Q    And who is that?

18  A    That's Robert Kelly.

19  Q    And prior to today, have you met Robert Kelly in person?

20  A    Prior to today, only one time.

21  Q    Now, do you see Robert Kelly in the courtroom here today?

22  A    I -- probably over there, but I need to, like, see the

23  faces.  The masks are hiding their face.

24          Yes.

25  Q    Can you point him out and identify an item of clothing

1  he's wearing?

2  A    He's sitting right there by the -- in the blue blazer

3  next to the gentleman with the striped tie.

4         THE COURT:  Indicating the defendant.

5  BY MS. CRUZ MELENDEZ:

6  Q    Now, you previously testified that you met the defendant

7  on one occasion.

8         Where did you meet the defendant?

9  A    I met the defendant at a concert.

10  Q    And where is the concert?

11  A    The concert is -- was in Miami, Florida.

12  Q    And do you remember what venue the concert was held at?

13  A    It was called American -- Miami Arena.  The name of the

14  concert was Budweiser Fest -- Super Fest.

15  Q    And Miami Arena, where was that?

16  A    It's in Miami, Florida.

17  Q    Sitting here today, do you recall the date of the

18  concert?

19  A    It was in September 1994.

20  Q    Now, at the time that you attended the concert, how old

21  were you?

22  A    I was 17 years old.

23  Q    And were you attending high school at the time?

24  A    Yes.

25  Q    Were you at high school in Florida?

1  A    Yes.  It was Homestead High.

2  Q    Do you recall which grade you were in at the time?

3  A    Junior high.

4  Q    Now, you mentioned that you went to this concert at the

5  Miami Arena.

6         How did you obtain tickets to the concert?

7  A    My mom had friends that worked at Power 96 that gave her

8  VIP tickets.

9  Q    And did you get the tickets from your mom?

10  A    Yes.

11  Q    Okay.  And what's Power 96?

12  A    Power 96 is a radio station.

13  Q    What kind of tickets did you have for the show?

14  A    It was all-access passes -- VIP.

15         MS. CRUZ MELENDEZ:  I'm showing just the witness

16  what's been marked for identification purposes as Government's

17  Exhibit 201.

18         May I approach, Your Honor?

19         THE COURT:  Yes.

20  BY MS. CRUZ MELENDEZ:

21  Q    Addie, do you recognize what's in Government's

22  Exhibit 201?

23  A    Yes.

24  Q    And what is it?

25  A    It's a program from the concert.

1    Q    The concert you went to in 1994, September?

2    A    Yes.

3              MS. CRUZ MELENDEZ:  Your Honor, the Government moves

4    to admit.

5              THE COURT:  Any objection?

6              MR. CANNICK:  May I see it?

7              (Pause.)

8              MR. CANNICK:  No objection.

9              THE COURT:  All right.  That's in evidence.

10             (Government's Exhibit 201 received in evidence.)

11             MS. CRUZ MELENDEZ:  Permission to publish, Your

12   Honor?

13             THE COURT:  Yes.  This can go to the jury and the

14   public.

15             (The above-referred to exhibit was published.)

16   BY MS. CRUZ MELENDEZ:

17   Q    Now, you mentioned that the -- that the concert -- you

18   recall that the concert was a festival involving Budweiser; is

19   that correct?

20   A    Yes.

21   Q    Now, do you see the name on Government's Exhibit 201 of

22   the concert?

23   A    Yes.  On top of the brochure.

24   Q    Okay.  What is that name?

25   A    Budweiser Superfest.

1  Q     And you had previously mentioned that you recall the

2  concert occurred in September of 1994.

3  A     Yes.

4  Q     Looking at -- well, first and foremost, what do we see

5  here in the center of Government's Exhibit 201?

6  A     That is the access pass that was given to me and my best

7  friend for attending.

8  Q     And, here, does it say 1994?

9  A     Yes.

10 Q     And at the top it says, Budweiser Superfest II, all

11 access?

12 A     Yes.

13 Q     Looking at the all access pass here, does that refresh

14 your recollection as to the date of the concert?

15 A     Yes.

16 Q     What was the date?

17 A     September 2nd, 1994.

18 Q     Now, did you attend the concert alone?

19 A     No.  I attended the concert with my best friend.

20 Q     How old was your best friend at the time?

21 A     She was 19.

22 Q     How did you and your friend get to the concert?

23 A     My mom lent me her car.

24 Q     And so did you drive to the concert?

25 A     Yes, I drove.

1  Q    Was the defendant the only performer at the concert, or

2  were there other musical acts?

3  A    There were various artists at the time.

4  Q    What artists do you recall were scheduled to perform at

5  the concert?

6  A    Well, the main artist that I went to go see was Aaliyah.

7  There was also -- I believe Salt-N-Pepa came.  There was also

8  Heavy D, I believe also Coolio.  There was another artist, but

9  I don't recall.

10  Q    Now, you testified that you had wanted to see Aaliyah at

11  the concert?

12  A    Yes.  That was the main reason why we went.

13  Q    Were you a fan of her music?

14  A    Yes, I was.

15  Q    Did she perform at that concert?

16  A    Unfortunately, she didn't perform.

17  Q    And did the defendant perform at the concert?

18  A    Yes, he did.

19  Q    And were you a fan of his music?

20  A    It was okay.

21  Q    Prior to this concert, had you ever been to any of the

22  defendant's performances?

23  A    No.

24  Q    Do you recall what you were wearing at the concert?

25  A    Yeah.  I was wearing sneakers, a pair of white shorts,

1  and a T-shirt.

2  Q    Now, you previously testified about having all-access

3  passes for the concert.

4          Do you recall where your seats were for the concert?

5  A    Yes.  The right side of the main stage near, like, the

6  access towards the back.

7  Q    How close were you to the stage?

8  A    We were pretty close.

9  Q    And what section were you in?

10  A    We were in right -- I would say maybe the third row

11  seating from -- within the VIP.

12  Q    Within the VIP section?

13  A    Yes.

14  Q    Did you and your friends stay for the entire concert?

15  A    Yes, we did.

16  Q    And approximately how long did the concert last?

17  A    About two hours.

18  Q    Do you recall who the closing act was for the concert?

19  A    R. Kelly was the closing act.

20  Q    And can you explain to the jury what happened after the

21  concert ended?

22  A    When the concert ended, like, a couple minutes

23  afterwards, there was some gentlemen that approached me and my

24  best friend asking us if we would like to go backstage to get

25  an autograph.

1   Q     And when they approached you, did they ask who you would

2   be getting --

3                  MR. CANNICK:  Objection.

4                  THE COURT:  Well, sustained as to form.

5                  What did they say to you?

6                  THE WITNESS:  They asked me if I wanted to go -- me

7   and my best friend wanted to get autographs from R. Kelly.

8   BY MS. CRUZ MELENDEZ:

9   Q     And can you describe the two men who approached you and

10  your friend?

11  A     They were African-American, looked like bouncers.

12  Q     Now, prior to being approached by these two individuals,

13  had you intended to go backstage?

14  A     No.

15  Q     Now, they -- they mentioned getting an autograph from the

16  defendant.

17                 Prior to that, had you gotten any other autographs

18  that time?

19  A     In the VIP section, there were other artists there, and

20  we were getting autographs from other artists as well.

21  Q     Do you recall who you got an autograph from?

22  A     Luke was one of them and -- and I believe there was

23  another artist, but I don't recall.

24  Q     I'm showing again Government's Exhibit 201.

25                 Do you see Government's Exhibit 201 on the screen?

1    A     Yes.

2    Q     And is there writing on Government's Exhibit 201?

3    A     Yes.   That's the autograph from Luke.

4    Q     Who is Luke?

5    A     Luke is a wrapper, more explicit rapper.

6    Q     Where did you get Luke's autograph?

7    A     He was in the VIP section where we were sitting at.

8    Q     Now, you testified that two men approached you and you --

9    and they asked if you wanted to go backstage to get an

10   autograph from the defendant.

11         Had you intended to go backstage prior to that?

12         MR. CANNICK:  Objection.

13         THE COURT:  I think you already asked her that.

14         MS. CRUZ MELENDEZ:  I did, Your Honor.

15   BY MS. CRUZ MELENDEZ:

16   Q     Why hadn't you -- I think you testified that you hadn't

17   intended to go backstage before that.   Why hadn't you intended

18   to go backstage?

19   A     We weren't -- we weren't -- I didn't intend to go

20   backstage because during the performance -- I think towards

21   the end, they said, you can come -- there are -- women can

22   come backstage if you are over the age of 18, so I

23   automatically assumed because I was under age I wasn't able to

24   go back there.

25   Q     Who said you couldn't go backstage unless you were

*Addie - Direct - Cruz Melendez*                                    1738

1    18 years old?

2    A    R. Kelly made the announcement at the end of his

3    performance.

4    Q    Where was he when he made that announcement?

5    A    On stage.

6    Q    Now, at the time that the two men approached you asking

7    if you wanted to get the defendant's autograph, did they ask

8    you how old you were?

9    A    No.

10   Q    Did they ask to see any identification?

11   A    No.

12   Q    And after the two men approached you, did you then go

13   backstage?

14   A    Me and my best friend followed them backstage, yes, into

15   a dressing room.

16   Q    When you got to the dressing room, did anyone check your

17   identification?

18   A    No.

19   Q    When you got to the dressing room, did anyone ask you --

20   when you first got to the dressing room, did anyone ask you

21   how old you were?

22   A    No.

23   Q    When you entered the dressing room, was the defendant in

24   the room?

25   A    Yes.  He was in the room being interviewed by media.

1    There were other publications that were there.

2    Q    Now, aside from the media who were interviewing the

3    defendant and the men who had escorted you into the dressing

4    room, were there any other concert goers in the room?

5    A    No, it was mostly just media.

6    Q    So what happened once you entered the room?

7    A    Me and my best friends followed the other guys, the two

8    bouncers that escorted us there into the room; and then once

9    we got into the room, pretty much he stopped his interview, we

10   approached him, and that's when we engaged in a conversation.

11   Q    Now, when you approached the defendant, did he

12   acknowledge you?

13   A    Yes.

14   Q    And what, if anything, did you say to the defendant?

15   A    I pretty much went up to him so -- with my program to see

16   if I could get the autograph.

17   Q    And did you, in fact, get an autograph?

18   A    Yes.  He asked me for my name, and I let him know my name

19   was Addie, and he was signing the program.

20   Q    So I'm showing you what's in evidence as Government's

21   Exhibit 201.

22            This is the other side of the program; correct?

23   A    Correct.

24   Q    And do we see here on Government's Exhibit 201 the

25   defendant's autograph?

1   A    Yes.

2   Q    And where is that?

3   A    It's in the right, upper, mid-portion of the program.

4   Q    Here where I have my pen (indicating)?

5   A    Yes.

6   Q    And it says here, "To Addie"?

7   A    Yes.

8   Q    Who wrote that?

9   A    R. Kelly.

10  Q    And how did he know to write that?

11  A    I told him my name.

12  Q    When you were speaking with him when he was signing your

13  program, what, if anything, else did you discuss?

14  A    When I approached him, I pretty much told him my name, he

15  signed the program.  He -- I told him that I was an aspiring

16  artist as well.  He also wrote down a room number suggesting

17  to come by to his hotel for an audition.

18  Q    What, if anything, else did you discuss?

19  A    Basically, I also -- towards the end, I also told him

20  that I wasn't sure if I was even allowed to be in the room

21  because I was 17 years old.

22  Q    Now, you previously mentioned that the defendant wrote

23  down a room number on the program.

24  A    Yes.

25  Q    Is that shown on Government's Exhibit 201?

1    A    That's on the bottom right side.

2    Q    Here where I have my pen (indicating)?

3    A    Correct.

4    Q    Can you read that for the jury?

5    A    Room Number 1031.

6    Q    And what was that a room number to?

7    A    To a hotel.

8    Q    And what, if anything, did the defendant say to you about

9    this room number in the hotel?

10   A    He verbally told me what hotel it was.  I don't recall

11   the hotel, but he wrote down the room number as well on the

12   program.

13   Q    Now, you also testified that you spoke with the defendant

14   about the fact that you were interested in dance and that you

15   were a dancer.

16            What, if anything, did the defendant say to you

17   about that?

18   A    Well, that's the whole purpose of him -- I'm assuming --

19   writing down the room number was for me to go after to do an

20   audition or to talk about maybe future opportunities.

21   Q    Did he speak with you about possible future

22   opportunities?

23   A    He engaged with me quickly about going to the hotel to do

24   an audition later and also mentioned something about an

25   after-party.

1  Q   So what happened after you got the defendant's autograph

2  and had this conversation with him?

3  A   As soon as I had told him that I thought I was under age

4  and I was 17 years old, he didn't respond about my age.  He

5  would speak to whatever bouncers; and quickly, after that,

6  they had everybody escorted to the room.

7  Q   And when you say "they," what do you mean?  Who are you

8  referring to?

9  A   The two gentlemen that R. Kelly had talked to.

10  Q   And so who left the room?

11  A   All the media that was there basically stopped doing his

12  interview and they escorted everybody out.

13  Q   Did you leave?

14  A   No.

15  Q   What about your friend?  Did your friend stay?

16  A   Yes, she stayed as well.

17  Q   How did you know to stay?

18  A   They told us to stay.

19  Q   Who is "they"?

20  A   The bouncer said to just stay here, and he was engaging

21  with us, and then he had everybody else escorted out of the

22  room -- out of the dressing room.

23  Q   So once the interviewers were out of the dressing room,

24  who, if anyone else, was left in the dressing room?

25  A   There was only R. Kelly, me, and my best friend.

1    Q    Can you describe the dressing room?

2    A    When you -- when you enter into the dressing room on the

3    right-hand side, there's audio equipment that was mobile.

4         Towards the back side of the room, there's a

5    dressing area where, I guess, you can put your makeup and get

6    ready for your performance.

7         On the left side, that was just a wall.

8         In the middle of the room, there was a bunch of

9    chairs where they were giving interviews with him.

10   Q    So what happened once you and your friend were alone in

11   the dressing room with the defendant?

12   A    Basically we start engaging -- it was very subtle, and we

13   started talking.  He wanted to play a game practically and

14   asked if -- who can kiss better.

15   Q    Prior to him asking you who could kiss better, what did

16   you discuss?

17   A    He wanted to -- he was talking about a new song he was

18   working on for a soundtrack called Low Down Dirty Shame.  Not

19   sure if I have the right movie soundtrack, but he went to the

20   equipment -- the audio equipment and started playing a song.

21   The lyrics of the song went something like, "homie, lover

22   friend," which is the only thing I, kind of, remembered from

23   that -- from that single soundtrack that he was playing.

24   Q    So you testified that after you had spoken, the defendant

25   said that he wanted to see which one of you kissed better.

1  A    Yeah.  Well, when he played the song, that's when he

2  started, like, I guess, pretty much saying, I want to know

3  which one of you can kiss better.

4  Q    And what happened next?

5  A    He started kissing on my best friend.

6  Q    And did she kiss him back?

7  A    Briefly, but then he, kind of, started kissing me.  He

8  stopped with her and then started to kiss on me.

9  Q    And did you kiss him back?

10 A    At first, and then I felt a little -- a little

11 overwhelmed, so I started pulling away.

12 Q    Now, when the defendant started kissing you, what, if

13 anything, did you -- what was your reaction to that?

14 A    At first, initially shocked.

15 Q    How much time passed between when the defendant started

16 playing the music and then when he said to you and your

17 friend, I want to play this -- this game seeing who could kiss

18 better?

19 A    It was during throughout -- during throughout the song.

20 Q    So after the defendant started kissing you, what happened

21 next?

22 A    He started getting a little more aggressive and

23 basically, kind of, moved towards the back of the room where I

24 was facing the dressing area, and that's when he started

25 engaging in -- on -- like, holding my wrists and then

1   unzippering my pants and pretty much pulled them down and

2   started having sexual intercourse with me.

3   Q    So you mentioned that the defendant moved you.

4          Where did he move you to?

5   A    We were in, like -- we were in the middle of the room,

6   and then he started guiding me towards the back of the room.

7   Q    And you testified that the defendant pulled down your

8   shorts and started to have sex with you.

9          Where were you -- how were you positioned?

10  A    I was facing in front -- I was in front of the counter,

11  and he was behind me.

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION

2   BY MS. CRUZ MELENDEZ: (Continuing)

3   Q    And when you say that the defendant started to have sex

4   with you, did -- what do you mean?

5   A    He had sex with me unprotected and penetrated my vagina.

6   Q    What, if anything, did you say when the defendant

7   penetrated your vagina?

8          And, I'm sorry, what did he use to penetrate your

9   vagina?

10  A    His penis.

11  Q    And what, if anything, did you say when this happened?

12  A    At this point I was in complete shock and I was kind of

13  just very introverted and shy and didn't know what to expect

14  or what to say at all, just basically went blank.

15  Q    Did your friend participate at all when the defendant

16  began having intercourse with you?

17  A    He grabbed her hands to try to make her participate, but

18  she refused.

19  Q    At some point did the defendant finish having intercourse

20  with you?

21  A    Yes.

22  Q    And what, if anything, did you do once the defendant was

23  finished?

24  A    Basically I got -- pulled everything back up and me and

25  my friend just -- we went to the door, unlocked the door and

Addie - Direct - Melendez                1747

1    ran out of there.

2    Q    And what happened once you ran out of the dressing room?

3    A    We were in the parking lot and me and my best friend were

4    discussing about what happened with the situation and my best

5    friend wanted me to call the police and press charges.

6    Q    And how were you feeling at the time?

7    A    At the time I was very scared and nervous.  I didn't feel

8    comfortable about talking about the situation, and informing

9    the police was something that it was very uncertain for me to

10   do at that time.  I didn't even know if they would believe me.

11   I didn't want to get victim shamed.

12   Q    And so at that time, did you report what happened to the

13   police or any law enforcement?

14   A    No.  I assumed that if I were to move forward with that,

15   I wouldn't be able to move forward with my career and be

16   blacklisted from the industry.

17            MS. MELENDEZ:  Your Honor, one moment.

18            Nothing further, Your Honor.

19            THE COURT:  Okay.  Cross-examination?

20            MR. CANNICK:  One second, please, Your Honor.

21            THE COURT:  Sure.

22            (Pause.)

23            MR. CANNICK:  Thank you, Your Honor.

24   CROSS-EXAMINATION

25   BY MR. CANNICK:

Addie - Cross - Cannick          1748

1    Q    Good morning.

2          You testified and told us that you attended this

3    concert in September 1994?

4    A    Yes.

5    Q    Now, when you first met with the government, you gave --

6    when you met with the government, you gave them a different

7    date, did you not?

8    A    Um, no.

9    Q    Isn't it a fact that you told the government that this

10   concert was in 1992?

11   A    Not that I recall, no.

12   Q    Not that you recall?

13   A    No.

14   Q    I am going to show you this document and direct your

15   attention to the highlighted portion with the red line and see

16   if that refreshes your recollection if you told the government

17   that you went to this concert in 1992.

18   A    I don't recall.

19   Q    You don't recall?

20   A    No.

21   Q    It's on the document though, right?

22   A    Yes.

23   Q    And when you -- you did, in fact, speak with the

24   government before coming here for testimony here, right?

25   A    Yes.

Addie - Cross - Cannick                                      1749

1   Q    And when you spoke to the government, they took notes, am

2   I correct?

3   A    Yes.

4   Q    And you were the only person giving them information, am

5   I correct?

6   A    Yes.

7   Q    And, in fact, when you were there, you had that program,

8   am I correct?

9   A    Correct.

10  Q    How long have you had the program?

11  A    Since I was 17 years old.

12  Q    So you had that program for, according to you, 25 years?

13  A    Yes.

14  Q    And that's if the concert was in 1994.  If it was in '92,

15  it would be 27 years?

16  A    Um, I don't understand the question.

17  Q    Well, you had it since it -- if you had it since 1992,

18  that would be 27 years that you had the program, right?

19  A    But I didn't.  It was 1994.

20  Q    Okay.  Now, where did you keep the program?

21  A    I had it with other memorabilia in a box.

22  Q    So someone raped you, according to you, and you keep that

23  program as a memorabilia?

24  A    That box has been in --

25  Q    I didn't ask you that.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Addie - Cross - Cannick                    1750

1          Someone raped you, and according to you -- someone

2    raped you, according to you, and you kept the program as a

3    memorabilia?

4    A    The program was in a box, yes.

5    Q    Now, you testified that you didn't believe that anyone

6    would believe your story about the supposed rape.  Remember

7    telling us about that?

8    A    Yes.

9    Q    Now, you hired a lawyer, am I correct?

10   A    Yes.

11   Q    What's the lawyer's name?

12   A    Leon Walsh.

13   Q    This is the lawyer?

14   A    Yes.

15   Q    He's here with you today?

16   A    Yes.

17   Q    Now, did you sue R. Kelly?

18   A    No.

19   Q    Do you plan on suing R. Kelly?

20   A    No.

21   Q    So you just happened to invite this lawyer to come and

22   watch you testify?

23   A    Um, legally I needed representation, just --

24   Q    My question is, did you just happen to invite this lawyer

25   to come and watch you testify today?

Addie - Cross - Cannick                    1751

1      MS. MELENDEZ:  Objection.

2      THE COURT:  You should just let her finish the

3  answer, please.

4      MR. CANNICK:  Sure.

5  A    I hired a lawyer to make sure that legally I was

6  represented.

7  Q    When did you hire the lawyer?

8  A    I don't recall the exact date.

9  Q    Did you hire the lawyer after that documentary called

10  *Surviving R. Kelly*?

11  A    It was actually prior to that.

12  Q    It was prior to that.

13      Now, when you hired the lawyer, did the lawyer --

14  did your -- did you at any point go to law enforcement before

15  hiring the lawyer?

16  A    Yes, I did.

17  Q    What year did you go to law enforcement?

18  A    I believe it was January of 2019.

19  Q    So January of 2019.  So if this happened, according to

20  you, in 1994, '95 went by, am I correct?

21  A    Correct.

22  Q    When you went to law enforcement?

23  A    Correct.

24  Q    '96?

25  A    Yes.

Addie - Cross - Cannick          1752

1  Q    '97?

2  A    'Yes.

3  Q    '98?  '99?

4  A    Yes.

5  Q    2000?

6          MS. MELENDEZ:  Objection, Your Honor.

7          THE COURT:  I think she said she hired the lawyer in

8  2019, so...

9  Q    So basically let's do the math.  2019 minus 1994, how

10 many years went by before you went to law enforcement?

11 A    I don't know, like what, 25 years.

12 Q    25 years?

13 A    Yes.

14 Q    Now, during that entire time you were traumatized, right?

15 A    Yes.

16 Q    You were humiliated, right?

17 A    Yes.

18 Q    And that humiliation and trauma did not cause you to go

19 to law enforcement until 25 years later?

20 A    Hello?  The Mike is off.

21         THE COURT:  Maybe you want to put the question

22 again.  We had to change the battery.

23         Do you mind reading back his question?

24         (The record was read.)

25 A    I didn't go to law enforcement because I didn't want more

Addie - Cross - Cannick                    1753

1   victim shaming and more trauma at that time.

2   Q    At that time?

3   A    Yes.

4   Q    Now, there came a time that the victim shaming, according

5   to you, didn't bother you any longer, am I correct?

6   A    I am an adult now, so no, I am no longer a little girl.

7   Q    Well, you were not an adult in 2001, am I correct?

8   A    Everybody deals with trauma differently.

9   Q    I didn't ask you that.

10        You told us that you are an adult now and you're no

11   longer a little girl.  And my question is, you were an adult

12   back in 2001, am I correct?

13   A    Yes.

14   Q    2002, am I correct?

15   A    Yes.

16   Q    2000?

17        MS. MELENDEZ:  Objection.

18   Q    '5, am I correct?

19        THE COURT:  Overruled.

20   A    Yes.

21   Q    2010, am I correct?

22   A    Yes.

23   Q    2015, am I correct?

24   A    Yes.

25   Q    Okay.  You listen to a person called Kim Fox, do you

Addie - Cross - Cannick                    1754

1    remember that?

2    A    Yes.

3    Q    Kim Fox is a prosecutor in Chicago, am I correct?

4    A    Yes.

5    Q    And Kim Fox went on the news and said anyone who has

6    information about R. Kelly, contact me or go to law

7    enforcement, am I correct?

8    A    I believe that she said any victims to please step

9    forward.

10   Q    And according to you, you hired your lawyer before that,

11   am I correct?

12   A    I'm not sure if it was before that or afterwards.

13   Q    Okay.  So now you're not sure?

14   A    Well, it took me time to find a lawyer.

15   Q    Okay.  In Miami, Florida it took you time to find a

16   lawyer?

17          MS. MELENDEZ:  Objection.

18          THE COURT:  Sustained.

19   Q    How long did it take you to find a lawyer?

20   A    I don't recall.  A few months.  Like a few months, yeah.

21   Q    Where were you looking?

22   A    First of all, trying to find someone who actually handles

23   this type of case.

24   Q    No.  My question was, where were you looking?

25          MS. MELENDEZ:  Objection as to form.

Addie - Cross - Cannick                1755

1          THE COURT:  I am not entirely sure that it is
2    relevant.
3          But I guess the better question might be what
4    process did you use to try to find an attorney?
5    A    Referrals.
6          I also looked at the Florida Bar.
7          And pretty much I also looked at other victims
8    online and looked to see who their lawyers were.
9    Q    Now, you testified and said that -- according to you,
10   that R. Kelly signed that program or put information in that
11   program?
12   A    Yes.
13   Q    What time did the concert end when you went to see it?
14   A    I don't know what time the concert ended.
15   Q    What time when you actually left this room that you said
16   he was in?
17   A    I'm not aware of the time.  There was no -- there was no
18   clock in there, so I'm not aware.
19   Q    What time did you get back in your car?
20   A    I'm not aware of the time.
21   Q    Now, who drove you to the concert?
22   A    Excuse me?
23   Q    Who drove you to the concert?
24   A    I drove myself.
25   Q    You sat with an adult, am I correct?

Addie - Cross - Cannick                1756

1   A    Yes.

2   Q    The adult who gave you the ticket, according to you, am I

3   correct?

4   A    Yes.

5   Q    And when R. Kelly announced, according to you, that

6   females were invited back to get an autograph but there was an

7   age requirement of 18, did you mention to the adult that you

8   were going backstage?

9   A    Um, I don't understand that question.

10  Q    You testified and told us that R. Kelly made an

11  announcement that he was giving autographs to folks who were

12  over 18?

13  A    Um, no.  I said he gave an announcement that you could

14  come in the back dressing room if you're 18 and older.

15  Q    If you're 18 and older?

16  A    Yes.

17  Q    And did you tell the adults that you were with that you

18  were going backstage?

19  A    Everybody in that room was an adult.

20  Q    No.  My question to you is that did you tell the adults

21  that you were with that you were going backstage to get an

22  autograph?

23  A    I don't understand the question.  What adults are you

24  referring to?

25  Q    You testified earlier and said that you were seated next

Addie - Cross - Cannick                    1757

1  to adults who -- to an adult who gave you the all-access pass,

2  am I correct?

3  A    My mom gave me the access pass.  She was not present.

4  Q    Okay.  And my question is, was there an adult with you?

5  A    No.

6  Q    You and your girlfriend were attending the show alone?

7  A    My girlfriend was 19 years old.  I was 17 years old.  And

8  yes, it was a family venue.

9  Q    My question was, you and your girlfriend were attending

10 alone, without any other adults?

11 A    No, there was no adults.

12 Q    Okay.  Now -- and according to you, R. Kelly had sex with

13 you and you ran out of the room?

14 A    Afterwards, yes, we left.

15 Q    At first you left?

16        THE COURT:  She said afterwards.

17 A    Afterwards we left.

18 Q    And you sure he didn't sign the program before you left,

19 according to you?

20 A    No.

21 Q    When was it in the process that he signed the program?

22 A    He signed the program when the room was full with other

23 personnel there.  He stopped the interview and was signing the

24 programs during that time.

25 Q    And you said press was in the room?

Addie - Cross - Cannick                    1758

1   A    Yes.

2   Q    You also said that you were escorted back to the room by

3   African-American bouncers?

4   A    That's what they looked like to me, yes.

5   Q    What does an African-American bouncer look like?

6              MS. MELENDEZ:  Objection.

7              THE COURT:  I will sustain it as to the form.

8              Do you want to ask her what a bouncer looks like?

9              MR. CANNICK:  Well, she described the person as an

10  African-American bouncer, so --

11             THE COURT:  Why did you think they were bouncers?

12             THE WITNESS:  Because they were a part of his

13  entourage.

14  Q    How do you know they were part of his entourage?

15  A    Because they communicated.

16  Q    So that's the only thing that made you come to the

17  conclusion that they were part of his entourage?

18  A    Well, they were the ones that escorted everybody out of

19  the room when he asked them to.

20  Q    So you don't know if they were working for him or for the

21  venue?

22  A    I wouldn't know.

23  Q    Yeah.  But you make this assumption that they were part

24  of his entourage and that they were African-American bouncers,

25  am I correct?

1  A    I don't understand your question.

2  Q    You just testified a short while ago that you didn't know

3  whether or not they worked for him or worked for the venue.

4  Remember telling us that?

5  A    I'm assuming if they're engaging with him and

6  communicating with him and he's telling them orders, that yes,

7  they were for him.

8  Q    So your testimony here is based on your assumption then,

9  am I correct?

10  A    Well, they're the ones that brought us back there.

11  Q    No, that's not -- my question is that your testimony is

12  based on your assumption, am I correct?

13  A    My testimony is based on my experience.

14  Q    You testified and told us that you hadn't been to an R.

15  Kelly concert before.  Remember telling us that?

16  A    Excuse me?  Can you please repeat?

17  Q    Do you remember telling us that you had not been to an R.

18  Kelly concert before?

19  A    That's correct.

20  Q    How many concerts had you been to before attending the R.

21  Kelly concert?

22  A    I never went to another concert before.

23  Q    So what experience are you talking about?

24  A    Excuse me?  Experience as far as what, the concert?

25  Q    You said that you're basing this on your experience and

1    you had never been to an R. Kelly concert, right?

2          THE COURT:  He is asking you about the bouncers.

3          THE WITNESS:  Oh.

4    A    I -- they approached us and they guided us to his

5    dressing room.

