2239

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,     :   19-CR-286(AMD)
 4
             Plaintiff,            :
 5
                                       United States Courthouse
        -against-                 :   Brooklyn, New York
 6
     ROBERT SYLVESTER KELLY,       :
 7
                                       September 1, 2021
             Defendant.           :   9:30 a.m.
 8
      - - - - - - - - - - - - - X
 9
10                       TRANSCRIPT OF TRIAL
                 BEFORE THE HONORABLE ANN M. DONNELLY
11            UNITED STATES DISTRICT JUDGE, and a jury.
12
     APPEARANCES:
13
14   For the Government:          JACQUELYN M. KASULIS
                                  Acting United States Attorney
15                                BY: ELIZABETH GEDDES
                                      NADIA SHIHATA
16                                    MARIA E. CRUZ MELENDEZ
                                  Assistant United States Attorneys
17                                271 Cadman Plaza East
                                  Brooklyn, New York
18
19   For the Defendant:          DEVEREAUX L. CANNICK, ESQ.
                                  NICOLE BLANK BECKER, ESQ.
20                                THOMAS FARINELLA, ESQ.
                                  CALVIN HAROLD SCHOLAR, ESQ.
21
22   Court Reporter:             Andronikh M. Barna
                                  225 Cadman Plaza East
23                                Brooklyn, New York
                                  (718) 613- 2178
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

Proceedings                                      2240

1          (In open court; jury not present.)

2          (Parties present.)

3          THE CLERK:  All rise.

4          THE COURT:  Everybody can sit down.

5          All right.  Anything before we get the witness?

6          MS. SHIHATA:  Your Honor there is one thing I wanted

7    to bring to the Court's attention.

8          THE COURT:  Okay.

9          MS. SHIHATA:  It's come to the government's

10   attention that in the overflow room there have been,

11   throughout the trial, audible negative reactions to testimony

12   and -- including yesterday.  And that yesterday at the end of

13   the trial day, the father of the witness who was testifying

14   was leaving with another family member, a nephew or a cousin,

15   I'm not sure, that an individual, as they were leaving, told

16   the father -- called the witness a stupid b-i-t-c-h.  And so I

17   just wanted to bring it to the Court's attention.  The

18   government, and I am sure the defense would agree, have used

19   the overflow room as an extension of this courtroom, and if

20   the Court would be willing to remind people in the room that

21   the same decorum that's required in this physical courtroom is

22   also what's proper in the overflow room.

23          THE COURT:  Well, that is true, you can lose your

24   permission to be in the overflow room if you do not treat

25   other people with respect and act like you are in a

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    2241

1  courthouse.  So to the extent that is happening, it has to

2  stop.

3          Anything the defense wants to say about that?

4          MR. CANNICK:  No.

5          THE COURT:  All right.  Anything else before we get

6  the witness?

7          All right.  I take it somebody brought that to the

8  attention of the court security officers or the marshals?

9          MS. SHIHATA:  Yes, I believe so.

10          THE COURT:  I also just have to say, their job is

11  hard enough.  If people cannot behave with respect and decorum

12  in the courtroom, we will see that they do not come in

13  anymore.

14          All right.  Let's get the witness.

15          (Witness enters the courtroom.)

16          THE CLERK:  All rise.

17          (Jury enters the courtroom.)

18          THE CLERK:  You may be seated.

19          THE COURT:  All right.  Good morning, everybody.  I

20  hope you had a good night.  We are ready to resume with the

21  direct examination of the witness.

22          Go ahead, Ms. Shihata.

23          THE CLERK:  The witness is reminded she is still

24  under oath.

25          You don't have to stand, just acknowledge.

Faith - Direct - Shihata                    2242

1           THE WITNESS:  Yes.

2    CONTINUING DIRECT EXAMINATION

3    BY MS. SHIHATA:

4    Q     Good morning.

5    A     Good morning.

6    Q     Now, at the end of the court session yesterday, you were

7    testifying about a trip to Los Angeles that the defendant's

8    assistant Diana made your travel arrangements for, correct?

9    A     Correct.

10   Q     And the defendant paid for that trip, correct?

11   A     Correct.

12   Q     Now, you testified yesterday that prior to that trip you

13   traveled to Dallas and saw the defendant there; is that right?

14   A     Correct.

15   Q     And you testified that it was in Dallas that you had a

16   conversation where the defendant told you about other girls

17   that he had been, to use his word, raising, correct?

18   A     Correct.

19   Q     And that's where you first met an individual introduced

20   to you as Joy; is that right?

21   A     Correct.

22   Q     Now, yesterday you testified about a time you were in the

23   Sprinter van with Joy and the defendant; is that right?

24   A     Correct.

25   Q     And during your time in the Sprinter with Joy and the

Faith - Direct - Shihata                    2243

1  defendant, did you have any opportunity to observe their

2  interactions?

3  A    I did.

4  Q    And what, if anything, did you observe?

5  A    Their interaction was very unnatural, almost.  Anything

6  he said, even if it had no humor to it, she got this odd

7  smile.  Or if he laughed, she laughed even louder.  He pulled

8  out a cigar, she's lighting it.  He wants to hear music, she's

9  playing it.  Anything -- any demand he really had, she was

10  just on it.  Anything he said, she's at his attention,

11  listening, very just on him.

12  Q    Now, you also testified yesterday about a time that you

13  and Joy were alone in the Sprinter in the back; is that right?

14  A    Correct.

15  Q    And you testified about needing to use the bathroom while

16  you were in the back with Joy, correct?

17  A    Correct.

18  Q    And what do you recall Joy telling you about that when

19  that happened?

20  A    That I had to ask to use the bathroom.

21  Q    And I think you testified yesterday that you also tried

22  to open the door to the Sprinter and it wouldn't open; is that

23  right?

24  A    Correct.

25  Q    Now, yesterday you testified about -- you also testified

1  about -- or you were also -- you testified about and you were

2  shown text messages between you and the defendant where you

3  were keeping him apprised of where you were and what you were

4  doing even when you weren't physically with him; is that

5  right?

6  A    Correct.

7  Q    And why did you do that?

8  A    Those were his rules.

9  Q    Now, I think where we left off yesterday, you were

10 testifying -- you had just testified about being in L.A.

11 outside the studio in a Sprinter; is that right?

12 A    Correct.

13 Q    And you testified about needing to use the bathroom when

14 you were in the Sprinter in L.A. as well, correct?

15 A    Correct.

16 Q    And again, who did you contact when you needed to use the

17 bathroom?

18 A    Diana Copeland.

19 Q    And why did you contact Diana Copeland?

20 A    Because R. Kelly told me to contact her.  Whenever I

21 needed anything, she was his assistant.

22 Q    And did you feel like you could just open the door and

23 leave the Sprinter?

24 A    No.

25 Q    Why not?

Faith - Direct - Shihata                    2245

1   A    Because I had to wait for somebody to come open it.

2   Q    Now, you testified that at some point Diana did take you

3   to the bathroom inside the studio, correct?

4   A    Correct.

5   Q    And what did she do when -- after taking you to the

6   bathroom?

7   A    Once we got to the bathroom, she waited outside the stall

8   for me to finish, sat there while I washed my hands, escorted

9   me back to the Sprinter.

10  Q    So she physically went inside the bathroom with you?

11  A    Yes.

12  Q    Did she use the bathroom?

13  A    No.

14  Q    And then she escorted you back to the Sprinter?

15  A    Correct.

16  Q    Yesterday you testified that at some point Diana took you

17  from the Sprinter to a room at the studio; is that right?

18  A    Correct.

19  Q    In L.A.?

20  A    Yes.

21  Q    And you testified that initially at some point the

22  defendant came in the room quickly and left?

23  A    Correct.

24  Q    And then that you waited there for several hours; is that

25  right?

Faith - Direct - Shihata                          2246

1   A    Correct.

2   Q    I'm going to show you what's in evidence as Government

3   Exhibit 208(b).

4            Now, these are, again, texts between you and Diana?

5   A    Correct.

6   Q    And I think you testified yesterday about the text about

7   the bathroom that are on this page of the exhibit, so I won't

8   go over that again, but is there another text where you write

9   "Can I leave back to the room lol or he wants me to wait?"

10  A    Correct.

11  Q    And what room -- where were you when you sent that text?

12  A    I was in the studio still waiting on him.

13  Q    And when you say "back to the room," what were you

14  referring to?

15  A    My hotel room.

16  Q    And Diana responds about an hour later, "please wait," is

17  that right?

18  A    Correct.

19  Q    Now, by the way, the text in Government Exhibit 208(b)

20  between you and Diana, you provided those to the government;

21  is that right?

22  A    Correct.

23  Q    And do you recall in what manner you provided them to the

24  government?

25  A    I provided the screen recording of my text between me and

Faith - Direct - Shihata                2247

1   Diana.

2   Q    And do you recall where you were when you provided the

3   screen recording?

4   A    In New York.

5   Q    Was that in the presence of agents?

6   A    Correct.

7   Q    And the time stamps in this exhibit, this screen

8   recording, was that in the local time where you were when you

9   made the screen recording?

10  A    Correct.

11  Q    So in New York time?

12  A    Correct.

13  Q    Now, why was it that you wrote -- that you texted Diana

14  to ask her if you could leave the room?

15  A    Because I had to get permission whenever I needed to go

16  somewhere.  Diana was the one to take me wherever I needed to

17  go, call an Uber if I needed to go somewhere.

18  Q    And according to who did you need permission for such

19  things?

20  A    According to R. Kelly, you needed his permission.

21  Q    Now, I think where we left off yesterday, you talked

22  about that after several hours, the defendant came into the

23  room you were in again; is that right?

24  A    Correct.

25  Q    And what, if anything, did he say when he came back into

Faith - Direct - Shihata                    2248

1   the room?

2   A    Once he came back into the room he had told me that had I

3   stood up or showed some type of excitement about him entering

4   the room, that he would have came back sooner.

5   Q    Was he referring to the first time he came into the room?

6   A    Correct.

7           The first time he quickly came in the room, I didn't

8   get up, I didn't say "hey, Daddy."  I didn't show any type of

9   excitement.  So the second time when he came back, hours

10  later, he let me know that that was why.

11  Q    And what happened next?

12  A    Shortly after that, he came in.  He -- I was sitting on

13  the couch, so he had told me to come over to where he was

14  across the room.  There was a piano right there, maybe like

15  two little rollie chairs, and he sat in the chair.  And he

16  told me to take my clothes off again and walk back and forth.

17  I had told him that I was on my period.  I wasn't at the time,

18  but I told him I was.

19  Q    Why did you tell him you were on your period if you

20  weren't?

21  A    I didn't want to have sex with him.

22  Q    All right.  So you testified he told you to take your

23  clothes off?

24  A    Correct.

25  Q    And what, if anything, did you do?

1    A    I had told him that I was on my period.  He let out this

2    sigh.  He was like "Well, why did you come?"  I said, "You

3    wouldn't want me to come just because I was on my period?"  He

4    nodded his head.  He said, "Take off your pants."  I took off

5    my pants -- I had on a body suit -- and he told me to walk

6    back and forth three times, keep on my shoes, and I did.

7              Shortly after that, he paused for a minute and we

8    went into one of the other rooms inside of the studio.

9    Q    I'm going to show you -- I am showing you what's in

10   evidence as Government Exhibit 946(d).

11             Do you see the smaller room you're referring to

12   here?

13   A    Correct.

14   Q    And can you describe where in the picture the room you're

15   referring to is?

16   A    It is the room on the left of the piano with the square

17   window next to it.

18   Q    This room right here?

19   A    Correct.

20   Q    All right.  And what happened next?

21   A    After I walked back and forth three times, he told me to

22   come into the room.  I kind of like hesitated when I entered

23   the room because when I looked, there was about like -- the

24   room is not that big, also.  So probably the room is about

25   from here to maybe like that third -- well, there's computers

Faith - Direct - Shihata                2250

1  right here.  It's like that third computer, so where that cart

2  is.  It's not that big at all.  And it was two chairs and like

3  an ottoman-looking thing.  And there was a gun.

4  Q    So just a moment.

5        You described the size of the room and you said it

6  was from kind of the corner where you are at to the cart, the

7  first cart in the courtroom?

8  A    Yes.

9  Q    Can you estimate approximately how many feet that is

10 or...

11 A    I'm not going to lie to you, I can't.  It's just a small

12 room.

13 Q    Okay.

14 A    Almost like closet size.  Maybe like a walk-in closet

15 size.  Maybe that's a better description.

16       But when I entered the room, there was a gun right

17 in the middle, an ottoman, and I kind of hesitated.  And he

18 walked over and he was like "don't look at it."  So I looked

19 away and I kind of gave a weird look.  He didn't say anything

20 different.  He said, "Come in the room."  Came in the room.

21 His demeanor changed.  He got real serious.  So I'm just

22 seeing what's about to happen.  I'm not really knowing where

23 he's going with this or what he's about to ask me.  And he

24 sits down in a chair and he tells me to go stand across from

25 him.  So he's sitting and he's looking at me.  He had moved

1    the gun by him.  It was still next to him, but not to where I

2    could see it.  So he's looking at me and he says, "I want to

3    ask you a question."  I said, "Yes?"  He paused.  Before he

4    got into the questions, at this point I'm still in my body

5    suit, my boobs are kind of out.  He gets his iPad and he is

6    like "pose."  And he starts taking pictures.  "Pose, pose."

7    He was like "you're not being sexy."  Again, I'm trying to

8    change my body, I'm trying to change my face.  He's like

9    "you're not being sexy enough."  And I could tell he just got

10   kind of irritated with me.

11           So after that, I stepped back.  He said he had

12   something to ask me and I said "Yes?"  He said, "How many men

13   have seen you naked?"  I just literally said a number.  And he

14   said, "Okay.  How many male friends do you have?"  I have a

15   lot of male friends, I know a lot of people; I just gave a

16   random number like ten.  He said, "How many of those male

17   friends have seen you naked?"  I said, "None of my male

18   friends have seen me naked.  They're really my male friends."

19   And he paused.  He said, "You want to take that back?"  I'm

20   like -- of course I'm like no, even though if I did know the

21   exact number I just wasn't going to take it back because I

22   didn't know what reaction I was going to get if I did.  So I

23   said no and he paused.  He had this real like stern look on

24   his face.  He just paused for a minute and he was like, you

25   know -- he said, "Me and your father, we have the same gift."

1    He said he had the spiritual discernment so that I would know

2    -- he would know if I was lying to him.  And that kind of took

3    me aback because me and him had never discussed my father

4    besides the first time we met with me and my sister; we said

5    we were pastor's kids.  You know, that was it.  But that kind

6    of took me aback, that he said spiritual discernment.  So I

7    said, "Okay, I'm not lying," even though I knew I was.  After

8    that he just gave me that look.  He kind of has this look when

9    he's grilling you down.  He just gets real serious.

10              So after that, he got up.  There was a little pillow

11   on the chair.  He put the pillow on the floor.  He told me to

12   get on my knees.  I did.  And he pulled out his penis, grabbed

13   my neck again and told me to suck his dick.

14   Q    Where was the gun at this point?

15   A    Right where he had left it, in his seat.

16   Q    When you saw the gun in the room and when he kept it next

17   to him, how did that make you feel?

18   A    Intimidated.  I really just -- at that point, like, I was

19   like okay, he's unpredictable, because how do we go from this

20   to that?

21   Q    Now, you said he grabbed -- he pulled his penis out and

22   grabbed you.  Where did he grab you?

23   A    He grabbed the back of my neck forward.  Once I was on my

24   knees, he grabbed my neck forward to make -- so my mouth made

25   contact with his penis.

Faith - Direct - Shihata                    2253

1   Q     Did you want to be giving him oral sex?

2   A     No.

3   Q     And while his penis was in your mouth, where was his

4   hand?

5   A     On the back of my neck, guiding.

6   Q     And did it stay there throughout?

7   A     Yes.

8   Q     Now, you testified earlier that you were wearing a body

9   suit that day and that he had asked -- and that you had taken

10  off your pants; is that right?

11  A     Correct.

12  Q     When he told you to, correct?

13  A     Correct.

14  Q     Can you just explain to the jury what you mean by "body

15  suit"?

16  A     A body suit is a one-piece, like a leotard.  It's not a

17  top.  It's like one whole piece.

18  Q     Now, you testified a moment ago about certain questions

19  the defendant asked you in that small room within the studio.

20  What, if anything, did the defendant say to you about

21  consequences if you didn't answer?

22  A     He just said that there would be an issue if I didn't

23  answer the questions truthfully.  When we were in that

24  setting, his demeanor was just real serious and I felt like he

25  still was upset about the whole me not getting up thing.

Faith - Direct - Shihata                    2254

1          Also, when we were having that conversation where he
2    was questioning me, he had let me know that he likes a woman
3    that reminds him of a puppy, his daughter or his mom.  He said
4    that when it came to sex, when it came to pleasing him, that I
5    need to be excited like a puppy would when they see their
6    owner or like a little girl is when she sees her dad.
7    Q    And when the defendant was telling you these things, what
8    was his tone?
9    A    Stern, serious.  There was no smiling, no laughing, dead
10   in my eye, straight contact.
11   Q    When you were in that smaller room and the events you
12   just described took place, did you feel like you could leave?
13   A    No.
14   Q    Why not?
15   A    I was under his rules and he had a weapon, so I wasn't
16   even going to step out of line.
17   Q    What happened after the oral sex?
18   A    After the oral sex, he proceeded to tell me to get
19   dressed.  And he laid on the couch, I sat in the chair, he
20   went to sleep.
21   Q    And where were you at that point when he was laying on
22   the couch and --
23   A    We were outside in the smaller room.  We were in the
24   recording part of the studio where the microphone and the
25   piano was.  There was a big couch.  He just laid down and he

Faith - Direct - Shihata                    2255

1    went to sleep.

2    Q    At some point after that, did you need to use the

3    bathroom?

4    A    Yes.

5    Q    And what, if anything, did you do?

6    A    I woke him up and I told him I had to use the bathroom.

7    He said, "You know where it is, right?"  I said yes.  He said,

8    "Okay.  Make sure you don't talk to nobody.  Go straight to

9    the bathroom and come back."

10   Q    And why did you wake the defendant up to use the bathroom

11   if you knew where it was already?

12   A    I didn't want to just leave and upset him without him

13   knowing where I was going.

14   Q    Was it part of his rules?

15   A    Correct.

16   Q    Now at some point did you return to your hotel?

17   A    Yes.

18   Q    And how did that come about?

19   A    When he woke up, he told me to text Diana and tell her to

20   call a car and I would see him later.

21   Q    And did you, in fact, do that?

22   A    I did.

23   Q    Now, did you see the defendant again during your trip to

24   L.A.?

25   A    Yes, I did.

Faith - Direct - Shihata                    2256

1   Q     And when did you see him again?

2   A     I saw him before my flight back out to Texas.

3   Q     And was that -- actually, withdrawn.

4               Where did you see him again?

5   A     At the studio.

6   Q     The same studio you had been in before?

7   A     Correct.

8   Q     And how did you get to the studio that time?

9   A     Diana had called an Uber to pick me up and take me to the

10  studio.

11  Q     And what happened when you arrived at the studio?

12  A     Once I got to the studio, it was just him and I.  Again,

13  Diana walked me to the room.  She was already there -- excuse

14  me -- so I met her at the door.  She walked me to where he

15  was.

16              This time he was listening to his music, so I caught

17  him in the middle of just working.  We were sitting down.  He

18  didn't ask me -- this time he didn't ask me to strip as soon

19  as I walked through the door.  This time he was a little more

20  calm, it seemed like.  He wasn't hypersexual.  Like what

21  happened yesterday, it didn't seem to affect today, so I

22  didn't really get a bad feeling.  He was playing me music.  He

23  had offered me something to drink.  That was, I would say, a

24  better moment.  It didn't feel as forced.  It felt natural at

25  the time.

Faith - Direct - Shihata                    2257

1       Not long though into the conversation he just
2   reminded me again, like he was like "I still have a lot to
3   teach you."  And in the middle of our interactions, we were
4   listening to his music, he gets up and he just puts out his
5   iPad and he starts recording us.  And we're -- he's like "come
6   sit next to me."  So I was sitting next to him or across from
7   him and he's just like "okay, rub Daddy's head, look at me."
8   Like he's directing my movements, just sitting there.  He's
9   telling me to sit up straight again and -- okay, and he's like
10  "just stare at me."  So what I thought was, like, a better
11  moment, it just kind of got like really awkward.

12  Q    And what room were you in when these events transpired?

13  A    We were in the studio.

14  Q    The same room that you had initially been taken to the
15  day before?

16  A    Correct.

17       MS. SHIHATA:  I'm showing the witness only a CD
18  containing Government Exhibits 327(a) and 327(b).

19  Q    Prior to your testimony today, did you have an
20  opportunity to review the contents of this CD?

21  A    Yes, I did.

22  Q    And after reviewing the contents of this CD, did you
23  initial the CD?

24  A    I did.

25  Q    Are these your initials here?

Faith - Direct - Shihata                    2258

1   A    Correct.

2          MS. SHIHATA:  I move to admit Government Exhibits

3   327(a) and (b).

4          THE COURT:  Any objection?

5          MR. CANNICK:  Just one second, please.

6          THE COURT:  Okay.

7          MS. SHIHATA:  And, actually, I can ask some more

8   foundational questions.

9   Q    So you testified a moment ago about a video recording

10  that the defendant made of you while you were at the studio

11  the second day; is that right?

12  A    Correct.

13  Q    Prior to -- actually, withdrawn.

14         And that was in the studio room while you were

15  sitting interacting with him?

16  A    Correct.

17  Q    And the contents of Government Exhibit 327A and 327(b)

18  that you reviewed, did you recognize the videos in -- on that

19  CD?

20  A    I'm sorry, can you repeat the question?

21  Q    Sure.  Sorry.

22         Did you recognize -- after viewing the videos on

23  Government Exhibits -- on this CD, did you recognize where

24  they were taken?

25  A    Correct.

Faith - Direct - Shihata                    2259

1   Q    And did you recognize who was in them?

2   A    Correct.

3   Q    And based on your review, where did you recognize the

4   videos as having been taken?

5   A    They were taken by him on his iPad.  They were from his

6   iPad.

7   Q    Did you recognize where physically you were?

8   A    Correct.  In the studio in L.A.

9   Q    And who did you see in the videos?

10  A    R. Kelly and I.

11          THE COURT:  All right.  Any objection to this coming

12  into evidence?

13          MR. CANNICK:  No.

14          THE COURT:  Okay.  It is in evidence.

15          MS. SHIHATA:  Thank you, Your Honor.

16          (Government Exhibits 327(a) and 327(b) were received

17  in evidence.)

18          THE COURT:  Is this -- are you playing it?

19          MS. SHIHATA:  I will be playing it.

20          THE COURT:  Do you want it to be jury only?

21          MS. SHIHATA:  These don't need to be jury only,

22  Judge.

23          THE COURT:  Okay.

24          (Pause.)

25  Q    So I am going to start first with Government Exhibit

Faith - Direct - Shihata                    2260

1   327(b).

2           You testified you had an opportunity to review that

3   prior to your testimony here today, correct?

4   A    Correct.

5   Q    And is that video approximately 20 minutes long?

6   A    Correct.

7   Q    All right.  The whole video is now in evidence.  I am not

8   going to play the whole video.  I am just going to play

9   certain portions of it.  Okay?

10  A    Okay.

11          MS. SHIHATA:  All right.

12          (Pause.)

13          Your Honor, this may -- I know it's a little soon,

14  but I think we're having some technical difficulties.

15          THE COURT:  That IS okay.  Do you want to move on to

16  something else and come back to it?

17          MS. SHIHATA:  Sure.

18          THE COURT:  Okay.  I am also just going to remind

19  the jury.  I think I told you this before, but any item of

20  evidence, you will be able to see in the course of your

21  deliberations.

22          But if you move on to something else, we will see if

23  we can work it out.  Okay?

24          MS. SHIHATA:  Yes, Your Honor.

25  Q    So we'll come back to that.

Faith - Direct - Shihata                    2261

1        Now, after what you just described at the studio,

2   did you go back home?

3   A    Yes, I did.

4   Q    To San Antonio?

5   A    Correct.

6   Q    And what, if any, communications did you have with the

7   defendant after returning to San Antonio?

8   A    Same; phone calls, texting, FaceTime.

9   Q    And did you travel to see the defendant one more time

10  after that?

11  A    Correct.

12  Q    And where did you end up traveling to?

13  A    I went to New York.

14  Q    And around when was that?

15  A    Around February of 2018.

16  Q    And why did you travel to New York?

17  A    I had traveled to New York to see Mr. Kelly.

18  Q    And why did you decide to do that on that occasion?

19  A    On this time I really was just like let me see how it's

20  going to go one last time.  It had been a couple of weeks

21  since I seen him in L.A., so I wanted to see how this time was

22  going to be.

23  Q    And who booked your flights to New York?

24  A    Diana Copeland.

25  Q    Who paid for your flights?

Faith - Direct - Shihata                    2262

1   A    R. Kelly.

2   Q    And where did you fly from to New York?

3   A    I flew from San Antonio to New York.

4   Q    And when you say "New York," are you referring to

5   New York City?

6   A    Correct.

7   Q    And after you arrived in New York, where did you go?

8   A    I went to the Mondrian Hotel.

9   Q    And how did you know to go to the Mondrian Hotel?

10  A    Diana had texted me and arranged for the Uber to pick me

11  up and take me to the airport -- I mean, excuse me, to the

12  hotel.

13  Q    I am showing you page -- what's in evidence as Government

14  Exhibit 208(b), page 76.

15         Again, are these texts between you and Diana?

16  A    Correct.

17  Q    And at the top, is there kind of an Uber map that she

18  sent you of the car?

