2442

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        :        19-CR-286(AMD)

        Plaintiff,        :

                        United States Courthouse
    -against-        :        Brooklyn, New York

ROBERT SYLVESTER KELLY,        :

                        September 2, 2021
      Defendant.        :        9:30 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:


For the Government:        JACQUELYN M. KASULIS
                        Acting United States Attorney
                        BY: ELIZABETH GEDDES
                            NADIA SHIHATA
                            MARIA E. CRUZ MELENDEZ
                        Assistant United States Attorneys
                        271 Cadman Plaza East
                        Brooklyn, New York


For the Defendant:        DEVEREAUX L. CANNICK, ESQ.
                        NICOLE BLANK BECKER, ESQ.
                        THOMAS FARINELLA, ESQ.
                        CALVIN HAROLD SCHOLAR, ESQ.


Court Reporter:        Andronikh M. Barna
                        225 Cadman Plaza East
                        Brooklyn, New York
                        (718) 613- 2178


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

Proceedings                                      2443

1          (In open court; jury not present.)

2          (Parties present.)

3          THE CLERK:  All rise.

4          THE COURT:  Everybody can have a seat.

5          All right.  Good morning, everyone.  Hope everybody

6  survived.

7          How many witnesses do we have for today?

8          MS. GEDDES:  We have four witnesses.  Well, we have

9  three plus witnesses.  One witness is en route.  Her plane was

10  diverted last night, but we are optimistic that she'll land

11  and we'll get her.

12          THE COURT:  Okay.  It has been an unusual 24 hours,

13  so we'll see what we can get done today.

14          And I assume you gave counsel notice?

15          MS. GEDDES:  Yes.

16          THE COURT:  Great.  Anything from either side before

17  we get the witness and the jury?

18          MR. CANNICK:  No, Your Honor.  Just thank you for

19  Your Honor's patience.

20          THE COURT:  That is fine.  Do not worry about it.

21          Let's get the witness and then we will get the

22  jurors.

23          (Discussion held off the record.)

24          (Witness enters the courtroom. )

25          THE CLERK:  All rise.

Proceedings                                            2444

1           (Jury enters the courtroom.)

2           THE CLERK:  You may be seated.

3           THE COURT:  All right, jurors.  Good morning.  Glad

4    to see you are all safe and dry.  It has been an eventful

5    24 hours, but we are ready to proceed.  I appreciate your

6    patience.

7           Are you ready to call your next witness?

8           MS. GEDDES:  Yes, Your Honor.  The government calls

9    Yongfei Wu.

10          THE CLERK:  Please raise your right hand.

11          Do you solemnly swear or affirm that the testimony

12   you're about to give will be the truth, the whole truth, and

13   nothing but the truth?

14          THE WITNESS:  Yes, I do.

15          (Witness sworn.)

16          THE CLERK:  Thank you.  You may be seated.

17          THE COURT:  And you can take your mask off.

18          All right.  Good morning.

19          THE WITNESS:  Good morning.

20          THE COURT:  Just a couple of things.  I want to make

21   sure the microphone is working.  Just give it a tap.

22          THE WITNESS:  Hello?  Do you hear me?

23          THE COURT:  Well, maybe you have to turn it on.

24          THE WITNESS:  Hello?  Do you hear me?

25          THE COURT:  That is good.  That is good.  You might

Proceedings                                              2445

1   want to pull it a little bit closer to you.  Great.

2          So our court reporter records everything that

3   everybody says, she takes it down, so it is really important

4   that you speak slowly so it does not make her job too hard.

5   And it is also important that we not speak over one another

6   for the same reason.

7          If there is a question that you want to have

8   repeated or clarified, tell me and I will direct the lawyers

9   to rephrase it.

10         And just do your best to answer only the question

11  you are being asked.  Okay?

12             THE WITNESS:  Sure.

13             THE COURT:  All right.  Go ahead.

14             MS. GEDDES:  Your Honor, I am going to begin by

15  reading into the record a stipulation entered by the parties.

16             THE COURT:  Okay.

17             MS. GEDDES:  The stipulation reads:  It is hereby

18  stipulated and agreed by and between the undersigned parties

19  that on July 15th of 2021, pursuant to a court-authorized

20  search warrant, Detective Dana Galante with the New York City

21  Police Department obtained a buccal swab from the defendant,

22  Robert Kelly the defendant's -- and then in parentheses, the

23  defendant's buccal swab.

24         The defendant's buccal swab was then provided to the

25  Illinois State Police, ISP; the Forensic Science Center, FSC;

Proceedings                          2446

1   and vouchered as Lab Item 2 and Lab Subitem 2a within ISP,

2   FSC, Case No. DFS 19-007090.

3           This stipulation is admissible in evidence at this

4   trial and it is signed by all parties and I am going to mark

5   that as Government Exhibit 1005.

6           THE COURT:  Okay.

7           (Continuing on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                          2447

1    **YONGFEI WU**, having been first duly sworn, was examined and

2    testified as follows:

3    DIRECT EXAMINATION

4    BY MS. GEDDES:

5    Q     Where do you work?

6    A     Illinois State Police, Forensic Science Center in

7    Chicago.

8    Q     What is your tile at the Forensic Science Center in

9    Chicago?

10   A     Forensic scientist.

11   Q     How long have you worked as a forensic scientist at the

12   Forensic Science Center of Chicago?

13   A     Six and a half years.  During the first one-and-a-half

14   years, is -- there's training program that's in Springfield,

15   Illinois, in the training lab.  That's one-and-a-half years.

16   Then the next five years is at the Forensic Science Center in

17   Chicago.

18   Q     And do you work within a specific unit at the Forensic

19   Science Center of Chicago?

20   A     Yes.  It's called biochemistry section.

21   Q     What is the biochemistry section responsible for?

22   A     Responsible for forensic biology and forensic DNA

23   testing.

24   Q     So it's responsible for forensic biology and DNA testing?

25   A     Yes.

Proceedings                              2448

1   Q    What are your duties and responsibilities at the Forensic

2   Science Center in the biochemistry unit?

3   A    Conducting forensic biology analysis, conducting forensic

4   DNA analysis --

5            THE COURT:  I am just going to ask you, I just want

6   to make sure you are speaking into the microphone.

7            THE WITNESS:  Okay.

8            THE COURT:  The chair does not move.  Sorry about

9   that.  But just try to bring the microphone a little bit

10  closer.

11  A    So conducting forensic biology analysis, conducting

12  forensic DNA analysis, write a report, conducting peer review,

13  testimony in court.

14  Q    All right.  So at the Forensic Science Center, you

15  conduct forensic biology testing; is that correct?

16  A    Yes.

17  Q    As well as forensic DNA testing?

18  A    Correct.

19  Q    And you mentioned that you also do peer review?

20  A    Right.

21  Q    What do you mean by peer review?

22  A    That's to review my colleagues' cases.

23  Q    So are you referring to your colleagues' cases involving

24  forensic biology and forensic DNA testing?

25  A    Right.  They write reports and then I conduct peer

Proceedings                                    2449

1    review.

2    Q     You review --

3    A     Before it was mailed.

4    Q     All right.  So you testified that you review the forensic

5    reports drafted by your colleagues; is that correct?

6    A     Correct.

7    Q     Is the Forensic Science Center of Chicago an accredited

8    lab?

9    A     Yes.

10   Q     Who is it accredited by?

11   A     It's called ANSI-ANAB, American National Standard

12   Institute - National Accreditation Board, based on ISO 17025

13   standards.

14   Q     And is that also known as ANSI, A-N-S-I?

15   A     Yes.

16   Q     And then you said it was the National --

17   A     ANAB.

18   Q     The National Accreditation Board?

19   A     Yes.

20   Q     Can you tell the jury about your educational background?

21   A     I received my bachelor's degree in medicine.  In China,

22   the first degree in medicine.  Medicine is the first degree,

23   not like in United States, it's -- we are second degree,

24   after.  The degree after are college graduation.  In China,

25   it's the first degree after your high school, that's in

1   medicine.  In the year 1994 from Xi'an Jiaotong University in

2   China.  Xi'an is spelled X-i-'-a-n.  Jiaotong is spelled

3   J-i-a-o-t-o-n-g.  That university in Xi'an, China.

4   Q    So you received your bachelor's in medicine; is that

5   correct?

6   A    Yes.  That's in the year 1994.

7            Then I received my bachelor's degree in forensic

8   medicine from same university in the year 1997.

9            And I receive my bachelor's degree in forensic

10  medicine from same university in the year 2004.

11           THE COURT:  What is the name of the university where

12  you got those degrees?

13           THE WITNESS:  Xi'an Jiaotong University in Xi'an,

14  China.

15           THE COURT:  I see.  Okay.

16  Q    And the final degree that you received from that

17  university, what was that again?

18  A    It's doctorate degree in forensic medicine.

19  Q    A doctorate degree?

20  A    Yes.

21  Q    In forensic medicine?

22  A    Yes.  That's Ph.D.

23  Q    And after you received your Ph.D. in forensic medicine,

24  what type of employment did you pursue?

25  A    I had ten years of cancer research experience at National

Proceedings                                              2451

1  University of Singapore and the University of Chicago and the

2  University -- and also Northwestern University in Chicago

3  also.

4  Q    All right.  So you conducted cancer research at two

5  universities in Illinois; is that correct?

6  A    Three.  Two university in Illinois and one in Singapore,

7  totaling ten years.

8  Q    You testified earlier about a training -- a

9  one-and-a-half year training program that you participated in

10 at the Forensic Science Center?

11 A    Oh, it's not at Forensic Science Center.  It's in a

12 training lab at -- in Springfield.

13 Q    And can you describe what is involved in that training

14 program?

15 A    It's -- there's training on forensic biology testing and

16 forensic DNA testing.

17 Q    And that was a year-and-a-half long program?

18 A    Yes.

19 Q    And do you also receive continuing education through the

20 Forensic Science Center?

21 A    Yes.

22 Q    What type of continuing education do you receive?

23 A    That's certificate -- conference, certificate, seminar

24 and literature review, totaling eight hours a year.

25 Q    So you receive eight hours of continuing education each

Proceedings                                    2452

1    year?

2    A    Yes.

3    Q    As a forensic scientist, have you had occasion to perform

4    DNA testing on items submitted to the Forensic Science Center?

5    A    Yes.

6    Q    Approximately, how many times have you conducted such

7    tests?

8    A    Thousands of times.

9    Q    Thousands of times?

10   A    Yes.

11   Q    And have you previously testified as an expert in court

12   regarding DNA testing and the interpretation of that testing?

13   A    Yes.

14   Q    How many times have you testified in court?

15   A    Twice.

16   Q    And where was that?

17   A    In Illinois.

18   Q    In Illinois?

19   A    Mm-hm.

20        MS. GEDDES:  Your Honor, pursuant to Federal Rule of

21   Evidence 702, I would like to offer Mr. Wu as an expert in the

22   field of forensic biology and DNA analysis.

23        MR. CANNICK:  No objection.

24        THE COURT:  Okay.  Ladies and gentlemen, I will give

25   you a little bit more of a -- I think I told you this before,

Proceedings                                           2453

1    but whenever somebody testifies as an expert in an area that

2    most of us don't have expertise in, they are permitted to

3    testify as to certain things.  I will give you a detailed

4    instruction about that in my final charge.

5             Go ahead.

6             MS. GEDDES:  Thank you.

7    Q    Can you briefly explain to the jury what DNA is?

8    A    DNA is the genetic blueprint of life passed down from

9    generation to generation.  It encodes various of genes which

10   are responsible for various types of factions of life.

11   Q    So you described it as the genetic blueprint of life that

12   is passed on from generation to generation?

13   A    Yes.

14   Q    Now, is every person's DNA unique?

15   A    Yes, except identical siblings.

16   Q    So aside from identical twins --

17   A    Right.

18   Q    -- each person has a different DNA?

19   A    Each person has a unique DNA sequence.

20   Q    Where do you find DNA in a person's body?

21   A    All types of cells, except mature red blood cells.

22   Q    So cells throughout your body --

23   A    Yes.

24   Q    -- contain DNA?

25   A    Mm-hm.  Except the mature red blood cells.

Proceedings                                            2454

1    Q    All right.  So with the exception of mature red blood

2    cells that; is right?

3    A    Right.

4    Q    And is a person's DNA the same throughout each of those

5    cells where DNA is found?

6    A    Yes, except some mutation.  Mutation happening in some

7    cancer cases, you can have some mutation.

8    Q    But aside from mutations caused by cancer, one's DNA is

9    the same throughout their body?

10   A    Right.

11   Q    And does DNA remain the same throughout one's life?

12   A    Yes.

13   Q    Are you familiar with the term "DNA profile"?

14   A    Yes.

15   Q    What is a DNA profile?

16   A    DNA profile is a combination of different alleles and

17   different loci we find.  For each specific person and each

18   specific locus, there are two alleles, one from father and one

19   from mother.  If those two alleles are same, they're called

20   homozygous in that locus.  If they are different, then they

21   are called heterozygous.

22   Q    Let me back up just a moment.

23        For the most part, is the DNA in one person the same

24   as DNA in other people?

25   A    Big majority of DNA sequence among different people are

```
                    Proceedings                    2455
```

1  the same.  Only small portion of DNA among different people

2  are different.

3  Q    And so for the most part, your DNA is the same among

4  everyone in the room?

5  A    Right.

6  Q    But are there certain portions of an individual's DNA

7  that varies from person to person?

8  A    Correct.

9  Q    Are you familiar with the term "short tandem repeat" or

10  STR?

11  A    Yes.  That's the marker we use for forensic

12  identification.

13  Q    And are short tandem repeat or STRs, does that vary from

14  person to person?

15  A    Yes.  It is called polymorphic.  In terms of forensics,

16  it's called polymorphic.  That means different people might

17  have different alleles at those loci.  That's called

18  polymorphic.  And we use that polymorphism for forensic

19  identification.

20  Q    And you used the term "loci" or "locus."  What do you

21  mean by that?

22  A    That's the specific DNA areas.  They are the polymorphic

23  areas.  Those DNA sequence are different from people to

24  people.

25  Q    Okay.  So is loci or locus just another word for --

Proceedings                                          2456

1    A      Plural and singular, yeah.

2    Q      Is it just another word for location or area?

3    A      Yes, location or area.  Yes.

4    Q      And you also talked about the term "allele"?

5    A      Yes.

6    Q      What is an allele?

7    A      Allele, in forensics, is called -- it's DNA type.  So I

8    have a specific locus for this person, that's two -- there are

9    two alleles, one from mother and one from father.

10   Q      All right.  And in a -- can you explain what is included

11   in a DNA profile?

12   A      My current kit has 24 loci.  One is called amelogenin;

13   that's a sex marker.  The other 23 are called STR loci.

14   Q      All right.  So within a DNA profile, are you essentially

15   looking at 24 different markers?

16   A      Yes.

17   Q      And are 23 of those markers called the STR loci?

18   A      Right.

19   Q      And then is there an additional marker -- we'll call it

20   the 24th marker -- that comes from amelogenin; is that

21   correct?

22   A      Yes.

23   Q      And what is the amelogenin marker?

24   A      Amelogenin marker is a sex chromosome.  Human cells

25   contain -- each human cell contains 23 pairs of DNA

Proceedings                                                    2457

1    chromosomes.  The 23rd pair is called sex chromosome.  One is

2    called Y chromosome, another one is called S chromosome.  S

3    chromosome is from mother.  For male person, the Y is from --

4    Y chromosome is from father, X is from mother.  For a female

5    person, one X is from father and the other X is from mother.

6    Q    All right.

7    A    The amelogenins for a male contributor, there are two

8    peaks, one from Y and one from X.  For a female contributor,

9    there's only one peak; that's called X.

10   Q    Now, are you able to determine one's sex or -- from a DNA

11   profile?

12   A    Yes.

13   Q    What is used to determine sex from a DNA profile?

14   A    An amelogenin at a locus, if there are two peaks, one Y

15   peak, one X peak detected, I call that a male contributor.

16   Q    If there --

17   A    And if there's only an X peak detected, that's called

18   female contributor.

19   Q    All right.  So if there's a Y peak present, that

20   indicates a male?

21   A    Yes.

22        There's actually a STR locus.  Out of those 23 STR

23   loci, there's a locus called DYS391.  That is a Y chromosome

24   from only -- only male contributor can be detected allele at

25   that locus.  For female DNA, there's no allele can be

Proceedings                                    2458

1   detected.  It's only -- this is specific for Y chromosome.

2   Q    All right.  So are you saying that in addition to the

3   amelogenin marker, there is also another way to identify the

4   sex of a particular DNA profile by looking at one of those 23

5   STR loci?

6   A    Yes.

7   Q    And I think you indicated a particular name for that

8   loci, locus?

9   A    DYS391 locus.

10  Q    All right.  And are there -- I don't want you to tell me

11  them, but are there names for each of the different 23 loci?

12  A    Yes.

13  Q    And DYS391 is just one of those names, correct?

14  A    Yes, yes.

15  Q    And that just indicates a particular location, correct?

16  A    Yes, yes.

17  Q    Now, when case evidence is received in your lab at the

18  Forensic Science Center, what is initially done with it?

19  A    The evidence is assigned a case number for that case.

20  And then each case may have -- a case may have a different

21  number of items; then we will assign a different item number

22  for different exhibit.

23  Q    So there is a case number assigned and then, within that

24  case number, each piece of potential evidence could be

25  assigned an item number?

Proceedings                                    2459

1   A     Yes.

2   Q     Are you familiar -- so once a case number and an item

3   number for each piece of evidence has been assigned, what

4   happens?

5   A     Then the case will be assigned to an analyst.

6   Q     And once it's assigned to an analyst, typically what

7   happens?

8   A     The analyst will do -- the biochemistry section.  The

9   analyst will do biology -- forensic biology testing and then

10  forensic DNA testing.

11  Q     All right.  And when forensic biology testing is done, is

12  that a way to identify whether any biological fluids are found

13  on a particular type of evidence?

14  A     Yes.

15  Q     And among the biological fluids that might be found, is

16  semen one of those?

17  A     Yes.

18  Q     And then you also mentioned that after the forensic

19  biology testing is done, it then goes to forensic DNA testing?

20  A     Right.

21  Q     And that's, at the lab, the type of testing that you do,

22  correct?

23  A     Yes.

24  Q     Are you familiar with the term "DNA standard"?

25  A     Yes.

Proceedings                                          2460

1    Q    What is a DNA standard?

2    A    That's a new standard from a people -- person of

3    interest.  We know the source of that DNA.  It's called a

4    standard.

5    Q    Okay.  So as opposed to a piece of evidence that is

6    submitted to the lab for DNA analysis where you don't know the

7    origin --

8    A    Yes, the items from the crime scene, we don't know what's

9    the source of that DNA.  But from the standard, we know who is

10   the contributor, who is that from.

11   Q    All right.  So it's fair to say that it's known who is

12   the provider of that particular sample?

13   A    Right.

14   Q    And when a DNA standard is submitted to the Forensic

15   Science Center, what happens?

16   A    Same as the question of samples.  They assign an exhibit

17   -- case number and item number.

18   Q    And are DNA -- is a DNA standard typically assigned to

19   the same case number associated with the evidence in question?

20   A    In most cases, that's the case.

21   Q    And then it is assigned a different item number?

22   A    Right.

23           MS. GEDDES:  Your Honor, may I approach?

24           THE COURT:  Yes.

25           MS. GEDDES:  I'm showing the witness what's in

Proceedings                                    2461

1  evidence as Government Exhibit 241.

2  Q    Can you take a look at 241 and identify the case number

3  assigned to 241?

4  A    It's DFS 19-002 -- no, -007090.

5  Q    And are you able, from looking at Government Exhibit 241,

6  to identify the item number assigned to this piece of

7  evidence?

8  A    Yes.  That's Item 1.

9  Q    And were you able to determine that by looking at this

10 tag that has been affixed to Government Exhibit 241?

11 A    Yes.

12 Q    And is that a tag affixed by your lab?

13 A    Yes.  That's my colleague, Forensic Scientist Veronica

14 Jackson, did it.

15         THE COURT:  Did you say Veronica Jackson?

16         THE WITNESS:  Yes, Veronica Jackson.

17         THE COURT:  Just make sure that you are speaking

18 microphone.

19         THE WITNESS:  Okay.

20         THE COURT:  Thanks.

21 Q    And were you asked to analyze evidence within

22 Case No. 19-007090?

23 A    Yes.

24 Q    What evidence were you asked to analyze?

25 A    Two cuttings from shirt.

Proceedings                                           2462

1    Q    And I'm showing you Government Exhibit 241, and there

2    appears to be a cutting here.  Were the cuttings that you were

3    given consistent with these cuts here?

