2618

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,    :   19-CR-286(AMD)
4
              Plaintiff,        :
5                                   United States Courthouse
        -against-               :   Brooklyn, New York
6
   ROBERT SYLVESTER KELLY,      :
7                                   September 3, 2021
              Defendant.        :   9:30 a.m.
8
   - - - - - - - - - - - - - X
9

10                  TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ANN M. DONNELLY
11          UNITED STATES DISTRICT JUDGE, and a jury.

12
   APPEARANCES:
13

14  For the Government:        JACQUELYN M. KASULIS
                               Acting United States Attorney
15                             BY: ELIZABETH GEDDES
                                   NADIA SHIHATA
16                                 MARIA E. CRUZ MELENDEZ
                               Assistant United States Attorneys
17                             271 Cadman Plaza East
                               Brooklyn, New York
18

19  For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                               NICOLE BLANK BECKER, ESQ.
20                             THOMAS FARINELLA, ESQ.
                               CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:            Andronikh M. Barna
                               225 Cadman Plaza East
23                             Brooklyn, New York
                               (718) 613- 2178
24
   Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

Proceedings                                    2619

1           (In open court; jury not present.)

2           (Parties present.)

3           THE CLERK:  All rise.

4           THE COURT:  Everybody can have a seat.

5           Do I need to decide this motion today?

6           MS. GEDDES:  No.

7           THE COURT:  I have a few questions about it, or we

8    can do it afterwards.

9           (Pause.)

10          MR. CANNICK:  Good morning, Your Honor.

11          THE COURT:  Hi.

12          All right.  I received the defense motion in limine

13   I do not know how you want to respond to it.  If I do not have

14   to decide it today, I think it can wait.  When were you

15   planning to produce the evidence?

16          MS. GEDDES:  Certainly not today and the earliest

17   would be late next week, because we're not meeting until late

18   next week.

19          THE COURT:  Okay.  So let's see what we can get done

20   with the testimony today and then before we break for the

21   mercifully long weekend, I will just ask you a couple of

22   questions about it.

23          Oh, Mr. Scholar is not here.

24          MR. CANNICK:  No.  He should be right back.

25          THE COURT:  Okay.  Is it okay to get moving?

|  | Proceedings | 2620 |
|---|---|---|

1           MR. CANNICK:  Yes, yes.

2           THE COURT:  So I have no recollection of what we did

3    yesterday.  Are we putting a new witness on now?

4           MS. GEDDES:  Yes.

5           THE COURT:  So let's get the witness.

6           Which witness is it?

7           MS. GEDDES:  We're calling Kate.

8           THE COURT:  Kate, okay.

9           MS. GEDDES:  Do you want me to let you know where we

10   are in the binders?

11          THE COURT:  That would be most helpful.

12          (Discussion held off the record.)

13          THE COURT:  Mr. Scholar, I was told by the other

14   lawyers that we will talk about this motion in limine right

15   before we break because they are not planning to put it in

16   today.

17          MR. SCHOLAR:  Okay.  Thank you.

18          THE COURT:  Okay.

19          All right.  And let's get the jury, please.

20          (Witness enters the courtroom.)

21          MS. GEDDES:  You could have a seat.

22          (Pause.)

23          THE CLERK:  All rise.

24          (Jury enters the courtroom. )

25          THE CLERK:  You may be seated.

Proceedings                        2621

1          THE COURT:  All right.  Good morning, everybody.  We

2    are ready to begin with the testimony of the next witness.

3          I just want to see the lawyers at the side for a

4    brief moment with the court reporter.

5               (Sealed sidebar.)

6               (Continuing on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SEALED BY ORDER OF THE COURT                    2622

1        (Sealed sidebar conference held on the record out of

2   the hearing of the jury.)



SEALED BY ORDER OF THE COURT                    2623



(Sealed sidebar ends.)

(Continuing on the next page.)

|                    | Proceedings                                    | 2624 |
|--------------------|------------------------------------------------|------|

1           THE COURT:  All right the witness is here.  Could

2      you call your next witness?

3                     MS. GEDDES:  Yes.  The government calls Kate.

4           THE CLERK:  Please stand and raise your right hand.

5           (Witness sworn.)

6           THE CLERK:  You may be seated.  You can remove your

7      mask.

8           THE COURT:  Just a couple of things before we begin.

9           I want to the make sure that everybody can hear you

10     and that the court reporter can take down what you are saying,

11     so I am going to ask that you speak into the microphone.  Do

12     not speak too quickly and do your best not to speak over

13     whichever lawyer is asking you questions.

14          If there is a question that you want to have

15     repeated or clarified, let me know.

16          And just do your best to answer only the question

17     you're being asked.  Okay?

18          Go ahead.

19          (Continuing on the next page.)

20

21

22

23

24

25

Kate - Direct - Geddes                           2625

1    **KATE,** having been first duly sworn, was examined and testified

2    as follows:

3    DIRECT EXAMINATION

4    BY MS. GEDDES:

5    Q    Good morning.

6    A    Good morning.

7              THE COURT:  Let's make sure the microphone is on.

8              I think you've got to turn it on.  It is right at

9    the top.

10             THE WITNESS:  Good morning.

11             THE COURT:  No.  Tap it.  Okay.

12             MS. GEDDES:  I'm showing the witness only what's

13   been marked for identification as Government Exhibit 60.

14   Q    Do you recognize what is shown in Government Exhibit 60?

15   A    Yes.

16   Q    What is that?

17   A    My photo.

18             MS. GEDDES:  The government offers Government

19   Exhibit 60.

20             MR. CANNICK:  No objection.

21             THE COURT:  Okay.  That is in evidence.  You can

22   publish it.

23             (Government Exhibit 60 was received in evidence.)

24             MS. GEDDES:  And I am now showing, the witness only,

25   what's been marked for identification as Government Exhibit

Kate - Direct - Geddes                    2626

1   60(a).

2   Q     In 60(a), is that that same photograph that was in

3   Government Exhibit 60 from a moment ago?

4   A     Yes.

5   Q     And is below that your true first and last name?

6   A     Yes.

7         MS. GEDDES:  The government offers 60(a).

8         MR. CANNICK:  No objection.

9         THE COURT:  Okay.  That is in evidence.

10        MS. GEDDES:  Published to the jury only.

11        (Government Exhibit 60(a) was received in evidence.)

12        MS. GEDDES:  Finally, I am showing the witness what

13  is marked for identification as Government Exhibit 60(b).

14  Q     Is that again that same photograph and below that the

15  name Kate?

16  A     Yes.

17  Q     And today we are going to call you just by Kate.

18        MS. GEDDES:  The government offers 60(b).

19        MR. CANNICK:  No objection.

20        THE COURT:  Okay.  That is in evidence.

21        (Government Exhibit 60(b) was received in evidence.)

22        MS. GEDDES:  And may we publish just briefly?

23        I'm showing what's in evidence as Government Exhibit

24  No. 1.

25  Q     Do you recognize the individual in Government Exhibit

1  No. 1?

2  A     Yes.

3  Q     Who is that?

4  A     Rob.

5  Q     And do you personally know him?

6  A     Yes.

7  Q     Do you see him in the courtroom today?

8  A     Yes, I do.

9  Q     Can you point to him and describe an article of his

10  clothing?

11  A     He appears to be wearing a white dress shirt with a gray

12  suit jacket.

13         THE COURT:  Indicating the defendant.

14         MS. GEDDES:  Thank you.

15  Q     What was the nature of your relationship with the

16  defendant?

17  A     We had been introduced and became friends.

18  Q     And at some point did you begin a sexual relationship

19  with him?

20  A     Yes.

21  Q     When did you meet the defendant?

22  A     Sometime in the year of 2001.

23  Q     In what city were you then living?

24  A     I was living in Chicago, Illinois.

25  Q     And approximately how old were you when you first met the

Kate - Direct - Geddes                    2628

1  defendant in 2001?

2  A    I was 27 years old.

3  Q    How were you introduced to the defendant, or how did you

4  come to meet him?

5  A    Through an acquaintance of both of ours.

6  Q    And where did you spend time with the defendant?

7  A    We had spend time in his recording studio and in various

8  cars he had, and public places.

9  Q    And when you say "public places," are you referring to

10  bars and clubs and things of that nature?

11  A    Yes.  We had been to the movies and concerts, and he had

12  taken me out a few places.

13         MS. GEDDES:  I'm showing the witness what's in

14  evidence as Government Exhibit 525(u).

15  Q    Do you recognize what's shown in 525(u)?

16  A    Yes, I do.

17  Q    What is that?

18  A    It appears to be the entrance, a gated fence for his --

19  one of his business operations.

20  Q    And which operation was that?

21  A    A recording studio of his.

22  Q    And was that recording studio the recording studio that

23  you just testified you spent time in with the defendant?

24  A    Yes, it is.

25         MS. GEDDES:  And I am also showing the witness

1    what's in evidence as Government Exhibit 525(q).

2    Q    Do you recognize that as well?

3    A    Yes, I do.

4    Q    What is that?

5    A    It is an entrance to the recording studio which was on

6    the side of the building.

7    Q    Now, what was the routine that you followed when you went

8    to see the defendant at the recording studio?

9    A    When I arrived there or how I was --

10   Q    When you arrived there.

11   A    When I would arrive there, you would -- if there were

12   cars before you, you would wait until your car would pull up

13   to the gate.  And there was a side panel of buttons, I

14   believe, to the left by the driver's door, and you would hit a

15   button or code and somebody would come on the microphone and

16   you would identify yourself.

17   Q    And would the gate then open?

18   A    If you were allowed in.

19   Q    What happened once you got through the gate?

20   A    You would find a parking spot.

21   Q    And then what?

22   A    You would exit your car and go to the side door.  And

23   there were security cameras so they would see who they would

24   let in.  You had to be buzzed in.  You couldn't just open the

25   door, from what I remember.

Kate - Direct - Geddes                    2630

1    Q    And once you were inside and had been buzzed in the

2    location, where would you go?

3    A    You would stand right at the door when you would walk in

4    and there would be a person sitting at the desk and they would

5    ask for your identification.

6    Q    And were you asked to sign anything else?

7    A    Yes.

8    Q    What were you asked to sign?

9    A    A document stating that I was over 18, with my

10   identification.

11   Q    And do you recall what else was in that document?

12   A    No, not -- perhaps not recording anything or taking any

13   pictures while inside.

14   Q    And after you signed that document -- and I think you

15   said you also provided an identification; is that correct?

16   A    On many occasions, yes.

17   Q    Okay.  Where would you -- what would happen after that?

18   A    One of the workers would take you to various places of

19   the building.

20   Q    And did you spend time in different locations within that

21   studio?

22   A    Yes.

23   Q    And you testified that one of the workers would take you

24   to various locations.  Do you recall the different rooms

25   within the studio where you would spend time or you spent

Kate - Direct - Geddes                    2631

1   time?

2   A    Yes.

3   Q    Where in the studio did you spend time?

4   A    You would like me to list all the rooms?

5   Q    Yes.

6   A    There were two large recording rooms.  I believe they

7   were labeled A and B, but I can't be for certain.  So you

8   would either go to one of the recording rooms where Rob was

9   present or you may go to a different room, if he was in a

10  different room, where you would be in a different room waiting

11  for him to come join you.

12  Q    Were there times when you spent time in a room on that

13  first floor of the studio?

14  A    Not routinely.

15  Q    Were there ever times though?

16  A    I believe there were some chairs by the front office, so

17  on occasion, very rarely, I might have sat there until I went

18  somewhere else.

19  Q    And then were there also locations on the second floor

20  where you would go to wait for the defendant?

21  A    From the best I recall, I believe we were always up some

22  flight of stairs.

23  Q    And was there a room within on that second floor where

24  you would often wait for the defendant?

25  A    I believe the majority of the rooms were on the second

Kate - Direct - Geddes                    2632

1    floor, even the recording studios, but I can't be for certain.

2    Q    Now, you testified earlier that there was a time when you

3    were, in fact, engaged in a sexual relationship with the

4    defendant; is that correct?

5    A    Yes.

6    Q    Was anyone other than the defendant a part of your sexual

7    encounters with him?

8    A    Rarely.

9    Q    But were there times when someone else was?

10   A    Yes.

11   Q    And whose idea was that?

12   A    Rob's.

13   Q    Do you recall the first time that another individual was

14   part of a sexual encounter with him?

15   A    Yes.

16   Q    What happened?

17   A    We had been in the recording studio and somehow he had

18   mentioned that there was another female in the building and we

19   should all be together.

20   Q    How did you respond?

21   A    I said that's not something I am interested in, it's not

22   something I have participated in.

23   Q    What happened next?

24   A    He then proceeded to tell me that it would -- I don't

25   remember the exact words, but proceeded to tell me to try, see

1    how it goes or something of that nature.

2    Q    And what, if anything, did the defendant do to facilitate

3    that happening?

4    A    Well, after several minutes of, you know, I'm not

5    interested in that, and well, just try it, he then said --

6    then escorted me to a different room.

7    Q    And what happened after that?

8    A    And then when we were in that room.  He had taken a

9    blindfold and put it on my eyes.  So it was just him and I in

10   the room and he had put a blindfold on my eyes.

11   Q    And what, if anything, did the defendant say before or as

12   he put a blindfold over you?

13   A    I don't recall.

14   Q    What was the purpose of the blind -- what did you

15   understand the purpose of the blindfold to be?

16   A    Perhaps to make me comfortable that -- because I didn't

17   want to see another individual there.

18   Q    What happened after that?

19   A    We were -- because I had the blindfold on, he, I don't

20   know, held my hand and had me walk a few steps, I believe, to

21   like an adjoining room.

22   Q    And then what?

23   A    And he told me to put my arms out and just helped me

24   kneel down.

25   Q    And was there a time when you learned that another person

1   was in the room?

2   A    Yes.  My hand touched somebody's leg.

3   Q    And what happened after that?

4   A    I just -- I heard another female say something and that's

5   all.

