4200

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,       :   19-CR-00286(AMD)
                                :
                                :
                                :   United States Courthouse
        -against-               :   Brooklyn, New York
                                :
                                :
                                :   September 22, 2021
                                :   9:30 a.m.
ROBERT SYLVESTER KELLY,         :
                                :
        Defendant.              :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

For the Government:        JACQUELYN M. KASULIS, ESQ.
                           Acting United States Attorney
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201

                           BY:  ELIZABETH GEDDES, ESQ.
                                MARIA E. CRUZ MELENDEZ, ESQ.
                                NADIA SHIHATA, ESQ.
                                Assistant United States Attorneys

For the Defendant:         DEVEREAUX LEON CANNICK, ESQ.
                           CALVIN HAROLD SCHOLAR, ESQ.
                           NICOLE BLANK BECKER, ESQ.
                           THOMAS A. FARINELLA, ESQ.

Court Reporter:            DENISE PARISI, RPR, CRR
                           225 Cadman Plaza East
                           Brooklyn, New York 11201
                           Telephone: (718) 613-2605
                           E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*Proceedings*                                                    4201

1              (In open court; jury not present.)

2         THE COURTROOM DEPUTY:  All rise.

3         THE COURT:  Everybody can have a seat.

4         Okay.  Just a few things before we start.  I got

5    Mr. Scholar's submissions on the jury charge and also in

6    response to the Government's application to admit Mr. Smith's

7    grand jury testimony.  I think that the hang up here is which

8    statute was in existence at the time the Government is talking

9    about.  I think that's what's changed.  What Mr. Scholar

10   requests, I don't think, was in the statute at the time that

11   we're talking about.

12        So do you want to double-check that, Mr. Scholar?

13        MR. SCHOLAR:  I will, Judge.

14        THE COURT:  Okay.  But I'm pretty sure that's

15   correct.

16        With respect to the application to admit the grand

17   jury testimony, I'm denying that application.  I don't really

18   even think the testimony is inconsistent, which is one of the

19   requirements; and the cases that permit this, as well as the

20   rule, require that it be inconsistent --

21        MS. CRUZ MELENDEZ:  Your Honor?

22        THE COURT:  -- so I'm not permitting it, and I don't

23   want to discuss it anymore.

24        Okay.  So what else do we have to discuss this

25   morning?

*Proceedings*                                                4202

1          MR. CANNICK:  Your Honor, we would like to make

2    further argument on the requested charge.  Mr. Farinella has

3    some more authority for the Court's consideration.

4          THE COURT:  On what topic?

5          MR. FARINELLA:  Your Honor, the email that the

6    Government had sent with regard to the additional language.

7          THE COURT:  What language?  It's a very long charge.

8          MR. FARINELLA:  Well, there was an email sent by the

9    Government on Tuesday, September 21st, with regard to the

10   enterprise and adding additional language to the jury charge

11   to include additional language on the jury's instructions with

12   regard to the definition of enterprise.

13         THE COURT:  Okay.  Do you object to that?

14         MR. FARINELLA:  The language they're seeking to add,

15   Your Honor, they are -- in the cases that they cite, and the

16   language that it comes from, are cases where there are

17   conspirator or co-conspirator defendants.

18         THE COURT:  I don't think that matters, but go

19   ahead.

20         MR. FARINELLA:  Well --

21         THE COURT:  You're saying that giving the charge

22   hinges on whether there are other people that are also

23   charged?

24         MR. FARINELLA:  Well, yes.  I think that the cases

25   that I read deal with co-defendants -- co-conspirators who had

*Proceedings*                                                    4203

1    knew -- who knew of the illicit activity that they were

2    engaging in.  There are other acts, though, that may have

3    taken place, and they're trying to assert that they were

4    unaware of those other acts.

5            THE COURT:  No, I don't understand that to be the

6    case.  I think the law says that in an enterprise -- I don't

7    think all of the people that make up the enterprise have to be

8    aware -- well, maybe I'm wrong about that.  Let me ask the

9    Government.  I'm pretty sure that's right, but --

10           MS. GEDDES:  Yes, that's right.  The Government's

11   position is, as set forth in the language we proposed, that

12   every member of the enterprise does not need to know

13   everything that the enterprise is doing; and, importantly,

14   that the critical question for the jury is that the defendant

15   had the requisite criminal intent.  It makes no difference

16   whether other members of the enterprise had criminal intent,

17   and the reason for that is simple; that the law recognizes

18   that an enterprise allows someone to become much more

19   powerful.  And under racketeering, it states that a defendant

20   can use a legitimate enterprise to commit a pattern of

21   racketeering act, and that makes him guilty of racketeering.

22   It is irrelevant what the other members of the enterprise,

23   what criminal -- if any -- criminal intent that they had, and

24   I think that the language we propose just reflects that basic

25   black letter law that is, frankly, reflective of the language

*Proceedings*                                                    4204

1    in the statute itself.

2          MR. FARINELLA:  Your Honor, in the first case they

3    cite, which is *USA vs. Rastelli*, the Court says, basically,

4    that the knowledge of the enterprise can be inferred from

5    eminence of close association with other co-conspirators with

6    the required knowledge and from participation with members of

7    the enterprise.

8          So what they're saying is that these are

9    co-conspirators who engaged in illicit illegal activity; and,

10   in this case, it's distinguishable, because this would be an

11   association of fact, technically -- an enterprise that's an

12   association of fact -- and I think there is a distinction, and

13   I think that this charge -- this additional language and

14   definition would cause confusion for the jurors.

15         THE COURT:  But I just don't understand, the

16   opposite of what you're saying is that everybody has to know

17   about it; is that your position?

18         MR. FARINELLA:  What I'm saying is that, for

19   example, in a conspiracy RICO case, for example, organized

20   crime, where there are members who are engaging in illegal

21   gambling, loan-sharking, while they all don't know of the

22   other's entire activities, they are all acting together for an

23   illicit means, a financial gain, reward at the end; and in the

24   event that they want to assert that they didn't realize that

25   someone else in the enterprise is going to be -- would commit

1   murder or other acts, they can't -- they can't allege the

2   ignorance to those issues, and I think that's what these cases

3   are discussing because they were all -- the cases in which are

4   cited deal with the -- with co-conspirators who all were

5   engaged in the illicit illegal activity and they knew that,

6   and so --

7           THE COURT:  Well that's one kind of racketeering

8   case.  I mean, there are those kind of classic racketeering

9   cases where the enterprise itself is illegal, but the law is

10  equally clear that the enterprise can be a not-illegal

11  enterprise, so that's just a different kind of case.  I don't

12  think you are going to find any case that says that every

13  person who makes up the enterprise has to know about every

14  single thing that's going on.  I'm quite certain that's not

15  the law.

16          MR. FARINELLA:  Well, when you're building an

17  association of fact, they have to have some understanding of

18  the underlying language that's charged in the indictment.

19          THE COURT:  I would love to see a case that says

20  that, but I don't think that's what -- I think the statute

21  itself says something quite different.

22          MR. FARINELLA:  Again, Your Honor, based upon my

23  reviewing of the cases that the Government cited, they were

24  not cases from association-of-fact cases; they were

25  co-conspirators who were alleging they weren't aware of

*Proceedings*                                           4206

1    certain activity.  That activity was actually intertwined

2    because they knew they were engaging in some illicit activity

3    for illegal -- that was illegal for financial reward.

4             THE COURT:  I don't have the cases at my fingertips,

5    but what charge did the judge give in that case?

6             MR. FARINELLA:  The charge said that for

7    co-conspirators who are engaging in illicit illegal activity

8    for financial reward can't say that they're not part of this

9    enterprise.

10            THE COURT:  Because they don't know every piece of

11   it.

12            MR. FARINELLA:  Correct.

13            THE COURT:  Are you saying that every member of the

14   enterprise has to be, I guess, indictable?  Is that what

15   you're saying; that they have to know that the enterprise was

16   criminal?  I don't think --

17            MR. FARINELLA:  Well, that's the question, Your

18   Honor.  So a CEO, for example, who is using his staff to

19   funnel in women -- or whatever, to engage in some sort of

20   activity -- that staff doesn't know what's happening.  You

21   know, it begs the question as to whether or not there's an

22   enterprise.  I mean, the fact remains that in this instance,

23   if the Court's going to contemplate this charge, then I think

24   it should be made clear that the enterprise itself can't be

25   just one person -- the person -- the defendant, himself, and

*Proceedings* 4207

1    the enterprise.

2           THE COURT:  I think it says that.  The enterprise --

3    that's what the charge says.

4           So it's always helpful to me -- the reason why I

5    send out the charge in advance is so I can get feedback and

6    time to fit it in.  I'm not sure I understand what you want me

7    to do.  I don't think that you will find a case that requires

8    that every member of the enterprise act with the same criminal

9    intent as the person who is being charged.  I just don't think

10   that's the law.

11          What's required is the existence of the structure

12   that enables the defendant -- or whoever is being charged --

13   to carry out what the illegal activity is -- I think I have

14   that right -- and I don't think there's any additional

15   requirement that every single person who makes up that

16   enterprise has to also act with the same criminal intent.

17          If you have a case that says otherwise, I will

18   certainly look at it, but I think the language the Government

19   submitted is a correct statement of the law.

20          I'm just curious, I know Raniere hasn't been

21   appealed yet, but I'm sure this was the same charge that Judge

22   Garaufis gave in Raniere.

23          MS. GEDDES:  Certainly the submission that we

24   offered to the Court was drawn from the Court's charge in

25   Raniere.  I don't know that every last word is the same but --

*Proceedings*                                                          4208

```
 1            THE COURT:  Well, I have the Raniere charge, I
 2   haven't compared them, but the RICO charge was similar, but I
 3   think there was a RICO conspiracy charge in that case, too.
 4   But, in any event, if you have a case and you want to submit
 5   it, you can do that.  I just like to make sure that everybody
 6   has what the charge is going to be before they sum up.  I'm
 7   not inclined to change it.
 8            MR. FARINELLA:  I appreciate that, Your Honor, and
 9   this came as a separate email suggestion, so it wasn't in the
10   original charge.  This is an additional charge that the
11   Government has --
12            THE COURT:  I know that.  That's fine.
13            MR. FARINELLA:  I would appreciate if the Court
14   would just give me --
15            THE COURT:  Well, the summations are going to start
16   today, so time's a-wastin'.
17            All right.  Anything else?
18            I understand you are not calling the expert; is that
19   correct?
20            MR. SCHOLAR:  That is correct, Your Honor.
21            THE COURT:  Okay.  So we just have the one witness?
22            MR. SCHOLAR:  Yes, Your Honor.
23            MR. CANNICK:  We have one witness, Your Honor, and
24   we have some stipulations that are being worked on now.
25   Unfortunately, we don't get home before 5:00, and we have to
```

*Proceedings*                                                         4209

1    pull them together, and we've got to coordinate with our

2    staff.

3              THE COURT:  I haven't gotten mad or anything.

4              MR. CANNICK:  Well, I've gotten a lot of chatter.

5              THE COURT:  Well --

6              MS. GEDDES:  The Government is a bit upset because

7    we have not seen any of these proposed stipulations despite

8    that counsel has been speaking about them for some time now,

9    so we're obviously not going to enter into a stipulation until

10   we've had an opportunity to review the proposed stipulation

11   and compare the language to what we understand the evidence to

12   be; but we're talking about things we haven't seen, so it's

13   difficult to predict how much time we might need.

14             THE COURT:  How many are there?

15             MR. CANNICK:  Probably about -- in terms of probably

16   inconsistent statements, probably about 20, 25.

17             THE COURT:  You know, I've got to say, now, we

18   really have talked about this for a while, and I'm not taking

19   two hours to sit down and figure it out.  We've been talking

20   about this for a couple weeks, I think.

21             MR. CANNICK:  Your Honor, the stipulations -- the

22   witnesses were confronted --

23             THE COURT:  I know what it was.  I'm not quarrelling

24   with the topic.  I'm just quarrelling with the timing, because

25   this is not news, so someone on the defense team should draft

1   the stipulations, give them to the Government, and it should

2   happened before lunch.

3            MR. CANNICK:  It will.  It will.

4            THE COURT:  Okay.  All right.

5            One other topic, since I'm talking about things that

6   make me impatient, what steps has the Government taken to deal

7   with the question of those recordings?

8            MS. CRUZ MELENDEZ:  Some of our tech people have

9   been able to convert most of the videos into straight audio

10  files.  I believe there are two outstanding that require

11  redactions and are taking a little bit longer.  We are hoping

12  to be able to have those finished by around lunchtime.  We

13  will need an opportunity just to give it a listen to make sure

14  that the redactions were properly done, and then it should be

15  done by this afternoon.

16           THE COURT:  Okay.  All right.

17           Now, your witness is here.

18           MR. CANNICK:  That's my understanding.

19           THE COURT:  We'll take the witness's testimony,

20  we'll break to get these --

21           MR. CANNICK:  Stipulations --

22           THE COURT:  -- stipulations done, and then we'll --

23  I guess we can begin summations this morning.

24           Do you have a preference for that?  I want us to use

25  our time as wisely as we can.

*Proceedings*                                                                  4211

1            MS. GEDDES:  The Government is prepared to move

2      forward with closings.  We'll need a short break just to set

3      everything up.  My concern is the 20 to 25 prior inconsistent

4      statements that we may be presented with at some point, and I

5      honestly don't know how long that's going to take, but I'm

6      prepared to give my closing --

7            THE COURT:  I think maybe it makes sense to take the

8      lunch break before you start, then, just to be -- even if we

9      have to go earlier for lunch.

10           All right.  Why don't we get the witness and then

11     get the jury.

12           (Pause.)

13           THE COURT:  Just before we get the jury, let me just

14     see the lawyers at the side for just a second.  We don't need

15     the reporter.

16           (Witness takes the stand.)

17           (Discussion held off the record at sidebar without

18     the court reporter.)

19           THE COURTROOM DEPUTY:  All rise.

20           (Jury enters.)

21           THE COURTROOM DEPUTY:  You may be seated.

22           THE COURT:  All right.  Mr. Scholar -- first of all,

23     good morning, everybody.  Sorry about that.  I'm trying to get

24     things moving here.  We are ready to proceed with the trial.

25           Mr. Scholar, do you want to call your next witness?

*Proceedings*                                                          4212

1              MR. SCHOLAR:  Yes, Your Honor.  Julius Darrington.

2              THE COURTROOM DEPUTY:  Please stand and raise your

3    right hand.

4              (Witness sworn.)

5              THE COURTROOM DEPUTY:  Thank you.

6              You may be seated.

7              THE COURT:  Just a couple of things before we begin.

8              THE WITNESS:  Yes.

9              THE COURT:  I want to make sure everybody can hear

10   you, so make sure you use the microphone.  And, if you want,

11   you can always take it out of the stand if that becomes

12   easier.

13             THE WITNESS:  Okay.

14             THE COURT:  The other thing is, please don't speak

15   too quickly.  Our court reporter takes down everything you

16   say --

17             THE WITNESS:  Okay.

18             THE COURT:  -- and if you speak too fast, it makes

19   her job harder.  For the same reason, let whichever lawyer is

20   asking you questions to finish talking before you start

21   talking, that way we don't have crosstalk.

22             If there's a question that isn't clear or you want

23   to have repeated, let me know, and I will have the lawyer

24   clarify.

25             And just do your best to answer only the question

*Proceedings*                                                    4213

1    that you are being asked, okay?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Okay.  Great.

4              Go ahead.

5              MR. SCHOLAR:  Thank you, Your Honor.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **JULIUS DARRINGTON**,

2                   called as a witness, having been first duly

3                   sworn/affirmed, was examined and testified as

4                   follows:

5   DIRECT EXAMINATION

6   BY MR. SCHOLAR:

7   Q     What do you do for a living?

8   A     Music consultant.

9   Q     Have you ever worked in the AR department?

10  A     Yes.

11  Q     What is AR?

12  A     A & R stands for artists and repertoire.

13  Q     And what do you do in A & R?

14  A     An A & R facilitates the music production of a specific

15  album -- production and engineering, mix, mastering.  Pretty

16  much, the liaison between the artist and the record company is

17  the A & R.

18  Q     And what labels have you worked for?

19  A     I was A & R consultant for RCA.

20  Q     Any other labels?

21  A     I did some consulting for a numbers -- numerous

22  independent labels, but only major labels was RCA.

23  Q     Do you know Robert Kelly?

24  A     Yes.

25  Q     How do you know him?

1  A    I worked as A & R on his last project that he worked on

2  over the last few years.

3  Q    And who introduced you to Mr. Kelly?

4  A    DJ Wayne Williams.

5  Q    And who is Wayne Williams?

6  A    Wayne Williams was a senior vice president of A & R and

7  RCA records.

8  Q    And what were you brought in to do?

9  A    I was brought in to assist Wayne Williams with the A & R

10 process of R. Kelly's album -- Robert's album.

11 Q    Did you ever meet Mr. Kelly?

12 A    Yes.

13 Q    And did you ever travel to Chicago?

14 A    Yes.

15 Q    And how many times have you been in his presence?

16 A    Years -- few years.  Every day almost.

17 Q    How many years did you provide A & R service for him?

18 A    About four years -- four years.

19 Q    And do you see him in court today -- Mr. Kelly?

20 A    Yes.

21 Q    Can you identify him by an article of clothing he's

22 wearing?

23 A    White mask, blue blazer.

24       THE COURT:  Indicating the defendant.

25 BY MR. SCHOLAR:

1  Q    Now, when you were -- were brought in, was there a

2  specific project you were working on?

3  A    Not a specific project, just his music in general.  The

4  project hasn't -- didn't form yet, but just facilitating

5  records and ideas for a possible album.

6          THE COURT:  What year was this?  I'm sorry.  What

7  year did you start working for him?

8          THE WITNESS:  I would say 2016.

9          THE COURT:  Okay.

10         Go ahead.

11 BY MR. SCHOLAR:

12 Q    And what duties did you have with respect to A & R for

13 Mr. Kelly?

14 A    Bring him ideas; production ideas; song ideas; connecting

15 with different, you know, mixing engineers; work side by side

16 with him on the creative process of his album.

17 Q    And where would these meetings take place with Mr. Kelly?

18 A    Meetings as in -- what meetings?  What do you mean?

19 Q    When you would discuss the A & R side of a project, where

20 would you meet with Mr. Kelly?

21 A    We would meet at the studio; we would meet at cigar

22 lounges.  Mainly the studio.

23 Q    And how many hours would you be with Mr. Kelly?

24 A    On average, during the week, I probably would be with him

25 about -- about, you know, 10 to 12 hours a day, or longer.

*Darrington - Direct - Scholar*                                          4217

1    Q    And can you describe a typical day with respect to the

2    A & R process with Mr. Kelly?

3    A    A typical day was he would wake up about 5:00 or

4    6:00 p.m. in the evening, give me a call, text message and

5    say, come to the studio about, you know, seven o'clock --

6    seven, eight o'clock.  I meet him at the studio, we would go

7    to the basketball gym, he would work out, play basketball.

8    After basketball, we would go to the studio and work through

9    the whole night.

10   Q    And the studio that you're familiar with is on Justine?

11   A    Yes, sir.

12   Q    And when you started working with Mr. Kelly, were you

13   based in Chicago?

14   A    I was based in Los Angeles.

15   Q    Did you move to Chicago?

16   A    No, I didn't move to Chicago, but I was there a lot,

17   so...

18   Q    And can you describe for the jury what that process was?

19   How did you go from Los Angeles to Chicago?

20   A    He would request me to come to Chicago, and they would

21   book me a flight and a hotel to come stay in Chicago at the

22   Homewood Suites, and there I would stay and commute from the

23   hotel to the studio and work.  Sometimes it would be couple

24   months at a time, three months at a time, maybe a couple

25   weeks.

1  Q     And did you ever spend the night at the studio on

2  Justine?

3  A     Well, we wouldn't start until the morning, so, yeah.

4  Technically, yes.

5  Q     And where in Justine would you stay when you stayed

6  there?

7  A     You know, a couple times I would crash or sleep on the

8  couch in the lounge area for a couple hours or go back to my

9  room.

10 Q     And where was the lounge area in relation to the studio

11 area?

12 A     When you walk in the door, you open the door and there's

13 a -- it's a area with a bar, chairs, and a couch, a kitchen,

14 bathroom.  As soon as you walk into the studio -- you walk

15 into the studio, there's one door, you open up the second

16 door, and that's the lounge area.

17 Q     And where is the studio where the recording would be in

18 relation to this room you are talking about?

19 A     The recording studio is in the -- a room behind the

20 lounge area, so you would open up another door, walk down the

21 hallway, and you will be in the recording studio area.

22 Q     And when you observed these rooms, did you see any locks

23 on the outside of these rooms?

24 A     No.

25 Q     And during the time that you were with Mr. Kelly

*Darrington - Direct - Scholar*                                        4219

1   providing A & R service, did you ever see any women locked in

2   these rooms?

3   A      No.

4   Q      Did you ever hear any women crying in these rooms?

5   A      No.

6   Q      Did you ever hear Mr. Kelly striking or hitting anyone?

7   A      No.

8   Q      Did you see him strike or hit anyone?

9   A      No.

10  Q      Did you ever see Mr. Kelly's girlfriends?

11  A      Yes.

12  Q      And where would you see his girlfriends?

13  A      I would see them outside of the truck coming in from

14  various stores, you know, leaving back and forth.

15  Q      And were they carrying anything when you saw them?

16  A      Shopping bags, mainly, from my observation.

17  Q      Were they by themselves?

18  A      Yes, I would say, you know -- yes.

19  Q      Now, were you ever with Mr. Kelly's girlfriends in the

20  same room?

21  A      Yes.

22  Q      And when you entered a room where Mr. Kelly's girlfriends

23  were, did they have to look at a wall?

24  A      No.

25  Q      And if one of Mr. Kelly's girlfriends entered a room

1    where you were, did you have to leave?

2    A    No.  I was never told to leave a room.

3    Q    Did you ever travel with Mr. Kelly?

4    A    Yes.

5    Q    Where did you travel to?

6    A    Multiple places.  Specifically, I remember Phoenix,

7    Arizona; and Dallas; St. Louis; south -- Charlotte.

8    Charlotte.

9    Q    And were these tours or were these events?

10   A    Events.  I would say events, spot dates, so to speak.

11   Q    And can you tell the jury what the distinction is between

12   a tour and a spot date?

13   A    Well, my distinction of a tour is a tour is usually about

14   ten to -- ten or more concerts lined up back to back.  A spot

15   date is you have one or two events, maybe three.  I wouldn't

16   consider that a tour.

17   Q    And when you traveled with Mr. Kelly, were you going to a

18   specific place?

19   A    Yes.

20   Q    And what happened when you got to the place?  Would

21   Mr. Kelly perform?

22   A    Yes.  He would perform, yes.

23   Q    Would you also attend the concerts?

24   A    Yes.

25   Q    Was that part of your duties as A & R?

1    A    No.

2    Q    Why would you attend the concerts?

3    A    Just support.

4    Q    When Mr. Kelly traveled, how would you travel?

5    A    We would travel in a Sprinter van.

6    Q    And would you ride the Sprinter van with Mr. Kelly?

7    A    Yes.

8    Q    And would you also be in the presence of his girlfriends

9    in the Sprinter van?

10   A    No.  I would be in the front.

11   Q    And as you rode in the front, could you hear any women

12   screaming?

13   A    No.

14   Q    Could you hear any women banging?

15   A    No.

16   Q    Did you hear Mr. Kelly striking anyone?

17   A    No.

18   Q    Did you hear any yelling?

19   A    No.

20              (Continued on the following page.)

21

22

23

24

25

Darrington - direct - Scholar                    4222

1    BY MR. SCHOLAR:   (Continuing)

2    Q    Did you ever go shopping with Mr. Kelly?

3    A    Yes.

4    Q    How many times?

5    A    A lot.

6    Q    Did you ever go shopping with Mr. Kelly and his

7    girlfriend?

8    A    Yes.

9    Q    What, if anything, did you see when you went shopping

10   with Mr. Kelly and his girlfriends?

11   A    Repeat the question?

12   Q    When you went shopping with Mr. Kelly and his

13   girlfriends --

14   A    Yes.

15   Q    -- what did they do?

16   A    Looked at clothes and, you know, Mr. Kelly would interact

17   with people who noticed him, fans, take pictures, but mainly

18   just look at clothes and, you know, shop.

19   Q    And when you observed Mr. Kelly's girlfriends during the

20   entire time that you were with him, how were they dressed?

