1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 19-CR-00286(AMD)
                                   :
                                   :
        -against-                  : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
                                   : Wednesday, August 18, 2021
ROBERT SYLVESTER KELLY,            : 9:30 a.m.
                                   :
        Defendant.                 :
                                   :

- - - - - - - - - - - - - - - - X


TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

For the Government:   JACQUELYN M. KASULIS, ESQ.
                        Acting United States Attorney
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                      BY:  ELIZABETH GEDDES, ESQ.
                        NADIA SHIHATA, ESQ.
                        MARIA E. CRUZ MELENDEZ, ESQ.
                        Assistant United States Attorneys


For the Defendant:    AIELLO & CANNICK, Esq.
                        69-06 Grand Avenue
                        Maspeth, New York 11378
                      BY:  DEVERAUX L. CANNICK, ESQ.

2

A P P E A R A N C E S:   (Continued)


For the Defendant:       BLANK LAW, P.C.
                            444 S. Washington Avenue
                            Royal Oak, Michigan 48067
                         BY:  NICOLE BLANK BECKER, ESQ.


                         THE LAW OFFICE OF THOMAS A. FARINELLA
                            260 Madison Avenue
                            8th Floor
                            New York, New York 10016
                         BY:  THOMAS A. FARINELLA, ESQ.


                         THE C.H. SCHOLAR LAW FIRM, PLLC
                            225 Broadway
                            Suite 225
                            New York, New York 10007
                         BY:  CALVIN HAROLD SCHOLAR, ESQ.


Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                    Official Court Reporter
                    E-mail:  SMaceRPR@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                                    3

1          (In open court - jury not present.)

2          THE COURTROOM DEPUTY:  All rise.

3          (Judge ANN M. DONNELLY entered the courtroom.)

4          THE COURT:  Good morning, everybody.  You can have a

5  seat.

6          (Defendant entered the courtroom.)

7          THE COURTROOM DEPUTY:  This is criminal cause for

8  trial, docket number 19-CR-286, USA versus Robert Kelly.

9          Counsel, state your appearance, Government first.

10         MS. GEDDES:  Elizabeth Geddes, Nadia Shihata, Maria

11  Cruz Melendez for the Government.

12         Also seated at counsel table is paralegal specialist

13  Kyra Wenthen and Special Agent Ryan Chabot with the Department

14  of Homeland Security, Homeland Security Investigations.

15         Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MS. BLANK BECKER:  Good morning, Your Honor.

18         Nicole Blank Becker, Calvin Scholar, Deveraux

19  Cannick, my client, Mr. Kelly, and Mr. Tom Farinella on behalf

20  of the defense, and we are ready to proceed.

21         THE COURT:  Okay, good morning, everybody.

22         Just a couple of preliminaries before we begin.

23         First, I want to remind everybody to microphones on

24  both sides so that people in the overflow room can hear.

25         With respect to the outstanding motions, these will

Proceedings                                                    4

1   be followed by written motions.

2           The motion to dismiss is denied in all respects.  I

3   have an exception to that ruling.  As I said, there will be a

4   written decision filed shortly.

5           With respect to the outstanding motions in limine, I

6   adhere to my decision that I made at our final pretrial

7   conference on August 3rd, but let me review the outstanding

8   motions in limine and let me know if I've forgotten one.

9           The first has to do with the alleged sexual abuse of

10  Jane Doe Number 7, a minor, in 1991.  That is granted only

11  insofar as there is evidence that Jane Doe Number 7 witnessed

12  the alleged sexual abuse of Jane Doe Number 1.  That's

13  admissible for the same reasons that I ruled that evidence

14  about Jane Doe 1 was admissible.

15          The remaining evidence is not admissible about Jane

16  Doe Number 7.  The conduct is alleged to have taken place

17  before the enterprise began.  So, I am excluding that.

18          The second category of evidence is the alleged

19  sexual abuse of Jane Doe Number 9, a minor, in 1995.  Evidence

20  that Jane Doe Number 9 informed the defendant she contracted

21  herpes from him is admissible.  It goes to knowledge for the

22  charged acts in Racketeering Acts Twelve and Fourteen, as well

23  as in Counts Six through Nine.  The evidence is not unduly

24  prejudicial and no more sensational than the conduct that's

25  charged.  The other allegations regarding Jane Doe Number 9

Proceedings                                          5

1   are not admissible.

2        The third outstanding motion in limine was the

3   alleged exposure of Jane Doe Number 11 and 12 to a sexually

4   transmitted disease in 2001.  The evidence that Jane Doe

5   Number 11 informed the defendant that she contracted herpes

6   from him is admissible for the same reasons that I just

7   described with Jane Doe Number 9.

8        The evidence of the settlement agreements with

9   victims is also admissible.  It is direct evidence of the

10  enterprise and the means and methods, specifically the steps

11  that the defendant and other members of the enterprise took to

12  conceal what was going on and to perpetuate the enterprise.

13       The next category is the alleged unlawful

14  imprisonment of Jane Doe Number 14 in 2008.  That is

15  admissible.  It is not unduly prejudicial.  It is direct

16  evidence of the enterprise and its means and methods.

17       The only other issue was this question of whether

18  the parties were going to stipulate to the dates of concerts

19  that took place, what was it, in Georgia?

20       MS. GEDDES:  Yes, Your Honor, in Georgia.

21       THE COURT:  Did you stipulate to that?

22       MS. GEDDES:  It's my understanding that defense

23  counsel is going to stipulate to all of the dates, with the

24  exception of the one newspaper article the Government sought

25  to admit that showed that Demetrius Smith was present at one

Proceedings                                                          6

1   of the concerts in a way that would directly corroborate

2   Mr. Smith's anticipated testimony regarding Racketeering Act

3   Number One.

4            THE COURT:  Are you going to deny that he was, is

5   the defense going to deny, I don't know who this person was,

6   but are you going to deny that he was there?

7            Just use the microphone, okay.

8            MS. BLANK BECKER:  Thank you, Judge.

9            Judge, it's not a question of whether we're going to

10  deny that he's there, it's a question he's going to take the

11  stand.  So, we think the best evidence will come when he takes

12  the stand.  They can just ask him that question.

13           THE COURT:  Well, that's my question.

14           Are you going to challenge his testimony that he was

15  at the concert?

16           It seems of vanishingly small importance to me, I

17  have to say.  There is an article that he was in at this

18  concert.

19           If you are going to dispute that he was actually

20  there, I will let the prosecutors introduce evidence from the

21  newspaper.  It's up to you.

22           MR. FARINELLA:  Your Honor, one moment.

23           (Pause.)

24           MS. BLANK BECKER:  Thank you, Judge.

25           Judge, at this point we are not going to stipulate

Proceedings                                  7

1    to that.  We are going to challenge that.

2              THE COURT:  Okay.

3              So, if he testifies that he was there and he's

4    cross-examined on it, the Government can introduce the

5    newspaper article showing that he was there.

6              I think that's it.

7              So, let me just say that in the opening instructions

8    to the jury I am going to just describe, in general terms,

9    what the case is about, just as I did when we selected the

10   jury.  I used that same language that I used then.

11             Oh, I know what the other thing was, the question

12   about whether Jane Doe Number 5 could testify, did I already

13   rule on that, that she could testify using a pseudonym?

14             MS. GEDDES:  Yes, Your Honor.  I believe you ruled

15   and you approved her testimony.

16             THE COURT:  That's what I thought.

17             All right, I think it is probably appropriate to

18   include a general instruction that some witnesses will be

19   testifying by their first names and explain that the reason is

20   that this is not uncommon in cases like this where they might

21   be testifying to things that are potentially embarrassing.

22             Okay.  And just remind me , is one of the witnesses

23   testifying, I don't know what to call it, using first names

24   or --

25             MS. GEDDES:  Nicknames.

                         Proceedings                    8

1          THE COURT:  -- or nicknames, okay.

2          All right, anything else that anybody wants to

3    raise?

4          MS. BLANK BECKER:  No, Judge.

5          THE COURT:  All right, I think we are ready for the

6    jury.

7          (Pause in the proceedings.)

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury enters.)

10         THE COURTROOM DEPUTY:  Everybody be seated.

11         THE COURT:  Good morning, ladies and gentlemen of

12   the jury.

13         THE JURY:  Good morning, Your Honor.

14         THE COURT:  We are about to begin the trial in the

15   criminal case for which you were all selected as jurors.  I am

16   going to give you some preliminary instructions, and also give

17   you an overview of what will happen during the course of the

18   trial.

19         Your job as jurors is to administer justice in this

20   case according to the law and according to the evidence.  You

21   must carry out your duties as jurors with complete fairness

22   and impartiality and without bias, prejudice or sympathy for

23   either side, either for or against the Government or for or

24   against the defendant.

25         I am going to give you a summary of charges.  Again,

Proceedings                                                                9

1    this is just a summary of the charges, it is not evidence.

2           The defendant, Robert Sylvester Kelly, is charged

3    with racketeering in violation of Title 18 United States Code

4    Sections 1962(c) and 1963, for his alleged role as a leader of

5    an enterprise.  He is alleged to have engaged in racketeering

6    acts that include bribery, sexual exploitation of a child,

7    kidnapping, transportation of minors and other people for the

8    purpose of engaging in illegal sexual activity, illegal

9    coercion and enticement of individuals and forced labor.

10          Mr. Kelly is also charged with violations of the

11   Mann Act, including the transportation of individuals,

12   including a minor, for the purpose of engaging in illegal

13   sexual activity and illegal coercion and enticement of

14   individuals, including a minor, in violation of Title 18

15   United States Code Sections 2421(a), 2422(a) and (b) and

16   2423(a).

17          Mr. Kelly has pleaded not guilty to all of the

18   charges.  It is the Government's burden to prove Mr. Kelly's

19   guilt beyond a reasonable doubt with respect to each charge.

20          As I told you when you were selected as jurors, the

21   indictment is the document that brings the case to court, but

22   it is just an accusation, it is not evidence of anything.

23          The Government has the burden of proving, as I just

24   said, each of the essential elements of each crime that's

25   charged beyond a reasonable doubt.  The purpose of the trial

Proceedings                                              10

1   is to determine whether the Government has met this burden.

2           A defendant in a criminal case does not have to

3   prove innocence.  On the contrary, the defendant is presumed

4   to be innocent of the charges in the indictment.

5           One of your jobs as jurors is going to be to

6   determine what the facts are based on the evidence.  You, as

7   jurors, are the sole judges of the facts.  You will then have

8   to apply to those facts the law as I will give it to you, and

9   you must follow that law regardless of whether you believe in

10  it or not.

11          Because I am the judge of the law, I will make legal

12  rulings, including on objections, or I may direct the lawyers

13  to move along so we can keep the case moving.  Do not assume

14  that because I make a ruling that I have some opinion about

15  the case or about what your verdict should be.  I don't have

16  any such opinion.

17          Sometimes during the course of an examination I will

18  ask a question of a witness.  If I do that, it's either

19  because I don't understand a particular question or because I

20  think somebody needs to be clarified for you.  Again, don't

21  assume that just because I ask a question that there is some

22  importance to it or that I have an opinion about the case.

23          As judges of the facts you will listen to the

24  evidence.  The evidence consists of the testimony of witnesses

25  on direct examination and cross-examination, documents and

1   other exhibits that come into evidence, and any facts on which

2   the lawyers agree.  These are called stipulations.

3           There are other things that are not evidence and you

4   may not consider them.  What any lawyer says during the course

5   of a trial, whether it's in opening statement or if it's in an

6   objection or if it's in summation, is not evidence.

7           With respect to objections, lawyers do have an

8   obligation to make objections if they think there is a reason

9   to object.  Do not hold it against lawyers if they do object,

10  that's part of their job.

11          If I sustain an objection it means that I have

12  determined that the question is not a valid one and you should

13  ignore the question.  If I overrule it, that means I have

14  determined that the question is proper.

15          Sometimes a witness will answer a question even

16  though I have sustained an objection.  If that happens, I will

17  just instruct you to disregard the answer.

18          Another thing that is not evidence is anything that

19  you have heard outside of the courtroom or seen outside of the

20  courtroom.  You must decide this case only on the evidence

21  that is presented here during the trial.

22          As I told you during jury selection, there will

23  undoubtedly be press coverage of this case.  You must not

24  read, watch or listen to any reports in any form about this

25  case.

Proceedings                                                          12

1          Now, I am just going to talk to you a little bit

2   about one of your tasks as jurors, which is to determine the

3   credibility of the witnesses who testify to determine whether

4   or not you believe what the witness is saying, whether you

5   believe the witness is telling you the truth, whether you

6   believe the witness is lying, whether you think the person is

7   being accurate, or whether the person has made an honest

8   mistake.

9          There is no magical test to deciding whether a

10  witness is credible.  You bring to this process your common

11  sense and you make these decisions all the time in your lives

12  when you're trying to decide whether what someone is telling

13  you is accurate and believable.

14         I am going to suggest some of the things you should

15  consider when you're listening to a witness testify.

16         What is the witness' demeanor?

17         Does the witness' testimony make sense?

18         Does the witness have a reason or a motive to

19  testify falsely?

20         Is the witness' testimony consistent or inconsistent

21  with other evidence or testimony?

22         If there are inconsistencies, are they important and

23  related to important facts or are they minor?

24         Has the witness said something contradictory at

25  another time?

Proceedings                                                    13

1          As I said, these are just some of the tests that you

2   use to determine whether a witness is telling you the truth or

3   is mistaken or being accurate.

4          Now, there are three rules, because this is a

5   criminal case, that you must keep in mind.

6          First, that the defendant is presumed innocent until

7   the Government has proven him guilty.

8          Second, the Government has the burden of proof.  The

9   defendant has no burden to prove his innocence or to present

10  any evidence.  He has no burden to put on a case or to

11  testify.  If the defendant does not testify or put on any

12  evidence, you may not hold those facts against him.

13         Third, as I have said a couple of times during the

14  course of these instructions, the Government must prove the

15  defendant's guilt beyond a reasonable doubt.  I will give you

16  further instructions on this concept later, but this is one of

17  the things that makes a criminal case different from a civil

18  case.

19         A few words about your conduct as jurors.

20         Because you are deciding this case only on the

21  evidence that is presented in the courtroom, that means you

22  may not conduct any independent research about anything having

23  to do with this case; not with the people that are involved,

24  not with the law, or anything having to do with this case.

25         In other words, do not look anything up on the

Proceedings                    14

1   internet.  Do not research the lawyers or any witness or the

2   parties.  Do not try to find out any information about this

3   case from any source outside of the courtroom.  Do not Twitter

4   about it.  I am not even aware of all the means of social

5   media, but don't use any of them to communicate about this

6   case, to express an opinion about this case, or to read about

7   other people's opinions about the case.

8            Related to that, you are not permitted to discuss

9   the case with anyone during the trial.  Until you retire to

10  the jury room to deliberate and reach a verdict, you are not

11  permitted to talk about the case.  That means you can't talk

12  about it with your family and friends, and it also means you

13  can't talk about it with your fellow jurors.  And I think I

14  said when you were selected as jurors, that's probably a lot

15  harder because this is the only thing that you have in common

16  and it's probably very tempting after a witness testifies to

17  share your thoughts about what the witness said or to talk

18  about something that happened in court, but you can't do that.

19  If you were to start talking about the case before you've

20  heard all of the evidence and before you've heard my charge on

21  the law, you would be deliberating prematurely and the law

22  doesn't permit that.  So, don't talk about the case.

23            None of the lawyers or the witnesses in the case are

24  permitted to greet you or to say anything to you at all.  I

25  think I told you this when you were selected as jurors, so

Proceedings                                            15

1    don't think they're being rude, they're just not permitted to

2    talk to you.

3           You must report directly to me any effort by any

4    person to influence you improperly or to influence another

5    juror improperly.

6           And related to all this is that you cannot form an

7    opinion about the case until all of the evidence is in.  Keep

8    an open mind until you start your deliberations at the end of

9    the case.

10          Now, I think all of you have note pads.  You may

11   certainly take notes if you wish during the course of the

12   trial, but if you do take notes, make sure that it doesn't

13   interfere with your ability to listen to the evidence.  Our

14   court reporters take down everything that everybody says and

15   if you need to have some testimony read back, you can do that

16   at the end of the trial.  So, that is the accurate record of

17   the trial.

18          If you do take notes, don't discuss them with anyone

19   before you begin your deliberations.  You will not be

20   permitted to take them home with you.  They will be collected

21   at the end of each day.  And if you decide that you don't want

22   to take notes, that's also completely fine, but you can't rely

23   on anybody else's notes because, as I said, the notes are just

24   for the individual juror.

25          As I said, during deliberations you will be able to

1   request portions of the trial transcript if you need to have

2   your recollection refreshed about evidence.

3               So, the last thing I am going to talk to you about

4   is just an overview of the trial.

5               The Government will make an opening statement, which

6   is really just an outline of the evidence to help you

7   understand the evidence as it comes in.  It's what the

8   Government expects the evidence to prove.

9               Defense counsel may, but does not have to, make an

10  opening statement.

11              Again, opening statements are designed for the

12  parties to tell you what they expect the evidence to prove.

13              After opening statements, if the defense counsel

14  chooses to make one, the Government will then present its

15  witnesses and counsel can cross-examine them.  Following the

16  Government's case, the defendant may, but, again, does not

17  have to, present witnesses or to put on a case.

18              After all of the evidence is in, the lawyers will

19  have the opportunity to address you in closing arguments.  And

20  after that I will instruct you on the law, and then you will

21  retire to deliberate on your verdict.

22              So, I think we're ready to begin.  Let's begin with

23  the opening statement by the Government.

24              You know, I forgot to add one thing that I want you

25  to keep in mind.

1           It may be during the course of the trial that

2    witnesses testify with either a nickname or by their first

3    names.  That is not unusual in a case like this that has a lot

4    of press attention and the witnesses may be testifying to

5    things that are very personal and potentially embarrassing.

6           All right, I'm sorry, go ahead.

7               <u>GOVERNMENT - OPENING STATEMENT</u>

8           MS. CRUZ MELENDEZ:  This case is about a predator, a

9    man who for decades used his fame, his popularity, and the

10   network of people at his disposal to target, groom and exploit

11   girls, boys and young women for his own sexual gratification.

12   A man who used lies, manipulation, threats and physical abuse

13   to dominate his victims and to avoid accountability for years

14   using his money, his clout, and his public persona to hide his

15   crimes in plain sight.

16           That man, that predator, is the defendant, Robert

17   Sylvester Kelly, more commonly known as R. Kelly.

18           Good morning, ladies and gentlemen, my name is Maria

19   Cruz Melendez, and I am an Assistant United States Attorney in

20   the Eastern District.

21           These are my colleagues, Elizabeth Geddes, Nadia

22   Shihata.  They are also Assistant United States Attorneys.

23           Special Agent Ryan Chabot of the Department of

24   Homeland Security, Homeland Security Investigations.

25           And paralegal specialist Kyra Wenthen.

1          Together, we represent the United States in this

2     case.

3          During the course of this trial you'll learn that

4     the defendant has surrounded himself with a team of people

5     made up of dedicated employees and close associates.  These

6     people formed the defendant's inner circle.  Now, over a

7     period of decades the members of the defendant's inner circle

8     changed, but at any given point all of these people had this

9     in common -- their purpose was to promote the defendant's

10    music and brand, that is his public persona as R. Kelly, and

11    to fulfill each and every one of the defendant's wishes and

12    demands.  They served him.  They were loyal to him.  And you

13    will learn that the defendant used that inner circle as his

14    means to a criminal end.

15         Now, in the early '90s the defendant was an

16    up-and-coming recording artist in the R & B industry, known as

17    R. Kelly.  As his success and popularity grew, he put out

18    multiple records and toured around the country.  He performed

19    alongside other well-known artists, and eventually began

20    headlining his own concerts.  And as part of his career, he

21    also began writing and producing music for both new and

22    established artists.

23         What this success and popularity brought him was

24    access, access to girls, boys and young women attending his

25    concerts, access to young aspiring artists who hoped for a

Case 1:19-cr-00286-AMD   Document 240   Filed 10/06/21   Page 19 of 208 PageID #: 5734

1    chance to work with him, and access to fans who looked up to

2    the defendant and jumped at the chance to meet him or just to

3    be around him.  And the defendant quickly learned that he

4    could take advantage of his access.  And he did.  At his

5    concerts and other locations like the mall or the local

6    McDonald's, the defendant had his pick.  He had his pick of

7    young fans in cities around the country, eager to meet him, to

8    get his autograph, or a picture.  And when he found a girl,

9    boy or young woman he liked, he either approached them himself

10   or had one of the members of his inner circle do it for him.

11   They were given backstage passes or invitations to

12   after-parties and a number where they could reach the

13   defendant, or he got their contact information.  And once they

14   communicated, via phone or text message, he invited them to

15   visit him at his home or at his studio or to travel to see him

16   at other performances.  He directed his employees to arrange

17   and pay for their travel, so that they could come and see him.

18   And when he had them alone with him, he used them to exert

19   power over them, to dominate and control them physically,

20   sexually and psychologically.

21            And let's be very clear, ladies and gentlemen, this

22   case is not about a celebrity who likes to party a lot or

23   about the defendant's own private sexual preferences.  The

24   real issue here, the reason that we're here today is because,

25   as the Government will prove during this trial, the sexual

1   conduct at issue in this case was illegal.  It was illegal

2   because in many situations the defendant engaged in sex with

3   minors, boys and girls under the age of 18; some even in their

4   very early teens.  And when he was having sex with these

5   minors, he often recorded it using video cameras, iPads, or

6   smartphones, to produce child pornography.

7        He also transported some of these girls and women

8   across state lines and sexually fondled them while they were

9   not able to consent and exposed them, without their consent,

10  to an incurable sexually transmitted disease, an STD or a

11  venereal disease, genital herpes, an STD that he knew for

12  years that he had and was being treated for.  And as the

13  Government will prove during this trial, he was not able to do

14  these things unchecked for multiple decades on his own without

15  help.

16       See, the defendant created this persona, R. Kelly,

17  and he was at the center of it all, and he surrounded himself

18  with people all at his disposal at his studios and on the road

19  when he was on tour.  People like his managers, his personal

20  assistants, bodyguards, drivers, runners -- those are people

21  who ran errands and answered phones -- lawyers, accountant,

22  and even unpaid members of his inner circle.  But he didn't

23  just use these people to help him with his music career, no,

24  he created and relied on this inner circle to facilitate and

25  to help him cover up his crimes.

1            For example, he directed members of his inner circle

2    to approach young women and young men on his behalf when he

3    wanted to meet them.  The defendant had employees and

4    associates give out his phone number to young people that he

5    targeted.  He instructed his assistants to book the travel of

6    his victims, including minors, all over the country to see

7    him.  He used these drivers, bodyguards, assistants and

8    runners to keep watch over his victims and carry out the

9    orders that he used to control them.  And to try to ensure

10   that his illegal conduct didn't ever see the light of day, he

11   used his accountant and lawyers to pay hundreds of thousands

12   of dollars of hush payments to people he thought might go

13   public or go to the authorities.

14           They did all of these things, often without

15   question, at the direction of the defendant.  And as you'll

16   hear, sometimes they did these things out of fear of him.

17   Relying on his inner circle, the defendant engaged in criminal

18   conduct over and over again throughout the country over the

19   course of almost 30 years.  And as time passed and the

20   defendant committed these crimes without repercussion, his

21   conduct became more and more egregious.  He began collecting

22   girls and women as if they were things, hoarding them like

23   objects that he could use however he liked.  He'd have them

24   visit him, and eventually he'd have some of them stay with him

25   at his home or at his studio or on the road with him in his

Case 1:19-cr-00286-AMD  Document 240  Filed 10/06/21  Page 22 of 208 PageID #: 5737

1  tour bus or his Mercedes Sprinter van when he traveled for

2  concerts, all so that he could have access to them for his

3  sexual and other needs whenever he pleased.

4        Now, the defendant maintained control over these

5  victims using every trick in the predator handbook.  First, he

6  targeted minors and vulnerable young adults, picking them out

7  himself or directing members of his inner circle to find them

8  for him.  He then got to work grooming them, which you will

9  learn is when someone works to build a relationship of trust,

10  an emotional connection with a vulnerable person, like a

11  minor, so that he can manipulate, exploit and abuse them.  In

12  many cases, when the defendant first met them, he would even

13  groom their family members, ingratiating himself with their

14  family or their friends.  Sometimes he promised to mentor

15  their careers in the music or in the entertainment business.

16        But then after quickly reeling them in, he isolated

17  these victims from their friends and family, convincing some

18  of them to spend long stretches of time with him or even move

19  in with him.  And as soon as he had these girls and women

20  under his thumb, he instituted a long list of rules that they

21  were required to follow.  Rules like he made them call him

22  "Daddy."  He told them never to speak or even look at another

23  man, but instead to keep their heads down if any other men

24  were in the room.  He instructed many of them to wear baggy

25  clothing when they were not accompanying him to an event or

1   unless he told them otherwise.

2           He instructed that they needed to come to him before

3   doing anything, causing them to spend hours on end waiting for

4   the defendant to approve some of the most basic of requests.

5   Requests like permission to leave to go to the bathroom and

6   leading them to, in some cases, urinate in a cup, rather than

7   violate one of his rules.

8           He required them to engage in sex at his direction

9   with whomever and whenever he decided, and he recorded most of

10  these sexual encounters.

11          And above all else, he demanded absolute obedience.

12  And if they didn't follow his rules, if they messed up in some

13  way in his eyes, the defendant made sure that there were

14  consequences.  He exacted cruel and demeaning punishments.

15  Sometimes he confined them to a room for days.  He physically

16  assaulted them, delivering violent spankings and beatings.

17  And these rules, these punishments, they kept his victims

18  compliant.

19          But the defendant also did what he could to cover

20  his tracks, just in case someone did actually decide to speak

21  out or to, for example, go to the police.  As insurance, as a

22  way to make sure that these girls and women felt that they

23  could never, ever tell anyone about what he was doing, he

24  created and kept collateral on them.  He directed them to

25  write letters containing false and sensitive information about

1    themselves or had them create embarrassing and degrading

2    videos that he could lord over them if any of them crossed

3    him.  He photographed and filmed them naked and engaging in

4    sex with him and others at his direction.  And he kept this

5    stash of sex videos and photos, not just for his own use, but

6    always at the ready if he needed to protect himself by

7    threatening their exposure.  And if he couldn't use one of

8    those methods to keep them quiet, he entered into secret

9    settlement agreements, paying victims off so that his criminal

10   conduct wouldn't become public.

11          That's the man who sits here before you.  That is

12   how he, with the help of his inner circle, operated.

13          I want to talk to you now about the experiences of

14   six of the defendant's victims and tell you about some of the

15   specific illegal acts that he committed with respect to these

16   victims.

17          First, I want to tell you about Aaliyah.  Aaliyah

18   met the defendant in approximately 1992 when she was about

19   12 years old.  Aaliyah had a gift.  She was a talented singer

20   and people thought that she could make it far in the industry,

21   so the defendant began to produce and write music for Aaliyah

22   when she was still a child.  And shortly after he began

23   working with her, the defendant began to engage in sexual

24   activity with her.  And for years while Aaliyah was a minor,

25   too young to even consent to sex, he continued to engage in

1    sexual activity with her that lasted several years.

2            One night in 1994, while the defendant was on tour,

3    he got some news about Aaliyah.  She thought that she was

4    pregnant.  This, of course, was a huge problem for him.  Why?

