209

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,      : 19-CR-00286(AMD)
4                                   :
                                    :
5                                   :
          -against-                 : United States Courthouse
6                                   : Brooklyn, New York
                                    :
7                                   :
                                    : Thursday, August 19, 2021
8    ROBERT SYLVESTER KELLY,        : 9:30 a.m.
                                    :
9              Defendant.           :
                                    :
10   - - - - - - - - - - - - - - - - - X
11
12             TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13             BEFORE THE HONORABLE ANN M. DONNELLY
                    UNITED STATES DISTRICT JUDGE
14
15                    A P P E A R A N C E S :
16
     For the Government:   JACQUELYN M. KASULIS, ESQ.
17                            Acting United States Attorney
                             Eastern District of New York
18                            271 Cadman Plaza East
                              Brooklyn, New York 11201
19                         BY:  ELIZABETH GEDDES, ESQ.
                               NADIA SHIHATA, ESQ.
20                             MARIA E. CRUZ MELENDEZ, ESQ.
                               Assistant United States Attorneys
21
22
     For the Defendant:    AIELLO & CANNICK, Esq.
23                            69-06 Grand Avenue
                              Maspeth, New York 11378
24                         BY:  DEVERAUX L. CANNICK, ESQ.
25
```

210

1

2

A P P E A R A N C E S:   (Continued)

3

4        For the Defendant:        BLANK LAW, P.C.
                                    444 S. Washington Avenue
                                    Royal Oak, Michigan 48067
5                                   BY:  NICOLE BLANK BECKER, ESQ.

6

7                                   THE LAW OFFICE OF THOMAS A. FARINELLA
                                    260 Madison Avenue
                                    8th Floor
8                                   New York, New York 10016
                                    BY:  THOMAS A. FARINELLA, ESQ.

9

10                                  THE C.H. SCHOLAR LAW FIRM, PLLC
                                    225 Broadway
11                                  Suite 225
                                    New York, New York 10007
12                                  BY:  CALVIN HAROLD SCHOLAR, ESQ.

13

14

15

16

17

18

19

20       Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                          Official Court Reporter
                          E-mail:  SMaceRPR@gmail.com
21       Proceedings recorded by computerized stenography.  Transcript
         produced by Computer-aided Transcription.

22

23

24

25

Proceedings                                    211

1          (In open court - jury not present.)

2          (Defendant entered the courtroom.)

3     THE COURTROOM DEPUTY:  All rise.

4          (Judge ANN M. DONNELLY entered the courtroom.)

5     THE COURT:  Everybody can have a seat.

6          Okay, just before we begin, I have just been kind of

7   keeping in touch with our epidemiologist and I know everybody

8   is vaccinated, but I think if you're not talking, let's all

9   stay masked, just why borrow trouble.

10          So, I think if someone doesn't have a mask, we have

11  them, but I think that's what we'll do, unless you're

12  speaking.  And I don't think there's any need to tell the jury

13  that.

14          The second thing is, let me just check one thing

15  with our court reporter.

16          (Pause.)

17     THE COURT:  The other thing, I guess there's been a

18  request for the transcripts.  I don't think there was anything

19  that can't be released in those from yesterday, so and,

20  obviously, that will include the sidebar conferences, but I

21  think that's fine.

22          So, as far as yesterday's transcript, I think it can

23  go as is.  And then I think just on a day-to-day basis, I am

24  going to ask both sides just to be aware and we will also take

25  a look at it, but we should be aware if there is anything in

Proceedings                                      212

1    there that can't be public.  Okay?

2          All right.

3          All right.  Anything else before we bring in the

4    jury?

5          We'll bring in the witness, and then bring in the

6    jury.

7          MS. GEDDES:  Your Honor, the Government has a couple

8    of housekeeping matters, which we could raise now or, perhaps,

9    at the lunch break, depending on what works for the Court.

10         THE COURT:  Let's get the show on the road, if they

11   don't have to be raised now.

12         Anything else?

13         MR. CANNICK:  Yes, Your Honor.

14         Yesterday during the direct examination of this

15   witness, the Government elicited her full name and I just want

16   to know whether or not we are still operating as first name

17   only with this particular witness.

18         MS. GEDDES:  We did not request that she testify

19   using her first name only, so you can refer to her by her

20   first and last name.

21         MR. CANNICK:  Okay, thank you.

22         THE COURT:  Anything else?

23         All right, let's get the witness.

24         (Pause.)

25         (Witness enters and resumes the stand.)

1          THE COURT:  All right, and let's get the jury.

2          MS. GEDDES:  Your Honor, can the witness take off

3    her mask?

4          THE COURT:  Can I just see counsel at the side?

5          We don't need the court reporter, I just want to ask

6    you a question.

7          (Sidebar held with the Court and counsel only,

8    outside of the hearing of the jury and the court reporter.)

9          THE COURTROOM DEPUTY:  All rise.

10         (Jury enters.)

11         THE COURTROOM DEPUTY:  You may be seated.

12         THE COURT:  All right, good morning, ladies and

13   gentlemen.  I see you're prepared for the temperature.  I

14   don't think it's that bad today.  But anyway, just a couple

15   things before we start.

16         I think I told you when we began jury selection that

17   we're keeping in touch with epidemiologists and all of that.

18   I've just asked all the participants, including me, to wear a

19   mask if they're not speaking.  Nothing's happened, nobody's

20   gotten infected or anything like that, but I just think better

21   safe than sorry.  So, I am going to keep in touch with the

22   experts just to make sure we're keeping everything as safe and

23   healthy as possible.  So, that's what we're doing.

24         We're going to continue with the direct examination

25   of the witness.

Proceedings                          214

1          Go ahead, Ms. Geddes.

2          MS. GEDDES:  Thank you.

3          THE COURT:  First, I think our clerk needs to remind

4  our witness.

5          THE COURTROOM DEPUTY:  You're reminded that you're

6  still under oath.

7          THE WITNESS:  Yes, okay.

8

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **JERHONDA JOHNSON PACE**,

2          called as a witness by the Government, having been

3          previously duly sworn/affirmed by the Courtroom Deputy,

4          was examined and testified further as follows:

5    DIRECT EXAMINATION (CONTINUING)

6    BY MS. GEDDES:

7    Q     Good morning.

8                Yesterday during your direct examination you

9    testified about the different devices that the defendant used

10   to record you.

11               Do you recall that?

12   A     Yes.

13   Q     What, if anything, specifically, do you recall the

14   defendant recording using the video camera on top of a tripod?

15               I think you testified earlier that it was a Canon

16   camera, is that correct?

17   A     Yes.

18   Q     What do you recall the defendant recording you doing

19   using that particular device?

20   A     He recorded us having sexual intercourse.

21   Q     While you were engaged in sexual activity with the

22   defendant, what, if anything, did the defendant request that

23   you wear during those encounters?

24   A     During those encounters, he wanted me to put my hair up

25   in pigtails and dress like a girl scout.

1   Q    Yesterday you also referenced The Cabin, one of the

2   recordings studios in the defendant's residence.

3        Is that correct?

4   A    Yes.

5   Q    Can you describe how The Cabin appeared?

6   A    It's a recording studio.  It looks like a log cabin.  So,

7   the inside of the room, it was just logs for, like, the walls

8   and everything.

9   Q    You also testified about documents and a camera, not --

10  excuse me.

11       You testified about documents and a cell phone and a

12  T-shirt that you picked up from your lawyer Fish.

13       Do you recall that?

14  A    Yes.

15  Q    How were the documents -- how did you pick up the

16  documents?  When you picked up the shirt and the cell phone,

17  how were the documents packaged?

18  A    They were in a box.

19  Q    And --

20  A    Everything was in a box and he handed me the box.

21  Q    And were the papers, physical papers that you picked up?

22  A    It was a flash drive.

23  Q    Containing scans of those documents?

24  A    Yes.

25       MS. GEDDES:  Your Honor, may I publish Government

Pace - direct - Geddes                      217

1    Exhibit 210(p), which is already in evidence?

2              THE COURT:  Yes.

3              (Exhibit published.)

4    BY MS. GEDDES:

5    Q    Directing your attention to Government Exhibit 210(p),

6    which is shown on the screen in front of you.

7              What was the telephone number for the cellular

8    telephone that you identified yesterday, which was in evidence

9    as Government Exhibit 210?

10   A    This is the number, it was 630-886-2837.

11   Q    And how is it that you would arrange times to go to the

12   defendant's residence?

13   A    It would be through phone calls.

14   Q    Including using this telephone?

15   A    Yes.

16   Q    I am showing Government Exhibit 210(e), which is also in

17   evidence.

18             (Exhibit published.)

19   Q    What is shown in 210(e)?

20   A    A picture of me.

21   Q    And approximately when was that picture taken?

22   A    It was taken probably around the summertime, 2009.

23             MS. GEDDES:  And I am showing now 210(m).

24             (Exhibit published.)

25   Q    What is shown in 210(m)?

Pace - direct - Geddes                218

1   A     Another photo of me.

2   Q     What are you wearing?

3   A     I am wearing some blue jeans and an Aéropostale T-shirt.

4   Q     Is that the same brand of T-shirts as the one that you

5   identified yesterday as using the last time you were at the

6   defendant's residence?

7   A     Yes, it is the same brand.

8   Q     Fair to say it's a different T-shirt, though?

9   A     Yes, it is.

10        MS. GEDDES:  I am showing the witness -- I am

11  showing everyone Government Exhibit 210(ab).  This is also in

12  evidence.

13        (Exhibit published.)

14  BY MS. GEDDES:

15  Q     What is shown in 210(ab)?

16  A     It's a photo of me.

17  Q     And I want to direct your attention to the tattoo that is

18  on your body shown in the photograph.

19        Do you see that?

20  A     Yes, I do.

21  Q     What is that a tattoo of?

22  A     It's a tattoo of Rob's name.

23  Q     And does that say Rob, R-O-B?

24  A     Yes, it does.

25  Q     And what, again, happened to that tattoo?

1   A    I covered it up with a black heart.

2   Q    So, you filled it in?

3   A    Yes.

4   Q    I am showing what's in evidence as Government

5   Exhibit 210(aa).

6             (Exhibit published.)

7   Q    What is shown on 210(aa)?

8   A    A photo of Dominique.

9   Q    And this was a photo that was on your cellular telephone?

10  A    Yes, it is.

11  Q    Who took this photograph?

12  A    Dominique took that photograph.

13  Q    How did you obtain it?

14  A    She sent it to me.

15            MS. GEDDES:  I am showing what's in evidence as

16  Government Exhibit 210(n).

17            (Exhibit published.)

18  BY MS. GEDDES:

19  Q    What is shown in Government Exhibit 210(n)?

20  A    Rob's contact information.

21  Q    Was this a contact that was saved on your cellular

22  telephone in evidence as Government Exhibit 210?

23  A    Yes, it is.

24  Q    And when you say "Rob," who are you referring to?

25  A    The defendant.

1  Q    What was the telephone number listed for the defendant?

2  A    708-337-9300.

3         MS. GEDDES:  I am showing what's in evidence as

4  Government Exhibit 210(z) as in zebra.

5         (Exhibit published.)

6  BY MS. GEDDES:

7  Q    What is shown in Government Exhibit 210(z)?

8  A    These are my contacts.

9  Q    And there's one contact highlighted there.

10        Do you recognize who that -- what is that a contact

11  for?

12  A    That's Rob's studio.

13  Q    And what was the telephone number for Rob's studio?

14  A    708-747-6 -- 6569.

15  Q    And just to be clear, when you say "Rob," are you

16  referring to the defendant?

17  A    Yes, I am.

18  Q    And was that a contact that was saved in your telephone,

19  Government Exhibit 210?

20  A    Yes, it is.

21        MR. CANNICK:  Your Honor, can I just have the

22  exhibit number before we go?

23        THE COURT:  Can you give the exhibit number again?

24        MS. GEDDES:  Oh, yes, 210(z) as in zebra.

25        THE COURT:  All right.

Pace - direct - Geddes                    221

1          MS. GEDDES:  I'm showing what's in evidence as

2     Government's Exhibit 210(y).

3               (Exhibit published.)

4     BY MS. GEDDES:

5     Q    What is shown in 210(y)?

6     A    My contact --

7               THE WITNESS:  My mic died.

8               MS. GEDDES:  We lost our mic.

9               (Pause.)

10    Q    All right, what is shown in Government Exhibit 210(y)?

11    A    My contacts.

12    Q    And what contact is highlighted there?

13    A    My mom's phone number.

14    Q    And was that a contact saved in your telephone in

15    Government Exhibit 210?

16    A    Yes, it was.

17    Q    Does your mother still have that telephone number?

18    A    No, she does not.

19    Q    What is the telephone number?

20    A    224-387-6519.

21         MS. GEDDES:  I am showing what's in evidence as

22    Government Exhibit 210(x).

23              (Exhibit published.)

24    Q    What's shown on 210X?

25    A    My contacts.

1   Q    Whose telephone number is highlighted in red?

2   A    Keyonia's.

3   Q    Is Keyonia the friend that you testified you first went

4   to the defendant's house back in 2009 with?

5   A    Yes.

6   Q    And was that a contact that was saved in Government

7   Exhibit 210?

8   A    Yes.

9   Q    What was Keyonia's telephone number back then?

10  A    773-612-1900.

11          MS. GEDDES:  I am showing what's in evidence as

12  Government Exhibit 210(v), as in Victor.

13          (Exhibit published.)

14  BY MS. GEDDES:

15  Q    What is shown in 210(v)?

16  A    My contacts.

17  Q    Whose contact is highlighted?

18  A    Dominique's.

19  Q    And how is Dominique referred to in your phone?

20  A    Domo.

21  Q    D-O-M-O?

22  A    Yes.

23  Q    Is that a nickname for her?

24  A    Yes, it is.

25  Q    And, again, was that a contact that was saved in your

Pace - direct - Geddes                    223

1   telephone that you had in 2009 and 2010?

2   A    Yes, it is.

3   Q    What was Dominique's number back then?

4   A    708-623-4142.

5   Q    And just to be clear, you've referred to a photograph of

6   Dominique just a few minutes ago, as well as this contact.

7          Is this the Dominique that was shown yesterday in

8   Government Exhibit 69 who you identified as Dominique?

9   A    Yes.

10          MS. GEDDES:  I am showing the witness what's in

11   evidence as Government Exhibit 210(u).

12          (Exhibit published.)

13   BY MS. GEDDES:

14   Q    What is shown on 210(u)?

15   A    A phone call.

16   Q    And was this a phone call that you -- can you tell

17   whether this is a phone call you sent or received, you made or

18   received?

19   A    No, I cannot.

20   Q    Okay.

21          Who is the phone call with?

22   A    Rob.

23   Q    The defendant?

24   A    Yes.

25   Q    And what telephone number was used to connect to the

Pace - direct - Geddes                         224

1    defendant?

2    A     708-337-9300.

3    Q     What was the date of that telephone call?

4    A     January 23rd.

5    Q     Do you know what year that would have been?

6    A     2010.

7    Q     What time?

8    A     1:36 p.m.

9    Q     And how long did the telephone call last?

10   A     Fifty-seven seconds.

11            MS. GEDDES:   I am showing what's in evidence as

12   Government Exhibit 210(t).

13   Q     What's shown in 210(t)?

14   A     Another phone log.

15   Q     And who is this communication with?

16   A     Rob.

17   Q     The defendant?

18   A     Yes.

19   Q     What is the date of this communication?

20   A     January 23rd.

21   Q     What time?

22   A     2:51 p.m.

23   Q     And, again, what year was that of January 23rd?

24   A     2010.

25   Q     How long did that telephone call last?

1    A    Fifty seconds.

2    Q    I am showing -- I'm sorry, did you say what time that

3    telephone call happened?

4    A    Yes, I did.

5    Q    Okay, thank you.

6              MS. GEDDES:  I am showing what's in evidence as

7    210(s).

8              (Exhibit published.)

9    BY MS. GEDDES:

10   Q    What's shown in 210(s)?

11   A    Another phone log.

12   Q    Who is that -- who is that communication with?

13   A    With Rob.

14   Q    What was the date of it?

15   A    January 23rd.

16   Q    Same date as the prior telephone calls with the

17   defendant?

18   A    Yes.

19   Q    What time?

20   A    4:47 p.m.

21   Q    And how long did that telephone call last?

22   A    Fifty-six seconds.

23             MS. GEDDES:  I'm showing what's in evidence as

24   210(r).

25             (Exhibit published.)

Pace - direct - Geddes                                226

1    BY MS. GEDDES:

2    Q    What is shown in 210(r)?

3    A    Another phone log.

4    Q    And who is that telephone call with?

5    A    Rob.

6    Q    The defendant?

7    A    Yes.

8    Q    What date?

9    A    January 23rd.

10   Q    And of 2010?

11   A    Yes.

12   Q    How long did it last?

13   A    Twenty-seven seconds.

14   Q    All right, and, oh, what time?

15   A    5:03 p.m.

16        MS. GEDDES:  And finally, I am showing Government

17   Exhibit 210(o).

18        (Exhibit published.)

19   Q    What is 210(o)?

20   A    It's a text message.

21   Q    And who is that text message with?

22   A    It's a text message from Rob.

23   Q    And what was the telephone number of it?

24   A    708-337-9300.

25   Q    And what does the text message say?

Pace - cross - Cannick                    227

1    A     "Please call."

2    Q     And was this a text message that was sent to your phone,

3    Government Exhibit 210?

4    A     Yes.

5    Q     What was the date of this text message?

6    A     February 3rd, 2010.

7    Q     And what time?

8    A     10:02 p.m.

9    Q     How can you tell that that's a message from Rob?

10   A     Because it says message from, and then it has his phone

11   number, and it says Rob.

12          MS. GEDDES:  No further questions for this witness.

13          THE COURT:  Okay, cross-examination.

14          MR. CANNICK:  Thank you, Your Honor.

15          Your Honor, may I move the podium up over here so I

16   can have access to the microphone?

17          THE COURT:  You have it over there, yes.

18          MR. CANNICK:  Okay, it's hidden.

19          THE COURT:  And I am going to keep nagging you to

20   use the microphone.

21          (Pause.)

22   CROSS-EXAMINATION

23   BY MR. CANNICK:

24   Q     Now, you just testified about a number of telephone

25   communications between you and Rob, am I correct?

SAM     OCR     RMR     CRR     RPR

1   A    Yes.

2   Q    Okay.  Now, those calls, according to you, and the

3   records, how many were they?

4   A    I don't recall.

5   Q    Would five sound correct?

6   A    Five sounds about right.

7   Q    And those calls were made on the same day, June -- I mean

8   January 23rd, 2010, am I correct?

9   A    Yes.

10  Q    And how long apart were they made?

11  A    I don't recall.

12  Q    Now, when you made those calls or when the calls were

13  made to you, do you recall whether or not you reached an

14  individual or whether or not you got an answering service?

15  A    We talked on the phone.

16  Q    Now, the calls -- you had conversations, and the longest

17  one was -- hold on a second.

18          So, the longest conversation was 57 seconds, am I

19  correct?

20  A    Yes.

21  Q    And you had five conversations, wherein the longest one

22  was 57 seconds?

23  A    Yes.

24  Q    And then you had a text message?

25  A    Yes.

SAM       OCR       RMR       CRR       RPR

1  Q    Now, when was it that you told -- withdrawn.

2         You told the jury yesterday that you had a

3  relationship with Rob for about six months, am I correct?

4  A    Yes.

5  Q    And you said that that relationship started in May 2009,

6  am I correct?

7  A    Yes.

8  Q    And you said it terminated in January 2010, am I correct?

9  A    Yes.

10  Q    Now, what date did it terminate in January 2010?

11  A    I don't recall the exact date.

12  Q    But you recall you told the jury yesterday that on that

13  particular day that Rob spat on you, am I correct?

14  A    Yes.

15  Q    And he slapped you in your face, am I correct?

16  A    Yes.

17  Q    And he made you wipe semen off of your face with a cloth,

18  am I correct?

19  A    That's incorrect.

20  Q    No, you didn't wipe semen off your face with a T-shirt?

21  A    He didn't make me wipe it off with the T-shirt, I did.

22  Q    You did.

23         But all of this happened the last time you saw him

24  in a romantic relationship, am I correct?

25  A    Yes.

1   Q    And it's your testimony that you have no recollection as

2   to when that date was, am I correct?

3   A    That's correct.

4   Q    But you recall his telephone number from -- you recall

5   his telephone number from ten years ago, am I correct?

6   A    That's correct.

7   Q    Didn't recall your mom's, am I correct?

8   A    I do recall my mom's.

9   Q    No; yesterday when you were asked on the witness stand,

10  you testified and told the jury that you did not recall your

11  mother's testimony -- your mother's telephone number?

12  A    That's incorrect.

13  Q    You didn't recall your own telephone number, is that

14  correct?

15  A    That is correct.

16          THE COURT:  Mr. Cannick, can I see you with counsel

17  at the side?

18          I don't need the court reporter.

19          (Sidebar held with the Court and counsel only,

20  outside of the hearing of the jury and the court reporter.)

21          THE COURT:  So, Mr. Cannick, just do your best --

22          MR. CANNICK:  Yes, Your Honor.

23          THE COURT:  -- to stay tethered.

24          MS. GEDDES:  We do, Your Honor, we have it.

25          THE COURT:  Oh, you do.

Pace - cross - Cannick                    231

1          MR. CANNICK:  May I have the last question read

2     back, question and answer?

3          THE COURT:  Can you hear?  I just want to make sure

4     everybody can hear.  I don't want to have to interrupt you

5     again.

6          MR. CANNICK:  Okay.  Hopefully, this works.

7          THE COURT:  Give it a shot.

8          (Record read back as requested.)

9     BY MR. CANNICK:

10    Q    Now, you may -- so, according to you, there was a

11    50-second communication between you and Rob on January 23rd,

12    2010 at 2:51.

13         Am I correct?

14    A    Yes.

15    Q    And according to you, there was a communication between

16    you and Rob on January 23rd, 2010 for 57 seconds?

17    A    Yes.

18    Q    At 1:36 p.m.?

19    A    Yes.

20    Q    And, again, another telephone communication January 23rd

21    at 4:47 p.m., 56 seconds?

22    A    Yes.

23    Q    And there is another one that does not -- withdrawn.

24         Now, you were, in fact, stalking him, weren't you?

25    A    No.

1    Q    You weren't stalking him?

2    A    I was not.

3    Q    Now, this -- these calls were made after you initiated a

4    lawsuit against Robert, am I correct?

5    A    That is correct.

6    Q    Now, when was your first lawsuit settled against Rob?

7    A    I believe it was February of 2010.

8    Q    What date specifically in February 2010?

9    A    I do not recall.

10   Q    Now, going back to the testimony, 210(n), Government

11   Exhibit 210(n).

12          MR. CANNICK:  Could you?

13          MS. GEDDES:  It is connected to your laptop.

14          (Pause.)

15          MR. CANNICK:  To speed up time, could you just post

16   it?

17          MS. GEDDES:  Here you go.

18   BY MR. CANNICK:

19   Q    Can you see 210(n)?

20   A    No.

21          THE COURT:  Are you connected to --

22          MR. CANNICK:  We are hoping that we are.

23          THE COURT:  Can we use the Government's?

24          I'm sorry.  The other thing we can do is take ten

25   minutes and try to fix it.  I'd rather not.

1              MR. CANNICK:  I'd rather not as well.

2              (Exhibit published.)

3     BY MR. CANNICK:

4     Q     Can you see 210(n)?

5     A     Yes.

6     Q     Now, you testified, you told us that that was a contact

7     of Rob that was stored in your phone?

8     A     Yes.

9     Q     Now, there's a photo there, correct?

10    A     Yes, it is.

11    Q     Where did you get the photo?

12    A     That photo came off the internet.

13    Q     He didn't give you a photo, am I correct?

14    A     That's correct.

15    Q     You went to the internet search and got a picture from

16    your phone?

17    A     Yes, I did.

18             MR. CANNICK:  You can take it down, please.

19    BY MR. CANNICK:

20    Q     Now, before coming and giving testimony to the jury

21    yesterday, how many meetings had you had with the Government?

22    A     I don't recall.

23    Q     Well, let's see if we can work it out.

24             When was the last time you met with the Government

25    before coming in and giving testimony to the jury yesterday?

Pace - cross - Cannick                234

1   A     Monday.

2   Q     Okay.  And how long was that meeting?

3   A     I don't recall.

4   Q     Well, was it five minutes?

5   A     It was longer than five minutes.

6   Q     Was it longer than 30 minutes?

7   A     Yes, it was.

8   Q     Was it longer than an hour?

9   A     Yes, it was.

10  Q     Was it longer than two hours?

11  A     Yes, it was.

12  Q     Was it longer than three hours?

13  A     Yes.

14  Q     Four hours?

15  A     Yes.

16  Q     Five hours?

17  A     Yes, it was.

18  Q     Six hours?

19  A     I'm not sure if it reached the six-hour mark.

20  Q     Who was present at the meeting?

21  A     Several of -- several people that's sitting at the table.

22  Q     When you say "several people" sitting at the table, what

23  table?

24  A     This table (indicating) right here.

25  Q     You're talking about the Government's table?

1    A    Yes, I am.

2    Q    Specifically, who were those people?

3    A    Ryan was present.  Maria was present.  Liz was present.

4    And I don't remember your name, I'm sorry.  She was present.

5    Q    She was present, as well?

6    A    She was present, as well, yes.

7                THE COURT:  Ms. Shihata?

8                THE WITNESS:  Yes.

9    BY MR. CANNICK:

10   Q    And you know these two by the first name, correct?

11   A    Yes.

12   Q    Who else?

13   A    Keith was present as well.

14   Q    Who's Keith?

15   A    A part of the government team.

16   Q    Who else?

17   A    I don't recall if there was more people.

18   Q    Now, at that meeting you went over, you rehearsed your

19   testimony, am I correct?

20   A    That is incorrect.

21   Q    You didn't go over the questions that were asked by

22   you -- asked of you by Ms. Geddes?

23   A    I did go over questions, but I did not rehearse.

24   Q    Oh.  So, the very questions that were asked of you by

25   Ms. Geddes yesterday and this morning, you went over them with

1   her in her office at that meeting?

2   A    That is correct.

3   Q    At that meeting did you look at any documents?

4   A    Yes, I did.

5   Q    What documents did you look at?

6   A    The evidence that I presented.

7   Q    The evidence that you presented?

8   A    Yes.

9   Q    Did you look at photographs?

10  A    Yes, I did.

11  Q    Did you listen to audios?

12  A    No, I did not.

13  Q    Videos?

14  A    No, I did not.

15  Q    Now, so this was all done on Monday for about six-plus

16  hours, am I correct?

17  A    I'm not sure it made the six-hour mark.

18  Q    And when I say Monday, I'm talking about three, four days

19  ago.

20          THE COURT:  Well, today is Thursday.

21          MR. CANNICK:  Okay, let's back it up.

22  BY MR. CANNICK:

23  Q    Four days ago?

24  A    It was on Monday of this week.

25  Q    Okay.  Before that, when was the last time you spoke with

1   the Government or met with the Government?

2   A    I don't recall.

3   Q    And you have no recollection as to how many times you met

4   with the Government?

5   A    I do not.

6   Q    Now, you did meet with the Government on prior occasions,

7   am I correct?

8   A    That is correct.

9   Q    Before Monday?

10  A    Yes.

11  Q    And would it be fair to say you met with them more than

12  once, am I correct?

13  A    That is correct.

14  Q    More than twice, am I correct?

15  A    That would be correct.

16  Q    More than three times, am I correct?

17  A    I'm not sure how many times it was.

18  Q    And when you met with them, you did the very same thing,

19  you went over your testimony, am I correct?

20  A    I did not go over my testimony.

21  Q    Well, didn't they ask you the questions that were asked

22  of you yesterday and this morning?

23  A    No, not at every meeting.

24  Q    Not at every meeting.

25         But you didn't go there to have cocktails with them,

Pace - cross - Cannick                238

1   am I correct?

2   A     That is correct.

3   Q     You didn't have lunch with them, correct?

4   A     That's correct.

5   Q     You went there to prepare to give your testimony, am I

6   correct?

7   A     That is correct.

8   Q     And each time you went there, there were a number of

9   government officials in the room taking notes, am I correct?

10  A     That is correct.

11  Q     Now, you've also had interviews regarding your story as

12  to what you say happened here, am I correct?

13  A     That is correct.

14  Q     How many?

15  A     I'm unsure of how many interviews it was.

16  Q     Was it more than one?

17  A     It was more than one.

18  Q     More than two?

19  A     Yes, it was more than two.

20  Q     More than three?

21  A     I'm not sure how many it was.

22  Q     Can you approximate?

23        MS. GEDDES:  Objection.

24        THE COURT:  Well, do you have any idea how many it

25  was?

Pace - cross - Cannick                    239

1            THE WITNESS:  I do not.

2            THE COURT:  But was it more than two, right?

3            THE WITNESS:  Yes, it was.

4            THE COURT:  All right, go ahead.

5    BY MR. CANNICK:

6    Q    And you've done YouTube postings?

7    A    One YouTube posting, yes.

8    Q    When did you do that?

9    A    That was in 2017.

10   Q    And when did you have your first television, give your

11   first television interview?

12   A    The same year, 2017.

13   Q    And the second one?

14   A    That, I'm unsure of.

15   Q    And did you do any Instagram posting?

16   A    Yes, I did.

17   Q    How many?

18   A    I'm not sure how many Instagram posts I did.

19   Q    More than one, though?

20   A    Yes, it was more than one.

21   Q    Now, when you gave the television interview, were you

22   compensated?

23   A    No, I was not.

24   Q    YouTube, any compensation there?

25   A    No.

1   Q    Instagram, any compensation there?

2   A    No.

3   Q    But you wrote a book, am I correct?

4   A    Yes, I did.

5   Q    And any compensation for the book?

6   A    Yes.

7   Q    How much was the compensation for the book?

8   A    I don't recall the exact number.

9   Q    Well, give me the not-exact number.

10  A    It would be more than 25,000.

11  Q    More than a hundred-thousand?

12  A    Less than a hundred-thousand.

13  Q    So, it would be fair to say more than 25, but less than a

14  hundred?

15  A    Yes.

16  Q    And when was it that you received these monies?

17  A    It happened over a period of months.

18  Q    And who was it that you got it from?

19  A    Amazon.

20  Q    And did you have an agent?

21  A    No, it was a self-published book.

22  Q    Self-published book, okay.

23          And what you wrote in the book was accurate, am I

24  correct?

25  A    Yes.

Pace - cross - Cannick                    241

1          THE COURT:  I'm sorry, I just couldn't hear what you

2     said.

3          MR. CANNICK:  Accurate.

4     A    Yes, it was.

5     Q    No embellishment?

6     A    No.

7     Q    Okay.  Now, I want to go over your testimony from

8     yesterday.

9          You testified and told us that -- you testified and

10    told us that you first had sexual contact with Robert when you

11    were 16 years old.

12         Do you remember telling us that?

13    A    Yes.

14    Q    And incidentally, before you came, when you came here

15    yesterday and you gave testimony to the jury, you swore to

16    tell the truth, am I correct?

17    A    That is correct.

18    Q    And you said that the initial encounter was in May of

19    2009, am I correct?

20    A    Yes.

21    Q    And you said you were 16 years old at that time, am I

22    correct?

23    A    Yes.

24    Q    And you said that this relationship lasted for about six

25    months, am I correct?

1  A    That's correct.

2  Q    And I think you testified and told us that it terminated

3  in January 2010, am I correct?

4  A    That is correct.

5  Q    But you testified here this morning that you don't know

6  specifically the date that it terminated?

7  A    That's correct.

8  Q    Now, you told us yesterday that you had an encounter with

9  Robert in 2008.

10        Do you remember telling us that?

11  A    Yes.

12  Q    And you told us that that encounter came about on

13  April 1st, 2008; am I correct?

14  A    Yes.

15  Q    Now, in fact, you told us it was April Fool's Day?

16  A    Yes.

17  Q    Now, you testified and told the jury that at that -- at

18  the time of that encounter, you were 14 years old; am I

19  correct?

20  A    Yes.

21  Q    So, let's try to do the math here.

22        You met him April 1st, 2008.  Am I correct so far?

23  A    Yes.

24  Q    And you were 14 years old?

25  A    Yes.

Pace - cross - Cannick                 243

1   Q     And then you had your sexual encounter with him May in
2   2010?
3   A     Yes.
4   Q     2010 or 2009?
5   A     2009.
6   Q     Okay.
7         See, so in May 2009 you had your encounter with him,
8   am I correct?
9   A     That's correct.
10  Q     And you told the jury that you were 16 years old at that
11  time, am I correct?
12  A     That's correct.
13  Q     Now, you would agree with me that from May 1st, 2008
14  to -- I'm sorry, April 1st, 2008 to May 2009 is one year and
15  one month, am I correct?
16  A     That's correct.
17  Q     But according to you, you were 14 years old May 1st --
18  A     April.
19  Q     -- 2008?
20  A     April 1st.
21  Q     -- April 1st, 2008 and you were 16 in May 2009?
22  A     My birthday is April 19th.
23  Q     I didn't ask you when your birthday was.
24        I said that you told us yesterday that on April 1st,
25  2008 when you met Rob you were 14 years old?

SAM     OCR     RMR     CRR     RPR

1    A    Yes.

2    Q    On April 1st, 2008?

3    A    Yes.

4    Q    Sexual encounter with Rob, a year-and-a-month later,

5    you're 16 years old?

6    A    Yes.

7    Q    Okay.

8         So, you advanced two years in that year-and-a-month?

9    A    That's incorrect.

10    Q    Okay.  I know.

11         Now, when you went to the court in 2008 to support

12    Rob, you were 14 years old?

13    A    Yes, I was.

14    Q    But you told the court officers that you were 19 years

15    old?

16    A    That is true --

17    Q    You lied?

18    A    I told them I was 18.

19    Q    I beg your pardon?

20    A    I told them I was 18.

21    Q    Either way, you lied to them, am I correct?

22    A    That's correct.

23    Q    And you lied to them for three months, am I correct?

24    A    That's correct.

25    Q    And you presented identification to them verifying that

1  age, am I correct?

2  A    That's incorrect.

3  Q    You didn't give them identification?

4  A    I gave them my high school ID.  I did not present

5  anything that represented 18.

6  Q    So, you're telling us now that you gave the court

7  officers your high school identification?

8  A    Yes, I did.

9  Q    What high school were you attending?

10        THE COURT:  Go ahead.

11  A    At the time I was attending Schaumburg High School.

12  Q    What grade were you in?

13  A    At the time, I was a freshman.

14  Q    And you stayed out of school for three months to attend

15  that proceeding, am I correct?

16  A    That's incorrect.

17  Q    Didn't you testify that it was April 1st?

18  A    Yes, I did.

19  Q    Okay.  Now, and it lasted until June, am I correct?

20  A    That's correct.

21  Q    And you went every day, am I correct?

22  A    I did not go every day.

23  Q    How many days per week did you go?

24  A    I went to some of the hearings, so that took some time in

25  between, that wasn't every day.  So, for -- I'm not sure how

1    many days I went.

2              MR. CANNICK:  Your Honor, we're going to try to pull

3    up another photograph that an investigator brought us.

4              THE COURT:  You don't have to explain where it came

5    from, but does the Government have it?

6              MS. GEDDES:  We do not.

7              MR. CANNICK:  No.  It's something that we --

8              THE COURT:  That's okay.

9              Do you want to come over to the side with the court

10   reporter and we can discuss it?

11             MR. CANNICK:  Yes.

12             (Sidebar held outside the hearing of the jury.)

13

14             (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                    247
```

