469

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,        : 19-CR-00286(AMD)
4                                :
                                 :
5                                :
        -against-                : United States Courthouse
6                                : Brooklyn, New York
                                 :
7                                :
                                 : Friday, August 20, 2021
8  ROBERT SYLVESTER KELLY,       : 9:30 a.m.
                                 :
9          Defendant.            :
                                 :
10
- - - - - - - - - - - - - - - - X
11

12
            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13           BEFORE THE HONORABLE ANN M. DONNELLY
              UNITED STATES DISTRICT JUDGE
14

15
                 A P P E A R A N C E S:
16
For the Government:  JACQUELYN M. KASULIS, ESQ.
17                      Acting United States Attorney
                      Eastern District of New York
18                      271 Cadman Plaza East
                      Brooklyn, New York 11201
19                   BY:  ELIZABETH GEDDES, ESQ.
                      NADIA SHIHATA, ESQ.
20                      MARIA E. CRUZ MELENDEZ, ESQ.
                      Assistant United States Attorneys
21

22
For the Defendant:   AIELLO & CANNICK, Esq.
23                      69-06 Grand Avenue
                      Maspeth, New York 11378
24                   BY:  DEVERAUX L. CANNICK, ESQ.

25

            SAM     OCR     RMR     CRR     RPR

470

A P P E A R A N C E S:  (Continued)


For the Defendant:      BLANK LAW, P.C.
                            444 S. Washington Avenue
                            Royal Oak, Michigan 48067
                        BY:  NICOLE BLANK BECKER, ESQ.


                        THE LAW OFFICE OF THOMAS A. FARINELLA
                            260 Madison Avenue
                            8th Floor
                            New York, New York 10016
                        BY:  THOMAS A. FARINELLA, ESQ.


                        THE C.H. SCHOLAR LAW FIRM, PLLC
                            225 Broadway
                            Suite 225
                            New York, New York 10007
                        BY:  CALVIN HAROLD SCHOLAR, ESQ.


Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                        Official Court Reporter
                        E-mail:  SMaceRPR@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                    471

1              (In open court - jury not present.)

2              THE COURTROOM DEPUTY:  All rise.

3              THE COURT:  All right, everybody can have a seat.

4              (Pause.)

5              THE COURT:  Good morning, everybody.

6              I think we're ready to go.

7              Do you have a witness?

8              MS. GEDDES:  We have a witness.  We can bring him

9       out.  Just one quick thing for Your Honor.

10              Our third witness is going to invoke the Fifth

11       Amendment and we are prepared to immunize him.  I think

12       usually we do that outside the presence of the jury.

13              THE COURT:  Yes.

14              MS. GEDDES:  So, if we could take a short break

15       after our second witness, it probably will align with the

16       morning break.

17              THE COURT:  But at 11:30 I have another matter.

18              MS. GEDDES:  Okay.

19              THE COURT:  That's going to take a hot second, but,

20       yes, we will figure that out.

21              How long do you think these first two are going to

22       be?

23              MS. GEDDES:  I was just corrected, he's actually our

24       fourth witness, but the --

25              THE COURT:  Maybe after lunch?

SAM      OCR      RMR      CRR      RPR

Proceedings                               472

1          MS. GEDDES:  Probably.

2          THE COURT:  Okay.

3          MS. GEDDES:  And then one other matter, that witness

4   has an attorney who will be present in the courtroom, and so

5   we just need to know at some point where the attorney should

6   be located.

7          THE COURT:  I think we decided that the attorney is

8   going to be over where you've helpfully placed your --

9          MS. GEDDES:  Our cart.

10          THE COURT:  Yes.

11          MS. GEDDES:  We'll move it.

12          THE COURT:  We'll figure it out.  But that's the

13   fourth witness?

14          MS. GEDDES:  Yes.

15          THE COURT:  All right, anything else that we have to

16   do before we start?

17          MS. BLANK BECKER:  I just have one thing, Judge.

18          THE COURT:  Yes; into the microphone.

19          MS. BLANK BECKER:  Yes.

20          Judge, there were medical records that were

21   discussed yesterday, and I believe we have a stipulation and

22   agreement that those records are not to be produced to the

23   media, to the public.

24          THE COURT:  I mean they are personal records, yes,

25   that makes sense to me.

SAM      OCR      RMR      CRR      RPR

Proceedings                                      473

1          Okay, anything else?

2          MS. GEDDES:  No, Your Honor.

3          Would you like us to bring our witness out now?

4          THE COURT:  Well, I guess that's fine, yes.

5          (Witness enters and takes the stand).

6          THE COURT:  Just have a seat over there, and we will

7    turn to you in just a second.

8          (Pause in the proceedings.)

9          THE COURTROOM DEPUTY:  All rise.

10         (Jury enters.)

11         THE COURTROOM DEPUTY:  You may be seated.

12         THE COURT:  All right, good morning, everybody.

13         I feel like it's a little warmer in here, but it

14   could just be wishful thinking.  Some of you are shaking your

15   heads, all right.

16         Anyway, I hope everybody had a good night.  We are

17   ready to proceed.  The Government is calling another witness.

18         MS. GEDDES:  Yes, Your Honor, the Government called

19   Anthony Navarro.

20         THE COURTROOM DEPUTY:  Mr. Navarro, please stand and

21   raise your right hand.

22         Do you solemnly swear or affirm that the answers you

23   give to the Court will be the truth, the whole truth and

24   nothing but the truth?

25         THE WITNESS:  Yes.

```
                        Proceedings                    474
```

1              (Witness sworn.)

2              THE COURTROOM DEPUTY:  Please state your name for

3       the record.

4              THE WITNESS:  Anthony Navarro.

5              THE COURTROOM DEPUTY:  Thank you.  Be seated.

6              THE COURT:  Okay, Mr. Navarro, just a couple of

7       things.

8              First of all, our court reporters take down

9       everything that you say, so please don't talk too quickly and

10      don't talk over whichever lawyer is asking you questions.

11             I just want to make sure they can get everything

12      down.

13             If there is a question you don't understand or you

14      need to have repeated, let me know.  And just do your best to

15      answer only the question that you're being asked.

16             Okay?

17             THE WITNESS:  Okay.

18             THE COURT:  All right, go ahead.

19             MS. GEDDES:  Thank you, Your Honor.

20

21             (Continued on the following page.)

22

23

24

25

1   **ANTHONY NAVARRO**,

2       called as a witness by the Government, having been duly

3       sworn/affirmed by the Courtroom Deputy, was examined and

4       testified as follows:

5   DIRECT EXAMINATION

6   BY MS. GEDDES:

7   Q    Good morning.

8   A    Hi.

9   Q    Did you receive a subpoena to testify here today?

10  A    I did.

11  Q    Do you want to be here?

12  A    In New York, yes; but not here.

13  Q    How old are you?

14  A    Thirty-six.

15  Q    Are you currently employed?

16  A    I am.

17  Q    What do you do?

18  A    I own two businesses.  I have a music production studio

19  called Motus Flow, and a smoothie shop called --

20         THE COURT:  Keep your voice up.

21         THE WITNESS:  Okay.

22  A    -- Proper Nutrition.

23         THE COURT:  Much better.

24  Q    How far did you go in school?

25  A    Five years' worth.

Navarro - direct - Geddes                476

1    Q     Where did you go to school?

2    A     Pensacola State College in Florida, and Full Sail

3    University.

4    Q     What is Full Sail University or what did you do at Full

5    Sail University?

6    A     I studied audio engineering and recording arts.

7    Q     How long were you there?

8    A     It was for an Associate's program, so about two years.

9    Q     When did you -- did you graduate from Full Sail?

10   A     Yes.

11   Q     When did you graduate?

12   A     2006.

13   Q     Where is Full Sail University located?

14   A     It's in Winter Park, Florida, which is right outside of

15   Orlando.

16   Q     Where, if anywhere, did you move after you finished at

17   Full Sail?

18   A     So, right after I graduated, I moved to the Los Angeles

19   area in California.

20   Q     And when you graduated, did you get a job in or near the

21   field of audio engineering?

22   A     Yes, I did.

23   Q     Where did you get a job?

24   A     It was R. Kelly's recording studio called The Chocolate

25   Factory.

Navarro - direct - Geddes                477

1    Q    In what city was The Chocolate Factory?

2    A    Olympia Fields, which is like a suburb of Chicago.

3    Q    When did you begin?

4    A    I started in the summer of 2007, like July-ish.

5    Q    Do you see the individual you knew as R. Kelly in the

6    courtroom today?

7    A    Yes.

8    Q    Can you please point to him and describe an article of

9    his clothing?

10   A    Gray suit, brown shirt.

11          THE COURT:  Indicating the defendant.

12          MS. GEDDES:  Thank you.

13   BY MS. GEDDES:

14   Q    How long did you work for the defendant?

15   A    It was about two-and-a-half years.

16   Q    When you stopped working for the defendant, where was he,

17   what was he doing?

18   A    He was on tour.

19   Q    Did you go on tour, on that particular tour with the

20   defendant?

21   A    No, I did not.

22   Q    Do you recall to whom you gave your notice that you were

23   stopping working for the defendant?

24   A    Yes.

25   Q    Who did you give your notice to?

Navarro - direct - Geddes                          478

1   A    His manager, Tom Arnold.

2         MS. GEDDES:  I'm showing the witness what's been

3   marked for identification as Government Exhibit 31.  This is

4   for the witness only, please.

5   Q    Do you recognize the individuals shown in Government

6   Exhibit 31?

7   A    Yes.

8   Q    Who is that?

9   A    That's Tom Arnold.

10  Q    Is that a fair and accurate photo of Tom Arnold?

11  A    It is.

12        MS. GEDDES:  The Government offers Government

13  Exhibit 31.

14        MS. BLANK BECKER:  No objection, Judge.

15        THE COURT:  That's in, and you can publish it.

16        MS. GEDDES:  Thank you.

17        (Government's Exhibit 31 was received in evidence.)

18        (Exhibit published.)

19  BY MS. GEDDES:

20  Q    You testified that you gave notice to Tom Arnold.

21        Do you recall where it was that you gave notice to

22  him?

23  A    Yeah, it was at one of the shows, and I believe it was --

24  we were -- it was in Chicago.

25  Q    And when you say "one of the shows," whose shows are you

SAM     OCR     RMR     CRR     RPR

Navarro - direct - Geddes                    479

1   referring to?

2   A    Rob's.

3   Q    Do you remember approximately what year that was?

4   A    It was 2009.

5   Q    And as you sit here today do you know the show that it

6   was in connection with?

7   A    I believe it was the Ladies Make Some Noise tour.

8   Q    And where, again, did you say the show was where you gave

9   notice to Tom Arnold, in what city?

10  A    It was in Chicago.

11  Q    During the time that you worked for the defendant, where

12  did you work?

13  A    It was at the recording studio, which was in his house.

14  Q    In the defendant's house?

15  A    Yes.

16       MS. GEDDES:  I am showing what's in evidence as

17  Government Exhibit 502(a).

18       (Exhibit published.)

19  Q    Do you recognize 502(a)?

20  A    Yes.

21  Q    What is that?

22  A    That's the security gate to the -- to the property, to

23  the house.

24  Q    Where the defendant lived and where you worked?

25  A    Yes.

1          MS. GEDDES:  And I am showing the witness only

2   what's been marked for identification as Government

3   Exhibit 502(c).

4   BY MS. GEDDES:

5   Q    Do you recognize what's shown in 502(c)?

6   A    Yes.

7   Q    What is that?

8   A    That is -- that's Rob's house.

9   Q    And can you tell from what vantage point that photograph

10  was taken?

11  A    Yeah, so that's the front, as soon as you get into the --

12  past the security gates, that's facing the front of the house.

13  Q    And is that a fair and accurate photograph of the

14  location where the defendant lived and where you worked?

15  A    Yep, there's -- it looks like there's more trees than I

16  remember, but that's it.

17          MS. GEDDES:  The Government offers 502(c).

18          THE COURT:  Any objection?

19          MS. BLANK BECKER:  No, objection, Judge.

20          THE COURT:  All right, that's in and you can publish

21  it.

22          (Government's Exhibit 502(c) was received in

23  evidence.)

24          (Exhibit published.)

25  BY MS. GEDDES:

1    Q    Now, you testified that you worked at of the defendant's

2    home.

3              Where specifically did you work?

4    A    In the -- in the recording studio that was inside the

5    house.

6    Q    And was there a name for the recording studio where you

7    worked?

8    A    Yeah, it was called The Chocolate Factory.

9    Q    Now, when you pull up to the defendant's residence where

10   you were working, what do you see, what's the first thing that

11   you see?

12   A    Like, are you saying when you're driving into the -- it's

13   the security gate.

14   Q    And once you go through the gate, can you describe the

15   structures that are on that property?

16   A    Yes.

17              (Pause.)

18   A    Oh, are you asking me to describe?

19   Q    Oh, yes.

20   A    So, as soon as you -- as soon as you go in --

21              THE COURT:  I think we lost our mic.

22              THE WITNESS:  The battery's dead.

23              (Pause.)

24   A    Okay, so, structures.  As soon as you go in there's, you

25   know, you can see the house and then there's a few different

1    structures.  There's a -- there's -- to the right there's a

2    basketball court, tennis court type of thing.  There's a log

3    cabin, like a miniature log cabin in the yard.

4    Q    Where is the log cabin?

5    A    It's in the front -- front yard of the house.  There's a

6    garage.  There's a few tents.

7    Q    You mentioned a garage.

8              What type of garage was it, was it an attached

9    garage or a detached garage?

10   A    It was detached from the house.

11   Q    And you also mentioned some tents.

12             Where were the tents situated?

13   A    So, they're -- the tents were, like, next to the garage.

14   It was like tents to park cars.  And then there's also a --

15   like a gazebo tent for just -- that was on the side of the

16   house, which they had, like, a patio out there.

17   Q    You testified that there was The Chocolate Factory at

18   that location, correct?

19   A    Yeah.

20   Q    Where was The Chocolate Factory located?

21   A    The Chocolate Factory was in the basement of Rob's house.

22   Q    And how would someone access The Chocolate Factory, the

23   studio?

24   A    To get into the studio, you had to -- there was a side

25   entrance towards the back of the house, and you had to go down

1   these stairs to access it.

2   Q    Fair to say you spent some time in that studio as part of

3   your employment with the defendant?

4   A    Yes.

5   Q    Can you describe what is inside the studio, the layout of

6   the studio?

7   A    Yeah.  So, as soon as you walk in there's a front desk

8   reception area with a computer, a couch, sitting area, and

9   then it's -- you walk in, there's a long hallway, a bunch of

10  platinum plaques on the wall; and to the right -- at the end

11  of the hallway there's a recording studio, a storage room.

12  And then you go past that, there's another door, there's a

13  stairwell to the -- to get to the main part of the house.  And

14  then you go down another hallway, there's another recording

15  studio, with a machine room that has, like, equipment.

16          And then when you go past that, there's like another

17  hallway with a movie theater, more storage rooms, a bathroom.

18  Q    Now, you just mentioned, I think, that there was a

19  stairway to get to the other part of the house.

20          Is that another way to get into the studio?

21  A    Yes.

22  Q    So, you could get to the studio, in addition to the side

23  entrance which you previously testified, you could also get

24  there from inside of the defendant's residence?

25  A    Yes.

Navarro - direct - Geddes                          484

1   Q    You mentioned two different recording studios in that

2   basement area.

3            Were there any names for those recording studios?

4   A    Yeah, the first -- Music 1 was -- Music 1 or Studio 1 was

5   the name of one of the studios, and then The Cabin was the

6   name of another one.

7   Q    Any reason why that other recording studio was called The

8   Cabin?

9   A    Like, the decor of the studio was designed to look like

10  the inside of a log cabin.  So, there was like logs on the

11  wall.

12  Q    Was there a kitchen area in that basement part of the

13  studio or in the basement part where The Chocolate Factory was

14  located?

15  A    Yes.

16  Q    Where was that?

17  A    The kitchenette was in the -- as soon as -- if you're

18  coming in from the side entrance of the house, there's the

19  reception at the front desk, and then the kitchen was right

20  there.

21  Q    Now, as part of your employment with the defendant, did

22  you have an opportunity to also spend time inside the main

23  house, so apart from the basement area where The Chocolate

24  Factory was located?

25  A    Yes.

Navarro - direct - Geddes                    485

1    Q     How many floors do you recall in the main house?

2    A     The main house had three floors.

3    Q     Had you been on each of those floors?

4    A     Yes.

5    Q     Can you describe what's on the first floor?

6    A     Yes.  So, the first floor was a kitchen.  There's a

7    poolroom.

8    Q     And when you say "poolroom," what are you referring to?

9    A     Like an indoor swimming pool.  So, the kitchen, the

10   living room.  There is a -- a giant, like, stage built for

11   performances.  There was a sun room.  There was another room

12   that was set up to be like a bar, cigar -- and cigar room.  A

13   couple of bathrooms.

14   Q     How about on the second floor, what's there?

15   A     So, the second floor was more bedrooms, and then also

16   there's like a game room, which was like a room for -- that

17   had a pool table and things like that, TVs.

18   Q     And how about the on third floor?

19   A     The third floor was where -- more rooms.  The master

20   bedroom was there.

21   Q     And when you say "more rooms," are you referring to

22   bedrooms?

23   A     Bedrooms, yeah.

24   Q     By the way, when you described the two studios in the

25   basement, does The Chocolate Factory refer to that entire area

SAM      OCR      RMR      CRR      RPR

1  or just one particular studio there?

2  A    The Chocolate Factory was the whole studio.

3  Q    You also testified that there was a garage, a detached

4  garage on the property.

5          Have you been inside?

6  A    Yes.

7  Q    What was inside the garage?

8  A    Inside the garage was, like, workout equipment.  There

9  was a boxing -- a boxing ring.  There was a bed.  A shower,

10  bathroom.

11  Q    What, if anything, do you recall being parked at the

12  defendant's residence?

13  A    So, there's quite a few vehicles there.  Do you need me

14  to like describe the vehicles?

15  Q    Sure; yes, please.

16  A    All right, so there's a handful of SUVs.  A Denali

17  Expedition, a couple of jeeps, jeep Cherokees.  There was a

18  Maybach, a Lamborghini.

19          THE COURT:  A what?

20          THE WITNESS:  A Lamborghini.

21          THE COURT:  But what did you say before that?

22          THE WITNESS:  A Maybach.

23          THE COURT:  Okay.  What is that, a kind of car?

24          THE WITNESS:  It's like a super luxury sedan type of

25  Mercedes.

1           THE COURT:  Okay, keep your voice up.

2           THE WITNESS:  Okay.

3           THE COURT:  Thanks.

4    BY MS. GEDDES:

5    Q    Do you recall any other vehicles that were there when you

6    were there?

7    A    Yeah, there's usually a couple of tour buses.

8    Q    Where were the tour buses kept when you were there?

9    A    The tour buses were kept in the driveway.

10   Q    Before you moved from Los Angeles to Chicago -- let me

11   back up.

12           Did you move to Chicago because of the job that you

13   got with the defendant?

14   A    Yes.

15   Q    So, before you moved, what did you understand your job

16   was going to be when you first started?

17   A    So, it was -- what I understood was it's like an entry-

18   level job into the recording studio business.  So, like a

19   general assistant, which does everything for the studio and

20   everything from like setting up sessions, cleaning, doing food

21   runs, and like helping out the staff.

22   Q    Did you understand it was going to be a paid or unpaid

23   position?

24   A    Initially, they got me on as like an intern, which was an

25   unpaid position.  And then eventually I got hired on as a paid

1    position.

2    Q    How long were you in that unpaid position?

3    A    Like two to three weeks.

4    Q    And then you eventually were transferred over to be a

5    paid employee?

6    A    Correct, yes.

7    Q    What, if any, paper work were you given when you first

8    started working at The Chocolate Factory for the defendant?

9    A    Just the standard W-2 forms, and then there was a

10   non-disclosure agreement as well.

11   Q    What did you understand were your obligations -- did you

12   sign the non-disclosure agreement?

13   A    Yes.

14   Q    What did you understand were your obligations as part of

15   that non-disclosure agreement?

16   A    It's along the lines of, like, privacy.  So -- so, I

17   wasn't supposed to share any kind of, like, information of

18   what happens there, no -- I couldn't take pictures and things

19   like that.

20   Q    Once you arrived at The Chocolate Factory, what were your

21   responsibilities, first as an intern, and then later as a paid

22   assistant?

23   A    Well, the first thing that I did when I worked my first

24   shift was I had to move this -- move a giant trampoline from

25   the front of the house to the back of the house; and then

1   cleaning duties, food runs, stocking up the studio with

2   groceries and things.  So, that -- that was like the initial

3   duties.

4   Q    Did those duties change over time or did you get

5   additional duties over time?

6   A    Yeah, there was more responsibilities.  So, then it was

7   more picking people up from the airport, driving around,

8   delivering packages and things.  More studio time.  So, I

9   would be in the studio more helping with -- helping the

10  engineers and things like that.

11  Q    What -- you mentioned that one of your responsibilities

12  were cleaning duties.

13             What areas were you responsible for cleaning or what

14  did you end up cleaning?

15  A    Pretty much the whole place, but most of it was down in

16  the basement in the studios.  So, all those rooms, like the

17  theater, the studios.  Sometimes I would clean the buses, the

18  garage, poolroom.

19  Q    What, if any, camera equipment did you ever see inside

20  the defendant's residence at Olympia Fields?

21  A    Yeah, so there's -- you know, it's a recording studio, so

22  there's usually -- there was always camera equipment

23  somewhere.  I've seen handheld cameras.  There's cameras in --

24  you know, like professional cameras, video cameras.

25  Q    Did you -- you testified about the fact that it was a

1   recording studio and you saw cameras in that capacity.

2          Did you ever see any camera equipment up on the

3   third floor of the residence?

4   A    Yes.

5   Q    What did you see?

6   A    In the master bedroom there was a -- there was one time I

7   had to go in there to get something, and there was cameras set

8   up in there.

9   Q    Can you describe the cameras that you saw?

10  A    Yeah.  It was just on a tripod, and there was like a

11  medium-sized camera.

12  Q    Were you able to determine whether the camera took still

13  photographs or a video camera that would take video?

14  A    This was a video camera.

15  Q    When you were an assistant for the defendant, where would

16  you spend most of your time when you were inside of the studio

17  and not running errands?

18  A    Most of the time I would spend -- so, either in the

19  studio or there was also like an area for us, like the front

20  reception area.  So, there's the desk and the chair and the

21  couch and stuff right there.

22  Q    What would you do when you were stationed in the

23  reception area?

24  A    So, there was a computer, a security camera that -- with

25  a TV screen so you could see the front gate and other security

1  cameras.  Like from there, you could let people into the gate.

2  And there's also the phone stations.  The phones were

3  stationed there and you'd answer the phone, take messages,

4  things like that.

5  Q    Generally speaking, who were the individuals who called

6  the phones in the reception area where you were answering

7  phones?

8  A    So, there's a lot of people that called.  There was --

9  you know, Rob would call the studio.  Any of the managers,

10 staff.  And then there would be, like, business associates.

11 And then there would be the -- Rob's, like, girlfriends and

12 guests, and people inside the house.

13 Q    Now, as you sit here today, do you recall the telephone

14 numbers that were in the reception area?

15 A    No.

16 Q    Do you remember the defendant's telephone number?

17 A    No.

18       MS. GEDDES:  I am showing the witness only what's

19 been marked for identification as 3500-AN3.  I am going to

20 start with showing the second page.

21 BY MS. GEDDES:

22 Q    Do you recognize what I'm showing you?

23 A    Yes.

24 Q    Generally speaking, what is it?

25 A    That's the phone number to one of the -- one of the lines

Navarro - direct - Geddes                    492

1    at The Chocolate Factory studio.

2    Q    And do you know where this phone number came from?

3    A    That's my -- that's -- I put that in there.

4    Q    Is that a screenshot from your telephone?

5    A    Yeah.

6    Q    Does that refresh your recollection as to the phone

7    number for the studio?

8    A    Yes, it does.

9    Q    What is the phone number, what was the phone number for

10   the studio back then?

11   A    So, it's 708-747-6569.

12   Q    And I'm showing you the first page again.

13             MS. GEDDES:  The witness only.

14   Q    Generally speaking, what is shown there?

15   A    All right, so that's the -- the office number for the

16   business office in downtown.

17   Q    And when you say the business office downtown, what are

18   you referring to?

19   A    Like, so for The Chocolate Factory.

20   Q    And where was the business office located?

21   A    In Chicago.

22   Q    Downtown Chicago?

23   A    Yeah.

24   Q    So, not at Olympia Fields, is that correct?

25   A    Right, this was a separate -- separate place.

1  Q    Do you recall who worked at that business office?

2  A    Yeah, so it was Rob's business manager and, like,

3  accountant, Derrel McDavid.

4         MS. GEDDES:  I'm showing the witness what's in

5  evidence, I'm showing everyone what's in evidence as

6  Government Exhibit 12.

7         (Exhibit published.)

8  BY MS. GEDDES:

9  Q    Do you recognize Government Exhibit 12?

10  A    Yes.

11  Q    Who is that?

12  A    That's Derrel McDavid.

13  Q    That's the defendant's -- that was the defendant's

14  business manager at the time that you worked for him?

15  A    Yes.

16         MS. GEDDES:  And going back to showing the witness

17  only.

18  Q    Do you recall the telephone number for that office?

19  A    Yes.

20  Q    What is it?

21  A    708-848-2115.

22  Q    And I also asked you about the defendant's telephone

23  number.

24         Did you speak with the defendant over the telephone

25  when you were working for him?

1    A    Yes.

2         MS. GEDDES:  I am showing the witness only the third

3    page of Government Exhibit 3500-AN3.

4    BY MS. GEDDES:

5    Q    Does that refresh your recollection as to what the

6    defendant's phone number was when you were working for him?

7    A    Yes.

8    Q    What is it?

9    A    630-220-1166.

10   Q    Now, you testified that you would answer phones in the

11   reception area, is that right?

12   A    Yes.

13   Q    What was the procedure for answering phone calls at The

14   Chocolate Factory?

15   A    So, you answer the phone.  You'd do the greeting:

16   Chocolate Factory.  How can I help you?"

17        And then, you know, whoever -- you find out who the

18   call is for.  If it's for Rob, then you would find out who's

19   calling.  And then you would just write a message down for him

20   and then give it to him, to give it to Rob for -- yeah, so he

21   could answer it.

22   Q    You testified that you would write a message.

23        Do you recall how you would write those messages or

24   on what you would write those messages?

25   A    Yeah, it was just on a piece of paper with -- you would

Navarro - direct - Geddes                              495

1   just write down, like, who the caller is, the name, and then

2   you would write down which line it was.  So it's either line 1

3   or line 2.

4   Q    When you were working as an assistant for the defendant,

5   did you have a regular schedule that you worked?

6   A    Yes.

7   Q    What was that?

8   A    I worked five days a week, and either the night shift or

9   the morning -- or the day shift.  And those shifts were from

10  like 8:00 p.m. to 8:00 a.m., or 8:00 a.m. to 8:00 p.m.

11  Q    And do you recall when in your time with the defendant

12  you worked the day shift and when you worked the evening

13  shift?

14  A    Yeah.  So, it -- when I first started it was the evening

15  shifts.  And then towards the later half of my time there, it

16  was the -- the day shift.

17  Q    Can you describe for the jury or can you give some

18  examples of some of the tasks or errands you were asked to

19  complete when you were an assistant?

20  A    Yeah.  So, there was a lot of food runs.

21  Q    Who were you making food runs for?

22  A    A lot of food runs for -- for Rob, and a lot of food runs

23  for the people at the house.

24  Q    Who was at the house?

25  A    The girls.

1   Q     And when you're referring to the house, what house are

2   you referring to?

3   A     Rob's house.

4   Q     And can you tell me what you mean by a food run?

5   A     People would call and request that we order food for them

6   and bring it back.

7   Q     And when you say "people would call," who would call?

8   A     Rob would call or the girls in the house would call.

9   Q     What would you do when you received a telephone call from

10  one of the women in the house who called?

11  A     So, you -- if it's a food run, you would write down the

12  order, and then you would get permission to go get it.

13  Q     Who would you get permission from?

14  A     So, it's either Rob or any of the managers; Tom, Tom

15  Arnold, or who else?  June Bug.

16  Q     Anyone else you recall?

17  A     It could be Donnie.

18  Q     Do you know Donnie's last name?

19  A     Donnie Lyle.

20        MS. GEDDES:  I am showing the witness only what's

21  been marked for identification as Government Exhibit 4.

22  Q     Do you recognize who's shown in Government Exhibit 4?

23  A     Yes.

24  Q     Who is that?

25  A     That's June Bug.

Navarro - direct - Geddes                    497

1    Q    And is June Bug a nickname or a true name?

2    A    That's a nickname.

3    Q    Do you know June Bug's true name?

4    A    I can't remember it, but --

5    Q    Okay.

6              MS. GEDDES:  Oh, the Government offers Government

7    Exhibit 4.

8              THE COURT:  Any objection?

9              MS. BLANK BECKER:  No objection.

10             THE COURT:  That's in evidence, and you can publish

11   it.

12             (Government's Exhibit 4 was received in evidence.)

13             (Exhibit published.)

14             MS. GEDDES:  I am showing the witness only what's

15   been marked for identification as Government Exhibit 32.

16   BY MS. GEDDES:

17   Q    Do you recognize what's shown in Government Exhibit 32?

18   A    Yes.

19   Q    What is shown there?

20   A    Donnie Lyle.

21   Q    And is that the Donnie you were just talking about?

22   A    Yes.

23   Q    Is that a fair and accurate photo of Donnie Lyle?

24   A    Yes, it is.

25             MS. GEDDES:  The Government offers Government

Navarro - direct - Geddes                498

1    Exhibit 32.

2              THE COURT:  Any objection?

3              MS. BLANK BECKER:  No objection.

4              THE COURT:  Let me just ask, do you have any

5    objection to any of these photos coming in?

6              If you'd rather do them photo by photo, that's

7    completely fine, but it seems like you're in a fair amount of

8    agreement here, so if it will move things along.

9              MS. BLANK BECKER:  Completely understood, Judge.

10             THE COURT:  Why don't we figure it out at a break,

11   okay?

12             I just think if there's a way that you're not

13   disagreeing about it, there's no reason to go through this,

14   but go ahead.

15             MS. BLANK BECKER:  Thank you.

16             MS. GEDDES:  May we publish 32?

17             (Government's Exhibit 32 was received in evidence.)

18             (Exhibit published.)

19   BY MS. GEDDES:

20   Q    Now, you said that you would get permission from, I think

21   you said the defendant or Tom or June Bug and on occasion

22   Donnie.

23             What would you do once you received permission to

24   get the food?

25   A    So, you would -- you would call the food order in and

1  then go get it.  Sometimes you'd have to get money if there

2  wasn't any money from -- in the petty cash drawer.

3  Q    And what would you do once you picked up the food?

4  A    You bring it back and -- so, you bring the food back to

5  the studio and then you would let Rob know that the food has

6  arrived or one of the managers know, or you would just go

7  deliver it to the person.

8  Q    And where would the person be?

9  A    The person could be anywhere in the house, so....

10 Q    When you said that you would let one of the managers

11 know, who were you referring to when you said one of the

12 managers?

13 A    So, like, it's whoever was on shift usually, but so Tom

14 Arnold or June Bug or Donnie Lyle.

15 Q    Were those considered some of the managers who worked for

16 the defendant?

17 A    Yes.

18 Q    All right, I had asked you some examples of the some of

19 the errands or tasks that you were asked to complete, and you

20 just described that one of them would be to go on food runs.

21      What are some other examples of errands or tasks

22 that you were asked to do while you were an assistant for the

23 defendant?

24 A    There was a lot of driving around people and a lot of

25 picking things up, like -- excuse me, yeah, you might have to

1  go to the office to pick something up or pick something up

2  from somebody or drop -- drop stuff off.

3  Q    So, let's start with there was a lot of driving people

4  around.

5              What do you mean by that, who were you driving

6  around?

7  A    Mainly, it was girls that were coming to the studio.

8  Q    And where would you be driving some of these girls who

9  came to the studio?

10  A    Like, where were they when I picked them up?

11  Q    Yes, from where to where would you be driving them?

12  A    Okay, so, airport was -- they could be at the airport

13  from flying in from a different place or they could be

14  somewhere in Chicago.

15  Q    And where would you take these individuals after you

16  picked them up from either the airport or somewhere in

17  Chicago?

18  A    The place where I took them was always different.  So,

19  it -- it could be the studio, the house, or it could be

20  anywhere.  Like, it could be at the mall or a hotel, or

21  oftentimes, like, the tour bus was parked somewhere and I

22  would take them to the tour bus.

23  Q    And what would you do upon taking someone to the tour

24  bus?

25  A    I would let somebody know, either Rob or one of the

1    managers, that the person has arrived.

2    Q    And would the individual then spend time on the tour bus?

3    A    Yeah.

4    Q    What, if any, rules or guidelines or protocols did you

5    understand you were to follow while you were in The Chocolate

6    Factory working for the defendant?

7    A    I mean some of the rules were just, obviously, do your

8    job.  Also, like, I wasn't supposed to be talking to any of

9    the girls or the guests that were in the house.

10            THE COURT:  Can you just speak up just a little bit

11    more?

12            Whether it's talking louder or into the microphone,

13    I just want to make sure everybody can hear you.

14            I'm sorry, go ahead.  You can continue with your

15    answer.

16    A    I forgot the question, sorry.  Can you --

17    Q    That's okay, I'll stop and then we can go back.

18            You testified that you weren't supposed to speak

19    with any of the girls or the other guests, is that correct?

20    A    Yes.

21    Q    Who did you learn that particular rule from?

22    A    Rob, that's one of Rob's rules that -- for us.  And then

23    also, Tom told me that when I started.

24    Q    You're referring to Tom Arnold?

25    A    Yes.

Navarro - direct - Geddes                502

1   Q    And what, if anything, were you supposed to do when the

2   guests were in your presence?

