2737

1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
  - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,   :   19-CR-286(AMD)
4
        Plaintiff,    :
5
                      United States Courthouse
     -against-      :  Brooklyn, New York
6
ROBERT SYLVESTER KELLY,   :
7
                     September 9, 2021
        Defendant.    :  9:30 o'clock a.m.
8
  - - - - - - - - - - - - - X
9

10              REDACTED TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE ANN M. DONNELLY
11      UNITED STATES DISTRICT JUDGE, and a jury.

12
APPEARANCES:
13

14  For the Government:      JACQUELYN M. KASULIS
                      Acting United States Attorney
15                  BY: ELIZABETH GEDDES
                      NADIA SHIHATA
16                      MARIA E. CRUZ MELENDEZ
                      Assistant United States Attorneys
17                  271 Cadman Plaza East
                  Brooklyn, New York
18

19  For the Defendant:       DEVEREAUX L. CANNICK, ESQ.
                      NICOLE BLANK BECKER, ESQ.
20                   THOMAS FARINELLA, ESQ.
                   CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:  Michele D. Lucchese,
               E-mail: MLuccheseENDY@gmail.com
               225 Cadman Plaza East
23                 Brooklyn, New York
               (718) 613-2272
24

25  Proceedings recorded by mechanical stenography, transcript
  produced by computer-aided transcription.

MDL     RPR     CRR     CSR

Proceedings                                              2738

1            (In open court; outside the presence of the jury.)

2            THE COURTROOM DEPUTY:  All rise.

3            THE COURT:  Everybody can have a seat.

4            (Defendant present.)

5            THE COURT:  I know there are a number of matters to

6    be resolved.  Do I have to resolve any of them before the next

7    witness testifies?

8            All right.  The other thing is that I would like you

9    to be thinking about -- I don't know if you saw on ECF.  I got

10   a letter from somebody representing a freelance journalist who

11   wants access to the defendant's medical records.

12           I'd like you to confer -- just let me know what your

13   thoughts are on that, but it did remind me that I was going to

14   ask you, I didn't look at what records were submitted and I

15   don't know how many there are.  Is it necessary to have the

16   entire -- it seemed like there were a lot.  Is it necessary to

17   have the entirety of his medical records in evidence or are

18   there things that can be redacted?

19           MS. SHIHATA:  Your Honor, the pages that we have

20   submitted are related to the herpes issue.

21           THE COURT:  Right.

22           MS. SHIHATA:  We have redacted out of those the

23   reference to other medical conditions.

24           THE COURT:  Okay.

25           MS. SHIHATA:  I'm happy to confer with defense

Proceedings                    2739

1  counsel.

2          THE COURT:  Why don't you talk about it and let me

3  know what your position is on it.  There is a right of access

4  to the exhibits with obviously certain exceptions.  So let me

5  know about that next.

6          And then just to remind mostly myself, the other

7  issues to resolve are the extent to which the videos, the

8  three exhibits will be admissible.

9          I will tell you, just not to keep everybody in

10  suspense, I do find that they are admissible, but I will hear

11  from you further whenever the appropriate time is.

12          And the other application is permitting Jane Doe

13  number seven to talk really about the entirety of her -- of

14  the nature of her relationship with Mr. Kelly.  Again, just

15  not to keep anybody in suspense, I'm also inclined to permit

16  that, but I take it we don't have to have this conversation

17  right now.

18          So who is your next witness?

19          MS. CRUZ MELENDEZ:  Sonja.

20          THE COURT:  Okay.  By the way, anything that anybody

21  else wants to put on the record?

22          Okay.  All right.  Shall we get Sonja and then get

23  the jurors.

24          (Witness takes stand.)

25          THE COURTROOM DEPUTY:  All rise.

Proceedings                                               2740

1           (The jury enters the courtroom.)

2           THE COURTROOM DEPUTY:  You may be seated.

3           THE COURT:  All right.  Good morning, jurors.  I

4      hope you had a good break there.  We are ready to resume.

5           And I'm going to ask the Government to call your

6      next witness.

7           MS. CRUZ MELENDEZ:  The Government calls Sonja to

8      the stand.

9           THE COURTROOM DEPUTY:  Please stand and raise your

10     right hand.

11          Do you solemnly swear or affirm that the testimony

12     you're about to give will be the truth, the whole truth, and

13     nothing but the truth?

14          THE WITNESS:  I do.

15          THE COURTROOM DEPUTY:  Thank you.  You may be

16     seated.  You can remove your mask.

17          THE COURT:  All right.  You can take your mask off.

18     Just a few things before we begin.  I want to make sure that

19     the jury hears everything that you have to say, so please

20     speak into the microphone and also don't speak too quickly.

21     Our court reporters take down everything that you say and I

22     want to make sure that they can get all of your testimony.

23     For the same reason, don't speak over whichever lawyer is

24     asking you questions.  It just makes it harder for the court

25     reporter and for the jurors to hear.  If there is a question

Proceedings                                    2741

1  that you want to have repeated or that you don't understand,

2  let me know and I will have the lawyer rephrase it.

3          And, finally, just do your best to answer only the

4  question that you are being asked, okay?

5          THE WITNESS:  Okay.

6          THE COURT:  All right.  Go ahead.

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sonja - direct - Cruz Melendez                    2742

1    **SONJA,**

2        called by the Government, having been duly sworn, was

3        examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MS. CRUZ MELENDEZ:

6    Q    Good morning.

7    A    Good morning.

8            MS. CRUZ MELENDEZ:  I'm showing just the witness

9    what has been marked for identification purposes as Government

10   Exhibit 62.

11   Q    Do you see that there?

12   A    Yes.

13   Q    Do you recognize what's in Government Exhibit 62?

14   A    I do.

15   Q    What is it?

16   A    A picture of me.

17   Q    And approximately how old are you in that photograph?

18   A    20s, 21, 22.

19           MS. CRUZ MELENDEZ:  The Government moves to admit

20   Government Exhibit 62.

21           THE COURT:  Any objection?

22           MR. CANNICK:  No objection.

23           THE COURT:  All right.  That's in evidence.

24           (Government's Exhibit 62 received in evidence.)

25           MS. CRUZ MELENDEZ:  May I publish, Your Honor?

Sonja - direct - Cruz Melendez                2743

1              THE COURT:  Yes.  Go ahead.

2              (Exhibit published.)

3              MS. CRUZ MELENDEZ:  I'm now showing just the witness

4    what's been marked for identification purposes Government

5    Exhibit 62-A.

6    Q    Do you see I Government Exhibit 62-A there?

7    A    Yes.

8    Q    Is that the same photograph that's in Government Exhibit

9    62?

10   A    It is.

11   Q    Is that your true name at the bottom of Government

12   Exhibit 62-A?

13   A    That's correct.

14             MS. CRUZ MELENDEZ:  Your Honor, the Government moves

15   to admit Government Exhibit 62-A.

16             MR. CANNICK:  No objection.

17             THE COURT:  That's in evidence.

18             (Government's Exhibit 62-A received in evidence.)

19             MS. CRUZ MELENDEZ:  We would like to publish just to

20   the jury.

21             MR. CANNICK:  It's not showing on our screen, at

22   least not this one.

23             MS. CRUZ MELENDEZ:  Would you like to see the

24   picture or are you okay?

25             THE COURTROOM DEPUTY:  Did you get the first

MDL       RPR       CRR       CSR

Sonja - direct - Cruz Melendez                    2744

1  picture?

2          MR. CANNICK:  No.  I think we solved the problem,

3  Your Honor.

4          THE COURT:  You turned on the monitor?

5          MR. CANNICK:  That would help a lot.

6          THE COURT:  It's magic.

7  BY MS. CRUZ MELENDEZ:

8  Q    Sonja, where did you grow up?

9  A    Salt Lake City, Utah.

10  Q    Did you graduate from high school?

11  A    Not necessarily.  GED, yes.

12  Q    You got your GED?

13  A    That's correct.

14  Q    Have you ever worked in media?

15  A    Yes.

16  Q    Approximately when did you first start working in media?

17  A    Oh, about 2 000, the end of 2000.

18  Q    Where did you work when you first started working in

19  media?

20  A    Millcreek Broadcasting.

21  Q    What is Millcreek Broadcasting?

22  A    It was a group of media stations.

23  Q    And what was your position when you first started working

24  for Millcreek Broadcasting?

25  A    I was an intern.

Sonja - direct - Cruz Melendez                2745

1    Q    Prior to you working at Millcreek as an intern, did you

2    have any interest in working in radio and media generally?

3    A    I did.

4    Q    What kinds of things did you do to advance your interest

5    in working in radio and media?

6    A    Well, I started in junior high and I basically started

7    out as in drama class as an anchor, just -- it was basically

8    like a little school newscast.  It wasn't anything really, but

9    that's really what started my love of broadcasting.

10   Q    And as part of your work as an intern at Millcreek, did

11   you ever interact with celebrities?

12   A    I did.

13   Q    While working at Millcreek, did you ever speak on air?

14   A    I did.

15   Q    When you were working with Millcreek, did you want to

16   pursue a career in radio?

17   A    Yes.

18   Q    And did you, in fact, pursue a career in radio?

19   A    I did.

20   Q    Since that initial internship at Millcreek, did you

21   generally remain in the radio industry?

22   A    Yes.

23   Q    Do you have any children?

24   A    One.

25   Q    And how old is your child?

Sonja - direct - Cruz Melendez                    2746

1   A    She is 20.

2   Q    Are you familiar with an individual named Robert Kelly,

3   also known as R. Kelly?

4   A    I am.

5   Q    Have you ever met Robert Kelly in person?

6   A    Yes.

7   Q    I'm showing what's in evidence as Government Exhibit 1.

8   Do you recognize this?

9   A    Yes.

10  Q    Who do you recognize it to be?

11  A    Rob Kelly.

12  Q    Do you see Robert Kelly in the courtroom here today?

13  A    I believe I do, yes.

14  Q    Can you point him out and identify an item of clothing he

15  is wearing?

16  A    Can you remove your mask?

17       THE COURT:  Can the defendant take his mask off.

18       All right.

19  A    He is over there in the blue, second to the end.

20       THE COURT:  Indicating the defendant.

21  Q    Approximately how old were you when you first met the

22  defendant?

23  A    About 21.

24  Q    Now, you previously testified that you were working as an

25  intern at Millcreek when you were in your early 20s.  When you

Sonja - direct - Cruz Melendez                    2747

1    met the defendant were you working at a radio station with

2    Millcreek?

3    A    Yes, I was an intern.

4    Q    Prior to meeting him, were you familiar with who the

5    defendant was at the time?

6    A    I was.

7    Q    And who did you know him to be?

8    A    R. Kelly.

9    Q    What kind of occupation did you know him to be?

10   A    He was an R&B artist, a huge R&B artist.

11   Q    Where were you when you first met the defendant?

12   A    I was at Valley Fair Mall in West Valley City, Utah.

13   Q    How did it come to be that you met the defendant at that

14   mall?

15   A    Well, we had heard that he was there, at Valley Fair

16   Mall, and I wanted to get an interview.  It would have been my

17   very first huge celebrity interview, so that was....

18   Q    When you say "we had heard," who do you mean?

19   A    Jerie.

20   Q    Who is Jerie?

21   A    Jerie was my best friend at the time.

22   Q    And, so, you were with Jerie when you heard that the

23   defendant was going to be at the mall?

24   A    That's correct.

25   Q    And did you go to the mall?

1    A    I did.

2    Q    And who, if anyone, went with you?

3    A    Jerie.

4    Q    So you testified that you had gone to the mall because

5    you wanted to do an interview of the defendant.  What affect

6    did you believe getting an interview with the defendant would

7    have on your job at Millcreek?

8    A    I thought it would really just kick start my career.

9    Q    Now, when you got to the mall, was the defendant there?

10   A    Yes.

11   Q    And what, if anything, did you see once you got to the

12   mall?

13   A    So there was a tour bus.  I parked at the very back of

14   the parking lot, and we parked, was going to go inside, and a

15   big group of people came walking outside, so we kind of

16   migrated back to the car and, you know, at that time I had to

17   muster up enough guts to go ask him for an interview.

18   Q    And did you approach the defendant and ask him about an

19   interview?

20   A    Eventually, yes, I drove over there to his tour bus to

21   try to catch him before they were driving off.

22   Q    And did you have an opportunity to speak with him?

23   A    I did.

24   Q    So what did you discuss with the defendant at that time

25   about doing an interview?

1   A    Well, I just asked for an interview and he kind of

2   pointed me in the other direction, said talk to him, ask him,

3   who -- I don't know who him was, but it was another gentleman.

4   Q    Who was with the defendant's group?

5   A    That's correct.

6   Q    And who did you understand that to be?

7   A    I want to say, and I could be wrong, I believe it was his

8   manager, somebody who did something along those lines for him.

9   Q    When you spoke to the defendant about doing an interview,

10  did your work at the radio station come up?

11  A    Well, I mean, I was wearing my lanyard, which had my

12  picture, the radio station's on there, everything was on

13  there, so....

14  Q    When you say --

15  A    It was evident, you know, that I worked for a radio

16  station.

17  Q    When you say your lanyard, do you mean an ID on a string?

18  A    That's correct.

19  Q    Based on that conversation, what, if anything, did you

20  discuss about whether or not you would be able to interview

21  the defendant?

22  A    Can you repeat that?

23  Q    Sure.  Based on the discussion that you had with the

24  defendant and the other individual who he pointed you to,

25  what, if any, discussion did you have about whether or not you

Case 1:19-cr-00286-AMD   Document 245   Filed 10/11/21   Page 14 of 245 PageID #: 6813

1   were going to be able to interview the defendant there at the

2   mall?

3   A    Okay.  So they -- they said it wasn't going to happen.

4   Basically they were trying to be nice about it but, you know,

5   it wasn't going to happen that day, they couldn't make it up

6   to the station.  They didn't necessarily want to do a phone

7   interview and that was really about it.

8   Q    What, if anything, happened at the mall while you were

9   with the defendant?

10  A    We took a picture and I was given Rob's number while we

11  were taking the picture.  It was given to me behind my back.

12           MS. CRUZ MELENDEZ:  I'm showing the witness what has

13  been marked for identification purposes as Government Exhibit

14  202.

15  Q    Do you see Government Exhibit 202?

16  A    Yes.

17  Q    And what is it?

18  A    It's a picture of me, Robert Kelly and Jerie.

19           MS. CRUZ MELENDEZ:  The Government moves to admit

20  Government Exhibit 202.

21           MR. CANNICK:  No objection.

22           THE COURT:  That's in evidence.

23           (Government's Exhibit 202 received in evidence.)

24           MS. CRUZ MELENDEZ:  I can publish, Your Honor?

25           THE COURT:  Yes.

Sonja - direct - Cruz Melendez                  2751

1                  (Exhibit published.)

2     BY MS. CRUZ MELENDEZ:

3     Q    So you had testified that you had taken a photograph with

4     the defendant.  Can you identify the item of clothing that you

5     are wearing in this photograph?

6     A    The yellow dress with red flowers.

7     Q    And who's in the center of the photograph?

8     A    Robert Kelly.

9     Q    And who's on the opposite side of you, on the other side

10    of the defendant?

11    A    Jerie.

12    Q    And here at the bottom of the photograph, it says O3812,

13    so August 12, 2003?

14    A    That's correct.

15    Q    Now, you also testified that at some point someone

16    slipped you the defendant's telephone number?

17    A    Yes.

18    Q    And what was the telephone number on?

19    A    Just a ripped off piece of paper.

20    Q    And was it handwritten, typed?  How was it on there?

21    A    Handwritten.

22    Q    Was there anything else written on the piece of paper?

23    A    No.

24    Q    How did you know that it was the defendant's number?

25    A    Well, they gave it to me.  I don't know if it was him or

MDL      RPR      CRR      CSR

Sonja - direct - Cruz Melendez                    2752

1    who it was, but, you know, like I said, it was behind my back,

2    but I didn't know anybody else there named Rob.

3    Q    So did the paper say Rob on it?

4    A    Yes.

5    Q    Okay.  Now, after meeting the defendant at the mall, at

6    some point did you call that number?

7    A    I did.

8    Q    And approximately when did you call the number?

9    A    That day.

10   Q    And why did you call the number?

11   A    Because I just was relentless, I wanted to try and get

12   him to, you know, give me the interview.

13   Q    Did you tell anyone at work that you had gotten the

14   defendant's contact information?

15   A    I did.

16   Q    Who did you tell?

17   A    My boss.

18   Q    So after you reached out to contact the defendant, were

19   you able to reach him?

20   A    Yes.

21   Q    You testified that you were still hoping to get an

22   interview of the defendant.  Did he agree to interview?

23   A    Yes, at some point in the conversations.  There were

24   numerous conversations.

25   Q    So you called the number more than once?

Sonja - direct - Cruz Melendez                    2753

1    A     Yes.

2    Q     Can you explain to the jurors what conversations you had

3    about a potential interview of the defendant?

4    A     Just that, you know, they basically wouldn't do a phone

5    interview because it sounds off and they didn't want to come

6    up to the station.  That kind of led me to a Chicago trip and

7    where I could interview him.

8    Q     When you say led you to a Chicago trip, who suggested

9    you're going to Chicago?

10   A     Rob.

11   Q     The defendant?

12   A     Uh-hum.

13   Q     Did you agree to go to Chicago to meet with the

14   defendant?

15   A     I did.

16   Q     And who made your travel arrangements for your trip to

17   Chicago?

18   A     Someone from his entourage, or his management team.

19   Q     When you say "his," do you mean the defendant?

20   A     Yes.

21   Q     So what kind of arrangements were made?  How were you

22   going to be traveling to Chicago?

23   A     Via airplane.

24   Q     Who paid for your travel to Chicago?

25   A     They did.

1  Q    The defendant?

2  A    The defendant.

3  Q    At the time, do you recall any discussion about where you

4  would be staying when you got to Chicago?

5  A    Not necessary, no.  I was told that it was the Chocolate

6  Factory, but I didn't know what the Chocolate Factory was.

7  There was really no internet at that point, so I couldn't

8  Google.

9  Q    Prior to leaving to Chicago, did you do anything to

10 prepare for your meeting with the defendant in the hopes of

11 doing that interview?

12 A    I did.

13 Q    What did you do to prepare?

14 A    Went through -- it's a similar form of, like a research

15 website.  It's for radio personalities or deejays to go in and

16 kind of read about an artist or an actor or actress.  It's got

17 different, you know, facts about the person.  So I just went

18 off that website, wrote down a few questions, and also looked

19 at a few of the albums that he had at that time and I was

20 ready.

21 Q    What, if anything, did you bring with you from work in

22 anticipation of your meeting?

23 A    A mini voice recorder.

24 Q    Where did you get in that voice recorder from?

25 A    It was borrowed to me from my boss.  It was actually the

Sonja - direct - Cruz Melendez                2755

1    first item that I was able to leave with out of the station

2    because I was just barely, you know, getting my feet wet in

3    radio, so it was kind of a big deal.

4    Q    Why did you want to bring that recording device with you?

5    A    To record the interview.

6    Q    Before traveling to see the defendant in Chicago, did you

7    tell anyone that you were going to meet with the defendant

8    there?

9    A    A couple people, yeah.

10   Q    Who did you tell?

11   A    My boss, Charity and Jerie.

12   Q    Who is Charity?

13   A    Charity is a good friend of mine at the time.

14   Q    At some point, did you, in fact, travel to Chicago to

15   meet the defendant?

16   A    Yes.

17   Q    Now, prior to that, had you ever been to Chicago before?

18   A    No.

19   Q    Did you know anyone who lived in Chicago at that time?

20   A    Not that I know of.

21   Q    You previously testified that you have a 20-year-old

22   child.  Was your child born at the time?

23   A    Yes.

24   Q    And who, if anyone, was watching your child while you

25   were away?

Sonja - direct - Cruz Melendez                2756

1    A    Just family.

2    Q    Who, if anyone, did you travel with to Chicago for that

3    trip?

4    A    By myself.

5    Q    So you testified that someone working with the defendant

6    arranged your travel.  How did you ultimately obtain your

7    ticket?

8    A    Just walked up to the counter and they printed off a pass

9    for me to get on the plane.  I ended up missing the first

10   flight, just so you know, so I had to wait there for hours at

11   the airport, which was pretty ridiculous, but ended up getting

12   on the next flight to Chicago.

13   Q    And did you bring any luggage with you?

14   A    I did.

15   Q    At the time that you traveled to Chicago, did you own a

16   personal cell phone?

17   A    I did, yes.

18   Q    Did you bring that cell phone with you?

19   A    No.

20   Q    Why not?

21   A    It was very cheap.  I was a single parent and wasn't

22   available to afford a Verizon cell phone, so I took my

23   grandparents' cell phone.

24   Q    Do you recall the number of your grandparents' cell

25   phone?

Sonja - direct - Cruz Melendez                    2757

1   A    I do.  (801) 699-6916.

2   Q    And who was the provider for that cell phone?

3   A    Verizon.

4   Q    Just to back up for a moment.  You mentioned that you had

5   told your boss that you were going to meet with the defendant

6   in Chicago.  Is your boss currently living?

7   A    No.  He's deceased.

8   Q    So you testified that you missed your flight.  Were you

9   able to get on another flight?

10  A    Yes.

11  Q    At some point, did you arrive in Chicago?

12  A    I did.  It was pretty late at night, and I called the guy

13  that had arranged my travel and told him that I was there.  He

14  said to take a taxi.  So I took a taxi to the address that he

15  had given me, which was also the Chocolate Factory, and on our

16  way there, we stopped at a gas station.

17  Q    After the stop at the gas station, did you ultimately

18  make it to the address that they gave you for the Chocolate

19  Factory?

20  A    I did.

21  Q    Can you --

22  A    The gas station was -- so you know, the gas station was

23  horrifying to me just because there was numerous different

24  things going on, and it was a very unsafe gas station to stop

25  at, but, yes.

1    Q    Can you describe -- once you got to the Chocolate

2    Factory, can you describe the location that you arrived at

3    from the exterior?

4    A    Yes, it had a fence.  It looked like a barbwire fence.

5    It was brick and there was one door basically that, you know,

6    you could walk through.  It looked almost like a loading dock,

7    something similar to that.

8    Q    Did you go into the building?

9    A    Yes.

10   Q    Where did you go when you first entered the building?

11   A    So I walked in, just right there at the door, I was

12   greeted by a guy.  It -- so on the left-hand side there was a

13   Caucasian gentleman.  And directly in front of me -- I don't

14   recall what his race was, but he was about my height, and he

15   asked me a couple of crazy questions.

16   Q    What did he ask you?

17   A    First of all, he just -- he said do you need protection?

18   And I didn't understand the question because, you know, at

19   first, I mean, it wasn't clicking.  So I thought -- I

20   immediately thought that he was talking about the gas station

21   that I had just stopped at because it was so terrifying, and I

22   thought well, how in the world does he know, you know, that I

23   need protection.  Like, yes, I need a security guard, please.

24   I need a security guard.  That was crazy there, but that

25   wasn't the type of question that he was asking.

Sonja - direct - Cruz Melendez                    2759

1    Q    At some point did he tell you what he meant by

2    protection?

3    A    Yeah, I had --

4    Q    What did he say?

5    A    He just came out and said do you need a condom?

6    Q    What did you say in response?

7    A    No, I'm not here for that.

8    Q    So after the individual who met you at reception asked

9    you if you needed condoms, what happened next?

10   A    They -- somebody took my luggage in the room and I kind

11   of followed with them, walked down, turned left, turned right

12   directly into a room, and....

13   Q    Was the room that you were escorted to on the same floor

14   as reception?

15   A    Yes.

16   Q    So what happened once you entered the room?

17   A    They asked for my ID, the cell phone, the first five or

18   so numbers that were on the phone that I had last dialed and

19   they had me sign an agreement.

20   Q    When you -- you're saying "they."  When you walked into

21   the room, how many individuals were in that room?

22   A    Two.

23   Q    And the individual who asked you for your ID, did you

24   give him your ID?

25   A    I did.

Sonja - direct - Cruz Melendez                    2760

1   Q    And what, if anything, did he do with your ID?

2   A    He went and copied it.

3   Q    And how do you know that he copied it?

4   A    Because I could hear the copy machine.  It was right

5   across the way, you know, from the door.

6   Q    And you also testified that they asked for your phone.

7   A    Yes.

8   Q    Did you give the man who asked for your phone your phone?

9   A    I did.

10  Q    And what, if anything, did he do with your phone?

11  A    He wrote down the numbers and eventually gave it back to

12  me and asked me who was what, what number that belonged to,

13  and if I knew their address, who it was.

14  Q    And did you respond to his questions about who the

15  numbers belonged to?

16  A    I did.

17  Q    And do you recall which numbers you told the defendant

18  about -- excuse me, you told the individual who asked you

19  about the numbers about?

20  A    Well, I told him just who each person was.  It was like

21  my aunt, my mom, my grandma, Jerie and Charity.

22  Q    You also mentioned that there was another individual in

23  the room?

24  A    Yes.

25  Q    When you arrived, what was that person doing?

Sonja - direct - Cruz Melendez                    2761

1   A     He was going through my luggage.

2   Q     Had you given any permission for anyone to go through

3   your luggage?

4   A     No.

5   Q     You also testified that you were provided with a

6   confidentiality agreement?

7   A     Yes.

8   Q     Did you sign that agreement?

9   A     I did.

10  Q     Before signing it, did you read the agreement in full?

11  A     Not necessarily.  The room that I was in was extremely

12  dark.  It had a beam kind of going across with a fan like set

13  on the bottom of the beam with a very dim light.  It was

14  almost like candle light so I couldn't necessarily read what

15  it said.

16  Q     After you signed that document, did they give you a copy

17  of the agreement?

18  A     No.

19  Q     After you signed the confidentiality agreement and they

20  asked you for your ID and went through your phone, what, if

21  anything else, did the individual say to you?

22  A     He kind of went through a list of rules, that I wasn't

23  allowed to look up, I wasn't allowed to talk to anybody, I

24  wasn't allowed to just basically do anything.  You know, there

25  was a list of rules that I had to abide by for being there.

Sonja - direct - Cruz Melendez                    2762

1    Q    What, if anything else, did he say about leaving the

2    room?

3    A    I couldn't.

4    Q    After he gave you this list of rooms -- excuse me, rules,

5    what happened next?

6    A    He said Mr. Kelly should be in shortly and went out of

7    the room.

8    Q    And what happened after -- did both individuals leave the

9    room?

10   A    Yes.

11   Q    And what happened when they left the room?

12   A    He closed the door behind him.

13   Q    What, if anything, happened next?

14   A    Well, a few minutes went by and I tried to open the door,

15   come to find out it was locked from the outside.

16   Q    How did you feel when you realized that the door was

17   locked?

18   A    I was scared, for one.  I was ashamed.  I was embarrassed

19   beyond.  I couldn't even tell you.  It was so embarrassing.

20   Q    So what, if anything, did you do once you realized that

21   the door was locked?

22   A    I turned to the left and went and sat on a couch, sat

23   there and kind of just was thinking to myself maybe that was

24   an accident, maybe they didn't mean to lock the door, maybe,

25   you know -- I mean, I was just going through numerous

Sonja - direct - Cruz Melendez                    2763

1    different things as to why this door wasn't opening.  And then

2    I thought maybe it was just so heavy and I'm not strong enough

3    to pull it up.  I have no idea.

4         I tried a few other times to get it to open and it

5    wouldn't.  So I realized, okay -- because there was also

6    noises, like a door locking when they closed the door the

7    first time and, so, eventually I just, you know, came to the

8    conclusion that, okay, it's locked from the outside, that's

9    why I can't open it.

10   Q    You referenced that there was a couch in the room.  What

11   other furniture was in that room?

12   A    A coffee table, a TV, and a table with two chairs.

13   Q    Was there a bathroom in the room?

14   A    No.

15   Q    What, if anything else, do you recall being in the room?

16   A    There was a book with to-go menus.  It was like a binder,

17   like a three ring binder with a whole bunch of to-go menus.

18        There was a fan on the ceiling with a very dim light

19   and I couldn't see above the beam that was kind of holding the

20   fan there.  But it looked like it was like a -- I don't know

21   what those types of ceilings are called, but it just looked

22   like it was a very high ceiling.

23   Q    From inside of the room, could you see outside of the

24   building?

25   A    No, there was no windows.

Sonja - direct - Cruz Melendez                    2764

1    Q    You mentioned a to-go menu.  Was that a reference to like
2    food to go?
3    A    Yes, to-go menus from like restaurants.
4    Q    You testified that when you arrived to the Chocolate
5    Factory that it was evening; correct?
6    A    Yes.  That's correct.
7    Q    On that first evening that you were there, did you see
8    the defendant?
9    A    No.
10   Q    What, if anything, did you do while you were in the room?
11   A    I read the menus, the to-go menus.  I talked on my
12   grandparents' cell phone as much as I possibly could.  I
13   banged on the door.  I tried to use the restroom as much as I
14   possibly could.
15   Q    You said you used your grandparents' phone.  Who did you
16   call?
17   A    I called mainly my friend Charity.
18   Q    Did you call anyone else?
19   A    I called to check on my daughter.  I called the front
20   desk, the reception desk, I guess it's called.
21   Q    You testified that at some point you banged on the door.
22   What, if anything else, did you do to try to get the attention
23   of the defendant's employees at the Chocolate Factory?
24   A    Just knocked and banged on the door.  I called numerous
25   times.  I asked to be let out.  I asked to go to the restroom.

Sonja - direct - Cruz Melendez                    2765

1    There's -- whatever I could do, I was doing it.

2    Q    So you mentioned you had your cell phone.  Did you use

3    anything else to contact employees at the reception area?

4    A    Well, there was also -- there was a phone in that room

5    that would let you dial the reception area and also for some

6    reason it allowed me to contact my friends, but it wouldn't

7    allow me to dial like family numbers.

8    Q    Now, when you called the reception area, did someone

9    always answer?

10   A    For the most part.  When he knew it was me -- when the

11   guy, you know, he knew it was me calling, he would answer.

12   Q    Now, you testified that you asked to go to the bathroom,

13   to be let out of the room.  What, if anything else, did you

14   request when you made these calls?

