2982

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,    :   19-CR-286(AMD)
4
          Plaintiff,         :
5                                United States Courthouse
     -against-               :   Brooklyn, New York
6
ROBERT SYLVESTER KELLY,      :
7                                September 10, 2021
          Defendant.         :   9:30 o'clock a.m.
8
     - - - - - - - - - - - - - X
9

10                  TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE ANN M. DONNELLY
11        UNITED STATES DISTRICT JUDGE, and a jury.

12
APPEARANCES:
13

14  For the Government:        JACQUELYN M. KASULIS
                               Acting United States Attorney
15                             BY: ELIZABETH GEDDES
                                   NADIA SHIHATA
16                                 MARIA E. CRUZ MELENDEZ
                               Assistant United States Attorneys
17                             271 Cadman Plaza East
                               Brooklyn, New York
18

19  For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                               NICOLE BLANK BECKER, ESQ.
20                             THOMAS FARINELLA, ESQ.
                               CALVIN HAROLD SCHOLAR, ESQ.
21
Court Reporter:  Michele D. Lucchese,
22               E-mail: MLuccheseENDY@gmail.com
                         225 Cadman Plaza East
23                       Brooklyn, New York
                         (718) 613-2272
24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

Proceedings                                    2983

1          (In open court; outside the presence of the jury.)

2          THE COURTROOM DEPUTY:  All rise.

3          (Defendant present.)

4          THE COURT:  All right.  Anything before we get the

5    witness and the jurors?

6          MS. CRUZ MELENDEZ:  Just one brief matter, Your

7    Honor.  Yesterday, during cross-examination, defense counsel

8    began asking a series of questions related to statements that

9    he believed the witness might be able to testify that were

10   made by the defendant.  In the first couple of questions, I

11   objected and the objections were overruled.  I just wanted to

12   make clear my basis, which was that, essentially, he was

13   eliciting hearsay because of statements from the defendant.

14         THE COURT:  Well, I thought about that.  I don't

15   really remember at that they had much substance to them,

16   whatever the statements were.

17         MS. CRUZ MELENDEZ:  Ultimately, most of them she

18   said she didn't recall, but just for the --

19         THE COURT:  Future?

20         MS. CRUZ MELENDEZ:  Right.

21         THE COURT:  Mr. Cannick knows he can't bring out --

22   I mean, I don't even remember what it was.  It was almost no

23   significance.  I thought about it at the time, but if there is

24   an objection to be made, you will make it, I will rule, and we

25   will see what happens.

Proceedings                                    2984

1          All right.  Anything else before we --

2          MR. CANNICK:  Do you want me to state my reasons as

3    to why I was objecting and feel as though they should have

4    been sustained?

5          THE COURT:  No, I would rather not, it can go in

6    your book.

7          MR. CANNICK:  Okay.

8          THE COURT:  Okay, let's get the witness and then

9    let's get the jurors.

10         (Witness takes stand.)

11         MR. CANNICK:  Your Honor, I do have a question.

12   Yesterday, I wanted to play a recording.

13         THE COURT:  I remember, yes.

14         MR. CANNICK:  Right.  Do you want it to be done in

15   the presence of the jury or can we do it now?

16         THE COURT:  I thought we were going headphones.

17         MR. CANNICK:  Yes, we have headphones.

18         THE COURT:  That's fine.  I think it is best to do

19   it in front of the jury.  You will play it and see if she

20   recalls it.

21         MR. CANNICK:  Okay.

22         MS. CRUZ MELENDEZ:  If it's played with the witness

23   with headphones, will I have the opportunity to hear it on

24   headphones as well?

25         MR. CANNICK:  I don't know.

Proceedings                                    2985

1          MR. SCHOLAR:  I have a copy.

2          THE COURT:  Do you have a copy of it?

3          MR. CANNICK:  Yes.

4          THE COURT:  I don't know.

5          Let's see what happens.  How long is it?

6          MR. CANNICK:  About a minute.

7          THE COURTROOM DEPUTY:  All rise.

8          (The jury enters the courtroom.)

9          THE COURTROOM DEPUTY:  You may be seated.

10          THE COURT:  All right.  Good morning, everybody.

11    Sorry for the late start.  This one is on me.

12          We are ready to continue with the cross-examination

13    of the witness.

14          Go ahead, Mr. Cannick.

15          THE COURTROOM DEPUTY:  The witness is reminded she

16    is still under oath.

17          THE WITNESS:  Yes.

18          MR. CANNICK:  Thank you.

19          (Continued on next page.)

20

21

22

23

24

25

Anna - cross - Cannick                    2986

1   **ANNA,**

2        having been previously duly sworn, was examined and

3        testified as follows:

4   CROSS EXAMINATION

5   BY MR. CANNICK:

6   Q    Now, did you meet with the Government last night after we

7   recessed?

8   A    No.

9   Q    After we left last night at 5:30, you didn't meet --

10  A    No, I did not, I left.

11  Q    Did you see them last night?

12  A    No.

13            MR. CANNICK:  Now, I'm going to ask that these be

14  marked as defense GG, HH, II, and JJ.

15            May I show them to the witness?

16            THE COURT:  Sure.

17  Q    Would you look through them, please?

18            Do you recognize them?

19  A    Yes.

20  Q    What do you recognize them to be?

21  A    Pictures of me and Rob.

22            MR. CANNICK:  Your Honor, I offer them into

23  evidence.

24            THE COURT:  Any objection?

25            MS. CRUZ MELENDEZ:  No objection.

                        Anna - cross - Cannick                2987

1              THE COURT:  All right.  Those are in evidence.

2              (Defendant's Exhibits GG, HH, II, and JJ received in

3    evidence.)

4              MR. CANNICK:  Your Honor, I would ask that they be

5    published.

6              THE COURT:  Okay.

7              (Exhibit published.)

8              THE COURT:  Do they get published?

9              MR. CANNICK:  Your Honor, we are just trying to --

10             THE COURT:  Sticking?

11             MR. CANNICK:  Yes.

12   Q    This photo that we are looking at now, you're in that

13   photograph?

14   A    Correct.

15   Q    And Robert Kelly is as well?

16   A    Correct.

17   Q    Do you know where this photograph was taken?

18   A    The house in Johns Creek that had the pool.

19   Q    And this was a party?

20   A    My birthday party; correct?

21   Q    I'm sorry, I didn't hear you.

22   A    My birthday party.

23   Q    Your birthday party?

24   A    Yes.

25   Q    And this is a party that he flew in his band that he had

Anna - cross - Cannick                    2988

1   to perform internationally?

2   A    Correct.

3   Q    Basically, when he flew that band in for your birthday

4   party, he basically performed a two-hour concert just to you,

5   am I correct?

6   A    Correct.

7   Q    What's in the next one?  That's you in the photograph?

8   A    Correct.

9   Q    You are wearing a t-shirt?

10  A    Yes.

11  Q    And that t-shirt has Mr. Kelly's face on it?

12  A    Correct.

13  Q    When was that photograph taken?

14  A    When or where?

15  Q    When.

16  A    I'm not sure when.  I don't remember when.

17  Q    Do you remember where?

18  A    I believe we were at the shops at Buckhead.

19  Q    The shops at Buckhead?

20  A    Yes.

21  Q    In Atlanta?

22  A    Yes.

23       MR. CANNICK:  Next photograph, please.

24  Q    Is this a photograph, another photograph of you and Mr.

25  Kelly?

Anna - cross - Cannick                    2989

1    A    Correct.

2    Q    Do you recall where that photograph was taken?

3    A    A club called Gold Room in Buckhead in Georgia.

4    Q    Do you remember what time?

5    A    It was in the evening, so maybe like 12:00, 1:00 a.m.

6    Q    About what year?  Do you recall what year?

7    A    I don't recall what year.

8         MR. CANNICK:  Next.

9    Q    These are photographs of yourself at your party?

10   A    Correct.

11   Q    And this was a stage that you were on or was this a pool

12   area?

13   A    That was just the pool area.

14   Q    And the concert that he performed, he had a concert

15   setting?

16   A    It was in the living room.  Basically, everything was

17   rearranged for that, so, yes.

18   Q    In fact, he hired an event planner, am I correct?

19   A    I believe so, yes.

20   Q    And the event planner staged the entire evening?

21   A    I'm not really sure who did, but....

22   Q    It was staged?

23   A    Yes.

24   Q    You enjoyed yourself; right?

25   A    Yes.

Anna - cross - Cannick                                     2990

1    Q     Your parents did?

2    A     My mom did, yes.

3    Q     Your mom did.

4          You had family and friends there?

5    A     Yes.

6    Q     They all had a good time; right?

7    A     Yes.

8          MR. CANNICK:  The next one, please.

9    Q     The same scenario here, your birthday party?

10   A     Correct.

11         MR. CANNICK:  Next one, please.

12         Can you tighten it up some.

13   Q     Do you see yourself there?

14   A     Yes.

15   Q     Are you to the right?

16   A     To the -- in the sparkly dress to the right, yes.

17   Q     The sparkly dress?

18   A     Uh-hum.

19   Q     And that's Mr. Kelly's left arm around your neck?

20   A     Correct.

21   Q     In a hugging fashion, am I correct?

22   A     Correct.

23   Q     The person who's on his right, who's that person?

24   A     Joy.

25   Q     Joy.  Okay.  Do you remember when that was taken?

1  A    This was in L.A., Snoop Dogg's wife's birthday or

2  something like that.

3  Q    And he took you and Joy to that party?

4  A    Correct.

5  Q    Do you remember how you got there?

6  A    I believe we all rode in the Sprinter.

7  Q    So went cross country in the Sprinter?

8  A    No.  We were already there, I believe.  We could have

9  been there.  I don't remember what we were there for already,

10  but we were already in L.A.

11  Q    Okay.  And do you recall how long you stayed there, in

12  L.A.?

13  A    Might be a week or two.  I don't really remember.

14  Q    You did a lot of traveling with Mr. Kelly, did you not?

15  A    Traveling, yes.

16  Q    And I think you -- you told us yesterday that you did a

17  lot of shopping with him as well?

18  A    Correct.

19  Q    And a lot of restaurants and cigar bars?

20  A    Yes.

21  Q    Now, I asked you yesterday about the time that this

22  incident -- I think it was in Mobile where Mr. Kelly and you

23  had an argument.

24       Do you remember you telling us that?

25  A    Correct.

Anna - cross - Cannick                    2992

1    Q    Now, you thought that Mr. Kelly -- well, withdrawn.

2         You were of the mind that Mr. Kelly thought you were

3    texting another guy, correct?

4    A    Correct.

5    Q    And you told that to the Government, correct?

6    A    Correct.

7    Q    And essentially, in that interview, you basically told

8    them that notwithstanding the arguments that you and Mr. Kelly

9    had you weren't afraid of him?

10   A    I could have said that.  I don't remember.

11   Q    Okay.  Let's see if this refreshes your recollection.

12   A    So where I say I speak my mind?  Okay.

13   Q    So after reading this and having your -- did it refresh

14   your recollection that you told the Government in your

15   interview with them, one of the interviews, that despite the

16   arguments, you weren't afraid of Mr. Kelly?

17   A    Correct.

18   Q    And you also told them that you still speak your mind?

19   A    Correct.

20   Q    And you also told them that you'd always stand up for

21   yourself?

22   A    Most of the time.  I said that, but most of the time.

23   Q    Right.  But what you told them is that you would always

24   stand up for yourself?

25   A    Correct.

Anna - cross - Cannick                    2993

1   Q    Now, when you left Mr. Kelly after that incident and you

2   went to the airport, eventually Mr. Kelly paid for a room for

3   you because he didn't want you to be out there alone, am I

4   correct?

5   A    Correct.

6   Q    And then he eventually paid for your flight to leave, am

7   I correct?

8   A    Correct.

9   Q    Now -- and we talked about this text he asked you to

10  write -- we talked about this yesterday, a text that he asked

11  you to write.  Do you remember telling us about that?

12  A    Which text?

13  Q    Well, you told the jury that it was a letter that he had

14  wanted you to write, but it was a text, was it not?

15  A    Depending on which time, which text?

16  Q    That -- it was you who attacked him.

17          THE COURT:  I'm not clear either.  Are you talking

18  about a text message or a handwritten letter?

19          MR. CANNICK:  Well, her testimony was, Your Honor,

20  that --

21          THE COURT:  Was it a text?

22          MR. CANNICK:  -- a written letter.

23          THE WITNESS:  I don't remember a text.  I do

24  remember writing the letter.

25  Q    I will show you this and see if it refreshes your

Anna - cross - Cannick                    2994

1    recollection that it was a text.

2    A    Okay.

3          MR. CANNICK:  Let's find it.

4    Q    Again, right where my finger is, my thumb.

5          You've read it?

6    A    Yes.

7    Q    Does it refresh your recollection that Mr. Kelly asked

8    you to send him a text indicating that the situation was not

9    his fault, that you attacked him?

10   A    The events that I just read were correct, but I don't

11   recall sending a text message.

12   Q    Okay.  But that's what's in here, am I correct, in this

13   document?

14   A    Correct.  About the incident that happened, correct?

15   Q    Yes.

16   A    Yes.

17   Q    And him asking you to send a text?

18         MS. CRUZ MELENDEZ:  Objection.

19   A    I don't remember the text part.

20   Q    Okay.  Now -- and that night after you went back to the

21   airport so that you could leave, there were no flights, am I

22   correct, that evening?

23   A    Correct.

24   Q    And then it was that time that he paid for you to get a

25   hotel so you wouldn't have to be alone?

Anna - cross - Cannick                    2995

1    A    Correct.

2    Q    Now, there came a point in time that Joy's parents

3    started making public comments about Mr. Kelly, am I correct?

4    A    Correct.

5    Q    And you told -- and after they started doing that, Mr.

6    Kelly, according to you, didn't trust anyone anymore, am I

7    correct?

8    A    That he didn't trust anyone?

9    Q    Yes.

10   A    Correct.

11   Q    And that was -- that distrust came before your mother

12   visited, am I correct?

13   A    Correct.

14            MS. CRUZ MELENDEZ:  Objection.

15            THE COURT:  Overruled.

16   Q    Now, when you were with Mr. Kelly, you never had an issue

17   where you didn't have food, am I correct?

18   A    No.

19   Q    I'm not correct?

20   A    I mean you're correct.  I never had an issue with food,

21   yeah.

22   Q    And you never had a situation where you didn't have

23   water, am I correct?

24   A    Correct.

25   Q    And you never had to, when you were with Mr. Kelly, spend

Anna - cross - Cannick                    2996

1   money on anything, am I correct?

2   A    Correct.

3   Q    In fact, he would give you money, am I correct?

4   A    Correct.

5   Q    Substantial sums, am I correct?

6   A    Correct.

7   Q    Now, Jane was jealous of you and your relationship with

8   Mr. Kelly?

9            MS. CRUZ MELENDEZ:  Objection.

10           THE COURT:  Sustained.

11  Q    Now, what was your relationship with Jane?

12           THE COURT:  Didn't we have this testimony yesterday

13  that they didn't get along?  I'm quite certain I remember

14  hearing it.  I don't want to do the same thing over again.

15           MR. CANNICK:  Okay.  I'm sure your recollection is

16  better than mind.

17           THE COURT:  Well, I don't know about that.

18  Q    Now, you testified yesterday about spanking?

19  A    Correct.

20  Q    Now, you were of the mind that Mr. Kelly viewed spanking

21  as a punishment?

22  A    Correct.

23  Q    And but you also were of a mind that it was a sexual turn

24  on for him, am I correct?

25  A    Correct.

Anna - cross - Cannick                    2997

1    Q     And the spanking, light spanking as well, am I correct?

2              THE COURT:  I didn't hear what you said.

3              MR. CANNICK:  Light spanking.

4              THE COURT:  Who did?

5              MR. CANNICK:  I'm saying this punishment was light

6    spanking as well.

7              THE COURT:  Light.  I see.

8    A     I would not say light.

9              MR. CANNICK:  Just one second.

10   Q     I'm going to she if this refreshes your recollection.

11   Well, withdrawn.

12             When you met with the Government and you were

13   interviewed by the Government, you told them that sometimes

14   the spankings were light; right?

15   A     I don't ever recall saying that.

16   Q     Again, where my thumb is.

17   A     I don't recall saying light.

18   Q     But it's in there, am I correct?

19   A     It's in there.

20   Q     What's in there, in fact, is that sometimes --

21             MS. CRUZ MELENDEZ:  Objection, Your Honor.

22   Q     -- there were light spankings?

23             THE COURT:  Well, sustained as to form.

24   Q     What you told them is that sometimes they were light

25   spankings, am I correct?

Anna - cross - Cannick                    2998

1   A    I don't recall telling them that.

2   Q    But it's in the document you just read?

3   A    It's in the document.

4   Q    Okay.  Now, you testified and told us about an occasion

5   or occasions where you urinated in a cup on the Sprinter?

6   A    Correct.

7   Q    Now, Mr. Kelly, according to you, his assistants also

8   urinated in the cups of the Sprinter, am I correct?

9   A    Yeah, I mean, everybody kind of did.

10  Q    Everybody.

11            Now, if you really didn't want to do something, an

12  activity that Mr. Kelly suggested, you wouldn't do it, am I

13  correct?

14  A    No, that's not correct.

15  Q    That's not correct.

16            Isn't it fact that you told the Government that if

17  you vehemently did not want to engage in some activity, you

18  wouldn't do it?

19  A    I wouldn't say all the time, but sometimes, yes.

20  Q    Okay.  That's what you told the Government, am I correct?

21  A    Could have.  I don't remember.

22  Q    Let's see if this refreshes your recollection.

23  A    Okay.

24  Q    The portion where my thumb is.

25            Finished reading it?

1              Thank you.

2              Isn't it a fact that you told the Government during

3    one of those interview sessions that if you vehemently did not

4    want to engage in some activity, you wouldn't do it?

5    A    I would say sometimes.  It does say that on there, but

6    sometimes.

7    Q    But on this document that you read --

8    A    Correct.

9    Q    -- it says that, am I correct?

10   A    Correct.

11   Q    Now --

12             MR. CANNICK:  Your Honor, may that question and

13   answer be read back, please.

14             (Record read.)

15             THE COURT:  I don't know which question.

16             MR. CANNICK:  The last.

17             THE COURT:  But on this document, is that the one?

18             MR. CANNICK:  Yes.

19             THE COURT:  All right.  Do you mind?

20             (Record read.)

21   Q    Now, these punishments that you told us about, none of

22   them would happen, according to you, for not doing something,

23   am I correct?  Not doing something that was asked of you by

24   Mr. Kelly?

25   A    I can't recall.

1   Q     You can't recall what?

2   A     That whatever you just said, that it was....

3   Q     Well, let's see if this refreshes your recollection.

4         Where my thumb is located at.

5         Having read the document, does it refresh your

6   recollection that you told the Government that none of the

7   punishment you suffered were because you said you didn't want

8   to do something?

9   A     It's there on the document.  I don't recall fully saying

10  that.

11  Q     It's on the document?

12  A     It's on the document.

13  Q     Okay.  And you were the person that was being interviewed

14  when this was being drafted?

15  A     Correct.

16  Q     Now, you -- isn't it fact that you told the Government

17  that punishments were more for things that Kelly thought that

18  you were doing behind his back, like lies?

19        MS. CRUZ MELENDEZ:  Objection.

20        THE COURT:  Overruled.

21        Did you make that statement?

22  A     I don't recall making that statement.

23  Q     Picking up where you left --

24  A     Right.  I see that.  I just don't recall saying that.

25  Q     Okay.  But it's on the document?

1  A    Correct.

2  Q    Now, you testified yesterday and told us about when you

3  and Mr. Kelly finally terminated the relationship.  Do you

4  remember telling us about that?

5  A    I was what?

6  Q    When you told us about the time that you and Mr. Kelly,

7  the relationship terminated.  Do you recall telling us that?

8  A    Correct.

9  Q    Now, this happened as a result of your having gone away

10 home and then you returned, am I correct?

11 A    You're saying the ending of our relationship?

12 Q    Yes.

13 A    I'm not understanding the other question.

14 Q    You testified yesterday and told us that there came a

15 point in time that you and Mr. Kelly's relationship

16 terminated.  Do you remember telling us about that?

17 A    Correct.

18 Q    And I think you testified and told us that this happened

19 after you had returned to Mr. Kelly from, I think it was a

20 Christmas trip, am I correct?

21 A    Correct.

22 Q    Okay.  And if -- this, according to you, happened because

23 when you returned you realized that Mr. Kelly had had women at

24 the apartment, am I correct?

25 A    In the hotel, correct.

Anna - cross - Cannick                3002

1   Q      At the hotel.

2   A      Yes.

3   Q      And you saw evidence of that, am I correct?

4   A      Correct.  In the hotel room we were staying in.  Correct.

5   Q      And then you spoke to him about it?

6   A      Yes.

7   Q      And you were under the impression that Jane had been

8   there, am I correct?

9   A      I think all of them.

10  Q      You thought all of his girlfriends?

11  A      Yeah.  Uh-hum.

12  Q      And then you had words about it and you left him, am I

13  correct?

14  A      I think we got into an argument, and then, yeah, I left

15  the hotel and went outside.

16  Q      Okay.  And there came a point in time a couple of weeks

17  later, you sent Mr. Kelly a text; right?

18  A      I don't recall.

19  Q      You don't recall sending him a text where you were

20  holding a baby?

21  A      Where I was holding a baby?

22  Q      Yeah.

23  A      I don't remember.

24  Q      Okay.  And whatever your recollection is, Mr. Kelly never

25  text you again, am I correct?

                    Anna - redirect - Shihata              3003

1    A    I wouldn't say that, no.

2    Q    You're saying he texted you again?

3    A    Not like recently, but we communicated down the line.

4    Q    After -- after the relationship was terminated?

5    A    Correct.

6    Q    And he didn't ask you to come back to him, did he?

7    A    No.

8    Q    And you didn't ask him --

9    A    No.

10   Q    -- to go back, am I correct?

11   A    Correct.

12   Q    Okay.

13            MR. CANNICK:  Just a second, please, Your Honor.

14            THE COURT:  Yes.

15            MR. CANNICK:  That's it.  Thank you.

16            THE COURT:  Okay.  Any redirect?

17            MS. CRUZ MELENDEZ:  Yes, Your Honor.

18   REDIRECT EXAMINATION

19   BY MS. CRUZ MELENDEZ:

20   Q    During cross-examination yesterday, defense counsel asked

21   you about a radio program that you gave some statements about?

22   A    Correct.

23   Q    And in response to his question, you stated that that was

24   different, a different situation from where we are here, when

25   you say where we are here, do you mean your testimony here

                    MDL      RPR      CRR      CSR

Anna - redirect - Shihata                    3004

1   today?

2   A    Correct.  I felt like obviously it's different with you

3   guys telling, you know, everything.

4            MR. CANNICK:  Objection.

5            THE COURT:  Overruled.

6   Q    You can continue.

7   A    So, yeah, that's why I didn't feel the need to tell the

8   radio everything.  I was actually trying to make him not sound

9   like everything that people were saying.

10  Q    Now, you were subpoenaed to testify here today; correct?

11  A    Correct.

12  Q    Is it fair to say that you don't want to be testifying

13  about some of the private things that happened with respect to

14  your relationship with the defendant; correct?

15  A    Correct.  I definitely didn't want to come do this, but

16  I'm having to.

17  Q    And you are here under oath; correct?

18  A    Correct.

19  Q    Now, when you were talking on that radio program, you

20  weren't under oath there; correct?

21  A    Correct.

22  Q    And isn't it fair to say that when you went on that radio

23  program, you weren't there to talk about the defendant;

24  correct?

25  A    Correct.

1   Q     Okay.  You were there to talk about other issues having

2   to do with yourself and your career; right?

3   A     Correct.

4   Q     Isn't it also fair to say that you said that there were

5   ups and downs in your relationship with the defendant;

6   correct?

7   A     Correct.

8   Q     And that you didn't want to fully go into everything or

9   go fully into depth with respect to your relationship with the

10  defendant; right?

11  A     Correct.

12  Q     Now, defense counsel also asked you about your appearing

13  on the second part of *Surviving R. Kelly.*  Do you remember

14  testifying to that?

15  A     Correct.

16  Q     I think you testified that you couldn't remember the

17  exact month that that appeared, but that it happened sometime

18  in 2020?

19  A     Correct.

20  Q     Were you still with the defendant in 2020?

21  A     No.

22  Q     When you -- do you know when the first portion of

23  *Surviving R. Kelly*, that docu series aired?

24  A     I can't fully remember.

25  Q     Do you remember whether you were with the defendant when

Anna - redirect - Shihata                    3006

1    that aired?

2    A    I think it was being talked about when I was with him,

3    but I don't think it was aired yet.  I think they were film --

4    or I don't know, but I did hear about it.

5    Q    You didn't participate in that first portion of *Surviving*

6    *R. Kelly*, did you?

7    A    No.

8    Q    I think you testified yesterday that you ended the

9    relationship with the defendant somewhere around New Year's

10   going into 2018; correct?

11   A    Correct.

12   Q    And defense counsel also asked you questions on

13   cross-examination with respect to the altercation that

14   happened between you and the defendant where your necklace was

15   broken.  Do you remember that?

16   A    Correct.

17   Q    That incident started because the defendant believed that

18   you were texting someone; correct?

19   A    Correct.

20   Q    During his concert; right?

21   A    Correct.

22   Q    That you were using your phone in a way that you weren't

23   supposed to be?

24   A    Correct.

25   Q    When that incident started, was the defendant upset?

Anna - redirect - Shihata                    3007

1   A    Correct.

2   Q    Defense counsel questioned you on cross-examining with

3   respect to that, about you having initiated physical contact

4   with the defendant; right?

5   A    Correct.

6   Q    What was he doing right before you pushed him away?

7   A    Yelling, raising his voice.

8   Q    And after you pushed him, what did the defendant do?

9   A    He grabbed me.

10  Q    Grabbed you up near your neck?

11  A    Up near my neck.

12  Q    How tall are you?

13  A    5'4".

14  Q    How much do you weigh?

15  A    125.

16  Q    Did you weigh about the same amount back when this

17  incident occurred?

