3967

```
1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,    :   19-CR-286(AMD)
4
           Plaintiff,           :
5                                     United States Courthouse
        -against-               :   Brooklyn, New York
6
   ROBERT SYLVESTER KELLY,      :
7                                     September 20, 2021
           Defendant.           :   9:30 o'clock a.m.
8
   - - - - - - - - - - - - - X
9

10                      TRANSCRIPT OF TRIAL
               BEFORE THE HONORABLE ANN M. DONNELLY
11          UNITED STATES DISTRICT JUDGE, and a jury.

12
   APPEARANCES:
13

14  For the Government:        JACQUELYN M. KASULIS
                               Acting United States Attorney
15                             BY: ELIZABETH GEDDES
                                   NADIA SHIHATA
16                                 MARIA E. CRUZ MELENDEZ
                               Assistant United States Attorneys
17                             271 Cadman Plaza East
                               Brooklyn, New York
18

19  For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                               NICOLE BLANK BECKER, ESQ.
20                             THOMAS FARINELLA, ESQ.
                               CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:  Michele D. Lucchese,
                     E-mail: MLuccheseENDY@gmail.com
23                           225 Cadman Plaza East
                             Brooklyn, New York
24                           (718) 613-2272

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
```

PROCEEDINGS                              3968

1          (In open court - jury not present.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Just before we get started, I received a

4   flurry of communications over the weekend.  I know that

5   defense still wants to respond to the one about Mr. Smith.

6          I'm not entirely sure I understand the application.

7   He testified.  Did you confront him or show him that portion

8   of the --

9          MS. CRUZ MELENDEZ:  Yes, your Honor.

10          THE COURT:  You're just seeking to admit it now.

11          MS. CRUZ MELENDEZ:  Yes.

12          THE COURT:  I'll give the defense an opportunity to

13   respond to that.

14          I think with respect to the charge there seems to be

15   a substantial amount of agreement based on what Mr. Scholar

16   submitted.  I think the Government's submission adopted some

17   of them.

18          I think one of them, the difference of opinion

19   really had to do with the fact that the statute was -- the

20   Government is relying on a statute that existed at the time of

21   the Indictment and it's been amended since then.  Do I have

22   that right?

23          MS. SHIHATA:  Yes, the statute was in effect at the

24   time of the charged conduct.

25          THE COURT:  Some of the things came in later than

PROCEEDINGS                                          3969

1  others, and but I think there is a fair amount of agreement on

2  all that, but we can talk about that later.

3          I'm not entirely sure I understood your letter,

4  Mr. Scholar.  I know we're going to finish with this witness

5  today.  Is the defense going to have any witnesses today?

6          MR. SCHOLAR:  Yes, Judge.  We should be able to get

7  into the mid to late afternoon today.

8          THE COURT:  That's fine.

9          MR. SCHOLAR:  We may have witnesses through

10 Wednesday based on the travel, securing travel for them.

11 That's what I meant by the letter, the finances.

12         THE COURT:  I wasn't sure if that meant there would

13 be nobody or -- okay, good to know.

14         Anything else before we bring the witness in?

15         MS. GEDDES:  Yes, a couple of things.

16         With respect to the defense witnesses.  Your Honor

17 had ordered the defense to, directed the defense, to provide

18 us a list of witnesses by midnight on Friday, which we got

19 shortly after midnight.  Then last night about 10:00 p.m., my

20 timing might be slightly off, the defense told us that they

21 weren't calling any of those witnesses today; and in fact,

22 added three new witnesses that we had never heard about.  We

23 have no 3500, 26.2 material for any of these witnesses.

24         And so we would just ask that the Court direct the

25 defense to provide these names with some actual notice to us

PROCEEDINGS                          3970

1   so that we can be prepared for cross-examination.

2            THE COURT:  Are they testifying today?

3            MR. SCHOLAR:  Yes, Judge, they are.

4            THE COURT:  Who are they?

5            MR. SCHOLAR:  It's Dhanai Ramnaran.

6            THE COURT:  Dhanai Ramnaran?

7            MR. SCHOLAR:  Yes.

8            THE COURT:  Who is that?

9            MR. SCHOLAR:  A person that was working with

10   Mr. Kelly front a musical project.

11            THE COURT:  What does he have to say?

12            MR. SCHOLAR:  He was present at the studios and

13   Olympia Fields house from about mid-2000s to 2019.  He was

14   there on a daily basis.

15            THE COURT:  And what's he going to say?

16            MR. SCHOLAR:  He was there on a daily basis, he

17   observe Mr. Kelly, he observed the girlfriends, and he didn't

18   see anything that was described here at trial.

19            THE COURT:  Okay.  Then who else?

20            MR. SCHOLAR:  Keyonia Jones, who is a friend of

21   Jerhonda Pace.  The Government spoke to her in 2019.

22            THE COURT:  Who is the third?

23            MR. SCHOLAR:  Larry Hood is a security officer for

24   Mr. Kelly.  He also was present from about 1991 until about

25   the mid-90s.  He came back as a security officer from 2002 to

1   2004.

2          THE COURT:  Okay.

3          MR. SCHOLAR:  I provided dates of birth for all of

4   the witnesses to the Government yesterday about 7:00 o'clock.

5          THE COURT:  I don't know why you couldn't have done

6   that sooner.  I mean it's Sunday night, that's not ideal.  It

7   seems to me that up to now that the Government has been pretty

8   good about giving you notice of who is testifying and all of

9   that, I think even provided extra copies of the discovery.  So

10  it really would disappoints me that you waited so long to tell

11  them.

12          What about any material that to turn over to them in

13  connection with those witnesses?

14          MR. SCHOLAR:  We don't have any materials.

15          THE COURT:  You have none.  No notes, nothing.

16          MR. SCHOLAR:  Nothing, Judge.

17          THE COURT:  So those three witnesses you think we

18  might get to today.

19          MR. SCHOLAR:  Yes.

20          THE COURT:  Who are the other witnesses?

21          MR. SCHOLAR:  Judge, we may call one of the

22  Perrymans.  There are two, Jen and Lindsay.  They were both

23  placed on the list provided to them Friday night.

24          Then there is the investigator that's been working

25  for us, Shawn Harris, who is also on the list.

```
                         PROCEEDINGS              3972
```

1              And we may be calling an accountant that worked for

2      Mr. Kelly, but we don't have that information presently.

3      We're still working out details with that person and travel.

4      We're not sure if he or she will be the witness.

5              THE COURT:  What is the relevance of that?

6              MR. SCHOLAR:  The relevance would be that there were

7      significant sums of money that the girlfriends used on their

8      own without Mr. Kelly's pre-knowledge, before-knowledge.  And

9      they were able to do that without him saying that the money

10     was okay, he didn't pre-authorize that money.

11             MS. GEDDES:  Who is the accountant?

12             MR. SCHOLAR:  Right now we're speaking to Joan

13     Sullivan, that's somebody that the Government knows about.

14             THE COURT:  The testimony is that they had access to

15     all this money in what form, like a bank accounts?

16             MR. SCHOLAR:  Bank accounts, Uber and Lyft accounts,

17     different bank cards, things like that.

18             THE COURT:  Is that it?  Is there anybody else?

19             MR. SCHOLAR:  That's it for right now.

20             I have to speak to our investigator to see if there

21     is anybody else who would agree to come, again, because of the

22     travel they have.  We are reaching out to different people

23     based on to speaking to these witnesses, they provided us with

24     other names and we're following up on those.  If we can get

25     them to the courthouse and pay for their lodging, we will

1    definitely give their names over to the Government.

2              THE COURT:  Is there some reason you can't do that

3    any way, that you couldn't just tell them who these people

4    might be?  Is there some reason why you couldn't?  I think

5    it's probably good even if you give these as potential names

6    so we don't lose any more time.

7              MR. SCHOLAR:  I'll check with our investigator and

8    provide that to them sometime today.

9              THE COURT:  Great.  The other thing we should

10   discuss, we don't have to discuss now, has to do with in what

11   form the evidence about the videos is going to take.

12             Upon reflection, the transcripts aren't going to go

13   back to the jury I don't think.  They are not evidence.  They

14   are an aid.  So I don't know that that's the form that that

15   evidence can go to media who are interested in it.  I think

16   the thing to do is redact the various, redact the audio and

17   then that can be played, how ever you seek to do it.  But I

18   think that's probably the way to go.

19             The least problematical of those, in terms of

20   protecting people's privacy, is the one that is just an audio

21   tape at the end.  Then there are the other ones as well.

22             I think that's the way to go on that, is to do that

23   just audio-wise.

24             MS. GEDDES:  I think that makes sense, what your

25   Honor proposes.  We would just ask, of course, that the tapes

PROCEEDINGS                         3974

1    not actually be released because they do contain the voices,

2    but that we could just set up a time for individuals to listen

3    to just the audio portion and redact any names.

4              THE COURT:  The redaction that we discussed in the

5    sealed part as well.

6              MR. SCHOLAR:  With respect to the video, so no

7    videos are being displayed for --

8              THE COURT:  No.  They can't be displayed.  Then you

9    can make those arrangements.  I consider that settled.

10             MS. CRUZ MELENDEZ:  Just to clarify.  With respect

11   to the Government's intention to offer Mr. Smith's Grand Jury

12   testimony, subject to your Honor's ruling, is the Government

13   going to rest subject to --

14             THE COURT:  Yes, I think that's what Mr. Scholar

15   proposed in his letter because he wanted a chance to respond

16   to it.  He was so busy making flight arrangements.  So once

17   you respond, I'll make a ruling, and the defense is not going

18   to object.  You're resting subject to that particular piece of

19   evidence going in.

20             MS. GEDDES:  I think that we would want to just

21   offer it, and I think you would make a ruling after we rest.

22             THE COURT:  Do you want to consider that it's

23   offered right now or do you -- are you offering it?

24             MS. GEDDES:  Yes.

25             THE COURT:  And you want a chance to respond,

PROCEEDINGS                    3975

1   correct?

2          MR. SCHOLAR:  Yes, your Honor.

3          THE COURT:  So I'm going to reserve decision on

4   that.  I know there is no objection by the defense if it

5   technically goes in after the Government has otherwise rested;

6   is that right, Mr. Scholar?

7          MR. SCHOLAR:  That's correct.

8          MS. GEDDES:  Just for the record, we're offering

9   Government 976, that's what it is marked as.

10         THE COURT:  I'm still reserving decision.  Anything

11  else?  Let's get the witness then.

12         MS. SHIHATA:  Judge, this does not need to happen

13  before the witness but I wanted to raise one issue regarding

14  Government 922A and B, which were these short clips from a

15  YouTube of Don Russell.  I wanted to make an argument about

16  that, but I'm happy to do that after the witness.

17         THE COURT:  I don't know if I mentioned this when we

18  first met, I generally don't go back and revisit things I

19  ruled on.  I always like to look forward.  So I'll hear you, I

20  guess, but it's not my favorite thing, I have to say.

21         Let's get the witness, please.

22         (Whereupon, the witness resumes the stand.)

23         (Jury enters the courtroom.)

24         THE COURTROOM DEPUTY:  You may be seated.

25         THE COURT:  Good morning, everybody.  I hope you had

1    a good weekend.  I'm sorry for the late start.  There has been

2    a little traffic disturbance throughout the city.  I think the

3    U.N. is here for the week.

4           We're ready to go now with the cross-examination of

5    the witness.  Go ahead.

6           MR. CANNICK:  Thank you, your Honor.

7           THE COURTROOM DEPUTY:  The witness is reminded she's

8    still under oath.

9    **DAWN HUGHES**,

10   called as a witness, having been previously first duly

11   sworn/affirmed, was examined and testified as follows:

12   CROSS-EXAMINATION

13   BY MR. CANNICK:

14   Q    Good morning.

15   A    Good morning.

16   Q    You testified and told us last week that you were

17   retained by the Government for your involvement in this case?

18   A    That's correct.

19   Q    You told us that you're being paid $500 per hour?

20   A    That's correct.

21   Q    How many hours have you spent on the case thus far?

22   A    I haven't tallied them up at this point when I'm in the

23   middle of the case, maybe ten hours.

24   Q    Of those ten hours, how many hours have you spent

25   interviewing someone being referred to as Jane?

1   A   I have not evaluated anybody in this case.

2   Q   You've not evaluated anyone in this case.

3   A   That's correct.

4   Q   Have you made any observations of anyone in this case?

5   A   I have not.

6   Q   Have you read the transcripts of this case?

7   A   I have not.

8          MR. CANNICK:  I have nothing else.

9          THE COURT:  Any redirect?

10          MS. GEDDES:  No, your Honor.

11          THE COURT:  Thank you so much.

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                      3978
```

1           (Sidebar conference.)

2           MS. GEDDES:  We still have a few tiny exhibits.

3           THE COURT:  Okay.  So after you're done, then I'll

4    send them out and you can make your -- or do you want to

5    reserve?

6           MR. SCHOLAR:  We're going to reserve until we have

7    the final decision on the extra portion of the --

8           THE COURT:  That's fine.

9           MS. GEDDES:  No objection.

10          THE COURT:  Then we'll go right into the defense

11   case then.

12          MS. GEDDES:  Can we address 922A and B now?  I

13   didn't realize it will be that short, that's the YouTube

14   videos.  The reason is that it was my colleagues information

15   and I was the one up here and I didn't do it justice.  I want

16   to give her an opportunity, if that's okay.

17          MR. CANNICK:  While Mr. Scholar is handling that, I

18   can go and alert our folks that the defense case is getting

19   ready.

20          MR. SCHOLAR:  I think you handled the videos, so

21   I'll go.

22          MR. CANNICK:  What is 922A?

23          MS. GEDDES:  The YouTube video.

24          MS. SHIHATA:  I know you don't want to hear from me

25   but --

```
                         Sidebar                        3979
```

1           THE COURT:  I'm delighted to hear from you.

2           MS. SHIHATA:  But your Honor it's our position --

3           THE COURT:  Just remind me, in a slow way, Donnell

4    Russell is the person who's charged is actually charged with

5    tampering -- interstate stalking.  And was he also the one

6    that sent text messages to the defendant?

7           MS. SHIHATA:  No.  So the text messages between

8    where the defendant says, the photos, in the text messages,

9    that ultimately end up being used in various locations is

10   between the defendant and Don Russell's mother, June Barrett,

11   who is also are part this conspiracy.  And then after June

12   Barrett receives those items, they make their way into the

13   letter that is sent to Faith's lawyer.

14          In addition, they are sent by Don Russell using the

15   pseudonym Colon Dunn to Faith's mother Kelly.

16          THE COURT:  Right.

17          MS. SHIHATA:  In addition, after that Mr. Russell

18   creates the Surviving Lies Facebook page and uploads those

19   materials there as well.

20          Now the next step in that is what is at issue with

21   these Government exhibits, which is, he then also goes on a

22   YouTube live with a blogger.  And just so we're clear, we're

23   only trying to admit, it's about two excerpts that last

24   probably a minute and a half total.

25          THE COURT:  What does he say?

