3749

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,     :    19-CR-286(AMD)

       Plaintiff,         :

    -against-               :    United States Courthouse
                       Brooklyn, New York

ROBERT SYLVESTER KELLY,        :
                       September 17, 2021
       Defendant.        :    9:30 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:


For the Government:          JACQUELYN M. KASULIS
                             Acting United States Attorney
                             BY: ELIZABETH GEDDES
                                 NADIA SHIHATA
                                 MARIA E. CRUZ MELENDEZ
                             Assistant United States Attorneys
                             271 Cadman Plaza East
                             Brooklyn, New York


For the Defendant:           DEVEREAUX L. CANNICK, ESQ.
                             NICOLE BLANK BECKER, ESQ.
                             THOMAS FARINELLA, ESQ.
                             CALVIN HAROLD SCHOLAR, ESQ.


Court Reporter:              Andronikh M. Barna
                             225 Cadman Plaza East
                             Brooklyn, New York
                             (718) 613- 2178

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

```
                      Proceedings                      3750
```

 1          (In open court; jury not present.)

 2          (Parties present.)

 3          THE CLERK:  All rise.

 4          THE COURT:  Everybody can sit down.

 5          All right.  Anything before we get started?

 6          MR. CANNICK:  Yes, Your Honor.  May we approach

 7   briefly?

 8          THE COURT:  Yes.  Do you want the court reporter?

 9   Might as well.

10          Is it scheduling or is it...

11          MR. CANNICK:  A little of both.

12          THE COURT:  Let's get the court reporter then.

13          (Sidebar.)

14          (Continuing on the following page.)

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                    3751
```

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel.)

3          MR. CANNICK:  I'll deal with the legal stuff first.

4          Your Honor it's my understanding the government is

5    going to call a witness this morning, Cheryl Mack.  Based on

6    the 302 it seems as though much of her testimony would be

7    hearsay.

8          And there's also going to be a reference to a

9    settlement agreement --

10          MS. GEDDES:  Do you mind holding on a second so I

11    could get my colleague who is putting on Ms. Mack?

12          (Pause.)

13          MR. CANNICK:  It's my understanding that the

14    government is going to call a witness this morning, Cheryl

15    Mack.  Based on my review of the 302, it seems as though much

16    of her testimony is going to call for hearsay testimony.

17          MS. SHIHATA:  I'm not.

18          THE COURT:  Just tell me who she is.

19          MS. SHIHATA:  She knew the defendant in two

20    different periods of time, one when she was a talent manager,

21    including a singer named Precious in the 2015-2019 period

22    initially with Devyne Stevens and became executive -- then

23    became his executive assistant.  I'm not planning to elicit

24    hearsay.  The statements I am going to elicit regarding

25    Precious and any claims she may have had against the defendant

Sidebar                                      3752

1   will be from what the defendant told her about that and what

2   -- and then the defendant's lawyer asked her to sign an

3   affidavit regarding that.  So that's where I am going to

4   elicit those things.

5                THE COURT:  Okay.

6                MR. CANNICK:  Okay.

7                MS. SHIHATA:  And I am purposely asking this way so

8   not to elicit hearsay.  I may ask her, do you speak to --

9   without telling me what she said -- did you speak to Precious

10  and then that did you have a conversation with the defendant.

11  I am not planning to go into hearsay.

12               MR. CANNICK:  Okay.

13               THE COURT:  Excellent.

14               Was there something else?

15               MR. CANNICK:  The other thing is that it's my

16  understanding that they plan on introducing a settlement

17  agreement between Mr. Kelly, Precious and Precious's mom, and

18  I don't see how they could get that in without --

19               MS. SHIHATA:  Well, there will be testimony about --

20  claimed from what the defendant and the lawyer -- defendant's

21  lawyer said to her about claims that Precious made.  And I can

22  tell you, it's not going to be very detailed.  The settlement

23  agreement is a business record maintained and it corroborates

24  the testimony, so I do think the law firm that had it.

25               THE COURT:  The settlement record, I mean.

```
                          Sidebar                      3753
```

1          MR. CANNICK:  Do you have any certification from

2   that?

3          MS. SHIHATA:  We do.

4          MR. CANNICK:  Okay, then I'm fine.

5          Just in terms of scheduling, we will be prepared,

6   Your Honor, for the charge conference Monday afternoon.

7          THE COURT:  Okay.  Do you have additional requests

8   to the charge you want to give me?

9          MR. CANNICK:  I think so.

10          THE COURT:  You are putting on a case?

11          MR. CANNICK:  Yes.

12          THE COURT:  So what I usually do is, I get the

13   request to charge.  We have already got a draft of the charge

14   now, but I would like to get the request charge, give it to

15   the parties and then have the --

16          MR. CANNICK:  Okay.

17          MS. SHIHATA:  Your Honor asked for us to give any

18   additional ones by some point today.

19          THE COURT:  That was my request.

20          MR. CANNICK:  We don't have the manpower.

21          THE COURT:  So do you have an idea of how many

22   witnesses you will be calling?  It will just help me figure

23   out.  I am thinking of the charge conference, we can do it

24   later on Monday.  I am not sure -- well, let's see.  I mean, I

25   have requested initially and I cannot remember if you were on

Sidebar                                                    3754

1   the team at this point.  I think you were, but brand new.  I

2   had asked the parties to submit a request to charge before we

3   started.

4            MR. CANNICK:  Yes, yes, I was on.

5            THE COURT:  And I do not think I incorporated all of

6   your requests.

7            MR. CANNICK:  I only had one and you rejected it.

8            You know, Judge Kaplan loves it; that's where I got

9   that charge from.

10           THE COURT:  He is a fine man.

11           MR. CANNICK:  I think if Kaplan finds it good

12  enough, I don't understand why judges consistently refuse to

13  tell jurors about something important.

14           THE COURT:  That is Southern District.  They are

15  much loftier than we are.

16           MR. CANNICK:  Oh, okay.

17           THE COURT:  But I do not know how much additional

18  you will have.  Obviously, there will be some instructions

19  about how to consider various things that have come in and I

20  will take both of your input on that, on just the -- how the

21  jury is to evaluate various kinds of evidence that came in.  I

22  am not sure that a whole lot has changed.  I mean, I had stuck

23  an instruction in there about, you know, witness prep, which I

24  may have had already, about witnesses having lawyers.

25           MS. SHIHATA:  So I think actually those were the two

Sidebar                                                3755

1   different ones we were planning to submit on.  It sounds like

2   you covered it, so...

3                THE COURT:  I have a very smart law clerk.

4                MS. SHIHATA:  I'm absolutely certain of that.

5                MR. CANNICK:  I think we will finish earlier today

6   because my cross won't be --

7                THE COURT:  Okay.  Are you doing both of them?

8                MR. CANNICK:  Yes.

9                And then are you anticipating -- what my request

10  would be regarding summation is that we do it all on one day.

11  I think it would be unfair, the case with all this evidence,

12  to have the people give theirs.  I mean, the government give

13  theirs, I give mine, and then they have overnight to do

14  rebuttal.

15               THE COURT:  Well let's see what happens.  I would

16  like to do that, but I also am very cognizant of the fact that

17  this jury has been sitting for quite some time, and so the

18  other thing I am concerned about, which is always in the back

19  of my mind, is I do get concerned about COVID.  And so it is

20  in everybody's interest to get it moving as quickly as

21  possible.

22               You know, perhaps I might have said this once

23  myself.  As a lawyer, they always think that there is a big

24  advantage about, you know, jurors thinking about something

25  overnight or whatever.  I do not happen to think that is such

Sidebar                            3756

1   a big deal.

2           MS. SHIHATA:  I will just say, I am doing the

3   rebuttal.  I actually prefer to go right after.  What I will

4   say, if it's 5:00, I don't want to be limited.  So if we can

5   start and conclude it the next day, I'm fine with that, but I

6   don't want to be limited to --

7           THE COURT:  Why don't we drive down this bridge when

8   we come to it.

9           MR. CANNICK:  Okay.  And I'm just trying to think

10  exactly when we finish today.  I would just like to run and

11  get home and just jump in the bed and shower later on.

12          THE COURT:  I have nothing to say about that.

13          (Sidebar ends.)

14          (Continuing on the following page.)

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                          3757

1          THE COURT:  All right.  Why don't we get the

2   witness.

3          MS. SHIHATA:  Our next witness is Cheryl Mack.

4          THE COURT:  Okay.

5          MS. GEDDES:  Your Honor, before we call the witness,

6   I was just going to read a couple of stipulations and enter

7   some exhibits.

8          THE COURT:  Sure.  And just with the stipulations, I

9   do not think you have to read the beginning and the end and

10  all that.

11         MS. GEDDES:  I got it.

12         THE COURT:  As great as that stuff --

13         MS. GEDDES:  Your Honor, could we just address

14  one -- we can actually do it out loud.  We don't need sidebar.

15         MS. SHIHATA:  Your Honor, since we're doing

16  stipulations, can we wait to bring the witness in?

17         THE COURT:  Yes.

18         MS. GEDDES:  So, Your Honor, as we discussed at the

19  end -- I guess it wasn't last week but what feels like it, but

20  the end of Wednesday, the government wanted to elicit just a

21  few quick questions from Special Agent Chabot about a 2017

22  BuzzFeed article and Your Honor urged us to reach a

23  stipulation.  I believe we had reached a stipulation; there's

24  just one dispute.  The government wants to include in this

25  stipulation that the article itself included not just

Proceedings                              3758

1   allegations by the parents of Jane, but also allegations by

2   the parents of Joy to help explain why the defendant then

3   engaged in, you know, various tactics to attack his

4   girlfriends' parents, and they engaged in that sort of

5   letter-writing campaign where there were, you know, numerous

6   allegations, in the government's view false allegations,

7   against those parents.  It's my understanding that -- and I

8   don't speak for defense counsel, but I think defense counsel

9   is fine with the inclusion of Jane but has an issue with

10  including Joy.

11          THE COURT:  Just correct me if I am wrong, but I

12  thought the letters were directed to a different witness's

13  parents?

14          MS. GEDDES:  There were -- the letters addressed

15  actually each, Jane, Anna and also Joy's parents.  And all of

16  those letters are in evidence, as well as Dominique.

17          THE COURT:  Can I just see the stipulation you have

18  reached and then maybe --

19          MR. CANNICK:  Your Honor, just so you know --

20          THE COURT:  Microphone, just so I can hear you.

21          MR. CANNICK:  Just so that you know, our objection

22  to the stipulation is just only the portion that deals with

23  the parents of Joy.

24          THE COURT:  Right.

25          MR. CANNICK:  We don't have an objection to Jane's

