3184

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,    :   19-CR-286(AMD)
4
            Plaintiff,        :
5                                 United States Courthouse
       -against-              :   Brooklyn, New York
6
ROBERT SYLVESTER KELLY,      :
7                                 September 13, 2021
            Defendant.       :   12:00 p.m.
8
   - - - - - - - - - - - - - X
9

10                     TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE ANN M. DONNELLY
11        UNITED STATES DISTRICT JUDGE, and a jury.

12
APPEARANCES:
13

14  For the Government:        JACQUELYN M. KASULIS, ESQ
                               Acting United States Attorney
15                             BY: ELIZABETH GEDDES, ESQ.
                                   NADIA SHIHATA, ESQ.
16                                 MARIA E. CRUZ MELENDEZ, ESQ.
                               Assistant United States Attorneys
17                             271 Cadman Plaza East
                               Brooklyn, New York
18

19  For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                               NICOLE BLANK BECKER, ESQ.
20                             THOMAS FARINELLA, ESQ.
                               CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:    SOPHIE NOLAN
                       225 Cadman Plaza East/Brooklyn, NY 11201
23                     NolanEDNY@aol.com
   Proceedings recorded by mechanical stenography, transcript
24  produced by Computer-Aided Transcription

25

Proceedings                                              3185

1          (In open court; outside the presence of the jury.)

2          THE COURTROOM DEPUTY:  All rise.

3          (Defendant present.)

4          THE COURT:  Just before we begin.  Can I see the

5     parties over at the side with the Court reporter?

6          (Sidebar held outside of the hearing of the jury.)

