3408

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,     :    19-CR-286(AMD)
4
          Plaintiff,          :
5                                  United States Courthouse
      -against-               :    Brooklyn, New York
6
ROBERT SYLVESTER KELLY,       :
7                                  September 14, 2021
          Defendant.          :    9:30 a.m.
8
     - - - - - - - - - - - - - X
9

10                    TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE ANN M. DONNELLY
11         UNITED STATES DISTRICT JUDGE, and a jury.

12
APPEARANCES:
13

14  For the Government:        JACQUELYN M. KASULIS, ESQ
                               Acting United States Attorney
15                             BY: ELIZABETH GEDDES, ESQ.
                                   NADIA SHIHATA, ESQ.
16                                 MARIA E. CRUZ MELENDEZ, ESQ.
                               Assistant United States Attorneys
17                             271 Cadman Plaza East
                               Brooklyn, New York
18

19  For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                               NICOLE BLANK BECKER, ESQ.
20                             THOMAS FARINELLA, ESQ.
                               CALVIN HAROLD SCHOLAR, ESQ.
21

22  Court Reporter:    SOPHIE NOLAN
                       225 Cadman Plaza East/Brooklyn, NY 11201
23                     NolanEDNY@aol.com
    *Proceedings recorded by mechanical stenography, transcript*
24  *produced by Computer-Aided Transcription*

25

                    SN      OCR      RPR

Proceedings                                            3409

 1          (In open court; outside the presence of the jury.)

 2          THE COURTROOM DEPUTY:  All rise.

 3          (Defendant present.)

 4          THE COURT:  Good morning, everybody.  I know we are

 5    going to get the witness in a minute.  I am prepared to rule

 6    on the motions in limine.  I am going to adhere to my decision

 7    with respect to the videos.  I know I've received

 8    Mr. Scholar's letter on it.

 9          I think that the evidence is relevant.  The

10    witnesses have testified to the almost constant videotaping of

11    various sexual encounters and this is obviously relevant to

12    the videotapes involving the sexual encounters, they're

13    obviously relevant.  I think some witnesses have been

14    questioned about whether it's Mr. Kelly who is taping them

15    and, in any event, I think they are relevant and I adhere to

16    my decision on those videotapes.

17          With respect to the recordings that the Government

18    represents show that the defendant is verbally abusing and

19    threatening someone, I also am going to adhere to my decision

20    that I made before the trial admitting those recordings.

21    Those recordings are -- they're obviously relevant because

22    they demonstrate the defendant behaving in a way that

23    witnesses have described throughout the trial, that he

24    demanded that they adhere to certain rules and that he

25    directed their activities.  The transcript or the evidence

Proceedings                                          3410

1    that the Government has submitted demonstrates precisely that.

2            I would also say that the defense, appropriately so,

3    has challenged witnesses about the extent to which they are --

4    that their actions were controlled.  As recently as yesterday

5    through Ms. Copeland, the defense brought out her opinion that

6    he had never locked anybody in any kind of a room, that he

7    showered people with gifts, never denied anybody food, and

8    that's been a theme of the cross-examination of several of the

9    witnesses.

10           So this testimony that the Government proffers or

11   the evidence that the Government proffers is absolutely

12   relevant to that question.  I am admitting that and you have

13   an exception to that ruling.

14           MR. CANNICK:  An exception to both the Court's

15   rulings, Your Honor?

16           THE COURT:  Yes.

17           MR. CANNICK:  Thank you.

18           THE COURT:  Is there anything else before we get the

19   witness?

20           All right.  Let's get the witness and they we will

21   get the jurors.

22           (Pause in proceedings.)

23           THE COURT:  One other thing while we are getting the

24   witness.  I know both sides submitted a request to charge.  We

25   are going through the process of drafting the charge.  I just

Mayweather - direct - Geddes                    3411

1  want people to be aware if there are additional things that

2  you want me to include in the charge, I would like those

3  sooner rather than later.  I know that there were -- they were

4  pretty standard at the beginning but I don't want to be doing

5  this at the last minute so I would like those by the end of

6  the week.

7              MR. CANNICK:  Can I ask for the Court's indulgence

8  for maybe a five-minute recess?  There's some questions that

9  Mr. Kelly has.  I got here late this morning because of the

10 traffic.

11             THE COURT:  You want to do it now?

12             MR. CANNICK:  Yes, please.

13             THE COURT:  Do you want to go in the back?

14             MR. CANNICK:  Yes, please.

15             THE COURT:  That is fine.

16             (Pause in proceedings.)

17             (Witness takes the stand.)

18             (Jury enters.)

19             THE COURTROOM DEPUTY:  You may be seated.

20             THE COURT:  Good morning, everybody.  Sorry for the

21 late start, but the good news is again we are doing some

22 time-saving work.  So we are ready to continue with the direct

23 examination of the witness.

24             THE COURTROOM DEPUTY:  The witness is reminded she

25 is still under oath.

Mayweather - direct - Geddes                          3412

1   **ALESIETTE MAYWEATHER**, having been previously duly

2       sworn/affirmed, testified as follows:

3   DIRECT EXAMINATION

4   BY MS. GEDDES:

5   Q    Good morning.

6   A    Good morning.

7   Q    When we stopped yesterday we were talking about your

8   employment with the defendant when you served as one of his

9   assistants.

10  A    Okay.

11  Q    What, if anything, did you notice about the defendant's

12  female guests or his live-in girlfriends' reaction when the

13  defendant entered a room where they were in?

14  A    They would get up to kiss him.

15  Q    How many of them would do that?

16  A    All of them.

17  Q    Now, when you were working for the defendant, what if any

18  requests did you receive regarding the use of a restroom?

19  A    Just a text message to ask him if they could go.

20  Q    And when you're referring to "they," who are you

21  referring to?

22  A    Whoever needed to go.

23  Q    Referring to the defendant's --

24  A    Girlfriends.

25  Q    -- live-in girlfriends?

Mayweather - direct - Geddes                    3413

1   A    Yes.

2   Q    And what would you do when you would receive those

3   messages?

4   A    I would reach out to him.

5   Q    Did you spend time on the defendant's Sprinter vans?

6   A    I did.

7   Q    And when you were on the Sprinter, what would you do if

8   you were stopped and you needed to use a restroom?

9   A    I would get off the Sprinter and use the restroom.

10             MR. CANNICK:  Can you please repeat --

11             THE COURT:  Just repeat what you said?

12             PROSPECTIVE JUROR:  I would get off the Sprinter to

13   use the restroom.

14   Q    And what, if anything, did you notice about his female

15   girlfriends -- female guests or live-in girlfriends what they

16   would do when they needed do use a restroom on the Sprinter

17   van?

18   A    They would use cups.

19   Q    And were there cups in the Sprinter van available for

20   their use?

21   A    Sometimes, yes.

22   Q    Did you accompany the defendant's female guests or his

23   live-in girlfriends on public outings?

24   A    I did.

25   Q    Where would you accompany them?

Mayweather - direct - Geddes                    3414

1   A     To the mall, to the nail salon, to get massages.

2   Q     And what was your role in going with the defendant's

3   female guests or live-in girlfriends to these locations?

4   A     I didn't have a particular role, but if -- if we went to

5   the mall and there was a male cashier, then I took care of the

6   transaction.

7   Q     And how, if at all, would you keep the defendant apprised

8   of what you were doing when you were with his girlfriends on

9   public outings?

10  A     If I needed to keep him apprised, I would text him.

11         MS. GEDDES:  The Government offers Government

12  Exhibit 240(p).  I believe there is no objection.

13         MR. CANNICK:  I just need to see what it is.

14         MS. GEDDES:  No problem.  The Government offers

15  240(p).

16         MR. CANNICK:  No objection.

17         THE COURT:  All right.  That's in evidence.

18         (Government Exhibit 240(p) received in evidence.)

19         MS. GEDDES:  May I publish?

20         THE COURT:  Yes.

21         (Exhibit published.)

22  BY MS. GEDDES:

23  Q     I'm going to direct your attention to page three of

24  Government Exhibit 240(p) and looking at line 20542 going down

25  to 20575, who are those text messages from?

Mayweather - direct - Geddes                    3415

1   A    They're from me.

2   Q    And who were you sending those messages to?

3   A    To Rob.

4   Q    The defendant?

5   A    Yes.

6   Q    And were those text messages on October 27th of 2015?

7   A    Yes.

8   Q    And I'm going to quickly read them and ask you a

9   question.  20540 says:  We're together.  Then it's:  Going to

10  410 North Wells.  In taxi.  At nail shop.  In taxi headed back

11  to hotel.  She's back in her room.

12       Now, as you sit here today do you know who was the

13  "she" in those particular text messages?

14  A    I don't recall.

15  Q    Even if you don't know who, is it fair to say that that

16  related to one of the defendant's female guests or live-in

17  girlfriends?

18            MR. CANNICK:  Objection.

19            THE COURT:  Overruled.

20            Do you know?

21            THE WITNESS:  Do I know --

22            THE COURT:  Do you know if these referred -- these

23  texts referred to one of the defendant's live-in girlfriends

24  or his female guests?

25            THE WITNESS:  Yes.

Mayweather - direct - Geddes                          3416

BY MS. GEDDES:

Q    I am now directing your attention to page ten of that
same Government exhibit and I will start with the text message
labeled 40867 and go down to 40901.

Again, looking at those text messages, are those
text messages that you sent to the defendant?

A    Yes.

Q    And were those sent on March 27th of 2016?

A    Yes.

Q    While you were working for him?

A    Yes.

Q    The first one reads:  Headed to Water Tower now.  Just
noticed my last text didn't go through.  We just left Old Navy
and now at the Gap on State.  We are headed back.  Taxi is
five minutes away.

What is the Water Tower?

A    It's a mall.

Q    It's a mall?

A    Yes.

Q    Is that in Chicago?

A    Yes.

Q    Now, what if any rules did you learn that the defendant
had with respect to his live-in girlfriends going to the salon
or a salon?

A    The person who provided the services needed to be a

Mayweather - direct - Geddes                    3417

1    female.

2    Q    And how did you learn that?

3    A    I know he mentioned it once.

4    Q    Do you recall what he said to you?

5    A    Well, it was when they were getting massages.  He just

6    wanted the person to be a female when they were getting

7    massages.

8    Q    And to be clear, the "he" in that sentence is the

9    defendant?

10   A    Yes, Rob, yes.

11   Q    And the "they" in that sentence, does that refer to his

12   live-in girlfriends?

13   A    Yes.

14   Q    Have you had an opportunity to ride in an elevator with

15   the defendant's live-in girlfriends?

16   A    Yes.

17   Q    What, if anything, did you see?  What, if anything, did

18   you observe during that?

19   A    If there were males on the elevator, they would face the

20   wall.

21   Q    Such that their back was to the door?

22   A    Yes.

23   Q    Are you familiar with punishment imposed by the

24   defendant?

25   A    Yes.

SN        OCR        RPR

Mayweather - direct - Geddes                    3418

1  Q     What do you know about punishment, generally speaking,

2  imposed by the defendant?

3  A     That maybe being on the tour bus or either in a room,

4  just left in a room.

5  Q     And who are you referring to when --

6  A     The girlfriends.

7  Q     And who was responsible for leaving the girlfriends on a

8  tour bus or in a room?

9  A     The defendant.

10  Q     I want to direct your attention to December 27th of 2015

11  during the time period that you worked for the defendant.  Do

12  you recall where you were that day?

13  A     No.

14         MS. GEDDES:  The Government offers 240(c).

15         MR. CANNICK:  No objection.

16         THE COURT:  That is in evidence.

17         (Government Exhibit 240(c) received in evidence.)

18         (Exhibit published.)

19  BY MS. GEDDES:

20  Q     Please take a look at 240(c) and let me know if that

21  refreshes your recollection as to where you were the day

22  before these text messages were sent.

23  A     Yes.

24  Q     Where were you?

25  A     At the studio.

Mayweather - direct - Geddes                    3419

1    Q    Which studio?

2    A    On Justine.

3    Q    That's in Chicago?

4    A    Yes.

5    Q    Do you know where Jane was that evening of December 27 of

6    2015?

7    A    In a room.

8    Q    Which room?

9    A    A room on the first level of the studio.

10   Q    And where did she stay that evening?

11   A    In the room on the first level of the studio.

12   Q    Approximately what time did she -- was she -- did she

13   start to be in that room?

14   A    According to this exhibit around 8 p.m. the day before.

15   Q    And just to be clear, are these text messages that you

16   sent?

17   A    Yes.

18   Q    And are they text messages that you sent on December 28th

19   of 2015?

20   A    Yes.

21   Q    I'm going to start by reading -- who did you send them

22   to?

23   A    My sister.

24   Q    I'm going to start by reading the first one.  It says:

25   Niece has been confined to the room since around -- around 6

Mayweather - direct - Geddes                         3420

1    p.m. and he has Juice, V and D are upstairs but he's gone

2    home.  And then you received a text question:  6 p.m.

3    yesterday?  And one text later you say:  Yes.  Yesterday after

4    maybe around 8 p.m.

5              Who were you referring to when you said Niece had

6    been confined to her room?

7    A    Jane.

8    Q    And when you referenced he has Juice, V and D upstairs,

9    who is the "he" in that sentence?

10   A    Rob.

11   Q    And are Juice, V and D -- who does D refer to?

12   A    Dominique.

13   Q    And are Juice, V and D some of the defendant's live-in

14   girlfriends that you defendant about yesterday?

15   A    Yes.

16   Q    Now, you sent these text messages at 7:30 p.m. on

17   December 28th of 2015; is that correct?

18   A    Yes.

19   Q    As you sit here today, do you know how long Jane stayed

20   in that room after you sent those text messages?

21   A    No.

22   Q    You can only -- and the reason -- do you recall that

23   particular day?

24   A    I do now, yes.

25   Q    Okay.  But is it fair to say that you recall having now

Mayweather - direct - Geddes                    3421

1   reviewed your text messages from that day?

2   A    Yes.

3   Q    I'm going to direct your attention to Mother's Day

4   weekend of 2016.

5             Do you recall where you were that weekend?

6   A    No.

7             MS. GEDDES:  I'm going to show the witness what's

8   been marked only for identification.  I'm not going to mark

9   this exhibit.  I'm going to show the witness what's been

10  marked for identification Government Exhibit 240(f).

11            (Exhibit published to witness only.)

12  Q    Does that refresh your recollection as to where you were

13  at lease as of May 5th of 2016?

14  A    In Chicago.

15  Q    Working for the defendant?

16  A    Yes.

17            MS. GEDDES:  And I now offer Government Exhibits

18  240(w) and 240(f).

19            THE COURT:  Any objection?

20            MR. CANNICK:  None, but while it's being retrieved

21  can I see the last document that was used to refresh her

22  recollection?

23            MS. GEDDES:  Yes.

24            The Government also offers Government Exhibit 971.

25            MR. CANNICK:  No objection.

Mayweather - direct - Geddes                    3422

1          THE COURT:  Okay.  That's in evidence.

2          (Government Exhibits 240(w), 240(f) and 971 received

3    in evidence.)

4          (Exhibit published.)

5    BY MS. GEDDES:

6    Q    I'm showing what's in evidence as Government Exhibit 971

7    and it's a calendar from May 2016 showing that Mother's Day

8    was on Sunday, May 8th.

9          (Exhibit published.)

10   Q    Now showing you what's in evidence as 240(f)?

11         (Exhibit published.)

12   Q    I'm going to start by showing you line 47816, which is

13   this text message where my pen is pointing.  Is that a text

14   message that you sent to your twin sister on May 10th of 2016?

15   A    Yes.

16   Q    And it says:  IDK.  We're on here now but she's in the

17   back.  No, I stayed with her Sunday night from around 9:30

18   p.m. - 9:30 a.m.  She was in the back and it was peaceful.  I

19   didn't hear her move at all, no restroom or nothing.  I got

20   much-needed sleep.  Then J went to the bus for a few hours.

21   We just left the bus.  She is still there.  Something is

22   strange.

23         And just going back to so that text message that I

24   just read was sent on May 10, 2016 which, looking back on

25   Government Exhibit 971, was a Tuesday; is that correct?

SN       OCR       RPR

Mayweather - direct - Geddes                    3423

1    A    Correct.

2    Q    And in the text message you refer to -- you wrote, you

3    said:  I stayed with her Sunday night.

4             It's fair to say that Sunday was Mother's Day

5    Sunday, May 8, 2016?

6    A    Yes.

7    Q    Now, when you wrote:  I stayed with her Sunday night from

8    around 9:30 p.m. to 9:30 a.m., what were you referring to?

9    A    The tour bus.

10   Q    And where was the tour bus parked?

11   A    Across the Main Street from the Justine studio.

12   Q    In Chicago?

13   A    In Chicago.

14   Q    Is that in downtown Chicago?

15   A    I don't think it's considered downtown.

16   Q    Okay.  Is it in the city of Chicago though?

17   A    It is in the city of Chicago.

18   Q    And when you said, I stayed with her Sunday night, who

19   was the "her" in that sentence?

20   A    Jane.

21   Q    Where did you stay that evening?

22   A    On the tour bus.

23   Q    And where did Jane stay?

24   A    On the tour bus as well.

25   Q    Why did you stay with the tour bus -- why did you stay

SN        OCR        RPR

Mayweather - direct - Geddes                3424

1    with Jane on the tour bus on Sunday evening, May 8th?

2    A    I'm sure I was asked to stay with her.

3              MR. CANNICK:  Objection.

4              THE COURT:  Overruled -- sustained as to form.

5              Do you have a recollection of why you stayed with

6    her?  Was there a hotel available?

7              THE WITNESS:  I don't know.  I don't know about the

8    hotel, but we were just on the bus on the same street as the

9    studio.

10             THE COURT:  You were outside the studio, I see, but

11   you stayed on the bus with Jane?

12             THE WITNESS:  Yes.

13             THE COURT:  Why did you do that?

14             THE WITNESS:  I would have done it because I was

15   asked to do it.

16             THE COURT:  Okay, go ahead.

17   BY MS. GEDDES:

18   Q    By whom?

19   A    Mr. Kelly.

20   Q    And just to be clear, there were rooms in the studio on

21   Justine Street; correct?

22   A    Yes.

23   Q    And you you've already testified earlier about -- I will

24   ask you again.

25             Did Jane stay in the studio sometimes?

Mayweather - direct - Geddes                        3425

1    A    Yes.

2    Q    And was there a particular room within the studio where

3    she often stayed?

4    A    Yes.

5    Q    Fair to say there was room for her in the studio if she

6    had been allowed to stay there?

7    A    Yes.

8    Q    Now I'm going to read line 40872 on that same Exhibit

9    240(f).

10             (Exhibit published.)

11   Q    And this is a text message that you sent on May 10, 2016

12   to your sister; is that correct?

13   A    Yes.

14   Q    And, again, May 10th looking at 971 was a Tuesday?

15   A    Yes.

16   Q    Two days after Mother's Day Sunday?

17   A    Yes.

18   Q    The text reads:  He left a female sitting in the little

19   foyer in the studio and we are gone.  Unless he text and tell

20   her to leave she will be there three hours.  SMDH.  Also, N is

21   still on the bus since Saturday.  He has J and V and Rebecca

22   with him.  We're headed to the gym, rolling.

23             When you wrote, also, N still on the bus since

24   Saturday, who were you referring to when you wrote N?

25   A    Jane.

Mayweather - direct - Geddes                    3426

1   Q    And what was the nickname that you and your sister used
2   for Jane?
3   A    Niece.
4   Q    And when you said N is still on the bus since Saturday,
5   what bus are you referring to?
6   A    The tour bus.
7   Q    The same tour bus where you spent the night on Mother's
8   Day, sun May 8, 2016 with Jane?
9   A    Yes.
10  Q    And when it says, He has J and V and Rebecca with him,
11  who are you referring to when you said "he" in that sentence?
12  A    Bob.
13  Q    The defendant?
14  A    Yes.
15  Q    And when you wrote J, who are you referring to?
16  A    Juice.
17  Q    And V is that the V that you previously testified was one
18  of the defendant's girlfriends?
19  A    Yes.
20  Q    And who are you referring to when you mentioned Rebecca?
21  A    A friend of the defendant.
22  Q    A female friend?
23  A    Yes.
24  Q    Did you ever have any conversations with the defendant
25  about Juice and whether she had ever been on punishment --

Mayweather - direct - Geddes                     3427

1          MR. CANNICK:  Objection.

2          THE COURT:  Overruled.

3   Q    -- with the defendant?  I'm sorry.

4          THE COURT:  Overruled.

5   Q    Did you ever have any conversations with the defendant

6   and Juice about whether she had been on punishment?

7   A    Yes.

8   Q    When did you have the conversation with the defendant;

9   was it during the time you were working for him?

10  A    Yes.

11  Q    What, if anything, did the defendant say to you?

12  A    Well, I asked him about -- I led the conversation.

13  Q    And what did you ask the defendant?

14  A    I asked him something about Juice being on punishment

15  because she didn't travel with us for a couple of days.

16  Q    Because you noticed that she hadn't been traveling for a

17  couple of days; is that correct?

18  A    Yes.

19  Q    And when you say you noticed that she hadn't been

20  traveling, traveling where?  What are you referring to?

21  A    To the outings, to the gym particularly, yeah.

22  Q    To locations in the particular city where you happened to

23  be at that time?

24  A    Yes.

25  Q    How, if at all, did the defendant respond when you asked

Mayweather - direct - Geddes                    3428

1   him that?

2   A    Well, I used the word "punishment" and he just responded

3   back with the same word I used and he said, yeah, Juice gets

4   punished too.

5   Q    I want to direct your attention to Monday, May 16th of

6   2016.  Do you remember where you were that day?

7   A    No.

8              MS. GEDDES:  I'm going to show the witness only

9   Government Exhibit 240T.

10             (Exhibit published to witness only.)

11  Q    I'm going to direct your attention to line 48138.  Does

12  that refresh your recollection as to where you were on May 16,

13  2016?

14  A    Chicago.

15  Q    And when did you arrive in Chicago, approximately?

16  A    The morning of the 16th.

17  Q    And had you -- where had you traveled from?

18  A    From L.A.

19  Q    And did you take a red eye to get to Chicago that

20  morning?

21  A    I did.

22  Q    Where did you go when you arrived?

23  A    To the studio on Justine.

24  Q    Do you remember where you went after you went to the

25  studio?

Mayweather - direct - Geddes                3429

1    A    No.

2              MS. GEDDES:  The Government offers 240(g).

3              THE COURT:  Any objection?

4              MR. CANNICK:  None.

5              THE COURT:  That is in evidence.

6              (Government Exhibit 240(g) received in evidence.)

7              MS. GEDDES:  And the Government also offers 240(x).

8              THE COURT:  Any objection?

9              MR. CANNICK:  Let me see what it is.

10             No objection.

11             THE COURT:  Okay.  That's in evidence.

12             (Government Exhibit 240(x) received in evidence.)

13             (Exhibit published.)

14   BY MS. GEDDES:

15   Q    Is this a text message that you sent on May 16, 2016?

16   A    Yes.

17   Q    And did you send it at 7:33 a.m. in Chicago time?

18   A    Yes.

19   Q    And it says:  Fucking tour bus with N.  I got to the

20   studio about 30 minutes ago so I relieved Diana from the tour

21   bus so she could leave.

22             Who are you referring to when you said N?

23   A    Jane.

24   Q    And is that the shorthand for the nickname Niece that you

25   and your sister used to refer to Jane?

Mayweather - direct - Geddes                3430

1    A    Yes.

2    Q    And when you say I got to the studio about 30 minutes

3    ago, what studio are you referring to?

4    A    On Justine.

5    Q    Then it says:  So I relieved Diana from the tour bus so

6    she could leave.

7            Who is the Diana that you're referring to?

8    A    At that time Diana was the -- was a previous assistant.

9    Q    And what's Diana's last name?

10   A    Copeland.

11   Q    Did you then -- after you went to the studio does this

12   refresh your recollection as to where you went after that?

13   A    To the tour bus.

14   Q    And who was on the tour bus when you arrived?

15   A    Diana and Jane.

16   Q    And did Diana then leave?

17   A    She did.

18   Q    How long did you stay on the tour bus that day?

19   A    Maybe a couple of hours.

20   Q    And did you see Jane again that day?

21   A    I don't recall.

22   Q    I am showing you line -- I'm going back to Government

23   Exhibit 240(g).

24            (Exhibit published.)

25   BY MS. GEDDES:

Mayweather - direct - Geddes                3431

1    Q    I'm going to direct your attention to line 48229 right up
2    here and you received a text that said Mr. Kelly said to come
3    to the bus to pick --
4              THE COURT:  Do you want to take that down, please?
5              MS. GEDDES:  Sorry.  Can I just show the jury only,
6    please?
7              THE COURT:  Yes.
8              MS. GEDDES:  Thank you, Judge.
9              (Exhibit published to jury only.)
10   BY MS. GEDDES:
11   Q    All right.  It says:  Mr. Kelly said to come to the bus
12   to pick, and then it uses the true first name of Jane.  And
13   then it says, Up.  Do you see that?
14   A    Yes.
15   Q    And you responded, Okay; correct?
16   A    Yes.
17   Q    And who did you receive that text message from where it
18   says, Mr. Kelly said to come to the bus?
19   A    Juice.
20   Q    And is the bus referenced here the tour bus?
21   A    Yes.
22   Q    Did you, in fact, then go and pick up Jane from the tour
23   bus as the defendant requested through Juice?
24   A    I did.
25   Q    Do you recall where you brought her?

Mayweather - direct - Geddes                    3432

1    A     To the studio on Justine.

2    Q     How did Jane appear when you picked her up on the bus?

3    A     I don't recall.

4          (Exhibit published.)

5          MS. GEDDES:  This can be displayed to the public and

6    this is page five of Government Exhibit 240(g).

7          (Exhibit published.)

8    BY MS. GEDDES:

9    Q     Is this a text message that you sent on May 17, 2016 --

10   I'm sorry, I'm referring to the text message where my pen is

11   which is item number 48362.

12   A     Yes.

13   Q     And who did you send that text message to?

14   A     Cash.

15   Q     Who is Cash?

16   A     She was Rob's stylist.

17   Q     What is her last name?

18   A     Howard.

19   Q     And the text message reads:  When she gets to Florida she

20   needs to run and never look back.  She should be living the

21   fun life of an 18-year-old high school senior.  She was on the

22   bus again.  I relieved Diana on the bus when I got here

23   yesterday morning at 7 a.m. and Juice relieved me at 10 a.m.

24   and then he had me to pick her up from the bus around 7 p.m.

25   and she has been in the back room...  she look rough eyes...

Mayweather - direct - Geddes                3433

1    eyes puffy and et cetera.  She was left here last night.

2           Now, the text message that is shown in 240(f) where

3    you said that I got to the studio about 30 minutes ago and

4    relieved Diana from the tour bus so she could leave, that was

5    sent on the morning of May 16th; is that correct?

6    A    Yes.

7    Q    And the text message that is shown where my pen is

8    pointing to Cash, that one was sent the following evening; is

9    that correct?

10   A    Yes.

11   Q    May 7th at 9:55 p.m.?

12   A    Yes.

13   Q    About 36 hours after you got to Chicago and relieved --

14   I'm sorry, I might have said it wrong.

15          This text message where my pen is pointing on page

16   five of Government Exhibit 240(g) which is number 48362, was

17   sent on May 17th, 2016; is that correct?

18   A    Yes.

19   Q    And is that about 36 hours after you got -- arrived in

20   Chicago and went to the tour bus to relieve Diana Copeland?

21   A    Yes.

22   Q    And in this text message that you sent, when you refer to

23   "she," who are you referring to?

24   A    Jane.

25   Q    And in this text message you sent where it says, she

1    looked rough, eyes puffy and et cetera who are you referring

2    to in that one?

3    A    Jane.

4    Q    Describing how she appeared when you saw her?

5    A    Yes.

6    Q    And then when it goes on to say:  She was left here last

7    night.  Are you referring to the evening of May 16, 2016, the

8    day before you sent -- the evening before you sent this text

9    message?

10   A    Yes.

11   Q    Do you know where the "here" was that you're referring

12   to?

13   A    The studio.

14   Q    In Chicago?

15   A    In Chicago.

16   Q    And I am now directing your attention to 48358.  Is that

17   a text message that you also sent that same evening to that

18   same Cash Howard?

19   A    Yes.

20   Q    And it says:  Something is really strange about the

21   treatment and behavior of the little one.  The punishment is

22   real.

23        Who were you referring to when you wrote, the little

24   one?

25   A    Jane.

Mayweather - direct - Geddes                    3435

1   Q    Now, when you reported to the studio on the morning of

2   May 16th and then went to the tour bus, at whose direction

3   were you acting?

