UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
                                            :

UNITED STATES OF AMERICA,      :

                                            :         19 Cr 286 (AMD)

                                            :

-vs-                                 :         NOTICE OF MOTION

                                            :

                                            :

ROBERT SYLVESTER KELLY,      :
        also known as "R. Kelly,"      :

                                            :

                    Defendant.      :
----------------------------------------------------X

**DEFENDANT ROBERT KELLY'S MEMORANDUM OF LAW IN SUPPORT OF HIS**
**<u>MOTION FOR A NEW TRIAL</u>**

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

*Attorney for Robert Kelly*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**………………………………………………………… ii

**INTRODUCTION**…………………………………………………………………….. 1

**ARGUMENT**

I.    **Defendant Was Denied Effective Assistance of Counsel Where His Trial Attorneys Failed to Conduct a Meaningful *Voir Dire* of Potential Jurors and Challenge Unqualified Jurors, Some of Whom Had Watched the Inflammatory Docuseries "Surviving R. Kelly" or Were Familiar with Prior Accusations of Sexual Abuse of Minors against Defendant. Counsel's Objectively Unreasonable Performance during *Voir Dire* Resulted in the Empaneling of a Jury that Was Neither Fair Nor Impartial.**
………………………………………………………………………….. 2

II.   **Defendant Is Entitled to a New Trial Where One Of His Trial Attorneys Labored Under A Disabling Conflict Of Interest As a Result of Her Simultaneous Representation Of The Defendant and the Government's Star Witness "Jane" That Was Imputed to the Entire Defense Team**……………. 13

**CONCLUSION**……………………………………………………………………….. 18

## **TABLE OF AUTHORITIES**

**CASES**

*Anwar v. United States,* 648 F. Supp. 820 (N.D.N.Y. 1986) ........................................................ 17

*Connors v. United States*, 158 U.S. 408 (1895) ........................................................................... 10

*In re Michael,* 326 U.S. 224 (1945) ............................................................................................... 2

*Irwin v. Dowd,* 366 U.S. 717 (1961) .............................................................................................. 2

*Lainfesta v. Artuz,* 253 F. 3d 151 (2d Cir. 2001 ......................................................................... 14

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) ................................................................. 10

*Smith v. Phillips,* 455 U.S. 209 (1982) ........................................................................................... 2

*Strickland v. Washington,* 666 U.S. 668 (1984) .................................................................... 11, 13

*United States v. Blount*, 479 F. 2d 650 (6th Cir. 1973) ............................................................... 11

*United States v. Daugerdas,* 735 F. Supp. 2d 113 (S.D.N.Y. 2010) ........................................... 17

*United States v. Fulton,* 5 F. 3d 605 (2d Cir. 1993) ............................................................... 14, 16

*United States v. Jiang,* 140 F. 3d 124 (2d Cir. 1998) .................................................................. 17

*United States v. Laird*, 239 Fed. Appx. 971 (6th Cir. 2007) ......................................................... 3

*United States v. Luciano,* 158 F. 3d 655 (2d Cir. 1998) .............................................................. 14

*United States v. Sanchez,* 969 F. 2d 1409 (2d Cir. 1991) .............................................................. 2

*United States v. Schwarz,* 283 F. 3d 76 (2d Cir. 2000) ............................................................... 14

*United States v. Stein,* 410 F. Supp. 2d 316 (S.D.N.Y. 2006) ..................................................... 17

*Waldorf v. Shuta,* 3 F. 3d 705, 710 (3d Cir. 1993) .................................................................. 3, 10

*Wheat v. United States,* 486 U.S. 153 (1988) ............................................................................... 14

**RULES**

Federal Rule of Criminal Procedure 24 ........................................................................................... 3

Federal Rule of Criminal Procedure 29 ........................................................................... 2

Federal Rule of Criminal Procedure 33 ........................................................................... 2

## **CONSTITUTIONAL PROVISIONS**

U.S. Const. Amend. VI. ............................................................................................ 1, 14