6    Q    Now, I asked you earlier about what adults, if any, that

7    you were seated next to in the concert was a member of your

8    party.  Remember me asking that?

9    A    There was no adults with us.

10   Q    Okay.  Now, you remember in that interview you had with

11   the government, you told the government -- just a second --

12   that you and Lele stayed in the VIP section alone with her

13   mother's friend.  Remember telling that to the government when

14   you had the interview with them?

15   A    No, there was no adults with us.

16   Q    So if the prosecutor's office wrote it down in their

17   report, they got it wrong, am I correct?

18   A    I don't know, I didn't look at their report.

19   Q    And you didn't tell them that during your interview, am I

20   correct?

21   A    I don't understand the question.

22   Q    What I just read to you, according to you, you didn't say

23   that during the interview to the government, am I correct?

24   A    No, there was no adults with us.

25   Q    Okay.  And you will concede, however, that you did have

Addie - Cross - Cannick                     1761

1   meetings with the government and told them what you said

2   happened to you on that particular night, am I correct?

3   A    Yes.

4   Q    And you will also concede that the people who were in the

5   room when you gave that information are at this table, am I

6   correct?

7   A    Yes.

8   Q    And you will concede that as you imparted the information

9   to them, that they wrote it down, am I correct?

10  A    Yes.

11  Q    You saw them writing, am I correct?

12  A    Yes.

13          MR. CANNICK:  May I have just a few more moments,

14  Your Honor?

15          THE COURT:  Sure.

16          (Pause.)

17  Q    Do you remember at some point speaking with someone by

18  the name of Mayweather?

19  A    No.

20  Q    Isn't it a fact that you told the government that you

21  eventually spoke to someone by the name of Mayweather and that

22  person helped you to make contact with the right people?

23  A    No.

24  Q    And again, if that's in the report, the government made

25  an error, correct?

Addie - Cross - Cannick                    1762

1          If it's in the report then it's an error, correct?

2    A    I have no idea.

3    Q    Now --

4          MR. CANNICK:  May I have a second?

5          THE COURT:  Sure.

6          (Pause.)

7    Q    Now, before you came here today to give testimony, you

8    had met with the government, am I correct?

9    A    Excuse me?

10   Q    Before coming here this morning and speaking to the jury,

11   you spoke with the government and went over your testimony, am

12   I correct?

13   A    Yes.

14   Q    How many times?

15   A    Um, I'm not quite sure.

16   Q    Well, when was the last time?

17   A    Yesterday.

18   Q    And how long was that?

19   A    I'm not certain.  I didn't keep track.

20   Q    Now, do you have an approximation?

21   A    Probably an hour.

22   Q    Do you remember what time you got there, into their

23   office?

24   A    1:00.

25   Q    Do you remember what time you left?

Addie - Cross - Cannick                    1763

1   A    Um, no, I don't recall.

2   Q    And your lawyer was with you, am I correct?

3   A    No.

4   Q    When was the time you met with them before yesterday?

5   A    Um, probably another time, sometime last week, I believe.

6   I don't recall.

7   Q    Sometime last week?

8   A    Yes.

9   Q    Okay.  And how long was that meeting?

10  A    Around the same time.

11  Q    What is the same time?

12  A    I don't know, like maybe an hour.

13  Q    An hour?

14  A    Yeah.

15  Q    And all of these people were there, am I correct?  When I

16  say "these people," at this table.

17  A    Not all.

18  Q    Not all of them?

19  A    Yeah.

20  Q    The majority?

21  A    I don't understand the question.

22  Q    You don't understand what "majority" means?

23            THE COURT:  Mr. Cannick, please do not do that.

24            MS. MELENDEZ:  Objection.

25            THE COURT:  He wants to know, do you recall which of

Addie - Cross - Cannick                    1764

1  those people at the government table, do you remember which

2  ones were at the meeting?

3          This is the last-week meeting?

4          MR. CANNICK:  Yes.

5          THE COURT:  Okay.  The meeting last week.

6  A    Probably two at the table, three.

7  Q    And before last week, before the meeting that we're

8  discussing that occurred last week, when had you met with them

9  before that?

10  A    Probably the first time when I let them know about the

11  situation.

12  Q    In that sense, it's your testimony that you met with them

13  about three times?

14  A    I would say that's a good number, yes.

15  Q    And according to you, you met with them about an hour

16  yesterday and an hour at the time previous to that, so the two

17  hours.

18          What about the first time you met them, how long was

19  that?

20  A    First time, I believe like an hour as well.

21  Q    Okay.  And during -- before coming in and giving

22  testimony, had you ever spoken with them over the phone?

23  A    No.

24  Q    So basically all your meetings with them have been face

25  to face?

1   A    Yes.

2   Q    And in their preparation of you to come and give

3   testimony, did they discuss your prior statements that you had

4   given?

5   A    Excuse me?

6   Q    Did they discuss with you your statements that you had

7   given them on prior occasions?

8   A    Oh, basically just prepping me to understand how the

9   system works, to understand testimony.

10  Q    Well, they did more than that; they went over the

11  questions that they were going to ask you, am I correct?

12  A    There was no set questions.

13  Q    There were no -- they didn't discuss with you yesterday

14  what they asked you here today?

15  A    Not in a set format, no.

16  Q    I'm not asking about the format.

17         I'm asking you, did they discuss with you yesterday

18  the questions, the subject matter that they asked you here

19  before?

20  A    They discussed the topic and subject matter.

21  Q    And did they discuss with you the questions that you

22  would likely be asked on cross-examination?

23  A    They can -- there's no way to know what the questioning

24  is.

25  Q    They didn't tell you, well, you may be asked this

Addie - Cross - Cannick                           1766

1    question by the other lawyer?

2    A    No.

3    Q    They didn't tell you that the other lawyer is going to

4    ask -- likely ask questions of you?

5    A    I don't think they know what you're going to ask.

6    Q    That's not my question.

7    A    No.

8    Q    My question is, they didn't tell you what the other

9    lawyer --

10   A    No.

11   Q    -- would likely --

12   A    No.

13   Q    Let me finish, please.

14        They didn't tell you that the other lawyer is likely

15   to ask you questions?

16   A    Of course, yes, you're likely to ask questions.

17   Q    And did they go over what questions they anticipate the

18   lawyer to ask?

19   A    They let me know what cross-examination was about.

20   Q    My question is, did they go over with you the questions

21   that they anticipate you being asked?

22   A    Yes.

23   Q    So they did.

24        MR. CANNICK:  Nothing further, Your Honor.

25        THE COURT:  Any redirect examination?

Addie - Redirect - Cruz Melendez                1767

1          MS. MELENDEZ:  Yes, Your Honor.

2    REDIRECT EXAMINATION

3    BY MS. CRUZ MELENDEZ:

4    Q    Addie, have you ever spoken publicly about what happened

5    to you in September 1994?

6    A    No.

7          MR. CANNICK:  Beyond the scope, Your Honor.

8          THE COURT:  Sorry?  I did not hear.

9          MR. CANNICK:  Beyond the scope.

10          THE COURT:  Overruled.

11    Q    Now, defense counsel asked you a question about the

12    individuals who approached you and your friend about getting

13    an autograph for -- from the defendant.  Do you recall those

14    questions?

15    A    I'm sorry, can you repeat that?

16    Q    Do you recall defense counsel asking you questions about

17    the two men who approached you to see if you wanted an

18    autograph from the defendant?

19    A    Yes.

20    Q    What made you think that those two men worked for the

21    defendant?

22    A    Because they came strictly straight to us, asked us if we

23    would like to go to the dressing room to get autographs from

24    R. Kelly and escorted us straight to him.

25    Q    Now, defense counsel also asked you about statements in a

Addie - Redirect - Cruz Melendez          1768

1   report saying that you once stated that the concert happened

2   in 1992.  Had you ever seen the report that defense counsel

3   showed you?

4   A    No.

5   Q    Government Exhibit 201, did you provide this to the

6   government?

7   A    Yes.

8   Q    Is this the pamphlet that you had on the date that the

9   defendant pinned your arms and had sex with you?

10  A    Yes.

11  Q    Is there any doubt in your mind that this is the pamphlet

12  from that concert?

13  A    No.

14           MS. MELENDEZ:  If I could show the witness and the

15  jury and the public Government Exhibit 201.

16  Q    Is there any doubt in your mind that this is the

17  all-access ticket that you used to get into that concert?

18  A    No doubt in my mind.

19  Q    And what is the year listed there?

20  A    1994.

21  Q    And what is the date?

22  A    September 2nd.

23           MS. MELENDEZ:  Nothing further, Your Honor.

24           THE COURT:  Any recross?

25           MR. CANNICK:  Just briefly.

Addie - Recross - Cannick                    1769

1   RECROSS EXAMINATION

2   BY MR. CANNICK:

3   Q    The pamphlet...

4   A    Yes.

5   Q    The pamphlet that you just testified about, did you take

6   that pamphlet with you when you had your interview, your

7   initial interview with the government?

8   A    Yes.

9   Q    And did you give it to the government on the date that

10  you had your initial interview?

11  A    Yes.

12  Q    Now, you were born in November of 1976, am I correct?

13  A    Correct.

14  Q    So basically on the date of this concert, according to

15  you, the concert you supposedly attended, you were 17 and

16  10 months?

17  A    Um, I believe so, yes.  My birthday is in November.

18  Q    And you do recall the announcement that you had to be 18

19  to go for the autograph, am I correct?

20  A    Yes.

21          MR. CANNICK:  Nothing further.

22          THE COURT:  Anything else?

23          MS. MELENDEZ:  No, Your Honor.

24          THE COURT:  All right.  Thank you so much.  You can

25  step down.

```
                        Proceedings                    1770
```

 1            (Witness excused.)

 2            Are you ready to call your next witness?

 3            MS. SHIHATA:  Yes, Your Honor.  The government calls

 4   Darrick Stephens.

 5            THE COURT:  Darrick -- say the last name again.

 6            MS. SHIHATA:  Stephens.

 7            THE COURT:  Stephens.

 8            (Pause.)

 9            MS. SHIHATA:  Judge, I understand the witness is

10   just using the bathroom.

11            THE COURT:  And now everybody knows.

12            (Witness enters the courtroom.)

13   **DARRICK STEPHENS**, called by Government, having been first duly

14   sworn, was examined and testified as follows:

15            THE CLERK:  Please state your name for the record.

16            Have a seat.

17            THE COURT:  Okay.  Just a couple of things before we

18   begin.

19            Our court reporter takes down everything that you

20   say, so try not to speak too quickly.  And just let whichever

21   lawyer is asking you questions finish speaking before you

22   start speaking.  It just makes it hard when we talk over one

23   another.

24            If there is a question that you need to have

25   repeated or that you do not understand, let me know and I will

Stephens - Direct - Shihata                1771

1   have the lawyer rephrase it.

2           And just do your best to answer all of the questions

3   that you are being asked.  Okay?

4           THE WITNESS:  Thank you.

5           THE COURT:  Is that on, the microphone?

6           It sounds like it.  Okay go ahead.

7           MS. SHIHATA:  Thank you, Your Honor.

8   DIRECT EXAMINATION

9   BY MS. SHIHATA:

10  Q    Good morning, Mr. Stephens.

11  A    Good morning.

12  Q    Your first name is Darrick, correct?

13  A    Correct.

14  Q    Do you go by any nicknames?

15  A    Devyne Stephens.

16  Q    And did you receive a subpoena to testify here today?

17  A    Yes.

18  Q    Do you want to be here today?

19  A    No, ma'am.

20  Q    How old are you?

21  A    51.

22  Q    Are you currently employed?

23  A    Yes.

24  Q    What do you do?

25  A    Music management and artist development.

Stephens - Direct - Shihata                    1772

1  Q    And do you own your own business?

2  A    Yes.

3  Q    How long have you worked in music and artist development?

4  A    30 years.

5  Q    Where are you based?

6  A    Atlanta.

7  Q    Are you familiar with an individual known as R. Kelly?

8  A    Yes, ma'am.

9  Q    And have you met him personally?

10 A    Yes.

11 Q    Have you worked professionally with him?

12 A    Yes.

13 Q    What is his real name?

14 A    Robert Sylvester Kelly.

15 Q    Do you see Robert Kelly in the courtroom here today?

16 A    Yes.

17 Q    Can you point him out and identify him by an item of

18 clothing he's wearing?

19 A    Blue suit, tie.

20        THE COURT:  Indicating the defendant.

21        THE WITNESS:  Yes.

22 Q    Around when did you first meet the defendant?

23 A    First met the defendant 2013.  Between -- yeah, 2013.

24 Q    And how did you first meet him?

25 A    I was introduced to Mr. Kelly through a lady by the name

Stephens - Direct - Shihata          1773

1   of Cheryl Mack.

2   Q    And I'm showing you what's been marked for identification

3   as Government Exhibit 38.

4          Do you recognize this person?

5   A    Yes, I do.

6   Q    Who is that?

7   A    Cheryl Mack.

8          MS. SHIHATA:  I move to admit Government Exhibit 38.

9          MR. CANNICK:  No objection.

10         THE COURT:  All right.  In evidence.

11         MS. SHIHATA:  I'm being told it may have already

12  been in evidence, so I apologize.

13         May I publish it, please?

14         THE COURT:  Yes.

15  Q    And in 2013, what if any relationship did you have with

16  Cheryl Mack?

17  A    She was my assistant.

18  Q    So she was working for you?

19  A    Yes.

20  Q    And around when did she, Cheryl Mack, become your

21  assistant?

22  A    I want to say in 2013 as well.

23  Q    And what were Cheryl Mack's responsibilities as your

24  assistant?

25  A    To handle my day-to-day affairs, my itinerary.

Stephens - Direct - Shihata                    1774

1   Q    And when you say day-to-day affairs, what do you mean?

2   A    Just day-to-day calendar in terms of setting up meetings

3   and things of that nature.

4   Q    And how was it that you ended up meeting the defendant

5   through Cheryl Mack?

6   A    Cheryl introduced me to Mr. Kelly at a mutual producer, a

7   friend's house.

8   Q    And whose house was that?

9   A    Lil' Ronnie.

10  Q    Was it your understanding that Cheryl Mack had known the

11  defendant from before?

12  A    Yes.

13  Q    You indicated, you testified you were introduced to the

14  defendant at Lil' Ronnie's house; is that right?

15  A    Correct.

16  Q    Where was that?

17  A    In Atlanta.

18  Q    And did you speak to the defendant at that house?

19  A    Yes.

20  Q    And what did you discuss with the defendant there?

21  A    We just talked about different business, talked about

22  music, talked about the legacy of R. Kelly.

23  Q    What do you mean by that?

24  A    Just in terms of where he was at musically and where he

25  was trying to go.

Stephens - Direct - Shihata                1775

1  Q    And what, if anything, did the defendant say to you about

2  that?

3            MR. CANNICK:  Objection.

4            THE COURT:  Overruled.

5  Q    Go ahead.  You can answer.

6  A    Just more like, you know, in terms of just growing his

7  business.  That's mostly what we spoke about.

8  Q    What, if anything, did you agree to do for the defendant

9  after meeting him at Lil' Ronnie's house?

10  A    I agreed to bring different collaborations, features and

11  just business dealings and help with his career.

12  Q    When you first met with the defendant, where was he

13  based?

14  A    Chicago.

15  Q    And did that change at some point?

16  A    Yes.

17  Q    How did it change?

18  A    Moved to Atlanta.

19  Q    Who moved to Atlanta?

20  A    The defendant.

21  Q    And where did the defendant initially stay when he first

22  moved to Atlanta?

23  A    I think he might have stayed at a hotel, somewhere like

24  -- it might have been Homestead Suite or something.

25  Q    While you were working with the defendant, did he use

1    your residence?

2    A    Yes.  I mean, he used my residence for recording and

3    fitness training.  And, you know, during the course of the

4    fitness training playing basketball was part of the training,

5    physical.

6    Q    At the time, what kind of residence did you have in

7    Atlanta?  Can you describe it for the jury, please?

8    A    The residence was an artist development residence.  It

9    had studios on both sides, the left and right, and four

10   regulation NBA basketball courts in the house.

11   Q    And did you also live in that house?

12   A    Yes.

13              (Continuing on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Stephens - Direct - Shihata                    1777

1   DIRECT EXAMINATION

2   BY MS. SHIHATA:   (Continuing)

3   Q    After agreeing to work with the defendant, what types of

4   things did you do with respect to the defendant?

5   A    In terms of the fitness part?  Could you repeat that

6   again.

7   Q    What type of work did you do for the defendant?

8   A    Just business deals.  I was able to work out a deal with

9   Live Nation for touring.  I also different collaborations with

10  artists, features.  Also, help consult in the process of his

11  negotiations with RCA.

12  Q    You mentioned Live Nation, what is that?

13  A    A touring booking company.

14  Q    You mentioned RCA what is that?

15  A    A record label, distribution company.

16  Q    With respect to the deal you put together for Live

17  Nation, what was that?

18  A    It was bringing in the agent, bringing in Phil Casey.

19  And Phil Casey went to Al Hayman and worked out a deal for a

20  tour that we was supposed to go on with him and Miss Mary J.

21  Blige.

22  Q    When you say "him," who are you referring to?

23  A    Mr. Kelly.

24  Q    Did that Live Nation tour in fact take place?

25  A    No, it never took place.

1   Q    What happened?

2   A    I think at that moment Mr. Kelly start playing second

3   tier markets and never did the --

4           MR. CANNICK:  I'm going to object to the response.

5           THE COURT:  Did you set up the dates?

6           THE WITNESS:  I set up with the agent Phil Casey, I

7   brought him in to set up the dates.

8           THE COURT:  Do you know what happened, whether they

9   went on tour?

10          THE WITNESS:  No, there was no tour.

11          THE COURT:  There was no tour.  All right.

12          Next question.

13  BY MS. SHIHATA:

14  Q    Was any money paid for the tour?

15  A    Yes.  My understanding the first half of the money was

16  paid.

17  Q    To whom?

18  A    Mr. Kelly.

19  Q    Were you involved at all in setting up any other tours or

20  working on any other tours with the defendant?

21  A    I think the very first one might have been the Black

22  Panties tour.

23  Q    What, if anything, did you do with respect to that?

24  A    That was just kind of negotiating just negotiating with

25  the gentleman by the name of Blackie and dealing with the

1   promoters.

2           THE COURT:  Keep your voice up.

3           THE WITNESS:  I'm sorry.

4   Q   Who was Blackie?

5   A   At the time he was the partner, he was partner and also

6   active CPA, I think, at the time.  I think he was handling the

7   business accountant, the business manager at the time.

8   Q   Who did you understand Blackie to work for?

9   A   Mr. Kelly.

10  Q   With respect to the deal with RCA that you mentioned, did

11  you work with any anyone will else that worked with the

12  defendant on that?

13  A   Yes, Ms. Linda Mensch and Red Light Coran Capshaw, I

14  think.

15  Q   You mentioned Linda Mensch, who was she?

16  A   At the time I think she was the active attorney.

17  Q   For who?

18  A   Mr. Kelly.

19  Q   You mentioned Red Light, what is that?

20  A   Coran Capshaw was the management for Red Light.

21  Q   Is that a management company?

22  A   Yes.

23  Q   Did they work with the defendant?

24  A   Yes.

25  Q   I'm showing you what is marked for identification as

1    Government's Exhibit 44.  Do you recognize this?

2    A    Yes.

3    Q    Who is this?

4    A    Ms. Linda Mensch.

5         MS. SHIHATA:  Move to admit Government's Exhibit 44.

6         MR. CANNICK:  No objection.

7         THE COURT:  That's in evidence.

8         (Government Exhibit 44, was received in evidence.)

9         MS. SHIHATA:  May we publish it?

10        THE COURT:  Sure.

11   BY MS. SHIHATA:

12   Q    At some point while you working with the defendant, did

13   Cheryl Mack's role change?

14   A    Yes, she became Mr. Kelly's assistant.

15   Q    Did she no longer work as your assistant?

16   A    No, correct.

17   Q    Was she off of your payroll?

18   A    Yes.

19   Q    You testified earlier that the defendant used your

20   residence at certain points; is that right?

21   A    Yes, correct.

22   Q    In what ways did he use your residence?

23   A    To actually to train, playing basketball and recording.

24   Q    Was that in one of the recording studios in your

25   residence?

Stephens - Direct - Shihata                1781

1    A    Yes.

2    Q    Did you ever attend any of the basketball playing that

3    the defendant did at your residence?

4    A    Yes.

5    Q    Did you play in any games?

6    A    I played a few games, I got a few rebounds, kicked the

7    ball out.

8    Q    Can you explain in the games that you attended or played

9    in what the set up was?

10   A    It was kind of us training, playing ball, always people

11   around, a few people in the gym while we are playing.

12   Q    What, if anything, unusual did you notice about people in

13   the gym watching?

14   A    I think it was always kind of like people around, but

15   Mr. Kelly would always have women watch him play.

16   Q    Where would they sit?

17   A    They would actually sit in a corner, like kind of away

18   from everybody, kind of isolated in the corner.

19   Q    What, if anything, did you notice about that?

20   A    I mean, you know, if the ball kind of rolled over by

21   them, you know, and you had to go get the ball, they would

22   actually like kind of like cross their legs and look at the

23   ceiling or look at the wall.

24   Q    That was when someone was approaching to get the ball?

25   A    Approaching to get the ball.

Stephens - Direct - Shihata                1782

1  Q    I'm showing what you is in evidence as Government's

2  Exhibit 4.  Do you recognize this person?

3  A    Yes.

4  Q    Who do you recognize that to be?

5  A    Junebug the security/personal assistant.

6  Q    To whom?

7  A    Mr. Kelly.

8  Q    Showing you in evidence Government's Exhibit 18.  Do you

9  recognize this?

10 A    Yes.

11 Q    Who is this?

12 A    Security, Hammer.

13 Q    He went by the name Hammer?

14 A    Goes by the name Hammer.

15 Q    Security for whom?

16 A    Mr. Kelly.

17 Q    Did there come a time when your business relationship

18 with the defendant deteriorated?

19 A    Say it again?

20 Q    Did there come a time when your business relationship

21 with the defendant ended?

22 A    Yes.

23 Q    Why did it end?

24 A    It ended because after negotiations of his last recording

25 agreement with RCA, I sent in after working on the deal with

Stephens - Direct - Shihata                    1783

1   Red Light and Linda Mensch, I sent in my invoice first and

2   then the invoice got rejected in terms of what the

3   compensation was supposed to be.

4   Q    So were you paid at all?

5   A    No, I was never paid.

6   Q    After you sent in the invoice and were not paid, what, if

7   anything, did you do?

8   A    Actually at that point I called my attorney.  And then my

9   attorney reached out to Linda Mensch and the response came

10  back:  Mr. Kelly said he doesn't owe you anything.

11  Q    Prior to that, had you attempted to reach the defendant

12  yourself?

13  A    Correct.

14  Q    In what methods did you use to do that?

15  A    Text message.

16  Q    Sitting here today do you recall what number you texted

17  the defendant at?

18  A    Yes, I can recall what number.

19  Q    You remember the exact number?

20  A    No, I don't remember the exact number.

21  Q    I'm showing the witness only what is marked for

22  identification as Government's Exhibit 255A.  Do you recognize

23  this?

24  A    Yes.

25  Q    What is this?

1  A    That looks like a screenshot from my cellphone,

2  Mr. Kelly's number.

3          MS. SHIHATA:  I move to admit Government's Exhibit

4  255A.

5          MR. CANNICK:  No objection.

6          (Government Exhibit 255A, was received in evidence.)

7          THE COURT:  That's in evidence.  You can publish.

8          MS. SHIHATA:  Thank you.

9  BY MS. SHIHATA:

10  Q    At the top it says R3K, who is that referring to?

11  A    Mr. Kelly.

12  Q    And what is the number you had saved your phone for him?

13  A    (312)972-7283.

14  Q    Is that the number you texted?

15  A    Correct.

16  Q    I'm showing the witness only what is marked for

17  identification as Government's Exhibit 255B.  I'm showing you

18  the first page first, and then the second page.  Do you

19  recognize this exhibit?

20  A    Yes, I do.

21  Q    Generally speaking, what is this exhibit?

22  A    Say it again?

23  Q    Generally speaking what is this exhibit?

24  A    A conversation that I was having with Mr. Kelly.

25  Q    Is it a text message conversation?

1    A    Text message, yes.

2    Q    And is this screenshots from your phone?

3    A    Yes.

4         MS. SHIHATA:  Move to admit Government's Exhibit

5    255B.

6         MR. CANNICK:  No objection.

7         (Government Exhibit 255B, was received in evidence.)

8         THE COURT:  That's in evidence.  You can publish.

9         MS. SHIHATA:  Thank you.

10   BY MS. SHIHATA:

11   Q    Starting with the first page of this exhibit, the text in

12   white with the black background and white, who is that from?

13   A    That's from Mr. Kelly.

14   Q    And are your responses in blue?

15   A    Correct.

16   Q    Looking at the text message that the defendant sent you,

17   what date is this from?

18   A    November 25, 2014.

19   Q    What were you working on around that time?

20   A    At that time that was the renegotiation of his agreement.

21   Q    With whom?

22   A    With RCA.

23   Q    And was that something you were working on?

24   A    Yes.

25   Q    And looking at this text message that he sent you, what

1  was this about?

2  A    What I can recall, I think it's about the team, the whole

3  team working together.  Because I think at this point I was

4  putting out the -- was working on more music, just trying to

5  formulate the team really is what that conversation was about.

6  Q    When the defendant texted you:  I just called her and she

7  didn't pick up but I text her.

8       Who did you understand the "her" and "she" to be in

9  that sentence?

10  A    Linda Mensch.

11  Q    On the bottom of the first page, did you write a response

12  saying:  Agree, let's go fourth quarter down by ten?

13  A    Correct.

14  Q    What did you mean by that?

15  A    Let's get it going, just trying to motivate him to let's

16  close out and keep moving forward, go down by ten.

17  Q    Close out what?

18  A    Any deals or bring the team together, whatever we need to

19  do to keep moving.

20  Q    I'm going to show you in a moment page two of

21  Government's Exhibit 255B.  I ask that this be for the jury

22  only be.  At the top of this -- is the top just a continuation

23  of the text from the defendant that we were looking at on the

24  first page plus your response that we just went over?

25  A    Yes.

1    Q    And then the series of text messages underneath that, are

2    those all text messages from you to the defendant?

3    A    Correct.

4    Q    And the first one is that dated November 25, 2014?

5    A    Yes.

6    Q    And you wrote:  King, you're still there, yo?

7    A    Yes.

8    Q    And why did you send that?

9    A    I think at the time he stated that he was going back to

10   Chicago and he'll be back.  I was just wondering was he still

11   in Atlanta.

12   Q    Then the next text message here is from March 21, 2015;

13   is that right?

14   A    Correct.

15   Q    What did you write there?

16   A    King you good?

17         Because I wasn't getting any response.

18   Q    Had you had any communications with the defendant between

19   November 25, 2014 and March 21, 2015?

20   A    No.

21   Q    When you said "King," who are you referring to?

22   A    Mr. Kelly.

23   Q    The next text message, is that from you to him, to the

24   defendant, on July 23, 2015?

25   A    Yes.

1    Q    And what did you write there?

2    A    You ready?  Here I come.

3    Q    Why did you write that?

4    A    Just letting him know, I think at that point I received a

5    letter back from, I think I sent a letter, back from Linda

6    Mensch stating that the work that I did that I wouldn't be

7    compensated.

8    Q    Did you send another message on August 21, 2015?

9    A    Correct.

10   Q    Does it say, without saying the name, does it say a

11   certain name there?

12   A    Yes.

13   Q    And what is depicted after that name?

14   A    A rat emoji.

15   Q    You sent that to the defendant?

16   A    Yes.

17   Q    You mentioned that you ended up, you at some point

18   retained a lawyer in connection with your dispute with the

19   defendant?

20   A    Yes.

21   Q    Did you ever end up filing a lawsuit against him?

22   A    No, I never filed a lawsuit.

23   Q    Why not?

24        MR. CANNICK:  Objection.

25        THE COURT:  Sustained.

1    Q    I'm showing you what is marked for identification as

2    Government's Exhibit 75?

3              THE COURT:  Ms. Shihata, I'm going to stop you.  Is

4    this a good time for your morning break?

5              MS. SHIHATA:  Sure.

6              THE COURT:  Ladies and gentlemen, we'll break for

7    about ten minutes.  Please don't talk about the case.  We'll

8    see you in a few minutes.

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury exits the courtroom.)

11             THE COURT:  The witness can step down.

12             (Whereupon, the witness steps down.)

13             THE COURT:  Do you know how much longer you have?

14             MS. SHIHATA:  A few minutes.

15             THE COURT:  And then is this your witness,

16   Mr. Cannick?

17             MR. CANNICK:  Yes.

18             THE COURT:  Do you think we'll fit in another

19   witness this morning?

20             MR. CANNICK:  I'm pretty confident we'll at least be

21   able to start another witness.

22             THE COURT:  We'll be in recess then.

23             (Brief recess.)

24             (Whereupon, the witness resumes the stand.)

25             (Jury enters the courtroom.)

1          THE COURT:  You may be seated.

2          THE COURTROOM DEPUTY:  The witness is reminded he's

3    still under oath.

4          THE COURT:  Go ahead.

5    BY MS. SHIHATA:

6    Q    I'm showing you what is in evidence as Government's

7    Exhibit 75.  Without saying this person's name, do you

8    recognize this person?

9    A    Yes.

10   Q    And do you knowing this person's full name without

11   saying?

12   A    Yes.

13   Q    I'm showing the witness only what is marked for

14   identification as Government's Exhibit 75A.  Is this the same

15   photo I just showed you?

16   A    Correct.

17   Q    And does this have this individual's full name

18   underneath?

19   A    Yes.

20   Q    And is this the name you know this individual by?

21   A    Yes.

22         MS. SHIHATA:  I move to admit Government's Exhibit

23   75A and would ask to publish it to the jury only.

24         THE COURT:  Any objection?

25         MR. CANNICK:  I thought it was in evidence.

Stephens - Direct - Shihata                    1791

1            THE COURT:  I thought so too.

2            MS. SHIHATA:  It's slightly different.

3            May we publish to the jury only?

4            THE COURT:  Yes.  Go ahead.

5            (Government Exhibit 75A, was received in evidence.)