19  A    Correct.

20  Q    And in blue, are you texting her "it's the Mondrian"?

21  A    Correct.

22  Q    And she responds, "Yes.  Stand by in the lobby for just a

23  moment, please."  And thereafter says, "Go to the 18th floor."

24  Is that right?

25  A    Correct.

Faith - Direct - Shihata                    2263

1   Q    And the Mondrian, is that in Manhattan?

2   A    Correct.

3   Q    And did you, in fact, go to the 18th floor?

4   A    I did.

5   Q    And after you arrived on the 18th floor, who, if anyone,

6   did you see?

7   A    Diana met me on the 18th floor.  And she had the key to

8   his hotel suite and she let me in.

9   Q    When you say "his hotel suite," who are you referring to?

10  A    R. Kelly.

11  Q    After Diana took you to his hotel suite -- well, first,

12  was that on the 18th floor?

13  A    Yes.

14  Q    And after she took you there, what did she do?

15  A    She opened the door for me and let me in.

16  Q    And did she stay or leave?

17  A    She left.

18  Q    Was anyone in the suite when you arrived?

19  A    No.

20  Q    And after you arrived, did you stay in the suite?

21  A    Yes.

22  Q    Did you go anywhere?

23  A    No.

24  Q    Why?

25  A    Don't leave anywhere without his permission.

Faith - Direct - Shihata                    2264

1    Q     The defendant's?

2    A     Correct.

3    Q     Now, at some point did you end up seeing the defendant?

4    A     I did.

5    Q     And when was that?

6    A     So I had got there like late, early morning, maybe like

7    1:00 a.m.  He came in around 8:00 a.m.

8    Q     And what happened -- well, when he came in, what were you

9    doing?

10   A     Sleep.

11   Q     And what happened after the defendant came into the room?

12   A     He knocked and I came to the door.  Of course I was

13   yawning.  And he was like "you're going to have to get used to

14   my schedule."  Again he asked me to take off my clothes.

15   Again I did.  He comes in this time -- this time his energy

16   was just like -- it was just a little more hyper.  He came in,

17   he was smiling.  He had a smile on his face.  And he said,

18   "You don't miss me?  You're not acting like you miss me."  And

19   any time, you know, my reaction wasn't the way he wanted, he

20   just let out that deep sigh, like.  He opened the curtains,

21   let all the light in at 8:00 in the morning and he said I

22   wasn't acting like I miss him, so he asked me to give him a

23   hug again.  I gave him a hug.  I kissed him.  My kiss, it

24   wasn't what he liked again.  He told me to kiss him again the

25   right way, so I did again.

Faith - Direct - Shihata                    2265

1           After that he got right into it, put out his iPad.

2    He told me to pose again.  He said I wasn't being sexy.  He

3    said, "You're not being sexy."  He said, "Okay, let's try

4    something else."  He said, "Okay, I want you to play with

5    yourself."  And I just couldn't do it.  I was like "I can't do

6    that."  Again, a sigh of dissatisfaction, like.

7           So after that I follow him to the bedroom.

8    Q     Can you hold on one moment?

9           The suite, could you describe how many rooms it was

10   and what the layout was?

11   A     So when you walk into the suite, it's like a living area,

12   there's a TV.  And then there is a room with the bathroom and

13   there's a chair and a TV in there as well.

14   Q     And the events you just described, where in the suite did

15   those take place?

16   A     We were in the front part of the living area.

17   Q     And then what happened next?

18   A     I followed him into the bedroom.  He asked me to lie on

19   my back.  And right away he just -- he plays with himself for

20   a little bit and then he starts to penetrate me.  My whole

21   body language just was off.  I was clenching on purpose and I

22   knew he could feel it because he kept trying to enter.  And it

23   was literally to the point where he was getting frustrated

24   that he couldn't get inside me, he started grunting.  And

25   after a while, like maybe, like, a minute of just tussling

Faith - Direct - Shihata                    2266

1   with me but we're in silence, like I'm not saying anything,

2   I'm just clenching up.  And he's telling me to relax, I'm not

3   relaxing.  I'm not telling him I'm not relaxing though, I'm

4   just clenching.  And I could tell he was getting upset.  So he

5   kind of let out that last, and he sat up.  Like, he sat up.

6           So when he got up, I just got up, I didn't say

7   anything and I went in the living room, and there was a chair

8   that we could still see each other through the door.  I wasn't

9   saying anything.  I knew I had pissed him off.  I knew I had

10  pissed him off, so I just didn't say anything.

11          And he got his iPad -- he already was recording us.

12  He got his iPad and he literally started jacking off, but it

13  was like high speed.  Like, the way he was masturbating was,

14  like, so fast, it was like an itch, like he had to scratch.

15  And he turned the volume up on loud.  So as I am sitting here,

16  I can hear him watching other females on the iPad.  And I know

17  he's in the video because I can hear him saying the names of

18  the women who are on the iPad.

19  Q    Now, without saying the names of the women that you could

20  hear on the iPad or hear him saying on the iPad video he was

21  watching, do you recall the names you heard?

22  A    Yes.

23          MS. SHIHATA:  I'm showing the witness only what's

24  been marked for identification as Government Exhibit 954 and

25  then I will also show Government Exhibit 955.

Faith - Direct - Shihata                    2267

1    Q    So showing you first 954, was that one of the names that

2    you heard the defendant say on the video that he was watching?

3    A    Correct.

4    Q    And now showing you Government Exhibit 955, was that

5    another name you heard him say on the video?

6    A    Correct.

7              MS. SHIHATA:  The government moves to admit

8    Government Exhibits 954 and 955.

9              MR. CANNICK:  No objection.

10             THE COURT:  All right.  Those are in evidence.

11             (Government Exhibits 954 and 955 were received in

12   evidence.)

13             Display to jury only?

14             MS. SHIHATA:  Yes, Your Honor.

15             And publishing first to the jury only, Government

16   Exhibit 955.

17             And, actually, 954 doesn't need to be to the jury

18   only.

19             THE COURT:  Okay.

20   Q    Now, Government Exhibit 954, is that the name Joy?

21   A    Correct.

22   Q    And was that the individual that the woman that the

23   defendant introduced you to in Dallas?

24   A    Correct.

25   Q    Now, you testified a moment ago that you were clenching

Faith - Direct - Shihata                    2268

1   your body while the defendant was trying to penetrate you.

2   Why were you clenching your body?

3   A    I didn't want to have sex with him.

4   Q    And you indicated that he was getting frustrated; is that

5   right?

6   A    Yes.

7   Q    Now, was the defendant able to fully penetrate you?

8   A    No.

9   Q    Was he able -- was he, nonetheless, putting his penis

10  somewhat inside your vagina?

11  A    Yes.

12  Q    Now, after you -- well, you testified you saw the

13  defendant masturbating to the video, to a video that he was

14  in, and using the two names we just discussed; is that right?

15  A    Correct.

16                  (Continuing on the next page.)

17

18

19

20

21

22

23

24

25

Faith - direct - Shihata                    2269

1    EXAMINATION CONTINUES

2    BY MS. SHIHATA:

3    Q    And what, if anything, happened after that?

4    A    After that, he had told me that I needed to be like them

5    and he called me back into the room.  He ordered food, he

6    ordered room service.  He had asked me if I wanted something;

7    I said:  No.  He kinda just said:  Okay.

8             He laid down and he said, he asked me if I knew how

9    to give a massage.  And I said:  I think so.  He said:  It's a

10   yes or no question.  I said:  Yes.  He said:  Come rub my

11   back.  And he literally went to sleep within maybe minutes of

12   me doing that.

13   Q    Now, at any point before the defendant was putting his

14   penis inside you that day, had he told you he had herpes?

15   A    No.

16   Q    Or any other sexually-transmitted disease?

17   A    No.

18   Q    Did he use a condom that day?

19   A    No.

20   Q    Now, earlier you testified these events that you just

21   described all occurred at the Mondrian Hotel in Manhattan, is

22   that right?

23   A    Correct.

24            MS. SHIHATA:  I'm showing the witness only what's

25   been marked for identification as Government Exhibit 514(a).

Faith - direct - Shihata                    2270

1    BY MS. SHIHATA:

2    Q    Do you recognize this photo?

3    A    Correct.

4    Q    And what do you recognize this photo to be?

5    A    The Mondrian.

6    Q    And is that the hotel where the events you just described

7    took place?

8    A    Correct.

9         MS. SHIHATA:  I move to admit Government

10   Exhibit 514(a).

11        MR. CANNICK:  No objection.

12        THE COURT:  All right, that's in evidence.

13        (Government's Exhibit 514(a) was received in

14   evidence.)

15        MS. SHIHATA:  And may we publish it?

16        THE COURT:  Yes.

17        (Exhibit published.)

18   BY MS. SHIHATA:

19   Q    Now, you also described the events occurring on a suite

20   on the 18th floor of the Mondrian, is that right?

21   A    Correct.

22        MS. SHIHATA:  I'm showing the witness only what's

23   been marked for identification as Government Exhibits 514(c)

24   through (i).

25        And may I approach, Your Honor?

SAM     OCR     RMR     CRR     RPR

Faith - direct - Shihata                    2271

1              THE COURT:  Yes.

2    BY MS. SHIHATA:

3    Q    Can you just take a moment to look through those, the

4    pages of that exhibit?

5    A    (Witness complies.)

6    Q    And do you recognize what's depicted in Government

7    Exhibits 514(c) through (i)?

8    A    Yes.

9    Q    And what is depicted in those photographs?

10   A    The hotel suite I was in.

11   Q    At the Mondrian?

12   A    Correct.

13             MS. SHIHATA:  The Government moves to admit

14   Government Exhibits 514(c) through (i).

15             MR. CANNICK:  No objection.

16             THE COURT:  Okay, that's in evidence.

17             (Government's Exhibits 514(c) through 514(i) were

18   received in evidence.)

19   BY MS. SHIHATA:

20   Q    All right, I am showing you what's in evidence as 514(c).

21             (Exhibit published.)

22   Q    Is that the entrance to the suite?

23   A    Correct.

24   Q    And do you see, is that the living area you testified

25   about earlier?

                SAM     OCR     RMR     CRR     RPR

Faith - direct - Shihata                    2272

1   A    Correct.

2   Q    I am now showing you 514(d).

3        (Exhibit published.)

4   Q    Is this another view of that living area?

5   A    Correct.

6   Q    And 514 again, the living area, 514(e)?

7        (Exhibit published.)

8   A    Correct.

9   Q    And now I'm showing you 514(f).

10       (Exhibit published.)

11  Q    What's depicted here?

12  A    The hotel suite.

13  Q    And the doorway that you see, what does that enter into?

14  A    The actual hotel room.

15  Q    The bedroom area?

16  A    Correct.

17  Q    And you testified earlier you were sitting on a chair in

18  the living room area when you saw the defendant masturbating

19  and watching a video on his iPad, is that right?

20  A    Correct.

21  Q    Do you see where you were in the room at that time?

22  A    Correct.

23  Q    Where were you?

24  A    Right in that corner where that chair is.

25  Q    I am showing you Government Exhibit 514(g).

Faith - direct - Shihata                    2273

1                    (Exhibit published.)

2    Q    Is this just another view of the chair area and the

3    entrance to the bedroom area?

4    A    Correct.

5    Q    And I am showing you Government Exhibit 514(h).

6                    (Exhibit published.)

7    Q    Is this the bedroom area?

8    A    Correct.

9    Q    And I am showing you 514(i).

10                   (Exhibit published.)

11   Q    Is this another photograph of the bedroom area?

12   A    Correct.

13   Q    And just to be clear, fair to say that these are

14   photographs of the hotel room, but not from the day you were

15   there; is that right?

16   A    Correct.

17   Q    Now, you testified a moment ago about rubbing the

18   defendant's back and then his falling asleep, is that right?

19   A    Correct.

20   Q    What happened after that?

21   A    Shortly after he fell asleep, his phone had kept going

22   off, just kept ringing, like, nonstop.  Just kept going off,

23   going off.  I had maybe shook him a couple of times, told him

24   his phone was ringing, he didn't say anything.  It just kept

25   going off and going off and going off, so I picked it up.

Faith - direct - Shihata                    2274

1          And when I picked the phone up, it was like a whole

2     group thread and one of the person's name was Mommabear.

3               MR. CANNICK:  Objection.

4               THE COURT:  Overruled.

5     BY MS. SHIHATA:

6     Q    You can continue.

7     A    I picked the phone up and there was a whole group text

8     and it was like multiple numbers.  And it was one contact that

9     said, like, Mommabear and it had a family emoji next to it,

10    and it was like a group text.  And some numbers were saved,

11    some numbers weren't.  They were all women.  And that kind

12    of --

13              MR. CANNICK:  Objection.

14              THE COURT:  I can't hear you.  Are you objecting?

15              MR. CANNICK:  Yes.

16              THE COURT:  Okay, overruled.

17    BY MS. SHIHATA:

18    Q    Go ahead.

19              THE COURT:  Are you still -- I hear noises.  I don't

20    know what you want.

21              Do you want a sidebar?

22              MR. CANNICK:  Yes, why not.

23              THE COURT:  Okay, let's have the court reporter come

24    over.

25              (Discussion off the record.)

Faith - direct - Shihata                    2275

1              THE COURT:  I think we decided we don't need the

2      sidebar.

3              MR. CANNICK:  Thank you, Your Honor.

4              MS. SHIHATA:  All right, you can continue with your

5      answer.

6      A     I had noticed that there was a whole bunch of numbers,

7      including some unsaved numbers and one that said Mommabear and

8      it had a family emoji.  And then I could see multiple phone

9      calls, Facetimes, like they were back to back to back to back.

10             And I looked at his other phone, he had multiple

11     phones, and it was the same thing -- back to back to back to

12     back in group text and this Mommabear.

13             And it kinda startled me, confused me a little bit,

14     like the Mommabear.  I know he had said it was like a family,

15     but that kinda just, like, put it in this is really happening

16     and I don't want to be a part of this.

17             I had took a picture on my phone of it, and after

18     that his phone was going off and there was a knock at the door

19     and it was Diana.

20             MS. SHIHATA:  All right, I am showing the witness

21     only what's been marked for identification as Government

22     Exhibit 239.

23     BY MS. SHIHATA:

24     Q     Do you recognize this?

25     A     I do.

Faith - direct - Shihata                    2276

1  Q     And what is there?

2  A     A picture I took of his phone.

3  Q     The defendant's phone?

4  A     Correct.

5  Q     And was that the picture you just described taking of one

6  of his phones while you were in the hotel room, in the hotel

7  suite in the Mondrian?

8  A     Correct.

9            MS. SHIHATA:  I move to admit Government Exhibit

10 239.

11           MR. CANNICK:  No objection.

12           THE COURT:  Okay, it's in evidence.

13           (Government's Exhibit 239 was received in evidence.)

14           (Exhibit published.)

15 BY MS. SHIHATA:

16 Q     And the date on the top here, that's Saturday,

17 February 3rd?

18 A     Correct.

19 Q     And does this appear to show messages, multiple messages

20 from someone saved as Joyce, a 646 number, messages from

21 someone saved as Mommabear?

22 A     Correct.

23 Q     Some missed calls from Diana Copeland?

24 A     Correct.

25 Q     Facetimes with Joyce?

Faith - direct - Shihata                    2277

1    A    Correct.

2    Q    And another -- and a 646 number?

3    A    Correct.

4    Q    I think before I showed you that exhibit you said that

5    Diana came to the room, is that right?

6    A    Correct.

7    Q    What happened at that point?

8    A    Shortly after she entered the room, she stayed in the

9    living part and she let him know he had a meeting, he was

10   late.  He got up, he kind of rushed.  Put on his clothes.

11        Again, before he left, he was giving me constructive

12   criticism, again, about my positions.  I didn't bend over

13   right.  He said, his words were:  Something's not right.

14        And I kinda got upset at that point because I just

15   felt embarrassed, like, nothing at this point was gonna work.

16   It's nothing I could do to make our intimacy better.  It just

17   seemed very unnatural and it never was gonna be natural.

18        So I kinda -- this time -- I never said anything

19   back, but this time I did because when he left he kinda gave

20   me like a -- like a pat on my shoulder, like, better luck next

21   time.  And I was like, you just patted my shoulder like you're

22   a coach and I'm like a team player, like my feelings were

23   hurt.  And he looked at me and he said:  'Cause you are.  He

24   said:  I'm a fuckin' legend.

25        I looked at him and he -- he just looked at me.  And

Faith - direct - Shihata                    2278

1   I was just like:  That doesn't mean -- and he stopped me.  And

2   he said:  I'm not one of them niggas you fuck with.  He said:

3   I'm not gonna go back and forth with you.

4           Diana was standing right there.  This was one of

5   them times, like I said, I had never spoke up for myself and I

6   had never really seen him get close to me.  We weren't

7   directly in each other's face, but we were pretty close.  I

8   definitely was looking up at him.  He said what he had to say

9   and he walked out.  I didn't see him again on that trip.  I

10  knew he was mad, too, because he didn't give me a kiss or say

11  he'll see me later or say anything.  Him and Diana, they just

12  walked out.  And that was the last time we saw each other.

13  Q    Now, at some point after that did you leave New York?

14  A    I did.

15  Q    And do you recall when that was?

16  A    I believe it was the next day.

17  Q    And where did you fly to when you left New York?

18  A    Back to San Antonio.

19  Q    Prior to leaving or at some point did you send a text to

20  the defendant?

21  A    I did.

22  Q    And what do you recall about that?

23  A    After I left I sent him sort of a apologetic text.  I

24  didn't really say too much, but I just let him know, you know,

25  I was embarrassed.  I just -- I really didn't know what was

Faith - direct - Shihata                    2279

1   gonna happen, if he was gonna be mad.

2          Like, there was no conversation.  I didn't know how

3   the chapter was ending.  I didn't hate him.  You know, I was

4   gonna go about my business, that was the plan.  I just hoped

5   he didn't have any harsh feelings to me.

6          So, I apologized to him.  I tried to get a response.

7   He never replied.  Well, he did respond, but we never spoke

8   after that on another romantic level.

9   Q    Did you have any concerns regarding anything that the

10  defendant had related to you?

11  A    Yeah.  Once I had got back to San Antonio, mind you

12  I'm -- I'm from Texas, so the climate is very hot there, even

13  in February.  So, when I got back to Texas, maybe like three

14  days after I got back home, I was coming down with a cold and

15  I thought I just had the flu.  And on the fourth day of having

16  a cold, my mouth had bumps everywhere and my tongue was

17  inflamed with bumps.  My mouth, it looked like disgusting.

18         I had went to urgent care because my sister -- my

19  other sister's a nurse and I hd sent her a picture of my mouth

20  and she said:  That looks like herpes.  So, me, I'm freaking

21  out.  Mind you, my parents are like:  What's on your mouth?

22         And that was the first thing that made me be like,

23  ugh, okay, I gotta go see what this is.  And I went to urgent

24  care and they had tested me for herpes and it came back

25  positive.

Faith - direct - Shihata                2280

1        I didn't -- I kinda was in shock.  So, I always go

2   to my OB/GYN every three months.  I was on birth control, so I

3   get the Depo shot and they test you, but I had went just -- I

4   needed her to just check, check me then.  So, she gave me a

5   pee test and a blood test and confirmed that I did have

6   herpes.

7   Q    And, what, if any, understanding did you have about what

8   type of herpes you had?

9   A    At the time she told me I had Type 1 herpes.  So, I

10  really just -- I didn't know what herpes was, that was my

11  first time learning that there was two different types.  I had

12  Type 1.

13  Q    Now, after you learned you had herpes, what, if anything,

14  did you do?

15  A    I reached out to him a couple times.  He never texted me

16  back.

17  Q    When you say you "reached out to him," who are you

18  referring to?

19  A    R. Kelly.

20  Q    And why did you reach out to him?

21  A    I wanted to know if he knew, like, what this was or if he

22  knew, like, anything, just -- it was just like I came home.

23  We weren't speaking and, boom, I find out I have herpes and

24  you said nothing to me.

25        I really just wanted him to maybe give me answers on

1    how to fix it or just acknowledge, like, he did it.  I knew it

2    was him.  And he just totally like cut off communication with

3    me and wouldn't respond to me.

4              When I was texting him, I wasn't saying:  Text me

5    back, I know you have herpes, that's -- I was saying, let's

6    have a conversation.  He would not reach back out to me.

7    Q    And why did you want to have a conversation with him?

8    A    I wanted to discuss my STD status.

9    Q    And did he respond?

10   A    No.

11   Q    After receiving no response from the defendant, did you

12   contact a lawyer?

13   A    Correct.

14   Q    And why did you do that?

15   A    Because there was no other way for me to get resolvement

16   [sic] [sic] in this.

17   Q    And the lawyer you contacted, was that a lawyer in Texas?

18   A    Correct.

19   Q    Where you were living?

20   A    Correct.

21   Q    And after contacting a lawyer in Texas, did you and the

22   lawyer go to report anything anywhere?

23   A    Yes.  So, shortly after I had obtained a lawyer, he heard

24   everything that happened between me and Mr. Kelly.  He had let

25   me know that it's actually illegal for somebody to give you a

1    STD and they know.

2              MR. CANNICK:  Objection.

3              THE COURT:  Well, sustained as to that.

4              You had a conversation with the lawyer and what

5    happened next.

6    A    After my conversation with my attorney, we went to Dallas

7    Police first and we tried to get some type of resolvement

8    [sic] there.  They told me that because the basis of my --

9    Q    Well, just while you were at the Dallas Police

10   Department, what, if anything, did the police you met with

11   while you were there try to do?

12   A    They had told me that I had to --

13             MR. CANNICK:  Objection.

14             THE COURT:  I know, it is difficult.  Don't tell us

15   what they told you.

16             Did you do something with them?

17             THE WITNESS:  Correct.

18             THE COURT:  Okay.  What did you do?

19             THE WITNESS:  So, I was -- I called him.

20             THE COURT:  You called who?

21             THE WITNESS:  I called R. Kelly and he did not

22   answer.  So, after I called --

23   BY MS. SHIHATA:

24   Q    Okay, so let's just stop there for a moment.

25             When you called R. Kelly, the defendant's phone

Faith - direct - Shihata                        2283

1   number, was that in the presence of Dallas Police personnel?

2   A    Correct.

3   Q    And was the plan to record that phone call?

4   A    Correct.

5   Q    What, if anything, were you planning to discuss with the

6   defendant if he answered the phone?

7   A    If he answered the phone, we were gonna discuss the

8   herpes.

9   Q    And I think you testified the defendant did not answer,

10  is that right?

11  A    Correct.

12  Q    Following that, were you advised to try to make another

13  recording or to make a recording of the defendant?

14  A    Correct.

15  Q    Discussing the herpes?

16  A    Correct.

17  Q    And after you left the Dallas Police Department that day,

18  did you and your lawyer attempt to do that?

19  A    We did.

20  Q    And how, if at all, did you try to get the defendant on

21  the phone after that?

22  A    In the wee hours of the morning a couple days later I had

23  got a phone call from Mr. Kelly.  I answered.  We had a

24  conversation.

25  Q    Prior to that, had you sent him any text messages?

SAM      OCR      RMR      CRR      RPR

Faith - direct - Shihata                    2284

1    A     Yes.

2    Q     And what was the purpose of sending him text messages?

3    A     So, that we could have a conversation to talk.

4    Q     Now -- and then I think you -- at some point did you, in

5    fact, speak to the defendant over the phone?

6    A     Correct.  He ended up calling me back.  I answered.  He

7    let me know, he said:  Your name came up.  And he said:

8    You're the only Faith I know.  He said:  I just want to let

9    you know you still have a friend in me.  You really do.

10             And I said:  I do?

11             He said:  Yeah.

12             And I said:  Well, why you didn't tell me?

13             He said:  Tell you what?

14             I said:  You didn't tell me you had anything.

15             He said -- well, basically he said if he had some --

16   excuse me, if he had something, we weren't gonna discuss it

17   over the phone.  He said:  I don't know what you're talking

18   about, but if I did know what you're talking about, we're not

19   gonna have that conversation over the phone.

20             He advised me to come to Chicago, but this time he

21   said, you know:  You get your flight and I'll give you the

22   money back.  He said:  You come up here, you meet me and you

23   just let me know.  And I said:  Okay.

24   Q     And did you go to Chicago?

25   A     No.

Faith - direct - Shihata                    2285

1   Q    Did you have any intention of going to Chicago?

2   A    No.

3   Q    When the defendant called you and you had the

4   conversation you just described, did -- what, if anything, did

5   you do during that phone call?

6   A    I had put my lawyer on three-way and he recorded the

7   call.

8   Q    Your lawyer recorded the call?

9   A    Yes.

10  Q    Now, in addition to the Dallas Police Department, did you

11  go to another police department after that?

12  A    Correct.

13  Q    And do you recall where that was?

14  A    In New York.

15  Q    And was that in Long Island?

16  A    Correct.

17  Q    And did you make a report there?

18  A    Yes.

19  Q    Now, at some point did your lawyer in Texas refer you to

20  a lawyer in New York?

21  A    Correct.

22  Q    And what, if anything, did the lawyer in New York file?

23  A    She filed my lawsuit.

24  Q    And that was a lawsuit against the defendant?

25  A    Correct.

Faith - direct - Shihata                    2286

1   Q    And was that lawyer's name Lydia Hills?

2   A    Correct.

3   Q    I am showing you what's in evidence as Government

4   Exhibit 231.

5              (Exhibit published.)

6   BY MS. SHIHATA:

7   Q    Do you see this envelope on your screen?

8   A    Correct.

9   Q    And is it addressed to Lydia C. Hills, Esquire at an

10  address in Brooklyn, New York?