4    A    No, they -- I don't remember that.  They originally --

5    Forensic Scientist Veronica Jackson made the cuttings and put

6    them into two tubes, so I then sealed and put them in the

7    evidence, both.  I took custody from there.  So I didn't make

8    that cutting, so I cannot recognize that cutting.

9    Q    Okay.  But the cuttings that you received, is it just

10   consistent with the cuts here?

11   A    Right.

12   Q    And when I say "here," I'm referring to Government

13   Exhibit 241.

14   A    Right.

15   Q    And the cuttings that you received, were those assigned

16   sub-item numbers?

17   A    Yes.  They are 1A and 1B.

18   Q    And again, you testified that you received those cuttings

19   from your colleague, Veronica Jackson?

20   A    She made cuttings, sealed -- make cutting, put them in

21   two different tubes and sealed them in the envelope and then

22   put them in evidence, both.  Then I took custody from both.

23   Q    So they were placed into evidence and you took over from

24   there?

25   A    Yes.

Proceedings                              2463

1   Q    Once you received those two cuttings which you identified

2   as Sub-item No. 1A and 1B within that same case number

3   associated with Government Exhibit 241, what did you do first?

4   A    I did extraction called differential extraction.

5   Q    And when you say "differential extraction," what do you

6   mean by that?

7   A    That method is to separate sperm cells from the

8   epithelial cells in a stain.

9   Q    Now, you've just referenced sperm cells and epithelial

10  cells.  Are epithelial cells just another name for skin cells?

11  A    Skin cells is one type of epithelial cells.  The

12  epithelial cells also include like oral -- the swab of the

13  cells from the oral surface and also from the rectal surface

14  and the vaginal areas, oral areas and also the rectal areas.

15  Those are epithelial cells.

16           THE COURT:  Can I just make sure I understand; you

17  said from the vaginal area?

18           THE WITNESS:  Yes.

19           THE COURT:  The rectal area?

20           THE WITNESS:  Area.

21           And also oral.

22           THE COURT:  The oral area?

23           THE WITNESS:  They are all epithelial cells.

24           THE COURT:  I see.  Go ahead.

25           THE WITNESS:  They are not skin cells, but they are

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                                    2464

1    epithelial cells.

2    Q    And then also, skin cells is another form of epithelial

3    cells?

4    A    Right.

5    Q    And so you testified that you performed differential

6    extraction as a means to separate out the sperm cells from

7    those epithelial cells; is that correct?

8    A    Correct.

9    Q    And did you do that on Sub-item 1A and 1B?

10   A    Yes.

11   Q    Today I want to focus on just the sperm cell fractions of

12   1A and 1B.  Okay?

13   A    Okay.

14   Q    Now, did you also conduct DNA testing on the non sperm

15   cell fractions, the epithelial cell fractions?

16   A    Yes.

17   Q    Okay.  So we're going to -- and you also -- in addition

18   to that, you conducted DNA testing on the sperm cell fractions

19   for 1A and 1B, correct?

20   A    Correct.

21   Q    I'm sorry, I was speaking over you.  Is that right?

22   A    Correct.  Correct.

23   Q    So again, referring to the sperm cell fraction of 1A,

24   were you able to determine a DNA profile for the sperm cell

25   fraction of 1A?

Proceedings                                        2465

1   A     Yes.

2   Q     And were you also able to determine a DNA profile for the

3   sperm cell fraction of 1B?

4   A     Yes.

5   Q     Now, you mentioned earlier that a complete DNA profile

6   under your current system includes 24 different loci, the 23

7   STR markers, as well as the one amelogenin marker; is that

8   correct?

9   A     Yes.

10  Q     How many loci were present in the DNA profile that you

11  identified for the sperm cell fraction of 1A?

12  A     24.

13  Q     All 24?

14  A     Yes.  But two of them are not complete.  That means

15  potentially some -- out of those two loci, the sister -- part

16  of the sister allele may be missing.  It's called incomplete,

17  partial.

18  Q     Were you able to identify alleles at each of the 24

19  markers?

20  A     Yes.

21  Q     But I think you are saying that at two of those markers,

22  you were only able to identify a partial result, so at least

23  one allele?

24  A     Yes.  One allele, yeah.  The other sister allele may be

25  missing, so that's why we call it partial result.

Proceedings                                    2466

1   Q    And with respect to the sperm cell fraction of 1B, how

2   many loci were present in the DNA profile that you identified

3   for that one?

4   A    24.

5   Q    And was that DNA profile a complete profile, including

6   both alleles at each of the 24 markers?

7   A    Correct.  That's complete.

8   Q    Now, did there come a time that your lab received

9   additional evidence regarding that particular case,

10  DFS 007090?

11  A    Yes.

12  Q    What did you receive?

13  A    A buccal swab from Robert Kelly.

14  Q    And when you say "buccal swab," what is that?

15  A    It's from the mouth cavity -- a swab from the mouth

16  cavity of Robert Kelly.

17  Q    And what was the condition of the buccal swab when your

18  lab received it?

19  A    It was sealed.

20  Q    It was sealed?

21  A    Yes.

22  Q    And the buccal swab associated with Robert Kelly, was

23  that vouchered as Lab Item No. 2 within that same case,

24  DFS 007090?

25  A    Correct.

Proceedings                                2467

1   Q    And was testing -- was DNA testing done on that buccal

2   swab?

3   A    Yes.

4   Q    And just to be clear, is the buccal swab that you

5   received for Robert Kelly also known as a standard, a DNA

6   standard?

7   A    Yes.

8   Q    And is the reason because you know who provided that DNA

9   sample?

10  A    Correct.

11  Q    Were you able to determine a DNA profile for the DNA

12  standard for Robert Kelly or that buccal swab?

13  A    Yes.

14  Q    And were you able to identify a complete profile

15  consisting of alleles at all 24 markers?

16  A    Yes, it's complete.

17  Q    And just to be clear, was the analysis of the buccal swab

18  done at a different time than when the analysis was done on

19  Lab Items 1A and 1B, the cuttings from within Government

20  Exhibit 241?

21  A    Right.  They are almost two and a half years apart.

22  Q    Okay.  Did you have an opportunity to compare the DNA

23  profile that you generated for the buccal swab of Robert Kelly

24  to the DNA profile that you generated for the sperm cell

25  fractions within Sub-item 1A and 1B?

Proceedings                              2468

1    A    Yes.

2    Q    And I want to first direct your attention to the DNA

3    profile in 1A.  What did you determine when you compared just

4    the DNA profile of Robert Kelly to the DNA profile which you

5    previously testified was slightly incomplete with respect to

6    1A?

7    A    Mr. Robert Kelly's DNA profile cannot be excluded from

8    the DNA profile identified in the sperm fraction of Item 1B --

9    1A.

10   Q    Of 1A, correct?

11   A    Mm-hm.

12            (Continuing on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MS. GEDDES:

2  Q    Of 1A, correct?

3  A    Yes.

4  Q    Similarly, did you compare the DNA profile of Robert

5  Kelly to the DNA profile generated for lab item 1B, which you

6  previously testified was a complete DNA profile?

7  A    Yes.

8  Q    What did you observe when you compared those two DNA

9  profiles?

10  A    My conclusion is Mr. Robert Kelly's DNA profile cannot be

11  excluded or is included in that DNA profile and in sperm

12  fraction of item 1B.

13  Q    Thank you for clarifying that.  I was just referring to

14  the sperm cell fraction of 1B.

15  A    Yes.

16  Q    When you say that it cannot be -- withdrawn.

17        When you look at the DNA profile for those 24

18  markers on the known standard for Robert Kelly and the 24

19  markers that you identified for the sperm cell fraction of 1B,

20  are they the same?

21  A    Yes, exactly the same.

22  Q    Are you familiar with random match probability?

23  A    Yes, that's what I calculated for this case.

24  Q    What is random match probability?

25  A    Random match probability means how common or how

1    difficult it is to have a person happen to share the same DNA

2    profile as 1B and identified in the crime scene items.

3    Q    Just to be clear, you testified earlier that with the

4    exception of DNA -- with the exception of identical twins,

5    every person's DNA is different, correct?

6    A    Yes.

7    Q    But now we're not talking about DNA, we're talking about

8    a DNA profile; is that correct?

9    A    Yes.

10   Q    Did your lab do any statistical calculations to determine

11   how rare the DNA profile of the DNA profile found in the

12   buccal swab for Robert Kelly and the same DNA profile found in

13   the sperm cell fraction of subitem 1B was?

14   A    I didn't calculate the statistics for the profile from

15   Robert Kelly.  I calculated the statistics for the question

16   sample, the sperm fraction from the file from sperm fraction

17   of 1A and 1B.

18   Q    Okay.

19   A    We didn't calculate for standard.

20   Q    I understand.  With respect to the statistical

21   calculation regarding the sperm cell fraction of 1A, what did

22   you determine about the frequency with which that DNA profile

23   the, one found in 1A, the sperm cell fraction of 1A, is found?

24   A    As I stated earlier, the first step -- when I found the

25   questionable, the DNA profile from sperm fraction of 1A, and

Wu - Direct - Geddes                    2471

1  then obtain the DNA profile from standard from Robert Kelly.

2  Then I compared these two profiles, and see if the DNA profile

3  from Robert Kelly cannot be excluded or is included in that

4  DNA profile and the sperm fraction of item 1A, then I cannot

5  be excluded or is included.

6          Then I calculate the random match probability based

7  on Federal Bureau of Investigation database.

8          The result I calculated is one in 86 nonillion in

9  random population.

10          THE COURT:  Nonillion?

11          THE WITNESS:  Yes.  Nonillion is followed by 30

12  zeros.

13  Q    I'm showing the witness only what is marked for

14  identification as Government's Exhibit 960.  Do you see what

15  is shown as Government's Exhibit 960 on your screen?

16  A    Yes.

17  Q    On 960 is that an accurate description of the term one

18  nonillion, one billion, and one decillion?

19  A    1 billion is followed by nine zeros; that is correct.

20  One nonillion is followed by 30 zeros, correct.  And then one

21  decillion is followed by 33 zeros.

22          MS. GEDDES:  The Government offers 960.

23          THE COURT:  Any objection.

24          MR. CANNICK:  No.

25          THE COURT:  That will be in evidence.

Wu - Direct - Geddes                    2472

1           (Government Exhibit 960, was received in evidence.)

2           MS. GEDDES:  May I publish, please?

3           THE COURT:  Yes.

4    BY MS. GEDDES:

5    Q    You were testifying about the random match probability

6    associated with the sperm cell fraction of the DNA profile in

7    1A; is that correct?

8    A    Correct.

9    Q    You use the term nonillion?

10   A    Yes, 68 nonillion.

11   Q    Where my finger is pointing, one nonillion, is that a

12   numerical representation of what a nonillion was?

13   A    Yes, followed by thirty zeros.

14          THE COURT:  Sixty-eight, it would be 68 followed by

15   30 zeroes.  Right?

16          THE WITNESS:  Yes.

17          THE COURT:  Did you also determine the random match

18   probability associated with the DNA profile for the sperm cell

19   fraction of the DNA -- for the sperm cell fraction of the item

20   1B?

21          THE WITNESS:  Yes.  I compared the filed and sperm

22   fraction of 1B with the DNA profile from Robert Kelly.  I

23   found followed Mr. Robert Kelly's DNA profile cannot be

24   excluded or included.  Then I cover the statistics for the

25   sperm DNA filed and identify the item 1B.  And then the result

Wu - Direct - Geddes                    2473

1   is one in 11 decillion.

2            THE COURT:  11 decillion?

3            THE WITNESS:  Yes.

4            THE COURT:  So I'm clear, when you say it can't be

5   excluded.

6            THE WITNESS:  The other is included.

7            THE COURT:  What are you comparing?

8            THE WITNESS:  I compare the DNA profile from the

9   sperm fraction of 1A and 1B, and the DNA profile from Robert

10  Kelly.

11           THE COURT:  And when you're talking about the

12  probability, what probability is it?

13           THE WITNESS:  That means how rare or how common it

14  is to find random person happen to share the same DNA profile.

15           THE COURT:  Are you saying that Mr. Kelly's profile

16  was the same as either of those two items or that the

17  likelihood that it was -- you tell me.

18           THE WITNESS:  That statistics shows me that for the

19  DNA profiles identified the sperm fractions of 1A and 1B how

20  common it is in the population, how common it is --

21           THE COURT:  To find the same.

22           THE WITNESS:  -- the same DNA profile.

23           THE COURT:  So the same DNA profile is in both of

24  those samples?

25           THE WITNESS:  Yes -- no.  I identifying the sperm

1    fraction of item 1A, there are two not complete.

2              THE COURT:  They are not complete.

3              THE WITNESS:  But the one identified in the sperm

4    fraction of 1A and 1B is complete.

5              THE COURT:  That's the one that is how many

6    decillion?

7              THE WITNESS:  11 decillion.

8              THE COURT:  Go ahead.

9              MS. GEDDES:  Thank you, Judge.

10   BY MS. GEDDES:

11   Q    Again, just to be clear, with respect to the sperm cell

12   fraction of 1B, the alleles at those 24 markers for the sperm

13   cell fraction of 1B, were the same found in the alleles that

14   those 24 markers for the DNA profile generated for Robert

15   Kelly; is that correct?

16   A    Yes, they match each other.

17   Q    And then you determined, you calculated the random match

18   probability, which was to determine how rare that particular

19   profile could be found given that it was the same 24 marker --

20   the alleles of the same 24 markers in both; is that correct?

21   A    Correct.

22   Q    So you testified with respect to the sperm cell fraction

23   of 1B, that the chance that DNA profile would occur in one in

24   11 decillion individuals; is that correct?

25   A    Yes.

1  Q    To put that in perspective, how many people -- what is

2  the population of the earth?

3  A    According to United Nations late test data, it is about

4  7.9 billion.

5  Q    7 billion?

6  A    7.9 billion.

7  Q    To be clear, when you say 7.9 billion, that's 7.9

8  followed by nine zeros; is that correct?

9  A    Yes, 7.9 followed by eight zeros.

10  Q    So seven, comma, nine, and then eight zeros?

11  A    Yes.

12  Q    Fair to say that one -- can you compare the 7.2 billion

13  with the 11 decillion?

14  A    That is over 1 million, billion, billion, times of

15  current world population.

16         MS. GEDDES:  One moment.

17  Q    One final question, earlier you testified that the DNA

18  profile generated for the sperm cell fraction of 1A and the

19  same one -- the DNA profile generated for the sperm cell

20  fraction of 1B, could not be excluded from the DNA profile

21  generated from Robert Kelly; is that correct?

22  A    The other way around.

23  Q    Can you say it one more time?

24  A    The DNA profile from Robert Kelly's cannot be excluded or

25  is included in the DNA profile I did find in the sperm

1    fraction of item 1A and item 1B.

2    Q    Is another way of saying cannot be excluded, that it's

3    included?

4    A    Yes.

5    Q    Then finally you were talking about the random match

6    probability with respect to the DNA profile found within the

7    sperm cell fraction of 1B.  I think you said that it was one

8    in 11 decillion; is that correct?

9    A    Yes.

10   Q    Do you mean there would be one person in 11 decillion

11   where that DNA profile will occur?

12   A    The statistics calculation we expect to find one who

13   happens to share that same DNA profile one in 11 decillion.

14   Q    So one person in 11 decillion?

15   A    We expect to see that.

16            MS. GEDDES:  I understand, that's just based on

17   statics.

18            Nothing further.

19            THE COURT:  Cross-examination?

20            MR. CANNICK:  Yes, your Honor.

21   CROSS EXAMINATION

22   BY MR. CANNICK:

23   Q    Good morning.

24   A    Good morning.

25   Q    The shirt that you were asked to do the analysis for, you

1    don't know where that shirt came from, am I correct?

2    A    No.

3    Q    That shirt, you don't know if someone jumped across

4    someone's fence and went into their home and took the shirt?

5    A    I don't know the story.

6         THE COURT:  Overruled.

7    Q    You don't know, do you, whether or not you were asked to

8    do a buccal swab analysis comparison for Jerhonda Pace?

9    A    No.

10   Q    No one asked you to do --

11   A    Nobody asked me that standard from Jerhonda Johnson.

12        MR. CANNICK:  Thank you.

13        THE COURT:  Any redirect?

14        MS. GEDDES:  No, your Honor.

15        THE COURT:  Next witness.

16        MS. CRUZ MELENDEZ:  The Government calls Chris

17   Wilson to the stand.

18        (Witness takes the witness stand.)

19        THE COURTROOM DEPUTY:  Please raise your right hand.

20        (Witness sworn.)

21        THE WITNESS:  I do.

22        THE COURTROOM DEPUTY:  State your name.

23        THE WITNESS:  Christopher M. Wilson.

24        THE COURTROOM DEPUTY:  You may be seated.

25        THE COURT:  A couple of things.  Our court reporter

1    takes down everything you say.  I obviously I want to make

2    sure that the jury hears too, speak slowly and into the

3    microphone.  If one of the lawyers asks you a question that

4    you don't understand or want to have repeated, let me know and

5    direct them to rephrase it.

6             Try not to speak over whichever lawyer is

7    questioning you.  Again, just makes it harder for the court

8    reporter to get it down.

9             Just do your best to answer only the question that

10   you're being asked.

11            Go ahead.

12   **CHRISTOPHER WILSON,** having been first duly sworn, was examined

13   and testified as follows:

14   DIRECT EXAMINATION

15   BY MS. CRUZ MELENDEZ:

16   Q    Good afternoon.  Are you employed?

17   A    Yes.

18   Q    How are you employed?

19   A    I'm a Special Agent and Computer Forensic Agent for the

20   United States Department of Homeland Security, Homeland

21   Security Investigations.

22   Q    What is your title there?

23   A    Special Agent and Bureau Forensics Agent.

24   Q    How long have you been a Computer Forensics Agent?

25   A    I've been a Computer Forensic Agent for about two years.

Wilson - Direct - Cruz                          2479

1   Q    Can you explain your duties and responsibilities as a

2   Computer Forensics Agent?

3   A    Sure.  We support over 500 Special Agents in our office.

4   And any evidence that's electronic evidence that they seize,

5   they bring it to us for imaging and images, make an exact copy

6   of the evidence for analysis.

7   Q    Did you conduct forensic examinations of devices obtained

8   pursuant to court authorized search warrants in connection

9   with this case?

10  A    Yes.

11         MS. CRUZ MELENDEZ:  Your Honor, may I approach?

12         THE COURT:  Yes.

13  BY MS. CRUZ MELENDEZ:

14  Q    I'm showing the witness what is marked for identification

15  as Government's Exhibit 493.  Can you review Government's

16  Exhibit 493 and tell me if you recognize it?

17  A    I do.

18  Q    What is it?

19  A    It's an iPhone that I imaged for this case.

20         MS. CRUZ MELENDEZ:  The Government moves to admit

21  Government's Exhibit 493.

22         MR. CANNICK:  May I see it?

23         MS. CRUZ MELENDEZ:  Your Honor, while they are

24  reviewing this, I can have the witness look at two other

25  pieces of evidence.

Rivka Teich, CSR, RPR, FCRR, RMR  Official Court Reporter

1             THE COURT:  Sure.

2             MS. CRUZ MELENDEZ:  I'm showing the witness

3    Government's Exhibit 346, and 486.

4    Q    If you can take a moment to review Government's Exhibit

5    346 and 486.

6    A    Okay.

7    Q    With respect to Government's Exhibit 486, do you

8    recognize it?

9    A    I do.

10   Q    What is it?

11   A    It's a laptop that I forensically imaged for this case.

12   Q    And with respect to Government's Exhibit 346, do you

13   recognize it?

14   A    I do.

15   Q    What is it?

16   A    An iPhone that I forensically imaged for this case.

17            THE COURT:  I take it you're offering all of those?

18            MS. CRUZ MELENDEZ:  I am, your Honor.

19            MR. CANNICK:  We have no objection to 493.

20            THE COURT:  Do you have that back, Ms. Cruz

21   Melendez?  Let's start with that.  Remind me, what is that

22   again?

23            MS. CRUZ MELENDEZ:  Government's Exhibit 493.  May I

24   publish, your Honor?

25            THE COURT:  Yes.

Wilson - Direct - Cruz                    2481

1          (Government Exhibit 493, was received in evidence.)

2     BY MS. CRUZ MELENDEZ:

3     Q    Government's Exhibit 493, is that and Apple iPhone?

4     A    Yes, it is.

5     Q    Did you conduct a forensic examination of Government's

6     Exhibit 493?

7     A    I did.

8     Q    I'm now showing the witness only Government's Exhibit

9     481.  Agent Wilson, when you conducted the forensic analysis

10    of Government's Exhibit 493, did you create a forensic

11    analysis report?

12    A    I did.

13    Q    Is 481 a partial analysis report with respect to text

14    messages in Government's Exhibit 493?