6   Q    Did you then have a sexual encounter with that other

7   female?

8   A    He had placed my hand maybe on her upper torso.

9   Q    And then what happened?

10  A    Him and I engaged in intimacy and that's it.

11  Q    When you say "him and I," are you referring to the

12  defendant?

13  A    Right.  Rob.

14  Q    And what if -- I don't need you to be detailed, but what,

15  if anything, happened between you and the female in the room

16  or the other person in the room?

17  A    Nothing.  I had the blindfold on.  I just -- my hand

18  touched her leg and maybe up here on her torso.

19  Q    And what, if anything, was the defendant doing or saying

20  as this was happening?

21  A    Well, I couldn't see what he was doing because I had a

22  blindfold on, but he was touching me, so I don't know what

23  else he was doing.

24  Q    Was the defendant telling you what to do?

25  A    No.

Kate - Direct - Geddes                              2635

Q    Did anything else happen with that female -- did anything
else happen with the female in the room that day?

A    No.  I couldn't see what she was doing.  I just had known
-- I could tell somebody was there.

Q    Okay.  How did the defendant respond to your reaction in
the room that day?

A    Once we had gotten in the room with the other female?

Q    Yes.

A    His hands were on me, we were engaging in intimacy, so
there wasn't really a reaction.

Q    Was there a time when the defendant asked you to leave
the room?

A    Not on that occasion, no.

Q    Was there another encounter with a female where the
defendant asked you to leave the room?

A    Yes.

Q    And just generally speaking, what was the nature of that
encounter with the female?

A    There was no physical interaction, but it was more just
like, I suppose, my attitude about being present with another
female.

Q    And what do you -- can you explain what you mean by that?

A    It was something I did not want to participate in, so it
was more of my reaction.

Q    And did you make your feelings known in any way to the

Kate - Direct - Geddes                    2636

1    defendant?

2    A     Yes.

3    Q     And how did the defendant respond?

4    A     Eventually just said go into the other room.

5    Q     And did you then go into the other room?

6    A     Yes, I did.

7    Q     After that encounter or those encounters with the other

8    females and the defendant, what, if any, conversation did you

9    have with the defendant about your concerns?

10   A     I had expressed to him that I worried about multiple

11   sexual partners; I worried about the AIDS virus.

12   Q     And were you concerned about potentially contracting some

13   type of sexually transmitted disease?

14   A     Yes.

15   Q     And did you make that clear to the defendant?

16   A     Yes.

17   Q     Now, I want to talk about before you first had sexual

18   intercourse with the defendant.  What, if anything, did you

19   ask him prior to first engaging in sexual intercourse with

20   him?

21   A     Prior to it I had asked if he was going to wear

22   something.

23   Q     And are you referring to protection?

24   A     Yes.

25   Q     And how did the defendant respond?

1   A    At first he just kind of looked at me quizzically.

2   Q    And what happened after that?

3   A    I repeated it and said "Are you going to use something?"

4   Q    And what happened?

5   A    He just said no.

6   Q    And did you then engage in sexual intercourse with the

7   defendant without any contraception?

8   A    Yes.

9   Q    What, if any, conversation did you have with the

10  defendant about your concerns in doing that?

11  A    I had asked him if he was, quote/unquote, okay.

12  Q    And what did you mean by that?

13  A    I was referring to if he had any sexually transmitted

14  diseases.

15  Q    How did the defendant respond?

16  A    It was either kind of a look or no, or I don't recall the

17  actual answer.

18  Q    At any point, did the defendant disclose to you that he

19  had a sexually transmitted disease?

20  A    No.

21  Q    And when you asked the defendant if he was okay, was that

22  in the context of engaging in sexual intercourse with him in

23  his not wearing any form of protection?

24  A    Yes, we were at that point, and it was right before the

25  first time was going to happen.

Kate - Direct - Geddes                          2638

1   Q    What, if any, disease did you contract after you began a

2   sexual relationship with the defendant?

3   A    The herpes virus.

4   Q    What were your first symptoms?

5   A    A small bump and some itching or some, like, burning, a

6   little pain.

7   Q    And on what area of your body was this?

8   A    My lower region.

9   Q    Was it in your vaginal area?

10  A    Yes.

11  Q    What happened after that?

12  A    Due to the tiny bump and the burning, I went to see an

13  OB/GYN.

14  Q    An OB/GYN?

15  A    Mm-hm.

16  Q    And what, if anything, happened when you went to the

17  OB/GYN?

18  A    The doctor took a scraping and sent it to the lab and

19  came back a positive diagnosis.

20  Q    Now, at the time -- a positive diagnosis for what?

21  A    Herpes.

22  Q    At the time that you contracted herpes, were you sexually

23  active with anyone other than the defendant?

24  A    No.

25  Q    What, if anything, did you say to the defendant after you

1    learned that you had contracted herpes?

2    A    At some point in time I said, "I think you gave me

3    something."

4    Q    How did the defendant respond?

5    A    There was no response.

6    Q    When you told the defendant that you think -- that you

7    thought he gave you something, do you remember the context in

8    which you described that?

9    A    As a -- where we were or?

10   Q    Did you make clear in any way what you meant by that he

11   gave you something?

12   A    It was just a statement, "I think you gave me something."

13   Q    And what were you trying to convey to the defendant?

14   A    That I had contracted an STD.

15   Q    And, I'm sorry, how did the defendant respond when you

16   told him that?

17   A    There wasn't an answer.

18   Q    Did he ask you any questions?

19   A    No.

20   Q    Did there come a time when you pursued legal action

21   against the defendant?

22   A    Yes.

23   Q    Do you recall when that was?

24   A    2004.

25   Q    And did you retain a lawyer?

Kate - Direct - Geddes                          2640

1   A    Yes.

2   Q    Who did you retain?

3   A    Mrs. Susan Loggans.

4   Q    And why did you decide to pursue legal action against the

5   defendant?

6              MR. CANNICK:  Objection.

7              THE COURT:  Overruled.

8   Q    What caused you to seek a lawyer?

9   A    Due to the diagnosis, I didn't know if there would be

10  potential medical cost in my future that wouldn't be covered

11  by insurance.

12  Q    And when you mentioned "due to the diagnosis," are you

13  referring to your contracting herpes?

14  A    Yes.

15  Q    Did you eventually reach a settlement with the defendant?

16  A    Yes.

17  Q    What, if anything, did you receive as part of that

18  settlement?

19  A    The monetary value?

20  Q    Yes.

21  A    $200,000.

22  Q    And what, if anything, did you understand were your

23  obligations as a result of that settlement?

24  A    To not disclose the nature of our relationship or speak

25  publicly about him or publish a book or do any media type

1    interviews.

2    Q    And when you talked about him, are you referring to the

3    defendant?

4    A    Yes.

5              MS. GEDDES:  I'm showing the witness only what's

6    been marked for identification as Government Exhibit 930.

7              May I approach?

8              THE COURT:  Yes.

9              MS. GEDDES:  Before I do...

10   Q    You testified that you entered into a settlement

11   agreement with the defendant.  What, if anything, other than

12   what you've already just testified, do you recall about the

13   settlement agreement that you ultimately reached with the

14   defendant?

15   A    After the settlement, I would no longer have claims as to

16   him or his business operations or his accountant.

17   Q    Who was his accountant?

18   A    Derrel.

19   Q    Do you know Derrel's last name?

20   A    I believe it's McDavid or Mc -- I just forgot it.

21   McDavid or something.

22   Q    Have you personally met this individual named Derrel who

23   you just mentioned?

24   A    Yes.

25              MS. GEDDES:  I'm showing the witness what's in

1    evidence -- I'm showing what's in evidence as Government

2    Exhibit 12.

3    Q    Do you recognize the individual shown in Government

4    Exhibit 12?

5    A    Yes.

6    Q    Who is that?

7    A    Derrel.

8    Q    Is that the individual who you just testified about who

9    you believed was the accountant and who was included in the

10   settlement agreement?

11   A    Yes.

12   Q    All right.  I am now approaching and showing you what's

13   been marked for identification as Government Exhibit 930.

14           Did you recognize what's shown in Government

15   Exhibit 930?

16   A    Yes.  I didn't read all the pages though.

17   Q    But did you recognize what it was?

18   A    Yes.

19   Q    What was it?

20   A    The settlement agreement.

21   Q    And is this the settlement agreement that you entered

22   between yourself and the defendant?

23   A    Yes.

24           MS. GEDDES:  The government offers Government

25   Exhibit 930.

Kate - Direct - Geddes                    2643

1           MR. CANNICK:  No objection.

2           THE COURT:  Okay.  That is in evidence.

3           You can publish it.

4           (Government Exhibit 930 was received in evidence.)

5           MS. GEDDES:  Can I publish to the jury only, please?

6           THE COURT:  Yes.

7           THE CLERK:  Give me one minute.

8           Okay.

9           MS. GEDDES:  One moment.  Sorry.

10   Q     Now, prior to coming here today, had you seen this

11   government exhibit?

12   A     Yes, many, many years ago.

13   Q     And do you still have a copy of the settlement agreement?

14   A     I don't believe so.

15   Q     Have you seen this settlement agreement in the past five

16   to ten years?

17   A     No.  Probably 20 years ago or close to.

18   Q     So this was an agreement -- you didn't provide this

19   agreement to the government, did you?

20   A     I did not, no.

21   Q     I'm going to direct your attention to paragraph 7, and it

22   reads:  "Effective upon execution and delivery of this

23   agreement," and then it has your last name, "on behalf of

24   herself and her heirs, executors, administrators,

25   representatives, successors and assigns, hereby forever

1  releases, remises, acquits and discharges R. Kelly Publishing

2  Inc., Bass Productions, Ltd., Derrel McDavid, Winkler &

3  McDavid, and to the extent applicable, each of their present

4  and former parent companies, subsidiaries, affiliates and

5  related companies," and then it goes on from there.

6          Is that the individual Derrel that you previously

7  identified, I think you couldn't remember the precise name?

8  A    Yes.

9  Q    Does that refresh your recollection as to his name?

10 A    Yes.

11 Q    What is it?

12 A    Derrel McDavid.

13 Q    And are you familiar with Winkler & McDavid?

14 A    No, not at all.

15 Q    And as you sit here today, do you have any understanding

16 of why either Derrel McDavid or Winkler & McDavid were

17 included in this agreement?

18 A    No, no idea.

19 Q    And finally, I want to direct your attention to this last

20 sentence of paragraph 6.  And again it reads, with your last

21 name, "further represents and warrants that she has provided

22 Kelly with a true, complete and accurate copy of her medical

23 records."

24          Are those medical records the records from your

25 OB/GYN?

Kate - Direct - Geddes                      2645

1    A    I believe so.  I didn't hand-deliver them, but the

2    attorney.

3    Q    Did you provide them to your attorney?

4    A    I signed a release for her to gather the records.

5    Q    Your medical records?

6    A    Correct.

7    Q    And when you say "a release," are you referring to a

8    release that allowed your medical records to be disclosed to a

9    third person?

10   A    Correct.

11            MS. GEDDES:  One moment.

12   Q    And just to be clear, the medical records, did they

13   relate to your herpes diagnosis?

14            MR. CANNICK:  Objection.

15            THE COURT:  Overruled.

16   A    Repeat the question, please?

17   Q    The medical records that you understood your attorney was

18   going to obtain, was that related to your herpes diagnosis?

19   A    Yes.  That was the doctor who had given the diagnosis.

20            MS. GEDDES:  And again, I'm just showing to the jury

21   only.

22   Q    Is that your signature on that last page?

23   A    Yes, but I don't believe that's me writing the date.

24   Q    Okay.  And what was the date of the agreement?

25   A    It appears to be 7/30/2004.

Kate - Cross - Cannick                    2646

1   Q     So July of 2004?

2   A     Correct.

3   Q     And is that approximately when you remember entering into

4   an agreement with the defendant?

5   A     Yes.

6   Q     Now, since you have been diagnosed with herpes, have you

7   informed your sexual partners about your diagnosis?

8           MR. CANNICK:  Objection.

9           THE COURT:  Overruled.

10  A     Before sexual intercourse?

11  Q     Yes.

12  A     Yes.

13  Q     And how, if at all, has your herpes diagnosis affected

14  your relationships?

15  A     It's greatly affected relationships.

16  Q     How so?

17  A     Relationships haven't proceeded because of it and also I

18  have prevented relationships from happening.

19  Q     Because of what reason?

20  A     Because of the diagnosis.

21          MS. GEDDES:  Nothing further.

22          THE COURT:  Cross-examination?

23          MR. CANNICK:  Yes.

24  CROSS-EXAMINATION

25  BY MR. CANNICK:

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Kate - Cross - Cannick                2647

1  Q    When was it that you got the diagnosis that you had
2  herpes?
3  A    2001.
4  Q    2001.
5          When was it that you terminated -- or the
6  relationship between you and Mr. Kelly terminated?
7  A    2004.
8  Q    So after you received the diagnosis in 2001, you dated
9  him for another three years?
10 A    That's correct.
11 Q    And you continued to have sexual relations with him after
12 that diagnosis?
13 A    Correct.
14 Q    Now, when was it -- how old were you when you met
15 Mr. Kelly?
16 A    As stated before, I was 27.
17 Q    And you were well into your career at that time, am I
18 correct?
19          THE COURT:  I think we discussed this.  I think we
20 discussed this earlier.
21          MR. CANNICK:  Yes.
22          THE COURT:  Okay.  Good.
23 Q    And you career is a professional career, am I correct?
24 A    Correct.
25 Q    And when you met Mr. Kelly, your relationship or at least

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Kate - Cross - Cannick                    2648

1  the involvement of seeing each other was somewhat sporadic, am

2  I correct?

3  A    That's correct.

4  Q    And that's because the both of you had very busy careers,

5  am I correct?

6  A    Correct.

7  Q    Now, you never traveled outside of the state of Illinois

8  to be with Mr. Kelly?