21   A    Just normal, normal clothes.  Nothing significant that I

22   can recall.

23   Q    When you were at the studio, did you become familiar with

24   the people that worked at the studio?

25   A    Yes.

Darrington - cross - Shihata                    4223

1   Q    Do you know a person named Dhanai?

2   A    Dhanai?

3   Q    Yes.  I think he had a nickname "El DeBarge"?

4   A    Yes.

5   Q    And how about Jeff Meeks, do you know Jeff Meeks?

6   A    Yes.

7   Q    Are you still in the music industry today?

8   A    Yes.

9   Q    What types of work are you doing?

10  A    Music consulting and I own my own record label.

11  Q    Thank you.

12            MR. SCHOLAR:  I have nothing further.

13            THE COURT:  All right.  Cross-examination?

14            MS. SHIHATA:  Yes, Your Honor.

15  CROSS-EXAMINATION

16  BY MS. SHIHATA:

17  Q    Good morning.

18  A    Good morning.

19  Q    Mr. Darrington, you're from Toledo, Ohio, correct?

20  A    Correct.

21  Q    And you didn't grow up with the defendant, right?

22  A    No.

23  Q    And before meeting the defendant, you were a fan of his,

24  is that right?

25  A    Yes.

1  Q    And working with him was kind of how you established

2  yourself, the first time you established yourself with a major

3  recording artist, correct?

4  A    Correct.

5  Q    And you first met the defendant around, in 2016, I think

6  you said?

7  A    Yes.

8  Q    And while you worked for the defendant or with the

9  defendant, you were based in Los Angeles, correct?

10 A    Correct.

11 Q    And he was not based in Los Angeles, correct?

12 A    Correct.

13 Q    At that time, he was based in Chicago and sometimes

14 Atlanta, is that right?

15 A    Correct.

16 Q    And so you weren't with him all the time, correct?

17 A    Correct.

18 Q    In fact, there were times when the defendant wanted you

19 to travel from LA to Chicago and you didn't because you didn't

20 have the funds at the time, correct?

21 A    Not that I can recall.

22        MS. SHIHATA:  I'm showing this to the witness only.

23 Q    Do you see the text in blue on your screen?

24 A    Yes.

25 Q    And these are texts you wrote to another individual,

Darrington - cross - Shihata                    4225

1    correct?

2    A    Those are my texts, yes.

3    Q    And in these texts, you state:  Rob asked me to fly out

4    today or tomorrow and he will reimburse me but I don't have

5    400-something right now for a flight.  Just paid my rent which

6    is 2,300, and I paid rent for July ahead of time so I'm flat.

7         Does that refresh your recollection that there were

8    times when the defendant wanted you to come from LA and you

9    didn't have the funds?

10   A    Well, that refreshes my memory about that particular

11   time, yes.

12   Q    And that's what I'm asking you about.  Okay?

13   A    Yes.

14   Q    Okay.  Now, I assume you were never present when the

15   defendant was engaged in sexual activity, correct?

16   A    Correct.

17   Q    And you were never present when the defendant filmed that

18   sexual activity, correct?

19   A    Correct.

20   Q    Or any other activity that he filmed with his female

21   guests and girlfriends, correct?

22   A    Correct.

23   Q    And you had never seen any of those videos, correct?

24        MR. SCHOLAR:  Objection, Your Honor.

25        THE COURT:  Overruled.

Darrington - cross - Shihata                    4226

1    Q     You can answer.

2    A     Correct.

3    Q     And you have no idea what's on them, correct?

4          MR. SCHOLAR:  Objection.

5          THE COURT:  Well, sustained as to form.

6    Q     In fact, you have no knowledge of what the defendant did

7    behind closed doors when you weren't there, correct?

8    A     Correct.

9    Q     Now, I think you said you spent time in the studio on

10   Justine Street, right?

11   A     Correct.

12   Q     And I think you said several hours each time, is that

13   right?

14   A     Correct.

15   Q     Ever see an accountant there?

16   A     Yes.

17   Q     And that was while were you in the studio recording with

18   the defendant?

19   A     No.

20   Q     So is it fair to say you spent, I think you testified on

21   direct examination, you would show up around 7 or 8, go play

22   basketball and then spend hours and hours at the studio

23   recording, correct?

24   A     That's correct.

25          So was -- can you repeat --

Darrington - redirect - Scholar                    4227

1   Q    I'm sorry.  There's no question pending, sir.

2          Now, you testified you met certain people that the

3   defendant worked with while you were present, correct?

4   A    Correct.

5   Q    And I'm showing you what's in evidence, and this can go

6   to everyone, Government Exhibit 14.

7          You met this person, correct?

8   A    Correct.

9   Q    Donnell Russell, correct?

10  A    Correct.

11  Q    You met him through the defendant?

12  A    I met him being around the defendant, yes, not through

13  the defendant.

14            MS. SHIHATA:  Nothing further.

15            THE COURT:  Any redirect?

16            MR. SCHOLAR:  Just briefly.

17            THE COURT:  Okay.

18  REDIRECT EXAMINATION

19  BY MR. SCHOLAR:

20  Q    Do you know a person named John Holder?

21  A    Yes.

22  Q    Who is John Holder?

23  A    Mr. Kelly's former accountant.

24  Q    Did you see John Holder when you would go to the studio?

25  A    Yes, John Holder at the studio before, yes.

                    Darrington - redirect - Scholar                4228

1    Q     And why was John Holder there?

2    A     Usually having meetings.

3                MR. SCHOLAR:  Nothing further.  Thank you.

4                THE COURT:  Anything else?

5                MS. SHIHATA:  No, Your Honor.

6                THE COURT:  Can I see the parties at the sidebar a

7    minute, please, just about scheduling.

8                Sorry, sir, you can step down.

9                (Witness excused.)

10               (Continued on next page.)

```
                              Sidebar                        4229
```

1            (The following occurred at sidebar.)

2            THE COURT:  Is the defendant going to testify?

3            MR. CANNICK:  No, Your Honor, he's not going to

4     testify.

5            THE COURT:  Well, I'm going to excuse the jury so I

6     can have you put that on the record.

7            What is our timing with regard to stipulations?

8            MR. CANNICK:  What time is it now?

9            THE COURT:  10:30.

10           MR. CANNICK:  Be back by 11:15?

11           THE COURT:  I think that's fine.  What is the, what

12    about motions?  You are going to rest?

13           MR. SCHOLAR:  I was thinking since we only have

14    summations lined up that I would just do a brief motion.  I

15    wasn't go to go into that now.

16           THE COURT:  You can actually make, you can make the

17    motion and I'm going, I'm probably going to deny it and then

18    let it go to the jury.

19           All right.  So I'll send the jury out and I'll have

20    Mr. Kelly put on the record that he does not wish to testify

21    and then I'll have them come back here at 11:30.  Let's see.

22           MS. GEDDES:  We have, we still have not seen any of

23    these 20 to 25 --

24           THE COURT:  I know.

25           MS. GEDDES:  In fact, it depends, in part, on when

Sidebar                                                    4230

1   we will actually receive these.

2          MR. CANNICK:  What we'll do -- I guess I think the

3   majority of them have been prepared so we get to go back,

4   we'll send them at least 50 percent of them and I just need my

5   office to finish typing them up.

6          THE COURT:  So the issue is, as I said, I might have

7   mentioned this just in passing to Mr. Scholar and Ms. Shihata,

8   that there may be some question about whether there actually

9   is -- I would imagine that the language for the most part

10  would be similar and you just have a list of what's to be seen

11  by the jurors.  Let me just -- if they're not going to

12  stipulate, then what?

13         MR. CANNICK:  Then we'll call the agent again.

14         MS. GEDDES:  Again, not knowing what these are

15  about, I don't know.  I'm confident we will -- I'm sorry.

16         THE COURT:  He may not have done the interview.

17         MR. CANNICK:  But he's staff, he's the case agent

18  and he reviewed all these reports.

19         MS. GEDDES:  Look, we're not going to make you call

20  the agent if what's, if the agent, we know the agent had

21  testified as to what you wanted in the stipulation, but I just

22  can't say it enough that this is really frustrating that you

23  have had these for so long and we kept being promised them and

24  we don't have them.  I would like to close today.

25         MR. CANNICK:  Yes, you're right.  We're going to

```
                        Sidebar                    4231
```

1    close today.

2            THE COURT:  Everybody, take the temperature down a

3    little bit.

4            MR. CANNICK:  You say that to me.

5            MS. GEDDES:  It goes to me too.

6            THE COURT:  I mean everybody.  The temperature has

7    been pretty good so far.

8            MR. CANNICK:  Thank you.

9            THE COURT:  There's no point in looking back now.

10   We can sit here and have a fight about it but then it's not

11   getting done so let's get it done.  I'm going to send the jury

12   out.  I'm going to tell them noon.

13           Do you know how long you are going to be?

14           MS. GEDDES:  228 pages, double-spaced?

15           THE COURT:  All right.  The only thing that I'm

16   going to suggest is that maybe what we'll do is when we bring

17   them back and have the long awaited stipulations -- are we

18   going to read them all into the record?

19           MR. CANNICK:  No.  We're going to use them for

20   summation purposes.

21           THE COURT:  And then we'll have you rest in front of

22   the jury and then break for lunch then and start afterwards.