5    Because at the time Aaliyah was only 15 years old and if she

6    was pregnant, that meant that there would be questions, a lot

7    of questions.  At the very top of that list of questions would

8    be:  Who is the father of that baby?

9            So, the defendant and his circle came up with a

10   plan, a plan that the defendant thought would keep Aaliyah

11   from talking and a plan that would keep him out of jail if

12   anyone found out.  His plan, the defendant decided that he

13   needed to marry Aaliyah, that way, as far as he understood, if

14   anyone found out about the pregnancy, about his sexual

15   activity with her, Aaliyah could not talk.  In other words, if

16   she's his wife, then she can't testify against him, or so he

17   thought.

18           Now, as I said, the defendant is on tour at the time

19   and about to go on stage for a concert.  In fact, he's got

20   other appearance dates as part of this tour over the next few

21   days, but he's got to get this done, and fast.  So, he flew

22   home to Chicago in the middle of the night with a few of his

23   most trusted friends and employees.  When they land, Aaliyah

24   was waiting for the defendant at a hotel airport -- excuse me,

25   at an airport near the hotel, and the defendant and his crew

Case 1:19-cr-00286-AMD  Document 240  Filed 10/06/21  Page 26 of 208 PageID #: 5741

1   got to work.  Aaliyah went to a hotel and they had a meeting

2   there, and they got to work gathering what they needed to make

3   this marriage happen.  But there was a problem, Aaliyah was 15

4   and she needed an ID showing that she was over the age of 18.

5   She needed that in order to get the marriage license.  So, the

6   defendant and his tour manager decided to bribe someone that

7   the manager knew at a local public assistance office, who

8   would give Aaliyah a fake ID that she could use to get the

9   marriage license.  And that's exactly what they did.  The

10  defendant, Aaliyah, and his tour manager, drove to the public

11  aid office.  Aaliyah and the tour manager went inside.  The

12  tour manager paid one of the employees at the public aid

13  office about $500 and they walked out with a fake ID for

14  Aaliyah.

15          They made a few phone calls and lined up a minister

16  to officiate the wedding.  And in that hotel suite, the

17  defendant, a 27 year-old man, married Aaliyah, a 15-year-old

18  girl.  And with that taken care of, the defendant flew back to

19  where he had been to finish his concert tour.

20          THE COURT:  Ms. Cruz Melendez, I am so sorry, I have

21  to interrupt you.

22          May I see counsel at the side with the court

23  reporter for just a minute?  Just one lawyer from each side is

24  fine.  Sorry about that.

25          (Sidebar held outside the hearing of the jury.)

```
                         Sidebar                      27
```

1              (The following sidebar took place outside the

2     hearing of the jury.)

3              THE COURT:  So, this goes in the category of things

4     I don't know why I'm hearing about it, but, apparently, your

5     witness wants to watch the opening statements.

6              MS. GEDDES:  Yes.

7              THE COURT:  That would ordinarily be a thing that

8     you should check with me before because counsel may have some

9     objections.

10             MR. CANNICK:  I definitely have objection to that,

11    Your Honor.

12             THE COURT:  It is not a good idea.

13             MS. GEDDES:  I apologize, Your Honor, but I spoke

14    with Mr. Farinella last night and I advised him of this and he

15    indicated he did not have an objection to it.

16             MR. CANNICK:  May I have a word?

17             THE COURT:  Sure.

18             (Pause in the proceedings.)

19             MR. CANNICK:  Your Honor, it's my understanding that

20    Mr. Farinella was under the impression, after speaking with

21    the Government, that the witnesses were entitled to be present

22    for the opening.  I told him that's not the case, and I

23    believe we will object to it.

24             So, any -- I am going to ask the witnesses now be

25    precluded from continuing to hearing the opening remarks.

```
                         Sidebar                      28
```

1       THE COURT:  I don't think they're listening to it.

2       MR. CANNICK:  They're not, okay.

3       THE COURT:  No.

4       Generally, we don't have witnesses in the courtroom

5  for proceedings that don't involve them.

6       I don't know that there is a blanket prohibition

7  against it, and it is certainly a subject for

8  cross-examination, but it is just generally not done.  And if

9  it is something that you're contemplating, you really should

10  raise it with me.

11       MS. GEDDES:  I apologize.

12       THE COURT:  So, I mean there is an objection to it

13  now.

14       I am quite confident that Ms. Geddes was clear.  I

15  don't think that was a hypothetical suggestion.  So --

16       MR. CANNICK:  I think it was misheard.

17       THE COURT:  Misheard, that's exactly right.

18       While I have you at the side, I am also told that

19  the guy who runs press at your office, I can't think of his

20  name.

21       MS. GEDDES:  John Marzulli.

22       THE COURT:  That he alerted all of the reporters

23  that he will have exhibits in a drop box.  It is probably

24  fine, but this is not his show.

25       MS. GEDDES:  I understand.

Sidebar                                           29

1           THE COURT:  So, if anything like that is going to

2      happen, obviously, nobody can look, I mean the press is

3      entitled to look at the exhibits once they come in, but that's

4      something that really should be done through the Court.  So, I

5      am going to ask you to instruct him not to do that again.

6           MS. GEDDES:  Yes, I will, and there are plenty of

7      exhibits we have an issue with.

8           Just for the record, I want to just let everyone

9      know that we found out late last night that this witness was

10     insisting on attending the opening statements, and it's under

11     the Crime Victims Rights Act which says that a victim witness,

12     as opposed to another witness, has a right not to be excluded.

13           Candidly, this was not the Government's choice and

14     we understand the obvious cross-examination avenue, but I

15     think it is the Government's position that under the Act she

16     does, in fact, have the right to attend.  But that's why we

17     wanted to put everyone --

18           MR. CANNICK:  Is that an absolute right or

19     discretionary?

20           Does the Court has discretion on it?

21           THE COURT:  No, I think it's an absolute right.

22           MS. GEDDES:  I think it's an absolute right as well.

23           It wouldn't be for a normal witness, and we have

24     advised every other witness who plans to testify that they

25     cannot attend the proceedings, with the exception of our case

1   agent, which is permitted under the law.  But I think because

2   she is a charged victim in this case, one of the rights

3   protected under the Act is the right not to be excluded.  And

4   my understanding under the law is that that includes, even if

5   she's a testifying witness.

6           THE COURT:  She can attend if there is room for her

7   in the overflow room.  There are limited seats in there.

8           So, you can cross-examine her about her attending

9   it.

10          Again, in the future --

11          MS. GEDDES:  Yes, Your Honor.

12          THE COURT:  -- always good to know about these

13  things ahead of time.

14          MR. CANNICK:  Which witness is this?

15          THE COURT:  Number 5.

16          MS. GEDDES:  No, it's not.  It's Jerhonda Pace,

17  she's our first witness.

18          MR. CANNICK:  Oh, Jerhonda Pace.  Thank you.

19          THE COURT:  Okay.

20          (Sidebar concluded.)

21

22          (Continued on the following page.)

23

24

25

1           (In open court - jury present.)

2           THE COURT:  Okay, I apologize to Ms. Cruz Melendez.

3    I apologize to the jury.  I wouldn't do that if I didn't have

4    to tend to some matter.

5           So, we're all set, go ahead.

6           MS. CRUZ MELENDEZ:  Thank you, Judge.

7           Next, I want to tell you about Stephanie.  When

8    Stephanie was only 16 years old she saw the defendant while

9    she was at a local well-known McDonald's known as the

10   Rock-n-Roll McDonald's.  She was there with her boyfriend and

11   some high school friends when the defendant eyed her.

12          When Stephanie went up to the counter, the defendant

13   sent one of his associates over to her who gave her a piece of

14   paper with the defendant's telephone number written on it and

15   he told her that the defendant wanted him -- wanted Stephanie

16   to call him.  She told the associate that she was only 16

17   years old and the defendant's associate said:  That's okay.

18          Stephanie, ultimately, decided not to call the

19   defendant.  But about a year later, in 1999, when Stephanie

20   was 17 years old, she heard that the defendant was making an

21   appearance at a Nike store close to her summer job where she

22   was working as a barista.  She went to see him because she

23   wanted to tell him about a friend of hers who was an aspiring

24   singer.  The defendant told Stephanie that he remembered her.

25   She asked the defendant whether he would be willing to meet

Case 1:19-cr-00286-AMD  Document 240  Filed 10/06/21  Page 32 of 208 PageID #: 5747

1  with her friend to hear her sing.  The defendant agreed to see

2  Stephanie's friend, but said he wanted to meet up with

3  Stephanie first.  And, again, he gave Stephanie his telephone

4  number.  Stephanie was only 17 years old at the time, the

5  defendant was 32.

6          Just a week or two later, the defendant began having

7  sex with Stephanie regularly for approximately six to eight

8  months.  Stephanie's friend eventually did sing for the

9  defendant at his studio, but he wasn't interested in that.

10  What he was interested in, what he wanted was to continue

11  having sex with Stephanie.  He'd have Stephanie come over to

12  his studio to meet him where she would wait in one of the

13  rooms there for hours and whenever he was ready, he would go

14  into the room where she was waiting and he'd have sex with

15  her; or he paid for her to travel out-of-state to meet him so

16  that she could have sex with him.  He told her to call him

17  "Daddy" and became controlling, directing her not to even

18  speak or look at other men, making her afraid of the

19  consequences if she did not do everything that he instructed

20  her to do.

21          On one occasion while Stephanie was still a minor,

22  the defendant told her he was picking her up from the studio

23  where she had been waiting for him to bring her to his house

24  to make a movie.  Once they arrived, the defendant used a

25  video camera to record a VHS tape of Stephanie having

1    intercourse with him.

2            Next, I want to talk to you about Sonja.

3            Now, Sonja met the defendant outside of a mall in

4    Salt Lake City, Utah, in 2003 when she was 22 years old.

5    Sonja was an intern at a radio station and heard that the

6    defendant was at the mall, so she headed over there with a

7    friend thinking that it would be great for her position as a

8    radio station intern, so that she could get an interview with

9    the defendant while he was still in town.  When she got there,

10   the defendant didn't give her an interview, but he or one of

11   his associates did slip Sonja the defendant's number.  Still

12   hoping to land the interview with the defendant, Sonja called

13   the number to see if she could set up a meeting with him.

14   After some time and several calls later, the defendant invited

15   Sonja to his studio in Chicago.  One of the defendant's

16   employees arranged her travel and she flew to Chicago to meet

17   with the defendant in the hopes of getting that interview.

18           When she arrived at the studio, it was nothing like

19   she expected.  One of the defendant's employees asked her if

20   she needed condoms.  Taken aback by the question, she said no,

21   that she wasn't there for anything like that.  One of the

22   defendant's employees then escorted her to a small room, went

23   through her luggage and phone, made copies of her ID, told her

24   to sign a non-disclosure agreement, and left.  Alone in the

25   room she soon discovered that the door was locked, and despite

1  her knocks on the door and calls to the front desk, no one let

2  her out to leave.

3          Sonja spent approximately three days in that room

4  pleading to be let out, to go home, to get some food, to be

5  able to go to the bathroom, but what she heard from the

6  defendant's various employees that were enforcing his

7  instructions was that they needed authorization from the

8  defendant first to let her leave the room.  The few times that

9  she was actually allowed to leave the room to use the

10  bathroom, she was generally escorted by one of the defendant's

11  employees.  Days went by and finally one of the defendant's

12  employees brought Sonja some cold Chinese food and a Coke.

13  After taking a few bites and drinking the soda, her eyes grew

14  heavy and she fell immediately to sleep.  Sonja woke up to

15  find her underwear had been taken off and felt a wetness

16  between her legs that made it clear to her that she had been

17  sexually abused in some way while she was not conscious.  She

18  also saw the defendant in the corner of the room doing up his

19  pants.  Confused, she stood up to speak with him.  He grabbed

20  her backside, pulled her towards him and said he had to go.

21  He then left.

22          That was the first and only time that Sonja saw the

23  defendant on that trip.  Only then did one of the defendant's

24  employees come and say that they would let her leave, but not

25  before telling her that she could never speak about what

Case 1:19-cr-00286-AMD  Document 240  Filed 10/06/21  Page 35 of 208 PageID #: 5750

1   happened there to anyone and taking a list of people,

2   including her grandmother's name, who were close to her.  All

3   of this she took as a terrifying threat, keep quiet or else.

4   And it worked.  She did keep quiet for almost 16 years.

5            Now, I want to tell you about Jerhonda.  Jerhonda

6   first met the defendant in 2009 when she was only 16 years old

7   at a party at the defendant's house.  In 2009, the defendant

8   was 42.

9            Jerhonda was a huge fan of the defendant's music and

10  when she met him at that party, she naturally was excited to

11  be talking to him.  And while they were talking, she told the

12  defendant that she was 19, which wasn't true.

13           On that night she and the defendant exchanged phone

14  numbers, and just a few days later the defendant invited

15  Jerhonda over to his house.  And when she got there, after

16  some conversation, she told him that she was a virgin.  He

17  told her that he wanted to train her, to teach her how to give

18  oral sex, and that's how it started with oral sex.

19

20           (Continued on the following page.)

21

22

23

24

25

1    MS. CRUZ MELENDEZ:  Soon after, the defendant and

2  Jerhonda had sexual intercourse.

3    Now, shortly after the defendant began having sex

4  with Jerhonda, Jerhonda told the defendant her true age.  She

5  told him that she was actually 16 years old.  She even showed

6  him his I.D. card.  She even showed him her I.D. card.  She

7  told him that she was actually 16 years old, and what did the

8  defendant do?  He didn't ask her to leave.  He didn't say, We

9  can't see each other because you're a minor, because you're

10  16 years old.  He shrugged it off.  He asked her, What's that

11  supposed to mean, and instructed her to just continue to tell

12  people that she was 19.

13    And for the next six months or so, the defendant

14  continued to have sex with Jerhonda, a 16-year-old girl too

15  young to consent to sex regularly for the better part of a

16  year.  At times he video recorded sex with Jerhonda using a

17  video camera or an iPhone.

18    The defendant also became controlling, making her

19  follow a list of rules and he became violent with her.  At one

20  point, the defendant even instructed Jerhonda to write and

21  sign a letter that he could keep an insurance policy of sorts

22  containing false information saying that she worked for him,

23  that she had stolen money and jewelry from him, and that her

24  parents told her to get close to the defendant.

25    On one occasion, one of the several times that the

1   defendant became angry with Jerhonda, he slapped her, choked

2   her, and threatened that the next time it would be even worse.

3   And then the defendant, while Jerhonda was shaken and upset

4   from the beating, made her give him oral sex.  That was the

5   last day that Jerhonda was with the defendant.

6          I'd like to talk to you now about Zel.  Zel first

7   met the defendant when she was 17 years old in 2015.  He was

8   48.  She had gone to one of the defendant's concerts with her

9   mom and dad.  And during the show, one of the defendant's

10  associates gave her a wristband so she could come up and stand

11  near the front of the stage.  During the show, the defendant

12  paid extra attention to her, singing some songs directly at

13  her.  And then one of his associates gave her his number and

14  told her not to say anything to anyone.

15         After the concert, Zel began to communicate with the

16  defendant.  Now, Zel initially told the defendant that she was

17  18.  She was a serious singer, performing in choirs and even

18  doing some paid gigs.  She thought maybe the defendant could

19  help her with her career.  The defendant told Zel that she

20  should come and audition for him thinking that this could be

21  her big opportunity.  Zel headed to meet the defendant one day

22  after her high school extracurriculars.  He told her to swing

23  by the hotel where he was staying.  So she met him on his

24  Mercedes Sprinter van that was parked outside the hotel.

25         Once there, he asked her to sit on his lap and give

1    him a kiss.  She was unsure but she did what he asked.  The

2    defendant then asked her to meet him upstairs in the hotel

3    room.  She did.  When they were alone in the room, Zel asked

4    if it was time for an audition.  The defendant told her before

5    he could hear her sing he needed to relieve himself.  It was

6    clear what he meant, he wanted to relieve himself sexually.

7    Not wanting to do anything with the defendant, Zel tried to

8    politely decline.  None of it phased him.  He continued to

9    hound her for some form of sex telling her that he wanted to

10   perform oral sex on her, and that if she lets him he'll take

11   care of her for the rest of her life.  Finally, reluctantly,

12   she let him.  Eventually, she got to sing for the defendant.

13           After that, the defendant spoke with Zel and he

14   invited her to travel to various shows around the country

15   where he was performing, or to visit him at his home in

16   Chicago directing members of his inner circle to arrange

17   travel for her.  During these trips, the defendant continued

18   to engage in sex with her video recording the sex most of the

19   time.  Still, the defendant talked to her parents about how

20   important it was for Zel to practice and learn the business

21   and telling them that he could help her with her career.  And

22   under the guise of mentoring her, telling Zel that she was

23   going to be the next Aaliyah, he invited her to travel with

24   him while he was on tour all the while continuing to have sex

25   with her.

1          After spending all summer with the defendant on

2    tour, when the time came for Zel to start her senior year in

3    high school, she told him that she was, in fact, 17 years old.

4    Did he end it?  No.  He suggested that she do her senior year

5    remotely and live with him full time.  He continued to have

6    sex with her in various locations around the country despite

7    the fact that she was a minor and too young to consent to sex.

8          And the defendant not only had sex with Zel when she

9    was a minor, but he also exposed her to an STD, genital

10   herpes.  Years earlier, the defendant was diagnosed by his

11   doctor with herpes, an incurable STD.  His doctor told him

12   that he had the disease and that he needed to disclose that

13   fact to his sexual partners and to practice safe sex.  But the

14   defendant never told Zel that he had herpes.

15         As you will learn during trial, ladies and

16   gentlemen, this is a crime in both New York and California,

17   two of the places that the defendant had sex with Zel.  And as

18   you will learn, herpes is an incurable disease that can cause

19   serious and permanent bodily injury.  And if you know you have

20   it, and the defendant was well aware that he did, the law

21   requires that you disclose that fact to your sexual partners

22   so that they can consent to having sex under those

23   circumstances but the defendant never did.

24         Over the next five years, Zel traveled and lived

25   with the defendant.  And throughout the defendant sexually,

1  physically, and psychologically abused Zel.

2          As with other girls before her, and after her, the

3  defendant subjected Zel to his strict rules instructing her to

4  call him "Daddy" and prohibiting her from doing even the most

5  basic of things without his authorization.  And as he did with

6  other girls and women he targeted, he punished her severely

7  when she broke his rules; giving her violent beatings that he

8  called "chastisements" to teach her how to behave and how to

9  follow his rules.

10          For some time, these chastisements happened every

11  day.  Sometimes the defendant forced her to have sex with a

12  man that she had never met before as punishment for breaking

13  one of these rules.  On multiple occasions, he confined her to

14  rooms for days without letting her leave.

15          I'd like now to talk to you about Faith.  Faith met

16  the defendant in 2017 backstage after one of the defendant's

17  concerts in San Antonio, Texas.  Faith was 19; the defendant

18  was 50.  Two of the defendant's associates approached Faith

19  after the concert and gave her and her half-sister wristbands

20  to go backstage for a meet and greet after party.  When Faith

21  got backstage, there was a party of about 30 people and

22  everyone at the party, except for the defendant's employees,

23  were women.

24          After watching her dance, the defendant approached

25  Faith, handed her his number, told her to take it but not to

1    tell anyone that he had given it to her.  Faith called the

2    number and the defendant and she began communicating.  Within

3    a week, the defendant told Faith that he loved her, invited

4    her to come see him, and told her that she could contact one

5    of his employees to make her travel arrangements.

6            Now, eventually, at the defendant's invitation and

7    completely on his dime, Faith began traveling to various

8    locations around the country to see the defendant and he began

9    a sexual relationship with her sometimes recording the sexual

10   activity on an iPad.

11           On one of these occasions, when the defendant had

12   one of his employees arrange travel for Faith to come and see

13   him, the defendant brought Faith into a small room and he told

14   her to take off her clothes.  In the room, in her view, right

15   by the defendant was a gun which the defendant placed nearby.

16   He then began to ask her a series of questions and told her

17   that there would be consequences if she lied.  Scared by the

18   situation, believing that she could not leave even if she

19   wanted to, Faith did what the defendant asked her to do

20   including when he directed her to give him oral sex.

21           Now, when she traveled to see the defendant

22   including in New York, as was his practice, he engaged in

23   unprotected sexual intercourse with her never disclosing the

24   fact that he had previously been diagnosed with herpes.  And

25   when Faith sued him for exposing her to herpes, the defendant

1   and others on his behalf threatened to expose compromising

2   photos and videos of her that he had in his possession if she

3   didn't cease her lawsuit or stop speaking publicly about the

4   defendant.

5          For all of this conduct, the defendant is charged in

6   a federal indictment with multiple crimes.

7          First, he is charged with racketeering.  You're

8   going to learn more detail about what racketeering is at a

9   later point in the trial from Judge Donnelly.  But what it

10  essentially means is that the defendant is charged with

11  committing a pattern of multiple crimes spanning almost three

12  decades as the leader of an enterprise, an enterprise which

13  you will learn more about as well as another word for a group

14  of people working together to carry out a certain purpose.

15  Here, the defendant and his inner circle.  Together, with the

16  defendant at the center of all of it, they formed the charged

17  enterprise.

18         The racketeering activity that the defendant is

19  having charged with committed by using his inner circle

20  includes conduct related to the six victims I told you about

21  earlier.

22         When I described to you some of the experiences of

23  the six victims, I explained that some of the victims like

24  Aaliyah, Stephanie, Jerhonda, and Zel were minors when the

25  defendant began having sex with them.

1          The charged racketeering activity related to those

2    victims include bribery, sexual exploitation of children by

3    producing child pornography, forced labor, and illegal

4    transportation, coercion, and enticement of minors for the

5    purpose of engaging in illegal sexual activity including sex

6    with minors and illegally failing to disclose his herpes to

7    his sexual partner before having unprotected sexual

8    intercourse.

9          Some of the other victims like Sonja and Faith were

10   over the age of 18.  The charged racketeering activity related

11   to them includes kidnapping, forced labor, and illegal

12   transportation, coercion, and enticement of these individuals

13   for the purpose of engaging in illegal sexual activity

14   including aggravated sexual abuse and illegally failing to

15   disclose his herpes to a sexual partner before having

16   unprotected sexual intercourse.

17         The defendant is also charged with eight other

18   separate crimes related to the defendant's transportation,

19   coercion, and enticement of Zel for the purpose of engaging in

20   sex with her while she was a minor as well as transportation,

21   coercion, and enticement of Faith to engage in unprotected

22   sexual intercourse with her without first disclosing to her

23   that he had contracted herpes.

24         Now, during the course of the trial over the next

25   few weeks, the Government's going to present evidence to you

1    that will prove these charges beyond a reasonable doubt.

2          So how will we prove these charges to you?  What is

3    the evidence?

4          First, you're going to hear from many of the

5    defendant's victims themselves who will tell you the many

6    different ways the defendant exploited them.  You will also

7    hear testimony from various former members and associates of

8    the defendant's inner circle.  People who worked for the

9    defendant such as his personal assistants, managers, and

10   runners as well as people who were his close associates going

11   back all the way to the 1990s and as recent as 2018.

12          People who the defendant used to facilitate his

13   crimes, for example, by directing them to arrange travel for

14   his victims throughout the United States including right here

15   in the Eastern District of New York and using them to enforce

16   the defendant's instructions that he used to control almost

17   every move of his victims.

18          You're also going to hear from expert witnesses

19   including a clinical and forensic psychologist.  She will

20   testify about the methods used by predators to target and

21   groom vulnerable people like minors and young men and women.

22   She will also testify about the effects of violence in

23   relationships and the associated trauma with those

24   relationships.  She will explain why victims often stay with

25   their abusers and delay reporting acts of abuse and violence

1    to law enforcement.

2            You will also hear from experts who will tell you

3    that the defendant's DNA was found in semen recovered from a

4    T-shirt by one of the victims when she was just 16 years old.

5            In addition, you will see evidence such as official

6    documents like birth certificates for the victims and the

7    documents proving that the defendant did marry Aaliyah when

8    she was just 15 years old.  Text messages showing that the

9    defendant demanded total obedience that he had members of his

10   inner circle stand guard over his victims when they were on

11   punishment.  Telephone records showing contact between the

12   defendant and his victims including while they were minors.

13           You're going to see travel records that show the

14   victims traveling to locations around the country to see the

15   defendant.  Medical and prescription records regarding his

16   treatment for the disease that will be explained during the

17   testimony of the defendant's primary care physician regarding

18   the defendant's herpes diagnosis.

19           You're also going to to see physical evidence

20   obtained by law enforcement from searches done pursuant to

21   search warrants authorized by a judge, the defendant's own

22   apartment and storage facility.  For example, you'll see

23   decades-old paper phone messages recording calls from his

24   victims.  You'll see video and audio recordings that the

25   defendant made himself or instructed victims to make that show

1    the type of control that the defendant had over his victims

2    and the demeaning punishment he forced them to perform if they

3    broke his rules.

4          Some of these recordings may be difficult to listen

5    to and to watch, but we will be presenting this evidence to

6    you to prove the defendant's pattern of illegal sexual,

7    physical, and psychological abuse.

8          You're also going to see letters the defendant kept

9    containing false and embarrassing information which the

10   defendant directed his victims and others to right so that he

11   could have them in his back pocket in case anyone attempted to

12   accuse him of wrongdoing.

13         You will see records such as settlement agreements

14   showing that the defendant tried to pay millions of dollars to

15   keep his victims silent.

16         Witness after witness, exhibit after exhibit, you'll

17   have the chance to hear and see all of the Government's

18   evidence.

19         Now, because of the nature of trial, some of the

20   evidence may be presented to you in a way that's not always in

21   complete chronological order.  But by the end of the

22   presentation of evidence, you will see how all the

23   Government's evidence fits together to prove each and every

24   one of the charges in this case.

25         And after we presented all of this evidence to you,

1  after you heard from the witnesses and seen all the exhibits,

2  the Government is going to have an opportunity to come before

3  you again and review all of that evidence with you.  And, at

4  that time, we're going to ask you to hold the defendant

5  accountable.  Accountable for years of engaging in sex with

6  minors, creating child pornography, and otherwise sexually

7  abusing, girls, boys, and young women.  Accountable for using

8  bribery, lies, fear, and extortionate tactics to keep his

9  victims and other potential witnesses silent.

10            We will ask you to reach the only verdict that is

11  consistent with all of that evidence and that is a verdict of

12  guilty on all counts.  Thank you.

13            THE COURT:  Thank you, Ms. Cruz Melendez.

14            Does the defendant wish to give an opening

15  statement?

16            MR. CANNICK:  Can we have a break?

17            THE COURT:  Surely.  We'll have a break for about

18  ten minutes.  Please don't talk about the case at all and

19  we'll see you in just a few minutes.

20            Thank you so much.

21            COURTROOM DEPUTY:  All rise.

22            (Jury exits courtroom at 11:14 a.m.)

23            THE COURT:  Okay.  Anything before we break just

24  with respect to the -- I think we can -- just to expand on

25  what happened at the sidebar.  There was a request that one of

Proceedings                                        48

1    the victims be permitted to view the opening statements which

2    is permissible under the Crime Victims Act also as enacted by

3    Federal Rule of Criminal Procedure 60.  The Government

4    represented that Mr. Farinella consented to this last night.

5    But, ordinarily, which is why I didn't rule on it before, but

6    if this is going to happen, it's usually good to bring it to

7    my attention.  All right?  Thank you so much.

8              (Defendant exits from courtroom at 11:15 a.m.)