1              (The following sidebar took place outside the
2    hearing of the jury.)
3              MR. CANNICK:  Your Honor, there's a photograph,
4    there's two photographs, in fact, that we want to introduce
5    into evidence.
6              THE COURT:  Can I see them?
7              MR. CANNICK:  Actually, we're trying to get them.
8    We have them on the phone -- we have them on the computer, but
9    investigators are trying to get a color photo of it.
10             THE COURT:  What is it?
11             MR. CANNICK:  It's a picture of her and she's at the
12   court proceeding walking near the defendant trying to grab
13   him, reach out to him.
14             And then the other one is just a picture of her with
15   a newspaper with his picture against her chest.
16             THE COURT:  Do you have any objection?
17             MS. GEDDES:  I have no objection.  I'd just like to
18   see them, but I have no objection.
19             MR. CANNICK:  We need to get them, so I am going to
20   ask for a break at this time.
21             THE COURT:  You can't ask about some other stuff and
22   come back to it?
23             MR. CANNICK:  I can.
24             THE COURT:  I don't want her to have a baby on the
25   stand, so I would really like to move this along.

```
                          Sidebar                      248

1           MR. CANNICK:  Okay.

2           THE COURT:  Yes, and then I know you know this

3    already, but you're really talking a lot about the trial in

4    2008.  I don't think there's any reason, I am just saying it's

5    out there.

6           MR. CANNICK:  It's out there.

7           MS. GEDDES:  But I would just say, part of what she

8    was trying to explain, but couldn't because I've instructed

9    her not to use the word trial, is that there was a hearing on

10   April 1st, 2008.  Jury selection in the trial doesn't start

11   until May, and so there's a period of weeks that she doesn't

12   go.

13          THE COURT:  You can bring that out on redirect.

14          MR. CANNICK:  Okay.

15          (Sidebar concluded.)

16

17          (Continued on the following page.)

18

19

20

21

22

23

24

25
```

J. Pace - Cross/Mr. Cannick                      249

1          MR. CANNICK:  May I, your Honor?

2          THE COURT:  Yes, go ahead.

3          MR. CANNICK:  Okay.  Thank you.

4     EXAMINATION BY

5     MR. CANNICK:

6     (Continuing.)

7     Q    Now, at the court proceeding you met someone and became

8     friendly with him, am I correct?

9     A    Yes.

10    Q    That person's name was Keyonia Jones?

11    A    Yes.

12    Q    You are no longer friendly with her; am I correct?

13    A    That's correct.

14    Q    And that friendship terminated when?

15    A    I don't recall.

16    Q    And you testified there came a point in time that you

17    spoke to someone connected with Robert about your being there

18    and being supportive and you were promised a T-shirt or an

19    autograph.  Do you remember telling us that?

20    A    An autograph, yes.

21    Q    An autograph, both.  And did that come to pass?

22    A    The autograph did.

23    Q    Okay.  And the autograph came to pass because,

24    basically, you stood in front of his tour bus and would not

25    move until you were given an autograph, am I correct?

1   A    That's incorrect.

2   Q    What did you do with the autograph?

3   A    I kept the autograph.

4   Q    Where?

5   A    I put it in my closet.  It was in my closet for a while.

6   Q    What was the autograph on?

7   A    It was on Keyonia's bank statement.

8   Q    Now, you testified and told us there came a point in

9   time this you were invited to a party at Robert's home, am I

10  correct?

11  A    That's correct.

12  Q    And you testified that you and Keyonia were invited and

13  you went, am I correct?

14  A    That's correct.

15  Q    And you testified and told us that you took the train

16  there?

17  A    That's correct.

18  Q    And the train was a two-hour ride?

19  A    From my home to the suburbs, yes.

20  Q    And after you got to the stop that you got off on, it

21  was a ten-minute walk, am I correct?

22  A    That's correct.

23  Q    So, in essence, to get from your home to this party took

24  you two hours and 10 minutes by public transportation and

25  walking the rest, am I correct?

J. Pace - Cross/Mr. Cannick            251

1   A    That's correct.

2   Q    And you testified that you got there and you saw

3   security, am I correct?

4   A    That's incorrect.

5   Q    What happened when you got there?

6   A    Bubba came to the gate and let us in.

7   Q    Now, when Bubba came to the gate, you didn't encounter

8   security at the gate at all?

9   A    No.

10  Q    Did anyone ask you for your identification at that time?

11  A    No.

12  Q    Did anyone ask you to sign a nondisclosure agreement at

13  that time?

14  A    No.

15  Q    So you got there and you just got with Bubba and then

16  just, basically, Bubba took you back up to the party?

17  A    That's correct.

18  Q    Now, you never told -- there was never a situation where

19  you were asked for identification and you told them that you

20  have to come right back because you left your identification

21  at your uncle's house?

22  A    No.

23  Q    Never told them that, right?

24  A    No.

25  Q    You are as truthful about as you are everything else you

J. Pace - Cross/Mr. Cannick                    252

1  testified about and told this jury today?

2  A    Yes.

3  Q    Now, you got to the party --

4       MR. CANNICK:  Withdrawn.

5  Q    How much money did you pay to get the train out there?

6  A    It took about $15.

7  Q    And was that for a roundtrip, or was that for a single

8  fare?

9  A    It was roundtrip both ways.

10  Q    And you testified and told us that you stayed at the

11  party for about 30 minutes?

12  A    Less than 30 minutes.

13  Q    Less than 30 minutes.  So you took a two-hour ride

14  there, a ten-minute walk, went there to the party, stayed for

15  less than ten minutes, I mean, 30 minutes and then you went

16  back on your way?

17  A    Yes.

18  Q    So, in essence, you traveled four hours and 20 minutes

19  for less than 30 minutes of partying?

20  A    Yes.

21  Q    And you left because the music was too loud?

22  A    Yes.

23  Q    Now, you knew when you left home you were going to

24  R. Kelly's party, am I correct?

25  A    That's incorrect.

J. Pace - Cross/Mr. Cannick                253

1   Q    You didn't know you were going to R. Kelly's party?

2   A    I did not.

3   Q    But you knew you were going to a party?

4   A    No, I did not.

5   Q    And you were truthful about that as everything else you

6   told us about?

7   A    Yes.

8   Q    Now, during this less than 30 minutes that you were at

9   the party, did you see any other celebrities?

10  A    No.

11  Q    About how many folks were at the party?

12  A    There was about 30 to 35 people.

13  Q    Do you remember what time you got to the party?

14  A    I do not.

15  Q    Do you remember what time you left the party?

16  A    I do not.

17  Q    Do you remember what time you left your home?

18  A    I do not.

19  Q    Do you remember if you saw Robert at the party?

20  A    I do.

21  Q    Now, when you saw Robert, did you subsequently have a

22  conversation with him?

23  A    I did have a conversation with him.

24  Q    Did you initiate that conversation or did Robert?

25  A    He did.

J. Pace - Cross/Mr. Cannick                254

1   Q     He did.

2                   I want to go back to when you met Robert.  You

3   told him that you were 19 years old?

4   A     That's correct.

5   Q     How did that come about?

6   A     He asked me my age.

7   Q     And you told him 19?

8   A     Yes.

9   Q     You lied?

10  A     I did.

11  Q     Just like you lied to the court officers?

12  A     That is incorrect.

13  Q     When you were going to Robert's court appearance back in

14  2018, did you tell your mom you were going to court?

15  A     No, I did not.

16  Q     Where did you tell her you were going?

17  A     I was supposed to be going to school.

18  Q     So you lied to her, too?

19  A     She didn't ask.

20  Q     And you didn't tell her?

21  A     I did not.

22  Q     So we have a lie to your mom, a lie to the corrections

23  officer, and a lie to Robert?

24              MS. GEDDES:  Objection.

25              THE COURT:  Sustained as to form.

J. Pace - Cross/Mr. Cannick                255

1          Now, when you went to Robert's party, you didn't
2   expect loud music?
3          THE WITNESS:  I did not.
4          MR. CANNICK:  Before going to Robert's party, have
5   you ever been to a party?
6          THE WITNESS:  I have.
7   Q    Loud music at those parties?
8   A    No.
9          MS. GEDDES:  Objection.
10         THE COURT:  Overruled.
11  Q    There was no loud music at those parties?
12  A    No.
13  Q    Were these parties attended -- hosted by
14  African-Americans?
15         THE COURT:  Which parties are you talking about?
16         MR. CANNICK:  Let me just back up.
17         THE COURT:  Okay.
18  Q    How many parties did you attend before going to
19  Robert's?
20  A    I don't recall.
21  Q    But you do recall going to parties?
22  A    Yes.
23  Q    And were any of them hosted by African-Americans?
24         MS. GEDDES:  Objection.
25         THE COURT:  Sustained.  Come on, Mr. Cannick, move

J. Pace - Cross/Mr. Cannick                256

1   along.

2   Q    You didn't hear loud music at any of those parties that

3   you went to before?

4           MS. GEDDES:  Objection.

5           THE COURT:  Overruled.  Did anybody play loud music

6   at a party that you went to?

7           THE WITNESS:  No.

8   Q    Now, you went to the party and you left after about

9   30 minutes and you went home?

10  A    Yes.

11  Q    Do you recall what time you got home?

12  A    I do not.

13  Q    And you were 16 years old when you went to this party?

14  A    Yes, I was.

15  Q    Now, you testified and told us earlier that you had an

16  uncle who lived in the Olympia fields area?

17  A    Yes.

18  Q    What was the address?

19  A    I don't recall the address.

20  Q    What was his name?

21  A    His name is Perry.

22  Q    Perry, what's his last name?

23  A    His last name is Marion.

24  Q    Perry Marion?

25  A    Yes, that's correct.

J. Pace - Cross/Mr. Cannick                 257

1  Q    And before the night of the party how many times have

2  you been to his home?

3  A    I hadn't.

4  Q    You had not?

5  A    No.

6  Q    Have you ever been to his home?

7  A    I have.

8  Q    When?

9  A    The first time was in May of 2009.

10 Q    May of 2009.  The same month that you went to the party?

11 A    Yes.

12 Q    Was it before or after you attended the party?

13 A    Can you rephrase your question?

14      THE COURT:  Before you rephrase your question, can

15 you adjust your microphone.  It's getting buried.

16 Q    You testified and told us you visited your uncle in May

17 of 2009.  Do you remember telling us that?

18 A    That's incorrect.

19 Q    May I have that last question before that one read back.

20      (The requested portion of the record was read back

21 by the Official Court Reporter.)

22 Q    When was it that you visited your uncle?

23 A    I was visiting my uncle throughout the years.

24 Q    Short while ago, I asked you before --

25           Short while ago, I asked you when is it that

J. Pace - Cross/Mr. Cannick                    258

1   you visit your uncle.  Do you remember me asking you that?

2   A    I recall you -- I thought you were talking about Rob.

3   When you asked me when was the first time I went to his home

4   because you were speaking a party.

5            THE COURT:  I think the question was:  Do you

6   remember -- you can rephrase it -- I thought the question

7   was, do you remember the first -- you said you had an uncle

8   that lived nearby, right?

9            THE WITNESS:  Yes.

10           THE COURT:  When did you first go to his house,

11  that's the question.

12           THE WITNESS:  Oh, I went to my uncle's house

13  probably back about in 2006.

14  Q    And since that first visit in 2006, how many other times

15  have you visit with him?

16  A    We used to go there yearly for celebrations.  So since

17  2006, it was like every year for celebrations.

18  Q    But you don't know his address?

19  A    No, I do not.

20  Q    You testified and told us yesterday by subsequent visits

21  you had at Rob's home.  Do you remember telling us about

22  that?  Subsequent to the party?

23  A    Yes.

24  Q    And you testified and told us that someone by the name

25  of Anthony picked you up from the Metro station?

J. Pace - Cross/Mr. Cannick                 259

1    A    That's correct.

2    Q    And that, you know, that this person that you identified

3    as Anthony, did he introduce himself to you?

4    A    Yes, he did.

5    Q    So he spoke with you?

6    A    Yes.

7    Q    Wasn't wearing a name tag or anything like that?

8    A    No.

9    Q    And you testified that he took you to Rob's home, am I

10   correct?

11   A    Yes.

12   Q    And you testified that when you arrived at Rob's home,

13   basically, you called him to let him know that you were there

14   and that he told you to go to the pool to change?

15   A    That's correct.

16   Q    And you did that, am I correct?

17   A    That's correct.

18   Q    And, at some point, you contacted them and let him know,

19   in fact, you had changed?

20   A    That's correct.

21   Q    And according to you, he came to the pool area and he

22   sat down on the lounge and told you to walk back and forth?

23   A    Yes.

24   Q    Okay.  And what did you take that to mean?

25   A    To just walk back and forth.

J. Pace - Cross/Mr. Cannick                    260

1   Q    Okay.  And you walked -- and you did walk back and forth
2   am I correct?
3   A    Yes.
4   Q    Where did you walk?
5   A    Along the pool.
6   Q    And when you were walking, did you walk model-like?
7   A    No, I was just regular walking.
8   Q    Regular walking.  And how many times you walk back and
9   forth?
10  A    I'm not sure.
11  Q    Were you removing your bathing suit each time you walked
12  back and forth?
13  A    That's correct.
14  Q    Did you do that on your own?
15  A    At the instruction of Rob.
16  Q    Tell me what that instruction was?
17  A    He told me to walk back and forth and remove my bathing
18  suit as I did it.
19  Q    And you did it.  Well, did you say to him when he asked
20  you to do this, no?
21  A    No.
22  Q    Did you say, I'm going home?
23  A    No.
24  Q    So you just took off your clothes?
25         MS. GEDDES:  Objection.

J. Pace - Cross/Mr. Cannick                    261

1         THE COURT:  Overruled.

2   A     Yes.

3   Q     Then, according to you, that after that happened he gave

4   you oral sex?

5   A     Yes.

6   Q     Then you said that after that happened that you felt

7   uncomfortable and you told him that you were 16?

8   A     Yes.

9   Q     Now, what about that that made you feel uncomfortable to

10  tell him you were 16?

11  A     I was uncomfortable with the situation.  I knew I had

12  lied about my age and I wanted to tell him my age.

13  Q     But you were not so uncomfortable with the situation

14  that you decided:  Hell, no, I'm not taking off my clothes;

15  I'm going home.

16  A     That's correct.

17  Q     And this didn't come about because some law enforcement

18  was at the home looking for a 17-year-old Dominique?

19  A     That's correct.

20  Q     That's not the reason why you told him that, correct?

21  A     That's correct what you're saying.

22  Q     Now, you testified, and you told us yesterday, that at

23  this point in time when you were telling Robert your real age

24  that you showed him your state I.D., am I correct?

25  A     That's correct.

J. Pace - Cross/Mr. Cannick                262

1    Q    Now, do you recall being arrested and charged for having

2    a bogus I.D.?

3    A    No.

4    Q    Do you recall being arrested and convicted at all?

5    A    No.

6    Q    Never happened, right?

7    A    I don't recall.

8    Q    Do you recall being arrested in Bloomfield, Illinois?

9    A    No.

10   Q    Do you remember where Bloomfield, Illinois is located?

11   A    I do not.

12   Q    Do you know of any city by the name of Bloomfield?

13   A    I've heard of Bloomfield.

14   Q    But you've never been to Bloomfield?

15   A    I've never been to Bloomfield.

16          THE COURT:  Mr. Cannick, can I see and you the

17   Government for a second.  No court reporter necessary.

18          (Discussion held off the record.)

19          THE COURT:  All right.  Ladies and gentlemen, I

20   think we'll take our morning break now.  It'll probably be

21   about 15 minutes.  Please don't talk about the case or

22   anything having to do with the case, but I'll see new about

23   15 minutes.

24          COURTROOM DEPUTY:  All rise.

25          (Jury exits courtroom at 10:58 a.m.)

Proceedings                                    263

1      THE COURT:  All right.  The witness can step down

2  and everybody can sit down.

3      Just I wanted -- I think what we're going to try to

4  accomplish is to fix whatever is going on over here with your

5  connection and then I just want to make sure that

6  Mr. Cannick's microphone is properly attached.

7      What else do you want to say, I'm sorry.

8      MS. GEDDES:  That's all right, your Honor.  I

9  wanted to raise with the Court that with the defense

10  counsel's line of questioning regarding the witness's -- why

11  she was uncomfortable once she engaged in sexual activity

12  with the defendant and why she felt the need to explain that

13  she was 16.

14      One of the reasons I anticipate she would testify

15  that she felt uncomfortable is because the year before the

16  defendant was on trial for making a recording of an underage

17  female and that --

18      THE COURT:  I think counsel is aware that the line

19  of questioning will open that door.  We had a slight

20  conversation about it at the side, but if that's part of the

21  explanation, it seems like something that's appropriate on

22  redirect.

23      MS. GEDDES:  Thank you.

24      THE COURT:  But, anyway, let's be back here in

25  about 15 minutes, all right?

```
                        Proceedings                    264
```

1           (A recess in the proceedings was taken.)

2           MS. GEDDES:  Your Honor, may we raise one thing

3   briefly before?

4           THE COURT:  Let's have the defendant come out

5   first.

6           MS. GEDDES:  Yes, sorry about that.

7           THE COURT:  I'm assuming we've straightened out the

8   issues with the exhibits and the display.

9           MR. CANNICK:  That's what I'm told, your Honor.

10          (Defendant enters the courtroom at 11:24 a.m.)

11          MR. CANNICK:  The hard copy we were supposed to get

12  is 15 minutes away.

13          THE COURT:  What did you want to raise Ms. Geddes.

14          MS. GEDDES:  On cross, defense counsel referenced a

15  prior arrest and conviction for using a false I.D. or

16  something along those lines.  The witness does not have a

17  conviction for using a false I.D. and, therefore, I don't

18  think it's a proper basis for cross-examination.

19          THE COURT:  Was she arrested for it?

20          MS. GEDDES:  She was arrested.  She was also not

21  arrested in Bloomfield.  She was arrested for shoplifting in

22  Bloomingdale.

23          THE COURT:  In Bloomingdale's?  You didn't know

24  what that was?

25          MS. GEDDES:  Bloomingdale, Illinois.

Proceedings                    265

1          THE COURT:  So, first of all, an arrest is really

2     not probative of anything.  So I do agree that's not a proper

3     question.  I can't hear you.  I'm sorry.

4          MR. CANNICK:  I just turned it off, too.

5          THE COURT:  Just to drive me out of my mind.

6          MR. CANNICK:  I asked the question, it was a

7     good-faith based question based on the information I had.

8     Waiting for it, she denied it, so I moved on.

9          MS. GEDDES:  As long as we're not going back there,

10    it's fine.

11         THE COURT:  Yeah, that's fine.  I think generally,

12    you know, we're all on the same page about arrests then, so

13    it won't happen again I'm sure.

14         All right.  Anything else before we get the

15    witness?  Okay.  Let's get the witness.

16         MS. GEDDES:  Your Honor, one other note.  When I

17    redirect this witness, I've instructed her not to talk about

18    the trial.  Can I have a minute with her or just lead her

19    through it.

20         THE COURT:  When cross is done.  How much longer do

21    you have?

22         MR. CANNICK:  Maybe about an hour and a half.

23         THE COURT:  You can't see my aghast face under my

24    mask.  Okay.

25         MR. CANNICK:  It may go faster.

Proceedings                           266

1          THE COURT:  We won't talk about how loud the music

2    was.  Whatever.  I'm sure it will be fine.

3          (Witness takes the witness stand.)

4          THE COURT:  If that's the case, that'll take us to

5    about the lunch break anyway, so we'll handle it that way.

6    Of course, no requirement that you go for an hour and a half.

7          MR. CANNICK:  I certainly understand, your Honor.

8          THE COURT:  All right.  And I'm correct that we've

9    remedied whatever the problem was with the displaying of your

10   evidence.

11         MR. CANNICK:  I think we have.

12         THE COURT:  Is that right, Donna.

13         COURTROOM DEPUTY:  Yes, it is.

14         THE COURT:  I just want to make sure we were

15   connected.  The witness is here.  Let's get the jury.

16         (A brief pause in the proceedings was held.)

17         COURTROOM DEPUTY:  All rise.

18         (Jury enters courtroom at 11:29 a.m.)

19         COURTROOM DEPUTY:  You may be seated.

20         THE COURT:  All right, everybody.  Welcome back.

21   We're ready to continue with the cross-examination by

22   Mr. Cannick?

23         MR. CANNICK:  Thank you, your Honor.

24         COURTROOM DEPUTY:  The witness is reminded that she

25   is still under oath.

J. Pace - Cross/Mr. Cannick                 267

1          THE WITNESS:  Yes.

2     EXAMINATION BY

3     MR. CANNICK:

4     (Continuing.)

5     Q    So, earlier this morning, you told us there came a point

6     in time that you told Robert your true age according to you

7     as being 16?

8     A    Yes.

9     Q    And you told us, well, I asked based on your testimony

10    this morning, you told us that this happened after you had a

11    sexual encounter with Robert?

12    A    Yes.

13    Q    And when you said, "a sexual encounter with Robert,"

14    what -- would you describe is that sexual encounter?

15    A    It was oral sex that he performed on me.

16    Q    Now, you testified and told us earlier this morning that

17    you had a number of interviews with the Government prior to

18    coming in and giving testimony here am I correct?

19    A    Yes.

20    Q    Do you recall giving an interview to the government on

21    February 27, 2019?

22    A    I don't recall the exact date.

23          MR. CANNICK:  Your Honor, may I approach the

24    witness and see if it refreshes her recollection?

25          THE COURT:  Sure.

1            (Approaching the witness.)

2            MR. CANNICK:  You can hold it and see if you need

3    to look at it.

4            THE WITNESS:  Yes.

5    Q    You've had an opportunity to look at the document?

6    A    Yes.

7    Q    Does it refresh your recollection that you had an

8    interview with the Government on February 27, 2019?

9    A    Yes.

10   Q    Now, and that meeting that you had on February 27, 2019,

11   would it be fair to say it was similar to all of the other

12   meetings that you had with the Government wherein there were

13   a number of prosecutors and agents in the room?

14   A    Yes.

15   Q    And there were folks taking notes?

16   A    Yes.

17   Q    And you saw them when they were taking notes, am I

18   correct?

19   A    Yes.

20   Q    Now, do you recall telling during this meeting that you

21   and Robert moved from the pool area to the game room which is

22   located inside the home and this was the area that the party

23   was previously held and that Robert brought in your personal

24   bag with your belongings into that game room and you were

25   still naked when you guys entered the game room and you and

J. Pace - Cross/Mr. Cannick                    269

1    Robert sat down on the couch?

2            MS. GEDDES:  Objection.

3            THE COURT:  Is it to the form of the question?

4            MS. GEDDES:  Yes.

5            THE COURT:  It sounds rather compound.  Maybe you

6    could break it down.

7            MS. GEDDES:  There's another objection as well.

8            THE COURT:  Well, let's start by breaking it down

9    and see if that fixes the problem.

10   EXAMINATION BY

11   MR. CANNICK:

12   (Continuing.)

13   Q    At that meeting, do you recall telling the Government

14   that you and Robert were sitting on the couch?

15   A    Yes.

16   Q    And this was in the game room, am I correct?

17   A    Yes.

18   Q    And it was there according to you that you told Robert

19   that you were 16 years old?

20   A    Yes.

21   Q    And, according to you, you removed your identification

22   from the bag and showed it to Robert, am I correct?

23   A    Yes.

24   Q    And according to you, Robert told you to tell everyone

25   that you're 19 but act like you're 21?

1   A    That's correct.

2   Q    Now, do you recall telling your civil lawyers a

3   different story?

4   A    No.

5   Q    Do you recall telling your civil lawyers that Robert

6   told you to tell people that you were 19 but act like you're

7   25?

8   A    No.

9   Q    You did tell us yesterday that your lawyer that you were

10  working with was Patrick Condron of Susan Loggans &

11  Associates, am I correct?

12  A    Yes.

13  Q    And you did have a meeting with him on February 1, 2010,

14  am I correct?

15  A    I don't recall the exact date.

16          MR. CANNICK:  May I approach again?

17          THE COURT:  Yes.

18          (Approaching the witness.)

19          MS. GEDDES:  Can you let me know what exhibit

20  you're talking about.

21          MR. CANNICK:  3500-JP-16.

22          Just look at the document and see if it refreshes

23  your recollection.

24          THE WITNESS:  Yes.

25  Q    When you say "yes," does it refresh your recollection

J. Pace - Cross/Mr. Cannick                    271

1   that you had a meeting with your lawyers, your civil lawyers,

2   on of the Loggans Law Firm February 1, 2010?

3   A    Yes.

4   Q    Now, you're testifying and telling us that at that

5   meeting you did not tell them that Rob told you to act -- to

6   tell folks you're 19 and act like you're 25?

7   A    I did not say that.

8   Q    Now, when you had those meetings with them, were they

9   taking notes?

10  A    No.

11  Q    Tell us how those meetings would go?

12  A    The meetings with my previous attorneys?

13  Q    Meetings with Patrick Condron of the Susan Loggans &

14  Associates Law Firm?

15  A    I only had a few meetings with them.  But I just went

16  there and I told them that I wanted to press criminal charges

17  against him originally and they did not recommend that I

18  press criminal charges against him.

19  Q    Okay.  Now, my question to you is tell us how the

20  meetings went.  Did you sit down in an office with them?

21  A    Yes, I did sit down in an office.

22  Q    And they took information from you?

23  A    Yes, they took -- they collected evidence from me.

24  Q    Did they ask you for a recitation of what your claim

25  was?

J. Pace - Cross/Mr. Cannick                272

1   A    Can you rephrase the question?

2   Q    Did they ask you to explain why you're there?

3   A    Yes.

4   Q    And you told them, correct?

5   A    Yes, I did.

6   Q    And you're telling this jury that they didn't take any

7   notes?

8   A    They did not take notes.

9   Q    Did you speak to anyone else?  Did they have you speak

10  to anyone else in connection with your claim?

11  A    I was able to speak with Susan over the phone.

12            MS. GEDDES:  Can I have one moment with counsel?

13            THE COURT:  Yes.  You don't need me, do you.

14            MS. GEDDES:  No.

15       (A brief pause in the proceedings was held.)

16       (Continued on the next page.)

17

18

19

20

21

22

23

24

25

```
                          Sidebar                      273
```

1           (The following sidebar conference was held outside

2    the hearing of the jury.)

3           MR. CANNICK:  The witness was interviewed by a

4    polygrapher.  What I'm asking her is did the law firm have her

5    speak to someone else.  Because I'm trying to make sure that I

6    don't open the door about bringing out the polygraph.