3   A    Like, if -- so, if I'm transporting them somewhere and I

4   was just not supposed to talk to them.

5   Q    You testified that you would transport some of these

6   guests.

7         Who gave you instructions about who to pick up?

8   A    Usually, it was one of the managers; Tom, June Bug,

9   Donnie Lyle or Rob.

10  Q    And once -- when you were bringing one of these guests to

11  the house, to the defendant's house, where would you bring

12  them?

13        You testified that on occasion you brought them to

14  the tour bus.

15        Were there other locations within the house that you

16  would bring these guests on occasion?

17  A    Yeah, so, I would bring them all over, all over the

18  property.  So, it could be into the studios.  It could be

19  upstairs in one of the rooms.  Yeah, pretty much anywhere

20  on -- anywhere on the property.

21  Q    How would you know where to bring a particular person?

22  A    I was given instructions to -- on where they were

23  supposed to go.

24  Q    Who would give you those instructions?

25  A    One of the managers or -- or Rob.

SAM      OCR      RMR      CRR      RPR

Navarro - direct - Geddes                503

1   Q    Were there particular places in the residence where you

2   would more often bring these guests to?

3   A    I mean I don't -- I can't remember.  They would go

4   everywhere.

5   Q    When you say "everywhere," could you explain some of the

6   places specifically where you would bring them, other than the

7   tour bus which you've already identified?

8   A    Yeah, so they could go to the garage, the tent, the log

9   cabin outside, Music 1, log -- or The Cabin studio, the

10  reception area, the game room, the theater, living room,

11  kitchen, any of the -- pretty much any of the rooms in the

12  house.

13  Q    What car would you use when you were picking up and

14  transporting the defendant's guests?

15  A    So, at one point we had like a minivan, but then the

16  minivan broke down so we used -- it could have been one of the

17  SUVs.  But usually we were instructed on which car to take

18  during that particular pickup.

19  Q    And whose cars would you use, would you use your own car

20  or somebody else's?

21  A    Usually, we used Rob's, one of Rob's vehicles.  Every

22  once in a while I would use my personal vehicle, but not that

23  often.

24  Q    Did you ever drive a Chrysler 300?

25  A    Yes.

1    Q    Whose car was that?

2    A    That was Rob's.

3    Q    That was another car used by Rob that you would drive?

4    A    Yes.

5    Q    Once a guest had been -- and let me back up a moment.

6            The guests who you described that you picked up and

7    brought to a particular location within the defendant's

8    residence, generally, who were they?

9    A    Who -- who were the guests who came?

10   Q    I don't mean the particular names, but who were they,

11   what was their relationship, what did you understand the

12   relationship to be with the defendant?

13   A    They were girlfriends of Rob.

14   Q    Once one of the defendant's guests was in a particular

15   room or on a tour bus, what, if any, communications would you

16   have with that guest?

17   A    So, they would call, the guests that were staying on the

18   property would call down to the studio lines.

19   Q    What would be some of the reasons, what would be some of

20   the reasons they would call?

21   A    Oftentimes, it was to talk to Rob or they wanted to order

22   food or they needed stuff, like whatever they needed.

23   Q    Were there other reasons that a defendant might call --

24   excuse me.

25           Were there other reasons that a guest might call?

1  A      So, they would call for food.  They would call to talk to

2  Rob.  Oh, they would request, like, rides sometimes.

3  Q      Rides where?

4  A      Some of them went, like, home to their house, and then

5  some of them wanted rides to -- they would request rides to go

6  meet with Rob wherever he was.

7  Q      What, if anything, would you do when you received a

8  request for a ride from one of the defendant's female guests?

9  A      So, any of the like, requests from any of the guests,

10 we'd have to -- we'd have to run it by one of the managers or

11 run it by Rob.

12 Q      And when you say "run it by" one of the managers or Rob,

13 what do you mean?

14 A      So, to get permission to do it, and then receive -- also

15 receive instructions on what to do with them.

16 Q      What, if anything, do you recall about the manner in

17 which the defendant's female guests were dressed?

18 A      So, you know, if they were going out or going somewhere,

19 like going to the mall to go shopping or going out, they would

20 have, like, I guess just normal clothes.  But then most of the

21 time they -- they were just like lounging in the house

22 somewhere, so they would be in, like, pajamas type of

23 clothing.

24

25             (Continued on the following page.)

A. Navarro - Direct/Ms. Geddes                    506

1   EXAMINATION BY

2   MS. GEDDES:

3   (Continuing.)

4   Q   What was your understanding based on your interactions

5   with these guests in the time that you spent at

6   Olympia Fields working for the defendant?

7           What was your understanding of the rules that

8   some of the defendant's female guests were to follow?

9           MS. BLANK BECKER:  Objection.

10          THE COURT:  Overruled.

11  A   So the question was what were the -- my understanding of

12  the guests' rules?

13  Q   Yes.

14  A   They had to get permission to do most things.  Like,

15  they'd have to call either down to the studio or get ahold of

16  Rob if they wanted anything, like, food or things like that.

17          THE COURT:  How did you know that?  How did you

18  know those were the rules?

19          THE WITNESS:  I was told that.

20  Q   By whom?

21  A   By Rob and by managers.  If anyone called, the rule was,

22  like, if anybody calls for anything, run it by -- ask us

23  first and we'll tell you what to do.

24  Q   What, if anything, did you understand that you should do

25  if a -- if you encountered a female guest outside of the

A. Navarro - Direct/Ms. Geddes          507

1    location or room where that guest had been escorted to?

2    A    I would pretty much just ask them if they needed help or

3    if they were looking for something and then just -- you would

4    also let somebody know.  One of the managers know that the

5    person's out and about.

6    Q    And what, if any, conversations did you have with the

7    defendant about an individual leaving her assigned room?

8    A    The general rule was if they're not where they're

9    supposed to be, then you'd have to call and tell either Rob

10   or whoever is managing at the time.

11   Q    And when you say, if they're not where they're supposed

12   to be, where did you understand they were supposed to be?

13                MS. BLANK BECKER:  Objection.

14                THE COURT:  Overruled.

15   A    So the instructions whenever they were to go to where

16   they were supposed to be, like, for instance, if they're

17   supposed to be in The Cabin recording studio, they weren't

18   supposed to be wandering around.  They weren't supposed to

19   leave that room.  And if they did, then we were instructed to

20   let somebody know.

21                MS. GEDDES:  I'm showing the witness only what's

22   been marked for identification as Government Exhibit 70.

23   Q    Do you recognize the individual shown in Government

24   Exhibit 70?

25   A    Yes.

A. Navarro - Direct/Ms. Geddes          508

1  Q     How do you recognize that individual?

2  A     She was one of the guests that were at the house, the

3  studio.

4  Q     And is that a fair and accurate photograph of one of the

5  guests that was at the studio?

6  A     Yes.

7  Q     Do you recall this particular individual's name?

8  A     It's something with a J.

9        MS. GEDDES:  The Government offers Government

10 Exhibit 70.

11       THE COURT:  Any objection?

12       MS. BLANK BECKER:  No objection.

13       THE COURT:  All right.  That's in evidence.  You

14 can publish it.

15       (Government's Exhibit 70 was received in evidence

16 as of this date.)

17       (The above-referred to exhibit was published to the

18 jury.)

19 Q     Where do you recall seeing the individual shown in

20 Government Exhibit 70?

21 A     Inside the.  House, so she was just there.

22 Q     What, if anything, do you recall about this particular

23 individual?

24 A     I just remember, like, giving her rides.  I think I've

25 picked her up.  I've given her -- picked up food for her as

A. Navarro - Direct/Ms. Geddes          509

1   well and brought it to the house.

2   Q    I think you testified earlier, but tell me if I'm wrong,

3   that you would also bring guests to other locations, bring

4   guests home; is that correct?

5   A    Yes.

6   Q    And how, again, would you know that it was time to bring

7   a particular guest home?

8   A    So if they're at the house, then if they wanted to go

9   somewhere they would call down to the studio to get

10  permission.  So either they would directly talk to Rob to

11  request a ride home, or they would ask us and then we would

12  relay the message to Rob.

13  Q    And what, if anything, do you recall giving to an

14  individual as they were leaving?

15  A    Sometimes, they would get, like, envelopes of money.

16  Q    How would you know to give an envelope of money to a

17  particular individual?

18  A    So either the manager, one of the managers, would

19  instruct -- would give it to me and instruct us to give it to

20  them or Rob would.

21  Q    As part of your -- as part of your job as an assistant,

22  were you ever asked to pick up any medication?

23  A    Yes.

24  Q    Where were you asked to pick up medication from?

25  A    A pharmacy, I think it was Walgreens.  Also, like, I

A. Navarro - Direct/Ms. Geddes                510

1   picked it up from the doctor downtown.

2   Q    Who is the doctor?

3   A    I can't remember his name.

4   Q    Okay.  Who did you understand the medication was for?

5   A    It was for Rob.

6   Q    What kinds of -- did you ever see the types of

7   medications that you picked up?

8   A    Yes.

9   Q    What type of medication do you recall picking up?

10  A    The medication is called Valtrex.

11  Q    You testified earlier about a gate that was outside of

12  the defendant's residence.  What, if any, security did the

13  defendant have in place in addition to that gate?

14  A    There is usually a security guard or a couple of

15  security guards out there in a truck.

16  Q    So where were the security guards stationed?

17  A    At the front of the gate.  They had a vehicle that they

18  would sit in.

19  Q    And what were the security guards -- what did you

20  understand the security guards were responsible for doing?

21  A    They greeted people that would come into the gate and

22  they also would escort people around.  Yeah.  So whenever Rob

23  would go out, there would also be, like, body guards,

24  security people.

25  Q    And I think you testified they would also escort people

A. Navarro - Direct/Ms. Geddes          511

1   from the gate.  How is the gate opened?

2   A    So they had -- the security guards had a gate clicker

3   that would -- they could click it to open the gate.  And then

4   sometimes they would call down to the studio to open the

5   gate.

6   Q    Was there a mechanism from within the studio to open up

7   the gate?

8   A    So it's from the inside of the studio, we had -- we also

9   had another clicker, so we would have to walk outside, go up

10  the stairs, and walk out to the side of the house to click it

11  so the -- it would reach, yeah.

12  Q    So the clicker would have to be within a certain

13  distance from the gate in order for it to be activated?

14  A    Yeah.  So one of the clickers you'd have to go outside

15  to do it, but then there is another one where you could do it

16  from the inside of The Cabin studios so you could point it

17  and it would reach from inside there.

18  Q    While you were at The Chocolate Factory, do you recall a

19  time when someone tried to get through the gates without a

20  guard opening the gate?

21  A    I'm sorry.  Can you repeat the question, please.

22  Q    Yes.  While you were working, at The Chocolate Factory,

23  do you recall an instance where someone was able to get

24  through the gate without the security guards opening the

25  gate?

A. Navarro - Direct/Ms. Geddes          512

1   A    So people -- the gate was usually closed.  Yeah, so

2   people couldn't get in unless they hopped a fence.

3   Q    Did that ever happen?

4   A    Yes, I've seen that happen before.

5   Q    How did you see that happen?  From what vantage point

6   did you see it?

7   A    I saw it from the security camera from the reception

8   desk.

9   Q    And do you recall that happening on one occasion or more

10  than one occasion?

11  A    I've only see that happen once.

12  Q    What do you recall from that particular occasion that

13  you saw that happening?

14  A    So it was two girls that had climbed over the fence and

15  I could see them running across the lawn, the front lawn, and

16  they ran.  I don't know where they ran but they disappeared

17  off the camera.  I guess they hid somewhere.

18  Q    What, if anything, did you do when you saw that happen?

19  A    I called.  At the time, I called one of the managers to

20  let them know what had happened.

21  Q    And can you describe the quality of the footage that you

22  saw?

23  A    It was like black and white footage, security camera.

24  And it was pretty clear, you could see.

25  Q    Did you recognize either of the individuals?

A. Navarro - Direct/Ms. Geddes          513

1    A    Yes.

2    Q    Who did you recognize either of the individuals to be?

3    A    So one of the girls was someone that had been to the

4    house before.

5    Q    What, if anything, do you recall about the ages of those

6    girls?

7              MS. BLANK BECKER:  Objection.

8              THE COURT:  Overruled.  Did you form an impression

9    about how old they were or did you know?

10             THE WITNESS:  Yeah, they looked really young.  The

11   one girl in particular that had been there before just looked

12   pretty young, younger than me.

13   Q    At the time you were working there, how old were you?

14   A    I was in my early 20s.  Like, 21, 22.  Around then.

15   Q    And when you say, "Looked really young," and "Younger

16   than you"?

17             MR. CANNICK:  Objection.

18             THE COURT:  I'm sorry.  Only the lawyer who is

19   doing the cross can make the objection.

20             MR. CANNICK:  I'm sorry.

21             THE COURT:  That's all right.  I take it

22   Ms. Blank Becker is making the objection.

23             MR. CANNICK:  Yes.

24             THE COURT:  The objection is overruled.

25

A. Navarro - Direct/Ms. Geddes                514

1       Go ahead.

2   EXAMINATION BY

3   MS. GEDDES:

4   (Continuing.)

5   Q    When you say that you thought that they looked really

6   young and younger than you, can you be more specific and how

7   old if you formed an impression you believed them to be?

8   A    Back then, I mean, I thought they were like mid-aged

9   teenagers.  Pretty young.

10  Q    And I'm now showing the witness only what's been marked

11  for identification as Government Exhibit 34.

12          Do you recognize 34?

13  A    Yeah.

14  Q    Who is shown in 34?

15  A    That's a picture of me.

16  Q    Is that a fair and accurate photo of you?

17  A    Yeah.

18          MS. GEDDES:  The government offers 34.

19          MS. BLANK BECKER:  No objection.

20          THE COURT:  Okay.  That's in evidence and you can

21  publish it.

22          (Government's Exhibit 34 was previously received in

23  evidence.)

24          (The above-referred to exhibit was published to the

25  jury.)

A. Navarro - Direct/Ms. Geddes                515

1           THE COURT:  How old were you when that picture was

2    taken?

3           THE WITNESS:  Is this my driver's license?  I feel

4    like that's my driver's license.

5    Q     Do you recall how old you were?

6    A     So that was my Illinois driver's license photo, but I

7    had to have been 22 at the time or 23.

8    Q     Is that approximately the time when you were at The

9    Chocolate Factory?

10   A     Yes.

11   Q     Are you aware of parties that were held at the

12   defendant's residence in Olympia Fields?

13   A     Yes.

14   Q     And did you attend those parties?

15   A     I did, yes.

16   Q     What was your role at those parties?  Were you there as

17   a guest or as an employee?

18   A     I was there as an employee.

19   Q     What did you do?

20   A     So there is different types of parties, but a lot of the

21   stuff I did was like stocking the bar because they would, you

22   know, they would have alcohol.  Sometimes, I would bar tend.

23   I would clean, take trash out.  I would, you know, go

24   shopping for the parties, pick stuff up, pick people up as

25   well.

1   Q     Did you learn where the guests would park who were

2   attending parties at Olympia Fields?

3   A     What was the question again.

4   Q     Did you learn where guests would park who were tending

5   parties at Olympia Fields?

6   A     Yeah.  So they either would park on the actual property,

7   or if they ran out of space, they could park, excuse me,

8   there is a hotel down the street.  They could park there.

9   Q     Approximately how far away was the hotel?

10  A     It was really close.  It was like a five-minute drive.

11  Not far at all.

12  Q     How would individuals, how would the guests get from the

13  hotel to the party in Olympia Fields?

14  A     There is different ways.  A tour bus would taxi them

15  back and forth, or they would use any of the vehicles that

16  Rob owned to taxi them back and forth.

17  Q     I'm showing the witness only what's been marked for

18  identification as Government Exhibit 521.

19              Do you recognize 521?

20  A     Yes.

21  Q     What is 521?  What is shown there?

22  A     So that's the Holiday Inn hotel that was down the street

23  from the studio.

24  Q     And what, if anything, happened at the Holiday Inn

25  hotel?

1  A    That's just where people would park.  Sometimes guests

2  would stay there.

3  Q    Is that one of the -- is that a location where guests at

4  a party would park and then be transported to the defendant's

5  residence?

6  A    Yes.

7            MS. GEDDES:  Government offers 521.

8            MS. BLANK BECKER:  No objection, your Honor.

9            THE COURT:  That's in evidence.  You can publish

10  it.

11            (Government's Exhibit 521 was received in evidence

12  as of this date.)

13            (The above-referred to exhibit was published to the

14  jury.)

15  Q    When you were working, were you working for the

16  defendant while the defendant had a court proceeding in

17  Chicago?

18  A    Yes.

19  Q    What was your role?

20  A    So my role while I was with Rob during that was just,

21  like, an assistant.  So I would have to deliver things or

22  pick up food or pick up people.  Yeah, that's pretty much it.

23  Q    What, if anything, would you do with respect to getting

24  to the court proceeding?

25  A    I don't understand the question.

A. Navarro - Direct/Ms. Geddes                518

1   Q    Did you have any role in transporting anybody to the

2   court proceeding?

3              MS. BLANK BECKER:  Objection.

4              THE COURT:  Overruled.

5   A    Yes.

6   Q    What was your role.  What did you do?

7   A    Like, I would drive people either guests or the crew.

8   Q    In what vehicles would you drive people?

9   A    It would be one of Rob's vehicles.  So it could be any

10  of the SUVs or the Chrysler, whichever vehicle was available.

11  Q    And where would you drive people to?

12  A    We would usually meet at -- we would park at a -- there

13  was a park nearby the courthouse.

14  Q    And what, if anything, else was parked in that park?

15              You said you would drive some of the

16  defendant's vehicles.  What, if anything, else would be in

17  that park?

18  A    So there would be a few of his vehicles and his staff.

19  And then the sometimes the tour bus, one of them or two of

20  them, would be there.

21  Q    Did you ever travel with the defendant?

22  A    Yes.

23  Q    For what reason?

24  A    I traveled with him during one of the concert tours that

25  he did.

A. Navarro - Direct/Ms. Geddes                    519

1   Q    Do you recall which tour you traveled with the defendant

2   for?

3   A    I do.  It's called the Double Up Tour.

4   Q    Do you remember when that was?

5   A    2008.

6   Q    What was your role when you traveled with the defendant

7   on the Double Up Tour?

8   A    My role is pretty much the same types of job things that

9   I would do at the studio in Chicago.  So whatever, whatever

10  Rob needed, if he needed food or if he needed things picked

11  up or people picked up, that's what I would do.

12  Q    Were you often in the same location as the defendant?

13  A    During the tour?

14  Q    Yes.

15  A    Yeah.  It's the same place that the tour cities that we

16  were in.

17  Q    What, if anything, did you see being distributed while

18  you were with the defendant on tour?

19  A    Can you say it again.

20  Q    Did you ever see anything being given out to other

21  people while you were on tour?

22  A    Yeah.  There is, there is, like, I guess people would

23  get invites and things to go to after parties.

24  Q    And what are you referring to when you say "invites."

25  What was it that was distributed?

A. Navarro - Direct/Ms. Geddes                 520

1   A    It was, like, Rob's phone number.

2   Q    And how was Rob's phone number distributed?

3   A    Usually, just on a piece of paper that was just handed

4   to the person.

5   Q    And did you have an opportunity to see those pieces of

6   paper?

7   A    Yes.

8   Q    What, if anything, was written on the pieces of paper?

9   A    Just his phone number.

10  Q    Was it a handwritten or typewritten as you recall?

11  A    These were handwritten.

12  Q    And who did you see giving out the defendant's phone

13  number?

14  A    So Tom has done, I've seen Tom Arnold distribute that.

15  Who else?  There was people that was on the tour with us.

16  Yeah, so any of the crew that was with us at the time would

17  do it.

18  Q    And where would you see the defendant's phone number

19  being distributed.  Where would this happen?

20  A    Usually, it was in the crowds at the shows.  So the

21  audience of the show.  Sometimes it was out when we would go

22  out places.  Yeah, they would give it out.

23  Q    In what other places outside of the shows do you recall

24  seeing people give out the defendant's --

25  A    The mall, restaurants.

A. Navarro - Direct/Ms. Geddes          521

1   Q    I want to finish my question for the record.

2            Is that where you would see individuals giving

3   out the defendant's phone number in those locations that you

4   just testified?

5   A    Yes.

6   Q    You testified that you would transport some of the

7   defendant's guests in and around Chicago.  Would you also

8   transport guests while you were working for the defendant on

9   tour outside of Chicago?

10  A    Yes.

11  Q    And did you ever transport guests on longer trips?

12  A    Yes.

13  Q    What do you recall?  Where do you recall transporting a

14  guest on a longer trip?

15  A    So from one of the shows, it was in Alabama.  I can't

16  remember the city, but I think it was Birmingham.  I took

17  someone from, well, I had to stay overnight at that tour

18  stop.  The rest of the crew had left it go to the next city.

19  Q    And where was the next city?

20  A    The next city was in Atlanta.

21  Q    What did you do the following day after you stayed

22  overnight?

23  A    So I was instructed to take a guest and take her from

24  that stop -- from that city in Alabama to Atlanta.

25  Q    And you said you were instructed to take her.  Was it a

A. Navarro - Direct/Ms. Geddes                522

1   female guest?

2   A    Yes.

3   Q    What did you understand the female guest relationship to

4   be to the defendant?

5   A    Just one of Rob's, like, girlfriends that was going to

6   visit him.

7   Q    What, if any, conversation did you have with --

8        MS. GEDDES:  Well, let me withdraw that question.

9   Q    How long is the drive from where you were in Alabama to

10  where you brought this female guest in Atlanta?

11  A    It was long.  I don't know.  I don't remember, like.

12  Q    More than a few hours?

13  A    Yeah.

14  Q    What, if any, conversation did you have with the female

15  guest during that trip?

16  A    There was no conversations.

17  Q    Why not?

18       MR. CANNICK:  Objection.

19       THE COURT:  Is there a reason why you didn't speak

20  to the woman you were -- the girl -- whatever, the female

21  that you were driving.

22       THE WITNESS:  Yeah, we were instructed to not talk

23  to anybody, any of the females.

24       THE COURT:  Okay.

25  Q    How were you paid while you were working for the

1  defendant?

2  A    Like, check.

3  Q    How regularly did you receive a paycheck?  Was it on a

4  regular basis?

5  A    Yeah, it was like weekly or biweekly.  I can't remember

6  how.  But it was, like, weekly.

7  Q    Do you recall whose name was listed on the paycheck as

8  the payor?

9  A    Yeah, it was Bass Productions.

10  Q    And what did you understand Bass Productions to be?

11  A    That was the company, like, the -- I guess, the

12  corporate entity of the recording studio, the business.

13  Q    Was there ever a time when you were, in fact, working

14  for the defendant when you were not paid for the time that

15  you worked for the defendant?

16  A    Yeah.  So when I first started as an intern there, I

17  wasn't paid.

18  Q    Aside from the time when you went on as an intern, was

19  there a time when you believed that you were going to get

20  paid but, ultimately, you were not paid for the time that you

21  worked?

22  A    Yes.

23  Q    Why did you understand that you were not paid?

24  A    So it was an overtime.

25  Q    So aside from the overtime, was there another time when

A. Navarro - Direct/Ms. Geddes                    524

1  you expected to be paid but your Honor not paid?

2  A    Yeah.  Yeah.

3  Q    What happened?

4  A    I was fined.

5  Q    By whom?

6  A    By Rob.

7  Q    And when you say fined what do you mean?

8  A    So you know when, like, an NBA player gets fined for, I

9  guess, breaking a rule and they, like, deduct their pay as a

10  penalty, that's what it was.

11  Q    And do you recall why you were fined and not paid for

12  time that you worked?

13  A    I can't remember why.  It was something trivial that, I

14  don't know.

15  Q    When you say "trivial," what are you referring to?

16  A    Just.

17        MS. BLANK BECKER:  Objection.  He said he doesn't

18  remember.

19        THE COURT:  Overruled.

20        THE WITNESS:  Yeah.

21        THE COURT:  Why did you call it trivial?

22        THE WITNESS:  Well, it was just something stupid

23  that didn't make any sense.  That's what I meant.  Didn't

24  seem like a valid reason to be penalized your pay for doing

25  this.  I just don't remember what I did.

A. Navarro - Direct/Ms. Geddes                525

1          THE COURT:  When you say you got fined, did that

2    mean that you didn't get paid at all, or that a portion of

3    your pay was -- that you didn't get a portion of the pay.

4          THE WITNESS:  At the time, I remember the fine -- I

5    can't remember if it was my whole check or if it was partial

6    of the check.

7          THE COURT:  Okay.  Go ahead.

8    Q    You testified earlier that you received checks from Bass

9    Productions.  Who did you understand it be in charge of Bass

10   Productions?

11   A    So Derrel McDavid and then the lady that was, like, the

12   manager of the office that we would talk to her, her name was

13   Shirley.

14   Q    Now, you also mentioned that there was an issue with

15   receiving overtime; is that correct?

16   A    Yes.

17   Q    Did you file a lawsuit against the defendant?

18   A    Yes.

19   Q    And how was that lawsuit resolved?

20   A    I was just compensated.

21   Q    When, in relation to the time that you were working for

22   the defendant was at that lawsuit filed?

23   A    That was after my time.  I wasn't working at the time

24   for the defendant.

25   Q    And the lawsuit that you filed against the defendant,

1   what was the nature of that lawsuit, just very generally

2   speaking, was it related to the overtime dispute?

3   A    Yeah.  So it was just a request to get compensated for

4   some overtime that I did and, you know, I had asked the

5   office for it and they said they didn't want to did it, so I

6   brought a lawsuit.

7   Q    And when you say you had asked the office for it, what

8   office are you referring to?

9   A    Bass Productions.

10  Q    What, if any, contact have you had with the defendant

11  since you filed and resolved that lawsuit?

12  A    There hasn't been any contact.

13          MS. GEDDES:  One moment.

14          (A brief pause in the proceedings was held.)

15          MS. GEDDES:  No further questions.

16          THE COURT:  Okay.  Cross-examination.

17          MS. BLANK BECKER:  Thank you, Judge.

18          THE COURT:  Okay.

19  CROSS-EXAMINATION

20  BY MS. BLANK BECKER:

21  Q    Good morning, Mr. Navarro.  How are you?

22  A    I'm fine.  How are you?

23  Q    I'm good, thank you.

24          Mr. Navarro, my name is Nicole Blank Becker

25  and I'm going to be asking you a bunch of questions.  If one

A. Navarro - Direct/Ms. Geddes                527

1   of them doesn't make sense, or you need me to repeat it, just
2   let me know.  Okay?
3   A    Sure.
4   Q    All right.  Mr. Navarro, my understanding is that you
5   worked for quite some time with Mr. Kelly; is that correct?
6   A    Yes.
7   Q    And you were pretty familiar with Olympia Fields, fair
8   enough?
9   A    Yes.
10  Q    All right.  That's basically -- that was your home base
11  for lack of better words, is that fair to say?
12  A    Yes.
13  Q    All right.  And you were talking about, you were kind of
14  giving us a map, if you would, of the home earlier; is that
15  correct?
16  A    Yes.
17  Q    Okay.  This house would, in your estimation, would you
18  say this is a small house, a huge house, what would you say?
19  A    It was huge.
20  Q    Did you have any, and I know some people aren't good
21  with square feet and so forth, did you have any concept or
22  any idea of how many square feet this house could be?
23  A    No.
24  Q    Huge is the best description, is that fair?
25  A    Yeah, it was a mansion.

A. Navarro - Direct/Ms. Geddes                528

1    Q    Okay.  Mansion.  Thank you.

2                   And the mansion, it was on a main road; is

3    that fair to say?

4    A    The man -- no, it was in, like, a subdivision.

5    Q    Okay.  You know what, I shouldn't have used that type of

6    verbiage.

7                   It was in a subdivision but there wasn't,

8    like, neighbors right next door, they were spread out; is

9    that fair to say?

10   A    There was, yes.  The other houses were, like, because

11   the property was pretty large.  So the neighbors were,

12   like -- they weren't really anywhere nearby, like, you

13   couldn't see the neighbors from the property.

14   Q    Thank you.  And with regards to parking cars when guests

15   would come or individuals who were employees and working at

16   the studio, would they park on the street in the front?

17   A    They would park on the street but like the driveway of

18   the house.

19   Q    Okay.  So you saw the picture of the gate earlier, is

20   that -- do you remember that; is that correct?

21   A    Yes.

22   Q    So when you were saying they would park on the driveway,

23   you're talking past the gate that they could park on that

24   driveway, that part of the driveway to the house; is that

25   correct?

A. Navarro - Direct/Ms. Geddes                    529

1  A    Yeah.  You'd have to -- they would park on the inside of

2  the gate.

3  Q    They weren't typically parking on the outside of the

4  gate, is that true?

5  A    Are you asking me if the staff did that?

6  Q    The guests who were coming and, you know, employees that

7  were parking working in the studio?

8  A    Usually, the guests would be, like, people would park on

9  the inside, yeah.

10  Q    And then when there were big, large parties at Olympia

11  Fields.  That's when it was necessary to sort of, I believe

12  you indicated, there was a tour bus at another location,

13  right?

14  A    Yes.

15  Q    Okay.  And you used the word "tour bus," and I apologize

16  I'm just going to be a little specific.  It wasn't actually a

17  tour bus, it was sort of like a charter bus; is that fair to

18  say?

19  A    No, these are tour buses.  These were the buses they

20  used on tours.

21  Q    Okay.  And, again --

22  A    But I guess that's the actual name of it is a charter

23  bus but I don't know.

24  Q    Okay.  And I apologize.  Let me try and clear that up

25  for you.

A. Navarro - Direct/Ms. Geddes          530

1              The buses that were used to bring the guests

2    over, those were different buses than the tour buses that

3    were used for a long journey for a tour; is that correct?

4    A    No, these were the actual tour buses that you used for

5    tour.

6    Q    That Mr. Kelly would use for the tour?

7    A    Yeah.

8    Q    Got it.  So you've been in those buses; correct?

9    A    Yes.

10   Q    Okay.  And when you're in those buses, did you notice

11   that there were any bedrooms?

12   A    So there is a bedroom, like, in the back of the bus had

13   a room with a bed in it.

14   Q    All right.  And then how about prior to getting to the

15   back of the bus.  Do you remember the bunk beds?

16   A    I don't remember.  I don't know.

17   Q    Did you ever sleep on any of the tour buses?

18   A    Yes.

19   Q    And when you slept on the tour bus, where would you

20   sleep?

21   A    I would sleep in the bunks that were on the bus.

22   Q    The bunks that you didn't remember out.  So there were

23   bunks on in the bus?

24   A    The bunk.  So the bus when we went on tour there was a

25   different bus.  The staff had separate buses than Rob's

A. Navarro - Direct/Ms. Geddes                    531

1   buses.

2   Q    Okay.  So there were different buses that were used

3   during the tour, isn't that what you just said?

4   A    Yeah there was additional buses that were booked.

5   Q    Okay.  And so you're saying, yes, you would sleep on

6   some of the tour buses.  There were different tour buses than

7   were shuttling the guests; correct?

8   A    I didn't sleep on the -- I didn't sleep on Rob's buses,

9   no.

10  Q    Okay.  You had been on Rob's buses, I'm pretty sure what

11  you just said, right?  You've been on the tour buses?

12  A    Yeah.

13  Q    Which are different -- okay.

14            And that's where, when you were on tour with

15  Mr. Kelly you, too, would sleep in one of the bunk beds on

16  that tour bus, is that correct?

17            MS. GEDDES:  Objection.

18            THE COURT:  It's a little bit confusing.

19            Are you saying that Mr. Kelly's bus did not have

20  bunk beds, correct so far, as far as you recall.

21            THE WITNESS:  I just can't remember if his buses

22  had bunk beds.

23            THE COURT:  But when you were talking about where

24  you and other employees slept, you were talking about a

25  separate bus; is that correct?

A. Navarro - Direct/Ms. Geddes                 532

1          THE WITNESS:  Yeah, there were different buses that

2    they had got and different drivers that came in for that.

3          THE COURT:  For the employees?

4          THE WITNESS:  Right.

5          THE COURT:  Okay.  Next question.

6    EXAMINATION BY

7    MS. BLANK BECKER:

8    (Continuing.)

9    Q    Thank you.  You were aware that there was always a lot

10   of people, for lack of better words, on Mr. Kelly's tour bus;

11   is that fair to say?

12   A    Can you repeat the question.

13   Q    Sure.  When you would go on tour, it sounds as if what

14   you're saying there was different tour buses for different

15   people who were going along with you on the tour, is that

16   true?

17   A    Yeah.

18   Q    And with regards to specifically, Mr. Kelly's tour bus.

19   You'd see people get in and out of the that tour bus; is that

20   fair to say?

21   A    Yes.

22   Q    It wasn't always -- it wasn't just Mr. Kelly getting in

23   and out of the tour bus, is that true?

24   A    On his bus, yes.

25   Q    Okay.  There would be women that would go in and out of

A. Navarro - Direct/Ms. Geddes                533

1    the tour bus, is that true?

2    A    Yes.

3    Q    And maybe men, his friends that were coming along?

4    A    Yes.

5    Q    And ultimately, was there a name for the tour bus that

6    you were on, was there a name for the bus?

7    A    No.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CROSS EXAMINATION

BY MS. BLANK BECKER:   (Continuing)

Q    Who else was on the tour bus with you when you would go
on the tour?

A    So it would be the different people, but like the band,
or not the band but like the other employees that were on the
tour.

Q    Okay.  And were there ever women that were getting on
your bus and staying on the bus perhaps overnight going from
tour to tour?  Excuse me, going from concert to concert?

A    Yes.

Q    And that was a regular thing; is that true?

A    There was a time on the tour where there was a guest on
our bus staying in the bedroom, in the back room of the bus.

Q    So your bus too -- that you would go on with the other
employees, that also had a bedroom in the back; is that
correct?