15   A    For food and water.

16   Q    When you made these calls, was it always the same person

17   you spoke to or different people?

18   A    It was different people.

19   Q    Did you ever speak to the same person more than once?

20   A    Yes.

21   Q    Now, when you made these requests to leave the room and

22   for food, water and to use the bathroom, what, if anything,

23   did the person answering the telephone say to you in response?

24   A    He had to get it cleared.  Basically he had to get it

25   approved and somebody would have to come and walk me from my

Sonja - direct - Cruz Melendez                    2766

1  room that they had me in to the restroom.

2  Q    Did they say who they needed to get it approved by?

3  A    Mr. Kelly.

4  Q    So you testified that multiple times you made these calls

5  and you asked to use the bathroom.  Were you at some point

6  able to use the bathroom?

7  A    Yes.

8  Q    And you testified earlier that you were informed that you

9  needed to be escorted to and from the bathroom.  When you were

10 permitted to use the bathroom, were you escorted?

11 A    Yes, I was.

12 Q    When you were escorted, were you escorted by the same

13 person or different people?

14 A    Different people.

15 Q    When you went to the bathroom, were you able to use the

16 bathroom for as long as you wanted?

17 A    Not necessarily.  But they did stand right next to the

18 door.  I had to keep the door open a couple of times just

19 depending on who it was that escorted me, and yeah, I mean....

20 Q    Can you describe the bathroom that you used?

21 A    So the first one that I was escorted to, you walk out of

22 the room and go directly to the left and then there's a

23 hallway that is a fairly long hallway.  You go all the way

24 down to the hallway.  There's doors on the left side there and

25 you turn right.  And right after you turn right, there's going

Sonja - direct - Cruz Melendez                    2767

1   to be mirrors on the left-hand side, like a dance studio type

2   of thing.  You go to the right and there's a restroom.  And I

3   believe there was just a sink and a toilet, but up above there

4   was actually a hole in the ceiling.

5   Q    And you mentioned the first bathroom, did you use any

6   other bathrooms?

7   A    I did.

8   Q    Where was the other bathroom that you used?

9   A    It was upstairs.  It was a very tiny staircase, but up

10  there, at the very top of the stairs and to the right.

11  Q    And can you describe the other bathroom?

12  A    It had a shower in it.  It was basically just a normal

13  bathroom.  It didn't have a bathtub, just a shower, a toilet

14  and a sink.

15  Q    At some point were you able to use that shower?

16  A    Yes.

17  Q    And had you been escorted to the bathroom to use that

18  shower?

19  A    No.

20  Q    Now, when you used the -- when you used the bathroom,

21  were you then escorted back to the same room where you had

22  been originally?

23  A    Yes.

24  Q    When you were walking through the hallways, what, if

25  anything, do you recall hearing?

Sonja - direct - Cruz Melendez                    2768

1  A    Just people, I mean, it sounded like somebody was having
2  sex.
3  Q    Now, you testified that while you were in that room you
4  also asked for food?
5  A    Yes.
6  Q    At some point did someone bring you food?
7  A    Yes.
8  Q    Prior to the point when you were brought food,
9  approximately how long had you gone without food?
10 A    It was like a couple days.
11 Q    And when you previously had requested food, what, if
12 anything, would the person answering the phone say in response
13 to your request for food?
14 A    He had to get it approved by Mr. Kelly.
15 Q    During that time that you were in the room now a couple
16 of days without being given food, were you given anything to
17 drink?
18 A    No.
19 Q    So at some point you requested food and someone did, in
20 fact, bring you food?
21 A    Yeah, after hours.  I mean, it was like -- it seemed like
22 forever.
23 Q    And what kind of food did they bring you?
24 A    They brought what I had ordered from the to-go menus,
25 which was Chinese food.

Sonja - direct - Cruz Melendez                2769

1    Q    Did they bring you anything to drink?

2    A    Yes.

3    Q    How was the food brought to you?

4    A    It was in a bag and just -- and want to say it was a

5    green tray.

6    Q    And the drink, how was the drink given to you?

7    A    Just in a cup, just a regular drink, you know, some type

8    of a soda.  I don't remember if it was Sprite, or Coke or Dr.

9    Pepper, but it was one of them.

10   Q    So like an open cup, not a bottle or a can?

11   A    Right.

12   Q    Did you eat any of the food?

13   A    I did.

14   Q    How much of the food did you eat?

15   A    Just a couple of bites.

16   Q    And what about the drink, did you have any of the drink?

17   A    I did.  A couple sips.

18   Q    Now, after you took a few bites of the food and had a few

19   sips of the drink, what happened next?

20   A    I got extremely just full.  I felt extremely full and

21   tired.

22   Q    And what do you mean by tired?

23   A    Well, I felt something coming on where I was like okay,

24   I'm done eating, but I don't remember how I got from my chair

25   at the table to the couch.

Sonja - direct - Cruz Melendez                    2770

1   Q     And, so, what do you remember?  What's the next thing you

2   remember?

3   A     The next thing I remember is waking up to some commotion

4   in the room and I was very -- extremely confused.  I didn't

5   know where I was at really for the most part and then

6   eventually I was reminded as I looked over to my right and saw

7   Rob Kelly doing up his pants in the corner.

8   Q     And what, if anything else, did you see?

9   A     My underwear at the end of the couch, kind of on the arm

10  ware or armrest.

11  Q     What, if anything else, did you notice upon wakening?

12  A     There was some wet stuff in between my legs.

13  Q     When you say in between your legs, do you mean in your

14  vaginal area?

15  A     Yes, and on my thighs.

16  Q     Now, you testified that you woke up on the couch

17  suddenly?

18  A     That's correct.

19  Q     Do you recall making your way over to the couch?

20  A     No.

21  Q     Do you even recall falling asleep?

22  A     No.

23  Q     Now, you also testified that when you woke up, your

24  underwear were on the arm of the couch.  When you were eating

25  the food, what were you wearing?

Sonja - direct - Cruz Melendez                    2771

1   A     Just my nightgown.

2   Q     Were you wearing underwear?

3   A     Yes.

4   Q     Did you remove your underwear?

5   A     No.

6   Q     Based on your underwear being removed while you were not

7   conscious and the wetness that you observed in your vaginal

8   area and the defendant standing in the corner doing up his

9   pants, what conclusion, if any, did you reach about what had

10  happened to you while you were unconscious?

11              MR. CANNICK:  Objection.

12              THE COURT:  Well, sustained as to form.

13              MS. CRUZ MELENDEZ:  Okay.

14  Q     The vaginal wetness between your legs, how did that make

15  you feel?

16  A     Just made me feel like something happened to me.  I know

17  my body.  I know when something is, you know, not right.

18  Q     And what do you mean by "not right"?

19  A     It just felt like somebody and something had been inside

20  of me.

21  Q     And can you explain what you mean by that?

22  A     I believe something -- I was touched.

23  Q     Sexually?

24  A     Sexually.

25  Q     Was anyone else in the room besides the defendant?

Sonja - direct - Cruz Melendez                    2772

1    A    No.

2    Q    At any point, did you consent to the defendant removing

3    your underwear?

4    A    Say that again.

5    Q    At any point did you consent to the defendant removing

6    your underwear?

7    A    No, I did not.

8    Q    At any point, did you consent to the defendant touching

9    you in any sexual manner?

10   A    Absolutely not.

11   Q    Did you find it -- what, if anything, did you find about

12   the fact that your underwear had been removed but you remained

13   asleep?

14             MR. CANNICK:  Objection.

15             THE COURT:  Sustained as to form.

16   Q    After seeing the defendant in the corner doing up his

17   pants, did you get up from the couch?

18   A    I did.

19   Q    What happened next?

20   A    I said, hey, how are you?  I was a little embarrassed,

21   you know, when I woke up because I really didn't know what was

22   going on, where I was at, and I said hey, how are you?  And he

23   was over there standing by the TV finishing up, doing up his

24   pant, his belt.  And I walked over, gave him a hug.  But as I

25   went to walk over and kind of give him a hug, he grabbed my

Sonja - direct - Cruz Melendez                    2773

1  butt with both hands and pulled me closer.

2  Q    What, if anything, did the defendant say to you?

3  A    Just that he would be back shortly.

4  Q    And did the defendant leave?

5  A    He did.

6  Q    Other than those few minutes when the defendant was in

7  the room with you, did you see the defendant again while you

8  were at the Chocolate Factory?

9  A    No, I did not.

10 Q    Had you seen the defendant prior to that when you were

11 locked into room?

12 A    No.

13 Q    Once the defendant left the room, what, if anything,

14 happened next?

15 A    A little while later, they -- one of the guys that works

16 for him came in and said that he apologized Mr. Kelly was not

17 going to be able to come back, that he had some things come up

18 and he basically said that I was able to go home.

19 Q    And what, if anything else, did he say prior to you

20 leaving to go home?

21 A    He had me sign another confidentiality agreement and

22 basically threatened me with Mr. Kelly, you don't want to mess

23 with Mr. Kelly.  He said that I am not to tell anybody, that I

24 cannot tell even my grandparents or my best friend or anybody,

25 so it was just kind of like okay.

Sonja - direct - Cruz Melendez                    2774

1    Q    And when you told --

2    A    Scary.

3    Q    You said that the individual said not to mess with Mr.

4    Kelly.  Were those his exact words?

5    A    He said don't fuck with Mr. Kelly.

6    Q    And how did you take that to mean?

7    A    I was threatened.  Basically, he was threatening me.  He

8    had my address, the address to where my daughter was at, the

9    address to my family, my friends.

10   Q    Prior to leaving the Chocolate Factory and signing that

11   confidentiality agreement, did you have a return ticket to get

12   home?

13   A    Not to my knowledge.

14   Q    And would you have been able to afford your own ticket?

15   A    Absolutely not.  I was a single parent.

16   Q    Now, you testified that you took this individual's

17   comments as a threat.  Did you take that threat to heart?

18   A    I did.

19   Q    Approximately how long were you in that room before you

20   ultimately were allowed to leave the Chocolate Factory to go

21   home?

22   A    It was days.  I believe it was three or four days.

23   Q    Did you want to be locked into room?

24   A    No, I did not.

25   Q    Did you ever get that interview that you went there for?

Sonja - direct - Cruz Melendez                2775

1    A    No, I didn't.

2    Q    After the defendant associate told you not to tell anyone

3    about what happened there, were you then able to leave?

4    A    Yeah, shortly after that.

5    Q    And did you fly back home?

6    A    I did.

7    Q    At some point did you go through the luggage that you had

8    brought to Chicago with you back home?

9    A    Yes, I did.

10   Q    What, if anything, did you find in your luggage?

11   A    There was a watch.

12   Q    Did you know how that watch got in your luggage?

13   A    I don't.

14   Q    Now, you previously testified that while you were locked

15   in that room at the Chocolate Factory you used your

16   grandparents' cell phone to call home?

17   A    That's correct.

18   Q    When you returned home, at some point did you have an

19   opportunity to see the telephone bill from the period that you

20   made those calls?

21   A    I did.

22   Q    What --

23   A    It was expensive.  I want to say it was like 6 or $900.

24   It was really high.

25   Q    What, if anything, did you notice that made it very

MDL      RPR      CRR      CSR

Sonja - direct - Cruz Melendez                    2776

1    expensive?

2    A    There was a lot of roaming charges on there because there

3    was -- I'm assuming that it was because there was no windows,

4    so every phone call that I was making, it was roaming.

5    Q    Now, when you returned home, did you speak to anyone

6    about what happened while you were in that room in the

7    Chocolate Factory?

8    A    Just the people that I was already speaking to that knew

9    I was there.

10   Q    Before today, have you ever spoken publicly about what

11   happened to you while you were locked in that room?

12   A    No.

13          MS. CRUZ MELENDEZ:  Your Honor, if I could have just

14   one moment.

15          THE COURT:  Sure.

16          (Pause.)

17          MS. CRUZ MELENDEZ:  Nothing further.

18          THE COURT:  Cross-examination?

19          MR. CANNICK:  Yes, Your Honor.

20

21          (Continued on next page.)

22

23

24

25

1    (Continuing.)

2    CROSS-EXAMINATION

3    BY MR. CANNICK:

4    Q    How old are you?

5    A    Thirty-nine.

6    Q    And, according to you, these things you just told the

7    jury happened to you when you are 21?

8    A    That's correct.

9    Q    And I see Ms. Allred is here with you.  You retained her?

10    A    Yes.

11    Q    When did you retain her?

12    A    I don't know.  A couple of years ago maybe.

13    Q    A couple of years ago.  Was it after the *Surviving*

14    *R. Kelly* -- the documentary?

15    A    Yes.

16    Q    And after these things that you said that happened to

17    you, when did you first make a report to law enforcement?

18    A    Can you repeat that?

19    Q    After these things that you just told us about that

20    happened to you, when was it that you made a report to law

21    enforcement?

22    A    A couple of years ago.

23    Q    Again, after the *Surviving R. Kelly*; am I correct?

24    A    That would be correct.

25    Q    And was this report made before you retained Ms. Allred

Sonja - cross - Cannick                2778

1   or after you retained Ms. Allred?

2   A    After.

3   Q    So, firstly, after these things happened to you, you

4   didn't go to law enforcement, but two years or so ago you

5   hired Ms. Allred?

6   A    That's correct.

7   Q    And after you hired Ms. Allred, then you went to the

8   police?

9   A    We didn't go to the police.

10  Q    So, you made a report to the police?

11  A    I never made a report to the police.

12  Q    Okay, law enforcement.

13  A    These guys are considered law enforcement, prosecutors,

14  so that's who I'm --

15  Q    So, the first time that you said anything about these

16  allegations, you said it to the federal government?

17  A    Yes.

18  Q    After the *Surviving R. Kelly* documentary was broadcast?

19  A    Yes.

20  Q    Okay.  Now after, according to you, you were raped by

21  Mr. Kelly, did you go to the hospital?

22  A    No, I didn't.

23  Q    Did you go to any medical personnel whatsoever to have

24  yourself checked out?

25  A    No, I did not.

Sonja - cross - Cannick                          2779

1    Q     Was there a rape kit done at any point in time by law

2    enforcement or anyone after this alleged rape that you spoke

3    of?

4    A     No, there was not.

5    Q     You testified that after you were placed in this room by

6    someone associated with Mr. Kelly, that you called and used

7    the phone as much as you possibly could.  Do you remember

8    telling us that?

9    A     Yeah.

10   Q     Now, that -- you were placed in a room after you

11   initially ran into the person who asked if you needed

12   protection; am I correct?

13   A     Can you repeat that?

14   Q     You were placed in the room, according to you, after you

15   were asked whether or not you needed protection, meaning a

16   condom; right?

17   A     That's correct.

18   Q     And you were placed in that room after you had had your

19   identification taken from you by someone associated with

20   Mr. Kelly?

21   A     No, they took it while I was in the room.

22   Q     While you were in the room.  And they also, according to

23   you, took down the names of your relatives?

24   A     Yes, that's correct.

25   Q     Contact information?

Sonja - cross - Cannick                    2780

1    A      Yes.

2    Q      Your child's name?

3    A      Yes.

4    Q      And after that happened, you were in the room and you

5    made a number of phone calls; am I correct?

6    A      That's correct, to mostly the same people.

7    Q      I'm not asking who they were to, I'm asking did you make

8    a number of phone calls.  You made a number of phone calls;

9    right?

10   A      I did.

11   Q      And you testified and told us that at that point while

12   you were in a room, you were uneasy; am I correct?

13   A      That's correct.

14          (Pause in proceedings.)

15   Q      And then at some point in time you felt as though you

16   were locked in that room; am I correct?

17   A      Yes, I was.

18   Q      And you were making contact with Charity?

19   A      That's correct.

20   Q      Over the phone?

21   A      That's correct.

22   Q      And you were in contact with your grandmother?

23   A      That's correct.

24   Q      And there was a point in time that you were actually

25   banging on the door to get out; am I correct?

Sonja - cross - Cannick                    2781

1    A    That's correct.

2    Q    At any point in time, did you call 9-1-1?

3    A    I did not.

4    Q    And you didn't call 9-1-1 the first day?

5    A    No, I didn't.

6    Q    Did you call 9-1-1 the second day?

7    A    No, I didn't.

8    Q    You didn't call 9-1-1 the third day?

9    A    I didn't.

10   Q    After you were raped, according to you, you didn't call

11   9-1-1 either, did you?

12   A    No.

13   Q    And, in fact, according to you, you got back on the plane

14   and went back to Salt Lake?

15   A    That's correct.

16   Q    When you went back to Salt Lake and told your family

17   about this, I am sure you called the police then; right?

18   A    I did not and I didn't tell my family.

19   Q    You didn't tell your family and you didn't call 9-1-1?

20   A    No.

21   Q    In fact, as you told us earlier, you first mentioned this

22   a couple of years ago?

23   A    Yes.

24             MR. CANNICK:  May I have the picture of -- --

25   Q    In fact, this is a photograph that you held onto from

SN        OCR        RPR

Sonja - cross - Cannick                                    2782

1   2001 until now, am I correct -- 2003?

2   A    2003 is what it says, yes.

3   Q    Okay.  And, according to you, this is a picture of your

4   rapist that you held onto; is that correct?

5   A    That is correct.

6   Q    You didn't go to law enforcement and say, hey, I have a

7   picture of him.  Here is the picture.  This is the guy who did

8   it to me; right?

9   A    No, I didn't.

10  Q    You didn't do that?

11  A    No, I didn't.

12  Q    You held on to it.  You held on to it?

13  A    I did.

14  Q    And you didn't tell your family about it either?

15  A    No, not what happened to me.

16  Q    Okay.  When you went out to Chicago, did you have a

17  return ticket?

18  A    I don't know if they had already planned the date that I

19  was coming back, but, no.

20  Q    But your ticket would have had an indication that it was

21  a one-way or a round trip, would it not?

22  A    I'm sure it did.

23  Q    So you knew whether or not this was a one-way or a

24  round-trip; am I correct?

25  A    I didn't pay too much attention.

Sonja - cross - Cannick                          2783

1    Q    Okay.  When you were in that room and you were in there

2    for three days and you wanted to get out and you were

3    desperate, you didn't look at the ticket to see whether you

4    had a roundtrip ticket to go home?

5    A    No, I didn't.

6    Q    Now, isn't it a fact, according to you, that when this

7    was happening, at some point the receptionist left the room

8    door open?

9    A    Yes, at the very end.

10   Q    At the very end.  Well, at some point he left it open; is

11   that correct?

12   A    That's right.

13   Q    And you didn't grab your stuff and say, I'm getting the

14   hell out of here with your round-trip ticket?

15   A    Where would I go?  How would I get there?

16   Q    You went to Chicago without a nickel?

17   A    I did.

18   Q    You had a phone; right?

19   A    I did.

20   Q    You didn't call 9-1-1 and say, you know what, I don't

21   have a nickel to get back to Salt Lake?

22   A    I did not.

23   Q    You didn't call your family and say, I'm stuck here in

24   this room and I can't get back and I need you to send me some

25   money?

1           MS. CRUZ MELENDEZ:  Objection.

2           THE COURT:  Overruled.

3           Did you do any of those things?

4           THE WITNESS:  I did not.

5   BY MR. CANNICK:

6   Q    But you were stuck, with a roundtrip ticket.

7           THE COURT:  Is that a question?  I don't know if

8   you're waiting for an answer.

9           MR. CANNICK:  No, we can withdraw that one.

10          THE COURT:  All right.

11  BY MR. CANNICK:

12  Q    Now you testified and told us that you had -- you got a

13  nondisclosure agreement that you couldn't read because the

14  room was dark.  Do you remember telling us that?

15  A    Yeah, I do.

16  Q    But you went on and told us that there were menus in the

17  room and you read those menus.

18  A    There was a TV.  It was a little bit brighter than the

19  light that was in there.

20  Q    So that TV was not in the room when you were reading

21  the nondisclosure agreement?

22          MS. CRUZ MELENDEZ:  Objection.

23          THE COURT:  Overruled.

24          Was the TV there when you looked at the

25  nondisclosure agreement?

Sonja - cross - Cannick                    2785

1           THE WITNESS:  The TV was over in the corner, but it

2      wasn't turned on.

3      BY MR. CANNICK:

4      Q    But that was a simple moving it over and hitting the

5      button and turning it on; correct?

6      A    The TV was all the way over in the far right corner and

7      we were at the table.  It was not on -- I didn't know it was

8      there.  I Didn't know what I was doing in that room, to be

9      honest?

10          THE COURT:  Can I ask a point of clarification?

11          Were there two separate times that you were asked to

12     sign these agreements?

13          THE WITNESS:  Yes.

14          THE COURT:  And how long, and I am sure you said

15     this but I just don't remember, how long after you got there

16     did you get the first one?

17          THE WITNESS:  It I was there for about five or ten

18     minutes.

19          THE COURT:  And the second one was when you left?

20          THE WITNESS:  Yes, a couple of days.

21          THE COURT:  Sorry Mr. Cannick.  Go ahead.

22          MR. CANNICK:  Sure.

23     BY MR. CANNICK:

24     Q    So you got it the second time.  You read it then?

25     A    No, I didn't.

Sonja - cross - Cannick                      2786

1   Q    The TV was still off; am I correct?

2   A    No, the TV was on, but I already signed the first one.

3   Q    Okay, you didn't want to know what was in the second one?

4            MS. CRUZ MELENDEZ:  Objection.

5            THE COURT:  Overruled.

6            Why didn't you read the second one?

7            THE WITNESS:  I just wanted to go home.

8   BY MR. CANNICK:

9   Q    And this was while the door was open, am I correct?

10  A    Yes.

11           THE COURT:  I am sorry again, the second agreement,

12  was that in the room or was that somewhere else?

13           THE WITNESS:  There was a guy that brought it in.

14  When he walked in, the door was open.  He had me sign whatever

15  it is, the NDA, and the door was still open.  He didn't close

16  the door behind him.

17           THE COURT:  Okay.

18           Sorry, Mr. Cannick.  Go ahead.

19  BY MR. CANNICK:

20  Q    Now, you testified and told the jury that when you were

21  going to see Mr. Kelly, you were going out to do an interview

22  with him?

23  A    That's correct.

24  Q    Had you in fact -- -- he or the staff, told you that he

25  would not be doing an interview with you?

SN        OCR        RPR

1   A    No.  Nobody ever said that.

2   Q    Isn't it a fact that when you were going out, you were

3   under the your impression that you were going to watch a photo

4   shoot with Mr. Kelly?

5   A    No.

6   Q    No?  Now, when you were en route to Mr. Kelly, you missed

7   your flight?

8   A    I did; the first one.

9   Q    The first one.  And you called and asked for a second

10  one?

11  A    No, I called to let him know that I missed the first one

12  and what he wanted me to do and he put me on another flight.

13  Q    He put you on another flight.  And when you got to the

14  airport, you missed your car?

15  A    He said that the car service -- it was so late that the

16  car service wasn't running anymore, to take a taxi.

17  Q    And you took a taxi?

18  A    That's correct.

19  Q    And then en route to the Chocolate Factory, you had the

20  taxi stop so you could change clothes?

21  A    I had them stop so I could change -- for feminine

22  hygiene, but, yes, he did stop.

23  Q    And then you changed and then you went on to his -- to

24  the Chocolate Factory?

25  A    That's correct.

Sonja - cross - Cannick                    2788

1    Q     And you testified and told us when you got to the

2    Chocolate Factory that someone asked for your ID?

3    A     That's correct.

4    Q     And took pictures of your ID?

5    A     He took a copy of it, yes.

6    Q     And your bank card?

7    A     Whatever other form of identification I could give him.

8    Q     And you saw that happening?

9    A     They took it and I heard it.

10   Q     And then there came a point in time that that's when you

11   were taken to the room and locked inside the room?

12   A     I was inside the room when they took my identification.

13   Q     Now, before going out to Mr. Kelly, did you tell your

14   boss?

15   A     Yes.

16   Q     And did you give your boss a reason as to why you were

17   going?

18   A     I did.

19   Q     And your boss did not provide you with any resources?

20   A     No.

21   Q     And --

22   A     The only thing he gave me --

23   Q     You answered my question.

24         Now you testified while being in the room and

25   knocking on the door to be let out to use the bathroom and get

1   some food, you eventually got some good?

2   A    Yes.

3   Q    This is food that you ordered; is that correct?

4   A    Correct.

5   Q    You were in the room for how many days before you got the

6   food?

7   A    Two, two and a half.

8   Q    You hadn't eaten anything in the interim?

9   A    No.

10  Q    No water?

11  A    No.

12  Q    No -- nothing to drink whatsoever?

13  A    No.

14  Q    And then when the food arrived, you took only a couple of

15  bites?

16  A    That's correct.

17  Q    And you took a couple of sips of the drink?

18  A    That's correct.

19  Q    You weren't famished?

20  A    What do you mean?

21  Q    You weren't hungry?

22  A    I was starving.

23  Q    But you only took a couple of bites?

24  A    Yes.

25  Q    You had testified that this was Chinese food, am I right?

Sonja - cross - Cannick                    2790

1    A    That's correct.

2    Q    And was it MSG?

3              THE COURT:  Was what?

4              MR. CANNICK:  Did it have MSG.

5              MS. CRUZ MELENDEZ:  Objection.

6              THE COURT:  Do you know, did it have MSG in it?

7              THE WITNESS:  I don't know.

8    BY MR. CANNICK:

9    Q    Okay.  Now, I asked you a short while ago isn't it a fact

10   that after you placed several calls to Mr. Kelly and left

11   messages, you eventually called back but he would not agree to

12   do an interview with you?

13   A    He wouldn't agree to do it on the phone.

14   Q    But when you spoke to the Government about this, you

15   didn't tell them that he refused to do it on the phone; you

16   just told them he refused to do an interview with you;

17   correct?

18   A    He refused to do it on the phone or come up to the studio

19   when he was in Utah.

20   Q    Now, you do recall speaking to the Government about this

21   case?

22   A    Yes.

23   Q    And it's your testimony that you did not tell -- that you

24   told them that he refused to come up to the station to do an

25   interview and do an interview over the phone?

Sonja - cross - Cannick                    2791

1   A    That's correct.

2   Q    And if they had -- you called Mr. Kelly, you left

3   messages, he eventually called you back and would not agree to

4   do an interview with you, that would be a misstatement by the

5   Government?

6   A    Can you repeat that?

7   Q    If the Government wrote down in their report during their

8   interview with you that you told them that you called

9   Mr. Kelly and left messages and he eventually called you back

10  but would not agree to do an interview with you, that would be

11  incorrect according to you; am I correct?

12           MS. CRUZ MELENDEZ:  Objection.

13           THE COURT:  Sustained.

14  BY MR. CANNICK:

15  Q    Didn't you tell the Government that Mr. Kelly would not

16  agree to do an interview with you?

17  A    So that depends really on what phone conversation you are

18  talking about.  Because the first one --

19  Q    I'm not -- Ms. --

20           THE COURT:  Maybe you want to show her what you're

21  talking about.

22           MR. CANNICK:  Yes.

23           THE COURT:  Why don't you do that, if that's what

24  your plan is.

25           MR. CANNICK:  I am allowed to approach?

Sonja - cross - Cannick                    2792

1            THE COURT:  Yes.  And I assume the Government knows

2   what you're using.

3            MS. CRUZ MELENDEZ:  Is it possible to ask for a

4   sidebar, Your Honor.

5            (Sidebar held outside of the hearing of the jury.)