18  A    Probably -- yeah, close to the same.

19  Q    And how tall approximately is the defendant?

20  A    He is 6'2", maybe.

21  Q    Now, with respect to that incident, defense counsel also

22  asked you questions about whether or not -- about whether or

23  not the defendant then paid for your airfare to go home after

24  that; correct?

25  A    Correct.

Anna - redirect - Shihata                3008

1   Q    Prior to him doing that, you had gone to the airport;
2   correct?
3   A    Correct.
4   Q    And you testified that you couldn't get on the plane
5   because you didn't have money for a ticket home; correct?
6   A    Correct.
7   Q    When you went to the airport, did you even bring all of
8   your belongings with you?
9   A    I believe I did have my suitcase with me.
10  Q    Were there other things that you didn't have with you
11  that you had brought with you on the trip?
12  A    Yes.  I believe I left like my makeup bag, and my -- when
13  my necklace broke, it was left behind, but I ended up getting
14  it.
15  Q    So it's fair to say you were in a rush to the airport;
16  correct?
17  A    Correct.
18  Q    And going back for a moment to the incident inside of the
19  hotel when the defendant grabbed you and you said that he was
20  yelling at you?
21  A    It was inside the arena but, yes.
22  Q    I'm sorry.  Inside the arena.  I apologize.  How was he
23  yelling at you?
24  A    Just in an aggressive tone, you know, upset.
25  Q    Where was he in relationship to you?

1    A    Where was he?

2    Q    Yes.

3    A    In front of me.

4    Q    So when you pushed him away, was he close to your face?

5    A    Yes.

6    Q    Now, when you went to the airport and you didn't have a

7    ticket and couldn't afford a ticket and you came back, defense

8    counsel asked you whether the defendant ultimately paid for

9    your ticket.  Do you remember those questions?

10   A    Correct.

11   Q    Before he paid for your ticket, the defense counsel asked

12   you to write something; correct?

13   A    Correct.

14   Q    I'm sorry.  Not defense counsel.  I think I said defense

15   counsel.  The defendant asked you to write something?

16   A    Correct.

17   Q    He asked you to write a letter, a note; correct?

18   A    Correct.

19   Q    Now, defense counsel, on cross-examination, asked you

20   questions as to whether or not you indicated to the Government

21   that that was -- that you had written a text, right, instead

22   of a letter.  Do you remember him asking you about that?

23   A    I just don't remember -- I do remember writing the

24   letter.  I don't remember a text.  It could have been, but I

25   don't remember.

                        Anna - redirect - Shihata              3010

1   Q    He showed you a document that was prepared by someone

2   other than you; correct?

3           Defense counsel, when he asked you about the text,

4   showed you a document?

5   A    Oh, yes.

6   Q    You didn't prepare that document; right?

7   A    What it said sounded right, but I don't remember saying

8   or --

9           THE COURT:  I think the question is did you write

10  that report that he showed you?

11          THE WITNESS:  I don't recall writing that, no.

12          THE COURT:  All right.  Go ahead.

13  Q    And I'll show it to you again, but you've never seen this

14  before; correct?

15  A    No.

16  Q    I'm going to show you what defense counsel showed you for

17  a moment and I will direct your attention, but you also

18  referred to this -- to the Government as a letter?

19          MR. CANNICK:  Objection as to form.

20          THE COURT:  Overruled.

21  A    She wrote the --

22  Q    Don't read it out loud?

23          THE COURT:  You don't have to read it.

24  Q    But did you refer to it as a letter?

25  A    Yes.  Yes.

1   Q    And in that letter, the note that the defendant asked you

2   to write, you testified that he asked you to write information

3   in there to protect himself; correct?

4   A    Correct.

5   Q    Now, defense counsel, on cross-examination, asked you

6   whether or not everything in that letter was true; correct?

7   A    Correct.

8   Q    Okay.  And I believe you testified that you weren't sure

9   whether or not everything in the letter was true; correct?

10  A    Correct.

11  Q    Is it fair to say that there were instances where the

12  defendant asked you to write a letter and that created

13  falsehoods; correct?

14  A    Correct.

15  Q    In fact, during direct examination we went through some

16  of those letters; correct?

17  A    Correct.

18  Q    Is it also fair to say that there were instances, might

19  be sentences in there that may have been true, for example,

20  you testified about having told the defendant your age being

21  something different than what it actually was?

22  A    Correct.  Some things were true, some things weren't.

23  Q    And it's fair to say that in those types of letters the

24  defendant directed you to include falsehood; right?

25  A    Correct.

Anna - redirect - Shihata                          3012

1   Q    Referring again to that incident with respect to where

2   the defendant broke your necklace when he grabbed you around

3   your neck --

4         MR. CANNICK:  Objection.  It's not the testimony.

5   Q    Near the area of your neck.

6         THE COURT:  I will sustain it as to form.

7   Q    I think you testified that he grabbed you in your upper

8   chest, near the area of your neck?

9   A    Correct.

10  Q    Other instances in which the defendant hit you for having

11  -- withdrawn.

12        You testified about other instances in which the

13  defendant hit you; correct?

14  A    Correct.

15  Q    For example, you testified about the time where you were

16  walking in a hotel and he smacked you in your face; correct?

17  A    Correct.

18  Q    Did you initiate any physical contact with the defendant

19  before he smacked you?

20  A    No.

21  Q    Isn't it fair to say he smacked you because he thought

22  you were looking at other men?

23        MR. CANNICK:  Objection, Your Honor.

24  A    Correct.

25        THE COURT:  Overruled.

Anna - redirect - Shihata                    3013

1    Q    You also testified about a time where the defendant hit

2    you because he believed you were texting with your

3    ex-boyfriend.

4    A    Correct.

5    Q    Do you recall testifying about that?

6    A    Correct.

7    Q    And the defendant hit you then?

8    A    Correct.

9    Q    Did you initiate physical contact with the defendant

10   before he hit you?

11   A    No.

12   Q    Defense counsel, on cross-examination, asked you about

13   reasons you might receive punishments from the defendant.  Do

14   you recall those questions?

15   A    Yes.

16   Q    What were some of the reasons that you received

17   punishments?

18   A    Let me get my thoughts together really quick.

19        Say it I went shopping and didn't wear something

20   that was loose enough or had a little bit of makeup on, maybe

21   talking to one of the assistants about something I shouldn't

22   have been.

23   Q    What were some of the things you shouldn't have been

24   talking to the assistants about?

25   A    Could have been about the situation I was in, about the

1    other girls.

2    Q    And were you not supposed to be talking about these

3    things because it was one of the defendant's rules?

4    A    Correct.

5    Q    You also talked about situations with respect to some of

6    the other girls.  Are you referring to the defendant's other

7    girlfriends?

8    A    Correct.

9    Q    Okay.  Were there rules regarding the types of

10   conversations that you could have with his other girlfriends?

11   A    Correct.

12   Q    Were you allowed to have private conversations with them?

13   A    No.

14   Q    And that's because that was one of the defendant's rules?

15   A    Correct.

16   Q    Fair to say that during the punishments that occurred --

17   let's focus in right now with the spankings -- that you didn't

18   initiate physical contact with the defendant before the

19   spankings?

20   A    No.

21   Q    Defense counsel asked you questions regarding the

22   spankings and I think he described them to you as having been

23   light.  Is that how you would describe them?

24   A    No.

25   Q    When you spoke to the Government, did you tell them that

Anna - redirect - Shihata                    3015

1    the spankings got harder?

2    A    I don't remember saying between the two which it was.  I

3    just --

4    Q    How would you describe -- sitting here today, how would

5    you describe the spankings?

6    A    You mean, some of the time they would leave marks, that

7    would kind of....

8    Q    Were they painful?

9    A    Yes.

10   Q    Is it fair to say that you told the Government that you

11   would cry?

12   A    Yes.

13   Q    So much know that snot would be coming out of your nose?

14   A    Correct.

15   Q    When the defendant spanked you, did he spank you multiple

16   times in one session?

17   A    Correct.

18   Q    Now, defense counsel showed you photographs of some

19   events that you attended with the defendant.  Do you recall

20   that?

21   A    Yes.

22   Q    And one of the events you said was a birthday party for

23   yourself; correct?

24   A    Correct.

25   Q    And you were dressed up for that birthday party; correct?

Anna - redirect - Shihata                    3016

1   A    Yes.

2   Q    You testified previously that there were times where the

3   defendant would tell you to get cute; correct?

4   A    Correct.

5   Q    But that other times, and you just testified, that for

6   the most part the defendant wanted you to wear baggy clothing,

7   no makeup and a baseball cap?

8   A    Correct.

9   Q    And that you would get in trouble if you didn't do that?

10  A    Correct.

11  Q    Defense counsel also asked you questions about your

12  having left the defendant during the course of your

13  relationship and then come back again.

14       Do you recall those questions?

15  A    Correct.  Yes.

16  Q    Why would you go back to the defendant?

17  A    It was, you know, in a relationship, habit and, you know,

18  like I said, feelings too, even though sometimes -- times were

19  hard, it was still hard to leave because at the time it's --

20  you know, you're -- I love him, so -- I loved him, so it was,

21  you know, feelings, and that would bring you back.

22       You know, just like people today, there are still

23  people out there that have similar issues like that and they

24  go back.  They leave.  They come back.

25       MR. CANNICK:  Your Honor, I'm objecting.

Anna - redirect - Shihata                    3017

1  A    -- it's how it is.

2         THE COURT:  Overruled.

3         MR. CANNICK:  It is about her testimony, her

4  experience.

5         THE COURT:  Overruled.

6  Q    What, if any, expectations did you have -- withdrawn.

7         You had testified on cross-examination that

8  sometimes you left and came back even after the defendant was

9  physically abusive towards you.  What expectations or hopes,

10 if any, did you have about whether or not that would change

11 when you came back?

12         MR. CANNICK:  Objection.

13         THE COURT:  Sustained as to form.

14         The question is did you hope that things would

15 change if you went back?

16         THE WITNESS:  Yeah, because when I would come back,

17 things would be great, you know.  He would be a little more

18 lenient, cool and laid back, you know, just like in the

19 beginning, you know, and then eventually, the longer time goes

20 on, the rules and stuff kicked back in.  So, yeah.

21 Q    And when you say the rules, the rules that we have talked

22 about and you have testified about --

23 A    Right.

24 Q    -- that the defendant instituted?

25 A    Correct.

Anna - redirect - Shihata                    3018

1   Q    Defense counsel asked you on cross-examination whether or

2   not the defendant would take you shopping.  Do you recall

3   that?

4   A    Yes.

5   Q    Did the defendant also physically abuse you?

6   A    Yes.

7   Q    Defense counsel asked you about whether or not the

8   defendant would take you out to dinner.  Do you recall those

9   questions?

10  A    Yes.

11  Q    Did the defense counsel -- did the defendant also make

12  you write letters with false information, embarrassing

13  information in it?

14  A    Correct.

15  Q    Defense counsel asked you whether or not the defendant

16  bought you gifts.  Do you recall those questions?

17  A    Yes.

18  Q    Did the defendant also make you record yourself doing

19  embarrassing and demeaning acts as punishment?

20  A    Yes.

21  Q    Defense counsel talked about the fact that the defendant

22  gave you money.

23           Do you recall those questions?

24  A    Yes.

25  Q    Did the defendant also make you walk back and forth and

Anna - redirect - Shihata                          3019

1  call yourself a slut and a bitch?

2  A     Correct.

3              (Continued on following page.)

Anna - recross - Cannick                    3020

1            MS. CRUZ MELENDEZ:  One moment, Your Honor

2            THE COURT:  Sure.

3            (Pause.)

4            MS. CRUZ MELENDEZ:  Nothing further.

5            THE COURT:  Any recross?

6            MR. CANNICK:  Yes.

7    RECROSS-EXAMINATION

8    BY MR. CANNICK:

9    Q    What ultimately caused you to leave the relationship was

10   other women and my client, am I correct?

11   A    Yes.

12           THE COURT:  Can you turn on your microphone?

13   Thanks.  Sorry about that.

14   Q    What caused you to leave the relationship, however, is my

15   client and other women, am I correct?

16   A    I would say it was more than just the other women.

17   Q    Well, you testified just a short while ago --

18   A    I did.

19   Q    -- 15 minutes ago, you testified and told this jury under

20   oath that what caused you to leave my client was the fact that

21   when you returned from a vacation, you found evidence of

22   another, of other women being with him in the hotel suite, am

23   I correct?

24   A    I would say that but that's just not the only reason.

25   It's everything.

Anna - recross - Cannick                              3021

1    Q    That's what you told the government, am I correct?

2    A    Yes, but there's some more to it.

3    Q    But you didn't tell the government the other things that

4    were to it that you're trying to suggest now; you told them

5    the reason you left is because when you returned, you saw

6    evidence of other women with him, am I correct?

7             MS. CRUZ MELENDEZ:  Objection.

8             THE COURT:  Overruled.

9    A    Correct.

10   Q    Now, you don't need to be put under oath to tell the

11   truth then, right?

12            MS. CRUZ MELENDEZ:  Objection.

13            THE COURT:  Sustained.

14            Just put a question to the witness.

15   Q    You testified and told us that when, I think the

16   government asked you this question, that when you were with

17   the radio station giving this interview, you were not under

18   oath.  Do you remember them asking you that question?

19   A    Correct.

20   Q    Now, are you suggesting that you need to be under oath in

21   order to tell the truth?

22            MS. CRUZ MELENDEZ:  Objection.

23            THE COURT:  Overruled.

24   A    I didn't feel like I had to tell them that.  I mean, this

25   is a different situation so it's different.

Anna - recross - Cannick                    3022

1  Q    My question is do you have to be under oath to tell the

2  truth?

3  A    No, you don't but it's choice as well.

4  Q    You had a choice?

5  A    Then, yes.

6  Q    Now, so you testified and told us that you would get in

7  trouble for speaking to an assistant, one of Mr. Kelly's

8  assistants, for discussing certain items with them.  Do you

9  remember telling us that?

10 A    Discussing certain items?

11 Q    Yes, you would have conversations with an assistant.  You

12 were asked that just a short while ago?

13 A    Correct.

14 Q    Okay.  Who was the assistant you got in trouble for

15 talking to?

16 A    It can be not just one individual.

17 Q    Well --

18 A    I talked to all of them.

19 Q    Well, who did you get in trouble --

20 A    I would say all of them because they would talk to me

21 too.

22 Q    Diana Copeland, did you get in trouble for talking to

23 her?

24 A    Yes.

25 Q    Okay.

Anna - redirect - Cruz Melendez                    3023

1          MR. CANNICK:  Just going over a few things,

2     Your Honor.

3          THE COURT:  It's okay.

4     Q    You testified on redirect that after abuse, having been

5     abused, you would go back to Mr. Kelly?

6     A    Correct.

7     Q    And you went back several times, am I correct?

8     A    Correct.

9     Q    More than a dozen, am I correct?

10    A    I wouldn't say more than a dozen but --

11    Q    Many times?

12    A    Many times.

13    Q    And it was your decision to go back, am I correct?

14         THE DEFENDANT:  Correct.

15    Q    You missed those shopping sprees?

16         MS. CRUZ MELENDEZ:  Objection.

17         THE COURT:  Sustained.

18         MS. CRUZ MELENDEZ:  Just very briefly, Your Honor.

19         THE COURT:  Okay.

20    REDIRECT EXAMINATION

21    BY MS. CRUZ MELENDEZ:

22    Q    Defense counsel asked you on cross-examination about the

23    defendant's assistants?

24    A    Correct.

25    Q    Who paid for those assistants?

CMH      OCR      RMR      CRR      FCRR

Anna - recross - Cannick                    3024

1    A    Robert.

2    Q    And defense counsel asked you about the reason that you

3    ultimately left the defendant, correct?

4    A    Correct.

5    Q    My question to you is what were the reasons that you left

6    the defendant?

7    A    I feel like it was everything built up over time.  That

8    just happened to be that incident that happened that really

9    caused me to just be, like, okay, I can't do this anymore but

10   it was not just that.  I feel like it was everything built up

11   over time and I finally was, like, okay, I don't want this

12   life for myself and I found the strength to just move on.

13           MS. CRUZ MELENDEZ:  Nothing further.

14   RECROSS-EXAMINATION

15   BY MR. CANNICK:

16   Q    You didn't tell that to the government during your

17   interview, right?

18   A    I don't recall.  I don't know if that question was fully

19   asked like that so no.

20   Q    No, you didn't tell them that, but you did tell them that

21   it was his other women?

22           MS. CRUZ MELENDEZ:  Nothing further.

23           THE COURT:  Is that a question?

24           MR. CANNICK:  It's a question.

25           THE COURT:  Okay.

CMH      OCR      RMR      CRR      FCRR

1    A    What kind, what question was it really?

2    Q    You didn't hear?

3              THE COURT:  Well, you don't have your microphone on

4    to be fair.

5              MR. CANNICK:  My mic is on.

6              THE COURT:  And I couldn't hear it.

7              MR. CANNICK:  You know what?  I withdraw it.

8              THE COURT:  All right.  Nothing else from the

9    government?

10             MS. CRUZ MELENDEZ:  No.

11             THE COURT:  The witness can step down.  Thank you

12   very much.

13             (Witness excused.)

14             THE COURT:  Are you ready to call your next witness?

15             MS. SHIHATA:  Yes.  The government calls Dr. Iffath

16   Hoskins.

17             THE CLERK:  Please stand and raise your right hand.

18             (The witness, IFFATH HOSKINS, was duly

19   sworn/affirmed by clerk.)

20             THE WITNESS:  Thank you.  You may be seated.

21             THE COURT:  You can remove your mask.

22             THE WITNESS:  Thank you.

23             THE COURT:  And let's make sure, first of all, your

24   microphone is on and move it a little closer to you.

25             So just a few things before we begin.  I just want

1    to make sure that everybody can hear you.

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  So I'm going to ask you to make sure

4    you're speaking into the microphone and speak slowly.  Our

5    court reporter takes down everything you say.  It makes it

6    easier if you take your time.  For the same reason, try not to

7    talk over whichever lawyer is asking you questions.  If there

8    is a question that isn't clear or you'd like to have repeated,

9    let me know and I'll have the lawyer do that and just do your

10   best to answer only the question this you're being asked.

11         Okay?

12         THE WITNESS:  Yes, ma'am.

13         THE COURT:  All right.  Go ahead.

14         MS. SHIHATA:  Thank you, Your Honor.

15   DIRECT EXAMINATION

16   BY MS. SHIHATA:

17   Q    Good morning.  What is your profession?

18   A    Good morning.  My profession is obstetrics, gynecologist,

19   women's health care.

20   Q    Are you currently employed somewhere?

21   A    Yes, ma'am.

22   Q    Where are you employed?

23   A    At New York University.

24   Q    And is it a particular part of New York University?

25   A    Yes, the medical aspect.  New York University School of

1    Medicine.

2    Q    And do you have any other employment as well outside of

3    New York University?

4    A    Yes, I do.  I also work at Bellevue Hospital which is the

5    public health system hospital.

6    Q    That's the public health system here in New York?

7    A    Yes, ma'am.  It's called Health and Hospitals and

8    Bellevue Hospital is the flagship hospital of that public

9    health system.

10    Q    And what is your position at NYU?

11    A    At NYU, I have an academic position which is professor.

12    I also have a clinical position which is director of patient

13    safety.

14    Q    And what is that, being director of patient safety?

15    A    So director of patient safety is a concept whereby -- NYU

16    is a private hospital so every patient is brought in by a

17    private attending and the idea is that this individual, this

18    patient safety person, myself or others in my own division,

19    would be the ones during any window of time to be helping to

20    ensure that all the safety protocols are being followed and/or

21    if there's emergencies and/or if there's complications and/or

22    if there's any question that needs to be addressed, to help

23    out with any and all of those.

24    Q    And are you the -- do you hold this position in the

25    Department of Obstetrics and Gynecology?

Hoskins - direct - Shihata                    3028

1   A     Yes, ma'am.

2   Q     And how long have you held that position at NYU?

3   A     In the current situation, since 2013.

4   Q     And you mentioned you are also employed at Bellevue.

5   What is your position there?

6   A     At Bellevue, I'm also an OB/GYN doctor and I do a lot of

7   the high risk ultrasounds, I take care of women's health

8   issues, both in the clinic and also with ultrasounds.

9   Q     And so is it fair to say you practice as an OB/GYN in the

10  clinical setting apart from your positions as director of

11  safety and so forth?

12  A     Yes, ma'am, day and night.

13  Q     And are you board certified in any specialties?

14  A     Yes, ma'am.

15  Q     What specialties?

16  A     Obstetrics and gynecology and then the higher level of

17  subspecialization.

18  Q     All right.  And, generally, what is obstetrics?

19  A     Obstetrics is the medical care of women who interestingly

20  are either planning to get pregnant, through the pregnancy and

21  then up to a year after the pregnancy is over.

22  Q     And how about gynecology, what's that?

23  A     Gynecology is the health care of women outside of what

24  I've just described in relation to the pregnancy.  So any

25  aspect of women's health care, from an adolescent all the way

1    to grave, et cetera, older age.

2    Q    And you also said you had a subspecialty, is that right?

3    A    Yes, ma'am.

4    Q    And what is that?

5    A    My subspecialty is in high risk obstetrics where I do a

6    lot of the surgical aspects.

7    Q    And are you board certified in that as well?

8    A    I'm board certified in that in the sense that it's a

9    higher level above obstetrics and gynecology.

10   Q    And in your work in gynecology, does that include

11   diagnosing and treating patients with sexually transmitted

12   diseases?

13   A    Yes, ma'am.

14   Q    And does that include herpes?

15   A    Yes.

16   Q    Now, are you also what's known as a board examiner?

17   A    Yes, I used to be.

18   Q    Used to be?  Okay.  And what is a board examiner?

19   A    A board examiner is, it's a body of people who help

20   address anybody practicing in the field which, in my case,

21   would be OB/GYN, anybody practicing in that field is, has

22   fulfilled the competence categories.  So in other words, the

23   board examiner, during the situation of the exam, will be

24   making an assessment in a window of time to say that that

25   individual has, knows how to practice within the scope and

Hoskins - direct - Shihata                    3030

1   breadth of the field of women's health, knows how to formulate

2   a treatment plan, knows how to handle complications, knows how

3   to guide a patient through whatever clinical situation it may

4   be.  So it's just overall addressing how women's health care

5   is delivered and the board examiner is the individual who,

6   with his or her colleagues, will decide that that person, the

7   candidate, has fulfilled those requirements and those

8   obligations.

9   Q    So is it fair to say that the board examiner with their

10  colleagues are the ones that determine whether someone is

11  board certified in a specialty?

12  A    Yes, that is the person who would say yes, I have

13  addressed this, I have assessed it, I've analyzed it, this

14  individual is deemed clinically competent to practice the

15  scope and breadth of the field.  So there's people who would

16  succeed and then there's others where we would say this one is

17  not ready yet.

18  Q    And when you served as a board examiner, what specialties

19  were you a board examiner for?

20  A    Again, both general women's health which is obstetrics

21  and gynecology and also in the field of high risk obstetrics.

22  Q    Now, can you please describe for the jury your

23  educational background beginning with medical school?

24  A    So my medical school was in Karachi in Pakistan, Dow

25  Medical College, after which, it wasn't educational but it was

Hoskins - direct - Shihata                    3031

1   considered a supervised clinical work after my medical school

2   degree.  I worked in the Middle East in Doha, Qatar for two

3   years under supervision so it's a way of training.  Then two

4   and a half years subsequent to that, I worked in women's

5   health in Muscat, Oman, both in the Middle East.

6              Subsequent to that, I came to the United States and

7   worked in internal medicine and psychiatry combined training.

8   I didn't practice in that field and switched over to training

9   in women's health obstetrics and gynecology.  After the

10  women's health -- after the obstetrics and gynecology

11  training, I got higher training in the field of high risk

12  obstetrics from the surgical and clinical aspect.

13  Q    And where did you do your residency in obstetrics and

14  gynecology?

15  A    My residency in obstetrics and gynecology was at the

16  National Naval Medical Center in Bethesda, Maryland.  It's

17  under the umbrella of the Uniformed Services University of the

18  Health Sciences.

19  Q    And are you or were you a member of the United States

20  Armed Forces?

21  A    Yes, I was.

22  Q    For how long?

23  A    Twenty-seven years.

24  Q    And did you practice medicine in that context?

25  A    Yes, I did.  I practiced while, in obstetrics and

Hoskins - direct - Shihata                3032

1   gynecology while on active duty which was 11 years.  The

2   remaining was in the Reserves and that was the United States

3   Navy.  Also at Walter Reed Army Medical Center and at NIH.

4   And then one small explanation, also with the United States

5   Marine Corps.  Because the Marine Corps doesn't have medical

6   assets, the Navy provides the medical assets.  So, overtly, it

7   looks as though it was also the Marine Corps but it was as a

8   medical person in the Navy towards the Marine Corps.

9   Q    And when you left the United States Armed Forces, what

10  rank did you hold?

11  A    Bird Colonel O-6.

12  Q    Now, you testified that you're currently employed at both

13  NYU and Bellevue.  Have you also previously worked in various

14  capacities at these and other hospitals?

15  A    Yes, I have.

16  Q    And does that include as the Chief and Residency Program

17  Director of the Department of Obstetrics and Gynecology at

18  NYU?

19  A    Yes, it does.

20  Q    And as an Attending of Obstetrics and Gynecology at NYU?

21  A    Yes, ma'am.

22  Q    As the Chair and Residency Director of the Department of

23  Obstetrics and Gynecology at Lutheran Medical Center?

24  A    Yes, ma'am.

25  Q    An as the Executive Director of the Women's Health

1   Institute at the Memorial Health University Medical Center in

2   Savannah, Georgia?

3   A    Yes, ma'am.

4   Q    And, finally, as the Director of Research and Infectious

5   Diseases at the Division of Maternal-Fetal Medicine at the NYU

6   Medical Center?

7   A    Yes, ma'am.

8   Q    You also testified that you also currently hold an

9   academic position at NYU, is that right?

10  A    Yes, ma'am.

11  Q    And how long have you been a professor at the NYU School

12  of Medicine approximately?