```
                          Sidebar                      3980
```

1          MS. SHIHATA:  During that portion that we want to

2     play, he literally carries out what he says he was going to

3     do, the text messages and the letter to the lawyer, and in the

4     text messages to Kelly which is publishing soon.  He takes the

5     lawsuit, literally the lawsuit, he shows it and says, I do not

6     consent to the proceeding, all of that.

7          THE COURT:  I remember that.

8          MS. SHIHATA:  He takes the attachments, he displays

9     them.  He makes numerous statements against penal interest,

10    plus statements in furtherance of both.

11         THE COURT:  So he takes the pictures and shows them

12    on the video.

13         MS. SHIHATA:  And displays them and says, this is

14    what we sent of course these pictures, I'm put them out there,

15    they are naked pictures all that stuff to prove, you know,

16    this came out of his phone, these are messages that she sent

17    to him that she sent to him.  He's showing the same items sent

18    to the lawyer.

19         Then he also admits, well, that's my commentary on

20    the bottom.

21         As you might recall --

22         THE COURT:  I remember.

23         MS. SHIHATA:  He's talking, let's address Faith.  He

24    basically is announcing, here is what I have, what I want to

25    do here today in this program.  I'm going to pull them out and

1    just show them.  I don't know if you all can read this.  Shows

2    this.  This is the lawsuit.  And then this date is important,

3    November 2018, which is by the way, when the letter was sent

4    to the lawyer as the U.S.P.S. records show.

5            Then the only other excerpt -- that's the second

6    one.  The first one is simply an earlier part of the same

7    video where he says that he was a consultant for the

8    defendant.

9            And then again, announces what he's there to do.

10   When it comes down to the general public knowing about them

11   and who they are, the accusers, they are prone to breaking the

12   law and the people holding the stones are hiding their hands.

13   He effectuates.

14           You may recall, Judge, that not only that, in the

15   text that are entered into evidence between the defendant and

16   June Barrett, who is another co-conspirator in all of this,

17   she tells him in one of the texts about trying to, why don't

18   you throw Don, her son, some money.  He's been doing all this

19   for you, including the Surviving Lies page.

20           There are text messages that show the defendant

21   never withdrew from this conspiracy.  He kept seeing them.  He

22   kept inviting her over to the house.  These are clearly both

23   co-conspirator statements in furtherance of the conspiracy and

24   also as well as statements against penal interests that Don

25   Russell makes which are clearly relevant, clearly admissible.

```
                        Sidebar                      3982
```

1           MR. CANNICK:  This argument is the same argument

2    that the Government made when they initially proffered.

3           THE COURT:  It actually isn't.

4           MR. CANNICK:  When they initially proffered this

5    evidence.  The Government is trying to get the Court to

6    accept --

7           THE COURT:  Let me ask you this, they clearly relate

8    to the series of text messages that happened before, correct?

9    I mean -- they clearly relate to the texts and they relate to

10   this effort to shame people that have sued him.

11          MR. CANNICK:  Your Honor, I think the point here

12   that the Government is not sharing with the Court is that

13   Mr. Kelly sent communications to these people that he was not

14   a part of any of this stuff, to not do anything of this

15   nature.  There are text messages and communications that he

16   has.  We now have to go through to find those, if you're going

17   to let this in.

18          He clearly disavowed this behavior.  The Government

19   knows he disavowed it.

20          MS. SHIHATA:  I'm not talking about the premiere,

21   what happened at the premiere.  There is a text message where

22   he disavows that.

23          I could be wrong, but I'm not aware of a text

24   message disavowing this effort to expose photos of Faith.  In

25   fact, you've got the text messages where he is the source of

Sidebar                                                3983

1  that material.  So to the extent there is a disavowal, they

2  can argue that, but it is certainly relevant.

3       THE COURT:  I will say that I did not understand --

4  I did not know that he's actually showing the pictures on the

5  YouTube video.  I thought you were just offering the audio.

6       Over your objection, I'm going to permit that.  If

7  there are text messages where he's withdrawing from it or

8  doesn't want any part of it, that's perfectly fine.  But I

9  think this is a piece with the letters sent in connection with

10 the 'I disavow this lawsuit,' as well as the text messages

11 back and forth in which Mr. Kelly is the one who sends these

12 embarrassing pictures of Faith.  So you have an exception to

13 that ruling.  I'll permit that.

14      MR. CANNICK:  Your Honor, we only ask that we be

15 given an opportunity.  Because unfortunately, where we're at,

16 the resources that we have, this now is going to take another

17 Herculean effort.

18      MS. SHIHATA:  One thing on the timing.  The YouTube

19 video is from January 2020.  There are no text messages from

20 his phone about the YouTube thing that he was withdrawing

21 because he was in custody at the time.  There is nothing to

22 look through on the phone.  It happened well after that phone

23 was seized.

24      THE COURT:  We've got four lawyers, somebody can

25 certainly -- I'm serious -- somebody can certainly do that.

Sidebar                                              3984

1    There are certain tasks that any person can perform with a

2    reasonable degree of competency.  I'm certain that you have

3    somebody that can do that.  You've got four lawyers who are

4    admitted into practice.

5            MR. CANNICK:  Yes, your Honor, but it's also -- I'm

6    certain it can be done and we can get it done -- it's just a

7    matter of how much time it's going to take us, given all the

8    other tasks.

9            THE COURT:  Also, this is not a new part of this

10   piece of evidence which I'm permitting; it's similar to all of

11   the things that lead up to it.  It starts with the planning of

12   retaliating against Faith for filing a lawsuit, it encompasses

13   that, the letter that was sent to the lawyer, and this is just

14   the last piece of.  It's not some new thing that you have to

15   seek out.  Presumably if there were text messages in which he

16   disavows, those would be equally applicable to everything that

17   came before.  I understand your position.

18           MR. CANNICK:  As I said, we'll find it.  It's just

19   going to take us away from what we're trying to do in terms of

20   the defense case.  We just ask the Court's indulgence.

21           THE COURT:  I'll give you the indulgence.  I'm sure

22   the Government, if there are text messages that relate to

23   this, you'll point counsel in the right direction.

24           MS. SHIHATA:  Just for the record, these two

25   exhibits are 922A and 922B, which are excerpts.

Rivka Teich, Official Court Reporter

```
                          Sidebar                        3985
```

1              And then we would also -- we plan to do this through

2      the agent -- but we were also going to admit 933, which is

3      simply the screenshot of the beginning of the video which

4      shows the date.

5              THE COURT:  Okay.  Those are in evidence over the

6      defense's objection.

7                  (End of sidebar conference.)

8                  (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                         3986

1    (Continuing)

2             THE COURT:  Okay.  Does the Government have any

3    additional witnesses?

4             MS. GEDDES:  We don't have any additional witnesses.

5    We do have some additional exhibits to admit.

6             THE COURT:  Okay.

7             MS. GEDDES:  The Government offers 407, 965-E, 830,

8    922-A and B, and 933, Government Exhibit 703, Government

9    Exhibit 1018, 831, and 832, and Government Exhibit 948-A.  I

10   previously entered 948-B, and I didn't mean to enter B.  That

11   is a business certified record.  I meant to do 948-A.

12            THE COURT:  Okay.

13            MS. GEDDES:  I would ask to publish, a stipulation

14   and we would like to play the videos in 922-A and B for the

15   jury only.

16            THE COURT:  Okay.

17            (Government's Exhibits 407, 965-E, 830, 922-A,

18   922-B, 933, 703, 1018, 831, 832, and 948-A received in

19   evidence.)

20            MS. GEDDES:  I'm publishing Government Exhibit 1018,

21   which is a stipulation in evidence which provides that records

22   from Florida Virtual School where the individual who testified

23   as Jane attended her senior year of high school showed that

24   Jane completed all of her classes on or before April 29th of

25   2016.

Proceedings                                    3987

1           And then I'd like to publish Government Exhibit 933,

2   which is a screen shot from a YouTube video that we are going

3   to play two excerpts of, which have been identified in

4   evidence as 922-A and B.

5           922-A will be able to play publicly.  922-B will be

6   for the jury only.

7           We will start with playing 922-A.

8           (Video playing.) (Video stopped.)

9           MS. GEDDES:  Now we would like to play Government

10  Exhibit 922-B, but for the jury only, please.

11          MS. GEDDES:  Both the video and the audio should

12  only go to the jury.

13          (Video playing for the jury.) (Video stopped.)

14          MS. GEDDES:  Your Honor, you admitted the exhibits

15  that I read out a few moments ago, didn't you?

16          THE COURT:  Yes.

17          MS. GEDDES:  The Government rests.

18          THE COURT:  Thank you very much.

19          Does the defense wish to call any witnesses?

20          MR. SCHOLAR:  Yes, Your Honor.

21          We call my Dhanai Ramnaran.

22          THE COURTROOM DEPUTY:  Please stand and raise your

23  right hand.

24          Do you solemnly swear or affirm that the testimony

25  you're about to give will be the truth, the whole truth, and

Proceedings                                            3988

1   nothing but the truth?

2           THE WITNESS:  Yes.

3           THE COURTROOM DEPUTY:  You may be seated.

4           THE COURT:  A couple of things before we start, you

5   can take your mask off because you are behind the partition.

6           THE WITNESS:  Thank you.

7           THE COURT:  I want to make sure everybody can hear

8   what you have to say, so speak into the microphone, which is

9   right there.  Tap it and see if it works.

10          THE WITNESS:  Is it possible to re-position?

11          THE COURT:  Yes.  That's fine.  If it's easier, you

12  can take off the microphone and use it that way.  The key

13  thing is everybody can hear you.  The second part of that is

14  make sure you don't speak too fast.  The court reporter takes

15  down everything that you say and it makes it harder if you

16  talk too fast or not loud enough.  Don't do that.

17          THE WITNESS:  Okay.

18          THE COURT:  For the same reason, try not to talk

19  over whichever lawyer is asking you questions, just let them

20  finish before --

21          THE WITNESS:  Okay.

22          THE COURT:  Just like this.  Let the person finish

23  before you start talking.

24          And if there's something that you don't understand,

25  let me know and I will have the lawyer phrase, okay?

Proceedings                                    3989

1          THE WITNESS:  Okay.

2          THE COURT:  Go ahead, Mr. Scholar.

3          MR. SCHOLAR:  Thank you, Your Honor.

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **DHANAI RAMNARAN,**

2       called by the Defendant, having been duly sworn, was

3       examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MR. SCHOLAR:

6  Q    Do you know Robert Kelly?

7  A    Yes, sir.

8  Q    How do you know him?

9  A    He's like a mentor to me and a friend, a good friend, and

10 that's basically how I know him.

11 Q    Do you see him in court today?

12 A    I can't see from this angle.

13 Q    Go ahead and stand up.

14      What is he wearing?

15 A    A gray suit.

16      THE COURT:  Indicating the defendant.

17      MR. SCHOLAR:  Thank you, Your Honor.

18 Q    Did you work with him on a musical project?

19 A    Yes, sir.

20 Q    And how many years did you work with Mr. Kelly?

21 A    I was around for a long time, been working on various

22 different things.  I was around 15 years, 16, something of

23 this nature.

24 Q    15 or 16 years?

25 A    Yeah.

Ramnaran - direct - Scholar                    3991

1   Q    Now, were you in his presence on a daily basis?

2   A    Uh-hum.  Yes, sir.

3   Q    And during that entire time, did you ever see him

4   verbally abuse a woman?

5   A    No.

6   Q    Did you ever see him lock a woman in room?

7   A    No.

8   Q    Did you ever see him tell another person to lock a woman

9   in a room?

10  A    No.

11  Q    Did you ever see him strike a woman?

12  A    No.

13  Q    Did you ever see him Da-Ni a woman food?

14  A    No.

15  Q    Did you ever see him tell anyone to Da-Ni a woman food?

16  A    No.

17  Q    Did you ever see him tell a woman she could not use the

18  bathroom?

19  A    No.

20  Q    Did you ever see him tell anyone else that a woman could

21  not use a bathroom?

22  A    No.

23  Q    Did you see him open doors for women?

24  A    Yeah, yeah, all the time.

25  Q    And did you see him stand up when women entered the

1   room?

2   A    Yes.

3   Q    And during that entire time when you were with Mr. Kelly,

4   did you see when his girlfriends would enter a room?

5   A    Yes.

6   Q    When his women guests entered a room, did you have to

7   leave?

8   A    No.

9   Q    And when you entered a room where Mr. Kelly's were, did

10  they have to look at a wall?

11  A    No.  What?

12  Q    Were you able to speak to Mr. Kelly's female guests?

13  A    He actually told me to.

14  Q    He asked you to speak to them?

15  A    Yeah.

16  Q    Why?

17  A    Because naturally me as a person, I really don't -- like,

18  I like people, I talk.  But I was there concentrating on what

19  I have to do, which is the musical aspect and just observing,

20  you know.  So, usually, if there were any ladies around, I

21  just never really paid attention to them because that wasn't

22  my focus, what I was there for.

23           And one day he pulled me to the side --

24           MS. CRUZ MELENDEZ:  Objection.

25           THE COURT:  Don't tell us anything that he said.

Ramnaran - direct - Scholar                    3993

1        Next question.  Try not to lead.  Okay?

2              MR. SCHOLAR:  I will not, Judge.  Just a preliminary

3    matter.

4    Q    How did you meet Mr. Kelly?

5    A    I was in Albuquerque, New Mexico.  I just got back from

6    Los Angeles and -- that's where my mother lives, and I heard

7    that somebody was at the mall, and I heard it was R. Kelly.

8    So I went down to the mall to see if it was true because of my

9    musical ambitions.  I actually met him there at a restaurant

10   called Chelsea's and I just approached him.  And I just told

11   him about me, who I am.  And I said I would like to make you

12   my guest here in Albuquerque because I have a lot of

13   connections, you know, basketball, movies, things of that

14   nature.  And that's how it started.

15   Q    Were you able to set those things up for him?

16   A    Yes, sir.

17   Q    And what types of activities did you set up for Mr.

18   Kelly?

19   A    I think we went to see a movie called *The Radio*, at the

20   movie theatre at Rio 24.  And then from there we got a private

21   basketball court, so, you know, my friends -- my brother and

22   his friends versed Rob and his friends, and we were able to

23   play, and we played all night.

24   Q    And after that, did Mr. Kelly leave Albuquerque?

25   A    Uh-hum.

Ramnaran - direct - Scholar                    3994

1   Q    You have to say yes.

2   A    Yes.

3   Q    At some point did you see Mr. Kelly again?

4   A    Yeah, yeah.  Basically, yes.

5   Q    Where was that?

6   A    In Las Vegas, Nevada.

7   Q    How did you get to Las Vegas?

8   A    After I was able to extend my, you know, things that I

9   could provide there in Albuquerque, he invited me to come to

10  Las Vegas, Nevada where he was closing the Billboard Music

11  Awards.

12  Q    Were you able to go to the award show?

13  A    Yes.

14  Q    How was it?

15  A    It was great, fabulous, had a great time.

16         MS. CRUZ MELENDEZ:  Objection.

17         THE COURT:  I don't see why this is relevant.  Why

18  don't you put another question to the witness.

19         MR. SCHOLAR:  Yes, Judge.

20  BY MR. SCHOLAR:

21  Q    And after Las Vegas, did you continue to communicate with

22  Mr. Kelly?

23  A    Yes, sir.

24  Q    Where did you go next after Las Vegas?

25  A    Chicago.

Ramnaran - direct - Scholar                    3995

1    Q    How did you get to Chicago?

2    A    I flew there.

3    Q    Who flew you?

4    A    Mr. Kelly.

5    Q    And what was the purpose of you going to Chicago?

6    A    To talk further, more about the music aspect and what

7    could be done.

8    Q    And at this time, were you also in the music promoting

9    business?

10   A    Yes, sir.

11   Q    And when you flew out to Chicago, did you ever have to

12   wait for Mr. Kelly?

13   A    Yes.

14   Q    And how long did you have to wait?

15   A    Well, it just depends what was going on, but I remember

16   one time, you know, waiting pretty much a couple of days

17   before I was able to -- but I understand how busy he is

18   because of who he is.

19   Q    Why didn't you leave?

20   A    Why did I leave?

21   Q    Yes.

22   A    I don't understand.

23   Q    When you had to wait that long, why didn't you leave?

24   A    I thought you asked why did I leave.

25   Q    Why didn't you leave?

Michele Lucchese, Official Court Reporter

Ramnaran - direct - Scholar                3996

1  A    No.  I didn't leave because I pretty much understand
2  what's going on as far as the music business is concerned and
3  how much of a busy person that he is and it's something for us
4  to work on, so I was willing to put in that time.
5  Q    Did you travel with Mr. Kelly on tours?
6  A    Yes, sir.
7  Q    And where would you go on tours?
8  A    All across the United States and Europe.
9  Q    You observed his tour buses?
10 A    Oh, yeah.
11 Q    Can you describe the tour buses?
12 A    I mean, yeah.
13 Q    How large were these tour buses?
14 A    Standard size, tour bus.
15 Q    When you say that, I don't know what that means.  What do
16 you mean?
17 A    I don't know the exact dimensions of the buses, but
18 basically bigger than RVs that you see on the road.
19 Q    What was in the tour bus?
20 A    Chairs, seats, sometimes bunks, refrigerator, you know,
21 seat, bathroom.
22 Q    And during the time that you traveled with Mr. Kelly on
23 tour, did you ever see a woman locked in the bathroom on a
24 tour bus?
25 A    No.

Ramnaran - direct - Scholar                3997

1          MS. CRUZ MELENDEZ:  Objection.

2          THE COURT:  Overruled.

3    A    No.

4    Q    When someone had to use the bathroom, did the bus stop?

5    A    Yeah.  I mean, well, we had bathrooms on the bus.  The

6    bus would also stop so people could use the bathroom., you

7    know, Flying Js, different type of truck stops.

8    Q    If you know, why did the bus stop at various locations?

9          MS. CRUZ MELENDEZ:  Objection.

10         THE COURT:  Well, sustained as to form.

11   BY MR. SCHOLAR:

12   Q    Were you aware of why the buses would stop?

13   A    Yeah.

14   Q    Why would the buses stop?

15   A    Mostly for gas on the road and also so people can use the

16   bathroom, get what they want to eat, drink, you know.  Because

17   like a lot of these places are like little malls, a lot of

18   these places, you know, like Flying J's and stuff, food

19   courts, whatever.

20   Q    Were you able to spend time with Mr. Kelly during the

21   stops?

22   A    Yeah.

23   Q    Did you also spend time with Mr. Kelly's wife and

24   children before the divorce?

25   A    Yeah.

Ramnaran - direct - Scholar                    3998

1  Q    What types of things would you do?

2         MS. CRUZ MELENDEZ:  Objection.

3         THE COURT:  I really don't see the relevance.  What

4  year are we talking about?

5  Q    What year was the divorce?

6  A    I can't recall exactly what year it was.

7         THE COURT:  I don't see the relevance.  Next

8  question.

9         MR. SCHOLAR:  Sure, Judge.

10 BY MR. SCHOLAR:

11 Q    Now, you stated earlier that you were able to observe Mr.

12 Kelly's girlfriends?

13 A    Well, I would see, you know, whoever was around.

14 Q    Did you ever see Mr. Kelly tell his girlfriends to behave

15 a certain way?

16 A    No, no.

17 Q    How did Mr. Kelly's girlfriends dress?

18 A    Normal people.

19 Q    Did you ever see Mr. Kelly's girlfriends go shopping?

20 A    Yeah, all the time.

21 Q    How would they dress to go shopping?

22 A    Pretty normal, but they go shop, get whatever they want.

23        THE COURT:  Were you shopping with them?

24        THE WITNESS:  No, I was just there.

25        THE COURT:  I see.  Go ahead.

Ramnaran - direct - Scholar                3999

1    Q    When you saw them leave, how were they dressed?

2    A    From the place that they shopped from?

3    Q    Yes.

4    A    The same way they went walking in just with a lot of

5    bags.

6    Q    And when they left, were they with anyone?

7    A    No.  I mean, Mr. Kelly would be there or, you know,

8    that's pretty much it.  I mean.

9    Q    And the girlfriends, when they left the house or the

10   studio, would they be by themselves?

11   A    Yeah.  Sometimes they'd go down the street, get something

12   to eat, go shop, come back, go to the bathroom, whatever, just

13   like the rest of us.

14   Q    And did you ever have the opportunity to be in the

15   presence of Mr. Kelly's girlfriends when they ate?

16   A    Yeah.  Yeah.

17   Q    And what did you observe when Mr. Kelly's girlfriends

18   ate?

19   A    What I observed?  I mean, whenever we would go to the

20   restaurant, they get to sit down first, order first, eat

21   first, chivalry basically.

22   Q    At the studios did you ever see menus?

23   A    Yeah, yeah, yeah.  There's menus all over the place from

24   various restaurant in the area.

25   Q    What was the purpose of the menus?

Ramnaran - direct - Scholar                    4000

1    A     For his guests to order off of.

2    Q     Did that include female guests?

3    A     Yeah, pretty much always them, not just only them, but

4    mostly them.

5    Q     Did Mr. Kelly's girlfriends have assistants?

6    A     Yeah, you know, the runners are basically like butlers.

7    Q     What did you see these runners do?

8    A     You know, serve, you know, go, whenever they would order

9    something, go get it, bring it back, clothes, give them rides

10   wherever, get coffee, drinks, walk dogs, you know, stuff of

11   that nature.

12   Q     And can you describe a typical day of what it was like

13   working with Mr. Kelly?

14   A     Yeah.  It just depends what was going on, workout twice a

15   day sometimes, Tuesdays and Thursday play basketball, and he

16   just records all the time.  Even when he's not in the studio,

17   he's thinking about the studio.  There's always music going

18   on.

19              MS. CRUZ MELENDEZ:  Objection.

20              THE COURT:  Sustained.  It's sustained as to that

21   last part.

22              What was your job actually there?

23              THE WITNESS:  To observe and to learn and to become.

24              THE COURT:  I see.  Go ahead.

25   BY MR. SCHOLAR:

Ramnaran - direct - Scholar                    4001

1    Q    Now, did you ever --  withdrawn.

2         Were you able to work on a musical project with Mr.

3    Kelly?

4    A    Yes, sir.

5    Q    What type of musical project?

6    A    Like in pop genre, I would say.

7    Q    Did you ever observe Mr. Kelly write songs?

8    A    All the time.

9    Q    Did Mr. Kelly record songs?

10   A    All the time.

11   Q    And did he record songs with other people?

12   A    Yeah, all the time.

13   Q    When you were at Mr. Kelly's studios did people have to

14   knock?

15   A    Yeah.

16   Q    Why did people have knock?

17   A    Basically, I'm an artist so --

18              MS. CRUZ MELENDEZ:  Objection.

19              THE COURT:  The question is were you told that you

20   had to knock.

21              THE WITNESS:  No, the question -- I mean, it's

22   common courtesy basically.

23              THE COURT:  When you say you had to knock, what

24   exactly are you talking about?

25              THE WITNESS:  The reason I would have to knock is

Ramnaran - direct - Scholar                    4002

1   because there's always a creative process going on, and when

2   you are focused and you have something to get done -- and a

3   lot of people probably don't understand this --

4              THE COURT:  That's okay.  I think it is a pretty

5   straightforward question.  If you went into another room, did

6   you knock on the door?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  Next question.

9   Q    What about the music studio when recording was going on,

10  did you have to knock to enter that room?

11  A    100 percent.

12  Q    Why?

13  A    You don't want to interrupt what's recording live.  You

14  don't want to do your best vocal and then somebody just walk

15  in on you and mess up the whole thing and mess the vibe.

16             When you record, we hear something totally different

17  than normal people hear, and it has to be totally aligned

18  correctly, and any little disturbance can just throw off the

19  whole project, especially if it's your best take.

20  Q    Did you ever see Mr. Kelly with a gun?

21  A    With a --

22  Q    With a gun.

23  A    No.

24  Q    During that time that you spent with Mr. Kelly, did you

25  go to the studios and homes?

Ramnaran - direct - Scholar                    4003

1   A     Yes.

2   Q     Which studios did you go to?

3   A     Chocolate Factory, which is on Larrabee.  He also had a

4   studio at his house later on and one in Ontario.

5   Q     Which homes did you go to?

6   A     Trump Towers, as well Olympia Fields.

7   Q     Now, at the studios, were there any doors that were

8   locked from the outside?

9   A     No.

10  Q     And at his homes, were there doors to interior rooms that

11  would be locked from the outside?

12  A     No, no.

13  Q     Were Mr. Kelly's girlfriends free to come and go?

14  A     Excuse me?

15  Q     Were Mr. Kelly's girlfriends free to come and go?

16  A     Yeah.  Always came and left, wherever.

17  Q     Did you actually see Mr. Kelly's girlfriends come and go?

18  A     Yes.

19  Q     Did Mr. Kelly ever tell you to have sex with one of his

20  girlfriends?

21  A     No, no.

22  Q     Did Mr. Kelly ever ask you to write a letter for him?

23  A     No, no, no.

24  Q     Do you know Cheryl Mack?

25  A     Yes.

Ramnaran - direct - Scholar                    4004

1   Q     What interactions did you have with Cheryl Mack?

2   A     At that time she was, I guess, managing and assisting in,

3   you know, booking shows and concerts.

4   Q     Without telling us what Cheryl Mack may have said, did

5   you set a show up for Mr. Kelly?

6   A     Yes.

7   Q     What happened with that show?

8   A     Well, the promotor sent the wire through to Cheryl and

9   Linda and basically what happened was that --

10            MS. CRUZ MELENDEZ:  Objection.

11            THE COURT:  Well, I'm not sure where you got this

12   information.  Did you see this or did someone tell you about

13   it?

14            THE WITNESS:  No, I'm involved in this.

15            THE COURT:  Well, did you watch as she received

16   whatever the communication is or did someone tell you what

17   happened?  That's my question.

18            THE WITNESS:  I was talking to her.

19            THE COURT:  Okay, you were talking to Ms. Mack?

20            THE WITNESS:  Yes.

21            THE COURT:  Could I see the parties at the side with

22   the court reporter for just a second.

23            (Continued on the following page.)

24

25

Michele Lucchese, Official Court Reporter