```
                        Proceedings                    3759
```

1    parents.

2            THE COURT:  Sorry?

3            MR. CANNICK:  Jane.

4            THE COURT:  Oh, I see what you are talking about.

5    Why don't you just say Jane's parents and others?

6            MR. CANNICK:  That's fine with us.

7            MS. GEDDES:  Yes.

8            THE COURT:  All right.

9            MS. GEDDES:  Can I say another girlfriend and other

10   girlfriends?

11           THE COURT:  Jane's parents, as well as if it is just

12   one other -- the parents of another girlfriend.

13           MR. CANNICK:  Yes, yes.

14           THE COURT:  All right.  I feel like that was such an

15   accomplishment.

16           MR. CANNICK:  It was.

17           THE COURT:  And so you want to read the stipulations

18   before we call the witness in?

19           MS. GEDDES:  Yes.

20           THE COURT:  Probably makes more sense than having

21   the person just sitting there.

22           So if we are ready for the jury, let's do that.

23           THE CLERK:  All rise.

24           (Jury enters the courtroom.)

25           THE CLERK:  You may be seated.

Proceedings                          3760

1           THE COURT:  Good morning, everybody.

2           THE JURY:  Good morning.

3           THE COURT:  We are ready to resume.  I think the

4    government has a few stipulations and then they will call the

5    witness.

6           Go ahead.

7           MS. GEDDES:  Thank you.

8           The government offers the following exhibits.  I

9    don't believe there is any objection from defense counsel as

10   to these.

11          410, 410(a), 411, 411(a), 641, 645, 913(a), 914(a),

12   950, 965(a), 948(b) and (c), 400, 162, 974, 233(g), (h), (n),

13   (q), (r), (s) and (t), 342(b) and (c), 329(b), 328(b), 702 and

14   then 932.

15          And then there are three stips that we are offering

16   right now, 1015, 1016 and 1017, as well as any exhibits that

17   are referenced in the stipulations.

18          And then I would like to read some of the now

19   admitted -- some of these stips were previously entered.

20          Your Honor, all of those exhibits are entered into

21   evidence.

22          THE COURT:  Oh, sorry, I guess I assumed -- are you

23   stipulating to them?  It does not matter, they are in.  Okay.

24          (Government's Exhibits 410, 410(a), 411, 411(a),

25   641, 645, 913(a), 914(a), 950, 965(a), 948(b) and (c), 400,

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                          3761

1  162, 974, 233(g), (h), (n), (q), (r), (s) and (t), 342(b) and

2  (c), 329(b), 328(b), 702, 932, 1015, 1016, 1017 were received

3  in evidence.)

4            MS. GEDDES:  Just one moment.

5            All right.  And if called as a witness -- and this

6  is Government Exhibit 1006.  If called as a witness at trial,

7  a representative of DuPont Teijin Films would testify as

8  follows:  A component part of all VHS tapes is polyester film.

9  DuPont and its successor entities, including DTF, which is

10 DuPont Teijin Films, manufactured polyester film, including

11 mylar, that was a component of VHS tapes in and before 1999.

12 Neither DuPont nor its successor entities had any plants used

13 to manufacturer polyester film in the state of Illinois.

14 While in and before 1999 there were entities, in addition to

15 DuPont and its successor entities that manufactured the

16 polyester film used in all VHS tapes, all of those entities

17 were located outside the state of Illinois and manufactured

18 polyester film outside the state of Illinois.

19            Then also if called as a witness at trial, a

20 representative of Cannon would testify that Cannon camcorders

21 manufactured between 1997 and 2010, including Cannon XL 1S

22 MiniDV digital video cassettes, were manufactured with

23 components and materials from outside the state of Illinois,

24 including components and materials from outside the

25 United States.

Proceedings                      3762

1        And Government Exhibit 1001 is a stipulation that

2   includes, if called as a witness at trial, Emiguela Paci would

3   testify as follows.  Paci is an assistant manager of the

4   Sheraton Suites Chicago O'Hare, a hotel located at 6501 North

5   Mannheim Road, Rosemont, Illinois.  A Sheraton hotel has been

6   located at that address since in or before 1994.

7        Government Exhibit 1015 includes the following.  If

8   called as a witness at trial, David Fish, Esquire would

9   testify as follows.  David Fish obtained a cellular telephone

10  and a t-shirt, which t-shirt he identified as Government

11  Exhibit 241, hereinafter the t-shirt, from the Loggans Law

12  Firm in Chicago, Illinois on or about June 10, 2013.  The Fish

13  Law Firm maintained the cellular telephone and t-shirt until

14  November 17, 2017, when it returned both items to Ms. Pace.

15       If called as a witness at trial, Detective Donald

16  Dean with the Olympia Fields Police Department would testify

17  as follows.  On November 18, 2017, Ms. Pace provided a

18  cellular telephone and a t-shirt, which he identified as

19  Government Exhibit 241, to the Olympia Fields Police

20  Department.  The Olympia Fields Police Department maintained

21  the cellular telephone and t-shirt until February 13th of

22  2019, when it provided the cellular telephone and t-shirt to

23  Anna Doyle, an investigator at the Cook County State's

24  Attorney's Office.

25       If called as a witness at trial, Investigator Anna

Proceedings                              3763

1    Doyle would testify as follows.  On February 13, 2019,

2    Investigator Anna Doyle with the Cook County State's

3    Attorney's Office provided a t-shirt, which she identified as

4    Government Exhibit 241, to the Illinois State Police --

5              THE COURT:  Slow down a little bit.

6              MS. GEDDES:  Sorry.

7              THE COURT:  That is all right.

8              MS. GEDDES:  -- the Illinois State Police Division

9    of Forensic Sciences.

10             Government Exhibit 1016, another stipulation,

11   includes the following.  Government Exhibit 902 is an excerpt

12   from the video with a title card stating:  "R. Kelly:  Born

13   into the '90s Docugroove, length 57:50.  First air date

14   May 5th, 1993.  Executive producer:  Billy Woodruff; Producer:

15   Andrea J. Smith; Editor:  Tracy Branson."  The video from

16   Government Exhibit 902 is -- I'm sorry.  The video from which

17   Government Exhibit 902 was excerpted first aired on the BET

18   Network on May 5th of 1993.

19             And finally, Government Exhibit 1017 is a

20   stipulation that includes in July 2017, BuzzFeed published an

21   article describing allegations against the defendant, Robert

22   Sylvester Kelly, which allegations had been lodged by the

23   parents of an individual who testified in this trial as Jane

24   and the parents of another of the defendant's girlfriends.

25             Your Honor, there is one other exhibit which I think

Proceedings                                    3764

1   we are going to make some additional redactions to and we will

2   enter that after the next witness.

3              THE COURT:  All right.

4              MR. CANNICK:  Your Honor, there is one item that

5   we --

6              THE COURT:  Can I just ask you to speak into the

7   microphone.

8              MR. CANNICK:  There's one item that we stipulated

9   to, I think the 702.  In reviewing it, I realized that there

10  is some extraneous notes on it.  We're not stipulating to

11  those notes, we're just stipulating to the document itself.

12             MS. GEDDES:  That's fine.  We can redact the notes.

13             MR. CANNICK:  Okay.

14             THE COURT:  Okay.  Other than that, are we ready to

15  go?

16             All right.  Why don't you call your next witness.

17             MS. SHIHATA:  The government calls Cheryl Mack.

18             (Witness enters the room.)

19             THE CLERK:  Please stand and raise your right hand.

20             Do you solemnly swear or affirm that the testimony

21  you're about to give will be truth, the whole truth and

22  nothing but the truth?

23             THE WITNESS:  Yes.

24             (Witness sworn.)

25             THE CLERK:  Thank you.  You may be seated.

Proceedings                          3765

1          THE COURT:  Okay.  Just before we begin, I just want

2    to give you a couple of guidelines for testimony.

3          First, you can take your mask off so we can hear you

4    better because we have got the Plexiglass there.

5          The first thing is, let's move the microphone a

6    little bit closer to you.  If it is easier, you can actually

7    take the microphone off the stand.  I think some people find

8    it easier to speak into it that way, but it is entirely up to

9    you.

10          So I do want to make sure the jurors can hear you

11    and I want to make sure the court reporter gets down what you

12    have to say, so please do not speak too quickly and do not

13    speak over whichever lawyer is asking you questions.  If a

14    lawyer does ask you a question that is not clear or you need

15    to have repeated, just let me know, and I will have them

16    straighten it out.

17          And just do your best to answer only the question

18    you are being asked.  Okay?

19          THE WITNESS:  Okay.

20          THE COURT:  Okay.  Go ahead.

21          I do not think your microphone is on though, so just

22    tap the end of it.

23          Oh, maybe it is.  Great.  All right.

24          Yes, okay, go ahead.

25          MS. SHIHATA:  Thank you, Your Honor.

Mack - Direct - Shihata                    3766

1  **CHERYL MACK,** having been first duly sworn, was examined and

2  testified as follows:

3  DIRECT EXAMINATION

4  BY MS. SHIHATA:

5  Q    Did you receive a subpoena to testify here today?

6  A    Yes.

7  Q    Do you want to be here today?

8  A    No.

9  Q    How far did you go in school?

10  A    College.

11  Q    And after college -- well first, what type of degree did

12  you receive in college?

13  A    Business management.

14  Q    And after college, did you work in corporate jobs for a

15  period of time?

16  A    I did.  I worked in corporate America, yes.

17  Q    And at some point did you start working professionally in

18  talent management?

19  A    Yes.

20  Q    Around when was that?

21  A    The latter part of 1998, '99.

22  Q    And what type of work did you do in talent management?

23  A    I scout talent.  I manage talent, pretty much.

24  Q    And when you started to work in talent management, did

25  you form your own company?

1   A    Yes.

2   Q    And did you start to work with various clients, artists

3   in the entertainment industry?

4   A    Yes.

5   Q    I'm showing you what is in evidence as Government

6   Exhibit 1.

7           Do you recognize this person?

8           If you look, there is a screen in front of you.

9           THE COURT:  I do not think --

10          MS. SHIHATA:  It's in evidence.

11          THE COURT:  It is in evidence, okay.

12          THE CLERK:  Why isn't the screen working?

13          (Pause.)

14  BY MS. SHIHATA:

15  Q    All right.  Do you see something on your screen?

16  A    No.

17          MR. CANNICK:  Your Honor, our screens are off.

18          THE COURT:  There we go.

19          MR. CANNICK:  Okay, now I see.

20  Q    Now do you see it?

21  A    Yes.

22  Q    Do you recognize the person in Government Exhibit 1?

23  A    Yes.

24  Q    Who is that?

25  A    Robert Kelly.

Mack - Direct - Shihata                3768

1  Q    And have you met Robert Kelly in person?

2  A    Yes.

3  Q    Do you see Robert Kelly in the courtroom here today?

4  A    Yes.

5  Q    Can you please identify him by an item of clothing he's

6  wearing?

7  A    Black jacket.

8        THE COURT:  Well, a couple of people there have a

9  black jacket.

10 Q    Can you point him out?

11 A    The second from the right.

12       THE COURT:  Indicating the defendant.

13       MS. SHIHATA:  Thank you.

14 Q    Around when did you first meet the defendant?

15 A    Around 2005.

16 Q    And were you working as a talent manager at that time?

17 A    Yes.

18 Q    And what city were you in when you first met him?

19 A    Nashville, Tennessee.

20 Q    Did you meet him -- in 2005, did you attend the Video

21 Music -- or did you attend events surrounding the Video Music

22 Awards, MTV Video Music Awards in Miami?

23 A    Yes.

24 Q    And did you meet him there or did you meet him sometime

25 prior to that?

1    A    There.

2    Q    Okay.  And was that in 2005?

3    A    Yes.

4    Q    And do you recall around when in 2005 this was?

5    A    It was August.  It was the weekend of Hurricane Katrina.

6    Q    And how was it that you ended up meeting the defendant in

7    August 2005 in Miami?

8    A    I was in a restaurant with my artist at the time and

9    there was a gentleman that came over to the table that we were

10   sitting at, said we looked pretty important, asked what we do,

11   what we were doing.  I explained that I was a manager, I had

12   my talent there.  He said, oh, pretty interesting, can she

13   really sing?  I said yes.  He said, I would like to introduce

14   you to somebody.

15   Q    And who was the singer that was with you at that time?

16   A    Sheri Hauck.

17   Q    And after that what happened?

18   A    After that he left.  And he came back to the table and he

19   said are you guys ready, and we said yes.  And he walked us

20   back to the table.  It was a table in the back.  And that is

21   where he introduced myself and my artist to Mr. Kelly.

22   Q    And after you were introduced to the defendant, what

23   happened?

24   A    So after that she sang for him.  He asked if she could

25   sing a song for him; she did.  She did amazing.  He asked her

Mack - Direct - Shihata                    3770

1  to do another song and she did; she did an amazing job.  And

2  he asked her to do a third one; she did, and again amazing.

3  Q    And when you say "he," are you referring to the

4  defendant?

5  A    That is correct.

6  Q    And the person who was singing was your client, Sheri?

7  A    Yes.

8  Q    During that encounter with the defendant, did the

9  defendant -- did you exchange contact information with the

10 defendant?

11 A    Yes.

12 Q    And what, if anything, did the defendant tell you about

13 calling him?

14 A    He said -- first he said let me help you, I see what

15 you're trying to do.  He gave me his number and said to keep

16 calling; if you don't get me, just keep trying until I answer.

17 Q    And did you understand that he -- well, what, if

18 anything, did he say about your client's singing?

19 A    He said she was amazing.

20 Q    And after you -- after that day, did you, in fact, call

21 the defendant?

22 A    Yes.

23 Q    And did you discuss your client Sheri with him over the

24 phone?

25 A    He had already met Sheri, so it was brief.  We discussed

Mack - Direct - Shihata                    3771

1    her coming to Chicago in the studio.

2    Q    Whose studio?

3    A    Mr. Kelly's.

4    Q    And did you and Sheri, in fact, travel to Chicago to go

5    to the defendant's studio?

6    A    Yes.

7    Q    And do you recall where it was that you met -- that you

8    first met with the defendant in the Chicago area?

9    A    Olympia Fields.

10   Q    I am showing you what's in evidence as Government

11   Exhibits 502(a) and 502(c).

12         Do you recognize these photos?

13   A    Yes.

14   Q    And what are these photos of?

15   A    The Olympia Fields home.

16   Q    And is that where the studio you went to was located?

17   A    Yes.

18   Q    Now, after you and Sheri met the defendant at his Olympia

19   Fields studio in the home, did the defendant end up working

20   with Sheri?

21   A    Yes.

22   Q    And what type of work was that?

23   A    She collaborated with him on a song for his album.

24   Q    Now, at a certain period of time, did Sheri stop working

25   with the defendant?

1   A     Yes.

2   Q     And after she stopped working with the defendant, did you

3   introduce the defendant to other artists?

4   A     After a time, a period of time, yes.

5         MS. SHIHATA:  I'm showing the witness only what's

6   been marked for identification as Government Exhibit 71.

7   Q     Without saying this person's name, do you know this

8   person?

9   A     Yes.

10  Q     And do you know this person's first -- true first and

11  last name?

12  A     Yes.

13        MS. SHIHATA:  I move to admit Government Exhibit 71.

14        THE COURT:  Any objection?

15        MR. CANNICK:  No objection.

16        THE COURT:  Okay.  That is in evidence.

17        (Government Exhibit 71 was received in evidence.)

18        MS. SHIHATA:  And may we publish it?

19        THE COURT:  Yes.

20        MS. SHIHATA:  Now I'm showing the witness only

21  what's been marked for identification as Government

22  Exhibit 71(a).

23  Q     Is this the same photo that I just showed you in

24  Government Exhibit 71 with this individual's true first and

25  last name?

Mack - Direct - Shihata                    3773

1    A    Yes.

2           MS. SHIHATA:  I move to admit Government's Exhibit

3    71(a).

4           THE COURT:  Any objection?

5           MR. CANNICK:  No objection.

6           THE COURT:  Okay.  That is in evidence.

7           (Government's Exhibit 71(a) was received in

8    evidence.)

9           MS. SHIHATA:  And I would ask to publish it to the

10   jury only, please.

11          THE COURT:  Okay.

12   Q    And for purposes of your testimony here today, we are

13   going to refer to this individual as Precious.  Okay?

14   A    Okay.

15          MS. SHIHATA:  I'm showing the witness only what's

16   been marked for identification as Government's Exhibit 71(b).

17   Q    Is this the same photo in the two exhibits I just showed

18   you with the name Precious written underneath?

19   A    Yes.

20          MS. SHIHATA:  I move to admit Government's Exhibit

21   71(b).

22          MR. CANNICK:  No objection.

23          THE COURT:  Okay.  Those are in evidence.

24          (Government's Exhibit 71(b) was received in

25   evidence.)

Mack - Direct - Shihata                     3774

1    Q    Now, at some point were you Precious's talent manager?

2    A    Yes.

3    Q    What kind of artist was Precious?

4    A    She was R&B with a little hip-hop.  She was a rapper and

5    a singer.  She did both.

6    Q    And around when did you begin managing Precious?

7    A    2009.

8    Q    How old was Precious when you began managing her?

9    A    Seventeen.

10   Q    And what city were you in when you first met Precious?

11   A    Atlanta.

12   Q    And when you first met Precious, who, if anyone, was she

13   with?

14   A    Her mother.

15   Q    Now, after you met Precious, what if any discussions with

16   -- did you have with the defendant about Precious?

17   A    I had a discussion with him about her talent.  She was

18   talented, would you be interested in meeting her.

19   Q    That's what you asked the defendant?

20   A    Mm-hm.  She was an artist on the rise.

21   Q    And how, if at all, did the defendant respond?

22   A    He agreed.

23   Q    And where did he agree to -- well, did you discuss where

24   the defendant would meet Precious?

25   A    Studio.

Mack - Direct - Shihata                    3775

1   Q     Which studio?

2   A     In Olympia Fields.

3   Q     After that conversation, did you -- who, if anyone, did

4   you travel to Olympia Fields with to meet with the defendant?

5   A     Precious and her mother.

6   Q     And was this when Precious was still seventeen?

7   A     Yes.

8   Q     And you testified that you, Precious and her mother went

9   to Olympia Fields to see the defendant; is that right?

10  A     Yes.

11  Q     And when you went to Olympia Fields to visit with the

12  defendant, was there any identification check for any of you

13  when you went into the Olympia Fields property?

14  A     No.

15  Q     Now, what happened after -- well, did you -- what

16  happened when you met with the defendant, Precious and her --

17  when you, Precious and her mother met with the defendant in

18  Olympia Fields?

19  A     So she showcased her music for him.  And we went into the

20  studio and started listening to more music, the three of us.

21  Q     At any point during -- what, if anything, did the

22  defendant agree to do regarding Precious at that meeting?

23  A     He did agree to work with her.  He thought she was

24  talented enough, yes.

25  Q     And what, if anything, did the defendant say to you,

Mack - Direct - Shihata                    3776

1    Precious and her mom about the use of his studios by Precious?

2    A    He did agree to let us use one of the studios at Olympia

3    Fields and we probably started to work a couple of months

4    after that.

5    Q    And when you, Precious and her mother traveled to Olympia

6    Fields, where did the three of you travel from?

7    A    Atlanta.

8    Q    And is that where you were living at the time?

9    A    Yes.

10   Q    And at the time of your travel for that first meeting

11   between Precious and the defendant in Olympia Fields, where

12   were Precious and her mother living at that time?

13   A    They were living in Atlanta at the time.

14   Q    And at some point did Precious begin working out of the

15   defendant's residence in Olympia Fields from a studio there?

16   A    Yes.

17   Q    And by the way, where was -- Precious and her mother,

18   where were they originally from?

19   A    Chicago.

20   Q    And at some point did -- well, when Precious began

21   working out of the studio in Olympia Fields, where, if

22   anywhere, did she stay?

23   A    At a hotel.

24   Q    A hotel where?

25   A    In -- probably two miles from the studio.

Mack - direct - Shihata                    3777

1    Q     From the Olympia Fields studio?

2    A     Yes.

3    Q     And who paid for the hotel Precious stayed in?

4    A     I believe Mr. McDavid.

5    Q     And do you know Mr. McDavid's full name?

6    A     Derrel McDavid.

7    Q     And what, if any, connection to the defendant did Derrel

8    McDavid have at that time?

9    A     His manager.

10   Q     Now, you testified earlier that Precious and her mom were

11   living in Atlanta when you met them and when you initially

12   went to meet -- to introduce Precious to the defendant in

13   Olympia Fields, correct?

14   A     Correct.

15              (Continuing on the following page.)

16

17

18

19

20

21

22

23

24

25

Mack - direct - Shihata                    3778

1    BY MS. SHIHATA:   (Continuing.)

2    Q    And you also testified she and her mother were originally

3    from Chicago; correct?

4    A    Correct.

5    Q    At some point did Precious's mom move back to Chicago?

6    A    Yes.

7    Q    And was this while Precious was working with the

8    defendant at his studios?

9    A    Yes.

10   Q    And when that happened, did Precious remain staying at

11   the hotel near the Olympia Fields residence?

12   A    Yes.

13   Q    Now, you indicated you were based in Atlanta at the time;

14   correct?

15   A    Correct.

16   Q    And did you continue to manage Precious while she was

17   working at the Olympia Field studio?

18   A    Yes.

19   Q    And how was it that you would do that from Atlanta?

20   A    I would come in and out of the city.  I didn't stay

21   there.

22   Q    So you would travel from Atlanta?

23   A    I would travel from Atlanta to Chicago in and out of the

24   city.

25   Q    And when you traveled in and out of Chicago, did you go

1   to the defendant's Olympia Fields residence?

2   A    Yes.

3   Q    I'm showing you what's in evidence as Government Exhibit

4   72.  Without saying this person's name do you recognize this

5   person?

6              (Exhibit published to witness only.)

7   A    Yes.

8   Q    And have you met this person?

9   A    Yes.

10  Q    And do you know this person's first and last name?

11  A    Yes.

12             MS. SHIHATA:  I am showing the witness and the jury

13  only what's been marked for identification -- what's in

14  evidence as Government Exhibit 72(a).  Jury only.

15             (Exhibit published to jury only.)

16  BY MS. SHIHATA:

17  Q    Is this the same photo I just showed you with this

18  individual's true first and last name?

19  A    Yes.

20  Q    And did this individual go by the nickname Vee?

21  A    Yes.

22  Q    I am showing you what's been marked for identification as

23  Government Exhibit 72(b).  Is this the same photo as I just

24  showed you with the nickname Vee underneath?

25  A    Yes.

1          MS. SHIHATA:  I move to admit Government Exhibit

2     72(b).

3          MR. CANNICK:  No objection.

4          THE COURT:  That is in evidence.

5          (Government Exhibit 72(b) received in evidence.)

6          MS. SHIHATA:  And may we publish it, please?

7          THE COURT:  Yes.

8          (Exhibit published.)

9     BY MS. SHIHATA:

10    Q    And for the purposes of your testimony here today we will

11    refer to this person as Vee, okay?

12    A    Okay.

13    Q    And how do you know Vee?

14    A    I met Vee in Atlanta.  We were looking for songwriters

15    for Precious's project.  I interviewed about three or four.

16    She was a pretty on-the-rise songwriter there.  She had

17    placements already.  I met her.  She was amazing and I figured

18    she would be great for the project.

19    Q    And when you say Precious's project what are you

20    referring to?

21    A    We were working in the studio on Precious's album, her

22    project.

23    Q    And which Studios?

24    A    Olympia Fields.

25    Q    The defendant's studios?

Mack - direct - Shihata                    3781

1    A    Yes.

2    Q    And after you met Vee did you hire her -- what did you do

3    after you met Vee?

4    A    After I met her, she sent probably about 16 songs.  They

5    were all good and I shared a little bit about, you know, her

6    music, her songwriting ability with Mr. Kelly.  She came, flew

7    out, and she and Precious met and they started writing

8    together immediately.

9    Q    And when you say she came, did Vee come from Atlanta to

10   Chicago?

11   A    She flew from Atlanta to Chicago, yes.

12   Q    And how old was Vee at the time that you -- that she

13   began working with Precious as a songwriter?

14   A    19.

15   Q    And after -- well, after you have hired V, where if

16   anywhere did she move to?

17   A    Chicago.

18   Q    And where did she stay in Chicago?

19   A    Initially she was at the same hotel, I believe.

20   Q    The same hotel as who?

21   A    As Precious initially.  And at a later time she was

22   living, I believe, at Olympia Fields or the studio.  I'm not

23   sure exactly.

24           MR. CANNICK:  I'm going to ask that if she's not

25   sure that it be stricken.

SN        OCR        RPR

Mack - direct - Shihata                    3782

1        THE COURT:  You don't know where she was living?

2        THE WITNESS:  Not initially.

3   Q    I think you testified initially that she was at the

4   hotel; is that right?

5   A    Initially she was at the hotel.  But permanently --

6   initially she was at the same hotel as Precious.

7        THE COURT:  Are you aware of when she moved

8   someplace else?

9        THE WITNESS:  At one point in time she actually

10  moved to one of the studios, I believe.

11       THE COURT:  All right.

12       THE WITNESS:  Yes.

13  BY MS. SHIHATA:

14  Q    Now, you testified earlier that Precious was working on a

15  project or album while at Olympia Fields; is that right?

16  A    Yes.

17  Q    At some point did you learn that Precious stopped working

18  with the defendant and at his studio?

19  A    Yes.

20  Q    And as her manager were you involved in that decision?

21  A    No.

22  Q    Was it an abrupt decision?

23  A    Yes.

24  Q    And without telling me or telling us what specifically

25  you learned, did you speak to Precious about her having

Mack - direct - Shihata                    3783

1   left -- her having stopped working with the defendant?

2   A    At some point, yes.

3   Q    And after speaking -- at some point after speaking with

4   Precious, did you speak with the defendant about the fact that

5   Precious had left?

6   A    Yes.

7   Q    And was -- was that initially over the phone?

8   A    Yes.

9   Q    And what do you recall about that conversation with the

10  defendant?

11  A    It was -- it was all of a sudden.  He told me that I

12  needed to come to Chicago.  When she left it was just

13  everything happened so fast.  He told me that she was trying

14  to file a lawsuit and I needed to pick a team.

15  Q    Now, you testified that he told you you needed to come to

16  Chicago; is that right?

17  A    Yes, that's correct.

18  Q    And where were you at that time when you got that phone

19  call?

20  A    Atlanta.

21  Q    And did you, in fact, shortly thereafter fly from Atlanta

22  to Chicago?

23  A    Yes.

24  Q    And where did you go after arriving in Chicago?

25  A    To Olympia Fields; to the studio.

1   Q    What happened when you got to Olympia Fields?

2   A    So, when I got there, we talked about what could possibly

3   be going on with Precious and -- could you repeat it?

4   Q    When you say "we talked" who is the "we" in that

5   sentence?

6   A    Mr. Kelly and I.

7   Q    And what did Mr. Kelly tell you at that time?

8   A    Well, he explained to me that Precious had filed a

9   lawsuit and it was right around him going to the World Cup.

10  It was important.  He told me, again, that I needed to pick a

11  team and generally in these types of situations people come up

12  missing.

13  Q    That's what the defendant told you, that people come up

14  missing?

15  A    Yes.

16  Q    And he said that to you after you said you needed to pick

17  a team?

18  A    Yes.

19  Q    And what did you understand him to mean by you needed to

20  pick a team?

21  A    Meaning either team Precious or team Mr. Kelly.

22  Q    Did the defendant say anything to you about what the

23  potential lawsuit was about?

24  A    Something along the lines of sexual harassment.

25  Q    You said that this was around the time that the defendant

1    was going to go to the World Cup?

2    A    Yes.

3    Q    And are you talking about the international FIFA Soccer

4    World Cup?

5    A    Yes.

6    Q    And was the defendant scheduled to perform at the World

7    Cup that year?

8    A    Yes.

9    Q    Now, when you first started the conversation with the

10   defendant, do you recall where in the Olympia Fields residence

11   you were?

12   A    We started the conversation in the studio.

13   Q    And at a certain point did the conversation with the

14   defendant move from the studio to another location?

15   A    To the pool area.

16   Q    And is that an indoor pool area?

17   A    Yes.

18   Q    And how did that move come about, if you recall?

19   A    I don't -- we just -- I don't recall.

20   Q    Now, when the defendant told you to pick a team and told

21   you that people go missing in these circumstances, what did

22   you understand the defendant to mean when he said that to you?

23   A    I don't recall.

24   Q    How did you take that statement?

25   A    I took it as a threat.

Mack - direct - Shihata                3786

1   Q    After that happened or how if at all did that

2   conversation end?

3   A    So, after that at some point, Mr. Arnold -- you know, we

4   go back inside and I went up to the pool area, there was a

5   pool table area and it's late and at some point Mr. Arnold

6   comes, knocks at the door and tells me to come downstairs and

7   I get in a car and we drive downtown at this point.

8   Q    So let me stop you for a moment.  You said you went to an

9   area -- after the conversation with the defendant you went to

10  an area in the Olympia Fields residence with a pool table; is

11  that right?

12  A    Yes.

13  Q    And what did you go there -- or who if anyone suggested

14  that you go there?

15  A    Mr. Kelly.

16  Q    And what, if anything, did he suggest did you do there?

17  A    Well, I believe he was working so just wait there and it

18  was late and then Tom came in.

19  Q    And about how long after your conversation with the

20  defendant did Tom come in?

21  A    It was a few hours.  It wasn't right away.  It was a few

22  hours.

23  Q    And you mentioned a Tom and a Mr. Arnold.  Are those the

24  same people that you're referring to?

25  A    Yes.

Mack - direct - Shihata                3787

1   Q    I'm showing you what's in evidence as Government Exhibit
2   31.
3           (Exhibit published.)
4   BY MS. SHIHATA:
5   Q    Do you recognize this person?
6   A    Yes.
7   Q    Who is that?
8   A    Tom -- Tom Arnold.
9   Q    And that's the person that --
10  A    Yes.
11  Q    -- came after a couple of hours after you talked to the
12  defendant?
13  A    Yes.
14  Q    Is that a yes?
15  A    Yes.
16  Q    Who is Tom Arnold to the defendant at that time?
17  A    I understood him to be his assistant.
18  Q    And you testified -- well, what, if anything, did Tom
19  Arnold say to you when he came to the room?
20  A    He basically said that --
21           MR. CANNICK:  Objection.
22           THE COURT:  Sustained.
23  BY MS. SHIHATA:
24  Q    Where, if anywhere, did you go after Tom Arnold came to
25  the room?

Mack - direct - Shihata                    3788

1   A    I went to the car that was parked and he drove me

2   downtown.

3   Q    And who is the "he"?

4   A    Mr. Arnold.

5   Q    And when you got into the car, did you know where you

6   were going specifically or for what purpose?

7   A    Nope.

8   Q    And where did Tom Arnold take you?

9   A    To Mr. Ed Genson's office downtown.

10  Q    Downtown Chicago?

11  A    Yes.

12  Q    And what happened after you arrived at the building where

13  that office was located?

14  A    So, when we arrived at the building, Mr. Arnold got me

15  out of the car.  We opened the car, pushed an elevator door

16  and up to the floor and Mr. Genson greeted me on the floor.

17  Q    After you got out of the elevator?

18  A    After I got out of the elevator.

19  Q    And who did you understand Ed Genson to be?

20  A    Mr. Kelly's lawyer.

21  Q    After he greeted you where if anywhere did you go in that

22  office?

23  A    We went to his office.

24  Q    Mr. Genson's office?

25  A    That's correct.

SN        OCR        RPR

Mack - direct - Shihata                3789

1  Q    And what happened in Mr. Genson's office?

2  A    Well, he explained that there was a lawsuit on the table

3  and he asked me several questions and --

4  Q    Did he reference who this lawsuit or potential lawsuit

5  pertained to?

6  A    Yes.

7  Q    And who was that?

8  A    Precious.

9  Q    And while you were in Mr. Genson's office did he present

10 you with any documents?

11 A    Yes.

12 Q    What document did he present you with?

13 A    It was some form of an affidavit.

14 Q    And was it already written when you entered the office?

15 A    Yes.

16 Q    And what, if anything, did he ask you to do with respect

17 to that document?

18 A    There were about four, maybe five questions.  They were

19 yes or no.  He asked me to sign it.

20 Q    Were the questions already answered when he asked you to

21 sign it?

22 A    No.

23 Q    What do you recall about -- well, did you read the

24 affidavit before you signed it?

25 A    No.

SN      OCR      RPR

1    Q    Did you read any part of it before you signed it?

2    A    Maybe a couple of the questions, yes.

3    Q    And do you recall anything about what was in the

4    document?

5    A    The couple of questions that I do recall reading were did

6    I ever see Mr. Kelly give her alcohol or did I ever see them

7    perform sex.

8    Q    And when you say "her," are you referring to Precious?

9    A    Yes.

10   Q    And when you say "them," are you referring to the

11   defendant and Precious?

12   A    Yes.

13   Q    Now, was this a typed document?

14   A    It was typed, yes.

15   Q    And I think you testified that these were yes or no

16   questions?

17   A    Yes.

18   Q    Did you write anything on the document other than signing

19   it?

20   A    No.

21   Q    Okay.  So were the questions already answered?

22   A    They weren't already answered, no.  They were already

23   typed.

24   Q    Okay.  But you did not provide answers to the questions?

25   A    I don't recall.

1          THE COURT:  I am still unclear about the affidavit.
2     When you say there were yes or no questions, was it a
3     situation that you would check in the yes or no box or circle
4     a yes or no?  Do you recall?
5          THE WITNESS:  I don't recall.  It was circle yes.
6     The question would be, did you see Mr. Kelly give her alcohol,
7     yes or no.
8          THE COURT:  Okay.  And, so if a person were filling
9     that out, the person would circle one of those two answers; is
10    that right?
11         THE WITNESS:  Correct.
12         THE COURT:  Did you -- do you recall if you ever
13    circled any of the answers?
14         THE WITNESS:  I don't recall, but -- I don't recall.
15         THE COURT:  Okay.
16         THE WITNESS:  One way or the other, I don't recall.
17    BY MS. SHIHATA:
18    Q    Now, did you sign the document?
19    A    I did.
20    Q    And did you, when you left Mr. Genson's office that day,
21    did you have a copy of the document with you?
22    A    No.
23    Q    And -- and where if anywhere did you go after signing the
24    affidavit and leaving Mr. Genson's office that day?
25    A    To the airport.

1    Q    And where did you go from there?

2    A    Back to Atlanta.

3    Q    And did you speak with -- well, did a period of time pass

4    after that when you did not have communication with either

5    Precious or the defendant?

6    A    Yes.

7    Q    Now, without telling me what you learned, at some point

8    did you later learn that Precious's legal claims against the

9    defendant were resolved in some way?

10   A    Yes.

11   Q    Now, I want to direct your attention to approximately

12   2013.  Was this now several years after the incident after the

13   events you described in Mr. Genson's office.

14   A    Yes.

15   Q    And in approximately 2013, did you reconnect with the

16   defendant sometime during that year?

17   A    Yes.

18   Q    And what were you doing for work at the time?

19   A    I was an executive assistant for Devyne Stevens.

20   Q    And who was Devyne Stevens, what type of work did he do?

21   A    He's a music mogul, entertainment manager/producer in

22   Atlanta.

23   Q    And you testified you were -- Mr. Stevens' executive

24   assistant?

25   A    Yes.

1    Q    And were you on his payroll at that time?

2    A    Yes.

3    Q    And what, if anything -- well, withdrawn.

4         How was it that you ended up reconnecting with the

5    defendant sometime in 2013?

6    A    Devyne and I were having a discussion about doing

7    something different and Devyne thought Robert would be a --

8    I'm sorry, Mr. Kelly, would be a perfect candidate.  He felt

9    like we could really get him off of the bench, his exact

10   words.

11   Q    What do you mean get him off of the bench?

12   A    Meaning that he wasn't as active as normal.

13   Q    Mean in the music business?

14   A    In the music business, yes.

15   Q    And at some point -- well, who if anyone -- after you and

16   Devyne have that -- Mr. Stevens have that conversation, who if

17   anyone or how did you go about on you -- how if at all did you

18   reach out to the defendant?

19   A    There was a mutual contact that Devyne and Mr. Kelly knew

20   and they met at his home and we were all there.  They hit it

21   off and we went to work.

22   Q    And after that, what type of work did you -- did Devyne

23   Stevens and with you as his executive assistant what type of

24   work did you do with respect to the defendant?

25   A    I don't understand the question.

1    Q     I will rephrase it.

2          So, you testified that there was a meeting at a

3    mutual -- at a house of a mutual friend of Mr. Stevens and the

4    defendant?

5    A     Yes.

6    Q     And that they hit it off there; is that right?

7    A     Yes.

8    Q     And after -- and at that meeting or after that meeting,

9    did you and -- did Mr. Stevens and you begin working with the

10   defendant?

11   A     Yes.

12   Q     And in what capacity -- what type of work was Mr. Stevens

13   doing with the defendant at that time?

14   A     Management.

15   Q     And you were also working on that as Mr. Stevens'

16   executive assistant?

17   A     That's correct, yes.

18   Q     And during that course of time, what types of things did

19   you and Mr. Stevens work on?

20   A     So, we worked on touring, putting together a tour for

21   Mr. Kelly.  We worked on an album for Mr. Kelly and that's

22   kind of how we started.

23   Q     And what, if any, use of Mr. Stevens' home did the

24   defendant have at that time?

25   A     Mr. Stevens built a studio in his home specifically for

1   Mr. Kelly.

2   Q    And did the defendant use that studio?

3   A    Yes.

4   Q    Did Mr. Stevens' home also have a basketball court?

5   A    Yes.

6   Q    And did the defendant use that basketball court?

7   A    Yes.

8   Q    Now, at some point did you transition from being on

9   Mr. Stevens' payroll as his executive assistant to working

10  exclusively for the defendant?

11  A    Yes.

12  Q    And in what capacity did you work for the defendant?

13  A    I don't understand the question.

14  Q    What kind of work did you do for the defendant after you

15  stopped being on Mr. Stevens' payroll?

16  A    So, I managed his calendar.  I worked on all of the

17  projects alongside Mr. Stevens.  We did -- again, we worked on

18  the album.  We worked on -- with songwriters.  We did -- we

19  put together tours.  I was right there alongside Devyne

20  working just as aggressive as he was.

21  Q    Now what if any role did Mr. Stevens have with respect to

22  hiring any staff for the defendant?

23  A    So we were challenged with getting a lawyer.  Mr. Kelly

24  wanted a new lawyer based in Chicago.  We hired a stylist and

25  that was immediate.

Mack - direct - Shihata                    3796

1    Q    I'm showing you what's in evidence as Government Exhibit

2    44?

3            (Exhibit published.)

4    BY MS. SHIHATA:

5    Q    Do you recognize this person?

6    A    Yes.

7    Q    And who is that?

8    A    Linda Mensch.

9    Q    Who is Linda Mensch?

10   A    She was Mr. Kelly's lawyer at the time.

11   Q    Is that the lawyer that you and Mr. Stevens helped to

12   hire?

13   A    Yes.

14   Q    And was she -- what type of a lawyer was she?

15   A    Entertainment lawyer.

16   Q    Did Linda Mensch, did she hire any staff for the

17   defendant?

18   A    Yes.

19   Q    Who did she hire?

20   A    She hired a bookkeeper.

21   Q    What was the bookkeeper's name?

22   A    Joan Sullivan.

23   Q    I'm showing you what's in evidence as Government Exhibit

24   37.

25           (Exhibit published.)

Mack - direct - Shihata                3797

1   BY MS. SHIHATA:

2   Q    Do you recognize this person?

3   A    Yes.

4   Q    Who is that?

5   A    Joan Sullivan.

6   Q    The bookkeeper?

7   A    Yes.

8   Q    And you mentioned you hired -- you and Mr. Stevens helped

9   to hire a stylist; is that right?

10  A    Yes.

11  Q    Who was the stylist you hired?

12  A    Kash Howard.

13  Q    I'm showing you what's in evidence as Government Exhibit

14  86.

15             (Exhibit published.)

16  BY MS. SHIHATA:

17  Q    Do you recognize this person?

18  A    Yes.

19  Q    And who is that?

20  A    Kash Howard.

21  Q    The stylist?

22  A    Yes.

23  Q    And you mentioned Joan Sullivan, the bookkeeper.  What if

24  any role -- what was Joan Sullivan's role?  What was she hired

25  to do?

SN        OCR        RPR

Mack - direct - Shihata                          3798

1   A    She was hired to oversee the books, oversee most of the

2   financials.  She worked very close with Linda so I don't know

3   exactly what her role was, but it started as a bookkeeper.

4   Q    After the attorney Linda Mensch came on board, what if

5   any company was created?

6   A    RSK Enterprises.

7   Q    And what does RSK stand for?

8   A    Robert Sylvester Kelly Enterprises.

9   Q    And around when was RSK Enterprises created?

10  A    Mid -- early 2014.

11  Q    And prior to the creation of RSK Enterprises are you

12  aware of any other companies that the defendant was associated

13  with?

14  A    Bass Productions.

15  Q    Bass Productions?

16  A    Bass Productions, sorry.

17  Q    To your knowledge what, if any, involvement did Derrel

18  McDavid in Bass Productions?

19  A    I don't recall.

20  Q    Now, when you and Mr. Stevens began working with the

21  defendant in 2013, what if any role did Derrel McDavid have at

22  that time?

23  A    I don't believe he was actively involved.

24  Q    What, if anything, did the defendant say to you regarding

25  his relationship with Derrel McDavid at that time?

1   A    We didn't discuss Mr. McDavid.

2   Q    Now, after you began working, you and Mr. Stevens, began

3   working with the defendant at some point in 2013 what, if

4   anything, changed about the defendant's living situation after

5   you began working with him?

6   A    He eventually moved to Atlanta.

7   Q    And initially where was the defendant staying in Atlanta?

8   A    Hotels.

9   Q    And did that change at some point?

10  A    Yes.

11  Q    How did that change?

12  A    So Devyne and I thought the hotel expenses were just

13  astronomical with that much of a team.  So most -- there

14  was -- part-time he was at Devyne's place and there were a

15  couple of condos in Atlanta and ultimately a home there.

16  Q    And did the defendant lease or buy the home there, if you

17  know?

18  A    Lease.

19  Q    And do you recall where that home was located?

20  A    It was in Duluth, Georgia.

21  Q    Do you recall the address or the street?

22  A    405 Old Homestead Road.

23  Q    And you mentioned that the hotel bills were what you

24  called -- what you testified what you believed were

25  astronomical when he was initially -- when the defendant was

1  initially staying at hotels in Atlanta; is that right?

2  A    Yes.

3  Q    And I think you said something about the number of people

4  that were traveling with him; is that right?

5  A    Correct.

6  Q    Who if anyone traveled with the defendant when he came to

7  Atlanta?  And I should say that to the extent you mention any

8  girlfriends, please just use first names.

9  A    His uncle, June Bug, June Brown.  I believe his nephew,