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        3186
```

1           (The following sidebar took place outside the

2   hearing of the jury.)

3           THE COURT:  Apparently on Friday, what number

4   alternate, Donna?

5           THE COURTROOM DEPUTY:  I want to say 4.  She was 5

6   because we lost one.  Alternate 4 said to Donna that she

7   wanted to get Gloria Allred's autograph.

8           Of course, none of that would have happened if you

9   hadn't alerted us to the fact that she was in the courtroom.

10          But I don't think this is anything.  You can do an

11  inquiry if you want.  Let me hear what you each have to say

12  about it.

13          MR. CANNICK:  Firstly, I think it's not appropriate

14  and, secondly, I would want an inquiry of her.  We can do it

15  at the end of the day.  I would want that.

16          THE COURT:  And the way that I will do it is we will

17  have counsel, not the defendant, in the jury room and I will

18  ask her about it.  I think an inquiry is probably appropriate.

19  I think it's extremely tangential.  I think to be on the safe

20  side I will do an extra reminder to everybody not to talk

21  about the case.  That's how we're going to go with it.

22          Anything else?

23          MS. GEDDES:  I don't think so.

24          (Sidebar ends.)

25          (Continued on next page.)

1            THE COURT:  Okay.  Let's get the witness unless

2     anybody has something to bring up.

3            Okay, let's get the witness.

4            (Witness takes the stand.)

5            (Jury enters.)

6            THE COURTROOM DEPUTY:  You may be seated.

7            THE COURT:  All right, everybody, welcome back.  I

8     hope everybody had a good weekend.  We are ready to resume

9     with, I don't remember where we were, direct?

10            MS. GEDDES:  That's correct.

11            THE COURTROOM DEPUTY:  The witness is reminded she

12     is still under oath.

13     **DIANA COPELAND**, having been previously duly sworn/affirmed,

14        testified as follows:

15     CONTINUED DIRECT EXAMINATION

16     BY MS. GEDDES:

17     Q    Good morning.

18     A    Good morning.

19     Q    On Friday before we ended for the day, you testified

20     about certain fines that the defendant imposed while you were

21     working for him.

22     A    Right.

23     Q    Do you recall the amount of the fine that were imposed by

24     the defendant?

25     A    I do not.

Copeland - direct - Geddes                    3188

1    Q    Were they always the same amount or did it differ?

2    A    It differed.

3    Q    And were there times when you did not receive any part of

4    your paycheck in a particular week as a result of a fine?

5    A    Correct.

6    Q    When we ended on Friday, you were testifying about a

7    computer that you had purchased.  Can you remind the jury when

8    you purchased that computer?

9    A    Somewhere around January 2018.

10   Q    And what type of computer was it?

11   A    It was a Macbook Air.

12   Q    And what did you use the computer for in connection with

13   your employment with the defendant?

14   A    In connection with the employment, it would have been

15   just to take notes in the meetings.

16   Q    And I think you might have testified to this on Friday

17   but it's been a while since then, what happened to the

18   computer?  When did you last see the computer?

19   A    I last saw it in April 2018 in the lounge area of the

20   studio.

21   Q    And who was present when you last saw the computer?

22   A    There were people there and Robert was there as well.

23   Q    Did you have any conversations with the defendant about

24   your computer?

25   A    I did.

Copeland - direct - Geddes                          3189

1   Q    What happened during those conversations?

2   A    Well, it wasn't exactly a conversation.  I just asked him

3   about it.

4   Q    And when did you ask the defendant about your computer?

5   A    When I first noticed it being missing.

6   Q    That day at the studio in April of 2018?

7   A    Correct.

8   Q    And how did the defendant respond when you asked him

9   about your computer going missing?

10  A    He didn't really respond.  He didn't know where it was.

11  Q    What did he say?

12  A    He was kind of -- he looked and didn't really know where

13  it was.

14  Q    What, if any, steps did the defendant take to try to

15  locate your computer?

16  A    None.

17  Q    And what, if any -- did you hear the defendant ask anyone

18  else in the room about what had happened to your computer?

19  A    No.

20  Q    Did you ever receive your computer back?

21  A    No, I did not.

22  Q    Did you take any steps to try to recover -- or find out

23  where your computer was located?

24  A    I did.  I did a search on the computer -- on the -- on

25  another computer.  It was -- it's called, like, Find Your

Copeland - direct - Geddes                    3190

1    Device and it located it.

2    Q     And when did you do that -- when did you conduct that

3    search?

4    A     Just a little bit after I noticed that it was missing.

5    Q     Was it that same day?

6    A     Yes.

7    Q     And based on that search where did it indicate your

8    computer was?

9    A     That it was still in the studio.

10   Q     Did you subsequently learn that your computer had been

11   used for something?

12              MR. CANNICK:  Objection.

13              THE COURT:  First of all, overruled.

14              Did you learn that; that your computer had been used

15   even though you didn't have it?

16              THE WITNESS:  Yes.

17              THE COURT:  Next question.

18   BY MS. GEDDES:

19   Q     What did you learn, what happened?

20   A     The Apple sends you a notification if the computer is

21   opened.

22   Q     And approximately when did you -- is that what you mean

23   that you received a notification from Apple that the computer

24   had been opened?

25   A     Correct.

Copeland - direct - Geddes                     3191

1  Q    And when did you receive that notification in connection

2  or relative to when you last saw your computer at the studio?

3  A    About a couple of months later.

4  Q    What, if anything, did you do upon receiving that

5  communication from Apple?

6  A    I sent a text to his then-manager.

7  Q    Who was his then-manager?

8  A    James Mason.

9  Q    And at the time that you received the notification from

10 Apple that your computer had been opened, what if any

11 information did you learn about its then-location?

12 A    I'm sorry, can you repeat that?

13 Q    Yes.  When you received that notification from Apple that

14 your computer had been opened, did you receive any information

15 about the location of your computer at that time?

16 A    I did not.

17 Q    And just to be clear, I'm referring to the notification

18 from Apple about where your computer was located?

19 A    Initially, but I don't think the second time it indicated

20 the location.

21 Q    When you contacted contacted the manager that you just

22 referenced, James Mason, whose manager was that?

23 A    Robert's.

24 Q    The defendant's?

25 A    Correct.

Copeland - direct - Geddes                          3192

1    Q    And you testified earlier or last week, that you stopped

2    working for the defendant in approximately April of 2018; is

3    that correct?

4    A    Correct.

5    Q    And was that the same month that your computer went

6    missing?

7    A    Correct.

8    Q    Why did you stop working for the defendant at that time?

9    A    A number of reasons.

10   Q    Was one of them --

11               THE COURT:  Well let's --

12               What were the reasons?

13               THE WITNESS:  Well, there was a lot going on.  Wow.

14   It was just we weren't seeing eye-to-eye.  There was, you

15   know, new management.  I kind of felt like things should have

16   been handled differently because we had had people in that we

17   didn't trust and so we weren't seeing eye-to-eye in terms of

18   that.

19   BY MS. GEDDES:

20   Q    In terms of "we" who are you referring to?

21   A    Myself and Robert.

22   Q    Now did you see the defendant after you stopped working

23   for him?

24   A    I did, yes.

25   Q    When was the last time that you saw the defendant prior

Copeland - direct - Geddes                    3193

1    to the beginning of your testimony last week?

2    A    The last time?

3    Q    That you saw him.

4    A    That would have been probably in 2019.

5    Q    And do you recall during what part of 2019 you last saw

6    the defendant?

7    A    I can't recall.

8    Q    Okay.  Where did you first see the defendant on that last

9    occasion when you saw him?

10   A    Well, we met at a park.

11   Q    Where was the park located?

12   A    Across from the water tower.

13   Q    Is that in Chicago?

14   A    Yes.

15   Q    And what happened when you showed up at the park?

16   A    When I showed up at the park, he was -- I was sitting on

17   the bench.  He called me and he said, Don't you see this big

18   giant van sitting here jokingly.  And so I eventually went to

19   the van.  We ended up going to the Trump Towers from there.

20   Q    And just to be clear, for the record when you say "he,"

21   are you referring to the defendant?

22   A    Yes.

23   Q    Who went to the Trump Towers that day?

24   A    I believe it was Robert, *Jane and myself.

25   Q    And what happened when you arrived at the Trump Towers?

Copeland - direct - Geddes                    3194

1   A    When I arrived at the Trump Towers, Jane gave me a robe

2   to put on.

3   Q    What, if anything, did she say?

4   A    She said that Mr. Kelly would like me to -- she asked me

5   was I wired.

6   Q    What did you understand her to mean when she asked you if

7   you were wired?

8   A    If I had some kind of device that would record or --

9   Q    Now, at the time that you last saw the defendant and went

10  to the Trump Towers, had you met with law enforcement at that

11  time?

12  A    I'm not sure if that was before or after.

13  Q    How did you respond when Jane asked you whether you were

14  wired?

15  A    I was shocked and I said no.

16  Q    What, if anything, did you do with the robe that Jane

17  provided to you?

18  A    Well, I took off my sweatshirt and I left on my tank top

19  and my pants and I put the robe on.

20  Q    And who did you understand wanted you to be putting on

21  that robe?

22  A    Robert.

23  Q    And what did you understand the defendant wanted you to

24  have other than the robe on?  What was the purpose --

25           What did you understand was the purpose of having

Copeland - direct - Geddes                3195

1   been provided with this robe?

2   A    To disrobe and to put the robe on.

3   Q    For what reason?

4   A    To make sure I wasn't wired.

5   Q    And just to be clear, were you wearing a wire?

6   A    No.

7   Q    Or did you have a recording device at any point?

8   A    Absolutely not.

9   Q    After you put on the robe and advised Jane that you were

10  not -- did not have a wire on, did you interact with the

11  defendant?

12  A    I did.

13  Q    What happened when you saw the defendant?

14  A    He was very upset at what was going on in the media.

15  Q    What, if anything, did he ask you to do?

16  A    At a certain point he just told me to write something

17  truthful about how I feel about him.

18  Q    And what, if anything, did he provide you in order to do

19  that?

20  A    I think it was a notebook and pen.

21  Q    And did you then write a letter?

22  A    I did.

23        MS. GEDDES:  I'm showing the witness only what's

24  been marked for identification as Government Exhibit 301.

25        THE COURT:  Any objection to this going into

1    evidence?

2              MR. CANNICK:  None.

3              THE COURT:  Okay.  This will be in evidence as 301?

4              MS. GEDDES:  Yes.

5              THE COURT:  Admitted.

6              (Government Exhibit 301 received in evidence.)

7    BY MS. GEDDES:

8    Q    Do you recognize what's shown in 301?

9              (Exhibit published.)

10   A    Yes.

11   Q    What is that?

12   A    This is my handwriting and this is the letter.

13   Q    And I want to -- you testified earlier that the defendant

14   asked you to write a letter that was truthful; is that

15   correct?

16   A    That is correct.

17   Q    Have you had an opportunity to review this letter prior

18   to your testimony today?

19   A    Yes, I have.

20   Q    And having reviewed the letter, was everything that you

21   wrote in this letter truthful?

22   A    Everything, yes.

23   Q    I want to direct your attention to the second page where

24   it indicates, he has never verbally, physically or mentally

25   abused anybody.

Copeland - direct - Geddes                3197

1          Based on what -- having worked for the defendant for

2    the lengthy period of time that you worked for him, was that

3    an accurate statement when you wrote that?

4    A    It probably should say I have never seen him verbally,

5    physically or mentally abuse anyone.

6    Q    Well, during the course of your employment with the

7    defendant, was there ever a time when the defendant verbally

8    abused you?

9    A    I don't know that I would call it verbally abuse --

10   verbal abuse.

11   Q    Did you and the defendant get into verbal altercations?

12   A    Yes.

13   Q    And what were the nature of those altercations?

14   A    Usually it would be over a fine.

15   Q    And what was the defendant's demeanor during some of

16   these discussions?

17   A    He could get pretty heated, yes.

18   Q    Could you describe what you mean by him getting pretty

19   heated?

20   A    He could get angry.  He could curse.  He could -- yeah.

21   Q    And what, if anything, would you do after you had some of

22   those verbal disputes with the defendant?

23   A    Sometimes cry.

24   Q    And did you always continue to work for the defendant

25   after those verbal disputes?

Copeland - direct - Geddes                    3198

1    A    Yes.  Well, sometimes I would leave.

2    Q    And when you say sometimes you would leave, what do you

3    mean?

4    A    It means sometimes I would quit.

5    Q    As a result of those verbal disputes?

6    A    Correct.

7    Q    Would the defendant raise his voice during some of those

8    disputes?

9    A    Correct.

10   Q    And would the defendant criticize you during some of

11   those disputes?

12   A    Correct.

13   Q    Now, you testified that you wrote this letter shown in

14   Government Exhibit 301 in 2019 at some time.

15        Was that the only time that you wrote a letter at

16   the defendant's direction?

17   A    No.

18   Q    When if -- what other time had the defendant asked you to

19   write a letter?

20   A    Years ago initially, I think the staff wrote letters

21   basically saying that they stole something and this was just

22   to make sure that no one was going to do something against

23   him.

24   Q    What did the defendant ask you to do?

25   A    Write a letter.

Copeland - direct - Geddes                    3199

1    Q    Did the defendant explain why he wanted you to write a

2    letter?

3    A    Yeah, I believe his attorneys had told him to have us do

4    that.

5    Q    And what did you understand the defendant wanted you to

6    write in the letter that he asked you to write?

7    A    That I stole something.

8    Q    At the time that you wrote the letter had you, in fact,

9    stolen anything from the defendant?

10   A    No.

11           MS. GEDDES:  I am showing the witness what's been

12   marked for identification as Plaintiff's Exhibit 3500-DC2-8.

13           THE COURT:  Any objection to this Mr. Cannick?

14           MR. CANNICK:  No.

15           MS. GEDDES:  The Government Plaintiff's Exhibit

16   3500-DC2-8.

17           THE COURT:  It's in evidence.

18           (Government Exhibit 3500-DC2-8 received in

19   evidence.)

20           (Exhibit published.)

21   BY MS. GEDDES:

22   Q    Do you recognize the letter that is in Plaintiff's

23   Exhibit 3500-DC2-8?

24   A    Yes.

25   Q    And at the top whose signature is that?

1   A     Mine.

2   Q     And it reads:  This is the hardest letter that I have

3   ever written.  I wanted to write it in the most honest and

4   humble way possible, but there is no perfect or easy way to

5   tell someone you love that you have betrayed them.  I have

6   stolen money from you and I am very sorry.  It took me two

7   years to admit it to myself and to you because I would rather

8   leave than have you look at me differently.  I am so thankful

9   that you are a forgiving person.  We have always been like

10  family and I would not be the same if I lost our relationship

11  over this.  I will never, ever betray in any way ever again.

12  I am truly disappointed in myself and I am ashamed.  There is

13  no pain greater than the one in my heart right now.  There is

14  no excuse for what I did and no way to make it look better.

15            I took something from you that didn't belong to me.

16  I stole money.  What makes it worse is that I know in my heart

17  that if I had asked you for some money, you would have no

18  problem with it.  You are a very giving and loving person and

19  there is no excuse for anyone you love to steal from you.

20  Right now I don't feel deserving of your love or your trust

21  and it's killing me inside.  It's the very feeling that I ran

22  away from for two years, but right now all I can do is

23  apologize and hope time heals the pain, trust and our

24  friendship.  Please feel my spirit when I say that I am truly

25  sorry and I will never betray you ever again.  I love you.

1          And then there are two signatures there.  Are those

2     both your signature as well?

3     A    Yes.

4     Q    And at the top of this -- of this third page, is that

5     also your signature there at the top right-hand corner?

6     A    Yes.

7     Q    And at the top of the second page, there is also a

8     signature, is that also your signature?

9     A    Yes.

10    Q    And just to be clear, did you ever steal anything from

11    the defendant?

12    A    No.

13    Q    I am showing the witness only what's been marked for

14    identification as Government Exhibit 970?

15             (Exhibit published for witness only.)

16    BY MS. GEDDES:

17    Q    Do you recognize what's shown in Exhibit 970?

18    A    Yes.

19    Q    What that?

20    A    My phone number.

21    Q    Is it still your phone number today?

22    A    Yes, it is.

23    Q    How long have you used that phone number?

24    A    For many years.  I don't know how many.

25    Q    And did you use that telephone number while you were

Copeland - direct - Geddes                3202

1    working with the defendant?

2    A    Yes.

3              MS. GEDDES:  The Government offers 970.

4              MR. CANNICK:  No objection.

5              THE COURT:  That is in evidence.

6              (Government Exhibit 970 received in evidence.)

7              THE COURT:  Jury only?

8              MS. GEDDES:  Jury only, please.

9              (Exhibit published to jury only.)

10             MS. GEDDES:  Nothing further.

11             THE COURT:  Cross-examination?

12             MR. CANNICK:  Yes, Your Honor, thank you.

13   CROSS-EXAMINATION

14   BY MR. CANNICK:

15   Q    I just want to go over your testimony a bit here.  The

16   letter that was just read to you by the Government, DC-8, in

17   that letter you said that Rob is a giving and loving person.

18   Did you find that to be true?

19   A    Yes, I did.

20   Q    Did you find him to be a generous person?

21   A    Yes.

22   Q    And you testified that that letter did not pertain to you

23   actually stealing anything from him.  There was a reference

24   that you stole something from him but that was not true;

25   correct?

Copeland - direct - Geddes                    3203

1   A    Correct.

2   Q    But what was true was that there was a dispute that you

3   and he had about something that was a misunderstanding; am I

4   correct?

5   A    Yes.

6   Q    And that misunderstanding caused you to decide, you know

7   what, given the misunderstanding I'm going to leave and you

8   wrote that letter on your way back to work with him, am I

9   correct?

10  A    That is correct.

11  Q    You left him for two years after that and on coming back,

12  you wrote that letter?

13  A    That's correct.

14  Q    And the misunderstanding was never resolved, right, you

15  just moved on from it?

16  A    That is correct.

17  Q    Now, the Government asked you about whether or not Robert

18  had ever verbally abused, do you remember them asking you

19  that?

20  A    Yes.

21  Q    And you testified that there were times that you and he

22  would have disagreements and sometimes you would cry, am I

23  correct?

24  A    Right.

25  Q    You met with the Government before coming her to give

Copeland - direct - Geddes                    3204

1   your testimony here?

2   A    Yes.

3   Q    And you met with them a number of times, am I correct?

4   A    That's correct.

5   Q    And during the prepaaration to come here, they asked you

6   questions, am I correct?

7   A    That is correct.

8   Q    And during their asking you those questions, you cried

9   then; am I correct?

10   A    That is correct.

11   Q    They didn't like how you were answering the questions and

12   you eventually cried; am I correct?

13          MS. GEDDES:  Objection.

14          THE COURT:  Sustained.

15   BY MR. CANNICK:

16   Q    But you cried?

17   A    Yes, I did.

18   Q    Now, you mentioned that there were times that Rob would

19   exact fines on you and his other employees; am I correct?

20   A    That is correct.

21   Q    Now, fines in the music industry is pretty commonplace;

22   am I correct?

23          MS. GEDDES:  Objection.

24          THE COURT:  Do you have any basis for having an

25   opinion about whether fines are common in the music industry?

SN        OCR        RPR

Copeland - direct - Geddes                    3205

1          THE WITNESS:  I do, Your Honor.

2          THE COURT:  What is the basis for your --

3          THE WITNESS:  I have friends that are in the

4   industry.

5          THE COURT:  Well, I guess the jury can take the

6   answer for what it is worth.

7          Go  ahead.

8   BY MR. CANNICK:

9   Q    And your friends in the industry, you find that they were

10  fined by their bosses; is that correct?

11  A    That is correct.

12  Q    And I'm sure being in the industry for the amount of time

13  you have been in there, you heard about how James Brown used

14  to fine --

15         MS. GEDDES:  Objection.

16         THE COURT:  Sustained.

17  BY MR. CANNICK:

18  Q    Now, you testified that there was a time that you left

19  your employment with Robert because you guys weren't seeing

20  eye-to-eye.  Do you remember that?

21  A    Right.

22  Q    Now, that was only because of business direction, am I

23  correct?

24  A    That is correct.

25  Q    In fact, there was new management and you weren't in

Copeland - direct - Geddes                3206

1    synch with the new management; am I correct?

2    A    Correct.

3    Q    Now during your final stint -- withdrawn.

4         Do you recall how many times you left your

5    employment with Robert and returning?

6    A    Many.

7    Q    Many; right?

8    A    Yes.

9    Q    And you would come back because you found it to be an

10   exciting job?

11   A    I came back sometimes because I felt he didn't have

12   trustworthy people around him.

13   Q    And when you say that, you knew that some of his

14   employees had stolen from him; am I correct?

15        MS. GEDDES:  Objection.

16        THE COURT:  Sustained.

17   BY MR. CANNICK:

18   Q    Well, wasn't your responsibility when you came back in

19   the final months of your job was to help him find his monies?

20   A    Yes.

21   Q    Okay.  Because there were large sums of monies that just

22   disappeared?

23        MS. GEDDES:  Objection.

24        THE COURT:  Sustained as to form.

25   BY MR. CANNICK:

SN      OCR      RPR

Copeland - direct - Geddes                    3207

1    Q    Why did you have that responsibility?

2    A    Robert did not have any control over his bank account.

3    He didn't even know even know his Social Security number.  He

4    had no control over over whether things were being paid, the

5    urgent things that needed to be paid.  He had no control over

6    that and he had no idea where his royalties were going.  Who

7    was getting that check and so that was a huge problem.

8    Q    Okay, thank you.  Given your employment with Mr. Kelly

9    you came to understand that he had a problem with reading and

10   writing?

11   A    Correct.

12   Q    Now, I want to go back and discuss some aspects of your

13   employment with Mr. Kelly.  You were employed with him at a

14   point in time as his executive assistant?

15   A    Correct.

16   Q    What was your responsibilities as his executive

17   assistant?

18   A    The focus was to make sure that he had everything

19   required to make music, to tour, to live comfortably, to make

20   sure that the bills were paid, that his home was running

21   smoothly, that his kids were taken care of.

22   Q    And you were pretty much his go-to person in terms of

23   making sure that those things were to his standard?

24   A    Correct.

25   Q    Now, you also testified that you worked as his assistant.

SN        OCR        RPR

1    Was that a personal assistant?

2    A    Correct.

3    Q    And what were the responsibilities -- what were your

4    responsibilities as his personal assistant?

5    A    So, at that time it was more so to manage the estate when

6    he was living in Olympia Fields.  The children were there at

7    the time and there were nannies and housekeepers and people

8    who took care of the grounds and things of that nature that

9    needed to be scheduled and paid.

10   Q    And did you have any direct involvement with his children

11   and wife?

12   A    Yes.

13   Q    What were those involvements?

14   A    That was another part of making sure that the household

15   ran smoothly.  You know, I was told when I first was hired

16   that I was an extension of him because he was really busy.

17   And he would be in the studio for hours so I had to make sure

18   that the kids had something to do.  He would have me schedule

19   trips to the museum and things like that with their teacher

20   and things of that nature.

21   Q    Now you mentioned that he was a very busy person.  Could

22   you give us an idea as to his daily routine?

23   A    That varied every day.  He would be in the studio from

24   nighttime until the sun came up many days.

25   Q    Let me stop you there.  In terms of being in the studio

Copeland - direct - Geddes                    3209

1    did he have an engineer staff with him?

2    A    At what period?

3    Q    At the time that you worked with him --

4    A    Actually he had engineers the entire time I was working

5    there.

6    Q    Do you know the shifts of those engineers?

7    A    I do not know their shifts.

8    Q    Okay.  But do you recall them working pretty much 24

9    hours a day?

10   A    24 hours, yeah.  There was always somebody there, but --

11   Q    And they would be there because oftentimes he would have

12   an inspiration or decide to go to the studio and he would

13   either work -- need to work on his music; am I correct?

14   A    Correct.

15              THE COURT:  I do not see the relevance, but let's

16   move on to something else.

17   BY MR. CANNICK:

18   Q    Now his band was there 24 hours?

19              THE COURT:  His band?

20              MR. CANNICK:  His band.

21              THE COURT:  I really don't see the relevance.

22              MR. CANNICK:  Your Honor --

23              THE COURT:  Go ahead.

24   BY MR. CANNICK:

25   Q    His band would be there to be ready to perform if he was

SN        OCR        RPR

Copeland - direct - Geddes                3210

1  deciding to go to the studio; right?

2  A    Sometimes, yes.

3  Q    And did he play basketball during his daily routine?

4  A    Yes.

5  Q    Do you know what his his basketball schedule?

6  A    Typically he would play somewhere around 11 p.m. or

7  midnight.

8  Q    So he would play in the -- closer to midnight for about

9  how many hours?

10  A    Maybe three.

11  Q    And then after that would he go back to the studio, to

12  your knowledge?

13  A    Yes.

14  Q    And when would he get to bed?

15         MS. GEDDES:  Objection.

16  A    Morning.

17         THE COURT:  Was this every day?

18         THE WITNESS:  It was a routine.

19         THE COURT:  Okay.

20  BY MR. CANNICK:

21  Q    Did he have any involvement during his daily routine with

22  other artists?  Did he work with other artists?

23  A    Absolutely.

24  Q    Other producers?

25  A    Yes.

1    Q     Record label?

2    A     Yes.

3    Q     Did he during his day have to plan concerts and tours?

4    A     That is correct.

5    Q     And do you know whether or not he would write music for

6    himself and for other artists?

7    A     Yes, he did.

8    Q     And these artists that he would write and produce for,

9    they were considered A-list musicians?

10             MS. GEDDES:  Objection.

11             THE COURT:  I think we're going quite far afield

12   here.  Let's move on to something else.

13   BY MR. CANNICK:

14   Q     What time would he begin his day?

15   A     Somewhere around maybe 4 p.m., 5 p.m.

16   Q     And you had total access of the properties that you

17   worked for when you worked with Mr. Kelly?

18   A     Yes.

19   Q     And what properties were they?

20   A     Olympia Fields, the Trump Towers, the estate in John's

21   Creek.

22   Q     And of all of those properties, did you note that any of

23   the bedrooms or rooms had locks on the outside of the door?

24   A     No, they did not.

25   Q     Do you know whether or not any of his phones were ever

Copeland - direct - Geddes                3212

1   rigged so that they could only call certain numbers?

2              THE COURT:  Any of his personal telephone?

3              MR. CANNICK:  The phones within the studio and in

4   the home.

5              THE COURT:  Like a landline?

6              MR. CANNICK:  Yes.

7              THE COURT:  Okay.

8   A    No.

9   Q    Have you ever heard that?

10  A    I have not heard of that.

11  Q    Now, did you have responsibility as relates to

12  Mr. Kelly's guests?

13  A    Yes.

14  Q    And what type of guests would he have?

15  A    It could range from record label executives, you know,

16  A-list stars like Whitney Houston, God bless her soul.

17  Q    What about his personal friends?

18  A    People he played basketball with or female friends.

19  Q    The female friends, some of them you learned that they

20  were his girlfriends; am I correct?

21  A    That is correct.

22  Q    And some of those girlfriends lived with him; am I

23  correct?

24  A    That is correct.

25  Q    Now, when you mentioned that you have involvement with

Copeland - direct - Geddes                3213

1   his record label and other entertainers, would those

2   individuals bring their entourage with them when they would

3   visit?

4   A    Sometimes.

5   Q    Now, does Robert have certain policies or procedures to

6   maintain decorum in his home and his business?

7   A    Yes.

8   Q    What were they?

9   A    The decorum in the home was that you could not roam his

10  home.  You could not -- you should knock if you come out of

11  one room and you go into another.  Those were the biggest

12  rules.

13  Q    And his wife was the one who put --

14          MS. GEDDES:  Objection.

15          THE COURT:  Overruled.

16  BY MR. CANNICK:

17  Q    His wife was the one who put the rules in place about

18  knocking on doors in the home and the business; am I correct?

19  A    That is correct.

20  Q    Now, this rule applied to everyone who came into his

21  home; am I correct?

22  A    That is correct.

23  Q    It wasn't just a rule for girlfriends; am I correct?

24  A    No, it wasn't just -- it was for everybody.

25  Q    Now, I asked you earlier if you ever -- if you had

Copeland - direct - Geddes                    3214

1   meetings with the Government.  Do you remember me asking you

2   that?

3   A     Yes.

4   Q     Now, when you went to visit the Government for these

5   sessions, you couldn't just roll out of the house; correct?

6   A     No.

7   Q     A marshal had to escort you; correct?

8   A     That is correct.

9   Q     You couldn't just get up and go to the bathroom; correct?

10              MS. GEDDES:  Objection.

11              THE COURT:  Overruled.

12              Did someone have to walk you to the bathroom?

13              THE WITNESS:  Yes.

14              THE COURT:  Inside?

15              THE WITNESS:  Yes.

16

17              (Continued on the following page.)

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION (CONTINUED)

2   BY MR. CANNICK:

3   Q    And if you wanted to go get some lunch, they had to

4   walk you out; am I correct?

5   A    I wasn't allowed.

6   Q    You weren't allowed lunch?

7   A    I wasn't allowed to go for lunch.  I'm sorry.

8   Q    Okay.  Now, I asked you about Mr. Kelly having live-in

9   girlfriends.  Did those live-in girlfriends lived there for

10  substantial periods; am I correct?

11  A    Yes.

12  Q    Okay.  Some lived there three, four, five years and

13  beyond; am I correct?

14  A    Correct.

15  Q    And some of them came and went; am I correct?

16  A    That is correct.

17  Q    In fact -- what's the name -- Anna was one who came and

18  left; am I correct?

19  A    Oh, yes.

20  Q    Many times, am I correct?

21  A    That's correct.

22  Q    And she also had an apartment in Atlanta; am I correct?

23  A    That is correct.

24  Q    And Robert paid for that apartment; am I correct?

25  A    I'm not aware who paid for it.

Copeland - Cross - Cannick                  3216

1   Q    Okay.  But you know she came and left?

2   A    Yes.

3   Q    And do you know someone that they called "Juice"?

4   A    I do.

5   Q    Now, "Juice" stayed for long periods of time; am I

6   correct?

7   A    That's correct.

8   Q    But she also left, as well; am I correct?

9   A    That's correct.

10  Q    Came and left, right?

11  A    Yes, sure.

12  Q    She also had a car?

13  A    Yes.

14  Q    And she had a job?

15  A    She did.

16  Q    And what about someone by the name of Dominique, that

17  person stayed for a period of time?

18  A    That is correct.

19  Q    And then left; am I correct?

20  A    That's correct.

21  Q    And others did, Sara?

22  A    Yeah.

23  Q    Okay.

24  A    I remember Sara, yeah.

25  Q    She never stayed in-house; am I correct?

Copeland - Cross - Cannick                3217

1   A     No, she never stayed.

2   Q     She stayed in a hotel?

3   A     Yes, that's correct.

4   Q     And she'd come and go; am I correct?

5   A     Yes.

6   Q     And there were a number of individuals who were of that

7   status of coming and leaving; am I correct?

8   A     That's correct.

9   Q     Now, you testified about taking Mr. Kelly's girlfriend

10  shopping.  That was part of your responsibility; am I

11  correct?

12  A     I don't know if it was a responsibility, but it was

13  part of what I did.

14  Q     Part of what you did?

15  A     Yeah.

16  Q     And Mr. Kelly would splurge on these on these young

17  ladies; am I correct?

18  A     Yes.

19  Q     He would have you -- have them go to high-end stores?

20  A     That's correct.

21  Q     He would pay for their cosmetic procedures?

22  A     That's correct.

23  Q     He would lavish them with gifts?

24  A     Correct.

25  Q     Parties?

Copeland - Cross - Cannick                3218

1    A    Correct.

2    Q    Picnics?

3    A    Correct.

4    Q    Rental getaways?

5    A    Correct.

6             THE COURT:  What did -- I didn't hear what you

7    said.

8    Q    Rental getaway, a house in the mountains?

9             THE COURT:  I see.

10   A    That is correct.

11   Q    Exotic pets?

12   A    That's correct.

13   Q    Extravagant parties?

14   A    That is correct.

15   Q    Trips abroad?

16   A    That's correct.

17   Q    He afforded them an exotic lifestyle, did he not?

18   A    Yes.

19   Q    Now, Mr. Kelly, you mentioned that he -- his

20   girlfriends would call his daddy.  Do you remember telling

21   us that?

22   A    That's correct.

23   Q    Now daddy is a term of endearment; am I correct?

24            THE COURT:  Sustained.

25   Q    I have something to say and I don't remember -- I

Copeland - Cross - Cannick                3219

1    don't.

2             THE COURT:  I said sustained.

3             MR. CANNICK:  Sustained.

4             THE COURT:  Yes.

5    Q    Have you ever heard --

6             THE COURT:  I'm going sustain this, too, I think,

7    beginning, have you ever heard.

8             MR. CANNICK:  No, no, not have you ever heard.

9             Your Honor, I think we need a sidebar.

10            (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Conference                3220

1              (The following occurred at sidebar.)

2              MR. CANNICK:  Your Honor --

3              THE COURT:  Her opinion, how can you defend --

4              MR. CANNICK:  How can I defend -- if the

5    Government's saying that he made her call him daddy, right,

6    I think that I have a right to show how the context was

7    used.

8              THE COURT:  First, the Government didn't say --

9    and don't you think, that haven't you ever heard that using

10   daddy in this way is whatever supports their opinion?

11   That's all.  I'm not letting you do -- you can certainly

12   argue that --

13             MR. CANNICK:  Yeah, I will.

14             THE COURT:  But this lady's opinion --

15             MR. CANNICK:  Okay.

16             THE COURT:  -- about when people called them daddy

17   is not really relevant.

18             Do you know how much longer you have with her?

19             MR. CANNICK:  Maybe 30 or 40 minutes.

20             THE COURT:  Okay.

21             MR. CANNICK:  I'm going a lot faster than I

22   thought.

23             THE COURT:  The only thing I was thinking about

24   was, right after in the next break, I would like to just

25   follow-up with that juror, with the alternate juror.

Sidebar Conference                    3221

1            MR. CANNICK:  Sure, okay.

2            THE COURT:  All right?  Because we're going until

3    6:00 tonight.

4            MR. CANNICK:  Right.

5            THE COURT:  So I think what we'll do is maybe if

6    anybody needs five minutes.

7            MR. CANNICK:  Okay.

8            THE COURT:  And then we're going to convene.  I'll

9    have Donna work out the details.

10           MR. CANNICK:  Okay.  We're going to take a break

11   now?

12           THE COURT:  No, no, no.

13           MR. CANNICK:  Oh, okay.

14           THE COURT:  That's why I wanted to figure out when

15   you're done.

16           MR. CANNICK:  Okay.

17           THE COURT:  And then we'll do it in Judge Chen's

18   jury room.

19           MR. CANNICK:  Do you have a set time in mind when

20   you want to take it?

21           THE COURT:  I'm think around 2:00ish.

22           MR. CANNICK:  2:00ish?  Okay.

23           THE COURT:  Yes.  That's 45 minutes.

24           If you're not done, that's also fine.

25           MR. CANNICK:  Yeah, okay.

Sidebar Conference                         3222

(Continued on the next page.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Copeland - Cross - Cannick          3223

1          (Sidebar ends; in open court.)

2          THE COURT:  All right.  Go ahead.

3    Q    Now, are you familiar with the lyrics of Mr. Kelly's

4    songs?

5          MS. GEDDES:  Objection.

6          THE COURT:  If you can answer the question.

7          Do you know the words to his song?

8    Q    Well, let me be specific.  To Chocolate Factory?

9          MS. GEDDES:  Objection.

10          THE COURT:  A few questions.

11          MR. CANNICK:  Okay.

12          THE COURT:  I don't really think this is --

13    Q    In this song he called himself daddy; am I correct?

14          MS. GEDDES:  Objection.

15          THE COURT:  Overruled.  She doesn't -- do you know

16    the words?

17          THE WITNESS:  To be totally honest.

18          THE COURT:  Let's move on to something else.

19          MR. CANNICK:  I will see if I can refresh her

20    recollection.

21          THE COURT:  No, no, no, no, no.  Next question.

22    Q    Well, in that song did he say --

23          MR. CANNICK:  I know I'm slow, Your Honor, but --

24          THE COURT:  Mr. Cannick, it does not matter what

25    the lyrics of his song were, that's all I'm saying.  Let's

Copeland - Cross - Cannick                3224

1    put some other questions to the witness.  She said she's not

2    familiar with the lyrics.

3            MR. CANNICK:  That's why I was trying to refresh

4    her recollection, Your Honor.

5            THE COURT:  The objection is sustained.

6            MR. CANNICK:  Thank you.

7    Q    Be you do know that he had a song called Chocolate

8    Factory?

9    A    I've heard that, yes.

10   Q    But you don't recall the lyrics of the song?

11   A    I don't.

12   Q    And you don't recall whether or not he called himself

13   daddy in that song?

14   A    I don't know.

15   Q    Now, Mr. Kelly, you mentioned earlier that -- in your

16   testimony that when he would come into the room -- I'm not

17   sure if this was your testimony or not -- but when he came

18   into the room his girlfriends kiss him?

19   A    They did, yes.

20   Q    Okay.  But when his girlfriends came into the room he

21   stood up; am I correct?

22   A    That's correct.

23   Q    In fact, when you came into the room he stood up; am I

24   correct?

25   A    That's correct.

Copeland - Cross - Cannick                    3225

1    Q    And, in fact, he would stand up anytime a female came

2    into the room; am I correct?

3    A    That's correct.

4    Q    And he would open the door for any female; am I

5    correct?

6    A    That's correct.

7    Q    It wasn't just his girlfriends; am I correct?

8    A    That's correct.

9    Q    Now, and he hired personal assistants to make sure that

10   the needs and the wants of his girlfriends were attended to;

11   am I correct?

12   A    That is correct.

13   Q    And the rules that -- the policies that we spoke about

14   earlier, knocking and to make sure that before you, leaving

15   and going into a room, that applied to staff as well as

16   girlfriends?

17            MS. GEDDES:  Objection.

18   A    Overruled.

19   Q    Now, have you ever been or have you ever traveled on

20   the tour bus?

21   A    I have, yes.

22   Q    Now, was there a rule in place as it relates to

23   knocking on a door before coming out of the bathroom?

24   A    Oh, yes.

25   Q    And why was that such a rule?

Copeland - Cross - Cannick                    3226

1  A    Well, the door was directly across from the microwave.

2  And so should you be warming something up or boiling water

3  for tea or coffee you could get pretty burned.

4  Q    Okay.

5  A    So...

6  Q    If you came out without letting folks know that you're

7  coming out by opening the door?

8  A    Yes.

9  Q    Now that rule applied to everyone; am I correct?

10  A    Oh, yes.

11  Q    It just didn't apply to Jane, do you know who Jane is?

12  A    I do.

13  Q    That rule just didn't apply to Jane, did it?

14  A    Oh, no.

15  Q    It applied to everybody?

16  A    Me included.

17  Q    Okay.  Now, you would take the tour bus and the

18  Sprinter sometimes on cross-country trips; am I correct?

19  A    That's correct.

20  Q    And these weren't pleasure trips, these are trips where

21  Mr. Kelly was going to perform; am I correct?

22  A    That's correct.

23  Q    And sometimes you would be out in the middle of

24  nowhere; am I correct?

25  A    Correct.

Copeland - Cross - Cannick                3227

1   Q    There would be no bathrooms in sight for miles; am I
2   correct?
3   A    That's correct.
4   Q    And, in fact, there would be no cell phone service
5   because you're so far out; is that correct?
6   A    That is correct.
7   Q    And there was a time when you didn't have rest room
8   coming up anytime soon, some people would urinate in large
9   cups; am I correct?
10  A    I'm not aware of that.
11  Q    You're not aware of the big gulp cups?
12  A    I -- I know about it, but I -- at the time, I didn't
13  know people were doing that.
14  Q    Oh, you didn't know people were doing that?
15  A    No.
16  Q    Okay.
17        All right.  Now, have you ever rented a car with
18  one of Mr. Kelly's runners driving you from Point A to Point
19  B?
20  A    Can you repeat the question.
21  Q    Mr. Kelly had runners; am I correct?
22  A    Yes, that's correct.
23  Q    And these runners would do whatever task that he would
24  want or what the staff would ask him; am I correct?
25  A    That's correct.

Copeland - Cross - Cannick                3228

1  Q    And sometimes it required them driving you someplace;

2  am I correct?

3  A    That's correct.

4  Q    And have you ever ridden with one of them?

5  A    Yes.

6  Q    And they would flip the mirror up; am I correct?

7  A    Yes.

8  Q    And you would want that; am I correct?

9         MS. GEDDES:  Objection.

10        THE COURT:  She would want the mirror up?

11        MR. CANNICK:  She would want the mirror up.

12        THE COURT:  Did you want the mirror up?

13        THE WITNESS:  I didn't necessarily want it, but it

14  was okay.

15  Q    Did you find it to be offensive?

16  A    No.

17  Q    What was the benefit?

18        MS. GEDDES:  Objection.

19        THE COURT:  Overruled.

20  A    Well, just not having to have conversation or --

21  Q    So --

22  A    -- to have eye contact with someone.

23  Q    So you appreciated the fact that you didn't have to

24  have conversation or eye contact with the driver?

25  A    That's correct.

Copeland - Cross - Cannick            3229

1   Q    Okay.  Now, there were occasions when you told us that

2   you escorted Mr. Kelly's girlfriends on shopping trips.  Do

3   you remember telling us that?

4   A    That's correct.

5   Q    And they would wear sweat clothes; am I correct?

6   A    That's correct.

7   Q    You would wear sweat clothes, too; am I correct?

8   A    That's correct.

9   Q    And they would be warmup suits and you did it for the

10  comfort; am I correct?

11  A    Oh, yeah.

12  Q    And there were times that you would escort them to rest

13  rooms?

14  A    That's correct.

15  Q    Okay.  Why would you escort them the rest room?

16  A    It would only be when we are at a venue that we weren't

17  familiar with.  One of the first things that my job required

18  was for me to find a bathroom, the rest rooms, were -- for

19  guests or even for him.

20  Q    So the first thing that you would do is find the

21  location of those rest rooms?

22  A    That's correct.

23  Q    And because you knew the location you would escort the

24  guests?

25  A    That is correct.

Copeland - Cross - Cannick          3230

1   Q    And, in fact, you would escort Mr. Kelly as well; am I

2   correct?

3   A    That is correct.

4   Q    Now, have you ever gone in the stall with them --

5   withdrawn.

6            Have you stood right outside of the stall with

7   them and -- with them being a girlfriend when they were

8   using the facility?

9   A    No.

10  Q    And lets be more specific.  Have you ever stood outside

11  the stall -- do you know someone by the fame of Faith?

12  A    I do.

13  Q    Okay.  Did you ever stand outside the stall when she

14  was using the facility?

15  A    No.  I escorted her one time and the bathroom did not

16  have a stall, it was one individual bathroom.

17  Q    Okay.  And where did you position yourself?

18  A    Outside the door of the rest room.

19  Q    Now, did you ever give her, serve her alcohol?

20  A    No.

21  Q    You're smiling.  Why are you smiling?

22  A    Because I don't drink and I would be the last person

23  that somebody would ask for that.

24  Q    Now, you testified and told us yesterday about

25  escorting Mr. Kelly's girlfriends shopping and you would

Copeland - Cross - Cannick                3231

1   interact with the salespeople?

2   A    Correct.

3   Q    Well, you would interact with salespeople -- well,

4   withdrawn.

5        You would go sopping with Mr. Kelly from time to

6   time; am I correct?

7   A    Yes, that's correct.

8   Q    And you would interact with the salespeople for him; am

9   I correct?

10  A    That is correct.

11  Q    Now when you were honing your duties as personal

12  assistant and executive assistant, Mr. Kelly's female guests

13  were not free to move around his business at home?

14  A    That's correct.

15  Q    But none of his guests were; am I correct?

16  A    That's correct.

17  Q    Now when you met with the Government, your attorney

18  with was you; am I correct?

19  A    That's correct.

20  Q    Ms. Rodriguez?

21  A    Yes.

22  Q    And she is here with you this mornings?

23  A    Yes, she is.

24  Q    This afternoon.

25       About how many hours you met with the Government

Copeland - Cross - Cannick                3232

1   in connection with this case?

2   A    Several.

3   Q    When you say several, more than ten?

4   A    Yes.

5   Q    More than 20?

6   A    Hard to say.  Probably.

7   Q    Okay.  Do you know, more than 30?

8   A    I don't think so.

9   Q    Okay.  And during those meetings, they would suggest

10  certain verbiage to you in terms of answering questions for

11  you; am I correct?

12  A    No, they did not.

13  Q    They didn't suggest to you how to answer certain

14  questions?

15  A    No.

16  Q    They didn't express a preference on terms of certain

17  language or verbs to use?

18  A    On some of the language, if they used it, I would in

19  turn use it.

20  Q    So they used words like directed, Mr. Kelly directed?

21  A    Correct.

22  Q    And Mr. Kelly instructed?

23  A    Right.

24  Q    Mr. Kelly commanded?

25  A    I don't know if I've heard that one.

Copeland - Cross - Cannick                3233

1    Q    Okay.  But before your meeting with the Government you

2    never in a conversation about Mr. Kelly said that he

3    directed someone to do something; am I correct?

4    A    No.

5    Q    Or he instructed someone to do something; am I correct?

6    A    No.

7    Q    Okay.  That language came from the Government?

8    A    I don't know.

9    Q    You can answer.

10            THE COURT:  You can answer the question if it's

11   correct you can say it is correct.  If it's not, say it's

12   not.

13            Did the Government suggest that you use that kind

14   of language?

15            THE WITNESS:  They did not suggest.  But if they

16   would say something in a certain way, I may repeat it that

17   way, if that makes sense.

18            THE COURT:  Okay.  Well, next question.

19            MR. CANNICK:  Okay.

20   Q    And now, and you testified on direct exam that

21   Mr. Kelly would require a female Uber driver when we were

22   driving guests; am I correct?

23   A    That's correct.

24   Q    And basically it was a safety concern with Mr. Kelly;

25   am I correct?

Copeland - Cross - Cannick          3234

1          MS. GEDDES:  Objection.

2          THE COURT:  Well, I don't know.  Do you know, was

3    it for safety?

4          THE WITNESS:  I believe so, yeah.

5    Q    And Uber drivers --

6          THE COURT:  Give it a try.

7          MR. CANNICK:  Give it a try?

8          THE COURT:  Yeah.

9    Q    Uber drivers have been known to rape --

10         MS. GEDDES:  Objection.

11         THE COURT:  Sustained.

12         MR. CANNICK:  I gave it a shot.

13         THE COURT:  You gave it a shot.

14   Q    Okay.  Now, they kill passengers, too?

15         MS. GEDDES:  Objection.

16         THE COURT:  Mr. Cannick, come on.

17         Sustained, if I didn't.

18         MR. CANNICK:  I'll went with, "Come on."

19   Q    You -- part of your job is that you arrange flights for

20   Mr. Kelly's guests?

21   A    That's correct.

22   Q    And hotel accommodations?

23   A    That's correct.

24   Q    And those would be for his girlfriends?

25   A    That's correct.

Copeland - Cross - Cannick                3235

1   Q    And also for his friends?

2   A    Friends, record label executives, business associates.

3   Q    Anyone who he asked you to bring to into town, you

4   would make the arrangements for?

5   A    That's correct.

6   Q    Did you have any instructions for them when they

7   arrived?

8   A    It would depend on if it was a hotel room most of the

9   time, yes.

10  Q    Okay.  Now, you testified and told us about a situation

11  you were in an elevator with one of Mr. Kelly's girlfriends,

12  Joycelyn.

13            Do you remember telling us about that?

14  A    Yes.

15  Q    And you testified that she was looking at the rear of

16  the elevator?

17  A    Yes.

18  Q    Did they're still together; am I correct?

19  A    I don't know.

20  Q    You don't know?

21  A    (Witness shakes head negatively.)

22  Q    Okay.  Now, would you also have responsibility for

23  Mr. Kelly's security concerns; am I correct?

24  A    I'm sorry, can you repeat that.

25  Q    You had some responsibility in making sure that

Copeland - Cross - Cannick          3236

1   Mr. Kelly was secure; am I correct?

2   A    Absolutely, yes.

3   Q    And you took that in consideration every time you were

4   dealing with him, you want to make sure that he was safe; am

5   I correct?

6   A    Yes.

7   Q    And the van -- withdrawn.

8        The Sprinter having its blind pulled up so that no

9   one could see in or see out, that was a security measure; am

10  I correct?

11  A    Yes.

12  Q    And how many security personnel did he have?

13  A    At any given time, at least three or four.

14  Q    And basically they worked to make sure that he was

15  secure; am I correct?

16  A    Correct.

17  Q    And did he have security for his girlfriends?

18  A    There was one female security guard.

19  Q    Okay.  And that person was named Candy?

20  A    Yes.

21  Q    And Candy pretty much made sure that the girls were

22  safe, the young ladies were safe?

23  A    Yes.

24  Q    Okay.

25       And basically protecting and securing Mr. Kelly

Copeland - Cross - Cannick          3237

1   was paramount; am I correct?

2   A    Correct.

3   Q    He was the meal ticket; am I correct?

4            MS. GEDDES:  Objection.

5            THE COURT:  Overruled.

6   A    Yes.

7   Q    And it was important to him that he was kept safe as

8   well as his girlfriends; am I correct?

9            MS. GEDDES:  Objection.

10           THE COURT:  Sustained.

11  Q    When he had security for his girlfriends; am I correct?

12  A    Correct.

13  Q    Now, you testified and told us about a situation where

14  you were by the Lifetime Fitness Center with Anna --

15  A    Yes.

16  Q    -- in the Sprinter.

17           And you testified that she really needed to use

18  the facility?

19  A    Yes.

20  Q    The rest room.

21           And basically Mr. Kelly was inside the facility

22  and he was working out?

23  A    Correct.

24  Q    And didn't have his cell phone with him?

25  A    Correct.

Copeland - Cross - Cannick                3238

1    Q    And she could not reach him?

2    A    Correct.

3    Q    And instead of going, she decided she would wait and

4    continue to try to reach him?

5    A    Yes.

6    Q    Now, you didn't prevent her from going to the rest

7    room; am I correct?

8    A    No.

9    Q    In fact, you wanted her and encouraged her to go to the

10   rest room; am I correct?

11   A    I did.

12   Q    And Mr. Kelly never told you to deny her to use the

13   facility; am I correct?

14   A    No.  In that particular situation he got mad because I

15   didn't really press her to go --

16   Q    Okay.

17   A    -- on her own.

18   Q    So he was angry at you for not letting her --

19   A    Yes.

20   Q    -- for not encouraging her to go?

21   A    Yes.

22   Q    Now you also testified and told us on direct that there

23   were times that you would make reservations at a hotel for

24   Mr. Kelly and he would use a fictitious name for him; am I

25   correct?

Copeland - Cross - Cannick          3239

1    A    That's correct.

2    Q    Now that was a security concern; am I correct?

3    A    Yes.

4    Q    And, in fact, it's commonplace for artists,

5    entertainers, celebrities to use fictitious names to ensure

6    their security when they go to these places; am I correct?

7              MS. GEDDES:  Objection.

8              THE COURT:  Overruled.

9    A    That is correct.

10   Q    Now, you testified and told us about a time that Anna

11   was smoking marijuana on the property?

12   A    I --

13             MS. GEDDES:  Objection.  I don't think that's the

14   testimony.

15             MR. CANNICK:  Okay.  Well, we'll see.

16   Q    Do you recall a time when Anna was smoking marijuana on

17   one of Mr. Kelly's properties in Atlanta?

18   A    I do recall it.

19   Q    Okay.  And do you recall calling Mr. Kelly and letting

20   him know that?

21   A    I do.

22   Q    Okay.  And Mr. Kelly was not pleased to hear that; am I

23   correct?

24   A    No, he was not.

25   Q    And he and Anna had an exchange about it?

Copeland - Cross - Cannick                3240

1   A    I believe so, yes.

2   Q    And Anna was very angry?

3   A    I -- I believe so.

4   Q    Right.

5        And as a result of this exchange, Mr. Kelly did

6   not take Anna on a cruise that he was about to go on; am I

7   correct?

8   A    I did not now that was the reason.

9   Q    Okay.  But she didn't go on the cruise, right?

10  A    That's correct.

11  Q    And, in fact, she left -- she left Mr. Kelly; am I

12  correct?

13  A    That's correct.

14  Q    And at some point she ultimately returned?

15  A    Correct.

16       MR. CANNICK:  Excuse me, Your Honor, I can't

17  remember what time you said we were taking a break.

18       THE COURT:  We've got some time.

19       MR. CANNICK:  I just need some water.

20       THE COURT:  Oh, go ahead.

21       MR. CANNICK:  I don't have any.

22       THE COURT:  Okay.

23       (Pause in proceedings.)

24       MR. CANNICK:  Thanks.

25  Q    Okay.  Now, there was part of your testimony last week

1    when you spoke about Mr. Kelly and you having a conversation

2    and he told you that someone said, this person said that you

3    let Anna escape.

4              Do you remember saying that?

5    A    Correct.

6    Q    Now, those were -- Mr. Kelly never used the word

7    "escape"; am I correct, other than repeating what someone

8    said?

9    A    Yes.

10   Q    And when the Government said here who used that word

11   "escape" and your answer was Mr. Kelly, you were talking

12   about Mr. Kelly repeating what someone else said; am I

13   correct?

14   A    That is correct.

15   Q    You weren't suggesting that Mr. Kelly told you that you

16   let someone escape, right?

17   A    That is correct.

18   Q    Okay.  In fact, did you in you 15 years with Mr. Kelly,

19   ever try to prevent someone from leaving?

20   A    Never.

21   Q    And women left him many times; am I correct?

22   A    Many times.

23   Q    And have you ever heard of Mr. Kelly or -- well, let me

24   back up.

25              Have you ever seen Mr. Kelly physically try to

Copeland - Cross - Cannick                    3242

1  stop someone from leaving him?

2  A    Never.

3  Q    Have you heard of him suggesting to someone else to

4  prevent someone from leaving him?

5  A    Never.

6  Q    In fact, when they left Mr. Kelly was the one who paid

7  for their airfare; am I correct?

8  A    That's correct.

9  Q    What Mr. Kelly's issue was --

10            MS. GEDDES:  Objection.

11            THE COURT:  Sustained as to form.

12 Q    Mr. Kelly did not want them to take any of the items he

13 purchased for them, correct?

14            MS. GEDDES:  Objection.

15            THE COURT:  Sustained.

16 Q    Did you ever try to stop someone from leaving

17 Mr. Kelly?

18 A    No.

19 Q    Now you testified and told us about seeing a gun behind

20 the bar.  Do you remember telling us about that?

21 A    That is correct.

22 Q    Okay.  Now how close did you get to that gun?

23 A    Maybe about 12 inches away.

24 Q    Okay.  And you didn't examine the gun, did you?

25 A    No.

Copeland - Cross - Cannick                3243

1   Q    Okay.  Now, you worked with Mr. Kelly for over 15 years

2   in both his house and his business.  Did you ever see him in

3   possession of a gun?

4   A    Never.

5   Q    When you saw the gun that day, do you recall what time

6   of day it was?

7   A    I believe it was nighttime.

8   Q    And do you recall who, if anyone else, was in the bar

9   at that time?

10  A    I believe it was -- besides the engineers, that I was

11  the only ere person there.

12  Q    And you don't know who was in the bar before you got

13  there; am I correct?

14  A    I'm sorry?

15  Q    You don't know who was in the bar before you got there?

16  A    I do not.

17  Q    All right.  You didn't like some of the rules

18  Mr. Kelly -- rules or policies that Mr. Kelly had; am I

19  correct?

20  A    Correct.

21  Q    But notwithstanding, you would still return and work

22  for him?

23  A    That is correct.

24  Q    Even times that you quit?

25  A    That is correct.

Copeland - Cross - Cannick                3244

1  Q    Those policies and procedures were still in place when

2  you returned?

3  A    That is correct.

4  Q    And that letter of -- withdrawn.

5         At any point in time that you were working for

6  Mr. Kelly, did he ever instruct you to recruit women for

7  him?

8  A    No.

9  Q    Did you ever hear him ask others to recruit women for

10 him?

11 A    No, I did not.

12 Q    Did you ever see Mr. Kelly take rooftop dinners with

13 his girlfriends?

14 A    Yes.

15 Q    To expensive restaurants?

16 A    Yes.

17         MR. CANNICK:  I'm almost there, Your Honor.

18         THE COURT:  Okay.

19 Q    Now, the computer that you spoke of early that went

20 missing, that computer basically had Mr. Kelly's information

21 on it; am I correct?

22 A    Correct.

23 Q    You basically used that computer to perform his job

24 responsibilities -- withdrawn.

25         You basically used that computer to help you, and

Copeland - Cross - Cannick          3245

1  assist you in doing your job as it related to him; am I

2  correct?

3  A    That's correct.

4  Q    So the information on that computer was his

5  information; am I correct?

6  A    That's correct.

7  Q    Now, when you said that Mr. Kelly, your -- withdrawn.

8         That your responsibilities in your last stint was

9  to help try to track down and trace his monies, Mr. Kelly

10  generated very large sums of revenue; am I correct?

11         MS. GEDDES:  Objection.

12         THE COURT:  Sustained as to form.

13  Q    Mr. Kelly's -- you were aware of his earning

14  capacity -- withdrawn.

15         You had some involvement with his -- familiarity

16  with his contracts?

17  A    Correct.

18  Q    And he collected -- he was generated revenues from

19  royalties?

20  A    Correct.

21  Q    Record sales?

22  A    Correct.

23  Q    Record production?

24  A    Correct.

25  Q    Song writing?

Copeland - Cross - Cannick                3246

1   A    Correct.

2   Q    Mr. Kelly generated hundreds of millions of dollars; am

3   I correct?

4   A    That is correct.

5   Q    Now, in the 15 years that you worked with Mr. Kelly,

6   did you ever see him try to stop or prevent any one of his

7   girlfriends from leaving him?

8   A    No.

9   Q    Have you ever saw him lock any of his girlfriends in a

10  room?

11  A    Never.

12  Q    Has he ever asked you to do such a thing?

13  A    Never.

14  Q    Have you ever heard him ask any of his staff to do such

15  a thing?

16  A    Never.

17  Q    Did you ever see Mr. Kelly deny any of his girlfriends

18  water?

19  A    Never.

20  Q    Did you ever hear him ask anyone else to deny them

21  water?

22  A    No.

23  Q    Did he ever ask you to deny the water?

24  A    No.

25  Q    What about food, have you ever seen him deny them food?

Copeland - Cross - Cannick                3247

1   A    No.

2   Q    In fact, they had Uber accounts for the girlfriends?

3   A    They did.

4   Q    They had menus all across the place to order food; am I

5   correct?

6   A    Yes.

7   Q    And they had runners available to them to go and get

8   food; am I correct?

9   A    That's correct.

10  Q    And they had personal assistants to also assist them

11  with getting food, water, drinks, shopping, anything of

12  those things; am I correct?

13  A    That is correct.

14  Q    You did not see anyone in Mr. Kelly's employment do any

15  of those things in terms of denying women food, water,

16  drinks?

17  A    No.

18  Q    Never saw anyone locked in a room?

19  A    Never.

20  Q    And you'd come to work, just do your job to the best of

21  your abilities; am I correct?

22  A    That's correct.

23           MR. CANNICK:  Your Honor, I have nothing further.

24           THE COURT:  All right.  Any redirect?

25           MS. GEDDES:  Yes, Your Honor.

Copeland - Redirect - Geddes                    3248

1    REDIRECT EXAMINATION
2    BY MS. GEDDES:
3    Q    Is it fair to say that testifying here today is hard
4    for you?
5    A    That is correct.
6    Q    And when you stopped working for the defendant, was
7    part of that because your name had been out there in the
8    media?
9    A    That's not correct.
10   Q    Were you concerned about how your name was portrayed in
11   media at some point?
12   A    Yes, that's correct.
13   Q    And does that still concern you here today?
14   A    No, it does not.
15   Q    You're not concerned about how the media will react to
16   your testimony here today?
17   A    No, I'm not.
18   Q    On cross-examination you were asked about that letter
19   that I showed you which admitted -- or claimed to admit to
20   stealing from the defendant.  Do you recall those questions?
21   A    I do.
22   Q    Were you the only person who was working for the
23   defendant who wrote that letter?
24              MR. CANNICK:  Objection.
25              THE COURT:  Overruled.

1          To your knowledge, did you ever see other people

2    write those letters?

3          THE WITNESS:  I did not.

4    Q    Did you hear about -- I think in your direct

5    examination you testified about he asked others to write

6    that letter; is that correct?

7    A    That's that I was told, yes.

8    Q    And the misunderstanding that you had, that had nothing

9    to do with stealing from him, correct?

10   A    I don't believe I remember what the misunderstanding

11   was about.

12   Q    I just want to be clear:  Did you ever steal from the

13   defendant?

14   A    No, I did not.

15   Q    So when you wrote that you stole from the defendant,

16   that was not true, correct?

17   A    That's correct.

18   Q    And you wrote that because the defendant wanted you to

19   write that, correct?

20   A    That is correct.

21   Q    And the defendant told you that it was his attorney's

22   idea to write that letter, correct?

23   A    That is correct.

24   Q    On cross-examination you were asked about how you would

25   dress when you were working for the defendant.  Do you

Copeland - Redirect - Geddes                3250

1    recall that?

2    A    Yes.

3    Q    Whose choice was it for you to wear the clothing that

4    you wore on a day-to-day basis while you worked for the

5    defendant?

6    A    It was my choice.

7    Q    The defendant never told how to dress, correct?

8    A    Never.

9    Q    And you remember also being asked about whether people

10   could roam within -- well, first off think about

11   Olympia Fields where the defendant was living.  And you

12   testified that people were not allowed to roam; is that

13   correct?

14   A    That is correct.

15   Q    But you were allowed to freely roam around

16   Olympia Fields, weren't you?

17   A    That is correct.

18   Q    And you were also asked about who put in place the rule

19   that individuals not roam around Olympia Fields, and I

20   believe you testified that it was his wife; is that correct?

21   A    That is correct.

22   Q    Was his wife there after the first two years that you

23   worked for the defendant?

24   A    No, she was not.

25   Q    And did the rule stay in place after you worked for the

Copeland - Redirect - Geddes                3251

1    defendant?

2    A    Yes, they did.

3    Q    While you worked for the defendant?

4    A    (No audible response.)

5    Q    You were asked on cross-examination about what you

6    would do when you shopped for the defendant; is that

7    correct?

8    A    Right.

9    Q    And you testified that you would interact with

10   salespeople on behalf of the defendant, correct?

11   A    That is correct.

12   Q    And would you interact with both female and male sales

13   employees when you were with the defendant?

14   A    No, just the males.

15   Q    You wouldn't help them with the female employees?

16   A    I'm sorry.  I don't think -- can you repeat the

17   question?

18   Q    Sure.  When you were shopping with the defendant --

19   A    Okay.

20   Q    -- acting as his executive assistant, you testified

21   that you would interact with salespeople; is that correct?

22   A    That's correct.

23   Q    And would you interact when you were with the defendant

24   with both men and women?

25   A    Correct.

Copeland - Redirect - Geddes     3252

1  Q    When you were with the defendant's live-in girlfriend

2  at the mall, who would you interact with?

3  A    The male.

4  Q    And the defendant's live-in girlfriends would interact

5  on their own with female salespeople, correct?

6  A    That is correct.

7  Q    When you were working for the defendant, who was in

8  charge of what you did on a day-to-day basis?

9  A    Robert.

10  Q    And at any point, who did you consider to be your boss?

11  A    Robert.

12  Q    And as your boss, is it fair to say that he gave you

13  direction?

14  A    Correct.

15  Q    And I don't want to put words into your mouth.  How

16  would you describe what -- the words that the defendant gave

17  you?

18  A    In terms of which words.

19            (Continued on the next page.)

20

21

22

23

24

25

Copeland - redirect - Geddes                    3253

1  EXAMINATION CONTINUES

2  BY MS. GEDDES:

3  Q    When the defendant asked you to do something, did you

4  understand that it was something the defendant wanted you to

5  do?

6  A    That is correct.

7  Q    And did you do it because the defendant asked you to do

8  it?

9  A    Correct.

10 Q    And over your 15 years, did the defendant ask you to do

11 many different things?

12 A    Correct.

13 Q    And because the defendant was your boss, is it fair to

14 say that you followed through with his requests?

15 A    That is correct.

16 Q    And as part of your working for the defendant, did the

17 defendant ask you to assist him with his female guests and

18 live-in girlfriends?

19 A    That is correct.

20 Q    And did you follow through with what the defendant asked

21 you to do and help out with his female guests and live-in

22 girlfriends?

23 A    Yes.

24 Q    You were asked on cross-examination about whether you saw

25 Anna smoking marijuana.

SAM      OCR      RMR      CRR      RPR

Copeland - redirect - Geddes                    3254

1              Do you recall that?

2    A    I do.

3    Q    Who told the defendant about Anna smoking marijuana?

4    A    I believe it was me.

5    Q    And did you do that because you understood that was

6    something the defendant would want to know?

7    A    I knew that it was against the rules, yes.  So, yes.

8    Q    And on -- did you sometimes act as an extension of the

9    defendant when he was not around?

10   A    Yes.

11   Q    In fact, were those your words in characterizing your

12   responsibilities in working for the defendant?

13   A    Can you clarify that question?

14   Q    Sure.  Did you view one of your responsibilities in

15   working for the defendant to be an extension of him when he

16   could not be present?

17   A    Yes.

18   Q    And did you use those words to describe to the Government

19   how you viewed your role in working for the defendant?

20   A    I did, yes.

21   Q    You were asked on cross-examination about the computer

22   that went missing when you were at the defendant's studio.

23              Do you recall those questions?

24   A    Yes.

25   Q    Did the defendant buy you that computer?

SAM     OCR     RMR     CRR     RPR

Copeland - redirect - Geddes                    3255

1    A    No.

2    Q    Did the defendant reimburse you for that computer?

3    A    No.

4    Q    Has the defendant ever given you back that computer?

5              MR. CANNICK:  Objection.

6              THE COURT:  Well, sustained as to form.

7              Have you ever gotten the computer back?

8              THE WITNESS:  No.

9              THE COURT:  Okay.

10   BY MS. GEDDES:

11   Q    Were you present -- were you able to hear the

12   defendant's, all of the defendant's interactions with his

13   live-in girlfriends?

14   A    No.

15   Q    Fair to say, that you don't know exactly what went on

16   behind closed doors?

17   A    Fair to say, yes.

18   Q    And when you received requests -- when you testified

19   about what happened at the LA Fitness when Anna needed to use

20   the bathroom, what did Anna ask you to do?

21   A    Call Mr. Kelly.

22   Q    And what did you do?

23   A    I called Mr. Kelly.

24   Q    And why was it that -- were you able to get in touch with

25   the defendant?

SAM     OCR     RMR     CRR     RPR

Copeland - redirect - Geddes                3256

1  A     No.

2  Q     And did you call him repeatedly?

3  A     Yes.

4  Q     You were asked on cross-examination about various

5  girlfriends and female guests of the defendant; is that right?

6  A     That is correct.

7  Q     And you were asked about certain events and opportunities

8  afforded to some of those -- to those female guests and

9  live-in girlfriends, correct?

10 A     Correct.

11 Q     And you answered yes to a lot of the defense attorney's

12 questions about what those individuals were afforded, correct?

13 A     That is correct.

14 Q     Fair to say that the defendant had many different guests

15 and live-in girlfriends over the course of your fifteen years?

16 A     Yes.

17 Q     And that as you sit here today, can you speak for each of

18 those female guests and live-in girlfriends?

19           MR. CANNICK:  Objection.

20           THE COURT:  Overruled.

21 A     No.

22 Q     And while you testified about certain things that were

23 given to them, you were talking about them as a whole,

24 correct?

25 A     That is correct.

Copeland - redirect - Geddes                    3257

1   Q    You weren't talking about each of the defendant's guests,

2   female guests or live-in girlfriends individually, correct?

3   A    Correct.

4   Q    You were asked about the defendant's reading and writing

5   abilities.

6             Do you recall that?

7   A    Correct.

8   Q    Did you communicate with the defendant by text message?

9   A    Yes.

10  Q    And would you write texts to the defendant?

11  A    Yes.

12  Q    And would you receive text messages from the defendant?

13  A    Yes.

14  Q    And on occasion did you help the defendant read certain

15  text messages that he had received?

16  A    Yes.

17  Q    And how was it that the defendant was able to send you

18  text messages?

19  A    Mostly talk-to-text.

20  Q    So, he was able to dictate communications, and then it

21  was translated into text; is that correct?

22  A    Correct.

23  Q    And on occasion did you also help him draft text messages

24  before that talk-to-text function existed?

25  A    I have, yes.

SAM     OCR     RMR     CRR     RPR

Copeland - cross - Cannick                3258

1   Q    And were you relieved when talk-to-text came into place?

2   A    Yes.

3   Q    Took away some of your responsibilities, yes?

4        MS. GEDDES:  One moment.

5        (Pause.)

6        MS. GEDDES:  Nothing further.

7        THE COURT:  All right, any recross?

8        MR. CANNICK:  Very briefly.

9   RECROSS-EXAMINATION

10  BY MR. CANNICK:

11  Q    Ms. Copeland, you were just asked a few minutes ago about

12  your ability to roam around Mr. Kelly's home.

13       Do you remember that question just being asked?

14  A    Yes.

15  Q    You were, essentially, for lack of a better word, the CEO

16  of the operation of the home, am I correct?

17       MS. GEDDES:  Objection.

18  A    That's correct.

19       THE COURT:  Were you the CEO?

20  Q    Your job was to manage that home, am I correct?

21  A    Yes.

22  Q    And so, it was natural that you would have access to roam

23  and do whatever you wanted in order to keep that home

24  afloat --

25  A    That is correct.

Copeland - cross - Cannick                3259

1    Q      -- am I correct?

2           And even with that ability to roam and do whatever

3    you wanted to do, you still had to knock, am I correct?

4    A      I did, yes.

5    Q      Everyone had to knock, am I correct?

6    A      That is correct.

7    Q      Now, you were just also asked about assisting Mr. Kelly

8    and his female guests and his live-in guests.

9           That was also part of your task, as well as that of

10   the runners and their personal assistants, is that correct?

11   A      That is correct.

12   Q      Mr. Kelly wanted them to have their conference and their

13   safety and their needs addressed?

14           MS. GEDDES:  Objection.

15           THE COURT:  Sustained.

16   BY MR. CANNICK:

17   Q      Well, wasn't that part of your responsibility, to take

18   care of their safety?

19   A      Yes.

20   Q      Their comfort?

21   A      Yes.

22   Q      Their needs?

23   A      Yes.

24   Q      Now, the Government asked you about a computer, did you

25   ever receive the computer back.

SAM      OCR      RMR      CRR      RPR

Copeland - cross - Cannick                3260

1          You don't know who took your computer, am I correct?

2    A    I do not.

3    Q    And the computer, basically, had Mr. Kelly's information

4    on it, am I correct?

5    A    That's correct.

6    Q    Okay.  And you filed a report for the computer, am I

7    correct, a police report?

8    A    I did.

9          MR. CANNICK:  Just one second, please, Your Honor.

10         (Pause.)

11   BY MR. CANNICK:

12   Q    And you were asked this just a second ago about Anna

13   being on the bus, on the Sprinter, and needing to go to the

14   bathroom.

15         I think you told us that when Mr. Kelly returned, he

16   got on you because you didn't prod Anna enough to make sure

17   that she took care of herself?

18   A    That is correct.

19         MR. CANNICK:  Nothing further.

20         THE COURT:  All right, anything else?

21         MS. GEDDES:  No.

22         THE COURT:  All right, thanks so much.  The witness

23   can step down.

24         (Witness steps down and exits courtroom.)

25         THE COURT:  All right, I am going to dismiss you for

1    a break in a minute, ladies and gentlemen, I just want to

2    speak to my courtroom deputy for just a second here.

3              (Pause.)

4              THE COURT:  I am just trying to figure out, this

5    will be a slightly longer break, we are going to do

6    20 minutes, but do not talk about the case at all.  Don't talk

7    about any aspect of the case, but have a nice break.  We'll

8    see you, 20, 25 minutes or so.

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury exits.)

11             THE COURT:  All right, everybody can have a seat.

12             Let me just see counsel at the side.  We don't need

13   to have a court reporter, just scheduling.

14             (Sidebar held off the record with the Court and

15   counsel only, outside the hearing of the jury.)

16             (Defendant exited the courtroom.)

17             (Recess taken; Judge ANN M. DONNELLY exited

18   courtroom.)

19

20             (Continued on the following page.)

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