4   A    Rob, the defendant's.

5   Q    Did there come a time where you obtained a cellular

6   telephone for one of the defendant's live-in girlfriends?

7   A    Yes.

8   Q    Who did you obtain a phone for?

9   A    Dominique.

10  Q    Do you recall when you obtained that phone?

11  A    No.

12         MS. GEDDES:  I am showing the witness only what's

13  been marked for identification as 240H.

14         (Exhibit published to witness only.)

15  Q    Do you recognize what's shown in 240H?

16  A    Yes.

17  Q    Does this refresh your recollection as to the general

18  timeframe when you obtained a cellular telephone for

19  Dominique?

20  A    Yes.

21  Q    Approximately when did you obtain that phone?

22  A    In June of 2016.

23  Q    And shown in 240H, are those text messages that you

24  ultimately exchanged with Dominique on the cell phone that you

25  obtained for her?

Mayweather - direct - Geddes                    3436

1   A    Yes.

2   Q    And what are the dates of those text messages?

3   A    June 12th, June -- June 12th, June 15th, June 16th and

4   June 17th.

5   Q    But the first text message was sent on June 12th of 2016?

6   A    Yes.

7   Q    And do you believe you obtained the phone prior to the

8   date of the first text message?

9   A    I did.

10  Q    Did you and Dominique discuss a code that you would use

11  to speak with each other?

12  A    Yes.

13  Q    And what, if anything, did you tell Dominique?

14  A    To just send her room number as her name.

15  Q    Rather than identifying her as Dominique?

16  A    Yes.

17  Q    And why did you tell Dominique to use her room number

18  rather than just say that it's Dominique?

19  A    So, I told her to text me if she needed me and to use her

20  room number instead of her name in case I was with Rob, the

21  defendant, so he wouldn't see her name if he saw my phone.

22  Q    Did the defendant ever confront you about obtaining that

23  cellular telephone for Dominique?

24  A    Not directly, no.

25  Q    And after Dominique sent you that first text message

1    identifying herself by a room number, did you ultimately save

2    her telephone number as Dominique in your phone?

3    A     I don't recall.

4              (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Mayweather - Direct - Geddes                    3438

1    DIRECT EXAMINATION (CONTINUED)

2    BY MS. GEDDES:

3    Q    If you look at Government's Exhibit 240H, does that

4    refresh your recollection as how her phone number was saved

5    in your phone?

6    A    It does not.

7    Q    Looking at that second --

8    A    The 9th.

9    Q    -- third column is that Dominique's name?

10   A    That's her name.

11   Q    And do you recall when you stopped working for the

12   defendant?

13   A    It was sometime in -- around June of 2016.

14         MS. GEDDES:  And I'm showing the witness only.

15   I'm showing the witness only what's been marked for

16   identification as 240Y.

17   Q    I want to direct your attention to the last three

18   entries.  Can you read them to yourself and let us know if

19   that refreshes your recollection as to the approximate date

20   when you stopped working for the defendant?

21   A    Yes.

22         MR. CANNICK:  May I have the Exhibit Number,

23   again, please.

24         MS. GEDDES:  Yes, 240Y.

25   Q    When did you stop working for the defendant?

Mayweather - Direct - Geddes                    3439

1    A    Around June 10th prior to -- just prior to June 10th.

2    Q    And so when Dominique sent you those text messages

3    starting on May 12th, was that after you had stopped working

4    for the defendant?

5    A    On May 12th?

6    Q    Yes -- I'm sorry.  June 12th, June 12th.

7    A    Yes.

8    Q    Okay.  You testified earlier that the defendant did not

9    confront you directly about obtaining a cellular phone for

10   Dominique.  What did you mean by that?

11   A    He spoke with my sister about it.

12   Q    Were you present for that conversation?

13   A    Not the initial conversation.

14   Q    Were you present for a subsequent conversation?

15   A    Only over the phone.

16   Q    Who called you?

17   A    My sister.

18   Q    Did you learn whether anyone else was listening to that

19   telephone call?

20            MR. FARINELLA:  Objection.

21            That part I'll withdraw.  Did you learn, there was

22   substantive stuff in there.

23            THE COURT:  I don't -- are you objecting on the

24   grounds -- I'm not --

25            MR. CANNICK:  It was --

Mayweather - Direct - Geddes                    3440

1          THE COURT:  Why don't I sustain it as to form.

2   Q    Who was on that telephone -- who was listening to that

3   telephone call?

4   A    Rob.

5   Q    And what, if anything, did your sister tell you -- say

6   to you during that call?

7          MR. CANNICK:  Objection.

8          THE COURT:  Let me make sure I understand.  There

9   were three people on the call?  You, your sister and the

10  defendant?

11         THE WITNESS:  No, just my sister on the phone.

12         THE COURT:  Okay.

13  Q    Where was the defendant?

14  A    He was with my sister.

15  Q    And was the call on speaker phone?

16         THE COURT:  How do you know he was there, that's

17  the question?  Was it on speaker?

18         THE WITNESS:  I don't remember if it was on

19  speaker.  But she called to find out if I had purchased the

20  phone in his presence.

21         THE COURT:  How do you know he was there?

22         THE WITNESS:  She told me.

23         THE COURT:  At that time or later?

24         THE WITNESS:  No, at the time.

25         THE COURT:  She said he's right here?

Mayweather - Direct - Geddes                3441

1              THE WITNESS:  She said, I'm with Rob and did you

2     purchase Dominique a phone.

3              THE COURT:  The objection's overruled.

4     Q    Now, why did you stop working for the defendant on or

5     about June 10th, 2016?

6     A    Well, it started with a confrontation with Jane.

7     Q    What happened?

8     A    We were at one of his shows and we -- I walked in with

9     his guest and his girlfriend and a couple of other

10    girlfriends of his that was not living with him.  And there

11    was a venue security person -- personnel in the area -- near

12    the area where we needed to enter to stand in front of the

13    stage.  And Jane felt like that person, who was a male, was

14    standing too close when we entered.  And she raised her

15    voice at me and we had words.  And then after the concert,

16    she told him what happened.

17    Q    And did you have a conversation with the defendant

18    about what happened?

19    A    No.

20    Q    Did you send a message to the defendant?

21    A    I did.

22    Q    What was the message that you sent?

23    A    I don't recall the message that I sent to him.  I don't

24    recall the message I sent to him, because it would have been

25    later.  But that particular night we did not have a

Mayweather - Direct - Geddes                3442

1   conversation.  I waited for him to have a conversation with
2   me, but we didn't.
3   Q    What made you believe that you might have a
4   conversation with the defendant that evening?
5   A    Because two of the girlfriends who did not live with
6   him, they came back and told me --
7              MR. CANNICK:  Objection.
8              THE COURT:  Sustained.
9   Q    Did you end up talking to the defendant?
10  A    No.
11  Q    And did the fact that you didn't end up talking to the
12  defendant contribute to your leaving that day?
13  A    Yes.
14  Q    Since that evening, or since about May 10, 2016, have
15  you seen -- until you testified today, have you -- I'm
16  sorry.  I keep saying May 10, 2016.
17              Until -- have you seen the defendant since June 10
18  of 2016 prior to seeing him in court yesterday?
19  A    Only on FaceTime once.
20  Q    And the FaceTime call where you saw the defendant, who
21  was on a FaceTime call with the defendant?
22  A    Him and my sister.
23  Q    And were you just in the room at some point during that
24  conversation?
25  A    Yeah.  I didn't realize she was on FaceTime with him

Mayweather - Direct - Geddes                    3443

1   and I just basically walked into the frame.  I had a stance

2   and I saw him.

3   Q    Aside from seeing him on FaceTime during that one

4   conversation, have you seen the defendant in person between

5   the time that you stopped working for him on or about June

6   10, 2016 --

7   A    No.

8   Q    -- and when you showed up in court yesterday?

9   A    No.

10  Q    Have you spoken to him other than during that the

11  FaceTime conversation?

12  A    No.

13  Q    And during the FaceTime conversation, did you have any

14  substantive conversations with the defendant?

15  A    It was just hi, hi, love you, love you, miss you, miss

16  you, and that was it.

17           MS. GEDDES:  One moment.  I just need to find one

18  exhibit.

19           THE COURT:  Sure.

20           (Pause in proceedings.)

21           MS. GEDDES:  Your Honor, there's one additional

22  exhibit that I need to locate.  But I have spoken with

23  counsel and I believe there's no objection to my admitting

24  it afterwards, so I have no further questions at this time.

25           THE COURT:  All right.  Cross-examination?

Mayweather - Cross - Cannick                3444

1              MR. CANNICK:  Yes.

2    CROSS-EXAMINATION

3    BY MR. CANNICK:

4    Q    Good morning.

5    A    Good morning.

6    Q    Now, you've have a role -- had a role in

7    *Surviving R. Kelly*; am I correct?

8    A    Somewhat.

9    Q    Well, when you say somewhat, what was that role?

10   A    I was a story advisor.

11   Q    So you were the story advisor, you were the one who

12   helped to narrate or put together the narrative?

13   A    No.  They only consulted with me about, you know, fact

14   finding.

15   Q    Fact finding?

16   A    Right.

17   Q    Now, *Surviving R. Kelly* was a fiction; am I correct?

18   A    I wouldn't call it a fiction.

19   Q    Yeah.

20            Now, when was it that you started with

21   *Surviving R. Kelly*?

22   A    I don't recall the date.

23   Q    And how long was it that you worked for them?

24   A    It wasn't like working for them.  I would get a phone

25   call like someone said X, Y, Z, do you think this is true.

Mayweather - Cross - Cannick                3445

1    That type of thing.

2    Q    Okay.  But you -- you did conclude it was a fictional

3    production?

4    A    I'm sorry?

5    Q    You did conclude it was a fictional production, right?

6                MS. GEDDES:  Objection.

7                THE COURT:  Can I see the parties at the side for

8    just a minute with the court reporter.

9                (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Conference                          3446

1           (The following occurred at sidebar.)

2           THE COURT:  Here's my concern, did we start

3    talking about whether or not -- I mean, I had thought that

4    we would avoid the content of *Surviving R. Kelly* just

5    because it really doesn't -- should not play any role in the

6    trial.  I have no problem with asking witnesses the extent

7    which they participated in it to the extent that it might

8    somehow show their basis or undermine their credibility.

9    But talking about whether the content of it is just true, is

10   really not a good road to go down because I don't think the

11   truth or nontruth of a television show really should be

12   playing in -- is it a TV is show?  I don't even know.  But I

13   don't think that we should be asking witnesses for their

14   evaluation of whether it's true or not.

15           Maybe she said something I don't know about and

16   there may be some other way of getting that out.

17           Is there something I'm missing?

18           MR. CANNICK:  Well, I believe the Government has

19   brought up with other folks' role in *Surviving R. Kelly*, and

20   I believe that leaving the impression with the jury that

21   there's factual basis for it, I just wanted -- know this

22   witness worked as a consultant, and I know from the labeling

23   that's on the program, it's a fictional program, and having

24   that role, I just wanted to clarify that and then move on.

25           THE COURT:  No.

Sidebar Conference                                    3447

1          MR. CANNICK:  Okay.

2          (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mayweather - Cross - Cannick                3448

1              (Sidebar ends; in open court.)

2              THE COURT:  Okay.  The objection is sustained.

3    Q    Now, you testified and told us that you worked for

4    Mr. Kelly?

5    A    Yes, I did.

6    Q    You started your employment with Mr. Kelly in December

7    of 2015?

8    A    Around that time, yes.  Formally, yes.

9    Q    Okay.  And then you worked for him until about June

10   10th of 2016?

11   A    Correct.

12   Q    So in essence you worked for him for about six months;

13   am I correct?

14   A    Formally, yes.

15   Q    And then when you were there you formed a lot of

16   opinions?

17   A    Did I form a lot of opinions?

18   Q    Yeah, about what you saw?

19   A    No.

20   Q    Okay.  You made assumptions?

21   A    No.

22   Q    Now you testified and told us about some text messages

23   that you sent regarding Jane.  Those text messages go back

24   to September of 2015?

25   A    I'm not sure how far they go back.

Mayweather - Cross - Cannick                    3449

1  Q    Well, the text message that you were shown this morning

2  about when you were at the Barclay's Center, that was in

3  September of 2016; am I correct -- 2015; am I correct?

4  A    If I recall it correctly, what I saw yesterday, yes.

5  Q    And you weren't working for him at that time; am I

6  correct?

7  A    No.

8  Q    And when I say him, I am talking about Mr. Kelly?

9  A    No, not formally, no.

10 Q    So basically you were in his presence or around his

11 business and you were recording certain, what you -- what

12 appeared to be observations to you?

13 A    You might --  you could probably say that, yes.

14 Q    And so you were basically gossiping with your sister;

15 am I correct?

16 A    I was having a conversation with my sister.

17         THE COURT:  What was the word you said?

18         MR. CANNICK:  Gossiping.

19 A    We can use gossiping, that's fine.

20 Q    Okay.  Now before your employment with Mr. Kelly, you

21 worked in law enforcement?

22 A    I did.

23 Q    As a probation officer?

24 A    I did.

25 Q    And as a correction officer?

Mayweather - Cross - Cannick                3450

1  A    I did.

2  Q    You also have had a criminal record, too; am I correct?

3  A    No, I did not.

4  Q    Never had a criminal record?

5  A    No.

6  Q    Never arrested?

7          MS. GEDDES:  Objection.

8          THE COURT:  I'll sustain as to an arrest.

9          MR. CANNICK:  I'll move on and come back to it.

10         THE COURT:  Okay.

11 Q    Now, before working for Mr. Kelly, you attended his

12 concert; am I correct?

13 A    I did.

14 Q    And you had attended a number of his concerts; am I

15 correct?

16 A    Yes.

17 Q    Okay.  And there came a point in time that you received

18 a pass to go backstage for a meet and greet?

19 A    There was many times.  I didn't necessarily receive a

20 pass, but there were many times I went backstage.

21 Q    Didn't you go back at one point because you had a

22 backstage pass?

23 A    Yes.

24 Q    Okay.  And who gave you that backstage pass?

25 A    Friends in the circle.

Mayweather - Cross - Cannick                    3451

1  Q    Friends in the circle of people who worked with him?

2  A    And people who worked with him.

3  Q    Okay.  And how old were you when you got that first

4  pass?

5  A    When I got the first pass?  I don't recall, I was an

6  adult.

7  Q    And when you say you were an adult, you were 18 years

8  old?

9  A    No, I was older.

10  Q    25?

11  A    I'm thinking.  It would have been over -- at least 20

12  years ago.  So I was definitely probably in my twenties.

13  Q    In your 20s.  You were given a pass and then you went

14  backstage and it was -- how were you dressed?

15              MS. GEDDES:  Objection.

16              THE COURT:  Sustained.

17  Q    You weren't dressed in revealing clothes, were you?

18              MS. GEDDES:  Objection.

19  A    No.

20              THE COURT:  Sustained.  Don't answer that

21  question.

22  Q    Did you see other women at that backstage meet and

23  greet?

24  A    There were other people there, yes.

25  Q    It was a large crowd there; am I correct?

Mayweather - Cross - Cannick                3452

1   A   Correct.

2   Q   And there were lots of women there, am I correct?

3   A   Correct.

4   Q   And these women covered the gamut in terms of ages; am

5   I correct?

6   A   I didn't pay attention to the women like that.  I don't

7   believe.

8           (Pause in proceedings.)

9           MR. CANNICK:  I'll return to it in a bit, Your

10  Honor.

11  Q   Now, there came a point in time before you started

12  working with Mr. Kelly, you went to a party at his home?

13  A   I went to more than one party at his home.

14  Q   Before you started working for him you went to a party

15  at his home; am I correct?

16  A   Yes.

17  Q   And when you went to that party at his home, you were

18  with your sister?

19          MS. GEDDES:  Can you clarify which party I think

20  she testified --

21          MR. CANNICK:  The first party.

22          THE COURT:  The first party she ever went to?

23          MR. CANNICK:  Yes.

24  A   No.

25  Q   Did you go with somebody by the name of Rowenna --

Mayweather - Cross - Cannick                3453

1   Ramina?

2   A    Yes.

3   Q    And you saw a number of people at that party?

4   A    It was a small crowd, yeah.

5   Q    It was a small crowd?

6   A    Yes.

7   Q    Okay.  And you saw a bunch -- you saw women in the

8   crowd; am I correct?

9   A    Yes.

10  Q    None of them appeared to be underage; am I correct?

11  A    No.

12  Q    Now, you also went to another party with someone called

13  Niecy?

14  A    Yes.

15  Q    Okay.  And you were also denied at that party

16  because -- entry to that party because Niecy started, or was

17  trying to take pictures of stars?

18  A    No.

19  Q    No?  That never happened, right?

20  A    Being denied, almost being denied entry?

21  Q    Yes.

22  A    No.

23  Q    Okay.  And now, when you were at that party with Niecy

24  you didn't see any underage women there at that party; am I

25  correct?

Mayweather - Cross - Cannick            3454

1   A    Correct.

2   Q    And at one of the parties there was a time that a

3   male -- you were all in a room and the male came to the room

4   and knocked on the door to give Mr. Kelly a note?

5   A    No.

6   Q    You don't remember that?

7   A    I don't recall that.

8   Q    You don't recall that either?

9   A    No.

10  Q    Okay.  And you don't recall telling the Government that

11  the male who knocked on the door and basically turned his

12  head not to make eye contact with Mr. Kelly?

13  A    No, I don't recall.

14  Q    I don't recall that either.

15       Now, you brought musicians to Mr. Kelly to

16  audition; am I correct?

17  A    Only one singer.

18  Q    Only one singer?

19  A    Yes.

20  Q    Okay.  Who was that singer?

21  A    Her name is Nickie, and it wasn't an audition.

22  Q    And it wasn't an addition?

23  A    No.

24  Q    What was it?

25  A    It was just asking him to provide some music for her.

Mayweather - Cross - Cannick                3455

1    Q    To provide some music for her?

2    A    Yeah.

3    Q    And how did that work out?

4    A    He said he was going to.  He played several songs.

5    Q    Uh-huh.

6    A    And he said he was -- he started to work with her.

7    Q    Niecy is that a male or female?

8    A    Nickie.

9    Q    Nickie?

10   A    A female.

11   Q    And how old was Nickie?

12   A    At the time?

13   Q    Yes.

14   A    At least in her 30s, maybe 40s.

15   Q    And that was someone that you were working with?

16   A    Yes.

17   Q    Okay.  She was from Houston?

18   A    I'm sorry.

19   Q    Was she from Houston?

20   A    Yes.

21   Q    And you brought her to Mr. Kelly's home; am I correct?

22   A    Studio.

23   Q    Okay.  The studio.  And basically that didn't work out

24   because it was concluded that she was a lazy artist; am I

25   correct?

Mayweather - Cross - Cannick                3456

1          MS. GEDDES:  Objection.

2    A    Well --

3          THE COURT:  I don't really see the relevance, but

4    overruled.

5          Was lazy, is that what you said?

6          MR. CANNICK:  Yes.

7          THE COURT:  Was that true?

8          THE WITNESS:  He never said that.

9    Q    No, did you come to that conclusion?

10   A    I said that, yes.

11   Q    Right.

12         And so that situation didn't work out but

13   Mr. Kelly did try to help?

14   A    He did.

15   Q    And what about Kim Burrell?

16         MS. GEDDES:  Objection.

17   A    Kim Burrell?

18         THE COURT:  Overruled.

19   A    What about Kim Burrell?

20   Q    You brought Kim Burrell to him; am I correct?

21   A    I didn't bring Kim Burrell to him.

22   Q    You didn't introduce Kim Burrell and ask Mr. Kelly to

23   work with her?

24   A    No.

25   Q    No?

Mayweather - Cross - Cannick                3457

1        And do you know whether or not Kim Burrell ever
2   worked with Mr. Kelly?
3   A    She did.
4   Q    And you had nothing to do with the introduction?
5   A    I intro -- well, my sister and I introduced her musical
6   to his music director.
7   Q    Uh-huh.
8   A    And this was in like the late '90s and the musical
9   director let him hear it.
10  Q    And it was not with Mr. Kelly that you made the
11  introduction?
12  A    No.
13  Q    And when you were at Mr. Kelly's studio for business or
14  for employment, did you ever see him with underaged women?
15  A    No.
16  Q    Now, when you testified earlier about Jane being on the
17  tour bus you said it was?
18  A    Yes.
19  Q    For a protracted period of time?
20  A    Yes.
21  Q    Do you recall what year Jane graduated from high
22  school?
23  A    I think it was 2016.
24  Q    Okay.  And would that be in May of 2016?
25  A    I don't recall the month.

Mayweather - Cross - Cannick          3458

1   Q    And you had certain work requirements in order to
2   fulfill -- withdrawn.
3          Jane had to fulfill certain work requirements in
4   order to graduate; am I correct?
5          MS. GEDDES:  Objection.
6          THE COURT:  Overruled.
7          Do you know that?
8          THE WITNESS:  I'm not sure what work requirements
9   he's talking about.
10          THE COURT:  He's talking about schoolwork.
11  A    Schoolwork, yes.
12  Q    And Jane was on that bus trying to finish her
13  schoolwork; am I correct?
14  A    I have no knowledge of that.
15  Q    You don't know that Jane was left behind with your
16  sister so that --
17          MS. GEDDES:  Objection.
18          THE COURT:  Well, let him finish the question.
19          Maybe it might not be a bad idea to rephrase it.
20          MR. CANNICK:  I thought it was perfectly good.
21          THE COURT:  I know, but sometimes we disagree.
22          MR. CANNICK:  I know.  Many times.
23  Q    Now are you aware that your sister was on the bus with
24  Jane so that she could continue to work -- complete her
25  schoolwork?

Mayweather - Cross - Cannick                    3459

1          MS. GEDDES:  Objection.

2          THE COURT:  Were you aware of that?

3    A    No.

4    Q    And if she was here and testified and told the jury

5    that --

6          MS. GEDDES:  Objection.

7          THE COURT:  Well, let him finish the question.

8    Q    If she was here and told the jury that she was on the

9    bus with Jane because she was left behind because she had

10   not finished her work, she would not have been mistaken; am

11   I correct?

12         THE COURT:  The objection is sustained.

13   Q    Now, I asked you a short while ago about the situation

14   where you were almost not allowed inside of the --

15   Mr. Kelly's party because Niecy was star struck and began

16   taking pictures and you said that didn't happen.

17         I want to show you this document and see if it

18   refreshes your recollection if that's, in fact, what you

19   told the Government?

20         MS. GEDDES:  What document are you showing her?

21         MR. CANNICK:  It -- I'll show you.

22         (Pause in proceedings.)

23         MR. CANNICK:  What's the number?

24         MR. FARINELLA:  AM186.

25         MS. GEDDES:  Okay, thanks.

Mayweather - Cross - Cannick                3460

1   Q    I believe the section is highlighted right there.

2   A    Oh, I read it.

3   Q    Does that refresh your recollection that you told the

4   Government in your meeting with them that there was a party

5   that you went to attend along with Niecy and you were almost

6   denied entry because she was star struck and taking

7   pictures?

8   A    No.

9   Q    That does not refresh your recollection?

10  A    No.

11  Q    Okay.  You saw it here though, correct?

12  A    I see it.

13  Q    Okay.  And you were the person who had the interview

14  with the Government; am I correct?

15  A    Well, it says Mayweather.

16  Q    Yes.

17  A    I don't believe that was me.

18  Q    You don't believe it was you?

19  A    No.

20  Q    Okay.

21          MR. CANNICK:  Let me have the...

22          (Pause in proceedings.)

23  Q    You were, in fact, interviewed by the Government?

24  A    I was.

25  Q    How many times?

Mayweather - Cross - Cannick          3461

1   A    Like three times.

2   Q    Now, your first interview, was that before you started

3   your role with *Surviving R. Kelly*?

4   A    No.

5   Q    It was after?

6   A    After.

7   Q    And by the way, how much money were you paid for your

8   participation in *Surviving R. Kelly*?

9   A    I don't recall the exact amount.

10  Q    Okay.  What's the approximate amount?

11  A    About $3,000.

12  Q    And you said that you made yourself available for phone

13  calls?

14  A    I did.

15  Q    And I'm going to show you this document.  Do you recall

16  being interviewing by the Government on --

17           MR. FARINELLA:  On Page 1.

18  Q    -- March 6, 2009?

19           MS. GEDDES:  2019.

20  Q    2019?

21  A    No, I do not.

22  Q    Look at that document and see if it refreshes your

23  recollection that you had an interview with them on that

24  particular day.

25  A    It says March 6th, 2019, I don't recall.

Mayweather - Cross - Cannick                    3462

1    Q    You don't recall, but it says it there; am I correct?

2    A    It does.

3    Q    Okay.  And you were the person who was being

4    interviewed not your sister; am I correct?

5    A    That was incorrect.

6    Q    Okay.  May I have it back?

7              And having look at that document, you said earlier

8    that you didn't know whether or not it was you who gave this

9    interview or you twin sister.  Did you look through from

10   Page 1 -- do you see your name and then go to Page 6 and see

11   if you were, in fact, the person who gave that interview to

12   the Government on...

13   A    It has my name.

14   Q    Okay.

15   A    Yes.

16   Q    So -- and it says that you were the person who told the

17   Government that you were at this party and almost couldn't

18   get in because Niecy being star struck and taking pictures;

19   am I correct?

20   A    Well, that's what you showed me.

21   Q    Okay.

22   A    But that's not what I said.

23   Q    That's not what you said?

24   A    No, it's not.

25   Q    So the Government got it wrong?

1  A    Yes.

2  Q    Let me see if the Government got a few more things

3  wrong.

4             MS. GEDDES:  Objection.

5             THE COURT:  Please don't do that.

6  Q    Now, I asked you earlier about Kim Burrell and

7  Mr. Kelly's involvement.  Are you familiar with the person

8  by the name of Percy Brady?

9  A    No.

10 Q    Okay.  And --

11 A    Not by the name you just called.

12 Q    Okay.  Now, do you recall that in 1996 you and your

13 sister asked Percy Brady if he would be able to request that

14 Kelly -- Mr. Kelly audition Kim Burrell?

15            MS. GEDDES:  Objection.

16            THE COURT:  Overruled.

17            Did that happen?

18 A    Okay.  So the person you're referring to Percy Badie.

19 Q    Uh-huh.

20 A    And, no, we did not ask for an audition for Kim

21 Burrell.

22 Q    Okay.  Isn't it a fact that you told the Government

23 during that interview that you asked Percy Brady or whatever

24 you said the person's name is, if they could -- if they were

25 able to request that Kelly audition Kim Burrell?

Mayweather - Cross - Cannick          3464

1  A    No, that is not what I said.

2  Q    Didn't tell them that, right?

3  A    I'm sorry?

4  Q    You didn't tell the Government that; am I correct?

5  A    No, not in those words, no.

6  Q    Well, what words did you use?

7  A    Okay.  So Kim Burrell was already a national recording

8  artist so she didn't need an audition.  I may have told them

9  what I already told you, that we allowed Percy to hear Kim's

10  music and he was so impressed with the music he wanted to

11  let Rob hear it.

12  Q    Isn't it a fact that you told the Government during

13  that interview that in 1996 you, your sister asked Percy if

14  he would be able to request that Kelly audition Kim Burrell?

15  A    That's not true.

16  Q    And if -- I'm going to show you this document and see

17  if it --

18  A    Okay.

19  Q    -- you see it in there.

20  A    I see it.

21  Q    So yeah; am I correct?

22  A    It's in here.

23  Q    And your testimony is that's not what you told during

24  that interview?

25  A    That's not what I said.

Mayweather - Cross - Cannick           3465

1   Q    When Jane graduated from high school, were you at the

2   ceremony?

3   A    No, I was not.

4   Q    Your sister was at the ceremony; am I correct?

5            MS. GEDDES:  Objection.

6            THE COURT:  Do you know where your sister was?

7            THE WITNESS:  She was not at the graduation

8   ceremony.

9   Q    You nor your sister?

10  A    No.

11  Q    Okay.  And do you know what month Jane graduated in,

12  what month of the year?

13  A    I don't recall the month.

14  Q    Uh-huh.

15  A    And I believe the year was 2016.

16  Q    Okay.  And when you testified and told the jury that

17  Jane was on this particular tour bus for an extended period

18  of time, you don't know why she was on the bus; am I

19  correct?

20  A    No, I do not.

21  Q    You never spoke to her about her reasons for being on

22  the bus; am I correct?

23  A    Correct.

24           MS. GEDDES:  Objection.

25  Q    You didn't have any conversation with Mr. Kelly as to

Mayweather - Cross - Cannick                     3466

1   why she was on that bus; am I correct?