## INTRODUCTION

It is axiomatic that a Defendant is entitled to the effective assistance of counsel. U.S. Const. Amend. VI. Incorporated in Defendant's Sixth Amendment guarantee is the right to conflict-free counsel. Defendant was denied his Sixth Amendment guarantees in a number of ways, some of which are clear from the record – some of which are not.[1] In this complex RICO prosecution, Defendant's legal team fell apart mere weeks before the commencement of trial. The docket reflects that Defendant's lawyers were unable to effectively represent Defendant as a team. Energy, resources, and time that should have been devoted to preparing for trial were expended battling each other until two of Defendant's more experienced attorneys were granted leave to withdraw. Defendant was left with a disjointed, unprepared trial team and no singular defense strategy.

This motion identifies two serious violations of Defendant's Sixth Amendment constitutional guarantees that require a new trial and are apparent from the record. Specifically, Defendant is entitled to a new trial where his trial team conducted no meaningful *voir dire* and acquiesced to the seating of jurors who were unqualified to serve on this jury. Defendant was also denied conflict-free counsel where his attorney Ms. Becker simultaneously represented one of the government's key witnesses. These violations of Defendant's Sixth Amendment rights are so serious as to demand a new trial without a showing of prejudice.

---

[1] Contemporaneous with this motion, Defendant is also filing a motion for leave to supplement this motion where undersigned counsel may raise additional claims of ineffective assistance of counsel, some of which may depend on outside the record information.

**LEGAL STANDARD**

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Unlike Rule 29, Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice," but such "discretion should be exercised sparingly." *United States v. Sanchez,* 969 F. 2d 1409, 1413-14 (2d Cir. 1991).

**ARGUMENT**

I.  **Defendant Was Denied Effective Assistance of Counsel Where His Trial Attorneys Failed to Conduct a Meaningful *Voir Dire* of Potential Jurors and Challenge Unqualified Jurors, Some of Whom Had Watched the Inflammatory Docuseries "Surviving R. Kelly" or Were Familiar with Prior Accusations of Sexual Abuse of Minors against Defendant. Counsel's Objectively Unreasonable Performance during *Voir Dire* Resulted in the Empaneling of a Jury that Was Neither Fair Nor Impartial.**

As United States Supreme Court Justice Black stated in *In re Michael,* 326 U.S. 224, 228 (1945): "[I]t is difficult to conceive of a more effective obstruction to the judicial process than a juror who has prejudged the case." That is, because "Due Process means a jury capable and willing to decide the case solely on the evidence before it, and a trial court ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips,* 455 U.S. 209, 217 (1982). In *Irwin v. Dowd,* 366 U.S. 717, 722 (1961), the United States Supreme Court observed, "the right to a jury trial guarantees to the criminal accused a fair trial by a panel of impartial and 'indifferent' jurors . . . This is true, regardless of the heinousness of the crime charged, the apparent guilty of the offender or the

station in life which he occupied  . . . a juror who has formed an opinion cannot be impartial." (internal citations omitted).

Rule 24 of the Federal Rules of Criminal Procedure governs *voir dire* in criminal trials. The rule provides that if the court examines jurors, it must permit the attorney for the parties to: (A) ask further questions that the court considers proper; or (B) submit further question that the court may ask if it considers them proper. Fed. R. Crim. P. 24(a). A trial judge, who under Rule 24, decides to examine prospective jurors himself "must at the very least solicit questions from both parties' attorney . . .," *United States v. Laird*, 239 Fed. Appx. 971, 972 (6th Cir. 2007).

Naturally, the trial court's duty to ensure that each and every juror is fair and impartial is heightened where, as here, pretrial publicity has greatly increased the odds that a potential juror has preconceived views of the accused's guilt. *Waldorf v. Shuta*, 3 F. 3d 705, 710 (3d Cir. 1993) (in a case of substantial pretrial publicity, jurors' subjective assessments of their own impartiality may not adequately screen for the possibility of prejudice).