6    BY MS. SHIHATA:

7    Q    For purposes of your testimony here today, we're going to

8    refer to the person in Government's Exhibit 75 and 75A as

9    Jane.  Okay?

10   A    Okay.

11   Q    Have you ever met Jane?

12   A    Yes.

13   Q    Around when did you meet her?

14   A    2020.

15   Q    What were the circumstances under which you met her?

16   A    Jane contact me through social media.

17            MR. CANNICK:  I want to object to the relevance.

18   Beyond the scope of the charges here and --

19            THE COURT:  You can just say objection.

20            Objection is overruled.

21            You can go ahead.

22   A    She contacted me through social media to ask me --

23            MR. CANNICK:  Objection.

24            THE COURT:  The conversation is -- I'll sustain it.

25   Q    For what purpose were you meeting with Jane?

Stephens - Direct - Shihata                1792

1    A    To help her with her career.

2    Q    Music career?

3    A    Music career.

4             THE COURT:  When?

5             MS. SHIHATA:  2020.

6             THE WITNESS:  2020.

7    Q    What, if anything, did you learn from Jane regarding the

8    text with her name and the rat emoji that you had sent to the

9    defendant?

10            MR. CANNICK:  Objection.

11            THE COURT:  Can I see the parties on the side with

12   the court reporter?

13            (Sidebar.)

14            (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                      1793
```

1    (Sidebar conference held on the record out of the

2    hearing of the jury.)

3    THE COURT:  I read the materials on this.  And here

4    is what I think, you're going to lead through this.  You want

5    to bring out the fact that he wasn't trying to say that she

6    was a rat, correct, and to send a different kind of message to

7    Kelly.  The problem is, the message that he wants to send the

8    defendant is I know you're messing around with younger --

9    MS. SHIHATA:  What I -- because of -- I was avoiding

10   asking that question because of the hearsay objection.  What

11   I'm trying to get is a prior consistent statement that Jane

12   had made to the defendant about what happened -- to this

13   witness -- about what happened after the defendant received

14   the text.

15   THE COURT:  I think it's relevant because there was

16   testimony from her.  I don't remember if there was

17   cross-examination, I think there was, about this message with

18   the rat.  I think it's relevant to show that he was not trying

19   to get her in trouble, which I think is the purpose for

20   bringing it out; is that right?

21   MS. SHIHATA:  Your Honor, Jane testified when she

22   was on the stand that after an incident that occurred after

23   the defendant received this text from Devyne Stephens where he

24   then hit her, including with a shoe.  So I'm -- I think if

25   he's permitted to respond to this question he will indicate

```
                         Sidebar                      1794
```

1    that she told him that that happened.

2            That's what I was trying to bring out as a prior

3    consistent statement.

4            MR. CANNICK:  You can't bring out a prior consistent

5    statement without the witness having been challenged as to an

6    application.

7            THE COURT:  Was she?  That's what I don't remember.

8            MS. SHIHATA:  She was challenged wholesale on

9    everything she said during the entire testimony including

10   that, including that she was not in fact hit, that this is all

11   made up by her.  So that's what I'm trying to elicit.

12           THE COURT:  I think though that even under that

13   theory the motive to fabricate has arisen by the time she

14   makes the statement.

15           MS. SHIHATA:  I'll move on.

16

17           (End of sidebar conference.)

18           (Continued on the next page.)

19

20

21

22

23

24

25

Stephens - Cross - Cannick                    1795

1              (In open court.)

2              THE COURT:  Go ahead.

3              MS. SHIHATA:  No further questions.

4              THE COURT:  Cross-examination?

5              MR. CANNICK:  Brief.

6              THE COURT:  Everybody makes that promise.

7    CROSS-EXAMINATION

8    BY MR. CANNICK:

9    Q    You testified and told us earlier about these basketball

10   games where you got a few rebounds.

11   A    Yes.

12   Q    And passed the ball out?

13   A    Yes, sir.

14   Q    People were in the audience to watch those games, am I

15   correct?

16   A    Yes, sir.

17   Q    Describe the gym for us?

18   A    Kind of like, it's kind of like one way in, in a sense.

19   It's --

20   Q    Let me see if I can help.  Bleachers?

21   A    Yes, like seats, bleachers.  Then there is the goal

22   underneath there, kind of like a cycling bike and other

23   things, and chairs isolated underneath on the right side of

24   where the basket is.

25   Q    You testified and told the jury that Mr. Kelly would have

Stephens - Cross - Cannick                    1796

1  females with him at the game.  Do you remember telling us

2  that?

3  A    Yes.

4  Q    Those females would be in those chairs, am I correct?

5  A    Correct, not in the bleachers.

6  Q    Not in the bleachers in the chairs?

7  A    Yes.

8  Q    Did you notice people smoking weed in the bleachers?

9  A    No.

10  Q    No.  You played in all the games?

11  A    A lot of the games, yes.

12  Q    You never saw folks drinking in the game?

13  A    No, sir.

14  Q    Did you see other celebrities at the game?

15  A    There's been other celebrities.

16  Q    Usher?

17  A    Yes, Usher has been there.

18  Q    Celebrities come through fairly often, am I correct?

19  A    Yes.

20  Q    In fact, you associate and associated with a lot of

21  celebrities, am I correct?

22  A    Yes.

23  Q    And they would come to the game.

24  A    Yes.

25  Q    When the young ladies that Mr. Kelly brought were

Stephens - Redirect - Shihata                1797

1    attending the game, they would sit in the chairs behind the

2    basket?

3    A    Off to the right.

4    Q    And sometimes the ball would get loose and go in that

5    correct, am I correct?

6    A    Yes, sir.

7    Q    When the ball got loose and went in that direction, they

8    would try to get themselves out of the way of the ball and the

9    people chasing the ball, am I correct?

10   A    Yes.

11   Q    They would turn their body and look towards the wall as

12   they were turning their body, am I correct?

13   A    Correct.

14            MR. CANNICK:  That's it.

15            THE COURT:  All right.  Any redirect?

16            MS. SHIHATA:  Just very briefly.

17            THE COURT:  Go ahead.

18   REDIRECT EXAMINATION

19   BY MS. SHIHATA:

20   Q    You were just asked some questions about the basketball

21   court at your house where the defendant would play games.  The

22   chairs where these females were sitting, can you tell the jury

23   again where that was?

24   A    Kind of like underneath the basket to the right.

25   Q    While the game was being played, where which way were the

Stephens - Redirect - Shihata                    1798

1  females facing?

2  A    Facing the game.

3  Q    And during this game, was everyone, all the players

4  playing?

5  A    Yes.

6  Q    Passing the ball around?

7  A    Yes.

8  Q    Shooting the ball?

9  A    Yes.

10 Q    Who, if anyone, did the females cheer for?

11 A    They only cheered for Mr. Kelly.

12 Q    No one else?

13 A    No one else.

14 Q    You were asked some questions when the ball, when someone

15 would have to get the ball, it would go out of bounds or

16 whatever, do you recall those questions?

17 A    Yes.

18 Q    What would those females do when that happened?

19 A    Sometimes cross their legs and look at the wall.

20 Q    And who was approaching when they would do that?

21 A    It can be other celebrities or any other ball players who

22 may approach.

23 Q    Any other men?

24 A    Other men.

25 Q    Apart from celebrities?

Stephens - Recross - Cannick                1799

1    A    Apart from celebrities.

2              MS. SHIHATA:  No further questions.

3              MR. CANNICK:  I have to ask this question.

4    RECROSS-EXAMINATION

5    BY MR. CANNICK:

6    Q    There weren't any female players in the basketball game?

7    A    No, sir.

8    Q    It wouldn't be a female running to chase the ball, am I

9    correct?

10   A    No, sir.

11             MR. CANNICK:  I'm trying to think if there is

12   anything else before I sit down.  I don't think there is

13   anything else, your Honor.

14             THE COURT:  Okay.

15             Nothing else?

16             MS. SHIHATA:  Nothing further.

17             THE COURT:  You can step down.  Thank you so much.

18             (Whereupon, the witness was excused.)

19             THE COURT:  Next witness.

20             MS. GEDDES:  The Government calls Louis.

21             (Witness takes the witness stand.)

22             THE COURTROOM DEPUTY:  Please raise your right hand.

23             (Witness sworn.)

24             THE WITNESS:  I do.

25             LOUIS, called as a witness, having been first duly

1  sworn/affirmed, was examined and testified as follows:

2         THE COURT:  A couple of things before we get

3  started.  Our court reporter takes down everything that you

4  say, so just don't speak too quickly, it makes their job

5  harder.

6         THE WITNESS:  Okay.

7         THE COURT:  For the same reasons, make sure that you

8  let whichever lawyer is asking you questions finish before you

9  start speaking, again, so it doesn't make their job too hard.

10        If there is a question that you need to have

11 repeated or isn't clear, tell me I'll have the lawyer rephrase

12 it.

13        And just do your best to answer only the question

14 that you're being asked, okay?

15        THE WITNESS:  Okay.

16        THE COURT:  Go ahead.

17        MS. GEDDES:  Thank you.

18 DIRECT EXAMINATION

19 BY MS. GEDDES:

20 Q    Good afternoon.

21 A    Hello.

22 Q    I'm showing the witness only what is marked for

23 identification as Government's Exhibit 64.  Do you recognize

24 what is shown in Government's Exhibit 64?

25 A    Yes.

1  Q     What is that?

2  A     It's me.

3  Q     Is that a photo of you?

4  A     Yes.

5  Q     Approximately how old were you when this photograph was

6  taken?

7  A     Sixteen or 17.

8          MS. GEDDES:  The Government offers Government's

9  Exhibit 64.

10         THE COURT:  Any objection?

11         MR. CANNICK:  No objection.

12         (Government Exhibit 64, was received in evidence.)

13         MS. GEDDES:  May I publish?

14         THE COURT:  Yes.

15 BY MS. GEDDES:

16 Q     I'm now showing the witness only what is marked for

17 identification as Government's Exhibit 64A.  Is the photograph

18 in 64A the same photograph as was just shown in Government's

19 Exhibit 64?

20 A     Yes.

21 Q     Underneath this photograph is that your true first and

22 last name?

23 A     Yes.

24         MS. GEDDES:  The Government's Exhibit offers 64A.

25         THE COURT:  Any objection.

Louis - Direct - Geddes                    1802

1         MR. CANNICK:  None.

2         (Government Exhibit 64A, was received in evidence.)

3         MS. GEDDES:  We ask it be published to the jury

4    only.

5         THE COURT:  Jury only.

6    BY MS. GEDDES:

7    Q    For today's purposes, we're going to refer to you as

8    Louis.  All right?

9    A    Okay.

10   Q    Finally, I'm showing the witness only what is marked for

11   identification as 64B.  Does 64B contain that same photograph?

12   A    Yes.

13   Q    And below there does it say Louis?

14   A    Yes.

15        MS. GEDDES:  Government offers 64B.

16        MR. CANNICK:  No objection.

17        (Government Exhibit 64B, was received in evidence.)

18        THE COURT:  That's in evidence.

19        MS. GEDDES:  May we publish?

20        THE COURT:  Yes.

21   BY MS. GEDDES:

22   Q    How old are you today?

23   A    Thirty-two.

24   Q    Are you currently working?

25   A    No.

Louis - Direct - Geddes                              1803

1  Q     Were you previously employed?

2  A     Yes.

3  Q     What type of work did you previously do?

4  A     Warehouse management.

5  Q     Are you married?

6  A     Yes.

7  Q     Do you have any children?

8  A     Yes.

9  Q     When were you born?

10 A     February 11, 1989.

11 Q     In what neighborhood did you live growing up?

12 A     Hazel Crest, Illinois.

13 Q     Where is that in reference to downtown Chicago?

14 A     Thirty, 40 minutes south.

15 Q     Hazel Crest is south of downtown Chicago; is that right?

16 A     Yes.

17 Q     Where did you go to high school?

18 A     Hill Crest High School.

19 Q     Did you graduate high school?

20 A     Yes.

21 Q     When did you graduate?

22 A     May of 2007.

23 Q     So based on being born in 1989, fair to say you turned 18

24 in February of your senior year of high school?

25 A     Yes.

Louis - Direct - Geddes                          1804

1   Q    What, if any, interests did you have during high school?

2   A    Football, basketball, music.

3   Q    What type of music were you interested in?

4   A    Hip hop.

5   Q    Were you interested as a spectator or a performer?

6   A    As an artist.

7   Q    Did you work during high school?

8   A    Yes.

9   Q    Where did you work?

10  A    McDonald's.

11  Q    During high school when you were working at the

12  McDonald's, where was it located?

13  A    Markham, Illinois.

14  Q    Do you remember when you started working at the

15  McDonald's in Markham, Illinois?

16  A    Yes.

17  Q    When was that?

18  A    Sophomore year in high school.

19  Q    Where is Markham in relation to Hazel Crest where you

20  were living when you were growing up?

21  A    About ten minutes away.

22  Q    I'm showing the witness only what is marked for

23  identification as Government's Exhibit 522A.  Do you recognize

24  Government's Exhibit 522A?

25  A    Yes.

Louis - Direct - Geddes                    1805

1   Q    I'm also showing the witness only 522B.  Do you recognize

2   that?

3   A    Yes.

4   Q    What is shown in Government's Exhibit 522A and B?

5   A    McDonald's in Markham, Illinois.

6   Q    The McDonald's where you worked?

7   A    Yes.

8   Q    Are those photographs of the McDonald's of how the

9   McDonald's appeared when you were working there in high

10  school?

11  A    Yes.

12           MS. GEDDES:  The Government offers --

13           MR. CANNICK:  No objection.

14           (Government Exhibit 522A & B, was received in

15  evidence.)

16           THE COURT:  They are in evidence.  You can publish

17  them.

18           MS. GEDDES:  Thank you.

19  BY MS. GEDDES:

20  Q    I'll start with 522A.  I'm showing what is in evidence as

21  Government's Exhibit 1, do you recognize the individual shown

22  in Government's Exhibit 1?

23  A    Yes.

24  Q    Who is that?

25  A    Robert Kelly.

1  Q    Do you personally know Robert Kelly?

2  A    Yes.

3  Q    Do you see him in the courtroom today?

4  A    Yes.

5  Q    Can you point to him and describe an article of his

6  clothing?

7  A    Right there, he has a blue jacket.

8         THE COURT:  Indicating the defendant.

9         MS. GEDDES:  Thank you.

10  BY MS. GEDDES:

11  Q    Do you recall where you were when you first met the

12  defendant?

13  A    Yes.

14  Q    Where were you when you first met the defendant?

15  A    McDonald's.

16  Q    What were you doing at the McDonald's?

17  A    Working the drive-thru.

18  Q    Where did you first encounter the defendant?

19  A    At the drive-thru window.

20  Q    I'm showing what is in evidence as 522B.  Is this the

21  photograph that you just identified of the drive-thru?

22  A    Yes.

23  Q    What happened when you were working at the drive-thru

24  when you encountered the defendant?

25  A    I was working the night shift, overnight, the Maybach

Louis - Direct - Geddes                    1807

1  came up to the window.  It was a driver up there and the next

2  thing I know the Maybach moved forward.  And Mr. Kelly asked

3  me who was the lady working that was behind me, which was the

4  manager.  And I told him who she was.  And he told me, can I

5  hook it up.

6          So I went over there and told the lady.  She didn't

7  know who he was.  She was like Hispanic.  She didn't know who

8  he was.  So I just told her the guy that sings "I believe I

9  can fly."  And I went back, I told her, she was like yeah,

10  yeah, yeah.  And then I went back to the window, told him that

11  she just wanted his number.  And he looked at me, like, you

12  really did that for me?  I said yeah.  He gave me two pieces

13  of paper; one for her and one was for me.  He told me, hit him

14  up to hang out sometime.

15  Q    How old were you when you met the defendant at drive-thru

16  at the McDonald's?

17  A    Seventeen.

18  Q    What year in high school were you?

19  A    Senior.

20  Q    You mentioned a Maybach, what do you know about a

21  Maybach?

22  A    Maybach, it's a vehicle.

23  Q    Who was in the Maybach when you encountered the

24  defendant?

25  A    Robert Kelly and a driver.

1  Q    There was also a driver there?

2  A    Yes.

3  Q    You mentioned had you previously seen that Maybach at the

4  McDonald's?

5  A    Yes.

6  Q    On prior occasions, when you had seen the Maybach, where

7  was the defendant at that time?

8  A    I would never see him, but it normally would only be the

9  driver that speaks at the window.

10 Q    So it was the little bit different because you actually

11 saw the defendant in the Maybach at that time?

12 A    Yes.

13 Q    What was on the piece of paper, the two pieces of paper,

14 that the defendant gave to you that day?

15 A    His phone number.

16 Q    What, if anything, did you do with those two pieces of

17 paper?

18 A    Actually I threw the one away for the lady.  She didn't

19 know who he was, so I threw that one away.  And I kept the

20 other one and gave it to my mother.

21 Q    You said you threw away the paper.  Did you tell the

22 defendant you were going to throw away the paper?

23 A    No.

24 Q    Why did you give the other piece of paper, the one you

25 didn't throw away, to your mom?

1   A    Because I was too nervous to call myself.

2   Q    Did you see what your mother, if anything, your mom did

3   with that piece of paper?

4   A    Yes.

5   Q    What did she do?

6   A    Put it in her bible and she eventually called him.

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MS. GEDDES: (Continuing.)

3    Q    Were you present when your mom called that telephone

4    number?

5    A    Yes.

6    Q    And were you able to hear the conversation?

7    A    Yes.

8    Q    How were you able to hear the conversation?

9    A    She had it on speakerphone.

10   Q    What did you hear your mother say when she called the

11   telephone number that the defendant gave to you on that piece

12   of paper?

13            MR. CANNICK:  Objection.

14            THE COURT:  Overruled.

15   A    She -- she was just telling him on the phone how I was a

16   big fan of his music and I was, like, rapper -- coming up

17   rapper -- and let him know how much of a fan I was and I would

18   be willing -- that I would love to work with him on my music.

19   Q    How, if at all, did the defendant respond after your mom

20   told him about your musical aspirations?

21   A    He said he appreciate that we was fans of his music and

22   that he was going to have a party coming up.

23   Q    And did he tell -- provide any additional information

24   about the party?

25   A    Yes.  He told me -- he told my mother that me and my

1    father and her could come to the party.

2    Q    Now, at the time that your mother first called the

3    defendant, had you spent any time in a recording studio?

4    A    Yes.

5    Q    Doing what?

6    A    Making demos, like, one or two songs.

7    Q    And when you said -- did you say "making demos"; is that

8    correct?

9    A    Yes.  Demo tapes.

10   Q    Featuring your music?

11   A    Yes.

12   Q    Did you attend the party that the defendant mentioned in

13   that first phone call?

14   A    Yes.

15   Q    Where was the party held?

16   A    At his house in Olympia Fields.

17   Q    Where within the defendant's house in Olympia Fields was

18   that party?

19   A    In the front room -- the living room.

20   Q    Do you remember when the party was?

21   A    I just remember it, like, around the holiday, 'cause I

22   just remember it being cold outside and him having a Christmas

23   tree and everything.  It just seemed like it was a holiday

24   around that time, maybe November, December.

25   Q    Of 2006, your senior year?

1   A    Yes.

2   Q    Who, if anyone, came with you to that party at the

3   defendant's house in Olympia Fields?

4   A    My mother and father.

5   Q    And just to be clear, when you're talking about your mom

6   and your dad, was it your biological father or somebody else?

7   A    My stepfather.

8   Q    At the defendant's party at Olympia Fields that you

9   attended with your parents, did you recognize anyone at the

10  party?

11  A    Yes.

12  Q    Who did you recognize there?

13  A    Robert Kelly and George Daniels.

14       MR. CANNICK:  I'm sorry, I didn't hear that.

15       THE WITNESS:  George Daniels and Robert Kelly.

16  BY MS. GEDDES:

17  Q    Who did you understand George Daniels to be?

18  A    Someone that helped develop artists -- that's who I

19  thought it was -- because around I heard that he helped

20  artists.

21       MS. GEDDES:  I'm showing the witness only what's

22  been marked for identification as Government's Exhibit 90.

23  BY MS. GEDDES:

24  Q    Do you recognize Government's Exhibit 90?

25  A    Yes.

1  Q    What is Government's Exhibit 90?

2  A    George Davis.

3           MS. GEDDES:   Government offers Government's

4  Exhibit 90.

5           THE COURT:  Any objection?

6           MR. CANNICK:  None.

7           THE COURT:  All right.  That's in evidence.

8           (Government's Exhibit 90 received in evidence.)

9           MS. GEDDES:  May we publish, please?

10          THE COURT:  Yes.

11          (The above-referred to exhibit was published.)

12 BY MS. GEDDES:

13 Q    What, if any, interaction did you have with George

14 Daniels at the defendant's party?

15 A    My mom told him -- she had let him know about my good

16 music, so -- that I was an upcoming artist trying to get into

17 the music industry.

18 Q    And did you hear how George Daniels responded?

19 A    Yes.  He would say:  We should try to get him to work

20 with Rob, and if he is willing, what do you want to do?

21 Q    And was the defendant present for that initial

22 conversation between your mom and George Daniels?

23 A    No.

24 Q    Did you have an opportunity to speak with the defendant

25 at that first party that you attended in Olympia Fields?

1   A     Yes.

2   Q     And what was the context in which you spoke with the

3   defendant?

4   A     So we had took a picture together.  George Daniels had

5   took it on my phone at the time, he had took the picture, and

6   after the picture, he -- he just told me in my ear that maybe

7   it would be best sometime if I come to the party by myself.

8   Q     Now, you said that "we had taken a picture together."

9   Who did you mean by "we" in that sentence?

10  A     Robert.

11  Q     And was George Daniels present when there was a picture

12  taken?

13  A     Yes.  He took the picture.

14  Q     Using your phone?

15  A     Yes.

16  Q     And who was the picture of?

17  A     Me and Robert.

18  Q     And how did it come to be that George Daniels took a

19  picture of you and Robert?

20  A     He had told him that this kid is trying to do music, and

21  maybe you should give him one shot.

22  Q     George Daniels told the defendant that you were trying to

23  do music; is that right?

24  A     Yes.

25  Q     Now, you said that someone whispered something in your

1   ear; is that correct?

2   A     Yes.

3   Q     Who whispered something in your ear?

4   A     Robert.

5   Q     The defendant?

6   A     Yes.

7   Q     What did the defendant say to you?

8   A     That I'm -- it would be best if I come by myself to the

9   party sometime.

10  Q     And who had you come to the party with?

11  A     My parents.

12  Q     Did you see the defendant again after that party?

13  A     Yes.

14  Q     How did you come to see the defendant again?

15  A     My mom took me over there to go to the studio.

16  Q     How did it come to be that you were going to the studio

17  with your mom?

18  A     My mom called him again.

19  Q     Were you present for that conversation?

20  A     Yes.

21  Q     And what, if anything, did you hear your mom say when she

22  called the defendant a second time?

23  A     Telling him -- still telling him that I wanted to do the

24  music and I been working on my music.

25  Q     How did the defendant respond during that phone

1  conversation?

2  A    Told me bring -- he told my mother to bring me back to

3  the studio.

4  Q    Where was the studio located?

5  A    Downstairs.

6  Q    Downstairs with respect to what?

7  A    Oh, downstairs at his house in Olympia Fields.

8  Q    The same location where the party was held?

9  A    Yes.

10 Q    And did you, in fact, go back to the defendant's house?

11 A    Yes.

12 Q    Who brought you there or how did you get there?

13 A    My mother.

14 Q    And did your mother stay with you at the defendant's

15 house that day?

16 A    No.

17 Q    What did she do?

18 A    Dropped me off at the gate.

19 Q    Can you describe the outside of the defendant's house in

20 Olympia Fields?

21 A    When you first arrive, it's a big, black gate; it's a

22 very long driveway; house is right in front of you -- very big

23 house; and to your right is a garage.

24        MS. GEDDES:  And -- I'm showing the -- I'm showing

25 what's in evidence as Government's Exhibit 502A.

1              (The above-referred to exhibit was published.)

2    BY MS. GEDDES:

3    Q    Do you recognize that?

4    A    Yes.

5    Q    What is that?

6    A    Robert's house.

7    Q    And is that the gate you were just referring to where my

8    pen is pointed (indicating)?

9    A    Yes.

10             MS. GEDDES:  And I'm also showing 502C.

11             (The above-referred to exhibit was published.)

12   BY MS. GEDDES:

13   Q    Do you recognize that?

14   A    Yes.

15   Q    What is that?

16   A    Robert's house.

17   Q    Just to be clear, is this the house that you went to for

18   both the party and that second time when your mother dropped

19   you off?

20   A    Yes.

21   Q    When you went to the defendant's house that second time,

22   how were you able to get through the gate?

23   A    Security at the gate.

24   Q    Do you recall who was present serving as security?

25   A    Yes.  Her name was Candy.

1   Q    I'm showing you what's in evidence as Government's

2   Exhibit 22.

3             Do you recognize Government's Exhibit 22?

4             (The above-referred to exhibit was published.)

5   A    Yes.

6   Q    Who is that?

7   A    Candy.

8   Q    And is that the Candy who helped you through the gate

9   that day?

10  A    Yes.

11  Q    What happened after your mom dropped you off at the

12  studio?

13  A    I had got to the studio, I had to wait for a little

14  while, sat in the waiting area to wait.  Then Rob -- Robert

15  came down, him and another gentleman, we went in the studio

16  together, and he was like:  All right, let me hear what you

17  got.

18            At the time, I had a -- it was like a casette tape

19  with the instrumental on it already -- instrumental -- it had

20  the instrumental on the tape.  I played the tape, and I

21  started to rap for them.

22  Q    When you said Robert, who were you referring to?

23  A    Robert Kelly.

24  Q    And how did they respond after you started to rap to the

25  instrumentals on the casette tape that you brought?

1  A    They say I sounded pretty good.  They said:  You got some

2  potential.

3  Q    What, if anything, did you hear them say?

4  A    They told me I got some potential.

5  Q    Now, did you recognize -- or did you learn the name of

6  the other individual who was there that day?

7  A    Yes.

8  Q    Who was that?

9  A    Name was Pat.

10 Q    What did you understand Pat's role to be?  Why was he

11 there?  Why did you understand he was there?

12 A    He was like a -- I'm not sure if he, like, music -- like,

13 someone that helps with the music, like, the production of the

14 music.

15         MS. GEDDES:  I'm showing the witness only what's

16 been marked for identification only as Government's

17 Exhibit 51.

18 Q    Do you recognize Government's Exhibit 51?

19 A    Yes.

20 Q    Who is that?

21 A    Pat.

22 Q    Is that the individual that was with the defendant in

23 this studio that day?

24 A    Yes.

25         MS. GEDDES:  The Government offers Government's

1    Exhibit 51.

2              MR. CANNICK:  No objection.

3              THE COURT:  Okay.  That's in evidence.

4              (Government's Exhibit 51 received in evidence.)

5              THE COURT:  You can publish it.

6              MS. GEDDES:  Thank you.

7              (The above-referred to exhibit was published.)

8    BY MS. GEDDES:

9    Q    Now, after you performed for the defendant and he

10   indicated that you had talent -- or they indicated that you

11   had talent -- what happened?

12   A    He had left out for a while.  He said he had something

13   else to do, he left out for a while, and I was still there

14   with Pat; and he told Pat to play a couple more beats for him,

15   and see what he can do on those beats.

16   Q    And what did you do?

17   A    I stayed there and I rap with him.

18   Q    With Pat?

19   A    Yes.

20   Q    What happened after that?

21   A    After about an hour or so, Rob came back and asked:  How

22   did it go?  And Pat told him that he believe I got some

23   talent; you should give him a shot.

24   Q    And what happened next?

25   A    Rob invited me to come back the next day.  He said:  Come

1    back tomorrow.  We'll work on some more stuff.

2    Q     Did you, in fact, come back the next day?

3    A     Yes.

4    Q     And where did you go?

5    A     To the studio again.

6    Q     And this was the studio at the defendant's house in

7    Olympia Fields?

8    A     Yes.

9    Q     What happened when you went back the next day?

10   A     They put me in, like, another room in -- in the studio --

11   downstairs in the studio area and they played -- and they had

12   a beat already selected for me and they told me to write to it

13   and that they was going to put me in the studio to record it.

14   Q     Now, you said they had put you in a room.  Who are you

15   referring to when you say "they"?

16   A     Rob told his engineers to put me in a room and play the

17   track for me and let me write to it.

18   Q     And what did you do then?

19   A     Spent about an hour or so in the room and was writing to

20   the -- to the beat.

21   Q     And who, if anyone, was present in the room with you when

22   you were doing that?

23   A     It was just me in the room.

24   Q     And what happened after you spent about an hour in that

25   room by yourself?

1   A     Then I went into the recording studio and recorded that

2   song.

3   Q     And was anyone present while you recorded that song?

4   A     Yes.

5   Q     Who was present?

6   A     One of the engineers.

7   Q     And what happened after you recorded the song?

8   A     After I recorded it, maybe about a little while later,

9   maybe 30, 40 minutes -- not -- not sure.  It was a little

10  while after.  Then Rob came downstairs, he -- he let the song

11  play for me only five seconds and said he didn't like it.

12  Q     And when you said "he let the song play for only five

13  seconds," what song are you referring to?

14  A     The one I had just recorded.

15  Q     And who was the "he" who let the song play for only five

16  seconds?

17  A     Robert Kelly.

18  Q     And he said he didn't like it; is that correct?

19  A     Correct.

20  Q     What did you do after the defendant said he didn't -- oh,

21  by the way, the five seconds that had been played, what part

22  was played during those five seconds?

23  A     Just the beat.

24  Q     Did it feature your actual performance on there?

25  A     We didn't get to that part yet.

1   Q    What happened after the defendant told you he didn't like

2   it?

3   A    He told me that I should go back in there and put more

4   effort into it.  He was the king of R & B, so I needed to put

5   more effort into it.

6   Q    What did you do?

7   A    I felt, kind of, discouraged, so I just went in there and

8   just said anything and I left.

9   Q    Where did you leave?

10  A    You say where did I leave?

11  Q    You said you left.  Where did --

12  A    I left the studio.

13  Q    And how old were you when you went to the defendant's

14  studio those first two times?

15  A    Seventeen.

16  Q    Did you see the defendant again after that?

17  A    Yes.

18  Q    Where did you next see the defendant?

19  A    At the gym.

20  Q    What gym did you see him at?

21  A    Markham Field House.

22  Q    And what was in the Markham Field House?

23  A    A basketball court.

24  Q    Where was the Markham Field House in relation to the

25  McDonald's that you worked, the one in Markham?

1  A    Around the corner.

2  Q    How did you end up seeing the defendant at those

3  basketball court -- at that basketball court in the Markham

4  Field House?

5  A    Because the last time I was at the studio, June Bug, one

6  of his assistants, had told me if I can't get in contact with

7  Rob, just call him, so I had called June Bug, and he informed

8  me that they were playing basketball.

9  Q    And were you invited to the basketball game?

10 A    Yes.

11        MS. GEDDES:  I'm showing -- I'm showing what's in

12 evidence as Government's Exhibit 523A.

13        (The above-referred to exhibit was published.)

14 BY MS. GEDDES:

15 Q    Do you recognize what's shown in 523A?

16 A    Yes.

17 Q    What is that?

18 A    Markham Field House.

19 Q    And that's the outside of the field house?

20 A    Yes.

21 Q    And I'm now showing you what's in evidence as 523C.

22        (The above-referred to exhibit was published.)

23 BY MS. GEDDES:

24 Q    Do you recognize 523C?

25 A    Yes.

1    Q    What is that?

2    A    Markham Field House.

3    Q    And is that where you next saw the defendant after those

4    two times at the defendant's studio?

5    A    Yes.

6    Q    And I'm showing you now what's in evidence as

7    Government's Exhibit 4.

8              (The above-referred to exhibit was published.)

9    BY MS. GEDDES:

10   Q    Do you recognize who is shown in Government's Exhibit 4?

11   A    Yes.

12   Q    Who is that?

13   A    June Bug.

14   Q    And is that the individual that you contacted who invited

15   you to the basketball court?

16   A    Yes.

17   Q    Now, when you first -- the first time you went to the

18   Markham Field House, did you play basketball that day?

19   A    No.

20   Q    What did you do instead?

21   A    Stayed and watched.

22   Q    Were you the only spectator at the basketball game?

23   A    No.

24   Q    Who else did you see there?

25   A    Couple more guys sitting around waiting to play, and also

1    some ladies on the sideline.

2    Q    What, if anything, did you notice about the females on

3    the sideline?

4    A    They was, kind of, like, facing the wall when we wasn't

5    playing the game, wearing, like, baggy -- baggy clothes.

6    Q    What, if anything, did the defendant say to you when you

7    were at the basketball court that day?

8    A    I had told him I had been calling him and he wasn't

9    answering since the last time I came to the studio.  He just

10   told me he's been real busy with his music.

11   Q    And had you, in fact, been calling the defendant after

12   you left that studio that second time?

13   A    Yes.

14   Q    What, if anything, else did the defendant say?

15   A    He had told me that -- he told me that -- call him later

16   on in the week, maybe we could hook up.

17   Q    And why had you been calling the defendant?

18   A    'Cause I was -- I still was interested in doing music.

19   Q    Did you -- after seeing the defendant at the basketball

20   court in Markham, did you, in fact, call him again?

21   A    Yes.

22   Q    And were you able to get in touch with him?

23   A    Yes.

24   Q    What happened when you got in touch with him?

25   A    He told me to come to the studio the next day.

1   Q     The one in Olympia Fields?

2   A     Yes.

3   Q     Do you remember how you got to the defendant's house that

4   day?

5   A     That day I had drove.  I had just got a car.

6   Q     And what did you do when you drove up to the defendant's

7   house?

8   A     This day was a little different.  Security guard was not

9   at the gate.

10  Q     How did you get through the gate?

11  A     I called Rob.  He had opened the gate for me.  He was at

12  the back of -- he was at the end of the driveway.

13  Q     And where did you take your car?

14  A     I had parked in the back near the garage area.

15  Q     What did you do after you parked your car in the back

16  near the garage area?

17  A     We had went into the garage where it was set up more like

18  a boxing ring or workout area.

19  Q     And now, was -- how, if at all, was the garage attached

20  to the defendant's studio?

21  A     It was not attached.

22  Q     It was a detached garage?

23  A     Yes.

24  Q     Who went into that detached garage?

25  A     Me and Robert.

1  Q    And you said that there was -- can you describe what

2  you -- what was inside the garage when you and the defendant

3  went in there?

4  A    Boxing -- a boxing ring and, like, workout -- exercise

5  equipment.

6  Q    What happened when you and the defendant went inside that

7  garage?

8  A    We had sat down and talked for a little while, and he was

9  just asking me, like, what was I willing to do for the music.

10  Q    How did you respond when the defendant asked you what you

11  were willing to do for music?

12  A    I started naming some crazy things as in:  I carry your

13  bags; I always have your bag; anything you ever need, I be

14  willing to do it.

15  Q    And how old were you at this time?

16  A    Seventeen.

17  Q    How did the defendant respond when you offered to do

18  those things to make it in the music world?

19  A    Just kept saying:  No, that's not it.  That's not it.

20  Q    What happened next?

21  A    He asked -- then he asked me, did I have any fantasies.

22  Q    How did you respond?

23  A    I said:  Yeah, I got fantasies.

24  Q    Did you tell the defendant what those fantasies were?

25  A    Yes.

1   Q     What did you say?

2   A     I told him I had fantasies of maybe having two or three

3   girls at one time.

4   Q     How did the defendant respond?

5   A     He had said:  You never had fantasies about a man -- you

6   and a man?

7   Q     What happened then?

8   A     I kept saying no, but he was -- he was crawling down

9   on -- on his knees to proceed to give me oral sex.

10  Q     Who did that?

11  A     Robert Kelly.

12  Q     And how did he do that?

13  A     He unzipped my pants down and started doing it.

14  Q     What, if anything, else did the defendant say?

15  A     He had -- he had stopped because I said I didn't like it,

16  I wasn't into it, and I wasn't getting a reaction, so he had

17  stopped.

18  Q     And did he say anything to you after he stopped?

19  A     Yeah.  He just told me we had to keep it between me and

20  him.  Like, we family now.  We, like -- we, like -- we

21  brothers.  We, like, brothers.

22  Q     What did you do next?  Did you stay at the defendant's

23  house?

24  A     Not yet.  He walked me outside and he -- he was, like,

25  taking me near my car, and I'm like:  I thought we was going

1   to the studio.  You said -- you said you got some people over

2   here and they was going to listen to my music.  And he was

3   like:  Man, not today, man, something came up, and I can't

4   even do it; and he just gave me a couple dollars for gas, and

5   I went home.

6   Q     Now, you said that you had thought that you were going to

7   go into the studio.  What made you think that you were going

8   to go into the studio that day?

9   A     Robert had told me that over the phone.

10  Q     The defendant?

11  A     Yes.

12  Q     After that encounter in the defendant's garage, did you

13  continue to see him?

14  A     Yes.

15  Q     Why did you continue to spend time with him?

16  A     Because I really wanted to make it in the music -- in the

17  music industry.

18  Q     And you testified that you went to the Markham Field

19  House to play basketball -- or you went to the Markham Field

20  House where the defendant was playing basketball.

21        Do you recall that?

22  A     Yes.

23  Q     Did you go to the Markham Field House again after that

24  first time?

25  A     Yes.

1  Q     Did you eventually start to play basketball with the

2  defendant?

3  A     Yes.

4  Q     How often would you play basketball with him?

5  A     Three to four times a week.

6  Q     And how did it come to be that you would play basketball

7  with the defendant?

8  A     Well, as I keep going as a spectator, eventually

9  someone -- someone that was on his team got hurt, and June Bug

10 told him:  Let's see what Louis got; let's give Louis a shot,

11 and I got to play.

12 Q     And how would you know about a basketball game?

13 A     He said I would get a call or text from June Bug.

14 Q     And he would tell you that the defendant was going to be

15 playing basketball?

16 A     Yes.  Or sometimes I would just pop up at the Field House

17 because it was around the corner.

18 Q     It was around the corner from what?

19 A     McDonald's.

20 Q     Now, in the months and early years after you first met

21 the defendant, where else other than the basketball court

22 would you see him?

23 A     At parties.

24 Q     Where were the parties held?

25 A     The house in Olympia Fields.

1   Q    And you testified that you played basketball with the

2   defendant at that court in Markham.  Were there other

3   locations in Chicago where you also played basketball with the

4   defendant?

5   A    Yes.

6   Q    Where were they?  Where was that?

7   A    Out west in California, Jackson Street.

8   Q    And what, if anything, do you remember about that

9   particular location?

10  A    It was a church.

11  Q    And other than June Bug, was there anyone else who you

12  would learn about the basketball games from?

13  A    Yes.  Eventually, Tom.

14  Q    Who was Tom?

15  A    From what I understood, he was, like, a assistant or

16  some -- some help to Rob.

17          MS. GEDDES:  I'm showing the witness what's in

18  evidence as Government's Exhibit 31.

19          (The above-referred to exhibit was published.)

20  BY MS. GEDDES:

21  Q    Do you recognize Government's Exhibit 31?

22  A    Yes.

23  Q    Who is that?

24  A    Tom.

25  Q    Is that the Tom who would sometimes tell you about

1  basketball games?

2  A    Yes.

3  Q    Now, you testified earlier that you went to parties at

4  the defendant's house in Olympia Fields other than that first

5  one that you went with your parents; is that right?

6  A    Yes.

7  Q    Would you go by yourself or with others?

8  A    It was -- it was a couple times I went by myself.  I

9  eventually brought others with me because it made me more

10 comfortable.

11 Q    Can you describe the defendant's Olympia Fields

12 residence?

13 A    Sorry, what was that?

14 Q    Yeah.

15       Can you describe the defendant's residence in

16 Olympia Fields?

17 A    Inside?

18 Q    Yes.

19 A    Yes.

20       When you first walk in the door, straight ahead is a

21 big living room area where it look like -- more like a club;

22 it has a stage to your right.  And then on your left-hand

23 side, there's a huge kitchen -- very big kitchen.  And then if

24 you -- if you keep going down the hall, he has a shark --

25 like, a shark tank in the wall with fishes and sharks in it.

1   And then as you go down farther, there's another bar area; and

2   off the bar area, there's a swimming pool area that look more

3   like a rain forest.

4   Q    And the swimming pool area, is that an inside swimming

5   pool or an outside swimming pool?

6   A    Indoor.

7   Q    And you testified about a bar area.  What, if anything,

8   was that bar area called?

9   A    The Five Star.

10  Q    Can you describe the defendant's studio at Olympia

11  Fields?

12  A    Did you say the studio?

13  Q    Yes.

14  A    Yes.

15        Couple pianos in there.  It's like a basic studio.

16  I mean, very big studio.

17  Q    And how did you get into the studio?

18  A    I would always go through -- through the back -- back way

19  area, and there's lots of stairs that lead you downstairs to

20  the basement.

21  Q    While you were still in high school, your senior year of

22  high school, were you bringing friends to the defendant's

23  parties at Olympia Fields at that time?

24  A    Yes.

25  Q    And did your friends include both males and females?

1   A    Yes.

2        MS. GEDDES:  I'm showing the witness only what's

3   been marked for identification as Government's Exhibit 67.

4   BY MS. GEDDES:

5   Q    Do you recognize what's shown in 67?

6   A    Yes.

7   Q    Who is that?

8   A    Akilah.

9   Q    Is that one of the individuals that you brought to the

10  defendant's house while you were in high school?

11  A    Yes.

12       MS. GEDDES:  Government offers 67.

13       MR. CANNICK:  No objection.

14       THE COURT:  That's in evidence.

15       (Government's Exhibit 67 received in evidence.)

16       THE COURT:  Do you want to display it for --

17       MS. GEDDES:  Yes, we can publish it.

18       THE COURT:  Okay.

19       MS. GEDDES:  Thank you.

20       (The above-referred to exhibit was published.)

21       MS. GEDDES:  And I'm showing the witness only what's

22  been marked for identification as Government's Exhibit 91.

23  BY MS. GEDDES:

24  Q    Do you recognize Government's Exhibit 91.

25  A    Yes.

1  Q    And what is -- who is that?  Just the first name, please.

2  A    Kendra.

3  Q    And was Kendra one of the individuals who you brought to

4  the defendant's parties while you were still in high school?

5  A    Yes.

6         MS. GEDDES:  The Government offers Government's

7  Exhibit 91.

8         MR. CANNICK:  No objection.

9         THE COURT:  That will be in evidence.

10        (Government's Exhibit 91 received in evidence.)

11        THE COURT:  You can display it publicly.

12        MS. GEDDES:  Yes.

13        THE COURT:  Okay.

14        (The above-referred to exhibit was published.)

15 BY MS. GEDDES:

16 Q    And do you know Kendra's last name without saying it?

17 A    Yes.

18        MS. GEDDES:  I'm showing the witness only what's

19 been marked for identification as 91A.

20 Q    Is the name written -- first of all, is the photograph

21 shown in 91A the same photograph that I just showed you in 91?

22 A    Yes.

23 Q    And is the name under that photograph the first -- the

24 true first and last name of Kendra?

25 A    Yes.

1           MS. GEDDES:  The Government offers 91A.

2           MR. CANNICK:  No objection.

3           THE COURT:  All right.  That will be in evidence.

4           (Government's Exhibit 91A received in evidence.)

5           THE COURT:  Jury only?

6           MS. GEDDES:  Jury only, please.

7    BY MS. GEDDES:

8    Q    And now you testified that you also brought male friends

9    to the defendant's house while you were in high school; is

10   that correct?

11   A    Yes.

12           MS. GEDDES:  I'm showing what's in evidence as

13   Government's Exhibit 68.

14           (The above-referred to exhibit was published.)

15   Q    Do you recognize who is shown in Government's Exhibit 68

16   without saying the first or last name?

17   A    Yes.

18           (Continued on the following page.)

19

20

21

22

23

24

25

Louis - Direct - Geddes                    1838

1    DIRECT EXAMINATION
2    BY MS. GEDDES:  (Continuing)
3    Q    Is that one of the males that you brought to the
4    defendant's house while you were still in high school?
5    A    Yes.
6    Q    And I am showing -- well, do you know the true -- without
7    saying it, do you know the first and last name of the
8    individual shown in Government Exhibit 68?
9    A    Yes.
10   Q    And what is the age difference between you and the
11   individual shown in 68?
12   A    One year.
13   Q    Is the individual in Government Exhibit 68 younger or
14   older than you?
15   A    Younger.
16   Q    He's one year younger than you?
17   A    Yes.
18   Q    Where did the individual in 68 go to high school?
19   A    Same school, Hillcrest.
20   Q    And when you were a senior, was he a junior at Hillcrest?
21   A    Yes.
22        MS. GEDDES:  I'm showing the witness only what's
23   been marked for identification as Government Exhibit 68 A.
24   Q    In Government Exhibit 68, is that that same photograph
25   that you just saw, in Government Exhibit 68?

Louis - Direct - Geddes                    1839

1    A    Yes.

2    Q    And underneath that photograph, is that the true first

3    and last name of the individual shown in 68 and now in 68-A?

4    A    Yes.

5            MS. GEDDES:  The government offers 68-A.

6            MR. CANNICK:  No objection.

7            THE COURT:  And that will be jury only?

8            MS. GEDDES:  Yes, please.

9            (Government's Exhibit 68-A was received in

10   evidence.)

11   Q    Now, do you recall some of the occasions in high school

12   when you brought some of your friends to the defendant's

13   house?

14   A    There was a couple, but the one that mostly stuck out to

15   me was the day I graduated from high school.

16   Q    And approximately when did you graduate from high school?

17   A    May of 2007.

18   Q    And what was -- what happened at that particular party?

19   What was it for?

20   A    It was for his album release party.

21   Q    Do you remember which album?

22   A    Yes.

23   Q    What album?

24   A    Double Up.

25   Q    And where was the party held?

Louis - Direct - Geddes                          1840

1    A    In his house in Olympia Field.

2    Q    And did you bring friends to that particular party?

3    A    Yes.

4    Q    And among the friends that you brought to the defendant's

5    Double Up party on your graduation day, did it include the

6    individual shown in Government Exhibit 68, which is in

7    evidence?

8    A    Yes.

9    Q    And also the individual shown in Government Exhibit 91

10   who you identified as Kendra?

11   A    Yes.

12   Q    And the individual shown in Government Exhibit 67, did

13   she also go with you to that party for the release of the

14   Double Up album?

15   A    Yes.

16   Q    I'm sorry, I'm going to show you Government Exhibit 68

17   just so that the jury can see.

18        How did you get to the party at the defendant's

19   house on graduation night?

20   A    My mom had dropped us off.

21   Q    And what happened when you arrived?

22   A    We couldn't get in.  We couldn't get in unless you had

23   the CD.

24   Q    What did you do?

25   A    My mom took us out to the store to get the CD.

1   Q    What CD did you need in order to get in?

2   A    We needed the CD for the release party, Double Up album.

3   Q    Did you return to the defendant's house?

4   A    Yes.

5   Q    What happened when you returned?

6   A    We all came through the gate and some of us had to sign

7   waivers.

8   Q    And what do you mean by waivers?

9   A    Like can't take pictures, no pictures inside the house.

10  Q    Did you sign a waiver when you went to the Double Up

11  party?

12  A    No.

13  Q    And what, if anything, did you did -- but did you see

14  some of your friends who had to sign a -- who did sign a

15  waiver?

16  A    Yes.

17  Q    What, if anything, did your friends provide when they

18  went to sign that waiver?

19  A    I'm not 100 percent sure.  I just know they had to sign

20  them.

21  Q    They had to sign a waiver?

22  A    Yes.

23  Q    You testified earlier that the individual shown in 68

24  went with you to that Double Up release party at the

25  defendant's house.  Was that the only party that you -- only

Louis - Direct - Geddes                     1842

1  party of the defendant's that you brought the individual shown

2  in 68 to?

3  A    No.

4  Q    Were there additional parties?

5  A    Yes.

6  Q    What, if anything, did the defendant say about the

7  individual shown in Government Exhibit 68?

8  A    One day we had a conversation on the phone.  He was

9  telling me -- he asked me who he was and I just told him that

10  was my friend.  And then he told me "He pretty funny, man.

11  Just keep bringing him with you.  He a funny dude."

12  Q    And in those early years when you first met the defendant

13  in or around 2006 and 2007, what if any interactions did you

14  see the defendant have with the individual shown in Government

15  Exhibit 68?

16  A    I just remember us going to a party and him coming back

17  to me.  It was like any time we come to a party, it's common

18  courtesy to greet whose house it is, so we go up to him and

19  greet him.  And this one time he came back after greeting him

20  and told me he gave him a piece of paper.

21  Q    And when you say that it's common courtesy to greet him,

22  who is the "him" in that sentence?

23  A    Robert.

24  Q    And you said that at some point he came back.  Were you

25  talking about the -- the "he" in that sentence, is that the

Louis - Direct - Geddes                    1843

1    individual shown in 68 or the defendant?

2    A    He came back.  That's shown on the screen.

3    Q    And what, if anything, did he show you?

4    A    He showed me he had a piece of paper in his hand.

5    Q    What was on the piece of paper?

6    A    His phone number.

7    Q    Whose phone number?

8    A    Robert.

9    Q    The defendant's?

10   A    Yes.

11   Q    After that initial time in the defendant's garage where

12   the defendant gave you oral sex, did you continue to have

13   sexual encounters with the defendant?

14   A    Yes.

15   Q    Were any of your sexual encounters recorded?

16   A    Yes.

17   Q    How?

18   A    You know, on a camcorder tripod or an iPad.

19   Q    And when you say on a tripod, what do you mean?

20   A    Basically a tripod holds the camera up.

21   Q    There was like a camcorder on top of the tripod?

22   A    Yes.

23   Q    And on other occasions, did you say the defendant also

24   used an iPad?

25   A    Yes.

Louis - Direct - Geddes                    1844

1   Q    How were you able to see that those sexual encounters

2   were recorded?

3   A    He would set the camera up.

4   Q    The defendant?

5   A    Yes.

6   Q    And were you able to see what was recording?

7   A    I can't see what's recording, but I know where the camera

8   is angled to.

9   Q    And was the camera angled towards you and the defendant

10  engaged in the sexual encounter?

11             MR. CANNICK:  Objection, leading.

12             THE COURT:  Overruled.

13  A    Yes.

14  Q    What, if anything, did the defendant ask you to call him?

15  A    Daddy.

16  Q    What was that?

17  A    Daddy.

18  Q    How, if at all, would the defendant characterize your

19  relationship with him?

20  A    As our relationship got stronger, he would call me more

21  like a brother; I was his little brother.

22  Q    At any point did your sexual encounters with the

23  defendant include anyone other than you and the defendant?

24  A    Yes.

25  Q    Do you remember the first time that it included someone

1    other than you and the defendant?

2    A    Yes.

3    Q    Where were you when this happened?

4    A    At the same place, in the boxing room, boxing ring area

5    of his house.

6    Q    In that detached garage?

7    A    Yes.

8    Q    What happened?

9    A    We had came in the garage area and then he had snapped

10   his fingers three times and a young lady came from under the

11   ring.

12   Q    And when you said we had come into the garage area, who

13   was the "we"?

14   A    Me and Robert.

15   Q    And who snapped his fingers three times?

16   A    Robert.

17   Q    And you said that a young lady came out from underneath

18   something; is that right?

19   A    Yes.

20   Q    Where did you first see that young lady?  Where did she

21   come from?

22   A    From under the boxing ring.

23   Q    What happened after the defendant snapped his fingers

24   three times and the young lady came out from under the boxing

25   ring?

1   A     She came out and he told her to come here.  She crawled

2   over to him and gave him oral sex.  And he told me to pull my

3   pants down and told her to do me the same way that she did

4   him.

5   Q     What happened?

6   A     Then she went ahead and did it.

7   Q     She gave you oral sex?

8   A     Yes.

9   Q     Did you hear the defendant say anything else to that

10  young lady that day?

11  A     Yeah.  He was telling her to say she like me, to say my

12  name.  He wanted her to say my name.

13  Q     Did you want that young lady to give you oral sex that

14  day in the boxing ring?

15  A     I didn't mind it.  It was just a weird, weird situation

16  being with another person, another male and a female, so it

17  just was uncomfortable.  It was uncomfortable.  I wouldn't

18  mind if it was just me and her, but it was uncomfortable.

19  Q     Was it just you and her?

20  A     No.

21  Q     Who else was there?

22  A     Me and Robert.

23  Q     Can you describe the young lady who gave you oral sex

24  after the defendant snapped his fingers three times?

25  A     So she was caramel-skinned and had long hair, very

Louis - Direct - Geddes                    1847

1   petite.  That's all I can remember.

2   Q    Had you seen her before that encounter?

3   A    She looked familiar, like maybe one of the girls from the

4   basketball court.  But it was really hard to really know if it

5   was her for sure because they always wear baggy clothes, so

6   they look a little different when they at the basketball

7   courts.

8   Q    What, if anything, was she wearing when she crawled out

9   from underneath the boxing ring?

10   A    She was naked.

11   Q    Did you ever encounter the defendant when you were

12   intoxicated?

13   A    Yes.

14   Q    What happened?

15   A    I remember the time when I was at the party and I got so

16   intoxicated.  And I was very drunk, so I passed out on the

17   couch.

18   Q    Where was the party?

19   A    This party was held at the Five Star inside the house,

20   Olympia Field.

21   Q    The defendant's house in Olympia Fields?

22   A    Yes.

23   Q    And you testified earlier that the Five Star was that bar

24   area on the first floor; is that correct?

25   A    Yes.

Louis - Direct - Geddes                    1848

1  Q     What happened?

2  A     I just remember me passing out on the couch and then I

3  woke up that morning and he was in there.

4  Q     Who is the "he" in that sentence?

5  A     Robert.

6  Q     The defendant?

7  A     Yes.

8  Q     What, if anything, was the defendant doing when you woke

9  up?

10 A     I just remember -- it was very blurry, so I just remember

11 him getting up and just seeing if I was all right.  And he

12 kind of like left, but to me it just -- it felt like we might

13 have -- he might have gave me oral sex.

14 Q     Was anyone else in the room when you woke up that day,

15 besides you and the defendant?

16 A     No.

17            THE COURT:  Is this a good time to break?

18            MS. GEDDES:  Sure.

19            THE COURT:  Okay.  All right.  Ladies and gentlemen,

20 we are going to break for lunch.  Please do not talk about the

21 case at all.  I will see you at 2:15.

22            THE CLERK:  All rise.

23            (Jury exits the courtroom.)

24            THE COURT:  All right.  Everybody can be seated.

25            And the witness can step out.  We will see you after

1    lunch.

2            (Witness exits the courtroom.)

3            Anything before we break for lunch?

4            MR. CANNICK:  Nothing from us, Your Honor.

5            MS. GEDDES:  No, Your Honor.

6            THE COURT:  Okay.  See you at 2:15.

7            (Luncheon recess taken.)

8            (Continuing on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Proceedings                    1850
```