11  A    Correct.

12  Q    And was that the lawyer who filed the lawsuit for you in

13  New York?

14  A    Correct.

15  Q    And was it sent by certified mail, this letter?

16  A    Correct.

17  Q    And is there a name and address indicated in the top left

18  corner?

19  A    Yes.  Robert Kelly, 219 North Justine Street, Chicago

20  Illinois.

21  Q    And just looking at Government Exhibit 231 again, I am

22  just going to zoom in.

23              Do you see the USPS postage on this?

24  A    Yes.

25  Q    And do you see a date where my finger is (indicating)?

Faith - direct - Shihata                    2287

1   A     Yes, November 20th, 2018.

2   Q     Now, at this point had your lawyer already filed the

3   lawsuit?

4   A     Correct.

5   Q     I am showing you what's in evidence as Government

6   Exhibit 231(a).

7                (Exhibit published.)

8                MS. SHIHATA:  Actually, I'm sorry, to the jury only,

9   please.

10               (Exhibit published to the jury only.)

11               THE COURTROOM DEPUTY:  You have to wait.

12               MS. SHIHATA:  I'm sorry.

13               THE COURTROOM DEPUTY:  It's okay.  You can go.

14               MS. SHIHATA:  Thank you.

15  BY MS. SHIHATA:

16  Q     Now, is this --

17               MS. SHIHATA:  Actually, may I approach for one

18  moment, Your Honor?

19               THE COURT:  Sure.

20  Q     Can you just take a look at the documents in Government

21  Exhibit 231(a) that I just handed you?

22  A     (Witness complies.)

23  Q     Having looked at the documents in Government

24  Exhibit 231(a), at some point did your lawyer show you these

25  documents?

SAM     OCR     RMR     CRR     RPR

1    A     Correct.

2            MS. SHIHATA:  Now, for the jury only.

3            (Exhibit published to the jury only.)

4    BY MS. SHIHATA:

5    Q    I am starting with the first page of Government

6    Exhibit 231(a).

7            THE COURT:  You are not going to read the whole

8    thing, are you?

9            MS. SHIHATA:  No, I'm not, don't worry, Judge.

10   BY MS. SHIHATA:

11   Q    Does this have a case caption with your full name and the

12   defendant's -- versus the defendant's full name?

13   A     Correct.

14   Q    And is this purportedly something -- a document titled

15   Notice of Delivery?

16   A     Correct.

17   Q    And it's addressed to the Law Office of Lydia C. Hills in

18   Brooklyn, New York?

19   A     Correct.

20   Q    And it has a declaration from someone named June Barrett

21   that she caused the foregoing notice of delivery to be

22   delivered, is that right?

23   A     Correct.

24   Q    And do you see the name and address of June Barrett on

25   the bottom of this?

Faith - direct - Shihata                    2289

1    A    Correct.

2    Q    And is that the address listed 1826 South Millard Avenue,

3    Chicago, Illinois, with a phone number listed and an e-mail,

4    junespointofview@yahoo.com?

5    A    Correct.

6    Q    All right, I am showing the second page of this exhibit.

7            And, again, does this appear to be a letter

8    addressed to your lawyer, Lydia C. Hills?

9    A    Correct.

10   Q    And it has a date on the top of October 22nd, 2018?

11   A    Correct.

12   Q    Now, I want to focus on a particular portion of this

13   letter.

14           Do you see the paragraph the second from the bottom

15   that I'm pointing to (indicating)?

16   A    Yes.

17   Q    And I'm not going to ask you to read the whole thing, but

18   does it state:

19           Please advise, and then your last -- Ms. and your

20   last name, your client, to abandon this heartless effort to

21   try to destroy my musical legacy for selfish personal

22   enrichment.  If she persists in court action, she will be

23   subjected to public opinion during the discovery process.

24           For example, my law team is prepared to request the

25   production of the medical test results proving the origin of

Faith - direct - Shihata                2290

1   her STD claim, as well as ten personal male witnesses

2   testifying under oath about her sex life in support of her

3   claim and complete records of her texts, Facetime message

4   exchanges, which will be reviewed to match and be

5   authenticated by the recipient to ensure there are no

6   omissions or deletions.

7          And then the following paragraph --

8          THE COURT:  Just slow down a little bit please, just

9   for the court reporter.

10          MS. SHIHATA:  I apologize.

11          THE COURT:  That's all right.

12  BY MS. SHIHATA:

13  Q    And then the last paragraph on that page says:

14          If Ms. and your last name, really cares about her

15  own reputation, she should cease her participation and

16  association with the organizers of this negative campaign.

17  Counteractions are in the developmental stages and due to be

18  released soon.

19          And do you see a sincerely, a signature, and then

20  the name Robert Sylvester Kelly?

21  A    Correct.

22  Q    Now, I am showing you the third page of this exhibit.

23          Now, does this appear to be a page from the lawsuit

24  or the complaint that your attorney filed in New York Supreme

25  Court?

SAM     OCR     RMR     CRR     RPR

1   A    Correct, that's what it is.

2   Q    And do you see a stamp on it?

3   A    Correct.

4   Q    And what does the stamp say?

5   A    I do not accept this offer to contract and I do not

6   consent to these proceedings.

7   Q    And do you see a notary signature?

8   A    Yes, from June Barrett.

9   Q    And is that dated October 29th?

10  A    October 29th, 2018.

11  Q    And then is there also a notary stamp, June A. Barrett,

12  Notary Public, State of Illinois?

13  A    Correct.

14  Q    And on that page, same page, does there also appear to

15  be -- above June Barrett's signature, does there appear to be

16  another line next to the word "by" and a signature written

17  there?

18  A    Correct.

19  Q    Now, I'm showing you the next page of the exhibit.

20       Again, is this stamped with:  I do not accept this

21  offer to contract and I do not consent to these proceedings?

22  A    Correct.

23  Q    And, again, is it -- is there a notary stamp for June A.

24  Barrett, signature for June A. Barrett and a date?

25  A    Correct.

Faith - direct - Shihata                    2292

1   Q    And above that, again, does there appear to be another

2   signature there?

3   A    Correct.

4   Q    Showing you the next page of the exhibit, does this

5   appear to be a summons for the lawsuit that your lawyer filed?

6   A    Correct.

7   Q    And, again, does it state:  I do not accept this offer to

8   contract, I do not accept these proceedings?

9   A    Correct.

10  Q    And signed and notarized by June A. Barrett?

11  A    Correct.

12  Q    And another signature on top of June A. Barrett's

13  signature?

14  A    Correct.

15  Q    Showing you the following page, is this titled Testimony?

16  A    Correct.

17  Q    And at the bottom is there a signature?

18  A    Yes.

19  Q    And a date?

20  A    Yes.

21  Q    And then a witness signature?

22  A    Correct.

23  Q    I am showing you the next page of the exhibit.

24       What do you see written at the top?

25  A    Here is Faith, your client.

Faith - direct - Shihata                    2293

1  Q    And yes, I apologize, make sure not to say your last

2  name.

3         Now, below where it says:  Here is Faith, your

4  client, do you see a series, first, of three photographs?

5  A    Yes.

6  Q    And are those photographs of you?

7  A    Yes.

8  Q    And the first two photographs, are those from television?

9  A    Correct, all -- the first three are.

10 Q    Okay.  And underneath those three photographs, can you

11 see what's written?

12 A    Here a sample of the real Faith ███████ --

13 Q    I'm sorry, I'm sorry.  Just remember not to say your last

14 name.

15        How about this, I'll read it, okay?

16 A    Okay.

17        THE COURT:  Is this in evidence?

18        MS. SHIHATA:  Yes, this is part of the same

19 Government Exhibit 231(a).

20        THE COURT:  Okay, go ahead.

21 BY MS. SHIHATA:

22 Q    Here is a sample of the real Faith, and then your last

23 name.  Remember, she lives in Texas, so her claim of being

24 intimidated falls flat because these pics were sent via text.

25        Is that right?

SAM     OCR     RMR     CRR     RPR

Faith - direct - Shihata                    2294

1    A    Correct.

2    Q    Did I read that correctly?  Okay.

3            And below that is there a series of four

4    photographs?

5    A    Correct.

6    Q    And the first photograph, do you recognize who is in that

7    photograph?

8    A    R. Kelly and I.

9    Q    And do you recognize the room you're in?

10   A    Yes.

11   Q    Where was that from?

12   A    In the recording studio that I was in, in LA.

13   Q    And is there another photograph right next to that?

14   A    Correct.

15   Q    Is that a photograph of you?

16   A    Correct.

17   Q    And is part of your breast exposed?

18   A    Yes.

19   Q    And do you recall anything about where this photograph

20   was taken?

21   A    I don't know where it was taken, but I know it was a

22   picture he took of me.

23   Q    When you say "he," who are you referring to?

24   A    R. Kelly.

25   Q    And is there another photograph of you next -- next to

1    that picture?

2    A    Correct.

3    Q    And in that picture does it show an exposed portion of

4    your buttocks?

5    A    Correct.

6    Q    And then the final photograph on that row, do you

7    recognize what that is a picture of?

8    A    Yes, he told me to send him a picture, and I sent him a

9    picture of my outfit.

10   Q    So, is that a photograph of text messages between you and

11   the defendant?

12   A    Correct.

13   Q    And in these, are what you sent -- is what you sent on

14   the left side and in gray?

15   A    Correct.

16   Q    And the pictures?

17   A    Correct.

18   Q    And is what the defendant said on the right side and in

19   blue?

20   A    Correct.

21   Q    And below a photograph of you, did you write:  Is this

22   better, Daddy?

23   A    Correct.

24   Q    And at the bottom of this page, is there some text

25   written?

SAM      OCR      RMR      CRR      RPR

Faith - direct - Shihata                    2296

1    A    Yes.

2    Q    And does it state:  I assure you, this would not be

3    considered a Sunday go-to-meeting dress.  The next two

4    pictures have been cropped for the sake of not exposing her

5    extremities to the world yet!!!  I'm a singer, not a doctor.

6    So, how does Ms. -- and your last name -- justify her

7    transmission of these kinds of pictures?

8             Is that what it said?

9    A    Correct.

10   Q    I'm now showing you the final page of Government

11   Exhibit 231(a).

12            And is there some text at the top of this page

13   followed by photographs of text messages?

14   A    Correct.

15   Q    And at the top of the page, does it state:  Ms., and your

16   last name, Ms. your last name's usage of daddy is/was her

17   choice!  It's very interesting how the difference in age only

18   becomes a factor when things didn't go as she planned.

19            Is that what it says?

20   A    Correct.

21   Q    Now, focusing on the first text message on this page.

22            Again, are the -- do you recognize who these texts

23   are between?

24   A    They're between him and I.

25   Q    The defendant and you?

Faith - direct - Shihata                    2297

1    A    Correct.

2    Q    And in these texts, are what you wrote to the defendant,

3    is that on the left side in gray?

4    A    Yes, it is on the left side in gray.

5    Q    And what the defendant wrote to you is on the right side

6    in blue?

7    A    Yes.

8    Q    And at some point in this text message exchange do you --

9    did you send the defendant an address?

10   A    Correct.

11   Q    And do you have any memory of why you were doing that?

12   A    I was going out.  I was sending him where I was going.

13   Q    And why did you need to send the defendant the address of

14   where you were going?

15   A    Those were his rules.

16   Q    Now, turning to the second text message, the middle text

17   message on this page.  I want to focus here on the date of

18   these text messages.

19        First of all, do you recognize -- do you have a

20   memory of these text messages?

21   A    Absolutely.

22   Q    And are these from April?

23   A    Correct.

24   Q    Do you know -- well, do you know April of what year?

25   A    April of 2018.

Faith - direct - Shihata                    2298

1   Q    And was this after your final trip to New York to see the

2   defendant?

3   A    Correct.

4   Q    And what are these texts, why were you sending the texts

5   in gray?

6   A    The texts in April, the first one, I sent that when I was

7   in Dallas.  And the one on the 21st was after he called me and

8   said he wanted to talk.

9   Q    And so, when you said you sent it when you were in

10  Dallas, what were you in Dallas doing?

11  A    Trying to file a police report.

12  Q    So, that was at the time or this was in the vicinity of

13  the time that you had tried to -- that you had gone to the

14  Dallas Police Department to make a report?

15  A    Correct.

16  Q    And as you testified earlier, while you were in the

17  police officer's presence, you attempted to make a recorded

18  call and the defendant did not answer?

19  A    Correct.

20  Q    And I think you testified earlier that thereafter you

21  contacted the defendant again via text message to try to make

22  another -- to make a recording as the police had advised you,

23  correct?

24  A    Correct.

25                (Continued on the following page.)

SAM     OCR     RMR     CRR     RPR

Faith - Direct - Shihata                    2299

1    BY MS. SHIHATA:

2    Q    Is that the text messages we're seeing here?

3    A    Correct.

4    Q    Why did you send the defendant:  I've been thinking and I

5    don't want to do this.  Can we talk about how to make it go

6    away?

7    A    That was after we had that conversation when he had told

8    me that I could come to Chicago and things like that, that was

9    supposed to be the follow-up conversation after that once he

10   had learned.  We didn't speak on the phone actually until the

11   news got out that I had obtained a lawyer to file a lawsuit.

12   If you see, those texts have the 12-day difference.

13   Q    Was it after these texts that you spoke to him on the

14   phone?

15   A    Correct.

16   Q    Fair to say you were trying to get him to call you?

17   A    Correct.

18   Q    Looking at the third photograph of text messages on this

19   page, is this a continuation of the second set of text

20   messages?

21   A    Correct.

22   Q    The items I just showed you including the photographs of

23   you and the text messages, those were all sent to your lawyer

24   Lydia Hills?

25   A    Correct.

1    Q     After you had filed the lawsuit?

2    A     Correct.

3              MS. SHIHATA:  Your Honor, this might be a good time

4    for a break.

5              THE COURT:  Okay.  Ladies and gentlemen, let's take

6    our morning break.  Please don't talk about the case at all.

7    We'll see you in ten minutes.

8              (Jury exits the courtroom.)

9              THE COURT:  The witness can step out.

10             (Whereupon, the witness steps down.)

11             THE COURT:  Do you have an estimate of how long

12   you're going to be?

13             MS. SHIHATA:  I think probably half an hour.

14             THE COURT:  All right.  Everybody can sit down.

15             Anything from either side before we break?

16             MS. SHIHATA:  Not from the Government.

17             MR. CANNICK:  No, your Honor.

18                (Brief recess.)

19             THE COURT:  Let's bring the witness back in.

20             (Whereupon, the witness resumes the stand.)

21             MS. SHIHATA:  I spoke with Mr. Cannick.  I think

22   there is one thing we wanted to raise with your Honor before

23   his cross, if you'd like to do it now or if you want to wait

24   until --

25             THE COURT:  Let's come over to the side with the

```
                        Sidebar                    2301
```

1    court reporter.  I might as well get a preview of it any way.

2              (Sidebar conference.)

3              THE COURT:  What is the issue?

4              MS. SHIHATA:  I had inquired in the break whether

5    Mr. Cannick intended to cross-examine Faith, the witness,

6    about Lydia.  So Lydia Hills, the lawyer who initially filed

7    the lawsuit for her in New York -- completely unrelated to the

8    lawsuit or anything like that -- was charged and convicted of

9    a federal offense.

10             THE COURT:  What did she do?

11             MS. SHIHATA:  I think it had something to do with

12   mortgage for her aunt or something like that.

13             THE COURT:  You're really going to ask her about

14   that?

15             MR. CANNICK:  They've made the lawyers here so

16   prominent.  I don't know what she's going to say in response

17   to my questions.  My answer was, if an answer comes out that

18   begs a question, then I would.  But if we get a ruling on it

19   beforehand.

20             THE COURT:  I don't see how it's relevant.  It looks

21   like she got two lawyers who -- wasn't the first guy who

22   leaked something to TMZ, that's in the 3500 material.  Then

23   you got this person who gets convicted.  Not really her fault.

24             MS. SHIHATA:  I don't think it's relevant Judge.

25             THE COURT:  I don't think that is relevant.  It's

```
                        Sidebar                        2302
```

1   relevant to ask her about did she file the lawsuit.

2          MR. CANNICK:  Right.

3          THE COURT:  You didn't represent him on that.

4          MR. CANNICK:  No.  That was Mr. Farinella.

5          THE COURT:  Really?

6          MS. SHIHATA:  No, no.  I don't think so.  No I don't

7   believe anybody in this courtroom is involved in that other,

8   than the defendant.

9          MR. CANNICK:  I know that Farinella was involved in

10  one a case in New York Supreme Court that was represented.

11         MS. SHIHATA:  I have no idea about that.  But I have

12  no information that Mr. Farinella was involved in the mailing

13  that went to --

14         MR. CANNICK:  Oh, the mailing, neither did my

15  client.

16         THE COURT:  This is not sealed?

17         MS. SHIHATA:  No.

18         THE COURT:  Not sealed, okay.

19         MR. CANNICK:  Actually, the portion where we mention

20  Mr. Farinella representing him in New York Supreme, any

21  references to Mr. Farinella, I ask that be sealed.

22         THE COURT:  That's fine.  I don't think it's such a

23  big deal.  Isn't it a public filing?

24         (End of sidebar conference.)

25         (In open court.)

Faith - Direct - Shihata                    2303

1           THE COURT:  Let's get the jurors.

2           (Jury enters the courtroom.)

3           THE COURTROOM DEPUTY:  You may be seated.

4           THE COURT:  First of all, let me apologize for the

5    delay.  We had a little bit of technical difficulty with some

6    of our ultra modern equipment.  I think we've got it resolved

7    and are ready to resume.  Go ahead.

8           MS. SHIHATA:  Thank you, your Honor.

9    BY MS. SHIHATA:

10   Q    So earlier this morning you testified about your trip to

11   L.A. and the studio you went to when you saw the defendant in

12   L.A.  Do you recall that?

13   A    Yes.

14   Q    I think we got to the point where you were talking about

15   what happened the second day you were in the studio.  And you

16   testified that the defendant started making certain videos of

17   you and him; is that right?

18   A    Correct.

19   Q    And I think at that point we were having some technical

20   difficulties and couldn't play them.  I want to start with

21   what is in evidence as Government's Exhibit 327B.  And as you

22   testified earlier today, you had a chance to review these

23   recordings prior to your testimony here today, correct?

24   A    Correct.

25   Q    And Government's Exhibit 327B, that is a video that is

1  approximately 20 minutes long, correct?

2  A     Correct.

3           MS. SHIHATA:  The entire video in this evidence but

4  we'll only play certain portions of it here today.

5           THE COURT:  So I think all the jurors have

6  headphones.

7           MS. SHIHATA:  Yes, but before we get to that point I

8  want to ask.

9  Q     Do you see the screen in front of you?

10 A     Correct.

11 Q     And do you recognize the people in the video?

12          THE COURT:  It's in evidence.  You asked her all

13 these questions.  I think she testified that she's in the

14 video, she initialed.  It, I'm not trying to rush you, except

15 I am.

16          MS. SHIHATA:  I will take your note, Judge.

17          If everyone can turn their headphones on, there is a

18 little button.

19          THE COURT:  Everybody should have a green light on

20 their headphones, there is a little button on the side.  It's

21 a sad day when I'm giving you technological advice.  Let us

22 know if it doesn't work and we'll figure something out.

23          You want to play it

24          MS. SHIHATA:  Yes.

25          We'll stop at about 32 seconds in.

1          (Video played)

2          THE COURTROOM DEPUTY:  It's on every where, you

3   don't need headphones.

4          THE COURT:  Just keep playing.

5          MS. SHIHATA:  It's playing in both.  So keep your

6   headphones on.

7          (Video played)

8   BY MS. SHIHATA:

9   Q    Did you see what was going on in the video at that point?

10  A    Correct.

11  Q    Could you hear anything about -- could you hear the

12  defendant saying anything to you?

13  A    Fix my legs.

14  Q    Could you hear anything else about that?

15  A    No.

16  Q    And then did you proceed to fix your legs?

17  A    Correct.

18          (Video played)

19  Q    Could you hear what the defendant was saying to you

20  there?

21  A    Whenever we out in the club or anywhere, my legs should

22  never be pointed towards another man, my energy should be

23  turned towards him.

24          MS. SHIHATA:  If we could fast forward to

25  approximately 305.

Faith - Direct - Shihata                    2306

1              (Video played)

2              If we could stop it.

3    Q    Can you tell the jury what was going on at this point?

4    A    He told me to give him a kiss and then rub his beard.

5    Q    Did you in fact do as he directed?

6    A    Correct.

7    Q    Did that rubbing of the beard go on for several minutes?

8    A    Correct.

9              MS. SHIHATA:  If we could fast forward to

10   approximately 620.

11             (Video played)

12             We appear to have lost the sound.  We can just press

13   play?

14             (Video played)

15   Q    Do you see yourself getting up there?

16   A    Yes.

17   Q    What, if anything, had the defendant asked you to do?

18   A    To go get his phones for him.

19   Q    Is that you coming back with the phones?

20   A    Correct.

21   Q    And how many phones does he appear to have there?

22   A    Three.

23             MS. SHIHATA:  If we could fast forward to 1025.

24   Q    I know the sound is not on, but do you see the defendant

25   get up and appear to be speaking to somebody?

Faith - Direct - Shihata                    2307

1   A    Correct.

2   Q    Who was he speaking to then?

3   A    The engineer in the other room.

4   Q    Where did you understand the engineer to be at that time?

5   A    Behind the curtain.

6   Q    Is that the curtain that is behind you in the video?

7   A    Correct.

8   Q    Covering that window you testified about earlier?

9   A    Correct.

10  Q    Based on your review of this video prior to your

11  testimony here today, were there various -- was there a point

12  in the video where the defendant said:  Talk to Daddy?

13  A    Correct.

14  Q    At the point, after he said something to the engineer

15  behind the curtain, did you and the defendant listen to

16  various tracks that the defendant had made?

17  A    Correct.

18          MS. SHIHATA:  I'd like to turn to Government's

19  Exhibit 327A.(Video played)

20  Q    Is this video in the same location?

21  A    Correct.

22  Q    Based on your review prior to your testimony here today,

23  is this video approximately four minutes and 25 seconds?

24  A    Correct.

25  Q    Was this recorded on the same day as the last one?

Faith - Direct - Shihata                    2308

1   A     Correct.

2            MS. SHIHATA:  If we could press play, please.

3            (Video played)

4            Pause it.

5   Q     What did the defendant ask you to do there?

6   A     Rub the top of his head real slowly.

7   Q     Did you then do as he directed?

8   A     Correct.

9   Q     Based on your prior review of this video, does that

10  rubbing of his head and looking at him, does that go on for

11  the rest of the video?

12  A     Correct.

13  Q     I'm showing the witness and the jury only what is in

14  evidence, a page of Government's Exhibit 231A, the items sent

15  to your lawyer in New York.  I want to focus on the photograph

16  on the bottom left corner.  Do you see that?

17  A     Correct.

18  Q     Did you see the same scene in the video we just watched?

19  A     Yes.

20  Q     You rubbing the defendant's head at the L.A. studio?

21  A     Correct.

22  Q     Just turning again to the last page of Government's

23  Exhibit 231A, you testified before the break about the text

24  messages on the left side where you sent the defendant an

25  address where you were; is that right?

Faith - Direct - Shihata                    2309

1    A    Correct.

2    Q    That's an address in San Antonio, Texas?

3    A    Correct.

4    Q    The defendant was not in San Antonio, Texas, with you at

5    that time, right?

6    A    Correct.

7    Q    Did you participate in a docuseries known as Surviving R.

8    Kelly?

9    A    Correct.

10   Q    I want to direct your attention to early December 2018.

11   Did you travel to New York City at that time?

12   A    Yes.

13   Q    Did you travel alone or with someone else?

14   A    I traveled with my mother and one of my friends.

15   Q    Why were you coming to New York City at that time?

16   A    There was going to be a preview -- a premiere, excuse

17   me -- of surviving R. Kelly.

18   Q    In Manhattan?

19   A    Correct.

20   Q    Do you recall where you stayed when you were in New York

21   for that trip?

22   A    At the Pearl.

23   Q    Is that a hotel?

24   A    Correct.

25   Q    I'm showing the witness only what is marked for

```
 1   identification as Government's Exhibit 517A.  Do you recognize

 2   this?

 3   A    Yes.

 4   Q    What is this a photo of?

 5   A    The Pearl.

 6              MS. SHIHATA:  I move to admit 517A.

 7              MR. CANNICK:  No objection.

 8              THE COURT:  That's in evidence.

 9              (Government Exhibit 517A, was received in evidence.)

10   BY MS. SHIHATA:

11   Q    Did you end up attending premiere for Surviving R. Kelly?

12   A    Yes.

13   Q    Did something happen while you were there?

14   A    Yes.

15   Q    What happened?

16   A    During about maybe less than ten minutes into the

17   premiere, we had to evacuate.  The producers let us know that

18   there --

19              MR. CANNICK:  Objection.

20              THE COURT:  Don't tell us what the producer said.

21   But you had to evacuate?

22              THE WITNESS:  Correct.

23              THE COURT:  Next question.

24   BY MS. SHIHATA:

25   Q    Did you later learn why you had to evacuate?
```

1   A    Yes.

2   Q    Why was that?

3            MR. CANNICK:  Objection.

4            THE COURT:  Sustained.

5   A    There had been --

6            THE COURT:  That means you can't answer.

7            THE WITNESS:  I'm sorry.

8            THE COURT:  Everybody had to leave the building

9   though, right?