15    A    Yes.

16              MS. CRUZ MELENDEZ:  Move to admit, your Honor.

17              THE COURT:  Any objection?

18              MS. CRUZ MELENDEZ:  I believe this is actually in

19    evidence I'm being told.

20              THE COURT:  Okay.

21              MR. CANNICK:  We consented to that already.

22              THE COURT:  It's in evidence.

23              MS. CRUZ MELENDEZ:  May we publish, your Honor?

24              THE COURT:  Yes.

25    BY MS. CRUZ MELENDEZ:

1  Q    Is this an excerpt from the report that you generated?

2  A    It is.

3  Q    As you testified a moment ago, there are text messages

4  included in Government's Exhibit 481, correct?

5  A    Yes.

6  Q    Does that include text messages for the phone numbers

7  (747)220-9363?

8  A    Yes.

9  Q    As well as (312)972-7283?

10  A    Yes.

11  Q    Directing your attention for a moment to this third

12  bubble here.  I'm going to read what is listed in this third

13  bubble, if you could let me know when I'm done if I've read

14  that correctly.

15  A    Okay.

16  Q    "I'm not going to lie, I was happy to know that as well.

17  I was really, I really was there.  But I also was kind of

18  thrown back the way you reacted to my reaction.  I don't care

19  what is going on in our life.  I need to be trusted by you

20  1 billion percent that when I say something you don't even

21  hesitate.  You do it.  You go with it.  When you do that, I

22  don't know just who you are to me.  I know you are young, but

23  that is no excuse to disobey me or not do what I tell you to

24  do.  You have some issues in the area of not doing what I tell

25  you all when you get in trouble, you shut down and be hard

Wilson - Direct - Cruz                    2483

1  headed.  You cut me off when I'm talking now, you didn't use

2  to do that.  So I'm telling you what you put into something is

3  exactly what you're going to get out of it.  Believe me, God

4  knows I want the same things you want.  But God also knows my

5  heart that it's never going to happened until you grow up and

6  start to show me you're going to do what you're supposed to

7  do.  Because I go through too much to have to deal with you

8  not give me the information that I told you over and over to

9  give me.  When you know you're young and there say lot of

10 things you don't know, so when you argue back at me it shows

11 me that you will rebel on me and it shows me that you're not

12 humble as you used to, as you're young.  Therefore, you have

13 no say yet.  Except that owned it and be glad that you have

14 someone to make the decisions.  And be thankful that he wants

15 all those things with you.  So make sure your motive is right

16 before doing something like that.  Make sure you want to do it

17 because you're old enough, wise enough, and strong enough, not

18 just because you want to be bonded with me.  Because I want to

19 groom you and be bonded with you one million percent before

20 that.  There's absolutely nothing wrong with it.  If you know

21 you're going to do what you're supposed to do and get it

22 together, you should have no problem being patient and

23 waiting.  That's all I'm going to say for you now."

24          Then the text goes on for a moment; is that correct?

25 A    Yes.

Wilson - Direct - Cruz                    2484

1   Q     The text message that I just read to you, is that dated

2   12/24/2017?

3   A     Yes.

4          MS. CRUZ MELENDEZ:  Your Honor, I'm not sure if

5   defense counsel had stated anything with respect to

6   Government's Exhibit 346 and 486.  The Government moves to

7   admit those into evidence.

8          MR. CANNICK:  No objection.

9          THE COURT:  Those are in evidence.

10          (Government Exhibit 346 & 486, was received in

11   evidence.)

12          MS. CRUZ MELENDEZ:  May I publish, your Honor?

13          THE COURT:  Yes.

14          MS. CRUZ MELENDEZ:  I'm publishing Government's

15   Exhibit 346.

16   BY MS. CRUZ MELENDEZ:

17   Q     Agent Wilson, did you perform a forensic analysis of

18   Government's Exhibit 346?

19   A     Yes.

20   Q     Now showing just the witness Government's Exhibit 325 and

21   325A.  Do you recognize Government's Exhibit 325A and 325 as

22   an excerpt of the forensic analysis report that you created

23   with respect to your forensic analysis of Government's Exhibit

24   346?

25   A     I do.

1          MS. CRUZ MELENDEZ:  Your Honor, the Government moves

2    to admit 325 and 325A.

3          MR. CANNICK:  No objection.

4          THE COURT:  Those are in evidence.

5          (Government Exhibit 325 & 325A, was received in

6    evidence.)

7    BY MS. CRUZ MELENDEZ:

8    Q    With respect to Government's Exhibit 325 -- if I could

9    publish your Honor -- here on the top it says "note," correct?

10   A    Yes.

11   Q    As part of your excerpt of the forensic analysis report,

12   here on 325A under the type it reads "note," correct?

13   A    Yes.

14   Q    Towards the left, bottom portion, underneath time, it

15   states created and the date, there is 8/30/2018, correct?

16   A    Yes.

17   Q    Then turning your attention again to Government's Exhibit

18   325.  Again, it says creation time 8/30/2018, correct?

19   A    Yes.

20   Q    You testified earlier that Government's Exhibit 325 and

21   325A were as a result of your forensic analysis of an iPhone,

22   correct?

23   A    Yes.

24   Q    Fair to say this is from the notes portion of an iPhone?

25   A    Correct.

1           MS. CRUZ MELENDEZ:  Permission to publish, your

2   Honor, Government's Exhibit 486?

3           THE COURT:  Go ahead.

4           MS. CRUZ MELENDEZ:  May I approach, your Honor?

5           THE COURT:  Yes.  I've handed the witness several

6   marked exhibits for identification starting with Government's

7   Exhibit 475, 475A, 476, 476A, 477, 477A, 478, 478A, 479, 479A,

8   480, 480A, 487, 487A, 488, 488A, 489, 489A, 490, 490A, 491,

9   491A, 492, and 492A.

10  Q    Prior to your testimony here today did you have an

11  opportunity to review those marked exhibits?

12  A    I did.

13  Q    Can you take a moment and look through them and tell me

14  if you recognize them?

15          (Witness reviewing document.)

16  A    Okay.

17  Q    Generally speaking, are the exhibits that I just listed

18  and handed to you forensic analysis reports and accompanying

19  images based on your forensic analysis of Government's Exhibit

20  486?

21  A    Yes.

22          MS. CRUZ MELENDEZ:  Your Honor, the Government moves

23  to admit the list of marked exhibits which I've just provided.

24          THE COURT:  Any objection?

25          MR. CANNICK:  Can I see them?

Wilson - Direct - Cruz                 2487

1           MS. CRUZ MELENDEZ:  While defense counsel is

2  reviewing those, is it fair to say the marked exhibits which I

3  listed out are partial results of the forensic analysis that

4  you conducted on Government's Exhibit 486?

5  A     Yes.

6           MR. CANNICK:  No objection.

7           THE COURT:  Okay.  Those are in evidence and you can

8  publish them.

9           (Government Exhibit 475, 475A, 476, 476A, 477, 477A,

10  478, 478A, 479, 479A, 480, 480A, 487, 487A, 488, 488A, 489,

11  489A, 490, 490A, 491, 491A, 492, and 492, was received in

12  evidence.)

13  BY MS. CRUZ MELENDEZ:

14  Q     Starting with Government's Exhibit 476.  This is a

15  partial -- an excerpt of the forensic analysis report that you

16  created, correct?

17  A     Yes.

18  Q     Directing your attention to page four -- your Honor, can

19  we have this for the jury only actually?

20           THE COURT:  Yes.

21  Q     Do you see here where it says -- I don't think the

22  juror's screens are on.

23           THE COURTROOM DEPUTY:  Sorry.

24  Q     Do you see underneath file name where it says created

25  date/time 12/12/2015.  Do you see that there?

Wilson - Direct - Cruz                    2488

1   A    Yes.

2   Q    Lower down where it says lens model iPhone 6 Plus back

3   camera?

4   A    Yes.

5   Q    You see that there?

6   A    Yes.

7   Q    Before continuing speaking with this, are you familiar

8   with the manners in which an iPhone can back up information

9   that's on the iPhone itself?

10  A    I am.

11  Q    What methods can one use to back up an iPhone?

12  A    You could back it up to the iCloud or to a specific --

13          MR. CANNICK:  I'm going to object.

14          THE COURT:  He's just testifying generally about how

15  to back things up.

16          I think it is in evidence, isn't it?

17          MS. CRUZ MELENDEZ:  This document, yes.

18          MR. CANNICK:  It's in evidence, but he's not

19  qualified.

20          THE COURT:  Overruled.

21  Q    What are the methods in which one might back up

22  information that is on an iPhone?

23  A    You could back it up to the cloud or to a specific device

24  like a computer or laptop.

25  Q    Based on your review of Government's Exhibit 476, here we

1  see the created date/time of 12/12/2015, and also lens model

2  iPhone 6 Plus back camera.  Is that consistent with the image

3  which is listed Government's Exhibit 476 having been taken by

4  iPhone and then backed up to Government's Exhibit 486?

5  A    Yes.

6  Q    Turning our attention to Government's Exhibit 476A.  Is

7  this the image that is reflected in the partial forensic

8  analysis report?

9  A    Yes.

10  Q    Directing your attention to Government's Exhibit 475.

11  Similar question here, below the image that we see in

12  Government's Exhibit 475, do you see the created date/time of

13  12/12/2015?

14  A    Yes.

15  Q    In the portion here where it says lens model iPhone 6

16  Plus back camera, based on your review, is this consistent

17  with this image being taken by an iPhone then being backed up

18  to Government's Exhibit 486?

19  A    It is.

20  Q    Government's Exhibit 475A, is it correct that is the

21  image associated with this forensic analysis report in 475?

22  A    Yes.

23  Q    Just to be clear and I'll use Government's Exhibit 476

24  for that purpose -- excuse me 475 -- for that purpose, as

25  you've testified that both 475 and 476, the dates and the

Wilson - Direct - Cruz                    2490

1    information in the forensic report you testified that it is

2    consistent with the image being taken by an iPhone then

3    subsequently being backed up on Government's Exhibit 486.  Is

4    it also fair to say that the created date, the 12/12/2015,

5    that we've looked at both Government's Exhibit 475 and 476,

6    that's the date that it was backed up on Government's Exhibit

7    486?

8    A    Yes.

9    Q    Turning our attention to Government's Exhibit 477,

10   turning to page four.

11            Your Honor, this can be published publicly.

12            THE COURT:  Okay.

13   Q    Again, you testified that this is an excerpt of the

14   forensic analysis report, correct?

15   A    Yes.

16   Q    Below the image that we see here there is another created

17   date 12/12/2015, do you see that there?

18   A    Yes.

19   Q    Below here where I'm pointing, you see information about

20   make model, make being Apple, model being iPhone 6 Plus.  Do

21   you see that there?

22   A    Yes.

23   Q    Just above where it says 841 Apple, do you see a date,

24   created date/time/local October 19, 2015.  Do you see that

25   there?

Wilson - Direct - Cruz                    2491

1    A    Yes.

2    Q    Based on your review of these documents and the reports,

3    is this consistent with the image in Government's Exhibit 477

4    and 477A having been taken by an iPhone on October 19, 2015,

5    and then backed up to Government's Exhibit 486 on 12/12/2015?

6    A    It is.

7    Q    I'd also like to direct your attention to the reference

8    to GPS latitude and GPS longitude.  Do you see that there?

9    A    I do.

10   Q    What does that mean?

11   A    That's the physical location that the iPhone was located

12   when it took the photo in question.

13   Q    Now directing our attention to Government's Exhibit 478,

14   is that another excerpt of your analysis of Government's

15   Exhibit 486?

16   A    Yes.

17   Q    Directing our attention to page four, again, we see here

18   below the image created date/time as 12/12/2015.  Do you see

19   that?

20   A    Yes.

21   Q    Below that there is another created date/time/local

22   October 19, 2015.  Do you see that there?

23   A    Yes.

24   Q    Below that we see make Apple model iPhone 6 Plus.  Do you

25   see that there?

Wilson - Direct - Cruz                    2492

1    A    Yes.

2    Q    There are again GPS coordinates; is that correct?

3    A    Yes.

4    Q    Based on your review, is this also consistent with the

5    iPhone Plus taking the photograph depicted in Government's

6    Exhibit 478 on October 19, 2015, and then subsequently being

7    backed up on Government's Exhibit 486 on 12/12/2015?

8    A    It is.

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MS. CRUZ MELENDEZ: (Continuing.)

3    Q    And is Government's Exhibit 478A, the same image that's

4    indicated in Government's Exhibit 478?

5    A    Yes.

6    Q    Directing our attention now to Government's Exhibit 479.

7         Is that another excerpt of the report you created

8    with respect to your analysis of Government's Exhibit 486?

9    A    It is.

10   Q    And at the top, we see an image here; correct?

11   A    Yes.

12   Q    And below the image, is there a created date time of

13   12/12/2015?

14   A    Yes.

15        THE COURT:  Is it fair to say for all of these

16   photographs that when you are looking at those times, is your

17   testimony the same for all of this in terms of when they were

18   created and when they were -- is it backed up or loaded?

19        MS. CRUZ MELENDEZ:  Backed up.

20        THE WITNESS:  Yes.

21        THE COURT:  Is it the same method that would apply?

22        THE WITNESS:  Yes.

23        THE COURT:  Okay.

24        I'm sorry, go ahead.

25        MS. CRUZ MELENDEZ:  I promise I will start to move

C. Wilson - Direct - Cruz Melendez                                    2494

1    through these.

2           THE COURT:  I was just clarifying for myself.

3    BY MS. CRUZ MELENDEZ:

4    Q    And, again, for Government's Exhibit 479, we have a

5    created date of 12/12/2015.

6           Based on your review, is it fair to say that that's

7    the backup date?

8    A    Yes, it is.

9    Q    With respect to the middle here where I'm pointing,

10   modify -- excuse me -- created date/time-local, October 19,

11   2015, that's the date that the iPhone 6 took the photograph;

12   is that correct?

13   A    Yes, the iPhone 6 Plus.

14   Q    Excuse me, iPhone 6 Plus.

15          MS. CRUZ MELENDEZ:  Now, Your Honor, if we can just

16   do jury only.

17          THE COURT:  Sure.

18   BY MS. CRUZ MELENDEZ:

19   Q    Turning your attention to Government's Exhibit 487, is

20   this, again, an excerpt of the forensic analysis report that

21   you created with respect to Government's Exhibit 486?

22   A    It is.

23   Q    And below the file name, is there a created date, slash,

24   time of 12/12/2015?

25   A    Yes.

C. Wilson - Direct - Cruz Melendez                    2495

1    Q     And further down, do we see a created date/time-local,

2    October 3rd, 2015?

3    A     Yes.

4    Q     And a little below that, do you see the make of Apple in

5    the model of iPhone 6 Plus?  Do you see that there?

6    A     Yes.

7    Q     And GPS coordinates are there as well; correct?

8    A     Correct.

9    Q     And, again, as you previously testified, is it fair to

10   say that the GPS coordinates are the location where the

11   photograph was taken?

12   A     Correct.

13   Q     And is it also fair to say, as you've pointed out, that

14   the image taken by the iPhone 6 Plus was taken on October 3rd,

15   2015, and then subsequently backed up to Government's Exhibit

16   486?

17   A     Yes.

18              MS. CRUZ MELENDEZ:  One moment, Your Honor.

19              THE COURT:  Okay.

20              (Pause.)

21   BY MS. CRUZ MELENDEZ:

22   Q     Government's Exhibits 487A, is that just the same image

23   that's included in Government's Exhibit 487, the excerpt of

24   the forensic examination report?

25   A     It is.

C. Wilson - Direct - Cruz Melendez                        2496

1  Q    And just to be clear, these are redaction boxes here;

2  correct?

3  A    Yes.

4         THE COURT:  That means part of the image is taken

5  out; is that it?

6         THE WITNESS:  Correct.

7         THE COURT:  Okay.

8  BY MS. CRUZ MELENDEZ:

9  Q    Now, directing your attention to Government's

10 Exhibit 488, and, again, that's a forensic -- that's an

11 excerpt of the forensic analysis report you created with

12 respect to Government's Exhibit 486?

13 A    Yes.

14 Q    There's an image at the top, and underneath that image,

15 do you see the created date and time of 12/12/2015?

16 A    Yes.

17 Q    Then a little below that, do you also see the created

18 date and time-local, of October 3rd, 2015, there?

19 A    Yes.

20 Q    And are there also GPS coordinates here --

21 A    Yes.

22 Q    -- listed.

23         Is it fair to say, as you've testified previously,

24 that based on your review, the image was taken by an iPhone 6

25 Plus on October 3rd, 2015, and then subsequently backed up to

C. Wilson - Direct - Cruz Melendez                    2497

1    Government's Exhibit 486 on 12/12/2015?

2    A    Correct.

3    Q    Now, turning your attention to Government's Exhibit 488A,

4    is that the same image that's included in your forensic

5    examination report?

6    A    Yes.

7    Q    And, again, is this a redaction box covering a portion of

8    that photograph?

9    A    Yes.

10   Q    Turning your attention now to Government's Exhibit 489.

11            Again, is that an excerpt of your forensic

12   examination report with respect to Government's Exhibit 486?

13   A    Yes.

14   Q    Turning our attention to Government's Exhibit -- excuse

15   me -- page 4 of the exhibit, again, do we see here a created

16   date below the file name of 12/12/2015?

17   A    Yes.

18   Q    And then an additional created date, slash, time of

19   October 3rd, 2015.

20            Do you see that there?

21   A    Yes.

22   Q    And do you also see the make as an Apple model as an

23   iPhone 6 Plus?

24   A    Yes.

25   Q    And there are also coordinates listed; correct?

1   A     Correct.

2   Q     And, again, is this consistent with the iPhone 6 Plus

3   taking this image on October 3rd, 2015, and subsequently

4   backing up the photograph on 12/12/2015 to Government's

5   Exhibit 486?

6   A     Yes.

7   Q     Government's Exhibit 489A, is that just the same

8   photograph that's listed in Government's Exhibit 489?

9   A     Yes.

10  Q     And also is there a redaction box in the middle of the

11  photograph?

12  A     Yes.

13  Q     Directing your attention to Government's Exhibit 690,

14  again, is that -- is this an excerpt of your forensic

15  examination report with respect to Government's Exhibit 486?

16  A     Yes.

17  Q     Turning to page 4, there's an image at the top in the

18  file name, and under "file name," do you see the created date

19  of 12/12/2015?

20  A     Yes.

21  Q     And in the middle of where my finger is pointing here

22  now, do you see created date, slash, time-local, October 3rd,

23  2015?  Do you see that date?

24  A     Yes.

25  Q     Do you also see where it says make, Apple, model, iPhone

1    6 Plus?  Do you see that there?

2    A    Yes.

3    Q    Are there also coordinates listed?

4    A    There are.

5    Q    And is this consistent with the image that's listed in

6    the exhibit being taken on October 3rd, 2015, and then

7    subsequently being backed up to Government's Exhibit 46 on

8    December 12th, 2015?

9    A    Yes.

10   Q    490A, is that the same photograph included in 490?

11   A    Yes.

12   Q    And are there redaction boxes covering portions of the

13   individual in 490A?

14   A    Yes.

15            THE COURT:  Did you place those redaction boxes on

16   it?

17            THE WITNESS:  I did not.

18            THE COURT:  Okay.

19   BY MS. CRUZ MELENDEZ:

20   Q    Is it fair to say that the images -- when you imaged

21   Government's Exhibit 486 and you did your analysis of the

22   redaction boxes, you didn't place those there; correct?

23   A    Correct.

24   Q    Government's Exhibit 491, again, is this an excerpt of

25   your forensic examination report of Government's Exhibit 486?

1    A    Yes.

2    Q    Turning our attention to Government's Exhibit -- excuse

3    me -- to page 4 of the exhibit, there's an image there.

4            Do you see that?

5    A    Yes.

6    Q    And underneath the image, do you see created date, slash,

7    time of December 12th, 2015?

8    A    Yes.

9    Q    Do you also see created date, slash, time-local of

10   October 4th, 2015?  Do you see that there?

11   A    Yes.

12   Q    Do you also see where it says:  make, Apple; model,

13   iPhone 6?

14   A    Yes.

15   Q    And are there also coordinates listed?

16   A    Yes.

17   Q    Government's Exhibit 491A, is that the same image that's

18   listed in Government's Exhibit 491?

19   A    Yes.

20   Q    And, again, there was a redaction box that was

21   subsequently placed that you didn't place there; correct?

22   A    Correct.

23   Q    Turning our attention to Government's Exhibit 492, is

24   this also an excerpt of your forensic examination report of

25   Government's Exhibit 486?

C. Wilson - Direct - Cruz Melendez                    2501

1    A    Yes.

2    Q    Turning to page 4, is there an image there?

3    A    Yes.

4    Q    And under the image "file name," do he see the created

5    date of 12/12/2015?

6    A    Yes.

7    Q    Further down, do we see the created date, slash, time,

8    dash, local of October 6, 2015?