9  A    No.

10  Q    And when you went to visit with him on the first

11  occasion, you testified that you had to go through a security

12  check?

13  A    Correct.

14  Q    And that security check, they wanted to see your

15  identification?

16  A    Yes.

17  Q    And after they saw your identification, you went to the

18  next step of signing a nondisclosure agreement?

19  A    Not on the first occasion, but that's correct.  On a

20  future occasion, yes.

21  Q    On future occasions, okay.

22        Now, when you were with Mr. Kelly, he was never

23  violent towards you, am I correct?

24  A    Never.

25  Q    In fact, whenever he was somewhat disappointed or had an

1    issue, he would speak softly, did he not?

2    A    That's correct.

3    Q    And you had names that you would call him; Rob?

4    A    Yes.

5    Q    Robert?

6    A    Yes.

7    Q    Kels?

8    A    Yes.

9    Q    And Daddy?

10   A    At times.

11   Q    At times Daddy, right?

12   A    Yes.

13   Q    And did Mr. Kelly ever tell you what to wear?

14   A    Perhaps only on two occasions.

15   Q    And what were those occasions?

16   A    The first time I recall us talking about my dress where

17   usually I would go in there, anything I wanted.  I was around

18   many different seasons and I could wear anything I wanted.

19   And he had invited me to go out, so I had asked him what type

20   of dress I should wear.  I didn't know if it was a formal

21   occasion or if it was casual, so I had asked him.

22   Q    And you mentioned there was another occasion?

23   A    Another occasion, he -- perhaps two, we were going to one

24   of his events.  And Rob is fashion-forward; that's his

25   business, it's his brand to look a certain way.  So he had

Kate - Cross - Cannick                    2650

1  just mentioned we were all going to wear black.

2  Q    Okay.  Thank you.

3  A    Thank you.

4  Q    Now, there were times that you visited with him and you

5  would have to wait for him?

6  A    At times, yes.

7  Q    And when you waited for him, those were -- sometimes

8  could be long periods of time, am I correct?

9  A    How -- like over a few minutes or?

10  Q    Let me withdraw it.

11        When you would wait for Rob, were there bathroom

12  facilities available to you?

13  A    Yes, always.

14  Q    You didn't have any issue using a restroom if you needed

15  to use one, am I correct?

16  A    You are correct.  If I had to use the restroom, I would

17  get up and go to the restroom.

18  Q    And what about food?

19  A    I would just call downstairs if I was hungry.

20  Q    And they would get food to you?

21  A    Yeah.

22  Q    No long wait or anything like that, am I correct?

23  A    Just the time it would take to take the order and one of

24  his associates or drivers would go get it.

25  Q    He never asked you to write any type of letters or

Kate - Cross - Cannick                    2651

1    anything, did he?

2    A    Never a letter, but...

3              (Continuing on the next page.)

Kate - cross - Cannick                    2652

1   EXAMINATION CONTINUES

2   BY MR. CANNICK:

3   Q    Lyrics?

4   A    Yes.

5   Q    Lyrics to a song, right?

6   A    Yes, on one occasion he asked me to help him write down,

7   as he was singing to write down so, I believe, it could be

8   published for the -- the recording studio.

9   Q    So, just to be clear, he had a tune in his head?

10  A    Uh-hum.

11  Q    And he was trying to work on it?

12  A    Uh-hum.

13  Q    And he'd asked you to write it down as he moved forward

14  with trying to capture it?

15  A    Yes, as the music was playing and he was humming it or

16  singing it in his head, he would start to record it and he had

17  me write down the lyrics so he could refer back or they could

18  be printed.

19  Q    Thank you.

20       To your knowledge, Rob never took any pictures of

21  you, am I correct?

22  A    To my knowledge, no, it was -- we had not taken a photo

23  together.

24  Q    What about videos?

25  A    Not that I'm aware of.

SAM      OCR      RMR      CRR      RPR

1    Q    Now, after you got the settlement from Robert, did you

2    continue to date him?

3    A    I did not see him face-to-face after the settlement.

4    Q    But you wanted to continue to date him, right?

5    A    Pardon me?

6    Q    You wanted to continue to date him after the settlement?

7    A    I had called him several occasions after.

8    Q    Okay.  Now, do you remember a telephone conversation that

9    you had with Robert and he told you that the reason why he

10    didn't want to see you and be around you was because he was

11    trying to concentrate on his family and --

12            THE COURT:  Mr. Cannick, can I see the parties at

13    the side with the court reporter?

14            (Sidebar held outside the hearing of the jury.)

15

16            (Continued on the following page.)

17

18

19

20

21

22

23

24

25



Sidebar - Sealed by Order of the Court        2654

(The following sidebar took place outside the hearing of the jury and was sealed by Order of the Court.)















Sidebar - Sealed by Order of the Court                    2662



1

2

3

4

5

6

7

8          (Sealed sidebar concluded.)

9

10         (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

1          (In open court - jury present.)

2          MR. CANNICK:  We're almost done.

3    BY MR. CANNICK:

4    Q    Now, when you were visiting Mr. Kelly at the studios and

5    he'd ask you to wait in a room, he gave you an explanation as

6    to why he wanted you to wait?

7          MS. GEDDES:  Objection.

8          THE COURT:  To the simple fact did he give you an

9    explanation, that's overruled.  The objection is overruled.

10          You can answer.

11          Just yes or no, did he give you an explanation if he

12    was late?

13          THE WITNESS:  I'm sorry, could you repeat?

14    BY MR. CANNICK:

15    Q    When you were waiting for Mr. Kelly in the room, he gave

16    you a reason as to why he wanted you to wait in the rooms?

17    A    He would never tell me to wait in the room.

18    Q    Okay, okay.

19          MR. CANNICK:  That's it, Your Honor, nothing more.

20          THE COURT:  Any redirect?

21          MS. GEDDES:  No, Your Honor.

22          THE COURT:  Okay, thank you so much.  You can step

23    down.

24          (Witness stepped down and was excused.)

25          THE COURT:  Are you ready to call your next witness?

Proceedings                              2664

1          MS. SHIHATA:  Yes.  The Government calls John

2    Mirandona.

3          THE COURT:  John?

4          MS. SHIHATA:  Mirandona.

5          THE COURT:  While the witness is coming in, can I

6    just see counsel at the time for just a second?

7          (Sidebar held outside the hearing of the jury.)