23           MS. GEDDES:  Okay.

24           MR. SCHOLAR:  You want to formally rest too?

25           MS. GEDDES:  I think we rested.

```
                           Sidebar                        4232

 1            THE COURT:  They have to rest after you.

 2            MS. GEDDES:  And I will say depending on what the

 3    stips are, there could be a rebuttal stip but let's see what

 4    it is.

 5            THE COURT:  All right.

 6            (Sidebar conference ends.)

 7            (Continued on next page.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                                        4233

1          (In open court.)

2          THE COURT:  Okay.  Ladies and gentlemen, I'm going

3     to excuse you probably until noon.  There are some legal

4     matters that we have to address.  My expectation is that we

5     will have a few little matters before you, then we'll break

6     for lunch and then we'll begin closing arguments this

7     afternoon.

8          Please don't talk about the case.  As I said, I do

9     apologize for the stops and starts but it happens in every

10    trial.  So please don't talk about the case at all and we'll

11    see you in a little bit.

12         (Jury exits.)

13         THE COURT:  Already.  Everybody can have a seat.

14         I understand from counsel that Mr. Kelly does not

15    wish to testify.

16         So, Mr. Kelly, I'm just asking you.  You can take

17    your mask off if you want.

18         Have you had a chance to discuss the decision of

19    whether to testify with your lawyers?

20         THE DEFENDANT:  Yes, ma'am, Your Honor.

21         THE COURT:  And is it your wish not to testify?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  Okay.  And that's a decision that you've

24    made freely and that's what you want to do, you don't want to

25    testify, correct?

Proceedings                                4234

1            THE DEFENDANT:  Yes.

2            THE COURT:  You can have a seat.

3            So we talked at the sidebar about these stipulations

4    and let's get to it.

5            MR. CANNICK:  Thank you.

6            THE COURT:  Is there anything else that we have to

7    do before that?

8            All right.

9            MR. CANNICK:  Thank you, Your Honor.

10           THE COURT:  Okay.  So I just need to see

11   Ms. Cruz Melendez and Mr. Cannick at sidebar for two seconds.

12           (Discussion off the record.)

13           THE COURT:  So we will be in recess until 11:30.

14           In the meantime, Mr. Farinella, if you want to send

15   me any cases on that subject that you raised, I'll consider

16   it.  Okay?

17           MR. FARINELLA:  Thank you, Your Honor.

18           THE COURT:  Thank you.

19           (Recess taken.)

20           (Continued on next page.)

21

22

23

24

25

Proceedings                                    4235

1              (In open court; jury not present.)

2              (Parties present.)

3              THE CLERK:  All rise.

4              THE COURT:  Okay.  Are the stipulations all taken

5     care of?

6              MS. GEDDES:  No, Your Honor.

7              THE COURT:  Do you have them?

8              MS. GEDDES:  We received them 14 minutes ago.

9              THE COURT:  How much time do you need to go over

10    them?

11             MS. GEDDES:  Some time.  There are several of them.

12    I think we're going to need at least an hour.

13             THE COURT:  All right.  Then I think -- let me just

14    ask...

15             All right.  I am just trying to figure out the

16    schedule here.  Again, you know, I am not a big believer in

17    looking backward, but I am more than a little annoyed this was

18    not done before, because we discussed it on several occasions,

19    but it is what it is.

20             I think what still has to be done in front of the

21    jury is for the defense to rest, and I guess we cannot do that

22    until after we sort this out.  So I think that I should

23    probably bring the jury out and tell them we probably won't

24    have them back out here until 2:00, because their lunches do

25    not come until closer to 1:00 and it is too late now to change

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                        4236

1    the time on that.

2              And then to the extent that I have got to hear any

3    kind of disagreement between the two sides about what should

4    be stipulated to and what should not -- and I do not think any

5    of this is the key to the case -- I think that, you know,

6    witnesses were cross-examined about statements they gave in

7    pretrial interviews, all of the interviews say at the top it

8    is not a verbatim transcript and with each and every one the

9    same questions were asked, so the question about whether

10   something is inconsistent, I think, is probably going to be

11   the only point of contention.

12             So, how many of them are there?

13             MS. GEDDES:  It looks like there are about 24

14   inconsistencies, plus we were given at least two other --

15   yeah, two other proposed stipulations that we're reviewing.

16             THE COURT:  Okay.  Anything else besides this that

17   we have to resolve?

18             MR. CANNICK:  Your Honor, I'm uncertain as to

19   whether or not Defense Exhibits A, B and C were admitted into

20   evidence.  I just wanted to confirm.

21             THE COURT:  I think they probably were.

22             MR. CANNICK:  I think they were, but...

23             MS. GEDDES:  I don't...

24             MR. CANNICK:  Oh, you know what happened?  Initially

25   when I started offering them, I offered as 1, 2 and 3, and

Proceedings                                    4237

1   then the Court reminded me it's A, B and C, so that's probably

2   why.

3           THE COURT:  They are in, I think.  Right?

4           MR. CANNICK:  Yes.

5           THE COURT:  I am just checking with Ms. Greene.

6           THE CLERK:  A, B, C, D, E.

7           MR. CANNICK:  Okay.  Thank you.

8           THE COURT:  So I think I am going to tell the jury

9   that we will start at 1:30 because Ms. Greene, who can do

10  everything, has already tried to get their lunch here a little

11  earlier, and I think that makes some sense.  So I think what I

12  will do is bring them in and tell them that we will see them

13  back here at 1:30.  All right?

14          THE CLERK:  All rise.

15          (Jury enters the courtroom.)

16          THE CLERK:  You may be seated.

17          THE COURT:  All right, jurors.  Again, in the

18  interest of making the best use of your time and ours, I think

19  it makes sense for us to get your lunch here a little bit

20  early, and so I am going to shoot for getting us all back

21  together here at 1:30.  And obviously if your lunches do not

22  get here in time, we will have to tinker with that a little

23  bit.  But I am going to excuse you until 1:30.  I appreciate

24  your patience.  This is fairly common in trials.  So please do

25  not talk about the case at all, but we will see you back here

Proceedings                               4238

1    in a little bit.  Thanks so much.

2              THE CLERK:  All rise.

3              (Jury exits the courtroom. )

4              THE CLERK:  You may be seated.

5              THE COURT:  Okay.  Anything else before we break for

6    whatever this is?

7              No?  Okay.  All right.

8              (Luncheon recess taken.)

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                4239

1              **A F T E R N O O N   S E S S I O N**

2              (In open court; jury not present.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Everybody can sit down.

5              (Defendant enters the courtroom.)

6              THE COURT:  Okay.  Just before I hear from you on

7    this question of stipulations, with respect to the charge, I

8    did review *Boyle vs. United States*, which is a case that

9    Mr. Farinella submitted.  That doesn't stand for the

10   proposition that every member of the enterprise has to

11   participate or know about its activities.  But one thing I

12   will say about the Government's proposed charge, which is on a

13   really entirely separate matter, is that the -- I think the

14   first two sentences, moreover, it is not necessary to prove

15   that every member of the enterprise participated in or knew

16   about all its activities, rather it is sufficient that the

17   defendant know the general nature of the enterprise and know

18   that the enterprise extends beyond his individual role.

19              The next two sentences are -- well, I mean, the next

20   two sentences are really not appropriate for a case like this.

21   It may be appropriate in some other case, but the language

22   that it's not necessary to prove that the enterprise or its

23   members acted with criminal intent is -- I don't think is

24   appropriate in this case, so I'm not going to give that.

25              The other thing that I noticed just looking through

*Proceedings*                                                4240

1    the charge is that there's no charge currently in the charge

2    about -- I think it's Louis who has an agreement with the

3    Government, and I assume you want that in the charge; correct?

4            MR. SCHOLAR:  Yes, Your Honor.

5            THE COURT:  So there's some language -- we probably

6    have it, but if somebody can submit that language to me, and

7    then to the extent that there should be a charge on Mr. Smith,

8    who I think was given immunity, I don't know if there needs to

9    be a charge for him.  Those are the only two that I can

10   recall.

11           MS. GEDDES:  Your Honor, with respect to Your

12   Honor's ruling about those second two sentences --

13           THE COURT:  I thought I could go through that so

14   quickly that you would forget about it.

15           MS. GEDDES:  Not so.

16           We anticipate that the defense is going to argue

17   that there was nothing illegal about the enterprise, and we're

18   not saying that there was something illegal about the

19   enterprise, and so that is why we wanted that additional

20   language to make clear that they -- the jury only needs to

21   find that defendant acted with criminal intent and not that

22   anyone else acted with criminal intent, because I think that's

23   going to be a significant focus of defense's closing.

24           THE COURT:  Well, I mean, I think that's an accurate

25   statement of the law, but I don't think the sentence that the

*Proceedings*                                                    4241

1   enterprise -- I think the rest of the charge adequately

2   conveys that, but that one sentence I don't think does.

3          Obviously, the defendant has to act with the

4   requisite intent.  I don't think anybody would quarrel with

5   that.  I think I say that in other places in the charge, but I

6   will add that sentence again.  I'm just not going to put

7   "under the circumstance of this case."  I think it would be

8   confusing to say that the enterprise doesn't -- when the

9   person who is the head of the enterprise is the defendant

10  under the Government's theory.  So, I mean, maybe there's a

11  different way to phrase it, but when you look at it, it's

12  confusing, and I think -- as applied to these facts.

13         The rest of the charge actually does have all of

14  that, so, I mean, if there's an argument that -- I mean, I

15  don't think it's a matter of dispute, at least it shouldn't

16  be, that enterprises can take all kinds of forms -- the charge

17  goes on at some length about that -- but I don't think that

18  that one sentence is appropriate, and so if something comes up

19  during the summation that makes me change my mind, we can

20  revisit that then.

21         So just with respect to the charge, then, the charge

22  with respect to -- I think it's cooperation agreement with

23  respect to Louis, and then with respect to Mr. Smith, I assume

24  the defense has no objection to that; is that correct?

25         MR. SCHOLAR:  No, Your Honor.

*Proceedings*                                                         4242

1          THE COURT:  Okay.

2          And then what are we doing about stipulations?

3          MS. GEDDES:  So we have reached agreement as to

4    some, but with respect to certain of the stipulations of prior

5    statements, the Government does oppose the admission of some

6    prior statements because we don't believe they were

7    inconsistent, in several instances -- and I can address them

8    one by one, but in several --

9          THE COURT:  Do it slowly, whatever you do.

10         MS. GEDDES:  -- in several instances, on

11   cross-examination, the witness was asked whether or not they

12   recalled making a particular statement, and their answer was,

13   no, they didn't recall it, and they were not asked

14   specifically whether that statement was true or not.  And so

15   simply saying that you don't recall making a statement is not

16   inconsistent with the substance of the statement, and so I

17   don't think that those particular prior statements should be

18   admitted because they're just not inconsistent with anything.

19         THE COURT:  Do you have a list?

20         MS. GEDDES:  I do.

21         THE COURT:  Maybe it's easier for me to look at it.

22         MS. GEDDES:  Yes.

23         (Pause.)

24         MS. GEDDES:  So I'm going to talk first about Jane,

25   Louis, and Alesiette, if that's okay.

*Proceedings*                                                   4243

1           THE COURT:  Sure.  Is this an extra copy.  I just

2    want to make sure you do it in the microphone.

3           MS. GEDDES:  I might have just given you my copy.

4           THE COURT:  Sorry.

5           MS. GEDDES:  That's okay.

6           So with respect to Number 4, where Jane was asked

7    about whether the defendant -- whether she said that the

8    defendant masturbated in front of her while she was singing,

9    her response to that was "I don't recall" --

10          THE COURT:  Right.

11          MS. GEDDES:  -- and so as far as I can see, there's

12   not an inconsistent statement.  She wasn't asked, "Was he

13   masturbating in the room while you were singing?"

14          THE COURT:  So what's your response?

15          MR. CANNICK:  I think "I don't recall" is the basis

16   for the introduction of a prior inconsistent statement.

17          THE COURT:  I actually don't recall if it is --

18          MR. CANNICK:  I think it is, Your Honor.

19          THE COURT:  -- the basis.  If someone says they

20   don't remember something, whether they told them that --

21          MR. GEDDES:  But they --

22          THE COURT:  Wait.

23          Did she tell them, or did she not tell them?

24          MS. GEDDES:  She was asked whether she remembered

25   telling the Government --

*Proceedings*                                                        4244

1          THE COURT:  Right.

2          MS. GEDDES:  -- that particular event happening,

3    whether -- she was not asked "was the defendant" -- "isn't it

4    true that the defendant was in the room masturbating?"  She

5    wasn't asked that, because if she was asked that, then her

6    statement -- and if she said no, then her statement where she

7    said that she was in the room while the defendant was

8    masturbating would be, of course, inconsistent.

9          THE COURT:  But I don't think that it's so much the

10   question of inconsistency.  If someone testifies to something

11   on their direct testimony, and then they're asked, basically,

12   you never told that to the Government -- isn't that the

13   question, or is it something different?

14         MS. GEDDES:  No.  Because on direct examination, she

15   testified about some events that happened.  She didn't say

16   whether or not the defendant was masturbating or not

17   masturbating.  It just wasn't part of the testimony, and what

18   defense counsel could have done was said, isn't it true that

19   the defendant was masturbating while --

20         THE COURT:  I'm still confused here because, is it

21   the fact that she -- why would the defense bring out that she

22   said that in her statement?  So I thought that the issue was

23   that she testified about that -- I mean -- and I have no

24   recollection, I must say, what she said about it, but --

25         MR. CANNICK:  Your Honor, my recollection --

*Proceedings*                                                    4245

1          THE COURT:  I will tell you the other reason why

2     this is so annoying is that this should have been done before,

3     and it's not -- I shouldn't have to be sitting here waiting

4     for a jury looking at this stuff, and there are -- one, two,

5     three, four, five, six, seven -- eight disputed statements,

6     and I'm not happy about it.  This is not the way this should

7     have been done.  This was brought up some time ago, and doing

8     it at the last minute like this is not the way things should

9     be happening.

10         Let me ask this.  Is any of this -- I guess you've

11    got to get the evidence in before the summations start.  I

12    just don't -- I'm not prepared to make the jury wait, so if

13    you want --

14         MS. GEDDES:  Your Honor, I'm prepared to close.  I

15    don't need a resolution as to these particular matters prior

16    to my closing.  I'm not going to be referencing any of these

17    statements, and we could deal with this after that if the

18    defense wants to close subject to --

19         THE COURT:  Well, I can decide it -- I don't imagine

20    that Mr. Cannick is going to start today, so I can decide it

21    after the Government's summation, but what I want is -- and I

22    want this from the defense, and there are four lawyers sitting

23    at the table -- so what I want is where this is in the

24    testimony, why it's an inconsistency, and whatever the rule is

25    about when a witness says the person doesn't remember.

*Proceedings*                                                4246

1   There's no reason with four lawyers on a case that somebody

2   can't get that done, and I want it by the end of the day, so

3   that's what we'll do.  And I'm sorry that I'm losing my temper

4   a little bit, but I'm not happy about that at all.

5            MS. GEDDES:  One additional matter is that defense

6   did propose a prior inconsistent statement by Faith, and we --

7   I think we've agreed upon what can be included with respect to

8   that particular statement, but in rebuttal, we would like to

9   introduce a prior consistent statement by Faith, and we

10  provided stipulation to defense counsel within a very short

11  time of receiving their prior inconsistent statement, and

12  they've advised that they're not going to consent to that.

13  I'm assuming that it's an argument question, and if Your Honor

14  rules that it's admissible as a prior consistent statement,

15  that that, too, could be introduced in the Government's

16  rebuttal case subject -- after I close, because, again, I'm

17  not referencing it in my closing.

18           THE COURT:  Is it something from the 3500 material?

19           MS. GEDDES:  Yes.

20           THE COURT:  Why wouldn't they be able to offer a

21  prior consistent statement if you're saying that there's an

22  inconsistency?

23           MR. CANNICK:  Because we don't think it's a prior

24  consistent statement.  It's a situation where --

25           THE COURT:  Sorry to cut you off.  We will deal with

*Proceedings*                                                          4247

1    this, then, when we deal with everything else, so add that to

2    the list of things that I would like an answer on as to why

3    it's not an inconsistency.  I don't want to have to be

4    searching through the transcript myself.

5              All right.  Anything else before we bring the jury

6    in?

7              MS. GEDDES:  I just want to set up the podium and

8    our board.

9              THE COURT:  Okay.  And, actually, we are just going

10   to take five minutes because I forgot one thing back in my

11   chambers, so we'll take five minutes.

12             MS. GEDDES:  And then, Your Honor, I assume the

13   defense will formally rest in front of the jury and then I

14   will begin.

15             THE COURT:  Yes.

16             All right.  So we are in recess for just a minute.

17             (A recess in the proceedings was taken.)

18             THE COURTROOM DEPUTY:  All rise.

19             THE COURT:  Everybody can have a seat.

20             All right.  I think we can get the jury -- oh, wait.

21   What else did we have to do?  Never mind.  The defense has to

22   rest.

23             Since this is my first trial in a year and a half,

24   or two years, are you going to rest again, too?  I don't think

25   you have to.  I just don't remember.  No, okay.

*Proceedings*                                                                                 4248

1          THE COURTROOM DEPUTY:  All rise.

2          (Jury enters.)

3          THE COURTROOM DEPUTY:  You may be seated.

4          THE COURT:  Everybody can sit down.

5          Ladies and gentlemen, we are ready to continue.

6          Does the defense wish to put on any additional

7    evidence?

8          MR. SCHOLAR:  No, Your Honor.  Subject to the

9    Court's rulings, we would rest at this time.

10         THE COURT:  All right.

11         Ladies and gentlemen, that means we're ready to move

12   on to the next phase of the trial in which the lawyers have

13   the opportunity to address you in summations.

14         As I told you when you were selected in the case and

15   at the beginning of the trial, what any lawyer says during the

16   course of his or her summation -- or, for that matter, at any

17   point in the trial -- is not evidence.  The evidence, as I

18   told you before, comes in the form of testimony, physical

19   evidence, and any stipulations, but this is the lawyer's

20   opportunity to speak to you about the evidence and what

21   conclusions they want you to draw from the evidence.  Under

22   our system, the Government sums up first, then the defense

23   sums up, and then the Government will address you again.

24         So, with that, we will begin with the summation by

25   the Government, Ms. Geddes.

1          Go ahead.

2          MS. GEDDES:  Thank you.

3          Good afternoon.

4          Can we publish what's on our video onto the screens,

5    please?

6          THE COURT:  As soon as Ms. Greene returns, which

7    will be in just a second.

8          MS. GEDDES:  All right.

9          THE COURT:  I would do it myself, but I don't know

10   how.

11         MS. GEDDES:  I could start.

12         THE COURT:  She will be here in just a minute.

13   She's getting me some water.  Sorry.  She'll be here in a

14   minute.

15         Oh, my goodness, Ms. Lawoyin got it to work, so --

16         MS. GEDDES:  Fabulous.

17         THE COURT:  No, it's still not working?  Well, just

18   a second, then.

19         Now it works?  Okay.  Thank you so much.

20         All right.  Go ahead.

21         MS. GEDDES:  Thank you.

22         At the beginning of this case, my colleague told you

23   that for over 25 years, the defendant, Robert Sylvester Kelly,

24   used his fame, his popularity, and the network of people at

25   his disposal to target, groom, and exploit girls, boys, and

1    young women for his sexual gratification.  He used lies,

2    manipulation, threats, and physical abuse to dominate his

3    victims.  He used his money and his public persona to hide his

4    crimes in plain sight.

5            Over the past six weeks, you have heard from more

6    than 45 witnesses and reviewed hundreds of exhibits showing

7    you that he did just that.

8            The defendant is charged with racketeering and eight

9    other counts.  Count One charges racketeering and includes 14

10   different predicate racketeering acts, and those relate to

11   Aaliyah, Stephanie, Sonja, Jerhonda, Jane, and Faith.

12           The eight other counts in the indictment are also

13   charged as racketeering acts, and since Counts Two through

14   Nine are essentially the same as certain racketeering acts,

15   I'll talk about those standalone counts -- Counts Two through

16   Nine -- when I talk about their corresponding racketeering

17   act.

18           Now, I just mentioned the six women who were listed

19   in the indictment and who are the subject of the charges.  You

20   heard from five of those victims.  The sixth one, Aaliyah, is

21   of course, now deceased; and I will spend a lot of time

22   talking to you today in detail about their testimony and how

23   it supports a particular charge, but you also heard from

24   several others, Angela, Addie, Alexis, Louis, and Alex, all of

25   whom met the defendant when they were under 18 years old.  And

1    you heard from two other victims of the defendant, Kate, and

2    Anna, who met the defendant when they were in their 20s.

3              Now, the defendant is not charged in any specific

4    racketeering act related to those other individuals, but I

5    will still talk about their testimony because it constitutes

6    proof of the racketeering charged in the indictment.

7              I want to start by talking about Count One,

8    racketeering.

9              The law recognizes that when someone commits a crime

10   as part of a group, he's more powerful, more dangerous.  Put

11   simply, racketeering means that the defendant was part of a

12   group of people who were working toward a common goal.  Under

13   the law, we call that -- we say that he was part of an

14   enterprise, and as part of his involvement in that enterprise,

15   he committed crime; and as you saw and heard during this

16   trial, the defendant was more than just a part of the

17   enterprise.  He was its leader, and he used its other members

18   to achieve his criminal goals.

19             Now, Judge Donnelly will instruct you later, and if

20   at any time during my closing remarks I say anything that is

21   different than what Judge Donnelly tells you, it is her

22   instruction that will control, but I anticipate that for Count

23   One, the racketeering count, she's going to tell you that the

24   Government has to prove five different elements beyond a

25   reasonable doubt; and, later on, you will get copies of the

1    charge, and you will have access to all of the exhibits that

2    have been admitted in this case.

3            Throughout my presentation today, I'm going to show

4    you some of those exhibits on a slide show.  You are not going

5    to get those, but if you note down a particular exhibit, you

6    will have access to that.  I will also be mentioning some

7    transcription cites, and you will have access to all of those

8    transcription cites as well.

9            All right.  So in terms of the elements of

10   racketeering -- and, again, Judge Donnelly will be instructing

11   you on this, so you don't need to write any of these down

12   unless you really want to -- the first element is that an

13   enterprise, as described in the indictment, existed on or

14   about the time alleged in the indictment; second is that the

15   enterprise engaged in or its activities affected interstate or

16   foreign commerce; third, that the defendant was employed by or

17   was associated with the enterprise; fourth, that the defendant

18   knowingly conducted or participated either directly or

19   indirectly in the conduct of the affairs of the enterprise;

20   and then the fifth is a really long count, and I'm going to

21   talk about it in a moment, so we'll just flip through that.

22           I'm going to talk about the first element, the

23   enterprise.

24           Now, the enterprise that you've learned about over

25   the past several weeks consists of the defendant's inner

1    circle.  You've heard all about his inner circle, his business

2    managers, his accountants, his personal assistants, the

3    runners, the drivers, security, and members of his entourage.

4              Now, over the past three decades, the names of those

5    individuals have changed, but their roles have remained the

6    same; and since the beginning, the defendant has always been

7    the leader of that enterprise.  And over on my right, you can

8    see the defendant's inner circle -- his enterprise -- shown

9    here where you have the defendant in the middle, you have some

10   of his closest advisors around, and then up and to the right,

11   there are some of his personal assistants.  Below are some of

12   the individuals you heard served as his drivers:  Terry, Joe

13   Allen, Top Gun.  At the bottom left, you see some of the

14   individuals who testified before you and served as runners for

15   the defendant:  Nick Williams and Anthony Navarro.  Above

16   there are some of the individuals who served as security for

17   the defendant:  Candy, Big John, Ronald Hardy.  Above there,

18   you have some individuals who served as his engineers; and

19   then in that inner circle, you see some of the defendant's

20   closest advisors who you heard a lot about during this trial,

21   and I will talk more about, but for your reference, we'll have

22   this board so you can put a face to some of the names.

23   There's not a face for every single name that I'll record

24   today, but some of them are there.

25             Now, defense counsel has suggested to you in opening

1    statements and in their cross-examination that there's nothing

2    abnormal about the defendant, a successful R & B singer and

3    performer having an inner circle such as the one shown on the

4    board, and that's right -- that's absolutely correct.  The

5    enterprise charged in the indictment is not a criminal one,

6    but I just told you that the law recognizes that an individual

7    becomes more powerful when he's backed by a group, and that is

8    exactly what happened here.  The defendant was able to carry

9    out the racketeering acts relating to the six women:  Aaliyah,

10   Stephanie, Sonja, Jerhonda, Jane, and Faith, because he had

11   the enterprise -- the one shown on the board -- at his

12   disposal to help him do it.

13          And while the enterprise on its own was not

14   necessarily a criminal one, having sat through the past six

15   weeks of testimony, you know that working for the defendant

16   was not like a normal job.  Remember Anthony Navarro, he's

17   shown in the bottom corner, he was once a runner for the

18   defendant, and he testified during the first week of trial

19   describing his employment with the defendant as the twilight

20   zone.

21          Nick Williams, another -- one of the Government's

22   last witnesses -- he described working there as a hostile work

23   environment.  The defendant set rules, lots of them, and he

24   demanded absolute obedience.  And you heard that he set these

25   rules for the girls and women around him, but he also set them

1    for the members of the enterprise.  You heard from Anthony

2    Navarro; his longtime studio manager, Tom Arnold -- he's in

3    that inner circle there -- his loyal, personal, and then

4    executive assistant Diana Copeland; and you heard from Suzette

5    Mayweather about how each of them were fined by the defendant

6    for their perceived violations, often when they violated one

7    of the defendant's rules, and those fines were among the means

8    by which the defendant kept his inner circle in line, kept

9    that enterprise in line; and as part of the defendant's

10   leadership of the enterprise, the defendant made his inner

11   circle -- when I say "inner circle," I'm referring to that --

12   the enterprise, not to that smaller inner circle -- he made

13   his inner circle sign confidentiality agreements, and he

14   refused to let anyone take photographs, anyone photograph the

15   inner workings of his world; and for many, many years, what

16   happened in the defendant's world stayed in the defendant's

17   world, but no longer.

18          Over the past several weeks, you've learned that the

19   defendant's inner circle worked together to promote the

20   defendant's music and brand, but his inner circle also served

21   as enablers for his criminal conduct.  Some, like Demetrius

22   Smith and Darrel McDavid, actively assisted with overtly

23   criminal acts.  Others turned a blind eye as this recruited

24   women and girls for the defendant's sexual gratification and

25   stood watch over the defendant's girlfriends and female

1    guests.  But without his inner circle, the defendant could not

2    have carried out the crimes that he carried out for as long as

3    he did.  In fact, the fines and other measures of control

4    imposed by the defendant helped to keep the enterprise running

5    and to ensure that its members did everything the defendant

6    directed without hesitation, without question.  And you