9              (A recess in the proceedings was taken.)

10             COURTROOM DEPUTY:  All rise.

11             THE COURT:  Everyone can have a seat.

12             (Defendant enters the courtroom at 11:30 a.m.)

13             THE COURT:  All right.  Are we ready for the jurors?

14             MR. CANNICK:  Yes, Your Honor.

15             THE COURT:  All right.

16             (A brief pause in the proceedings was held.)

17             COURTROOM DEPUTY:  All rise.

18             (Jury enters courtroom at 11:35 a.m.)

19             COURTROOM DEPUTY:  You may be seated.

20             THE COURT:  All right, jurors, we're ready to

21   continue.

22             I do want to say I think I've told you this before:

23   I know it's cold in here.  It's either really hot or really

24   cold, and it's believe me it's much better when it's cooler,

25   but it's probably not a bad idea to bring a sweater with you

1  or something.  So I truly am sorry about that but it's the way

2  it is.

3          All right.  We're ready to proceed with opening

4  statements, does the defense wish to give an opening?

5          MS. BLANK BECKER:  Yes, Judge.  Thank you.

6          THE COURT:  Go ahead.

7          MS. BLANK BECKER:  Thank you.

8          Sorry, ladies and gentlemen, we don't learn in law

9  school how to put these microphones on.

10          Good morning, ladies and gentlemen.

11          THE JURY: (Collectively) Good morning.

12          MS. BLANK BECKER:  Ladies and gentlemen, my name is

13  attorney Nicole Blank Becker and I am one of four attorneys

14  who are here today defending our client.

15          Ladies and gentlemen, I want to introduce to you who

16  is sitting at the table.

17          We've got attorney Tom Farinella who, ladies and

18  gentlemen, has been working as a lawyer for over 20 years here

19  in New York federally and statewide.  Additionally, we have

20  Deveraux Cannick, a long veteran of both state and federal

21  court who started has a prosecutor.

22          THE COURT:  I'm so sorry.  Can I see the lawyers at

23  the side, please.

24          (Continued on the next page.)

25

                              Sidebar                          50

1           (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4           THE COURT:  So you can't make those kind of remarks

5    in an opening statement.  You're supposed to talk about what

6    you expect the evidence to prove and not talking about

7    everybody's backgrounds as lawyers, it's just not appropriate.

8    But you can certainly talk about what you think the evidence

9    is going to prove but let's not have any more bios, okay.

10          MS. BLANK BECKER:  Okay.  You remember when the

11   prosecutor did her opening, she described what she does and

12   who she is.

13          THE COURT:  No, she did not.  She said she was an

14   Assistant United States Attorney.  You've already said you're

15   a lawyer but we don't do résumés in an opening statement.  So

16   what I would like to you do -- I don't like to interrupt

17   lawyers during opening statements but that's just improper so

18   let's go ahead.

19          (Sidebar discussion concludes.)

20          (Continued on the next page.)

21

22

23

24

25

1          (In open court.)

2          MS. BLANK BECKER:  May I, Judge.

3          THE COURT:  Yes, go ahead.

4          MS. BLANK BECKER:  Thank you.

5          Lastly, ladies and gentlemen, I don't want to leave

6    out Calvin Scholar who is with us as well.

7          Ladies and gentlemen, I suggest to you that the

8    fundamental reason that we are all here today is because the

9    Government, the Government wants you to believe that our

10   client, an internationally known singer, someone that they

11   want you to believe is the leader of some large enterprise

12   similar to John Gotti, the head of a mob family.

13         Ladies and gentlemen, by charging Mr. Kelly an

14   internationally known singer as the leader of an enterprise,

15   the evidence will show that this is uncharted territory.

16         You're not going to hear any evidence of anybody who

17   comes in here and tells you about their experience with these

18   kinds of charges.  Ladies and gentlemen, I'm going to ask that

19   throughout this trial, my team is going to ask that you listen

20   carefully to how the Government puts on their case.

21         In an attempt to paint Mr. Kelly, our client, who

22   sits at the defense table out to be some singing boss, it will

23   be clear that the Government will not be able to prove their

24   case beyond a reasonable doubt and here's why.

25         What the Government wants you to believe, and stood

1    up here and will ask questions about throughout this trial,

2    the Government is going to tell you that Mr. Kelly himself is

3    being charged with what is known as a RICO statute.

4              RICO, ladies and gentlemen, a statute that

5    is -- that is and was used and founded for organized crime,

6    that the Government is also charging Mr. Kelly with something

7    that you will learn is called the Mann Act.  Again,

8    110-year-old charge.

9              MS. GEDDES:  Objection.

10             THE COURT:  Sustained.

11             MS. BLANK BECKER:  Ladies and gentlemen, I want to

12   explain to you and break it down what the defense believes the

13   evidence is going to show and I'm going to break it down by

14   who so that one plus one equals two.  Make it that easy for

15   you because I know, and our team knows, that words like

16   "enterprise," "trafficking," "transportation over state

17   lines," those sound like some pretty serious charges.

18             Let me show you how the Government's going to have a

19   difficulty proving their case.

20             Ladies and gentlemen, the evidence is going to show

21   that the Government wants you to think that Mr. Kelly single

22   handedly directed a very elaborate scheme, a scheme that was

23   all hidden behind R. Kelly, the singer.

24             Ladies and gentlemen, the whole purpose, they will

25   tell you, of promoting Mr. Kelly's music for years and years

Opening Statement - Ms. Blank Becker                    53

1   and years was designed to recruit women and girls, fly them

2   from state to state, country to country, all for one purpose:

3   So he could have illegal sexual activities with them.

4           Ladies and gentlemen, you will see for yourselves,

5   not just me standing before you and telling you that the idea,

6   the notion, that individuals are going to get on the stand and

7   they are going to tell you enough concrete evidence that

8   Mr. Kelly is part of this huge conglomerate, I suggest to you,

9   it's not going to happen.

10          Ladies and gentlemen, we believe that you're going

11  to hear about several gaps in the Government's case,

12  specifically, part of what they have to prove to you is that

13  there was a continuous, ongoing enterprise.

14          Ladies and gentlemen, I suggest to you that you are

15  not going to hear from one person on that witness stand who is

16  going to say I've been with Mr. Kelly for 30 years, almost as

17  long as he's been singing.

18          (Continued on the next page.)

19

20

21

22

23

24

25

1          MS. BLANK BECKER:  Why is that important?

2          Ladies and gentlemen, why do I care to stand here

3    and tell you about that.  Well, ladies and gentlemen, that's

4    part of what they must prove to you beyond a reasonable doubt,

5    a continuous and ongoing enterprise.

6          Additionally, ladies and gentlemen, you're also

7    going to hear this case starts with allegations from 1993.

8    Well, ladies and gentlemen, you're going to hear from that

9    witness stand that Mr. Kelly although he had begun singing in

10   the early 90s, he stopped his career.  He actually played

11   professional basketball.  And you'll hear individuals on the

12   stand tell you that, from 1995, to 1997 -- excuse me -- 1997

13   to 1999 he wasn't singing at all.  He wasn't allowed to sing

14   when he was doing his professional basketball.  And why is

15   that important?  Again, must be ongoing, continuous, can't

16   have something happen here in the 90s, let's wait five years,

17   ten years, 20 years and call it an enterprise.  That's not

18   what the law will tell you.

19         Those are details, ladies and gentlemen, that you

20   must pay attention to.  The details in this case, we

21   anticipate, are going to make you think to yourself, is there

22   something else?  Did I miss something?  But ladies and

23   gentlemen, if you don't believe this element, this part that

24   we're talking about right now, the fact that there was some

25   ongoing and continuing enterprise, then ladies and gentlemen

1    you have to be the ones to stand up, raise your hand in that

2    jury room and say, I didn't hear that, or I'm following the

3    law, the law doesn't say that.

4           The evidence that you're going to hear throughout

5    this trial, we believe, will make it nearly impossible for the

6    Government to prove their case beyond a reasonable doubt.

7           We believe that the witnesses that take that stand

8    they will not hold up to scrutiny.  In fact, we believe their

9    testimony will crumble when it comes to cross-examination.  We

10   suggest that there will be so many untruths told to you,

11   ladies and gentlemen, that even the Government won't be able

12   to untangle the mess of lies.  Remember ladies and gentlemen,

13   that each witness who comes into this courtroom and who takes

14   the stand, swears to tell the truth.  You, ladies and

15   gentlemen, ultimately get to be the only ones determining if

16   you believe that they are actually the truth.

17          If you decide that you don't believe everything or

18   even just part of what a witness says, you have the ability,

19   and the law and your Honor will tell you, you as jurors have

20   that power to decide who you believe, what you believe, and

21   how much you want to believe.

22          As sworn jurors on this case, you have one of the

23   most awesome responsibilities.  And when you listen to both

24   the direct, which is when the Government asks questions, and

25   the cross-examination by the defense, you will wonder where is

1    the proof.  Where is the proof beyond a reasonable doubt.

2              Now, the Government they will, we anticipate, parade

3    witness, after witness, after witness to that witness stand.

4    And they will attempt, we believe, they will attempt to put a

5    square peg into a round hole.  Ladies and gentlemen, as they

6    do that, you will use your common sense and it will be obvious

7    that that's what's happening.  You will ultimately come up

8    with one conclusion as you watch witness after witness come

9    forward untruths, after untruths, after a little bit of truth,

10   and more untruths, that if the Government isn't able to fit

11   all of their witnesses into this round hole it will be obvious

12   that these charges are overreaching.

13             While the Government will showcase basically every

14   witness as they come up, you'll get to hear them for yourself.

15   Don't assume that everybody is telling the truth.  I know that

16   sounds like something that is obvious, but ladies and

17   gentlemen, remember, when people talk, when people testify,

18   you don't leave your common sense at the door.  No, ladies and

19   gentlemen, you come in to a courtroom and you swear to tell

20   the truth.  And I hope that you hold them to that.

21             Now, no matter how many witnesses the Government may

22   call -- and I suggest and we anticipate it may be a number, a

23   lot -- just because someone has five, 15, 20 witnesses that

24   take that stand, the law is actually, and the Court will tell

25   you, that you don't judge guilt or innocence based on the

1   number of people that take the stand.  You base it on the

2   number of people, the testimony that you believe.

3           Ladies and gentlemen, we suggest that you are going

4   to hear a number of half-truths, exaggerated, exaggerated

5   testimony.  And we also suggest that the witnesses that you're

6   going to hear from have an agenda.  An agenda, ladies and

7   gentlemen.  I don't just pick that out of the air.

8           You're going to hear that some of the witnesses they

9   wrote a book, a number of them wrote books.  You're going to

10  hear some of the witnesses would get cash from Mr. Kelly to

11  pay for their family's bills or issues that were going on with

12  them at home.  You're going to hear some of the witnesses went

13  on elaborate shopping sprees.  And some enjoyed the notoriety

14  of being able to tell their friends that they are with a

15  superstar.

16          Frankly, ladies and gentlemen what we believe the

17  evidence is going to show is that these women, these witnesses

18  who take the stand, he didn't recruit them.  Ladies and

19  gentlemen, you will hear that they were fans, that they came

20  to Mr. Kelly.

21          Now, did he pay for an airplane ticket?  Yes, he

22  did.  Would he pay for a hotel or an Uber?  Yes, he did.  But

23  ladies and gentlemen, does that mean that he was running some

24  monumental enterprise?  No.  You won't see that or hear that

25  when the judge tells you about the law.

1          These witnesses, each one of them, specifically Jane

2     Does, you will see that they had both a personal, and

3     financial bias to be in different relationships with

4     Mr. Kelly.

5          Now, the Government will paint a picture, and the

6     witnesses will take the stand, and tell you all these negative

7     things.  In fact, they are going to form a picture that

8     basically Mr. Kelly is this monster.

9          Ladies and gentlemen, you are also going to hear

10    that some of these relationships that Mr. Kelly had, they were

11    beautiful.  He actually had which, no one is talking about,

12    long-term relationships with many of the Jane Does and

13    individuals who take the stand.  And the evidence is also

14    going to show that these witnesses, they knew exactly what

15    they were getting into.

16          What do I mean by that.  Ladies and gentlemen, it

17    was no secret that Mr. Kelly had multiple girlfriends.

18    Everybody, the witnesses that you'll hear from, they knew

19    about that.  It's no surprise.  And ladies and gentlemen,

20    you'll even know that Mr. Kelly was quite transparent.  And he

21    would tell the witnesses, the Jane Does, those he was intimate

22    with, that there are other women that he's dating as well.

23          From a man, who you will hear, has a very, very busy

24    schedule, he had relationships that he tried to cultivate.

25    How do you cultivate a relationship with a woman -- or the

1    Government wants to say, a man -- you bring them in to

2    wherever you're working because you don't have one place.  He

3    doesn't have just one house, one office.

4          No, ladies and gentlemen, he is on the road, you

5    will hear, most of the year when he's doing a tour.  If he

6    wants to see -- or you'll hear, they want to come see

7    Mr. Kelly -- it makes sense they hop on a plane and get to see

8    him.

9          Ladies and gentlemen, you'll hear that Mr. Kelly was

10   married before.  Not only was he married, he is the father of

11   three children with his ex-wife.  Ladies and gentlemen, it's

12   not a secret that he wasn't trying to get married again.  And

13   each individual who came into his life was made aware of that.

14         We believe that you will hear that the relationships

15   that Mr. Kelly had with the various Jane Does were consenting

16   relationships.  These were individuals who knew what they were

17   getting into.  And I don't mean, you may be thinking to

18   yourself, well, you're going to hear that they were getting

19   into some, as the Government suggested, horrible types of

20   relationship with Mr. Kelly.  No.  You will hear that they,

21   the Jane Does, most of them, they contacted Mr. Kelly.  Sure,

22   did they contact him because they received his phone number?

23   Yes.  How else in the 90s and coming into the 2000s do people

24   contact each other?

25         So the fact that these individuals, these

1    individuals who wanted to be in Mr. Kelly's life, whether or

2    not we understand their reasoning or we agree with the

3    reasoning.  This is not a situation, and you will not hear

4    that they were recruited.  If by recruited the Government

5    wants you to believe that that means that Mr. Kelly had an

6    assistant, an assistant who was responsible for keeping his

7    daily routine up to par and on time.  And the assistant was

8    the one who if Mr. Kelly and/or you're going to see the

9    witnesses spoke with the assistant, if they wanted to come or

10   depending on what date not only worked for Mr. Kelly but

11   you'll see that worked for the individuals coming to see

12   Mr. Kelly.  Yes, they dealt with one of his assistants.  The

13   Government will have you believe that the assistant was part

14   of this large enterprise.

15          Ladies and gentlemen, I suggest that you will hear

16   from one of his assistants, if not more.  And you will hear

17   what her role was, her job as an employee.  And it will be

18   nothing more, and nothing less, than anyone else that was

19   standing in her shoes.  It was for purposes of being an

20   assistant.

21          Now, ladies and gentlemen, we've discussed how

22   you're going to hear about a number of consensual

23   relationships with adults.  You're going to hear about how

24   those relationships often times ended.  You will hear that

25   when a relationship, not all, but when a relationship ended

1  and it soured, those individuals became angry, resentful, and

2  even spiteful.  And that's when the evidence will show, and

3  you will be able to see, that's when they take advantage of

4  their situation.

5          We anticipate, ladies and gentlemen, that some of

6  the witnesses that are going to take the stand, they are going

7  to tell you, they are going to admit that they have stolen

8  money from Mr. Kelly.  They are also going to tell you that

9  when they were in a relationship with Mr. Kelly, they had

10  cheated on Mr. Kelly.  These aren't things that you're going

11  to hear are made up.  They will tell you this themselves.

12  You're also going to hear, they are going to tell you they

13  boldfaced lied to Mr. Kelly.

14          Now, the other part that you're going to hear, that

15  there were a number of relationships in which Mr. Kelly and

16  the individual broke up and it was amicable.  They are still

17  friends.  They formed life-long relationships.  But nobody

18  wants to talk about that.

19          The evidence is also going to show you that there

20  was a clear distinct difference between Mr. Kelly and his

21  personal life, as we all have, and R. Kelly and his business

22  life.

23          Now, you're going to hear that Mr. Kelly had a

24  persona, is what they called it.  We know that he goes by the

25  name of R. Kelly.  Why, ladies and gentlemen?  He's a singer.

Opening Statement - Becker                62

1   He is not the first, and he will not be the last, person to do

2   so.

3           Now, you're going to hear that he had these

4   relationships that had nothing to do with R. Kelly, the singer

5   on stage.  What do I mean by that?  Why am I talking about

6   that?  Well, ladies and gentlemen, you're going to hear that

7   the witnesses, that the individuals who testify, the Jane

8   Does, they rarely, if ever, had anything to do with R. Kelly

9   on stage.  Did they go to the concerts?  Did they travel with

10  Mr. Kelly?  Sure.

11          In fact, I keep saying they, I should explain that

12  to you, ladies and gentlemen.  Remember earlier I told you

13  that they, you will hear, that they knew about each other.

14  You'll hear that they didn't just know about each other, they

15  all became like a family.  Sure, were some women not so

16  interested in being in those kinds of situations?  Yes.  And

17  they have a right to be.  You'll hear, ladies and gentlemen,

18  that they ended their relationship because that's not what

19  they wanted to sign up for.

20          But, you will also hear that the Jane Does and/or

21  other women and Mr. Kelly's life that the Government is going

22  to put on the stand, they were part of his personal life.  His

23  personal life, if you notice on the charges, is not on trial

24  here.  His personal life is separate.  He is not being charged

25  individually.  The charges are grandiose.  He can't be the

1  leader of his own enterprise and the enterprise.  It's not how

2  it works.

3          THE COURT:  I'm going to caution the jury, I'll

4  instruct you on the law at the appropriate time.

5          Go ahead, Ms. Becker.

6          MS. BLANK BECKER:  Thank you, Judge.

7          You're going to hear that the witnesses in this case

8  they will take the stand, and they are going to tell you all

9  about their experience, their personal experience with

10  Mr. Kelly.  I suggest to you, ladies and gentlemen, we believe

11  the evidence is going to show that they had relationships just

12  like anyone else.  In fact, ladies and gentlemen, just because

13  the girls, women -- excuse me -- the witnesses, the Jane Does

14  that he dated, just because they came to the concerts with

15  him, they sat in the audience and would watch in support, it

16  doesn't mean they are part of the show.  Just as much, ladies

17  and gentlemen, as my family isn't part of me being a lawyer.

18  There is a clear distinction, and that distinction is

19  important.

20          When your Honor tells you the law, you will see how

21  important it really is.

22          Now, if the Government is unable to prove to you

23  that Mr. Kelly's personal life and his business life are not

24  interchanged -- excuse me, yes, that they are not

25  interchanged, they are two separate things, guess what

1   fails --

2          THE COURT:  Again, Ms. Becker, I will instruct the

3   jury on the law.  Please confine yourself to arguing what you

4   expect the evidence to prove.

5          MS. BLANK BECKER:  Thank you, Judge.

6          We expect, ladies and gentlemen, that the witnesses

7   will take the stand.  They will look at you in the eye.  They

8   will swear that they are telling the truth.  In fact, they are

9   going to tell you they were victimized.  They are going to

10  tell you about a number of horribly sounding things that they

11  experienced while with Mr. Kelly.

12         In fact, they are going to allege that he would take

13  their phones and they wouldn't have a phone to call anyone.

14  They are going to allege that they were starved and they

15  couldn't eat unless they were told they could.  You're going

16  to hear that they were in locked rooms in secret places, and

17  they weren't permitted to leave the room without permission.

18  You're going to hear that they weren't allowed to even look at

19  other people, let alone other men.  And you're going to hear

20  that they were made to urinate in cups or buckets.

21         Ladies and gentlemen, you will see and you will hear

22  that all of their stories, all of their explanations are going

23  to sound kind of similar.  Now, they are going to use the same

24  buzz words.  And you may as you listen to that think to

25  yourself, well, whoa, it must have really happened if they are

1   all saying similar things.

2           But ladies and gentlemen, remember when you were

3   asked questions initially when we were trying to find a jury

4   about the media, about TV, anything about it.  Well, ladies

5   and gentlemen, I suggest to you that those who take the stand

6   they are going to tell you they have seen, read, or even

7   personally been involved in all that stuff that we were asking

8   you guys about.  And why is that important?  Why am I bringing

9   that up?  Because ladies and gentlemen, that all makes --

10  using those words, buzz words like I couldn't eat, it was a

11  cult, those buzzwords they are amazing in the media.  They are

12  amazing on a TV show that some of these witnesses will tell

13  you talk shows that they went on.  That is audience-grabbing.

14          Ladies and gentlemen, as we all know, they must come

15  in here and testify in a courtroom, no matter what they heard

16  or saw.  This is a courtroom where they must tell the truth.

17  Watch as this unfolds.

18          Ladies and gentlemen, you're also going to hear that

19  Mr. Kelly had rules, rules that they must follow.  The sound

20  of that alone is pretty daunting.  Rules in a relationship.

21          Ladies and gentlemen, when the ladies -- the Jane

22  Does, take the stand or the witnesses, and they tell you about

23  the rules, here is another place to pay special attention to.

24  Listen to how fantastical they tell you the rules are.

25          Ladies and gentlemen, we suggest that they are

1   Monday morning quarter-backing.  What do we mean by that?

2   Ladies and gentlemen, we suggest you'll see and you'll hear

3   from the stand that when things didn't get to be the way they

4   wanted, I don't know, maybe they wanted the relationship to

5   continue and it couldn't; ladies and gentlemen, when the

6   witnesses were in a relationship with Mr. Kelly that worked,

7   nobody will testify they complained about some rules.  But

8   guess what, when that relationship, that sexual relationship

9   ended, now what?  All the private conversations, the private

10  understandings that they would have with someone they are

11  dating and sexually active with, it's time to start talking to

12  the public about it.  And when you tell someone that you had

13  to wear baggie clothes, you're going to get someone's

14  attention.

15          But ladies and gentlemen, what you also have to

16  listen to is what we call the totality of circumstances.  What

17  do I mean by that?  Ladies and gentlemen, you're going to

18  hear, yes, a lot of the girls ended up wearing baggie clothes

19  but not because it was a rule.  You'll hear, ladies and

20  gentlemen, that concerts that Mr. Kelly would put on had

21  thousands, if not tens of thousands of people that would go to

22  them.  And ladies and gentlemen, you will hear, the witnesses

23  will tell you, that it wasn't always so fun to be ushered

24  amongst the crowd to get into the seats so they could watch

25  their man and his craft.  In fact ladies and gentlemen, you're

1  going to hear that that was becoming a problem for the women.

2  And so, ladies and gentlemen, in order for them not to have to

3  feel like they are being looked at, or watched, or poked at,

4  they wore baggie clothing.

5          But because we're here for charges of a RICO, we

6  have got to make the narrative different.  And the narrative

7  that comes from that stand is going to almost make everything

8  seem shady.

9          Ladies and gentlemen, throughout this trial we're

10  going to ask that you ignore what we're going to call the

11  window dressing.  You're going to hear so much drama from that

12  stand.  In fact, so much drama it will almost take you off

13  your path.  But ladies and gentlemen, if you stick to your

14  goal, if you stick to what you're here for, and you apply the

15  laws as the Court will give you, the drama will dissipate and

16  the truth will be clear.

17          You're going to hear from the witnesses that they

18  hopped on a plane, that they drove their car to go see

19  Mr. Kelly, that they checked in on their own to hotels, and

20  got themselves Ubers, all while claiming they were held in

21  some secret room and couldn't get help.  Ladies and gentlemen,

22  that's the kind of drama that we hope after hearing each

23  witness or while listening to them, you're able to put aside.

24          We suggest to you that you're going to hear that the

25  girls -- excuse me -- that the witnesses, they would go out.

1    They would get their hair done.  They would get their nails

2    done.  They would go shopping without Mr. Kelly.  And guess

3    what, they would have with them when they would do it.  A

4    cellphone, a cellphone that could, essentially, rescue them if

5    that's the position they were really in.

6              I want to address another thing, another drama that

7    you're going to hear about; and that is, that one of the rules

8    were that they had no go to the bathroom in a bucket or a cup,

9    that they weren't allowed to use the bathroom.

10             Ladies and gentlemen, you will hear from that stand

11   that a number of the witnesses went with Mr. Kelly on long

12   tours.  And you're going to hear also, ladies and gentlemen,

13   that because Mr. Kelly is scared to fly, the tour bus was the

14   main transportation.  Not only did he have a tour bus, but

15   you'll also hear about a Sprinter van that traveled from

16   location to location as well.  And yes, ladies and gentlemen,

17   you will hear that there were times when they are on one of

18   their long tour drives in cities they weren't familiar with

19   and did someone in the Sprinter van that doesn't have a

20   bathroom pee in a cup?  Yes, you might hear that.  It's not

21   illegal, though, ladies and gentlemen.  Wait until you hear

22   the law.  It's not as nefarious, ladies and gentlemen, as the

23   Government would like you to believe.

24             The tour bus you will hear, the tour bus had a

25   bathroom.  So that part when they testify about that, or if it

Opening Statement - Becker                         69

1   they testify about that, ladies and gentlemen, that doesn't

2   make any sense.

3           There will also be testimony that Mr. Kelly had

4   employed what are called runners.  Runners, which is a common

5   term you'll learn in the music industry.  Runners basically,

6   you will hear, they did what everybody else didn't want to do.

7   They are equivalent to interns.  They didn't get paid; some of

8   them, they did.

9           Ladies and gentlemen, you will hear that one of the

10  roles of the runners included being at the receptionists desk,

11  included ordering food any guests at the studios needed.  They

12  also had to clean the studio.  And yes, when they would clean

13  the studio and they had to do the nitty gritty work.  A studio

14  that you'll hear had enormous amounts of people in and out and

15  in and out.  Then yes, a runner or two will take that stand

16  and tell you that they recall when they were cleaning one of

17  the buckets or the cups that they had to throw out or get rid

18  of smelled like urine.

19          Now ladies and gentlemen, does that sound like the

20  rules that you're going to hear by the women on the stand

21  about not being able to go to the bathroom and having to pee

22  in the cup?  Or does that sound like what may happen in your

23  vehicle when you drive on a long-term vacation?

24          (Continued on next page.)

25

1    (Continuing.)

2            MS. BLANK BECKER:  Now, you are also going to hear,

3    ladies and gentlemen, that Mr. Kelly, he lived and has been

4    living what some may call an extraordinary life.  You will

5    hear that he has sold millions upon millions of records.  You

6    will hear that he was number one in his craft.  In fact,

7    you're going to hear that he has so many fans that truly love

8    and adore him, ladies and gentlemen, you are going to hear

9    that he had music and wrote music that truly touched and

10   uplifted people's lives.

11           MS. GEDDES:  Objection.

12           THE COURT:  Sustained.  Sustained.

13           MS. BLANK BECKER:  Now, ladies and gentlemen, those

14   are -- thank you -- those are blessings, ladies and gentlemen,

15   that you will hear --

16           THE COURT:  Sustained.  I sustained the objection to

17   that.

18           Move on to something else, please.

19           MS. BLANK BECKER:  When Mr. Kelly grew up, which is

20   something you're going to hear about, and, ladies and

21   gentlemen, you are going to hear the Court tell you that

22   sympathy, feeling bad for someone, cannot play a role at all

23   in your deliberations, but when I -- excuse me, when you hear,

24   and you will, about how Mr. Kelly worked his way to being who

25   he is, the discipline that Mr. Kelly was involved in, ladies

1    and gentlemen, that's what we're talking about when I say the

2    totality of the circumstances.