7           THE COURT:  I assume she passed it?

8           MR. CANNICK:  She passed portions of it.

9           MS. GEDDES:  She passed this one.

10          MR. CANNICK:  She said he told her, tell people that

11   she was 19 but act 25, but a prior inconsistent statement.

12   And I think the way I'm asking it does not open the door by

13   saying to her they had you speak to someone else, and in fact

14   you told them this.

15          THE COURT:  You already have done that.  I don't

16   know to what extent they permitted her to review whatever

17   their report was.

18          MS. GEDDES:  She hasn't.

19          THE COURT:  I'm just saying.  I think you're bound

20   by her answer unless you get the person in to say that she

21   said it.

22          MR. CANNICK:  I'm sure the Government will stipulate

23   to that.

24          MS. GEDDES:  I don't know about that.

25          MR. CANNICK:  You're not going to stipulate?  Then

```
                         Sidebar                        274
```

1    we'll drag them in.

2          THE COURT:  The only stipulation would be that

3    whoever it was prepared the notes at some time afterwards and

4    didn't show them to her.  I'm assuming that's what it is.  I'm

5    not trying to tell you how to do your business.  It doesn't --

6    you ask her the question if she says --

7          MR. CANNICK:  I can get the stipulation.  Because

8    she's --

9          THE COURT:  Go with God.

10         MS. GEDDES:  Just to be clear, I think you already

11   asked about this.  I think we're done.  We're moving on from

12   this.  I agree, I'm not going to bring in the polygraph based

13   on what you said.

14             (End of sidebar conference.)

15

16             (Continued on the next page.)

17

18

19

20

21

22

23

24

25

J. JOHNSON PACE - CROSS - CANNICK          275

1              (In open court - jury present.)

2    BY MR. CANNICK:

3    Q    Earlier this morning before we took our break I asked you

4    when you got this autograph from Robert.  Didn't you in fact

5    stand in front of his tour bus and did not move until you were

6    granted an autograph?  You remember me asking you that?

7    A    Yes.

8    Q    I think your answer was no; is that correct?

9    A    That's correct.

10   Q    Do you also recall a meeting with the Government where

11   the Government, where you told the Government that you and

12   Keyonia stood in front of Kelly's bus until they agreed to

13   give you an autograph?

14   A    I don't recall.

15              MR. CANNICK:  May I approach?

16              THE COURT:  Sure.

17   Q    I'm directing your attention to the second highlighted

18   portion in yellow.

19              Isn't it a fact that you and Keyonia stood in front

20   of Kelly's bus until they granted you an autograph?

21   A    We did not stand in front of his tour bus.

22   Q    If the Government has that written in their notes in

23   someplace, that's an error?

24   A    If it says tour bus, that's an error.

25   Q    Well, did you stand in front of any type of vehicle to

J. JOHNSON PACE - CROSS - CANNICK          276

1  get an autograph?

2  A    In front of a car, yes.

3  Q    In front of a car?

4  A    Yes.

5  Q    What kind of car?

6  A    I don't recall the exact car, but he was in the back of a

7  car.

8  Q    You saw the car with him in the back of the car, am I

9  correct?

10  A    Yes.

11  Q    Had you seen him in that car before?

12  A    Yes.

13  Q    Where did you see him in that car before?

14  A    Coming to court.

15  Q    He didn't come to court in a tour bus?

16  A    Yes, he came to court in a tour bus, and he would get in

17  the car or in an SUV and be dropped off at the courthouse.

18  Q    You stood in front of that car, am I correct?

19  A    Yes.

20  Q    You refused move, am I correct?

21  A    We did not refuse to move; we waived the car down.

22  Q    If the Government wrote in their reports that you and

23  Keyonia stood in front of this vehicle until he agreed to give

24  you and autograph, that would be wrong by the Government to

25  put that in the report, correct?

J. JOHNSON PACE - CROSS - CANNICK          277

1   A    It would not be wrong.

2   Q    Because that was -- it wouldn't be wrong because that's

3   what in fact happened, am I correct?

4   A    That is incorrect.

5   Q    Now, the day that -- the first day that you went to

6   Robert's home, did you have intercourse with him?

7   A    No.

8   Q    What happened that day sexually between the two of you?

9   A    Nothing.

10  Q    The first day, that's because of the party, correct?

11  A    The first day is the party.

12  Q    The second time, did you have intercourse with him?

13  A    Yes, I did.

14  Q    After you had intercourse with him, according to you, he

15  prepared you a drink?

16  A    Yes.

17  Q    And you described that drink yesterday as being

18  delicious, am I correct?

19  A    Yes.

20  Q    After a while you felt a little funny after having the

21  drink, am I correct?

22  A    Yes.

23  Q    You told Robert that?

24  A    Yes, I did.

25  Q    And then he, according to you, escorted you to the room

J. JOHNSON PACE - CROSS - CANNICK                278

1   with the mirror, am I correct?

2   A    Yes.

3   Q    You laid down, according to you, in that room until you

4   felt better, am I correct?

5   A    No.

6   Q    Did you eventually leave the room?

7   A    Yes.

8   Q    When you left the room, where did you go to?

9   A    Down to the studio.

10  Q    Now, this was only the second time you were at his home,

11  am I correct?

12  A    Yes.

13  Q    And the first time you were at his home, you were there

14  for only about, less than 30 minutes, am I correct?

15  A    Yes.

16  Q    You went to a party, and that party was where?

17  A    It was at his home in the game room.

18  Q    And no one during that time gave you a tour of his home,

19  am I correct?

20  A    That's correct.

21  Q    And when you went there the second time you were

22  escorted, according to you, by Anthony to the pool area, am I

23  correct?

24  A    Correct.

25  Q    Prior to going to the pool area, Anthony did not give you

J. JOHNSON PACE - CROSS - CANNICK                279

1   a tour of the house, am I correct?

2   A    That's correct.

3   Q    This room that, the mirror room, according to you, is on

4   the first floor?

5   A    Incorrect.

6   Q    Where is the mirror room?

7   A    First level of the home.

8   Q    First level of the home?

9   A    Yes.

10  Q    How many levels?

11  A    Basement, first level then upstairs.

12  Q    So you when you said first level of the home, is that the

13  first floor?

14  A    No.

15  Q    What is the first floor?

16  A    The first floor would be the basement.

17  Q    Uh-huh.  Before this day you never had any type of tour

18  or orientation of Robert's home, am I correct?

19  A    That's correct.

20  Q    After you were lying in the mirror room for a period of

21  time, you got up and went where?

22  A    I was taken down to the studio.

23  Q    You were taken down to the studio?

24  A    I was escorted down to the studio.

25  Q    Who escorted you?

J. JOHNSON PACE - CROSS - CANNICK          280

1   A    Robert.

2   Q    Robert escorted you?

3   A    Yes.

4   Q    Wasn't Robert preparing for a party downstairs?

5   A    No.

6   Q    Weren't you in that room by yourself sleeping trying to

7   feel better?

8   A    No.

9   Q    So Robert was in the room with you as you slept in the

10  mirror room?

11  A    He wasn't in the room the entire time.

12  Q    Do you recall testifying and telling the jury yesterday

13  under oath.

14       Question:  Did you drink the drink?

15       Answer:  I did drink it.

16       Question:  How did it make you feel?

17       Answer:  It was delicious.  I just started feeling a

18  bit ill and I told the defendant I wasn't feeling well.

19       Question:  What happened once you told the defendant

20  you weren't feeling well?

21       Answer:  He opened a door to the mirror room and he

22  told me I can lay down in the mirror room.

23       Question:  Can you describe the mirror room?

24       Answer:  A room where the entire room is just

25  mirror.  There is a huge mirror above the bed.

J. JOHNSON PACE - CROSS - CANNICK                281

1        Question:  What happened once you were inside the
2   mirror room?
3        Answer:  I just laid down.
4        Question:  And where, if anywhere, did the defendant
5   go once you were in the mirror room?
6        Answer:  He told me -- well, he was preparing for a
7   party that he was going to have later, so he ended up leaving
8   the room.
9        Question:  Where did you go?
10       Answer:  About, I want to say ten minutes later, I
11  went downstairs.
12       When you testified under oath to this jury
13  yesterday, you didn't tell them that Robert took you
14  downstairs, am I correct?
15  A    That is correct.
16  Q    You told them that you laid there for about ten minutes
17  then you went downstairs, am I correct?
18  A    That's correct.
19  Q    So when you testified just a short while ago that Robert
20  took you downstairs you lied, didn't you?
21       MS. GEDDES:  Objection.
22       THE COURT:  Sustained as to form.
23  Q    Were you telling the truth when you told the jury just a
24  short while ago that it was Robert who took you downstairs?
25  A    Yes.

J. JOHNSON PACE - CROSS - CANNICK          282

1   Q    Do you know what the truth is?

2        THE COURT:  Mr. Cannick, sustained.

3   Q    Let's go back to this mirror room.  There is a bathroom

4   inside that room, am I correct?

5   A    Yes.

6   Q    And the mirror room has a lock on the outside of the

7   door, am I correct?

8   A    I don't recall.

9   Q    It's your testimony that you could just walk up to the

10  door in the mirror room after that ten minutes elapsed and

11  just open the door and walk downstairs?

12  A    You can repeat?

13       THE COURT:  Rephrase.  I don't understand it either,

14  rephrase.

15  Q    It's your testimony -- withdrawn.

16       So correct me if I'm wrong.  You just got up after

17  about ten minutes, opened the door of the mirror room, and you

18  walked downstairs?

19  A    That's incorrect.

20  Q    Tell me what happened?

21  A    Robert came to the mirror room and he escorted me down

22  the stairs.

23  Q    Did there come a point in time that you left Robert's

24  home to go back to your home that day?

25  A    The next day I did.

J. JOHNSON PACE - CROSS - CANNICK          283

1  Q    What time was it that you left the next day?

2  A    I'm unsure of the time, but I do remember saying I wanted

3  to go home at 6:00 a.m., but I'm not sure what time I actually

4  left his home.

5  Q    What time did you arrive at his home?

6  A    I don't recall the time I arrived.

7  Q    So you were, according to you, 16, and you stayed

8  overnight at his home?

9  A    Yes.

10 Q    You testified and told us at one point you eventually

11 left.  Did you alert him that you wanted to leave?

12 A    Yes.

13 Q    And how did you do that?

14 A    Through text message and a phone call.

15 Q    What happened?

16 A    I was able to leave.

17 Q    You were able to leave?

18 A    Yes.

19 Q    No one held you there, right?

20 A    I had to wait to be escorted, but I was able to leave.

21 Q    Well, were you given money to take the train?

22 A    Yes, I was given money to take the train back home.

23 Q    How much money were you given?

24 A    It was $50 in an envelope.

25 Q    And you decided to take the train as opposed to taking a

J. JOHNSON PACE - CROSS - CANNICK                    284

1   cab?

2   A    Yes.

3   Q    Who was it that came down to give you the envelope?

4   A    One of the runners came down to give me the envelope.

5   Q    Do you know the runner's name?

6   A    Tom.

7   Q    What did Tom tell you?

8   A    That he was going to take me to the train station.  And

9   he handed me the envelope and said that it was from Rob.

10  Q    Now, you testified and told us about Dominique being your

11  friend from a fan club of Rob's?

12  A    Yes.

13  Q    This fan club, how long before this date had you been a

14  member?

15  A    Since about 2007.

16  Q    Would you describe yourself as a super fan?

17  A    At the time, yes.

18  Q    And what made you a super fan?

19  A    Well, what makes a super fan is somebody that is just

20  like a really big fan of a person's music or whatever they do

21  and you're just very supportive of it.

22  Q    And that's when you went to the court proceeding in 2008?

23  A    Yes.

24  Q    Would you categorize yourself as being a groupie?

25  A    No, I would not.

J. JOHNSON PACE - CROSS - CANNICK          285

1   Q     Had you ever considered yourself as being a groupie of

2   Roberts?

3               MS. GEDDES:  Objection.

4               MR. CANNICK:  Of Roberts.

5               THE COURT:  I'm not sure the distinction.

6               Do you consider yourself a groupie?

7               THE WITNESS:  No.

8               THE COURT:  Go ahead.

9   BY MR. CANNICK:

10  Q     You testified and told us that you eventually introduced

11  Dominique to Robert?

12  A     Yes.

13  Q     You have a tattoo of Dominique on your body, am I

14  correct?

15  A     Yes.

16  Q     Where is that tattoo?

17  A     It's on my leg.

18  Q     What is that tattoo?

19  A     It's a tattoo of a heart that says her full name.  And I

20  have a cup cake tattoo.  And also a tattoo with me and

21  Dominique's anniversary date.

22  Q     When you say you and Dominique's anniversary date?

23              MS. GEDDES:  Objection.

24              THE COURT:  Overruled.

25  A     Me and Dominique used to date.

J. JOHNSON PACE - CROSS - CANNICK                286

1   Q    When was that?

2   A    It started March 17 of 2010.

3   Q    You testified and told us yesterday that there came a

4   point in time that Robert took your, I think you said, your

5   pink Palm Centro phone.  Do you remember telling us that?

6   A    Yes.

7   Q    And you told us that the reason why he did it is that he

8   didn't want you to be in contact with anyone.  Remember

9   telling us that?

10  A    Yes.

11  Q    But you also told us that he, according to you, took the

12  phone and gave you the memory card, am I correct?

13  A    That's correct.

14  Q    And I think you testified and told us that he eventually

15  replaced that phone by giving you money to buy another one?

16  A    That's correct.

17  Q    How much money did he give you there?

18  A    $250.

19  Q    You bought another phone, a prepaid phone?

20  A    Yes.

21  Q    How much was that prepaid phone?

22  A    I don't recall the price of it.

23  Q    Not $250 though, right?

24  A    That's right.

25  Q    On that other phone, you use it to contact the very same

J. JOHNSON PACE - CROSS - CANNICK                287

1   people, am I correct, that you were contacting before?

2   A    Not all of them.

3   Q    But you contacted Dominique?

4   A    Yes.

5   Q    Keyonia?

6   A    Yes.

7   Q    Your friend Danika?

8   A    Yes.

9   Q    And other family members?

10  A    Yes.

11  Q    Those are some of the same people that you said Rob said

12  he didn't want you to contact; is that correct?

13  A    That's correct.

14       MR. CANNICK:  Your Honor, the Government has agreed

15  to --

16       THE COURT:  Are you offering some things into

17  evidence?

18       MR. CANNICK:  Yes.

19       MS. GEDDES:  No objection.

20       THE COURT:  How are they going to be identified?

21       MR. CANNICK:  Defense 1, 2, 3.

22       THE COURT:  Okay.  One, two, three?

23       MR. CANNICK:  Yes.

24       THE COURT:  Why don't you mark them afterwards.  Do

25  you have exhibit stickers, Mr. Cannick?

J. JOHNSON PACE - CROSS - CANNICK                288

1              MR. CANNICK:  Okay.  Your Honor, I'm going to ask

2     that Robert 1 for identification be published.

3              THE COURT:  Defendant's 1.

4              MR. CANNICK:  Yes.

5              THE COURT:  Defendant's Exhibit 1, okay.

6     BY MR. CANNICK:

7     Q    You're looking at Defendant's Exhibit 1 for

8     identification.  Do you recognize that?

9     A    Yes.

10    Q    That's a color photograph, a color version, of the

11    photograph that was offered by the Government earlier in this

12    trial, am I correct?

13    A    Yes.

14    Q    Now, that is you on the bed, am I correct?

15    A    Yes.

16    Q    And where is this where are you?

17    A    In the mirror room.

18    Q    In the mirror room.  Okay.

19             And you testified and told us earlier -- withdrawn.

20             Do you remember the date this was taken?

21    A    I do not.

22    Q    Do you remember what you were doing there that day?

23    A    Yes, I was visiting Rob.

24    Q    You were visiting Rob.

25             Now, I want you to describe the outfit that you're

J. JOHNSON PACE - CROSS - CANNICK                289

1   wearing?

2   A    I'm wearing some tan capris and a red shirt.

3   Q    You're not wearing baggie sweats, am I correct?

4   A    That's correct.

5   Q    The shirt, describe the shirt.

6   A    It's a red, fitted shirt.

7   Q    Red, fitted shirt.  That's fitted, not baggie?

8   A    That's correct.

9   Q    What do you have on your feet?

10  A    I have heels on.

11  Q    You have heels on?

12  A    Yes.

13  Q    You're lying on the bed with heels on, am I correct?

14  A    Yes.

15          MR. CANNICK:  Your Honor, I'm going to --

16          THE COURT:  Are these additional photographs?

17          MR. CANNICK:  Yes.

18          THE COURT:  You already marked Defendant's

19  Exhibit 1, 2, 3 -- wait.  You should be A, B, C.

20          MR. CANNICK:  Yes.

21          THE COURT:  Those first things will be A, B and C.

22  Now you're on D and E.  All right.

23          MR. CANNICK:  Your Honor, I'm going to ask the

24  witness be shown what is marked for identification as

25  Defendant's Exhibit D and E.

J. JOHNSON PACE - CROSS - CANNICK          290

1          May I approach?

2          THE COURT:  Yes.  So these are not in evidence.

3          MR. CANNICK:  Not yet.

4     BY MR. CANNICK:

5     Q    Take a look at these.  Do you recognize what is marked as

6     Defendant's Exhibit D for identification?

7     A    Yes.

8     Q    What do you recognize it to be?

9     A    That's a photo of me, Rob, June, and another R. Kelly

10    fan.

11    Q    Do you have a sense of when this photograph is taken?

12    A    I believe that was taken in April of 2008.

13    Q    And does this seem to be a fair and accurate depiction of

14    what you recall the situation would be back at that time?

15    A    Yes.

16          MR. CANNICK:  Your Honor, I offer this into evidence

17    as Defendant's Exhibit D.

18          MS. GEDDES:  No objection.

19          THE COURT:  Okay.

20          (Defendant's Exhibit D, was received in evidence.)

21    BY MR. CANNICK:

22    Q    I'm going to show you what is previously marked

23    Defendant's Exhibit E for identification.  Do you recognize

24    that?

25    A    Yes.

J. JOHNSON PACE - CROSS - CANNICK          291

1   Q     What do you recognize it to be?

2   A     That is me.

3               MR. CANNICK:  Your Honor, I'm going to offer this as

4   Defendant's Exhibit E.

5               MS. GEDDES:  No objection.

6               THE COURT:  Okay, that's in evidence.

7               (Defendant's Exhibit E, was received in evidence.)

8               MR. CANNICK:  I ask that Defendant's Exhibit D be

9   published.

10              THE COURT:  Okay.

11              (Exhibit published.)

12  BY MR. CANNICK:

13  Q     You're looking at Defendant's Exhibit D.  Do you

14  recognize yourself in the photograph?

15  A     I do.

16  Q     Where do you recognize -- what are you wearing?

17  A     I'm wearing a black coat with white pants and brown

18  heels.

19              MR. CANNICK:  I'm going to ask that Defendant's

20  Exhibit E be published.

21              THE COURT:  Okay.

22  Q     Do you recognize yourself in that one?

23  A     Yes.

24  Q     What do you recognize yourself -- withdrawn.  In this

25  photograph you're holding a news article or something with

J. JOHNSON PACE - CROSS - CANNICK                292

1   Robert's picture on it?

2   A    Yes, that's correct.

3   Q    What is it?

4   A    This was me outside of the trial holding a newspaper

5   article with him.

6   Q    You're 14 at this time, am I correct?

7   A    I'm not sure if this was taken when I was 14 or a few

8   weeks later when I turned 15.

9   Q    Do you recall whether or not this was a school day?

10  A    Yes, it was a school day.

11  Q    Incidentally, you're wearing a wig here, am I correct?

12  A    Yes, I am.

13  Q    And you're wearing a wig because you wanted to project

14  yourself as being older, am I correct?

15  A    No, that's not correct.

16  Q    It's just a style thing?

17  A    Yes.

18  Q    You testified and told us yesterday that there came a

19  point in time that you and Dominique went to Rob's home in

20  Olympia Fields, am I correct?

21  A    That's correct.

22  Q    And you testified and told us you got through the gate,

23  am I correct?

24  A    That's correct.

25  Q    And you testified and told us that you were stopped by

J. JOHNSON PACE - CROSS - CANNICK                 293

1    Bubba, am I correct?

2    A    That's correct.

3    Q    What were you doing at his home?

4    A    We just ran through the gate.  We had no plan.

5    Q    You had no plan?

6    A    No.

7    Q    You live two hours away, am I correct?

8    A    That's correct.

9    Q    So you had no plans but you drove -- withdrawn.

10            How did you get there?

11   A    Dominique drove her mom's car.

12   Q    So how far did Dominique live from there?

13   A    She lives about 15 minutes away from him.

14   Q    How did you get to Dominique?

15   A    I took the Metro train to go out to her house.

16   Q    With no plans, you left your home, went met up with

17   Dominique, and you decided to go to Rob's home?

18   A    I planned to meet up with Dominique and we had no plans

19   as far as going to his home, it just happened.

20   Q    You testified and showed us, you testified about a huge

21   gate yesterday to this property, am I correct?

22   A    That's correct.

23   Q    You climbed across that gate?

24   A    No, we did not climb the gate.

25   Q    How did you get through the gate?

J. JOHNSON PACE - CROSS - CANNICK          294

1   A    We waited for a car to go through, and when the car went

2   in we ran in behind in.

3   Q    Rob was on tour, am I correct?

4   A    I'm not sure.

5   Q    How long had you waited for a car to come and go through

6   the gate?

7   A    We drove up, it was probably about two minutes; and then

8   we saw a car going in and we ran in.

9   Q    So you were waiting outside of Dominique's car?

10  A    We were getting out of her car.

11  Q    Can you describe the car that went in the gate?

12  A    It was a black car.  I'm not sure of the make or model.

13  Q    It was Bubba who caught you, right?

14  A    That's correct.

15  Q    What did you tell Bubba your reason for being there?

16  A    I just told him that I was getting my heels, I wanted to

17  get my heels that I left.

18  Q    That was not your purpose though, right?

19  A    It originally wasn't my purpose.

20  Q    When did it become your purpose?

21  A    When we got caught.

22  Q    So it wasn't your purpose.  After you told Bubba that,

23  what, if anything, did Bubba do, according to you?

24  A    Can you repeat the question?

25  Q    After you told Bubba that you were there to get your

J. JOHNSON PACE - CROSS - CANNICK                    295

1  heels what, if anything, did Bubba do according to you?

2  A    He went back and he went to the house and he got my heels

3  for me.

4           MR. CANNICK:  May I have a second please, your

5  Honor?

6           THE COURT:  Sure.

7  Q    Isn't it a fact, ma'am, that the day that you went to

8  Robert's home, he was not home?

9           MS. GEDDES:  Objection.

10           THE COURT:  Overruled.

11  A    That's incorrect -- I'm sorry, which date are you

12  speaking of?

13  Q    The date you and Dominique went to his home, isn't it a

14  fact that he was not home that day?

15  A    That's correct.

16  Q    Isn't it a fact that you did in fact get into his home

17  that day?

18  A    That's -- I got into his gate.  I did not get into his

19  home.

20  Q    Isn't it a fact that you got into his home and you went

21  inside of his home and you took pictures of his home while he

22  was not at his home?

23  A    That is not true.

24  Q    Isn't it a fact that the picture that you're taking while

25  in his bed was taken on that date that you and Dominique

J. JOHNSON PACE - CROSS - CANNICK                296

1    burglarized his home?

2         THE COURT:  Objection.  Sustained as to form.

3    Q    Isn't it a fact that you took this picture in his bed the

4    date that you and Dominique actually went there?

5    A    That's incorrect.

6    Q    Your shoes are on, am I correct?

7    A    Yes.

8    Q    You're dressed in tight-fitting clothes, am I correct?

9    A    That's correct.

10   Q    And you're testifying that you told the jury yesterday

11   that Robert's rules were that you could not wear tight-fitting

12   clothes.  That's what you told the jury yesterday, am I

13   correct?

14   A    That's correct.

15   Q    You testified and told the jury that Robert said that you

16   were to wear baggie clothes, sweatpants, am I correct?

17   A    That's correct.

18   Q    And loose-fitting blouse, am I correct?

19   A    A loose-fitting shirt.

20   Q    Shirt.  You would agree with me that the pants that

21   you're wearing are not baggie, am I correct?

22   A    That's correct.

23   Q    You would agree with me that the shirt you're wearing is

24   not loose fitting?

25   A    That's correct.

J. JOHNSON PACE - CROSS - CANNICK                  297

1   Q    Now, this photograph that you said you took when Robert

2   was home, how long had you been in his home that day?

3   A    I'm not sure.

4   Q    Do you recall what time you got there?

5   A    I do not.

6   Q    When you would go to Robert's home, would you lie in his

7   bed with your shoes on?

8   A    You can repeat that?

9   Q    When you would go to Robert's home, would you lie in his

10  bed with your shoes on?

11  A    Not all the time.

12  Q    Not all the time.  When did you do it?

13  A    I would randomly do it at times.

14  Q    This just happened to be one of the days, right?

15  A    Yes.

16  Q    Now, you and Bubba had a relationship, am I correct?

17         MS. GEDDES:  Objection.

18         THE COURT:  Overruled.

19  A    What kind of relationship?

20  Q    Come on, a sexual relationship.

21         MS. GEDDES:  Objection.

22         THE COURT:  Sustained.

23  Q    You and Bubba had a sexual relationship?

24         MS. GEDDES:  Objection.

25         THE COURT:  Can I see the parties at the side?

```
                          Sidebar                          298
```

1              (The following sidebar conference was held outside

2      the hearing of the jury.)

3              THE COURT:  I made a pretrial ruling that the

4      witness's prior sexual conduct was not relevant and I

5      precluded inquiry of this.  This is the second question that

6      you put to this witness about her relationships with other

7      people.  And if there is some reason for an exception to my

8      ruling, I would expect that you would apply to me first before

9      asking the witness.

10             I'm sustaining the objection.  I do not see the

11     relevance of it, unless you can explain it.

12             I'm very disappointed with this line of questioning.

13             MR. CANNICK:  Your Honor, this witness testified

14     that she gave my client large sums of money after she got the

15     settlement from him.  Based on the records we received from

16     the Government, she gave Bubba monies from the settlement

17     money.  Bubba was the person, according to her, that stopped

18     her from actually burglarizing my client's home.  And Bubba

19     was the one who is supposed to call my client and alert my

20     client and did nothing about it.

21             There is a theory here that she and Bubba were

22     basically in cahoots in terms of what was going on to get

23     money from my client.

24             THE COURT:  I mentioned when I made this ruling, the

25     rules require that you have to make a specific and articulate

Sidebar                                    299

1    reason to question a witness along these lines.  You are among

2    the best lawyers that I have worked with, so I know you know

3    this, and you did not do that.  You just asked her the

4    question.  And I'm precluding.

5              You had to make an application to me.  You didn't do

6    it.  If this was your theory, that's what you should have

7    done.

8              It's beyond inappropriate to ask a witness in this

9    situation a question like that.

10             MR. CANNICK:  Well, then am I allowed to ask the

11   witness about their relationship leaving out the sexual part?

12             THE COURT:  First of all, if the theory is she

13   conspired with him, I'm not sure the sex part of it matters.

14             MR. CANNICK:  It shows the closeness and the trust.

15             THE COURT:  I don't know what evidence you have that

16   they had any kind of relationship, but it doesn't matter

17   because I precluded it.  I precluded you from bringing out

18   this evidence.

19             And if there is some reason for you to do it you

20   should have made the application.  You can't do it.

21             This talking about herpes has zero to do with this

22   questioning.

23             MR. CANNICK:  Look how broad this question is.

24             THE COURT:  So the record is clear, Mr. Cannick's

25   co-counsel has come with a portion of the transcript during

Sidebar                                                300

1   which the Government was asking the witness questions about

2   herpes.  The questions were confined specifically to this

3   period of time.

4           I'm not going to discuss this any more because I

5   don't see that there is a foundation for this question, and

6   it's in direct contradiction to what I told you.  So please

7   don't ask the question, move on to something else.

8           MR. CANNICK:  Can I get some water?

9           THE COURT:  Yes.

10          (End of sidebar conference.)

11

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MR. CANNICK:

3   Q    Now, yesterday you testified and told the jury about a

4   settlement that you got from Robert, am I correct?

5   A    Yes.

6   Q    And you testified about your giving him monies back?

7   A    Yes.

8   Q    Now, you also gave Bubba some of that money, am I

9   correct?

10  A    Yes.

11  Q    How much money did you give Bubba?

12  A    $4,000.

13  Q    Now, do you remember when it was that you started giving

14  Bubba money?

15  A    It was only once, and I don't recall.

16  Q    Now, yesterday you testified and told the jury that Rob

17  settled the case with you and gave you money for your silence.

18       Do you remember telling us that?

19  A    That's correct.

20  Q    Now, I want you to --

21       MR. CANNICK:  Your Honor, may I approach the

22  witness?

23       THE COURT:  Yes.

24  Q    I am going to ask you to look at Government Exhibit 928.

25  A    (Witness complies.)

1   Q    That's the settlement agreement, am I correct, between

2   you and Robert?

3   A    This is the second one, yes.

4   Q    It's the second one?

5   A    Yes.

6   Q    Okay.

7         Now, may I have that back for a second?

8   A    Yes.

9         MS. GEDDES:  And just for the record, can you make

10  clear that you previously showed 3500-JP29, not 928?

11        MR. CANNICK:  Yes.

12  BY MR. CANNICK:

13  Q    I am now showing you Government Exhibit 928.

14        That is the agreement that you signed, am I correct?

15  A    That's correct.

16  Q    And who was your attorneys at that time?

17  A    Susan Loggans and Patrick Condron.

18  Q    And you testified, you told us yesterday, that basically,

19  the settlement agreement came about for Rob's purchase for

20  your silence.

21        Do you remember telling us that?

22  A    Yes.

23  Q    I want you to read that agreement and when you get to the

24  part where it says it's for the purchase of your silence, I

25  want you to let me know.  Okay?

Pace - cross - Cannick                        303

1             MS. GEDDES:  Objection.

2             THE COURT:  Well, overruled.  Actually, sustained as

3    to form.

4             Why don't you just put the question to the witness

5    and then if you have a question you want to ask her, you can

6    do that.

7    BY MR. CANNICK:

8    Q    Look at that document.

9             Does it say anyplace in there that Rob is signing

10   this agreement to purchase your silence?

11            THE COURT:  This is a completely ministerial

12   question for you.

13            (Sidebar held with the Court and counsel only,

14   outside of the hearing of the jury and the court reporter.)

15   A    Now, what's your question?

16            MR. CANNICK:  May it be read back?

17            THE COURT:  Sure.

18            (Question read.)

19   A    No, it does not.

20   Q    Read paragraph 1 to the jury.

21   A    Kelly enters into this confidential Settlement Agreement

22   and Release without any admission of liability or wrongdoing,

23   and Kelly expressly denies engaging in any inapprop --

24   improper or wrongful conduct of any type of -- or manner.