A    Yes.

Q    So, in other words, to get to that bedroom you had to
pass by the bunks where you had slept and perhaps some of the
other employees; correct?

A    Yes.

Q    Got it.

     And the -- you indicated at one point there may have
been a woman that was on the bus; is that correct?

1    A    Yes.

2    Q    Okay.  And is that -- that wasn't someone that was on the

3    bus the whole time; is that correct?

4    A    Yes.

5    Q    Okay.  And so is it fair to say that maybe at one of the

6    concerts, one of the cities you were in that woman came on to

7    the bus?

8    A    No, it...can you repeat the question?

9    Q    Sure.  Where did the woman come from that was on the bus,

10   do you remember?

11   A    She was one of the dancers of the tour, so...yeah.  I

12   don't remember like where she got on to the bus.

13   Q    Understood.

14        Dancers, they had another tour bus, is that fair to

15   say?

16   A    Yes.

17   Q    And that tour bus for the dancers, they were all females;

18   is that correct?

19   A    The bus for the dancers?

20   Q    Yeah.

21   A    All the dancers were females, yes.

22   Q    Thank you.

23        And on your bus, they were all males; is that

24   correct?

25   A    Yes.

Navarro - cross - Blank Becker                    536

1   Q    Now, these tour buses, they had bathrooms; correct?

2   A    Yes, they did.

3   Q    Locks on the doors on the bathroom?

4   A    Yes.

5   Q    From the inside, the lock was on the inside or on the

6   outside?

7           I know it sounds like a silly question, but I have

8   to ask.

9           In other words, you go into the restroom, you lock

10  it on the inside when you go in?

11  A    Yeah, I think so.  I don't remember that, but -- I don't

12  know.

13  Q    You don't remember thinking, you're going to go in the

14  bathroom someone might walk in?

15  A    Yeah.  The lock was on the inside.

16  Q    Got it.  Thank you.

17          And were there any rules about when you could or

18  couldn't use the bathroom on the tour buses?

19  A    The only rule was like you couldn't take a number two

20  because like it -- you know -- travel with you, and the

21  drivers all get mad.

22  Q    All right.  So maybe, for lack of a better word, it would

23  stink up the place?

24  A    Yeah.  Yeah.

25  Q    And everyone would smell it and there was an issue?

Navarro - cross - Blank Becker                537

1   A     Yeah, you would smell it the whole time.

2   Q     In order to relieve yourself in that manner, were there

3   stops taken if that was necessary?

4   A     Yeah.

5   Q     Okay.  Now, I'd like to move on to Olympia Fields

6   specifically.  And you indicated that you were responsible

7   sometimes to coordinate guests there; correct?

8   A     Yes.

9   Q     Okay.  I would like to go through the process of what

10  would happen when you would bring a guest there.  I believe

11  initially you indicated that once you arrived at Olympia

12  Fields and you had a guest with you, you first obviously had

13  to stop at the gate; is that correct?

14  A     Yes.

15  Q     Okay.  And that's where the security would come to talk

16  to you or you guys did it on the phone?

17        How did that work?

18  A     The -- both ways.  So you could -- the security guard

19  would come out or you would just call.

20  Q     Okay.  And the purpose of having to go through security

21  is to make sure nobody's coming in that's not supposed to be,

22  fair enough?

23  A     Yes.

24  Q     At the time when you were there, Mr. Kelly, for lack of a

25  better word, was a celebrity; is that correct?

1   A    Yes.

2   Q    He had security guards; correct?

3   A    Yes.

4   Q    And he -- part of the role and the -- strike that.

5        Part of the reason that individuals were stopped was

6   to make sure he was safe in his own home, is that fair?

7   A    Yes.

8   Q    When you would get and see security and/or by the phone

9   or in person, the security had another role, which was they

10  check IDs, is that fair to say?

11  A    Yes.

12  Q    So, specifically, they would check and make sure it's the

13  person's name that's supposed to be there; is that correct?

14  A    I don't know.

15  Q    Okay.  So you have no idea why the guests that you would

16  bring to Olympia Fields had to give their ID to the security?

17            MS. GEDDES:  Objection.

18            THE COURT:  Why don't you rephrase the question.

19            MS. BLANK BECKER:  Sure.

20  Q    You saw the guests that were in the vehicle that you were

21  bringing -- you saw those guests hand over an ID; is that

22  correct?

23  A    When I brought people over, no, they -- the only time

24  I've seen them check IDs were at parties.

25  Q    Okay.  You never saw the security check an ID at the

Navarro - cross - Blank Becker                    539

1   front gate?

2   A    Well, actually, yes.  Never mind.  I have.  I have seen

3   that.

4   Q    Thank you.

5        And after they would do a check of the person's ID,

6   do you also remember then they would have those individuals

7   sign nondisclosures?

8   A    Yes.

9   Q    And the nondisclosure would be handed over and then the

10  guest would choose to sign it or not sign it; is that correct?

11  A    Yes.

12  Q    All right.  And then after that part, that's when

13  security and/or yourself would escort the person to the home?

14  A    Yes.

15  Q    And then eventually bring the person into the home, is

16  that true?

17  A    Yeah.  So, security check point and then they were given

18  instructions on where to take them.

19  Q    Great.

20       Now, you indicated well -- strike that.

21       The first thing that they would do is you indicated

22  there was sort of like a separate entrance instead of the

23  front entrance to get in to go to the studio, is that fair to

24  say?

25  A    Yes.

1    Q    Okay.  And when you would enter through that second

2    entrance and go to the studio, you didn't have to walk through

3    the home; is that correct?

4    A    No, this was -- that second entrance, no, that was not

5    through the home.

6    Q    And take us through when you open the door, you come in

7    and take us from that point then to the front desk?  What

8    happened?

9              Is it immediately there you're at the front desk?

10             Tell us about that.

11   A    So when you're going into the basement to get into the

12   studio, as soon as you walk in, the front desk is the first

13   thing on your left.

14   Q    Got it.

15             Now, oftentimes you would be seated at the

16   receptionist desk?

17   A    Yes.

18   Q    All right.  So if a guest came and you were not the one

19   who picked up the guest, is it fair to say sometimes they came

20   themselves to the studio and you didn't have to pick them up?

21   A    Yes.

22   Q    Okay.  In fact, were Ubers often used, and, you know,

23   obviously you didn't have to drive anyone anywhere?

24   A    Hmm.

25   Q    And I said Uber.  Maybe it was a cab back at that time.

1   A    Yeah, I don't think Uber was around then.

2   Q    Yes.  Sorry.

3   A    Taxicabs would.  Sometimes people had their own cars as

4   well.

5   Q    In their own cars.  Got it.

6         So I take it it's fair to say they're driving their

7   own car, they're catching a cab?  No one is directing them to

8   the house?

9         In other words, you didn't have -- I believe earlier

10  you were saying that you had directions of what to do once you

11  picked up a guest; correct?

12  A    Yep.

13  Q    Okay.  I'm going to move forward.  All right.

14        So, someone comes into Olympia Fields.  They come

15  down stairs and the first thing is the desk to the left;

16  correct?

17  A    Yes.

18  Q    The front desk, I believe you referred to it, or I

19  referred to it as; right?

20  A    Yes.

21  Q    All right.  What else was in that area?  Were there some

22  couches and so forth?

23  A    In the front area of the reception?

24  Q    Yes.  Yes.

25  A    So there's a couch.  There's a TV.  There was a like a

1    kitchen.  There's a kitchen.

2    Q    Okay.  Now, not to sound silly, but the kitchen, did that

3    have food in it?  Was there food in there?

4    A    There is a fridge, but there was usually not food in

5    there.  There was usually drinks.  Sometimes we would have

6    our, like, lunch, we would store it in there, but there wasn't

7    like stuff to eat.  I mean, sometimes there was groceries in

8    there, but -- I guess yeah,  there was food in there.

9    Q    Thank you.

10           And when guests would come to the studio there, was

11   it like immediately they'd go see whomever there were there

12   for or sometimes you would have them actually hang out there

13   at the couch and wait?

14   A    Yes, sometimes they would wait.

15   Q    When I use the word wait, maybe that's why you hesitated.

16           THE COURT:  Could you just put a question to the

17   witness, please.

18           MS. BLANK BECKER:  Of course, Judge.

19           THE COURT:  Thanks.

20   Q    Sometimes they would wait not just for a couple of

21   minutes, but maybe hours, is that fair to say?

22   A    Sometimes, yes.

23   Q    And when they were waiting there for hours, they could

24   get up and leave if they wanted to; right?  Go back out the

25   door they came in?

Navarro - cross - Blank Becker                543

1   A    Yes.

2   Q    All right.  Sometimes guests would wait for days, is that

3   true?  Like stay overnight waiting; is that true?

4   A    Yes.

5   Q    Again, they could have left if they wanted to?

6   A    Yes.

7   Q    Now, the next thing that happened when someone came to

8   the studio is soon as someone was there you would call the

9   office and/or call Mr. Kelly or Mr. Arnold or whomever and let

10  them know that a guest had arrived, is that fair to say?

11  A    Yes.

12  Q    Did you -- strike that.

13       You didn't know where the guest was supposed to be

14  hanging out or if they were coming to sing for Mr. Kelly?  You

15  didn't know those details, is that fair to say?

16  A    The details of why they're visiting, is that what you're

17  asking?

18  Q    Yes.  Sorry.  Yes.

19  A    No.

20  Q    Because you said to us earlier you weren't even allowed

21  to speak to them; correct?

22  A    Yes.

23  Q    Obviously you could -- pleasantries, so forth, but their

24  actual purpose for being at the house, at the studio, that

25  wasn't for your -- that wasn't conversation for you; is that

1  correct?

2  A    I was only instructed on what to do with that person, so

3  they didn't tell me why they were here.

4  Q    Okay.

5  A    Sometimes.  Sometimes, I mean, if there would be someone

6  that's recording and they would tell me to bring them to the

7  studio or something like that.

8  Q    Okay.  So, basically, you did your job, is that fair to

9  say, with regards to you would find out when a guest gets

10  there where the guest was supposed to go?

11  A    Yeah.

12  Q    And, ultimately, I believe you indicated that wherever

13  you were told the guest should go, you would then take the

14  guest to that place; is that correct?

15  A    Yes.

16  Q    And I believe you also said it was oftentimes throughout

17  the entire house, it wasn't one specific place; is that

18  correct?

19  A    Yes.

20  Q    In fact, you took them -- you would take them on that

21  level, which is the basement level, maybe to different

22  studios, is that fair to say?

23  A    Yes.

24  Q    And then on the main floor, you indicated there was a

25  game room and such, sometimes you took them there; is that

1    right?

2    A    Yes.

3    Q    And the top floor of the house where there were bedrooms,

4    sometimes you went up there; correct?

5    A    Yes.

6    Q    Okay.  Now, I'm going to start at the top floor.

7         You indicated there was a number of bedrooms, plus

8    there was a master bedroom; is that correct?

9    A    Yes.

10   Q    All right.  The number of bedrooms, do you remember that

11   each one of those bedrooms had a bathroom?

12   A    I know the master bedroom had a bathroom, but I don't

13   remember if the other bedrooms had bathrooms in it.

14   Q    Fair enough.  If you don't remember, I want you to say I

15   don't remember.

16        This is a mansion that we are talking about; right?

17   A    Yes.

18   Q    The Olympia Fields mansion?

19   A    Yes.

20        MS. GEDDES:  Objection.

21        THE COURT:  Objection?  Overruled.

22   Q    Now, you indicated something about the fact that you

23   recall in the master bedroom seeing a camera with a tripod;

24   correct?

25   A    Yes.

Navarro - cross - Blank Becker                    546

1   Q    Prior to coming into court today, you spoke with the
2   Government; correct?
3   A    Yes.
4   Q    And you kind of went over everything that you might
5   testify about; correct?
6   A    Yes.
7   Q    And there was certain things that you probably didn't
8   remember because it's so long ago, is that fair to say?
9   A    Yes.
10  Q    And they helped you remember those things, is that fair
11  to say?
12  A    Yes.  Going -- just talking over it several times kind
13  of.
14  Q    Talking it over several times?
15  A    Yeah.
16  Q    Okay.  And then the more you talked the more things would
17  be discussed about specific facts; correct?
18  A    Yes.
19  Q    And they even showed you pictures in that meeting; is
20  that correct?
21  A    Yes.
22  Q    Most recently, they even showed you the picture that you
23  identified today as someone with the name J, they showed you
24  that picture; right?
25  A    Yes.

Proceedings                                              547

1           THE COURT:  I'm going to -- we are going to have to

2   take a break at this point.

3           MS. BLANK BECKER:  Okay.

4           THE COURT:  It's time for a morning break.  I also

5   have another matter to handle.

6           Ladies and gentlemen, I am going to excuse you.  It

7   will probably take about 15 minutes.  Please don't talk about

8   the case.

9           We will see you in a few minutes.  All right.  Thank

10  you so much.

11          THE COURTROOM DEPUTY:  All rise.

12          (Jury exits the courtroom.)

13          THE COURT:  Okay, the witness can step down and we

14  will be back here, let's say, 11:40.

15          MR. CANNICK:  Your Honor, do we have to clear our

16  stuff?

17          THE COURT:  No, it's a telephone conference.

18          (Recess taken.)

19          (In open court - jury not present.)

20          THE COURTROOM DEPUTY:  All rise.

21          THE COURT:  You could all have a seat.

22          MS. GEDDES:  Your Honor, should we bring in the

23  witness.

24          THE COURT:  I'm sorry?

25          MS. GEDDES:  Your Honor, should we bring in the

```
                    Navarro - cross - Blank Becker              548
```

 1   witness.

 2          (Witness takes stand.)

 3          THE COURT:  All right.  Are we ready for the jurors?

 4          MS. GEDDES:  Yes, Judge.

 5          THE COURT:  The other witness is going to be after

 6   lunch; correct?

 7          MS. GEDDES:  Definitely.

 8          THE COURTROOM DEPUTY:  All rise.

 9          (The jury enters the courtroom.)

10          THE COURT:  You may be seated.

11          Okay, folks, I apologize.  That took a little

12   longer.  This other matter that I had that people were just

13   too chatty.  But we are ready to continue with the

14   cross-examination of the witness.

15          THE COURTROOM DEPUTY:  The witness is reminded he is

16   still under oath.

17          THE WITNESS:  Yes.

18          THE COURT:  Go ahead, counsel.

19          MS. BLANK BECKER:  Thank you, Judge.

20   CROSS-EXAMINATION (Continuing)

21   BY MS. BLANK BECKER:

22   Q    Mr. Navarro, we left off discussing a number of things

23   with the studio and what would happen when the guests arrived.

24          Do you recall that?

25   A    Yes.

1   Q    Okay.  Another thing that would happen when the guests

2   arrived at the front desk is you were responsible, or whomever

3   was at the front desk, to scan or copy their ID; correct?

4   A    That usually wasn't my responsibility, no.

5   Q    Okay.  So that was someone else's responsibility to do?

6   A    Yes.

7   Q    At the front desk?

8   A    Yes.

9   Q    Whenever a new guest would arrive?

10  A    Yes.

11  Q    So that would be -- if my math is correct, that would be

12  two checks of their IDs, once from security and then once when

13  they are actually inside the house, the studio, is that fair

14  to say?

15  A    Are you asking about security checks?

16  Q    You know what, I'm going to move forward because we

17  already went through that and I don't want to belabor.  Thank

18  you.

19          Let's talk about some of your duties, some of your

20  role -- your job description, okay.

21          My understanding is one of the things -- you

22  indicated that you were an intern initially; correct?

23  A    Yes.

24  Q    And then you were paid?

25  A    Yes.

Navarro - cross - Blank Becker                550

1   Q    All right.  Part of your job, though, is you kind of had

2   to do the things that maybe nobody else wanted to do, so to

3   speak, is that fair to say?

4   A    Yes.

5   Q    And that included, I think you said earlier, cleaning;

6   correct?

7   A    Yes.

8   Q    And when you would have to clean, is it fair to say that

9   times when you would clean some of these rooms the odor would

10  be pretty bad?

11  A    Yes.

12  Q    And is that the kind of smell that you have told the

13  Government that is like sort of resonated in your head, that

14  you can't forget it?

15  A    Yes.

16  Q    You never saw any buckets of urine anywhere in the house

17  when you were cleaning, did you?

18  A    No.

19  Q    You never saw any buckets with feces, did you?

20  A    No.

21  Q    You never picked up a bucket and thought it smelled so

22  awful and the smell that you remembered was that of urine;

23  correct?

24  A    No.

25  Q    Now, when you would have to clean, another thing you

1   would often see is condoms or boxes of condoms, is that fair

2   to say?

3   A    Whenever I cleaned, I don't remember seeing stuff like

4   that.

5   Q    Okay.  Let me change that then.

6        You remember that you would see boxes of condoms all

7   over the studio?

8   A    No.

9   Q    So you remember that earlier we talked a little bit about

10  how you had spoke to the Government prior to today; correct?

11  A    Yes.

12  Q    And you actually had spoke to him -- excuse me, spoke to

13  them for the first time back in February 2nd of 2020; is that

14  correct?

15  A    Yeah, I think so.

16  Q    Okay.  You talked to them -- you for sure talked to them

17  once; right?

18  A    Yes.

19  Q    You for sure talked to them twice; right?

20  A    Yes.

21  Q    Do you remember talking to them a third time?

22  A    Last -- the other day.

23  Q    I'm sorry, the other day, you remember?

24  A    Yes.

25  Q    I'm sorry.  I'm not trying to trip up.  I'm just trying

1   to understand.  The other day.

2          Now, is it possible in one of those conversations

3   that you had with them that you told them that you remember

4   seeing boxes of condoms?

5   A    It's possible, yes, it's possible.

6   Q    All right.  And when you would go -- and I believe -- I'm

7   going to move on to another duty, so to speak.

8          You indicated that you would go and you would get

9   food sometimes.  That was happening, what?  Daily?

10  A    Yes.

11  Q    And the food that you would get, that food would be for

12  staff members, is that true?

13  A    Yeah.  Yep.

14  Q    Okay.  There was no Uber Eats or anything like that at

15  the time; is that correct?

16  A    No, not at the time, pizza delivery.

17  Q    I'm sorry?

18  A    Well, there was pizza delivery.  I think that was the

19  only thing that delivered.

20  Q    Who delivered often to the studio, is that fair to say

21  too?

22  A    There was -- yeah, we had a lot of pizza come in.

23  Q    Isn't it fair to say as well that food was around a lot

24  there at the studio?  That was a common thing for Mr. Kelly

25  and/or any of the staff to ask you to get food?

Navarro - cross - Blank Becker                    553

1   A    Yeah, it was daily thing.

2   Q    Now, not only did you get food -- and I believe you

3   indicated this a little bit earlier, not only did you get food

4   for staff and Mr. Kelly, but for any of the guests that were

5   there as well, that was part of your role?

6   A    Yes.

7   Q    And the way you would know what those guests wanted is

8   they'd call and tell you; correct?

9   A    Yes.

10  Q    All right.  And then -- strike that.

11          When they would call you and tell you they're hungry

12  and they wanted food, you didn't just hang up on them and say,

13  no, you can't have food, did you?

14  A    No.

15  Q    Okay.  And then, I believe you indicated that in order

16  for them to get the food, you had -- you had asked someone,

17  you know, is this okay, this is what they're requesting, is

18  that fair to say?

19  A    Yes.

20  Q    All right.  So you weren't allowed to just go get someone

21  lobster and steak every day, is that true?

22  A    Correct.

23  Q    There was like a budget, is that fair to say?

24  A    Yeah.  I mean, yeah.

25  Q    Not that you were in charge of the budget, but the

1   purpose -- one of the purposes for calling someone else is you

2   needed money to pay for it, is that fair to say?

3   A    Yes.

4   Q    And you always got like a receipt from whatever food you

5   went and picked up, is that fair to say?  For the most part, I

6   should say.

7   A    I don't remember needing receipts, no.

8   Q    Okay.  So how was it that you would sort of report back

9   as to how much money was actually spent for the times you

10  would go get food?

11  A    I didn't.

12  Q    You never wrote that down?

13  A    I don't remember writing that down.  I know -- so there

14  is a petty cash drawer that had like a till, but I don't

15  remember if we had to write it down there.

16  Q    Okay.  But ultimately you could use the petty cash that

17  was supplied obviously by someone, not you, is that fair to

18  say?

19  A    Yes.

20  Q    All right.  Now, another one of your duties is you would

21  run errands for either the staff, Mr. Kelly, or any guest; is

22  that true?

23  A    Yes.

24  Q    And one of the things I believe you indicated that you

25  did is you would go to Walgreens and pick up prescriptions,

1   you said; right?

2   A    Yes.

3   Q    Okay.  But that's not the only thing you would pick up at

4   Walgreens; right?

5   A    I -- I think -- yeah, I picked up other things from

6   there.

7   Q    Like tampons?

8   A    Yes.

9   Q    Pads, maxi pads for women?

10  A    Yep, yep.

11  Q    In fact, sometimes you had lists from the guests of

12  things that they needed and you would go to the drugstore and

13  grab them for them?

14  A    Yeah.  There was always a list of things to get that came

15  from -- not specifically the guests but from Diana -- Diane,

16  which was somebody in the house.

17  Q    So let me just understand that a little bit more.

18       You said the list would come from Diana.  Diana,

19  that was one of the assistants for Mr. Kelly; correct?

20  A    Yes.  Diana.

21  Q    And Mr. Kelly -- excuse me, Diana, for lack of a better

22  word, she was the go-between for guests sometimes with you and

23  other employees, is that true?

24  A    She was just like I guess the assistant to R. Kelly,

25  so...she was like a house manager, did things, yeah.

1   Q    Okay.  So as the assistant, are you saying that sometimes

2   she would give you the list of things that the girls had --

3   excuse me, that the women had asked for?  Is that what you're

4   saying?

5   A    I didn't specifically know who the list was for, but

6   there was always a shopping list of things to get.

7   Q    Okay.  So this -- and I'm not trying to bog you down on

8   the details of that, but the shopping list that you're talking

9   about, this is something that you'd received and then you'd go

10  and get what you would had to get and you'd bring it back,

11  true?

12  A    True.

13  Q    Got it.  Thank you.

14         Now, when your job title changed a little bit from

15  intern to -- and I apologize, were you like assistant

16  engineer?  Is that what you said?  What was the name?

17  A    Like a general assistant.

18  Q    General assistant.

19  A    Runner is what they called it.

20  Q    Sorry?

21  A    The title is runner --

22  Q    Runner.

23  A    -- which is a general assistant.

24  Q    Okay.  And that title runner, is that the only time

25  you've heard that word used in the music industry or is that a

1    pretty common thing that's -- word that's used for --

2    A    It's a common thing in the music industry.

3    Q    Okay.  And speaking of common words, when you would be at

4    the studio or around Mr. Kelly or around the guests, they --

5    they being the guests, would refer to Mr. Kelly as Mr. Kelly,

6    is that fair to say?

7    A    Yes.

8    Q    You never heard them refer to him as daddy; correct?

9    A    I've heard of that, yes.

10   Q    So you've heard that coming from whom?

11   A    Guests.

12   Q    Guests.  Okay.

13        And when you heard that word coming from guests, the

14   context of it, were they telling you -- strike that.

15        What was the context of them using that word?

16   A    In conversation, so....

17   Q    With you?

18   A    No, with -- with Rob.

19   Q    So you would be present for conversations between Mr.

20   Kelly and his guests?

21   A    Sometimes, yeah.

22   Q    And, so, the context -- strike that.

23        Would you describe when the guest would use the word

24   daddy as a negative connotation or a positive connotation, if

25   you know?

Navarro - cross - Blank Becker                558

1          MS. GEDDES:  Objection.

2          THE COURT:  Sustained as to form.

3    Q    So remember when you talked to the Government on at least

4    three other occasions that we've established?  Remember that?

5    You said at least three other times; right?

6    A    Yes.

7    Q    You never told them anything about the word daddy, did

8    you?

9    A    I don't remember, no.

10   Q    And the word daddy, fair enough to say it's often used as

11   a term of endearment?

12         MS. GEDDES:  Objection.

13         THE COURT:  Overruled.

14         You can answer.  Do you have an answer for that?

15         THE WITNESS:  I don't know what that means,

16   "endearment."

17   Q    Sorry.  In a somewhat positive way as opposed to in a

18   nasty, negative way.

19         THE COURT:  Okay, that I will sustain.

20   Q    You tell us what -- how -- when you would hear the word

21   daddy, how did that make you feel?  What were you seeing?

22   A    It was I guess more --

23   Q    The demeanor.  Sorry.  That's the word I'm looking for.

24   A    Okay.

25         THE COURT:  I do not understand the question.  I'm

1    sorry.

2              Would you repeat the question to the witness?

3              MS. BLANK BECKER:  Judge, I'm just going to move on.

4    Thank you.

5              THE COURT:  Okay.

6    Q    All right.  So when you were working at the studio, I

7    believe you indicated, or I'm not sure it was even discussed,

8    but you yourself had a -- oh, yeah,  it was -- a

9    non-disclosure; correct?

10   A    Yes.

11   Q    You signed that right at the beginning when you started

12   working there; correct?

13   A    Yes.

14   Q    Not a big deal, common thing to do in the musician world,

15   is that fair?

16   A    Yes.

17   Q    And at some point I believe you indicated that you were

18   working throughout the night, like 9:00 to 9:00, is that true?

19   A    Yes.

20   Q    And then there were times you started to work even during

21   the day; correct?

22   A    Yes.

23   Q    You were working a lot of hours, fair to say?

24   A    Yes.

25   Q    All right.  In fact, there was always things that needed

Navarro - cross - Blank Becker                    560

1   to be done there at the studio, is that fair to say?

2   A    Yes.

3   Q    And you didn't have all the burden of doing everything on

4   your shoulders, you guys sort of worked as a team, is that

5   fair to say?

6   A    Yes.

7   Q    Okay.  And if there was something that needed to be done

8   and someone else would who normally be in that role, you would

9   help out or vice versa, is that fair to say?

10  A    Yes.

11  Q    Okay.  And in all the hours that you were at the studio,

12  Mr. Kelly, for the most part, was working, is that true?

13  A    Yes.  Is that fair to say.

14  Q    Mr. Kelly was also known to work throughout the evening

15  hours; is that correct?

16  A    Yes.

17  Q    And he had the engineers in the studios oftentimes

18  working with him doing that as well, fair to say?

19  A    Yes.

20  Q    And that was also going on sometimes through the entire

21  day; true?

22  A    Yes.

23  Q    Now, you're aware that Mr. Kelly couldn't read or write;

24  is that correct?

25  A    I was aware that he -- I was told that he couldn't read,

1   but I'm not sure about the writing thing.

2   Q    Okay.  He never wrote any letters to you or anything like

3   that, is that true?

4   A    I did not receive any letters, no, from him.

5   Q    Thank you.

6          So there -- when Mr. Kelly was working in the

7   studio, you've been in the studio when he's been working, fair

8   to say?

9   A    Yes.

10  Q    Okay.  And one of the ways that Mr. Kelly does his work

11  is by getting melodies or songs and he would tape it?  And,

12  again, I apologize, I'm probably not using the right verbiage,

13  but make a recording there in the studio, is that true?

14         MS. GEDDES:  Objection.

15         THE COURT:  Sustained.

16  Q    Did you ever see Mr. Kelly make a recording of a song in

17  the studio?

18         MS. GEDDES:  Objection.

19         THE COURT:  Sustained.

20  Q    Was there ever singing going on when you were in the

21  studio?

22         MS. GEDDES:  Objection.

23         THE COURT:  Overruled.

24  A    Yes.

25  Q    And were there engineers actively working in concert with

1   Mr. Kelly when that was happening?

2   A    Yes.

3   Q    How many engineers would you say there was given at one

4   time?

5   A    Are you asking about the sessions with Rob?

6   Q    Yes.  Thank you.

7   A    Usually it's one engineer and then one assistant.

8   Q    And one assistant?

9   A    And then there might be the musical director would be

10  there or musicians or other producers.

11  Q    I'm sorry, I didn't hear the last thing you just said.

12  A    There could be other musicians or producers there as

13  well.

14  Q    And sometimes those individuals would be there for hours

15  and hours and hours too; is that correct?

16  A    Yes.

17  Q    And speaking of other musicians, Mr. Navarro, is it fair

18  to say that there was some larger than life musicians that

19  showed up at the studio sometimes?

20  A    Yes.

21  Q    Okay.  Whitney Houston?

22       MS. GEDDES:  Objection.

23       THE COURT:  Sustained.

24  Q    So when the larger than life celebrities would show up at

25  the studio, they would come with their own security; is that

Navarro - cross - Blank Becker                    563

1   correct?  Sometimes?

2            THE COURT:  Do you know?

3            THE WITNESS:  I don't remember.

4   Q    Okay.  When celebrities would come to the studio, is it

5   fair to say that oftentimes guests or whomever was at the

6   location they had to sort of stay where they were and not

7   interact with the celebrities and whoever else they brought

8   with them?

9   A    The guests --

10  Q    Yes.

11  A    -- in the house?

12           I don't remember them being around in the sessions,

13  but -- well, yeah, I guess they were around in the studios

14  sometimes, but I don't remember any kind of interaction

15  between the guests and the people that came in.

16  Q    Okay.  So at this point I'm just asking about the

17  celebrities, when they would come there.

18  A    Okay.

19           THE COURT:  You should really only answer the

20  question if you know the answer to it, okay?  If you don't

21  know, say you don't know.

22           THE WITNESS:  Okay.

23  A    I don't know.

24  Q    Okay.  So let's now discuss -- we're going to...you

25  talked about different cars that you've had to drive when you

1   would go pick up any guest; correct?

2   A    Yes.

3   Q    And you listed a couple different vehicles.  You never

4   drove a black Range Rover, did you?

5   A    No.

6   Q    Do you remember even seeing a black Range Rover as a

7   vehicle that Mr. Kelly had?

8   A    No.

9   Q    And you drove a bunch of the different cars that were

10  there; right?

11  A    Yes.

12  Q    Including a Maybach?

13  A    Yes.

14  Q    All right.  So if there was a black Range Rover there,

15  you would know about it?

16  A    Yes.

17  Q    Now, you indicated there was a number of different guests

18  that you would pick up, maybe you would have to pick them up

19  at a train station ever?

20  A    Yes.

21  Q    Airport?

22  A    Yes.

23  Q    Hotels?

24  A    Yes.

25  Q    And when you would pick up these guests, none of them

1   appeared to be under age to you; is that correct?

2   A    Yes.

3   Q    So if you picked up someone at the train station and

4   brought them to the house, that person seemed to be sort of

5   maybe around your age at the time, 21, 22; is that fair to

6   say?

7            THE COURT:  Who are we talking about being picked

8   up?  Just anyone?

9            I just want to understand the question.

10           MS. BLANK BECKER:  Okay.

11           THE COURT:  Is there a particular person to whom

12   you're referring?

13           MS. BLANK BECKER:  Sure.  Thank you, Judge.

14           THE COURT:  Yes.

15   Q    When you would pick up the female guests, did they appear

16   to be around the same age as you at the time, 21, 22?

17   A    Yes.

18   Q    And when you -- you indicated you would pick up guests at

19   the train; correct?

20   A    Yes.

21   Q    Okay.  And you remember having to pick up the girl that

22   was in the picture and you said you thought her name started

23   with a J.  Do you remember picking her up at the train?

24   A    I don't, no.

25   Q    You don't remember that; right?

1   A    No.

2   Q    Because if you did remember that, you told us earlier --

3   strike that.

4           You've told us about a camera that caught two

5   younger girls on the property; correct?

6   A    Yes.

7   Q    Okay.  And you indicated those girls looked really young,

8   is that true?

9   A    Yes.

10  Q    You can tell -- I believe you said the camera was pretty

11  clear, right?

12  A    Yes.

13  Q    So you could tell from the camera that those two girls

14  looked super young; right?

15  A    Yes.

16  Q    And you also said that when you watched, you could see

17  them running, I believe you said across the property.  Is that

18  what you said?

19  A    Yes.

20  Q    Okay.  And then you thought maybe that's when -- after

21  that, that's when they maybe hid.  That was your word;

22  correct?

23  A    Yes.

24  Q    Okay.  You don't know if instead of hiding they actually

25  went into the house, is that true?

Navarro - cross - Blank Becker                567

1          THE COURT:  Do you know where they went?  That's the

2    question.

3          MS. BLANK BECKER:  Thank you, Judge.

4    A    I don't know where they went.

5    Q    Okay.  Well, let me ask you this.  You were at the house

6    looking at the security cameras.  That's what you said; right?

7    A    Yes.

8    Q    Okay.  And the security cameras were in the basement?

9    A    Yes.

10   Q    And the security cameras in the basement, you weren't by

11   yourself when the girls -- excuse me -- these two women,

12   girls, jumped over the fence; right?

13   A    No.

14   Q    Bubba, someone by the name of Bubba was there too; right?

15   A    I don't remember if Bubba was there.

16   Q    You don't remember that when you saw these two

17   individuals come into Mr. Kelly's property or come on Mr.

18   Kelly's property, you don't recall seeing -- excuse me, having

19   a conversation with Bubba about what you just saw?

20   A    I don't remember.

21   Q    Okay.  Someone called Mr. Kelly and told him about what

22   you had just seen; correct?

23          MS. GEDDES:  Objection.

24          THE COURT:  Sustained.

25          Unless it was you.  Did you call him?

Navarro - cross - Blank Becker                    568

1          THE WITNESS:  I called somebody.  I don't remember.

2     I don't think it was Rob that I called.  I think it was one --

3     maybe Tom.  Yeah.

4               (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Navarro - cross - Blank Becker                    569

1   EXAMINATION CONTINUES

2   BY MS. BLANK BECKER:

3   Q    Okay.

4   A    I called somebody, though, and told them what was going

5   on.

6   Q    You don't remember Bubba being the one who called someone

7   to figure out what was going on?