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                      2793
```

1           (The following sidebar took place outside the
2    hearing of the jury.)
3           MS. CRUZ MELENDEZ:  She's testified that she
4    hasn't -- she gave a response.  She indicated that she didn't
5    recall, not that she needs to be refreshed.
6           THE COURT:  I think rather than reading out long
7    phrases, it moves things along a little bit.  That's something
8    you can consider.
9           Off the record.
10          (Sidebar ends.)
11          (Continued on next page.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Sonja - cross - Cannick                          2794

1   BY MR. CANNICK:

2   Q    I'm going to show you this document and ask you to read

3   it to yourself and see if you did, in fact, tell the

4   Government that Mr. Kelly called you back --

5              THE COURT:  Just point it out where you want her to

6   see.  Show her what you want to show her.

7   BY MR. CANNICK:

8   Q    Isn't it a fact that Mr. Kelly simply told you that he

9   would not agree to allow you to have an interview?

10  A    The very first conversations, yes.

11  Q    Now, according to you, when you were locked in a room and

12  eventually let out, you took a shower in the bathroom?

13  A    Can you repeat that question?

14  Q    After you had been let out of the room after a couple of

15  days, you took a shower; correct?

16             MS. CRUZ MELENDEZ:  Objection?

17             THE COURT:  I do not know if the sequence of events

18  is correct.

19             Did there come a point during the events that you

20  described that you took a shower?

21             THE WITNESS:  Yes.  It was during the time that I

22  was there.  The guy at the reception area allowed me to go up

23  and take a shower.  It was after I was already locked in the

24  room for a couple of days.  I was supposed to have the room.

25             THE COURT:  I think the question was at what point

Sonja - cross - Cannick                    2795

1    did the sequence of events happen?  How long before you left?

2              THE WITNESS:  I took a shower probably a day before

3    I left.

4              THE COURT:  Okay.

5              Go ahead.

6    BY MR. CANNICK:

7    Q    Did you get your meal before the shower, the same day of

8    the shower or a day after the shower?

9    A    It was after the shower.

10   Q    The same day?

11   A    I don't know what time of day it was because there was no

12   windows, no clock.

13   Q    No windows.  And your communication to the outside world

14   was with your family?

15   A    And a friend.

16   Q    And a friend, okay.

17             And did you have communication with the father of

18   your child at that point during this time?

19   A    I don't know what you mean by that.

20   Q    Were you talking to the father of your child while you

21   were at the Chocolate Factory?

22   A    I might have talked to him.

23   Q    And when you were talking to the father of your child,

24   this was after information was taken about your child by this

25   person; am I correct?

1  A    By what person?

2  Q    The person who was taking the information from you.

3  A    That's correct.

4  Q    And did you tell the father of your child that there's a

5  person here that took information about our child?

6  A    No.

7  Q    Did you tell the father of your child that, you know, I'm

8  here.  I've been locked in this room for several days and I

9  feel uneasy and I just want you to know where I am?

10 A    No.

11 Q    Did you tell the father of your child, you know what,

12 maybe you should send me some money?

13 A    No.

14 Q    Did you tell your parents when you were calling them --

15 your grandparents, that I'm in this room, I'm locked up, I'm

16 feeling uneasy.  I just want you to know where I am?

17 A    No.

18 Q    Did you tell anybody that you know, I'm uneasy here and

19 if anything happens I want to be sure that someone knows where

20 I am?

21 A    I did.

22 Q    Who did you tell that to?

23 A    Charity and Jerry.

24 Q    Charity and who?

25 A    Jerry.

Sonja - cross - Cannick                    2797

1    Q    Did you tell them, you know what, if you don't hear from

2    me by the next couple of hours, call law enforcement?

3    A    No.

4    Q    Did you tell them that you were at the Chocolate Factory?

5    A    They knew where I was.

6    Q    No.  My question was did you tell them that that you were

7    at the Chocolate Factory?

8    A    Yes.

9    Q    And did you tell them that you hadn't seen Mr. Kelly, but

10   you were being asked these questions by this individual?

11   A    Charity, yes.

12   Q    Did you tell them that this person got all the family

13   personal information?

14   A    I told Charity basically everything.

15   Q    And then you hung up?

16   A    That's correct.

17   Q    You were scared; right?

18   A    I was.

19   Q    Petrified?

20   A    I was terrified.

21   Q    Terrified, embarrassed; right?

22   A    That's correct.

23   Q    Humiliated right?

24   A    Uh-huh.

25   Q    But never called law enforcement?

Sonja - cross - Cannick                    2798

1    A    No.

2    Q    You never told someone to send me some money so I can

3    come home?

4    A    No, I didn't.

5    Q    Never looked at the roundtrip ticket as said, you know

6    what, that door is open; I'm going home?

7               MS. CRUZ MELENDEZ:  Objection.

8               THE COURT:  I feel like we have been over this

9    before, but you can answer the question.

10   A    No, I didn't.

11   Q    And after, according to you, Mr. Kelly raped you, you

12   didn't go back to Salt Lake and tore up the picture?

13   A    No, I didn't.

14   Q    Now before you went out to Salt Lake, I mean to Chicago

15   from Salt Lake to see Mr. Kelly, you spoke to your manager and

16   he told you to go out and meet him and do an interview and a

17   photo shoot, do you remember that?

18   A    He never said photo shoot.

19   Q    Okay.  I'm going to ask you to read starting with

20   "During" to yourself and let me know when you are finished.

21   A    (Reviewing.)

22   Q    Have you finished?

23   A    Yes.  There is no photo shoot.

24   Q    Isn't it a fact that when you spoke to the Government you

25   told them that your manager told you to go meet Mr. Kelly and

Sonja - cross - Cannick                    2799

1   to do an interview and a photo shoot?

2   A    That is incorrect.

3   Q    So if the Government wrote that in their report, that's

4   inaccurate; am I correct?

5   A    That's correct.

6   Q    And you were -- you interviewed with them, you told us;

7   am I correct?

8   A    That's correct.

9   Q    And when you were giving your interview they took notes;

10  am I correct?

11  A    That is correct.

12  Q    And you were the only person in the room who actually

13  gave them this account that you said had happened to you, am I

14  correct?

15  A    Yes.

16  Q    Now, when you initially went out to meet with Mr. Kelly

17  for this interview, how long had you planned on staying?

18  A    A day.

19  Q    So you were planning to return the next day?

20  A    The day after the next day because I missed that flight,

21  yes.

22  Q    And that's why you took luggage?

23  A    Yes.

24  Q    And when the next day came you didn't let the

25  receptionist know, look, it's time for me to go, to leave?

Sonja - cross - Cannick                              2800

1  A    I did, five minutes after I got there, basically.

2  Q    So five minutes after you got to the Chocolate Factory

3  you told them that you wanted to leave?

4  A    Yeah, the door was locked I wanted to get out.

5  Q    I don't want to belabor this but you wanted to get out of

6  there, right?

7  A    I did.

8  Q    But you never called the cops?

9          MS. CRUZ MELENDEZ:  Objection.

10          THE COURT:  I feel like we've established that.

11          MR. CANNICK:  Yeah.

12  BY MR. CANNICK:

13  Q    Now, before going out to meet Mr. Kelly for this

14  interview, did you know where you were going to stay?

15  A    I did not.

16  Q    And you didn't ask where you were staying?

17  A    No.

18  Q    Your manager who wanted you to take this interview or do

19  this interview and a photo shoot, he didn't provide

20  accommodations for you?

21          MS. CRUZ MELENDEZ:  Objection.

22          THE COURT:  Overruled.

23  A    He did not.

24  Q    Okay.  And he didn't purchase the tickets, the airline

25  tickets?

Sonja - cross - Cannick                    2801

1   A    No.

2   Q    He didn't give you cab fares?

3   A    No.

4   Q    He did not give you monies for food?

5   A    No, he didn't.

6   Q    He did not give you anything whatsoever by way of

7   finances to help you make this trip successful?

8   A    No.

9   Q    Now, you testified that there came a point in time that

10  you ate the food and the food made you drowsy?

11  A    That's the word, yes.

12  Q    How do you know that it was the food that made you

13  drowsy?

14  A    What else could it have been?

15  Q    Well, you said you hadn't eaten in three days; am I

16  correct?

17  A    Correct, a long time.

18  Q    Could you be drowsy for not having eaten?

19  A    I don't know.

20  Q    And you testified that there came a point in time that

21  after eating a couple of bites and drinking a couple of sips,

22  you got extremely fatigued; correct?

23  A    That's correct.

24  Q    And so fatigued --

25  A    I just felt full.

Sonja - cross - Cannick                    2802

1  Q     You were so fatigued that you did not know how you got

2  from the chair to the sofa?

3  A     Yes.

4  Q     And when that -- just before eating, you were in the room

5  by yourself; am I correct?

6  A     That's correct.

7  Q     And after you finished eating you were in the room by

8  yourself; am I correct?

9  A     As far as I remember, yeah.

10  Q     And you told us that you don't have a recollection as to

11  what else happened that night correct; correct?

12  A     Not correct.  I don't remember --

13          THE COURT:  You have to let her finish.

14          MR. CANNICK:  I'm sorry.

15  Q     I'm sorry.

16  A     I don't remember how I got from the table to the couch.

17  Q     You don't remember how you got from the table to the

18  couch and you don't remember how you got undressed; am I

19  correct?

20  A     I don't know how my underwear came off, no.

21  Q     You don't know how your clothes came off?

22          MS. CRUZ MELENDEZ:  Objection.

23          THE COURT:  Sustained.

24          She answered the question.  Next question.

25  BY MR. CANNICK:

SN        OCR        RPR

Sonja - cross - Cannick                    2803

1   Q    You don't know how you got from the table to the couch

2   and you don't know how your underwear came off?

3                MS. CRUZ MELENDEZ:  Objection.

4                THE COURT:  Overruled.

5   Q    Right?

6   A    That is correct.

7   Q    What were you wearing when the food was delivered to you?

8   A    My nightgown.

9   Q    And when you woke up you had your nightgown on?

10  A    That's correct.

11  Q    But you didn't have your underwear on?

12  A    That's correct.

13  Q    And you don't know whether or not you took it off?

14  A    I mean, no, I was sleeping.

15  Q    You don't know because, according to you, you were

16  unconscious, you don't know what happened to you; right?

17  A    That's correct.

18  Q    So you don't know how your underwear got off?

19                MS. CRUZ MELENDEZ:  Objection.

20                THE COURT:  I feel like she's answered the question

21  several times.  I am not stopping you, but she has answered

22  you.

23                MR. CANNICK:  What was the answer?

24                THE COURT:  She said she doesn't know.

25                MR. CANNICK:  Okay.

Sonja - cross - Cannick                    2804

1   BY MR. CANNICK:

2   Q    Now -- and you just testified that at some point

3   Mr. Kelly came in the room?

4   A    When I woke up Mr. Kelly was in the corner.

5   Q    Do you know whether or not that was -- how much time had

6   elapsed between your going to sleep and waking up and

7   finding -- seeing Mr. Kelly in the corner?

8   A    Can you repeat the question?

9   Q    Do you know how much time elapsed between your going to

10  sleep and then waking up and Mr. Kelly being in the corner?

11  A    No, I don't.

12  Q    Do you know whether or not that was morning that

13  Mr. Kelly was in your room in the corner?

14  A    I don't.

15  Q    Do you know whether or not it was ten minutes later?

16  A    I don't.

17  Q    Three minutes later?

18       MS. CRUZ MELENDEZ:  Objection.

19       THE COURT:  Overruled.

20       Do you know -- overruled.

21  A    I do not.

22  Q    Now, and according to you, you saw Mr. Kelly in the

23  corner and he was fixing his pants, am I correct, according to

24  you?

25  A    That's correct.

Sonja - cross - Cannick                          2805

1   Q    And you said to him, good morning; am I correct?

2   A    No.

3   Q    Did you say, how are you doing?

4   A    How are you doing.

5   Q    Okay.  And did he respond?

6   A    He did.

7   Q    And at this time, according to you, you felt a little

8   strange because you said you felt discharge in your vaginal

9   area, am I right?

10  A    I felt something wet.

11  Q    You felt something wet.  Now you told the Government that

12  you didn't know what was going on or what happened; correct?

13  A    That's correct.

14  Q    And, in fact, you told them that you could not say

15  categorically that there was a sexual encounter; am I correct?

16  A    That is correct.

17  Q    So, basically, according to you, you woke up, according

18  to you, you saw Mr. Kelly in your room and according to you he

19  was fixing his pants, but you can't say that there was a

20  sexual encounter; am I correct?

21  A    Something had happened to me.

22  Q    My question is you can't say and, in fact, you told the

23  Government that you could not say categorically that there was

24  a sexual encounter; correct?

25           MS. CRUZ MELENDEZ:  Objection.

SN       OCR       RPR

1           THE COURT:  Overruled.

2    A    That's correct.

3           MR. CANNICK:  Nothing further.

4

5           (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    SN      OCR      RPR

Sonja - Redirect - Cruz Melendez                    2807

1          THE COURT:  Any redirect examination?

2          MS. CRUZ MELENDEZ:  Yes, your Honor.

3   REDIRECT EXAMINATION

4   BY MS. CRUZ MELENDEZ:

5   Q    On cross-examination, defense counsel asked you some

6   questions and showed you some reports; do you recall that?

7   A    Yes.

8   Q    Had you ever seen those reports before?

9   A    No.

10  Q    Did you ever have a chance to review those reports?

11  A    I haven't.

12  Q    In fact, other than the photographs that I showed you

13  here today, did the Government provide you with any evidence?

14  A    No.

15  Q    Any floor plans.  Anything of that nature?

16  A    No.

17  Q    On cross-examination, defense counsel also asked you

18  about whether or not you had a round trip ticket; do you

19  remember questions about that?

20  A    Yes.

21  Q    Who made your travel arrangements?

22  A    Mr. Kelly's team, management team, somebody.

23  Q    So, you didn't make them yourself?

24  A    No.

25  Q    When you got to the airport, you said you went to the

Sonja - Redirect - Cruz Melendez                    2808

1    counter, correct?

2    A    That's correct.

3    Q    You obtained a boarding pass?

4    A    That is correct.

5    Q    Sitting here today, do you know whether or not you had a

6    round trip ticket?

7    A    No.

8    Q    Defense counsel also asked you questions about the

9    fatigue that came on after you took a couple bites of food.

10             Did that fatigue come on suddenly?

11   A    It did.

12   Q    Defense counsel also asked you questions about your

13   having hired an attorney; do you remember those questions?

14   A    I do.

15   Q    You also testified earlier that at two points when you

16   were at The Chocolate Factory you signed nondisclosure

17   agreements; do you recall that?

18   A    That is correct.

19   Q    Why did you hire an attorney?

20   A    I wanted to know my rights because I was a victim, and I

21   know what I went through and I know what I signed.

22   Q    And what did you understand your signing those

23   nondisclosure agreements to mean?

24   A    That I wasn't supposed to tell anybody.

25   Q    Now, defense counsel also asked you several questions

Sonja - Redirect - Cruz Melendez                2809

1    about why you didn't go to the police when this happened to

2    you.

3            Why didn't you go to the police?

4    A    Number one, I didn't think anybody would believe me.

5            And, two, he had the address, the names, the phone

6    numbers of the people that I cherish the most; more

7    importantly, my daughter.

8    Q    And you testified that just prior to your leaving, the

9    individual who made you sign that nondisclosure agreement

10   said, You don't fuck with Mr. Kelly.

11           Is that correct?

12   A    That's correct.

13   Q    How did you interpret that?

14   A    As a threat that, you know, he's not somebody to mess

15   with.

16   Q    Is that why you didn't call the police?

17           MR. CANNICK:  Objection.

18           THE COURT:  Sustained as to the form.

19   A    That is correct.

20           THE COURT:  That means you can't answer.

21           THE WITNESS:  Sorry.

22           THE COURT:  That's all right.

23           You can rephrase, if you want it.

24           MS. CRUZ MELENDEZ:  Sure.

25   Q    Did that have anything to do with the reason you didn't

LAM      OCR      RPR

Sonja - Redirect - Cruz Melendez                2810

1   call the police?

2   A    Yes.

3   Q    Is it fair to say that it's not easy for you to be here

4   today?

5   A    That is very true.

6   Q    Testifying before strangers about what happened?

7             MR. CANNICK:  Objection.  It's beyond the scope.

8             THE COURT:  Overruled.

9   A    That's very true.

10  Q    Sitting here today, do you have any intention of talking

11  about these events publicly again?

12  A    No.

13  Q    Defense counsel asked you questions about what happened

14  when you suddenly awoke on that couch.

15            Is there any doubt in your mind that when you woke

16  up you found your underwear on the arm of that couch; any

17  doubt in your mind?

18  A    No.

19  Q    Any doubt in your mind that before you suddenly fell

20  asleep, that you were wearing your underwear?

21  A    No.

22  Q    Any doubt in your mind that when you woke up, the

23  Defendant was standing in the corner doing up his pants?

24  A    No.

25  Q    Is there any doubt in your mind that when you suddenly

1    woke up, that you had fluid and wetness in your vaginal area?

2    A    No.

3    Q    Now, defense counsel asked you about whether or not you

4    know definitively what happened in that room.  You testified

5    that you know your body.

6    A    That is correct.

7    Q    Based on knowing your body, what happened in that room?

8    A    I was sexually assaulted.  There was something in me that

9    wasn't -- it wasn't something I invited.

10   Q    Was there anyone else in the room when you woke up other

11   than the Defendant doing up his pants?

12   A    No.

13            MS. CRUZ MELENDEZ:  Nothing further.

14            THE COURT:  Any recross?

15            MR. CANNICK:  Brief.

16   RECROSS-EXAMINATION

17   BY MR. CANNICK:

18   Q    You knew your body when you spoke to the Government; am I

19   correct?

20   A    That's correct.

21   Q    And you knew your body well; am I correct?

22            THE COURT:  I think your microphone might not be on.

23   Q    You knew your body when you had spoke to the Government?

24   A    Yes.

25   Q    And you knew your body when you told them that you

LAM      OCR      RPR

Sonja - Recross - Cannick                    2812

1   couldn't say categorically that a sexual encounter occurred.

2   A    That is correct.

3   Q    You knew your body then; am I correct?

4   A    Yes.

5              MR. CANNICK:  Nothing further.

6              THE COURT:  Anything else?

7              MS. CRUZ MELENDEZ:  Nothing further.

8              THE COURT:  The witness can step down.

9              (Witness excused.)

10             THE COURT:  Jurors, I'm just going to give you a

11  break for about ten minutes.  Please don't talk about the

12  case.  We'll see you in a few minutes.

13             THE COURTROOM DEPUTY:  All rise.

14             (Jury exits.)

15             THE COURT:  Everybody can have a seat.

16             Anything before we take our break?

17             MR. CANNICK:  No, your Honor.

18             THE COURT:  Not from the defense.

19             And who is the next witness?

20             MS. CRUZ MELENDEZ:  Anna.

21             THE COURT:  Okay.  And that doesn't require me to --

22  I can make the decisions.  I'd rather just give you the break.

23             MS. CRUZ MELENDEZ:  It doesn't require.

24             THE COURT:  So, we'll see you in about ten minutes.

25             (Recess taken.)

Proceedings                                        2813

1          THE COURT:  Are we ready for the next witness?

2    Anything before we start?

3          MS. CRUZ MELENDEZ:  No, your Honor.

4          THE COURT:  Let's get the witness.

5          And while the witness is getting here, we talked off

6    the record about scheduling.  I just want to see the parties

7    just about that.  We don't need the court reporter for that.

8    I'm just wondering what our next days will look like.

9          (Sidebar conference held.)

10          (Witness enters.)

11          THE COURT:  I'm just trying to get an idea of

12    scheduling because we have a few -- one of the jurors would

13    like to leave a little early tomorrow, which is fine.  And

14    then we have another issue on Monday morning, so I don't think

15    we'll be able to start until noon.

16          And, so, I was just trying to get a sense of where

17    we might be.  I'm not sure I have it yet, but I'm just going

18    to ask the parties to keep that in mind.

19          Let's get the jurors.

20          (Jury enters.)

21          THE COURTROOM DEPUTY:  You may be seated.

22          THE COURT:  All right, jurors, we're ready to

23    continue.

24          Will you call your next witness, please?

25          MS. CRUZ MELENDEZ:  Yes.  The Government calls Anna

Proceedings                              2814

1   to the stand.

2          THE COURTROOM DEPUTY:  Please stand and raise your

3   right hand.

4          Do you solemnly swear or affirm that the testimony

5   you're about to give will be the truth, the whole truth, and

6   nothing but the truth?

7          THE WITNESS:  I do.

8          THE COURTROOM DEPUTY:  Thank you.  You may be

9   seated.

10         THE COURT:  All right.  Just a few things before we

11  get started.

12         I do want to make sure that the jurors can hear you

13  and that the court reporter can take down everything that

14  you're saying.  So, please do your best to speak slowly and

15  into the microphone.

16         And for the same reason, let whichever lawyer is

17  asking you questions finish talking so we don't talk over one

18  another.  It makes it hard for the court reporters to get it

19  down.

20         If there's a question you want to have clarified or

21  repeated, let me know, and I will have the lawyer rephrase the

22  question.  And just do your best to answer only the question

23  that you're being asked.

24         THE WITNESS:  Okay.

25         THE COURT:  Go ahead.

Anna - Direct - Cruz Melendez                    2815

1  **A N N A**,

2          called by the Government, having been

3          first duly sworn, was examined and testified

4          as follows:

5  DIRECT EXAMINATION

6  BY MS. CRUZ MELENDEZ:

7  Q    Good afternoon.

8  A    Good afternoon.

9          MS. CRUZ MELENDEZ:  I'm showing the witness only --

10          THE COURT:  I want to make sure the microphone is

11  on.

12          THE COURTROOM DEPUTY:  On the top.

13          THE COURT:  There's a button there.

14          THE WITNESS:  Hello.

15          THE COURT:  Okay, great.

16  Q    I'm showing what's in evidence as Government Exhibit 76.

17          Do you recognize Government Exhibit 76?

18  A    Yes.

19  Q    And who is that, without saying your name?

20  A    Anna.

21  Q    Is it fair to say that Anna is -- let me ask you this

22  way:  This photograph, is that a photograph of you?

23  A    Correct.

24          MS. CRUZ MELENDEZ:  I'm now showing the witness

25  Government -- I'm showing just the witness what is marked as

Anna - Direct - Cruz Melendez                    2816

1    Government Exhibit 76A.

2    Q     Is this the same photograph that's in Government Exhibit

3    76?

4    A     Correct.

5    Q     And at bottom of the photograph, is that your true name?

6    A     Correct.

7              MS. CRUZ MELENDEZ:  Your Honor, the Government moves

8    to admit Government's Exhibit 76A.

9              MR. CANNICK:  No objection.

10             THE COURT:  That's in evidence.

11             (Government Exhibit 76A so marked.)

12             MS. CRUZ MELENDEZ:  May we publish just to the jury?

13             (Exhibit published to the jury.)

14

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Anna - direct - Cruz Melendez                    2817

1          MS. CRUZ MELENDEZ:  I'm showing just the witness

2    what's been marked for identification purposes Government

3    Exhibit 76-B.

4    DIRECT EXAMINATION

5    BY MS. CRUZ MELENDEZ:  (Continuing)

6    Q    Do you see Government Exhibit 76-B there?

7    A    Correct.

8    Q    Is that the same photograph in Government Exhibit 76 and

9    76-A?

10   A    Correct.

11   Q    And written below, do you see the name Anna there?

12   A    Correct.

13   Q    For the purposes of today's testimony, you're going to be

14   referred to as Anna.  Okay?

15          MS. CRUZ MELENDEZ:  The Government moves to admit

16   Government Exhibit 76-B.

17          MR. CANNICK:  No objection.

18          THE COURT:  All right.  That's in evidence.

19          (Government's Exhibit 76-B received in evidence.)

20          MS. CRUZ MELENDEZ:  Permission to publish?

21          THE COURT:  Yes.

22          (Exhibit published.)

23   Q    Anna, where did you grow up?

24   A    Greenville, South Carolina.

25   Q    How far did you go in school?

MDL       RPR       CRR       CSR

Anna - direct - Cruz Melendez                    2818

1   A    A year and a half in college.

2   Q    Are you familiar with an individual named Robert Kelly,

3   also known as R. Kelly?

4   A    Yes, I am.

5   Q    Have you ever met Robert Kelly in person?

6   A    Yes, I have.

7            MS. CRUZ MELENDEZ:  I'm showing the witness --

8   Q    I'm showing what's in evidence as Government Exhibit 1.

9   Do you recognize that?

10  A    Yes, I do.

11  Q    And who is that?

12  A    Robert Kelly.

13  Q    Do you see Robert Kelly in the courtroom here today?

14  A    I do.

15  Q    Can you point him out and describe an article of clothing

16  he is wearing?

17  A    Light blue shirt.

18            THE COURT:  Indicating the defendant.

19  Q    You previously testified that you've met the defendant

20  personally.  Approximately when did you first meet the

21  defendant?

22  A    I believe it was 2016 at a show in Colombia, South

23  Carolina.

24  Q    And approximately how old were you when you first met the

25  defendant?

Anna - direct - Cruz Melendez                    2819

1    A    I believe 19, going on 20.

2    Q    And how did you come to meet the defendant?

3    A    Back stage at a show, at the show.

4    Q    And can you explain how that happened?

5    A    I was told he saw me walking in and wanted to meet me.

6              MR. CANNICK:  Objection.

7              THE COURT:  Overruled.

8    Q    Who told you?

9    A    Whoever worked for him at the time.

10   Q    Did you later learn that individual's name?

11   A    I believe it was Bubba, his name.

12   Q    And what, if anything, did Bubba say to you?

13   A    That Mr. Kelly wanted to meet me.

14   Q    What happened after Bubba told you the defendant wanted

15   to meet you?

16   A    I went back to the dressing room where he gets ready for

17   his shows.  We talked and then he went and performed.  And

18   then after that, we went to the meet and greet.

19   Q    When you say "we," who went to the meet and greet?

20   A    My mom and I.

21   Q    And did you see defendant at the meet and greet?

22   A    Yes.

23   Q    What happened when you saw the defendant there?

24   A    We were all just talking.  You know, he was talking to

25   his fans.  That was pretty much it.

Anna - direct - Cruz Melendez                    2820

1   Q    And at any point did you discuss getting in contact with

2   each other at a later time?

3   A    We exchanged numbers in the dressing room.

4   Q    After meeting the defendant at the concert and exchanging

5   numbers, did you speak with the defendant again?

6   A    Not for several months after.  After the concert, we both

7   went separate ways.

8   Q    Did you communicate during that time period?

9   A    A little bit right after, but then it was, like I said,

10  several months that we didn't go without speaking.

11  Q    And at some point did you see the defendant again?

12  A    Yes.

13  Q    And where did you see the defendant?

14  A    In Atlanta, Georgia, I believe.

15  Q    What were you doing in Atlanta?

16  A    I was there visiting a friend.

17  Q    Where did you see the defendant?

18  A    At his house.

19  Q    Do you recall where the defendant lived at the time?

20  A    I believe it was Johns Creek in Atlanta, Georgia.

21  Q    After seeing the defendant in Atlanta, did you begin to

22  see him regularly?

23  A    Yes.

24  Q    And at some point did you enter into a relationship with

25  the defendant?

Anna - direct - Cruz Melendez                    2821

1    A    Correct.

2    Q    Okay.  What was the nature of your relationship?

3    A    It was like a relationship.

4    Q    Was it sexual in nature?

5    A    Eventually, yes.

6    Q    And approximately -- and at some point did your

7    relationship with the defendant come to an end?

8    A    Down the line, yes.

9    Q    Approximately when did that happen?

10   A    I believe it was December of 2019, I believe.  I know it

11   was December, going on New Year's.

12   Q    Approximately how long were you with the defendant?

13   A    Sorry.  2018, I believe.

14   Q    So December of 2018?

15   A    Yeah, I would say.

16   Q    Okay.  Generally speaking, how would you describe the

17   nature of your relationship when you first started seeing the

18   defendant?

19   A    It was cool.  You know, we would always go out and have a

20   good time.  It was always fun, you know, in the beginning.

21   Q    At some point did things change with the defendant?

22   A    Yes.

23   Q    In what ways?

24   A    In more controlling ways, I would say.

25   Q    When you say controlling, who was controlling?

Anna - direct - Cruz Melendez                    2822

1    A    Robert.

2    Q    While you were seeing the defendant, did you ever travel

3    to attend any of his concerts?

4    A    Yes.

5    Q    And when you traveled to see his concerts, in the

6    beginning, how would you travel?

7    A    By plane.

8    Q    And when you traveled by plane, who made your travel

9    arrangements?

10   A    I believe Suzette, Twin.

11   Q    And who was Suzette?

12   A    One of the assistants.

13   Q    One of the defendant's assistants?

14   A    Correct.

15   Q    Who paid for your airfare when you traveled by air?

16   A    I believe Robert did.

17   Q    And when you traveled to see the defendant, where would

18   you stay?

19   A    In a hotel.

20   Q    And who paid for the hotels?

21   A    I believe Robert did as well.

22   Q    Did you ever pay for a hotel out of pocket?

23   A    No, never.

24   Q    At some point did you begin traveling with the defendant

25   to shows where he was performing?

Anna - direct - Cruz Melendez                    2823

1   A    Correct.

2   Q    When you traveled with the defendant to performances, how

3   would you travel?

4   A    On the Sprinter.

5   Q    Where do you recall traveling with the defendant for his

6   performances?

7   A    We went several different places, really all over the

8   U.S.

9   Q    Did you travel to any places in the east coast?

10  A    Yes.

11  Q    Where did you travel?

12  A    Charlotte, North Carolina; New York; Alabama.

13  Q    And did you travel to the west coast as well?

14  A    Correct.

15  Q    Where in the west coast, that you recall?

16  A    Arizona, California.

17  Q    Is it fair to say that there are other places that you

18  traveled to with the defendant that you don't recall

19  necessarily here today?

20  A    Correct.

21  Q    At any point during the course of the time you were

22  seeing the defendant, did you come to live with him?

23  A    Yes.

24  Q    How soon into seeing the defendant did you begin to live

25  with him?

Anna - direct - Cruz Melendez                2824

1    A    I would say a couple weeks later.

2    Q    When you were living with the defendant and you weren't

3    traveling on the road, where did you stay?

4    A    Mostly in hotels, but back and forth from the houses or

5    studio, or the Trump.

6    Q    So you mentioned houses and you previously testified

7    about a house in Atlanta; correct?

8    A    Correct.

9    Q    Did you stay there?

10   A    Sometimes.

11   Q    Okay.  You also mentioned the Trump?

12   A    Correct.

13   Q    What was the Trump?

14   A    In Chicago.

15   Q    Who lived -- is it fair to say Trump is a building, a

16   residence?

17   A    Right, a high-rise.

18   Q    Who lived there?

19   A    I -- Robert did.

20   Q    So defendant's home?

21   A    Correct.

22   Q    Would you spend time at the Trump?

23   A    Sometimes, not all the time.

24   Q    You also mentioned the defendant's studio?

25   A    Correct.

Anna - direct - Cruz Melendez                2825

1    Q    Where was that studio located?

2    A    That was also in Chicago.  I'm not exactly sure where.

3    Q    Do you recall the address?

4    A    I don't recall the address.

5    Q    While you were with the defendant, did you ever have

6    occasion to visit the doctor?

7    A    The doctor?  I went to the hospital one time.

8    Q    And during your trip to the hospital, were you ever

9    tested for a sexually transmitted disease?

10   A    Yes.

11   Q    When you went to the doctor, did you go alone?

12   A    No.

13   Q    Who went with you?

14   A    Diana, the assistant at the time.

15   Q    When you say the assistant, whose assistant was she?

16   A    Robert's.

17   Q    And you testified that you had tests regarding -- related

18   to sexually transmitted diseases done.  Did you get results

19   back?

20   A    Yes.

21   Q    Who received those results?

22   A    The assistant.

23   Q    Diana?

24   A    Correct.

25   Q    Did you ever speak to the doctor yourself with respect to

1    your results?

2    A    No.

3    Q    At any point did the defendant learn about your results?

4    A    I'm not sure.

5    Q    While you were seeing the defendant, did you come to meet

6    any female individuals who were regularly with the defendant?

7    A    Yes.

8            MS. CRUZ MELENDEZ:  I'm showing what's in evidence

9    as Government Exhibit 75-C.  We are going to refer to this

10   individual as Jane.

11   Q    Do you recall seeing Jane when you were with the

12   defendant also with the defendant?

13   A    Yes.

14   Q    Using first names only and nicknames to the extent you

15   know them, who, if anyone, else do you recall seeing the

16   defendant regularly with who were female?

17   A    Joycelyn, Dominique.  Vee, when I first came around.

18   That was pretty much it.

19   Q    Are you familiar with an individual named -- nicknamed

20   Juice?

21   A    Juice, yes.

22   Q    Did you ever see Juice with the defendant?

23   A    Here and there, but not really.  She would come to

24   parties, or something like that, but that was pretty much it.

25   Q    When you first began seeing the defendant, what, if

Anna - direct - Cruz Melendez                    2827

1  anything, did the defendant tell you about who these women

2  that we've just been talking about were to him?

3  A    In the beginning, it was friends, you know, women he's

4  cared about, he cares about.

5  Q    The defendant told you that?

6  A    Correct.

7  Q    At some point did you have additional discussions with

8  the defendant about the actual nature of his relationship with

9  these individuals?

10  A    Yes, down the line.

11  Q    What, if anything, did he say?

12  A    They're women he cares about, and basically, yeah.

13  Q    What, if anything, did the defendant say about why these

14  women were with him?

15  A    Because maybe their families, you know, they didn't want

16  to be at home with their families and enjoyed more time being

17  with him than being at home.

18  Q    Now, based on your own observations, at some point did

19  you learn that Jane, Dominique, Juice, Vee and Joycelyn were

20  more than just friends of the defendant?

21  A    Yes.

22  Q    And how did you learn that?

23  A    Down the line with, you know, interactions and things

24  like that.

25  Q    At any point did you observe any of these individuals

Anna - direct - Cruz Melendez                    2828

1  engage in sex with the defendant?

2  A    Yes.

3  Q    During that time that you were with the defendant, did

4  you also see the defendant with other women who we've not

5  specifically discussed here today?

6  A    I don't recall.

7  Q    Now, during the course of your relationship with the

8  defendant, what, if any, rules did the defendant have that he

9  expected you to follow?

10 A    No makeup, going outside, baggy clothing, baseball cap,

11 getting permission to go to certain places.

12 Q    Do you recall any other rules with respect to your

13 communications with other people?

14 A    Yes, communications kind of monitored.

15 Q    What do you mean by that?

16 A    He would mostly be, you know, around if I spoke to

17 someone or was on the phone.

18 Q    When you say "he," are you referring to the defendant?

19 A    Robert, yes.

20 Q    You testified that one of the rules that the defendant

21 expected you to follow was that you had to ask permission to

22 go anywhere?

23 A    Correct.

24 Q    What kinds of things did you need to request permission

25 from the defendant in order to do?

1   A    To leave the house, to go to another room.  Yeah.

2   Q    What, if anything, were you expected to do if you needed

3   to go to the bathroom, for example?

4   A    That was mostly during travel, like on the Sprinter, if

5   he wasn't on the Sprinter, I would have to contact him before

6   getting off to make sure it was okay to use the restroom.

7   Q    What, if anything, were you expected to do by the

8   defendant if, say, for example, you wanted food?

9   A    Reach an assistant to see if they could get it or get

10  ahold of him.

11  Q    When you say "him," do you mean the defendant?

12  A    Robert, yes.

13  Q    Now, based on your own observations, were the other women

14  you've discussed, like Jane, Joycelyn, Vee, Juice, and

15  Dominique, subject to similar rules as you?

16  A    I believe so, yes.

17  Q    And how do you know that?

18  A    Just from being around them and, you know, studying

19  what's going on.

20  Q    Okay.  So you testified that while you were on the

21  Sprinter you would need to contact the defendant in order to

22  leave the Sprinter.  Were there periods of time when you were

23  on the Sprinter for extended periods?

24  A    A few times traveling.

25  Q    Other than traveling, so if you're not on the road, but

Anna - direct - Cruz Melendez                    2830

1   if the Sprinter is parked somewhere, were there times where

2   you spent extended periods of time on the Sprinter?

3   A    I recall maybe one or two nights parked at a studio.

4   Q    Where you spent time in the Sprinter?

5   A    Correct.

6   Q    Approximately how long did you spend in the Sprinter?

7   A    Overnight.

8   Q    Was the defendant with you?

9   A    Yes, he -- yeah, he would come.

10  Q    Was he with you for the entire time?

11  A    The entire time, no, but eventually he came and slept in

12  the Sprinter as well.

13  Q    Other than the defendant, while you were on the Sprinter,

14  who, if anyone, else would be with you?

15  A    Sometimes the assistants.  Mostly that would be pretty

16  much it.

17  Q    You mentioned previously two assistants.  I believe you

18  mentioned Diana and Suzette?

19  A    Correct, or LeLe sometimes.

20  Q    Who is LeLe?

21  A    She was like a helper, assistant.

22  Q    To the defendant?

23  A    Correct.

24  Q    And there were times where they were on the Sprinter with

25  you?

Anna - direct - Cruz Melendez                    2831

1   A    Correct.

2   Q    What, if anything, would you need to do if you were on

3   the Sprinter and needed to use the restroom?

4   A    I would use a cup.

5   Q    And why would you use a cup?

6   A    If there wasn't access to a restroom or we couldn't stop

7   or anything like that.

8   Q    Let's say that you are stopped so you're not on the road,

9   what, if anything -- you had testified that there were times

10  where you needed to reach out to the defendant if you needed

11  to leave the Sprinter?

12  A    Correct.

13  Q    Were there times where you needed to reach out to the

14  defendant before you could leave to go to the restroom?

15  A    Correct.

16  Q    What, if anything, would you do if you couldn't reach the

17  defendant?

18  A    Use the cup.

19  Q    And when you say use the cup, do you mean urinate in the

20  cup?

21  A    Urinate only.  That was it.

22  Q    Did there ever come an occasion where you left the

23  Sprinter to use the restroom without seeking the defendant's

24  permission?

25  A    Yes, I believe that happened one time.

Anna - direct - Cruz Melendez                    2832

1   Q    And what happened?

2   A    I just remember him being very upset, that was kind of

3   before I really knew the full rules.

4   Q    When you say the defendant was upset, how do you mean?

5   A    Just angry.  It wasn't anything physical, just letting me

6   know not to do that again.

7   Q    Now, when you were spending time in the Sprinter, were

8   there other rules in terms of things you could or could not do

9   in the Sprinter?

10  A    The blinds.

11  Q    What do you mean when you say the blinds?

12  A    Just pulling them down if he wasn't on the Sprinter.

13  Q    If the defendant wasn't in the Sprinter, how, if at all,

14  would he know you were breaking one of these rules?

15  A    I believe I saw me being recorded at one point.

16  Q    What do you mean by being recorded?

17  A    When he would step off, I noticed there was an iPad

18  recording.

19  Q    Was it the defendant's iPad?

20  A    Correct.

21  Q    And you say you saw it recording?

22  A    Correct.

23  Q    You also testified that on some occasions you would spend

24  time at the defendant's studio in Chicago; is that correct?

25  A    Correct.

Anna - direct - Cruz Melendez                    2833

1    Q    Okay.  Were there locations in the studio where you or

2    the defendant's other girlfriends stayed in the studio?

3    A    Correct.

4    Q    Where in the studio would the defendant's other

5    girlfriends stay?

6    A    Upstairs.

7    Q    When you say upstairs, what do you mean?

8    A    There was a renovated part upstairs, on the far left that

9    had three rooms, and a main living room, and that's where they

10   would stay.

11   Q    And were there specific rooms where the defendant's

12   girlfriends would stay?

13   A    Correct.

14   Q    And what, if anything, would the defendant say when he

15   wanted them to go to these designated locations?

16   A    Take place.

17   Q    And what did you understand that to mean?

18   A    Like go wherever you're supposed to be.

19   Q    In a particular room in the studio?

20   A    Correct.

21   Q    Now, when in these particular rooms in the studio, you

22   had testified that you would need to get the defendant's

23   permission in order to move around.  Was this true in the

24   studio as well?

25   A    Correct.

Anna - direct - Cruz Melendez                    2834

1   Q    Okay.

2         You testified that one of the defendant's rules was

3   also that he monitored your personal conversations with

4   others.  What do you mean by that?

5   A    Just like I said, was around when I would be -- make a

6   phone call or send a certain text.

7   Q    Were there any rules with respect to personal

8   conversations involving the other girlfriends?

9   A    Can you ask me that one more time?

10  Q    Sure.  With respect to communications or conversations

11  that you had with the defendant's other girlfriends, did the

12  defendant have any rules about the type of conversations you

13  could have?

14  A    Yes, just wanted it no talk about, you know, anything --

15  how can I say this?  No compliments to each other, no talk

16  about social media or anything like that, no -- nothing about

17  him, obviously.

18  Q    Did you ever get in trouble with the defendant for

19  breaking this particular rule?

20  A    Yes, I believe one time.

21  Q    And what happened then?

22  A    I believe it was with Jane.  I gave her a compliment and

23  she told him and he didn't like that.

24  Q    And did he express to you that he didn't like that?

25  A    Yes.

1  Q    Now, you testified that one of the defendant's rules was

2  that you had to wear baggy clothes?

3  A    Correct.

4  Q    And you said no makeup and a hat?

5  A    Correct.

6  Q    You previously testified that there were times where you

7  went out in public with the defendant?

8  A    Correct.

9  Q    How did you dress for those appearances with the

10 defendant?

11 A    Sometimes would be chilled, but most of the time it would

12 be get cute, you know.

13 Q    Who determined when you were able to dress up in, as you

14 say, get cute?

15 A    Robert.

16 Q    Apart from the instances when you were with the defendant

17 and he specifically told you that you could dress up, how

18 would you dress?

19 A    Can you ask me that one more time?

20 Q    Sure.  So you testified that there were times where the

21 defendant did, in fact, say get cute or dress up.  Apart from

22 those instances, would you follow the rule for baggy clothes,

23 no makeup and hats?

24 A    Correct.

25 Q    So we have been talking about various rules that you said

Anna - direct - Cruz Melendez                2836

1    the defendant had and expected you to follow.  Were there any

2    consequences if you did not follow these rules?

3    A     Yes.

4    Q     Okay.  Did you personally experience any of these

5    consequences for breaking the rules?

6    A     Yes.

7    Q     What, if anything, did the defendant do to you for

8    breaking his rules?

9    A     Spankings or, you know, no going out and about in the

10   day.  There was really an option between the two.

11            THE COURT:  I'm going to just ask you to keep your

12   voice up.

13            THE WITNESS:  Sorry.

14            THE COURT:  That's all right.

15   Q     You had -- you testified that spanking was one of the

16   consequences.

17   A     Correct.

18   Q     And we'll get to that in just a moment, but while you

19   were with the defendant, did you ever have a cell phone?

20   A     Yes.

21   Q     When you broke the defendant's rules, what, if anything,

22   might happen with respect to your cell phone?

23   A     It would be taken.

24   Q     Who would take it?

25   A     Robert.

Anna - direct - Cruz Melendez                    2837

1    Q    Approximately how many times did the defendant take your

2    cell phone for breaking one of his rules?

3    A    A few times.

4    Q    And what, if any, instances do you recall when the

5    defendant took your cell phone, generally speaking, for what

6    reasons?

7    A    Are you asking what reasons?

8    Q    Yes.

9    A    Maybe being on social media.  I remember one time -- I

10   think I was texting an ex.

11   Q    Fair to say that there were other reasons that you can't

12   recall?

13   A    There were other reasons that I can't recall, yes.

14   Q    When the defendant took your cellular phone from you, how

15   long would he hold on to your cellular telephone?

16   A    Sometimes a couple of days and sometimes a few months.

17   Q    When you did have access to a cellular phone, what, if

18   any, restrictions did the defendant place on the type of

19   cellular phone that you could have?

20   A    No social media, no internet, only could talk to certain

21   people.

22   Q    And when you say certain people, who were the certain

23   people?

24   A    Mainly my family, mom, dad.

25   Q    And when you did have your cellular telephone, were you

Anna - direct - Cruz Melendez                    2838

1   able to use it freely whenever you wanted?

2   A    I wouldn't say freely because, you know, no internet, not

3   just pick up the phone and talk, you know.

4   Q    And you testified earlier that the defendant would often

5   monitor your calls?

6   A    Correct.

7   Q    Now, while you were with the defendant, did you have a

8   job?

9   A    No.

10  Q    Did you have your own bank account or credit card?

11  A    I believe I did.  I don't think I had much in it, but,

12  yes.

13  Q    Did you have regular access to your own source of money?

14  A    I wasn't -- I didn't have any income, so, no.

15  Q    So if the defendant took your phone and you wanted to buy

16  a phone, would you have been able to do that without his

17  knowledge?

18  A    No.

19  Q    In addition to holding on to your phone for certain

20  periods of time, did the defendant ever hold on to any other

21  important personal items or documents belonging to you?

22  A    I believe my passport.

23  Q    Now, you referenced that there were times where you had

24  phones and you could not have social media on those phones.

25  Prior to your being with the defendant, did you have any

Anna - direct - Cruz Melendez                    2839

1  social media accounts?

2  A    Yes.

3  Q    What kinds of social media accounts did you have?

4  A    Facebook, Instagram, Twitter.

5  Q    While with the defendant, what, if anything, happened to

6  your Instagram account?

7  A    I had to deactivate it.

8  Q    Why did you have to deactivate it?

9  A    I believe this was around the time a lot of the hype

10  started with all of this and just didn't want me having it.

11  Q    When you say didn't want you having it, do you mean the

12  defendant didn't want you having it?

13  A    I'm sorry.  The defendant, correct.

14  Q    Did you, in fact, delete your Instagram account?

15  A    Correct.

16  Q    What were the circumstances under which you deleted it?

17  A    I just had someone sitting there to make sure it was

18  completely deleted.

19  Q    And who was sitting there?

20  A    LeLe.

21  Q    You mentioned that LeLe was sort of an assistant for the

22  Defendant; correct?

23  A    Yes, correct.

24  Q    What was LeLe's role in terms of being there while you

25  deleted your Instagram?

1    A     Just to make sure I deleted it.

2    Q     And did you delete your Instagram account at the

3    defendant's direction?

4    A     Yes.

5    Q     You previously testified with respect to certain rules

6    that the defendant had you following.  What, if any, rules

7    were there with respect to your interactions with other men?

8    A     Can you ask me that one more time?

9    Q     Sure.

10           What, if any, rules did the defendant have about

11   your interactions with other men?

12   A     That there would be no interactions.

13   Q     What, if anything, were you supposed to do if you were in

14   the presence of another man?

15   A     Turn away.

16   Q     You previously mentioned that the defendant would spank

17   you as a form of punishment for breaking one of his rules?

18   A     Correct.

19   Q     When was the first time that you learned that the

20   defendant used spankings as a form of punishment?

21   A     I believe in the Sprinter and I feel it came across kind

22   of like a joke, you know, telling me, but it really wasn't a

23   joke.

24   Q     Who was telling you this joke?

25   A     The defendant.

Anna - direct - Cruz Melendez                    2841

1    Q    And at the time you believed it was a joke?

2    A    Kind of, yeah, because....

3    Q    Did he refer to these spankings to you in any particular

4    way?

5    A    What do you mean refer?

6    Q    Did he call the spankings anything?

7    A    Oh, no, just spankings.

8    Q    Okay.  And when he -- at some point, did you learn that

9    when he referred to spanking as a punishment that it was not,

10   in fact, a joke?

11   A    Correct.

12   Q    How did you learn that?

13   A    When it came down to it happening.

14   Q    When you say it happened, what do you mean?

15   A    Like the actual spankings.

16   Q    Who spanked you?

17   A    Rob.

18   Q    When the defendant spanked you, was this as punishment,

19   as you've testified?

20   A    Correct.

21   Q    Can you explain to the jurors, generally speaking, what

22   would happen during these spankings?

23   A    It would be just like spankings.

24   Q    What were you wearing during the spanking?

25   A    Nothing, like.

Anna - direct - Cruz Melendez                    2842

1    Q    And you said spankings.  Would the defendant strike you?

2    A    Correct.

3    Q    Where would he strike you?

4    A    The behind, backside.

5    Q    What would he use to strike you?

6    A    His hand.

7    Q    At any point, were the spankings painful?

8    A    Yes.

9    Q    Did the spankings ever leave marks or bruises on your

10   body?

11   A    Correct.

12   Q    How, if at all, did you react when the defendant spanked

13   you in this manner?

14   A    I would cry.

15   Q    Were you visibly upset?

16   A    Yes.

17   Q    Did you want to be hit in this way?

18   A    No.

19   Q    At any point did you ever say to the defendant that you

20   enjoyed the spankings?

21   A    I believe, yes, through text.

22   Q    Why did you say this?

23   A    Because I was told to.

24   Q    Who told you?

25   A    Robert.

Anna - direct - Cruz Melendez                    2843

1   Q    So when you texted saying that you liked the spankings,

2   what would he have you say?

3   A    Basically I want you to come, you know, turns me on.

4   Q    So that's what you would be writing?

5   A    Yeah.

6   Q    And did it -- is that something that you wanted to be

7   happening?

8   A    No.

9   Q    How often would these spankings occur?

10  A    Every now and then.

11          THE COURT:  I'm sorry, you said every now and then?

12          THE WITNESS:  Every now and them.

13          THE COURT:  What would cause it to happen?  Again,

14  why did he spank you?

15          THE WITNESS:  If it was something -- some rule that

16  you didn't abide by or something like that.

17          THE COURT:  I see.  I'm sorry.  Go ahead.

18  BY MS. CRUZ MELENDEZ:

19  Q    Did the defendant ever spank you in front of anyone else?

20  A    Dominique, I believe.

21  Q    Where was this?

22  A    On the Sprinter.  She had her back turned.

23  Q    But Dominique was present when the defendant spanked you?

24  A    She was present.  Correct.

25  Q    Was that spanking part of punishment?

Anna - direct - Cruz Melendez                  2844

1   A    Correct.