13  A    Ten plus years.

14  Q    And in that capacity, who do you train?

15  A    A multitude of individuals get trained.  The overt most

16  common example is training fellows at the highest level of

17  residency, so medical students, residents, fellows within the

18  field.  We also help train young attendings as they need to

19  learn additional or more things.  I also am involved in the

20  training of what we call allied health professionals.  So they

21  could be nurse practitioners, midwives, physician assistants,

22  nurses.  They would be unique components who want to do extra

23  within women's health.

24  Q    And the area you focused on is women's health, obstetrics

25  and gynecology for the training as well?

1    A    Yes, ma'am.

2         THE COURT:  Do you have an application with regard

3    to this witness?

4         MS. SHIHATA:  I do.  I can move on to it.

5         THE COURT:  All right.

6         MS. SHIHATA:  Your Honor, pursuant to Federal Rule

7    of Evidence 702, I'd like to offer Dr. Hoskins as an expert in

8    the field of medicine with a specialization in obstetrics and

9    gynecology including the diagnosis, treatment and effects of

10   sexually transmitted diseases.

11        THE COURT:  Any objection?

12        MS. BLANK BECKER:  No objection, Judge.

13        THE COURT:  I gave you an instruction about expert

14   witnesses.  As I said before, I'll give you a little bit more

15   instruction on that in my final charge.

16        Go ahead, Counsel.

17        MS. SHIHATA:  Thank you.

18   Q    Now, you're testifying here as an expert witness, is that

19   correct?

20   A    That's correct.

21        THE COURT:  Is the microphone working?

22        THE WITNESS:  Yes.  I had just tilted it a little

23   bit.

24        THE COURT:  It may need another battery.

25        THE WITNESS:  So it wasn't me.

Hoskins - direct - Shihata                    3035

1          THE COURT:  Not you.

2          (Pause.)

3          THE WITNESS:  It's on, ma'am.

4          THE COURT:  Now it's good.  Go ahead.

5          MS. SHIHATA:  Thank you.

6    Q    Are you being compensated for your time here testifying

7    as an expert?

8    A    Yes, ma'am.

9    Q    Now, Dr. Hoskins, what is a sexually transmitted disease?

10   A    Exactly what the term says.  Illness or infection or

11   disease that has been obtained or has occurred in the, during

12   the interaction of sexual intercourse.

13   Q    And is it -- sexually transmitted diseases also known as

14   STDs?

15   A    Yes, ma'am.

16   Q    And are these diseases also known as venereal diseases?

17   A    Yes, ma'am.

18   Q    Now, what are some examples of STDs?

19   A    Well, there are several examples.  They can come in the

20   categories of bacteria, viruses, fungus infections.  Some

21   examples are chlamydia, gonorrhea, syphilis, HIV.

22   Q    And how about herpes?

23   A    Herpes also.

24   Q    Now, are some STDs curable?

25   A    Yes, ma'am.

CMH      OCR      RMR      CRR      FCRR

1    Q    And what are some of the ones that are curable?

2    A    The once that are curable are chlamydia, syphilis,

3    gonorrhea, and we know that because we can do a test of cure

4    to verify that they are cured.

5    Q    And are some STDs not curable?

6    A    Correct.  Correct.  Some are not curable.

7    Q    Is herpes curable?

8    A    No, ma'am.

9    Q    So once you contract herpes, do you have it for the rest

10   of your life?

11   A    Yes.

12   Q    Now, generally speaking, what is the herpes simplex

13   virus?

14   A    Well, generally speaking, it's a body of viruses.  That's

15   the name, herpes simplex.  There's two types.  It's a very

16   contagious, transmissible virus that can, that lives in the

17   human body, in various tissues in the human body.

18   Q    And now focusing specifically on genital herpes, what

19   does that term mean?

20   A    Well, genital herpes means that it is herpes virus

21   infection in the genital area of the human body.

22   Q    How does genital herpes, how does that enter the body?

23   A    The herpes virus would enter, in the aspect of genital,

24   it would be contact with the genital, with some area of the

25   genital tract.  It has to have a direct contact between an

Hoskins - direct - Shihata                    3037

1   area on an individual or an item that is containing or

2   carrying the virus and then direct contact with any aspect of

3   the human body in the genital area but it has to be a direct

4   contact.

5   Q     And can that direct contact be through sexual

6   intercourse?

7   A     Yes, ma'am.

8   Q     Now, once the herpes virus enters the body, where does it

9   go?

10  A     Well, once the virus enters the body, it's going to stay

11  in that local general area where it entered, create a response

12  from the body in that general area and then, ultimately, over

13  a window of time, it will go into where its preferred location

14  and place is which is the central nervous system.

15        MS. SHIHATA:  All right.  I'd like to show the

16  witness only what's been marked for identification as

17  Government Exhibit 962.

18        THE COURT:  Do you have any objection to this going

19  into evidence?

20        MS. BLANK BECKER:  I do not, Judge.

21        THE COURT:  So this is in evidence.

22        (Government Exhibit 962 so marked.)

23        MS. SHIHATA:  If we can publish it, please.

24  Q     You just mentioned the central nervous system.  What is

25  the central nervous system?

Hoskins - direct - Shihata                3038

1   A     Well, the central nervous system is the combination of

2   the brain as can be seen over there and then whole rest of the

3   nerves which is the spinal cord and the rest of the nerves for

4   the entire body.

5   Q     And is that represented in this diagram, Government

6   Exhibit 962?

7   A     Yes, ma'am.

8   Q     And can you describe how it's represented here?

9   A     Well, it's showing a human body.  Theoretically, it's

10  showing, I'm assuming, the back of the person.  It's showing

11  at the top, the brain, the long narrow yellowish tubular

12  structure is the spinal cord, and it's showing different

13  colors like a bluish color and a greenish color of like fibril

14  or tendril-like things which are various nerves that are being

15  depicted as they're going through various aspects of the body

16  and you can see it's going throughout the entire body.

17  Q     And after the herpes virus goes to the central nervous

18  system, what happens then?

19  A     Well, once the herpes virus goes to the central nervous

20  system, it's going to stay there.  That's it's preferred area

21  of location so it can be in the central tube that you can see,

22  that long yellow narrow tube.  It stays there in a specific

23  unique portion of the central nervous system.

24  Q     And how, if at all, is entry of the herpes virus into the

25  central nervous system dangerous?

Hoskins - direct - Shihata                    3039

1   A    Well, it's dangerous because once it's within the,

2   technically the area within the central nervous system which

3   are called the dorsal roots but it's just a component of the

4   central nervous system, it will remain there.  It's dangerous

5   because once it's there, it's always there so it can

6   reactivate and when it reactivates, it can cause a result or

7   an effect based on its reactivation and then other parts of

8   the body, any place that what we call are innervated or where

9   the nerves are going, any part or many parts can then be

10  affected.

11  Q    And how can those other parts of the body be affected?

12  A    By how, you mean what can happen or the pathway?

13  Q    What can happen.

14  A    What can happen.  So what can happen is when it goes,

15  when there's reactivation, there can be a resurgence of a

16  pattern that was similar to the initial attack.  For example,

17  so the person would show evidence of a new herpes event or a

18  situation or an outbreak, and that would be in various stages

19  of quantity in terms of the width and the extent of where the

20  outbreak is in terms of the severity of the symptoms in

21  relation to the outbreak and in terms of the depth of that

22  outbreak, in terms of how deep into the tissue.

23  Q    Now, you've used the term "outbreak" a few times.  What

24  is a herpes outbreak?

25  A    Well, herpes outbreak is just a way of saying that there

1   is an area in the body where the herpes is causing its effect

2   and the reason we call it outbreak is it's sort of like a

3   generalized area.  So an outbreak can be in one area like the

4   genital area or in some other part of the human body and not

5   in the whole body even though the nervous system is in the

6   whole body.

7   Q    And focusing specifically on an outbreak in the genital

8   area, how does that manifest itself?

9   A    Well, the outbreak in the genital area, again, first

10  clarifying would it be a primary outbreak or a secondary

11  outbreak, but having said that, it would manifest itself by

12  what are the classic findings of the infection of herpes which

13  would be blisters, ulcers, pustules, vesicles.  These are

14  technical terms but they basically mean raised areas filled

15  with fluid.  If the blister breaks open, then it's red

16  appearing because it's a denuded or raw area within that

17  blister.

18        So those are the ways that the herpes infection can

19  show itself and then there will be like wherever the blister

20  was, it's usually a small area which has a lining, it's got a

21  raw area within the base of it and then some weepiness of the

22  fluid coming out.

23  Q    You mentioned primary and secondary infections or, sorry,

24  outbreaks.  What do you mean by primary outbreak?

25  A    What we call primary outbreak in herpes means that that

Hoskins - direct - Shihata                3041

1    human body has never seen the attack by the herpes virus so

2    it's going to be the first time and we're talking about herpes

3    simplex type 2 for example.  So the primary outbreak would be

4    that the body is going to mount a very strong response to this

5    attack or this insult of the herpes virus.  So that's a

6    primary outbreak.  There are various aspects of the human body

7    that get involved and react to this infection.

8              Then a secondary outbreak means the herpes was

9    already within the body.  The body defense cells and

10   mechanisms had already got a prior memory of having been

11   exposed to that, living in the central nervous system like we

12   see and now it's a secondary outbreak where it got

13   reactivated.  Similar findings can occur like with the primary

14   outbreak but now that the body has defense cells that have

15   already been exposed to that, have a practice and a memory of

16   having attacked it or tried to tamp it down, the secondary

17   outbreak would be a situation where it's less extensive, less

18   severe, less intense, similar findings.

19   Q    And when you say similar findings, are you referring to

20   the same blisters and pustules, fluid filled, that you were

21   talking about before?

22   A    Yes.  Similar findings means those which you've

23   described, the blisters, the vesicles, the pustules, the

24   broken areas, the scabs, the denuded areas.  In addition to

25   that, it's also a bunch of symptoms both in the primary

1   outbreak and the secondary outbreak, burning, tingling, pain,

2   a sensation of numbness sometimes.  Severe pain is probably at

3   the top of the list.

4   Q    And with respect to genital herpes, how does that severe

5   pain manifest itself?

6   A    Well, with genital herpes, once the vesicles, pustules,

7   blisters appear, there is pain in that general area.  It could

8   be before the actual blister has been seen but the pain is

9   there.  It can be during the time when the blister is present,

10  when the blister breaks open and the fluid weeps out and then

11  subsequent to that, when it's crusting over.

12              So the pain manifests itself -- if it's a primary

13  outbreak, the pain is very, very intense because you recall

14  that herpes is preferentially wanting to be with the nerves.

15  So the nerves gets overactivated, overstimulated, so the

16  intensity of the response of that nerve is very high and,

17  therefore, the pain is very intense.  The burning is very

18  intense.  Then that pain causes the individual to then have

19  secondary complications or problems due to the actual

20  existence of the pain.

21  Q    What are some of those secondary complications or

22  problems?

23  A    So the secondary complications or problems would

24  obviously depend on where the blisters were, where the pain

25  was but, in general, if it's in the general area and there's

1    all these blisters in the genital area with the severe pain

2    and burning and that sensation, then the individual might have

3    severe pain just because that tissue is very, in deep pain

4    and, therefore, the person may not be able to have even

5    anything touching like a sheet or clothes, may not be able to

6    walk, may not be able to lie down.  Anything touching that

7    area or even air sort of being exposed to that area might

8    cause pain.  It can also be when the individual needs to

9    urinate, for example, because the area might be extra

10   responsive and sensitive.  So there may be a stinging, burning

11   sensation actually during the act of, you know, urinating,

12   therefore, the individual, the body tends to like avoid trying

13   to do that.

14          So because of the pain, because of the burning,

15   there can be secondary situations such as the person won't

16   move, the person may not urinate, the person may then retain

17   the urine, the person may need to have a burning sensation

18   which may mean that they cannot wear their clothes at that

19   time because nothing can touch it.  So that's what I'm trying

20   to describe as the secondary.  And it's all because it's a

21   very severe, high level of intense pain and burning that

22   occurs with the primary outbreak.

23          THE COURT:  I'm just going to ask you if you can

24   slow down just a little, just a little bit just so our court

25   reporter can get everything that you're saying.

Hoskins - direct - Shihata                     3044

1          THE WITNESS:  I'll try.

2          THE COURT:  Thank you so much.

3          Go ahead.

4  Q    All right.  So now, these secondary outbreaks that you

5  mentioned, what, if anything, causes a secondary outbreak?

6  A    So the answer to what causes a secondary outbreak is a

7  range and it starts from unknown, unpredictable, to known

8  factors that might trigger a secondary outbreak.

9          So in the unknown and unpredictable, it could be

10 everything was going along fine in the individual's life and

11 suddenly there was an outbreak, an overt identifiable trigger.

12         The other end of the spectrum could be known

13 triggers such as just the person living their lives.  You

14 know, in a woman, it would be her menstruation is starting.

15 It could be if a person happens to get a common cold or cough

16 where they are getting another infection and another attack on

17 their immunity and now this also will get reactivated in

18 addition.  It can be sunlight.  Ultraviolent light is a very

19 common trigger for herpes reactivation.  So people going out

20 into the sunlight in the daytime, some have described that

21 that is a trigger.  It can also be people who have already got

22 other illnesses, asthma, cancer, hypertension, diabetes.

23 Anything which is already giving a burden to your immune

24 system can also be a trigger for the herpes to get

25 reactivated.

Hoskins - direct - Shihata                    3045

1          So like I said, it goes from unknown, unpredictable
2    all the way to known triggers where the individual may know.
3    When I get a cold, when I get my periods, when I'm out in the
4    sunlight, et cetera, et cetera, those are the kinds of things
5    that are triggers.
6    Q    And is it fair to say based on what you just said, from
7    unpredictable to known triggers, that the known triggers are
8    often very common, everyday things?
9    A    Yes, ma'am.  It's just generally living their lives.
10   Q    And so does that make it relatively unpredictable for a
11   person with herpes about when they're, they might get a
12   secondary outbreak?
13   A    Yes, it is unpredictable.  It's known to be unpredictable
14   but on the other hand, they can then say I'll never have my
15   menses, I'll never be out in the sunlight, I'll never get
16   another cold.  So it is unpredictable because they have to
17   live their lives or they would just have to stop living their
18   lives.
19   Q    So fair to say it's difficult for a women to stop having
20   menses or getting colds or any of those lists of things?
21   A    Correct.
22   Q    Okay.  Now, are you familiar with the, in the context of
23   herpes, are you familiar with the term "shedding"?
24   A    Yes, I am.
25   Q    And what is that?

1  A    Shedding means, in the context of herpes, shedding means

2  that the virus is being excreted.  It's coming from the tissue

3  where it is at that moment present to the outside, whether

4  it's contact with something else or outside into the air.

5  Q    And does a person have to be -- well, withdrawn.

6            Are you familiar with the term, in the context of

7  herpes, are you familiar with the term "asymptomatic

8  shedding"?

9  A    Yes, ma'am.

10  Q    And what is that?

11  A    Asymptomatic shedding, again, means that the virus is

12  being excreted but it is coming at a time in the individual's

13  life when he or she does not have evidence of the herpes

14  itself.  In other words, they don't have a blister, they don't

15  have the symptoms of the tingling, the numbness, the burning,

16  the pain so they might be thinking I'm, my herpes is at rest

17  right now but, in reality, it has reactivated because there's

18  no evidence that it has reactivated but the shedding is

19  occurring in the absence of any overt evidence of

20  reactivation.

21  Q    And does that mean a person can still be shedding the

22  virus even when they're not having an outbreak?

23  A    Yes.

24  Q    Now, does every individual who is exposed to genital

25  herpes, does that mean they a hundred percent will get genital

1   herpes?

2   A    In my personal, clinical opinion, nothing in medicine is

3   a hundred percent or zero percent, but as close to a

4   hundred percent as possible.  It's a very contagious, very

5   transmissible virus.  I personally am not aware that if

6   somebody is exposed to herpes and then they wouldn't get it.

7   Q    All right.  But there are times when a person can be

8   exposed and perhaps -- well, withdrawn.

9          Are there certain precautions that can be taken to

10  reduce the likelihood of herpes infection, of a person with

11  herpes infecting somebody else?

12  A    Yes, there are precautions which would mean that they

13  didn't get exposed to it.

14  Q    Okay.  And, well, starting -- why don't you tell me what

15  you're thinking of.

16  A    So what I mean by that is when I talk about being exposed

17  to it, I mean that there has to be the opportunity for a

18  contact, a direct contact, and that's what I was trying to

19  explain, that when there is direct contact from an area of

20  body tissue, utensil, an item that is carrying the herpes

21  virus and it has direct contact with the skin or mucous

22  membrane of the human body, there will definitely be the

23  infection with the herpes.

24          If there is no contact such as decreasing the

25  exposure by doing protection for one's self, either the person

Hoskins - direct - Shihata                    3048

1   with the herpes or the person who is not yet infected, either

2   one of them is protecting themselves, then, yes, the

3   likelihood of getting the herpes would be decreased.

4   Q    And when you say protecting themselves, does that include

5   using a condom?

6   A    That includes using a condom.

7   Q    Now, are you familiar with treatments for herpes?

8   A    Yes, ma'am.

9   Q    And is one treatment a drug known as Valtrex?

10  A    Yes, ma'am.

11  Q    Now, we'll talk a bit more about that later, but can

12  Valtrex also be taken prophylactically?

13  A    Yes, ma'am.

14  Q    And what does that mean?

15  A    Well, basically Valtrex is an antiviral so it's going to

16  attack virus cells.  And when Valtrex is taken

17  prophylactically, it means that even if there is herpes

18  available or present, the Valtrex is going to keep it tamped

19  down or prevented and that's the word, prophylaxis.  That

20  means that even though its presence is there, it won't be

21  enough either in quantity or duration to be able to transmit

22  it to somebody else.

23  Q    So is that also a case where notwithstanding that the

24  person has herpes, it might reduce the risk of transmitting it

25  to somebody else if they're taking Valtrex prophylactically?

1   A    Yes.

2   Q    Okay.  So fair to say then that that's a situation where

3   someone might have sex with somebody and not necessarily a

4   hundred percent give it to the other person?

5   A    Yes.

6   Q    Okay.  Now, now, can you explain -- well, actually prior

7   to that, you talked about outbreaks, primary and secondary

8   outbreaks from herpes.  Are there also other medical

9   complications that can result from having the herpes simplex

10  virus in your, in one's body?

11  A    I'm -- by other medical complications, what I would take

12  from that is when there is an outbreak, be it primary or

13  secondary, that there can be a further spread, a further

14  complication, a further event.

15        So if there is an outbreak, whether it's primary or

16  secondary, there can be an infection in that area.  If there's

17  an outbreak and there's an infection, that infection can go

18  into the bloodstream to the fullest extent where it may be

19  only in the bloodstream and then to a higher level where we

20  may call it sepsis.  The infection can go into the central

21  nervous system where we may call it just an infection in that

22  nerve area directly or it may go all the way to the brain or

23  the rest of the central nervous system or even the layers that

24  cover the brain and the central nervous system.  Technically

25  that's called meninges.

Hoskins - direct - Shihata                    3050

1            So when we look at what are the other outcomes with

2    the primary or a secondary outbreak, it can be a local area of

3    everything we've talked about.  That area can get infected an

4    then there can be blood infections, there can be brain and

5    central nervous infections.  There can be secondary problems

6    like urine retention.  We've talked about that.  There can be

7    secondary problems such as the person is in such severe pain,

8    they don't move around at all, therefore, they are at a little

9    bit higher risk of having maybe blood clots because they're

10   not moving around so much.  They're lying still because of the

11   pain.  So it can go on and on like a ripple effect.

12   Q    Okay.  And fair to say that some of these secondary

13   effects that you've talked about, going into the brain and

14   sepsis, that those are rarer than the outbreaks, is that fair

15   to say?

16   A    They are rarer, yes, they are less common but during the

17   outbreak is when they can occur meaning as a result of the

18   outbreak.

19   Q    I see.  So notwithstanding that they are rarer, they

20   remain a risk when someone has herpes, is that fair to say?

21   A    Always.

22            (Continued on next page.)

23

24

25

1    DIRECT EXAMINATION (Continued.)

2    BY MS. SHIHATA:

3    Q    And just so the jury understands, what are some of the

4    terms -- some of the terms you mentioned, what is sepsis?

5    A    Sepsis means that there is an infection in the

6    bloodstream.  In general, sepsis we mean by bacterial

7    infection, but they can be viral infection in the bloodstream

8    as well.  Sepsis is overarching term that just means that the

9    infection is so intense that it is affecting the bloodstream

10   and therefore the heart and the lungs and the brain.  Sepsis

11   is a very serious, heavy term that denotes that the infection

12   in the bloodstream is heavy enough that it is now beginning to

13   have effects on the rest of the human body.

14   Q    And I think you used the term meninges, is that --

15   A    Yes, ma'am.

16   Q    What is that?

17   A    Yes.  So meningitis is when the infection, in this case

18   herpes, has gone into the central nervous system and has,

19   whether it's a primary or reactivation, it's now caused an

20   inflammation in the tissues of the brain.  The brain itself,

21   the tissue of the brain when we use the technical term we call

22   it encephalitis, it's a different technical term.  If we use

23   the term where the infection is the layers or the covering of

24   the brain, those are what's called the meninges and that term

25   would be called meningitis.

Hoskins - direct - Shihata                    3052

1  Q     Now, can you explain to the jury what a medical diagnosis
2  is?
3  A     A medical diagnosis in my opinion basically means that
4  the clinician has used his or her medical knowledge, expertise
5  to come up with an answer of a particular condition that this
6  is what the condition is, name the illness, name the clinical
7  situation, identify it.
8  Q     And what methods do doctors use to diagnose genital
9  herpes?
10  A     For genital herpes specifically the most common and very
11  reliable, accurate method would be physical exam.  Where we
12  would take the history from the patient, but basically
13  physically examining the area where the outbreak has been
14  identified and can be seen and that would be the most common
15  way.  There are additional ways to clinch the diagnosis, to
16  reconfirm higher level and they could be using laboratory
17  tests.
18  Q     And what does a doctor look for in the clinical exam with
19  respect to herpes?
20  A     In the clinical exam, you know, in general the patient
21  would say, I have certain symptoms, and we described those
22  before, and then when the doctor or whoever the clinician is
23  is examining that specific area, they would look for redness,
24  a sensation of numbness.  You can take a Q-tip or some other
25  object and feel around in the area the patient would say this

1    feels numb.  There can be -- similarly, there can be a finding

2    of intense pain and burning in that area either with the

3    patient having touched it or some other object touched it or

4    the clinician examining the patient, and then visual is the

5    biggest category where you would see a blister.  You could see

6    the blister, the area is weeping and wet because there is

7    fluid seeping out, you could see the redness, the rawness in

8    the base of the blister, you could see a crusting over because

9    different blisters will be in different stages, some have

10   popped open, some are starting out, some have already opened

11   and are raw and the final side would be that they've crusted

12   over already.  So all those put together, looking at the area

13   visually in the setting of what the patient has described, is

14   the most accurate way of doing it.

15   Q    Now you mentioned other testing that's available.  Are

16   you familiar with the term herpes simplex culture?

17   A    Yes, I am.  That is one of the other tests.

18   Q    And what is that?

19   A    Well, any time you're talking about a culture, and in

20   this setting herpes simplex culture, the idea is to take a

21   sample, be it a sample from the fluid, the edge of the

22   blister, a portion of that tissue and grow it in a special

23   growth medium in the laboratory under specific conditions so

24   that more of that virus can grow with the assumption being

25   that the virus was in the sample that was collected, with the

1  benefit of the growth medium it will grow and multiple and the

2  culture will be positive, because it will be -- it will grow

3  enough to be identified and looked at under the microscope.

4  Q    Is timing of when a culture is taken for the herpes

5  simplex virus, is that important to the accuracy of the

6  result?

7  A    It is important in the sense that it is -- you know, when

8  there is an active lesion there's the highest likelihood of

9  identifying the virus, so from that point of view the timing

10  is important.

11  Q    And can an outbreak last anywhere from several days to

12  several weeks?

13  A    Yes, ma'am, it usually does.

14  Q    And does the manner in which the blisters or the -- does

15  it change throughout that time, the manner in how whether they

16  are more fluid or less fluid or dried up, does that change

17  over the course of the outbreak?

18  A    Yes, it does.  The initial part of the outbreak will have

19  more of the blister, more of the liquid, more of the

20  weepiness, seeping and then as it opens up and then dries to

21  air or with some other way then there will be -- that will

22  change, the appearance will change and the amount of the virus

23  coming out will also change.

24  Q    So is it fair to say that even within the outbreak time

25  period it can matter where within the time period the culture

Hoskins - direct - Shihata                3055

1   is taken?

2   A    In general, yes.

3   Q    And as a result, does herpes -- the results of herpes

4   simplex cultures sometimes provide false negatives?

5   A    Yes.

6   Q    Now, are there any other tests other than the culture

7   that can be used to test for herpes?

8   A    There are two other categories of tests.  One would be to

9   look for the actual genetic material of the herpes virus.  So

10  there can be a certain chemical reaction and a laboratory test

11  that looks for that and that would come out as positive if the

12  DNA, for example, the genetic material of the virus is found.

13  And then there is another category of test which is blood

14  tests in the person looking for the presence of defense cells

15  that have been exposed to herpes so they can be -- a certain

16  type of cell within the human body that would be positive for

17  having been exposed to herpes.

18  Q    And you testified earlier that the -- notwithstanding the

19  existence of these different types of testing, the most common

20  method that doctors use is the history and physical exam?

21  A    Yes, ma'am, it is the most common and very, very

22  reliable.

23  Q    Now I want to turn now to treatment for herpes.  What

24  medications are used to treat herpes?

25  A    The medications used to treat herpes would be in two big

Hoskins - direct - Shihata                3056

1    categories.  One would be to treat the symptoms.  So there's a

2    herpes outbreak and then there could be treatment for the pain

3    and et cetera, et cetera, and preventing a secondary

4    infection, but the targeted medication for treating the herpes

5    are what's called antivirals.  They are going to attack the

6    virus.