```
                          Sidebar                      4005
```

1              (Sidebar conference held on the record out of the

2     hearing of the jury.)

3              THE COURT:  What is it that he is going to say?

4              MR. SCHOLAR:  Cheryl Mack messed up the project and

5     that was the beginning of the end between the relationship

6     with Mr. Kelly and Cheryl Mack.

7              THE COURT:  It's not entirely clear to me what his

8     role would be other than observing and --

9              MR. SCHOLAR:  He set up the show and Cheryl Mack set

10    up the show for the same day, his show had to get pushed back

11    and Cheryl Mack show was not a real show, so everybody lost

12    money on it.

13             THE COURT:  Why is this relevant?

14             MR. SCHOLAR:  This is relevant to why she -- it is

15    not entirely clear how he knows about it.

16             MS. CRUZ MELENDEZ:  I would also argue it is in

17    violation of Rule 608(b), extrinsic evidence with respect to

18    Cheryl Mack's testimony.

19             THE COURT:  I don't know about that.  I think she

20    gave various reasons why she left and this is another reason,

21    so, if he has -- if he is in a position to observe this, you

22    can ask him.

23             Maybe you can lead him a little bit.

24             MR. SCHOLAR:  I'm not going to go too far.

25             THE COURT:  I might move on.  If it's admissible,

Sidebar                                    4006

1   you can ask.

2              MR. SCHOLAR:   Thank you.

3              (Sidebar concluded.)

4              (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ramnaran - direct - Scholar                    4007

1          MR. SCHOLAR:  Can I move on judge?

2          THE COURT:  Go ahead.  Do you want to put another

3   question to the witness?

4          MR. SCHOLAR:  Thank you, Judge.

5          THE WITNESS:  Okay.

6   BY MR. SCHOLAR:

7   Q    While you were with Mr. Kelly, you were recording music?

8   A    Yes, sir.

9   Q    And that was in anticipation of the project you were

10  working on?

11  A    Yes, sir.

12  Q    And would you be at the studio on a daily basis?

13  A    Yes.

14  Q    And would you also set up shows for Mr. Kelly?

15  A    Yeah.  I was attempted to do stuff.

16  Q    And did you set up shows in Baton Rogue and San Antonio?

17  A    Yes.

18  Q    While you were doing that, did Cheryl Mack set up a show

19  in Phoenix?

20  A    Yes.

21  Q    Were your shows moved as a result of that?

22          THE WITNESS:  Yes.

23          MS. CRUZ MELENDEZ:  Objection.

24          THE COURT:  Overruled.

25  Q    Did you lose money?

Michele Lucchese, Official Court Reporter

Ramnaran - direct - Scholar                    4008

1    A    Yes.

2              MS. CRUZ MELENDEZ:  Objection.

3    Q    Did Cheryl Mack's show go on?

4    A    Excuse me?

5    Q    Did Cheryl Mack's show in Phoenix, did that go on?

6    A    Well --

7              MS. CRUZ MELENDEZ:  Objection.

8              THE COURT:  The question is a simple one, did her

9    show go on?

10             THE WITNESS:  It was not a simple answer.

11             THE COURT:  Well, give it a try.  Did it happen?

12   Did the show happen?  How about that?

13             THE WITNESS:  The date was scheduled to happen, but

14   things went awry.

15             THE COURT:  I see.  Next question.

16   BY MR. SCHOLAR:

17   Q    Now, you were with Mr. Kelly up until 2019?

18   A    Yeah, off and on and talked to him on the phone and

19   stuff.

20   Q    Did you see the documentary *Surviving R. Kelly*?

21   A    I didn't see much of it.  I saw just like a little bit of

22   it.  I turned it off because I saw the real thing, I was there

23   for the real show.

24             MS. CRUZ MELENDEZ:  Objection.

25             THE COURT:  Sustained.

Ramnaran - direct - Scholar                    4009

1   Q    Now, were you able to finish a project with Mr. Kelly?

2   A    Yeah.

3   Q    And was it ever released?

4   A    No.

5   Q    Why was it not released?

6   A    Well, a lot of stuff started happening, you know,

7   concerning this and, you know, also that show that came out,

8   so it didn't seem like the temperature was right.

9   Q    When was the project scheduled to be released?

10  A    Couple years ago.

11  Q    And were you ever on Mr. Kelly's payroll?

12  A    No.

13  Q    And did you bring a song with you today?

14  A    Uh-hum.

15            MR. SCHOLAR:  Would it be possible --

16            MS. CRUZ MELENDEZ:  Objection.

17            THE COURT:  No.  Denied.

18  Q    But you actually have music with you that you recorded

19  with Mr. Kelly?

20            MS. CRUZ MELENDEZ:  Objection.

21  A    Yes.

22            THE COURT:  It's not relevant.

23            MR. SCHOLAR:  Thank you, Judge.

24  Q    Are you involved in any other businesses today besides

25  music?

Ramnaran - cross - Cruz Melendez                    4010

1    A    I'm working on a line of shoes.

2              MR. SCHOLAR:  And thank you.  I have no further

3    questions.  Thank you so much.

4              THE WITNESS:  No problem.

5              THE COURT:  Cross-examination?

6              MS. CRUZ MELENDEZ:  Yes, Your Honor.

7    CROSS EXAMINATION

8    BY MS. CRUZ MELENDEZ:

9    Q    Sir, on cross-examination -- I'm sorry, on direct

10   examination you testified that you were off and on with

11   respect to communication with the defendant; correct?

12   A    Yes.

13   Q    So off and on, meaning you were not there every day;

14   correct?

15   A    Well, I was there every day, but then when I left, I

16   would keep in communication.

17   Q    So there were times when you were there and there were

18   times where you were not there; correct?

19   A    Correct.

20   Q    So that would not be with the defendant every day;

21   correct?

22   A    It would depend when you're talking about.

23   Q    Okay.  So let's talk about when we're talking about.

24              You mentioned that you have known the defendant for

25   approximately 15 or 16 years?

Ramnaran - cross - Cruz Melendez                 4011

1   A    Yeah.  Give or take, possibly even more.

2   Q    Okay.  15 or 16 years.  I'm sorry, what was your job with

3   respect to the defendant?

4   A    As I stated before, I didn't have a job.  I was there

5   observing, learning and to become, because I am an artist.

6   Q    To become what, sir?

7   A    I just said I'm an artist.

8   Q    You testified that you first met the defendant in

9   Albuquerque; is that correct?

10  A    Yes, ma'am.

11  Q    Were you living in Albuquerque?

12  A    Yes.

13  Q    The defendant didn't live in Albuquerque; right?

14  A    No.

15  Q    When was it in Albuquerque that you met the defendant?

16  A    I met him at Coronado Mall.

17  Q    When, sir?

18  A    Oh, it might have been like 2000, whatever year it was

19  that he closed the Billboard Awards, I don't know if it was

20  2005, somewhere in that area.

21  Q    To be clear, prior to 2005, you did not know the

22  defendant; correct?

23  A    Correct.

24  Q    So you can't speak to anything with respect to the

25  defendant's conduct prior to 2005; correct?

Ramnaran - cross - Cruz Melendez                    4012

1    A    Only what I know.

2    Q    You didn't know the defendant prior to 2005; correct?

3    A    Correct.

4    Q    When you met the defendant in Albuquerque, you said you

5    met him because he was traveling through Albuquerque; is that

6    correct?

7    A    Yes.

8    Q    And then he left Albuquerque; correct?

9    A    Yes, he invited me.

10   Q    But you didn't leave with the defendant, did you?

11   A    Correct.

12   Q    So when he left Albuquerque, you weren't with the

13   defendant; correct?

14   A    Correct.

15   Q    So you can't speak to what the defendant did after he

16   left Albuquerque and stopped speaking with you at the mall?

17            MR. SCHOLAR:  Objection to form, Judge.

18            THE COURT:  Overruled.

19            I mean, you weren't with him right?

20            THE WITNESS:  No.  I can't speak for what happened

21   in the six-hour, seven-hour travel.  But I did fly out like

22   the next day or so.

23   Q    You said you flew out to Las Vegas?

24   A    Correct.

25   Q    Okay.  And when you flew out to Las Vegas, it's your

Ramnaran - cross - Cruz Melendez                    4013

1    testimony that you spent every second in Las Vegas with the

2    defendant?

3    A     Every second, no.  You know, pretty much the whole time,

4    but, you know.

5    Q     So there were times when you were not with the defendant;

6    correct?

7    A     Like when I had to go use the bathroom, whatever, yeah.

8    Q     And I assume you slept?

9    A     Yeah, I do that as well.  I'm just talking about during

10   waking hours.

11   Q     Now, you also testified that at some point you left Las

12   Vegas; correct?

13   A     Yes.

14   Q     And that at a later date you were then flown by the

15   defendant to Chicago; correct?

16   A     Yes.

17   Q     Fair to say that between the time that you were in Las

18   Vegas and then you left to Chicago, you also were not with the

19   defendant?

20   A     No.

21   Q     That's not fair to say?

22   A     No.  I'm saying I wasn't there.

23   Q     You weren't there with the defendant; correct?

24   A     Correct.

25   Q     Now, you testified that at some point you traveled with

Ramnaran - cross - Cruz Melendez                4014

1    the defendant; is that correct?

2    A    Yes.

3    Q    And when was that?

4    A    Tours.  Whenever the tour would come up, you know, during

5    tours.

6    Q    What tour, sir?

7    A    There's several tours, Mr. Showbiz.  I can't remember all

8    the names of all the tours, whenever the tours come up, we

9    would be....

10   Q    What was your role on tour?

11   A    Observing.

12   Q    Do you recall any of the names of the tours?

13   A    Yeah, I just said Mr. Showbiz was one of them.  There's

14   many tours.  I can't remember all names.

15   Q    Do you recall the years of the tours?

16   A    Well, within that time I was there, there's usually a

17   tour like every, you know, year and a half, or something like

18   that.

19   Q    And it's your testimony that you traveled on each one of

20   those tours?

21   A    On every tour, no.  I traveled on many tours, but not

22   every single tour.  I'm can't remember which exact tour you're

23   trying to single out.

24   Q    I'm asking you whether or not you recall what tours you

25   were on?

Michele Lucchese, Official Court Reporter

Ramnaran - cross - Cruz Melendez                4015

1    A    Yeah.  I just answered, like Mr. Showbiz.

2              There's a few tours, like give me some names

3    probably would help.

4    Q    So you can't provide the names of the tours that you were

5    on, is that fair to say?

6    A    There were some different tours, I was there for some of

7    the tours.

8              Do I remember each and every name of the tours?  No.

9    Q    Do you recall how many tours you traveled with the

10   defendant on?

11   A    There was a few tours here in the States and also in

12   Europe.

13   Q    When you travelled to Europe, you flew there; correct?

14   A    Yes.

15   Q    When you traveled, according to you, on tour with the

16   defendant, you took a tour bus?

17   A    Yes.

18   Q    Is it fair to say there were multiple tour buses that

19   traveled when the defendant was on tour?

20   A    Yes.

21   Q    Is it also fair to say that you traveled with the roadie

22   tour bus?

23   A    Roadie tour bus?

24   Q    Yes.  That's what I am asking.

25   A    What's your definition of roadie?

Ramnaran - cross - Cruz Melendez                    4016

1    Q    Do you understand what a roadie is?

2         You're in the music business; correct?

3    A    Yeah, but I'm asking what's a roadie because I never

4    heard of a roadie tour bus.

5    Q    Are you familiar with the term roadie?

6    A    Yes.

7    Q    But can you explain what a roadie?

8    A    I was asking you to tell me.

9         THE COURT:  You don't get to ask questions

10   unfortunately.  If you don't understand a question, I can ask

11   the lawyer to rephrase it.

12        THE WITNESS:  Yeah, please.  Yes, ma'am.

13        THE COURT:  Do you have another question you would

14   like to put to the witness?

15   Q    Were there individuals who were responsible for equipment

16   on tour?

17   A    Yeah.

18   Q    Is it fair to say that roadie is a term for an individual

19   who may be responsible for equipment on tour?

20   A    Yeah.

21   Q    Did you travel with roadies when you were on tour?

22   A    No.

23   Q    Did you travel in the United States when you traveled on

24   tour, according to you, with the defendant, did you travel in

25   the defendant's Sprinter?

Ramnaran - cross - Cruz Melendez                4017

1   A    Yes, I've been on the Sprinter.

2   Q    You have been on the Sprinter.

3        Did you travel with the defendant every single time

4   he was in the Sprinter?

5   A    Not every single time because not every single time was

6   the Sprinter used.

7   Q    I'm showing what's in evidence as Government Exhibit --

8   first let me ask you this:  You testified that you were with

9   the defendant -- on direct examination you testified you were

10  with the defendant pretty much every day?

11  A    Whenever I was there, I was there all the time.

12  Q    I'm showing what's in evidence as Government Exhibit

13  257-A, 257-B, and 257-C.  Do you see that there, sir?

14  A    Yes.

15  Q    Do you know what that's a photograph of?

16  A    Sprinter.

17  Q    Are you in that photograph?

18            MR. SCHOLAR:  Objection, judge.

19            THE COURT:  Overruled.

20            Do you see yourself in the picture?

21            THE WITNESS:  No.

22            THE COURT:  Okay.

23  BY MS. CRUZ MELENDEZ:

24  Q    I'm showing you Government Exhibit 257-B.  Do you see the

25  defendant in this photograph?

Michele Lucchese, Official Court Reporter

Ramnaran - cross - Cruz Melendez                4018

1   A    Yeah, I assume that's him.  It's real messed up, like,
2   you know, real bright.
3   Q    You see him in the photo; correct?
4   A    Yeah.
5   Q    In 257-A, B, and C, are you in any of these photographs?
6   A    No.
7   Q    Now, you testified that you're an artist; correct?
8   A    Yes.
9   Q    And that you promote shows; is that correct?
10  A    Yes.
11  Q    Have you worked -- have you promoted shows prior to 2008
12  with other artists other than the defendant?
13  A    Yes.  Well, parties, as well as shows.
14  Q    Okay.  When you were working with other artists, did you
15  ever open shows for those other artists?
16  A    Did I ever open shows for those other artists?
17  Q    Yes.
18  A    Yes.
19  Q    Fair to say when you were opening shows for those other
20  artists, you weren't with the defendant; correct?
21  A    Correct.
22  Q    Going back to the times when you stated that you were
23  traveling on the road with the defendant, you testified on
24  direct examination that the tour bus would sometimes stop at
25  food courts; is that correct?

Ramnaran - cross - Cruz Melendez                    4019

1    A    No.  Well, they're like truck stops, but those truck

2    stops are pretty big, so you had food courts, multiple

3    different kinds of restaurants, shopping in there, little

4    things people need.

5    Q    You would get out to get food; correct?

6    A    Not all the time, but whenever I want.

7    Q    And not particularly dangerous places, is that fair to

8    say?

9    A    Dangerous places?

10   Q    No, there weren't dangerous places; right?

11   A    No.  There....

12   Q    You testified on direct examination that you have never

13   seen the defendant with a gun?

14   A    100 percent.

15   Q    Are you aware that the defendant has a gun permit?

16   A    No, I never had a gun conversation.

17   Q    So you are not aware that the defendant has a gun permit?

18   A    No.

19   Q    Now, Mr. Ramnaran -- am I pronouncing that correctly?

20   A    Close enough.