10 Van.  Another one I can't remember the name, security.

11 Q    And did any assistants travel with the defendant that you

12 recall?

13 A    There was Michelle Adams, Diana, I can't remember her

14 last name.

15 Q    All right.  So starting with -- I'm showing you --

16 starting with Government Exhibit 3, do you recognize this

17 person?

18         (Exhibit published.)

19 A    Yes.

20 Q    And who is that?

21 A    June Brown.

22 Q    And what if any role did -- and I think you just

23 testified that that was one of the people that traveled with

24 the defendant?

25 A    Yes; correct.

Mack - direct - Shihata                3801

1   Q    And what, if any, role did June Brown have?

2   A    He was Mr. Kelly's assistant.

3   Q    I'm showing you what's in evidence as Government Exhibit

4   4.  Do you recognize this person?

5            (Exhibit published.)

6   A    Yes.

7   Q    Who is that?

8   A    June Bug.

9   Q    And do you know June Bug's real name?

10  A    I don't.

11  Q    And what if any role did June Bug have with the

12  defendant?

13  A    I believe he was an assistant.

14  Q    And I think you also testified earlier was he also the

15  defendant's uncle?

16  A    That's correct, yes.

17  Q    I'm showing you what's in evidence as Government Exhibit

18  5.  Do you recognize this person?

19           (Exhibit published.)

20  A    Yes.

21  Q    And who is that?

22  A    Van.

23  Q    And what if any role did Van have with the defendant?

24  A    I don't know exactly what his role was.

25  Q    And I think you testified earlier that Van was the

1   defendant's nephew; is that right?

2   A    Yes.

3   Q    I'm showing you what's in evidence as Government Exhibit

4   36.

5            (Exhibit published.)

6   Q    Do you recognize this person?

7   A    Yes.

8   Q    And who is that?

9   A    Diana.

10  Q    And what if any role did Diana have with respect to the

11  defendant?

12  A    Personal assistant or house assistant.

13  Q    Now apart from employees and family members, did the

14  defendant -- did any women travel with the defendant to

15  Atlanta as well?

16  A    Yes.

17  Q    And I'm going to show you a few photographs.

18           (Exhibit published.)

19  Q    I'm showing you what's in evidence as Government Exhibit

20  69(b).  Without saying is the name of this person, do you

21  recognize this person?

22  A    Yes.

23  Q    Do you know her full name without saying it?

24  A    Yes.

25  Q    Okay.  And can you -- what is her first name only?

Mack - direct - Shihata                    3803

1    A    Dominique.

2    Q    And is she one of the women that traveled with the

3    defendant to Atlanta?

4    A    Yes.

5    Q    I'm showing you what's in evidence as Government Exhibit

6    52(b).

7             (Exhibit published.)

8    Q    Do you recognize this person?

9    A    Yes.

10   Q    And without saying -- well, do you know a nickname that

11   this person used?

12   A    Yes.

13   Q    And what was that nickname?

14   A    Juice.

15   Q    And was Juice one of the women who traveled with the

16   defendant to Atlanta?

17   A    Yes.

18   Q    Did you ever -- did you have an occasion to meet Juice's

19   mother?

20   A    One occasion.

21           MS. SHIHATA:  I'm showing the witness only what's

22   been marked for identification as Government Exhibit 53.

23           (Exhibit published to witness only.)

24   BY MS. SHIHATA:

25   Q    Do you recognize the individual in this photograph?

Mack - direct - Shihata                    3804

1   A    Yes.

2   Q    And who is this?

3   A    Her mother, Juice's mother.

4           MS. SHIHATA:  I move to admit Government Exhibit 53.

5           MR. CANNICK:  No objection.

6           THE COURT:  That is in evidence.

7           (Government Exhibit 53 received in evidence.)

8           MS. SHIHATA:  May we publish it, please?

9           THE COURT:  Yes.

10          (Exhibit published.)

11  BY MS. SHIHATA:

12  Q    And I am showing you what's been marked for -- what's in

13  evidence as Government Exhibit 72(b).  This is the individual

14  you previously testified about the songwriter, Vee; correct?

15  A    Yes.

16  Q    Was she one of the women who traveled with the defendant

17  to Atlanta?

18  A    Yes.

19  Q    Now, I am also showing you what's in evidence as

20  Government Exhibit 8.

21          (Exhibit published.)

22  Q    Do you recognize this person?

23  A    Yes.

24  Q    And who do you recognize that to be?

25  A    Gerald Jones.

Mack - direct - Shihata                          3805

1    Q    And did he go by any nicknames?

2    A    Blackie.

3    Q    And what if any relationship to the defendant did Blackie

4    have?

5    A    He was acting manager.

6    Q    In what time period?

7    A    During 2013.

8    Q    Now, you testified earlier that there was a period of

9    time where you transitioned to working basically exclusively

10   as the defendant's executive assistant; is that right?

11   A    Yes.

12   Q    Do you recall around when that was?

13   A    Early -- early 2014, the latter part of 2013, early part

14   of 2014.

15   Q    And as -- once you transitioned to that role, did you

16   also have -- did you have any responsibilities regarding

17   making travel arrangements for the defendant's guests?

18   A    I'm sorry, repeat the question.

19   Q    After you transitioned to working as the defendant's

20   executive assistant, did you have any responsibilities with

21   respect to making travel arrangements for the defendant's

22   guests?

23   A    Yes.

24   Q    And what did those -- what did that entail?

25   A    Could you --

Mack - direct - Shihata                    3806

1   Q    Sure.  What did you do with respect to making travel
2   arrangements?
3   A    Are you asking how would it come about or what was the
4   process of doing it?
5   Q    Both.
6   A    Okay.  So I would get a text message from a person, a
7   potential traveler to initiate a travel conversation via text.
8   Q    And what, if anything, would you do after getting that
9   initial text from a potential traveler?
10  A    I would ask for their information, name, date of birth,
11  departure city.
12  Q    And what, if anything, would you do after that?
13  A    I would get approval to book from Mr. Kelly.
14  Q    And if you, in fact, received approval to make a booking,
15  how did you go about doing that?
16  A    In most instances we would use the travel company,
17  preferred travel.  If it was after-hours or late or something
18  that needed to happen urgent and couldn't reach them, we would
19  do it.  I would do it.
20  Q    And what, if any, credit card would you use in those
21  circumstances?
22  A    The company credit card.
23  Q    The company credit card?
24  A    Yes.
25  Q    And other than you, are you aware of anyone else who had

1   a company credit card?

2   A    Linda Mensch, Joan Sullivan.

3   Q    And when you say company credit card, are you referring

4   to RSK Enterprises?

5   A    Yes.

6

7            (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (CONTINUED)

2    MS. SHIHATA:

3    Q    And did you get such requests from potential travelers

4    often via text?

5    A    Yes.

6    Q    And you mentioned you used -- you often used Preferred

7    Travel to make the arrangements; is that right?

8    A    Correct.

9    Q    And did Preferred Travel -- that was a company that

10   RSK Enterprises used regularly?

11   A    Correct.

12   Q    And did they have RSK debit or credit cards on file?

13   A    Yes.

14   Q    Now, are you familiar with the Black Panties Tour?

15   A    Yes.

16   Q    And whose tour was that?

17        What artist did the Black Panties Tour?

18   A    Mr. Kelly.

19   Q    And around when did that tour take place, if you

20   recall?

21   A    I don't recall exactly when.

22   Q    Did you ever travel as part of that tour?

23   A    Yes.

24   Q    And how did you get from city to city on the tour?

25   A    I flew.

Mack - Direct - Shihata                    3809

1   Q    And how did the defendant travel from city to city on

2   the tour?

3   A    On the tour bus ..

4   Q    After the Black Panties Tour, were there a series of

5   one-off performance dates that the defendant did?

6   A    Yes.

7   Q    And can you just explain to the jury what that means, a

8   "one-off performance"?

9   A    They were initially in the industry called "spot

10  dates," and they're -- they're random dates that a booking

11  agent will book.  In some instances, it could be near a city

12  that he's already in or just left.  But there are spot

13  dates, so they're not five dates in a row.  It's spot dates.

14  Q    And did you -- did the defendant have certain spot

15  dates or concert dates in 2015?

16  A    Yes.

17  Q    I'm showing you what's in evidence as

18  Government's Exhibit 75.  Without saying this person's name,

19  do you recognize this person?

20  A    Yes.

21  Q    And do you know this person's first and last name?

22  A    Yes.

23       MS. SHIHATA:  I'm showing the witness and the jury

24  only what's in evidence as Government's Exhibit 75A.

25       (Exhibit published to the jury.)

1  Q    All right.  Is this a photo -- the same photo with this

2  person's true first and last name underneath?

3  A    Yes.

4          MS. SHIHATA:  And I'm showing the witness -- I'm

5  showing everybody what's in evidence as

6  Government's Exhibit 75B.

7  Q    For purposes of your testimony here today, we're going

8  to refer to this person as "Jane," okay?

9  A    Okay.

10  Q    Now, about when did you first become aware of Jane?

11  A    It was April 2015.

12  Q    And how did you become aware of her?

13  A    I received a text message from her.

14  Q    And what was the text message about?

15  A    She -- Mr. Kelly gave her my number.  She text messaged

16  me to book travel.

17  Q    And I'm showing you what's in evidence as

18  Government's Exhibit 233C.

19          MS. SHIHATA:  Jury only, please.

20  Q    I'm showing you what's in evidence as

21  Government's Exhibit 233B.  Are these text messages -- are

22  these the text messages you just referenced between you and

23  Jane?

24  A    Yes.

25  Q    And is the first one dated April 28th, 2015?  That's an

Mack - Direct - Shihata                    3811

1    outgoing message from Jane to you?

2    A    Yes.

3    Q    And in response -- well, she gives you her name, and

4    she says that she's in Orlando, Florida, currently.

5            And then in response, you say, Okay, please send

6    me your date of birth for air travel and then travel

7    tomorrow or question mark?

8    A    Yes.

9    Q    And did she then send you her date of birth,

10   December 30, 1997, and say, yes, a flight for tomorrow?

11   A    Yes.

12   Q    And just looking down on the text messages, did you

13   then -- well, after you received that information from Jane,

14   what did you do?

15   A    So, after I received that information, I ran it by

16   Mr. Kelly to approve it.

17   Q    And did he, in fact, approve it?

18   A    Yes.

19   Q    And after he approved it, did you make travel

20   arrangements for Jane to travel?

21   A    Yes.

22   Q    And just looking back at Government's Exhibit 233C, is

23   the last text message a text message from you to Jane

24   confirming she's on an American Airlines flight that departs

25   Orlando at 7:00 a.m. to arrive in Los Angeles?

Mack - Direct - Shihata                    3812

1   A    Yes.

2   Q    And you sent her the confirmation number?

3   A    Yes.

4   Q    Now, at some point, did you meet Jane in person?

5   A    Yes.

6   Q    And do you recall where it was that you met Jane in

7   person?

8   A    Mandalay Bay in Las Vegas.

9   Q    And what, if anything, was the defendant doing in Las

10  Vegas at that time?

11  A    A show.

12  Q    And where physically did you meet Jane in Las Vegas?

13  A    In the lobby of Mandalay Bay.

14  Q    And what was she doing at that time?

15  A    I'm sorry?

16  Q    What was Jane doing when you met here in the lobby at

17  that time?

18  A    What was she doing?

19  Q    Well, let me rephrase the question.

20         What was the purpose of your meeting her in the

21  lobby at that time?

22  A    She was checking into her hotel.  To make sure -- I was

23  there to make sure everything went smooth through check-in.

24  Q    And do you recall whether Jane attended the show in

25  Las Vegas?

1   A    Yes.

2   Q    Yes, she attended?

3   A    Yes.

4   Q    Now I'm showing you what's in evidence as

5   Government's Exhibit 233G.

6          MS. SHIHATA:  Okay.  This can be published to

7   everyone.

8          (Exhibit published to the jury.)

9   Q    Are these text messages between you and Jane from when

10  she was in Las Vegas in 2015?

11  A    Yes.

12  Q    And are these text messages dated May 3rd, 2015?

13  A    Yes.

14  Q    Now, the first text message, 5879, that's on this

15  exhibit, is that a message you received from Jane that said,

16  Do you know where the closest mall is?

17  A    Yes.

18  Q    And then you provided her with some information,

19  correct?

20  A    Correct.

21  Q    And then she also asks how she could get to the mall,

22  McDonald's, and Western Union, correct?

23  A    Correct.

24  Q    And then your response is after that, and you asked

25  her, What time?  And then she responds, Now.  Anytime soon,

1    if possible.  And then you respond, Okay.  Stand by.

2            Now, just going down a little bit, did you inform

3    her that there were some issues with getting a car service?

4            Is that right?

5    A    Yes, correct.

6    Q    And I want to focus on the text message 5837.  That's a

7    text message from you to Jane that states:  Trying to figure

8    it out.  Is Mr. Kelly okay with you going out of the room?

9    It's very hectic out.

10           And then Jane responds:  I didn't ask him, and if

11   you can't get it, it's fine.  I'll just chill inside because

12   the taxi lines are hectic.  Thank you for your help.

13           And then your response:  Oh, okay.  Yeah, we will

14   need to make sure it's okay, and it's just very, very

15   hectic.  I can get McDonald's to you, no problem.

16           When you said, We will need to make sure it's

17   okay, what were you referring to there?

18   A    What I meant by that was she would need to get an okay

19   from Mr. Kelly.

20   Q    And how did you know that she would need to get an okay

21   from Mr. Kelly?

22   A    I don't understand the question.

23   Q    When you were working for the defendant as his

24   executive assistant, were there certain rules in place?

25   A    Yes.

1  Q    And what, if any, rules were there in place regarding a

2  situation like the one we just looked at the text messages

3  on?

4  A    Mr. Kelly would have to approve it.

5  Q    Now I would like to direct your attention to July

6  of 2015.  Did you travel to see the defendant perform in

7  Connecticut around that time?

8  A    Yes.

9  Q    And do you recall where the defendant was performing in

10 Connecticut on July 15th?

11 A    It was a casino.

12 Q    And using first names only, for the pseudonym we just

13 went through, did any female guests also travel to

14 Connecticut to see the defendant?

15 A    Yes.

16 Q    And using first names only or -- or the pseudonym Jane,

17 who do you recall -- what female guests do you recall

18 traveling to Connecticut?

19 A    Jane, Joycelyn -- a Joycelyn, and Christy, Christy Lee.

20 Q    I'm showing you what's in evidence as

21 Government's Exhibit 78.  Do you recognize this person, and

22 using first names only?

23 A    Yes.

24 Q    And who is it?

25 A    Joycelyn.

1  Q    Now, in Connecticut, when the defendant was

2  performing -- you testified the defendant was performing at

3  a casino; is that right?

4  A    Correct.

5  Q    And do you recall approximately how many shows he was

6  doing at that casino?

7  A    I believe it was three nights, two or three nights.

8  Q    And to the best of your recollections, were there any

9  shows in between the shows in Connecticut?

10  A    New Jersey.

11  Q    There was a show in New Jersey?

12  A    Yes.

13  Q    Now I want to direct your attention to the final show

14  in Connecticut.  First of all, were you at that show?

15  A    Yes.

16  Q    And after the show, where were you physically?

17  A    The dressing room area.

18  Q    And who, if anyone else, was in the dressing room area?

19  A    Everyone was in the -- security was there, the -- I

20  believe the majority of the staff was there.

21  Q    And was the defendant there?

22  A    Yes.

23  Q    And what happened -- well, while you were in the

24  dressing room, did the defendant ask you to do anything?

25  A    I don't understand the question.

1   Q    While you were -- after the show in Connecticut, you

2   said -- you testified you were in the dressing room, the

3   defendant was there, and lots of other people were there; is

4   that right?

5   A    Yes.

6   Q    At some point did the defendant -- while you were in

7   that room, did the defendant ask you to make sure someone

8   else was in the room?

9   A    Yes, to make sure his guests were --

10  Q    And which -- and using pseudonyms, which guest was

11  that?

12  A    Jane.

13  Q    And did you take steps to have Jane come to the room?

14  A    Yes.

15  Q    And what, if any, understanding did you have about

16  where Jane was coming from to get to the dressing room?

17  A    She would have been coming from -- inside of that

18  particular casino, there was a pit, I believe it was.  It's

19  about the --

20  Q    Okay.  "A pit" meaning?

21  A    She was --

22  Q    What do you mean by "pit"?

23  A    An open area where guests of the show will stand to see

24  the show.

25  Q    So an area to watch the show?

Mack - Direct - Shihata                    3818

1    A    Close to the stage, yes.

2    Q    Close to the stage?  Okay.

3              And how, if at all, would Jane get from that pit

4    area to the dressing room?

5    A    Someone would have to escort her back.

6    Q    And what do you mean by that?

7    A    Someone, a team member would have to walk out to that

8    area and walk her back past security to get backstage.

9    Q    And did Jane end up coming to the dressing room?

10   A    Yes.

11   Q    And you testified earlier that there were multiple

12   people in the dressing room before Jane arrived, correct?

13   A    Correct.

14   Q    And did that include men and women?

15   A    Yes.

16   Q    And what, if anything, happened regarding the

17   composition of the people who were in the dressing room once

18   Jane arrived?

19   A    Well, their dinner was being served prior to that.  So

20   once she arrived, everyone sort of exited through.  The men.

21   Q    The men exited?

22   A    Yes.

23   Q    And do you know why that was?

24   A    Repeat the question.

25   Q    Do you know why the men exited the room when Jane came

Mack - Direct - Shihata                3819

1   in?

2   A    Generally when Mr. Kelly's guests --

3            MR. CANNICK:  Objection.

4            THE COURT:  Overruled.

5   Q    You can answer.

6   A    Generally when Mr. Kelly's guests enter a room, most of

7   the men will leave the room.

8   Q    And why is that?

9   A    Why --

10           MR. CANNICK:  Objection.

11           THE COURT:  Overruled.

12           It's based on your observations in working there?

13           THE WITNESS:  In my observation, yes.

14  Q    And based on working there, had you learned -- what, if

15  anything, had -- what, if any, protocols did the defendant

16  have about men being in the room when his female guests were

17  there?

18  A    It wasn't acceptable.

19  Q    Now, after the men left the room, who was left in the

20  dressing room?

21  A    Myself, the stylist, Mr. Kelly, and Jane.

22  Q    And when you say "the stylist," are you referring to

23  Kash Howard?

24  A    Yes.

25  Q    And at some point, did Kash Howard leave the room?

Mack - Direct - Shihata                3820

1   A     Yes.

2   Q     And after that, who remained in the room?

3   A     Myself, Mr. Kelly, and Jane.

4   Q     And what, if anything -- well, what, if any,

5   discussions were you having with the defendant when it was

6   just you, the defendant, and Jane in the dressing room?

7   A     So we were having a -- a casual conversation about the

8   show.  We talked about Kash's birthday, getting her a gift;

9   and we were just really having a casual conversation about

10  work.

11  Q     And where -- if you recall, where in the room was the

12  defendant situated at the time of this conversation?

13  A     She was sitting in the --

14  Q     The defendant, where was the defendant situated?

15  A     Oh, sorry.  I'm sorry.

16  Q     That's okay.

17  A     He was sitting on sort of a huge ottoman.

18  Q     And how was he sitting on the ottoman?

19  A     He was laying back on it with his hands behind his head

20  there.

21  Q     And where, if anywhere, were you sitting?

22  A     I was sitting on the opposite side of it.

23  Q     And where, if anywhere, do you recall Jane was during

24  the conversation?

25  A     She was sitting in a chair right across -- right there

Mack - Direct - Shihata                3821

1   in front of it.

2   Q    Now, did Jane participate in the conversation that you

3   and the defendant were having about the show?

4   A    No.

5   Q    Was that unusual for her not to participate?

6   A    No, I -- no.

7   Q    And other than receiving text messages from Jane, did

8   you generally -- generally speak to her?

9   A    No.

10  Q    And why didn't you speak to her?

11  A    We weren't allowed to commingle with the guests.

12  Q    Now, after the conversation that you had about the show

13  with the defendant, what, if anything, happened?

14  A    Could you elaborate?

15  Q    Sure.  You testified you had a conversation about the

16  show; is that right?

17         MR. CANNICK:  Objection.  That's not her

18  testimony.

19         THE COURT:  Overruled.

20         The question really is, just what happened next --

21         THE WITNESS:  Okay.

22         THE COURT:  -- while you were in the room.

23         THE WITNESS:  Okay.

24  A    So we're having a conversation, very casual, very

25  normal.  The -- Jane is sitting across, and she gets up and

1    moves a little closer to Mr. Kelly and --

2    Q    And did you see what, if anything, prompted Jane to get

3    up and move closer?

4    A    No, I -- no.

5    Q    What happened next?

6    A    So then she got a little closer, and we were kind of

7    wrapped with the conversation that we were having and --

8    Q    What do you mean by "wrapped"?

9    A    Like we were -- we were discussing cool things about

10   the show and Kash's birthday.  And when she started to move

11   in a little closer to Mr. Kelly, I -- I -- I -- that was

12   kind of my cue to -- to leave.

13   Q    Okay.  And you used the word "wrapped."  Do you mean

14   the conversation was finishing up?

15   A    We were finishing up, yes.

16   Q    And then after Jane moved closer to the defendant, what

17   did you see?

18   A    Well, I saw her touch his leg, sort of like a massage

19   motion.

20   Q    And what did you see after that?

21   A    And then after -- after that, she got a little closer,

22   and I'd already started gathering my things to leave.  I

23   just -- I just saw her move in closer.

24   Q    What part of her body did you see move in closer and to

25   whom?

Mack - Direct - Shihata                      3823

1   A    Rephrase the question.  I'm sorry.

2   Q    You testified that you saw Jane "move in closer."

3   A    Yes.

4   Q    Who did she move in closer to?

5   A    Mr. Kelly.

6   Q    And what part of her body did he move in closer?

7   A    The leg area.

8        THE COURT:  So if you could, just describe exactly

9   what you saw.

10       THE WITNESS:  So all that I saw, exactly what I

11  saw was her moving in slowly closer to his relined body.

12  She's massaging his legs as she's doing it, and I could see

13  on the left -- on the right side of me, not my left -- the

14  right side of me, her go, sort of face motion, and I walked

15  out.

16  Q    And where did you see her face motion?

17       What part of her body -- his body did you --

18  A    The lower part of his body, and I sat -- I don't know

19  what happened after that.

20  Q    When you say the lower part of his body, does that

21  include his penis?

22       MR. CANNICK:  Objection.

23       THE COURT:  Well, over- -- I mean, you said you

24  saw her head going down.  Was that to the -- below the

25  waist, in that area?

Mack - Direct - Shihata                3824

1            THE WITNESS:  In that area.

2            THE COURT:  All right.  Next question.

3   Q    Now, you testified you left the room, correct?

4   A    Yes.

5   Q    And why did you leave the room?

6   A    I was -- that was my exit.

7   Q    Why did you exit?

8   A    I was very uncomfortable.  That wasn't my business.  I

9   was there to work.

10  Q    Now, what, if anything, happened the following day with

11  respect to your employment?

12  A    So, the following day -- I'd already started drafting

13  my exit letter.  But the following day, we -- we were at a

14  McDonald's; and we were sitting, talking about, again,

15  Kash's birthday.

16  Q    Who was at the McDonald's?

17  A    Myself; Mr. Kelly; Jane; Joan Sullivan; Hammer, the

18  security guy; the DJ; and one other guy.  I don't remember

19  which one -- I know there was another person.

20  Q    And what, if any, discussions did you have with the

21  defendant at the McDonald's?

22  A    So we started a conversation about Kash's birthday, and

23  he -- I was being accused of telling or spoiling the

24  surprise for Kash, and I just -- I think I just -- at that

25  moment, I just -- I -- I just had enough.  I started

Mack - Direct - Shihata                    3825

1  getting -- he started yelling at me.  He told me that -- one

2  second.

3           (Pause in proceedings.)

4           THE WITNESS:  I'm sorry.

5           MS. SHIHATA:  That's all right.

6  Q    You said "he started yelling" at you.

7           Who is the "he" you're referring to?

8  A    Mr. Kelly.

9  Q    And what happened?

10  A    So we were -- so we were having the discussion about

11  Kash and her birthday and he started yelling at me, saying

12  that I spoiled the surprise, and I told her what we

13  discussed previously about what her birthday gift was going

14  to be.  And for whatever reason, he started cursing me

15  and -- and then ultimately said that I needed to apologize

16  to the guests.  And in this moment, I quit.

17  Q    And which guests were you referring to that you said he

18  made you apologize to?

19  A    Jane.

20  Q    Jane?

21  A    For my behavior when he was pounding the table.  I just

22  could not agree with it.

23  Q    And who was pounding the table?

24  A    Mr. Kelly.

25  Q    And did you stop working for the defendant after that

1   day?

2   A    Yes.

3   Q    And where, if anywhere, did you travel -- I'm sorry.

4        You were still the Connecticut when that happened;

5   is that right?

6   A    Yes.

7   Q    And where, if anywhere, did you travel to after

8   deciding to stop working for him?

9   A    Home.

10  Q    And where was that?

11  A    Atlanta.

12  Q    Now, during the time you worked for the defendant in

13  that 2013 to 2015 time period, were there times where the

14  defendant had you write letters?

15  A    I'm sorry.  Restate the question.

16  Q    When you worked for the defendant from 2013 --

17  approximately 2013 to July 2015 --

18  A    Uh-huh.

19  Q    -- approximately, during that time period, were there

20  occasions where the defendant told you to write letters?

21  A    Yes.

22  Q    And in what circumstances did he tell you to do that?

23  A    It would have been an apology letter.

24  Q    And whose idea was it to write those letters?

25  A    Mr. Kelly's.

1   Q    And how, if at all, did he tell you to write them?

2   A    I'm not clear on that question.

3              THE COURT:  Can I -- excuse me.  I'm sorry.

4         Just so I could clarify, do you know about how

5   many times you wrote apology letters?

6              THE WITNESS:  Once.

7              THE COURT:  Once?  And at whose direction did you

8   do that?

9

10             THE WITNESS:  Mr. Kelly's.

11             THE COURT:  Was it in response to something in

12  particular?

13             THE WITNESS:  Yes.

14             THE COURT:  What happened?

15             THE WITNESS:  So, during that time, I was being

16  accused of partnering with booking agents and taking money

17  on the side that I never did.

18             THE COURT:  And so what happened after that?

19             THE WITNESS:  And so he told me to apologize for

20  it and write it.  And I -- I -- I'm -- I have a corporate

21  background, so I understand how it works.  I apologized for

22  not telling him that one of the booking agents paid me out

23  of his own commission.

24             THE COURT:  Okay.

25             THE WITNESS:  But I apologized out of fear.

1          THE COURT:  Okay.  And so did you say that in the
2     letter?
3          THE WITNESS:  Yes.
4          THE COURT:  And did you write the letter on your
5     own, or did you follow a script, or how did that --
6          THE WITNESS:  I was 1,000 percent scripted, yes.
7          THE COURT:  In what regard?
8          THE WITNESS:  I was -- I was -- I was --
9     everything that he would say, I was just so ready to not
10    have to deal with it, I would just write it.
11         THE COURT:  What --
12         THE WITNESS:  I kept writing and kept writing and
13    kept writing.
14         THE COURT:  Were you by yourself when you wrote
15    it?
16         THE WITNESS:  Yes.
17         THE COURT:  Okay.  Go ahead.
18    BY MS. SHIHATA:
19    Q    I'm sorry, you said it was a script, it was scripted,
20    the letter?
21    A    (No verbal response.)
22    Q    Did you just testify that it was scripted?
23    A    Yes.
24    Q    And whose script was it?
25    A    I was writing everything he was saying, just to write

                    Mack - Direct - Shihata                    3829

1    it.

2    Q    And what --

3    A    At Mr. Kelly's direction, I would just write.

4    Q    And was the defendant in the room when you wrote it?

5    A    Yes.

6              MS. SHIHATA:  I'm showing first what's in evidence

7    as Government's Exhibit 424, an envelope with Ms. Cheryl

8    Mack's statement.

9              I'm now showing what's in evidence as

10   Government's Exhibit 424A.

11   Q    Is this your handwriting?

12   A    Yes.

13   Q    And just focusing on the beginning of this letter, it

14   states:  Mr. Kelly, I'm writing you this letter to apologize

15   to you because I'm aware that you discovered that I accepted

16   money on the side from Reece and Baldy.

17             Is this the letter regarding the booking agent --

18   A    Yes.

19   Q    -- that you just described?

20   A    Yes.

21   Q    And at the bottom, is that your signature?

22   A    Yes.

23             THE COURT:  Ms. Shihata, I'm sorry to interrupt

24   you.

25             I just want to make sure:  Is everybody on the

1    jury okay?  I've had you sit here for a little while.

2             Does anyone need a break?

3             THE JURY:  (Indicates.)

4             THE COURT:  Yes?  Okay.  Let's just take a

5    ten-minute break.  Please don't talk about the case at all.

6             THE COURTROOM DEPUTY:  All rise.

7             (Jury exits the courtroom.)

8             (The following matters occurred outside the

9    presence of the jury.)

10            THE COURT:  The witness can step out.

11            (The witness is excused.)

12            THE COURT:  We'll see you in a few minutes.

13            Everybody can step down.

14            I'm just trying to get a sense of time here.  Do

15   you have an idea how long you might be?

16            MS. SHIHATA:  Maybe another five to ten minutes.

17            THE COURT:  Okay.  I just don't like to keep them

18   sitting too long.

19            Anything else that anyone wants to raise?

20            MR. CANNICK:  Your Honor, just one thing.

21            We -- again, we agreed to -- by stipulation to

22   allow the document in regarding Mr. Kelly's appearance at

23   the Albany center.

24            THE COURT:  Right.

25            MR. CANNICK:  It was an item --

1           THE COURT:  Let me just pull it out.

2           MR. CANNICK:  Yeah.  It was an item that we

3    discussed yesterday, and the Court --

4           THE COURT:  Right.  I remember.

5           MR. CANNICK:  -- mentioned, you know, it was just

6    for the date.  But I notice that there's a reference that

7    was left in here after redaction that pertains to Lumpkin

8    said his officers met with Mr. Kelly.  That has nothing to

9    do with --

10          MS. GEDDES:  I'm happy to redact that.

11          THE COURT:  Yeah.

12          MS. GEDDES:  It was not intentional.

13          THE COURT:  Right.

14          So it's nothing to get mad about.

15          MR. CANNICK:  It's a Friday.

16          THE COURT:  All right.  So you're going to take it

17   out?

18          MS. GEDDES:  Yes, Your Honor.

19          THE COURT:  All right.

20          Anything else?

21          MR. CANNICK:  No.

22          THE COURT:  Okay.

23          MR. CANNICK:  Thank you.

24          THE COURT:  Okay.  See you in a few minutes.

25          (Recess taken.)

1          (In open court; outside the presence of the jury.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Let's get the witness, please.

4          (The witness resumes the stand.)

5          THE COURT:  All right.  Let's get the jury,

6     please.

7          (Pause in proceedings.)

8          (Jury enters the courtroom.)

9          (Jury present.)

10          THE COURTROOM DEPUTY:  You may be seated.

11          THE COURT:  All right.  Folks, we're ready to

12     continue with the direct examination of the witness.

13          Go ahead, Ms. Shihata.

14          MS. SHIHATA:  Thank you, Your Honor.

15          THE COURTROOM DEPUTY:  The witness is reminded

16     she's still under oath.

17          THE COURT:  Yes.

18     BY MS. SHIHATA:

19     Q    Now, before the break, I had shown you

20     Government's Exhibits 424 and 424A, and I think you

21     testified this is the letter you wrote regarding the booking

22     agents; is that right?

23     A    Yes.

24     Q    And after you wrote this letter, what, if anything, did

25     you do with it?

Mack - Direct - Shihata                    3833

1    A    I left it with Mr. Kelly.

2    Q    And did you retain a copy of this letter?

3    A    No.

4    Q    I'm showing you what's in evidence as

5    Government's Exhibit 425, which is a five-paged document.

6         Do you recognize the handwriting on this letter?

7    A    Yes.

8    Q    Is it your handwriting?

9    A    I believe so, yes.

10   Q    And I'm showing you the last page of

11   Government's Exhibit 425.

12        Is that your signature at the bottom?

13   A    Yes.

14   Q    And does that refresh your recollection that you wrote

15   more than one letter to the defendant?

16   A    It was all done in the same night.

17   Q    And just -- I'm not going to go over the whole letter.

18   I'm just going to show you the first part -- first page of

19   Government's Exhibit 425 and -- where it says:  I'm writing

20   that letter to Robert, not Mr. Kelly, about my own faults.

21   Yes, I have insecurities, but I want to be healed.  It's

22   like a sickness.

23        Do you see that?

24   A    Yes.

25   Q    Who, if any, told you to write that?

Mack - Direct - Shihata                    3834

1    A    I don't even remember that.

2    Q    Did you keep a copy of this letter?

3    A    No.

4    Q    Do you recall writing any letters of this type about

5    insecurities, because you wanted to?

6    A    No.

7              MR. CANNICK:  Objection.

8              THE COURT:  Overruled.

9    Q    And I just showed you what's in evidence as

10   Government's Exhibit 425.  I'm now showing you what's in

11   evidence as Government's Exhibit 424B.

12             And does this appear to be a photocopy of what's

13   in Government's Exhibit 425?

14   A    It appears to be, yes.

15   Q    And I'm now showing you what's in evidence as

16   Government's Exhibit 426.

17             Again, is this your handwriting?

18   A    I don't recall.  I -- I -- I don't recall this.

19   Q    I'm asking you if it's your handwriting.

20   A    It looks like it, but I don't recall.

21   Q    Ma'am, does it look like your signature?

22   A    It looks like -- it looks like an old signature of

23   mine.

24   Q    Now, during the course of time that you were employed

25   by the defendant as his executive assistant, were you ever

1    fined?

2    A    I had a reduction in pay.

3    Q    And what was that -- why -- why did you have a

4    reduction in pay?

5    A    During that time, there was a -- a show that myself and

6    Linda Mensch booked that Mr. Kelly didn't believe was the

7    proper amount of money that the show should have been booked

8    for.  So he reduced our pay to -- for me, it was nothing,

9    and I believe Linda was the same.

10   Q    And Linda was the entertainment lawyer; is that right?

11   A    That's right, yes.

12   Q    And when you say he reduced your -- your -- for you, it

13   was nothing, what do you mean?

14   A    So whatever the number was during that time that he

15   felt like it should have been -- keep in mind that that

16   particular show was a pickup date, a spot day, meaning he

17   was already en route.  We thought that it made sense, but he

18   wasn't happy with the number, so he reduced our pay to

19   offset whatever he thought it should have been.

20   Q    And when --

21   A    And mine was nothing.

22   Q    Right.  I guess what I'm asking is, what do you mean

23   that yours was nothing?

24   A    Meaning I was no longer being paid for it.

25              THE COURT:  How long was that?

Mack - Direct - Shihata                3836

1          THE WITNESS:  It was about six months, three

2     months -- three to six months, something like that.

3     Q     Now -- well, you mentioned that Mr. Stevens, Devyne

4     Stevens, had a basketball court at his house; is that right?

5     A     Yes.

6     Q     And I think you testified before the break that the

7     defendant used that basketball court at times; is that

8     correct?

9     A     Yes.

10    Q     Did you ever attend any basketball -- any -- any

11    basketball games where the defendant was playing at that

12    house in Atlanta?

13    A     A couple of games, yes.

14    Q     And what, if anything, did you notice regarding any of

15    the defendant's female guests at the couple of basketball

16    games that you attended?

17    A     The times that female guests were there, they were --

18    there was a -- when you walk into the court, there was a

19    wall there.  Then they were sitting on the opposite side,

20    but they were facing the wall, opposite side of the

21    bleachers.

22          (Continued on the next page.)

23

24

25

Mack - Direct - Shihata                    3837

1    DIRECT EXAMINATION

2    BY MS. SHIHATA:   (Continuing)

3    Q    Now, you testified a moment ago about a reduction in your

4    salary.  You worked previously with Devyne Stevens; is that

5    right?

6    A    Yes.

7    Q    And I think you testified he worked in -- he was

8    successful in the music industry; is that right?

9    A    Yes.

10   Q    And did Mr. Stevens ever reduce your pay in that manner?

11            MR. CANNICK:  Objection.

12            THE COURT:  Overruled.

13   A    No.

14   Q    Now, when you were the defendant's executive assistant,

15   did you personally have any responsibilities related to the

16   defendant's security?

17   A    No.

18   Q    And when you worked with the defendant as his executive

19   assistant, when you entered a room, did the defendant always

20   stand up?

21   A    No.

22   Q    What, if anything, did you notice happened when the

23   defendant entered a room that his girlfriends were in?

24   A    They would stand.

25            MS. SHIHATA:  Nothing further.

Mack - Cross - Cannick                3838

1          THE COURT:  All right.  Thank you.

2          Mr. Cannick?

3          MR. CANNICK:  Thank you, Your Honor.

4    CROSS-EXAMINATION

5    BY MR. CANNICK:

6    Q    You were just asked whether or not Mr. Kelly would ever

7    stand when you entered the room and your testimony is that he

8    never did?

9          MS. SHIHATA:  Objection.  Misstates the testimony.

10         THE COURT:  Overruled.  She can answer.

11         Is that what you said, that he never stood up when

12   you walked in -- is that the question, when you walked into a

13   room?

14         MR. CANNICK:  Yes.

15   A    No.

16   Q    That's not your testimony, right?

17   A    That is my testimony.

18   Q    That he never stood up when you walked into the room?

19   A    He never stood up to greet me when I walked into a room.

20   Q    And you would -- have you ever been in a car with him?

21   A    Yes.

22   Q    And did he open the door for you?

23   A    Yes.

24   Q    Did he open the door for others?

25   A    Yes.

1  Q    But it's your testimony that he never stood when you

2  entered the room?

3  A    That is correct.

4  Q    Now, you were asked a short while ago whether or not

5  Mr. Stevens, Devyne Stevens, ever reduced your pay.  Do you

6  remember that question being asked of you?

7  A    Yes.

8  Q    But you actually left Mr. Stevens' employment to work for

9  Mr. Kelly, am I correct?

10  A    Rephrase the question, sir.

11  Q    You were working for Mr. Stevens, am I correct?

12  A    You are correct.

13  Q    And at some point you left Mr. Stevens to work for

14  Mr. Kelly, am I correct?

15  A    You're incorrect.

16  Q    You testified and told the jury earlier that you left

17  Mr. Stevens and you started working for Mr. Kelly.  I am

18  incorrect about that?

19  A    So Mr. Stevens and I were working --

20  Q    My question is --

21        MS. SHIHATA:  Objection.

22  Q    Am I incorrect about that?

23  A    So Mr. Stevens and I were working together.

24  Q    Okay.

25  A    So I never left.  We were all a team.  We were all

                    Mack - Cross - Cannick            3840

1   working together.  The majority of my responsibility --

2   Q    Ma'am.  Ma'am, answer my question.

3   A    Well --

4        THE COURT:  Well, do you want to put another

5   question to the witness?  Thank you.

6   Q    There was a time when you were on Stevens's payroll, am I

7   correct?

8   A    You're correct.

9   Q    And you left Stevens's payroll and went to Kelly's

10  payroll, am I correct?

11  A    My job responsibility --

12  Q    That's not my question.  I'm not asking about your job.

13       THE COURT:  Mr. Cannick.

14       MS. SHIHATA:  Objection.

15       THE COURT:  The objection is sustained as to form.

16       Just put another question to the witness.  There

17  seems to be a miscommunication.

18  Q    There was a time that you were on Mr. Stevens's payroll,

19  am I correct?

20  A    You're correct.

21  Q    What time frame was that?

22  A    2013.

23  Q    And there was a time that you started on Mr. Kelly's

24  payroll.  What time was that?

25  A    2014.

1  Q    Were you on Mr. Stevens's payroll on 2014?

2  A    No.

3  Q    Now, you testified that you went to basketball games and

4  you saw Mr. Kelly's guests at the basketball game, female

5  guests?

6  A    Yes.

7  Q    And you testified and told the jury that they were facing

8  the wall?

9  A    During the time that I was in attendance, yes.

10  Q    Were you in attendance at the same time that Mr. Stevens

11  was in attendance?

12  A    I'm not sure if he was in attendance or not.

13  Q    Did you ever see Mr. Stevens at the game when you were

14  there?

15  A    I would see him in the basketball court.  He had a knee

16  injury, so he didn't always play.  Sometimes he'd come in,

17  sometimes he didn't.

18  Q    I'm not asking you whether or not you saw him playing.

19  I'm asking whether or not you saw him in the gym when you were

20  there.

21  A    I don't recall.  I don't know.

22  Q    Now, you testified and told us that there came a point in

23  time that you and Mr. Stevens were working together and you

24  decided that you were going to try to work with Mr. Kelly.  Do

25  you remember telling us that?

1   A    I didn't say that we decided we were going to try.  Those

2   weren't my words.

3   Q    Didn't you say that Mr. Stevens -- there was a time that

4   Mr. Stevens and you decided that you would try to get Kelly

5   off the bench?

6   A    Getting him off the bench is the activity.

7   Q    Getting him off the bench meant that you were going to

8   try to work with him, am I correct?

9   A    No.  No, you misunderstood what I said.

10  Q    I'm asking you if when you said getting off the bench,

11  did that mean that you were going to try to work with him?

12  A    In the music business, sitting on the bench doesn't mean

13  in the literal sense.  What that means is that he could be a

14  little more active if Devyne put his magic on it.  That's what

15  I meant.

16  Q    Tell me who Devyne was working with at the time that you

17  were trying -- you and Devyne decided that you want to work

18  with Kelly?

19  A    Akon.

20  Q    Akon?

21  A    Akon.

22  Q    So Akon, according to you and Devyne, was bigger than

23  Kelly?

24           MS. SHIHATA:  Objection.

25  A    I never said that.

1          MS. SHIHATA:  Relevance.

2          MR. CANNICK:  They brought it.

3          THE COURT:  I am sure that is a matter of taste, but

4    the objection is overruled.

5          MR. CANNICK:  Thank you.

6    Q    Are you saying that Akon was an A-list performer at that

7    time?

8    A    I'm not saying that, either way.

9    Q    Has Akon ever had a number-one hit?

10         MS. SHIHATA:  Objection.

11         THE COURT:  Sustained.

12         MR. CANNICK:  Your Honor, may we approach?

13         THE COURT:  No, we may not.  Let's just move on to

14   another question.

15   Q    Didn't you testify that you were going to pull Kelly --

16   you guys were going to give Kelly's career this new infusion?

17   A    I don't understand the question.

18   Q    Are you aware that in two thousand -- this was in 2013,

19   am I correct?

20   A    The latter part.  You're correct.

21   Q    And by the way, Akon left Devyne, am I correct?

22         MS. SHIHATA:  Objection.

23         THE COURT:  Overruled.

24   A    I can't speak on that.  I don't know.

25   Q    You can't speak on that?