```
                          Sidebar                          3262
```

1              (The following took place in a jury room with the

2     Court, counsel for both sides and Alternate Juror No. 4,

3     outside of the presence of the jury.)

4              THE COURT:  How are you doing?

5              ALTERNATE JUROR NO. 4:  Okay.

6              THE COURT:  Don't worry.  I am told that you asked

7     about getting Gloria Allred's autograph.

8              ALTERNATE JUROR NO. 4:  Yes.

9              THE COURT:  So, I just want to make sure, why did

10    you want it?

11             ALTERNATE JUROR NO. 4:  Because I admire her.  Just

12    'cause, you know, other cases.  I've never heard -- I didn't

13    know she was gonna be here, I just admire her for what she's

14    accomplished.

15             THE COURT:  I just want to make sure, you're

16    impressed with her?

17             ALTERNATE JUROR NO. 4:  Yes, that's right.

18             THE COURT:  I just want to make sure that you won't

19    give any of the witnesses that she represents any additional

20    credibility just because --

21             ALTERNATE JUROR NO. 4:  No, no, no.

22             THE COURT:  -- just because she happens to be in

23    connection with them?

24             ALTERNATE JUROR NO. 4:  No, no.

25             THE COURT:  Okay.  So, at the end of the case I am

Sidebar                                              3263

1   going to be telling you how to evaluate the credibility of the

2   witnesses who testify and that you have to be able to apply

3   those instructions irrespective of the fact that Ms. Allred

4   might have represented --

5            ALTERNATE JUROR NO. 4:  She had nothing to do with

6   any of it, she just sat there.

7            I mean, as I said, I just -- I was impressed by the

8   fact that she was there, that's all.  It has nothing to do

9   with --

10           THE COURT:  Okay.  So, you are not going to give any

11  of those --

12           ALTERNATE JUROR NO. 4:  No.

13           THE COURT:  -- witnesses any special favor?

14           ALTERNATE JUROR NO. 4:  No, because she -- I

15  understand she's there to represent them, but she really had

16  no input in anything, at least in my opinion.

17           THE COURT:  Okay.

18           ALTERNATE JUROR NO. 4:  I don't know what happened

19  with her -- you know, what happened with them and her

20  otherwise.

21           THE COURT:  And it's not relevant.

22           ALTERNATE JUROR NO. 4:  No, right, I'm saying -- but

23  I'm saying for me it was just that, oh, you know, like a fan

24  girl kind of thing.

25           THE COURT:  Okay, but even feeling that way, I just

Sidebar                                3264

1    have to make absolutely sure that you are not going to hold it

2    against Mr. Kelly --

3              ALTERNATE JUROR NO. 4:  No, no, no.

4              THE COURT:  -- or give those witnesses any

5    additional credibility?

6              ALTERNATE JUROR NO. 4:  No, because all I'm doing is

7    listening to what they say, what the defense asks them, what

8    the prosecution asks them, the way they answer questions that

9    are asked.

10             THE COURT:  And just bottom line, you are going to

11   treat those witnesses just like any other witness?

12             ALTERNATE JUROR NO. 4:  Absolutely.

13             THE COURT:  Anything that either of you wants me to

14   ask?

15             MR. SCHOLAR:  No, Your Honor; thank you.

16             MS. GEDDES:  No.

17             THE COURT:  And, obviously, don't talk about this

18   with anybody?

19             ALTERNATE JUROR NO. 4:  About what?

20             THE COURT:  Good answer.  All right, thank you so

21   much.

22             ALTERNATE JUROR NO. 4:  Thank you.

23             THE COURT:  Donna, do you want to take the juror?

24             THE COURTROOM DEPUTY:  I'll take her, yes.

25             (Alternate Juror No. 4 exits the jury room.)