2   A   Correct.

3   Q   And that bus was the luxury tour bus; am I correct?

4   A   It was a tour bus.

5   Q   It was a tour bus?

6   A   Yes.

7   Q   It was not a luxury bus?

8   A   Not in our opinion.

9   Q   Okay.  So it didn't have a bathroom?

10  A   It did.

11  Q   A bedroom?

12  A   It did.

13  Q   Lofts?

14  A   (No response.)

15  Q   Loft beds?

16  A   Well, if you called it a bunkbed?  Yes.

17  Q   Refrigerator?

18  A   Yes.

19  Q   Microwave?

20  A   Yes.

21  Q   But not a luxury bus?

22  A   Not in our opinion.

23  Q   Not in your opinion.

24         How many buses did Mr. Kelly have?

25  A   He had a couple of buses.

Mayweather - Cross - Cannick                    3467

1    Q    Okay.  Was his Sprinter a luxury bus?

2    A    It was.

3    Q    But not the tour bus?

4    A    Not in our opinion.

5    Q    Okay.  And Mr. Kelly would ride those tour buses; am I

6    correct?

7    A    One of them, yes.

8    Q    He would ride cross country; am I correct?

9    A    He did.

10   Q    Okay.  And he would be on them for hours; am I correct?

11   A    Yes.

12   Q    In fact, he would go from the east coast to the west

13   coast on those buses; am I correct?

14   A    Correct.

15   Q    Now you've been on the buses as they would travel

16   through the mountains?

17   A    Yes.

18   Q    And were there any bathrooms -- withdrawn.

19          There were certain stretches on those trips from

20   the east coast to the west coast where there were be no

21   bathrooms in sight; am I correct?

22   A    Correct.

23   Q    Okay.  And you also were in situations sometimes where

24   there were no phone services; am I correct?

25   A    Correct.

1   Q    Okay.  And you testified and told the jury that there

2   were people who would urinate in cups?

3   A    Yes.

4   Q    And would that be one of the times that they would

5   urinate in cups when they were on this long stretch without

6   bathrooms?

7   A    Not in my presence.

8   Q    Not in your presence.

9          How many trips did you take on the bus with him?

10  A    I don't remember a number.  It was a number of trips.

11  I don't remember how many.

12  Q    Okay.  And how many times you saw someone urinating in

13  a cup?

14  A    I never saw that.

15  Q    You heard that?

16          MS. GEDDES:  Objection.

17          THE COURT:  Overruled.

18          Did you hear it?  What do you mean when you say

19  did you hear that people urinated in cups?

20          THE WITNESS:  He said I heard that, I didn't say

21  that.

22          THE COURT:  You didn't hear it either?

23          Well, you tell us.  Did you hear about people

24  urinating in cups?

25          THE WITNESS:  I knew they were doing it.  I said I

Mayweather - Cross - Cannick                3469

1    didn't see it.

2              THE COURT:  I see.

3              THE WITNESS:  Right.

4              THE COURT:  How did you know they were doing it?

5              THE WITNESS:  Because they had the cups and there

6    were times when they would dispose of the cups.

7              THE COURT:  I see.

8              Go ahead.

9    Q    So who?

10   A    I'm sorry?

11   Q    Who did you see have a cup and dispose of the cup?

12   A    His girlfriends or...

13   Q    Which one?

14   A    All of them.

15   Q    All of them?

16             When?

17   A    Well, we would get off of the vehicle, they would leave

18   the cups on the vehicles.

19   Q    But you would take the cups off?

20   A    No, not me.

21   Q    Okay.

22             Did you ever pick up a cup?

23   A    No.

24   Q    Ever smell the cup?

25   A    No.

1   Q   Ever looked in the cup?

2   A   No.

3   Q   But you knew it was urine in there, right?

4   A   I knew they were using the cups to urinate.

5   Q   Okay.  But you never saw them do it, right?

6   A   No.

7   Q   Never handled the cups?

8   A   No.

9   Q   Never smelled the cups?

10  A   No.

11  Q   Never carried the cups?

12  A   No.

13  Q   But you knew they were doing it?

14  A   Yes.

15  Q   You told that to *Surviving R. Kelly* lifetime as well?

16  A   No.

17  Q   Now, when you were travelling with the Kelly --

18  withdrawn.

19          How many times did you take a cross country trip

20  with Mr. Kelly on the tour bus?

21  A   At least -- oh, there were a couple of times but not a

22  number of times probably east to the west.

23  Q   Okay.

24  A   A couple of times.

25  Q   And that stretch that I was just talking about where no

Mayweather - Cross - Cannick                 3471

1   bathrooms around, was there ever a situation where you had

2   to use the facilities?

3   A    Yes.

4   Q    And you held it; am I correct?

5   A    I did.

6   Q    Some people did?

7   A    I'm sorry?

8   Q    Withdrawn.

9        Now, when you started first hanging out with

10  Mr. Kelly and going around with Mr. Kelly, he would allow

11  you and your sister to go on his road trips; am I correct?

12  A    Correct.

13  Q    You weren't working for him; am I correct?

14  A    No.

15  Q    Okay.  In fact, he would pay for your airfare?

16  A    No.

17  Q    He wouldn't pay for your airfare?

18  A    I don't recall.

19  Q    Okay.

20  A    Honestly.

21  Q    Do you recall whether or not he paid for your hotel?

22  A    He did.

23  Q    Do you recall whether or not he paid for your meals?

24  A    He would.

25  Q    Now while you were going on those trips cross country

Mayweather - Cross - Cannick                3472

1   with Mr. Kelly, did you ever see him hit any of his

2   girlfriends?

3   A    No.

4   Q    Did you ever see him deny them the right to -- he would

5   deny them going to the bathroom?

6   A    I didn't see him deny them the right, no.

7   Q    And did you ever see him deny them food?

8   A    No.

9   Q    Did you ever see Mr. Kelly in any of the properties

10  deny them the use of the bathroom?

11  A    Any of the properties?

12  Q    Yeah.  Any of his properties that he was staying in?

13  A    No.

14  Q    Did you see him deny them food?

15  A    No.

16  Q    Did you see him deny them water?

17  A    No.

18  Q    But you did see him giving them lavish gifts; am I

19  correct?

20  A    There were the times.

21  Q    There were times.

22       When you would take them shopping, what kind of

23  stores would you take them shopping?

24  A    Nordstrom's, Sak's, and then the -- just the other

25  brands, Gap.  Whatever store they wanted to go to, actually.

Mayweather - Cross - Cannick                3473

1    Q    Whatever store they wanted to go they could go; am I

2    correct?

3    A    Correct.

4    Q    Okay.  Now, did you handle their money --

5    A    No.

6    Q    -- when they went to the store?

7         They had their own money; am I correct?

8    A    Correct.

9    Q    And you would give their money to the cashier?

10   A    If the cashier was a male.

11   Q    Okay.

12   A    Only.

13   Q    If the cashier was a male.

14        Now, you never had an occasion where one of them

15   told you that I was glad to have the privilege to go

16   shopping at Nordstrom's, I don't want to do that.

17   A    No.

18   Q    They all went; am I correct?

19   A    Yes.

20        (Continued on the next page.)

21

22

23

24

25

Mayweather - cross - Cannick                3474

1    CROSS EXAMINATION

2    BY MR. CANNICK:   (Continuing)

3    Q    They all went, am I correct?

4    A    Yes.

5    Q    Now, you testified that when Rob would come into a room,

6    his girlfriends would get up and kiss him?

7    A    Yes.

8    Q    He would kiss them back too, am I correct?

9    A    Yes, ma'am.

10   Q    Would he stand when they came into the room?

11   A    I'm sorry, what did you say?

12   Q    Would he stand when women came into the room?

13   A    Would he stand up?  I don't recall.

14   Q    Would he open the door for women?

15   A    I don't recall.

16   Q    Now, when you were there and you were around Jane, you

17   saw her speak on the phone regularly with her parents, am I

18   correct?

19   A    With her father more than her mom.

20   Q    But --

21   A    Yes.

22   Q    -- with her parents and then more so with her father?

23   A    Yes.

24   Q    And those conversations seemed to be happy conversations,

25   were they not?

Mayweather - cross - Cannick                3475

1          MS. CRUZ MELENDEZ:  Objection.

2          THE COURT:  Sustained as to form.

3   Q    Describe the conversations.  How did they appear?

4          THE COURT:  Let me just ask you, did you hear both

5   sides?

6          THE WITNESS:  No, not both sides.

7          THE COURT:  Go ahead and ask, Mr. Cannick, the next

8   question.

9   Q    Isn't it a fact that you told the Government that they

10  were happy conversations?

11  A    They were general conversations.  I don't remember using

12  the word happy.

13  Q    Now, during Jane's stay with Mr. Kelly when you were

14  working there, her brother would fly into Chicago to visit

15  her, am I correct?

16  A    He flew in once that I know of.

17  Q    Mr. Kelly paid for that airfare?

18  A    He did.

19  Q    And the hotel?

20  A    Yes.

21  Q    Do you recall her parents coming in to visit?

22  A    Only her mother.

23  Q    And Mr. Kelly paid for that airfare?

24  A    I only know of once and, yes, he did.

25  Q    And the hotel?

Mayweather - cross - Cannick                3476

1    A    He did.

2    Q    You testified and told the jury about a fight --

3    withdrawn -- about an altercation that you and Jane had.  Do

4    you remember telling us about that?

5    A    Yes.

6    Q    Okay.  And that was a verbal altercation, am I correct?

7    A    It was verbal.

8    Q    And, basically, it was a situation where you were going

9    through an arena, you were escorting them to their seat, am I

10   correct, Kelly's girlfriends?

11   A    No.

12   Q    It's not correct?

13   A    No.

14   Q    This was an arena?

15   A    It was an arena.

16   Q    What happened?  What was it about?

17   A    I actually was not escorting them per se.  We were

18   escorted in, me with their girlfriends by another employee.

19   Q    But someone was escorting her in, am I correct?

20   A    Yes.

21   Q    And something happened between her and one of the

22   security people, am I correct?

23   A    No.

24   Q    That's not correct?

25   A    No.

Mayweather - cross - Cannick                    3477

1    Q     Okay.  What happened?

2    A     We, the group of us, me and his girlfriends, we were

3    walking to the area where he wanted them to stand, directly in

4    front -- on side of the stage, and the security guy --

5              THE COURT:  Hold on for just a second.

6              So, I let you sit here for too long.  We are going

7    to take a 10-minute break and then we will resume.  Please

8    don't talk about the case at all.

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury exits the courtroom.)

11             THE COURT:  All right.  Everybody can have a seat.

12   And the witness can step down.

13             (Witness steps down.)

14             THE COURT:  Anything before we break?

15             MR. CANNICK:  Nothing from us, Your Honor.

16             THE COURT:  Do you have just a general idea of how

17   much longer you might be?

18             MR. CANNICK:  Maybe 20, 30 minutes.

19             THE COURT:  Okay, and do you have a lot of redirect?

20             MS. GEDDES:  No.

21             THE COURT:  All right.  And then what are we doing

22   after that?

23             MS. CRUZ MELENDEZ:  We have a witness Nicholas

24   Williams.

25             THE COURT:  How long is that witness, do you think?

Mayweather - cross - Cannick                3478

1    A long one?

2              MS. CRUZ MELENDEZ:  No.  I probably wouldn't go over

3    an hour.

4              THE COURT:  All right.  And if you can agree on any

5    exhibits that will come in, that would be great, too.  We can

6    just use our time-wisely.  We will be in recess for a few

7    minutes.

8              (Recess taken.)

9              THE COURTROOM DEPUTY:  All rise.

10             THE COURT:  Everybody can sit down.  Let's get the

11   witness.

12             (Witness resumes stand.)

13             THE COURTROOM DEPUTY:  All rise.

14             (The jury enters the courtroom.)

15             THE COURTROOM DEPUTY:  You may be seated.

16             THE COURT:  All right.  Everybody, we are ready to

17   resume with the cross-examination.  First remind the witness.

18   Go ahead.

19             THE COURTROOM DEPUTY:  The witness is reminded she

20   is still under oath.

21             THE WITNESS:  Yes.

22             MR. CANNICK:  Your Honor, may I have the last

23   question and answer read back?

24             THE COURT:  Sure.

25             (Record read.)

Mayweather - cross - Cannick                     3479

1    BY MR. CANNICK:

2    Q    Now, I asked you earlier whether or not you were

3    escorting Mr. Kelly's girlfriends to the area that they were

4    to be in and you told me that you were not escorting them.  Do

5    you remember telling me that?

6    A    I do.

7    Q    Now, when you met with the Government, you did tell them

8    that you were the one who was escorting them, am I correct?

9    A    Well, I would like to rephrase what I said.

10   Q    No, I'm asking you when you met with the Government, you

11   told the Government that you were the one who was escorting

12   them, am I correct?

13   A    I don't recall what I told the Government.

14   Q    Let's see if this refreshes your recollection.

15   A    Okay.

16   Q    I'm going to show you the highlighted portion up top and

17   read it to yourself and see if it refreshes your recollection.

18   A    I see that.

19   Q    Have you read it?

20   A    I did.

21   Q    Does it refresh your recollection that you told the

22   Government that you were the one who escorted Kelly's

23   girlfriends?

24   A    It does not.

25   Q    But it's there; right?

Mayweather - cross - Cannick                    3480

1   A    It's there.

2   Q    And you do recall being interview by the Government, am I

3   correct?

4   A    I do.

5   Q    And you recall them taking notes while you spoke?

6   A    I don't recall them taking notes.

7   Q    You didn't see any of them with pens, writing?

8   A    I wasn't paying attention to anyone on the side.

9   Q    Isn't it a fact that and you were escorting them through

10  the crowd and security personnel accidentally bumped into

11  Jane?

12  A    Okay, so we were escorted in by another employee and then

13  the part I want to rephrase is that after he took us a certain

14  point in the crowd, then, yes, I walked us to the area that he

15  wanted us to stay in.  And then as far as the employee bumping

16  into her, I don't quite recall.

17  Q    Let's see if this refreshes your recollection, the same

18  document.  It is the same paragraph.

19  A    Okay, I saw it.

20  Q    Okay?

21  A    Yeah.

22  Q    Isn't it a fact that you told the Government that the

23  security personnel bumped into Jane?

24  A    I don't recall saying that a security person bumped into

25  her.

Mayweather - cross - Cannick               3481

1   Q     But it's in the document?

2   A     It's in the document.

3   Q     Now -- and isn't it a fact that after the security

4   personnel bumped into Jane, Jane became extremely belligerent?

5   A     That's not how it happened, no.

6   Q     And you saw that in the document?

7   A     I saw it.

8   Q     And you said the document is not accurate?

9   A     I would say the document is not accurate.

10  Q     Now, and then after this bumping into between Jane and

11  the security person, Jane became belligerent and starting

12  arguing, am I correct?

13  A     That's not what happened.

14  Q     Tell us what happened.

15  A     Okay.  So as we were coming to the area where  he wanted

16  them to stay in, it was blocked off by partitions, partitions,

17  and so there was a young man who was venue security who needed

18  to open that part to let us into the area closer to the stage.

19  She felt like the guy was standing too close to her, Jane felt

20  like the guy was --

21  Q     How do you know what Jane felt like?

22  A     She said it.

23  Q     What did she say?

24  A     That he was standing too close.

25  Q     Where was he standing in relationship to her?

Mayweather - cross - Cannick                    3482

1   A    He was standing between me -- well, I was standing

2   between him and Mr. Kelly's girlfriends was standing.

3   Q    And where was he standing in relationship to Jane?

4   A    He was standing opposite of me in relationship to Jane.

5   Q    Was he to Jane's rear, side or front?

6   A    I don't even think Jane was the closest one to me, but --

7   Q    I'm not asking you --

8   A    -- he would have been behind me, which would have been --

9   I don't know.  If she was facing him, he would have been to

10  her front.  If her back was turned, he would have been to her

11  back.

12  Q    I'm not asking what you think.  I'm asking you what was

13  her position -- what was the security person's position

14  vis-à-vis Jane?

15  A    He was not near her.

16  Q    He was not near her?

17  A    No.

18  Q    Okay.  And after that, what happened?

19  A    So I had to tell him to let us in, into that part because

20  he was venue security.  So he didn't know that we needed to go

21  to that part.  So I had to tell him to open the little gate

22  that had that part blocked off to let us in.

23  Q    And what happened between you and Jane?

24  A    He opened the gate and she was like -- I don't remember

25  her exact words, but it was basically she was telling me he

Mayweather - cross - Cannick                    3483

1   was too close and I needed to tell him to move.

2   Q     Okay.  And what happened between you and Jane?

3   A     And I told her to not raise her voice at me.

4   Q     And what happened next?

5   A     And then I told her basically she needed to chill, do not

6   raise your voice at me because I don't have time for this.

7   Q     So her voice was elevated?

8   A     Yes.

9   Q     Was yelling at you?

10  A     Yes.

11  Q     And she got in your face?

12  A     No, she didn't get in my face.  She raised her voice.

13  Q     Did you get in her face?

14  A     No, I did not.

15  Q     Did you point at her?

16  A     I don't recall pointing at her.

17  Q     Okay.  Now, after you told her to lower her voice, did

18  she lower her voice?

19  A     We stopped talking and she started texting.

20  Q     And she started texting?

21  A     Yes.

22  Q     What did you do?

23  A     I think I started texting as well.

24  Q     Okay.  And who did you text?

25  A     I think I texted Robert.

Mayweather - cross - Cannick                    3484

1    Q    When Jane did this, you became furious, am I correct?

2    A    No.

3    Q    You weren't angry?

4    A    I wasn't furious --

5    Q    What were --

6    A    -- and I wasn't angry, but I told her do not yell at me.

7    Q    And how long did this encounter between you and Jane

8    last?

9    A    Just a couple of minutes.

10   Q    Okay.  And afterwards, you quit?

11   A    Not immediately.

12   Q    Well, when did you quit?

13   A    After the show and we got back to the hotel.

14   Q    Right, and you felt as though Jane disrespected you, am I

15   correct?

16   A    Well, I didn't say that, but that's how I felt, yes.

17   Q    And you felt so disrespected you decided if you weren't

18   going to be respected, you were going to quit, am I correct?

19   A    No, that's not why I quit.

20   Q    That's not why you quit?

21   A    No.

22   Q    Why did you quit?

23   A    Because I felt like they had -- Jane and Juice and two of

24   Mr. Kelly's other girlfriends had the conversation with him

25   about what had happened, and I felt like he needed to have an

Mayweather - cross - Cannick                3485

1   adult conversation with me to hear my side of what happened

2   because he told his girlfriends, two of the other girlfriends

3   that he only believed what his girlfriends said because his

4   girlfriends don't lie to him.

5   Q    Okay.  That's not what you told the Government; right?

6   A    I don't know what I told the Government, but that should

7   have been what I told the Government.

8   Q    I know it should have been now.

9           MS. GEDDES:  Objection?

10          PROSPECTIVE JUROR:  I don't know what's on that

11  paper, but I know I should have told them.

12  Q    Do you recall telling the Government that you and another

13  person -- that two other people tried to speak with Mr. Kelly

14  and explain the entire situation and Kelly said whatever my

15  girlfriend said happened, that's what happened?

16  A    That's what I just said, yes.  But I said the end result.

17  So, yes, I did have a conversation with two other girlfriends

18  of his.  They came back and had a conversation with me and

19  they told me that they tried to explain to him what happened,

20  he didn't believe it, and he said because whatever his

21  girlfriends tell him, that that's what he believes because

22  they would not lie to him.

23  Q    He's loyal to those girls?

24  A    You're saying he's loyal to them?

25          MS. GEDDES:  Objection.

Mayweather - cross - Cannick                3486

1          THE COURT:  Overruled.

2          Is that what they told you, that he said he was

3   loyal to them?

4          THE WITNESS:  No.

5   Q    When he said that whatever they said happened, that's

6   what he's going to believe; right?

7   A    That's what they said.

8          THE COURT:  I think your microphone might be off.

9   No?  I guess my hearing is getting bad.

10  Q    Now, there came a point in time that you quit and Mr.

11  Kelly offered you your job back, am I correct?

12  A    No, he didn't offer me my job back.  He had my sister

13  call me.

14  Q    Okay.  Well, your sister couldn't give you the job;

15  correct?

16  A    She called me and told me what he said.  No, I didn't

17  have a direct conversation with him.

18  Q    Okay.  But there was communication between someone and

19  you where Mr. Kelly offered you an opportunity to return to

20  your job?

21  A    Right.

22  Q    Now, when Mr. Kelly initially hired you, he hired you to

23  assist with his girlfriend Summer, am I correct?

24  A    He hired me to be his assistant, but he did say that he

25  would need me to help Summer, like with her doctor's

Mayweather - cross - Cannick                3487

1   appointments.

2   Q    So he hired you to be his executive assistant?

3   A    Well, I would call it personal assistant because I didn't

4   do anything executive.

5   Q    Now, weren't you hired to take care of the needs of his

6   girlfriends?

7   A    No.

8   Q    So, you were hired to take care of Mr. Kelly's needs, is

9   that what you're saying?

10  A    Yes.

11  Q    And you were also hired to take care of Summer's needs?

12  A    No.

13  Q    Just Mr. Kelly?

14  A    Yes.

15  Q    And then it involved Summer's needs?

16  A    No.

17  Q    Didn't you just testify a few seconds ago that you also

18  had to take care of Summer and her pregnancy?

19  A    That was a part of the conversation that we had prior to

20  me being hired.

21  Q    Okay.  But you didn't take on that responsibility?

22  A    No.

23  Q    Now, when you were given an opportunity to have your job

24  back, you refused the job, the offer, am I correct?

25  A    Correct.

Mayweather - cross - Cannick                    3488

1    Q     Okay.  And you made that choice?  You made a decision

2    that you weren't going back, am I correct?

3    A     Correct.

4    Q     Okay.  And Mr. Kelly didn't make any further contact or

5    have anyone contact you to try to get you to come back, am I

6    correct?

7    A     Correct.

8    Q     Now, I asked you a short while ago did Mr. Kelly pay for

9    your airfares and you told us you didn't remember that

10   happening.  Do you remember telling us that?

11   A     Yes.

12   Q     I'm showing you this document and see if it refreshes

13   your recollection --

14   A     Okay.

15   Q     -- that you told the Government that he paid for your

16   air, hotel and food.

17              MS. GEDDES:  What document?

18              MR. CANNICK:  The same document, page 7.

19              MS. GEDDES:  Thank you.

20   BY MR. CANNICK:

21   A     Okay.  Which one?

22   Q     Where your thumb is, highlighted in yellow?

23   A     Okay.

24   Q     Where your thumb is, highlighted in yellow.

25   A     Okay.  Okay.

Mayweather - cross - Cannick                    3489

1    Q     You read it?

2    A     I did.

3    Q     Does that refresh your recollection that you told the

4    Government Mr. Kelly, before you started working for him,

5    would take care of your airfare, hotel and food on various

6    trips?

7    A     Before I started work for him, yes.

8    Q     And I also asked you before we took the recess if you

9    recall -- if you recall telling the Government that the

10   conversations that Jane had with her parents seemed to be

11   happy ones, that you heard them?

12   A     I recall, yes.

13   Q     Right.  And you testified and told us that you don't

14   recall saying that they were happy ones?

15   A     I don't recall using the word happy.

16   Q     Okay.  I'm going to show you this document and see if it

17   refreshes your recollection that you told the Government that

18   those conversations seemed to be happy.

19   A     Okay.

20   Q     Where my thumb is.

21   A     Okay.

22             THE COURT:  What page?

23             MR. CANNICK:  13 of 24.

24   A     Okay.

25   Q     Have you looked at it?

Mayweather - cross - Cannick                3490

1   A     I did.

2   Q     Does it refresh your recollection that you told the

3   Government during those interviews that the conversation that

4   Jane and her parents had seemed to be happy ones?

5   A     I see it on the paper, I just don't remember using the

6   word happy.

7   Q     But that's what's on the paper?

8   A     It is.

9   Q     Now, during the six months or so that you worked with Mr.

10  Kelly, did he ever ask you to deny anyone food?

11  A     No, he did not.

12  Q     Did he ever ask you to deny anyone water?

13  A     No, he did not.

14  Q     Did he ever ask you to deny someone the freedom to move

15  about?

16  A     No, he did not.

17  Q     Did he ever ask you to go out and recruit women for him?

18  A     No, he did not.

19          MR. CANNICK:  Thank you, Your Honor.

20          THE COURT:  Any redirect?

21          MS. GEDDES:  Yes, Your Honor.

22          The Government offers 240(z).  I don't believe there

23  is any objection from defense counsel.

24          MR. CANNICK:  No objection.

25          (Government's Exhibit 240(z) received in evidence.)

Mayweather - cross - Cannick                3491

1              MS. GEDDES:  May I publish?

2              THE COURT:  Yes.

3              (Exhibit published.)

4    REDIRECT EXAMINATION

5    BY MS. GEDDES:

6    Q    I'm showing you what's now in evidence as Government

7    Exhibit 240-Z.

8              Are those three telephone numbers that you had saved

9    in your telephone for the defendant?

10             MR. CANNICK:  Your Honor, this is beyond the scope.

11             MS. GEDDES:  This was the exhibit that we discussed.

12             THE COURT:  This is what you discussed before.  So

13   if that's an objection, it is overruled.  Go ahead.

14   A    If this came from my cell phone, then, yes.

15   Q    On cross-examination, you were asked about text messages

16   that you exchanged with your sister and others and you

17   testified on direct examination about it.

18             Do you recall those?

19   A    I do.

20   Q    And in your cross-examination you said something along

21   the lines of, you know, you could call it gossip.  Do you

22   recall that?

23   A    I do.

24   Q    When you wrote to your sister and others what you

25   observed during your employment with the defendant, were you

Mayweather - cross - Cannick                    3492

1   writing truthfully about what you saw and heard?

2   A    I was.

3   Q    And were you writing truthfully about what you saw and

4   heard firsthand?

5   A    I was.

6   Q    And fair to say sometimes gossip also has the benefit of

7   being true?

8   A    Yes.

9   Q    And in this case, was it true?

10  A    Yes.

11  Q    And when you -- you were asked about your participation

12  on *Surviving R. Kelly*.  Those text messages that you wrote

13  were well before *Surviving R. Kelly*; correct?

14  A    Correct.

15           MR. CANNICK:  Objection to the leading.

16           THE COURT:  Overruled.

17  Q    You were also asked about whether you ever saw any

18  underaged girl at the defendant's parties, houses, studios.

19  Do you recall those questions?

20  A    I do.

21  Q    Now, prior to -- well, when you were working for the

22  defendant, did you sometimes attend parties at the defendant's

23  studio?

24  A    Yes.

25  Q    And was there a particular location where his female

Mayweather - cross - Cannick                3493

1    guests or live-in girlfriends would spend their time?

2    A    During the parties?

3    Q    Yes?

4         PROSPECTIVE JUROR:  If they attended, there was a

5    VIP section for them.

6    Q    And in that VIP section, was there anything separating

7    that section from the rest of the party?

8    A    Black pipe and drape.

9    Q    There were curtains, drapes?

10   A    Yes.

11   Q    And when you attended parties prior to starting to work

12   for the defendant, were you always in that VIP section?

13   A    At the black pipe and drape area was at the studio while

14   I was working for him.

15   Q    Right.  And prior to when you were working for him, were

16   you always in any VIP sections where the defendant's female

17   guests or live-in girlfriends were at that time?

18   A    Prior to working for him?

19   Q    Yes?

20        PROSPECTIVE JUROR:  Yes.

21   Q    And were you always there?

22   A    Not always.

23   Q    Sometimes you were there, though; correct?

24   A    Yes.

25   Q    And when you were back there, did you ask for the

MDL        RPR        CRR        CSR

Mayweather - cross - Cannick                3494

1   identification documents of each and every female that was

2   back there?

3   A    No.

4   Q    And you were asked whether or not you ever saw anyone --

5   any females who were underage at that locations.

6            Fair to say that when you met Jane she was 17 years

7   old?

8            MR. CANNICK:  Objection.

9            THE COURT:  Overruled.

10  A    She was, but I didn't know she was.

11  Q    But you later learned she was, in fact, underage,

12  correct?

13           MR. CANNICK:  Objection.

14           THE COURT:  Didn't you ask her what the birthday

15  was?  I think.

16           MR. CANNICK:  No, I didn't ask her that.

17           THE COURT:  I think you did.

18           The objection is overruled.

19  Q    Fair to say she was 17?

20  A    She was 17.

21  Q    You were also asked about whether you ever saw the

22  defendant physically hit any of his guests or girlfriends.  Do

23  you recall that?