In an effort to protect Defendant's cherished guarantee of a fair and impartial jury trial, this Court implemented a procedure whereby potential jurors were asked to complete questionnaires that probed whether they had prior knowledge, preconceived notions, or biases about Defendant given the unprecedent pretrial publicity he faced. (Dkt. No. 115) Indeed, the questionnaire contained an entire section entitled "Knowledge of the Case and People" that asked jurors to reveal whether they had "read, seen, or heard anything about the case, the alleged crimes, or people involve" and to describe in detail any information they had previously learned by the Defendant. The questionnaire expressly asked prospective jurors whether they had "watched or heard any interviews of Robert Kelly, of any TV shows featuring him, or any specials or documentaries about him."

3

The court invited counsel for the government and the Defendant to review the questionnaires in advance of jury selection and determine whether they could agree that certain individuals should be excluded for "cause." The parties conducted that process and identified a set of potential jurors for the *voir dire* process. Inexplicably, Defendant's counsel failed to challenge several jurors who ultimately sat on Defendant's jury who were clearly unqualified to serve on account of their preconceived beliefs about Defendant's guilt. These decisions cannot be justified by trial strategy where the record fails to reflect that trial counsel conducted a sufficient inquiry to probe these jurors' biases. Indeed, trial counsel was mostly silent throughout *voir dire*. Although the court was responsible for questioning prospective jurors, it afforded the parties the opportunity to weigh in the questioning of prospective jurors who had made representations in their questionnaires that raised red flags. These questionnaires were highly effective tools for putting the parties on notice of jurors who might not be qualified to serve. But trial counsel made no effort to drill down on troubling representations that demanded further inquiry to ensure that the juror could be fair and impartial, regardless of any general assurances he/she provided to follow the court's instructions.

Perhaps most troubling, most of Defendant's jurors were aware of prior allegations of sexual abuse against him, and *several* seated jurors had actually seen a scathing, one-sided, docuseries entitled "Surviving R.Kelly" that portrayed Defendant as a serial predator and included interviews with many of the government's witnesses – albeit outside the adversarial process.[2] Defendant's jury should *not* have included a single person who saw the documentary "Surviving R. Kelly." It defies all logic that a juror could possibly remain "indifferent" and consider only the evidence heard from the witness stand after watching this docuseries. But this

---

[2] https://www.rollingstone.com/tv/tv-features/surviving-r-kelly-lifetime-docuseries-review-774317/

Court could not make cause challenges for Defendant or do defense counsel's job for it (although

it tried at points). It was defense counsel's responsibility to conduct a meaningful *voir dire,*

particularly in this highly publicized case to ensure that Defendant's jury was fair and impartial.

Trial counsel failed in its duty.

For example, Juror No. 3 provided the following information in the questionnaire

| | |
|---|---|
| Question 29: | The case for which you are summoned involved the defendant Robert Sylvester Kelly, also known as "R.Kelly," Have you read, seen or heard anything about the case, alleged crimes, or people involved? |
| Answer: | **I watched the documentary, but I forgot the name of it**. |

| | |
|---|---|
| Question 30: | Have you read, seen, or heard about Robert Kelly, also known as R. Kelly? |
| Answer: | Yes. Entertainer, **I heard that he has been sleeping with underage girls**. |

| | |
|---|---|
| Question 31: | Have you watched or heard any interviews of Robert Kelly or any TV shows featuring him or any specials or documentaries about him? |
| Answer: | Yes. |

| | |
|---|---|
| Question: | What were your general impressions? |
| Answer: | **I saw a documentary about him and his legal troubles**. I don't know the full story so I have no feelings and remain impartial. |

| | |
|---|---|
| Question 91: | Do you know anything about the "Me Too movement?" |
| Answer: | Yes. It's a movement that seeks justice for rape victims 25-30 years after the fact. |

Trial counsel did not ask the court to question the juror further about his responses to these

questions or to determine whether the juror could truly serve as impartial and unbiased juror in

light having seen the salacious and highly prejudicial docuseries. Not a single question was

asked of the juror about his impressions of the documentary, nor did counsel ask the court to

inquire about what information he learned about Defendant's prior legal issues or his reputation

for "sleeping with underage girls." Frankly, anyone who had seen the docuseries should have

been automatically removed for cause.