 1                    AFTERNOON SESSION

 2             (In open court;jury not present.)

 3             (Parties present.)

 4             THE CLERK:  All rise.

 5             THE COURT:  Everybody can have a seat.

 6             All right.  Let's get the witness.  Are we -- no, we

 7    got everybody already.  Okay.

 8             Anything before we bring the witness?  I'm sorry.

 9             MR. CANNICK:  Yes, a brief non-record issue, Your

10    Honor.

11             THE COURT:  Sure.  He can still go get the witness

12    though, right?

13             MR. CANNICK:  Yes.

14             THE COURT:  Thanks.

15             (Pause.)

16             (Witness enters the courtroom.)

17             Are we ready for the jury?

18             Okay let's get them in.

19             (Pause.)

20             (Jury enters the courtroom. )

21             THE CLERK:  You may be seated.

22             THE COURT:  All right, everybody.  I hope you

23    enjoyed your lunch.

24             We are ready to resume with the direct examination

25    of the witness.  Go ahead.

Louis - Direct - Geddes                    1851

1              MS. GEDDES:  Thank you.

2              THE CLERK:  The witness is reminded he's still under

3    oath.

4              THE WITNESS:  Yes.

5    DIRECT EXAMINATION

6    BY MS. GEDDES:   (Continuing)

7    Q    Earlier today you testified about the first time that you

8    met the defendant.  Who was -- do you recall the name of the

9    individual who the defendant wanted to be put in touch with

10   that day at the McDonald's?

11   A    One of the managers.

12   Q    Do you remember her first name?

13   A    Valerie.

14   Q    And how, if at all, did Valerie respond when you told

15   Valerie that the defendant wanted to meet her or talk to her?

16   A    She really didn't know who he was.

17   Q    Before we broke, you testified about a time when you were

18   at the defendant's house and you were intoxicated.  Do you

19   recall which room you were in when you woke up and saw the

20   defendant?

21   A    It was another room off from the studio.

22   Q    Okay.  And what, if anything, do you recall happening

23   when -- or seeing when you woke up?

24   A    I just remember him leaving when I woke up.

25   Q    And what, if anything, made you believe that something

Louis - Direct - Geddes                    1852

1  sexual had happened between you and the defendant that day?

2  A    Because my pants was kind of unbuttoned.

3  Q    Your pants were unzipped or unbuttoned?  Is that what you

4  said?

5  A    Yes.

6  Q    And to your knowledge, had they been unbuttoned before?

7  A    No.

8  Q    And what, if anything, did the defendant -- do you recall

9  the defendant saying anything to you during that encounter or

10 after that encounter?

11 A    No.

12        MS. GEDDES:  I'm showing the witness and everyone

13 what's in evidence as Government Exhibit 69.

14 Q    Without saying the individual's name, do you recognize

15 who this is?

16 A    Yes.

17 Q    What is her first name?  You can say her first name.

18 A    Dominique.

19 Q    And how do you know Dominique?

20 A    Went to school together and also worked together.

21 Q    She went to Hillcrest?

22 A    Yes.

23 Q    And were you and Dominique the same age or different

24 ages?

25 A    Different.

1   Q    And was she younger or older than you?

2   A    Younger.

3   Q    By how much?

4   A    I believe one to two years.

5   Q    Have you ever discussed the defendant with Dominique?

6   A    Yes.

7   Q    When was the first time that you discussed the defendant

8   with Dominique?

9   A    We was at McDonald's.

10  Q    And you testified earlier that you worked with Dominique.

11  Where did you work with Dominique together?

12  A    In McDonald's.

13  Q    And which McDonald's was this?

14  A    Richton Park, Illinois.

15  Q    So a different one than the Markham McDonald's where you

16  met the defendant?

17  A    Correct.

18  Q    And what caused you to discuss the defendant with

19  Dominique?

20  A    I was leaving work and I had locked my keys in the car.

21  And Rob house is kind of like maybe ten minutes away from

22  there, so I had -- when I went back in I was joking with

23  Dominique, like maybe I should see if my Uncle Rob will help

24  me get in the car.

25  Q    How did Dominique respond?

1    A    She said, "You know Rob, too?"  I was like yeah.  She was

2    like "That's my boyfriend."  I'm like -- I didn't believe it.

3    Q    What, if anything, did she do or say after that?

4    A    She showed me the tattoo behind her ear.

5    Q    And what was on the tattoo?

6    A    It was his, Rob's, initials.

7    Q    And what happened after that?

8    A    She said that she can call him and get him to help me get

9    in the car.

10   Q    And were you -- did she, in fact, then call the

11   defendant?

12   A    Yes.

13   Q    Were you able to hear that conversation?

14   A    No.

15   Q    What, if anything, happened after the conversation?

16   A    She just told -- she just told me that he told her to

17   hang up.  Meanwhile she got off the phone with him, do not

18   talk to me, stay away from me.

19   Q    Did you continue to associate with Dominique after that,

20   after the defendant told her not to speak with you?

21   A    Yes.

22   Q    And to your knowledge, did the defendant ever learn that

23   you continued to speak with Dominique?

24   A    Yes.

25   Q    How did you learn that the defendant learned you were

Louis - Direct - Geddes                1855

1   still talking with Dominique?

2          MR. CANNICK:  Hearsay; objection.

3          THE COURT:  Are you objecting?  I hear you not that

4   good.

5          MR. CANNICK:  Yes, I am.

6          THE COURT:  Well, from whom did you hear it?

7          THE WITNESS:  I'm sorry, what was that?  What was

8   the question?

9   Q    Did you ever have -- how did you learn that the defendant

10  found out that you continued to associate with Dominique?