10           THE WITNESS:  Correct.

11           THE COURT:  Did you get back in?

12           THE WITNESS:  No.

13           THE COURT:  Next question.

14  BY MS. SHIHATA:

15  Q    Was that the end of the event that night?

16  A    Yes.

17  Q    Where did you go after you were evacuated from the

18  location of the premiere?

19  A    Back to the Pearl.

20  Q    The hotel?

21  A    Correct.

22  Q    I'm showing the witness only what is marked for

23  identification as Government's Exhibit 80.  Do you recognize

24  the person in this photograph?

25  A    Correct.

Faith - Direct - Shihata                    2312

1    Q    Who do you recognize it to be?

2    A    Kash Jones.

3    Q    Have you met Kash Jones in person?

4    A    Yes.

5             MS. SHIHATA:  I move to admit Government's Exhibit

6    80.

7             MR. CANNICK:  No objection.

8             THE COURT:  That's in evidence.  You can publish.

9             (Government Exhibit 80, was received in evidence.)

10   BY MS. SHIHATA:

11   Q    When did you first meet Kash Jones?

12   A    In January of 2019.

13   Q    Did you meet her when you were in New York for the

14   premiere?

15   A    Yes.

16   Q    And did you meet her after you were evacuated from the

17   premiere?

18   A    Yes.

19   Q    Was it later that same night?

20   A    Yes.

21   Q    Where were you -- where did you first encounter her?

22   A    I first encountered her at the Pearl.

23   Q    The hotel you were staying at?

24   A    Correct.

25   Q    And what, if anything, did she say to you?

Faith - Direct - Shihata                    2313

1   A    She said nothing --

2            MR. CANNICK:  Objection.

3            THE COURT:  Overruled.

4   A    She said nothing to me directly.

5   Q    At some point did you speak to her on the phone?

6   A    Yes.

7   Q    And what, if anything, did she say to you then?

8            MR. CANNICK:  Same objection.

9            THE COURT:  Overruled.

10  A    She had said she wanted to meet up with me to discuss

11  some file she had.

12  Q    Do you know where she was when she was telling you this?

13  A    In New York.

14  Q    Did she -- did you end up meeting with her?

15  A    Yes.

16  Q    And where did you end up meeting with her?

17  A    We met at an Applebee's.

18  Q    Where in relation to your hotel was the Applebee's?

19  A    About a five-minute walk.

20  Q    Near your hotel?

21  A    Correct.

22  Q    Who, if anyone, went with you to meet Kash Jones at the

23  Applebee's?

24  A    My mother and my friend at that time.

25  Q    I'm showing the witness only what is marked for

Faith - Direct - Shihata                    2314

1   identification as Government's Exhibit 510.  Do you recognize

2   this?

3   A    Yes.

4   Q    What is this?

5   A    The Applebee's I met Kash Jones at.

6            MS. SHIHATA:  I move to admit Government's Exhibit

7   510.

8            MR. CANNICK:  No objection.

9            THE COURT:  That's in evidence.

10            (Government Exhibit 510, was received in evidence.)

11   Q    When you arrived at the Applebee's, who was there?  Did

12   you meet with Kash Jones at the Applebee's?

13   A    Correct.

14   Q    Was she with anyone else?

15   A    Yes.

16   Q    What, if anything -- can you describe the person or

17   persons she was with?

18   A    She had someone she described as her cousin with her, and

19   she had a security guard with her.

20   Q    And the security guard, was that a male or female?

21   A    A male.

22   Q    What, if anything, did you notice regarding that male

23   person while you were at the Applebee's?

24   A    When me and Kash were engaging, he was at a distance in

25   the corner.  He had on a black suit, black tie.  And had his

1   hand on his gun, on his hip.

2   Q    Was he wearing a jacket?

3   A    Correct.

4   Q    At some point did you see the -- were you able to notice

5   a handgun?

6   A    Correct.

7   Q    Under his jacket?

8   A    Correct.

9   Q    Did you and Kash Jones speak at the Applebee's?

10  A    Yes.

11  Q    What, if anything, did she show you?  And what, if

12  anything, did she say to you?

13  A    She stated to me that she was --

14          MR. CANNICK:  I'm going to object.

15          THE COURT:  The objection is overruled to the

16  conversation between this witness and Ms. Jones.  Go ahead.

17  A    She stated to me that she wasn't a fan of Mr. Kelly, that

18  she worked for him.  But she said she wasn't against us, but

19  she wasn't for the women coming forward.  She was just trying

20  to figure out who was telling the truth and who was lying.

21          She told me she had a file.  And I asked her to see

22  it.  In the file it was like little profiles of me and other

23  women that were in the documentary.

24          She showed me my profile picture and it was a

25  picture of me.  It was some mug shots that weren't me.  And my

Faith - Direct - Shihata                    2316

1    nude pictures were in there.  And she had let me know that

2    basically this is what he plans on putting out if you guys

3    move forward with the documentary.

4              MR. CANNICK:  Objection.

5              THE COURT:  The objection is overruled.

6    Q    At that point you were there for the premiere, but is it

7    correct that the documentary had not yet aired on television?

8    A    Correct.

9    Q    The nude photos that you saw, did you recognize when or

10   where those had been taken?

11   A    Yes.

12   Q    What did you recognize about them?

13   A    I recognized they were the same pictures that I had seen

14   before that were sent to my attorney's offices, except you

15   could see the full thing, I wasn't covered.  There were more

16   pictures that I knew he took of me I was never sent, they were

17   taken of me.

18   Q    When you say you recognized pictures he take of you.  Who

19   is "he" that you're referring to?

20   A    Robert Kelly.

21   Q    After that, did Surviving R. Kelly air on Lifetime

22   television in early January 2019?

23   A    Yes.

24   Q    Are you familiar with a Facebook page called Surviving

25   Lies?

Faith - Direct - Shihata                    2317

1   A    Yes.

2   Q    And in relation to when Surviving R. Kelly aired on

3   television, can you say, do you have a recollection of when

4   you became aware of the Surviving Lies Facebook page?

5   A    It was maybe not that long after the documentary had

6   aired, maybe about a week.  I just woke up to a whole bunch of

7   messages and people were screenshoting me my nude body parts

8   all over the Internet as well as addresses.

9   Q    Did you understand that those items had been posted on

10  the Surviving Lies Facebook page?

11  A    Yes.

12  Q    Was what was posted similar to what you testified about

13  here, the photos and text messages in Government's Exhibit

14  231A?

15  A    Yes, they were the same pictures except they were not

16  cropped.

17  Q    You testified earlier that during the course of the time

18  that you communicated and saw the defendant, that you

19  sometimes spoke using Facetime; is that right?

20  A    Correct.

21  Q    I'm showing the witness only what is marked for

22  identification as Government's Exhibit 207A.  Do you recognize

23  that?

24  A    Correct.

25  Q    Is this a screenshot of a Facetime conversation between

1    you and the defendant?

2    A    Correct.

3          MS. SHIHATA:  I move to admit Government's Exhibit

4    207A.

5          MR. CANNICK:  No objection.

6          THE COURT:  That's in evidence.

7          (Government Exhibit 207A, was received in evidence.)

8    BY MS. SHIHATA:

9    Q    You testified earlier -- Government's Exhibit 207A is

10   this a screenshot that you provided to the Government?

11   A    Correct.

12   Q    You testified earlier that prior to the first time you

13   went to see the defendant, you engaged in texting

14   communications with him?

15   A    Correct.

16   Q    And I'm showing the witness only what is marked for

17   identification as Government's Exhibit 207B and 207C.  Do you

18   recognize the documents I just showed you?

19   A    Correct.

20   Q    And are these text message communications between you and

21   the defendant from early on in your communications?

22   A    Correct.

23         MS. SHIHATA:  I move to admit Government's Exhibit

24   207B and 207C.

25         THE COURT:  Any objection?

```
                    Faith - Direct - Shihata              2319
```

1           MR. CANNICK:  No objection.

2           THE COURT:  Those are in evidence.

3           (Government Exhibit 207B & 207C, was received in

4    evidence.)

5    BY MS. SHIHATA:

6    Q    Starting with 207B, if we can publish them.  Are these

7    text messages from March 2017 prior to your first trip?

8    A    Correct.

9    Q    You also testified before the break about that final trip

10   to New York.  And you testified that you texted the defendant

11   after that trip or after the events that occurred in the hotel

12   room that day?

13   A    Correct.

14   Q    Showing the witness only Government's Exhibit 207I.  Do

15   you recognize this?

16   A    Correct.

17   Q    Is this a text between you and the defendant from

18   February 3rd, 2018?

19   A    Correct.

20           MS. SHIHATA:  I move to admit Government's Exhibit

21   207I.

22           MR. CANNICK:  No objection.

23           THE COURT:  That's in evidence.

24           (Government Exhibit 207I, was received in evidence.)

25           MS. SHIHATA:  If we can publish it please?

1    Q    The texts in blue are from you?

2    A    Yes.

3    Q    The texts in gray on this one are from the defendant,

4    correct?

5    A    Correct.

6    Q    Where it says:  Daddy coming now.  That was written by

7    the defendant?

8    A    Correct.

9    Q    And was that before he came to the hotel room?

10   A    Correct.

11   Q    And that's a morning time stamp; is that right?

12   A    Correct.

13   Q    And then later the same day in the evening time did you

14   write him a text message?

15   A    Correct.

16   Q    Can you explain why you wrote him this text message?

17   A    I sent him that text because after the interaction in

18   that room I didn't know if he was mad or what was going to

19   happen next.  I was trying to fix the situation, make sure

20   there wasn't anything like bad blood after that interaction.

21   Q    Why were you concerned about bad blood?

22   A    I didn't want there to be any repercussions for anything

23   that I said or did that may have made him upset.

24   Q    What do you mean by repercussions?

25   A    I didn't know.  I didn't know what was going happen.

Faith - Cross - Cannick                     2321

1  Q     At that point, had the defendant filmed you?

2  A     Yes.

3  Q     Engaged in sexual intercourse with him?

4  A     Yes.

5  Q     Had he taken pictures of you and your naked body?

6  A     Yes.

7  Q     Were you concerned about those coming out at some point?

8  A     Absolutely.

9  Q     Did they in fact come out on the Surviving Lies Facebook

10 page?

11 A     Ultimately, yes, they did.

12             MS. SHIHATA:  No further questions.

13             THE COURT:  Okay.  Cross-examination.

14 CROSS-EXAMINATION

15 BY MR. CANNICK:

16 Q     Before you started your testimony yesterday, you had met

17 with the Government to go over the questions that they were

18 going to ask of you in this courtroom, am I correct?

19 A     Correct.

20 Q     And you also spoke with them last night?

21 A     Incorrect.

22 Q     You didn't speak with them last night?

23 A     I didn't speak with them last night.

24 Q     You said you did or you didn't?

25 A     I didn't.

Faith - Cross - Cannick                2322

1    Q    You did?

2             THE COURT:  Did not.

3    A    Did not.

4    Q    When was the last time you spoke with them?

5    A    This morning when we said good morning.

6    Q    And other than the good morning, you had no communication

7    about the facts that you just testified to today or yesterday?

8    A    Can you ask your question again?

9    Q    When you spoke with them and said good morning this

10   morning, did you discuss any of the details concerning what

11   you've been telling the jury?

12   A    No.  We discussed me looking at something that I had

13   already seen.

14   Q    What was it that you looked at?

15            THE WITNESS:  Do I have to answer that question?

16            THE COURT:  Yes.  I'll let you know if you don't.

17   A    Okay.  It was a picture of my texts.  I was looking at

18   the time.

19   Q    That was something concerning about the case, am I

20   correct?

21            MS. SHIHATA:  Objection as to form.

22            THE COURT:  Did you look at anything else besides

23   that text?

24            THE WITNESS:  No, I just looked at the time.

25            THE COURT:  Okay.  Next question.

Faith - Cross - Cannick                    2323

1    BY MR. CANNICK:

2    Q    Now, before yesterday, when was it that you last met with

3    the Government to discuss the case have?

4         MS. SHIHATA:  Objection as to form.  She testified

5    she didn't meet yesterday.

6         MR. CANNICK:  I said before yesterday.

7         THE COURT:  The objection is overruled.

8    A    Can you ask the question again?

9    Q    Before yesterday, when was the last time you met with the

10   Government to discuss this case?

11   A    I saw them on Sunday.

12   Q    What time you saw them on Sunday?

13   A    I'm not sure.

14   Q    You saw them in the morning?

15   A    I don't remember what time I saw them.

16   Q    So you don't remember what time you saw them on Sunday,

17   but you remember all these details from three years ago?

18        MS. SHIHATA:  Objection.

19        THE COURT:  Overruled.

20   A    Correct.

21   Q    Do you remember what time you left them on Sunday?

22   A    No.

23   Q    Do you remember what time -- how much time you spent with

24   them on Sunday?

25   A    No.

Faith - Cross - Cannick                     2324

1   Q     What about other than Sunday, had you met with them

2   before to discuss the details of this case?

3   A     Correct.

4   Q     Does that mean you did?

5   A     Yes.

6   Q     And what date was that?

7   A     I'm not sure of the exact date.

8   Q     And was it a week prior?

9   A     I'm not sure of the exact date.

10  Q     I'm not asking you about the exact date, I'm asking you

11  if it was a week prior?

12          THE COURT:  I'm a little confused right now.  Are

13  you asking before Sunday, the time before that?

14          MR. CANNICK:  Yes.

15          THE COURT:  Okay.  Just approximately, did you meet

16  with -- you met with them before Sunday, correct?

17          THE WITNESS:  Correct.

18          THE COURT:  Do you remember about when that was

19  generally?

20          THE WITNESS:  I met with them last month I believe

21  as well.

22  BY MR. CANNICK:

23  Q     How many times have you met with the Government before

24  coming and giving testimony to this Court?

25  A     I'm not sure to be exact.

Rivka Teich, CSR, RPR, FCRR, RMR  Official Court Reporter

Faith - Cross - Cannick                    2325

1    Q    Now, was it more than three?

2    A    Correct.

3    Q    More than five?

4    A    I'm not sure.

5    Q    Before speaking to the Government, well at least --

6    withdrawn.

7              You also made talk show appearances concerning what

8    you're telling us about now, am I correct?

9    A    You're correct.

10   Q    What talk shows have you been on to give your account as

11   to what you said happened here?

12   A    I've been on a few.  I'm not exactly sure of all the

13   names, but I've been on a few.

14   Q    You've been on Dr. Oz?

15   A    Correct.

16   Q    Were you also on some social media shows?

17   A    Correct.

18   Q    And you participated in Surviving R. Kelly, correct?

19   A    Correct.

20   Q    When did you start your participation in Surviving R.

21   Kelly?

22   A    My participation in Surviving R. Kelly happened after my

23   lawsuit was filed.

24   Q    My question is, when was it that you started your

25   participation in Surviving R. Kelly?

Faith - Cross - Cannick                    2326

1   A     I'm not sure of the exact date.

2   Q     It was certainly before you went to New York for the

3   premiere, am I correct?

4   A     I'm sorry, can you ask that question again?

5   Q     Your participation in Surviving R. Kelly started before

6   you came to New York for the premiere, am I correct?

7   A     Correct.

8   Q     When was it that you made the trip to New York for the

9   premiere?

10  A     January 2019.

11  Q     When you participated in Surviving R. Kelly, did you

12  receive compensation?

13  A     I received compensation for the picture of me, my sister,

14  and R. Kelly.

15  Q     So you did receive compensation?

16  A     For a picture, yes.

17  Q     How much compensation did you receive?

18  A     $1,000 for the picture.

19            (Continued on next page.)

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. CANNICK:   (Continuing)

3    A    A thousand dollars for the picture.

4    Q    That's all the monies that you received from your

5    involvement with *Surviving R. Kelly?*

6    A    Correct.

7    Q    Did you receive any monies for any of the talk shows that

8    you participated in?

9    A    No.

10   Q    What about any of the social media appearances?

11   A    Podcasts; no, sir.

12   Q    Now, what were you doing before -- withdrawn.

13        And when was it you met R. Kelly?

14   A    In 2017.

15   Q    And you were in college at that time?

16   A    Correct.

17   Q    And you said that you realized college was not for you

18   and you decided that you would -- you weren't going to pursue

19   that anymore, correct?

20   A    Correct.

21   Q    Now, after you made that decision, did you seek

22   employment?

23   A    No, sir.

24   Q    And so at any point in time during your relationship with

25   Mr. Kelly, were you employed?

Faith - Cross - Cannick                    2328

1    A    No, sir.

2    Q    Now, before meeting Mr. Kelly, had you been in pursuit of

3    an acting career?

4    A    No, sir.

5    Q    Before your involvement with *Surviving R. Kelly*, were you

6    in pursuit of an acting career?

7    A    No, sir.

8    Q    After *Surviving R. Kelly*, did you start pursuit of an

9    acting career?

10   A    The opportunity came and went.  No, sir.

11   Q    And when the opportunity came -- when you say that the

12   opportunity came and went, what do you mean?

13   A    I was asked to be a part of something, I considered it, I

14   decided not to move forward.

15   Q    And was that a project in Los Angeles?

16   A    No, sir.

17   Q    You appeared on a podcast in L.A.?

18   A    Yes, sir.

19   Q    What was the name of that podcast?

20   A    I don't remember.

21   Q    You appeared on a podcast.  Was there a host or a

22   hostess?

23   A    Correct.

24   Q    And you sat opposite that hostess, am I correct?

25   A    Correct.

Faith - Cross - Cannick                    2329

1   Q     It was a female, am I correct?

2   A     Correct.

3   Q     An African-American female, am I correct?

4   A     Correct.

5   Q     And you sat opposite her and you had a conversation for

6   well over an hour, am I correct?

7   A     Correct.

8   Q     And in that podcast, you discussed what were going --

9   some of the things that were happening for you since *Surviving*

10  *R. Kelly*, am I correct?

11  A     Correct.

12  Q     And you told her that you had opportunities that came

13  about, opportunities -- not an opportunity, but opportunities

14  -- that came about for acting, am I correct?

15  A     I don't remember saying that with her.

16  Q     You know that was televised?

17        Well, it was recorded and there is a video up?

18  A     Correct.

19  Q     Now, after *Surviving R.* -- well, withdrawn.

20        Before your participation in *Surviving R. Kelly*, did

21  you have an attorney?

22  A     Can you ask your question again?

23  Q     Before your participation in *Surviving R. Kelly*, did you

24  have an attorney?

25  A     Yes.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Faith - Cross - Cannick                    2330

1    Q    Who was that attorney?

2    A    Lee Merrick.

3    Q    And Lee Merrick is an attorney out of San Antonio?

4    A    Incorrect.

5    Q    I'm asking you a question.  I'm not -- is Lee Merrick an

6    attorney out of San Antonio?

7    A    He's an attorney out of Dallas, Texas.

8    Q    So the answer to my question is that he's not from

9    San Antonio?

10   A    No.

11   Q    Now, after, did you at some point retain another

12   attorney?

13   A    Yes.

14   Q    And who was that attorney?

15   A    Gloria Allred.

16   Q    And Gloria Allred is in the courtroom with you today,

17   correct?

18   A    Yes.

19   Q    And do you have any pending lawsuits?

20   A    Yes.

21   Q    And is Ms. Allred involved in those lawsuits?

22   A    She is not.

23   Q    Another lawyer is?

24   A    Lee Merrick.

25   Q    Now, when was it that you retained Ms. Allred?

Faith - Cross - Cannick                    2331

1           MS. SHIHATA:  Objection, Your Honor, as to

2    relevance.

3           THE COURT:  Overruled.

4    A    Once the whole trial and everything came about, the

5    criminal process started, I got legal advising from Ms.

6    Allred.

7    Q    So my question, ma'am, is when was it that you retained

8    Ms. Allred?

9    A    I'm not sure of the exact date.

10   Q    Do you remember the year?

11   A    Around 2019, I believe.

12   Q    And do you remember the month?

13   A    No.

14   Q    That show, that podcast that I spoke to you about is

15   called *The Paper Route*, am I correct?

16          THE COURT:  It is called the what?

17          MR. CANNICK:  *The Paper Route.*

18          THE COURT:  *The Paper Route*?

19          MR. CANNICK:  Yes.

20          THE COURT:  Yes.

21   A    Correct.

22   Q    And what's the name of the hostess?

23   A    I don't remember her name.  That was my first time

24   meeting her.

25   Q    My question was, what was her name?

Faith - Cross - Cannick                    2332

1      THE COURT:  She said she did not remember.

2      Next question.

3   Q    Your appearance there was about a year ago?

4   A    Give or take, yes.

5   Q    On that podcast, you also discussed the choices you've

6   made in connection with this, with Mr. Kelly, correct?

7   A    Correct.

8   Q    We'll get to it.

9      THE COURT:  I did not hear what you said.

10      MR. CANNICK:  I said we'll get to it.

11      THE COURT:  Oh.

12   Q    Now, before you brought any lawsuit here, you and

13   Mr. Merrick had a demand letter sent to Mr. Kelly for money,

14   am I correct?

15   A    That is incorrect.

16   Q    Didn't you and Mr. Merrick send a demand letter to

17   Mr. Kelly for $3 million?

18   A    That is incorrect.  I wasn't aware of that.

19   Q    Mr. Merrick was your attorney, am I correct?

20   A    Correct.

21   Q    You retained him, am I correct?

22   A    Correct.

23   Q    And you're telling this jury that he sent out -- that he

24   sent out a demand letter for $3 million you were not aware of?

25   A    I did not read over the demand letter.  I was not aware

Faith - Cross - Cannick                    2333

1   he was asking for $3 million or money.

2   Q    What did you hire him for?

3              MS. SHIHATA:  Objection.

4              THE COURT:  Sustained as to form.

5   Q    Well, you hired him to sue Mr. Kelly, am I correct?

6   A    Incorrect.

7   Q    You didn't hire Mr. -- this attorney to sue Mr. Kelly,

8   claiming that he gave you herpes?

9              THE WITNESS:  May I answer?

10             THE COURT:  You can answer.

11  A    I hired Mr. Merrick prior, before even looking at a

12  lawsuit, to help me pursue criminal charges against Mr. Kelly,

13  which I got no help from, so then came the lawsuit next.

14  Q    Okay.  It became a lawsuit next.

15             When was the first time you attempted to bring

16  criminal charges against Mr. Kelly?

17  A    In Dallas, Texas.

18  Q    My question is when.

19  A    I don't remember the exact date.

20             MR. CANNICK:  May I approach the witness?

21             THE COURT:  Yes.

22  Q    I'm going to direct your attention to this highlighted

23  area.

24             You looked at the document?

25  A    Correct.

Faith - Cross - Cannick                2334

1  Q    Did it refresh your recollection that you went to the

2  Dallas Police Department on April 9, 2018?

3  A    Correct.

4  Q    And you had Mr. Merrick file a lawsuit on April 17, 2018,

5  am I correct?

6  A    Can you repeat those dates again?

7  Q    Dallas Police Department, April 9th, 2018, lawsuit --

8  well, demand letter dated April 17, 2018.

9  A    Are you asking me a question?

10 Q    I did.  And you asked me to give you the dates again.

11         MR. CANNICK:  Can I have the question read back to

12 her?

13         THE COURT:  Sure.

14         MR. CANNICK:  Where she asked for the dates.

15         (The record was read.)

16 A    Correct.

17 Q    Now, before making an effort to file a complaint with the

18 Dallas Police Department, had you made an attempt to file a

19 criminal complaint anywhere else?

20 A    In New York.

21 Q    What was the date of that?

22 A    I'm not sure of the exact date.

23 Q    And when you say that you filed one in New York, where

24 specifically?

25 A    I don't remember where specifically.

Faith - Cross - Cannick                    2335

1   Q    Did you go to these places to file these lawsuit -- these

2   criminal --

3   A    Correct.

4   Q    And as you sit here today, you don't have a recollection

5   as to where you went?

6   A    I do not know the exact location and city name.

7   Q    Was one in New York City?

8   A    Correct.

9   Q    And was one in Westbury, Long Island?

10           THE COURT:  I think I am having a little trouble

11   hearing you.  I do not know if your microphone...

12           Better, better.  Okay.

13   Q    You said one was in New York City.  Do you remember the

14   date of that?

15   A    I don't remember the date.

16   Q    Wasn't that in January 14, 2019?

17   A    I don't remember the date.

18   Q    Well, let's see if this refreshes your recollection, the

19   top portion.

20           No, down.

21   A    Right here?

22   Q    Right there.

23           Does that refresh your recollection?

24   A    Yes.

25   Q    What's the date?

Faith - Cross - Cannick                    2336

```
 1              THE COURT:  Again, your microphone is not...
 2    Q    You said that refreshes your recollection?
 3    A    Yes.
 4    Q    What's the date?
 5    A    January -- may I see it again?
 6    Q    Beg your pardon?
 7    A    Can I see it again?
 8              January 14th.
 9    Q    What year?
10    A    2019.
11    Q    And you filed another lawsuit, criminal case in Suffolk
12    County?
13              THE COURT:  She filed a criminal case or did she
14    make a complaint?
15              MR. CANNICK:  She made a complaint to file a
16    criminal case.
17              THE COURT:  Well, that is still --
18              MS. SHIHATA:  Objection.
19              THE COURT:  It is still sustained as to form.
20              First, you cannot file a criminal case.
21              She made a complaint to detectives in Suffolk
22    County; is that what you are asking her?
23              MR. CANNICK:  That's exactly what I'm asking her.
24              THE COURT:  Okay.  Or police officer.
25    Q    Now, you made this complaint in June 21, 2018, Suffolk
```

Faith - Cross - Cannick                    2337

1   County?

2   A      I don't remember.

3              THE COURT:  You don't remember the date?

4              You want to show her the --

5              MR. CANNICK:  Yes.

6              THE WITNESS:  I'm sorry, I'm getting confused.

7              THE COURT:  That is all right.  He is going to show

8   you the date.  All he wants to know is whether you remember

9   the date you spoke to the police in Suffolk County here in

10  New York.

11             THE WITNESS:  Correct.

12             THE COURT:  Does that refresh your recollection of

13  when that happened?