9    A    Yes.

10   Q    And is the make an Apple model iPhone 6 Plus listed here

11   as well?

12   A    Yes.

13   Q    They're also coordinates; correct?

14   A    Correct.

15   Q    And, again, is this consistent with the iPhone 6 Plus

16   taking the photograph included on October 6th, 2015, and then

17   subsequently being backed up to Government's Exhibit 486?

18   A    Yes.

19        THE COURT:  Can I see the parties at the side for

20   just one second?  We don't need the court reporter.

21        (Sidebar conference held off the record out of the

22   hearing of the jury.)

23        MS. CRUZ MELENDEZ:  Your Honor, for the sake of

24   clarity, counsel has conferred, and defense counsel stipulates

25   that the redaction boxes that appear on the images from the

C. Wilson - Direct - Cruz Melendez                    2502

1   forensic analysis -- the images that I've been going through

2   with respect to Government's Exhibit 486 were not on the

3   images at the time that the device was analyzed by Agent

4   Wilson.

5            THE COURT:  Okay.

6            MS. CRUZ MELENDEZ:  And that they were placed by the

7   Government for purposes of in-court review.

8            THE COURT:  I think I told you, jurors, when you

9   were selected that stipulations are just agreements between

10  the parties that they agree on certain evidence, and that's

11  what this is.

12           Go ahead.

13  BY MS. CRUZ MELENDEZ:

14  Q    And then finally with respect to Government's

15  Exhibit 492A, is that the same image that was in 492?

16  A    Yes.

17  Q    And, again, there were redaction boxes that were not

18  present at the time that you imaged Government's Exhibit 486?

19  A    Correct.

20           MS. CRUZ MELENDEZ:  If I could just show the

21  witness, Your Honor, Government's Exhibit 961.

22  BY MS. CRUZ MELENDEZ:

23  Q    Agent Wilson, do you recognize Government's Exhibit 961?

24  A    Yes.

25  Q    And what is it?

C. Wilson - Direct - Cruz Melendez                    2503

1  A    It's a summary of the items of evidence that we just

2  reviewed with creation date, the longitude and latitude

3  coordinates.

4  Q    And prior to your testimony here today, based on the

5  latitude and longitude coordinates that were present in the

6  excerpted forensic analysis reports, were you able to

7  determine the corresponding location?

8  A    Yes.

9           MS. CRUZ MELENDEZ:  Your Honor, the Government moves

10 to admit Government's Exhibit 961 into evidence.

11          MR. CANNICK:  No objection.

12          THE COURT:  Okay.  That's in evidence.

13          (Government's Exhibit 961 received in evidence.)

14          MS. CRUZ MELENDEZ:  If we could publish, Your Honor.

15          (The above-referred to exhibit was published.)

16          THE COURT:  In other words, when you were pointing

17 out all those coordinates, these are just the corresponding

18 cities on those exhibits; is that right?

19          THE WITNESS:  The corresponding addresses.

20          THE COURT:  Addresses, right.

21          THE WITNESS:  Yes.

22          THE COURT:  Okay, thanks.

23 BY MS. CRUZ MELENDEZ:

24 Q    First, looking at this first column here, the

25 Government's Exhibit 487A, there's was a creation date of

C. Wilson - Direct - Cruz Melendez                    2504

1   October 3, 2015; correct?

2   A    Yes.

3   Q    And, for example, with respect to this, that was based on

4   the creation date listed on Government's Exhibit 487, your

5   analysis report; is that correct?

6   A    Yes.

7   Q    The coordinates -- latitude and longitude -- were also

8   based on the coordinates of where the iPhone 6 Plus took the

9   photograph that's listed in Government's Exhibit 487A;

10  correct?

11  A    Correct.

12  Q    And then there's a corresponding location; correct?

13  A    Yes.

14  Q    Is the same process true for all of the exhibits listed

15  in this first column here?

16  A    Yes.

17  Q    So going through with respect to Government's Exhibit --

18           THE COURT:  I don't know if we have to go through

19  all of them.

20           MS. CRUZ MELENDEZ:  I won't.

21           THE COURT:  I think it's probably not necessary.

22           MS. CRUZ MELENDEZ:  I won't.

23  BY MS. CRUZ MELENDEZ:

24  Q    With respect to Government's Exhibit 487A, the

25  corresponding location for the coordinates of latitude and

1    longitude here are Oakland Convention Center, 550 10th Street,

2    Oakland, California, 94607; correct?

3    A    Yes.

4    Q    And going down the chart, each one of these locations

5    corresponds to the latitude and longitude coordinates that

6    were in the excerpted analysis report that we went through;

7    correct?

8    A    Yes.

9         MR. CANNICK:  Can I just get the exhibit number

10   again?

11        MS. CRUZ MELENDEZ:  961.

12        MR. CANNICK:  961.

13        Thank you.

14   BY MS. CRUZ MELENDEZ:

15   Q    Now, you testified previously with respect to photographs

16   and images that were taken by an iPhone 6 Plus.  Generally

17   speaking, based on your experience, when text or photographs

18   are taken on an iPhone, is it the local time where the iPhone

19   is?  For example, were the coordinates -- latitude and

20   longitude -- the local time and date that is used -- that

21   appears on the text or the photograph that is defaulted with

22   respect to an iPhone?

23        So that was a very unclear question.  I'm going to

24   back up, and I'm going to ask that question again.

25        THE COURT:  What do you have to say about how the

1    dates appear on the phone in any of these -- that's not a very

2    good question either, but I would rather have you tell it than

3    me ask all the details.

4              THE WITNESS:  It usually defaults to the time zone

5    that the phone is physically in by default unless it's

6    changed.

7              THE COURT:  I see.

8              MS. CRUZ MELENDEZ:  Nothing further.

9              THE COURT:  Okay.  Any cross-examination?

10             MR. CANNICK:  Very briefly.

11             THE COURT:  Okay.

12   CROSS-EXAMINATION

13   BY MR. CANNICK:

14   Q    Sir, I think you testified and told us this was a partial

15   forensic --

16             THE COURT:  Turn on your microphone.

17   BY MR. CANNICK:

18   Q    I think you testified and told us that this was a partial

19   forensic analysis?

20   A    Yes.

21   Q    What's a partial forensic analysis?

22   A    So we image the device and then there's an electronic

23   version of the analysis of that device using different

24   analysis software.  That digital report that we provide the

25   case agent with is everything that was on that phone; so it

1   will have text messages, it will have photos, it will have

2   call logs, it will have notes, any kind of encrypted chats

3   like WeChat -- WeChat or WhatsApp, Facebook messaging.  So all

4   that is presented to the agent in a digital report, and then

5   they could go through it and just look at specific sections of

6   it.

7   Q    So they could go through it and cherry-pick the ones that

8   they want.

9             MS. GEDDES:  Objection.

10            THE COURT:  Sustained.

11  BY MR. CANNICK:

12  Q    They could go through it and pick out the ones that they

13  want?

14  A    To print, yes.

15            MR. CANNICK:  Thank you.

16            MS. CRUZ MELENDEZ:  Just brief clarification.

17  REDIRECT EXAMINATION

18  BY MS. CRUZ MELENDEZ:

19  Q    Agent Wilson, when you analyze the exhibits that we have

20  just gone through, you created a report of all the information

21  that was on each one of those devices; correct?

22  A    Correct, yes.

23  Q    And you provided that full report to the agents; correct?

24  A    I did, yes.

25  Q    When we went through the partial results or the excerpted

1    reports, those were portions of the full analysis report that

2    you created; correct?

3    A      Correct.

4             MS. CRUZ MELENDEZ:  Nothing further.

5             THE COURT:  Okay.

6             Anything else, Mr. Cannick?

7             MR. CANNICK:  Nothing.

8             THE COURT:  Just hold on for one second.

9             (Pause.)

10            THE COURT:  I'm just trying to coordinate with when

11   your lunch gets here so we can make the best use of our time.

12            Do you have another witness available?

13            MS. GEDDES:  We do, although it might be more

14   productive if we broke for lunch.

15            THE COURT:  Let's try to squeeze all we can out of

16   the time that we have.  Why don't you call your next witness.

17            MS. GEDDES:  Okay.

18            THE COURT:  Let me excuse you.

19            This witness is excused.

20            THE WITNESS:  Thank you.

21            (Witness steps down.)

22            MS. GEDDES:  The Government calls Mike Wilson.

23            THE COURT:  Mike Wilson?

24            MS. GEDDES:  Yes.

25            THE COURT:  Okay.

*Proceedings*                                                2509

1          (Witness takes the stand.)

2          THE COURTROOM DEPUTY:  Mr. Wilson, please raise your

3    right hand.

4          (Witness sworn.)

5          THE COURTROOM DEPUTY:  Please state your name for

6    the record.

7          THE WITNESS:  Michael Wilson.

8          THE COURT:  Okay.  Just a couple of things before we

9    start.

10         Please don't speak too quickly or speak over the

11   person that's asking you questions.  The court reporter takes

12   down everything that you say, and if you speak too quickly or

13   you talk over somebody, she can't get what you're saying, and

14   then the jury can't hear you.

15         If there's a question that you want to have

16   clarified or repeated, tell me that, and I will direct the

17   lawyers to rephrase, and just do your best to answer only the

18   question that you are being asked, okay?

19         THE WITNESS:  Yes.

20         THE COURT:  Okay.  Speak into the microphone.

21         Hold on for one second.

22         (Pause.)

23         THE COURT:  Okay.  Go ahead.

24         (Continued on next page.)

25

1    MIKE WILSON,

2                called as a witness, having been first duly

3                sworn/affirmed, was examined and testified as

4                follows:

5    DIRECT EXAMINATION

6    BY MS. GEDDES:

7    Q    How are you employed?

8    A    I'm a special agent with Homeland Security

9    Investigations.

10   Q    What is your title?

11   A    Special agent.

12   Q    And are you assigned to a particular unit within the

13   Department of Homeland Security?

14   A    Yes.  I'm also certified as a computer forensics agent.

15   Q    How long have you been certified as a computer forensics

16   agent?

17   A    Full-time for 18 months, and then the last two years as a

18   collateral duty.

19   Q    And do you have a relative who is also a computer

20   forensic agent at the Department of Homeland Security?

21   A    Yes, I do.

22   Q    Chris Wilson?

23   A    Yes.

24   Q    How are you related?

25   A    Yes, he's my cousin.

1   Q    What are your duties and responsibilities as a computer

2   forensic agent at the Department of Homeland Security?

3   A    To assist case agents with the proper seizure, proper

4   evidence collection, and then the extraction and analysis of

5   digital evidence.

6   Q    I want to direct your attention to July 11th of 2019.

7        Did you participate in the execution of a search

8   warrant on that date?

9   A    Yes, I did.

10  Q    And was that in Chicago, Illinois?

11  A    Yes.

12       MS. GEDDES:  I'm showing the witness what's been

13  marked for identification as Government's Exhibit 345.

14       I'm going to show counsel first.

15       THE COURT:  All right.

16       (Pause.)

17  BY MS. GEDDES:

18  Q    Do you recognize that?

19  A    Yes.

20  Q    What is it?

21  A    This phone was seized from the defendant's hands during

22  the execution of the arrest warrant.

23  Q    And was the individual from whom it was seized Robert

24  Kelly?

25  A    Yes.

1  Q     Do you see him in the courtroom today?

2  A     Yes.

3  Q     Can you point to him and describe an article of his

4  clothing?

5  A     Sitting at the far table wearing a blue jacket with a

6  blue tie.

7          THE COURT:  Indicating the defendant.

8  BY MS. GEDDES:

9  Q     And after you received the -- I'm sorry, let me publish,

10 it, please.

11         (The above-referred to exhibit was published.)

12 BY MS. GEDDES:

13 Q     You may have already testified to this, but what is that,

14 by the way?

15 A     This is an iPhone -- Apple iPhone.

16 Q     And after the Apple iPhone was seized from the defendant

17 on July 11th, 2019, what, if anything, did you do with it?

18 A     At that time, it was processed to attempt to crack the

19 password.

20 Q     All right.  And were you ultimately present when the

21 password was cracked?

22 A     No, I was not.

23         MS. GEDDES:  May I approach?

24         THE COURT:  Yes.

25         MS. GEDDES:  I'm showing the witness what's been

```
 1   marked for identification as Government's Exhibit 347.

 2            I'm going to show counsel, too.

 3            (Pause.)

 4   BY MS. GEDDES:

 5   Q    Do you recognize Government's Exhibit 347?

 6   A    Yes.

 7   Q    And did you conduct a forensic examination of

 8   Government's Exhibit 347?

 9   A    Yes, I did.

10            MS. GEDDES:  The Government offers Government's

11   Exhibit 347.

12            MR. CANNICK:  No objection.

13            THE COURT:  All right.  That's in evidence.

14            (Government's Exhibit 347 received in evidence.)

15            MS. GEDDES:  And just briefly I'll hold it up.

16   BY MS. GEDDES:

17   Q    What is Government's Exhibit 347?

18   A    It is an Apple iPad.

19            THE COURT:  Where did you get that?

20            Were you just about to ask that?

21   BY MS. GEDDES:

22   Q    Were you present when that was seized?

23   A    Yes, I was.

24   Q    Where was that seized from?

25   A    That was in the residence of the defendant.
```

M. Wilson - Direct - Geddes                    2514

1   Q    And was that residence located in Chicago, Illinois?

2   A    Yes, it was.

3   Q    At 401 North Wabash Avenue in Apartment 48F, as in

4   "Frank"?

5   A    Yes.

6   Q    And is that building located at 401 North Wabash, is that

7   also known as the Trump Towers?

8   A    Yes, it is.

9   Q    I'm showing?

10            MS. GEDDES:  I'm showing the witness what's been

11   marked for identification as 326, as well as 326A through J,

12   327, 328, 329, 336, 330 -- sorry, I'm out of order -- and 341

13   through 343.

14            MR. CANNICK:  Excuse me.  Just let me get the

15   exhibit numbers again.

16            MS. GEDDES:  Sure.

17            326, as well as 326A through H; 327, -28, -29, and

18   -30; 336 and 336A -- I might have just added 336 -- and then

19   341 through 343.

20   BY MS. GEDDES:

21   Q    Now, prior to your testimony today, did you have a chance

22   to look at these exhibits?

23   A    Yes, I did.

24            MR. CANNICK:  Your Honor, I'm going to ask for a

25   sidebar.

1          THE COURT:  Sure.

2          (Sidebar.)

3          (Continued on next page.)

*Sidebar*                                                                2516

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3              THE COURT:  You know, their lunch is here right now,

4    so maybe we'll break now and then you can tell me what the

5    issue is.

6              MR. SCHOLAR:  Sure.

7              THE COURT:  Let me excuse them and we'll do it open

8    court.

9              (Sidebar ends.)

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                          2517

1          (In open court.)

2          THE COURT:  I'm told your lunches are here, so I

3    think this is a good time to break.

4          Please don't discuss the case at all, and enjoy your

5    lunch.  We'll see you, let's say, 2:30.  Have a good lunch.

6          THE COURTROOM DEPUTY:  All rise.

7          (Jury exits.)

8          THE COURT:  Okay.  Everybody can sit down, and you

9    can take the witness out.

10          We'll see you after lunch.

11          (Witness steps down.)

12          THE COURT:  Mr. Scholar, I'm just going to ask you

13    to use the microphone so I can hear.  I must confess, I don't

14    know what the exhibits are we are about to see.  Should I look

15    at them?

16          MS. GEDDES:  Do you want to do this as sidebar?

17          MR. SCHOLAR:  Yes, we should do it at sidebar,

18    please.

19          THE COURT:  All right.

20          (Sealed Sidebar.)

21          (Continued on next page.)

22

23

24

25

SEALED BY ORDER OF THE COURT                    2518

1       (Sealed sidebar conference held on the record out of

2  the hearing of the jury.)











SEALED BY ORDER OF THE COURT          2522





SEALED BY ORDER OF THE COURT

2525



*SEALED BY ORDER OF THE COURT*                              2526

1

2

3      (Sealed sidebar ends.)

4      (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                    2527

1          (In open court.)

2          THE COURT:  I think we will break for lunch now.

3    We'll be back at 2:30.

4          (A recess in the proceedings was taken.)

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    2528

1                    AFTERNOON SESSION

2              (In open court; jury not present.)

3              (Parties present.)

4              THE CLERK:  All rise.

5              THE COURT:  Everybody can have a seat.

6              All right just before we bring the witness in, have

7    the parties had a chance to think about what we discussed?  I

8    am prepared to rule on it.

9              MR. CANNICK:  Your Honor, before you rule, might we

10   be given an opportunity to brief it?

11             THE COURT:  Well...

12             MR. CANNICK:  I don't think anything is coming in

13   today.

14             THE COURT:  Nothing is coming in today.

15             I will tell you what I am thinking about, just so I

16   do not surprise anyone.

17             MR. CANNICK:  Sure.

18             THE COURT:  I think the first video is clearly

19   relevant to come through the witness Anna.

20             The second one, however, is cumulative.  I think it

21   is unfairly prejudicial and it is not related to anybody who

22   is testifying, so I am excluding that.

23             Do you still need to brief it or do you want to

24   snatch defeat from the jaws of victory?

25             MR. CANNICK:  Let me find out from Mr. Scholar which

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    2529

1   is the first and which is the second.

2          THE COURT:  Okay.  Yes, speak to him about that.

3          But the only caveat that is, as is the caveat with

4   everything, is that there is some suggestion that -- I cannot

5   imagine what it could be, but if there is some suggestion that

6   it did not happen or some way that the door gets open, yes.

7          But I think the evidence as it relates to the

8   victim -- the witness who is going to testify is clearly

9   relevant, not only to what her own experience was, but what

10  the experience was of one of the other witnesses, specifically

11  Jane, who testified.

12         And, I mean, I think it is fair to say that for a

13  lot of people, including me, it is very difficult to imagine

14  that somebody -- that people would engage in this kind of

15  conduct, and so the evidence of it is relevant.  And so that

16  is my ruling.

17         If you still want to brief it, you can.

18         MR. CANNICK:  Thank you, Your Honor.

19         THE COURT:  Okay.  All right.  I guess you could

20  brief it, too, but...

21         MS. GEDDES:  All right.  I was planning to offer it

22  now though.  I am not going to publish it.

23         THE COURT:  I mean, I do not think it should come

24  into evidence, so I am --

25         MS. GEDDES:  No, no, I'm sorry, I was going to offer

Proceedings                              2530

1    the one involving Anna.

2            THE COURT:  Yes.  Yes, it can be offered into

3    evidence; it is not going to be played right now.

4            MS. GEDDES:  That's right.

5            THE COURT:  There is no problem with that, is there?

6            MR. CANNICK:  I'm just thinking about it,

7    Your Honor.

8            THE COURT:  Turn on your...

9            MR. CANNICK:  Oh.

10           THE COURT:  Because the witness is here now.  So I

11   don't think that there is any dispute that the evidence is on

12   the defendant's computer.

13           MR. CANNICK:  Yes, I understand, Your Honor.  I

14   understand perfectly.

15           THE COURT:  All right.  And so that part of it, it

16   will -- the foundation has been established through -- or will

17   be established through this witness.

18           MR. CANNICK:  I was just a little confused because I

19   didn't know who Anna was.

20           THE COURT:  I see.  Do you know now?

21           MR. CANNICK:  I know now, yes.

22           THE COURT:  Okay.  I think we are all on the same

23   page.

24           Shall we get the -- anything else before we get the

25   witness?

Proceedings                                      2531

1           MS. BECKER:  I'm sorry, Judge, can we also brief the

2    issue -- the other issue with regards to the introduction of

3    some of the videos that involved -- my understanding is this

4    was talked about at sidebar as well or no?

5           THE COURT:  That is what we were just talking about.

6           MS. GEDDES:  No.  I think --

7           MS. BECKER:  Not those videos, Judge.

8           MS. GEDDES:  There are additional videos that we --

9    within that list that we seek to offer right now which were

10   not raised before Your Honor at the last sidebar.

11          THE COURT:  Well, are those similar to what -- they

12   are not the same as --

13          MS. GEDDES:  They're not the same.

14          THE COURT:  Do they involve people who are

15   testifying or conduct that is an issue?

16          MS. GEDDES:  There is conduct that's an issue and,

17   yes, people who are testifying at well.

18          THE COURT:  Mr. Scholar?

19          MR. SCHOLAR:  Yes, Judge.

20          THE COURT:  Can you get a microphone?

21          MR. SCHOLAR:  Yes.

22          THE COURT:  Thanks so much.

23          You can sit down if it is easier.

24          MR. SCHOLAR:  Sure, Judge.  Thank you.

25          Judge, these are videos that the government wants to

Proceedings                    2532

1   admit through this witness that may involve three people.