8

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        2665
```

1            (The following sidebar took place outside the

2      hearing of the jury.)

3            THE COURT:  The court reporters, who are always on

4      the ball all the time, want to know which one of these

5      conferences should be sealed?

6            I take it the last one should be sealed, the one

7      that we just had the, the last sidebar.

8            Then we had a sidebar at the beginning.

9            MS. GEDDES:  Today?  Today we had a sidebar?  I

10     don't think we did.

11           THE COURT:  Didn't we start with one?

12           MR. CANNICK:  No, because Scholar was outside and I

13     think the conversation was that if it's not something to today

14     or coming in today.

15

16           (Sidebar concluded.)

17

18           (Continued on the following page.)

19

20

21

22

23

24

25

Proceedings                               2666

1          (In open court - jury present.)

2          (Witness entered and took the stand.)

3          THE COURT:  Okay, did you swear him in yet?

4          THE COURTROOM DEPUTY:  I did not.

5          THE COURT:  Okay.  I think they called him already.

6          THE COURTROOM DEPUTY:  Please stand and raise your

7     right hand.

8          Do you solemnly swear or affirm that the testimony

9     you are about to give will be the truth, the whole truth, and

10    nothing but the truth?

11         THE WITNESS:  I do.

12         (Witness sworn.)

13         THE COURTROOM DEPUTY:  Please state and spell your

14    name.

15         THE WITNESS:  John Mirandona, Jr.  J-O-H-N,

16    M-I-R-A-N-D-O-N-A, Junior.

17         THE COURT:  Okay, you can sit down.

18         THE WITNESS:  Thank you.

19         THE COURT:  And you can also take your mask off.

20         Just a couple of ground rules for your testimony.

21         Please don't speak too quickly, make sure you are

22    using the microphone, that way the jury can hear you and our

23    court reporter can take down everything that you say.

24         For the same reasons, don't talk over which person

25    is asking you questions, just let them finish the question

Proceedings                                    2667

1    before you begin to answer.

2            If there is a question that is unclear or you want

3    to have repeated, let me know that and I will have the lawyers

4    ask a different question.

5            And then, just do your best to answer only the

6    question that you are being asked.

7            Go ahead.

8            MS. SHIHATA:  Thank you, Your Honor.

9

10           (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **JOHN MIRANDONA, JR.**,

2       called as a witness by the Government, having been

3       duly sworn/affirmed by the Courtroom Deputy, was examined

4       and testified as follows:

5  DIRECT EXAMINATION

6  BY MS. SHIHATA:

7  Q    Good morning.

8  A    Good morning.

9  Q    Are you currently employed?

10 A    I am.

11 Q    How are you employed?

12 A    I am employed by the Department of Homeland Security as a

13 criminal investigator.

14 Q    And other than being a criminal investigator, do you have

15 any other titles at the Department of Homeland Security?

16 A    Supervisory special agent.

17 Q    Do you work in a particular group?

18 A    I do.

19 Q    What is that?

20 A    I supervise the Technical Services Group, which is made

21 up of the Computer Forensics Unit and the Technical Operations

22 Enforcement Unit.

23 Q    And is this all part of a division known as Homeland

24 Security Investigations?

25 A    Yes.

Mirandona - direct - Shihata                    2669

1    Q     Now, how long have you worked for Homeland Security

2    Investigations?

3    A     I've worked for Homeland Security Investigations,

4    Department of Homeland Security, and one of its legacy

5    agencies, since November of 2000.

6    Q     And how long have you held your current position as a

7    supervisory special agent over the Technical Services Group?

8    A     Since the beginning of November -- the beginning of 2014.

9    Q     And apart from your -- well, you have supervisory

10   responsibilities, correct?

11   A     Yes.

12   Q     And do you -- what type of personnel do you supervise?

13   A     I supervise computer forensics analysts and technical

14   enforcement operations officers.

15   Q     And in your duties and responsibilities, apart from

16   supervising computer forensic analysts, do you also engage in

17   duties and responsibilities as a computer forensic analyst

18   yourself?

19   A     Yes.

20   Q     And have you had training in the area of computer

21   forensic analysis?

22   A     Yes.

23              MS. SHIHATA:  May I approach, Your Honor?

24              THE COURT:  Yes.

25   BY MS. SHIHATA:

SAM     OCR     RMR     CRR     RPR

1   Q    I am going to show you what's in evidence as Government

2   Exhibit 345.

3   A    Thank you.

4   Q    And having now looked at what I just handed you, do you

5   recognize Government Exhibit 345?

6            (Exhibit published.)

7   A    Yes, I do.

8   Q    And what do you recognize this to be?

9   A    To be the phone in question that I examined.

10           THE COURT:  Can you just pull the microphone a bit

11  closer to you?

12           THE WITNESS:  Yes, I'm sorry.

13           THE COURT:  Thanks so much.

14  BY MS. SHIHATA:

15  Q    You conducted a forensic examination of this phone?

16  A    I did.

17  Q    And was this the phone that was seized from the

18  defendant, Robert Kelly, at the time of his arrest?

19  A    Yes.

20           MS. SHIHATA:  Now, I am showing the witness only

21  what's been marked for identification as Government Exhibit

22  345(a).

23  Q    Do you recognize this document?

24  A    Yes.

25  Q    What is this document?

Mirandona - direct - Shihata                    2671

1    A    It is the first page or the summary page of a forensic

2    extraction report that I conducted.

3    Q    And fair to say when you're conducting your forensic

4    examination report, is it a computerized report that's

5    generated?

6    A    Yes.

7    Q    And can portions of that report be printed out?

8    A    Yes.

9    Q    But generally, when you're looking at it, it's on a

10   computer screen, is that right?

11   A    Yes.

12   Q    And you testified this is the extraction summary or a

13   page -- the first page of the extraction summary of the

14   report?

15   A    Yes.

16            MS. SHIHATA:  I move to admit Government

17   Exhibit 345(a).

18            THE COURT:  Any objection?

19            MR. CANNICK:  No, no objection.

20            THE COURT:  Okay, that's in evidence.

21            (Government's Exhibit 345(a) was received in

22   evidence.)

23            MS. SHIHATA:  And may we publish it, please?

24            (Exhibit published.)

25   BY MS. SHIHATA:

SAM      OCR      RMR      CRR      RPR

Mirandona - direct - Shihata          2672

1  Q    Now, looking here (indicating), does this indicate that

2  the phone you examined was an iPhone X with a certain serial

3  number?

4  A    Yes.

5  Q    And you are listed here as the examiner, is that correct?

6  A    Yes.

7  Q    And going down, is there an Apple -- was there an Apple

8  ID associated with this phone?

9  A    Yes.

10 Q    And is that SylvesterKelly12@icloud.com?

11 A    Yes.

12 Q    And then further down where it says, "last used MSISDN,"

13 is the number +1-678-756-8219 listed?

14 A    Yes.

15 Q    And is that the last used number on that phone that you

16 examined?

17 A    Yes.

18 Q    And finally on this page, does this indicate a time zone?

19 A    Yes.

20 Q    And what does that mean?

21 A    That is the time zone that was set while the phone was in

22 operation, and it's skewed based off universal time.

23 Q    And here does it say, is the time zone listed as Chicago?

24 A    It is Chicago, minus 6 UTC.

25 Q    So, UTC minus 6, so Chicago time?

Mirandona - direct - Shihata                    2673

1    A    Yes.

2    Q    And just to be clear, the phone number ending in 8219

3    that we just spoke about, that's the last phone number that

4    was associated with this phone, is that right?

5    A    Yes.

6              MS. SHIHATA:  May I approach, Your Honor?

7              THE COURT:  Yes.

8              MS. SHIHATA:  I am going to start by showing the

9    witness what's been marked for identification as Government

10   Exhibits 344(a) through 344(k), and 348(a) and 348(b).

11             THE WITNESS:  I don't want to lick my fingers.

12   BY MS. SHIHATA:

13   Q    Now, starting first with Government Exhibit 344(a), is

14   this a portion of your extraction report of the phone, of

15   Government Exhibit 345, that sets forth certain SMS messages

16   and MMS messages between that phone and telephone number

17   312-513-1020?

18   A    Yes.

19   Q    And are certain -- it's -- the document is several pages,

20   correct?

21   A    Yes.

22   Q    And certain messages are redacted, is that right?

23   A    Yes.

24             MS. SHIHATA:  I move to admit Government

25   Exhibit 344(a).

SAM      OCR      RMR      CRR      RPR

Mirandona - direct - Shihata                    2674

1         MR. CANNICK:  No objection.

2         THE COURT:  That's in evidence.  You can display it.

3         (Government's Exhibit 344(a) was received in

4    evidence.)

5         (Exhibit published.)

6    BY MS. SHIHATA:

7    Q    Okay, now, I'd also now like to show you what I handed

8    you earlier, Government Exhibit 348(a).

9         Is this another extraction report from the forensic

10   report you've done, but now in a chat view of SMS messages

11   involving the Government Exhibit 345, the 8219 phone, and that

12   same phone number that we discussed?

13   A    Yes.

14   Q    And fair to say that the redacted messages from 344(a)

15   are excluded in 348(a)?

16   A    Yes.

17   Q    And now I'm showing you what you just looked at when I

18   handed it to you, Government Exhibit 348(b).

19        Is this, again, now an extraction report based on

20   your same full forensic report of MMS messages between the

21   phone you examined, Government Exhibit 345, the 8219 phone,

22   with that same phone number 312-513-1020 in chat format?

23   A    Yes.

24        MS. SHIHATA:  I move to admit Government Exhibits

25   348(a) and (b).

SAM     OCR     RMR     CRR     RPR

1          MR. CANNICK:  No objection.

2          THE COURT:  Okay, those are in evidence.

3          (Government's Exhibits 248(a) and 348(b) were

4    received in evidence.)

5    BY MS. SHIHATA:

6    Q    So, first of all, can you explain what an SMS message is?

7    A    It is a simple text message, simple message service,

8    between two devices.

9    Q    And how about an MMS message, what's that?

10   A    Multimedia message service, where it would be a simple

11   message with an attachment, like a photo or just an attachment

12   of a photo.

13   Q    And the reports we just went through divide up the MMS

14   and the SMS messages, is that right?

15   A    Yes.

16   Q    All right, so starting with Government Exhibit 348(a).

17          Now, the messages in green here (indicating), are

18   these messages being sent from the device you examined to

19   telephone number 312-513-1020?

20          (Exhibit published.)

21   A    Yes.

22   Q    And the first message, this is from October 21st, 2018,

23   it says:  Call me when you get this message.

24          Is that right?

25   A    Yes.

Mirandona - direct - Shihata                  2676

1          THE COURT:  And if you want, it's in evidence, so
2     you can just have him read it or whatever you like.
3          MS. SHIHATA:  All right, got it.
4     BY MS. SHIHATA:
5     Q    So, now, in this, the first page, there's a series of
6     messages between these two numbers from October -- the first
7     one was October 21st, then October 23rd, and these appear to
8     be about meeting up.
9          So, the 1020 number texts the phone:  Hey, Syl, I'm
10    prepping to leave in about 15 minutes.  It will be around
11    1:30 pm when I arrive for our meeting.  Is that cool???
12         And then a response of 2:30?
13         THE COURT:  Just don't go too fast, okay.
14         MS. SHIHATA:  All right.
15         THE COURT:  I am not trying to throw you off your
16    game, just read it slowly.
17         MS. SHIHATA:  I don't think I need help with that.
18         THE COURT:  Okay.
19    BY MS. SHIHATA:
20    Q    Okay, 2:30 it is.
21         And then again another text message, saying:  Hey,
22    Syl, I'll arrive in the loop at 2:30.  It will take me about
23    10 to 15 minutes to walk to the building.  Will you be ready
24    at 2:45 or do you need more time?
25         And then some responses from the phone you examined,

Mirandona - direct - Shihata                    2677

1    indicating times:  3:15; I'll be ready.

2              Okay, now I want to turn to Government Exhibit

3    348(b).

4              MS. SHIHATA:  And this is jury only, please.

5    BY MS. SHIHATA:

6    Q    Do you see that in front of you?

7    A    Yes.

8    Q    And these are the MMS messages, correct?

9    A    Yes.

10             MS. SHIHATA:  If we could publish to the jury,

11   please.

12             (Exhibit published to the jury only.)

13   Q    These are the MMS multimedia messages, correct?

14   A    Yes.

15   Q    Now, these are -- this in green, this is a text message

16   sent from the phone you examined to the telephone number

17   312-513-1020, is that right?

18   A    Yes.

19   Q    And do there appear to be three images that were sent?

20   A    Yes.

21   Q    And the date of this message is October 26th, 2018, 10:34

22   and 23 seconds a.m., correct?

23   A    Yes.

24             THE COURT:  Can I just ask you a question about the

25   numbers on 348(a)?

1           So, the green one, the top has the plus phone number

2    that ends in 1020, and then the blue one also has the same

3    thing.

4           What does that mean?

5           THE WITNESS:  It indicates the number that the text

6    is going to or the number that is sending --

7           THE COURT:  I see.

8           THE WITNESS:  -- or receiving.  It identifies which

9    phone is which.

10          MS. SHIHATA:  So, Judge, maybe I can ask it clearer.

11          THE COURT:  Okay.

12   BY MS. SHIHATA:

13   Q    So, I have in front of you now Government Exhibit 348(a),

14   the second page which has both messages in both green and

15   blue.

16          I think you testified earlier that the messages in

17   green are the ones being sent by the phone you examined,

18   correct?

19   A    Yes.

20   Q    And the number that appears up top that I'm pointing to

21   (indicating), that's the number, the phone you examined is

22   sending the text message to, is that right?

23   A    Correct.

24   Q    And then now looking at the text messages in blue, these

25   are responses from that 1020 number to the -- to the phone

Mirandona - direct - Shihata                2679

1   that you examined, correct?

2   A    Correct.

3   Q    And so, the number here (indicating) indicates that this

4   is the number sending the text message to the phone you

5   examined, correct?

6   A    Yes.

7   Q    All right, so going back for a moment to Government

8   Exhibit 348(b), you testified there were three images sent

9   from the phone you examined to that 1020 number on October

10  26th, 2018 at 10:34:23 a.m., correct?

11  A    Yes.

12  Q    And I have just zoomed in a little bit so you could see

13  those photos a little bit more clearly.

14       MS. SHIHATA:  I am now going to show the witness

15  only what's been marked for identification as Government

16  Exhibits 344(b), 344(c) and 344(d).

17  BY MS. SHIHATA:

18  Q    So, I'm starting with 344(b), 344(c), and 344(d).

19       Are these photographs that you extracted from --

20  during your forensic examination or that were extracted during

21  your forensic examination and that were the photos that were

22  sent in the MMS message we just went over?

23  A    Yes, they are full-size versions of those attachments.

24       MS. SHIHATA:  I move to admit Government

25  Exhibits 344(b), (c) and (d).

SAM     OCR     RMR     CRR     RPR

1           MR. CANNICK:  No objection.

2           THE COURT:  All right, those are in evidence.

3           (Government's Exhibits 344(b), 344(c) and 344(d)

4    were received in evidence.)

5           THE COURT:  Jury only?

6           MS. SHIHATA:  Yes.

7           (Exhibit published to the jury only.)

8           MS. SHIHATA:  And so, I'll start with 344(d).

9           (Published individually to the jury.)

10          MS. SHIHATA:  344(c).

11          (Published individually to the jury.)

12          MS. SHIHATA:  And 344(b).

13          (Published individually to the jury.)

14   BY MS. SHIHATA:

15   Q    Now, you testified earlier that the way these exhibits