7    know -- and we'll talk more about it today -- that those

8    directives -- sometimes explicit, other times implied -- those

9    directives allowed the defendant to commit the racketeering

10   acts that he's charged with.

11           You also learned that the defendant's inner circle,

12   it didn't function like other inner circles, and you know that

13   because the defendant's drivers did much more than drive

14   around the defendant's -- the defendant and members of his

15   entourage.  They transported girls and young women the

16   defendant recruited.  You heard Alexis, the young woman from

17   Jacksonville, who testified.  She told you that the

18   defendant's bus driver, Terry, once drove her from

19   Jacksonville to see the defendant in Miami -- an hour long

20   drive -- and you know that because the runners did more than

21   just get coffee and supplies for the defendants and others at

22   his studios.  They picked up the defendant's guests from

23   airports, trains, train stations, and their homes and brought

24   them to nearby hotels.  You heard Jeffreys just testify about

25   that, one of the defense witnesses.  They escorted them to

1    rooms within the studio were the individual women stayed for

2    long periods of time.

3              (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summations - Geddes                    4258

1           MS. GEDDES:  Anthony Navarro and Tom Arnold told you

2    all of that, and you saw e-mails confirming that they did just

3    that.

4           And on your screen, you see two e-mails that were

5    recovered from a computer within the defendant's storage

6    facility.  This is Government Exhibit 468.  And one is an

7    e-mail referring to arranging for Alexis to be picked up.  And

8    again, that's when Alexis was 17.

9           There is another e-mail below that from June of

10   2009, asking -- mentioning that another individual needs to be

11   picked up.  And we'll talk more about how you know this, that

12   that individual was Dominique, the one you've heard a lot

13   about.  And she, too, was just 17 at the time that e-mail was

14   sent.

15          Now, to accommodate the defendant's rule that women

16   in his orbit have no contact with men, including runners

17   picking them up, you heard Tom Arnold tell you that he would

18   put the rearview mirror up, sacrificing everyone's safety

19   since he could no longer fully or easily see what was behind

20   him.

21          You know I'm talking about why his inner circle was

22   different than others.  You know that the personal assistants

23   did much more at the concerts than coordinate after-parties

24   and manage the defendant's wardrobe.  The personal assistants,

25   along with the runners, distributed little pieces of paper

Summations - Geddes                    4259

1   with the defendant's phone number to girls and young women.

2   And you know this because Tom Arnold and Anthony Navarro told

3   you that they distributed the defendant's number to females at

4   concerts, malls, after-parties and other events.  And you saw

5   those typewritten numbers that were found in the defendant's

6   storage facility, and this is shown in Government Exhibit 401.

7   Those are three little slips of paper with a phone number

8   ending in 7283.  And you can see from Government Exhibit

9   117(a) that that phone number, it was subscribed to by the

10  defendant's business, RSK Enterprises, and it was also saved

11  in someone's phone as a phone number for the defendant.  It

12  was actually saved in a couple of individuals' phones, and

13  those are shown on the screen.  And so that's just one very

14  small example of how you know that the defendant's runners and

15  personal assistants were distributing his phone numbers.

16          Now, you know that the defendant's assistants also

17  did much more than just make sure he was on time for business

18  meetings with record executives.  They also made travel

19  arrangements for the girls and young women to fly across the

20  country.  You know this because Diana Copeland told you that

21  she made travel arrangements for females to travel around the

22  United States.  So did his studio manager, Tom Arnold, and his

23  personal assistants, Cheryl Mack and the Mayweather sisters,

24  all of whom testified at this trial.

25          You know that the defendant's male personal

Summations - Geddes                          4260

1    assistants -- that's some of the group that is in that circle

2    around the defendant -- they did much more than drive the

3    Sprinter vans and carry his luggage.  Like the others in his

4    inner circle, they contributed to the success of the

5    defendant's crimes.  They carried that backpack that stored

6    the defendant's many iPads that he used to record girls and

7    young women engaging in sexually explicit conduct.  Diana

8    Copeland told you that the defendant's male personal

9    assistants -- and I'm using that distinction because you've

10   heard many witnesses talk about the female assistants and the

11   male assistants.  So Diana Copeland told you that his male

12   personal assistants carried the backpack that stored his

13   iPads.  Special Agent Chabot, from the Department of Homeland

14   Security, told you that the day before the defendant was

15   arrested, he actually saw George Kelly, who is also known as

16   June Bug -- he is over there in that circle around the

17   defendant -- carrying a backpack that the defendant had been

18   carrying a few minutes earlier.

19          And you also know that his assistants picked up the

20   defendant's prescriptions to treat his herpes.  In evidence

21   are Walgreens records.  And I am going to talk about a lot of

22   evidence, some of which you just heard the government

23   admitting a particular exhibit number but we didn't put it on

24   the screen.  So I am going to be talking about some pieces of

25   evidence that you will be seeing for the first time today, but

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Summations - Geddes                                4261

1   again, you will have access to all of this in your

2   deliberations.

3          So in evidence are Walgreens records, and it's shown

4   on this screen now.  And you can see that the records show

5   that there was a prescription for valacyclovir.  That's one of

6   the medications used to treat herpes, as Dr. McGrath told you.

7   And this is just one example where you can see that on a

8   particular occasion, a J. Brown picked up that prescription.

9   And you know that because J. Brown's Walgreens loyalty card

10  was used to pick it up and pay for the prescription.  And

11  J. Brown is, of course, June Brown, and he's shown in that

12  inner circle.  And there is another exhibit in evidence

13  showing that J. Brown, June Brown, lived at that same address

14  that's shown on the screen right now.

15         The defendant's engineers, you heard a little bit

16  about them.  You heard from Jeff Meeks as part of the defense

17  case, another one of the defendant's engineers.  They didn't

18  just set up and operate sound equipment in the recording

19  studio; they, too, helped the defendant.  They helped the

20  defendant carry out his surveillance efforts and to maintain

21  some of the digital collateral, another technique that you

22  have heard, and we'll talk about, that the defendant used to

23  control his victims.

24         Now, Jane -- and I am going to, by the way, refer to

25  the names that these individuals testified here at trial.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Summations - Geddes                    4262

1    You, of course, have in evidence and have seen their true

2    first and last names.  But remember that Jane told you that

3    the defendant told her that those engineers could access an

4    iCloud account, could access the iCloud to find out who she

5    had been speaking with, and she told you that's in the

6    transcript at 1027.

7              The engineers also helped the defendant dig up

8    surveillance video and keep his digital collateral.  And

9    you'll recall a couple of days ago, during Special Agent

10   Chabot's testimony, that we played that audio recording.  It's

11   in evidence as Government Exhibit 485.  And on the recording,

12   the defendant accused a young woman -- we'll call her Kyla for

13   today.  He accused a young woman of stealing a Rolex watch.

14   And you heard -- and we'll talk about some of the threats that

15   the defendant made during that, but at the end of the

16   recording -- and we didn't play this for you, but it's in

17   evidence.  But at the end of the recording, you can hear the

18   defendant's engineers joking about how they think they should

19   have -- the defendant should have strip searched Kyla, and

20   again showing that the engineers were around for this.  And in

21   that same recording, the defendant mentions that his engineers

22   had dubbed up the videotapes, the video surveillance that

23   purportedly showed Kyla taking that Rolex watch.

24             Now, in more recent years, the defendant also relied

25   on his personal assistants to ensure that his female guests

Summations - Geddes                         4263

1   and his live-in girlfriends complied with the defendant's

2   many, many rules.  You heard that from his female assistants,

3   Diana Copeland, Cheryl Mack and the Mayweather sisters, who

4   all told you how they helped the defendant manage his female

5   guests and live-in girlfriends.  They told you how they

6   accompanied those women on public outings and the defendant

7   relied on his assistants to, you know, make sure that they

8   didn't leave.  Now, no one is saying in this particular

9   assistance that they were under lock and key, but you will

10  recall Diana Copeland talked about a conversation that

11  surprised her, where the defendant was upset with her for

12  letting Anna escape and said to her that she should have let

13  Lele handle it.  And Lele is also shown up on this board.

14          The defendant also relied on his assistants to make

15  sure that his girlfriends didn't get off the bus, and you

16  heard some testimony about that at this trial.  And again, one

17  of the Mayweathers talked about a time when Joy was let off

18  the bus and the defendant was upset.  "Why would you let her

19  off the bus?"  That's what he said.  Similarly, he relied on

20  his assistants to make sure that these individuals, these

21  women, didn't get off his Sprinter van without receiving

22  permission from him.

23          Now, each of these individuals in his inner circle

24  enabled the defendant in various ways and without them at his

25  service, the defendant could not have carried out the pattern

Summations - Geddes                                4264

1    of crime that he committed for almost three decades.  So you

2    know that the purposes of the enterprise included legitimate

3    things like promoting R. Kelly's music and his brand, but you

4    also know that the enterprise led by the defendant had other

5    purposes, too.  Those purposes, as mentioned earlier, included

6    recruiting girls and women to engage in illegal sexual

7    activity with the defendant, to produce pornography, including

8    child pornography.

9              Now, to be clear, this does not mean that all of the

10   other enterprise members necessarily wanted any of these

11   things to happen or were happy about it happening, but that's

12   not what the law requires.  As you saw and heard through this

13   trial, the network of people that the defendant had at his

14   disposal, they carried out the defendant's directives, they

15   didn't ask questions and they effectively enforced the

16   defendant's rule.  They enabled his crimes, and those crimes

17   occurred over and over again.

18             During the past several weeks, you've also learned

19   about how the defendant led and participated in the enterprise

20   for his criminal acts, and that is why we're here today,

21   because of what the defendant did.  He groomed girls and boys

22   for sexual activity despite that they were too young to

23   consent to any of that sexual activity.  And you heard from

24   Angela, Addie, Stephanie, Louis, Alex, Jerhonda and Jane, each

25   of who told you that the defendant initiated contact with them

Summations - Geddes                    4265

1   when they were under 18 years old.

2           In evidence are phone records showing telephone

3   calls between the defendant and Alexis, Louis, Alex, Jerhonda

4   and Jane, all when they were under 18 years old.  And you can

5   see on the board in very small type are Government Exhibits

6   153 and 154.  And 154 shows a summary of telephone calls

7   between the defendant and Louis.  And these are calls between

8   the defendant's number -- and Louis testified to you, and you

9   saw in other evidence as well, what the defendant's number was

10  back then, that (630) 220-1166 number.

11          And then on the right you also see a summary --

12  that's in Government Exhibit 153.  You see a summary of

13  telephone contact between the defendant and Alex.  That's the

14  individual that other witnesses identified as Nephew.  And

15  again, you see that contact when Alex -- within the first few

16  months of 2007, and Alex was just 17 years old.  Again, just

17  as he testified in court to you.

18          And I am going to talk in more detail later, but

19  Government Exhibits 149 and 157, those show telephone calls

20  between the defendant and Jerhonda -- that's in Government

21  Exhibit 149 -- and then Government Exhibit 157 shows a summary

22  of calls between the defendant and Jane.  And those calls

23  shown in those two summary charts all show contact with Jane

24  when she was just 17 years old and telephone contact with

25  Jerhonda when she was just 16 years old.

Summations - Geddes                          4266

1          Phone records in evidence also show contact between

2    the defendant and Alexis when she was just 15 years old, and

3    that's consistent with her testimony before you that she met

4    the defendant at that concert in Jacksonville on March 26,

5    2006 and then went, the following day, to The Avenues mall in

6    Jacksonville.  And in evidence are phone records showing

7    communication between the phone number that Alexis identified

8    as hers and the defendant's number then.

9          The defendant also arranged for girls and women to

10   meet him for the purpose of sexual activity without telling

11   them that he had this incurable sexually transmitted disease.

12   And you heard from Kate, Jerhonda, Faith and Jane, who each

13   told you that the defendant exposed them to herpes during

14   unprotected sexual intercourse and never told any of them

15   about the fact that he had herpes.

16         The defendant also produced child pornography.  You

17   heard Stephanie, Jerhonda and Jane tell you that.  He recorded

18   each of them engaging in sexually explicit conduct when they

19   were each under 18 years old.

20         And you learned how the defendant used a plethora of

21   tactics to keep total control over his employees -- these

22   individuals -- and his victims.

23         First I want to talk about those letters.  And I am

24   going to talk more about some of the letters later on, but

25   just briefly, recall that you heard from Jerhonda and Jane --

Summations - Geddes                     4267

1  and remember, Jerhonda was the government's first witness.

2  She was very, very pregnant when she came here to testify.

3  And Jane started the following Monday, so both of them were

4  much earlier in the trial.  But remember that both Jerhonda

5  and Jane told you that the defendant directed them to write

6  letters containing false and embarrassing allegations,

7  purportedly about their own conduct and the conduct of their

8  families.  And you saw several of those letters, and I am

9  going to show you those letters later today, that they told

10  you they wrote at the defendant's direction.  And Jane told

11  you that she wasn't the only one, that the defendant's other

12  girlfriends wrote the same letters at the defendant's

13  direction.  And you saw some of those letters as well.

14        And you heard the same thing from Louis and Nephew.

15  Those were -- I call him Nephew here, but he also testified as

16  Alex in this trial.  And remember, Louis and Alex were best

17  friends before Louis introduced Alex to the defendant.  But

18  both of them told you that they, too, wrote letters that were

19  false at the defendant's direction.

20        And you heard about how and where the defendant kept

21  those letters, in a safe in a storage facility, ready for his

22  retrieval should a day like this ever come, a day where he is

23  charged with very serious crimes.  And you even heard and saw

24  how the defendant stored those letters.  Not all of them, but

25  some of them were stored in those plastic document protectors.

Summations - Geddes                              4268

1   Some of them had reinforced plastic around the holes of

2   looseleaf paper.  And you know why he kept them at the ready

3   and in pristine condition; he kept those letters that way

4   because he intended to use the letters in the future and they

5   wouldn't serve any value, any purpose if their contents were

6   no longer available, you can no longer see what was written on

7   those letters.

8              You also heard that the defendant directed some of

9   his employees to do the same.  You saw the letter that Diana

10  Copeland wrote at the defendant's direction, purportedly

11  confessing to stealing from the defendant and feeling terrible

12  about it.  And you saw the letters that Cheryl Mack told you

13  that she wrote, again at the defendant's direction, where she

14  purportedly confessed to wrongfully accepting money.

15             Other ways to control, that the defendant used to

16  control folks, he used those settlement agreements.  And you

17  heard how the defendant used his attorneys to negotiate

18  settlement agreements to ensure that any of his victims who he

19  had lost control over, so someone who went and potentially was

20  going to speak publicly about what the defendant had done to

21  them, he had his attorney negotiate settlement agreements to

22  ensure that they remain silent.  And you saw three of those

23  settlement agreements; they're in evidence for Kate, Jerhonda,

24  and Precious.  And again, in those agreements which are in

25  evidence, the defendant agreed to pay hundreds of thousands of

1    dollars in exchange for those individuals' silence.

2           Third, you heard should any of his employees or the

3    girls or young women that the defendant had recruited cross

4    him, he used his henchman to lodge threats and exact revenge.

5    You heard the defendant threaten Kyla in Government

6    Exhibit 45.  I spoke about this a moment ago.  She was the one

7    who he believed took that Rolex watch.  And you heard him

8    say -- and I'm going to play the audio in a moment, but you

9    heard him say that people get murdered for doing shit like

10   this.  Those are the defendant's words, and I'll play it.

11          All right.  It's okay, you can take off your

12   headphones, I can just read it.  But you see on the screen

13   that in that particular recording, the defendant said -- it

14   says "unintelligible," but "murdered for doing shit like

15   this."  And it says, "Shut up.  Shut the fuck up.  You're

16   going to do this shit fucking right."  These are his words.

17   "You're going to gain my trust because you owe me that, you

18   hear me.  You understand me?  You think I'm going to walk

19   around with all these people and not videotape my house?"

20          And then he continues and he says, "You're going to

21   do what I tell you to do to gain my trust and loyalty.  And

22   you gotta do that now."

23          And he continues from that and he says, "You better

24   not ever in your life take from me again or I will be in

25   Florida and something will happen to you.  You understand what

Summations - Geddes                        4270

1   I'm telling you?"  And, ladies and gentlemen, I submit that

2   you understand what he was telling them; that was a threat.

3              Cheryl Mack, she told you that the defendant told

4   her she had to, quote, "pick a team," and made clear that if

5   she picked the wrong team, "people go missing."  Not very

6   different from what he said to Kyla in Government Exhibit 485.

7              And then you saw that together with Donnell

8   Russell -- he's up there -- and you just heard the defendant's

9   last witness, Julius Barrington, talk that he met Donnell

10  Russell when he was at places with the defendant.  So you saw

11  that together with Donnell Russell and Russell's mother, June

12  Barrett, the defendant sent that threatening letter to Faith's

13  attorney.  And that letter was sent right here in Brooklyn.

14  And you'll recall it's Government Exhibit 231(a).  And we'll

15  talk more about this later, but in that, she threatened to

16  release -- I said she.  I meant that in the letter, the

17  defendant threatened to release sexually explicit and

18  embarrassing photos of Faith if Faith didn't drop her lawsuit

19  against the defendant.  And when that didn't work, when Faith

20  didn't drop the lawsuit and she went on to participate in the

21  *Surviving R. Kelly* docuseries -- she testified about that --

22  another individual, Kash Jones, his bodyguard who had a gun,

23  summoned Faith to an Applebee's in Manhattan -- this happened

24  again right here in New York -- and showed Faith some of the

25  nude photographs that would be released if they didn't stop

Summations - Geddes                          4271

1   talking publicly about the defendant.

2            You also heard -- and again, we'll talk much more

3   about this, but Donnell Russell, using an alias Colon Dunn,

4   sent threatening text messages to Faith's mother, Kelly.  And

5   her mom, Kelly, testified in this trial.  And in those text

6   messages, there were those sexually explicit photos of Faith.

7   And in the text messages he said that he would be, quote,

8   "publishing soon," unquote, and that criminal charges would

9   follow.  And when Faith still didn't stop, Russell carried out

10  exactly what he threatened to do; he created that

11  Surviving Lies Facebook page where he published the sexually

12  explicit photos, the uncropped versions of the photos of

13  Faith, and we're going to talk more about that later.

14           The defendant was able to do all of this because of

15  this inner circle.  And without the defendant's extensive

16  network of devoted employees and associates, he just couldn't

17  have carried out the crimes he's charged with.

18           I want to turn back to the elements of racketeering.

19  And I just talked a lot about the enterprise.  And the first

20  element that the government has to prove, of course, is that

21  the enterprise existed.  And I just walked you through exactly

22  how you know that this enterprise, the one shown on the board,

23  did, in fact, exist.

24           The second element is that the enterprise engaged in

25  or its activities affected interstate or foreign commerce, and

Summations - Geddes                          4272

1    that just means that the operations of the defendant and his

2    inner circle involved the movement between one or more states

3    and maybe between the United States and another country.  And

4    you've heard overwhelming evidence of this element, including

5    that members of his inner circle traveled across the country

6    and the world when the defendant toured.  They recruited

7    females from all over the United States and people then

8    traveled from those places across many state lines to see the

9    defendant.  So there can be no serious dispute that the

10   government has proven this particular element.

11            I've already discussed elements 3 and 4, that the

12   defendant was associated with the enterprise and that he

13   participated in the affairs of the enterprise, and those

14   elements are easily met here.  Without the defendant at the

15   center, there is no enterprise, there's no R. Kelly music,

16   there's no R. Kelly brand.  This is a Robert Kelly centric

17   universe and an inner circle; they revolved around him.  And

18   for the next couple of hours we are going to talk about the

19   many crimes the defendant committed personally as part of that

20   enterprise.

21            And that brings us to the fifth and the final

22   element of racketeering, the -- sorry, the defendant's

23   participation in a pattern of racketeering.  And in order to

24   find that the defendant participated in a pattern of

25   racketeering activity, you have to find that he committed two

Summations - Geddes                          4273

1   of the 14 racketeering acts that are alleged in this case.

2   And as we go through the evidence this morning -- this

3   afternoon, you will see that for each racketeering act, the

4   defendant either committed the act itself or he commanded it,

5   he had another person make it happen.  And under the law, even

6   if you don't personally commit a crime, if you command it or

7   you help it in some respect with the intent of making it

8   happen, that's the same as committing it yourself.

9            Now, you also have to unanimously agree on the

10  particular facts on any of those racketeering acts and you

11  have to find that the last act that was committed was within

12  ten years of a prior act, and I submit that you are going to

13  find that all of the 14 racketeering acts have been proven,

14  not just two.

15           You also have to find that those racketeering acts

16  have a nexus.  That just means that they're connected to the

17  enterprise and are related.  And we'll talk about those

18  requirements as to each of the racketeering acts when we go

19  through them in depth, but both requirements are easily met in

20  this case because the defendant was able to commit the acts

21  because of his position, his position as the leader in the

22  enterprise.  And because of the defendant's position in the

23  enterprise, that helped him commit the acts he committed, and

24  so either of those two factors would satisfy those

25  requirements.  And we've talked about that already.

Summations - Geddes                    4274

1          Now, finally, you have to find that the racketeering

2    acts occurred over a substantial period of time and that there

3    was the threat of continued criminal activity.  And I don't

4    think there can be any real dispute about that.  The

5    racketeering acts in this case have spanned more than two

6    decades, more than 25 years, and there was no sign that the

7    defendant or his inner circle had any intention of stopping.

8          One last note before we start talking about the

9    individual racketeering acts.  While the government has to and

10   embraces proving the existence of the enterprise and all of

11   the other elements that I described, it does not need to prove

12   that the enterprise itself or its members acted with criminal

13   intent, although some certainly, as I explained, did.  But the

14   government just has to establish that the defendant, Robert

15   Kelly, that he acted with the required criminal intent.  And

16   you know that he did over and over again.  The defendant

17   relied on his inner circle, the enterprise, to carry out his

18   pattern of crimes.  And his inner circle, those individuals,

19   they were a means to his criminal ends.

20         I want to turn now to Racketeering Act No. 1.  This

21   Racketeering Act 1 is the bribe that the defendant had

22   Demetrius Smith pay to an employee at the Illinois Department

23   of Public Aid to obtain a fake I.D. for the 15-year-old

24   Aaliyah so that the defendant, who was then 27 years old,

25   could marry her.

Summations - Geddes                            4275

1        Now, before I go over the evidence proving that the

2   defendant had Demetrius Smith pay that bribe, I want to back

3   up and talk to you about the defendant's sexual abuse of

4   Aaliyah, beginning when she was in her early teens.  Now, the

5   defendant is not charged in a separate racketeering act with

6   sexual abuse of Aaliyah, but as you've now seen during the

7   course of this trial, that abuse was part of the defendant's

8   pattern of racketeering.  And it's important background for

9   you to understand what led the defendant to causing Demetrius

10  Smith to pay the bribe that allowed him to marry Aaliyah by

11  fraud.

12        You learned about the defendant's sexual abuse of

13  Aaliyah from Angela, Demetrius Smith, and Jane.  I am going to

14  talk first about what Angela told you, and there is a photo of

15  Angela on the screen.  Angela, she testified in the last week

16  of trial, so relatively recently, and she told you that she

17  met the defendant when she was 14 or 15 years old, that she

18  met him through her friend Tiffany.  And starting from that

19  very first day that Angela met the defendant and for the next

20  few years, the defendant had sex with her and with her young

21  friends.  At the defendant's direction, Angela quit school and

22  started to sing and eventually worked as a backup dancer with

23  the defendant.  And the defendant asked Angela to bring other

24  girls around, as Angela testified the defendant told her,

25  quote, "get me some girls or bring me some new talent," he

Summations - Geddes                                    4276

1   called it.  And you knew what the defendant meant by that.

2   Who does a teenager like Angela know and hang out with?  Other

3   teenagers.  And Angela told you during her testimony that was

4   exactly how she met the defendant, through another teenager,

5   her high school -- a high school teenager named Tiffany who

6   had invited Angela to meet the defendant at his apartment and

7   some other young girls.  This was part of the defendant's

8   grooming process.  It was one of the ways he continued to have

9   access to young girls and used young teens that he had or

10  later abused to bring him other teens that he could then

11  abuse.  And as you heard during the trial, and we'll discuss

12  later, it was one of the methods that he continued to use

13  throughout the period charged in the indictment.

14          Now, we're going to speak more about Demetrius Smith

15  in a moment, but you heard from Smith about how the

16  defendant's manager -- and again, I've told you that the

17  defendant's employees changed over the decades that he was

18  running this enterprise, but back in the early '90s his

19  manager was Barry Hankerson.  And Smith told you how Hankerson

20  introduced the defendant to Aaliyah at her family home in

21  Detroit in approximately 1992.  And you can see from her birth

22  certificate -- this is Aaliyah's birth certificate, which is

23  in evidence as Government Exhibit 802 -- in 1992 Aaliyah would

24  have been about 13 years old.  And Smith testified -- and by

25  the way, at the same time you can see that the defendant

Summations - Geddes                          4277

1   was Government Exhibit -- I'm sorry, Aaliyah's birth

2   certificate is in evidence as Government Exhibit 802, the

3   defendant's is in evidence as 801, and so at the time the

4   defendant was much older.

5                    (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation - Geddes                                    4278

1           MS. GEDDES:  (Continuing)  During her testimony,

2    Angela told you -- I'm sorry.  Let me back up.

3           So when they first met in Detroit at the family

4    home, Smith told you the defendant began writing and producing

5    music for the young Aaliyah and that she would come to Chicago

6    to record with the defendant.

7           And during her testimony, Angela told you how the

8    defendant introduced Aaliyah to Angela and her friends on or

9    around Aaliyah's birthday in January of 1992.  And you can see

10   from her birth certificate, that's when she would have been

11   13 years old.  The defendant told Aaliyah that he wanted

12   Angela, who was a couple years older, he wanted Angela and her

13   friends to become Aaliyah's friends.

14          She testified that, do you recall -- the question

15   says:  Do you recall whether the defendant said anything else

16   to Aaliyah about the three of you?  Referring to Angela, her

17   friend Tiffany and another young friend.

18          She answered:  He told her that we were going to

19   give her some street vibes and we were going to be there to be

20   her friends.  That's in transcript 3295.

21          And it worked.  You have heard defense witness Larry

22   Hood testify and described Angela as "one of Aaliyah's little