3            Mr. Kelly, you will hear, started on the streets of

4    Chicago.

5            THE COURT:  Could I see the lawyers at the side,

6    please, with the court reporter?

7            (Sidebar held outside the hearing of the jury.)

8

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                            Sidebar                        72
```

1              (The following sidebar took place outside the

2     hearing of the jury.)

3              THE COURT:  What's your objection?

4              MS. GEDDES:  My objection is I don't know how this

5     has any relevance whatsoever to the case nor how it's coming

6     in.

7              THE COURT:  Well, I am curious about that.

8              Is he going to testify?

9              That's the only way that will come in.

10             MS. BLANK BECKER:  No, they have a witness,

11    Demetrius Smith, that is going to testify about this stuff.

12    And specifically, the reason we're even going back to 1993 is

13    due to his testimony for Aaliyah.

14             THE COURT:  I made a ruling at the pretrial hearing

15    that specific evidence of good conduct is not admissible

16    unless you are calling somebody who is going to testify about

17    his character, and there are particular rules that go along

18    with that.  But I specifically ruled that this was not

19    permissible.  It is certainly not permissible through someone

20    else.

21             I mean if the defendant is going to testify about

22    his life as part of his testimony, that's one thing, but you

23    cannot have another witness come in here and say that he grew

24    up on the streets of Chicago and worked hard.  It is just not

25    permissible.  And I, frankly, already ruled on it.

```
                         Sidebar                         73
```

1          So, stop doing that, please.

2          MS. GEDDES:  Can I just address one other thing?

3          You're not planning to reference his own

4   upbringing --

5          MS. BLANK BECKER:  No.

6          MS. GEDDES:  Just want to make sure.

7          THE COURT:  Do you know about how much longer you're

8   going to be?

9          MS. BLANK BECKER:  Maybe half-an-hour.

10          THE COURT:  All right, I just wanted to see if we

11   were going to be able to start a witness.

12          Okay, great.

13          MS. BLANK BECKER:  Okay.

14          (Sidebar concluded.)

15

16          (Continued on the following page.)

17

18

19

20

21

22

23

24

25

1              (In open court - jury present.)

2         MS. BLANK BECKER:  May I, Judge?

3         THE COURT:  Yes, go ahead.

4         MS. BLANK BECKER:  Thank you.

5         Ladies and gentlemen, let's talk a little bit more

6    specific, let's talk about each individual Jane Doe that you

7    will hear from on that witness stand and what we anticipate

8    the evidence will show.

9         Ladies and gentlemen, the first charge that has been

10   presented to you by the Government has to do with bribery.

11   Bribery, ladies and gentlemen.  And it dates all the way back

12   to 1994.

13        Ladies and gentlemen, when you hear that testimony

14   and when you hear how long ago the crime that they are

15   alleging occurred, require them to prove the specifics to you,

16   because, ladies and gentlemen, use your common sense.  If

17   Mr. Kelly was involved in a crime back in 1994, would we be

18   here today?

19        MS. GEDDES:  Objection.

20        THE COURT:  Sustained.

21        MS. BLANK BECKER:  Ladies and gentlemen, you are

22   going to find that when it comes to Aaliyah, Jane Doe

23   Number 1, the Government suggested that you're going to hear

24   that she was pregnant and that was the reasoning for a false

25   marriage.

1          Ladies and gentlemen, Aaliyah, God rest her soul,

2   she passed away.  She's not going to be here to testify from

3   that stand, ladies and gentlemen.  Hold them to having a

4   witness that is going to say that she was pregnant.

5          Now, did she have friends that she probably talked

6   to?  Does she have family?  Of course.  But, ladies and

7   gentlemen, there will be no evidence, no proof that any of

8   that is even true.  Now, I wish I could say that when Aaliyah

9   takes the stand she could tell you that herself, but instead,

10  ladies and gentlemen, under the circumstances, under the way

11  the Government has chosen to charge Mr. Kelly with a very,

12  very serious --

13          THE COURT:  Sustained.  The charges are what they

14  are, please talk about what you expect the evidence to prove.

15  I will instruct the jury on the law.

16          Go ahead.

17          MS. BLANK BECKER:  Thank you, Judge.

18          Make sure you listen to the few witnesses that they

19  are going to have for the bribery charge.  You will see that

20  RSK, which is the enterprise that they are suggesting --

21          MS. GEDDES:  Objection.

22          THE COURT:  Overruled.

23          MS. BLANK BECKER:  -- that Mr. Kelly was the head of

24  was somehow involved in this illegal request of a state

25  employee to change an ID.  Listen to the very minute,

1   important details of that testimony.  And we suggest that you

2   won't hear enough, you won't hear the truths that will allow

3   them to succeed on that charge.  And if they can't prove that

4   charge beyond a reasonable doubt, you ultimately will have to

5   find Mr. Kelly guilty -- excuse me, not guilty of that charge.

6           Now, ladies and gentlemen, you are also going to

7   hear from Jane Doe Number 2.  Jane Doe Number 2, ladies and

8   gentlemen, you will hear had met Mr. Kelly.  In fact, you'll

9   hear that she met him initially, but it wasn't until, I

10  believe it was about a year or so later, at a coffee shop.

11  Ladies and gentlemen, you are going to hear that they

12  exchanged phone numbers there and that she called Mr. Kelly.

13  In fact, ladies and gentlemen, you are going to hear that they

14  dated for six, eight months.  And when I say "dated," she came

15  to see Mr. Kelly often in different states.

16          Now, you're going to hear how the way that she ended

17  up getting to come and deciding to go visit Mr. Kelly was she

18  showed up at a Nike store, the Nike store in Chicago up on

19  Michigan Avenue, and that's where she exchanged phone numbers.

20  Although, I indicated they talked at the coffee shop, but

21  nothing actually came about until Nike.

22          Now, the Government has told you, excuse me, and

23  they expect the evidence to show that Jane Doe Number 2, she

24  formed a relationship with Mr. Kelly because she had a friend

25  that she wanted to introduce to Mr. Kelly who was a good

1  singer.  Ladies and gentlemen, you are also going to hear that

2  when she ended up going to visit Mr. Kelly, you won't see a

3  plane ticket for her friend, you won't hear testimony from

4  that stand that the friend, her friend ever sang for

5  Mr. Kelly.  No, ladies and gentlemen, that was a relationship

6  that she formed and that, ultimately, ended.

7        Now, with Jane Doe Number 2, you are going to hear,

8  and the allegations are, that there was a sex tape video.  In

9  fact, the allegations are that she was exploited is the word

10 under the law, that Mr. Kelly intentionally and knowingly

11 coerced her into having sex.

12       Ladies and gentlemen, we believe the evidence will

13 show quite the contrary.  And that's why, ladies and

14 gentlemen, we need you to use your common sense when you hear

15 about the relationship that Jane Doe Number 2 had with

16 Mr. Kelly.

17       Now, you are also going to hear about Jane Doe

18 Number 3.  Now, Jane Doe Number 3, Mr. Kelly's charged in the

19 indictment with regards to Jane Doe Number 3 with secretly

20 confining her.  He is charged with confining her for the

21 purpose of kidnapping her.  Ladies and gentlemen, we

22 anticipate that you're going to hear that she came to the

23 studio in Chicago, Mr. Kelly's studio, in the hopes of getting

24 to know Mr. Kelly.  Initially, she'll tell you it was because

25 she worked at a radio station and her boss at the station

1   wanted her to come and go find Mr. Kelly or interact with

2   Mr. Kelly in an interview.  The interview was declined you

3   will hear, but she continued to talk to Mr. Kelly.  And over

4   weeks, if not months, they decided that they would get

5   together.

6             When she got on that plane, of which nobody forced

7   her to do, she ends up in Chicago and she does go to the

8   studio she says.

9             Well, ladies and gentlemen, we anticipate that

10  you're going to hear that when she got to the studio she was

11  taken to one of the rooms there.  In fact, the studio, you'll

12  hear, it has bedrooms there.  It has, I want to call it like

13  hanging out rooms with couches.  There were several parties

14  that happened at those studios.  And you'll hear that she was

15  escorted or taken by one of the runners to the room to wait,

16  so she could meet and be engaged to talk to Mr. Kelly.

17            Now, you're going to hear that she waited hours,

18  hours, and then it sounds like she's going to tell you it was

19  days where she was locked in a room -- a secret confined room,

20  that's what the law says -- and she couldn't do anything.  She

21  couldn't eat.  She was starving.  And she was not able to get

22  out.

23            Ladies and gentlemen, you're going to hear, she will

24  also tell you she was comfortable enough that she went and

25  took a shower, which was not in the room that she was waiting

1  for Mr. Kelly.  She'll tell you, yes, she went to the

2  bathroom.  Again, not in the room.  And she's going to tell

3  you that she had her cell phone the entire time.  Not only did

4  she have her cell phone where she could have called the police

5  if she was in some kind of danger or felt like she was being

6  held against her will, there was a phone in the room.  This

7  was back -- this was back when there were phones that actually

8  connected to the wall.

9          She's also going to tell you that she used the

10  phone.  She'll tell you she called the front desk, the

11  reception area where the runners are, almost as many as 80

12  times:  Where is Mr. Kelly?  Where is Mr. Kelly?

13          She also was hungry, and you'll hear that they ended

14  up getting her Chinese food and the drink, she'll tell you,

15  that didn't have any ice.  There's a reason why I bring that

16  up.  The allegations are that Mr. Kelly, when he kidnapped

17  her, when he locked her in the room, because I believe she's

18  going to tell you the doors only lock from the outside in,

19  hold the Government to that, please.  I suggest that you won't

20  see one picture or one other person tell you the same.

21          So, ladies and gentlemen, the other part of the

22  charges against Mr. Kelly with Jane Doe Number 3 is that he

23  engaged in fondling or touching her and she was drugged.

24          Ladies and gentlemen, you will not hear her take

25  that stand and tell you that she knows that she had any kind

1    of sexual relations with Mr. Kelly.

2          No, you're going to be asked to make assumptions

3    based on what she tells you.  I believe the Government said

4    she woke up and there was some liquid coming from her private

5    area.

6          Ladies and gentlemen, don't let the Government prove

7    a case to you or try to prove a case to you based on:  I think

8    we had sex.  It feels like I might have had sex with him.

9          In fact, ladies and gentlemen, you're going to hear

10   her tell you she felt and she believed she was drugged.  Hold

11   the Government to that, ladies and gentlemen.  Make the

12   Government show you beyond a reasonable doubt that that is, in

13   fact, true.  And when you see that they can't, when you see

14   that this is a narrative, you won't be able to find Mr. Kelly

15   guilty of that charge either.

16         Now, next, ladies and gentlemen, I am going to move

17   on to Jane Doe Number 4.  Now, you're going to hear, not one,

18   not two, not three, but I can't even count as high as the

19   number of untruths, stories that you're going to hear from

20   Jane Doe Number 4 on that stand.  Ladies and gentlemen, she is

21   going to tell you from her own mouth, she will admit that

22   she's a liar.  She's lied to Mr. Kelly.  In fact, she's going

23   to tell you and admit that she was a super fan.  She'll tell

24   you since a young age, Mr. Kelly's music has been around her

25   family, friends, the neighborhood, and she listened to it and

1   that his music was everything to her.  You're also going to

2   hear her tell you that she was completely enveloped in her

3   passion for R. Kelly, the singer.

4          In fact, ladies and gentlemen, the proverbial word

5   groupie, which I don't -- which we don't usually like to use,

6   but it's a word, is an understatement when it comes, you will

7   see, to Jane Doe Number 4.

8          Jane Doe Number 4 is going to tell you about how she

9   met Mr. Kelly.  In fact, she's going to tell you that there

10  was a court procedure and she heard that it was going to be in

11  Chicago where she lived, at 14 years old, and she wanted to

12  get a chance to see, support, Mr. Kelly.

13         In fact, ladies and gentlemen, she is going to tell

14  you that she went to the hearings every day.  She skipped

15  school.  Mom and dad -- mom didn't know about it.  She lied to

16  her parents -- excuse me, she lied to her mom.  I believe her

17  father may have passed, so I apologize, I'm not sure.  But

18  she'll tell you she lied to her mom, who she had a very close

19  relationship with she'll tell you, so she could pursue her

20  passion, Mr. Kelly.

21         In fact, Jane Doe Number 4 is going to tell you that

22  she was even personally acknowledged by Mr. Kelly and that he

23  had promised her a signature or autograph.

24         You're going to also hear, ladies and gentlemen,

25  that there were other women who were as supportive as Jane Doe

1   Number 4 of Mr. Kelly.  They had a forum, you'll hear, on the

2   internet for R. Kelly supporters.  She met and befriended

3   people from that forum.

4          It will be obvious when she takes the stand that she

5   possessed a special passion for Mr. Kelly.

6          Now, what you're also going to hear, ladies and

7   gentlemen, with regards to Jane Doe Number 4, she wrote a

8   book.  She talked to several talk shows, one of which you will

9   hear is a talk show that she was on that had nothing to do

10  with Mr. Kelly.

11         Ladies and gentlemen, why the media stuff is so

12  important in that aspect is because you're going to see how

13  Jane Doe Number 4's story, it's like a snowball.  It's small,

14  it's:  I met R. Kelly; oh, I saw R. Kelly.  And it just gets

15  bigger and bigger and bigger, the lies, the untruths that she

16  attaches to herself and Mr. Kelly.  You'll see them unfold.

17         THE COURT:  Ms. Becker, I hope this is a good time

18  to break.

19         MS. BLANK BECKER:  Sure.

20         THE COURT:  I am going excuse the jury for lunch, so

21  you can have a seat.

22         MS. BLANK BECKER:  Thank you.

23         THE COURT:  All right, folks, I am going to excuse

24  you for lunch.

25         Again, please do not talk about anything having to

1   do with the case, but have a good lunch and we'll be back here

2   at 2:15.  All right, see you then.

3            THE COURTROOM DEPUTY:  All rise.

4            (Jury exits.)

5            THE COURTROOM DEPUTY:  You may be seated.

6            THE COURT:  All right, anything before we break for

7   lunch?

8            MR. CANNICK:  No, Your Honor.

9            THE COURT:  Ms. Geddes?

10           MS. GEDDES:  No, Your Honor.

11           THE COURT:  All right.

12           How much longer do you think you have, Ms. Becker?

13           It's been going on a little while.  As long as you

14   want is fine, no more discussions about the law at all, but I

15   am just trying to get an idea of when we'll get the witness

16   on.

17           MS. BLANK BECKER:  Judge, I talk slow, so --

18           THE COURT:  Well, can you use the microphone, too?

19   That's all right.

20           MS. BLANK BECKER:  Sorry, Judge.

21           THE COURT:  That's all right.

22           MS. BLANK BECKER:  Judge, I know I speak slow and

23   I'll speed it up.

24           THE COURT:  I don't want you to speak faster, and if

25   you have more to say to the jury, I am going to let you do

1  that within the bounds of the rules.  I am really just trying

2  to figure out scheduling, that's all.

3          MS. BLANK BECKER:  Twenty-five minutes, Judge, we'll

4  try to keep it at that.

5          THE COURT:  Okay.  And the first witness is?

6          MS. GEDDES:  Jerhonda Pace.

7          And, Your Honor, there may be one issue that we're

8  going to raise before Ms. Pace testifies.

9          Are you still talking about Ms. Pace in your

10 opening?

11         MS. BLANK BECKER:  I think we just --

12         MS. GEDDES:  Did we just finish?  Okay.

13         So, Your Honor had previously ruled that evidence of

14 the defendant's 2002 arrest and 2008 trial was not going to

15 come in.  However, I think the defense brutally attacked

16 Ms. Pace's credibility and part of what she's going to testify

17 to is that she, of course, met the defendant at the trial and

18 attended virtually every single day of the trial.  But, most

19 importantly, when she last saw Mr. Kelly he assaulted her, and

20 she then retained a lawyer to discuss what, if any, options

21 she had.  And ultimately, she reached a civil settlement with

22 Mr. Kelly.

23         However, she did not pursue criminal charges against

24 him, in large part because she had seen what had happened

25 during the 2002 arrest and trial thereafter, and that greatly

1    informed how she ultimately resolved those charges.

2           I anticipate based on defense's opening that she's

3    going to be attacked again for pursuing that civil settlement,

4    and it is going to be difficult to explain to the jury some of

5    the reasons why she didn't go to the police.

6           THE COURT:  Well, I think, I don't know who is

7    cross-examining her.

8           Are you going to challenge the fact that she didn't

9    go to the police?

10          I don't know which one of you has the witness.

11          MS. BLANK BECKER:  I do, Judge.

12          THE COURT:  All right.

13          I mean just as a general matter, I made rulings

14   pretrial, some of them to protect the defendant.  And I did

15   notice that you were referring to that trial.  I think I ruled

16   that you should refer to it as a court proceeding, which is

17   fine.  But I think you just have to bear in mind if you start

18   questioning her about why she didn't go to the police about

19   it, if that's one of the factors, it could open the door.

20          I have not heard the testimony, so I am not making a

21   ruling on it now.  But like in every case, you have to be

22   mindful about the steps that I have taken to protect

23   Mr. Kelly, and you can't use it as a sword.

24          So, I would be mindful of that ruling.  They are

25   subject to change if either side opens the door or something

1    like that.

2            So, all right, have a good lunch.  I will see you

3    back here afterwards.

4            (Judge ANN M. DONNELLY exited the courtroom.)

5            (Luncheon recess now taken.)

6

7            (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Proceedings                        87
```

| | |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | COURTROOM DEPUTY:  All rise. |
| 3 | THE COURT:  You can have a seat. |
| 4 | (Defendant enters the courtroom at 2:21 p.m.) |
| 5 | THE COURT:  Okay.  Is there anything before we bring |
| 6 | the jurors in? |
| 7 | MR. CANNICK:  Nothing from us. |
| 8 | THE COURT:  Just about another 20 minutes on the |
| 9 | opening? |
| 10 | MS. BLANK BECKER:  Yes. |
| 11 | THE COURT:  Okay, great.  Let's get the jurors. |
| 12 | MS. GEDDES:  Your Honor, just so you know, when the |
| 13 | Government calls our first witness, I understand that the CSOs |
| 14 | are going to bring her through that door right there. |
| 15 | THE COURT:  Yes. |
| 16 | (A brief pause in the proceedings was held.) |
| 17 | COURTROOM DEPUTY:  All rise. |
| 18 | (Jury enters courtroom at 2:24 p.m.) |
| 19 | COURTROOM DEPUTY:  You may be seated. |
| 20 | THE COURT:  All right, jurors, I hope you enjoyed |
| 21 | your lunch and I hope you got the chance to warm up a little |
| 22 | bit.  We are ready to resume. |
| 23 | Go ahead, Ms. Blank Becker. |
| 24 | MS. BLANK BECKER:  Thank you, Judge. |
| 25 | May I, Judge? |

1              THE COURT:  Go ahead.

2              MS. BLANK BECKER:  Thank you.

3              Ladies and gentlemen, just before lunch, we were

4      talking about Jane Doe No. 4.

5              Ladies and gentlemen, the evidence is going to show

6      that, yes, Jane Doe No. 4, on one occasion, did go over to

7      Mr. Kelly's house.  It was a party and she was there with a

8      friend of her's.  She was invited there not by Mr. Kelly but

9      by somebody else.

10             That is the only time you will hear, ladies and

11     gentlemen, that she was actually invited there.  Why do I say

12     that?  You're not going to see any text messages between

13     Mr. Kelly and Jerhonda Pace.  Excuse me, Jane Doe No. 4.

14             Ladies and gentlemen, you're actually going to hear

15     that she was at Mr. Kelly's house uninvited with a friend of

16     her's.  Her friend is going to testify as well and you're

17     going to hear what happened when they went into Mr. Kelly's

18     home and took pictures of themselves in the house.

19             And I suggest to you, you won't get to see any

20     pictures of Mr. Kelly with Jane Doe No. 4 other than the media

21     might have taken some pictures.  You'll see.  You might see a

22     picture, or he posed for a picture, and gave her a signature,

23     something to that effect.  But never, you will not see, and

24     you will not hear, about any text messages.  Why?  Because,

25     ladies and gentlemen, remember she is a self-proclaimed liar.

1          And I suggest to you, ladies and gentlemen, that

2     when you have someone on the stand who is a self-proclaimed

3     liar, and what I mean by that, she is going to admit she lied

4     about her age.  And that's an important factor here, ladies

5     and gentlemen, because she's going to be asked about that.

6     Listen to what she says.

7          Now, I also got to tell you, I'm here telling you

8     what you're going to hear from the stand but sometimes, with

9     Jane Doe No. 4, you never know.  So I anticipate that she is

10    going to get on the stand, she's going to claim she had this

11    magnificent relationship with Mr. Kelly until it was time to

12    write a book.  She'll tell you about her book.  Until she

13    found out that there was a lawyer who is advertising for

14    individuals who, if they felt they were victimized by

15    Mr. Kelly, call this number and she did.  That's what I talk

16    about.  That is what I mean when they say "The Jane Does, they

17    have a motive."  And Jane Doe No. 4's motive is no different.

18    Only we believe that it will be obvious when she testifies and

19    we try to get her to stick to a story.  She can't do it.  And

20    why?  Why?  Because when you tell the truth over and over

21    again.  It's easy, you come in here and tell you guys the

22    truth.  But when you hear the number of times she changed even

23    the minutia, even some of the small details, snowballed.

24         Ladies and gentlemen, you get to be the judges of

25    credibility and I believe that when Jane Doe No. 4 takes the

1    stand her credibility will be at issue.

2          Now, I'm next going to talk about Jane Doe, I'm

3    going to skip five for a moment, and I'm going to talk about

4    Jane Doe No. 6.

5          Jane Doe No. 6.  You will hear that she met

6    Mr. Kelly at one of his concerts.  Her sister had backstage

7    passes.  She went with her sister, they got to go in what's

8    called typically the "green room" which is where you'll hear

9    that's where a number of people go after a concert whether

10   it's to do an interview, sound bite for radio, or fans.  She

11   was there and she ultimately exchanged phone numbers with

12   Mr. Kelly.

13         Remember, ladies and gentlemen, one of the elements

14   in this whole thing, the whole enterprise is that Mr. Kelly's

15   people and, in fact, the indictment says his entourage

16   recruited people, right?  What you're going to hear, actually,

17   that isn't always true.  It's a nice umbrella to put all the

18   Jane Does but, ladies and gentlemen, she exchanged phone

19   numbers with Mr. Kelly himself and she called him.

20         You'll hear, ladies and gentlemen, that ultimately

21   they had a dating relationship.  In fact, you'll hear they had

22   a dating relationship for quite some time, and ultimately, it

23   ended.

24         Now, she'll give you her reason for why she believed

25   it ended like any other couple.  Oftentimes, there's two sides

Opening Statement - Ms. Blank Becker            91

1    to a story.  But, ladies and gentlemen, when she takes the

2    stand and she tells you about her reasons for why she believed

3    it was over, I believe that you're going to add her to the

4    saying, "Hell hath no fury like a woman's scorn."  Meaning,

5    ladies and gentlemen, when Jane Doe No. 6 testifies, she will

6    tell you that she learned about the other girls that, excuse

7    me, the other women that Mr. Kelly was dating.  And when she

8    learned about that, she was none too happy.

9           Now, she's going to claim that she didn't know about

10   them, ladies and gentlemen, but I anticipate what we

11   anticipate that you're going to get a chance to see text

12   messages and messages where she is on them with other

13   girlfriends of Mr. Kelly.

14          But ultimately, ladies and gentlemen, one of the

15   things that she's going to testify about is she's going to

16   tell you that she believes that she is confident that she

17   contracted herpes from Mr. Kelly.  Confident.  And what's even

18   more interesting, and I hope listen to this testimony at this

19   point, she's going to tell you that she knows exactly when she

20   got herpes from Mr. Kelly the last time she was in New York.

21   She's going to tell you guys that that's when she believes she

22   contracted the disease because, ladies and gentlemen, one of

23   the ways you'll see that one of the ways that Mr. Kelly is

24   here before you in New York is because of Jane Doe No. 6.'S

25   claims.

1          Now, Jane Doe No. 6 is going to tell you about her

2    relationships.  And Jane Doe No. 6 is going to look you in the

3    eye and tell you that this is the man that gave her herpes.

4          Well, ladies and gentlemen, you're going to hear

5    from doctors, probably doctors, both sides, and when you hear

6    what they explain to you about herpes in your mind I hope you

7    reflect back on what Ms. Jane Doe No. 6 said and ask

8    yourselves, Does that make any sense?  Use your common sense.

9    We believe that your common sense is going to be a very

10   important tool when it comes to Jane Doe No. 6.

11         Now, ladies and gentlemen, another interesting thing

12   just to note because it's a huge topic and something that's

13   going to be asked about a lot regarding herpes.  The

14   individuals, the witnesses, who take the stand and point to

15   Mr. Kelly and say that that's the person that gave it, that

16   particular herpes, to them, wait till you see how confident

17   they are.  And, again, ringing that bell and listen to the

18   doctors, what they tell you about herpes and then the number

19   of witnesses that are on that stand you'll be able to just

20   cross them off, I suggest.

21         Now, let's move on to Jane Doe No. 5.

22         Jane Doe No. 5 you will hear was a long-term

23   girlfriend of Mr. Kelly's.  You're going to hear that the way

24   she met Mr. Kelly was her parents decided to take her to one

25   of his shows.  They went to the show her parents went as well,

1    and during the show you'll hear that Mr. Kelly has a part in

2    his show where people from the audience are allowed to come up

3    on stage and dance or do, you know, what people do on a stage

4    at a rock concert.  And you're going to hear, ladies and

5    gentlemen, that Jane Doe No. 5, she was up on that stage.

6    You'll hear that.  And not only was she up on the stage,

7    you'll hear about her dance moves.  And ultimately, ladies and

8    gentlemen, you're going to hear, as a result of that, phone

9    numbers were exchanged and her parents were aware of it.

10           You're going to hear that --

11           MS. GEDDES:  Objection.

12           THE COURT:  The objection is overruled.

13           But please bear in mind the rulings that I made

14    prior to trial.  Let's move on to something else.

15           MS. BLANK BECKER:  Thank you, Judge.

16           You're going to hear that the way their, Mr. Kelly

17    and Jane Doe No. 5's relationship began, it began on a lie.

18           Now, keep you all in suspense you're going to hear

19    about that when she takes the stand.  You're going to hear and

20    actually see what kind of relationship she had with Mr. Kelly.

21    She was in an envious position for lack of better words.  She

22    was super close with Mr. Kelly.  You'll hear that they did

23    everything together a lot.  Driving the car, going places, she

24    was there.  And then it wasn't until she talked to Mr. Kelly

25    and they -- at that point, which was recently, Mr. Kelly had a

1  relationship with Jane Doe No. 5 but also another young woman

2  and they were friends.

3           You'll hear Jane Doe No. 5 and the other woman they

4  were all friends.  But there came a point where Jane Doe No. 5

5  drew a line in the sand and Jane Doe No. 5 told Mr. Kelly it

6  was time to get rid of her.  Not only that, you'll hear that

7  she asked/told Mr. Kelly she wanted her own place.  And when

8  Mr. Kelly told her he's not going to do that, the other woman

9  is just as love willing and supportive as you are he's not

10  going to get rid of, break up, with the other girl.  Not going

11  to get this new apartment for Jane Doe No. 5 to have by

12  herself guess what happened.