25   Johnson acknowledges, confirms and represents that at one time

SAM      OCR      RMR      CRR      RPR

1   she told Kelly that she was 19 years of age.  Kelly asserts

2   that Johnson showed him an identification card stating that

3   she was 19 years of age, that she never told him that she was

4   under 19 years of age, and never showed him any identification

5   indicating that she was under 19 years of age.  Johnson

6   has agreed to substantially reduce her original settlement

7   demand in light of assertions of Kelly.  Kelly has agreed to

8   pay the settlement proceeds solely to avoid the cost of

9   litigation.

10  Q    And you signed that, am I correct?

11  A    I did sign this.

12  Q    May I have it back?

13       And you signed this after consulting with your

14  attorneys, am I correct?

15  A    I didn't see the agreement before I signed it, but I

16  signed the last page of it.

17  Q    So, you signed something that you didn't see?

18  A    That's correct.

19  Q    Are you telling this jury that you never read it?

20  A    I read it after I got -- after I obtained my file from my

21  attorney, but I never knew what was in the original settlement

22  because my attorneys never let me get it.

23  Q    So, it's your testimony that you went to the office --

24  you did go to their office?

25  A    That's correct.

Pace - cross - Cannick                                305

1   Q    And how long were you at the office?

2   A    On which day?

3   Q    On the date that you signed this agreement.

4   A    I was there less than an hour.

5   Q    And before that date, had you been to that office before?

6   A    Yes.

7   Q    How many times?

8   A    I was there probably twice before having to sign papers.

9   Q    And during the times that you were there, those two

10  occasions, did you discuss settlement?

11  A    We talked about the settlement the day that I had to sign

12  the paper.

13  Q    And before that, you never discussed settlement?

14  A    I didn't know anything about it.

15  Q    But you did learn about it the day that you were there

16  for the settlement, am I correct?

17  A    Yes.  A lot of things wasn't discussed with me --

18  Q    I didn't ask you that.

19        I said that you did learn about it on the date that

20  you went for the settlement?

21  A    Yes.

22  Q    Okay.  And before signing it, your attorneys explained it

23  to you?

24  A    Yes.

25  Q    Okay.  And you were how old at that time?

1    A    At the time, I was 16.

2    Q    And your mother was there?

3    A    Yes, she was.

4    Q    And your mother signed it, am I correct?

5    A    Yes, she did.

6    Q    And your mother had been involved with this procedure at

7    the outset, am I correct?

8    A    I don't understand your question.

9    Q    Wasn't your mother involved with this litigation and

10   helping you -- well, with this process and helping you with

11   this process?

12   A    She was present, yes.

13   Q    Now, after you signed this, you got another lawyer, am I

14   correct?

15   A    That's correct.

16   Q    How much longer after that did you retain another lawyer?

17   A    It was a few months after.

18   Q    So, a few months after you retained another lawyer?

19   A    Yes.

20   Q    And you retained that other lawyer to sue Rob?

21   A    Yes.

22   Q    And then you retained a third lawyer?

23   A    Yes.

24   Q    And you retained that lawyer, as well, to sue Rob?

25   A    Yes.

Pace - cross - Cannick                          307

1   Q     Now, there was another settlement, am I correct, a

2   settlement agreement?

3   A     That's correct.

4   Q     And that one was signed by you, as well; am I correct?

5   A     Yes.

6   Q     And that one was read before you signed it?

7   A     Yes, I was allowed to read that one.

8   Q     And was it explained to you before you signed it?

9   A     Yes, it was.

10  Q     And your mother was with you in the process as well?

11  A     No, she wasn't.

12  Q     So, you did this one by yourself?

13  A     Yes, I did.

14  Q     How old were you at that time?

15  A     I'm not sure.

16  Q     Do you remember what year you signed it?

17  A     I don't recall the year I signed it.

18              MR. CANNICK:  Well, may I approach the witness?

19              THE COURT:  Yes.

20  BY MR. CANNICK:

21  Q     Look at this document and see if it refreshes your

22  recollection as to the date you signed it, the second

23  agreement.

24  A     (Witness complies.)

25              MS. GEDDES:  Can you note for the record what

1   document you just showed her?

2           MR. CANNICK:  3500-JP29.

3   A    So, this is familiar.

4   Q    You've had an opportunity to review the document?

5   A    Yes.

6   Q    Does it refresh your recollection as to the date --

7   A    Yes.

8   Q    -- that it was signed by you?

9   A    Yes.

10  Q    What was the date?

11  A    August of 2013.

12  Q    And how old were you at that time?

13  A    I was 20.

14  Q    Now, when you would stay at, according to you, Rob's

15  house, you testified that there were times that you had to ask

16  permission to go to the bathroom?

17  A    That's correct.

18  Q    Now, what rooms were you in, generally, when you were

19  there?

20  A    I was mainly in the mirror room and Music 1.

21  Q    So, the mirror room has a bathroom, am I correct?

22  A    Yes, it does.

23  Q    And it's your testimony that you had to ask permission to

24  go to the bathroom in the mirror room?

25  A    Yes.

1   Q    And how long, generally, would you have to wait in there

2   before you could get permission?

3   A    Generally, it would be fast if I was on his good side,

4   and he'll get back to me within about five minutes.

5   Q    And what if you were on his bad side?

6   A    If I was on his bad side, then I'd have to wait until he

7   would give me permission.

8   Q    What I'm asking you, approximately how long?

9   A    The longest period was three days.

10  Q    So, you're in a room, you don't see the man for three

11  days, you need to go to the bathroom, and you don't relieve

12  yourself?

13  A    That's incorrect.

14  Q    You just testified and told us that the longest you had

15  to wait was three days, am I correct?

16  A    That's correct.

17  Q    You're in the mirror room?

18  A    Yes.

19  Q    The bathroom is right there?

20  A    Yes.

21  Q    Okay.

22        Now, you testified and told us yesterday about an

23  occasion where you were called to the tour bus by Rob?

24  A    What's your question?

25  Q    You testified and told the jury yesterday that there came

Pace - cross - Cannick                          310

1   a point in time when you were actually in his home and he was

2   in the tour bus and he called you to the tour bus?

3   A    Yes.

4   Q    And when you got to the tour bus, you testified and told

5   us about two people being on the bus, am I correct?

6   A    Yes.

7   Q    Rob and another woman, correct?

8   A    That's correct.

9   Q    And before that, had you ever been on the tour bus?

10  A    No.

11  Q    Describe the tour bus.

12  A    His tour bus was a big black travel bus, and it had red

13  and tan lines on the outside of it.

14  Q    Now, you had seen that bus on a number of occasions, am I

15  correct?

16  A    That's correct.

17  Q    So, it was no problems with you recognizing that bus, am

18  I correct?

19  A    That's correct.

20  Q    Now, describe the interior of the bus.

21  A    The interior of the bus was tan, and there's a table in

22  there and he has, like, long --

23  Q    Where's the table?

24  A    The table is to the left side of the bus when you get on

25  it.

SAM     OCR     RMR     CRR     RPR

1   Q    And go ahead, finish responding.

2   A    And then there's seating and there's a bathroom on the

3   bus.

4   Q    What about bunkbeds?

5   A    I don't recall seeing bunkbeds on the bus.

6   Q    How many bathrooms on the bus?

7   A    I only saw one.

8   Q    Where was that one?

9   A    It was towards, like, the -- after the table, like

10  towards the middle of the bus.

11  Q    And then you testified and told us that there came a

12  point in time when you got herpes?

13  A    Yes.

14  Q    And you testified that before that, Rob had never

15  mentioned anything to you about herpes, am I correct?

16  A    That -- about him having herpes?

17  Q    Yes.

18  A    That's correct.

19         (Pause.)

20         MR. CANNICK:  Well, until I find it, I'll move to

21  another area.

22  Q    Now, let's go to the blue T-shirt.

23         You testified and told us yesterday that,

24  essentially, that Robert assaulted you on the last time you

25  met with him and had a sexual encounter with him?

1   A    That's correct.

2   Q    And you testified and told us that he slapped you with an

3   open hand in your face, am I correct?

4   A    That's correct.

5   Q    And you testified that he also choked you out, am I

6   correct?

7   A    That's correct.

8   Q    That you literally passed out?

9   A    That's correct.

10  Q    And you testified that he also spat in your face?

11  A    That's correct.

12  Q    And then you went on and told us that after all of this,

13  you had a sexual encounter with him; am I correct?

14  A    That's correct.

15  Q    Now, when he slapped you, did you fall?

16  A    No, I did not.

17  Q    He slapped you with a lot of force, though; am I correct?

18  A    Yes.

19  Q    Okay.  And did you have any marks on your body, on your

20  face?

21  A    I don't recall.

22  Q    But he slapped you real hard, am I correct?

23  A    Hard to me, yes.

24  Q    And he's much bigger than you are, correct?

25  A    That's correct.

Pace - cross - Cannick                    313

1   Q    And where specifically on your face were you hit?

2   A    I was hit on my right side.

3   Q    Okay.

4        On your jaw or across your lips or --

5   A    I was hit across my cheek.

6   Q    Across your cheek.

7        Did it catch any part of your -- of your -- your

8   lip?

9   A    The side of it.

10  Q    The side of your lip.

11       Now, with that force, your lips were swollen, am I

12  correct?

13  A    My lips were not swollen.

14  Q    Cheeks were swollen?

15  A    My cheek was stinging, but I'm not sure if it was

16  swollen.

17  Q    And any blood coming from the lip?

18  A    No.

19  Q    And then what happened first, did he slap you first or

20  choke you first?

21  A    He slapped me first.

22  Q    And then he choked you?

23  A    That's correct.

24  Q    And when he choked you out, where were you?

25  A    I don't understand that question.

1   Q     Well, when he choked you, were you standing?

2   A     Yes, I was.

3   Q     And you were right in front of him?

4   A     Yes, I was.

5   Q     And you said he choked you out till you passed out, is

6   that correct?

7   A     Yes, against the wall.

8   Q     So, when you woke up, you were on the floor; am I

9   correct?

10  A     That's correct.

11  Q     And had he spat on you before that?

12  A     Had he did what?

13  Q     You said he spit on you, right?

14  A     Yes.

15  Q     Was that before the slap?

16  A     That was after I got up and I was on the floor.

17  Q     You were on the floor, so he reached down and -- looked

18  down and spat on you?

19  A     That's correct.

20  Q     And it was in your face?

21  A     That's correct.

22  Q     And then after that, you got up and you had sex with him?

23  A     That's correct.

24  Q     And then you went home?

25  A     That's correct.

Pace - cross - Cannick                    315

1   Q    And it was on that ride home -- you took the train?

2   A    Yes, I did.

3   Q    It's a two-hour ride?

4   A    Yes.

5   Q    And on that ride on the train you started thinking about

6   how humiliating that was?

7   A    Yes.

8   Q    And you start thinking about, you know what, I'm not

9   gonna take this anymore?

10  A    Yes.

11  Q    You start thinking about, I'm gonna go to a lawyer?

12  A    Not at the time.

13  Q    Well, when did you start thinking about going to a

14  lawyer?

15  A    I wanted to go to the lawyer, like, when I got home.  I

16  didn't think about it on the train ride.

17  Q    Okay.  But when you got home, you thought about going to

18  a lawyer, right?  Am I correct?

19  A    That's correct.

20  Q    And you started gathering your evidence, is that correct?

21  A    That's incorrect.

22  Q    You didn't start thinking about, okay, what am I going to

23  tell this lawyer what evidence I have?

24  A    That's in -- no, I did not.

25  Q    Well, after you were taking the ride home and he'd

1    smacked your face, did you take any photographs of your face?

2    A    I did not.

3    Q    Did you tell your mom?

4    A    Once I got home, yes, I did.

5    Q    Did you call the cops?

6    A    No, we did not.

7    Q    But you called a civil lawyer?

8    A    Yes.

9    Q    A civil lawyer would try to get you money, am I correct?

10   A    That's correct.

11   Q    And a criminal lawyer bring you here?

12   A    That's --

13            THE COURT:  I'm sorry, I don't understand the

14   question.

15            MR. CANNICK:  I'm sorry.

16   BY MR. CANNICK:

17   Q    The criminal lawyer -- criminal case brings you here.

18            THE COURT:  I see.

19   A    That's correct.

20   Q    Now, I want to go to that shirt, the blue T-shirt that

21   you testified about.

22            You said as of that day, the last day you saw Rob,

23   you used that T-shirt, which was yours, am I correct?

24   A    That's correct.

25   Q    You wore that T-shirt over there?

1  A    Yes, I did -- wait, can you -- can you clarify to where

2  is the destination, over where?

3  Q    Well, you said you were at Rob's house, am I correct?

4  A    Yes.

5  Q    And you said that there came a point in time that you

6  used the T-shirt to wipe the spit off your face and the semen

7  off your face, am I correct?

8  A    Yes.

9  Q    And that was the T-shirt that you wore over there, am I

10 correct?

11 A    Yes.

12 Q    What did you wear home?

13 A    My T-shirt.

14 Q    The same T-shirt?

15 A    Yes.

16 Q    So, you'd been in that, in control of that T-shirt from

17 that date until you took it to your lawyer, am I correct?

18 A    That's correct.

19 Q    Now, do you know whether or not anyone ever took, ran a

20 test to see if your DNA was on that T-shirt to see if that

21 shirt belongs to you?

22 A    Not that I know of.

23 Q    So, the only information that we have that this T-shirt

24 belongs to you is your word, am I correct?

25       MS. GEDDES:  Objection.

1              THE COURT:  Sustained.

2              Mr. Cannick, if you can find a convenient place.

3              MR. CANNICK:  This is it.

4              THE COURT:  Ladies and gentlemen, your lunches are

5    here, so I am going to excuse you for lunch.

6              Please, again, I know I say it all the time, but I

7    still mean it, do not talk about the case at all.  Do not look

8    anything up about the case.

9              We'll see you back here at 2:15, and have a good

10   lunch.

11             THE COURTROOM DEPUTY:  All rise.

12             (Jury exits.)

13             THE COURT:  Okay, everybody can have a seat.

14             MS. GEDDES:  Can we let the witness leave, Your

15   Honor?

16             THE COURT:  Yes.  I keep forgetting.  Go ahead.

17             (Witness steps down and exits courtroom.)

18             THE COURT:  All right, just in terms of scheduling,

19   how much longer do you have?

20             MR. CANNICK:  I thought it would be faster, but it's

21   about an hour.

22             THE COURT:  Another hour?

23             MR. CANNICK:  Yes.

24             THE COURT:  You told me when we broke before that

25   you had an hour-and-a-half.

1          MR. CANNICK:  You know, I'm horrible at this, Your

2     Honor.

3          THE COURT:  All right, but we have a witness who is

4     ready to deliver a baby at any moment, and so I am going to

5     ask you to be economical or more economical in your

6     examination of the witness.

7          MR. CANNICK:  Will do, Your Honor.

8          THE COURT:  I think it's in everybody's interest to

9     get this witness finished.  And to the extent there is any

10    redirect, I expect the same thing.

11         So, I know you can't determine how much redirect you

12    have, but think about it.

13         Another question that I just have for you all

14    generally is there seem to be a number of exhibits that you

15    seem to agree can go into evidence.  If you can agree on them

16    in advance without the need to lay a foundation, that will

17    also move things along.  As interesting as it is to hear

18    foundation questions, if there is no dispute about particular

19    pieces of evidence, let's just agree on them.

20         All right, we will return at 2:15.

21         MS. GEDDES:  Your Honor, can we raise some of the

22    housekeeping matters or do you want to wait?

23         THE COURT:  Yes, go ahead.

24         MS. GEDDES:  It has come to our attention that

25    Mr. Farinella issued a tweet, I don't know if that's the

Proceedings                                          320

1  proper use, on Tuesday of this week that, in our opinion, is a

2  violation of Local Rule 23.1 and in direct --

3           THE COURT:  What does the tweet say?

4           MS. GEDDES:  Excuse me?

5           THE COURT:  What does it say?

6           MS. GEDDES:  The tweet says:  After all, the RICO

7  enterprise is based on a series of independent relationships

8  and events that the Government is trying to patch together,

9  like different types of fabric and trying to pass it off as

10  silk.

11          And the rule provides --

12          THE COURT:  I am familiar with the rule.

13          Did you tweet, Mr. Farinella?

14          MR. FARINELLA:  Yes, Your Honor.

15          THE COURT:  Why did you do that?

16          Didn't I specifically instruct you not to make

17  remarks to the media?

18          And in keeping with that rule, are you familiar with

19  the rule, that local rule?

20          MR. FARINELLA:  Yes, Your Honor.

21          THE COURT:  Why did you do that then?

22          MR. FARINELLA:  I did not think that that tweet was

23  violative of the rule, Your Honor.

24          THE COURT:  It violates the rule.  Do not do it

25  again.

Proceedings                                      321

1          MR. FARINELLA:  Yes, Your Honor.

2          THE COURT:  Anything else?

3          MS. GEDDES:  Yes, Your Honor.  It's two quick

4    matters.

5          The Government wishes to call one witness by video

6    conference, such that she will testify from a courthouse in

7    Chicago.  The defense has no objection.

8          And if we can set it up, does Your Honor have any

9    problem with that?

10          THE COURT:  I don't, as long as everybody agrees to

11    it.

12          MS. GEDDES:  And then the last matter is there have

13    been requests by the media for several pieces of evidence that

14    were entered into evidence yesterday to include the

15    defendant's Government Exhibit 1, which is a photograph of the

16    defendant.

17          THE COURT:  I am just going to cut you off just to

18    say, the evidence, the items that have been admitted into

19    evidence, can, obviously, be shared with media outlets, except

20    to the extent there is non-public information in them.

21          So, as long as they are admitted into evidence, I

22    understand someone from your office took it upon himself to

23    make those arrangements.  As I said to you before, that is

24    going a little out of his lane.  These are court exhibits, but

25    if there is something set up for you to do that, you can use

Proceedings                                        322

1    it.

2              MS. GEDDES:  Okay, but just to be clear, we haven't

3    shared anything.

4              THE COURT:  No, that's fine.

5              MS. GEDDES:  Yes.

6              THE COURT:  But if there's a request, you know, in

7    the olden days we would lay out the exhibits and the media

8    could come and look at them.

9              Whatever form it is that you want to share it with

10   them, is fine.

11             MS. GEDDES:  And just lastly, there will be some

12   exhibits that the Government will enter into evidence that we

13   will object to sharing more publicly, but we can address those

14   as they come.

15             THE COURT:  I think that's fine.

16             All right, have a good lunch.

17             (Judge ANN M. DONNELLY exited the courtroom.)

18             (Luncheon recess now taken.)

19

20             (Continued on the following page.)

21

22

23

24

25

323

1                          AFTERNOON SESSION

2

3              (In open court.)

4              (Parties present.)

5              COURTROOM DEPUTY:  All rise.

6              THE COURT:  While we're getting Mr. Kelly.  I'd

7    like to see counsel at sidebar.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        324

1          (Sidebar conference held on the record in the

2     presence of the Court and Ms. Geddes and Mr. Cannick.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```





Sidebar                                                                 326



Sidebar                                                    327



(Sidebar discussion concludes.)

(Continued on the next page.)

Sidebar                                                           328

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel.)





Sidebar                                                              329

Sidebar                                    330

1   ████████████████████████████████

2   ████████████████████████████

3   ████████████████████████

4   (Sidebar discussion concludes.)

5   (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                                331

1             (In open court.)

2             THE COURT:  Okay.  Let's get the witness.  Do you

3    want -- when do you want me to give her that instruction?

4    Now?

5             MS. GEDDES:  I think so.  So that we don't have to

6    take a break between when he finishes.

7             THE COURT:  That's fine.

8             (Witness takes the witness stand.)

9             THE COURT:  Before we bring in the jury, I want to

10   tell the witness Mr. Cannick has a few more questions for

11   you, then the Government is going to ask you some questions.

12   I know they gave you some instruction not to talk about

13   certain things including the nature of the trial that took

14   place in 2008, but you may answer any questions that the

15   lawyers ask you, okay?

16            THE WITNESS:  Okay.

17            THE COURT:  That's lifted.  I mean, unless I

18   sustain an objection during the course of the questioning,

19   but it's okay for you to answer questions on that subject.

20   Okay?

21            COURTROOM DEPUTY:  Okay.

22            THE COURT:  Okay.  Great.  Let's get the jury.

23            (A brief pause in the proceedings was held.)

24            COURTROOM DEPUTY:  All rise.

25            (Jury enters courtroom at 2:33 p.m.)

J. Pace - Cross/Mr. Cannick                332

1        THE COURT:  You may be seated.

2        All right.  Well back, ladies and gentlemen, we're

3   ready to resume.

4        Mr. Cannick, whenever you're ready.

5        MR. CANNICK:  Thank you, your Honor.

6        COURTROOM DEPUTY:  The witness is reminded she's

7   still under oath.

8        THE WITNESS:  Yes.

9   CROSS-EXAMINATION

10  BY MR. CANNICK:

11  (Continuing.)

12  Q    Good afternoon, ma'am.

13  A    Good morning.

14  Q    I want to visit that party, the first party you went to,

15  for the less than 30 minutes one last time.

16            Now, at that party, there was a DJ, am I

17  correct?

18  A    I don't recall a DJ being there.

19  Q    Okay.  Now, you were asked earlier by the Government

20  what, if anything, that Mr. Kelly told you about herpes.  Do

21  you remember that?

22  A    Yes.

23  Q    Okay.  And your response is that he told you nothing

24  about herpes, am I correct?

25  A    He told me nothing about him having herpes.

1  Q     Now, you testified and told us earlier that you had

2  several meetings with the Government, am I correct?

3  A     That's correct.

4  Q     And when you had these meetings, there were agents and

5  Assistant United States Attorneys, am I correct?

6  A     Yes.

7  Q     Now, prior to the briefing and asking you questions,

8  they advised you that making a false statement or telling a

9  lie to a federal official is a crime, am I correct?

10  A     That's correct.

11  Q     And they told you that on numerous indications, am I

12  correct?

13  A     That's correct.

14  Q     And you swore here earlier today to tell the truth?

15  A     That's correct.

16  Q     And you swore yesterday to tell the truth?

17  A     That's correct.

18  Q     And then you recall being interviewed by the agents on

19  February 27, 2019?

20  A     I'm not sure of the exact date.

21         MR. CANNICK:  May I approach the witness, your

22  Honor.

23         THE COURT:  Sure.

24         MR. CANNICK:  JP-2.

25         (Approaching the witness.)

J. Pace - Cross/Mr. Cannick                    334

1  Q     I direct your attention to the top left-hand portion

2  under "Details of Investigation" and see if that refreshes

3  your recollection as to whether or not you had an interview

4  with the Government on that particular day?

5  A     Yes.

6  Q     When you say, "Yes," after having reviewed the document,

7  does that refresh your recollection that you had an interview

8  with the Government on February 27, 2019?

9  A     Yes.

10 Q     And on that date, they gave you the admonition that

11 making a false statement to the -- is a federal offense, am I

12 correct?

13 A     Yes.

14 Q     Now, when they asked you about herpes and my client on

15 that date, you told them one day, Kelly confided in me and

16 informed her, Daddy's not doing too good.  Have you ever

17 heard of herpes?

18            That he further informed you that a few people

19 close to him have it and it has been traveling around since

20 the late '90s.

21            He went on to explain that herpes was a virus,

22 even though it was curable, you cannot get rid of it.  And

23 then, according to you, he instructed you to look down there

24 to make sure it wasn't traveling.  And that he opened -- you

25 stated to the Government that he opened -- only opened up to

J. Pace - Cross/Mr. Cannick                335

1   people about herpes that he really trusts.  And that you

2   recall that conversation took place around July 2009.

3            And that he further, according to you,

4   instructed you to lay down.  He visibly and physically

5   inspected your vagina with his finger and that he informed

6   you that you could tell anyone that she contracted genital

7   herpes from him.

8            Do you remember telling the Government that on

9   February 27, 2019?

10  A    Most of it, yes.

11  Q    But you just testified under oath that he told you

12  nothing about herpes?

13  A    This was during my outbreak when I had found out I had

14  it.

15  Q    No, that's not my question.  My question is you came in

16  here yesterday, took an oath to tell this jury the truth, and

17  when you were asked by the Government what did my client tell

18  you about herpes you said he told you nothing.  Do you

19  remember telling us that?

20  A    Yes.

21  Q    But now what I just read to you, you told the Government

22  a total different story, am I correct?

23  A    What you read I don't recall.

24  Q    Oh, I see.  Now, you did testify and told us earlier

25  that prior to coming in and giving testimony to this jury,

1    you and the Government went over these questions that they

2    put to you at least three times?

3              MS. GEDDES:  Objection.

4              THE COURT:  Sustained as to form.

5    Q    You and the Government went over the questions they put

6    to you, am I correct?

7    A    Yes.

8    Q    More than once?

9    A    Yes.

10   Q    More than twice?

11   A    I'm not sure it was more than twice.

12   Q    Now, I think you testified yesterday as well that there

13   came a point in time that you started after you sued Robert

14   and got a settlement that you gave monies back.  Do you

15   remember telling us that?

16   A    Yes.

17   Q    And I think you told us that you did that because you

18   felt bad about what was happening, what you guys have been

19   going through?

20   A    Yes.

21   Q    Okay.  But you sued him three other times, am I correct?

22   A    That's incorrect.

23   Q    Two other times?

24   A    That's correct.

25   Q    And after the first lawsuit, how long -- how much time

1  elapsed before you sued him a second time?

2  A    A few months.

3  Q    And that was the only other time you sued him?

4  A    No, it wasn't.

5  Q    There was another time, am I correct?

6  A    Yes.

7  Q    Okay.  And how much time elapsed from the second to the

8  next time?

9  A    Three years.

10 Q    But you felt bad about what you were going through, am I

11 correct?

12 A    That's correct.

13 Q    And now, you also testified and told the jury that even

14 after the lawsuits you wanted to continue to be his friend?

15 A    That's correct.

16 Q    In fact, you wanted to get back with him according to

17 you?

18 A    That's correct.

19 Q    In fact, according to you, you wanted to just get the

20 relationship back in gear again?

21 A    That's correct.

22 Q    Now, when you were hoping to get the relationship back

23 in gear again was that after the first lawsuit but before the

24 second?

25 A    Yes.

J. Pace - Cross/Mr. Cannick                338

1  Q    And when you sued him the second time, did you

2  try -- were you still hopeful after the second time to get

3  the relationship jump started again?

4  A    Yes.

5  Q    In fact, as you sit here today, you're still hopeful of

6  getting a relationship with him, am I correct?

7  A    That's incorrect.

8  Q    When did you stop hoping and wanting to get a

9  relationship with him?

10  A    I'm not sure of the date.

11  Q    Was it in 2017?

12  A    It was before then.

13  Q    2016?

14  A    It was before then.  I'm just not sure of the year.

15  Q    Okay.  So I asked you this morning about the time that

16  you went to Mr. Kelly's house for a party and whether or not

17  you encountered security.  Do you remember me asking you

18  that?

19  A    Yes.

20  Q    And you told us that, basically, what you did is that

21  you called Bubba, he met you, and just escorted you through,

22  am I correct?

23  A    That's correct.

24  Q    Well, again, you had interviews with the Government

25  where you discussed these details, am I correct?

J. Pace - Cross/Mr. Cannick                    339

1    A    Yes.

2    Q    And do you recall, or isn't it a fact, that you told the

3    Government on February 27, 2009, in that same interview that

4    was just referenced that when you arrived at Kelly's front

5    gate, security asked for your names.  That's what you told

6    the Government on that date, am I correct?

7    A    Yes.

8    Q    So you didn't tell them that when you got to the gate

9    you had already called Bubba and Bubba came and met you, you

10   didn't tell him that; right?

11   A    I don't recall.

12   Q    But you now admit that you were encountered by security.

13   They stopped you, am I correct?

14   A    It wasn't, like, actual security that stopped us.

15              THE COURT:  I'm just confused.  Is Bubba security?

16              MR. CANNICK:  No.

17              THE COURT:  Oh, this is somebody else?

18              MR. CANNICK:  Yes.

19              THE WITNESS:  Bubba, he plays the security role.

20              THE COURT:  I'm sorry.  I'm just trying to clarify.

21   Q    Bubba owns a tattoo parlor, am I correct?

22   A    That's correct.

23   Q    Bubba is a friend of Robert Kelly; is that correct?

24   A    That's correct.

25   Q    You are telling this jury under oath that Bubba was part

J. Pace - Cross/Mr. Cannick                340

1    of the security?

2    A    Yes, Bubba is part of his security team.

3    Q    Okay.  Now, so when you told the jury earlier this

4    morning that you had no encounter with security, what you are

5    telling us is that because Bubba who, according to you, is

6    part of security but you don't view him as security.  So it

7    was fair for you to say that you had no encounter with

8    security?

9            MS. GEDDES:  Objection.

10           THE COURT:  Sustained.

11   Q    I confused myself with that one, Judge.

12           Now, when you told the jury this morning that

13   you did not have any encounter with security you meant that

14   because you had Bubba, who was part of security, come to get

15   you?

16   A    That's correct.

17   Q    Now, tell the jury why when you were interviewed by the

18   Government you told them that security came, that security

19   stopped you and asked you for your name?

20   A    I don't recall.

21   Q    Now, I'm not asking you if you recall anything, I'm

22   asking you to explain something.  Why, if Bubba was part of

23   the security and you did not view him as security, why would

24   you tell the Government in that meeting that when you arrived

25   at the front gate, security asked you for your name?

J. Pace - Cross/Mr. Cannick                     341

1          MS. GEDDES:  Objection.

2          THE COURT:  Do you remember why you told the

3    Government that?

4          THE WITNESS:  I don't recall.

5    Q    But you would agree with me that Bubba knew your name,

6    right?

7    A    Yes, Bubba knew my name.

8    Q    So you got --

9          THE COURT:  Let the witness finish.

10   A    Bubba knew my name.

11   Q    So Bubba would not have asked you for your name, am I

12   correct?

13   A    That's correct.

14         THE COURT:  I'm sorry to interrupt.  Were you by

15   yourself at this time?

16         THE WITNESS:  No, I was with Keyonia.

17         THE COURT:  I see.  Go ahead.

18   Q    According to you, what you told us the other day, is

19   that Bubba invited you and Keyonia, am I correct?

20   A    Bubba invited me and I was with Keyonia.

21   Q    Bubba did not invite you and Keyonia?

22   A    Me and Keyonia was together.

23   Q    When Bubba extended the invitation, he did not invite

24   you and Keyonia?

25   A    That's correct.  He invited me and I was with Keyonia.

1    Q    So, during your interview with the Government, isn't it

2    a fact that you told the Government -- isn't it a fact that

3    you told the Government in and around May 2009 that you

4    formally met Kelly through one of his friends identified as

5    Jermaine at the time you were approximately 16 years old and

6    you identified Jermaine as Jermaine Maxey also known as Bubba

7    and you stated that --

8                 MS. GEDDES:  Objection.

9                 THE COURT:  Well, do you have a question to put to

10   the witness.

11                MR. CANNICK:  Yes.

12                THE COURT:  Rather than just reading the whole

13   thing.

14   Q    Isn't it a fact that you told the Government that you

15   stated that you first met Maxey through MySpace, and after

16   communicating with Maxey, he invited you and your friend to

17   personally meet up.