8           MS. GEDDES:  Objection.

9           THE COURT:  I'll sustain it as to form.

10          You called someone, you don't remember whom you

11  called, correct?

12          THE WITNESS:  Yeah, just to -- yeah, to tell them

13  that someone had ran onto the property.

14          THE COURT:  Okay.

15          MS. BLANK BECKER:  Judge, may I just have one

16  moment, please?

17          THE COURT:  Sure.

18          (Pause.)

19          MS. BLANK BECKER:  Thank you, Judge.

20  BY MS. BLANK BECKER:

21  Q    You indicated that when you would pick up different

22  guests, oftentimes you were picking up the same guest, like a

23  repeat guest.

24          Is that fair to say?

25  A    Yeah, there was -- yes, there was regulars that came.

                SAM    OCR    RMR    CRR    RPR

Navarro - cross - Blank Becker                    570

1   Q    You never received any calls at the front desk that said

2   that they wanted to leave and they weren't allowed to,

3   correct?

4   A    There's been times where there's people that wanted to

5   leave and they -- they couldn't 'cause either they couldn't

6   get a ride or we couldn't get ahold of Rob.

7   Q    Okay.  These -- these -- these people, they had cell

8   phones as well, correct?

9   A    I don't know.

10  Q    So, are you saying, Mr. Navarro, that if a guest wanted

11  to leave, they couldn't walk out the door?

12  A    No, they -- they could walk out the door.

13  Q    Okay, thank you.

14         MS. BLANK BECKER:  Sorry, Judge, I'm thinking.

15         THE COURT:  That's all right.

16  BY MS. BLANK BECKER:

17  Q    When you saw the different bedrooms -- strike that.

18         Were there bedrooms in the basement level?

19  A    No.

20  Q    Were there bedrooms on the main level?

21  A    Yes.

22  Q    And then upstairs, correct?

23  A    Yes.

24  Q    Okay.  And I believe you indicated for some of the

25  guests, you were the one responsible for sort of taking them

1   to go to different rooms; true?

2   A    Yes.

3   Q    And when you would take them to those rooms, did you need

4   a key to get into the room to open it up for them?

5   A    No.

6   Q    Did you have to unlock something on the outside to allow

7   them to get into the rooms?

8   A    No.

9   Q    For lack of better words, it was a normal kind of

10  doorknob, nothing special about it?

11  A    Yeah, it was just regular doorknobs.

12  Q    Thank you.

13        At some point earlier you were talking about the

14  fact that there was a long hallway, correct, that you had to

15  sort of take guests through?

16  A    Yes.

17  Q    And you said something about platinum plaques?

18  A    Yes.

19  Q    What is that?

20  A    A platinum plaque is, like, a certificate that shows --

21        MS. GEDDES:  Objection.

22        THE COURT:  Overruled.

23        MS. BLANK BECKER:  Thank you.

24        THE COURT:  Overruled.  It's not particularly

25  relevant, but you can answer.

1          THE WITNESS:  Okay.

2    A    It's like a certificate that says you've achieved a

3    certain amount of record sales.  So, like -- kinda like a

4    trophy.

5    Q    Got it, thank you.

6          Now, briefly there was some conversations about the

7    garage of the home, do you remember that, there were some

8    questions and answers about that?

9    A    Yes.

10   Q    All right.  There was -- and you mentioned something

11   about boxing, correct?

12   A    Yes.

13   Q    There was an actual, like, full-sized boxing ring in

14   there, is that correct?

15   A    Yes.

16   Q    Okay.  There wasn't -- you said something about that you

17   remember there was a bed in there, correct?

18   A    Yes.

19   Q    Okay.  What did that bed look like?

20   A    Just like -- just a bed with blankets on it.  It might

21   have been queen sized.

22   Q    Had you ever seen anyone in it?

23   A    I have never seen anyone in it, no.

24   Q    Thank you.

25          In fact, have you ever seen Mr. Kelly in his home or

1   in the studio engaging in sexual activities?

2   A    No.

3           MS. BLANK BECKER:  Again, Judge, I apologize.

4           THE COURT:  That's all right.

5           MS. BLANK BECKER:  Thank you.

6           (Pause.)

7           MS. BLANK BECKER:  Again, Judge, I apologize, I'm

8   trying to speed it up.

9           THE COURT:  It's all right, take your time.

10          MS. BLANK BECKER:  Thank you.

11  BY MS. BLANK BECKER:

12  Q    There were -- there was things that you talked about with

13  regards to getting fined, is that true?

14  A    Yes.

15  Q    And you equated it to, like, a basketball team when

16  individuals get fined on a team, correct?

17  A    Yes.

18  Q    All right.  And typically, the purpose of a fine is

19  because you did something wrong?

20  A    Yes.

21  Q    Okay.  And it didn't have to be the worst penalty in the

22  world, correct, that's what you were saying?

23          MS. GEDDES:  Objection.

24          THE COURT:  I will sustain it as to form.

25          MS. BLANK BECKER:  Sure.

Navarro - cross - Blank Becker                 574

1   BY MS. BLANK BECKER:

2   Q    You indicated that sometimes you thought the fines were

3   for, like, I don't know if this was your exact words, but

4   little things, is that fair to say?

5   A    No.

6   Q    Okay.

7          You thought sometimes you got fined and you

8   shouldn't have, true?

9   A    Yes.

10  Q    All right.  Now, fines are typically, in basketball, if

11  someone breaks the rules they get a fine, right?

12         THE COURT:  Please, just ask the question.  Let's

13  keep the prelude out of it.  Just put a question to the

14  witness.

15  Q    Sometimes basketball players get fined because they did

16  not follow a rule, correct?

17         MS. GEDDES:  Objection.

18         THE COURT:  Sustained.

19  Q    Sometimes employees working with and for Mr. Kelly, they

20  would get fined for not following their job duties, correct?

21  A    Yes.

22  Q    All right.

23         In other words, if someone didn't show up when they

24  were supposed to, fine; true?

25  A    Yes.

1    Q    If someone was late, they'd get fined; true?

2    A    No, I don't -- I don't remember that.

3    Q    Were you ever late?

4    A    Probably, yeah.

5    Q    And you don't remember getting fined?

6    A    No.

7    Q    And this was between the evening hours and the day hours?

8    A    Correct.

9    Q    And the fine didn't come directly from the -- I shouldn't

10   say that.

11        The -- the breaking of a -- you know, not doing your

12   job correctly, if there was going to be a fine, I believe you

13   indicated that was Mr. Arnold sort of followed through on

14   that, is that correct?

15   A    The fine did not come from Mr. Arnold, no.

16   Q    And that was probably a bad question on my part, and I

17   apologize.

18   A    That's okay.

19   Q    Mr. Arnold was someone that would talk to you if there

20   was a fine -- excuse me, if there was something that was done

21   that wasn't supposed to be done, is that true?

22   A    Yeah.

23   Q    Thank you.

24        Had you ever seen the security for Mr. Kelly armed?

25   A    No.

Navarro - cross - Blank Becker                   576

1    Q    You never saw Mr. Kelly armed either, correct?

2    A    Correct.

3    Q    You never saw any physical abuse while you were at the

4    studio, correct?

5    A    No.

6    Q    You never saw any what you would consider verbal abuse

7    while you were at the studio, correct?

8    A    Yes.

9    Q    And yes, you saw verbal abuse?

10            I'm sorry, that probably is a bad question.

11            How about this:  Did you see any verbal abuse when

12   you were there?

13   A    To --

14   Q    Guests?

15   A    -- anybody?

16   Q    Yes, guests?  Did you -- okay, sorry.

17   A    Yeah, yeah, I would see it.

18   Q    You would, you would see verbal abuse?

19   A    Yes.

20   Q    Okay.  So, when you talked to the Government back in

21   February 2nd of 2020, do you remember telling them that you

22   didn't see any physical or verbal abuse at the studio?

23   A    Yes, I remember now, but I guess I just had a memory just

24   now.

25   Q    Oh, so just now you're saying you remembered something

1  about that?

2  A     Yes.

3            THE COURT:  Wait, I am just unclear.

4            You say you remember verbal abuse now, is that what

5  you're saying?

6            THE WITNESS:  Yes.

7            THE COURT:  Okay.

8  BY MS. BLANK BECKER:

9  Q     And when you say you remember verbal abuse, there was

10  times where employees got reprimanded for things that they

11  would do, is that true?

12  A     Yes.

13  Q     Now, you said something, and I'm just about done, you

14  said something about touring, that you would go on some tours

15  with Mr. Kelly, fair enough?

16  A     Yes.

17  Q     More than one or just one?

18  A     I've only been on one.

19  Q     And that tour lasted about how long?

20  A     Three months.

21  Q     As part of that tour, you remember after the concerts

22  there was usually a backstage, everyone would get together

23  backstage afterwards, is that true?

24  A     Yeah, there is a -- yeah, there was a backstage area for

25  the -- for the artists.

1   Q    Okay, for lack of better words, like a green room, is

2   that fair to say?

3   A    Yeah, yeah.

4   Q    Okay.  A common thing with musicians or artists?

5   A    Correct, yes.

6   Q    Okay, got it.

7         And in the green room after the concert that was

8   typically for, like, autographs, true, that was one thing?

9   A    Yeah, that -- they would do meet-and-greets for the fans.

10  Q    Okay, thank you.

11        And fans, sometimes would there be kids with their

12  parents?

13  A    Yeah.

14  Q    And sometimes were there just a lot of women?

15  A    Yes.

16  Q    And there was food back there, is that right?

17  A    Yeah, there is a -- there is food in the backstage areas.

18  Q    Drinks?

19  A    Yes.

20  Q    And did you happen to -- strike that.

21        Were there any -- there was no underage girls back

22  there at the time, correct?

23  A    Yes.

24  Q    In fact, there is an announcement that is made prior to

25  the green room gathering that unless you're over 21, you

Navarro - cross - Blank Becker                579

1    couldn't come backstage unless you had a parent with you; is

2    that true?

3    A    I don't remember.

4    Q    You don't remember, okay.

5         Well, are you familiar, there's a very -- strike

6    that.

7         Are you familiar with the music of Mr. Kelly?

8         MS. GEDDES:  Objection.

9         THE COURT:  Sustained.

10   BY MS. BLANK BECKER:

11   Q    When Mr. Kelly would perform at a concert on stage, were

12   you there?

13   A    Was I at the concert, is that the question?

14   Q    Yes.

15   A    Yes.

16   Q    Thank you.  And at the concert when you would be there,

17   is there a time in his concerts that he would allow for

18   individuals from the audience to come up on the stage?

19   A    I don't remember.

20   Q    How about do you recall whether or not there was -- there

21   was a certain song that he would sing and there would be a

22   sign that someone from --

23        MS. GEDDES:  Objection.

24        THE COURT:  Yes, just put a question to the witness,

25   if you could, not compound.  If you have to do it in more than

1    one, you can do that, but just put a single question to the

2    witness.

3              MS. BLANK BECKER:  Thank you, Judge.

4    BY MS. BLANK BECKER:

5    Q    Do you remember a sign that was sometimes held -- excuse

6    me, that was held by someone on stage?

7    A    No, I don't remember that.

8    Q    So, you don't remember the sign that was paraded sort of

9    back and forth on the stage that said you had to be --

10             MS. GEDDES:  Objection.

11   Q    -- over 21?

12   A    No.

13             THE COURT:  I'll sustain it as to form.

14             Do you remember any signs?

15             THE WITNESS:  No.

16             THE COURT:  Okay, next question.

17             MS. BLANK BECKER:  Got it.  Thank you, Judge.

18   BY MS. BLANK BECKER:

19   Q    Was it your understanding that in order to be backstage,

20   you had to be 21, or over, sorry?

21   A    I don't know what the -- the age thing was for that.

22   Q    Okay.  So, it could have been --

23   A    I wasn't told.

24   Q    -- 18, it could have been 21, you just don't know?

25             MS. GEDDES:  Objection.

1           THE COURT:  Sustained as to form.

2   BY MS. BLANK BECKER:

3   Q    Were you the one responsible for checking IDs prior to

4   individuals coming backstage?

5   A    No.

6   Q    That was someone else's job?

7   A    Yes.

8           MS. BLANK BECKER:  Thank you.

9           Judge, may I have one moment?

10          THE COURT:  Sure.

11          MS. BLANK BECKER:  Thanks.

12          (Pause.)

13          MS. BLANK BECKER:  Thank you, Judge.  Thank you.  I

14  don't have any additional questions.

15          THE COURT:  Okay, any redirect?

16          MS. GEDDES:  Briefly, Your Honor.

17          THE COURT:  Okay.

18  REDIRECT EXAMINATION

19  BY MS. GEDDES:

20  Q    A few minutes ago you were asked whether or not you

21  recalled hearing any verbal abuse, and you indicated that you

22  had.

23          What do you remember?

24  A    The employees getting, like, verbally abused.

25  Q    By whom?

1    A    Rob.

2    Q    And by the way, when you were initially interviewed by

3    agents in February of 2020, how were you feeling?

4    A    I think I had Coronavirus, I was pretty sick.

5         MS. BLANK BECKER:  I didn't hear the answer, I'm

6    sorry, Judge.

7         THE COURT:  Can you just?

8         THE WITNESS:  Yes.  I was very sick with

9    Coronavirus.

10   BY MS. GEDDES:

11   Q    You were asked on cross-examination about the procedures

12   when a -- when individuals came to Olympia Fields and you were

13   asked about identifications that were checked.

14        Were guests' identifications always checked at the

15   security gate?

16   A    Not always.

17   Q    And what was the purpose of -- did you understand what

18   the purpose was of those ID checks?

19   A    No.

20   Q    And the same question, when guests would enter the studio

21   area at the reception area, were IDs always copied then?

22   A    When -- whenever security would check IDs, they did, yes,

23   they usually made a copy of it.

24   Q    But did they always check?

25   A    They didn't always, no.

1   Q    And I think on cross-examination you were also asked

2   about copies of IDs that were made in the studio, itself.

3         Do you recall those questions?

4   A    Yeah.

5   Q    Were guests -- were IDs always checked when they entered

6   the studio at that time?

7   A    Not always.  There was a time when IDs weren't being

8   checked and people were in and out.

9   Q    I'm sorry, can you say that again?

10  A    They weren't always checked for people that came in.

11  Q    You were also asked about whether certain practices were

12  common in your experience interacting in sort of the music

13  industry, and I think one of the things that on cross you were

14  asked about was whether it was common to sign an NDA, for an

15  employee to sign an NDA.

16        Do you recall those questions?

17  A    Yes.

18  Q    And you were also asked about, you know, common terms

19  that -- that were used in the music industry.

20        Do you remember that?

21  A    Yes.

22  Q    Was working for the defendant common based on your

23  experience?

24             MS. BLANK BECKER:  Objection, Judge.

25             THE COURT:  Overruled.

1    A    Was my -- can you repeat the question again, please?

2    Q    Yes.

3         Was your experience working for the defendant

4    similar to the way in which other -- your other experiences in

5    the music industry?

6    A    No.

7              MS. BLANK BECKER:  Objection.

8              THE COURT:  Overruled.

9    BY MS. GEDDES:

10   Q    How would you --

11             THE WITNESS:  No.

12   Q    -- describe your experience working --

13             MS. GEDDES:  Oh, I'm sorry.

14   A    The answer to the previous question was no.

15   Q    How would you describe your experience working for the

16   defendant?

17   A    It was a weird time for me, but just the things that you

18   had to do was just a bit uncomfortable.  The music part, the

19   production and all that was really good, but all the other

20   stuff that was going on was just kind of strange.

21        It was almost like the twilight zone when you went

22   into the gate, like you're in this different world that was

23   just a strange place.

24             MS. GEDDES:  Nothing further.

25             THE COURT:  Any recross?

SAM     OCR     RMR     CRR     RPR

1           MS. BLANK BECKER:  Yes, briefly.  Thank you, Judge.

2    RECROSS-EXAMINATION

3    BY MS. BLANK BECKER:

4    Q    When you say the twilight zone, Mr. Navarro, have you

5    ever worked for any celebrities that were known as nationally

6    and internationally as Mr. Kelly before?

7    A    No.

8    Q    In fact, you don't have anything to really compare your

9    relationship to or, excuse me, your employment to at that

10   time, correct?

11   A    At that time, no, it was my first job.

12           THE COURT:  Do you have something now to compare it

13   to?

14           THE WITNESS:  I've done gigs with Taylor Swift,

15   Jay Z, Kanye.  Yeah, it was just normal kind of -- who else?

16           Yeah, most of the work is just professional,

17   professional work.  There's not a lot of extra personal stuff

18   you had to do.

19   BY MS. BLANK BECKER:

20   Q    Sure, and when you say you've done gigs, you've worked in

21   sound in different capacities than what we're talking about in

22   how you worked for and with Mr. Kelly, correct?

23   A    Yes.

24   Q    And, Mr. Navarro, you had indicated, and the Government

25   had asked you about the fact, you know, how were you feeling

SAM     OCR     RMR     CRR     RPR

1  when you gave the interview initially when they spoke with you

2  in February 21st of 2000 [sic] and you indicated something

3  about the fact that you had the Coronavirus and you weren't

4  feeling great.  Correct?

5  A    Yes.

6  Q    Mr. Navarro, did you also have the Coronavirus the second

7  time you talked with them?

8  A    No.

9            MS. GEDDES:  Objection.

10            THE COURT:  Overruled.

11            I think you meant 2020, is that right?

12            MS. BLANK BECKER:  I did.  I apologize, 2020.

13  BY MS. BLANK BECKER:

14  Q    Was that when you had Corona?

15  A    So, the first time that I talked to them, is that what

16  you're asking me?

17  Q    Yes, if the first time was on February 21st,

18  2000 [sic]  --

19            MS. GEDDES:  And 20.

20            MS. BLANK BECKER:  Oh, geez, I keep saying that.

21            THE WITNESS:  2020.

22            MS. BLANK BECKER:  I'm so sorry.

23            THE COURT:  You had Corona then, correct?

24            What the lawyer is asking you is did you have Corona

25  the second time you spoke to the Government?

1         THE WITNESS:  The second time I spoke, no.

2    BY MS. BLANK BECKER:

3    Q    And how about the other day when you spoke with them?

4    A    No.

5    Q    You didn't have Corona then either?

6    A    No.

7         MS. BLANK BECKER:  Okay, thank you.  I don't have

8    any additional questions.

9         Thank you, Judge.

10        THE COURT:  Any redirect?

11        MS. GEDDES:  No, Your Honor.

12        THE COURT:  All right, you can step down.

13        (Witness excused.)

14        THE COURT:  I think it probably makes sense to take

15   our lunch break now.  So, let me just check to make sure your

16   lunches are here.  I assume they are.

17        Is that right?

18        THE COURTROOM DEPUTY:  I didn't hear anything.

19        MS. GEDDES:  Your Honor, our next witness is

20   relatively short.

21        THE COURT:  Okay, so why don't we press ahead.

22   Let's make the best use of our time.

23        Call the next witness, please.

24        MS. GEDDES:  The Government calls Courtnay Wilson.

25        (Witness enters and takes the stand.)

Proceedings                                                588

1          THE COURTROOM DEPUTY:  Please remain standing.

2    Raise your right hand.

3          Do you solemnly swear or affirm that the testimony

4    you are about to give will be the truth, the whole truth and

5    nothing but the truth?

6          THE WITNESS:  Yes.

7          (Witness sworn.)

8          THE COURTROOM DEPUTY:  Please state your name for

9    the record.

10          THE WITNESS:  Courtnay Wilson.

11          THE COURTROOM DEPUTY:  Thank you.  You may be

12   seated.

13          THE COURT:  Okay, hold on for just one second.

14          (Pause.)

15          THE COURT:  Okay, Ms. Wilson, just a couple of

16   things.

17          Please speak slowly so the court reporter can get

18   everything down.  Don't speak over whichever lawyer is

19   questioning you.  And if there is something that isn't clear

20   or you need to have repeated, just let us know, okay.

21          THE WITNESS:  Okay.

22

23          (Continued on the following page.)

24

25

                    SAM    OCR    RMR    CRR    RPR

Wilson - direct - Geddes                    589

1    **COURTNAY WILSON**,

2         called as a witness by the Government, having been

3         duly sworn/affirmed by the Courtroom Deputy, was examined

4         and testified as follows:

5    DIRECT EXAMINATION

6    BY MS. GEDDES:

7    Q    What do you do for a living.

8    A    I'm an attorney.

9    Q    I want to direct your attention to January of 2010.

10   Where were you working then?

11   A    I was working at a law firm Susan Loggans and Associates.

12   Q    In what city was that?

13   A    Chicago.

14   Q    When you were working at the Loggans law firm in 2010,

15   what name were you using back then?

16   A    Courtnay Martin, Courtnay Hancock Martin.

17   Q    And Courtnay Wilson is a married name?

18   A    Yes.

19   Q    How long did you work at the Loggans law firm?

20   A    Almost two years.

21   Q    In what capacity?

22   A    As an associate.

23            THE COURT:  Maybe move a little bit closer to the

24   microphone.  Move it to you, sorry about that, the chairs

25   don't move.

SAM      OCR      RMR      CRR      RPR

1          Go ahead.

2    BY MS. GEDDES:

3    Q     You testified that you were working as an associate.

4          Were you working as an attorney?

5    A     Yes.

6    Q     In an associate position?

7    A     Yes.

8    Q     Can you tell the jury what happened, generally speaking,

9    when there was a prospective client who contacted the Loggans

10   law firm?

11   A     So, in general, we would probably take a phone call from

12   a prospective client.  I would take down the basic facts, date

13   of incident, the facts surrounding the case.  And at that

14   point we would make a determination whether we would want to

15   bring them in for an in-person meeting, and then we would set

16   up a meeting for them to come in person.

17   Q     I'm showing you what's in evidence as Government Exhibit

18   70.

19          (Exhibit published.)

20   Q     Do you recognize the individual shown in Government

21   Exhibit 70?

22   A     Yes.

23   Q     Who is that?

24   A     Jerhonda Pace.

25   Q     And how did you meet her?

Wilson - direct - Geddes                    591

1   A    In a client intake meeting.

2   Q    Do you recall the date that you first met Ms. Pace?

3   A    It was in January.

4   Q    Of what year?

5   A    2010.

6   Q    And I'm showing you --

7              MS. GEDDES:  The witness only.

8   Q    -- what's been marked for identification as 3500-CW1.

9   And I am going to show you the first page, and then I am going

10  to show you the second page.

11             Does that refresh your recollection as to the

12  particular date in January when you met her?

13  A    January 27th.

14  Q    Of 2010?

15  A    Yes.

16  Q    And at the time that you met Ms. Pace, do you recall what

17  name she was using?

18  A    Jerhonda Johnson.

19  Q    And did you subsequently learn her last name as Ms. Pace?

20  A    Yes.

21  Q    Where did you first encounter Ms. Pace?

22  A    At the law firm, at the office.

23  Q    And what were the circumstances under which you

24  encountered her?

25  A    A new client intake.

1    Q    Did you conduct that new client intake?

2    A    Yes.

3    Q    And was that in person?

4    A    Yes.

5    Q    What, if anything, did Ms. Pace say to you occurred on

6    January 18th to the 21st of 2010?

7              MR. CANNICK:  Objection.

8              THE COURT:  Sustained.

9              MS. GEDDES:  Your Honor, may we approach?

10             THE COURT:  Yes.

11             (Sidebar held outside the hearing of the jury.)

12

13             (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                        593
```

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          THE COURT:  What's the basis for the --

4          MS. GEDDES:  Prior consistent statements on the part

5    of Ms. Johnson.

6          Yesterday she testified about a journal entry, but

7    it was unclear on what date that journal entry was prepared.

8          Ms. Wilson is going to testify that she met with her

9    on January 27th.  And she's only going to testify about two

10   things:  The fact that Ms. Pace said the defendant was calling

11   her; and what Ms. Pace said occurred on January 23rd of 2010,

12   showing that it was just four days later where she described

13   what happened.  And she also will say that she used her

14   T-shirt to wipe off the defendant's semen.

15         And so, it's one additional part that was not

16   included in the journal entry.

17         THE COURT:  How long ago, how long after the last

18   date she saw the defendant was this?

19         MS. GEDDES:  Four days.

20         THE COURT:  Four days.  It is pretty similar to what

21   came in yesterday to which there was no objection.

22         MR. FARINELLA:  So long as I can cross-examine the

23   witness on the entire document.

24         MS. GEDDES:  The Government objects.

25         MR. FARINELLA:  Well, then --

```
                          Sidebar                        594
```

1          THE COURT:  Well, hold on.

2          MS. GEDDES:  She is testifying solely about prior

3   consistent statements.

4          You did not cross-examine Ms. Pace or give her an

5   opportunity to explain any other statements to the extent that

6   you are going to assert that they're prior inconsistencies

7   and, therefore, eliciting them now is completely improper.

8          MR. FARINELLA:  But I am allowed to ask her about

9   the information that she took down, specifically in the

10  report, without any characterization.

11         THE COURT:  No, that is the same thing.

12         The question is --

13         MR. FARINELLA:  I --

14         THE COURT:  The question is -- you can't

15  cross-examine her about anything that she wasn't confronted

16  with because the witness has to be given an opportunity to

17  explain.

18         MR. FARINELLA:  Oh, I understand that.  So, so long

19  as there's a connection to Ms. Pace's direct testimony.

20         THE COURT:  So, the issue with a prior inconsistent

21  statement is it can only come in if you have confronted the

22  witness, Ms. Pace, with the inconsistency.

23         I've perused the statement.  I don't know what's in

24  it.  I don't know that she has to be confronted with the

25  inconsistency in this particular document or if it can be