2   Q    Did the defendant ever record these spankings?

3   A    Yes.

4   Q    How did he record the spankings?

5   A    On the iPad.

6   Q    At any point did you ever tell any of the defendant's

7   employees about having been spanked by the defendant?

8   A    Yes.

9   Q    Who did you tell?

10  A    Twin.

11  Q    And Twin, I believe you testified, that's Suzette?

12  A    Suzette, correct.

13  Q    What did you tell her?

14  A    I believe I showed her like the red mark.

15  Q    Where was the mark that you showed her?

16  A    On my backside.

17  Q    Did you ever speak to anyone else who was employed or who

18  worked with the defendant about the defendant having hit you?

19  A    Correct.

20  Q    Who did you speak to?

21  A    Cash.

22  Q    And who is Cash?

23  A    She was a stylist.

24  Q    The defendant's stylist?

25  A    Correct.

Anna - direct - Cruz Melendez                    2845

1    Q    In addition to the spankings, were there ever any other

2    types of punishments that the defendant handed out to you?

3    A    Besides the phone, no, not that I can recall.

4    Q    Were there ever instances in which the defendant recorded

5    you walking back and forth?

6    A    Yes.

7    Q    Can you explain what happened when the defendant had you

8    walking back and forth?  What did that mean?

9    A    That would be a punishment as well.

10   Q    So can you explain to the jurors what you would do as

11   part of that punishment?

12   A    Walk back and forth.

13   Q    Was the defendant present when you were walking back and

14   forth?

15   A    Correct.

16   Q    And what, if anything, were you wearing?

17   A    Nothing.

18   Q    And when you were walking back and forth, what, if

19   anything, did you say or do?

20   A    Call myself names.

21   Q    What kinds of names?

22   A    Stupid, slut.

23   Q    Who, if anyone, told you to call yourself those names?

24   A    The defendant.

25   Q    Did you want to be calling yourself stupid or slut while

1   you were walking back and forth?

2   A    No.

3   Q    And generally speaking, how long might this session, for

4   lack of a better word, of you walking back and forth last?

5   A    Approximately like 30 minutes, probably.

6              THE COURT:  Is this a good time to break?

7              MS. CRUZ MELENDEZ:  Sure.  Yes, Your Honor.

8              THE COURT:  All right.  So we are going to break for

9   lunch.  Please don't talk about the case, but enjoy your lunch

10  today and I will see you back here at 2:15.

11             Thanks so much.

12             THE COURTROOM DEPUTY:  All rise.

13             (Jury exits the courtroom.)

14             THE COURT:  All right.  The witness can step out.

15  We will see you after lunch.

16             (Witness steps down.)

17             THE COURT:  And everybody can sit down.

18             Anything that we have do before we break for lunch?

19             All right.  I'm assuming that there is no way to

20  change the Monday situation; is that correct?

21             MR. CANNICK:  Yes, I will call again.

22             THE COURT:  Just double-check, because if you can't

23  change it, I have another matter that I was going to do at

24  5:30 that I will switch to the morning instead.

25             MR. CANNICK:  Okay.

Anna - direct - Cruz Melendez                    2847

1          THE COURT:  I would rather not.  If you can

2    rearrange it, that would be great, but I understand if you

3    can't.

4          MR. CANNICK:  All right.

5          THE COURT:  I don't know how long you expect this

6    witness to be.  Do you think there will be an additional

7    witness after this?

8          MS. CRUZ MELENDEZ:  Oh, definitely, yes.

9          THE COURT:  Okay.  Well.

10          MS. CRUZ MELENDEZ:  Hard to say with respect to

11    cross-examination.

12          THE COURT:  Okay, I will give you rulings on those

13    motions before we begin for the afternoon, so I will see

14    everybody at 2:15.

15          (Lunch recess.)

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

Proceedings                                    2848

1          A F T E R N O O N   S E S S I O N

2          (Time noted:  2:20 p.m.)

3          THE COURT:  All right.  On the two motions in

4    limine, the defense motion in limine is to preclude the

5    admission of certain videotapes involving witnesses who are

6    going to testify.  The videotapes apparently -- the witnesses,

7    I guess, will testify --

8          When is it anticipated the person will testify,

9    tomorrow?

10         MS. GEDDES:  No, I don't think until next week.

11         THE COURT:  In any event, the Government represents

12   that in these videos the witnesses appear, as well as the

13   defendant, and that the evidence is relevant for a number of

14   purposes including the charged conduct.  One of the goals of

15   the enterprise, according to the indictment, is to produce

16   pornography.  I find that the evidence is relevant, it's

17   directly relevant to the witness' experience, corroborates the

18   testimony of witnesses who described the defendant

19   videotaping -- not videotaping -- recording sexual contact

20   with the witnesses and among other people who were at

21   whichever residence they were at the time.

22         And some of the witnesses have testified that they

23   were directed to do this against their will.  I think it's

24   directly relevant to the charges and it's directly relevant to

25   the witness's own experience.  And so I am permitting that

Proceedings                                    2849

1    over the defense objection.

2         The second question has to do with Jane Doe No. 7.

3    I had ruled prior to trial that Jane Doe No. 7 would be

4    permitted to testify about her -- it was proffered that Jane

5    Doe No. 7 witnessed the defendant having sexual contact with

6    Jane Doe No. 1, who was a minor at the time.  The Government

7    also proffers that Jane Doe -- that the defendant had sexual

8    contact with Jane Doe No. 7 when she was a minor in 1991.  I

9    had initially ruled that that portion of the testimony -- that

10   I wasn't going to permit it because it occurred -- because it

11   was too remote and the Government has asked me to reconsider

12   that.

13        The defense opposes the evidence as cumulative,

14   unfairly prejudicial and unreliable.  The Government proffers

15   that Jane Doe will testify that she was an aspiring performer

16   and that she was with the defendant in his apartment with a

17   number of other young women and that his associates, including

18   Demetrius Smith were also in the apartment and that the

19   defendant asked each young girl to come into the room and had

20   sexual conduct with Jane Doe No. 7 as well as some of the

21   other young women.

22        Do I have that about right?

23        MS. CRUZ MELENDEZ:  Yes, Your Honor.

24        THE COURT:  The evidence is relevant to the

25   existence of the enterprise, particularly that the defendant's

Proceedings                                    2850

1   employees were aware of his activities and didn't do anything

2   to stop it, including Mr. Smith.

3          In opening statements the defense contested both the

4   existence of the enterprise and that -- and that any of the

5   evidence was evidence of a criminal enterprise.  The evidence

6   that the enterprise was in existence before the charges

7   related to Jane Doe No. 1 is relevant to the fact that it

8   was -- that the enterprise existed at the time of the

9   allegations regarding Jane Doe No. 1; that it predates it

10  doesn't make it inadmissible.

11         In addition, having seen the additional proffer of

12  what the evidence is, it really does give a context to Jane

13  Doe's own relationship and the contact that she had with the

14  defendant.  I don't find it to be unfairly prejudicial or

15  cumulative.  It's relevant to that -- to the charge related to

16  Jane Doe No. 1 and it explains why she was in the position she

17  was at the time of her -- of what's alleged to be her seeing

18  the defendant having sexual contact with Jane Doe No. 1.

19         So, the defense objection to that is overruled and

20  you have an exception to that ruling.

21         Has either side had a chance to weigh in on this

22  question of the medical records and the request by -- I can't

23  remember who it was I'm sorry, but the request to have a

24  freelance journalist look at the medical records?  Have you

25  solved that issue?

Proceedings                              2851

1          MS. GEDDES:  We haven't, Your Honor, but we will do

2    that at the break.

3          THE COURT:  Anything else that anybody needs to put

4    on the record?

5          Let's get the witness and let's get the jury.

6          (Pause in proceedings.)

7          (Jury enters.)

8          THE COURT:  Okay, everybody.  I hope you enjoyed

9    your lunch.  We are ready to resume with the direct

10   examination of the witness.

11         (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Go ahead.

2           THE COURTROOM DEPUTY:  The witness is reminded she

3    is still under oath.

4    A N N A, called as a witness, having been previously duly

5        sworn, was examined and testified as follows:

6    CONTINUED DIRECT EXAMINATION

7    BY MS. CRUZ MELENDEZ:

8    Q    Anna, at the time of the break you were testifying about

9    instances which, as part of punishment for breaking the

10   defendant's rules, he had you walk back and forth for a period

11   of time saying things such as calling yourself a bitch or a

12   slut.  Do you recall testifying about that?

13   A    Correct.

14   Q    Who, if anyone, directed you to say those things during

15   those punishments?

16   A    Rob.

17   Q    And did you want to be saying those things?

18   A    No.

19   Q    During those types of punishments, how if at all would

20   you react when you were being punished in that way?

21   A    Can you ask that one more time?

22   Q    Sure.  You previously testified about spankings and that

23   there were times during those spankings in which you became

24   visibly upset.  Did that ever occur while you were engaging in

25   this type of punishment at the defendant's direction?

Anna - direct - Cruz Melendez                    2853

1    A    I would say sometimes.

2    Q    And when you say "sometimes," how would you be upset?

3    How would you visibly show that you were upset?

4    A    Maybe crying.

5              MR. CANNICK:  Objection to maybe.

6              THE COURT:  Overruled.

7              Generally what -- what was your reaction to these

8    kinds of things?  Into the microphone.

9              THE WITNESS:  I can't fully recall honestly.  I just

10   remember doing it.  So, yeah.

11             THE COURT:  Go ahead.

12   BY MS. CRUZ MELENDEZ:

13   Q    Were there times in which you expressed your displeasure

14   to the defendant about having to do the punishment?

15   A    Yes.

16   Q    And how did you do that?

17   A    Wait, rewind.  Can you ask me that one more time?

18   Q    Were there ever instances which during the punishments

19   you would express either vocally or other ways to the

20   defendant that -- your displeasure with having to do these

21   punishments?

22   A    I would say no, probably, so I would just get it over

23   with and move on to whatever is next.  So I would say no.

24   Q    Were there ever times where you appeared as if you were

25   not enjoying it?

                    SN      OCR      RPR

Anna - direct - Cruz Melendez                    2854

1   A    Yes.

2   Q    And what, if anything, would the defendant say to you if

3   he saw that you were not enjoying it or appearing to enjoy it?

4   A    Get it together.

5   Q    And what did you understand it to mean when he said to

6   get it together?

7   A    To do whatever I was supposed to be doing.

8   Q    Based on what the defendant told you to do?

9   A    Correct.

10  Q    Now, during these punishments did the defendant ever

11  record them?

12  A    I believe so, yes.

13  Q    And how would he record them?

14  A    On the iPads.

15  Q    While you were walking back and forth and making the

16  statements about yourself directed by the defendant, what, if

17  anything, did the defendant do while you were engaging in this

18  conduct?

19  A    I would say sometimes jack off.

20  Q    So you talked about the spanking punishments and you

21  talked about these types of punishments while you were walking

22  back and forth at the defendant's direction.

23       During any of these punishments did the defendant

24  ever instruct you to perform sexual acts on him?

25  A    During the times of these punishments?

Anna - direct - Cruz Melendez                    2855

1   Q      In conjunction with the punishment.

2   A      Yes.

3   Q      And what kind of sexual acts?

4   A      Maybe oral or --

5   Q      When you say oral, do you mean giving oral sex to the

6   defendant?

7   A      Yes.

8   Q      At those times did you want to be doing that?

9   A      Not during that time, no.

10  Q      Why not?

11  A      Probably because of the me being worked up and not happy

12  in that moment.

13  Q      And why were you not happy in that moment?

14  A      Probably because of the punishment or whatever just

15  happened.

16  Q      In addition to the spankings and the other punishments

17  that you just testified about, did the defendant ever become

18  violent with you in other ways for breaking the rules?

19  A      Yes.

20  Q      So, for example, you testified that one of the rules that

21  the defendant put in place for you was that you were not to

22  interact with other men.  Did the defendant ever become

23  physically violent with you because he believed that you had

24  broken that rule?

25  A      Yes.

Anna - direct - Cruz Melendez                    2856

1   Q    Did that happen on more than one occasion?

2   A    I can't recall.

3   Q    So, I want to direct your attention to an occasion when

4   you're at the defendant's studio in Chicago.

5   A    Correct.

6   Q    What did the defendant say, if anything, about you having

7   spoken or interacted with another man?

8   A    Can you ask me that one more time?

9   Q    Sure.  With respect to the rule of the defendant that you

10  not interact with other men, directing your attention to a

11  time when you were in Chicago in the studio what, if anything,

12  happened with the defendant because he thought that you had

13  broken that rule?

14  A    I believe that when we were upstairs he went through my

15  phone and saw that I was communicating with an ex and he

16  didn't like that.

17  Q    When you say upstairs, upstairs in the studio?

18  A    In the main room upstairs.

19  Q    And who was going through your phone?

20  A    Rob.

21  Q    And you testified that the defendant didn't like that;

22  correct?

23  A    Correct.

24  Q    What, if anything, happened is when the defendant found

25  out that you had been communicating with your ex-boyfriend?

1   A     He hit me.

2   Q     How did he hit you?

3   A     On the side, right here (indicating).

4         MR. CANNICK:  I'm sorry, I didn't hear.

5         THE WITNESS:  On the side.

6   BY MS. CRUZ MELENDEZ:

7   Q     Did he hit you with an open hand or closed hand?

8   A     Maybe open.

9         THE COURT:  Next question.

10  Q     And you made a motion toward your face.  Did the

11  defendant hit you in the face?

12  A     Correct.

13  Q     Where if anywhere else did the defendant hit you?

14  A     I would say that was it, area-wise.

15  Q     So, I want to direct your attention to -- at some point

16  did you travel to see the defendant in concert in Alabama?

17  A     Correct.

18  Q     And why did you travel to Alabama?

19  A     To see him.

20  Q     To see the defendant?

21  A     Correct.

22  Q     Directing your attention to the trip to Alabama when you

23  went to see his concert there what, if anything, happened

24  related to the defendant's rules that you not communicate with

25  another man?

Anna - direct - Cruz Melendez                    2858

1   A    Can you ask me that again?

2   Q    Sure.  So, directing your attention to the time you went

3   to go see the defendant in concert in Alabama --

4   A    Correct.

5   Q    -- did you have a discussion with the defendant at some

6   point about his belief that you had broken the rule about

7   communicating or interacting with another man?

8   A    That incident I don't think was about another man.

9   Q    What happened?

10  A    I believe he was performing and I was recording him but I

11  think he thought I was doing something else on my phone.

12          MR. CANNICK:  Objection to what he thought.

13  Q    What, if anything --

14          THE COURT:  There's an objection.  The objection is

15  overruled.

16          Why did but think that's what he thought?

17          THE WITNESS:  Because I don't recall the reasoning

18  why he was upset, but it was after I was doing whatever on my

19  phone.

20          THE COURT:  Next question.

21  BY MS. CRUZ MELENDEZ:

22  Q    Would it be fair to say that it was related to you

23  possibly communicating with another man?

24          MR. CANNICK:  Objection.

25          THE COURT:  Overruled.

SN       OCR       RPR

Anna - direct - Cruz Melendez                2859

1    A    No, I don't think it was related to another man.  I think

2    it was just being on my phone.

3             THE COURT:  Just tell us what happened.

4             THE WITNESS:  So when that happened, we were

5    backstage and he was yelling, very upset and I think I just --

6    in the heat of that moment I was really, really worked up and

7    kind of over that thing and I targeted him and when I did

8    that, he reacted and grabbed, me but when he grabbed me I had

9    a chain around my neck.  So I think the nail on the chain

10   scratched my chest which caused marks.

11   Q    Where did the defendant grab you when he grabbed you?

12   A    Like right here (indicating).

13            MS. CRUZ MELENDEZ:  I think the witness is pointing

14   to the chest area.

15   A    Yeah, my necklace broke which cut me on the chest and I

16   was trying to leave.  There was a lot of people outside of the

17   dressing room so he didn't want me to leave the dressing room.

18   Then he finally walked out of the dressing room and I found a

19   way to just leave without him knowing and I walked to a hotel

20   around the corner --

21            THE WITNESS:  Do you want me to keep going?

22            THE COURT:  Yes.

23   Q    What happened next?

24   A    I walked to a hotel around the corner.  I didn't have a

25   phone on me but -- I don't remember if I had my phone or not,

Anna - direct - Cruz Melendez                    2860

1    so I remember going to the airport.  I don't remember the

2    exact order, but I do remember going back to the hotel because

3    I didn't have a way to get home and he told me he would get me

4    a flight home but I had to write something first in order to

5    get my plane ticket so he would feel comfortable if I tried to

6    say the scratches -- he, whatever.  So I wrote, whatever I

7    wrote and --

8    Q    Well, let me stop you there.

9    A    Okay.

10   Q    When you -- what did the defendant ask you to write?

11   A    I don't recall exactly what I wrote.  I just remember it

12   was something on his defense if I were say how that

13   altercation, you know, tried to put more of the blame on him,

14   I guess.

15              THE COURT:  Can I just ask, so you were back at the

16   hotel when he told you to write this?

17              THE WITNESS:  Yes.

18              THE COURT:  Did he tell you what he wanted you to

19   say?

20              THE WITNESS:  Yes, I just don't remember.

21              THE COURT:  It had more to do with this incident.

22              THE WITNESS:  More in the defense of him related to

23   the incident.

24              THE COURT:  To make it seem like it wasn't his

25   fault?

1          THE WITNESS:  Yes, or if I wanted to say he beat me

2    or something that and that wasn't the case because my necklace

3    cut me.  Those marks would be there.

4          THE COURT:  So was he in the room when you were

5    writing this?

6          THE WITNESS:  Yes.  I believe it I was on the

7    Sprinter or something.

8          THE COURT:  You wrote whatever the statement was and

9    you gave it to him?

10          THE WITNESS:  I don't remember if it was Dominique

11   who I gave it to and she gave it to him.  I don't remember.

12          THE COURT:  What happened next?

13          THE WITNESS:  I got -- I went to the airport and I

14   got my necklace back and went to the airport and that was it.

15          THE COURT:  Okay, go ahead.

16   BY MS. CRUZ MELENDEZ:

17   Q    Did you also travel to Miami to attend one of the

18   defendant's performances?

19   A    Yes, but I was with him at the time.

20   Q    So the defendant was in Miami with you?

21   A    Yes.

22   Q    So directing your attention to a time where you were in

23   Miami with the defendant what, if anything, happened with

24   respect to the defendant's belief that you had broken a rule

25   about looking at other men?

1  A    I believe we were walking into the hotel and I was -- my

2  head was turned looking down the hall and then he smacked me

3  in the face I guess thinking I was looking at whatever men

4  were down there, but I didn't even notice that there were men

5  down there.

6  Q    What, if anything, did the defendant say to you?

7  A    I don't recall fully.

8           THE COURT:  What, in substance, did he say?

9           THE WITNESS:  Probably like, you know, you're not

10  supposed to be looking, you know, in the direction of men.

11           MR. CANNICK:  Objection to probably.

12           THE COURT:  I know you don't know it word for

13  word --

14           THE WITNESS:  Okay.

15           THE COURT:  -- but give us the substance of what he

16  said.

17           THE WITNESS:  I think it was something like you're

18  not supposed to be looking in the direction of other men or,

19  you know there's men down there, why are you looking down

20  there.  I don't fully recall.

21           THE COURT:  Okay, next question.

22  BY MS. CRUZ MELENDEZ:

23  Q    Now, during the time that you were with the defendant,

24  did he ever ask you to sign any documents?

25  A    Yes.

Anna - direct - Cruz Melendez                    2863

1    Q    What, if anything, did he ask you to sign?

2    A    I want to say NDA but I don't fully remember because I

3    didn't read through them, but I just do remember signing

4    documents and then signing over permission for pictures as

5    well.

6    Q    When you say permission for pictures, what kind of

7    pictures?

8    A    Some of the pictures he has taken of me.

9    Q    And with respect to those pictures, those pictures

10   weren't of a sexual nature; is that correct?

11   A    No.

12   Q    And I understand based on your testimony that you weren't

13   exactly clear because you hadn't read the full document of the

14   non-disclosure agreement but what in substance did you

15   understand that agreement to be?

16   A    I think it was something, you know, for his protection

17   but, like I said, I don't fully remember.

18   Q    And did you sign it?

19   A    Yes.

20   Q    And who provided you with that agreement?

21   A    I believe probably one of the assistants.

22   Q    One of the defendant's assistants?

23   A    Yes, correct.

24   Q    Did you ever write anything else at the direction of the

25   defendant?

1    A    At the direction of the defendant, is that what you said?

2    Q    Yes.

3    A    As far as something that he ordered?

4    Q    That he asked you to write.

5    A    Yes.

6    Q    And what did you write?

7    A    Maybe things about saying my dad molested me or my

8    cousin -- I messed around with my cousin or something of that

9    sort.

10   Q    Were those things true when you wrote them?

11   A    No.

12   Q    And approximately how many times did the defendant ask

13   you to write letters of that nature?

14   A    A few times.

15   Q    And when you were writing these letters who if -- how did

16   you know what to write in the letter?

17   A    A lot of the time he would direct me on what to write.

18   Q    So was he there when you were writing these letters?

19   A    Most of the time, not all the time.

20   Q    Did you ever get a copy of any of these letters?

21   A    No.

22   Q    Did you ever try to get a copy of any of these letters?

23   A    I remember filming one time when I was writing one.

24   Q    And when you say filming what did you do?

25   A    I was filming on my phone because I figured that it would

Anna - direct - Cruz Melendez                          2865

1   be at a time like this, just thinking like -- saying basically

2   I'm not wanting to write this, this is not me, anything that

3   I'm saying or anything that's truthful, so that's basically

4   what I was recording.

5            THE COURT:  I just want to make sure I understand.

6   You said you were writing out one of these letters; correct so

7   far?

8            THE WITNESS:  Correct.

9            THE COURT:  And then you -- I'm sorry, you recorded

10  yourself with your phone?

11           THE WITNESS:  Correct.  Just to have proof down the

12  line when I was writing it.

13           THE COURT:  Were you saying things as you were --

14           THE WITNESS:  I was saying I'm not willing to write

15  this.  I believe it was in the Trump.  I was in the Trump

16  writing this letter, I don't want to write this.  Yadda,

17  yadda.

18           THE COURT:  Maybe you said this already, but what

19  was the reason -- was there a reason given to you for why you

20  were to write these things?

21           THE WITNESS:  Like I said, I think it was more on

22  his defense for him to have saying to hold against or down the

23  line if something were to happen or come about.  That's my

24  only --

25           THE COURT:  He just told you to write these things

Anna - direct - Cruz Melendez                2866

1    out and --

2           THE WITNESS:  Write things that sound embarrassing

3    or sound a little crazy I guess.

4           THE COURT:  Go ahead.

5    BY MS. CRUZ MELENDEZ:

6    Q    And I think you testified that the information that you

7    were writing in these letters was untrue; correct?

8    A    Correct.

9    Q    And now that recording that you made on your phone, did

10   you keep that recording?

11   A    I did, but then he went through my phone and saw that and

12   deleted it.

13   Q    When you say "he," do you mean the defendant?

14   A    Yes.

15   Q    So, when you were writing these letters what, if

16   anything, would you do with the letters once you finished

17   writing them?

18   A    I would give them to him.

19          MS. CRUZ MELENDEZ:  I am showing just the witness

20   for identification purposes Government Exhibits 430-A, B, C

21   and D and Government Exhibit 439 for identification purposes.

22          THE COURT:  Mr. Cannick, have you seen these?

23          MR. CANNICK:  I would like to see them.

24          THE COURT:  I know you have copies of them, but I

25   just want to know if you object to them.

SN        OCR        RPR

Anna - direct - Cruz Melendez                2867

1             MS. CRUZ MELENDEZ:  While doing that, can I just

2    approach the witness, Your Honor?

3             THE COURT:  Sure.

4             (Counsel approaches.)

5             MR. CANNICK:  I have no objection to them your.

6             THE COURT:  They are in evidence and you can display

7    them.

8             (Government Exhibits 430A, B, C, D and Government

9    Exhibit 439 received in evidence.)

10   BY MS. CRUZ MELENDEZ:

11   Q    Do you recognize those items?

12   A    Yes.

13            MS. CRUZ MELENDEZ:  Your Honor, if I could publish

14   Government Exhibit 430A.  This can go to the public.

15            (Exhibit published.)

16   BY MS. CRUZ MELENDEZ:

17   Q    What are we looking at in Government Exhibit 430A?

18   Generally speaking, what is it?

19   A    A letter that I wrote.

20   Q    And you previously testified that you had written letters

21   at the direction of the defendant.  Is this one of these such

22   letters?

23   A    Correct.

24   Q    Now, in Government Exhibit 430A, I won't read the whole

25   thing but starting at the beginning it says:  I feel a little

SN        OCR        RPR

Anna - direct - Cruz Melendez                    2868

1    bit better now that I told you that.  I want you to know that

2    my mom wanted me to start going out with you because she

3    thought it would be good for my modeling career.  She said

4    that that I wouldn't be the only one.  That that's what all of

5    the pretty girls do.  I agreed with her because I knew that if

6    people thought we were dating it would definitely blow up my

7    career.  That's why I sent out the pictures we took because I

8    knew it would cause controversy.  At the time I didn't care

9    who got hurt from it all because I was just interested in

10   myself and my career.  I feel so bad about that.  We have also

11   spread lies and rumors about you and other females which I

12   know has hurt you and I am sorry about that.  This is hard for

13   me, but I have to continue to be honest.  My mom and I have

14   had a conversation about blackmailing you but once the

15   relationship didn't work out the plan was to threaten you to

16   help me with my career or pay me or we're going to tell a

17   bunch of lies on you.

18            Is anything written there true?

19   A    No.

20   Q    And who directed you to write this information?

21   A    Rob.

22   Q    So was there ever a plan with your mother to blackmail

23   the defendant?

24   A    Never.

25   Q    Showing you Government Exhibit 430B just reading an

Anna - direct - Cruz Melendez                    2869

1   excerpt from it:  We would also lie and say that we had sex

2   and you gave me some type of disease, but as I started

3   spending time and realizing how nice of a guy you are, I

4   started changing my mind.  I actually love you so much but I

5   don't want to do those things to you anymore.  The only

6   problem is that my mom is still nagging me about continuing on

7   with those plans.  I keep telling her I don't want to do it

8   anymore.

9         And the letter goes on, but with respect to the

10  information in here, who were you writing that you were

11  telling lies about?  Is that a reference to the defendant?

12  A    Yes.

13  Q    When you wrote this letter did you -- again, did you have

14  a plan with your mother about telling lies or blackmailing the

15  defendant?

16  A    No.

17  Q    Who instructed you to write the information that was in

18  this letter?

19  A    Rob.

20  Q    I also admitted to her that we did have sex and it took a

21  while because at first we didn't want to and that's when we

22  did finally is because I kept coming on to you.  She got so

23  angry at me and I find myself trying to convince my mother not

24  to do these things, but she continues to argue and curse me

25  out because I don't want to any longer be a part of that

1   negativity and those lies.  I am sorry again for all of this

2   and I know this is definitely changed your mind about me.  And

3   like I said I don't blame you if it did.  I just hope that you

4   can forgive me and my mom.  Sorry again, Rob, and please call

5   me once you get yourself to speak to me again.  Whatever you

6   do, don't leave me hanging.  I love you and thank you for

7   everything you have done for us.

8            Again, did you have any conversations with your

9   mother about spreading lies or blackmailing the defendant?

10  A    No, but I do remember writing this and I do know this was

11  when a lot of this all riled up --

12  Q    When you say all riled up, what do you mean?

13  A    I don't know, when this got, like, more attention to this

14  whole thing.

15  Q    With respect to the defendant?

16  A    Yes.  So I do remember him wanting me to write this

17  thinking my mom may say something.  She didn't have anything

18  to say because none of this was true, but I guess the other

19  females' parents were doing it.  This was in case my mom was

20  doing that as well, coming out and saying whatever, so --

21  Q    So to be clear.  You testified that other females'

22  parents were saying negative things about the defendant?

23  A    Yes.

24  Q    And so did the defendant ask you to write this as a

25  precaution you for having your mother say negative things

1    about him?

2    A    Correct.

3              MS. CRUZ MELENDEZ:  Your Honor, if I could show just

4    for one moment just to the jury?

5              THE COURT:  Sure.

6              (Exhibit published to jury only.)

7              MS. CRUZ MELENDEZ:  The true name of Anna is listed

8    at the bottom of Government Exhibit 430B.

9              (Exhibit published.)

10             MS. CRUZ MELENDEZ:  We can publish this Exhibit

11   430C.

12             (Exhibit published.)

13   BY MS. CRUZ MELENDEZ:

14   Q    Just directing your attention to the last few lines on

15   this side of the exhibit, where it says:  So I wanted to lie

16   about my age as well and I am sorry for that but I am actually

17   20.  I know I should have told you but I didn't want to take a

18   chance on you not wanting to see me.  I heard you like younger

19   women.  I just didn't want to take the chance.  I hope this

20   doesn't affect the way you think of me and if it does I

21   totally understand.  I wouldn't blame you if you didn't want

22   to see me or speak to me anymore.  I am sorry again for lying

23   to you.  If you don't do anything else I wish you at least

24   forgive me.  There's more I have to get myself together

25   because I feel so bad.

Anna - direct - Cruz Melendez                2872

1              Again, who directed you to write this?

2    A    Rob, but I did want to say in the beginning when I first

3    met him I did say I was 21.

4    Q    How old were you when you met him?

5    A    20.  But I guess I did say 19 but I was 20.  I can't

6    remember honestly, 19 or 20.  But maybe at the time I already

7    turned 20 because I was just about to have a birthday.

8

9              (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Anna - Direct - Cruz Melendez                    2873

1    BY MS. CRUZ MELENDEZ (Continuing):

2    Q    And when you were writing this, was the Defendant telling

3    you what to say?

4    A    Yes.

5    Q    I'm now showing Government Exhibit 449.  This portion can

6    be published.

7              (Exhibit published to the jury.)

8    Q    Similar to the other letters you just testified about, is

9    this, again, one of the letters that the Defendant directed

10   you to write?

11   A    Correct.

12   Q    Going down towards the bottom of the page, it says:  She

13   would tell me to be very seductive when I'm around him.  She

14   also told me on several occasions to --

15             THE COURT:  Please slow down a little bit.

16   Q    -- to seduce him but also record him as much as I could.

17   And sorry to say -- I'm turning the page -- but at first, I

18   was down with that.  I started wearing skimpy clothes,

19   sometimes little, if nothing, just to get his attention

20   sexually.  As I did that, I would bring up my modeling career,

21   and he would always say encouraging words to me and give me

22   advice on keeping myself healthy and looking good, but never

23   did he ever once tell me that he was going to help me with it.

24   As I started spending more and more time with him, we became

25   very close; close to the point I didn't want to be a part of

Anna - Direct - Cruz Melendez                    2874

1    my mom's stupid plan to use R. Kelly to make me a star or get

2    money from him.

3            Again, was there a plan that you had with your mom

4    to black mail or get money from the Defendant?

5    A    No.

6    Q    And when you wrote this, was that true then when you

7    wrote that?

8    A    Can you go to the top part?  No.

9    Q    And who, if anyone, directed you to write this?

10   A    Rob.

11   Q    I'm now showing another portion of the letter.  At the

12   top of the first line, starting where it says:  But I knew my

13   mom was still going forward with some kind of plan with other

14   girls' parents to try and destroy R. Kelly's career.  The

15   reason I know is because at some point that's all she would

16   talk about.  I'm writing this letter because I want to clear

17   my name from all of this madness that's happening.  And a lot

18   of people that might read this probably won't believe me and

19   think R. Kelly had me write this, and that's okay.  But for

20   those of you out there that are interested in the truth, then

21   all of these girls' mothers, including mine, just tried to use

22   us as sexual bait to the get R. Kelly to somehow magically

23   snap his fingers and make us stars.  And if it backfired and

24   didn't work, then their backup plan -- their backup plan is

25   just what they're doing now.

Anna - Direct - Cruz Melendez                    2875

1        Again, was there any plan against the Defendant

2   involving you or your mother?

3   A    No.

4   Q    So when you wrote that, was that true?

5   A    No, it wasn't true.

6   Q    Who directed you to write that in this letter?

7   A    Rob.

8   Q    Directing your attention to the middle of the page where

9   it says:  I'm not brainwashed, controlled, abused, starved,

10  beaten.  I'm not a sex slave, I'm not held captive, I'm not

11  being told when to come or when to go or I'm not being told

12  when to turn my phone on or when to turn it off.

13       Based on your previous testimony, is it fair to say

14  there were times when the Defendant controlled you?

15  A    Correct.

16  Q    Is it fair to say there were times when the Defendant

17  abused you?

18  A    Correct.

19  Q    Is it fair to say there were times when the Defendant hit

20  you?

21  A    Correct.

22  Q    Is it also fair to say that there were times when the

23  Defendant told you when to come and when to go?

24  A    I feel like that choice was probably mine.

25  Q    Based on his rules, were there times when you couldn't

LAM        OCR        RPR

Anna - Direct - Cruz Melendez                    2876

1  leave without the Defendant --

2  A    Oh, correct.

3  Q    Were there times when the Defendant had control of your

4  phone?

5  A    Correct.

6  Q    So when you wrote those things, was that at the

7  Defendant's direction?

8  A    Correct.

9  Q    Is it fair to say that those things are not true?

10  A    Correct.

11  Q    So, we talked about some of the letters that the

12  Defendant asked you to write containing some false

13  information.  And, also, you testified about some potential

14  embarrassing information, such as false statements that you

15  had been molested by family members.

16  A    Correct.

17  Q    In addition to writing about this embarrassing

18  information, were there times when the Defendant ever directed

19  you to video record yourself doing something embarrassing?

20  A    Correct.

21  Q    What, if anything, did the Defendant direct you to video

22  record yourself doing?

23  A    Basically, being sexual and seductive with bodily fluids.

24  Q    Now, on the occasion where the Defendant had you record

25  yourself doing something with the bodily fluid, what did you

1   use to record?

2   A     The iPad.

3   Q     And where did you get the iPad from?

4   A     From him.

5   Q     From the Defendant?

6   A     Yes.

7   Q     And where did you record this?

8   A     In the hotel bathroom.

9   Q     And where was the Defendant while you were recording?

10  A     In the room outside of the bathroom.

11  Q     Did you want to be doing what you were doing in that

12  recording?

13  A     No.

14  Q     Who, if anyone, was instructing you what to say and do in

15  that recording?

16  A     Rob.

17  Q     After you were done recording, what did you do with the

18  video?

19  A     I just gave him the iPad.

20  Q     You testified that you, yourself, wrote letters

21  containing false information.

22         Did you ever see anyone else write letters similar

23  to the ones that you've testified about here today?

24  A     I never saw, but I came across letters that I believe

25  Dominique wrote.

Anna - Direct - Cruz Melendez                    2878

1      MR. CANNICK:  Objection.

2      THE COURT:  Overruled.

3  Q    And where did you see the letters that Dominique wrote?

4  A    In a drawer in the guesthouse.

5  Q    In the Defendant's guesthouse?

6  A    Correct.

7  Q    Did you ever hear the Defendant instructing others to

8  write similar types of letters?

9  A    Yes.

10 Q    Can you explain to the jurors the circumstances in which

11 you heard this?

12 A    I believe on the Sprinter.

13 Q    You were on the Sprinter.

14       Was the Defendant there?

15 A    Correct.

16 Q    And what was the Defendant doing?

17 A    Talking to the girls on something they were writing.

18 Q    And just being mindful of who the girls are that you're

19 referring to --

20 A    Jane and Jocelyn.

21 Q    And what, if anything, did you hear the Defendant say to

22 Jane and Jocelyn?

23 A    I don't remember exactly, but I just know it was in

24 direction of telling them what to say.

25 Q    What to say in the letter?

LAM     OCR     RPR

1    A    Correct.

2    Q    Was there ever an occasion where your mother visited you

3    were when you were staying with the Defendant?

4    A    Correct.

5    Q    Where were you when your mother visited you?

6    A    In Chicago.

7    Q    And when your mother came to visit, what, if anything,

8    happened?

9    A    I know she made Rob uncomfortable with her being there,

10   wanted her to leave her phone at the front and write a letter

11   in the sauna, basically saying everything that those other

12   letters said.

13   Q    So, when you say -- I didn't hear the pronoun you used,

14   but who wanted to be comfortable?

15   A    Rob.

16   Q    And who asked your mother to write this letter?

17   A    I asked her to write it --

18   Q    And why did you ask your mother to write this letter?

19   A    For Rob, to make him feel comfortable.

20   Q    And did Rob instruct you to ask your mother?

21   A    Correct.

22   Q    So, what, if anything, did you say to your mother when

23   the Defendant asked you to tell your mother to write a letter?

24   A    What did I say to my mother?

25   Q    Yes.

Anna - Direct - Cruz Melendez                2880

1   A    I was just telling her that he just wants her to write

2   this letter so he feels comfortable if she were to come

3   against him in any type of way.

4          She didn't want to write it.  But she wanted to the

5   be around me, so she wrote it and obviously knew what she was

6   writing wasn't true.

7   Q    And you testified that it was similar statements to the

8   other statements that we've read in the letters?

9   A    Blackmailing and all that stuff, yes.

10  Q    What, if anything, did you do -- did your mother do with

11  the letter once she was done writing it?

12  A    She gave it to me and I believe I gave it to an

13  assistant.

14  Q    Do you remember which assistant?

15  A    I believe Diana.

16  Q    Now, you mentioned that this took place in the sauna?

17  A    Correct.

18  Q    Why did it take place in the sauna?

19  A    Because that felt for him to be the safest place.

20          THE COURT:  Why specifically?

21          What happened when you say the "safest" place?

22          THE WITNESS:  I guess because in the sauna, well,

23  she didn't have -- she had on a towel, so no clothes.  Just to

24  make sure there was no hidden microphones or something.

25          I don't really know why the sauna.  That's my

LAM      OCR      RPR

Anna - Direct - Cruz Melendez                    2881

1  only...

2           THE COURT:  Whose idea was it to use the sauna?

3           THE WITNESS:  Rob's.

4           THE COURT:  Next question.

5  Q    Other than writing that letter on that trip, did your

6  mother have to sign or write anything else?

7  A    Maybe NDA.  But other than that, I think that was it.

8  Q    Going back for a moment to the video that the Defendant

9  had you record involving a bodily fluid, how did you feel

10 having to make that video?

11 A    Humiliation, yeah.

12 Q    Was that something that you wanted to do?

13 A    No.

14 Q    During the time when you were with the Defendant, did you

15 ever engage in sexual activity with the Defendant that

16 involved other women?

17 A    Yes.

18 Q    So, you previously testified about other women, including

19 Jane, Joy, Dominique, Vee, and Juice who were also the

20 Defendant's girlfriends.

21           Do you remember testifying about that?

22 A    Yes.  I won't say all of them.  There was a sexual --

23 Q    Who, if anyone, do you recall engaging in sexual activity

24 involving one or more of those females and the Defendant?

25 A    Jane, Dominique, and Joy.

LAM      OCR      RPR

Anna - Direct - Cruz Melendez                    2882

1   Q    Did you want to be engaging in sexual activity with these

2   other women?

3   A    No.

4   Q    Whose idea was it to engage in the sexual activity with

5   these women?

6   A    Rob's.

7   Q    And during these sexual encounters, was the Defendant

8   present?

9   A    Yes.

10  Q    Now, you testified that you didn't want to be engaging in

11  sexual activity with these women.

12       Were there times when you made your discomfort known

13  to the Defendant?

14  A    Yes.

15  Q    How would you do that?

16  A    By just my facial expression, attitude.

17  Q    What happened when your facial expression and attitude

18  were not enthusiastic?

19  A    Basically, him pulling me to the side, telling me to get

20  it together.

21  Q    Now, were any of these sexual encounters with other women

22  and the Defendant, were the they ever recorded?

23  A    Yes.

24  Q    And what did the Defendant use to record them?

25  A    The iPad.

Anna - Direct - Cruz Melendez                    2883

1  Q    During the sexual encounters, who, if anyone, was in

2  charge?

3  A    Rob.

4  Q    And how would he demonstrate that he was in charge?

5  A    By directing what to do.

6  Q    When you say "directing," what kinds of things did the

7  Defendant direct?

8  A    Mainly, them coming on to me.

9  Q    And when you say "direct," what, if anything, would the

10 Defendant say during these encounters?

11 A    I don't recall.  I just know, you know, telling, you

12 know, what to do.  I don't know exactly.

13 Q    When you say "what to do," do you mean what to do

14 sexually?

15 A    Sexually, yes.

16 Q    So, in addition to the sexual encounters that you had

17 with the Defendant and other women, did you engage in sexual

18 activity with the Defendant and other men?

19 A    Yes.

20 Q    What other men or man do you recall engaging in sexual

21 activity with that involved you and the Defendant?

22 A    He called him by Nephew.

23 Q    And could you describe Nephew?

24 A    Light skinned, tall, African-American.

25            MS. CRUZ MELENDEZ:  I'm showing the witness what's

                    LAM      OCR      RPR

Anna - Direct - Cruz Melendez                    2884

1    in evidence as Government Exhibit 68.

2               (Exhibit published to the jury.)

3    Q    Do you recognize the individual in Government 68?

4    A    Yes.

5    Q    Who is that?

6    A    The one referred as Nephew.

7    Q    At any point did you know Nephew's name?

8    A    No.

9    Q    Do you know whether or not Nephew was actually related to

10   the Defendant?

11   A    I don't believe so.

12   Q    How did it come to happen that you engaged in sexual

13   activity with Nephew and the Defendant?

14   A    I remember Rob talking about it and then believe in

15   Chicago one time we were in a hotel room.

16   Q    And what happened in the hotel room in Chicago?

17   A    I don't know how to...

18   Q    Just generally speaking.

19   A    Sex, you know.

20   Q    Did you engage in sex with Nephew, the individual in

21   Government Exhibit 68?

22   A    Yes.

23   Q    And did the Defendant?

24   A    I didn't see, no.

25   Q    With respect to Nephew, did you engage in sexual activity

Anna - Direct - Cruz Melendez                    2885

1  with him while the Defendant was there on more than one

2  occasion?

3  A    Twice.

4  Q    And you mentioned you discussed one time.

5        Do you recall where the other time occurred?

6  A    I believe it was in Miami.

7  Q    And, again -- withdrawn.

8        What, if anything -- I know you testified you didn't

9  know his name, but what, if anything, did you learn about

10 Nephew?

11 A    I didn't really know much about him.

12 Q    Did you learn where Nephew worked?

13 A    I want to say McDonald's, but I really don't remember.

14 Q    During these encounters involving Nephew and the

15 Defendant, did you want to be having sex with Nephew?

16 A    No.

17 Q    And who, if anyone, directed your sexual activity with

18 Nephew?

19 A    Rob.

20 Q    During these sexual encounters with Nephew, were they

21 recorded?

22 A    Yes.

23 Q    Who recorded them?

24 A    Rob.

25 Q    And what did he use to record?

Anna - Direct - Cruz Melendez                    2886

1    A    IPad.

2    Q    During the sexual encounters that you had with the

3    Defendant, either alone or involving other people, did the

4    Defendant use condoms?

5    A    No.

6    Q    Now, during sexual encounters that just involved you and

7    the Defendant, did he ever record those?

8    A    Yes.

9    Q    And what would he use to record those sexual encounters?

10   A    iPad.

11   Q    At any point, did you ever see any of the videos

12   involving either yourself or other people engaged in sexual

13   activity with the Defendant?

14   A    Yes.

15   Q    And how did you come to see those?

16   A    He would show me.

17   Q    Meaning the Defendant would show you?

18   A    Correct.

19   Q    Now, you mentioned that the Defendant used an iPad to

20   record these encounters.

21        How many iPads did you see the Defendant with?

22   A    I'm not sure how many, I just know it's more than one.

23   Q    And where, if anywhere, would you see these iPads?

24   A    Bookbag.

25   Q    Whose bookbag?

1    A    Rob's.

2    Q    Did you ever see a recording of yourself engaged in

3    sexual activity with the Defendant while the Defendant wasn't

4    around?

5    A    Can you ask that one more time?

6    Q    Did you -- did there ever come a time where you were able

7    to see a recording of you engaged in sexual activity with the

8    Defendant when the Defendant wasn't around?

9    A    No.

10   Q    You testified previously that you would see the Defendant

11   keep iPads in a --

12         I'm sorry, what was the word you described?

13   A    Bookbag.

14   Q    Is that the same thing as a backpack?

15   A    Backpack, yeah.

16   Q    During your sexual activity with the Defendant, what, if

17   anything, did the Defendant say to you about how he wanted you

18   to dress during certain sexual activity?

19   A    Sometimes it would be, you know, role play, dress up,

20   costume, or --

21   Q    And in what way would you role play?

22   A    Sometimes as a cartoon Disney character.

23   Q    Anything else?

24   A    A young girl.

25   Q    And did the Defendant ask you to role play as a young

1  girl?

2  A    Yes.

3  Q    When you say "young girl," did he ever discuss with you

4  an age?

5  A    I can't recall.

6  Q    At some point, did your relationship with the Defendant

7  end?

8  A    Yes.

9  Q    And approximately when was that?

10 A    I think it was -- like, I know it was December going on,

11 like, New Year's of maybe 2018.

12 Q    So, New Year's into 2018?

13 A    Well, it was December of -- maybe 2017 going on to 2018.

14 I don't really remember, I just know it was December.

15 Q    And how did it come to be that your relationship with the

16 Defendant ended?

17 A    We were at a hotel in LA and it was just around Christmas

18 and there was just a lot going on.  So, I think I kind of just

19 was over it at that point.

20      And, yeah, one of my friends came.  She lived nearby

21 and came and picked me up, and that was the last time I've

22 seen him.

23 Q    Prior to your leaving, did you have a conversation with

24 the Defendant at the hotel?

25 A    Yeah, he was outside when I left.

1   Q    What about before you left inside of the hotel?

2   A    Yeah, we had a little argument the night before.

3   Q    And what happened during the argument?

4   A    I think it was me arguing about him being with other

5   girls.

6   Q    What, if anything, did the Defendant do?

7   A    I mean, we just were arguing back and forth.

8   Q    Did you have a cell phone with you at the time?

9   A    Yes.

10  Q    And what, if anything, happened to your cell phone?

11  A    He took it, but then he gave it back.  So, I had my cell

12  phone then.

13  Q    During the course of your relationship, other than Rob,

14  what, if anything, did the Defendant ask you to call him?

15  A    Daddy.

16  Q    After your relationship ended with the Defendant, did you

17  ever speak publicly about certain aspects of your relationship

18  with the Defendant?

19  A    Yes.

20  Q    Are you familiar with the docuseries Surviving R. Kelly?

21  A    Yes.

22  Q    Did you participate in that docuseries?

23  A    Yes.

24  Q    What, if anything, did you provide to the makers of the

25  docuseries as part of your participation?

Anna - Direct - Cruz Melendez                    2890

1    A    Pictures.

2    Q    What kind of pictures?

3    A    Pictures of us, you know, the good times.

4    Q    Did you also discuss incidents of abuse on the docuseries

5    or physical altercations with the Defendant?

6    A    Not that I can recall.  I do know they edited it out they

7    wanted to edit it, but I am pretty sure I didn't go into

8    detail on that.

9    Q    You previously discussed that in the beginning of your

10   relationship or there were times in your relationship that

11   were good with the Defendant, correct?

12   A    Correct.

13   Q    And there were other times that were not good, correct?

14   A    Correct.

15   Q    During your public statements, did you talk about both of

16   those facets of your relationship?

17   A    Mostly I feel like I spoke on the positive side, publicly

18   speaking.

19   Q    And were there things that you didn't mention; for

20   example, some of the things you testified here today, when you

21   were publicly speaking?

22   A    Correct.

23   Q    Now, you testified that you participated in the

24   docuseries Surviving R. Kelly.

25        Are you familiar -- is it fair to say that's a

LAM      OCR      RPR

1   two-part series?

2   A    Yes.

3   Q    And which part of the docuseries did you participate in?

4   A    The second part.

5   Q    Do you remember approximately when that was?

6   A    I don't remember.  It might have been last year, maybe

7   August.  I don't really remember.

8   Q    When you say "last year," do you mean 2020?

9   A    Correct.

10  Q    So, you don't remember the month, but perhaps sometime in

11  2020?

12  A    Correct.

13  Q    And you testified that you provided photographs to the

14  docuseries.

15       Did you receive any payment for the docuseries?

16  A    Correct.

17  Q    How much payment did you receive?

18  A    I think it was, like, a thousand to fifteen hundred.  It

19  don't fully remember.

20       MS. CRUZ MELENDEZ:  I'm showing the witness what's

21  in evidence as Government Exhibit 48.

22       (Exhibit published to the jury.)

23  Q    Do you recognize this individual?

24  A    Yes.

25  Q    Who do you recognize that individual to be?