7    Q    And what are some of the medications, these antiviral

8    medications?

9    A    Regarding herpes simplex specifically there is Valtrex,

10   Famvir, there's a third one that I'm blocking on, Acyclovir.

11   Q    Is Valtrex a brand name?

12   A    Valtrex is a brand name.  The generic name is valtra -- I

13   can't remember.

14   Q    Does Valaciclovir, is that the generic name?

15   A    That's the one.

16   Q    And what does Valtrex do?

17   A    Valtrex is going to help suppress the herpes infection.

18   It will attack the component of the herpes virus that's what's

19   called an antiviral and what it will end up doing is it will

20   decrease the overall duration of that particular herpes

21   outbreak.  It will decrease the overall depth and severity of

22   that particular herpes outbreak.  So, in other words, it tries

23   to prevent the infection and additionally tamps it down so

24   that the severity and the duration and the depth is tamped

25   down.

Hoskins - direct - Shihata                3057

1  Q    Now we talked earlier about the prophylactic use of

2  Valtrex, do you recall that?

3  A    Yes.

4  Q    Now I think you just testified it's -- well, withdrawn.

5  Does taking Valtrex, can it eliminate herpes from your body?

6  A    I don't think that it can eliminate it specifically for

7  it to ever be completely gone.

8  Q    Okay.  So all I'm getting at here is, it's not a cure for

9  herpes; is that right?

10  A    Yes, ma'am, there is no cure for herpes.

11  Q    Now when you diagnose a patient with herpes, what, if

12  anything, do you advise that patient?

13  A    Well, again in diagnosing the patient there will be the

14  component that's the more urgent, the more acute of how to

15  manage the current outbreak for her -- his or her, in this

16  case, her own comfort and safety, not to get it secondary

17  infected, take care of -- how to handle the pain, the burning,

18  et cetera.

19            In addition to that, we do tell the patients, you

20  know, this is a serious situation right now, the person is

21  highly infectious, can transmit and therefore that individual

22  has to take certain precautions to avoid that risk.

23  Q    And what precautions are those?

24  A    Well, basically the person has to take the precaution to

25  avoid contact with any other part of her own body per se, but

1    specifically sexual intercourse, transmitting it to another

2    individual because she is, at that point, highly infectious

3    and is, you know, able to transmit this very contagious virus.

4    Q    Do you advise patients about the use of condoms?

5    A    Yes, we do.

6    Q    What, if anything, do you tell patients regarding

7    informing sexual partners of the diagnosis?

8    A    Well, we do tell them that because they are very

9    contagious, because herpes is chronic, it's permanent, that

10   they should ideally be communicating to, you know, the

11   individual that they are planning to have a sexual

12   relationship with, that they would be likely to transmit it

13   and therefore they should avoid having that contact, avoid

14   intercourse.  If they wish to, they should share the knowledge

15   that there is herpes present, either it's a chronic or acute

16   outbreak and therefore that vulnerable has a right to then

17   make a choice, but also that both can have a choice to protect

18   themselves.  The person infected has a -- I would say, an

19   obligation to use a condom or some other protection and then

20   the person who is -- the other person who is not infected, but

21   is likely to get exposed, would have a choice to do some

22   preventive measure for himself or herself.

23   Q    I think earlier in your testimony you mentioned that

24   there are two types of the herpes simplex virus; is that

25   correct?

Hoskins - direct - Shihata                    3059

1    A    Yes, ma'am.

2    Q    And are those known as type 1 and type 2?

3    A    Yes.

4    Q    And -- well, can you explain to the jury what that means.

5    A    So herpes simplex virus type 1, we call it type 1, type

6    2, part -- and also partly because of the generic location

7    where it stays.

8            So herpes simplex type 1 can be more in the oral

9    area around the lips, in the mouth, on the tongue.  Fever

10   blisters, cold sores, in that general category.  So type 1 is,

11   again, highly contagious, highly infectious, but it stays

12   localized in that general area, does not cause such is a big

13   all encompassing effect as type 2, which is more intense.

14   Q    And is type 2, generally speaking, in the genital area?

15   A    Generally in the genital area, yes.

16   Q    Can a person have both type 1 and type 2 herpes?

17   A    Yes.

18   Q    You testified earlier that herpes can be transmitted

19   through sexual intercourse, correct?

20   A    Yes.

21   Q    And can it also be transmitted through oral sex?

22   A    Yes.

23   Q    And with respect to the prophylactic use of Valtrex, I

24   think you testified that that helps to lower the risk of

25   spreading; is that right?

1    A    Yes.

2    Q    Is there anything in the medical literature and studies

3    regarding what the risk remains even when someone is using

4    Valtrex prophylactically as directed by their doctor?

5    A    Again, herpes is chronic, it remains.  There is the

6    possibility of shedding even in the absence of any symptoms,

7    et cetera, so it's always there.

8            Having said that, using something like Valtrex is

9    going to try to decrease that.  That's the intention of giving

10   the Valtrex or taking the Valtrex, but there will never be a

11   situation where there's a hundred percent protection knowing

12   or not knowing there is an actual lesion or an ulcer or an

13   outbreak.  So in general, we tell the patients that you will

14   never be hundred percent protected even if you took the

15   Valtrex all the time or whatever window of time, because there

16   is a subset, and it varies in the range of 10 to 20 percent,

17   usually, there is a subset of situations and people where

18   there will still be the possibility of you transmitting it or

19   shedding it because the Valtrex's usefulness is not anywhere

20   close to a hundred percent.

21   Q    And the percentages you mentioned there, that's based on

22   a person who is actually following the directions of their

23   doctor and taking the Valtrex as prescribed, is that fair to

24   say?

25   A    Correct.  Whenever the medication is given, the

Hoskins - direct - Shihata                3061

1   assumption between the clinician and the patient, the covenant

2   is you will follow the instructions.  Human life, human nature

3   comes in, there may be a missed dose, there may be a missed

4   window of time and therefore again that also adds to that 10

5   to 20 percent concern that there will never be a

6   hundred percent protection.

7              MS. SHIHATA:  One moment, your Honor.  No further

8   questions.

9              THE COURT:  All right.  How is everybody doing?

10  Does anybody need a break?  Yes.  Okay, we'll take 10 minutes.

11             Please don't talk about the case.  See you in a few

12  minutes.

13             THE COURTROOM DEPUTY:  All rise.

14             (Jury exits courtroom.)

15             THE COURT:  Everybody can have a seat.  The witness

16  can step out.

17             (Whereupon the witness stepped down.)

18             THE COURT:  Anything before we break?

19             MS. SHIHATA:  No, your Honor.

20             (Recess.)

21             THE COURTROOM DEPUTY:  All rise.

22             THE COURT:  Everybody can have a seat.

23             Are we ready for the witness?

24             Let's get the witness then we'll get the jury.

25             (Whereupon the witness resumed the stand.)

1          THE COURTROOM DEPUTY:  All rise.

2          (Jury enters courtroom.)

3          THE COURTROOM DEPUTY:  You may be seated.

4          THE COURT:  We are ready to resume with the witness.

5    Cross-examination.

6          THE COURTROOM DEPUTY:  The witness is reminded she's

7    still under oath.

8          THE WITNESS:  Yes, ma'am.

9          MS. BLANK BECKER:  May I, Judge?

10         THE COURT:  Yes.

11         MS. BLANK BECKER:  My name is attorney Blank

12   Becker --

13         THE COURT:  I think we need to fix your microphone.

14   I wonder if it's better to use the standing one.  It might be

15   better.  Turn that one off.

16         MS. BLANK BECKER:  Sorry, Judge.  This one is

17   better, it doesn't reach up here.

18         Can I ask the questions from the seat?

19         THE COURT:  Whatever is most convenient.  It really

20   doesn't reach?

21         MS. BLANK BECKER:  No, we tried.

22         THE COURT:  Let's move the -- yes.  Does that work.

23         MS. BLANK BECKER:  I believe so, Judge.  Perfect.

24         THE COURT:  Go ahead.

25         MS. BLANK BECKER:  Thank you.

Hoskins - cross - Blank Becker                    3063

1   CROSS-EXAMINATION

2   BY MS. BLANK BECKER:

3   Q    I going to ask you a number of questions.  If you don't

4   understand something I ask you or you need it repeated, just

5   let me know, okay?

6   A    Yes.

7   Q    Is that a yes?

8   A    Yes.

9   Q    Thank you.

10        Doctor, it's my understanding, and I want to ask

11  you, isn't it true that you don't need to have sexual

12  intercourse in order to get herpes?

13  A    Yes.

14  Q    And in fact, if a person's not having an outbreak the

15  likelihood of transmitting is significantly less, correct?

16  A    Could you explain what you mean by significantly less?

17  Q    Sure.

18        Well, if a person isn't currently having the

19  outbreak, isn't it true that there is really only about four

20  to 10 percent chance that they're going to be transmitting the

21  disease to someone else?

22  A    That is correct.  I wouldn't call it "only," that's a big

23  number.

24  Q    Okay.  But that's four to 10 percent out of a hundred --

25        Is that correct?

Hoskins - cross - Blank Becker                    3064

1   A    Yes.

2   Q    -- percent?

3   A    Yes.

4   Q    Now you discussed earlier HSV-1, HSV-2, correct?

5   A    Correct.

6   Q    Now HSV-1, the oral herpes, that can be passed from

7   person to person just by kissing; isn't that correct?

8   A    Correct.

9   Q    And --

10              THE COURT:  I'm so, sorry is your microphone on?

11              THE WITNESS:  Hello?

12              THE COURT:  Better.  Go ahead.

13              MS. BLANK BECKER:  Thank you.

14              THE WITNESS:  I brought it closer, it might work.

15              THE COURT:  That's fine.

16  BY MS. BLANK BECKER:

17  Q    And not only can it be transmitted by kissing, but it

18  could also be transmitted through sharing objects such as like

19  lip balm; isn't that correct?

20  A    Yes, that's HSV-1, yes.

21  Q    Yes.  Okay.  Then HSV-2, that is most commonly -- which

22  is the genital herpes we talked about earlier -- it's most

23  commonly passed by vaginal sex or anal sex, correct?

24  A    Most commonly because it's genital, yes, but that's not

25  the only route.

1  Q    Okay.  Yes, I just wanted to know most commonly.  Thank

2  you.

3        Genital herpes is very common in the United States

4  in general, correct?

5             MS. SHIHATA:  Objection.

6             THE COURT:  Well, I don't know, can you answer that

7  question?  Can you answer that question?

8  A    I don't know what you mean by very common, because in

9  terms of percentages, common may mean something higher percent

10 or lower percent.

11 Q    Okay.  Well, isn't it true that more than one out of six

12 individuals have genital herpes?

13 A    Yes.

14 Q    And isn't it also true that most people who have herpes,

15 they don't even know they have herpes?

16 A    I disagree with that.

17 Q    Okay.  Isn't it next to impossible to pinpoint when a

18 person has contracted herpes?

19 A    I disagree with that.

20 Q    So you believe that it is very easy to determine when

21 someone has -- when someone has contracted herpes?

22 A    Yes.  Because that's when they find out that -- the way

23 they think about it is after they have developed the problems

24 and that's when they know that they have contracted herpes.

25 It's a specific point in time.

Hoskins - cross - Blank Becker                    3066

1    Q    Well, you indicated earlier that herpes can lie dormant,
2    correct?
3    A    Correct.
4    Q    It can lie dormant for days, correct?
5    A    Correct.
6    Q    Months, correct?
7    A    Correct.
8    Q    Years, correct?
9    A    Correct.
10   Q    Okay.  So, if it could lie dormant for years and someone
11   contracts the disease let's say in 1980, but doesn't show any
12   type of symptoms, as you just indicated, which helps a person
13   know that they have it, isn't it possible that years could go
14   by before they even think to go to a doctor to see if they
15   have herpes?
16   A    No.  I think it's apples and oranges.  When they contract
17   the herpes there will be a specific point in time when they
18   first got the illness.  The lying dormant is after they got
19   the illness that can be years and up to years.  So when they
20   contract it initially, it will always be able to be pinpointed
21   in time.
22   Q    So an individual has sex with their partner on Monday and
23   partner X, then they have sex with someone on Tuesday, partner
24   Y, and then they have sex with somebody on Wednesday, partner
25   Z, if that person goes to get tested on Friday, are you saying

Hoskins - cross - Blank Becker                    3067

1   that they could pinpoint when they contracted herpes?

2   A    No, they cannot.

3   Q    Time has passed, right?

4   A    It's not so much the time has passed, it's the exposures.

5   Q    So time has passed from Monday to Friday, correct?

6   A    Oh, yes.

7   Q    Okay.  And there's been a number of different potential

8   exposures, correct?

9   A    Yes.

10  Q    Okay.  And so you can't tell us today whether the person

11  who had sexual intercourse with X, Y and Z, which one of them

12  could have given them the disease if they came positive on

13  Friday for -- with a test, correct?

14  A    That is correct.

15  Q    No way to tell who gave it to that person?

16  A    That is correct.

17  Q    Now you also, I believe, talked a little bit about ways

18  to know who gave you herpes and you had indicated that if you

19  were with that partner and then you came in, you had some

20  outbreak, then you could do a physical exam, correct?

21  A    Yes.

22  Q    Now if you aren't diagnosed immediately after you're

23  having sex with that partner, isn't it true that the only way

24  to determine that that person received or contracted herpes

25  from that person they had sex with, is if that person never

1   had sex before.  Let me -- you know what?  Even that was a

2   confusing question how I said it.  Let me say that better.

3   A     Thank you.

4   Q     Person A has sex with person B, and person A has symptoms

5   of herpes and they come in to see you as the doctor.  Now,

6   isn't it true that the only way to determine if person A got

7   this herpes simplex from person B and be definitive that

8   person B gave it to person A, is the fact that person A would

9   have to have had no partners prior to being with person B.

10  A     I don't think it is no partners prior to person B.  I

11  think it is if it's in the window of time.  If the person had

12  partners a year earlier, that's not relevant.  It's inside the

13  incubation window.

14  Q     So it's not relevant if person A had sex with another

15  individual a year before having sex with person B?

16  A     Not for the first attack.

17  Q     Okay.  So you're saying that if person A had sex with

18  person C -- let's call it X, so we can differentiate.

19             Person A has sex with person X a year prior and they

20  have a relationship and they have sex, I don't know a couple

21  of times through the year, they then have sex on Monday with

22  person B, you're saying that the fact that they had a previous

23  partner who may have given them herpes, contracted herpes from

24  has no significance to the current case?

25  A     Again it's apples and oranges.  If person X had a prior

1  relationship with person A, and person A did not, from person

2  X, get herpes, because the first outbreak would show, there's

3  nothing hidden about the initial contact with herpes, it would

4  show.  Then when person A has sex with person B and they get

5  herpes, then it came from the person they had sex with, the

6  prior person did not give it to them.  They never showed the

7  evidence.  You can't have contact with herpes for the first

8  time and it never show up.

9  Q    Okay.  How about if the person doesn't go to get tested

10 during that year and they don't end up getting tested -- after

11 they had sex with person Z, there is no test during that year,

12 they wait until they have at some point they have sex with

13 person B and then sometime after that, not right after but

14 maybe six months later, they go to get tested.  Does that make

15 a difference?

16 A    Well, it always makes a difference if they don't go to

17 get tested, but again the testing is a tertiary aspect.

18            Person X, if they had herpes and if person X gave it

19 to person A for the first time, it would show up.  Whether

20 they get the testing or not is a tertiary aspect, because the

21 individual might be able to manage himself or herself and

22 never show up for any clinical care --

23 Q    Correct.

24 A    -- but the fact that if the person X had first time

25 infected person A, that would show up for person A.

1          What person A does with that information is his or
2    her own situation.  That's all I'm trying to clarify, that the
3    past exposure is different from a past acute primary exposure.
4    Q    Okay.  When you do the tests, whatever tests you choose,
5    the tests don't give you the DNA of the other person who gave
6    your patient herpes, correct?
7    A    Correct.
8    Q    Yes.  So when you're asking questions and/or informing
9    your patients about herpes, is it important -- isn't it
10   important that you talk about whether or not they have one
11   partner or multiple partners?
12   A    Yes, we do.  Yes, we do.
13   Q    And that's important because you're trying to figure out
14   and trying to sort of narrow down where this person could have
15   contracted the disease from, correct?
16   A    Yes.  That's usually the model for sexually transmitted
17   diseases.
18   Q    Now isn't it true that a blood test certainly can tell
19   you if you have herpes or not?
20   A    Correct.
21   Q    And a blood test is a pretty sure way of determining
22   whether this person, your patient, has herpes or not, correct?
23   A    Correct.
24   Q    Now --
25   A    Had, not has, had.

Hoskins - cross - Blank Becker                3071

1  Q    Okay.  Had --

2  A    In the past.

3  Q    Had been -- I'm sorry, say that again.

4  A    Had in the past.

5  Q    Yes.  Had in the past, okay, got it.

6         Now the blood test, they can't tell you the person

7  who gave your patient herpes, correct?

8  A    No.

9  Q    And they also can't determine how long the person has

10 been infected, correct?

11 A    They can to a small extent.

12 Q    A blood test?

13 A    Yes, ma'am.

14 Q    Tell me about that.

15 A    So in the blood test you're looking for what type of a

16 cell, that's call the antibody.  If you find an antibody of a

17 certain type, which is called M, as in Mary, that is an acute,

18 recent current exposure.  If you find the antibody which is

19 named G, as in God, that denotes past exposure.

20        So if I draw a blood test on a patient and I'm doing

21 what's called an antibody test, I will get an answer that says

22 IGM, as in Mary, positive or negative.  I will get an answer

23 IGG, as in God, positive or negative.  And that will allow me

24 to tell the duration, is it acute, recent now, which would be

25 M as Mary, or is it past, in the past of her life, which would

Hoskins - cross - Blank Becker                    3072

1   be the G.

2   Q    Okay.  So what's recent?  What timeline, what does that

3   mean?

4   A    In general, about two weeks on average.  It can be up to

5   a month.

6   Q    So if the test is done after two weeks or up to a month,

7   then you're saying that is considered G, as in God.  Excuse

8   me, that's considered past exposure, past the two weeks or the

9   month?

10  A    Correct.  The lab will tell me which immunoglobulin it

11  is, IGM or IGG.  The lab will say positive, and then it will

12  tell me which type of antibody cell.

13  Q    So is it fair to say then that the blood test is a pretty

14  accurate way to determine whether or not someone has herpes?

15  A    Well, in fact it's a very inaccurate way.

16  Q    Tell me then what you mean by that.

17  A    Well, it means, in general when someone is trying to

18  diagnose herpes, the last thing we look for is a blood test.

19  It is part of the armamentarium of trying to diagnose herpes.

20  The first thing is, as I had mentioned earlier, the physical

21  exam, highly reliable, and many, many clinicians will not

22  bother to do any additional lab testing of any kind.  However,

23  if somebody wishes to do lab testing a preferred way is to get

24  the genetic material of herpes virus.  If for some reason that

25  is not available or what we call equivocal, non-diagnostic and

Hoskins - cross - Blank Becker                    3073

1    for whatever additional reason, that I can't think of right

2    now, somebody says I wish to do the antibody test which will

3    tell me if this body mounted a defense mechanism against

4    exposure to the herpes virus, that's the antibody test, the M

5    and the G.  So that's the least chosen is that blood test.

6    Q    So it requires the patient to ask to get a blood test in

7    order for you to do a blood test on someone who may have

8    symptoms or outbreaks of herpes?

9    A    Well, the patient would be offered, after her physical

10   exam and the clinician says you have herpes, primary outbreak

11   or secondary outbreak, the patient may accept that and they

12   move on with the management plan and the counseling and

13   precautions.  The patient or the clinician may say, both may

14   say or one may say, I want further diagnosis, I want to clinch

15   this.  I'm almost certain, but I want more certainty.  Then

16   they would do the blood test or the culture.

17          In the setting of the blood test, which we are

18   discussing, we could do -- draw a sample of a blood and look

19   for the genetic material of the virus, or we could draw a

20   sample of blood and say I'm looking for the antibody, which is

21   the IGG, IGM.

22   Q    Thank you.

23          You're familiar with the CDC, correct?

24   A    Yes.

25   Q    What does that stands for?

Hoskins - cross - Blank Becker                    3074

1    A    Centers for Disease Control.

2    Q    And the Center for Disease Control, they come out with

3    way they believe are appropriate standards and guidelines; is

4    that correct?

5    A    Guidelines.

6    Q    Guidelines, thank you.

7              So you're familiar with the fact that the CDC's

8    guidelines indicate that the only way to know for certain if a

9    person has herpes is by a blood test you're aware of that?

10   A    Yes, because you have to define what certain means.

11   Q    Okay.  So when you -- strike that.  So a blood test is

12   the best way to determine if a person has herpes?

13   A    If you're talking about as close to a hundred percent

14   certainty, yes, blood test.

15   Q    Isn't it true that herpes is one of the most common STDs

16   in the world?

17   A    I don't know what you mean by most common in the world.

18   Q    Well, herpes type 1, the oral infection, that's a very

19   common infection, correct?

20   A    It is very common, yes.

21   Q    And isn't it true that according to the World Health

22   Organization -- you're familiar with them?

23   A    Yes, I am.

24   Q    Who are they, I guess I should ask.

25   A    Well, they are a group of medical personnel or medical

1    affiliated personnel who have opinions and managements on the

2    public health, on the overall health of geographically various

3    communities.

4    Q     Do you rely on their information at times?

5    A     Almost never to be very honest.

6    Q     Okay.  And how come?

7    A     Because of many reasons.  The top reasons are that the

8    World Health Organization will not -- will -- will be very

9    particular about not being specific because they're talking

10   global.  So they will give opinions and guidelines that would

11   apply to a global concept which would then be defined or

12   controlled by what are resources available there, what

13   abilities of clinicians and their expertise available there,

14   et cetera, et cetera.  So that's just one example of why World

15   Health Organization information are suggestions, they are

16   guidelines and they are not really used to hone in and to hang

17   your hat on in terms of diagnosis and clinical management.

18   Q     So you would be surprised if doctors in the United States

19   relied on their suggestions and guidelines?

20              MS. SHIHATA:  Objection.

21              THE COURT:  Well, overruled.  Can you answer that

22   question?

23              THE WITNESS:  Yes.  I wouldn't be surprised.  A

24   clinician once he or she is a competent, qualified clinician

25   can do whatever they want to do.  I personally wouldn't use

Hoskins - cross - Blank Becker                    3076

1   it.

2   Q     Thank you.

3         Now, isn't it true, doctor, someone with oral type 1

4   herpes can unsuspectingly -- sorry, I always get that word

5   wrong -- unsuspectingly self-inoculate a herpes infection from

6   oral to genital area simply by touching the sores and then

7   touching the genital area?

8   A     It's rare, but it is possible.

9   Q     Can you tell me a few of the diagnosis that are possible

10  when a patient shows up with genital ulcers?

11  A     Oh, okay.  So the diagnoses with genital ulcers are, they

12  are in the categories of infections, sexually transmitted

13  infections.  They can be in the category of allergies, contact

14  issues, et cetera.  They can be in the category of a

15  medication reaction, et cetera.  So it's different columns.

16  Q     And just so we can make sure we're all on the same page,

17  what is a genital ulcer, what does that mean?

18  A     A genital ulcer you're basically talking the ulcer means

19  it's a blister that opened or broke open and it's raw and

20  exposed to the outside.

21  Q     So fair to say there's things other than herpes that

22  appear as genital ulcers?

23  A     But they each have a unique appearance.

24  Q     Yes.  And the most common of the causes of genital ulcers

25  is not herpes, but it is an infectious disease.

Hoskins - cross - Blank Becker                    3077

1   A      The most common, again you have to clarify what you mean

2   by most common --

3   Q      Well --

4   A      -- you have to look at the clinical setting of where that

5   occurred.

6   Q      Okay.  So when determining -- looking at genital ulcers

7   and trying to determine what they are in the patient, isn't it

8   true that herpes is not typically the number one diagnosis

9   when seeing genital ulcers?

10  A      I disagree.

11  Q      How about syphilis, that can cause genital ulcers, right?

12  A      You're using genital ulcer like saying there's a cover

13  when it's raining.  The cover can be a hat, it can be an

14  umbrella, it can be whatever else, a cape or anything.

15          Genital ulcer is a bucket of things that can -- it's

16  a term that a lot of things can go into that bucket.

17          So a syphilis ulcer is going to physically look

18  different, its behavior, its appearance, historically when it

19  appeared in the context, that's why I was talking about the

20  clinical context of how when you see what you're calling a

21  genital ulcer, you're not going to look at a patient and say,

22  oh, this a genital ulcer, I have a checklist the most common

23  is whatever item and then herpes is somewhere on that list.

24  You're going to take the whole clinical context, look at that

25  genital ulcer and say the most likely underlying cause is X,

1   Y, Z, based on clinical context which includes the appearance

2   of that particular ulcer.

3   Q    Well, could you tell us about a Lipschutz ulcers?

4   A    Well, Lipschutz ulcers are those which due to a more of

5   an irritation from a prior infection, you know, underlying, et

6   cetera, and they would not look anything close to a herpes

7   ulcer.

8   Q    So your opinion or your testimony states that those sores

9   don't look anything like herpes?

10  A    Not in my clinical opinion they don't.

11  Q    And those sores aren't usually -- strike that.  Those

12  type of sores typically are found after a flu or maybe someone

13  has mono; is that correct?

14  A    Yeah.

15  Q    Okay.  That's called a Lipschutz ulcer not herpes,

16  correct?

17  A    Yeah.

18  Q    Chlamydia, that can cause ulcers, correct?

19  A    Sometimes.

20  Q    Syphilis, that can cause ulcer sometimes?

21  A    Sometimes.  Very different appearances.

22              (Continued on the next page.)

23

24

25

1  CROSS EXAMINATION

2  BY MS. BLANK BECKER:  (Continuing)

3  Q    And there's other STDs that can cause ulcers as well;

4  correct?

5  A    Correct.

6  Q    So it's quite possible that one of the -- if someone has

7  a genital ulcer, it could be any one of these different

8  ulcers?

9  A    The possibility would only be in the realm of the

10  clinical context.