21   Q    You and I have never met before; correct?

22   A    No.

23   Q    So before this moment, we have never spoken; right?

24   A    First time.

25   Q    So we haven't spoken about anything that you have

Ramnaran - cross - Cruz Melendez                4020

1    testified here today; right?

2    A    Right.

3    Q    Have you met with anyone on the defense team?

4    A    If have I met with anybody on the defense team?

5    Q    Yes.

6    A    Well, I just got in town and, you know, I saw him.

7    Q    You saw Mr. Scholar, the individual who asked you

8    questions on direct examination?

9    A    Yes.

10   Q    And you spoke to him; right?

11   A    Yes.

12   Q    He asked you questions about testimony you were going to

13   give here today?

14   A    No.

15        What do you mean?  What do you mean?

16   Q    Mr. Scholar didn't ask you any questions?

17   A    He just asked me what happened, what was going on, I told

18   him the truth.

19   Q    He asked you questions?

20   A    Yeah.

21   Q    About what you would be testifying here today; correct?

22   A    Yeah.

23   Q    Did you provide the defense with any paperwork?

24   A    No.

25   Q    Did you provide them with any documents?

Ramnaran - cross - Cruz Melendez                    4021

1    A    What do you mean?

2    Q    Any documents.  Did you provide any documents to the

3    defense?

4    A    No.

5    Q    Any pictures?

6    A    No.

7    Q    Any pictures of you with the defendant?

8    A    No.

9    Q    Now, when you were speaking with Mr. Scholar, was anyone

10   taking notes?

11   A    No.

12   Q    So no one wrote anything down of what you said?

13   A    Not that I know of.

14   Q    There is no recording of what you previously said to

15   defense?

16          MR. SCHOLAR:  Objection.

17          THE COURT:  Overruled.

18   A    No, I mean....

19   Q    Now, you said you go by the name -- excuse me, you said

20   you were in the music industry; correct?

21   A    Yes, my name is Da-Ni.

22   Q    Can you spell that?

23   A    Which?  My artist spelling or personal spelling?

24   Q    Your artist spelling.

25   A    D-A, N I, Da-Ni.

Ramnaran - cross - Cruz Melendez                    4022

1   Q    Before you met the defendant, you wanted to be in the
2   music business; correct?
3   A    Yes.
4   Q    You wanted to be a singer?
5   A    Well, I rap and sing as well.
6   Q    And you wanted to be a producer?
7   A    I write.
8   Q    I'm sorry?
9   A    I write.
10  Q    You write.  You wanted to write music?
11  A    But I have an ear for production.
12  Q    So you wanted to write music; correct?
13  A    Yeah.
14  Q    When you first met the defendant you testified on direct
15  examination that you approached him because you wanted to work
16  with him; right?
17  A    Correct.
18  Q    And that you were hoping you could collaborate in some
19  way; correct?
20  A    Correct.
21  Q    Fair to say that you were hoping that he would write some
22  songs for you?
23  A    Or participate in some kind of way, yeah.
24  Q    You wanted to put out an album; right?
25  A    Right.

Ramnaran - cross - Cruz Melendez                4023

1    Q    And at some point you started working on an album;

2    correct?

3    A    Yes, I worked on different songs, yeah.

4    Q    For the purpose of an album?

5    A    Right.

6    Q    And that -- is that the project that you testified about

7    on direct examination?

8    A    Yes.

9    Q    And that album was called --

10   A    Undaniable.

11   Q    Undaniable; correct?

12   A    Yes.

13   Q    Spelled U-N-D-A-N-I-A-B-L-E; is that correct?

14   A    Correct.

15   Q    Fair to say you were hoping that that album would sell?

16   A    Well, yeah, who...

17   Q    And that the songs would be popular, you were hoping for

18   in that?

19   A    Everybody strives for success.

20   Q    Were you hoping to strive for success?

21   A    I was.

22   Q    When you were pursuing putting out that album, you used

23   Kelly's name to promote your music; right?

24   A    The song that he was on.

25   Q    And you used that name to your advantage; correct?

Ramnaran - cross - Cruz Melendez                    4024

1   A    Used to my -- yes, whenever someone's featured, yes,
2   that's part of it.
3   Q    And you described yourself, while you were trying to put
4   that album, as being under the defendant's musical wing;
5   right?
6   A    Right.
7   Q    But you never -- did you release that song, a song from
8   that album?
9   A    No, Automatic has never been released.
10  Q    That was in 2000 -- approximately 2010, is that fair to
11  say?
12  A    Which song?
13  Q    The project, Undaniable?
14  A    Yeah, somewhere around that area.
15  Q    2008, 2009, 2010?
16  A    Yeah.
17  Q    That's over ten years ago; correct?
18  A    Correct.
19  Q    Now, when you were publicizing your attempt at putting
20  out this Undaniable album, you plugged it as being -- as
21  having worked with R. Kelly, is that fair to say?
22  A    Yeah.
23  Q    And you stated that you were learning the business from
24  him; right?
25  A    Correct.  Correct.

Ramnaran - cross - Cruz Melendez                    4025

1    Q    Fair to say you wanted to make music -- excuse me, you

2    wanted to make money doing music?

3    A    Correct.

4    Q    And that you wanted to make a name for yourself?

5    A    Correct.

6    Q    And you wanted to be famous?

7    A    I mean, that's -- everybody that strives wants to have

8    successes.  You're describing success.

9    Q    And did you want to have success?

10   A    Yes.

11   Q    And you hoped the defendant could help you with that;

12   right?

13   A    Correct.

14   Q    Because he was a known artist at the time?

15   A    Correct.

16   Q    And you were an unknown artist at the time?

17   A    Correct.

18   Q    It would have been important to your career to have the

19   defendant on your side; right?

20   A    Correct.

21   Q    So you wanted to be loyal to him; right?

22   A    Correct.

23   Q    To make sure to stay on his good side?

24   A    No.

25   Q    You didn't want to make sure to stay on his good side?

Ramnaran - cross - Cruz Melendez                    4026

1    A    How do I -- okay.

2    Q    Yes or no, did you want to stay on his good side?

3    A    What do you mean by that?

4         Well, I don't understand what you mean by stay on

5    his good side?

6    Q    You wanted him to continue to help you with your music;

7    correct?

8    A    We recorded, but stay on the good side?

9    Q    I'm asking you now whether or not you wanted him to

10   continue to help you with your music?

11   A    That would be preferable.

12   Q    Because that would help your career; right?

13   A    Correct.

14   Q    Now, in social media, when you talked about that album

15   project, you listed the defendant's name; correct?

16   A    Correct.

17   Q    You listed his name on your MySpace page, is that fair?

18   A    Correct.

19   Q    On your Facebook page?

20   A    I don't know about MySpace, but Facebook, I have to go

21   back and check the Facebook, because I really don't do social

22   media as much as I probably should.

23   Q    If I showed you --

24   A    But when I have done press releases.

25   Q    If I showed you your Facebook page, would that refresh

Ramnaran - cross - Cruz Melendez                    4027

1   your recollection as to whether or not you mentioned him on

2   your Facebook page?

3   A    You're talking about music though.  You're talking about

4   my music.

5   Q    With respect to your music.

6   A    Yeah.  If I'm pushing my music, it would have it on it,

7   but like I did not socially interact as much as probably most

8   artists would.

9   Q    Fair to say on your social media, on your Facebook page,

10  when you were promoting your music, you also used the

11  defendant's name?

12  A    Yeah, featuring R. Kelly, just like movie features,

13  whoever is acting.

14  Q    Now, since that project 2008, 2009, 2010 time period, you

15  haven't released any other music, have you?

16  A    No. We've worked on something.

17  Q    What did you work on?

18  A    It's a song called Automatic.

19  Q    You didn't release that; correct?

20  A    No.

21  Q    And fair to say that you're still an unknown artist?

22           MR. SCHOLAR:  Objection.

23  A    Correct.

24           THE COURT:  Overruled.

25  Q    You're currently still in the music business?

Ramnaran - cross - Cruz Melendez                    4028

1   A    Not as much right now.  I kind of -- yes, I still have my

2   ambitions, but I kind of -- I have different focuses now.

3   Q    You still want to release that Undaniable album; correct?

4   A    It's kind of like the past now.  Music has changed., you

5   know, music is a very fluid game and things always change.  So

6   a lot has changed since what I record.

7   Q    So as of November 2020, you weren't still trying to

8   publicize the album release for Undaniable?

9   A    November 2020?  You know, I don't have a recollection of

10  trying to publicize it, but, you know, I would have to record

11  new material because music has changed quite a bit.

12  Q    On Twitter, you didn't state check out your website for

13  the latest on the Undaniable album?

14  A    Yeah, but I have to -- if you go to the website, there is

15  no website, and then I would have to record new material I.

16  Was thinking about getting some things done.

17  Q    Okay.  So it's fair to say that you still want to try and

18  release an album in the music business; correct?

19  A    I've changed my focus, like I've said earlier.

20  Q    You own your own company?

21  A    Do I own my own company?  Well, I'm starting a company.

22  Q    On Linkedin, you don't list your own company, that you

23  are CEO and chairman of the company called Undaniable Music?

24  A    Yeah.  That would be for my album, but that -- I haven't

25  touched Linkedin in I don't know how many years, ten years.  I

Ramnaran - cross - Cruz Melendez                4029

1   don't know how long it's been.  I haven't been on Linkedin?

2   Q    Sir, on your Linkedin page it doesn't say since 1998 you

3   have been the chairman and CEO of Undaniable Music?

4   A    That would be my own recordings.

5   Q    I'm sorry, so you do purport to be the chairman and CEO

6   of Undaniable Music; is that correct?

7   A    Yeah, I'm the head of my own recordings, whatever I

8   decide to do in my own home studio.

9   Q    And you continue to be in the music industry according to

10  your own statements; is that fair to say?

11  A    No.  Like I said, I switched my focus.  And I haven't

12  been -- check to see when is the last time I've been on

13  Linkedin.  It might have been over ten years ago or more.

14  Q    Now, as you previously testified, much of your success

15  has been linked to the defendant's; is that correct?

16  A    Most of my -- what do you mean by my success?

17  Q    With respect to your music, it's been linked to the

18  defendant; correct?

19  A    Well, we still -- nothing got -- you know, it's not

20  released.  The latest song that we worked on never got

21  released and never will be.

22  Q    Fair to say social media is forever?

23  A    Yeah, as long as you stay in business I guess.

24  Q    And so that your name is linked with the defendant's;

25  correct?

Ramnaran - cross - Cruz Melendez                4030

1    A    Yeah, I mean, because we had a song.

2    Q    If the defendant were to be convicted, it wouldn't be in

3    your best interest to connect your name with him anymore;

4    correct?

5              MR. SCHOLAR:  Objection, Judge.

6              THE COURT:  Sustained.  That means you don't have to

7    answer.

8              THE WITNESS:  Yeah.

9              THE COURT:  Nothing more needs to be said.  Go

10   ahead.

11   Q    Now, you testified that there were times where you were

12   in the studio with the defendant?

13   A    Yes.

14   Q    You said you wanted to focus on the music with the

15   defendant, is that fair to say?

16   A    It wasn't just music.  I was observing everything, how

17   people interact with him, because I understand that at some

18   point when my ambitions were lined up with what I was doing at

19   that time --

20             MS. CRUZ MELENDEZ:  Objection as nonresponsive.

21             THE COURT:  Just do your best to answer the question

22   you are being asked.

23             THE WITNESS:  Okay.  I was just trying to give her

24   the details she wants.

25             THE COURT:  Well, I think Ms. Cruz Melendez is fully

Ramnaran - cross - Cruz Melendez                    4031

1    capable of letting you know when she needs an answer.

2             Go ahead.  Next question.

3    BY MS. CRUZ MELENDEZ:

4    Q    When you were in the studios, the various studios that

5    you said you went to, you said Chocolate Factory; is that

6    correct?

7    A    Yes.

8    Q    You said you spent time at Olympia Fields; is that

9    correct?

10   A    Yes.

11   Q    When you were there, you were, as you testified, working

12   on music; correct?

13   A    Yes.

14   Q    So you were in the recording studio?

15   A    Yes.

16   Q    When you were in the recording studio you were in the

17   actual area of recording; correct?

18   A    Yeah.

19   Q    Fair to say you weren't in each and every room in Olympia

20   Fields?

21   A    Well, there's a lot of -- you know, I've been to

22   different rooms, but, yes.

23   Q    But not every room; correct?

24   A    Excuse me?

25   Q    Not every room; correct?

Ramnaran - cross - Cruz Melendez                    4032

1    A    Not every single room.

2    Q    You weren't in every single room at the Chocolate

3    Factory, is that fair to say?

4    A    Yeah.

5    Q    Okay.  So -- now, when you were working on this project

6    from over ten years ago with the defendant, did you have a

7    job, like a day job?

8    A    No, no, I didn't have a day job.

9             (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION

2   BY MS. CRUZ MELENDEZ: (Continuing.)

3   Q    Fair to say, sir, that you weren't with the defendant

4   when he was alone in rooms with his girlfriends?

5   A    No.

6   Q    And fair to say that you weren't with the defendant when

7   he was alone with his girlfriends on tour buses?

8   A    No.

9   Q    It's not fair to say that?

10   A    I don't understand --

11   Q    You were not --

12   A    If he's alone, then I'm not there, if that's what you're

13   saying.

14   Q    Right.  So when he's alone with his girlfriends on the

15   tour bus, for example, you were not there?

16   A    Right.

17   Q    When he was alone on the tour bus in the Sprinter, you

18   were not there; correct?

19   A    I mean, there's been times I've been on the Sprinters and

20   there is other guests there.

21   Q    What I'm asking you is, when he's alone with someone on

22   the Sprinter, you're not there; correct?

23   A    When he's alone, he's alone, yeah.

24   Q    When the defendant was alone in hotel rooms with his

25   girlfriends, you were not there; correct?

1  A    Correct.

2           MS. CRUZ MELENDEZ:  Nothing further.

3           THE COURT:  Any redirect?

4           MR. SCHOLAR:  No, Your Honor.

5           THE COURT:  All right.

6           Thank you so much.  You can step down.

7           THE WITNESS:  Thank you.

8           (Witness excused.)

9           THE COURT:  Do you have another witness you would

10 like to call.

11          MR. SCHOLAR:  Judge, if it's possible, can we have

12 the morning break?

13          THE COURT:  Sure.

14          Folks, we are going to break for ten minutes or so.

15 Please don't talk about the case at all.  I'll see you in a

16 few minutes.

17          THE COURTROOM DEPUTY:  All rise.

18          (Jury exits.)

19          THE COURT:  Everybody can have a seat.

20          The witness can step out.

21          (Witness exits the courtroom.)

22          THE COURT:  Who is the next witness?

23          MR. SCHOLAR:  Judge, I just want to speak to our

24 investigator to see who is cued up.

25          THE COURT:  Okay.  Anything before we break?

*Proceedings* 4035