```
 1            MS. SHIHATA:  Objection.

 2            THE COURT:  Do you know the answer to the question?

 3            THE WITNESS:  No.

 4            THE COURT:  Okay.

 5   A    No.

 6   Q    How long did Devyne represent Akon?

 7   A    Many years.  Many years.

 8   Q    Is he still representing Akon?

 9            MS. SHIHATA:  Objection.

10   A    Not to my knowledge.

11            THE COURT:  Overruled.

12   Q    Did he represent Akon last year?

13   A    Not to my knowledge.

14   Q    The year before?

15   A    I'm sorry, not to my knowledge.

16   Q    2015?

17   A    I left the music business in 2015.

18   Q    I'm not asking you when you left the music business.

19   A    I don't know.

20            THE COURT:  She said she doesn't know.

21            Next question.

22   A    I don't know.  I don't know.

23   Q    Other than Akon, who else was Devyne -- who, other than

24   Akon, did you and Devyne represent?

25   A    Devyne had a pretty long list of clients, but us
```

1 | collectively would have just been Mr. Kelly.

2 | Q    So the biggest client you and Devyne represented was

3 | Akon?

4 | A    Collectively, yes.

5 | Q    And then you tried representing Mr. Kelly, you and

6 | Devyne?

7 | A    We actually did.

8 | Q    For how long?

9 | A    My time frame was a year.  I don't know -- I left.  I

10 | don't -- I can't speak for Devyne.

11 | Q    Well, you started working for Mr. Kelly exclusively,

12 | right?

13 | A    Devyne was acting manager on the management team.  I was

14 | working as the executive assistant.  We were all still working

15 | together.

16 | Q    But I think we established a short while ago that you

17 | were being paid exclusively by Mr. Kelly in 2014, am I

18 | correct?

19 | A    That is correct.

20 | Q    And you don't know if Devyne was being paid by Kelly in

21 | 2014 or not, am I correct?

22 | A    That is correct.

23 | Q    Now, you testified and told the jury a short while ago

24 | about Mr. Kelly telling you -- withdrawn -- that there was a

25 | letter that Mr. Kelly had you write regarding this double

Mack - Cross - Cannick                    3846

1   dipping, am I correct?

2   A    Double dipping?  I'm sorry, I don't understand.

3   Q    You don't understand that phrase?

4   A    Maybe a different term.

5   Q    Okay.  You didn't use double dipping when you --

6   A    Double dipping is nothing close to what I was referring

7   to in that letter.

8   Q    You didn't use the word "double dipping" when you spoke

9   to the government?

10  A    Double dipping is not the correct term for what I just

11  described.

12  Q    I'm not asking you if it's the correct term, ma'am.  I'm

13  asking if that's a term that you used when you spoke to the

14  government.

15  A    I don't recall, no.

16  Q    Now, wasn't it Mr. Kelly's attorney and accountant that

17  first approached you about your booking side deals with the

18  promoters?

19  A    No.

20  Q    You're sure about that?

21  A    It was Mr. Kelly.

22  Q    You never spoke to Linda Mensch about it?

23  A    You said wasn't it Mr. -- Mrs. Linda Mensch and Ms. Joan

24  that spoke to me first.  No.  First it was Mr. Kelly.

25  Q    First it was Mr. Kelly?

Mack - Cross - Cannick                    3847

1    A    Yes.

2    Q    And then did you speak to the attorney subsequently?

3    A    We were all working together, yes.

4    Q    About the side booking that you were doing with the --

5    A    There was no side booking.

6    Q    About the allegation --

7    A    I've never said there was side booking.  There was no

8    side booking.

9    Q    There was an allegation, was there not?

10   A    There was no side booking.

11              THE COURT:  I think the question Counsel is asking

12   you is just whether or not somebody accused you of that.

13              Is that right, Mr. Kelly?

14              MR. CANNICK:  Yes.

15              Cannick.

16              THE COURT:  Mr. Cannick.

17              MR. CANNICK:  It happens.

18              THE COURT:  Okay.

19              THE WITNESS:  I'm not sure if he's he asking me if

20   it was double dipping or side dealing.

21              I don't understand your question.

22   Q    The question I asked you, ma'am, and I'll ask it again --

23   you know what, I'll have it read back.

24              THE COURT:  My question to the witness?

25              MR. CANNICK:  No, no, I --

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Mack - Cross - Cannick                3848

1          THE COURT:  All right.  My question was:  I think

2    the question Counsel is asking you is whether or not somebody

3    accused you of that, of having side deals or whatever the

4    phrase is.

5    A    So it's fair to say that that was the accusation, the

6    allegation.

7    Q    And was that allegation by Mr. Kelly?

8    A    It was a false allegation, yes.

9    Q    I didn't ask you if it was a false allegation.  I asked

10   you if the allegation was by Mr. Kelly.

11   A    Yes.

12   Q    And subsequently, Mr. Kelly's attorney spoke to you about

13   it, am I correct?

14   A    Yes.

15          THE COURT:  You're talking about Ms. Mensch?

16          MR. CANNICK:  Yes.

17          THE COURT:  Okay.

18   A    In a followup, yes.

19   Q    And the accountant as well, Joan?

20   A    No.

21   Q    So when you and Linda Mensch spoke about this, this was

22   in the office, am I correct?

23          MS. SHIHATA:  Objection.

24          THE COURT:  Overruled.

25   Q    In the office, am I correct?

Mack - Cross - Cannick                    3849

1          THE COURT:  Did you speak to them both together?

2          I think that was the basis of the objection.

3          Did you speak to both the accountant and the lawyer

4   together about this particular subject?

5   A    No, neither.  So Mr --

6          MS. SHIHATA:  The objection wasn't on the basis of

7   that, Judge.

8          THE COURT:  You are objecting to me?  Oh, it

9   happens.

10         MS. SHIHATA:  I think you were saying what the basis

11  of my objection was and I was clarifying --

12         THE COURT:  That it is not?

13         MS. SHIHATA:  That I had a different basis for it.

14         THE COURT:  A different basis.  Well, all right.

15         Why don't you put another question to the witness.

16  Q    After, when you spoke to Ms. Mensch subsequently to

17  Mr. Kelly speaking to you, was that conversation in the

18  office?

19  A    No.

20  Q    Where was the conversation?

21  A    It was in the cigar room at 405 Old Homestead Trail in --

22  Q    In your --

23  A    -- Atlanta, Georgia.

24         No, in Mr. Kelly's home.

25  Q    And you're confident that Mr. Kelly's accountant wasn't

Mack - Cross - Cannick                    3850

1   there?

2   A     You asked me if she spoke to me.  You didn't ask me if

3   she was present.  Sorry.

4   Q     Okay.  Who else was there?

5   A     So in that room that particular night was Mr. Kelly,

6   Linda Mensch; Ms. Sullivan was in the room, nonverbal; there

7   was a gentleman promoter, I can't -- his name leaves me; and

8   another gentleman, I don't recall his name.

9   Q     Wasn't Kash there?

10  A     No, she was not in that particular room.  No, she was

11  not; no.

12  Q     Now, in that room, you admitted to take -- to working out

13  these side deals, am I correct?

14  A     Never.

15  Q     You never did?

16  A     Never.

17  Q     So you wrote the letter, am I correct?

18  A     That is correct.

19  Q     And you have a bachelor's degree, am I correct?

20  A     That is correct.

21  Q     How old were you then?

22  A     What, we're talking 2015?  Pretty close to 50.

23  Q     And you're 50 years old, pretty close to 50 years old;

24  you're telling us that Mr. Kelly made you write a letter that

25  you didn't want to write?

Mack - Cross - Cannick                3851

1    A    That's correct.

2    Q    How long had you been in business at that time?

3    A    During that time I had been in business many, many years.

4    Maybe ten, maybe longer.

5    Q    And you knew the consequences of writing a letter of that

6    nature, am I correct?

7    A    I've never had to do it.

8    Q    I didn't ask you if you ever had to do it before.  I

9    asked you if you understood the consequences of doing it.

10   A    No.

11   Q    You're 50 years old with a bachelor's degree, in business

12   for about ten years; you didn't know the consequences of

13   writing a --

14              MS. SHIHATA:  Objection.

15              THE COURT:  Mr. Cannick, sometimes people object.

16              The objection is sustained as to form.

17              You can rephrase.

18   Q    You had a bachelor's degree.  You obtained a bachelor's

19   degree from the University of Tennessee?

20   A    Correct.

21   Q    And that was in business?

22   A    Yes.

23   Q    And part of your education, you learned how to negotiate

24   business arrangements, am I correct?

25   A    Well, I learned that by being in corporate America for

1    12 years.

2    Q    Okay.  So you learned it from corporate America, but I am

3    sure at Tennessee at Martin they taught you something?

4    A    Absolutely.

5    Q    And the something that they taught you, that you majored

6    in, was business, am I correct?

7    A    That is correct.

8    Q    And when you got out, you believed that you had the

9    principles and basic concept of business down, am I correct?

10   A    I did.

11   Q    And you represented individuals for a number of years, am

12   I correct?

13   A    That is correct.

14   Q    And you knew when you read a document, that basically

15   those documents had consequences, am I correct?

16            MS. SHIHATA:  Objection.

17            THE COURT:  Well, sustained as to form.

18            Well, I mean, let's put it this way.  Were you

19   thinking about whether there would be consequences for

20   handwriting that letter?

21            THE WITNESS:  In the letter --

22            THE COURT:  I guess just first of all, just that

23   question, if you can answer.

24            THE WITNESS:  I wasn't thinking at all along those

25   lines.

Mack - Cross - Cannick                3853

1   Q     But in that letter, you were apologizing for a wrongful

2   act, am I correct?

3   A     I was apologizing for not making him aware of doing

4   something that wasn't wrong.  That's what I apologized for.

5   It wasn't wrong.  It wasn't wrong.  It wasn't wrong.

6              In my background --

7   Q     I'm not asking you about your background.  I asked that

8   question already.

9              My question is, you were -- you wrote a letter,

10  acknowledging in the letter that you had done something wrong?

11  A     It wasn't wrong.

12  Q     I'm not asking if the conduct today was wrong.

13  A     That's not what I apologized for in the letter.  I

14  apologized for not telling him, for not telling Mr. Kelly that

15  his people, friends, booking agents that he knew were paying

16  me out of their own personal commission.

17  Q     Is that --

18  A     And they have every right to do that.

19  Q     Is that what you wrote in the letter?

20  A     That's what I wrote in the letter.

21  Q     So basically you didn't apologize for anything?

22  A     I apologized for not telling him.  He should have been

23  made aware of that; that's what I apologized for in the

24  letter.

25  Q     Now, you testified and told us earlier that there came a

Mack - Cross - Cannick                    3854

1   point in time that you went to Mr. Kelly's attorney's office.

2   That's Attorney Genson, I think it is?

3   A    That's correct.

4   Q    And you testified and told the jury that Mr. Genson had

5   you sign -- had an affidavit already prepared?

6   A    That's correct.

7   Q    And that you don't know if you answered the questions or

8   not, but you signed the affidavit?

9   A    I signed it.

10  Q    How old were you then?

11  A    Early forties.

12  Q    Still had that business degree?

13       MS. SHIHATA:  Objection.

14  A    Yes.

15       THE COURT:  Overruled.

16  Q    Still been practicing business?

17  A    Yes.

18  Q    Knew the consequences of an affidavit though, right?

19  A    Yes.

20  Q    Knew it was a legally binding document, right?

21  A    Correct.

22  Q    And you signed it?

23  A    Just as aggressively as I wanted to get out of there.

24  Q    No.  My question is, did you sign it?

25  A    Yes.

Mack - Cross - Cannick                    3855

1   Q    You signed it, right?

2   A    Yes.

3   Q    And you signed it because you wanted to get out of there,

4   am I correct?

5   A    That is correct.

6   Q    And you don't know whether or not you answered the

7   questions or not, am I correct?

8   A    That was many years ago.

9            THE COURT:  Could I see the parties at the side for

10  just a minute with the court reporter?

11           (Sidebar.)

12           (Continuing on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                            Sidebar                      3856
```

1          (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4          THE COURT:  I'm going to have to break.  I have

5   another proceeding, because why should I eat lunch.