```
                          Sidebar                    3265
```

1          THE COURT:  You don't want do anything; do you?

2          MR. SCHOLAR:  I would ask that she be removed.  I

3   just want to make the record.

4          THE COURT:  You want her to be removed?

5          MR. SCHOLAR:  Yes.

6          THE COURT:  On what basis?

7          MR. SCHOLAR:  I can't think of anything more

8   disqualifying than a juror asking for the autograph of one of

9   the attorneys who represents one of the witnesses.  It speaks

10  to a bias for the prosecution's witnesses, and for that reason

11  I would ask that she be removed.

12         THE COURT:  What's your position?

13         MS. GEDDES:  I think there's no basis for her

14  removal here.  She made clear that she is not attaching any

15  additional weight to those witnesses' credibility and that she

16  will follow Your Honor's instructions to make a decision based

17  solely on the testimony before her.

18         And so I think in light of her responses, there's no

19  reason to remove her.

20         THE COURT:  I think based on her responses, and they

21  were sincere, she did not hesitate in saying that she didn't

22  even connect Ms. Allred with the witness really, and as I said

23  , I don't know that anybody would have noticed that Ms. Allred

24  was in the courtroom because she had a mask on if it hadn't

25  been brought up, which is fine to bring up, but the lawyers

Sidebar                                          3266

1    are sitting there in their representative capacity.

2            I understand the concern, which is why I had the

3    juror brought in, but I think under the circumstances she has

4    given us assurances that she can judge the witnesses fair and

5    impartially, and so I am going to deny the application, but

6    you have an exception.

7            MR. SCHOLAR:  Thank you, Your Honor.

8            THE COURT:  And she's Alternate 4?

9            MS. GEDDES:  That's what I think you described her

10   as.

11           (Sidebar in a jury room concluded.)

12

13           (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                           3267

1              (Pause in the proceedings.)

2              (In open court - jury not present.)

3              THE COURTROOM DEPUTY:  All rise.

4              (Judge ANN M. DONNELLY entered the courtroom.)

5              THE COURT:  Everybody can sit down.

6              (Defendant entered the courtroom.)

7              THE COURT:  Okay, who is our next witness?

8              MS. SHIHATA:  Angela.

9              THE COURT:  Angela, okay.

10             (Pause.)

11             (Witness enters and takes the stand.)

12             THE COURT:  Can I just see the lawyers at the side?

13             I don't need the court reporter, just for a minute.

14             (Sidebar held off the record with the Court and

15     counsel only, outside the hearing of the jury.)

16             THE COURTROOM DEPUTY:  All rise.

17             (Jury enters.)

18             THE COURTROOM DEPUTY:  You may be seated.

19             THE COURT:  All right, everybody, we are ready to

20     resume.

21             Will you call your next witness, please.

22             MS. SHIHATA:  Yes; the Government calls Angela.

23             THE COURT:  Okay, you can take off your mask.  Just

24     a few things before we begin.

25             THE COURTROOM DEPUTY:  Please stand and raise your

SAM      OCR      RMR      CRR      RPR

1    right hand.

2              Do you solemnly swear or affirm that the testimony

3    you are about to give will be the truth, the whole truth, and

4    nothing but the truth?

5              THE WITNESS:  Yes.

6              (Witness sworn.)

7              THE COURTROOM DEPUTY:  Thank you, you may be seated.

8              THE COURT:  Thank you, Donna.

9              As I was saying, there are just a few things to keep

10   in mind.  It is really important that the jurors hear what you

11   have to say, so I am going to ask you to make sure you use the

12   microphone.  Sometimes it's easier just to hold it, then you

13   don't have to keep leaning in.

14             The second thing is our court reporter takes down

15   everything that you have to say, and so it's important that

16   you not talk too fast.  I just want to make sure that we get

17   an accurate record of what you're saying.  And for the same

18   reason, don't speak over whichever lawyer is asking you

19   questions.

20             If there is a question that isn't clear or you want

21   to have repeated, let me know and I'll have the lawyer

22   rephrase it.

23             And just do your best to answer only the question

24   that you're being asked, okay?

25             THE WITNESS:  Yes, ma'am.

Proceedings                                    3269

1          THE COURT:  Go ahead.

2          MS. SHIHATA:  Thank you, Your Honor.

3

4          (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Angela - direct - Shihata                    3270

1   **ANGELA**,

2        called as a witness by the Government, having been

3        duly sworn/affirmed by the Courtroom Deputy, was examined

4        and testified as follows:

5   DIRECT EXAMINATION

6   BY MS. SHIHATA:

7   Q    Good afternoon.

8   A    Good afternoon.

9            THE COURT:  Woops, I don't think it's on.  There is

10  a button on the top.

11           THE WITNESS:  Good afternoon.

12           THE COURT:  There you go.  Try it again.

13           THE WITNESS:  Good afternoon.

14           THE COURT:  Okay, it works.

15           Go ahead.

16           MS. SHIHATA:  I am showing the witness only what's

17  been marked for identification as Government Exhibit 82.

18  Q    Do you recognize this photo?

19  A    Yes, I do.

20  Q    Who is this a photo of?

21  A    That is myself.

22           MS. SHIHATA:  I move to admit Government Exhibit 82.

23           THE COURT:  Any objection?

24           MR. CANNICK:  None.

25           THE COURT:  Okay, that's in evidence.

Angela - direct - Shihata                3271

1              (Government's Exhibit 82 was received in evidence.)

2    BY MS. SHIHATA:

3    Q    I am now showing you what's been marked for

4    identification as Government Exhibit 82(a).

5              Is this the same photograph with your true first and

6    last name?

7    A    That is correct.

8              MS. SHIHATA:  I move to admit Government Exhibit 82

9    and publish for the jury only, please.

10             THE COURT:  Any objection?

11             MR. CANNICK:  No.

12             MS. SHIHATA:  Sorry, 82(a).

13             THE COURT:  No objection, right?

14             MR. CANNICK:  None.

15             THE COURT:  All right, that's in evidence.

16             (Government's Exhibit 82(a) was received in

17   evidence.)

18             MS. SHIHATA:  And may we publish to the jury only,

19   please?

20             (Exhibit published to the jury only.)

21   BY MS. SHIHATA:

22   Q    Now, for purposes of your testimony here today, we are

23   going to refer to you as Angela.  Okay?

24   A    Yes, ma'am.

25   Q    And I am showing you what's been marked for

Angela - direct - Shihata                    3272

1   identification as Government Exhibit 82(b).

2           Is this the same photograph that I've just shown you

3   with the name "Angela" underneath?

4   A    Yes, it is.

5           MS. SHIHATA:  I move to admit Government

6   Exhibit 82(b).

7           MR. CANNICK:  No objection.

8           THE COURT:  That's in evidence.

9           (Government's Exhibit 82(b) was received in

10  evidence.)

11          MS. SHIHATA:  Thank you.

12  BY MS. SHIHATA:

13  Q    How old are you?

14  A    I am 44 years old.

15  Q    And when were you born?

16  A    November 19th, 1976.

17  Q    Where did you grow up?

18  A    Chicago, Illinois.

19          THE COURT:  I'm sorry.  I don't think there's

20  anything on.

21          A JUROR:  It wasn't on before either.

22          THE COURT:  Let's try it again.

23          MS. SHIHATA:  I'll just quickly publish the photos

24  that we entered into evidence.

25          So, here is 82.

Angela - direct - Shihata                    3273

1          (Exhibit published to the jury only.)

2          THE COURT:  You got it now?  Good, good, thanks.

3          MS. SHIHATA:  82(b), sorry, 82(a).

4          (Exhibit published to the jury only.)

5          MS. SHIHATA:  And 82(c) -- (b), sorry.

6          (Exhibit published to the jury only.)

7          THE COURT:  Okay.

8   BY MS. SHIHATA:

9   Q    All right, now, you grew up in Chicago, is that right?

10  A    Yes, ma'am.

11  Q    And how far did you -- did you go in school?

12  A    I have a degree in clinical massage therapy.

13  Q    And did you finish high school or did you get your go

14  ahead?

15  A    I got my go ahead, ma'am.

16  Q    Approximately when did you stop going to high school?

17  A    In 1991.

18  Q    And approximately, when did you get your go ahead?

19  A    2008.

20  Q    Are you currently employed?

21  A    Yes, I am.

22  Q    And what kind of work do you do?

23  A    I am in retail, and I am also a clinical massage

24  therapist.

25  Q    I am showing you Government Exhibit 1.

Angela - direct - Shihata                    3274

1          Do you recognize this person?

2  A    Yes, I do.

3  Q    And who is this person?

4  A    That's Rob.

5  Q    Do you know his full name?

6  A    Robert Sylvester Kelly.

7  Q    Have you met Robert Kelly in person?

8  A    Yes, I have.

9  Q    Do you see him in the courtroom here today?

10 A    Yes, I do.

11 Q    Can you point him out and identify him by an item of

12 clothing he's wearing?

13 A    He's the gentleman in the gray suit, black glasses.

14       THE COURT:  Indicating the defendant.

15 BY MS. SHIHATA:

16 Q    Around when did you first meet the defendant?

17 A    1991.

18 Q    Do you recall what grade you were in at the time?

19 A    It was the break between freshman and sophomore year.

20 Q    And about how old were you at that time?

21 A    Fourteen, fifteen.

22 Q    And at that time in your life, what, if anything -- what,

23 if any, career aspirations did you have?

24 A    I wanted to sing and to dance, entertainment.

25 Q    Now, you testified you met the defendant in 1991.

Angela - direct - Shihata                    3275

1          After meeting him, did you spend time regularly with

2    the defendant for several years after that?

3    A    Yes, I did.

4    Q    Until approximately when did you spend time regularly

5    with him?

6    A    Mid '90s.

7    Q    And did that include times when you worked for him as a

8    backup dancer?

9    A    That is correct.

10   Q    And after you stopped -- did there come a point where you

11   stopped working for him as a backup dancer?

12   A    That is correct.

13   Q    And after that, did you still see him on occasion?

14   A    Yes, I did.

15   Q    Until approximately when?

16   A    1998.

17   Q    Okay.  Now, where did you first meet the defendant?

18   A    At his apartment.

19   Q    Do you recall where the defendant's apartment was at the

20   time you met him?

21   A    I believe the address was 8 East 9th at Burnham Place

22   Apartments, Chicago, Illinois, South Loop.

23   Q    And how did you end up at the defendant's apartment on

24   that occasion?

25   A    I met him through a friend of mine named Tiffany.

Angela - direct - Shihata                    3276

1    Q    And did Tiffany invite you to go to the apartment?

2    A    Yes, she did.

3    Q    How long had you known Tiffany at that time?

4    A    I had met her the day before, two days before prior.

5    Q    And was Tiffany also in high school at the time?

6    A    Yes, she was.

7    Q    Do you know what high school she attended?

8    A    Kenwood Academy, Chicago, Illinois.

9    Q    And was that the same high school as you or a different

10   high school?

11   A    That was a different school.

12   Q    Now, when Tiffany was in high school, what, if anything,

13   did she want to be?

14   A    Tiffany wanted to be a singer.

15   Q    When Tiffany invited you to go to the defendant's

16   apartment with her, did you initially know who the defendant

17   was?

18   A    No, I did not.

19   Q    And did she explain to you who he was?

20   A    Yes, she did.

21   Q    And what do you recall her explaining to you?

22   A    Actually, his first album had just come out and "Vibe"

23   was the single, and she showed me the video.  And I was like:

24   Yeah, I'll go.

25   Q    Now, did anyone else go to the defendant's apartment with

1   you and Tiffany at that time?

2   A    Yes, they did.

3   Q    And without saying their names, how many other people

4   went to the apartment with you and Tiffany?

5   A    There were two other young ladies.

6   Q    And do you know whether or not they were in high school?

7   A    Yes, I do.  They're both in -- they both were in high

8   school at the time.

9   Q    Now, how long, if at all, had you known either of the two

10  girls that went with you and Tiffany to the defendant's

11  apartment, how long had you known them before you went?

12  A    One of them I met the day that I met Tiffany; the other

13  two I met the day that I went to Robert's house.

14  Q    Okay.  How many people -- so, it's -- just so we're

15  clear, it's you and Tiffany that go to the apartment.

16       And then how many other people go to the apartment?

17  A    There are two other young ladies that go along with us.

18  Q    Okay.  Now, when you and Tiffany and the two other young

19  ladies arrive at the apartment, was there anyone at the

20  apartment when you arrived?

21  A    Yes, there was.

22  Q    And when you got to the apartment, did you know anyone

23  who was present inside the apartment when you arrived at that

24  time?

25  A    No, I did not.

Angela - direct - Shihata                    3278

1   Q    Did you learn any of their nicknames while you were in

2   the apartment?

3   A    Yes, I did.

4   Q    And over the years that you knew the defendant, did you

5   see these individuals again?

6   A    Yes, I did, ma'am.

7   Q    And did you later learn their real names?

8   A    Yes, I did, ma'am.

9   Q    Who do you recall was present at the apartment when you

10  arrived that first time with Tiffany and the two other young

11  ladies?

12  A    Bruce Kelly was at the apartment.  Demetrius Smith was at

13  the apartment.  Larry Hood was at the apartment.

14  Q    And was the defendant at the apartment?

15  A    Yes, the defendant was also at the apartment.

16  Q    Now, what, if any -- what, if any, nickname did you know

17  Demetrius Smith by?

18  A    We called Demetrius Smith "Johnny."

19  Q    And I am showing you Government Exhibit 6.

20       Do you recognize this person?

21  A    That's Demetrius Smith.

22       THE COURT:  I don't know that --

23       MS. SHIHATA:  And this can be published.

24       THE COURTROOM DEPUTY:  Oh, I'm sorry.

25       (Exhibit published.)

SAM     OCR     RMR     CRR     RPR

Angela - direct - Shihata                    3279

1    BY MS. SHIHATA:

2    Q    And you mentioned -- well, I am showing you Government

3    Exhibit 2.

4              (Exhibit published.)

5    Q    Do you recognize this person?

6    A    That's BK.

7    Q    And that was his nickname?

8    A    That's his nickname.  His government name is Bruce Kelly.

9    Q    And what, if any, relation to the defendant does Bruce

10   Kelly have?

11   A    Bruce Kelly is Robert Kelly's older brother.

12   Q    And you previously identified a photo of Demetrius Smith.

13             Over the years that you knew the defendant, did you

14   learn what, if any, role Demetrius Smith had with respect to

15   the defendant?

16   A    Yes, ma'am.

17   Q    And what was that?

18   A    Demetrius was Robert's road manager.

19             MS. SHIHATA:  I am showing the witness only what's

20   been marked for identification as Government Exhibit 92.

21   BY MS. SHIHATA:

22   Q    Do you recognize this person?

23   A    Yes, I do.

24   Q    And who is that?

25   A    That is Larry Hood.

              SAM      OCR      RMR      CRR      RPR

Angela - direct - Shihata                3280

1           MS. SHIHATA:  I move to admit Government Exhibit 92.

2           MR. CANNICK:  No objection.

3           THE COURT:  Okay, that's in evidence.

4           (Government's Exhibit 92 was received in evidence.)

5           MS. SHIHATA:  And may we publish?

6           THE COURT:  Yes.

7           (Exhibit published.)

8    BY MS. SHIHATA:

9    Q    And was Larry Hood also present that day, along with

10   Bruce Kelly and Demetrius Smith, when you first went to the

11   defendant's apartment?

12   A    That is correct.

13   Q    And over the years that you knew the defendant, did you

14   learn what, if any, relationship the defendant had with Larry

15   Hood?

16   A    Yes, I did, ma'am.

17   Q    And what was that?

18   A    That is Robert's childhood best friend.

19   Q    And at some point did you learn whether Larry Hood became

20   employed by the City of Chicago in any capacity?

21   A    Yes, ma'am.

22   Q    And what capacity was that?

23   A    He was a Chicago police officer.

24   Q    Now, after you, Tiffany, and the two other young ladies

25   got to the defendant's apartment that first time, what

SAM      OCR      RMR      CRR      RPR

1  happened?

2  A    When we arrived at the apartment, we entered the space.

3  We sat down and we actually played Yo Mama jokes and the

4  dozens.

5  Q    And what does it mean to play the dozens?

6  A    That means to signify, to talk about each other in a

7  playful way.

8  Q    Okay.  Fair to say you were joking around?

9  A    Yes, ma'am.

10 Q    And who was participating in that?

11 A    Everyone that was there at that time, ma'am.

12 Q    Okay.  So, the people that you identified already that

13 were present at the apartment when you arrived, as well as you

14 and the three other girls?

15 A    That is correct, ma'am.

16 Q    And do you recall about how long that went on for?

17 A    Maybe an hour or so.  I don't recall the exact amount of

18 time, but a sizeable amount.

19 Q    And at some point did the defendant go -- well,

20 withdrawn.

21        Where -- do you recall where that joking around

22 occurred, where in the apartment?

23 A    In a communal space in the apartment, right across from

24 where the kitchen is.

25 Q    And at some point did the defendant go into another room

Angela - direct - Shihata                    3282

1   of the apartment?

2   A    Yes, he did.

3   Q    And after the defendant went into another room, who, if

4   anyone else, went into the same room as him?

5   A    All of us, one by one.

6   Q    And when you say "all of us," who are you referring to

7   specifically?

8   A    All of the young ladies that were in the home.  None of

9   the gentlemen moved, outside of the defendant.

10  Q    Okay.  And so, at some point did you go inside the room?

11  A    Yes, ma'am, I did.

12  Q    And do you recall how that came about?

13  A    I don't recall if it was Tiffany or if it was Robert that

14  invited me into the room, but I was asked to come into the

15  room.

16  Q    And what, if anything, did you observe once you entered

17  the room?

18  A    When I entered the room, three of the other young ladies

19  were stationed in different spots.  One of them was unrobing,

20  the other one was standing there, and the other one was also

21  taking off her shirt.

22  Q    And when you say "unrobing," do you mean taking off her

23  clothes?

24  A    Yes, ma'am.

25  Q    What, if anything, did the defendant say to you after you

Angela - direct - Shihata                    3283

1   entered the room?

2   A    He asked me to climb on top of him.

3   Q    And what happened next?

4   A    I paused for a moment.  I was a little startled.  I

5   wasn't really sure what I should do, but then I did exactly

6   what he asked me to do.

7   Q    And what happened after you climbed on top of the

8   defendant?

9   A    I asked the defendant -- actually, the defendant asked me

10  to straddle him and to ride him, and I asked him if I could

11  grab a condom.

12           THE COURT:  Could I just ask, at this point what

13  were you wearing?

14           THE WITNESS:  I had on a dress.

15  BY MS. SHIHATA:

16  Q    And how old were you at this time, approximately?

17  A    Between 14 and 15.  It's close -- I would assume closer

18  to 15 since it's the break between freshman and sophomore

19  year.

20  Q    And after you asked about getting a condom, what

21  happened?

22  A    The defendant said he didn't have any.

23  Q    And what happened next?

24  A    I said I had one.

25  Q    And what, if anything, did you do?

Angela - direct - Shihata                    3284

1    A    I asked to get it.  I don't recall if I retrieved it or I

2    had my friend retrieve it, my bag.

3    Q    Okay.  And after that, what happened?

4    A    After that, I proceeded to put the condom on the

5    gentleman and then I straddled him.

6    Q    And did the defendant have sexual intercourse with you

7    that day?

8    A    Yes, he did.

9    Q    And was that vaginal penetration?

10   A    Yes, it was.

11   Q    And who, if anyone else, was in the room when that

12   happened?

13   A    Tiffany and the other two young ladies, as well.

14   Q    After the defendant had intercourse with you, do you

15   recall anything else that happened in the room that day?

16   A    The defendant had intercourse with more than one of us,

17   and there was sexual contact with all of us.

18   Q    When you say "sexual contact," what do you mean?

19   A    One young lady's breasts were caressed, the other young

20   lady's breasts were suckled, and one young lady was fingered.

21   Q    And was that all by the defendant?

22   A    Yes, ma'am.

23   Q    Now, at some point did you leave the room?

24   A    We all did, ma'am.

25   Q    And when you left the room, were Demetrius Smith, Bruce

Angela - direct - Shihata                3285

1    Kelly and Larry Hood still in the apartment?

2    A    Yes, they were.

3    Q    Now, at some point did you leave the defendant's

4    apartment that day?

5    A    Yes, we did.

6    Q    By the way, do you recall around what time of day you

7    went to the defendant's apartment?

8    A    It was night, ma'am.

9    Q    Now, before you left the apartment, do you recall whether

10   the defendant said anything to you and Tiffany and the other

11   two girls?

12   A    Yes, he invited us to come back the following day.

13   Q    And did you go back the following day?

14   A    Yes, we did.

15   Q    How often did you see the defendant after that?

16   A    Every day for quite a few years.

17   Q    And at what locations did you generally see him?

18   A    If we weren't at the apartment, we were at CRC Recording

19   Company in Chicago, Illinois, downtown.

20   Q    And is CRC Recording Company, is that a recording studio?

21   A    Yes, it is.

22   Q    And do you recall where that studio's located?

23   A    I believe the first address is 232, where the Apple store

24   is located, downtown Chicago.

25              The other one is a block east of that, closer to

Angela - direct - Shihata                  3286

1   McClurg Court on the opposite side, north side of the street,

2   and it is also Chicago Recording Company.

3   Q    Okay, and you said a number 232 when you said where the

4   Apple store is.

5            Is the location now where an Apple store is in

6   Chicago?

7   A    The location is no longer a recording studio, it is now

8   the Apple store.

9   Q    And do you remember what street, 232 of what street?

10  A    It's Michigan Avenue and Eire, I believe.

11  Q    Okay.  And how about the other location?

12  A    It's also -- actually, no, I'm wrong.  That's Ohio, Ohio

13  and -- right before you get to the lake.

14  Q    Okay.

15           And who, if anyone, did you generally go to these

16  locations with to see the defendant?

17  A    Tiffany and myself were together every day, and a

18  different assortment of young ladies on a regular basis.

19  Q    Now, at some point did you stop going to school?

20  A    Yes, ma'am.

21  Q    And why did you stop going to school?

22  A    We were given an option, we were either gonna sing or we

23  were gonna go to school.

24  Q    And who gave you that option?

25  A    Robert did.

SAM      OCR      RMR      CRR      RPR

Angela - direct - Shihata                    3287

1    Q    What, if any, discussions do you recall having with the

2    defendant about that?

3    A    We were leaving or trying to attempt to leave one day and

4    he was like:  Where are you, guys, going?

5              And we were like:  We gotta go to school tomorrow.

6              And he was like:  Well, look, if you guys are gonna

7    sing, you're gonna sing.  You don't have time for school.  So,

8    you're either gonna sing or you're gonna go to school.

9              And we made a decision to sing.

10   Q    Now, apart from the first time you met the defendant that

11   you've already testified about, were there other times that

12   the defendant had sexual intercourse with you?

13   A    Yes, there was.

14   Q    And do you recall on how many occasions that occurred?

15   A    No, I do not.

16   Q    Was it multiple occasions?

17   A    Yes, it was.

18   Q    And do you recall the locations where sexual intercourse

19   with the defendant occurred?

20   A    It was either at the apartment, at the studio, and there

21   were a few times while we were on the road.

22   Q    Now, other than sexual intercourse, did the defendant

23   ever touch you in other ways?

24   A    Outside of fondling , no.

25   Q    Okay, but fondling was one of the ways?

SAM      OCR      RMR      CRR      RPR

Angela - direct - Shihata                    3288

1    A    Yes, ma'am.

2    Q    Now, you testified you went -- that apartment that you

3    initially went to when you met the defendant, you went there

4    on multiple occasions, is that correct?

5    A    Yes, ma'am.

6    Q    And can you describe for the jury kind of how big of an

7    apartment it was?

8    A    It's a small apartment.  If I recall correctly, there are

9    two bedrooms, one communal space and a kitchen, and a

10   bathroom.

11   Q    Now, you testified that there were multiple occasions

12   where you had sexual intercourse with the defendant.

13        About how old were you over the span of time that

14   you had sexual intercourse with the defendant?

15   A    Roughly, 15, 16, 17.

16   Q    And did you want to have sexual intercourse with the

17   defendant?

18   A    No.

19   Q    Why did you do so?

20   A    Keep in mind, I just met the young ladies the day before.

21   I wasn't sure whether or not I was getting ready to get jumped

22   on, so...

23   Q    Okay, so that's the first occasion?

24   A    Yes, ma'am.

25   Q    You testified you had intercourse with him again after

SAM     OCR     RMR     CRR     RPR

Angela - direct - Shihata                    3289

1    that, is that right?

2    A    Yes, ma'am.

3    Q    Why did you do so?

4    A    He told us that we had to pay our dues.  It was a

5    requirement to be around.

6

7                (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1    BY MS. SHIHATA:   (Continuing.)

2    Q    Now, did the defendant ever ask you to bring other girls

3    around?

4    A    Yes, he did.

5    Q    What do you recall him saying?

6    A    Get me some girls or bring me some new talent.

7    Q    Now, at a certain point did the defendant's sexual

8    interactions with you become less frequent?

9    A    Yes, ma'am.

10   Q    And do you recall around when that happened?

11   A    '92-ish going into '93.

12   Q    Did there come a time when the defendant employed you?

13   A    Yes, ma'am.

14   Q    In what capacity?

15   A    As a dancer.

16   Q    And as a dancer for what?

17   A    On the road for touring.  We were the first set of road

18   dancers.

19   Q    And around when was that?

20   A    '92.

21   Q    About how old were you then?

22   A    Sixteen.

23   Q    Did you travel with the defendant as one of his backup

24   dancers?

25   A    Yes, I did.

Angela - direct - Shihata                3291

1   Q    And how would you travel with him on the road?

2   A    We traveled via tour bus.

3   Q    When you were working as a backup dancer for the

4   defendant, were you paid?

5   A    Yes and no.

6   Q    What do you mean by that?

7   A    We were given a per diem which was an amount of money

8   that you use for food while we were out on the road and we

9   were given cash.  Any time we were given any form of a check,

10  it never went through.

11  Q    What do you mean it never went through?

12  A    It would bounce.  Oak Street Bank, Chicago, Illinois.

13  Q    I'm showing you what's marked as Government Exhibit 54.

14       (Exhibit published.)

15  Q    Do you recognize this person?

16  A    Yes, I do.

17  Q    Who do you recognize this person to be?

18  A    That is Aaliyah Dana Haughton.

19  Q    Have you met Aaliyah in person?

20  A    Yes, I have.

21  Q    Is Aaliyah currently deceased?

22  A    Yes, she is.

23  Q    Do you know around when she passed away?

24  A    Early 2000s, August 25, I believe, 2001.  I could be

25  wrong about the year.

Angela - direct - Shihata                3292

1    Q    And do you know how she passed away?

2    A    In a plane crash.

3    Q    Around when did you first meet Aaliyah?

4    A    January of 1992.

5    Q    Prior to meeting Aaliyah, had the defendant spoken to you

6    about her?

7    A    Yes, he did.

8    Q    What had the defendant told you about Aaliyah before you

9    met her?

10   A    That she was the next up and coming artist, the next

11   hottest wave coming out of Detroit.

12   Q    And who, if anyone, introduced you to Aaliyah?

13   A    Robert did.

14   Q    The defendant?

15   A    Yes, ma'am.

16   Q    Do you recall where you were when you first met her?

17   A    CRC Studios.

18   Q    And do you recall who if anyone else was there when you

19   first met her?

20   A    It was Aaliyah, it was Robert.  It was also her brother

21   Rashad and that was it.

22   Q    Were any of your other friends there?

23   A    Yes, ma'am.

24   Q    And who was that or, well, actually, was Tiffany there?

25   A    Yes, she was.

                    Angela - direct - Shihata              3293

1   Q     And was any -- without saying the names, was anyone else
2   there?
3   A     Yes, she was.
4   Q     And you mentioned someone's brother Rashad.  Whose
5   brother was that?
6   A     Rashad is Aaliyah's brother.
7   Q     Is that an older brother?
8   A     Yes, he is.
9   Q     Now, you had testified -- you testified earlier that at a
10  certain point you stopped going to school because you were
11  given a choice between school and singing; is that right?
12  A     That is correct.
13  Q     And at that point were you singing with anybody else?
14  A     I don't understand the question.
15  Q     Sure.  Were there any other girls that you were singing
16  with?
17  A     Yes, ma'am.
18  Q     And was one of those girls Tiffany?
19  A     Yes, ma'am.
20  Q     And was there a third person that you were singing with
21  as well?
22  A     Yes, ma'am.
23  Q     Now, was it those two girls, Tiffany and the other girl,
24  that were with you when you met Aaliyah?
25  A     Yes, ma'am.

Angela - direct - Shihata                    3294

1          MS. SHIHATA:  I'm showing the witness only what's

2    been marked for identification as Government Exhibit 964

3          (Exhibit published to witness only.)

4    BY MS. SHIHATA:

5    Q    Do you recognize this photo?

6    A    Yes, I do.

7    Q    Does this photo include you, Tiffany and the third person

8    that was in your singing group?

9    A    Yes, it does.

10   Q    And is that person's face blurred out, that third person?

11   A    Yes, it is.

12         MS. SHIHATA:  The Government offers, for the jury

13   only, Government Exhibit 964

14         MR. CANNICK:  Just one question.  Are these members

15   of the singing group or dancers?

16         THE COURT:  The witness would know the answer to

17   that?

18         THE WITNESS:  Members of the singing group.

19         MR. CANNICK:  No objection.

20         THE COURT:  Okay.

21         (Government Exhibit 964 received in evidence.)

22         MS. SHIHATA:  If we could publish to the jury only.

23         (Exhibit published for jury only.)

24   BY MS. SHIHATA:

25   Q    And where I am pointing on the left of the photograph, is

Angela - direct - Shihata                    3295

1    that you?

2    A    Yes, it is.

3    Q    And on the right of the photograph, is that Tiffany?

4    A    Yes, it is.

5    Q    And in the middle is the third member of the group?

6    A    Yes, it is.

7    Q    Now, when the three of you met Aaliyah and her brother

8    Rashad, what, if anything, did the defendant tell Aaliyah

9    about the three of you?

10            MR. CANNICK:  Objection.

11            THE COURT:  Were you present when he said something?

12            THE WITNESS:  Yes, ma'am.

13            THE COURT:  Okay, overruled.

14   BY MS. SHIHATA:

15   Q    And what did he say?

16   A    He told her that we were going to be her background just

17   like he had Public Announcement, we were going to be her

18   background as well.

19   Q    You mentioned Public Announcement.  What is that?

20   A    Public Announcement is a group that used to sing

21   background and dance with Robert as well.

22   Q    And do you recall whether the defendant said anything

23   else to Aaliyah about the three of you?

24   A    He told her that we were going to give her her street

25   vibe and that we were going to be there to be her friends as

Angela - direct - Shihata                3296

1    well.

2    Q    Now, at some point around the time that you met Aaliyah,

3    did the defendant name your girl group after that?

4    A    Yes, he did.

5    Q    And what did he call it?

6    A    Second Chapter.

7    Q    Now, do you recall anything specific about the day you

8    met Aaliyah?

9    A    It was her birthday.

10   Q    And do you recall whether the defendant said anything

11   about what birthday it was?

12   A    He told us exactly how old she was going to be that year.

13   Q    And to the best of your recollection, how old did you

14   believe her to be at that time?

15   A    She was 12.

16   Q    Now, did you see Aaliyah again after that?

17   A    Regularly, daily.

18   Q    And what types of places would you see Aaliyah at?

19   A    At the studio, at the hotel.  We would sneak her out,

20   take her on the train, to my dad's house.  Riding all around

21   the south side of Chicago, Tiffany and myself.

22   Q    And what was Aaliyah doing in Chicago during that time

23   period?

24   A    Aaliyah was working on her first album.

25   Q    And are you aware of who, if anyone, wrote and produced

Angela - direct - Shihata                          3297

1   that album?

2   A    Yes, I am.

3   Q    And who is that?

4   A    Robert.

5   Q    And do you know what that album was called?

6   A    *Age Ain't Nothing But a Number*.

7   Q    Now, when Aaliyah was in Chicago working on her album, do

8   you know where she stayed?

9   A    At the Inn of Chicago, Best Inn of Chicago, directly

10  across the street from CRC Studios.

11  Q    And who, if anyone, came with Aaliyah to Chicago?

12  A    Her mother occasionally, but she had a chaperone as well.

13  Q    And did you ever meet the chaperone?

14  A    Yes, I did.

15  Q    Was her chaperone always around?

16  A    No, she was not.

17  Q    And did her older brother Rashad also travel with her

18  sometimes as well?

19  A    Yes, he did.

20  Q    Was he always around?

21  A    No, he was not.

22  Q    Now, you testified earlier that you were employed as a

23  backup dancer on certain tours with the defendant; is that

24  right?

25  A    That is correct.

1    Q    Do you recall a tour that you worked as a backup dancer

2    on where a performer called Gerald Levert was also on tour

3    with the defendant?

4    A    Yes, I do.

5    Q    To the best of your recollection around when do you

6    recall that tour being?

7    A    '93-ish.

8    Q    And approximately how old were you at that time?

9    A    Maybe 17.

10    Q    And how --

11    A    It's between '92 and '93.  I'm not sure, but between

12    those two years.  So between 16 or 17.

13    Q    Fair to say you are not -- sitting here today in 2021

14    you're not sure of the exact date of that tour?

15    A    That is correct.

16    Q    Now, how did you travel from city to city?

17    A    By tour bus.

18    Q    And was there more than one tour bus traveling from city

19    to city?

20    A    Yes, there was.

21    Q    Do you remember anything about the tour bus you traveled

22    on, what it looked like?

23    A    Yes, ma'am.

24    Q    What do you recall about that tour bus?

25    A    There are small tables and couch-like chairs in the very

1  front.  There are sleeping bunks that are on either side of

2  the bus and at the very rear of the bus is the main cabin and

3  there's also a bathroom as well.

4  Q    Now, do you recall a tour stop during that tour in

5  Washington, D.C.?

6  A    Yes, I do.

7  Q    And about how long were you in Washington, D.C. for that

8  tour stop?

9  A    A couple of days.

10  Q    And after you got to Washington, D.C., where did you

11  stay?

12  A    I don't recall what hotel we stayed in, ma'am.

13  Q    But it was at a hotel?

14  A    Yes, ma'am.

15  Q    And did the defendant become upset with you at any point

16  while you were at that tour stop in D.C.?

17  A    Yes, he did.

18  Q    Was that once or more than once?

19  A    It was more than one occasion, ma'am.

20  Q    Do you recall what happened the first time he became

21  upset with you while at that tour stop?

22  A    Yes, I do, ma'am.

23  Q    What do you recall about that?

24  A    I recall that myself, Tiffany, Aaliyah and one of the

25  other dancers, Gerald Levert had a swim party, a splash party

Angela - direct - Shihata                    3300

1    and we went to the splash party.  We were in the swimming pool

2    and the defendant came and got us out of the pool.

3    Q     And did he say anything about why he was upset?

4    A     Yes, we were always instructed not to associate with

5    other artists on the tour.  He was always afraid that someone

6    may do something --

7                    MR. CANNICK:  Objection.

8                    Your Honor, I objected to that.

9                    MS. SHIHATA:  I think there was an objection, Judge.

10                   THE COURT:  I did not hear it.  I'm sorry.

11                   Well, sustain it as to the last part, he was always

12   afraid.

13                   But did he tell you not to associate with other

14   people?

15                   THE WITNESS:  Yes, he did.

16                   THE COURT:  And did he tell you why?

17                   THE WITNESS:  Yes, he did.

18                   THE COURT:  What did he say?

19                   THE WITNESS:  He didn't want anybody dropping drugs

20   on his tour bus.  He always felt that people were out to get

21   him.

22                   MR. CANNICK:  I withdraw my objection.

23                   THE COURT:  Okay.

24   BY MS. SHIHATA:

25   Q     Did he say anything specific about the pool party why he

Angela - direct - Shihata                    3301

1    didn't want you at the pool party?

2    A    He didn't want us communicating or congregating with

3    other artists, period.

4    Q    And when you say other artists, is that any other artist

5    or certain types of artists?

6    A    Any other artist.  He didn't like people looking at his

7    girls.

8    Q    Now, you mentioned that there was another time that the

9    defendant got upset with you during that tour stop; is that

10   right?

11   A    That is correct.

12   Q    And what do you recall about that second time he became

13   upset?

14   A    After he got us out of the pool, they were attending an

15   after party for himself so --

16   Q    Who is the "they" that you're referring to?

17   A    Public Announcement, R. Kelly and the entourage of people

18   that were allowed to go to the after party.

19   Q    And were those people men?

20   A    Yes, ma'am.

21   Q    Okay, continue.

22   A    We were told to stay put and not to leave the hotel or

23   our rooms and we decided to go out for food.

24   Q    And you say we were told, who is the "we" in that

25   sentence?

SN        OCR        RPR

Angela - direct - Shihata                    3302

1    A    All of us, all of the dancers including Aaliyah were told

2    to stay put and not leave the hotel and Tiffany as well.

3    Q    And what, if anything, was Aaliyah doing on this trip to

4    D.C.?

5    A    She was seeing what traveling road life was like.  She

6    was protege.  At the time she wasn't performing but she was

7    getting her feet wet.

8    Q    You said you went to get food.  Do you recall where you

9    went?

10   A    We went to the 7-11.

11   Q    And what happened after you went to the 7-11?

12   A    We thought we were lost on our way coming back.

13   Q    And what happened then?

14   A    We were trying to find our way back, making a bunch of

15   noise walking over the bridge, and we saw a group of guys.  We

16   weren't sure who they were.  Aaliyah started freaking out

17   saying we shouldn't have left.  Robert told us don't leave.

18   In the interim, we realized that it was Robert and the rest of

19   the guys.

20   Q    That was the group of guys you saw?

21   A    Yes, ma'am.

22   Q    And what happened after that?

23   A    Once we got back to the hotel lobby, Robert told all of

24   us we would have to put out that night.

25   Q    What did you understand him to mean by "put out"?

Angela - direct - Shihata                    3303

1    A    It was dues time.

2             THE COURT:  What does that mean, dues time?

3             THE WITNESS:  When Robert tells you that you have to

4    pay your dues, that means he wants to have sexual contact or

5    sexual intercourse with you.

6    BY MS. SHIHATA:

7    Q    Now, you testified earlier that at a certain point after

8    you met the defendant, the frequency of your sexual

9    interactions with him diminished; is that right?

10   A    Yes, ma'am.

11   Q    And while you were -- at the time that you were in D.C.

12   the events you just described, had it been a while since the

13   defendant had engaged with in sexual intercourse with you at

14   that point?

15   A    Sexual intercourse, yes; sexual contact, no.

16   Q    Okay.  And by sexual contact, what do you mean?

17   A    He would still ask me to take my clothes off and dance

18   periodically and still fondle.

19   Q    Now, did you end up engaging in sexual intercourse with

20   him that night?

21   A    No, ma'am, I did not.

22   Q    And what happened?

23   A    He let us -- he told us that he would let us know when it

24   was time for us to come up and when he told me to come up,

25   when I got off the elevator before we got to the room, I said

Angela - direct - Shihata                    3304

1    I wasn't doing it that time.

2    Q    And how did he respond?

3    A    He said he was going to send me home.

4    Q    And what happened next?

5    A    I told him I would call my mom and she would have me home

6    on a private jet faster than he could get me there on a

7    commercial plane and he responded:  I was just joking.

8    Q    Did you end up staying on the tour?

9    A    Yes, I did.

10   Q    Now, did there come a point in time when -- while you

11   were in D.C. at that tour stop where you were playing pranks?

12   Is that a yes?

13   A    Yes, ma'am.

14   Q    And were you playing pranks by yourself or with someone

15   else?

16   A    I was playing pranks with someone else.

17   Q    Okay.  And what kind of pranks were you playing at that

18   time?

19   A    On that particular day we were tossing water.

20   Q    Can you explain what you mean by that?

21   A    Should I start with how the game starts --

22   Q    Well, let's start --

23   A    -- or that specific day?

24        THE COURT:  What do you mean by tossing water, water

25   balloons?

SN        OCR        RPR

Angela - direct - Shihata                3305

1          THE WITNESS:  No just water out of a cup or the ice

2    buckets from the hotel.

3          THE COURT:  Go ahead.

4    BY MS. SHIHATA:

5    Q    What happened that day with respect to the prank playing

6    and the water?

7    A    Well, we had a game that we would play on the bus called

8    All Out GD Fucking.  And that was like a truth or dare.

9    Somebody would dare you to do something crazy or you would

10   have to tell the truth, but the name that Robert gave it was

11   All Out GD Fucking.  And so this particular day we were going

12   to get them back.  Robert has a thing where he likes to play

13   jokes.  He'll put salt or pepper in your nose or your mouth or

14   put your hand in warm water so you pee on yourself, things

15   like that.

16          And so this particular day we were going to get the

17   guys back.  And so we started at the hotel and we started with

18   Public Announcement having the maids open their doors and

19   tossing water into their rooms.

20   Q    And at some point you decide to continue this game or

21   this prank playing on the tour bus?

22   A    Yes, we did.  We were in the process of getting ready to

23   leave for a show and people were moving about, in and out of

24   bus, and we got wind that Robert was in his quadrant and we

25   were going to go and toss water on him.

Angela - direct - Shihata                3306

1   Q    And when you say his quadrant, what are you referring to?

2   A    There's a main cabin at the rear of the bus where he

3   slept.

4   Q    And what, if anything, happened after you got on the bus?

5   A    I proceeded to the rear of the cabin.  I slightly opened

6   the door and saw --

7   Q    Which door did you open?

8   A    The door to the main cabin.

9   Q    And what, if anything, did you see after you opened that

10  door?

11  A    I saw Robert and Aaliyah in a sexual situation.

12  Q    And what specifically did you see?

13  A    It appeared that he had his head up in between her legs

14  and was giving her oral sex.

15  Q    And do you recall where in the room that was when that

16  was happening?

17  A    There's a small portion that you can sit on and that's

18  where she was sitting.  Just like a little couch thing.  It's

19  a small sitting area.  I don't know if you would call it a

20  couch.

21  Q    And how was Aaliyah seated on the couch?

22  A    She was seated with her legs open.

23  Q    Was she seated upright?

24  A    Upright, yes, ma'am.

25  Q    And where did you see the defendant?

Angela - direct - Shihata                    3307

1    A    On his knees, ma'am.

2    Q    And where was his head?

3    A    In between her legs.

4    Q    In her vaginal area?

5    A    That's what it appeared to me, ma'am.

6    Q    What did you do after seeing that?

7    A    I closed the door abruptly and pushed the other girl

8    behind me away from the door.

9    Q    Now, prior to that date, did you know that the defendant

10   was engaged sexually with Aaliyah?

11              MR. CANNICK:  Objection?

12              PROSPECTIVE JUROR:  No, I did not.

13              THE COURT:  Overruled.

14   BY MS. SHIHATA:

15   Q    Did you ever talk to the defendant about what you saw

16   that day?

17   A    No, I did not.

18   Q    At some point did you stop working as a dancer for the

19   defendant?

20   A    Yes, I did.

21   Q    And around when was that?

22   A    Right before the Download Tour.

23   Q    Do you recall around when that was?

24   A    Mid-'90s.  I'm not certain what year.

25   Q    After you stopped working as a dancer for the defendant,

Angela - direct - Shihata                    3308

1   did you continue to work with any other artists that were

2   affiliated with him after that?

3   A    Yes, I did.

4   Q    Which artist did you work with?

5   A    I danced for Sparkle.

6   Q    You were a dancer for an artist named Sparkle?

7   A    Yes, ma'am.

8   Q    And in that capacity did you sometimes continue to see

9   the defendant?

10  A    Yes, I did.

11  Q    At what types of locations?

12  A    In passing, the studio.

13  Q    Are you familiar with a docuseries called *Surviving*

14  *R. Kelly*?

15  A    Yes, I am.

16  Q    Did you participate in that docuseries?

17  A    Yes, I did.

18  Q    What, if anything, did you provide to the producers of

19  that docuseries?

20  A    Photographs only.

21  Q    What types of photographs did you provide?

22  A    Of me during that time period.

23  Q    And what, if anything, did you receive for those -- for

24  the use of those photographs?

25  A    I don't recall the amount.

Angela - direct - Shihata                    3309

1   Q    Did you receive money?

2   A    Yes, I did.

3   Q    You don't recall about how much?

4   A    I don't recall the exact amount.

5   Q    Do you have an estimate of how much?

6   A    A few grand.

7   Q    Did you talk about Aaliyah on *Surviving R. Kelly*?

8   A    Yes, I did.

9   Q    And did you talk about the defendant having sex with you

10  as a minor on the docuseries?

11  A    No, I did not.

12  Q    Why not?

13          MR. CANNICK:  Objection.

14          THE COURT:  Overruled?

15          PROSPECTIVE JUROR:  I was embarrassed.  I never

16  wanted anyone to know that I had been in that situation at

17  all.

18  Q    Now, during the course of time that you knew and spent

19  time with the defendant what, if anything, did he say about

20  protecting him?

21  A    We were taught from day one to protect Robert and that

22  people were always out to get him.  So from day one we were

23  told to make sure that we protected him.

24          MS. SHIHATA:  One moment, Your Honor.

25          Nothing further.

Angelal - cross - Cannick                    3310

1          THE COURT:  Cross-examination?

2          MR. CANNICK:  Yes, briefly, Your Honor.

3     CROSS-EXAMINATION

4     BY MR. CANNICK:

5     Q     What year was it that you were hired to be a dancer for

6     Robert?

7     A     1992.

8     Q     And how old were you then?

9     A     16, roughly.

10    Q     And who hired you?

11    A     Robert.

12    Q     Did you have a contract?

13    A     No.

14    Q     You went on the road with him?

15    A     Yes, I did.

16    Q     And did you perform in any videos with him?

17    A     Yes, I have.

18    Q     So then if we were to look we would find your name on the

19    credit side of these performances; am I correct?

20    A     No, you would not.

21    Q     We would not.  We would not because you didn't do it;

22    right?

23    A     That's incorrect, sir.

24    Q     So you are telling us that you performed with him on

25    videos but we would not see you receiving any credit for it on

1   the video label?

2   A    I don't know if tour dancers get credits on concerts that

3   are recorded that people perform in.

4   Q    I didn't ask you about concerts.  You testified and told

5   us just a short while ago that you performed on videos with

6   him.

7   A    Perhaps maybe I didn't understand you.  When you say

8   video do you mean a music video or do you mean being in a

9   concert and those videos being recorded and then replayed?

10  Q    Ma'am --

11          THE COURT:  Can you clarify that question?

12  A    Please.

13  Q    Ma'am, when you think of a music video what do you think

14  of?

15          MS. SHIHATA:  Objection.

16          THE COURT:  Sustained.

17          Just clarify what the difference is.

18          Were you ever on a video like on MTV, a non-concert

19  video?

20          THE WITNESS:  No.

21  BY MR. CANNICK:

22  Q    On those videos are dancers; correct?

23  A    The majority of his music videos in the early 90s didn't

24  have dancers in the videos.

25          THE COURT:  Just do your best to answer the question