24  A    I do.

25  Q    Now, were there times when the defendant was alone in

Mayweather - cross - Cannick                3495

1    rooms with his female guests and girlfriends?

2    A     Yes.

3    Q     And were you always in that same room with them?

4    A     No.

5    Q     So can you say what happened behind closed doors?

6    A     No.

7    Q     Was there a time when you were on the tour bus with the

8    defendant and Jane?

9    A     Yes.

10   Q     Several times; right?

11   A     Yes.

12   Q     And was there ever a time when the defendant and Jane

13   were in that back room of the tour bus and you were in more of

14   the main cabin area of the tour bus?

15          MR. CANNICK:  Your Honor, I'm objecting.  This is

16   beyond the scope.

17          THE COURT:  Overruled.

18   A     Yes.

19   Q     Did you ever hear -- even though you didn't see the

20   defendant physically hit any of his live-in girlfriends or

21   female guests, did you ever hear anything that was consistent

22   with a hit or a spanking?

23   A     I did once.

24   Q     What did you hear?

25   A     Something that sounded like maybe a lick.

Mayweather - cross - Cannick                3496

1    Q    Like a spanking?

2    A    Like a lick.

3    Q    When you say lick, what do you mean?

4    A    Like an open hand sound.

5    Q    And where was the defendant when you heard that?

6    A    In the bedroom.

7    Q    I'm sorry?

8    A    In the bedroom.

9    Q    In the bedroom?

10   A    Uh-hum.

11   Q    Where were you at that time?

12   A    In the area where the couch was, one of the couches.

13   Q    Were you in the bus or the studio?

14   A    The tour bus.  We were on the tour bus.

15   Q    Who was with him in the bedroom at that time?

16   A    Jane.

17   Q    On cross-examination you were asked about whether you

18   were told the reasons for which Jane was on the tour bus on

19   those occasions when you would stay on the tour bus with her.

20   Do you recall those questions?

21   A    I do.

22   Q    Based on your time working for the defendant, what did

23   you believe she was on the tour bus for?

24              MR. CANNICK:  Objection.

25              THE COURT:  Sustained as to form.

MDL      RPR      CRR      CSR

Mayweather - cross - Cannick                3497

1  Q    You were asked whether it was the case that the -- you

2  were asked whether it was the case that Jane was simply doing

3  -- had work to do.  Do you recall those questions?

4  A    I do.

5  Q    And whether she may have been on the tour bus just doing

6  work that she had for high school; correct?

7  A    Correct.

8  Q    Now, was Juice in high school when you worked for the

9  defendant?

10 A    No.

11           MR. CANNICK:  Ob --

12           THE COURT:  I heard a noise.  Is that an objection?

13           MR. CANNICK:  No.

14           THE COURT:  All right.

15 Q    Was there a time that you, in fact, discussed Juice being

16 on punishment?

17 A    No.

18 Q    With the defendant.  By the way, you testified that

19 punishment was your word; correct?

20 A    Yes.

21 Q    Did the defendant say what are you talking about?

22 A    No.

23 Q    Did the defendant respond when you asked him about

24 punishment?

25 A    He did.

Mayweather - cross - Cannick                    3498

1   Q    And what did he say again?

2   A    He just said yeah, Juice gets punished too.

3   Q    He used the term "punished" in that sentence; correct?

4   A    After I used it, yes.

5   Q    You were asked -- oh, by the way, you were asked about

6   whether Jane might have been doing homework on the tour bus.

7   Are there tables in the studio?

8   A    Yes.

9   Q    Pens?

10  A    Yes.

11  Q    Papers?

12  A    Yes.

13  Q    Room for a laptop to sit somewhere?

14  A    Yes.

15  Q    Is it fair to say that someone can also do homework in

16  the room within the studio?

17  A    Yes.

18  Q    You were asked on cross-examination whether the

19  defendant's live-in girlfriends went shopping.  Do you recall

20  those questions?

21  A    Yes.

22  Q    Based on your time working for the defendant, when one of

23  his live-in girlfriends was, in your words, on punishment, did

24  they get to go shopping?

25  A    No.

Mayweather - cross - Cannick                3499

1    Q     Where would they stay?

2    A     At the studio.

3    Q     You were asked about the time that you quit working for

4    the defendant and I think you testified on cross-examination

5    that you -- your sister communicated an offer from the

6    defendant to come back.  Do you recall those questions?

7    A     I do.

8    Q     What were the terms under which the defendant offered for

9    you to come back as communicated by your sister?

10   A     Six months without pay.

11   Q     How many months?

12   A     Six months without pay.

13   Q     And by the way, you were also asked several questions

14   regarding events that occurred in the late '90s, maybe early

15   2000s before you started working for the defendant; correct?

16   A     Correct.

17   Q     And you weren't working for him in the '90s or, you know,

18   the first ten years of 2000; correct?

19   A     No.

20   Q     You were also asked several questions about an incident

21   involving Niecy, if I remember correctly?

22   A     Correct.

23   Q     Niecy, do you recall who Mr. Cannick was referring to

24   when he used the term Niecy?

25   A     Yes.

Mayweather - cross - Cannick                    3500

1   Q     That's not Jane?

2   A     No.

3   Q     And was it Niecy where there were some questions about

4   whether there was an incident involving taking photographs?

5   A     It was Niecy, yes.

6   Q     And do you recall a situation involving Niecy taking

7   photographs?

8   A     Yes.

9   Q     What happened?

10  A     I believe she snapped a photo of a poster, the banner

11  that was in front of the house.

12  Q     And what happened at that time?

13  A     One of the security asked her did she take a photo.

14  Q     And how did she respond?

15  A     I believe she told him yes.

16  Q     And then what happened?

17  A     And he just basically told her she couldn't take photos,

18  as far as I recall.

19  Q     And then did you go inside to the party?

20  A     Yes.

21  Q     You were shown several reports on cross-examination about

22  certain statements that reflected -- during meetings that you

23  had with the Government.  Do you recall those questions and

24  those reports?

25  A     Yes.

Mayweather - cross - Cannick                    3501

1    Q    Did you write those reports?

2    A    No.

3    Q    Prior to your testimony today, had you read any of those

4    reports?

5    A    No.

6    Q    And ever had an opportunity to check them for accuracy?

7    A    No.

8         MS. GEDDES:  I'm showing the witness only what has

9    been marked for identification as 3500-AM1-1, page two.

10   Q    Do you see what's written in this paragraph where my pen

11   is pointed?

12   A    Yes.

13   Q    Fair to say these reports make clear that they are not

14   verbatim accounts of the statements made during those

15   meetings?

16   A    Yes.

17   Q    And fair to say it also makes clear that it doesn't

18   memorialize all statements made during a particular interview?

19   A    Yes.

20   Q    By the way, you were asked about times that you escorted

21   some of the defendant's female guests and live-in girlfriends

22   into a concert venue.  Do you recall those questions?

23   A    Yes.

24   Q    Was your job to provide security for the defendant -- I

25   mean for those live-in girlfriends or female guests?

Mayweather - cross - Cannick                3502

1    A    No.

2    Q    And did the defendant employ other people to provide

3    security for him?

4    A    For him, yes.

5    Q    Were those other people who he employed as security, were

6    they there to provide security for the defendant's female

7    girlfriends and live-in guests?

8    A    No.

9    Q    By the way, you were asked on cross-examination about

10   whether the defendant would stand up when a female -- one of

11   his female guests entered the room.  Do you recall those

12   questions?

13   A    I do.

14   Q    Did the defendant stand up when you walked into a room?

15   A    No.

16            MS. GEDDES:  Nothing further.

17            THE COURT:  Any recross?

18            MR. CANNICK:  Yes.

19            THE COURT:  Okay.

20   RECROSS-EXAMINATION

21   BY MR. CANNICK:

22   Q    You were asked some questions about being at one of Mr.

23   Kelly's party and it was your responsibility to check the IDs

24   of his guests.

25            Do you remember that question just being of you?

Mayweather - cross - Cannick                    3503

1   A    Yes.

2   Q    That was the role of security, am I correct?

3   A    Yes.

4   Q    Okay.  He had, as you just testified, a staff, a security

5   staff that would check ID for age, am I correct?

6   A    I don't think they checked ID for every party.

7   Q    My question was not that.  My question was simply this:

8   He had a staff that was there and that staff was a security

9   staff and they would check ID's am I correct?

10  A    I can't say they did.

11  Q    You can't say that they did?

12  A    No.

13  Q    But you can't say that they didn't?

14  A    I cannot say they did not.

15  Q    Now, just like you can't say -- you were asked a question

16  about what happened behind closed doors.  Do you remember that

17  question being asked of you?

18  A    Yes.

19  Q    Well, you don't know what happened behind closed doors,

20  am I correct?

21  A    Correct.

22  Q    You testified and talked about hearing something that

23  sounded like a spank?

24  A    I said lick.

25  Q    A lick.  After you heard the lick, did you hear any

Mayweather - cross - Cannick                3504

1  screams?

2  A    No.

3  Q    Did you hear any crying?

4  A    No.

5  Q    Did you hear any muffled noise whatsoever?

6  A    No.

7  Q    Now, the bottom line is that you never saw an underaged

8  female at one of Mr. Kelly's parties, am I correct?

9  A    Correct.

10 Q    And you never saw Mr. Kelly physically hit anyone, am I

11 correct?

12 A    Correct.

13 Q    And when you testified that Jane was on this bus, on the

14 tour bus, you don't know why she was on the tour bus, am I

15 correct?

16 A    Correct.

17 Q    Now, you were asked about whether or not there were pens

18 and paper and a desk in the studio, am I correct?

19 A    Correct.

20 Q    But there's also recording going on in the studio, am I

21 correct?

22 A    Correct.

23 Q    People are recording songs, am I correct?

24 A    Correct.

25 Q    Loud music, am I correct?

Proceedings                            3505

1    A    Correct.

2    Q    There's no recording going on in the studio bus, is it?

3    A    No.

4    Q    There was no loud noise in the studio when Jane was there

5    and you were there, am I correct?

6    A    No.

7              MR. CANNICK:  Nothing further, Your Honor.

8              THE COURT:  Any --

9              MS. GEDDES:  Just one question.

10             THE COURT:  Okay.

11   REDIRECT EXAMINATION

12   BY MS. GEDDES:

13   Q    In the recording studio, is the recording studio itself

14   soundproof?

15   A    The recording part, yes.

16   Q    Where someone would record?

17   A    Yes.

18             MS. GEDDES:  Nothing further.

19             THE COURT:  Anything else?  Any other questions?

20             MR. CANNICK:  Just one second, please.

21             No questions.

22             THE COURT:  All right.  I'm trying to think about

23   using our time well.  I think we might start another witness

24   since we are staying a little bit late and we will begin lunch

25   at like 1:20 or so, does that work for everybody?  Nobody is

Proceedings                                  3506

1    saying no.

2              THE COURTROOM DEPUTY:  It's not here any way.

3              THE COURT:  Let's soldier on.  Can you call your

4    next witness, please.

5              MS. CRUZ MELENDEZ:  The Government calls Nicholas

6    Williams to the stand.

7              THE COURT:  Okay, we can take this witness away.

8    Thank you so much.

9              THE WITNESS:  You're welcome.

10             (Witness steps down.)

11             THE COURTROOM DEPUTY:  Please stand and raise your

12   right hand.

13             Do you solemnly swear or affirm that the testimony

14   you're about to give will be the truth, the whole truth, and

15   nothing but the truth?

16             THE WITNESS:  I do.

17             THE COURTROOM DEPUTY:  Thank you.  You may be

18   seated.

19             THE COURT:  All right.  You can take your mask off.

20             Just a couple of things.  The microphone is on,

21   right?  Do you want to tap it?

22             THE WITNESS:  Yes, it is.

23             THE COURT:  I want to make sure the jury can hear

24   what you have to say.  You are also perfectly free to take it

25   out and hold it if it makes it easier.  I want to make sure

Proceedings                                     3507

1   they can hear you.  The court reporters take down everything

2   that you say, so don't speak too quickly.

3              THE WITNESS:  Okay.

4              THE COURT:  Or don't speak over whoever is

5   questioning you.

6              And if there is a question that you want to have

7   clarified or repeated, just tell me and I will have the

8   lawyers rephrase it.

9              THE WITNESS:  Okay.

10             THE COURT:  Just do your best to answer the

11  questions that you are being asked and not volunteer anything,

12  okay?

13             THE WITNESS:  Sure.

14

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Williams - direct - Cruz Melendez          3508

1  **NICHOLAS WILLIAMS**,

2      called by the Government, having been duly sworn, was

3      examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MS. CRUZ MELENDEZ:

6  Q    Mr. Williams, where did you grow up?

7  A    I grew up in Springfield, Illinois.

8  Q    Are you currently employed?

9  A    I am.

10 Q    How are you employed?

11 A    I am a product designer for a medical device

12 manufacturer.

13 Q    And how far did you go in school?

14 A    Officially I obtained an associate's degree.  I've taken

15 coursework in electrical engineering and computer programming,

16 but officially the associate's is the furthest I have gone.

17 Q    Where did you get your associate's degree?

18 A    Full Sail University.

19 Q    Where is Full Sail University located?

20 A    Winter Park, Florida near Orlando.

21 Q    And what field did you get your associate's degree?

22 A    Audio engineering.

23          (Continued on next page.)

24

25

MDL      RPR      CRR      CSR

Williams - direct - Geddes                3509

1    BY MS. GEDDES:   (Continuing.)

2    Q    Why did you get a degree in audio engineering?

3    A    I played drums growing up since I was a kid and I wanted

4    to move into doing sounds in recording studios and wanted to

5    do it professionally.

6    Q    After you completed Full Sail University, did you get a

7    job related to the music industry?

8    A    I did, but not immediately.

9    Q    Where did you get a job once you got one in the music

10   industry?

11   A    I stayed in contact with Full Sail's placement department

12   and they put me in contact with what I thought was Chicago

13   Trax in Chicago.

14   Q    What's Chicago Trax?

15   A    Chicago Trax was a recording studio.

16   Q    And when did you obtain the job?

17   A    I believe that I interviewed in April of 2003 and then

18   obtained the job roughly May or June.

19   Q    Now you testified that Chicago Trax Studio was located in

20   Chicago; correct?

21   A    Correct.

22   Q    Do you recall do recall the address of the studio?

23   A    I do.  It was 865 North Larrabee.

24   Q    North Larrabee Street in Chicago?

25   A    Yes.

SN      OCR      RPR

Williams - direct - Geddes                    3510

1   Q    I believe that you testified that you obtained the job in
2   May or June of 2003; correct?
3   A    That's correct.
4   Q    Or, excuse me, that you started your job approximately
5   May or June of 2003; correct?
6   A    Yes, correct.
7   Q    And how long did you work at Chicago -- the studio?
8   A    It was roughly one year.
9   Q    Approximately how old were you when you first began
10  working at Chicago Trax?
11  A    I would have been 19.
12  Q    I'm showing you what's in evidence as Government Exhibit
13  30.
14       MS. CRUZ MELENDEZ:  We can show this to the jury and
15  the public.
16       (Exhibit published.)
17  BY MS. CRUZ MELENDEZ:
18  Q    Do you recognize that?
19  A    Unfortunately, I do.
20  Q    And who is that?
21  A    That's a very embarrassing picture of myself.
22  Q    And approximately how old were you at that time?
23  A    I believe I was 19 at that point.
24  Q    Now when you first started working at what you believed
25  was going to be Chicago Trax Studio, did you know who you

1  would be working for?

2  A    When I accepted the position or was offered the position,

3  I did not know.  I found out my first day of work.

4  Q    And said on your first day of work you found out?

5  A    Yes.

6  Q    And who did you find out you would be working for?

7  A    I was told by Tom Arnold, the studio manager, that I

8  would be -- the way the conversation went is when I sat down

9  for my first day of work to get my instructions for what to do

10  I was told that basically my job was to do whatever Rob

11  wanted.

12  Q    And --

13  A    And I asked who Rob was.  And he was like, are you

14  serious.  No, I don't.  He said you are working for Robert

15  Kelly.  You are working for R. Kelly and your job is to do

16  whatever he wants for him.

17  Q    At the time did you know who Rob Kelly was?

18  A    I did, yes.

19  Q    Who did you understand him to be?

20  A    A global musician R&B performing artist.

21  Q    And are you excited the prospect of working with

22  R. Kelly?

23  A    I was.

24  Q    Now, you testified when you originally started working at

25  the studio, you thought you were going to be working for

Williams - direct - Geddes                         3512

1  Chicago Trax Studios and then you learned that you were going

2  to be working for Robert Kelly.

3           What was the difference between working for Chicago

4  Trax or working for Robert Kelly?

5  A    So, I believe I found out in the first week that Chicago

6  Trax was no longer an actual studio.  It was purchased by

7  Robert Kelly to use for his own studio.  And Chicago Trax

8  itself was no longer in business.

9  Q    So you mentioned Tom Arnold is the studio manager?

10 A    Correct.

11          (Exhibit published.)

12 Q    I am showing you what's in evidence as Government Exhibit

13 31.  Do you recognize this individual?

14 A    I do.

15 Q    And who is that?

16 A    That is Tom Arnold.

17 Q    I'm also showing you what's in evidence as Government

18 Exhibit 1.  Do you recognize the individual in that

19 photograph?

20 A    I do.

21 Q    Who is that?

22 A    That's Robert Kelly.

23 Q    At some point when you started working at the studio that

24 was owned by Robert Kelly, did you have an opportunity to meet

25 him?

SN        OCR        RPR

1  A    I did.  I -- from early on I worked with him or saw him

2  or interacted with him daily.

3  Q    Do you see him in the courtroom here today?

4  A    It's difficult to tell with the mask, but I do believe I

5  see the gentleman with a blue striped tie, blue suit

6  between --

7          THE COURT:  Why don't we make it easier if Mr. Kelly

8  can take his mask off.

9          THE WITNESS:  Can you please lower it?

10  A    Yes, that is Rob.

11          THE COURT:  Indicating the defendant.

12  BY MS. CRUZ MELENDEZ:

13  Q    Now when you first started working at the studio, what if

14  any paperwork were you required to sign when you began working

15  there?

16  A    I signed a confidentiality agreement.

17  Q    And who presented you with that confidentiality

18  agreement?

19  A    That would have been Tom Arnold.

20  Q    And what did you understand your obligations to be under

21  the confidentiality agreement?

22  A    Basically, like most agreements or NDAs, anything that

23  was sought -- anything that was seen, discussed, talked about,

24  any interactions that occurred within the walls of the studio

25  or out publicly, if out in public with Rob, was to be kept to

1  myself, not released to the public, not talked about with

2  friends, not talked about on social media, et cetera.

3  Q    Now, you stated that when you first learned that you were

4  going to be working with R. Kelly, the defendant, that you

5  were excited about that prospect.  Did that change at some

6  point?

7  A    It did.  Over time it did.

8  Q    Why?

9  A    Well, many of the things that I saw that I was required

10 to do, they made me uncomfortable.  It seemed -- there were

11 times when there was hostility from the defendant and it felt

12 like a hostile work environment.  In addition, I was under the

13 impression that I would be eventually able to use audio

14 equipment and I wasn't able to do that.

15 Q    You testified you started -- when you started at this

16 studio, what was your position again?

17 A    When I first started, I was an intern.

18 Q    And was that a paid position?

19 A    It was not, no.

20 Q    What were your duties and responsibilities when you first

21 started as an unpaid intern?

22 A    As an intern, I was required to do basic cleaning,

23 vacuuming, wiping down of any bathrooms, sinks, toilets,

24 cleaning the floors, making coffee in the morning and just any

25 general requests that came in from Tom, Rob or any other

1    employees that were above me.

2    Q    Now, at some point did your position as an intern change?

3    A    It did.  After three months, I was promoted to -- I don't

4    know if there was ever a technical name for the position, but

5    I basically sat at the front security desk and answered phones

6    and let people in and out of the gated parking lot outside.

7    Q    Now, was that a paid position?

8    A    That was.  That was $6 an hour.

9    Q    And how long were you in that position?

10   A    I was in that position for roughly nine months since the

11   internship was three months so a total of about 12.

12   Q    When you were answering phones at the security desk at

13   the studio did you work a particular shift?

14   A    Yes.  I worked four days a week from 10 p.m. until noon

15   the following day.

16   Q    And did you ever work hours longer than that designated

17   shift?

18   A    I did.  The individual that was supposed to replace me

19   would generally come in a couple of hours late.  So a 14-hour

20   shifts ends up being 16 or 17 hours.

21   Q    Now, when you worked, did you have to keep track of your

22   time in some way?

23   A    I did.  There was an old manual timecard machine on the

24   wall with paper timecards that you would slide in, press the

25   button and it would record the time and you would enter that

Williams - direct - Geddes                    3516

1    in a box, your arrival and end time.

2    Q    Were the timesheets used for the purposes of you

3    receiving your pay?

4    A    Yes, they would have been.

5    Q    When you filled out your timesheets, fair to say that you

6    wanted to be accurate on those timesheets?

7    A    That's accurate, yes.

8    Q    When you received payment, how did you get paid?

9    A    I believe it would have been in the form of a check.

10   Q    And who issued your checks?

11   A    Those came from a company called Bass Productions.

12   Q    Now, you testified that you worked the late shift from 10

13   p.m. to 12 p.m. the following day when you worked shifts and

14   that there was another individual who would often show up

15   late.  Who if anyone worked that day shift while you were

16   working at the studio?

17   A    That would have been Blake Chaffin.

18        MS. CRUZ MELENDEZ:  Showing the witness what's in

19   evidence as Government Exhibit 24.

20        (Exhibit published.)

21   BY MS. CRUZ MELENDEZ:

22   Q    Do you recognize that individual?

23   A    I do.

24   Q    Who is that?

25   A    Blake Chapman with much shorter hair.

1   Q    During your time working for the defendant at the studio

2   on Larrabee Street, did you have an opportunity to meet other

3   individuals who worked for the defendant?

4   A    I did.  There were the positions of what I knew to be

5   business manager which would have been Donnie Lyle along with

6   head of security which would have been Big John.

7   Q    Now, you mentioned a Donny Lyle.  I'm showing you what's

8   in evidence as Government Exhibit 32.

9            (Exhibit published.)

10  Q    Do you recognize that individual?

11  A    Yes.

12  Q    Who is that?

13  A    That is Donny Lyle.

14  Q    What was his position?

15  A    As far as I knew it was business manager.

16  Q    For the defendant?

17  A    Correct.

18  Q    You also mentioned a Big John as working security?

19  A    That's correct.

20  Q    I'm showing you what's in evidence as Government Exhibit

21  23.

22           (Exhibit published.)

23  Q    Do you recognize that individual?

24  A    I do.

25  Q    And who is that?

Williams - direct - Geddes                    3518

1    A    That is Big John.

2    Q    Do you know Big John's full name?

3    A    Unfortunately I do not.

4    Q    I'm also showing you what's in evidence as Government

5    Exhibit 49.

6              (Exhibit published.)

7    Q    Do you recognize this individual?

8    A    I believe I do.

9    Q    And who is that?

10   A    That would have been one of the engineers, Ian Mereness.

11   Q    And did he work at the studio at the time that you were

12   working at the studio?

13   A    He did, yes.

14   Q    And did he work as an engineer for the defendant?

15   A    He was one of the primary engineers, yes.

16   Q    I'm showing you what's in evidence as Government Exhibit

17   50.

18             (Exhibit published.)

19   Q    Do you recognize that individual?

20   A    I do.

21   Q    Who is that?

22   A    That is Abel Garibaldi.

23   Q    And what, if anything, did he do?

24   A    He was also one of the primary engineers, if not the

25   primary audio engineer for Rob.

1  Q    Okay.  I'm also showing what's in evidence as Government

2  Exhibit 26.

3           (Exhibit published.)

4  Q    Do you recognize this individual?

5  A    I do recognize that individual.

6  Q    And what if -- how do you recognize him?

7  A    I believe he was one of the assistant engineers at the

8  studio.

9  Q    Do you recall his name?

10  A    I think it might be Jeff but I don't recall the last

11  name.

12  Q    So you testified that you answered telephones as part of

13  your responsibilities once you moved into your paid position.

14  How many telephone lines were there at this studio?

15  A    There were four telephone lines.  There was one primary,

16  but four total lines.

17  Q    Were you responsible for answering all of those telephone

18  lines?

19  A    I was, yes.

20  Q    Other than the telephone at the reception area where you

21  worked and answered telephone, were there telephones in other

22  locations around the studio?

23  A    Yes.  There were -- I don't recall exactly the location

24  or the number of them, but there would have been one in Tom's

25  office, his main office, as the studio manager.  There were

Williams - direct - Geddes                 3520

1    two or three spread out on the wall in the hallway.  So if we

2    were -- since it was primarily two stories.  If I had to run

3    up a note upstairs and I needed to answer the phone upstairs

4    there was one in the hallway and then there were occasional

5    rooms that had phones.

6    Q    So you mentioned a couple of different types of phones in

7    the studio.  You mentioned the hallway area.  Obviously you

8    mentioned the offices.  What other types of rooms were there

9    at is the studio?

10   A    So there were -- I know there was a large warehouse that

11   had garage access.  There was a room for, like, telephone

12   service and IT-type things.  There was a waiting room up

13   front.  There was a small lounge/waiting room for any music

14   artists that came through the studio and upstairs what used to

15   be, I believe, four or five different industry-standard

16   recording studios, only two of those were kept open to be

17   operated as recording Studios and the rest then were turned

18   into lounges for guests.

19   Q    And who turned them into lounges?

20   A    It occurred before I arrived there, but I believe it

21   would have been at Rob's direction.

22              MR. CANNICK:  Well --

23              THE COURT:  If you don't know, don't testify.

24              Did you object?

25              MR. CANNICK:  Yes.

1          THE COURT:  All right, the objection is sustained as

2     to that part.

3     BY MS. CRUZ MELENDEZ:

4     Q     But fair to say that there were lounges inside of the

5     studio?

6     A     Yes.

7     Q     You also testified about Tom Arnold's office do you

8     recall what floor that was on?

9     A     It was on the first floor right next to the security

10    area.

11    Q     Now, while you were on shift did anyone other than you

12    use or answer the studio telephone lines?

13    A     Occasionally Rob would pick up the phone himself but if I

14    was there overnight, it would generally be me picking up.

15    Q     Now if someone called into the studio, what would you say

16    when you answered the phone?

17    A     Initially whenever I would pick up the phone it was just

18    a simple "Studio" and that's it.  As time progressed we were

19    instructed to call is the studio the Chocolate Factory.  I

20    would answer the phone saying "Chocolate Factory."

21    Q     Why would you answer the phone as Chocolate Factory?

22    A     Rob directed us to answer the phone as Chocolate Factory.

23    Q     While working at the studio did you answer calls of

24    people trying to reach the defendant?

25    A     I did.

Williams - direct - Geddes                    3522

1    Q    And what types of people would call the studio asking to

2    speak to the defendant?

3    A    It could be any number of people; his personal trainer,

4    other musical artists or actors that needed to be in touch

5    with him.  Anybody that arrived at the front gate to come into

6    the studio or other fans or guests that were within the walls

7    of the studio.

8    Q    When you say fans or guests, did you ever receive calls

9    from female individuals looking to speak with the defendant?

10   A    I did, yes.

11   Q    So if someone called the studio trying to reach the

12   defendant what, if any, process did you have for alerting the

13   defendant to a call?

14   A    So, next to the phone we had a stack of cut up pieces of

15   paper that were roughly one and a half by two and a half

16   inches in dimension and the process was to write down the name

17   of the person who was on the phone line, along with the

18   four-digit extension of that particular phone that they were

19   calling in on.  Once that's written down, I would run up to

20   whatever location I knew Rob to be.  It was generally the

21   recording studio, the primary recording studio.

22         I would wait for music to stop, open the door, step

23   in and stand in the corner without looking at anybody waiting

24   to be acknowledged and then I would hand that piece of paper

25   to Rob when I was and he would say either, Yeah man, I got it

1    or I'm not here.

2    Q    When he said I'm not here, meaning for you to tell the

3    individual on the phone that Rob was not there?

4    A    Correct.  That I'm sorry, I can't find him.

5    Q    So just to be clear, you previously testified that

6    individuals would call the studio lines; correct?

7    A    That's correct.

8    Q    And some of those individuals were females; correct?

9    A    Correct.

10   Q    Okay.  Did some of these calls come from outside of the

11   studio?

12   A    Yes.

13   Q    And while working reception did you ever answer calls

14   from inside the studio from individuals trying to reach the

15   defendant?