Juror No. 4 revealed in the questionnaire:

Question 39:   The charge in this case involves allegations regarding exposure to one or more sexually transmitted diseases. Is there anything about such an allegations that you believe would affect your ability to serve as a fair and impartial juror?

Answer:   **Yes. I find transmission of STDs in a nonconsensual act to be particularly repulsive.**

Question 55:   Have you ever known anyone, including yourself, who was the victim of a sexual assault, other assault or homicide or other act of violence that required medical treatment or counseling?

Answer:   Yes. Close friend received asylum due to sexual assault and infection with HIV from the police in a foreign country

Question 78:   Which publicly known person do you least admire?

Answer:   Jeffrey Epstein

Although the court generally asked whether anything the juror read would affect his/her ability to be fair and impartial in the case, and the juror replied, "not that I know of." But trial counsel did *not* ask the court to question the juror whether his feelings of "repulsion" about the transmission of STDs in a nonconsensual scenario would interfere with his ability to serve as fair and impartial juror. No conceivable reason exists for failing to inquire further about the juror's feelings about the transmission of STDs in nonconsensual circumstances where the government charged Defendant with precisely that act. Incredibly, this juror willingly disclosed that the publicly known person he *least* admires is Jeffrey Epstein, an accused pedophile – just like the Defendant. With no meaningful inquiry about whether this juror could truly serve as a fair and impartial juror, the juror was seated.

Juror No. 5 disclosed the following in his/her questionnaire:

Question 31:   Have you watched or heard any interviews of Robert Kelly or any TV shows featuring him or any specials or documentaries about him?

Answer:   **Yes.**

Question:   What were your general impressions?

Answer:   **He loves underage girls**

Question 32   From what you have seen, or heard, do you have a general impression of defendant?

Answer:         Somewhat negative.

Question     Why do you feel that way?
Answer:         The allegation that related he was sleeping with underage girls (minors)

Although the court asked the prospective juror general questions about her ability to "put aside other things she might have heard," when asked if he/she could be fair, the juror indicated that he/she would "give it a shot." (R. 94) The court reminded the juror that he/she had to be certain that she would consider only evidence offered at trial, and the juror acquiesced. Incredibly, the court seemed very concerned about this juror's ability to be fair, observing "So I don't know about you, but when someone says they think they can do something in this context, I don't think that's an unqualified assurance. And I don't know what the parties' position is on that. I think I pushed her pretty hard on it, and we still ended up with "I think so." Let me hear from the government, if you have a position on that."

Not surprisingly, the government was confident that the juror indicated she could be fair. The court still expressed doubts. Inexplicably, trial counsel agreed with the government and the juror was seated. To be blunt, defense counsel agreed to the seating of a juror who not only watched "Surviving R. Kelly" but concluded that Defendant "loves underage girls." There simply cannot be any rial strategy for failing to excuse this juror for cause. Had trial counsel challenged this clearly unqualified juror, the court seemingly would have struck him/her for cause. Trial counsel not only didn't move to disqualify the juror, he did not even ask the court to probe more deeply into the juror's statements on the questionnaire that Defendant "loves underage girls."

Juror No. 7 also revealed in his questionnaire that that he had heard about the case and the alleged crimes. Trial counsel did not ask the court to question the juror further about *what* he

heard specifically or where he heard it. The court merely asked the juror whether he could put aside what he heard and rely on the evidence presented in the case. (R. 152-153)

Juror No. 8 also disclosed that he/she had heard about crimes Defendant is alleged to have committed, and further indicated that he/she believed that the allegations related to another case in another state. Again, trial counsel failed to probe what precisely the prospective juror had heard or conduct a meaningful inquiry into whether she could be fair given what she had heard. (R. 157)

Juror No. 9 also indicated that she knew that Defendant "had issues with the law" but could not say exact what for. She also described the "MeToo" movement as "the power structure of the male dominated move industry has been turned on its head." Again, trial counsel did not ask the court to question this juror about any details she may have heard about Defendant's "issues with the law" nor did he ask that the court inquire about the Defendant's views concerning the "Me Too" movement and role in changing power dynamics in the male-dominated movie industry.