11         THE COURT:  If that's a conversation with someone

12  other than the defendant, I will sustain the objection.

13  A    You saying how --

14         THE COURT:  Did you speak to the defendant about it?

15  Did you speak to Mr. Kelly about it?

16         THE WITNESS:  Yes.

17         THE COURT:  All right.  Is that -- okay.

18         What happened?

19         THE WITNESS:  Well, he -- you want to know how he

20  first found out or...

21  Q    Did you overhear a conversation between the defendant and

22  Dominique?

23  A    Yes.

24  Q    And where were you when this conversation took place?

25  A    She was on the phone.  We was on the phone.  Me and

1    Dominique was on the phone.

2    Q    And at some point did you hear the defendant during that

3    conversation?

4    A    Yes.

5    Q    What did you hear the defendant say?

6    A    He said, "Who you on the phone with?"  And then she just

7    dropped the phone and he got on the phone.

8    Q    And what did he say to you?

9    A    He said -- he kept saying hello, hello.  And I just hung

10   up.

11   Q    And this conversation, this telephone call where you were

12   speaking with Dominique and the defendant got on the phone,

13   was this before or after you met the defendant at the

14   drive-through in Markham McDonald's?

15   A    After.

16   Q    Was it several years after?

17   A    Yes.

18   Q    And when you spoke with Dominique that day, were you

19   calling from your phone number?

20   A    Yes.

21   Q    How if at all did your relationship with the defendant

22   change after that telephone conversation?

23   A    He really didn't want nothing to do with me.

24   Q    The defendant stopped having anything to do with you or

25   didn't want anything to do with you?  Is that what you said?

Louis - Direct - Geddes                    1857

1    A    Yes.

2    Q    I want to direct your attention to October of 2011.

3    What, if anything, happened then?

4    A    I'm not sure what's your question.

5    Q    Were you arrested in October of 2011?

6    A    Yes.

7    Q    What were you arrested for?

8    A    Robbery.

9    Q    Did you, in fact, commit the robbery?

10   A    Yes.

11   Q    How did you resolve your case?

12   A    Plea deal.

13   Q    You pled guilty?

14   A    Yes.

15   Q    And do you recall what your sentence was?

16   A    Five-years' probation.

17   Q    Were you the only one charged with that particular

18   robbery or were there other people charged with the robbery?

19   A    Others.

20   Q    I'm showing what's in evidence as Government Exhibit 68.

21        Was the individual shown in Government Exhibit 68

22   one of the individuals charged with that same robbery?

23   A    Yes.

24   Q    And after he was charged, was he immediately released on

25   bail or did he remain in jail for a time?

Louis - Direct - Geddes                          1858

1   A    He remained in jail for some time.

2   Q    Did you have a conversation with the defendant about the

3   individual shown in Government Exhibit 68?

4   A    Yes.

5   Q    What was the nature of that conversation?

6   A    He had asked have I seen him.  And he was asking -- he

7   said he haven't heard from him, he been trying to get in touch

8   with him.

9   Q    Who asked you if you had seen the individual shown in 68?

10  A    Robert Kelly.

11  Q    Did you tell the defendant where the individual shown in

12  68 was?

13  A    Yes.

14  Q    What, if anything, did the defendant say?

15  A    He asked why he was still in there.  And I told him

16  because he didn't have bail money.

17  Q    And what happened?

18  A    Once I told him the certain amount, he just said, "Oh, my

19  God.  I don't have it."

20  Q    At some point did the defendant provide some money for

21  the -- for this individual's bail?

22            MR. CANNICK:  Objection.

23            THE COURT:  Sustained.

24            Unless you had a conversation with the defendant

25  about it?

Louis - Direct - Geddes                    1859

1          THE WITNESS:  Yes, I did.

2          THE COURT:  Okay.  You spoke to Mr. Kelly about this

3  subject, about giving bail money?

4          THE WITNESS:  Yes.

5          THE COURT:  All right.  Go ahead.

6  Q    And what, if anything, did the defendant say or do?

7  A    He did -- so he gave me a certain amount that he did

8  have, which was $2,000.

9  Q    The defendant gave you $2,000?

10 A    Yes.

11 Q    And what did you understand that money was for?

12 A    For his bail.

13 Q    For the individual shown in Government Exhibit 68?

14 A    Yeah.

15 Q    Was that $2,000 ultimately used to pay the individual in

16 68's bail?

17 A    No.

18 Q    What did you do with the money?

19 A    Kept it.

20 Q    And was the individual shown in 68 released on bail at

21 some point?

22 A    Yes.

23 Q    I want to direct your attention to 2018.  How would you

24 characterize your relationship with the defendant at that

25 time?

1  A     I would say we had a great -- a good relationship, more

2  of a friendship.

3  Q     And where would you spend time -- did you continue to

4  spend time with the defendant?

5  A     Yes.

6  Q     Where did you spend time with the defendant in or about

7  2018?

8  A     Mostly playing basketball.

9  Q     And would you see him outside of the basketball courts as

10 well?

11 A     Yes.

12 Q     Where would you see him?

13 A     Either we'd be at parties or we'd be at cigar lounges or

14 -- that's mostly it, or we'd go out of town or like a bar or

15 somewhere, a club or something.

16 Q     Where did you attend parties with the defendant?

17 A     In the studio in Chicago.

18 Q     Do you recall the street where that studio was located?

19 A     Justine.

20 Q     It was located on Justine Street?

21 A     Yes.

22 Q     Did there come a time when you and the defendant and the

23 individual shown in Government Exhibit 68 were all in the same

24 place together after the defendant was no longer living at

25 Olympia Fields?

1    A    Yes.

2    Q    Where was it that the three of you were altogether?

3    A    At the Trump Towers.

4    Q    What was at the Trump Towers when the three of you were

5    there?

6    A    Sorry, what was that question?

7    Q    Who, if anyone, lived at the Trump Towers when the three

8    of you were there?

9    A    Robert Kelly.

10   Q    The defendant?

11   A    Yes.

12   Q    How did it come to be that the three of you were at the

13   Trump Towers together?

14   A    He called me and told me that we need to fix our

15   relationship, me and the individual, and that we need to be

16   more like -- we're like brothers, so we need to fix the

17   situation.

18   Q    Who had called you and told you that you needed to fix

19   the situation?

20   A    Robert.

21   Q    The defendant?

22   A    Yes.

23   Q    And what had -- you testified earlier today before we

24   broke for lunch that you brought the individual shown in

25   Government Exhibit 68 to the defendant's house when you were

Louis - Direct - Geddes                    1862

1    still in high school, correct?

2    A     Yeah.

3    Q     And what was your relationship with this individual when

4    you were in high school?

5    A     My best friend.

6    Q     And at some point did your friendship deteriorate?

7    A     Yes.

8    Q     And was that prior to the time when the defendant said

9    that you needed to fix your relationship with this individual

10   in Government Exhibit 68?

11   A     Yes.

12   Q     What happened after the defendant said that you needed to

13   fix your relationship with him, with the individual in 68?

14   A     He had told both of us to come down, so we both rode down

15   there.

16   Q     To the defendant's house at Trump -- at the Trump Towers?

17   A     Yes.

18   Q     What happened when you arrived?

19   A     We all went into like a living room, you know, a living

20   room area and we was all sitting there, and he had instructed

21   me and the individual to touch each other and kiss each other.

22   We didn't really want to because we friends, we grew up

23   together, so we didn't do it.

24   Q     What did you do at that time?

25   A     I sat there and I watched him.

1   Q      Where were you when this happened?

2   A      Sitting on the couch.

3   Q      In the Trump Towers?

4   A      Yes.

5   Q      And what did the defendant want you and the individual

6   shown in 68 to do?

7   A      Kiss each other.

8   Q      Anything more?

9   A      He wanted us to touch each other.

10  Q      Where did he want you to touch each other?

11  A      My privates.

12  Q      Did you want to do that?

13  A      No.

14  Q      From what you -- did the individual in 68 appear to want

15  to do that?

16  A      No.

17                 (Continuing on the next page.)

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION

2   BY MS. GEDDES:    (Continuing)

3   Q    Did you express that to the defendant?

4   A    No.

5   Q    What happened?

6   A    Since we wasn't doing what was told, he told the

7   individual, come on, let's show him how it's supposed to be

8   done.

9   Q    When you said he told the individual, who is the "he" in

10  that sentence?

11  A    Robert.

12  Q    And I think going forward, to the extent you can, let's

13  try to refer to the individual as number 68.  Is that okay?

14  A    Number 68, okay.

15  Q    So the defendant told the individual number 68,

16  Government's Exhibit 68, to do what?

17  A    Let's show him how it's supposed to be done.

18  Q    What, if anything, did you observe?

19  A    I saw them having sex together.

20  Q    What did you do after that?

21  A    I was instructed to go sit in the bathroom.

22  Q    Who instructed you to go sit in the bathroom?

23  A    Robert.

24  Q    The defendant?

25  A    Yes.

Louis - Direct - Geddes                    1865

1    Q    During the encounter that you witnessed between the

2    defendant and the individual in 68, who if anyone, appeared to

3    be in charge?

4    A    Robert.

5    Q    How so?

6    A    He instructing us what to do.

7    Q    When you say "us," are you referring to yourself and

8    individual in 68?

9    A    Yes.

10   Q    I'm showing you what is in evidence as Government's

11   Exhibit 78.  Without saying who it is, do you recognize the

12   individual shown in Government's Exhibit 78?

13   A    Yes.

14   Q    Have you ever had a sexual encounter with the individual

15   shown in Government's Exhibit 78?

16   A    Yes.

17   Q    Now, at the time when you had that sexual encounter with

18   this individual in Government's Exhibit 78, did you know her

19   name?

20   A    No.

21   Q    How was it that -- where was it that you had a sexual

22   encounter with this individual?

23   A    In the studio on Justine.

24   Q    Whose studio?

25   A    Robert.

1    Q    The defendant's?

2    A    Yes.

3    Q    Why were you at this studio?

4    A    We were all hanging out that night.  We was -- we went

5    out for some cigarette, and eventually we went back to the

6    studio to listen to some the music.

7    Q    Who was hanging out that night?

8    A    I can say the name?

9    Q    Yes.

10   A    Me, Robert, and Julius.

11   Q    And who did you understand Julius to be?

12   A    A and R.

13   Q    What is A and R?

14   A    Somebody to help you develop your music.

15   Q    How did you know Julius?

16   A    From the parties, people at the party telling me who he

17   was.

18   Q    Through the defendant that you met him?

19   A    Yes.

20   Q    Or saw him?

21   A    Yes.

22   Q    And did all three of you, you Julius and the defendant,

23   go back to the defendant's studio on Justine Street?

24   A    Yes.

25   Q    And what, if anything, were you doing when you went back

Louis - Direct - Geddes                    1867

1    to the defendant's studio?

2    A    First we sat at the bar for a while.  And then I had

3    asked him did he have any new music he was working on.  He

4    took us to the back area to the studio and start listening to

5    the music.

6    Q    Who did you ask if he had any new music?

7    A    Robert.

8    Q    What happened after that?

9    A    After we sat there, the same song kept playing over and

10   over.  He started to doze off.  When he doze off, I was

11   letting him know that I was leaving for the day.

12   Q    Where was the defendant at this time?

13   A    He was all sitting on a couch in the studio.

14   Q    Do you remember what room in the studio you were in?

15   A    From what I'm told, it was the main studio in there.

16   Q    And what, if anything, do you remember in that studio?

17   A    I remember the engineer, all the mixing materials, and

18   the keyboard, everything.

19   Q    You testified a moment ago that he dozed off, who dozed

20   off?

21   A    Robert.

22   Q    At that time when the defendant dozed off, where was

23   Julius?

24   A    He was still sitting on the couch.

25   Q    What happened next?

Louis - Direct - Geddes                    1868

1    A     I woke Rob up and told him I was leaving.  He said, okay,

2    you can walk me out; instead, we went into another room.

3    Q     Who went into another room?

4    A     Me and Rob.

5    Q     Where was Julius at that point, could you tell?

6    A     He still stayed in the studio.

7    Q     And do you remember which room you went into?

8    A     Like another room like right next door to the studio.

9    Q     What happened when you went next door to the studio?

10   A     He told me he wanted me to -- he wanted me to have sex

11   with his girlfriend.

12   Q     And how did he describe his girlfriend?

13   A     Just told me she was a girlfriend.

14   Q     How did you respond?

15   A     I said okay.

16   Q     What happened?

17   A     He had left me in there for a minute, went and got her,

18   brought her back.  And then when she got there, he instructed

19   her what to do.

20   Q     When you say he left you in there for a minute, do you

21   literally mean a minute?

22   A     Probably like I would say maybe ten, 15 minutes.

23   Q     When he returned, who was with him?

24   A     The individual.

25   Q     The individual shown in Government's Exhibit 78?

1    A    Yes.

2    Q    Prior to that time, had you seen this individual, the one

3    shown in Government's Exhibit 78?

4    A    No, just looked maybe familiar from women from the

5    basketball court, but I never seen her like in-person, met

6    her.

7    Q    Had the defendant ever introduced you to the woman in 78?

8    A    No.

9    Q    What happened when the defendant and the woman in

10   Government's Exhibit 78 came into the room?

11   A    He instructed her what to do.

12   Q    What did you hear the defendant say to her?

13   A    Told her to give me oral sex.

14   Q    And how was the individual in 78 dressed when she entered

15   the room?

16   A    She had on just a T-shirt.

17   Q    And what happened when she came into the room and after

18   the defendant told her to give you oral sex?

19   A    She then gave me oral sex.

20   Q    Where was the defendant when that happened?

21   A    Standing off into the corner.

22   Q    What, if anything, was the defendant doing when that

23   happened?

24   A    Recording.

25   Q    What was he using to record?

Louis - Direct - Geddes                    1870

1   A    IPad.

2   Q    How were you able to see that?

3   A    I was sitting down in a chair.  She was on her knees.  I

4   could see him right there.

5   Q    Could you see the iPad?

6   A    Yes.

7   Q    Could you see what was shown on the iPad?

8   A    Could I see what was shown?

9   Q    Uh-huh.

10  A    Could you redirect your question?

11  Q    Sure.  Were you able to see what was being recorded on

12  the iPad?

13  A    No.

14  Q    Why not?

15  A    It's faced towards him.

16  Q    And what, if anything, did the defendant do or say while

17  the individual shown in 78 was giving you oral sex, aside from

18  the recording?

19  A    What was he saying?

20  Q    Uh-huh.

21  A    Just telling her, call him Daddy, call him by his name.

22  Q    And the defendant was telling the individual in 78 to

23  call who Daddy?

24  A    Me at that moment.

25  Q    During that encounter, who if anyone, was giving

Louis - Direct - Geddes                          1871

1    instructions?

2    A     Robert.

3    Q     What, if anything, did you do while the defendant gave

4    instructions?

5    A     Sat there.

6    Q     Did you say anything?

7    A     No.

8    Q     What, if anything, did the individual in Government's

9    Exhibit 78 say during that encounter?

10   A     She just did as she was told.  She didn't say nothing

11   except call me by my name and call me Daddy.

12   Q     To be clear -- I don't want you to say your name -- but

13   did the defendant use your real name when he told her to call

14   you by your name?

15   A     Yes.

16   Q     How did you respond when the individual in Government's

17   Exhibit 78 was giving you oral sex with the defendant in the

18   room?

19   A     How did I react?

20   Q     Yes.

21   A     I was just sitting there.  I really couldn't get really

22   excited because it was an uncomfortable situation.

23   Q     What made it uncomfortable?

24   A     Because Robert was just standing there.

25   Q     The defendant?

Louis - Direct - Geddes                    1872

1   A    Yes.

2   Q    Did you want the individual shown in Government's Exhibit

3   78 to be giving you oral sex in front of the defendant?

4   A    No.

5   Q    What, if anything, did you defendant say?

6   A    He seen I wasn't getting excited from what was going on.

7   He was, like, I'm confused.  I don't know what you want.  I

8   don't want if you want a woman or a man.

9   Q    Just to be clear for the record, when you say that you

10  weren't getting excited, do you mean you weren't sexually

11  responding to what was happening?

12  A    Yes.

13            MR. CANNICK:  Leading.

14            THE COURT:  Overruled.

15  Q    During the time that you spent with the defendant at his

16  house or at his studio -- and by the way, before I ask that

17  question.  You testified earlier about the studio at Olympia

18  Fields and also about the studio on Justine Street.  Have you

19  visited any other studios that the defendant used?

20  A    Yes.

21  Q    Where were those?

22  A    On Ohio Street.

23  Q    Do you recall when the defendant -- when you say Ohio

24  Street, in what city?

25  A    Chicago, Illinois.

1   Q    Do you recall when the defendant was using the studio on

2   Ohio Street?

3   A    I'm not sure of the dates or the year.  I know it was in

4   between Olympia Fields and Justine.

5   Q    So it was after his time in Olympia Fields and before his

6   time in the studio on Justine Street?

7   A    Correct.

8   Q    During the time that you spent with the defendant at his

9   house or at his studios, have you ever taken anything from

10  him?

11  A    Yes.

12  Q    Just to be clear, I'm talking about other than the time

13  you took that money that he provided for the individual number

14  68's bail.  What have you taken?

15  A    A camcorder.

16  Q    When did you take the camcorder from the defendant?

17  A    You said when?

18  Q    Yes.

19  A    We was -- me and one of my friends was at a party, most

20  of the time you got to wait around before you get to the party

21  sometimes.  There was a camcorder sitting on a desk with a

22  runner.  And I asked the runner about it.  He had said he

23  thinks it was somebody that left it there from a party.  It

24  was there for some days.  So I took it.

25  Q    When you say a runner, who are you referring to?  What do

Louis - Direct - Geddes                    1874

1   you mean by a runner?

2   A    Someone who works for Robert.

3   Q    Where was this that this happened?

4   A    The house in Olympia Fields.

5   Q    What, if anything, did you do with that camcorder?

6   A    I took it home and watched it.

7   Q    What was on the camcorder?

8   A    It was just him rehearsing.

9   Q    The defendant rehearsing?

10  A    Yes.

11  Q    And what happened to that camcorder?

12  A    Later on my friend had called me and told me to give it

13  back.

14  Q    The individual who called you, was it the individual

15  shown in Government's Exhibit 68, which I'm putting on the

16  screen?

17  A    Yes.

18  Q    What did do you with the camcorder at that time?

19  A    Gave it to him.  He took it back.

20  Q    You gave it to this individual --

21  A    Yes.

22  Q    -- in 68, for the record?

23  A    Yes.

24  Q    Aside from that camcorder, was there anything else that

25  you took from the defendant or the defendant's residences?

1    A    No.

2    Q    Do you remember the last time that you saw the defendant

3    in person?

4    A    Yes.

5    Q    Prior to today?

6    A    Yes.

7    Q    Where did you last see the defendant in person?

8    A    At the Trump Towers.

9    Q    Where was the defendant living at that time?

10   A    At the Trump Towers.

11   Q    What led to you seeing the defendant at the Trump Towers?

12   A    He told me he needed to talk to me.

13   Q    Do you remember approximately when this happened, when

14   you last saw him?

15   A    Not sure of the date.

16   Q    You said that you saw him at the Trump Towers.  Was that

17   the Trump Towers in Chicago?

18   A    Yes.

19   Q    Where he was living?

20   A    Yes.

21   Q    You said that the defendant said he needed to see you; is

22   that correct?

23   A    Yes.

24   Q    Who, if anyone else, was there when you saw the defendant

25   at the Trump Towers that day?

Louis - Direct - Geddes                1876

1   A    The only person I saw there that day was him.

2   Q    What happened when you saw the defendant?

3   A    We sat in the hallway.

4   Q    Which hallway?

5   A    Of the Trump Towers.

6   Q    And do you remember what floor you were on?

7   A    No.

8   Q    Do you remember -- what happened when you saw the

9   defendant?

10  A    He came to the door.  He came out, said we need to talk.

11  He had a notepad and a pen.

12  Q    And were you meeting with the defendant inside an

13  apartment at the Trump Towers or outside?

14  A    Outside in the hallway.

15  Q    Okay, so in the hallway outside of the apartment; is that

16  correct?

17  A    Correct.

18  Q    You testified he came out with what?

19  A    A notepad and a pen.

20  Q    What did he say to you?

21  A    Told me he said he need me to write this letter to

22  protect me and him.

23  Q    And how did you respond?

24  A    I said okay.

25  Q    Did the defendant tell what you he wanted you to write in

1   this letter?

2   A    Yes.

3   Q    Did you, in fact, write the letter?

4   A    Yes.

5   Q    How did you write it?

6   A    How did I write it?

7   Q    Uh-huh.

8   A    He gave me the notepad and I wrote the letter.

9   Q    A handwritten letter?

10  A    Yes.

11  Q    And whose idea was the content in that letter?

12  A    He told me word for word what to say.

13  Q    What did he tell you what to write?

14  A    He told me that some people were trying to contact me and

15  pay me off because they say we was having a sexual,

16  homosexual, relationship.

17  Q    And so what did he want you to say about that?

18  A    That's what he wanted me to write in the letter, that

19  some people was calling me to contact me to pay me to say we

20  was having a sexual relationship.

21  Q    Did you indicate in that letter whether you were or were

22  not having a sexual relationship with the defendant?

23  A    No.

24  Q    At that time, had anyone contacted you to -- had anyone

25  contacted you about a sexual relationship with the defendant?

Louis - Direct - Geddes                          1878

1    A    No.

2    Q    Had anyone paid you any money --

3    A    No.

4    Q    -- in regard to a sexual relationship with the defendant?

5    A    No.

6    Q    So was the content of the letter that you wrote true?

7    A    No.

8    Q    You testified that the defendant told you it was for his

9    protection; is that correct?

10   A    Yes.

11   Q    What did you understand the defendant to mean by that?

12   A    I thought it was something that will protect us, so what

13   happened in the past will never come to light.

14   Q    What do you mean what had happened in the past?

15   A    Sexual encounters that we had.

16   Q    Aside from telling the Government in prior meetings and

17   your lawyer, and today in this courtroom, have you told anyone

18   about that letter?

19   A    No -- well, yes, I did.  I did.

20   Q    Do you remember who you told, without saying the name?

21   A    Number 68.

22   Q    The individual shown in number 68?

23   A    Yes.

24   Q    Do you remember when you told this individual in number

25   68 about the letter?

Louis - Direct - Geddes                1879

1   A    I think we was out.  We went to the mall or something

2   like that.  I had just told him that I had to write a letter;

3   and he told me he had to write the same letter.

4   Q    I want to switch gears for a moment.  Who did you live

5   with during high school?

6   A    My mom and stepfather.

7   Q    And what, if any, relationship did you have with your

8   biological father when you were in high school?

9   A    Somewhat relationship.

10  Q    Would you spend time with him?

11  A    Yes.

12  Q    When would you spend time with him?

13  A    Mostly on the weekends.

14  Q    Without saying it, do you remember your home telephone

15  number at your mother's house when you were growing up?

16  A    Yes.

17  Q    Did you provide that telephone number to the Government?

18  A    Yes.

19  Q    Does she still have that phone number today?

20  A    Yes.

21  Q    I'm showing the witness only what is marked for

22  identification as Government's Exhibit 939.  Do you recognize

23  what is shown in Government's Exhibit 939?

24  A    Yes.

25  Q    What is that?

Louis - Direct - Geddes                    1880

1    A    My parents' phone number.

2    Q    Is that the phone number for your mother and stepfather

3    when you were in high school?

4    A    Yes.

5              MS. GEDDES:  The Government offers 939.

6              MR. CANNICK:  My only objection is to relevance,

7    your Honor.

8              THE COURT:  Overruled.

9              Jury only?

10             MS. GEDDES:  Yes, jury only.

11             THE COURT:  Admitted into evidence, jury only.

12             (Government Exhibit 939, was received in evidence.)

13   BY MS. GEDDES:

14   Q    Do you remember the telephone number of your biological

15   father's house when you were in high school?

16   A    Yes.

17   Q    Did you provide that telephone number to the Government?

18   A    Yes.

19   Q    I'm showing you what is marked for identification as

20   Government's Exhibit 953A, witness only.  Do you recognize

21   Government's Exhibit 953A?

22   A    Yes.

23   Q    What is that?

24   A    My father's phone number.

25             MS. GEDDES:  The Government offers 953A.

Louis - Direct - Geddes                    1881

1                MR. CANNICK:  Same objection.

2                THE COURT:  The objection is overruled.

3                Is this jury only?

4                MS. GEDDES:  Yes, please.

5                THE COURT:  It's admitted into evidence.

6                (Government Exhibit 953A, was received in evidence.)

7    BY MS. GEDDES:

8    Q    And finally, are you aware of -- was your biological

9    father remarried when you were in high school?

10   A    Yes.

11   Q    And are you aware of her telephone number when you were

12   in high school?

13   A    Yes.

14   Q    Did you provide that telephone number to the Government?

15   A    Yes.

16   Q    Government is showing the witness only what is marked for

17   identification as 953D.  Do you recognize what is shown in

18   953D?

19   A    Yes.

20   Q    What is that?

21   A    My stepmother's phone number.

22   Q    And when you say your stepmother, are you referring to

23   your biological father's then wife?

24   A    Yes.

25   Q    This is where you would spend weekends in high school at

Louis - Direct - Geddes                    1882

1   their house?

2   A     Yes.

3            MS. GEDDES:  The Government offers 953D.

4            THE COURT:  Same objection?

5            MR. CANNICK:  Yes, your Honor.

6            THE COURT:  The objection is overruled.

7            Jury only.  It's in evidence.

8            (Government Exhibit 953D, was received in evidence.)

9   BY MS. GEDDES:

10  Q     Since 2007 -- or 2006, when you first met the defendant,

11  how regularly did you speak with the defendant over the

12  telephone when you were in speaking terms with him?

13  A     A lot.

14  Q     Did he have the same phone number during the 15-year

15  period or multiple phone numbers?

16  A     Multiple.

17  Q     Do you recall any of his telephone numbers?

18  A     Yes.

19  Q     How many?

20  A     I remember one specifically.

21  Q     And do you remember when he had this particular phone

22  number?

23  A     No.

24  Q     What was the telephone number?

25  A     I could say it?

Louis - Direct - Geddes                    1883

1    Q    Yes.

2    A    (630)220-1166.

3    Q    Over the years that you spent time with the defendant,

4    what, if anything, did you see the defendant carrying with

5    him?

6    A    Mostly a backpack.

7    Q    Did you ever have an opportunity to see what was inside

8    that backpack?

9    A    I don't know everything that was in there, but from most

10   are part I seen an iPad or money come out of it.

11   Q    When would you see an iPad come out of the backpack?

12   A    At the gym or when the encounter is about to happen.

13         THE COURT:  Excuse me.  Did you say it was

14   (630)220-1166?

15         THE WITNESS:  Yes, ma'am.

16         THE COURT:  Sorry about that.

17   Q    Who did you see taking out the iPad from the backpack?

18   A    Robert.

19   Q    The defendant?

20   A    Yes.

21   Q    Did there come a time that you offered money to a

22   potential witness in the Government's case against the

23   defendant here?

24   A    Yes.

25   Q    Did you learn that at the time you offered that money to

Louis - Direct - Geddes                    1884

1    that potential witness, that witness was cooperating with the

2    Government and was recording your conversations?

3    A    Yes.

4    Q    What did you offer that potential witness money to do?

5    A    To not cooperate.

6    Q    With the Government?

7    A    Yes.

8    Q    Did there come a time when you were arrested and charged

9    with a crime in federal court?

10   A    Yes.

11   Q    What were you charged with?

12   A    Bribery.

13   Q    Just to be clear, was the defendant involved in any way

14   with that offer to pay money to a potential witness?

15   A    No.

16   Q    Whose idea was it?

17   A    Mine.

18   Q    You testified that you were charged with bribery.  Was it

19   bribery of that potential witness who you just testified

20   about?

21   A    I'm sorry, what was that?

22   Q    You testified that you were charged with bribery.  Were

23   you charged with bribing that potential witness?

24   A    Yes.

25   Q    How did you resolve that case?

1  A    I took a -- I pled guilty.

2  Q    What crime did you plead guilty to?

3  A    Attempted bribery.

4  Q    What is the maximum sentence that you face?

5  A    Fifteen years.

6  Q    You testified that you pleaded guilty to attempted

7  bribery.  What, if any, type of agreement did you have with

8  the Government?

9  A    Just a cooperation deal.

10 Q    What are your obligations under that cooperation

11 agreement?

12 A    To be truthful and honest to the Government.

13 Q    Do you have to testify here today?

14 A    Yes.

15 Q    Do you want to be here today?

16 A    No.

17 Q    What, if anything, do you understand you'll receive in

18 exchange for being truthful with the Government and testifying

19 here today?

20 A    A letter.

21 Q    What is in that letter?

22 A    Basically letting the judge know everything I've done up

23 to this point.

24 Q    Who writes that letter?

25 A    The Government.

1   Q     In that letter does the Government recommend a particular

2   sentence to the judge who will sentence you today -- who will

3   sentence you?

4   A     No.

5   Q     As you sit here today, do you know what your sentence

6   will be?

7   A     No.

8   Q     You testified earlier that when you first met the

9   defendant you wanted him to help you with your musical

10  aspirations; is that right?

11  A     Yes.

12  Q     Do you still hope to make it in the music world?

13  A     Yes.

14  Q     What, if anything, over the 15 years that you knew the

15  defendant did he, the defendant, do to help with you your

16  musical ambitions?

17  A     Nothing.

18  Q     How, if at all, do you believe that your testimony today

19  will affect your ability to make it in the music industry?

20  A     It will affect it.

21  Q     How so?

22  A     My reputation.

23  Q     In a good way or bad way?

24  A     In a bad way.

25              MS. GEDDES:  One moment.  Nothing further.

Louis - Cross - Cannick                    1887

1        THE COURT:  Cross-examination.

2   CROSS-EXAMINATION

3   BY MR. CANNICK:

4   Q    So you testified and told us that you're here today under

5   a cooperation agreement?

6   A    Yes, sir.

7   Q    When was it that you entered that cooperation agreement?

8   A    I'm sorry, what was that?

9   Q    When did you enter the cooperation agreement?

10       THE COURT:  When did you enter it?

11  A    February.

12  Q    February.  When?  What year?

13  A    2021.

14  Q    2021.  Did you have proffer sessions before entering the

15  agreement?