14             THE WITNESS:  Correct.

15             THE COURT:  When was it?

16             THE WITNESS:  In 2018.

17             THE COURT:  But do you know the specific --

18             THE WITNESS:  June 2018.

19             THE COURT:  Okay.  Next question.

20  BY MR. CANNICK:

21  Q      Now, before coming in and speaking to us, you and I had

22  never spoken, am I correct?

23  A      Correct.

24  Q      Now, you testified and told us that there came a point in

25  time that you went to a concert with your sister and at some

Faith - Cross - Cannick                    2338

1    point that evening you met Mr. Kelly.  Do you remember telling

2    us about that?

3    A    Correct.

4    Q    And you testified and told us that you exchanged numbers?

5    A    I did not testify and say we exchanged numbers.  I said

6    he gave me his number.

7    Q    And you did not give him your number?

8    A    We texted.

9    Q    And at some point, there came a point where you had

10   conversations afterwards?

11   A    Correct.

12   Q    And there was an agreement or an understanding that you

13   could visit him on, some point, the road or wherever?

14   A    Correct.

15   Q    In fact, he told you that whenever you wanted to, that

16   you could visit him?

17   A    Correct.

18   Q    So after he told you that, you made a decision that you

19   would go and visit him?

20   A    Correct.

21   Q    You made a choice, am I correct?

22   A    Correct.

23   Q    In fact, you met him at the show and you said that you

24   were invited to an afterparty, along with your sister, and he

25   made certain overtures to you at that meeting, am I correct?

Faith - Cross - Cannick                                    2339

1    A    Correct.

2    Q    And after he made those overtures to you, you started

3    texting?

4    A    Correct.

5    Q    And eventually started speaking?

6    A    Correct.

7    Q    And then eventually start FaceTiming?

8    A    Correct.

9    Q    And in those communications, he flirted with you, am I

10   correct?

11   A    Correct.

12   Q    And you returned the flirt, am I correct?

13   A    Correct.

14   Q    And then it came, as said earlier, that he invited you,

15   that if you want to come and visit, contact someone from his

16   office, correct?

17   A    Correct.

18   Q    And you made that contact, right?

19   A    Correct.

20   Q    Not your sister; you made that contact, right?

21   A    Correct.

22   Q    And then you got -- you texted and you told Diana?

23   A    Correct.

24   Q    You told her Mr. Kelly says to get me a ticket?

25   A    I didn't say give me a ticket.

Faith - Cross - Cannick                    2340

1    Q    What did you say?

2    A    I gave her the days I would like to come and she checked

3    with him to make sure that was okay, and then the flight was

4    booked.

5    Q    Flight was booked.

6              And eventually you got a return from Diana with

7    respect to your interest in going to visit him, am I correct?

8    A    Can you say that again, please?

9    Q    Eventually you got a response that Mr. Kelly said it was

10   okay and a flight was booked?

11   A    Correct.

12   Q    And then eventually you received a ticket?

13   A    Correct.

14   Q    And the ticket was not in your name?

15   A    Correct.

16   Q    The ticket was in another person's name?

17   A    Correct.

18   Q    Another female?

19   A    Correct.

20   Q    And after you got that ticket, you made the choice in

21   saying I ain't going?

22             THE COURT:  I did not hear what you said, I am

23   sorry.  Did you say "I ain't going"?

24             MR. CANNICK:  Yes, "I ain't going."

25             THE COURT:  That is all right.  I just could not

Faith - Cross - Cannick                     2341

1   hear it.

2           MR. CANNICK:  Okay.

3   Q    Am I correct, ma'am?

4   A    You're correct.

5   Q    And you made that choice, right?

6   A    Correct.

7   Q    So after you got this ticket in someone else's name, you

8   realized, came to the conclusion that you know what, that

9   offends my dignity, I'm not going, right?

10  A    I never said that it offended my dignity.

11  Q    Okay.  Why you chose not to go?

12  A    I just felt like for the first time, that was improper.

13  Q    Okay.  Let's talk about the second time.

14          After you felt still that that was not the proper

15  thing, you eventually continued to communicate with Mr. Kelly,

16  am I correct?

17  A    Correct.

18  Q    And there were text messages?

19  A    Correct.

20  Q    Telephone calls?

21  A    Correct.

22  Q    FaceTimes?

23  A    Correct.

24  Q    And you participated of your own will, am I correct?

25  A    Correct.

Faith - Cross - Cannick                    2342

1    Q    You answered the phone when he called?

2    A    Correct.

3    Q    You sent text messages?

4    A    Correct.

5    Q    And you got involved into FaceTiming?

6    A    Correct.

7    Q    And then eventually you decided I'm going, I want to take

8    another trip?

9            THE COURT:  Take another trip?

10           MR. CANNICK:  Yes, to visit Mr. Kelly.

11           THE COURT:  Had she been yet?

12           MR. CANNICK:  Well, "give it another shot."

13           THE COURT:  All right.

14   Q    You gave it another shot?

15   A    Can you ask me the question all over again?

16   Q    After exchanging communications, continuing to flirt, you

17   decided that you would give it another shot to visit

18   Mr. Kelly?

19   A    Correct.

20   Q    Now, again, you made that decision?

21   A    Correct.

22   Q    And you decided that you would then contact Diana, am I

23   correct?

24   A    Correct.

25   Q    And you asked for another ticket, am I correct?

Faith - Cross - Cannick                2343

A     Correct.

          MR. CANNICK:  Your Honor, would this be a good time?

          THE COURT:  Sure.

          All right, ladies and gentlemen, we are going to
break for lunch.  We are going to take a slightly longer lunch
today.  I have another matter to attend to, so we will be back
at 2:30.  Please don't talk about the case or look anything up
or anything like that, but enjoy your lunches.

          THE CLERK:  All rise.

          (Jury exits the courtroom.)

          THE COURT:  All right.  Everybody can sit down.

          The witness can step out.  We will see you after
lunch.

          Anything from either side before we break for lunch?

          MS. SHIHATA:  Not from the government.

          MR. SCHOLAR:  No, Your Honor.

          THE COURT:  Okay.  And, Mr. Cannick, I am going to
ask my same fruitless question that I ask all the time.  Do
you have a sense of how long you are going to be?  I am just
trying to figure out what we can accomplish today.

          MR. CANNICK:  I'm sure that we'll be finished with
her before the end of the day.  We may be finished with her
probably around 4:00, maybe.

          THE COURT:  Okay.  All right.  All right.  So --

          MR. CANNICK:  If that long.

Faith - Cross - Cannick                    2344

1          THE COURT:  Okay.

2          All right.  Everybody enjoy their lunches.

3          (Luncheon recess taken.)

4          (Continuing on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2              (In open court; jury not present.)

3              (Parties present.)

4              THE CLERK:  All rise.

5              THE COURT:  Everybody can sit down.

6              All right.  Let's get the witness, please.

7              (Discussion held off the record.)

8              (Witness enters the courtroom.)

9              THE CLERK:  All rise.

10             (Jury enters the courtroom.)

11             THE CLERK:  You may be seated.

12             THE COURT:  All right, everybody, does it feel any

13    warmer in here today?

14             THE JURY:  Yes.

15             THE COURT:  Glad to hear it.  Wish I could say I had

16    something to do with it.

17             All right.  We are ready to resume the

18    cross-examination of the witness.

19             Go ahead, Mr. Cannick.

20             MR. CANNICK:  Thank you.

21             THE CLERK:  The witness is reminded she is still

22    under oath.

23             THE WITNESS:  Yes.

24    CROSS-EXAMINATION

25    BY MR. CANNICK:  (Continuing.)

1    Q    Before going out to meet Mr. Kelly -- well, let me

2    withdraw that.

3              After your initial meeting with Mr. Kelly at the

4    afterparty, did you Google him?

5    A    Yes.

6    Q    And why did you Google him?

7    A    To find out who he was, because I wasn't a fan.

8    Q    And you did, in fact, read up about who he was?

9    A    Can you ask your question again?

10   Q    You read -- after you Googled him, you read what was

11   returned, am I correct?

12   A    I'm sorry, can you ask that question again?

13   Q    You Googled him?

14   A    Yes.

15   Q    You read what you saw on the computer, am I correct?

16   A    Yes.

17   Q    Okay.  Now, do you recall an instance where in your

18   earlier communications with Mr. Kelly he responded to you

19   "Come on, I am who I am.  I see a few people, but I'm not

20   married, laugh out loud."

21   A    Yes.

22   Q    And your response was "Laugh out loud.  I understand."

23   A    Correct.

24   Q    Now, what were you -- what did you take that

25   communication to mean?

Faith - Cross - Cannick                    2347

1  A     I understood that he wasn't married, he dates multiple
2  people.
3  Q     And he told you that in the initial part of the
4  communication between the two of you, am I correct?
5  A     Correct.
6  Q     Now, you told us about a situation when you were dating
7  your first boyfriend, that you were assaulted by his other
8  girlfriend.  Do you remember telling us about that?
9  A     The mother of his child, not his other girlfriend.  Yes,
10 I remember saying that.
11 Q     There's a distinction?
12 A     The mother of your child and a girlfriend, yes, there's a
13 distinction.
14 Q     Okay.
15 A     That's like a wife and a girlfriend.  Two different
16 things.
17 Q     If I ask a question, please just respond to the question
18 that I ask.  Okay?
19        Now, you testified as a result of that you developed
20 a problem, epilepsy?
21 A     Correct.
22 Q     And you testified that as a result, you have to be
23 careful with drinking alcohol because alcohol may trigger a
24 seizure?
25 A     Correct.

Faith - Cross - Cannick                    2348

1   Q     Now, you testified and told us as well that when you went
2   to Mr. Kelly's afterparty, you had some alcohol?
3   A     That is incorrect.  I never said that.
4   Q     You didn't have any alcohol?
5   A     I did not have any alcohol.
6   Q     There was an occasion where you did have alcohol with
7   Mr. Kelly, am I correct?
8   A     Yes.
9   Q     And you did a -- you consumed the alcohol of your own
10  choosing, am I correct?
11  A     Can you ask that question again?
12            THE COURT:  I think he is asking, nobody made you
13  drink alcohol; is that right?
14            THE WITNESS:  Correct.
15            THE COURT:  Okay.  Next question.
16  Q     So that wasn't just one time, it was multiple times that
17  you consumed alcohol of your own choosing?
18  A     Correct.
19  Q     Now, you testified and told us that you were asked by
20  Mr. Kelly to call him Daddy.  Do you remember telling us about
21  that?
22  A     Correct.
23  Q     And you did call him Daddy, am I correct?
24  A     Yes.
25  Q     And in your conversations with him, you called him Daddy?

Faith - Cross - Cannick                    2349

1    A    Yes.

2    Q    And in your text messages you called him Daddy, am I

3    correct?

4    A    Yes.

5    Q    Now, that was of your choosing, am I correct?

6    A    Yes.

7    Q    He asked you to and you decided yes, I can call you

8    Daddy?

9    A    I respected what he asked to be called, yes.

10   Q    Well, you didn't have to call him Daddy, right?

11   A    No.

12   Q    In fact, if I recall your testimony correctly, you said

13   that there was a time that he called you on the phone and you

14   answered the phone, and basically he was not satisfied with

15   you not calling him Daddy and he hung up.  Do you remember

16   telling us about that?

17   A    Yes.

18   Q    And then, according to you, he called back again and this

19   time you called him Daddy, am I correct?

20   A    Correct.

21   Q    Now, you had the option of not answering the phone, am I

22   correct?

23   A    Correct.

24   Q    You knew it was him that was calling, am I correct?

25   A    Correct.

Faith - Cross - Cannick                    2350

1    Q    And you answered the phone and you called him Daddy?

2    A    Correct.

3    Q    When you sent those text messages, you called him Daddy?

4    A    Yes, sir.

5    Q    So he asked you to call him Daddy and you started calling

6    him Daddy?

7    A    Yes, sir.

8    Q    Now, let's talk about the first trip to New York.  You

9    testified and told us that there came a point in time that he

10   invited you -- well, you asked for a trip to New York.  Do you

11   remember telling us about that?

12   A    Yes.

13   Q    And you text Diana?

14   A    Yes.

15   Q    And you asked for the accommodation to be arranged, am I

16   correct?

17   A    Yes.

18   Q    You did all that, correct?

19   A    Yes.

20   Q    And after you asked for the accommodation to be arranged,

21   you got on the plane?

22   A    Yes.

23   Q    And you took the plane to New York?

24   A    Yes.

25   Q    In fact, wasn't this a connecting flight?

1   A     Yes.

2          THE COURT:  I could not hear you.

3          THE WITNESS:  Yes.

4   Q     So you had an opportunity in Nashville, where you made

5   the connecting flight, to change your mind, right?

6   A     Yes.

7   Q     But instead you boarded the next flight from Nashville to

8   Long Island, right?

9   A     Yes.

10  Q     And then you came there and you went to a hotel?

11  A     Yes.

12  Q     What time you got to the hotel?

13  A     I don't remember.

14  Q     Was it in the afternoon?

15  A     I don't remember.

16  Q     Was it in the morning?

17  A     I don't remember.

18  Q     Was it in the evening?

19         MS. SHIHATA:  Objection.

20         THE COURT:  Overruled.

21         Do you remember what time of day?

22         THE WITNESS:  I don't remember.

23  Q     Now, you, at some point, contacted Diana after you

24  arrived at the hotel?

25  A     Correct.

Faith - Cross - Cannick                    2352

1  Q    And you wanted to know what you should be doing, what's

2  going to happen next, am I correct?

3  A    Yes.

4  Q    And could you speak a little louder?

5  A    Yes.

6  Q    And basically, you had that option, right?  You didn't

7  have to go out; you contacted Diana to ask what are we going

8  to do next, right?

9  A    Yes.

10 Q    Okay.  And then Diana told you nothing was going to

11 happen until 8:00, do you remember that?

12 A    Yes.

13 Q    And then at 8:00, sometime around that, you went to the

14 concert?

15 A    Yes.

16 Q    Okay.  And you testified and told us that you didn't sit

17 in the first row, but you were someplace very close to the

18 front?

19 A    Yes.

20 Q    Now, this was at Westbury Coliseum?

21 A    Correct.

22 Q    And you testified and told the jury that Mr. Kelly

23 actually performed to you, he was making eye contact with you

24 and singing to you, am I correct?

25 A    Correct.

Faith - Cross - Cannick                    2353

1   Q     And you stared back at him, am I correct?

2   A     Yes.

3   Q     Now, was the stage a rotating stage?

4   A     I don't remember.

5   Q     How many acts you saw that night?

6   A     Just him.

7   Q     And when you were watching Mr. Kelly, did you notice that

8   the stage would rotate around and come back around?

9   A     I don't remember if the stage was rotating.

10  Q     Well, according to you, during that show he was singing

11  to you?

12  A     I stated he interacted with me during the show, yes, I

13  said that.

14  Q     Okay.  Now, you testified that after the show you went --

15  you were asked if you were going to go to the afterparty?

16  A     Incorrect.

17  Q     Were you asked if you were going to go to the afterparty?

18  A     Are you referring to the show in New York?

19  Q     Well, that's what we're talking about.

20  A     That's incorrect.  I wasn't asked if I was going to go

21  anywhere.  Diana told me where I was going and where he was

22  going.

23              (Continuing on the next page.)

24

25

Faith - cross - Cannick                    2354

1    EXAMINATION CONTINUES

2    BY MR. CANNICK:

3    Q     Did you go to the after-party?

4    A     No.

5    Q     Now, you got an Uber back to the hotel?

6    A     Yes.

7    Q     And you were not told about the after-party?

8    A     I was told he was going to the after-party and I was

9    going back to my hotel.

10   Q     And you were told that and then you did, right?

11   A     Yes.

12   Q     Okay.  And then you testified and told the jury at some

13   point in the early morning hours, around 6:00, Mr. Kelly came

14   to your room?

15   A     Correct.

16   Q     And according to you, there was a sexual encounter

17   that -- that really humiliated you?

18   A     I said it was awkward, yes.

19   Q     Awkward.  You didn't want that to happen you told the

20   jury, right?

21   A     Correct.

22   Q     In fact, you -- you felt -- you felt a kind of way about

23   it that you even called your sister, correct?

24   A     Incorrect.

25   Q     You called your friend?

Faith - cross - Cannick                    2355

1   A    My best friend.

2   Q    Yes.  And, basically, you called your best friend because

3   you said that you wanted to find out if you were off?

4   A    Incorrect.

5   Q    Why did you call your best friend?

6   A    I said I wanted to see what she had to say about the

7   situation.

8   Q    Okay.  And she -- she had something to say about the

9   situation, and you felt as though that whatever Mr. Kelly said

10  to you as he was leaving the room was constructive criticism

11  according to you?

12  A    Incorrect, I stated that's what he told me.  I did not

13  say that's what it was.

14  Q    So, he told you that it was constructive criticism?

15  A    Yes.

16  Q    Now, after he gave you that constructive criticism and

17  after you went through that degrading experience with him, you

18  flew back to San Antonio, am I correct?

19  A    Correct.

20  Q    And then there came a point in time, according to you, he

21  contacted you again?

22  A    Correct.

23  Q    And after he contacted you, you and he exchanged text

24  messages?

25  A    We were already exchanging text messages.

Faith - cross - Cannick                    2356

1   Q    Did you continue to exchange text messages?

2   A    Correct.

3   Q    Did you continue to talk on the phone?

4   A    Correct.

5   Q    Did you continue to Facetime?

6   A    Correct.

7   Q    And after this experience that you had in New York that

8   you felt degraded about, you asked for another trip; am I

9   correct?

10  A    We talked about another trip, me coming again, yes.

11  Q    You asked for another trip, am I correct?

12  A    He said he wanted to see me and I gave Diana the dates I

13  was available.

14  Q    And you did that?

15  A    Correct.

16  Q    Even after that experience that you supposedly had in

17  New York?

18  A    Correct.

19  Q    You decided, you know what, I want to see him again?

20  A    Correct.

21  Q    Forget the fact that he constructively criticized me, I

22  want to go back again?

23  A    Correct.

24  Q    Forget the fact that he -- he degraded me, I want to see

25  him again?

Faith - cross - Cannick                    2357

1   A    Correct.

2   Q    And after you made that decision to contact Diana, you

3   got a ticket, am I correct?

4   A    Correct.

5   Q    You got yourself prepared, am I correct?

6   A    Correct.

7   Q    And you went to the airport?

8   A    Correct.

9   Q    And you took the flight to where he was, am I correct?

10  A    Correct.

11  Q    And then after you got to that place -- where was that

12  place, anyhow?

13  A    Which place are you referring to?

14  Q    The trip after New York.

15  A    I went back home.

16  Q    Come on.

17  A    You're very --

18  Q    I know what I'm talking about, you know what I'm talking

19  about?

20          THE WITNESS:  He's not being clear, I'm sorry, Your

21  Honor.

22          THE COURT:  All right, everybody stop.  You stop and

23  you stop.

24          The question is what is the -- I think the question

25  is what is the next place that you went to, to see Mr. Kelly?

Faith - cross - Cannick                  2358

1          Do I have that right, Mr. Cannick?

2          MR. CANNICK:  Absolutely, Your Honor.

3          THE COURT:  All right, so that's the question.

4          What city did you go to next?

5          THE WITNESS:  The city I went to next after New York

6   was Chicago.

7          THE COURT:  All right, next question.

8   BY MR. CANNICK:

9   Q    So, in Chicago you had another sexual encounter with him,

10  am I correct?

11  A    Correct.

12  Q    An unwanted sexual encounter?

13  A    Correct.

14  Q    And after you had this unwanted sexual encounter, you

15  went back to San Antonio, am I correct?

16  A    Correct.

17  Q    And then you continued to text -- exchange text messages

18  with him?

19  A    Correct.

20  Q    And you continued to have telephone calls with him?

21  A    Correct.

22  Q    And you continued to Facetime with him?

23  A    Correct.

24  Q    And then you asked for another trip?

25  A    We discussed me coming next time, yes.

SAM     OCR     RMR     CRR     RPR

Faith - cross - Cannick                    2359

1    Q    And you discussed it after that degrading experience --

2              MS. SHIHATA:  Objection.

3              THE COURT:  Overruled.

4    BY MR. CANNICK:

5    Q    You discussed it and you decided that you're going to

6    take another trip to see him?

7    A    Correct.

8    Q    And you went through the same process, you contacted

9    Diana?

10   A    Correct.

11   Q    And you got out to the airport?

12   A    Yes.

13   Q    And then you went to meet him again?

14   A    Yes.

15   Q    When you met him again, where was that city?

16   A    After Chicago, I went to Dallas.

17   Q    Okay.  And Dallas was a similar experience, another

18   degrading sexual encounter, am I correct?

19   A    I never said that.

20   Q    You didn't like what was going on with him sexually, am I

21   correct?

22   A    I didn't say that about the Dallas trip either.

23   Q    In the Dallas trip you testified and told us that you --

24   you consumed a lot of alcohol?

25   A    Correct.

Faith - cross - Cannick                    2360

1  Q    In fact, you told us that it was Cîroc?

2  A    Correct.

3  Q    And this was -- now, you had been diagnosed with this

4  condition that would cause you to have a seizure before you

5  went to Dallas, am I correct?

6  A    Correct.

7  Q    And you knew that the alcohol would cause or could

8  trigger a seizure, am I correct?

9  A    Too much alcohol can cause you to have a seizure, yes.

10  Q    And you made that decision to consume the alcohol again,

11  am I correct?

12  A    Correct.

13  Q    And after some point, I think you alluded to the fact

14  that because of the alcohol you had sexual encounters with

15  Mr. Kelly, am I correct?

16  A    I never said because of the alcohol that's why I had sex

17  with him.  I never said that.

18  Q    Okay.  Now, you also indicated that you were left in the

19  Sprinter for long periods of time?

20  A    I didn't indicate.  I said I was left in the Sprinter for

21  a long period of time.

22  Q    Yes.  So, you indicated that you were left there while

23  they were in the cigar bar?

24  A    Incorrect.

25  Q    So, you were left in the Sprinter?

1  A    Correct.

2  Q    And how long were you left in the Sprinter?

3  A    For a number of hours.

4  Q    When you say "a number of hours," more than two?

5  A    Correct.

6  Q    More than four?

7  A    It might have been about four hours.

8  Q    You didn't like that?

9  A    Correct.

10 Q    In fact, you felt a little humiliated?

11 A    I never said I felt humiliated.

12 Q    I'm asking you, did you feel humiliated?

13 A    Humiliated, no; left behind, yes.

14 Q    And you didn't want to be left behind, right?

15 A    Correct.

16 Q    You wanted to be with him, right?

17 A    Correct.

18 Q    Okay.  And so -- and you felt as though he was not

19 sensitive to the fact that you wanted to be with him?

20 A    Incorrect, I never said that.

21 Q    I didn't ask you if you said that, I'm asking you if

22 that's how you felt?

23 A    No.

24 Q    So, when you said a short while ago that you felt left

25 behind, it didn't bother you that you were left behind for

Faith - cross - Cannick                    2362

1  about four hours?

2  A    It bothered me for the amount of time that I was left

3  behind.  If he had something to do, that's his job, he's an

4  entertainer; it was just being there.

5  Q    But weren't you -- weren't you -- weren't you upset that

6  you couldn't leave on your own will?

7  A    Correct.

8  Q    Weren't you upset that you didn't have food to eat?

9  A    I was upset about not being able to use the bathroom.  I

10  wasn't hungry in the Sprinter.

11  Q    Okay.  But you were upset about not being able to use the

12  bathroom, am I correct?

13  A    Correct.

14  Q    And anything else about the trip upset you?

15  A    No.

16  Q    So, then eventually you went back to San Antonio?

17  A    Yes.

18  Q    Okay.  And then after being left in the Sprinter in this

19  occasion for an excessive amount of hours and feeling left

20  behind, you decided to visit him again at another destination,

21  am I correct?

22  A    Correct.

23  Q    And, again, of your own will?

24  A    Correct.

25  Q    You contacted Diana to make those arrangements for you?

Faith - cross - Cannick                                    2363

1    A    Correct.

2    Q    And what city did you go to next?

3    A    Los Angeles.

4    Q    And it was in Los Angeles that you testified and told the

5    jury that he was stern?

6    A    Correct.

7    Q    And you testified and told the jury that he had a gun

8    next to him as he spoke to you?

9    A    The gun was beside him, yes.

10   Q    And frightened you, right?

11   A    Made me uncomfortable, yes.

12   Q    Very uncomfortable, scared?

13   A    Yes.

14   Q    And then he had unwanted sex with you?

15   A    Oral sex.

16   Q    Oral sex, yes.  You didn't want that?

17   A    Correct.

18   Q    So he had a gun, that frightened you, right?

19   A    Correct.

20   Q    He performed oral sex on you that you didn't want, am I

21   correct?

22   A    Incorrect, I never said that happened in LA.

23   Q    What?

24            (Pause.)

25   BY MR. CANNICK:

SAM     OCR     RMR     CRR     RPR

Faith - cross - Cannick                    2364

1    Q    So, he made you perform oral sex on him?

2    A    Correct.

3    Q    And you definitely didn't want to do that, right?

4    A    Correct.

5    Q    And then he left you for long periods of time?

6    A    Correct.

7    Q    So, gun, perform oral sex on him, left you, and then

8    eventually you went back to San Antonio?