2          THE COURT:  Right.

3          MR. SCHOLAR:  And I --

4          THE COURT:  And there has been testimony about that.

5          MR. SCHOLAR:  And I understand, Judge.  I know

6   you've ruled on that previously.  However --

7          THE COURT:  Was there an objection to it?

8          MR. SCHOLAR:  There was an objection.

9          I believe the government said they were going to

10  play snippets.  First, we wanted to know what snippets they're

11  intending to play.

12         THE COURT:  Well, nobody is playing anything today.

13         MS. GEDDES:  That's correct.

14         THE COURT:  And as I understand it -- and I could

15  really be wrong on this because there were a number of motions

16  in limine -- I don't recall any specific motions in limine

17  about video evidence.  And correct me if I am wrong about

18  that.  I just do not recall that there was a motion to

19  preclude anything, so I am a little bit in the dark about some

20  of the things that we are talking about.

21         What I would suggest is, as I said with respect to

22  that other evidence, this is the -- this is a foundational

23  witness who you probably could have stipulated to that he

24  recovered this, this laptop or whatever it is, and I do not

25  think there is any real dispute that this stuff is on there.

Proceedings                           2533

1        So the question is, which of it comes into evidence?

2   I have made my ruling, so you can try to persuade me that I am

3   wrong about the one that we talked about at the side.  There

4   is no application before me on the other ones, unless you are

5   making one now.

6            MR. SCHOLAR:  Judge, we would make one now with

7   respect to the --

8            THE COURT:  But I do not know what you are asking

9   because I would need to identify what the videos are and to

10  whom they relate.  There has clearly been testimony by

11  multiple witnesses that one of the features of their time with

12  the defendant was that he was taping things on a pretty

13  constant basis, and so they are clearly relevant to that

14  testimony.  But again, I am just speaking generally here

15  because of what has been represented to me.  This isn't

16  something that anybody litigated before.

17       So the witness is here, I am trying to move the

18  trial along a little bit.  My suggestion is that he can

19  testify to what is on there and then we can have a

20  conversation about which of the videos comes in, but I would

21  have been happier to have this conversation before now.

22           MR. SCHOLAR:  Understood, Judge.

23           THE COURT:  So why don't we proceed that way.

24  Nobody is playing anything today, as far as I understand, and

25  so I think why don't we finish the witness.

```
                        Proceedings                    2534
```

```
 1              Who comes after this, by the way?

 2              MS. GEDDES:  We have a witness who is en route and I

 3   believe she will be next.  And her name is Alexis.

 4              THE COURT:  Okay.  Also, but no videos related to

 5   Alexis, correct?

 6              MS. GEDDES:  No videos related to Alexis.

 7              MR. CANNICK:  I just want to know from the

 8   government; they said she is en route?

 9              MS. GEDDES:  Is she on the ground?

10              MR. CANNICK:  Okay.

11              MS. GEDDES:  Yes.

12              MR. CANNICK:  Okay.

13              THE COURT:  She is on the Bronx River Parkway.

14   Kidding.

15              All right.  Shall we get the witness?

16              MS. GEDDES:  Yes.

17              Just to be clear -- my team has corrected me --

18   there are videos, but not that type of video.

19              THE COURT:  Okay.  All right.  Go ahead.

20              (Witness enters the courtroom.)

21              THE COURT:  You can have a seat until we get the

22   jury.

23              THE CLERK:  All rise.

24              (Jury enters the courtroom. )

25              THE CLERK:  You may be seated.
```

M. Wilson - Direct - Geddes                    2535

1      THE COURT:  All right, jurors.  Welcome back.  We
2  are ready to proceed with the direct examination of the
3  witness.
4      MS. GEDDES:  Thank you.
5      THE CLERK:  The witness is reminded he is still
6  under oath.
7      THE WITNESS:  Yes.
8  DIRECT EXAMINATION
9  BY MS. GEDDES:  (Continuing)
10 Q   All right.  Before we broke for lunch, I had showed you a
11 series of exhibits, 326, 326(a) through (j), 327, 328, 329,
12 336, and 341 through 343.
13      Do you recall those exhibits?
14 A   Yes.
15 Q   And do those exhibits reflect partial examination reports
16 from your forensic examination of Government Exhibit 345,
17 which was that iPad that was introduced into evidence earlier
18 today?
19 A   Yes, it does.
20      MS. GEDDES:  At this time the government offer --
21 oh, one moment.
22      And I'm showing the witness what's been marked for
23 identification as 327(a) and 327(b).  This is already in
24 evidence.
25 Q   Do you recognize 327(a) and (b)?

M. Wilson - Direct - Geddes                    2536

1   A    Yes, I do.

2   Q    And are those your initials there?

3   A    Yes.

4   Q    And have you had an opportunity to review 327(a) and (b)?

5   A    Yes, I have.

6   Q    And are those videos that were recovered on Government

7   Exhibit 347?

8   A    Yes.

9        MS. GEDDES:  And now I am showing just the witness

10  what's been marked for identification as 328(a), 330(a),

11  342(a), 329(a), 341(a) and 343(a).

12  Q    Do you recognize that?

13  A    Yes.

14  Q    And is that a CD containing videos as well?

15  A    Yes, it is.

16  Q    And were those videos also recovered from the iPad which

17  is in evidence as Government Exhibit 347?

18  A    Yes.

19  Q    That was recovered from the defendant's residence?

20  A    Correct.

21  Q    And are these your initials listed here?

22  A    Yes.

23       MS. GEDDES:  At this time the government offers 326

24  and 326(a) through (j), 327, 328 and 328(a), 329 and 329(a),

25  336 and 336(a) and 341, 342, and 343, along with 341(a),

M. Wilson - Direct - Geddes                2537

1   342(a) and 343(a).

2          THE COURT:  Subject to the discussion that we had

3   before, those are admissible.

4          (Government Exhibits 326, 326(a) through (j), 327,

5   328, 328(a), 329, 329(a), 336, 336(a), 341, 342, 343, 341(a),

6   342(a) and 343(a) were received in evidence.)

7          MR. CANNICK:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MS. GEDDES:  I am going to provide -- may I

10  approach, Your Honor?

11         THE COURT:  Yes.

12         MS. GEDDES:  I am going to provide the witness

13  Government Exhibit 326.

14         And may I publish to the jury only?  This is 326(a),

15  326(b), 326(c).

16  Q    Did you recognize the photo shown in 326(a) through

17  326(c)?

18  A    Yes.

19  Q    And are those photographs that were found on the

20  defendant -- on the iPad that was seized from the defendant's

21  residence, in evidence as Government Exhibit 347?

22  A    Yes, they were.

23  Q    And if you -- referring to what's in front of you,

24  Government Exhibit 326, I want to direct your attention to

25  Image 1914.

M. Wilson - Direct - Geddes                    2538

1              Do you see that?

2  A     Yes.

3  Q     And I believe that corresponds to what's shown as 326(a);

4  is that correct?

5  A     Yes, it does.

6  Q     And are you able to see, from looking at 326, when that

7  particular photograph was taken?

8  A     Yes, I can.

9  Q     When was it taken?

10  A     January 14th of 2018.

11  Q     And are you able to determine with what it was taken?

12  A     Yes.

13  Q     What device?

14  A     Yes.  It was taken with an Apple iPad Pro.

15  Q     And are there a series of photographs of that individual

16  in the same attire that were also taken on January 14th of

17  2018?  And specifically directing your attention to Image

18  1915, 1916, 1917, 1918, 1919 and 1920.

19  A     Yes.

20  Q     And were each of those images also photographs taken on

21  January 14th of 2018?

22  A     Yes.

23  Q     And were they taken using that same device that you just

24  identified, the iPad Pro?

25  A     Yes, they were.

M. Wilson - Direct - Geddes                    2539

1    Q    And I just referred to a series of images.  Is that

2    just -- I said image, I think.  And then it's listed as

3    image_1915.  Is that just the file name that a particular

4    photograph was saved as?

5    A    Yes.  That's the default naming convention for Apple

6    products.

7    Q    And now I want to direct your attention to what's

8    identified in Government Exhibit 326 or what's listed in

9    Government Exhibit 326 as Image 2026 and 2025.

10          Can you take a look at those?

11   A    Yes.

12          MS. GEDDES:  And I'm showing, again to the jury

13   only, what's in evidence as 326(i) and 326(j).

14   Q    Are those photographs reflected in Image 2026 and Image

15   2025?

16   A    Yes, they are.

17   Q    And are you able to determine, from reviewing Government

18   Exhibit 326, when those two photographs were taken?

19   A    February 3rd, 2018.

20   Q    And are you able to determine what device was used to

21   take those two photographs?

22   A    Yes.  Apple iPad Pro.

23   Q    And is that also the same device that was listed for the

24   photographs you just testified about a moment ago?

25   A    Yes.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

M. Wilson - Direct - Geddes                    2540

1    Q    And I am going to take back 326 for a moment from you.

2         MS. GEDDES:  And I am now showing what's in evidence

3    as Government Exhibit 327.

4         And this can be shown to everyone.

5    Q    And this right here is page 4 of Government Exhibit --

6         MS. GEDDES:  Oh, I'm sorry, it can't be shown to

7    everyone.  I apologize, Your Honor.

8         Can I just show it to the jury only?

9         THE COURT:  Sure.

10        MS. GEDDES:  All right.  I'm showing, the jury only,

11   what's in evidence as Government Exhibit 327.

12   Q    Can you just briefly describe what is shown where my pen

13   is, what's reflected there, just generally speaking?

14   A    That's usually what happens, is it's showing a video, and

15   those are thumbnails from the video showing segments of it.

16   Q    All right.  And that particular file is identified by

17   file name img_1930.mov; is that correct?

18   A    Yes, it is.

19   Q    And was that one of the videos featured on Government

20   Exhibit 327(a) and (b), that CD that you reviewed previously?

21   A    Yes, it is.

22   Q    And from looking at Government Exhibit 327, are you able

23   to determine on what day that video was created?

24   A    Yes.  January 14th, 2018.

25   Q    And are you able to determine what device was used to

M. Wilson - Direct - Geddes                          2541

1    create that video?

2    A    Yes, with the Apple iPad Pro.

3    Q    And now I want to direct your attention to --

4              THE COURT:  Could I just see the parties at the side

5    for a minute just with the court reporter.

6              (Sidebar.)

7              (Continuing on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        2542
```

1           (Sidebar conference held on the record out of the
2    hearing of the jury.)
3           THE COURT:  I just want to clarify, are these
4    thumbnails some of the videos?
5           They're not?
6           MS. GEDDES:  No.
7           So what I'm going to -- these two videos are in
8    evidence from yesterday.  What we played yesterday, I'm not
9    going to show the thumbnails for the videos in question.  I'm
10   only going to establish the date that they were made.  That's
11   it.
12          THE COURT:  Okay.  Do you object to Counsel doing
13   that sort of as a group?
14          MR. CANNICK:  Not at all.
15          THE COURT:  Okay.  Rather than going through each
16   one.
17          It is riveting.
18          MS. GEDDES:  I understand, it is riveting.
19          THE COURT:  If there is a way to do it.  If they do
20   not object to the dates, it might move things along if your
21   witness needs more time to get here.
22          MS. GEDDES:  She literally just walked in.
23          THE COURT:  We will just take a little break.
24          But it seems to me there is not a whole lot of
25   dispute about where these came from or what the dates are, and

Sidebar                                                    2543

1   so if we just want to say -- I mean, I think it is fine to say

2   do them as a group.

3           MS. GEDDES:  Yes, they're listed a little bit

4   differently, but I will do my best to move it along.

5           THE COURT:  Yes, I just think if nobody is disputing

6   it, there is no reason to.

7           MR. CANNICK:  I'm not disputing it, Scholar is not

8   disputing it.

9           THE COURT:  Just in terms of that sort of basic

10  foundation, also.

11          MS. GEDDES:  Yes.

12          THE COURT:  Okay.

13          (Sidebar ends.)

14          (Continuing on next page.)

15

16

17

18

19

20

21

22

23

24

25

M. Wilson - Direct - Geddes                2544

BY MS. GEDDES:

Q    And you have testified about the creation date of several

photographs and now two videos.  And on the examination

reports that you have seen, have you seen both a create -- one

field that says "creation date/time" and then below that a

"created date/time"?

A    Yes.

Q    And is the "created date/time" the date on which the

photograph or video was taken by a particular device?

A    Yes.

Q    And the create -- the -- and that is located as the -- I

just want to make sure that I have not misspoken.

        All right.  Just looking at Government Exhibit 327

again, where my finger is pointed there is something at the

top that says "created date/time" and then it goes on to say

"UTC."  And then there's another, "created date/time-local."

Is it -- the created date/time-local, that is the date on

which the video or photograph was taken?

A    Yes, it is.

Q    Okay.  And at least as with respect to this video where

-- the created date/time that is above that, is that the date

on which this report was created?

A    Yes, it is.

Q    Not the date when it was -- the photograph itself or

video itself was taken, correct?

M. Wilson - Direct - Geddes                    2545

1   A     That's correct.

2              MS. GEDDES:  Nothing further.

3              THE COURT:  Okay.  Any cross-examination?

4              MR. CANNICK:  No, none.

5              THE COURT:  Okay.  Thank you so much.  You can step

6   down.

7              (Witness excused.)

8              THE COURT:  Now, do we need a few minutes to --

9              MS. GEDDES:  Maybe just a five-minute break,

10  Your Honor.

11             THE COURT:  It is never really five.

12             I think we will make it ten minutes just because of

13  the weather.  We have had a little difficulty getting some of

14  the people here, so I just want to make sure everything is in

15  place.

16             So, ten minutes.  Please do not talk about the case.

17             THE CLERK:  All rise.

18             (Jury exits the courtroom. )

19             THE COURT:  Okay.  Everybody can sit down.

20             And unless anybody has anything they want to

21  discuss, we are in recess for a little bit.  All right?  For

22  -- do you really think five minutes?

23             MS. GEDDES:  Yes.

24             THE COURT:  Okay.

25             (A recess was taken.)