16   are set forth, the MMS messages and the SMS messages are

17   separate, correct?

18   A    Yes.

19   Q    So, I'm showing you --

20          MS. SHIHATA:  I'm showing the jury only again the

21   first page of 348(b).

22          (Exhibit published to the jury only.)

23   Q    Is there a second MMS message sent from the phone you

24   examined to that same 1020 number on October 26th, 2018 at

25   9:45:14 p.m.?

Mirandona - direct - Shihata          2681

1   A     Yes.

2   Q     And actually, I'm sorry, before we get to that, we went

3   over this MMS message that was sent on October 26th, 2018 at

4   10:34:23 a.m.

5            I am now going to turn to Government Exhibit 348(a),

6   which is in evidence.

7            MS. SHIHATA:  This can be for everyone.

8            (Exhibit published.)

9   BY MS. SHIHATA:

10  Q     Looking at the second page, is there a response from that

11  same 1020 number to the phone you examined on October 26th,

12  2018 at 12:30:20 p.m. -- so, after those three images were

13  sent -- that states:  Oh my eyes!!!  She's pathetic!!!  Thank

14  you for sending the tamed pictures!!!

15           And then following that another message from that

16  1020 number to the phone you examined on October 26th, 2018 at

17  2:48 p.m.

18           Question:  Do you have a way of sending me one more

19  picture showing her phone number at the top?  I am going to

20  print it and include it, along with the other three, and

21  include them in the letter to her attorney.  Do you agree that

22  she should really know her client???

23           And then I am going to turn now back to Government

24  Exhibit 348(b).

25           MS. SHIHATA:  Jury only, please.

SAM      OCR      RMR      CRR      RPR

Mirandona - direct - Shihata                    2682

1          (Exhibit published to the jury only.)

2    BY MS. SHIHATA:

3    Q    The second message here, is that a message from the phone

4    you examined to that same 1020 number on October 26th, 2018 at

5    9:45 p.m., and what's sent to that number is two images?

6    A    Yes.

7          MS. SHIHATA:  Now, I am showing the witness only

8    what's been marked for identification as Government Exhibit

9    344(e) and 344(f).

10   BY MS. SHIHATA:

11   Q    Are these the images that were sent in the SMS messages

12   we just went over -- sorry, the MMS message we just went over?

13   A    Yes.

14         MS. SHIHATA:  I move to admit Government

15   Exhibits 344(e) and (f)?

16         MR. CANNICK:  No objection.

17         THE COURT:  Okay, those are in evidence.

18         (Government's Exhibits 344(3) and 344(f) were

19   received in evidence.)

20         MS. SHIHATA:  And these can be published beyond the

21   jury.

22         THE COURT:  Okay.

23         (Exhibit published.)

24   BY MS. SHIHATA:

25   Q    And at the top does this appear to be a text message

SAM      OCR      RMR      CRR      RPR

Mirandona - direct - Shihata                2683

1   exchange involving an individual saved in the phone, in the

2   image of the text message, as Faith?

3   A    Yes.

4   Q    All right, now, turning back to Government Exhibit

5   348(a), second page.

6              MS. SHIHATA:  This can be for everyone.

7              (Exhibit published.)

8   BY MS. SHIHATA:

9   Q    I am looking at now, focusing on the bottom text message

10  sent from the phone you examined to the 1020 number on October

11  26th, 2018 at 9:46:06 p.m. and it states:

12             I'm going to get you more, but let me know if you

13  have any questions.  The bottom of that is when she was trying

14  to tell me she didn't want to do what she was doing out there

15  in the media, so she was asking me can we make it stop.

16             And then turning to page 3 of Government Exhibit

17  348(a), there is a response from the 1020 number to the phone

18  you examined on October 26th, 2018 at 10:17:40 p.m., that

19  states:

20             Make it stop is exactly what we are going to do with

21  the paper work you signed and the letter to her attorney!!!

22  She's is a very troubled individual that you hopefully will

23  either block or keep at a far distance.

24             My mother used to say, "Feed 'em with a long-handled

25  spoon!!!"  Like Michael Jackson sang, "She's dangerous!!!"

1          Now, I am switching back to Government Exhibit

2     348(b).

3               MS. SHIHATA:  This can be for everyone.

4          (Exhibit published.)

5     BY MS. SHIHATA:

6     Q    This is the MMS messages now.

7          Is there a message from the phone you examined to

8     the same 1020 number on October 26th, 2018 at 10:20:04 p.m.,

9     and sending five images, is that correct?

10    A    Yes.

11

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Mirandona - Direct - Shihata                    2685

1    DIRECT EXAMINATION (Continued.)

2    BY MS. SHIHATA:

3    Q    I'm showing the witness only what's been marked for

4    identification as Government Exhibit 344G, 344H, 344I, 344J,

5    and 344K.

6              Are these the images that were sent by the phone you

7    examined in the MMS message we just went over?

8    A    Yes.

9              MS. SHIHATA:  I move to admit Government

10   Exhibits 344G through K.

11             MR. CANNICK:  No objection.

12             THE COURT:  Those are in evidence.

13             MS. SHIHATA:  Thank you, your Honor.

14             (Government Exhibits 344G through K, were received

15   in evidence.)

16   Q    I'm just zooming in on the images we just -- in the MMS

17   message we just went over and now I'll display 344K, 344J,

18   344H, 344I, 344G.

19             Now I want to turn back to page 3 of Government

20   Exhibit 348A.

21             Is there a text message from that same 1020 number

22   to the phone that you did a forensic examination on from

23   December 6, 2018 at 1:38:22 a.m.  And focus on the second

24   paragraph of that text message.  It states, If you have no

25   plans to reimburse Don for the truck rental would you please

Mirandona - Direct - Shihata                    2686

1  communicate that directly to him.  He's agitated about the

2  situation and you're the one with the power to offer a remedy.

3  Maybe you might consider enriching him for sabotaging the

4  "Survivors" event and sending out cease and desist letters.

5  Their whole production has fallen apart thanks to his actions.

6  Whatever your thought process he deserves to hear it directly

7  from you.

8          Then there is a response from the phone you examined

9  to that same 1020 number on December 6, 2018 at 10:09:16 a.m.

10  I will be more than happy to meet with Don but first me and

11  you need to talk because I feel that I'm in a very awkward

12  position as well, so if you can come by around 7:30 tonight

13  that would be perfect.  If not, just let me know when you can.

14  Thanks, love you.

15          And then there is a response from the 1020 number on

16  the same date at 10:15 a.m.  Okay, I will make preparations to

17  meet you this evening at 7:30 p.m.  I'll confirm the time with

18  George.  Love you back at cha.

19          And then a response from the phone you examined same

20  date, K.

21          Now I want to turn back to Government Exhibit 348B,

22  the MMS message report, and looking now at the message in blue

23  that's from the 1020 phone to the phone you examined, correct?

24  A    Yes.

25  Q    And that's from January 30, 2019 -- I'm sorry, that's

Mirandona - Direct - Shihata                2687

1   at -- sorry, January 30th, 2019 at 12:40:13 a.m.  It states,

2   Subject:  Victorious, followed by three exclamation points.

3   It states the paperwork you sent in not consenting to the

4   contract and including a sample of pictures you received

5   totally derailed the case exclamation point, exclamation

6   point, exclamation point.  Believe me, the paperwork has put a

7   wrench in their program and struck fear in their minds.  This

8   has them wondering what else you are capable of, exclamation

9   point, exclamation point.  There are more hurdles to go but at

10  least you can cross this one off the list.

11          Then there is a link to a TMZ website and it states,

12  R. Kelly Criminal Case Closed NYC Sexual Assault, the name

13  Faith, and then if we could now just have jury only, and a

14  last name listed there, correct?

15  A    Yes.

16  Q    Now turning back to Government Exhibit 348A, page 3,

17  these are the SMS messages.  And turning to the last message

18  on that page there is a response to the MMS message we just

19  went over and this is dated January 30th, 2019 at 9 a.m. to

20  that 1020 number from the phone you examined.

21          It states, Yes, everybody's been sending me that.

22  I'll take any victory I can get.

23          This could be published.  Sorry.

24          (Exhibit published.)

25  A    Now turning to page 4 of Government Exhibit 348A, these

Mirandona - Direct - Shihata                    2688

1   are the SMS messages again and on the top this is a message

2   from the phone you examined to the 1020 phone from

3   January 30th, 2019 at 9 a.m.  I'm on my way back to sleep, if

4   you can call me around seven, to that 1020 number.

5           And then below that now is a message, a redacted

6   message from February 21st, 2019 at 1:17 a.m., this is from

7   the 1020 number to the forensic phone -- to the phone you

8   forensically examined, and it states, When the docu-series was

9   aired and we answered with the Surviving Lies page on

10  Facebook, the backlash was, quote, you never attack or stoop

11  to the level of your adversarial opponent.

12          And then below that I'm not going to read each of

13  these messages, but there are series of messages from

14  March 15, 2019 between the phone you examined and the 1020

15  number involving meeting up.  And that continues on to page 5

16  of the exhibit.

17          Your Honor, at this point I'd like to move to admit

18  Government Exhibit 108A -- 108A as a certified business record

19  of subscriber information from T-Mobile for telephone number

20  (312)513-1020.

21          THE COURT:  Any objection?

22          MR. CANNICK:  No.

23          THE COURT:  That's in evidence.

24          (Government Exhibit 108A was received in evidence)

25  Q    And Agent Mirandona, the phone number that -- the text

Mirandona - Direct - Shihata                    2689

1   communications between the phone you examined and a certain

2   phone number that we just went over, that number was

3   (312)513-1020, correct?

4   A    Yes.

5        MS. SHIHATA:  And now if I could publish Government

6   Exhibit 108A.

7        (Exhibit published.)

8        MS. SHIHATA:  This is subscriber information for

9   that same phone number.  The subscriber name listed is June,

10  no middle name, Barrett, and an address 1826 South Millard

11  Chicago, Illinois 60623.  And activation date, 10/30/2012,

12  termination date, 09/08/2019.

13       Now showing what's in evidence as Government

14  Exhibit 231A, jury only.  This is a notice of delivery page,

15  in the bottom there's a signature and a name June Barrett,

16  care of 1826 South Millard Avenue, Chicago, Illinois with a

17  phone number (312)513-1020 and the email

18  junespointofview@yahoo.com.

19       Turning to the third page, a signature and notary

20  stamp for a June A. Barrett.  Same thing on the next page.

21       And the following page, and the last two pages of

22  this exhibit.

23       And the second page of the exhibit dated

24  October 22nd, 2018 to Lydia C. Hills, Esquire.

25       I'm now showing the witness only what's been marked

1  for identification as Government Exhibits 337 and 337A.  Do

2  you recognize these documents?

3  A    Yes.

4  Q    And starting with 337, what is this?

5  A    It is a printout of part of the forensic extraction

6  report.

7  Q    Is this printout related to a particular image that was

8  saved on the phone you examined?

9  A    Yes.

10  Q    Is there a -- does this include the metadata associated

11  with the phone?

12  A    Yes.

13  Q    -- sorry, with the image?

14  A    Yes.

15  Q    Is there a thumbnail of the image as well?

16  A    Yes.

17  Q    I'm now showing you 337A, is that just a full photo of

18  the thumbnail image?

19  A    Yes.

20            MS. SHIHATA:  I move to admit Government Exhibits

21  337 and 337A.

22            MR. CANNICK:  No objection.

23            THE COURT:  Okay.  Those are in evidence.  You can

24  publish them.

25            (Government Exhibits 337 and 337A were received in

Mirandona - Direct - Shihata                    2691

1  evidence.)

2          THE COURT:  Can this go to everybody?

3          MS. SHIHATA:  Yes.  Thank you.

4          THE COURT:  Okay.

5  Q    Starting with 337, there's an image.  This is the image

6  in question that was saved on the phone that this metadata

7  relates to?

8  A    Yes.

9  Q    And 337A, does this appear to be a photo of a driver's

10  license for Robert S. Kelly?

11  A    It appears to be.

12  Q    And the address listed is 219 North Justine Street,

13  Chicago, Illinois 60607.

14          I'm now showing the witness only what's been marked

15  for identification as Government Exhibit 338 and 338A.

16          Is Government Exhibit 338 a portion of your report

17  related to a certain image saved on the phone you examined and

18  the metadata associated with that image?

19  A    Yes.

20  Q    And is there a thumbnail of the image in 338?

21  A    Yes.

22  Q    Is Government Exhibit 338A just a full size photo of that

23  thumbnail image that was saved on the phone?

24  A    Yes.

25          MS. SHIHATA:  I move to admit Government Exhibits

Mirandona - Direct - Shihata          2692

1    338 and 338A.

2              MR. CANNICK:  No objection.

3              THE COURT:  All right.  Those are in evidence.

4              (Government Exhibits 338 and 338A were received in

5    evidence.)

6              MS. SHIHATA:  And we would publish it.  Thank you.

7              THE COURT:  You want it published to the jury only?

8              MS. SHIHATA:  This can be for everyone.

9              THE COURT:  Okay.

10             (Exhibit published.)

11   BY MS. SHIHATA:

12   Q    So starting with Government Exhibit 338.  Is this just

13   the file name for the image that was saved on the phone?

14   A    Yes.

15   Q    And this is the image here --

16   A    Yes.

17   Q    -- thumbnail of the image.

18             All right.  Just so the jury is clear, the dates on

19   top where it says created and modified that relate to 2021, is

20   that -- are those dates referring to creation and printing of

21   the report?

22   A    No.

23   Q    What does that refer to?

24   A    Oh, I'm sorry, yes.

25   Q    Up here --

1  A    Yes.

2  Q    -- yes?

3        And then the dates here under additional file info,

4  is that the dates and times associated with this image?

5  A    Yes.

6  Q    Now turning to 338A.  Does this appear to be a photograph

7  of a driver's license and a document underneath for an

8  individual named Cavonttey Alicia Jones?

9  A    It does appear to be.

10 Q    Then there is a document underneath with a signature and

11 a printed name Cavonttey Jones and an address.

12       Again, this was recovered from the phone you

13 examined, correct, the 8219 phone?

14 A    Yes.

15            MS. SHIHATA:  No further questions.

16            THE COURT:  All right.  Do you have a lot?  It's

17 about time for the morning break.

18            MR. CANNICK:  We can take a break.

19            THE COURT:  All right, folks.

20            MR. CANNICK:  I don't want to -- I have no

21 questions.

22            THE COURT:  You have no questions.  All right.

23       The witness can step down and we'll take our morning

24 break about 10 minutes.  Please don't talk about the case at

25 all.

Mirandona - Direct - Shihata          2694

1    (Whereupon the witness was excused.)

2              THE COURTROOM DEPUTY:  All rise.

3    (Jury exits courtroom.)

4              THE COURT:  Everybody can have a seat.

5              How many more witnesses have you got?

6              MS. SHIHATA:  We have two, your Honor.

7              THE COURT:  It seemed like we can fit them in before

8    lunch, don't you think?

9              MS. SHIHATA:  Yes.

10             THE COURT:  Anything that anybody wants to raise

11   before we break just for the morning, just the morning break,

12   nothing?  Okay.  Great.

13   (Recess.)

14             THE COURTROOM DEPUTY:  All rise.

15             THE COURT:  Everybody can have a seat.

16             While we're trying to sort out the technical issue

17   with the pink mark, we can bring the witness in.

18             Who is it by the way?

19             MS. SHIHATA:  Stephen Flatley.

20             THE COURT:  We fixed the problem.

21             Who is your next witness?

22             MS. SHIHATA:  Stephen Flatley.