23   friends."  That's in the transcript at 4043.

24          After the defendant had access to Aaliyah and he

25   surrounded her with teens that he had already been abusing

CMH        OCR        RMR        CRR        FCRR

Summation - Geddes                                         4279

1    like Angela, the defendant sexually abused Aaliyah too.

2          Angela told you about how on one night, while they

3    were traveling on tour in 1992 or 1993 with the defendant at a

4    tour stop in Washington, D.C., the defendant became angry with

5    Angela and Aaliyah and her friends because they disobeyed his

6    instructions to stay at the hotel and the defendant approached

7    the group of girls including Aaliyah and said to them that

8    they have to "put out that night."  Angela told you what the

9    defendant meant by "put out."  She was it was dues time and

10   she told you what that meant.  When the defendant told you you

11   have to pay dues, that means he wants to have sexual contact

12   or sexual intercourse with you.  Now, she avoided it that day

13   but the pattern was there.

14         Angela also told you that during that same tour,

15   while, you know, they were young kids, while they were trying

16   to play a prank aboard a tour bus, she walked in on the

17   defendant and saw his head between Aaliyah's legs performing

18   oral sex on Aaliyah and Aaliyah was just 13 or 14 at that

19   time.

20         You also learned about the defendant's sexual abuse

21   of Aaliyah from Demetrius Smith.  Now, remember, Demetrius

22   Smith did not want to testify at this trial.  He certainly

23   didn't want to testify against the defendant.  He described

24   him as being like a brother to him and he didn't want to

25   testify about the defendant and Aaliyah and as you heard, the

Summation - Geddes                    4280

1  government had to serve him with a subpoena and then an

2  immunity order to get him to tell you what he knew.  Even

3  then, he tried to resist directly answering my colleague's

4  questions, but even he admitted based on the interactions that

5  he saw between the defendant and young Aaliyah, he suspected

6  the defendant was "messing" with Aaliyah.  That's in the

7  transcript at 690.

8         He told you what he meant by "messing around," that

9  based on what he could see, he was concerned that the

10 defendant was "being flirtatious, seducing her," Aaliyah, and

11 that's on 691.  He told you he was concerned because Aaliyah

12 was young and the defendant's behavior concerned him enough

13 that he asked him about it more than once because it is

14 concerning.  At the time, Aaliyah was barely a teenager, too

15 young, far too young to consent to sexual conduct with the

16 defendant.

17        Now, let's fast forward to August of 1994.

18        You heard from Smith that he was then in 1994

19 serving as the defendant's tour manager and that the defendant

20 was performing at a venue in the south when the defendant told

21 Smith that they needed to return to Chicago that night and he

22 told him why, that Aaliyah was "in trouble."  That's at 692 to

23 693 in the transcript.

24        It wasn't in the defendant's schedule to go to

25 Chicago, he had other performances that he had to do, but the

Summation - Geddes                                    4281

1   defendant told Smith to book some tickets, some plane tickets

2   for him and another member of defendant's inner circle at the

3   time, Tyree, because they needed to get back to Chicago.

4            As you heard from Smith, it was on that plane ride

5   back to Chicago where Smith saw the defendant concerned,

6   crying a lot, and the defendant told Smith what he meant when

7   he had said earlier that day that Aaliyah was "in trouble."

8   The defendant told Smith that Aaliyah believed that she was

9   pregnant.  And the defendant was obviously concerned and you

10  know why he was concerned.  The defendant was concerned

11  because he knew Aaliyah, at a young age, he believed that she

12  was pregnant and that the baby was his and the defendant knew

13  that if anyone found out, her being a minor and him being

14  nearly two times her age, he was facing serious trouble.

15           Again, here are the defendant's and Aaliyah's birth

16  certificates in evidence.  You can see in August of '94,

17  Aaliyah was just 15 years old and the defendant was 27 years

18  old.

19           You know that the defendant knew exactly how old

20  Aaliyah was because the year before, in March of 1993, the

21  network BET released a video featuring the defendant talking

22  about Aaliyah and in the clip, and I'll play it for you in a

23  moment, you hear the defendant say that Aaliyah was just

24  14 years old at the time.  This is in evidence as Government

25  Exhibit 901 and let me see if our audio will work.

Summation - Geddes                                    4282

1           (Audio played.)   (Audio stopped.)

2           MS. GEDDES:  Demetrius Smith also told the

3    defendant's solution that night to Aaliyah being, in the

4    defendant's words, in trouble.  The defendant decided that he

5    would marry, he needed to marry Aaliyah to protect himself.

6    And remember, when my colleague asked Smith what the defendant

7    needed to protect himself from, Smith told you, jail.  That

8    was in the transcript at 706 to 07.

9           In addition to Demetrius Smith's testimony about why

10   the defendant was so desperate to marry Aaliyah, you also know

11   what happened that day in August of 1994 or that month in

12   August of 1994 because the defendant told Jane, another

13   teenager that the defendant seduced nearly two decades later

14   who testified powerfully, I submit, during the second week of

15   the trial.

16          On the screen is a photo of Jane.

17          I'll talk much more about her testimony later but

18   for now, remember what Jane told you or when Jane told you

19   that one afternoon, the defendant -- and at the time, Jane was

20   one of the defendant's live-in girlfriends -- she told you

21   that the defendant told her and his other live-in girlfriends

22   what had happened decades earlier with Aaliyah.

23          The defendant told Jane and she told you that he had

24   married Aaliyah when she was 15 years old because she was

25   pregnant and he had to marry her to make sure that Aaliyah

Summation - Geddes                                       4283

1    gets an abortion.  And we all know what the defendant was

2    thinking.  No baby, no jail.  He believed that that was his

3    way of getting away with sexual abuse of Aaliyah.

4              MR. SCHOLAR:  Objection, Judge.

5              THE COURT:  Overruled.

6              MS. GEDDES:  And this makes sense, ladies and

7    gentlemen.  You heard Demetrius Smith's account of how the

8    defendant reacted when he heard that Aaliyah believed she was

9    pregnant and he said -- and it's entirely consistent, that

10   reaction, because you saw how the defendant then reacted

11   decades later in October of 2015 when Jane was 17 years old.

12   She told the defendant that she believed she was pregnant and

13   the defendant told Jane she couldn't have the baby because

14   like Aaliyah, in August of 1994, Jane was still a minor, just

15   17 years old.

16             Just as he believed in August of '94 when he learned

17   that the 15 year old Aaliyah thought she was pregnant, the

18   defendant believed that he would be in trouble if anyone

19   learned that he had impregnated Jane.

20             You saw Jane's text messages, and I want to talk

21   more about this later, but you saw Jane's text messages with

22   one of her close friends who also testified in the trial where

23   she told her friend that the defendant wasn't going to let her

24   keep the baby and that he told her that she had to get an

25   abortion.  You saw all those photographs were showing that

Summation - Geddes                              4284

1   Jane was petrified of having an abortion.

2          Then what's significant is if you look at that last

3   red box on the bottom, she wrote:  Now if I was 18 --

4   remember, at this time, she's 17 -- now, if I was 18 he

5   wouldn't care about the baby, speaking I'm 17.

6          Let's turn back to that day in August of 1994.  So

7   we're going back two decades.  During his testimony, Demetrius

8   Smith also told you what happened when they arrived in

9   Chicago.  So remember, they flew from the venue in the south

10  up to Chicago on a last-minute basis and they started talking

11  about how they could carry out the defendant's plan to marry

12  Aaliyah.

13         During one of those conversations, the defendant

14  made clear to Smith that he expected Smith to help him get it

15  done.  And Smith told you that he raised questions about the

16  plan.  Smith tried to convince the defendant that he couldn't

17  marry Aaliyah because she was too young and suggested to the

18  defendant that they should reach out to Aaliyah's uncle, Barry

19  Hankerson, was also then the defendant's manager, but the

20  defendant wasn't having it.  He made clear that Smith needed

21  to "pick a side" and that's in the transcript at 710.

22         His testimony about the defendant's words, they ring

23  true because you heard the same thing from another one of the

24  defendant's former employees, Cheryl Mack.  More than 15 years

25  later, when the defendant faced another legal predicament

Summation - Geddes                                    4285

1    involving another young female, that one was Precious, she

2    told you that he told her that she needed to "pick a team."

3             You also heard the defendant in his own words on

4    Government Exhibit 485 tell Kyla, the one who he believed

5    stole the watch, that she needed to be on his "team or else."

6    And he said:  If you bullshit me now, then I'm going to look

7    at you like you're not on my team at all.

8             You know what he meant.  It was a threat just as it

9    was to Demetrius Smith, just as it was to Cheryl Mack.  So

10   Smith told you that he did pick a side, the defendant, and he

11   told you why.  He wanted to stay in that inner circle, in the

12   enterprise.  He didn't want to get "pushed out of the loop."

13   So he worked with the defendant to carry out this plan but to

14   do it, as Smith told you, they were going to need some

15   fraudulent IDs for Aaliyah because she was under age, she was

16   under 18 years old.  That's in the transcript at 712 to 713.

17            You know that this is true because you heard from

18   Carolyn Harris.  She was the supervisor who testified at the

19   beginning of the trial from the clerk's office in Cook County

20   in Illinois and she told you that 15 year olds cannot legally

21   get married, not now and not in 1994.  The defendant knew

22   Aaliyah's age as we've already seen so the defendant turned to

23   an inner circle for a solution.

24            Demetrius Smith told you that he suggested to the

25   defendant and the others who were there that day that he could

1   get an ID from one of the public aid offices.  He could get an

2   ID for Aaliyah and he paid one of the employees some money.

3   That's the bribe.  He also had a conversation with Derrel

4   McDavid, the defendant's long-time business manager and

5   accountant, about where and how they could get that ID.

6          Again, as you recall, Smith did not want to testify

7   against a man he described as a brother, but he told you that

8   the defendant was there for that conversation and that's in

9   the transcript at 744.

10          So Derrel McDavid, the defendant's then business

11  manager and accountant, gave Demetrius Smith $500 in cash to

12  execute the bribe.  You know that the $500 was the defendant's

13  money.  It came from his accountant.  And this was all done

14  for the defendant's benefit, for his protection, to keep him

15  out of jail.

16          So Demetrius Smith, the defendant and Aaliyah then

17  drove to one of the local benefits offices in Cook County in

18  Illinois where Smith offered an employee $500, money he told

19  you he got from McDavid.  He offered that money to have that

20  official create a fraudulent ID for the 15 year old Aaliyah

21  and he wanted the ID to suggest that Aaliyah was, in fact,

22  18 years old.

23          Now, the Judge will instruct you, I believe, that it

24  doesn't matter whether the defendant was the one who handed

25  over the cash to the public employee who created that

Summation - Geddes                                    4287

1   fraudulent ID and it makes no difference that it was Smith was

2   the one who actually passed over the bribe payment.  As you'll

3   see from the Judge's instructions, the defendant doesn't even

4   need to be present when this happens but he was close by.

5         Smith told you that the defendant stayed in the car

6   outside waiting for the deed to be done while Smith was inside

7   paying the bribe and then Aaliyah went in to have her

8   photograph taken so that it could be on that fraudulent ID.

9         The defendant though was the one who needed to marry

10  Aaliyah and he told Smith to pick a side.  The defendant was

11  there when the plan was discussed and Aaliyah was in the car

12  when they drove to the public aid office where Smith paid that

13  bribe.  Defendant agreed that that bribe should be carried out

14  and the cash used to pay it was from the defendant's coffers

15  handed over to Smith by business manager and accountant

16  McDavid.  In those circumstances, the defendant was just as

17  guilty of bribery under the law as Smith was.  Just because

18  you have one of your henchmen do your dirty work doesn't mean

19  you're any less responsible.

20        By the way, you know that effecting payoffs, bribes,

21  is part of the defendant's tried and true MO.  I talked about

22  this earlier but you've heard that the defendant resorted to

23  pay off to stay out of legal trouble.  You saw those

24  settlement agreements in evidence.  He did that with Kate,

25  Precious and Jerhonda.

Summation - Geddes                    4288

1          I don't want to spend too much time on this but you

2     also know the public employee who the defendant and Smith

3     bribed.  Smith told you that he went into that local benefits

4     office and paid someone who worked there to pay somebody who

5     worked there the cash.  And he told you that he had previously

6     applied for and received public benefits so he was familiar

7     with the process and thought that he could get an ID from

8     someone who worked there and so that's what he did.

9          Now, you also know that Demetrius Smith carried out

10    that bribe he told you about in August of 1994 not just

11    because he told you but because the certified official

12    documents corroborate, they back up his testimony.

13         You saw the application for the marriage license.

14    That's Government Exhibit 803(a) showing that the defendant --

15    and it's shown on the screen right now -- it shows that the

16    defendant presented his driver's license and that Aaliyah

17    Haughton presented an Illinois Department of Public Aid card.

18         You can see -- it will pop up in a moment, but you

19    can see at the top where it says ID Bride, "B" for "bride",

20    and you see the IDPA, Illinois Department of Public Aid.  Then

21    below that is the ID for "G," the groom, the defendant, and

22    that has Illinois driver's license.

23         So how else do you know -- and by the way, that

24    IDPA, the one that's listed there, that's the card that was

25    secured by the $500 bribe.  That was the identification

Summation - Geddes                                    4289

1    document that Aaliyah ultimately was able to use to get this

2    fraudulent marriage license.

3           Now, how else do you know that it was a bribe, how

4    else do you know that it was a bribe that secured the

5    fraudulent ID for Aaliyah?  Well, Mr. Rosario, he explained to

6    you that in response to a government subpoena, both the

7    Illinois Department of Human Services and the Department of

8    Health and Family Services, and those two groups used to make

9    up the Illinois Department of Public Aid, they searched for

10   records of Aaliyah Haughton and there were no records found

11   because there wasn't a legitimate ID provided to Aaliyah

12   Haughton that day, that it was fake, it was secured by a

13   bribe.

14          You can see that as well in Government Exhibit 904

15   and 905 which are the responses -- they're not shown on your

16   screen -- but those are the responses from those two

17   departments saying that no records were found for Aaliyah

18   Haughton and there are also no records found for that

19   particular ID number that is shown on Government

20   Exhibit 803(a).  So that means that based on Mr. Rosario's

21   testimony regarding the legitimate channels that would need to

22   happen for Aaliyah to get that ID card -- filling out an

23   application, doing an interview, having an eligibility

24   assessment -- he told you that would take about 30 days in

25   1994.  That didn't and, frankly, it couldn't have happened.

Summation - Geddes                                    4290

1   So you know the way that Smith and the defendant got their

2   hands on that fake ID for Aaliyah was by using illegal

3   channel, illegal channels, paying the bribe.

4           Smith also testified that the defendant and his

5   inner circle obtained another form of ID for Aaliyah to use to

6   get that marriage license and Smith testified one of their

7   friends, Keith Williams, helped to arrange Aaliyah to get that

8   fake, to get a fake employee ID from some sort of shipping

9   company and Smith thought that it might have been a Fed Ex but

10  he wasn't positive but he did use a shipping company.  Keith

11  Williams actually told you, he testified in this trial as

12  well, he had told you that he worked at UPS prior to August of

13  1994.

14          If you look at the marriage application in

15  Government Exhibit 803(a), you can see that Aaliyah's

16  occupation was listed as "Messinger Ser," a messenger service,

17  like Fed Ex, UPS, a shipping company.

18          Now, Carolyn Harris, the supervisor at the Cook

19  County clerk's office, told you that the marriage application,

20  the one shown in 803 is not returned to the applicants, the

21  bride and the groom, and it's not otherwise available to

22  members of the public.  She told you that when a couple

23  applies for a license, they're provided with a copy of the

24  license but not the application.

25          In the license -- I'm sorry.  In the applications

Summation - Geddes                                          4291

1    shown in 803(a) where the nomenclature that I discussed, where

2    it says the IDPA and the ILDL for the bride and the groom,

3    it's in the application itself where that nomenclature is

4    included and other than the bride or the groom, here, the

5    defendant or Aaliyah, a member of the public just can't get a

6    copy of this application but Demetrius Smith knew the facts

7    that were on that application because he was there and he

8    participated in the scheme.

9            Demetrius Smith even told you that McDavid, the

10   business manager/accountant, had to do some convincing of the

11   clerk with the forms of ID that they provided at City Hall

12   when the defendant and Aaliyah went to get the license because

13   the clerk was a little hesitant about accepting the IDs that

14   they were trying to use for Aaliyah.  And that's in evidence

15   at 726 and 27.

16           Carolyn Harris told you that the clerk's office

17   accepts certain types of identification cards for a marriage

18   license, and that an IDPA, the Illinois Department of Public

19   Aid, isn't typically one of the approved forms of

20   identifications that are accepted but, ultimately, it's up to

21   the clerk who is handling a particular application to decide

22   whether or not to accept the ID present, presented.

23           So once armed with a marriage license, and you saw

24   and heard that the defendant and Aaliyah were able to obtain

25   the marriage license using that IDPA card, the group which

Summation - Geddes                              4292

1   included the defendant returned to, they went to that Sheraton

2   Hotel, the one by the airport for that, for a secret wedding

3   ceremony.  That was the ceremony that the defendant hoped was

4   going to keep him out of jail.

5           By the way, it makes sense that the ceremony was

6   held at the Sheraton right by an airport and I'll show you how

7   you know that in a moment because the defendant didn't have

8   much time.  He needed to fly out to go back to his next show.

9   We'll talk about that in a minute.

10          Now, you heard about how the marriage ceremony was

11  set up not only from Smith but also from Nathan Edmond.  He

12  testified by video, I think it was the first, maybe second

13  witness to testify by video, and you also heard from Keith

14  Williams.  Both Edmond and Williams told you that Williams was

15  friendly with the defendant at the time in 1994 and that

16  Williams recruited Nathan Edmond who was a pastor to perform

17  the ceremony.  Edmond told you about the ceremony itself.  It

18  was a 5 to 10 minute ceremony at the Sheraton Hotel by the

19  airport.

20          You saw on the marriage license shown -- so now this

21  is the marriage license, not the application, and it's shown

22  in 803(b).  You can see that Edmond wrote that the ceremony

23  was performed at 6501 North Mannheim Road in Rosemont,

24  Illinois.

25          There's a stipulation in evidence, Government

Summation - Geddes                                              4293

1   Exhibit 1001, showing that in 1994, that location, 6501 North

2   Mannheim was a Sheraton Hotel just like you heard.  You can

3   see that the Sheraton is right by the airport in Chicago,

4   O'Hare, and, again, that makes sense given that the

5   defendant's performance schedule.

6           So Edmond, Nathan Edmond, the pastor, and Demetrius

7   Smith told you about the ceremony itself.  It took place in a

8   hotel suite.  The defendant and Aaliyah were dressed in

9   matching sweats.  And Smith also told you that about an hour

10  after the ceremony, he and the defendant but not Aaliyah

11  returned to the tour because, remember, the defendant was

12  performing venues in the south, Demetrius Smith recalled.

13  Indeed, that same night, August 30th of 1994, that's the date

14  listed on the marriage application, the defendant returned to

15  the south and he performed at a venue in Macon, Georgia.

16          You saw a -- well, you may not have seen it but this

17  is a newspaper article that's in evidence as 948(a) and 948(c)

18  and it shows that the defendant, in fact, performed at the

19  Albany Civic Center in August of 1994.  You'll have the

20  article in evidence and you can see that in the article,

21  948(c), it talks about how the defendant performed on

22  August 30th, the night before this article was written, at

23  Macon, Georgia, that venue, and then the following day,

24  August 31st, is when he performed at the Albany Civic Center,

25  also Albany, Georgia, the two venues in Georgia.

1   (Continuing.)

2           MS. GEDDES:  And you can see in this article that

3   his manager was Demetrius Smith, like I told you.

4           Now, to be sure, the marriage certificate, the one

5   in evidence as 803, it lists the date of the marriage as

6   August 31st.  So, remember, the application shows August 30th,

7   and on the marriage certificate, it indicates that the

8   marriage took place on the following day, August 31st.  But

9   you heard that that date entry was completed by hand by Nathan

10  Edmond, the friend of a friend who performed the ceremony; and

11  you know that the defendant didn't get married that day, the

12  31st, because he -- he wasn't going to fly home twice, and so

13  you know that he was performing on the 30th in Georgia, and

14  the 31st also in Georgia, and so it makes more sense that

15  Nathan Edmond just wrote down August 31st instead of

16  August 30th because you heard from Carolyn Harris that -- the

17  supervisor of the clerk's office, that in order to get a

18  marriage -- or have a valid marriage in Illinois, the marriage

19  has to be performed a day after the application is submitted

20  or it wouldn't be a valid marriage -- it would be void -- but

21  the defendant didn't have time to spare, so Edmond just

22  incorrectly writes that the ceremony occurred on the 31st

23  rather than the 30th.

24          You also learned that the defendant's pattern of

25  sexual abuse of minors, it didn't change after he married

1   Aaliyah.  In fact, he didn't skip a beat.  And you heard from

2   Addie -- she was one of the individuals that testified at this

3   trial, she's not named in any particular racketeering act, but

4   she told you that she went to a concert in Miami in September

5   of 1994.  She was about to begin her senior year in high

6   school, and she didn't recall the exact date in September of

7   '94 when she went to this concert performance, but you know it

8   because she had a pamphlet that she provided to the

9   Government, and it's in evidence as Government's Exhibit 201,

10  and you can see that it shows a concert sponsored by Budweiser

11  beer, and it shows that it took place on September 2nd of

12  1994.  And, again, you can see that on Government's

13  Exhibit 201 where it says night, slash, two; and then over on

14  the left-hand side, you can see vertically it says 1994.

15          And so on September 2nd, 1994, three days after the

16  defendant brought Smith to bribe a county official to provide

17  that fraudulent ID so he could marry the 15-year-old Aaliyah,

18  you heard how he sexually abused and assaulted another minor,

19  Addie.  She told you that that happened backstage at that

20  show; and like Aaliyah, Addie was too young to consent to the

21  unwanted sex that he subjected her to.

22          So briefly I want to just turn back to Racketeering

23  Act 1 itself.  I told you I was going to talk a bit about the

24  defendant's sexual abuse of Aaliyah, but ultimately

25  Racketeering Act 1 charges bribery, and there are two elements

1    that the Government has to prove beyond a reasonable doubt in

2    order for you to find this act proven, and the first is that

3    the defendant -- or somebody for whom he's legally responsible

4    for -- for whose conduct he's legally responsible for --

5    promised or tendered property to another individual; and,

6    second, that the defendant, or that person whose conduct he's

7    legally responsible for, did so with the intent to cause

8    another individual to influence the performance of an act

9    related to the employment or a function of a public employee.

10             And I anticipate that Judge Donnelly will tell you

11   that the defendant is legally responsible for the conduct of

12   another person -- I'm using that term, because that's the term

13   in the instructions and in the law -- so someone is legally

14   responsible when either before or during the commission of an

15   offense and with the intent to promote that particular

16   offense, the defendant knowingly solicits, aids, abets,

17   agrees, or attempts to aid another person in the planning or

18   commission of an offense.  And you can find this predicate act

19   proven because of everything that I've just laid out for you

20   here.  The defendant, needing this fake ID for Aaliyah so that

21   he could have legally married her, had Demetrius Smith carry

22   out the plan of bribing a public employee at the public aid

23   office.  The money came from the defendant through his

24   manager, Darrel McDavid, and the defendant drove with Smith

25   and Aaliyah to that office -- the public aid office -- to

1   ensure that Smith remained on the defendant's side.  That's

2   the team or the side that Smith took -- picked and that the

3   bribe was carried out just as the defendant wanted and just as

4   he needed.

5           THE COURT:  Ms. Geddes, I wonder if this might be a

6   good time for a break.  I'm sorry to interrupt you.

7           MS. GEDDES:  Sure.

8           THE COURT:  All right.

9           Ladies and gentlemen, I think we will just take a

10  break so everybody can stretch their legs.  Let's say 3:30

11  we'll come back.

12          Please don't talk about the case at all.

13          THE COURTROOM DEPUTY:  All rise.

14          (Jury exits.)

15          THE COURT:  Everybody can sit down.  We will just be

16  in recess for a few minutes.

17          I hope I didn't get you in a bad place.

18          MS. GEDDES:  That's fine.

19          MR. SCHOLAR:  He's working on the stipulations.

20          THE COURT:  Oh, okay.

21          All right.  I will see you all in a few minutes.

22          (A recess in the proceedings was taken.)

23          THE COURTROOM DEPUTY:  All rise.

24          THE COURT:  Everybody can sit down.

25          By the way, we did have somebody here just checking

*Summation - Ms. Geddes*                                        4298

1    to see if the sound issue was on our end, and it apparently

2    isn't, so...

3           MS. GEDDES:  We got it to work with the second

4    slide, so thank you.

5           THE COURT:  Can someone get Mr. Scholar and

6    Mr. Cannick, please?

7           MS. BLANK BECKER:  I'm going to text them right now,

8    Judge.

9           (Pause.)

10          THE COURT:  All right.  Let's get the jury, please.

11          THE COURTROOM DEPUTY:  All rise.

12          (Jury enters.)

13          THE COURTROOM DEPUTY:  You may be seated.

14          THE COURT:  Okay.  Jurors, we are ready to continue

15   with the closing argument by the Government.

16          Go ahead, Ms. Geddes.

17          MS. GEDDES:  Just finishing up with respect to

18   Predicate Act Number 1, Smith -- Demetrius Smith, with the

19   defendant's approval, and for the defendant's benefit, gave a

20   public employee -- an employee at the department of public

21   aid -- property -- $500 -- in exchange for obtaining a

22   fraudulent identification card with Aaliyah's name and

23   Aaliyah's photo.

24          Under the law, the defendant is legally responsible

25   for the actions of Demetrius Smith, and so you know that the

1    Government has proven to you each of the elements of

2    Racketeering Act Number 1.

3              So I'm going to turn now to Racketeering Act 2,

4    which relates to Stephanie -- the defendant's sexual abuse of

5    Stephanie.

6              Now, Stephanie, she testified here, and she was

7    17 years old when she met the 32-year-old defendant; and under

8    the law in place in Illinois, she was legally old enough to

9    consent to sexual contact with the much older defendant, but

10   when the defendant videotaped Stephanie while she was 17

11   engaged in sexually explicit conduct, that, as the judge will

12   instruct you, is a federal crime, and that's what the

13   defendant did, and that's what Racketeering Act 2 is about.

14   But before I speak to you about how you know that the

15   defendant made the video when Stephanie was 17 and how the

16   Government has proven each of the elements of Racketeering Act

17   2, we need to back up again to when the defendant first tried

18   to recruit Stephanie.

19             Now, Stephanie testified -- she told you that she

20   grew up in Chicago and attended the Chicago Academy For the

21   Arts.  She since moved out of Chicago, she's gotten married,

22   has kids, and she works in the food and beverage industry, but

23   she told you that the defendant, through a member of his inner

24   circle -- she didn't know who it was -- first approached

25   Stephanie when she was 16 years old at the Rock 'N' Roll

1    McDonald's in downtown Chicago, and, specifically, she told

2    you that one of the men in the defendant's entourage slipped

3    her the defendant's number; and when she told that man at the

4    Rock 'N' Roll McDonald's where they work that she was just

5    16 years old, his answer, Not a problem.  Stephanie's age of

6    16 wasn't a problem.

7            Now, she ignored the defendant then, but the

8    following year, she heard that the defendant was at the Nike

9    store down the block from her job at the Allerton Hotel where

10   she worked as a barista -- and 965 is the map showing you how

11   close the Allerton is to the Nike store -- and she told you

12   this happened in the summer of 1999 shortly after she had

13   graduated from high school, and she was still 17 years old,

14   and it was during a time in her life where she felt at her

15   most vulnerable.  She previously endured a sexual assault and

16   abuse from others, and she told you briefly about that.  And