13          You're going to hear, and you're going to see, and

14  you're going to hear she unravelled.  No longer was she

15  supportive, was she close to Mr. Kelly.  Instead, it was like

16  the total opposite and you're going to her talk about how, I

17  anticipate, how horrible Mr. Kelly is.  You're going to get to

18  see the pictures as well, the happy times, the good times, and

19  somehow you will see that Jane Doe No. 5 won't have it.  That

20  is not the reality she'll tell you.  That relationship, even

21  though you see the pictures, you hear that we're out together,

22  all the other girls are -- all the other women are -- they're

23  going to say, yes, they seemed like they were the closest.

24  But wait till she testifies and wait till you see and hear the

25  web of truth, confusion, and unbelievability of that witness.

1          Jane Doe No. 5 is just another example, ladies and

2    gentlemen, of someone who ended up having a motive.  You're

3    going to hear what her motive ends up being.  And, ladies and

4    gentlemen, I suggest to you that when you hear her testimony

5    and you put it in context and you hear the totality of the

6    circumstances, you're not going to be able to believe her

7    either.  And if you don't believe the witness, and there's a

8    charge connected to that witness, you as jurors can say no.

9    And I anticipate that that will happen if you listen to all of

10   the testimony.

11          Now, I apologize, I'm slow, but I just want to make

12   sure you hear every word and it sinks in.

13          Now, ladies and gentlemen, what we have described

14   thus far is a number of women that are after revenge.

15   Revenge.  That word is going to make sense when you hear their

16   testimony.  Now, that's a big word, big shoes to fill, but I

17   think after you hear everyone's testimony that word will ring

18   true.

19          Now, you're going to hear all sorts things

20   throughout this trial from that stand and I suggest that some

21   things you're going to hear have to do with Mr. Kelly's choice

22   in partner.  In fact, ladies and gentlemen, you're not going

23   to hear anyone take the stand who is a male, who is listed as

24   a Jane Doe or John Doe in the indictment.  No.  You're going

25   to hear from a number of other people including the John Does

Case 1:19-cr-00286-AMD   Document 240   Filed 10/06/21   Page 96 of 208 PageID #: 5811

1   about Mr. Kelly's personal sexual desires.  Why, ladies and

2   gentlemen?

3          Well, ladies and gentlemen, there have been, you'll

4   hear that there have been rumors, there have been several

5   things like Mr. Kelly is gay.  Ladies and gentlemen, we're in

6   a court of law, you'll hear yourself whether he is gay,

7   bisexual, heterosexual, who cares?

8          Ladies and gentlemen, you're going to hear that some

9   of the sexual activities that Mr. Kelly and his girlfriends

10  engaged in, there were others that were involved.  Does

11  that -- strike that.

12         You're not going to hear that anybody, any of the

13  witnesses, any of the Jane Does objected to it.  Yes, now you

14  may hear about issues that they have with it, but doesn't it

15  make sense -- strike that.

16         Doesn't it make sense and you're going to hear and

17  make sense of the fact that a red flag doesn't get waved until

18  when?  The breakup.  And then, you'll hear how Mr. Kelly

19  enjoyed, wanted, was involved, with men.

20         Ladies and gentlemen, I suggest to you, we hope,

21  that as you listen to the testimony you will see that that

22  topic we call that fluff.  The topic of his sexual preference

23  it's window dressing and we hope that you see through that.

24         Ladies and gentlemen, you're also going to hear

25  about a number, and I'm sorry, I've moved past Jane Doe No. 5.

1  Now, you're going to hear about a number of civil lawsuits and

2  they will take the -- the individuals who were involved with

3  those including Jane Does will take the stand and tell you

4  about it and, in fact, Jane Doe No. 4 is going to tell you

5  that she gave the money back.

6          Ladies and gentlemen, like I said, I suggest you're

7  going to hear some details that you're literally going to say

8  that doesn't make sense.  Listen to yourself.  Let the alarms

9  go off.  You're going to hear that certain words, certain

10  verbiage was used between Mr. Kelly and his girlfriends.

11  "Daddy."

12          And somehow, ladies and gentlemen, you're going to

13  hear from that stand that the word "daddy" has now become

14  equivalent to the worst word you could ever think of.

15  "Daddy."  I suggest to you, you'll hear nobody was complaining

16  about having sexual relations with him, with Mr. Kelly.

17          But now, ladies and gentlemen.  Now, ladies and

18  gentlemen, we've got a word that I believe you will hear from

19  that stand is a common word, a word you used oftentimes in

20  sexual relationships, even not sexual relationships.  In fact,

21  you will hear that it's a common nice way of referring to

22  someone.

23          Now, ladies and gentlemen, I am confident that that

24  word is going to be slung in the mud.  That word is going to

25  be another rule.

Opening Statement - Ms. Blank Becker            98

1          Ladies and gentlemen, usually when you get rules,

2   how to play the game, for example.  How to perform in your

3   job, usually you don't get Rule 1 at the beginning and six

4   months into the job you get Rule 7.  That doesn't make sense.

5          So, ladies and gentlemen, when they start to talk to

6   you about all of these horrible things that occurred, think

7   about that and think about if that makes any sense.

8          Now, you're going to hear, ladies and gentlemen,

9   that Mr. Kelly cannot read or write.  You're going to hear,

10  ladies and gentlemen, and you're -- from the stand that

11  oftentimes, since he couldn't read or write.  He literally

12  came up with melodies and songs in his head.  And, ladies and

13  gentlemen, you're going to hear that he worked crazy, crazy

14  amounts of hours because his process as an artist is very

15  different than maybe someone else's.  And it's a

16  time-consuming process.

17         In fact, you'll hear that oftentimes, he worked

18  through the whole night of the not by himself, with his

19  engineers.  You'll hear that when he would go on tour, and

20  with a tour bus, he'd bring his band and his engineer and,

21  yes, girlfriends and, yes, his friends oftentimes.

22         But, ladies and gentlemen, what you're going to hear

23  is the different Jane Does are going to tell you about how

24  much time they spent with Mr. Kelly.

25         Ladies and gentlemen, you're going to see, and

1  you're going to hear, the dates of different tours that he was

2  on.  Mr. Kelly was on the move on a lot.  The studio was where

3  he created mentally.  And because he was a mental, cerebral,

4  thinker that's how he does his music.  In order to go from the

5  bottom to the top --

6            THE COURT:  Can I see the parties at the side,

7  please.  Excuse me just a minute.