18                Do you remember telling the Government that?

19   A    Yes.

20   Q    And then you made plans to meet at the tattoo shop?

21   A    That's correct.

22   Q    And after making arrangements at the tattoo shop, Maxey

23   contacted you and invited you and your friend to attend one

24   of Kelly's parties instead?

25   A    That's correct.

J. Pace - Cross/Mr. Cannick                    343

1  Q    So he invited you and your friend?

2  A    He invited me and I was with my friend.  So, in speaking

3  terms, he invited us.  I'm saying it's the person I'm with,

4  so if I'm invited I'm bringing them with me.

5  Q    Isn't it a fact that you told the Government during that

6  meeting of February 27, 2019, that Maxey contacted you and

7  invited you --

8          MS. GEDDES:  Objection.

9  Q    -- and your friend to attend one of Kelly's parties

10 instead?

11         THE COURT:  Overruled.  That means you can answer.

12         THE WITNESS:  Okay.

13         THE COURT:  That's okay.

14 A    That's correct.

15 Q    When you gave testimony here under oath, you testified

16 to the question what led you to go into the defendant's house

17 in May of 2009 and your answer was, We were supposed to be

18 going to a tattoo parlor and ended up getting invited to his

19 home by Bubba.  He invited to us a party.  That's what you

20 testified to under oath?

21 A    That's correct.

22 Q    Now, you testified earlier and told us that about this

23 assault according to you that Robert inflicted upon you the

24 last time you two got together for a sexual encounter.  Do

25 you remember telling us about that?

J. Pace - Cross/Mr. Cannick                    344

1   A    Yes, I do.

2   Q    You told us that after the assault, according to you,

3   that he asked you to engage in sex then as well, am I

4   correct?

5   A    That's correct.

6   Q    And after you had some initial sex, he told you to put

7   on some heels, so you can have intercourse.  Am I correct?

8   A    That's incorrect.

9   Q    That's incorrect.  What did he tell you about the heels?

10  A    Those -- the heels are the heels that we usually -- that

11  he wanted me to wear whenever we had sex.

12  Q    And he didn't ask you according to you?

13  A    He asked me about the heels and that's when I told him

14  that I left them at my uncle's house.

15  Q    And he asked you about the heels for the purpose of

16  having intercourse, am I correct?

17  A    I'm assuming that's what he wanted.

18  Q    Right.  But when you spoke to the Government in one of

19  those interviews you had, you told them that on that same

20  day, Robert was having a party and you told him, Robert, that

21  you needed to grab the heels for the party.  Do you remember

22  telling the Government that?

23  A    Yes.

24  Q    And you told the Government that you left and never

25  returned?

J. Pace - Cross/Mr. Cannick                345

1    A    That's correct.

2    Q    So when you told the Government about this during that

3    interview, you told them that you grabbed the heels for the

4    party and not for sex, am I correct?

5    A    That's correct.

6    Q    Incidentally, do you remember telling someone that in

7    connection with this case, or with this incident, that you

8    drove, you drove by Rob's house over 30 times?

9    A    No.  I do not recall that.

10             MR. CANNICK:  May I approach.

11             THE COURT:  Yes.

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

J. JOHNSON PACE - CROSS - MR. CANNICK          346

BY MR. CANNICK:

Q    I'm going to direct your attention to the highlighted
portion, see if that refreshes your recollection that you
told someone of the fact that you drove by Rob's home?

          MS. GEDDES:  What document are you showing her?

          MR. SCHOLAR:  JP15.

Q    Yes or no, does that refresh your recollection that you
told someone that you drove past Rob's studio to see if his
tour bus was there over 30 occasions?

          THE COURT:  When did this happen?

          MR. CANNICK:  The document or the 30 occasions?

          THE COURT:  The 30 occasions.

          MR. CANNICK:  About --

          THE COURT:  Go ahead.  Does that refresh your
memory.

          THE WITNESS:  It does not.

BY MR. CANNICK:

Q    When you say -- withdrawn.

          Now, yes or no, are you familiar --

          May we have a brief sidebar?

          THE COURT:  Sure.

          (Sidebar conference held.)


          (Continued on the next page.)

```
                              Sidebar                         347
```

1          (The following conference was held outside of the

2    hearing of the jury.)

3          MR. CANNICK:  I'm almost done.  So in this interview

4    this post interview of the polygraph because I -- I don't want

5    it to be an argument that by asking of the name of polygrapher

6    that I'm opening the door to the polygraph.

7          THE COURT:  I think you asked her if this refreshes

8    her memory about whether she said this.  And then she said it

9    doesn't.  I don't think it matters to whom she said it.

10          MR. CANNICK:  Okay.

11          THE COURT:  I think that's probably -- is this

12    before any of this happened?

13          MR. CANNICK:  After.

14          MS. GEDDES:  This is after the lawsuit is settled

15    and referring to --

16          THE COURT:  I see.

17          MR. CANNICK:  She's still stalking, that's the point

18    I'm trying to make.

19          THE COURT:  I'm not accepting that characterization,

20    but I understand what you're saying.

21          (End of sidebar conference.)

22

23          (Continued on the next page.)

24

25

```
 1              (In open court - jury present.)
 2   BY MR. CANNICK:
 3   Q    Do you remember having a video recording done as you
 4   waited out by Robert's home?
 5   A    I do.
 6   Q    Do you remember when it was that you were waiting outside
 7   of his home?
 8   A    I do not.
 9   Q    Were you waiting alone?
10   A    I'm not sure.
11   Q    What were you waiting in?  Were you just standing around
12   waiting or were you in a car?
13   A    A car.
14   Q    How old were you?
15   A    I don't recall.
16   Q    Was this before January 10 -- January 2010?
17   A    I'm not sure.
18   Q    Let me show you a document and see if it refreshes your
19   recollection.
20              MR. CANNICK:  May I approach the witness?
21              THE COURT:  Yes.
22   BY MR. CANNICK:
23   Q    If you look at the bottom portion underlined in red, see
24   if it refreshes your recollection as to whether or not this
25   was before or after your initial lawsuit?
```

J. JOHNSON PACE - CROSS - MR. CANNICK          349

1   A    I'm not sure.

2              MS. GEDDES:  What page are you showing her?

3              MR. CANNICK:  Fifty-four.

4              THE WITNESS:  Reading that doesn't look familiar.

5   Q    When you were waiting out by Rob's house, you were in a

6   vehicle, were you not?

7              MS. GEDDES:  Objection.

8              THE COURT:  I think you have to refer her to -- my

9   recollection is the witness said she didn't recall that.

10             MR. CANNICK:  I'm going to get to that.

11             THE COURT:  Let's do it with a proper question.

12  BY MR. CANNICK:

13  Q    You testified earlier that you recall making a video

14  recording as you sat in front of Rob's house; is that correct?

15  A    That's correct.

16  Q    When you sat in front of Rob's house, how long was it

17  that you sat there?

18  A    I'm not sure.

19  Q    Was it hours?

20  A    I'm not sure how long it was.

21  Q    Was it more than five minutes?

22  A    I'm not sure.

23  Q    What were you waiting for?

24  A    I don't know.

25  Q    You drove from somewhere to go to his home, am I correct?

J. JOHNSON PACE - CROSS - MR. CANNICK          350

1   A     That's correct.

2   Q     You park your car in front of his home, am I correct?

3   A     That's correct.

4   Q     And you wait there, am I correct?

5   A     That's correct.

6   Q     And you're telling this jury that you did that, you took

7   these steps, but you don't know why?

8   A     It was -- yes, that's what I'm telling you.

9   Q     Did you have an occasion where you would leave your home

10  and go and park in front of anyone else's house and sit there?

11              MS. GEDDES:  Objection.

12  A     Yes.

13              THE COURT:  I haven't ruled on the objection.

14              Sustained.

15  Q     Now, when you sat there, you were concerned as to whether

16  or not Rob had moved, am I correct?

17  A     I don't recall.

18  Q     You don't recall as you sat there telling the other

19  person that you wondered whether or not he had moved?

20  A     I do not recall.

21  Q     You don't recall telling the other person that you had

22  been sitting there for a while and hadn't seen him?

23  A     I don't recall.

24  Q     You don't recall telling the other person --

25              MS. GEDDES:  Objection.

1          THE COURT:  Overruled.

2   Q    -- I should just walk up to him, you're Rob, you're

3   Robert Kelly.  I'm hoping his manager is not around.  His

4   manager will get in the way --

5          THE COURT:  Did you show her this already and asked

6   her if she recollected it rather than reading it?  Do you want

7   to refresh her recollection, see if it refreshes her

8   recollection?

9          MR. CANNICK:  Sure.

10  Q    To the bottom portion.

11  A    I don't recall this.

12         MR. CANNICK:  Just one second, your Honor.  I'm

13  looking to see if there is anything further.

14         THE COURT:  Sure.

15  Q    You testified us earlier you do in fact recall driving

16  from someplace and sitting in front of his home.  Do you

17  remember how many times you actually did that?

18  A    I do not recall.

19  Q    But you do recall doing it?

20  A    I recall at least once, yes.

21         MR. CANNICK:  Nothing further, your Honor.

22         THE COURT:  Okay.  Are you ready to redirect?

23         MS. GEDDES:  Yes, your Honor.

24         MR. CANNICK:  Just two questions, your Honor.

25         THE COURT:  You already said you're done.

J. JOHNSON PACE - CROSS - MR. CANNICK          352

1          Just kidding.  Go ahead.

2     BY MR. CANNICK:

3     Q    In your book you testified you didn't embellish anything

4     when you wrote the book about your experiences in connection

5     with these facts that you told us about.

6               MS. GEDDES:  Objection.

7               THE COURT:  Did you testify that you didn't make

8     anything up in the book that you wrote?

9               THE WITNESS:  Yes.

10              THE COURT:  Go ahead.

11    Q    In the book you wrote that during that trial that you sat

12    through in 2008, that Rob blew kisses at you, correct?

13    A    That's correct.

14    Q    Did that happen?

15    A    Yes, that did.

16    Q    It happened.  He didn't know you, right?

17    A    He did not know me.

18              MR. CANNICK:  Thank you.  Nothing further.

19              THE COURT:  Go ahead, Ms. Geddes.

20              Can I see the lawyers on the side, without the court

21    reporter.

22              (Sidebar held with the Court and counsel only,

23    outside of the hearing of the jury and the court reporter.)

24              (Continued on the following page.)

25                            ///

J. JOHNSON PACE - REDIRECT - MS. GEDDES          353

1  REDIRECT EXAMINATION

2  BY MS. GEDDES:

3  Q    On cross-examination I believe earlier today defense

4  counsel asked you about certain telephone calls that were

5  stored in your telephone in Government's Exhibit 210 and are

6  reflected on 210 U, T, S, and R.  Do you recall those

7  questions?

8  A    Yes.

9  Q    And one of the questions that defense counsel asked was

10  whether or not the date of these telephone calls, January 23,

11  was after the last time that you saw the defendant at his

12  house.  Do you recall that question?

13  A    Yes.

14  Q    As you sit here today, do you know the date that you last

15  saw the defendant at his residence?

16  A    I do not.

17  Q    You testified, however, that shortly after you last saw

18  the defendant, you retained a lawyer, correct?

19  A    That is correct.

20  Q    And you said that happened in January 2010, right?

21  A    That's correct.

22  Q    As part of that, you prepared this journal that was

23  reflected in 3500JP9, which I'm showing you.

24          MR. CANNICK:  Objection, your Honor.

25          THE COURT:  Overruled.

J. JOHNSON PACE - REDIRECT - MS. GEDDES          354

1   A     That's correct.

2   Q     I'm going to turn to --

3              THE COURT:  I don't think this is in evidence, is

4   it?

5              MS. GEDDES:  It's not in evidence yet.

6              THE COURT:  Can I see the parties on the side for a

7   minute.

8              (Sidebar conference held.)

9

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                      Sidebar                    355
```

1            (The following sidebar conference was held outside

2   the hearing of the jury.)

3            THE COURT:  Are you planning to admit it?

4            MS. GEDDES:  I'm planning to show her this to, one,

5   see if it refreshes her recollection as to the date on which

6   she last saw him.  Then I do want to have her read this as a

7   prior consistent statement.  I think her credibility has been

8   significantly attacked both in opening and on

9   cross-examination.  She said the exact same thing four days

10  after when she retained a lawyer as to what happened on

11  January 23.  I think she should be permitted to say that she

12  said the same thing four days after it happened.

13           THE COURT:  Do you object to that?

14           MR. CANNICK:  I don't see what is the prior

15  consistent statement?

16           MS. GEDDES:  Prior consistent or inconsistent?

17           MR. CANNICK:  You're offering it as prior consistent

18  statement?

19           MS. GEDDES:  Yes, to rebut the claim of -- and to

20  rehabilitate the witness, both.

21           MR. CANNICK:  What is the prior consistent

22  statement?

23           MS. GEDDES:  January 23, 2010, she went to Rob's

24  house, Rob slapped me three times said I lied to him, it's not

25  going to be an open hand next time.

Sidebar                                                356

1          MR. CANNICK:  I'm not going to object.  Let it in.

2

3          (End of sidebar conference.)

4

5          (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. JOHNSON PACE - REDIRECT - MS. GEDDES          357

1          (In open court - jury present.)

2   BY MS. GEDDES:

3   Q    I'm showing you the last page -- I'll show the witness

4   only -- the last page of 3500JP9 -- the second to last page.

5   Do you see what is shown on JP9?

6   A    Yes, I do.

7   Q    I'm going to direct your attention to the last entry.

8   You can read those two lines then I'll turn it over to the

9   next page.

10          (Witness reviewing document.)

11          Can I turn it over?

12  A    Yes.

13          (Witness reviewing document.)

14          Yes.

15  Q    Does looking at those last two pages of 3500JP9 refresh

16  your recollection as to the last date that you saw the

17  defendant at his residence?

18  A    Yes.

19  Q    When was it?

20  A    January 23.

21  Q    Of 2010?

22  A    Yes.

23  Q    Can you please read to the jury your entry for January 23

24  of 2010.  Take a moment.

25  A    It says:  I went to Rob's house and Rob called me a

1    silly, a silly bitch.  Rob slapped me three times.  He said if

2    I lie to him again it's not going to be an open hand next

3    time.  He spit in my face and in my mouth.  And he slapped me

4    in my face again for the fourth time.  He choked me during an

5    argument.  I had sex with him.  I had oral sex with him.  And

6    I became fed up with him and went home and confessed.

7              Can I have a bathroom break?

8              THE COURT:  Yes.  Let's take our afternoon break,

9    ladies and gentlemen.

10             Let's take the witness out first.

11             (Whereupon, the witness steps down.)

12             THE COURT:  We'll be in recess for 15 minutes.

13             Don't talk about the case at all.  We'll see you in

14   a few minutes.

15             (Jury exits the courtroom.)

16             THE COURT:  One thing I want everyone to keep on

17   their radar -- Ms. Greene will correct me if I'm wrong --

18   alternate number three, let me see if I have this, alternate

19   number three can't start a new job until -- she doesn't start

20   until the 23 but -- she's supposed to start orientation on the

21   23 and won't get paid if she doesn't do the orientation.  And

22   if she doesn't get that, she also won't have any benefits.

23   Apparently her husband doesn't have benefits.

24             There are many layers.  I think I told you before,

25   there were some issues about picking kids up from school also.

J. JOHNSON PACE - REDIRECT - MS. GEDDES          359

1  But you can -- we don't have to decide this right now -- but

2  talk amongst yourselves see if you'll agree to excuse or --

3  what day is the 23rd?

4          THE DEPUTY CLERK:  Monday.

5          THE COURT:  We'll talk about it at the end of the

6  day.

7          (Brief recess.)

8          (Whereupon, the witness resumes the stand.)

9          (Jury enters the courtroom.)

10          THE DEPUTY CLERK:  You may be seated.

11          MS. GEDDES:  May I proceed, your Honor?

12          THE COURT:  Yes.  Go ahead.

13          THE DEPUTY CLERK:  The witness is reminded she's

14  still under oath.

15  BY MS. GEDDES:

16  Q    On cross-examination do you recall being asked a question

17  about where in Government's Exhibit 928 it said that your

18  silence was being purchased.  Do you recall those questions?

19  A    Yes.

20  Q    Did you draft Government's Exhibit 928?

21          MR. CANNICK:  Objection.

22          THE COURT:  Overruled.

23  A    No.

24  Q    And how old you were when Government's Exhibit 928 --

25          MR. CANNICK:  Objection.

1           THE COURT:  Overruled.

2    Q    -- was drafted?

3    A    I was 16.

4    Q    And because you were 16, was your mother also required to

5    sign this agreement?

6    A    Yes, she was.

7    Q    Is that her signature?

8    A    Yes, it is.

9           MS. GEDDES:  I'm showing one of the pages of 928.

10   This is in evidence, may I publish that to the jury?

11          THE COURT:  Yes.

12   BY MS. GEDDES:

13   Q    Where my finger is pointing, is that your mother's

14   signature?

15   A    Yes, it is.

16   Q    Again, what was your understanding of your obligations

17   under this agreement?

18   A    That I wasn't supposed to talk about it with anyone.  I

19   was supposed to remain silent and keep everything

20   confidential.

21   Q    And in exchange for that obligation, what did you get?

22   A    I was supposed to get $1.5 million settlement.

23   Q    I'd like to direct your attention to paragraph three, do

24   you see paragraph three?

25   A    It's a bit blurry, but I can see it.

J. JOHNSON PACE - REDIRECT - MS. GEDDES          361

1    Q    Can you see that now?

2    A    Yes, I can.

3    Q    Can you read paragraph three for the jury, please?

4    A    Johnson and Kelly, Susan E. Loggans, Susan E. Loggans and

5    Associates PC, and Loggans' firm expressly acknowledge and

6    agree that the following are of highly confidential nature,

7    and that Johnson and Kelly, Susan E. Loggans, Susan E. Loggans

8    and Associates PC, and Loggans' firm and anyone acting on

9    their behalf under the control or in their employ will not

10   disclose nor discuss in any fashion with anyone the following

11   items.

12   Q    Can you continue and read the items which were not to be

13   discussed.  Just before you do that, that first name up there

14   says Johnson, who is Johnson?

15   A    Johnson is me.

16   Q    That was your maiden name?

17   A    Yes.

18   Q    Can you now please read to the jury the items that you

19   were not to discuss as provided in paragraph three that you

20   just read?

21   A    A:  The existence of a relationship, if any, between

22   Johnson and Kelly.

23          B:  The fact that there was a dispute between

24   Johnson and Kelly.

25          C:  The allegations underlying the dispute between

J. JOHNSON PACE - REDIRECT - MS. GEDDES          362

1   Johnson and Kelly.

2            D:  The fact that the dispute has been terminated.

3            And E:  Any term of this agreement provided however

4   that this provision does not prohibit any disclosure of the

5   proceeds to the proper taxing authorities or the allegations

6   underlying the dispute when ordered by a court competent

7   jurisdiction, or as otherwise required by law.

8   Q    On cross-examination you were also asked about how you

9   were able to advance two years from April of 2008 until May of

10  2009.  Do you recall those questions?

11  A    Yes, I do.

12  Q    When was the first day that you encountered the

13  defendant?

14  A    April Fool's day of 2008.

15  Q    How old were you then?

16  A    I was 14.

17  Q    When was your birthday?

18  A    April 19.

19  Q    When did you turn 15?

20  A    April 19, 2008.

21  Q    Eighteen days after you met the defendant?

22  A    That's correct.

23  Q    When did you turn 16?

24  A    April 19, 2009.

25  Q    When did you meet the defendant?  When did you first go

J. JOHNSON PACE - RECROSS - MR. CANNICK          363

1   to the defendant's house.

2   A    It was May of 2009.

3   Q    So fair to say there were about 13 months that passed

4   between April 1st of 2008 and May of 2009 when you met the

5   defendant?

6   A    That's correct.

7            MS. GEDDES:  Nothing further.

8            THE COURT:  Any recross?  It's limited to what came

9   out on redirect.

10           MR. CANNICK:  Yes.

11  RECROSS-EXAMINATION

12  BY MR. CANNICK:

13  Q    The journal that you just testified to on redirect, your

14  lawyers asked you to prepare that journal, am I correct?

15  A    That's correct.

16  Q    They asked you after you had gone to their office to

17  consult with them, am I correct?

18           THE COURT:  Mr. Cannick, you can take your mask off.

19           MR. CANNICK:  Thank you.

20  Q    And when you were putting the entries into the journal,

21  you were not doing it contemporaneous, am I correct, with the

22  incidents that you put in there?

23  A    Rephrase your question.

24  Q    When you made the entries in the journal, you made those

25  entries well after the items that you placed in the journal,

J. JOHNSON PACE - RECROSS - MR. CANNICK          364

1   am I correct?

2   A    I don't understand your question.

3   Q    May I have the journal?  What was the date that you

4   prepared this journal?

5   A    I'm not sure of the date I prepared the journal.

6   Q    You have an entry from May 30, 2009.

7              MS. GEDDES:  Objection.

8              THE COURT:  Overruled.

9   Q    You have an entry from May 30, 2009.  You didn't prepare

10  the journal on May 30, 2009, am I correct?

11  A    I don't recall exactly when I prepared the journal.

12  Q    Well, had you seen the lawyer before May 30, 2009?

13  A    No, I did not.

14  Q    But there is an entry in the journal, am I correct?

15  A    I didn't see the journal.

16  Q    You testified and told the jury a short time ago --

17  A    I didn't see what the page you're talking about.

18             THE COURT:  I think what Mr. Cannick is asking you

19  is, did you prepare that journal after you met the lawyers?

20             THE WITNESS:  Yes, I did.

21             THE COURT:  So that was after all of the things that

22  you told us about that happened in 2009, correct?

23             THE WITNESS:  That's correct.

24             THE COURT:  You didn't prepare the journal right

25  after it happened, correct?

1          THE WITNESS:  That's correct.

2          THE COURT:  Sorry about that.

3          MR. CANNICK:  Thank you, your Honor.

4    BY MR. CANNICK:

5    Q    When you were asked to prepare this journal by your

6    attorneys, they told you to be accurate with the information,

7    am I correct?

8    A    That's correct.

9    Q    In the journal you told the attorneys that Robert slapped

10   you three times, am I correct?

11   A    That's correct.

12   Q    And an eventual fourth time.

13   A    That's correct.

14   Q    You told the lawyers, at least you put in the journal,

15   that he choked you?

16   A    That's correct.

17   Q    You didn't put in there that he choked you out?

18   A    That's correct.

19   Q    You put absolutely nothing in the journal about the

20   supposed T-shirt that you found -- withdrawn -- about the

21   supposed T-shirt that you had that you used to wipe off semen

22   and spit from your face?

23   A    That's correct.

24   Q    Nothing.

25          MR. CANNICK:  I think that's it, your Honor.

J. JOHNSON PACE - REDIRECT - MS. GEDDES          366

1           THE COURT:  Anything else?

2           MS. GEDDES:  Very briefly.

3    REDIRECT EXAMINATION

4    BY MS. GEDDES:

5    Q    On recross-examination you were asked about your meeting

6    with a lawyer.  Why did you go to a civil lawyer rather than

7    seek another avenue?

8           MR. CANNICK:  Objection.

9           THE COURT:  Sustained.

10   Q    On recross you were also asked about the T-shirt that you

11   testified earlier about that you used to wipe off the

12   defendant's semen from your face.  Do you recall that?

13   A    Yes.

14   Q    What did you do with that T-shirt?

15   A    I gave that T-shirt to my attorney.

16

17           (Continued on next page.)

18

19

20

21

22

23

24

25

1    EXAMINATION CONTINUES

2    BY MS. GEDDES:

3    Q     And that was your attorneys at the Loggans law firm?

4    A     Yes.

5              MS. GEDDES:  Nothing further.

6              THE COURT:  Anything else?

7              MR. CANNICK:  Yes, one.

8              THE COURT:  You're kidding, right?

9              All right, one.

10   RECROSS-EXAMINATION

11   BY MR. CANNICK:

12   Q     When, when did you give that T-shirt to your attorneys?

13   A     I don't recall the exact date.

14             MR. CANNICK:  Thank you.

15             THE COURT:  All right, the witness can step down.

16             (Witness excused.)

17             THE COURT:  Are you ready to call your next witness?

18             MS. GEDDES:  Yes, the Government calls Garrick

19   Amschl.

20             (Pause.)

21             THE COURT:  Can you tell me the witness' last name

22   again?

23             MS. GEDDES:  Yes, it's Amschl, A-M-S-C-H-L.

24             (Witness enters the courtroom and takes the stand.)

25             THE COURTROOM DEPUTY:  Raise your right hand for me,

1    please.

2            Do you solemnly swear or affirm that the testimony

3    you are about to give will be the truth, the whole truth and

4    nothing but the truth?

5            THE WITNESS:  I do.

6            (Witness sworn.)

7            THE COURTROOM DEPUTY:  Please have a seat and state

8    your name for the record.

9            THE WITNESS:  Garrick Amschl.

10

11           (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **GARRICK AMSCHL,**

2       called as a witness by the Government, having been duly

3       sworn/affirmed by the Courtroom Deputy, was examined and

4       testified as follows:

5  DIRECT EXAMINATION

6  BY MS. GEDDES:

7  Q    What do you do for a living?

8  A    I'm a police officer.

9  Q    Where?

10 A    The Village of Olympia Fields in Illinois.

11 Q    How long have you been a police officer with the Village

12 of Olympia Fields?

13 A    Almost 24 years.

14         THE COURT:  Can I interrupt?  I forgot to give my

15 instructions.

16         I'm sure they won't be necessary, but I just want to

17 remind you we have a court reporter that is taking down

18 everything that you say.  Try not to talk over whoever is

19 asking you questions.  And if there's a question that isn't

20 clear, just let me know.

21         All right.

22         THE WITNESS:  Yes, ma'am.

23         THE COURT:  Sorry, go ahead.

24 BY MS. GEDDES:

25 Q    What is your call sign with the Olympia Fields Police

```
                  Amschl - direct - Geddes              370
```

1  Department?

2  A    4423.

3  Q    What is a call sign?  I probably should have started with

4  that.

5  A    It's a radio designated number.

6  Q    I'd like to direct your attention to June 13th of 2009.

7        Were you working that day?

8  A    I was.

9  Q    Do you recall what shift you were working that day?

10  A    Afternoons.

11  Q    And what are the hours of the afternoon shift?

12  A    4:00 p.m. to midnight.

13  Q    I want to direct your attention to 10:53, approximately

14  10:53 p.m. that evening.

15        What did you do that evening?

16  A    I was dispatched to a call.  It was an assist other

17  agency for Country Club Hills Police Department looking for a

18  missing juvenile.

19        THE COURT:  Slow down a little.

20  A    I was dispatched to a call for another agency.  It was

21  for Country Club Hills Police Department, also in Illinois,

22  for a missing juvenile.

23  Q    And you indicated that you were dispatched to a call.

24        What does that mean?

25  A    Meaning I received a call over the radio.

Amschl - direct - Geddes                    371

1  Q     And were you told to go somewhere?

2  A     Yes.

3  Q     Where were you told to go?

4  A     One Maros Lane.

5  Q     Is that also in Olympia Fields?

6  A     Yes, it is.

7            MS. GEDDES:  I'm showing the witness what's in

8  evidence as Government Exhibit 502(a).

9            (Exhibit published.)

10  Q     Do you recognize what's shown in 502(a)?

11  A     I do.

12  Q     What is that?

13  A     That is the front gate to One Maros Lane in Olympia

14  Fields.

15  Q     And is that the location where you were dispatched to on

16  June 13th of 2009?

17  A     It is.

18  Q     And you testified that you were going to look for a

19  missing juvenile.

20            Did you learn the name of the individual you were

21  going to look for?

22  A     Dominique ████.

23            MS. GEDDES:  And I'm showing the witness and the

24  jury only what's in evidence as Government Exhibit 69(a).

25  Q     Underneath the photograph shown in 69(a), is that the

Amschl - direct - Geddes                               372

1    name of the Dominique that you were -- who was listed as the

2    missing juvenile?

3    A    It is.

4    Q    Do you recall what happened when you responded to One

5    Maros Lane?

6    A    I was met by security.

7    Q    And what happened when you were met by security?

8    A    Security referred me to a phone call for the business

9    manager for Mr. Kelly.

10   Q    And by Mr. Kelly, who are you referring to?

11   A    Robert Sylvester Kelly.

12   Q    What was Robert Sylvester Kelly's association with One

13   Maros Lane?

14   A    He was the owner of the residence.

15   Q    And you testified that someone at security referred you

16   to the business manager, is that correct?

17   A    Yes.

18   Q    Did you learn the name of the business manager?

19   A    I did not.

20   Q    Did you learn the telephone number of the business

21   manager?

22   A    I did.

23   Q    As you sit here today, do you recall that telephone

24   number?

25   A    I do not.

Amschl - direct - Geddes                    373

1          MS. GEDDES:  I am showing the witness what's been

2     marked for identification as Government Exhibit 3500-GA1.

3     BY MS. GEDDES:

4     Q    And I am showing you page 4 of that.

5          Does that refresh your recollection as to the

6     telephone number for the business manager?

7     A    It does.

8     Q    What was the telephone number?

9     A    312-659-1040.

10    Q    Did you have an opportunity to speak with the business

11    manager after security referred you to him?

12    A    I did.

13    Q    What happened?

14    A    The business manager advised that the juvenile was 17,

15    and that he had asked her to leave the prior week.

16    Q    What, if anything, did the business manager say about

17    Mr. Kelly?

18    A    I'm sorry?

19          MR. CANNICK:  Objection.

20          MS. GEDDES:  Let me rephrase.  Withdraw that

21    question.

22    BY MS. GEDDES:

23    Q    Did you have an opportunity to speak with Mr. Kelly that

24    day?

25    A    No.

Amschl - direct - Geddes                        374

1   Q    What, if anything -- now I'm going back to my question.

2         What, if anything, did Mr. Kelly's business manager,

3   the business manager that you spoke with, say about Mr. Kelly?

4         MR. CANNICK:  Objection, Your Honor.

5   BY MS. GEDDES:

6   Q    And before --

7         THE COURT:  Sustained.

8         MS. GEDDES:  Your Honor, may we have a brief

9   sidebar on that?

10         THE COURT:  Okay.

11         (Sidebar held outside the hearing of the jury.)

12

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

```
                          Sidebar                    375
```

1           (The following sidebar took place outside the

2    hearing of the jury.)

3           MS. GEDDES:  Your Honor, the business manager is an

4    employee of Mr. Kelly.  He was operating in his capacity as

5    the business manager for the defendant, and the Government's

6    position is that's a statement of an employee, as part of

7    his --

8           THE COURT:  The enterprise?

9           MS. GEDDES:  Excuse me?

10          THE COURT:  Is it part of the enterprise, is that

11   what you're saying?

12          MS. GEDDES:  I mean I think it's in addition to

13   that, it's a co-conspirator statement, but I don't think you

14   even have to get there because under 801 it's also a statement

15   of an employee.  He was working as the business manager and he

16   was answering that phone call in his capacity as the business

17   manager and it's an employee, like a statement as an agent of

18   the defendant.

19          THE COURT:  What's the statement?  I don't know what

20   it is?

21          MS. GEDDES:  It's going to say that --

22          MR. FARINELLA:  We don't know the statement.

23   There's also the foundation --

24          THE COURT:  How do you not know the statement?

25          MS. GEDDES:  Can I just say what the statement is?