```
                              Sidebar                      595
```

1    something else.  I think it can be.

2         MS. GEDDES:  Even so, she was not confronted in any

3    way on any inconsistencies that are set forth in this

4    document.

5         During cross yesterday there was some confrontation

6    about whether she said that the defendant said she should act

7    25 instead of 21, that's not referenced here.

8         MR. FARINELLA:  But --

9         THE COURT:  Hold on, hold on.

10        Ms. Geddes, is there something else you want to say?

11        MS. GEDDES:  And I think there was one other

12   inconsistency about -- honestly, I can't recall, but there was

13   one other inconsistency that she was confronted on.  Those

14   aren't in here.

15        So, what inconsistency is set forth in here that --

16        MR. FARINELLA:  There's a number.

17        MS. GEDDES:  That she was confronted on.

18        MR. FARINELLA:  I have actually pointed them out in

19   the transcript.  I can point to them.

20        THE COURT:  Okay, so what we are going to do is I am

21   going to excuse the jury for lunch.  We will excuse the

22   witness.

23        You tell me, how many inconsistencies are you

24   talking about?

25        MR. FARINELLA:  They're with my notes, but it's

Sidebar                                                      596

1   about five or six.

2            THE COURT:  All right.  So let's see what they are

3   and then I'll decide.

4            MS. GEDDES:  Thank you, Judge.

5            (Sidebar concluded.)

6

7            (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                597

1            (In open court - jury present.)

2            THE COURT:  All right, hold on just one second.

3  This is actually going to take me a little longer than I

4  thought, so I think what I am going to do is excuse you for

5  lunch.  I just want to see if it has gotten here yet.

6            So, we think your lunch is here.

7            So, let's come back at 2:15.  Please do not talk

8  about the case, look anything up, form any opinions about the

9  case; but have a good lunch.

10            THE COURTROOM DEPUTY:  All rise.

11            (Jury exits.)

12            THE COURT:  All right, everybody can have a seat.

13  The witness can step down.

14            (Witness steps down and exits the courtroom.)

15            THE COURT:  All right, the question is the extent to

16  which -- let me just go back a little bit.

17            The Government wants to ask the witness about fairly

18  limited aspects of the exhibit that is marked 3500-CW1, and

19  this document was prepared four days after the witness

20  testified that she last saw Mr. Kelly.

21            Most of what the Government seeks to bring out was

22  really what was contained in Ms. Pace's journal, with one

23  additional, and I think part of this had to do with the date.

24            Is that right, Ms. Geddes?

25            MS. GEDDES:  Yes, Your Honor.

SAM     OCR     RMR     CRR     RPR

Proceedings                                    598

1          THE COURT:  All right.

2          Now, Mr. Farinella says that he wants to ask her

3    about the entire document.

4          I mean I don't know why you would want to do that

5    with some of these questions, but he wants to ask about the

6    entire document.

7               But five different aspects of it, is that correct?

8               MR. FARINELLA:  Approximately, Your Honor.

9               THE COURT:  And what are the areas?

10         Because, just to be clear, the rule is, as you know,

11   the rule is that to bring out a prior inconsistency, the

12   witness, Ms. Pace, has to have been confronted with the

13   inconsistency.

14              MR. FARINELLA:  Correct, Your Honor.

15              THE COURT:  For example, asked:  You never told X.

16              MR. FARINELLA:  Yes.

17              THE COURT:  So, why don't you identify those

18   inconsistencies that Ms. Pace was confronted with.

19              MR. FARINELLA:  So, Ms. Pace was confronted with --

20   first, she was asked about whether or not Mr. Kelly had left

21   the Chicago area.  And in -- in this item it talks about

22   June 3rd, June 5th, June 12th, June 13th, June 14th.  Ms. Pace

23   testified specifically:

24              Do you know where Mr. Kelly went in June 2009?

25              And she said yes.

Proceedings                                      599

1          And Ms. Geddes asked:  Where?

2          And she said:  South Africa.

3          THE COURT:  Okay, and so you want to bring out the

4    fact that she told these lawyers that she was with him on

5    various dates in June.

6          And just from my quick perusal of this document,

7    those dates that she says she was there were June 3rd,

8    June 12th, June 13th and June 14th; correct?

9          MR. FARINELLA:  Correct, Your Honor.

10         THE COURT:  And so, you want to cross-examine.

11         You have no problem with that, do you?

12         MS. GEDDES:  I only have a problem with it, but I

13   don't think it's a proper -- number one, I don't think there's

14   anything inconsistent about this statement because --

15         THE COURT:  It is not all of June.  It is not all of

16   June, but besides that, you don't have any problem with it,

17   right?

18         MS. GEDDES:  If he's going to say:  Isn't it true

19   that Ms. Pace told you that she was with the defendant on

20   June 3rd, June 12th, June 13th, June 14th, I have no problem

21   with that one question.

22         THE COURT:  Good, that's fine.

23         That's what you want to ask, right?

24         MR. FARINELLA:  Yes.

25         THE COURT:  Okay, next question.

Proceedings                                    600

1            MR. FARINELLA:  Ms. Pace testified yesterday that

2    she witnessed Mr. Kelly speaking with an attorney.  The

3    subject of what was said was not -- was, obviously, not

4    testified to, but she specifically stated that she overheard

5    Mr. Kelly on the phone with a lawyer.

6            In this statement she says here that there was a

7    party and the police were there because -- police showed up at

8    the front gate looking for a 17-year-old girl.

9            THE COURT:  Right.

10           MR. FARINELLA:  This is relating to the person that

11   we discussed yesterday, and it says:

12           R. Kelly called his attorney Ed Genson and then

13   walked out of the room.

14           THE COURT:  Okay.

15           MR. FARINELLA:  So, that's an inconsistent

16   statement.

17           THE COURT:  It is not inconsistent, and it is also

18   not at all helpful to you.

19           Do you really want to bring that out?

20           MR. FARINELLA:  Well, the other issue --

21           THE COURT:  It's really not inconsistent.  I mean if

22   you want to bring it out, I am going to say you can bring it

23   out.

24           Go ahead.

25           MR. FARINELLA:  The other issue is that the

SAM      OCR      RMR      CRR      RPR

1  17-year-old girl that was being looked for, was -- that -- the

2  reason why yesterday when the police officer testified he

3  spoke to the business manager occurred was because Mr. Kelly

4  was out of the country.  So, this never happened is the point.

5          THE COURT:  Oh, well, I don't think that was the

6  testimony yesterday, but if you want to ask about that, about

7  her saying that, you can surely ask about that.

8          MS. GEDDES:  But, Your Honor, again, it's not

9  inconsistent.

10          THE COURT:  No, it's not.

11          MS. GEDDES:  Your Honor struck the fact that she was

12  even speaking with an attorney at the defendant's insistence.

13          THE COURT:  Oh, I did?

14          MS. GEDDES:  Yes.

15          THE COURT:  Okay.

16          MS. GEDDES:  In addition to that, the rule states

17  that you have to confront her about an inconsistent statement.

18  They never said:  You told somebody else that he walked out of

19  the room.  They didn't say that.  She never was given an

20  opportunity to explain this prior statement.

21          It is completely improper for them to be able to

22  elicit a prior inconsistent statement without that, even

23  assuming there's any inconsistency here.

24          THE COURT:  It is improper, and I didn't realize

25  that I had struck the reference.  So, you can't do that then.

Proceedings                                                602

1          MR. FARINELLA:  You stopped me.  I don't --

2          THE COURT:  Well, it's --

3          MR. FARINELLA:  I recall looking at the transcript

4   and I don't see that you struck the reference.  You stopped

5   Ms. Pace from continuing -- I'm sorry, yes, that's fine,

6   right.

7          THE COURT:  So, the testimony did not come out

8   because I told her not to say it?

9          Yes, that's what happened?

10         MR. FARINELLA:  Her testimony is in the record that

11  he was on the phone with his lawyer and I heard --

12         THE COURT:  Okay.  So, that he was on the phone with

13  his lawyer.  That's what this says.  So, it is not

14  inconsistent.

15         MR. FARINELLA:  But she says she was in the room

16  with him while he was on the phone.

17         THE COURT:  Okay.

18         MR. FARINELLA:  Well, he --

19         THE COURT:  Still not inconsistent.  You may have a

20  theory.

21         MR. FARINELLA:  It is inconsistent.

22         THE COURT:  Let me finish.

23         You may have a theory that he wasn't there, but she

24  said this, the same thing twice.  So, that is not a thing.

25         I mean, like I say, I don't know the case like you

Proceedings                                          603

1   all do.  I don't see how this helps you, but if you didn't

2   confront her with it and it's not an inconsistency, I am not

3   going to permit it.

4           What else?

5           MR. FARINELLA:  One moment, Your Honor.  May I

6   confer with counsel?

7           THE COURT:  Yes.

8           (Pause.)

9           MR. FARINELLA:  So, Your Honor, the other issue is I

10  believe the Government is seeking to use this in connection

11  with her journal, correct, with the witness' journal?

12          THE COURT:  Well, the witness was, I think,

13  cross-examined about the contents of the journal.  I don't

14  know when she prepared the journal.  I don't recall.

15          MR. FARINELLA:  I believe she prepared it --

16          THE COURT:  After?

17          MR. CANNICK:  After.

18          THE COURT:  Okay.

19          MS. GEDDES:  She testified she prepared it when she

20  retained a lawyer.

21          THE COURT:  Okay.

22          MR. FARINELLA:  And the Government's also seeking to

23  use this to corroborate -- to corroborate the witness'

24  statement with regard to the spit and semen regarding the

25  T-shirt.

Proceedings                                           604

1          THE COURT:  Right.

2          MR. FARINELLA:  Okay.  The problem is, is that we

3   should be able to ask the question:  Does -- are there any

4   notations in your -- in your report that indicate that the

5   witness stated that she still has the T-shirt?

6          THE COURT:  You can ask her that.  Go ahead.  Yes,

7   that's fine.  All right.

8          Anything else?

9          MR. FARINELLA:  Let me just check.

10         (Pause.)

11         MR. FARINELLA:  If I could just take it over the

12  lunch break, Your Honor?

13         THE COURT:  Sure.  And I hate to keep interrupting

14  you.  It makes it very hard for the court reporter when we

15  speak too quickly, and I say that as a reformed fast talker.

16  So, just try to slow down.  All right?

17         MR. FARINELLA:  I'll make believe I'm in the

18  midwest.

19         THE COURT:  I didn't hear you.

20         MR. FARINELLA:  I'll make believe I'm in the

21  midwest.

22         THE COURT:  All right.  Okay, let's be back at 2:15.

23         (Judge ANN M. DONNELLY exited the courtroom.)

24         (Luncheon recess taken.)

25         (Continued on the following page.)

605

1                    AFTERNOON SESSION

2

3              (In open court.)

4              (Parties present.)

5              (Defendant enters the courtroom at 2:23 p.m.)

6              THE COURT:  Okay.  So what did you decide you want

7    to do with this witness.

8              MR. FARINELLA:  Your Honor, one second.

9              THE COURT:  Sure.

10             MR. FARINELLA:  So, your Honor, I would just like

11   to have the opportunity to just -- the last portion that we

12   talked about before we broke which was the T-shirt.

13             THE COURT:  So you want to be able to ask her about

14   it?

15             MR. FARINELLA:  I believe the Government's going to

16   ask her about the T-shirt.

17             THE COURT:  Right.

18             MR. FARINELLA:  So I would like to be permitted to

19   ask her if, in fact, that report contains any notations

20   regarding, you know, the potential client having evidence.

21             THE COURT:  Sure.  That's fine.  Not a problem.  So

22   I think we're all on the same page then, correct?

23             MR. FARINELLA:  Yes, Your Honor.

24             THE COURT:  Good.  All right.  Let's get the

25   witness.

C. Wilson - Direct/Ms. Geddes                606

1              (Witness takes the witness stand.)

2              THE COURT:  Then let's get the jurors.

3              COURTROOM DEPUTY:  All rise.

4              (Jury enters courtroom at 2:25 p.m.)

5              COURTROOM DEPUTY:  You may be seated.

6              THE COURT:  All right.  Welcome back, ladies and

7    gentlemen, we're ready to continue with the direct

8    examination of the witness.

9              Go ahead.

10             COURTROOM DEPUTY:  The witness is reminded that

11   she's still under oath.

12             THE WITNESS:  Yes.  Thank you.

13   DIRECT EXAMINATION

14   BY MS. GEDDES:

15   (Continuing.)

16   Q    Good afternoon.  When we broke, I was asking what, if

17   anything, did Ms. Pace say to you occurred on January 18th to

18   the 21st of 2010?

19   A    She had said that there was some physical abuse and that

20   she had had a relationship with Mr. Kelly and --

21   Q    And let me stop you for a moment?

22   A    Sure.

23   Q    Because I want to better frame my question.

24             I am talking, specifically, what Ms. Pace told you

25   happened between her and the defendant on those particular

C. Wilson - Direct/Ms. Geddes                607

1   dates.  So I think you testified earlier that you met with

2   Ms. Pace on January 27th of 2010; is that correct?

3   A    Yes.

4   Q    And do you recall, specifically, what Ms. Pace told you

5   happened on January 18th to the 21st of 2010?

6   A    Yes.

7   Q    What happened?

8   A    That she had gone to see him and I think that he had

9   choked her and spit on her and then they had sex.

10  Q    And I just want to direct your attention to a particular

11  date.  As you sit here today, do you remember the particular

12  date that she said that incident happened?

13  A    No.

14  Q    I'm showing the witness what's been marked for

15  identification as 3500-CW-1 and I'm going to I think -- and

16  then I'm going to direct your attention to this paragraph

17  right there where my pen is pointing.

18       Can you take a look at that --

19  A    Yes.

20  Q    -- and let me any if that refreshes your recollection.

21       THE COURT:  You just have to focus it there.

22  Q    And I can bring it to you if that's easier.

23  A    That's fine, I can see it.  January 23rd.

24  Q    She said that the incident you just described occurred

25  on January 23rd?

C. Wilson - Direct/Ms. Geddes                608

1   A    Yes.

2   Q    Of what year?

3   A    2010.

4   Q    And what, if anything, did the witness say about a

5   T-shirt?

6   A    That she had a T-shirt that had semen on it from

7   Mr. Kelly.

8   Q    And did she say how it came to be that she had a T-shirt

9   that had Mr. Kelly's on semen on it?

10  A    That she had used the T-shirt to wipe it off.

11  Q    It wipe it off what?

12  A    Her body.

13  Q    From an incident that happened on January 23rd?

14  A    Yes.

15          MS. GEDDES:  Nothing further.

16          THE COURT:  All right.  Cross-examination.

17          MR. FARINELLA:  Yes, Your Honor.

18  CROSS-EXAMINATION

19  BY MR. FARINELLA:

20  Q    Good afternoon.

21          So you had just, excuse me, so you had just

22  testified that the document that you reviewed said that she

23  had a T-shirt, right?

24  A    Yes.

25  Q    Isn't it a fact that the document doesn't say that she

C. Wilson - Cross/Mr. Farinella          609

1    had a T-shirt?

2    A    That she used a T-shirt to wipe it off.

3    Q    Yes.  But you said that what you just read indicated she

4    had a T-shirt.

5    A    Yes.

6    Q    Okay.  But that's not in the document, right?

7    A    I don't know.

8         MR. FARINELLA:  My document does have a notation on

9    it.

10        THE COURT:  Do you want to show it to her and I

11   think maybe put your question to her again.  It's a little

12   confusing.

13        MR. FARINELLA:  Okay.

14   EXAMINATION BY

15   MR. FARINELLA:

16   (Continuing.)

17   Q    You had just testified when you were asked about the

18   memo you prepared and you had indicated that it stated that

19   the new potential client had a T-shirt, right?

20   A    Yes.

21   Q    Okay.  In your memo that you prepared, it does not

22   indicate that the new potential client had a T-shirt.  It

23   simply says --

24        THE COURT:  No, that's really not an appropriate

25   question.  Why don't you show her the document?  Ask her to

C. Wilson - Cross/Mr. Farinella                610

1    take a look at the part you want her to look at and then put

2    your question to her.

3              MR. FARINELLA:  So we'll mark this as defense

4    exhibit --

5              THE COURT:  You don't even have to mark it, just

6    show it to her.  We're not putting it in, I don't think.

7              (Approaching the witness.)

8              (Showing to the witness.)

9              MS. GEDDES:  Counsel, which document are you

10   showing her?  Is it this 3500-CW-1?

11             MR. FARINELLA:  It's the memo.

12             MS. GEDDES:  CW-1.

13             MR. FARINELLA:  Yes, CW-1, Page 3.

14             MS. GEDDES:  Thank you.

15             THE WITNESS:  Yes.

16   Q    So you've reviewed the memo, correct?

17   A    Yes.

18   Q    Okay.  And in that memo, it does not indicate that the

19   new potential client stated she had a T-shirt, right?

20   A    That's correct.

21   Q    It just simply states that she used a T-shirt?

22   A    That's correct.

23   Q    Okay.  And one last question.

24             Isn't it a fact that you have, at that point, when

25   you're interviewing your client, you had no independent

C. Wilson - Cross/Mr. Farinella          611

1  knowledge of the truth about the information that she

2  provided to you, correct?

3  A     Correct.

4          MR. FARINELLA:  Thank you.  Nothing further, your

5  Honor.

6          THE COURT:  Any redirect?

7          MS. GEDDES:  No, Your Honor.

8          THE COURT:  Thank you so much.  You can step down.

9          (Witness takes the witness stand.)

10         THE COURT:  Do we need -- who is your next -- okay.

11  Are you ready to call your next witness?

12         MS. CRUZ MELENDEZ:  Yes, Your Honor.  Yes, Judge.

13  The Government calls Carolyn Harris to the stand.

14         THE COURT:  Carolyn Harris.

15         MS. CRUZ MELENDEZ:  Yes, Your Honor.

16         THE COURT:  Okay.

17         (A brief pause in the proceedings was held.)

18         (Witness takes the witness stand.)

19         COURTROOM DEPUTY:  Please raise your right hand.

20         (Oath administered.)

21         THE WITNESS:  Yes.

22         (Witness sworn.)

23         COURTROOM DEPUTY:  Please state your name for the

24  record.

25         THE WITNESS:  Carolyn Harris.

1          COURTROOM DEPUTY:  Thank you.  You may have a seat.

2    And you can remove your mask.

3          THE COURT:  Okay.  Ms. Harris, just a couple of

4    things.

5          The court reporter takes down everything that you

6    say, so please make sure you don't speak too quickly and that

7    you don't talk over whichever lawyer is asking you questions.

8    That way it makes their job easier, okay?

9          THE WITNESS:  Yes.

10          THE COURT:  Second, if you don't understand a

11    question, or you want to have it repeated, just let me any

12    know.

13          And the final thing is, please just do your best to

14    answer the question that you're being asked, okay?

15          THE WITNESS:  Yes.

16          THE COURT:  All right.  Good.

17

18          (Continued on the following page.)

19

20

21

22

23

24

25

C. Harris - Direct/Ms. Cruz Melendez          613

1  **CAROLYN HARRIS**, called by the Government, having been first

2  duly sworn, was examined and testified as follows:

3  DIRECT EXAMINATION

4  BY MS. CRUZ MELENDEZ:

5  Q    Good afternoon, Ms. Harris.

6  A    Hi.

7  Q    Are you employed?

8  A    Yes.

9  Q    And how are you employed?

10 A    Cook County Clerk, Karen Yarbrough.

11       THE COURT:  Say it again, I'm so sorry.

12       THE WITNESS:  The Cook County Clerk, Honorable

13 Karen Yarbrough's office.

14 Q    How long have you worked at the Cook County -- what was

15 the last?

16 A    Cook County Clerk.

17 Q    Clerk, yes.  And how long have you worked at the Cook

18 County Clerk's Office?

19 A    21 years.

20       THE COURT:  Ms. Cruz Melendez, you also need to

21 speak up.

22       MS. CRUZ MELENDEZ:  Yes, Judge.

23       THE COURT:  Better.

24 Q    What's your current title at the office of the clerk?

25 A    Supervisor.

C. Harris - Direct/Ms. Cruz Melendez          614

1   Q     And what are your duties and responsibilities as a
2   supervisor?
3   A     Supervise over 24 people in birth, marriages, and
4   deaths.
5   Q     Can you explain to the jurors what Cook County is, where
6   is it located?
7   A     Cook County Clerk's Office is located 118 North Clark,
8   Chicago, Illinois.
9   Q     And how long have you held the position as a supervisor?
10  A     21 years.  Well, 15 years as a supervisor.
11  Q     And prior to being a supervisor, what, if any, position
12  did you have?
13  A     A clerk.
14  Q     What were your duties and responsibilities as a clerk?
15  A     To service the public.
16  Q     In what manner?
17  A     Birth, marriage, and death certificates.
18  Q     Now, during your, sounds like almost 30 years of working
19  there, have you become familiar with the policies and
20  procedures related to members of the public seeking to be
21  married in Cook County, Illinois?
22  A     Yes.
23  Q     And, in that capacity, as part of your work as a clerk
24  and then later as a supervisor, are you familiar with the
25  documents generated by the Cook County Clerk's Office related

C. Harris - Direct/Ms. Cruz Melendez          615

1  to marriage?

2  A     Yes.

3  Q     And are you familiar with the procedures that were in

4  place in 1994 as well?

5  A     Yes.

6  Q     What's the procedure for obtaining a marriage license in

7  Cook County, Illinois in or around 1994?

8  A     Both people must be present with valid I.D.s over the

9  age of 18.

10 Q     So you mentioned valid I.D.s.  so what, if any,

11 documentation did a person seeking a marriage license during

12 that time period in 1994, need to present prior to obtaining

13 a license?

14 A     State I.D., driver's license, or U.S. passport.

15 Q     So you previously mentioned that individuals coming in

16 would have to provide identification, correct?

17 A     Yes.

18 Q     And you used the phrase, "both people"?

19 A     Yes.

20 Q     Who are the people that you are talking about?

21 A     The expected bride and groom.

22 Q     Now, if a person didn't have a state I.D. or driver's

23 license, what, if any, other forms of identification did the

24 clerk's office take?

25 A     They were required to produce two pieces of

C. Harris - Direct/Ms. Cruz Melendez                616

1    identification.

2    Q    Okay.  And what kinds of identification?

3    A    Birth certificate, consular card, foreign passport.

4    Q    Anything else?

5    A    No.

6    Q    Does the Cook County Clerk's Office ever accept baptism

7    records?

8    A    Oh, I'm sorry, yes.  Yes.

9    Q    What, if any, eligibility requirements existed in 1994

10   with respect to individuals seeking to get married in

11   Cook County, Illinois?

12   A    What was that?

13   Q    Eligibility requirements?

14   A    Well, you had to be 18 and older.  And as we also accept

15   minors but they must be accompanied by adults.

16   Q    When you say minors, how old of a minor must you be?

17   A    16, 17.

18   Q    So when you say, "must be accompanied by adult," which

19   adult are you referring to?

20   A    The parents.

21   Q    The parents of the minor?

22   A    Yes.

23   Q    Generally speaking, now and in 1994, how could an

24   applicant prove their age?

25   A    By the I.D.

1   Q    So once the applicants, the expectant bride and groom,

2   provided identification, what happened next in the process?

3   A    We would enter the information into our system.

4   Q    And what system is that?

5   A    The vital checks -- I mean, the marriage license system.

6   Q    And once a couple obtained a marriage license, is it

7   automatically effective on the date that the marriage license

8   is issued?

9   A    It's actually valid any time after that day.

10  Q    It's valid on that day?

11  A    It's valid any time after that day.

12  Q    Okay.  So is there a waiting period between when the

13  marriage license is issued and when it is effective?

14  A    Yes, 24 hours.

15  Q    Okay.  And was that true in 1994?

16  A    Yes.

17  Q    Are there any exceptions to that one-day waiting period

18  that you mentioned?

19  A    Yes.  Military.

20  Q    When you say "military," can you explain to the jurors

21  what that exception?

22  A    That would be military services, active duty, they are

23  ability able to get married within the same day.

24  Q    And if a person in the military was seeking to get

25  married before that one-day period, how, if at all, would

C. Harris - Direct/Ms. Cruz Melendez          618

1    that be reflected on the marriage application?

2    A    Well, it would be reflected by them showing they

3    military I.D.

4    Q    Okay.  What, if anything, would happen if a couple was

5    married on the same day that their marriage license was

6    issued if they were not military personnel?

7    A    We would actually conduct the customer.

8    Q    What would you say to the customer?

9    A    They would have to come back in and redo the marriage.

10   Q    So does that mean that their marriage would be void?

11   A    Yes.

12   Q    And how long is a marriage license effective?

13   A    It's valid for 60 days.

14   Q    And was that true in 1994?

15   A    Yes.

16   Q    Now, when the expectant bride and groom, the applicants

17   --

18           First, let me ask you this.  Once an application is

19   drawn out and a marriage license is issued, do they receive a

20   copy of marriage license?

21   A    The marriage license, yes.

22   Q    Okay.  And when they receive a copy of the marriage

23   license, do they also get a copy of the application for the

24   license?

25   A    No.

C. Harris - Direct/Ms. Cruz Melendez          619

1   Q    So once a marriage license is issued to the expectant

2   bride and groom what, if anything, are they required to do in

3   order for them to be officially married?

4   A    To get married by an officiant, priest, or any elder.

5   Q    And do they have to provide any documentation?

6   A    They would provide the marriage license.

7   Q    And what, if any, any other information would be on that

8   marriage license?

9   A    The information that we keyed in in the computer.

10  Q    Any other information?

11  A    Information for the officiant to fill out.

12  Q    Once that's filled out, what needs to happen with the

13  marriage license?

14  A    Must be returned back to our office.

15  Q    And generally speaking, how is the marriage license

16  returned to the clerk's office?

17  A    Through the mail or walk in.

18  Q    And, again, the procedures that we just discussed was

19  that true in 1994?

20  A    Yes.

21  Q    So what happens once the marriage license is returned to

22  the office that you work at?

23  A    We would then enter it in and generate -- to generate a

24  certification copy.

25  Q    And is that a certification of marriage?

C. Harris - Direct/Ms. Cruz Melendez                620

1    A    Yes.

2    Q    Okay.  Now, once that certification of marriage is

3    generated, what, if anything, does that mean with respect to

4    the marital status of the couple who came in to obtain the

5    license?

6    A    Just letting the world know they are married.

7    Q    So once the certification of marriage is issued, are

8    they officially married?

9    A    Yes.  In our office, yes.

10   Q    And, at that point, can the married couple get a copy of

11   marriage certificate?

12   A    Yes.

13   Q    And how would they go about doing that?

14   A    They would pay a fee of $15.

15   Q    Now, if a member of the public, so not the married

16   couple at issue here, wanted to get a copy of the documents

17   related to the marriage.  So we talked about three documents

18   now.  We talked about the application, we talked about the

19   marriage license, and the certificate of marriage.  If a

20   member of the public wanted to get a copy of those documents,

21   could they?

22   A    A certification copy, yes.

23   Q    How would they do that?

24   A    They would come in, present their I.D. and a $15 fee.

25   Q    I'm sorry, I may have confused you with my question.

C. Harris - Direct/Ms. Cruz Melendez          621

1          So I'm not talking about the married couple.  I'm

2    talking about a member of the public who is not the married

3    couple.  Can they get access to that married couple's

4    application, marriage license, or certificate of marriage?

5    A    They can get a copy of the certificate of marriage.

6    Q    A member of the public is what I'm asking?

7    A    Yes.

8    Q    How would they go about doing that?

9    A    They would come in and see for the information to

10   search, search a marriage.

11   Q    Okay.  We'll get back to that in a moment.

12          MS. CRUZ MELENDEZ:  So, your Honor, at this point,

13   I would like to move to admit as certified records pursuant

14   to Federal Rule of Evidence 902(4) Government's Exhibit

15   803(a), 803(b), and 803(c).

16          THE COURT:  Any objection?

17          MR. FARINELLA:  May I see the documents?

18          MS. CRUZ MELENDEZ:  Certainly.

19          MR. FARINELLA:  No objection, your Honor.

20          THE COURT:  That is in evidence and you can publish

21   it.

22          MS. CRUZ MELENDEZ:  Thank you, your Honor.

23          (Government's Exhibits 803(a), 803(b), and 803(c)

24   were received in evidence as of this date.)

25          (The above-referred to exhibit was published to the

C. Harris - Direct/Ms. Cruz Melendez          622

1   jury.)

2   EXAMINATION BY

3   MS. CRUZ MELENDEZ:

4   (Continuing.)

5   Q    So, Ms. Harris, I would like you to take a moment and

6   look at the documents.

7           Are you familiar with these documents?

8   A    Yes.

9   Q    And prior to testifying here today, did you have an

10  opportunity to review these documents?

11  A    Yes.

12  Q    So I'd like to turn your attention to Government's

13  Exhibit 803(a).  Can you explain to the jurors what we're

14  looking at here?

15  A    Application of marriage.

16          THE COURT:  Keep your voice up a little.

17          THE WITNESS:  Application of marriage.

18          THE COURT:  Thank you.

19  Q    And does Government's Exhibit 803(a) reflect the names

20  of the applicants seeking a marriage license?

21  A    Yes.

22  Q    And I want to direct your attention to the top portion

23  here where my pen is.  Do you see that here?

24  A    Yes.

25  Q    Do you see the word "groom" there?

C. Harris - Direct/Ms. Cruz Melendez          623

1   A    Yes.

2   Q    So can you tell us what the name of the groom is in the

3   application?

4   A    Robert S. Kelly.

5   Q    Does the groom area of information also include a date

6   of birth?

7   A    Yes.

8   Q    What's that date of birth?

9   A    January -- I can hardly read -- January 8, 1967.

10  Q    Does it also include an address?

11  A    Yes.

12  Q    And does the address say 195 North Harbor, Chicago, Cook

13  County, Illinois?

14  A    Yes.

15  Q    Is there also an age indicated?

16  A    Yes.

17  Q    And what does the age say?

18  A    27.

19  Q    Do you see here just to the right of the age, two boxes

20  over, where it says Social Security Number?  Do you see that

21  there?

22  A    Yes.

23  Q    And there are a series of zeros listed?

24  A    Yes.

25  Q    What, if anything, does that indicate?

C. Harris - Direct/Ms. Cruz Melendez                624

1    A    Optional.

2    Q    And what do you mean by optional?

3    A    They could either give the Social Security Number or

4    not.

5    Q    Okay.  So did the individual provide here, did Robert S.

6    Kelly provide a Social Security Number?

7    A    No.

8    Q    Moving to the next entry over to the right, it says

9    "occupation"?

10   A    Yes.

11   Q    Okay and what's the occupation listed there?

12   A    Singer.

13   Q    Now, moving down one row, do you see where it says,

14   "father's name"?

15   A    Yes.

16   Q    And it says, "legally omitted," correct?

17   A    Yes.

18   Q    And what does that mean?

19   A    The father's name wasn't given.

20   Q    And one box below that where it says, "mother's maiden

21   name," do you see that there?

22   A    Yes.

23   Q    What's listed there?

24   A    The mother's name Joanne Kelly.

25   Q    And in the address box to the right of that, does it say

C. Harris - Direct/Ms. Cruz Melendez                625

1    "deceased"?

2    A    Yes.

3    Q    So the information that we've just gone through here

4    with respect to the groom's name, address, and date of birth,

5    how is that information generated?

6    A    Generated off the I.D.

7    Q    The identification provided by the groom?

8    A    Yes.

9    Q    Okay.  So I'd like to now attention your attention a

10   little further down in the section that says, "bride"?

11   A    Yes.

12   Q    Okay.  Do you see that there?

13   A    Yes.

14   Q    What name is listed for the bride's name?  Do you see

15   that where my pen is?

16   A    Yes.

17   Q    What does it say?

18   A    Aaliyah D. Haughton.

19   Q    Haughton?

20   A    Yes.

21   Q    Did I read that correctly, Haughton?

22   A    Yes.

23   Q    To the right of the last name, do you say where it say,

24   "maiden name," it says same there, correct?

25   A    Yes.

C. Harris - Direct/Ms. Cruz Melendez          626

1    Q     On the row below that there's an address listed,

2    correct?

3    A     Yes.

4    Q     And that address is 1322 South Tripp, Chicago,

5    Cook County, Illinois; is that correct?

6    A     Yes.

7    Q     And just below that, the left-most of the next row,

8    there is a date of birth listed, correct?

9    A     Yes.

10   Q     And does that date of birth say 1/16/1976?

11   A     Yes.

12   Q     So January 16, 1976?

13   A     Yes.

14   Q     Is there an age listed?

15   A     Yes.

16   Q     What's the age listed?

17   A     18.

18   Q     Moving over to where it says, "Social Security Number."

19   Do you see that there?

20   A     Yes.

21   Q     There's another series of zeros, correct?

22   A     Yes.

23   Q     Does that mean the same thing as you previously

24   testified to that the bride also did not provide a Social

25   Security Number?

C. Harris - Direct/Ms. Cruz Melendez          627

1   A    Yes.

2   Q    Moving to the right of that series of zeros, there's

3   another box for the bride's occupation.  Do you see that

4   there?

5   A    Yes.

6   Q    Does that say, "Messenger, SER."?

7   A    Yes.

8   Q    Moving down one row for the father's name.  Does that

9   say Michael Haughton?

10  A    Yes.

11  Q    And then to the right of that, there's an MI.  What is

12  that?

13  A    Michigan.

14  Q    And one row below where it says, "mother's maiden name."

15  Do you see that there?

16  A    Yes.

17  Q    Does it say Diane Hankerson?

18  A    Yes.

19  Q    And in the address line does it say Michigan?

20  A    Yes.

21  Q    Or MI?

22  A    Yes.

23  Q    Is it correct that that means Michigan?

24  A    Yes.

25  Q    So, again, with respect to the information that we've

1   gone through here.  So the bride's name, address, the date of

2   birth, how is that information generated on this application?

3   A     With the identification given.

4   Q     So you testified earlier that identification is

5   necessary to obtain a marriage license, correct?

6   A     Yes.

7   Q     So does Government's Exhibit 803(a) reflect the form of

8   identification that was used by Robert S. Kelly?

9   A     Yes.

10  Q     So I want to direct your attention to the left top-most

11  entry here.  Do you see where it says I.D. (g) and ILDL

12  followed by the letters and numbers K40077747008.  Do you see

13  that there?

14  A     Yes.

15  Q     What does ID (G) mean?

16  A     I.D. for the groom.

17  Q     So the G in the parenthesis stands for groom?

18  A     Yes.

19  Q     Looking at where it says ILDL, what can you ascertain as

20  to the type of identification that was used by the groom?

21  A     Illinois driver's license.

22  Q     Okay.  So now I want to move to the right side of the

23  document.  Is the based on the information that's on this

24  document, was a particular form of identification also used

25  by the bride?

1   A    Yes.

2   Q    And is that reflected on 803(a)?

3   A    Yes.

4   Q    So I want to turn your attention to still the top of the

5   document, but on the right side.  Do you see here where it

6   says I.D. (b) in parenthesis and then ILIDPA and a series of

7   numbers following that?

8   A    Yes.

9   Q    Okay.  What does the (B) in parenthesis stand for?

10   A    Bride.

11   Q    Here where it says, "ILIDPA," what can you ascertain as

12   to the type of identification that was used by the bride?

13   A    Illinois Department of Public Aid.

14   Q    So you testified earlier that there are a number of

15   forms of identification that the clerk's office typically

16   requires to obtain a marriage license.  I believe when you

17   listed those things, a public aid identification card was not

18   included in that list, correct?

19   A    Yes.

20   Q    Is a public aid I.D. card one of the forms of

21   identification that would generally be accepted as an I.D. to

22   get a marriage license?

23   A    No.

24   Q    Who makes the ultimate decision when applicants come in

25   as to what form of I.D. to accept when the applicants are

C. Harris - Direct/Ms. Cruz Melendez          630

1   looking to get a large license?

2   A    The clerk.

3   Q    And is that the clerk who handles the application for

4   the bride and the groom?

5   A    Yes.

6   Q    Now, were the applicants here, Robert Kelly and Aaliyah

7   Haughton, were they required to sign the application?

8   A    Yes.

9   Q    And do we see those signatures on this document?

10  A    Yes.

11  Q    So I'm going to point your attention here where it says,

12  "affidavit," and do you see where my pen is here?

13  A    Yes.

14  Q    Does that signature says, "Robert S. Kelly"?

15  A    Yes.

16  Q    And moving to the right of that where it says, "bride,"

17  is that the signature of Aaliyah Haughton?

18  A    Yes.

19  Q    Or does it reflect to be the signature of Aaliyah

20  Haughton?

21  A    Yes.

22  Q    Just below those signatures, do you see a signature here

23  that says, "David D. Orr"?

24  A    Yes.

25  Q    Who is David D. Orr?

C. Harris - Direct/Ms. Cruz Melendez          631

1   A    He was the Clerk for the Cook County Clerk's Office at

2   the time.

3   Q    There was another signature to the right of David D. Orr

4   whose signature would that be?

5   A    The clerk that created the application.

6   Q    Okay.  So does this application reflect the date that

7   the application was created on?

8   A    Yes.

9   Q    Okay.  And what's that date?

10  A    I can't hardly see it.

11  Q    Sorry.  Say 8/30/1994?

12  A    Yes.

13  Q    Now, looking at this document, 803(a), do you see this

14  other date here where it says, "08/31/1994"?

15  A    Yes.

16  Q    Is this the effective on date?

17  A    Yes.

18  Q    So does that mean that 08/31/1994 is the date that the

19  marriage license would be effective?

20  A    Yes.

21  Q    So as you previously testified, the applicants, once

22  they obtain their marriage license, they would have to wait

23  until 08/31/1994 in order to be married?

24  A    Yes.

25  Q    So you explained to the jury earlier that after

C. Harris - Direct/Ms. Cruz Melendez          632

1    submitting an application that it's a general matter a

2    marriage license is then issued.  Based on your review of the

3    documents, was a marriage license issued for Robert Kelly and

4    Aaliyah Haughton?

5    A    Yes.

6    Q    I'm directing your attention to Government's Exhibit

7    803(b).

8              Can you explain to the jurors what we're looking at

9    here?

10   A    A marriage license.

11   Q    And how is the information on the marriage license

12   generated?

13   A    From the application.

14   Q    Okay.  So taking a look at the document here, do you see

15   here the name Robert S. Kelly?

16   A    Yes.

17   Q    And it says, "Robert S. Kelly of Chicago in the County

18   of Cook and State of Illinois of the age of 27 years."  Did I

19   read that portion correctly?

20   A    Yes.

21   Q    And, "Aaliyah D. Haughton of Chicago in the County of

22   Cook and the State of Illinois of the age of 18 years."  Did

23   I read that correctly as well?

24   A    Yes.

25   Q    How long after applicants fill out the marriage

1   application is the marriage license generated?

2   A    Applicants?

3   Q    So the applicants fill out the application or have an

4   application generated, correct?  How long after that is a

5   marriage license generated?

6   A    Once the officiant marries them.

7   Q    I'm going to back up for a second.  So we have an

8   application?

9   A    Mm-hmm.

10  Q    And the couple fills out an application?

11  A    Yes.

12  Q    Okay.  And then I believe you testified that the Cook

13  County Clerk's Office then generates a marriage license,

14  correct?

15  A    Yes.

16  Q    How much time passes between when they filled out the

17  application and when the marriage license is generated?

18  A    Sorry.

19  Q    That's okay.

20  A    It comes right after.

21  Q    Okay.  So, approximately, how long?

22  A    Push of a button.

23  Q    Okay.  So it's fair to say they receive it on the same

24  day that they've filled out the application, correct?

25  A    Yes.

C. Harris - Direct/Ms. Cruz Melendez          634

1    Q    Now, looking at Government's Exhibit 803(b) here, what
2    portion of the marriage license is generated by the clerk's
3    office?
4    A    The top portion.
5    Q    Okay.  So is that the typewritten portion at the top
6    half of the marriage license?
7    A    Yes.
8    Q    So looking at the middle area of the marriage license
9    here on Government's Exhibit 803(b), what's the date that the
10   marriage license was issued?
11   A    August 30, 1994.
12   Q    And turning back for just a moment with respect to
13   803(a), is that the same date that the application was filled
14   out?
15   A    Yes.
16   Q    So directing your attention once more to Government's
17   Exhibit 803(b).  I'd like to start at the top of the document
18   here on the right-hand top corner.  Do you see here where it
19   says Maywood?
20   A    Yes.
21   Q    And what does that signify?
22   A    Where they applied for the license.
23   Q    And is Maywood an office what is that?
24   A    Yes, it's one of the satellite offices.
25   Q    For the Cook County Clerk's Office?

C. Harris - Direct/Ms. Cruz Melendez          635

1   A    Yes, it is.

2   Q    And just below that, it's number and then the numbers

3   9428588 what is that?

4   A    Marriage license generated that day.

5   Q    So that's the marriage license number?

6   A    Yes.

7   Q    And here we see a what says, "Return date," and then

8   September 6, 1994.  What's that date?

9   A    The day it was returned back to our office.

10  Q    So that return date there, that September 6, 1994, would

11  that date have to occur before or after the couple gets

12  married?

13  A    After.

14  Q    I'd now like to turn your attention to the bottom third

15  of Government's Exhibit 803(b).  This information here, who

16  is required to fill out that information?

17  A    The officiant.

18  Q    Okay.  So the handwriting here is filled out by the

19  officiant.

20       What's an officiant?

21  A    Pastor, minister, elder.

22  Q    So the person who presides over the marriage ceremony?

23  A    Yes.

24  Q    So looking at Government's Exhibit's 803(b) where it

25  says, "Print name of person officiating," what does that say

1   there?

2   A    Nathan J. Edmond.

3   Q    And to the right of that, does it say, "Elder Nathan J.

4   Edmond, Sr."?

5   A    Yes.

6   Q    And it says below that, "Hereby certified that Robert S.

7   Kelly and Aaliyah D. Haughton were united in marriage by me

8   at 6501 North Mannheim Road, Rosemont, Illinois the County of

9   Cook and State of Illinois on the 31st day of August, 1994."

10  Do you see that there?

11  A    Yes.

12  Q    Is there a signature there that reads "Nathan J.

13  Edmond"?

14  A    Yes.

15  Q    And then address below that says, "8515 South Indiana

16  Avenue, Chicago, Illinois 600619"?

17  A    60619.

18  Q    And that address, is that the officiant's address?

19  A    Yes.

20  Q    Okay.  And the address above that where it says, "Were

21  united in marriage by me at 6501 North Mannheim Road in

22  Rosemont, Illinois," what address is that?

23  A    The where the marriage took place.

24  Q    So I want to turn your attention now to Government's

25  Exhibit 803(c).

C. Harris - Direct/Ms. Cruz Melendez          637

1          Can you explain to the jurors what Government's
2    Exhibit 803(c) is?
3    A    Certification of marriage.
4    Q    How is the information on the certification of marriage
5    generated?
6    A    Generated off the marriage license.
7    Q    So I'd like to first start from the top of the document
8    where it says, "License number."  Do you see that there?
9    A    Yes.
10   Q    It reads, "M19949428588."  Do you see that number?
11   A    Yes.
12   Q    Okay.  What does the M stand for there?
13   A    Marriage.
14   Q    And then the first four numbers, 1994.  What does that
15   mean?
16   A    The year.
17   Q    I'm sorry, just let me finish the question.
18   A    I'm sorry.
19   Q    No, it's okay.  1994.  What is that?
20   A    The year.
21   Q    So 1994?
22   A    Yes.
23   Q    Okay.  And is that followed by 9428588?
24   A    Yes.
25   Q    And, just for a moment, putting up Government's Exhibit

C. Harris - Direct/Ms. Cruz Melendez          638

1   803(b), is that the same number listed here as the marriage

2   license number, 9428588?

3   A     Yes.

4   Q     So moving down the certificate it says the groom's name

5   as Robert S. Kelly; is that correct?

6   A     Yes.

7   Q     And the age is listed as 27?

8   A     Yes.

9   Q     It says the bride's name, Aaliyah D. Haughton age 18; is

10  that correct?

11  A     Yes.

12  Q     And, again, how is that information generated?

13  A     Generated from the marriage license.

14  Q     The date of marriage is also listed here; is that

15  correct?

16  A     Yes.

17  Q     It says August 31, 1994; is that correct?

18  A     Yes.

19  Q     How is that date generated?

20  A     From the marriage license.

21  Q     And when it's generated on the marriage license, and

22  when you say "generated from the marriage license," turning

23  your attention back to 803(b), the dates of the marriage

24  where was that located?

25  A     The lower part is the officiant box.

C. Harris - Direct/Ms. Cruz Melendez                639

1    Q    So that's that handwritten date here where it says, "the

2    31st day of August, 1994?

3    A    Yes.

4    Q    Who fills this portion out?

5    A    The officiant.

6    Q    Continuing down these certification of marriage.  It

7    says, "Were you united in marriage in the County of Cook and

8    State of Illinois in a religious ceremony by Nathan J.

9    Edmond."

10            Did I read that correctly?

11   A    Yes.

12   Q    And then it says "The officiant title, Elder, at site of

13   ceremony Rosemont, Illinois."

14            Did I read that correctly as well?

15   A    Yes.

16   Q    Okay.  And again how is that information generated?

17   A    Generated from the marriage license.

18            (Continued on the next page.)

19

20

21

22

23

24

25

1   DIRECT EXAMINATION

2   BY MS. CRUZ MELENDEZ:  (Continuing)

3   Q    And from the handwritten portion that's filled out by the

4   officiant?

5   A    Yes.

6   Q    And just below that, it says date recorded September 6,

7   1994.  Do you see that?

8   A    Yes.

9   Q    What does that mean?

10  A    The date it was returned and recorded.

11  Q    What was returned and recorded?

12  A    The marriage license.

13  Q    And we see here just below that, it says application date

14  August 30, 1994; correct?

15  A    Yes.

16  Q    And I will put up 803-A for a moment.  Is that the same

17  date as the date on the application?

18  A    Yes.

19  Q    Can you explain to the jurors when a marriage is

20  considered official?

21  A    Once we put it in our system.

22  Q    And, so, when you put it in your system, is that the

23  certificate of marriage?

24  A    Yes.

25  Q    Okay.  So once a certificate of marriage is issued,

1  that's when the marriage is official?

2  A    No.  Sorry.  Once we receive the marriage license back,

3  then we enter the marriage license to generate a certificate.

4  Q    Okay.  Now, I want to go back for a moment with respect

5  to the documents we see here.  If someone other than Robert S.

6  Kelly or Alliyah Haughton wanted to get either the certificate

7  of marriage, the marriage license, or the marriage

8  application, what, if anything, would they have to do?

9  A    Other than the bride and groom?

10  Q    Other than the bride and groom.

11  A    The certificate, they would come and search for a

12  certificate.

13  Q    What about the application?

14  A    Application, no.

15  Q    They couldn't get a copy of the application?

16  A    No.

17  Q    A member of the public couldn't get a copy of the

18  application; correct?

19  A    No.

20  Q    So based on the marriage certificate issued for Robert

21  Kelly and Alliyah Haughton, what was their marital status as

22  of date of this certificate of marriage, the Government 803-C?

23  A    You say who?

24  Q    The groom, Robert S. Kelly and Alliyah D. Haughton, once

25  the certificate of marriage was issued, what was their marital

1    status?

2    A    They were married.

3    Q    To each other?

4    A    Yes.

5             MS. CRUZ MELENDEZ:  Nothing further, Your Honor.

6             THE COURT:  All right.  Cross-examination.

7             MS. BLANK BECKER:  Thank you, Judge.

8    CROSS EXAMINATION

9    BY MS. BLANK BECKER:

10   Q    Good afternoon, Ms. Harris.

11   A    Hi.

12   Q    Ms. Harris, I just have a couple quick questions.

13            Ms. Harris, I believe one of the things that you

14   indicated is at the beginning when someone comes in for a

15   certificate for marriage, both the partners have to be there;

16   is that correct?

17   A    Yes.

18   Q    Okay.  And that's when they fill out some paperwork

19   initially; is that correct?

20   A    Yes.

21   Q    Okay.  And in this particular instance, we've been

22   talking about a specific marriage between Mr. Kelly and Ms.

23   Haughton; correct?

24   A    Yes.

25   Q    And if I also understand correctly, you were not the

Harris - cross - Blank Becker                643

1    individual who helped them back then; is that correct?

2    A    Yes.

3    Q    All right.  Now, when it came to the application and the

4    marriage license, that would have to be, I believe as you

5    indicated, one day later?  Those two things cannot be done on

6    the same day; correct?

7    A    No, they are done on the same day.

8    Q    Excuse me.  Thank you for correcting me.

9         Those two things are done on the same thing, but

10   then the next day, you have to wait 24 hours for something;

11   correct?

12   A    Yes.

13   Q    Okay.  What do you have to wait 24 hours for?

14   A    To get married.

15   Q    Now, you've had an opportunity to see a copy of their

16   marriage license; is that correct?

17   A    Yes.

18   Q    And their marriage license indicates that they were

19   married on the 30th, August 30th of '94; is that correct?

20   A    The marriage license indicated they was married August

21   31st.

22        MS. BLANK BECKER:  Give me one moment, please.  May

23   I, Judge?

24        THE COURT:  Sure.

25        (Pause.)

1        MS. BLANK BECKER:  And I apologize, but can you

2   bring up the marriage license, please.  At this point, it is

3   just so the witness can see it, but there is an earlier

4   exhibit that has been allowed in.  Can I publish it?

5        THE COURT:  If it's in evidence --

6        MS. BLANK BECKER:  Yes.

7        THE COURT:  -- you can publish it.

8        MS. BLANK BECKER:  Thank you.

9        (Exhibit published.)

10  BY MS. BLANK BECKER:

11  Q    This is the marriage license that you had a chance to

12  see; is that correct?

13  A    Yes.

14       MS. BLANK BECKER:  Just for the record, Government

15  Exhibit 803-B.

16  Q    And on this marriage certificate, there is an indication

17  on here that when it come to -- sort of in the middle, where

18  it has a date, that would be -- which is the 30th, that's the

19  date -- tell us, that's the date of what?

20       MS. CRUZ MELENDEZ:  Your Honor, I'm sorry to

21  interrupt.  I just want to clarify, it's the marriage license,

22  not the certificate.

23       MS. BLANK BECKER:  I apologize.  You are correct.

24       THE COURT:  Okay.

25  Q    Marriage license, towards the center of that marriage

Harris - cross - Blank Becker                645

1   license, there's a date there that says August 30th.  What is

2   that date?

3   A    The date they apply.

4   Q    That they applied for it, which would have been the day

5   before the actual license; correct?

6   A    Yes.

7   Q    Okay.  Is there ever a timestamp that's given?

8   A    No.

9   Q    So earlier when you said it had to be 24 hours, how do

10  you determine if it's 24 hours or not?

11  A    We advise them that the marriage license is valid any

12  time after that day.

13  Q    Okay.  It's not necessarily a 24-hour thing.  It's just

14  -- if it's a Monday, it's got to be Tuesday, the following

15  day, not necessarily 24 hours?

16  A    Yes.

17  Q    Thank you.

18       And was that also true back in 1994, that's how it

19  worked?

20  A    Yes.

21  Q    Now, you were asked some questions about the

22  certification of marriage.  Remember that?

23  A    Yes.

24  Q    Okay.  And, in fact, that was another exhibit that was

25  looked at.

1           There's no reason to have more than one certificate,

2   certification of marriage; is that correct?

3   A     What?  To obtain or?

4   Q     Sorry.  Let me be more specific.

5           The certification of marriage that we had a chance

6   to see, that's sort of a final documentation, is that fair to

7   say?

8   A     Yes.

9   Q     All right.  And there's only -- strike that.

10          And the certificate of marriage, which -- I

11  apologize.

12          Okay.  And the certificate of marriage, which is

13  what I am showing on the ELMO currently, on the bottom right,

14  there is a number there that says 6002844; is that correct?

15  A     Yes.

16  Q     What does that number refer to?

17  A     The paper number.

18  Q     Paper number meaning what?  I apologize?

19  A     The paper number, the count of the paper.

20  Q     And if you could, explain to us what you mean by that,

21  the count of the paper.

22  A     Meaning from 1 to 600, whatever the -- thousands, the

23  paper.

24  Q     Does it have significance, meaning that that number --

25  does that number correlate at all to the fact that this is the

Harris - redirect - Cruz Melendez                647

1   certificate of marriage for these two individuals?

2   A    No.

3   Q    Okay.  That number has to do with, you're saying, just

4   something that has to do with when it's processed?

5   A    Just a paper count.

6   Q    Paper count?

7   A    Yes.

8   Q    So there could be a variety of different people who could

9   print it out with a different number on the bottom right, is

10  that what you're saying?

11  A    Yes.

12  Q    Got it.  Thank you.

13          MS. BLANK BECKER:  Ms. Harris, I don't have any

14  additional questions.  Thank you very much.

15          THE COURT:  Any redirect?

16          MS. CRUZ MELENDEZ:  I just want to clarify two

17  things, Your Honor.

18          THE COURT:  Sure.

19  REDIRECT EXAMINATION

20  BY MS. CRUZ MELENDEZ:

21  Q    Ms. Harris, on cross-examination, I think Ms. Becker

22  stated that the marriage license occurs -- is generated a day

23  after the application; is that correct?

24  A    No.

25  Q    When is the marriage license created with respect to the

Harris - redirect - Cruz Melendez                648

1    application?

2    A    The same day.

3    Q    And, again, looking at the marriage license, which is

4    Government Exhibit 803-B, at the bottom -- we talked about

5    this on direct examination -- there's the date that the

6    ceremony occurred according to the marriage license; correct?

7    A    Yes.

8    Q    Does the Cook County Clerk's Office do any independent

9    verification with respect to the actual date of marriage?

10   A    No.

11   Q    So with respect to the certification of marriage -- I

12   will put that back on the screen.  That's Government Exhibit

13   803-C, where it says here date of marriage, August 31, 1994,

14   again, is that coming straight from the handwritten

15   information provided by the officiant on the marriage license

16   in Government Exhibit 803-B?

17   A    Yes.

18   Q    Thank you.

19           MS. CRUZ MELENDEZ:  Nothing further, Your Honor.

20           THE COURT:  Any recross?

21           MS. BLANK BECKER:  No, Judge.  Thank you.

22           THE COURT:  Thank you so much, Ms. Harris.  You can

23   step down.

24           THE WITNESS:  Thank you.

25           (Witness steps down.)

Proceedings                                    649

1          THE COURT:  Is now a good time to take our afternoon

2     break?

3          Okay, ladies and gentlemen, we're going to take our

4     afternoon break.  15 minutes, I think.  Please don't talk

5     about the case.  I'll see you in 15 minutes.

6          THE COURTROOM DEPUTY:  All rise.

7          (Jury exits the courtroom.)

8          (In open court - jury not present.)

9          THE COURT:  All right.  Everybody can sit down.

10         So is the next witness the witness -- is this next

11    witness the one you told me about this morning?

12         MS. CRUZ MELENDEZ:  Yes.

13         THE COURT:  Can you just put on the record what it

14    is that you -- is this someone that I have signed an order for

15    previously?

16         MS. CRUZ MELENDEZ:  Your Honor, you haven't signed

17    an order for, but there is an order that's dated October 22,

18    2019 as Ms. Geddes mentioned this morning, we anticipate the

19    witness will assert his Fifth Amendment privilege and the

20    Government is prepared to offer immunity if that occurs.

21         THE COURT:  All right.

22         MS. CRUZ MELENDEZ:  And it was signed by Judge

23    Mauskopf.

24         THE COURT:  Okay.  So what's the procedure then?  I

25    haven't done this in a while.  If I remember correctly, you

Proceedings                              650

1    bring him in and I ask him whether he intends to assert his

2    Fifth Amendment privilege; is that right?

3              MS. CRUZ MELENDEZ:  We can certainly do it that way,

4    Your Honor, or I can ask a question and see if he asserts his

5    Fifth Amendment.

6              THE COURT:  But outside of the presence of the

7    jury --

8              MS. CRUZ MELENDEZ:  Yes, outside the presence of the

9    jury.

10             THE COURT:  I'm sorry to interrupt you.

11             And then the immunity includes immunity except for

12   perjury; is that right?

13             MS. CRUZ MELENDEZ:  That's correct, Your Honor.

14             THE COURT:  Just put on the record what the

15   conditions of the immunity are.

16             MS. CRUZ MELENDEZ:  It was my intention to read the

17   order, Your Honor.

18             THE COURT:  Great.

19             MS. CRUZ MELENDEZ:  So I would ask -- I think the

20   simplest thing, Your Honor, is when the witness comes in if

21   you would like to ask the witness if they intend to assert his

22   Fifth Amendment privilege.

23             THE COURT:  Okay.  Who is the witness?

24             MS. CRUZ MELENDEZ:  His name is Demetrius Smith.

25             THE COURT:  And assuming he does, he is going to

Proceedings                                              651

1    have an attorney here as well?

2            MS. CRUZ MELENDEZ:  That's correct.

3            THE COURT:  Anything else that you want to put on

4    the record about this?

5            MS. CRUZ MELENDEZ:  Nothing further from the

6    Government.

7            THE COURT:  I simply plan to ask him if he intends

8    to invoke his Fifth Amendment privilege and then if he says

9    yes, I will tell him that you are going to read the order

10   then.

11           MS. CRUZ MELENDEZ:  That's correct.

12           THE COURT:  And then he will no longer have a

13   privilege to invoke and I will advise him of that.

14           MS. CRUZ MELENDEZ:  Thank you, Your Honor.

15           THE COURT:  Anything from the defense on this

16   subject?

17           MR. CANNICK:  No, Your Honor.

18           THE COURT:  All right.  So why don't we take our

19   break and then we will handle this in about ten minutes, okay.

20           (Recess taken.)

21           THE COURTROOM DEPUTY:  All rise.

22           THE COURT:  Everybody can sit down.

23           All right.  Shall we bring in the witness.

24           I'm sorry, Ms. Cruz Melendez, can you tell me his

25   name again?

1          MS. CRUZ MELENDEZ:  Demetrius Smith, Your Honor.

2          THE COURT:  Okay.  And I take it his lawyer is with

3     him?

4          MS. CRUZ MELENDEZ:  Yes.

5          THE COURT:  Who is his counsel?

6          MS. CRUZ MELENDEZ:  Susan Marcus.

7          THE COURTROOM DEPUTY:  Please remain standing.

8          THE COURT:  Ms. Marcus, do you want to stand next to

9     the witness?  Is that helpful?

10          MS. MARCUS:  Sure.

11          THE COURTROOM DEPUTY:  Please raise your right hand.

12          (Witness sworn.)

13          THE COURTROOM DEPUTY:  State your name for the

14     record.

15          THE WITNESS:  Demetrius Smith.

16

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

Proceedings                                      653

1    **DEMETRIUS SMITH**,

2        called by the Government, having been duly sworn, was

3        examined and testified as follows:

4            THE COURT:  Mr. Smith, just have a seat.  There is a

5    microphone right there.  I am going to ask you a couple of

6    questions.

7            I'm told if you are called to testify you plan to

8    assert your Fifth Amendment privilege against self

9    incrimination; is that correct?

10           THE WITNESS:   Yes, I don't want to be here, period.

11           THE COURT:  I can't hear what you're saying.

12           THE WITNESS:  Yes.

13           THE COURT:  Ms. Cruz Melendez.

14           MS. CRUZ MELENDEZ:  Your Honor, the Government would

15   like to now read into the record an order signed by Judge

16   Mauskopf dated October 22, 2019.

17           It reads:  In re testimony of Demetrius Smith.

18           On motion of Richard P. Donoghue, United States

19   Attorney for the Eastern District of New York, by Assistant

20   United States Attorney Maria Cruz Melendez, filed in this

21   matter on October 22, 2019, it appearing to the satisfaction

22   of the Court; that Demetrius Smith, the witness, has been

23   called to testify or provide other information before the

24   grand jury; that in the judgment of the United States Attorney

25   the witness is likely to refuse to testify or provide other

Proceedings                                          654

1   information on the basis of his privilege against

2   self-incrimination; that in the judgment of the United States

3   Attorney the testimony or other information from the witness

4   may be necessary to the public interest and that the aforesaid

5   motion filed herein has been made with the approval of

6   Jennifer A.H. Hodge, Acting Deputy Assistant of the Attorney

7   General of the Criminal Division of the United States,

8   Department of Justice, pursuant to the authority vested in her

9   by Title 18, United States Code, Section 6003(b) and Title 28,

10  Code of Federal Regulations, Section 0.175(a).

11          Now, therefore, it is ordered, pursuant to Title 18,

12  United States Code, Sections 6002 and 6003, that the witness

13  give testimony or provide other information which he refuses

14  to give or to provide on the basis of his privilege against

15  self-incrimination as to all matters about which he may be

16  questioned before the grand jury, and in any further

17  proceedings resulting therefrom or ancillary thereto.

18          It is further ordered that, pursuant to Title 18,

19  United States Code, Sections 6002 and 6003, no testimony or

20  other information compelled under this order or any

21  information directly or indirectly derived from such testimony

22  or another information may be used against the witness in any

23  criminal case, except in a prosecution for perjury, giving a

24  false statement, obstruction of justice, or otherwise failing

25  to comply with this order.

1           This Order shall become effective only if, after the

2    execution of this Order, the witness refuses to testify or

3    provide other information on the basis of his privilege

4    against self-incrimination.

5           It is dated October 23, 2019, in Brooklyn, New York.

6           It is signed by the Honorable Roslyn R. Mauskopf,

7    United States District Judge Eastern District of New York.

8           THE COURT:  Okay.  Mr. Smith, have you discussed

9    this with your attorney?

10          THE WITNESS:  I do have a question for you right

11   now.

12          THE COURT:  Speak to your lawyer about it.  Okay.

13          (Pause.)

14          THE WITNESS:  She is telling me stuff, but I don't

15   understand it.

16          THE COURT:  So I'm going to give you a little more

17   time to consult with your lawyer, but the bottom-line here is

18   you had invoked your Fifth Amendment privilege against self

19   incrimination, and I know you know what that means; correct?

20          THE WITNESS:  Yes, I was told that was given to me

21   -- offered to me, but I didn't want to be here anyway, but.

22          THE COURT:  Well, you would be in good company.

23   There are lots of people who don't want to testify, but that's

24   really not the question.  The question is now that the

25   Government has secured an order signed by another district

Proceedings                                                       656

1  judge in this courthouse, that if you testify, you cannot be

2  prosecuted for anything that you talk about.

3          THE WITNESS:  All right.

4          THE COURT:  So you don't have -- well, you can't

5  take the Fifth anymore because they have an order that you

6  have immunity from prosecution.  So you have a good lawyer

7  here with you.  She will explain what that means to you, but

8  the bottom-line is that you have to testify about those things

9  that you were concerned that you could yourself face

10 prosecution for.

11         Do you understand that?

12         THE WITNESS:  Yeah.  I don't feel like I did on the

13 first prosecution for, so why do I have to testify here?

14         THE COURT:  Do you want to speak to your lawyer for

15 a minute?

16         MS. MARCUS:  May I have a moment?

17         THE COURT:  Yes.  Go ahead.

18         (Pause.)

19         MS. GEDDES:  Your Honor, can I address something?

20         THE COURT:  Of course.  You can take your mask off.

21         MS. GEDDES:  Your Honor previously admitted

22 Government Exhibit 241 subject to connection.  That was that

23 blue T-shirt that Ms. Pace identified as one that she had used

24 to wipe semen from her face.

25         The Government is prepared to call two witnesses

Proceedings                                        657

1  next week who will testify that there was, in fact, semen

2  found on the shirt and the semen matched that of the

3  defendant's.  Your Honor previously admitted subject to

4  connection, but I believe it should be admitted period because

5  the witness identified it as the t-shirt that she used to wipe

6  off the defendant's semen.  The defense counsel claimed that

7  they wanted to challenge the chain of custody, but any

8  challenges to chain of custody go to weight, not to

9  admissibility.

10        The Government is planning to call additional

11  witnesses who will establish a chain of custody, but I want to

12  be able to call the DNA witnesses next week and I'm not sure

13  that those other custody witnesses are going to testify before

14  them.

15        THE COURT:  I don't think you would have any

16  objection to that, do you?

17        It is true essentially that the chain of custody

18  issue in this circumstance really will go to weight, not

19  admissibility.  But they are planning to establish it anyway.

20        You can take your mask off too.

21        MR. CANNICK:  Your Honor, I would maintain my

22  objection.

23        I -- I certainly would not object to the witnesses

24  testifying without that custody chain.

25        THE COURT:  Okay.

Proceedings                        658

1           MR. CANNICK:  Okay.

2           THE COURT:  And then -- I mean, it sounds like

3    whatever objection you have will be, if the Government can do

4    it, will be made moot by the testimony of the chain of custody

5    people, assuming they can.  So I think we are in agreement

6    about that.

7           MS. GEDDES:  So that exhibit is now in evidence.

8           MR. CANNICK:  No.

9           THE COURT:  It is still subject to connection.  It's

10   fine.  Your DNA people can testify.

11          MS. GEDDES:  Okay.

12          THE COURT:  It's not a thing.

13          MS. GEDDES:  Okay.  Thank you, Judge.

14          MR. CANNICK:  Your Honor, while they are talking,

15   can I run out?

16          THE COURT:  Yes.

17          MS. GEDDES:  I have one other procedural matter.

18   I'm sorry.

19          THE COURT:  Maybe co-counsel can handle it.

20          MS. GEDDES:  Your Honor, we previously discussed not

21   sitting on the two-day Rosh Hashanah holiday and I think Your

22   Honor was going to perhaps talk with the jury about whether

23   they wanted to take both days, if there was anyone who

24   celebrated both days.

25          THE COURT:  I don't know that they celebrate both.

1    I know there are that celebrate one day.  We will find out.

2              MS. GEDDES:  Okay.

3              MS. BLANK BECKER:  Judge, for the record, I'm Jewish

4    as well.  I do celebrate Rosh Hashanah.

5              THE COURT:  We are taking the day off.

6              MS. BLANK BECKER:  Okay, I just thought that was a

7    discussion we were having.

8              MS. GEDDES:  I think the question is whether we take

9    off one or two days.

10             THE COURT:  Do you want to take both days off?

11             MS. BLANK BECKER:  I would, Your Honor, because I

12   have to fly home and come back.  All right.  That's the plan.

13             THE COURT:  That would have been good to know

14   before.  When is Rosh Hashanah?

15             MS. GEDDES:  The 7th and 8th.  Labor Day is Monday

16   the 6th and then the 7th and 8th are Tuesday and Wednesday.

17   My understanding, and certainly Ms. Becker can correct me, is

18   that the first day is the day that is celebrated almost by

19   all, but the second day is for more religious individuals.

20             THE COURT:  Well, Donnellys generally don't weigh in

21   on things like this.  I'm not telling you you have to, but

22   since it is going to be Labor Day before, you're going to have

23   the whole weekend, can you consider coming back on the Tuesday

24   assuming the jurors don't want to?

25             It's just that we have a long road ahead of us, and

Proceedings                     660

1    if we can make the most of the time that we have.  It may all

2    be rendered moot if there is also a juror -- I got the idea

3    from Ms. Becker that this was a travel issue rather than an

4    observation issue.

5            MS. BLANK BECKER:  Judge, because I hadn't been

6    asked about it before, I wasn't trying to keep anything from

7    you.

8            THE COURT:  I know.  Listen, it's not my habit to

9    inquire of the lawyers what their particular religious

10   observances are.  I'm simply trying to keep this trial on

11   schedule.  There are a lot of moving parts here and if you

12   want to take both days, you know, you can take them.  But I'm

13   just suggesting that because it's on the Tuesday after a long

14   holiday that if you don't need it, you don't have to.  But

15   let's not get into a debate about it.  Let's find out from the

16   jurors what they are doing and we will deal with that issue

17   when we have to deal with it.

18           MS. GEDDES:  Thank you.

19           MS. BLANK BECKER:  Thank you, Judge.

20           MS. CRUZ MELENDEZ:  Your Honor, we have just

21   received word that Mr. Smith and his attorney are done.  So I

22   think we might be able to bring them back in.

23           THE COURT:  All right.  Did he testify in the grand

24   jury?

25           MS. CRUZ MELENDEZ:  He did, Your Honor.

Proceedings                                          661

1          THE COURT:  Okay.  Thanks.

2          MS. BLANK BECKER:  Judge.

3          THE COURT:  Wait.  Why don't we wait until Mr.

4   Cannick gets back.

5          (Pause.)

6          THE COURT:  There he is.  Now you can go and get the

7   witness.

8          (Witness takes stand.)

9          THE COURT:  Okay.  Mr. Smith, you can take your mask

10  off.  I want to make sure the court reporter can hear what you

11  are saying.

12          Have you had a chance to speak with your lawyer?

13          THE WITNESS:  Yes, I have.

14          THE COURT:  And you understand the consequences of

15  what we talked about earlier?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.  So I think we can get the

18  jury.

19          He is going to be here and this is just because of

20  our COVID protocol.

21          And if you need at any time during the course of

22  your examination to consult with your lawyer, just let me

23  know, okay, and then we will make the arrangements.

24          THE WITNESS:  Yes, ma'am.

25          How's everybody doing today?

Proceedings                                              662

1          THE COURT:  Let's just wait until we start the

2    questioning.  Okay?  It won't be that bad.

3          THE COURTROOM DEPUTY:  All rise.

4          (The jury enters the courtroom.)

5          THE COURTROOM DEPUTY:  You may be seated.

6          THE COURT:  All right.  Ladies and gentlemen, we are

7    ready to continue.

8          Are you ready to call your next witness?

9          MS. CRUZ MELENDEZ:  Yes, Your Honor.

10         The Government calls Demetrius Smith.

11         THE COURT:  And here he is.

12         Mr. Smith, I'm just going to give you a couple of

13   directions before the testimony starts.

14         The first thing is our court reporter takes down

15   everything that you say.  So it's important first that you

16   speak into the microphone so she can hear you, and second,

17   that you not speak too quickly, and the third part is that you

18   don't speak over whoever is questioning you.  It just makes it

19   hard for them to do their job.

20         The next thing is if there is a question that isn't

21   clear or you want to have repeated, just let me know.

22         And, finally, do your best to just answer the

23   question that you are being asked, okay?

24         THE WITNESS:  Yes, ma'am.

25         THE COURT:  Great.

1              Go ahead.

2    DIRECT EXAMINATION

3    BY MS. CRUZ MELENDEZ:

4    Q    Good afternoon, Mr. Smith.

5              Did you receive a subpoena to appear here today?

6    A    Yes, I did.

7    Q    You don't want to be here testifying, do you?

8    A    No, I'd rather not.

9    Q    Have you also received a grant of immunity for your

10   testimony today?

11   A    Yes.

12   Q    What do you understand that to mean?

13   A    That I won't be prosecuted for anything that I say.

14   Q    Now, do you also understand that that grant of immunity

15   does not extend to perjury?

16   A    Yes.

17   Q    Or giving a false statement, do you understand that?

18   A    Yes.

19   Q    Or obstruction of justice, do you understand that?

20   A    Yes.

21   Q    Or otherwise failing to comply with the immunity order

22   issue, do you understand that?

23   A    Yes.

24   Q    Mr. Smith, how old are you?

25   A    65.

D. Smith - direct - Cruz Melendez                664

1  Q    Where did you grow up?

2  A    In Chicago, Illinois.

3  Q    Are you employed?

4  A    At the present, no.

5  Q    And what did you do before your unemployment status?

6  A    I worked as a limousine driver and then COVID hit.  I

7  worked as a limousine driver and the COVID hit.  Since then, I

8  have been unemployed.

9          THE COURT:  Just do your best to use that

10  microphone.  It's a big room.

11          THE WITNESS:  Yes, ma'am.

12          THE COURT:  That's great.  Go ahead.

13  Q    Do you have any nicknames?

14  A    My family calls me Johnny.

15          MS. CRUZ MELENDEZ:  I'm showing the witness what has

16  been marked for identification purposes as Government Exhibit

17  6.

18  Q    Do you see Government Exhibit 6 for identification

19  purposes there?  Do you see that there on the monitor?

20  A    Yes, I do.

21  Q    Do you recognize the individual in that photograph?

22  A    Yes.

23          MS. CRUZ MELENDEZ:  If the defense has no objection,

24  the Government moves to admit Government Exhibit 6 into

25  evidence.

D. Smith - direct - Cruz Melendez                665

1          MR. CANNICK:  No objection.

2          THE COURT:  All right.  That will be in evidence.

3          (Government's Exhibit 6 received in evidence.)

4          THE WITNESS:  You can publish it.

5          (Exhibit published.)

6   BY MS. CRUZ MELENDEZ:

7   Q    Are you familiar with an individual named Robert Kelly,

8   also known as R. Kelly?

9   A    Yes, ma'am.

10  Q    I'm sorry.  I need to back up for a moment.

11         Who is the individual in this photograph?

12  A    That's me.

13         MS. CRUZ MELENDEZ:  I moved too soon.

14  Q    So back to my other question:  Are you familiar with an

15  individual named Robert Kelly, also known as R. Kelly?

16  A    Yes, I am.

17  Q    Have you met Robert Kelly in person?

18  A    Yes, I have.

19  Q    I'm showing you what is in evidence as Government Exhibit

20  1.  Do you recognize the individual in this photograph?

21  A    It looks like Robert.

22  Q    When you say Robert, do you mean Robert Kelly?

23  A    Yes.

24  Q    Do you see Robert Kelly in the courtroom here today?

25  A    Take your mask off.

D. Smith - direct - Cruz Melendez                666

1    Q     If you see him, can you please point him out?

2    A     That's Robert.

3    Q     And indicate an item of clothing he is wearing?

4    A     He's wearing a gray suit with a brown shirt.

5          THE COURT:  Indicating the defendant.

6    BY MS. CRUZ MELENDEZ:

7    Q     Mr. Smith, approximately when did you first meet the

8    defendant?

9    A     I met Robert Kelly in '84.

10   Q     And how did you meet the defendant?

11   A     I met him at a talent show, at Kenwood Academy.

12   Q     And what's Kenwood Academy?

13   A     It's -- it was a park district function and Kenwood

14   Academy is a high school.

15   Q     Now, when you met the defendant, were you in the

16   entertainment business?

17   A     Yes.

18   Q     What did you do in the entertainment business?

19   A     I was a singer.  I had a band.

20   Q     After meeting the defendant, what, if any, relationship

21   did you have with him?

22   A     When I met Robert, he was performing.  He was a

23   youngster.  He was singing original songs.  And at that time I

24   was looking for songs and Robert totally impressed me and I

25   approached him for it.  And from that moment, we began working

D. Smith - direct - Cruz Melendez                 667

1   together.

2   Q    And in what capacity did you start working for the

3   defendant?

4   A    Well, I just assisted him with anything he needed to

5   further his career.

6   Q    And approximately when did you begin working with him?

7   A    1984.

8   Q    Over what total period of time did you work with the

9   defendant?

10  A    I worked with Robert from '84 to '96, I think is when we

11  ended.  '94, we ended.  I went back again.  Pretty much '96 it

12  all ended.

13  Q    Would it be fair to say that you took some breaks from

14  your employment with the defendant?

15  A    A couple, yes.  Yes.

16  Q    Now, during periods of these breaks that you mentioned,

17  did you maintain contact with the defendant?

18  A    We ran back into each other.  As far as me calling him on

19  a regular basis, in the beginning, no.  We got separated

20  again.  You know, I went to prison at one time.

21  Q    Now, you had mentioned that you had almost immediately

22  began working for the defendant?

23  A    Uh-hum.

24  Q    What was your title?  How would you describe yourself?

25  A    Well, in the beginning I would -- you know, I would say I

D. Smith - direct - Cruz Melendez                  668

1    just wanted to be somebody that he could look up to that could

2    help.  But as time developed, I was like a personal assistant

3    to him.

4              (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MS. CRUZ MELENDEZ:

3   Q    And what were your responsibilities as his personal

4   assistant?

5   A    Again, just seeing to it that he got things that he

6   needed to further his career.  I mean I just wanted him to be

7   comfortable to -- to -- to write.

8   Q    What, if any, responsibilities did you have with respect

9   to the defendant's schedule?

10  A    When we signed with the record company, you know, they

11  gave me tours to do.  So, I would do the scheduling.  Yeah, I

12  did pretty much everything.

13  Q    Did you have any responsibilities with respect to travel?

14  A    I did scheduling, scheduling included traveling.  If he

15  needed something to get something to his family or something,

16  I would do that, you know.

17  Q    Now, were you paid when you were the defendant's personal

18  assistant?

19  A    Well, in the beginning there was no money.  And as time

20  went on, I got -- I was paid.

21  Q    And how were you paid as time went on?

22  A    I was paid in check.

23  Q    Prior to being paid in check, did you have any other --

24  what was the agreement in terms of how much you would be paid?

25  A    In the beginning me and Robert, we've always discussed

1  5 percent.  That was with me, him and a former manager, Chuck

2  Smith, and we discussed 5 percent.  And pretty much Robert, in

3  the beginning we would make money in the subways.  You know,

4  he'll make his money, he'll give me 5 percent, which was a

5  little bit.

6  Q    Now, when you were working for the defendant, did you

7  have an opportunity to meet people in the defendant's inner

8  circle?

9  A    Yes, I did.

10  Q    Who did you meet?

11  A    I met his buddies.

12  Q    And who were they?

13  A    They had --

14        MR. CANNICK:  Your Honor, I am going to object to

15  relevance.

16        THE COURT:  Overruled.

17  BY MS. CRUZ MELENDEZ:

18  Q    You can answer.

19  A    Well, I met his buddies.  I met his family.  I met his

20  brother.  I met his, you know, brothers.  I met his sisters,

21  his mom.  His buddy Larry, Torrey.

22  Q    Do you remember Larry's last name?

23  A    Larry?  I mean we don't -- if I may say, you know --

24  Q    Sir.

25        THE WITNESS:  If I may ask?

1           THE COURT:  Oh, you want to speak to your counsel?

2           THE WITNESS:  Yes.

3           THE COURT:  Okay.

4           (The witness consults with his counsel.)

5    A    Yeah, I know Larry Hood.

6    Q    And what other names do you recall of people you met

7    while working with the defendant?

8    A    Torrey Diggs, Jim Pratts.  Neighborhood friends, you

9    know.

10   Q    Are you familiar with an individual named Bruce Kelly?

11   A    That's his brother.

12   Q    When you say "his," who do you mean?

13   A    That's Robert's brother.

14   Q    And are you familiar with an individual named Tyree

15   Jameson?

16   A    Tyree Jameson; yes, I know Tyree.

17   Q    And what, if any, job or responsibility did Tyree Jameson

18   have with the defendant?

19   A    Tyree was hired as --

20           MR. CANNICK:  Objection.

21   A    -- security for Robert.

22           THE COURT:  Overruled.

23           I want to make sure your microphone is on.  We're

24   having a little trouble hearing.  And you can take your mask

25   off, too.

1           Sorry about that.  Go ahead, Ms. Cruz Melendez.

2    BY MS. CRUZ MELENDEZ:

3    Q    You had mentioned that you originally met the defendant

4    at a talent show.

5           At some point did the defendant begin singing

6    professionally?

7    A    Yes.

8    Q    And was the defendant signed to a record label?

9    A    Yes.

10   Q    And which record label was the defendant signed to?

11   A    Signed to Jive Records.

12   Q    And approximately when was he signed to Jive Records?

13   A    About '89, '88, something like that maybe.

14   Q    Now, as part of the defendant working with the record

15   labels, did the defendant release any songs?

16   A    Yes, he did.

17   Q    And when you were working with the defendant, did the

18   defendant release any albums under Jive Records?

19   A    Can you repeat that?

20   Q    Did the defendant release any albums under Jive Records?

21   A    Yes.

22   Q    And what was the name of the defendant's first album?

23   A    Born Into The 90's.

24   Q    Generally speaking, who wrote the songs released by the

25   defendant?

Smith - direct - Cruz Melendez                    673

1   A    Robert Kelly.

2   Q    And after releasing the Born Into The 90's album, did the

3   defendant release any other albums?

4   A    Yes, he did.

5   Q    Now, at the time the defendant was signed with Jive

6   Records, did he have a manager?

7   A    Yes, he did.

8   Q    And what was his manager's name?

9   A    Barry Hankerson.

10  Q    After signing with Jive Records, did the defendant ever

11  perform live?

12  A    Yes.

13  Q    And did people come to see his performances?

14  A    Yes, they did.

15  Q    Now, you testified earlier that you first began working

16  as the defendant's personal assistant, and then at some point

17  you were also assisting with tours; is that correct?

18  A    Yes.  I worked as a tour manager as well.

19  Q    And approximately when did you become his tour manager?

20  A    Our first tour.

21  Q    And do you recall when that first tour was?

22  A    The Born Into The 90's album.

23  Q    Do you remember an approximate date?

24  A    Not off the top of my head.  Let me see.  Born Into The

25  90's we did -- we did shows way before that.  We did shows

Smith - direct - Cruz Melendez                    674

1   with Heavy D and the boys.  We did -- this was before his

2   deal.  So, signed with Jive.  We got Born Into The 90's came

3   out.  So, I would say '90, in 1990, you know.

4   Q    In the vicinity of that timeframe?

5   A    In the vicinity, yeah.

6   Q    So, as his tour manager, what were your responsibilities?

7   A    To get him to and from the tour and on stage on time,

8   safe.  And at the same time, make sure everything was

9   accommodated, you know, his payroll.  I took care of the

10  artists.  I took care of the crew.  My responsibility was a

11  lot.

12  Q    Now, you mentioned that you assisted with the tour

13  responsibilities.

14          Did the defendant ever perform live outside of

15  Illinois?

16  A    Yes.

17  Q    And did you travel on tour with the defendant?

18  A    Yes.

19  Q    What locations do you recall traveling to with the

20  defendant on tour?

21  A    We did -- we had tours over down south.  We had tours all

22  over the states.

23  Q    Are you --

24  A    We went overseas.  We did a lot of tours.  We covered a

25  lot of ground.

SAM      OCR      RMR      CRR      RPR

Smith - direct - Cruz Melendez                    675

1  Q    Are you familiar with an individual named Jovante?

2  A    Yes, I remember Jovante.

3  Q    And did Jovante ever travel on tour with you and the

4  defendant?

5  A    One time I remember, yes.

6  Q    And what, if any, role did Jovante have with respect to

7  the defendant's tour?

8  A    She didn't have a role, they were just like little

9  singers.  They were singers and he wanted them to see what it

10 was like on the road and watch the other acts that were out

11 there as well.

12 Q    So, you testified that you traveled on tour with the

13 defendant outside of Illinois, around the country?

14 A    Yes.

15 Q    Did people come to see the defendant perform when he

16 performed outside of Illinois on tour?

17 A    Yes.

18 Q    And when the defendant performed live at shows, did any

19 other musicians perform in any of those shows?

20 A    Yes.

21 Q    Earlier you also testified that the defendant generally

22 wrote his songs.

23      Did Kelly ever -- did the defendant ever write or

24 produce any songs for other musical artists?

25 A    Yes, he did.

Smith - direct - Cruz Melendez                676

1   Q    And did the defendant ever collaborate on music projects

2   with any other artists?

3   A    Yes, he did.

4   Q    Are you familiar with an individual name Aaliyah

5   Haughton?

6   A    Yes, I'm familiar with Aaliyah.

7   Q    Did you ever meet Aaliyah Haughton in person?

8   A    Yes, I did.

9        MS. CRUZ MELENDEZ:  I'm showing just the witness

10  what's been marked for identification purposes as Government's

11  Exhibit 54.

12  BY MS. CRUZ MELENDEZ:

13  Q    Mr. Smith, do you recognize the individual in this

14  photograph?

15  A    Yes.

16  Q    And who do you recognize it to be?

17  A    That's Aaliyah.

18       MS. CRUZ MELENDEZ:  Your Honor, if there's no

19  objection from the defense, the Government moves to admit

20  Government Exhibits's 54.

21       MR. CANNICK:  No objection, Your Honor.

22       THE COURT:  All right, that's in evidence.  You can

23  publish it.

24       (Government's Exhibit 54 was received in evidence.)

25       (Exhibit published.)

Smith - direct - Cruz Melendez                677

1   BY MS. CRUZ MELENDEZ:

2   Q    Is Aaliyah still living?

3   A    No, she's not.

4   Q    How did you come to meet Aaliyah?

5   A    I met Aaliyah through her -- through her -- through her

6   uncle, Barry Hankerson.

7   Q    And what, if any, relation, again, did Barry Hankerson

8   have with the defendant?

9   A    Barry was Robert's manager.

10  Q    And do you recall approximately when you first met

11  Aaliyah?

12  A    Yes.

13  Q    When was that?

14  A    We went -- we went to Detroit to meet Aaliyah and her

15  family.

16  Q    Do you remember approximately what date that was?

17  A    No, I don't remember.

18  Q    If I showed you -- is there something that might refresh

19  your recollection?

20  A    Uh-hum.

21       MS. CRUZ MELENDEZ:  May I approach, Your Honor?

22       THE COURT:  Yes.

23  A    Fall of '92, that's about right.

24  Q    So, this refreshes your recollection?

25  A    Maybe, yeah.  I'm not sure if I was precise, but it's

Smith - direct - Cruz Melendez                   678

1   around that time.

2          THE COURT:  Did you say the fall of 1992?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Okay.  Go ahead.

5          THE WITNESS:  Could have been around that time, it

6   could have been a little later, you know.

7          THE COURT:  Okay.

8   BY MS. CRUZ MELENDEZ:

9   Q    And I think you mentioned that you met the defendant --

10  excuse me, that you met Aaliyah in Detroit.

11         Who, if anyone else, was with you?

12  A    I think the first time was me and Robert and --

13  Q    Okay, and when we're talking about Detroit, we're talking

14  about Detroit, Michigan?

15  A    Uh-hum.

16  Q    And is that where Aaliyah lived?

17  A    Yes.

18  Q    And who, if anyone else, did Aaliyah live with in

19  Detroit?

20  A    I met her, she was with her dad, her mom, and her

21  brother.

22  Q    Do you recall her brother's name?

23  A    Rashad.

24  Q    Do you recall her parents' names?

25  A    Michael and Diane.

                    Smith - direct - Cruz Melendez              679

1    Q    At the time that you and the defendant met Aaliyah in

2    Detroit, did you also meet her brother at that time?

3    A    Yes.

4    Q    And I'm sorry if you answered this already, but what was

5    her brother's name?

6    A    Rashad.

7    Q    And approximately how old was her brother at the time

8    that you first met him?

9    A    If I said how old he was, I would be assuming, you know.

10   Q    So, you currently don't recall?

11   A    I mean I don't recall his exact -- you know, how old he

12   actually was.

13   Q    Is there something that might refresh your recollection?

14   A    If I -- if I said it even before, maybe 15 or 14,

15   something like that.

16   Q    Okay.  So, you think --

17   A    That's an assumption of his age.  No one ever told me his

18   age.

19   Q    But he appeared to you to be about 15 or 16?

20   A    He appeared to be a young teenager.

21   Q    Now, was Rashad older or younger than Aaliyah?

22   A    I think Rashad was older than Aaliyah.

23            MR. CANNICK:  I'm going to object.  If he knows, he

24   knows.  If he doesn't, then he's speculating.

25            THE COURT:  He can say he thinks.