```
                        Proceedings                    2892
```

1   A    Dr. McGrath.

2   Q    Sorry, did you say McGrath?

3   A    Correct.

4   Q    And who, if anyone, was that individual in relation to

5   the Defendant?

6   A    Rob's doctor.

7   Q    Did you ever meet this individual in person?

8   A    Yes.

9   Q    And where did you meet this individual?

10  A    Cigar Lounge.

11  Q    And who, if anyone else, was with Dr. McGrath when you

12  met him?

13  A    His wife Jeannie was -- would be sometimes.

14          MS. CRUZ MELENDEZ:  Your Honor, if I could just have

15  one moment.

16          THE COURT:  Sure.

17          (Pause in proceedings.)

18          MS. CRUZ MELENDEZ:  Nothing further.

19          THE COURT:  I think this might be a good time to

20  take our afternoon break.  So, don't talk about the case.  See

21  you in a few minutes.

22          THE COURTROOM DEPUTY:  All rise.

23          (Jury exits.)

24          THE COURT:  Everybody can sit down.  The witness can

25  step out.

Proceedings                                    2893

1          (Witness exits.)

2          THE COURT:  Anything before we break?

3          MS. CRUZ MELENDEZ:  I just wanted to make the Court

4    aware of something just in case.

5          As everyone is aware, the witness has testified

6    under a pseudonym.  I've conferred with defense counsel.  He

7    may have some questions about her current employment.  And

8    I've discussed it with defense counsel, and I've asked him to

9    refer to her employment as being in media, which I think is

10   broad enough.

11         But to the extent that there are any questions that

12   move beyond that in a way that may identify Anna, because she

13   is in a public-facing sphere, I just ask for a moment to

14   confer with the Court before the questions are put to the

15   witness.

16         THE COURT:  I have no idea of the specifics of what

17   you're talking about, so I wonder if it might not be a bad

18   idea to go to the side and let me know what it is, with the

19   court reporter.

20         MS. CRUZ MELENDEZ:  That's fine.

21         THE COURT:  And let's do that, because I take it we

22   don't want to disclose her identity.

23         MS. CRUZ MELENDEZ:  That's correct.

24         THE COURT:  Let's do that with the court reporter.

25         (Continued on the following page.)

SEALED - Sidebar - SEALED                2894

1        (The following occurred at sidebar.)



22       (Sidebar ends.)

23

24       (Continued on the following page.)

25

LAM      OCR      RPR

Proceedings                          2895

1          (In open court.)

2          THE COURT:  Just to finish that up, it doesn't sound

3     like this line of inquiry is going to come up, so I don't

4     think there's any cause for concern.

5          Now you can go.

6          MR. CANNICK:  Thank you.

7          (Recess taken.)

8

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                      2896

1           (In open court; outside the presence of the jury.)

2           THE COURTROOM DEPUTY:  All rise.

3           THE COURT:  I understand that we want to take a

4   witness out of order.

5           You have no objection, do you?

6           MR. CANNICK:  No, Your Honor.

7           THE COURT:  We have to wait for the defendant.

8           Why don't we get that witness.

9           (Defendant present.)

10          THE COURT:  So, again, the Government's is going --

11  the witness has to leave.  We are going to call a witness out

12  of order.

13          What is the witness' name?

14          MS. SHIHATA:  Katherine Lee.

15          THE COURT:  Katherine Lee?

16          MS. SHIHATA:  Yes.

17          (Witness takes the stand.)

18          THE COURTROOM DEPUTY:  All rise.

19          (The jury enters the courtroom.)

20          THE COURTROOM DEPUTY:  You may be seated.

21          THE COURT:  All right.  Ladies and gentlemen, this

22  happens every once in a while.  We have a witness who has a

23  scheduling issue, so we are going to take the witness out of

24  turn and then we will finish with the examination of the other

25  witness.

Proceedings                              2897

1          Go ahead.  Why don't you call the witness.

2          MS. SHIHATA:  The Government calls Katherine Lee.

3          THE COURTROOM DEPUTY:  Please stand and raise your

4   right hand.

5          Do you solemnly swear or affirm that the testimony

6   you're about to give will be the truth, the whole truth, and

7   nothing but the truth?

8          THE WITNESS:  Yes.

9          (Witness sworn.)

10         THE COURTROOM DEPUTY:  Thank you.  You may be seated.

11         THE COURT:  You can also take your mask off.

12         There are just a couple of preliminaries before you

13  testify.  I want to make sure that everybody can hear you, so

14  speak into the microphone and don't speak too quickly.  Our

15  court reporter takes down everything that you say, so it is

16  easier for her if you don't speak too quickly.  For the same

17  reason, try to let whichever lawyer is asking you questions to

18  finish before you start talking so we are not talking over

19  each other.

20         If there is a question that you don't understand or

21  you want to have repeated, let me know and I will have the

22  lawyer either repeat it or rephrase it.  And just do your best

23  to answer whatever the specific question that you are being

24  asked.  Okay?

25         THE WITNESS:  Yes.

Lee - direct - Shihata                2898

1          THE COURT:  All right.  Go ahead.

2          MS. SHIHATA:  Thank you.

3   **KATHERINE LEE**,

4       called by the Government, having been duly sworn, was

5       examined and testified as follows:

6   DIRECT EXAMINATION

7   BY MS. SHIHATA:

8   Q    Good afternoon.

9   A    Good afternoon.

10         THE COURT:  Let's make sure the microphone is on.

11  You can pull it closer to you surely and just tap it.  Good.

12  Great.

13  Q    How old are you?

14  A    39.

15  Q    Where did you grow up?

16  A    Chicago.

17  Q    How far did you go in school?

18  A    A bachelor's degree.

19  Q    What high school did you attend?

20  A    Chicago Academy for the Arts.

21  Q    When did you graduate from the Chicago Academy for the

22  Arts?

23  A    In 1999.

24         THE COURT:  Let's just bring the microphone a little

25  bit closer, if you can.  Great.

Lee - direct - Shihata                    2899

1  Q    What kind of high school is the Chicago Academy for the

2  Arts?

3  A    At the time it was Chicago's only arts preparatory high

4  school, so it prepared students who would like to attend

5  college on a musical basis.  They would have prepared us for

6  that.

7  Q    And when you attended high school there, did you want to

8  be a singer?

9  A    I did.

10  Q    Are you currently employed?

11  A    I am.

12  Q    What type of work do you do?

13  A    I work for a nonprofit.

14  Q    I'm showing you what's in evidence as Government Exhibit

15  57.  Do you recognize this person?

16  A    I do.

17  Q    And do you know -- without saying it, do you know this

18  person's full name?

19  A    Yes, I do.

20  Q    What is her first name?

21  A    Stephanie.

22        MS. SHIHATA:  I'm showing the witness and the jury

23  only what's in evidence as Government Exhibit 57-A?

24  Q    Is this the same photo I just showed you with the full

25  name of this individual?

Lee - direct - Shihata                    2900

1    A    Yes, it is.

2    Q    I'm showing you what's in evidence as Government Exhibit

3    57-B.  For the purposes of your testimony here today, we will

4    refer to this person as Stephanie.  Okay?

5    A    All right.

6    Q    How do you know Stephanie?

7    A    She and I attended high school together.

8    Q    And did you graduate in the same class?

9    A    Yes, we did.

10   Q    In 1999?

11   A    Yes.

12   Q    I'm showing you what's in evidence as Government Exhibit

13   1.  Do you recognize this person?

14   A    Yes.

15   Q    And who do you recognize that to be?

16   A    R. Kelly.

17   Q    Have you met R. Kelly in person?

18   A    Yes.

19   Q    Do you see R. Kelly in the courtroom here today?

20   A    Yes.

21   Q    Can you identify him, point him out and identify him by

22   an item of clothing he is wearing?

23   A    The gentleman in the blue suit.

24        THE COURT:  Indicating the defendant.

25   Q    Around when did you first meet the defendant?

Lee - direct - Shihata                    2901

1   A    It was right after graduation, so like the end of spring
2   in 1999.
3   Q    So after your high school graduation?
4   A    Yes.
5   Q    And what were the circumstances of your meeting him?
6   A    Stephanie wanted to introduce me to him to sing to him.
7   Q    And did you, in fact, audition or sing for the defendant?
8   A    I did.
9   Q    Where did that take place?
10  A    I'm not exactly sure.  I know it was a studio.  I believe
11  it was Trek Studio.
12  Q    And is that in Chicago?
13  A    It is.
14  Q    Do you recall who was there for your audition for the
15  defendant?
16  A    Yes.  Stephanie and her mother.
17  Q    And what happened when you went to the studio to sing for
18  the defendant?
19  A    He was very unimpressed.
20  Q    Do you recall what you sang for him?
21  A    I sang *My Funny Valentine*.
22  Q    And how, if at all, did the defendant respond?
23  A    He said no one would like to hear that song, that wasn't
24  a popular song.
25  Q    Do you recall whether or not he said anything about your

1   voice?

2   A    No.

3   Q    And about how long were you, Stephanie and her mother in

4   the studio for on that occasion?

5   A    30 minutes.

6   Q    At the time, where was Stephanie living?

7   A    We were roommates.  We had an apartment together.

8   Q    In Chicago?

9   A    Yes, ma'am.

10  Q    And at the time, did you have an understanding that

11  Stephanie was seeing the defendant?

12  A    Yes, I knew she had met him, yes.

13  Q    Did you ever meet any of the defendant's associates or

14  employees?

15  A    Yes, one by name.

16  Q    Who do you recall meeting?

17  A    His name was Blackie.

18  Q    I'm showing you what's in evidence as Government Exhibit

19  8.  Do you recognize this person?

20  A    Yes.

21  Q    Who is that?

22  A    That would be Blackie.

23  Q    Now, did there come a time when you saw the defendant

24  outside of Chicago?

25  A    Yes.

Lee - direct - Shihata                              2903

1    Q    Where did you see him?

2    A    In Orlando, Florida.

3    Q    Around when was that?

4    A    This was maybe a month or so after I sang for him in the

5    studio.

6    Q    And how was it that you ended up in Orlando at that time?

7    A    Stephanie invited.  She asked could I come along with

8    her, that she would be going and she wanted me to come along.

9    Q    And did you have an understanding of who Stephanie was

10   going to be going to see in Orlando?

11   A    Yes.

12   Q    And who was that?

13   A    R. Kelly.

14   Q    Who, if anyone, made the arrangements for you and

15   Stephanie to travel to Orlando?

16   A    I'm not exactly sure.

17   Q    Do you recall speaking to anyone on the phone or

18   providing any information to anyone to make those travel

19   arrangements?

20   A    Yes, I spoke with Blackie.

21   Q    Did you -- who, if anyone, did you understand was paying

22   for your travel?

23   A    I didn't know who was paying.

24   Q    Okay.  Did you pay?

25   A    No, ma'am.

Lee - direct - Shihata                     2904

1  Q    Okay.  Now, about how long did you travel to Orlando for?

2  A    You mean the duration of the trip?

3  Q    Yes, the duration of the trip.

4  A    We were there for maybe two days.

5  Q    And what, if anything, happened after you arrived in

6  Orlando?

7  A    Nothing.  We arrived the first day and there was no one

8  home.  We were there -- well, we were there pretty much for

9  the night by ourselves.

10 Q    And do you recall what kind of home it was or where you

11 were staying?

12 A    Yeah, it was like a vacation community, all of the homes

13 were identical and it was several of them, you know, several

14 kind of blocks and streets of homes.  So I was assuming it was

15 a rental home.

16 Q    Okay.  And had you ever been to Orlando before?

17 A    No.

18 Q    Now, the first day, the day you arrived, did you go

19 anywhere that day other than the rental home?

20 A    No.

21 Q    And how about the next day?

22 A    Later in the afternoon we did.

23 Q    Later in the afternoon the next day?

24 A    The next day, yes.

25 Q    And what happened then?

Lee - direct - Shihata                          2905

1   A     We were picked up and taken in like separate vehicles to

2   the mall.  I rode in a white van, kind of like a cargo

3   passenger van and she rode in a -- with the defendant in a

4   like roadster, like a motorcycle type sports car ahead of us.

5   Q     Okay.  And you recall going to the mall; is that right?

6   A     Yes.

7   Q     About how long did you spend at the mall?

8   A     Maybe an hour or so, hour and a half.

9   Q     And do you recall if any of the defendant's associates

10  went with you?

11  A     Yes.  There was two other gentlemen.  I don't know names

12  at all and I believe Blackie was there as well.

13  Q     Okay.  And after the mall, did you go anywhere?

14  A     We went to the studio.

15  Q     And is that a recording studio?

16  A     Yes, a music studio.

17  Q     Did everyone go?

18  A     No.

19  Q     Who do you recall went to the studio?

20  A     Stephanie and I.

21  Q     Was that again in separate cars?

22  A     Yes, we were dropped off separately.

23  Q     Okay.  And what did you do once you got to the recording

24  studio?

25  A     I slept.

Lee - direct - Shihata                    2906

1   Q    Do you remember where you were taken or where that
2   happened?
3   A    It was kind of like a kitchenette room.  It had a large
4   couch and that's where I was told to wait.
5   Q    And did you know where Stephanie was at that time?
6   A    She was with Rob, I assumed.  I assume.
7              MR. CANNICK:  I'm objecting.
8              THE COURT:  She wasn't there, in other words, right?
9              THE WITNESS:  I'm sorry?
10             THE COURT:  Do you know where she was?
11             THE WITNESS:  She was in the building with me.  We
12  both entered together, however, I was sent to a separate room
13  and she was sent somewhere else.
14             THE COURT:  I see.
15  Q    You said you fell asleep; is that right?
16  A    Uh-hum.
17  Q    At some point were you awakened?
18  A    Yes.
19  Q    By what or by whom?
20  A    Stephanie woke me up and she was very upset and she had
21  complained --
22             MR. CANNICK:  Objection.
23             THE COURT:  Sustained.
24  A    Stephanie woke me up --
25             THE COURT:  No, that means that --

                          Sidebar                    2907

1            MS. SHIHATA:  Your Honor, may we have a sidebar?

2            THE COURT:  Sure.

3            (Sidebar conference held on the record out of the

4       hearing of the jury.)

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                         2908
 1              (Sidebar.)
 2              MS. SHIHATA:  Stephanie testified her -- on
 3   cross-examination her credibility was challenged.  She was
 4   accused of essentially making up the entire thing.  She was
 5   asked questions about no pictures having ever been taken
 6   between her and the defendant, no public outing*.  This is a
 7   prior consistent statement at the time of the events.
 8              THE COURT:  The people are running together a little
 9   bit.  Did she testify about this incident?
10              MS. SHIHATA:  Yes.
11              THE COURT:  For some reason I thought it was
12   somebody else.
13              MS. SHIHATA:  No, Stephanie testified while in
14   Orlando there was an incident at the studio where the
15   defendant told her to give him oral sex.
16              THE COURT:  Right, and then he left it on -- okay.
17              MS. SHIHATA:  Yes.
18              THE COURT:  You are offering that as an excited
19   utterance?
20              MS. SHIHATA:  It is a prior consistent statement.
21   Her credibility was challenged.
22              THE COURT:  What's your response?
23              MR. CANNICK:  She refuted it.
24              Your Honor, I don't think I cross-examined her.  Ms.
25   Becker --
```

```
                         Sidebar                      2909
```