11  Q    You have said -- you know, you have qualified, sort of, a

12  number of these questions in the clinical context; correct?

13  A    Correct.

14  Q    How do you explain then if someone comes to see you and

15  they have no symptoms when they come to see you, how is the

16  clinical context relevant?

17  A    The clinical context -- well, that information would be

18  part of the clinical context.  And no symptoms of what?  What

19  is it that I'm looking for?  What is it that I am concerned

20  for?

21          If I see a patient and there is no history, there is

22  no complaint of any kind and the patient has no physical exam

23  and evidence of any ulcers and no history and no symptoms or

24  signs, then that's a clinical context.

25          If a patient has a particular finding, physical

Hoskins - cross - Blank Becker                3080

1    finding, like an ulcer somewhere, I have to put it into the

2    context of other aspects of her personal life and her clinical

3    life:  Medications, infections, what she was doing about her

4    partners, about her sexual history, her personal medical

5    history, illnesses, et cetera.  So that's what I mean by

6    clinical context.

7              No symptoms, again, matters in relation to other

8    symptoms you're talking about towards the ulcer or the finding

9    or are you talking about no symptoms in her physiologic -- in

10   the rest of her body?

11   Q    Well, it could be both; correct?

12   A    It can.

13   Q    Okay.  Now, you also discussed earlier about the use of

14   cultures to determine if someone has herpes; correct?

15   A    Correct.

16   Q    And are cultures used -- let's say within the past ten

17   years, have cultures been used to do such a thing?

18   A    Well, I can't comment on that because I don't know what a

19   clinician might want to order.

20   Q    Okay.  Fair enough.  So a culture is always an option for

21   a clinician to order?

22   A    Yes.

23   Q    Okay.  And would you say, in your practice, a culture

24   would come before a blood test?  Would that be something you

25   would do prior to a blood test or either/or?

Hoskins - cross - Blank Becker                    3081

1    A    It can be neither.  It can be either.  It can be or, or

2    all of them.  It depends on the clinical context, what I'm

3    trying to find out and what is in front of me in terms of the

4    patient's symptoms and signs.

5    Q    Okay.  So, doctor, let me give you an example.  If a

6    patient had ulcers and they had a swab done to culture, and

7    test the sores and it was negative, does that prove that the

8    person doesn't have herpes?

9    A    No, it does not.

10   Q    So these tests, including cultures, they are not

11   100 percent; right?

12   A    Nothing in medicine is 100 percent.

13   Q    So I believe you indicated earlier that there could be a

14   false negative; is that correct?  Or not?

15   A    What was I speaking about?  I don't recall.

16   Q    With regards to cultures and testing.

17   A    Yes.

18   Q    You're saying there would be a false negative?

19   A    Yes, did he tell.

20   Q    And you're also saying that these tests are not

21   100 percent accurate; correct?

22   A    Correct.

23   Q    All right.  So based on the testimony you just indicated

24   with regard to a visit with a patient and getting all their

25   background and so forth, if you examine that patient, can you

Hoskins - cross - Blank Becker                3082

1  always tell from the examination whether the person has herpes

2  or not?

3  A    I think it's a very open-ended question.  If you could

4  help narrow it down a little bit.

5  Q    Sure.

6        Is it an exam by itself 100 percent sensitive for

7  diagnosis of herpes?

8  A    Nothing in medicine is 100 percent.

9  Q    Okay.

10 A    Having said that, the physical exam is highly reliable

11 and the most common, most chosen, most frequent model of how

12 we diagnose herpes.  It's more of all these, preferable,

13 reliable, likely, if it's a primary outbreak because it's so

14 particular, so unique, the finding, the location, the whole

15 appearance of the ulcer and the whole genital area, the

16 lesions, et cetera.

17        If it's a secondary outbreak, we take into context

18 the patient telling us her history, what her symptoms were,

19 what we call -- it's a technical term, but we call it

20 prodromal, meaning before the physical, actual ulcer, they

21 were other sensations:  Burning, tingling, pain, et cetera.

22 So then we put into context of that.

23        So when we do a physical exam, it's very highly

24 reliable.  When we have the clinical context both ways, its

25 primary, so clear, so specific.  It's secondary, we can get it

1    in the context of what she's describing to us.

2    Q    So if you examine a patient, are you suggesting that you

3    can always tell if they have herpes or not?

4    A    I think we are going a little circular.

5         If the patient has the classic presentation on exam,

6    we can break it down into primary or secondary.  The primary

7    is the most easy to identify.  It's very unique.  It's very

8    specific.  It's highly likely to be that just by us clinicians

9    seeing it, knowing the location, the appearance, the timing

10   and what the patient is describing.  So it's very likely.

11   Nothing is 100 percent.  It can be clinched with additional

12   tests.

13        With the secondary, the appearance of the ulcer in

14   the context of what the patient is describing by history and

15   by the current symptoms, it would again be also very likely

16   but not as high of a likelihood as with the primary.

17   Q    Okay.  I'm going to move on.

18   A    Thank you.

19   Q    Doctor, can a baby acquire herpes --

20   A    Yes.

21   Q    -- from their mother?  I'm sorry?

22   A    Yes.

23   Q    And can children even acquire herpes over time from their

24   parents, growing up with their parents, especially if their

25   parents have the Type 1 herpes?

1    A    Yes.

2    Q    Doctor, isn't it also true that the rates for herpes are

3    higher in African-Americans?

4    A    I think some studies have shown that but not all studies

5    have shown that because there are many other factors that

6    affect the rate of herpes.

7              MS. BLANK BECKER:  Sorry, Judge.

8              THE COURT:  It's all right.

9              MS. BLANK BECKER:  I am trying to move forward

10   through this.

11             May I have one moment, Judge?

12             THE COURT:  Sure.

13             (Pause.)

14             MS. BLANK BECKER:  Thank you, Judge.

15             THE COURT:  Sure.

16             MS. BLANK BECKER:  Judge, may I approach?

17             THE COURT:  Sure.

18             MS. BLANK BECKER:  Thank you.

19   Q    I am going to hand you --

20             THE COURT:  You want to talk to the witness?

21             MS. BLANK BECKER:  Yes.

22             THE COURT:  I see.

23   Q    I'm going to hand you a document and just ask that you

24   look at it and then I can ask you some additional questions.

25   Okay?

Hoskins - cross - Blank Becker                    3085

1   A    Yes.

2   Q    Okay.

3           MS. BLANK BECKER:  May I, Judge?

4           THE COURT:  Yes.

5           THE WITNESS:  Do you want me to put my mask on?

6           THE COURT:  No.  It's all right.

7           MS. BLANK BECKER:  May I approach, Judge?

8           THE COURT:  Yes.

9   Q    I am going to ask...

10          MS. BLANK BECKER:  Judge, I ask that this be marked

11  as Exhibit KK, please.

12          THE COURT:  All right.  You know, we are coming

13  right up to the lunch break.  Do you have a lot more for this

14  witness?

15          MS. BLANK BECKER:  I have some more questions, but

16  I'm almost done.

17          THE COURT:  That's okay.  If you have ten minutes or

18  so, we can finish the cross.  But, anyway, so you are marking

19  this for identification.

20          Are you offering it into evidence?

21          MS. BLANK BECKER:  Yes, Judge, and only for the

22  jury.

23          THE COURT:  Do you have any objection to this?

24          MS. SHIHATA:  No, as long as it is jury only.

25          THE COURT:  It's in evidence, then.

Hoskins - cross - Blank Becker                3086

1              (Defendant's Exhibit KK received in evidence.)

2              MS. BLANK BECKER:  Judge, do you wish for me to

3    continue or do you want to take a break?

4              THE COURT:  Go ahead.

5              MS. BLANK BECKER:  Thank you.

6              Judge, this is to be published to the jury only.

7              THE COURT:  Yes.  If you are trying to -- just take

8    it off the screen.  You are showing it to everybody.  If there

9    is something that you have to take out of it.

10             MS. BLANK BECKER:  No, I don't have to take it out.

11             MS. SHIHATA:  As long as it is jury only.

12             THE COURT:  All right.

13             MS. BLANK BECKER:  Judge, may I approach to just let

14   her know something?

15             THE COURT:  Sure.

16             You're going to have to have some kind of way to

17   project your voice.

18             MS. BLANK BECKER:  Sorry, Judge.  Is it okay if I

19   could possibly sit so the jury can hear me?

20             THE COURT:  That's fine.

21             MS. BLANK BECKER:  I appreciate it.

22   BY MS. BLANK BECKER:

23   Q    Doctor, I apologize for the brief break there.

24   A    No worries.

25   Q    Doctor, I have handed you Defense Exhibit KK.  What does

Hoskins - cross - Blank Becker                3087

1   that appear to be?

2   A    It looks like a medical summary visit.

3   Q    Okay.  Is that a common thing to do as a gynecologist

4   when someone comes to write a report?

5   A    Any clinician, sure.

6   Q    Okay.  Thank you.

7            And specifically, in this particular report that you

8   are looking at, there are several questions that appears that

9   were asked of this individual with regards to their

10  gynecological history; correct?

11  A    Correct.

12  Q    And specifically there is a question that was asked about

13  her -- in this case, this is a female; is that correct?

14  A    Correct.  I assume.

15  Q    Yes.  And she was asked, in regards to her gynecological

16  history, sexual history, sexually active; correct?

17  A    Correct.

18  Q    Do you see that?

19  A    Yes.

20  Q    Okay.  And she indicated -- it appears that she

21  indicated, per this piece of paper, that -- she indicated that

22  she had a partner since April 2015; correct?

23  A    Correct.

24  Q    And the date of this particular report is dated

25  8/14/2015; correct?

Hoskins - cross - Blank Becker                    3088

1   A     Correct.

2   Q     All right.  So April 2015, we're talking what?  Four

3   months prior to when she was there; correct?

4   A     Correct.

5   Q     Okay.  And it also indicates on here that she had -- her

6   sexual history and whether she was sexually active, that's a

7   question; correct?

8   A     Correct.

9   Q     And she -- that's where she indicated that she had only

10  been sexually active or sexual history since April 2015;

11  correct?

12  A     No.  That's not what it means.

13               THE COURT:  Could I see the parties at the side

14  please for a minute with the court reporter.

15               (Sidebar held outside of the hearing of the jury.)

16               (Continued on next page.)

17

18

19

20

21

22

23

24

25

```
                           Sidebar                      3089
```

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          THE COURT:  Are we getting into sexual history

4    questions again?

5          MS. SHIHATA:  I don't think we are because the

6    sexual partner she had there was the friend.

7          MS. BLANK BECKER:  Yeah.

8          THE COURT:  It sounds like the witness is about to

9    answer something different.

10          MS. SHIHATA:  I have no idea what the witness is

11    about to say.

12          MS. BLANK BECKER:  Yes.

13          MS. SHIHATA:  I don't have an issue with partner

14    since 4/2015.

15          THE COURT:  All right.

16          (Sidebar concluded.)

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

Hoskins - cross - Blank Becker                    3090

1          MS. BLANK BECKER:  May I, Judge?

2          THE COURT:  Yes, go ahead.

3          MS. BLANK BECKER:  Thank you.

4   BY MS. BLANK BECKER:

5   Q    And, Doctor, the date of birth is listed on this sheet;

6   correct?

7   A    Correct.

8   Q    And what is that?

9   A    12/30/1997.

10  Q    Okay.  So -- and I'm not very good at math.  Maybe you're

11  better.  1997 until 2015, when this test was done, how old

12  would that make that individual?

13  A    Well, I could do the math or I could just read it, which

14  says 17 years.

15  Q    There you go.

16          So this test was done when the individual was 17

17  years old?

18  A    Correct.  According to this paper, yes.

19  Q    And this particular paper that we are looking at, I'm

20  going to switch now to the second part of this piece of paper.

21          Are you able to see that?

22  A    Yes, ma'am.

23  Q    Okay.  And ultimately it was determined, or this

24  particular paperwork indicates that the plan was for treating

25  herpes; is that correct?

Hoskins - cross - Blank Becker                    3091

1    A    Correct.

2    Q    Thank you.

3         Because there is such a lapse in time from the time

4    where this individual indicated she had sexual intercourse

5    with her partner from April 2015 until four months later, in

6    August 2015, can you tell by looking only at what you have

7    here whether or not you can determine who she got that from?

8    A    I'm not interpreting it the way you are.

9    Q    Well, I'm not here to interpret.  I'm asking questions.

10   So you can tell us your interpretation.

11   A    No.  The reason I say what I do is because you said

12   because there was a lapse of time and when I read this medical

13   report, I look at the words that says she has a partner since

14   April 2015.  It says she is sexually active.

15        When we ask patients that, what we're trying to

16   identify is are they currently sexually active, were they past

17   sexually active, are they virginal, et cetera.  So I am

18   interpreting it from a textbook medical point of view.

19   Q    Thank you.

20        MS. BLANK BECKER:  Judge, I believe this would be a

21   good point to take a lunch break.

22        THE COURT:  Okay.

23        MS. BLANK BECKER:  Thank you.

24        THE COURT:  Ladies and gentlemen, we are going to

25   break for lunch.  Please have a good lunch.  Don't talk about

1    the case.  Let's see you at, let's make it 2:25.

2              THE COURTROOM DEPUTY:  All rise.

3              (Jury exits the courtroom.)

4              THE COURT:  All right.  Everybody can have a seat.

5              Doctor, you are excused.  We will see you after

6    lunch.

7              THE WITNESS:  Thank you.

8              (Witness exits.)

9              THE COURT:  Anything before we break for lunch?

10             MS. BLANK BECKER:  No.

11             MS. GEDDES:  Yes.

12             THE COURT:  Before you do this, I want to figure out

13   how much longer we have with this witness.

14             MS. BLANK BECKER:  Honestly, Judge, that took longer

15   than I thought.  I have a couple more things and that's it.

16             THE COURT:  That's fine.

17             And you are not going to have a lot redirect

18   examination.

19             MS. SHIHATA:  Not a lot.

20             MS. GEDDES:  On Monday, since we are not going to

21   start until 12 clock, we proposed to defense counsel that we

22   have the jurors eat an early lunch and maybe take two

23   afternoon breaks to make the most out of our time.

24             THE COURT:  I think we might be ahead of you on

25   that.

1              MS. GEDDES:  Thank you.

2              THE COURT:  Ms. Greene is the person in control.

3    She has it covered.

4              Anything else?  All right.

5              See you after lunch.

6

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MDL        RPR        CRR        CSR

1

2                    AFTERNOON SESSION

3          (In open court; outside the presence of the jury.)

4          THE COURTROOM DEPUTY:  All rise.

5          THE COURT:  Everybody can have a seat.

6          All right.  Let's get the witness and then we will

7   get the jury.

8          THE COURTROOM DEPUTY:  All rise.

9          (The jury enters the courtroom.)

10         THE COURTROOM DEPUTY:  You may be seated.

11         THE COURT:  All right.  I hope everybody enjoyed

12  their lunch.  We are ready to continue.

13         Go ahead, Ms. Becker.

14         MS. BLANK BECKER:  Thank you.

15         THE COURTROOM DEPUTY:  The witness is reminded she

16  is still under oath.

17         THE WITNESS:  Yes.  Thank you.

18  CROSS EXAMINATION

19  BY MS. BLANK BECKER:  (Continuing)

20  Q    Good afternoon, Doctor.

21         Doctor, you testified that the most common method of

22  diagnosing herpes is through history and physical exam; is

23  that fair to say?

24  A    Yes, ma'am.

25  Q    All right.  And then you also agreed with the CDC that

Hoskins - cross - Blank Becker                3095

1    the most accurate way to verify herpes, a herpes diagnosis is

2    through a blood test; correct?

3    A    If one choses to go on a higher level, yes.

4    Q    Okay.  With regards to herpes, we've talked about how

5    there is a herpes simplex 1 and a 2; correct?

6    A    Correct.

7    Q    All right.  And isn't it a fact that it wasn't until

8    around the 1960s that the scientists were able to determine

9    that there were two different strands?

10   A    I wouldn't know which year, but, yes, it was considered

11   relatively recent if you talk about history of medicine,

12   correct.

13   Q    Thank you.

14        And that's when the classification of genital herpes

15   came out; is that correct?

16   A    I don't recall it by the year.

17   Q    Not the year, but that was when they separated it?

18   A    A separation.  Correct.

19   Q    I got it.  Thank you.

20        You also testified earlier that syphilis and

21   chlamydia, those are bacterial infections; correct?

22   A    Correct.

23   Q    But with regards to herpes, that's not a bacterial?

24   A    No.

25   Q    -- infection?  It's a virus?

1    A    Correct.

2    Q    Got it.

3         MS. BLANK BECKER:  And I don't have any additional

4    questions.  Thank you, Doctor.  Thank you, Judge.

5         THE COURT:  Thank you.

6         Any redirect?

7         MS. SHIHATA:  Yes, Judge.

8    REDIRECT EXAMINATION

9    BY MS. SHIHATA:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    Now, during cross-examination you were asked some

13   questions, or a question or two about whether a mother can

14   transmit herpes to her baby; is that right?

15   A    Yes, ma'am.

16   Q    And what are some of the effects that herpes can have on

17   a pregnant woman?

18   A    Well, whenever we look at a pregnant woman, we're always

19   looking at two patients, because it's the mother and the baby.

20   So like you pointed out, when you say what are the effects on

21   the pregnant woman, on the woman itself would be if it's a

22   primary outbreak, it would be a flu-like thing with fever,

23   sniffles, runny nose, malaise, aches and pains, it would be

24   the lesions in the genital area that are extremely painful.

25   We've been through all of that, with the weeping ulcers, et

1   cetera.   And that would be in the mother.

2          But the fact that the mother in pregnancy -- this is

3   going to be a little bit of a long-ish answer.   During

4   pregnancy, every single mother is -- her immunity is down.

5   And the reason her immunity is down is that's how she is

6   accepting that other person inside her, the fetus who's

7   growing.   And the best way to explain that, to show what I am

8   talking about, later on in life, if that same mother and that

9   same child were to give each other -- to donate an organ or

10  share blood or tissue, they would have to be tested to see if

11  there is a match.   Yet every single mother, 100 percent of the

12  time, carries a baby where the organ, the blood and

13  everything, it's inside her, it's a completely different

14  person, so her immunity has to be suppressed in order for her

15  to accept that for the duration of the pregnancy.

16         Because her immunity is suppressed, she's going to

17  be at increased risk for, A, getting an infection, and, B, if

18  she gets an infection, it would be on a higher plane, higher

19  degree, worse:   Depth of the illness, longer duration of the

20  illness, more serious possibility of complications.   That's

21  the back story.

22         Going to your question about herpes effect on the

23  mother, because her immunity inherently is less because it is

24  suppressed because of carrying the pregnancy, the herpes is

25  going to have a bigger effect.

1          If it's a primary infection, then all these things

2     that I have described are going to be on a higher degree,

3     higher amount, higher quantity.

4          If it's a secondary infection, there are studies in

5     the literature where she is more likely to have an outbreak

6     because her immunity is suppressed, it was lying in her

7     central nervous system, now it's going to reinfect her.

8          So there are the concerns in a mother:  Flu-like

9     problems, additional problems in terms of secondary

10    infections, and then the fact that everything is going to be

11    of a higher degree.

12    Q     And what kind of complications can it have on the fetus

13    or baby that's being carried?

14    A     So for the fetus it's very much more serious because the

15    fetus does not have any inherent immunity.  So the fetus has

16    only got a little bit of protection through the mother.  The

17    herpes virus, even though the mother maybe now, as a secondary

18    infected person, she had it before, assume, and now she's

19    carrying the virus, and if it gets transmitted to the fetus

20    through the placenta, the fetus's body has never seen this

21    virus before, it doesn't have very good efficient immunity, so

22    the fetus can get very sick even inside the uterus.

23         If the baby has been delivered, the concern is if

24    there was a direct contact between wherever the virus is

25    shedding to the baby, either through the nares -- that's the

1  nasal passages -- in the eyes, through the ears, mouth, any

2  skin.

3          When there is direct contact, if the mother is

4  shedding and now there's contact to this newborn that just

5  came out or is in the passage, in the birth canal, that fetus

6  or newborn can get very sick very quickly and has a higher

7  likelihood that it would go to the brain and the infection in

8  the brain would cause serious long-term damage.

9  Q    Like what?

10 A    So the infection in the brain for a newborn, if it's

11 coming from a herpes virus infection is a condition that would

12 be an inflammation in the brain.  The technical term is

13 encephalitis or -- and the implication is that there would be

14 a cerebral palsy like picture.  Cerebral palsy is just an

15 umbrella for lots of conditions that are resulting from damage

16 to the brain.  Herpes is one of them.

17 Q    So fair to say that a woman of child bearing age

18 diagnosed with herpes, this is yet another serious

19 complication that they have to be concerned with?

20 A    Correct.  We do tell our patients that this is a burden

21 you carry if you have herpes and you are now pregnant or

22 planning to get pregnant, this is a risk that could occur to

23 you because of your immune suppression, but also the definite

24 very serious risk to your baby if you get an activation at

25 that time and the reactivation at that time is an

Hoskins - redirect - Shihata                    3100

1  unpredictable point in time.

2  Q    Now, you were asked a lot of questions on

3  cross-examination about testing for herpes and various methods

4  and whether someone can have herpes and not know it and so

5  forth.  Fair to -- certainly someone whose doctor tells them

6  they have herpes knows they have herpes; correct?

7  A    They have herpes, yes.

8  Q    Now, you were asked a lot of questions about person X, Y,

9  Z and person A, B.  I want to make a simpler version of that

10 question, okay.

11       So if person X has a doctor who has told them they

12 have herpes and they go out and sleep and have sexual

13 intercourse with multiple partners, they are exposing each of

14 those partners to herpes; correct?

15 A    Yes.

16 Q    You were also asked questions about different types of

17 ulcers in the genital area on cross-examination and I think

18 you were asked about ulcers related to syphilis and chlamydia.

19 Do you take Valtrex to treat syphilis?

20 A    No.  It's a bacterial infection.

21 Q    And do you take Valtrex to treat chlamydia?

22 A    No.

23 Q    Those are both bacterial infections?

24 A    Yes.

25 Q    And Valtrex is an anti-viral; correct?

1   A    Correct.

2   Q    Now, you also talked about diagnosing herpes in a

3   clinical setting, and when you do that, does that include

4   taking the history of the patient?

5   A    Yes.

6   Q    Including their sexual history?

7   A    Yes.

8   Q    Whether they're having sex with multiple partners?

9   A    Yes.

10  Q    Whether they have had sexually transmitted diseases in

11  the past?

12  A    Yes.

13  Q    All of that is part of it; right?

14  A    Yes.

15  Q    Now, you were shown a medical record, I believe it was

16  Defense EE -- I'm sorry, KK.  I'm going to show you, jury

17  only, please, the record here.  This one is marked Government

18  Exhibit 909, but it is the same record.

19          Now, the date of this exam is August 14, 2015;

20  correct?

21  A    Yes, ma'am.

22  Q    The age of the patient 17 years old?

23  A    Yes, ma'am.

24  Q    And it indicates they have a partner, singular, since

25  April 2015?

Hoskins - redirect - Shihata                3102

1   A    Yes.

2   Q    And if you look under examination, it says external

3   genitalia, multiple ulcerated weeping lesions, exquisitely

4   tender?

5   A    Correct.

6   Q    Now we will look under assessment on the second page,

7   assessment herpes; correct?

8   A    Correct.

9   Q    And then plan, there's a plan to start Valtrex.  That's

10  the treatment we talked about earlier; correct?

11  A    Correct.

12  Q    Under notes, it says, "Discussed clinical appearance of

13  primary herpes outbreak, discussed culture for confirmation

14  and typing.  Patient refuses culture due to discomfort.

15  Discussed additional STD testing.  Patient declines due to

16  discomfort but will consider once current outbreak is less

17  painful."

18           MS. BLANK BECKER:  Excuse me one second.  We are

19  supposed to get rid of the --

20           THE COURT:  Is there an objection?

21           MS. SHIHATA:  It's jury only.

22           MS. BLANK BECKER:  My understanding is that the last

23  name, we were still getting rid of.  Thank you.

24           MS. SHIHATA:  The jury is aware of the name.

25           THE COURT:  All right.

1   BY MS. SHIHATA:

2   Q    Now, this is a situation where the doctor diagnosed

3   herpes based on the physical exam and history?

4   A    Correct.  And that is the most common way of doing it,

5   yeah.

6   Q    And here it appears the doctor discussed doing a culture

7   but the patient refused because it was so painful at the time;

8   correct?

9   A    Correct.

10           MS. SHIHATA:  Nothing further.

11           THE COURT:  Any recross?

12           MS. BLANK BECKER:  Thank you, Judge, just briefly.

13           THE COURT:  Sure.

14           MS. BLANK BECKER:  Could I do it from here, is that

15   all right?

16           THE COURT:  Sure.

17           MS. BLANK BECKER:  Thank you.

18   RECROSS EXAMINATION

19   BY MS. BLANK BECKER:

20   Q    Doctor, there is no indications in those reports that

21   there were any blood tests done; correct?

22   A    I would have to look at it again.

23   Q    Certainly.

24           MS. BLANK BECKER:  May I approach, Judge?

25           THE COURT:  Sure.

1   A     Thank you.

2            No blood tests were ordered.

3            MS. BLANK BECKER:  May I approach?

4            THE COURT:  That's it.

5            MS. BLANK BECKER:  May I approach and get the forms,

6   please?

7            THE COURT:  Sure.

8            (Continued on following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   RECROSS-EXAMINATION

2   BY MS. BLANK BECKER (Continuing):

3   Q    There were some questions just now, and I initiated some

4   questions regarding the pregnant woman transferring to the

5   child, correct?

6   A    Correct.

7   Q    Isn't it a fact that a pregnant woman could actually

8   knowingly expose their child or newborn to herpes?

9   A    Could you clarify "knowingly"?

10  Q    Sure.

11       The adult -- sometimes the adult, the mother, is

12  going to know that they have herpes, correct?

13  A    Correct.

14  Q    Sometimes when they -- strike that.

15       And when they know that they have herpes and they

16  have a baby, they are, I think you believe -- I believe you

17  said it's like they understand the risk that they might be

18  taking by having a child?