```
 1              MR. SCHOLAR:  No, Your Honor.

 2              THE COURT:  No?  Okay.

 3              (A recess in the proceedings was taken.)

 4              THE COURTROOM DEPUTY:  All rise.

 5              THE COURT:  Everybody can sit down.

 6              All right.  Are we ready for the next witness?

 7              MR. SCHOLAR:  I think so.

 8              THE COURT:  Do you want to get -- maybe it's a good

 9    idea --

10              MR. CANNICK:  I will get him.

11              THE COURT:  -- to have him here before the jury gets

12    out.

13              Who is it, by the way?

14              MR. SCHOLAR:  It's Larry Hood.

15              THE COURT:  Larry Hood, okay.

16              (Witness takes the stand.)

17              THE COURT:  Just have a seat and we'll start in a

18    minute.

19              THE COURTROOM DEPUTY:  All rise.

20              (Jury enters.)

21              THE COURTROOM DEPUTY:  You may be seated.

22              THE COURT:  All right, everybody.  We're ready to

23    proceed.

24              Will you call your next witness?

25              MR. SCHOLAR:  Yes, Your Honor.  Larry Hood.
```

*Proceedings*                                              4036

1           THE COURT:  Okay.

2           THE COURTROOM DEPUTY:  Please stand and raise your

3    right hand.

4           (Witness sworn.)

5           THE COURTROOM DEPUTY:  Thank you.

6           You may be seated.

7           THE COURT:  Okay.  Mr. Hood, you can take your mask

8    off, and then just pull the microphone a little closer to you.

9    A couple of things before we start.  I want to make sure

10   everybody hears what you have to say, so speak into the

11   microphone.  Don't speak too fast.  It makes it harder for the

12   court reporter to do her job.  She takes down everything that

13   you say.

14          THE WITNESS:  Okay.

15          THE COURT:  If there's a question that you don't

16   understand or want to have repeated, let me know and I will

17   have the lawyer rephrase it.  And just do your best to answer

18   only the question that you are being asked.

19          THE WITNESS:  Okay.

20          THE COURT:  And, finally, let the lawyer --

21   whichever lawyer is asking you questions -- let the lawyer

22   finish speaking before you start speaking --

23          THE WITNESS:  Okay.

24          THE COURT:  -- that way, again, it's easier for the

25   court reporter.

*Proceedings*                                                        4037

1              THE WITNESS:  Okay.

2              THE COURT:  Okay.  Let's make sure your microphone

3    is on.

4              THE WITNESS:  It's on now.

5              THE COURT:  Yes, it is.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **LARRY HOOD**,

2             called as a witness, having been first duly

3             sworn/affirmed, was examined and testified as

4             follows:

5    DIRECT EXAMINATION

6    BY MR. SCHOLAR:

7    Q    What do you do for a living?

8    A    I buy and sell cars at the present time.

9    Q    Do you know Robert Kelly?

10   A    Yes, I do.

11   Q    And do you see him in court today?

12   A    Yes, I do.

13   Q    Can you say something that he's wearing right now?

14   A    Pardon me?

15   Q    Can you point to something that he's wearing right now?

16   A    He's wearing a gray suit.

17             THE COURT:  Indicating the defendant.

18   BY MR. SCHOLAR:

19   Q    And how did you know Robert Kelly?

20   A    Well, I know him from grammar school.

21   Q    Were you friends?

22   A    Yes.

23   Q    And did you know Mr. Kelly when he was a street

24   performer?

25   A    Yes, I did.

1  Q    And did you ever protect him while he was a street

2  performer?

3  A    Yes, I did.

4  Q    How did you protect him?

5  A    I sat in the subway with him as he performed in the

6  subway, and as the people put the money in his bucket, I just

7  made sure that nobody bother him.

8  Q    Where did Mr. Kelly perform on the streets?

9         MS. SHIHATA:  Objection.

10        THE COURT:  I don't really see the relevance.  Let's

11 move on to something else.

12 BY MR. SCHOLAR:

13 Q    At some point in time, did Mr. Kelly get a record deal?

14 A    Yes, he did.

15 Q    Did you provide protection once he got a record deal?

16 A    Yes, I did.

17 Q    Earlier on in his career, did you go on tour with

18 Mr. Kelly?

19 A    Yes, I did.

20 Q    And prior to selling cars, what did you do for a living?

21 A    Chicago police officer.

22 Q    When did you become a police officer?

23 A    1994, I was in the academy, and '95, I hit the streets.

24 Q    Now, when you went on tour with Mr. Kelly, were you a

25 police officer?

*Hood - Direct - Scholar* 4040

1  A    Yes, I was.

2  Q    And in the earlier portion of his career when you went on

3  tour with Mr. Kelly, were you a police officer then?

4  A    Not at the very beginning of his career, no.

5  Q    And where did you go on tour with Mr. Kelly at the

6  beginning of his career?

7  A    To oversees to Europe.

8  Q    Did you ever see any under-aged performers performing

9  with Mr. Kelly?

10 A    No, I did not.

11 Q    Did you know a person by the name of Aaliyah?

12 A    Yes I did.

13 Q    How did you know Aaliyah?

14 A    I was with Mr. Kelly when he met Aaliyah in her living

15 room.

16 Q    Did you ever observe Mr. Kelly acting inappropriately

17 with Aaliyah?

18 A    No, I did not.

19 Q    Do you know a person named Angela?

20      MS. SHIHATA:  Objection.

21      THE COURT:  Overruled.

22      MS. SHIHATA:  Regarding the name used, Your Honor.

23      MR. SCHOLAR:  I apologize.

24      What was that name?

25      THE COURT:  Can we see the parties at the side with

1    the court reporter for just a minute?

2              (Sidebar.)

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar* 4042

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3          THE COURT:  Is this a situation where you would talk

4    to him about whatever name we're using for this witness?

5          MR. SCHOLAR:  I thought she was being referred to as

6    Angela.  I thought we were referring to her as Angela.

7          MS. SHIHATA:  She testified as Angela last week.

8          THE COURT:  Angela?  So what's the best way to

9    let --

10         MS. SHIHATA:  I think we could -- we have pictures

11   and evidence that have her real name for the jury only and

12   then her pseudonym.

13         THE COURT:  I guess they will be referring to her

14   as -- let's do it that way.

15         Do you have those pictures that you can just loan to

16   him?

17         MS. SHIHATA:  Yes.  I will get them.

18         THE COURT:  Thanks.

19         (Sidebar conference ends.)

20         (Continued on following page.)

21

22

23

24

25

*Hood - Direct - Scholar*                                              4043

1              (In open court.)

2              MR. SCHOLAR:  Your Honor, this is for the witness

3      and the jury only.

4              THE COURTROOM DEPUTY:  Take it off for one minute.

5              THE COURT:  There you go.

6      BY MR. SCHOLAR:

7      Q    Do you recognize that person?

8      A    Yes.

9      Q    And for the trial, we'll be referring to her as Angela.

10     A    Okay.

11     Q    Did you know Angela?

12     A    Yes.

13     Q    How did you know Angela?

14     A    She was just one of the young ladies that came around

15     when Aaliyah was around -- one of Aaliyah's little friends.

16     Q    Did you ever see Mr. Kelly acting inappropriately with

17     Angela?

18     A    No, sir.

19     Q    After you became a police officer, did you also still

20     provide protection for Mr. Kelly?

21     A    Yes, sir.

22     Q    And what kind of protection did you offer him?

23     A    Security as a bodyguard.

24     Q    At some point in time, did you stop providing security

25     for Mr. Kelly early in his career?

1   A     Yes.

2   Q     Did you continue to work as a police officer in Chicago?

3   A     Yes.

4   Q     Did you also have a family?

5   A     Did I have a family?

6   Q     Yes.

7   A     Yes.

8   Q     And did you continue to speak to Mr. Kelly from that

9   point in time until about 2002?

10  A     Yes.

11  Q     In 2002, did Mr. Kelly contact you?

12  A     Yes, he did.

13  Q     After Mr. Kelly contacted you, did you go to Orlando,

14  Florida?

15  A     Yes, I did.

16  Q     And did you meet Mr. Kelly in Florida?

17  A     Yes, I did.

18  Q     What happened in Florida, if anything?

19  A     Well, I was called down as a support system for him, and

20  I was just -- I just worked security for him while I was down

21  in Florida.

22  Q     Were you on his payroll at that time?

23  A     No, not at that time.

24  Q     And when you say you provided security, what kind of

25  security did you provide him?

*Hood - Direct - Scholar*                                      4045

1  A     Well, like I stated to you guys, I've always been a

2  friend of his, so he called me down in need of my support and

3  I went to support him.

4  Q     And did you see him at different events in Florida?

5  A     Yeah.  We hung out down in Florida.

6  Q     And when you hung out, did you manage the crowd in

7  Florida?

8  A     Yes.

9  Q     And how did you manage the crowd?

10 A     Well, when we were out, we went and played basketball,

11 and I just made sure, you know, that his fans -- if he wanted

12 them to come up and sign autographs or whatever, I would, you

13 know, just, kind of, do the crowd control.

14 Q     And after Florida, did you go back to Chicago?

15 A     Yes.

16 Q     Why did you go back to Chicago?

17 A     Well, I only stayed in Florida a weekend.  We went back

18 to Chicago, I had to go back to work, and at that time, I was

19 instructed by Mr. Kelly to --

20           MS. SHIHATA:  Objection.

21           THE COURT:  Well, don't tell us anything that he

22 told you.

23           You went back to Chicago?

24           THE WITNESS:  Yes, ma'am.

25           THE COURT:  All right.

1          Go ahead.

2     BY MR. SCHOLAR:

3     Q     And when you went back to Chicago, did you continue

4     working as a police officer?

5     A     Yes, sir.

6     Q     And did you become a security officer for Mr. Kelly?

7     A     Yes.

8     Q     And, if you could, could you describe for the jury what a

9     typical day was like for you being a police officer and

10    providing security services?

11    A     Well, would you like to know my hours?

12          I worked with the Chicago Police Department from

13    1:00 p.m. to approximately 9:00, 9:30, and after I got off

14    work, I met up with Robert.

15    Q     And then what would happen once you met up with Robert --

16    Mr. Kelly?

17    A     Well, we would generally go to the gym for him to play

18    basketball.

19    Q     What would happen next, if anything?

20    A     After playing basketball?

21    Q     Yes.

22    A     We might go and sit at White Castle or go to McDonald's

23    and then back to the studio.

24    Q     During that time, did you ever hand out Mr. Kelly's phone

25    number to women at the White Castle or McDonald's?

1    A     No, sir.

2    Q     Did you ever recruit women for Mr. Kelly at these places?

3    A     No, sir.

4    Q     During this time, did you also provide Mr. Kelly with the

5    services of another Chicago police officer?

6    A     Yes.

7    Q     And who was that person?

8    A     Well, it was just guys -- fellow police officers.  If we

9    needed them, I would get them to come and work with me to

10   provide security for him.

11   Q     Now, in the early days when Mr. Kelly went on tour, was

12   there a tour bus?

13   A     Yes.

14   Q     And now, 2002, when you went back to work with him, were

15   there more than one tour bus?

16   A     Yes.

17   Q     And how many tour buses were there?

18   A     It was definitely two, but sometimes three.

19   Q     And did you ride on those buses?

20   A     I rode on one of the buses.

21   Q     Which bus did you ride on?

22   A     Just a bus we called the homie bus.

23   Q     And who was on the homie bus?

24   A     The homies.

25   Q     And did the bus have a bathroom?

1    A    Yes, it did.

2    Q    Did it have a kitchen?

3    A    Yes.

4    Q    Did it have a sleeping area?

5    A    Yes.

6    Q    Did the tour buses stop for bathroom breaks?

7    A    Yes, it did.

8    Q    And did the tour buses stop so people could eat?

9    A    Yes.

10   Q    When the tour buses stopped, what were your duties as

11   security?

12   A    Just to make sure that, you know -- that we didn't have

13   any unruly fans, you know.

14   Q    And when you went to a new location to perform on a

15   scheduled night, would you advance the area?

16   A    Yes, I did.

17   Q    What do you mean by the term "advance"?

18   A    When you advance the area, you would -- say we would go

19   to a different state and we would be in the city, and once we

20   got in the hotel rooms, I would go up and check his room to

21   make sure it was all clear.  Or if we was going to a venue, I

22   would go on the venue and check out all the exits and, you

23   know, the strategies of the venue of where we would be.

24   Q    Now, during the time that you provided security for

25   Mr. Kelly, did you ever see him with underage women?

*Hood - Direct - Scholar* 4049

1   A    No, sir.

2   Q    During that time, did you ever see him strike any female?

3   A    No, sir.

4   Q    Did you ever see him observe -- sorry, withdrawn.

5        Did you ever see him stop anyone from eating?

6   A    No, sir.

7   Q    And did you ever see him prevent anyone from leaving a

8   room?

9   A    No, sir.

10  Q    Did you ever see Mr. Kelly lock a woman in a room?

11  A    No, sir.

12  Q    And did you ever lock a woman in a room?

13  A    No, sir.

14  Q    Did -- withdrawn.

15       As security as a police officer, were you ever made

16  aware of any woman being locked in a room?

17  A    No.  If I was ever to be made aware of a woman being

18  locked in a room, as a police officer, I would have to take --

19  take some action against that.

20  Q    Did you take any action of any type with respect to

21  Mr. Kelly --

22  A    No.  I never had to take any action.  I was never made

23  aware of any wrongdoing.

24  Q    Were you aware of any woman being kept in a room for days

25  without eating or drinking?

1    A    No, sir.

2    Q    And you were an active police officer during this entire

3    time from 2002 to 2004?

4    A    Yes, sir.

5    Q    And you stopped providing security services for Mr. Kelly

6    in 2004?

7    A    Yes.

8    Q    And why was that?

9    A    They stopped paying me on leave because -- his accountant

10   called me to the office and said that they wasn't -- they

11   couldn't afford to pay me anymore.

12   Q    Did you stop being his friend?

13   A    Pardon me?

14   Q    Did you stop being his friend?

15   A    No, sir.

16   Q    Though you have been his friend for this amount of time,

17   would you lie for him?

18   A    No, I would not.

19   Q    Now, did you leave the police department at some point?

20   A    In 2007, yes.

21   Q    And did you leave in good standing with your pension?

22   A    Yes, I left in good standing with my pension.

23   Q    And when did you begin selling cars?

24   A    Probably about two years after.

25        MR. SCHOLAR:  Thank you.  Nothing further.

1          THE COURT:  All right.  Thank you.

2          Cross-examination.

3          MS. SHIHATA:  Yes.

4    CROSS-EXAMINATION

5    BY MS. SHIHATA:

6    Q    Good morning.

7    A    Good morning.

8    Q    Now, Mr. Hood, you are a childhood friend of the

9    defendant; correct?

10   A    Yes, ma'am.

11   Q    I think you said you met him in grammar school?

12   A    Yes, ma'am.

13   Q    Did you also live in the same neighborhood growing up?

14   A    Well, not in the immediate same neighborhood.

15   Q    Close by?

16   A    Close, yeah.

17   Q    Would you see each other pretty much every day growing

18   up?

19   A    Every day.

20   Q    And you went to the same school as well; correct?

21   A    Yes, ma'am.

22   Q    Including the same high school?

23   A    Yes, ma'am.

24   Q    That was Kenwood Academy?

25   A    Yes, ma'am.

1   Q    Were you in the same grade?

2   A    Yes.  We graduated grammar school and went to high school

3   together, yeah.

4   Q    Okay.  And you graduated from Kenwood Academy?

5   A    I graduated, yes.

6   Q    The defendant did not graduate; correct?

7   A    No, he did not.

8   Q    He dropped out in his senior year?

9   A    No.  It was before senior year.

10  Q    Before his senior year?

11  A    Yes, ma'am.

12  Q    Okay.  And you said at some point you became security for

13  the defendant; is that right?

14  A    Yes, ma'am.

15  Q    And, by the way, what year did you graduate from Kenwood

16  Academy?

17  A    1986.

18  Q    Now, after you graduated from Kenwood Academy, did you

19  continue to hang out there?

20  A    Did I continue to hang out at Kenwood Academy?

21  Q    Yes.

22  A    No, ma'am.

23  Q    How about the defendant?  Did he?

24  A    I don't know.

25  Q    You don't know?

*Hooo - Cross - Shihata*                                              4053

1   A     I don't, ma'am.

2   Q     Okay.  And, now, in the early days at the start of the

3   defendant's career, you were with him a lot; correct?

4   A     Yes, ma'am.

5   Q     And back in the early '90s, you saw Demetrius Smith with

6   the defendant; correct?

7   A     Yes, ma'am.

8   Q     And Demetrius went by the nickname Johnny; correct?

9   A     Johnny, yes.

10  Q     And he ended up being the defendant's road manager for a

11  period of time; right?

12  A     Yes, ma'am.

13  Q     And, for a period of time, you acted as his -- as the

14  defendant's personal security.

15  A     Yes, ma'am.

16  Q     Now, around 1991, the defendant had an apartment in a

17  building called the Burnham at 40 East 9th Street, the corner

18  of 9th Street and Wabash Avenue in Chicago; correct?

19  A     Yes.

20  Q     And you spent time at that apartment; correct?

21  A     Yes, I did.

22  Q     And that was a two-bedroom apartment?

23  A     Yes, it was.

24  Q     And the defendant would have guests at that apartment;

25  correct?

1    A    Not guests that I knew of.

2    Q    You never saw a single guest when you were at the

3    apartment on 9th and Wabash; is that your testimony?

4    A    No, ma'am.

5    Q    Never saw a single guest?

6    A    No.

7    Q    How often were you there?

8    A    I actually only stayed with him at that apartment for

9    maybe a month.

10   Q    You were living there?

11   A    Yeah.  I lived there for about a month.

12   Q    Apart from living there, did you ever go to that

13   apartment when you weren't living there?

14   A    Yes, I did.

15   Q    Is it your testimony that each time you were there, it

16   was just you and the defendant?

17   A    Sometimes I would be there by myself.

18   Q    That's not my question, sir.

19         I said, were there times when other people other

20   than you and the defendant were at that apartment?

21   A    At the -- when I was there, it was just him.

22   Q    So you were never at that apartment with anybody else

23   either in the month you were living there or the times you

24   stopped by the apartment --

25   A    No, ma'am.

*Hood - Cross - Shihata*                                      4055

1  Q    -- that's your testimony?

2       Okay.  Now, you mentioned you met Aaliyah with the

3  defendant; correct?

4  A    Yes.

5  Q    That was before she was famous; right?

6  A    Yes.

7  Q    And that was in Detroit?

8  A    In Detroit.

9  Q    And that was at her family home?

10 A    At her family home.

11 Q    She was living with her parents at the time?

12 A    Yes, ma'am.

13 Q    Older brother?

14 A    Yes.

15 Q    And Aaliyah was Barry Hankerson's niece; correct?

16 A    Yes.  Yes, she was.

17 Q    Back in the early '90s, Barry Hankerson was the

18 defendant's manager; correct?

19 A    Yes.

20 Q    And, in fact, you met Aaliyah in Detroit around 1992 or

21 so; is that right?  Or before that.

22 A    Which -- whichever year it was.

23 Q    Well, which year do you think it was?

24 A    I -- I do not have recollection of the year it was, but

25 it was when he first met her, I was there with him.

*Hooc - Cross - Shihata*                                                    4056

1    Q    And who else was there?

2    A    Her mother, her father, and her younger brother.  I think

3    her brother was younger than her, I think.

4    Q    Who else was there?  Was it just you and the defendant or

5    anyone else with the defendant?

6    A    No.  It was me and the defendant.

7    Q    How about Barry Hankerson?  Was he there?

8    A    I don't recall whether Barry was there or not.  I

9    don't -- I don't think so.

10   Q    And I know you don't remember the exact year, but fair to

11   say she was around 12 owe 13 years old at the time?

12   A    Yeah, approximately.

13   Q    And you knew that; correct?

14   A    No, I didn't -- I didn't know her age.

15   Q    Well, could you tell her age by looking at her?

16   A    Yeah, she -- she was a young lady, yes.

17   Q    Now, the defendant ended up working with Aaliyah;

18   correct?

19   A    Yes.

20   Q    And Aaliyah traveled from Detroit to Chicago to record

21   her first album; right?

22   A    Yes.

23   Q    And that was at.

24              (Court reporter clarification.) Recording Studios;

25   correct?

*Hooc - Cross - Shihata*                                                4057

1    A

2              (Court reporter clarification.).

3    Q    And the defendant wrote and produced her first album;

4    correct?

5    A    Correct.

6    Q    That was called "Age Ain't Nothing But a Number";

7    correct?

8    A    Correct.

9    Q    And there was also a titled song with that same name on

10   that album; correct?

11   A    Yes.

12   Q    And you've heard that song before; correct?

13   A    Yes.

14   Q    And it's about a young girl trying to convince an older

15   man to, quote, go all the way; correct?

16             MR. SCHOLAR:  Objection.

17             THE COURT:  Sustained.

18   BY MS. SHIHATA:

19   Q    Now, Aaliyah was about 14 when she recorded the album;

20   correct?

21   A    Approximately, yes.

22   Q    Now, you testified on -- well, actually, withdrawn.

23             At some point, you became aware that the defendant

24   married Aaliyah; correct?

25             MR. SCHOLAR:  Objection, Judge.