6          I don't know, how much do you have left?

7          MR. CANNICK:  About another 40 minutes or so.

8          THE COURT:  I see.

9          So the only concern I have around this kind of

10  questioning is the potential for opening the door about the

11  allegations about Precious.  That's the only concern I have

12  about it.  I mean, look, you do you, I am just saying.

13         MR. CANNICK:  The only questions that I'm asking

14  here is she signed a document and she didn't read it, she

15  doesn't know whether or not she answered any questions.  And I

16  am going to follow up as to what was -- what did she do next.

17         THE COURT:  Okay.

18         MR. CANNICK:  Nothing else about this or --

19         THE COURT:  It just has a little bit of risk to it,

20  is my only concern.

21         MR. CANNICK:  Right.  And that's why I'm moving her

22  away from it.

23         THE COURT:  All right.  I thought there was

24  something that was in evidence.  Is it the actual, whatever

25  the settlement agreement is --

```
                              Sidebar                        3857
```

1          MS. SHIHATA:  The settlement agreement is, yes.

2          THE COURT:  It is in evidence?

3          MR. CANNICK:  It's in evidence.

4          THE COURT:  I forgot about it.  Okay.

5          MS. SHIHATA:  She didn't get a copy of it.

6          THE COURT:  Okay.

7          MR. CANNICK:  So we're done until what time?

8          THE COURT:  I guess 2:15.

9          MR. CANNICK:  Okay.

10         THE COURT:  Thanks.

11         (Sidebar ends.)

12         (Continuing on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                            3858

1              MR. CANNICK:  Lunch hour, Your Honor?

2              THE COURT:  Well, just a minute.

3              MR. CANNICK:  No, I just want to know if I should go

4    back to my --

5              THE COURT:  Stay in your lane.  Just a second.

6              Okay, ladies and gentlemen, I have another matter

7    that I have to handle over the lunch hour, so rather than

8    continue with this witness now, we are going to break for

9    lunch.  And if you could be back at 2:15, we will see you

10   then.  Please do not talk about the case at all in any way,

11   shape or form, but have a good lunch.

12             THE CLERK:  All rise.

13             (Jury exits the courtroom.)

14             THE COURT:  Okay.  Everybody can have a seat.

15             The witness can step out.  We will see you after

16   lunch.

17             (Witness exits the courtroom.)

18             THE COURT:  So if you all could just move some of

19   your things to the side.

20             MR. CANNICK:  Oh, okay.

21             THE COURT:  We have a criminal case.

22             MR. CANNICK:  Your Honor, I don't think the Court

23   noticed my inflection in my voice.  It was:  Lunch,

24   Your Honor?

25             THE COURT:  Did you notice the inflection in mine?

Proceedings                          3859

1            MR. CANNICK:  I noticed it in yours.

2            THE COURT:  I think everything is okay.

3            So just move everything over to the side and just to

4      make a little bit of room.

5            (Luncheon recess taken.)

6            (Continuing on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Proceedings                    3860
```

1        A F T E R N O O N    S E S S I O N

2                        --oo0oo--

3           (In open court; outside the presence of the jury.)

4           THE COURTROOM DEPUTY:  All rise.

5           THE COURT:  Good afternoon.  You can sit down.

6           (Pause in proceedings.)

7           THE COURT:  Let's get the witness, unless there's

8    something --

9           MR. CANNICK:  I do have an issue, Your Honor.

10          THE COURT:  All right.  Everybody here?

11          MR. CANNICK:  Yes.

12          THE COURT:  Okay.  Is your microphone on?

13          MR. CANNICK:  Yes.

14          THE COURT:  Okay.  What's your issue?

15          MR. CANNICK:  Your Honor, in the Government's

16   direct of this witness, they -- in the Government's direct

17   examination of this witness, they elicited testimony

18   about -- I think the testimony was that we -- we were

19   engaged to get Mr. Kelly off the bench.

20          THE COURT:  Yes, I recall.

21          MR. CANNICK:  Right.  And basically that testimony

22   is that his correct -- his career was stagnant and he was

23   doing nothing.

24          THE COURT:  I don't think that's what she said.  I

25   think she said something a little bit different, but I

Proceedings                              3861

1    recall the testimony.

2              But go ahead.

3              MR. CANNICK:  And then they mentioned when I

4    asked, Well, you know, he's working with Akon -- Akon came

5    up on direct examination as well.

6              THE COURT:  Fascinating.

7              MR. CANNICK:  Right, fascinating.

8              But inasmuch as --

9              MS. SHIHATA:  It actually did not come up on

10   direct examination.

11             THE COURT:  I don't think it did.  But in any

12   event, it's interesting.

13             MR. CANNICK:  Right.  It's a situation where I

14   think the cross-examination or crux of it regarding that

15   whole line, was that, well, you were hired to revive his

16   career, and basically you had nothing going on.  And when I

17   was trying to impeach and attack her credibility on that,

18   there was an objection and the objection was --

19             THE COURT:  You were --

20             MR. CANNICK:  It was sustained.

21             THE COURT:  I'm interrupting you because you were

22   asking whose career was bigger, and that's not relevant.

23             If you want to -- I think you've established or at

24   least you've asked her what other people she's represented,

25   but it was just that particular line of questioning which --

Proceedings                    3862

1    you know, it's not relevant to me.  It's not important who

2    that -- who Akon is or who is more popular.

3           And if you want to -- I think -- it seems to me

4    that you asked her quite a few questions about her not

5    having -- either her or Devyne not having any ability to get

6    clients.  I'm not sure she's in a position to talk about

7    Devyne.

8           He was here, I think, wasn't he?

9           MR. CANNICK:  But she said they work as a tandem.

10          THE COURT:  Right.  I mean, it's of such marginal

11   relevance.  If you feel this is essential to your

12   cross-examination, you can surely ask her questions; but, A,

13   part of the problem is that you -- that it's at a little bit

14   of a volume and I think the witness doesn't always

15   understand exactly what you're getting at, and I don't think

16   it's that relevant.

17          Is there some other question that you want to put

18   to her that you feel you need to do in order to undermine

19   her credibility?

20          MR. CANNICK:  No.  The whole purpose of this,

21   Your Honor, is to let you know that there's certain

22   questions I'm asking, and I'm certainly asking those

23   questions based either on her testimony or the 302's.  I

24   believe that, from my review of the 302's or from her

25   testimony, it's an attempt to attack our credibility.  And I

Proceedings                              3863

1   was just hoping that the Court would be mindful of that and

2   not preclude me from attacking the credibility.

3           THE COURT:  I'm not precluding you from doing

4   anything.

5           MR. CANNICK:  Okay.

6           THE COURT:  What I am precluding you from doing, I

7   would appreciate it if you lowered the volume a little bit

8   and I would also -- sometimes you ask compound questions and

9   I prefer that I give directions to the witness, rather than

10  the lawyers.  But other than that, I'm pretty much letting

11  you ask her anything that's relevant.  I did not think it

12  was particularly relevant what Akon's -- whatever the

13  questions you were asking about, how many records he put out

14  or whatever it was, that, to me, wasn't relevant.  But you

15  can -- if you -- if there's something that undermines the

16  credibility or that's relevant to that, I've given you

17  pretty free range on that.

18          All right.  Is there anything else?

19          MS. SHIHATA:  Just for the record, I think the

20  defense counsel asked numerous questions about Akon and who

21  else she worked with, with DeVyne and so forth, and that

22  area was explored fully.  Certain objections were sustained,

23  but there were certainly a number of questions that she

24  answered on cross-examination on that topic.

25          THE COURT:  All right.  Anything else?  I cut you

Proceedings                                  3864

1   off, Mr. Cannick.  Is there anything else that you wanted to

2   say?

3            MR. CANNICK:  No, Your Honor.  I've said what I

4   needed to say.

5            THE COURT:  All right.  So I guess now we should

6   probably go get the witness.  Anything else before we --

7   okay.  I guess it's possible that we may not finish today,

8   I'm feeling, but...

9            MR. CANNICK:  Painfully, yes.

10            MS. SHIHATA:  I think we're still planning to do

11   our best.

12            THE COURT:  No, that's fine.  This is a day I

13   didn't tell them to stay late, so...

14            (Pause in proceedings.)

15            (The witness resumes the stand.)

16            THE COURTROOM DEPUTY:  All rise.

17            (Jury enters the courtroom.)

18            (Jury present.)

19            THE COURTROOM DEPUTY:  You may be seated.

20            THE COURT:  All right.  Everybody, we're ready to

21   continue with the cross-examination of the witness.

22            Go ahead, Mr. Cannick.

23            MR. CANNICK:  Thank you, Your Honor.

24            THE COURTROOM DEPUTY:  The witness is reminded

25   she's still under oath.

Mack - Cross - Cannick                    3865

1              THE WITNESS:  Yes.

2    CROSS-EXAMINATION (CONTINUED)

3    BY MR. CANNICK:

4    Q    How long did you work with Mr. Kelly?

5    A    A year.

6              THE COURTROOM DEPUTY:  Your mic.

7              THE WITNESS:  I'm sorry.

8              MR. CANNICK:  I'm sorry.

9    Q    How long did you work for Mr. Kelly?

10   A    2014 to 2015.

11   Q    Okay.  And was that the sum total that you worked for

12   him?

13   A    2014 to 2015.

14   Q    Yeah.  I'm asking, was that the sum total that you --

15   A    That was the time frame that I was being compensated

16   for working for him.

17   Q    Okay.

18   A    So from 2013, the latter part of 2013, 2014, and the

19   middle of 2015.

20   Q    And when was it that you had the situation where you

21   were at Mr. Gensen's office and signed the affidavit?

22   A    That was in 2009.

23   Q    Okay.  And prior to that, you testified and told us

24   that Mr. Kelly had told you -- had told you about a

25   prospective lawsuit against him by Precious?

1    A    Correct.

2    Q    When was that call made to you; what year?

3    A    That was -- I believe it was early 2010.

4    Q    Okay.  And you testified and told us that during the

5    conversation related to that, that the -- Mr. Kelly asked

6    you to choose a team?

7    A    Pick a team, yes.

8    Q    Pick a team.  And then you followed up and told us that

9    he told you that people go missing?

10   A    Yes.

11   Q    Okay.  When was that?

12   A    When was that?

13   Q    Yes.

14   A    2010.

15         THE COURT:  Okay.  Hang on.  I'm sorry to

16   interpret you.

17         Your microphone is situated in a way that it's

18   hard to hear you.  And it was just noticeable, very hard to

19   hear what you were saying.

20         MR. CANNICK:  Okay.

21         THE COURT:  I could hear your tie, I couldn't hear

22   you voice.

23         So go ahead.

24         MR. CANNICK:  We'll give this a try.

25   Q    Now, he told you that people go missing and you took it

1   as a threat?

2   A    Correct.

3   Q    Okay.  And you weren't a teenager at that time; am I

4   correct?

5   A    Correct.

6   Q    You were in your thirties?

7   A    Correct.

8   Q    Okay.  Did -- and it frightened you when he told you

9   that?

10  A    Correct.

11  Q    Did you report it to the police?

12  A    No.

13  Q    Did you quit working for him?

14  A    I wasn't working for him at that time.

15  Q    So you weren't working for him at that time.  Did you

16  start working for him subsequent to this supposed threat?

17  A    Years later, yes.

18  Q    So years later after he threatened you, you came back

19  and you worked for him?

20  A    Correct.

21  Q    Okay.

22           No longer frightened?

23  A    I had a partner.

24  Q    I didn't ask you if you had a partner.  I didn't ask

25  you if you had a partner.

1          I asked you did you return -- did you start

2    working for him subsequent to him, according to you,

3    threatening you?

4    A    Yes.

5    Q    Okay.  When was it that you started working for him?

6    A    The later part of 2013, confrontation in 2014; and I

7    resigned in 2015.

8    Q    And you testified that there was an affidavit that you

9    signed at Gensen's office and you have no recollection as to

10   whether or not you made any notations on that affidavit?

11   A    No.

12   Q    Do you remember telling us about that?

13   A    That's correct.

14   Q    Do you recall what year that happened?

15   A    That was early 2010.

16   Q    Okay.  And I think --

17   A    2009, 2010.

18   Q    Okay.  And you had been in business for a while at that

19   time; am I correct?

20   A    That is correct, yes.

21   Q    Had a college degree in business?

22   A    That is correct.

23   Q    And you signed an affidavit without reading it?

24   A    That is correct, yes.

25   Q    And after -- now, you said that after you signed this

1   affidavit, you went directly home; am I correct?

2   A    That is correct.

3   Q    And home was where?

4   A    I'm sorry?

5   Q    Where was home?

6   A    Atlanta.

7   Q    Atlanta.  So you got on a plane?

8   A    Uh-huh, yes.

9   Q    And you flew back to Atlanta?

10  A    That is correct.

11  Q    Okay.  And when you got home, did you make a notation

12  to yourself, vis-à-vis, telling the attorney's office,

13  signed an affidavit, did not read it?

14  A    No, I did not.

15  Q    Did you make any entry or recording of that anywhere

16  whatsoever?

17  A    No, I did not.

18  Q    So you sign an affidavit, didn't read it, and you did

19  not journal -- put it in a journal or any type of notation?

20  A    That is correct.

21  Q    And again, you had been in business for a substantial

22  period of time; am I correct?

23  A    That is correct.

24  Q    And after you signed that affidavit without having read

25  it, you went back at some point and starting working for

Mack - Cross - Cannick                    3870

1    Mr. Kelly as a paid employee; am I correct?

2    A    That is correct, yes.

3    Q    Incidentally, what was your salary when you worked --

4    starting working for Kelly?

5    A    Initially, I wasn't getting a salary.  So are you

6    referring to when it actually started?

7    Q    Yeah, when you became a salaried employee of Kelly's,

8    what was your salary?

9    A    10,000 a month.

10   Q    10,000 a month?

11   A    Uh-huh.

12   Q    And then you had a situation where Mr. Kelly accused

13   you of working side deals with promoters.

14          Do you remember that?

15   A    That is correct, yes.

16   Q    And when was it that he accused you of making side

17   deals with promoters?

18   A    I don't recall.

19   Q    Okay.  But you continued working for him; am I correct?

20   A    That is correct.

21   Q    Now, when he approached you about that, there came a

22   point in time that you, he, and the lawyers and others had a

23   meeting; am I correct?

24   A    That is correct.

25   Q    And then it was subsequent to that that you wrote the

1    letter of apology; am I correct?

2    A    That is correct.

3    Q    Okay.  Now, was the lawyer with you when you wrote the

4    letter of apology?

5    A    No.

6    Q    Mr. Kelly wasn't with you, either; am I correct?

7    A    Yes, he was.

8    Q    Okay.  He was?

9    A    Yes.

10   Q    Now, there was a point earlier this morning when

11   the Court asked you, when the Judge asked you if you were by

12   yourself.  You told the Judge you were alone when you wrote

13   that letter.  Do you remember telling the Judge that?

14   A    Yes.

15   Q    Okay.

16            Now, you testified and told us about Mr. Kelly

17   renting a house from Mr. Stevens?

18   A    No.

19   Q    You didn't tell us about that?

20            You told us about a gym that Mr. Stevens had

21   installed in the house.  Do you remember telling us about

22   that?

23   A    Yes.

24   Q    Okay.  Mr. Kelly paid for that gym's installation; am I

25   correct?

1    A    I don't recall.

2    Q    Okay.

3    A    I don't remember.

4    Q    Okay.  Now, when you entered -- when did you start

5    working with Precious?

6    A    2009.

7    Q    Okay.  And how long did you work with Precious?

8    A    Almost a year.

9    Q    When did you introduce Precious to Mr. Kelly?

10   A    In -- I believe it was late August of 2009.

11   Q    Okay.  And -- and was that introduction by phone or in

12   person?

13   A    It was in person.

14   Q    Okay.  What was Precious's date of birth?

15   A    October -- I want to say it was October 8th of -- I

16   don't recall the year.

17   Q    Okay.  You don't recall the year.

18        Okay.  Incidentally, when Precious was working

19   with Mr. Kelly, Mr. Kelly didn't tell her what to wear; am I

20   correct?

21   A    Not -- I -- I -- I don't know -- I don't have any

22   information about that.

23   Q    Now, you testified and told the jury that Mr. Kelly did

24   not allow you to have conversations with the male employees?

25   A    Could you repeat the question?

Mack - Cross - Cannick                3873

1    Q    Did you testify this morning and tell the jury that

2    Mr. Kelly did not allow you to have conversation with male

3    employees?

4    A    Correct.

5    Q    Okay.  Well, he didn't allow any male-female

6    conversation in his workplace; am I correct?

7    A    Correct.

8    Q    Okay.  So that wasn't just that he prevented -- that he

9    did not allow you.  It was a part of his practice to not

10   allow males and females who were working for him to have any

11   fraternization?

12   A    Correct.

13   Q    Now, you testified and told us about Mr. Kelly

14   performing in Connecticut at a casino, and you told us about

15   something that you saw -- that you saw happening in the --

16   in his dressing room with Jane.

17         Do you recall telling us about that?

18   A    Correct.

19   Q    Now, when you first were contacted by Jane, you -- you

20   received Jane's date of birth; am I correct?

21   A    That is correct.

22   Q    And according to you, you saw a situation that Jane

23   engaged in oral sex with Mr. Kelly; am I correct?

24   A    Repeat the question.

25   Q    According to you, the night that you made these

Mack - Cross - Cannick                3874

1   observations in Connecticut, what you were really telling us

2   is that you witnessed Jane performing oral sex with

3   Mr. Kelly; am I correct?

4   A    I never said that.

5   Q    You never said that because you never saw that; am I

6   correct?

7   A    I never saw her give him oral sex --

8   Q    Okay.

9   A    -- no.

10  Q    And if you did -- withdrawn.

11         And at any point in time after you saw what made

12  you uncomfortable, did you contact Mr. Kelly and say, You

13  know what?  What I saw the other night made me

14  uncomfortable?

15  A    That was certainly my intention to --

16  Q    I didn't ask you that.

17  A    -- bring that to the table.

18  Q    I didn't ask you if that was your intention.  I'm

19  asking you if, at any point in time, you contacted

20  Mr. Kelly and --

21  A    No, I did not.

22  Q    At any point in time, did you contact law authorities,

23  law enforcement and say, I saw something between an adult

24  and a minor that made me uncomfortable?

25  A    I filed a complaint with a lawyer in Chicago.

Mack - Cross - Cannick                    3875

1    Q    Is that law enforcement?

2         You know what law enforcement is; am I correct?

3    A    I certainly do.

4    Q    Okay.  At any point in time, did you contact law

5    enforcement and say, I saw something between an adult and a

6    minor that made me uncomfortable?

7    A    No.

8    Q    And Mr. Kelly and you had a conversation early on when

9    he first introduced you to Jane and he told you that Jane

10   was 18; am I correct?

11   A    I have no knowledge of that.

12   Q    Now, you testified and told the jury that subsequent to

13   your making an observation that made you uncomfortable, that

14   you quit your employment with Mr. Kelly.

15        Do you remember telling us about that?

16   A    That is correct.

17   Q    Now, you quit your employment because of the scene that

18   you thought that Mr. Kelly made at the McDonald's; am I

19   correct?

20   A    I had already drafted my letter.

21   Q    You quit your employment with Mr. Kelly because -- as

22   you told the jury this morning, it was because of the scene

23   that Mr. Kelly made at McDonald's; am I correct?

24   A    I quit my employment the night before.  I had already

25   started drafting my later.

1   Q    When you spoke --  withdrawn.

2        There was a time in this case that you spoke with

3   some federal agents about your supposed observations; am I

4   correct?

5   A    Correct.

6   Q    And there was a time that you spoke with them about

7   your quitting your work with Mr. Kelly; am I correct?

8   A    Correct.

9   Q    Did you tell them that you drafted your resignation

10  letter the night before?

11  A    Did I tell them...? --  I'm sorry.

12  Q    That you drafted your letter of resignation the night

13  before the incident at the McDonald's?

14  A    I drafted the letter.

15  Q    No, that's not my question.

16  A    You can ask my lawyer.

17       THE COURT:  What he wants to know is whether --

18  when you were talking to the Government, whether you told

19  them about that.

20       THE WITNESS:  I don't recall.  I don't remember.

21  Q    At these basketball games that you went to that you

22  said that women were faced away from the game and wearing

23  sweats, Precious didn't face away from the game, did she?

24  A    I don't recall.

25  Q    Okay.  And Precious didn't wear sweats, did she?

1    A    I don't recall.

2    Q    Well, I'm going to show you what you told the

3    Government and see if it refreshes your recollection.

4         MS. SHIHATA:  Can you show me what you're showing

5    her?

6         (Pause in proceedings.)

7         MS. SHIHATA:  What page number?

8         MR. CANNICK:  8 of 12.

9    Q    I'm going to show you this document, the top paragraph.

10   Please read it to yourself; and when you finish reading it,

11   let me know, please.

12   A    (Witness complies.)

13   Q    Have you read it?

14   A    (No audible response.)

15   Q    Does it refresh your -- having read that document, does

16   it refresh your recollection that you told the Government

17   that Precious didn't have to -- didn't face away from the

18   game?

19   A    So I believe that --

20   Q    That's a question.

21        THE COURT:  He just wants to know if when you read

22   that, does that refresh your memory about whether you told

23   them that Precious didn't have to face the wall?

24        THE WITNESS:  Yes.

25        THE COURT:  Okay.

1   Q    And does it refresh your recollection you told the

2   Government that Precious didn't have to wear sweat clothes?

3   A    Yes.

4   Q    Okay.  Now, I asked you earlier if you recall Mr. Kelly

5   telling you --

6              (Pause in proceedings.)

7              THE COURT:  Okay.  I'm going to just ask the jury

8   to step out for about five minutes or so.  We'll be back in

9   just a second.

10              THE COURTROOM DEPUTY:  All rise.

11              (Jury exits the courtroom.)

12              (The following matters occurred outside the

13   presence of the jury.)

14              THE COURT:  All right.  Everybody can sit down,

15   and the witness can step out for a minute.

16              (Witness exits the stand.)

17              (In open court; outside the presence of the jury.)

18              THE COURT:  Okay.  The witness is feeling faint.

19   So let's give her a few minutes to drink some water.

20              And maybe your special -- I'd really like to know

21   what the situation is.  I just didn't want to do it in front

22   of the jury.  So maybe he can find out how long she needs

23   or...

24              THE COURTROOM DEPUTY:  Do you want me to find out?

25              THE COURT:  Actually, Donna will find out.

Mack - Cross - Cannick                3879

1           (Pause in proceedings.)

2           THE COURT:  Can I see the lawyers at the side with

3    the court reporter?

4           (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SEALED BY ORDER OF THE COURT                3880

1        (The following occurred at sidebar.)





SEALED BY ORDER OF THE COURT                    3881

(Continued on the next page.)

Mack - Cross - Cannick                3882

1              (Sidebar ends; in open court outside the presence

2     of the jury.)

3              (Pause in proceedings.)

4              THE COURT:  We good?

5              All right.  I just want to also make sure that

6     Ms. Mack has some water and -- okay, just take your time.

7     All right?

8              Okay.  Let's get the jury.

9              (The witness resumes the witness stand.)

10             THE COURTROOM DEPUTY:  All rise.

11             (Jury enters the courtroom.)

12             (Jury present.)

13             THE COURTROOM DEPUTY:  You may be seated.

14             THE COURT:  All right.  Everybody, we're ready to

15     resume.

16             Go ahead, Mr. Cannick.

17             MR. CANNICK:  Thank you.

18     BY MR. CANNICK:

19     Q    I asked you earlier if there was a point where

20     Mr. Kelly told you that Jane was 18 years old, and you told

21     me, no, that didn't happen.  Am I correct?

22     A    I don't recall.

23     Q    Okay.  Do you recall your asking Mr. Kelly at Mandalay

24     Bay who was Jane, and he told you that Jane was a singer and

25     she was 18 years old?

Mack - Cross - Cannick                3883

1   A    I don't recall that.

2   Q    I'm going to show you this document and see if it

3   refreshes your recollection that you asked Mr. Kelly, Who is

4   Jane, and he responded she's a singer who's 18 years old.

5            Look at the second highlighted pink area.

6   A    Okay.

7   Q    Have you looked at it?

8   A    Yes.

9   Q    I didn't hear you.

10  A    Yes.

11  Q    Does that refresh your recollection that Mr. Kelly

12  asked you -- withdrawn.

13           -- that you asked Mr. Kelly who was Jane when you

14  were at the Mandalay Bay and he told you that Jane was a

15  singer and she was 18 years old?

16  A    Okay.

17           THE COURT:  He just -- what he wants to know is,

18  when you look at that, does that refresh your memory about

19  Mr. Kelly telling you that?

20           THE WITNESS:  Yes.

21           THE COURT:  Okay.  Next question.

22  Q    Now going back to the incident that happened at

23  McDonald's, now, after Mr. Kelly, according to you, made

24  that scene, he told you that you had to apologize to Jean --

25  to Jane; am I correct?

Mack - Cross - Cannick                3884

1   A    Right.

2   Q    And you told him that you were not going to apologize

3   to a guest; am I correct?

4   A    That is correct, yes.

5   Q    And at that point in time, you went back to your room,

6   packed your bags, and left the next day; am I correct?

7   A    That is correct.

8   Q    Now, you testified and made reference earlier that you

9   engaged an attorney.  Do you remember telling us that?

10  A    That is correct.

11  Q    When did you engage the attorney?

12  A    I don't recall the date.

13  Q    Do you recall engaging the attorney back in 2015?

14  A    I recall that vaguely.

15  Q    Okay.  Do you recall when in -- are you saying that you

16  engaged an attorney in 2015?

17  A    Yes.

18  Q    Who was that attorney?

19  A    Scott Hoopes would have been the first attorney and

20  then Brian Caplan after that.

21  Q    Okay.  And who is the attorney you have with you here

22  today?

23  A    Brian Caplan.

24  Q    Okay.  Now, you still have a lawsuit pending against

25  Mr. Kelly; am I correct?

Mack - Cross - Cannick                    3885

1    A    No, I do not.

2    Q    You don't?

3         Did you have a lawsuit pending with Mr. Kelly?

4    A    I did.

5    Q    Okay.  And when did you initiate that lawsuit?

6    A    It was never issued in court.  It was a complaint filed

7    with a lawyer.

8    Q    And my question is when.

9    A    I don't recall the month.

10   Q    Do you recall the year?

11   A    It was 2015.

12   Q    2015?

13   A    I believe -- I -- I don't recall.

14   Q    Now, you -- were you involved at all with the

15   Surviving R. Kelly television program?

16   A    I was not.

17   Q    Okay.  But you wrote a manuscript or an outline that

18   made it on -- on the Internet; am I correct?

19   A    I didn't initiate it, but it made it, yes.

20   Q    Right.  I'm not asking if you initiated it.  You -- you

21   wrote it --

22   A    The answer is yes.

23   Q    -- the outline, right?

24   A    Yes.

25   Q    And you -- in that outline, you characterized Mr. Kelly

Mack - Cross - Cannick                3886

1  as a man who could write a record better than he could spell

2  his name?

3          THE COURT:  Could I see the lawyers at the side,

4  please, just for a minute.

5          (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SEALED BY ORDER OF THE COURT                3887

1     (The following occurred at sidebar.)





SEALED BY ORDER OF THE COURT                3888

(Continued on the next page.)

                    Mack - Cross - Cannick              3889

1                (Sidebar ends; in open court.)

2                THE COURT:  Go ahead.

3    BY MR. CANNICK:

4    Q    When was it that you wrote that outline and manuscript?

5    A    I don't remember exactly.

6    Q    Well, you wrote it before the Surviving R. Kelly

7    television program; am I correct?

8    A    That is correct, yes.

9    Q    And in that manuscript or outline, you made a number of

10   exaggerated claims about Mr. Kelly; am I correct?

11   A    I don't recall.

12   Q    Okay.  Well, didn't you -- do you recall telling the

13   Government that you had exaggerated claims in the

14   manuscript?

15   A    I'm not understanding you.  I'm sorry.

16   Q    You interviewed with the Government; am I correct?

17   A    That is correct, yes.

18   Q    And they asked you about the manuscript; am I correct?

19   A    That is correct.

20   Q    And they asked you about the contents of the

21   manuscript; am I correct?

22   A    Yes.

23   Q    And they asked you about the claims that you made in

24   the manuscript; am I correct?

25   A    It wasn't -- it was a proposal.

Mack - Cross - Cannick                    3890

1    Q    Okay.  Well, they asked you about --

2    A    It was a proposal.

3    Q    -- the claims that you made in the proposal; am I

4    correct?

5    A    That is correct.

6    Q    And you told them that some of the claims were

7    exaggerated; am I correct?

8    A    Correct.  For the purpose of the proposal, yes.

9    Q    And what was this proposal for?

10   A    I was in the process of looking into a book

11   opportunity --

12   Q    Uh-huh.

13   A    -- not to include everything that was in that proposal.

14   Q    And you wrote that, the exaggerated claims, to make it

15   a more juicy sell; am I correct?

16   A    It is a proposal.

17   Q    But my question is:  You made the exaggerations to make

18   it a little bit more juicy; am I correct?

19   A    And with it being a proposal, yes.

20   Q    And some of those things were salacious?

21   A    It was a proposal.

22   Q    No, my question is:  Are some of the claims that you

23   made in the book salacious?

24   A    I don't recall.

25              (Continued on the next page.)

1   CROSS-EXAMINATION

2   BY MR. CANNICK:  (Continuing)

3   Q    You wanted someone to pick up the proposal, am I correct?

4   A    I don't recall it going that way.

5   Q    You don't recall whether or not you -- you wrote a

6   proposal and you don't recall whether or not you wanted

7   someone to buy?

8   A    I wasn't shopping it around.  It was one person that it

9   went to, just one.

10  Q    You weren't hoping that one person would bite on it?

11  A    Possibility.

12  Q    You testified and said that you don't recall the date of

13  the -- that you prepared?

14          THE COURT:  Prepared what?  The proposal?

15          MR. CANNICK:  The proposal.

16  Q    Do you recall the date?

17  A    It wasn't a one-day close.  I mean, I don't recall.

18          THE COURT:  Do you remember what year you prepared

19  it?

20          THE WITNESS:  I believe it was -- I may have started

21  it in 2010 and I might have finished it in 2015, I don't

22  recall.

23  Q    But as you sit here today, you don't have an independent

24  recollection?

25  A    Excuse me?

Mack - Cross - Cannick                    3892

1    Q    As you sit here today, do you have an independent

2    recollection as to when it was that you --

3    A    As I sit here today, no, I don't.

4    Q    Now, the lawsuit that you filed against Mr. Kelly, that

5    was on October 1st, 2015, am I correct?

6    A    I don't recall the date exactly.

7             THE COURT:  Are you asking her the date the suit was

8    filed or that she spoke to a lawyer?

9             MR. CANNICK:  I'll show the document.

10            THE COURT:  All right.

11   Q    What was the name of the law firm that you consulted with

12   regarding the suit of Mr. Kelly?

13   A    I believe it was Susan.  I don't recall the last name.

14   Q    I'm going to show you this document and see if it

15   refreshes your recollection.

16   A    Oh, I'm sorry.

17   Q    Having shown you that document, do you now recall the

18   name of the law firm that you consulted with regarding your

19   suit against Mr. Kelly?

20   A    Yes.

21   Q    What was the name of the law firm?

22   A    Mills Hughes.

23   Q    And what was the date of their claim?

24   A    October 2015.

25            THE COURT:  Well, is that the claim?  Maybe I am

Mack - Redirect - Shihata                    3893

1    splitting hairs here, but is that -- I am not sure what date

2    you are asking her.  It seems to be the date of a letter, but

3    I do not know if that is the...

4            THE WITNESS:  It was the date of the letter.

5            THE COURT:  Whatever.  Go ahead.

6    Q    I am going to show you this document again and see if it

7    refreshes your recollection as to whether or not it is the

8    date of the letter or the date of the claim.

9    A    It was the date of the claim.

10           MR. CANNICK:  Can I have a second please,

11   Your Honor?

12           THE COURT:  Sure.

13           MR. CANNICK:  Thank you, Your Honor.  Nothing

14   further.

15           THE COURT:  All right.  Any redirect?

16           MS. SHIHATA:  Very briefly.

17           THE COURT:  Okay.

18   REDIRECT EXAMINATION

19   BY MS. SHIHATA:

20   Q    Good afternoon.

21   A    Good afternoon.

22   Q    On cross-examination before the lunch break, you were

23   asked some questions by defense counsel regarding the work you

24   and Devyne Stevens did together.  Do you recall those

25   questions?

Mack - Redirect - Shihata                3894

1    A    Yes.

2    Q    And you were asked some questions about the list of

3    clients that you and Devyne had, correct?

4    A    Correct.

5    Q    And I believe in response to one of the questions that

6    Mr. Cannick, the defense counsel, asked you, you indicated

7    that Devyne, Mr. Stevens, had a long list of clients, correct?

8    A    That is correct.

9    Q    Who were some of Mr. Stevens's clients?

10   A    Past or present?  I think he was asking present and I --

11   Q    Do you know any of the clients that Mr. Stevens had or

12   has?

13   A    Well, in the past, he -- in the past he's worked with

14   Akon, T-Pain.  Oh, God, it's a long list of -- TLC.  It's a

15   long list of Atlanta artists.  I don't recall them all.

16   Q    Has he worked with Jay-Z?

17            MR. CANNICK:  Objection.

18            THE COURT:  Overruled.

19   A    I'm not sure.  Indirectly I believe, yes.

20   Q    Fair to say he's worked with many high-caliber artists in

21   the music industry?

22   A    Yes.  I know he's worked with Beyonce, Destiny's Child,

23   the Braxton sisters and Monica, and the list goes on.

24   Q    All well-known artists, correct?

25   A    Very much so, yes.

Mack - Redirect - Shihata                3895

1   Q    Now, when you began working with the defendant again in

2   2013, when you and Mr. Stevens began working with him at that

3   time, he was no longer living at the Olympia Fields residence

4   you had been to previously, correct?

5   A    Correct.

6   Q    And, in fact, that residence had been foreclosed on,

7   correct?

8          MR. CANNICK:  Objection.  This is beyond the scope.

9          THE COURT:  Yes.  Sustained.

10  Q    Now, you were asked some questions on cross-examination

11  about your education and background and the affidavit you

12  signed in Mr. Genson's office.  Do you recall being asked

13  those questions?

14  A    Yes.

15  Q    And that was, as you testified on direct examination, the

16  incident in Mr. Genson's office that was just a few hours

17  after the defendant told you that you had to pick a team and

18  that people go missing in situations like this, correct?

19  A    That's correct.

20  Q    And was that still in your mind while you were in

21  Mr. Genson's office?

22         MR. CANNICK:  Objection.

23         THE COURT:  Overruled.

24  Q    You can answer.

25  A    Yes.

Mack - Redirect - Shihata                    3896

1  Q    And you were also asked questions about how you were in

2  business for a substantial period of years.  Do you remember

3  those questions?

4  A    Yes.

5  Q    And I think you testified on direct examination that you

6  worked in corporate America, correct?

7  A    That is correct.

8  Q    And you worked in your own business as a talent manager,

9  correct?

10  A    That is correct.

11  Q    That was your own business?

12  A    Yes.

13  Q    AND you worked for Mr. Stevens for a period of time?

14  A    Yes.

15  Q    And then you worked first with and then for the

16  defendant, correct?

17  A    Correct.

18  Q    And in any of those -- apart from working with the

19  defendant, in any of those other business situations, had you

20  ever been in a situation like the one in Mr. Genson's office?

21  A    Never.

22  Q    Have you ever -- apart from with the defendant, had you

23  ever been in a business situation where your employer asked

24  you to write a letter, apology letter?

25  A    Never.

Mack - Redirect - Shihata                3897

1   Q    In his presence?

2   A    Never.

3   Q    And you were asked on cross-examination questions about

4   whether -- that when the Court, when the judge asked you

5   whether you were alone when you wrote the letters.  Do you

6   remember those questions?

7   A    Yes.

8   Q    What did you mean by "alone" when you said that?

9             MR. CANNICK:  Objection.

10            THE COURT:  Overruled.

11  A    Meaning that there was no other staff members or anyone

12  else there.

13  Q    And who was there?

14  A    Just Mr. Kelly.

15  Q    And yourself?

16  A    And myself.

17  Q    So the two of you were alone when you wrote those

18  letters?

19  A    Yes.

20  Q    You were asked some questions about a book proposal that

21  you wrote.  Did that have anything to do with the docuseries

22  *Surviving R. Kelly*?

23  A    No.

24  Q    In fact, was that written years before that?

25  A    I started it in 2010, right after Precious exited.  I

Mack - Recross - Cannick                3898

1    started it years before that.

2    Q    And did you ever do anything to make it public?

3    A    Never.

4         MS. SHIHATA:  One moment, Your Honor.

5    Q    And you were asked some questions on cross-examination

6    about an October 2015 letter that your lawyer sent.  Do you

7    recall those questions?

8    A    Yes.

9    Q    And that was a letter, not, in fact, an actual lawsuit,

10   correct?

11   A    It was a letter.  It was not a lawsuit.

12   Q    And, in fact, you never filed a lawsuit, correct?

13   A    I've never filed a lawsuit with the courts, ever.

14        MS. SHIHATA:  Nothing further.

15        THE COURT:  Any recross?

16        MR. CANNICK:  Yes.

17   RECROSS EXAMINATION

18   BY MR. CANNICK:

19   Q    I'm going to -- you were just asked a few seconds ago

20   about this meeting that you supposedly had with you and

21   Mr. Kelly.

22        THE COURT:  Can you turn on your microphone?

23        MR. CANNICK:  I just did.

24        THE COURT:  Oh.

25        MR. CANNICK:  Is it not --

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Mack - Recross - Cannick                3899

1              THE COURT:  Maybe I am getting a little old.  I

2    cannot hear it.

3              MR. CANNICK:  It's on.

4              THE COURT:  Now it is.  All right.

5    Q    Do you recall this question from the Judge:

6              "Were you by yourself when you wrote it?"

7              Your answer:  "Yes."

8              Now, when the Judge asked you that, were you by

9    yourself, were you by yourself, did you think the Judge was

10   asking you were -- or meant -- "yourself" meant you and

11   Mr. Kelly?

12             MS. SHIHATA:  Objection.

13             THE COURT:  Overruled.

14             How did you interpret that question?

15   A    So when you asked the question "by myself," I thought you

16   were referring to the lawyer Linda Mensch or Joan or some

17   other staff member, other than just myself and the obvious.

18   Q    So when the Judge asked you were you by yourself when you

19   wrote it, that's your response?

20             MS. SHIHATA:  Objection.

21             THE COURT:  Well, that is her response so the

22   objection is overruled.

23             Anything else?

24             MR. CANNICK:  Yes, a little bit more.

25   Q    Now, you testified and said that Mr. Stevens worked for

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Mack - Recross - Cannick                    3900

1  Jay-Z?

2  A     Yes.

3  Q     To do what?

4  A     I'm not sure the scope of the business that he provided

5  for Jay-Z, but he did.

6  Q     When?

7  A     I don't recall the year.

8  Q     What project?

9  A     I don't recall the project.

10 Q     Where?

11 A     I don't recall the location.

12 Q     Were you involved with it?

13 A     I was not, no.

14 Q     It just happened when you and him were working together?

15 A     No, prior.

16 Q     Prior?

17 A     He already had built his legacy.

18 Q     I didn't ask you about his legacy.  I asked you whether

19 or not this happened prior to your working with Mr. Stevens.

20 A     Yes.

21 Q     And when was it that you started to work with

22 Mr. Stevens?

23 A     I don't recall.

24 Q     You testified and told us that he worked with Akon.  What

25 year?

Mack - Recross - Cannick                              3901

1   A    From inception of Akon's career up until he no longer
2   worked with him.

3   Q    And when was it that --

4   A    Many years.

5   Q    When was it that he did all the work for him?

6   A    I'm not sure exactly the year.  I'm not sure exactly the
7   year.

8   Q    2008?

9   A    Could have been later.

10  Q    When was it he worked with Beyonce?

11  A    Early years of her career.

12  Q    Mr. Stevens basically worked as a choreographer, dancers,
13  am I correct?

14  A    That was a different group of talent.  That would have
15  been Usher, because Usher is a dancer.  That would have been
16  Bieber, because Bieber is a dancer.  That would have been
17  other -- that was also a service that he provided.

18  Q    Were you with him when he worked with Usher?

19  A    No.

20  Q    Were you with him when he worked with Justin Bieber?

21  A    No.

22  Q    Now, when you worked with Mr. Kelly in 2013, he was
23  working on a project with Mariah Carey, am I correct?

24  A    Who exactly was working on a project with Mariah?

25  Q    Mr. Kelly.

Mack - Recross - Cannick                3902

1   A    I'm not too -- I don't recall.

2   Q    Was he working in 2013 with Bruno Mars?

3   A    I believe we closed a record with Bruno Mars.

4   Q    Was he working with Whitney Houston?

5              MS. SHIHATA:  Objection.

6              THE COURT:  Overruled.

7              Do you recall if Mr. Kelly was working with Whitney

8   Houston?

9   A    Prior to -- I do recall a year that he worked with

10  Whitney Houston, but not after Devyne Stephens, no.

11  Q    Well, what about Lady Gaga?  That was in --

12             THE COURT:  Can I see the lawyers at the side with

13  the court reporter for a minute?

14             (Sidebar.)

15             (Continuing on the following page.)

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        3903
```