```
                      Angelal - cross - Cannick              3312
```

1   that he's asking?

2           PROSPECTIVE JUROR:  I'm sorry, sir.

3           THE COURT:  Just put the question again.

4   BY MR. CANNICK:

5   Q    I'm not asking about the majority.  On the video there

6   are dancers; am I correct?

7   A    Well, that would be a two-part question, sir.  A part of

8   that would be yes and a part of that would be no.  Some videos

9   have dancers and some videos do not.

10  Q    So, now where was it that you would perform with Robert?

11  A    I was a tour dancer, sir, over several states.

12  Q    Again, my question is -- withdrawn.

13          Did you perform with him in arenas?

14  A    Yes.  Let me ask you, are theaters and arenas the same

15  thing, sir, so I have clarity.

16          THE COURT:  If you don't want to clarify, don't.

17  BY MR. CANNICK:

18  Q    Tell us the venues that you performed in with him.

19  A    Sir, you just asked me that --

20  Q    The venues.

21          THE COURT:  He didn't say videos?

22          PROSPECTIVE JUROR:  I don't recall the names of the

23  venues.  That was 25 years ago.  Chicago Theater is one.

24  That's because I'm from Chicago and it was a really big deal

25  that he was at the Chicago Theater and we were excited to be

1    there.

2    Q    I'm sure you were excited to be at the other venues as

3    well; correct?

4    A    Yes, but I don't recall the names of the venues, sir.  I

5    do apologize.

6    Q    You said you performed with him in D.C., do you remember

7    telling us that?

8    A    That is correct.

9    Q    What kind of venue was it in D.C.?

10   A    We did several different things, even a high school.

11   Q    Again, when you said you did several types of things, did

12   you perform in arenas?

13   A    We performed in arenas, we performed in high schools.

14   We've performed in gyms.

15   Q    Did you perform in a nightclub?

16   A    No, sir we did not.

17   Q    And when you say you performed in an arena, did you have

18   a recollection as to which arena?

19   A    No, sir, I do not.

20   Q    And do you recall performing in arenas that had -- where

21   they also played basketball?

22   A    That's correct and I also remember the Ohio State Fair.

23   Q    Now, the arenas that you performed in, you were still 15,

24   16 years old when you were performing?

25   A    That is correct, sir.

Angelal - cross - Cannick                3314

1   Q    And the arenas had no age requirements for performers?

2   A    I wouldn't be aware of that, sir.

3   Q    Well, you do know that Aaliyah was not allowed to perform

4   in certain arenas because of her age; correct?

5              MS. SHIHATA:  Objection.

6              THE COURT:  Sustained as to form.

7   Q    Were you aware that Aaliyah wasn't able to perform in

8   certain arenas with Robert because of her age?

9   A    I think I specified earlier --

10  Q    I --

11             THE COURT:  Mr. Cannick.

12             The question is do you know whether or not she was

13  prohibited from performing because of her age.

14             THE WITNESS:  I do not.

15  BY MR. CANNICK:

16  Q    Are you aware that arenas have age requirements that

17  underage folks are not allowed to perform?

18  A    I wouldn't be aware of that, sir.

19  Q    Now, when did you hire a lawyer?

20  A    Last year, sir.

21  Q    And when was it that you were engaged by *Surviving*

22  *R. Kelly*?

23  A    That was in 2018, sir.

24  Q    And you testified and told us that on that show where you

25  were paid money to provide photographs, you did not tell

Angela - redirect - Shihata                    3315

1   anyone on that show that Robert Kelly assaulted you sexually?

2   A    That is correct, sir.

3            MR. CANNICK:  Nothing further.

4            THE COURT:  Any redirect?

5            MS. SHIHATA:  Just briefly, Your Honor.

6            THE COURT:  Okay.

7   REDIRECT EXAMINATION

8   BY MS. SHIHATA:

9   Q    Have you been asked in other media outlets whether

10  anything occurred between you and Robert Kelly sexually?

11  A    Yes, I have, sir -- I mean, ma'am.  I'm sorry.

12           MR. CANNICK:  Objection.

13  Q    And how if at all did you respond on those occasions?

14           MR. CANNICK:  Objection.

15           THE COURT:  Could I see the parties at the side just

16  for a moment, please?

17           (Sidebar held outside of the hearing of the jury.)

18           (Continued on next page.)

19

20

21

22

23

24

25

SN        OCR        RPR

```
                          Sidebar                        3316
```

1          (The following sidebar took place outside the

2     hearing of the jury.)

3               THE COURT:  What is your objection?

4               MR. CANNICK:  It's beyond the scope of cross.  She

5     asked specifically about *Surviving R. Kelly* and I asked very

6     specifically about what -- my question only pertained to

7     *Surviving R. Kelly* and what her response was and that was in

8     direct relationship to a question that was asked of her on

9     direct.

10               THE COURT:  What is your answer to that?

11               MS. SHIHATA:  He clearly ended on that question.

12     It's beyond the scope.  He's making it seem like she has never

13     said anything prior to today.  I think her response will be

14     when she was directly asked that question by another media

15     outlet she said that is not something I want to discuss.  That

16     is consistent and he opened the door by asking this question.

17               MS. SHIHATA:  I'm allowed redirect

18               THE COURT:  It's certainly related to the topic.  At

19     least in my view.  Certainly part of it was directed for

20     undercutting her credibility.  Correct so far?

21               MR. CANNICK:  Correct.

22               THE COURT:  And part of it was leaving the jury with

23     the impression that she's never said anything to anybody about

24     it.

25               MR. CANNICK:  She still hasn't.

```
                              Sidebar                        3317

1           MS. SHIHATA:  There's a difference between nothing
2   happened and I don't want to talk about it.
3           THE COURT:  I am going to permit the question.
4           (Sidebar ends.)
5           (Continued on next page.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Angela - redirect - Shihata                3318

1    BY MS. SHIHATA:

2              THE COURT:  The objection is overruled go ahead.

3    BY MR. CANNICK:

4    Q    So when you were asked in the media directly whether

5    anything happened sexually happened between you and the

6    defendant how if at all did you respond?

7    A    There were things that had occurred that I chose not to

8    discuss at that time.

9    Q    And that's how you responded?

10   A    Yes, ma'am.

11             MS. SHIHATA:  Nothing further.

12             THE COURT:  Anything else?

13             MR. CANNICK:  Nothing.

14             THE COURT:  Thank you so much.  You can step down.

15   And then are you ready to call another witness?

16             MS. CRUZ MELENDEZ:  We are, Your Honor.

17             THE COURT:  And who is that.

18             MS. CRUZ MELENDEZ:  Jerie Ortez.

19             MR. CANNICK:  Your Honor, may we speak at sidebar,

20   please.

21             THE COURT:  Yes.

22             (Sidebar held outside of the hearing of the jury.)

23             (Continued on next page.)

24

25

```
                            Sidebar                        3319
```

 1          (The following sidebar took place outside the

 2     hearing of the jury.)

 3          MR. CANNICK:  The Government asked us to enter into

 4     a stipulation.  We entered into a stipulation but I thought

 5     that's why we entered the stipulation, to obviate the need for

 6     this witness and if we did, this would be wholly cumulative.

 7          MS. CRUZ MELENDEZ:  There were two witnesses that

 8     would testify to prior consistent statements regarding Sonia,

 9     one was Charity Torres who we provided the stipulation for and

10     the other is Jerie Ortez who had already traveled and was

11     here.

12          MR. CANNICK:  It doesn't matter to me.

13          THE COURT:  Why don't you stipulate.

14          MS. CRUZ MELENDEZ:  I don't have language.  What I

15     don't want to have happen is -- and I am happy to do that, is

16     what I don't want to have happen is we fly her back home and

17     then they say they're unwilling to stipulate.

18          THE COURT:  I am going to excuse the jury for ten

19     minutes.  If you can work out a stipulation that's fine.  But

20     if not that's also fine.

21          (Sidebar ends.)

22          (Continued on next page.)

23

24

25

Proceedings                                    3320

1          THE COURT:  Ladies and gentlemen, I think this is

2    going to speed things along.  I am going to excuse you for

3    just ten minutes or so while we work this out and this will

4    move things along.  So don't talk about the case at all, but I

5    will see you in a few minutes.

6          (Jury exits.)

7          THE COURT:  Everybody have a seat.  Take this time

8    and see if you can work out a stipulation with respect to this

9    witness.  Thank you so much.

10

11          (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                  3321

1            (In open court; outside the presence of the jury.)

2            THE COURTROOM DEPUTY:  All rise.

3            THE COURT:  Everybody can sit down.

4            (Pause in proceedings.)

5            MS. CRUZ MELENDEZ:  We have got the stipulation.

6    We'll print out a copy of it.  But I think we're in

7    agreement.

8            THE COURT:  Oh, great.  So are you going to call

9    another witness, then?

10           MS. CRUZ MELENDEZ:  Yes, we are, Your Honor.

11           MS. SHIHATA:  The Government is going to call

12   Alex.

13           THE COURT:  So if you want to just go get the

14   witness, and Ms. Shihata, just let me know where I should

15   be.