16   A    I did, yes.

17   Q    And did you ever receive calls from inside of the studio

18   from females trying to reach the defendant?

19   A    That is correct, yes.

20   Q    Generally speaking who would these females be?

21   A    These would be female guests that came to see Rob and

22   were in one of the lounges, one of the lounges on the second

23   floor.

24   Q    You testified that --

25                MS. CRUZ MELENDEZ:  One second, Your Honor.

1          THE COURT:  Okay.

2    BY MS. CRUZ MELENDEZ:

3    Q    Just backing up for a moment when you were talking about

4    answering calls, you mentioned a four-digit extension?

5    A    That's correct.

6    Q    What were you referring to?

7    A    The -- IT would be the last four digits of whatever the

8    phone number was that they were calling from.

9    Q    From inside the studio?

10   A    So, basically if somebody is calling down from -- down to

11   the front lobby area from any other phone, they would pick up

12   and choose a line and the last four digits of that particular

13   line would then light up as they were calling me on the main

14   line and then I would write down which room that they were in

15   and who it was if I knew who it was.

16   Q    So someone calling from inside the studio when you saw

17   the four-digit extension, that's the extension to the

18   telephone number from whatever phone it is inside of the

19   studio?

20   A    You could select different four-digit phone numbers from

21   whatever phone you were at.  So it wouldn't tell me which room

22   they were in.

23   Q    But it's fair to say it's from inside of the studio?

24   A    Correct, yes.

25              THE COURT:  Okay, I think now is a good time to stop

1  for lunch.

2          The witness can step down.

3          (Witness steps down.)

4          THE COURT:  Folks I'm going to excuse you for lunch.

5  Don't talk about the case in any way, shape or form but have a

6  good lunch.  We will be back here at 2:30.

7          THE COURTROOM DEPUTY:  All rise.

8          (Jury exits.)

9          THE COURT:  Everybody can sit down.  How much more

10 do you think you have with this witness?

11         MS. CRUZ MELENDEZ:  Maybe half an hour.

12         THE COURT:  Is this your witness, Mr. Cannick?

13         MR. CANNICK:  Yes.

14         THE COURT:  Okay.  I wondered how much more we're

15 going to get done today.  Who is after this witness?

16         MS. GEDDES:  Our case agent.  We have one witness --

17         THE COURT:  Somebody had surgery?

18         MS. GEDDES:  Yes.  We have a short witness for

19 tomorrow which we may ask to take out of order because that

20 witness is flying in and two more witnesses on Friday.

21         THE COURT:  Anything anybody has to bring up BEFORE

22 we break?

23         MS. GEDDES:  No.

24         MR. CANNICK:  No.

25         (Luncheon recess taken.)

1                 A F T E R N O O N   S E S S I O N

2                      (In open court.)

3            (The Hon. Ann M. Donnelly, presiding.)

4                    (Defendant present.)

5      (The following occurs outside the presence of the jury.)

6            THE COURT:  We've been talking about scheduling a

7   little bit.  I had told the jurors that we would go to 6 today

8   and I am told by the optimistic representatives of both sides

9   that that's not necessary.  I think we will just see because

10  if the plan is to finish the Government's case on Friday, I

11  really would like that to happen and I would rather have extra

12  time on Friday than today.  The other thing is that obviously

13  for anyone who observes Yom Kippur, it will be nicer to leave

14  earlier tomorrow.

15           I think I'm going to stick with the 6 o'clock unless

16  there's a burst of speed here that moves us along which I

17  don't sense.  So let's get the witness and then we will get

18  the jury.

19           (Witness takes the stand.)

20           (Jury enters.)

21           THE COURTROOM DEPUTY:  You may be seated.

22           THE COURT:  We had a few little matters to discuss

23  but we are doing fine schedule-wise so we will continue with

24  the direct examination.

25           Go ahead.

Proceedings                                          3527

1          THE COURTROOM DEPUTY:  The witness is reminded he is

2    still under oath.

3          THE WITNESS:  Yes, agreed.

4    NICHOLAS WILLIAMS having been previously duly sworn/affirmed,

5        testified as follows:

6    CONTINUED DIRECT EXAMINATION

7    BY MS. CRUZ MELENDEZ:

8    Q    Prior to the lunch break you were testifying about

9    receiving calls from both inside and outside the studio.  Do

10   you recall that?

11   A    Yes.

12   Q    I believe you testified that when you received calls, you

13   received calls from females both outside and inside the studio

14   looking to speak with the defendant; is that correct?

15   A    That's correct.

16   Q    With respect to both calls coming from outside and inside

17   of the studio, did you use that same process you testified

18   earlier before, writing the message down and then going to the

19   defendant wherever he was in the studio?

20   A    Yes, that's correct.

21   Q    So, you testified that as part of your responsibilities

22   while working the reception desk that also included letting

23   visitors into the studio premises?

24   A    Correct.

25   Q    Can you describe the exterior of the building that housed

Proceedings                                            3528

1   the defendant's studio?

2   A    Okay.  North Larrabee Street if you were on the street

3   facing the facility, on the right side is the primary facility

4   and on the left side is a chain link fenced-in parking lot.

5   From the street on the main part of the building, there was a

6   rollup garage door.  That was the only other entrance that I

7   was aware of from outside of the gated parking lot.

8           When you pull up to the gated parking lot surrounded

9   by a very tall chain link fence, there was a phone call keypad

10  on the left in front of an automatic sliding chain link fence

11  and someone could come up to that to call into me.  When you

12  enter the parking lot, the main entrance was on the first

13  level to the left.  If you're now facing the side of the

14  building and there was also a stairway that led upstairs to a

15  second story on the right side of that facing the building.

16          MS. CRUZ MELENDEZ:  So I'm showing the witness

17  what's in evidence as Government Exhibit 525(u).

18          (Exhibit published.)

19  BY MS. CRUZ MELENDEZ:

20  Q    What do we see in 525(u)?

21  A    If you look under the sign that says Chicago Trax, that's

22  the call keypad that you would use to call whoever was working

23  the front desk to enter, but this is the chain link that

24  surrounds the parking lot part of Chicago Trax along with the

25  automatic gates.

Proceedings                                         3529

1   Q     Showing you 525(b) below the center of the photographs is
2   that the keypad that you testified about?
3   A     Yes, yes.
4   Q     Also showing you Government Exhibit 525(q) which is in
5   evidence what do we see here?
6   A     That is the main first floor entrance to the facility.
7   Q     And showing you what's in evidence as Government Exhibit
8   525(r) what do we see here?
9   A     I see the rolltop garage door, but this looks slightly
10  different from what I remember during my employ.
11  Q     Now, what kinds of visitors would come see the defendant
12  at a studio?
13  A     Visitors that would come see Rob could vary from other
14  professional artists, musicians, actors that he was doing
15  projects with, his personal trainer, some of his close
16  entourage.  Obviously any of the other employees that worked
17  there can come to the facility.  But to see Rob directly were
18  the folks that I just listed before and any female guests that
19  he invited to the studio after a show or after a performance,
20  something of that nature.
21  Q     Now, when -- focusing on the visitors who came to the
22  studio, how did you know who to let into the studio to see the
23  defendant?
24  A     This was a similar process to the phone call.  If
25  somebody came to the front gate, I would write down who the

Proceedings                                                3530

1   person was at the front gate instead of the four-digit number

2   and the name of the person who it was and run that up to Rob.

3   Q     And once an individual was inside of the chain link fence

4   that you testified about, what, if anything, would you do to

5   let people in?

6   A     I would -- I feel like I recall a buzzer at the front

7   door that I would have to buzz to let them open the main door

8   to the building itself.

9   Q     Was there access into the studio building other than

10  through the front door?

11  A     There was, but not public access.  That stairway that

12  goes upstairs, that was another entrance and then of course

13  the rolltop door where he parked his vehicle.

14  Q     When you say "he" who do you mean?

15  A     Where Rob, the defendant, would park his vehicle.

16  Q     Where would he park his vehicle?

17  A     He entered the garage that was accessed from the street

18  and pull into a garage type room within the facility.

19  Q     And if someone entered in through the garage, how would

20  they get into the building?

21  A     There was an elevator that went directly up to the second

22  floor from there.

23  Q     Were there cameras inside the garage from what you could

24  see?

25  A     Not that I was aware of, no.

Proceedings                                              3531

1   Q    If there was a visitor inside the gate by the front door

2   where you would let them in?

3   A    There were cameras at the front entrance, cameras in the

4   front main hallway leading to the waiting area.  So, facing

5   the door and then also facing down the hallway in the other

6   direction I believe was another camera.

7   Q    You testified that some of the defendant's guests who

8   came to visit him were females; is that correct?

9   A    That's correct.

10  Q    And during your time working for the defendant did you,

11  in fact, let female guests into the studio who came to see the

12  defendant?

13  A    I did, yes.

14  Q    And on those instances, would you alert the defendant to

15  their presence?

16  A    Before they would be let into the building, I would have

17  to get permission of where to move those guests within the

18  building.  I would generally be told something in the nature

19  of put them in lounge two.

20  Q    Who would tell you that?

21  A    Rob would tell me that.

22  Q    To be clear, if a female came to see Rob, you would speak

23  with Rob, the defendant, and he would tell you where in the

24  studio to place that female guest?

25  A    That's accurate, yes.

Proceedings                                          3532

1   Q    Now, you mentioned that there were times when the

2   defendant left to do performances and concerts and parties, I

3   believe you said.  On those occasions would female guests come

4   to the studio?

5   A    On occasion, they would.  I believe they would come in --

6   I know that they would come into -- I know that they would

7   come to the front gate either immediately after Rob returned

8   or within the next hour or so, but I also am aware that some

9   of the female guests entered the garage with him.

10  Q    What, if anything, did you notice about some of the

11  female guests that came to see the defendant after these

12  concerts and parties?

13  A    All of them were very young.

14  Q    And how old were you at the time?

15  A    19.

16  Q    Now, did any of the defendant's female guests who came to

17  see the defendant remain at the studio overnight?

18  A    On a regular basis, yes.  Generally if there was a guest

19  that came to the studio they would arrive on a Thursday or

20  Friday and stay until Sunday or Monday.

21  Q    When you say "guests" are you referring to female guests

22  that would stay that long?

23  A    I am, yes.

24  Q    What if any instructions were you given regarding how you

25  were interact with the defendant's female guests?

SN        OCR        RPR

Proceedings                                          3533

1    A    My direct rules were that I did not interact with the

2    female guests at all.  None of us were allowed to.  You

3    couldn't look them in the eye or greet them when they entered

4    the door in the building.  You were not allowed to talk to

5    them in their room.  You don't have extra conversation if they

6    happen to call down to the front desk.  There was basically no

7    interaction with these guests.

8    Q    Who gave you these instructions?

9    A    These instructions came from Rob.

10   Q    And did you follow these instructions?

11   A    I did.

12   Q    So, you testified that you would get instruction from the

13   defendant as to where to put female guests when they visited

14   the studio; is that correct?

15   A    That's correct.

16   Q    Were there times where you escorted female guests to

17   various locations within the studio?

18   A    As directed as just described, yes.

19   Q    So you previously testified in answering phone calls you

20   received calls from inside the studio from the defendant's

21   guests.  When you received the defendant's female guests'

22   calls, what types of calls would they be calling for?

23   A    It was rare that I would receive a call but the majority

24   of the time it was requesting food.

25   Q    And if you received a request from -- fair to say, just

SN        OCR        RPR

Proceedings                                                3534

1   to be clear we're talking about defendants' guests who were

2   already inside the studio; correct?

3   A    That's correct.

4   Q    And if you received a request from the defendant's female

5   guests seeking food what, if anything, were you supposed to

6   do?

7   A    Find the location of Rob, go let him know and ask him how

8   to proceed.

9   Q    Now, in these instances in which you received phone calls

10  from the defendants' female guests, what if Rob wasn't

11  available, what would you do?

12  A    This scenario was not as familiar to me, but generally

13  there would be --

14           MR. CANNICK:  Objection.

15           THE COURT:  Overruled?

16           PROSPECTIVE JUROR:  Generally there would be some

17  other representative of Rob's entourage in the building that I

18  could reach out to and have him get ahold of Rob, but I do not

19  remember what would happen when Rob was not in the building.

20  Q    You testified previously about individuals who worked for

21  the defendant including Donnie Lyle and Big John.

22           Did you communicate with them with respect to -- on

23  occasion with respect to the defendant's female guests?

24  A    Yes, I did.  And, I'm sorry, I would like to clarify my

25  answer on the last question.

Proceedings                                              3535

1              When I said I don't know -- I don't remember what

2    happened when Rob wasn't in the building, what I was referring

3    to -- I was referring to what I would do when none of the

4    entourage was in the building.  If Donnie Lyle or Big John

5    were in the building --

6              I'm sorry, can you repeat the second question?

7    Q    Whether or not you had conversations with Donnie Lyle or

8    Big John with respect to female guests in the event that the

9    defendant wasn't around.

10   A    Yes.  Occasionally one of the individuals, Donnie Lyle or

11   Big John would be the one to escort one of the girls in or out

12   of the building.  It wasn't always my responsibility.

13   Sometimes it was -- they on their own would retrieve food or

14   items that were requested by any of the guests.

15   Q    Now, you testified that when you got such a request for

16   food from the defendant's female guests that you would seek

17   some form of authorization.  What, if anything, would you do

18   if you couldn't get authorization from either the defendant or

19   Donnie Lyle or Big John?

20   A    If they were in the building or just in general?

21   Q    If for -- if they were busy or if they were not in the

22   building would you wait before doing -- before acting?

23   A    That is the portion that I don't recall.  I don't

24   remember what my procedure was if none of them were available

25   or I couldn't reach them.

Proceedings                                              3536

1    Q    So when you did order food and food arrived, what, if

2    anything, would you do with the food once it arrived?

3    A    So, this could also be any number of scenarios where

4    either I delivered it myself and knocked on the door and set

5    it outside of the door and left, or the door was cracked and

6    it was handed to whichever female guest was in that room.  The

7    door is not open very far.  You hand it and go, no

8    conversation or Rob, Donnie or Big John would deliver it

9    themselves once it arrived.

10   Q    And you mentioned that you would knock on the door and

11   deliver the food or leave it in front of the door, perhaps

12   crack the door a little bit.  Why did you deliver the food in

13   this manner?

14   A    In the manner of very little interaction?

15   Q    Yes.

16   A    Because we were not allowed to interact with the guests.

17   Q    Based on the rules that you said were set forth by the

18   defendant?

19   A    That is correct.

20   Q    How would the defendant's female guests interact with you

21   if at all when you dropped off the food?

22   A    They wouldn't.  Any time that I did see one of them their

23   eyes were down to the ground.  They wouldn't say anything.

24   There wouldn't be a thank you or anything like that.  They

25   just seemed -- I don't know, they seemed sad.  But they would

SN        OCR        RPR

Proceedings                                                    3537

1   take the food, close the door and that was it.

2   Q    Now, based on your observations while working at the

3   defendant's studio were the defendant's female guests allowed

4   to move freely around the studio?

5   A    Absolutely not.

6   Q    Did you ever observe the defendant's female guests moving

7   freely around the studio?

8   A    I did not.

9   Q    Were the defendant's male friends and employees able to

10  move about the studio freely?

11  A    They were, yes, unless there a moment that was called a

12  blackout.

13  Q    Can you explain what you mean by that?

14  A    There were numerous occasions where I would get a call

15  directly from Rob that would say it's blackout upstairs or

16  entire nights or it could be for the next hour.  And what a

17  blackout is that nobody -- nobody that wasn't Donnie or Big

18  John could be upstairs.  I couldn't be upstairs, none of the

19  other engineers could be in the hallway.  It was -- what's the

20  word I'm looking for, off limits.  The area was off limits.

21  Q    With respect to these blackout -- withdrawn.  You had

22  previously testified that there were times where Donnie, Lyle

23  or Big John would escort the defendant's female guests around

24  the studio.  Were there blackout moments during those times?

25  A    If there was a blackout, I wasn't allowed to go upstairs

Proceedings                                    3538

1  so unfortunately I don't know if that's what was occurring

2  upstairs.

3  Q    What, if anything, to you recall being told to you if the

4  defendant's female guests was going to be moved from one area

5  to another area?

6            MR. CANNICK:  Objection, hearsay.

7            THE COURT:  Sustained as to form.

8  BY MS. CRUZ MELENDEZ:

9  Q    You previously testified that there were instances in

10 which Donnie Lyle or Big John would escort the defendant's

11 female guests through the studio.  Would you interact with the

12 defendant's female guests when they were being moved through

13 the studio?

14 A    No, not at all.

15 Q    Now, you also testified that the -- what, if anything,

16 would you hear from the defendant's employees or the defendant

17 himself about where you should be when the defendant's female

18 guests were being moved through the studio?

19           MR. CANNICK:  Same objection.

20           THE COURT:  Overruled?

21           PROSPECTIVE JUROR:  If I knew that there was a

22 blackout period, which is the moment in time when there was

23 movement upstairs, I was required to stay in my seat

24 downstairs by the phone.

25 Q    Movement by female guests?

Proceedings                                3539

1    A    Correct.

2    Q    Now, you previously testified that some of the

3    defendant's guests, female guests excuse me, would be escorted

4    to stay in various rooms including lounges throughout the

5    studio.  Did the rooms used as lounges all have bathrooms in

6    them?

7    A    I don't believe they did, no.

8    Q    And you also said that female guests couldn't move freely

9    around the studio.  So if, for example, the female guest

10   needed to use the bathroom, what would happen?

11   A    If they were able to talk to Rob they would likely -- let

12   me retract that, because I don't know that.

13            This would be, I guess another one of the scenarios

14   where I believe I stated before, I testified before, that it

15   was generally only food calls that came down.  I could

16   occasionally get a call saying I need to use the restroom and

17   the process would be the same.

18   Q    They would be escorted by someone to the bathroom?

19            MR. CANNICK:  Objection.

20            THE COURT:  Sustained as to form.

21            Did you ever get these calls for somebody who wanted

22   to go to the bathroom?

23            THE WITNESS:  Yes, that's -- yes.

24            THE COURT:  And what happened if a female guest was

25   calling to say saying that she wanted to go to the bathroom?

```
                    Proceedings                    3540
```

1           THE WITNESS:  I'm sorry?

2           THE COURT:  Are you saying that you got calls at the

3      desk?

4           THE WITNESS:  I did.

5           THE COURT:  From a female guest that said that she

6      needed to use the bathroom?

7           THE WITNESS:  Yes.

8           THE COURT:  Did you escort the person?

9           THE WITNESS:  I was never allowed to escort that

10     person.

11          THE COURT:  What did you do when you got the calls?

12          THE WITNESS:  The same process with the food

13     request.  The paper would have the person calling and what the

14     request was and you would deliver that piece of paper to Rob

15     and he would handle it.

16          THE COURT:  Okay, next question.

17

18          (Continued on the following page.)

19

20

21

22

23

24

25

1  DIRECT EXAMINATION (CONTINUED)

2  BY MS. CRUZ MELENDEZ:

3  Q    Were there any bathrooms on the first floor of the

4  studio?

5  A    I believe I recall one towards the back of the first

6  floor, but not in the main area up front.

7  Q    And did any of the bathrooms have showers in them at

8  the studio?

9  A    The bathroom on the second floor at the end of the

10  hallway, did have a bathroom, yes.

11  Q    I'm showing you what's in evidence as

12  Government's Exhibit 525F.  Do you recognize that?

13  A    I do.

14  Q    And what is that?

15  A    That is the bathroom that's at the end of the hallway,

16  the stand-alone bathroom with regular studio hallway access

17  not within a room.

18  Q    And looking at the left-most portion of the photograph,

19  is that the shower that you were referring to?

20  A    That is the shower, yes.

21  Q    You testified that the defendant's female guests were

22  not able to move freely about the studio.  What did you

23  observe about whether the defendant's female guests were

24  able to leave the studio?

25  A    Since they were never allowed freely in the hallways, I

Williams - Direct - Cruz Melendez                3542

1   don't believe it ever got to a point where they would just

2   freely walk around.

3             MR. CANNICK:  Objection.

4             THE COURT:  Sustained.

5   Q    You testified that individuals employed with the

6   defendant would escort the defendant's female guests around

7   the studio.  Do you recall testifying about that?

8   A    Yes.

9   Q    Were they also escorted when they left the studio?

10  A    They would have been, yes.

11            MR. CANNICK:  Objection.

12  A    The answer is yes.

13  Q    During your time working at the --

14            THE COURT:  Did you make an objection?

15            MR. CANNICK:  I did, yes.

16            THE COURT:  Okay.  Okay.  I didn't hear you.  I'm

17  sorry.

18            MR. CANNICK:  Okay.

19            THE COURT:  The objection is overruled.

20  Q    During your time working at the studio, did you ever

21  observe the defendant going into the room where some of the

22  female guests were staying in the studio?

23  A    Yes.

24  Q    And were there any occasions when you had an

25  opportunity to hear anything after the defendant entered a

Williams - Direct - Cruz Melendez            3543

1   room with a female guest?

2   A    Yes.

3   Q    What, if anything, did you hear while the defendant was

4   in a room with the female guests?

5   A    Even though it was formally a recording studio and the

6   walls ideally are soundproof, the volume involved of the two

7   difference scenarios could be heard through the walls.

8   Q    What did you hear?

9   A    I heard sexual activity and yelling.

10  Q    Who was yelling?

11  A    Rob.

12  Q    Was the defendant married during any period of time

13  that you worked for him?

14  A    Yes.  He was married the entire time, yes.

15  Q    Did the defendant's wife visit the studio?

16  A    She did, yes.

17  Q    At times when the defendant's wife came to the studio,

18  were there times when the defendant had female guests there?

19  A    Yes.

20  Q    What, if any, responsibilities did you have when the

21  defendant's wife came to the studio?

22  A    Rob's wife had a personal assistant that drove her

23  around, and she would call me in advance of the process to

24  let me know that she was on the way.

25  Q    And what did you do once you learned that the

Williams - Direct - Cruz Melendez                3544

1   defendant's wife was coming to the studio?

2   A    As soon as I received this information, I worked a fast

3   as I can to take one of those pieces of paper and write

4   down, Important.  His wife's code name was Important.  So

5   wrote down Important and 15 minutes away, and I brought it

6   as fast as I can up to Rob to find out wherever he is and

7   hand it to him.

8   Q    And then what would happen -- or why would you write

9   Important and deliver a message like that to the defendant?

10  A    Because it -- it was to alert Rob that his wife was

11  coming so that there were no young female guests available

12  in the hallway, and that he was available, you know, to meet

13  with her.

14  Q    Generally speaking -- oh, strike that.

15          So turning your attention to rooms used as lounges

16  at the defendant's studio, what, if anything, do you recall

17  about the lighting in those rooms?

18  A    It was rare that we got to observe these rooms.  But

19  what I could see on moments of the door being cracked was

20  very low lighting.  There were in one or two of the rooms

21  Christmas lights and white or warm-white light Christmas

22  lights strung on the back wall.  And there were also in

23  every one of these rooms a battery-powered LED Coleman

24  remote control lantern light.

25  Q    And who had the remote controls for those lights?

Williams - Direct - Cruz Melendez          3545

1  A    Rob carried the remotes around and would activate the
2  remote before entering a room.
3  Q    Now, you mentioned Christmas lights.  How often were
4  those Christmas lights up?
5  A    Year-round.
6  Q    While you were working at the studio, were there any
7  rooms throughout the studio with locks on the doors?
8  A    There would be locks on the front door, the offices,
9  the IT room, bathrooms, and that is what I know -- the
10 extent of what I know.
11 Q    And with respect to the offices, could any of these be
12 locked from the outside?
13 A    I seem to recall that offices like Tom's office could
14 be locked and just with a key.
15 Q    Fair to say that there may be other types of room in
16 the studio that had locks on them, but you don't
17 necessary -- because of the passage of time, approximately
18 17 years, that you may not recall every room that had locks
19 on it?
20         MR. CANNICK:  Objection.
21 A    Exactly.
22         THE COURT:  Sustained, sustained.
23 Q    Do you recall whether or not there was a copy machine
24 at the studio?
25 A    I don't recall.

1  Q    How long did you work for the defendant at his studio

2  at Larrabee Street?

3  A    For one year.

4  Q    And I believe you testified that you stopped working

5  there from in approximately May or June of 2004?

6  A    That's accurate.

7  Q    And why did you stop working there?

8  A    It is for a number of reasons.  It had become clear

9  that -- you know, as I testified earlier, I wanted a career

10  in this industry.  The way that it works to become an

11  engineer in the industry is you start as an intern, move up

12  to assistant engineer, and then you move up to head

13  engineer -- or lead engineer, rather.  None of this ever

14  happened.  After an entire year there, I never touched a

15  single piece of audio equipment.  I had to experience

16  running pieces of paper warning that his wife was coming to

17  make sure his wife didn't see the girls in and out of the

18  studio.  He was angry all the time.

19          I was nervous when I first came in here because I

20  finally had the opportunity to look at him -- look him in

21  the eye --

22          MR. CANNICK:  Your Honor, I'm going to object

23  to --

24          THE COURT:  Sustained, sustained, sustained.

25          Don't say anything.

Williams - Direct - Cruz Melendez                3547

1            THE WITNESS:  Okay.

2            THE COURT:  Could I see the parties at the side,

3   please.

4            (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Sidebar Conference                    3548

1            (The following occurred at sidebar.)

2            THE COURT:  What's going on?

3            MS. CRUZ MELENDEZ:  I don't know.  I -- I did not

4   expect -- my question was not to elicit that.

5            THE COURT:  How much more do you have with him?

6            MS. CRUZ MELENDEZ:  Literally three more

7   questions.

8            THE COURT:  Okay.  Let's end it.  I'm going to

9   instruct the jury to disregard.  Not that much came out yet,

10  and I'm just going to instruct him to just answer the

11  questions that you're asking.

12           MR. CANNICK:  Thank you, Your Honor.

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Williams - Direct - Cruz Melendez          3549

1           (In open court, sidebar ends.)

2           THE COURT:  Okay, folks, I'm going to instruct you

3   to disregard that last little bit.

4           And I'm going to instruct the witness, please,

5   just answer the questions that you're being asked.  Okay?

6   All right.  Thanks so much.

7           All right.  Go ahead.

8   BY MS. CRUZ MELENDEZ:

9   Q    After you stop --

10          THE WITNESS:  Can I say something?

11          THE COURT:  No, you can't.  That's not the way it

12  works.  The Assistant United States Attorney will ask you

13  questions and just answer the questions that she's asking

14  you.

15          Go ahead.

16  Q    After you stopped working for the defendant what, if

17  anything, happened to the building where the defendant's

18  studio was?

19  A    Eventually the building was demolished.

20  Q    And approximately when was that?

21  A    It would have been shortly after I left.

22          MS. CRUZ MELENDEZ:  Nothing further.

23          THE COURT:  All right.  Cross-examination?

24          MR. CANNICK:  Yes.

25

1  CROSS-EXAMINATION

2  BY MR. CANNICK:

3  Q    Did you see the location after the building was

4  demolished?

5  A    I have seen it, yes.

6  Q    Did you see it -- when was it that you saw that

7  location?

8  A    When -- when did I see what was -- what replaced it?

9  Q    After the building was demolished --

10 A    Yes.

11 Q    -- when was it that you saw the building in a

12 demolished state?

13 A    I didn't see the building demolished.

14 Q    Okay.

15       You talked about blackouts.  What is a blackout?

16 A    Repeat, please.

17 Q    You testified and told the jury about a blackout.  Do

18 you remember telling us that?

19 A    Yes.

20 Q    What was a blackout?

21 A    What was a blackout?

22 Q    Yes.

23 A    I meant that none of the employees were -- none of the

24 employees that were not part of Rob's entourage were allowed

25 upstairs.

Williams - Cross - Cannick                3551

1   Q    How do you know who was moving if you weren't allowed
2   upstairs?
3   A    I do not know.
4   Q    Yeah.
5        Because the movement was upstairs, right?
6   A    Yes.
7   Q    And you were supposed to be downstairs; am I correct?
8   A    Yes.
9   Q    And you were supposed to stay there; am I correct?
10  A    That's correct.
11  Q    And you didn't know what was going on upstairs; am I
12  correct?
13  A    I did not know.
14  Q    When you worked at the front desk, you worked pretty
15  much as a receptionist; am I correct?
16  A    That's accurate, yes.
17  Q    And when you first started, you started as an intern;
18  am I correct?
19  A    That's correct.
20  Q    And within three months you got to be -- offered a job
21  position; am I correct?
22  A    Correct.
23  Q    And you were offered minimum wage; am I correct?
24  A    Less than because we were not paid overtime.
25  Q    Okay.  Well, you were offered minimum wage for the

Williams - Cross - Cannick                3552

1    hours you worked; am I correct?