Juror No. 11 similarly disclosed that he/she "saw the case mentioned on the news when he was first being investigated and that she had read or seen that he had "allegations of misconduct lodged against him." Shockingly, trial counsel did not ask the court to follow up on any of these important revelations to determine whether this juror was qualified.

Juror No. 12 offered several concerning answers in response to the questionnaire:

Question 29:   Have you read, seen or heard anything about the case, the alleged crimes or people involved?
Answer:        **Yes.**

Question:      Describe in detail what you recall reading, seeing or hearing about, etc…
Answer:        **Sex with minors, specific details do not come to mind, parodies on TV regarding details of defendant's personal life (SNL, Dave Chapelle); Was in jail prior then released.**

Question 30:    Have you read, seen or heard about R Kelly?
Answer:         Yes. Same as answer above. Various instances of achievement in musical career, songs on the radio, videos, entertainment news shows. Specifics are not remembered.

Question 32:    From what you have seen, read, or heard, do you have a general impression of the defendant?
Answer          Somewhat negative

Question        Why?
Answer          I really never cared one way or the other regarding the defendant. **The somewhat negative impression is an emotional one impacted by the nature of the charges against him.**

Question 91:    Do you know anything about the "Me Too" movement.
Answer          Entertainment industry led movement encouraging when to come forward and name their accusers. Associate it with accusers of Harvey Weinstein. Various news articles and TV news segments.

Trial counsel questioned the juror about his/her ability to be fair and obtained assurances from the juror that he/she could. But trial counsel did not bother to ask the court to inquire about the juror's reference to Defendant's "personal life" "sex with minors" or Dave Chapelle's SNL skit which referenced prior allegations against Defendant of videotaping a sexual encounter that depicted him urinating on a minor, a crime for which he was prosecuted although not convicted.

It is beyond comprehension that trial counsel would not have sought to inquire further of this juror about his prior knowledge about allegations against Defendant or press whether he could truly be fair given the information with which he came to the jury.

Nearly all of the alternative jurors admitted that they were aware of allegations of sexual abuse against Defendant. In fact, one of the alternative jurors stated "know there have been accusations related to this for quite some time. Think [Defendant] was married to Alliyah who was underage at the time." And further admitted that she had seen Defendant's interview with Gayle King in which "he stood up and yelled to defend himself." Although defense counsel

9

indicated that he intended to challenge this alternate for cause, no motion was formally made and the alternate remained on the jury.

Critically, Alternate Juror No. 4 revealed that she was aware that Defendant was married to Aaliyah when she was young but claimed that she had not really heard much about the case and assured the court she could be fair. Again, trial counsel had no follow up questions for this alternate juror. Notably, this juror apparently was familiar with well-known "MeToo" lawyer Gloria Allred who represented some of the government's witnesses and asked if she could get Allred's autograph in the middle of trial. (R. 2186; 3262-3266)

Defendant had no chance to defend himself where most of the jurors in his case were fully aware of his prior legal issues, some had watched the damning docuseries "Surviving R. Kelly," and many seemed to accept that he was known for abusing minors. Frankly, everyone in the courtroom seemed to accept that Defendant's jury would be prejudiced against him, and made virtually no effort to empanel a truly unbiased jury. Although the court generally asked jurors about their ability to be fair, it was counsel's job to elicit as much information as possible to determine whether the juror could actually be fair. As stated previously, in a case of substantial pretrial publicity, jurors' subjective assessments of their own impartiality may not adequately screen for the possibility of prejudice. *Waldorf*, 3 F. 3d at 710.