16  A    I'm sorry, what?

17  Q    Did you have meetings with the Government before you

18  entered this cooperation agreement?

19  A    Yes.

20  Q    How many meetings did you have with the Government before

21  you entered the cooperation agreement?

22  A    Maybe one or two.

23  Q    So you had one or two meetings with the Government and

24  they decided to sign you up as a cooperator?

25  A    Yes.

1  Q    When you first spoke with the Government, you didn't tell

2  them that it was your idea to make this bribery offer, right?

3  A    Yes, I did.

4  Q    Didn't you tell them that it was -- you were doing it to

5  help the person because you knew the person needed money?

6  A    What?  Can you say that again?

7  Q    Didn't you tell the Government that the reason why you

8  tried bribing this person, is that you did it to benefit the

9  person?

10 A    No.

11 Q    You didn't tell them that you did it to benefit the

12 person because you knew the person would need money?

13 A    No.

14 Q    You didn't tell them that the person asked for

15 $2 million?

16 A    Yes, I did.

17 Q    The person asked for $2 million after you extended an

18 opportunity for the person to get money, am I correct?

19 A    Yes.

20 Q    And when you -- going back to the cooperation agreement.

21 You said that the Government would write a letter to your

22 sentencing judge if you came here, testified, and told the

23 truth, am I correct?

24 A    Correct.

25 Q    Now, it's the Government who decides what the truth is,

Louis - Cross - Cannick                          1889

1    am I correct?

2    A     No.

3    Q     They are the ones who decide whether or not you're being

4    truthful or not?

5    A     No.

6    Q     Who makes that decision?

7    A     My statements.

8    Q     The Government will only write that letter if you tell

9    the truth, right?

10   A     Yes.

11   Q     Someone has to evaluate what the truth is, whether or not

12   you're telling the truth, right?

13   A     Correct.

14   Q     Isn't it the Government who makes that determination as

15   to whether or not you're telling the truth?

16   A     Yes.

17   Q     So you have to tell the truth according to what the

18   Government finds to be truthful, right?

19   A     Say that one more time.

20   Q     You have to tell the truth according to what the

21   Government finds to be truthful?

22   A     Yes.

23   Q     If you don't tell a story that fits with the Government's

24   version of the truth, you don't get the letter, right?

25

1   CROSS-EXAMINATION

2   BY MR. CANNICK: (Continuing.)

3   Q    How do you know?

4   A    I don't know.

5   Q    You haven't gotten a letter yet; right?

6   A    No.

7   Q    So part of your getting a letter is coming here and

8   testifying.  That's one part; right?

9   A    Yes.

10  Q    The second part is that the Government has to make a

11  determination as to whether or not they think that you're

12  being truthful; am I correct?

13  A    Correct.

14  Q    And then if they think that your testimony fits their

15  version of truth, then they write a letter.

16          MS. GEDDES:  Objection.

17          THE COURT:  Sustained.

18  BY MR. CANNICK:

19  Q    They don't write that letter unless they think that

20  you're telling the truth; am I correct?

21          MS. GEDDES:  Objection.

22          THE COURT:  Do you know anything about when they

23  will write the letter?

24          THE WITNESS:  No, I don't.

25  BY MR. CANNICK:

1  Q     You had a lawyer; am I correct?

2  A     Yes, I do.

3  Q     And the lawyer was with you during this process; am I

4  correct?

5  A     Correct.

6  Q     The lawyer explained to you what this is all about --

7             THE COURT:  Sustained.

8             Don't ask about his communications with his lawyers.

9             MR. CANNICK:  I'm not asking about communication.

10  I'm asking about whether or not he -- the lawyer assisted him

11  in getting an understanding of what he was signing.

12             THE COURT:  He has a right to counsel.

13             MR. CANNICK:  Okay.

14  BY MR. CANNICK:

15  Q     Before -- you signed an agreement; right?  You signed a

16  Cooperation Agreement --

17             THE COURT:  Can I just see the lawyers at the side

18  for just a second with the court reporter?

19             (Sidebar.)

20             (Continued on next page.)

21

22

23

24

25

*Sidebar*                                                                1892

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3          THE COURT:  I don't have any problems with asking

4    him questions about the letter, but you can't ask him about

5    his communications with his counsel.

6          MR. CANNICK:  Right.

7          THE COURT:  Because, again, I find it always sort of

8    interesting that lawyers are so outraged when witnesses have

9    lawyers represent them, but he does have lawyer-client

10   communications, and you can't ask him about what his lawyer

11   told him.

12         MR. CANNICK:  I didn't ask him that.  I asked him --

13         THE COURT:  I think you did.

14         MR. CANNICK:  What I've been trying to ask him is

15   before signing the agreement, he and his lawyer discussed

16   it -- I'm not asking what they discussed -- and then the

17   lawyer helped him to understand the contents of the letter.

18         THE COURT:  You can ask him if he spoke to the

19   lawyer before he signed it.  I just don't think it's -- I

20   mean, I think everybody knows you can't ask him what the

21   lawyer told him about it in terms of his right to counsel.

22         MR. CANNICK:  I'm not asking that; and, if I did, I

23   got wound up.

24         THE COURT:  Just one more thing.

25         I just think at some point, maybe in my final

1    instructions, but I do think the jury is entitled to know that

2    he's got his right to counsel.

3              MR. CANNICK:  Right.

4              THE COURT:  I don't need to do it now, but I guess

5    what I'll do is just give an instruction in the final charge.

6              MR. CANNICK:  Okay.  Sure.

7              (Sidebar end.)

8              (Continued on following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court.)

2    BY MR. CANNICK:

3    Q    Now, a short while ago, I asked you whether or not --

4    withdrawn.

5              You knew what you were signing, am I correct, when

6    you signed the cooperation agreement?

7    A    Yes, sir.

8    Q    Prior to signing the cooperation agreement, you and your

9    attorney discussed the cooperation agreement; am I correct?

10   A    Yes, sir.

11   Q    And, basically, that was done to make sure that you

12   understood what, in fact, you were signing; am I correct?

13             MS. GEDDES:  Objection.

14             THE COURT:  Overruled.

15   A    Yes, sir.

16   Q    And, now, again, the cooperation agreement gave you

17   certain -- there are certain requirements you have to fulfill

18   in order to get that five -- what's -- do you know what the

19   letter is called?

20   A    5K letter.

21   Q    Now, the 5K letter, that's the letter they send to the

22   judge?

23   A    Yes, sir.

24   Q    And it's your hope that you don't do any more time in

25   jail; right?

1    A    Yes.

2    Q    You want this to be behind you; am I correct?

3    A    Yes, sir.

4    Q    And you are going to do what's necessary to make sure

5    that happens; am I correct?

6    A    I'm going to do the right thing.

7    Q    Oh, the right thing.

8         According to you, the right thing is telling the

9    truth in accordance to what the Government finds the truth to

10   be; am I correct?

11              MS. GEDDES:  Objection.

12              THE COURT:  Sustained.

13   BY MR. CANNICK:

14   Q    Now, I asked you a short while ago about what you told

15   the Government about why you were seeking to bribe someone.

16        Do you remember me asking that?

17   A    Yes, sir.

18   Q    And I said what -- you told the Government that you were

19   trying to help this person by bribing them -- offering them a

20   bribe -- and you told me, no, that was not the case.

21   A    Not the case.

22   Q    Did you tell me that?

23   A    Not the case.

24   Q    Okay.  You told us that you had certain interviews with

25   the Government --

1  A    Yes.

2  Q    -- before coming to give testimony here?

3  A    Yes.

4  Q    Do you recall telling the Government --

5           THE COURT:  What page are you referring to?

6           MR. CANNICK:  Page 3 of 8.

7           MS. GEDDES:  Excuse me?

8           MR. CANNICK:  Three of eight.

9           THE COURT:  Of what, though?

10           MR. CANNICK:  Yeah, I can only tell you 8.

11           MS. GEDDES:  500-8.

12           MR. CANNICK:  500-8.

13           THE COURT:  Okay.  Go ahead.

14           MR. CANNICK:  I think you may be --

15  BY MR. CANNICK:

16  Q    You told the agent that at the time of the conversation

17  with this person, you were just trying to help the person out

18  and was trying to stop -- well, the first part is you were

19  just trying to help the person.  Remember?  Remember telling

20  the Government that now?

21  A    Yes.

22  Q    You weren't trying to help the person out, were you?

23  A    I was trying to help myself.

24  Q    Yeah, you were trying -- so you lied to the Government.

25           MS. GEDDES:  Objection.

 1          THE COURT:  Overruled.  Overruled.

 2          Were you telling truth or lying when you said that?

 3   A    Sorry, can you reask the question?

 4   Q    You weren't lying to the Government when you say that you

 5   were just trying to help the person out; right?

 6   A    I still was trying to help that person.  Yeah, I was

 7   trying to help myself as well.

 8   Q    Sir, when you told the Government that you were offering

 9   a bribe because you were just trying to help the person, you

10   were lying, weren't you?

11          MS. GEDDES:  Objection.

12          THE COURT:  Overruled.

13   A    I said I was trying to help myself and that person.

14          THE COURT:  How would it help you?

15          THE WITNESS:  I was going to get a certain part of

16   it.

17          THE COURT:  I see.

18          THE WITNESS:  I was going to get a certain part of

19   the money, and I also thought that that person might have some

20   tapes on me as well.

21          THE COURT:  I just didn't hear what he said.  I'm

22   sorry.

23          Some tapes?

24          THE WITNESS:  I thought that person might have some

25   tapes of the things that happen with me and the defendant.

1           THE COURT:  I see.

2  BY MR. CANNICK:

3  Q    Did you tell the Government that you felt that that

4  person might have some tapes on you?

5  A    Yeah, I told them I was trying to protect myself.

6  Q    No.  My question, sir, is, did you tell the Government

7  that you thought that person might have some tapes on you?

8  A    I'm trying to remember.  I --

9  Q    No, I'll give you your paperwork.

10          You said you're trying to remember whether or not

11  you told the Government that?

12  A    I had a couple interviews with them --

13  Q    You had more than a couple.

14          THE COURT:  Mr. Cannick, you have to let him finish.

15  It's too hard on the court reporter.

16          MR. CANNICK:  I'm sorry.  I'm a little wild.

17          THE COURT:  You can finish your answer.

18  A    I was just saying, I had a couple interviews, and that's

19  very, very nerve-racking.  I might have forgot some of the

20  things I say.

21          MR. CANNICK:  May I approach, Your Honor?

22          THE COURT:  Sure.

23  BY MR. CANNICK:

24  Q    I'm going to show you these documents, and I want you to

25  look through them.

1    MS. GEDDES:  Objection.

2    THE COURT:  Well, why don't you confer with the

3  Government rather than go through -- that looks like quite a

4  number of pages, and I would just like to do this as

5  efficiently as we can.  I don't want to keep you from your

6  cross, but if there's a particular point you want to show him,

7  or if you want to get a stipulation from the Government, or --

8    MR. CANNICK:  I want to show -- he said that --

9    THE COURT:  Go ahead, then, show him.

10 BY MR. CANNICK:

11 Q    Okay.  Look at them.

12   THE COURT:  Is there one or two that would deal with

13 this topic?  The only reason I'm asking is, does he need to

14 look at every single one.

15   MR. CANNICK:  He said he doesn't recall.

16   THE COURT:  Fine.  Go ahead, then.

17   MR. CANNICK:  I want him to look at everything.

18   THE COURT:  Go ahead.  Look through them.

19   MS. GEDDES:  Is there a question, though, for him?

20   MR. CANNICK:  Yes.  I think the question is already

21 there.

22 A    I said I don't remember.

23 Q    Yeah, and that will hopefully help you remember.

24   THE COURT:  The question is, do you remember whether

25 you told anybody from the Government whether or not you had

1    hoped that this person might have some of the tapes of the

2    sexual encounters between you and the defendant?  Do you know

3    whether or not you told anyone that?

4              THE WITNESS:  I believe I did.

5              THE COURT:  Okay.  What Mr. Cannick is asking you to

6    do is to go through that stack of papers and see if there's

7    anywhere in there that shows you that you said that, but if

8    there's --

9              MR. CANNICK:  Maybe I can speak with the Government.

10             THE COURT:  Let's do that.

11             (Pause.)

12             MR. CANNICK:  The Government will stipulate that

13   it's not there.

14             THE COURT:  Okay.

15             So now you don't have to look through those papers.

16             THE WITNESS:  Thank you.

17   BY MR. CANNICK:

18   Q    Now, you testified and told us that -- withdrawn.

19             How much money did you tell the person that you

20   would work to try to get?

21   A    I think the first number I threw out was like 200,000.

22   Q    Was it 200,000 or was it 2 million?

23   A    She -- she asked for 2 million.

24   Q    She asked for 2 million.

25             And you were hoping to get some of the 200,000; am I

1   correct?

2   A    Yes.

3   Q    Who were you hoping to get that from?

4   A    The individual.

5   Q    When you say the individual, who are you talking about?

6        THE COURT:  Are you talking about the person who you

7   were --

8        THE WITNESS:  No, that I was bribing.

9   BY MR. CANNICK:

10  Q    So you were hoping to get it from the person you were

11  bribing.

12  A    Yes.

13  Q    So you were hoping to get a kickback?

14  A    Yes.

15  Q    You had not had any discussions with Robert Kelly about

16  any of this; am I correct?

17  A    Correct.

18  Q    He doesn't know anything about you were doing that; am I

19  correct?

20  A    Correct.

21  Q    Now, you had another scheme going on, am I correct,

22  regarding a book deal?

23  A    About a book deal?

24  Q    Yeah.

25  A    A scheme?

1   Q     Yeah.

2   A     I know we had talks about a book deal.

3   Q     Who were you having the talks about the book deal with?

4               MS. GEDDES:  One moment.

5               THE COURT:  Maybe move on to a different area.

6   BY MR. CANNICK:

7   Q     You tried to set up a book deal where you would get

8   20 percent of the book deal?

9   A     Yes.

10  Q     Okay.  And this was all after Robert was in jail; am I

11  correct?

12  A     Yes.

13  Q     The bribery?

14  A     Yes.

15  Q     And the book deal?

16  A     Yes.

17  Q     He had nothing to do with the book deal, as far as you

18  know; right?

19              THE COURT:  Can I see counsel at the side with the

20  court reporter?

21              (Sealed Sidebar.)

22              (Continued on next page.)

23

24

25

*Sealed Sidebar*                                                    1903

1          (Sealed Sidebar conference held on the record out of
2     the hearing of the jury.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23     (Sealed Sidebar end.)
24     (Continued on following page.)
25



1          (In open court.)

2          THE COURT:  You're withdrawing that last question?

3          MR. CANNICK:  Yeah.

4   BY MR. CANNICK:

5   Q    Now, you testified and told us about your being arrested

6   on a bribery here; am I correct?

7   A    Yes, sir.

8   Q    Now, when you were arrested on the charges, were you

9   incarcerated after being arrested?

10  A    No.

11  Q    You were not -- you were never incarcerated?

12  A    No.

13  Q    Never -- never went inside the jail?

14  A    Oh, I did, yeah.  When you say "incarcerated," I thought

15  you mean sentenced.

16  Q    No.

17          When you were incarcerated after your arrest, you

18  were incarcerated for how long of a period?

19  A    Maybe a couple hours.

20  Q    Couple of hours.

21          And then you were released?

22  A    Yes, sir.

23  Q    And did you start cooperating on the date of your arrest?

24  A    Yes.

25  Q    And that cooperation pretty much got you a bail.

1    A    I don't know.

2    Q    But you got a bail.

3    A    Yes, sir.

4    Q    And you never went into a federal facility.

5    A    Yes, I was in the facility.

6    Q    You were in a facility for about two hours; right?

7    A    I believe so, yes.

8    Q    Never spent a night in there.

9    A    No.

10    Q    But you're facing 15 years.

11    A    Yes.

12    Q    And you are hoping that you won't see 15 minutes of jail;

13    am I correct?

14    A    That's my prayer.

15    Q    That's your prayer.

16             Now, you testified earlier on direct examination

17    that there was a time that you went to visit Robert, and

18    Robert was the person who came and let you into the gate

19    because there was no security there.

20    A    Yes.

21    Q    Okay.  Do you remember in another interview with the

22    Government -- three of ten -- you told them that Candy, who

23    worked for security for Kelly, was at the gate?

24    A    I told them that she -- she normally always at the gate.

25    Q    In that meeting, that conversation you had with the

1   Government on that particular date regarding this supposed

2   encounter that you had with Robert, you told them that Candy,

3   who works security for Kelly, was at the gate.  Normally,

4   Candy would be the one to get in touch with Kelly and then

5   open the gate; however, Kelly was the one who opened the gate

6   for you on this occasion.

7           So, here, in that meeting with the Government, you

8   told them that Candy was, in fact, at the gate that day.

9           MS. GEDDES:  Objection.

10          THE COURT:  Overruled.

11  BY MR. CANNICK:

12  Q    You don't remember that?

13  A    I said that she's at the gate.  She normally always opens

14  the gate, that's correct, but she did not open the gate on

15  that day.

16  Q    In your testimony earlier to the jury, you told them that

17  no one is at the gate, you call Robert, and Robert came and

18  Robert was the person who opened up the gate.

19          Do you remember telling us that?

20  A    Yes.  On that date.  On that date.

21  Q    But my question to you is, do you recall telling the

22  Government during an interview that Candy, who works security

23  for Kelly, was at the gate?

24          MS. GEDDES:  Objection.

25          THE COURT:  Overruled.

1        Is that what you said; that she was at the gate, and

2  then she let you in?

3             THE WITNESS:  No, she was not at the gate.

4             MR. CANNICK:  I'm going to show him --

5             THE COURT:  Can you just tell me what page?

6             MR. CANNICK:  Three of 10.

7             THE COURT:  Okay.

8             MR. CANNICK:  Thirty-five.

9             MS. GEDDES:  It's 3500, Exhibit Number 9 --

10            THE COURT:  Okay.

11            MS. GEDDES:  -- page 3.

12  BY MR. CANNICK:

13  Q    I direct your attention to the highlighted portion.  I

14  will point it to you to speed it up.

15  A    I said:  Normally Candy would.  It says:  Normally Candy

16  would.

17  Q    Just correct me if I'm reading this incorrectly, okay?

18        Candy, who works security for Kelly, was at the

19  gate.

20  A    That must --

21  Q    I read that correctly, didn't I?

22  A    When it says "normally," is when normally would get in

23  touch with him.

24  Q    Yeah, but you say here that she was at the gate.

25            MS. GEDDES:  Objection.

1    A     She was not at the gate.

2          THE COURT:  Whatever the objection is, it's

3    overruled.

4    BY MR. CANNICK:

5    Q    Now, you testified and told us that this encounter at the

6    McDonald's where Robert inquired about a certain young lady,

7    you said Robert gave you two pieces of paper.

8          Do you remember telling us that?

9    A     Yes.

10         THE COURT:  Mr. Cannick, I'm sorry to interrupt.  I

11   don't know how much longer you have, but we have a break

12   coming up whenever is a convenient time.

13         MR. CANNICK:  This would be a convenient time.

14         THE COURT:  Convenient time, okay.

15         So, ladies and gentlemen, we are going to take our

16   break.  Please don't talk about the case.  I will see you in a

17   few minutes.

18         THE COURTROOM DEPUTY:  All rise.

19         (Jury exits.)

20         THE COURT:  Okay.  Everybody can sit down.

21         You can take the witness out.

22         (Witness steps down.)

23         THE COURT:  Okay.

24         Anything before we break?

25         MR. CANNICK:  No, not from me.

1            THE COURT:  Okay.  So we'll see you in a few

2    minutes.

3            (A recess in the proceedings was taken.)