9    A    Correct.

10   Q    Did there come -- did there come a point in time that you

11   went to visit him again?

12   A    Yes.

13   Q    So, after all that, after being forced to perform oral

14   sex on him, after being intimidated by him because he had a

15   gun next to him as he spoke to you, and leaving you behind,

16   you went to visit him again?

17   A    Correct.

18   Q    Your choice, right?

19   A    Yes.

20   Q    What city did you go to this time?

21   A    New York.

22   Q    So, New York.  Now, I want to go back to something we

23   started discussing before the lunch recess.

24        Now, when you spoke to the New York police when you

25   filed a complaint against Mr. Kelly, you told them that

Faith - cross - Cannick                    2365

1   Mr. Kelly penetrated your vagina and your anus, right?

2   A     I never said that.

3            MR. CANNICK:  May I approach, Your Honor?

4            THE COURT:  Sure.

5   BY MR. CANNICK:

6   Q     Read the second paragraph.

7   A     (Witness complies.)

8   Q     You read it?

9   A     Correct, I read it.

10  Q     Isn't it a fact that you told the police officers --

11  A     What's on that paper is incorrect.

12  Q     I didn't ask you --

13           THE COURT:  Just let -- okay.

14           First of all, let him finish the questions before

15  you start to answer.  He is going to ask you questions.

16           And let the witness respond.

17           MR. CANNICK:  Thank you.

18           THE COURT:  So, what is the question you want to put

19  to the witness?

20  BY MR. CANNICK:

21  Q     Isn't it a fact that when you were interviewed by the

22  police officers who took this complaint, you told them that he

23  inserted his penis in your anus and your vagina?

24  A     That is not a fact.

25  Q     So, you didn't tell them that?

Faith - cross - Cannick                2366

1    A    No.

2    Q    And if it's here, they made it up?

3    A    Well -- that is not a fact.

4         THE COURT:  Well, sustained as to whether they made

5    it up.

6         You're saying you didn't tell them that; is that

7    right?

8         THE WITNESS:  Yes.

9    BY MR. CANNICK:

10   Q    And when you were speaking with them, were they taking

11   notes?

12   A    Yes.

13   Q    And you were the only one who were giving them details of

14   this account that you were complaining that happened, am I

15   correct?

16   A    Correct.

17   Q    Now, isn't it a fact that you also told them in that

18   interview that Mr. Kelly told you that if you didn't allow --

19   well, that you pushed -- that he pushed you and said that he

20   would not allow you to eat during the meeting?

21   A    That's incorrect.

22   Q    And if it's in here, that's an error?

23   A    Absolutely an error.

24   Q    Okay.  And isn't it a fact that you told the detectives,

25   or whomever interviewed you, that you were tested and found to

Faith - cross - Cannick                2367

1    be positive for herpes in December 2017?

2    A    Incorrect, I never said that.

3    Q    Okay, you never said it.  And if it's in here, then it's

4    an error?

5    A    A hundred percent a error.

6    Q    Now --

7            MR. CANNICK:  May I have a second, Your Honor,

8    please?

9            (Pause.)

10   BY MR. CANNICK:

11   Q    Now, after this experience that you had in LA where you

12   said that Mr. Kelly had a gun near him as he spoke to you and

13   that he violated you sexually and had you wait around, you

14   flew back to San Antonio?

15   A    Yes.

16   Q    And did there come a time that you decided to visit him

17   again?

18   A    Yes.

19   Q    Where was that?

20   A    New York.

21   Q    And now, the experiences that you had in those other

22   visits, none of them were to your liking, am I correct?

23   A    Correct.

24   Q    And you felt as though he violated you in some fashion on

25   each and every one of those trips, am I correct?

SAM      OCR      RMR      CRR      RPR

Faith - cross - Cannick                      2368

1    A    Correct.

2    Q    And those violations were sexual violations?

3    A    Correct.

4    Q    And you said that you felt as though that you couldn't go

5    and use a bathroom when you wanted to use a bathroom?

6    A    Correct.

7    Q    And you felt as though that you were not given food?

8    A    I never said that.

9    Q    You were given food?

10   A    I never said that.

11   Q    What do you say -- withdrawn.

12        Now, after you had that experience in LA, you

13   decided that you were going to contact Diana and arrange for

14   another trip?

15   A    Correct.

16   Q    And the same process, you contacted her and she sent a

17   trip, and then you got to the airport and eventually got to

18   the -- what hotel was it?

19   A    You're asking me about which trip?

20        THE COURT:  He asked what hotel you went to.

21        THE WITNESS:  Yes.

22   A    Which trip again?  I'm sorry.

23   Q    New York.

24        THE COURT:  Well, you went to New York twice, right?

25        So, I think you're talking about the last time --

                SAM     OCR     RMR     CRR     RPR

Faith - cross - Cannick                    2369

1          MR. CANNICK:  The last trip.

2          THE COURT:  -- the last trip?

3          MR. CANNICK:  Yes.

4          THE COURT:  Was it the Mondrian or something?

5          THE WITNESS:  Yes, the Mondrian.

6          THE COURT:  Okay, go ahead.

7    BY MR. CANNICK:

8    Q     And you got to that hotel by Uber?

9    A     Yes.

10   Q     And, again, this was your own volition, you decided, you

11   had asked for this trip and you got the trip and you made the

12   trip, am I correct?

13   A     Yes, sir.

14   Q     And I think you testified -- withdrawn.

15         At some point you said you met someone by the name

16   of Joy or Joycelyn?

17   A     Correct.

18   Q     And what city was it that you met this person?

19   A     Dallas.

20   Q     I'm sorry, I can't hear you?

21   A     Dallas.

22   Q     And you testified and you told us that she appeared to be

23   unkempt to you, am I correct?

24   A     Correct.

25   Q     And you told us that you and her were in the Sprinter for

Faith - cross - Cannick                    2370

1    a prolonged period of time?

2    A    Correct.

3    Q    And this trip that you met Joy, you, basically, did not

4    have a good experience in that trip either?

5    A    I didn't say that the whole trip was terrible, but

6    meeting her, it was a weird experience.

7    Q    And notwithstanding that, you made another trip, am I

8    correct?

9    A    Correct.

10   Q    Now, you testified and told us about an occasion where

11   you needed to go to the bathroom and Diana followed you from

12   the Sprinter to the bathroom.

13            Do you remember telling us that?

14   A    She didn't follow me, she led me to the bathroom.

15   Q    She led you?

16   A    I didn't know where it was.

17   Q    Oh, okay.  So, she escorted you to the bathroom and she

18   stayed there while you used the bathroom?

19   A    Correct.

20   Q    And you didn't think that she was trying to restrain you

21   in any way, am I correct?

22   A    No.

23   Q    And you eventually went back to the Sprinter?

24   A    Yes.

25   Q    And you walked back to the Sprinter?

SAM     OCR     RMR     CRR     RPR

Faith - cross - Cannick                    2371

1   A    I followed her back to the Sprinter, yes.

2   Q    Right.  She never put her hands on you, am I correct?

3   A    No.

4   Q    Now, you testified and told us that there -- while she --

5   when she escorted you to the bathroom, that, basically, she

6   stood outside of the stall?

7   A    Correct.

8   Q    Right outside of the stall you said?

9   A    Correct.

10  Q    So, you could -- and that somehow caused you to be

11  unnerved?

12  A    Can you ask your question again?

13  Q    Were you -- did that bother you in any way that she stood

14  outside the stall?

15  A    It was different.  I didn't understand it.

16  Q    Okay, but did it bother you?

17  A    It was different.

18  Q    How so?

19  A    Nobody has ever waited for me outside of the stall, maybe

20  outside the bathroom, but not directly outside the stall.

21  Q    Oh, okay, okay.  You were a guest of Mr. Kelly's, am I

22  correct?

23  A    Correct.

24  Q    And you knew that she worked for Mr. Kelly, am I correct?

25  A    Correct.

Faith - cross - Cannick                    2372

1   Q    And were you aware that she had responsibilities to
2   Mr. Kelly and his guests?
3   A    She was his assistant, yes.
4   Q    And you knew that she was pretty much escorting you and
5   whomever else was with you, Joy or whomever, wherever you
6   went, am I correct?
7   A    I didn't know she was an escort and supposed to escort us
8   everywhere we went, no.  At the time, I wasn't aware.
9   Q    Did you become aware of that?
10  A    Later on.
11  Q    Now, there were times that -- well, withdrawn.
12       You were asked on direct examination about certain
13  text messages that you sent to Mr. Kelly about the outfits
14  that you were wearing?
15  A    Yes.
16  Q    Okay.  You -- he asked you and you sent them, am I
17  correct?
18  A    Yes.
19  Q    You were in San Antonio when you were sending those
20  photographs, am I correct?
21  A    Correct.
22  Q    And he was definitely not in San Antonio?
23  A    Correct.
24  Q    And there was an occasion where you told him that you
25  were going someplace.

Faith - cross - Cannick                    2373

1          You sent that, am I correct?

2    A    Correct.

3    Q    And you sent that because you said that he'd asked you or

4    said to you that he wanted to know where you're going to be?

5    A    You're asking, like, what did I send exactly?

6          I'm not understanding your question.  It's not

7    clear.

8    Q    He asked you at some point to keep him in informed as to

9    where you're going to be, according to you, am I correct?

10   A    Correct.

11   Q    And that's why you sent the photo to him, am I correct?

12   A    Sent a photograph?

13   Q    A text message.

14   A    Of what?

15   Q    You and your friend at the Olive Garden.

16   A    Me and my family at Olive Garden, yes, I sent him a

17   picture.

18   Q    Right.  And you sent that because he had asked you or

19   said to you, let me know where you're going to be?

20   A    He asked me where I was, clear as day, in the text.

21   Q    So, might the answer to my question be yes then?

22          MS. SHIHATA:  Objection.

23          THE COURT:  Well, overruled.

24          I mean he asked you where you were and you sent him

25   a picture of where you were, right?

SAM      OCR      RMR      CRR      RPR

Faith - cross - Cannick                    2374

1      THE WITNESS:  He asked me like two questions in one,

2  Your Honor, I'm sorry.

3      THE COURT:  That's okay.  All right, but the

4  question was where are you and you sent the picture, right, or

5  one of the questions.

6      All right, next question.

7  BY MR. CANNICK:

8  Q    And then there was a time where you sent him a picture of

9  your outfit and asked him if that was okay?

10 A    Yes, sir.

11 Q    And you did that because at some point he asked you to do

12 so?

13 A    Yes, sir.

14 Q    And you were in San Antonio when you'd sent that photo,

15 am I correct?

16 A    Yes, sir.

17 Q    And of your volition you sent it -- him an outfit -- a

18 picture of your outfit and asked him if that outfit was okay?

19 A    Can you start over?

20 Q    At some point you sent him a picture of the outfit and

21 asked him if the outfit was okay?

22 A    Yes, sir.

23 Q    Now, you testified and told us about a situation where

24 Mr. Kelly, I think this was in the LA trip in the studio, that

25 he, it appeared, to be jogging into where you were, grabbed

SAM      OCR      RMR      CRR      RPR

Faith - cross - Cannick                    2375

1    something and jogged back out?

2    A    Correct.

3    Q    Now, you knew before going out on any of these trips that

4    Mr. Kelly was a very busy man, am I correct?

5    A    Correct.

6    Q    And you knew that he -- he and his talents were in high

7    demand, am I correct?

8    A    No, not at the time.

9    Q    But you learned that, am I correct?

10   A    I wasn't aware.

11   Q    You never learned it?

12          MS. SHIHATA:  Objection.

13          THE COURT:  Well, I am a little unclear.

14          Are you saying, are you asking her was his talent

15   was in high demand?

16          MR. CANNICK:  High demand, yes.

17          THE COURT:  All right.  And did you know whether

18   that was true or not?

19          THE WITNESS:  No, ma'am, I would not know that.

20          THE COURT:  All right, next question.

21   BY MR. CANNICK:

22   Q    You Googled him, right?

23          MS. SHIHATA:  Objection, Your Honor.

24          THE COURT:  Overruled.

25   Q    You Googled him, right?

SAM     OCR     RMR     CRR     RPR

Faith - cross - Cannick                    2376

1          THE WITNESS:  Your Honor, may I --

2          THE COURT:  No.  He's entitled to ask you questions.

3   Just do your best to answer them.  If you don't understand

4   them, just let me know.

5   BY MR. CANNICK:

6   Q     You Googled him, am I correct?

7   A     Yes.

8   Q     And the purpose of your Googling him was to find out

9   about him, am I correct?

10  A     Yes.

11  Q     And when you Googled him, you learned of all the Number 1

12  hits that he had, am I correct?

13  A     No.

14  Q     You overlooked that part?

15          MS. SHIHATA:  Objection.

16          THE COURT:  Overruled.

17          How much time did you spend Googling him?

18          THE WITNESS:  It literally was a Google, and then

19  that's it.  I'm not -- Your Honor, I'm not looking to see

20  every Number 1 hit, latest album.  It's not --

21          THE COURT:  If you didn't know that, that's fine.

22          THE WITNESS:  He's asking specific questions.

23          THE COURT:  Well, do your best to answer them.

24  BY MR. CANNICK:

25  Q     In fact, you spoke to one of your friends about Mr. Kelly

SAM     OCR     RMR     CRR     RPR

Faith - cross - Cannick                    2377

1   after you initially met him, am I correct?

2   A    Incorrect.

3   Q    Didn't you tell us -- well, didn't you tell us -- didn't

4   you say in your interview with the Government that you

5   contacted your -- well, after the after-party, the first time

6   you ever met Mr. Kelly, your sister was very excited and she

7   said to you:  You gotta talk to Mr. Kelly?

8   A    Yes, sir.  You asked me if I talked to my friend, I did

9   not.  I had a conversation with my sister.

10          MR. CANNICK:  Your Honor, I am going to ask you to

11   instruct the witness to listen to the question and answer the

12   question.

13          THE COURT:  She did.  She said she didn't ask her

14   friend, she asked her sister.

15          Let's not argue, please.  Put your question to the

16   witness.  Don't argue with counsel, just answer his question.

17   If you don't understand, say you don't understand and he'll

18   rephrase it.

19          Go ahead, Mr. Cannick.

20          MR. CANNICK:  Okay.

21   BY MR. CANNICK:

22   Q    So, isn't it a fact -- so, you don't remember telling the

23   Government that you spoke to your friend about Mr. Kelly and

24   having met him, and your friend said:  You better talk to

25   Mr. Kelly, he's a grown-ass man?

Faith - cross - Cannick                2378

1  A    You said right after the concert, sir, and that's not the

2  conversation that was had.

3             THE COURT:  Okay, the question is --

4             MS. SHIHATA:  Your Honor --

5             THE COURT:  -- he's asking you -- I'm sorry?

6             MS. SHIHATA:  May we just have a sidebar?

7             THE COURT:  No, we don't have to have a sidebar.

8             Just the question is you're saying that you spoke to

9  your friend at a separate time, is that right?

10             THE WITNESS:  Yes.  These questions are very, like,

11  general.  Like, I'm not understanding.  The questions are not

12  clear, Your Honor, at all.

13             THE COURT:  Well, I think they are.  If you have

14  difficulty answering them, you let me know.

15             Mr. Cannick, can you put another question to the

16  witness?

17  BY MR. CANNICK:

18  Q    After you had met Mr. Kelly initially, you contacted your

19  friend, am I correct?

20  A    Sure.

21  Q    And you told your friend that you just met R. Kelly, am I

22  correct?

23  A    Incorrect.

24  Q    You didn't tell your friend that you met R. Kelly?

25  A    I did not initially after the concert; no, I didn't.

Faith - cross - Cannick                    2379

1           THE COURT:  Sometime later did you tell your friend

2     that?

3           THE WITNESS:  Yes.

4           THE COURT:  All right, next question.

5     BY MR. CANNICK:

6     Q     And your friend said to you that you better talk to him,

7     he's a grown-ass man?

8     A     Correct.

9     Q     And your friend was excited, am I correct?

10    A     Encouraging.

11    Q     Encouraging?

12    A     Yes, sir.

13    Q     And encouraging of you to speak with him, develop a

14    relationship with him?

15    A     Yes.

16    Q     Now, you followed that advice, am I correct?

17    A     Yes.

18    Q     And your sister was equally encouraging, am I correct?

19    A     Yes.

20    Q     And you followed her advice as well, am I correct?

21    A     Yes.

22    Q     Now, when you were in LA and you were waiting in the

23    Sprinter, you felt uncomfortable because you were waiting in

24    there for such a long time?

25    A     Are you asking me if I felt uncomfortable?

SAM      OCR      RMR      CRR      RPR

Faith - cross - Cannick                                  2380

1    Q     That's my question.

2    A     Yes.

3    Q     And did you open the door?

4    A     In LA, no, sir.

5    Q     And you text Diana?

6    A     Yes.

7    Q     And she came?

8    A     Yes.

9    Q     And she opened the door?

10   A     Yes.

11   Q     And you and Diana went somewhere?

12   A     Diana showed me where the bathroom was.

13   Q     Okay.  And then you eventually came back to the bathroom,

14   right?

15   A     I think you said back to the bathroom, no, we didn't come

16   back to the bathroom.

17   Q     Back to the Sprinter?

18   A     Correct.

19   Q     Now, how many times did you have to text Diana in order

20   to get her to come to take you to the bathroom?

21   A     Are you asking me that night or just then?

22   Q     We're talking about that night.

23   A     I had to text her twice about the bathroom.

24   Q     And there was the first text, and then about 15 minutes

25   later you sent a second text?

SAM      OCR      RMR      CRR      RPR

1    A    I don't know.

2    Q    And then she eventually came?

3    A    Yes.

4    Q    You don't know what she was doing when you sent the text,

5    am I correct?

6    A    At the time in LA, yes, I did know what she was doing the

7    first time I sent the text.

8    Q    What was she doing?

9    A    Waiting in the Sprinter with me in the passenger seat.

10   Q    And so, she's in the passenger seat and you text her?

11   A    Yes.

12   Q    Didn't call out to her?

13   A    She wouldn't be able to hear me.

14   Q    That's not my question, my question is you didn't call

15   out to her?

16   A    No.

17   Q    Now, and then you eventually text her a second time and

18   she got out of the passenger seat and --

19   A    I texted her to use the bathroom the first time in that

20   setting and she said, okay, stand by, and she came back.

21   Q    Okay.  Now, you testified earlier today about Mr. Kelly

22   being asleep and your picking up his phone and answering his

23   phone.

24        Do you remember telling us that?

25   A    Incorrect, I never said I answered his phone.

Faith - cross - Cannick                    2382

1   Q     You looked at the messages coming on his phone, am I
2   correct?
3   A     I looked at the screen, his phone is locked.
4   Q     Okay.  And you looked at all of the phones, am I correct,
5   that he had?
6   A     The two, yes.
7   Q     Was it two or three?
8   A     There was two by me.
9   Q     And you had no fear doing that, right?
10  A     No.
11  Q     And he didn't say anything to you about it, am I correct?
12  A     He didn't know, he was sleep.
13  Q     So, he didn't know.
14          So, when you picked up the phone and you looked at
15  the messages, you said to us this morning that it was a group
16  text and all of them were from women.
17          Do you remember telling us that?
18  A     No.
19
20          (Continued on the following page.)
21
22
23
24
25

SAM     OCR     RMR     CRR     RPR

Faith - Cross - Cannick                    2383

1   BY MR. CANNICK:

2   Q    You don't remember saying that before lunch?

3   A    I said a group text of women.

4   Q    Of women, okay.  There were names associated with the

5   text messages?

6   A    Correct.

7   Q    Basically you discerned that all of those people were

8   women?

9   A    I went off of the female names I saw on the screen.

10  Q    You saw some numbers on the screen too, right?

11  A    Correct.

12  Q    Basically you saw those calls, those messages, and you

13  said you tried to wake him up?

14  A    I tried to wake him up while his phone was going off

15  before I looked at the phone.

16  Q    At some point Diana came to the room?

17  A    Yes.

18  Q    And got him up to go to a meeting?

19  A    Yes, sir.

20  Q    I asked you earlier this morning about the shows that

21  you've appeared on to talk about this.  You appeared on at

22  least seven shows, am I correct?

23  A    I don't know the exact number.

24  Q    Do you recall appearing on something called Corein

25  Carter?

Faith - Cross - Cannick                    2384

1   A    Can you say that again?

2   Q    C-O-R-E-I-N?

3   A    That's a show?

4   Q    I'm asking you.

5   A    I never heard of a show called that.

6   Q    What about CBS This Morning?

7   A    Yes.

8   Q    And on that show, you appeared with your attorney

9   Ms. Allred?

10  A    Correct.

11  Q    Then you appeared on something called She Talk L.A.?

12  A    Correct.

13  Q    And Dr. Oz?

14  A    Correct.

15  Q    And on Dr. Oz, again, you had Ms. Allred with you?

16  A    Correct.

17  Q    In fact, she participated in the interview, am I correct?

18  A    Correct.

19  Q    And then you went on something called Chelsea Grayson?

20  A    That's a person.

21  Q    Yes.  Did you have an interview with this person Chelsea

22  Grayson?

23  A    Yes.

24  Q    Then you went on Channel Five?

25  A    Channel Five, that's a channel.  I don't know.

Faith - Cross - Cannick                    2385

1   Q    Okay, but fair to say you appeared on at least five to

2   seven television shows?

3   A    Correct.

4   Q    And podcasts as well?

5   A    Correct.

6   Q    In one of the podcasts we spoke about this morning, the

7   Paper Route.  On that show you said during that interview:  I

8   don't like the word victim because I don't feel like I'm a

9   victim.  I'm a young woman.  And let's be clear, let's be

10  clear, I made a choice to be involved with that person.  Do I

11  feel like everything he did was right?  Hell, no.  But I had a

12  choice.  And that's why I walked away.  I did not move in with

13  him.  I did not live with him.  I did not take any money from

14  him.  There is a choice that you have to make.

15           You said that?

16  A    Correct.

17  Q    You made a choice.

18  A    Correct.

19  Q    And you're not a victim.

20  A    Correct.

21           MR. CANNICK:  Thank you.

22           THE COURT:  Any redirect?

23           MS. SHIHATA:  Yes, your Honor.

24           THE COURT:  Do you think it's long?  It might be not

25  a bad time to take a break.

Rivka Teich, CSR, RPR, FCRR, RMR  Official Court Reporter

1          MS. SHIHATA:  I don't think it's very long.

2          THE COURT:  Okay good.

3    REDIRECT EXAMINATION

4    BY MS. SHIHATA:

5    Q    Good afternoon.

6    A    Good afternoon.

7    Q    During cross-examination before the lunch break you were

8    asked some questions about how you remembered all these

9    details from three years ago.  Do you remember those

10   questions?

11   A    Correct.

12   Q    You provided the Government with a screen recording of

13   all your chats with Diana Copeland, correct?

14         MR. CANNICK:  Objection.

15         THE COURT:  Overruled.

16   A    Correct.

17   Q    That spanned the time that you began traveling and seeing

18   the defendant, correct?

19   A    Correct.

20   Q    As you testified, the defendant told you to keep Diana

21   apprised as things were happening on your trip, correct?

22   A    Correct.

23   Q    And to ask for permission to do certain things, correct?

24   A    Correct.

25   Q    Is it fair to say that having text messages from that

Faith - Redirect - Shihata                    2387

1    time period is a way you've been able to refresh your
2    recollection about certain details?
3    A    Correct.
4    Q    You were also asked some questions before lunch on
5    cross-examination about your having been in college then
6    leaving college.  Do you remember those questions?
7    A    Yes.
8    Q    Had your parents supported you financially?
9    A    Yes.
10   Q    And did that include while you were seeing the defendant?
11   A    Yes.
12   Q    And do they continue to support you financially?
13   A    Yes.
14   Q    Are your parents successful?
15   A    Yes.
16   Q    Have you ever wanted for anything on a financial aspect?
17   A    No.
18   Q    Did you ask the defendant to support you?
19   A    No.
20   Q    You were asked some questions on cross-examination before
21   the lunch break about certain dates about when you went to a
22   lawyer and when you went to the Dallas Police Department and
23   so forth.  Do you remember those questions?
24   A    Yes.
25        MS. SHIHATA:  One moment, your Honor.

Faith - Redirect - Shihata                2388

1           THE COURT:  Sure.

2   Q    You testified that you went to the Dallas Police

3   Department on April 9, 2018.  Do you remember that?

4   A    Yes.

5   Q    Mr. Cannick, the defense attorney, showed you a document

6   that indicated something about a demand letter being sent on

7   April 17, 2018.  Do you remember those questions?

8   A    Yes.

9   Q    April 9, 2018, that's before April 17, 2018, correct?

10  A    Correct.

11  Q    So you went to the Dallas Police Department first,

12  correct?

13  A    Correct.

14  Q    You were asked some questions on cross-examination about

15  various things that happened in your travels to see Mr. Kelly.

16  Do you remember those questions?

17  A    Correct.

18  Q    And I think you testified on cross-examination that

19  certain things happened on those trips that you were

20  uncomfortable with or that you didn't want to happen; is that

21  correct?

22  A    Correct.

23  Q    You also testified yesterday that there were two sides to

24  the defendant, correct?

25  A    Correct.

1    Q    In fact, you testified that at the very beginning of your

2    testimony, correct?

3    A    Yes.

4    Q    That it wasn't all bad, correct?

5    A    Correct.

6    Q    Just before you finished, Mr. Cannick asked you some

7    questions about a podcast where you indicated you didn't like

8    the term victim, right?

9    A    Correct.

10   Q    In that same podcast did you also say you didn't like the

11   term survivor?