```
                        Proceedings                    2546
```

 1          THE COURT:  Let's get everybody out here.  Thank
 2  you.
 3          Do we have everyone?  Are we missing anybody?
 4  That's what I thought.  Do you know where she is?
 5          MR. FARINELLA:  She is nearby.  I think she went to
 6  the bathroom, Your Honor.
 7          THE COURT:  Okay.  Thanks.  She is just not here
 8  right now, but we will be back soon, right?
 9          Great.  Okay.
10          Why don't we get the witness and then we will see,
11  we will move on from there.
12          (Witness enters the courtroom.)
13          THE COURT:  Okay.  Let's get the jury, please.
14          THE CLERK:  All rise.
15          (Jury enters the courtroom.)
16          THE CLERK:  You may be seated.
17          THE COURT:  All right.  We are ready to proceed with
18  the next witness.
19          Will you call the witness, please?
20          MS. GEDDES:  The government calls Alexis.
21          THE CLERK:  Please stand and raise your right hand.
22          Do you solemnly swear or affirm that the testimony
23  you're about to give will be the truth, the whole truth, and
24  nothing but the truth?
25          THE WITNESS:  I do.

Proceedings                                    2547

1           (Witness sworn.)

2           THE CLERK:  You may be seated.

3           THE COURT:  You can take your mask off.

4           All right.  Just a couple of things before we begin.

5           I want to make sure the jury can hear you and that

6   our court reporter can take down everything that you say, so

7   please speak into the microphone and speak slowly.

8           THE WITNESS:  Okay.

9           THE COURT:  If there is a question that you want to

10  have clarified or repeated, let me know, and I will tell the

11  lawyer to rephrase it.

12          THE WITNESS:  Okay.

13          THE COURT:  Just that same thing about making sure

14  the court reporter can take everything down, just do not talk

15  over whichever lawyer is asking you questions.

16          And do your best just to answer the question you are

17  being asked.  Okay?

18          THE WITNESS:  Okay.

19          THE COURT:  Let's make sure the microphone is on.

20          Just tap it.

21          There is a button there.  Try now.

22          THE WITNESS:  It's on.

23          THE COURT:  Cannot hear you.

24          That is good.  All right.  So pull it a little bit

25  closer to you.  Great.  Go ahead.

Alexis - Direct - Geddes                    2548

1    **ALEXIS,** having been first duly sworn, was examined and

2    testified as follows:

3    DIRECT EXAMINATION

4    BY MS. GEDDES:

5    Q    Good afternoon.

6    A    Hi.

7              MS. GEDDES:  I'm showing the witness only what's

8    been marked for identification as Government Exhibit 63.

9    Q    Do you recognize what's shown in 63?

10   A    Yes, that's myself.

11   Q    Is that a photo of you?

12   A    Yes.

13             MS. GEDDES:  The government offers 63.

14             MR. CANNICK:  No objection.

15             THE COURT:  All right, no objection.

16             All right, it is in.

17             (Government Exhibit 63 was received in evidence.)

18             MS. GEDDES:  And then I'm showing the witness only

19   what's been marked for identification as 63(a).

20   Q    Does 63(a) show that same photograph in Government

21   Exhibit 63?

22   A    Yes.

23   Q    And beneath that, is that your true first and last name?

24   A    It is.

25             MS. GEDDES:  The government offers 63(a) and ask

Alexis - Direct - Geddes                    2549

1    that it be published just to the jury.

2              THE COURT:  Any objection?

3              MR. CANNICK:  None.

4              THE COURT:  Okay.  We can publish it just to the

5    jury.

6              (Government Exhibit 63(a) was received in evidence.)

7    Q    For today, I am just going to refer to you as "Alexis."

8    Okay?

9    A    Okay.

10   Q    How old are you?

11   A    31.

12   Q    When is your birthday?

13   A    July 9, 1990.

14   Q    Are you employed?

15   A    I am.

16   Q    What do you do?

17   A    I am a registered nurse.

18   Q    And where were you raised, in what city?

19   A    Jacksonville, Florida.

20             THE COURT:  And keep your voice up.

21             THE WITNESS:  Okay.

22             THE COURT:  That is much better.  Thanks.

23             THE WITNESS:  Okay.

24   Q    Did you graduate with your high school class?

25   A    I did not.

Alexis - Direct - Geddes                    2550

1   Q     What happened?

2   A     I dropped out and then I later obtained my GED.

3   Q     And how old were you when you stopped going to high

4   school, before you got your GED?

5   A     I was probably 16, 17.

6   Q     And after getting your GED, did you continue your

7   education?

8   A     I did.

9   Q     And are you still in school today?

10  A     I am.

11  Q     What are you in school for?

12  A     For a nurse practitioner, my master's of science and

13  nursing.

14  Q     And did you previously get your bachelor's degree in

15  nursing?

16  A     I did.

17          MS. GEDDES:  I am showing what's in evidence as

18  Government Exhibit 1.

19  Q     Do you recognize the individual shown in Government

20  Exhibit 1?

21  A     Yes, I do.

22  Q     Who is that?

23  A     The defendant, Robert Kelly.

24  Q     And do you see him in court today?

25  A     Yes, I do.

Alexis - Direct - Geddes                    2551

1   Q    Can you point to him and describe an article of his
2   clothing?
3   A    He has a blue tuxedo on.
4           MS. GEDDES:  Let the record reflect that the witness
5   has identified the defendant.
6           THE COURT:  Yes.
7   Q    Do you personally know the defendant, Robert Kelly?
8   A    I do.
9   Q    Where did you first meet him?
10  A    Jacksonville, Florida.
11  Q    And where was it that you met him in Jacksonville?
12  A    It was at a concert.
13  Q    Do you remember who the headliner of the concert was, who
14  was headlining it?
15  A    I believe it was him at the Light It Up Tour.
16  Q    Do you recall when the concert took place?
17  A    It was sometime in 2006.
18  Q    And how old were you at the time of the concert?
19  A    I believe 15 turning 16 that year.
20  Q    And approximately how old was the defendant?
21  A    Oh, I don't know.
22  Q    Who did you attend the concert with?
23  A    Family and a friend.  My mother, my uncle, and then one
24  of my good friends.
25  Q    Whose idea was it to attend the concert?

1   A    It was kind of a collective idea, but mostly my mom.

2   Q    And would you describe yourself as a fan of the

3   defendant's music back in 2006?

4   A    Yes, I would.

5   Q    Where in the venue were you sitting?

6   A    In the front row.

7   Q    What if any interaction did you have with the defendant

8   or his associates that night?

9   A    We were asked to come backstage and we kind of hung out

10  for the night, went to a club called the Leopard Lounge and

11  then later went to IHOP.

12  Q    You said you were asked to go backstage.  Do you recall

13  how you were asked to go backstage?

14  A    It was some man.  I'm taking that it was someone from his

15  entourage.

16  Q    And how did that individual go about asking you to come

17  backstage?

18  A    He just walked up to me and Elizabeth and stated that Rob

19  wanted us to meet him in the back.

20  Q    And you just referenced Elizabeth.  Is that your good

21  friend who you went to the concert with as well?

22  A    Yes.

23  Q    And you testified earlier that you went backstage.  Who

24  initially went backstage?

25  A    It was just myself and Elizabeth at first, but then it

Alexis - Direct - Geddes                2553

1  was my family after that.

2  Q    And what if any interaction did you have with the

3  defendant when you and your friend Elizabeth first went

4  backstage?

5  A    We just talked about the show.

6         And then he asked who we were there with.  I told

7  him I was there with my family, and then he invited them

8  backstage with us.

9  Q    And did your family then go backstage?

10 A    Yes.

11 Q    You mentioned that after speaking with the defendant

12 backstage, you went somewhere else; is that correct?

13 A    Yes.  We stayed there for -- I don't recall the amount of

14 time, but we were playing cards, eating, and then we left to

15 go to the club after that.

16 Q    And what was the name of the club where you went?

17 A    Leopard Lounge.

18 Q    And who went to the club with you?

19 A    We all did.

20 Q    To include your family and your friend Elizabeth?

21 A    Yes.

22 Q    As well as the defendant?

23 A    Yes.

24 Q    Where, if anywhere, did you go after going to the club?

25 A    IHOP.

Alexis - Direct - Geddes                    2554

1   Q    The restaurant?

2   A    Mm-hm.

3   Q    And do you remember who went to the IHOP?

4   A    We all did.

5   Q    And again, with your mom, and did you say it was your

6   stepfather?

7   A    Yes.

8   Q    What if any arrangements did you make to communicate with

9   the defendant after that night?

10  A    I had just told him that I would be calling him.  And he

11  informed me that he was going to be at The Avenues mall the

12  next day.

13  Q    And how were you going to get in contact with him?

14  A    Via cell phone.

15  Q    Did he give you his number?

16  A    Yes.

17  Q    And did you, in fact, call the defendant?

18  A    I did.

19  Q    And did you make arrangements to see him again?

20  A    I did.

21  Q    Where did you arrange to see him?

22  A    The next day that I saw him was the day after the concert

23  at The Avenues mall.

24  Q    And do you remember how you got to The Avenues mall that

25  day?

Alexis - Direct - Geddes                    2555

1   A    Yes, by car.

2   Q    Did you go by yourself or with somebody else?

3   A    Elizabeth took me.

4   Q    And at the time did you have your driver's license?

5   A    I may have had my permit.  I'm not sure if I had my

6   license at that time.

7   Q    You were 15 years old at that time?

8   A    So it would have been permit.

9   Q    Okay.  Where within The Avenues mall did you arrange to

10  meet the defendant?

11  A    I met him on the tour bus.

12  Q    And do you remember where the tour bus was parked?

13  A    Just in the parking lot.

14  Q    Of The Avenues mall?

15  A    Yes, ma'am.

16  Q    When you arrived at the mall, was the defendant on the

17  tour bus?

18  A    He was not.

19  Q    What did you do when you arrived?

20  A    I got to the tour bus, I let him know that I was there,

21  and he told me to just go on the bus and wait for him and that

22  he was coming, he was finishing up shopping.

23  Q    Approximately -- did you eventually see the defendant

24  that day?

25  A    I did.

Alexis - Direct - Geddes                    2556

1    Q    Approximately how long was it before you saw the
2    defendant?
3    A    It may have been an hour, maybe two, but I wasn't really
4    sure.
5    Q    And where did you eventually see the defendant?
6    A    On the tour bus.
7    Q    Do you remember whether anyone else was on the tour bus
8    with you and the defendant?
9    A    No, there was -- it was just us.
10   Q    And what, if anything, was your friend Elizabeth doing
11   while you were waiting on the tour bus?
12   A    She was waiting for me.  She might have went inside
13   briefly, but she was just waiting for me to get done.
14   Q    And when you said "she might have went inside," did she
15   ever come inside the tour bus?
16   A    No, inside the mall.
17   Q    Okay.  What happened when the defendant arrived on the
18   tour bus itself?
19   A    He walked in and then we kind of just generally talked
20   about the next city that he would be going to, and then I
21   signed a nondisclosure.
22   Q    How did it come to be that you signed a nondisclosure?
23   A    He just told me that I should never take pictures and I
24   just was told to sign it, so I did.
25   Q    Did you receive a copy of that nondisclosure agreement?

Alexis - Direct - Geddes                    2557

1   A    I did not.

2   Q    And were you asked to provide any identification when you

3   signed that nondisclosure agreement?

4   A    No.

5   Q    Do you recall having a discussion with the defendant

6   about your age?

7   A    Yes, I may have.  But his general response was just

8   there's nothing wrong with platonic friendship at that time

9   and then if it turns into something over time, then so be it.

10  Q    At any point did you hide your true age from the

11  defendant?

12  A    No.

13  Q    Do you recall what types of -- what topics you discussed

14  with the defendant on the tour bus?

15  A    I don't.  I believe it was just where he was going next.

16  Q    How, if at all, did you communicate with the defendant

17  after you saw him on the tour bus at The Avenues mall?

18  A    I would call him or text him via cell phone.  It was just

19  random.

20  Q    Did you eventually see the defendant again?

21  A    I did.

22  Q    Do you have a clear memory as to the next time or next

23  location where you saw the defendant?

24  A    I do not.

25  Q    Did you ultimately have a sexual relationship with the

Alexis - Direct - Geddes                    2558

1  defendant while you were still in your teens?

2  A    When I was in my teens, I'm not sure, like 18 or over.  I

3  don't really recall when the first relation was between me and

4  him.

5  Q    Do you remember where you were when you first had sexual

6  contact with the defendant?

7  A    In Chicago.

8  Q    Where in Chicago?

9  A    His home in Olympia Fields.

10 Q    And did you ultimately travel to Chicago to see the

11 defendant at his home in Olympia Fields?

12 A    I did.

13 Q    On one occasion or more than one occasion?

14 A    More than one occasion.

15 Q    And when you did travel to see the defendant in Chicago,

16 how often would you have sexual contact with him during those

17 trips?

18 A    It would be kind of random.  Sometimes it was we didn't

19 have sexual intercourse, but it was usually related to

20 something that came up in between menstrual cycle or he was

21 busy.

22 Q    When you saw the defendant and you were not on your

23 menstrual cycle, did you have sexual contact with the

24 defendant?

25 A    For the most part.

Alexis - Direct - Geddes                2559

1   Q    Yes?

2   A    Yes.

3   Q    And when you were with the defendant, what if any

4   protection did he use?

5   A    None.

6   Q    What, if anything, did he ever tell you about any

7   sexually transmitted diseases that he had?

8   A    None.

9   Q    And to your knowledge, have you ever contracted an STD

10  from the defendant?

11  A    No.

12  Q    Aside from seeing the defendant in your teens -- and I'm

13  using "teens" to refer to 15, when you met him, until 19 --

14  A    Okay.

15  Q    -- do you remember -- did you see the defendant in cities

16  other than Chicago?

17  A    I believe Miami.

18  Q    And when you saw the defendant in Miami, were you still

19  living in Jacksonville?

20  A    Yes, I was.

21  Q    Approximately how far is Miami from Jacksonville?

22  A    Five and a half hours by driving.

23  Q    And do you remember how you got from your home in

24  Jacksonville to Miami to see the defendant?

25  A    I drove to The Avenues mall and then the bus, the tour

Alexis - Direct - Geddes                    2560

1    bus, picked me up and took me to Miami.

2    Q    And The Avenues mall, was the mall in Jacksonville where

3    you first met the defendant?

4    A    Correct.

5    Q    You testified that the tour bus took you from The Avenues

6    mall in Jacksonville to Miami.  Do you know how that was

7    arranged?

8    A    I believe I called him.  And he informed me that he was

9    in Miami, so I asked if I could come to see him and he had it

10   set up.

11   Q    And when you say "he" and "him" now, are you referring to

12   the defendant?

13   A    I am.

14   Q    Do you remember who, if anyone else, was on the tour bus

15   when you traveled from Jacksonville to Miami to see the

16   defendant?

17   A    It was just the driver and myself, Terry.

18   Q    The bus driver's name was Terry?

19   A    Yes.

20   Q    Do you remember his last name?

21   A    I do not.

22   Q    Do you recall -- during that particular trip when you

23   took the tour bus from Jacksonville to Miami, do you recall

24   how long you stayed in Miami?

25   A    It may have been a night, but I'm not 100 percent sure.

Alexis - Direct - Geddes                    2561

1    Q    Okay.  Fair to say your memory is a little bit shaky when

2    it comes to that time frame?

3    A    Yes.  That was over 15 years ago.

4    Q    What, if anything, do you recall going on in Miami when

5    you got there?

6    A    I believe he was at the hospital because I think he may

7    have had a ruptured appendix and I was seeing him post

8    surgery.

9                   (Continuing on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alexis - Direct - Geddes                    2562

1    BY MS. GEDDES:

2    Q    And do you remember why the defendant was in Miami in

3    the first place?

4    A    I do not.

5    Q    Approximately -- not approximately -- how old were you in

6    February of 2007?

7    A    Sixteen.

8    Q    Aside from that particular trip to Miami, do you recall

9    any other trips to Miami while you were still in your teens?

10   A    I don't.

11   Q    Was there a time when there was a video shoot in Miami?

12   A    There may have been, not a video shoot, but there may

13   have been recordings while we were at eating at the McDonald's

14   I believe.

15   Q    Do you remember where that McDonald's -- what city that

16   McDonald's was located in?

17   A    I believe it's Miami, but there is a possibility it could

18   have been Jacksonville.

19   Q    Was it in Florida?

20   A    Yes.

21   Q    What, if anything, do you remember that was being

22   recorded on that occasion that you just referenced?

23   A    We were just all sitting around eating and kind of just

24   joking around.

25   Q    When you say we all were just sitting around eating, who

Alexis - Direct - Geddes                    2563

1    do you recall being there?

2    A    It was part of his entourage and him and me.

3    Q    Again, referring to the defendant and his entourage?

4    A    Yes.

5    Q    What, if anything, do you recall thinking while that

6    video was being made?

7    A    I was just worried about being in the video.

8    Q    Why were you worried about being in the video?

9    A    Because of the relation of who he is, and you know, just

10   being there.

11   Q    Do you have a memory as to not your exact age, but

12   anything about your age at the time of that video?

13   A    I'm pretty sure I was probably 17 at the time.

14   Q    Why do you remember -- why do you believe you were 17 at

15   the time?

16   A    I just know that I wasn't of age because of the

17   recording.

18   Q    What do you mean by that?

19   A    Because of how I felt whenever the recording was going

20   on.

21   Q    Can you explain just so the jury understands what you

22   were concerned about, what you're referring to?

23   A    Because I was under the age of 18 and being on recording

24   was a concern for me.

25   Q    Just to be clear, in the McDonald's I think you testified

1   that the video was being recorded in the McDonald's, what type

2   of video was being recorded?

3   A    I think it was just a videography of what was going on at

4   that time.

5   Q    As you sit here today, do you know who was making that

6   recording?

7   A    I don't.

8   Q    You testified earlier that you traveled to Chicago to see

9   the defendant while you were still in your teens; is that

10  correct?

11  A    Yes.

12  Q    How did you travel from Jacksonville to Chicago?

13  A    By plane.

14  Q    When you traveled to Chicago, did you have a cellphone?

15  A    I did.

16  Q    Would you bring your cellphone with you?

17  A    I would.

18  Q    Who arranged your travel from Jacksonville to Chicago?

19  A    Sometimes I would reach out to him and tell him I would

20  want to come, and he would either get it set up.  Or I would

21  talk with a runner or someone else.

22  Q    Again, the "he" is referring to the defendant?

23  A    Yes.

24  Q    You mentioned that you would speak with a runner, what do

25  you mean by a runner?

Alexis - Direct - Geddes                              2565

1   A    I guess, his employees.

2   Q    Other than traveling to Chicago, did you otherwise fly

3   when you were under 18 years old?

4   A    No.

5   Q    Referring to the time when you were in your teens, I

6   think you testified -- you tell me -- where would you stay

7   when you visited the defendant?

8   A    Most of the time in his home in Olympia Fields in what I

9   believe was the master bedroom.

10  Q    Do you recall how you would get to Olympia Fields -- to

11  the defendant's house in Olympia Fields from the airport?

12  A    Sometimes either by taxi or someone would come pick me

13  up, one of his workers.

14  Q    When you arrived at the defendant's residence, do you

15  recall having to sign a second non-disclosure agreement?

16  A    No.

17  Q    When you visited the defendant do you recall being asked

18  to provide your identification?

19  A    I don't recall.

20  Q    What would happen when you arrived at the defendant's

21  residence in Olympia Fields?

22  A    For the most part whenever I would arrive I would drop my

23  things off in the room.  And usually I was tired, I would

24  probably sleep or what have you.  I would let him know that I

25  was there.  If I wanted to go to the mall or wherever I wanted

Alexis - Direct - Geddes                    2566

1  to go, I would tell him and they would take me.

2  Q    Initially when you got to the inside of the residence,

3  how would you get to the room where you were staying?

4  A    I was escorted there.

5  Q    What, if any, communication would you have with others

6  while you were at the defendant's residence in Olympia Fields?

7  A    Can you clarify the question?

8  Q    Sure.  I think you mentioned earlier that if you wanted

9  to go to the mall, you would contact someone; is that correct?

10  A    Yes.

11  Q    Who would you contact?

12  A    Usually whoever scheduled my flight or I would call him

13  and tell him I wanted to go somewhere and just whoever it was

14  at the time that I was able to reach out to.

15  Q    Again, when you say that you would call "him" you're

16  referring to the defendant?

17  A    Yes.

18  Q    How about if you wanted to eat while you were at the

19  defendant's house in Olympia Fields?

20  A    Yes.  They had a menu.  So it was a book, they called it

21  room service, you could order whatever you wanted of the

22  nearby restaurants.  So I would just call them and tell them

23  what I would want, whatever it was that I was wanting.

24  Q    Who would you call?

25  A    Either the runners or him, the defendant.

Alexis - Direct - Geddes                    2567

1  Q    Did you -- you think you testified that you believe on

2  most occasions you stayed in the defendant's master bedroom;

3  is that correct?

4  A    Yes.

5  Q    Were there other locations within the defendant's house

6  that you spent time?

7  A    Yes.

8  Q    Where else do you remember spending time when you were at

9  the defendant's house?

10 A    In the studio, in the living room area.  Then there was a

11 room that was adjacent to there, I stayed in that room.  There

12 was also like a studio, not a studio, but like a cigar room

13 area, as well as the theater.

14 Q    You mentioned the room that was adjacent to the living

15 room, what, if anything, do you remember about that room?

16 A    There was a mirror on the ceiling.

17 Q    You also mentioned that on occasion you were in the

18 studio, was there a particular room within the studio where

19 you spent time?

20 A    The recording room.

21 Q    What, if anything, do you remember about the recording

22 room where you spent time?

23 A    It was just kind of like wooden, like log cabin feel.

24 Q    Were you ever in the a garage at the defendant's

25 residence?

Alexis - Direct - Geddes                    2568

1   A    Yes.

2   Q    How do you recall the garage appearing to you?

3   A    There was a boxing ring in there.  And I believe, if my

4   memory serves me correct, there was a sauna.

5   Q    What, if anything, do you recall occurring with respect

6   to one of your flights to Chicago when you were visiting the

7   defendant when you were still in your teens?

8   A    I lost my luggage.

9   Q    Do you remember on which part of the trip you lost your

10  luggage?

11  A    I think I do, but it's kind of hazy, but I'm pretty sure

12  that I do.

13  Q    Which part did you lose your luggage?

14  A    Can you clarify?

15  Q    Yes.  When you arrived in Chicago after traveling from --

16  you were traveling from Jacksonville, correct?

17  A    Yes.

18  Q    When arrived in Chicago from Jacksonville, did you have

19  your luggage with you?

20  A    No.

21  Q    Had you brought luggage with you?

22  A    Yes.

23  Q    Do you remember what airline you flew?

24  A    I don't.

25  Q    Was there a particular airline that you often flew or do

Alexis - Direct - Geddes                    2569

1    you not know?

2    A    I don't know.

3    Q    The time when you flew to Chicago what, if anything, do

4    you recall happening when you got to Chicago without your bags

5    or bag?

6    A    I let him know, the defendant know, that I didn't have

7    anything.  And so he told me not to worry that someone would

8    go get me some things.  They brought back a whole bunch of

9    options for me to choose from, bathing suits, clothes, and I

10   had everything that I needed.

11   Q    What, if any, sexual contact did you have with the

12   defendant during that particular trip?

13   A    There was no sexual contact that trip that I can recall.

14   Q    Had you previously had sexual contact with the defendant?

15   A    Not intercourse, no, ma'am.

16   Q    How about other than intercourse?

17   A    No.

18   Q    Who, if anyone, do you recall meeting -- what, if

19   anything, do you recall happening during that trip?

20   A    I recall, I believe, it was a party, it was like a luau

21   theme.  We were outside.  So we were all kind of hanging out,

22   listening to music.  There was some random guy that walked up

23   to me and was trying to talk to me.  The defendant came up and

24   let him know that I was with him and to basically move on,

25   kind of leave me alone, because he was trying to get my

Alexis - Direct - Geddes                    2570

1  number.

2  Q    Do you recall having a conversation with another female

3  during that trip during that luau party?

4  A    Yes, I do.

5  Q    Who do you recall having a conversation with?

6  A    Brittany.

7  Q    Who is Brittany?

8  A    Some girl that was there.  It was her first time there.

9  She was just asking if I've ever been there before.

10              MR. CANNICK:  Objection.

11              THE COURT:  Overruled.

12  Q    Do you recall whether you had been to the defendant's

13  house prior to that trip?

14  A    Yes.

15  Q    Had you been there to his house before?

16  A    Yes.

17  Q    Do you recall on how many occasions you traveled to the

18  defendant's house before that trip?

19  A    No, I don't.

20  Q    Who, if anyone, else was part of your sexual encounters

21  with the defendant?

22  A    Eventually there was sexual relations between me and

23  Juice.

24  Q    Who is Juice?

25  A    A girl that used to be up there whenever I was there.

Alexis - Direct - Geddes                    2571

1   Q    How did it come to be that you had a sexual encounter

2   with the defendant and Juice?

3   A    I believe we had went out that night or something.  And

4   then we both had come back to wherever we were at, I don't

5   recall the exact first time.

6   Q    Is it fair to say that you had sexual contact with the

7   defendant and Juice on more than one occasion?

8   A    Yes.

9   Q    Aside from sexual contact with Juice, do you recall

10  another encounter, sexual encounter, with the defendant where

11  another woman was included?

12  A    It wasn't sexual, but it was kind of like dominance like

13  BDSM type.

14  Q    What do you recall about that particular encounter?

15  A    I walked a girl around on a leash.  We both had on

16  lingerie.  I don't recall what was said or what I was told to

17  say, but I just recall that moment.

18  Q    Do you remember where that happened?

19  A    It was in the garage or the boxing room where the boxing

20  ring was.

21  Q    You indicated that you walked this other female on a

22  leash.  What do you mean by that?

23  A    So I put the collar on her, and then she was like on her

24  hands and knees and I was walking her.

25  Q    Whose idea was that?

Alexis - Direct - Geddes                    2572

1          MR. CANNICK:  Objection.

2          THE COURT:  Overruled.

3     A    It was his.

4     Q    To your knowledge, did the defendant ever record you

5     engaging in sexual activity?

6     A    Not to my knowledge.

7     Q    Did you ever see the defendant with any video equipment?

8     A    Not video equipment.

9     Q    Just backing up one moment, you just testified it was his

10    idea, the encounter with that other female in the boxing ring,

11    why you referring to the defendant?

12    A    Yes.

13    Q    I'm sorry, I didn't hear your answer to my question.  Did

14    you ever see the defendant with video equipment?

15    A    Not video equipment.

16    Q    How about with videotapes?

17    A    I saw tapes.  I know that since he doesn't write his

18    music, he had a tape recorder when he would, like, come up

19    with lyrics.

20    Q    Like a Dictaphone?

21    A    Like recording audio, just audio.

22    Q    So I'm referring to videotapes.

23    A    Okay.

24    Q    Was there a time when you saw the defendant with

25    videotapes?

Alexis - Direct - Geddes                    2573

1   A    Randomly maybe in his backpack.

2   Q    Do you recall what type of backpack?

3   A    Usually designer.

4   Q    Was there a time when you recall seeing the defendant

5   with lighting equipment?

6   A    Yes, there was one time.  It looked like a construction

7   light.  It was yellow.

8   Q    Where was that?

9   A    In the master bedroom.

10  Q    What, if anything, do you recall about where that

11  construction light was?

12  A    It was just randomly sitting like kind of between the bed

13  and the window, like, not window, but there was doors where

14  you could look out to the indoor pool area.

15  Q    Was the lighting equipment on, that particular

16  construction light, when you were with the defendant?

17  A    No.

18  Q    Was the lighting equipment set up in the room?

19  A    Yes, it was plugged up but it wasn't on.

20  Q    Did there come a time when you stopped communicating with

21  the defendant for a period?

22  A    Yes.

23  Q    What do you recall prompting that initial stoppage in

24  communication?

25  A    I became pregnant, so I had my first child.

Alexis - Direct - Geddes                    2574

1    Q    When did you learn that you were pregnant?

2    A    It was June of 2010.

3    Q    Would that make you 19 at that time?

4    A    Yes.

5    Q    For how long did you stop communicating with the

6    defendant?

7    A    Approximately two years.

8    Q    Did you later resume communicating with him?

9    A    Yes.

10   Q    Approximately when?

11   A    2012.

12   Q    When you resumed communicating with him, did you continue

13   to travel to see the defendant in Chicago?

14   A    Yes.

15   Q    When you traveled to Chicago to see him, after you

16   resumed communications, where did you stay?

17   A    I believe either there was a studio in Chicago or I would

18   stay at hotels.

19   Q    Who arranged your hotels?

20   A    The defendant or a runner.

21   Q    What, if any, instructions did the defendant give you

22   about what you should do and not do when you were at those

23   hotels?

24   A    I wasn't given any instructions at the hotels.

25   Q    What, if anything, did the defendant tell you about

Alexis - Direct - Geddes                    2575

1   leaving the hotel room?

2   A    I wasn't never told I couldn't leave the hotel room.  But

3   whenever I was staying in the Olympia Fields, I was told if I

4   needed anything just to call someone and they would bring it

5   to me.

6   Q    I'm showing the witness what is marked for identification

7   as Government's Exhibit 959 -- before I do that.

8          Do you remember the last four digits of your

9   telephone number when you were in high school?

10  A    0160.

11  Q    Approximately what ages, approximately what time frame

12  did you have that telephone number ending 0160?

13  A    I just know since I was in the sixth or seventh grade, so

14  like 12, 13.  I don't know when I got a new number.

15  Q    Did you eventually get a new number?

16  A    Yes.

17  Q    Do you recall the last four digits of that new number?

18  A    0057.

19  Q    I'm showing the witness only what is marked for

20  identification as Government's Exhibit 959.  Do you recognize

21  what is shown in 959?

22  A    Yes, I do that's my first phone number.

23  Q    0160?

24  A    Yes.

25  Q    I'm showing the witness only what is marked for

Alexis - Direct - Geddes                    2576

1   identification as 938.  Do you recognize what is known in 938?

2   A    I do.

3   Q    What is that?

4   A    My current cellphone number.

5   Q    Is that the one ending in 0057?

6   A    It is.

7            MS. GEDDES:  The Government offers 938 and 959.

8            MR. CANNICK:  No objection.

9            THE COURT:  Those are in evidence.

10           (Government Exhibit 938 & 959, was received in

11   evidence.)

12   BY MS. GEDDES:

13   Q    Did you use any other telephone numbers during the time

14   that you knew the defendant?

15   A    No.  There was a phone that I had that I could directly

16   call him from, but I don't remember that number.

17   Q    How did you get that telephone?

18   A    He gave that to me.

19   Q    Do you remember what type of phone it was?

20   A    A Motorolla Razor.

21   Q    What color?

22   A    Pink.

23   Q    You indicated that he gave it to you, are you referring

24   to the defendant?

25   A    Yes.

Alexis - Direct - Geddes                    2577

1   Q    What did you understand that particular phone was used

2   for?

3   A    To contact him.

4   Q    Did you use it to contact anyone else?

5   A    I could not dial any other number but his, or it was

6   already stored with his number in there.

7   Q    What do you mean that you couldn't dial anyone else's

8   phone number?

9   A    It wouldn't let me call any other number.  I don't know,

10  it was locked out.

11  Q    Do you recall what the area code was?

12  A    I don't.

13  Q    Who provided that telephone number to you, that telephone

14  to you?

15  A    The defendant.

16  Q    Do you recall the telephone numbers that you used to

17  reach the defendant?

18  A    Yes.

19  Q    Did you save his telephone numbers in your phone?

20  A    Yes.

21  Q    Did you provide screenshots of those phone numbers to the

22  Government?

23  A    Yes.

24  Q    I'm showing the witness only what is marked for

25  identification as 259A through H.

Alexis - Direct - Geddes                    2578

1          MS. GEDDES:  May I approach?

2          THE COURT:  Yes.

3     Q    Do you recognize what was shown in 259A through H?

4     A    Yes.

5     Q    What were those generally speaking?

6     A    Telephone numbers.

7     Q    And beginning with 259A, for the witness only please,

8     what would a telephone number for?

9     A    The studio.

10    Q    Who's studio?

11    A    His studio in Olympia Fields, the chocolate factory.

12    Q    The defendant's?

13    A    Yes.

14    Q    And 259B, what was that?

15    A    Also the studio.

16    Q    The defendant's studio?

17    A    Yes.

18    Q    Do you remember where that studio was located?

19    A    I believe the same.

20    Q    Also in Olympia Fields?

21    A    Yes.

22    Q    259C, what was that a phone number for?

23    A    His phone number.

24    Q    The defendant's?

25    A    Yes.

1   Q    And do you remember what time period the defendant had

2   that particular phone number?

3   A    I don't.

4   Q    259D, what was that a phone number for?

5   A    His phone number.

6   Q    Again the defendant's?

7   A    Yes.

8   Q    Again, do you remember when the defendant had that

9   particular phone number?

10  A    No.

11  Q    259E, do you recognize that?

12  A    I do.

13  Q    What is that?

14  A    His number.

15  Q    The defendant's?

16  A    Yes.

17  Q    Again do you remember what time frame he had that phone

18  number?

19  A    That was more recent, but I don't know the exact time

20  frame.

21  Q    How do you recognize that as a phone number that he had

22  more recently?

23  A    Because of how I have it in my phone saved, like the

24  emojis.

25  Q    You recognize those emojis as ones that you saved for a

Alexis - Direct - Geddes                    2580

1   more recent phone number for the defendant?

2   A    Yes.

3   Q    259F, as in Frank?

4   A    A phone number for a runner.

5   Q    Do you remember which runner?

6   A    Diana.

7   Q    A runner for whom?

8   A    The defendant.

9   Q    Where did you get that phone number from?

10  A    More than likely the defendant.

11  Q    259G?

12  A    Another runner, Cheryl.

13  Q    Is that another runner of the defendant?

14  A    Yes.

15  Q    That's a phone number for Cheryl?

16  A    Yes.

17  Q    259H?

18  A    That's a runner, but I don't have a name associated with

19  that one.

20  Q    Is that a runner for the defendant?

21  A    It is.

22  Q    Was that during a particular time frame?

23  A    2014 and 2015.

24  Q    How are you able to tell that?

25  A    That's how it's saved in my phone.

Alexis - Direct - Geddes                2581

1          MS. GEDDES:  The Government offers 259A through H.

2          MR. CANNICK:  No objection.

3          THE COURT:  Those are in evidence.

4          (Government Exhibit 259A - 259H, was received in

5     evidence.)

6     Q     What, if anything, happened in 2015 with the defendant?

7     A     Can you clarify?  I don't recall what you're referring

8     to.

9     Q     Sure.  Let me back up.

10          You testified earlier that there was a period of

11    time after you got after you were pregnant where you stopped

12    communicating with the defendant.  I think you testified that

13    was approximately two years; is that right?

14    A     Yes.

15    Q     Then you got back in touch with the defendant, correct?

16    A     Yes.

17    Q     At that time, you continued to travel to see the

18    defendant, correct?

19    A     Yes.

20    Q     You testified earlier that you would travel to see the

21    defendant and at times you would stay in a hotel.  And did you

22    also say you would sometimes stay somewhere else?

23    A     Yes, at the studio.

24    Q     At that time, where was the defendant's studio located?

25    A     Somewhere in downtown Chicago.

Alexis - Direct - Geddes                              2582

1   Q    Was it still at the defendant's house in Olympia Fields?

2   A    No.

3   Q    Do you remember what street that studio was on?

4   A    I don't.

5   Q    Approximately when you got back in touch with the

6   defendant after that two-year time period where you didn't see

7   him, how regularly did you travel to see him?

8   A    Quite frequently, maybe every other month, every two

9   months.

10  Q    Was there ever a time that you lived with the defendant?

11  A    No.

12  Q    Did you ever have any discussions with the defendant

13  about living with him?

14  A    Yes, in the beginning.

15  Q    What, if anything, do you recall about that?

16  A    We kind of just generally talked about me going to stay

17  in his home in Olympia Fields while I went to college.

18            THE COURT:  When you say the beginning, you mean the

19  beginning of when you first met him?

20            THE WITNESS:  Yes.

21  Q    You met him when you were 15 years old, correct?

22  A    Yes.

23  Q    When did you get your GED?

24  A    I was 16 or 17.

25  Q    So before you naturally would have finished high school?

Alexis - Direct - Geddes                    2583

1  A    I would have finished high school when I was 17 turning

2  18; so, yes.

3  Q    Did you get your GED at the same time period as when you

4  would have if you continued on through high school and

5  finished high school in the normal course?

6  A    It might have been six months before I would have

7  graduated in 2008.

8  Q    Did you also travel to see the defendant in other

9  locations besides Chicago as you started to have communication

10 with him again after that two-year hiatus?

11 A    I believe Atlanta.

12 Q    Did you travel to other cities as well to see him in

13 concert?

14 A    Yes.

15 Q    Where else did you travel to see the defendant?

16 A    Detroit and I believe Philadelphia.

17 Q    Did you travel to California, Palm Springs --

18 A    Yes.

19 Q    -- to see the defendant?

20 A    Yes.

21 Q    Did there come a time when you stopped traveling to see

22 the defendant?

23 A    In like 2015 I believe.

24 Q    What, if anything, happened in 2015?

25 A    I kind of cut ties with him.

Alexis - Direct - Geddes                    2584

1   Q    Why did you cut ties with the defendant?

2   A    It started -- I was in a relationship and just kind of

3   letting that go.

4   Q    Did you tell your partner about your prior relationship

5   with the defendant?

6   A    I did.

7   Q    What, if any, communication did your partner have with

8   the defendant?

9            MR. CANNICK:  Objection.

10           THE COURT:  Sustained.

11  Q    Was there ever a time when your telephone was used to

12  send a message to the defendant but you weren't the one who

13  sent it to the defendant?

14           MR. CANNICK:  Objection.

15           THE COURT:  Overruled.

16  A    Yes.

17  Q    And did you later have an opportunity to see that text

18  message or that text message that was sent?

19  A    Yes.

20  Q    And did the defendant have an opportunity to respond to

21  that text message?

22  A    Yes.

23  Q    And when the text message was sent from your phone, was

24  it made to appear that you had sent the message?

25  A    Yes, but I'm sure he knew it wasn't me.

Alexis - Direct - Geddes                    2585

1   Q    How is that?

2   A    Just because the nature of the message.

3   Q    Can you describe the nature of the message?

4   A    It was more spiritual speaking, I guess, like as in --

5   I'm not very -- we didn't have that type of conversation, so

6   he probably knew that it was not coming from me because we

7   didn't talk like that.

8   Q    What, if anything, was said in the message?

9             MR. CANNICK:  Objection.

10            THE COURT:  Overruled.

11  A    Basically allow me to, I guess, something along the lines

12  of move on in my life, that I wanted to be a wife one day, or

13  something along those lines.

14  Q    You hadn't actually written that text message, had you?

15  A    No.

16  Q    It was your partner who wrote it?

17  A    Yes.

18  Q    At the time when that text message was sent, did you

19  continue to harbor feelings for the defendant?

20  A    I did.

21  Q    Did the defendant eventually respond?

22  A    Yes.

23  Q    Do you recall how he responded?

24  A    He just basically told me don't get caught up with --

25  basically, don't waste your time on someone that is unworthy

Alexis - Direct - Geddes                    2586

1   of you.  And not to send him a message like that ever again.

2   Q     Did you continue to communicate with the defendant?

3   A     I did.

4   Q     Did you see the defendant again after that?

5   A     I did.

6   Q     Where did you see the defendant?

7   A     Mostly in Jacksonville, Florida, when he would come for a

8   concert.

9   Q     Would you go to those concerts?

10  A     I did.

11  Q     Would you also interact with the defendant during those

12  concerts?

13  A     Yes.

14  Q     At some point were you approached by members of my office

15  to speak with you?

16  A     Yes, I was.

17  Q     Do you want to be here today?

18  A     No.

19  Q     What, if anything, did you provide to the Government

20  after you were approached by the Government?

21  A     Just what I had from my time going up there.

22  Q     What types of things did you have?

23  A     I believe I had a shirt that I asked him for and he gave

24  it to me.  And some I guess stubs from the concert and then

25  tickets from the airline.

Alexis - Direct - Geddes                    2587

1   Q    Had you maintained those ticket stubs since your teens

2   when you first received them?

3   A    Yes.

4   Q    And you had maintained boarding passes and other

5   itineraries associated with your travel to see the defendant?

6   A    Yes.

7            MS. GEDDES:  I'm showing the witness only what is

8   marked for identification as Government's Exhibit 212.

9            THE COURT:  Could I see the parties on side with the

10  reporter.

11            (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                              Sidebar                          2588

 1               (Sidebar conference.)

 2               THE COURT:  Do you have a lot of stuff to put in, a

 3     lot of memorabilia?

 4               MS. GEDDES:  Some, not a ton.

 5               THE COURT:  Do you have an objection to putting it

 6     all in at once?

 7               MR. CANNICK:  Put it all in at once.

 8               THE COURT:  It will be in evidence, so you can argue

 9     about it.  You don't have an objection?

10               MR. CANNICK:  None.

11               THE COURT:  It can go into evidence.

12               MS. GEDDES:  Okay.

13               (End of sidebar conference.)

14               (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25
```