23             THE COURT:  Flatley, okay.  Then let's get the

24   jurors.

25             (Jury enters courtroom.)

Mirandona - Direct - Shihata                    2695

1          THE COURTROOM DEPUTY:  All rise.

2          You maybe seated.

3          THE COURT:  All right, everybody, we are ready to

4    continue with the next witness.  The witness is here but could

5    you call him please.

6          MS. SHIHATA:  Yes, the government calls Stephen

7    Flatley.

8          THE COURTROOM DEPUTY:  Please stand and raise your

9    right hand.

10          (Witness sworn.)

11          THE WITNESS:  I do.

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Flatley - Direct - Shihata                    2696

1          **STEPHEN FLATLEY**, having been first duly sworn, was

2     examined and testified as follows:

3          THE COURTROOM DEPUTY:  You may be seated.

4          THE COURT:  Just a couple of things before we get

5     started.  I just want to make sure everyone can hear you, so

6     obviously speak in the microphone.

7          Don't speak too fast, it makes it harder for the

8     court reporter to take down everything that you're saying.

9          If there's a question you want to have repeated or

10    that isn't clear just tell me and I'll have the lawyer

11    rephrase.

12         Just do your best to answer only the question you're

13    being asked, okay?

14         THE WITNESS:  Yes, your Honor.

15         THE COURT:  Go ahead.

16         MS. SHIHATA:  Judge before I start with this witness

17    there is one exhibit, 344A, that I laid the foundation for

18    with the last witness but forgot to offer.  I discussed it

19    with Mr. Cannick so the government now would offer Government

20    Exhibit 344A.

21         MR. CANNICK:  No objection.

22         THE COURT:  That's in evidence.

23         (Government Exhibit 344A was received in evidence.)

24    DIRECT EXAMINATION

25    BY MS. SHIHATA:

Flatley - Direct - Shihata                    2697

1    Q    Good afternoon.

2    A    Good afternoon.

3    Q    Are you currently employed?

4    A    Yes, I am.

5    Q    Where do you work?

6    A    I work for the Federal Bureau of Investigation, New York

7    division.

8    Q    And what is your title at the FBI?

9    A    I am an information technology specialist, forensic

10   examiner for the Computer Analysis Response Team or CART.

11   Q    How long have you been doing that for?

12   A    For 16 years.

13   Q    And as part of your responsibilities do you receive

14   training in forensic examination?

15   A    Yes, we do.

16   Q    Is that including of cell phones and other devices?

17   A    Yes, ma'am.

18   Q    Do your duties include conducting forensic examinations

19   of electronic devices?

20   A    Yes, they do.

21        MS. SHIHATA:   I want to show the witness only what's

22   been marked for identification as Government Exhibit 913.

23        May I approach?

24        THE COURT:   Yes.

25   Q    Prior to your testimony here today, have you had an

Flatley - Direct - Shihata                    2698

1   opportunity to review Government Exhibit 913?

2   A    Yes, I have.

3   Q    Is Government Exhibit 913 an excerpted portion of a

4   forensic examination report that you made?

5   A    Yes, it is.

6   Q    And is that in relation to an Apple iPhone with serial

7   number FCDR2ON2GRWN?

8   A    Yes, ma'am.

9          MS. SHIHATA:  I move to admit Government

10  Exhibit 913.

11         THE COURT:  Any objection?

12         MR. CANNICK:  No objection.

13         THE COURT:  That's in evidence.  Do you want it

14  published?

15         MS. SHIHATA:  Yes, please.

16         THE COURT:  Jury only or everybody?

17         MS. SHIHATA:  This can be everybody.

18         (Government Exhibit 913 was received in evidence.)

19         (Exhibit published.)

20  Q    So now looking at the first page of Government

21  Exhibit 913, does it here indicate that you're the examiner

22  that created this extraction?

23  A    That's correct.

24  Q    And where it -- under the part, heading that says device

25  information the Apple ID is listed as ib.drussell@iCloud.com.

Flatley - Direct - Shihata                    2699

1  What is an Apple ID?

2  A    So an Apple ID is usually an email address that

3  identifies you uniquely to Apple.  So if you have an iPhone or

4  a MacBook Pro or something like that, they use that to track

5  you and to backup your information for your apps and for other

6  things like that.

7  Q    And then looking down further on this there's a serial

8  number for the phone you examined an IMEI number -- one

9  moment.  Can you explain what an IMEI number is?

10 A    Sure.  The IMEI is the International Mobile Equipment

11 Identifier.  It is the number that the phone is -- it's like a

12 serial number for that phone for the phone system, for the GSM

13 system.

14 Q    So is it unique to the phone?

15 A    Yes, it is.

16 Q    Now, under device information there's last used MSISDN

17 and a phone number +1(312)975-5608, is that the last phone

18 number associated with the phone you examined?

19 A    Yes, it is.

20 Q    And by the way, you testified earlier about the IMEI

21 number.  Are you also familiar, based on your training and

22 experience, with something called an ESN number?

23 A    Yes, that is the Electronic Serial Number.

24 Q    Can you explain to the jury what that is.

25 A    So an ESN -- it gets a little bit of alphabet soup, but

Flatley - Direct - Shihata                    2700

1   the ESN is for a different kind of cellular network.  So, for

2   instance, Verizon is on what is called a CDMA network, and

3   AT&T is on a GSM network, and a phone that is on the CDMA

4   network would have an ESN, whereas a phone that is on the GSM

5   network has an IMEI.

6   Q    Is it -- apart from network is it unique to a particular

7   phone, that ESN number?

8   A    Yes.  It is.

9   Q    We just went over the last phone number associated with

10  this phone you examined, this (312)975-5608 number.

11           MS. SHIHATA:  Your Honor, at this point I'd like to

12  offer Government Exhibit 132A which is a certified business

13  record from T-Mobile for subscriber information for that

14  number.

15           MR. CANNICK:  No objection.

16           THE COURT:  Okay, that's in evidence.

17           (Government Exhibit 132A was received in evidence.)

18  Q    I'm just turning to page 3 of that exhibit.  And this is

19  information for the subscriber associated with (312)975-5608.

20  Subscriber name is Indy Build Corp. With an address in

21  Chicago, Illinois.  Activation date 6/12/2018.  Termination

22  date, 7/14/2019, and a device number listed is

23  353332074522087.

24           Now I'm putting back on the screen Government

25  Exhibit 913 and that corresponds with the IMEI number on this

Flatley - Direct - Shihata                2701

1    report.

2            Now turning to page 2 of Government Exhibit 913,

3    under the section that says, Contents, is this simply a

4    summary of the types of content you were able to extract from

5    this phone?

6    A    Yes, that's what it is.

7    Q    And in the part where it says, Chats, iMessage and a

8    phone number ending 5608, is that the phone number that the

9    phone used to engage in iMessage chats?

10   A    Yes, it is.

11   Q    I'm going to turn to the fifth page of the report.

12   Sorry, for the jury only please.

13           Now does this -- obviously there's some redactions

14   on this page; is that right?

15   A    Yes, ma'am.

16   Q    Now focusing on the two chats in -- chat messages in

17   blue, are those coming from a number (786)502-5659 to the

18   phone you examined?

19   A    Yes, that's correct.

20   Q    And these are two messages and the first one was sent on

21   December 21st, 2018 at 9:50, and the second message,

22   December 21st, 2018 at 9:50 as well?

23   A    Correct.

24   Q    And where it says the name Shotwell, Ryan, is that --

25   what does that signify?

1   A    That was the contact name put in the contacts for that

2   particular person in the phone.

3   Q    So that's -- this number is saved in the phone under that

4   name; is that correct?

5   A    Correct.

6   Q    And then under where there is a name Kelly with a last

7   name that I won't say out loud and a phone number beginning in

8   210, where it says Status read and a date read, 12/21/2018,

9   11:17, what does that signify the status and the read?

10  A    The status signifies that the message was received by who

11  it was sent to and that they actually read it and the time and

12  date when that occurred.

13  Q    And then the second message there's another name Faith

14  followed by a last name that I won't read out loud and another

15  number beginning in 210, and that also indicates status read,

16  correct?

17  A    That is correct.

18  Q    Now I'm turning to another page of the exhibit, this is

19  from the contact section of the phone, correct?

20  A    That's correct.

21  Q    And what's listed here is a contact June Barrett and a

22  telephone number (312)513-1020 and email

23  JBarrett@indybuild.com?

24  A    That's correct.

25  Q    Now turning to the next page of the exhibit, this is also

Flatley - Direct - Shihata                2703

1   part of the contacts section, correct?

2   A    Yes, it is.

3   Q    There is a contact saved as RSK with a phone number

4   1(678)756-8219.

5   A    That's correct.

6   Q    Now turning to another page under the contact section

7   there is a contact Shotwell, Ryan -- this can be for everyone,

8   I'm sorry.

9         -- and there's an email address associated with the

10  contact, kashmicouture@iCloud.com, then three different

11  numbers associated with that contact, correct?

12  A    That's correct.

13        MS. SHIHATA:  Your Honor, I'd like to offer

14  Government Exhibit 915 as a certified business record from

15  Apple related to the kashmicouture@gmail -- sorry, related to

16  an iCloud account.

17        THE COURT:  Any objection?

18        MR. CANNICK:  No.

19        THE COURT:  Okay, that's in evidence.

20        (Government Exhibit 915 was received in evidence.)

21        MS. SHIHATA:  I'd like to publish Government

22  Exhibit 915.

23        (Exhibit published.)

24  Q    And here is an email address listed at

25  kashmicouture@gmail.com associated with first name Cavonttey

Flatley - Direct - Shihata                2704

1  and the last name Jones and also Kash Jones and an address,

2  same address throughout.

3          Turning to another page of Exhibit 913 and here you

4  have a section called User Accounts.  What does that section

5  show?

6  A    So if you have an email account or some app that has a

7  user name and password or some other identifying information

8  like that, the phone will keep it in one particular spot

9  called the key chain and it will display it when we run it

10  through -- it won't give us the passwords, but it will give us

11  the user names associated with it.

12  Q    Looking here, is there a user account associated with a

13  Yahoo.com?

14  A    Yes, there is.

15  Q    And the user name is Colon Dunn?

16  A    Right.

17  Q    And also then a user account associated with My AT&T with

18  the email address ib.drussell@gmail.com?

19  A    That's correct.

20  Q    Now I'm turning to the next page.  Does this section

21  include various types of communications sent by the phone you

22  examined or received by the phone you examined?

23  A    Yes, it does.

24  Q    And at the top, the top one, is that an email or listed

25  under 332, is that an email from December 4th, 2018 from

Flatley - Direct - Shihata                    2705

1   ib.drussell@gmail.com, Don Russell, to kashtaughtme@gmail.com,

2   Kash Jones, forwarding something titled The Survivors Exposed?

3   A    Correct.

4        MS. SHIHATA:  And your Honor, I'd like to offer

5   Government Exhibit 914C, certified business records from -- of

6   subscriber information from Google for kashtaughtme@gmail.com.

7        MR. CANNICK:  No objection.

8        THE COURT:  That's in evidence also.  You can

9   publish.  Do you want to publish it?

10       MS. SHIHATA:  I will publish it very briefly.

11       THE COURT:  Whatever you want to do.

12       * (Government Exhibit 914C was received in

13   evidence.)

14       (Exhibit published.)

15   Q    And here the name associated with kashtaughtme@gmail.com

16   is listed as Kash Jones.

17       Looking below at another email listed as 1333,

18   forwarded from don@indybuild to ib.drussell -- Don Russell--

19   @gmail.com.  It's an email signed, Respectfully, Don Russell

20   President/CEO Indy Build Corp. With the number (312)975-5608.

21       And just turning back to the first page of

22   Government Exhibit 913, that's the last used phone number of

23   the phone you examined, correct?

24   A    That's correct.

25   Q    Going back to this page with the various communications,

Flatley - Direct - Shihata                    2706

1    I'm going to turn to the communication here 1342, which is an

2    incoming email to ib.drussell@gmail.com the subject line,

3    alternate email address removed from your account.  It says,

4    Hi, Colon, the following alternate email address was removed

5    from your Yahoo account, with an i, then some stars,

6    ll@gmail.com.  This email charge was made on December 4th,

7    2018.

8            And finally, I'm going to turn to the last page of

9    the exhibit, where I'm pointing next to the number eight, what

10   are we looking at here?

11   A    This is -- my mic died.

12           THE COURT:  We'll fix it.

13           THE WITNESS:  Sorry about that.

14   BY MS. SHIHATA:

15   Q    What are we looking at here?

16   A    This is a thumbnail of a video that was taken by the

17   phone or at least by an iPhone 6S Plus that was on this --

18   that was saved on this phone that I examined.

19   Q    So this video was saved on the device you examined; is

20   that correct?

21   A    Yes.

22   Q    Here it is just a thumbnail of that video?

23   A    Correct.

24           MS. SHIHATA:  I'm now going to show you Government

25   Exhibit 913A, which I think we need to switch to...this is for

GEORGETTE K. BETTS, RPR, FCRR, CRR  Official Court Reporter

Flatley - Direct - Shihata                 2707

1   witness only, witness only.

2   Q    Prior to your testimony here today, did you have an

3   opportunity to view the video that we just went over that was

4   saved in the report -- sorry, saved in the phone you examined?

5   A    Yes, I did.

6   Q    And is what I'm showing you the video that was extracted

7   from that phone?

8   A    Yes, it is.

9              MS. SHIHATA:  I would offer 913A.

10             MR. CANNICK:  No objection.

11             THE COURT:  All right.

12             MS. SHIHATA:  If we could play it, jury only please.

13             (Government Exhibit 913 was received in evidence.)

14             (Video recording played; video recording stopped.)

15             MS. SHIHATA:  I think it's only a few seconds so I

16   paused it.

17             Now, your Honor, at this point I would offer

18   Government Exhibit 916, which is certified business records

19   from Google subscriber information for the email account

20   ib.drussell@gmail.com.

21             MR. CANNICK:  No objection.

22             THE COURT:  That's in evidence.

23             (Government Exhibit 916 was received in evidence.)

24             MS. SHIHATA:  And if I could publish it please.

25             THE COURT:  Sure.

Flatley - Direct - Shihata                    2708

1              (Exhibit published.)

2              MS. SHIHATA:  And looking at that subscriber

3    information for ib.drussell@gmail.com, the subscriber name is

4    Don Russell.

5              And now I would offer Government Exhibit 816 as a

6    certified official record, a birth certificate for Donnell

7    Russell.

8              THE COURT:  Any objection?

9              MR. CANNICK:  No objection.

10             (Government Exhibit 816 was received in evidence.)

11             (Exhibit published.)

12   Q    And here's the name of the person for the birth

13   certificate, Donnell Anton Shedale Russell, and mother's name,

14   June Annette Barrett.

15             MS. SHIHATA:  No further questions.

16             THE COURT:  Any cross examination?

17             MR. CANNICK:  None.

18             THE COURT:  Okay, the witness can step down.

19             (Whereupon the witness was excused.)

20             (Continued on the next page.)

21

22

23

24

25

|  |  |
|---|---|
| Proceedings | 2709 |

1            (In open court.)

2            THE COURT:  Do you have an additional witness to

3    call?

4            MS. GEDDES:  Yes, Your Honor.  The government calls

5    Rosanna Corrado.

6            (Witness enters the room.)

7            THE CLERK:  Raise your right hand for me, please.

8            Do you solemnly swear or affirm that the testimony