17   you saw in evidence a receipt from a Nike Town from -- from

18   the Nike Town store on Michigan Avenue in Chicago that was in

19   the defendant's storage facility for some goods that were

20   purchased on July 30th of '99.

21           Now, Stephanie told you that she approached the

22   defendant because one of her closest friends, Katherine Lee,

23   was an aspiring singer, and she believed that the defendant

24   could be Katherine's big break.  She told you that the

25   defendant gained interest in her friend's music and agreed to

1    listen to her sing -- the friend -- but you know, however,

2    that the defendant's interest in Stephanie was always sexual.

3           During the initial encounter at the Nike store --

4    around the Nike store, he told Stephanie that he liked to

5    cuddle and asked Stephanie if that would be okay, and the next

6    time that Stephanie saw the defendant was at the defendant's

7    studio at Chicago Trax, and that's the one on 865 North

8    Larrabee, and that was the first time that the defendant had

9    sex with Stephanie.

10          Just very briefly, because we're going to talk about

11   the defendant's studios a lot today, you heard from his former

12   studio manager, Tom Arnold, that in the late 1990s until about

13   2004, the defendant used that studio on 865 North Larrabee,

14   the one in downtown Chicago -- it was initially known as

15   Chicago Trax -- the defendant was using a recording studio

16   within Chicago Trax, but eventually the defendant renamed that

17   studio that was formerly Chicago Trax.  He renamed it the

18   Chocolate Factory, but in 2004 -- in 2004, the building

19   holding the former Chicago Trax, and now the defendant's

20   Chocolate Factory, was demolished, and at that time, the

21   defendant started to use his studio at his home at Olympia

22   Fields, and so that's the suburb of Chicago, but the defendant

23   called that studio also the Chocolate Factory, so it can get a

24   little bit confusing, and I'm going to do my best to make

25   clear for you when I'm talking about Chocolate Factory in

1    downtown Chicago, the one on Larrabee Street, and when I'm

2    talking about the Chocolate Factory in Olympia Fields.

3           So going back to Stephanie, she told you where the

4    studio was where she first met the defendant after the day

5    outside the Nike store, and she told you that it was just off

6    Chicago Avenue in the Cabrini-Green neighborhood, and you

7    see -- that's her testimony at 631, and you see a map of where

8    865 North Larrabee Street is, and, in fact, it's right as

9    Stephanie described to you, and that's the studio that was

10   later demolished.

11          Now, Stephanie told you that for a period of about

12   six months, the defendant had sex with Stephanie, and she

13   consented, but she told you that her time with the defendant

14   was a lot more than she had bargained for.  She was young and

15   imagined the defendant to be her boyfriend, and she told you

16   that they typically had sex in that room within the Chocolate

17   Factory -- this is the one at Chicago Trax -- she said it was

18   the one on the second floor, and she identified the photos

19   shown in Government's Exhibit 525P, -K, and -J, as the one --

20   as the room where she often met the defendant and where they

21   had sex.  And she told you, like many others, what sex with

22   the defendant was like, including how the defendant directed

23   each of their sexual encounters, including the position, and

24   the sounds that she should make during those encounters, and

25   she also told you about some of the humiliating and degrading

1    tactics that the defendant used.  He would ejaculate on her

2    face, he would tell her -- he would position her body in a

3    particular way and then leave the room, and if she moved when

4    he came back into the room, which would be hours later, if she

5    had moved, he would verbally berate her.  Never physically

6    struck her, she testified, but he would show that he was

7    upset, and that's in the transcript at 1638 where she

8    described, you know, that particular humiliation she endured.

9            She also told you about one particular event where

10   the defendant asked Stephanie to give him oral sex in the

11   backseat of a car, and there were two other people in the

12   front seat, and then he told her that he wanted her to be

13   vocal, to make noise, and she told you that she knew, even

14   though she was deeply embarrassed and thought it was

15   humiliating and degrading what was going on, but that the

16   defendant wanted the people in the car to know that she was

17   giving him oral sex.  Just another humiliating -- another

18   means of humiliating her.

19           And, like others, Stephanie told you that on some

20   occasions, a member of the defendant's inner circle would pick

21   her up or take her home from the studio, and she didn't

22   remember his name, but she told you it was the man shown in

23   Government's Exhibit 23, and other witnesses in this case, Tom

24   Arnold and Nick Williams, identified Government's Exhibit 23

25   as Big John, and he is shown on the screen -- on the board in

1    the security section next to Candy -- in between Candy and

2    Ronald Hardy.

3          And like many others, Stephanie told you that on two

4    occasions, when she had sexual encounters with the defendant,

5    the defendant recorded them with a video camera.  At least one

6    of those two occasions occurred when she was just 17 years

7    old, and she told you that it happened in Chicago, and that's

8    in the Northern District of Illinois, and that is the basis

9    for Racketeering Act 2.

10          Stephanie told you that she went to the studio, the

11   one on North Larrabee in downtown Chicago, and while she was

12   there, the defendant called her and told her that he was going

13   to pick her up and he was going to make a video of them having

14   sex, and she made clear that it wasn't a request, it was a

15   directive.  You might recall that when my colleague asked

16   about what was going through her head when the defendant,

17   quote/unquote, asked her to make a videotape, she answered, He

18   didn't ask me, he told me.  And she told you that she was

19   scared and didn't want to make a sex tape with -- didn't want

20   the defendant to make a sex tape of her, but shortly after the

21   call, the defendant did, in fact, pick up Stephanie and

22   brought her to his home in Lincoln Park, so this was a house

23   that the defendant had before the one in Olympia Fields, and

24   you can see that, the 1010 West George, and Stephanie

25   identified Government's Exhibit 501B as the location of the

1   house where the defendant took her that day when he made the

2   video.

3           And Stephanie told you what happened when they

4   arrived at his home.  Defendant took out a large video

5   camera -- this is back in 1999 -- so he took out a large video

6   camera and filmed her coming into the door; and, on camera, he

7   told her to take off her clothes and to go over to the sofa,

8   and then he started to vaginally penetrate her from behind,

9   also on camera.  And while he was having sexual intercourse

10  with her, he gave her a dildo and instructed her to put that

11  in her mouth, and that, too, he captured on camera.

12          And Stephanie described the video camera to you.

13  She said, you know, he was holding it, it was a large video

14  camera, and when asked what type of video camera it was, she

15  described it as an old video camera, like you put a VHS

16  casette tape in it in order to record.  And, again, later she

17  says he testified, This was a VHS video camera?  She says yes.

18          So using that large VHS video camera, the defendant

19  filmed Stephanie taking off her clothes, penetrating her from

20  behind, and then with a dildo in her mouth as he continued to

21  have sexual intercourse with her in 1999 when she was just

22  17 years old.

23          Her friends, Katherine Lee and Richard Ray,

24  confirmed for you what Stephanie told you.  Katherine Lee took

25  the witness stand and told you that Stephanie told her about

1   meeting the defendant and that Stephanie arranged for

2   Katherine to audition for him and she told you that this

3   happened right after they graduated from high school the

4   spring of '99, which you know was when Stephanie was just 17.

5          And Katherine Lee also confirmed for you that

6   Stephanie was sexually active with the defendant.  She told

7   you about an occasion in Florida where the defendant -- where

8   she and Katherine Lee and Stephanie had traveled to Florida at

9   the defendant's expense and they went to a studio there, and

10  she told you that Stephanie told her that the defendant

11  ejaculated on her face and left it there humiliating her.  And

12  you heard that same story from Jane, who told you about an

13  instance where she was with the defendant, he ejaculated on

14  her face and let his semen harden on her face, and then one of

15  his employees walked into the room humiliating her like he did

16  to Stephanie.

17         So you know that the defendant was, in fact, engaged

18  in sexual activity with Stephanie when she was a minor at

19  17 years old.  And you didn't hear from Richard Ray, he didn't

20  come and take the witness stand, but there's no dispute about

21  what Stephanie's friend Richard Ray knew because the

22  Government and the defense entered into a stipulation about

23  his testimony, and that stipulation is in evidence as

24  Government's Exhibit 1007, and you can see in 1007, it says

25  that Stefanie told Richard Ray, who dated Stephanie for a

1    couple of years after -- several years -- just after Stephanie

2    stopped seeing the defendant, so Stephanie told Ray that the

3    defendant, quote, videotaped her engaging in sex acts with

4    R. Kelly on two or possibly three occasions, and that included

5    when Stephanie was 17 years old.  That's what Richard Ray

6    said.

7              And Stephanie also told Richard Ray -- this is in

8    the stipulation -- that one of those instances -- one of those

9    occasions where he videotaped her occurred at a town home in

10   Lincoln Park just like Stephanie told you.  Richard Ray

11   supported Stephanie's testimony in another way, too.  You saw

12   in this -- you see in this stipulation that Stephanie told

13   Richard Ray about a sex act in a car with others, and you know

14   what he was referring to.  I just mentioned it.  She told you

15   also -- Stephanie told you about that very sex act, that the

16   defendant made her give him oral sex in the back of the car

17   with the others in front humiliating her.  And so from

18   Stephanie, Katherine Lee, and Richard Ray, you know that the

19   defendant recorded Stephanie engaging in sexually -- very

20   sexually explicit conduct when she was just 17 years old.

21             I want to briefly speak about the elements that the

22   Government must prove for you to find this racketeering act

23   proven, and I'm going to put the elements on the slide now and

24   I will show it to you again, but these are going to be the

25   same elements with respect to other racketeering acts

1    involving other victims.

2          The first one is that Stephanie was under the age of

3    18 at the time of the acts alleged in the indictment; the

4    second is that the defendant used, employed, persuaded,

5    induced, or enticed Stephanie to take part in a sexually

6    explicit conduct for the purpose of producing a visual

7    depiction of that contact; and, finally, that the visual

8    depiction -- that recording -- was produced using materials

9    that had been mailed, shipped, or transported in or affecting

10   interstate and foreign commerce.

11         And you know that the defendant had -- I'm sorry --

12   you know that the Government has proven those first two

13   elements because Stephanie told you that when she was 17 years

14   old during the summer of 1999, the defendant used that large

15   video camera to make a recording of Stephanie engaged in

16   sexual intercourse with the defendant.  And her birth

17   certificate is in evidence as Government's Exhibit 807 showing

18   you that Stephanie's birthday is in October of 1981 and

19   confirming for you that in the summer of 1999, she was just

20   17 years old.  And, again, Stephanie's friends, Katherine Lee

21   and Richard Ray, back up her testimony.  And, again, when

22   Stephanie was 17 years old, the defendant was 32 years old, so

23   almost twice her age.

24         The final element of Racketeering Act 2 is what we

25   call the interstate commerce element, and the judge is going

1    to instruct you that the affects on interstate commerce that

2    the Government has to show in order to make this a federal

3    crime can be almost nothing, and the Government has easily

4    satisfied that low burden, because in Government's

5    Exhibit 1006 -- another stipulation that's in evidence and was

6    entered into by the parties -- the parties have agreed that

7    polyester film was a central component of VHS tapes in 1999 --

8    or in or before '99 -- and that the type -- that that type of

9    film, that polyester film, was not produced in the state of

10   Illinois where the defendant made that sexually explicit video

11   of Stephanie when she was 17 years old, and what that means is

12   that the videotape used to make that recording -- the child

13   pornography -- was produced with materials -- the polyester

14   film -- that had been transported in or affecting interstate

15   commerce.  So it's just as simple as that.  It's the

16   components of something that was made outside the state of

17   Illinois, and it made it into the state of Illinois where the

18   defendant used it to film Stephanie, then the Government has

19   satisfied that element, and so you know that the Government

20   has proven that final element.

21              (Continued on the following page.)

22

23

24

25

Summations - Geddes                    4310

1              (Continuing.) MS. GEDDES:  The defendant made a

2      sexually explicit videotape of Stephanie in 1999, when she was

3      just 17 years old, and he used members of the enterprise to

4      recruit her at that McDonald's when she was 16 and used

5      members of the enterprise to drive her on occasion to and from

6      the studio where she met and had sex with the defendant.  And

7      that was the same studio where she waited for the defendant

8      before he picked her up to take her to his Lincoln Park home,

9      the one on 1010 West George, and then make the child

10     pornography videotape of her.  That racketeering act,

11     Racketeering Act 2, has been proven.

12             Racketeering Acts 3 and 4 relate to Sonja.  You'll

13     recall that Sonja, shown here in Government Exhibit 202, was a

14     young 21-year-old aspiring radio broadcaster.  And she told

15     you that she and her friend Jerie, Jerie Ortez, met the

16     defendant in a parking lot in Salt Lake City, Utah, where they

17     took the photograph shown in Government Exhibit 202.  And it's

18     also in evidence in Government Exhibit 203 because Jerie Ortez

19     also provided a copy of that photograph.  And Sonja told you

20     she also met the defendant at the mall parking lot in Salt

21     Lake City.  She mustered up the courage to ask him for an

22     interview and he referred her to another member of his crew.

23     She also explained to you that her proposed interview was

24     ultimately declined by the defendant because with her in Salt

25     Lake City and the defendant on his way to Chicago, it would

Summations - Geddes                    4311

1   have been a phone interview and the defendant and his inner

2   circle didn't want to do a phone interview.

3          But Sonja told you that during that meeting at the

4   mall, someone slipped her a piece of paper with the

5   defendant's name and telephone number handwritten on it.  And

6   she told you that she got it from behind her back, so she

7   couldn't tell you who gave it to her, but she got it and she

8   started to call the number on that piece of paper.  And she

9   told you that she called the defendant multiple times in the

10  hopes of getting her big break, arranging for a radio

11  interview with R. Kelly, the defendant.

12         Now, ultimately, the defendant asked her to travel

13  to Chicago for what she thought was going to be the interview

14  and Sonja told you that the defendant's people, the inner

15  circle, made arrangements for her to fly from her home in Salt

16  Lake City to Chicago, Illinois.  And that's in the transcript

17  at 2753.  But when she arrived in Chicago, it wasn't at all

18  like she had imagined; her big break turned into her

19  nightmare, and she told you about that nightmare.

20         Racketeering Act 3 relates to Sonja being secretly

21  confined at the defendant's studio and Racketeering Act 4

22  relates to the defendant causing Sonja's travel across state

23  lines from Utah to Illinois for the purpose of sexual activity

24  and that that sexual activity was of the type for which the

25  defendant could be charged with a crime.  Here, the sexual

Summations - Geddes                    4312

1   activity was illegal or criminal because it wasn't consensual.

2   We'll talk more about that, but first I'm going to talk about

3   how you know that the defendant committed Racketeering Act 3.

4          And the government, to prove Racketeering Act 3,

5   needs to prove two elements beyond a reasonable doubt.  First,

6   that the defendant or, again, someone for whose conduct he's

7   legally responsible for acted knowingly; and second, that the

8   defendant or that person for whose conduct he's legally

9   responsible either secretly confined or caused Sonja to be

10  secretly confined against her will or by deceit or enticement

11  induced Sonja to go from one place to another place, and that

12  when the defendant or somebody else for whose conduct he was

13  responsible for did so, he or someone else intended to

14  secretly confine Sonja against her will.  And Judge Donnelly

15  will instruct you, I believe, that confinement, as you hear,

16  just means that the victim had been clearly enclosed within

17  something.  Here, Sonja told you that she was inside of a room

18  within the defendant's studio.  And secret confinement, that

19  secret confinement aspect can be shown just by proof of

20  secrecy of either the confinement itself or the place of

21  confinement.

22         So that's exactly what happened here to Sonja.  And

23  before I discuss what happened and how you know it when Sonja

24  was confined at the defendant's studio against her will, I

25  want to first talk about when the -- when Sonja's nightmare

1    happened.

2         And also, before I go there, I want to make clear

3    that Sonja identified the studio where this happened as The

4    Chocolate Factory, and she showed you the photo of The

5    Chocolate Factory where it happened.  And this is the one at

6    865 North Larrabee, the one in Downtown Chicago.  So when I

7    talk about The Chocolate Factory, that's the one that I'm

8    referring to, that first studio.

9         So now I want to talk about when this happened.  On

10   the screen you can see a summary of telephone calls created

11   from telephone records between Sonja and the defendant's

12   studio on March 11 and March 12th of 2004.  Sonja testified

13   that when she went to Chicago in the hopes of finally getting

14   that interview, she was invited to the defendant's studio and

15   she called it The Chocolate Factory.  And I already told you

16   that here The Chocolate Factory is the one downtown in

17   Chicago, on Larrabee Street.

18        Now, the telephone records in evidence give you an

19   idea, a good picture, actually, of when the events related to

20   Sonja occurred at The Chocolate Factory.  And to understand

21   the telephone records, I just need to briefly explain to you

22   how you know that each of these phone numbers belongs to Sonja

23   and to The Chocolate Factory.  And so you can see in

24   Government Exhibit 151, that it shows contact numbers between

25   a phone number -- an 801 phone number ending in 6116 and then

Summations - Geddes                    4314

1    with two different 312, the Chicago area code, ending in 5599

2    and 8005.  And you know that the 5599, the one ending in 5599

3    was The Chocolate Factory because you can see on the screen in

4    Government Exhibit 405 that that phone number is actually

5    listed on that fax cover sheet that's in evidence as a phone

6    number for The Chocolate Factory.  And again, The Chocolate

7    Factory on Larrabee.  And that's just another piece of paper

8    that was found within the defendant's storage facility many

9    years later.

10           You also know that the 312 number ending in 8005 is

11   the defendant's phone number because in evidence is Government

12   Exhibit 165, which is another summary chart -- it's not shown

13   on the screen, but it is a summary chart showing the most

14   frequent contacts for that 8005 number.  And if you look at

15   that, you will see that the most frequent contacts are

16   contacts associated with the defendant.  One of the most

17   frequent contacts is the -- one of the most frequent contacts

18   of the 8005 number is the 5599 number.  There's another number

19   that's also listed on an AT&T phone bill that was found within

20   the defendant's storage facility that is in evidence as

21   Government Exhibit 400, which actually lists another phone

22   number associated with the 8005 account, and that one is one

23   ending in 6308.  And again, that's another one of the most

24   common phone numbers for the 8005 number.  And so you know

25   that both the 5599 one and the 8005 one are related to the

Summations - Geddes                      4315

1    defendant and specifically to The Chocolate Factory.

2            And you also know that that 801 telephone number

3    ending in 6116 is associated with Sonja because also found

4    within the storage facility were messages.  Like remember, you

5    heard several witnesses testify that as part of their job

6    operating the phones at The Chocolate Factory, they would

7    handwrite messages for the defendant, and some of those

8    messages were found within the defendant's storage facility.

9    And among those found were messages from Sonja.  And her name

10   is blocked out there, but you have the unredacted version in

11   evidence and you will see that that is Sonja's true last name.

12   And so from that you can tell that Sonja had that 801 phone

13   number ending in 6116.  And again, going back to Government

14   Exhibit 165, you can see -- or 151, I'm sorry, you can see

15   that there were phone calls between Sonja's number and the two

16   Chocolate Factory numbers on March 11th and March 12th of

17   2004.

18           And, now, Sonja told you that when she traveled to

19   Chicago, she took her grandfather's cell phone and she didn't

20   take her own phone, so that 6116 phone number, I submit, is

21   Sonja's own personal cell phone, but that's not the one that

22   she brought with her to Chicago.  She told you, though, the

23   phone number for her grandfather and she described it was an

24   801 number, 801 being the area code in Salt Lake City, ending

25   in 6916, so similar to Sonja's phone, but not exactly.  And

Summations - Geddes                              4316

1   Government Exhibit 156 is another summary chart of phone

2   records, and it shows that on the following day, after those

3   two phone calls that you saw on March 11th and March 12th

4   between Sonja and The Chocolate Factory, Sonja, in fact, began

5   to use her grandfather's phone to call her friends, Charity

6   Torres and Jerie Ortez.  And Jerie was the other individual

7   shown in Government Exhibit 202, which is shown on the screen

8   now.  And so you see in evidence, in Government Exhibit 156,

9   that beginning on March 13th, Sonja starts to call her

10  friends, Charity Torres and a Jerie Ortez.  And if you look

11  closely at the records in Government Exhibit 138(a), which are

12  just AT&T call detail records showing certain records for

13  Sonja's grandfather's number -- that's the one that she told

14  you she took to Chicago -- you'll see that there were no other

15  communications between Sonja's grandfather's phone and Charity

16  Torres or Jerie Ortez after August of 2003, when Sonja told

17  you, and you saw that photo showing Sonja meeting the

18  defendant.  And so the only time that there is contact after

19  that date between the grandfather's phone and her friends is

20  beginning on March 13th and 14th and the 15th.  And I will

21  show you those phone records.  And so you know that that is

22  when Sonja had her grandfather's phone, when she traveled to

23  Chicago, since that's the time where you see records showing

24  communications with her friends.

25              You also know that Sonja was in Chicago at The

Summations - Geddes                              4317

1   Chocolate Factory because on March 14th of 2004 and March 15th

2   of 2004 and at no other time Sonja's grandfather's phone was

3   connecting to several different but similar telephone numbers

4   beginning with a 630 area code, and that's an area code used

5   in Chicago, Illinois.  And you know -- and I'll show you this,

6   this is shown in Government Exhibit 156.  You can see that

7   there are several connections to those 630 numbers, and most

8   of them go (630)831- and then the four digits after that are a

9   little bit different, but you know what those 630 numbers are

10  because -- and by the way, I was saying that the only time you

11  see these connections are on that short time frame in March of

12  2004.

13          And there is a stipulation in evidence, Government

14  Exhibit 1011, which indicates that these were -- all those

15  numbers shown in the column under "terminating number," all of

16  those numbers are Verizon Wireless numbers.  And in the

17  stipulation it says that they may be routing numbers; Verizon

18  Wireless says that they are Verizon Wireless numbers and they

19  are not assigned to any particular user, but then it also goes

20  on to say that Verizon Wireless uses routing numbers to track

21  a user's roaming using a wireless phone, to track a user's

22  roaming for billing purposes, and that when it does that, it

23  uses telephone numbers that are local to the particular area

24  where the user is roaming.

25          So here I submit that you know that Sonja was in

Summations - Geddes                              4318

1    Chicago because numbers with that 630 area code, the

2    Chicago-based area code, were used to route calls and bill

3    Sonja's grandfather for all of those roaming calls.  And

4    you'll remember that Sonja told you about how high her

5    grandfather's cell phone bill was when she returned to Utah.

6    That's in the transcript at 2776.  And you can see some of

7    those roaming -- the numbers that I submit were used to track

8    those roaming expenses.

9            So with that backdrop of when this occurred, I want

10   to turn back to what happened when Sonja was confined at The

11   Chocolate Factory.  You'll remember how Sonja told you that

12   the defendant arranged and paid for her to be flown from her

13   home in Salt Lake City to his studio in Chicago.  And she told

14   you how she spent time preparing for her big interview, which

15   she thought was going to be her big interview in Chicago,

16   planning questions, researching him and even securing a

17   special recording device that she could use to record their

18   interview.  Armed with all of that prep, she went to the

19   airport, but unfortunately when she got to the airport, things

20   were a little off schedule.  And Government Exhibit 156 shows

21   that the defendant -- I'm sorry, Government Exhibit 156 shows

22   that Sonja used her grandfather's phone to call American

23   Airlines on March 13th, 2004.  And that's in evidence,

24   Government Exhibit 138(a), and there's also a stipulation in

25   evidence telling you that that particular number -- it's an

1   800 number -- belongs to American Airlines.  And you know why

2   Sonja called American Airlines on March 13th of 2004; she told

3   you that she had -- the defendant had purchased a ticket for

4   her, but she had missed her scheduled flight and so she needed

5   to call to rearrange her flight.

6          Now, when Sonja arrived in Chicago, she told you

7   that she went to the defendant's recording studio.  And again,

8   this is the recording studio at the old Chicago Trax, and she

9   described for you that big barbwire fence that was outside,

10  and you can see that shown in the government exhibit shown on

11  the screen.  And she told you what happened when she arrived

12  at The Chocolate Factory.  As soon as she got to reception,

13  she encountered a Caucasian man and two African-American

14  males.  And someone in that group, in the defendant's inner

15  circle, asked her if she needed, quote, "protection."  And she

16  told you that this caught her totally off guard.  And she

17  explained she became confused and how finally someone

18  explained what they meant by protection; he was asking if

19  Sonja needed a condom.  And Sonja quickly made clear that that

20  wasn't why she was there, she wasn't there for that.  And so

21  right then, the defendant's inner circle knew that -- I'm

22  sorry.  So right at the outset, the members of the defendant's

23  inner circle made clear that the defendant had brought her

24  there for sexual activity; that's why they offered her the

25  condoms.  And that was typical of many women and girls who had

Summations - Geddes                    4320

1    come to the studio, but Sonja wasn't there for that, and she

2    told you that.

3            Even so, Sonja was escorted when she arrived to a

4    small, dim room in The Chocolate Factory where a man went

5    through her luggage and another man made her sign a

6    confidentiality agreement, took her I.D. and made a copy of it

7    across the way.  She also told you how someone went through

8    her phone, asking her for names and other details about each

9    of the people she had recently contacted, her closest friends

10   and family members.  And after going through her luggage and

11   her phone and getting personal details about her and her

12   family, the man gave her a list of rules, telling her she

13   wasn't allowed to look up, she wasn't allowed to talk to

14   anyone and, most importantly, that she wasn't allowed to leave

15   the room.  And that's in the transcript at 2762.  And she was

16   then told that the defendant would be there shortly.  The two

17   men left the room, and she told you that she heard the door

18   lock behind them and there she stayed for multiple days, in a

19   room with no windows, where the days and nights ran together

20   for Sonja.

21           Now, Sonja only went to the defendant's studio once,

22   and it was more than 15 years ago, but her memory of that

23   studio and what happened to her is seared into her brain, I

24   submit.  And you know that because she described in vivid

25   detail how she was brought to that room and how, on the few

1   occasions that she was permitted to leave the room, the way --

2   the particular pathway she was brought to the bathroom on the

3   first floor.  And then she also told you about being brought,

4   on one occasion, to a bathroom on the second floor that had a

5   shower.  And these events stood out in her mind, going to the

6   bathroom, something as mundane as that, because other than

7   those monitored trips, she was stuck in that small room on the

8   first floor.  And what's significant is that her description

9   of getting to each of those locations was spot on, and I am

10  going to show you how you know that.

11          You saw the floor plans of The Chocolate Factory

12  because they're in evidence.  And you also heard Tom Arnold

13  and Nick Williams, who both worked at The Chocolate Factory on

14  North Larrabee, testify about the layout of the studio.  And

15  so I want to start with Sonja's testimony about how she got

16  into the room from the entrance.  And she told you that she

17  followed them, she walked down, she made a left and then she

18  turned right.  And you see on the right-hand side, Government

19  Exhibit 411(a), shows you that exactly at the -- following

20  that exact pathway, that does get to a room.  And on that

21  particular government exhibit, another item that was found

22  from the defendant's storage facility, you see that it's

23  marked "Rob."  And you also see that right across the hall

24  from the location marked "Rob" is marked with "Tom."  And that