8            (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                            Sidebar                      100
```

1            (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4            THE COURT:  First of all, you got to wrap this up.

5    You've been going on for quite a long time, it's getting

6    repetitive.

7            Second, we're back into the world of talking about

8    things that Mr. Kelly does or thinks that if he is not going

9    to testify, they're not admissible.  His process as an artist

10   is completely irrelevant.  I really do want to get going with

11   some testimony.  I'm asking you to wrap it up.  Please don't

12   do things that I keep telling you not to do.

13           Is there anything else that you want to say?

14           MS. GEDDES:  I'll save this for after the court day,

15   but I do have a concern with some of her arguments with

16   respect to which are arguments with respect to the charges

17   involving the exposure of a sexually transmitted disease.  I

18   think that counsel completely misstated what the charge is and

19   making the jury believe that we have to prove that he actually

20   is the reason for someone contracting an STD and that's not

21   the charge.

22           THE COURT:  I've instructed them what lawyers say is

23   not evidence but I do expect the lawyers to follow that rule

24   and you just have to talk about the evidence is going to show

25   and you really have to wrap it up.    (Sidebar concludes.)

Proceedings                                          101

1              THE COURT:  (Continuing.)  Go ahead.

2              MS. BLANK BECKER:  Thank you, Judge.

3              Ladies and gentlemen, the evidence that you will

4    hear from that stand, the Government has to prove to you

5    beyond a reasonable doubt each and every element of each

6    charge.

7              We anticipate that there will be a lot of testimony

8    coming from that stand, and I wish I could go through every

9    little part of it, but that's what closing arguments are for.

10             Ladies and gentlemen, ultimately the charges that

11   you are here to determine that the Government must proof

12   beyond a reasonable doubt, we suggest, that is going to be a

13   very tough pill to swallow.  Because, ladies and gentlemen,

14   the United States of America against Mr. Robert S. Kelly, that

15   is some big shoes to fill.  And fortunately, ladies and

16   gentlemen, we have you.  You get to fill those shoes, meaning

17   you get to listen and you get to interpret and listen to the

18   facts.  And we are confident that when you do that, you will

19   see there is no enterprise.  You will see and you will hear

20   that the testimony does not lineup with kidnapping, secret

21   rooms.

22             So we ask you keep an open mind and listen to the

23   testimony as it comes in.  And that way we, as the defense,

24   know Mr. Kelly will have a fair trial and that is why we are

25   all here today.

1              Thank you very much, ladies and gentlemen.

2              Thank you, Judge.

3              THE COURT:  Thank you.  All right, are you ready to

4    call your next witness?

5              MS. GEDDES:  Yes, your Honor.

6              THE COURT:  Your first witness.

7              MS. GEDDES:  Yes, your Honor.  The Government calls

8    Jerhonda Pace.

9              (Witness takes the witness stand.)

10             THE COURTROOM DEPUTY:  Please raise your right

11   hand.

12             (Oath administered.)

13             THE WITNESS:  I do.

14             (Witness sworn.)

15             THE DEPUTY CLERK:  State your name.

16             THE WITNESS:  Jerhonda Johnson Pace.

17             THE COURT:  You can have a seat.  Tell us your name

18   again.

19             THE WITNESS:  Jerhonda Johnson Pace.

20             THE COURT:  A couple of things before we begin.

21   It's critical that everybody in the courtroom can hear you, so

22   make sure that you're using the microphone all right.  Just do

23   your best to answer only the question that you're being asked.

24   And wait until whichever lawyer is questioning you finishes

25   before you start to answer.  Our court reporter taking down

1    everything that you say and if we start talking over each

2    other, it makes their jobs very difficult.

3            Do you have water and everything over there?

4            THE WITNESS:  No.

5            THE COURT:  Okay, hold on one second.

6            And then if somebody asks you a question and you

7    need to have it repeated or you don't understand it, just let

8    me know.  All right?

9            THE WITNESS:  Okay.

10           THE COURT:  Let's just, I'm still concerned with

11   this microphone.

12           MS. GEDDES:  It may help if the witness takes off

13   her mask so the jury and everyone else can see her as well.

14           THE COURT:  That's fine.

15           Then if you face Ms. Geddes, it will make it easier

16   too.  Go ahead.

17

18           (Continued on the following page.)

19

20

21

22

23

24

25

1  **JERHONDA JOHNSON PACE**,

2       called as a witness by the Government, having been

3       first duly sworn/affirmed by the Courtroom Deputy, was

4       examined and testified as follows:

5  DIRECT EXAMINATION

6  BY MS. GEDDES:

7  Q    Good afternoon.  How old are you today?

8  A    Twenty-eight.

9            THE COURT:  It sounds like the mic is not on.

10  Perhaps just hold it.

11  Q    What is your birthday?

12  A    April 19 --

13            (Microphone not working.)

14            THE COURT:  We do have to fix this.

15            It has to be that Ms. Geddes can use the microphone

16  on the desk.  If she uses that one, will the witness's

17  microphone work?

18            THE DEPUTY CLERK:  Yes.  She just can't use the one

19  on her chest.

20            THE COURT:  Put the microphone up to where you can

21  have access to it, Ms. Geddes.

22            MS. GEDDES:  I don't think we can go further than

23  this.  But I can do this.

24            THE COURT:  Let's try that.  And keep your voice up

25  too.

J. JOHNSON PACE - DIRECT - GEDDES                105

1          I think we established that you're 28 years old,

2    correct?

3               THE WITNESS:  Yes.

4               THE COURT:  Go ahead.

5    BY MS. GEDDES:

6    Q    What is your birthday?

7    A    April 19, 1993.

8    Q    I'm showing the witness only what is marked for

9    identification as Government's Exhibit 1.

10          This is just for -- can we have it just for the

11   witness only?  I think now it's also being published to the

12   jury.

13          I'm showing the witness only what is marked for

14   identification as Government's Exhibit 1.  Do you recognize

15   Government's Exhibit 1?

16   A    Yes.

17   Q    Who is shown in Government's Exhibit 1?

18   A    Rob.

19   Q    Do you know Rob's last name?

20   A    Kelly.

21   Q    Did you personally know Rob Kelly?

22   A    Yes.

23   Q    Is that a fair and accurate photograph of Rob Kelly?

24   A    Yes.

25               MS. GEDDES:  Government offers Government's Exhibit

1  1.

2          THE COURT:  Any objection?

3          MS. BLANK BECKER:  No objection.

4          THE COURT:  That will be in as Exhibit 1.

5          (Government's Exhibit 1 was received in evidence.)

6  BY MS. GEDDES:

7  Q    Do you see Mr. Kelly in the courtroom today?

8  A    Yes, I do.

9  Q    Can you please point to him and identify an article of

10 his clothing?

11 A    He's right there and he's wearing a gray suit.

12          THE COURT:  Indicating the defendant.

13          MS. GEDDES:  Thank you, Judge.

14 Q    Have you ever had sexual contact with the defendant?

15 A    Yes.

16 Q    How old were you when you first had sexual contact with

17 the defendant?

18 A    Sixteen.

19 Q    Approximately when was that?

20 A    May of 2009.

21 Q    How old was the defendant when you first had sexual

22 contact with him?

23 A    Between 41 and 43.

24 Q    Over what period of time did you have sexual contact with

25 the defendant?

1    A    For six months.

2    Q    When did that end?

3    A    January of 2010.

4    Q    Where did you grow up?

5    A    I grew up in a suburb of Chicago.

6    Q    What is the particular neighborhood?

7    A    Streamwood.

8    Q    In what direction is that from downtown Chicago?

9    A    Northwest.

10   Q    Approximately how far from downtown Chicago?

11   A    Forty-five minutes.

12   Q    How far did you go in school?

13   A    Eleventh grade.

14   Q    Did you go to school continuously until the 11 grade?

15   A    Yes.

16   Q    Did you eventually graduate from high school?

17   A    I graduated high school online.

18   Q    Taking classes online?

19   A    Yes.

20   Q    Are you still living in Chicago or its suburb?

21   A    No.

22   Q    Without saying where you are living now, when did you

23   leave Chicago or its suburbs?

24   A    2019.

25   Q    Are you married?

1   A    Yes, I am.

2   Q    Since when?

3   A    2014.

4   Q    You indicated that your last name now is Pace, is that

5   the name that you were born with?

6   A    No.

7   Q    What was the name that you used before you were married?

8   A    Johnson.

9   Q    Do you have any children?

10  A    Yes, I do.

11  Q    How many?

12  A    Four and one on the way.

13  Q    When are you due?

14  A    Any day.

15  Q    What is the age range of your children?

16  A    Ages one to six.

17  Q    Are you currently working?

18  A    I'm a business owner, so yes.

19  Q    What type of business?

20  A    Skin care.

21  Q    Growing up, were you a member of any fan clubs?

22  A    Yes, I was.

23  Q    Who's fan club were you a member of?

24  A    An R. Kelly fan club.

25  Q    What type of fan club was it?

J. JOHNSON PACE - DIRECT - GEDDES                109

1   A    It was a online fan club, on My Space.

2   Q    What is My Space?

3   A    A social network where people go to talk to other people.

4   Q    It's online, correct?

5   A    Yes, it is.

6   Q    Who, if anyone, from that fan club, that online fan club,

7   did you meet in person?

8   A    Dominique.

9   Q    I'm showing the witness only what is marked for

10  identification as Government's Exhibit 69, for the witness

11  only.

12          Do you recognize the individual in Government's

13  Exhibit 69?

14  A    Yes, I do.

15  Q    Who is that?

16  A    That's Dominique.

17  Q    Without saying it, do you know Dominique's true name?

18  A    Yes, I do.

19          MS. GEDDES:  May I publish Government's Exhibit 69

20  to the jury?

21          THE COURT:  Any objection?

22          MS. BLANK BECKER:  No objection.

23          THE COURT:  That's in evidence.

24          (Government's Exhibit 69 was received in evidence.)

25  Q    Did you know Dominique's true name?

J. JOHNSON PACE - DIRECT - GEDDES                110

1    A    Yes.

2    Q    I'm showing the witness only what is marked for

3    identification as 69A.

4         Is Dominique's full name written under her

5    photograph on 69A?

6    A    Yes, it is.

7         MS. GEDDES:  The Government offers 69A.

8         THE COURT:  Any objection?

9         MS. BLANK BECKER:  No, Judge.

10        THE COURT:  69A is in evidence.

11        (Government's Exhibit 69A was received in evidence.)

12        THE COURT:  I'm going to remind counsel to use the

13   microphone.

14   BY MS. GEDDES:

15   Q    Where did you first meet Dominique in person?

16   A    At R. Kelly's concert.

17   Q    Do you recall which concert that was?

18   A    The Double Up tour.

19   Q    Where was it that you met Dominique?  Where was the

20   concert?

21   A    In Chicago at the United Center.

22   Q    Do you recall when that was?

23   A    It was in December of 2007.

24   Q    After attending the defendant's Double Up concert in

25   2007, when did you next encounter the defendant?

1   A     I encountered him at court.

2   Q     Do you recall when that was?

3   A     That was in 2008.

4   Q     Do you remember when in 2008?

5   A     April 1st, 2008.

6   Q     April Fool's day?

7   A     Yes.

8   Q     How old were you then?

9   A     I was 14.

10  Q     Why were you at the courthouse?  Why were you at court?

11  A     Being a fan and curiosity.

12  Q     Did you go to court on multiple days to see the

13  defendant?

14  A     Yes, I did.

15  Q     For approximately what period of time did you go to court

16  to see the defendant?

17  A     It was from April until June.

18  Q     Of 2008?

19  A     Yes.

20  Q     Who, if anyone, did you meet by going to court on a

21  regular basis?

22  A     I met his manager.

23  Q     Who was his manager?

24  A     Derrel.

25  Q     Do you know Derrel's last name?

J. JOHNSON PACE - DIRECT - GEDDES                112

1   A    McDavid.

2   Q    Who, if anyone, else did you meet by going to court on a

3   regular basis?

4   A    I made a friend going to court on a regular basis.

5   Q    Who was that?

6   A    Keyonia.

7   Q    What is Keyonia's last name?

8   A    Jones.

9   Q    How old was Keyonia Jones?

10  A    Approximately 23.

11  Q    During the time that you went to court in Chicago, what

12  if any, contact did you have with the defendant?

13  A    When I would go to court, I would just see him come in

14  and out of court and I was able to speak with him.  And I also

15  got to speak with him at a park where he parked his tour bus

16  at.  So I was able to talk to him there.

17  Q    How did you know to go to the park?

18  A    We were, Keyonia and I was on the bus, and we were

19  leaving the courthouse, and we saw his tour bus.

20  Q    So just to be clear, when you said that you and Keyonia

21  were on the bus, you're not referring to the tour bus, are

22  you?

23  A    No.  We were on the Chicago public transportation bus.

24  Q    You saw the defendant's tour bus; is that correct?

25  A    That is correct.

J. JOHNSON PACE - DIRECT - GEDDES                113

1  Q    What, if anything, did the defendant say to you when you

2  saw him on those days when you went to court?

3  A    He was just speaking to me.  He would say hi to me.  And

4  on April Fool's day when I saw him for the very first time, I

5  was walking next to him.  And I said, like, I was a fan.  And

6  he said, thank you for your support.  And he also -- I said,

7  that it was my birthday coming up.  He said happy early

8  birthday.

9  Q    What, if any, conversation -- what, if anything, did the

10 defendant's manager, Derrel McDavid, say to you?

11 A    Derrel McDavid had promised Keyonia and I a T-shirt and

12 autograph once everything was over.

13 Q    Did you eventually get a T-shirt or an autograph?

14 A    I did not get a T-shirt, but I did get an autograph.

15 Q    Who's autograph?

16 A    R. Kelly's autograph.

17 Q    The defendant's?

18 A    Yes.

19 Q    Have you ever been inside of the defendant's home?

20 A    Yes, I have.

21 Q    Where does the defendant live?  Where did the defendant

22 live when you went there?

23 A    In Olympia Fields.

24 Q    Where is Olympia Fields?

25 A    South suburb of Chicago.

J. JOHNSON PACE - DIRECT - GEDDES          114

1  Q    Approximately how far is the defendant's residence in
2  Olympia Fields from where you were living in Streamwood?
3  A    On public trans, about two hours.
4  Q    Do you recall the very first time that you were inside of
5  the defendant's home in Olympia Fields?
6  A    Yes.
7  Q    Approximately when was that?
8  A    It was in May of 2009.
9  Q    How old were you?
10 A    I was 16.
11 Q    When you first went to the defendant's house in May 2009,
12 who, if anyone, did you go with?
13 A    I went with Keyonia.
14 Q    Keyonia Jones?
15 A    Yes.
16 Q    What led you to going to the defendant's house in May of
17 2009?
18 A    We were supposed to be going to a tattoo parlor and we
19 ended up getting invited to his home by Bubba.  He invited us
20 to a party.
21 Q    You said you were supposed to be going to a tattoo
22 parlor?
23 A    Originally, yes.
24 Q    How did it come to be that you were going to go to a
25 tattoo parlor?

1   A    Keyonia wanted to get a tattoo.  I posted about it on My

2   Space.  And that's when Bubba had messaged me.  He told me he

3   had a tattoo shop in Harvey.

4   Q    Did you and Keyonia start to go to the tattoo shop?

5   A    Yes, we did.

6   Q    What happened?

7   A    On our way to the tattoo shop, that's when Bubba had text

8   me and said that, invited us to R. Kelly's party.

9   Q    Do you know Bubba's -- is Bubba a nickname or true name?

10  A    Bubba is his nickname.

11  Q    Do you know the true name?

12  A    Yes.

13  Q    What is?

14  A    Jermaine Maxey.

15  Q    I'm showing the witness only for identification as

16  Government's Exhibit 9.  Do you recall the individual shown in

17  Government's Exhibit 9?

18  A    Yes, I do.

19  Q    Who is that?

20  A    This is Bubba.

21  Q    Is this photograph a fair and accurate photograph of how

22  Bubba appeared?

23  A    Yes.

24        MS. GEDDES:  Government offers Government's Exhibit

25  9.

1        THE COURT:  Any objection?

2        MS. BLANK BECKER:  No objection.

3        THE COURT:  That's in evidence.

4        (Government's Exhibit 9 was received in evidence.)

5        MS. GEDDES:  May we publish to the jury?

6        THE COURT:  Yes.

7        (Exhibit published.)

8   BY MS. GEDDES:

9   Q    What happened -- so you were invited to a party at the

10  defendant's house, did you go?

11  A    Yes.

12  Q    How did you get there?

13  A    We got there on the Metro train.

14  Q    How did you get from -- do you recall what stop you went

15  to?

16  A    211 Street.

17  Q    How did you get from the stop at 211 Street to the

18  defendant's house?

19  A    Keyonia and I walked.

20  Q    Approximately how far was that?

21  A    About a ten-minute walk from the train station.

22  Q    You eventually got to the defendant's residence?

23  A    Yes.

24  Q    Can you describe the outside of the defendant's house?

25  A    The outside of the house there is a gate that leads up --

J. JOHNSON PACE - DIRECT - GEDDES          117

1   there is a small driveway that leads up to a gate, then a

2   longer driveway that leads up to the house.

3   Q    I'm showing the witness only what is marked for

4   identification as Government's Exhibit 502A.  Do you recognize

5   what is shown in 502A?

6   A    Yes, I do.

7   Q    What is that?

8   A    This is the gate outside of his home.

9   Q    Is that a fair and accurate depiction of the gate outside

10  the defendant's home that you went to?

11  A    Yes, it is.

12            MS. GEDDES:  Government offers 502A.

13            THE COURT:  Any objection?

14            MS. BLANK BECKER:  No, Judge.

15            THE COURT:  That's in evidence.

16            (Government's Exhibit 502A was received in

17  evidence.)

18            MS. GEDDES:  May we publish to the jury, please?

19            THE COURT:  Yes.

20            (Exhibit published.)

21  BY MS. GEDDES:

22  Q    So you testified that you walked from the 211 Street

23  station to the defendant's residence.  What happened when

24  arrived at the gate outside his residence?

25  A    I contacted Bubba and let Bubba know I was there, and

1    Bubba came out to get me and Keyonia.

2    Q    Where did you go next?

3    A    We went inside of his house.

4    Q    Do you recall where inside his house you went to?

5    A    We went to the game room.

6    Q    What was going on at the defendant's house when you

7    arrived?

8    A    There was a party going on.

9    Q    You testified that you went to the game room.  Where in

10   the defendant's house was the game room?

11   A    It's on the main level.  So it's right above his

12   basement, the first level above the basement.

13   Q    What, if any, interaction did you have with the defendant

14   that day when you went to his house for a party?

15   A    I talked to him.  He told me that he remembered me from

16   court.  And we exchanged phone numbers.

17   Q    Do you recall how you exchanged phone numbers with the

18   defendant?

19   A    He asked me for my phone, and I handed him my phone and

20   he put his phone number in it.  Then he handed me his iPhone

21   and I put my phone number in it.

22   Q    What type of phone did you have back then?

23   A    I had a pink Palm Centro.

24   Q    What, if anything, did you tell the defendant about how

25   old you were at that party?

J. JOHNSON PACE - DIRECT - GEDDES          119

1    A    I told him I was 19.

2    Q    Were you 19?

3    A    No, I wasn't.

4    Q    How old you were again?

5    A    I was 16.

6    Q    What, if anything, did you do after you had that

7    conversation with the defendant and got his phone number?

8    A    Once I had his phone number, me and Keyonia and I went

9    to, we left away from his bar area where he was sitting.  We

10   just stayed there, we stayed listening to music for a few

11   minutes then we left.

12   Q    Why did you leave?

13   A    It was a way too loud and you can't really, we couldn't

14   hear each other talk without screaming in each other's ear.

15   Q    Approximately how long did you stay at the defendant's

16   house that night?

17   A    I stayed less than 30 minutes.

18   Q    When did you next speak with the defendant?

19   A    It was a couple days later.

20   Q    What happened when you spoke to him?

21   A    He had invited me to come back to his house.

22   Q    Do you recall how you were communicating with him?

23   A    Through text messaging and phone calls.

24   Q    You testified that he invited you to come to his house.

25   Did you accept his invitation?

1  A    Yes, I did.

2  Q    Where did you go?

3  A    I went back to his home in Olympia Fields.

4  Q    How did you get there?

5  A    On the Metro train.

6  Q    What happened?  Did you go to the same stop or a

7  different one?

8  A    I went to the 211 Street stop.

9  Q    What happened when you got to the 211 Street stop?

10  A    I was picked up.

11  Q    How were you picked up?

12  A    I was picked up by someone in a red and black Chrysler

13  300.

14  Q    Do you know who arranged for you to be picked up?

15  A    Yes, I do.

16  Q    Who?

17  A    Rob did.

18  Q    Do you remember the particular individual who picked you

19  up that day?

20  A    Yes.

21  Q    Who was it?

22  A    It was Anthony.

23  Q    Who is Anthony?

24  A    A runner.

25  Q    When you say a runner, what do you mean?

1  A    He was a runner for Rob, like, so he would run errands.

2  Q    So Anthony picked you up at the train station, and where

3  did you go from there?

4  A    To Rob's house.

5  Q    In Olympia Fields?

6  A    Yes.

7  Q    What happened when you arrived at the defendant's

8  residence in Olympia Fields?

9  A    When I got there I had my bathing suit because he told me

10 to bring my bathing suit from our conversation.  And when I

11 got there, I contacted him and let him know that I was there

12 and I was in the pool area.  And he told me that he was

13 getting a haircut and that he would be down soon, to go change

14 into my bathing suit.

15 Q    You testified that the defendant had told you to bring

16 your bathing suit; is that correct?

17 A    Yes.

18 Q    When did the defendant tell you to bring your bathing

19 suit?

20 A    When he invited me to his house.

21 Q    When Anthony drove you to his house in Olympia Fields,

22 how did you get to the pool room once you arrived there?

23 A    Anthony walked me to the pool room through a side door.

24 Q    Just to be clear to the jury, when you say pool room are

25 you referring to a swimming pool or pool game?

J. JOHNSON PACE - DIRECT - GEDDES          122

1   A     It's a swimming pool.

2   Q     What happened next?

3   A     After I got there, I had contacted him and let him know.

4   And he said he was getting his haircut, he'll be down soon.

5   He told me to change into my bathing suit, which I did.  I

6   went and changed into my bathing suit.  Then I came back out

7   and I was just standing there, then he walked into the pool

8   room.

9   Q     And just to be clear, the pool room is that an outside

10  pool or an indoor pool?

11  A     Indoor pool.

12  Q     You said you changed into your bathing suit, what type of

13  bathing suit was it?

14  A     Two-piece bathing suit.

15  Q     What happened when the defendant came into the pool area?

16  A     He sat down on a lounger and told me to walk back and

17  forth.  And when I walked back and forth, to remove a piece of

18  my bathing suit every time I came back towards him.

19  Q     What did you do?

20  A     I did what I was told.  I walked back and forth and I

21  removed my bathing suit.

22  Q     And when you said you removed your bathing suit, how did

23  you remove your bathing suit?

24  A     I untied it as I was walking and dropped it on the floor.

25  Q     What happened after that?

1  A    I walked over to him and he grabbed me and we started

2  kissing.

3  Q    At that time when the defendant grabbed you what, if

4  anything, were you wearing?

5  A    Nothing.

6  Q    What happened when you started -- when the defendant

7  started kissing you?

8  A    He picked me up and took me into his game room, which is

9  connected to his swimming pool room.

10 Q    What happened in the game room?

11 A    That's when he started performing oral sex on me.

12 Q    When you say oral sex, what do you mean?

13 A    Him using his mouth on my vagina.

14 Q    What, if anything, did the defendant say when he was

15 giving you oral sex?

16 A    He just gave me oral sex, and then, he wasn't saying

17 anything.

18 Q    Okay.  What happened after that?

19 A    That's when I felt uncomfortable and then I told him that

20 I was actually 16.  I told him my real age and I showed him my

21 state ID.

22 Q    Why did you tell the defendant your true age?  You said

23 you felt uncomfortable, what do you mean?

24 A    I felt uncomfortable.  I felt it wasn't right, that I

25 should tell him my age.

J. JOHNSON PACE - DIRECT - GEDDES                124

1   Q    You testified that you showed the defendant your state

2   ID, do you recall when you got that state ID?

3   A    Yes, it was my 16th birthday gift, so a couple days after

4   my 16th birthday.

5   Q    Who arranged for you to get that state ID?

6   A    My stepfather.

7   Q    At the time when you went to the defendant's house, did

8   you have a driver's license?

9   A    No, I did not.

10  Q    So instead you had a state ID?

11  A    Yes, I did.

12  Q    How, if at all, did the defendant respond when you told

13  him your true age of being just 16 years old?

14  A    He asked me, what is that supposed to mean?  And he told

15  me to continue to tell everyone that I was 19 and to act 21.

16  Q    What happened after that?

17  A    After that I performed oral sex on him.

18  Q    And again, just to be clear, what do you mean by that?

19  A    That was me using my mouth on his penis.

20  Q    What, if anything, did the defendant say as you gave the

21  defendant oral sex?

22  A    He told me that he was going to train me on how to please

23  him sexually and he was going to teach me how to moan and hum

24  on his penis at the same time.

25  Q    Did you have any other sexual contact with the defendant

J. JOHNSON PACE - DIRECT - GEDDES          125

1   on that occasion?

2   A    Yes, I did.

3   Q    What happened?

4   A    He bent me over the back of his sofa and he took my

5   virginity.

6   Q    At the time you were a virgin; is that correct?

7   A    Yes.

8   Q    What, if any, protection did the defendant use?

9   A    None.

10  Q    When you say that he bent you over, just to be clear for

11  the record, what exactly happened between you and the

12  defendant then?

13  A    He just took me behind the back of his couch and he like

14  pushed at my neck and bent me over, and then he put his penis

15  inside of my vagina.

16  Q    Prior to engaging in sexual contact or sexual intercourse

17  with the defendant, what, if anything, did you tell the

18  defendant about your virginity?

19  A    That I was a virgin.

20  Q    Did you tell him that?

21  A    Yes.

22  Q    How did you respond?

23  A    He said that's good.  And that's when he talked that he

24  would train me.

25  Q    Before you had sexual intercourse with the defendant,

J. JOHNSON PACE - DIRECT - GEDDES          126

1  what, if anything, did he tell you about any sexually

2  transmitted diseases that he had?

3  A      Nothing.

4  Q      What happened after that?

5  A      After?

6  Q      After you had intercourse with the defendant, do you

7  remember, what, if anything, happened after that?

8  A      Yes, we had drinks.

9  Q      What type of drink did you have?

10 A      We had a blue drink and he called it Sex In The Kitchen.

11 Q      Who prepared the drink?

12 A      The defendant.

13 Q      How did you feel after or during -- did you drink the

14 drink?

15 A      I did drink it.

16 Q      How did you it make you feel?

17 A      It was delicious.  I just started feeling a bit ill, and

18 I told the defendant I wasn't feeling well.

19 Q      What happened once you told the defendant you weren't

20 feeling well?

21 A      He opened the door to the mirror room, and he told me I

22 can lay down in the mirror room.

23 Q      Can you describe the mirror room?

24 A      A room where the entire room is just a mirror, there is a

25 huge mirror above the bed.

1  Q    Where is the mirror room in relation to the game room

2  where you said you had been with the defendant?

3  A    It's connected to the game room.

4

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    EXAMINATION CONTINUES

2    BY MS. GEDDES:

3    Q    What happened once you were inside of the mirror room?

4    A    I just laid down.

5    Q    And where, if anywhere, did the defendant go once you

6    were in the mirror room?

7    A    He told me -- well, he was preparing for a party that he

8    was gonna have later, so he ended up leaving the mirror room.

9    Q    And where did you go?

10   A    About, I want to say, ten minutes later I went

11   downstairs.

12   Q    And what happened downstairs?

13   A    I went into the studio.

14   Q    And what happened once you were in the studio?

15   A    That's where I hung out until 6 o'clock in the morning.

16   Q    And at 6 o'clock in the morning -- by the way, were you

17   hanging out by yourself or with others?

18   A    I was by myself, but there were people coming in and out

19   of the studio.

20   Q    And what happened at 6:00 in the morning?

21   A    That's when I ended up texting the defendant telling him

22   I was ready to leave.

23   Q    And what, if anything, did the defendant say when you

24   texted him this?

25   A    I didn't hear back from him, but then someone came down

1    there and they brought me an envelope and told me that they

2    were gonna drop me off at the train.

3    Q    And when you say someone came down, who are you referring

4    to?

5    A    One of the runners.

6    Q    Someone who was working for the defendant?

7    A    Yes.

8    Q    Now, you said that after you were in the mirror room for

9    a time, you went down in the studio?

10   A    Yes.

11   Q    What type of studio was it?

12   A    The Cabin room.

13   Q    And just to be very clear to the jury, when you say

14   studio, what type of studio was it?

15   A    It's a music recording studio.

16   Q    Okay.

17         And where was the recording studio?

18   A    In the basement of the home.

19   Q    Could you get to the recording studio from the inside of

20   the home?

21   A    Yes, you can.

22   Q    And is that how you got there?

23   A    Yes.

24   Q    You testified that someone, one of the defendant's

25   runners, brought you an envelope.

1          What, if anything, was inside of that envelope?

2    A    It was $50.

3    Q    What did you understand the $50 to be for?

4    A    It was for me to get home.

5    Q    And did you then go home?

6    A    Yes, I did.

7    Q    Did you continue to see -- did you see the defendant

8    again after that?

9    A    Yes.

10   Q    Do you recall how soon after the first time that you had

11   sexual contact with the defendant you saw the defendant?

12   A    I don't recall.

13   Q    Okay.

14          Without saying -- I understand you don't recall the

15   specific date, but approximately how long was it before you

16   saw the defendant again?

17   A    About a week.

18   Q    Who, if anyone, did you introduce to the defendant?

19   A    Dominique.

20   Q    I think your mic just cut out for a minute.  Can you say

21   that again?

22   A    Dominique.

23   Q    Is that the Dominique that was shown in Government

24   Exhibit 69, which is in evidence, and I'll place on the

25   screen?

1              (Exhibit published.)

2    A    Yes.

3    BY MS. GEDDES:

4    Q    Why did you introduce Dominique to the defendant?

5    A    Because I was -- he told me that since I was at the

6    studio and I was gonna be hanging out and he would be working

7    for long periods of time recording music, that I could bring a

8    friend to hang out with so that I'm not bored.

9    Q    And how did you introduce the defendant to Dominique?

10   A    He wanted her phone number because he wanted to keep up

11   with everyone that was coming around him.  So, I gave him

12   Dominique's phone number and I gave Dominique his phone

13   number.

14   Q    And just could you remind the jury how you knew Dominique

15   again?

16   A    Dominique was a part of the fan club on My Space.

17   Q    To your knowledge, had Dominique met the defendant before

18   you gave her his number?

19   A    No.

20   Q    To your knowledge, did Dominique end up meeting the

21   defendant?

22   A    Yes.

23   Q    And did she end up going to the defendant's house?

24   A    Yes.

25   Q    Did you see Dominique inside of the defendant's house at

1    Olympia Fields?

2    A    No.

3    Q    What made you believe then that Dominique was, in fact,

4    going to the defendant's house in Olympia Fields?

5    A    We were texting about being at his house at the same

6    time.

7    Q    And you testified earlier that the defendant had

8    suggested that you bring a friend so that you wouldn't be

9    bored, is that right?

10   A    Yes.

11   Q    What, if anything, prevented you and Dominique from

12   seeing each other inside Olympia Fields if you were both there

13   at the same time?

14   A    We were not able to leave out of the rooms.  Whatever

15   area we were in, we couldn't leave out to go meet up.

16   Q    What made you believe that?

17            MS. BLANK BECKER:  Objection, Judge.

18            THE COURT:  Overruled.

19   BY MS. GEDDES:

20   Q    What made you believe that you were not able to leave the

21   rooms and meet up?

22   A    Because it was a part of the rules.

23   Q    Whose rules?

24   A    Rob's rules.

25   Q    The defendant?

1    A    Yes.

2    Q    Now, you testified earlier that the defendant initially

3    put his telephone number into your pink Palm Centro, is that

4    correct?

5    A    Yes.

6    Q    As you sit here today, do you remember the telephone

7    number for that telephone?

8    A    Yes.

9    Q    What was the telephone number?

10   A    708-337-9300.

11   Q    And just to be clear, whose phone number did you just

12   give?

13   A    That's Rob's number.

14   Q    Okay.

15        And so I was asking do you remember the -- I asked a

16   bad question, but let me ask another question.

17        Do you recall your telephone number that you were

18   using when you had the pink Palm Centro?

19   A    No.

20   Q    Okay.

21        Whose name was your telephone, your telephone number

22   in, that pink Palm Centro?

23   A    My mom's name.

24   Q    What is your mother's name?

25   A    Lutrinia Woods.

1   Q    What, if anything, happened to your pink Palm Centro?

2   A    Rob took it away.

3   Q    Why, what happened?

4   A    He didn't want me -- he told me that he didn't want me in

5   contact with anyone other than him, and he didn't think that

6   Keyonia was a good friend.

7   Q    You just mentioned Keyonia.

8        Is this the Keyonia who you met at court supporting

9   the defendant?

10  A    Yes.

11  Q    How did Keyonia come up when you were -- when the

12  defendant took your pink Palm Centro?

13  A    He told me that she wasn't a good friend and that I

14  needed to stop talking to her and that he only wanted me

15  talking to him.

16  Q    How did you respond when the defendant took your pink

17  Palm Centro?

18  A    I just told him that I wanted my memory card out of the

19  phone.

20  Q    And by "memory card," what are you referring to?

21  A    It's a small SD card that goes inside of a phone to --

22  it's to hold, like, pictures.

23  Q    Why did you want your SD card?

24  A    Because my niece had died and it was, like, the only

25  photos that I had of my niece was on that phone, on my SIM --

SAM      OCR      RMR      CRR      RPR

1    I mean not my SIM card, it was on my SD card.

2    Q    How did the defendant respond when you asked for the SD

3    card?

4    A    Well, he was okay with it once I told him about me

5    wanting the pictures of my niece dying.  And he allowed me to

6    take my SD card.

7    Q    Did you ever get your pink Palm Centro back?

8    A    No.

9    Q    Did you get a new phone?

10   A    Yes, I did.

11   Q    What did you do?

12   A    Well, he gave me money to get a new phone, and I went to

13   Walmart and I got a Virgin Mobile phone.

14   Q    And when you say he gave you money to get a new phone,

15   who were you referring to?

16   A    Rob.

17   Q    The defendant?

18   A    Yes.

19   Q    And do you recall the telephone number for that new

20   phone?

21   A    I do not.

22   Q    Do you recall whether you used that new phone or if you

23   continued to get additional phones during the time that you

24   were with the defendant?

25   A    I used that new phone and I had an additional phone.

1    Q     And as you sit here today, do you recall the telephone

2    numbers -- the telephone number for that other phone?

3    A     No.

4    Q     Did you have the same -- did you use the same phone

5    for -- when you had -- withdrawn.

6          The telephone number that you had when you got a new

7    phone, did you use it only with the new phone or also with

8    other phones?

9          MS. BLANK BECKER:   Objection.

10         THE COURT:   Overruled.

11   A     Can you repeat the question?

12   Q     Yes.

13         You testified that you got a new phone at Walmart.

14   Is that correct?

15   A     Yes.

16   Q     And was there a telephone number associated with that

17   particular phone?

18   A     Yes.

19   Q     Did you use that telephone number with any other phones,

20   besides the one you got from Walmart?

21   A     No.

22   Q     During the time, those six months that you testified you

23   were spending time with the defendant, who were you most in

24   communication with?

25         And when I mean communication, I'm referring to

Pace - direct - Geddes                           137

1   telephonic communication.

2   A     Dominique and Keyonia, and my other friend, Danika.

3   Q     Any family members?

4   A     My older sister.

5   Q     How about your mom?

6   A     I would talk to my mom, but I would talk to the others

7   more frequently.

8   Q     Okay.

9         What is your grandmother's name?

10  A     Loretta Johnson.

11  Q     Did you speak to her over the telephone?

12  A     I did.

13  Q     And you testified that you also spoke with Keyonia.

14        What is -- do you recall Keyonia's -- do you know

15  Keyonia's mom's name?

16  A     I know her first name, I don't know her last name.

17  Q     What is her first name?

18  A     Pearlann.

19  Q     I'm sorry, can you say it?

20  A     Pearlann.

21  Q     Like two names, Pearlann?

22  A     Yes, two names put together.

23  Q     Okay.

24        Did you use the telephones that you just described

25  to communicate with the defendant?

1    A    Yes, I did.

2            MS. GEDDES:  I want to show the witness only

3    Government Exhibit, what's been marked for identification as

4    Government Exhibit 929.

5    Q    Before I do, do you know your grandmother's telephone

6    number?

7    A    Yes, I do.

8    Q    Okay.

9            MS. GEDDES:  I am going to show the witness only

10   what's been marked for identification as Government Exhibit

11   929.

12   BY MS. GEDDES:

13   Q    Do you recognize what's shown in Government Exhibit 929?

14   A    Yes.

15   Q    What is that?

16   A    My grandmother's telephone number.

17           MS. GEDDES:  The Government offers 929.

18           THE COURT:  Any objection?

19           MS. BLANK BECKER:  No objection, Judge.

20           THE COURT:  Okay, that's in evidence.

21           (Government's Exhibit 929 was received in evidence.)

22   BY MS. GEDDES:

23   Q    You testified earlier that you connected the defendant to

24   your friend Dominique.

25           How old was Dominique when you connected her to the

1    defendant?

2    A    Seventeen.

3    Q    So, a year older than you?

4    A    Yes.

5    Q    What, if anything, happened when you were inside of the

6    defendant's house at Olympia Fields involving Dominique?

7    A    We would just be texting one another and trying to meet

8    up in the home.

9    Q    Was there a time when there was an incident relating to

10   Dominique that happened at Olympia Fields?

11   A    Yes.

12   Q    What happened?

13   A    The police were called --

14            MS. BLANK BECKER:  Objection, Judge.

15            THE COURT:  Overruled.

16   A    The police were called to his home to look for a

17   17-year-old Dominique.

18   Q    Were you present for that?

19   A    Yes, I was.

20   Q    What do you recall happening?

21   A    I remember being back in his African safari room and him

22   being on the phone talking to someone about the police being

23   at his gate.

24   Q    And just to be clear, when you said you remember him

25   being in the African safari room, who was the "him" in that

1   sentence?

2   A    Rob.

3   Q    And what did you hear him say, the defendant say?

4   A    He was on the phone with his attorney and his attorney

5   told him not to --

6              MR. CANNICK:  Objection.

7              THE COURT:  Hold on a second.

8              Can I see counsel?

9              I think actually this might be a good time for the

10  jury to have a break.  They've been sitting here for a good

11  little while.

12             So, we'll break.  Please do not talk about the case

13  at all.  I am going to say that every time, but I mean it.

14  And then we will see you, it is probably going to be about

15  15 minutes.  Okay?

16             THE COURTROOM DEPUTY:  All rise.

17             (Jury exits.)

18             MS. GEDDES:  Can he escort the witness out?

19             THE COURT:  Yes, let's have the witness taken out.

20             (Witness steps down and exits the courtroom.)

21             THE COURT:  Okay, everybody can have a seat.

22             Okay, first of all, whoever is doing the questioning

23  is the one who objects.  Just one lawyer on a witness.  You

24  can nudge the person and tell them to object, but that's the

25  way we are going to do it.

1          It did sound like something inadmissible was coming

2    out, so I take it that's why you were objecting to what the

3    lawyer said, unless she heard the conversation.

4          MS. GEDDES:  She is testifying about what she heard

5    because she was present in the room when the defendant was

6    talking to his attorney.

7          So, I think there is no privilege because the

8    defendant was aware that she was right there.

9          THE COURT:  And what is the substance of the

10   statement that you anticipate will come out?

11         MS. GEDDES:  I think that he is going to advise his

12   attorney that there was members of the Olympia Fields Police

13   Department there looking for a 17-year-old girl, who was

14   Dominique.

15         And why this is important is that the defense has

16   already brutally attacked Ms. Pace's credibility.  And, in

17   fact, in, I think, the opening said she was only at the

18   defendant's residence on one occasion.

19         This is a second occasion, and the Government will

20   call as a witness the officer who responded to Olympia Fields

21   and will directly corroborate what the witness is testifying

22   to.

23         THE COURT:  Well, I don't have any problem with that

24   and I don't think that counsel is objecting to that, but I

25   think is it your position that the witness could hear both

Pace - direct - Geddes                             142

1    sides of the conversation?

2              MS. GEDDES:  Yes.

3              THE COURT:  And what is the relevance of what the

4    lawyer says?

5              MS. GEDDES:  I don't even think she is going to talk

6    about what the lawyer said, it's just in order to establish

7    that the defendant was saying that there were police officers

8    present at Olympia Fields.  That's how she learns about it.

9              THE COURT:  And why is it relevant that it's the

10   lawyer that he's speaking to and how does she know that?

11             MS. GEDDES:  How does she know that it's an

12   attorney?

13             THE COURT:  Yes.

14             MS. GEDDES:  For one, she recognized the attorney

15   because she had been in court for two months --

16             THE COURT:  Okay.

17             MS. GEDDES:  -- and it was the same attorney, but

18   we're not going to go into that.

19             And -- or two, it just explains to the jury why it

20   is that the defendant would be having this conversation in

21   front of her and the attorney does then respond, you know,

22   don't let them in unless they have a warrant, which gives her,

23   you know, some ease because in addition to a 17-year-old girl

24   being present in Olympia Fields, there was a 16-year-old girl,

25   namely her.

 1          THE COURT:  Ms. Becker, what's your position?

 2          MS. BLANK BECKER:  (No response.)

 3          THE COURT:  I don't think anybody is objecting to

 4    the defendant's statements, because those are the defendant's

 5    statements.

 6          I'm correct about that, right?

 7          MS. BLANK BECKER:  That is correct, Judge.

 8          THE COURT:  All right.

 9          I take it that the objection, I don't see the need

10    to have the person identified as the lawyer.  I think what is

11    relevant is for the fact that the statement was made.  And if

12    you are having a police officer testify that he responded to

13    that, I think that's all you need.

14          And so, then the only question is, when the jury

15    comes back, sometimes lawyers don't want me to highlight

16    statements to tell the jury to disregard something, but what

17    I'll tell them is the objection is sustained and that you can

18    ask the question again, and lead her to ask her what it was

19    that he said.

20          Does that satisfy everybody?

21          MS. BLANK BECKER:  Yes, Judge, understood.

22          THE COURT:  Okay.

23          Then we'll be in recess just for about between five

24    and ten minutes.

25          (Judge ANN M. DONNELLY exited the courtroom.)

1          (Recess taken.)

2          (In open court - jury not present.)

3          THE COURTROOM DEPUTY:  All rise.

4          (Judge ANN M. DONNELLY entered the courtroom.)

5          MS. GEDDES:  Can we bring the witness out now?

6          THE COURT:  Yes.

7          I just have one thing that I want to just raise with

8     you.  Just wait until Mr. Kelly comes out.

9          (Defendant entered the courtroom.)

10          THE COURT:  I don't want to spend a lot of time on

11    this particular thing.

12          Alternate Number 3 is telling Ms. Greene that her

13    new job is not going to pay her and she's not going to get

14    health benefits.  She's not asking to be excused, but I can

15    propose a couple of things.

16          I think I can find out the place where she works and

17    find out what the story is.  I haven't done this in a while,

18    but I can call the employer and see what the story is.  I

19    propose that we do that.

20          She is not asking to be let go, but I feel like

21    that's coming.  And so rather than just doing it, I think

22    maybe what we'll do is bring her in afterwards.  Today we are

23    going to work until 5:30.  After that, I'll bring her in, I'll

24    speak to her, and then I'll have Ms. Greene get whatever

25    information we need to get from her.

1          I am, obviously, not going to ask her where she

2   works on the record or anything like that, but I will get that

3   if everybody is in agreement that that's how we should

4   proceed.

5          I am going to take that as a yes.

6          Let's get the witness.

7          (Witness enters and resumes the stand.)

8          THE COURT:  All right, let's get the jury, please.

9          MS. GEDDES:  And, Your Honor I believe that the

10  witness no longer needs to hold the mic.

11         THE COURT:  You got it working now.

12         MR. CANNICK:  And, Your Honor, you may see me

13  objecting.  I am actually going to take this witness.

14         THE COURT:  Oh, you've changed, all right.

15         (Pause.)

16         THE COURTROOM DEPUTY:  All rise.

17         (Jury enters.)

18         THE COURTROOM DEPUTY:  You may be seated.

19         The witness is reminded that she's still under oath.

20         THE COURT:  All right, folks, I am sustaining the

21  objection to the last question.

22         Why don't you put another question to the witness?

23         MS. GEDDES:  Thank you, Judge.

24  BY MS. GEDDES:

25  Q    What, if anything, do you recall the defendant saying

1  during the telephone conversation that you overheard in

2  Olympia Fields?

3  A    That the police were at his gate looking for a

4  17-year-old Dominique.

5  Q    And who did you understand the Dominique to be?

6  A    The Dominique I introduced him to, my friend.

7          MR. CANNICK:  Objection, Your Honor.

8          THE COURT:  Did you know any other Dominiques

9  besides the one that you had met before?

10          THE WITNESS:  No.

11          THE COURT:  Okay, next question.

12          Mr. Cannick, make sure your microphone is on.

13          MR. CANNICK:  Thank you.

14  BY MS. GEDDES:

15  Q    Now, you testified earlier that you and Dominique never

16  saw each other inside the defendant's residence at Olympia

17  Fields.

18          When, if ever, were the two of you together outside

19  of the defendant's house?

20  A    We hung out a lot.

21  Q    Let me rephrase.  Let me ask another question.

22  A    Okay.

23  Q    Were you and Dominique ever together at Olympia Fields,

24  but outside of the house as opposed to inside?

25  A    Yes.

1   Q     What happened?

2   A     We ran through his gate.

3   Q     And when you say "his gate," who are you referring to?

4   A     Rob.

5   Q     And who went through the defendant's gate?

6   A     Dominique and I.

7   Q     Why were you running through the defendant's gate?

8   A     It was just something childish that we decided to do.

9              MR. CANNICK:  I'm sorry, I didn't hear that.

10             THE COURT:  Just repeat your answer, could you?

11             THE WITNESS:  It was something childish that we

12  decided to do.

13  BY MS. GEDDES:

14  Q     How old were you?

15  A     Sixteen and seventeen.

16  Q     You were sixteen and Dominique was seventeen?

17  A     Yes.

18  Q     What happened when you ran through the gate?

19  A     Well, when we ran through the gate we actually got

20  caught.

21  Q     By who?

22  A     Bubba.

23  Q     Is that the Bubba who first invited you to the

24  defendant's house?

25  A     Yes, it is.

1    Q    And what happened when you were caught?

2    A    Once we were caught, Bubba had came out and he asked us

3    why did we run through the gate and we didn't have an answer,

4    and he called Rob.

5            And then I asked -- I told Bubba that I had some

6    heels that I had left there.

7    Q    You mentioned "heels."

8            Are you referring to shoes?

9    A    Yes.

10   Q    And where did you say you had left the shoes?

11   A    I told him that I left them in Music 1.

12   Q    What is Music 1?

13   A    Music 1 is -- it's a studio inside of Rob's house.

14   Q    At Olympia Fields?

15   A    Yes.

16   Q    Had you, in fact, left a pair of heels in Music 1?

17   A    Yes, I did.

18   Q    Was that why you were there that day?

19   A    No, it wasn't.

20   Q    What, if any, conversations did you have with the

21   defendant about running through his gate?

22   A    Once I ran through the gate, I ended up getting a phone

23   call from him later on that night, later in the night.

24   Q    What did he say?

25   A    He was mad about me running through his gate and told

1    me that I was, like, childish and that I would be on

2    punishment.

3    Q    Now, when you and Dominique went to the defendant's house

4    that day, had you been invited?

5    A    No.

6    Q    Okay.

7         During the time that you spent with the defendant,

8    what, if anything, did the defendant ever tell you to write or

9    sign?

10   A    I had to sign a non-disclosure agreement and I had to

11   write a letter saying that I had stolen a hundred-thousand

12   dollars' worth of jewelry from him and that I had stolen money

13   from him.  And that my -- my sister had put me up to say that

14   he gave me genital herpes.

15   Q    Let's back up a moment.

16        You first mentioned a non-disclosure agreement.

17        Whose idea was it for you to sign a non-disclosure

18   agreement?

19   A    It was Rob's idea.

20   Q    The defendant's?

21   A    Yes.

22   Q    And why did you understand the defendant to be telling

23   you to sign a non-disclosure agreement?

24   A    Because he had people around him that he couldn't trust,

25   so I had to prove that I was trustworthy.

1  Q    Did you sign the agreement?

2  A    Yes, I did.

3  Q    Prior to signing it, did you read it?

4  A    No, I did not.

5  Q    Were you given a copy of the agreement?

6  A    No.

7  Q    You also just mentioned a letter that the defendant told

8  you to write.

9         Do you recall the circumstances under which the

10  defendant told you to write that letter?

11  A    Yes, it was all about gaining his trust and he told me

12  that if it wasn't true, that I wouldn't mind writing it.

13         THE COURT:  I'm sorry, I didn't hear what you said.

14         THE WITNESS:  It was all about gaining his trust and

15  he told me if it wasn't true, that I wouldn't mind writing it.

16  BY MS. GEDDES:

17  Q    And what is it that the defendant told you to write?

18  A    He told me to write that I had stolen a hundred-thousand

19  dollars' worth of jewelry from him, and that my sister had put

20  me up to say that he had given me genital herpes, and that I

21  had stolen money from him.  And also, that I worked for him.

22  Q    All right, let's start with did you, in fact, then write

23  the letters?

24  A    Yes, I did.

25  Q    Let's start with the part of the letter that said you had

1    stolen a significant amount of jewelry.

2           Had you, in fact, stolen anything from the

3    defendant's house?

4    A    No.

5    Q    And you also testified that he told you to write

6    something about your sister.

7           Was there any truth to that?

8    A    No.

9    Q    Whose idea was it to write about stealing the jewelry and

10   the sister's plan?

11   A    It was Rob's idea.

12   Q    And you, in fact, did write the letter?

13   A    Yes, I did.

14   Q    What did you do with the letter once you had written it?

15   A    I gave it to Rob.

16   Q    Were you given a copy of that letter?

17   A    No.