```
                          Sidebar                        376
```

1          THE COURT:  I just read some stuff in discovery, so

2     it's definitely there.

3          MR. FARINELLA:  Right, no.  I mean he relates

4     what -- what the conversation was.

5          MS. GEDDES:  Mr. Kelly advised that he had not seen

6     her.  He spoke with Mr. Kelly who advised him he had had

7     previous contact.  And why it's relevant is because I want to

8     establish that the defendant was aware that the police

9     officers went to One Maros Lane in search of Dominique ████

10    to corroborate what Ms. Pace just testified about.

11         THE COURT:  Do you object?

12         MR. FARINELLA:  Well, the only issue I have is that

13    the foundation as to who -- who was the officer was speaking

14    to.  We only have a phone number.  There's been no link up to

15    the phone number as to who the business manager is.  And

16    throughout the discovery there are a number of different

17    business managers.  So, there's no specific delineation as to

18    who he was on the phone with.

19         THE COURT:  Can you tell him who it was?  Do you

20    know who it was?

21         MS. GEDDES:  Yes, I do.  It's Derrel McDavid, and

22    there's already been testimony about Derrel McDavid in his

23    role.

24         THE COURT:  I think that clears it up.  Okay, great.

25              (Sidebar concluded.)

Amschl - direct - Geddes                377

1          (In open court - jury present.)

2          THE COURT:  Go ahead.

3   EXAMINATION CONTINUES

4   BY MS. GEDDES:

5   Q    What, if anything, did the business manager to whom you

6   spoke say about Robert Kelly?

7   A    I'm not quite sure I understand the question.

8          That he had spoken to Mr. Kelly and advised that she

9   had not been seen or had contact with the juvenile.

10  Q    Who said that they had spoken to Mr. Kelly?

11  A    The business manager.

12  Q    So, yes, so the business manager -- you testified that

13  the business manager told you that he had spoken with

14  Mr. Kelly.

15         And what did he say Mr. Kelly said?

16  A    That he learned -- learned last week, the previous week,

17  that the juvenile was 17 and that he had asked her to leave.

18  Q    And just to be clear, who said that he learned last week

19  that the individual you identified as Dominique had been found

20  last week, was 17 years of age, and was asked to leave?

21  A    The business manager.

22  Q    And what did the business manager say about Mr. Kelly?

23  A    That he had not had contact with her since that time.

24  Q    That Mr. Kelly had not had contact with Dominique since

25  that time, is that correct ?

```
                  Amschl - cross - Farinella              378
```

1   A     Correct.

2              MR. CANNICK:  Objection.

3              THE COURT:  Overruled.

4              MS. GEDDES:  Nothing further.

5              THE COURT:  Cross-examination.

6              MR. CANNICK:  Yes, Your Honor.

7   CROSS-EXAMINATION

8   BY MR. FARINELLA:

9   Q     Good afternoon, Officer.

10  A     Good afternoon.

11  Q     So, the Government has show -- has shown you what's been

12  marked as Exhibit 3500-GA1.

13             And that consists of the report that you prepared

14  that day, correct?

15  A     It's actually not technically a police report.  It's the

16  CAD notes, the computer-aided dispatch notes, for the calls

17  that were generated.

18  Q     Okay.

19             And in those notes, it does indicate -- and you

20  prepared these notes, right?

21  A     Those notes were probably prepared via radio by the

22  dispatcher.  The dispatcher typed them into the computer as I

23  dictated.

24  Q     Okay.  But the source is you?

25  A     Correct.