```
                  Smith - direct - Cruz Melendez              680
```

1              What made you think that?

2              THE WITNESS:  Well, he was a big boy.  You know,

3     taller, you know.  You know, I never really knew their

4     birthdays or nothing like that.

5              THE COURT:  Okay, so you're not sure?

6              THE WITNESS:  Yeah, I'm not sure.

7              THE COURT:  All right.

8              THE WITNESS:  I think Rashad was older.

9     BY MS. CRUZ MELENDEZ:

10    Q    Do you recall how old Aaliyah was at that time?

11    A    I think at that time Barry told me she was --

12             MR. CANNICK:  Objection to what he was told.

13             THE COURT:  Overruled.

14             THE WITNESS:  Your Honor, can my attorney sit here?

15             THE COURT:  If it makes you more comfortable.  Let's

16    just do it two seats apart, if that's okay.

17             THE WITNESS:  It's okay.

18             MS. MARCUS:  It's fine with me.

19             THE COURT:  Okay.

20             MS. CRUZ MELENDEZ:  Your Honor, I just want to make

21    sure that the jury can see Mr. Smith.

22             THE COURT:  Can everybody see the witness?

23             THE JURY:  (Collectively) yes.

24             MS. MARCUS:  Would you prefer I sit here?

25             THE JURY:  (Collectively)  That's fine.

1          MS. MARCUS:  Okay.

2          THE COURT:  So, what was the last question?

3          I'm sorry, do you mind reading it back?  Thanks.

4          (Record read.)

5   BY MS. CRUZ MELENDEZ:

6   Q    So, you can answer.

7          How old do you think Aaliyah was?

8   A    I think at the time she was maybe 14, 15.  I remember

9   they told me that she did a -- she had won some kind of a TV

10  show, American Got Talent, something like that, back in the

11  day.  She was about 13, 14, yeah.

12  Q    Where were you and the defendant when you met Aaliyah?

13  A    We were at her house with her mom and her dad.

14  Q    And why were you and the defendant in Detroit?

15  A    Barry wanted us to -- he wanted Robert to meet Aaliyah

16  because she had talent and he wanted to see if Robert thought

17  she had something.

18  Q    And where had the two of you, you and the defendant,

19  where had you traveled from?

20  A    Chicago.

21  Q    And did you travel together to go to the Detroit?

22  A    Yes.

23  Q    How did you get there?

24  A    I think we drove.  I mean I know if we got there, we

25  drove, you know, so, from Detroit, you know, Chicago, yeah, we

SAM    OCR    RMR    CRR    RPR

Smith - direct - Cruz Melendez                682

1  drove.

2  Q   Can you explain to the jury what happened when you and

3  the defendant first met Aaliyah?

4              MR. CANNICK:  I'm going to object, Your Honor.

5              THE COURT:  Again, I can't hear you.

6              MR. CANNICK:  It's on.

7              THE COURT:  I know, but I guess I'm getting old.

8              MR. CANNICK:  Well, join the club.

9              Your Honor, I'm going to object to form.

10             THE COURT:  Okay, the objection is overruled.

11             Go ahead.

12 BY MS. CRUZ MELENDEZ:

13 Q   Mr. Smith, can you please explain to the jury what

14 happened when you and the defendant first met Aaliyah?

15 A   When we first met Aaliyah, first of all, her mom and her

16 dad were just special, you know, it's like -- it was like

17 walking into the Cosby house, you know, Bill Cosby and Felicia

18 Rashad and that's how the family greeted us.

19             THE COURT:  You have to speak into the microphone.

20 A   That's how the family greeted us.  It was open.  It was

21 warm.  It was just a good place to be at that time.

22             And Robert -- and Aaliyah was kinda shy when he

23 asked her to sing, so Robert went to the piano.  And he'll

24 play something and that relaxed everybody.  And he'll have

25 Aaliyah do something very simple and it brought her voice out

Smith - direct - Cruz Melendez                683

1   and we started hearing some angelic stuff out of her, and it

2   was like a special time.

3   Q      So, Aaliyah sang --

4   A      Yes, she did.

5   Q      -- for you and the defendant?

6   A      Yes.

7   Q      And what, if anything, did the defendant say about

8   Aaliyah singing after Aaliyah sang for you and the defendant?

9   A      Thought she had something special.  Barry asked him:

10  What do you think?  And he thought she had something special.

11  Q      During your trip to Detroit with the defendant, did you

12  and the defendant spend any additional time with members of

13  Aaliyah's family?

14  A      We went to play basketball with Rashad.  We played with

15  his -- with her uncle, Jomo Hankerson.  We played with Tommy

16  Turns and, you know, we went out and had fun, you know.

17  Q      And how long were you and the defendant in Detroit for

18  that trip?

19  A      Maybe a day or two.

20  Q      Now, you mentioned, you testified that Barry Hankerson

21  had wanted the defendant to hear Aaliyah sing?

22  A      Yes.

23  Q      At some point did the defendant begin working with

24  Aaliyah on her music?

25  A      Later.

1   Q    And once he began working with Aaliyah, the defendant

2   began working with Aaliyah on her music, what, if anything,

3   did the defendant do with Aaliyah with respect to her music?

4   A    I mean he wrote her songs.

5   Q    Did Aaliyah put out any albums?

6   A    Yes, she did.

7   Q    And who wrote that album?

8   A    Robert Kelly wrote her first album.

9   Q    And what was the name of her first album?

10  A    Age Ain't Nothing But a Number.

11  Q    Did Aaliyah ever travel to Chicago to work in the studio

12  with the defendant?

13  A    Yes, she did, with her parents.

14  Q    Now, when Aaliyah came to Chicago to record in the

15  studio, which studio did she and the defendant use to record

16  music?

17  A    As I remember, it was CRC Studios downtown, Ohio Street.

18  Q    And did you and the defendant ever travel back to Detroit

19  to visit Aaliyah?

20  A    We went back to Detroit several times.  We did visit

21  Aaliyah's house, and we had other musicians in Detroit that

22  Robert worked a lot with.  And so we had other purpose in --

23  in -- in Detroit, other than Aaliyah.

24  Q    Did Aaliyah and the defendant ever socialize outside of

25  the studio?