1          THE COURT:  Oh, I remember.

2          MR. CANNICK:  -- cross-examined her and she

3    basically stood her ground.  She was questioned about it, but

4    she didn't relent.

5          THE COURT:  I think it is your position that it

6    didn't happen.  The fact that she reported it immediately

7    after tends to support it.

8          I do now recall this witness and she was challenged,

9    which is obviously your right to do, but a prior consistent

10   statement before the motive to fabricate arose is admissible,

11   so you can have an exception to the ruling.

12         MS. SHIHATA:  Thank you, Your Honor.

13         (Sidebar concluded.)

14         (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

Lee - direct - Shihata                    2910

1           THE COURT:  All right.  The objection is overruled.

2   Go ahead.

3           MS. SHIHATA:  Thank you.

4   BY MS. SHIHATA:

5   Q    Before we just took that little break, you were

6   testifying that you were awoken by Stephanie; is that right?

7   A    Correct.

8   Q    And I think you testified she was very upset?

9   A    Yes.

10  Q    And what did she tell you?

11  A    She told me that in the separate room she was in that the

12  defendant had come in and she had performed oral sex on him

13  and when he ejaculated, he did it on her face and he would not

14  let her wipe it off.  He told her that she would have to walk

15  down the hall to the other bathroom to wipe it off her face.

16  Q    What state was Stephanie in when she told you this?

17  A    Upset.  She was...upset.

18  Q    Now, what, if anything, happened the next day?

19  A    I just remember us going home.

20  Q    Back to Chicago?

21  A    That's correct, in the morning.

22  Q    Now, you testified you lived with Stephanie in this time

23  period; is that right?

24  A    Yes.

25  Q    And during that time, what, if anything, did Stephanie

Lee - direct - Shihata                    2911

1    tell you regarding her interactions with the defendant while

2    she was living with you?

3              MR. CANNICK:  Objection.

4              THE COURT:  Overruled.  I take it it's the same --

5              MS. SHIHATA:  Yes.

6              THE COURT:  The objection is overruled.

7    A    She had mentioned like he -- we were bad girls, we were

8    smoking cigarettes and he didn't like cigarette smoking, so

9    she would have to be sure not to smell like smoke when she was

10   around him, stuff like she would have to call him daddy.

11   Q    Did she indicate that the two of them had sex?

12   A    Yes.

13   Q    What, if anything, did Stephanie tell you about whether

14   she had been to the defendant's home?

15   A    She said she had.  She mentioned there were baby items

16   around the house and she also mentioned a camera that she saw

17   in the bedroom.

18   Q    Now, when was the last time that you saw Stephanie?

19   A    20 years, maybe, 18 years.

20   Q    Ago?

21   A    Yes.

22   Q    And when was the last time you spoke to Stephanie?

23   A    Maybe ten years ago.

24   Q    What were the circumstances of that?

25   A    Her grandmother had passed away and she had asked me to

Lee - cross - Cannick                        2912

1  sing at the funeral.

2  Q    Did you end up doing that?

3  A    No.

4         MS. SHIHATA:  No further questions.

5         THE COURT:  All right.  Cross-examination?

6         MR. CANNICK:  Yes, Your Honor.

7  CROSS EXAMINATION

8  BY MR. CANNICK:

9  Q    You testified and told us that there was a situation that

10 happened at the studio and you were in this particular room

11 and Stephanie came in?

12 A    Yes.

13 Q    Okay.  And you said that you had been asleep?

14 A    Yes.

15 Q    Okay.  And you testified that she told you about

16 something that supposedly happened to her between her and Mr.

17 Kelly?

18 A    Yes.

19 Q    Now, you didn't see that; am I correct?

20 A    No, sir.

21 Q    Okay.  And after Stephanie told you that, what did you do

22 next?

23 A    Can you be more specific?

24 Q    Well, after she told you what she explained happened to

25 her, what did you do?

1    A    Hugged my friend.

2    Q    That's not my question.  I'm not asking about your

3    relationship.  I'm asking what did you do next after she told

4    you that?

5    A    I'm not exactly sure how you would like me to respond.

6         My actions were to hug my friend, so I'm not --

7    Q    Now, what did your friend do?

8    A    She was very sad, so she hugged me back.

9    Q    I'm not asking you about her state of mind.

10   A    Okay.

11            MS. SHIHATA:  Objection, Your Honor.

12            THE COURT:  No.  Overruled.  You might be more

13   specific about what you're trying to -- information you're

14   trying to find out.

15            MR. CANNICK:  Right.

16   BY MR. CANNICK:

17   Q    After she divulged this information to you, did she

18   remain in that room with you?

19   A    Of course.

20   Q    Okay.  How long did the two of you stay in that room?

21   A    Maybe another 10, 15 minutes.

22   Q    And what happened after -- where did you go after 10,

23   15 minutes?

24   A    We were taken back to the vacation house.

25   Q    And after being taken back to the vacation house, did you

1    see Mr. Kelly again that day?

2    A    No.

3    Q    Do you know whether or not Stephanie was with him again

4    that day?

5    A    She was not.

6    Q    Okay.  What about the next day, was she with him the next

7    day?

8    A    We were on a flight.

9    Q    No.  My question is was she with him the next day?

10   A    No.

11   Q    Now, what time was the flight?

12   A    Morning.

13   Q    Morning, and what time did this conversation between you

14   and Stephanie allegedly was had at the studio?

15   A    The day before?

16   Q    Yes.

17   A    Maybe six, seven o'clock.

18   Q    Okay.  And you don't recall what time you got to the

19   studio?

20   A    Maybe 3:00.

21   Q    Okay.  And you testified that you had this conversation.

22   Do you have any idea as to what time you had this

23   conversation?

24   A    Again, it was about 15, 20 minutes before we left, so

25   maybe fourish, five, but we weren't there very long.

Lee - cross - Cannick                    2915

1   Q    Now, you testified and told the jury early on that you

2   did audition for Mr. Kelly and he was very unimpressed?

3   A    Yes.

4   Q    Now, basically, you've told the Government when you

5   interviewed with them, you told them that Mr. Kelly, you

6   realized that he could not help you; is that correct?

7   A    Yes.

8   Q    Okay.  And you realized that he could not help you

9   because you sung a different kind of music than he; am I

10  correct?

11  A    Correct?

12  Q    In fact, you went and you gave -- you sung a song for a

13  musical, not something that was R&B; correct?

14  A    Correct.

15  Q    When you went there, you knew Mr. Kelly was an R&B

16  legend; am I correct?

17  A    Yes.

18  Q    And you opted to sing a musical?

19  A    Correct.

20  Q    Did you think that he would be impressed with the

21  musical?

22  A    I was a musical theater major at school.

23  Q    No. I didn't ask what you majored in at school.  I asked

24  did you think he would be impressed with you singing a

25  musical?

Lee - cross - Cannick                    2916

1    A    I didn't.

2    Q    But you sung one anyhow?

3    A    Yes.

4    Q    Now, you mentioned a person by the name of Blackie.  You

5    were dating Blackie; am I correct?

6    A    No.

7    Q    You did not date Blackie?

8    A    We did not date.  We didn't know each other long enough

9    to date.

10   Q    Okay.  Well, you hung out with Blackie?

11   A    One time.

12   Q    One time?

13   A    I mean, it might have been at the studio another time or

14   so.  It wasn't a relationship.  We didn't have each other's

15   phone numbers.

16   Q    Okay.  When you said at the studio another time, what

17   studio are you talking about?

18   A    Random studios.  I'm not exactly sure of every address

19   and this was 20 years ago, so I can't tell you specifically

20   the names of the studio.

21   Q    So you saw him in other cities after that --

22   A    No, sir.  Chicago.

23   Q    You saw him in Chicago?

24   A    Yes.

25   Q    Let me back up.  The initial time you saw him at the

Lee - cross - Cannick                    2917

1   studio was in Orlando; am I correct?

2   A    No, sir.

3   Q    You didn't see him at the studio in Orlando?

4   A    Oh, yes.  I saw him at the studio, but that was not the

5   initial.

6   Q    So you saw him before that day?

7   A    Yes.

8   Q    And you saw him at the studio in Chicago before that day

9   for the audition?

10  A    Yes.

11  Q    And after seeing him at the studio in Chicago, after you

12  auditioned, did you see him at any other time before going to

13  Orlando?

14  A    No.

15  Q    So it's your testimony to this jury that you only saw him

16  twice?

17  A    Maybe three times.

18  Q    Maybe three times.  Do you have a recollection as to that

19  third time?

20  A    No.

21  Q    Did you see him in a social capacity?

22  A    Maybe at a party.  I don't think he recognized me,

23  though.