19  A    Well, I would hope they do, but I can't give you a

20  guarantee that every mother understands the risk she's taking

21  by having a child because she has a chronic infection.

22  Q    Understood.  I'm not suggesting you know what they're

23  thinking.

24       But if the individual knows that they have herpes,

25  the mother knows she has herpes, we'll just leave it at that,

Hoskins - Recross - Blank Becker                3106

1    isn't it true that she is or she can knowingly expose the

2    newborn baby?

3              MS. SHIHATA:  Objection.

4              THE COURT:  Can I see counsel at sidebar for a

5    minute, please?

6

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    3107

1          (The following occurred at sidebar.)

2          THE COURT:  Is there some dispute that -- is there

3   a dispute about whether all the people had herpes or not?

4          I'm confused, what's the purpose of this?

5          MS. BLANK BECKER:  The issue is knowingly, because

6   the public health code is knowingly.

7          THE COURT:  Right, but what does that have to do

8   with whether somebody -- is there a pregnant woman here?

9          MS. BLANK BECKER:  No, it's just showing that there

10  are ways that people knowingly know that they can transmit

11  herpes.

12         THE COURT:  Right.

13         MS. BLANK BECKER:  And they're not -- there's no

14  public health code against that, the --

15         THE COURT:  That's a legal question and the jury is

16  not going to be able to decide -- there's not going to be any

17  instruction to the jury about that.

18         The question is with this individual Defendant.  So,

19  the fact that the there may be other people -- I don't know if

20  it's a violation of that code or not, but it might be reckless

21  endangerment, very well may be, but I don't really see the

22  significance of it.  I would like to move things along --

23         MS. BLANK BECKER:  That's my last question.

24         MS. SHIHATA:  The question -- whether some other

25  hypothetical human being could be subject to the legal

Sidebar                                          3108

1   prohibition is completely irrelevant to this trial and the

2   charges in this trial.

3             THE COURT:  I just don't see the relevance of it.

4   So, if you can, explain it.

5             MS. BLANK BECKER:  Sorry.  One of the elements for

6   the transmission is knowingly transmitting.

7             THE COURT:  Right.  I don't think it's "transmit."

8             MS. SHIHATA:  No, it's the risk.  I've said it a

9   million times.

10            THE COURT:  I know.

11            MS. SHIHATA:  And by the way, unless he is a

12  pregnant man I don't know how this is relevant.

13            MS. BLANK BECKER:  I certainly could laugh with you

14  guys because I understand what you're saying, but the point is

15  not that he's a pregnant man or she is pregnant.  The point is

16  the "knowingly" part.

17            When someone has herpes, a female who is having a

18  baby has herpes and they have the baby, they know they're

19  having a baby who could have this horrible result that she

20  said, right?

21            THE COURT:  But I'm going to stop you here.  I get

22  where you're going here, sort of, except it doesn't -- it

23  doesn't have any relevance.

24            The question for the jury is going to be under these

25  facts whether this Defendant had herpes, which there seems to

Sidebar                                                          3109

1   be serious dispute about that, and whether he subjected

2   someone else to it without informing them.  And the fact that

3   some other hypothetical person could be or not be prosecuted

4   is just irrelevant.  It's not an argument I'd permit anybody

5   to make in summation anyway.

6              MS. BLANK BECKER:  That's my understanding, is that

7   the summation --

8              THE COURT:  Let her finish.

9              MS. SHIHATA:  I'm just shaking my head.  I

10  apologize.

11             MS. BLANK BECKER:  A summation comparison of some

12  sort that we want to make --

13             THE COURT:  I see what you're saying.  But that

14  would be if you're making an argument for selective

15  prosecution.  But you can't do that, at least -- if there's

16  some law that you want to submit that says you can do that,

17  you're welcome to do it.  But I'm pretty sure you can't.

18             It would be like arguing, look, they didn't

19  prosecute this other person for robbing a bank and they're

20  prosecuting my guy.  That's not going to be a permissible

21  argument.  So, if that's the way that we're going, I just

22  think we should move on to something else.

23             MS. BLANK BECKER:  I'm not arguing.

24             THE COURT:  Okay, great.

25             (Continued on the following page.)

Proceedings                                      3110

1              (Sidebar ends; in open court.)

2              MS. BLANK BECKER:  Thank you, Judge.

3              Doctor, I don't have any additional questions.

4              Thank you, Judge.

5              THE COURT:  Thank you.

6              Any redirect?

7              MS. SHIHATA:  No, your Honor.

8              THE COURT:  Doctor, thank you so much.  You can step

9      down.

10             (Witness excused.)

11             THE COURT:  Are you ready to call your next witness?

12             MS. GEDDES:  Yes, Judge.  The Government calls

13     Phillip Fanara.

14             THE COURTROOM DEPUTY:  Please raise your right hand

15     for me.

16             Do you solemnly swear or affirm that the testimony

17     you're about to give will be the truth, the whole truth, and

18     nothing but the truth?

19             THE WITNESS:  I do.

20             THE COURTROOM DEPUTY:  Thank you.  You may be

21     seated.

22             THE COURT:  You can also take off your mask.

23             THE WITNESS:  Thank you.

24             THE COURT:  Just a couple of things before we start.

25             Please make sure that you're speaking into the

1   microphone.  I want to make sure our jurors can hear and that

2   the court reporter can take down everything that you're

3   saying.

4           And if there's a question that you need to have

5   repeated or clarified, let me know, and I'll tell the lawyers

6   to rephrase it.

7           And just do your best to answer only the question

8   that you're being asked, okay?

9           THE WITNESS:  Yes.

10          THE COURT:  Go ahead.

11          MS. GEDDES:  Before I begin, pursuant to Federal

12  Rule of Evidence 8036 and 901 -- 90211, the Government offers

13  Government Exhibit 121A.  I don't believe there's any

14  objection from defense counsel.

15          MR. SCHOLAR:  No objection.

16          THE COURT:  Okay.

17          (Government Exhibit 121A so marked.)

18  **PHILLIP FANARA**,

19          called by the Government, having been

20          first duly sworn, was examined and testified

21          as follows:

22  DIRECT EXAMINATION

23  BY MS. GEDDES:

24  Q    Where do you work?

25  A    I'm a trial analyst for AT&T.

Fanara - Direct - Gedes                          3112

1   Q    How long have you worked as a trial analyst for AT&T?

2   A    Since 2013.

3   Q    And what do you do in that capacity?

4   A    I provide testimony in court for AT&T.

5   Q    And through your employment -- actually, one moment.

6        Through your employment at AT&T, have you become

7   familiar with how telephone calls are routed?

8   A    Yes.

9   Q    Can you explain to the jury the basics of how a telephone

10  call from one cellular telephone to another cellular telephone

11  is routed?

12  A    Sure.  Someone places a call, it goes to a cell site or

13  cell tower subsequently within the telecom's network, and then

14  it's rerouted back to another tower, back to another device.

15  Q    And in the event where there's a telephone call from a

16  cell phone to a landline, how is that routed?

17  A    It's routed within the AT&T -- well, using an AT&T

18  example, it's routed within AT&T's network.

19  Q    And I take it on the terminating end where it's a call

20  from a cell phone to a landline, it doesn't get connected to a

21  second cell tower, correct?

22  A    That's correct, yes.

23  Q    Are you familiar with records maintained by AT&T?

24  A    Yes.

25  Q    For how long does AT&T retain call records?

Fanara - Direct - Gedes                              3113

1   A    Full detailed records are maintained for about seven

2   years.

3   Q    And what, if any, records does AT&T retain for telephone

4   calls involving a particular telephone number where AT&T is

5   not the service provider for that telephone number?

6   A    It would still be about seven years.

7   Q    And just with respect to the types of records that are

8   maintained for telephone calls by non-AT&T users?

9   A    Can you repeat that please?

10  Q    Sure.  What types of records does AT&T maintain for

11  telephone calls by non-AT&T users?

12  A    They might appear on the mobility usage report or the

13  Y-line report.

14  Q    So, fair to say when a telephone user who does not have a

15  telephone subscribed to by AT&T but a telephone call is routed

16  over AT&T's network, AT&T may have some records reflecting

17  parts of that telephone call?

18  A    Yes.

19  Q    But in cases where a telephone call by a non-AT&T user is

20  routed over a system not using AT&T's network, does AT&T have

21  any records of that telephone call?

22  A    No.

23  Q    So, AT&T is only going to maintain records if the phone

24  call is routed in some capacity over AT&T's network; is that

25  correct?

Fanara - Direct - Gedes                      3114

1   A     Yes.

2   Q     Are you familiar with the term "roaming"?

3   A     Yes.

4   Q     What is "roaming"?

5   A     Roaming is when a wireless customer lands on another

6   wireless or telecom network other than AT&T if you're the AT&T

7   customer.

8   Q     And does a user incur an additional charge for roaming?

9   A     They can.

10  Q     And I want to direct your attention back to the early

11  2000s.

12          Back then, was it typical for users to have plans

13  that didn't allow for them to travel across the country and

14  place telephone calls throughout the country without incurring

15  additional fees?

16  A     I would say yes, there were times when people would not

17  have that.  I wouldn't say "typical," I would just say yes, it

18  is.

19  Q     And nowadays, many people have telephone numbers and

20  plans for those telephone numbers where they can, in fact,

21  travel across the United States and make telephone calls

22  throughout the United States without necessarily incurring

23  additional charges; is that right?

24  A     Yes.

25  Q     But you're just saying that in the past, that wasn't

1   always the case, correct?

2   A     Yes.

3   Q     And when a non-AT&T user -- so, someone who had a

4   telephone that is subscribed to another carrier, other than

5   AT&T -- is roaming over AT&T's network, is that an example of

6   where AT&T might have records reflecting usage by that

7   non-AT&T subscriber?

8   A     Yes.

9   Q     Are you familiar with telephone records maintained by

10  AT&T in a file called a "Report AU"?

11  A     Yes.

12  Q     What records are shown in reports that are titled by AT&T

13  "Report AU"?

14  A     Sometimes that report is called a "mobility usage" or

15  "call detail report."  It shows wireless usage for voice,

16  data, and text.

17  Q     And do those -- does that report show AT&T records over

18  AT&T's wireless network?

19  A     Yes.

20  Q     And are you familiar with records reflected in an AT&T

21  file named "Report ICDR"?

22  A     Yes.

23  Q     What are those?

24  A     Those should be International Call Detail Report.

25  Q     And what records are reflected in an International Call

1  Detail Report?

2  A    It shows calls placed and received with international

3  connections.

4  Q    Okay.  And put another way, do records in a Report ICDR

5  show records that use AT&T's international network?

6  A    They use AT&T's national network here, but it could be

7  AT&T overseas or it could be other carriers overseas.

8  Q    But it shows international calls; is that correct?

9  A    Yes.

10  Q    Are you familiar with records shown in an AT&T filed

11  named Report Landline?

12  A    Yes.

13  Q    What records are shown in that particular report?

14  A    That shows calls that are touching on a landline

15  database.

16  Q    When you say "landline database," are you differentiating

17  AT&T's network that provides traditional telephone service as

18  opposed to wireless service?

19  A    Yes.

20  Q    And what time zone is used to report the date and time in

21  all of those AT&T records you just discussed?

22  A    It's universal time, UTC.

23  Q    I want to talk about some terms that are used in some of

24  the AT&T reports that you just described.

25           In the report, one of the terms used is an

1   "originating number."  And for an example, I'm going to put on

2   the screen what's in evidence as Government Exhibit 138B, as

3   in boy.

4            (Exhibit published to the jury.)

5   Q    And I'm going to direct your attention to that first -- I

6   guess the third column, that's titled "Originating Number."

7            What is reflected in the column titled "Originating

8   Number"?

9   A    That's the originating number that was placing the call.

10  Q    And next to that is a column titled "Sec. Orig."

11           What is that?

12  A    That's a secondary originating number within the call.

13  Q    Can you explain what you mean by that?

14  A    Sometimes an originating number will be masked as a

15  secondary number or is placed through another number, and

16  that's where that secondary number would come in.

17  Q    Is it fair to say there is not always a secondary

18  originating number reflected in these reports?

19  A    Yes.

20  Q    And next to that column is one labeled "Terminating

21  Number."

22           What is that?

23  A    That's the number that ultimately where the originating

24  number placing the call ends up calling.

25  Q    Okay.  And, finally, that fourth column lists a "dialed

Fanara - Direct - Gedes                3118

1    number."

2           What is reflected in the column labeled, "Dialed

3    number"?

4    A    That's the number that the originating number has dialed.

5    Q    And can you describe an example where the dialed number

6    might be different than the terminating number?

7    A    Yes.  For example, the originating number can dial a

8    certain number, it goes to or through that number, and

9    ultimately ends up in a final number, which could be a call

10   forwarding number or voice mail.  Could be a number of things.

11   Q    So, if I called a telephone number and it went to voice

12   mail, the call might then be re-routed to a telephone number

13   associated with the voice mailbox; is that correct?

14   A    Yes.

15   Q    And in that scenario, the terminating number might

16   reflect the telephone number for the voice mail but the dialed

17   number would still reflect the telephone number that actually

18   entered into the telephone; is that correct?

19   A    Yes.

20   Q    Are you familiar with cell site location records?

21   A    Yes.

22   Q    Just generally speaking, what are those?

23   A    Well, it's a general term, but, in our case, the mobility

24   usage report and/or call detail report, AU that you referred

25   to earlier, has a column in it which shows cell site location

Fanara - Direct - Gedes                    3119

1  for AT&T.

2  Q    And what specifically is reflected in that column that

3  says cell site location?

4  A    That shows the cell location of an AT&T site and its

5  longitude, latitude, as well as its cell site ID.

6  Q    And the cell site location information that is contained

7  in AT&T records, is that the cell site location for the

8  particular AT&T user for whom records were requested?

9  A    Can you repeat that again?

10 Q    Sure.  If records are requested for a particular

11 telephone number, on that report there are multiple numbers

12 listed in the report, right?

13        There's going to be the telephone number that I

14 requested records for and there will be all the telephone

15 numbers that were in communication with the telephone number

16 that I requested records for, correct?

17 A    Yes.

18 Q    And the cell site location information that is reflected

19 on -- in AT&T's records in the reports provided by AT&T, is

20 that for the user for which records were requested, not

21 necessarily all those other telephone numbers that were in

22 contact with that user?

23 A    A request for the user that was requested.

24 Q    Are you familiar with an "IMSI"?

25 A    Yes.

Fanara - Direct - Gedes                    3120

1   Q    What is the IMSI?

2   A    That's the SIM card that goes within the phone and the

3   serial number of that.

4   Q    And when you say "SIM card," can you explain what you

5   mean by that?

6   A    It's a card that goes in the phone that has information

7   on it within that phone.

8   Q    And does a particular telephone number have an IMSI

9   associated with it?

10  A    Yes.

11  Q    Okay.  And does the IMSI necessarily reflect the

12  particular device that was used?

13  A    It's the card that goes in the device.

14  Q    Is there another term, "IMEI," that is used to refer to

15  the device?

16  A    Yes.  That's the serial number of the actual device.

17  Q    For how long does AT&T retain cell site location records?

18  A    For about seven years.

19  Q    So, same as for call detail records?

20  A    Yes.

21  Q    What, if any, cell site location records would AT&T

22  retain for a telephone number that is not serviced by AT&T --

23  a telephone number that is not subscribed to AT&T?

24  A    We keep the records for the reports about seven years.

25  So, whether it is an AT&T customer that appears in a report or

                    LAM      OCR      RPR

1   doesn't, we just keep the records for seven years.

2   Q    When would AT&T retain cell site -- in what circumstances

3   would AT&T retain cell site location records for a user who is

4   not an AT&T subscriber?

5   A    I really don't understand the question again.  Could you

6   repeat that, please?

7   Q    Sure.  When let's say a Sprint subscriber, a Sprint

8   wireless subscriber, is roaming over AT&T's network, would

9   AT&T retain cell site location records in some instances for

10  that telephone number?

11  A    We would keep the records for seven years for an AT&T

12  wireless customer.  But if a Sprint user's number appeared on

13  that report, it would stay for seven years as well.

14  Q    Right.  But what I'm asking is when an AT&T -- when a

15  user is not an AT&T subscriber, are there instances where AT&T

16  retains cell site location records for that user even though

17  it's not an AT&T subscriber?

18  A    We retain the records for seven years.  And if that user

19  is on the report, then, yes, it's seven years.

20  Q    But in my example where the telephone user is not an AT&T

21  customer but is, let's say, a Sprint customer and is roaming

22  over AT&T's network, would AT&T in that instance potentially

23  have location information for that Sprint user?

24  A    It would have it for the records of the AT&T wireless

25  user.  But for the Sprint user's number on that report, yes,

Fanara - Direct - Gedes                    3122

1   for seven years.

2   Q    And it's fair to say that AT&T does not have cell site

3   location information for all telephone calls placed by that

4   Sprint user?

5   A    No.

6   Q    It would only have it when the Sprint user was roaming

7   over AT&T's network, correct?

8   A    Yes.

9        MS. GEDDES:  I'm showing the witness a portion of

10  what's in evidence as Government Exhibit 130.

11  Q    I want to direct your attention to the top portion where

12  it says "mobility."

13       Is this an example of a portion from one of those

14  reports that you described earlier as the Report AU?

15  A    Yes.

16  Q    And does this show mobility or wireless telephone records

17  for this particular phone number, 708-337-9300?

18  A    Yes.

19  Q    I want to direct your attention to Line 39528, which is

20  highlighted on this particular exhibit where my pen is.  In

21  the column labeled IMEI, it lists a series of numbers.  And

22  then below that, it says "Apple" and then "iPhone 3GS."

23       Can you explain what is reflected by that entry

24  there?

25  A    It shows that the Apple 3GS serial number is specific to

1    that particular phone for that particular call.

2    Q    Does this record show that this particular telephone

3    number, 708-337-9300, was using or assigned to an Apple

4    iPhone 3GS as of that particular date and time reflected in

5    the report?

6    A    Yes.

7    Q    And there are many instances, just as an example, on this

8    page, Page 1825 of Government Exhibit 130B, where there's no

9    entry for an IMEI and there's no entry for the make or model

10   of that particular device.

11         Why is that?

12   A    It sometimes does not capture the data.

13   Q    When an iPhone user, such as this Apple iPhone 3GS, sends

14   a message to another iPhone user, does that show up on AT&T

15   records?

16   A    Sometimes it does and sometimes it doesn't.

17   Q    Under what circumstances would it not show up on AT&T's

18   records?

19   A    If it's connected on the Apple network.

20   Q    Okay.  And in that scenario, is it fair to say that that

21   text message or message never hits AT&T's network?

22   A    That's correct.

23   Q    And, therefore, AT&T doesn't maintain any records of that

24   particular message?

25   A    That's correct, yes.

Fanara - Direct - Gedes                    3124

1    Q    And are you familiar with the term "iMessage."

2    A    Yes.

3    Q    Is that an example of an iMessage from one Apple user to

4    another Apple iPhone user?

5    A    Yes.

6              MS. GEDDES:  And I'm now putting back on the screen

7    an excerpt from Government Exhibit 138B.

8              (Exhibit published to the jury.)

9    Q    And at the top, you see it says "Wireline."

10             Is that an example of the records from the report

11   that you previously identified as a Report Landline?

12   A    Yes.

13   Q    And I want to direct your attention to the particular

14   lines that I've highlighted; for example, on this page, it's

15   1667 -- it's Item 1667, 1668, and 1669.

16             Do you see those entries?

17   A    Yes.

18   Q    And before I go forward, let me show you what's in

19   evidence as Government Exhibit -- one moment.

20             And in that instance, you can see on that report in

21   Item 1667 there's an originating number ending in 6916 and

22   then there's a secondary originating number of 3268; is that

23   correct?

24   A    Yes.

25   Q    Now, are you familiar with routing numbers?

Fanara - Direct - Gedes                    3125

1    A    Yes.

2    Q    What are routing numbers?

3    A    They're used for billing purposes within our network.

4    Q    And, so, is that sort of an internal number used by a

5    telephone company?

6    A    In our case, yes.

7    Q    And, again, you talked earlier about records maintained

8    by AT&T for telephone numbers that are not subscribed by AT&T;

9    do you recall that testimony?

10   A    Yes.

11   Q    Now, in an example of telephone calls placed or received

12   by a wireless user who is not an AT&T subscriber, I think you

13   testified earlier, but I want to make clear, AT&T does not

14   maintain records of any portion of a telephone call placed by

15   that non-AT&T user that does not go over the AT&T network,

16   correct?

17   A    Yes.

18   Q    And, so, records maintained by AT&T for non-AT&T users

19   may not show the entirety of a particular telephone call; is

20   that fair to say?

21   A    Yes.

22   Q    And when routing numbers are used by AT&T for billing

23   purposes, do they sometimes reflect the particular location

24   where a telephone call was placed?

25   A    No.

LAM        OCR        RPR

1   Q    So, in an instance where a routing -- let's say there's a

2   routing number associated with a local Chicago telephone

3   number.

4          Could that indicate that that user is in Chicago

5   just because that's where the routing number was?

6   A    No.

7   Q    You testified earlier about that AT&T maintains records

8   for seven years.

9          Are there some instances where AT&T might have

10  records for longer periods of time?

11          As a general matter, I understand that AT&T

12  maintains records for seven years, but does sometimes AT&T

13  have records that go beyond that seven-year period?

14  A    Not that I'm aware of.

15  Q    So in this particular instance, you can see -- and,

16  again, I'm referring to Government Exhibit 138B -- you can see

17  that this report was generated on May 20, 2019; do you see

18  that?

19  A    Yes.

20  Q    But the telephone records are from 2004, correct?

21  A    Yes.

22  Q    So, it's fair to say this is an example where AT&T had

23  records that went beyond the seven-year retention period that

24  AT&T typically followed?

25          THE COURT:  Well, it's printed on 2019, but the

Fanara - Direct - Gedes                    3127

1    records show from 2004, so, yes, technically, the records are

2    from earlier, yes.

3    Q    And, so, as a policy, AT&T maintains records for seven

4    years, but is it fair to say that on occasion AT&T has records

5    that goes beyond that seven-year period?

6    A    Yes.

7    Q    And some of those records are reflected in this

8    particular exhibit, 138B?

9    A    Yes.

10   Q    Earlier when you were referring to cell site location

11   records, you mentioned that the records reflect a particular

12   latitude and longitude; do you recall that testimony?

13   A    Yes.

14   Q    What is the latitude and longitude -- what is it the

15   latitude and longitude of that's reflected in the records?

16   A    It's the latitude and longitude of where that cell site

17   of AT&T is located.

18   Q    So, how does that cell site correspond, generally

19   speaking, with the particular user that is -- for which

20   records were provided?

21   A    It just shows where the cell phone or device that's

22   connecting with AT&T's network, what cell site is located and

23   the cell site ID that it's using.

24   Q    So, fair to say that it's just an approximate location of

25   where the user is?

1  A    No.  It's the location of where the cell site is and the

2  longitude and latitude of that cell site.

3  Q    Correct.  But does the cell site, the location of the

4  cell site, provide an approximate location, the vicinity of

5  the location, where a particular user is?

6  A    Yes, generally speaking, it's the closest cell site that

7  bounces off the -- for the phone to connect to another device.

8  Q    Right.  So, it doesn't give you the precise location

9  where someone is, but it can provide within a range of an

10  approximate location or sort of vicinity where that user may

11  be?

12  A    It's the cell site ID longitude and latitude, but,

13  generally speaking, when a call is being made, it goes to one

14  of the closest sites that's available to it.

15  Q    Okay.  You testified earlier about routing numbers and

16  you said that it's an internal billing number.

17       Can you explain what you meant by that?

18  A    Well, when other networks have other users on our

19  network, we had to keep records on this; and, therefore, when

20  we see that information within our database, I don't know the

21  billing process, but believe that some kind of charge will be

22  made for that use of our network.

23  Q    So, for example, when a user is roaming -- when a

24  non-AT&T user is roaming on AT&T's network, does AT&T

25  occasionally use routing numbers for billing purposes to

Proceedings                                    3129

1   ensure that AT&T is compensated for the use of AT&T's network?

2   A    Yes.

3              MS. GEDDES:  No further questions.

4              THE COURT:  Cross-examination?

5              MR. SCHOLAR:  No, your Honor, thank you.

6              THE COURT:  Thanks so much.  You can step out.

7              (Witness excused.)

8              THE COURT:  How is everybody doing?  Can we call

9   another witness or do we need a break?

10             All right.  Call your next witness, please.

11             MS. GEDDES:  The Government calls Diana Copeland.

12             THE COURT:  Can I see one of the prosecutors and one

13  of the defense counsel?

14             No need for the court reporter, just a scheduling

15  question.

16             (Pause in proceedings.)

17             THE COURT:  While we've got this moment, ladies and

18  gentlemen, we're just working out the schedule for next week.

19             We'll stay until 6 o'clock on Monday and Tuesday.

20  Obviously, we can't do that on Wednesday for people that are

21  observing Yom Kippur.  We'll see how far that gets us, and I

22  still think we're doing a pretty good job of keeping on

23  schedule.

24             Thanks so much.  So, that will be those two

25  nights -- well, not "nights," but you know, and then we'll see

LAM       OCR       RPR

Proceedings                                    3130

1    where we are.

2              THE COURTROOM DEPUTY:  Please raise your right hand.

3              Do you solemnly swear or affirm that the testimony

4    you're about to give will be the truth, the whole truth, and

5    nothing but the truth?

6              THE WITNESS:  Yes.

7              THE COURTROOM DEPUTY:  Thank you.  You may be

8    seated.

9              THE COURT:  You can take your mask off.  Just a few

10   things before we start.

11             Our court reporter takes down everything that you

12   say, and, so, I'm going to ask you to speak slowly and into

13   the microphone.  I also want to make sure our jurors hear your

14   testimony.  And the other part of that is don't speak too

15   quickly and don't talk over whichever lawyer is asking you

16   questions.

17             If you don't understand a question or you want the

18   lawyer to repeat it, tell me.  And then just do your best to

19   answer only the question that you're being asked.