```
 1              THE COURT:  Overruled.
 2    A    I don't understand what you are asking me.
 3    Q    At some point, you became aware that the defendant
 4    married Aaliyah; correct?
 5    A    I wasn't present.
 6    Q    That's not my question, sir.
 7              Did you become aware of that?
 8    A    Later.  Later in life, yes.
 9              THE COURT:  When you say "later in life," what do
10    you mean?
11              THE WITNESS:  I -- I wasn't aware of it when it
12    happened.
13              THE COURT:  I see.
14              Go ahead.
15              MS. SHIHATA:  Okay.
16    BY MS. SHIHATA:
17    Q    So you weren't at the marriage ceremony; correct?
18    A    No, I was not.
19    Q    And you didn't see it with your own eyes; correct?
20    A    No, ma'am.
21    Q    But that doesn't mean it didn't happen; correct?
22              MR. SCHOLAR:  Objection, Judge.
23              THE COURT:  Sustained.
24    BY MS. SHIHATA:
25    Q    Now you testified you became a Chicago police officer
```

1    around 1994; correct?

2    A    Yes.  August of '94.

3    Q    And you remained a Chicago police officer for several

4    years after that; right?

5    A    Yes, ma'am.

6    Q    In fact, you stayed on the force until approximately

7    2007; correct?

8    A    Yes, ma'am.

9    Q    And the defendant knew you were working as a police

10   officer; right?

11   A    Yes.

12   Q    So from 1994 to 2007, that's about 13 years; right?

13   A    Yes, ma'am.

14   Q    And so during those 13 years, the defendant knew that you

15   were -- one of his closest friends were on the police force;

16   correct?

17        MR. SCHOLAR:  Objection, Judge, to "knew."

18        THE COURT:  Sustained as to form.

19   BY MS. SHIHATA:

20   Q    Did the defendant know that you worked as a police

21   officer?

22   A    Yes, ma'am.

23        MR. SCHOLAR:  Objection.

24   BY MS. SHIHATA:

25   Q    Did he know that for the entire period of 13 years that

*Hood - Cross - Shihata*                                    4060

1    you --

2              MR. SCHOLAR:  Objection, Judge.

3    Q    -- worked as a police officer?

4              THE COURT:  Overruled.

5    BY MS. SHIHATA:

6    Q    You can answer.

7    A    Yes, ma'am.

8    Q    And I think you testified on direct that you continued to

9    work security for the defendant when you weren't on duty as a

10   police officer; is that right?

11   A    Yes.

12   Q    And that you had sometimes brought on other members of

13   the Chicago Police Department to work security for the

14   defendant --

15   A    Yes.

16   Q    -- is that right?

17             Who did you bring on?

18   A    Just fellow officers.

19   Q    What were their names?

20   A    I -- I can't recall.

21   Q    A single one?

22   A    Well, yes, Ricky Bell.  I also had a friend that was a

23   county sheriff; his name was Louis Smith.  Chauncey Moore.

24   Q    Now, you were aware of other people that worked as

25   security for the defendant; is that right?

1    A    Yes.

2    Q    And I'm showing you -- I'm showing you what's in evidence

3    as Government's Exhibit 19.

4              MS. SHIHATA:  This is going to be public, please.

5              (The above-referred to exhibit was published.)

6    BY MS. SHIHATA:

7    Q    Do you recognize this person?

8    A    Yes.

9    Q    Who is that?

10   A    Ronald Hardy.

11   Q    And what did he do for the defendant?

12   A    Security.

13   Q    And did he go by any nicknames?

14   A    Pardon me?

15   Q    Did he go by any nicknames?

16   A    Called him Hardy.

17   Q    I'm showing you what's in evidence as Government's

18   Exhibit 23.

19              (The above-referred to exhibit was published.)

20   BY MS. SHIHATA:

21   Q    Do you recognize this person?

22   A    No.

23   Q    You don't recognize this person?

24   A    No, I do not.

25   Q    Now, you talked about a person that, for purposes of the

1    trial, we're referring to as Angela.

2             Do you recall that testimony?

3    A    Yes.

4    Q    And I think you mentioned she was, I think you said one

5    of Aaliyah's little friends.

6    A    Yes.

7    Q    And you saw her around in the early days; is that

8    correct?

9    A    Yes.

10   Q    And you saw her at the studio; is that right?

11   A    At the studio.

12   Q

13             (Court reporter clarification.)?

14   A    Yes.

15   Q    And you saw her with some other people as well; correct?

16   A    Yes.

17   Q    Someone who went by the name Tiffany?

18   A    Tiffany.

19   Q    And what was -- just use her first name, please.

20             What was Tiffany doing at the studio?

21   A    Same thing.  One of Aaliyah's girlfriends.

22   Q    Did Tiffany record music at the studio?

23   A    Yeah.  I think -- I think they were just, like, some

24   little hype girls or something, you know.

25   Q    They were Aaliyah's hype girls?

*Hood - Cross - Shihata*                                                          4063

1   A     Pardon me?  Yeah, Aaliyah's little hype girls.

2   Q     And did you ever go on tour -- were you ever on a tour

3   where Aaliyah was present?

4   A     No, I don't recall being on a tour with -- with Aaliyah.

5   Q     Now, Tiffany and Angela -- the person we're referring to

6   as Angela -- they were in a group with a third person called

7   Second Chapter; correct?

8   A     I don't know of any group they ran.

9   Q     When you saw them hanging out at the studio, they were

10  under age; correct?

11  A     I don't know what their ages were.

12  Q     Well, you testified earlier you never saw anyone under

13  age around.  Fair to say you weren't checking IDs?

14  A     No, I -- I wasn't checking IDs at the studio with the --

15  Q     So that's a no, you weren't checking IDs?  That's a no,

16  you weren't checking?

17  A     At the studio, no, I was not checking IDs.

18  Q     Now, you testified -- I believe you testified on direct

19  examination that you left the police department in 2007 in

20  good standing with your pension.  That was your testimony.

21  A     Yes, ma'am.

22  Q     Mr. Hood, isn't it true that you left the police

23  department in 2007 because you were convicted of felony

24  forgery?

25  A     I pled on a felony, and I left the department in good

1    standing with my pension.

2    Q    Your testimony is that with a felony conviction, you left

3    the department in good standing; that's your testimony?

4    A    Yes.

5    Q    And, in fact, that felony forgery conviction was related

6    to the use of counterfeit hundred dollar bills; correct?

7    A    Yes.

8    Q    You were trying to get a money order using counterfeit

9    hundred dollar bills that were, in fact, five dollar bills;

10   correct?

11   A    I wasn't aware of it.

12   Q    You weren't aware of it?

13   A    No, ma'am.

14   Q    You pled guilty under oath in a court of law to that

15   crime; correct?

16   A    Yes.

17   Q    And you're saying you weren't telling the truth then?

18   A    I was not aware that the money was fake.

19   Q    So you weren't telling the truth under oath in court when

20   you pled guilty?

21   A    Yes.

22   Q    And your under oath in court here today; correct?

23   A    Yes, ma'am.

24            MS. SHIHATA:  Nothing further.

25            THE COURT:  Any redirect?

*Proceedings*                                                4065

1          MR. SCHOLAR:  Nothing further, Judge.

2          Thank you.

3          THE COURT:  Okay.

4          Thanks so much.  You can step down.

5          THE WITNESS:  Thank you.

6          (Witness excused.)

7          THE COURT:  Are you ready to call your next witness?

8          MR. SCHOLAR:  Judge, the witness was not scheduled

9  to be here until after lunch.

10         THE COURT:  Okay.  We will do an early lunch today.

11         MR. SCHOLAR:  Thank you.

12         THE COURT:  Okay, folks.  We'll break for an early

13 lunch, and I think we will come back at -- let's come back at

14 two o'clock.

15         Please don't talk about the case at all.  We'll see

16 you in a little bit.

17         THE COURTROOM DEPUTY:  All rise.

18         (Jury exits.)

19         THE COURT:  All right.  Everybody can sit down.

20         What's does the afternoon look like?  You've got

21 another witness?

22         MR. SCHOLAR:  Yes, Judge.  If we could have a sidebar?

23         THE COURT:  Sure.  Let's bring the court reporter.

24         (Sidebar.)

25         (Continued on next page.)

*Sidebar*                                                          4066

1          (Sidebar conference held on the record out of the

2   hearing of the jury.)

3          THE COURT:  Both of you?

4          MR. SCHOLAR:  Yes.

5          So we have another witness after lunch, it's Keyonia

6   Jones, and I just wanted to know if -- she was being called

7   for a very limited purpose --

8          MS. GEDDES:  Right.

9          MR. SCHOLAR:  -- which was to discuss her meeting

10  Jerhonda Pace --

11         MS. GEDDES:  Right.

12         THE COURT:  Her meeting?

13         MR. SCHOLAR:  -- her meeting Jerhonda Pace.  I

14  wanted to know if you were going to allow any admission of

15  hearsay with respect to that either on direct or cross.

16         THE COURT:  That's such an open-ended question.  I

17  need a little more.

18         MR. CANNICK:  I guess, Your Honor, what's going on

19  is that we want to call her to just elicit testimony about

20  this party that Jerhonda testified about going to and what

21  happened when she got to the party.  We're only calling her

22  for that purpose, and if it's a situation where I think the

23  Government has interviewed her, and I know that interview they

24  got some hearsay information from her, and we just want to

25  make sure that the Court is alerted to it that she doesn't

1   have any firsthand knowledge of the relationship between Kelly

2   and Jerhonda, and we don't want the -- we just want to flag

3   the fact that the Government may try to bring out information

4   that's hearsay about a relationship.

5           MS. GEDDES:  I have no intention --

6           MR. CANNICK:  Okay.

7           MS. GEDDES:  -- of bringing out hearsay.

8           MR. SCHOLAR:  Of the relationship?

9           THE COURT:  She's not bringing out any -- I mean, I

10  know what --

11          MR. CANNICK:  We will just jump up and say hearsay.

12          THE COURT:  I think I know what hearsay is, so I'm

13  not too concerned about being able to identify it.  I'm just

14  trying to figure out what you want me to do, because it sounds

15  to me -- and I don't know anything about this witness -- it

16  sounds to me like you want to make sure that she only

17  testifies about the part that you want her to testify about

18  and you don't want the Government to ask her any other

19  questions.

20          MR. CANNICK:  Any other questions about hearsay.  As

21  long as she's --

22          THE COURT:  Don't ask hearsay.

23          MS. GEDDES:  Done.

24          THE COURT:  All right.  Is that it?

25          MR. SCHOLAR:  That's it.  Thank you.

*Sidebar*                                                                4068

1                  Is there anybody after that?

2                  MR. SCHOLAR:  That was the last one.

3                  THE COURT:  Okay.  So it's fine.

4                  What's our universe of witnesses for tomorrow?

5                  MR. SCHOLAR:  We may have three witnesses.  It would

6       be possibly an accountant, a studio engineer, and a -- one of

7       the Perryman, P-E-R-R-Y-M-A-N.

8                  MR. CANNICK:  The twins as well.

9                  MR. SCHOLAR:  And the twins.  That should get us

10      through the morning, and I have a question -- I have a CJA

11      interview with Southern District tomorrow.  They moved it from

12      10:00 to 4:15, and I was wondering if you would be able to --

13                 THE COURT:  I hardly ever say no, but what I really

14      want to know, for everyone's sake, is when we're going to be

15      done.

16                 MR. SCHOLAR:  I think we'll be done Wednesday --

17      Wednesday morning, I think we'll be finished with witnesses.

18                 THE COURT:  Okay.  And are you anticipating calling

19      the defendant, or you don't know yet?

20                 MR. CANNICK:  Right now we don't think we are, but

21      we -- you know, it could change.

22                 THE COURT:  Here's my concern.  I mean, in any case

23      that goes on for a long time, I'm always concerned about

24      keeping the jury together.  I'm obviously especially concerned

25      about it in these unprecedented times, and I also want to keep

*Sidebar*                                                                4069

1    everything moving.  So it sounds like we're not going to have

2    a full day tomorrow, but we can -- I mean, I can give you -- I

3    hope I can give you the charge.  I don't think there's a whole

4    lot of dispute about the charge.  I could be missing

5    something, but -- and then I know, you know, which happens in

6    every single trial ever, that everybody wants to sum up on the

7    same day, and if we can do that, we will.  But if we can't,

8    we're not.  I just don't want to give an afternoon off, and

9    then charge on Friday, it's late, if I don't have to.  I want

10   to use our time as wisely as I can.

11          That being said, I'm really trying to give you some

12   leeway here on your case, you know, in terms of filling up the

13   day, and I will do that, but I really want to get this case to

14   the jury this week if we can do it.

15          MR. CANNICK:  Your Honor, might I make a suggestion?

16          THE COURT:  Of course.

17          MR. CANNICK:  And I haven't discussed this with the

18   investigator who is lining these witnesses up, nor have I

19   discussed it with Mr. Scholar, but maybe we could bring all of

20   our witnesses in on Wednesday and then sum up on Thursday.

21          THE COURT:  And what's happening tomorrow?

22          MR. CANNICK:  Tomorrow, get all of them lined up;

23   ███████████████████████████████████████

24       ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████



*Sidebar* 4070

24   MR. CANNICK:  We have witnesses coming in.

25   THE COURT:  Okay.

*Sidebar*                                                              4071

1          MR. CANNICK:  It's just that I was thinking that for

2     efficiency sake, we could call them all on one day.

3          THE COURT:  But who knows what's going to happen.

4     So none of them can come this afternoon, I take it.

5          MR. CANNICK:  No.  They are out of state.  Chicago,

6     LA, and Florida.

7          THE COURT:  Okay.

8          MR. SCHOLAR:  That's part of the problem with the

9     funds and trying to line them up, and having to volunteer,

10    maybe, not getting reimbursed.

11         MR. CANNICK:  Especially last-minute airfares.

12         THE COURT:  Are you anticipating having a rebuttal

13    case?

14         MS. GEDDES:  Not so far, but I don't know -- I mean,

15    having not seen a single piece of 3500 material, I have no