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  So, I mean, this is of such marginal

5    relevance.  If you want to ask those questions, one little

6    problem with these questions is, I have heard, although it may

7    not be true, that none of these people want to work with

8    Mr. Kelly now, which would not -- but I am saying it is just

9    -- it is not of much relevance in the first place except I

10   guess to show that -- I am not even quite sure what it is to

11   show, but I think that you should wrap it up.

12         If you have got more cross, I am not telling you

13   that you cannot cross-examine.

14         And you do not have to show me your notes.

15         MR. CANNICK:  I only have two more names, and this

16   is an area that they opened the door on.

17         MS. SHIHATA:  Can I just say one thing on that,

18   please?

19         I did not go into any of that.  He is making it -- I

20   did in redirect and the only reason I did is because he was

21   trying to say there is no way that Devyne Stevens -- that

22   R. Kelly would work with Devyne Stevens to get his -- for his

23   career to be more active, which is I think what she testified

24   to.  And frankly, Judge, the reason I brought up the

25   foreclosure of Olympia Fields, which is frankly directly

```
                        Sidebar                      3904
```

1  relevant to the argument he is trying to make.

2          THE COURT:  I know, but who knows why he foreclosed.

3          Did he live with Mr. Stevens for a while?

4          MS. SHIHATA:  I think he used the studio and the

5  basketball court.  I don't think he lived there.

6          THE COURT:  In any event, it is all extremely

7  interesting probably to musicologists.  I do not see a huge --

8  I mean, it is getting to be a little bit who is better, which

9  so what?

10          But if you want to ask him about two more people...

11          MR. CANNICK:  Two more people.

12          THE COURT:  Who are they?

13          MR. CANNICK:  Lady Gaga and Justin Bieber.

14          MS. SHIHATA:  You asked about Lady Gaga and Justin

15  Bieber.

16          THE COURT:  Go ahead.

17          (Sidebar ends.)

18          (Continuing on the following page.)

19

20

21

22

23

24

25

Mack - Further Redirect - Shihata            3905

1   BY MR. CANNICK:

2   Q    Mr. Kelly also worked in 203 with Lady Gaga and Justin

3   Bieber, am I correct?

4   A    That is correct.

5   Q    And these are the folks he worked with when you were just

6   joining him in 2013, am I correct?

7   A    That is correct.

8           MR. CANNICK:  I think that's it, Your Honor.

9           THE COURT:  All right.  Anything else on

10  re-redirect?

11          MS. SHIHATA:  One moment, Your Honor.

12          I have one question.  And I promise it's not on that

13  topic.

14          THE COURT:  All right.  That is all right.

15  FURTHER REDIRECT EXAMINATION

16  BY MS. SHIHATA:

17  Q    You were asked some questions on recross-examination

18  about the question the Judge asked you, about whether you were

19  alone when you wrote the letter?

20          MR. CANNICK:  Objection.

21          THE COURT:  Overruled.

22  Q    In prior meetings with the government, had you told the

23  government that you were with Mr. Kelly and no one else when

24  you wrote that letter?

25          MR. CANNICK:  Objection.

Mack - Further Recross - Cannick                    3906

1          THE COURT:  Overruled.

2    A    I was with Mr. Kelly and no one else.  There was no other

3    staff members there.

4    Q    And you previously told the government that, correct?

5          MR. CANNICK:  Objection.

6          THE COURT:  Overruled.

7    A    Correct.

8          THE COURT:  Anything else?

9          MS. SHIHATA:  Nothing else.

10         THE COURT:  All right.  Anything else?

11         MR. CANNICK:  Just one second.  I want to find it.

12         THE COURT:  All right.

13         (Pause.)

14   FURTHER RECROSS EXAMINATION

15   BY MR. CANNICK:

16   Q    As you sit here today, do you have a recollection as to

17   when it was that you told the government that you were alone

18   when you wrote those letters?

19         THE COURT:  Oh, I think I am sustaining as to the

20   form of the question.

21   Q    As you sit here today, do you recall when it was that you

22   told the government that you wrote those letters, that you

23   were alone when you wrote those letters?

24         THE COURT:  The only reason I am -- I do not think

25   that was the question on redirect, that she was alone when she

1   wrote the letters.

2           MR. CANNICK:  Maybe I can have that question back so

3   I can make sure that I am accurate.

4           THE COURT:  I think the question was, the only

5   question with an answer was "In prior meetings with the

6   government, had you told government that you were with

7   Mr. Kelly and no one else when you wrote that letter?"  That

8   was the question.

9   Q    When did you tell the government that?

10  A    I don't recall the exact date.

11  Q    Was it in your first meeting with him?

12  A    It would have been in my first meeting, as far as I

13  recollect.

14  Q    I'm going to show you these documents and I want you to

15  look through it, then let me know when you find it.

16          THE COURT:  Just so I know, which -- what are the

17  pages you are showing?  Is this from a particular -- which

18  interview is this?

19          MR. CANNICK:  This is from the interview that

20  occurred 2/6/19.

21          THE COURT:  Okay.

22  Q    And let me know when you find the portion that you just

23  testified to that you told them in that meeting.

24  A    I'm sorry, I'm not finding it.

25          MR. CANNICK:  Okay.  Your Honor, I think the

Mack - Further Redirect - Shihata          3908

1   government will stipulate that it's not in the document.

2           THE COURT:  Okay.  Is that the stipulation?

3           MS. SHIHATA:  Yes, that it's not in that document.

4           MR. CANNICK:  I have nothing further, Your Honor.

5           THE COURT:  So I take it you have another document

6   you would like to show her?

7           MS. SHIHATA:  Yes, I do.

8           And this will be for the witness only, I'm showing.

9   FURTHER REDIRECT EXAMINATION

10  BY MS. SHIHATA:

11  Q    Do you see this -- sorry.  Sorry.

12          Do you see this document in front of you?

13  A    Yes.

14  Q    And is this document a meeting you had over Zoom with the

15  government on July 30th, 2021?

16  A    Yes.

17  Q    And during that meeting, did you state to the government,

18  in sum and substance, that you recall the time when Kelly

19  made -- well, I'll just read.

20          "Mack stated that she recalled the time when Kelly

21  made her write a letter in reference to an incident where she

22  was receiving money from concert promoters.  She stated it

23  took place in Kelly's studio in Chicago in late 2014, early

24  2015.  Kelly told Mack what to write in the letter.  And Mack

25  stated that he was very aggressive while telling her what to

1   write.  Mack was shown a letter that began with 'Mr. Kelly'

2   and she stated that she recalled Kelly made her change her

3   phone number so that the promoters couldn't contact her

4   anymore.  She stated that she wrote the letters in Kelly's

5   presence, at his direction, and that she was scared of him

6   while writing the letters."

7              Do you recall stating that previously?

8   A    I recall, yes.

9              MS. SHIHATA:  No further questions.

10             (Continuing on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (continuing.)

2            MR. CANNICK:  Just one.

3            THE COURT:  Just one?

4            MR. CANNICK:  One and some subsets.

5   RE-RECROSS-EXAMINATION

6   BY MR. CANNICK:

7   Q    You told us that you are on the letter -- you told the

8   Government that -- in your first meeting that you had with

9   him; am I correct?

10  A    Correct.

11  Q    The letter that was just read to you was -- what's the

12  date on that?  July 30th of this month, am I correct -- of

13  this year; am I correct?

14  A    Correct.

15  Q    Nine days before the beginning of trial?

16           MS. SHIHATA:  Objection.

17           THE COURT:  Well, the objection is sustained.

18  BY MR. CANNICK:

19  Q    You had this Zoom meeting on July 30, 2021?

20  A    Correct.

21  Q    And you're aware that the trial started August 9, 2021?

22           MS. SHIHATA:  Objection.

23           THE COURT:  Sustained.  Come on.

24           MR. CANNICK:  Nothing further.

25           MS. SHIHATA:  Nothing further.

Proceedings                                           3911

1           THE COURT:  Thank you so much.  The witness can step

2   down.

3           (Witness excused.)

4           THE COURT:  Can I see the parties.

5           (Sidebar held off the record without the court

6   reporter.)

7           THE COURT:  Okay, ladies and gentlemen.  I am trying

8   to figure out scheduling.  My main concern is squeezing out as

9   much time as we can so we can stay on schedule.  We will only

10  go to 5 o'clock, but we will start with the next witness so we

11  can keep this train moving.  Does anybody need a break?  It

12  doesn't look like it.

13          Call your next witness.

14          MS. GEDDES:  The Government calls Dr. Dawn Hughes.

15          (Witness takes the stand.)

16          THE COURTROOM DEPUTY:  Raise your right hand.

17          (Witness sworn/affirmed.)

18          THE COURTROOM DEPUTY:  Have a seat.

19

20          (Continued on the next page.)

21

22

23

24

25

Hughes - direct - Geddes                    3912

1    **DR. DAWN HUGHES**,

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5    DIRECT EXAMINATION

6    BY MS. GEDDES:

7              THE COURT:  Just a couple of things.  I want to make

8    sure everyone can hear you.  The microphone I think is on and

9    just make sure you are speaking into it and speak slowly so

10   the court reporter can get everything recorded.  If there is a

11   question that isn't clear or you would like to have rephrased,

12   just let me know.  Do your best to answer only the question

13   you are being asked.

14             MR. CANNICK:  Before we get started may we approach?

15   We don't need the reporter.

16             (Sidebar held without the court reporter.)

17             THE COURT:  Go ahead.

18   BY MS. GEDDES:

19   Q    Dr. Hughes, what is your profession?

20   A    I'm a clinical and forensic psychologist.

21   Q    What is clinical psychology?

22   A    Clinical psychology is the study of human behavior both

23   normal and abnormal human behavior.  We assess and treat and

24   diagnose individuals who are suffering from either a major

25   mental illness or also problems in living.  They may not have

SN        OCR        RPR

Hughes - direct - Geddes                    3913

1    a psychiatric diagnosis.

2    Q    What is forensic psychology?

3    A    So forensic psychology is just the application of the

4    science and principles of psychology to a particular legal

5    question at hand.  Forensic just means of the forum of the

6    law.  So forensic in front of a discipline like psychology

7    means I'm talking about psychological issues that may be

8    applicable to a legal issue.

9    Q    Can you describe your educational background?

10   A    Sure.  I received my Batchelor's Degree in psychology at

11   Hamilton College in Upstate New York.  I then received my

12   master of science and my doctorate in clinical psychology both

13   from Nova Southeastern University which is in Florida.  I then

14   had to complete a one-year internship up in New Haven at Yale

15   University in the School of Medicine, the department of

16   psychiatry.  And after that one has to do another year

17   fellowship and I came back to New York and did that Weil

18   Cornell Medical College New York Presbyterian hospital in the

19   anxiety and traumatic stress program.

20   Q    Can you describe your training and your experience in

21   psychology and trauma?

22   A    Sure.  The majority of my training throughout graduate

23   school has been some form of traumatic stress or violence or

24   abuse.  I worked at a domestic violence program that was

25   housed within a community health center in Fort Lauderdale

1    that was run by the university and there on we assessed and

2    treated individuals who were coming to the clinic to deal with

3    the consequences of having been in an abusive relationship.

4    In that clinic we also treated male batterers, men who were

5    court ordered for treatment because of having been violent

6    with their partner.

7            I also worked after that at the Veterans

8    Administration and had the opportunity to work with veterans

9    who were suffering from post-traumatic stress disorder or

10   other trauma-based disorders.  It was awhile ago and I was

11   fortunate to work with World War II veterans and Vietnam

12   veterans and the first Gulf war.  And during the time I was a

13   research coordinator for a program housed within our

14   university which was the child sexual abuse survivors program.

15   And those were individuals who were coming to the clinic to

16   receive help and services for the psychological consequences

17   of having been abused as a child.

18   Q    What positions do you currently hold?

19   A    I am currently in independent practice here in New York

20   City.  I also am a clinical assistant professor of psychology

21   in the department of psychiatry at Weil Cornell Medical

22   College New York Presbyterian Hospital.  That is a voluntary

23   faculty position which means I do not get paid for that

24   position, but participate in the training program and do some

25   teaching in the program as well.

1          THE COURT:  And just slow down just a little bit if

2   you could.

3   BY MS. GEDDES:

4   Q    How many years have you practiced as a psychologist?

5   A    Well, I was licensed in 1996.  So I guess 25 years.

6   Q    Can you briefly describe your private practice?

7   A    Sure.  So, I do a number of things.  One is I function as

8   a clinical psychologist which means I see individuals in my

9   office for therapy, the majority of whom have, because of my

10  specialization, suffered some kind of trauma or abuse or

11  violence in their lives.  Around 70 percent of the individuals

12  that I see have had some type of trauma.

13          And then the other individuals have some type of

14  anxiety disorder, either a panic disorder, social anxiety

15  disorder, obsessive compulsive disorder.  I also do forensic

16  psychology, like I am here for today, consulting with

17  attorneys or evaluating individuals who are involved in a

18  court case, assessing their mental status or their

19  psychological damages and then I also do a number of

20  professional activities.  I'm involved in a number of

21  psychological organizations and I volunteer my time and work

22  with those organizations.  I served as a council

23  representative in the governance of the American Psychological

24  Association and on the board of trauma divisions and do that

25  over time as well.