16           (Pause in proceedings.)

17           THE COURT:  I'm sorry, Ms. Shihata?

18           MS. SHIHATA:  Yes.

19           (Pause in proceedings.)

20           THE COURTROOM DEPUTY:  All rise.

21           (Jury enters the courtroom.)

22           (Jury present.)

23           THE COURTROOM DEPUTY:  You may be seated.

24           THE COURT:  All right.  Well, so that was a very

25   productive break.  The parties have agreed to stipulate to

Proceedings                                3322

1   some evidence, but they're going to call a different witness

2   now.

3           Go ahead.

4           MS. SHIHATA:  The Government calls Alex.

5           THE COURTROOM DEPUTY:  Please stand and raise your

6   right hand.

7   **A L E X**,

8           called as a witness having been first duly

9           sworn/affirmed, was examined and testified as

10          follows:

11          THE COURTROOM DEPUTY:  You may be seated.

12          THE COURT:  You can remove your mask.

13          So a couple of things:  I want to make sure the

14  microphone is working.  Will you just give it a tap.

15          THE WITNESS:  All right.

16          THE COURT:  There's a button on the top, maybe...

17          (Pause in proceedings.)

18          THE COURT:  Try it again.  Just speak into it.

19          (Pause in proceedings.)

20          THE COURT:  Okay.  So just a couple of things:

21  First of all, I want to make sure that everybody can hear

22  you.

23          THE WITNESS:  Hello.

24          THE COURT:  Okay.  Good.

25          All right.  So speak into the microphone.  Our

Alex - Direct - Shihata                3323

1   court reporter is taking down everything that you say.

2           THE WITNESS:  Okay.

3           THE COURT:  So I actually think it's easier just

4   to hold onto it.  Yeah.  Then you won't have to keep leaning

5   in.  But the court reporter takes down everything that you

6   say, so try not to speak too quickly.  I want to make sure

7   he can get it all.

8           If there is a question that you don't understand

9   or that you want repeated, just let me know and I'll have

10  the lawyers rephrase.  Just do your best to answer what best

11  answers the particular question that you're being asked.

12          Okay.

13          THE WITNESS:  Yes.

14          THE COURT:  All right.  Go ahead.

15  DIRECT EXAMINATION BY

16  BY MS. SHIHATA:

17  Q    Good afternoon.

18  A    Good afternoon.

19  Q    I'm showing you what's in evidence as

20  Government's Exhibit 68.

21          Do you recognize the person in this photograph?

22  A    Yes.

23  Q    And who is this is photograph of?

24  A    Myself.

25          MS. SHIHATA:  I'm showing the witness only what's

1   been marked for identification as Government's Exhibit 68 A.

2   Q    Is this is the same photograph of you with your true

3   first and last name?

4   A    Yes, it is.

5              MS. SHIHATA:  I move to admit

6   Government's Exhibit 68A to the jury only.

7              THE COURT:  Any objection?

8              MR. CANNICK:  None.

9              THE COURT:  Okay.  That's in evidence.

10             (Government's Exhibit 68A marked and received in

11  evidence.)

12             MS. SHIHATA:  And may we publish it the jury only?

13             (Exhibit published.)

14  Q    Now, for purposes of your testimony here today, we're

15  going to refer to you as Alex, okay?

16  A    Yes.

17  Q    I'm showing you what's been marked for identification

18  as Government's Exhibit 68B.  Is this the same photograph

19  with your name, Alex, underneath?

20  A    Yes.

21             MS. SHIHATA:  I move to admit Government Exhibit

22  68B.

23             MR. CANNICK:  No objection.

24             THE COURT:  Okay.  It's in evidence.

25             (Government's Exhibit 68B marked and received in

 1  evidence.)

 2           MS. SHIHATA:  And may we publish it?

 3           THE COURT:  Yes.

 4           (Exhibit published.)

 5           (Pause in proceedings.)

 6           THE COURT:  Okay.  Go ahead.

 7           MS. SHIHATA:  Thank you.

 8  BY MS. SHIHATA:

 9  Q    How old are you?

10  A    Thirty-one.

11  Q    And when were you born?

12  A    2/13/90.

13  Q    Is that February 13th, 1990?

14  A    Yes, ma'am.

15  Q    And in what neighborhood did you grow up?

16  A    In the south suburbs of Chicago.

17  Q    What neighborhood was that?

18  A    Hazel crest.

19  Q    Now, where did you go to high school?

20  A    Hillcrest High School.

21  Q    And when did you graduate from Hillcrest High School?

22  A    2008.

23  Q    And after high school, did you continue your education?

24  A    Yes, some college.

25  Q    And after college -- after high school and some

1   college, did you work?

2   A    Yes.

3   Q    What kind of work did you do?

4   A    After high school, I immediately -- I was working at

5   McDonald's after high school.

6   Q    And do you recall where the McDonald's that you worked

7   at was?

8   A    Markham, Illinois.

9   Q    Now, are you currently employed?

10  A    Yes.

11  Q    What kind of work do you do?

12  A    Construction.

13  Q    And do you also have your own business?

14  A    Yes.

15  Q    What kind of business?

16  A    Clothing line.

17  Q    I'm showing you what's in evidence as

18  Government's Exhibit 1.  Do you recognize this person?

19  A    Yes.

20  Q    Who do you recognize this to be?

21  A    Mr. Kelly.

22  Q    Do you know his full name?

23  A    Robert Sylvester Kelly.

24  Q    And have you met Robert Kelly before?

25  A    Yes.

Alex - Direct - Shihata                3327

1   Q     Do you see him in the courtroom here today?

2   A     Yes.

3   Q     And can you please point him out and identify by an

4   article of clothing he's wearing?

5   A     White -- oh, right there (indicate), in the gray.

6                THE COURT:  Indicating.

7   Q     Now, what stage in your life were you in when you first

8   met the defendant?

9   A     I was a teenager in high school.

10  Q     And approximately how old were you when you first met

11  him?

12  A     Approximately 16.

13  Q     What grade were you in in high school?

14  A     When I met the defendant?  A junior.

15  Q     And apart from here today in the courtroom,

16  approximately when was the last time you saw the defendant?

17  A     2019.

18  Q     Now, do you recall where you were when you first met

19  the defendant when you were a junior in high school?

20  A     Yes.  At a party at his resident in Olympia Fields.

21  Q     And over the years, did you go to the defendant's

22  Olympia Fields residence multiple times?

23  A     Yes.

24  Q     I'm showing you what's in evidence as

25  Government's Exhibit 502A.  Do you recognize this?

1   A    Yes.

2   Q    What is this?

3   A    The gates of the Olympia Fields residence of Mr. Kelly.

4   Q    Is this is gate to enter the residence?

5   A    Yes.

6   Q    Now, over the years, approximately how many parties did

7   you attend at the defendant's Olympia Fields residence?

8   A    Upwards of, like, nine.

9   Q    Now, you testified you first met the defendant at the

10  party at the Olympia Fields residence.  Without saying the

11  person's name, did you go with someone to that party?

12  A    Yes, my best friend at that time.

13  Q    I'm showing you what's in evidence as

14  Government's Exhibit 64.  Do you recognize this person?

15  A    Yes.

16  Q    And without saying his full name, do you know his full

17  name?

18  A    Yes.

19  Q    I'm showing the jury only what's in evidence as

20  Government's Exhibit 64A.

21       Is this is same photograph with this individual's

22  full name written underneath.

23  A    Correct.

24  Q    Now, for purposes of your testimony here today, we're

25  going to refer to the individual in the photograph that I

1   just showed you as Louis.  Okay?

2   A    Yes.

3   Q    And now I'm showing you what's in evidence -- I'm

4   showing everyone what's in evidence as

5   Government's Exhibit 64B.  Is this the same photograph with

6   the name Louis underneath?

7   A    Yes.

8   Q    Now, you testified that you went with your best friend

9   at the time to the party where you first met the defendant

10  at Olympia Fields; is that right?

11  A    Correct.

12  Q    And was Louis your best friend at that time?

13  A    Yes.

14  Q    And did you live in the same neighborhood?

15  A    Yes.

16  Q    And did you go to high school together?

17  A    Yes.

18  Q    Was Louis the same age as you?

19  A    One year older.

20  Q    And was he in the same class as you in high school?

21  A    No, one year above me.

22  Q    So when you were a junior, he was a senior?

23  A    Correct.

24  Q    How was it that you ended up going to the party at the

25  Olympia Fields residence with Louis?

Alex - Direct - Shihata                3330

1   A    Louis got invited and he invited me also to come with

2   him.

3   Q    Did you understand that Louis had already met the

4   defendant before you?

5   A    Correct.

6   Q    And where did Louis work where you guys were in high

7   school?

8   A    McDonald's.

9   Q    Do you recall which McDonald's he worked at?

10  A    Markham, Illinois.

11  Q    And what, if any, understanding did you have about how

12  Louis had met the defendant?

13  A    Through a drive through at McDonald's.

14  Q    At which McDonald's?

15  A    In Markham.

16  Q    Where Louis was working?

17  A    Yes.

18  Q    I'm showing you Government's Exhibit 522A and 522B.  Do

19  you recognize these photos?

20  A    Yes.  It's the McDonald's in Markham.

21  Q    And is that the McDonald's that Louis worked at --

22  A    Yes.

23  Q    -- when you were in high school?

24  A    Yes, that's correct.

25  Q    Now, you testified earlier that you recall first

1  meeting the defendant at the party at Olympia Fields when

2  you were 16 during your junior year of high school.  Do you

3  recall approximately what time of year it was when you

4  attended that first party?

5  A    Around 2007, Januaryish.

6  Q    And your birthday is in February, correct?

7  A    Correct.

8  Q    Now, when you got to the defendant's residence at

9  Olympia Fields -- well, actually withdrawn.

10       Do you recall how you got to the residence for the

11 party that first time?

12 A    My best friend at that time.

13 Q    Okay.  And what happened when you were -- how did you

14 physically get in the party, if you recall?

15 A    We had to go to a Holiday Inn and get shuttled over to

16 the party.

17 Q    A shuttle, is that what you say?

18 A    Yes.

19 Q    Okay.  And what do you mean by shuttle?

20 A    Well, we go to the Holiday Inn and just tell them -- we

21 all get on the shuttle to the -- to the residence of

22 Mr. Kelly's.

23 Q    So was that just a bus transporting people --

24 A    Correct.

25 Q    -- from the hotel nearby to the residence?

Alex - Direct - Shihata                3332

1   A    Yes.

2   Q    And after you got to the residence, what, if anything,

3   happened?

4   A    Just -- just a live party.

5   Q    Okay.  And did you have to go through any security or

6   anything before you got in?

7   A    Yes?  Around the side there, they was doing waivers and

8   checking ID's.

9   Q    And did anyone check your ID?

10  A    No.

11  Q    Did anyone ask you to sign a waiver?

12  A    No.

13  Q    Did you see that happen to others?

14  A    Yes.

15  Q    Now, once you got to the party, what was the atmosphere

16  like?

17  A    It was -- it was real nice, nice music, good time,

18  people was dancing, you know...

19  Q    And was any alcohol being served?

20  A    Yes.

21  Q    And what was the gender makeup of the party?

22  A    98 percent women, 2 percent men.

23  Q    Now, at that first party, did you speak to the

24  defendant at that party?

25  A    Just a casual, brief greet.

Alex - Direct - Shihata                    3333

1   Q    And how did that come about?

2   A    My best friend at the time introducing me.

3   Q    Louis?

4   A    Yes.

5   Q    And how long was that interaction with the defendant?

6   A    Very brief, it was very brief.

7   Q    After that first party, did you attend other parties at

8   Olympia Fields?

9   A    Yes, I have.

10  Q    And what kinds of parties did you attend at the

11  defendant's Olympia Fields residence?

12  A    Album release; party birthday parties; regular

13  Saturday, Friday night parties.

14  Q    And when you say "birthday parties," for whose

15  birthday?

16  A    Mr. Kelly.

17  Q    The defendant?

18  A    Yes.

19  Q    And who, if anyone, do you recall attending those

20  parties with?

21  A    My best friend, Louis.

22  Q    Louis?

23  A    Uh-huh.

24  Q    You mentioned album release parties.  Do you recall any

25  specific album release party you attended at Olympia Fields?

Alex - Direct - Shihata                     3334

1   A    Double Up album release party.

2   Q    And was that the defendant's album.  Double Up?

3   A    Yes.

4   Q    And approximately when did you attend the Double Up

5   album release party?

6   A    The spring of 20 -- 2007.

7   Q    And were you still a junior in high school at that

8   time?

9   A    Yes -- yes, going to be -- yeah, going into my senior

10  year.  But I was still a junior, yes.

11  Q    So it was toward the end of your junior year?

12  A    Yes.

13  Q    And do you recall speaking with the defendant at that

14  party?

15  A    Yes.

16  Q    What, if anything, do you recall about that

17  conversation with the defendant?

18  A    He slipped me his number.

19  Q    And how did he slip you his number?

20  A    Just a balled up piece of paper in his hand and he slap

21  it in my hand.

22  Q    And at some point did you look at what was on the piece

23  of paper?

24  A    Correct.

25  Q    And what was on the piece of paper?

1   A    His phone number.

2   Q    And how was it written?

3   A    It was handwritten.

4   Q    Handwritten?

5   A    Yes.

6   Q    Did you have a cell phone when you were in high school?

7   A    Yes.

8   Q    And was your cell phone in your name or someone else's

9   name?

10  A    My brother-in-law's name.

11  Q    And without saying his name, do you recall your

12  brother-in-law's name?

13  A    Yes, correct.

14  Q    I'm showing you what's been marked for identification

15  at Government's Exhibit 969.  Do you recognize this?

16  A    Yes.

17  Q    Is that your brother-in-law's name?

18  A    Correct.

19           MS. SHIHATA:  I move to admit

20  Government's Exhibit 969.

21           MR. CANNICK:  Not a problem.

22           THE COURT:  Okay.

23           (Government's Exhibit 969 marked and received in

24  evidence.)

25           MS. SHIHATA:  And may we publish it to the jury

Alex - Direct - Shihata                3336

1  only?

2          (Exhibit published.)

3  Q    And your sister -- when you were in high school was

4  this person your brother-in-law already or was he seeing

5  your sibling?

6  A    I believe they was married already.

7  Q    Okay.  And was he married to your sister?

8  A    Correct.

9  Q    Now, did your brother-in-law know the defendant

10 personally?

11         MR. CANNICK:  Objection.

12 A    No.

13         THE COURT:  Overruled.

14 Q    Did your sister know the defendant personally?

15 A    No.

16 Q    Now, when the defendant -- I'm sorry.  Withdrawn.

17         When the defendant gave you his phone number, I

18 think you testified you were toward the end of your junior

19 year in high school, correct?

20 A    Correct.

21 Q    And at that time, how did the defendant giving you his

22 phone number make you feel?

23 A    Feel pretty good, you know, getting a number from a

24 celebrity, you know, his status, it made me feel really

25 good.

1    Q    Now, after the defendant gave you his phone number, at

2    some point did you communicate with the defendant by phone?

3    A    Yes.

4    Q    In what manner?

5    A    He just wanted to -- he just wanted me to keep in

6    contact with him, so -- through texts, you know, just --

7    Q    Okay.

8    A    -- just make sure I -- you know, just check up on me.

9    Q    He would check up on your?

10   A    Yeah.

11   Q    And you said that was mainly through texts; is that

12   right?

13   A    Yeah.  And I would check up on him.  We would also

14   check up on each other.

15   Q    Now, other than seeing the defendant at parties at his

16   residence in the Olympia Fields, did you also see him at

17   other times?

18   A    Yes.

19   Q    And what other places did you see the defendant in?

20   And let me ask you it this way:  When you were -- when he

21   was still living at Olympia Fields, what other places would

22   you see the defendant?

23   A    At he residence or at the rec center where he plays

24   ball.  Around that time, that was pretty much it.

25   Q    Okay.  And when you say "ball," do you mean basketball?

Alex - Direct - Shihata                    3338

1    A    Yes.

2    Q    And do you recall where the rec center was where the

3    defendant played basketball when he was living in

4    Olympia Fields?

5    A    Markham, Illinois.

6    Q    And did you attend those basketball games?

7    A    Correct.

8    Q    And about how far was the Markham Rec Center where the

9    defendant played basketball from his -- from the defendant's

10   house in Olympia Fields?

11   A    No less than five other ten minutes.

12   Q    Okay.  And is that driving?

13   A    Yes, just straight shot.

14   Q    Now I'm showing you Government's Exhibits 523 -- what's

15   in evidence Government's Exhibit 523 A, B and C.  Do you

16   recognize these photographs?

17   A    Yes, that's the rec center in Markham.

18   Q    Where the defendant played basketball?

19   A    Correct.

20   Q    And how often -- about how many times did you attend

21   basketball games at that rec center where the defendant was

22   playing?

23   A    Two or three times.

24   Q    And did you ever play during any of those basketball

25   games?

Alex - Direct - Shihata                    3339

```
1    A    Not there.  I played once with him before, but not at
2    that one.
3    Q    At a different location?
4    A    Yes.
5    Q    After he left Olympia Fields, did you also see the
6    defendant play basketball somewhere else?
7    A    Yeah.  He used to play at a church in the city of
8    Chicago.
9            (Pause in proceedings.)
10           MS. SHIHATA:  I'm sorry.  My watch just started
11   speaking to me.  I apologize.
12           THE COURT:  All right.
13   Q    I'm sorry.  Where else did you see --
14   A    At a church in the city of Chicago.
15   Q    And was there a basketball court there?
16   A    Yes.
17   Q    And did you see the defendant play basketball multiple
18   times there?
19   A    Yes.
20   Q    And I think you testified is that where you also played
21   in one basketball game?
22   A    Yes.
23   Q    And how did you generally learn about the basketball
24   games when they were played at the Markham Rec Center?
25   A    My best friend Louis at the time.
```

1   Q    He would let you know about them?

2   A    Yes, he would go play.

3   Q    And what were these basketball games like?

4   A    Pretty much Kelly ball.  You get the rebound, pass it

5   to him, let him shoot.

6   Q    And you called that Kelly ball; is that what you called

7   it?

8   A    Yes.

9   Q    Okay.  Now, other than you, what other types of people

10  did you see who attended the defendant's basketball game?

11  A    You had the regular ongoing watchers.  You had the

12  hoopers that got invited.  And you had, you know, his

13  ladies, his lady friends, you would have.

14  Q    And when you say "the hoopers that got invited," do you

15  mean other players?

16  A    Yes.

17  Q    And you said you also saw ladies there; is that right?

18  A    Yeah, his lady friends.

19  Q    Do you mean the defendant's?

20  A    Yes.

21  Q    From where, if anywhere, did you see the defendant's

22  female friends watch the games?

23  A    Apart from everyone else.

24  Q    Apart from everyone else; is that what you said?

25  A    Yes, correct.

Alex - Direct - Shihata                3341

1  Q    And was everyone, when you were there, at least, were

2  those men?

3  A    Yes.

4  Q    Now, during those earlier days when the defendant still

5  lived at Olympia Fields when you would go to the parties at

6  Olympia Fields and basketball games in Markham, did you see

7  or meet any of the defendant's employees or associates?

8  A    Yes.

9  Q    I'm showing you what's in evidence as

10 Government's Exhibit 4.  Do you recognize this person?

11 A    Yes.

12 Q    Who is this?

13 A    I think they call him "June Bug."

14 Q    And do you know what, if any, role "June Bug" had with

15 the defendant?

16 A    Personal assistant, you know, someone like his

17 right-hand guy for different matters.

18 Q    I'm showing you Government's Exhibit 31.  Do you

19 recognize this person?

20 A    Yes.  I believe his name is Tom, I'm not sure.  He was

21 an assistant for Mr. Kelly.

22 Q    I'm showing you what's in evidence as

23 Government's Exhibit 21.  Do you recognize this person?

24 A    Yes.

25 Q    Who is that?

Alex - Direct - Shihata                  3342

1   A    They called him Bowden.

2   Q    And what, if any, role did he have with the defendant?

3   A    Just longtime friend, good friend of Mr. Kelly's.

4   Q    I'm showing you Government's Exhibit 9.  Do you

5   recognize this person?

6   A    I've seen him before.

7   Q    Do you know his name or nickname?

8   A    No, I don't.

9   Q    Where do you recall seeing this person?

10  A    At the earlier days at parties at Olympia Fields.

11  Q    I'm showing you Government's Exhibit 22.  Do you

12  recognize this person?

13  A    I believe so.  I believe she did -- she did security

14  for Mr. Kelly.

15  Q    Do you know her name?

16  A    Cookie.  I'm not for sure, but I would say Cookie.

17  Q    Okay.  Now, did there come a time when the defendant

18  asked you to come to his resident at Olympia Fields, and it

19  wasn't for a party?

20  A    Correct.

21  Q    And how did that come about?

22  A    He just wanted to see me and told me to come on by.

23  Q    And what, if anything -- and did you go?

24  A    Yes.

25  Q    And what, if anything, happened once you got to the

Alex - Direct - Shihata                3343

1   Olympia Fields residence?

2   A    He opened the gates for me and told me to wait inside

3   his Maybach at that time.

4   Q    And did you wait inside the Maybach?

5   A    Yes.

6   Q    And did the defendant stay or leave after letting you

7   inside?

8   A    He -- he told me to wait on him for like 20 minute.

9   Q    And actually just to be clear, when he opened the gates

10  for you, did you actually see him at that time?

11  A    No.  He was already gone from the house.

12  Q    Okay.  So how did he tell you to a wait in the Maybach;

13  was that by phone.

14  A    Yes.  I believe through texts, he told me to get inside

15  the Maybach and wait for him.

16  Q    And about how long did you wait inside the Maybach?

17  A    Roughly around 20 minutes.

18  Q    And what, if anything, happened after 20 minutes,

19  roughly?

20  A    Then Mr. Kelly came out and we got inside the Maybach,

21  as well.

22  Q    And after the defendant got inside the Maybach with

23  you, what do you recall happening?

24  A    I recall him just talking to me, then forcefully

25  kissing me and licking my face.

Alex - Direct - Shihata                3344

1    Q    And how, if at all, did you react at that time?

2    A    Numb, shocked, that's about all I could do.

3    Q    What, if anything, do you recall the defendant saying

4    to you at that time?

5    A    Just to be open-minded --

6    Q    And what --

7    A    -- just to be open-minded.

8    Q    Do you recall anything else about that encounter?

9    A    No.  That was just a brief contact that night, and then

10   like I went home.

11   Q    Now, did the defendant stop making sexual advances to

12   you after that?

13   A    No.

14   Q    And what other sexual advances do you remember him

15   making to you?

16   A    One time he told me to take off my pants, sit down in

17   the chair, and he began to give me oral sex.

18   Q    And who initiated that encounter?

19   A    Mr. Kelly, the defendant.

20   Q    Do you remember where that took place?

21   A    At his residence in Olympia Fields.

22   Q    And do you remember anything about where in the

23   residence that was?

24   A    That particular time, no.  It was in one of the rooms

25   upstairs.

<pre>
                    Alex - Direct - Shihata              3345
</pre>

1   Q    And do you recall whether that encounter was recorded?

2   A    Yes.

3   Q    Do you remember how it was recorded?

4   A    IPad.

5   Q    And whose iPad was it?

6   A    Mr. Kelly's.

7   Q    And who set up the recording?

8   A    The defendant.

9   Q    Now, did there also come a time when the defendant --

10  well, actually, withdrawn.

11         At some point did you have a sexual encounter with

12  the defendant and another person?

13  A    Yes.

14  Q    And how did that come about, the first time that

15  happened?

16  A    He said he had a gift for me and to come by his house.

17  Q    Who said that to you?

18  A    The defendant.

19  Q    And where did you go after you arrived at

20  Olympia Fields?

21  A    He told me to wait in one of the rooms upstairs.  I

22  believe it was one of his kids' rooms.

23  Q    And what happened after you waited in the room?

24  A    He came in and told me to, you know, don't be nervous,

25  and, you know, take off my clothes, and he sent a half-naked

Alex - Direct - Shihata                    3346

1    lady into the room.

2    Q    And did you know the lady he sent into the room before?

3    A    No.

4    Q    Did the defendant tell you her name?

5    A    No.

6    Q    Prior to that day, had you asked the defendant to

7    provide you with a girl or a woman?

8    A    No.

9    Q    What happened after this person entered the room?

10   A    He pretty much just told us to go at.  But we didn't

11   know what to do because he was still in the room, so we

12   didn't know what to do.

13   Q    And after that, what happened?

14   A    So he instructed us to start kissing and mean it.

15   Q    He told you to "mean it"?

16   A    Yeah, he told us to mean it.  Start kissing each other.

17   Q    And what, if anything, did you notice was in the room

18   while this was happening?

19   A    IPad, recording camera, lights, production lights.

20   Q    And after the defendant told you and the female present

21   to start kissing and to mean it, what happened?

22   A    He started recording it and started masturbating.

23   Q    And what, if anything, else did the defendant tell you

24   to do?

25   A    Pretty much to have sex with her, before she gave us --

Alex - Direct - Shihata                3347

1   should I say, "blow jobs"?  Can I say blow jobs?

2          She gave us blow jobs.

3   Q    Okay.  So who, if anyone, told the female to give you a

4   blow job?

5   A    The defendant.

6   Q    Okay.  And by "blow job," do you mean oral sex?

7   A    Yes.

8   Q    And who, if anyone, told the female to give the

9   defendant oral sex?

10  A    Nobody.

11         What's you mean?  Rephrase that question.

12  Q    Did anyone tell the female to give Rob oral sex?

13  A    The defendant.

14  Q    Now, after the oral sex, what, if anything, did the

15  defendant tell you to do?

16  A    After the oral sex and everything, he told me to wait

17  in the room.

18  Q    Okay.  When you say "and everything" what are you

19  referring to?

20  A    Because I had to penetrate the young lady at that time.

21  Q    And by "penetrate," do you mean you had sexual

22  intercourse with her?

23  A    Yes.

24  Q    And did you penetrate her vaginally?

25  A    Yes.

Alex - Direct - Shihata                    3348

1   Q    During this encounter, who, if any, was in charge?

2   A    The defendant.

3   Q    Why did you do what the defendant told you to do?

4   A    Actually, I have no idea.

5   Q    And after the encounter you just described with this

6   other female at Olympia Fields, did you have other sexual

7   encounters with the defendant?

8   A    Correct.

9   Q    Including with other females?

10  A    Correct.

11  Q    And did the sexual encounters, sometimes were they just

12  you and the defendant?

13  A    Yes.

14  Q    When you had sexual encounters with you and just the

15  defendant, who was in control?

16  A    The defendant.

17  Q    What did the defendant tell you to do to him?

18  A    Give him oral -- oral sex.

19  Q    Did he ask you to do anything else, as well?

20  A    Drive up his butt.

21  Q    How, if at all, were these encounters recorded?

22  A    IPad.

23  Q    Where did these sexual encounters with just the

24  defendant take place?