2    A    I believe the minimum wage at that time was $6.15.

3    Q    And you were paid $6?

4    A    $6.

5    Q    And then that spoke to -- and that offer was made to

6    you and you accepted that offer; am I correct?

7    A    I did, yes.

8    Q    And you worked there for another nine months; am I

9    correct?

10   A    That's correct.

11   Q    During that nine months that you worked there, did you

12   ever have any exchange or conversation with any of the

13   engineers?

14   A    On a regular basis, yes.

15   Q    On a regular basis.

16        And after having exchanges with them on a regular

17   basis, you were not offered a job as an engineer; am I

18   correct?

19   A    Engineers are not --

20   Q    Am I correct, sir?

21   A    I was not, no.

22   Q    Okay.  And isn't it a fact, sir, that you never got an

23   opportunity to work with them after speaking with them for

24   nine months?

25   A    That is what I testified, yes.

1    Q    And they would -- you didn't even handle their

2    equipment; am I correct?

3    A    Correct.

4    Q    You testified and told the jury that Mr. Kelly's female

5    guests couldn't move freely around the building; do you

6    remember telling us that?

7    A    Yes.

8    Q    Well, no one could; am I correct?  None of his guests

9    could?

10   A    That's not true.  Any music artists or actors that came

11   to see him were able to freely move around the building.

12   Q    And when you say "actors," you're talking about folks

13   who were A-list actors coming to visit with him; am I

14   correct?

15   A    That's correct.

16   Q    All right.  Did his friends move around the building?

17            THE COURT:  Whose friends?

18            MR. CANNICK:  Mr. Kelly's.

19   A    What friends would these be besides the music artists

20   and actors that I just stated?

21   Q    You testified and told us that he had other friends

22   visiting and other folks visiting him, am I correct?

23   A    Yes, that's correct.

24   Q    Okay.  So does his trainer move freely around the

25   building?

Williams - Cross - Cannick                3554

1   A    Yes.

2   Q    Okay.  Where did his trainer go?

3   A    I'm sorry?

4   Q    Where would his trainer generally go around the

5   building?

6   A    The trainer would most of the time be in the training

7   room upstairs.

8   Q    Right.  Would you see him in the training room?

9   A    If I went up to deliver a message to Rob, yes.

10  Q    But that's only if you went upstairs to deliver a

11  message; am I correct?

12  A    That I would see him in the training room?  Yes.

13  Q    Because your job was to stay at the receptionist desk

14  until Rob -- Mr. Kelly received a message; am I correct?

15  A    That's not true at all.  I was not required to stay

16  there unless there was a blackout.

17  Q    Were you allowed to go upstairs?

18  A    Absolutely, yes.

19  Q    And when you went upstairs, did you see any of his male

20  guests moving around?

21  A    Sure, yeah.

22  Q    You did?

23  A    Yeah.

24  Q    So the only people you didn't see moving around were

25  female guests?

1   A    That's correct.

2   Q    And do you know if he had managers?

3   A    The only manager that I was aware of was Don Russell.

4   Q    Now, when you moved around, did you knock on doors that

5   you moved around?

6   A    (No audible response.)

7   Q    When you went from one room to the next, did you knock

8   on a door?

9   A    Most of the area that I resided in --

10  Q    That's not my question.

11       My question is, when you --

12  A    I didn't --

13  Q    -- knocked on the door --

14  A    That's the wrong question.  I didn't knock on any

15  doors.

16  Q    Don't tell me it's the wrong question.

17       THE COURT:  Mr. Cannick, let's take its down a

18  notch, please.

19       Put another question to the witness.

20  Q    When you went from one room to the next, did you knock

21  on the door?

22  A    I did not go from room to room.

23  Q    You never -- when you walked into a room to find

24  Mr. Kelly, did you knock on a door?

25  A    No.

1  Q    When you walked to find the trainer in the training

2  room, did you knock on that door?

3  A    The door was open.

4  Q    Never a time that the door was closed?

5  A    Not to the training room.

6  Q    Any other room that you walked in to see?  Let's say

7  Tom, did you knock on the door?

8  A    If the door was closed.

9  Q    Now, Tom was a manager; am I correct?

10 A    Correct.

11 Q    Where was Tom's office in relationship to yours?

12 A    Directly next door.

13 Q    And he would have his door open?

14 A    Most of the time, yes.

15 Q    And you just walked right on in?

16 A    Yes.

17 Q    Now, you testified about getting food for Mr. Kelly's

18 female guests.  Did you get food for anyone else?

19 A    I would get food for Mr. Kelly and for -- if any of the

20 music artists requested it.  I would get food for Big John

21 and Donny.

22 Q    What about artists who were there visiting him?

23 A    If there was an artist that was with him and they

24 requested food also, yes.

25 Q    What about if a record label executive was there?

Williams - Cross - Cannick                3557

1    A    I'm sorry?

2    Q    A record label executive, did you get food for that

3    person as well?

4    A    Yes.

5    Q    And when the record label executives were in the

6    building, were you able to move around?

7    A    I don't recall a record label executive in the

8    building.

9    Q    Don't recall that, right?

10   A    I don't.

11   Q    Okay.  But you do recall actors in the building?

12   A    Yes.

13   Q    And were you able to move around when the actors were

14   in the building?

15   A    Yes.

16   Q    Were you able to move around when other artists were in

17   the building?

18   A    Yes.

19   Q    Now, were you able -- you testified and told the jury

20   that you were not allowed to have any interaction with

21   Mr. Kelly's female guests; am I correct?

22   A    That's correct.

23   Q    Were you allowed to have interactions with any of those

24   artists who visited?

25   A    Yes.

Williams - Cross - Cannick                 3558

1   Q    You could walk up -- which artists?

2   A    Tyrese Gibson, B2K when they were coming up.  Beyoncé

3   was there at one point.  Regarding actors, Sylvester

4   Stallone was there.  Members of *Cash Money Millionaires* were

5   there, and I interacted with all of them.

6   Q    You interacted with all of them?

7   A    Yeah.

8   Q    What was that interaction?

9   A    That interaction required being allowed to great

10  individuals.

11  Q    So your interaction was good morning?

12  A    If it was morning, yes.

13  Q    Or good evening?

14  A    If it was evening, yes.

15  Q    Nothing more than that?

16  A    You could talk to them, say, How are you doing?

17  Q    I'm not asking whether you could talk to them.  I'm

18  asking about your interaction?

19  A    I was able to interact more than that, yes.

20  Q    How often would you see Mr. Kelly on a daily basis?

21  A    It varied.  I could not see him for three to four days,

22  or I could see him five to ten times a night, throughout the

23  night.

24  Q    What were your hours?

25  A    My hours were 10:00 p.m. until 12:00 noon the following

1    day.

2    Q    Did you see him during the hours of 10:00 p.m. to

3    2:00 a.m.?

4    A    Occasionally, yes.  Artists like to record at night.

5    Q    I beg your pardon?

6    A    Artists like to record at night, so, yes, they --

7    Q    I'm not asking you what artists like to do.  I'm asking

8    you whether you saw him --

9    A    Yes.

10   Q    -- during those hours?

11        Well, isn't it a fact that those were the hours

12   that he played basketball every night?

13   A    That is not true.

14   Q    That is not true.

15        Do you know -- did you know him to play

16   basketball?

17   A    Yes.

18   Q    Did he play basketball every night?

19        MS. CRUZ MELENDEZ:  Objection.

20        THE COURT:  Overruled.

21   A    I don't know.

22   Q    Do you know where he played basketball?

23   A    He played basketball at a number of locations, but I

24   don't know what the locations are.

25   Q    And do you know who he played with?

1   A    I don't know everybody that he played with, no.

2   Q    Name me one person that he played with.

3   A    I believe he always went with an individual by the name

4   of "June Bug."

5   Q    You believe he went with -- always played with an

6   individual by the name of "June Bug"?

7   A    Yes.

8   Q    And where -- do you know what time he and "June Bug"

9   would leave to go?

10  A    I didn't keep track of their hours, no.

11  Q    Now, what time would he come back in the -- what time

12  would he normally be in the studio at night?

13  A    There were no normal times.

14  Q    There were no normal times.

15       And when you would see him go to a basketball

16  game, it would just be he and "June Bug" who would go?

17  A    It could vary.  But generally, Big John went with him

18  everywhere.

19  Q    Okay.  Well, just those two?

20  A    I said it can vary.

21  Q    Well, who -- when you --

22  A    I don't know who else would go with him, but I know

23  that he would go with an entourage.

24  Q    Well --

25  A    And if he didn't leave the building with an entourage,

Williams - Redirect - Cruz Melendez        3561

1   he would meet people outside the facility.

2   Q    Did he have live-in girlfriends?

3   A    I don't know the answer to that.

4   Q    Isn't it a fact that he went to play basketball every

5   night and his live-in girlfriend would go with him?

6   A    I don't know.

7          MR. CANNICK:  May I have a second, please, Your

8   Honor?

9          THE COURT:  Sure.

10          (Pause in proceedings.)

11  Q    You wanted to be an engineer?

12  A    I did, yes.

13  Q    Didn't work out for you?

14  A    That's correct.

15          MR. CANNICK:  Thank you.

16          THE COURT:  Anything else from the Government?

17          MS. CRUZ MELENDEZ:  Just very briefly.

18  REDIRECT EXAMINATION.

19  BY MS. CRUZ MELENDEZ:

20  Q    After working at the defendant's studio, were you able

21  to work in other -- in the music industry in other studios?

22  A    Did you say after or before?

23  Q    After.

24  A    Afterwards, no.

25  Q    Did you work in other studios or with other artists

Williams - Redirect - Cruz Melendez          3562

1   after working with the defendant?

2   A    I did not work for studios.  I ended up moving to live

3   sound.

4   Q    And so you continued to work in the music industry?

5   A    I did, yes.

6   Q    On cross-examination defendants counsel asked you about

7   how often you might see the defendant.  How often did you

8   deliver messages to the defendant?

9   A    I can't put a number on the number of times that I

10  would deliver a message to him.  But if he was in the

11  building, it would be numerous times throughout any shift.

12  Q    And I believe defense counsel on cross-examination

13  asked you questions about knocking on doors before entering

14  to be able to get to Rob?

15  A    That's correct.

16  Q    From where you were in reception, what route would you

17  take to get to the recording area where Rob might be?

18  A    So most of my travels in that building were through

19  hallways.

20            MS. CRUZ MELENDEZ:  Nothing further.

21            THE COURT:  All right.  Anything else,

22  Mr. Cannick?

23            MR. CANNICK:  Not at all.

24            THE COURT:  All right.  The witness can step down.

25            (The witness is excused.)

Proceedings                    3563

1              THE COURT:  Are you ready to call your next

2    witness?

3              MS. SHIHATA:  Your Honor, I think there are a few

4    stipulations that we would like to put in the record first.

5              THE COURT:  Okay.

6              All right.  And is everyone good on the jury?

7              All right.  Great.

8              MS. SHIHATA:  I'm going to start with

9    Government's Exhibit 1001, a stipulation that reads:  It is

10   hereby stipulated and agreed by and between the undersigned

11   parties --

12             THE COURT:  Just don't real too quickly.

13             MS. SHIHATA:  Okay.

14             THE COURT:  Thank you.

15             MS. SHIHATA:  If called as a witness at trial,

16   Emiguela Paci would testify as follow:

17             Paci is an assistant manager at the Sheraton

18   Suites, Chicago O'Hare, a hotel located at 6501 North

19   Mannheim Road, Rosemont, Illinois, "the Sheraton," a

20   Sheraton Hotel which is located at 6501 North Mannheim --

21   North Mannheim Road, Rosemont, Illinois since in or before

22   1994.

23             This stipulation is admissible in evidence at

24   trial.  And it's Government's Exhibit 1001.

25             So we move to admit that, Your Honor.

1           THE COURT:  Okay.

2           (Government's Exhibit 1001 received in evidence.)

3           THE COURT:  And I think I've told the jurors this

4    before.  A stipulation is just an agreement between the

5    parties about certain evidence, and the Government is

6    introducing those stipulations.

7           Go ahead.

8           MS. SHIHATA:  So all of the stipulation I'm

9    reading have been signed by both parties, so if we could

10   publish them while I'm reading them, it might be helpful.

11          THE COURT:  Sure.

12          MS. SHIHATA:  Thank you.

13          (Exhibit published to the jury.)

14          MS. SHIHATA:  I'm now reading

15   Government's Exhibit 1003.

16          It is hereby stipulated and agreed by and between

17   the undersigned parties that since at least 2004, the

18   telephone Number (800) 433-7300 has been an American

19   Airlines telephone number for customers to make reservations

20   and ticket changes.

21          In or about and between at least 2004 and 2009,

22   the telephone number (800) 535-5225 was an American Airlines

23   telephone number for customers to make inquiries of baggage

24   delays fewer than five days.

25          This stipulation is admissible at trial.

Proceedings                                    3565

1              THE COURT:  Could I see the parties at sidebar

2     just for a minute.  No court reporter necessary.

3              (Sidebar not taken by the court reporter.)

4              (Pause in proceedings.)

5              MS. SHIHATA:  And, Judge, I think I neglected to

6     offer Government's Exhibit 1003.

7              THE COURT:  Okay.  With respect to all of those --

8     oh that goes along with the stipulation, correct?

9              MS. SHIHATA:  No.  That is what the stipulation

10    that I just read is marked.

11             THE COURT:  Okay.  All the stipulations are

12    admitted into evidence.

13             (Government's Exhibit 1003 received in evidence.)

14             MS. SHIHATA:  Okay.

15             So I'm now going to put on the screen

16    Government's Exhibit 1007, another stipulation in evidence.

17             (Exhibit published to the jury.)

18             MS. SHIHATA:  It is hereby stipulated -- actually,

19    this one could be to the jury only.

20             THE COURT:  Okay.

21             MS. SHIHATA:  It is hereby stipulated and agreed

22    by and between the undersigned parties, that if called as a

23    witness at trial Richard Rey would testify as follows:

24    Richard Rey met Stephanie -- and then there's a last name

25    listed, which I won't read out loud -- in 1999 at the end of

Proceedings                                    3566

1   September or early October approximately two weeks before

2   Stephanie's 18th birthday in Chicago, Illinois, and they

3   became friends.  They met at a pizzeria where Stephanie was

4   working.  Stephanie was a college student at the time.

5           After they met Stephanie and Richard Rey --

6   Stephanie told Richard Rey that she was in a relationship

7   with singer R. Kelly.  Stephanie went to Orlando, Florida

8   with her friend, Katherine, for a weekend to see R. Kelly

9   for her 18th birthday.

10          Richard Rey and Stephanie began dating after

11  Stephanie's 18th birthday and after Stephanie ended her

12  relationship with R. Kelly.  They ultimately dated for

13  approximately four and a half years.

14          In approximately September 2000, Richard Rey and

15  Stephanie moved to Miami, Florida together.  During their

16  relationship, Stephanie told Richard Rey that R. Kelly

17  videotaped her engaging in sex acts with R. Kelly on two or

18  possibly three occasions, including when she was 17 years

19  old.  Stephanie told Richard Rey that such videotaping

20  occurred at a town home in Lincoln Park and at a recording

21  studio in the Cabrini Green neighborhood of Chicago.

22  Stephanie also told Richard Rey that R. Kelly had her

23  perform a sex act on him in a car with other people.

24          This stipulation is marked as

25  Government's Exhibit 1007 and is admissible as evidence at

Proceedings                           3567

1    trial.

2              (Government's Exhibit 1007 received in evidence.)

3              MS. CRUZ MELENDEZ:  Now reading

4    Government's Exhibit 1009.

5              This can be published to everyone.

6              (Exhibit published to the jury.)

7              MS. CRUZ MELENDEZ:  It is hereby stipulated and

8    agreed by and between the undersigned parties that if called

9    as a witness at trial, Jerie Ortez, or Ortez, would testify

10   as follows:  Government's Exhibit 83 is a photograph of

11   Jerie Ortez.  Government's Exhibit 83 is admissible as

12   evidence at trial.

13             (Government's Exhibit 83 received in evidence.)

14             MS. CRUZ MELENDEZ:  Ortez met Sonja, the

15   individual depicted in Government's Exhibit 62 and 62(a), in

16   junior high school in Salt Lake City, Utah, and she and

17   Sonja became best friends spending almost every day

18   together.  Ortez and Sonja also communicated regularly by

19   telephone.  Ortez's friendship with Sonja continued during

20   their late teens and into their early twenties.

21             (Government's Exhibits 62 and 62(a) received in

22   evidence.)

23             MS. CRUZ MELENDEZ:  Ortez is aware that Sonja

24   worked during her early twenties at local radio stations in

25   Salt Lake City.  Ortez often visited Sonja at radio

Proceedings                              3568

1   stations, and recalled that Sonia worked hard at the station

2   in various capacities, sometimes appearing on air.

3            In approximately 2003, Ortez was with Sonja at the

4   Valley Fair Mall in West Valley, Utah when they heard that

5   R. Kelly was at the mall.  They saw Kelly's tour bus in the

6   mall parking lot.  When Sonja and Ortez walked over, Kelly

7   was near the tour bus.  Ortez and Sonja took a photograph

8   with Kelly.

9            Sonja advised Kelly that she was a DJ at the local

10  radio station, and that she wanted to conduct an interview

11  of Kelly.  In response, Kelly told Sonja to talk to one of

12  her personnel.  Sonja was then given Kelly's telephone

13  number.  Ortez kept a copy of the photograph she and Sonja

14  took with Kelly.

15           Ortez provided the photograph, Government Exhibit

16  203 to the Government.  Government's Exhibit 203 depicts

17  Sonja, the defendant, and Ortez.  The photograph is dated

18  August 12th, 2003.

19           Kelly is the individual in the center of the

20  photograph.  Ortez is the individual on Kelly's left side

21  wearing a white shirt.  Sonja is the individual on the right

22  side of R. Kelly wearing a floral garment.  Government

23  Exhibit 203 is admissible in evidence.

24           (Government's Exhibit 203 received in evidence.)

25           MS. CRUZ MELENDEZ:  I'm now publishing

Proceedings                          3569

1   Government's Exhibit 203.

2            (Exhibit published to the jury.)

3            MS. CRUZ MELENDEZ:  Sometime later, Sonja told

4   Ortez that she had contacted Kelly, and that Kelly had

5   invited Sonja to come to Chicago.  At a later date, Sonja

6   always told Ortez that Kelly made all the arrangements for

7   Sonja to fly to Chicago to visit him there.

8            While Sonja was in Chicago, Sonja contacted Ortez

9   by telephone.  Sonja was nervous on the call and whispered.

10  Sonja told Ortez that she was in a room and could not leave.

11  Sonja also told Ortez that Kelly's team took her belongings

12  and put Sonja in a room where she was waited alone.  Sonja

13  also told Ortez that she had to ask Kelly of his security

14  team for permission to go to the bathroom.  Sonja also told

15  Ortez that she only saw Kelly for a brief time while Sonja

16  was in Chicago.  Ortez believed that Sonja was in Chicago

17  for approximately four days in total.  When Sonja returned

18  to Utah, Sonja did not speak to Ortez much about what

19  happened in Chicago, but told Ortez that it was a horrible

20  experience.

21           Ortez has not see Sonja since approximately 2008,

22  and she has not spoken to Sonja since approximately 2009 or

23  2010.

24           Eleanor Ortez -- if I could just actually publish

25  to jury at this moment.

Proceedings                                3570

1           (Exhibit published to the jury.)

2           MS. CRUZ MELENDEZ:  Eleanor Ortez is Jerie Ortez's

3    mother.

4           In or about 2003 and 2004 or and her mother lived

5    at -- and there's an address listed there.  This stipulation

6    is marked as Government's Exhibit 1009 and is admissible in

7    evidence at trial, and it is signed by the parties.

8           (Government's Exhibit 1009 received in evidence.)

9           THE COURT:  And like, folks, all the evidence,

10   you'll have access to this, so you don't need to commit

11   every word to memory.

12          MS. CRUZ MELENDEZ:  Just briefly, I'm publishing

13   Government's Exhibit 83.

14          THE COURT:  Is that to everybody?

15          MS. CRUZ MELENDEZ:  Yes.

16          (Exhibit published to the jury.)

17          MS. CRUZ MELENDEZ:  As stated on

18   Government's Exhibit 1009, this is Jerie Ortez.

19          This first piece will be just for the jury

20   Government's Exhibit 1008.

21          (Exhibit published to the jury.)

22          THE COURT:  And I take it, though, that they all

23   have the same introduction?

24          MS. CRUZ MELENDEZ:  That is correct.

25          THE COURT:  So you probability don't have to read

Proceedings                                    3571

1    that.

2              MS. CRUZ MELENDEZ:  Okay.

3              If called the testify as a witness, Charity Torres

4    would testify as follows:

5              Individual depicted in the photograph that is

6    marked for identification purposes as

7    Government's Exhibit 84 is Charity Torres.

8              Government Exhibit 84 is admissible in evidence at

9    trial.

10             (Government's Exhibit 84 received in evidence.)

11             MS. CRUZ MELENDEZ:  I'm just publishing for a

12   moment, and this can go to everyone,

13   Government's Exhibit 84, Charity Torres.

14             (Exhibit published to the jury.)

15             MS. CRUZ MELENDEZ:  If we could just go back to

16   1008?

17             Torres met Sonja -- and there's a last name, Sonja

18   in parenthesis -- when she was approximately 15 or 16 years

19   old.  Over the next couple of years, she and Sonja became

20   very close friends and spent a lot of time together.  Torres

21   and Sonja also communicated on the telephone, and as part of

22   their friendship, they shared information together.  Sonja

23   told Torres that she met the singer, R. Kelly, and that he

24   had invited Sonja to Chicago.  Sonja also told Torres that

25   Kelly made Sonja's travel arrangements, and that Sonja was

1    going to fly to meet with Kelly in Chicago.

2              I believe the remainder can be published to the

3    public.

4              (Exhibit published to the jury.)

5              MS. CRUZ MELENDEZ:  Prior to flying to Chicago,

6    Sonja told Torres that she would call her once she arrived

7    and was settled in Chicago.  Approximately one day after

8    Sonja flew to Chicago, Sonja called Torres and was upset and

9    very scared.  Sonja told Torres that Kelly's people took

10   Sonja's belong, and that Sonja was in a room by herself and

11   was not permitted to leave.  Sonja also told Torres that

12   Kelly's people told her that Kelly was recording music and

13   that he could not meet Sonja at that time and that she would

14   have to wait.  Sonja also told Torres that she had to ask to

15   go to bathroom and had not eaten.  Sonja also told Torres

16   that Sonja said she could hear people having sex.  Sonja

17   called Torres numerous times and told her what was happened

18   while Sonja was in Chicago.  In or about 2004, Torres's

19   telephone was (303) 617-7167.

20             As a result of Sonja's demeanor and what Sonja

21   told Torres while she was in Chicago, Torres was concerned

22   about Sonja's well-being and wanted to assist in some way.

23   So Torres, who did not have her own financial resources at

24   the time, asked her mother to buy a plane ticket for Sonja

25   to return to Utah.  A return plane ticket from Chicago to

Proceedings                              3573

1   Utah was too expensive, however, given Torres's family

2   financial circumstances, and Torres's family would not have

3   been able to afford it, so they did not purchase one.

4          Torres was not sure if purchasing a return ticket

5   would help Sonja's situation, but believed that if Sonja

6   could advise Kelly's people that someone else had purchased

7   her a return ticket home, that might allow Kelly's people to

8   let Sonja leave.

9          When Sonja returned home, Sonja was very upset

10  about what happened in Chicago.  Sonja did not want to talk

11  about what happened while she was in Chicago visiting Kelly.

12  Sonja told Torres that Sonja wanted nothing to do with Kelly

13  ever again.

14         This stipulation is marked as

15  Government's Exhibit 1008 and is admissible in evidence and

16  is signed by the parties.

17         (Government's Exhibit 2008 received in evidence.)

18         MS. CRUZ MELENDEZ:  I believe for now, that's all

19  the stipulations we have.

20         THE COURT:  Okay.  How is everybody doing?  Want a

21  break?

22         THE JURY:  No.

23         THE COURT:  Nobody's saying yes.  So I just don't

24  want to -- it's not my intention to torture you.

25         Why don't you call your next witness, and

Proceedings                              3574

1   obviously if anybody needs a break you'll signal me or let

2   me know.

3            MS. GEDDES:  Your Honor, I was actually going to

4   propose a break so I could quickly discuss with Defense

5   Counsel the exhibits that we wanted to introduce.

6            THE COURT:  All right.  So that's what we will do.

7            Okay.  So after that speech, I'm going to give you

8   a break.  So we'll see you in about ten minutes.  Don't talk

9   about the case.

10           THE COURTROOM DEPUTY:  All rise.

11           (Jury exits the courtroom.)

12           (The following matters occurred outside the

13   presence of the jury.)

14           THE COURT:  Everybody can sit down.  What is it

15   that's happening?  I'm sorry.  I couldn't hear you.

16           MS. GEDDES:  I'm sorry.  The Government is

17   introducing several exhibits through Special Agent Chabot.

18   I just think it might be productive for me to go over with

19   Defense Counsel real quickly so that if we can agree, which

20   I suspect we will.

21           THE COURT:  That will be delightful.

22           All right.  Anything from the defense?

23           MR. CANNICK:  No, Your Honor.

24           THE COURT:  Okay.  (Recess taken.)

25

Proceedings                                3575

1              (In open court; outside the presence of the jury.)

2              THE COURTROOM DEPUTY:  All rise.

3              THE COURT:  Well, that was short.

4              All right.  I'm hopeful that we use this time

5    productively.  Did you agree to a number of exhibits, is that

6    what happened?

7              MS. GEDDES:  Yes, I believe there is an objection to

8    two exhibits, but we don't need to do that today, we can do

9    that later.  So we can proceed.  And I think there is no

10   objection and we just reached three additional stipulations.

11   So it was time well spent.

12             THE COURT:  I'm glad to hear it.

13             Is the agent testifying?

14             MS. GEDDES:  Yes.  And one other thing, the

15   Government has prepared transcript binders and we would like

16   to distribute that to the jury.

17             MR. CANNICK:  Are you playing those today?

18             MS. GEDDES:  Not the ones that we have had 17

19   motions on, but the BET one, and then we won't do the Don

20   Russell ones today.

21             MR. CANNICK:  The one that you sent the marked for

22   identification in this morning, we want to make sure that your

23   folks get an opportunity to look at your transcription and

24   listen to the tape.

25             MS. GEDDES:  That's fine.

MDL       RPR       CRR       CSR

Proceedings                                        3576

1          THE COURT:  We are not going to get anything done if

2     we don't get the show on the road.  Are we good to go?

3          MS. GEDDES:  Yes.

4          THE COURT:  All right.  Do you want to have the

5     witness take the stand?

6          MS. GEDDES:  Yes, and can we distribute the

7     transcript to the jurors?

8          THE COURT:  Sure.

9          You are going to do that first, that's great.

10          THE COURTROOM DEPUTY:  All rise.

11          (The jury enters the courtroom.)

12          THE COURT:  Everybody can sit down.  You can have a

13     seat.

14          So, ladies and gentlemen, just before we have our

15     next witness, I know we took a little bit of time there, but

16     I'm told that much progress was made and that the parties have

17     come to some stipulations and things like that, which will

18     move things along.  So that's what happened there.

19          Are you ready to call your next witness?

20          MS. GEDDES:  I am.

21          The Government calls Special Agent Ryan Chabot.

22          THE COURTROOM DEPUTY:  Raise your right hand for me,

23     please.

24          Do you solemnly swear or affirm that the testimony

25     you're about to give will be the truth, the whole truth, and

```
                        Proceedings                     3577
```

1   nothing but the truth?

2           THE WITNESS:  I do.

3           (Witness sworn.)

4           THE COURTROOM DEPUTY:  Thank you.  You may be

5   seated.

6           THE COURT:  All right.  I know you have heard me

7   give this instructions several times, but it is always a good

8   reminder, don't talk too fast.  Make sure you are using the

9   microphone and if there is a question that you want to have

10  clarified or repeated, let me know.  And also just do your

11  best to answer only the question that you are being asked,

12  okay?

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Okay, go ahead.