*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). As early as 1895, the Supreme Court in *Connors v. United States*, 158 U.S. 408, 413, (1895) explained that an adequate *voir dire* is essential to ensure that prospective jurors will be free of bias or prejudice and will perform their duties impartially. The primary purpose of the *voir dire* is to make possible the empaneling of an impartial jury through questions that permit

the intelligent exercise of challenges by counsel. *United States v. Blount*, 479 F. 2d 650, 651 (6th Cir. 1973).

Defendant received ineffective assistance of counsel where his trial counsel failed to conduct any meaningful *voir dire* of prospective jurors to ensure they were free of bias or prejudice. Counsel also failed to challenge jurors who were clearly disqualified from serving, including those who had seen the highly prejudicial documentary "Surviving R.Kelly." To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that his attorney's representation was unreasonable under the "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland v. Washington,* 666 U.S. 668 (1984).

Trial counsel's performance was unreasonable under prevailing professional norms where he failed to question clearly biased jurors about the extent of their knowledge about Defendant's prior legal issues, allegations of sexual abuse, and their feelings about the documentary "Surviving R.Kelly." An attorney cannot make an intelligent decision about whether to challenge a potential juror for cause or whether to exercise the Defendant's peremptory challenges without properly questioning potential jurors to learn of potential biases. In this case, numerous jurors divulged that they had prior biases from having learned information about Defendant through other sources prior to the jury selection process. Their own subjective assurances that they could be fair was not sufficient to ensure that they did not harbor beliefs or preconceived ideas about Defendant's guilt.

Significantly, one alternate juror saw "MeToo" lawyer Gloria Allred in the courtroom. Allred represented a few of the government's witnesses and was a common fixture on all media

platforms declaring Defendant "the worst" predator she has ever pursued.[3] During the middle of trial, the juror asked a courtroom deputy if she could obtain an autograph from Allred. When asked by the court why she wanted the autograph, the juror responded, "Because I admire her. Just 'cause, you know, other cases. I've never heard – I didn't know she was gonna be here, I just admire her for what she's accomplished." (R.3262) This was the same alternate juror who admitted during the jury selection process that she knew about allegations against Defendant and specifically that he was married to Aaliyah when she was underage.

Trial counsel belatedly sought to remove the juror, stating "I can't think of anything more disqualifying than a juror asking for the autograph of one of the attorneys who represents one of the witnesses. It speaks to a bias for the prosecution's witnesses, and for that reason I would ask that she be removed." (R. 3265) The request was denied.

Trial counsel was, of course, correct that this juror clearly evinced a bias against Defendant and in favor of his accusers. But counsel's failure to ask the court to question the juror during *voir dire* more extensively about her factual knowledge of Defendant's marriage to Aaliyah and her feelings concerning allegations of sexual abuse made it impossible for the Defendant to gather an accurate impression and make an educated decision about whether she was qualified to serve. Had counsel competently questioned this juror, he likely would have learned information that revealed a bias consistent with her request to obtain an autograph from Allred, a woman she admired, who called Defendant the "worst predator" she has pursued.

Defendant has demonstrated prejudice by trial counsel's failure to conduct any meaningful *voir dire* where his jury was comprised largely of people who were seated with an

---

[3] https://www.theguardian.com/us-news/video/2021/sep/28/attorney-gloria-allred-says-r-kelly-is-the-worst-predator-she-has-ever-pursued-video

understanding that Defendant was a sexual predator. Because Defendant cannot possibly prove the likelihood of success if his case was heard by a fair and impartial jury, prejudice must be presumed. Trial counsel abdicated all responsibility to conduct a meaningful *voir dire* which resulted in a jury that was largely unqualified to serve. The United States Supreme Court has recognized that "in certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. *Strickland,* 466 U.S. at 692. This case is one of those rare cases. Accordingly, this Court should vacate the verdicts of guilt and grant Defendant a new trial.