4            (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    Proceedings                    1910
```

1              (In open court; jury not present.)

2              (Parties present.)

3              THE CLERK:  All rise.

4              THE COURT:  Everybody can sit down.

5         So are we ready for the witness?

6              MR. FARINELLA:  Yes.

7              THE COURT:  Let's get the witness.

8              (Witness enters the courtroom. )

9              THE COURT:  All right.  And let's get the jury.

10             You can sit down until they come in.  It takes a few

11   minutes.

12             THE WITNESS:  Thank you.

13             (Pause.)

14             THE CLERK:  All rise.

15             (Jury enters the courtroom.)

16             THE CLERK:  You may be seated.

17             THE COURT:  All right, folks.  We are ready to

18   resume with the cross-examination by Mr. Cannick.

19        Go ahead.

20             MR. CANNICK:  Yes.  Thank you, Your Honor.

21             THE CLERK:  The witness is reminded he's still under

22   oath.

23             THE WITNESS:  Yes, ma'am.

24   CROSS-EXAMINATION

25   BY MR. CANNICK: (Continuing)

1   Q    Now, you testified and told us that normally Candy or

2   some other security officer would be at the gate whenever you

3   went to Robert's home?

4   A    Like I said previous, I said normally she would be at the

5   gate.

6   Q    Well, the question is a little different this time.

7        When you would go to his home, there would be

8   security at the gate?

9   A    Yes.

10  Q    And the security, they would take your I.D., would they

11  not?

12  A    No.

13  Q    They never took your I.D.?

14  A    No.

15  Q    Never asked you for your I.D.?

16  A    No.

17  Q    Even the first time you went there?

18  A    No.

19  Q    And the first time you went there, according to you, you

20  went with your mother and your stepfather?

21  A    Correct.

22  Q    Okay.  Do you know whether or not they took their --

23  whether or not they gave the security I.D.?

24  A    I don't believe so.

25  Q    Now, what about a nondisclosure agreement, you never

1   signed one of those either?

2   A    I believe so.

3   Q    You believe that you signed a nondisclosure agreement,

4   but you never gave them your I.D.?

5   A    No.

6   Q    When was it that you believe that you signed the

7   nondisclosure agreement?

8   A    I'm sorry, what was that?

9   Q    When was it that you believe that you signed a

10  nondisclosure agreement?

11  A    When I went to that first party.

12  Q    Okay.  And the second time you went there, you didn't

13  sign a nondisclosure, nor did you give I.D.?

14  A    No.

15  Q    But Candy or some other person from security was at the

16  gate, am I correct?

17  A    Correct.

18  Q    Now, when you went there the first time, you testified

19  and told the jury that the -- it was in the Christmas season?

20  A    Yes.

21  Q    And you saw a huge Christmas tree?

22  A    Correct.

23  Q    And that it was cold?

24  A    It was cold out, yes.

25  Q    And you recall the Christmas tree though, right?

1   A    Yes.

2   Q    Now, when you first met Robert, according to you, you

3   were 16 years old?

4   A    I believe about 17.

5   Q    You believe you were 17?

6   A    Yes.

7   Q    Okay.  Isn't it a fact that you told the government that

8   when you had one of those meetings with him that you were 14?

9   A    I was getting the date -- as the time went on, I got the

10  dates correct.

11  Q    So the answer to my question is yes?

12  A    Not for sure.

13  Q    Not for sure.

14        So you don't -- as you sit here today under oath,

15  you have no recollection as to if you told the government

16  during one of those meetings that you were 14, at the first --

17  in the first meeting with Robert?

18  A    No, I just remember trying to get the age right and the

19  timing right.

20  Q    Do you have a recollection of telling them on one

21  occasion that you were 16 and on another occasion that you

22  were 14?

23  A    It's possible.

24  Q    It's possible.

25        Did the government tell you at that meeting that if

Louis - Cross - Cannick                    1914

1  you were to make a false statement to them, that's a federal

2  offense?

3  A    Yes.

4  Q    Now, what was the young lady's name that you said that

5  worked with you at McDonald's?

6  A    Dominique.

7  Q    The one that Robert was trying to get you to hook him up

8  with.

9  A    Oh, what was the lady name from the first time I met?

10  Q    Yes.

11  A    Valerie.

12  Q    Valerie?

13       Do you recall telling the government that the lady's

14  name was Violet?

15  A    Probably.

16  Q    Probably.

17       It doesn't matter to you what you told them, right?

18       MS. GEDDES:  Objection.

19       THE COURT:  Sustained.

20  Q    Well, you will acknowledge that Valerie and Violet are

21  two separate names, two different names, right?

22  A    Correct.

23  Q    As you sit here today, do you have an independent

24  recollection as to what name you told them?

25  A    On which occasion?

1   Q     That's a good question.  I will show you.

2           Isn't it a fact that --

3           MR. CANNICK:  Page 206.

4           MS. GEDDES:  Which number is it?

5           MR. CANNICK:  206.

6   Q     Isn't it a fact that you told the government during one

7   of those meetings that he asked you if you could get Violet's

8   number for him?  That's what you told the government, right?

9   A     That's correct.  That's what's on this paper.

10  Q     And you made the Valerie up when you came here today, am

11  I correct?

12          MS. GEDDES:  Objection.

13          THE COURT:  He did what?  He made it up?  Is that

14  the question is?

15          MR. CANNICK:  Yes.

16          THE COURT:  Did you make that up when you said

17  Valerie?

18          THE WITNESS:  No.

19  Q     Where did you get the name from?

20  A     As I said, the more we talk about it, the more everything

21  is coming back to me.

22  Q     Now, you told the government at some point in time that

23  Mr. Kelly -- withdrawn.

24          What's your date of birth?

25  A     February 11, 1989.

Louis - Cross - Cannick                    1916

1    Q     February 11, 1989.

2          You told the government that when you were about 17

3    or 18 years old, that Kelly recorded you in one of those

4    encounters that you told us about on an iPad.  Do you remember

5    telling us that -- telling the government that?

6    A     Yes.

7    Q     Now, when you were 17 years old, that would have been in

8    2006, am I correct?

9    A     Correct.

10   Q     And if you were 18 years old, it would be 2007, am I

11   correct?

12   A     Correct.

13   Q     And you told the government that when you were one of

14   those ages, Kelly recorded you on an iPad in the sexual

15   encounter?

16   A     Correct.

17   Q     Are you aware that the iPad was not released until 2010?

18   A     Are you saying that I said it happened in that period of

19   time or -- you said one of the encounters.  It happened on one

20   of the encounters.  It had to happen in 2007 or 2006.

21   Q     Isn't it a fact that you told the government that as you

22   got older and was 17, 18, Kelly recorded you on iPads at 17

23   and 18?

24   A     I remember at the beginning it was on the camera and then

25   eventually iPads.

1  Q    No, that's not my question.

2        My question is, isn't it a fact that you told the

3  government that when you were 17 and 18, Kelly recorded you on

4  an iPad, on iPads at that time?

5  A    Not for sure.

6  Q    Well, see if this refreshes your recollection.

7        Where my thumb is, just read there and see if it

8  refreshes your recollection that you told the government that

9  when you were 17 and 18 years old, Kelly recorded you on iPads

10  in sexual encounters.

11  A    I see it.

12  Q    You see it.

13        It's written there, right?

14  A    Yes, sir.

15  Q    And again, when the government told you that it's a lie

16  to make a false statement to a government official, your

17  attorney was there, am I correct?

18        THE COURT:  I think you mean it was a crime to make

19  a false statement.

20        MR. CANNICK:  Oh, I'm sorry, Your Honor.

21        THE COURT:  Do you understand the question?

22  A    Can you rephrase it?

23  Q    When the government told you, during those sessions that

24  you met with them, that you had to be truthful because it was

25  a crime to tell a lie to a federal official, your attorney was

1    there, right?

2    A    He wasn't there the first time I got locked up and they

3    asked me questions.

4    Q    Was he there the second time?

5    A    I believe so, yeah.

6    Q    And the first time you were there, there was no lawyer

7    with you?

8    A    No.

9              MS. GEDDES:  Objection.

10             THE COURT:  Overruled.  I mean, he said no.

11             Next question.

12   Q    But the government did tell you that you had to be

13   truthful to them, am I correct?

14   A    Yes.

15   Q    Now, you were asked a short while ago about if Kelly did

16   anything whatsoever to help your musical career.  Do you

17   remember that, being asked that question?

18   A    Yes, sir.

19   Q    Now, you testified and told us that there came a point in

20   time that you went to Kelly's home and he had some beats for

21   you, am I correct?

22   A    Yes, he played a beat.

23   Q    And you performed the beat?

24   A    He had me record on that beat.

25   Q    Right.

Louis - Cross - Cannick                          1919

1          And afterwards he told you that you need to learn

2    how to sing and rap, did he not?

3    A    Yes.

4    Q    And you told the government that, right?

5    A    Yes.

6    Q    Now, after -- how long have you been at your music

7    career?

8    A    Since I'm about 15, 16.

9    Q    Have you recorded a song?

10   A    Yes.

11   Q    What's the name of the song?

12   A    New songs?  Old songs?

13   Q    Any song.

14   A    Any song?

15   Q    Yes, that you've recorded.

16   A    Do the Dash.

17   Q    Do the Dash?

18   A    Yes, sir.

19   Q    And is that something that someone can buy or is that

20   just something you recorded on a tape?

21   A    You can buy it.

22   Q    You can buy it?  Okay.  Under what name?

23          MS. GEDDES:  Objection.

24          THE COURT:  Let's not do that.

25   Q    Did you have a recording company that you were working

Louis - Cross - Cannick                    1920

1   with?

2   A    No, just producers.

3   Q    Who is the producer?

4   A    I don't -- I don't remember.

5   Q    So you made a song, you had a producer, but you don't

6   remember the name of the producer?

7   A    You're talking recent producer?

8   Q    Do the Dash, who is the producer?

9   A    Is it okay to call people's names out?

10  Q    Who is the producer of Do the Dash?

11            THE COURT:  May I just see the lawyers without the

12  court reporter just for a minute?

13            (Discussion held off the record.)

14            MR. CANNICK:  Almost finished, Your Honor.

15            THE COURT:  Sure.

16  Q    You testified earlier that there was a meeting that

17  Mr. Kelly had at the Trump Towers where you and another

18  individual attended?

19  A    Yes.

20  Q    How old were you when that occurred?

21  A    I'm not sure.

22  Q    Well, wait a minute.  You said it happened in 2018?

23  A    2018, I believe, I believe I said.  When I wrote the

24  letter in the hallway?

25            THE COURT:  Is that the time you are talking about

1    when he wrote the letter in the hallway?

2    Q    Let's go with that one.

3            THE COURT:  Do you remember when that was?

4            THE WITNESS:  It had to be in 2019, sometime at the

5    beginning.

6    Q    2019.

7            You said you're 31 now, right?

8    A    Didn't say --

9            THE COURT:  32, right?

10   Q    32 now.

11           And how many years has passed since 2019?

12   A    Two.

13   Q    Two.

14           You would have been 30 years old, right?

15   A    Yes, sir.

16   Q    And according to you, he called you over, told you that

17   you had to write this letter.  And you're a grown man at that

18   time, am I correct?

19   A    Yes, sir.

20   Q    30 years old?

21   A    Yes, sir.

22   Q    And according to you, you did it?

23   A    Yes, sir.

24   Q    Now, the time that you and this other person that you

25   identified in the photograph earlier had the meeting where he

Louis - Cross - Cannick                    1922

1    was trying to, according to you, repair the relationship

2    between the two of you, how old were you then?

3    A    I'm not sure, sir.

4    Q    Not sure.

5             Do you remember what year that was?

6    A    You want an estimate?

7    Q    What year did it occur?

8    A    I don't remember.

9    Q    And you don't remember how old you were?

10   A    No, sir.

11   Q    But you were a grown man?

12   A    Yes, sir.

13   Q    And basically these encounters that you told us about,

14   they, according to you, happened when you were a grown man,

15   some of them?

16   A    Yes, sir.

17   Q    Now, lastly, you were asked about that you're still

18   pursuing your music career by the government.  Have you had

19   anything released that made any of the charts?

20   A    No, sir.

21   Q    Anything released that received any sale?

22   A    Sales?

23   Q    Yes.

24   A    Yes.

25   Q    Which was that?

1    A    Bare minimum.

2    Q    Beg your pardon?

3    A    Bare minimum.  Like maybe 150.

4    Q    Bare minimum?

5    A    150 streams or something like that.

6    Q    And what's the name of the song?

7              MS. GEDDES:  Objection.

8              THE COURT:  I will sustain it.

9    Q    What year was it released?

10   A    This year.

11   Q    And you had...

12             MR. CANNICK:  Nothing, Your Honor.

13             THE COURT:  Sorry, what did you say?  Oh, you are

14   done?

15             MR. CANNICK:  I was about to ask a question, but I

16   don't need to know.

17             THE COURT:  All right.  Any redirect?

18             MS. GEDDES:  Yes.  Yes, Judge.

19   REDIRECT EXAMINATION

20   BY MS. GEDDES:

21   Q    On cross-examination, you were asked about certain

22   statements contained within a report that defense counsel

23   showed you that referenced Candy.  Do you recall reading that

24   report?

25   A    Yes.

1          MS. GEDDES:  And I am showing the witness only that

2     report, 3500-9, page 3 of 10.

3     Q     And on cross-examination you were asked about your

4     testimony that on that occasion where you met the defendant in

5     that detached garage where that first sexual encounter with

6     the defendant occurred, who was the individual who let you in

7     that day.  Who was the individual who let you in that day?

8     A     Robert Kelly.

9     Q     And normally who was the individual who let you in?

10    A     Candy.

11    Q     The security guard?

12    A     Yes.

13    Q     And directing your attention to page 3 of 10, does it say

14    normally Candy would let you in, however, on this occasion

15    Kelly was the one who let you in?

16    A     Yes.

17    Q     Just as you testified?

18    A     Yes.

19    Q     You were asked about the -- your participation in that

20    bribery that led to your arrest.  Do you recall those

21    questions?

22    A     Yes.

23    Q     Were your telephone -- were your -- how did you

24    communicate with the individual who -- the potential witness

25    that you offered money to?

Louis - Redirect - Geddes                    1925

1    A     On the phone.

2    Q     And did you understand that those phone conversations

3    were all recorded?

4    A     Can you ask that one more time?  I'm sorry.

5    Q     Sure.

6           Did you understand -- at the time when you had the

7    phone conversations, did you know those conversations were

8    being recorded?

9    A     No.

10   Q     Did you later learn that the government was recording

11   each of those conversations?

12   A     Yes.

13   Q     And that the individual that you offered money to was

14   cooperating with the government when you offered money to her?

15   A     Yes.

16   Q     On cross-examination you were asked about a book deal.

17   Do you recall those questions?

18   A     Yeah.

19   Q     That wasn't a book deal for yourself, correct?

20   A     Correct.

21   Q     You weren't going to publicly disclose what the defendant

22   did to you when you were 17 years old in that book deal, were

23   you?

24   A     Correct.

25   Q     You were asked on cross-examination about the particular

Louis - Redirect - Geddes                    1926

1    device that was used to record sexual encounters between you

2    and the defendant.  Do you recall those questions?

3    A    Yes.

4    Q    And how long did you -- have you known defendant?

5    A    I believe 15, 16 years.

6    Q    And did he use different devices over those 15, 16 years

7    to record sexual encounters with them?

8    A    Yes.

9    Q    And what types of devices did he use?

10   A    Camcorder or iPad.

11   Q    And do you recall the particular date on which he used a

12   camcorder or an iPad?

13   A    No.

14   Q    Fair to say you just remember that they were recorded?

15   A    Yes.

16   Q    And do you recall the order in which he used those two

17   devices, the camcorder and then the iPad?

18   A    I just know the camcorder, that period came before the

19   iPad.

20   Q    Which one was first?

21        THE COURT:  You have to just keep your voice up.

22   A    The camcorder came before the iPad came.

23   Q    So first he used the camcorder and then later on he used

24   the iPad?

25   A    Correct.

Louis - Redirect - Geddes                    1927

1   Q    You were asked on cross-examination about the individual

2   at the McDonald's who the defendant wanted you to put in

3   contact when you first met him there.  Do you recall those

4   questions?

5   A    Yes.

6   Q    Who was the individual that you recall the defendant

7   wanting to meet that day?

8   A    Valerie.

9   Q    And do you remember her last name?

10  A    No.

11  Q    And what do you remember about her?

12  A    I just remember she was my manager at the time.

13  Q    And aside from her name, which you recall as Valerie, do

14  you remember anything else?

15  A    Just a Hispanic beautiful young lady.

16  Q    Fair to say, though, you don't remember much about her

17  other than the fact that she was your manager?

18  A    Yes.

19  Q    You were asked on cross-examination about whether you

20  understood that it was a crime to lie to the government.  Do

21  you recall those questions?

22  A    Yes.

23  Q    Do you also understand it's not a crime to make a mistake

24  with the government?

25  A    Yes.

Louis - Redirect - Geddes                1928

1      MR. CANNICK:  Objection.

2      THE COURT:  Overruled.

3  Q    You were asked on cross-examination about statements you

4  made about the age in which you met the defendant.  Do you

5  recall those questions?

6  A    Yes.

7  Q    And were you expected to -- were you expecting to get

8  arrested on the day that you were arrested in this case?

9  A    No.

10      MR. CANNICK:  Objection.

11      THE COURT:  Overruled.

12  Q    And had you prepared for the fact that you might get

13  arrested and you might be asked about your relationship with

14  the defendant prior to that day?

15  A    No.

16  Q    And when you were asked or when you told the government,

17  the agent who arrested you, about when you first met the

18  defendant, did you remember that you met him in high school?

19  A    Yes.

20  Q    Did you remember the particular year in high school?

21  A    No.

22  Q    And over the course -- you spoke with the government on

23  multiple occasions, correct?

24  A    Correct.

25  Q    And during the course of those conversations, how was it

1  that you were able to determine that you met him when you were

2  a senior in high school?

3  A    Because I remember showing my friends in my senior year

4  of high school the picture of him, in class, in my DECA class.

5  Q    And you mentioned a DECA class.  What is DECA?

6  A    It's a job program where you get released early from

7  school so you can go to work.

8  Q    And what year did you take that DECA class?

9  A    My senior year.

10  Q    And did that help you to identify the point in time when

11  you first met the defendant?

12  A    Yes.

13  Q    You were asked on cross-examination about the -- the fact

14  that you offered money to a prospective witness.  Do you

15  recall those questions?

16  A    Yes.

17  Q    And you testified on direct that the defendant had no

18  participation in that, correct?

19  A    Correct.

20  Q    You weren't going to pay -- if the witness had agreed to

21  accept money, you weren't going to pay that money, were you?

22  A    No.

23  Q    And were you going to get -- were you hoping to get it

24  from somebody else?

25  A    Yes.

Louis - Cross - Cannick                    1930

1   Q    Prior to your arrest in this case, who, if anyone, had

2   you told about what happened between you and the defendant

3   when you were 17 years old?

4   A    No one.

5   Q    Had you told your wife?

6   A    No.

7   Q    Had you told your friends?

8   A    No.

9   Q    Is this easy for you to discuss here today?

10  A    No.

11  Q    Why not?

12  A    Just going to be looked at different.

13  Q    What do you mean by that?

14  A    People might think I'm bisexual.

15  Q    And prior to your testimony today, had you talked with

16  anybody, aside from the people we just talked about, about

17  your having a sexual relationship with another man?

18  A    Yes.

19  Q    Who is that?

20  A    My wife.

21  Q    But before your -- before you started cooperating, had

22  you had that discussion?

23  A    Oh.  No.

24  Q    Okay.  So prior to your arrest, had you had that

25  discussion about having a sexual relationship with a man with

Louis - Cross - Cannick                    1931

1    anyone else?

2    A    No.

3              MS. GEDDES:  Nothing further.

4              THE COURT:  Any recross?

5              MR. CANNICK:  Yes, briefly, Your Honor.

6    RECROSS-EXAMINATION

7    BY MR. CANNICK:

8    Q    The government just went over your statement that you

9    made to them in one of your proffer sessions.  Isn't it a fact

10   that you told the agent and the prosecutors who were in that

11   room that day Candy, who worked security for Kelly, was at the

12   gate?

13   A    Like I said, I said normally she did the gate.

14   Q    I am going to ask you to read and stop at the first

15   sentence.  Read where it says Candy and stop at the end of the

16   first sentence.

17   A    "Candy, who works security for Kelly, was at the gate."

18   Q    Read it again.  And loud this time.

19   A    "Candy, who worked security for Kelly, was at the gate."

20   Q    "Candy, who worked security for Kelly, was at the gate."

21   That's what you told them, right?

22   A    That's what this paper say.

23   Q    Well, you were the one who was giving the information,

24   were you not?

25             MS. GEDDES:  Objection.

1    A    I said normally afterwards.

2    Q    Okay.

3    A    Thank you, sir.

4    Q    Before you said normally, you said she was at the gate?

5    A    If I'm correct, I said normally.

6              MR. CANNICK:  Your Honor, I'm going to offer this

7    into evidence.

8              THE COURT:  Well, I do not think you can just offer

9    that.  Why don't you get the relevant portion?

10             MR. CANNICK:  Okay.

11             THE COURT:  We can talk about that in a little

12   while.

13             MR. CANNICK:  Sure.

14             THE COURT:  Do you have any further questions for

15   this witness?

16             MR. CANNICK:  Yes, I do have a few more.

17             THE COURT:  Okay.

18   Q    And you were asked a short while ago about the devices

19   that were used.  You were the one who told the government that

20   Kelly used iPads when you were 17 or 18, am I correct?

21   A    I don't remember the dates, but it was a camcorder used

22   and an iPad.

23   Q    Isn't it a fact that you told the government that as you

24   got older and was 17 or 18, Kelly recorded you on iPads?

25   Isn't that what you told government in one of the proffer

Louis - Cross - Cannick                    1933

1   sessions?

2   A    Yes.

3   Q    Now, the government just asked you a short while ago if

4   you were aware that the calls that you were making to the

5   person you were trying to bribe, if you were aware that those

6   calls were recorded.  You were not aware of that, am I

7   correct?

8   A    Correct.

9              (Continuing on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Louis - Cross - Cannick                    1934

1    CROSS-EXAMINATION

2    BY MR. CANNICK:  (Continuing)

3    Q    Because you would not dare to try to offer a bribe if

4    you knew the calls were recorded, am I correct?

5    A    Correct.

6    Q    In fact, you were shocked when you heard that, am I

7    correct?

8    A    Correct.

9    Q    But you knew that you were committing a crime when you

10   were doing it, am I correct?

11   A    Correct.

12   Q    And you were committing that crime to try to benefit

13   yourself, am I correct?

14   A    Correct.

15         MR. CANNICK:  Your Honor, I think --

16   Q    The person who gave the Government the name of the young

17   lady who Kelly asked you to hook him up with, you were that

18   person, am I correct?

19   A    Yes.

20   Q    And you were the one who told the Government that the

21   person's name was Violet, am I correct?

22   A    Yes.

23         MR. CANNICK:  If I can get an agreement with the

24   Government on something?

25         THE COURT:  Do we have to do this now?  I want to

1  finish with the witness, then figure out what we can get an

2  agreement on.

3          MR. CANNICK:  We can do that, Judge.

4          I'm done with this witness.

5          THE COURT:  Anything else?

6          MS. GEDDES:  No, Judge.

7          THE COURT:  The witness will step down.  Thank you

8  so much.

9          THE WITNESS:  Thank you, your Honor.

10          (Whereupon, the witness was excused.)

11          THE COURT:  Are you ready to call your next witness?

12          MS. CRUZ MELENDEZ:  We are, your Honor.

13          The Government calls Suzette Mayweather.

14          (Witness takes the witness stand.)

15          THE COURTROOM DEPUTY:  Please raise your right hand.

16          (Witness sworn.)

17          THE WITNESS:  I do.

18          SUZETTE MAYWEATHER, called as a witness, having been

19  first duly sworn/affirmed, was examined and testified as

20  follows:

21          THE COURT:  You can take your mask off.  Just a few

22  things before we start.  The first thing is, please don't

23  speak too quickly or talk over whichever lawyer is asking you

24  questions.  Our court reporters are taking down everything you

25  say and it's easier for them if you speak slowly and you wait

Mayweather - Direct - Cruz Melendez                1936

1  until the lawyer finishes asking you questions.  If there is a

2  question that you don't understand or you want to have it

3  repeated, let me know I'll have the lawyer change the question

4  or rephrase it.  And just do your best to answer the specific

5  question that you're being asked.  Okay?

6            THE WITNESS:  Okay.

7            THE COURT:  Go ahead.

8  DIRECT EXAMINATION

9  BY MS. CRUZ MELENDEZ:

10  Q    Ms. Mayweather, where did you grow up?

11  A    In Houston.

12  Q    Do you have any siblings?

13  A    I do.

14  Q    How many siblings do you have?

15  A    Three.

16            THE COURT:  Keep your voice up.  Three.

17  Q    Do you have any nicknames?

18  A    Yes.

19  Q    And what is your nickname?

20  A    Twin.

21  Q    Why is your nickname twin?

22  A    I have a twin sister.

23  Q    What is your twin sister's name?

24  A    Alesiette.

25  Q    Does she share the same last name as you?

Mayweather - Direct - Cruz Melendez          1937

1   A    Yes.

2   Q    I'm showing what is in evidence as Government's Exhibit

3   39.  Do you recognize the individual in Government's Exhibit

4   39?

5   A    Yes.

6   Q    Who is that?

7   A    My sister.

8   Q    Alesiette?

9   A    Yes.

10  Q    And you mentioned you were twins, correct?

11  A    Yes.

12  Q    What kind of twins are you?

13  A    Identical.

14  Q    Ms. Mayweather, how far did you go in school?

15  A    College.

16  Q    What did you study in school?

17  A    Biology.

18  Q    Did you graduate from college?

19  A    Yes.

20  Q    Are you employed?

21  A    Yes.

22  Q    Have you ever worked in the entertainment business?

23  A    Yes.

24  Q    What kind of work have you done in the entertainment

25  business?

Mayweather - Direct - Cruz Melendez          1938

1   A    Management, consulting, promotions, personal assistant,
2   logistics.
3   Q    I'm showing what is in evidence as Government's Exhibit
4   1.  Ms. Mayweather, do you recognize the individual in
5   Government's Exhibit 1?
6   A    Yes.
7   Q    Who is that?
8   A    Rob.
9   Q    Do you know Rob's last name?
10  A    Kelly.
11  Q    Do you see -- have you met Rob Kelly in person before?
12  A    Yes.
13  Q    Do you see him in the courtroom today?
14  A    Yes.
15  Q    Can you point him out and identify an item of clothing
16  that he's wearing?
17  A    Yes, blue suit.
18            THE COURT:  Indicating the defendant.
19  Q    Approximately when did you first meet the defendant?
20  A    Early 90s, like late 90s.
21  Q    How did you first come to meet the defendant?
22  A    Through mutual friends, band members, at a concert.
23  Q    Whose band members?
24  A    Rob's.
25  Q    The defendant's?

Mayweather - Direct - Cruz Melendez                1939

1    A    Yes.

2    Q    Where were you when you first met the defendant?

3    A    That I recall, London.

4    Q    Why were you in London?

5    A    For the show, the concert.

6    Q    Who's show?

7    A    Rob's.

8    Q    Did you attend the defendant's concert?

9    A    Yes.

10   Q    Prior to meeting the defendant, had you attended any

11   concerts of the defendant before that?

12   A    Maybe stateside before London, I don't recall.

13   Q    Would you consider yourself a fan of the defendant's at

14   that time?

15   A    At that time, no.

16   Q    After seeing the defendant in London, did you see him

17   again?

18   A    Yes.

19   Q    Where do you recall next seeing the defendant?

20   A    Other shows.

21   Q    Shows of the defendant's?

22   A    Yes.

23   Q    At some point did you begin to see the defendant outside

24   of his concerts?

25   A    Yes.

Mayweather - Direct - Cruz Melendez          1940

1   Q    In what capacity would you see the defendant?

2   A    Friend.

3   Q    Where would you see the defendant?

4   A    It could be a show, it could be after the show, it could

5   be at a restaurant.

6   Q    Did you ever go to the defendant's home?

7   A    Yes.

8   Q    Where was the defendant living when you went to his home?

9   A    In Olympia Fields.

10  Q    Where is Olympia Fields?

11  A    It's in Chicago, outside of Chicago.

12  Q    Do you recall the first time you visited the defendant's

13  home?

14  A    Yes.

15  Q    What was the reason for visiting his home?

16  A    A friend passed away that worked for him.

17  Q    Do you recall the friend's name?

18  A    We called him Janky.

19  Q    What, if anything, did he do for the defendant?

20  A    He was his videographer.

21  Q    Who, if anyone, do you recall meeting at this event?

22  A    That I still associate with, would be Bubba and Jabba

23  Q    Do you know Bubba -- is Bubba a nickname?

24  A    Yes.

25  Q    Do you know Bubba's real name?

Mayweather - Direct - Cruz Melendez          1941

1   A    Jermaine.

2   Q    What is his full name?

3   A    Maxey, Jermaine Maxey.

4   Q    You mentioned Jabba, is that a nickname?

5   A    Yes.

6   Q    Do you know Jabba's real name?

7   A    Elijah Maxey.

8   Q    Any relation between Elijah Maxey and Jermaine Maxey?

9   A    Yes.

10  Q    What is that relation?

11  A    Brothers.

12  Q    Do you recall meeting anyone else at the defendant's home

13  at that event?

14  A    No.

15  Q    After that event at the defendant's home in Olympia

16  Fields, did you continue to see the defendant after that?

17  A    Yes.

18  Q    How would you describe your relationship with the

19  defendant?

20  A    Friends, Rob is like a brother.

21  Q    Over time as you developed your friendship with the

22  defendant, did you ever travel to see him in concert?

23  A    Yes.

24  Q    And did you ever travel with the defendant while he was

25  on tour?

Mayweather - Direct - Cruz Melendez          1942

1    A     While working with him or before?

2    Q     During your friendship with the defendant.

3    A     Yes.

4    Q     So you mentioned working with the defendant.  At some

5    point did you begin working with the defendant?

6    A     Yes.

7    Q     And approximately when did you start working for the

8    defendant?

9    A     Around October 2015.

10   Q     What kind of an arrangement did you have with the

11   defendant?

12   A     As far as work?

13   Q     Yes.

14   A     Personal assistant.

15   Q     Did you have a particular schedule when you were working

16   with the defendant?

17   A     Yes.

18   Q     What schedule was that?

19   A     Two weeks on, two weeks off.

20   Q     You mentioned that you were two weeks on two weeks off.

21   Did he have a personal assistant who would be working with him

22   while you were on your two weeks off?

23   A     Yes.

24   Q     Who was that?

25   A     My sister, Alesiette.

1   Q    So at the time that you started working for the defendant

2   in approximately October 2015, was your twin sister Alesiette

3   also working for the defendant?

4   A    Yes.

5   Q    Did you ever have any agreements about payment?

6   A    Yes.

7   Q    What agreement was that?

8   A    I think it was $800 weekly.

9   Q    Did you have any agreements with respect to other

10  expenses?

11  A    Yes.

12  Q    What kind of agreement did you have?

13  A    Rob covered travel and hotel.

14  Q    And so when you were working for the defendant, did you

15  in fact travel as part of your work?

16  A    Yes.

17  Q    You testified that you started working in approximately

18  October of 2015 for the defendant.  How long did your working

19  relationship with the defendant last?

20  A    Until around February of 2017.

21  Q    Once you entered into the formal working agreement with

22  the defendant, what were your responsibilities?

23  A    As his personal assistant anything he needed, running

24  errands, shopping, grocery shopping, taking care of laundry.

25  If he had guests that needed to come into town, book a hotel

Mayweather - Direct - Cruz Melendez          1944

1   or book airfare.

2   Q    Did you, in fact, for the defendant when you were working

3   for him make travel arrangements?

4   A    Yes.

5   Q    Who would you make travel arrangements for?

6   A    Friends or some of his friends, female friends, male

7   friends.

8   Q    When you booked travel arrangements for the defendant's

9   friends, including you testified female friends, how you would

10  know who to book travel for?

11  A    He would call me and say I have a guest coming to town

12  and they will be texting you.

13  Q    When you say "he," do you mean the defendant?

14  A    Yes.

15  Q    Were there times that female friends of the defendant

16  called or texted you?

17  A    Text, yes.

18  Q    For the purpose of booking travel?

19  A    Yes.

20  Q    What information would you obtain from the female friend

21  of the defendant when you were booking their travel?

22  A    City that they were traveling from, date that they were

23  traveling, name, and date of birth.

24  Q    Who paid for the defendant's female friend's travel?

25  A    Mr. Kelly.

Mayweather - Direct - Cruz Melendez          1945

1   Q    Who paid for their accommodations if they stayed -- if
2   they were traveling into another city?
3   A    Mr. Kelly.
4   Q    Based on both your friendship with the defendant and your
5   attendance at events involving the defendant and then
6   ultimately your work as his personal assistant, did you meet
7   members of the defendant's circle of friends and his other
8   employees?
9   A    Yes.
10  Q    I'm showing just the witness Government's Exhibit 2,
11  marked for identification purposes.  Do you recognize the
12  individual in Government's Exhibit 2?
13  A    Yes.
14  Q    Who is that?
15  A    Bruce.
16  Q    Who is Bruce's last name?
17  A    Kelly.
18  Q    Have you met Bruce Kelly in person before?
19  A    Yes.
20  Q    Who is Bruce -- does Bruce have a relation to the
21  defendant?
22  A    Yes.
23  Q    What is that relation?
24  A    His brother.
25          MS. CRUZ MELENDEZ:  The Government offers Government

Mayweather - Direct - Cruz Melendez          1946

1    2 into evidence.

2              MR. CANNICK:  No objection.

3              THE COURT:  That's in evidence.  You want to publish

4    it.

5              MS. CRUZ MELENDEZ:  Yes, your Honor.

6              (Government Exhibit 2, was received in evidence.)

7    Q    What, if anything, did Bruce Kelly do for the defendant?

8    A    When I met him he was one of his assistants.

9    Q    I'm showing the witness what is in evidence as

10   Government's Exhibit 3.  Do you recognize this individual?

11   A    Yes.

12   Q    Who is that?

13   A    June Brown.

14   Q    What, if anything, did he do for the defendant?

15   A    Just knew him to be another assistant.

16   Q    Showing the witness what is in evidence as Government's

17   Exhibit 4.  Do you recognize this individual?

18   A    Yes.

19   Q    Who do you recognize this to be?

20   A    George Kelly.

21   Q    Does George Kelly have any relation to the defendant?

22   A    Yes.

23   Q    Who is that relation?

24   A    Uncle.

25   Q    Does he have any nicknames?

Mayweather - Direct - Cruz Melendez          1947

1   A     June Bug.

2   Q     What, if anything, did he do for the defendant?

3   A     Assistant.

4   Q     I'm showing the witness what is in evidence as

5   Government's Exhibit 5.  Do you recognize this individual?

6   A     Yes.

7   Q     Who is that?

8   A     Van.

9   Q     Do you know Van's last name?

10  A     Pullen.

11  Q     What, if anything, did he do for the defendant?

12  A     Van driver and basketball.

13  Q     When do you mean by basketball?

14  A     Rob plays basketball a lot, he would play.

15  Q     So Van would play basketball with the defendant?

16  A     Yes.

17  Q     Showing the witness what is in evidence as Government's

18  Exhibit 8.  Do you recognize this individual?

19  A     Yes.

20  Q     Who is this?

21  A     Blackie.

22  Q     Is Blackie a nickname?

23  A     Yes.

24  Q     Do you know Blackie's real name?

25  A     No.

Mayweather - Direct - Cruz Melendez                1948

1   Q     What, if anything, did Blackie do for the defendant?

2   A     I believe tour manager at one point.

3   Q     We've spoken about a number of individuals in the

4   photographs that I've just spoken with you, and you mentioned

5   some of them were assistants, some were drivers, some were

6   tour manager.  Is it fair to say that they all worked for the

7   defendant?

8   A     Yes.

9   Q     You testified that you worked for the defendant from

10  October 2015 to approximately February of 2017?

11  A     Yes.

12  Q     And you also testified that you had traveled and engaged

13  with the defendant prior to your working with the defendant,

14  correct?

15  A     Yes.

16  Q     Did you see these individuals in their capacity as

17  employees for the defendant during the time prior to your

18  working with the defendant?

19  A     Yes.

20  Q     And also when you were working for the defendant as well?

21  A     Yes, all except for Blackie.

22  Q     Do you recall when it was that you met Blackie?

23  A     Maybe early 2015, I don't recall.

24  Q     I'm showing you what is in evidence as Government's

25  Exhibit 9.  Do you recognize this individual?

Mayweather - Direct - Cruz Melendez                1949

1    A    Yes.

2    Q    Who is that?

3    A    Bubba, Jermaine Maxey.

4    Q    Is that the individual you met at the defendant's house

5    in Olympia Fields?

6    A    Yes.

7    Q    What, if any, relation did Jermaine Maxey have to the

8    defendant?

9    A    They were like really close friends, like brothers.

10   Q    Did he work for the defendant?

11   A    No.

12   Q    I'm showing you what is in evidence as Government's

13   Exhibit 17.  Do you recognize this individual?

14   A    Yes.

15   Q    Who is that?

16   A    Top Gun.

17   Q    Do you know Top Gun's real name?

18   A    Foster, I believe, Lay.

19   Q    What, if anything, did Top Gun do for the defendant?

20   A    He was the tour bus driver.

21   Q    Was he the tour bus driver while you were working for the

22   defendant?

23   A    Yes.

24   Q    What about prior to you're working for the defendant?

25   A    Yes.

Mayweather - Direct - Cruz Melendez          1950

1   Q    Showing the witness that is in evidence as Government's
2   Exhibit 36.  Do you recognize the individual in this
3   photograph?
4   A    Yes.
5   Q    Who is that?
6   A    Diana Copeland.
7   Q    What, if anything, did Diana Copeland do for the
8   defendant?
9   A    Assistant.
10  Q    Was she the defendant's assistant prior to October 2015
11  when you were not working for the defendant?
12  A    Yes.
13  Q    And did she act as the defendant's assistant after you
14  began working for the defendant in October of 2015?
15  A    No.
16  Q    At any point after 2015 did she work with the defendant?
17  A    Yes, the latter part of 2016.
18  Q    Showing the witness what is in evidence as Government's
19  Exhibit 38.  Do you recognize the individual in Government's
20  Exhibit 38?
21  A    Yes.
22  Q    Who is that?
23  A    Cheryl Mack.
24  Q    What, if anything, did Cheryl Mack do for the defendant?
25  A    I knew her to be an assistant.  She did his bookings,

Mayweather - Direct - Cruz Melendez          1951

1    some form of management.

2    Q    What time frame do you recall Cheryl Mack working for the

3    defendant?

4    A    I'm not sure when she started, I think I may recall

5    Cheryl around 2014, 2015.

6    Q    Was she working with the defendant after you began

7    working for the defendant in October 2015?

8    A    No.

9    Q    Showing the witness what is in evidence as Government's

10   Exhibit 42.  Do you recognize this individual?

11   A    Yes.

12   Q    Who is it?

13   A    LeLe.

14   Q    Do you know if LeLe is a nickname?

15   A    Yes.

16   Q    Do you know LeLe's full name?

17   A    I do not recall.

18   Q    What, if anything, did LeLe do for the defendant?

19   A    I met her as his god-sister.  I don't recall her being on

20   staff.  She wasn't on staff.

21   Q    What time frame do you recall meeting LeLe?

22   A    2016 sometime mid 2016.

23   Q    I'm showing what is in evidence as Government's Exhibit

24   44.  Do you recognize the individual in Government's Exhibit

25   44?

Mayweather - Direct - Cruz Melendez          1952

1   A     Yes.

2   Q     Who is that?

3   A     Linda Mensch.

4   Q     What, if anything, did she do for the defendant?

5   A     She was his attorney.

6   Q     While you were working for the defendant in 2015 to 2017,

7   do you know whether or not she was acting as the defendant's

8   attorney?

9   A     Yes, she was.

10   Q     What about prior to your formal working relationship with

11   the defendant?

12   A     Yes, she was.

13   Q     Showing the witness what is in evidence as Government's

14   Exhibit 48.  Do you recognize this individual?

15   A     Yes.

16   Q     Who is that?

17   A     Dr. McGrath.

18   Q     What, if anything, did Dr. McGrath do with respect to the

19   defendant?

20   A     His physician.

21   Q     Have you met Dr. McGrath in person before?

22   A     Yes.

23   Q     In what capacity?

24   A     When Rob had to go to the hospital, Dr. McGrath was

25   there.  And I met him at a show, concert, one of Rob's

Mayweather - Direct - Cruz Melendez          1953

1    concerts.

2    Q    Showing the witness what is in evidence as Government's

3    Exhibit 49.  Do you recognize Government's Exhibit 49?

4    A    Yes.

5    Q    Who is that?

6    A    Ian.

7    Q    Do you know even's full name?

8    A    No.

9    Q    What, if anything, did Ian do?

10   A    His engineer.

11   Q    The defendant's engineer?

12   A    Yes.

13   Q    Was Ian working for the defendant when you were working

14   for the defendant?

15   A    Yes.

16   Q    What about during the time frame prior to your formal

17   working arrangement with the defendant?

18   A    Yes.

19   Q    I'm showing what is in evidence as Government's Exhibit

20   50.  Do you recognize the individual in this photograph?

21   A    Yes.

22   Q    Who is that?

23   A    Abel.

24   Q    What, if anything, did Abel do for the defendant?

25   A    Engineer.

Mayweather - Direct - Cruz Melendez           1954

1  Q     An engineer for the defendant?

2  A     Yes.

3  Q     Do you recall whether or not Abel was working for the

4  defendant from when you were with the defendant as his

5  personal assistant?

6  A     Yes.

7  Q     What about prior to your formal working arrangement?

8  A     Yes.

9  Q     You previously testified that you attended the

10 defendant's concerts during your friendship as well, as while

11 you were working for him; is that correct?

12 A     Yes.

13 Q     At those concerts did you ever see the defendant or his

14 employees or members of his entourage distributing anything

15 during those concerts?

16 A     Yes.

17 Q     What did you see -- what did you see being distributed?

18 A     His number.

19 Q     When you say his number, whose number do you mean?

20 A     Rob's.

21 Q     Who did you see distributing his number?

22 A     I don't recall specifically who, just some of the guys.

23 Q     Guys who either worked for or were friends with the

24 defendant?

25              MR. CANNICK:  Objection.  Leading.

Mayweather - Direct - Cruz Melendez                1955

1              THE COURT:  Overruled.

2   Q    You can answer.

3   A    Yes.

4   Q    When you say they were distributing the defendant's

5   number, how were they doing that?

6   A    I don't recall.

7   Q    Would they distribute -- my question is in what form

8   would they distribute it?

9   A    On paper.

10  Q    I'm showing the witness what is in evidence as

11  Government's Exhibit 75C -- actually I'll start with

12  Government's Exhibit 75, which in evidence.  Do you recognize

13  the individual in Government's Exhibit 75?

14  A    Yes.

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2              MS. CRUZ MELENDEZ:  And I'm showing just the witness

3    and the jury currently.

4    Q    Before I show the witness, do you know the -- the

5    individual who is in Government's Exhibit 75, do you know that

6    individual's name?

7    A    Yes.

8    Q    Showing you Government's Exhibit 75A, listed on that

9    document, is that a photograph of the individual who was in

10   Government's Exhibit 75?

11   A    The name?

12   Q    Is that the same individual who was just in the

13   photograph I showed you just a moment ago?

14   A    Yes.

15   Q    And is that the name that you know this individual by?

16   A    Yes.

17             MS. CRUZ MELENDEZ:  Now I'm showing -- which can be

18   published to both the jury and the public -- Government's

19   Exhibit 75C.

20             (The above-referred to exhibit was published.)

21   BY MS. CRUZ MELENDEZ:

22   Q    That's the same photograph, correct, in 75 and 75A?

23   A    Yes.

24   Q    And for the purposes of your testimony here today, when

25   we refer to this individual, we're going to refer to this

1   individual as Jane, okay?

2   A    Okay.

3   Q    Have you ever met Jane in person?

4   A    Yes.

5   Q    Where were you when you met Jane?

6   A    New York.  Here in New York.

7   Q    And why were you in New York?

8   A    For Rob's concert.

9   Q    And do you recall the venue where the concert occurred?

10  A    I believe Barclay.

11  Q    You said -- I'm sorry, you said Barclay?

12  A    Yes.

13  Q    Sitting here today, do you recall the date of the concert

14  at the Barclays?

15  A    No.

16  Q    During your travels with the defendant, did you have a

17  social media?

18  A    Yes.

19  Q    And did you have a Facebook page?

20  A    Yes.

21  Q    And did you post on your Facebook page about your travels

22  with the defendant?

23  A    Yes.

24        MS. CRUZ MELENDEZ:  So I'm showing just the witness

25  3500 SM11.

1    BY MS. CRUZ MELENDEZ:

2    Q    Do you see that there?

3    A    Yes.

4    Q    Does this refresh your recollection as to the location

5    and the date on which you met Jane?

6    A    Yes.

7    Q    And what was that date?

8    A    September the 25th, 2015.

9    Q    Okay.  And you previously had testified that you thought

10   the venue was Barclays.

11   A    Yes.

12   Q    What's the full name of the venue?

13   A    Barclays Center.

14   Q    Can you please explain to the jury how it came to be that

15   you met Jane?

16   A    Yes.

17        I called Rob to let him know that we had -- my

18   sister and I had arrived in New York for his show and he

19   called me back -- he didn't answer, but he called me back

20   FaceTime, and when he called me back on FaceTime, he and I

21   were talking.

22   Q    And can you just explain to the jurors what FaceTime is?

23   A    It's like facial chat.

24   Q    So like a --

25   A    Facial video.

1   Q      A video phone call?

2   A      Yes.

3   Q      And so you -- the defendant called you back via FaceTime.

4   A      Yes.

5   Q      And what happened?

6   A      And he and I were talking, and then he put the phone on

7   her and said:  Tell Auntie Twin hi.

8   Q      When you say "her," do you mean he put the phone on Jane?

9   A      Yes.

10  Q      Now, had -- this was the first time -- I think you

11  testified this was the very first time you were meeting Jane;

12  correct?

13  A      Yes.

14  Q      And at the time, did the defendant or anyone else

15  introduce Jane by her name?

16  A      No.

17  Q      And you testified that the defendant stated:  Say hello

18  to Auntie?

19  A      Auntie Twin.

20  Q      And when he said, "Say hello to auntie twin," who was the

21  defendant referring to?

22  A      Me.

23  Q      Now, do you have any relation to the defendant?

24  A      No.

25  Q      Do you have any relation to Jane?

1   A    No.

2   Q    Can you explain to the jurors why the defendant referred

3   to you as Auntie?

4            MR. CANNICK:  Objection.

5            THE COURT:  Overruled.

6   A    Because we had more than just a friendship.  He was like

7   my brother; he's like my brother.  And culturally, you know,

8   we say cousins, auntie, uncle.

9   Q    And so what, if anything, happened once the defendant

10  said to Jane, "Say hello to auntie"?

11  A    I said -- she said:  Hi, Auntie Twin.

12           And I said:  Hey, niece.

13  Q    And when you referred to Jane as niece, is it fair to say

14  that's a similar cultural term of endearment?

15  A    Yes.

16  Q    After -- what, if anything, else happened on the FaceTime

17  call?

18  A    He just directed me to call June Brown to meet with us to

19  get us into the show and -- and that he would see us at the

20  venue.

21  Q    Now you told the jury that you referred to Jane as niece.

22           Did you continue to refer to Jane as niece after

23  that?

24  A    Yes.

25  Q    So you testified that there was a concert at the Barclays

1    Center.

2          Did you attend that concert?

3    A    Yes.

4    Q    Did you see the defendant after the concert?

5    A    Yes.

6    Q    And what, if anything, did you do after the concert?

7    A    I recall we went to a cigar bar.

8    Q    Do you recall where that cigar bar was?

9    A    Harlem.

10   Q    Harlem, New York?

11   A    Yes.

12   Q    And who went to the cigar bar?

13   A    I recall myself, my sister, Rob, Kash, Bubba, Van, a

14   friend of his named Todd.

15   Q    And how did you get to the cigar bar?

16   A    On his Sprinter.

17   Q    And was Jane on the Sprinter?

18   A    Yes.

19   Q    And once you all got to the cigar bar, did you go in?

20   A    Yes.

21   Q    Did Jane go in?

22   A    No.

23   Q    And where was Jane while you were all in the cigar bar?

24   A    On the Sprinter.

25   Q    After initially meeting Jane on -- in the vicinity of

1   attending that concert, did you speak with the defendant about

2   who Jane was?

3   A    Yes.

4   Q    And what, if anything, did you discuss?

5   A    I eventually asked who was she and why was she there.

6   Q    And what, if anything, did the defendant say in response?

7   A    He told me that she was an aspiring artist and that her

8   parents had asked him if she could travel with him so that he

9   could mentor her.

10  Q    Now, after the concert at the Barclays Center, did you

11  attend any of the other defendant's shows?

12  A    Yes.

13  Q    Actually, to clarify and to back up, the concert at

14  Barclays Center, was that part of a tour?

15  A    I'm not sure if it was a tour or if it was just spot

16  dates.

17  Q    Did the defendant have any additional shows after the

18  Barclays Center show?

19  A    Yes.

20  Q    And did you attend the next show?

21  A    Yes.

22  Q    Do you recall where you attended the next show?

23  A    D.C.

24  Q    Washington, D.C.?

25  A    Yes.

1   Q    And did you travel with the defendant to that show?

2   A    I did not, no.

3   Q    And so how did you get to Washington, D.C.?

4   A    I flew.

5   Q    Do you recall the venue where the next show in

6   Washington, D.C. occurred?

7   A    No.

8           MS. CRUZ MELENDEZ:  I'm showing the witness 3500

9   SM11 at page 14.

10  BY MS. CRUZ MELENDEZ:

11  Q    Do you see this there?

12  A    Yes.

13  Q    And does this refresh your recollection as to the name of

14  the venue?

15  A    Yes.

16  Q    And what was the name of the venue?

17  A    Capital One Arena.

18  Q    And what date did that occur?

19  A    September the 26th, 2015.

20  Q    And when you were in Washington, D.C., was Jane there?

21  A    Yes.

22  Q    Sitting here today, do you recall what city you were in

23  on September 27th of 2015?

24  A    Baltimore.

25  Q    Okay.  And what were you doing in Baltimore?

1   A    A show -- concert.

2   Q    Whose show?

3   A    Mr. Kelly.

4   Q    And did you attend that show?

5   A    Yes.

6   Q    And was Jane also in Baltimore?

7   A    Yes.

8   Q    After the show in Baltimore, did you attend any other

9   concerts of the defendant's?

10  A    Not in Baltimore, no.

11  Q    And where was the next location, if you recall?

12  A    We came back to New York.

13  Q    Do you recall what date you came back to New York?

14  A    No.

15        MS. CRUZ MELENDEZ:  Showing the witness 3500 SM11,

16  page 17.

17  BY MS. CRUZ MELENDEZ:

18  Q    Does that refresh your recollection as to the date you

19  were in New York after you were in Baltimore?

20  A    Yes.

21  Q    And what was that date?

22  A    September 28th, 2015.

23  Q    Have you ever been to a location called Jungle City

24  Studios?

25  A    Yes.

1   Q    And do you recall where Jungle City Studios is?

2   A    No.

3          MS. CRUZ MELENDEZ:  And referring the witness again

4   to 3500 SM11 at page 17.

5   BY MS. CRUZ MELENDEZ:

6   Q    Where is Jungle City Studios located?

7   A    New York.

8   Q    And do you recall why you went to Jungle City Studios?

9   A    Yeah.  It was Rob's listening party for his album.

10  Q    What's a listening party?

11  A    Where there's media and some of, you know, his fans,

12  record execs, and they take a listen to his album that was

13  coming out.

14  Q    And who, if anyone, other than yourself, was at the

15  Jungle City Studios listening party?

16  A    Kash.

17  Q    And who is Kash?

18  A    Kash was Rob's stylist.

19  Q    And was the defendant there?

20  A    Yes.

21  Q    Do you recall what, if anything, happened on

22  September 29th, 2015, the day after the listening party?

23  A    No.

24         MS. CRUZ MELENDEZ:  Showing the witness 3511 -- SM11

25  at page 18.

1   BY MS. CRUZ MELENDEZ:

2   Q    Does that refresh your recollection as to what happened

3   on September 29th, 2015?

4   A    Yes.

5   Q    And what happened?

6   A    He left New York to go to the West Coast.

7   Q    Now, when you say you left New York, who left New York?

8   A    Everyone.  Mr. Kelly, myself.  Everyone.

9   Q    Mr. Kelly's employees?

10  A    Yes.

11  Q    And his entourage who was with him at the time as well?

12  A    I believe so.

13  Q    And prior to leaving New York, was Jane still there?

14  A    Yes.

15  Q    And when you say you left New York to go to the West

16  Coast, why were you going to the West Coast?

17  A    He had shows.

18  Q    And do you recall what the first stop on the West Coast

19  was going to be?

20  A    I believe it was Oakland.

21  Q    Now, when you were leaving New York, is that New York

22  City?

23  A    Yes.

24  Q    How did you get from New York City to the West Coast in

25  Oakland, California?

1   A     Sprinter.

2   Q     What's a Sprinter?

3   A     It was his -- his van.

4   Q     The defendant's van?

5   A     Yeah.

6   Q     And the other employees and other individuals who were

7   going to the West Coast, how were they traveling?

8   A     Well, security had a security van, and most of the

9   employees, like the production team, they flew.

10  Q     What about the -- did the defendant have a tour bus with

11  him at the time?

12  A     Yes.

13  Q     Okay.  Did the tour bus also go cross-country?

14  A     Yes.

15  Q     So you mentioned that you traveled in the Sprinter --

16  A     Yes.

17  Q     -- from New York City to the West Coast; correct?

18  A     Yes.

19  Q     Who do you recall being in the Sprinter for that trip?

20  A     Jane.

21  Q     Anyone else?

22  A     On and off, Mr. Kelly.

23  Q     And any -- anyone else?

24  A     My sister, Alesiette.

25  Q     How long was that trip from New York City to Oakland?

1   A    It was maybe over 24 hours.

2   Q    Do you recall exactly how long it took?

3   A    No.

4         MS. CRUZ MELENDEZ:  I'm showing the witness 3500

5   SM11 at 019.

6   BY MS. CRUZ MELENDEZ:

7   Q    Can you see that there?

8   A    Yes.

9   Q    So do you recall where you were on October 1st, 2015?

10  A    The exhibit says --

11  Q    Well, first, do you recall offhand?

12  A    Looking now, yes.

13  Q    Where were you?

14  A    Exit 214, I-80.

15  Q    And so is it fair to say you were still on the road on

16  October 1st, 2015?

17  A    Yes.

18  Q    And turning to page 22, do you recall where you were on

19  October 3rd, 2015?

20  A    Oakland.

21  Q    And is that Oakland, California?

22  A    Yes.

23  Q    So is it fair to say that if you left on the 29th of 2015

24  and you arrived in Oakland in approximately October 3rd of

25  2015, it took a few days to get there?

1    A    Yes.

2    Q    Now, during the trip between New York City and Oakland,

3    California, did you make any stops?

4    A    Yes.

5    Q    What kind of stops did you make?

6    A    Food, restroom, just breaks.

7    Q    Were there any shows between New York City and Oakland,

8    California?

9    A    I do not recall.

10   Q    Had you ridden in a car cross-country before that time?

11   A    No.

12   Q    And was Jane on the Sprinter the entire time between when

13   you left New York City to when you reached Oakland,

14   California?

15   A    Yes.

16   Q    Now, sitting here today, do you recall the date when the

17   defendant was scheduled to perform in Oakland, California?

18   A    No, not the exact date.

19        MS. CRUZ MELENDEZ:  Showing the witness 3500 SM11.

20   BY MS. CRUZ MELENDEZ:

21   Q    Does this refresh your recollection as to the date of the

22   defendant's performance in Oakland, California?

23   A    Yes.

24   Q    And what was that date?

25   A    October the 2nd.

1  Q    After the defendant performed in Oakland, California, do

2  you recall whether the defendant had any other performances in

3  California?

4  A    Yes.

5  Q    And did you attend those performances as well?

6  A    Yes.

7  Q    Do you recall where the next location was that you

8  attended with the defendant?

9  A    I just remember it was an outdoor theater.

10  Q    Do you remember the specific venue?

11  A    Name, no.

12         MS. CRUZ MELENDEZ:  I'm showing the witness 3500

13  SM11, page 23.

14  BY MS. CRUZ MELENDEZ:

15  Q    Does that refresh your recollection as to the name of the

16  next venue?

17  A    Yes.

18  Q    And what was the name of the venue?

19  A    Thunder Valley Outdoor Theater.

20  Q    Where was that located?

21  A    Lincoln, California.

22  Q    Do you recall the date?

23  A    It shows October the 4th.

24  Q    Of 2015?

25  A    Yes.

1   Q    After the defendant's performance on October 4th of 2015

2   in Lincoln, California, do you recall the next location that

3   you went with the defendant to in California?

4   A    I believe Los Angeles.

5   Q    And do you recall when you were in Los Angeles?

6   A    Exact date, no.

7            MS. CRUZ MELENDEZ:  I'm showing the witness 3500

8   SM11 at page 26.

9   BY MS. CRUZ MELENDEZ:

10  Q    Does this help to refresh your recollection approximately

11  when you were in Los Angeles with the defendant?

12  A    Yes.

13  Q    And what's the date?

14  A    October the 6th, 2015.

15           MS. CRUZ MELENDEZ:  One moment, Your Honor.

16           (Pause.)

17           MS. CRUZ MELENDEZ:  I'm showing just the witness

18  Government's Exhibit 257A, -B, and -C for identification

19  purposes.

20  BY MS. CRUZ MELENDEZ:

21  Q    Do you recognize those -- what's in 257A, -B, and -C?

22  A    Yes.

23  Q    And what are those, generally speaking?

24  A    Those are pictures that were taken in the Sprinter.

25  Q    And starting with --

1          MS. CRUZ MELENDEZ:  Well, Your Honor, the Government

2   moves to admit 257A, 257B, and 257C.

3          THE COURT:  Any objection?

4          MR. CANNICK:  Just one question -- one question by

5   way of voir dire.

6          THE COURT:  Okay.

7   VOIR DIRE EXAMINATION

8   BY MR. CANNICK:

9   Q    Ms. Mayweather, do you have a recollection as to when

10  those photographs were taken?

11  A    Without seeing the date, no.

12  Q    Do you remember if -- were you present when they were

13  taken?

14  A    Yes.

15  Q    And you testified a short while ago that it was sometime

16  in October when this was likely taken?

17  A    Yes.

18          MR. CANNICK:  No objection.

19          THE COURT:  All right.

20          Those are in evidence, then.

21          (Government's Exhibit 257A, 257B, and 257C received

22  in evidence.)

23  DIRECT EXAMINATION

24  BY MS. CRUZ MELENDEZ: (Continuing.)

25  Q    Prior to publishing them, does this refresh your

1   recollection as to the date that those photographs were taken?

2   A    I show October the 7th.

3   Q    Of 2015?

4   A    2015.

5          MS. CRUZ MELENDEZ:  If we could publish for the jury

6   and the public Government's Exhibit 257A.

7          (The above-referred to exhibit was published.)

8          MS. CRUZ MELENDEZ:  257B.

9          (The above-referred to exhibit was published.)

10         MS. CRUZ MELENDEZ:  And 257C.

11         (The above-referred to exhibit was published.)

12   BY MS. CRUZ MELENDEZ:

13   Q    Starting with 257C, are you -- even if partially -- are

14   you in this photograph?

15   A    Yes.

16   Q    And where can you be seen in this photograph?

17   A    I see my -- my knee -- my leg.

18   Q    So here on the rightmost bottom corner of the 257C,

19   that's your leg?

20   A    Yes.

21   Q    Okay.  With the striped garment here?

22   A    Yes.

23   Q    And who is depicted in this photograph?

24   A    Mr. Kelly.

25   Q    Showing you now Government's Exhibit 257A, again,

1   referring not to the individual's real name, who do we see in

2   this photograph?

3   A    I can see Mr. Kelly and Jane.

4   Q    And in 257B, on the right-hand side, who is the

5   individual there?

6   A    Mr. Kelly.

7   Q    And on the left-hand side, who is the individual there?

8   A    Jane.

9   Q    And I think there's an individual, sort of, center of the

10  photograph -- top center.

11  A    Yes.

12  Q    Who is that?

13  A    My sister Alesiette.

14  Q    Do you recall what, if any, other shows the defendant had

15  in California after October 7th, or after the Los Angeles

16  show?

17  A    No.

18       MS. CRUZ MELENDEZ:   I'm showing the witness 3500

19  SM11 at page 34.

20  BY MS. CRUZ MELENDEZ:

21  Q    Does that refresh your recollection as to the next show

22  of the defendant's?

23  A    Yes.

24  Q    And where did that show take place?

25  A    The Forum.

1   Q    And do you recall the date?

2   A    It shows October the 10th, 2015.

3   Q    And the location?

4   A    The Forum.

5   Q    The city?

6   A    In Englewood, California.

7   Q    Now, it states here -- well, I will ask you this way.

8        Do you recall who, other than yourself and the

9   defendant, were at the venue for the show?

10  A    I specifically remember myself, my sister, and Kash, but

11  I did see that I tagged Ruby Chris.

12  Q    Who is Ruby Chris?

13  A    Which is Bubba Jermaine.

14       (Court reporter requests clarification.)

15  A    Bubba.

16  Q    And I think you also said Jermaine?

17  A    Jermaine.

18  Q    And was Jane there?

19  A    Yes.

20  Q    And we've talked about a number of different -- we've

21  talked about a number of different locations in California

22  that you -- after the open show.

23       Was Jane there for those shows as well?

24  A    Yes.

25  Q    You also mentioned Kash.

1    A    Yes.

2    Q    Who is Kash?

3    A    Stylist.

4    Q    The defendant's stylist?

5    A    Yes.

6    Q    And do you know Kash's full name?

7    A    Kash Howard.

8              MS. CRUZ MELENDEZ:  I'm showing what's in evidence

9    as Government's Exhibit 86.  That can be published to the

10   public and the jury.

11             (The above-referred to exhibit was published.)

12   BY MS. CRUZ MELENDEZ:

13   Q    Who is that?

14   A    Kash.

15   Q    And is that the defendant's stylist?

16   A    Yes.

17             MS. CRUZ MELENDEZ:  I'm showing the witness what has

18   been previously marked for identification purposes as

19   Government's Exhibit 256.

20   BY MS. CRUZ MELENDEZ:

21   Q    Do you recognize this?

22   A    Yes.

23   Q    And what is it?

24   A    It's a photo of me and Mr. Kelly.

25   Q    And where was that photograph taken?

1   A    It was taken in Chicago at his photo shoot for his

2   Christmas album.

3   Q    And do you recall the date that that photograph was

4   taken?

5   A    It shows October the 19th, 2015.

6            MS. CRUZ MELENDEZ:  Your Honor, the Government moves

7   to admit Government's Exhibit 256.

8            MR. CANNICK:  No objection.

9            THE COURT:  Okay.  That's in evidence.

10           You can publish.

11           (Government's Exhibit 256 received in evidence.)

12           (The above-referred to exhibit was published.)

13   BY MS. CRUZ MELENDEZ:

14   Q    And is that you in the striped skirt to the right of the

15   photograph?

16   A    Yes.

17   Q    And you said the defendant is also in the photograph;

18   correct?

19   A    Yes.

20           (Continued on the following page.)

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MS. CRUZ MELENDEZ:   (Continuing)

3    Q     You testified previously that the defendant introduced

4    you to Jane prior to you all leaving from New York City to

5    California.  At any point did you discuss with the defendant

6    how he first came to meet Jane?

7    A     Yes.

8    Q     And do you recall where this discussion took place?

9    A     Yes.

10   Q     And where did it take place?

11   A     At his studio in Chicago.

12   Q     And approximately how long after you returned from the

13   trip, cross-country trip to California did this discussion

14   take place in Chicago?

15   A     I don't recall the exact time, but it was shortly after.

16   Q     And what, if anything, did the defendant say about his

17   first meeting with Jane?

18   A     He met her at a concert in Florida and after the show the

19   parents wanted her to travel.  Well, before the parents wanted

20   her to travel, she called him to -- Jane called him to meet up

21   with him at his hotel.  And she came to the hotel and she came

22   to meet him there about going on the road with him.  And he

23   said that -- she told him she was 18 years old.  And it was

24   until -- while they were at the hotel, the police came.  And

25   he was afraid because he didn't know what was going on.  And

1   they checked her I.D. and gave her back her I.D.  And

2   eventually she came back to Chicago with him.

3   Q    With the defendant?

4   A    Yes.

5   Q    And what did he say happened with respect to Jane after

6   she came back to Chicago with him?

7   A    She confessed to being 17.

8   Q    And what, if anything, did the defendant say to you about

9   when Jane told the defendant about the fact that she was 17?

10  A    He was very upset.  He was very upset that she lied to

11  him.  He put her out of the sprinter, because they were in a

12  sprinter.  He said he put her out of the sprinter.  And a

13  couple of hours later or so, Juice went to find her and she

14  was in a park.

15  Q    And the conversation that you were having with the

16  defendant when she's telling you this you said was shortly

17  after the trip to -- when you were in California, correct?

18  A    Correct.

19  Q    And what, if anything, did the defendant tell you about

20  what he did with respect to Jane after she told him that she

21  was 17?

22  A    Well, once he learned that she was 17, he had a

23  conversation with her parents and the parents gave him

24  guardian -- signed guardianship.

25  Q    And did he tell you what -- who, if anyone, would be

S. Mayweather - Direct - Cruz Melendez        1980

1    responsible for Jane?

2    A    Yes.

3    Q    And what did the defendant tell you?

4    A    Auntie Shel.

5            MS. MELENDEZ:  Your Honor, if this makes sense for

6    the Court, this might be a good stopping point.

7            THE COURT:  Okay.  So, ladies and gentlemen, we are

8    going to finish for the day.  We will start up again tomorrow,

9    same time, 9:30.  Please do not talk about the case, do not

10   look anything up.  But do have a good night and I will see you

11   tomorrow.

12           THE CLERK:  All rise.

13           (Jury exits the courtroom.)

14           THE COURT:  Okay.  Everybody can have a seat.  And

15   let's take the witness out.

16           (Witness exits the courtroom.)

17           About how much longer do we have on direct with this

18   witness?  Forever?

19           MS. MELENDEZ:  Maybe forever.  No, I'm kidding,

20   Your Honor.

21           It's hard to tell.  I think I'll definitely be done

22   before the lunch break tomorrow.

23           THE COURT:  Let's just try to make sure we don't get

24   too repetitive with her though.  Okay?

25           MS. MELENDEZ:  Yes.