12   A    Correct.

13   Q    Mr. Cannick asked you a lot of questions about choices

14   you made.  Do you remember those questions?

15   A    Correct.

16   Q    And pretty much all of the questions asked you about

17   choices to get on flights and choices to contact Diana.  Those

18   were all things you had talked about and testified about on

19   direct examination, correct?

20   A    Correct.

21   Q    In your time seeing the defendant, the defendant also

22   made some choices, correct?

23   A    Correct.

24            MR. CANNICK:  Objection.

25            THE COURT:  Overruled.

Faith - Recross - Cannick                    2390

1   Q    The defendant chose not to tell you he had herpes,
2   correct?
3   A    Correct.
4   Q    The defendant chose to ignore you when you said you
5   weren't comfortable with sex, correct?
6   A    Correct.
7   Q    In Los Angeles the defendant chose to grab the back of
8   your head put his penis in your mouth, keep his hand pushing
9   towards your (sic) penis with a gun next to him, correct?
10  A    Correct.
11           MS. SHIHATA:  No further questions.
12           THE COURT:  Any recross?
13           MR. CANNICK:  Yes.
14  RE-CROSS EXAMINATION
15  BY MR. CANNICK:
16  Q    And you made the choice to go back to see him, right?
17  A    Correct.
18  Q    After he had done all those things to you --
19  A    Correct.
20  Q    -- according to you, right?
21  A    Correct.
22  Q    In fact, you didn't make the choice to go to another
23  city, you went to several other cities, am I correct, to visit
24  him after that?
25  A    After what?

Faith - Recross - Cannick                2391

1  Q    You don't know what I'm talking about?

2  A    I don't.

3        THE COURT:  I don't actually either.

4  Q    We're talking about the fact the Government just asked

5  her on redirect about --

6        THE COURT:  The easiest thing to do is put the

7  question again, if you don't mind.

8  BY MR. CANNICK:

9  Q    After you saw -- it was in L.A. that, according to you,

10 he grabbed your head put it on his penis?

11 A    Correct.

12 Q    And according to you, it was in L.A. that he had the gun

13 next to him when he did this?

14 A    Correct.

15 Q    And after that, you went to see him in another city, am I

16 correct?

17 A    Correct, one last time.

18 Q    But you went to see him in another city after that, am I

19 correct?

20 A    Yes.

21 Q    What city was that?

22 A    New York.

23 Q    You went through making the choice of contacting him for

24 another trip, am I correct?

25 A    Correct.

1   Q    The Government asked you a short while ago about, you

2   were told to ask Diana to give you permission to do things?

3   A    I'm sorry.  Can you ask that question again?

4   Q    You testified a short while ago in a question put to you

5   that you were told to ask Diana for permission to do things?

6   A    That's incorrect.  That's not what I said.

7   Q    My question was, was that asked of you a short while ago

8   by the Government?

9   A    No.

10  Q    You didn't ask her say you had to ask Diana for

11  permission?

12  A    No.

13  Q    You didn't have to ask anyone for permission?

14  A    I had to ask your client, R. Kelly.

15  Q    Beg your pardon?

16  A    R. Kelly.

17  Q    R. Kelly is who you had to ask for permission?

18  A    Correct.

19  Q    The permission that you were asking is what R. Kelly told

20  you, to check in with Diana to make sure that she knows where

21  you are and make sure that you're okay.  Isn't that a fact?

22  A    Correct.

23            MR. CANNICK:  Thank you.

24            THE COURT:  Anything else?

25            MS. SHIHATA:  No, your Honor.

Proceedings                          2393

1           THE COURT:  The witness can step down.

2           (Whereupon, the witness was excused.)

3           THE COURT:  I think this is a good time to take our

4    afternoon break.  It will be about ten minutes.  Don't talk

5    about the case.  We'll see you soon.

6           THE COURTROOM DEPUTY:  All rise.

7           (Jury exits the courtroom.)

8           THE COURT:  I trust there is nothing anybody has to

9    bring up before the break?

10          MS. SHIHATA:  No, your Honor.

11          MR. CANNICK:  No, your Honor.

12          THE COURT:  Who is the next witness.

13          MS. SHIHATA:  Kelly.

14          THE COURT:  We'll see you after the break.

15          MS. GEDDES:  One small matter, our witness I believe

16   after this next witness is going to be testifying by video.  I

17   think we'll just need like a few minutes to set up the video.

18          THE COURT:  That's fine.

19          (Brief recess.)

20          THE COURT:  Just before we call the next witness, I

21   need to see Ms. Shihata and Mr. Cannick at sidebar.  We don't

22   need the reporter.

23          (Discussion held off the record at sidebar.)

24          THE COURT:  Do you want to get the witness, unless

25   there is anything somebody wants to raise?  All right.

Proceedings                                      2394

1              (Whereupon, the witness enters.)

2              (Jury enters the courtroom.)

3              THE COURTROOM DEPUTY:  All rise.  You may be seated.

4              THE COURT:  We are ready to continue.  Will you call

5     your next witness, please.

6              MS. SHIHATA:  The Government calls Kelly.

7              (Witness takes the witness stand.)

8              THE COURTROOM DEPUTY:  Please raise your right hand.

9              (Witness sworn.)

10             THE WITNESS:  I do.

11             THE COURTROOM DEPUTY:  You may be seated.

12             THE COURT:  You can take your mask off.  Just a

13    couple of things before we start.

14             Our court reporter takes down everything that you

15    say so it's important that you don't speak too quickly or talk

16    over which ever lawyer is asking you questions.

17             If there is a question that isn't clear to you or

18    you don't understand, just let me know.  I'll direct the

19    lawyer to rephrase it.

20             The last thing is, just do your best to answer only

21    the question that you're being asked.

22             All right.  Go ahead.

23             KELLY, called as a witness, having been first duly

24    sworn/affirmed, was examined and testified as follows:

25

Rivka Teich, CSR, RPR, FCRR, RMR  Official Court Reporter

Kelly - Direct - Shihata                    2395

1  DIRECT EXAMINATION

2  BY MS. SHIHATA:

3  Q    Good afternoon.

4  A    Good afternoon.

5  Q    Where did you grow up?

6  A    San Antonio.

7  Q    Is that where you live now?

8  A    Yes.

9  Q    Are you employed?

10  A    Yes.

11  Q    What kind of work do you do?

12  A    Child care business.

13  Q    Are you married?

14  A    Yes.

15  Q    How long have you been married?

16  A    Twenty-nine years.

17  Q    What, if anything, does your husband do?

18  A    He works for North Side Independence School District.

19  Q    Is he an administrator there?

20  A    Yes.

21  Q    Does he do anything else?

22  A    He's a pastor.

23  Q    Do you have any children with your husband?

24  A    Yes.

25  Q    How many children do you have?

1   A    Two.

2   Q    I'm showing you what is in evidence as Government's

3   Exhibit 79.  Is this your daughter Faith?

4   A    Yes.

5   Q    Without saying your last name, do you and Faith have the

6   same last name?

7   A    Yes.

8   Q    When was Faith born?

9   A    June 20, '97.

10  Q    I want to direct your attention -- withdrawn.

11            Are you familiar with a docuseries called Surviving

12  R. Kelly?

13  A    Yes.

14  Q    Did Faith appear in Surviving R. Kelly?

15  A    Yes.

16  Q    I want to direct your attention to early December 2018.

17  Did you travel to New York City at that time?

18  A    Yes.

19  Q    Who, if anyone, did you travel with?

20  A    Faith.

21  Q    What were you going to New York to do?

22  A    To watch the premiere of Surviving R. Kelly.

23  Q    Did you stay at a hotel in Manhattan?

24  A    Yes.

25  Q    Did you attend the premiere?

Kelly - Direct - Shihata                 2397

1   A    Yes.

2   Q    At some point after you arrived at the premiere were you

3   evacuated?

4   A    Yes.

5   Q    Where did you go after you were evacuated?

6   A    Back to the hotel.

7   Q    Showing you in evidence as Government's Exhibit 80.  Do

8   you recognize this person?

9   A    Yes.

10  Q    Have you met this person?

11  A    Yes.

12  Q    Who is this person?

13  A    Kash.

14  Q    Where did you first meet Kash?

15  A    At the hotel.

16  Q    Was that after you were evacuated from the premiere?

17  A    Yes.

18  Q    Where did you see her at the hotel?

19  A    In the downstairs lobby.

20  Q    What, if any, conversation did you have with her at that

21  time?

22  A    She -- as I was coming out of the elevator she said

23  hello.

24           MR. CANNICK:  Objection.

25           THE COURT:  Overruled.

Kelly - Direct - Shihata                    2398

1    Q    I would remind you not to use your last name.  Go ahead.

2    A    She said:  Hello, Kelly.

3    Q    When she said it to you, did she say Mrs. And your last

4    name?

5    A    Yes.

6    Q    You can go ahead.

7    A    Yes.  I looked over to my right at her, and I asked her

8    who she was.  And she proceeded to tell me she was Kash.

9    Q    Did she tell you anything else at that time?

10   A    No.

11   Q    Did you see Kash again at some point?

12   A    Yes.

13   Q    Where did you see Kash again?

14   A    At the Applebee's.

15   Q    Was that that same night?

16   A    Yes.

17   Q    Who, if anyone, did you go to the Applebee's with that

18   night?

19   A    Faith.

20   Q    And anyone else?

21   A    Yes.

22   Q    Who else?

23   A    Summer.

24   Q    Was that a friend of Faith's?

25   A    Yes.

Kelly - Direct - Shihata                    2399

1   Q    When you got to the Applebee's was Kash there?

2   A    Yes.

3   Q    Was she with anyone else?

4   A    Yes.

5   Q    Who do you recall that she was with?

6   A    A gentleman and another female.

7   Q    What, if anything, did you notice about the man that was

8   with her?

9   A    He was in the corner to my left, standing up against the

10  wall.  And he proceeded to -- he was in a suit.  He proceeded

11  to move his jacket over where I could see that he had a gun.

12  Q    You were at a table at this point?

13  A    I was headed to the table.

14  Q    Did you eventually get to a table?

15  A    Yes.

16  Q    Did you meet with Kash?

17  A    Yes.

18  Q    What happened?  What, if anything, do you recall Kash

19  doing or saying at the table?

20  A    She proceeded to tell Faith that she had a file.  And

21  Faith asked her what file.  She handed Faith the telephone.

22  And Faith looked at it briefly, slid it back to her.  And told

23  her she wasn't worried about that.

24  Q    At that time did you see what was on the phone?

25  A    No.

Kelly - Direct - Shihata                    2400

1  Q    I want to direct your attention to December 21, 2018 and

2  January 3rd, 2019.  On those dates did you receive a series of

3  texts related to Faith and others on those dates?

4  A    Yes.

5  Q    Do you recall what your phone number was at the time?

6  A    Yes.

7  Q    Without saying it, is it still your phone number now?

8  A    Yes.

9  Q    I'm showing the witness only what is marked for

10  identification as Government's Exhibit 958.  Do you recognize

11  this phone number?

12  A    Yes.

13  Q    What phone number is it?

14  A    My phone number.

15         MS. SHIHATA:  I move to admit Government's Exhibit

16  958?

17         MR. CANNICK:  No objection.

18         THE COURT:  That's in evidence.

19         (Government Exhibit 958, was received in evidence.)

20         MS. SHIHATA:  May we publish it to the jury only.

21  BY MS. SHIHATA:

22  Q    When you received these texts did you recognize the

23  number that sent them?

24  A    No.

25  Q    Sitting here today do you recall the phone number that

Kelly - Direct - Shihata                    2401

1    sent the text to you?

2    A    Yes.

3    Q    You recall the precise number?

4    A    Not the precise number, no.

5    Q    I'm showing the witness only what is marked for

6    identification as Government's Exhibit 230A.  Do you recognize

7    this exhibit?

8    A    Yes.

9    Q    It's a three-page exhibit, I'll just show you the pages.

10   Are these certain of the texts that you received from that t

11   number that you didn't recognize?

12   A    Yes.

13            MS. SHIHATA:  I move to admit Government's Exhibit

14   230A.

15            MR. CANNICK:  No objection.

16            THE COURT:  Those are in evidence.

17            (Government Exhibit 230A, was received in evidence.)

18            MS. SHIHATA:  May we publish it?

19            THE COURT:  Both?

20            MS. SHIHATA:  To the jury only.

21            THE COURT:  Okay.

22   BY MS. SHIHATA:

23   Q    The text in green, was that from you to the person who is

24   sending the text?

25   A    Yes.

Kelly - Direct - Shihata                    2402

1    Q    And at the very top it says two people do you see that?

2    A    Yes.

3    Q    Do you know who these texts were sent to?

4    A    Yes.

5    Q    Who is that?  Who received the text from the unknown

6    number?

7    A    Gloria Allred.

8    Q    Who were the texts -- you received the texts, correct?

9    A    I received them, yes.

10   Q    Were they also sent to your daughter Faith?

11   A    Yes.

12   Q    Had Faith recently changed her number at that time?

13   A    Yes.

14   Q    The phone number that sent you the text, I'm going to

15   turn to the second page, do you see that phone number here?

16   A    Yes.

17   Q    Can you read it out, please?

18   A    1(312)203-3030.

19   Q    Do you see a date January 3rd, 2019 then additional texts

20   from that phone number?

21   A    Yes.

22   Q    At the time you received the text from this (312)203-3030

23   number, was it fair to say that (312)203-3030 number was not

24   saved in your phone, correct?

25   A    Correct.

Kelly - Direct - Shihata                    2403

1    Q    In fact, it shows up as the number here, correct?

2    A    Correct.

3    Q    Did you later provide screenshots of some of the texts

4    that you received from this (312)203-3030 number to your

5    attorney's office?

6    A    Yes.

7    Q    After you did that, did your phone associate the

8    (312)203-3030 number that sent those texts with your attorney?

9    A    Yes.

10   Q    At some point did a federal agent travel to Texas to take

11   photos of all the texts you received from the (312)203-3030

12   number?

13   A    Yes.

14   Q    I'm going to show the witness only what is marked for

15   identification as Government's Exhibit 230B.  If I may

16   approach, your Honor?

17           THE COURT:  Yes.

18   Q    Can you take a quick look at the document I just handed

19   you?

20           (Witness reviewing document.)

21           Having reviewed Government's Exhibit 230B, are these

22   photographs of the texts you received from (312)203-3030 from

23   your phone at the time?

24   A    Yes.

25           MS. SHIHATA:  I move to admit Government's Exhibit

Kelly - Direct - Shihata                    2404

1    230B.

2            MR. CANNICK:  No objection.

3            THE COURT:  That's in evidence.  Jury only?

4            MS. SHIHATA:  The first page can be to everyone.

5            (Government Exhibit 230B, was received in evidence.)

6            THE COURT:  Okay.

7    BY MS. SHIHATA:

8    Q    The date at the top, does that say December 21, 2018?

9    A    Yes.

10   Q    At the time these photographs were taken, was this when

11   after you had sent certain of the texts to your attorney?

12   A    Yes.

13   Q    You testified earlier that your iPhone -- was this an

14   iPhone, by the way?

15   A    Yes.

16   Q    Did your iPhone start to associate it with your attorney?

17   A    Yes.

18   Q    So where it says "maybe" and it's redacted, was that your

19   attorney's name?

20   A    Yes.

21   Q    The first two -- was this an image that was sent to you

22   your phone by that number?

23   A    Yes.

24   Q    Do you see there it says:  Survivor number three,

25   Jerhonda M. Pace Johnson?

1    A    Yes.

2    Q    Below that did it say, did the text you say:  Just a

3    sample.  We will seek criminal charges.  You've been warned.

4    A    Yes.

5    Q    Was there another image that was sent to you?

6    A    Yes.

7    Q    Were there various images that were sent to you after

8    that from that same number?

9    A    Yes.

10   Q    I'm going to turn to page three of Government's Exhibit

11   230B, this is for the jury only.  Looking towards the bottom

12   of the page, were you sent by this 312 number an image that

13   said:  Survivor number seven Faith.  Then Faith's last name?

14   A    Yes.

15   Q    I'm going to turn to page four of the exhibit, again for

16   the jury only.  Were you sent certain images of your daughter

17   Faith and certain photographs of text messages?

18   A    Yes.

19   Q    These are the images you were sent?

20   A    Yes.

21   Q    Does it appear to have some text below each line of

22   images?

23   A    Yes.

24   Q    Then these are the text messages, photographs of text

25   messages you were sent?

1    A    Yes.

2    Q    Below that does it say:  To be continued.

3    A    Yes.

4    Q    In green was that a message you sent back to the person

5    who sent you these texts?

6    A    Yes.

7    Q    You wrote:  Who sent this.

8    A    Yes.

9    Q    Then turning to page five of the exhibit.  After you

10   sent, "who sent this," did the person respond:  Criminal

11   charges to follow?

12   A    Yes.

13   Q    Then sent you some additional images of other people?

14   A    Yes.

15   Q    I want to turn to page 15 of the exhibit, this can be to

16   everyone.  Did the person who was sending you these texts

17   write:  Publishing soon.

18   A    Yes.

19   Q    Then how did you respond?

20   A    "Who is this texting.  Kash?"

21   Q    Were you referring there to the Kash that you had met at

22   the Applebee's?

23   A    Yes.

24   Q    What did you write after that?

25   A    "You are stupid and you were a real man just call and

1   let's talk about this.  It's Faith's mom."

2   Q    Was there a typo in what you wrote there?

3   A    Yes.

4   Q    When you said if you were a real man, who were you

5   referring to when you sent that?

6   A    Robert Kelly.

7   Q    Was that based on the content of the text that you had

8   received?

9   A    Yes.

10  Q    Did you then receive a response from the sender saying:

11  No, this is Colon.  My investigation will be done soon enough.

12  A    Yes.

13  Q    There is a response from you in green, correct?

14  A    Yes.

15  Q    It says:  No, seriously, call me back.  I have another

16  question.

17  A    Yes.

18  Q    Between the text where the sender said, "No, this is

19  Colon, my investigation will be done soon enough," and the

20  text from you that follows, did you receive a phone call?

21  A    Yes.

22              (Continued on next page.)

23

24

25

Kelly - Direct - Shihata                    2408

1   DIRECT EXAMINATION
2   BY MS. SHIHATA:  (Continuing)
3   Q    And what happened on that phone call?
4   A    I don't recall.
5   Q    Did you receive a phone call from the same number that
6   was texting you?
7   A    Yes.
8   Q    And do you recall anything about what transpired on that
9   phone call?
10  A    I do recall him saying he was an investigator for Robert
11  Kelly.
12  Q    And did he say what he wanted you to do?
13  A    He wanted me to drop the case.
14  Q    Now, after you sent that text, did you receive texts
15  again from the same number on January 3rd, 2019?
16  A    Yes.
17  Q    And did the text say "pull the plug or you will be
18  exposed"?
19  A    Yes.
20  Q    And we went over just a moment ago the text that you had
21  received, photos, the photographs of your daughter and the
22  photographs of text messages that you received from this
23  number, correct?
24  A    Yes.
25           MS. SHIHATA:  And I am now showing the witness only

1    page 18 of Government Exhibit 230.

2            This is now just for the jury only.

3    Q    Again, is this just the actual images that were sent to

4    you?

5    A    Yes.

6    Q    And again, it was followed with "to be continued"?

7    A    Yes.

8            MS. SHIHATA:  No further questions.

9            THE COURT:  All right.  Cross-examination?

10           MR. CANNICK:  May I see that, please?

11   CROSS-EXAMINATION

12   BY MR. CANNICK:

13   Q    Good afternoon, ma'am?

14   A    Good afternoon.

15   Q    You testified and told us that you had received a text

16   from someone by the name of Colon?

17   A    Yes.

18   Q    And that person told you that he was an investigator?

19   A    Yes.

20   Q    And you testified and told us that that was an

21   investigator of Robert Kelly?

22   A    Yes.

23   Q    Do you know whether or not Robert Kelly had an

24   investigator by the name of Colon?

25   A    No.

Kelly - Cross - Cannick                    2410

1   Q     That's just something that someone told you, right?

2   A     Yes.

3   Q     Now, you have spoken to Robert, am I correct?

4   A     No.

5   Q     You don't recall having a conversation, a brief

6   conversation with Robert over FaceTime when he was talking

7   with Faith?

8   A     I recall being in the mall one day when he called Faith

9   and Faith flashed the phone and I just said hi.

10  Q     You said hi?

11  A     That's it.

12  Q     No conversation whatsoever?

13  A     No.

14        MR. CANNICK:  I think that's it, Your Honor.  Just

15  one second.

16  Q     You ever met this investigator?

17  A     No.

18  Q     And before that date that you received this text, you had

19  no other communication from him?

20  A     No.

21  Q     And according to you, he told you that he worked for

22  Robert?

23  A     Yes.

24  Q     But you don't know that to be a fact?

25  A     No.

```
                        Proceedings                    2411
```

1              MR. CANNICK:  Thank you.

2              THE COURT:  Any redirect?

3              MS. SHIHATA:  Just one moment, Your Honor.

4              THE COURT:  Okay.

5              MS. SHIHATA:  No further questions.

6              THE COURT:  Thank you so much.  You can step down.

7              THE WITNESS:  Thank you.

8              THE COURT:  Just be careful of the wires there.

9              THE WITNESS:  Yes.

10             (Witness excused.)

11             THE COURT:  All right.  Are we ready?  I guess we

12    need a couple of minutes; the next witness is going to be

13    testifying over the video.  Does that require a break?  It

14    really does not, does it?

15             MS. MELENDEZ:  I don't believe so.

16             THE COURT:  We've got the expert here, so...

17             MS. MELENDEZ:  We just need a moment to move the

18    video screen.

19             THE COURT:  And what is the name of the witness?

20             MS. MELENDEZ:  Nathan Edmond, Your Honor.

21             THE COURT:  Okay.  Ready to call the witness?

22             MS. MELENDEZ:  Yes, Your Honor.

23             The government calls Nathan Edmond to the stand.

24             (Witness appears by video.)

25             THE CLERK:  Mr. Edmond, please stand and raise your

Proceedings                                    2412

1  right hand.

2          Do you solemnly swear or affirm that the testimony

3  you're about to give will be the truth, the whole truth and

4  nothing but the truth?

5          THE COURT:  Whoops.  Still having trouble hearing.

6          I take it that he can hear us?

7          THE WITNESS:  Do you hear me?

8          Yes.

9          THE COURT:  Good.  Okay.  Let's try again.

10          THE WITNESS:  I affirm.

11          THE COURT:  You affirm?

12          THE CLERK:  He affirms.

13          THE WITNESS:  Yes.

14          (Witness affirmed.)

15          THE COURT:  Okay.  Have a seat.  Just a couple of

16  things.  We have a court reporter who takes down everything

17  that everyone says, so I am going to ask you not to speak too

18  quickly or to talk over whichever lawyer is asking you

19  questions.

20          The second thing is, if someone asks you a question

21  that you do not understand or you want to have repeated, let

22  me know and I will have the lawyer either repeat it or

23  rephrase it.

24          And just do your best to answer only the question

25  you are being asked.  Okay?

Proceedings                                    2413

1          THE WITNESS:  Yes.

2          THE COURT:  Okay, go ahead.

3          (Continuing on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **NATHAN EDMOND**, called by the Government, having been first

2   duly affirmed, was examined and testified as follows:

3   DIRECT EXAMINATION

4   BY MS. MELENDEZ:

5   Q    Good afternoon, Mr. Edmond.

6   A    Good afternoon.

7   Q    Mr. Edmond, did you receive a subpoena to testify here

8   today?

9   A    Yes.

10  Q    And do you want to be testifying today?

11  A    Not especially.

12  Q    How old are you, Mr. Edmond?

13  A    73 years old.

14  Q    And are you employed?

15  A    Self-employed.

16  Q    How are you employed?

17  A    In the real estate business.

18  Q    Other than working in the real estate business, do you

19  work in any other professions?

20  A    No.

21  Q    Mr. Edmond, are you a minister?

22  A    Yes, I am.

23  Q    Are you a minister at a particular church?

24  A    Yes.

25  Q    And how long have you been a minister?

Edmond - Direct - Cruz Melendez                    2415

1    A     Probably over 30 years.

2    Q     In your capacity as a minister, have you officiated

3    weddings?

4    A     Yes, I have.

5    Q     Are you licensed to officiate weddings?

6    A     Yes, I am.

7    Q     And approximately when did you first receive your

8    license?

9    A     Maybe in early '90s or late '80-something.  I don't

10   remember exactly.

11   Q     And approximately when did you first begin to officiate

12   weddings?

13   A     Not too long after I got the license.

14   Q     And approximately, in your time as a minister after

15   receiving your license, how many weddings have you officiated?

16   A     Less than a dozen.

17   Q     Have you ever met an individual named Robert Kelly in

18   person?

19   A     Yes.

20   Q     Under what circumstances did you meet Robert Kelly?

21   A     To perform a wedding ceremony.

22   Q     I'm showing you what's in evidence as Government Exhibit

23   803(b).

24         MS. MELENDEZ:  If you could hand the witness

25   Government Exhibit 803(b), please.

1              If we could publish this.  It's in evidence.

2    Q    Mr. Edmond, do you have a copy there of Government

3    Exhibit 803(b)?

4    A    Yes, I do.

5    Q    And what is this?

6    A    This is a marriage license from the state of Illinois.

7    Q    On Government Exhibit 803(b), I want to direct your

8    attention to the bottom portion of the marriage license.  Do

9    you see that there, the portion where there is handwriting?

10   A    Yes.

11   Q    So I want to direct your attention to that first line of

12   handwriting where it says "print name of person officiating."