Alexis - Direct - Geddes                    2589

1          (In open court.)

2          THE COURT:  I think there is an agreement that the

3    items you're discussing can all go into evidence.  Is that

4    right, Mr. Cannick?

5          MR. CANNICK:  That is right.

6          MS. GEDDES:  The Government offers Government's

7    Exhibit 211, 212, 213, 214, 215, 216, as well as Government's

8    Exhibit 260.

9          THE COURT:  Okay.  Those are in evidence.

10         (Government Exhibit 211, 212, 213, 214, 215, 216 &

11   260, was received in evidence.)

12         MS. GEDDES:  May I publish Government's Exhibit 212?

13         THE COURT:  Sure.

14   Q    What is shown in 212?

15   A    A ticket for a concert.

16   Q    What was the date of this particular concert?

17   A    March 26, 2006.

18   Q    Was this the concert where you first met the defendant in

19   Jacksonville?

20   A    Yes.

21   Q    When you were 15?

22   A    Yes.

23   Q    I'm showing what is in evidence as Government's Exhibit

24   211.  I'll show the front and then I'll turn it over and show

25   the back.  What is written on Government's Exhibit 211?

Alexis - Direct - Geddes                    2590

1   A    To Alexis, stay sweet to me.

2   Q    Who signed that?

3   A    The defendant.

4   Q    Who wrote that?

5   A    R. Kelly, Robert Kelly.

6   Q    When did the defendant -- is this a placemat that you're

7   looking at?

8   A    It is.

9   Q    That you provided to the Government?

10  A    Yes.

11  Q    When did the defendant sign that?

12  A    When we were at IHOP.

13  Q    After that concert on March 26, 2006?

14  A    Yes.

15  Q    I'm now showing Government's Exhibit 215.  What is shown

16  in Government's Exhibit 215?

17  A    American airlines ticket -- my screen went blank.

18  Q    Can you see it now?

19  A    I can now.

20  Q    Is that a boarding pass for travel by you?

21  A    Yes.

22  Q    From Jacksonville to Chicago?

23  A    Yes.

24  Q    On what date were you traveling to Chicago?

25  A    July 28, 2007.

Alexis - Direct - Geddes                    2591

1    Q    Had you just turned 17 years old?

2    A    Yes.

3    Q    Why were you traveling to the Chicago?

4    A    To see the defendant.

5    Q    Who paid for that travel?

6    A    He did, the defendant.

7    Q    Do you recall going to -- let me show you.

8              I'm putting on the screen Government's Exhibit 214

9    and 213; first, 213 and then below that 214.  Is that a ticket

10   stub for a concert on December 30, 2007?

11   A    It is.

12   Q    And where was that concert held?

13   A    Jacksonville, Florida.

14   Q    Do you recall where you got those tickets from?

15   A    The defendant.

16   Q    Were you 17 at the time of that concert?

17   A    Yes.

18   Q    Below there, Government's Exhibit 214, is that access to

19   a particular location at the concert?

20   A    Yes, like backstage.

21   Q    It says a meet and greet; is that right?

22   A    Yes.

23   Q    Is that for that same concert, the Double Up Tour, on

24   December 30, 2007?

25   A    Yes.

1  Q    Do you recall how you received that access pass to meet
2  and greet?
3  A    I don't recall, but I'm sure it was from a runner or
4  someone who gave it to me.
5  Q    From the defendant?
6  A    Yes.
7  Q    Did you provide that ticket stub and that access pass to
8  the Government?
9  A    Yes.
10 Q    I'm showing what is in evidence -- I'd like to show this
11 to the jury only -- Government's Exhibit 260.  Is that a
12 photograph of an e-mail taken from your cellphone?
13 A    Yes.
14 Q    Do you recall when this photograph was taken
15 approximately?
16 A    When you guys came to Jacksonville or --
17 Q    So relatively recently?
18 A    Uh-huh.
19 Q    When you say "you guys" are you referring to the
20 Government?
21 A    Yes.
22 Q    Is this a copy of an e-mail between yourself and someone
23 who used the e-mail address Dlocksmith01@gmail.com?
24 A    Yes.
25 Q    What was the date -- does this e-mail reflect travel

Alexis - Direct - Geddes                    2593

1    arrangement between Jacksonville and Chicago?

2    A    Yes.

3    Q    What was the date of the travel?

4    A    Sunday May 25, 2008.

5    Q    Were you 17 at that time?

6    A    I was.

7    Q    Who do you understand -- do you have any understanding of

8    who Dlocksmith01@gmail.com was?

9    A    I don't.

10   Q    Do you know who arranged your travel to Chicago?

11   A    It was whoever that person is.

12   Q    Do you understand that individual to be someone who

13   worked for the defendant?

14   A    Yes.

15          MR. CANNICK:  I'm going to object.  I don't want to

16   make a speaking objection.

17          THE COURT:  I think I know.

18          You don't know the person's name, but you know the

19   person worked for him.  Is that what you're saying?

20          THE WITNESS:  Yes.

21          THE COURT:  All right.  Overruled.

22   Q    On the second page of Government's Exhibit 260 -- I'm

23   only publishing this to the jury -- there is an address that

24   says billing/delivery information.  Do you recognize that

25   address?

Alexis - Direct - Geddes                    2594

1   A      Yes.

2               (Continued on next page.)

1    DIRECT EXAMINATION

2    BY MS. GEDDES: (Continuing.)

3    Q    Whose address is that in relation to you?

4    A    My great aunt's address.

5    Q    And at the time when you were 17 years old, who were you

6    living with?

7    A    With her.

8    Q    And you testified earlier that the defendant paid for

9    your travel to Chicago when you were in your teens.

10              Was there ever a time when you paid for your own

11   travel?

12   A    I believe there was one time.

13   Q    And what, if anything, happened after you paid for your

14   travel?

15   A    I believe we were reimbursed, like, via MoneyGram or

16   something like that, Western Union.

17   Q    So is it fair to say that you initially put out money for

18   the travel, but ultimately the defendant paid for the travel?

19   A    Yes.

20   Q    Now, earlier I asked you when you first had sexual

21   contact with the defendant.

22              As you sit here today, do you recall the first time

23   you had sexual contact with the defendant?

24   A    I don't -- I don't recall how old I was, but I remember

25   where I was.

1    Q    Where were you?

2    A    At his home in Olympia Fields.

3    Q    Was it the first time you went to Olympia Fields?

4         MR. CANNICK:  Objection.

5         THE COURT:  Overruled.

6    A    No.  No.

7    Q    And what, if anything, do you recall happening the first

8    time that the defendant flew you out to Olympia Fields to see

9    him?

10   A    Can you clarify?

11   Q    Sure.

12        Do you recall -- first time that you traveled to

13   Chicago from Jacksonville and the defendant paid for your

14   flight, what, if any, contact did you have with the defendant

15   during that first trip?

16   A    There wasn't any sexual encounter during the first trip.

17   Q    What type of contact did you have with the defendant?

18   A    We basically just went to the movies, we kind of just

19   hung out, went to the mall, just did general things, but we

20   didn't have sexual contact.