9    you're about to give will be the truth, the whole truth and

10   nothing but the truth?

11           THE WITNESS:  I do.

12           (Witness sworn.)

13           THE CLERK:  You may be seated.

14           THE COURT:  You can take your mask off.

15           All right.  Just a couple of things.

16           Please make sure that you are speaking into the

17   microphone.  I want to make sure everybody can hear you.

18           Do not talk too fast.  I want to make sure the court

19   reporter can get down everything that you have to say.

20           If there is something that someone asks you that is

21   not clear or you would like to have repeated, just let me

22   know.

23           And do your best just to answer only the question

24   you are being asked.  Okay?

25           Go ahead.

Corrado - Direct - Geddes                    2710

1               MS. GEDDES:  Thank you.

2     **ROSANNA CORRADO,** having been first duly sworn, was examined

3     and testified as follows:

4     DIRECT EXAMINATION

5     BY MS. GEDDES:

6     Q     Good afternoon.

7               By whom are you employed?

8     A    I am employed by DANY, the District Attorney's Office of

9     New York, and I am assigned to HSI.

10              THE COURT:  Sorry, which one?  I did not hear what

11    you said.

12              THE WITNESS:  Oh, sorry.

13              THE COURT:  I do not know if your mike is working.

14              I think it is.  I think you need to speak up a

15    little bit.

16              THE WITNESS:  Is that better?

17              THE COURT:  Yes.

18              THE WITNESS:  Okay.  Sorry.

19              THE COURT:  Which unit are you assigned to?

20              THE WITNESS:  I am employed DANY, the District

21    Attorney's Office of New York, and I am assigned to Homeland

22    Security.

23              THE COURT:  Go ahead.

24    Q    And how long have you been assigned to Homeland Security?

25    A    It will be two years in October.

Corrado - Direct - Geddes                    2711

1   Q     And what do you do for them?

2   A     I am an intelligence analyst.

3   Q     Have you participated in an investigation of Robert

4   Kelly?

5   A     Yes, I have.

6   Q     And as part of your investigation, have you reviewed

7   telephone records?

8   A     Yes, I have.

9          MS. GEDDES:   The government offers, pursuant to

10  Federal Rule of Evidence 803(6) and 902(11), Government

11  Exhibit 101(a) and (b), 102(a), 103(a), 104(a), 105(a) and

12  (b), 107(a), 109(a) and (b), 110(a) and (b), 111(a), 112(a),

13  113(a), 114(a), 115(a) and (b), 116(a) and (b), 117(a) and

14  (b), 118(a) and (b), 119(a) and (b), 120(a) and (b), 120(a),

15  122(a) and (b), 123(a), 124(a).

16         THE COURT:   Slow down just a little.

17         MS. GEDDES:   Sorry.

18         THE COURT:   That's alright.

19         MS. GEDDES:   125(a) and (b), 126(a) and (b), 127(a),

20  128(a), 129(a), 130(a), (b) and (c), 131(a), 133(a), 134(a),

21  135(a), 136(a), 137(a), 138(a), 139(a), 140(a), 141(a),

22  142(a), 143(a), and 152(a), all of which are telephone

23  records.

24         THE COURT:   Any objection?

25         MR. CANNICK:   No.

Corrado - Direct - Geddes                    2712

1          THE COURT:  Okay.  Those are in evidence.

2          (Government Exhibits 101(a) and (b), 102(a), 103(a),

3    104(a), 105(a) and (b), 107(a), 109(a) and (b), 110(a) and

4    (b), 111(a), 112(a), 113(a), 114(a), 115(a) and (b), 116(a)

5    and (b), 117(a) and (b), 118(a) and (b), 119(a) and (b),

6    120(a) and (b), 120(a), 122(a) and (b), 123(a), 124(a),

7    125(a) and (b), 126(a) and (b), 127(a), 128(a), 129(a),

8    130(a), (b) and (c), 131(a), 133(a), 134(a), 135(a), 136(a),

9    137(a), 138(a), 139(a), 140(a), 141(a), 142(a), 143(a), and

10   152(a) were received in evidence.)

11         MS. GEDDES:  I am showing, the witness only, what's

12   been marked for identification as Government Exhibit 149.

13   Q    Can you see that or do you want me to bring it to you?

14   A    No, it's okay, I can see it.

15   Q    Do you recognize what's shown in 149?

16   A    Yes.

17   Q    And just generally speaking, what is shown there?

18   A    It is a summary chart of the excerpts of some of the

19   telephone records that I reviewed.

20   Q    And does it relate to -- does it show contact between two

21   particular numbers and four other numbers?

22   A    Yes.

23   Q    Five other numbers?

24   A    Yes.

25         MS. GEDDES:  The government offers Government

Corrado - Direct - Geddes                    2713

1    Exhibit 149.

2             THE COURT:  Any objection?

3             MR. CANNICK:  None.

4             THE COURT:  Okay.  That is in evidence.

5             (Government Exhibit 149 was received in evidence.)

6             MS. GEDDES:  And may I publish, please?

7    Q    So you testified that these are -- this is a summary

8    chart showing contact between two numbers and five other

9    numbers.

10             I want to start with those two numbers.  There's one

11   ending in 337-9300 and one ending in 747-6569.  And I am going

12   to show what's in evidence as Government Exhibit 482.  I'll

13   put it right below.  And that same number ending in 9300 is

14   saved as a telephone number for Rob under phone mobile home,

15   and that number ending in 6569 is saved as a number for the

16   studio.  And then you testified that this document shows

17   telephone records between those two numbers, the 9300 and 6569

18   telephone numbers, and five other telephone numbers, the first

19   one of which ends in 2117.

20             And I am going to show what's in evidence as

21   Government Exhibit 210(p).  And before I do, just to remind, I

22   am going to put on -- these are all in evidence.  Government

23   Exhibit 210(d) is a photograph taken from -- saved on a cell

24   phone.  And then from that same series is 210(p) and it lists

25   a phone number, (630) 886-2837, which is one of the telephone

Corrado - Direct - Geddes                    2714

1   numbers listed in Government Exhibit 149.

2        And I am now going to show what's in evidence as

3   Government Exhibit 133(a), which is subscriber information for

4   that same telephone number ending in 2837, and it lists an

5   electronic serial number, also known as an ESN.  And it's a

6   long number and it ends in 5518.

7        And I am now going to show Government Exhibit 140(a)

8   and 141(a), both of which are in evidence.  And this -- just

9   beginning with 140(a), this is subscriber records for

10  (630) 379-1136, another telephone number listed in Government

11  Exhibit 149.  And this subscriber record for the phone number

12  ending in 1136 also includes an ESN, and it is the same

13  electronic serial number as that listed in the prior exhibit

14  for the phone number ending in 2837.  And that one also,

15  that's the same number, it ends in 5518, much longer number.

16       And then I am going to show you Government Exhibit

17  141(a), also in evidence, which is another subscriber record.

18  This one is for a telephone number ending in 2407, and that

19  phone number -- it's hard to see with the small type.  And

20  that phone number is also listed in Government Exhibit 149 as

21  one of the phone numbers for which the summary was provided.

22       And going back to 141(a), there is also an ESN

23  listed for that particular phone number and, like the other

24  two numbers, it's the same electronic serial number ending in

25  5518.

Corrado - Direct - Geddes                    2715

1            In addition, there are three other telephone numbers

2    listed on Government Exhibit 149.  One of those telephone

3    numbers is ending in 2117, and that -- I am going to show

4    Government Exhibit 131(a) now, in evidence, which is another

5    subscriber record.  This is a subscriber record for that

6    telephone number ending in 2117 and it lists the name of the

7    subscriber as Lutrinia Woods at an address in Streamwood,

8    Illinois.

9            And then I am going to show what's in evidence as

10   Government Exhibit 111(a), which is a subscriber record for

11   another telephone number listed -- actually, this phone number

12   is not listed in the exhibit, so I won't go through it.

13           And the government also offers, as a certified

14   official record, Government Exhibit 813.

15                THE COURT:  Any objection?

16                MR. CANNICK:  No.

17                THE COURT:  Okay.  It is in evidence.

18                (Government Exhibit 813 was received in evidence.)

19                MS. GEDDES:  May I publish?

20                THE COURT:  Yes.

21                MS. GEDDES:  And this is a certification of a birth

22   record for Jerhonda Johnson and the mother's name is listed as

23   Lutrinia Woods.

24   Q    And just directing your attention to Government

25   Exhibit 149 --

Corrado - Direct - Geddes                    2716

1          MS. GEDDES:  Oh, actually there's -- I'm sorry,

2     there's one additional phone number listed on this summary

3     chart and that is one ending in 5655.

4          And may I show, the witness only, what's been marked

5     for identification as Government Exhibit 160?

6     Q    Do you recognize what's shown in Government Exhibit 160?

7     A    Yes, I do.

8     Q    And what is that?

9     A    It is a frequency chart that I created.

10    Q    And is it a frequency chart showing the telephone numbers

11    that were frequently in contact with telephone number (630)

12    336-5655 between a certain period?

13    A    Yes.

14          MS. GEDDES:  The government offers Government

15    Exhibit 160.

16          MR. CANNICK:  No objection.

17          THE COURT:  Okay.  That is in evidence.

18          (Government Exhibit 160 was received in evidence.)

19          MS. GEDDES:  And may I publish?

20          THE COURT:  Yes.

21    Q    And there are several telephone numbers listed on

22    Government Exhibit 160.  Does this show all of the telephone

23    numbers that were in contact with 5655 during that time

24    period?

25    A    No, it just shows the most frequent numbers that were in

1    contact.

2    Q    And so does this one list -- when it says count, what

3    does that refer to?

4    A    It refers to the amount of communications those numbers

5    had with the 5655 number in the time periods listed in the min

6    date, max date columns.

7    Q    And when it says min date, is that the first date in that

8    period of June 12, 2009 to July 9, 2009 when there was a

9    contact between that particular contact I.D. and the 5655

10   telephone?

11   A    Correct.

12   Q    And where it says the max date, is that the end date

13   between that time period between June 12 to July 9 that there

14   was a contact between that particular contact I.D. and the

15   5655 telephone?

16   A    Yup.

17   Q    All right.  The second telephone number listed ends in

18   1900; is that correct?

19   A    Yes.

20        MS. GEDDES:  And I'm showing what's in evidence as

21   210(x).

22   Q    And is that that same telephone number ending in 1900?

23   A    Yes.

24        MS. GEDDES:  And it's saved in the telephone as

25   Keyonia.

Corrado - Direct - Geddes                    2718

1          And there's also, below that, some contact with a

2     telephone number ending in 6519.  And I'm showing what's in

3     evidence as 210(y), and this is a photograph of a contact

4     saved in this particular phone.  And the contact for -- that's

5     saved as Mom lists that same 6519 phone.

6          And then I'm showing what's in evidence as 210(q).

7     Before I do, there's a phone contact with a telephone number

8     ending in 2708.

9          And now looking at 210(q), this is a photograph of a

10    particular screen on a cell phone and it indicates certain

11    calls, and it includes a call with that same number ending in

12    2708.

13         And then just finally, with respect to this, I just

14    showed a screenshot where this 6519 telephone number was saved

15    as a contact for Mom.  I am now going to show what's in

16    evidence as Government Exhibit 111(a).  And this is a

17    subscriber record for that same telephone number ending in

18    6519 and it shows the subscriber name as Lutrinia Woods, the

19    same subscriber that was listed as a subscriber for the 2837,

20    the phone number ending in 2837, as well as the name of the

21    mother of Jerhonda Johnson, as set forth in Government Exhibit

22    813.

23    BY MS. GEDDES:

24    Q    All right.  So now referring to Government Exhibit 149,

25    you testified earlier that this reflects telephone calls

Corrado - Direct - Geddes                    2719

1    between the telephone numbers ending in 9300 and 6569, the two

2    numbers that were saved respectively as Rob and the studio in

3    that prior Government Exhibit, as well -- so it's telephone

4    contact between those two numbers and these five numbers; is

5    that right?

6    A    Correct.

7    Q    And what is the range of contact between those two top

8    numbers and the five numbers below?  When is the first

9    contact?

10   A    The first contact is on June 2nd, 2009.

11   Q    And I'm going to turn to the final page.  When is the

12   last contact indicated, as shown in this government exhibit?

13   A    It is January 24, 2010.

14   Q    And on the exhibit at the top, there are telephone

15   numbers listed.  Which of the -- what are the telephone

16   numbers?  I'm going to turn to the front, the first page.

17   What are the telephone numbers that are included in that

18   telephone number list?  Is that the ones ending in 9300 and

19   6569?

20   A    Yes.

21   Q    And where it says direction, incoming or outgoing, what

22   does an incoming call denote in light of -- as you prepared

23   this report?

24   A    So in the telephone number column, those are the numbers

25   that had the cell phone records that I reviewed.  So those are

Corrado - Direct - Geddes                    2720

1    the numbers that we received records for.

2           And then in the contact telephone number, those are

3    the numbers that -- the numbers in the telephone number column

4    we're contacting.  So in the direction column, you're able to

5    tell if it was an incoming or outgoing call to those contact

6    telephone numbers.  So, for example, in the first line, the

7    9300 is the telephone number.  It's the record that I

8    reviewed, it made an in -- it was a -- it received an incoming

9    call from the 2117 number in the contact telephone number

10   column.

11   Q    And fair to say that the contact telephone number is just

12   the telephone number that was in contact with that, what's

13   listed under the telephone number?

14   A    Correct.

15          MS. GEDDES:  I'm showing the witness what's been

16   marked for identification as Government Exhibit 148.

17   Q    Do you recognize what is shown in Government Exhibit 148?

18   A    Yes.

19   Q    What is that?

20   A    It is another summary chart I created.

21   Q    And does it reflect contact between that same telephone

22   number that you just testified about ending in 2117 for which

23   there was a subscriber information indicating that it was

24   subscribed to a Lutrinia Woods, as well as the phone number

25   ending in 8200?

Corrado - Direct - Geddes                    2721

1  A    Yes.

2          MS. GEDDES:  The government offers Government

3  Exhibit 148.

4          MR. CANNICK:  No objection.

5          THE COURT:  Okay.  That is in evidence.

6          (Government Exhibit 148 was received in evidence.)

7          MS. GEDDES:  May I publish, please?

8          THE COURT:  Yes.

9  Q    And what is the date range of the contact between these

10 two telephone numbers?

11 A    The first contact is on May 31st, 2009 and the last is

12 June 7, 2009.

13 Q    And I am showing what's now in evidence as Government

14 Exhibit 102(a).

15          (Continuing on the next page.)

16

17

18

19

20

21

22

23

24

25

Corrado - direct - Geddes                    2722

1    EXAMINATION CONTINUES

2    BY MS. GEDDES:

3    Q    And this is the subscriber record for Jermaine Maxey for

4    that same telephone number, the one ending in 8200, that's

5    included on Government Exhibit 148.

6              MS. GEDDES:  I am showing the witness only what's

7    been marked for identification as Government Exhibits 150,

8    151, 153, 154 and 145.

9    Q    Do you recognize what I just put in front of you?

10   A    Yes.

11   Q    And, generally speaking, what are they, these?

12   A    Some of them are excerpts from telephone records, and I

13   believe there was another summary chart that was in the stack;

14   yes.

15   Q    I just showed you 154, is that an example of a summary

16   chart?

17   A    Yes.

18   Q    And did you prepare those summary charts?