25  makes sense because Sonja told you that she heard the copies

1    being made.  She didn't see anyone making copies, but she had

2    heard the copy machine running.  And Tom Arnold -- he's on the

3    board.  Tom Arnold told you that he was the former studio

4    manager at The Chocolate Factory and he sometimes made copies

5    of licenses, just like Sonja heard that day.

6             And Sonja's testimony that she stayed in that

7    particular room, the one marked with "Rob" in 411(a), makes

8    sense given some of Tom Arnold's other testimony.  He was

9    talking about the different rooms in The Chocolate Factory

10   where guests would stay, where he would escort -- he and

11   others would escort guests of the defendant's.  And he told

12   you that that room, the one marked "Rob" there, was the former

13   office of the prior owner of Chicago Trax.  So before The

14   Chocolate Factory was The Chocolate Factory, it was

15   Chicago Trax, and it was owned by someone named Reid Hyams.

16   And after, Tom told you -- Tom Arnold told you that after

17   Mr. Hyams left, it was then used as an office and a lounge, a

18   lounge where sometimes they may have put guests, like Sonja

19   told you she was there.

20             And you'll see on the floor plan, there is not an

21   obvious door, you just see an opening on the floor plan, but

22   Tom told you that even though the floor plan didn't show it,

23   there was a door, and she described it as being right across

24   from the reception area.

25             Sonja's memory about where the bathrooms were that

Summations - Geddes                    4323

1    she was allowed to use was no different.  And again on the
2    screen, you can see that same government exhibit, 411(a),
3    along with her testimony.  And Sonja told you that when she
4    walked out of the room, she made a left, then she goes down
5    that long hallway.  She talked about a dance-studio-like room
6    with mirrors in it and then you go to the right and there is a
7    restroom.  And again, this is completely corroborated by what
8    Tom Arnold told you.  He told you that in that area -- and I
9    should make clear that there are a couple of different floor
10   plans that are in evidence.  On the screen, I've shown you the
11   floor plan that's in evidence as Government Exhibit 411(a),
12   but Tom Arnold also provided the government with a floor plan
13   that he had in his belongings, and that floor plan is marked
14   as Government Exhibit 235.  And if you compare 235 and 411(a),
15   you will see that they are identical, with the exception that
16   they don't have those handwritten notations that are shown in
17   Government Exhibit 411.  So Tom Arnold, using Government
18   Exhibit 235, the other floor plan, told you that that area
19   that's marked "Rockland Records" was another room that guests
20   would be escorted to, and so it makes sense that Sonja would
21   have walked through that room to get to the bathroom.
22        And finally, Sonja also told you about the bathroom
23   on the second floor, and she told you how she was escorted up
24   a tiny flight of stairs and at the very top and to the right
25   there was a bathroom.  And you see that this is in evidence as

1    410(a).  The second floor of Chicago Trax is 410(a), the first

2    floor was 411(a).  You see that pathway is exactly how one

3    would get to what's marked as a restroom on Government

4    Exhibit 410(a).  And what's important is that Tom Arnold and

5    Nick Williams, the two employees who testified that they

6    worked at that very studio that -- about a restroom in Chicago

7    Trax -- or the old Chicago Trax, now The Chocolate Factory or

8    then The Chocolate Factory, that had a shower.  And Tom

9    Arnold, during his testimony, identified where on the floor

10   plan was the restroom with the shower, and you'll see that he

11   identified it as the one shown in 410(a) and marked with the

12   restroom area.  And you also saw photographs of that bathroom,

13   525(s), and Nick Williams and Tom Arnold identified that as

14   the bathroom with the shower in it.  That was the one that was

15   accessible to the public, not someone's private bathroom

16   within the -- in Chicago Trax.

17          In addition, you know that Sonja was at -- so in

18   addition to her very vivid and accurate memory of where each

19   of these locations were in this place that she had only been

20   once, you know that Sonja was at that studio for another

21   reason.  She testified that she was greeted by a Caucasian man

22   when she entered the studio and it was late in the evening.

23   And, you know, it makes sense because the defendant had

24   runners working for him 24 hours a day, and you heard from a

25   couple of individuals that there were shifts that they would

1  work.  Nick Williams was one of those individuals who

2  testified about the shifts.  And here you can actually see a

3  time sheet that was recovered from the storage facility

4  covering that period of time where Sonja's grandfather's cell

5  phone was hitting off of those Chicago routing numbers, and

6  you can see that Nick Williams was one of the individuals who

7  was working that day.  And that's in evidence as Government

8  Exhibit 405.

9       Now, I told you that one of the elements the

10  government has to prove for Racketeering Act 3 is that Sonja

11  was secretly confined, and you know that she was.  Sonja told

12  you that after she was first escorted into that room, the one

13  that I showed you that was marked with the name "Rob," she

14  heard the door lock and that when she tried to open the door

15  from the inside, it wouldn't budge.  To get someone's

16  attention, she told you she had to bang on the door and she

17  had to call the reception area from the phone in that room

18  where she was staying.  And she told you that she repeatedly

19  asked to leave and she was told she couldn't, not without the

20  defendant's permission, and the defendant hadn't given her

21  permission to leave.

22       Now, as we discussed, Sonja had a cell phone on her,

23  but Sonja told you why she didn't call the police.  And you

24  know why.  As soon as she got there, the defendant's employees

25  not only took her I.D. and so know where she and her young

Summations - Geddes                                    4326

1   child lived at that time, the address is listed on the I.D.,

2   but also had information about some of her closest family

3   members because someone had been going through those phone

4   numbers called on her phone.  And so there she was in a

5   strange city, in a studio with a big star, and she told you

6   that between the fear of reprisal and no one believing her,

7   she just did her best to do what she could to get them to let

8   her go, those people at The Chocolate Factory.

9           And you can see on the screen there's testimony from

10  Sonja where my colleague asked her:  You know, at some point

11  you banged on the door.  What, if anything else, did you do to

12  try to get the attention of the defendant's employees?

13          And she answered:  Just knocked and banged on the

14  door.  I called numerous times.  I asked to be let out.  I

15  asked to go to the restroom.  You know, whatever I could, I

16  was doing it.

17          And then continuing, she says -- the question is:

18  When you made those requests to leave the room and for food,

19  water and to use the bathroom, what, if anything, did the

20  person answering the phone say to you in response?

21          And the answer, which became a refrain at this

22  trial, was she had to get it cleared.  Basically would have to

23  get it approved and somebody would have to come and walk me

24  from my room to the restroom.

25          And then my colleague asked:  Did they say who it

Andronikh M. Barna, Official Court Reporter, RPR, CRR

1    needed to be approved by?

2              Mr. Kelly, the defendant.  That's the answer.

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation - Geddes                                    4328

1          MS. GEDDES:   (Continuing)   Sonja told you.  It was

2    supported by other testimony in the case.  The testimony of

3    Nick Williams and Tom Arnold.

4          Nick Williams told you that the defendant's female

5    guests at the studio would include Sonja were "absolutely not"

6    allowed to move freely around the studio and that another

7    employee like Big John on the screen or Donnie Lyle would have

8    to escort guests to the bathroom or to leave the studio.  Nick

9    Williams also told you that he generally contacted the

10   defendant for approval before doing much of anything,

11   especially when it came to the defendant's female guests.  Tom

12   Arnold went even further.  He told you that when a guest

13   wanted to leave, he contacted the defendant for further

14   instructions.  And that's in the transcript at 1338 to 1340.

15         So based on all of that, it rings true when Sonja

16   testified that when she tries to leave, the person answering

17   the phones told her they needed to reach out to the defendant

18   and when they couldn't get in contact with the defendant or

19   perhaps the defendant denied her permission to leave, she had

20   no choice.  She had to stay.

21         And now, it makes no difference that Sonja had no

22   contact with the defendant for most of the time that she was

23   locked in that room because as I talked about before, under

24   the law, the defendant doesn't always have to be the person

25   who placed or locked Sonja in the room by herself.  Over the

Summation - Geddes                                    4329

1   past several weeks, you heard from witness after witness who's

2   told you that the defendant and no one else called the shots.

3   He had standing orders, especially regarding his female

4   guests, and he expected his employees and inner circle to

5   follow those rules.  And they did that.

6          As Nick Williams told you, the defendant directed

7   what room to place a guest in at the studio.  The defendant

8   decided when it was okay for a female guest to eat.  He

9   decided when it was okay for a female guest to move around the

10  studio to use a restroom.  And he decided when it was okay to

11  leave.  That's how he operated and his employees and inner

12  circle carried his instructions out and it was no different

13  for Sonja.

14         So based on all of this testimony, you know that

15  when Sonja was in that room for a period of days, she was

16  there because the defendant wanted her in that room, because

17  the defendant directed his employees that that was where she

18  should be escorted to and that's where she should stay.

19         Now, various witnesses have talked to you about that

20  electric fence covered in barbed wire that surrounded the

21  studio on Larrabee Street in that photo that's in evidence.

22  Nick Williams talked to you about how a button needed to be

23  pushed in order to open that gate for anyone to get in or out

24  of the studio.

25         Sonja also told you about passing through the barbed

Summation - Geddes                         4330

1    wire fence surrounding the studio when she first arrived.

2    And, again, you saw photographs of the fence.

3              They're in evidence that I showed you a few minutes

4    ago, 545(v) and (u).

5              So without the defendant's authorization to let her

6    leave, the employees kept her there in that small black

7    windowless room for a period of days in a studio surrounded by

8    that barbed wire fence.  That was her place of secret

9    confinement in a strange city she had never visited before

10   with no ability to leave despite her rejected pleas to let her

11   do, repeated pleas, excuse me, also rejected, to let her do

12   just that.

13             Now, you can find that the defendant secretly

14   confined Sonja in multiple ways, not just by the location

15   where she was kept in that Chocolate Factory room, but also by

16   the fact that the defendant or his employees intended to

17   secretly confine Sonja against her will when the defendant,

18   through deceit, and this is the language in the statute,

19   through deceit or enticement, induced Sonja to travel from her

20   home in Utah to Chicago and you know that's what happened

21   here.

22             The defendant lured Sonja to Chicago under totally

23   false pretenses.  He had her travel there pretending that he

24   was promising that she was going to get an interview from him,

25   but you know from everything that you've learned in this

Summation - Geddes                                    4331

1  trial, that the defendant had no intention of doing that.  He

2  brought her there for sex.  She just didn't know it.

3          And you know the defendant's intentions because of

4  what happened once she arrives.  We talked about how the

5  defendant's employees offered her condoms right when she

6  walked through the door.  Then she was held there for days and

7  the only time that the defendant came to see Sonja, Sonja

8  wakes up and sees the defendant doing up his pants and we'll

9  talk about that in a moment.

10          So you know that the defendant and his employees

11  intended to secretly confine Sonja when they walked locked her

12  in that room and you know this because of what they did to

13  keep her being there a secret.

14          You heard that they brought her into this room, had

15  her sign a confidentiality agreement, told her not to tell

16  anyone about what was happening in the studio, they gave her a

17  list of rules to follow and they locked the door.  So faced

18  with these threatening actions and instructions by the

19  employees, including taking down the names and the details of

20  her loved ones that were listed her phone, made clear to her

21  that she shouldn't be speaking to anybody and that's exactly

22  what the defendant and his employees intended.

23          Now, I reviewed for you that Sonja told you exactly

24  what happened that weekend in Chicago and you know that what

25  she told you is what happened because her testimony was

1  supported by so much other evidence.  I've already explained
2  some of that to you like the pathways that she recalled that
3  were accurate, but you've also heard about stipulations in
4  evidence showing that her two friends, Jerie Ortez and Charity
5  Torres, said about what happened when Sonja met the defendant
6  and when she traveled to Chicago.  Those stipulations are in
7  evidence as if they both came to court and testified before
8  you.  There is no dispute at all of what these two women would
9  say that they learned from Sonja.  That's what a stipulation
10  is.
11          So I want to first talk about Government
12  Exhibit 1009.  That's a stipulation regarding Jerie Ortez.
13          You'll see on the screen that Jerie Ortez said that
14  while Sonja was in Chicago, Sonja contacted Ortez by telephone
15  and Sonja was nervous on the call and whispered.  Sonja told
16  Ortez that she was in a room and could not leave, just as she
17  told you.  Sonja also told Ortez that Kelly's team had taken
18  her belongings and put Sonja in a room where she was waiting
19  alone.  Sonja also told Ortez that she had to ask Kelly or his
20  security team for permission to go to the bathroom and she
21  told Ortez that she only saw Kelly for a brief period of time
22  when she was in Chicago.
23          It goes on to say, Ortez believed that Sonja was in
24  Chicago for approximately four days and when Sonja returned to
25  Utah, Sonja didn't speak to Ortez much about what happened but

Summation - Geddes                     4333

1    she did tell Ortez that it was "a horrible experience."

2              Government Exhibit 1008 is similar.  It's another

3    stipulation and this is a stipulation regarding what Charity

4    Torres said Sonja told her.  Charity Torres and Jerie Ortez

5    were Sonja's close friends back then.

6              You'll recall that in Government Exhibit 202, that

7    was the photograph I started off by showing you, Jerie Ortez

8    was the other woman in the screen.  Charity Torres is another

9    close friend.

10             In 1008, Torres reported that one day after Sonja

11   flew to Chicago, Sonja called Charity Torres and was upset and

12   very scared.  Sonja told Torres that Kelly's people took

13   Sonja's belongings and that Sonja was in a room by herself and

14   was not permitted to leave.  Sonja also told Charity Torres

15   that Kelly's people told her that Kelly was recording music

16   and couldn't see Sonja at the time and that she would have to

17   wait and that Sonja also told Charity Torres that she had

18   asked to go to the bathroom and hadn't eaten.  And, finally,

19   Sonja told Charity that Sonja, that she could hear people

20   having sex.

21             That's what she learned while Sonja was in Chicago.

22   She also talked to Sonja when she returned home and that's in

23   paragraph H and it says -- and paragraph H isn't shown here

24   but it's in evidence and you'll have it with you.

25             What it says is that when Sonja returned home, Sonja

Summation - Geddes                          4334

1   was very upset about what happened in Chicago.  Sonja did not

2   want to talk about what happened while she was in Chicago

3   visiting the defendant.  And Sonja said to Torres, Charity

4   Torres, that Sonja wanted nothing to do with Kelly, the

5   defendant, ever again.

6           You also know that what Sonja told you happened is

7   what happened based on the phone records or you're seeing the

8   phone records now, I believe.

9           This is in evidence as Government Exhibit 150 and

10   these are call records for Sonja's grandfather's phone, the

11   one she borrowed, the one ending in 6916, and they show

12   communications on that phone between March 13th of 2004 and

13   March 16th of 2004.  This is only one page of that exhibit but

14   you'll have the whole exhibit there.

15          You can see that in blue are the calls to American

16   Airlines.  I talked earlier about that first call when Sonja

17   misses her flight and needs to rearrange it so that makes

18   sense, but you also see her phone conversations with her

19   friends Charity Torres and Jerie Ortez which explain to you

20   how they were able to provide the information that they

21   provided to you in those two stipulations.

22          So in peach are the calls to Charity Torres and in

23   gray are the calls to Jerie Ortez.  And you know that those

24   were their telephone numbers because Jerie Torres told you in

25   the stipulation what her telephone number was ending in 7167

Summation - Geddes                              4335

1   and Jerie Ortez told you where her mother lived and there is a

2   subscriber record in evidence for a phone number that links to

3   that same address and individual and that's in evidence as

4   Government Exhibit 136.

5            So on these records shown in 150, you see the phone

6   calls to Charity and Jerie just like Sonja told you.

7            So let me turn to Racketeering Act 4.  So I've

8   talked to you about the secret confinement and how you know

9   that Sonja was secretly confined on account of the defendant

10  in the Chocolate Factory, but the second part is Racketeering

11  Act 4 which is the transportation of Sonja for the purpose of

12  sexual activity.  It has to be illegal sexual activity meaning

13  of the type that a person can be charged with a criminal

14  offense.

15           There are two sub predicates and they're very

16  similar but I'm going to address the differences briefly.

17           For Racketeering Act 4A, the government needs to

18  prove two different elements:  One, that the defendant

19  knowingly transported or caused the transportation of Sonja in

20  interstate commerce, that just means across state lines, and,

21  two, that the defendant transported Sonja with the intent that

22  he would engage in sexual activity with Sonja and that for

23  that sexual activity, a person can be charged with a criminal

24  offense.

25           Now, it's important before I go on for you to

Summation - Geddes                              4336

1   understand that the sexual activity for these purposes does

2   not need to be sexual intercourse.  It's sufficient that the

3   defendant fondle Sonja's genital area.  That qualifies as

4   sexual activity under the law and it's defined, it will be

5   defined in the Judge's instructions for you.

6           Government Exhibit -- I'm sorry -- Racketeering

7   Act 4B is very similar, we'll call that coercion of Sonja to

8   travel, and there, again, the government needs to prove that

9   the defendant knowingly persuaded or induced or enticed Sonja

10  to travel in interstate commerce, meaning across state lines,

11  that Sonja, in fact, traveled in interstate commerce and,

12  three, that the defendant acted with the intent that -- I'm

13  sorry -- that the defendant acted with intent that he engage

14  in illegal sexual activity with Sonja.

15          So I'm going to first speak about the travel

16  components of 4A and 4B.

17          As I mentioned a few minutes ago, Sonja told you

18  that the defendant caused her to be transported from her home

19  in Utah to Chicago and he also enticed her to travel there

20  because he told her that she was going to come for an

21  interview and so that satisfies that travel element of 4A and

22  4B.

23          You know all this because she told you that the

24  defendant arranged for her to come, that they paid for her

25  airline tickets and that she, in fact, traveled.  You also saw

Summation - Geddes                                    4337

1    that call to American Airlines supporting that she, in fact,

2    traveled that day.

3           So based on that testimony and the other evidence

4    that I previously reviewed with you, you know that Sonja did,

5    in fact, travel from Utah to Chicago.  The government has

6    proven that so the government has proven that component of the

7    Racketeering Act 4.  So the only remaining requirement for

8    those two racketeering predicates, those two sub predicates to

9    Racketeering Act 4A and 4B is that the purpose of the travel

10   was for sexual activity for which an individual could be

11   charged with a criminal offense.

12          You know the reason that the defendant flew Sonja to

13   Chicago.  You've heard from witness after witness including

14   people in the defendant's inner circle as well as some of the

15   women and girls themselves who told you that the defendant

16   regularly flew in guests for the purposes of sexual activity.

17   He met them at the malls, concerts and other events, and then

18   flew them from across the country to stay with him at his

19   recording studio, at his residence, at a nearby hotel.  You

20   heard from Tom Arnold, Diana Copeland, Cheryl Mack and the

21   Mayweather sisters, a part of their jobs were to arrange

22   travel for these guests.

23          Again, there can be little dispute of the reason

24   given all the evidence that you heard in this case of why the

25   defendant flew in these women.  Defendant wasted no time when

CMH        OCR        RMR        CRR        FCRR

Summation - Geddes                                    4338

1    he actually encountered these female guests, quickly engaging

2    in sexual activity and as we discussed, the members of the

3    defendant's inner circle who met Sonja when they first

4    arrived, they asked her if she needed protection.  So everyone

5    knew or believed they knew why Sonja was there since the first

6    question they asked her was if she needed condoms or

7    protection.

8            So with respect to Racketeering Acts 4A and 4B, the

9    sexual acts, the sexual activity was criminal for three

10   different reasons.  You have to agree on which of the

11   circumstance occurred but you only need to find that one of

12   these circumstances were present for you to find this part of

13   Racketeering Act 4A or 4B proven, but I submit that you

14   learned that it's criminal for each of the reasons.

15           So these are the three reasons why the sexual

16   activity was criminal with respect to Sonja.  Number one,

17   Sonja wasn't physically able to consent to sexual activity.

18   Number two, it happened during the course of that secret

19   confinement which we've already discussed.  And number three,

20   it happened after Sonja was drugged.  You heard her talk and

21   we'll talk more about it in a moment that she had that Chinese

22   food and the soda and that caused her to immediately lose

23   consciousness and fall asleep.  The government has proven each

24   of these.

25           Now, Sonja testified that in the room, in that small

Summation - Geddes                                    4339

1  room, the one that I submit was labeled with the name "Rob,"

2  there was a book with menus.

3          Government Exhibit 499 is a three-ring binder just

4  as Sonja told you that was found in the storage facility that

5  the defendant used and it's labeled "Menus."  You can also see

6  on Government Exhibit 499 which is just an excerpt from within

7  that, among the menus included, there are lots of them, there

8  are also ones for Chinese food.

9          So Sonja told you that she had been asking for food

10 for a long time but none was coming but, eventually, she was

11 able to pick out a location.  She selected Chinese food and

12 after what she described as seemingly forever, she was brought

13 the food.

14         Sonja told you that despite being starving and, you

15 know, having wanted food for a really long time, she, as soon

16 as she took a few bites of that Chinese food that she had

17 received, she became extremely full and tired and she didn't

18 know how that fatigue came on so suddenly.  She didn't recall

19 falling asleep and she didn't even know how she got from the

20 table where she had been eating the Chinese food to the couch

21 where she eventually woke up sometime later, but she told you

22 what happened when she came to.

23         She was confused, she woke up in a bit of a haze,

24 and she saw the defendant.  This was the first and only time

25 that she saw the defendant in Chicago.  And she told you what

Summation - Geddes                                    4340

1    he was doing.  He was doing up his pants.  And she saw and

2    realized that the underwear that she had been wearing while

3    she was eating, while she had been in that room, had been

4    removed and they were at the other end of the couch.  She told

5    you unequivocally that she was not the one who removed her

6    underwear.  She also noticed a wetness in her vaginal area and

7    on her thighs.

8            Ladies and gentlemen, you know what happened in that

9    room and she did too.  She told you that she knew her body and

10   based on how she felt and what she saw and all the other

11   circumstances, she knew she had been touched sexually.  And

12   you know that what Sonja told you is what happened inside the

13   defendant's studio because of all the other evidence that you

14   saw supporting it.

15           A few minutes ago, I spent a considerable amount of

16   time explaining how Sonja's testimony was backed up and I'm

17   not going to go over that again now but I want to just take a

18   moment and remind you about a similar situation that you heard

19   about during this trial.

20           You heard from Louis.  On the screen is a photograph

21   of Louis taken when he was younger but Sonja's testimony was,

22   you know, eerily similar to what Louis told you.

23           Now, his memory was fuzzy but he told you that he

24   recalled attending a party at the defendant's residence in

25   Olympia Fields and waking up the next morning to find the

Summation - Geddes                    4341

1    defendant in the room with his pants unbuttoned, with his own

2    pants, Louis's own pants unbuttoned, and he told you that he

3    believed that the defendant had given him oral sex despite

4    that he wasn't conscious or awake to consent to such activity.

5            Sonja too told you that the defendant had sexual

6    contact with her despite that she wasn't conscious or awake to

7    consent to it.

8            I told you earlier that there were three separate

9    bases for how the sexual contact was illegal.  First, I told

10   you that how you know it was illegal was because she couldn't

11   consent to it.  I'm sorry.

12           First, I just told you how you know that it was

13   illegal because she couldn't physically, she wasn't physically

14   awake to consent to it.  Second, it was illegal because the

15   defendant had sexual contact with Sonja during the course of

16   that secret confinement and she didn't consent to it.  And,

17   finally, the sexual contact was illegal because it happened

18   after someone in the defendant's inner circle drugged her.

19           You know that she was drugged with something

20   secreted in her food or her drink because she told you that

21   despite being starving, not having eaten for over a day, she

22   felt immediately full and extremely tired after just taking a

23   single bite or a couple of bites and a few sips of the drink.

24   And you know that this sudden fatigue came out of nowhere

25   because there was something -- you know where it came from.

Summation - Geddes                    4342

1   There was something in her food or drink.

2         So the defendant is guilty of this predicate act

3   under that theory as well.  Again, you don't need to find all

4   three.  You only need to find one to find this predicate

5   proven but the evidence is clear.  She wasn't conscious.

6   Whatever the reason, she could not and did not consent to the

7   defendant's sexual contact with her.

8         Finally, you know that the defendant's sexual

9   contact with Sonja was illegal because of what happened right

10  after the defendant left the room after barely saying a few

11  words to her.

12        One of his employees came in and made Sonja sign

13  another confidentiality agreement before saying that she could

14  go and arranging her return ticket.  Not only that, he

15  threatened her, scaring her into silence, telling her not to

16  speak with anyone, not even her closest friends or

17  grandparents about what had happened.  His exact words, he

18  told her:  Don't fuck with Mr. Kelly.

19        You've heard a lot -- you've heard Mr. Kelly say

20  that a few times and I've already talked about that.

21        Based on all of this evidence, the government has

22  proven this racketeering act so you know, so I checked off

23  both 3 and 4, the secret confinement as well as the Mann Act

24  violation.

25        I should have said this earlier but the

Summation - Geddes                                      4343

1    transportation counts that we talked about are also called

2    Mann Act violations so that's why I've written them here as

3    Mann Act violations.

4              I want to now turn to Jerhonda.

5              Jerhonda Johnson Pace told you that she first saw

6    the defendant when she was just 14 years old.

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

1    (Continuing.)

2              MS. GEDDES:   She remembered that it was on April

3    Fool's Day, just a couple of weeks before her 15th birthday,

4    and she and her friend, Keyonia Jones attended a court

5    proceeding on a regular basis for almost two months and they

6    attended that court proceeding supporting the defendant.  And

7    there was a defense exhibit -- Defense Exhibit E, I believe --

8    where the media took notice of Jerhonda attending this Court

9    proceeding, and she was actually in the newspaper, so the

10   media noticed, but so, too, did the defendant.  So that was in

11   2008.

12             Fast forward a year, the defendant's close friend,

13   Jermaine Maxey -- he's also known as Bubba -- reached out to

14   Jerhonda on My Space -- that's just an application that was

15   then popular for sharing music, supporting musical stars --

16   and Bubba invited Jerhonda to a party at the defendant's house

17   in Olympia Fields; and Jerhonda, a big fan of the defendant

18   back then, jumped at the opportunity; and in Government's

19   Exhibit 148, you see phone records showing telephone contact

20   between Jerhonda and Bubby -- sorry -- Bubba, whose real name

21   is Jermaine Maxey, so it shows phone contact on May 30th, 2009

22   just as she told you that they had had.

23             So, remember, in 2008, she's attending the court

24   proceeding for a couple of months, fast forward a year to May

25   or June of 2009 is where she first goes to a party at the

1    defendant's residence.  And, again, you see the phone contacts

2    between her and Bubba supporting what she told you.

3            Now, at that party, at the defendants house -- this