18   Q    You also mentioned that he asked you to sign something

19   about working for him, is that correct?

20   A    Yes.  I had to sign that I worked -- I had worked for him

21   and sign another letter saying that he fired me.

22   Q    Now, at the time, how old were you?

23   A    I was 16.

24   Q    Who -- what were you given that you had to sign?

25   A    It was two -- two contracts saying that I worked with him

1  and one saying that I was fired.

2  Q    Had you ever worked for the defendant?

3  A    No.

4  Q    Were you ever fired from working for the defendant?

5  A    No.

6  Q    Did you read those contracts before you signed them?

7  A    Partially.

8  Q    Were you given a copy of either of them?

9  A    No.

10  Q    What, if anything -- what, if any, instructions did the

11  defendant give you regarding signing the letters -- signing

12  that contract, the one about being hired and fired?

13  A    He told me whatever I do, just don't write the date on

14  anything.

15  Q    Did you write a date on it?

16  A    No.

17  Q    At some point after you went to the defendant's house in

18  May of 2009, did he leave the area?

19  A    Can you rephrase the question?

20  Q    Yes.

21        At some point after you met the defendant in -- at

22  his house in May of 2009, did he leave the Chicago area?

23  A    Yes, he did.

24  Q    Where did he go?

25  A    I'm sorry, it wasn't in May of 2009.  It was -- it wasn't

1    in May that he left the Chicago area.

2    Q    Okay, but at some point after May of 2009 --

3    A    Yes.

4    Q    -- did he leave?

5    A    Yes.

6    Q    Do you remember when it was that he left?

7    A    Yes.

8    Q    When was it?

9    A    It was in June of 2009.

10   Q    And what happened in June of 2009, where did he go?

11   A    He went to South Africa.

12   Q    How did you learn that the defendant was going to South

13   Africa?

14   A    He talked about it.

15   Q    And what did you understand the defendant was going to

16   South Africa for?

17   A    I believe it was for the World Cup that was happening in

18   South Africa.

19   Q    Okay.  Approximately how long was the defendant in South

20   Africa or away from Chicago, at least?

21   A    For a couple weeks.

22   Q    What, if any, communication did you have with the

23   defendant while he was outside of the U.S.?

24   A    Text messaging and phone calls.

25   Q    You continued to speak with him?

1    A    Yes.

2    Q    What happened once he returned to the Chicago area, did

3    you see him again?

4    A    Yes, I did.

5    Q    And you testified earlier that you spent approximately

6    six months with the defendant.  Is that correct?

7    A    Yes, it is.

8    Q    How regularly did you see the defendant during that

9    six-month period?

10   A    I would see him every visit that I was at his home.

11   Q    And do you recall how often you would go to his house?

12   A    I would go to his home every time I was invited.

13   Q    Okay.

14        And were you invited on more than one occasion?

15   You've already testified, I think, as much.

16   A    Yes.

17   Q    Did you establish -- was there a routine that you

18   followed when you were invited to go to the defendant's house?

19   A    Yes, I followed the rules.

20   Q    Okay.  I want to back up before you get to that.

21        Was there -- what would happen when -- how would you

22   get to the defendant's house when you would visit him?

23   A    I would get to his house by taking the Metro train to

24   211th Street.

25   Q    And you already testified about one time when you were

SAM    OCR    RMR    CRR    RPR

1   picked up by one of the defendant's runners --

2   A    Yes.

3   Q    -- at 211th Street.

4        What would happen on the other occasions when you

5   got to 211th Street, when you were going to visit with the

6   defendant?

7   A    I was usually picked up by a runner, and on the rare

8   occasion I was picked up by him.

9   Q    Now, you testified earlier that you remembered one of the

10  runners was named Anthony.

11       Do you recall the names of any of the other runners

12  who picked you up?

13  A    Yes.

14  Q    Who were they?

15  A    There was Anthony.  There was Tom.  There was -- Rob

16  picked me up once.

17  Q    You mentioned that Rob picked you up.

18       You're referring to the defendant, correct?

19  A    Yes.

20       MS. GEDDES:  I am showing the witness only what's

21  been marked for identification as Government Exhibit 34.

22  BY MS. GEDDES:

23  Q    Do you recognize the individual shown in Government

24  Exhibit 34?

25  A    Yes.

1   Q    Who is that?

2   A    That's Anthony.

3   Q    Is that the Anthony who you testified earlier was one of

4   the runners who picked you up?

5   A    Yes.

6   Q    Do you know Anthony's last name?

7   A    I do not.

8   Q    Is that a fair and accurate photograph of Anthony?

9   A    Yes.

10            MS. GEDDES:  The Government offers Government

11   Exhibit 34.

12            THE COURT:  Any objection?

13            MR. CANNICK:  No objection.

14            THE COURT:  That's in evidence.

15            (Government's Exhibit 34 was received in evidence.)

16            MS. GEDDES:  May we publish to the jury, please?

17            THE COURT:  Yes.

18            (Exhibit published.)

19   BY MS. GEDDES:

20   Q    During the time that you went with the defendant, who, if

21   anyone, did you tell about your interactions with the

22   defendant during that time?

23   A    During what time?

24   Q    During between May of 2009, when you met the defendant at

25   his house, and January 2010, who, if anyone, did you tell that

1    you were spending time with the defendant?

2    A    Dominique.

3    Q    Did you tell anybody else?

4    A    I was talking to Keyonia, as well.

5    Q    And aside from Keyonia?

6    A    No.

7    Q    Why not?

8    A    Because I wasn't supposed to tell anyone that I was

9    spending time with him.

10   Q    Why did you believe you weren't supposed to tell anybody?

11   A    He told me not to tell anyone.

12   Q    Who was the "he" in that sentence?

13   A    Rob.

14   Q    Do you have a sense of approximately how many occasions

15   you were at the defendant's house in Olympia Fields?

16   A    No.

17         MR. CANNICK:  Objection.

18         THE COURT:  Overruled.

19         MS. GEDDES:  I am showing the witness what's been --

20   witness only what's been marked for identification as 908(a)

21   through 908(e).

22   BY MS. GEDDES:

23   Q    Do you recognize what was shown to you in Government

24   Exhibit 908(a) through (e)?

25   A    Yes.

1   Q     What are those?

2   A     It was Music 1.

3   Q     Generally speaking, what are they?

4   A     Oh, photos of me.

5   Q     And who took those photographs?

6   A     I took those photos.

7   Q     And where were those photographs taken, generally

8   speaking?

9   A     At Rob's house.

10  Q     And when were the photographs taken?

11  A     In 2009, between, like during my time that I was spending

12  time over there.

13            MS. GEDDES:  The Government --

14  Q     And are those fair and accurate --

15            MS. GEDDES:  Regardless, actually.

16            All right, the Government offers 908(a) to (e).

17            MR. CANNICK:  No objection.

18            THE COURT:  Those are in evidence.

19            (Government's Exhibits 908(a) through 908(e) were

20  received in evidence.)

21            MS. GEDDES:  I want to begin with 908(a).

22            And may we publish to the jury, please?

23            (Exhibit published.)

24  BY MS. GEDDES:

25  Q     What is shown in 908(a)?

Pace - direct - Geddes                    159

1   A     Music 1.

2   Q     And, again, where is Music 1?

3   A     In Rob's house.

4   Q     And what part of Rob's house?

5   A     The basement, his studio.

6   Q     And I think you testified earlier that Music 1 was one of

7   the recording studios, is that correct?

8   A     Yes.

9   Q     Was there another recording studio within the defendant's

10  house?

11  A     Yes.

12  Q     Was there a name for that one?

13  A     That was The Cabin.

14        MS. GEDDES:  All right, let's move on to Government

15  Exhibit 908(b).

16        (Exhibit published.)

17  BY MS. GEDDES:

18  Q     What is shown in 908(b)?

19  A     Music 1.

20  Q     It's another photograph with Music 1?

21  A     Yes.

22  Q     And just to be clear, were you in either 908(a) or

23  908(b)?

24  A     No.

25  Q     But you were taking the photos, is that correct?

1   A    Yes.

2          MS. GEDDES:  All right, let's go on to 908(c).

3          (Exhibit published.)

4   BY MS. GEDDES:

5   Q    What is shown in 908(c)?

6   A    Me in the mirror room.

7   Q    And can you describe the angle from which you were taking

8   this photo?

9   A    I was laying on the bed and I took -- I used the mirror

10  above the bed to take the photo.

11  Q    And you testified earlier that there was a mirror on the

12  ceiling, is that correct?

13  A    Yes.

14  Q    Is that the mirror that is shown in 908(c)?

15  A    Yes.

16         MS. GEDDES:  Let's show 908(d), please.

17         (Exhibit published.)

18         MS. GEDDES:  Can we also publish this to the public

19  as well?

20         (Exhibit published.)

21         MS. GEDDES:  Thank you.

22  BY MS. GEDDES:

23  Q    908(d), do you recognize -- you already indicated you

24  recognize.

25         What is 908(d)?

1    A    A photo of me and Snow.

2    Q    Who is Snow?

3    A    The defendant's dog.

4    Q    And where was this photograph taken?

5    A    In Music 1.

6    Q    In the defendant's house?

7    A    Yes.

8    Q    At the time did the defendant have any other pets?

9    A    Yes, he did.

10   Q    What were those pets' names?  Did you know the names of

11   the pets?

12   A    Yes.  It was another little Yorkie named Buddy.

13   Q    Another dog?

14   A    Yes.

15   Q    And this dog that's in this photograph was named Snow, is

16   that correct?

17   A    Yes.

18             MS. GEDDES:  All right, let's go to 908(e).

19             (Exhibit published.)

20   Q    What is shown in 908(e)?

21   A    A photo of me in the mirror room.

22   Q    And just so everyone can see.

23             Can you let the jury know the angle from which that

24   picture was taken?

25   A    I was laying in the bed and that's one of the walls of

Pace - direct - Geddes                          162

1   the mirror room.

2   Q     All right, and what are the walls in the mirror room?

3   A     The walls are mirrors.

4   Q     And is that how you're able to see yourself in that

5   photograph?

6   A     Yes.

7

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1   EXAMINATION BY

2   MS. GEDDES:

3   (Continuing.)

4   Q    Now, what if any -- we can take that off.

5            What, if any, instructions did the defendant

6   share with you for the time that you spent with him?

7   A    Can you rephrase that?

8   Q    Sure.  What, if any, instructions did the defendant tell

9   you that you should follow when you were at the defendant's

10  house?

11  A    I had to wear baggy clothes.  So I had to wear some

12  sweats and a T-shirt.

13  Q    Who told you that you were to wear baggy clothes?

14  A    Rob did.

15  Q    What else?

16  A    And I couldn't leave the room.  Wherever I was, I

17  couldn't leave without permission.  If I had to go to the

18  bathroom, I had to get his permission to go to the bathroom.

19  If I wanted to eat, I had to get his permission to eat.  And

20  when I wanted to make phone calls, I had to get his

21  permission.  And he will -- so that he could walk me through

22  the phone calls.

23  Q    And how would you get the defendant's permission?

24  A    By either calling or texting him.  And -- or reaching

25  out to someone in the studio.

J. Pace - Direct/Ms. Geddes                164

1   Q    Who would you reach out to?

2   A    I would have to call the front desk if I couldn't get

3   ahold of him and whoever picked up at the front desk.

4   Q    And who did you understand would be picking up at the

5   front desk?

6   A    It was usually Anthony or Tom.

7   Q    And, by the way, I asked earlier if you knew Anthony's

8   last name.  Do you know Tom's last name?

9   A    I do not.

10  Q    What, if anything, did the defendant tell you to do when

11  he entered a room?

12  A    When he entered --

13           MR. CANNICK:  Objection.  Leading, your Honor.

14           THE COURT:  Overruled.

15  A    When he entered the room, he needed to be acknowledged.

16  And by acknowledging him, I would have to either stand up to

17  kiss him or just look up at him.

18  Q    What, if anything, did the defendant ask you to call

19  him?

20  A    I had to call him Daddy.

21  Q    What would he call you?

22  A    Nickname Jo-Jo.

23  Q    Is that a nickname that you used with just the defendant

24  or with others as well?

25  A    Well, I carried on with others.

1   Q     Now, do you remember have sexual contact with anyone

2   other than the defendant when you were in the defendant's

3   presence?

4   A     Yes, I did.

5   Q     What happened?

6   A     He called me and told me to come to his tour bus.

7   Q     Where was his tour bus at the time?

8   A     It was parked outside of his home near some tents.

9   Q     Do you remember where you were at the time that he

10  called?

11  A     I was in Music 1.

12  Q     Did you go to his tour bus?

13  A     Yes, I did.

14  Q     What happened when you got to the tour bus?

15  A     When I got to the tour bus, I got on the bus and there

16  was him and a naked -- a woman that was naked.

17  Q     And what, if anything, did the defendant say?

18  A     He told me that she was going to train me on how to

19  sexually please him.

20  Q     What, if anything, did the defendant say about that

21  particular woman who she was?

22  A     He told me that it was -- her name was Juice and she has

23  been around since she was 15 years old.

24  Q     And aside from you and the defendant, who was there?

25  You said there was another woman there; is that correct?

J. Pace - Direct/Ms. Geddes                 166

1   A    Yes.

2   Q    Other than the three of you, was there anyone there?

3   A    No, it was just the three of us.

4   Q    And so, what happened after the defendant told you that

5   she was going to train you?

6   A    I had to follow her lead.

7   Q    And what was -- what happened then?

8   A    He told both of us to perform oral sex on him and we

9   did.  And then he told us to spit his nut from my mouth to

10  her mouth and just go back and forth with it.

11  Q    And did you do that?

12  A    Yes, we did.

13  Q    And to be clear, what do you mean by what "his nut"?

14  A    His semen.

15  Q    You testified earlier about certain instructions that

16  the defendant had given you.  Did you ever break any of those

17  rules?

18  A    Yes, I did.

19  Q    What rules do you recall breaking?

20  A    Not agreeing with him.

21  Q    What happened?

22  A    When I didn't agree with him, it was like a -- it was a

23  dispute about the Cleveland Cavaliers and the Chicago Bulls.

24  Q    How did the Chicago Bulls and Cleveland Cavaliers come

25  up?

1  A    He's a basketball fan and he's a Chicago Bulls fan.  And

2  I said that I liked the Cleveland Cavaliers and he did not

3  agree with that.

4  Q    How did he respond when you said that?

5  A    He responded by slapping me.

6  Q    What, if anything, did he say?

7  A    He told me that he kept just bringing up the Bulls and

8  kept saying that he's a Chicago Bulls fan and told me that I

9  was disrespecting him.

10 Q    You testified that he slapped you.  How did he slap and

11 where did he slap you?

12 A    He slapped me in the face backhanded.

13 Q    With the back of his hand?

14 A    Yes.

15 Q    Were there other rules that you broke when you were

16 spending time with the defendant?

17 A    Yes.

18 Q    And can you tell us about some of these rules and what

19 happened?

20 A    It was a disagreement again.  It was in Music 1 where we

21 were having Chinese food, and he brought up the fact that he

22 wanted me to use a dildo on him.

23 Q    And how did you respond?

24 A    I gave a certain look and I said that that was, like, I

25 was taught that that would be gay.  And he started getting

1    mad and he said that he's not fucking gay.

2    Q    And what, if anything, else happened after that?

3    A    And that's when he slapped me in my face and slapped the

4    food out of my mouth.  And then he asked me to perform -- he

5    told me to perform oral sex on him as he stuck a dildo up his

6    butt.

7    Q    And you testified that he slapped you on your face.  How

8    did he slap you that time?

9    A    It was an open-handed slap.

10   Q    During that six-month period that you spent with the

11   defendant, how often did the defendant have sexual contact

12   with you?

13   A    Every time I was there.

14   Q    What, if anything, else do you recall about your sexual

15   encounters with the defendant?

16   A    I recall, like, him recording everything.  He would

17   record and take photos of me.

18   Q    What did he use to record you?

19   A    He would use his iPhone to record me or he would set up

20   a tripod and use his Canon camera.

21   Q    And when you say that he was recording you, what was

22   he -- what was being recorded?

23   A    Our sexual activities were being recorded.

24   Q    And do you remember, specifically, what type of sexual

25   activities he recorded?

J. Pace - Direct/Ms. Geddes                169

1  A    He would record me performing oral sex on him, him

2  performing oral sex on me, and both of us engaging in sexual

3  intercourse.

4  Q    Did you ever see any of the recordings that he made of

5  you engaged in sexual conduct with him?

6  A    Yes, I did.

7  Q    What was the circumstances under which you saw those?

8  A    It was for critiquing.

9  Q    Can you explain?

10  A    We would watch the recordings and he would tell me where

11  I could use some improvement or how he wanted me to do

12  something different the next time we do it.

13  Q    Now, during your sexual encounters with the defendant,

14  what, if anything, did the defendant do or say during those

15  encounters?

16  A    He would lead everything and he would, like, guide me

17  and tell me everything.  He would tell me to do this and tell

18  me which ways to do it.

19  Q    And was that a regular occurrence?

20  A    Yes, it was.

21  Q    You testified that he used a tripod and sometimes he

22  used an iPhone.  How would the defendant use an iPhone to

23  record you engaged in sexual activity with him?

24  A    He would have his phone angled, like, he would hold it

25  up like this as I was performing activities on him.

J. Pace - Direct/Ms. Geddes                    170

1    Q    And, again, just to be clear, what do you mean by

2    "performing activities" on him?

3    A    As I was giving him fellatio.

4    Q    And by "fellatio," referring to?

5    A    My mouth on his penis.

6    Q    Thank you.  You also said that the defendant was -- the

7    defendant was telling -- leading you and guiding you through

8    some of these sexual encounters.  Can you recall some of the

9    specific instructions that he would give you during those

10   encounters?

11   A    Yes.  He would tell me to stick the dildo up his butt

12   and he would tell me to get on top of him and he would guide

13   me as I was on top of him.

14   Q    And when you say "guide you," what do you mean?

15   A    He would just grind my hips and everything.  And he

16   would also tell me how to, like, please him when it came to

17   giving fellatio.  He would tell me to moan and to hum and do

18   certain things on his penis.

19   Q    I want to step back a moment.  Can you describe the

20   inside of the defendant's residence of Olympia Fields?  And I

21   want to start with the area where the recording studio was.

22   On what level of Olympia Fields was that, his residence?

23   A    The basement.

24   Q    Can you describe the basement area for the jury?

25   A    Well, you come in through the side door.  There was a

1   desk over to the left, there was a desk.  And over to the

2   right there was a sitting area and a bathroom.  And if you

3   walked down the hallway, I mean, there's a little small

4   kitchenette.  And if you walk down the hallway, there's

5   plaques and awards of all of his music and things like that.

6   Then, when you get to the end of that hallway, to the right

7   there is Music 1 and there is a soundproof room.

8                    And if you go past that, there is some

9   antiques and everything under his stairs.  But if you make a

10  left at the end of that hallway, there is a door that ends

11  and then there is The Cabin room.  And if you keep going

12  down, there is a bathroom and then there is a movie theater.

13  Q    Did you spend any time in the movie theater?

14  A    Yes, I did.

15  Q    At the beginning of your response to my question, you

16  said, "If you come in through the side door."  What are you

17  referring to when you mention the side door?

18  A    There is a side door on the side of his house.

19  Q    And is that an exterior door?

20  A    Yes, it is.

21  Q    And can you describe what's on the first floor of the

22  defendant's residence in Olympia Fields?

23  A    The first level is where his game room is.  And that's

24  where the pool room is as well, and the Mirror Room and the

25  VIP section.  And if you leave out of there and you make a

J. Pace - Direct/Ms. Geddes                    172

1   right, and then you do a quick left that's going to take you

2   into his main area.  He has his kitchen there and that's

3   his -- the living space.  And if you go past that, there is

4   a -- that's where the African Safari Room is in the back and

5   there's another bedroom connected.

6   Q    And during the time that you spent in Olympia Fields,

7   where would you spend your time?

8   A    I spent most of my time between Music 1 and the

9   Mirror Room.

10  Q    And the Mirror Room was located on which floor?

11  A    The may main level.

12  Q    And Music 1 was on which floor?

13  A    The basement.

14  Q    You testified earlier that some of the defendant's

15  runners picked you up from the train station and drove to you

16  Olympia Fields.  Do you recall the cars that were used to

17  pick you up?

18  A    Yes.

19  Q    What are some of the cars that were used?

20  A    A red and black Chrysler 300C.  And there was a Cube

21  used one time.  And there was a black Range Rover used once.

22  Q    What is the Cube?

23  A    It's a car that it just looks like the shape of a cube.

24  Q    What, if any, medical problems did you have between

25  May 2009 and January of 2010?

J. Pace - Direct/Ms. Geddes                173

1    A    Can you rephrase that?

2    Q    Yes.  Did you have any medical problems during the time

3    that you were with the defendant?

4    A    Yes.

5    Q    What happened?

6    A    I ended up contracting herpes.

7    Q    When did you first come to believe that you had

8    contracted herpes?

9    A    It was towards the end of the summer.

10   Q    And what happened?  What made you believe that you had

11   contracted herpes?

12   A    I had sores on my vagina.

13   Q    What did you do once you believed you had sores on your

14   vagina?

15   A    I told the defendant about it.

16   Q    How did the defendant respond?

17   A    It was -- he didn't really react to it.  He just said

18   okay.

19   Q    And what, if anything, happened after that with respect

20   to that?

21   A    He set me up to see a doctor.

22   Q    Where did that happen?

23   A    In his home.

24   Q    What do you recall -- did you, in fact, then see a

25   doctor at his house?

1  A    Yes, I did.

2  Q    What do you recall about the doctor?

3  A    It was just like an older guy with, like, a white beard.

4  It wasn't, like, fully white but he had a white beard and he

5  was older and he had a white coat on.

6  Q    And what happened when you saw the doctor?

7  A    We went to the back room and he looked at my vagina

8  while Rob was present and then he told him, Yes, that's it.

9  Q    What did you understand him to be saying when he said,

10  Yes, that's it?

11  A    Herpes confirmation.

12  Q    And who was he, by the way, in that?

13  A    Excuse me.

14  Q    When he -- I think you testified that he said, Yes,

15  that's it.

16  A    Yes.

17  Q    Who is the he in that sentence?

18  A    The doctor.

19  Q    What, if anything, did the defendant do once you

20  developed these sores on your vagina?

21  A    He didn't do anything other than the doctor just told me

22  to take some pills and he walked me back to the game room.

23  Q    Were you given those pills to take?

24  A    Yes, I was.

25  Q    Did you, in fact, take the pills?

J. Pace - Direct/Ms. Geddes                175

1    A    No, I did not.

2    Q    Why not?

3    A    I don't believe in taking medication.

4    Q    What, if any, conversations did you have with the

5    defendant about tattoos?

6    A    He asked me if I had any tattoos.

7    Q    At the time, did you have any tattoos?

8    A    No, I did not.

9    Q    What happened after that?  How did you respond?

10   A    I told him I didn't have any tattoos.

11   Q    What did the defendant say or do?

12   A    He asked me would I get his name tattooed on me.

13   Q    Did you agree?

14   A    I said yeah.

15   Q    Did you, in fact, get a tattoo?

16   A    Yes, I did.

17   Q    What is the -- what was the tattoo of?

18   A    It was a tattoo of his name.

19   Q    Where did you get the tattoo?

20   A    I got the tattoo on my left breast.

21   Q    Do you still have it today?

22   A    It's covered up with a black heart.

23   Q    I want to direct your attention to the last time that

24   you were inside the defendant's residence in Olympia Fields.

25   Do you remember that day?

1   A    Yes, I do.

2   Q    What happened that day?

3   A    I showed up to his house, and before he walked in the

4   room I was texting on my phone and when he, like, he came in

5   so quietly I didn't hear him so I didn't acknowledge him.

6   Q    How did the defendant respond when you didn't

7   acknowledge him?

8   A    He was angry about it and he asked me what I was doing

9   on my phone.  And I told him that I was texting a friend?

10  Q    What happened after that?

11  A    He didn't believe that I was texting a friend and he got

12  mad about it.

13  Q    What, if anything, did he do?

14  A    That's when he slapped me and he choked me until I

15  passed out.

16  Q    I want to start by talking about where he slapped you.

17  Where did he slap you?

18  A    He slapped me in my face.

19  Q    How did he slap you?

20  A    It was an open-handed slap.

21  Q    You testified that he also choked you?

22  A    Yes.

23  Q    What do you remember from that?

24  A    I remember him just putting his hand around my neck and

25  choking me and when I got up I was on the floor.

J. Pace - Direct/Ms. Geddes                177

1   Q     What, if anything, was the defendant saying during this?

2   A     Can you repeat the question?

3   Q     What was the saying as he was doing this to you?

4   A     After he spit in my face and told me to put my head down

5   in shame.

6   Q     What did you understand him to mean by that?

7   A     I just put my head down in shame and embarrassment.

8   Q     Did you do that?

9   A     Yes, I did.

10  Q     What happened next?

11  A     And then after that, I got up off the floor and we

12  walked over to the VIP room and we sat down, and that's when

13  he instructed me to perform oral sex on him.

14  Q     Did you then perform oral sex on him?

15  A     Yes, I did.

16  Q     And, specifically, what did you do?

17  A     I put my mouth on his penis.

18  Q     What happened then?

19  A     He ejaculated on my face.

20  Q     What did you do when he ejaculated on your face?

21  A     I waited for him to tell me what to do next, and he told

22  me to go get a towel so that he could wipe off and I ended up

23  using my T-shirt to wipe off the spit that was running town

24  my face and the semen and I went to the bathroom to get a

25  towel.

1   Q      You testified that you used your T-shirt.  Do you

2   remember the T-shirt that you used?

3   A      Yes, I do.

4   Q      What type of T-shirt was it?  What do you remember about

5   it?

6   A      It was a blue Aeropostale T-shirt.

7   Q      And you indicated that you also wiped spit off your

8   face.  What was that from?

9   A      It was from him spitting in my face.

10  Q      Now, was that the first time when he spit at you or was

11  that a second time?

12  A      It was a second time.

13  Q      What, if anything, did you say or do next?

14  A      I just followed his directions and went to go get the

15  towel.

16  Q      And what happened then?

17  A      Then I took the towel back to him for him to wipe off.

18  Q      And what did you do after that?

19  A      Once all of that was done, he said that he was, like,

20  getting ready for a party.  He was preparing for a party that

21  evening.

22  Q      And what were you going to do?  What did you do?

23  A      And he told me that he wanted me he to put on certain

24  heels for us to have sex.  And I told him that those heels

25  were my uncle's house and I needed to go get them.

J. Pace - Direct/Ms. Geddes                179

1    Q    At the time, where was your uncle living?

2    A    My uncle was living in Olympia Fields.

3    Q    Is that the same Olympia Fields where the defendant

4    lived?

5    A    Yes, it is.

6    Q    What did you do next?  How did the defendant respond

7    when you said you wanted to go get your heels from your

8    uncle's house?

9    A    He told me that I could go get them and to hurry up

10   back.

11   Q    What did you do?

12   A    I left and I didn't return.

13   Q    Were you, in fact, planning to go to your uncle's house?

14   A    No.

15   Q    How old were you at the time?

16   A    I was 16.

17   Q    As you sit here today, do you remember the date that

18   that happened?

19   A    I do not.

20   Q    Approximately when was it?

21   A    January of 2010.

22   Q    Did you go back inside the defendant's house after that

23   particular incident?

24   A    No.

25   Q    What did you do instead?

J. Pace - Direct/Ms. Geddes                    180

1    A    I left his house and I went home.

2    Q    At some point, did you find a lawyer or a law firm to

3    represent you?

4    A    Yes, I did.

5    Q    What law firm represented you?

6    A    Susan E. Loggans.

7    Q    Do you remember when you retrained a lawyer?

8    A    In -- towards the end of January.

9    Q    Of 2010?

10   A    Yes.

11   Q    In connection with what did the Loggans Law Firm or

12   Ms. Loggans represent you?

13   A    Can you rephrase the question.

14   Q    Yes.  Why did you get a lawyer?

15   A    I got a lawyer because I wanted to press charges against

16   him.

17   Q    Did you end up pressing charges against the defendant?

18   A    No, I did not.

19   Q    What did you do instead?

20   A    I filed a -- well, I filed a civil suit against him.  I

21   sued him.

22   Q    I want to back up a moment.

23        Do you recall the names of the individuals at

24   Ms. Loggans' law firm that you met?

25   A    Yes, I do.

J. Pace - Direct/Ms. Geddes                181

1  Q    Let's start with Ms. Loggans.  Have you met her in
2  person before?
3  A    No.
4  Q    Who did you meet in person?
5  A    I met Kim Jones and Patrick Condron.
6  Q    Who is Kim Jones?
7  A    Kim Jones is an executive assistant under Susan Loggans
8  Law Firm.
9  Q    And who is Patrick Condron?
10 A    He's an attorney at Susan Loggans Law Firm.
11 Q    What, if anything, did the law firm, the lawyers at the
12 law firm tell you to do when you first went there?
13            MR. CANNICK:  Objection.
14            THE COURT:  Overruled.
15 A    They didn't recommend me pressing charges against him.
16 Q    And so, in preparation for a lawsuit, I think you
17 testified earlier that you were going to pursue a civil
18 lawsuit?
19 A    Yes.
20 Q    What, if anything, did they recommend you to do to
21 prepare for that?
22 A    They recommended that I wrote -- that I write everything
23 down.
24 Q    Did you, in fact, write everything down?
25 A    I did not write everything down, but I wrote some things

J. Pace - Direct/Ms. Geddes                    182

1    down.

2    Q    And when did you do that?

3    A    I did this in January of 2010.

4              MS. GEDDES:  I'm showing the witness only what's

5    been marked for identification as 3500-JP-9 and I'm just

6    showing you that first page.

7              Do you recognize what's shown in 3500-JP-9.

8    A    Yes, I do.

9    Q    What is that?

10   A    That is the front cover of my journal that I wrote.

11   Q    And who, if anyone, did you provide that journal to?

12   A    Susan Loggans Law Firm.

13   Q    And did you later get the journal back?

14   A    Yes, I did.

15   Q    And who did you give it to after that?

16   A    I gave it to law enforcement.

17   Q    Including my office?

18   A    Yes.

19   Q    Now, since you gave it to my office, have you read the

20   contents of this journal?

21   A    No.

22   Q    As you sit here today, do you recall the precise dates

23   on which the various events that you've testified about

24   involving the defendant happened?

25   A    I do not.

J. Pace - Direct/Ms. Geddes                183

1   Q    When you created this journal, was it important for you

2   to be accurate to the best of your abilities?

3   A    Yes.

4   Q    And at the time that you created the journal, was it

5   fresh in your mind?

6   A    Yes, it was.

7   Q    And, in addition to creating this journal, did you also

8   speak with lawyers at Susan Loggans Law Firm regarding your

9   interactions with the defendant?

10  A    Yes.

11  Q    And, again, was it -- when you spoke with the lawyers

12  then, were the events between yourself and the defendant

13  fresh in your mind back then?

14  A    Yes.

15  Q    And was it important at that time for you to be accurate

16  in how you describe what happened with the defendant?

17  A    Yes.

18  Q    And, to the best of your ability, were you, in fact,

19  accurate?

20  A    Yes.

21  Q    What, if anything, did you give your lawyers when you

22  first retained them in January of 2010?

23  A    I gave them my T-shirt.  I gave them my -- that journal

24  that they asked me to tell me to make sure I write everything

25  down and I gave them my cell phone.

J. Pace - Direct/Ms. Geddes                184

1            THE COURT:  Can I just clarify when did you prepare

2   the journal?

3            THE WITNESS:  In January of 2010.

4            THE COURT:  After you left the defendant's --

5            THE WITNESS:  Yes.

6            THE COURT:  -- house.  Okay.

7   Q    What, if anything, regarding your date of birth did you

8   give your lawyers?

9   A    I gave them my birth certificate and I gave them my

10  state I.D.

11  Q    I'm showing the witness only.  Let me back up one

12  moment.

13            You testified that you gave the lawyers a

14  T-shirt.  What T-shirt were you referring to?

15  A    It was the T-shirt that I last wore at Rob's house which

16  was my blue T-shirt.

17  Q    The one that you used to wipe off his semen?

18  A    Yes.

19            MS. GEDDES:  The Government is showing the witness

20  only what's been marked for identification as Government

21  Exhibit 241.

22            Your Honor, may I approach the witness?

23            THE COURT:  Yes.

24            (Approaching the witness.)

25  Q    This is Government Exhibit 241.  Do you recognize this?

1    A    Yes.

2    Q    What is this?

3    A    That's my T-shirt.

4    Q    Is that the T-shirt that you gave your lawyers that you

5    were just testifying about?

6    A    Yes, it is.

7              MS. GEDDES:  The Government offers Government

8    Exhibit 241.

9              THE COURT:  Any objection?

10             MR. CANNICK:  Yes, Your Honor.

11             THE COURT:  Okay.  Can I see the lawyers at the

12   side.

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          THE COURT:  What's your objection?

5          MR. CANNICK:  Chain of custody.  I think this

6     witness testified that she gave this T-shirt to her attorney

7     and then subsequently got it back and gave it to her

8     attorneys.  I don't think that we know anything from the

9     other folks that she gave the T-shirts to regarding their

10    control and custody of it.

11         THE COURT:  Go ahead.

12         MS. GEDDES:  So continuing on in my questioning, I

13    plan to elicit from the witness that she provided the T-shirt

14    in 2010 to the Loggans Law Firm.  In 2013, she retained a new

15    lawyer who obtained a copy of the file.  In 2017, she

16    retrieved the T-shirt from her new lawyer and that very same

17    day brought it to the Olympia Fields Police Department.

18         I will call a witness from the law firm in 2010 as

19    well as in 2013 who will establish that they maintained the

20    T-shirt in a safe and secure manner in a paper bag.  I have

21    one from the lawyer that retained it from 2010 to 2013; a

22    separate witness who he testified that he kept it from 2013

23    until 2017.  And we will also call a witness from the

24    Olympia Fields Police Department who will testify that it was

25    maintained in a safe and secure way from 2017 until February

Sidebar                              187

1    of 2019, at which point, it was transferred to the Illinois

2    State Police Forensic Investigations Division who then did

3    DNA testing.  And we will call a -- two DNA witnesses who

4    will testify that they recovered semen from the T-shirt and

5    that the semen matched the defendant's semen.

6              MR. CANNICK:  Your Honor, I think given that

7    recitation --

8              THE COURT:  Subject to connection.

9              MR. CANNICK:  That's where I was about to go.

10             THE COURT:  I think it's admissible subject to

11   connection.  She's just identifying that it's her T-shirt and

12   so it will come in subject to connection.

13             (Sidebar discussion concludes.)

14             (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court.)

2              THE COURT:  All right.  The evidence is admissible

3    subject to connection.

4    EXAMINATION BY

5    MS. GEDDES:

6    (Continuing.)

7    Q    The defendant is showing the witness only what's been

8    marked for identification as 241(a).

9              Do you recognize what's shown in 241(a)?

10   A    Yes.

11   Q    What is that?

12   A    That's my T-shirt.

13   Q    Is that a photograph of your T-shirt?

14   A    Yes, it is.

15             MS. GEDDES:  The Government offers 241(a) subject

16   to connection?

17             THE COURT:  Any objection?

18             MR. CANNICK:  No objection.

19             THE COURT:  That's in evidence.

20             (Government's Exhibit 241(a) was received in

21   evidence as of this date.)

22   Q    You testified earlier that you also gave your attorneys

23   a cell phone.  What cellular telephone did you give your

24   attorneys?

25             And just to be clear, I'm referring to the

1  Susan Loggans Firm?

2  A    I gave them my cell phone that I was -- that I had.  And

3  it should be, like, a Virgin Mobile phone, a sliding one.

4  Q    The cell phone that you provided to your attorneys, when

5  had you been using that cell phone?

6  A    I had been using it since Rob had taken my phone away.

7  Q    So that was in 2009; is that correct?

8  A    Yes.

9         MS. GEDDES:  May I approach again, your Honor.

10        THE COURT:  Yes.

11        (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. GEDDES:

2   Q    The Government is showing the witness what is marked for

3   identification as Government's Exhibit 210.

4            Do you recognize what is Government's Exhibit 210?

5   A    Yes.

6   Q    What is Government's Exhibit 210?

7   A    My cellphone.

8   Q    Is that the cellphone that you testified you were using

9   during the period of time when you were with the defendant and

10  that you provided to your lawyers?

11  A    Yes.

12            MS. GEDDES:  The Government offers Government's

13  Exhibit 210.

14            THE COURT:  Any objection?

15            MR. CANNICK:  No objection, subject to connection.

16            THE COURT:  Okay, subject to connection.

17            (Government Exhibit 210, was received in evidence.)

18  BY MS. GEDDES:

19  Q    Did you in fact file a lawsuit in court against the

20  defendant?

21  A    No.

22  Q    What did you do instead?

23  A    It was an out-of-court settlement.

24  Q    Between whom?

25  A    Myself and Rob.

1  Q    The defendant?

2  A    Yes.

3  Q    How much money did you -- what were the terms of the

4  settlement?

5  A    In exchange for my silence I was supposed to be --

6         MR. CANNICK:  Objection.

7         THE COURT:  Overruled.

8         This is the terms of the settlement?  That's

9  admissible overruled.

10 A    In exchange for my silence, I would be paid $1.5 million,

11 a million to myself and $500,000 to my attorneys.

12 Q    Do you remember when the settlement agreement was

13 entered?

14 A    I do not.

15 Q    Do you remember approximately when it was?

16 A    Around February of 2010.

17 Q    Do you remember when you were supposed to receive your

18 portion of the proceeds under the settlement agreement?

19 A    For my 18th birthday I was supposed to receive a trust

20 with a million dollars in it.

21 Q    I'm showing the witness only what is marked for

22 identification as Government's Exhibit 928.  I'm going to show

23 you the last page as well.

24         Do you recognize what is shown in Government's

25 Exhibit 928?

J. JOHNSON PACE - DIRECT - GEDDES            192

1   A    Yes.

2   Q    What is that?

3   A    That is the settlement.

4   Q    Is that the settlement agreement that you reached with

5   the defendant?

6   A    Yes, it is.

7            MS. GEDDES:  The Government offers 928.

8            THE COURT:  Any objection?

9            MR. CANNICK:  No.

10           THE COURT:  That's in evidence.

11           (Government Exhibit 928, was received in evidence.)

12           MS. GEDDES:  May I publish, your Honor?

13           THE COURT:  Yes.

14  BY MS. GEDDES:

15  Q    What is the date listed on the settlement agreement shown

16  here?

17  A    2/19/2010.

18  Q    February 19, 2010?

19  A    Yes.

20  Q    How old were you then?

21  A    I was 16.

22  Q    You testified earlier that you were paid a sum of money

23  in exchange for your silence.  Specifically, what did you

24  understand were your obligations under the settlement

25  agreement?

J. JOHNSON PACE - DIRECT - GEDDES          193

1   A    I was to not talk about anything that happened.

2   Q    Who were you to not talk about anything that happened

3   with?

4   A    I was not supposed to talk about anything that happened

5   between Rob and I.

6   Q    Who were you not allowed to tell?

7   A    Anyone.

8   Q    What, if any, contact did you have with the defendant

9   after you signed that settlement agreement in 2010?

10  A    I still was in contact with him through phone calls, text

11  messaging.

12  Q    You continued to stay in communication with him?

13  A    Yes.

14  Q    After you entered into your settlement agreement with the

15  defendant, did you in fact speak with anyone about the time

16  that you spent with the defendant?

17  A    Yes.

18  Q    Who if anyone learned about that?

19  A    My friend Danika.

20  Q    To be clear, what did Danika learn?

21  A    She learned about the settlement agreement because I

22  talked to her about it.

23  Q    To your knowledge, who if anyone, learned that you had

24  talked to Danika about your time with the defendant?

25  A    The defendant learned about it and so did my attorneys.

1  Q    What happened when the defendant learned about the fact

2  that you had spoken to Danika?

3  A    My attorneys told me that I breached the contract and

4  that I wouldn't get any money.

5  Q    Did you learn how it was that the defendant learned that

6  you had spoken about your time with him?

7  A    Yes.

8  Q    What happened?

9  A    She recorded me talking about it.

10 Q    Did you ultimately receive a copy of that recording?

11 A    Yes, I did.

12 Q    You testified that your lawyers indicated that you might

13 have breached the agreement; is that correct?

14 A    Yes.

15 Q    You also testified that you had continued to communicate

16 with the defendant, did you also see him in person?

17 A    Yes.

18 Q    At the time that you saw the defendant, had you received

19 the payments that you were owed under the settlement

20 agreement?

21 A    Some of them.

22 Q    And what, if anything, were you doing with the money that

23 you had received?

24 A    I returned the money.

25 Q    To whom?

1  A    To Derrel McDavid to give to the defendant.

2  Q    How did that come about?

3  A    I talked to him.  I talked to Rob and I was, I wasn't

4  happy about like having to go through those steps and I still

5  wanted to be involved with him.  And I talked to him about it.

6  Q    Just to be clear, when you said you weren't happy about

7  having to go through those steps, what are you referring to?

8  A    Such as suing him.

9  Q    How did the defendant respond when you talked to him

10 about that?

11 A    If I wanted to regain his trust, he told me I would have

12 to return the money.

13 Q    How would you -- did you in fact return some of the

14 money?

15 A    Yes.

16 Q    How did you return the money?

17 A    I would return it in -- I would get $50,000 every other

18 month.  I would put a thousand dollars in each envelope.  And

19 I would return it to Derrel McDavid.

20 Q    I'm sorry, how much money were you getting on a

21 bi-monthly basis?

22 A    $50,000.

23 Q    $50,000?

24           THE COURT:  I'm a little unclear.  You said twice a

25 month you got $50,000 or every two months?

J. JOHNSON PACE - DIRECT - GEDDES          196

1          THE WITNESS:  Every other month.

2          THE COURT:  Go ahead.

3    BY MS. GEDDES:

4    Q    You said that you would put money in an envelope; is that

5    correct?

6    A    Yes, a thousand dollars in each envelope.

7    Q    And what would you do with the envelopes then?

8    A    I would return them to Derrel McDavid so he could give it

9    to the defendant.

10   Q    Where did you do that?

11   A    At his studio.

12   Q    Who's studio?

13   A    At Rob's studio.

14   Q    The studio in Olympia Fields?

15   A    No.

16   Q    What studio was it?

17   A    In Chicago.

18   Q    At the time that you returned these envelopes or gave

19   these envelopes ultimately to the defendant, what had happened

20   to the defendant's studio at his residence in Olympia Fields?

21          MR. CANNICK:  Objection.

22          THE COURT:  Overruled.

23   A    Can you rephrase that?

24   Q    To your knowledge, was the defendant still living at

25   Olympia Fields?

1   A    No.

2   Q    Did the defendant still have the recording studio at

3   Olympia Fields?

4   A    Not to my knowledge.

5   Q    Okay.  Do you remember where this new recording studio

6   was where you gave those envelopes?

7   A    It was downtown Chicago.

8   Q    Do you remember what street it was on?

9   A    It was off of, I believe it was off of New Orleans Street

10  or Orleans, somewhere around Ohio Street.

11  Q    In downtown Chicago?

12  A    Yes.

13  Q    When your lawyers told you that you may have breached the

14  agreement, what happened then, going back to the first

15  agreement that is shown in Government's Exhibit 928.  I think

16  you testified earlier that you had shared what happened with

17  the defendant with your friend Danika and the defendant had

18  learned about that; is that correct?

19  A    Yes.

20  Q    Was that agreement ultimately breached or what happened

21  to that first agreement?

22  A    The first agreement it was considered breached.  And it

23  was not valid.

24  Q    So what happened after that?

25  A    I retained a different attorney a little while later.

J. JOHNSON PACE - DIRECT - GEDDES                198

1  Q    Who did you retain to represent you?

2  A    Jason Fink.

3  Q    Did Jason Fink continue to represent you?

4  A    No.

5  Q    Who did you retain another lawyer after Jason Fink?

6  A    Yes, I did.

7  Q    Who was that?

8  A    David Fish.

9  Q    What, if any, agreements were reached by either Jason

10 Fink or David Fish?

11 A    The agreement with Jason Fink is I had to take another

12 lie detector test and then I would receive another $50,000

13 payment.  I took the lie detector test.

14        MR. CANNICK:  Objection.

15        THE COURT:  Sustained.

16 Q    Without talking about any tests that you might have taken

17 through Mr. Fink, did you ultimately reach another agreement?

18 A    Yes.

19 Q    What was the nature of that agreement?

20 A    It was a $50,000 payment.

21 Q    Was there a written agreement entered between you and the

22 defendant?

23 A    No, it was -- no, it wasn't.

24 Q    Did you eventually -- you said that you also retained

25 another lawyer after that, David Fish?

1   A    Yes.

2   Q    What did David Fish represent you in connection with?

3   A    David Fish did another lawsuit that was settled outside

4   of court.

5   Q    With whom?

6   A    Between myself and the defendant.

7   Q    I'm showing you what is marked for identification as

8   3500JP-29.

9         I think it would be easier if I approach.  May I

10  approach?

11        THE COURT:  Yes.

12  Q    Take a look at what is shown here.  Do you recognize

13  that?

14  A    Yes.

15  Q    What is it?

16  A    It's my settlement.

17  Q    Who is it a settlement with?

18  A    A settlement between Rob and I.

19  Q    Is this a settlement reached, negotiated, by your lawyer,

20  David Fish?

21  A    Yes, it is.

22        MS. GEDDES:  The Government offers 3500JP-29?

23        MR. CANNICK:  No objection.

24        THE COURT:  That's in evidence.

25        (Government Exhibit 3500JP-29, was received in

1   evidence.)

2   BY MS. GEDDES:

3   Q    Under the terms of that second agreement, what did you

4   understand your obligations to be?

5   A    I was still was not supposed to speak about anything that

6   happened between Rob and I.

7   Q    Did you abide by that agreement?

8   A    For sometime.

9   Q    And did you --

10          MR. CANNICK:  I didn't understand the answer.

11          THE COURT:  For sometime.

12  Q    Did you continue to abide by that agreement?

13  A    I did not.

14  Q    What did you do instead?

15  A    I ended up speaking out publicly about what happened

16  between Rob and I.

17  Q    Approximately when did you do that?

18  A    In August of 2017.

19  Q    Who, if anyone, did you speak with publicly about the

20  defendant?

21  A    I made a YouTube video.

22  Q    Did you speak with anybody else?

23  A    Yes, I did.

24  Q    Do you recall who else in 2017 that you spoke with

25  publicly about the defendant?

1  A    I did an interview with TV show, The Real.

2  Q    Did you also sit down with reporters?

3  A    Yes, I did.

4  Q    That was also in 2017?

5  A    Yes.

6  Q    What, if any, contact did you have with law enforcement

7  in 2017?

8  A    I went to law enforcement and I filed a police report, I

9  went through that.

10  Q    Who did you file a police report with?

11  A    It was with Olympia Fields.

12  Q    The Olympia Fields Police Department?

13  A    Yes.

14  Q    What was the nature of your complaint to the Olympia

15  Fields Police Department?

16  A    I don't understand your question.

17  Q    Sure.  What did you -- I don't mean word for word, but

18  generally speaking -- what did you report to the Olympia

19  Fields Police Department when you went there in 2017?

20  A    I reported what happened between Rob and I.

21  Q    What, if anything, did you give the Olympia Fields Police

22  Department?

23  A    I turned over the evidence that I had.

24  Q    Which included what?

25  A    It included my T-shirt, my entire file from, it included

J. JOHNSON PACE - DIRECT - GEDDES          202

1   my file from Fish, so my T-shirt, along with my journal, and

2   all of my paperwork from my previous attorney.

3   Q    Did it also include the cellphone that you identified in

4   210?

5   A    Yes, it did.

6   Q    You indicated that you got your whole file from Fish, who

7   is the Fish in that sentence?

8   A    Sorry, David Fish, my attorney.

9   Q    How did you obtain the items that you just described to

10  include the T-shirt and the cellphone?

11  A    I went to his office to pick it up.

12  Q    And how do you recall it being packaged when you picked

13  it up from him?

14  A    It was in a box.

15  Q    What did you do with the box?

16  A    I took the box to the police station.

17  Q    Which police station?

18  A    In Olympia Fields.

19  Q    Did you stop anywhere in between?

20  A    I did not.

21  Q    So was it the same day that you picked up the file from

22  David Fish's office that you then went to the Olympia Fields

23  Police Department?

24  A    Yes.

25  Q    I'm showing the witness only what is marked for

1    identification as Government's Exhibit 210E, F, O, M, N, P, R,

2    T, U, V, X, Y, Z, AA, AB.

3              May I approach, your Honor?

4              THE COURT:  Yes.

5    Q    Take a look at those exhibits.  Do you recognize the

6    Government's exhibits that I just showed you?

7    A    Yes.

8    Q    Generally speaking, what are they?

9    A    Those are photos from my phone.

10   Q    From the cellphone in evidence that is Government's

11   Exhibit 210?

12   A    Yes.

13   Q    The cellphone you used when you were spending time with

14   the defendant when you were 16 years old?

15   A    Yes.

16             MS. GEDDES:  The Government offers those exhibits in

17   evidence.

18             THE COURT:  Any objection?

19             MR. CANNICK:  May I just see them?

20             MS. GEDDES:  Yes.

21             MR. CANNICK:  No objection.

22             THE COURT:  Those are in evidence.

23             (Government Exhibits 210E, F, O, M, N, P, R, T, U,

24   V, X, Y, Z, AA, AB, were received in evidence.)

25             THE COURT:  I think given the time, we should find a

1    convenient time to break.

2              MS. GEDDES:  This is as good as any.

3              THE COURT:  Okay, let's have the witness step

4    down -- let's excuse the jury first.

5              Ladies and gentlemen, just before I excuse you for

6    the night, we'll begin again tomorrow at 9:30 a.m.

7              Please do not look anything up about this case.  Do

8    not read or watch any reports about it, look on anything on

9    social media.  You must report directly to me any effort by

10   any person to influence you improperly or to influence another

11   juror improperly.

12             Have a good night.  I can't predict if it will be

13   hot or cold in here tomorrow, but let's prepare for both.  See

14   you tomorrow.

15             (Jury exits the courtroom.)

16             THE COURT:  I'm going to propose this with respect

17   to all -- let's get the witness out.

18             (Whereupon, the witness was excused.)

19             THE COURT:  I'm going to propose this with counsel's

20   agreement, that rather than having me bring this juror in and

21   speak to her now, she's spoken with Ms. Green.  I also think

22   because I don't know who the juror is, I obviously can't make

23   the call.  And so what Ms. Green suggested, and I think is a

24   good idea, is to have our jury coordinator make the call to

25   the employer to figure out what the situation is.