```
                  Amsch1 - cross - Farinella          379
```

1    Q    Okay, thank you.

2         Now, I'll point you to page -- I apologize -- page 4

3    of the report.

4         THE COURT:  Is there a number on it, the 3500

5    material.

6         MR. FARINELLA:  Yes, Government's 3500-GA1.

7         THE COURT:  All right.  Do you want him to look at

8    it?

9         MR. FARINELLA:  Yes.

10         THE COURT:  Can we put that up?

11         I guess your side should be doing it, but do you

12    mind putting it up?

13         MS. GEDDES:  Sure.

14         THE COURT:  Thanks.

15         MS. GEDDES:  Page 4?

16         MR. FARINELLA:  Yes, please.

17    BY MR. FARINELLA:

18    Q    So, on page 4, it's true that you indicate that you

19    received a call regarding Dominique ███████, but found out

20    last week she was -- forgive me, apologize?

21         THE COURT:  Just slow down a little bit, please.

22         MR. FARINELLA:  Okay.

23         THE COURT:  Thanks.  And do you want this displayed

24    to everybody?

25         MS. GEDDES:  It's not in evidence.

1            THE COURT:  It's not in evidence, okay.

2    BY MR. FARINELLA:

3    Q    So, in the report it doesn't indicate that you had

4    requested any additional investigation in the matter, right?

5    A    That's correct.

6    Q    And it was -- and you didn't request any search warrants

7    with regard to this particular complaint, correct?

8    A    That's correct.

9    Q    And it's a fact that this complaint came from the person

10   that you were looking for's mother, right?

11   A    It actually came from Country Club Hills Police

12   Department was the request.  They -- they had requested us to

13   initiate the contact.

14   Q    So, isn't it a fact that when you were concluded with

15   Mr. Kelly's business manager, you, at that point, left the

16   scene?

17   A    That's correct.

18   Q    And it was at that point you determined that there was no

19   further investigation required?

20   A    It was referred to Country Club Hills for their

21   follow-up.  It was their case initially.

22   Q    But in terms of the initial immediacy or you had -- you

23   had closed it out from your perspective?

24   A    That's correct.

25            MR. FARINELLA:  Thank you, nothing further.

Proceedings                    381

1              THE COURT:  Okay, any redirect?

2              MS. GEDDES:  No, Your Honor.

3              THE COURT:  Okay, thank you so much.  You can step

4    down.

5              (Witness excused.)

6              THE COURT:  Do you have another witness to call?

7              MS. SHIHATA:  Yes, Your Honor.  The Government calls

8    Kris McGrath.

9              (Witness enters and takes the stand.)

10             THE COURTROOM DEPUTY:  Raise your right hand for me,

11   please.  Stand.

12             THE WITNESS:  Oh, stand.

13             THE COURTROOM DEPUTY:  Do you solemnly swear or

14   affirm that the answers you're about to give will be the

15   truth, the whole truth, and nothing but the truth?

16             THE WITNESS:  I do.

17             (Witness sworn.)

18             THE COURTROOM DEPUTY:  Thank you.  State your name

19   for the record.

20             THE WITNESS:  Kris McGrath.

21             THE COURTROOM DEPUTY:  Thank you.  You may be

22   seated.

23             THE COURT:  Okay, you can remove your mask, and just

24   a couple of things regarding your testimony.

25             Our court reporters take down everything the

SAM      OCR      RMR      CRR      RPR

Proceedings                                        382

1    witnesses say, so if you could make sure you don't speak too

2    quickly.  And then, if you could also just wait until whoever

3    is asking you the question finishes before you start to

4    answer, that way we're not talking over one another and it

5    doesn't make the court reporter's job too hard.

6              And finally, if you don't understand a question or

7    want to have it repeated, just let me know.

8              Okay?

9              THE WITNESS:  Yes.

10             THE COURT:  Is the witness' microphone working?

11   Just tap it.

12             Yes, so speak into it.

13             THE WITNESS:  (Witness complies.)

14             THE COURT:  All right.

15             THE WITNESS:  Testing.

16             THE COURT:  Perfect, go ahead.

17             MS. SHIHATA:  Thank you, Your Honor.

18

19             (Continued on the following page.)

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

1  **KRIS McGRATH, MD**,

2      called as a witness by the Government, having been

3      duly sworn/affirmed by the Courtroom Deputy, was examined

4      and testified as follows:

5  DIRECT EXAMINATION

6  BY MS. SHIHATA:

7  Q    Good afternoon.

8  A    Good afternoon.

9  Q    Did you receive a subpoena to testify here today?

10 A    Yes, I did.

11      THE COURT:  I am going to ask you to keep your voice

12 up, too, and use the microphone.

13      MS. SHIHATA:  I'm sorry.

14 Q    Did you receive a subpoena to testify here today?

15 A    Yes, I did.

16 Q    Are you currently employed?

17 A    Yes, I am.

18 Q    What do you do for a living?

19 A    I'm a physician.

20 Q    What kind of physician are you?

21 A    Internal medicine and allergy and immunology.

22 Q    Where do you practice?

23 A    Chicago, Illinois.

24 Q    I am showing you what's in evidence as Government

25 Exhibit 1.

1                    (Exhibit published.)

2    Q    Do you recognize the person in this photograph?

3    A    Yes, I do.

4    Q    Who is that?

5    A    Robert Kelly.

6    Q    Do you personally know Robert Kelly?

7    A    Yes, I do.

8    Q    In what capacity?

9    A    As his physician.

10   Q    Do you know him in any other ways as well?

11   A    Socially.

12   Q    Do you see Robert Kelly in the courtroom here today?

13   A    Yes, I do.

14   Q    Can you point him out and indicate and identify him by an

15   item of clothing that he's wearing?

16   A    The man over there in the blue suit and blue tie.

17            THE COURT:  Indicating the defendant.

18   BY MS. SHIHATA:

19   Q    Now, you indicated you were his primary care physician,

20   correct?

21   A    Correct.

22   Q    Can you briefly describe your medical training to the

23   jury?

24   A    I'm trained in internal medicine, which is a three-year

25   program after medical school; internal medicine residency,

McGrath - direct - Shihata                385

1   that was followed by a two-year allergy/immunology fellowship.

2   Both were at Northwestern University.  Preceded by medical

3   school at the University of Iowa.

4   Q    And do you practice in both internal medicine and allergy

5   and immunology?

6   A    Yes, I do.

7   Q    And are you board certified?

8   A    Yes, I am.

9   Q    In both of those specialties?

10  A    Yes, I am, both specialties.

11  Q    Generally speaking, what is internal medicine?

12  A    It's primary care, with the knowledge studied also in the

13  subspecialties of internal medicine such as allergy,

14  immunology, infectious disease, endocrinology,

15  gastroenterology, cardiology, and others.

16  Q    And does that include diagnosing sexually-transmitted

17  diseases?

18  A    Yes, it does.

19  Q    Including herpes?

20  A    Yes, it does.

21  Q    Now, following your medical training, did you open a

22  practice or did you buy a practice?

23  A    Yes, I bought a practice.

24  Q    And around when was that?

25  A    1984, June.

1  Q    And where was that practice located?

2  A    The practice was originally at 100 East Ohio from 1984 to

3  1988; and then in 1988, I moved the practice about four blocks

4  away to 500 North Michigan Avenue.

5  Q    And is that all in Chicago, Illinois?

6  A    Yes.

7  Q    And do you still practice at 500 North Michigan Avenue?

8  A    Yes, I do.

9  Q    Aside from your medical practice, do you hold any other

10  positions?

11  A    Yes.  I also have a teaching faculty position at

12  Northwestern University Medical School, that's professor of

13  medicine where I work with allergy/immunology fellows,

14  residents and medical students at the Northwestern Medical

15  School.

16          MS. SHIHATA:  I am showing the witness only what's

17  been marked for identification as Government Exhibit 48.

18  BY MS. SHIHATA:

19  Q    Is this just a photo of you, Dr. McGrath?

20  A    Yes, it is.

21          MS. SHIHATA:  I move to admit Government Exhibit 48.

22          THE COURT:  Any objection?

23          MS. BLANK BECKER:  No objection, Judge.

24          THE COURT:  All right, that's in evidence.

25          (Government's Exhibit 48 was received in evidence.)

McGrath - direct - Shihata                387

1   BY MS. SHIHATA:

2   Q    Now, for how long were you the defendant's primary care

3   physician?

4   A    Approximately 25 years.

5   Q    And approximately when did you first meet the defendant?

6   A    1994.

7   Q    And how did you meet him?

8   A    I was asked to see him by his accountant, Derrel McDavid,

9   as a favor.

10  Q    And how did you know Derrel McDavid at the time?

11  A    He was an internal medicine patient.

12  Q    I am showing you what's in evidence --

13       MS. SHIHATA:  I am showing the witness only what's

14  been marked for identification as Government Exhibit 12.

15  Q    Do you recognize the person in this photograph?

16  A    Yes, I do.

17  Q    Who do you recognize it to be?

18  A    Derrel McDavid.

19       MS. SHIHATA:  I move to admit Government Exhibit 12.

20       MS. BLANK BECKER:  No objection, Judge.

21       THE COURT:  Okay, that's in evidence.

22       (Government's Exhibit 12 was received in evidence.)

23       MS. SHIHATA:  May we publish it?

24       THE COURT:  Yes.

25       MS. SHIHATA:  To the jury, please.  Thank you.

McGrath - direct - Shihata                    388

1          (Exhibit published.)

2    BY MS. SHIHATA:

3    Q    Now, at some point did you receive a subpoena from the

4    Government for the defendant's medical records?

5    A    Yes, I did.

6    Q    And what, if anything, did you do after receiving that

7    subpoena?

8    A    I called an attorney and had them copied and numbered.

9          THE COURT:  You had the records copied and numbered?

10         THE WITNESS:  Yes, I had the records copied and

11   numbered.

12   Q    And were those records then provided to the Government?

13   A    Yes, they were.

14   Q    And what kinds of records did you provide the Government

15   with?

16   A    The original paper records, pre-electronic records.  So,

17   from about 1994 to 2011 was paper records.  And then the rest

18   are electronic-generated records from 2011 to -- to present.

19   Q    So, fair to say a copy of both your paper file with

20   respect to the defendant, as well as electronic records?

21   A    That's correct.

22   Q    And how were those files maintained at your office?

23   A    In a -- secure medical files -- drawers.

24   Q    For the paper records you mean?

25   A    For the paper records, and the rest are through

SAM     OCR     RMR     CRR     RPR

McGrath - direct - Shihata                   389

1   e-clinical work, so electronic health records.

2   Q    And were those records kept in the regular course of your

3   business?

4   A    Yes, they were.

5   Q    And as a regular practice of your business?

6   A    Yes, as a regular practice of my business.

7            MS. SHIHATA:  I am showing the witness only what's

8   been marked for identification as Government Exhibit 237.

9   BY MS. SHIHATA:

10  Q    Prior to your testimony here today, did you have an

11  opportunity to review Government Exhibit 237?

12  A    Yes, I did.

13  Q    And does it consist of portions of the medical records

14  for the defendant that you provided to the Government?

15  A    Yes, it does.

16           MS. SHIHATA:  I move to admit Government

17  Exhibit 237.

18           THE COURT:  Any objection?

19           MS. BLANK BECKER:  No, Judge, thank you.

20           THE COURT:  Okay.

21           (Government's Exhibit 237 was received in evidence.)

22           (Exhibit published.)

23  BY MS. SHIHATA:

24  Q    Now, based on your prior review of Government

25  Exhibit 237, does it include records from both your hard copy

SAM     OCR     RMR     CRR     RPR

1  file, as well as electronic records, that your office

2  maintained in printout format?

3  A    Yes, it does.

4  Q    Now, approximately when did your office begin using

5  electronic record keeping?

6  A    In March of 2011.

7  Q    And once you switched to electronic records, did you use

8  that recordkeeping system exclusively for patient records?

9  A    Yes.

10  Q    All right, now, I'd like to focus on the time period

11  before March 2011, before the switch to electronic

12  recordkeeping.

13        In that time period, what were the methods you used

14  to issue prescriptions for your patients?

15  A    Handwritten prescriptions or telephone call-in

16  prescriptions.

17  Q    And when you say telephone call-in prescriptions, who

18  would you be calling?

19  A    The pharmacy.

20  Q    And in those circumstances where you would call the

21  pharmacy, what information did you have to provide to the

22  pharmacy?

23  A    The patient's name, date of birth, medications, quantity,

24  dose of the medication, refills, and a signature if it was

25  written; otherwise, just a verbal over the phone.

McGrath - direct - Shihata                391

1   Q    Now, in your paper records did you keep a record of each

2   time you called in a prescription for a patient?

3   A    No, I did not.

4   Q    Why not?

5   A    It was just the standard of practice at the time that you

6   wouldn't write a note every time you called in a prescription.

7   Q    Now, in your medical practice do you sometimes receive

8   phone calls from patients?

9   A    Yes.

10  Q    And prior to moving to your electronic system in 2011,

11  did you always create a paper record of such phone calls?

12  A    Not every time, sometimes.

13  Q    Now, turning to when you switched to electronic

14  recordkeeping in March 2011, what, if any, ways were you able

15  to issue prescriptions to your patients at that time -- after

16  that time?

17  A    After that time they would be done electronically through

18  opening a telephone encounter, and then you put in the name of

19  the medicine, the dose, all the specifics, and then you would

20  hit send and it would go to the pharmacy.

21  Q    And could you also still at that time, in addition to

22  that, do call-in prescriptions?

23  A    You could also -- yes, call-in prescriptions, also.

24  Q    And did you, in fact, do both in your practice?

25  A    Yes, I did both.

SAM     OCR     RMR     CRR     RPR

McGrath - direct - Shihata                    392

1    Q    All right, now going back to Government Exhibit 237, do

2    you see the first page of the exhibit on your screen?

3    A    Yes, I do.

4    Q    And can you explain to the jury what type of record this

5    first page is?

6    A    It's a written medical record of an encounter or progress

7    note on patient Robert Kelly, dated September 12th, 1994.

8    Q    And is this your handwriting on the page?

9    A    Yes, that's my handwriting.

10   Q    Now, directing your attention to that first entry on the

11   page, had you met the defendant before that date?

12   A    No, I had not.

13   Q    So, was this your first meeting with him?

14   A    Yes, it was.

15   Q    And when you, in your practice when you meet a patient

16   for the first time, what is your practice as to that first

17   meeting, what do you do?

18   A    The first meeting you take a history first while they're

19   there.  That's the history of present illness, preceded by the

20   chief concern or chief complaint.  Followed by past medical

21   history, past surgical history, family medical history, review

22   of systems, assessment and plan, plus or minus some laboratory

23   or imaging or testing results.

24   Q    Now, I want to direct your attention to the first line on

25   the page.  What is indicated there?

1    A    Twenty-seven, black male, singer.

2    Q    And was the defendant 27 years old when he first came to

3    see you?

4    A    Yes.

5    Q    Now, I want to go down to the fourth line.  What is

6    indicated there?

7    A    Concerned about chlamydia.  No genital urinary symptoms.

8    Q    All right, I'd like to direct your attention to the

9    middle of the page where there is some numbers written.

10            What does that refer to?

11   A    That's his weight, 193 pounds; height, 6-foot-1-inch.

12   Q    And does this record reflect whether you conducted a

13   physical exam during this office visit with the defendant?

14   A    Yes, it does.

15   Q    And what does it reflect in that regard, did you do a

16   physical exam?

17   A    Yes, it's under those two numbers.  The skin exam,

18   normal; skeletal, lymphatic, head, ears, eyes, nose and

19   throat, lungs, heart, abdomen, extremities, neurological and

20   genital urinary.

21   Q    And did you order any tests related to

22   sexually-transmitted diseases following your physical exam?

23   A    Yes, I did.

24   Q    And what tests did you order?

25   A    The tests I ordered were a chemistry, which is generally

1  kidney and liver; a blood count to screen for, like, anemia

2  and leukemia; and then a chlamydia test and syphilis test.

3  Q    So, those last two are related to STDs?

4  A    Yes, they are.

5  Q    Now, I'm turning to page 8 of the exhibit.

6        Do you recognize what type of document this is?

7        (Exhibit published.)

8  A    This is a lab result.

9  Q    And do you see where it says "drawn date and time"?

10  A    Yes.

11  Q    What date is listed there?

12  A    September 13th, 1994.

13  Q    All right.

14        Now, going back to the first page, you had indicated

15  this date here (indicating), is that September 12th or 13th of

16  1994, now having looked at the lab report?

17  A    I'd say it's September 13th, 1994.

18

19        (Continued on the following page.)

20

21

22

23

24

25

K. McGrath - Direct/Ms. Shihata                 395

1    EXAMINATION

2    BY MS. SHIHATA:

3    Q    And according to this document, what were the results of

4    those two STD tests that you ordered on September 13, 1994?

5    A    The two tests, chlamydia and syphilis tests, were

6    negative.

7    Q    All right.  I'd like to now turn to Page 2 of Government

8    Exhibit 237.

9              Is there an entry on this page for an

10   encounter with the defendant on January 23, 1995?

11   A    Yes, there is.

12   Q    And what kind of encounter was this?

13   A    It's a progress note with the chief concern,

14   examination, assessment, and plan.

15   Q    And what was the chief concern on that visit?

16   A    Penile stinging, one and a half days, no discharge.  No

17   partners, illness, no known drug allergies.

18   Q    And can you tell from this record whether you examined

19   the defendant that day?

20   A    It says "Exam," and then, "Decline rectal exam, penis."

21   There was no discharge.

22   Q    What, if any, tests did you order fooling following this

23   exam?

24   A    I ordered a gonorrhea culture and a chlamydia test.

25   Q    I'm going to direct your attention to Page 11 of

K. McGrath - Direct/Ms. Shihata          396

1    Government Exhibit 237.

2                    Does this indicate the results of those tests?

3    A    Yes, it is t does.

4    Q    And what does it indicate?

5    A    Positive growth of Neisseria gonorrhea, negative test

6    for chlamydia and syphilis.

7    Q    And so, what does that test result mean with respect to

8    gonorrhea?

9    A    That he had gonorrhea explaining his chief concern at

10   that visit.

11   Q    What is gonorrhea?

12   A    It's a sexually transmitted bacterial disease.

13   Q    Is it curable?

14   A    It's curable.

15   Q    Now, as we see in this exhibit the lab issued this

16   report on January 28, 1995, correct?

17   A    Correct.

18   Q    I want to turn back to Page 2 of Government Exhibit 237.

19                    Is there an encounter on this page from

20   February 7, 1995?

21   A    Yes, there is.

22   Q    And what kind of encounter was that?

23   A    Progress note.

24   Q    And what, if anything, happened during that encounter?

25   Was that an in-person visit?

K. McGrath - Direct/Ms. Shihata                397

1   A   It was an in-person visit.

2   Q   And what happened during that?

3   A   After talking to somebody, I can't make out that name, a

4   patient came today and I treated him because of that result

5   with an Z-Pak and a shot of Ceftriaxone, 250 milligrams,

6   intramuscularly and educated the patient to tell partners and

7   to practice safe sex.

8   Q   And is that indicated over here?

9   A   Yes.

10  Q   And what does that mean, "Advised the patient to tell

11  partner and recommend safe sex"?

12  A   With sexually transmitted diseases, you have to educate

13  the patient, make sure you treat the patient, and have the

14  patient inform any sexual contacts that they should be seen

15  and treated.

16  Q   Meaning, sexual partners?

17  A   Yeah, sexual partners.

18  Q   And why did you advise the defendant in that manner?

19  A   Because I just diagnosed him with gonorrhea.

20  Q   Is that your regular practice when you tell a patient

21  that he or she has an STD?

22  A   Yes, that's my regular practice.

23  Q   And by STD, you mean sexually transmitted disease?

24  A   Sexually transmitted diseases, correct.

25  Q   Has it always been your regular practice?

1   A     It always has been and is my regular practice.

2   Q     I'd like to direct your attention to Page 3 of the

3   exhibit.

4               What's reflected for the encounter on May 1,

5   1996?

6   A     It's a progress note.  Visit.  Do you want me to

7   proceed?

8   Q     Sure.

9   A     Chief concern is penile purulent drip, two days.

10  Declines cultures, et cetera, for privacy.

11  Q     And what cultures did you want to run at that point?

12  A     I would only have to take an educated or retrospective

13  guess, chlamydia.

14              MS. BLANK BECKER:  I would object.

15              THE COURT:  Make sure you have the microphone on

16  and you can take your mask off, otherwise I can't hear you.

17              Are you objecting?

18              MS. BLANK BECKER:  Yes.

19              THE COURT:  When you say you have an educated

20  guess, are you talking about your usual practice or do you

21  know what happened next?

22              THE WITNESS:  It would be my usual practice to

23  repeat what I just did in the previous visits.

24              THE COURT:  Okay.

25

1          MS. BLANK BECKER:  Thank you.

2     EXAMINATION

3     BY MS. SHIHATA:

4     Q    Would those be testing for STDs?

5     A    Yes, it would.

6     Q    And that involves cultures; is that correct?

7     A    Gonorrhea culture, chlamydia, and whatever else I would

8     have thought of at that time.

9     Q    And your notes indicate that the patient, the defendant,

10    declined for privacy reasons; correct?

11    A    That's correct.

12    Q    Now, is there another entry on this page for

13    October 29th, well, what date is that entry for?

14    A    October 29, 1988.

15    Q    '88 or '98?

16    A    I'm sorry '98.

17    Q    And what does that indicate?

18    A    Chief concern was sore tip of the penis within 24 hours,

19    episodic.  No discharge.  Exam negative.  Impression:

20    Urethritis.  And I drew the arrow pointing to the treatment

21    above which is I think was a treatment I gave on May 1, 1996.

22    Q    So the same treatment?

23    A    I think the treatments for both those visits.

24    Q    What was that treatment for?

25    A    Most causes of urethritis, most likely, treat chlamydia

1   and gonorrhea.

2   Q    Now, I'm going to direct your attention to Page 162 of

3   Government Exhibit 237.  Was there an office visit by the

4   defendant on this date?

5   A    Yes, there was.

6   Q    And what is the date indicated?

7   A    June 5, 2000.

8   Q    And what was the complaint on that date?

9   A    The complaint was irritated penis, Saturday evening.

10  Progressed into swelling of the head of penis and red bumps.

11  Itched.  Preceded by several hours before wore leather pants.

12  They were black, tight around the waist without underwear for

13  a photo shoot.  No dysuria, that's burning on urination.  No

14  hematuria, that's blood in the urine.  No frequency of

15  urination.  Otherwise, feels well.

16  Q    I'm just going to stop you for a moment.  That portion

17  that you read, is that what the patient, the defendant,

18  Mr. Kelly, reported to you on that visit?

19  A    And, right, it's what he reported and then what I asked

20  for pertinent positives or negatives.

21  Q    And did you conduct any examination during that visit?

22  A    Yes, there was an examination.

23  Q    And what do your notes reflect regarding that?

24  A    It says, "Exam glans penis," that's the head of penis.

25  Very small vesicles, those are very small blisters.

K. McGrath - Direct/Ms. Shihata          401

1   Q     And what else is reflected on your notes for that visit?

2   A     My impression and plan.

3   Q     And what was that?

4   A     My impression was either contact dermatitis from the

5   black dye in the leather or leather components or herpes

6   simplex virus.

7   Q     Is that what's known as a differential diagnosis?

8   A     That is correct, a differential diagnosis for this

9   visit.

10  Q     And what does that mean?

11  A     That means the possibilities based on the history and

12  the exam.

13  Q     And you mentioned contact dermatitis.  What is that?

14  A     That's a skin reaction most common in the community

15  would be like poison ivy.  I was wondering if it was from the

16  dyes in the leather pants or the leather tanning agents

17  causing it.

18  Q     And what was the other possible diagnosis?

19  A     Herpes simplex virus or genital herpes.

20  Q     And, to be clear, was genital herpes the type of herpes

21  you suspected the defendant had at that point based on your

22  examination?

23  A     Correct.

24  Q     And why did you suspect genital herpes as, well?  Why

25  did you indicate genital herpes as one of the two diagnoses

K. McGrath - Direct/Ms. Shihata                402

1  in your differential diagnosis?

2  A    They both were causes of vesicles or blisters or bumps.

3  Q    And what is genital herpes?

4  A    A sexually transmitted disease caused by the herpes

5  simplex virus, usually Type 1 or it could be Type 2.

6  Q    And so genital herpes, I'm sorry, genital herpes is

7  which type generally?

8  A    It's a viral illness caused by the herpes simplex virus.

9  There's more than with your serotype.  Most common is

10  Serotype 1.  It could also be, most commonly, it's Type 2 and

11  could also be Type 1.

12  Q    Okay.  So, just to be clear, most commonly it's Type 2;

13  is that correct?

14  A    I believe it's Type 2, I could be wrong on that at this

15  moment.

16  Q    All right.  Now, what, if any, tests did you order at

17  this visit?

18  A    The herpes simplex virus culture.

19  Q    And why did you do that?

20  A    Because I suspected herpes simplex causing the irritated

21  penis that progressed into swelling of the head of the penis

22  with red bumps and a physical exam of small vesicles.

23  Q    And, as we just went over, prior to that date, you had

24  previously diagnosed the defendant with an STD, correct?

25  A    Correct.

1    Q    Gonorrhea, specifically, correct?

2    A    Correct, gonorrhea.

3    Q    Now, is genital herpes curable?

4    A    It is not curable.  It can go in remission but generally

5    not curable.

6    Q    Now, you indicated that you ordered -- or that you

7    conducted a herpes culture; is that right?

8    A    That's right.

9    Q    And can you explain to the jury what that is, what that

10   means?

11   A    It's where you swab, take, like, a cotton tip swab, swab

12   the lesions on the penis and then put it into a culture

13   media.  The results can vary.  If you don't get it at the

14   right time you can get a false negative.  I like to catch it

15   early so you get a positive culture.

16   Q    So just to explain a little bit more about what that

17   means.  Is timing very important for a herpes virus culture?

18   A    Timing is very important for a herpes virus culture.

19   Q    Can you explain why that is?

20   A    Because it goes through its changes of the skin from the

21   watery blisters with a red base to the drying blisters and

22   the flaking of the blisters.  They're not shedding the virus,

23   the virus is absent by then.  The viruses are usually present

24   at the beginning of lesions and even then you might get a

25   negative culture.

1  Q    And does a negative herpes culture mean you don't have

2  herpes?

3  A    No, it doesn't mean you don't have herpes.  You may not

4  have captured it.  It's a total clinical presentation of the

5  history, the exam, and then in the future response to

6  treatment which helps you confirm the diagnosis.  You don't

7  always get a positive culture.

8  Q    And so, how is it that you, as a doctor, diagnose

9  herpes?  I think you were just alluding to it.  What factors

10 do you look at?

11 A    Over time, if a patient has recurrent skin lesions or

12 penis lesions of the same nature, and then it responds to

13 treatment, then it's genital herpes.

14 Q    Now, I'm going to show you Page 20 of Government

15 Exhibit 237.

16            What is this record?

17 A    It's a lab result from June 5, 2000, herpes simplex

18 culture.  The result was negative.

19 Q    And did this result come in on June 7, 2000?

20 A    Yes, it did.  It came in on June 7, 2000.

21 Q    And what, if anything, did you conclude from that

22 negative result of the herpes culture?

23 A    That it was not conclusive and that we had to follow the

24 clinical course to see if he called or reported any more

25 future bumps or penis lesions and then try treatment and see

1  if it responds to treatment either intermittently or long

2  term.

3  Q    So, fair to say, you did not conclude that the defendant

4  did not have herpes based on this test?

5  A    I did not conclude that he did not have herpes, he still

6  could have herpes.

7  Q    Now, given the uncertainty of the negative culture

8  result that you just testified about, as a doctor, what, if

9  any, practice do you have regarding advising your patients

10  regarding such results if they exhibit herpes symptoms?

11  A    Well, if it's pretty possibly herpes or could be herpes,

12  I, once again, advise the patient to seek medical help when

13  the lesions occur or advise.  Inform sexual partners of

14  potential herpes, safe sex, use a condom.  Inform your sexual

15  partners so they could make a decision whether or not to have

16  sex with you or not.

17  Q    And is that something you did with the defendant?

18  A    Eventually, I came to the conclusion he had herpes

19  simplex with recurrent calls or complaints about bumps and he

20  did respond to herpes treatment when they became more common.

21  I recommend regular treatment instead of intermittent

22  treatment.

23  Q    So after this initial office visit in 2000, did you, in

24  fact, hear from the defendant again regarding the same types

25  of symptoms?

K. McGrath - Direct/Ms. Shihata          406

1  A    At some point, because I began prescribing valacyclovir,

2  the treatment for herpes, I do recall him making a comment

3  once when I educated him on safe sex:  "Then I should not put

4  it in raw, I should put a hood on it."

5  Q    That's what the defendant said to you?

6  A    At one point.  And I said, yes, you should use a condom.

7  Q    What did you understand him to mean, "I should not put

8  it in raw"?

9  A    That he should have protection on his penis, shouldn't

10  be just uncovered.

11  Q    And what did you understand him to be referring when he

12  used the term a hood?

13  A    A condom.

14  Q    And this was after you diagnosed the defendant with

15  herpes?

16  A    At some point over the years from June 5, 2000.

17          MS. SHIHATA:  One moment, your Honor.

18          THE COURT:  Okay.

19          (A brief pause in the proceedings was held.)

20  Q    And, Doctor, just to be clear, when you advised the

21  defendant to put on a condom that was during for purposes of

22  engaging in sexual activity, correct?

23  A    I don't know what other reason you put a condom on for.

24  I'm sorry.

25  Q    Just so we're clear.

K. McGrath - Direct/Ms. Shihata                407

1  A     I guess we're clear.

2  Q     Now, you testified that you began treating the defendant

3  in 1994 and continued to treat him for, approximately,

4  25 years; correct?

5  A     Correct.

6  Q     And I believe you also testified that, at some point,

7  you concluded the defendant had contracted genital herpes; is

8  that correct?

9  A     That's correct.

10  Q     And how did you come to that conclusion?

11  A     Over time, complaints that the patient had concerns

12  about the bumps and that, at times, the medicine would help

13  so he would call and request a prescription for what he

14  called "the blue pill."

15  Q     And what did you understand the defendant to mean when

16  he asked you for "the blue pill"?

17  A     To treat him for genital herpes.

18  Q     What, if any -- well, how did you, in your practice,

19  treat the defendant's genital herpes?

20  A     Well, initially, as I recall, intermittently until, in

21  general, the rule is if it occurs more than three times in a

22  year, you should be taking medicine every day, a pill a day,

23  to reduce shedding and reduce the risk, but not eliminate the

24  risk of spreading it to someone else.  But you can reduce the

25  risk by taking medicine every day instead of as needed.

K. McGrath - Direct/Ms. Shihata          408

1   Q    And when you say, "As needed," what are you referring

2   to?

3   A    As needed for outbreaks.  Like, if you just have one

4   outbreak a year, or two outbreaks a year, that would be

5   appropriate.  But if it's more than three, the rule is, in

6   general, to start them on a daily pill to perhaps not have

7   any more outbreaks, reduce the viral shedding.

8   Q    And, in your time as the defendant's doctor, did there

9   come a time where the defendant had more than three outbreaks

10  in a year?

11  A    Well, I can only assume based on me insisting on taking

12  it once a day and prescribing him at a month at a time with a

13  year of refills to reduce phone calls and to encourage

14  regular treatment.

15  Q    And so, you did, in fact, prescribe the defendant with a

16  medication to treat genital herpes for a 12-month supply?

17  A    Yeah, the phone calls seemed to be frequent for the blue

18  pill, so I would encourage one a day, 30 pills, instead of a

19  five-day treatment course or ten-day treatment course.

20  Q    Now, I think you mentioned the medication Valtrex?

21  A    It's an antiviral agent valacyclovir.

22  Q    Is valacyclovir the generic name of the drug?

23  A    Yes, it is the generic name.

24  Q    Is Valtrex the brand name?

25  A    That's correct.

K. McGrath - Direct/Ms. Shihata          409

1  Q    After you first prescribed Valtrex or valacyclovir to

2  the defendant, how did he respond to the treatment?

3  A    It would make the bumps go away.

4  Q    Okay.  It would help with the outbreak?

5  A    Yes, it would.

6  Q    Did you prescribe Valtrex or its generic version to the

7  defendant multiple times?

8  A    Yes, I did.

9  Q    After you first prescribed Valtrex or its generic

10 version to him, did the defendant continue to ask you to

11 prescribe to for him?

12 A    Yes, he did.

13 Q    And how did he do so?

14 A    It was a phone call, usually, from one of his employees.

15 Most commonly, from a man named June Brown.

16 Q    And did he also sometimes call you himself?

17 A    He would call himself, yes.

18 Q    Now, you mentioned --

19              Well, I'm going to show the witness only

20 what's been marked for identification as Government Exhibit

21 3.

22              Do you recognize this person?

23 A    Yes, I do.

24 Q    Who do you recognize it to be?

25 A    June Brown.

1    Q    And have you met June Brown personally?

2    A    Yes.

3    Q    Is that a fair and accurate photo of him?

4    A    It's a fair and accurate photo of him.

5              MS. SHIHATA:  I move to admit Government Exhibit 3.

6              MS. BLANK BECKER:  No objection.

7              THE COURT:  That's in evidence.

8              (Government's Exhibit 3 was received in evidence as

9    of this date.)

10             MS. SHIHATA:  And may we publish it?

11             THE COURT:  Yes.

12             (The above-referred to exhibit was published to the

13   jury.)

14   Q    And who did you understand June Brown to be with respect

15   to the defendant?

16   A    An employee of Mr. Kelly.

17   Q    Now, sitting here today, do you recall the exact date

18   that you came to the conclusion that the defendant had

19   genital herpes?

20   A    No, I cannot come to the conclusion about the exact

21   date.

22   Q    Based on your review of Government Exhibit 237 prior to

23   your testimony here today, is it fair to say that Government

24   Exhibit 237 includes multiple records indicating that you had

25   reached such a conclusion in the past medical history

1  portions of various progress notes?

2  A    Yes, in the electronic medical records.

3  Q    And, again, you made that switch to electronic records

4  in March 2011?

5  A    Correct.

6  Q    I want to show you Page 124 of Government Exhibit 237.

7  What is the date of this record?

8  A    The date is December 9, 2011.

9  Q    And what, if anything, does this record reference

10  regarding herpes?

11  A    Herpes is in the past medical history as also along with

12  the current assessments.

13  Q    And what, if any, treatment plan is indicated here?

14  A    Continue Valtrex 500 milligram, one tablet orally once a

15  day.

16  Q    And does it also indicate that at this time -- or what,

17  if anything, does it indicate about what medications the

18  defendant was currently taking at that time?

19  A    The current medication was Valtrex 500 milligram, one

20  tablet once a day.

21  Q    And, again, the Valtrex was prescribed to treat his

22  genital herpes?

23  A    That is correct.

24  Q    And what is indicated under "History of Present

25  Illness"?

1  A     The reason why he was at the office.  I had asked him to

2  come in to register since the office changed to electronic

3  medical records.  At the time, I also asked him to have a

4  well adult exam, review of systems, examinations, screening

5  labs, and a flu shot and he declined.

6  Q     All right.  So EMR that's that switch?

7  A     Electronic Medical Record.

8  Q     Just for the court reporter, let's make sure we're not

9  talking at the same time, okay?

10            Now, you indicated that at a certain point you

11 changed the way you were prescribing Valtrex to the

12 defendant, correct?

13 A     Yes, that's true.

14 Q     And did you explain why you were doing so to the

15 defendant?

16 A     I don't think I explained it to him, but it was a

17 transition from less phone-ins and more electronic

18 prescriptions.

19 Q     So explain what you mean by that?

20 A     Well, before electronic records, prescriptions were

21 called in, not always recorded.  Electronic Medical Records

22 allow you to record more prescriptions unless it's at night

23 or on a weekend or something where you don't have access to

24 the system.

25 Q     Did you indicate to the defendant that you were

1  prescribing 11 refills at a time?

2  A    I frequently encouraged him to take it daily instead of

3  as needed.  So I frequently would prescribe 30 pills to

4  encourage one a day with a year of refills to reduce requests

5  for the pill and encourage him to stay on it long term.

6  Q    And what, if any, based on your treatment of the

7  defendant what, if any, conclusions did you reach about

8  whether he was, in fact, taking it every day, 12 months a

9  year?

10 A    My conclusion from this one visit gives me the

11 impression he was taking it once a day.

12 Q    Did you ever reach a different conclusion?

13 A    Not that I can recall.

14 Q    All right.  I'm going to show you another page, okay?

15 Before I get to that, going back to how you issued

16 prescriptions for the defendant.

17            Would you both call the pharmacy and issue

18 electronic prescriptions for him?

19 A    Yes, that would occur.

20 Q    And what was the main pharmacy that you called to issue

21 the defendant's prescriptions?

22 A    Walgreens at 641 North Clark in Chicago.

23 Q    And was there a name commonly used to refer to that

24 Walgreens?

25 A    It was referred to the Rock N Roll McDonalds Walgreens.

1   Q    Why was it referred to that way?

2   A    It was a rock and roll theme to the McDonalds.  And

3   there was also a Hard Rock Café across the street.  The

4   Walgreens was across the street from those two rock and roll

5   places.

6   Q    Showing the witness only what's been marked for

7   identification, it's Government Exhibit 520.

8               Do you recognize this photograph?

9   A    Yes, I do.

10  Q    And what is depicted in this photograph?

11  A    It's a McDonalds which was referred to as the

12  Rock N Roll McDonalds in Chicago.

13  Q    And that is what the Rock N Roll McDonalds in Chicago

14  looked like in the past?

15  A    That's how it looked like in the past, correct.

16          MS. SHIHATA:  I move to admit Government

17  Exhibit 520.

18          THE COURT:  Any objection?

19          MS. BLANK BECKER:  Judge, I simply ask for a date

20  if we could, please.

21          THE COURT:  Well, it's really a question is it the

22  McDonalds, did it change or something?

23          THE WITNESS:  It's since been torn down and

24  rebuilt.

25          THE COURT:  This is what it looked like when?  I

K. McGrath - Direct/Ms. Shihata                415

1    guess before it was torn down and rebuilt.

2            THE WITNESS:  Yes.

3            THE COURT:  All right.

4            MS. SHIHATA:  I move to admit it, your Honor.

5            THE COURT:  It's admitted.

6            (Government's Exhibit 520 was received in evidence

7    as of this date.)

8            MS. SHIHATA:  Thank you, your Honor.  May we

9    publish it?

10           THE COURT:  Yes.

11           (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. SHIHATA:

2    Q    Where was the Walgreens at 641 N. Clark in relation to

3    this Rock 'N Roll McDonald's?

4    A    To the left and behind across the street, kitty corner.

5    I believe there is another restaurant across, directly across,

6    kitty corner.

7    Q    Did that Walgreens have any special feature?

8    A    A drive-thru was available at that Walgreens.

9    Q    Among the prescriptions that you issued to the defendant

10   at that Walgreens, was Valtrex included as one of those?

11   A    Yes, that was one frequently.

12   Q    Over the years how often did you issue Valtrex

13   prescriptions to the defendant at that Walgreens?

14   A    It was so often that I had memorized the phone number at

15   that Walgreens since then.

16   Q    Do you remember it now?

17   A    (312)587-1416.

18   Q    After you made the switch to electronic records in

19   March 2011, did you also issue prescriptions electronically

20   for the defendant to that Walgreens?

21   A    Yes, I did.

22   Q    Did you also issue prescriptions to the defendant at

23   other pharmacies?

24   A    Yes, other pharmacies.

25   Q    Is there a record in the medical records that you

K. McGRATH - DIRECT - MS. SHIHATA          417

1  provided to the Government, Government's Exhibit 237, of the

2  first time you issued a prescription for Valtrex to the

3  defendant to treat his genital herpes?

4  A    I'm not sure of the exact first prescription, I think the

5  earliest --

6  Q    The question I asked is, is there a record in

7  Government's Exhibit 237 of the first time you did so?

8  A    I can't be sure if it's a yes or no.

9          MS. SHIHATA:  May I approach, your Honor?

10         THE WITNESS:  Yes, sure.

11         THE COURT:  It's okay with you, okay.  Go ahead.

12  BY MS. SHIHATA:

13  Q    Can you please take a look through Government's Exhibit

14  237?

15  A    Yes.

16  Q    And let me know when you've had a chance to do so.

17         (Witness reviewing document.)

18  A    Okay.

19  Q    Does that refresh your recollection as to whether there

20  is any record in Government's Exhibit 237 of the first time

21  you issued a Valtrex prescription for the defendant?

22  A    Yes.

23  Q    What is the answer?

24  A    The earliest date I can see is December 8, 2011.

25  Q    That's an electronic record, correct?

K. McGRATH - DIRECT - MS. SHIHATA          418

1  A    That's electronic, correct.

2  Q    As you testified previously, you called-in Valtrex

3  prescriptions for the defendant prior to switching to

4  electronic records, correct?

5  A    Right.

6  Q    So does that mean -- does that refresh your

7  recollection -- withdrawn.

8        Are those called-in prescriptions prior to the

9  switch to electronic recordings included in the medical

10  records that you provided to the Government regarding the

11  defendant?

12  A    No, they are not.

13  Q    Why is that?

14  A    In general, in the written days called-in prescriptions

15  weren't recorded all the time.

16        MS. SHIHATA:  May I approach, your Honor?

17        THE COURT:  Yes.

18  Q    I want to direct your attention to page 221 of

19  Government's Exhibit 237.  What is this document?

20  A    Telephone encounter dated August 15, 2012.

21  Q    What does it indicate?

22  A    Refill, continue Valtrex 500-milligram once a day, number

23  30 with 11 refills.

24  Q    Is that what are you referring to earlier about

25  prescribing a years' worth of Valtrex at a time?

K. McGRATH - DIRECT - MS. SHIHATA                    419

1   A    To encourage regular treatment instead of episodic

2   treatment.

3   Q    That's from August 15, 2012?

4   A    Yes.

5   Q    Again, this was to treat genital herpes?

6   A    That's correct.

7   Q    I want to direct your attention to page 219 of the same

8   exhibit.  What is the date of this record?

9   A    December 26, 2012.

10  Q    So a little over four months later?

11  A    Yes.

12  Q    What is indicated in this record?

13  A    Another refill for 30 days with 11 refills.

14  Q    So another year-long prescription?

15  A    Yes.

16  Q    Just four months later?

17  A    Just four months later.

18  Q    You indicated earlier that the defendant would sometimes

19  contact you and indicate the bumps are back.  Do you recall

20  that testimony?

21  A    Yes.

22  Q    What did you understand him to be referring to when he

23  said the bumps are back?

24  A    That his genital herpes had acted up.

25  Q    So bumps on his genitals?

1  A    Yes, bumps on the genitals.

2  Q    Having just looked through each page of this Exhibit 237,

3  does it also include indications of prescribing Valtrex in

4  2015?

5  A    Yes.

6  Q    2016?

7  A    Yes.

8  Q    2017?

9  A    Yes.

10  Q    2019?

11  A    Yes.

12  Q    I'm showing the witness only what is marked for

13  identification as Government's Exhibit 402.  Do you see this

14  exhibit?

15  A    Yes, I do.

16  Q    What is it?

17  A    It's a prescription for Robert Kelly dated March 19, 2007

18  for Valtrex, 500-milligram tablets, quantity 60, with three

19  refills before March 1st, 2008.

20  Q    Does it indicate who prescribed this medication to the

21  defendant?

22  A    I prescribed the medication for the defendant.

23          MS. SHIHATA:  I move to admit Government's Exhibit

24  402.

25          MS. BLANK BECKER:  No objection.

K. McGRATH - DIRECT - MS. SHIHATA          421

1          THE COURT:  That's in evidence.

2          (Government Exhibit 402, was received in evidence.)

3          MS. SHIHATA:  May we publish it?

4          THE COURT:  Yes.

5   BY MS. SHIHATA:

6   Q    You indicated this is a prescription for Valtrex

7   500-milligram tablets, correct?

8   A    That's correct.

9   Q    I think I'm going to zoom in, the three refills is before

10  3/18/08, correct?

11  A    Correct.

12  Q    And the date of the prescription is March 19, 2007,

13  correct?

14  A    Correct.

15  Q    And based on this record, is it your conclusion that you

16  were already treating the defendant for genital herpes by

17  March 19, 2007?

18  A    Yes, that's my conclusion, that I was treating him by

19  March 19, 2007 for genital herpes.

20  Q    In the course of your doctor/patient relationship with

21  the defendant, where did you conduct your examinations of the

22  defendant or where did you treat him?

23  A    Most of the time at the office, occasionally at his house

24  or studio.

25  Q    Do you have any other offices or addresses associated

K. McGRATH - DIRECT - MS. SHIHATA                422

1   with your medical practice?

2   A     Not with my private practice.

3   Q     Is there another part of your practice?

4   A     I practice at Northwestern Clinic at a different address

5   on Tuesdays.

6   Q     What address is associated with that clinic that you

7   practice at?

8   A     675 North Saint Clair Street in Chicago, Illinois.

9   Q     Are you familiar with the address 251 East Huron Street,

10  Chicago, Illinois?

11  A     Same building around the corner, yes.

12  Q     The same building as your clinic?

13  A     Same building as the clinic.

14  Q     You mentioned you sometimes treated the defendant at his

15  home or studio; is that right?

16  A     That's correct.

17  Q     I'm showing you what is in evidence as Government's

18  Exhibit 502A, do you recognize this?

19  A     Yes, I do.

20  Q     What is this?

21  A     The defendant's house that the defendant lived in at one

22  time.

23  Q     Is have you been to this house?

24  A     Yes, I have.

25  Q     Where is it located?

K. McGRATH - DIRECT - MS. SHIHATA          423

1   A    Olympia Fields Illinois.

2   Q    Is that a suburb of Chicago?

3   A    Yes, it is.

4   Q    What part of this residence have you been in inside?

5   A    The entry way, the living room, the den, kitchen, side

6   room, game room, the hallway and the basement.

7   Q    What, if anything, is located in the basement?

8   A    Studio.

9   Q    You mentioned that sometimes you treated the defendant at

10  his studio, was that the studio at Olympia Fields?

11  A    Yes.

12  Q    Any other studios?

13  A    There is one on, in the earlier days, Larrabee; another

14  one on Ohio Street; then one on Justine.

15  Q    Showing the witness only what is marked for

16  identification as Government's Exhibit 525(q).  Do you

17  recognize this?

18  A    Yes, I do.

19  Q    What is this a photograph of?

20  A    Entrance to the studio on Larrabee.

21  Q    That was a studio the defendant used?

22  A    Yes.

23  Q    Did you personally go to this studio?

24  A    Yes.

25  Q    Is this a fair and accurate photograph of what the studio

K. McGRATH - DIRECT - MS. SHIHATA                424

1  looked like at the time you went to it?

2  A    Yes.

3           MS. SHIHATA:  I move to admit Government's Exhibit

4  525(q).

5           MS. BLANK BECKER:  No objection.

6           THE COURT:  All right.  You can publish it.

7           (Government Exhibit 525(q), was received in

8  evidence.)

9  BY MS. SHIHATA:

10  Q    I'm going to show the witness only what is marked for

11  identification as Government's Exhibit 505(a).  Do you

12  recognize this?

13  A    Yes.

14  Q    What do you recognize this to be?

15  A    Studio on Ohio Street.

16  Q    Is that a studio you personally visited the defendant in?

17  A    Yes.

18           MS. SHIHATA:  I move to admit Government's Exhibit

19  505(a).

20           MS. BLANK BECKER:  No objection.

21           THE COURT:  It's in.  You can publish it.

22           MS. SHIHATA:  Thank you, your Honor.

23           (Government Exhibit 505(a), was received in

24  evidence.)

25  BY MS. SHIHATA:

1  Q     On the occasions when you treated the defendant outside

2  of your office, what led you to do so?

3  A     I would get a call from usually one of his employees that

4  Robert would need to be seen, occasionally from Robert

5  himself.

6  Q     And did you in fact go when you received these calls?

7  A     Majority of the times, yes.

8  Q     What time of day would you go?

9  A     Usually evening, 7:00 p.m. or later.

10  Q     During the course of your 25-year doctor/patient

11  relationship with the defendant, did he have health insurance?

12  A     Yes, he did.

13  Q     Did he pay for your medical services using health

14  insurance?

15  A     No, he did not.

16  Q     Did he pay for your medical services at all?

17  A     No, he did not.

18  Q     Over the course of your 25-year relationship with the

19  defendant, did you learn that he was a successful singer?

20  A     Yes, I did.

21  Q     In addition to your relationship with the defendant as

22  his doctor, what if any, other relationship did you have with

23  the defendant?

24  A     Social relationship.

25  Q     Can you describe that relationship to the jury?

K. McGRATH - DIRECT - MS. SHIHATA                426

1    A    My wife and I at times would go to his house for dinner,

2    children's birthday party, or special parties at the house.

3    Q    Did you also see the defendant socially at other

4    locations?

5    A    Occasionally at a restaurant or one of his concerts.

6    Q    How about at his studios?

7    A    We'd be invited to listen to music at his studio, that's

8    correct.

9    Q    You mentioned parties you attended, where did those take

10   place?

11   A    The parties I recall were at the Olympia Fields house.

12   Q    Did you attend the defendant's 52nd birthday party?

13   A    That was attended.

14   Q    Where did that take place?

15   A    Justine studio.

16   Q    When you say the Justine studio, are you referring to the

17   street the studio was on?

18   A    Yes, the studio that is on Justine Street.

19   Q    When did that 52nd birthday party take place?

20   A    January 8, 2019.

21   Q    You and your wife attended that?

22   A    Yes.

23   Q    Showing the witness only what is marked for

24   identification as Government's Exhibit 503(a).  Do you

25   recognize what is depicted in this photo?

1    A    That's the building studio on Justine Street.

2    Q    Is this a fair and accurate photo of that building?

3    A    Yes, it is.

4         MS. SHIHATA:   I move to admit Government's Exhibit

5    503(a).

6         MS. BLANK BECKER:   No objection.

7         THE COURT:   It's in evidence.  You can publish it.

8         (Government Exhibit 503(a), was received in

9    evidence.)

10   BY MS. SHIHATA:

11   Q    Is this the studio where you attended the defendant's

12   52nd birthday?

13   A    Yes.

14   Q    You mentioned you also attended some the defendant's

15   concerts; is that right?

16   A    That is right.

17   Q    Approximately how many of the defendant's concerts have

18   you attended over the years?

19   A    At least ten, perhaps 12.

20   Q    So ten to 12?

21   A    Yes.

22   Q    Approximately?

23   A    Yes.

24   Q    Did you attend those concerts alone or with someone else?

25   A    With my wife.

K. McGRATH - DIRECT - MS. SHIHATA                 428

1   Q    What, if any, relationship did your wife have with the

2   defendant?

3   A    I'd call it a friendship, or a mother-like friendship, or

4   a caring relationship.

5   Q    Where did most of those concerts that you and your wife

6   take place?

7   A    The majority were in the Chicago.

8   Q    Did you ever travel to attend any of the defendant's

9   concerts?

10  A    Yes.

11  Q    Where did those take place?

12  A    New York, just outside of St. Louis in St. Charles,

13  Missouri, Las Vegas, Los Angeles, Atlanta.

14  Q    Did you attend a concert in Nashville?

15  A    In Nashville, yes.

16  Q    Were the tickets to those concerts provided to you by the

17  defendant for free?

18  A    Yes.

19  Q    Who paid for your travel to those destinations?

20  A    He paid for it; and sometimes I paid for it.

21  Q    When you paid for it, what were the circumstances of

22  that?

23  A    The St. Charles concert I just paid for it on my own.

24  Two other times I went to check out at the desk and his

25  employees hasn't made arrangements, so I just paid for it.

K. McGRATH - DIRECT - MS. SHIHATA                429

1    Q    Had you been expecting it to be paid for?

2    A    I had been expecting it to be paid for, but it wasn't.

3              MS. SHIHATA:  One moment, your Honor.

4              I want to show the witness only what is marked for

5    identification as Government's Exhibit 336(a).

6              THE COURT:  I'm going to ask, after this to find a

7    convenient time to break.

8              MS. SHIHATA:  I'm about to be done, your Honor.

9              THE COURT:  Great.

10   BY MS. SHIHATA:

11   Q    Do you recognize this photo?

12   A    Yes, I do.

13   Q    What do you recognize it to be?

14   A    Picture of myself and Mr. Kelly.

15             MS. SHIHATA:  I move to admit Government's Exhibit

16   336(a).

17             MS. BLANK BECKER:  No objection.

18             THE COURT:  Okay.  That's in evidence.

19             MS. SHIHATA:  May we publish it?

20             THE COURT:  Yes.

21             (Government Exhibit 336(a), was received in

22   evidence.)

23             THE COURT:  When I say it's in evidence --

24             MS. SHIHATA:  Sorry.

25   BY MS. SHIHATA:

K. McGRATH - DIRECT - MS. SHIHATA                430

1   Q     Is that you depicted where I'm pointing on the right

2   side?

3   A     Yes, that is me.

4   Q     And is this the defendant?

5   A     Yes.

6   Q     Looking at this photograph, can you tell where it was

7   taken?

8   A     I think a cigar bar.

9   Q     When is the last time you were at a cigar bar with the

10  defendant?

11  A     Sometime in 2019, I don't recall the exact date.

12  Q     How was it that you ended up at a cigar bar with the

13  defendant?

14  A     I got a phone call from my wife to meet at a cigar bar.

15  Q     What is your wife's name?

16  A     Jean.

17  Q     Same last name as you?

18  A     Yes, Jean McGrath.

19  Q     Fair to say this was a social event?

20  A     Yes, fair to say.

21  Q     When, if at all, did you stop being the defendant's

22  primary care physician?

23  A     In early 2019.

24  Q     After the cigar bar or before?

25  A     Whenever his apprehension occurred.

K. McGRATH - DIRECT - MS. SHIHATA                431

1   Q    Sometime in 2019?

2   A    Sometime in 2019.

3   Q    When was the last time you had spoken to the defendant?

4   A    To the best of my recollection, that would have been at

5   this gathering, social event.

6   Q    At the cigar bar?

7   A    Yes.

8           MS. SHIHATA:  No further questions.

9           THE COURT:  Do you have a lot or do you want to go

10  tomorrow?

11          MS. BLANK BECKER:  Half hour, Judge.

12          THE COURT:  I think we'll wait until tomorrow then.

13          MS. SHIHATA:  Can I just mention one thing at

14  sidebar?

15          (Sidebar conference held.)

16

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