```
                    Smith - direct - Cruz Melendez              685
```

1              MR. CANNICK:  Objection.

2              THE COURT:  Overruled.

3    A     Did they socialize outside of the studio?

4              Yes, I mean we all socialize.  We went out, had ice

5    cream, went to movies.

6    Q     Including Aaliyah and the defendant?

7    A     Whatever Robert did with Aaliyah was all about music.  I

8    mean if Robert wanted to be alone with Aaliyah in the other

9    room, in the studio, it was over vocals and stuff like that.

10             I would just say if Robert took Aaliyah out by

11   herself, I couldn't say she did that; no.  Didn't see that,

12   no.

13             But leave her alone in her room while -- or if

14   Robert was in the studio doing something and Aaliyah was

15   uncomfortable, he would clear the studio and he would be there

16   with her.  If he wanted to go eat with her, I would take them

17   to eat.  If he wanted to spend time, it was all about her

18   music.

19   Q     So, sir, you just testified that at times defendant might

20   clear the room when he was with Aaliyah, is that correct?

21   A     Well, I mean the studio.  Not just clear a room to, like,

22   just him and her.  It's like if -- if Aaliyah is not bringing

23   out a note, he might say:  Turn the lights down in there, and

24   he'll be on one side and she'll be on the other side or he'll

25   go in and talk to her.  Stuff like that, you know.

1   Q    Sir, is your testimony here today that the defendant did

2   not spend time alone with Aaliyah?

3   A    No, I'm not saying that.

4   Q    Okay, so did the defendant spend time alone on

5   occasion --

6   A    Yes.

7   Q    -- with Aaliyah?

8   A    Yes.

9   Q    What did the defendant say to you about needing to be

10  alone with Aaliyah?

11          THE COURT:  Mr. Smith, please have pity on our court

12  reporter.  She can't hear what you're saying.

13          THE WITNESS:  Speak into the microphone.

14          THE COURT:  Do you need to have your recollection

15  refreshed?

16          THE WITNESS:  Yes.

17          MS. CRUZ MELENDEZ:  Your Honor, may I approach?

18          THE COURT:  Yes.

19          THE WITNESS:  Yes.

20  BY MS. CRUZ MELENDEZ:

21  Q    So, what, if anything, did the defendant say to you about

22  needing to spend time alone with Aaliyah?

23  A    To work on her vocals, as it says in there, that he would

24  say he need to spend time with her to work on her vocals.  In

25  other words, I'm always under him, so go get you something to

Smith - direct - Cruz Melendez                    687

1    eat.

2    Q    In a private setting, is that correct?

3    A    A private setting is a studio, wherever we are, it's a

4    studio, yeah.

5    Q    But alone, correct?

6    A    Yeah.

7         MR. CANNICK:  Objection, Your Honor.

8         THE COURT:  Overruled.

9    BY MS. CRUZ MELENDEZ:

10   Q    To your knowledge, were there times when the defendant

11   and Aaliyah ended up being alone in the defendant's apartment?

12   A    Yes, I could -- I would think so, yes.

13   Q    And how long might they spend time alone in his

14   apartment?

15   A    I mean her mom would come up with her and they'd all

16   sleep -- you know, all stay over.  And if her mom left out,

17   Robert would be there with her and stuff like that.

18   Q    Sir, my question is --

19   A    I'm just trying to see where you're trying to drive me

20   with your question.

21        THE COURT:  So, here is the deal.  You listen to the

22   question that Ms. Cruz Melendez is asking you and then answer

23   that question.

24        Remember that instruction I gave you at the

25   beginning to answer the question that you are being asked?

SAM     OCR     RMR     CRR     RPR

1           What is the question that you're asking?

2           MS. CRUZ MELENDEZ:  I asked how long might they

3    spend at his apartment.

4           THE COURT:  Do you know how long that --

5           MS. CRUZ MELENDEZ:  The defendant and Aaliyah, when

6    they were alone, how long might they spend at his apartment?

7           THE COURT:  That's the question.  A, did they spend

8    time alone at Mr. Kelly's apartment?

9           THE WITNESS:  Yes.

10          THE COURT:  And when they did that, how long did

11   that happen?  How long were they alone together?

12          THE WITNESS:  Maybe about an hour, maybe sometimes

13   fifteen minutes, sometimes ten minutes.  I'll go back and

14   forth sometimes.  You know, it's like I don't know what you're

15   asking me.

16          THE COURT:  Okay, again --

17          THE WITNESS:  Yes.

18          THE COURT:  -- listen to the question --

19          THE WITNESS:  I listened to the question.

20          THE COURT:  -- and if you don't understand --

21          THE WITNESS:  I heard the question.  I understand

22   the question.

23          THE COURT:  Okay, so remember, I also told you at

24   the beginning if you don't understand a question --

25          THE WITNESS:  I understand the question.

1          THE COURT:  You do, okay.

2          THE WITNESS:  Yeah.

3          THE COURT:  So do your best to answer it, all right?

4          THE WITNESS:  Yes, ma'am.  Yes, ma'am.

5          THE COURT:  Thank you so much.

6          Go ahead.

7     BY MS. CRUZ MELENDEZ:

8     Q    I think you said you mentioned fifteen minutes, ten

9     minutes, but you also said an hour, correct?

10    A    Maybe an hour, yeah.

11    Q    Did you ever have any conversations with the defendant

12    about his behavior with Aaliyah?

13    A    Okay, can you ask that again, please?

14    Q    Yes.

15         Did you ever have any conversations -- sir, did you

16    ever have any conversations with the defendant about his

17    behavior with Aaliyah?

18    A    I've asked Robert at times.  I thought that they were,

19    you know, playful.  They played a lot.  And I thought that at

20    times I was concerned that Robert -- that it was all playful,

21    yes, so at times -- at times I have asked him:  Robert,

22    everything cool with you and Aaliyah, man?

23    Q    And what did you mean by that when you asked the

24    defendant if everything cool there?

25    A    I mean I just thought they were playful, you know, just

1   over-playful and -- sometimes.

2   Q    Sir --

3   A    And I might have asked him every time, Robert,

4   everything -- you ain't messing with Aaliyah or nothing like

5   that or something like that, yeah.  And he'll say no.  He said

6   no, and I believed it.

7   Q    What, if anything, did you see or hear that made you ask

8   the defendant about his behavior with Aaliyah?

9   A    Being too playful.  Just being together and being too

10  playful.  That was just like, you know, it was just being too

11  playful and Aaliyah was young and I didn't want people to have

12  the wrong vision of things.

13  Q    Did you raise concerns with the defendant more than one

14  time?

15  A    A couple times, maybe.  I just don't remember all of

16  that, but maybe.

17  Q    Now --

18  A    I remember that one time, and I remember a time --

19  that's -- I only remember one time actually right now.

20  Q    You had used the phrase you asked the defendant whether

21  or not he was "messing with Aaliyah."

22       What did you mean by "messing with Aaliyah"?

23  A    Yes, I did ask him that before.  I did ask him that.

24  Q    Okay, can you explain to the jury --

25  A    This was a few years after.  Well, what I meant by that

1  was -- well, I just thought they were too playful.  I just

2  thought that -- I didn't assume anything, and I don't want to

3  assume anything now.

4  Q    I'm not asking you to assume anything, sir, I'm asking

5  you --

6  A    What I meant by that --

7         MR. CANNICK:  Your Honor, can he be allowed to

8  answer?

9         THE COURT:  Well, I think she needs to put the

10  question.

11         So, let her finish the question and you let him

12  finish the answer, and just listen to the question and answer

13  it.

14         Go ahead.

15  BY MS. CRUZ MELENDEZ:

16  Q    I'm asking you, sir, what did you mean by the phrase

17  "messing with Aaliyah" when you spoke to the defendant about

18  his behavior with Aaliyah?

19  A    Again, I thought they were kinda too friendly, and by

20  being so friendly I just wanted to make sure that Robert

21  wasn't messing with Aaliyah.

22         Messing with Aaliyah means flirting, being

23  flirtacious, seducing her, Aaliyah.

24  Q    At some point did you, in fact, learn that Aaliyah and

25  the defendant were more than friends?

1           MR. CANNICK:  Objection.

2           THE COURT:  Overruled.

3    A    Ask that again.

4    Q    Did you learn that Aaliyah and the defendant were more

5    than friends?

6    A    They were more than friends from the very beginning,

7    Aaliyah was a happy spirit, and at the same time Robert seemed

8    to be on the same page with Aaliyah in respect to their

9    communication.  They just had -- and, wait, ask again.

10   Q    I'll rephrase my question, sir.

11          Was there a time when you learned that Aaliyah's and

12   the defendant's relationship was more than professional or

13   more than platonic?

14   A    Well, yes.  That was when I -- boy, boy, boy.

15          We were on tour and Robert mentioned to me that

16   Aaliyah was in trouble.  And we didn't explain anything until

17   we got into the airport and got us home.  And that was the

18   only time.

19   Q    Okay, so I want to back you up for a moment.  You

20   mentioned that you were on tour.

21   A    Uh-hum.

22   Q    Were you outside of Chicago?

23   A    Yes, yes.

24   Q    Do you recall sitting here today what city you were in

25   when you and the defendant were on tour?

Smith - direct - Cruz Melendez                    693

1    A    I think we were in Orlando, I think.

2    Q    Is it fair to say you're not sure?

3    A    Yes.

4    Q    And as part of this tour, did the defendant have a

5    performance schedule?

6    A    Yes.

7    Q    And what, if anything, did the defendant say to you prior

8    to his going on stage?

9    A    Aaliyah's in trouble, man, we need to get home.

10   Q    And did he tell you what he meant by Aaliyah was in

11   trouble?

12   A    No.  Not at the time, no.

13   Q    What, if anything, did you say in response to the

14   defendant telling you that Aaliyah was in trouble?

15   A    I asked -- I wanted to call Barry Hankerson.  I wanted to

16   call her uncle and figure out what was going on.

17   Q    And what did the defendant say when --

18   A    He said:  Don't call Barry.  He said:  It's deeper than

19   you think, you know, so I'll tell you about it.

20          And I made the arrangements and after the show we

21   went, boarded a plane to Chicago.

22   Q    Okay, and I just want to make sure that things are clear

23   for the defendant -- I mean, excuse me, clear for the jury.

24          What was the defendant's demeanor when he said that

25   Aaliyah was in trouble?

1   A    His demeanor?

2   Q    Yes.

3   A    He was about to go on stage.

4   Q    But when he told you that Aaliyah was in trouble, what

5   was he like?  What was his demeanor?

6   A    He was concerned.

7   Q    And I think you mentioned you testified that you had

8   suggested calling Barry Hankerson?

9   A    Uh-hum.

10  Q    Can you just remind the jurors who Barry Hankerson was

11  with respect to the defendant?

12  A    Barry Hankerson was Robert Kelly's manager and Aaliyah's

13  uncle.

14  Q    So, you testified that at some point you made the

15  arrangements, I believe that's what you said?

16  A    Yes.

17  Q    What arrangements did you make?

18  A    I called our travel agent and she got us some flight to

19  Chicago.

20  Q    Why did you call the travel agent?

21  A    Because that's who arranged our flights.

22  Q    But who asked you to call the travel agent or to arrange

23  flights?

24  A    Robert said we need to get home, so I called my travel

25  agent.

Smith - direct - Cruz Melendez                695

1   Q    Okay.  And did the defendant say when he wanted to leave

2   to go back to Chicago?

3   A    We had to leave after the show.

4   Q    And so, what arrangements did you make?

5   A    I called my travel agent.

6   Q    Do you remember the travel agent's name at the time?

7   A    I actually don't.

8   Q    So, what kind of tickets did you arrange, were they

9   one-way, round-trip?

10  A    I don't remember.

11  Q    So, is there something that would refresh your

12  recollection?

13  A    Sure.

14           MS. CRUZ MELENDEZ:  May I approach, Your Honor?

15           THE COURT:  Yes.

16           (Pause.)

17  BY MS. CRUZ MELENDEZ:

18  Q    Does that refresh your recollection?

19  A    Yeah, they were round-trip.

20  Q    What kind of tickets?

21  A    Yeah, it was round-trip tickets.

22  Q    I'm sorry, I just want to ask the question.

23           What kind of tickets did you arrange?

24  A    Round-trip tickets.

25           (Continued on the following page.)

D. Smith - Direct/Ms. Cruz Melendez               696

1    EXAMINATION BY

2    MS. CRUZ MELENDEZ:

3    (Continuing.)

4    Q    And you said you contacted the travel agent.  How did

5    you contact that travel agent?

6    A    Wrote a letter.

7             THE COURT:  Come on.

8    A    I used the telephone.

9    Q    And who paid for the tickets?

10   A    Who paid for the tickets?

11   Q    Yes.

12   A    The company we were under Black Round Records.

13   Q    And when you say the company in Black Round Records?

14   A    Jive Records, whoever paid for his transit.  I would

15   submit the bill, they paid it.  Who paid it directly?

16   Q    You didn't pay, specifically, for the tickets, though?

17   A    Not out my pocket, no.  Travel agent had hooked up with

18   Jive Records or Black Round Records.

19   Q    Where was the defendant while you were making the travel

20   arrangements?

21   A    Performing.

22   Q    Now, you had testified earlier that the defendant was on

23   tour at the time and you also testified that he went on

24   stage.

25             With respect to this tour, was this day the last

D. Smith - Direct/Ms. Cruz Melendez                697

1   day of the tour?

2   A    I wouldn't think so, no, because they got roundtrip

3   tickets.

4   Q    So were there other performances scheduled after that

5   day as part of the tour?

6   A    Yes.

7   Q    Were you surprised by the defendant's request to leave

8   the location of the show to go to Chicago?

9   A    Yes.

10              MR. CANNICK:  Objection.

11              THE COURT:  Overruled.

12              Can I see the parties at the side, please.

13              (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

                        Sidebar                    698

1           (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4           THE COURT:  You've got to move this along.  Just

5     cut to the chase with him.  You're not going to get every

6     single detail out of him and I would love to finish him today

7     but I suspect you have --

8           MR. CANNICK:  I have some cross.

9           THE COURT:  -- a fair amount of cross with him.

10    But the longer spend with him, the more difficult it is to

11    get information out of him.

12          MS. CRUZ MELENDEZ:  I do understand, your Honor.  I

13    think he is testifying with respect to Racketeering Act 1.

14          THE COURT:  I know, I get it, but some of it is --

15    let's go.  I mean, it's -- I'm not -- I'm kind of telling you

16    how to do your direct, but I would like to move it along a

17    little bit, but I recognize he's a difficult guy.  But if we

18    can just move the ball a little bit forward to see as much as

19    we can get done he'll be back on you Monday.

20          MR. CANNICK:  That's what I was going to tell you.

21          THE COURT:  But still.  Just try.  I'm not going to

22    yell and scream but I'm --

23          MR. CANNICK:  Also, note my objection.  I don't

24    know if it was -- I think it was not intended but there were

25    questions being asked where the question presupposed an

Sidebar                                                  699

1  answer and there was no connectivity.  It's the kind of a

2  situation where the witness had already gave that testimony.

3  I think the question was just asked ahead of the foundational

4  question to get that answer.

5          THE COURT:  I don't remember what it was.

6          MR. CANNICK:  I don't remember now.

7          THE COURT:  It seemed like whatever it was, I

8  remember the context seemed like it wasn't an earth

9  shattering performance.

10          MR. CANNICK:  Right.  It wasn't earth shattering.

11          THE COURT:  We have to move it along.

12          MS. CRUZ MELENDEZ:  To your point, your Honor, if

13  I'm going to move things along I anticipate that there would

14  not need to be some leeway with respect to --

15          THE COURT:  I don't supposed you're going to object

16  to leading through sort of obvious things.

17          MR. CANNICK:  There are certain things that I

18  probably should be objecting to but I'm letting it go.  I'm

19  just letting it go so we can move on.

20          THE COURT:  I don't want the court reporters to

21  quit because he's freestyling a lot.  He's hard to hear and

22  he likes to add his own.  Some leading I think is fine on

23  this to direct him to an answer.  I've be been looking at his

24  §3500 material so I know we can get there.  All right?

25          MR. CANNICK:  There's a hurricane coming I'm told

Sidebar                                                700

1   about that I want to get out of here.

2              (Sidebar discussion concludes.)

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. Smith - Direct/Ms. Cruz Melendez          701

1              (In open court.)

2              THE COURT:  Mr. Smith.

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  I want you to listen to the question

5    and answer the question that you're being asked as best as

6    you can.  Try not to add color to the answer, all right?

7    Just listen to Ms. Cruz Melendez's question and answer that

8    question.  Deal?  Yes, Judge.

9              THE WITNESS:  Yes, Judge.

10             THE COURT:  Thank you so much.  Go ahead.

11   EXAMINATION BY

12   MS. CRUZ MELENDEZ:

13   (Continuing.)

14   Q    Your Honor, I believe my last question was, "Were you

15   surprised by the defendant's request to leave the location of

16   the show to go to Chicago.

17   A    Yes.

18   Q    And why were you surprised?

19   A    It wasn't in the schedule.

20   Q    Now, you had mentioned that you had made travel

21   arrangements who did you make travel arrangements for?

22   A    Me, Robert, and Tyree Jamieson went with us.

23   Q    Do you recall approximately what time the defendant's

24   performance had started?

25   A    Normally, they start about 7:30, 8:00 o'clock.

D. Smith - Direct/Ms. Cruz Melendez          702

1    Q    How long was the show, if you recall?

2    A    To about 10:30, 11:00 o'clock.

3    Q    And after the show, you had mentioned you made travel

4    arrangements.  Did you head to the airport?

5    A    Yes.

6    Q    And how long after the show, did you head to the

7    airport?

8    A    As soon as the show was over, we get in the car, we go

9    to the airport.

10   Q    And you had mentioned being in the car.  Who was in the

11   car?

12   A    The limo driver, me, Robert, and Tyree.

13   Q    And what was the defendant's demeanor during the car

14   ride to the airport?

15   A    Quiet.

16   Q    What, if any, conversations did you have with the

17   defendant while on the drive?

18   A    We didn't talk.  He was quiet.

19   Q    And you arrived to the airport and got on the plane, is

20   that fair to say?

21   A    Yes.

22   Q    Now, what, if anything, did the defendant say to you

23   once you were on the plane about Aaliyah?

24   A    He asked me, well, I asked him what was going on?

25   Q    And what did the defendant say?

D. Smith - Direct/Ms. Cruz Melendez          703

1  A    Give me a moment.  Just a moment.  I'm just trying to
2  think.  I want to say it right.  We got on the plane and.
3            THE COURT:  Into the microphone.
4  A    We got on the plane.  Robert, again, quiet all the way
5  to the airport until we got on the plane.  I said, What's
6  going on?  He said, Aaliyah, man, she think she pregnant.
7  And that was a shock.
8  Q    And what was the defendant's demeanor when he was
9  telling you that Aaliyah thought she was pregnant?
10 A    Well, his demeanor was he was concerned about her.  He
11 was concerned and I didn't know what was going on or they
12 were like, you know, talking all the time.  So I didn't know
13 what was really going on, his demeanor, he was worried about
14 her.
15 Q    How did he appear to her during that plane ride?
16 A    Worried about her.  He spoke to his sister about it.
17 She told him, and I told him, you know, what you can say it
18 was him but, you know.  And that's where we left it, we
19 didn't really talk about anything else about that until we
20 got to the Chicago and I saw Derrel and it was crazy.
21 Q    Mr. Smith?
22 A    Yes.
23 Q    Is it your testimony that you didn't have any other
24 conversations with the defendant on the plane?
25 A    Well, while on the plane, I think I told him, like I

D. Smith - Direct/Ms. Cruz Melendez          704

1   said, she thinks she's pregnant.  I said, Robert -- I don't

2   remember that.  Let me see what I said.

3             THE COURT:  You need your recollection refreshed?

4             THE WITNESS:  Yes, can I refresh it?  I don't want

5   to say yes to anything.  I'm on medications.

6             Like I said, he told me that Derrel knew he was

7   making arrangements for him to marry Aaliyah.

8   Q    And did the defendant say why he had to marry Aaliyah?

9   A    Well, they told him that he -- that's what he told me

10  that they told him, Derrel and him, to protect himself.

11  Q    To protect himself from what?

12  A    To protect Aaliyah.  That was --

13            MR. CANNICK:  Your Honor, I'm going to object.

14  A    -- you're asking me stuff.

15            THE COURT:  First of all, the objection is

16  overruled.

17            Don't have an argument with the Assistant United

18  States Attorney, she's asking you a question.

19            THE WITNESS:  I have to use the bathroom.

20            THE COURT:  You need a break?

21            THE WITNESS:  Yes, ma'am.

22            THE COURT:  All right.  Ladies and gentlemen, we're

23  going to take a five-minute break.

24            And can you escort the witness out, please.

25            COURTROOM DEPUTY:  All rise.

1          (Jury exits courtroom at 4:48 p.m.)

2          (Witness leaves the witness stand.)

3          THE COURT:  All right.  We can take Mr. Kelly in

4    the back, but I'm staying here so don't anybody go too far.

5    As soon as he comes back, we'll continue.

6          (Defendant enters the courtroom at 4:49 p.m.)

7          (A recess in the proceedings was taken.)

8          (Witness takes the witness stand.)

9          THE COURT:  Just before the jury comes out,

10   Mr. Smith.  Mr. Smith.

11         THE WITNESS:  Yes, ma'am.

12         THE COURT:  This will go a lot smoother and a lot

13   faster if you listen to the question and answer the question.

14   I'm running a little bit out of patience here.  If you can

15   answer the question, answer the question.

16         THE WITNESS:  You running out of patience?

17         THE COURT:  I am and I run the show.

18         THE WITNESS:  Then we can go home then, right?

19         THE COURT:  No, you can't.  You answer the

20   questions that you're asked and cooperate with the prosecutor

21   and answer the questions that she asks you it's five to 5:00.

22   Let's go, let's get the jury in.

23         (A brief pause in the proceedings was held.)

24         COURTROOM DEPUTY:  All rise.

25         (Jury enters courtroom at 4:57 p.m.)

D. Smith - Direct/Ms. Cruz Melendez            706

1            COURTROOM DEPUTY:  You may be seated.

2            THE COURT:  Okay.  Ladies and gentlemen, we're

3    ready to continue.

4            Go ahead, Ms. Cruz Melendez.

5            MS. CRUZ MELENDEZ:  Your Honor, if I could have the

6    last question read back.

7            THE COURT:  Sure.

8            COURTROOM DEPUTY:  The witness is reminded he is

9    still under oath.

10           (The requested portion of the record was read back

11   by the Official Court Reporter.)

12           MS. CRUZ MELENDEZ:  Can I have the witness remove

13   his mask?

14           THE COURT:  Take your mask off, Mr. Smith.

15   EXAMINATION BY

16   MS. CRUZ MELENDEZ:

17   (Continuing.)

18   Q    Mr. Smith, when the defendant said that Derrel had said

19   that he needed to marry Aaliyah to protect himself, protect

20   the defendant from what?

21   A    I guess jail, I guess.

22   Q    I'm sorry.

23   A    I guess jail.

24           MR. CANNICK:  Objection.  If he doesn't know.

25           THE COURT:  Overruled.

D. Smith - Direct/Ms. Cruz Melendez          707

1   Q     Did the defendant say that?

2         MR. CANNICK:  Objection.

3   A     Yes.

4         THE COURT:  Overruled.

5   Q     And you mentioned Derrel, who was Derrel.

6   A     Derrel McDavid.

7   Q     Who is he in relation to the defendant?

8   A     He was Robert's accountant as well as Robert's acting

9   manager.

10  Q     What, if anything, did the defendant say to you on the

11  plane with respect to where Aaliyah was?

12  A     With respect to where Aaliyah -- at the hotel.

13  Q     What hotel?

14  A     I think it was the Sheraton in Maywood.  Sheraton or I

15  think it was the Sheraton.

16  Q     In what city, though?

17  A     What was that?  Maywood.

18  Q     What state is that located in?

19  A     Illinois.

20  Q     On that plane ride who, if anyone else, did the

21  defendant tell you he had spoken to about Aaliyah possibly

22  being pregnant?

23  A     He spoke to his sister, he told me that.

24  Q     And what did he say about that?

25  A     He spoke to his sister.  He spoke to his sister.

D. Smith - Direct/Ms. Cruz Melendez              708

1  Q    And what did he tell you that he told his sister?

2  A    His sister said that, well, if Aaliyah said she's

3  pregnant, doesn't mean she's pregnant, you know.

4  Q    And when the defendant was telling you these things,

5  what was his demeanor?

6  A    Concerned.

7  Q    Is it your testimony here today that he was -- his

8  demeanor was just concerned?

9              MR. CANNICK:  Objection.

10             THE COURT:  Overruled.  Was it anything else

11 besides concerned?

12             THE WITNESS:  I mean, what did I say before?

13             THE COURT:  You need to have your recollection

14 refreshed?

15             THE WITNESS:  Yes.

16             MS. CRUZ MELENDEZ:  May I approach, your Honor.

17             THE COURT:  Yes.

18             (Approaching the witness.)

19             (Showing to the witness.)

20             THE WITNESS:  Yeah, he was crying a lot.  Yeah he

21 was crying.

22 Q    So did you and the defendant and Tyree ultimately land

23 in Chicago?

24 A    Yes.

25 Q    And what time did the plane land in Chicago,

D. Smith - Direct/Ms. Cruz Melendez          709

1   approximately?

2   A    I don't recall.

3   Q    Was it in the morning, evening?

4   A    Early morning, probably.  Yeah, early morning.

5   Q    And once you landed what happened?  Where did you go

6   after you landed?

7   A    Can you ask that again?

8   Q    Where did you go after you landed?  You, the defendant,

9   and Tyree, where did you go?

10  A    I remember correctly we went to the hotel, to the

11  Sheraton Hotel.  I remember correctly.

12  Q    Okay.  Mr. Smith, do you recall giving grand jury --

13  A    Can I just read that so we don't have to keep on going

14  through this here.

15            THE COURT:  Does it refresh your recollection?

16            THE WITNESS:  Yes, it does.

17            THE COURT:  Why don't you show him, direct him to

18  the page.

19            THE WITNESS:  I feel like I'm on trial for Aaliyah.

20  Shit.  Aaliyah not even here to say where you go after that.

21            We went home to his house.  When you say, Home to

22  his house, what do you mean?

23  Q    Don't read it.

24  A    Lake Point Towers.

25  Q    Don't read it.

1      THE WITNESS:  I'm sorry, Judge.

2      THE COURT:  That's all right.  Just answer the

3  questions.

4  Q    And when you say, his house, whose house did you go to?

5  A    Lake Point Towers, Robert's house.

6  Q    And when you were at the defendant's house what, if any,

7  conversations did you have with the defendant there about the

8  situation with Aaliyah?

9  A    I remember that and I told Robert that this is something

10 that just couldn't happen; that he shouldn't listen to

11 Derrel.  I told him that he couldn't marry Aaliyah, that she

12 was too young and, you know, that she couldn't go to school

13 without a truant officer coming after her.  So that's

14 something you shouldn't do.  That's what I do remember about

15 that.

16 Q    And what did the defendant say to you?

17 A    He was confused.  He was confused and he just asked me

18 whose side I was on.

19 Q    And you said he asked which side were you?

20 A    Who you with, me or them?  That's, you know.

21 Q    And, at some point, did you leave the defendant's

22 apartment?

23 A    Yes.

24 Q    After leaving the defendant's apartment, where did

25 you -- where did you go?