24  Q    I'm asking you when you had another encounter with him

25  other than those two occasions, was there ever a situation

```
                          Sidebar                          2918

1    that the two of you were alone purposely with each other?

2              MS. SHIHATA:  Your Honor, objection.

3              THE COURT:  Sustained.

4              Let me see the parties at the side with the court

5    reporter, please.

6              (Sidebar conference held on the record out of the

7    hearing of the jury.)

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                         Sidebar                      2919
```

1              (Sidebar.)

2              MR. CANNICK:  I could answer that another way.  I'm

3       almost done with this, because in the 302 she told the

4       Government --

5              THE COURT:  But what's the relevance?

6              MR. CANNICK:  I can connect.

7              THE COURT:  But it sounds to me a piece of the same

8       conversations that we have had about her.  I mean, it sounds

9       like it is going on the road of asking about her history.

10             MR. CANNICK:  Not at all.  That comes with --

11             MS. SHIHATA:  Your Honor, she is not a victim in

12      this case.  She is talking about her own experience.  I don't

13      understand how any of this is relevant.

14             MR. CANNICK:  It is going more towards her

15      credibility.

16             THE COURT:  But I don't get it.  I'm sure it is my

17      own fault, but what about whether or not she knew Blackie, how

18      is --

19             MR. CANNICK:  They were the ones who brought in

20      Blackie.

21             THE COURT:  I know, but I don't get it.  What about

22      it makes her not credible?

23             MR. CANNICK:  Because, basically, it's our

24      information that she was there, they hung out, they had a

25      great time, and it was her and Blackie and my client and this

                          Sidebar                          2920

1    other girl.

2              THE COURT:  It goes in the category of nice to know.

3    Does that make a person a liar?

4              MR. CANNICK:  She is saying Stephanie had a horrible

5    time.  They were treated horribly and our position is it's far

6    from that.

7              THE COURT:  That's different than asking her if she

8    dated Blackie.  I don't have any problem if you want to probe

9    her.  I don't recall that she said they had a horrible time.

10   She talked about that one conversation, but if that's --

11   that's okay.  Again, marginally relevant, if at all.

12             And is *My Funny Valentine* really from a musical.

13             MR. CANNICK:  I think it is.

14             THE COURT:  I thought it was just an old song.

15             MR. CANNICK:  I think it is.

16             THE COURT:  Just a couple of more questions.

17             MR. CANNICK:  Sure.

18             (Sidebar concluded.)

19             (Continued on the following page.)

20

21

22

23

24

25

1      THE COURT:  All right.  Are you done?  Do you have

2   another question for this witness?

3      MR. CANNICK:  Yes.

4   BY MR. CANNICK:

5   Q    Now, when you interviewed with the Government --

6      THE COURT:  Let's turn on the microphone.

7   Q    When you interviewed with the Government back on June 18,

8   2019, didn't you tell them that you dated Mr. Kelly's cousin

9   Blackie for a short period of time?

10  A    Dated, again, is loosely.

11  Q    Beg your pardon?

12  A    Dated is loosely, as a loose term.

13  Q    But that's what you told them; right?

14  A    That might have been how they asked me.

15  Q    Now, you testified and you told us that when you were

16  picked up from the vacation home and taken to the mall, you

17  went into two different cars?

18  A    Yes, in separate vehicles.

19  Q    And the car that Stephanie rode in was a two-seater?

20  A    Yes, sir.

21  Q    Okay.  And then, of course, the vehicle that you and

22  Blackie were in, that was some type of van?

23  A    There were two other gentlemen as well.  There were four

24  of us in the van.

25  Q    All right.  But Blackie was in there with you?

Lee - cross - Cannick                    2922

1   A    Yes.

2   Q    And it was a van?

3   A    Yes.

4   Q    Now --

5        MR. CANNICK:  I'm almost there, Your Honor.

6   Q    Mr. Kelly, do you recall how long was -- did Mr. Kelly

7   and Stephanie dated?

8   A    You're asking me?

9   Q    Yes.  You're the only person --

10       THE COURT:  I think you might have called her by the

11  wrong name, but I'm not sure about that.  Go ahead.

12       MS. CRUZ MELENDEZ:  You said Mr. Kelly by accident.

13  Q    Do you recall how long Mr. Kelly and Stephanie dated?

14  A    Maybe four or five months.

15  Q    Would six sound correct?

16  A    Sure.

17  Q    And during that time you saw gifts that Mr. Kelly bought

18  for Stephanie, am I correct?

19  A    I can't hear you.

20  Q    During that period you saw gifts that Mr. Kelly bought

21  for Stephanie; am I correct?

22  A    I don't know.

23  Q    Well, didn't you tell the Government that you saw gifts

24  that he boughted [sic] for her, that he bought for her?

25  A    I don't remember.

Lee - cross - Cannick                    2923

1   Q    Okay.  Let's see if this refreshes your recollection.

2          THE COURT:  Just tell the Government what you are

3   looking at.

4          MR. CANNICK:  3 of 3.

5   Q    Directing your attention to the upper portion that's

6   highlighted.

7   A    Okay.  Should I read?

8   Q    No, don't read it.  Just see if it refreshes your

9   recollection.

10  A    It says that I don't remember a particular gift.

11  Q    Okay.  You don't remember telling the Government that the

12  Government -- that Mr. Kelly bought gifts, but you don't

13  remember the particular gift?

14  A    As I said, I don't remember any particular gifts.

15  Q    But he bought gifts?

16  A    Sure, yes.

17  Q    And you went on to tell the Government that you saw those

18  gifts to be part of the dating between the two of them?

19         THE COURT:  Did you -- what did you think the gifts

20  were?

21         THE WITNESS:  I'm assuming clothes and jewelry, you

22  know.  We were young.

23         THE COURT:  Well, that was a badly phrased question

24  on my part.  But did you see that this was part of the dating

25  process?

MDL      RPR      CRR      CSR

```
                        Proceedings                      2924
```

1          THE WITNESS:  Yes.

2          MR. CANNICK:  I think that may be it, Your Honor.

3          THE COURT:  Okay.

4          MS. SHIHATA:  Nothing further from the Government.

5          THE COURT:  Are you done, Mr. Cannick?

6          MR. CANNICK:  Yes, I am.

7          THE COURT:  Thank you so much.

8          You can step down.  And let's bring back the other

9   witness.

10          (Witness leaves the stand.)

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (continuing.)

2    ANNA,

3        called as a witness, having been previously duly

4        sworn, was examined and further testified as follows:

5            THE COURT:  The witness is reminded she is still

6    under oath.

7            THE WITNESS:  Yes.

8            THE COURT:  Go ahead Mr. Cannick.

9            MR. CANNICK:  Thank you.

10   CROSS-EXAMINATION

11   BY MR. CANNICK:

12   Q    You testified and told us earlier about your relationship

13   with Mr. Kelly.  How long were you in that relationship?

14   A    About three years.

15   Q    And the Government asked you this morning to describe the

16   nature of the relationship and your description was that it

17   was a sexual relationship in nature?

18   A    I wouldn't say all of it was, but what do you mean in

19   nature?

20   Q    You answered the Government's question this morning.

21   They asked you what did you -- how did you view the

22   relationship, the nature of it and you said it was a sexual

23   relationship.

24   A    I don't recall ever saying that.

25   Q    You don't recall saying that because that would not be

Anna - cross - Cannick                    2926

1    true, am I correct?

2    A    I don't understand what you're saying.

3    Q    It would not be true to characterize your relationship

4    with Mr. Kelly as just a sexual relationship; am I correct?

5    A    Correct.

6    Q    Because you would go out; am I correct?

7    A    Correct.

8    Q    You would go shopping all the time; am I correct?

9    A    A lot of the time, correct.

10   Q    Almost every week you would go shopping; am I correct?

11   A    Correct.

12   Q    And he would take you out to dinner almost every other

13   day; am I correct?

14   A    Often.

15   Q    And cigar bars?

16   A    Correct.

17   Q    Starbucks?

18   A    Correct.

19   Q    Now, you would boast about the relationship, am I

20   correct?

21   A    Once or twice I have before.

22   Q    In fact, he didn't like that, right?  He being Robert?

23            THE COURT:  I did not hear what you said --

24   Q    In fact he did not like that and he asked you not to do

25   that, right?

1           THE COURT:  Sorry?

2   A    After the fact of a post being posted, he didn't like

3   that and that's when my social media wasn't up anymore, but

4   there was a time when he actually did want me to post.

5   Q    Now, his reasoning to not want can you to post was a

6   security concern of his, am I correct?

7           MS. CRUZ MELENDEZ:  Objection.

8           THE COURT:  Overruled.

9   A    I don't recall that.

10  Q    You don't recall him telling you that --

11  A    For security reasons, no.

12  Q    Okay.  And he told you as well that you couldn't just do

13  things because of his celebrity and his status and it would

14  expose him to unnecessary risk?

15  A    When you say do things --

16  Q    Post, leave the bus, not have someone escort you?

17          THE COURT:  You know, that's quite a compound

18  question.  Do you want to break it down a little bit, please?

19          MR. CANNICK:  Yes.

20  BY MR. CANNICK:

21  Q    He would tell you that if you were to just get off the

22  van and no -- the Sprinter van or the bus and no one was with

23  you that could expose you as well as him to a security risk;

24  is that correct?

25  A    Down the line I feel like when like I said a lot of this

1  roared up, that's what he would sometimes say, but I wouldn't

2  say all the time, no.

3  Q    But he would say it?

4  A    Down the line, yes.

5  Q    And you testified and told the jury earlier that Robert

6  controlled you?

7  A    Yes.

8  Q    How did he control you?

9  A    In ways of controlling what you wear, what I did with my

10  phone, traveling and not being able to leave the Sprinter to

11  use the restroom.  I can keep going.

12  Q    You would not be able to use --

13  A    Well, a bathroom stall.

14  Q    I'm sorry, what do you mean bathroom stall?

15  A    A toilet.

16  Q    What about it?

17  A    I just said I wouldn't be able to use the restroom, so I

18  am clarifying.

19  Q    When you say you couldn't use the bathroom stall, what do

20  you mean?

21  A    You asked in what ways was he controlling.

22  Q    Right.

23  A    So, not, I use the ballroom stall now, so not being able

24  to freely get off the Sprinter to use the restroom or if we

25  were at a certain place, I couldn't just walk up to use the

Anna - cross - Cannick                    2929

1  restroom.

2  Q    And you don't think that all of that was just because he

3  was controlling, not because there were security issues?

4  A    I would say sometimes it could have been security issues,

5  but not all the time, no.

6  Q    The Sprinter was rather distinctive was it not?

7  A    In what way?

8  Q    Well, when you saw it -- it was customized, am I correct?

9           MS. CRUZ MELENDEZ:  Objection.

10           THE COURT:  Overruled.

11  A    I don't know if it was customized.

12  Q    It had blinds on it, you couldn't see it?

13  A    If the blinds were up, no.

14  Q    When you say the blinds were up, if you were in the

15  outside of the van, the Sprinter, could you see inside?

16  A    No.

17  Q    And you have no idea why those blinds were put in that

18  position?

19           THE COURT:  When you say the blinds are up --

20           MR. CANNICK:  She said it's up.  I thought it was

21  down.

22           THE COURT:  I do not know, I think of blinds being

23  up that you can see.

24           THE WITNESS:  The blinds were where you pull them up

25  not down.  They came from the bottom up.

Anna - cross - Cannick                    2930

1          THE COURT:  And so they covered the windows -- so

2     the blinds come up and that's how they covered the window.

3          THE WITNESS:  Correct.

4          THE COURT:  Go ahead.

5     BY MR. CANNICK:

6     Q    So when you were outside you could not see inside the

7     Sprinter; correct?

8     A    Correct.

9     Q    And you don't think that that was for security reasons?

10    A    It could have been, but I wouldn't say all the time.

11    Q    Okay.  And do you recall giving an interview on a radio

12    program called No Chill Radio?

13    A    Yes.

14    Q    And you did that interview on October 1, 2019 -- I'm

15    sorry.  August 1, 2019?

16    A    I don't remember the date.

17    Q    But you do remember the interview?

18    A    Correct.

19    Q    Now, in that interview you told the interviewers --

20    because there were several folks participating other than

21    yourself; correct?

22    A    The other people that were part of the radio, yes.

23    Q    So there was a primary host, an African American male; am

24    I correct?

25    A    Yes.

Anna - cross - Cannick                    2931

Q    And there were two other males in the room?

A    Correct.

Q    And you told them that much of what people were hearing

about R. Kelly and the relationship, yours as well as the

other women were untrue; that's what you told them, right?

A    I didn't know if I said untrue.  I didn't go into details

of that because I felt like-

Q    I'm not asking --

          THE COURT:  So you can't cut her off.  It's hard on

the court reporter and you have to let her finish her answer.

          MR. CANNICK:  Even if she's not being responsive?

          THE COURT:  Let her finish her answer, please.

A    I forgot where I was --

Q    Did what you told --

          MS. CRUZ MELENDEZ:  Objection, Your Honor.  Can she

have a moment to think?

          THE COURT:  You were testifying about the interview

you gave --

A    Saying that nothing was true.  Yes, I didn't feel like

speaking bad about him publicly in any type of way, even like

today, you know, I have to be here and this is something that

I have to do.  So it's a little different.  So that was why I

was speaking more on a positive note about him.

Q    So, when you told them that you didn't experience any of

those things, you were lying to them?

1   A     I could have been.

2   Q     You could have been or were you?

3   A     I don't recall the interview and exactly what I said so I

4   don't know.

5           MR. CANNICK:  Your Honor, I want to play it so I can

6   refresh your recollection as to what she said.

7           THE COURT:  What is the best way to do that?  Do you

8   have headphones?

9           MR. CANNICK:  I think we're going to try to get some

10  headphones so we can have her listen.  I know we have them.

11          THE COURT:  We don't have a transcript, do we?

12          MR. CANNICK:  Just written for important me, Your

13  Honor.

14          I could move on to another area and come back to

15  this once we figure it out.

16          THE COURT:  Sure.  Let's do that.

17  BY MR. CANNICK:

18  Q     Now I want to go back to when you met Mr. Kelly.  You

19  went to his concert and the concert was where?

20  A     Columbia, South Carolina.

21  Q     And you had All Access E-tickets; correct?

22  A     I don't remember what type of ticket I had.

23  Q     Okay.  And you were there with your mother?

24  A     Correct.

25  Q     And eventually at some point after the show you went back

Anna - cross - Cannick                            2933

1   stage and met Mr. Kelly?

2   A    Correct.

3   Q    Your mother was with you?

4   A    Correct.

5   Q    And there came a point in time that you engaged in

6   conversation with him?

7   A    Correct.

8   Q    And he basically your mother had been telling him about

9   your interest in modeling?

10  A    I'm not sure.

11  Q    And isn't it a fact that at some point your mother left

12  the room and you went on to tell Mr. Kelly that, you know,

13  your mother is a little over the top about your modeling?

14  A    I don't recall that happening at all.

15  Q    And do you recall Mr. Kelly telling you that a mother is

16  never over the top when she's supporting a child?

17  A    I don't recall that conversation.

18  Q    Okay.  Do you recall this:  That after a point in time

19  the conversation changed and Mr. Kelly was asking about if you

20  knew where the after parties were?

21  A    I don't remember that conversation.

22  Q    You don't remember.  Do you recall Mr. Kelly then asking

23  you about cigar bars?

24  A    He could have.

25  Q    I'm asking do you recall?

1    A    I don't recall, no.

2    Q    And do you recall exchanging numbers with him?

3    A    Yes.

4    Q    And do you recall that after about -- the passage of

5    about three months you called him?

6    A    Correct.

7    Q    And you had a conversation with him?

8    A    Correct.

9    Q    And then there came a point in time another lapse of

10   about two to three months and you called him again?

11   A    I don't -- I know it was like two or three months that we

12   didn't speak and when I did speak to him again it was a couple

13   of weeks later and I was in Atlanta, so --

14   Q    And there came a point in time -- withdrawn.

15        During those times that you weren't speaking he did

16   not reach out to you; am I correct?

17   A    I can't remember.

18   Q    Well, you reached out to him; am I correct?

19   A    I know at one point I did, but before that I don't

20   remember if he reached out to me.

21   Q    And when you were in Atlanta, you reached out to him one

22   afternoon, one Saturday afternoon?

23   A    I don't really know how it was organized.  I just know

24   when I did come to Atlanta, we got together at his house and

25   we went to a cigar bar and, yeah.

1    Q    Okay.  When you went to the cigar bar you hung out for a
2    while?
3    A    Yes.
4    Q    And eventually you went back to his place?
5    A    Yes.
6    Q    Now, after you went back to his place you hung out and
7    then you spent the night?
8    A    I don't know if I spent the night.  I do know I was
9    staying -- he got me a hotel or the assistant.  I don't think
10   I spent the night at his house the first couple of nights.  I
11   believe I went back to the hotel.
12   Q    Okay.  So now do you recall spending the night and
13   getting up the next morning to go to Starbucks?
14   A    No.  We could have went to Starbucks, but I don't recall
15   spending the night.
16   Q    Now, you -- do you recall meeting him at another venue
17   and you were with your -- a friend or another female?
18   A    I know I didn't have -- I know I had friends come to a
19   show.  I don't remember which show.
20   Q    And do you remember meeting him at his hotel, your friend
21   left and you and he walked and talk for about four hours?
22   A    Yes, I do remember that.
23   Q    Do you remember what city that was in?
24   A    I remember there was a gay pride event.  I think maybe
25   Charlotte.

Anna - cross - Cannick                    2936

1   Q    And there came a point in time that you started seeing

2   him regularly; is that correct?

3   A    Correct.

4   Q    There were times that you would go out to a club; am I

5   correct?

6   A    Correct.

7   Q    And then after leaving the club you would go over to his

8   house?

9   A    Correct.

10  Q    And that happened very frequently; am I correct?

11  A    Yes.

12  Q    And you had your apartment?

13  A    I had an apartment, but I only stayed there for, like,

14  maybe a week out of the whole year that I had it.

15  Q    But you had an apartment?

16  A    Correct.

17  Q    And when you -- there came a point in time that you would

18  stay with Mr. Kelly relatively consistently?

19  A    Yes.

20  Q    But you would go back and forth to your apartment; am I

21  correct?

22  A    Not often.

23  Q    Okay.  Well you did -- did you tell him that you were

24  going back to your apartment?

25  A    No.

Anna - cross - Cannick                    2937

1   Q    Did there come a time when he started paying for that

2   apartment?

3   A    Yes, when we were traveling a lot and I was not there.

4   Q    And when you would leave did you go back and forth to

5   your parents'?

6   A    When I would leave in what way?

7   Q    When you would leave Robert's home did you go, if not to

8   your apartment, to your parents?

9   A    No, I didn't go home often.

10  Q    Okay.  So most of your time you spent with Robert?

11  A    Correct.

12  Q    But you could come and go as you pleased; am I correct?

13  A    I would say yes, but if I would leave -- unless there was

14  like an incident where there was an argument or something like

15  that, but I didn't go home that often unless we got into an

16  argument or something and I would leave.

17  Q    But you would get into arguments relatively often; am I

18  correct?

19  A    Yes.

20  Q    And when you got into an argument you left Robert many

21  times; am I correct?

22  A    Yes.

23  Q    Now even if you didn't go home, you left, am I correct?

24  A    Correct.

25  Q    And you left whenever you wanted to; am I correct?

SN        OCR        RPR

Anna - cross - Cannick                    2938

1   A    Correct.

2   Q    And he didn't get in front of the door and chain you down

3   or anything like that; am I correct?

4   A    Unless I was leaving with something that he bought.

5   Q    Right.  So unless you were leaving with something he

6   bought, he would not stop you or talk to you about it and you

7   could walk away; correct?

8   A    Correct.

9   Q    And you never left with anything that he bought; am I

10  correct?

11  A    Shoes on my feet.  I tried to leave with shoes on my

12  feet.  The dog that he bought me.  Maybe a bag or a bookbag

13  that I had.  Clothes because the only clothes that I had were

14  the clothes he purchased.  So of course I tried to leave with

15  some of that.

16  Q    He bought you a lot of stuff?

17  A    Yeah.

18  Q    The dog was a Christmas gift; am I correct?

19  A    Correct.

20  Q    He would take you on shopping sprees all the time; am I

21  correct?

22  A    Correct.

23  Q    And he even paid for your cosmetic surgeries; correct?

24  A    Correct.

25  Q    At least two; am I correct?

Anna - cross - Cannick                    2939

1   A    Correct.

2   Q    And would you ask him to give money to anyone in your

3   family?

4   A    No.

5   Q    Do you know whether or not anyone in your family asked

6   him to give them money?

7   A    Not to my knowledge.

8   Q    Now, there came a point in time that Rob wanted you to --

9   there came a point in time that your mother wanted you to come

10  home for Christmas; correct?

11  A    Correct.

12  Q    Didn't he encourage you to go home for Christmas to be

13  with your family?

14  A    I remember him encouraging it but I also do remember

15  there was an issue with that.  I don't remember what exactly

16  the issue was, but it -- there was an issue.  I just don't

17  remember what the issue was.

18  Q    But he encouraged it?

19  A    Yes.

20  Q    And he told you that when you returned you would

21  celebrate Christmas at his place; correct?

22  A    Yes.

23  Q    And he also gave you a birthday party?

24  A    Correct.

25  Q    In fact, where was that birthday party?

Anna - cross - Cannick                    2940

1    A    The house, the main house in Atlanta.

2    Q    And isn't it a fact that he flew his entire band there to

3    perform for your birthday party?

4    A    Yes.

5    Q    And your mother was at that birthday party; correct?

6    A    Correct.

7    Q    And your friends?

8    A    Correct.

9    Q    It was a big gala affair; am I correct?

10   A    Correct.

11   Q    You posted about it?

12   A    Correct.

13   Q    Now, what birthday party was it?

14   A    I think it might have been my -- I don't remember.

15   Q    How long were you with him before you had that party?

16   A    Maybe, like, a year.

17   Q    And he would have parties for his other friends who were

18   living with him, other girlfriends who were living with him;

19   am I correct?

20   A    Yes.

21   Q    And, in fact, there was a particular party where -- that

22   he had for Joy.  Do you remember that?

23   A    Yes, when I first came and met everybody.

24   Q    And he gave you money as well as all the other

25   girlfriends to go out and buy gifts for Joy; correct?

1    A    Correct.

2    Q    And your mother attended that party; am I correct?

3    A    No.

4    Q    Your mother wasn't at that party?

5    A    She was not at that party, no.  There was two parties for

6    Joy; one at the beginning and then one at the studio down the

7    line.  She was at that one.  She was at that one depending on

8    which party you are talking about.

9    Q    Now, these parties, describe them for me, Joy's?

10             THE COURT:  Which one?

11   Q    The first one.

12   A    The first one was at the big house as well, the main

13   house in Atlanta.  That was a pool party.  That's when I first

14   came around and to my knowledge I was told that that was a

15   good friend of his.  It was her birthday so he was throwing a

16   big party for her and that's when he was like you're just

17   meeting her.  He gave me money to get her a nice gift and I

18   was, like, cool.

19   Q    That wasn't the only time he gave you money; correct?

20   A    No.

21   Q    And, in fact, there was a point when you went with him to

22   a show, I think it was in New York and he gave you and someone

23   else a wad of money; am I correct?

24   A    Correct.

25   Q    And what did you do with the money?

Anna - cross - Cannick                      2942

1   A    I don't remember.

2   Q    You spent it?

3   A    I'm sure.

4   Q    Do you recall how much money it was?

5   A    It could have been, like -- maybe, like, 2,000.

6   Q    Okay.

7   A    I don't remember.  Something like that.  It was just a

8   wad of different bills, so --

9   Q    So the wad of money that you described this wad of

10  different bills that equals about $2,000?

11  A    It could have been, yeah.

12  Q    But as you sit here today --

13  A    I don't remember the exact number.

14  Q    Okay.  And you testified and told us that Robert had

15  assistants?

16  A    Correct.

17  Q    Okay.  Do you know what the role or responsibilities of

18  the assistants was?

19  A    Really to be there for anything we needed or questions we

20  had if we couldn't reach him, ask them.

21  Q    Any questions we needed you are talking about someone who

22  was in your capacity; correct?

23  A    Yes, me or one of the other girls.

24  Q    And basically these assistants were there to make sure

25  that you had information and you had service, am I correct?

Anna - cross - Cannick                    2943

1          MS. CRUZ MELENDEZ:  Objection.

2          THE COURT:  Overruled.

3          Is that why they were there?

4          THE WITNESS:  Correct, but still really wouldn't

5    move unless they had permission on certain things.

6    Q    My question is the purpose --

7    A    Was for us, yes.

8    Q    And how many of them were there for you and your

9    counterparts?

10   A    The ones that were there for me I would say at the time

11   was Twin and then Diana came.

12   Q    You were serviced by Twin.  And subsequently Diana?

13   A    Twin and then Diana came in.

14   Q    If twin was not available did, you have access to others?

15   A    Other assistants?

16   Q    Yes, other assistants?

17   A    It was two separate times after Twin was here, she left,

18   and Diana -- as far as -- didn't work for him anymore.  Diana

19   came in so that question is kind of -- they weren't ever at

20   the same time.

21   Q    Did you have any other assistants when Twin was working

22   there?

23   A    LeLe would be around here or there.  But it was mostly

24   Diana or 2009.

25   Q    Did you utilize their services?

1   A    Yes.

2   Q    Now you testified and told us about a broken necklace;

3   that there was an incident, I believe it was at a concert, and

4   you said that you believe Mr. Kelly thought that you were

5   videotaping other men?

6   A    I don't know what he thought I was doing on my phone.  He

7   just didn't like it.

8   Q    And you said that an argument ensued?

9   A    Correct.

10  Q    And you did something to him first; am I correct?

11  A    I don't know if I shoved him or whatever the case may be,

12  but I did target him first and that's when he grabbed me and

13  the necklace broke.

14  Q    And the necklace snapped?

15  A    Correct.

16  Q    And there came a point in time that he asked you to write

17  a letter?

18  A    Right.

19  Q    And he asked you to write a letter about that, am I

20  right?

21  A    Correct.

22  Q    And that request came after the *Surviving R. Kelly*

23  documentary was being broadcast; am I correct?

24  A    No.

25  Q    That's not correct?

1    A    No.

2    Q    There came a point in time that the *Surviving R. Kelly*

3    documentary series was being televised.  Do you remember what

4    year that was?

5    A    Rewind.  You're saying when I wrote the letter it was

6    because of the first *Surviving R. Kelly*?

7    Q    My question was there came a point in time -- withdrawn.

8         He asked you according to you to write a letter; am

9    I correct?

10   A    A letter about what?

11   Q    The incident that you just described.

12   A    That was -- I don't believe that was anything to do with

13   the *Surviving R. Kelly*.

14   Q    I'm not asking you about your belief, ma'am.  I'm asking

15   you when was it that he asked you to write this letter.

16         MS. CRUZ MELENDEZ:  Objection as to form.

17         THE COURT:  I am confused.  Are you asking her when

18   in relation to that television show?  So it has nothing to do

19   with the show?

20         MR. CANNICK:  Not yet.

21         THE COURT:  Why don't you put if the question to the

22   witness again.

23         MR. CANNICK:  Your Honor, I have a method to my

24   madness.

25   BY MR. CANNICK:

1   Q     Do you recall what year it was that you were asked to

2   write this letter?

3   A     About the necklace incident?

4   Q     Yes.

5   A     It was whatever that show was where we got into that

6   altercation.  It was the same evening that I wrote the letter

7   about the necklace.

8   Q     And my question to you, ma'am, is do you remember what

9   year that was?

10  A     I don't remember.  Probably whenever it says that he had

11  the showed in Mobile.

12  Q     And do you remember what year you started your

13  relationship with him?

14  A     I believe it was 2018 or 2019.

15  Q     And do you remember when the *Surviving R. Kelly* started

16  being broadcast?

17  A     Last year?  I don't really remember.  Or the year before.

18  I don't really remember.

19  Q     Now before -- withdrawn.

20        Whenever you wanted to go leave and go back home or

21  you had an issue with Mr. Kelly where you decided you wanted

22  to leave him, you didn't have a problem getting your ticket

23  paid for; am I correct?

24  A     As far as with him, he didn't have a problem getting a

25  ticket.  Is that what you're asking?

Anna - cross - Cannick                          2947

1   Q    Someone associated with him would always buy your ticket

2   to leave; correct?

3   A    Not the last time when I didn't see him again.

4   Q    I will get there.  Every other time before the last time

5   the ticket was purchased for you; am I correct?

6   A    Yes.

7   Q    And I think you testified and told the jury that there

8   came a point in time when this necklace incident -- you left

9   him then as well; am I correct?

10  A    Correct.

11  Q    And you went downstairs and went to a hotel?

12  A    I walked around the corner to a hotel, yes.

13  Q    But you didn't have money to pay for it; am I correct?

14  A    No, I wasn't trying to check into the hotel.  I was just

15  leaving the venue.

16  Q    When you say the venue you're talking about --

17  A    The arena.

18  Q    The arena?

19  A    Correct.

20  Q    How far was the arena from the airport?

21  A    I'm not sure.  I don't think it was that far, but I don't

22  remember.

23  Q    When you got to the airport you found that you had no

24  money; am I correct?

25  A    I believe I already knew I didn't have any money.

Anna - cross - Cannick                                    2948

1    Q     You knew you had no money and you contacted him?

2    A     Yeah, because I was trying to find someone else to get me

3    a flight home.  I don't remember if I had a phone or not.  I

4    don't remember.

5    Q     So you contacted someone associated with Mr. Kelly or

6    Mr. Kelly; correct?

7    A     Correct -- actually I remember I did not have a phone

8    because I remember having to find quarters to pay -- to call.

9    I had numbers written down on a piece of paper.

10

11                (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Anna - Cross - Cannick                    2949

1    BY MR. CANNICK (Continuing):

2    Q    So, you found the quarters, but you call him; am I

3    correct?

4    A    I called -- I don't remember if it was an assistant or

5    him.  It could have been him because I remember he had three

6    different numbers that I had written down.