20             Okay?

21             THE WITNESS:  Okay.

22             THE COURT:  Go ahead.

23             MS. GEDDES:  Thank you, your Honor.

24

25

1    **DIANA COPELAND,**

2             called by the Government, having been

3             first duly sworn, was examined and testified

4             as follows:

5    DIRECT EXAMINATION

6    BY MS. GEDDES:

7    Q    Are you currently employed?

8    A    Yes.

9             THE COURT:  Is the microphone on?

10             THE COURTROOM DEPUTY:  I think it's just not close

11   enough.

12             (Pause in proceedings.)

13   Q    What do you do?

14   A    I am not employed, I am actually -- I'm a writer and a

15   filmmaker.

16   Q    And were you previously employed?

17   A    Yes.

18   Q    And just to be clear, when you said you were employed, do

19   you have a business right now?

20   A    Yes, I have a film company.

21             THE COURT:  I'm having trouble hearing you, which

22   may be my problem, but I'll ask you just to speak up just a

23   little bit into the microphone.

24             THE WITNESS:  Okay.

25   Q    How were you previously employed?

Copeland - Direct - Geddes                3132

1  A    I was previously employed as executive assistant to

2  R. Kelly.

3  Q    And do you see him in the courtroom today?

4  A    Yes, I do.

5  Q    Can you point to him and describe an article of his

6  clothing?

7  A    He's right there and he has a gray suit jacket on.

8         THE COURT:  Indicating the Defendant.

9  Q    Now, when did you start working for the Defendant?

10  A    Around 2004, 2005.

11  Q    And how long did you work for him?

12  A    About 15 years on and off.

13  Q    Fifteen years, is that correct?

14  A    Yes, on and off.

15  Q    And you testified that you worked "on and off" during

16  that 15 year period.

17         As you sit here today, do you remember the

18  particular dates of your stints working for the Defendant?

19  A    Just a little.

20  Q    Do you remember the exact dates of when you worked for

21  the Defendant?

22  A    Not the exact dates, no.

23  Q    When was the last stint or period of time that you worked

24  continuously for the Defendant?

25  A    That would be the end of 2016 to 2018.

Copeland - Direct - Geddes                    3133

1   Q    Okay.  And do you remember when in 2018 you stopped

2   working for him?

3   A    It was around April.

4   Q    Of 2018?

5   A    Correct.

6

7            (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Copeland - direct - Geddes                3134

1    DIRECT EXAMINATION (Continued.)

2    BY MS. GEDDES:

3    Q    Of 2018?

4    A    Correct.

5    Q    Now you testified that you were his executive assistant,

6    was that your title for him?

7    A    Yes.

8    Q    And were you always -- did you always have the title

9    executive assistant during the 15 years that you worked for

10   the defendant?

11   A    No.  It was personal assistant and then it changed.

12   Q    To an executive assistant?

13   A    Yes.

14   Q    When you first started working for the defendant, in what

15   state did you live?

16   A    Michigan.

17   Q    And where in -- what state did the defendant live?

18   A    Illinois.

19   Q    How were you able to work for the defendant living in a

20   different city?

21   A    So I would commute from Michigan to Chicago every week.

22   Q    And during the time period that you were in Chicago

23   working for the defendant in a particular week, where were you

24   staying?

25   A    I'm sorry, can you repeat.

Copeland - direct - Geddes                    3135

1      THE COURT:  Just where did you stay when you came to

2  Chicago to work?

3      THE WITNESS:  Oh, I would stay at the estate.

4  Q    And where was that estate?

5  A    At Robert's estate.

6  Q    Where was it?

7  A    It was in Olympia Fields.

8  Q    Is that in Chicago?

9  A    Correct.

10 Q    When you first started to work for the defendant as his

11 personal assistant, what were your responsibilities?

12 A    Um, my responsibilities were more so household

13 responsibilities.  Making sure that, you know, the maids,

14 housekeepers and nannies were scheduled correctly and that

15 they were paid.

16 Q    And you mentioned a nanny, was there a period of time

17 that you worked for the defendant where there were children

18 living at the estate?

19 A    Yes.

20 Q    And how long was that for?

21 A    That probably was about two years into my employment.

22 Q    And was that the first two years that you worked for the

23 defendant?

24 A    Correct.

25 Q    Then after that two-year period, were there no longer

Copeland - direct - Geddes                    3136

1   children living in a permanent basis in the defendant's

2   estate?

3   A    Correct.

4   Q    What other responsibilities did you have over the course

5   of your 15-year employment for the defendant?

6   A    Later responsibilities would include just, you know,

7   answering calls when someone was trying to reach him, making

8   sure that he, you know, made certain meetings on time or

9   was -- woke up in time to do like radio drops or something

10  like that.

11  Q    And did you also handle aspects of the defendant's

12  personal life?

13  A    Absolutely.

14  Q    Like what?

15  A    If there were guests I made sure that they felt

16  comfortable.

17  Q    When you refer to guests, what type of guests are you

18  referring to?

19  A    It could be anybody from a record label executive to a

20  personal guest.

21  Q    And who are the individuals who were personal guests of

22  the defendant, just generally speaking who are we referring

23  to?

24  A    Well, we're referring to -- well, he had male guests and

25  female guests.

Copeland - direct - Geddes                 3137

1   Q    Were these girlfriends of the defendant's?

2   A    The female guests, yes.

3   Q    And now you testified that you worked as a personal

4   assistant and an executive assistant for the defendant, did

5   the defendant employ other people in other capacities?

6   A    Yes.

7   Q    And I'm going to show you what's in evidence as

8   Government Exhibit 12.  Do you recognize that individual?

9   A    Yes, I do.

10  Q    What, if anything, did he do for the defendant?

11  A    He was an accountant and also seemed to serve as a

12  manager.

13  Q    I should have asked you initially, who is that?

14  A    Derrel McDavid.

15  Q    And over what period of time did Derrel McDavid serve as

16  the defendant's accountant and partially his manager as well?

17  A    I'm not sure when he left, but my best guess is 2013.

18  Q    And was Mr. McDavid working for the defendant when you

19  started to work for him in 2004 or 2005?

20  A    Correct.

21  Q    I'm showing what's in evidence as Government Exhibit 3,

22  do you recognize who that is?

23  A    Yes, I do.

24  Q    Who is that?

25  A    June Brown.

Copeland - direct - Geddes                    3138

1   Q    And what did, if anything, did June Brown do for the

2   defendant?

3   A    June Brown was a personal assistant.

4   Q    And over what period of time?

5   A    At least the entire period of time that I worked there.

6   Q    So he was there when you started and when you left?

7   A    Correct.

8   Q    I'm showing Government Exhibit 4, which is in evidence.

9   A    This is --

10  Q    Who is that?

11  A    June Bug.  I'm sorry, George Kelly.

12  Q    Does George Kelly have a nickname?

13  A    June Bug.

14  Q    What, if anything, did George Kelly, also known as June

15  Bug, do for the defendant?

16  A    He was also a personal assistant.

17  Q    Over what period of time?

18  A    On and off the entire time that I worked there as well.

19  Q    But like you he worked on during some of that time and

20  did not work for the defendant at other parts of that time; is

21  that correct?

22  A    Correct.

23  Q    I'm showing what's in evidence as Government Exhibit 5 do

24  you recognize who that is?

25  A    I do.

1    Q    Who is that?

2    A    Van Pullen.

3    Q    What, if anything, did he do for the defendant?

4    A    He was also a personal assistant.

5         THE COURT:  I'm going to ask again, I hate to be a

6    nag, I'm having a little trouble hearing you.  Sometimes that

7    works if you just actually hold the microphone.

8         THE WITNESS:  Okay.

9         THE COURT:  Take it out of that and just hold it in

10   your hand.  This might be better, then I don't have to keep

11   annoying you.  Go ahead.

12   BY MS. GEDDES:

13   Q    I'm sorry, did you say who this individual was?

14   A    Van Pullen.

15   Q    What, if anything, did Van Pullen do for the defendant?

16   A    He was a personal assistant.

17   Q    Over what period of time?

18   A    I believe he came later, like sometime in, I really don't

19   know just a few years.  I remember seeing him just maybe a

20   couple of years or...

21   Q    Do you remember whether that was in the beginning, the

22   middle, or the end period of when you worked for the

23   defendant?

24   A    The end period.

25   Q    Was he still there when you left in April of 2018?

1    A    I can't say one way or another, I don't know.

2    Q    Was he there for at least a portion of your last stint

3    that you worked for the defendant?

4    A    I'm not sure if he was there at that period of time,

5    sorry.

6    Q    Okay.  Government Exhibit 22, which is in evidence, do

7    you recognize that individual?

8    A    I do.

9    Q    Who is that?

10   A    This is Candy.

11   Q    And what, if anything, did Candy do for the defendant?

12   A    She was a security.

13   Q    Over what period of time?

14   A    Well, she worked in and out the entire time that I worked

15   there, on and off.

16   Q    And do you know Candy's full name?

17   A    I think it is Cynthia Oliphant.

18   Q    Is Candy a nickname?

19   A    Yes, it is.

20   Q    I'm showing what's in evidence as Government Exhibit 16.

21   Let me make sure it's in evidence.  It is.

22          I'm showing what's in evidence as Government

23   Exhibit 16, do you recognize that individual?

24   A    I do.

25   Q    Who is that?

Copeland - direct - Geddes                    3141

1    A    This is the bus driver.

2    Q    Do you know his name?

3    A    I can't remember his name.

4    Q    And over what period of time was this individual a bus

5    driver for the defendant?

6    A    I don't remember the period of time either.

7    Q    Okay.  I'm showing Government Exhibit 15 which is also in

8    evidence.  Do you recognize that individual?

9    A    This is a bus driver as well.

10   Q    And do you know his name?

11   A    His name is Terry.

12   Q    And over what period of time did Terry work for the

13   defendant?

14   A    I don't recall the time period.

15   Q    Okay.  I'm showing Government Exhibit 19, which is in

16   evidence.  Do you recognize that individual?

17   A    This is Ronald Hardy.

18   Q    And what, if anything, did he do for the defendant?

19   A    He was security.

20   Q    Over what period of time?

21   A    On and off the entire time I was there, yeah.

22   Q    And Government Exhibit 17, which is also in evidence, do

23   you recognize that individual?

24   A    I only know him by his nickname.

25   Q    Which is?

Copeland - direct - Geddes                    3142

1    A    Top Gun.

2    Q    What, if anything, did Top Gun do for the defendant?

3    A    He was a bus driver.

4    Q    Do you know over what period of time he served as a bus

5    driver for the defendant?

6    A    I do not.

7    Q    And I'm showing you the witness only what's been marked

8    for identification as Government Exhibit 13.

9         Do you recognize Government Exhibit 13?

10   A    I do.

11   Q    Who is that?

12   A    James Mason.

13   Q    What, if anything, did James Mason do for the defendant?

14   A    He was his manager.

15        MS. GEDDES:  The government offers Government

16   Exhibit 13.

17        MR. CANNICK:  No objection.

18        THE COURT:  It's in evidence.

19        (Government Exhibit 13, was received in evidence.)

20   Q    Over what period of time did James Mason serve as the

21   defendant's manager?

22   A    The last stint of my employment, that would have been

23   like 2016 to 2018.

24   Q    And was James Mason still working for the defendant when

25   you stopped working for him in April of 2018?

1   A    Yes.

2   Q    Now when you started to work for the defendant, where did

3   the defendant live?

4   A    Olympia Fields.

5   Q    At the estate you testified you stayed at?

6   A    Correct.

7   Q    Did he stay at Olympia Fields through the time period

8   that you worked for him?

9   A    Yes, he did.

10  Q    Did he continue to stay there or did there come a time

11  when the defendant moved out of Olympia Fields?

12  A    There came a time when he moved out.

13  Q    Where did he live after that?

14  A    Trump Towers.

15  Q    In Chicago?

16  A    In Chicago.

17  Q    Are there any other locations where the defendant at

18  times lived while you were working for him?

19  A    There were two homes in Johns Creek, Georgia.

20  Q    Is that a suburb of Atlanta?

21  A    Correct.

22  Q    Do you remember what time period the defendant was using

23  those two homes in Johns Creek?

24  A    Somewhere around 2000 -- at least 2016 to 2018.  I am not

25  sure when he initially moved in there.

Copeland - direct - Geddes                    3144

1  Q    Now where was the defendant's recording studio when you

2  first started to work for him?

3  A    In the basement -- oh, no, it was Trax, so it was in

4  Chicago.

5  Q    And you started to talk about a different recording

6  studio, what recording studio did the defendant use after the

7  recording studio at Trax?

8  A    That would have been the one that's in the basement --

9  was in the basement of the Olympia Fields home.

10 Q    What other recording studios, if any, did the defendant

11 use after he moved out of his residence at Olympia Fields?

12 A    There was a studio on Ohio Street in Chicago and then

13 there was another one on Justine in Chicago.

14 Q    And which one did the defendant use first, which studio?

15 A    The one on Ohio.

16 Q    And are both of those located in downtown Chicago?

17 A    Correct.

18 Q    While you were working for the defendant and when the

19 defendant was not on tour, what was your schedule?

20 A    My schedule was like Sunday to Thursday.  It was just

21 really just four days a week and it didn't matter which four,

22 but mostly Sunday to Thursday.

23 Q    And during that four-day period when you were scheduled

24 to work for the defendant, what hours did you work?

25 A    They were like 24-hour shifts.

Copeland - direct - Geddes                3145

1   Q    So fair to say you were on call for that entire four-day

2   period?

3   A    Yes, just on call.

4   Q    When you were staying at Olympia Fields while you were on

5   call for that four-day period and after the defendant's

6   children moved out of Olympia Fields, who, if anyone, else

7   stayed at that residence?

8   A    Various women.

9   Q    And where did those females stay, where within Olympia

10  Fields?

11  A    Um, in the office maybe, the studio, maybe on the tour

12  bus, the theater downstairs.

13  Q    Fair to say they stayed in a number of locations within

14  Olympia Fields?

15  A    Correct.

16  Q    And were those individuals effectively living there?

17  A    Sometimes.

18  Q    Now were there also female guests who visited the

19  defendant at Olympia Fields but didn't stay there on a longer

20  term basis?

21  A    Correct.

22  Q    What, if anything, did you notice about the defendant's

23  female guests and his live-in girlfriends' movement around the

24  residence in Olympia Fields?

25  A    They were not free to roam the house.

Copeland - direct - Geddes                         3146

1   Q    Now did you roam Olympia Fields while you were working

2   there?

3   A    I did.

4   Q    And what, if anything, would you do when you walked

5   through the residence at Olympia Fields to announce your

6   presence?

7   A    I would knock.

8   Q    And what do you mean?

9   A    If I was going from one room to another, I might knock on

10  the wall.

11  Q    To announce your presence?

12  A    Correct.

13  Q    Now while you were living or staying, I should say, while

14  you were staying at Olympia Fields, what, if anything, did you

15  notice about the way in which the defendant's live-in

16  girlfriends dressed around the house?

17  A    They dressed casually like, you know, loose-fitting

18  clothing.

19  Q    Just backing up one moment.  You testified that you would

20  knock on a wall before entering a room; is that correct?

21  A    That is correct.

22  Q    Why would you do that?

23  A    To make sure that I announced my presence.

24  Q    So the defendant knew that you were entering the room?

25  A    Correct.

Copeland - direct - Geddes                    3147

1   Q     You just mentioned -- you just testified that the
2   defendant's live-in girlfriends dressed in, I think
3   loose-fitting clothing while they were in Olympia Fields; is
4   that correct?
5   A     Correct.
6   Q     How about when those same live-in girlfriends went out in
7   public, what, if anything, did you notice about the way in
8   which they dressed when out in public?
9   A     When out in public?  They would sometimes wear the same
10  clothing.
11  Q     The same loose-fitting clothing?
12  A     Correct.
13  Q     When the defendant moved out of his residence at Olympia
14  Fields, where did those females who were effectively living
15  with the defendant, where did they go at that time?
16  A     Can you repeat that please.
17  Q     Sure.  When the defendant moved out of his residence in
18  Olympia Fields, and I think you testified that at least at one
19  point he moved into the Trump Towers, where, if anywhere, were
20  his live-in girlfriends staying at that time?
21  A     When he moved to the Trump?
22  Q     Yes.
23  A     Live-in girlfriends might be at the Trump, they might be
24  at the studio.
25  Q     And when you referring to the studio, you're referring to

Copeland - direct - Geddes                     3148

1    the studio on Ohio Street?

2    A    Correct.

3    Q    And when the defendant was no longer using the studio on

4    Ohio Street were there also some females who stayed at the

5    studio on Justine Street?

6    A    Correct.

7    Q    What, if anything, did you notice about those females'

8    movements around those two studios when you were there?

9    A    It was pretty much the same, they didn't roam.

10   Q    They did not roam throughout the studio?

11   A    They did not roam.

12   Q    Where would they stay?

13   A    Depending on which studio, the one on Ohio, I think they

14   would either be in the actual control room with him, or they

15   would be in like another room, it's kind of like a lobby.

16   Q    Where they would stay?

17   A    Correct.

18   Q    Now as part of your working for the defendant, did you on

19   occasions arrange for local transportation for the defendant's

20   female guests or live-in girlfriends?

21   A    Correct.

22   Q    What, if anything, did the defendant or his guests

23   request regarding the transportation?

24   A    Female drivers.

25   Q    And when you were arranging local transportation, how

Copeland - direct - Geddes                    3149

1   would you arrange that transportation?

2   A    I would -- well, it would be Ubers, so --

3   Q    And was there a mechanism in arranging an Uber to ensure

4   that there was a female driver?

5   A    No, there wasn't.

6   Q    What, if anything, did the defendant -- did you advise

7   the defendant of that?

8   A    I -- I don't know if I advised him, but I think he

9   noticed that the male drivers would show up.

10  Q    And were you -- did you learn what, if anything, the

11  defendant did when a male driver showed up in an Uber that you

12  had arranged?

13  A    I would have to call another one.

14  Q    And how did you know you needed to call another one?

15  A    He would ask me to.

16  Q    And on occasion did you call multiple Ubers in order to

17  obtain a female driver?

18  A    I did.  He did eventually realize that you can't pick the

19  gender of the driver, so he didn't ask any more.

20  Q    And earlier I asked you about the defendant's female

21  guests and live-in girlfriends' movements around the studios

22  where they later stayed.  I want to focus on when those

23  individuals were staying at Justine Street --

24  A    Okay.

25  Q    -- the studio on Justine Street.

1          Where, if anywhere, would those individuals stay

2     when the defendant had the studio on Justine Street?

3     A    For the most part there were bedrooms upstairs, so they

4     would be up there, and there was also on the main floor like a

5     kitchen, lounge area, or they might be in the control room in

6     the studio with him.

7     Q    And as you testified earlier, was it the case that they

8     would stay in one of those particular locations?

9     A    Like in their room.

10    Q    They would remain in their room, correct?

11    A    Right.

12    Q    Would you on occasion accompany some of the defendant's

13    female guests or live-in girlfriends on public outings?

14    A    Yes.

15    Q    Can you give some examples of where you might accompany

16    these individuals.

17    A    Sure.  I accompanied them to shopping, to get massages,

18    to get their nails done, things of that nature.

19    Q    And before I ask my next question I want to show you

20    what's in evidence as Government Exhibit 75C.

21          Now, without saying the first or last name of this

22    individual, do you recognize her?

23    A    I do.

24    Q    And again, without saying it, do you know her first and

25    last name?

1   A     I do.

2   Q     For today's purpose we're just going to refer to her as

3   Jane, okay?

4   A     Okay.

5   Q     Now was Jane one of the defendant's live-in girlfriends

6   for a period of time?

7   A     Yes, she was.

8   Q     And I'm showing you what's in evidence as Government

9   Exhibit 78.  Again, without saying her first and last name, do

10  you recognize this individual?

11  A     I do.

12  Q     And what is her first name?

13  A     Joycelyn.

14  Q     And was Joycelyn one of the individuals who lived with

15  the defendant for a period of time?

16  A     Correct.

17              (Continued on the next page.)

18

19

20

21

22

23

24

25

Copeland - direct - Geddes                    3152

1    DIRECT EXAMINATION

2    BY MS. GEDDES:   (Continuing)

3    Q     I'm showing you -- I am going to show you what's in

4    evidence as Government Exhibit 69 B, and again, without saying

5    her first and last name, do you recognize the individual shown

6    in Government Exhibit 69 B?

7    A     I do.

8    Q     And what is her first name?

9    A     Dominique.

10   Q     And was she also one of the defendant's live-in

11   girlfriends for a period of time?

12   A     Yes, she was.

13   Q     And I am going to show you what's in evidence as

14   Government Exhibit 52.  Again, without saying her first and

15   last name, do you recognize this individual?

16   A     I do.

17         MS. GEDDES:  I'm sorry, well, the Government offers

18   Government Exhibit 52.

19         MR. CANNICK:  No objection.

20         MS. GEDDES:  I apologize.

21         THE COURT:  That's all right.  That's in evidence.

22         (Government's Exhibit 52 received in evidence.)

23   Q     What is this individual's nickname?

24   A     Juice.

25   Q     And was Juice one of the defendant's live-in girlfriends

Copeland - direct - Geddes                    3153

1   for a period of time?

2   A    Yes, she was.

3   Q    And referring to Jane, Joycelyn, Dominique and Juice,

4   were they spending time with the defendant during your last

5   stint working for him between 2016 and 2018?

6   A    Yes.

7   Q    All right.  I want to go back to my question earlier

8   about when you would accompany those individuals and I want to

9   refer specifically to those four individuals that I just

10  mentioned:  Jane, Joycelyn, Dominique and Juice.

11           What, if anything, did you notice about the manner

12  in which they interacted with men other than the defendant?

13  A    They did not want to interact with the men.

14  Q    And what, if anything, did you observe when you

15  accompanied some of those individuals on public outings?

16  A    They would not interact with men.

17  Q    Can you describe an example?

18  A    An example is if we walked in a shoe store and the

19  salesman was a male, they would ask, can I help you directly

20  to that individual?  And they would turn away.

21  Q    And just to be clear, the person asking can I help you,

22  was that the male salesperson?

23  A    Correct.

24  Q    And the "they" in your sentence who turned away, are you

25  referring to some of the defendant's live-in girlfriends?

Copeland - direct - Geddes                    3154

1    A    Yes.

2    Q    What, if anything, might they ask you in that particular

3    instance?  Or what would you do in that instance?

4    A    Oh, they would ask me to interact with that salesperson

5    and I would do that.

6    Q    And were you also present with some of the defendant's

7    live-in girlfriends where a female salesperson walked over and

8    offered to help them?

9    A    Yes.

10   Q    How, if at all, did they respond in that scenario?

11   A    They would interact with that person.

12   Q    Without any intervention by you?

13   A    No.

14   Q    Meaning you didn't do anything, they just interacted on

15   their own; correct?

16   A    Correct.

17   Q    Did you have occasion to ride elevators in public spaces

18   with some of the defendant's live-in girlfriends?

19   A    I did.

20   Q    What, if anything, did you notice about the way in which

21   some of his live-in girlfriends rode on elevators?

22   A    I did notice one particular time when I was in the

23   elevator with Joycelyn.  She turned away and I stepped off the

24   elevator, and she did not see me step off because she was

25   turned away.  I think she was turned away because a gentleman

Copeland - direct - Geddes                3155

1   had gotten on the elevator.  So she ended up being left on the

2   elevator because she didn't see me get off.

3   Q    And do you remember where you were when that happened?

4   A    We were at a hotel, but I don't know which one.

5   Q    And why were you on the elevator with Joycelyn in the

6   first place?

7   A    I was walking her to her room.

8   Q    What did you hear the defendant's female guests or

9   live-in girlfriends call the defendant in the defendant's

10  presence?

11  A    Daddy.

12  Q    How did they refer to the defendant to you when the

13  defendant was not around?

14  A    Mr. Kelly.

15  Q    What, if anything, did you observe about what, if

16  anything, the women would do when the defendant walked into a

17  room where the defendant's live-in girlfriends were?

18  A    I'm sorry, can you repeat that?

19  Q    It was a terrible question.

20       Did you have occasion to see what, if anything, the

21  defendant's live-in girlfriends did when the defendant entered

22  a room where they were?

23  A    Yes.

24  Q    What --

25  A    They would jump up and give him a big kiss.

1    Q    And would all of them do that?

2    A    Yes.

3    Q    Did you spend time with the defendant's female guests or

4    live-in girlfriends on the Sprinter van?

5    A    I have, yes.

6    Q    Under what circumstances would you spend time with those

7    individuals on the Sprinter van?

8    A    We may ride with him to an important meeting and if this

9    was not a meeting that I was going into, I would sit in the

10   Sprinter with his guest and we would be there.

11   Q    And just to be clear, the "him" in that sentence, is that

12   referring to the defendant?

13   A    Yes.

14   Q    Now, in that scenario that you just described, what, if

15   anything -- what would you do if you needed to use a restroom

16   and were on the Sprinter van waiting?

17   A    I would get off the Sprinter and use it.

18   Q    Find a bathroom and use it?

19   A    Yes.

20   Q    What, if anything, did you observe the defendant's female

21   guests or live-in girlfriends do in that scenario if they

22   needed to use a bathroom?

23   A    They would ask me to get ahold of him.

24   Q    And what, if anything, would you do when you received

25   those requests?

Copeland - direct - Geddes                    3157

1    A    I would get ahold of him.

2    Q    And were there -- and what would you do once you got

3    ahold of them?

4    A    Just let him know that his guests needed to use the

5    restroom.

6    Q    What would happen after that?

7    A    He would just say okay and I'd take them to the restroom,

8    I'd accompany them.

9    Q    And, again, just to be clear, the "him" is referring to

10   the defendant?

11   A    Yes.

12   Q    Were there times in which you were not able to

13   immediately get ahold of the defendant?

14   A    Yeah, there have been times.

15   Q    And what would happen in those circumstances?

16   A    Well, the one that comes to mind --

17   Q    And please don't use any names.

18   A    Okay, I will not.

19        She was insistent on me getting ahold of him before

20   she went.  She ended up just having to hold it for maybe like

21   30 minutes.  He was working out in Lifetime Fitness and he

22   didn't have his phones on him, so.