16    idea what they're going to say, so...

17         THE COURT:  All right.

18         MR. CANNICK:  I haven't either.

19         MS. GEDDES:  Wait.  I'm sorry, just one other thing.

20    So what time do you think you will finish on Wednesday?  Do

21    you think it will just be the morning?

22         MR. CANNICK:  Probably just the morning, but he

23    would know better than I.

24         MR. SCHOLAR:  Probably the morning.

25         MS. GEDDES:  So when would I sum up?  On Wednesday

1   afternoon?

2            THE COURT:  I think so, yes.

3            MS. GEDDES:  Okay.

4            THE COURT:  Believe it or not, I once was a trial

5   lawyer.  Everybody wants to have their schedule fit just

6   perfectly, it rarely ever does, but I'm also obviously aware

7   of how unfun it is to be summing up at 4:45, you know,

8   watching people yawn at you -- of course that never happened

9   to me -- so I am aware of that, but I really want to make good

10  use of our time, so we'll see how far we can get.

11           I won't do what Judge Johnson does, which is ask in

12  front of the jury how long your summation will be.

13           MR. CANNICK:  Do you anticipate your statement all

14  of Wednesday afternoon?

15           MS. GEDDES:  Yes.

16           MR. CANNICK:  Okay.

17           MS. GEDDES:  I mean, I think it will be about three

18  hours.

19           THE COURT:  Yes, and then you can come up the next

20  day, and then they can do their rebuttal summation, and then

21  we'll charge hopefully in the afternoon --

22           MR. CANNICK:  In the afternoon.

23           THE COURT:  -- and then, at some point, I guess -- I

24  haven't gone over every single word of the charge, which I

25  would like to do, so maybe -- is that going to be your

1   bailiwick?

2          MR. SCHOLAR:  Yes.

3          THE COURT:  All right.  So let me see what I can

4   accomplish over lunch just so the larger issues we have

5   resolved, and then what I will try to do is get it to you --

6   we'll get it done today.  I'm looking at the smarter person in

7   the group.  All right.

8          MS. GEDDES:  Do you want a -- I assume you probably

9   know this already, but do you want a list to identify the Jane

10  Does with the names that they testified in trial since the

11  jury obviously doesn't know their Jane Doe number?  I think in

12  the indictment, it lists a Jane Doe number, and we should

13  probably substitute the actual name that they testified --

14         THE COURT:  In the indictment?

15         MS. GEDDES:  In the jury charge where we repeat the

16  indictment.  Like where it says --

17         THE COURT:  We can, except I give the charge in open

18  court.

19         MS. GEDDES:  Oh, no.  I meant the pseudonyms that

20  they went under.

21         THE COURT:  The pseudonyms, all right.  That makes

22  sense.

23         Just, parenthetically, there was a request to fix

24  some very mechanical -- there's a wrong citation or something

25  in the charge.  You don't have any problem with fixing that?

1            MR. SCHOLAR:  No.

2            THE COURT:  I'm trying to think if there's any other

3    ministerial part of that.

4            Oh, and just in terms of -- it's my practice --

5    well, the jury will be in -- I keep forgetting -- they will be

6    in Judge DeArcy Hall's courtroom, and if they want to review

7    video evidence, I want them to be able to do it in there.  I

8    don't like to bring jurors back in to do that because I think

9    it inhibits their ability to discuss it, so I'm assuming there

10   will be a method to do that.

11           MS. GEDDES:  We have been talking about it and

12   trying to identify one, but we agree that that would be the

13   most prudent way to do it.

14           THE COURT:  We usually do it -- and maybe the other

15   much smarter person in this courtroom can remind me what we

16   do, because we always do that, so --

17           MS. GEDDES:  Great.

18           THE COURT:  All right.

19           MR. CANNICK:  Two o'clock?

20           THE COURT:  Two o'clock.

21           (Sidebar conference ends.)

22           (Continued on following page.)

23

24

25

*Proceedings*                                                    4075

1          (In open court.)

2          THE COURT:  Okay.  We've just been talking about

3     scheduling, and just given what I've been told about when

4     people are available, we'll have a little bit of downtime,

5     which is perfectly fine.  I guess we'll probably finish a

6     little bit early today, and then tomorrow there are witnesses

7     through lunch, you think?

8          MR. SCHOLAR:  I believe so, Judge, yes.

9          THE COURT:  Okay.  And then perhaps because of the

10    afternoon, maybe it makes sense to -- to the extent there's

11    really anything to discuss about the charge, we can discuss

12    it, you know, maybe, like, from 1:00 to 2:00, then we'll be

13    done for the rest of the day?  Does that make sense?

14         MR. CANNICK:  Yes.

15         THE COURT:  What I plan to do is incorporate all of

16    the things that you agree on.  I don't think there's a lot of

17    dispute about the charge, but I hope to get that to you at the

18    end of the day today so you can review it and let me know if

19    there are changes to be made.

20              One thing that we also discussed was just apparently

21    a ministerial fix to the indictment in terms of the language

22    to be used, as well as substituting the pseudonyms that were

23    used for the various witnesses for that Jane Doe

24    identification in the indictment.  It sounds like nobody has a

25    problem with that.

1           MR. SCHOLAR:  Correct.

2           THE COURT:  Okay.

3           Anything else that we need to put on the record?

4  Oh, and I just need to make -- Mr. Scholar, I know you have a

5  lot on your plate, but I do just need to make a ruling on that

6  about that prior inconsistent statement with regard to

7  Mr. Smith, and I think he was shown the testimony; correct?

8           MS. CRUZ MELENDEZ:  He was, on multiple occasions.

9           THE COURT:  All right.  So we'll try to resolve that

10 as quickly as we can.

11           Anything else that we need to put on the record?

12           Okay.  Have a good lunch.

13           (A recess in the proceedings was taken.)

Proceedings                                                    4077

1                        AFTERNOON SESSION

2              (In open court; jury not present.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Everybody can have a seat.

5              (Defendant present.)

6              THE COURT:  Okay, we are ready to continue.  I

7    understand you had a little hang up with your witnesses.

8              MR. SCHOLAR:  Yes, Your Honor, during the lunch

9    break we were able to speak to our investigator and he has to

10   do a little more investigation with respect to that third

11   witness.  We may still call her, but we are not in a position

12   to call her today.

13             THE COURT:  I see.  Is it a very long witness?

14             MR. SCHOLAR:  No, she is not a very long witness.

15             THE COURT:  This is the one we discussed?

16             MR. SCHOLAR:  Yes, Judge.

17             THE COURT:  I see.  Is that a person who is local?

18             MR. SCHOLAR:  Judge, she's not, but we are working

19   diligently trying to find funds to pay for lodging and travel

20   as well.

21             THE COURT:  All right.  Is there anything else that

22   we can accomplish this afternoon?  I guess we really -- you're

23   reserving on your motions; right?

24             MR. SCHOLAR:  I am, Your Honor.

25             THE COURT:  I guess we will excuse the jury early

Proceedings                                    4078

1    then.

2              Anything from the Government?

3              MS. GEDDES:  Just that we again request a list of

4    the witnesses that the defense intends to call Wednesday.

5              THE COURT:  Didn't we already resolve that?

6              MS. GEDDES:  I don't think we know for Wednesday and

7    I think we also haven't received pedigree information for the

8    witnesses from Friday night so that we can identify some of

9    them.

10             MR. CANNICK:  I was just speaking with the

11   investigator and he is waiting for me and I will go back and

12   make sure that we send whatever pedigree information we have

13   for the witnesses and also confirm who is on tomorrow and then

14   whose -- confirm for Wednesday, and if not confirm, at least

15   we will send their information as well.

16             THE COURT:  All right.  I know that you had a couple

17   of people on reserve that you were thinking about.  If you can

18   turn those over too, I don't think there is any reason not to.

19             MR. CANNICK:  Yes.

20             THE COURT:  That's what I want you to do.  All

21   right.  Let's get the jurors.

22             THE COURTROOM DEPUTY:  All rise.

23             (The jury enters the courtroom.)

24             THE COURTROOM DEPUTY:  You may be seated.

25             THE COURT:  All right.  Good afternoon, everybody.

Proceedings                                    4079

1    It turns out that the witness we were expecting this afternoon

2    isn't able to be called.  It doesn't really change our

3    schedule too much.  But what that means is you have the

4    afternoon off.  So I don't know if that's good news or bad

5    news, but it isn't derailing our schedule at all.

6              So we are going to continue tomorrow.  Tomorrow will

7    also be on the short side.  It will probably be just the

8    morning again.  This doesn't derail our plans.  I expect to

9    give you the case by the end of the week, probably on

10   Thursday.  But that's subject to a little change, so I don't

11   want to over promise.  But I do want to assure you that this

12   is not going to take us off schedule.

13             So I am going to excuse you for the day.  I will see

14   you tomorrow.  Please don't look up anything about the case,

15   talk about the case at all.  As I think I told you when you

16   were selected, these rules about not discussing it and not

17   looking it up are going to go right until the very end of the

18   case, right until you deliberate and reach a verdict.  That is

19   a reminder.

20             I hope you have a good rest of the day and I will

21   see you tomorrow.  Thank you very much.

22             THE COURTROOM DEPUTY:  All rise.

23             (Jury exits the courtroom.)

24             THE COURT:  All right.  Everybody can be seated.

25             So, just to review the outstanding things that I

Michele Lucchese, Official Court Reporter

Proceedings                                    4080

1    need to decide.  I think the only question that I have to

2    decide is whether or not that prior inconsistent statement

3    comes into evidence and you are going to give me a response on

4    that, right, Mr. Scholar?

5              MR. SCHOLAR:  Yes, Your Honor.

6              THE COURT:  What's the other thing?

7              MS. CRUZ MELENDEZ:  I just wanted to clarify.  I

8    believe on Saturday defense submitted a motion to dismiss

9    racketeering act one.  The Government responded yesterday with

10   respect to that and also provided additional supplemental jury

11   charge.

12             THE COURT:  Right.  I saw that.  That seemed to be a

13   little bit premature because all the evidence wasn't in.  Do

14   you want to supplement that motion to dismiss the racketeering

15   act one?

16             MR. SCHOLAR:  Judge, it was more so to illustrate

17   the jury charge as opposed to a formal motion to dismiss.

18             THE COURT:  Okay.  So it's not a motion to dismiss?

19             MR. SCHOLAR:  No, that will be included in the

20   motion we're making.

21             THE COURT:  Okay.  Until I get that, I will assume

22   there is no motion to dismiss now.  Obviously you've reserved,

23   so we will hear from you on that.

24             So we will get you the charge I hope later this

25   afternoon.  What I would like to do, as we said before, is

Proceedings                                    4081

1    tomorrow to go over it.  I don't mean go over it in court.

2    What I want you to do is go over it and then tell me if there

3    is anything that you want to have added.  I think that's the

4    most efficient way to do it, or anything that you want to have

5    added or that I have left out or something that you want to

6    take out, anything like that.

7              Anything else?

8              MS. GEDDES:  Just briefly, with respect to the

9    recordings, I think Your Honor has now ruled that we can

10   provide the audio with the redactions that we discussed at

11   sidebar, as well as the victims' names.

12             THE COURT:  Yes.

13             MS. GEDDES:  So we will start to do that.

14             And then I think there is an outstanding motion with

15   respect to the defendant's medical records and whether those

16   can be provided.

17             THE COURT:  That's right.  If someone can show me a

18   copy of what's actually in evidence.

19             I take Mr. Scholar's point as a general matter about

20   -- I don't know that HIPAA applies, but I think that's usually

21   directed to the doctor, but it is evidence in the case about

22   which there was testimony from the physician, and so, with

23   appropriate redactions, things that aren't relevant, social

24   security numbers, and things like that need to come out.  But

25   I believe the doctor testified using the medical records, so

Michele Lucchese, Official Court Reporter

Proceedings                                      4082

1    that can also go out with appropriate redactions.

2              MS. GEDDES:  All right.  So Government Exhibit 237,

3    which are the medical records, it doesn't contain any

4    personally identifiable information with respect to social

5    security numbers or anything like that and has already been

6    redacted.  So I think that, based on what Your Honor is

7    saying, can now go to the outlet who requested it.

8              THE COURT:  Why don't I just take a quick look at

9    it.

10             Do you have a copy of it, Mr. Scholar?

11             MR. SCHOLAR:  What exhibit is it?

12             MS. GEDDES:  237.

13             MR. CANNICK:  Your Honor, as Mr. Scholar looked

14   through the medical records, I'm just thinking that maybe,

15   given the Court's ruling, that the only thing that should be

16   released is that portion that is germane to the testimony that

17   was received and not his full medical history, his whole

18   medical history is not relevant to --

19             THE COURT:  Well, it's not really in there.  There

20   are huge portions that are redacted.  The only thing that is

21   in there has to do with what the testimony was.

22             I want to see the parties at the side with the court

23   reporter about one aspect which is not particularly exciting,

24   but I want to know whether it needs to be in there.

25             (Sidebar held; continues on next page.)