Hughes - direct - Geddes                    3916

1   Q    Have you treated patients who are victims of domestic
2   violence?
3   A    Of course.
4   Q    And have you treated patients who are victims of sexual
5   assault and sexual abuse?
6   A    Of course, many.
7   Q    Approximately how many victims of interpersonal violence
8   have you examined or interviewed in your career?
9   A    Likely hundreds upon hundreds, probably into thousands at
10  this point starting even before I was licensed because I was
11  working with this population throughout graduate school.
12  Q    Are you board certified?
13  A    Yes, I am board certified in forensic psychology.
14  Q    And what does it mean to be board certified?
15  A    Board certification is somewhat analogous to what our
16  medical doctors have.  It's the highest level of
17  specialization in the field of psychology.  And to be board
18  certified in forensic psychology means that you've amassed
19  enough experience and passed a number of tests in order to get
20  that board certification.
21  Q    How many board certified forensic psychologists are there
22  in the United States?
23  A    I think there's less than 400.  I think there's 375 the
24  last time that I checked.
25  Q    And how about in New York?

Hughes - direct - Geddes                    3917

1   A      And the state of New York, I believe there's about 25 of

2   us who are board certified.

3   Q      And are you licensed to practice psychology?

4   A      Yes.  I am licensed to practice in the State of New York,

5   in Connecticut, as well as North Carolina.

6   Q      Have you given trainings and presentations in the area of

7   trauma and abuse?

8   A      Yes, I have.

9   Q      And do you belong to any professional organizations?

10  A      Sure.  As I mentioned, I belong to the American

11  Psychological Association.  I belong to -- because that's the

12  largest body of psychologists.  I belong to subdivisions of

13  that larger organization.  One is the trauma psychology, the

14  division of trauma psychology, which I was a founding member

15  of and have served in various positions throughout, I think

16  we're about 14 or 15 years now.  I was just elected as

17  president of that organization as president elect.  I also

18  belong to other divisions, psychology in women, psychology in

19  law, psychologists in independent practice.

20          I'm a member of the International Society For

21  Traumatic Stress Studies as well as the Anxiety Disorders

22  Association of America and then I'm a fellow with the American

23  Board of Professional Psychology.

24  Q      Have you been qualified in the field of psychology as an

25  expert witness in interpersonal violence and traumatic stress?

Hughes - direct - Geddes                          3918

1   A    Yes, I have.

2   Q    Approximately how many times?

3   A    I have testified over the past 23 years probably about

4   50, 60 times at this point.

5   Q    In what jurisdictions?

6   A    In the states of New York, Pennsylvania, Connecticut, New

7   Jersey, and then in federal court in the Eastern District

8   court where we are today in the Southern District and also the

9   Northern District of New York.

10  Q    And have you worked or testified for the prosecution

11  previously?

12  A    Yes, I have.

13  Q    And have you also worked or testified for the defense?

14  A    Yes, I have.

15  Q    Are you being compensated for your work in this case?

16  A    Yes, I am.

17  Q    What is your hourly rate?

18  A    My hourly rate is $500 per hour.

19  Q    And have you ever not been qualified as an expert?

20  A    No.

21       MS. GEDDES:  Your Honor, we would offer Dr. Hughes

22  as an expert in clinical and forensic psychology with a

23  specialization in interpersonal violence and traumatic stress.

24       MR. CANNICK:  No objection.

25       THE COURT:  The same thing about experts.  I will

1   give you a longer instruction in my final charge.

2          Go ahead.

3          MS. GEDDES:  Thank you.

4   BY MS. GEDDES:

5   Q    Are you familiar with the term grooming?

6   A    Yes, I am.

7   Q    Generally speaking, what is grooming?

8   A    So, grooming are nonviolent techniques that a child

9   offender would use in order to gain compliance of a child

10  victim and also to assure nondisclosure of the abuse.  The

11  type of grooming techniques usually mirror what the

12  relationship is between the two individuals.  We know that the

13  overwhelming majority of child sex abuse is by someone known

14  by the victim.  The child offender would use that and exploit

15  that in order to get access to the child.  If it was a Boy

16  Scout leader, it will be I can help you do your Eagle Scout.

17  If it's a gymnastics coach, I will help you get to the

18  Olympics.  They will use the vulnerabilities or the interest

19  of the child in order to perpetrate the abuse.

20          The techniques are usually in the form of nonviolent

21  gifts, kindness, trips, material enticement, a sense of

22  specialness; you and I have this special bond no one really

23  knows about; give them special privileges that perhaps is not

24  appropriate to the developmental age of the child.  The

25  introduction of adult type of behaviors, alcohol, going out,

1    introduction to pornography.  And all of these sort of come

2    together to assure the compliance of the child.

3            The difficulty is because the children usually like

4    those things -- they like -- and the adolescent, they like to

5    be made to feel special, they want the attention and the

6    kindness.  So the damage of this, it makes them feel complicit

7    in the abuse.  It makes them feel that they have some part of

8    blame in the abuse and that's why it makes it very difficult

9    for the child to disclose the abuse and to tell other people

10   about the abuse.  The important part about grooming as well is

11   that it usually sort of has its seeds in the family and the

12   people who are supporting around the child.

13           So in order to really maintain access to the child

14   or the adolescent, an opportunity to abuse, they do some of

15   the same manipulation and techniques to the family members as

16   well.

17   Q    You touched briefly earlier on interpersonal violence or

18   I referenced it.  Can you explain what the meant by the term

19   interpersonal violence?

20           THE COURT:  Can you do it slowly?  Let's try to slow

21   you the down a little bit.

22   A    So interpersonal violence is when one person is simply

23   violent toward the other with the intent to inflict some type

24   of harm on the other individual.  So that can be rape, sexual

25   assault, domestic assault, sexual harassment, physical

1  assault.  All of those things where somebody is being

2  violated.

3  Q    And can you describe how an individual copes in the

4  aftermath of interpersonal violence?

5  A    So, we often look at it as in acute coping, which is the

6  immediate aftermath, and then the more long-term damages or

7  the long-term effects of the violence.  It's important to

8  understand that in most of these situations of interpersonal

9  violence it's not an event, it's a pattern.  It's not a single

10  incident, it's a process.

11        So we don't usually have an immediate acute effect

12  of one incident because there's all of these behaviors

13  circling at once that harm the individual.  Some of the coping

14  is shock, disbelief, psychological confusion because of these

15  grooming and manipulation techniques that I just referenced,

16  that the child may not have or the adolescent or even the

17  adult has the awareness that this is abuse.  If this person

18  likes me and cares about me, why would they hurt me.  Maybe it

19  was my fault.  Maybe I brought it upon myself.

20        So all of that self-doubt and self-blame circles

21  through their head and of course we have anxiety and fear

22  that's sort of butterfly uneasiness that people walk around

23  with when they're in an abusive situation.  Depression and

24  depressive disorders are highly on the list of a consequence

25  of being exposed to this pattern of abuse.

Hughes - direct - Geddes                    3922

1       We have post-traumatic stress disorder.  We see
2  substance abuse disorders, shame and humiliation and a sense
3  of lack of self-worth and a lack of self-efficacy that what
4  you think or feel no longer matters.  So it has a chronic
5  deteriorating effect on the psychological status of the
6  victim.
7  Q    And how about rationalization, is that part of the coping
8  mechanisms?
9  A    So, rationalization is one way that a victim is trying to
10 make sense of what is happening to them.  As I said, they're
11 really trying to reconcile two irreconcilable facts that
12 someone who is giving me this kindness and attention and gifts
13 and specialness is also hurting me in a way that I don't
14 understand.  You try to rationalize that, well, maybe he had a
15 bad day or maybe he was drinking or maybe I brought it on
16 myself; trying to figure out a way to make sense of a very
17 difficult situation.
18 Q    And forgive me if I missed you saying this, but did you
19 address dissociation?  Are you familiar with that?
20 A    I am familiar.  I did not address it but I will be happy
21 to.  So some of the other coping mechanisms if you're really
22 trying to and which a lot of the victims are because they want
23 the good art of these relationships, they're really trying to
24 find a way to stay within the relationship so they want the
25 good parts of the relationship.  They just don't want the

1  abuse part.  So some of the ways that psychologically they do

2  that, one of them is dissociation and that's where you sort of

3  separate yourself from the psychological pain that you're

4  feeling.  They'll talk about being in a zone or seeing

5  yourself from afar or just focusing on a manila folder and not

6  being able to see the rest of the room.  That's a way of

7  disconnecting.  The same way with compartmentalization, trying

8  to box up that really bad part of the relationship and put it

9  over there so I don't have to deal with it because they're

10  always trying to balance the loyalty and the positive aspects

11  of that person with the knowledge and the fear of the betrayal

12  of what they're doing to them and the abuse.

13  Q    By the way, earlier when you were discussing grooming and

14  you talked largely about grooming of children, are adolescents

15  and young adults also susceptible to grooming mechanisms?

16  A    Absolutely.  Adolescents are not little adults.  We know

17  that.  The brain development of the adolescent is not fully

18  formed until they're 25.  So the brain is constantly trying to

19  figure out, as what adolescents do with impulse control and

20  developmental and sexual maturity, the brain is under

21  construction.  So they're very vulnerable and susceptible to

22  these types of techniques.

23  Q    Going back to the coping strategies that you just

24  discussed, victims who are experiencing and engaging in these

25  strategies, can they appear normal to the untrained observer?

Hughes - direct - Geddes                           3924

1    A      Yeah.  We call that the appearance of normalcy.

2    Sometimes we say the appearance of competency because they are

3    very much trying to be normal.  They're very much trying to

4    make this okay, make this not hurt.  Make this not confusing.

5    So one of the things we certainly know from my field is the

6    outside doesn't always match the inside.  People come into our

7    office, competent men and women who have trauma histories and

8    are really dealing with the consequences of trauma and abuse.

9    And they can go to their job and hold onto a job but there's a

10   lot of suffering inside.

11   Q      I want to first talk about one form of interpersonal

12   violence, physical abuse.  Can you explain what a victim might

13   experience when the physical abuse takes the form of spankings

14   as a form of punishment?

15   A      That's a couple of problems with that.  Physical abuse is

16   the intent to inflict harm on someone.  Certainly one of the

17   consequences of any type of physical abuse is certainly

18   physical injury, somebody can be injured, but then there's

19   also psychological injury.  What does it mean when somebody is

20   inflicting such pain and injury and suffering upon you.

21          When you say punishment that's where my red flags go

22   up.  The punishment dynamic should not be present if it's not

23   a parent and a child.  People who are in healthy relationships

24   do not punish one another for not complying with expectations

25   or rules or something that they said.  So, to be spanked from

Hughes - direct - Geddes                    3925

1   one adult to a child it really gives me that look of a very

2   severe power imbalance in that relationship.

3   Q    Turning to interpersonal violence in the form sexual

4   assault, can you explain how a victim of sexual assault

5   specifically might act in the immediate aftermath of her

6   sexual assault?

7   A    So, the difficulty with sexual assault and rape and

8   sexual assault is the overwhelming majority of individuals who

9   perpetrate sexual assault are known to the victim.  So it

10  happens within this relational context.  It's not the myth

11  that someone is going to pull me in an alley and it's dark and

12  with a knife.  That is the least-likely scenario anyone will

13  ever come into.

14          The most likely scenario is happening within this

15  relational content.  So we're back to all of that confusion;

16  why would someone who is, again, liking me, giving me special

17  attention, telling me that they're going to take care of me in

18  doing some of those things perpetrate such a vulnerable and

19  invasive type of assault on my body.  So that shock, the

20  disbelief, the anxiety, the dissociation, the avoidance and

21  compartmentalization, all of those coping strategies sort of

22  go on overdrive.

23  Q    Now, do all victims of sexual assault react in the same

24  manner?

25  A    Of course not.  Just as we're all different human, we

Hughes - direct - Geddes                          3926

1    have different coping strategies that we may use.  A lot of

2    times we may use things that have worked for us in the past

3    whether we were victimized in the past there are other ways of

4    learned behavior to deal with extreme stress.

5    Q    And can the circumstances of a sexual assault affect a

6    victim's actions in the immediate aftermath of a sexual

7    assault?

8    A    I mean, of course.  I mean, I don't know what specific

9    sort of circumstances you are saying, but it's

10   context-specific.  So if it's happening within the relational

11   context, if there's particular violence in the sexual assault,

12   if there's particular humiliating aspects of the sexual

13   assault, that can absolutely affect how somebody copes.

14   Q    For example, where a victim had too much to drink and was

15   sexually assaulted while intoxicated, how might a victim in

16   those circumstances react in the immediate aftermath?

17   A    We call that incapacitated rape or sexual assault.  That

18   means that somebody themselves voluntarily, perhaps, drank

19   alcohol or took drugs and that has affected their mental

20   status where they're not able to really properly consent.  If

21   you are intoxicated or incapacitated, that is not consent to

22   sexual activity.  If you can't say no, that's not consent to

23   sexual activity.  If that is happening, we know that alcohol

24   and drugs can also interfere with memory.  So it becomes very

25   difficult for the victim to, one, really know what had

Hughes - direct - Geddes                           3927

1    happened and trust her own perceptions of what happened

2    because of the influence of drugs and alcohol.  And, two, to

3    feel perhaps partially responsible because she drank even

4    though people should be able to drink and not get raped.

5    Q    And how might a victim in those circumstances interact

6    with her abuser, again in the immediate aftermath of an

7    assault?

8    A    Well, many times, again, in this relational context, the

9    victim still tries to make peace with their perpetrator.  They

10   want to appease their perpetrator.  They want to make it okay.

11   They want to make it better so they may still try to do kind

12   things and bring out that part of him that that's why they're

13   with this person because there were some good things.  So they

14   try to do those type of behaviors to access that good person

15   that they once saw.

16   Q    Now, does interpersonal violence always include physical

17   violence?

18   A    No, it doesn't always.  It does in a lot of cases because

19   we have a lot of situations where the psychological

20   aggression, the emotional abuse, the coercive control really

21   dictates that type of relationship.

22   Q    I want to focus on some of those coercive, nonviolent

23   elements of interpersonal violence.

24          Are you familiar with the term isolation?

25   A    Yes.

1  Q    What role does social isolation play in this coercive

2  dynamic?

3  A    So, one of the things that we know in the field of

4  psychology is that social support helps buffer the effects of

5  psychological distress.  If somebody isolates you and takes

6  you away from your support network you are not going to have

7  that ability to rely on that kind of social support.  If

8  somebody is saying, oh, your mother, she doesn't really get us

9  and your sister is just jealous of us and your friends just

10 want to be around you, but they don't really like you.

11           So slowly they whittle away all of your social

12 support and your resources.  Now, how are you going to

13 extricate yourself from this relationship?  How are you going

14 to get out of this relationship when you don't have that

15 external base.  And then what happens is the abuser just sort

16 of whittles away and chips away at all of those resources that

17 you have and then they step in to be that social support and

18 they step in and that person who is abusing you is the only

19 one who you can talk to about what's going on and they're the

20 only one now who can give you emotional support or care or

21 consideration, even though they're the one perpetrating the

22 abuse.

23 Q    How about indoctrination?  What role does indoctrination

24 play in this coercive dynamic?

25 A    So indoctrination is a strategy, a tactic, to make

Hughes - direct - Geddes                                3929

1   someone believe what you believe; to continue to pound away at

2   your belief system is the right belief system.  You have to do

3   what I say, you have to believe what I say.  And there's no

4   room for your individual autonomy and your individual thought

5   and your individual decisionmaking.  So that certainly lends

6   the person to feel just very overcontrolled in this dynamic.

7   Q    How about subjugation.  What role does subjugation play

8   in the coercive dynamic?

9   A    It's a way of trying to get power and control over an

10  individual.  It's done in very male/female stereotypical ways

11  to make her feel she's a servant, she's there to serve him,

12  she's there to do what he says without regard to her own

13  thoughts wishes or desires.

14  Q    Are you familiar with surveillance as another tactic of

15  coercive control?

16  A    Yes.

17  Q    What role does surveillance play in that dynamic?

18  A    So, surveillance allows the victim to know that no matter

19  where she goes or what she does, he will be there.  He has

20  eyes on the scene.  He is seeing what she's doing and we see

21  that through tracking somebody's cell phone, making sure they

22  have their location services on, checking their e-mail,

23  checking their text, checking their social media, actually

24  popping up and showing up at places where they are.  If you're

25  going to the Chipotle, where are you, are you there, I saw you

1  there.

2          So there's this feeling that he is omnipresent, he

3  is everywhere which makes it really difficult for you to

4  believe then that you can get away from this person because no

5  matter where you go, he is going to find you.

6  Q    How about secrecy; what role does secrecy play in the

7  coercive dynamic?

8  A    Whenever someone -- when I hear someone has to keep a

9  secret, that's a huge red flag.  If it's a healthy

10  relationship you shouldn't have to keep it a secret.  If it's

11  a healthy relationship, there should be no problem talking to

12  your mom or sister or best friend about it.  The secrecy

13  allows the perpetrator to continue to perpetrate physical,

14  psychological and sexual violence because you are not telling

15  someone else.  You are not exposing this secret and this

16  relationship.

17  Q    How about intimidation; what role does intimidation play

18  in the coercive control dynamic?

19  A    So intimidation functions to coerce compliance.  It

20  functions to get someone to do what you want them to do with

21  the threat of violence.  So -- or the threat of some type of

22  harm.  So, if somebody has already established that

23  contingency where they've already demonstrated an ability and

24  a willingness to use either sexual violence or physical

25  violence against you just by saying it or giving a look or

Hughes - direct - Geddes                    3931

1   pounding a fist on a table or throwing things or throwing a

2   fit, that's enough to raise the fear level of the individual

3   who has been abused by that person to really modify their

4   behavior.  Fear is a very powerful behavior modification to

5   not get hurt, to not get further abused.

6   Q    What, if any, role can shame or humiliation play in this

7   coercive dynamic?

8   A    Shame and humiliation are very, very difficult emotions

9   that victims often are left with in these abusive situations.

10  I mean, first when you are sexually violated, humiliated and

11  defiled in such an intimate way, one of these natural feelings

12  is shame and humiliation.  And then usually you have a

13  perpetrator saying things to you that are shameful and

14  humiliating and putting you down and calling you all kinds of

15  gross names and saying gross things about you.  So not only do

16  you have the internal consequence of rape and sexual assault

17  or intimate partner violence, but you have this perpetrator

18  throwing these shamed-based, offensive comments at you.  So

19  you kind of have a double whammy.

20           And when you're so shameful and humiliated, you

21  don't want to talk about it.  No one wants to talk about

22  things that are so private and difficult for them.  So it has

23  the added bonus for the perpetrator that the person is not

24  going to disclose or tell what's going on.

25           (Continued on the following page.)

SN       OCR       RPR

Hughes - Direct - Geddes                3932

1    DIRECT EXAMINATION (CONTINUED)

2    BY MS. GEDDES:

3    Q    What, if any, role does emotionally abuse or

4    degradation play in the dynamics?

5    A    So emotional abuse functions to belittle a person's

6    sense of self and sense of self-worth.  So if you don't feel

7    good about yourself and you're continued, again, to be

8    called offensive names, you know, slurs, racial putdowns,

9    gender putdowns, all of those things in this dynamic and you

10   don't feel good about yourself, you are even less likely to

11   believe that you could leave this relationship, less likely

12   to even be able to contemplate and problem solve your way

13   out of this relationship because you feel so low.

14            And then sometimes, you know, if you -- we've seen

15   in these studies the more often someone tells you you're

16   stupid, you -- you end up feeling stupid.  And if you feel

17   that low, you're really interfering with your ability to,

18   you know, pull yourself out of that relationship and believe

19   even perhaps that you do deserve to be out of that

20   relationship.

21   Q    Are you familiar with the term "gaslighting"?

22   A    Yes.

23   Q    What is gaslighting?

24   A    So gaslighting is another form of psychological abuse.

25   The function is to make you think you're crazy by telling

Hughes - Direct - Geddes                    3933

1  you what your perceptions are.  You know, you say, well,

2  you -- you hit me really hard last night and you left this

3  bruise.  I don't know where you got this bruise.  I don't

4  know what you're talking about.  I wasn't even here last

5  night, you know, those types of techniques that, you know,

6  continue to sort of chisel away at a person's own perception

7  and their own view of reality.

8           (Pause in proceedings.)

9           THE COURT:  No you're got two of us.

10          THE WITNESS:  Three.

11          THE COURT:  Three.

12  Q    How might negative information or collateral play into

13  the coercive dynamic.

14  A    So we do see this a lot in some of these -- in partner

15  violence and child sex abuse cases in that the perpetrator

16  will add something of value which is something shameful

17  or --

18          THE COURT:  Even slower.

19  A    -- shameful --

20          THE WITNESS:  Your Honor, my mind's going a

21  hundred miles an hour --

22          THE COURT:  All right.  But just --

23          THE WITNESS:  I will.  But I will go slower than

24  what I'm talking.

25          THE COURT:  It makes it really hard on the court

Hughes - Direct - Geddes                    3934

1   reporters so just talk like this.  All right?

2           THE WITNESS:  All right.

3   A    -- that a perpetrator will have something harmful on

4   their victim.  We see this in cases such a revenge porn

5   where -- you know, and I've had clients and people who have

6   this happen where they've been threatened, Well, if you

7   leave me, I'm going to send this email blast to your office.

8   I'm going to send this to your mother.  You know, your

9   grandmother doesn't want to see this.

10          And so we see a lot of this collateral, something

11  that's damaging to the victim, that makes it really

12  difficult for her to figure out how am I going to leave this

13  person if I know that is going to happen?  How am I going to

14  tell of this abuse if I know in doing so, I'm going to be

15  raking over the coals, even if it's not true.  Even if it is

16  harmful, that's a very, very big deterrent for an individual

17  to not talk about and tell what's happened to them.

18  Q    I want the talk for a moment about economic abuse.

19  What sorts of behaviors can be described as economic abuse?

20  A    Well, economic abuse is when one person is making all

21  the financial decisions in this relational context how we

22  find it.  So if you don't have tangible resources, then how

23  are you going to leave, right?  You can't just -- if you

24  don't have a credit card, a debt card, cash money in your

25  pocket you're just going to get up and leave and get into an

1    apartment or get in a cab or get in an Uber?  If your cell

2    phone has been taken away and you don't have access to

3    funds, it makes it very difficult to leave an abusive

4    relationship.  So what we talk about is called tangible

5    resources.  You have sort of psychological resources, but

6    you also need tangible resources in order to get out.

7    Q    And in your experience, what do all of these behaviors

8    or techniques that you've just described, what do they

9    accomplish?

10   A    So the -- the goal of -- of this intimate partner

11   violence or even in child sex abuse is first gain, and then

12   name change, power and control over either your intimate

13   partner or adolescent or a child.  And once you have that

14   power, you continue to exploit it.  So you continue to have

15   access over that person, and you continue to know that the

16   likelihood of them telling is very slim.  And if the

17   likelihood of them telling is slim, that means you're not

18   going to get caught, that means you can continue to act in

19   these very aberrant and abusive ways.

20   Q    Does this dynamic happen overnight?

21   A    Absolutely not.  I mean, certainly an immediate sexual

22   assault or an immediate physical sexual assault can be an

23   incident that happens.  But as I stated, this isn't -- it's

24   not an event, it's a process.  It's not a behavior, it's a

25   pattern, and the pattern happened slowly over time that we

1  often say it's slowly erodes away at the defendant's

2  psychological well-being that they're slowing sucking the

3  oxygen out of the room.  And then before you know it and you

4  realize it, you're suffocating and you can't get out.

5  Q    How might a victim's age affect one's susceptibility to

6  these tactics?

7  A    Well, certainly, we know that children and adolescents

8  are susceptible to these actions because of their brain

9  development, their cognitive maturity, their developmental

10 maturity that they are not fully formed, reasoning adults.

11 Usually children and adolescents require adults to care for

12 them, right?  They are not independent.  They're not

13 financially independent.  They don't have the resources, the

14 overwhelming majority, to live on their own and to be

15 self-sufficient.  So we need adults to make sure that they

16 have actually those tangible resources, food, shelter,

17 education, clothing medical care --

18             THE COURT:  Slow down.

19 A    They require those types of resources so it becomes

20 very easy then for a perpetrator to exploit that and then to

21 keep them captive because they need that in order to

22 survive.

23 Q    And how might pre-existing power and balance between an

24 abuser and a victim affect one's susceptibility to these

25 coercive tactics that you've explained?

1   A    Well, the power and balance between an adult and a

2   child is inherent, right?  We teach children to trust

3   adults, so why wouldn't they trust an adult?  Why wouldn't

4   they trust someone with whom they hold in some tape of

5   esteem?  You just automatically assume as an adolescent or a

6   child is that they would trust that person.

7            The problem is that if somebody is going to be an

8   abuser, they can exploit that power on them.  Certainly from

9   a teacher and a student, a coach and an athlete, all of

10  those are abused-based organizations where we see that power

11  differential where you, as an adult, just come with that

12  power and as such as the adult, can abuse and exploited it.

13  Q    And can an abuser exert control from afar?  Meaning

14  when somebody is physically distanced from their abuser, can

15  they still be susceptible to some of those coercive tactics

16  that you've just described?

17  A    Absolutely.  Because as we know, it's not an event,

18  it's a process, right?  So it's a process of psychological

19  entrapment, when we have the isolation, the micromanaging,

20  what you can wear, where you can go, who you can talk to,

21  how you wear your hair, what lipstick you choose, when you

22  go to the bathroom, when you eat.  When someone's

23  micromanaging your day, just because they're not there

24  doesn't mean that that sort of way of going about your way

25  of life is still there.  So that sense of psychological

Hughes - Direct - Geddes                    3938

1    entrapment is what keeps victims in the relationship, not

2    necessarily that the person is right there outside the door

3    not letting them leave.  So leaving is a process that's

4    mediated -- it's regulated by your psychological state of

5    mind, and that's what is extraordinarily compromised by all

6    of these abusive tactics.

7    Q    Have you been involved in cases where the abuse took

8    place in front of others, and the others took no action to

9    assist?

10   A    Regrettably, all the time.  We just saw in USA

11   Gymnastics, the gymnastics -- because everybody knew about

12   this and nobody did anything.  I see that all the time in

13   the Boy Scout cases that I've worked with, in the clergy

14   cases, and other youth sports.  And that's very

15   psychologically damaging, because the child and the child

16   adolescent is looking toward the adult who are the

17   protectors, who are supposed to be the protectors, if other

18   people are around and they're seeing things and they have a

19   reasonable cause to suspect that something's going on and

20   they do nothing, then ones of the things you think of as a

21   kid is, Well, it must be my fault.  Maybe I've got it wrong.

22   Maybe something's wrong with me.  And then it also makes you

23   think, Well, if everybody else knows that this is happening

24   and they're not doing anything, well, how am I going to get

25   out of this?

Hughes - Direct - Geddes                    3939

1   Q    You were discussing this coercive dynamic involving

2   perpetrators and victims.  In those relationships are the

3   abusive acts that you've discussed, the physical abuse, the

4   coercive tactics often interspersed with times of normalcy

5   or positive moments?