25  A    At his residence, at his studio, tour bus.

1  Q    And when you say "his residence," which residence --

2  which residence or residences are you referring to?

3  A    The Olympia Fields residence, the Trump Towers

4  apartment.

5  Q    And when you say "studios," which studios are you

6  referring to?

7  A    The studio off Ohio and the studio off Justine.

8  Q    Showing you what's in evidence as

9  Government's Exhibit 503A.  Do you recognize this?

10  A    Sure.  Yes, I do.

11  Q    What is this a photograph of?

12  A    The studio on Justine.

13  Q    Now, during your sexual encounters with the defendant,

14  what, if anything, did the defendant tell you to call him?

15  A    Daddy.

16  Q    You also mentioned a sexual encounter with the

17  defendant on a tour bus; is that correct?

18  A    Correct.

19  Q    And where on the tour bus did that take place?

20  A    Back room.

21  Q    The back room of the tour bus?

22  A    Yes.

23  Q    And was the tour bus parked or moving when that

24  happened?

25  A    Parked.

Alex - Direct - Shihata                    3350

1    Q    And do you recall where it was parked?

2    A    Downtown Chicago.

3              (Continued on the next page.)

Alex - direct - Shihata                    3351

1    EXAMINATION CONTINUES

2    BY MS. SHIHATA:

3    Q    Now, apart from, I think you testified that apart from

4    the first encounter with the defendant and a female at Olympia

5    Fields that you've already described, that there were other

6    times, other encounters with the defendant and other females,

7    is that right?

8    A    Correct.

9    Q    About how many times do you recall having an encounter

10   with the defendant and another female?

11   A    Countless.

12   Q    Countless?

13   A    Correct.

14   Q    And who was in charge during those encounters?

15   A    The defendant.

16   Q    What types of sexual acts did he direct you to engage in

17   with these females?

18   A    Penetration, they put they mouth on me, you know, hugging

19   and kissing.

20   Q    And when you say put their mouth on me, what part of your

21   body are you referring to?

22   A    My genitals.

23   Q    And while these acts were going on, what was the

24   defendant doing?

25   A    Either masturbating or watching.

SAM      OCR      RMR      CRR      RPR

Alex - direct - Shihata                    3352

1  Q    Did the defendant tell you or the female what you should

2  be doing?

3  A    Correct.

4  Q    And did he record these interactions?

5  A    Yes.

6  Q    And how did he record them?

7  A    By iPad.

8  Q    Did the defendant ever engage with you and the females

9  during these interactions, did he ever engage with you or the

10 females sexually during the interactions?

11 A    Correct, yes.

12 Q    What, if anything, did the defendant call you during

13 these encounters with other females?

14 A    Nephew.

15 Q    Are you the defendant's nephew?

16 A    No.

17 Q    Are you in any way related to the defendant?

18 A    No.

19 Q    At the times you engaged in these sexual acts with other

20 females that the -- withdrawn.

21       At the time you engaged in these sexual acts, did

22 you know the names of any of these females?

23 A    No.

24 Q    In what locations do you recall engaging in sexual acts

25 with these females?

SAM    OCR    RMR    CRR    RPR

Alex - direct - Shihata                    3353

1    A    His residence, his studio, trips out the state.

2    Q    And do you recall -- do you recall whether any of these

3    encounters ever occurred in hotel rooms?

4    A    Yes.

5    Q    What, if any, rules were there during these encounters?

6    A    Not that -- we wasn't allowed to talk to each other.

7    Q    And when you say "we" weren't allowed to talk to each

8    another, who is the "we" you're referring to?

9    A    His lady, the female.

10   Q    And yourself?

11   A    Yes.

12   Q    Now, did you engage in sexual acts with certain of these

13   females more than once?

14   A    Correct.

15   Q    And were all of these encounters in the defendant's

16   presence?

17   A    Correct.

18   Q    Do you recall what some of the females the defendant told

19   you to engage in sexual acts with, what they looked like?

20   A    Yes.

21   Q    And fair to say you don't recall all of them?

22   A    Fair to say.

23   Q    I'm showing you what's in evidence as Government

24   Exhibit 69(b).

25            Do recognize this person?

Alex - direct - Shihata                3354

1          (Exhibit published.)

2    A    Correct.

3    Q    And is this one of the females that the defendant

4    directed you to engage in sexual acts with?

5    A    Yes, one of the first ones, yes.

6    Q    Did you engage in sexual acts with her once or multiple

7    times?

8    A    Multiple.

9    Q    At the time of those acts, did you know her name?

10   A    No.

11   Q    What type of acts do you recall engaging in with the

12   individual in Government Exhibit 69(b)?

13   A    Sexual.

14   Q    And what do you mean by that?

15   A    Sexual acts and things sexual.

16   Q    What type of sexual acts?

17   A    Penetration or kissing or orally, she giving me orally.

18   Q    And did the defendant ever engage in sexual acts with

19   both you and this individual?

20   A    Yes.

21   Q    And, again, were these interactions recorded?

22   A    Yes.

23   Q    And do you recall how they were recorded?

24   A    iPad.

25   Q    And who, if anyone, told you what to do during your

SAM     OCR     RMR     CRR     RPR

Alex - direct - Shihata                3355

1    encounters with the individual in 69(b)?

2    A    The defendant.

3    Q    And who, if anyone, told the individual in 69(b) what to

4    do during these encounters?

5    A    The defendant.

6    Q    I am showing you what's in evidence as Government

7    Exhibit 75.

8              Do you recognize this person?

9              (Exhibit published.)

10   A    Correct.

11   Q    Is this one of the females that the defendant directed

12   you to engage in sexual acts with?

13   A    Correct.

14   Q    Was that once or more than once?

15   A    More than once.

16   Q    And at the time of these sexual encounters, did you know

17   this person's name?

18   A    No.

19   Q    And what types of acts did he -- did the defendant direct

20   you to engage in --

21   A    Sexual.

22   Q    -- with this person?

23   A    Sexual acts.

24   Q    Including penetration?

25   A    Yes.

Alex - direct - Shihata                    3356

1    Q    And by that I mean sexual intercourse?

2    A    Yes.

3    Q    And during those encounters with this individual in

4    Government Exhibit 75, who directed you, who, if anyone,

5    directed what you should be doing during those encounters?

6    A    The defendant.

7    Q    And who, if anyone, directed what the individual in

8    Government Exhibit 75 should be doing during those encounters?

9    A    The defendant.

10   Q    Were these encounters with this individual recorded?

11   A    Yes.

12   Q    How were they recorded?

13            THE COURT:  Can I just ask, is it fair to say that

14   for all of these people that you're describing, you were

15   instructed to do the same types of sexual acts?

16            THE WITNESS:  Correct.

17            THE COURT:  All right, go ahead.

18            MS. SHIHATA:  Thank you.

19   BY MS. SHIHATA:

20   Q    How --

21            THE COURT:  Let me ask one other question, sorry.

22            And is it also fair to say for all of them they were

23   recorded?

24            THE WITNESS:  A hundred percent.

25            THE COURT:  On an iPad?

Alex - direct - Shihata                     3357

1           THE WITNESS:  Yes.

2           THE COURT:  Sorry, go ahead.

3   BY MS. SHIHATA:

4   Q    I'm showing you Government Exhibit 78.

5           Do you recognize this person?

6           (Exhibit published.)

7   A    Yes.

8   Q    And is this one of the females that the defendant

9   directed you to engage in sexual acts with?

10  A    Correct.

11  Q    Once or more than once?

12  A    More than once.

13  Q    I'm showing you what's in evidence as Government

14  Exhibit 76.

15          Do you recognize this person?

16          (Exhibit published.)

17  A    She looks familiar, but I'm not a hundred percent sure --

18  Q    Okay.

19  A    -- I recognize.

20  Q    Where do you think she looks familiar from?

21  A    One time in Miami.

22  Q    And what happened in Miami?

23  A    In the room, sexual, sexual intercourse with a young lady

24  and the defendant.

25  Q    Fair to say she looks familiar, but you're not sure if

Alex - direct - Shihata                3358

1    that's the person --

2    A    Fair to say.

3    Q    -- that you engaged in a sexual act with?

4    A    Very fair to say.

5    Q    But was there a female in Miami that you engaged in a

6    sexual -- in sexual acts with at the defendant's direction?

7    A    Correct.

8    Q    And, again, was this recorded?

9    A    Correct.

10   Q    And at the time of -- at the time of these acts, fair to

11   say, like all the others, you didn't know the female's name?

12   A    No; fair to say.

13   Q    Now, during these encounters with these females and the

14   defendant, how did the females appear to you during these

15   encounters?

16        MR. CANNICK:  Objection.

17        THE COURT:  Well, I'll sustain it as to form.

18        Are you asking about demeanor and things like that?

19        MS. SHIHATA:  Yes.

20        THE COURT:  All right.

21        Describe what you noticed about all or some of the

22   women that you've discussed so far.

23        THE WITNESS:  I don't know, zombie-ish.

24   BY MS. SHIHATA:

25   Q    Apart from telling you what sexual acts to engage in with

Alex - direct - Shihata                3359

1    these women, what, if any -- what other types of things would

2    the defendant tell you and the -- and the females during these

3    encounters?

4    A    Can you rephrase that?

5    Q    Sure.

6         I think you testified he would direct what acts --

7    A    Correct.

8    Q    -- sexual acts should happen, is that fair to say?

9    A    Correct.

10   Q    And other than that, would he also tell you other than,

11   you know, have sex or give oral or whatever, did he also

12   direct you in other ways or say other things during these

13   encounters?

14   A    Yeah, like, we kissing, do it like we mean it, you know,

15   things like that.

16   Q    And when he said "do it like you mean it," was that only

17   in reference to kissing or other things as well?

18   A    Just every -- just other things.  Like, he might tell us

19   to moan, you know.  Moan like you mean it or something like

20   that.

21   Q    Now, I think just going back for a moment to the first

22   sexual encounter you had, the first time there was a female

23   brought into the room by the defendant in Olympia Fields.

24        I think you mentioned on that occasion you remember

25   some lights, is that right?

Alex - direct - Shihata                    3360

1   A      Yes.

2   Q      And an iPad, is that correct?

3   A      Yes.

4   Q      And do you remember any other recording equipment on that

5   occasion?

6   A      Just that -- just the recorder I mentioned.

7   Q      Which recorder was that, what type of recorder?

8   A      Like a regular video recorder on a tripod.

9   Q      Now, after your sexual encounters with the defendant or

10  with these other women and the defendant, were there times the

11  defendant gave you something?

12  A      Yeah, he had gave me a few dollars, you know.

13  Q      And what do you mean by a few dollars?

14  A      He'd slap a hundred or two in my hand, you know, just for

15  my time and my gas and everything.

16  Q      Were there ever times you traveled to see the defendant?

17  A      Yes.

18  Q      And where do you recall traveling to see the defendant?

19  A      I believe twice in Atlanta and once in Miami.

20  Q      And approximately when do you recall those two times that

21  you traveled to Atlanta, approximately when was that?

22  A      Around 2014.

23  Q      And how about when you traveled to Miami, approximately

24  when was that ?

25  A      Approximately 2017.

Alex - direct - Shihata                    3361

1   Q    And who paid for your travel to Atlanta and Miami?

2   A    The defendant.

3   Q    And did you stay at a hotel?

4   A    Correct.

5   Q    And did he pay for the hotel?

6   A    Correct.

7   Q    And who made those arrangements for you?

8   A    Some lady, I believe her name was Diana, his assistant.

9   Q    And who put you in touch with Diana?

10  A    The defendant.

11  Q    How, if at all, did you communicate with Diana?

12  A    Strictly text.

13  Q    Did you ever meet Diana in person?

14  A    No.

15  Q    When you traveled to see the defendant, what was the

16  purpose of the travel?

17  A    Sexual.

18  Q    And did you engage in sexual encounters during those

19  trips?

20  A    Correct.

21  Q    With the defendant?

22  A    Yes, correct.

23  Q    How about with any others?

24  A    Yes, correct.

25  Q    Other females?

Alex - direct - Shihata                         3362

1   A     Yes.

2   Q     During the time you knew the defendant, did he ever

3   invite you to any of his concerts?

4   A     No.

5   Q     Did he ever take you out publicly anywhere?

6   A     No.

7   Q     Now, you mentioned you went to parties at Olympia Fields.

8         Did you also sometimes go to parties at the

9   defendant's studios?

10  A     Correct.

11  Q     And do you recall what types of parties you went to at

12  the studio?

13  A     Just regular Saturday night parties he would throw,

14  Friday night; regular Friday, Saturday night parties that he

15  would throw over the weekend.

16  Q     Now, you mentioned earlier that you traveled to Atlanta

17  twice and Miami or that you recall traveling to those

18  locations to see the defendant, correct?

19  A     Correct.

20  Q     At any of those locations do you recall the defendant

21  telling you anything about what you should tell people, who

22  you should tell people you were?

23  A     Yeah, I was his stylist.

24  Q     And what do you recall him telling you about that?

25  A     Just -- just if anybody ever asked, he said you my

Alex - direct - Shihata                    3363

1  stylist.

2  Q    Over the time you knew the defendant, were there times

3  when you distanced yourself from him?

4  A    Yes.

5  Q    And why did you distance yourself from him?

6  A    Just feeling used, abused, lied to.  So many emotions, so

7  many reasons for different times.

8  Q    Did this happen more than once?

9  A    Correct.

10  Q    Do you recall around what time periods this happened?

11  A    Yes, 2015, 2016, half of 2017.

12  Q    Now, did those periods of distance last?

13  A    No.

14  Q    Why not?

15  A    My best friend at the time, he would reach out to him and

16  try to get in contact with me each and every time.

17  Q    And when you say your best friend, are you --

18  A    Louis.

19  Q    -- referring to Louis?

20        And when you say he would reach out to him, who is

21  the "he" in that sentence and who is the "him" in that

22  sentence?

23  A    The defendant would reach out to Louis.

24  Q    And reach out to him for what?

25  A    To -- to tell me to call him or just to get in contact

Alex - direct - Shihata                    3364

1    with me.

2    Q    To tell you to call the defendant?

3    A    Yes.

4    Q    Have you ever stolen anything from the defendant?

5    A    Yes.

6    Q    What did you steal?

7    A    Cash.

8    Q    Approximately how much money did you steal from the

9    defendant?

10   A    Around 8,000.

11   Q    And do you recall around when that happened?

12   A    2013.

13   Q    And where did you steal that money from?

14   A    Out of his backpack.

15   Q    And how did that come about, why were you -- why were you

16   at his backpack?

17   A    I think I was in his backpack to retrieve a iPad or

18   something.

19   Q    And what did you -- what, if anything -- well, is that

20   where you noticed cash inside of the backpack?

21   A    Yes.

22   Q    And do you recall anything about what the backpack looked

23   like?

24   A    It was a designer backpack, could have been a Gucci

25   backpack.

Alex - direct - Shihata                    3365

1   Q    After you met, going back to when you met the defendant

2   back in high school, did the defendant ever tell you he would

3   look out for you?

4   A    All the time.

5   Q    And what did he say to you?

6   A    How he got me and how he will give me a job, you know, or

7   make me his height man.  Just things like that.

8   Q    And when the defendant began telling you this, was that

9   before or after your first sexual encounter with him?

10  A    Both.

11  Q    And did that ever happen?

12  A    No.

13  Q    I'd like to direct your attention to the year 2011.

14       Were you arrested that year?

15  A    Yes.

16  Q    And what were you arrested for?

17  A    At the time it was robbery, but it was theft.

18  Q    Did you end up pleading guilty to theft?

19  A    Yeah.

20  Q    And following your arrest, were you immediately released

21  on bond or did you spend some time in jail?

22  A    No, I spent some time in jail.

23  Q    And were you eventually released on bond?

24  A    Yes.

25  Q    After about how long?

1  A    About four months.

2  Q    And who, if anyone, posted your bond to get you released?

3  A    My mom.

4  Q    What, if anything, did you learn about the defendant

5  providing money for your bond?

6  A    I learned that he gave my best friend at the time money

7  towards my bond that my mom had never -- my mom never

8  received.

9  Q    And when you say your best friend, are you referring to

10 Louis?

11 A    Yes.

12 Q    And who did you learn that from?

13 A    From the defendant and from Mr. -- Louis.

14 Q    After that, what, if anything, happened regarding your

15 friendship with Louis?

16 A    Soured.

17 Q    Did you stop speaking to Louis for a period of time?

18 A    Correct.

19 Q    And did you eventually start speaking with Louis again?

20 A    Correct.

21 Q    Are you familiar with the docuseries "Surviving

22 R. Kelly"?

23 A    Yes, I am.

24 Q    Did you see the defendant after "Surviving R. Kelly"

25 aired on television?

Alex - direct - Shihata                     3367

1    A    Yes.

2    Q    And where did you see him?

3    A    Where did I see him?  I seen him several occasions.

4    Q    Okay.  Did there come a point where you saw the defendant

5    at his residence in Trump Tower?

6    A    Yes.

7    Q    In 2019?

8    A    Yes.

9    Q    And how did it come about that you were at the

10   defendant's apartment in Trump Tower on that occasion?

11   A    He said he needed me to do something for him, and stop on

12   by.

13   Q    When you say "he," are you referring to the defendant?

14   A    To the defendant, yes.

15   Q    And after you arrived at the defendant's apartment at

16   Trump Tower, what happened?

17   A    I gets there and he say he need me to write something for

18   him.

19   Q    And what did the defendant tell you he needed you to

20   write for him?

21   A    Pretty much just saying we had no sexual relationship

22   with each other.

23   Q    Did you write the letter the defendant asked you to

24   write?

25   A    Yes.

Alex - direct - Shihata                3368

1   Q    And did the defendant ask you to sign the letter?

2   A    Correct.

3   Q    Who decided, who, if anyone, decided what would be

4   written in that letter?

5   A    He told me word for word.

6   Q    When you say --

7   A    Word for word, the defendant.

8   Q    The defendant.

9        And after you wrote and signed the letter, who, if

10  anyone, did you give it to?

11  A    The defendant.

12  Q    Was what you wrote in the letter false?

13  A    Correct.

14  Q    Why did you write the letter?

15  A    Just for him.

16  Q    Did you receive a subpoena to be here today?

17  A    Correct.

18  Q    Do you want to be here today testifying about these

19  matters?

20  A    No.

21  Q    Have you ever spoken publicly about these matters before

22  today?

23  A    No.

24            MS. SHIHATA:  No further questions.

25            THE COURT:  Cross-examination?

SAM     OCR     RMR     CRR     RPR

Alex - cross - Cannick                3369

1           MR. CANNICK:  Yes, ma'am.

2    CROSS-EXAMINATION

3    BY MR. CANNICK:

4    Q    You testified and told us about being arrested for

5    robbery?

6    A    Yes.

7    Q    And when was that?

8    A    Around 2012.

9    Q    That was 2012.

10          You were arrested along with Louis for that robbery,

11    am I correct?

12    A    Correct.

13    Q    Yes.  You and Louis robbed somebody, am I correct?

14    A    Not somebody, but a business, yes.

15    Q    A business?

16    A    Yes.

17    Q    Okay.  What did you take from the business?

18    A    Cash.

19    Q    Cash?

20    A    Yes.

21    Q    How much cash?

22    A    I don't know.

23    Q    How old were you?

24    A    I was twenty -- probably 22.

25    Q    Okay.  Rob didn't direct you to do that, am I correct?

```
                     Alex - cross - Cannick              3370

 1    A     No.

 2    Q     Rob didn't instruct you to do that, am I correct?

 3    A     Not at all.

 4    Q     In fact, you and Louis did that on your own, am I

 5    correct?

 6    A     Yeah, I did it as a favor for Louis, yes.

 7    Q     You did it as a favor?

 8    A     Yes.

 9    Q     So, Louis asked you for a favor and you did it?

10    A     Took some real pulling, but yes.

11    Q     Took some real pulling.

12          But he pulled you -- it took some pulling, but you

13    did it.

14          How did you get in the place?

15    A     A key.

16    Q     A key.  How did you get the key?

17    A     From Louis.

18    Q     Louis.  How did Louis get the key?

19    A     He worked there.

20    Q     How was you caught?  How were you caught?

21    A     Louis came back for his last check.

22    Q     So, Louis set up the place that he worked for?

23    A     Yeah.

24    Q     And you -- after that you stole, at some point you stole

25    from Mr. Kelly?
```

Alex - cross - Cannick                    3371

1   A    Yeah, correct.

2   Q    And Louis stole from Mr. Kelly as well, am I correct?

3             MS. SHIHATA:  Objection.

4             THE COURT:  Did you see anything like that?

5             THE WITNESS:  So, I'll say yes.

6   BY MR. CANNICK:

7   Q    Well, yes, you'll say yes because he stole from him, am I

8   correct?

9   A    Yeah, yeah, he stole a camera before I left, that's how I

10  know that.

11  Q    And according to you, he also stole the bail money that

12  Mr. Kelly put up?

13  A    Yes, correct.

14  Q    Would you call him a thief?

15            MS. SHIHATA:  Objection.

16            THE COURT:  Sustained.

17  BY MR. CANNICK:

18  Q    Would you call yourself a thief?

19            MS. SHIHATA:  Objection.

20            THE COURT:  Sustained.

21  Q    Now, you testified and told us that you got Mr. Kelly's

22  number when you were in your junior high school year?

23            MS. SHIHATA:  Objection.  Junior high school or

24  junior in high school?

25  BY MR. CANNICK:

Alex - cross - Cannick                    3372

1    Q    Junior year in high school?

2    A    Okay.

3    Q    Okay what?

4    A    Correct.

5    Q    Well, how old were you in your junior year in high

6    school?

7    A    When I met Mr. Kelly, I was 16.

8    Q    No, I'm not asking you when you met Mr. Kelly, I'm asking

9    you how old were you when you were in your junior year in high

10   school?

11   A    I was 16 going on 17.

12   Q    And how old were you when you got Mr. Kelly's number?

13   A    Seventeen.

14   Q    Okay.  Are you sure about that?

15   A    Yeah, I'm pretty positive.

16   Q    You're pretty positive?

17   A    Yeah.

18   Q    Would it surprise you that you told the Government that

19   you met -- when you got his number -- that you didn't get his

20   number until around 2009?

21   A    No, false.

22   Q    What?

23   A    False.

24   Q    That's false, right?

25   A    Yes.

SAM      OCR      RMR      CRR      RPR

Alex - cross - Cannick                    3373

1    Q    Didn't happen, right?

2    A    What you mean?

3    Q    That if it's in here and the Government wrote down that

4    you told them that you got Mr. Kelly's number around 2009,

5    that would be false, am I correct?

6    A    No, I didn't get his number around 2009.

7    Q    Right, because you would have been 19 at that time, am I

8    correct?

9    A    Yes, correct.

10   Q    I want you to look at this document and see if it

11   refreshes your recollection that you told the Government that

12   this was around 2009?

13           PROSPECTIVE JUROR:  It's not gonna reflect [sic].  I

14   don't remember it saying 2009.

15   Q    Without even looking at it --

16           THE COURT:  Just take a look at it and see if it

17   refreshes your recollection.

18           And just questions, Mr. Cannick, not statements.

19           MR. CANNICK:  Right.

20           (Pause.)

21   BY MR. CANNICK:

22   Q    Down to the bottom in the highlighted yellow portion.

23   You read it?

24   A    (No response.)

25   Q    Did you read it?

Alex - cross - Cannick                3374

1   A    Correct.

2   Q    Does it refresh your recollection that you told the

3   Government it was in 2009 that you got Mr. Kelly's number?

4          THE COURT:  Do you understand the question?

5          THE WITNESS:  Yeah, I understand the question.

6          THE COURT:  Okay.  So, he wants to know if it

7   refreshes your recollection?

8          THE WITNESS:  No, but I didn't get his number in

9   2009.  So, I don't know what happened with that statement.

10  BY MR. CANNICK:

11  Q    But you read it in that document, am I correct?

12  A    Correct.

13  Q    The document said you told them that you got it -- got

14  Mr. Kelly's number in 2009, am I correct?

15         MS. SHIHATA:  Objection.

16         THE COURT:  Sustained as to form.  It doesn't

17  refresh his recollection.

18  BY MR. CANNICK:

19  Q    It's written in the document that you got Mr. Kelly's

20  number --

21         MS. SHIHATA:  Objection.

22         THE COURT:  Sustained.

23  BY MR. CANNICK:

24  Q    You interviewed with the Government, am I correct?

25  A    Correct.

SAM     OCR     RMR     CRR     RPR

Alex - cross - Cannick                    3375

1   Q    And you were the one who gave the information about when

2   it was that you supposedly got Mr. Kelly's number, am I

3   correct?

4   A    Correct.

5   Q    Now, these things that you said that happened between you

6   and Mr. Kelly sexually, how old were you?

7   A    I was around twenty.

8   Q    You were twenty years old or older?

9   A    Hum?

10  Q    Is that a yes or a no, sir?

11  A    I said I was twenty years old.

12  Q    You were at least twenty years old?

13  A    Yeah, I was at least twenty years old; yes.

14  Q    And then you testified and told us about Mr. Kelly,

15  according to you, directed you to be involved in a sexual

16  encounter with a female?

17  A    Correct.

18  Q    And how old were you the first time that happened?

19  A    Twenty.

20  Q    Twenty as well?

21  A    Yes.

22  Q    Now, and you testified and told us that there came a

23  point in time that you had a sexual encounter, according to

24  you, at Mr. Kelly's direction with --

25          MR. CANNICK:  May I see the photograph 75?

Alex - cross - Cannick                    3376

1   BY MR. CANNICK:

2   Q     Is it on your monitor?

3   A     Yes.

4   Q     You testified and told us that Mr. Kelly directed you,

5   according to you, to have sex with this person?

6              (Exhibit published.)

7   A     Correct.

8   Q     When you had sex with this person, did you -- did you use

9   a condom?

10  A     Sometimes, sometimes not, no.

11  Q     But sometimes you didn't, am I correct?

12  A     Yes.

13  Q     And you testified that Mr. Kelly also asked you or

14  instructed you, according to you, to have sex with a number of

15  females?

16  A     Correct.

17  Q     And do you recall having sex with these females with a

18  condom?

19  A     Sometimes there wasn't a condom.

20  Q     But most of the times it was no condom according to you?

21  A     Yeah -- I mean not most of the time.  Most of the time it

22  probably was with a condom.

23  Q     Oh, most of the time it was with a condom?

24  A     It was probably less time without a condom.

25  Q     Oh, okay.

Alex - cross - Cannick                    3377

1          MR. CANNICK:  Your Honor, if the Court would just

2    bear with me for a few minutes.

3          THE COURT:  Sure.

4          (Pause.)

5    BY MR. CANNICK:

6    Q    Did you ever work for Mr. Kelly?

7    A    No.

8    Q    Never ironed his clothes or anything like that?

9    A    No.

10   Q    And you testified that there were times that you tried --

11   that you distanced yourself from Mr. Kelly?