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Chabot - direct - Geddes                    3578

1   **RYAN CHABOT**,

2          called by the Government, having been duly

3          sworn, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MS. GEDDES:

6   Q     How are you employed?

7   A     Homeland Security Investigations.

8   Q     And what is your title with Homeland Security

9   Investigations?

10  A     Special agent.

11  Q     And are you assigned to a particular group or squad?

12  A     I am.

13  Q     What group is that?

14  A     Trafficking and persons group.

15  Q     What is that group responsible for?

16              MR. CANNICK:  I'm sorry, I didn't hear the response.

17              THE COURT:  Can you just repeat that?

18              PROSPECTIVE JUROR:  Trafficking and persons group.

19  Q     What is that group responsible for doing?

20  A     Investigating human trafficking and human smuggling.

21  Q     And did you participate in -- let me back up.

22          How long have you been assigned as a special agent

23  with Homeland Security Investigations?

24  A     Since October of 2017.

25  Q     And prior to that, how were you employed?

MDL       RPR       CRR       CSR

Chabot - direct - Geddes                    3579

1   A     I was a police officer, then a detective at Virginia

2   Beach Police Department.

3   Q     For how long?

4   A     Approximately 15 years.

5   Q     In your time as a special agent with Homeland Security

6   Investigations, did you participate in the investigation of

7   Robert Kelly?

8   A     I did.

9   Q     Do you see him in the courtroom today?

10  A     I do.

11  Q     Can you point to him and describe an article of clothing?

12  A     Sure.  He is sitting at the defense table and in the dark

13  colored suit.

14        THE COURT:  Indicating the defendant.

15  Q     I want to direct your attention to July 10th of 2019.

16  Did you conduct surveillance on that day?

17  A     I did.

18  Q     Where did you conduct surveillance?

19  A     In Deerfield, Illinois at the Residence Hotel.

20  Q     Where is Deerfield, generally speaking, in relation to

21  Chicago, Illinois?

22  A     I believe it's a northern suburb of Chicago.

23  Q     Who were you surveilling that day in Deerfield, Illinois?

24  A     The defendant, Robert Kelly.

25        MS. GEDDES:  I'm showing the witness what has been

Chabot - direct - Geddes                     3580

1    for identification as Government Exhibit 526.

2    Q    Do you recognize what is shown in 526?

3    A    I do.

4    Q    What is that?

5    A    That is a picture that I took on July 10th of 2019 while

6    I was conducting that surveillance.

7    Q    And where was that picture taken?

8    A    That's at the Residence Inn in Deerfield, Illinois.

9    Q    And who are the individuals shown in Government Exhibit

10   526?

11   A    To the left in the photo is the individual with the white

12   t-shirt is George Kelly.  To the right, the individual in the

13   red colored hoodie sweatshirt is the Defendant Robert Kelly.

14           MS. GEDDES:  The Government offers 526.

15           MR. CANNICK:  No objection.

16           THE COURT:  It's in evidence.

17           (Government's Exhibit 526 received in evidence.)

18           MS. GEDDES:  May we publish, please?

19           THE COURT:  Yes.

20           (Exhibit published.)

21           MS. GEDDES:  If we can zoom in.

22   BY MS. GEDDES:

23   Q    Now, you testified that the defendant is the individual

24   in red and then in white is the individual you identified as

25   George Kelly; is that correct?

Chabot - direct - Geddes                                3581

1    A    That's correct.

2    Q    What, if anything, did you see the defendant holding on

3    that day?

4    A    On the left side of the defendant, a black bookbag.

5    Q    And who, if anyone else, did you see carry that black

6    bookbag that day?

7    A    The individual to the left, George Kelly.

8    Q    What did you see George Kelly do?

9    A    He went out of view out of my sight to the right, both

10   him and the defendant, and then George Kelly came back into

11   the view to the left walking back towards the area that he's

12   in in the photograph with the black bag.

13   Q    And did you see the defendant leave that day?

14   A    Yes.

15   Q    In what vehicle did the defendant leave?

16   A    It was a gray Mitsubishi SUV.

17   Q    How about George Kelly, did you see George Kelly leave

18   that area that day?

19   A    I did.

20   Q    In what vehicle did George Kelly leave that day?

21   A    In the Jeep that he is standing in front of.

22   Q    So they left in two separate cars?

23   A    Correct.

24   Q    I want to direct your attention to the following day.

25   Did you participate in a search that day?

Chabot - direct - Geddes                3582

1    A    Yes, I did.

2    Q    Was that pursuant to a court-authorized search warrant?

3    A    Yes, it was.

4    Q    Where was the search conducted?

5    A    Mr. Robert Kelly's address at the time, which was with

6    the Trump Towers, 401 North Wabash in Chicago, apartment 48

7    Frank.  Sorry, F as in Frank.

8         MS. GEDDES:  And at this time the Government wants

9    to read into a stipulation entered by the parties marked as

10   Government Exhibit 1013.

11        THE COURT:  Okay.

12        MS. GEDDES:  I'm going to actually just read the

13   second paragraph right now.

14        If called as a witness at trial, one or more

15   representatives of the Department of Homeland Security,

16   Homeland Security Investigations, would testify as follows:

17        The defendant was arrested pursuant to a federal

18   arrest warrant on July 11, 2019 outside the building where his

19   residence at the time, 401 North Wabash, Apartment 48F in

20   Chicago, Illinois, short cited, the Residence, was located.

21   The Residence is an apartment within the Trump Towers in

22   Chicago, Illinois.  At the time of the defendant's arrest, the

23   defendant was residing in the Residence along with the

24   individual depicted in Government Exhibit 75, who testified at

25   trial using the pseudonym Jane, and the individual depicted in

Chabot - direct - Geddes                    3583

1   Government Exhibit 78, who has been identified by certain

2   witnesses at trial as Joy and Joycelyn.

3          On July 11, 2019, law enforcement agents conducted a

4   search of the Residence pursuant to a court-authorized search

5   warrant.  During the July 11, 2019 search of the Residence,

6   four iPads and multiple iPhones were recovered, including the

7   iPhone containing Government Exhibit 325 and the iPad

8   containing a number of other Government Exhibits, and one of

9   those is 343-A.  I'm sorry, that iPad is then short cited,

10  identified herein as iPad A.

11         IPad A contained photographs and video recordings of

12  sexually explicit conduct involving the individuals depicted

13  in Government Exhibit 68, who testified using the pseudonym

14  Alex and was identified by certain witnesses at trial as

15  Nephew.  Also 69, who has been identified by certain witnesses

16  at trial as Nicq and Dominique; 75, who testified using the

17  pseudonym Jane; 76, who testified using the pseudonym Anna; 77

18  and then 78, who was identified by certain witnesses at trial

19  as Joy and Joycelyn; and 79, who testified as Faith, all of

20  which were made -- referring to the photographs and video

21  recordings -- were made between January 2017 and February

22  2018.

23  Q    Now, as part of the search that you conducted at the

24  apartment within Trump Tower on July 11, 2019, did you look

25  for that black bookbag that you saw the defendant holding the

Chabot - direct - Geddes                        3584

1    day earlier?

2    A    I did.

3    Q    Was that black bookbag recovered from the Trump Towers

4    residence?

5    A    No, it was not.

6    Q    I then want to direct your attention to January 9th of

7    2020.  Did you also participate in a search on that day?

8    A    I did.

9         MS. GEDDES:  And I'm now going to read another

10   excerpt of the stipulation marked as Government Exhibit 1013.

11   Paragraph one states "That if called as a witness at trial,

12   Howard Gross would testify that since at least February 2015

13   and continuing through at least January 2020, the defendant,

14   Robert Kelly Sylvester leased and used a storage facility

15   located at 360 Kent Avenue in Elk Grove Village, Illinois,"

16   and then it is short cited here, "the storage facility."

17        And then continuing on to paragraph 2C of that same

18   stipulation, and it reads, "On January 9, 2020, law

19   enforcement agents conducted a search of the storage facility

20   pursuant to a court-authorized search warrant.  During the

21   January 9, 2020 search of the storage facility, two iPads and

22   multiple phones were recovered, including an iPhone containing

23   Government Exhibit 481 and a cellular telephone containing

24   Government Exhibit 482.

25        Also during the January 9, 2020 search of the

Chabot - direct - Geddes                3585

1  storage facility, multiple hard drives were recovered,

2  including the hard drives containing Government Exhibits 468,

3  469, 470, 470 one, 472, and 473," and I will read more of that

4  in a moment.

5  BY MS. GEDDES:

6  Q    Now, during the search of the storage facility on January

7  9th of 2020, was that black backpack -- I'm sorry, black

8  bookbag that you saw the defendant holding that day recovered?

9  A    No, it was not.

10  Q    And during either the July 10th -- I'm sorry, July 11,

11  2019 search or the January 9, 2020 search, was any book

12  backpack recovered that day?

13  A    Not that I recall.

14         MS. GEDDES:  At this time the Government offers

15  Government Exhibits 902 and 902-T.  I don't believe there's an

16  objection.

17         THE COURT:  Any objection?

18         MR. CANNICK:  No.

19         THE COURT:  Okay, those are in evidence.

20         (Government's Exhibits 902 and 902(t) received in

21  evidence.)

22         MS. GEDDES:  We have distributed transcript binders

23  and I would ask that the jury -- if the jury could turn just

24  to tab one.

25  BY MS. GEDDES:

Chabot - direct - Geddes                              3586

1   Q    And Special Agent Ryan Chabot, you also have one in front

2   of you; correct?

3   A    Yes, ma'am.

4        MS. GEDDES:  We are now going to play for the jury

5   what's now in evidence, and the public, what's now in evidence

6   as Government Exhibit 902, and I believe there is video and

7   audio hopefully.

8             Yes, this is a certified record from BET.

9             We can just listen to this without the headphones so

10  everyone can listen.  So you can take off your headphones.

11  And just to conserve batteries, if you turned on the light, if

12  you could just turn it off.  They were already off.  So if you

13  didn't do anything, you don't need to....

14            (Video playing.) (Video stopped.)

15  Q    Now, did you recognize the voice in that recording?

16  A    Yes.

17  Q    Whose voice was that?

18  A    The defendant, Robert Kelly's.

19            MS. GEDDES:  The Government offers Government

20  Exhibit 901.

21            THE COURT:  Any objection?

22            MR. CANNICK:  No.

23            THE COURT:  That is in evidence.

24            (Government's Exhibit 901 received in evidence.)

25            MS. GEDDES:  May I publish?

Chabot - direct - Geddes                          3587

1              THE COURT:  Yes.

2              (Exhibit published.)

3              MS. GEDDES:  I'm putting what's in evidence now as

4    Government Exhibit 901, a copy of a CD cover and a CD by

5    Aaliyah, titled *Age Ain't Nothing But a Number*.

6              On the inside of that cover it indicates produced by

7    R. Kelly.

8    Q    Now, are you familiar with spousal privilege?

9    A    Yes.

10   Q    What is spousal privilege, just very generally speaking?

11   A    Generally speaking it's a privilege that two individuals

12   were --

13             MR. CANNICK:  Objection.

14             THE COURT:  Sustained.

15             MS. GEDDES:  The Government offers 948-A and 948-C.

16             THE COURT:  Any objection?

17             MR. CANNICK:  Yes, we object to this.

18             THE COURT:  All right.  I have no idea what they

19   are.  Can I see the parties at the side, please.

20             (Sidebar.)

21             (Continued on next page.)

22

23

24

25

MDL      RPR      CRR      CSR

Sidebar                                            3588

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3          THE COURT:  All right.

4          MS. GEDDES:  Your Honor, this is the article that

5    the Government briefly moved on and I believe Your Honor

6    stated that we could introduce it.  It is simply for the

7    purpose that on August 30, maybe August 31, of 1994, the

8    defendant was with Demetrius Smith.

9          THE COURT:  Why don't you just stipulate to that?  I

10   mean, the article has a lot of things that are completely

11   unnecessary for this.

12         MR. CANNICK:  My only problem, Your Honor, is

13   Demetrius Smith was here.  He was on the stand and there was

14   every opportunity to ask him and for me to confront him about

15   the veracity of that article, he is no longer here.

16         THE COURT:  Okay, the question is:  So, what strikes

17   me as I look at this article, which has a lot of stuff, that

18   he leaves the 4,000 fans when he learns the cops are taping

19   the racy performance.

20         MS. GEDDES:  I don't want any of that.  I want to

21   read one line of this, but my understanding is they wouldn't

22   stipulate to this.

23         THE COURT:  Well, it's in the article, but it is --

24   I don't --

25         MS. GEDDES:  Could I show you the line that I want

```
                          Sidebar                        3589
```

1    to read?

2           THE COURT:  Yes.

3           MS. GEDDES:  There was an R. Kelly concert Wednesday

4    night at the Albany Civic Center and there was a quote by tour

5    manager Demetrius Smith.  Only for the very narrow proposition

6    that, as Demetrius Smith testified he was, in fact, with the

7    defendant the day after the marriage was performed in Chicago,

8    they then flew back, he didn't remember the precise location

9    that he flew to, but he did testify that he was with the

10   defendant before he heard about the marriage, that they then

11   flew to Chicago and then immediately following the marriage he

12   flew back to where the next concert performance was, which he

13   indicated was that day.

14          MR. CANNICK:  I don't think that we challenged him

15   on his testimony regarding flying out and flying back.

16          THE COURT:  Why don't you just stipulate to that

17   part of it.  I mean, it's in the record.

18          MR. CANNICK:  Let me think about it.  We can move on

19   and I will think about it.

20          THE COURT:  The only question I have is this the

21   performance he left for to go --

22          MS. GEDDES:  This is the performance that

23   immediately following the marriage they go to, and it's

24   relevant to show that, just like he testified, he was, in

25   fact, with the defendant.  It's very narrow corroboration.

Sidebar                                3590

1    But when you're trying to corroborate something that happened

2    25 years ago, any corroboration is useful.

3            THE COURT:  I think the fact that it is recorded in

4    a newspaper with the date and time is something that you can

5    probably stipulate to about putting -- I think we are spending

6    way too much time on this.

7            MR. CANNICK:  What I said earlier is I want to think

8    about it.

9            THE COURT:  Fine.

10           MR. CANNICK:  Because I have a calendar of all of

11   his concerts.  If it matches up, then there is no issue.

12           THE COURT:  Good.

13           What's the second thing?

14           MS. GEDDES:  It was just establishing the date of

15   this concert.  I don't need it.  It's the same thing.

16           THE COURT:  All right.

17           (Sidebar concluded.)

18           (Continued on the following page.)

19

20

21

22

23

24

25

 1                THE COURT:  Next question.

 2                MS. GEDDES:  The Government offers 922 -- I'm sorry.

 3     Excuse me, 828-A, 828-B, 965-D, and 804.

 4                THE COURT:  And these are things that you have

 5     agreed on?

 6                MS. GEDDES:  These are all -- yes, my understanding

 7     is that there is no objection to any of these.

 8                THE COURT:  Any objection that you know of, Mr.

 9     Cannick?

10                MR. CANNICK:  We need to see the list.

11                MS. GEDDES:  I'm sorry, which list do you need?

12                MR. CANNICK:  No objection.

13                THE COURT:  Okay.  Those are in evidence.

14                (Government's Exhibits 828-A, 828-B, 965-D, and 804

15     received in evidence.)

16                MR. CANNICK:  Your Honor, in an effort to try to

17     speed this up, if I could see Ms. Geddes about something.

18                THE COURT:  Sure.

19                (Pause.)

20                MR. CANNICK:  I don't think we will ever speed it

21     up.

22                THE COURT:  It doesn't seem like things are getting

23     speeded up at all.

24                MR. CANNICK:  Okay.  If you can just tell us what it

25     is.

1        MS. GEDDES:  I am going to publish what's now in
2   evidence as Government Exhibit 804.  And these are certified
3   annulment records for the marriage of Aaliyah Haughton to
4   Robert Kelly.  The date is October 18, 1994.  And in the page
5   of Government Exhibit 804 that is titled Answer to Complaint
6   for Annulment, it states in paragraphs 2, 3, and 4, Defendant,
7   referring to Robert Kelly, admits paragraph 2, defendant
8   admits paragraph 3, defendant admits paragraph 4.
9        And then with respect to 7, 8, and 9, it says
10   defendant admits paragraph 7, paragraph 8, and paragraph 9.
11   And I'm going to then read paragraphs 2, 3, 4, and 7, 8, 9 of
12   the Complaint to which the defendant admitted.  So this is on
13   the first page of the Complaint for Annulment, and it reads,
14   "The parties," referring to Aaliyah Dana Haughton and Robert
15   Kelly, "were married on August 31, 1994 in Chicago, Illinois.
16   Plaintiff's complete name before the marriage was Aaliyah Dana
17   Haughton and is the same currently.  Defendant's complete name
18   before the marriage was Robert Kelly and is the same
19   currently.
20        "That on August 31, 1994, they stopped living
21   together as husband and wife.
22        "That the alleged marriage was solemnized while the
23   plaintiff was under the age of legal consent, therefore, this
24   marriage was induced by fraud and plaintiff gave an incorrect
25   birth date."

Chabot - direct - Geddes                    3593

1         All right.  I just errored in reading paragraph 5.

2   There was no admission to paragraph 5.

3         And then 7, 8, 9, that the plaintiff was not

4   pregnant, that the parties have no minor children and that the

5   parties have not co-habitated as husband and wife since August

6   31, 1994.

7         And now the Government offers Government Exhibit

8   403.  I believe there is no objection to that one.

9         THE COURT:  Is that right?

10        MR. CANNICK:  That's correct.

11        THE COURT:  Okay.

12        (Government's Exhibit 403 received in evidence.)

13  Q    And Special Agent Ryan Chabot, where was Government

14  Exhibit 403 recovered?

15  A    From the storage unit.

16  Q    The one that was searched on January 9, 2020?

17  A    360 Kent Avenue.

18  Q    And that's one that was searched on January 9th?

19  A    Correct.

20  Q    I'm now showing Government Exhibits 965-B and 965-C.

21        This is a receipt from Chicago Nike Town on July 30

22  of 1999 and the address of Chicago Nike Town was 669 North

23  Michigan Avenue in Chicago.

24        And Special Agent Ryan Chabot, have you been to the

25  Nike Town store at 669 North Michigan Avenue in Chicago,

Chabot - direct - Geddes                    3594

1    Illinois?

2    A    I have.

3    Q    And the receipt that was just shown was from 1999.  Have

4    you been there more recently than that?

5    A    Yes.

6    Q    But the same address, is there still a Nike Town there?

7    A    Correct.

8    Q    And have you also been to the Warwick Allerton Hotel

9    located at 701 North Michigan Avenue in Chicago?

10   A    Yes, I have.

11   Q    What is the proximity between the Nike Town and the

12   Allerton Hotel?

13   A    It's within a block.  There is a street that divides the

14   two locations.

15           MS. GEDDES:  And the Government is showing the

16   witness only what's been marked for identification as

17   Government Exhibit 965-B and then 965-C.

18   Q    There is 965-B and 965-C.  Do you recognize those?

19   A    I do.

20   Q    Are those just Google Maps showing those two locations,

21   the Nike Town and the Allerton Hotel?

22   A    Yes, they are.

23           MS. GEDDES:  The Government offers 965-B and C.

24           MR. CANNICK:  No objection.

25           THE COURT:  Those are in evidence.

Chabot - direct - Geddes                    3595

1          (Government's Exhibits 965-B and then 965-C received
2    in evidence.)
3          MS. GEDDES:  Very briefly, if I can publish 965-B.
4          (Exhibit published.)
5    Q    Does that red dot indicate the Nike Town Chicago?
6    A    Yes.
7    Q    And that's the one you visited more recently than 1999?
8    A    Yes.
9    Q    And on 965-C, that blue where it says Nike Chicago, is
10   that the Nike Town?
11   A    It is.
12   Q    And right around the corner, is that the Allerton Hotel?
13   A    Yes.
14          MS. GEDDES:  The Government offers Government
15   Exhibits 405, 406, 408, 408-D, 415 and 415-A.
16          MR. CANNICK:  No objection.
17          THE COURT:  Okay.
18          (Government's Exhibits 405, 406, 408, 408-D, 415 and
19   415-A received in evidence.)
20   Q    And Government Exhibits that I just mentioned, 405, 406,
21   408, 408-D, 415 and 415-A, did you review those prior to
22   coming to court today?
23   A    I did.
24   Q    Where were those items recovered or where did you obtain
25   them?

1  A    The same store, from the search warrant on January of
2  2020.
3  Q    And beginning with Government Exhibit 405, at the top it
4  indicates the Chocolate Factory, and below it states 865 North
5  Larrabee, Chicago, Illinois.  This is a fax cover sheet that
6  reads here, "Are the timecards for the phone people at the
7  studio?  Let me know if you have any questions or concerns,"
8  and it is signed Tom Arnold.
9         And there is also a telephone number listed at the
10  top for the Chocolate Factory at 865 North Larrabee,
11  (312) 944-5599.
12         And then I'm now showing that second page of
13  Government Exhibit 405, and at the top -- I'm sorry, on the
14  first page of Government Exhibit 405 it indicates the date
15  that this fax was sent, on March 23rd of 2004, and it is a
16  seven-page fax.
17         And here is an individual -- what appears to be a
18  time card for Nicq Williams for the dates between March 8th
19  and March 21st.
20         And I'm now publishing what's been marked for
21  identification as Government Exhibit 408.  I'm sorry, it is in
22  evidence as Government Exhibit 408.  If we could publish it,
23  please.
24         (Exhibit published.)
25         MS. GEDDES:  I will just show Government Exhibit 408.

Chabot - direct - Geddes                    3597

Q     And where was -- was this Fed Ex envelope also found at
the storage facility, did you testify to that earlier?

A     It was.

Q     And were there several Fed Ex envelopes that were found
at the storage facility?

A     Yes.

Q     And generally speaking, what were in those envelopes?

A     A lot of paper message slips with dates, numbers and
names.

Q     From within 408, I'm now showing Government Exhibit
408-D, which consists of two messages, and this can be
published.

            (Exhibit published.)

Q     Were Government Exhibits 408-D, was that recovered from
within Government Exhibit 408?

A     Yes, they were.

Q     And this is a message from Sonja and there's a telephone
number and a date October 12th.  And I'm going back to
Government Exhibit 408, the Fed Ex envelope, and there is a
date on this Fed Ex envelope which indicates December 13,
2003.

            And then the second page of Government Exhibit 408
is another telephone message from Sonja with that same
telephone number and that one is dated December 14th.  And is
801 an area code for Salt Lake City?

MDL       RPR       CRR       CSR

Chabot - direct - Geddes                    3598

1    A    Yes.

2    Q    I'm now showing what's in evidence as Government Exhibit

3    415, another Fed Ex envelope, this one labeled old messages.

4    You can see it is marked 415.  And I'm showing what's in

5    evidence as Government Exhibit 415-A.  So that was just 415.

6              If we could publish to the jury only, please.

7              (Exhibit published to the jury.)

8    Q    Just to be clear, I showed you a moment ago Government

9    Exhibit 415 where it is written old messages.  Was that how it

10   was found when you obtained it?

11   A    Yes.

12   Q    You didn't write that on that; right?

13   A    No, I did not.

14   Q    Now, showing you 415-A.  This is just for the jury.

15             (Exhibit published to the jury.)

16   Q    There is that same telephone number that was just listed

17   on Government Exhibit 408-D ending in 6116 with the Salt Lake

18   City area code of 801, and these messages are dated March

19   22nd, March 16th, and March 21st.

20             And there is -- the top two -- on each of them, it

21   indicates from Sonja.  And on the top two there is a last name

22   on it.  And for the jury only, I'm showing what's in evidence

23   as Government Exhibit 62-A, a photograph of that same

24   individual, of the individual, a photograph with that same

25   name written below.

Chabot - direct - Geddes                               3599

1              (Exhibit published to the jury.)

2    Q    Now, prior to coming to court, did you review an

3    electronic file that was marked as Government Exhibit 138 for

4    phone records related to a telephone number ending in 6916?

5    A    Yes.

6    Q    And did you review what was labeled as the landline, were

7    those AT&T records in a file labeled landline?

8    A    Yes.

9    Q    In that particular report, did it reflect calls ranging

10   from January 1, 2001 until December 31, 2005?

11   A    It did.

12   Q    Now, were there telephone calls between the telephone

13   number (303) 617-7167 and the phone number (801) 699-6916 only

14   between March 13, 2004 and March 15, 2004, so just for that

15   three-day period?

16   A    That's correct.

17   Q    And have you also reviewed -- within that 2001 to 2005

18   timeframe, have you reviewed just the calls after August 1,

19   2003?

20   A    Correct.

21   Q    And fair to say that there were no telephone calls

22   between the telephone number (801) 964-6771 and (801) 699-6916

23   other than on March 13, 2004 and to March 16, 2004?

24   A    Correct.

25   Q    I'm showing what's in evidence as Government Exhibit

Chabot - direct - Geddes                          3600

1   70-A.  There is a photograph underneath that says Jerhonda

2   Pace.

3          MS. GEDDES:  I'm sorry.  The Government is offering

4   Government Exhibit 70-A.

5          THE COURT:  I thought it was already in.

6          MS. GEDDES:  I think you admitted Government Exhibit

7   70 but not 70-A.

8          THE COURT:  Any objection?

9          MR. CANNICK:  None.

10          THE COURT:  Okay, that's in evidence.

11          (Government's Exhibit 70-A received in evidence.)

12          THE COURTROOM DEPUTY:  For the public?

13          MS. GEDDES:  Yes, it can be published.

14          (Exhibit published.)

15  Q    I'm now offering Government Exhibit 820 which is a

16  certified DMV record?

17          THE COURT:  Any objection?

18          MR. CANNICK:  No.

19          THE COURT:  That's in evidence.

20          (Government's Exhibit 820 received in evidence.)

21          THE COURT:  Is that jury only?

22          MS. GEDDES:  No, this is can go to the public.  All

23  right.  Actually, it should be for the jury only.  Thank you.

24          (Exhibit published to the jury.)

25  BY MS. GEDDES:

Chabot - direct - Geddes                    3601

1   Q    On Government Exhibit 820 is that same photograph shown

2   in 70-A, and it indicates an application date of April 22,

3   2009.  It indicates that it was issued that same day, April

4   22, 2009.  And it expires -- actually, it has the same

5   expiration date of April 2, 2009, and there is also a driver's

6   license ID.

7           And based on the driver's license ID and

8   specifically the fact that the J is at the end of that number,

9   are you able to tell whether this is a driver's license versus

10  a state ID?

11          MR. CANNICK:  Objection.

12          THE COURT:  Overruled.

13          Do you know the difference?

14          THE WITNESS:  I do, Your Honor.

15          THE COURT:  Overruled.

16  A    It's an ID.

17  Q    A state ID?

18  A    Yes.

19  Q    Just to be clear, the birth day is listed as April 19,

20  1993?

21  A    Correct.

22  Q    So on April 22nd, that individual would be 16 years old

23  in a few days?

24  A    That's correct.

25  Q    And a few days.

MDL      RPR      CRR      CSR

Chabot - direct - Geddes                    3602

1          All right.  Have you had a chance to review
2     Government Exhibit 210, which I will hold up?
3          MS. GEDDES:  This is in evidence.
4     Q    Have you had a chance to review the contents of
5     Government Exhibit 210?
6     A    I have.
7     Q    And that is listed as a Virgin Mobile cellular telephone;
8     is that correct?
9     A    Correct.
10         MS. GEDDES:  I'm showing Government Exhibit 210-S.
11    This is not in evidence.
12         Actually, the Government offers 210-S.
13         MR. CANNICK:  No objection, Your Honor.
14         THE COURT:  Okay.
15         (Government's Exhibit 210-S received in evidence.)
16
17         (Continued on next page.)
18
19
20
21
22
23
24
25

Chabot - direct - Geddes                          3603

1    BY MS. GEDDES:  (Continuing.)

2              (Exhibit published.)

3    Q    And is Government Exhibit 210(s) just another screenshot

4    taken from Government Exhibit 210, the phone itself?

5    A    Yes.

6    Q    And looking at Government Exhibit 210(s) as well as the

7    other calls that were entered into evidence which you were

8    present for when they were entered into evidence, can you tell

9    just from looking at this whether that was an incoming or

10   outgoing telephone call?

11   A    I cannot.

12             MS. GEDDES:  The Government offers 466, 408, 408(b),

13   417, 417(a), 432, 432(c), 433, 433(a).

14             THE COURT:  Any objection?

15             MR. CANNICK:  No objection.

16             THE COURT:  Okay, those are all in evidence.

17             (Government Exhibits 466, 408, 408(b), 417, 417(a),

18   432, 432(c), 433, 433(a) received in evidence.)

19   BY MS. GEDDES:

20   Q    Beginning with Government Exhibit 466, have you had a

21   chance to review Government Exhibit 466 prior to your

22   testimony today?