II.     **Defendant Is Entitled to a New Trial Where One Of His Trial Attorneys Labored Under A Disabling Conflict Of Interest As a Result of Her Simultaneous Representation Of The Defendant and the Government's Star Witness "Jane" That Was Imputed to the Entire Defense Team.**

Defendant is entitled to a new trial where he was denied his Sixth Amendment constitutional guarantee of conflict-free counsel. Mere weeks before the commencement of trial, it was discovered that one of Defendant's attorneys, Ms. Becker, may be suffering from a conflict of interest because of her prior representation of the government's key witnesses, Jane. Consistent with its obligations, the court conducted a *Curcio* hearing and concluded that Ms. Becker had entered into an attorney-client relationship with Jane while she was representing the Defendant. Although this conflict was an unwaivable conflict, the court permitted Defendant to waive it. Because Defendant was denied conflict-free counsel by an attorney who likely possessed information that could have been used to discredit Jane's testimony but was unable to utilize the information without revealing attorney-client communications, Defendant was prejudiced by this conflict.

The Sixth Amendment mandates that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. "This right to counsel includes a criminal defendant's right to be represented by the counsel of his choice." *Lainfesta v. Artuz,* 253 F. 3d 151, 154 (2d Cir. 2001) *citing Wheat v. United States,* 486 U.S. 153, 159 (1988). However, this qualified right is supported by, among other things, the Sixth Amendment right to effective assistance of counsel. *Id.* "A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States v. Schwarz,* 283 F. 3d 76, 90 (2d Cir. 2000).

A *per se* conflict of interest exists: "(1) where the attorney was not licensed to practice law because he failed to satisfy the substantive requirements of admission to the bar, and (2) where the attorney was implicated in the defendant's crime." *United States v. Luciano,* 158 F. 3d 655, 661 (2d Cir. 1998). "The *per se* rule applies when an attorney is implicated in the crimes of his or her client since, in that event, the attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." *United States v. Fulton,* 5 F. 3d 605, 611 (2d Cir. 1993).

"An attorney has an actual, as opposed to potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of actions." *Schwarz,* 283 F. 3d at 91. While a defendant is generally required to demonstrate prejudice to prevail on a claim of ineffective assistance of counsel, this is not so when counsel is burdened by an actual conflict of interest. *Id.* Prejudice is presumed under such circumstances. *Id.*

In the case at bar, Defendant is entitled to a new trial where his attorney labored under a *per se* and/or actual conflict of interest that could not be waived. At a *Curcio* hearing held on

July 15, 2021, just weeks before the commencement of trial, Jane's prior attorney, Ms. Rodriguez disclosed to the court that she was previously retained by Jane and another possible government witness (J. Savage) in July 2019. (R. 6) Rodriguez met Defendant's attorney, Ms. Becker in person at a bond hearing at the Dirksen Center in July 2019. Ms. Rodriguez expressly told Ms. Becker that she represented Jane and Savage, instructing her *not* to contact Jane. (R. 7) Ms. Rodriguez provided a text message to the court that showed that she [Rodriguez] texted Ms. Becker, stating "I don't want the lines blurred regarding our role and I think they are already blurred. Please do not contact them at all without my knowledge." (R. 8)

Rodriguez told the court that she later learned that Ms. Becker had been contacting Jane and Savage. According to Rodriguez, Jane suggested that she was getting advice from Becker in connection to how to handle the media. (R. 11) Rodriguez declined to divulge further information about her conversations with Jane but stated that her representation formally ended when she received an instruction signed by Jane telling her to provide her attorney's file to her new attorney, Ms. Becker. (R. 12)

Ms. Becker confirmed that she had communications with Jane. (R. 24) The government also confirmed that Jane had told prosecutors that she had a lengthy meeting with Ms. Becker in August 2019. (R. 23)  The government revealed that in their conversations with Jane, Jane revealed information to the government that she received from Ms. Becker that the government viewed as *adverse* to the Defendant. (R. 23)