```
                    Proceedings                    1981
```

 1          THE COURT:  And then are you anticipating another

 2   witness tomorrow?  I guess it depends a little bit on the

 3   cross, but...

 4          MS. SHIHATA:  Yes, we are anticipating another

 5   witness.

 6          THE COURT:  Okay.  How far along are we now in terms

 7   of witnesses?

 8          MS. GEDDES:  We're pretty far along.

 9          THE COURT:  I mean in terms of how much longer do

10   you think the government's case will be.

11          MS. GEDDES:  I am hopeful that we will be able to

12   finish the week of the 13th.

13          THE COURT:  Okay.

14          MS. GEDDES:  The fact that next week is a short week

15   is obviously --

16          THE COURT:  No, I know.  I know.  Okay.  All right.

17          Let me just see the parties over to the side just

18   for scheduling purposes.

19          (Discussion held off the record.)

20          THE COURT:  Anything before we break for the day?

21          MR. CANNICK:  Nothing from us, Your Honor.

22          MS. GEDDES:  Nor from the government.

23          THE COURT:  All right.  See you tomorrow.  Thanks

24   very much.

25          (Matter adjourned to August 31, 2021 at 9:30 a.m.)

1                                **INDEX**

2    **WITNESS:**                                                        **PAGE:**

3      **ADDIE**

4                  DIRECT EXAMINATION                                    1724
                   BY MS. CRUZ MELENDEZ

5                  CROSS-EXAMINATION                                     1747
                   BY MR. CANNICK

6

7                  REDIRECT EXAMINATION                                  1767
                   BY MS. CRUZ MELENDEZ

8                  RECROSS EXAMINATION                                   1769
                   BY MR. CANNICK

9
     **DARRICK**
10   **STEPHENS**

11                 DIRECT EXAMINATION                                    1771
                   BY MS. SHIHATA

12                 CROSS-EXAMINATION                                     1795
                   BY MR. CANNICK

13

14                 REDIRECT EXAMINATION                                  1797
                   BY MS. SHIHATA

15                 RECROSS-EXAMINATION                                   1799
                   BY MR. CANNICK

16

17     **LOUIS**

18                 DIRECT EXAMINATION                                    1800
                   BY MS. GEDDES

19                 CROSS-EXAMINATION                                     1887
                   BY MR. CANNICK

20

21                 REDIRECT EXAMINATION                                  1923
                   BY MS. GEDDES

22                 RECROSS-EXAMINATION                                   1931
                   BY MR. CANNICK

23

24

25

**INDEX (Continued)**

WITNESS:                                                    PAGE:

SUZETTE                                                      1935
MAYWEATHER
        DIRECT EXAMINATION                                  1936
        BY MS. CRUZ MELENDEZ

        VOIR DIRE EXAMINATION                               1972
        BY MR. CANNICK

        DIRECT EXAMINATION                                  1972
        BY MS. CRUZ MELENDEZ

**<u>EXHIBITS</u>**

| | |
|---|---|
| Government's Exhibit 56 | 1725 |
| Government's Exhibit 56A | 1725 |
| Government's Exhibit 56B | 1726 |
| Government's Exhibit 201 | 1732 |
| Government Exhibit 44 | 1780 |
| Government Exhibit 255A | 1784 |
| Government Exhibit 255B | 1785 |
| Government Exhibit 75A | 1791 |
| Government Exhibit 64 | 1801 |
| Government Exhibit 64A | 1802 |
| Government Exhibit 64B | 1802 |
| Government Exhibit 522A & B | 1805 |
| Government's Exhibit 90 | 1813 |
| Government's Exhibit 51 | 1820 |
| Government's Exhibit 67 | 1835 |
| Government's Exhibit 91 | 1836 |
| Government's Exhibit 91A | 1837 |
| Government's Exhibit 68-A | 1839 |
| Government Exhibit 939 | 1880 |
| Government Exhibit 953A | 1881 |
| Government Exhibit 953D | 1882 |
| Government Exhibit 2 | 1946 |
| Government's Exhibit 257A, 257B, and 257C | 1972 |
| Government's Exhibit 256 | 1977 |