13   Do you see that there?

14   A    Yes.

15   Q    And what does that say there?

16   A    Nathan J. Edmond.

17   Q    And did you write that?

18   A    Yes, I did.

19   Q    And to the right of that it says, "Elder Nathan J Edmond,

20   Sr."  Did you also write that?

21   A    Yes.  Yes, I did.

22   Q    What's an elder?

23   A    An elder is an ordained minister --

24   Q    And is it fair to say --

25   A    -- of the gospel.

Edmond - Direct - Cruz Melendez                    2417

1    Q    Sorry, what did you say at the end?

2    A    An ordained minister of the gospel.

3    Q    Is it fair to say that was your title at the time?

4    A    Yes.

5    Q    And below that it says, "Hereby certify that Robert S.

6    Kelly and Aaliyah D. Haughton were united in marriage by me

7    at," and then there's an address.  Do you see that there?

8    A    Yes, I do.

9    Q    Did you also write what's written here, "Robert S. Kelly

10   and Aaliyah D. Haughton"?  Did you write that?

11   A    Yes.  Yes, I did.

12   Q    And where it says "were united in marriage by me at 6501

13   North Mannheim Road, Rosemont, Illinois" and then there's an

14   area code that says "60018," did you write that as well?

15   A    Yes, I did.

16   Q    And then going further it says, "The County of Cook and

17   State of Illinois on the 31st day of August 1994."  Did you

18   fill that in?

19   A    Yes, I did.

20   Q    And there's a signature to the right of that, "Nathan J.

21   Edmond."  Is that your signature?

22   A    Yes, it is.

23   Q    And below that there's an address listed, 8515 South

24   Indiana Avenue in Chicago Illinois.  Was that your address at

25   the time?

Edmond - Direct - Cruz Melendez                    2418

1   A    Yes, it was.

2   Q    Did you, in fact, officiate the wedding between Robert

3   Kelly and Aaliyah Haughton?

4   A    Yes, I did.

5   Q    And prior to officiating the wedding, had you ever met

6   Robert Kelly before?

7   A    No.

8   Q    Prior to officiating the wedding, did you know who Robert

9   Kelly was?

10  A    No.

11  Q    Prior to officiating the wedding, had you ever met

12  Aaliyah Haughton?

13  A    No.

14  Q    And did you know who Aaliyah Haughton was prior to

15  officiating the wedding?

16  A    No.

17  Q    So when did you first meet Robert Kelly and Aaliyah

18  Haughton?

19  A    The day that I officiated the wedding.

20  Q    Now, so you testified that you had not previously met

21  Robert Kelly or Aaliyah Haughton prior to officiating the

22  wedding, so how did it come to pass that you presided over

23  their wedding?

24  A    A friend of Mr. Kelly's was also a friend and a business

25  associate of mine, and he asked me to do him a favor and I

Edmond - Direct - Cruz Melendez                2419

1   agreed.

2   Q    Who is that friend?

3   A    Keith Williams.

4   Q    And how did you know Keith Williams?

5   A    He was in the mortgage business and I was in the real

6   estate business.

7   Q    And so you knew him through your business contacts?

8   A    Yes.

9   Q    Now, at the time that Keith Williams contacted you to do

10  this favor for Robert Kelly, did you know whose wedding

11  specifically you would be officiating?

12  A    No.

13  Q    And where did the wedding take place?

14  A    It took place at 6501 North Mannheim Road, which was a

15  large hotel.  I don't remember whether it was the Marriott or

16  the Hilton or something like that.

17  Q    Okay.  And looking at -- again, to Government

18  Exhibit 803(b) where you wrote that location, 6501 North

19  Mannheim Road, you don't recall the name of the hotel, but you

20  recall that it was a hotel, correct?

21  A    Yes, I don't remember.

22  Q    And where in the hotel did the wedding take place?

23  A    In a private room.

24  Q    And can you describe the room, generally speaking?

25  A    The room had a private bedroom and it had an open area

1  where you could -- it had a couch, you could sit down.  And

2  then I think it had a table and just an open area and a

3  television, something like that.

4  Q    And when you arrived at the hotel suite, when you arrived

5  there, who was present?

6  A    Mr. Williams and about three other gentlemen.

7  Q    And can you describe the gentlemen?

8  A    Just was three African-American gentlemen, about 5 feet,

9  7 to 10, and Mr. Williams and myself.

10  Q    So what, if anything, happened first when you arrived at

11  the hotel suite?

12  A    I was introduced to one of the gentlemen.  And after

13  being introduced to him, he gave me the marriage license

14  and then I had --

15  Q    And what did --

16  A    I looked at the marriage license.  It was an official

17  marriage license from the -- you know, Cook County.  And I

18  filled in everything like you see here in the document.

19  Q    Other than the marriage license, were you presented with

20  anything else to sign?

21  A    Yes.

22  Q    And what were you presented with?

23  A    What was to be a confidentiality agreement.

24  Q    And what, if anything, did you do when you were presented

25  with this confidentiality agreement?

1    A    I looked at it, I read it, and then I kind of chuckled.

2    And he asked me why did I do that, and I said to him because

3    it wasn't worth the paper that it was written on.

4    Q    What did you mean by that?

5    A    I meant that if it was supposed to be a confidentiality

6    agreement, it should have been a lot more airtight than that.

7    Q    And what if anything else did you say after you sort of

8    chuckled at the idea of the confidentiality agreement?

9    A    Well, he said to me -- well, asked me would I give him my

10   word that I wouldn't talk about this.  So I said yeah, I give

11   you my word.  I mean, I don't know, I didn't know why, but I

12   said I give you my word and he said okay.

13   Q    And so what, if anything, happened once you decided that

14   you weren't going to sign the confidentiality agreement but

15   you would give your word that you wouldn't tell anyone about

16   what you were doing that day?  What happened next?

17   A    Well, after I chuckled, after then he said, well, forget

18   it, you know, it wasn't necessary, you know, if I give him my

19   word.  I told him I honored my word and that was it.

20   Q    And what happened after that?

21   A    After that he said -- asked me was I ready and I said

22   yes, I'm ready.

23   Q    And what happened next?

24   A    The door opened to the bedroom and out stepped I guess

25   Aaliyah and Mr. Kelly.

Edmond - Direct - Cruz Melendez                    2422

1   Q    Now, can you please describe Aaliyah Haughton's

2   appearance when you saw her on that date?

3   A    Yes.  They both had on what looked like matching jogging

4   suits and they both had one leg on the jogging suit up to the

5   knee.

6   Q    What if anything else did you notice Aaliyah Haughton?

7   A    I didn't notice anything else about her, other than the

8   fact that she -- you couldn't see her whole face because her

9   hair was over half of her face.

10  Q    And can you please describe the ceremony itself?

11  A    Well, the ceremony was just they stood before me and you

12  have a minister's book to do weddings and that's what's just

13  standard.  And you say, "Dearly beloved, we are gathered

14  together here in the sight of God and these witnesses to join

15  together Aaliyah Haughton -- Robert Kelly and Aaliyah Haughton

16  in holy matrimony."  And you pretty much read the ceremony.

17  Q    And did you, in fact, do that?

18  A    Yes, that's what I did.

19  Q    And did the defendant -- did Robert Kelly and Aaliyah

20  Haughton exchange vows?

21  A    Yes, they did.

22  Q    And at the end of the ceremony, did you pronounce Robert

23  Kelly and Aaliyah Haughton as husband and wife?

24  A    Yes, I did.

25  Q    And how long did the ceremony last?

Edmond - Direct - Cruz Melendez                2423

1   A    About ten minutes or less.

2   Q    After you finished officiating the wedding, what happened

3   next?

4   A    After I finished officiating the wedding, you know, like

5   you standardly do, "you may kiss your bride," and they did.

6   And I think they walked back into the room.  I think I might

7   have said something to the gentleman that showed me the

8   license.

9        Normally, one of two things can happen:  Either the

10  minister keeps the license and turns it into the county or the

11  family keeps the license and turns it over to the county.  So

12  I thought that I was going to take it.  He said, "No, we'll

13  take it from here."  And that was it.

14  Q    And so did you turn in the license to the County Clerk's

15  Office?

16  A    No, I didn't.  They did.

17  Q    Did you receive any payment for officiating the wedding?

18  A    I think they offered me, what was it, 25 or $50, or

19  something like that, Keith might have said.  He might have

20  asked me.  I was just doing it as a favor.  I wasn't doing it

21  for, you know, no money.  I didn't think it was anybody

22  special and I didn't understand it at all.

23  Q    Mr. Edmond, I am now showing you Government Exhibit 89.

24       Do you have that there in front of you, a copy of

25  that?

Edmond - Direct - Cruz Melendez          2424

1   A    Yes.

2   Q    Do you recognize Government Exhibit 89?

3          MS. MELENDEZ:  We can publish this.  It's in --

4   A    Yes.

5   Q    And what is that?

6   A    That's me.  It's a picture of me, a little younger.

7   Q    Fair to say you were a little younger in that photograph?

8   A    Yes.

9   Q    So you previously testified that when you first walked

10  into the hotel suite, you were asked to sign a confidentiality

11  agreement and that instead you gave your word that you

12  wouldn't reveal to anyone that you had performed the ceremony

13  between Robert Kelly and Aaliyah Haughton.  Since officiating

14  that wedding, have you been approached by individuals from the

15  media or the public about the wedding?

16  A    Yes.  Radio stations, other people approached me.  But

17  one radio station kept calling my house.

18  Q    And despite being approached by the media and others,

19  have you spoken publicly before today about the wedding you

20  officiated between Robert Kelly and Aaliyah Haughton?

21         MR. CANNICK:  Objection to relevance.

22  A    Not at all.

23         THE COURT:  Overruled.

24  Q    I'm sorry, you said not at all?

25  A    "Not at all."

Proceedings                                          2425

1           MS. MELENDEZ:  Nothing further.

2           THE COURT:  Cross-examination?

3           MR. CANNICK:  None.

4           THE COURT:  All right.  Thank you so much, sir.  You

5    can I guess we can turn off the video.  Thanks a lot.

6           THE WITNESS:  Okay.  You're welcome.

7           (Witness excused.)

8           (Continuing on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    2426

1    (Continuing.)

2              THE COURT:  Do you have an additional witness?

3              MS. SHIHATA:  Yes, the Government calls Tracy

4    Montenegro.

5              THE COURT:  Is she a video witness also?

6              MS. SHIHATA:  No, and it's a he.

7              (Witness enters and takes the stand.)

8              THE COURTROOM DEPUTY:  Please stand and raise your

9    right hand.

10             Do you solemnly swear or affirm that the testimony

11   you are about to give will be the truth, the whole truth, and

12   nothing but the truth?

13             THE WITNESS:  I do.

14             (Witness sworn.)

15             THE COURTROOM DEPUTY:  Please state and spell your

16   name.

17             THE WITNESS:  Name, Tracy Montenegro.  First name

18   T-R-A-C-Y; last name M-O-N-T-E-N-E-G-R-O.

19             THE COURTROOM DEPUTY:  Thank you.

20             THE COURT:  You can take your mask off.

21             So, just a few things before we start.

22             THE WITNESS:  Yes.

23             THE COURT:  First thing is, don't speak too fast.

24   Our court reporters take down everything that you say.  It

25   makes it harder if we talk too fast.

Proceedings                                2427

1          And for the same reason, wait until whichever lawyer

2     is questioning you finishes the question before you start to

3     answer, so you're not talking over each other.

4          And finally, if there's a question that you don't

5     understand or you want to have repeated, let me know and I'll

6     direct the lawyer to rephrase the question.

7          All right?

8          THE WITNESS:  All right.  Thank you, Your Honor.

9          THE COURT:  All right, go ahead.

10         MS. SHIHATA:  Thank you, Your Honor.

11         And before I begin the questioning I'd like to admit

12    Government Exhibit 957 as a certified business record from

13    Apple pursuant to Federal Rule of Evidence 803(6) and 902(11);

14    and the business records certification has been marked as

15    Government Exhibit 957(a).

16         THE COURT:  And this is on consent?

17         MR. CANNICK:  Yes.

18         THE COURT:  Okay.

19         (Government's Exhibits 957 and 957(a) were received

20    in evidence.)

21

22         (Continued on the following page.)

23

24

25

SAM      OCR      RMR      CRR      RPR

Montenegro - direct - Shihata                2428

1  **TRACY MONTENEGRO,**

2       called as a witness by the Government, having been

3       duly sworn/affirmed by the Courtroom Deputy, was examined

4       and testified as follows:

5  DIRECT EXAMINATION

6  BY MS. SHIHATA:

7  Q    Good afternoon.

8  A    Good afternoon.

9  Q    Mr. Montenegro, where do you work?

10 A    I work for Apple.

11           THE COURT:  Can you just make sure you're speaking

12 into the --

13           THE WITNESS:  Oh, yes.

14           THE COURT:  Great, thank you.

15 A    I work for Apple, Fifth Avenue in midtown Manhattan.

16 Q    And how far did you go in school?

17 A    Bachelor's degree and then a Juris Doctorate degree.

18 Q    And what is your position, your current position at

19 Apple?

20 A    My current title is lead genius.

21           THE COURT:  Is what?

22           THE WITNESS:  That's lead genius.

23           THE COURT:  Lead genius.

24           THE WITNESS:  Yes, it's part of the management team

25 for technical support in store.

Montenegro - direct - Shihata                    2429

1           THE COURT:  All right, go ahead.

2           MS. SHIHATA:  That's a great title.

3    BY MS. SHIHATA:

4    Q    And what does it mean, what does the position of lead

5    genius, what does that mean?

6    A    Lead genius is a customer and technical point of

7    escalation for everyday issues arising in the store.  Also,

8    manage the staff, make sure we have adequate staffing, and

9    customers are seen in a timely fashion.

10   Q    And does that include management of the Genius Bar?

11   A    Yes, that is specifically for the Genius Bar.

12   Q    And that's the technical support?

13   A    Yes.

14   Q    Now, how long have you held the position of lead genius?

15   A    Four years approximately.

16   Q    And how long have you worked at Apple total?

17   A    In total, just under 17 years.

18   Q    And prior to your position as lead genius at Apple, what

19   other types of positions have you held?

20   A    Prior to lead genius, I was a genius.  And then a -- a

21   lead specialist, so lead for the sales team.  And prior to

22   that at a different location I was part of the -- the

23   full-time management staff.

24   Q    Now, in your 17 years working at Apple in various

25   positions, have you became familiar with Apple products,

Montenegro - direct - Shihata                    2430

1    including iPhones and iPads?

2    A    Yes.

3    Q    Now, I'm showing you what's in evidence as Government

4    Exhibit 957.

5    A    I see it.

6    Q    Is this a spreadsheet of iPad production history from

7    2010 to 2021 and iPhone production history from 2008 to 2014?

8    A    Yes.

9            (Exhibit published.)

10   BY MS. SHIHATA:

11   Q    And is this a certified business record from Apple?

12   A    Yes.  It tracks manufacturing of Apple products and

13   models and subsequent models and generations.

14           THE COURT:  A little trouble hearing you, so just

15   make sure you're speaking into the microphone.

16           THE WITNESS:  Okay, yes, Your Honor.

17   BY MS. SHIHATA:

18   Q    And looking at this exhibit, the first column, the first

19   part of it relates to iPads, correct?

20   A    That's correct.

21   Q    And then below that there's some information about

22   iPhones, is that right?

23   A    That's correct.

24   Q    Now, the first iPad, the iPad first generation, was that

25   released in April 2010?

1    A    Yes, it was.

2    Q    And the production site for the first generation of

3    iPads, was that a location in China?

4    A    That was, yes.

5    Q    And thereafter, does this document show the other types

6    of iPads and generations up through March 2020, through TBD?

7    A    Yes, every generation of iPad released since then.

8    Q    And looking at this document, has every generation of

9    iPad been produced at a production site outside the United

10   States?

11   A    Yes, it has.

12   Q    In either locations in China or locations in Brazil?

13   A    That's correct.

14   Q    And now, turning to the portion of the spreadsheet

15   related to iPhone production history from 2008 to 2014.

16            Does that indicate that the iPhone 3G was released

17   in 2008?

18   A    Yes, it was.

19   Q    And produced at a location in China?

20   A    Yes.

21   Q    And the iPhone 3GS was released in June 2009 and produced

22   in a location in China?

23   A    Yes, that's correct.

24   Q    And finally, the iPhone 4 was released in July 2010 and

25   all iPhone 4s were produced in either a location in China or a

1   location in Brazil?

2   A     That's correct.

3   Q     Now, what is the first iPhone that had video recording

4   capability?

5   A     The first iPhone that had video recording capability was

6   the iPhone 3GS.

7   Q     And what is the first iPad that had video recording

8   capability?

9   A     That was actually the iPad 2, or the second generation.

10  Q     And so, on this Government Exhibit 257, that's the iPad

11  second generation that was released in March 2011?

12  A     That is correct.

13  Q     And currently, do iPhones and iPads have front and back

14  cameras?

15  A     Yes, currently all models of iPhones and iPads have front

16  and -- front-facing and rear-facing cameras.

17  Q     And can you explain to the jury what that means?

18        THE COURT:  In a louder voice.

19        THE WITNESS:  Yes.

20        THE COURT:  Thanks.

21  A     A front-facing camera is a camera that's located along

22  the display or above the -- the viewing area of the display.

23  And it looks at the person viewing the screen as they're

24  holding the device up.  It's how selfies were born.

25        And the rear-facing camera is on the back of the

Montenegro - direct - Shihata                    2433

1   device and it faces away from the person holding or viewing

2   the display.

3   Q     And what was the first iPhone that had a front-facing

4   camera, as well as a back-facing camera?

5   A     That was actually the iPhone 4.

6   Q     Okay.  And looking here, that was released in July 2010,

7   correct?

8   A     Correct.

9   Q     And how about iPad -- you testified earlier that the

10  first iPad with video recording capability was an iPad 2,

11  second generation, correct?

12  A     Correct.

13  Q     And when -- since when have iPads had both front- and

14  back-facing cameras?

15  A     That I cannot recall off the top of my head.

16  Q     Okay.

17              Now, are you familiar with the text messaging

18  capabilities of iPhones?

19  A     Yes.

20  Q     And are you familiar with something known as iMessage?

21  A     Yes.

22  Q     What is iMessage?

23  A     IMessage is an Apple service that is offered aside from

24  standard text messaging that -- standard text messaging goes

25  through your carrier.  So, you have to have a -- a carrier

1  connection connected to one of the satellites with one of the

2  main carriers, for example.

3          IMessage allows you to bypass that and utilize an

4  Apple-based messaging service that uses Apple cloud, if you

5  will, Apple servers.  So, as long as you have any kind of

6  network connection, you can send a direct message to someone.

7  Q    So, it doesn't go through your telephone carrier, is that

8  right?

9  A    That's correct.

10 Q    And do both individuals need to have an Apple device to

11 participate in iMessage?

12 A    Yes.

13 Q    Now, when an individual receives or sends text messages

14 or iMessages on their phone, does it often display the date

15 and time of those messages?

16 A    It keeps the date.  It only shows the date right above

17 the first message sent for that day, and then it keeps the

18 date relative until it goes back a week.  And then it starts

19 listing the date.

20 Q    Okay.

21 A    The time is hidden, but if you swipe slightly across the

22 messages, you will see the time stamps for each individual

23 message.

24 Q    And is the time -- the time indicated, the time stamp for

25 messages, is that the local time where the phone is at the

Montenegro - direct - Shihata                    2435

1   time you're looking at the phone?

2   A    Based on the time zone set on the device, that usually is

3   defaulted to your local region.  But some people, for

4   different reasons, keep it to their home time zone.

5   Q    Okay, but the default is wherever the phone is, that's

6   the times that will show up?

7   A    That's correct, that's the default.

8   Q    So, just to be clear, if I'm -- if I'm looking at my text

9   messages in New York, my prior text messages, the date and

10  time stamp, will be in my local New York time; is that right?

11  A    That's correct.

12  Q    And if I travel to another time zone and look at those

13  same messages, the date and time will be in that other local

14  time zone?

15  A    Correct.

16  Q    Now, you testified that iMessages don't go through the

17  phone carrier and are between two -- between Apple devices,

18  correct?

19  A    That's correct.

20  Q    And when you look at the messages, is there anything that

21  distinguishes an iMessage from a text message as far as the

22  color of the message or anything like that?

23  A    Yes, it's specifically the color of the message.

24          IMessages are sent in blue, what we affectionately

25  call bubbles.

Montenegro - direct - Shihata                2436

1          The cellular-based messages or standard text

2     messages are in green.

3     Q    And are any messages in gray on an iPhone?

4     A    (No response.)

5     Q    Or let me show you an example.

6     A    In --

7     Q    Hold on one second.

8          (Pause.)

9     BY MS. SHIHATA:

10    Q    So, I'm showing you what's in evidence as the first page

11    of Government Exhibit 208(b).

12         (Exhibit published.)

13    Q    Do you see that in front of you?

14    A    I do.

15    Q    And the green, I think you just testified, does that

16    signify these are text messages not iMessages?

17    A    Correct.

18    Q    And do you see how some messages are in green and some

19    message are in gray?

20    A    Correct.

21    Q    What, if anything, does that signify?

22    A    The ones in gray and usually on the left side of the

23    messaging window are from the person you're sending a message

24    to.

25    Q    Okay.

Montenegro - direct - Shihata                2437

1           So, green is, if this is my phone, I am sending the

2    messages in green?

3    A    Correct.

4    Q    And the person who's responding is in gray?

5    A    Correct.

6    Q    Now, you testified you didn't recall precisely when iPads

7    began to have both front and back cameras, correct?

8    A    Initially, but I was thinking about it.  Yes.

9    Q    Okay, do you recall now?

10   A    Yes.  It was the second generation.

11   Q    The second generation iPad?

12   A    Yes.

13   Q    And so, that would be, looking at Government Exhibit 957,

14   that would be the one that was released in March 2011?

15   A    Correct.

16   Q    So, since that date, iPads have had both front-facing and

17   back-facing cameras?

18   A    That's correct.

19           MS. SHIHATA:  No further questions.

20           THE COURT:  All right, any cross?

21           MR. CANNICK:  None.

22           THE COURT:  Okay, thank you so much.  You can step

23   down.

24           THE WITNESS:  Thank you.

25           (Witness steps down and was excused.)

Proceedings                                    2438

1            MS. SHIHATA:  Your Honor, I think we've run out of

2   witnesses for today.

3            THE COURT:  Well, that's okay.

4            All right, so we are going to stop for today, but I

5   think we're moving along very well.  So, we will see you

6   tomorrow at 9:30.  Please don't talk about the case or read

7   any accounts or watch any television accounts, if there are

8   any, about the case at all.  Don't talk about it with anybody,

9   but do have a good night and I'll see you tomorrow.

10           THE COURTROOM DEPUTY:  All rise.

11           (Jury exits.)

12           THE COURT:  All right, everybody can have a seat.

13           So, what do we anticipate tomorrow in terms of

14   witnesses?

15           MS. GEDDES:  Can we approach, do you mind?

16           THE COURT:  Sure.  Do we need the reporter?

17           MS. GEDDES:  No.

18           THE COURT:  Okay.

19           (Sidebar held off the record with the Court and

20   counsel only.)

21           THE COURT:  All right, we were just having a quick

22   conversation about scheduling.

23           And so, there is some uncertainty about how many

24   witnesses we will have tomorrow.  And so, the Government is

25   going to let the defense know how many and who as soon as they

SAM      OCR      RMR      CRR      RPR

Proceedings                                      2439

1    possibly can.

2          So, I mean this happens during trials every once in

3    a while, so we will see where we are tomorrow.  All right?

4          Okay, anything else that we need to put on the

5    record?

6          MR. CANNICK:  Not from us, Your Honor.

7          THE COURT:  Okay.

8          MS. GEDDES:  Or us; thank you.

9          THE COURT:  All right, thanks so much, everyone.

10

11

12

13        (Matter adjourned to September 2, 2021 at 9:30 a.m.)

14

15                          ooo0ooo

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1                                **INDEX**

2      **WITNESS:**                                          **PAGE:**

3       **FAITH**
                        CONTINUING DIRECT EXAMINATION
4                       BY MS. SHIHATA                        2242

5                       CROSS-EXAMINATION
                        BY MR. CANNICK

                                                             2321

7                       REDIRECT EXAMINATION
                        BY MS. SHIHATA                        2386
8
                        RE-CROSS EXAMINATION
9                       BY MR. CANNICK                        2321

10      **KELLY**
                        DIRECT EXAMINATION
11                      BY MS. SHIHATA                         2395

12                      CROSS-EXAMINATION
                        BY MR. CANNICK                        2409

13

14      **NATHAN EDMOND**

15                      DIRECT EXAMINATION                    2414
                        BY MS. MELENDEZ
16
        **TRACY MONTENEGRO**
17
                        DIRECT EXAMINATION                    2428
18                      BY MS. SHIHATA

19

20

21

22

23

24

25

1

## **EXHIBITS**

2

3   Government Exhibits 327(a) and 327(b)              2259

4   Government Exhibits 954 and 955                    2267

5   Government's Exhibit 514(a)                        2270

6   Government's Exhibits 514(c) through 514(i)        2271

7   Government's Exhibit 239                           2276

8   Government Exhibit 517A                            2310

9   Government Exhibit 80                              2312

10  Government Exhibit 510                             2314

11  Government Exhibit 207A                            2318

12  Government Exhibit 207B & 207C                     2319

13  Government Exhibit 207I                            2319

14  Government Exhibit 958                             2400

15  Government Exhibit 230A                            2401

16  Government Exhibit 230B                            2404

17  Government's Exhibits 957 and 957(a)               2427

18

19                          * * * * *

20

21

22

23

24

25