21   Q    And do you recall the second time that you traveled to

22   see the defendant?

23   A    I don't.  I mean I -- it's so long ago.

24   Q    Fair to say you traveled on several occasions to see the

25   defendant; correct?

1    A    Yes.

2    Q    And you traveled on several occasions when you were under

3    18 years old; correct?

4    A    Yes.

5            MS. GEDDES:  I would like to show the witness what's

6    been marked for identification as 3500-A2-3.

7            THE COURT:  Do you want to hand it to her?

8            MS. GEDDES:  I will just put it on the screen.

9            THE COURT:  Okay.  For the witness only; right?

10           MS. GEDDES:  That's correct.

11   BY MS. GEDDES:

12   Q    And I'm showing you the third page of Government's

13   Exhibit 3500-A2-3.

14           And can you read to yourself what's written in that

15   paragraph where my pen is pointed?

16           MR. CANNICK:  Your Honor, I'm going to object to

17   this.

18           THE COURT:  She's refreshing her recollection.

19           Just read it to yourself; don't read it out loud.

20           THE WITNESS:  Okay.

21           (Pause.)

22   A    Okay.

23   Q    Does that refresh your recollection as to how old you

24   were during the time frame when you were having sexual contact

25   with the defendant?

1    A    Yes and no, but I mean, it's -- it's, kind of, not what I

2    remember.

3              THE COURT:  Does it refresh your recollection as to

4    the age you were when you first had sex with him?

5              THE WITNESS:  In general, yes.  I mean, it's, kind

6    of, hard to ask me -- you know what I mean?  I was -- that was

7    16 years ago, so it was, kind of -- I don't want to --

8              THE COURT:  If it doesn't refresh your recollection,

9    say it doesn't refresh --

10             THE WITNESS:  Okay.  It does not --

11             THE COURT:  If it does refresh your recollection,

12    then you have to say that it does.  If it doesn't, then you

13    say that it doesn't.

14             THE WITNESS:  Okay.  It doesn't.

15             MS. GEDDES:  I'm showing the witness -- one moment.

16             (Pause.)

17             MR. CANNICK:  Okay.  No objection.

18             MS. GEDDES:  The Government offers 483B through -E.

19             THE COURT:  Any objection?

20             MR. CANNICK:  Your Honor, we've seen them.  I have

21    no objection.

22             THE COURT:  Okay.  Those are in evidence.

23             (Government's Exhibit 483B through -E received in

24    evidence.)

25             MS. GEDDES:  In addition, the Government offers

1   483A, which is --

2              MR. CANNICK:  Okay.  No objection.

3              (Government's Exhibit 483A received in evidence.)

4              MS. GEDDES:  May I publish, Your Honor, beginning

5   with 483B?

6              THE COURT:  Yes.

7   BY MS. GEDDES:

8   Q    What is shown in 483B?

9   A    The defendant on stage and Elizabeth and myself in the

10  crowd.

11  Q    Which one are you?

12  A    I'm the one to the right of the defendant's hand.

13  Q    And is that right here?

14  A    Yes.

15  Q    And do you remember where this photograph was taken?

16  A    The concert in 2006.

17  Q    The concert when you were 15 years old when you met the

18  defendant?

19  A    Yes, ma'am.

20  Q    And, now, did you provide these photographs to the

21  Government?

22  A    I did not.

23  Q    Was there a time when the Government provided a video for

24  you that you reviewed?

25  A    Yes.

1   Q    And are these photographs -- and I'm going to show you

2   them before I ask the question -- before you answer the

3   question, but my question is going to be, are these

4   photographs still shots taken from the video?

5   A    Yes.

6   Q    I'm going to show you 483C, E, and D, slightly out of

7   order.

8            (The above-referred to exhibits were published.)

9   BY MS. GEDDES:

10  Q    Are those still shots taken from the video?

11  A    Yes.

12           MS. GEDDES:  And can we please play, if our

13  recording equipment is working, 483, please?

14           THE COURT:  Sure.

15           MS. GEDDES:  483A.  I'm sorry.

16           (Video played.)

17           (Video paused.)

18           MS. GEDDES:  All right.  Please continue.  Sorry.

19           (Video played.)

20           MS. GEDDES:  Can you pause for a moment?

21           (Video paused.)

22  BY MS. GEDDES:

23  Q    What, if anything, did you just see on the video?

24  A    The defendant was standing there, and then we're walking

25  to go towards the -- like, the stairs to go up on the stage.

1   Q    And what, if any, contact did you just have with the

2   defendant?

3   A    It looked like maybe he -- can we go back?

4   Q    Sure.

5              (Video played.)

6              (Video paused.)

7   Q    What, if any, contact did you have with the defendant?

8   A    I believe he touched he Elizabeth's hand, but we were

9   talking -- I don't know what exactly was said, but we were

10  talking, and I probably asked him if I can come up on stage.

11  Q    All right.

12             MS. GEDDES:  Can you continue playing?

13             (Video played.)

14             (Video paused.)

15             MS. GEDDES:  One moment.

16             (Pause.)

17             MS. GEDDES:  Nothing further.

18             THE COURT:  All right.

19             Cross-examination?

20             MR. CANNICK:  Very, very briefly.  Maybe there won't

21  be a question.  Let's just see.

22             (Pause.)

23             MR. CANNICK:  Your Honor, with the consent of the

24  Government, I'm offering this -- these text messages into

25  evidence as Defense Exhibit DD.

1            THE COURT:  DD, and then -- collectively?

2            MR. CANNICK:  Collectively.

3            THE COURT:  All right.  We'll figure out a way to do

4    this.  Do you know how many pieces there are, approximately?

5    We can work that out later.

6            MR. CANNICK:  Yes.

7            THE COURT:  DD in evidence.

8            No objection?

9            (Pause.)

10           THE COURT:  It's a collective exhibit?

11           MR. CANNICK:  Yes.

12           THE COURT:  I'm going to go with "yes."

13           (Defense Exhibit DD received in evidence.)

14           Any questions for the witness?

15           MR. CANNICK:  None.

16           THE COURT:  All right.

17           MR. CANNICK:  Thank you.

18           THE COURT:  I guess there's no redirect.

19           Okay.  So the witness can step out.

20           (Witness steps down.)

21           THE COURT:  Are we done for the day?

22           MS. GEDDES:  I have one additional witness that we

23   could call, or --

24           THE COURT:  Let's do it.

25           MS. GEDDES:  All right.

*Proceedings*                                                     2603

1            THE COURT:  Go ahead.

2            MS. GEDDES:  The Government calls Scott Delaney.

3            THE COURT:  Does your colleague know to get him?

4            MS. GEDDES:  I don't know, but I will let him know.

5            THE COURT:  All right.

6            (Pause.)

7            (Witness takes the stand.)

8            THE COURTROOM DEPUTY:  Raise your right hand for me.

9            (Witness sworn.)

10           THE COURTROOM DEPUTY:  Please have a seat.

11           THE COURT:  You can take the mask off.

12           All right.  Just a couple of things before we start.

13           Just make sure you speak into the microphone and

14   slowly so the jury can hear you and the court reporter can

15   take down everything that you say.  And don't speak over

16   whichever lawyer is asking you questions; just let the person

17   finish the question.  If something is not clear or you want to

18   have it repeated, let me know, and I will direct the lawyer to

19   rephrase the question or to repeat it.  And just do your best

20   to answer the specific question that you are being asked,

21   okay?

22           THE WITNESS:  Yes, ma'am.

23           THE COURT:  Go ahead.

24           (Continued on next page.)

25

1    **SCOTT DELANEY**,

2              called as a witness, having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5    DIRECT EXAMINATION

6    BY MS. GEDDES:

7    Q    Good afternoon.

8              How are you employed?

9    A    I'm a special agent with Homeland Security

10   Investigations.

11   Q    And are you assigned to a particular unit within Homeland

12   Security Investigations?

13   A    Yes.  The Computer Forensics Unit.

14   Q    And for how long have you been with the Computer

15   Forensics Unit?

16   A    Since May of 2018.

17             MS. GEDDES:  I'm showing the witness what's been

18   marked for identification as Government's Exhibit 495, 496,

19   and 494, and I will just briefly show defense counsel.

20   BY MS. GEDDES:

21   Q    Can you take a look at those three exhibits?

22             (Pause.)

23             MS. GEDDES:  I'll take it back.

24   BY MS. GEDDES:

25   Q    Did you recognize those three Government exhibits I just

1    showed you?

2    A    Yes.

3    Q    And did you conduct a forensic examination of those three

4    Government's exhibits?

5    A    Yes, I did.

6              MS. GEDDES:  The Government offers 495, 496, and

7    494.

8              THE COURT:  Any objection?

9              MR. CANNICK:  Maybe to one, Your Honor.

10             THE COURT:  Beg your pardon?

11             MR. CANNICK:  There might be an objection to one.

12   We are just getting the number so we can speak with the Court

13   as to our position.

14             THE COURT:  Okay.

15             Are you objecting?  Would you like a sidebar?

16             MR. CANNICK:  Yes, Your Honor.

17             (Sidebar.)

18             (Continued on next page.)

19

20

21

22

23

24

25

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          MR. CANNICK:  We only have an objection to -- I

4     think it's 484 that pertain to the Johnson sisters.

5          MS. GEDDES:  I'm not --

6          MR. CANNICK:  You are not offering the Johnson

7     sisters?

8          MS. GEDDES:  Not here.

9          MR. CANNICK:  Oh, okay.

10         Thank you.

11         Which ones here are --

12         MS. GEDDES:  These are just --

13         THE COURT:  Is this on the record?

14         MR. CANNICK:  No.

15         THE COURT:  Okay.

16         (Discussion held off the record.)

17         THE COURT:  Are you introducing anything else

18    through him?

19         MS. GEDDES:  No.

20         MR. CANNICK:  And how much longer?

21         MS. GEDDES:  I'll be, like, literally, five minutes.

22         MR. CANNICK:  You said that earlier this morning.

23         THE COURT:  No, no, this is a good day.  We've

24    gotten a lot done today.

25         (Sidebar ends; continued on following page.)

1           (In open court.)

2           THE COURT:  So no objection; right?

3           MR. CANNICK:  No objection.

4           (Government's Exhibit 495, 496, and 494 received in

5    evidence.)

6           THE COURT:  Those are in evidence.  You can publish

7    them or whatever you want to do with them.

8           MS. GEDDES:  I'm beginning with Government's

9    Exhibit 468 and 460 -- well withdrawn.  I'm going to show the

10   witness only what's been marked for identification as

11   Government's Exhibit 468 and 469.

12   BY MS. GEDDES:

13   Q    Prior to your testimony today, did you have an

14   opportunity to review Government's Exhibit 468 and 469?

15   A    Yes, I did.

16   Q    And do you recognize those as partial forensic

17   extractions from the hard drive that is now in evidence as

18   Government's Exhibit 494?

19   A    Yes, I did.

20          MS. GEDDES:  The Government offers 468 and 469.

21          MR. CANNICK:  No objection.

22          THE COURT:  Okay.

23          (Government's Exhibit 468 and 469 received in

24   evidence.)

25          MS. GEDDES:  I'm now showing the witness what's been

1   marked for identification as Government's Exhibit 470, 471,

2   472, and 473.

3           May I approach?

4           THE COURT:  Yes.

5   BY MS. GEDDES:

6   Q    Prior to your testimony today, did you have an

7   opportunity to review Government's Exhibits 470 to 473?

8   A    Yes, I did.

9   Q    And are those Government's Exhibits also partial forensic

10  extractions from the hard drive in evidence as Government's

11  Exhibit 495?

12  A    Yes.

13          MS. GEDDES:  The Government offers 470 through 473.

14          MR. CANNICK:  No objection.

15          THE COURT:  Okay.  Those are in evidence.

16          (Government's Exhibit 470 through 473 received in

17  evidence.)

18          MS. GEDDES:  I want to just publish Government's

19  Exhibit 473, and this can go to everyone.  This is

20  Government's Exhibit 473.

21          (The above-referred to exhibit was published.)

22  BY MS. GEDDES:

23  Q    Does this appear to be an email sent from an address that

24  says tom.arnold@tcfrs.com to staff@tcfrs.com?

25  A    Yes, it does.

1   Q    And can you tell the date that this email was sent?

2   A    June 4th, 2009, at 11:04:47 p.m.

3   Q    And it looks like that time is in UTC; is that correct?

4   A    Yes, that's correct.

5   Q    And are you familiar with what UTC is?

6   A    Yes.

7   Q    What is UTC?

8   A    It's the standard time zone, used to be Greenwich Mean

9   Time.

10              THE COURT:  Just slow down a little bit, okay?

11              THE WITNESS:  Yes, ma'am.

12              THE COURT:  Thanks.

13   BY MS. GEDDES:

14   Q    Is the body of that -- excuse me.  Is the subject line of

15   that email listed on that Government's exhibit?

16   A    Yes, it is.

17   Q    What is it?

18   A    For runner.

19   Q    And what is the body -- what is in the body of the email?

20   A    Please call 312-545-7366.  Call her in five minutes, and

21   she will give you an address to where she needs to be picked

22   up.  I think we can pick her up on the way back with the

23   tavern.  I will find out.  Thanks.  Sent from my Verizon

24   Wireless BlackBerry.

25              MS. GEDDES:  And at this time, pursuant to Federal

1    Rule of Evidence 803(6) and 902(11), the Government offers

2    Government's Exhibit 106A --

3                THE COURT:  Is that the only one?

4                MS. GEDDES:  I'm also going to offer 817.

5                THE COURT:  Any objection?

6                MR. CANNICK:  No objection.

7                THE COURT:  Okay.

8                (Government's Exhibit 106A and 817 received in

9    evidence.)

10               MS. GEDDES:  May I publish?

11               THE COURT:  Yes.

12               (The above-referred to exhibit was published.)

13   BY MS. GEDDES:

14   Q    In the email you just read, it listed a telephone number

15   312-545-7366; is that correct?

16   A    Yes.

17   Q    And I'm publishing what's now in evidence as Government's

18   Exhibit 106A, and does that indicate the same subject number

19   as the number listed in the email that you just read,

20   312-545-7366?

21   A    Yes, it does.

22               MS. GEDDES:  And if I can publish to the jury only,

23   please, I'm now going to the second page, and if we could just

24   zoom in on this particular -- where my finger is pointed.

25               Can you see an individual's name and address listed

*Delaney - Direct - Geddes*                    2611

1   there?

2   A     Yes.

3   Q     And does that show an effective date of May 6th of 2008?

4   A     Yes, it does.

5   Q     And continuing to the effect of through October 24th of

6   2009?

7   A     Yes.

8   Q     Again, just for the record, these are records provided by

9   Sprint, a telephone company related to that same telephone

10  number that you just described.

11         And what is the first name listed there?  Without

12  reading the last name, what's the first name?

13  A     Michelle.

14         MS. GEDDES:  And I'm now putting on the screen what

15  is now in evidence as Government's Exhibit 817.

16         (The above-referred to exhibit was published.)

17  BY MS. GEDDES:

18  Q     And is that a -- that's a certified record from the

19  County of San Diego within the State of California; is that

20  correct?

21  A     Yes.

22  Q     And can you read the first name of the individual listed

23  there?

24  A     Dominique.

25  Q     And below that it lists a mother.

1          Do you see that first name?

2    A    Yes.

3    Q    And what is that?

4    A    Michelle.

5    Q    And without reading it, do you see the last name listed

6    there?

7    A    Yes.

8    Q    And is that the same last name as what was shown in

9    Government's Exhibit 106A right where my finger is pointing?

10   A    Yes, it is.

11   Q    And does this birth certificate indicate a birth date of

12   August in 1991?

13   A    Yes, it does.

14   Q    And at the time of the email that you just read, which I

15   believe you said was dated -- and just for the record, I'm

16   referring to Government's Exhibit 473 -- that was dated

17   June 4th of 2009?

18   A    Yes.

19   Q    And so as of June 4th, 2009, is the individual listed in

20   Government's Exhibit 817, would that individual, based on a

21   birth date of August '91 would have been 17 years old?

22   A    Correct.

23          MS. GEDDES:  And, finally, I'm showing the witness

24   what's been marked for identification as Government's

25   Exhibit 482.

1    BY MS. GEDDES:

2    Q     Do you recognize Government's Exhibit 482?

3    A     Yes.

4    Q     And are those contacts that were saved in cellular

5    telephone provided in Government's Exhibit 496 --

6    A     Yes, they are.

7    Q     -- which is now evidence?

8          MS. GEDDES:  The Government offers Government's

9    Exhibit 482.

10          THE COURT:  Any objection?

11          MR. CANNICK:  None.

12          (Government's Exhibit 482 received in evidence.)

13          MS. GEDDES:  May I publish, please?

14          THE COURT:  Yes.

15          (The above-referred to exhibit was published.)

16    BY MS. GEDDES:

17    Q     You don't need to read the phone numbers, but who are the

18    individuals saved in that cell phone?

19    A     June Bug, Rob, Studio, Tom, and Voicemail.

20    Q     And were those the only contacts listed in that

21    particular cell phone?

22    A     Yes, they were.

23          MS. GEDDES:  No further questions.

24          THE COURT:  Any cross-examination?

25          MR. CANNICK:  None.

1              THE COURT:  All right.

2              You can step down.  Thank you so much.

3              THE WITNESS:  Thank you.

4              (Witness steps down.)

5              THE COURT:  I think that does it for today?

6              MS. GEDDES:  It does.

7              THE COURT:  Okay.  So we're going to break for

8    today.  We'll be working just until one o'clock tomorrow, so

9    don't talk about the case tonight, don't read anything about

10   it, or watch any news accounts or anything like that, but have

11   a good night, I'll see you tomorrow.  Let's pray for no rain.

12             THE COURTROOM DEPUTY:  All rise.

13             (Jury exits.)

14             THE COURT:  All right.

15             Everybody can have a seat.

16             What's the general plan for tomorrow?

17             MS. GEDDES:  The Government has about four to five

18   witnesses, most of them are relatively short.

19             THE COURT:  Okay.  All right.

20             I know you know this already, but, you know, if

21   something is in evidence, you don't have to ask the -- you can

22   just read right from it.  You don't have to ask him the

23   question.  I know you know that, but it's fine to do it

24   yourself.  You won't get an objection, I don't think.

25             MS. GEDDES:  Thank you.

*Proceedings*                                                2615

1          THE COURT:  Is there anything anybody wants to put

2     on the record before we break for today?

3          (Pause.)

4          THE COURT:  It looks like no.

5          Okay.  Good.  I will see you tomorrow morning, then.

6

7     (Matter adjourned to September 3, 2021, at 9:30 a.m.)

8

9                    *       *       *       *       *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

**WITNESS:**                                                          **PAGE:**

 **YONGFEI WU**
                DIRECT EXAMINATION                          2447
                BY MS. GEDDES

                CROSS EXAMINATION                           2476
                BY MR. CANNICK

 **CHRISTOPHER WILSON**

                DIRECT EXAMINATION                          2478
                BY MS. CRUZ MELENDEZ

                CROSS-EXAMINATION                           2506
                BY MR. CANNICK

                REDIRECT EXAMINATION                        2507
                BY MS. CRUZ MELENDEZ

 **MIKE WILSON**
                DIRECT EXAMINATION                          2510
                BY MS. GEDDES

 **ALEXIS**
                DIRECT EXAMINATION                          2548
                BY MS. GEDDES

 **SCOTT DELANEY**
                DIRECT EXAMINATION                          2604
                BY MS. GEDDES

* * * * *

**EXHIBITS**

Government Exhibit 960                                             2472

Government Exhibit 493                                             2481

Government Exhibit 346 & 486                                       2484

Government Exhibit 325 & 325A                                      2485

Government Exhibit 475, 475A, 476, 476A, 477, 477A,               2487
478, 478A, 479, 479A, 480, 480A, 487, 487A, 488,
488A, 489, 489A, 490, 490A, 491, 491A, 492, and 492

Government's Exhibit 961                                           2503

Government's Exhibit 347                                           2513

Government Exhibits 326, 326(a)-(j), 327, 328,                    2537
328(a), 329, 329(a), 336, 336(a), 341, 342, 343,
341(a), 342(a), 343(a)

Government Exhibit 63                                              2548

government Exhibit 63(a)                                           2549

Government Exhibit 938 & 959                                       2576

Government Exhibit 259A - 259H                                    2581

Government Exhibit 211, 212, 213, 214, 215, 216 &                 2589
260

Government's Exhibit 483B-E                                        2598

Government's Exhibit 483A                                          2599

Defense Exhibit DD                                                2602

Government's Exhibit 495, 496, and 494                            2607

Government's Exhibit 468 and 469                                  2607

Government's Exhibit 470-473                                      2608

Government's Exhibit 106A, 817                                    2610

Government's Exhibit 482                                          2613

* * * *