19   A    Yes.

20   Q    And are they prepared in a similar manner to the summary

21   charts that you previously testified about?

22   A    Yes.

23             MS. GEDDES:  The Government offers 145, 154, 153,

24   151, 150 and -- and 150?

25             MR. CANNICK:  No objection.

SAM      OCR      RMR      CRR      RPR

Corrado - direct - Geddes                    2723

1            THE COURT:  Any objection?

2            (Government's Exhibits 145, 150, 151, 153 and 154

3  were received in evidence.)

4            THE COURT:  Can I see counsel at the side for a

5  minute?

6            No need for the court reporter.

7            (Sidebar held off the record with the Court and

8  counsel only.)

9            (Sidebar concluded.)

10            (In open court - jury present.)

11            MS. GEDDES:  The Government also offers 156 into

12  evidence.

13            MR. CANNICK:  No objection.

14            (Pause.)

15            MS. GEDDES:  The Government offers 156.  There was

16  no objection.

17            THE COURT:  Okay, that's in evidence.

18            (Government's Exhibit 156 was received in evidence.)

19            MS. GEDDES:  The Government also offers Government

20  Exhibit 147 and 157, which are also summary charts prepared by

21  this witness.

22            MR. CANNICK:  No objection.

23            THE COURT:  All right, in evidence.

24            (Government's Exhibits 147 and 157 were received in

25  evidence.)

Corrado - direct - Geddes                    2724

1          MS. GEDDES:  And I am now showing the witness only

2     what's been marked for identification as Government

3     Exhibit 159(a) through (f).

4          THE COURT:  I don't think there's any objection to

5     this either.  Is there, counsel?

6          MR. CANNICK:  No.

7          THE COURT:  Those are in evidence as well.

8          (Government's Exhibit 159(a) through 159(f) was

9     received in evidence.)

10    BY MS. GEDDES:

11    Q     Beginning with 159(b).

12          (Exhibit published.)

13    Q     Can you describe what is shown in 159(b)?

14          And before you do, did you prepare this exhibit?

15    A     I did.

16    Q     Can you describe what is shown in 159(b)?

17    A     It is a map plotting out the cell site location data for

18    numbers ending in 0880, 7283 and 4738 for the time period

19    between September 29th, 2015 and October 3rd, 2015.

20    Q     And at the bottom there is a key, and just referring to

21    the last four digits of each phone number, the 0880 is the

22    denoted by pink; 7283 is denoted by blue; and 4738 is denoted

23    by yellow.

24          Is that correct?

25    A     Correct.

Corrado - direct - Geddes                    2725

1    Q    And on Government Exhibit 159(b), are there many dots on

2    this map that are not necessarily individually shown on the

3    map?

4    A    Yes, there are a bunch that overlap.

5    Q    And from what you see on 159(b), does it show certain

6    dots associated with the yellow, certain dots associated with

7    the blue, and certain dots associated with the purple?

8    A    Yes.

9    Q    And you testified earlier that these dots denoted cell

10   site records or cell site location information for those

11   particular cell sites, is that correct?

12   A    Yes.

13   Q    And do the cell sites locations approximately show where

14   a particular cell phone is at a particular moment?

15   A    Yes.

16             MS. GEDDES:  And I'm showing what's in evidence as

17   Government Exhibit 159(e).

18             (Exhibit published.)

19   BY MS. GEDDES:

20   Q    Can you just describe what is shown in these three boxes

21   (indicating) at the bottom?

22             So, for example, starting with where my finger is.

23   A    So, these points, the three points plot specific

24   communications and the approximate cell tower and location

25   that they were hitting off of at the time of those

SAM     OCR     RMR     CRR     RPR

Corrado - direct - Geddes                              2726

1    communications.

2            So, the first one is September 29th, 2015 at 4:29.

3    And the phone that made that communication or received that

4    communication was zero -- ending in 0880.

5    Q    And is that same key that you just testified about, that

6    same color key that you just testified about on 159(b), is

7    that also reflected -- are those same colors used on 159(e)?

8    A    Yes, those same colors are used throughout all of the

9    maps that I created.

10   Q    And the time that is indicated here, is that reflected in

11   what is known as UTC?

12   A    Yes.

13   Q    And then, again, there are other dots here which don't

14   have the particular callouts reflected.

15           Are these three callouts just a sampling of the date

16   and time of those particular communications?

17   A    Yes.

18   Q    Fair to say that if it listed every one, there might be

19   bubbles everywhere on the map?

20   A    Yes.

21   Q    And the location of this particular call, the one at 4:29

22   UTC, does that show that the phone is approximately in

23   Manhattan?

24   A    Yes.

25   Q    And is Manhattan an island?

1  A    Yes.

2  Q    To get out of Manhattan, do you have to cross over one of

3  the waters surrounding Manhattan?

4  A    Yes.

5  Q    And there appear to be a series of dots right around

6  where my finger is pointed (indicating) in the purple dots and

7  the blue dots.

8        Do you see that?

9  A    Yes.

10  Q    Is that right around where the Lincoln Tunnel is located?

11  A    Yes.

12  Q    And are there then subsequently dots over here

13  (indicating) in New Jersey?

14  A    Yes.

15  Q    And I used the term subsequently because do those -- do

16  those locations occur after the communication at 4:29 a.m.?

17  A    Yes.

18  Q    And then, just briefly, I am showing you what's in

19  evidence as 159(d).

20        Is that just a close-up photograph of a portion that

21  was shown in 159(b)?

22        (Exhibit published.)

23  A    Yes.

24  Q    And do you know what state or where this occurred?

25  A    This looks like Pennsylvania.

Corrado - direct - Geddes                     2728

1  Q     And you can see that there's some communications around

2  State College, Pennsylvania, is that correct?

3  A     Yes.

4  Q     And then similarly showing you 159(f).

5        (Exhibit published.)

6  BY MS. GEDDES:

7  Q     Again, is that just a close-up of communications that are

8  shown on 159(b)?

9  A     Yes, it's a close-up of communications in Nebraska.

10 Q     And I am showing -- right, and just to be clear, you said

11 it's a close-up of communications.

12        Those dots reflect the location data for those

13 particular cell phones, is that correct?

14 A     Correct.

15 Q     Thank you.

16        And I am showing what's in evidence as 159(a).

17        (Exhibit published.)

18 Q     This is just a Google map prepared showing the travel

19 from New York, New York to Oakland, California.

20        Is that correct?

21 A     Yes.

22 Q     And this path shown in blue, does that show a path

23 driving, in part, along Interstate 80?

24 A     Yes.

25 Q     And finally, I am showing you 159(c).

Corrado - direct - Geddes                    2729

1              (Exhibit published.)

2    BY MS. GEDDES:

3    Q    Again, is that just another close-up of communications

4    that are shown on 159(b)?

5    A    Yes.

6    Q    And -- and, again, where are these communications,

7    generally?

8    A    They're in the state of California.

9    Q    And you can see that there are cities, such as Oakland

10   and San Francisco, written; is that correct?

11   A    Yes.

12   Q    And I used the term, I think I interchangeably used the

13   term pink and purple for that color, but are they indicating

14   the same particular cell phone?

15   A    Yes.

16   Q    And, again, using the same key?

17   A    Yes.

18              MS. GEDDES:  Nothing further.

19              THE COURT:  All right, any cross-examination?

20              MR. CANNICK:  No.

21              THE COURT:  All right, you can step down.

22              (Witness stepped down and was excused.)

23              THE COURT:  And I think that takes us right to

24   1 o'clock, which is when we are going to break.

25              So, we have a very long weekend.  I won't see you

Corrado - direct - Geddes                    2730

1   again until Thursday.  That is, obviously, a very long time,

2   and I am sure you will miss us, but I want to just caution you

3   again, because we will be apart for so long, please do not

4   read anything about the case.  Do not Google anything.  Do not

5   look on social media.  Do not listen to any news reports.

6   Report to the Court during that time if anybody tries to

7   contact you or contact any other juror, let us know.

8                I hope you have a relaxing few days here.  For those

9   who are observing the holiday, have a good holiday.  And I

10  will see you next Thursday.

11               All right, thank you.

12               THE COURTROOM DEPUTY:  All rise.

13               (Jury exits.)

14               THE COURT:  Okay, everybody can have a seat.

15               THE COURTROOM DEPUTY:  You may be seated.

16               THE COURT:  Just to be clear, the person who came in

17  momentarily is a lawyer I have on a conference after this

18  case.  He was very early.

19               Anything that anybody wants to bring up before we

20  break for the -- I was going to say weekend, but for a long

21  time?

22               MS. GEDDES:  Did Your Honor want to address the

23  defendant's motion?

24               THE COURT:  Yes.  Yes, I do.

25               So, I don't want to take a whole lot of time with

Corrado - direct - Geddes                    2731

1   this.  I am just looking at Mr. Scholar's letter, and the
2   point of contention is the extent to which the Government
3   should be permitted to offer these videos depicting, I guess,
4   sexual contact among and between the defendant and various
5   people.
6            My first question is, is any of the other two people
7   who appear, are they testifying?
8            MS. GEDDES:  Yes, Your Honor.
9            THE COURT:  Okay.  I think that might answer the
10  question.
11           I know that some of your submission was premised on
12  the assumption that they wouldn't be testifying.
13           Do you want to think about that and let me know if
14  that affects what your position is on this evidence?
15           MR. SCHOLAR:  Yes, Your Honor.  Thank you.
16           THE COURT:  Okay.  So, if you want to submit
17  something in between then.  I don't want to ruin your weekend
18  or your holiday, but it's always better if I get it a little
19  bit sooner, the Government has a chance to respond, and I can
20  think about it.
21           MR. SCHOLAR:  Sure.  When would you like it?
22           THE COURT:  When would I like it?
23           MR. SCHOLAR:  Not like it, but when should I submit
24  it?
25           THE COURT:  I mean as long as I get it by Tuesday or

1    something.

2              Is that okay with the Government?

3              I mean I don't anticipate it is going to be a really

4    long thing.  It just gives me some time to contemplate it and

5    for the Government to respond.

6              So, if you get me something by Tuesday.  You get a

7    response by Wednesday.  I'll get back to you on Thursday.

8              All right?

9              MR. SCHOLAR:  Thank you, Your Honor.

10             MS. GEDDES:  Thank you.

11             THE COURT:  Thanks so much.

12             Anything else?

13             MR. CANNICK:  Your Honor, during the testimony of

14   Pace, I was about to make inquiry of a relationship that she

15   had with Maxey and, basically, to establish that they had

16   communications and -- and other things going on in the

17   relationship.

18             The telephone records that the Government submitted,

19   I think there was some communication between Maxey and Pace.

20   And precluding me from going into that now, I can't really

21   argue what I need to argue to the jury with respect to that

22   line of communication.

23             THE COURT:  I confess, I have no recollection of

24   this line of questioning.

25             MR. CANNICK:  Well, what I will do, Your Honor,

Corrado - direct - Geddes                    2733

1    because I don't want to belabor it right now, is get it in the

2    transcript, send it to Your Honor, and then we can revisit it

3    when we come back.

4               THE COURT:  All right.

5               MS. GEDDES:  I am happy to address it right now

6    because the communication is exactly as Jerhonda Pace

7    testified; that she was invited to the defendant's residence

8    in Olympia Fields by someone named Jermaine Maxey, also known

9    as Bubba, and that they exchanged communications as they

10   arranged to go to meet him.  And it happened in May of 2009,

11   which is exactly what those telephone contacts show.

12              That does not alter the Government's position that

13   it is a violation of Federal Rule of Evidence 412 to then

14   further go into any subsequent sexual relationship between

15   Jerhonda Pace and anybody else.

16              THE COURT:  Oh, I do recall that, yes.  We can talk

17   about this further because I think people have places to be --

18              MR. CANNICK:  Okay.

19              THE COURT:  -- but I am not inclined to change my

20   ruling on that.

21              MS. GEDDES:  Thank you.

22              THE COURT:  All right.

23              (Defendant exited the courtroom.)

24              (Judge ANN M. DONNELLY exited the courtroom.)

25         (Matter adjourned to September 9, 2021 at 9:30 a.m. )

**<u>INDEX</u>**

**<u>WITNESS</u>:**                                                      **<u>PAGE</u>:**

  **KATE**
                    DIRECT EXAMINATION                    2625
                    BY MS. GEDDES

                    CROSS-EXAMINATION                     2646
                    BY MR. CANNICK

  **JOHN MIRANDONA, JR.**

                    DIRECT EXAMINATION                    2668
                    BY MS. SHIHATA

  **STEPHEN FLATLEY**

                    DIRECT EXAMINATION                    2696
                    BY MS. SHIHATA

  **ROSANNA CORRADO**

                    DIRECT EXAMINATION                    2710
                    BY MS. GEDDES

                         * * * * *
                         **EXHIBITS**

Government Exhibit 60
                                                         2625

Government Exhibit 60(a)                                 2626

Government Exhibit 60(b)                                 2626

Government Exhibit 930                                   2643

Government's Exhibit 345(a)                              2671

Government's Exhibit 344(a)                              2674

Government's Exhibits 248(a) and 348(b)                  2675

Government's Exhibits 344(b), 344(c) and 344(d)          2680

Government's Exhibits 344(3) and 344(f)                  2682

Government Exhibits 344G through K                       2685

EXHIBITS (CONTINUED)                                    Page:

Government Exhibit 108A                                 2688

Government Exhibits 337 and 337A                       2690

Government Exhibits 338 and 338A                       2692

Government Exhibit 344A                                 2696

Government Exhibit 913                                  2698

Government Exhibit 132A                                 2700

Government Exhibit 915                                  2703

Government Exhibit 914C                                 2705

Government Exhibit 913                                  2707

Government Exhibit 916                                  2707

Government Exhibit 816                                  2708

Government Exhibits 101(a) and (b), 102(a), 103(a),    2712
104(a), 105(a) and (b), 107(a), 109(a) and (b),
110(a) and (b), 111(a), 112(a), 113(a), 114(a),
115(a) and (b), 116(a) and (b), 117(a) and (b),
118(a) and (b), 119(a) and (b), 120(a) and (b),
120(a), 122(a) and (b), 123(a), 124(a),  125(a) and
(b), 126(a) and (b), 127(a), 128(a), 129(a), 130(a),
(b) and (c), 131(a), 133(a), 134(a), 135(a), 136(a),
137(a), 138(a), 139(a), 140(a), 141(a), 142(a),
143(a), and 152(a)

Government Exhibit 149                                  2713

Government Exhibit 813                                  2715

Government Exhibit 160                                  2716

**EXHIBITS (CONTINUED)**                                    **Page:**

Government Exhibit 148                                          2721

Government's Exhibits 145, 150, 151, 153 and 154               2723

Government's Exhibit 156                                        2723

Government's Exhibits 147 and 157                               2723

Government's Exhibit 159(a) through 159(f)                     2724

* * * * *