4    is the one that Bubba invited her to -- Jerhonda met the

5    defendant again, and she told you that she exchanged numbers

6    with him, and the defendant recognized Jerhonda from court

7    from the prior year, and it was during that first party that

8    the defendant also asked Jerhonda's age, and she claimed to

9    him at that time that she was 19 years old, but she was really

10   just 16 years old and actually had just turned 16 in April of

11   that year, and Jerhonda told you that after the party, the

12   defendant and Jerhonda began to speak by phone and that the

13   defendant invited her to come back to his house.  At this

14   time, he had one of his employees -- his inner circle -- pick

15   her up.  She told you that someone picked her up in a red and

16   black Chrysler 300, and Tom Arnold told you that the defendant

17   had that red and black Chrysler 300.  And you also see as part

18   of Government's Exhibit 912B that, in fact, the defendant had

19   it, that Chrysler 300 -- this one was purchased in 2007, so

20   making sense that he had it in 2009 -- and that was used to

21   pick up Jerhonda, she told you.

22           Now, Jerhonda only remembered the first name of that

23   employee who picked her up -- she remembered it as Anthony --

24   and she identified a photo of Government's Exhibit 34 as a

25   photo of Anthony.  And you know who that was?  That was

1   Anthony Navarro.  Government's Exhibit 34 is in evidence, and

2   he testified in this trial, in the very beginning of the

3   trial.  And Navarro testified that he also recognized Jerhonda

4   as somebody that he had seen at the studio, and that's in the

5   transcript at 508 and 509.

6            Jerhonda told you about her first time with the

7   defendant, so after they speak at the party -- she told them

8   she was 19 when she's actually 16 -- they exchange phone

9   numbers, and then they speak by telephone, and the defendant

10  invites Jerhonda over to his home.  And so he had told her to

11  bring a bathing suit, and when she got to the residence, she

12  goes into the pool area of the defendant's house, and there he

13  instructed her to play a game that he created where she would

14  walk toward him and then away from him, and each time he

15  wanted her to take off one item of clothing, and she told you

16  she was wearing a two-piece bathing suit.  And once she had

17  removed all of her clothing, he grabbed her and he started to

18  give her oral sex, she told you.

19           Now, she told you that she -- at that first party,

20  she didn't tell the truth about her age, but she also told you

21  that she came clean when the defendant started to give her

22  oral sex during that first time that she goes -- well, it's

23  the second time that she's at Olympia Fields, the first time

24  she's at the party -- and she told you how she told the

25  defendant about her true age.  She said she showed him her

1  ID -- her state ID card, and she told you that she had gotten
2  that state ID card as a gift from her step dad for her 16th
3  birthday, and you saw a record, which is in evidence as
4  Government's Exhibit 820, showing that Jerhonda had, in fact,
5  received a state ID card on April 22nd of 2009, just a few
6  days after her 16th birthday and a couple of weeks before she
7  meets the defendant.  And you know that it's a state ID
8  because you -- Special Agent Chabot testified that when the
9  driver's license ID ends in a letter -- here, J -- that
10 indicates a state ID.  When it begins with a letter, that
11 indicates a driver's license.
12       Now, when Jerhonda came clean and told the defendant
13 that she was just 16 years old, his reaction:  Not a problem.
14 She told you -- and this is in the transcript at 124 -- I
15 asked her:  How, if at all, did the defendant respond when you
16 told him your true age of being just 16 years old?  And she
17 answered:  He asked me, What is that supposed to mean?  And he
18 told me to continue to tell everyone that I was 19 and to act
19 21.  And when she told him, she gave him oral sex, and they --
20 he then penetrated her vaginally, she told you.  And she told
21 you that they then started to have sex nearly every time she
22 saw him thereafter.
23       Now, the defendant's reaction to learning Jerhonda's
24 true age is hardly a surprise.  Faith -- and we'll talk more
25 about her testimony later -- Faith told you that when she

1   truthfully told the defendant that she was 19 years old, he

2   said -- his response was:  You can tell me if you are just

3   16 years old.  That's in the transcript at 2174.  And just a

4   few years before the defendant invited Jerhonda over, in March

5   of 2006, the defendant also had no problem when Alexis, the

6   woman from Jacksonville, told you that her -- I'm sorry --

7   when Alexis told the defendant her true age of 15 years old.

8   And, remember, Alexis testified at this trial, and she told

9   you that she met the defendant after she attended that concert

10  in Jacksonville with her family, and, like many witnesses,

11  Alexis did not want to testify before you, and you heard her

12  responses to my questions.  She did her best to protect the

13  defendant, but even she had to admit that when she met him at

14  15, they started to communicate by phone, and there are phone

15  records that support just that, and that then the defendant

16  then started to fly her to his house in Chicago, including a

17  time where she told you she lost her luggage, and from phone

18  records, you can see that that happened when she was just 16

19  years old.

20          Now, Jerhonda told you -- going back to Jerhonda,

21  Jerhonda told you about other aspects of this six months that

22  she spent with the defendant.  Now, she was the first witness

23  to testify in what I suspect has seemed like a long trial, but

24  since then, you have heard witness after witness tell you the

25  same thing.  Like others, Jerhonda told you that the defendant

1    had to write letters containing false information; and at his

2    direction, she then gave him those letters so that he could

3    use them if he ever chose to do so.  Like others, Jerhonda

4    told you that the defendant was in full control of their

5    sexual encounters and how he told her that he was going to

6    train her on how to please him sexually.  Like others,

7    Jerhonda told you that the defendant directed her to wear

8    baggy clothes and told her that she couldn't leave the room

9    where she was in without getting his permission.  And like

10   others, the defendant summoned Jerhonda to the tour bus so

11   that she could meet Juice -- one of the defendant's

12   girlfriends who there's been a lot of testimony about -- so

13   she could meet juice and had both Jerhonda and Juice give him

14   oral sex.  Like others, Jerhonda told you that he didn't use a

15   condom when they had sex and that she eventually contracted

16   herpes during that six-month period that she was with the

17   defendant.  And like others, Jerhonda told you about the

18   defendant's violent temper and how he physically assaulted her

19   when she went against his wishes, including something as

20   mundane as supporting the Cavaliers instead of the Chicago

21   Bulls.

22           With that backdrop, I want to talk about the

23   racketeering acts related to Jerhonda.  There are three of

24   them.  Racketeering Acts 5, 6, and 7.

25           I'm going to first talk about Racketeering Act 5,

1    that's the defendant's coercion of Jerhonda's Pace.  It's

2    another one of those Mann Act violations.

3              So the coercion of Jerhonda Pace, a minor, to engage

4    in illegal sexual activity using a facility of interstate

5    commerce.  Here, the sexual activity was illegal because

6    Jerhonda, at 16 years old, was too young to consent to sexual

7    activity in the state of Illinois, which is where she

8    interacted with the defendant.  So for this racketeering act,

9    the Government has to prove the following four elements:  That

10   the defendant used a facility of interstate commerce; that the

11   defendant knowingly persuaded or induced or enticed or coerced

12   Jerhonda to engage in sexual activity; that the sexual

13   activity would violate Illinois law; and that Jerhonda was

14   less than 18 years old.

15             Now, I want to talk about the third and fourth

16   elements first.

17             There's no dispute that between May of 2009 when the

18   defendant met Jerhonda in January of 2009 -- I'm sorry --

19   January of 2010 when the defendant -- when Jerhonda stopped

20   spending time with the defendant, that Jerhonda was just

21   16 years old.  She's under 18.  Because --

22             MR. CANNICK:  I have an objection to that.

23             THE COURT:  Overruled.

24             MS. GEDDES:  Because Jerhonda was 16 years old,

25   sexual penetration between Jerhonda and the defendant would be

1    illegal, provided that the defendant was five years older than

2    Jerhonda, and you can see from the birth certificates, as well

3    as Jerhonda's testimony, that there's no reasonable dispute

4    about any of that.  During that time period that the defendant

5    was with Jerhonda, the defendant was 42, Jerhonda was 16.

6            Now, the Government also has to show that the

7    defendant did not reasonably but wrongly believe that Jerhonda

8    was 17 or older.  Meaning, if the defendant really believed

9    that Jerhonda was 17 and that was reasonable, then he wouldn't

10   be guilty of this predicate act, but Jerhonda told you that

11   she wasn't initially truthful with the defendant about her

12   age.  She said she was 19 when she was actually 16.  But,

13   after he starts to give her oral sex, she told you that she

14   had to tell him the truth, and she decided to tell him the

15   truth, and I already talked about her showing the defendant a

16   copy of her state ID, not -- I mean, her actual state ID.  You

17   saw the record related to it.  And so I submit that, based on

18   her testimony, you know that defendant knew Jerhonda's true

19   age and so certainly didn't have a reasonable belief that her

20   defense -- that he thought Jerhonda was older.

21           Now, you also know that the defendant knowingly

22   persuaded Jerhonda to engage in sexual activity.  She told you

23   that.  But I want to talk about some of the other evidence

24   that backs up what Jerhonda told you, and there is a lot.

25           Now, defense counsel, in her opening, told you that

1    you wouldn't see a single text message between the defendant

2    and Jerhonda.  And in cross-examination, defense counsel

3    accused Jerhonda of being, quote, stalker.  They were wrong,

4    and you know it.  You know it, for one, because you saw

5    Government's Exhibit 210(O).  This is a text message that was

6    recovered from Jerhonda's phone from the defendant, telephone

7    number ending in 9300; message was, please call; and that

8    phone -- that text message was found on Jerhonda's cell phone,

9    which she provided to the Government, and you saw it in

10   evidence as Government's Exhibit 241.

11              There can be no serious dispute that Jerhonda spent

12   a lot of time at the defendant's house in Olympia Fields, and

13   I would like you -- and, again, it's a long time ago, I know,

14   but I want you to recall the precision and the accuracy with

15   which Jerhonda described Olympia Fields.  At one point during

16   my questions of Jerhonda, I asked her to describe the studio,

17   and I submit, if you can go back that far, which seems like a

18   long time ago, you could see her literally visualizing the

19   studio as she describes the studio, and it's in evidence --

20   I'm sorry, it's in the transcript as 170, and I won't read

21   through it, but she described exactly the layout of that

22   basement area of the Olympia Fields, and she described it

23   because she had been there, and she's been there on several

24   occasions in that time period when she spent time with the

25   defendant.  And you know that what she said was accurate

1    because Tom Arnold, the defendant's long time studio manager,

2    told you the same thing.  He described the same layout that

3    Jerhonda told you.

4              But you also know that Jerhonda -- that what

5    Jerhonda was true because it was backed up by so much other

6    evidence.  I'm going to talk about that, but to just quick

7    take you through, there was DNA evidence, the phone records,

8    screenshots from her phone -- that's the one that's in

9    evidence as Government's Exhibit 241 -- and then all of the

10   information she told you that was exactly right.  She knew

11   about the defendant's 2009 trip to South Africa.  She told you

12   that she introduced the defendant to Dominique.  She told you

13   that the police came to the defendant's house in search of

14   Dominique in June of 2009, and she showed you those photos

15   that she took in the mirror room.  That's the room on the

16   first floor.  They're in evidence as Government's Exhibit 908A

17   through -E.

18             So I want to talk briefly about each of those things

19   that support what Jerhonda told you.

20             You know what Jerhonda told you about her time is

21   true because you saw the DNA evidence directly confirming that

22   she had a sexual encounter with the defendant when she was

23   just 16 years old.  Jerhonda told you that she used her

24   T-shirt -- this one, shown -- the actual T-shirt is in

25   evidence, but here's a photograph of it in Government's

1   Exhibit 241A, and she told you that she used the T-shirt to
2   wipe semen off of her face when she last saw the defendant in
3   January of 2010.  And she told you that she provided that
4   T-shirt to her attorney at the Loggans law firm -- Susan
5   Loggans' law firm.  And from a stipulation that's in evidence
6   as Government's Exhibit 1015, you know that Jerhonda's next
7   attorney, David Fish, retrieved the T-shirt from the Loggans
8   law firm in 2013, he kept it for a period of years until he
9   returned it to Jerhonda in 2017.  And that next day, according
10  to stipulation, undisputed, Jerhonda turns that T-shirt over
11  to a detective with the Olympia Fields Police Department who
12  then keeps it for a period of years until finally in 2019,
13  it's transferred to an investigator, and then to the Illinois
14  State Police.

15          And you will recall Veronica Jackson, she was a
16  forensic scientist who testified by video.  She told you that
17  she reviewed Government's Exhibit 241 for the presence of
18  biological fluids, and she told you that when she did that,
19  she obtained several samples -- or a couple of samples of what
20  appeared to be semen and she then put it under the microscope
21  and saw that there was, in fact, sperm there, and she said
22  there was a lot of it, and that after that, she then provided
23  it to another individual for it to be DNA tested.  And you
24  heard from that witness, too, Yongei Wu, another forensic
25  scientist at the Illinois State Police, who told you that the

1    DNA profile that he generated on the T-shirt matched the DNA

2    profile of the defendant.

3              (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2           MS. GEDDES:   And then he went further and he

3    calculated the statistical likelihood that he would randomly

4    find that DNA profile in the population.   And he provided some

5    really, really big numbers, and one of them is on the screen.

6    But he said that the statistical probability of randomly

7    finding that profile was 11 decillion.   And he told you that

8    11 decillion is 11 followed by 33 zeros.   And he then went on

9    to say that there are only 7.2 billion people on this earth,

10   and so it would take more than a million billion, billion

11   earths to get to 11 decillion.   The defendant's DNA was on

12   Government Exhibit 241 and it was on there because the

13   defendant had a sexual encounter with Jerhonda when she was

14   16 years old and she happened to have used that t-shirt to

15   wipe off his semen.

16          Jerhonda's account is also fully supported by the

17   phone records.   I already talked about the initial contact

18   between Jerhonda and Bubba, the defendant's long-time friend,

19   but you also -- the phone records also show regular contact

20   between Jerhonda and the defendant between June of 2009, when

21   she says she met him -- probably May 30th, 2009 based on those

22   other phone records -- and January of 2010.   We'll talk about

23   those phone records in a moment.

24          Jerhonda also told you that at the defendant's

25   request, he gave the defendant a phone number for one of her

Summation - Geddes                                    4357

1    friends, Dominique.  And she told you that she had met

2    Dominique on a fan page for the defendant.  It was a Myspace

3    fan page for the defendant.  And she told you that she gave

4    the defendant Dominique's phone number.  And in evidence is an

5    e-mail, and I showed you this e-mail earlier today, from June

6    4th of 2009, just a couple of days after the defendant and

7    Jerhonda met, so supporting what she told you.  And it shows

8    one of the defendant's runners arranging for someone to pick

9    up someone at a particular location.  And there's a phone

10   number for that individual.  There's not a name, but you know

11   who that phone number was for because there is a subscriber

12   record in evidence which shows -- Government Exhibit 106,

13   which shows that the subscriber for that phone number back

14   then, at the time of the e-mail, was a particular individual,

15   and then you can see that that individual is listed as the

16   mother of Dominique in Government Exhibit 817.  And Dominique

17   is now shown on the screen as Government Exhibit 69.

18          Jerhonda also told you about something else that she

19   knew from her time at Olympia Fields.  She told you that when

20   she was there, she was in the defendant's safari room.  She

21   overheard the defendant say that there was a police officer at

22   the gate, and that was the gate of the Olympia Fields

23   residence.  And that police officer, she heard, was looking

24   for 17-year-old Dominique.  And you know from Dominique's

25   birth certificate that in June of 2009, she was seventeen.

Summation - Geddes                    4358

1        And you heard from that police officer, Police

2   Officer Garrick Amschl.  He told you the same thing.  He

3   responded on the evening of June 13th of 2009.  He went to the

4   defendant's residence in Olympia Fields, looking for the

5   17-year-old Dominique, and there he encountered security,

6   security shown on the board.  And the security referred

7   Officer Amschl to the defendant's business manager, and

8   Officer Amschl provided a phone number for that business

9   manager.  And that phone number is listed in Government

10  Exhibit 152, which is a subscriber record, and it belonged to

11  Derrel McDavid, the defendant's business manager and

12  accountant.  So Jerhonda knew all that, again, because she was

13  there.

14        You'll also recall that Jerhonda told you in June of

15  2009, so shortly after she met him, the defendant traveled to

16  South Africa for a few weeks.  And just like she told you,

17  Government Exhibit 635 are records from Customs and Border

18  Protection showing the defendant leaving the country on June

19  15th of 2009 and not returning until June 6th -- I'm sorry,

20  July 6th of 2009.  And now these records show that he traveled

21  to London, but Tom Arnold, who was the defendant's studio

22  manager, told you that that year, in June or July of 2009, he

23  traveled with the defendant to South Africa, just like

24  Jerhonda told you.

25        You also saw the settlement agreement -- that's in

1    evidence as Government Exhibit 928 -- where the defendant

2    agreed to pay Jerhonda 1.5 million dollars in exchange for her

3    silence, a tried and true tactic used by the defendant.

4            MR. CANNICK:  Objection.

5            THE COURT:  Overruled.

6            MS. GEDDES:  He did not want -- the defendant did

7    not want Jerhonda to go to the police, and the payment worked

8    for a long time.  She remained silent for years.  And that is

9    powerful evidence of the defendant's guilt.

10           But finally in 2017, Jerhonda had enough and she

11   spoke publicly for the first time about having underage sex

12   with the defendant.  And when she did, you saw the steps that

13   the defendant and others working with the defendant took to

14   create a cover story.  And these are additional documents that

15   were found at the defendant's storage facility.  And these

16   documents, which I will go over in a moment, were found in

17   that locked safe of the storage facility along with some of

18   those letters in plastic document protectors that we've talked

19   about already, and we'll talk about more.

20           So within that storage facility, there were altered

21   copies of a birth certificate, a state I.D. card, and there

22   was also some type of employment I.D.  And if you take a look

23   at it, these were paper copies that were in the safe, not the

24   originals.  And if you take a look at it, you will see that

25   each of those copies were altered to reflect an incorrect

Summation - Geddes                                4360

1   birthday, trying to support that Jerhonda was actually 19 when

2   the defendant met her and not her true age of 16.  And you can

3   see that there is a birth certificate which lists Jerhonda's

4   date of birth of April 19, 1990, when, in fact, her true birth

5   certificate is in evidence and shows that she was born that

6   same day, but three years later in 1993.  You also see a state

7   I.D., it has the same picture that you saw in that other

8   record that's her actual state I.D. record, but it lists her

9   birthday as April 19, 1990, again three years earlier.  And

10  you can tell that this was a very obviously doctored document

11  because if you look at the I.D. number -- and that's a portion

12  of the state I.D. we talked earlier today with respect to

13  Aaliyah about those I.D. numbers -- you can see those middle

14  four digits say 3390.  And we've enlarged it a little bit.

15  You can see, and you'll have it in evidence, that it's

16  obviously altered from a different number.  And I submit you

17  can see underneath that it used to be 3393, now it says 3390.

18          And Special Agent Chabot, in his testimony,

19  explained to you what that meant.  In Illinois, that, those

20  two digits, those final two digits, the 90, correlates to

21  someone's birth year.  So that reflects 1990 rather than 1993.

22  So it should have been 1993, but the defendant and his

23  associates, or his associates, had that altered to make it

24  seem like Jerhonda was older when, in fact, she was just 16.

25          So once you find that Jerhonda told the defendant

Summation - Geddes                          4361

1   that she was 16 years old and that they then had sexual

2   contact while she was 16 years old, there's only one

3   additional element that you need to find for this racketeering

4   act, and that's that the defendant use a facility of

5   interstate commerce.  That just means he used a cell phone,

6   and the evidence of that is overwhelming.

7          You know that the defendant used facilities of

8   interstate commerce because you saw the phone records or in

9   evidence are the phone records showing that the defendant

10  called Jerhonda and answered calls from Jerhonda.  There is

11  Government Exhibit 149.  And this is just a page of Government

12  Exhibit 149, but what this exhibit shows is contact between

13  the defendant's numbers.  And you have the number ending in

14  9300, as well as the number ending in 6569.  Both of those

15  numbers were saved in Jerhonda's phone and they're also

16  subscriber records in evidence showing that they belonged to

17  the defendant.  9300 was his personal cell phone.  6569 was

18  saved in Government Exhibit 241 -- I'm sorry, 210, that's the

19  cell phone as a number for the studio, the defendant's studio.

20  And so in this Government Exhibit 149, you see page after page

21  of phone contact between the defendant's numbers and these

22  other numbers that are listed.

23          Now, Jerhonda did not remember her telephone number

24  from back in 2009, but she told you how she initially used

25  that pink Palm Centro before the defendant took it from her

Summation - Geddes                          4362

1    and that then she used a Virgin Mobile telephone.  And then

2    you saw Government Exhibit 210.  This is the Virgin Mobile

3    telephone that Jerhonda identified as her phone and provided

4    to the government.  And on Government Exhibit 210, it shows

5    the telephone number.  So she didn't remember it, but you can

6    tell from Government Exhibit 210 that this phone number was

7    the phone number listed on Government Exhibit 149 that ends in

8    2837.  And I am just going to refer to the numbers by their

9    last four digits.  And so this, Government Exhibit 210, is the

10   one ending in 2837.  And also in evidence are two other

11   subscriber records, Government Exhibit 140 and 141, that show

12   that the same ESN, electronic serial number, for the telephone

13   ending in 2837, this one, the one shown in 210, are also in

14   the phone numbers 1136 and 2407.

15           And FBI Special Agent Steven Flatley told you, and

16   you may know from your own experience, that an ESN is just a

17   phone -- that's just a number that links to a particular

18   device, and so you can have different telephone numbers

19   attached to a device.  And that's exactly what Jerhonda had.

20   She had different phone numbers attached to the same device,

21   and so you can tell that those were other phone numbers that

22   she used.  And if you look at the records, you'll see that the

23   2407 number was active for a period of time and then right

24   after that, the 1136 number was active for a period of time

25   and then it goes to the 2837 number.

Summation - Geddes                              4363

1          Now, on Government Exhibit 149, there are two other

2    phone numbers listed here, one ending in 2117 -- and there's a

3    subscriber record showing that that was a phone number

4    subscribed in Jerhonda's mother's name, so again it makes

5    sense she would be using that -- and then you also see one

6    phone number ending in 5655 and there is not subscriber

7    records for that.  But what is -- so this right here, what I'm

8    showing on the screen, is just the subscriber record for that

9    2117, showing Jerhonda's mother's name listed there.

10         Then Government Exhibit 160 is a list of the most

11   frequently called numbers by this 5655 number, and Jerhonda

12   talked about several of the numbers listed there.  You see a

13   phone number ending in 1900.  That's Keyonia Jones' telephone

14   number, the one that she went to the party with.  You see a

15   phone number ending in 2407, and that's the phone number for

16   her grandmother.  And she testified about that particular

17   phone number.  You also see a phone number for Dominique, that

18   one ending in 7366 that is subscribed to Dominique's mother's

19   name and also it's listed in that e-mail where the defendant's

20   people were arranging to pick up Dominique.

21         And so you can tell, going back to Government

22   Exhibit 149, that the defendant and Jerhonda were in regular

23   communication during the time period, and so there can be no

24   serious dispute that a facility of interstate commerce was

25   used.  And so I submit that based on all of that, you know

1    that that particular racketeering act has been proven because

2    the defendant used a telephone to arrange for Jerhonda to come

3    over and you know that he did it for the purpose of sexual

4    activity and that they then engaged in sexual activity for a

5    period of months.

6               I want to turn now to the next racketeering act

7    related to Jerhonda, and that's Racketeering Act 7.

8               THE COURT:  Ms. Geddes, so this is probably a good

9    time to break because we are at 5:30.  So sorry for the

10   interruption.

11              But, ladies and gentlemen, we are going to suspend

12   for the evening.  Please do not talk about the case at all.

13   We are in the homestretch and those rules continue to be just

14   as important as they have been throughout the trial.  Do not

15   follow any news reporting that there might be about this case

16   in whatever form it might be.  Do not look anything up on the

17   internet or on social media.  But do have a good night and I

18   will see you tomorrow morning.

19              THE CLERK:  All rise.

20              (Jury exits the courtroom.)

21              THE COURT:  Okay.  Everybody can sit down.

22              Could I just see the parties at the side without the

23   court reporter for just a minute?  We can do it over here.

24              (Discussion off the record.)

25              (Continued on the next page.)

4365

1          (In open court; outside the presence of the jury.)

2          THE COURT:  All right.  I'm just trying to get an

3    idea of the scheduling.  What's the story with the

4    stipulations now?

5          MR. CANNICK:  I have the line and pages that you

6    want and the case, not the case law but the statute that

7    applies.

8          THE COURT:  All right.

9          MR. CANNICK:  I can either give them to you now or

10   send them to you.

11         THE COURT:  I think the government needs to see them

12   too.

13         MR. CANNICK:  Okay.

14         THE COURT:  So it seems to me to make the most sense

15   to put that up on ECF as soon as possible.

16         How many are we talking about again?

17         I mean, I'm repeating myself but I don't know why

18   I'm doing this at this stage of the trial, I really don't, but

19   I am hoping that it will be in a form that enables the

20   government to know what you're talking about.

21         Are you in a position to respond tonight so that I

22   can make a decision?

23         MS. GEDDES:  Yes.

24         MR. CANNICK:  Your Honor, I think what you asked us

25   for is you asked us to go, that you wanted to make sure that

4366

1  we gave you the page and line number, the page and line number

2  of each of the proposed stipulations and we've done that.

3  Then you wanted to know the statute that applies to this as

4  being a prior inconsistent statement and we have that as well.

5  So that's what we plan on putting up on ECF.

6             THE COURT:  I mean, okay.  I mean, again --

7             MR. CANNICK:  I can give them now.

8             THE COURT:  I'm happy to decide this issue.  I don't

9  mind it.  I'm happy to stay late deciding it.  Well, I'm not

10  happy to stay late, I'm annoyed, but I just want to make sure

11  I have all the tools to do it.

12             So if it's a simple question about, if the simple

13  question is about whether somebody testified they don't

14  remember whether they said something before, that's probably

15  all I need to know.

16             If you want to give a copy of it to Ms. Greene, I'll

17  have a sense of what I'm looking for, but then immediately put

18  it up on ECF so the government can look at it too.

19             Do you have two copies of it?

20             MR. CANNICK:  Well, what I did is I just put the

21  line and page under each stipulation that we were proposing.

22             THE COURT:  All right.  So do you want us to make a

23  copy of it?

24             MR. CANNICK:  I can just read it into the record,

25  Your Honor.

4367

1          THE COURT:  I'd really rather not.

2          MR. CANNICK:  Okay.  Then I can write it out.

3          THE COURT:  I thought you did that already.

4          MR. CANNICK:  I wrote it under each question.

5          THE COURT:  I think the best idea is to just put it

6     up on ECF.

7          Anything else that we have to decide for today?

8          MS. GEDDES:  No, Your Honor.

9          THE COURT:  Anything else?

10          MR. CANNICK:  No.  It will be on ECF in ten minutes.

11          THE COURT:  All right.  Thank you.

12

13          (Matter adjourned to September 23, 2021 at

14     9:30 a.m.)

15

16                              ooo0ooo

17

18

19

20

21

22

23

24

25

4368

1                            <u>I N D E X</u>

2

3        <u>WITNESS</u>                                      <u>PAGE</u>

4

5        JULIUS DARRINGTON

6             DIRECT EXAMINATION

7             BY MR. SCHOLAR                           4214

8             CROSS-EXAMINATION

9             BY MS. SHIHATA                           4223

10            REDIRECT EXAMINATION

11            BY MR. SCHOLAR                           4227

12

13

14

15

16

17

18

19

20

21

22

23

24

25