```
                          Proceedings                      205

 1              Does that sound good to everyone?

 2              MR. CANNICK:  Yes, your Honor.

 3              MS. GEDDES:  Yes, Judge.

 4              THE COURT:  So that's what we'll do and we'll figure

 5     that out tomorrow.

 6              Is there anything else that we have to address

 7     before we break for the day?

 8              MR. CANNICK:  Nothing from us.

 9              MS. GEDDES:  Nor from the Government.

10              THE COURT:  All right.  I'll see you tomorrow at

11     9:30 a.m.

12

13

14              (Proceedings adjourned to resume on August 19, 2021

15     at 9:30 a.m.)

16

17                              ooo0ooo

18

19

20

21

22

23

24

25
```

206

I N D E X

**WITNESS**                                              **PAGE**


OPENING STATEMENT
        MS. CRUZ MELENDEZ:                                17
OPENING STATEMENT
        MS. BLANK BECKER                                  49


**JERHONDA JOHNSON PACE**
        DIRECT EXAMINATION BY MS. GEDDES            104

1           <u>E X H I B I T S</u>

2     DESCRIPTION                                        PAGE

3

4

5     Government's Exhibit 1                              106

6

7     Government's Exhibit 69                             109

8

9     Government's Exhibit 69A                            110

10

11    Government's Exhibit 9                              116

12

13    Government's Exhibit 502A                           117

14

15    Government's Exhibit 929                            138

16

17    Government's Exhibit 34                             156

18

19    Government's Exhibits 908(a) through 908(e)         158

20

21    Government's Exhibit 241(a)                         188

22

23    Government Exhibit 210                              190

24

25    Government Exhibit 928                              192

208

1

2                          **E X H I B I T S**

3      **DESCRIPTION**                                    **PAGE**

4

5      Government Exhibit 3500JP-29                         199

6

7      Government Exhibits 210E, F, O, M, N, P, R,

8      T, U, V, X, Y, Z, AA, AB                             203

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25