```
                          Sidebar                      432
```

1          (The following sidebar conference was held outside

2     the hearing of the jury.)

3          MS. SHIHATA:  I just thought I'd mention this, I

4     don't know if anything can be done, he is scheduled to be

5     flying back at 7:00 a.m. tomorrow to get back to his medical

6     practice.  I don't know if it's possible if the jury is

7     willing to stay longer.

8          THE COURT:  Can you stay longer?

9          THE COURT REPORTER:  Yes.

10          THE COURT:  You only have half hour?

11          MS. BLANK BECKER:  Can we strike the apprehension

12     part that he said.

13          THE COURT:  I guess we can.  I think they figured

14     out that he got apprehended, he's here.

15          MS. BLANK BECKER:  I agree.

16          THE COURT:  It's up to you.  If you decide you want

17     to highlight it, let me know.  Let's let it go for now.

18          (End of sidebar conference.)

19

20          (Continued on the next page.)

21

22

23

24

25

1              (In open court - jury present.)

2              THE COURT:  Ladies and gentlemen, I'm going to ask

3    your indulgence.  Apparently the witness has got to be out of

4    town.  I'm told that the cross-examination isn't very long

5    so.  So if you'll bear with me, we'll finish the witness

6    today.

7              Anybody have a problem with that?

8              All right.  Go ahead, MS. BLANK BECKER.

9              MS. BLANK BECKER:  Thank you, Judge.

10   CROSS-EXAMINATION

11   BY MS. BLANK BECKER:

12   Q    Good afternoon.

13   A    Good afternoon.

14   Q    Dr. McGrath, my name is attorney Nicole Blank Becker --

15             THE COURT:  You can take your mask off.

16   Q    My name is Nicole Blank Becker.  I'll be asking you a

17   bunch of questions about the stuff that you had just spoken

18   about.  Okay?

19   A    Okay.

20   Q    Dr. McGrath, you indicated that you had been treating

21   Mr. Kelly for about 25 years; is that fair to say?

22   A    Yes.

23   Q    You think you also indicated you started seeing him

24   somewhere around 1994; is that correct?

25   A    That's correct.

1  Q    When the Government was just going over with you when was

2  the first time that you were able to make some type of -- the

3  first time you had impression that Mr. Kelly had potentially

4  had herpes, I believe you indicated that that must have been

5  sometime between starting December 8 of 2011, does that sound

6  right?

7  A    That sounds right; until the other prescription was shown

8  to me, which is 2007.

9

10              (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MS. BLANK BECKER:

3   Q    Yes.  I apologize, right.  And then there was one in

4   2007.

5          Prior to 2007, so we're talking, and I'm not that

6   good at math, from 1994 to 2007, the medical records that were

7   turned over, they had -- there was no notes or past history or

8   anything in there that had anything to do with herpes,

9   correct?

10  A    Correct.

11         MS. SHIHATA:  Objection, misstates the evidence.

12         THE COURT:  Well, you can ask, clear it up on

13  redirect.

14         MS. SHIHATA:  Yes, Your Honor.

15  BY MS. BLANK BECKER:

16  Q    Okay, so maybe there was the word herpes, because maybe

17  you would have to test for it.

18         THE COURT:  You know, it is really much easier if

19  you just put a question to the witness.  Don't make a long

20  statement, just ask him a question.

21  BY MS. BLANK BECKER:

22  Q    So, when it comes to herpes and, obviously, that's the

23  hot topic, there's herpes and you started to talk about

24  there's different ways to diagnosis -- there's two different

25  kinds of, let's call it, strains of herpes, correct?

McGrath - cross - Blank Becker                    436

1   A    There's different strains of herpes, correct.

2   Q    And when you were talking earlier about trying to figure

3   out which strain someone would have, you have to actually do a

4   blood test, is that correct?

5   A    At this time.  Contemporaneously in 1994, we did not do a

6   blood test.

7   Q    And what did you do?

8   A    A culture.

9   Q    And that's what you were describing earlier, correct?

10  A    Correct.

11  Q    Thank you.

12           Now, in the medical records that we have, there's

13  actually no positive cultures, correct --

14  A    Correct.

15  Q    -- for herpes, correct?

16  A    Correct.

17  Q    And that covers the genital herpes and/or oral herpes,

18  correct?

19  A    Correct.

20  Q    And there were some discussions also about testing done

21  for other venereal diseases, correct?

22  A    Correct.

23  Q    And the -- there was a discussion -- well, gonorrhea was

24  one of the things that was tested for, correct?

25  A    Yes.

McGrath - cross - Blank Becker                    437

1    Q    And syphilis, as well?

2    A    Yes.

3    Q    Now, are those bacteria infections?

4    A    Gonorrhea is a bacteria; syphilis is not.

5    Q    And how about herpes?

6    A    Herpes is a virus.

7    Q    Not bacteria infection then, correct?

8    A    Correct.

9    Q    Do you remember what year the testing for herpes changed

10   from the cultural to the blood-taking?

11   A    No, I do not know the exact year.

12   Q    Sure, okay.

13        Was it just a couple years ago or was it a long time

14   ago?  Could you give us that?

15   A    I said I wasn't -- I'm not sure.

16   Q    No idea?

17   A    No idea.

18   Q    Okay, got it.

19        You mentioned earlier that you actually knew

20   Walgreens's phone number by heart, correct?

21   A    That is correct.

22   Q    And you have plenty of other patients that would get

23   prescriptions from there as well, is that correct?

24   A    Some patients would use that pharmacy.

25   Q    Now, the words that you used in your medical notes

McGrath - cross - Blank Becker                          438

1   regarding herpes was that it was your impression, is that fair

2   to say?

3   A    Assessment, that would be more -- that would be more fair

4   to say.

5   Q    Okay.  So, in one of the records that the Government had

6   shown you, it actually says it's your impression.

7           That doesn't ring a bell?

8   A    No, but the letter "A" in my notes is for assessment.

9   I'll go along with the word impression also.

10          MS. SHIHATA:  Objection.

11          THE COURT:  Overruled.

12          I mean to you does it mean the same thing?

13          THE WITNESS:  I would need more time to think,

14   they're pretty close.

15          THE COURT:  All right.

16          THE WITNESS:  I'll go along with either one.

17          THE COURT:  All right.

18          MS. BLANK BECKER:  Thank you.

19   BY MS. BLANK BECKER:

20   Q    Now, there's a difference between an impression and a

21   final diagnosis, is that correct?

22   A    They sometimes can be the same.

23   Q    Sure, they could end up being the same, correct?

24   A    Hopefully, they'd be close to the same at the initial.

25   Q    So, how do you get from your impression to the final

McGrath - cross - Blank Becker                    439

1   diagnosis typically?

2   A    A combination of the history, the exam and the response

3   to therapy.

4   Q    Specifically, when we're talking about something like

5   herpes, how -- and I understand you've indicated that there's

6   some things you could visually see, but with regards to

7   testing, how do you get from the impression to the final

8   diagnosis?

9   A    A combination of all those things I just mentioned:  The

10  history, the exam and the laboratory supportive data,

11  sometimes imaging and response to therapy.

12  Q    Is it fair to say, Dr. McGrath, that from your experience

13  in treating Mr. Kelly, sitting here in court today you cannot

14  say that 100 percent he has herpes?

15  A    I feel that 100 percent he has herpes.

16  Q    Okay.

17        Are you saying you feel as in, you know, I feel like

18  it's freezing in here --

19        MS. SHIHATA:  Objection.

20  BY MS. BLANK BECKER:

21  Q    -- but someone else might not feel that way?

22  A    Is that a question?

23        MS. BLANK BECKER:  We have to wait for the judge.

24        THE COURT:  Oh, you were asking me.

25        MS. SHIHATA:  There's an objection.

1          THE COURT:  Oh, I didn't hear it.  You guys have to

2    use the microphone.

3          MS. SHIHATA:  I apologize.

4          THE COURT:  The objection is sustained as to form.

5    BY MS. BLANK BECKER:

6    Q    When someone is diagnosed in your experience, let's say,

7    with, God forbid, AIDS, usually there's testing done; correct,

8    in order to determine if they have AIDS?

9    A    Regarding AIDS, yes.

10   Q    Okay.  And the testing is done to confirm whether or not

11   medically they have it, correct?

12   A    With AIDS --

13   Q    Yes.

14   A    -- it helps support the diagnosis, it helps confirm the

15   diagnosis of AIDS.

16   Q    Confirm the diagnosis, yes.

17          All right, so if you got -- excuse me, if a patient

18   had a test come back and the results were negative, you could

19   say you know a hundred percent this person does not have AIDS;

20   correct?

21   A    I'm not sure about the false negatives with AIDS, so I

22   can't answer that on the base of my knowledge.  I can't answer

23   that question regarding AIDS on the base of my knowledge.

24   Q    So, there's always the possibility of false negatives, is

25   that what you're saying?

McGrath - cross - Blank Becker                441

1          THE COURT:  I think he said he doesn't know.

2   A    You could repeat the question for me and I could

3   re-answer it.

4   Q    Sure.

5          My understanding was that you're saying even though

6   a test can come back negative for AIDS, there's still this

7   possibility of a false negative, so you wouldn't say a hundred

8   percent that someone had AIDS?

9   A    Well, there's other tests for AIDS.  There's viral

10  counts.  And it's not that simple, so I can't answer that.  I

11  don't have the knowledge of AIDS.

12  Q    Dr. McGrath, I understand that you earlier said that you

13  think that that's what he has.

14         MS. SHIHATA:  Objection.

15  BY MS. BLANK BECKER:

16  Q    Is that a common --

17         THE COURT:  Well, sustained as to form, but you can

18  rephrase the question.

19         MS. BLANK BECKER:  Thank you, Judge.

20  Q    That you believe a hundred percent that he has or --

21  yeah, has herpes, correct?

22  A    I believe that 100 percent based on his concern, the one

23  exam I had, the recurrence of the description of the lesions,

24  and the response to therapy.

25  Q    Okay, Doctor.

McGrath - cross - Blank Becker                    442

1          You never told him to come in and come see you,

2    perhaps, during an outbreak or the shedding that you talked

3    about earlier, so that he could get tested and you could

4    officially, say, stamp those medical records and say, yes, he

5    actually has this?

6    A    I don't recall if I ever asked him to come in during an

7    outbreak.

8    Q    Nor did he ever come to see you when he was claiming he

9    had an outbreak, correct?

10   A    I feel he didn't need to, if he responded so quickly to

11   the treatment.

12   Q    Well, the treatment, I think what you're referring to is

13   Valtrex, right?

14   A    The treatment is Valtrex.

15   Q    Yes.

16          Well, Valtrex can be used to treat other things,

17   besides herpes?

18   A    Such as?

19   Q    You don't get to ask me the questions.

20   A    I know, but --

21          THE COURT:  Well --

22          THE WITNESS:  Sorry.

23          THE COURT:  That's okay.

24          Can it be used to treat things other than herpes?

25   Have you prescribed it for other things other than herpes?

McGrath - cross - Blank Becker                443

1          THE WITNESS:  I prescribed it for herpes simplex,

2     cold sores; herpes genitally, genital herpes, and herpes

3     zoster.  Herpes, herpes, herpes.

4     Q    Okay, herpes, herpes, herpes, but, Doctor, there's --

5     there's different types.

6              We just discussed that, right, there's different

7     kinds of strands of herpes, correct?

8     A    Different serotypes.  Herpes, herpes, herpes, 1, 2, I

9     think there's up to 6 or 7 or 8.

10    Q    Okay, and I'm not a medical doctor, but, Dr. McGrath, are

11    you saying that someone who has herpes, Person A, and then

12    we've got Person B over here who has herpes, they

13    automatically have the same kind of herpes?

14    A    Is that a question or --

15    Q    That is a question.  I can ask it again, if you like.

16    A    Yes, ask me again, please.

17

18              (Continued on the following page.)

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1    EXAMINATION BY

2    MS. BLANK BECKER:

3    (Continuing.)

4    Q    This is a question I can ask to again if you like?

5    A    Ask me again please.

6    Q    Person A has herpes, person B has herpes.  Are you

7    telling this jury that that means they have the same herpes,

8    the same type herpes, 1, 2?

9              MS. SHIHATA:  Objection.

10             THE COURT:  Well, overruled.  Can you answer the

11   question?

12             THE WITNESS:  They may have the same kind of

13   herpes, they may not.

14   Q    Right.  50/50, right?

15             THE COURT:  Well, I'll sustain the objection to

16   that.

17             Put another question to the witness.

18   Q    You're saying, yes, they might have the same type and

19   they might not, is that fair to say, is that what you just

20   said?

21   A    That's correct.

22             THE COURT:  Who are we talking about?  Three

23   different patients?

24             Is that what you understand the question to be?

25             THE WITNESS:  I'm confused with the question.

1          THE COURT:  Let's just clarify what the testimony

2    is.

3          Is your question that -- why don't you rephrase a

4    question so the doctor can answer it.

5          MS. BLANK BECKER:  Sure.

6    Q    There is genital herpes, right?

7    A    Yes.

8    Q    And how would you say it is a subcategory, it's a type

9    of herpes -- what is the proper?

10   A    It's when the herpes virus is present on the genitals.

11   It doesn't matter which of the herpes serotypes it is.  It

12   would be genital herpes no matter which one it was.

13   Q    Got it.  There's other kinds of herpes, right, than just

14   genital?

15   A    Right.

16   Q    So there's oral, right?

17   A    Usually on the lips, not the mouth.

18   Q    I apologize, I should have said on the lips.  And those

19   are two different strains; is that correct?

20   A    They may or may not be.  It can be the same strain.

21   Q    Okay.  They could be the same strain or they cannot be.

22   Is that what you said, right?

23   A    Yes.

24   Q    Additionally, would -- when a patient comes in, and

25   ultimately, you determine that you believe they have herpes,

1    you do your testing, are you able to tell -- you can't

2    actually tell them who gave it to them, is that fair to say?

3    A    That's fair to say, yes.

4    Q    Herpes could lie dormant, I think you even indicated

5    that earlier, for a long period of time; is that correct?

6    A    Yes.

7    Q    And then someone might not have an outbreak and we're

8    talking it could be years; is that fair to say?

9    A    Yes.

10   Q    All right.  And so, if someone came into your office,

11   they ultimately they had herpes and they told you that they

12   were intimate with one person, that would help you try to

13   figure out the who is, right?

14          MS. SHIHATA:  Objection.

15          THE COURT:  Well, is it part of your job as a

16   doctor to figure out who transmitted the herpes to your

17   patient?

18          THE WITNESS:  No, it is not.  Part of my job is to

19   instruct the patient to call their sexual contacts and inform

20   them of the diagnosis.  It's not my job to call the patients

21   who he had sex with and transfer he or she or whoever went to

22   from who to who.

23   Q    So you don't ask him questions and try to ascertain if

24   he's having slept with multiple people that you want to make

25   sure he protect?

K. McGrath - Cross/Ms. Blank Becker          447

1  A    What's the question?

2  Q    In discussing with your patients, and obviously,

3  specifically, Mr. Kelly, you never discussed with him about

4  who is this other person, maybe I should give them medication

5  as well?

6              MS. SHIHATA:  Objection.

7              THE COURT:  Overruled.  Did you ever have that

8  conversation with Mr. Kelly?

9              THE WITNESS:  I had the conversation to inform his

10 partners.

11             THE COURT:  You told him to inform his partners?

12             THE WITNESS:  That was in the medical record.

13 "Inform partners."

14 Q    Got it.  So the answer to my question is no?

15 A    Repeat the question.

16 Q    I'm going to move on because I can't even remember that

17 one at this point.

18              Dr. McGrath, when it comes to genital herpes,

19 that is or is not a bacterial disease?

20 A    It's not a bacterial disease.  It's a viral disease.

21 Q    I'm sorry, I didn't hear you?

22 A    It's a viral disease.

23 Q    You indicated that you also had a friendship with

24 Mr. Kelly is that fair to say?

25 A    Yes.

1  Q    Socially as well?

2  A    Yes.

3  Q    Correct.  All right.  And, in fact, you'd been to a

4  number of his different studios to treat him; is that fair to

5  say, or to see him if he's not feeling well?

6  A    Yes.

7  Q    Okay.  And how often would you say, often that you've

8  been to these studios, or just once or twice?

9  A    In 25 years, not often.

10 Q    Okay.  And I think you said so you've been to three

11 different locations; is that right, studios?

12 A    I'll have to read that.  I'd have to re-add the studios.

13 Larabee, The House Studio, Ohio Street and Justine.  That

14 adds up to four.

15 Q    I apologize.  You've been to four.  Thank you.

16              And when you've gone to those studios, there's

17 been, there have been other people there?

18 A    Yes.

19 Q    Men, women, one or other both?

20 A    Yes, as I recall.

21 Q    Ever see any underage girls there?

22 A    Not that I recall.  I didn't check their ages.

23 Q    You didn't ask them for their license?

24 A    No.

25 Q    Not your job when you go there, huh?  All right.  I

1   apologize.

2         Doctor, did you notice -- were there bedrooms

3   at any of these studios that you would go to that you

4   noticed?

5   A    I don't recall seeing any bedrooms.

6   Q    And was there any activities -- there were -- when you

7   were there, I believe the testimony was that sometimes you'd

8   go later at night, is that fair to say?

9   A    Yes.

10  Q    And sometimes, you'd have to kind of wait there for a

11  while, is that fair to say?

12  A    Yes.

13  Q    And when you were waiting, Mr. Kelly was working on his

14  music, is that fair to say?

15  A    I don't know what he was always doing while I was

16  waiting.

17  Q    Not always.  So you never went into the studio and

18  listened to him while you were waiting to get, you know, to

19  get a chance to speak with him?

20  A    I would wait and wait until he wanted to see me.  And

21  then sometimes it was just to listen to some music that he

22  was proud of or wanted me to hear it.

23  Q    Okay.  Thank you.  Timing wise, are we talking

24  10:00 o'clock at night sometimes you'd go there?

25  A    I would unlikely get there at 10:00.  I may be there

K. McGrath - Cross/Ms. Blank Becker          450

1  until 10:00.  If it was much longer, I would leave because I

2  go to bed at 9:00 p.m. usually.

3  Q    Okay.  When you would be there in the evening hours,

4  were you aware of any --

5          MS. BLANK BECKER:  Strike that.

6  Q    There are people that were working there with Mr. Kelly

7  at the same time when you were there, is that fair to say?

8  A    Yes.

9  Q    Okay.  He wasn't usually just there by himself, true?

10 A    Yes.

11 Q    Okay.  He had engineers and so forth that were there,

12 correct?

13 A    Yes.

14 Q    And you've met some of them; is that correct?

15 A    Yes.

16 Q    All right.  And when you had the chance to finally speak

17 with Mr. Kelly, it wasn't like -- he continued to work after

18 you left, is that fair to say?

19         MS. SHIHATA:  Objection.

20         THE COURT:  Sustained.

21 Q    When you would go, oftentimes I think you said there's

22 different times where you'd go to his house, is that true?

23 A    Yes.

24 Q    And, in fact, you'd go, I believe you indicated

25 sometimes for parties, is that true?

K. McGrath - Cross/Ms. Blank Becker          451

1    A    Yes.

2    Q    You also went for -- there was the time where

3    Mr. Kelly's daughter's dog passed away and he had a funeral

4    for the dog.  Do you remember being there for that?

5    A    I remember being there for a dog funeral.

6    Q    And there was a lot of people there for that; is that

7    correct?

8    A    How do you define a lot?

9    Q    Okay.  The house that he lived in there, was it -- how

10   many square feet, and just a guesstimate, would you say it

11   is?

12   A    I would not know how many square feet in the house.

13   Q    Okay.

14   A    I'm not familiar with square feet in homes at all.  I

15   couldn't tell you the square feet here.

16   Q    Well, if we pretend that this is a house, the courtroom

17   that we're in right now, would you say that Mr. Kelly's home

18   was about this size?

19            MS. SHIHATA:  Objection, your Honor.

20            THE COURT:  I don't understand the relevance.

21   Let's move on to something else.

22   Q    When you would go to parties at Mr. Kelly's house, there

23   was music playing, I assume, right?

24   A    There was often music playing.

25   Q    Okay.  DJ a lot of times as well?

K. McGrath - Cross/Ms. Blank Becker          452

1   A      Occasionally, yes, DJ.

2   Q      Loud music?

3   A      I don't know the volume or the decibels.  I'm sorry, I

4   can't be sure of that.

5                (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K. McGRATH - CROSS - MS. BLANK BECKER          453

1   BY MS. BLANK BECKER:

2   Q    Okay.  So you never had to leave because you were like,

3   this music is too loud, I got to get out of here?

4            MS. SHIHATA:  Objection.

5            THE COURT:  Sustained.

6   BY MS. BLANK BECKER:

7   Q    When you went to his house for whatever reason it was,

8   either for work medically, or social gatherings, do you

9   remember ever seeing any under-age girls?

10           MS. SHIHATA:  Objection.

11           THE COURT:  I feel like we went over this already.

12           Do you remember seeing anybody?

13           THE WITNESS:  No, I don't remember seeing what I

14   would consider under-age girls.

15   BY MS. BLANK BECKER:

16   Q    This is at the house, correct?

17   A    At the house.

18   Q    Yes, thank you.

19           When you would go, whether at the house or to the

20   studio, did you go and like in your doctor's coat that often

21   times we see or we envision a doctor wearing when they treat

22   their patients?

23   A    No.

24   Q    No.  You never would go to his home and treat other

25   people at his house, correct?

1   A    No.

2   Q    Okay.  And you certainly wouldn't do, you wouldn't have

3   one of his guests sitting there and you wouldn't be doing a

4   gynecological exam at his home of one of his female guests; is

5   that correct?

6   A    That's correct.

7   Q    That sounds preposterous, correct?

8          MS. SHIHATA:  Objection.

9          THE COURT:  Sustained.

10  Q    You indicated earlier that the who part is not your job,

11  right; who else he was having sex with, correct?

12  A    Clarify the question for me.

13  Q    I'm sorry?

14  A    What is the specific question for me?

15  Q    You said earlier that the who -- we can't determine the

16  who based on whatever information you have with Mr. Kelly, you

17  have no idea who gave that to him, correct?

18  A    Correct.

19  Q    You spoke -- this isn't the first time you had to testify

20  about this; is that correct?

21  A    How do you define testify?

22  Q    Well, you --

23          THE COURT:  If you want to ask about a statement he

24  made at a prior time, you can do that.

25          MS. BLANK BECKER:  Thank you.

K. McGRATH - CROSS - MS. BLANK BECKER          455

1  Q    You had to take an oath before, correct, and you were

2  asked questions, there was a stenographer taking it all down

3  and you had to answer the questions?

4  A    Yes.

5           MS. SHIHATA:  Objection as to form.

6           THE COURT:  Did you testify at another proceeding?

7           THE WITNESS:  Yes.

8           THE COURT:  Next question.

9  Q    That proceeding occurred on April 17 -- I'm making sure I

10 got the right date.

11          THE COURT:  April of 2020?

12          MS. BLANK BECKER:  2019.

13          THE COURT:  2019, all right.

14 Q    Do you remember when you were asked some questions that

15 you specifically -- and I'll get that.

16          THE COURT:  Let's do the form correctly:  Were you

17 asked the following question and did you give the following

18 answer.

19          MS. BLANK BECKER:  Thank you, Judge.

20 Q    Were you asked several questions similar to what you're

21 being asked about today?

22 A    Yes.

23 Q    And that was a result of you being at work one day and

24 Secret Agents --

25          MS. SHIHATA:  Objection.

1              THE COURT:  Sustained.

2    Q     Special Agents --

3              THE COURT:  Sustained.

4              If you want to direct him to a question and answer,

5    you may do so.

6              MS. BLANK BECKER:  Thank you.

7    Q     You ended up turning over all the medical records that

8    you had to the Government, correct?

9    A     Yes.

10   Q     In fact, to the United States Government you gave them --

11   obviously we can't count -- but whatever you had, correct?

12   A     Yes.

13   Q     And that was a result of a Special Agent coming to --

14             THE COURT:  Can I see counsel at the side?

15             (Sidebar conference held.)

16

17             (Continued on the next page.)

18

19

20

21

22

23

24

25

```
                         Sidebar                    457
```

1              (The following sidebar conference was held outside

2      the hearing of the jury.)

3              THE COURT:  They were subpoenaed.

4              MS. SHIHATA:  He was served with a subpoena.

5              THE COURT:  He testified to that on direct.

6              MS. BLANK BECKER:  I heard you say that when you

7      read the report it says that --

8              MS. SHIHATA:  They came there and served him with a

9      subpoena, and he thereafter complied with it.

10             MS. BLANK BECKER:  Yes.

11             THE COURT:  There is nothing nefarious about that.

12     It's a properly served subpoena.

13             MS. BLANK BECKER:  I'm not saying --

14             THE COURT:  It's been a long day.  He had to answer

15     the subpoena.  You can't suggest to the jury that it was

16     improper.  It's not a jury question.

17             I don't understand the point.

18             MS. BLANK BECKER:  Judge, the point is my

19     information that I have is that he was -- again, this is just

20     information I'm told -- that he was forced to turnover -- he

21     wanted to -- he wanted to get Mr. Kelly's signature first.

22             THE COURT:  But the thing is, you can't litigate the

23     proprietary of the subpoena in front of the jury.

24             MS. BLANK BECKER:  I wasn't going to say it's a bad

25     subpoena.

                          Sidebar                          458

1            THE COURT:  Let me finish.  It could be that the

2   subpoena wasn't properly served, but there is another form to

3   do that; and it isn't here.  I don't want to have any more

4   questioning about that.

5            Is there something else you want to say?

6            MS. SHIHATA:  Just that it was properly served.  He

7   complied with it.  Under the law, a patient signature is not

8   required for Grand Jury subpoena.

9            MS. BLANK BECKER:  I agree with you.

10            THE COURT:  I don't think there is any point.  Just

11   because somebody feels that way.  Move on to something else.

12

13            (End of sidebar conference.)

14            (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

K. McGRATH - CROSS - MS. BLANK BECKER          459

1          (In open court - jury present.)

2          THE COURT:  Next question, please.

3          MS. BLANK BECKER:  Thank you, Judge.

4  BY MS. BLANK BECKER:

5  Q    Dr. McGrath, is it fair to say -- did you ever have a

6  goatee?

7  A    No.

8  Q    Dr. McGrath, did you ever have a beard?

9  A    No.

10  Q    Dr. McGrath, you indicated that there were times that you

11  went to concerts and Mr. Kelly paid for the airfare; is that

12  correct?

13  A    That's correct.

14  Q    And he would also leave tickets for the show so you could

15  go there at Will Call, correct?

16  A    Yes.

17  Q    And he would pay for those too obviously, right?

18  A    Yes.

19  Q    So that was common; is that correct?

20  A    Not that common; no, that's not correct.

21  Q    Okay.  So you had to pay for your own tickets to go to

22  the concerts?

23  A    I thought you meant common like frequently.

24  Q    No, sorry.  You would come -- you would go, other than I

25  believe you indicated a few times you had to pay for your own

K. McGRATH - CROSS - MS. BLANK BECKER          460

1   airline ticket?

2   A    Room, yes.  Not airline, ticket hotel room.

3   Q    Okay, so the airline ticket was --

4   A    I paid for that once or twice, yes.

5   Q    Okay.  The times when you didn't pay for that, you dealt

6   with an assistant of Mr. Kelly's who set it up for you; is

7   that correct?

8   A    Yes.

9             (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  EXAMINATION CONTINUING

2  BY MS. BLANK BECKER:

3  Q     And the assistant would ask you questions about what day

4  works for you, hours, and, ultimately, you guys would figure

5  out your schedule, is that fair to say?

6  A     Yes.

7  Q     And if there was an issue with you not being able to get

8  the tickets at Will Call or so forth, you had a number or

9  someone you could call, is it that same person to try to

10 figure out?

11 A     There was never an issue at Will Call, so --

12 Q     Okay.

13 A     -- I didn't have to call anybody.

14 Q     Okay.

15        Did you have a number of anybody you could call if

16 you needed to?

17 A     I'm sure I had a phone number at the time.  I don't

18 remember who or what number.

19 Q     Okay, how about Diana Copeland, do you know her name?

20 A     I've heard that name, yes.

21 Q     You've seen her at your doctor's office, correct?

22 A     Not as a patient.

23 Q     No, not as a patient.  My question was you've seen her,

24 correct?

25 A     I've seen her.

1  Q    And you're aware that she was an assistant of Mr. Kelly,

2  correct?

3  A    I'm aware of that.

4           MS. BLANK BECKER:  Judge, may I just have a moment?

5           THE COURT:  Sure.

6           MS. BLANK BECKER:  Thank you.

7           (Pause.)

8           MS. BLANK BECKER:  Thank you, Judge.

9           Thank you, Dr. McGrath, I don't have any further

10  questions.

11          THE COURT:  Any redirect?

12          MS. SHIHATA:  Very briefly, Your Honor, I promise.

13          THE COURT:  When I shake my head and go like this

14  (indicating.)

15  REDIRECT EXAMINATION

16  BY MS. SHIHATA:

17  Q    Dr. McGrath, did you diagnose the defendant with genital

18  herpes?

19  A    Yes.

20  Q    Is there any doubt in your mind that the defendant had

21  genital herpes?

22  A    No.

23  Q    After you diagnosed the defendant with genital herpes,

24  did you prescribe him Valtrex?

25  A    Yes.

McGrath - redirect - Shihata                    463

1   Q     Was that to treat genital herpes?

2   A     Yes.

3   Q     Did you prescribe him Valtrex to treat anything else?

4   A     No.

5   Q     After you diagnosed the defendant with herpes, did you

6   inform him that he had herpes?

7   A     Yes.

8   Q     And did you advise him to let his sexual partners know of

9   his diagnosis and to practice safer sex?

10  A     Yes.

11  Q     Is there any doubt in your mind about that?

12  A     No.

13             MS. SHIHATA:  No further questions.

14             THE COURT:  Any recross?

15             MS. BLANK BECKER:  No, Judge, thank you.

16             THE COURT:  Thank you so much, Doctor.  You can step

17  down.

18             (Witness excused.)

19             THE COURT:  Thank you, ladies and gentlemen, for

20  staying late.

21             I am just going to give you the usual instructions.

22  Please don't look anything up about the case.  Don't read any

23  news reports.  Don't do any research on your own.  Report to

24  me any effort by anyone to influence you improperly or to

25  influence another juror improperly.

SAM     OCR     RMR     CRR     RPR

Proceedings                                    464

1              Have a great night.

2              I also want to thank our court reporters for staying

3    late as well.

4              Have a good night, everybody.

5              THE COURTROOM DEPUTY:  All rise.

6              A JUROR:  What time?

7              THE COURT:  Well, you'll get the instructions about

8    when to come, usual time.

9              (Jury exits.)

10             THE COURT:  All right, everybody can have a seat.

11             I think I am just going to have Donna dismiss that

12   juror without the need of bringing her out here.  I think

13   everybody agrees with that.

14             Yes, from the defense.

15             MS. GEDDES:  It's fine, Your Honor.

16             THE COURT:  Okay.

17             MS. BLANK BECKER:  No objections, Judge.

18             THE COURT:  The only thing I'm wondering about,

19   though, is if I need to give her an instruction about speaking

20   to other jurors or anything like that.

21             MR. CANNICK:  I think you do, Your Honor.  We would

22   make that request.

23             THE COURT:  And then can I just see one of the

24   marshals over at the sidebar?

25             (Alternate Juror No. 3 enters the courtroom.)

Proceedings                                465

1          THE COURT:  Just in the front row is fine, just have

2     a seat.  That's perfect.

3          Okay, this is Alternate Juror No. 3.

4          I understand from Ms. Greene that you need to go to

5     your job in order to get benefits and things like that.

6          Is that right?

7          ALTERNATE JUROR NO. 3:  Correct.

8          THE COURT:  And this would be a hardship for you?

9          ALTERNATE JUROR NO. 3:  There's going to be no

10    income for the next four weeks and I'll have no benefits.

11         THE COURT:  No benefits and no income, so I am going

12    to excuse you from this jury.

13         I am going to give you some instructions.  Do not

14    speak to any of your fellow jurors about the case, and do not

15    speak to anybody else about the case.

16         Okay?

17         ALTERNATE JUROR NO. 3:  Okay.

18         THE COURT:  We are keeping your name confidentially

19    and for the reasons I described before.

20         Okay?

21         ALTERNATE JUROR NO. 3:  Okay.

22         THE COURT:  So, you're excused from the case.

23         ALTERNATE JUROR NO. 3:  Thank you.

24         (Alternate Juror No. 3 is excused.)

25         THE COURT:  All right, anything else that anyone

Proceedings                                    466

1    needs to raise?

2            I think we've got to let everybody go.

3            MS. GEDDES:  No, Your Honor.

4            THE COURT:  All right, see you tomorrow.

5

6

7

8    (Matter adjourned to Friday, August 20, 2021 at 9:30 a.m. )

9

10

11

12                            ooo0ooo

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

467

1                              I N D E X

2

3    WITNESS                                          PAGE

4

5       JERHONDA JOHNSON PACE

6            DIRECT EXAMINATION BY MS. GEDDES:         215

7            CROSS-EXAMINATION BY MR. CANNICK          227

8            REDIRECT EXAMINATION BY MS. GEDDES        353

9            RECROSS-EXAMINATION BY MR. CANNICK        363

10           REDIRECT EXAMINATION BY MS. GEDDES        366

11           RECROSS-EXAMINATION BY MR. CANNICK        367

12

13      GARRICK AMSCHL

14           DIRECT EXAMINATION BY MS. GEDDES          369

15           CROSS-EXAMINATION BY MR. FARINELLA        378

16

17      KRIS McGRATH, MD

18           DIRECT EXAMINATION BY MS. SHIHATA         383

19           CROSS-EXAMINATION BY MS. BLANK BECKER     433

20           REDIRECT EXAMINATION BY MS. SHIHATA       462

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

468

1                        **E X H I B I T S**

2

3      **Defendant's Exhibit D**                        **290**

4

5      **Defendant's Exhibit E**                        **291**

6

7      **Government's Exhibit 48**                       **386**

8

9      **Government's Exhibit 12**                       **387**

10

11     **Government's Exhibit 237**                      **389**

12

13     **Government's Exhibit 3**                        **410**

14

15     **Government's Exhibit 520**                      **415**

16

17     **Government Exhibit 402**                        **421**

18

19     **Government Exhibit 525(q)**                     **424**

20

21     **Government Exhibit 505(a)**                     **424**

22

23     **Government Exhibit 503(a)**                     **427**

24

25     **Government Exhibit 336(a)**                 **429**