```
                 D. Smith - Direct/Ms. Cruz Melendez        711
```

1    A    I think to the hotel.

2    Q    And who went with you to the hotel?

3    A    Me and Robert.  I think me and Robert were together, I

4    think.

5    Q    And you testified earlier that you thought it was a

6    Sheraton?

7    A    Yes.

8    Q    And why did you go to that Sheraton?

9    A    To meet with Derrel.

10   Q    And was anyone else at that Sheraton?

11   A    I don't remember.

12        THE COURT:  Do you need to have your recollection

13   refreshed?

14        THE WITNESS:  Yes, please.

15        THE COURT:  All right.  You just need to ask.

16        THE WITNESS:  Yes.

17        THE COURT:  Go ahead.

18        MS. CRUZ MELENDEZ:  I think I can ask a question

19   that might assist.

20        THE COURT:  Whatever will be best.

21   Q    Was Aaliyah there at the hotel?

22   A    Yes.

23   Q    And when you say you went to the hotel, where in the

24   hotel did you go?

25   A    To the room.

D. Smith - Direct/Ms. Cruz Melendez          712

1   Q    And do you recall what kind of room it was?

2   A    It was a hotel suite.

3   Q    Now, once you reached the hotel, what, if any,

4   conversation did you have with the defendant about his plan

5   to marry Aaliyah?

6              MR. CANNICK:  Objection.

7              THE COURT:  Overruled.

8              MR. CANNICK:  It's not the testimony.

9              THE COURT:  Overruled.  You got to use the

10  microphone, I can barely here you.

11             Thanks.

12  A    I was always an objection to what Robert was being told

13  to do.

14  Q    What, if any, next steps did you discuss?

15  A    They wanted to figure out how to make that happen, make

16  the marriage happen.  And I felt I was going to get ready to

17  get pushed out the loop in respect to and I wanted to keep

18  ahold of Robert.  So I suggested that I could get

19  identification.  I wanted to stay in the loop, I wanted to

20  stay -- I want to just do things to make it happen but not

21  happen.

22  Q    Okay.

23  A    I said that I could get the I.D.ss I know somebody who

24  could get her I.D. or something like that and that's what I

25  did.

D. Smith - Direct/Ms. Cruz Melendez          713

1  Q     I.D.s for what?

2  A     For it I.D.s to prove her age.

3  Q     And why did you need an I.D. for Aaliyah?

4  A     Aaliyah was underage.

5  Q     When you say, "underage,' under 18?

6  A     Yes.

7  Q     Okay.  Did you discuss at all what kinds of

8  identification you needed to get for Aaliyah?

9  A     I felt that when you go to get a marriage license you

10  would need to have proper identification, state I.D. And only

11  state I.D. I knew was to get a welfare I.D. and so...

12  Q     Did you discuss any other types of identification that

13  Aaliyah might need?

14  A     She needed more than one piece of I.D.

15  Q     How did you know she needed one more than piece of

16  identification?

17  A     I figured you need that to do anything to get a license,

18  to get a marriage license, to get on an airplane or you need

19  more than piece of I.D. and that I.D. was not official

20  identification it was just an I.D. for that office.  It

21  suppose that there.

22  Q     So were there -- did you have any other discussions

23  about the other types of identification?

24  A     Yes, there was a FedEx work I.D., a school I.D., those

25  were the three pieces of I.D.

D. Smith - Direct/Ms. Cruz Melendez                714

1  Q    So going back to the identification that you mentioned

2  from the welfare office.  What, if any, discussion did you

3  have with the defendant about how you could obtain the

4  welfare office identification?

5  A    Well, I actually didn't have any discussion with Robert,

6  it was with Derrel.

7  Q    What did you discuss with Derrel?

8  A    I said I could probably get that.  I could probably go

9  in there and talk her into it.  You know, everybody needs

10 some money.

11 Q    Now, was when you -- I'm sorry can you say that again?

12          MS. CRUZ MELENDEZ:  Can you read back to me his

13 answer.

14          (The requested portion of the record was read back

15 by the Official Court Reporter.)

16 Q    And what did you mean, "Everybody needs some money"?

17 A    I mean, I felt like I could offer somebody some money to

18 give me an I.D.

19 Q    Who would you be offering money to get?

20 A    Whoever would open up to it.  To be receptive to it.

21 Q    Who would you be offering money to get the

22 identification from?

23 A    Well, I went to the welfare office and I went in and I,

24 hey, want to make some money?

25 Q    And before we get there, though, did you have a

D. Smith - Direct/Ms. Cruz Melendez                715

1   discussion about how much money you would need?

2   A    I told Derrel give me about 500 bucks.

3

4               (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. Smith - direct - Cruz Melendez                716

1   DIRECT EXAMINATION (Continuing)

2   BY MS. CRUZ MELENDEZ:

3   Q    Now, did you have any discussion with the defendant about

4   the amount of money you would need in order to get this

5   identification from the welfare office?

6               MR. CANNICK:  Objection.

7               THE COURT:  Overruled.

8   A    Did I have a discussion with Robert about -- recall.

9   Q    Do you not recall?

10  A    You got it write it down.  I said it before.  I don't

11  want to say what I said, because I don't remember discussing

12  money with Robert about anything in that respect.  I don't

13  remember that.

14              Again, I might have mentioned it, but, you know, my

15  communication was with Derrel.

16  Q    You might have mentioned it to whom?

17  A    I might have mentioned it to Robert.

18  Q    So you testified that at some point you did, in fact, go

19  to a welfare office to get an identification card; is that

20  correct?

21  A    Yes, I did.

22  Q    Okay.  Who went with you?

23  A    Aaliyah and...I think -- I don't remember who I was with.

24  Q    How did you get there?

25  A    Drove.

D. Smith - direct - Cruz Melendez          717

1  Q     And was Aaliyah in the car with you?

2  A     I don't remember.

3            THE COURT:  But eventually -- but she went to the

4  same place --

5            THE WITNESS:  If she wasn't in the car with me, then

6  she was in the car behind me.

7            THE COURT:  All right.  Next question.

8  Q     And who, if anyone, was in the car with Aaliyah?

9  A     If Aaliyah was in the car, she probably was in the car

10 with Robert.

11           MR. CANNICK:  Objection.

12           THE COURT:  Overruled.

13           Do you remember?

14           Is there anything that would refresh his

15 recollection?

16           MS. CRUZ MELENDEZ:  Yes, Judge.  I'm going to show

17 him his grand jury testimony, which is 3500...I'm sorry, Your

18 Honor.  It's 3500-DS1-4.

19           THE COURT:  Okay.

20           MS. CRUZ MELENDEZ:  Just for the record, Your Honor,

21 when I have been refreshing Mr. Smith's recollection, it's

22 been 3500-DS1-4.

23           THE COURT:  Got it.  Great.

24           THE WITNESS:  Uh-hum.  Let me see.  I mean, like I

25 said, if she wasn't with me, she was in the car behind me, as

D. Smith - direct - Cruz Melendez                    718

1  that says.

2  Q    My question was whether or not the defendant was with

3  Aaliyah in the car behind you?

4  A    Yes.

5  Q    Now, you testified that you thought that you could get an

6  ID from a welfare office.  Had you ever had public benefits

7  from the welfare office before?

8  A    Yes.

9  Q    So had you ever been to the welfare office that you went

10  to?

11  A    Yes.

12  Q    Do you recall where it was that you went to, which

13  welfare office you went to?

14  A    22nd Street and State.  22nd and State, I think it was.

15  21st.

16  Q    What happened once you got to the welfare office?

17  A    I went inside, you know, felt my way around, and I

18  approached a person, and she agreed and she made an ID.

19  Aaliyah came in.  She took the ID.

20  Q    Now, when you say you approached a person, who did you

21  approach?

22  A    I don't know her.

23  Q    Okay.  Do you recall -- you said it was a her.  It was a

24  woman?

25  A    Uh-hum.

1    Q     And what was the woman's race?

2    A     She was African-American.

3    Q     And what, if any -- what was her position at the welfare

4    office?

5    A     Taking photos.

6    Q     And what, if anything, did you say to the woman who took

7    photos at the welfare office?

8    A     I don't remember word for word, but I made her an offer

9    and she took the money.

10   Q     How much money did you give her?

11   A     I gave her 500 bucks.

12   Q     Where had you gotten that money from?

13   A     Derrel.

14   Q     And how did he give the money to you?

15   A     Cash.

16   Q     Now, you had earnings inned that the woman at the welfare

17   office took photos there.  Did she work at the welfare office?

18   A     Yes, I would assume.

19          MR. CANNICK:  Objection to the assumption.

20          THE COURT:  Overruled.

21   A     I mean, she -- I went in there.  She took a photo.

22   Apparently she had to work there, I don't think she would've

23   been able to do that.

24   Q     You didn't know her specifically?

25   A     I don't know her personally, specifically, I never seen

D. Smith - direct - Cruz Melendez                720

1    her --

2              THE COURT:  It appeared to you that she worked

3    there, right?

4              THE WITNESS:  Yes.

5              THE COURT:  That's why you gave her the money?

6              THE WITNESS:  Yes.  Yes.

7              THE COURT:  All right.  Next question.

8    BY MS. CRUZ MELENDEZ:

9    Q    So after you gave her the money, what did you do?

10   A    Aaliyah came in, she went and took the ID and we left.

11   Q    And --

12   A    It was just that fast.

13   Q    What kind of identification was it?

14   A    It was a public aid ID.  It wasn't a State -- it wasn't

15   an official identification or anything.  It was just a picture

16   with a -- an ID with a picture on it.  It didn't have her age

17   or anything.

18   Q    So did the woman who you gave the money to, the woman who

19   worked at the welfare office, did she take Aaliyah's photo?

20   A    Yes.

21   Q    Once you obtained the photo and the identification was

22   given to Aaliyah, what happened next?

23             Oh, actually, I'm sorry, just to back up for a

24   moment.

25             You had previously testified that you had obtained

1  -- you had gone to a welfare office before?

2  A    Yes.

3  Q    Now, in applying for public assistance, did you ever --

4  did you have to fill out any paperwork?

5  A    Yes.

6  Q    And did you have to provide any documentation when you

7  applied for --

8  A    Yes.

9  Q    -- for welfare services?

10  A    Yes.

11  Q    And generally speaking, what types of documents did you

12  have to provide?

13  A    State ID, birth certificate, social security card.

14  Q    Did you provide your name when you were seeking benefits?

15  A    State ID, social security card, birth certificate.

16  Q    Okay.  And at the time that you took Aaliyah to the

17  welfare office, did she fill out any paperwork?

18  A    No.

19  Q    Now, when you and Aaliyah went into the welfare office,

20  did the defendant come inside?

21  A    No.

22  Q    Where was he?

23  A    In the car.

24  Q    So what happened after you left the welfare office with

25  the ID that you had obtained for Aaliyah?

D. Smith - direct - Cruz Melendez                722

1   A    Went back to the hotel or -- let me see.  She needed to

2   get another ID, so we went somewhere else, I think like a Fed

3   Ex, something like that.

4   Q    And who went to --

5   A    Got another work ID.

6   Q    You believe it was a Fed Ex.  Who went there?

7   A    Me, Robert, Aaliyah and...Tyree, I guess.

8   Q    Why did you go to the Fed Ex that you went to?

9   A    To get work ID.

10  Q    But why specifically a Fed Ex?

11  A    Somebody knew somebody there.

12  Q    Who do you recall knowing someone there?

13  A    I don't know.  I didn't know that person.  I didn't know

14  --  the guy that said he knew somebody, I went with him and I

15  didn't know who he was.  I forgot his name.  He was with us.

16  Q    So you don't recall his name at the moment?

17  A    I don't remember his name at all, no.

18  Q    Is there something that would refresh your recollection?

19  A    What's his name?

20          THE COURT:  Well, she'll show you the transcript.

21          MS. CRUZ MELENDEZ:  I'm showing the witness again

22  3500-DS-14.

23  A    Mr. Williams.

24  Q    Does that refresh your recollection?

25  A    Mr. Williams.  I remember a Williams, but I don't

1    remember his name.  I don't remember it.  I remember the

2    Williams, though.

3    Q    And do you recall anything about Williams in terms of --

4    do you recall any information about Williams?

5    A    No.  He was one of Robert's friends.

6    Q    And what, if anything, did Williams do for a living?

7    A    Real estate or something like that, if I remember

8    correctly.

9    Q    And, so, when you arrived at this shipping place, or the

10   Fed Ex place -- excuse me, who -- did you go inside?

11   A    Yes.

12   Q    Who went inside?

13   A    Me, and Aaliyah, and Williams.

14   Q    And what happened once you went inside?

15   A    She took a work ID.

16   Q    What do you mean she took a work ID?

17   A    She took a picture.

18   Q    When you say a work ID, work from where?

19   A    The company, the Fed Ex office, wherever we went.  I

20   don't remember if it was Fed Ex or what, because I don't know

21   if Fed Ex existed there.

22   Q    What type of company was it?

23   A    It was a courier company.

24            THE COURT:  Is it correct, when you say she got an

25   ID, an ID like --

D. Smith - direct - Cruz Melendez                724

1            THE WITNESS:  A work ID.

2            THE COURT:  As though she worked there?

3            THE WITNESS:  Yes.

4            THE COURT:  All right.  Next question.

5   BY MS. CRUZ MELENDEZ:

6   Q    So what happened after Aaliyah obtained the ID card from

7   the courier location?

8   A    We went back to the hotel.

9   Q    And what happened after you went to the hotel?

10  A    We went to get the marriage license.

11  Q    And who went to go get the marriage license?

12  A    Derrel McDavid, me, Robert, and Aaliyah.

13  Q    Do you recall where you went to go get the marriage

14  license?

15  A    City Hall in Maywood.

16  Q    How did you get there?

17  A    Drive.

18  Q    So who went into the City Hall?

19  A    Me, Derrel McDavid, Robert and Aaliyah.

20  Q    Was anyone else there?

21  A    No.

22  Q    Was Tyree there?

23  A    Maybe Tyree possibly was there, yes.  I mean....

24  Q    What happened once you got into the City Hall?

25  A    They applied for their marriage license.

D. Smith - direct - Cruz Melendez                725

1   Q    When you say "they," who do you mean?

2   A    Robert and Aaliyah.

3   Q    From what you observed, when Aaliyah and the defendant

4   went into the Maywood City Hall, did anyone review Aaliyah's

5   ID?

6   A    Yes.

7   Q    What, if anything, happened when -- was it an employee at

8   the City Hall?

9   A    Yes.

10  Q    Okay.  What, if anything, happened when the employee at

11  the City Hall reviewed Aaliyah's ID?

12  A    She let them sign the marriage license.

13  Q    Did she let them sign the marriage license right away?

14  A    She reviewed the ID and she gave the marriage license.

15  Q    Do you recall giving testimony in the grand jury?

16  A    Yes.

17  Q    And do you recall taking an oath to tell the truth?

18       MR. CANNICK:  Objection.

19       THE COURT:  Overruled.

20  A    You keep on threatening me.  I'm ready to go home.

21       THE COURT:  Well, we're not going home yet.

22       Do you want to show him something and see if it

23  refreshes his recollection?  Let's do that.  Okay?

24       MS. CRUZ MELENDEZ:  Absolutely.

25       THE WITNESS:  I mean --

D. Smith - direct - Cruz Melendez                726

1            THE COURT:  We are almost.

2            THE WITNESS:  Yes, ma'am.

3            THE COURT:  Thank you so much.  All right.

4            THE WITNESS:  And the lady was a little hesitant.

5            MS. CRUZ MELENDEZ:  Read it to yourself.

6            THE WITNESS:  Let me just read it because you keep

7    asking me stuff over and over.  I'm getting older and I can't

8    just remember everything.

9            THE COURT:  Well, look at it and see if it refreshes

10   recollection.

11           Does that refresh your recollection?

12           THE WITNESS:  I'm uncomfortable with this, Your

13   Honor.  I'm truly uncomfortable.  We're continuously talking

14   about Aaliyah.  Her parents are not here and I don't

15   understand why I got to do that.

16           THE COURT:  Well, we can have a conversation about

17   that another time.  Let's try to move this along.

18           The question is does that refresh your recollection

19   about --

20           THE WITNESS:  Yes, it does.

21           THE COURT:  -- what happened?

22           THE WITNESS:  Yes.

23           THE COURT:  And what happened?

24           THE WITNESS:  Okay.  Yes, because the IDs didn't

25   have her age on it, yes.

D. Smith - direct - Cruz Melendez          727

1   Q    So what --

2   A    I don't know what Derrel did.  I don't know, you know.

3        THE COURT:  But you said Derrel talked -- is that

4   what you said, Derrel --

5        THE WITNESS:  Yes, Derrel talked to somebody in

6   there.  I don't know what he did.

7        THE COURT:  All right.  And then what happened next?

8        THE WITNESS:  Then they signed the marriage license.

9        THE COURT:  All right.  Next question.

10       THE WITNESS:  Then they went and got married.

11  BY MS. CRUZ MELENDEZ:

12  Q    And did they obtain a marriage license?

13  A    Yes.

14  Q    And what, if anything, happened with the marriage

15  license?

16  A    Took it to a preacher, right.

17  Q    So where did you all go after the --

18  A    Back to the hotel.

19  Q    The same hotel?

20  A    Yes.

21  Q    And what happened once you got back to the hotel?

22  A    They had arranged for a minister and a ceremony took

23  place.

24  Q    Was there a minister there?

25  A    Yes.

D. Smith - direct - Cruz Melendez                728

1    Q    And do you recall the name of the minister?

2    A    No, I do not.

3         You can show it to me and I'll remember his name.  I

4    don't know his name.

5         I mean, I didn't remember his name because it wasn't

6    important to me.

7              THE COURT:  But he was a preacher, right?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Next question.

10             MS. CRUZ MELENDEZ:  Your Honor, I would like to

11   refresh the witness' recollection.

12             THE WITNESS:  What's his name?

13   Q    Can you read that and see if it refreshes your

14   recollection?

15   A    Edmond, I think, something like that, yes.

16             MS. CRUZ MELENDEZ:  One moment, Your Honor.

17             THE COURT:  Sure.

18             Actually, this is a good time to break.  It is

19   almost 5:30 and I know some of the jurors have to get home.

20             MS. CRUZ MELENDEZ:  Okay.  Your Honor, if I could.

21             THE COURT:  Do you want to finish up?  Whatever you

22   want to do.  Two minutes.

23             MS. CRUZ MELENDEZ:  I want him to repeat his last

24   answer.

25             THE COURT:  Okay.

1  BY MS. CRUZ MELENDEZ:

2  Q    What was the name?

3  A    It said Edmond.  I think Edmond something.

4  Q    Was the name of the officiant who was at the hotel?

5  A    Yes.  Yes.

6          MS. CRUZ MELENDEZ:  I'm fine with ending there.

7          THE COURT:  Ladies and gentlemen, we are going to

8  break for the weekend.

9          Please do not talk about the case, don't look

10 anything up, don't read any articles about it, don't watch any

11 news or anything like that.

12         I thank you for your patience this week.  I will see

13 you Monday morning.  We will begin at 9:30.  And, again, don't

14 look anything up, don't talk to anybody about the case, don't

15 read anything.

16         Have a great weekend.

17         THE COURTROOM DEPUTY:  All rise.

18         (Jury exits the courtroom.)

19         THE COURT:  Okay, you can take the witness out.

20         MS. CRUZ MELENDEZ:  Your Honor, just one moment, if

21 you could instruct the witness he does need to return.

22         THE COURT:  You need to be here on Monday morning.

23 And what time do you want him here?

24         We are starting at 9:30.  So I will see you both

25 then.  Thank you so much.  Have a great weekend.

Proceedings                                              730

1           MS. CRUZ MELENDEZ:  Thank you.

2           THE WITNESS:  Tell the judge to do things --

3           THE COURT:  See you later.  Have a good weekend.

4           (Witness exits courtroom.)

5           THE COURT:  Let's talk about schedule.  I assume

6    there will come a time when we finish this witness and then if

7    that happy day arrives, then I take it you will have some more

8    witnesses on Monday.

9           Are there any more witnesses of a category -- I

10   assume this person is his own unique fellow, but are there any

11   other people that fall into this same category?

12          MS. GEDDES:  It is within the realm of possibility.

13          THE COURT:  I see.  Okay, well, you will let me

14   know.  I'm not going to ask you how much time you expect to

15   spend with this gentleman, but I'm sure it will be productive.

16          MR. CANNICK:  I hope.

17          THE COURT:  I take it you don't really have a whole

18   lot more left.

19          MS. CRUZ MELENDEZ:  I don't know.

20          MR. CANNICK:  Your Honor, could I get an

21   understanding as to Court's ruling as to overruling my

22   objection?

23          The Government was impeaching its witness by --

24          THE COURT:  I didn't let her do it.

25          MR. CANNICK:  Okay.  Okay.

                    MDL       RPR       CRR       CSR

Proceedings                          731

1          THE COURT:  So it never happened.

2          MR. CANNICK:  All right.  Okay.

3          THE COURT:  I think we suggested that she refresh

4   his recollection instead.

5          MR. CANNICK:  Yeah.

6          THE COURT:  Because he said he was getting older, as

7   we all are.

8              All right.  Anything else before we stop?

9              All right.  Everybody have a good weekend.

10             (Matter adjourned to August 23, 2021 at 9:30 a.m.)

11

12                          ooo0ooo

13

14

15

16

17

18

19

20

21

22

23

24

25

732

1                          <u>I N D E X</u>

2

3     <u>WITNESS</u>                                         <u>PAGE</u>

4

5        ANTHONY NAVARRO

6             DIRECT EXAMINATION BY MS. GEDDES              475

7             CROSS-EXAMINATION BY MS. BLANK BECKER         526

8             REDIRECT EXAMINATION BY MS. GEDDES            581

9             RECROSS-EXAMINATION BY MS. BLANK BECKER       585

10

11       COURTNAY WILSON

12            DIRECT EXAMINATION BY MS. GEDDES              589

13            CROSS-EXAMINATION BY MR. FARINELLA            608

14

15       CAROLYN HARRIS

16            DIRECT EXAMINATION BY MS. CRUZ MELENDEZ       613

17            CROSS-EXAMINATION BY MS. BLANK BECKER         642

18            REDIRECT EXAMINATION BY MS. CRUZ MELENDEZ     647

19

20       DEMETRIUS SMITH

21            DIRECT EXAMINATION BY MS. CRUZ MELENDEZ       663

22

23

24

25

SAM     OCR     RMR     CRR     RPR

733

**E X H I B I T S**

Government's Exhibit 31                                    478

Government's Exhibit 502(c)                               480

Government's Exhibit 4                                     497

Government's Exhibit 32                                    498

Government's Exhibit 70                                    508

Government's Exhibit 521                                   517

Government's Exhibits 803(a), 803(b), 803(c)        621

Government's Exhibit 6                                     665

Government's Exhibit 54                                    676

SAM      OCR      RMR      CRR      RPR