7    Q    So, you were leaving but you called him or his staff?

8    A    Right.

9    Q    And they got a ticket; am I correct?

10   A    Yes.

11        I went back to the hotel -- do you want me to

12   explain.

13   Q    No.  I want you to answer my question.

14   A    I'm answering it.

15   Q    Now, when you got to the airport and you made the call

16   back, was there a flight leaving out that night?

17   A    Ask the question again.

18   Q    When you got to the airport and you wanted to leave, was

19   there a flight leaving that night?

20   A    I'm sure, but I didn't get on the plane.

21   Q    What did you do?

22   A    I went back to the hotel.

23   Q    Okay.  When you went back to the hotel, was that the

24   hotel that you said you went to that was near the venue?

25   A    No, that was the hotel that Rob was staying at.

Anna - Cross - Cannick                    2950

1    Q    Okay.  And you stayed in his hotel that night?

2    A    I don't remember if I stayed the night.

3         I do remember writing a letter and then catching a

4    flight.  I'm pretty sure -- it was late in the night because

5    after the show, it's 12 o'clock, 1 a.m.  So, it could have

6    been the next morning.

7    Q    Now, isn't it a fact that there was no flights and you

8    stayed in a hotel that night and Mr. Kelly paid for that

9    hotel?

10   A    That sounds right.

11   Q    So, he knew you were leaving, he knew you wanted to

12   leave, and he also accommodated you to leave; am I correct?

13   A    With the exception of me writing a letter, correct.

14   Q    I'm not asking about the exception.

15        He paid for your hotel; am I correct?

16   A    Right.

17   Q    And he also paid for your flight; am I correct?

18   A    You're right.

19   Q    And the letter that you wanted to tell us about is a

20   letter saying that he did not initiate any contact with you,

21   that basically you targeted him, to use your phrase.

22   A    To use what?

23   Q    Your phrase.

24        THE COURT:  There's a lot in that question.  Why

25   don't you rephrase it?

1               MR. CANNICK:  I thought that was...

2               THE COURT:  But I disagree, so let's rephrase it.

3               MR. CANNICK:  I'm trying to remember which part,

4    your Honor, because --

5               THE COURT:  Because there were so many?

6               MR. CANNICK:  No, there's only one.

7               THE COURT:  Want to have it read back?

8               MR. CANNICK:  Yes, please.

9               (Record read.)

10              THE COURT:  It was a perfect question.

11              MR. CANNICK:  It was a perfect question.

12   Q    So, I'll try another perfect question.  Now, the letter

13   that he asked you to write pertained to the incident that

14   occurred after the show in the arena?

15   A    Correct.

16   Q    And essentially, what he wanted you to write is that he

17   was not the initiator.

18   A    Correct.

19   Q    And that's true; am I correct?

20   A    Correct.

21   Q    So, he wasn't asking you to write a lie; am I correct?

22   A    Depends on what the letter said.  I don't remember what

23   it says.

24   Q    You know what letter I'm talking about.  The letter --

25   A    I don't remember what I said in the letter.

Anna - Cross - Cannick                    2952

1    Q    Okay.  Now, I think you just testified and told the jury

2    that he wanted you to write a letter indicating that he was

3    not the initiator.

4    A    Right.

5         But you're wanting me to say that whatever I said

6    was true, but I don't any what else I said in the letter.

7    Q    What I'm asking you is that the fact that he was not the

8    initiator was true; am I correct?

9    A    That he wasn't the initiator?  Correct.

10   Q    Now, and you eventually left him, correct?

11   A    Yes.

12   Q    How long were you gone for?

13   A    Maybe a week or two.

14   Q    After that week or two elapsed, you contacted him, am I

15   correct?

16   A    Correct.

17   Q    And you asked him to -- you told him that you wanted to

18   come back; am I correct?

19   A    Correct.

20   Q    Now, let me ask you this:  These things that you said

21   that he had been doing to you, had they started before this

22   incident?

23   A    Yes.

24   Q    So, before you left, he had already been spanking you; am

25   I correct?

Anna - Cross - Cannick                    2953

1   A    Correct.

2   Q    And before you left, he had already been punching you; am

3   I correct?

4   A    Correct.

5   Q    And you stayed away for two weeks and you said, I want to

6   come back.

7   A    Correct.

8   Q    And he got you a ticket?

9   A    Yes.

10  Q    And you went back?

11  A    Yes.

12  Q    Now, after you got back, you went back -- you testified

13  that before leaving, you didn't have a phone.

14        Did you have a phone when you returned?

15  A    I don't remember.

16  Q    Now, and you testified and told us that Mr. Kelly would

17  punish you for violating these rules that you said he had;

18  remember telling us that?

19  A    Correct.

20  Q    When you spoke to the Government, you told them that the

21  punishment was not for those but for little lies you would

22  tell.

23        Remember telling the Government that?

24  A    I don't recall that.

25  Q    Okay.  Let's see if I can refresh your recollection.

Anna - Cross - Cannick                    2954

1        MR. CANNICK:  Now I'm pulling it up, your Honor, and

2   I'll move on to another area until we get it.

3   Q    Now, when you were at Mr. Kelly's home, you noticed that

4   the other young ladies, his girlfriends, they had cell phones;

5   did they not?

6   A    Yes.

7   Q    And --

8   A    Well, no, I wouldn't say all of them, no.

9   Q    Well, who had phones?

10  A    Jane.  I'd really say her.

11  Q    Joy didn't have a phone?

12  A    Not at one point, no.

13  Q    But when you spoke to the Government, you told them that

14  Jane and Joy both had phones.

15        Do you remember telling them that?

16  A    I wouldn't say the whole time.

17  Q    But my question is when you spoke to the Government, you

18  told them that Jane and Joy both had phones, right?

19  A    Depending on what time we were talking about, could have.

20  Q    Did you tell the Government, Well, depending on the time

21  Jane and Joy had phones?

22        MS. CRUZ MELENDEZ:  Objection.

23        THE COURT:  Sustained.

24  Q    You didn't quantify when you spoke to the Government

25  about it; am I correct?

LAM      OCR      RPR

1           MS. CRUZ MELENDEZ:  Objection.

2           THE COURT:  Sustained.

3   Q    When you spoke to the Government, you told them that Jane

4   and Joy had phones but you didn't tell them "at times"; am I

5   correct?

6   A    Correct.

7   Q    Now, I'm going to show you -- a few minutes ago, I asked

8   you a question about these punishments that you said that you

9   got.  I want you to read there and see if it refreshes your

10  recollection if you told the Government that the basis of the

11  punishment that you got were for telling lies and not for

12  doing something.

13          Have you read it?

14  A    I'm not understanding --

15  Q    No.  The question is --

16          THE COURT:  No, no, no.  If she doesn't understand

17  the question, she can say so.

18          Please rephrase the question.  If she doesn't

19  understand the question, you have to rephrase it.  So,

20  rephrase the question.

21  Q    Are you saying you doesn't understand the question --

22  A    I know I didn't say this.

23  Q    Okay.

24          THE COURT:  Next question.

25  Q    So, what's on the document, you know you didn't say that,

1    right?

2    A     I know I didn't say that.

3    Q     And what's on the document is that you said, according to

4    the document --

5              MS. CRUZ MELENDEZ:  Objection.

6              THE COURT:  Sustained.

7              MR. CANNICK:  Your Honor, may we have a sidebar?

8              THE COURT:  Of course.

9

10             (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                      2957

1              (The following occurred at sidebar.)

2    Q    Your Honor, my understanding is that in order for me to

3    establish later on this is a prior inconsistent statement,

4    because now she's saying she has no recollection, I have to

5    confront her with it.

6              THE COURT:  Okay.

7              MS. CRUZ MELENDEZ:  She didn't say she didn't

8    recognize it, she said she didn't say that.

9              THE COURT:  It's the same thing.

10             MR. CANNICK:  It's the same thing.

11             THE COURT:  But you're just not doing it in the

12   right way, which I think you know.  So, I think there's a

13   proper way to phrase the question, and it's not waving around

14   the thing and --

15             MR. CANNICK:  I think that's what's objectionable,

16   Judge.

17             THE COURT:  It's not, it's just that -- call me a

18   maverick, but I do like to do this the way it's supposed to be

19   done.

20             So, if you want to say to her, "Isn't it a fact that

21   you gave this answer," then you can do that.  And then she can

22   say "No," and then you can ask Ms. Cruz Melendez if she agrees

23   that that's what's contained in the document, and she'll say

24   she does.

25             And then she on redirect examination is going to

```
                    Sidebar                      2958
```

1  say, "Did you get to review this document?" and the witness

2  will say, "No."

3            MR. CANNICK:  Judge, that's what I was about to do.

4            THE COURT:  Then I'm wrong and you're right.

5            MR. CANNICK:  No, that's never the case.

6            THE COURT:  I'm just asking you to do it the proper

7  way.

8            MR. CANNICK:  I thought I'd been doing it the proper

9  way the entire trial.

10           MS. CRUZ MELENDEZ:  Well, the document itself is not

11 in evidence.

12           THE COURT:  Just do it, all right?

13           MR. CANNICK:  All right.

14           THE COURT:  Thank you.

15

16           (Continued on the following page.)

17

18

19

20

21

22

23

24

25

Anna - Cross - Cannick                    2959

1          (Sidebar ends; in open court.)

2          THE COURT:  I believe you were about to rephrase

3    that question; is that correct?

4          MR. CANNICK:  Yes, your Honor, under much duress.

5    BY MR. CANNICK:

6    Q    Isn't it a fact that you told the Government during one

7    of the interviews, specifically an interview that occurred on

8    October -- November 28, 2020, none of the punishments you

9    received were because you said you didn't want to do

10   something, you received the punishments more for things that

11   Mr. Kelly thought that you were doing behind his back, like

12   little lies?

13   A    I never said that.

14   Q    You never said that?

15   A    No.

16   Q    And if it's in the document, then the Government wrote it

17   down wrong?

18   A    Possibly.

19         MR. CANNICK:  Will the Government concede that

20   that's what's in the document?

21         MS. CRUZ MELENDEZ:  That is what's written in the

22   document.

23         MR. CANNICK:  That's all I want.

24         THE COURT:  I thought you said you were done

25   questioning.

Anna - Cross - Cannick                    2960

1          MR. CANNICK:  No, no, we have a while to go, your

2    Honor, actually.

3          THE COURT:  All right.

4    Q    Now, after you returned to -- asked Mr. Kelly to allow

5    you to return after the incident we spoke about where the

6    necklace was broken, you came back and you continued to live

7    with him; am I correct?

8    A    Correct.

9    Q    And you continued shopping?

10   A    Correct.

11   Q    Continued going out?

12   A    Correct.

13   Q    Continued living with him?

14   A    Correct.

15   Q    Now, did there come a point in time that you decided,

16   Well, I'm going to leave again?

17   A    I'm sure.

18   Q    And do you recall what caused you to leave?

19   A    I don't know.  I feel like every time it was something

20   different.

21   Q    But essentially, the point is that you left when you

22   wanted to; am I correct?

23   A    Yes.

24   Q    And then there came a point in time you returned.

25   A    Say it again.

Anna - Cross - Cannick                    2961

1   Q    There came a point in time you returned again.

2   A    Correct.

3   Q    Now, when you were there, you testified earlier that you

4   met Jane.

5   A    Correct.

6   Q    You knew Jane?

7   A    Did I know her, like, prior?

8   Q    When you got to live with Mr. Kelly, did you get to know

9   Jane?

10  A    A little bit, yes.

11  Q    How often would you see her?

12  A    I wouldn't say that often, but I just -- I wasn't around

13  them like they were around each other.

14  Q    Okay.  Because you stayed in another house; am I correct?

15  A    Sometimes.

16  Q    And when you were in Atlanta, where would you stay?

17  A    Depends.  Sometimes we would stay at the big house,

18  sometimes we would stay at the guesthouse, and other times

19  we'd stay at a hotel.

20  Q    What about in Chicago?

21  A    Between the studio, The Trump, and a hotel.

22  Q    Now, you and Jane didn't particularly get along; am I

23  correct?

24  A    Yes.

25  Q    And she didn't particularly like you?

Anna - Cross - Cannick                    2962

1          MS. CRUZ MELENDEZ:  Objection.

2          THE COURT:  Do you know if she liked you or not?

3          THE WITNESS:  Not really, but maybe the senses, you

4    know, of being a woman sharing the same man, basically, you

5    know.

6    Q    You told the Government when you met with them that Jane

7    was basically jealous of you; am I correct?

8    A    Correct.

9    Q    Now, you testified and told us earlier about Nephew.

10         Do you recall sending a text message to Mr. Kelly

11   asking him about Nephew?

12   A    Yes.

13         MR. CANNICK:  One second, please, your Honor.

14         (Pause in proceedings.)

15   Q    Just getting back to something I asked you earlier, I

16   want to see if this refreshes your recollection.

17         MR. CANNICK:  May I approach, your Honor?

18         THE COURT:  Yes.

19   Q    I want you to read this and see if this refreshes your

20   recollection that a family member asked Mr. Kelly to send

21   money.

22   A    I don't recall this.

23   Q    Okay.  And you have no knowledge of it?

24   A    No.

25         I do remember my cousin having --

Anna - Cross - Cannick                    2963

1  Q    You've answered my question.

2  A    Okay.

3  Q    You have no knowledge of either your parent asking

4  Mr. Kelly for money?

5  A    No knowledge of that, no.

6  Q    Now, do you know what "scat sex" is?

7  A    No.

8  Q    Never heard of "scat sex"?

9  A    Never.

10 Q    The testimony that you gave to the jury earlier this

11 morning regarding bodily fluids and sex, you never watched a

12 video about that?

13 A    No.

14 Q    Never?

15 A    Never.

16 Q    Under oath?

17         MS. CRUZ MELENDEZ:  Objection.

18         THE COURT:  Sustained.

19 Q    Now, you testified and told us about there being a time

20 that Mr. Kelly was jealous of -- well, withdrawn -- suspicious

21 of you and other men?

22 A    Correct.

23 Q    But you dated other men when you were dating Mr. Kelly;

24 am I correct?

25 A    While I was dating him?  No.

LAM      OCR      RPR

1  Q     There was a Christmas season when you went home, didn't

2  you hookup with a football player?

3             MS. CRUZ MELENDEZ:  Objection.

4             THE COURT:  Sustained.

5             Want to have a sidebar?

6             MR. CANNICK:  Yes, please.

7

8             (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                           Sidebar                          2965
```

 1                (The following occurred at sidebar.)

 2                MR. CANNICK:  Your Honor, I'm not going into her

 3        history.

 4                THE COURT:  Here's the problem I have with these

 5        questions:  Because every time we have this discussion, one of

 6        the features of it is that you haven't applied to ask her.

 7        You just asked her if she hooked up with somebody.  I mean,

 8        I'm old, but that sounds like inquiring into her sexual

 9        history.

10                MR. CANNICK:  No.

11                THE COURT:  It doesn't mean that?

12                MR. CANNICK:  It doesn't mean that.

13                THE COURT:  Are you asking did she go out on a date

14        with someone?  I know that's very old fashioned.

15                But that's what sets off an alarm bell for me.

16                MR. CANNICK:  Okay.

17                THE COURT:  I know my lips are moving when we're

18        having this conversation, but sometimes I feel like the sound

19        isn't coming out because I know the issue is, as we've

20        discussed on prior occasions, is that you have to make an

21        application to ask those kinds of questions, which I know I'm

22        not telling you something that you don't know, but that's what

23        I thought you were asking.

24                So, you're not asking her about a sexual encounter.

25                MR. CANNICK:  No, I'm just asking about -- she's

Sidebar                                    2966

1   saying that he was concerned or jealous, and I'm just showing

2   that she was out with a couple of guys, hanging out with a

3   couple of guys, and that was the basis for all of this.  I'm

4   not asking about sexual history.

5        THE COURT:  Well, you can certainly ask her if -- I

6   don't know, does he know about this?

7        MR. CANNICK:  Yes.

8        THE COURT:  So, if there's a basis for you to ask

9   her did she socialize with other men or see other men, that's

10  perfectly fine because of the Government's theory that she

11  was -- that he wouldn't permit her to do it.  You can ask her

12  that.  Like I said, maybe I'm old fashioned, but when somebody

13  says "hook up," I hear something different.

14       Anything else that we need to chat about?

15       MR. CANNICK:  No.

16       THE COURT:  All right.

17

18       (Continued on the following page.)

19

20

21

22

23

24

25

Anna - Cross - Cannick                    2967

1          (Sidebar ends; in open court.)

2          THE COURT:  You want to rephrase?

3          MR. CANNICK:  Yes.

4   BY MR. CANNICK:

5   Q    On one of your separations from Mr. Kelly, you dated a

6   football player?

7   A    Correct.

8   Q    And then you also dated a rap musician?

9   A    After, yes.

10  Q    And he spoke to you about it?

11  A    Did Rob speak to me about it?

12  Q    Yes.

13  A    Yes.

14  Q    And you testified that you were -- that at some point you

15  decided that you didn't want to share Rob any longer?

16  A    Sure, yes.

17  Q    But when you started dating him, you knew that -- you

18  knew that he had these girlfriends -- well, withdrawn.

19          There came a point in time that you realized that he

20  had other girlfriends; am I correct?

21  A    Correct.

22  Q    And you got introduced to them as being part of the

23  relationship; am I correct?

24  A    Correct.

25  Q    And he would introduce you to them one at a time?

Anna - Cross - Cannick                    2968

1   A     Yeah, you could say that.

2   Q     And basically, you were then eventually involved in

3   sexual encounters with them as well; am I correct?

4   A     Correct.

5   Q     And you and he spoke about that before that all came to

6   pass; am I correct?

7   A     Correct.

8   Q     And you didn't resist; he told you about it, and then you

9   decided, Yes, okay.

10        Am I correct?

11  A     Correct.

12  Q     You testified and told us about there came a time that

13  Mr. Kelly took your passport?

14  A     Correct -- I know he had it.  We were supposed to go to

15  Africa or something like that, so I think he had everybody's

16  passport.

17  Q     So, it wasn't a situation where he just took your

18  passport, correct?

19  A     He didn't take it, no.

20  Q     All right.  That's all.

21        Now, there was a time that you and he were supposed

22  to go on a cruise together; remember that?

23  A     I do remember him going on a -- performing or something.

24  I slightly remember that.

25  Q     Weren't you supposed to go on that cruise as well?

Anna - Cross - Cannick                    2969

1    A    Yes.

2    Q    And the reason why you didn't go on the cruise is because

3    he had asked for you not to smoke marijuana in his house or on

4    the property and you did; am I correct?

5    A    Correct.

6    Q    In fact, you had three or four other young ladies with

7    you and you smoked marijuana; am I correct?

8    A    Yes, while he was not around.

9    Q    But the question is you smoked the marijuana in the

10   house?

11   A    In the garage, yes.

12   Q    And then he decided that he was not going to take you on

13   that cruise; am I correct?

14   A    Correct.

15   Q    In fact, it was the Tom Joyner cruise; am I correct?

16        THE COURT:  The what cruise?

17        MR. CANNICK:  Tom Joyner.

18   A    I believe so.

19   Q    And he was going to perform; am I correct?

20   A    Yes.

21   Q    And he didn't spank you or anything for that, did he?

22        MS. CRUZ MELENDEZ:  Objection.

23        THE COURT:  I didn't hear the question.

24        MR. CANNICK:  He didn't spank you or anything for

25   that; am I correct?

1          THE COURT:  Didn't spank her for smoking marijuana?

2          MR. CANNICK:  Right.

3          THE COURT:  Did that happen?

4          THE WITNESS:  I don't remember anything.  I just

5   know he left for a show and I didn't have a phone or anything

6   like that and he just left me with the assistant.

7   Q    And who was the assistant he left you with?

8   A    I don't remember if it was Diana or Twin -- no, it was

9   LeLe.  LeLe was with me at the time.

10  Q    Now, when Diana was working for Mr. Kelly, LeLe was

11  working for Mr. Kelly as well?

12  A    Yes.  I just remember LeLe was with me at the house and

13  is the one that told him about the marijuana.

14  Q    You said what?

15  A    She's the one who told him about the marijuana.

16  Q    Who, LeLe?

17  A    LeLe, yes.

18  Q    And you didn't leave at that time; am I correct?

19  A    I believe I left the next day.

20          I went to my friend's house.  Because I didn't have

21  a phone, but I had my computer.  So, I wrote my friend off of

22  my computer and she came and picked me up.

23  Q    Where was your friend?

24  A    She lived in Atlanta.

25  Q    In Atlanta.

1          Are you suggesting that Mr. Kelly took your phone?

2    A    He had my phone, yes.

3    Q    He had your phone?

4    A    Correct.

5    Q    And when did he get your phone?

6    A    He came to the house before he left.  And I don't

7    remember how he took it, but he took my phone with him.

8    Q    And you saw him get your phone?

9    A    Yes.

10   Q    You had it in your hand, on your person, when he took it?

11   A    I don't know if he asked to see it and just never gave it

12   back, but I don't exactly know how he took it.  I don't

13   remember.

14   Q    Now, he left the next day for the cruise; am I correct?

15   A    Correct.

16   Q    Do you know where the cruise departed from?

17             MS. CRUZ MELENDEZ:  Objection.

18             THE COURT:  Overruled.

19             Do you have any idea?

20             THE WITNESS:  Where it departed?

21             THE COURT:  Yes.

22             THE WITNESS:  I don't remember.  Florida?

23   Q    Do you remember what time of the day this was that he

24   took your phone?

25   A    I know he left, like, in the morning time, I think.

Anna - Cross - Cannick                          2972

1   Q    My question is, do you know what time it was that he took

2   your phone?

3   A    Oh, I don't remember.

4   Q    Did he take your phone that evening when he got in or was

5   it in the morning?

6   A    It was before he left to go for the cruise.

7   Q    And when did you get your phone back?

8   A    I don't believe I ever got it back.

9

10              (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAM      OCR      RPR

Anna - cross - Cannick                              2973

1   CROSS EXAMINATION

2   BY MR. CANNICK:  (Continuing)

3   Q    Do you know?

4   A    I don't remember because I know I left.  So I don't

5   remember how I got another phone after that.

6   Q    And after leaving, you returned; am I correct?

7   A    Yes.

8   Q    And before leaving, you were still getting these

9   spankings; am I correct?

10  A    Yes.

11  Q    You were still getting physically abused?

12  A    Yes.

13  Q    You were still being made to have sex with people you

14  didn't want to have sex with?

15  A    Yes.

16  Q    You were still being subjected to other rules?

17  A    Correct.

18  Q    And you left?

19  A    Again, yes.

20  Q    He's out of the country?

21  A    Say it again, I don't understand.

22  Q    He's out of the country; right?

23  A    For the cruise?

24  Q    Yes.

25  A    I don't even know if he did the show.  I don't remember.

Anna - cross - Cannick                      2974

1   Q    I thought you told us a short while ago that did he --

2   A    He left for it, but I feel like something happened  where

3   the show, where the boat didn't take off or something.

4   Q    But he was not in the house any longer with you; right?

5   A    No.

6   Q    And you left?

7   A    Correct.

8   Q    How long did it take you to come back?

9   A    I don't remember.

10  Q    Okay.  Did you have your -- did you have your cosmetic

11  procedure before he left?

12  A    This time, I don't remember.

13  Q    Did you return so that you could get him to pay for your

14  cosmetic procedure?

15  A    I don't remember if I had it already or not.

16  Q    Well, you had two; am I correct?

17  A    I went back for my follow up and they didn't do something

18  correctly, so they did it over.

19  Q    All right.  But he paid for those things?

20  A    Right.

21  Q    Isn't it a fact that you told the Government that you

22  stayed with Kelly so -- because you needed a second one and

23  you needed him to pay for it?

24  A    I don't recall telling them that.

25  Q    Okay.

Proceedings                                          2975

1              THE COURT:  Just so I can clarify, is it one

2    procedure?

3              THE WITNESS:  I had one, but when I went back for my

4    follow up, they didn't do something right, so they were like

5    we can just go ahead now and fix --

6              THE COURT:  I see.

7              MR. CANNICK:  Your Honor, could we pick this up

8    tomorrow morning?

9              THE COURT:  Sure.  I think we will break for the

10   evening.  I do want to talk to you a little bit about

11   scheduling.  We are going to stop early tomorrow.  I think

12   4:30 is the time that works.  I think that's right.  So we

13   will stop at 4:30 tomorrow.

14             Our Monday is going to be a little bit shortened

15   because we are not going to be able to start until around noon

16   on Monday.  But we are still moving along at a good pace.

17             It is possible, and I'm not saying I will definitely

18   do it, it's possible I may ask you to stay a little late.  And

19   if that's impossible for any of you, you can let Ms. Greene

20   know.  But I just want to make sure we're staying on track a

21   little.

22             I may ask you one or two days to stay until 6:00

23   instead of 5:30 if that helps us move along.  So if you need

24   to bring some extra supplies of any kind, you might be

25   thinking of that.  We will talk a little bit more about that

```
                           Proceedings                    2976
```

1   tomorrow.

2          Please have a good night and don't look anything up

3   about the case, don't read any news accounts, don't listen to

4   them.  Report to me any effort by any person to influence you

5   improperly or to influence another juror improperly.

6          Have a great night.  I will see you tomorrow.

7          THE COURTROOM DEPUTY:  All rise.

8          (Jury exits the courtroom.)

9          THE COURT:  Everybody can have a seat.  The witness

10  can step out.  We will see you tomorrow.

11         THE WITNESS:  Thank you.

12         (Witness leaves the stand.)

13         THE COURT:  Anything before we break for the day,

14  from the Government?

15         MS. CRUZ MELENDEZ:  No.

16         THE COURT:  No?

17         Anything from the defense?

18         MR. SCHOLAR:  No.

19         THE COURT:  Do you have a sense of how much longer?

20  I'm trying to figure out what we're going to do tomorrow.

21         MR. CANNICK:  Maybe 30, 40 minutes.

22         THE COURT:  Okay.  How many witnesses do we have for

23  tomorrow?

24         MS. GEDDES:  We have five or six.  I think we have

25  to re-evaluate in light of the early ending and where we are

Proceedings                                              2977

1  now.  But we have lots of witnesses planned for tomorrow.

2          THE COURT:  All right.  We will do our best.  So I

3  will see everybody tomorrow.  Thanks so much.

4          MS. GEDDES:  Your Honor, do you want to address the

5  medical records?

6          THE COURT:  Yes, I do.  Thanks so much for reminding

7  me. Okay.

8          MS. GEDDES:  Do you want to do it at sidebar?

9          THE COURT:  The only question really is I know there

10 are certain materials that were testified to that should be

11 released, but I'm sure there are other things that are not

12 part of the -- that are not going to be part of the record, so

13 I take it there will be some redactions.

14          Do we need Mr. Kelly here for this or no?

15          MR. CANNICK:  No, we are consenting to him not being

16 here for this.

17          MS. GEDDES:  So the medical records have already

18 been redacted, but to the extent I think on page 1 there may

19 be some additional --

20          MR. SCHOLAR:  Judge --

21          THE COURT:  If you don't mind using the microphone

22 so I can hear you.  Thanks so much.

23          You can sit down.

24          MR. SCHOLAR:  Judge, we had previously spoken to the

25 Government about the medical records and we had asked them not

Proceedings                                              2978

1    to make them available to the press.

2              THE COURT:  Right.  But, I mean, they are judicial

3    documents and there's really a presumption of public access

4    and there was testimony about them.

5              MR. SCHOLAR:  Then we would ask for another

6    opportunity to speak to the Government about redacting them

7    further.

8              THE COURT:  So I know that you are all very familiar

9    with the law on this subject, but there are a number of recent

10   -- there are a number of cases and I think -- I want to say

11   Judge Rakoff decided one fairly recently in the Southern

12   District that outlines when -- particularly when we are

13   talking about evidence that comes in at trial, so surely there

14   can be some redactions about things that are not pertinent to

15   the case or dates of birth.  Maybe that's not even a thing.

16   But if there are matters that are irrelevant and that are not

17   -- I mean, my understanding is that the only thing the medical

18   records are coming in for is for the testimony that the doctor

19   gave, and the doctor gave some pretty explicit testimony and

20   pretty particularized testimony.  So for that reason, none of

21   that was -- as far as I could tell was not objected to.  So

22   there is a presumption of access to them.

23              If you want to agree to some limited redactions for

24   things that were not the subject of the testimony, you can do

25   that, but I think it should really be more of an eye toward

Proceedings                                    2979

1    making the document public.

2              So I don't have that cite of that case recently, but

3    I know it was a case that -- I think it was a bank fraud case

4    that was tried, one of the first trials after COVID, but this

5    was certainly a topic of discussion.  Take a look at the case

6    and then let me know.

7              All right.  Thanks so much.

8              (Matter adjourned to September 10, 2021 at 9:30

9    a.m.)

10

11                          ooo0ooo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2980

1                          I N D E X

2

3    **WITNESS**                                        **PAGE**

4    **SONJA**

5        DIRECT EXAMINATION BY MS. CRUZ MELENDEZ     2742

6        CROSS-EXAMINATION BY MR. CANNICK            2777

7        REDIRECT EXAMINATION BY MS. CRUZ MELENDEZ   2807

8        RECROSS-EXAMINATION BY MR. CANNICK          2811

9    **ANNA**

10       DIRECT EXAMINATION BY MS. CRUZ MELENDEZ     2815

11        CROSS-EXAMINATION BY MR. CANNICK           2925

12   **KATHERINE LEE**

13       DIRECT EXAMINATION BY MS. SHIHATA           2898

14       CROSS EXAMINATION BY MR. CANNICK            2912

15

16

17

18

19

20

21

22

23

24

25

2981

1                        E X H I B I T S

2

3       Government's Exhibit 62                        2742

4

5       Government's Exhibit 62-A                      2743

6

7       Government's Exhibit 202                       2750

8

9       Government Exhibit 76A                         2816

10

11      Government's Exhibit 76-B                      2817

12

13      Government Exhibits 430A, B, C, D and

14      Government Exhibit 439 Exhibit                 2867

15

16

17

18

19

20

21

22

23

24

25