23   Q    Was the Sprinter van parked outside the Lifetime Fitness?

24   A    Yes.

25   Q    I am going to show you what's in evidence as Government

Copeland - direct - Geddes                3158

1   Exhibit 76.  And, again, without identifying this individual,

2   do you recognize who that is?

3   A    I do.

4   Q    And was that the individual you were just referring to

5   who needed to use the restroom and didn't use it, waited

6   instead?

7   A    Correct.

8   Q    And during the period of time when that individual was

9   waiting to use or you were trying to get in contact with the

10  defendant, did it appear like she needed to use the bathroom

11  badly?

12           MR. CANNICK:  Objection.

13           THE COURT:  Sustained.

14  Q    During that time period when you were trying to get ahold

15  of the defendant to let him know that that particular

16  individual needed to use the restroom, what, if anything, did

17  you notice about her actions?

18  A    She really had to go.

19  Q    To the bathroom?

20  A    Yes.

21  Q    Was one of your responsibilities as the defendant's

22  personal assistant or executive assistant to arrange travel

23  for some of the defendant's female guests?

24  A    Correct.

25  Q    By the way, going back to what I was just asking you

Copeland - direct - Geddes                3159

1    about that particular scenario where one of -- someone needed

2    to use the restroom, you said that it took about 30 minutes.

3    What happened after that 30 minutes?

4    A    He came to the Sprinter.

5    Q    And what happened at that point?

6    A    And she went to the restroom.

7    Q    Over what period of time did you make travel arrangements

8    for the defendant's female guests?

9    A    That started in about 2016.  So the last stint, maybe a

10   little bit before that, I can't remember.

11   Q    And what, if any, instructions did the defendant give you

12   regarding making travel reservations?

13   A    I -- can you clarify?

14   Q    Sure.  How would you know to make travel arrangements for

15   a particular individual?

16   A    Oh, he would let me know that someone was going to be

17   calling me, or I'm sorry, texting me about visiting.

18   Q    And what would you do upon receiving those text messages?

19   A    I would, you know, get the information, and make the

20   travel arrangements and send the travel arrangements to the

21   guest.

22   Q    And were there times where you received text messages

23   from individuals that you hadn't previously discussed with the

24   defendant?

25   A    Didn't happen often, but rarely.  And when it did, I

Copeland - direct - Geddes                3160

1   would just make sure I confirmed it with him.

2   Q    And who were you making these travel arrangements for?

3   A    Well, I made travel arrangements for everybody from

4   record executives to just personal guests.

5   Q    Okay.  And did those personal guests include his female

6   guests?

7   A    Correct.

8   Q    When you made travel reservations, did that also include

9   hotel reservations?

10  A    Sometimes.

11  Q    Whose name would you book hotel reservations under when

12  you were making arrangements for one of his female guests?

13  A    Sometimes my name, sometimes their name.

14  Q    And did you also arrange for hotel reservations for the

15  defendant?

16  A    Yes.

17  Q    And under whose name would you make hotel reservations

18  when you were making arrangements for the defendant?

19  A    Sometimes my name.  Sometimes a fictitious name because

20  he's a celebrity.

21  Q    Do you remember the particular fictitious name that you

22  used?

23  A    I do not.

24  Q    Okay.  Did you sometimes make reservations for a George

25  Kelly?

Copeland - direct - Geddes                3161

1    A    Yes.

2    Q    Who is George Kelly?

3    A    The personal assistant.

4    Q    And does he have a nickname?

5    A    June Bug.

6    Q    Did you sometimes use the name George Kelly for the

7    defendant's reservations?

8    A    Yes.

9    Q    I want to go back to the individual shown in Government

10   Exhibit 76.

11        MS. GEDDES:  I'm putting Government Exhibit 76,

12   which is in evidence, on the screen.

13        (Exhibit published.)

14   Q    I should have asked you and I did not.  Without saying

15   it, do you know this individual's first and last name?

16   A    I do.

17   Q    For today's purpose, let's call her Anna.

18   A    Okay.

19   Q    What was Anna's relationship with the defendant?

20   A    She was his girlfriend.

21   Q    Over what time period do you recall this individual being

22   one of the defendant's girlfriends?

23   A    Before I came back, I believe that's when they started

24   the relationship.  So it had to have been like maybe 2016 to

25   2018.

Copeland - direct - Geddes                3162

1   Q    So when you say before you came back, when you started

2   working that last stint for the defendant, was she already one

3   of the defendant's girlfriends at that time?

4   A    Correct.

5   Q    Now, did there come a time when Anna left the defendant

6   while you were working for the defendant?

7   A    Yes.

8   Q    Where were you at that time?

9   A    She left many times.

10  Q    Was there a particular time when you were in the same

11  location at the time that she physically left?

12  A    Yes.

13  Q    Where were you at that particular time?

14  A    Atlanta.

15  Q    Where was the defendant at that time?

16  A    He had left to go to a -- perform at a concert.

17  Q    And do you remember where that concert was?

18  A    I do not.

19  Q    All right.  But you were with Anna and not -- you were

20  physically with Anna and not with the defendant at that time;

21  is that correct?

22  A    That is correct.

23  Q    What happened -- what do you recall happening on that

24  particular occasion when Anna left?

25  A    I remember her being really angry.  I think they had just

Copeland - direct - Geddes                    3163

1   had like an argument before he left, and she was really angry.

2   She was packing her things and she left.

3   Q    And who, if anyone else, was present when she left?

4   A    I think I was the only one actually present, but in the

5   home was also LeLe.

6   Q    And what home was it where you were when she left that

7   day?

8   A    It was the smaller home.  There was two homes in Atlanta

9   -- in Johns Creek, Georgia and this was the smaller home.

10  Q    All right.  And you mentioned that LeLe was also at the

11  house that day; is that correct?

12  A    Correct.

13  Q    Do you know LeLe's full name?

14  A    Alicia Evan.

15  Q    And I'm going to show you what's in evidence as

16  Government Exhibit 42.  Do you recognize what's in evidence as

17  Government Exhibit 42 two?

18  A    I do.

19  Q    What is that?

20  A    LeLe.

21  Q    That was the individual who was present that day?

22  A    Correct.

23  Q    Did there come a time when you spoke with the defendant

24  about Anna leaving that day?

25  A    Yes.

Copeland - direct - Geddes                    3164

1   Q    Where did that conversation take place?

2   A    It took place at a park near the studio.

3   Q    In what city?

4   A    In Chicago.

5   Q    And approximately how long after Anna's leaving did that

6   conversation occur?

7   A    Maybe a few days.

8   Q    What, if anything, did the defendant say to you?

9   A    Well, someone had contacted him, another coworker

10  contacted him and said that I let Anna escape, and, so, he

11  asked me about that.

12  Q    What did the defendant ask you?

13  A    He just told me that this person told him that I let Anna

14  escape.

15  Q    How did you respond?

16  A    I was really upset because there were like these rumors

17  swirling in the media and, you know, I didn't like the words

18  that that person had used to tell him that.

19  Q    Now, who used the term "escape" during your conversation

20  with the defendant?

21  A    The defendant.

22  Q    And how did you respond when he -- how did he -- what was

23  his demeanor when he was having this conversation with you?

24  A    He was disappointed in me.

25  Q    And what did he say?

Copeland - direct - Geddes                    3165

1   A     Well, he said that if I -- that I should just let LeLe

2   handle it.

3   Q     Referring to Alicia Evan?

4   A     Correct.

5   Q     Who was also in the house that day?

6   A     Correct.

7   Q     What did you understand him to mean when he said you

8   should have left LeLe handle it?

9   A     Probably just that I am a little bit more --

10         MR. CANNICK:  Your Honor, I'm going to object to the

11  "probably."

12         THE COURT:  I will sustain it as to that.

13  Q     What did you understand -- if you know, what did you

14  understand the defendant to mean when he said that he should

15  have let LeLe handle it?

16  A     I really would be just guessing on that.  I don't know.

17  Q     Okay.  Well, what had you done?

18  A     Nothing.

19  Q     You had let Anna leave?

20  A     Yes.

21         MR. CANNICK:  Objection.

22         THE COURT:  Well, overruled.

23         Is that what happened?  Is that what happened, that

24  she left?

25         THE WITNESS:  Anna.

Copeland - direct - Geddes                    3166

1          THE COURT:  And you didn't keep her from going;

2    correct?

3          THE WITNESS:  Correct.

4          THE COURT:  All right.  Next question.

5    Q    What, if anything --  well, withdrawn.

6          Switching gears, what, if anything, did you see the

7    defendant carrying on a regular basis?

8    A    A backpack.

9    Q    Did he carry it or did others carry it on his behalf?

10   A    Sometimes he carried it, sometimes other people carried

11   it.

12   Q    Can you describe -- well, let me -- during the 15 years

13   that you worked for the defendant, did the defendant have one

14   backpack or multiple backpacks?

15   A    Multiple.

16   Q    And what, if anything -- can you describe the different

17   backpacks?  I don't mean one by one, but what characteristics

18   did you observe about the backpacks?

19   A    They were always designer backpacks, Gucci, Louis

20   Vuitton.

21   Q    Who, if anyone, other than the defendant, would carry the

22   defendant's backpack?

23   A    Any of his male personal assistants would carry the

24   backpack.

25   Q    And did you ever have an occasion to see what was inside

Copeland - direct - Geddes                    3167

1    the defendant's backpack?

2    A    I never went through his backpack, but I did see like an

3    iPad one time.

4    Q    How did you see the iPad?

5    A    It was kind of like just sticking out.

6    Q    Of the backpack?

7    A    Correct.

8    Q    Fair to say there might have been other things in the

9    backpack at that same time that you just didn't see?

10   A    Yes.

11   Q    Now, during the 15 years on and off that you worked for

12   the defendant, how were you paid?  Were you a salary -- did

13   you have a salary or were you paid on an hourly basis?

14   A    Salary.

15   Q    As an employee of the defendant, were you always paid for

16   the work that you performed?

17   A    No.

18   Q    When were you not paid?

19   A    When I was fined.

20   Q    What do you mean by fined?

21   A    A fine is basically like if you don't do your job

22   correctly, you get fined.

23   Q    Who used the term fine?

24   A    Robert.

25   Q    And approximately how many times were you fined while you

Copeland - direct - Geddes                    3168

1  were working for the defendant?

2  A    I do not know.  Several times.

3  Q    Can you recall some of the reasons for which you were

4  told that you had been fined?

5  A    Well, one time would have been when I was trying to

6  search for this really rare puppy and I could not find this

7  puppy.

8  Q    Did you tell the defendant that?

9  A    Well, it took a really long time, so he did notice, and

10 yeah.  So that was one time.

11 Q    And what happened?

12 A    I was fined.

13 Q    Prior to being fined, did you inform the defendant that

14 you were having trouble finding this puppy?

15 A    Yes.

16 Q    Are there other occasions that you recall -- by the way,

17 who were you finding a puppy for?

18 A    Robert.

19 Q    Were there other occasions that you were fined that you

20 recall the purported reasons for being fined?

21 A    Another time was when I made a nail appointment and there

22 was a male at the nail salon.

23 Q    Who did you make a nail appointment for?

24 A    One of his guests.

25 Q    One of his female guests?

Copeland - direct - Geddes                    3169

1   A    Well, actually three of his guests.

2   Q    And referring -- using the names that we previously used,

3   can you -- do you remember which guest it was that you made a

4   nail appointment for?

5   A    Yes.

6   Q    Who was it?

7   A    Jane, Joycelyn, and Dominique.

8   Q    And now, were you present for --

9   A    I think it was just Jane and Joycelyn.  I don't think

10  Dominique.

11  Q    Okay.  Were you present for when Jane and Joycelyn

12  arrived at the nail salon?

13  A    I was not.

14  Q    How did you hear that you had been fined as a result of a

15  male being there?

16  A    When I got fined, that's how I found out.

17  Q    What were you told?

18  A    That I was fined because the appointment that I made that

19  was -- that should have been a female only did have a male

20  working there.

21  Q    And when you say that there had been -- what did you

22  understand the defendant wanted you to do in making nail

23  appointments?

24  A    Just to make sure that there were -- it was all-female

25  establishment.

Copeland - direct - Geddes                    3170

1   Q    And when you say all female, does that mean there

2   couldn't even be like a male janitor in the location?

3   A    Correct.  Correct.

4   Q    Who told you that you had been fined?

5   A    I believe it was the accounting person.

6   Q    Who was the accounting person at that time?

7   A    Joan Sullivan.

8            MS. GEDDES:  I am going to show the witness only

9   what has been marked for identification as 37.

10  Q    Do you recognize that individual?

11  A    I do.

12  Q    Who is that?

13  A    Joan Sullivan.

14           MS. GEDDES:  The Government offers Government

15  Exhibit 37.

16           MR. CANNICK:  No objection.

17           THE COURT:  That's in evidence.

18           (Government's Exhibit 37 received in evidence.)

19  Q    You testified earlier that Derrell McDavid served as the

20  defendant's accountant and sometimes manager until

21  approximately 2013; is that correct?

22  A    Right.

23  Q    Over what period of time did Joan Sullivan serve as the

24  defendant's accountant?

25  A    She was -- she would take his place somewhere around

Copeland - direct - Geddes                    3171

1   2014, 2015.

2   Q    So she served as the defendant's accountant after Derrel

3   McDavid no longer served as his accountant?

4   A    Right.

5   Q    Now, you testified that Derrel McDavid also served in a

6   managerial role.  Did Sullivan also serve in a managerial

7   role?

8   A    I don't believe so.

9   Q    Just as an accountant?

10  A    Correct.

11  Q    Have you ever seen the defendant with a weapon?

12  A    No.

13  Q    Have you ever been in one of the defendant's studios or

14  residences where you saw a weapon?

15  A    Yes.

16  Q    What kind of weapon did you see?

17  A    I saw a gun.

18  Q    Can you describe the gun that you saw?

19  A    It was small handgun.

20  Q    And where did you see it?  Did you say it was a studio?

21  Where did you see it?

22  A    The studio on Justine.

23  Q    Where specifically in the studio on Justine Street did

24  you see the gun?

25  A    It was behind the bar.

Copeland - direct - Geddes                    3172

1    Q    And I am going to show you what's in evidence as

2    Government Exhibit 926, page 23.  Do you recognize what's

3    shown there?

4    A    I do.

5    Q    What is that?

6    A    That is the lounge area of the studio.

7    Q    On Justine Street?

8    A    Yes.

9    Q    And do you see where my pen is pointing?

10   A    Yes.

11   Q    What is that?

12   A    That's the bar.

13   Q    And is that the bar area where you saw a gun?

14   A    It looks different.

15   Q    Is that the location of the bar area where you saw the

16   gun?

17   A    I believe so, yes.

18   Q    And where in the bar area did you see it?

19   A    It was on the shelf behind the bar.

20   Q    Like where liquor in a bar might be stored?

21   A    Yes.

22   Q    Approximately when did you see a gun in that bar area of

23   the defendant's recording studio?

24   A    That was approximately either March or April of 2018.

25   Q    Shortly before you stopped working for the defendant?

1    A    Correct.

2    Q    Did you ever have any discussions with anyone about the

3    defendant having a firearm?

4    A    I did.

5    Q    Who did you have that discussion with?

6    A    I'm sorry, what was the question?

7    Q    Did you ever have any -- my first question was did you

8    ever have any discussions with anyone about the defendant

9    having a firearm or a gun?

10              MR. CANNICK:  Objection to that, Your Honor.  It's

11   not the testimony.

12              THE COURT:  Sustained as to form.

13              Did you say did you ever have any discussions with

14   anyone about the gun?

15              MS. GEDDES:  Yes, and then I asked her who she had a

16   discussion with.

17              THE COURT:  You're not asking for the substance of

18   the conversation?

19              MS. GEDDES:  I'm about to, at which point can we

20   have a brief sidebar on it?

21              THE COURT:  Yes, but we don't have too much time, so

22   let's do a quick one.

23              MS. GEDDES:  We could break.  I still have a little

24   bit --

25              THE COURT:  I am going to squeeze every minute out

1   of you.  So let's not have a sidebar.  Let's ask another

2   question and we will deal with that later.

3           MS. GEDDES:  All right.

4   Q    I'm showing the witness page 37 of Government Exhibit

5   926.  Do you recognize what's shown there?

6   A    I do.

7   Q    What is shown there?

8   A    This is the bar area of the studio.

9   Q    And is that the bar area where you saw the gun?

10  A    Yes.

11  Q    And I'm putting my pen on that shelf area underneath,

12  where those two lamps are.  Is that the location where you saw

13  it or where on this diagram?

14  A    Correct.

15  Q    That shelf underneath where the two lamps are set?

16  A    Yes.

17  Q    And without saying the nature of the conversation, who

18  was the individual that you had a discussion with about the

19  defendant having a gun?

20          MR. CANNICK:  Objection.

21          THE COURT:  I think the objection is to the fact

22  that the defendant had the gun.  The testimony was that she

23  saw a gun in the studio.

24          Do I have that right, Mr. Cannick?

25          MR. CANNICK:  Yes, Your Honor.

Copeland - direct - Geddes                    3175

1         THE COURT:  So did you have a conversation with

2    somebody about the fact that you saw a gun in the studio?

3         THE WITNESS:  No.

4         MS. GEDDES:  My question was actually about

5    something other than that.  I can address it afterwards.

6         THE COURT:  All right.

7    BY MS. GEDDES:

8    Q    I want to direct your attention to January of 2018.  Did

9    you have a computer that you used in connection with your work

10   for the defendant?

11   A    I did.

12   Q    What type of computer did you have?

13   A    It was a MacBook Air.

14   Q    When did you get that computer approximately?

15   A    Approximately January of 2018.

16   Q    And who purchased the computer?

17   A    I did.

18   Q    What did you use it for?

19   A    I took notes in meetings.

20   Q    Meetings for the defendant or meetings with the

21   defendant?

22   A    Correct.

23   Q    But was it your own personal computer?

24   A    Correct.

25   Q    Do you still have that computer?

Copeland - direct - Geddes                    3176

1   A    I do not.

2   Q    What happened?

3   A    It went missing one day when we were having -- when there

4   were guests in the studio.

5   Q    Which studio were you in?

6   A    On Justine.

7   Q    And where were you when you last saw your computer?

8   A    I was sitting on the couch in the lounge area of the

9   studio.

10  Q    And was that the same lounge area that was just shown in

11  Government Exhibit 926?

12  A    Correct.

13  Q    Who, if anyone, was present while you were there?

14  A    There were guests.  There was Robert and Alicia Evan was

15  there.

16  Q    And where was your computer?

17  A    On the coffee table.

18  Q    And do you recall -- I think you said that you were on

19  one of the couches around the coffee table; is that correct?

20  A    Correct.

21  Q    And do you recall what you were doing at that time?

22  A    Just working.

23  Q    And do you remember where the defendant was?

24  A    He was adjacent to us, I think maybe playing cards at

25  another table.

Proceedings                                    3177

1          THE COURT:  We are going to have to finish this next

2    week because it is 4:30 and I did make a promise.  So we are

3    going to break for the weekend.

4          Please don't look anything up about the case.  Don't

5    listen to or read any accounts of the case, wherever they

6    might be.  But do have a good weekend and we will see you on

7    Monday.  Thank you so much.

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury exits the courtroom.)

10          THE COURT:  All right.  The witness can step out.

11    We will see you on Monday.

12          (Witness exits.)

13          THE COURT:  Everybody can sit down.  So I think I

14    see in the grand jury minutes what you were planning to ask.

15    I don't see any admissible basis for that, I have to say.

16          MS. GEDDES:  Can I make a pitch at least?

17          THE COURT:  What?

18          MS. GEDDES:  Can I make a pitch?

19          The Government's position is it's a statement of one

20    of the employees of the defendant and in his capacity as an

21    employee of the defendant as a coworker, he worked as a

22    personal assistant as well, and he was making the statement

23    to, you know -- ensure that this coworker was not, you know,

24    unnecessarily wrapped up in, you know, possessing an

25    unregistered firearm.

Proceedings                                    3178

1          THE COURT:  Just so the record is clear here, the

2     testimony is that -- as I understand it, the testimony would

3     be that June Brown told her that the defendant didn't own the

4     gun and that she shouldn't put it in her purse and that it was

5     illegal, is that the substance of what you expect her to say?

6          MS. GEDDES:  She would say that June Brown said that

7     the gun was not registered, not that he didn't like own it, I

8     mean.

9          THE COURT:  Well, I don't need to really hear from

10    the defense on this.  That's not a winner.  There are other

11    ways to prove, I suppose, that there's no gun license, that he

12    doesn't have a gun license, but this wouldn't be one of them.

13    So I'm sustaining the objection to that.

14          Anything else that anybody has to raise?

15          MS. GEDDES:  What time are we starting on Monday?

16          THE COURT:  Well, Mr. Cannick.

17          MR. CANNICK:  Your Honor.

18          THE COURT:  I know you have some other things going

19    on.  If you can get them to see you first and be there early

20    for your appointment.

21          MR. CANNICK:  I am first.

22          THE COURT:  I'm hoping we can start at, you know,

23    11:30 or so, or noon.

24          MR. CANNICK:  I think noon is more realistic.

25          THE COURT:  That's my hope.  I hope it's not a

Proceedings                                    3179

1   triumph of hope over experience.  We will do what we can and

2   make the most out of the time.  We will have the jury eat

3   lunch before we start and try to work from that.

4        I know this is shocking, this is not my only case,

5   so I have other things to do that morning anyway, which I have

6   scheduled for then because of this, but I will finish all that

7   stuff before.

8        Anything anybody else has to raise?

9        MS. GEDDES:  Should we plan to be here by 12 or

10  11:30?

11       THE COURT:  Noon.

12       MR. CANNICK:  When I'm leaving, I will alert

13  everyone.

14       THE COURT:  All right.  When you are taking a jet

15  back down or a helicopter.

16       I just want to see the parties at the side.  I know

17  there were going to be some applications next week.  We can do

18  it on the record actually.  I'm going to get some

19  communications from Mr. Scholar.  Maybe he doesn't know that

20  yet, but if you can tell me the two witnesses about whom you

21  are speaking, I will take a look at it so I am ready for it.

22       MR. CANNICK:  Jerie Ortez and Richard Wright.

23       THE COURT:  Richard?

24       MS. GEDDES:  Richard Ray.

25       THE COURT:  Is this in connection with the witness

1    who testified yesterday?

2         MS. GEDDES:  It refers -- Richard Ray relates to

3    Stephanie.  And Jerie Ortez relates to Sonja.  Both of them

4    will testify about prior consistent statements made close in

5    time to the incidents about which they testified.

6         THE COURT:  What I am going to suggest is you see to

7    what extent you can do a stipulation on that because my sense

8    is that since the -- I don't know particularly what statements

9    we are talking about, but if the person was challenged on

10   something, it is appropriate to bring in a prior consistent

11   statement that was made before the motive to fabricate would

12   have arisen.  So if you can agree on that and you can

13   stipulate to something, that's fine.  If you can't, I will

14   consider the application.  But that would save us two

15   witnesses.

16        And as I said, I don't recall, I must say, what the

17   witnesses said, but it sounds like a pretty straightforward

18   application of that rule.  I might be wrong about it, but

19   that's what it sounds like to me.  So think about that.

20        What else does anybody have to say?  Anything else

21   that I can expect over the weekend in my leisure time?

22        MR. CANNICK:  Your Honor, there was a third one but

23   I can't remember.

24        THE COURT:  I guess you're not going to do it then.

25        MR. CANNICK:  No, no.

Proceedings                                        3181

1          THE COURT:  All right.

2          MS. GEDDES:  There is a third witness who's going to

3     testify about a prior consistent statement.  I don't know if

4     that's what you're referring to.  There is also a Charity.

5          THE COURT:  I don't think the court reporter can

6     hear you.

7          MS. GEDDES:  I'm sorry.  In addition to the two

8     witnesses that were just identified, there is one final

9     witness, Charity Torres who will also testify about prior

10    consistent statements made by Sonja, also made close in

11    time/during the events that she testified about.

12         THE COURT:  All right.  Do we need all three

13    witnesses to say -- well, two for Sonja and one for Stephanie?

14         MS. GEDDES:  That's correct.

15         THE COURT:  Give that some thought in terms of --

16    because, as I say, if it's the same testimony that we -- I

17    think we had another witness testify about that.  Like I said,

18    it's a fairly straightforward application of that rule.

19         Anything else?

20         MR. CANNICK:  Nothing else from us.

21         THE COURT:  Have a good weekend, everybody.

22         MR. CANNICK:  Thank you.

23         (Matter adjourned to September 13, 2021 at 9:30

24    a.m.)

25

3182

1                          I N D E X

2

3       **WITNESS**                                        **PAGE**

4       **ANNA**

5          CROSS EXAMINATION BY MR. CANNICK            2986

6          REDIRECT EXAMINATION BY MS. CRUZ MELENDEZ   3003

7          RECROSS-EXAMINATION BY MR. CANNICK          3020

8          REDIRECT EXAMINATION BY MS. CRUZ MELENDEZ   3023

9          RECROSS-EXAMINATION BY MR. CANNICK          3024

10      **IFFATH HOSKINS**                               3025

11         DIRECT EXAMINATION BY MS. SHIHATA           3026

12         REDIRECT EXAMINATION BY MS. SHIHATA         3096

13         RECROSS EXAMINATION BY MS. BLANK BECKER     3103

14      **PHILLIP FANARA**

15         DIRECT EXAMINATION BY MS. GEDDES            3111

16      **DIANA COPELAND**

17         DIRECT EXAMINATION BY MS. GEDDES            3131

18

19

20

21

22

23

24

25

3183

1                        **E X H I B I T S**

2

3

4      Defendant's Exhibits GG, HH, II, and JJ          2987

5

6      Government Exhibit 962                           3037

7

8      Defendant's Exhibit KK                           3086

9

10     Government Exhibit 121A                          3111

11

12     Government Exhibit 13                            3142

13

14     Government's Exhibit 52                          3152

15

16     Government's Exhibit 37                          3170

17

18

19

20

21

22

23

24

25