```
                         Sidebar                      4083
```

 1          (Sidebar conference held on the record out of the

 2     hearing of the jury.)

 3          THE COURT:  The only thing that I have a question

 4     about is, and maybe this is more about me than anything else,

 5     it has his height and weight.  Do we need that?

 6          MR. SCHOLAR:  I would say no.

 7          THE COURT:  I don't see why it matters.  ████████

 8     ██████████████████████████████████████████████████

 9     ████████████████████████████████████████████████████

10          MS. SHIHATA:  We can redact that.  That's fine.  The

11     only part that was relevant about it, the change to the EMR

12     system, electronic medical records.

13          THE COURT:  There was testimony --

14          MR. SCHOLAR:  Yes.

15          THE COURT:  There was testimony about that?

16          MS. SHIHATA:  That's why that part was left

17     unredacted.

18          THE COURT:  I think to be extra careful, I think we

19     can have that to ask to come in to register since office

20     changed to EMR, that will stay in, what comes afterwards.

21          MS. SHIHATA:  Do you mind if I dog ear the page?

22          THE COURT:  Not at all.  Just that second part,

23     which, again, is not particularly exciting, but it is also not

24     very relevant.

25          We can go back on the record.

```
                          Sidebar                    4084

1              Do we seal this part?  It doesn't reveal what the

2    information is.

3                   MR. CANNICK:  I don't think so.

4                   THE COURT:  I don't think we have to seal it.

5

6                   (End of sidebar conference.)

7                   (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                                          4085

1          (In open court - jury not present.)

2          THE COURT:  The record should just reflect that I

3   have gone through the exhibit, which contains medical records,

4   but I think it is fair to say that a majority of the pages

5   have huge redacted sections, which relates to information

6   about which the doctor did not testify.

7          I've also directed the Government to remove one

8   section that, again, there is nothing particularly noteworthy

9   about it except that it doesn't pertain to the case except a

10  portion that references the chain to the electronic medical

11  records.  So everything else is really what the doctor

12  testified to.

13         If there's something else that I have missed in

14  those records, you can let me know the jury won't -- well,

15  you're going to release them.  Just double-check to make sure

16  there is nothing else other than those things that we have

17  discussed and then I think they're in shape to release to

18  whichever outlet requested them.

19         All right.  Anything else?

20         MR. SCHOLAR:  No, Your Honor.

21         THE COURT:  All right.

22         I know that your investigator has been coordinating

23  with witnesses and all of that.  He's testifying, isn't he?

24  Maybe?

25         MR. SCHOLAR:  If he does, Judge, it would be

Proceedings                                    4086

1    testifying about -- if he testifies, it would be just about

2    doing investigative tasks, maybe looking at locations.

3                THE COURT:  It is a general rule that we don't have

4    -- witnesses aren't listening to the testimony, so I guess he

5    has been in the overflow room; is that correct?

6                MR. SCHOLAR:  That's correct, Judge.

7                THE COURT:  Under these circumstances, I'm not sure

8    that there is anything so terrible.

9                I mean, your investigator is also here in court and

10   testified.  You don't have any objection, do you?

11               MS. GEDDES:  I don't have any objection.  But to the

12   extent that the investigator is going to testify about

13   photographs, we would like copies of any photographs that he

14   is going to be testifying about.  And I'm not sure what

15   investigative tactics the defense investigator could testify

16   about that would not amount to either being irrelevant or

17   hearsay.  So we would ask to the extent that that is going to

18   be the subject of testimony that the defense make a proffer as

19   to what tactics he intends to discuss.

20               THE COURT:  Well, I take everybody at their word

21   that they are going to have relevant testimony to offer.

22               I'm assuming that he took pictures of buildings and

23   measured things.

24               MR. SCHOLAR:  Judge, if he has anything that's

25   irrelevant or improper, I wouldn't call him, Judge.

Michele Lucchese, Official Court Reporter

Proceedings                                        4087

1           THE COURT:  I don't generally make people do

2    proffers unless there is some reason to think that the person

3    has nothing of value to say.

4           MS. GEDDES:  I'm sure he could have something of

5    value to say, and to the extent that there are photos, I could

6    imagine the relevance of that.

7           I just don't know what tactics a defense

8    investigator could testify about that -- if we are talking

9    about investigative steps and he is producing materials that

10   he obtained as part of his investigation, then I assume we

11   would be provided with those materials and we would understand

12   the relevance just from that.

13          If these are investigative tactics that did not

14   result in tangible materials, I just don't understand what the

15   relevance of that would be.  But perhaps that's not the

16   subject of his testimony.

17          THE COURT:  I guess we will find out.

18          Which day do you think he is going to testify, if he

19   testifies?

20          MR. SCHOLAR:  If he testifies, we would save him

21   probably to the end just to evaluate whether he was needed or

22   not.

23          THE COURT:  All right.  So that would be Wednesday,

24   you think?

25          MR. SCHOLAR:  Possibly, yes.

Proceedings                                    4088

1           THE COURT:  Anything else?

2           MS. GEDDES:  No, Your Honor.

3           MR. SCHOLAR:  No, Judge.

4           THE COURT:  Thank you so much.

5           (Matter adjourned to September 21, 2021 at 9:30

6   a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4089

I N D E X

**WITNESS**                                          **PAGE**

**DAWN HUGHES**

    CROSS-EXAMINATION BY MR. CANNICK          3976

**DHANAI RAMNARAN**

    DIRECT EXAMINATION BY MR. SCHOLAR         3990

    CROSS EXAMINATION BY MS. CRUZ MELENDEZ    4010

**LARRY HOOD**

    DIRECT EXAMINATION BY MR. SCHOLAR         4038

    CROSS-EXAMINATION BY MS. SHIHATA          4051


E X H I B I T S


 Government's Exhibits 407, 965-E, 830,

 922-A, 922-B, 933, 703, 1018, 831, 832, and

 948-A                                             3986