6   A    Absolutely.  And that's what makes it so

7   psychologically confusing.  The individual wants to be with

8   that kind, loving, caring individual who, you know, used

9   those grooming tactics to get them through the door, that's

10  what they keep going back for.  That's what they keep hoping

11  for.  So when they see a glimmer of that, you know, that's

12  what they hold onto, they hope, secretly hope that, you

13  know, he's not going to sexual assault me again.  He's not

14  going to hurt me again.  And then they try to do things to

15  figure out the pattern, figure out the rules, How do I get

16  the good guy back?  And unfortunately what we know from the

17  research is that the only person that can stop the abusive

18  behavior, is the abuser.  It is not dependent upon the

19  strategies and the coping that the victim uses.

20  Q    So you're touched on this, but why might an individual

21  remain in a relationship or in a scenario that includes

22  interpersonal violence to include the physical violence as

23  well as the coercive-control tactic you've testified about

24  today?

25  A    All right.  So it's really bringing together what I've

1    talked about.  You know, there is certainly that kind of

2    love and care and affection for that person.  There is

3    certainly fear about leaving.  Usually we see there is fear

4    in staying and there is fear in leavings.  There is sort of

5    also mixed feeling of loyalty towards that person and trying

6    to reconcile the -- the betrayal and the pain that the

7    person caused them.

8            They may fear retaliation that -- and we talked

9    about what's collateral or other type of data or information

10   that this abuser might have against them.  They fear that no

11   one's going to believe them.  Maybe they don't -- I don't

12   have real proof.  How is anyone going to believe me against

13   this esteemed individual?  I'm a nobody.  I'm a nothing.

14   Nobody would ever believe me.  So all of these sort of

15   things swirled together and making it very difficult for an

16   individual to leave that abusive relationship.

17           And it doesn't mean that the individual's not

18   concerned about the violence and abuse.  And I say this all

19   the time, all individual the individuals that I've met, I've

20   never met one woman or one man who was not concerned about

21   the abuse being inflicted upon them.  They're very

22   concerned.  They just don't have the wherewithal because of

23   the constant abuse, the psychological, the coercive control,

24   the physical, you know, the sexual to get out of that

25   relationship.

Hughes - Direct - Geddes                    3941

1    Q    Do victims of interpersonal violence engage in a form

2    of internal bargaining about whether or not to stay or

3    leave?

4    A    Sure.  As most of us do as humans in difficult

5    situations, is we do this cost benefit analysis.  What is it

6    going to look like if I leave?  And once even if they can

7    even get to that point, how am I going go that?  Back to

8    those tangible resources and psychological resources, How do

9    I even make that happen?

10          Certainly we know when we're having all of these

11   behaviors happen in this sort of process of abuse, right,

12   this pattern of abuse that the individual -- the abused

13   victim is so worried about the day-to-day, trying to figure

14   out what comes next, that it actually interferes with

15   long-term problem solving of about how do I get out, because

16   I'm just trying to figuring out how am I going to get

17   through dinner tonight?

18   Q    And can some of those coping strategies that go in

19   internal bargaining and other coping strategies that you've

20   just describe, can they result in behavior that can make it

21   appear that this is consensual?

22   A    Well --

23          THE WITNESS:  Did this go off?

24          THE COURT:  I think so.  I think it wants you to

25   slow down.

1           THE WITNESS:  Okay.

2           (Pause in proceedings.)

3           THE WITNESS:  Better?

4           MS. GEDDES:  Yes, much.

5           THE WITNESS:  Can you ask the question again,

6   please.

7           MS. GEDDES:  I sure can.

8   Q    Can the coping strategies that you were just discussing

9   in terms of -- in the form of internal bargaining, as well

10  as the coping strategies that we talked about earlier --

11          THE COURT:  You also have to slow down,

12  Ms. Geddes.

13          MS. GEDDES:  I'm feeding off of her.

14          THE COURT:  Right.

15  Q    Can these coping strategies result in behavior that

16  makes it appear as though there's -- or there's consent or

17  consenting?

18  A    Sure.  Well, if somebody which -- and I'll use my air

19  quote -- "voluntarily" goes back to their partner, right,

20  goes back to the abuser, it may seem that they are acting

21  under free will, right?  So we have to sort of take a step

22  back and understand, you know, is this a choice in the face

23  of very contained choices?  You know, what is the

24  consequence if I don't go back?  You know, what is the

25  consequence by continuing to call out abusive behavior?  So,

Hughes - Direct - Geddes                    3943

1   you know, just looking on the outside can be very

2   misleading.  You really have to sort of dig a little bit

3   deeper and see, you know, what are all of these dynamics at

4   play for that individual?

5   Q    So how are you able to determine whether a relationship

6   or sort of scenario between two individuals is actually

7   consensual or not?

8   A    Well, you look for all of these types of abusive

9   behaviors that I've referenced.  If you -- when we look at

10  healthy relationships, healthy relationships are built on

11  mutual respect, that you have an opinion, and I have an

12  opinion.  Can you say no in this relationship?  What are the

13  consequences for saying no?  If you feel that you're not

14  respected and you're put down, is that a healthy

15  relationship?  Who makes the decisions in the relationship?

16  If you have no decision-making ability whatsoever, it's

17  likely not an egalitarian, equal relationship.

18           And, of course, I assess for are there elements of

19  psychological violence?  Are there elements of sexual

20  coercion or sexual abuse, where you're kind of being told

21  and forced to do things that you don't really want to do,

22  that this isn't really what you're here for.  You know, are

23  there other elements of emotional abuse and putdowns and

24  offensive behavior where someone's making you feel

25  belittled.  Healthy relationship, we build upon each other.

1   We -- we build upon each other's strengths and we offer nice

2   things about one another.  And, of course, couples fight,

3   and you know, of course, bad things can be said, but it's

4   not a pattern.

5           You know, we look at that psychological aggression

6   of somebody micromanaging every aspect of your life, where

7   you can't come or go or say anything without fear or

8   retribution, fear of punishment.  Like that dynamic of

9   punishment does not exist in a healthy relationship.  So you

10  look at all of these dynamics to really make that

11  assessment.

12  Q    In your experience after a victim extricates herself

13  from a coercive relationship of the type that you've

14  described, how does such an individual feel about having

15  previously remained in that relationship or scenario?

16  A    I mean, often the first feeling is they feel very

17  shameful.  They feel very humiliated.  They feel very

18  stupid.  A lot of my clients say, I was so stupid.  How did

19  not see it?  What was wrong with me?  How did this happen?

20  You know, I had all of these opportunities, but I couldn't

21  see it?  So there's a lot of shame and humiliation and

22  sometimes guilt and sometimes self-blame.  You know, Why did

23  I go there in the first place?  Why did I, you know, let him

24  give me, you know, this wonderful trip or this beautiful bag

25  when it wasn't feeling right to me?  So really trying to

1    make sense of that dynamic, and it's not until we really,

2    you know, unpack it and -- and look at all of the abusive

3    things that were going on that the person comes to sort of

4    integrate that trauma and understand it for what it was.

5    Q    Are you aware that many victims suffer repeat abuse by

6    different abusers?

7    A    Of course.

8    Q    Why is there such a high degree of revictimization?

9    A    All right.  So when we say revictimization we know from

10   the data and the literature that if you were sexually

11   victimized as child, the likelihood that you will be

12   victimized again as an adult goes up between 2 and 13 times

13   more than somebody who hadn't had that original trauma.

14        So one of the reasons that we know that trauma

15   affects an individual, that sexual abuse in childhood

16   affects an individual.  When you come out of that as a

17   child, you feel defective, dirty, shameful, maybe you're to

18   blame.  So then when you come encounter that as an adult,

19   it's something that you already know.  Well, maybe I am

20   defective.  Maybe this is what it's supposed to be.  Maybe I

21   am supposed to be maltreated, because you don't have a sense

22   of a -- a normal construct for what a healthy relationship

23   is.

24        You know, sometimes we say that individuals also

25   have those -- they lose those detectors, where people who

1    have not be abused as a child may see some of those warning

2    signs earlier.  They may get out of some of these

3    micromanaging a little sooner than someone who has already

4    been maltreated as a child.

5    Q     In your experience, is there a particular way victims

6    of interpersonal violence remember the violence that they

7    endured?

8    A     Well, a lot of times, we know that memory for traumatic

9    events can be different than memory for regular events.  The

10   more events happen, like the more you get on the subway or

11   you go to your favorite diner for breakfast, the more likely

12   you're going to remember that event, but you may not

13   remember the specific details of each time it happened.

14   So -- and this was something -- this was actually my

15   dissertation, that what we saw were people remember the

16   larger context for having been abused, having been subjected

17   to violence and maltreatment, but some of discrete details

18   get blurred over time, and they don't always, you know, a

19   time, place, and occurrence where we can say, This happened

20   on this date, and before this, but after that because it all

21   tends to jumble together.

22   Q     Are you familiar with the frequency with which victims

23   of interpersonal violence report their abuse to law

24   enforcement?

25   A     Yes.

1    Q    Can you describe the current data regarding that?

2    A    Okay.  So sex crimes and crimes against women are the

3    most underreported crimes that we have.  And that's from the

4    Federal Bureau of Investigation, their Unified Crime Report.

5    The study varied from about 12 percent to 20 percent that

6    are actually reported to the police, which means out of a

7    hundred women, 80 of them are not reporting to law

8    enforcement.  So it's very low reporting.

9    Q    In your experience, do victims sometime delay

10   reporting, so eventually report but not right away?

11   A    Many times.  Many times, even if the person is not

12   formally reporting -- and when I say "formal," that means to

13   law enforcement or authorities or campus police; but they

14   may tell a best friend, a current partner, a mom that

15   they're close with.  So sometimes they do disclose to

16   somebody within their immediate circle in order to get that

17   much-needed psychological support.

18            And then later on, especially for our adolescents

19   and our children, as they reach some more maturity, as they

20   grow stronger, as they grow a little more into the awareness

21   of what happened, they may feel more comfortable at a later

22   date to disclose what happened to them.  So it's really

23   mediated by a number of factors:  The relationship of the

24   perpetrator, what's happening in their life, the

25   psychological resources they have, and how safe they

1    actually feel to do so.

2    Q    And how, if at all, might trauma affect the likelihood

3    that a victim would report an instance or pattern of

4    interpersonal violence?

5    A    Well, by definition, in the psychological and

6    psychiatric communities, it means both that intimate-partner

7    violence with sexual assault is a traumatic stressor.  So

8    they have trauma right from the get-go.

9         But one of the natural responses to trauma for

10   most of us is to push it and go on.  Right?  They don't want

11   to think about it, they don't want to talk about it, they

12   don't want to deal with it.  They want to put it behind

13   them, especially our adolescents.  That's very adolescent

14   functioning in general, they just want to go on.

15        So the more that someone suppresses, avoids,

16   compartmentalizes, the less likely the trauma gets

17   integrated and they have a sense of being able to tell a

18   real kind of coherent narrative about what happened to them.

19   Q    And how about the victims who are a part of a larger

20   community; does that affect the likelihood of reporting at

21   all?

22   A    Well, while they are part of that community, not so

23   much because then they have to run the risk of taking down

24   that community, and we see that in a variety of contexts,

25   that if you are -- even on our college campuses.  If you're

Hughes - Direct - Geddes                    3949

1    going to report, you know, the star quarterback, then you're

2    the one who got that kid kicked off the team and you're

3    responsible for all of the, you know, losses that are going

4    to come to you.  So there's really a social cost for

5    reporting.

6              If there's a large community that's sort of

7    surrounded around and invested in protecting the abuser, you

8    might not think that you stand a chance in order to stand up

9    to that pressure, not only from the abuser but from the

10   people who are also protecting him.

11   Q    And in your experience, is a victim's unwillingness to

12   report interpersonal violence magnified when a perpetrator

13   is a celebrity?

14   A    I mean, it's any perpetrator who has power, power that

15   extends outside of your little world makes it that much more

16   difficult.  And we've seen that in a lot of the cases that

17   have been in the popular meter and certainly the cases that

18   I have worked on where it becomes very frightening to go up

19   against such a force because it's basically a David and

20   Goliath.  Here's this larger-than-life individual with all

21   the resources that come with that.  Talk about that's tangle

22   resources and here I am, a nobody.  How am I going to be

23   believed?  Who's really going to take me seriously and

24   listen to me?

25   Q    And in your experience, is it common for victims of

Hughes - Direct - Geddes                    3950

1   interpersonal violence to try to rationalize their abuser's

2   conduct or abuser's abuse as the incident passes in time and

3   it becomes more distant?

4   A    Rationalize it in a way of making it better, making it

5   worse?

6   Q    That's what they might say as the time passes.

7   A    I mean, we've talked about reasons that individuals

8   stay in those relationships.  I mean, leaving is also a

9   process, we know from the data.  We don't just leave once.

10  I mean, any of us who has been in any kind of relationship

11  know that breaking up is hard to do.

12            So a person -- what we always say is they leave

13  for all the right reasons, they go back for all the wrong

14  reasons.  Right?  They leave because the abuse or the trauma

15  or the coercive control has gotten too much; but what pulls

16  them back is the psychological attachment, the emotional

17  attachment, the love, the loyalty, the affection.  So that's

18  why they go back to the relationship, not to go back to get

19  abused.

20  Q    And you touched on this, but how, if at all, might a

21  victim's age contribute to a delay in reporting,

22  specifically?

23  A    Well, we know that, you know, adolescents and children

24  who are sexually abused are not likely to disclose.  The

25  majority of children don't tell while the abuse is

1    occurring, and that may be because of rationalization but it

2    also may be because of that confusion over actually what's

3    happening over the sexual acts that are happening, over the

4    control that is happening because of all of those grooming

5    techniques.  If you succeed in making a child or adolescent

6    feel complicit in their own abuse, make them feel as if they

7    share equal responsibility to the abuse, they are going to

8    be less likely to disclose.

9    Q    And what, if any, effect does one person's public

10   reporting of interpersonal violence by an abuser have on

11   another victim's willingness to report interpersonal by that

12   same abuser?

13   A    So we're seen this a lot, even before the #MeToo.

14   Again, I've been doing this over 20 years, 25 years.  We saw

15   that in the beginning when, you know, the clergy abuse cases

16   would come up on the paper and, you know, a client find the

17   priest on the cover of the *New York Post*.  That was enough

18   to let him disclose to authorities what had happened.  So

19   there's a universality in experience when we see that

20   something has happened to someone else, we don't necessarily

21   feel so isolated and so alone, that we might have some

22   strength to say, Okay, you know, there's safety in numbers.

23   I can also report this because I'm not going to go out there

24   on the limb all by myself.

25            MS. GEDDES:  One moment.

1          I have no further questions.

2          THE COURT:  All right.  Do you think it makes

3    sense for you to start on Monday?

4          MR. CANNICK:  I think to start on Monday, Your

5    Honor.

6          THE COURT:  That's fine.  All right.

7          So, ladies and gentlemen, we are going to break

8    for the weekend.  First of all, I just want to thank you so

9    much for the careful attention that you've obviously been

10   paying and for being on time and all of that.  I don't think

11   I've done that enough.

12         But please don't talk about the case, look

13   anything up, listen to any accounts or anything like that.

14   But I do hope you have a very nice weekend, and I'll see you

15   on Monday morning.

16         Thanks so much.

17         THE COURTROOM DEPUTY:  All rise.

18         (Jury exits the courtroom.)

19         (The following matters occurred outside the

20   presence of the jury.)

21         THE COURT:  Everybody can sit down.

22         The witness can step down.  We'll see you on

23   Monday morning.  Don't drink coffee.

24         (The witness exits the stand.)

25         THE COURT:  All right.  And then I just want to --

1     this is the Government's last witness, correct?

2              MS. SHIHATA:  That's correct.

3              THE COURT:  Okay.  And then we'll -- I'm sure that

4     information has been or will be exchanged regarding what the

5     defense plans?

6              MR. CANNICK:  Yes, Your Honor.

7              THE COURT:  You've given the names --

8              MS. SHIHATA:  No.  We have not received any

9     information.

10             MR. CANNICK:  It will be --

11             THE COURT:  Didn't I ask for that to be done

12    today?

13             MR. CANNICK:  It's going to be done today.

14             THE COURT:  Okay.  Before midnight?

15             MR. CANNICK:  Before midnight.

16             THE COURT:  All right.  Let's get that done.

17             Also, if there are additional requests to the

18    charge, I think, at the sidebar, the Government mentioned --

19    I think that I've already included what it was that you were

20    contemplating asking, which was witness preparation and an

21    instruction on witnesses with lawyers, which we have already

22    incorporated in the charge.

23             Mr. Scholar, I think that is your line of work; am

24    I correct?

25             MR. SCHOLAR:  Yes, Your Honor.

Proceedings                              3954

1          THE COURT:  Do you anticipate making any

2    additional requests to the charge?

3          MR. SCHOLAR:  Judge, if we do, we'll probably

4    submit them tonight.

5          THE COURT:  Okay.  That's fine.  That's fine.

6          And just so you know, I know we did -- there were

7    submissions made prior to trial; but, of course, some

8    thing's come up that makes me change that calculation.  The

9    way I do it is that once I get everybody's request to

10   charge, we'll incorporate it in what we have already and

11   then we'll give it to the parties to the review and then

12   we'll have a charge conference after that.  Okay?

13         All right.  And the verdict sheet, I think I've

14   already received the proposed verdict sheet some time ago.

15         MS. SHIHATA:  I believe we've sent that.

16         THE COURT:  Yes.

17         So anything else the anybody wants to raise?

18         MS. SHIHATA:  Yes, Your Honor.  I think we've

19   raised this in an email to your deputy and clerk but we --

20   the media has made various requests regarding the

21   transcripts -- since there was no testimony about the

22   transcripts -- I'm sorry, about the videos that were played

23   in court on -- I believe it was Wednesday now, there have

24   been requests made, to the extent transcripts exist, and if

25   they don't exist for all the videos.  But for some of them,

Proceedings                                3955

1      they do, there have been requests for those transcripts.

2              What the Government proposes is to the extent a

3      transcript exists, that we would redact the names of any

4      victims that appear in the transcripts and that those be

5      provided, given this is public trial and public assess is

6      something that are our Criminal Justice System affords, that

7      we proceed in that manner.  And so that's our proposal.

8              THE COURT:  Anything that you want to say about

9      that, Mr. Scholar?

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                              3956

1          MR. SCHOLAR:  Judge, with respect to the

2    transcripts, we might want to look just to see if there is any

3    other redactions we want to ask for.

4          THE COURT:  Well, I mean, this is a public trial.

5    Obviously given the COVID restrictions, there have been some

6    necessary restrictions involved, but even in a case with

7    allegations like this, it still remains public.  And so my

8    inclination is to do what the government says, to take out the

9    names of any identifying information with respect to the

10   victims.  But I believe that the transcripts should be -- you

11   know, there is one matter that occurs to me that if I can see

12   the parties at the side.  One additional matter that I just

13   want to raise with the parties, if I could see everybody at

14   the side with the court reporter.

15               (Sealed sidebar.)

16               (Continuing on the following page.)

17

18

19

20

21

22

23

24

25

SEALED BY ORDER OF THE COURT                    3957

1        (Sealed sidebar conference held on the record in the

2   presence of the Court and counsel.)





SEALED BY ORDER OF THE COURT                          3958

20          (Sealed sidebar ends.)

21          (Continuing on the following page.)

1           THE COURT:  All right.  I am just going to have the

2   parties just consult with one another, but I think the

3   extremely minimal redactions is really what it is with these

4   transcripts, but I think those are appropriate.  It sounds to

5   me like you are in a fair amount of agreement on that, so that

6   is how you should proceed.

7           Is there anything else that anybody has to raise?

8           MR. CANNICK:  Your Honor, the only issue that I have

9   with respect to the transcripts is that the transcripts of the

10  video, I suspect they were read into the record or at least

11  when it was being played.  In our review of it, some of it is

12  inaccurate and I certainly don't want it to go out to the

13  public if there are inaccuracies in there.

14          THE COURT:  Well, I would have expected someone to

15  raise that with me before I gave the transcripts to the jury.

16  If there are inaccuracies in the transcript, that is something

17  that should be addressed before trial.  And as far as I

18  recall, I do not remember anybody bringing that to my

19  attention.

20          MR. CANNICK:  When did we receive them, Your Honor?

21  I don't think we received them much before trial.

22          THE COURT:  Again, I cannot remedy that if nobody

23  alerts me that it is a problem.

24          MR. CANNICK:  But, Your Honor, my understanding is

25  that the transcript is an aid to the jury.

1           THE COURT:  Correct.

2           MR. CANNICK:  And it's the jurors' ears that really

3    determines what the evidence truly is.

4           THE COURT:  That's correct.

5           MR. CANNICK:  And I think that in as much as that's

6    the government's interpretation of it, when I argue, I'm going

7    to point out to the jury that when they listen to it

8    carefully, they will see that some of it is not what the

9    government is saying.  And I'm going point to the time and the

10   transcript in particular.

11          THE COURT:  All right, if you want to alert the

12   government to those particular instances.

13          But, you know, one of the videos, one of the tapes

14   could have been played in open court.  And if this were not

15   COVID times, people would be sitting, you know, including

16   members of the media, in the courtroom listening to the

17   recording.  They would not necessarily see the -- depending on

18   which one we are talking about, but obviously under these

19   circumstances, given the nature of the videos, no judge would

20   release those to the public for obvious reasons.  But again,

21   this is a public trial.  And as the record stands now, there

22   is nothing in the record about what those tapes are, and they

23   are important evidence.

24          So if you have authority that you want to provide to

25   me on whether or not any of this can be released, I will

Proceedings                          3961

1   surely hear it.  But again, the presumption is in favor of a

2   public access to court proceedings and I have done my level

3   best to make sure that that happens under these circumstances.

4   So if you want to submit something to me over the weekend

5   telling me why the public should not have access to this

6   portion of it, you may certainly do that.  And if there is

7   something in the transcript that you think is not accurate,

8   you can discuss it with the government.  Like I say, these are

9   the sorts of conversations that I like to hear before I hand

10  out a transcript to a juror as an aid.

11          Yes?

12          MS. SHIHATA:  Your Honor, I would just note that

13  Mr. Cannick appears to be conflating two different issues

14  here.  There is the public access issue, which is what we're

15  really concerned with right now, with the question of the

16  release of the transcripts, and then there's the arguments he

17  can make to the jury about any inaccuracies in the transcript

18  to the jury, which is a completely separate issue.

19          MR. CANNICK:  I appreciate that distinction,

20  Your Honor.

21          THE COURT:  I am sure you do.

22          In any event, like I said, I am inclined to go along

23  with what the government is suggesting.  And if there is some

24  case, case law that I am sure Mr. Scholar will find for me, if

25  it exists, I will read it.

Proceedings                                           3962

1          MS. SHIHATA:  And the only other issue I would bring

2     up, Judge, because we have also been waiting for the brief

3     about the medical records issue, which I don't think is --

4          THE COURT:  I thought we took care of that.

5          MS. SHIHATA:  No.  I think they said they were going

6     to file something with Your Honor about that.  And as far as I

7     know, the government didn't receive a copy of any brief on

8     that matter.  So those records -- I know Your Honor received

9     the request from some member of the press about --

10          THE COURT:  I just thought they had been taken care

11     of quite some time ago.

12          MS. SHIHATA:  No, it hasn't, because I believe we

13     were waiting on the defense to submit something to Your Honor.

14          THE COURT:  All right.  Well, there is really no

15     reason -- I have not seen -- I must say, I am not aware of

16     which records we are talking about.  There has been testimony,

17     in fact, from the physician, so obviously it is all out there

18     anyway, so those records should come in.  If there is

19     something that is not relevant, if there is, you know, other

20     medical diagnoses that have nothing to do with this, obviously

21     that should not be before the jury, nor should it be released.

22     Personal information like social security numbers, things like

23     that, obviously that should not be a part of it either.  But I

24     do not really see any reason for the delay.  I am actually

25     surprised that had not happened yet.

Proceedings                                        3963

1              All right.  Anything else?

2              And so that is something I want to hear about.  What

3     is your response right now?

4              MR. SCHOLAR:  Judge, you have not seen the

5     Judge Rakoff case, with respect to what he ruled in that case?

6     We would submit that this is quite different than a porn case.

7              THE COURT:  Wait.  Can you just talk into the

8     microphone?

9              You are citing the Southern District to me again?

10             MR. SCHOLAR:  Yes, Judge.

11             THE COURT:  Turn on the microphone though, okay?

12             MR. SCHOLAR:  Yes, Judge.

13             What I could do is, I can include that with the

14    information about the transcripts and I will have it filed

15    before tomorrow morning.

16             THE COURT:  Okay.  That is fine.

17             But the only thing that I am saying is that

18    regardless of the nature of the particular information, it is

19    in the record.  There was testimony, specific testimony from

20    Mr. Kelly's doctor, so there is nothing -- I mean, while

21    certainly the information is personal, it is already out

22    there.  But I will wait to get your submission on that.  And

23    if you want to file a letter in response or I suspect the

24    person that you file a letter in response is probably the

25    entity that wants it, but my inclination, just for whatever it

Proceedings                                        3964

1   is worth, is that it is public, it is appropriately public,

2   subject to public access.

3          All right.  Anything else?

4          MS. SHIHATA:  Not from the government.

5          THE COURT:  Okay.  Thanks so much.

6          (Matter adjourned to Monday, September 20, 2021 at

7   9:30 a.m.)

8

9

10                    *    *    *    *    *    *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                **INDEX**

2   **WITNESS:**                                                  **PAGE:**

3     **CHERYL MACK**
                    DIRECT EXAMINATION                        3766
4                   BY MS. SHIHATA

5                   CROSS-EXAMINATION                         3838
                    BY MR. CANNICK
6
                    REDIRECT EXAMINATION                      3893
7                   BY MS. SHIHATA

8                   RECROSS EXAMINATION                       3898
                    BY MR. CANNICK
9
                    FURTHER REDIRECT EXAMINATION              3905
10                  BY MS. SHIHATA

11                  FURTHER RECROSS EXAMINATION               3906
                    BY MR. CANNICK
12
                    FURTHER REDIRECT EXAMINATION              3908
13                  BY MS. SHIHATA

14                  FURTHER RECROSS-EXAMINATION               3910
                    BY MR. CANNICK
15
      **DR. DAWN HUGHES**
16
                    DIRECT EXAMINATION                        3912
17                  BY MS. GEDDES

18

19                          * * * * *

20

21

22

23

24

25

1

**INDEX** (CONTINUED)

2

**EXHIBITS**

3

**Page**

4

Government's Exhibits 410, 410(a), 411, 411(a), 641,       3760
645, 913(a), 914(a), 950, 965(a), 948(b) and (c),
400, 162, 974, 233(g), (h), (n), (q), (r), (s) and
(t), 342(b) and (c), 329(b), 328(b), 702, 932, 1015,
1016, 1017

5

6

7

Government Exhibit 71                                      3772

8

Government's Exhibit 71(a)                                 3773

9

Government's Exhibit 71(b)                                 3773

10

Government Exhibit 72(b)                                   3780

11

Government Exhibit 53                                      3804

12

* * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25