12   A    Correct.

13   Q    And then you then went back because of a phone call or

14   something like that?

15   A    Yes.

16   Q    Okay.  And you did that of your own choosing, am I

17   correct?

18   A    Correct.

19         MR. CANNICK:  Your Honor, I am trying to find a

20   document.

21         THE COURT:  That's all right.

22         (Pause.)

23   Q    And you weren't paid to be his personal shopper?

24   A    No, one time I shopped for him from his request.

25   Q    Okay.  Now, during your interview with the Government,

Alex - cross - Cannick                    3378

1  didn't you tell the Government that Kelly hired you to pick

2  out his clothes day-to-day and assist in his wardrobe for his

3  concert, didn't you tell that to the Government?

4  A    Those are the things he wanted me to --

5  Q    Beg your pardon?

6  A    Those are the things he wanted me to say that I did.

7  Q    But that's what you told the Government, am I correct?

8  A    Yeah, I told --

9  Q    Mr. Kelly wasn't there with you at the Government's

10 office?

11           THE COURT:  You have to let him finish answering --

12           MR. CANNICK:  Okay.

13           THE COURT:  -- and then you can --

14 BY MR. CANNICK:

15 Q    Mr. Kelly wasn't with you at the Government's office when

16 you were giving this interview, am I correct?

17 A    Correct.

18 Q    You were there alone with U.S. Marshals, am I correct?

19           MS. SHIHATA:  Objection.

20 A    No.

21           THE COURT:  Overruled.

22           Do you know who was there?

23           THE WITNESS:  Yes.  Some agents, but not marshals.

24 I don't think they marshals.

25 BY MR. CANNICK:

SAM      OCR      RMR      CRR      RPR

Alex - cross - Cannick                    3379

1  Q    Okay, so you were there with some federal agents?

2  A    Yes.

3  Q    You were there with some federal lawyers?

4  A    Okay.

5  Q    Okay what?

6  A    Yes, true.

7  Q    But you weren't there with Mr. Kelly?

8  A    Correct.

9  Q    You were giving them information?

10 A    Yes.

11 Q    "Them" being these government officials that you just

12 spoke of?

13 A    Correct.

14 Q    And when you gave them this information, isn't it a fact

15 that you told them that during 2012 to 2004 [sic] that Kelly

16 paid you to be his personal shopper, Kelly hired you to pick

17 out his clothing for day-to-day wear and wardrobe his concert,

18 didn't you tell them that?

19 A    No, he told me to -- to lie and say I did those things,

20 but I did pick out his clothes once.

21 Q    So, you lied to the federal agent?

22 A    No, those are things he told me that I did.

23 Q    Well, if he told you and it wasn't true, then it's a lie?

24 A    I'm telling them what he told me.

25 Q    No, my question is he wasn't in the room when you were

SAM    OCR    RMR    CRR    RPR

1    telling the federal government this, am I correct?

2    A    No; correct.

3    Q    You were sitting there in front of them, am I correct?

4    A    Correct.

5    Q    You were giving them information, am I correct?

6    A    Correct.

7    Q    Mr. Kelly was no place to be found, am I correct?

8    A    Correct.

9    Q    So, when they asked you about what you were doing for

10   him, you told them that he hired you to be his personal

11   shopper?

12   A    Yeah, when you brainwashed along, yeah.

13   Q    Oh, you were brainwashed now?

14   A    When you brainwashed along, that's how.

15   Q    Okay.  You were brainwashed for how long, sir?

16   A    Objection.

17        THE COURT:  You can't object.  Do you understand the

18   question?

19        THE WITNESS:  No, I don't.  I don't know how -- I

20   don't know what time.

21        MR. CANNICK:  You want an objection, don't you?

22        THE COURT:  Do you want to put another question?

23        MR. CANNICK:  No, Your Honor, I'm done.

24        THE COURT:  I overruled his objection.

25        No more questions?

Alex - redirect - Shihata                    3381

1          MR. CANNICK:  I'm done.

2          THE COURT:  Any redirect?

3          MS. SHIHATA:  Yes.

4          THE COURT:  Okay.

5    REDIRECT EXAMINATION

6    BY MS. SHIHATA:

7    Q    The first time you met with federal agents, they came to

8    your house, correct?

9    A    Correct.

10   Q    And you had no idea how they found you, correct?

11   A    No idea.

12   Q    Were you expecting them --

13   A    No.

14   Q    -- when they came?

15   A    No.

16   Q    And you told them -- I think you testified on

17   cross-examination -- did you tell them that you told them

18   things the defendant had told you to say previously, is that

19   right?

20   A    Correct.

21   Q    That you were his stylist?

22   A    Correct.

23   Q    And previously the defendant had told you to say these

24   things if anybody asked, right?

25   A    Correct.

Alex - recross - Cannick                3382

1          MS. SHIHATA:  Nothing further.

2          THE COURT:  Anything else?

3          MR. CANNICK:  Just one thing.

4          THE COURT:  Only one?

5          MR. CANNICK:  Give me four.

6   RECROSS-EXAMINATION

7   BY MR. CANNICK:

8   Q    When they came, when the agents came to you, they

9   introduced themselves as federal marshals -- federal agents?

10         THE COURT:  As what?

11         MR. CANNICK:  Federal agents.

12  A    No, no, I was at home at the time.

13  Q    No, at some point in time you met them?

14  A    Yeah, yeah.

15  Q    And they introduced themselves to you as federal agents,

16  am I correct?

17  A    Like Homeland Security or something.

18  Q    Yes, Homeland Security?

19  A    Right.

20  Q    You you understood that they were federal agents, am I

21  correct?

22  A    Correct.

23  Q    And they also told you that making a false statement to

24  them was a crime, am I correct?

25  A    Correct -- no.

Alex - recross - Cannick                    3383

1    Q    Oh, they didn't tell you that?

2    A    They didn't tell me nothing like that, no.

3    Q    Oh, okay.

4         MR. CANNICK:  No more questions, Your Honor.

5         THE COURT:  All right, anything else?

6         MS. SHIHATA:  Nothing further.

7         THE COURT:  All right, thank you so much.  You can

8    step down.

9         THE WITNESS:  Thank you.

10        (Witness steps down and exits the courtroom.)

11        THE COURT:  How is everybody doing?  Good?  Do you

12   want a break?

13        All right, so a few people want a break.  We will

14   break for -- you do want to go or you don't?

15        THE JURORS:  Yes.

16        THE COURT:  All right.

17        THE COURTROOM DEPUTY:  All rise.

18        (Jury exits.)

19        THE COURT:  Everybody have a seat.

20        Do you have another witness?

21        MS. GEDDES:  Yes.

22        THE COURT:  And who is the witness?

23        MS. GEDDES:  Alesiette Mayweather.

24        THE COURT:  Oh, could I see the parties at the side

25   for just a second?

Alex - recross - Cannick                    3384

1              (Sidebar held off the record with the Court and

2       counsel only.)

3              THE COURT:  We're in recess.

4              (Recess taken.)

5              (Judge ANN M. DONNELLY exited the courtroom.)

6

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                             3385

1   (continuing.)

2           THE COURT:  Tell me the name of the witness.

3           So, there are some exhibits that this next witness

4   is going to testify about.  They're in the form of text

5   messages that she sent to various people, I guess.

6           MS. GEDDES:  That's correct.  There are text

7   messages that she sent to her sister and a coworker and a

8   friend about her employment with the defendant while she was

9   working for him.

10          THE COURT:  And you have no objection; is that right

11  Mr. Cannick.

12          MR. CANNICK:  None.

13          THE COURT:  What is the number?

14          MS. GEDDES:  They're in the 240 series.

15          THE COURT:  I think we can get the witness and then

16  we can get the jury and we will see how far we get.

17          (Jury enters.)

18          THE COURTROOM DEPUTY:  You may be seated.

19          THE COURT:  Okay, everybody, we are ready to

20  continue.  Do you want to call your next witness?

21          MS. GEDDES:  Yes, the Government calls Alesiette

22  Mayweather.

23          (Witness takes the stand.)

24          THE COURTROOM DEPUTY:  Raise your right hand.

25          (Witness sworn/affirmed.)

Proceedings                                    3386

1          THE COURTROOM DEPUTY:  Have a seat.  Please state

2     your name for the record.

3          THE WITNESS:  Alesiette Mayweather.

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    SN      OCR      RPR

Mayweather - direct - Geddes                              3387

1    **ALESIETTE MAYWEATHER,**

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5    DIRECT EXAMINATION

6    BY MS. GEDDES:

7              THE COURT:  Just a couple of things before you

8    start, the microphone is on, isn't it?  The key thing is want

9    to be sure that everybody can hear you.  Make sure you use the

10   microphone.  Don't speak too quickly.  I want to be sure that

11   the Court reporter can get down everything you say.  If

12   there's a question that isn't clear or you want it repeated,

13   tell me and I will direct the lawyers to rephrase it.  And do

14   your best to just answer the question that you are being asked

15   Q    Did you receive a subpoena to testify here today?

16   A    I did.

17   Q    Do you want to be here today?

18   A    Absolutely not.

19   Q    I am showing you what's in evidence as Government Exhibit

20   1.  Do you recognize the individual shown in Government

21   Exhibit 1?

22   A    I do.

23   Q    Who is that?

24   A    It's Robert.

25   Q    Do you know him personally?

Mayweather - direct - Geddes                3388

1    A    I do.

2    Q    Do you see him in the courtroom today?

3    A    I do.

4    Q    Can you point to him and describe and article of his

5    clothing?

6    A    He has on a gray suit.

7              THE COURT:  Indicating the defendant.

8    Q    I want to direct your attention to 2015.  What was your

9    relationship to the defendant at that time?

10   A    I was a friend.

11   Q    Did you start -- go ahead.

12   A    And then I later became an employee.

13   Q    And what type of employee were you with the defendant?

14   A    A personal assistant.

15   Q    For how long were you a personal assistant for the

16   defendant?

17   A    Formally about eight months.

18   Q    And do you recall when you formally became his personal

19   assistant?

20   A    Around December of that year.

21   Q    Of 2015?

22   A    Of 2015.

23   Q    And do you recall when you stopped working as his

24   personal assistant?

25   A    Somewhere in June of 2016.

1    Q    And prior to formally starting to work for the defendant,

2    did you accompany him on some bus trips while he was on tour?

3    A    I did.

4    Q    Do you have any siblings?

5    A    I do.

6    Q    How many?

7    A    One.

8    Q    How old is she compared to you?

9    A    We're twins.

10   Q    And do you have a nickname?

11   A    Yes.

12   Q    What is that?

13   A    Twin.

14   Q    Now you testified that you formally started working for

15   the defendant at the end of 2015.  When did you meet him,

16   approximately?

17   A    Sometime in the late '90s.

18   Q    And how did you meet him?

19   A    Through mutual friends.

20   Q    Prior to being introduced to him through mutual friends,

21   had you attended any R. Kelly concerts?

22   A    I had, yes.

23   Q    And would you consider yourself a fan?

24   A    Yes.

25   Q    Before you started to work for the defendant either on an

1   informal or a formal basis, where did you see the defendant?

2   A    Where did I see him?

3   Q    Yes, just generally speaking where would you see the

4   defendant?

5   A    At shows, at parties.

6   Q    And where did you attend parties?

7   A    At his house or at the studio.

8   Q    Where was he -- what house did you attend parties at?

9   A    Olympia Fields.

10  Q    Is that a suburb of Chicago?

11  A    Yes.

12  Q    And you testified that you also went to some parties at

13  his studios; is that correct?

14  A    Yeah, I did.

15  Q    Or that you saw him at his studio?

16  A    I saw him at his studio, yes.

17  Q    Which studios do you recall seeing the defendant at?

18  A    His studio in downtown Chicago and then of course the

19  Justine studio.

20  Q    And the second studio that you mentioned, was that a

21  studio on Justine Street?

22  A    Yes.

23  Q    Also in Chicago?

24  A    Yes.

25  Q    Now, when you started to work for the defendant, what was

1    your schedule?

2    A    Two weeks on, two weeks off.

3    Q    And when you were not -- when you were on a two-week

4    break or you were on a two-week break not working, who was

5    working and performing your job?

6    A    My sister.

7    Q    Your twin sister?

8    A    My twin sister.

9    Q    What were your responsibilities as a personal assistant

10   for the defendant?

11   A    Just basically taking care of his daily needs whether it

12   was running errands or making sure he was awake for meetings

13   when someone would come to the studio.

14   Q    While you were working for the defendant did you

15   accompany him on any tours?

16   A    I did.

17   Q    Which tour or tours did you go on?

18   A    One was the Buffet tour and I think some other dates were

19   just dates.  I'm not sure if it was an actual tour.

20   Q    So, in addition to accompanying the defendant on the

21   Buffet tour did you also go to other cities where he was

22   playing at these one-off concerts?

23   A    I did, yes.

24   Q    And when you were on tour with the defendant or going to

25   other cities where he was performing, while you were working

Mayweather - direct - Geddes                    3392

1   for minimum would you attend the concerts?

2   A    Yes.

3   Q    And what if any responsibilities did you have during

4   those concerts?

5   A    Just making sure his guests were seated where they needed

6   to be seated or making sure he needed what he needed.

7   Q    And what you're referring to -- in your last answer when

8   you refer to guests, what type of guests are you referring to?

9   A    Any guests that were invited to the show or his

10  girlfriends.

11  Q    I'm showing you what's in evidence as Government Exhibit

12  75.

13           (Exhibit published.)

14  BY MS. GEDDES:

15  Q    Without saying this individual's name, do you recognize

16  her?

17  A    Yes.

18  Q    And do you know her first and last name?

19  A    Yes.

20  Q    And I am showing the jury only what's in evidence as 75A.

21           (Published to jury only.)

22  Q    Is that -- is that that same photograph shown in

23  Government Exhibit 75 with the true first and last name of

24  that individual?

25  A    Yes.

SN        OCR        RPR

1    Q    For today we're going to call her Jane, okay?

2    A    Okay.

3    Q    Where did you first meet Jane?

4    A    In New York.

5    Q    And through whom did you meet Jane?

6    A    Through Rob.

7    Q    And what happened, where did you meet her?

8    A    At would have been of his shows at the Barclay, but

9    initially it was he and my sister were on a FaceTime call.

10   Q    And were you with your sister when she was on a face time

11   call with the defendant?

12   A    I was, yes.

13   Q    And during that call, did you see Jane on the other end

14   of the FaceTime call?

15   A    Yes.

16   Q    And then subsequently you saw her when you were in New

17   York for the concert at the Barclays; is that correct?

18   A    Yes.

19   Q    What if any nicknames did you and your sister use for

20   Jane?

21   A    We called her Niece.

22   Q    And do you recall how the defendant introduced you or --

23   you and your sister to Jane?

24   A    I don't know how he introduced me but he introduced my

25   sister.

1   Q    Were you present for that conversation?

2           MR. CANNICK:  Objection.

3           THE COURT:  Overruled.

4   BY MS. GEDDES:

5   Q    I want to direct your attention tension to September 25

6   of 2018.  Do you recall where you were that day?

7   A    No.

8   Q    I'm showing the defendant what's been marked for

9   identification as 540K and I'm going to direct your attention

10  to where my pen is pointed.  Can you read that?

11  A    It says, Okay --

12  Q    Does it refresh your recollection as to where you were?

13  A    Yes, yes.

14  Q    Where were you?

15  A    In New York.

16          THE COURT:  Are these in evidence?

17          MS. GEDDES:  This is not.  This was just to refresh

18  her recollection.

19  BY MS. GEDDES:

20  Q    And why were you in New York?

21  A    For Rob's concert.

22  Q    And was that the concert at the Barclays?

23  A    Yes.

24  Q    Where did you go after the concert -- do you know where

25  the Barclays is?

Mayweather - direct - Geddes                    3395

1    A    Yes.

2    Q    Where is it?

3    A    In Brooklyn.

4    Q    Here in Brooklyn, New York?

5    A    Yes.

6    Q    And did you -- where did you go after Brooklyn?  Did you

7    continue to travel -- did you go somewhere else with the

8    defendant?

9    A    Yes.

10   Q    Where did you go?

11   A    From New York to D.C.

12   Q    And how did you travel between New York and D.C.?

13   A    On the Sprinter.

14   Q    And how about your sister?  I -- you testified earlier

15   that you -- was your sister in Brooklyn with you?

16   A    Yes.

17   Q    And did she travel to D.C. with you?

18   A    No.

19   Q    What did she do?

20   A    She went back to the airport.

21   Q    And did you then meet her in D.C.?

22   A    Yes.

23   Q    Or did she return to D.C..

24        How did you get from New York to D.C.?

25   A    On a Sprinter.

1  Q    Whose Sprinter?

2  A    Rob's Sprinter.

3  Q    Who if anyone else was on the Sprinter with you from that

4  trip between New York and D.C.?

5  A    Jane, and Rob was on and off.

6  Q    The defendant was on and off during the trip between New

7  York and D.C.; is that correct?

8  A    Correct.

9  Q    What, if anything, did you observe about Jane during that

10  trip?

11  A    She slept most of the trip.

12  Q    Did she get off the Sprinter van?  Did you answer or are

13  you thinking?

14  A    I'm thinking.  Only when we made one particular stop that

15  I recall.

16  Q    And which stop are you recalling, where did you stop?

17  A    I think it was a Best Buy.

18  Q    And did do you recall why you were at the Best Buy?

19  A    To purchase a computer.

20  Q    For whom?

21  A    For Jane.

22  Q    And who purchased the computer for Jane?  Who paid for

23  that?

24  A    I believe Robert did.

25  Q    And by the way when you said that the defendant was on

Mayweather - direct - Geddes                    3397

1   and off the Sprinter van, what do you mean by that?

2   A    He, well part of the way on the Sprinter and then he

3   would get on the tour bus.  He got on the tour bus at some

4   point.

5   Q    What, if anything, did you hear Jane call the defendant

6   during that trip?

7   A    Daddy.

8   Q    Once you arrived in D.C., what did you do?

9   A    Checked into a hotel and then I flew out the next

10  morning.

11  Q    And do you recall why you were in D.C.?

12  A    I believe he had a show.

13  Q    In D.C.?

14  A    Yes.

15  Q    And you then returned to Los Angeles; is that correct?

16  A    Correct.

17  Q    Were you living in Los Angeles at that time?

18  A    Yes.

19  Q    Now, when you started to -- at the time when you traveled

20  with Jane from New York to D.C., were you formally working for

21  the defendant at that time?

22  A    No.

23  Q    But you did later start to formally work for him; is that

24  correct?

25  A    Correct.

Mayweather - direct - Geddes                    3398

1   Q    When you did start to formally work for him, were there

2   females who were effectively living with the defendant?

3   A    Yes.

4   Q    And was Jane one of those females?

5   A    Yes.

6   Q    I'm showing you what's in evidence as Government Exhibit

7   69B?

8             (Exhibit published.)

9   Q    Do you recognize that individual?

10  A    Yes.

11  Q    What is her first name only?

12  A    Dominique.

13  Q    And do you know her true first and last name without

14  saying it?

15  A    Yes.

16  Q    Was Dominique one of the females effectively living with

17  the defendant when you started to formally work for him?

18  A    Yes.

19  Q    I'm showing you what's in evidence as Government Exhibit

20  52B?

21            (Exhibit published.)

22  Q    Do you recognize that individual?

23  A    Yes.

24  Q    Without saying it do you know her true first and last

25  name?

Mayweather - direct - Geddes                    3399

1    A    Yes.

2    Q    Do you also know a nickname for her?

3    A    Yes.

4    Q    What is her nickname?

5    A    Juice.

6    Q    And when you started to formally work for the defendant,

7    was Juice one of the females who were effectively living with

8    him?

9    A    Yes.

10            MS. GEDDES:  I'm showing the witness what's in

11   evidence as Government Exhibit 72.

12            (Exhibit published.)

13   Q    Do you recognize the individual shown in Government

14   Exhibit 72?

15   A    Yes.

16   Q    And do you know her true first and last name?

17   A    Yes.

18   Q    And do you also know a nickname for her?

19   A    Yes.

20   Q    What is her nickname?

21   A    Vee.

22   Q    And was Vee one of the females who was effectively living

23   with the defendant when you started to work for him formally?

24   A    Yes.

25   Q    And I'm showing you what's in evidence as Government

1   Exhibit 78?

2            (Exhibit published.)

3   Q     Do you recognize that individual?

4   A     Yes.

5   Q     And without saying it, do you know her first and last

6   name?

7   A     Yes.

8   Q     What is her first name?

9   A     Jocelyn.

10  Q     During the period that you were working for the

11  defendant, what was her relationship with the defendant?

12  A     A girlfriend.

13  Q     Was she living with him at the time that you worked for

14  the defendant?

15  A     Not immediately, no.

16  Q     And during any point during the eight-month period that

17  you were formally working for the defendant, was she

18  effectively living with the defendant?

19  A     She was transitioning in at the end when I was leaving,

20  right before I left.

21  Q     And when you say transitioning, what do you mean?

22  A     She was moving in, I guess, I would say.

23  Q     And prior to that time, what was her relationship with

24  the defendant?

25  A     She was the girlfriend who would fly in and out to visit.

Mayweather - direct - Geddes                 3401

1   Q     And did you sometimes arrange her travel to see the

2   defendant?

3   A     Yes.

4   Q     Now, what if any rules did the defendant tell you about

5   during your employment with him?

6   A     Just one was to knock before entering rooms and then not

7   to talk to any guys around his girlfriends.

8   Q     Now, from the time that you first met the defendant in,

9   did you say, the late '90s?

10  A     Yes.

11  Q     Until you started to formally work for him, had you met

12  some of the men who worked for an associated with the

13  defendant?

14  A     Yes.

15  Q     And had you become friendly with them?

16  A     Yes.

17  Q     And when the defendant told you that he didn't want you

18  to interact with those individuals, what did you understand

19  him to mean?

20  A     Only not to interact with them around his girlfriends.

21  Q     So it's fair to say that you were free under the

22  defendant's rule to interact with them as long as the

23  defendant's girlfriends were not present?

24  A     Yes.

25  Q     Did you interact with any of the defendants girlfriends

1   by telephone?

2   A     Yes.

3   Q     Who did you interact with?

4   A     Juice.

5   Q     Did you have an opportunity other than Jane to hear how

6   the defendant's girlfriends referred to the defendant in his

7   presence?

8   A     Yes.

9   Q     What did they call him?

10  A     Daddy.

11  Q     All of them?

12  A     Yes.

13  Q     How did the defendant's female guests and live-in

14  girlfriends refer to the defendant when they were talking

15  about him to you?

16  A     Mr. Kelly.

17  Q     And would all of them do that?

18  A     Yes.

19  Q     I'm showing you what is --

20              MS. GEDDES:  Well, the Government offers 240U.  I

21  think this is one that there is no objection to.

22              THE COURT:  All right.

23              No objection; right, Counsel?

24              MR. CANNICK:  No.

25              THE COURT:  That is in evidence.

Mayweather - direct - Geddes                    3403

1              (Government Exhibit 240U received in evidence.)

2    BY MS. GEDDES:

3    Q    Now, are these text messages that you sent on September

4    27 of 2015?

5    A    Yes.

6    Q    Are these messages that you exchanged with your twin

7    sister?

8    A    Yes.

9    Q    And in the column marked Name, does that indicate your

10   twin sister and her telephone number?

11   A    Yes.

12   Q    And we're going to cover up her telephone number so it

13   can be published to the jury or to the public.

14              (Exhibit published.)

15   Q    In the first text where it says:  She says yes, sir, no,

16   sir to him.  He makes them respect him.  Do you recall who you

17   were referring to, the "she"?

18   A    Jane.

19   Q    And who was the "he" in that sentence?

20   A    Rob.

21   Q    And then continuing on you say:  And Daddy.  So I figured

22   that's why he told her we are her aunties because we are his

23   sisters.  Who is the "her" in that sentence?

24   A    Jane.

25   Q    And the "his"?

1    A       Rob.

2              THE COURT:  Is this a good time to break?  I think

3    I've got us right to 6 o'clock.

4              MS. GEDDES:  Sure.

5              THE COURT:  So the witness can step out.  We will

6    see you tomorrow.

7              (Witness steps down.)

8              THE COURT:  Ladies and gentlemen we are going to

9    break for tonight.  I will see you tomorrow morning, same

10   time.  Don't talk about the case in any way, shape or form.

11   Don't look anything up about the case, don't listen to any

12   reports about it or read anything about it or anything like

13   that.  Do have a good night.  I will see you tomorrow morning.

14   Thank you so much.

15             THE COURTROOM DEPUTY:  All rise.

16             (Jury exits.)

17             THE COURT:  Everybody can have a seat.

18             Is there anything that we have to do before we break

19   for the day?

20             MR. CANNICK:  Nothing from us, Your Honor.

21             THE COURT:  Okay.

22             MS. GEDDES:  Can we just address one issue at

23   sidebar?

24             THE COURT:  The reporter isn't needed for this?

25             MS. GEDDES:  No, Your Honor.  It's just for

1    scheduling purposes.

2            THE COURT:  Okay.  Thank you.

3

4

5        (Matter adjourned until September 14, 2021 at 9:30 a.m.)

6

7                        - ooOoo -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3406

<u>**I N D E X**</u>

<u>**WITNESS**</u>                                                    <u>**PAGE**</u>


DIANA COPELAND, Continued


     DIRECT EXAMINATION BY MS. GEDDES          3187

     CROSS-EXAMINATION BY MR. CANNICK          3202

     CROSS-EXAMINATION (CONTINUED)             3215

     REDIRECT EXAMINATION BY MS. GEDDES         3248

     RECROSS EXAMINATION BY MR. CANNICK        3258


ANGELA

     DIRECT EXAMINATION BY MS. SHIHATA         3270

     CROSS-EXAMINATION BY MR. CANNICK          3310

     REDIRECT EXAMINATION BY MS. SHIHATA       3315

ALEX

     DIRECT EXAMINATION BY BY MS. SHIHATA      3323

     CROSS-EXAMINATION BY MR. CANNICK          3369

     REDIRECT EXAMINATION BY MS. SHIHATA       3381

     RECROSS-EXAMINATION BY MR. CANNICK        3382

**ALESIETTE MAYWEATHER**

     DIRECT EXAMINATION BY MS. GEDDES          3387

3407

1                              <u>E X H I B I T S</u>

2

3        Government Exhibit 301                    3196

4

5        Government Exhibit 3500-DC2-8            3199

6

7        Government Exhibit 970                    3202

8

9        Government's Exhibit 82                   3271

10

11       Government's Exhibit 82(a)               3271

12

13       Government's Exhibit 82(b)               3272

14

15       Government's Exhibit 92                   3280

16

17       Government Exhibit 964                    3294

18

19       Government's Exhibit 68A                  3324

20

21       Government's Exhibit 68B                  3324

22

23       Government's Exhibit 969                  3335

24

25       Government Exhibit 240U                   3403