23   A    I have.

24   Q    And where was Government Exhibit 466 obtained?

25   A    The same storage unit.

Chabot - direct - Geddes                    3604

1    Q    And are these -- these are several phone calls -- message

2    slips from an individual listed on these as Juice.  And they

3    are from a variety of different dates including this one where

4    my finger is pointing, this one dated December 6, 2002 and one

5    from January 10, 2003.  Now, not all of these phone slips list

6    the year; is that correct?

7    A    Correct.

8    Q    When the phone messages were recovered, however, how were

9    they recovered just generally?

10   A    Generally a large Fed Ex or other carrier postal

11   envelope, just all inside that envelope.

12   Q    I think you testified earlier that there were several

13   different envelopes that were recovered, all containing phone

14   messages; is that correct?

15   A    Correct.

16   Q    And were they bundled in batches?  Like, did -- go ahead?

17   A    Some were.

18   Q    And what do you mean by that?

19   A    Some were together, some were just all of them lose

20   inside of the envelope.

21   Q    And within the envelope did they appear to include, you

22   know, ranges of time, like, for a couple of months here and a

23   couple of months there?

24   A    Yes and some of the envelopes had dates on the outside

25   which corresponded.  Some did not.

Chabot - direct - Geddes                                    3605

1    Q    Now, are you familiar with the -- having sat through this

2    trial are you familiar with, without saying it, the true name

3    of the individual named Juice?

4    A    I am.

5    Q    And are you familiar with her birth date, and I think we

6    actually have --

7              MS. GEDDES:  Yeah, at this time the Government

8    offers Government Exhibit 824, which is a certified DMV

9    record.

10             MR. CANNICK:  May I see it?

11             No objection.

12             THE COURT:  Okay.  That's in evidence.

13             (Government Exhibit 824 received in evidence.)

14             MS. GEDDES:  May I publish to the jury only, please?

15             THE COURT:  Yes.

16             (Exhibit published to jury only.)

17   BY MS. GEDDES:

18   Q    Now, you testified earlier that you're familiar with the

19   true first and last name of Juice.  Is that the name indicated

20   in the first name and last name fields on what I'm showing

21   you, Government Exhibit 824?

22   A    Yes, it is.

23   Q    And is her birthday listed right below those two?

24   A    Yes, it is.

25   Q    And based on that birthday in January of 1985, fair to

SN        OCR        RPR

Chabot - direct - Geddes                                3606

1    say she was 17 in December of 2002?

2    A    Yes.

3    Q    I'm showing you what's in evidence as Government Exhibit

4    417.   Is that another Fed Ex envelope that was recovered from

5    the Fed Ex facility?

6    A    Yes, it is.

7    Q    And were the messages marked in 417(a) having reviewed

8    them prior to your testimony today, were those recovered from

9    within Government Exhibit 417?

10   A    Yes.

11   Q    And the messages in 417(a), is that just a subset of the

12   messages that were recovered within Government Exhibit 417?

13   A    Correct.

14          THE COURT:  Is this in evidence or are you offering

15   it?

16          MS. GEDDES:  It's in evidence.

17          THE COURT:  Okay.

18   BY MS. GEDDES:

19   Q    And 432 is also in evidence.

20          (Exhibit published.)

21   Q    And is this another example of an envelope recovered from

22   the defendant's -- from that storage facility?

23   A    Yes.

24   Q    And on the front it indicates messages; is that correct?

25   A    Correct.

Chabot - direct - Geddes                    3607

1   Q    And, again, that's how it was when you found it?

2   A    Yes.

3   Q    And were Government Exhibits 432(b) and (c) recovered

4   from within Government Exhibit 432?

5   A    Yes.

6   Q    And these are additional phone messages from an

7   individual named Juice and the date on these is listed as

8   November 29th and November 28th.  And, now, in these two

9   messages it doesn't indicate a year.  Is that correct?

10  A    That's correct.

11  Q    Now did you, prior to your testimony today, have a chance

12  to review the other telephone messages that were recovered

13  from within Government Exhibit 432?

14  A    I did.

15  Q    And based on your review of that, were you -- were

16  there -- what was the date range of messages listed in 432?

17  A    I only recall the year of 2002.

18  Q    Okay.  And I'm just going to show the witness.

19       (Counsel approaches.)

20  Q    Take a look at that and let us know if that refreshes

21  your recollection as to the date range of messages contained

22  within Government Exhibit 432?

23  A    Give me a moment.  There's quite a few.

24  Q    You don't have to read through every last one but just

25  generally describe the date range.

Chabot - direct - Geddes                          3608

1    A    September of 2002 through November.

2    Q    And these two from Juice are from November; is that

3    correct?

4    A    Correct.

5    Q    And, finally, I'm showing Government Exhibit 433 which is

6    also in evidence?

7              (Exhibit published.)

8    Q    Another example of a Fed Ex envelope that you recovered

9    that day; is that correct?

10   A    Yes.

11   Q    And written on here it indicates Rob's messages 12/19/02

12   and then it doesn't have a date.  Is that how it was when you

13   recovered it?

14   A    Yes, it was.

15   Q    And I'm showing what's in evidence as 433(a)?

16             (Exhibit published.)

17   Q    433(A) did you review that also prior to your testimony

18   today?

19   A    Yes.

20   Q    And was 433(a) recovered from within 433?

21   A    Yes.

22             MS. GEDDES:  The Government offers Government

23   Exhibit 909.

24             THE COURT:  Any objection?

25             MS. GEDDES:  I think it's already introduced with a

Chabot - direct - Geddes                           3609

1    defense exhibit number, so I assume there's no objection.

2              MR. CANNICK:  Yes, KK.  No objection.

3              THE COURT:  Okay.

4              (Government Exhibit 909 received in evidence.)

5              MS. GEDDES:  And this will be for the jury only,

6    please.

7              (Exhibit published to jury only.)

8              THE COURT:  I think this did come into evidence.

9              MS. GEDDES:  It did, yeah.

10             And I'm going to read a stipulation what has been

11   marked as Government Exhibit 1010 and it reads:  Government

12   Exhibit 910(a), 910(b), 910(c), 911(a), and 911(b) are

13   certified business records from Walgreens, a company that

14   operates pharmacies throughout the United States.  Certain

15   portions of these exhibits not relevant to the trial have been

16   redacted from these exhibits.

17             Government Exhibits 910(a), 910(b) and 910(c) are

18   records related to prescriptions for the defendant Robert

19   Kelly.  And then Government Exhibit 910(c) identifies the

20   Walgreens balance reward account number used to purchase

21   certain prescriptions for the defendant, Robert Kelly.  And I

22   will show 910 and 911 in a moment.  Government Exhibit 911(a)

23   and 911(b) are records related to prescriptions written --

24   Government Exhibits 911(a) and (b) are records related to the

25   prescriptions for the witness who testified using the

1    pseudonym Jane at trial who is depicted in Government Exhibit

2    75.

3                THE COURT:  Slow down just a bit, please.

4                MS. GEDDES:  Sorry.  Government Exhibit 911(b),

5    identifies the Walgreens balance reward account number used to

6    purchase a certain prescription for the witness who testified

7    using the pseudonym Jane at trial who is depicted in

8    Government Exhibit 75.

9                The Government subpoenaed records from Walgreens

10   related to prescriptions for the defendant Robert Kelly in

11   2019.  If called as a witness at trial, Jessica Sahny, a

12   pharmacy manager and representative of Walgreens would testify

13   as follows:

14               Walgreens maintains its business records for a

15   period of approximately eleven years.  Government Exhibits

16   910(a) and 910(b) include records of certain prescriptions for

17   Robert Kelly that date back to 2008.  Because Walgreens

18   retains records for only approximately eleven years, the fact

19   that Government Exhibits 910(a) and 910(b) do not include

20   prescriptions predating 2008 -- and then in parenthesis,

21   approximately eleven years prior to the date of the subpoena,

22   does not mean that no such prescriptions were issued to Robert

23   Kelly through Walgreens prior to 2008.

24               And then it goes on to say:  Valtrex is a

25   prescription drug used to treat herpes infections,

Chabot - direct - Geddes                    3611

1  Valaciclovir, the generic version of the brand name Valtrex is

2  also used to treat herpes infections.  Government Exhibit

3  910(b) includes certain pages with handwritten notations.  The

4  handwritten portions of Government Exhibit 910(b) reflect

5  prescriptions that were called into Walgreens by telephone by

6  a doctor or doctor's office.  The handwritten notations belong

7  to the pharmacist who received the call for the respective

8  prescription from the doctor or doctor's office.

9        And, finally, Government Exhibits 910(c) and 911(b)

10 consist of Walgreens records for the Walgreens balance reward

11 account number used in connection with certain purchases from

12 Walgreens.  The Walgreens balance reward program is a loyalty

13 rewards program for Walgreens customers that provides certain

14 discounts and benefits to customers who use their balance

15 reward number for purchases.  Each balance reward number

16 reflected as, quote, BR_customer_ID and, quote, balance reward

17 customer ID.  On Government Exhibits 910(c) and 911(c) -- I

18 think that's supposed to be 911(b) is associated with a

19 particular person, name, street address and, where provided,

20 e-mail address.  The numbers in the column titled UPC

21 Description is the Government Exhibit -- in Government

22 Exhibits 910(c) and 911(b) reflect the prescription number

23 associated with a particular transaction.

24        Every prescription has a unique prescription number

25 and this stipulation along with Government Exhibits 910(a),

Chabot - direct - Geddes                    3612

1    (b) and 910(c) and 911(a) and 911(b) are admissible at trial.

2              I think Your Honor has ruled that all the

3    stipulations are in evidence.

4              THE COURT:  I have and no need to read every word of

5    them.

6              MS. GEDDES:  I promise I won't.

7              THE COURT:  Okay.

8              MS. GEDDES:  I'm sorry.

9              THE COURT:  You didn't promise that?

10             MS. GEDDES:  The Government though does offer

11   Government Exhibits 910(a), (b) and (c) and 911(a) and (b),

12   which are I think that's included in the stipulation as

13   admissible.

14             THE COURT:  Any objection?

15             MR. CANNICK:  No.

16             THE COURT:  Okay.

17             (Government Exhibits 910(a), 910(b) and 910(c) and

18   911(a) and 911(b), received in evidence.)

19             (Exhibit published.)

20             MS. GEDDES:  These records are now in evidence.  I'm

21   show Government Exhibit 910(a) and these are Walgreens records

22   for Robert Kelly.

23             MS. GEDDES:  Any objection to the publishing?  I

24   don't believe so.

25             THE COURT:  Mr. Cannick, do you want these jury only

SN        OCR        RPR

Chabot - direct - Geddes                    3613

1   or -- I think they're -- there is already evidence about them

2   in the record.

3            MR. CANNICK:  Yes they are.  No objection.

4            THE COURT:  Okay.

5   BY MS. GEDDES:

6   Q    So looking at Government Exhibit 910(a), there are

7   entries, there are the redactions as referenced in the

8   stipulation which are indicated by those black boxes, but here

9   is a prescription for Valaciclovir.  I won't go through each

10  one of them.  Valaciclovir.  Valaciclovir.  Valaciclovir.

11  Here is one for Valaciclovir where the doc name is listed as

12  K. McGrath.  That's from April 15th of 2017.  I am not reading

13  every single one.  This is another one for Valaciclovir and

14  this is also -- this one is September 6th of 2011 and I will

15  read --

16           The final one included in Government Exhibit 910(a)

17  are prescriptions for Valtrex, there were three prescriptions,

18  each were issued on July 30 of 2008.  And the doctor for each

19  is -- well, the doctor for the bottom two is listed as

20  K. McGrath and on the top one it's listed as K. Mc.

21           And Government Exhibit 910(c) , which pursuant to

22  the stipulation reflects the rewards card number used for a

23  particular prescription and where my finger is pointing there

24  is someone named Stephen Pullen, J. Brown and are you familiar

25  with June Brown?

```
                  Chabot - direct - Geddes                    3614
```

1   A    I am.

2   Q    And are you familiar with a Van Pullen?

3   A    Yes.

4   Q    And there's been testimony about both of them during this

5   trial?

6   A    Correct.

7   Q    And Government Exhibit 911(a) and (b).

8            (Exhibit published.)

9

10           (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Chabot - Direct - Geddes                    3615

1           MS. GEDDES:  This is for the jury only, please.

2           So again showing Government's Exhibit 909.  And

3    the patient listed, there's a first and last name.  That

4    individual has been identified here and testified at trial

5    as Jane.  And for that -- and the date of those medical

6    records are in evidence as Government's Exhibit 909 is

7    August 14th, 2015, again, when Jane was 17 years old listed

8    under the age.

9           (Government's Exhibits 909 and 911A received in

10   evidence.)

11          MS. GEDDES:  And then Government's Exhibit 911A,

12   in very small type, are three different prescriptions.  The

13   middle one is listed as Valacyclovir, and the last one is

14   listed as Valacyclovir.  And the middle one is for a

15   prescription of RX0207582, which it's listed right there,

16   RX020 -- I can't -- 7582.

17          And I'm now showing 911B, which is a stipulation

18   identified as that particular balance reward card that was

19   used for that purchase that I just read, and it indicates a

20   first and last name.

21   BY MS. GEDDES:

22   Q    And Special Agent Chabot, are you familiar -- without

23   saying it, are you familiar with who this is?

24   A    I am.

25   Q    And what is her nickname again?

Chabot - Direct - Geddes                     3616

1    A    "Juice."

2         MS. GEDDES:  The Government offers

3    Government's Exhibit 925, 935A, 940.

4         MR. CANNICK:  No objection.

5         THE COURT:  Okay those are in evidence.

6         (Government's Exhibits 925, 935A, received in

7    evidence.)

8         MS. GEDDES:  And I'm showing what's in evidence as

9    Government's Exhibit 935A.  It has really small type.

10        All right.  935A shows a subscriber record for an

11   iCloud used by someone with the first name Victoria, and the

12   last name of Coates.

13        And then 935B is already in evidence as

14   Government's Exhibit 935B, and --

15        THE COURTROOM DEPUTY:  Is this for public, too.

16        MS. GEDDES:  This can be for the public.

17        (Exhibit published to the jury.)

18   BY MS. GEDDES:

19   Q    And Special Agent Chabot, is 935B a printout of an

20   image that was recovered on the iCloud account referenced in

21   935A?

22   A    It is.

23   Q    And was that obtained pursuant to a search warrant?

24   A    Yes.

25        MS. GEDDES:  And the Government also offers,

1  pursuant to 8036 and 9211, 121A, which are telephone records

2  for which there is a business record certificate.

3              THE COURT:  Okay.  Any objection?

4              MR. CANNICK:  No.

5              THE COURT:  Those are in evidence.

6              (Government's Exhibits 8036 and 9211, 121A

7  received in evidence.)

8              MS. GEDDES:  The Government offers Government

9  Exhibit 907; 945A and B; 946A, B, C, and D; Government

10  Exhibit 314; Government Exhibit 514B, as in "boy."

11              MR. CANNICK:  No objection.

12              THE COURT:  Okay.  Those are in evidence.

13              (Government's Exhibits 907, 945A, 945B, 946A,

14  946B, 946C, 946D, 314, and 514B received in evidence.)

15              MS. GEDDES:  And I want to show

16  Government's Exhibit 314 which is now in evidence.

17              (Exhibit published to the jury.)

18  BY MS. GEDDES:

19  Q    I'm showing what's in evidence as Government

20  Exhibit 314.  Special Agent Chabot, where was that

21  Government's Exhibit 34 obtained from?

22  A    Mr. Kelly's residence at the Trump Towers.

23  Q    And that was pursuit to that search on July 11th, 2018?

24  A    Correct.

25  Q    This is a certification of completion of a basic

Chabot - Direct - Geddes                    3618

1    training course for Robert S Kelly listing a home address as

2    219 North Justine Street in --

3              THE COURT:  Can you just take it off for a minute?

4              Could I see you at the side for a minute?  No need

5    for the court reporter.

6              (Sidebar not taken by the court reporter.)

7              (Continued on the next page.)

8              (Pause in proceedings.)

9              (Exhibit published to the jury.)

10   BY MS. GEDDES:

11   Q    All right.  And I'm showing the second page of that

12   same government exhibit, which is Government Exhibit 314.

13   And it's says Illinois State Police Concealed Carry Firearm

14   Training Certificate for Robert Kelly, and it looks like

15   it's issued on May 23rd of 2018?

16             Now, are you familiar with a lawsuit filed by the

17   individual who testified here as ^ face that was filed

18   against the defendant in New York Supreme Court?

19   A    Yes.

20   Q    Was that lawsuit filed on May 21st of 2018?

21   A    It was.

22             MS. GEDDES:  Your Honor, I'm prepared to go

23   forward and perhaps enter another section, so if you wanted

24   to break for the night --

25             THE COURT:  I really do want to get as much done

Chabot - Direct - Geddes                    3619

1   as we can.

2           MS. GEDDES:  Okay.

3           THE COURT:  And again, not necessary to read every

4   single thing.  And I know that you're not, but just --

5           MS. GEDDES:  Yes.

6           THE COURT:  Okay.

7           MS. GEDDES:  The Government now offers Government

8   Exhibits 307, 311, 312, 317, 318, 319, 320, 321, 324, 418,

9   421, 422, 454, 455, 309, 431, 302, 303, 308, 419, 420, 423,

10  444, 445, 446, 447, 448, 450, 452, 304, 310, 428, 429, 451,

11  424, 424A, 424B, 425, and 426.

12          THE COURT:  Any objection?

13          MR. CANNICK:  None.

14          THE COURT:  Okay.  Those are all in evidence.

15          (Government's Exhibits 307, 311, 312, 317, 318,

16  319, 320, 321, 324, 418, 421, 422, 454, 455, 309, 431, 302,

17  303, 308, 419, 420, 423, 444, 445, 446, 447, 448, 450, 452,

18  304, 310, 428, 429, 451, 424, 424A, 424B, 425, and 426

19  received in evidence.)

20          MS. GEDDES:  I want to show 311.

21          (Exhibit published to the jury.)

22  BY MS. GEDDES:

23  Q   All right.  The exhibits that I just read out, that

24  very long list, some were in the 300s and some were in the

25  400s.  Prior to testifying today, did you have a chance to

Chabot - Direct - Geddes                    3620

1   review the exhibits in the 300s and the 400s?

2   A    I did.

3   Q    And when an exhibit starts with 3, in the 300 series,

4   what does that indicate to you?

5   A    That it was recovered from the Trump Towers residence.

6   Q    During the search on July 11th of 2019?

7   A    Correct.

8   Q    And when the exhibit starts a 4, in the 400s, what does

9   that indicate to you?

10  A    That it was recovered from the storage unit on January

11  of 2020 search warrant.

12  Q    And was there a safe within the storage facility?

13  A    There was.

14  Q    And was that safe locked when you conducted the search

15  of the storage facility?

16  A    It was.

17  Q    And were you able to access the contents of the safe?

18  A    Yes.

19  Q    And were there items found within that safe?

20  A    Yes.

21              (Continued on the next page.)

22

23

24

25

Chabot - direct - Geddes                    3621

1   BY MS. GEDDES: (Continuing)

2        MS. GEDDES:  And I'm now reading paragraph 2-E from

3   the stipulation marked Government Exhibit 1013, and it reads

4   during the January 9, 2020 search --

5        THE COURT:  Even though I tell you not to read the

6   whole thing, just don't read the part that you are reading too

7   fast.

8        MS. GEDDES:  Sorry.

9        During the January 9, 2020 search the storage

10  facility and Apple iPhone containing Government Exhibit 481

11  and miscellaneous documents and other items, including

12  Government Exhibits 412, 413, 420, 421, 423, 424, 424-A,

13  424-B, 425, 426, 427 and 428 were recovered from a locked safe

14  in the storage facility.

15       I'm showing what's now in evidence as Government

16  Exhibit 421 and I just read a stipulation indicating that

17  Government Exhibit 421 was recovered from a locked safe within

18  the storage facility.

19       Now, Government Exhibit 421 is a document protector

20  and then a handwritten letter inside.

21  Q    How was it recovered in the storage -- in the safe from

22  which this was recovered?  Did it include the document

23  protector?

24  A    Yes.

25  Q    And were there other documents that were also included in

Chabot - direct - Geddes                    3622

1  document protectors found within the storage facility?

2  A    Yes.

3  Q    And just to be clear, this is a handwritten letter; is

4  that correct?

5  A    That's correct.

6           MS. GEDDES:  And if I could show to the jury only.

7  Government Exhibit 421 is a seven-page handwritten letter and

8  it is signed at the end in -- with an individual.

9           (Exhibit published to the jury.)

10 Q    Without seeing it, do you recognize the signature there

11 or who is written in the signature there?

12 A    I do.

13 Q    Is that a signature for the individual who testified here

14 as Jane?

15 A    It is.

16          MS. GEDDES:  And I'm not going to read this seven

17 pages mostly front and back letter, but I will read the first

18 part.  It says, "As a ground woman, I am embarrassed and

19 humiliated to have to wake up to not only my parents but

20 others who are choosing to lie R. Kelly to try and create a

21 story to ruin his image.  At the time that I met Robert he

22 decided to help me develop my craft.  I was a singer who was

23 given the chance to sing for R. Kelly who eventually started

24 allowing me to watch him in the studio and enjoy the making of

25 a song so that when I'd go home, I'd be inspired to be just as

Chabot - direct - Geddes                    3623

1    him with my career.

2          "After learning of flaws in my singing that Robert

3    noticed, not only would he tell me amazing stories of his

4    prior teacher, Ms. McLynn, but he would also let me take

5    notes.  He gave me warmups and instructions to practice.  He

6    worked with me on everything from the National Anthem to a

7    cover song being played on the radio."

8          It says, "Song being played on the radio to

9    classical music.  In the middle of walking, eating or talking,

10   he'd tell me to sing on the spot.  Indoors, outdoors, and in

11   the middle of drinking Starbucks, he'd test me and see the

12   places I'd improved in and the places I was still lacking in,

13   and he continued to fix me and help me.

14         "This man has not only been a great friend through

15   my years of knowing him, but he has also helped me and taught

16   me and allowed me to enjoy my life as an adult.

17         "At the age of 18 -- I'm sorry.  "At the age 17, I

18   never had sex with Robert Kelly.  He has never asked me to

19   participate in anything with him.  I never did anything sexual

20   with Robert at 17.  I have never performed any sexual

21   intercourse with others or in front of others for him or with

22   him while around him -- or with him.

23         "While around him, I learned as much as I could

24   about music so that when I went home I could impress my

25   parents with all that I learned."

MDL        RPR        CRR        CSR

Chabot - direct - Geddes                                    3624

1           And it continues from there.

2    Q    I'm showing what's now evidence in as Government Exhibit

3    319.  And, again, you testified earlier that the exhibits in

4    the 300 series were recovered from the defendant's residence;

5    is that correct?

6    A    Correct.

7    Q    Just reading the first paragraph, it states, "Hey, there.

8    I know today was tough and hard, but you will get through

9    this.  You are so strong and that beautiful smile makes the

10   world shine even on the ugliest day.  God would never give you

11   something you could not handle.  You will get through this.  I

12   know all the beautiful angels are holding hands, blessing you,

13   watching over you, your mother, and Luscious your grandmother,

14   your first crush Lulu, and even Alliyah, all watching you,

15   supporting you, and cheering you on from the spirit."  And it

16   continues from there.

17           I want to show you Government Exhibit 324, which is

18   in evidence, another handwritten note signed mama bear, and it

19   reads, "I've thought about what you said and I do want to fix

20   us.  I just do not want to delete my entire e-mail.  So

21   hopefully we can figure out another way to build trust.  The

22   more I think of it, the more I realize I have to delete.  It's

23   not because I have anything to hide because I don't.  So if

24   you do not feel comfortable with that, we need to figure

25   something else out."  And it goes on from there.

                    MDL      RPR      CRR      CSR

Proceedings                                   3625

1          And, again, that's Government Exhibit 324 recovered
2    from the defendant's residence?
3    A    Correct.
4          THE COURT:  I think we have reached six o'clock, so
5    I think it might be a good time to stop.
6          Ladies and gentlemen, we are done for tonight.  I
7    will see you tomorrow at 9:30.  Please don't talk about the
8    case or anything having to do with the case.  Don't read any
9    accounts of the case or watch any news accounts or anything
10   like that.  But I hope you have a good night.  We will see you
11   tomorrow morning.  Thank you.
12         THE COURTROOM DEPUTY:  All rise.
13         (Jury exits the courtroom.)
14         THE COURT:  Okay, the witness can step down.
15         (Witness leaves the stand.)
16         THE COURT:  Everybody can sit down.
17         Anything before we break?
18         All right.  I guess just so I can have a little bit
19   of a preview, are there any objections to any evidence that's
20   going in?
21         MS. GEDDES:  I think I understand that there is an
22   objection to two excerpts of statements made by Donnell
23   Russell, but I think that counsel wants to wait until tomorrow
24   morning perhaps.
25         THE COURT:  Is that in the binder?

Proceedings                                          3626

1          MS. GEDDES:  It is.

2          THE COURT:  Was that something on television or on a

3     blog?

4          MS. GEDDES:  YouTube, yes.

5          THE COURT:  All right.  Anything else?

6          Thanks so much.  Thanks again to the marshals.

7          I will see everybody tomorrow.

8          (Matter adjourned to September 15, 2021 at 9:30

9     a.m.)

10

11                         ooo0ooo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3627

<u>I N D E X</u>

<u>WITNESS</u>                                                    <u>PAGE</u>


ALESIETTE MAYWEATHER


     DIRECT EXAMINATION BY MS. GEDDES          3412


     CROSS-EXAMINATION BY MR. CANNICK          3444

     REDIRECT EXAMINATION BY MS. GEDDES        3491

     RECROSS-EXAMINATION BY MR. CANNICK        3502

     REDIRECT EXAMINATION BY MS. GEDDES        3505

**NICHOLAS WILLIAMS**

     DIRECT EXAMINATION

     BY MS. CRUZ MELENDEZ                      3508

     CROSS-EXAMINATION BY MR. CANNICK:         3550

     REDIRECT EXAMINATION BY

     MS. CRUZ MELENDEZ:                        3561

**RYAN CHABOT**

     DIRECT EXAMINATION BY MS. GEDDES          3578

3628

<u>**E X H I B I T S**</u>

1

2

3

4      Government Exhibit 240(p)                        3414

5

6      Government Exhibit 240(c)                        3418

7

8      Government Exhibits 240(w), 240(f) and 971       3422

9

10     Government Exhibit 240(g)                        3429

11

12     Government Exhibit 240(x)                        3429

13

14     Government's Exhibit 240(z)                      3490

15

16     Government's Exhibit 1001                        3564

17

18     Government's Exhibit 1003                        3565

19

20     Government's Exhibit 1007                        3567

21

22     Government's Exhibit 83                          3567

23

24     Government's Exhibits 62 and 62(a)               3567

25

3629

1

2        Government's Exhibit 203                    3568

3

4        Government's Exhibit 1009                   3570

5

6        Government's Exhibit 84                     3571

7

8        Government's Exhibit 2008                   3573

9

10       Government's Exhibit 526                    3580

11

12       Government's Exhibits 902 and 902(t)        3585

13

14       Government's Exhibit 901                    3586

15

16       Government's Exhibits 828-A, 828-B, 965-D,

17       and 804                                     3591

18

19       Government's Exhibit 403                    3593

20

21       Government's Exhibits 965-B and then 965-C  3595

22

23       Government's Exhibits 405, 406, 408, 408-D,

24       415 and 415-A                               3595

25

3630

1

2          Government's Exhibit 70-A                    3600

3

4          Government's Exhibit 820                     3600

5

6          Government's Exhibit 210-S                   3602

7

8          Government Exhibits 466, 408, 408(b), 417,

9          417(a), 432, 432(c), 433, 433(a)             3603

10

11         Government Exhibit 824                       3605

12

13         Government Exhibit 909                       3609

14

15         Government Exhibits 910(a), 910(b) and

16         910(c) and 911(a) and 911(b),                3612

17

18         Government's Exhibits 909 and 911A           3615

19

20         Government's Exhibits 925, 935A,             3616

21

22         Government's Exhibits 8036 and 9211, 121A    3617

23

24         Government's Exhibits 907, 945A, 945B, 946A,

25         946B, 946C, 946D, 314, and 514B              3617

SN      RPR      OCR

3631

Government's Exhibits 307, 311, 312, 317,
318, 319, 320, 321, 324, 418, 421, 422, 454,
455, 309, 431, 302, 303, 308, 419, 420, 423,
444, 445, 446, 447, 448, 450, 452, 304, 310,
428, 429, 451, 424, 424A, 424B, 425, and 426        3619

SN      RPR      OCR