After considering statements made by Ms. Rodriguez, the court noted that Ms. Rodriguez stated that Ms. Becker had given her clients legal advice that conflicted with the advice that Rodriguez had given her client. This court seemingly concluded that Ms. Becker had formed an attorney-client relationship with Jane while she was representing Defendant, evidenced not only

by Ms. Rodriguez's statements but by the fact that Jane instructed Rodriguez to send her file to Ms. Becker. (R. 27-28) The government further pointed out that Ms. Becker might suffer from a so-called *Fulton* conflict which arises when a lawyer is accused of misconduct (whether true or not). In those scenarios, the attorney may violate his/her duty of loyalty to her client by prioritizing her own interest in defending herself against accusations of misconduct. *Fulton, supra.* (R. 33)

This court acknowledged that Becker did suffer from a conflict, but that it amounted to a conflict that could be waived and mitigated by ensuring that Becker did not conduct the cross-examination of Jane. This court afforded Defendant the opportunity to consult with a third-party lawyer and admonished him before accepting his waiver of conflict-free counsel.

Defendant is entitled to a new trial where his attorney Ms. Becker labored under a *per se* or actual conflict of interest that could not be waived. First, as the government pointed out, Ms. Becker seemingly suffered from a *Fulton* conflict, a *per se* conflict, where there is no question that by communicating about the case with the government's key witness, notwithstanding that the witness had her own counsel and did not consent to the communications, she opened herself up to accusations of misconduct or even possibly an attempt to influence a government witness on behalf of her client. That is not to say that the allegation is true, but an attorney who may be perceived as having engaged in that type of misconduct suffers from a *per se* conflict since the attorney "cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." *Fulton, supra.*

Second, when Ms. Becker formed an attorney-client relationship with Jane, her interests diverged from the Defendant because she also owed a duty of loyalty to Jane, the government's key witness. Ms. Becker was placed under inconsistent duties because of her representation of

16

the Defendant and Jane, an adverse witness. Prejudice must be presumed where Ms. Becker had

at least one extended conversation with Jane about her relationship with Defendant and may have

obtained privileged information from the file that Jane's prior attorney sent to Becker at Jane's

request. However, Becker was prohibited by the attorney-client privilege from disclosing any

information she may have received from conversations with Jane or from her prior attorney's

file, even if that information would have been beneficial to the Defendant's defense. Similarly,

as the government suggested (although the record is unclear on this point), Jane may have

obtained privileged information from Becker that was adverse to the Defendant, information that

most certainly was passed along to the government.

Courts have recognized that where a lawyer seeks to simultaneously represent a

defendant and a cooperating witness in the same criminal proceedings, a conflict of interest

exists. *United States v. Jiang,* 140 F. 3d 124, 127 (2d Cir. 1998); *see also United States v.*

*Daugerdas,* 735 F. Supp. 2d 113, 117 (S.D.N.Y. 2010). Further, whenever a defense attorney has

previously represented an important government witness who testifies against his client, the

possibility of a conflict of interest exits. *Anwar v. United States,* 648 F. Supp. 820, 826

(N.D.N.Y. 1986).

With these principles in mind, Ms. Becker suffered from an actual conflict of interest that

could not be waived. That conflict was imputed to her trial partners. *United States v. Stein,* 410

F. Supp. 2d 316, 325 (S.D.N.Y. 2006) ("an attorney's conflicts are ordinarily imputed to his firm

based on the presumption that associated attorneys share client confidences.") If Becker had

merely interviewed or conversed with Jane, she would have had no duty of loyalty to Jane that

conflicted with her duty of loyalty to Defendant. But as this Court concluded, Becker formed an

attorney-client relationship with Jane that put her at odds with her duty of loyalty to the

17

Defendant. The risk of prejudice was made more significant by the fact that Jane was not just any witness, but the government's star witness. Defendant's Sixth Amendment guarantee of a conflict-free counsel was denied.

In light of the foregoing, Defendant's convictions must be vacated and a new trial ordered.


Dated: February 17, 2022
          New York, New York                          Respectfully submitted,

                                                      /s/JENNIFER BONJEAN
                                                      Jennifer Bonjean
                                                      Bonjean Law Group, PLLC
                                                      750 Lexington Ave., 9th Fl.
                                                      New York, NY  10022
                                                      718-875-1850