UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
                                  :

UNITED STATES OF AMERICA,      :

                                  :           19 Cr 286 (AMD)

                                  :

-vs-                             :

                                  :

ROBERT SYLVESTER KELLY,     :
      also known as "R. Kelly,"     :

                                  :

                 Defendant.     :
----------------------------------------------------X

## DEFENDANT ROBERT KELLY'S MEMORANDUM OF LAW IN SUPPORT OF <u>A JUDGMENT OF ACQUITTAL</u>

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

*Attorney for Robert Kelly*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………... iii

INTRODUCTION……………………………………………………………… 1

ARGUMENT

I.  THE GOVERNMENT FAILED TO PROVE DEFENDANT GUILTY OF
    THE OFFENSE OF RACKETEERING (COUNT ONE)……………………… 3

   A.  The Government's Proof Did Not Establish an Enterprise………………… 5

   B.  Common Purpose……………………………………………………………... 6

   C.  Enterprise Distinct from Racketeering Activities…………………………….. 9

   D.  Person-Enterprise Rule……………………………………………………….. 10

   E.  The Government Failed to Prove that the So-Called Enterprise's Activities
       Affected Interstate Commerce……………………………………………… 13

   F.  The Government's Proof Did not Establish a Pattern of Racketeering……... 16

      1.  Racketeering Act One: (Bribery)…………………………………… 18

      2.  Racketeering Act Two (Sexual Exploitation of a Child –
          Stephanie)……………………………………………………………... 20

      3.  Racketeering Act Five (Mann Act Violation – Jerhonda)………….... 22

      4.  Racketeering Act Six (Forced Labor – Jerhonda)…………………… 24

      5.  Racketeering Act Seven: (Sexual Exploitation of a Child –
          Jerhonda)……………………………………………………………… 27

      6.  Racketeering Act Eight (Mann Act Violations – Jane)…………….. 28

         a.  Racketeering 8A – Transportation………………………….... 29

            i.  Intent……………………………………………………... 29

            ii.  Violation of Cal. Health Safety Code § 120290……... 31

         b.  Racketeering Act 8B – Coercion or Enticement…………… 34

7.   Racketeering Act Nine: (Mann Act Violations – Jane)……………..   41

      a.   Racketeering Acts 9A – Transportation…………………....   41

      b.   Racketeering Acts 9B – Coercion or Enticement…………...   41

      c.   Racketeering Act 9C – Coercion or Enticement…………...   42

      d.   Racketeering Act 9D – Transportation……………………..   43

8.   Racketeering Act 10: (Sexual Exploitation of Jane)………………..   44

9.   Racketeering Act Eleven - Forced Labor of Jane…………………..   45

10. Racketeering Act Twelve: (Mann Act Violations – Faith)…………   46

      a.   Intent…………………………………………………………...   47

      b.   Coercion or Enticement………………………………………...   48

      c.   New York Public Health Law Section 2307 and Penal Law
           120.20………………………………………………...............   50

11. Racketeering Act Thirteen: (Forced Labor – Faith)………………...   52

12. Racketeering Act Fourteen – (Mann Act Violations – Faith)………   54

II.    **THE GOVERNMENT FAILED TO PROVE COUNTS TWO THROUH
       NINE OF THE INDICTMENT**…………………………………………...   55

**CONCLUSION**………………………………………………………………   56

## **TABLE OF AUTHORITIES**

### **CASES**

*Atkinson v. Anadarko Bank & Trust Co.,* 808 F. 2d 438 (5th Cir. 1987) ..................................... 13

*Bennett v. U.S. Trust Co. of New York*, 770 F. 2d 308 (2d Cir. 1985)..................................... 6, 10

*Boyle v. United States,* 556 U.S. 938 (2009) ................................................................. 5

*Brannon v. Boatmen's First Nat'l Bank of Oklahoma, T.B.A.,* 153 F. 3d 1144 (10th Cir. 1998) .. 6

*Brittingham v. Mobil Corp.,* 943 F. 2d 297 (3d Cir. 1991)................................................ 11

*Burner Corp. v. R.A. Bruner Co.,* 133 F. 3d 491 (7th Cir. 1998) .................................... 8

*Callan v. State Chemical Mfg. Co.,* 584 F. Supp. 619 (E.D. Pa 1984)........................... 4

*Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001)................................... 10

*Crab House of Douglaston v. Newsday,* 801 F. Supp. 2d 61 (E.D.N.Y 2011) ............................. 5

*Cullen v. Margiotta,* 811 F. 2d 698 (1987) ........................................................ 11

*Discon, Inc. v. NYNEX Corp.,* 93 F. 3d 1055 (2d Cir. 1996)........................................ 12

*First Capital Asset Mgmt., Inc.. v. Satinwood, Inc.,* 385 F. 3d 159 (2d Cir. 2004) ............... 5, 6, 7

*Fitzgerald v. Chrysler Corp.,* 116 F. 3d 225 (7th Cir. 1997)........................................ 1

*Gonzalez v. Raich,* 545 U.S. 1 (2005)............................................................ 22

*H.J., Inc. v. Northwestern Bell tel. Co.,* 492 U.S. 229 (1989) ......................................... 4, 16, 17

*Hirsch v. Enright,* 751 F. 2d 628 (3d Cir. 1984)...................................................... 6

*McCullough v. Suter,* 757 F. 2d 142 (7th Cir. 1985) ................................................. 6

*Muchira v. Al-Rawaf,* 850 F. 3d 605 (4th Cir. 2017)............................................... 25, 53

*Reich v. Lopez,* 858 F. 3d 55 (2d Cir. 2017) ....................................................... 16, 17

*Reves v. Ernest & Young,* 507 U.S. 170 (1993)..................................................... 4

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,*

30 F. 3d 339 (2d Cir. 1994)........................................................................................ 6, 10, 12

*Sessions v. Dimaya,* 138 S. Ct. 1204 (2017) ........................................................... 33, 52

*Stein v. World-Wide Plumbing Supply Inc.,* 71 Supp. 3d 320 (E.D.N.Y. 2014)............................ 5

*United States v Marcus,* 487 F. Supp. 387 (E.D.N.Y. 2007)........................................ 25

*United States v. Brand,* 467 F. 3d 179 (2d Cir. 2006) ................................................ 22

*United States v. Burden,* 600 F. 3d 204 (2d Cir. 2010)................................................ 17

*United States v. Campbell,* 49 F. 3d 1079 (5th Cir. 1995)............................................ 30

*United States v. Chambers,* 291 U.S. 217 (1934) ...................................................... 31

*United States v. Cryar,* 232 F. 3d 1318 (10th Cir. 2000)............................................. 30

*United States v. Daidone,* 471 F. 3d 371 (2d Cir. 2005).............................................. 17

*United States v. Giordano,* 442 F. 3d 31 (2d Cir. 2006).............................................. 22

*United States v. Hayward,* 359 F. 3d 631 (3d Cir. 2004) ............................................. 30

*United States v. Indelicato,* 865 F. 2d 1370 (2d  Cir. 1989) .................................... 6, 7, 17

*United States v. Jackson,* 368 F. 3d 59 (2d Cir. 2004) ............................................... 3

*United States v. Keltner,* 147 F. 3d 662 (8th Cir. 1998) ............................................. 9

*United States v. Kinslow,* 860 F. 2d 963 (9th Cir. 1988) ............................................. 30

*United States v. Lopez,* 514 U.S. 549 (1995)........................................................ 22

*United States v. Lukashov,* 694 F. 3d 1107 (9th Cir. 2012) ....................................... 30, 47

*United States v. Marcus,* 487 Supp. 387 (E.D.N.Y. 2007)…………………………………52

*United States v. Perkins,* 948 F. 3d 936 (8th Cir. 2020) ........................................... 30

*United States v. Pizzonia,* 577 F. 3d 455 (2d Cir. 2009)........................................... 16

*United States v. Reyes,* 302 F. 3d 48 (2d Cir. 2002) ................................................ 2

*United States v. Robertson,* 514 U.S. 669 (1995) ................................................... 14

*United States v. Smith,* 413 F. 3d 1253 (10th Cir. 2005) ............................................... 9

*United States v. Toviave,* 761 F. 3d 623 (6th Cir. 2014) ........................................ 25, 27

*United States v. Turkette,* 452 U.S. 576 (1981) ...................................................... 5, 6

*United States v. Vang,* 128 F. 3d 1065 (7th Cir. 1997) ........................................... 30

## STATUTES

18 U.S.C. § 1961(4) ...................................................................................... 5

18 U.S.C. § 1961(5) ..................................................................................... 16

18 U.S.C. § 1962(a) ..................................................................................... 13

18 U.S.C. § 1962(c) ...................................................................... 5, 10, 11, 13

18 U.S.C. § 2421(a) ......................................................... 29, 30, 46, 47

18 U.S.C. § 2422(b) ............................................................ 22, 23, 43

18 U.S.C. § 2423(a) ..................................................................................... 30

18 U.S.C. § 2425 ........................................................................................ 22

18 U.S.C. §1589 ...................................................................... 24, 25, 52

18 U.S.C. 2251(a) ..................................................................... 20, 27, 44

18 U.S.C. 2256(3) ..................................................................... 21, 28, 45

18 U.S.C.§ 2422(a) ..................................................................................... 46

## OTHER AUTHORITIES

California Penal Law Section 261.5(b) .................................................... 42

California Penal Law Sections 261.5(a) .................................................. 42

D'Angelo, Frank, NOTE:  Turf Wars: Street Gangs and the Outer Limits of RICO's "Affecting
    Commerce" Requirement, 76 Fordham L. Rev. 2075, 2084 (March 2008) ........................... 16

Gerald E. Lynch, RICO:  The Crime of Being a Criminal, 87 Colum. L. Rev. 661,

666, n. 22 (1987 ..................................................................................................................... 15

New York Penal Law Section 120.20 ....................................................................................... 46

New York Public Health Law Section 2307 ........................................................................ 47, 52

## **RULES**

Federal Rule of Criminal Procedure 29(c) ................................................................................. 2

## **CODES**

Cal. Health and Safety Code § 120290 ................................................................. 29, 31, 32, 41

## INTRODUCTION

In *Fitzgerald v. Chrysler Corp.,* 116 F. 3d 225, 226-27 (7th Cir. 1997), Chief Judge Posner cautioned that where a "statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of it being applied to situations absurdly remote from the concerns of the statute's framers." Such is the case here, where the Government (mis)used both the Racketeer Influenced and Corrupt Organizations statute ("RICO") and the Mann Act in a manner never previously conceived or carried out.

Invigorated by an influential social movement determined to punish centuries of male misbehavior through symbolic prosecutions of high-profile men, the government brought a RICO prosecution against the Defendant that was "absurdly remote" from the drafters' intent. Stretching the "liberal construction" clause well beyond the intent of Congress, the government constructed a RICO theory of prosecution designed, not to "effectuate the purpose" of the RICO statute, but to prosecute the Defendant for alleged misdeeds going back decades without pesky statutes of limitations obstacles.

Adding to its history of celebrity Mann Act prosecutions, the government extended the broad language of the Mann Act to conduct it never intended to remedy. While the Mann Act may be an effective tool for combating human trafficking, it was not designed to punish sexual misconduct like that alleged against Defendant. Where Defendant's alleged transportation of females (largely consenting adults) was incidental to his travels as a world-renown performer, he is not guilty of Mann Act violations. If the government intends to prosecute Mann Act violations in the fashion it did here, it might consider investigating the many influential, wealthy, mostly White, corporate leaders who frequently arrange travel for paramours who later conclude that the experience was less than pleasant.

A detached and unemotional review of the evidence in this case shows that the government presented an overabundance of bad character evidence to compensate for its insufficient proofs of the specific elements of RICO and the Mann Act. Accordingly, this Court must acquit Defendant of the verdicts of guilt entered against him.

## **RELEVANT FACTS**

The government charged Defendant with one count of racketeering based on fourteen predicate acts and eight stand-alone counts of violations of the Mann Act that were also charged as racketeering acts. With the exception of Racketeering Act One, alleging the offense of bribery, the charged offenses involve conduct alleged by five women, Jerhonda (Jane Doe #4), Jane (Jane Doe #5), Stephanie (Jane Doe #2), Sonja (Jane Doe #3), and Faith (Jane Doe #6). The jury returned a verdict convicting Defendant of all charged counts but acquitted him of those racketeering acts related to Sonja. Given the length of the record, Defendant will incorporate relevant facts into the argument sections as appropriate.

## **ARGUMENT**

This Court must set aside the verdict of guilt entered against the Defendant and enter a judgment of acquittal where the government presented insufficient evidence of the offense of racketeering (Count One) and all Mann Act violations (Counts Two through Nine). Federal Rule of Criminal Procedure 29(c) provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." A court can enter a judgment of acquittal on the grounds of insufficient evidence "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes,* 302 F. 3d 48, 52 (2d Cir. 2002). To sustain a conviction, the jury must

have been able to find each of the essential elements of the crime beyond a reasonable doubt. *United States v. Jackson,* 368 F. 3d 59, 63 (2d Cir. 2004).

As set out in detail below, Defendant's RICO conviction cannot stand where the government failed to prove the existence of an enterprise, the activities of which affected interstate commerce, and a pattern of racketeering activity. Moreover, insufficient evidence existed to prove each and every element of the charged Mann Act violations by proof beyond a reasonable doubt.

## I.   THE GOVERNMENT FAILED TO PROVE DEFENDANT GUILTY OF THE OFFENSE OF RACKETEERING (COUNT ONE)

This Court must acquit Defendant of the offense of racketeering where the government failed to prove Defendant guilty beyond a reasonable doubt of each and every element of the offense. The government effectively swamped the jury with bad character evidence that was guaranteed to produce a guilty verdict, but its proofs on the charged offenses were insufficient as a matter of law. Ignoring the distinctly economic legislative history of the RICO statute, the government brought a RICO prosecution against Defendant, not to remedy widespread criminal activity of an enterprise, but to punish one man whose alleged crimes could no longer be prosecuted by state and local agencies. The government's belated interest in protecting Defendant's alleged victims does not justify application of the RICO statute to alleged private, sexual misconduct of the Defendant (and only the Defendant), even if some of that conduct could have been timely prosecuted by local authorities long ago.

As a reminder, RICO's primary purpose was to combat organized crime, by prosecuting "the highly diversified acts of a single organized crime enterprise under a RICO's umbrella." The overarching goal of the statute was "to curb the infiltration of legitimate business

organizations by racketeers." In its Statement of Finding and Purposes accompanying the RICO

statute, Congress declared the following:

> The Congress finds that (1) organized crimes in the United States is a highly
> sophisticated, diversified, and widespread activity that annually drains billions of
> dollars from America's economy by unlawful conduct and the illegal use of force,
> fraud, and corruption; (2) organized crime derives a major portion of its power
> through money obtained from such illegal endeavors and syndicated gambling,
> loan sharking, the theft and fencing of property, the importation and distribution
> of narcotics and dangerous drugs, and other forms of social exploitation; (3) this
> money and power are increasingly used to infiltrate and corrupt legitimate
> business and labor unions and to subvert and corrupt our democratic processes;
> (4) organized crime activities in the United States weaken the stability of the
> Nation' economic system, harm innocent investors and competing organizations,
> interfere with free competition, seriously burden interstate and foreign commerce,
> threaten the domestic security, and undermine the general welfare of the Nation
> and its citizens; and (5) organized crime continues to grow because of defects in
> the evidence-gathering process of the law inhibiting the development of the
> legally admissible evidence necessary to bring criminal other sanctions or
> remedies to bear the unlawful activities of those engage in organized crime and
> because the sanctions and [sic] remedies available to the Government are
> unnecessarily limited in scope and impact. It is the purpose of this Act to seek the
> eradication of organized crime in the United States by strengthening the legal
> tools in the evidence-gathering process, by establishing new penal prohibitions,
> and by providing enhanced sanctions and new remedies to deal with the unlawful
> activities of those engaged in organized crime. Organized Crime Control Act of
> 1970, 1 of Publ.L. No 91-452. *Callan v. State Chemical Mfg. Co.,* 584 F. Supp.
> 619, 621 (E.D. Pa 1984).

Admittedly, prosecutors have used RICO in a wide variety of circumstances under the

statute's "liberal construction" clause. *H.J., Inc. v. Northwestern Bell tel. Co.,* 492 U.S. 229, 248-

49 (1989). The "liberal construction" clause notwithstanding, the Supreme Court has

acknowledged that the clause is not without limits. *Reves v. Ernest & Young,* 507 U.S. 170, 183.

(1993). As the Court held in *Reves,* the liberal construction clause was "not an invitation to apply

RICO to new purposes that Congress never intended." The government clearly exceeded those

limits with this prosecution as evidenced by its failure to prove the charged offense of

racketeering.

To sustain a conviction for RICO, the government must prove that the defendant: (1) through the commission of two or more acts constituting a pattern of racketeering activity; (2) directly or indirectly invested in, maintained an interest in, or participated in, an enterprise; (3) the activities of which affected interstate or foreign commerce. 18 U.S.C. § 1962(c). As set out below, the government offered insufficient proof of all elements of the offense of racketeering.

**A.    The Government's Proof Did Not Establish an Enterprise.**

The government's case was doomed from the start where it failed to plead and prove an enterprise. An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The United States Supreme Court has defined a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583 (1981). *See also Boyle v. United States,* 556 U.S. 938, 950 (2009). An enterprise is demonstrated "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *First Capital Asset Mgmt., Inc.. v. Satinwood, Inc.,* 385 F. 3d 159, 173 (2d Cir. 2004). For an association of individuals to constitute an enterprise, "the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Id.* at 174. The enterprise's purpose must be common to all of its members. *Stein v. World-Wide Plumbing Supply Inc.,* 71 Supp. 3d 320, 325 (E.D.N.Y. 2014). *See also Crab House of Douglaston v. Newsday,* 801 F. Supp. 2d 61, 77 (E.D.N.Y 2011) *citing Satinwood,* 385 F. 3d at 174.

The "enterprise" is neither the individual defendant nor the "pattern of racketeering activity;" rather it is "an entity separate and apart from the pattern of activity in which is

engaged," and must be alleged and proved separately. However, there must be a nexus between the enterprise and the racketeering activity that is being conducted. *United States v. Indelicato,* 865 F. 2d 1370, 1384 (2d  Cir. 1989). Furthermore, the RICO enterprise must have an ascertainable structure separate and distinct from the pattern of racketeering activities. *Turkette,* 452 U.S. at 583.

Finally, for §1962(c) purposes, the "person" charged with a RICO violation and the alleged "enterprise" must be separate and distinct from one another. This requirement flows from the statutory mandate that a *person* who engaged in a pattern of racketeering activity must be "employed by or associated with" the enterprise. *Satinwood,* 385 F. 3d 159 (2d Cir. 20014); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F. 3d 339, 344 (2d Cir. 1994); *Bennett v. U.S. Trust Co. of New York*, 770 F. 2d 308, 315 (2d Cir. 1985); *Brannon v. Boatmen's First Nat'l Bank of Oklahoma, T.B.A.,* 153 F. 3d 1144, 1146 (10th Cir. 1998). An entity cannot simultaneously be the enterprise and the person who conducts its affairs, permitting that would be tantamount to permitting an entity to associate with itself. *Bennett,* 770 F. 2d at 315; *Hirsch v. Enright,* 751 F. 2d 628, 633 (3d Cir. 1984)*; McCullough v. Suter,* 757 F. 2d 142, 144 (7th Cir. 1985).

### B.    Common Purpose

In its third superseding indictment, the government alleged that the Defendant, his employees (managers, bodyguards, drivers, personal assistant, and runners), and other members of his entourage constituted the enterprise for RICO purposes. According to the government, the purpose of the enterprise was to: (1) promote Defendant's music and his "brand;" (2) recruit women and girls to engage in illegal sexual activity with the Defendant; and (3) produce pornography, including child pornography. The government did not allege that the enterprise

constituted a legal entity, but rather an association of individuals. [Dkt. No. 43 – Superseding Indictment]

As held in *Satinwood, supra,* for an association of individuals to constitute an enterprise, "the individuals must share a *common purpose* to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." (emphasis added) Thus, for the government to establish an enterprise here, it was required to prove that Defendant, his employees, and entourage came together with the common purpose of recruiting women and girls to engage in "illegal sexual activity" and produce pornography – not merely the broader purpose of promoting Defendant's music or brand. Assuming the Defendant's employees and entourage *did* share a common objective of promoting Defendant's music, that objective had no nexus to the underlying racketeering activity. *Indelicato,* 865 F. 2d at 1384. Defendant did not go through all the trouble of becoming a world-famous R&B singer for the purpose of engaging in illegal sexual activity, even if his job put him in proximity to women. The government cannot end run the "common purpose" requirement by identifying a broad objective of the enterprise unrelated to any fraudulent activity with no nexus to the racketeering activity.

The government's evidence of an enterprise was insufficient because it failed to establish that Defendant's employees and entourage shared the common purpose of recruiting women to engage in "illegal sexual activity" with Defendant that included creating pornography. Notably, the government does not define "illegal sexual activity," but based on the predicate acts charged the government contends that Defendant's employees and entourage shared an objective of ensuring that Defendant had his sexual needs met by women (some but not all underage women) while at home and while traveling, was able to control these women to engage in sexual conduct the government deems abusive, was able to videotape his sexual activities with these women,

and could expose his sexual partners to herpes. To be clear, the government contends that making sure that Defendant's sexual needs were met was the objective of the enterprise (in addition to promoting his music and brand).

Concededly, the government offered evidence that Defendant's various employees carried out some tasks that related to connecting the Defendant to women with whom he had a personal, even sexual, relationship or with women whom he was interested in having a sexual relationship. These tasks included providing Defendant's phone number to women who attended his concerts, inviting women to after-parties, arranging for travel for Defendant's female guests, and ordering food for those guests while they visited his property. However, the record is devoid of evidence that the members of the enterprise acted with the common objective of ensuring that Defendant engaged in *illegal* sexual activity.

It is true that RICO does not have a *mens rea* requirement beyond what is necessary for proving the predicate crimes. *Burner Corp. v. R.A. Bruner Co.,* 133 F. 3d 491, 495 (7th Cir. 1998). But where the government's evidence of an enterprise centers on its claim that the associated-in-fact members shared a *common purpose* of ensuring Defendant's *illegal* sexual activities, the government must offer some evidence that the members of the enterprise *knew* that their actions were promoting not just legal sexual activities but *illegal* sexual activities and the production of pornography. Put in terms expressed in *Satinwood,* the government was required to show that the individuals who made up the enterprise shared a common purpose to engage in "a fraudulent course of conduct." To share a purpose requires the members to agree on what that purpose is.

Defendant is not claiming that each member of the enterprise must have possessed knowledge about every predicate act that the Defendant is alleged to have committed, but the

government cannot prove a common purpose without showing that the members of the enterprise shared an understanding of what that purpose was which according to the government was promoting "illegal sexual activity" and producing pornography. Despite its bullying tactics, the government came up short on evidence that all of Defendant's employees who made up this vague enterprise were working as a continuing unit to ensure Defendant could engage, not just in sex, but illegal sex.

No employee testified that he/she understood that their purpose in the enterprise was to recruit *underage* women nor did any member of the enterprise present any testimony that they had any knowledge about Defendant's herpes diagnosis, that he practiced unsafe sex, or that he videotaped his sexual experiences. The government can point to no evidence that any employee possessed specific information about what precisely transpired in Defendant's bedroom once he was alone with his female guests. Even if Defendant's employees knew that Defendant expected his guests to follow strict, even controlling, rules, and possessed recording devices like iPads and iPhones, it does not follow that the members of the enterprise shared a goal of promoting *illegal* sexual activity.

### C.    Enterprise Distinct from Racketeering Activities

To the extent the government argues that its evidence showed that the members of the enterprise shared a common purpose and had knowledge of promoting the Defendant's *illegal* sexual conduct, the government has failed to demonstrate that the purpose of the enterprise was distinct from the racketeering activities. *United States v. Smith,* 413 F. 3d 1253, 1267 (10th Cir. 2005). *United States v. Keltner,* 147 F. 3d 662, 668 (8th Cir. 1998).

### D.       Person-Enterprise Rule

Separately, the government was required to demonstrate that Defendant was *distinct* from the enterprise. It is axiomatic that § 1962(c) "clearly envisions" that the "person" and the "enterprise" will be distinct. *Bennett,* 770 F. 2d at 315. "This requirement focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity." *Id.* The United States Supreme Court has held that a RICO defendant must have "participated in the conduct of the 'enterprises affairs,' not just his own affairs. *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163 (2001). The government cannot plead its way around the distinctness requirement by simply alleging that the enterprise is Defendant's "inner circle" and introduce a series of headshots of all of Defendant's former employees as evidence of an enterprise. The enterprise as alleged by the government existed because of its goal to promote the Defendant in his legal and alleged illegal sexual activities; it had no function unrelated to the Defendant. Under this factual pattern, the distinctness requirement was not satisfied.

Because the government's RICO prosecution under this fact pattern is entirely unique, there is a dearth of factually analogous authority on this issue. That said, guidance offered in factually dissimilar cases leads to the clear conclusion that the government failed to prove an enterprise *distinct* from the Defendant. In *Riverwoods, supra,* the plaintiff Riverwoods Chappaqua Corporation ("Riverwoods") claimed that through acts of extortion and mail fraud, the defendant Marine Midland Bank coerced Riverwoods to "restructure" loan agreements between Riverwoods and Westchester Federal Savings, later acquired by Marine Midland. *Riverwoods,* 30 F. 3d at 341. Riverwoods purchased a property in New Castle, New York to develop residential condominiums and obtained a loan from Westchester Federal Savings made a

for that purpose. *Id.* at 341-42. Marine Midland later acquired Westchester Federal Savings and inherited the loan agreement. According to Riverwoods, shortly after the acquisition, Marine Midland officers made it clear that they intended to dishonor the existing agreement and that they engaged in "extortive" behavior to force Riverwoods to enter into a new loan agreement with terms more favorable to Marine Midland. *Id.* at 342.

In its complaint, Riverwoods alleged, *inter alia,* that through a pattern of racketeering activity, Marine Midland and two of its loan officers participated in the affairs of an association-in-fact enterprise known as the "Restructuring Group," in violation of 18 U.S.C. § 1962(c). The Second Circuit reiterated that under the plain language of the statute the RICO "person" must conduct the affairs of the RICO "enterprise" through a pattern of racketeering and that "the person and the enterprise referred to must be distinct." *Id*. at 344. The court emphasized that "a corporate entity may not be both the RICO person and the RICO enterprise, acknowledging that the distinctness requirement could be satisfied where there is partial overlap between the RICO person and the RICO enterprise, and that a defendant may be a "RICO 'person' and one of a number of members of the RICO 'enterprise." *Id*. *citing Cullen v. Margiotta,* 811 F. 2d 698, 730 (1987). However, by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented. *Id.*

Finding that the Riverwoods had failed to prove the distinctness requirement, the *Riverwoods* court observed that because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. *Id; see also Brittingham v. Mobil Corp.,* 943 F. 2d 297, 301 (3d Cir. 1991). Where employees of a corporation associate together to

11

commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation. *Id*.

The *Riverwoods* court scoffed at the notion that the plaintiff seriously contended that the actions of the Restructuring Group were anything other than the activities of Marine Midland employees carrying out the business of that bank. *Id.* The court reasoned:

> Both the allegations in the complaint and the proof at trial showed that the individual members of the Restructuring Group were employed by Marine Midland at the relevant times. Those employees were acting within the scope of their authority as officers of Marine Midland, and all of the actions taken by the Restructuring Group, such as negotiating and executing the restructured loan and exacting personal guarantees from Shapiro, were undertaken on behalf of Marine Midland and were directly related to the bank's business. *Id*. at 345.

The Second Circuit reached a similar conclusion in *Discon, Inc. v. NYNEX Corp.,* 93 F. 3d 1055 (2d Cir. 1996). There, Discon, Inc., was a New York corporation whose primary business was to provide "removal services" to telephone companies. *Id.* at 1057. Discon argued that the defendant NYNEX, a holding company, that controlled subsidiaries MECo and NYTel (collectively, the "NYNEX Defendants") conspired with AT&T technologies to eliminate Discon from the market removal services by defrauding the public. *Id.* at 1058.

Discon sued the NYNEX defendants for civil RICO, alleging that the NYNEX group which consisted of NYNEX, MECo, and NYTel were three separate corporate "persons" that conducted the affairs of the NYNEX group "enterprise" through a number of illegal predicate acts. *Id.* at 1063. The Second Circuit observed that the distinctiveness requirement could not be circumvented "by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant." *Id*. Relying on *Riverwoods,* the Second Circuit stated that "[w]here employees of a corporation

12

associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in associated with the corporation do not form an enterprise distinct from the corporation." *Id*. The court observed that like the defendants in *Riverwoods,* NYNEX, MECo and NYTel operated within a unified corporate structure, and even though they were legally separate entities, the relationship between NYNEX, MECo, and NYTel was not substantially different from that between the loan officers in *Riverwoods* in comparison to the bank. *Id*. at 1064. In both cases, the individual defendants were acting within the scope of s ingle corporate structure, guided by a "single corporate consciousness." *Id. See also, Atkinson v. Anadarko Bank & Trust Co.,* 808 F. 2d 438, 440-41 (5th Cir. 1987) (finding no enterprise distinct from the person where the defendant bank, its holding company, and three employees were not associated in any manner apart from the activities of the bank).

Applying the rules of the foregoing cases, the government failed to prove an enterprise distinct from the Defendant. By alleging a RICO enterprise that consists of Defendant and his own employees/agents carrying on his affairs, namely promoting his brand, his music, and his sexual needs, the government fails to satisfy the distinctness requirement. Put differently, because the government alleged that Defendant's employees associated together for no purpose other than to carry out Defendant's needs, including his illegal sexual activity, the employees did not form an enterprise distinct from Defendant. Defendant and the alleged enterprise were one in the same.

### E.    The Government Failed to Prove that the So-Called Enterprise's Activities Affected Interstate Commerce.

To sustain a conviction for racketeering, the government must offer proof beyond a reasonable doubt that the alleged racketeering activity affected interstate commerce. 18 U.S.C. § 1962(a)-(c). Section 1962(c) declares that it is illegal for "any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." This provision anchors the Act to Article I congressional power by incorporating an "affecting interstate commerce" requirement.

The United States Supreme Court has determined that an enterprise is "engaged in commerce" when it is "directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce." *United States v. Robertson,* 514 U.S. 669, 672 (1995). However, consistent with the liberal construction clause of the RICO Act, some courts have held that the racketeering activity of the enterprise need only have a *de minimum* effect on interstate commerce. This Court instructed this jury consistent with the view that the government need only prove that beyond a reasonable doubt that the enterprise had a "minimal effect" on interstate commerce. [Dkt. No. 117-1 – Jury Charge] This Court further instructed the jury that " it is not necessary for the government to prove that the individual racketeering acts themselves affected interstate or foreign commerce; rather it is the enterprise and its activities considered in their entirety that must be shown to have had that effect." No source was provided for this specific statement of law.

Assuming the government was only required to prove that the enterprise had a *de minimus* effect on interstate commerce, the government failed to establish that element by proof beyond a reasonable doubt. Because the existence of the enterprise in this case hinges on the specific activity of promoting Defendant's illegal sexual activity (rather than promoting his music) the government *was* required to prove that those racketeering acts affected interstate commerce. Courts have held that to satisfy RICO, only the enterprise, and not the predicate acts themselves, must affect interstate commerce; however, that is only where there a nexus between

14

the objective of the enterprise and the charged racketeering activities. While the government may, and did, argue that Defendant's activities centered around promoting and performing his music affected interstate commerce, the charged racketeering acts are untethered to those activities. The government cannot end-run the "affecting commerce" requirement by claiming an economic purpose of the enterprise that has no connection to the charged racketeering activities.

The government's ability to prove an enterprise turns on its claim that the purpose of the enterprise was to promote Defendant's illegal sexual activities and create pornography (albeit for his own personal use). Thus, the government does have to prove that those activities affected interstate commerce. Defendant's alleged conduct of engaging in sexual activities with young women under the age of 18, exposing adult women to herpes, and/or videotaping his sexual activities with individuals under the age of 18 cannot be said to have any impact on interstate commerce.

Indeed, the *de minimus* effect approach here amounts to an unconstitutional extension of Congress's commerce power and is contrary to RICO's distinctly economic legislative history. It is beyond debate that the legislative history and the congressional findings accompanying the Act reflect Congress's prevailing concern with the negative economic impacts of criminal infiltration into legitimate businesses. Some scholars have argued that eradicating criminal infiltration of legitimate business activities was the Act's *only* purpose. Gerald E. Lynch, RICO: The Crime of Being a Criminal, 87 Colum. L. Rev. 661, 666, n. 22 (1987). Admittedly, the Supreme Court in *Turkette* sanctioned the application of RICO to non-infiltrations when it held that a RICO enterprise may be a wholly illegitimate organization.

Scholars have observed that *Turkette* marked an expansion in RICO prosecutions.

D'Angelo, Frank, NOTE:  Turf Wars: Street Gangs and the Outer Limits of RICO's "Affecting

Commerce" Requirement, 76 Fordham L. Rev. 2075, 2084 (March 2008). D'Angelo writes:

> The first wave of expansion extended RICO in the areas of government and
> corporate corruption. During the 1980s, federal prosecutors used RICO to
> prosecute corrupt corporate officers, state officials, and judges. A second wave
> saw prosecutors use RICO to prosecute violent gangs. Until the late 1980s,
> murder was rarely prosecuted in federal court, but since then federal prosecutors
> have used RICO to bring down murderous motorcycle gangs, white supremacist
> groups, and ethnic street gangs. *Id.* (citations omitted)

As D'Angelo points out, in most of these types of cases, RICO's commerce requirement was

easily satisfied. *Id.* In all of those scenarios, an economic motive was driving the racketeering

activities. In contrast, here the alleged enterprise in this case had the objective of ensuring that

Defendant's sexual desires were satisfied. There was no economic motive driving these

activities.

### F.    The Government's Proof Did not Establish a Pattern of Racketeering

The government must also demonstrate a pattern of racketeering activity by proving, at a

minimum, two predicate racketeering acts that occurred within ten years of one another. *See* 18

U.S.C. §1961(1), (5). Proof of two predicate acts is not sufficient to satisfy its burden of proof,

the government must also show that the racketeering acts are related to each other and to the

enterprise, and together pose a threat of continuing criminal activity. *H.J. Inc. v. Nw. Bell Tel.*

*Co.,* 492 U.S. 229, 239 (1989). *See also, Reich v. Lopez,* 858 F. 3d 55, 59 (2d Cir. 2017).[1]

Predicate acts must bear a relationship to each other that "manifest[s] the continuity required to

prove a pattern." *United States v. Pizzonia,* 577 F. 3d 455, 465 (2d Cir. 2009). RICO is

---

[1] This Court observed in *Reich* that the Supreme Court has instructed courts to interpret the pattern element the same way in civil and criminal cases. *Reich,* 858 F. 3d at 61, n.4

inapplicable to perpetrators of "isolated" or "sporadic" criminal acts; "criminal conduct only 'forms a pattern if it embraces criminal acts'" that are related. *Indelicato,* 865 F. 2d at 1383.

Focusing on the relatedness requirement, the "[p]redicate crimes must be related both to each other (termed 'horizontal relatedness') and to the enterprise as a whole (termed 'vertical relatedness'). *Reich,* 858 F. 3d at 60-61. *See also United States v. Daidone,* 471 F. 3d 371, 376 (2d Cir. 2005). Horizontal relatedness can be shown through predicate acts that "have the same or similar purpose, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240. *See also, Indelicato,* 865 F. 2d at 1382 (relatedness shown by "temporal proximity, or common goals, or similarity of methods, or repetitions"). Where the enterprise in question is not primarily in the "business of racketeering activity" predicate acts must be related to each other in kind for a RICO case to proceed." *Reich,* 858 F.3d at 60-61.

Vertical relatedness requires only "that the defendant was enabled to commit the offense solely because of his position in the enterprise of his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise." *United States v. Burden,* 600 F. 3d 204, 216 (2d Cir. 2010).

With regard to the continuity requirement, the government must present evidence regarding the timing and temporal scope of the alleged racketeering acts to demonstrate either close-or open-ended continuity. *Reich,* 858 F. 3d at 60. Criminal activity that occurred over a long period of time in the past has close-ended continuity, regardless of whether it may extend not the future. Close-ended continuity is "primarily a temporal concept," that requires that the predicate crimes extend "over a substantial period of time." *Id.*

In contrast, criminal activity "that by its nature projects into the future with a threat of repetition" possesses open-ended continuity, and that can be established in several ways. Some crimes may be by their very nature a future threat. *Id.* When the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future. Similarly, criminal activity is continuous when "the predicate acts were the regular way of operating that business," even if the business itself is a primarily lawful. *Id.*

The government failed to demonstrate a pattern of racketeering activity because it offered insufficient evidence of most of the predicate acts and the charged acts lacked sufficient relatedness and continuity.

### 1.    Racketeering Act One: (Bribery)

The government failed to prove Racketeering Act One where insufficient evidence existed to prove that Defendant caused Demetrius Smith to pay a public aid employee $500 to secure identification for Jane Doe #1 (Aaliyah). Despite blatant strong-arming by the government, Smith's testimony was inconsistent and vague about whether Defendant was even present during any discussions about paying money to bribe someone for the fraudulent identification. Smith consistently testified that he discussed the prospect of bribing someone to obtain the fake identification with Derrel McDavid. (R. 745) Smith did not obtain any money from the Defendant and did not recall discussing it with him although he allowed that he might have. (R. 719) Whenever Smith failed to testify *precisely* as the government wanted, he was refreshed with his prior statements, *not* because he needed refreshing, but as a clear reminder that if he contradicted himself, he could be charged as a co-conspirator. That type of bullying pervaded Smith's examination and suggested that Smith's testimony may have been pressured by the government.

After the subject matter had been discussed numerous times throughout Smith's

testimony. The AUSA asked the following on re-direct:

> Q.      When you spoke to the group, as you testified on direct
> examination, when you spoke to the group about acquiring a state ID from the
> welfare office Aaliyah for money, the defendant was there, right?
>
> A.      I'm pretty sure. I think so but I'm not. I'm just not positive. Even if
> I said it before, I'm just not positive. I just don't see that in my head right now.
> (R. 758)

Not satisfied with that answer, the AUSA asked Smith again whether Defendant was present

when there was any discussion about a bribery. Despite his clear concern of facing legal

repercussions for his testimony, Smith declared, "I don't remember if Robert was there. If I said

he was there before, I'm not changing that story to change the story. I'm just going back and I'm

just trying – I don't see it in my head Robert next to me. . . " (R. 759)

No rational juror could conclude that this less than convincing testimony provided proof

beyond a reasonable doubt that defendant caused Smith to tender money to the public aid officer.

Even if the evidence showed that the Defendant turned to Smith for assistance in facilitating his

marriage to Aaliyah, the offense of bribery requires proof that Defendant at least *knew* of Smith's

intent to bribe a public official and facilitated in the bribery in some way. The record is devoid of

evidence that Defendant knew *how* Smith obtained the identification or facilitated Smith in

obtaining the identification. As far as Defendant knew Smith obtained the identification from a

friend who worked in the public aid office. Without Smith's unequivocal testimony that

Defendant was part of the planning process of obtaining the fraudulent identification, the

evidence was insufficient to sustain the Bribery offense.

Furthermore, Racketeering Act One, Bribery, lacks both vertical and horizontal

relatedness. It was an isolated offense having no connection to the other charged acts or to the

purpose of the enterprise itself. Indeed, as discussed, *supra,* the record simply fails to show that in 1994 any enterprise existed that had a common purpose of facilitating Defendant's sexual desire for minors. Smith testified at length that he had no idea that Defendant was involved in any type of sexual relationship with Aaliyah or any other young women. Smith was certainly part of Defendant's close circle of confidantes but the mere identification of a group of people who worked for the Defendant does not an enterprise make. Smith did not testify about any other conduct in which he engaged to advance the alleged purpose of the enterprise. Smith's conduct was nothing more than a singular event that bore no connection to the purpose of the enterprise (which did not exist in any event) and which bears no connection to the other racketeering acts.

Furthermore, because the Act did not occur within 10 years of any other predicate Act that was sufficiently proven, the Act is time-barred.

Racketeering Act One was not proved beyond a reasonable doubt.

### 2.      Racketeering Act Two (Sexual Exploitation of a Child – Stephanie)

The government failed to prove Racketeering Act Two, that is, sexual exploitation of Stephanie where it offered insufficient evidence that Defendant used, employed, persuaded, induced, or enticed Stephanie to take part in sexually explicit conduct for the purpose of producing a visual depiction. The government contends that on a single occasion prior to her 18th birthday, Defendant had sexual relations with Stephanie at his studio in Chicago, Illinois and recorded the episode on a video camera. The government cannot produce the video or the camera on which it was allegedly recorded. To be clear, the Defendant is alleged to have recorded a legal and seemingly consensual sex act under the law of the state of Illinois that was only a violation of 18 U.S.C. 2251(a) because Stephanie was not 18 years of age.

To demonstrate that Defendant committed sexual exploitation of a child pursuant to 18 U.S.C. 2251(a), it is not enough for Stephanie to simply allege that Defendant recorded sexually explicit conduct. Stephanie offered no testimony that proved that Defendant "used, persuaded, induced, enticed or coerced" her into "sexually explicit" conduct. Stephanie had an ongoing sexual relationship with Defendant before the video-recording incident and after the video-recorded incident. Although she described those sexual experiences in hindsight as "humiliating," it does not follow that Defendant did *anything* to persuade, induce, entice or coerce her into the sexual activity that was recorded. In fact, Stephanie admits that Defendant called her on the phone and told her that he was picking her up and that "he wanted to make a video of us having sex and that he would be there shortly." (R. 1643) To which Stephanie responded, "Okay." Although Stephanie clearly regrets this decision, her own testimony shows that Defendant did not thing but tell her he wanted to videotape them having sex and she agreed. The government must prove that Defendant did something more than just film the sexually explicit conduct. If the act of filming or recording alone was sufficient to sustain the charge, Congress would not have included a requirement that the Defendant "employ, persuade, indue, entire, or coerce."

Furthermore, the government failed to prove that Defendant acted with a purpose of "producing" a visual depiction of that conduct. Although the jury was erroneously charged that the government could sustain the charge by proving that the purpose was "transmitting a visual depiction." The statute requires something different. Indeed, "producing" is defined by the statute as "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. 2256(3). While the statute also prohibits the transmission of *live* visual depictions, Defendant was not charged with transmitting a live visual depiction and there is no evidence that he did.

21

Lastly, the parties' stipulation that the film used in VHS tapes was a type of film that was not produced in Illinois is insufficient to prove by a reasonable doubt that the conduct was recorded on a "device" made in a foreign country or "affected interstate" commerce. Accordingly, the government failed to prove Racketeering Act Two by proof beyond a reasonable doubt.

### 3. Racketeering Act Five (Mann Act Violation – Jerhonda)

The government failed to prove Racketeering Act Five where there was insufficient evidence that Defendant: (1) used a facility of interstate commerce to knowingly persuade, induce, entice, or coerce Jerhonda to engage in sexual activity that violated Illinois law; and that (2) Defendant knowingly committed the prohibited sexual activity.

To obtain a conviction under §2422(b), the government must show that the defendant "(i) used a facility of interstate commerce; (ii) to knowingly persuade, induce or entice; (iii) any individual who is younger than eighteen-years old; (iv) to engage in sexual activity of a criminal nature." *United States v. Brand,* 467 F. 3d 179, 201-02 (2d Cir. 2006).

First, the government did not prove that Defendant used a facility of interstate commerce to persuade Jerhonda to engage in aggravated criminal sexual abuse between May 2009 and January 2010. Defendant contends that purely intrastate use of cell phones does not constitute use of a facility of interstate commerce. *United States v. Lopez,* 514 U.S. 549 (1995). *Gonzalez v. Raich,* 545 U.S. 1 (2005) (there are limits on Congress's power to create federal criminal prohibitions on traditionally state-regulated spheres of noneconomic activity). *But see United States v. Giordano,* 442 F. 3d 31, 40-41 (2d Cir. 2006) (finding that the jurisdictional element of § 2425 is satisfied by intrastate use of a telephone capable of transmitting communicates between states).

22

Even *if* purely intrastate use of cell phones constituted use of a facility of interstate commerce, the government's evidence that Defendant called Jerhonda on a telephone is not sufficient proof that he *used* the facility of interstate commerce (a cell phone according to the government) to knowingly "induce, persuade, entice, or coerce" Jerhonda to come to Olympia Fields to engage in prohibited sexual activity. The government provided no text exchanges showing that Defendant used any words to "induce, persuade, entice, or coerce" nor did Jerhonda testify that during any telephone conversation or on any text messages did Defendant use words for the purpose of inducing, persuading, entice or coercing her to come to his home or studios for prohibited sexual activities. Under the plain reading of the statute, there must be a nexus between the use of the cell phone and the words of persuasion, enticement, or coercion to satisfy a §2422(b) violation. For example, if Defendant called Jerhonda and invited her to a party at his home. And then once there, he coerced her into prohibited sexual activity – that does not constitute a Mann Act violation pursuant § 2422(b) since the Defendant did not use the facility of interstate commerce (the cell phone) to coerce or induce her into the prohibited sexual activity. Use of the cellphone for some unknown communication coupled with a subsequent prohibited sex act is not sufficient to establish a violation of § 2422(b).

Lastly, if Defendant really believed that Jerhonda was 17 when they engaged in sexual activity and that belief was reasonable, then he would not be guilty of aggravated criminal sexual abuse. (R. 4351) Taking the evidence in the light most favorable to the prosecution, no reasonable juror could conclude that Defendant knew that Jerhonda was 16 years old when they allegedly engaged in sexual activity between May 2009 and January 2010. Jerhonda turned 17 years old in April 2010. Government's Exhibit 70 which depicts a photo of Jerhonda would fail to put any reasonable person on notice that she was 16 years old rather than 17 years old.

23

The record reflects that Jerhonda habitually lied about her age. When she was 15 years old, she befriended a 23-year-old woman with whom she would attend Defendant's Illinois state court appearances in 2008. To gain access to those court appearances, Jerhonda had to demonstrate that she was 18 years of age, presumably by showing an identification. After using her older connections to get invited to a party at Defendant's home in Olympia Fields, she sought out the Defendant and falsely told him that she was 19 years old. To be clear, there is *no* evidence that Defendant sought out Jerhonda.

Jerhonda implausibly claims that after going through all the trouble of lying about her age to get close to Defendant and past his security team, she decided to disclose her true age of 16 immediately after their first sexual encounter. Jerhonda claims that Defendant was indifferent to her age and continued to engage in sexual relations with her until January 2010.

The government's evidence falls painfully short of proving that Defendant did not reasonably believe that Jerhonda was 17 years old at the time of their alleged sexual activities. The government allegedly recovered a copy of Jerhonda's fake ID and birth certificate in a storage facility purportedly belonging to Defendant. Rather than reach the obvious conclusion that Jerhonda provided a fake ID to Defendant's security team to gain access to the home, the government alleges that Defendant or someone in his "inner circle" went through the trouble of altering her ID and photocopying it. No rational juror could conclude that Defendant engaged in sexual activities with Jerhonda with the understanding that she was not of legal consenting age.

### 4. Racketeering Act Six (Forced Labor – Jerhonda)

No rational juror could conclude based on the evidence adduced at trial that Defendant knowingly obtained, or agreed to obtain, any labor or services from Jerhonda on January 23, 2010.  A conviction of forced labor under 18 U.S.C. §1589 requires the government to prove

beyond a reasonable doubt that: (1) the defendant obtained the labor or services of another

person; (2) through, *inter alia,* threats of serious harm; and (3) the defendant acted knowingly.

*United States v Marcus,* 487 F. Supp. 387, 310 (E.D.N.Y. 2007). The language "by means of"

contained in the forced labor statute, 18 U.S.C. §1589(a), requires the government to establish  a

causal link between the labor and services provided by the person and the threat of "serious

harm." *Id.* Serious harm, for purposes of §1589(a)(2) is defined as:

> [a]ny harm, whether physical or nonphysical, including psychological, financial
> or reputational harm, that is sufficiently serious, under all the surrounding
> circumstances, to compel a reasonable person of the same background and in the
> same circumstances to perform or to continue to performing labor or service in
> order to avoid incurring that harm. *Muchira v. Al-Rawaf,* 850 F. 3d 605, 618 (4th
> Cir. 2017).

Section 1589 is "intended to address *serious* trafficking, or cases where traffickers threaten harm

to third persons, restrain their victims without physical violence or injury, or threaten dire

consequences by means other than overt violence." *Id.* The harm or threat of harm, "considered

from the vantage point of a reasonable person in the place of the victim, must be 'sufficiently

serious' to *compel* that person to *remain"* in her condition of servitude when she otherwise

would have left. *Id.*

"Part of a fair reading of statutory text is recognizing that Congress legislates against the

backdrop of certain unexpressed presumptions." *United States v. Toviave,* 761 F. 3d 623, 628 (6th

Cir. 2014) Section 1589, the forced labor statute, was "passed to implement the Thirteenth

Amendment's [prohibition] against slavery or involuntary servitude." *United States v. Toviave,*

761 F. 3d 623, 629 (6th Cir. 2014). "Congress intended to reach cases in which persons are held

in a condition of servitude through nonviolent coercion" as well as through "physical or legal

coercion." *Muchira,* 850 F. 3d at 617.

According to the government, on an isolated date in January 2010, Defendant violated the forced labor statute by using threats of violence to obtain labor, an act of oral sex, from Jerhonda. The forced labor statute was not intended to reach isolated conduct like that described by Jerhonda. Accepting the government's evidence in its best light, Jerhonda described an isolated incident in which the Defendant allegedly assaulted her because he was angry that she was on her phone and did not properly acknowledge him when he entered the room. Jerhonda claimed that Defendant slapped and choked her because, "[h]e didn't believe that I was texting a friend and he got mad about it." (R. 176) Jerhonda testified that after the purported assault, she sat down with Defendant in the VIP room and he "instructed" her to perform oral sex on him. Jerhonda complied with the "instruction." Jerhonda did not testify that Defendant threatened her, forced her, or even demanded that she give him oral sex. Jerhonda did not claim that she feared Defendant would assault her again if she declined the request. Jerhonda then left Defendant's home and never came back.

The government did not establish a causal link between the isolated act of oral sex and any threat of physical violence. Any physical violence that occurred during that episode in January 2010 preceded Jerhonda providing oral sex to Defendant. Jerhonda's testimony simply does not lead to the reasonable inference that she gave Defendant oral sex because she feared physical violence. Jerhonda did not claim that Defendant used any words suggesting she would suffer an assault if she did not provide him with oral sex nor did she claim that she feared another assault if she refused his request for oral sex. Jerhonda did not even testify that she did not want to give Defendant oral sex. As troubling as Jerhonda's story may be, the government still must prove the elements of the crime of forced labor by proof beyond a reasonable doubt. It

26

would not have taken much for Jerhonda to make the causal link between the act of oral sex and her fear of physical assault by the Defendant. But she simply did not provide that testimony.

Absent "clear expression of Congressional intent," courts should resist the urge to transform the forced labor statute to cover the circumstances alleged in Racketeering Act Six which bear virtually no resemblance to those paradigmatic forced labor cases and their victims. *See Toviave,* 761 F. 3d 623, 626 (5th Cir. 2014) (describing prostitution, forced sweatshop work, and forced domestic service as "paradigmatic forced labor cases.") Jerhonda came and went as she pleased, even if Defendant prohibited her from wandering his property at will. Defendant did not force Jerhonda into a condition of servitude through threats of physical force and an isolated example of oral sex with an alleged abusive act is just not forced labor.

### 5.    Racketeering Act Seven: (Sexual Exploitation of a Child – Jerhonda)

The government failed to prove Racketeering Act Seven, that is, sexual exploitation of Jerhonda. According to Jerhonda, during her six-month sexual relationship with the Defendant, he recorded her with a Canon video camera and on an iPhone. The government produced no images or meta-data corroborating this claim. Rather, the government contends that evidence that Defendant owned a Canon video camera and had an iPhone that had the ability to video is sufficient evidence to establish the elements of the offense.

The government failed to prove that Defendant used, employed, persuaded, induced, or enticed Jerhonda to take part in sexually explicit conduct for the purpose of producing a visual depiction. To demonstrate that Defendant committed sexual exploitation of a child pursuant to 18 U.S.C. 2251(a), it is not enough for Jerhonda to simply allege that Defendant recorded sexually explicit conduct. Jerhonda's testimony was insufficient to prove that Defendant "used, persuaded, induced, enticed or coerced" her into "sexually explicit" conduct. According to

Jerhonda, she had an ongoing sexual relationship with Defendant before Defendant allegedly video-recorded here, a relationship that Defendant would have no reason to believe was prohibited since Jerhonda misrepresented her age. Although Jerhonda describes those sexual experiences in hindsight as "humiliating," it does not follow that Defendant did *anything* to persuade, induce, entice or coerce her into the sexual activity that was recorded. The government must prove that Defendant did something more than just film the sexually explicit conduct. If the act of filming or recording alone was sufficient to sustain the charge, Congress would not have included a requirement that the Defendant "employ, persuade, indue, entire, or coerce."

Furthermore, the government failed to prove that Defendant acted with a purpose of "producing" a visual depiction of that conduct. Although the jury was erroneously charged that the government could sustain the charge by proving that the purpose was "transmitting a visual depiction." The statute requires something different. Indeed, "producing" is defined by the statute as "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. 2256(3). While the statute also prohibits the transmission of *live* visual depictions, Defendant was not charged with transmitting a live visual depiction and there is no evidence that he did.

Lastly, the government's "affecting interstate" commerce evidence was insufficient where it could not establish what device, if any, was used to make these recordings.

### 6.  Racketeering Act Eight (Mann Act Violations – Jane)

The government failed to prove that Defendant committed Mann Act violations in connection with his sexual activity with Jane on or about April 28, 2015, and May 1, 2015, in the state of California. Jane was 17 years old in May 2015. She concedes that she misrepresented her age to Defendant when she met him and kept her true age a secret until Fall 2015. After meeting

Defendant in Orlando, Florida in April 2015, Jane traveled to meet him in California at the end of April 2015.

The government charged Defendant with two Mann Act violations in connection with this trip, alleging first that Defendant violated 18 U.S.C. § 2421(a).

### a.      Racketeering 8A – Transportation

Preliminarily, the government's use of the Mann Act under the present set of facts is unprecedented and unjustified. 18 U.S.C. § 2421(a) provides that "[w]hoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both." The government contended that Defendant arranged for Jane to travel to California with the intent of willfully exposing her to a "contagious, infectious, or communicable disease" in violation of Cal. Health and Safety Code § 120290.

The government failed to prove a Mann Act violation under § 2421(a) where it offered insufficient evidence that Defendant: (1) transported Jane with the *intent* of exposing her to herpes; and (2) committed a violation of Cal. Health and Safety Code § 120290 by proof beyond a reasonable doubt.

### i.      Intent

Because there is no link connecting Defendant's transportation of Jane with an intent to expose her to herpes, Defendant cannot be guilty of a Mann Act violation. The Ninth and Tenth Circuit Courts of Appeal have held that to establish the intent requirement of the Mann Act violation, the government must prove that the illegal sexual activity is the "dominant, significant,

or motivating purpose" behind the transportation. *see United States v. Kinslow,* 860 F. 2d 963 (9th Cir. 1988); *United States v. Lukashov,* 694 F. 3d 1107, 1110 (9th Cir. 2012); *United States v. Cryar,* 232 F. 3d 1318 (10th Cir. 2000).

Similarly, in *United States v. Hayward,* 359 F. 3d 631 (3d Cir. 2004), the Third Circuit approved the district court's jury instruction that stated:

> It is not necessary for the government to prove that the illegal sexual activity was the sole purpose for the transportation. A person may have several different purposes or motives for such travel, and each may prompt in varying degrees the act of making the journey. The government must prove beyond a reasonable doubt, however, *that a significant or motivating purpose of the travel across state or foreign boundaries was to have the individual transported to engage in the illegal sexual activity. In other words, the illegal sexual activity must have not been merely incident to the trip. Id.* at 637.

In *United States v. Campbell,* 49 F. 3d 1079 (5th Cir. 1995), the Fifth Circuit analyzed the intent requirement of 18 U.S.C. § 2421 and held that, "[i]n determining whether a dominant purpose exists, we instead ask whether the illicit behavior is one of the efficient and compelling purposes of the travel." *Id.* at 1083. *See also, United States v. Vang,* 128 F. 3d 1065 (7th Cir. 1997) (interpreting the "dominant purpose" standard to mere merely "significant" or "compelling" or efficient"); *United States v. Perkins,* 948 F. 3d 936 (8th Cir. 2020) (holding that to prove the intent elements under § 2423(a), the illicit behavior must be *one of the purposes motivating* the interstate transportation).

The Second Circuit does not seem to have answered the intent question, but whether this Court applies a true "dominant purpose" standard or merely a "significant" or "motivating" purpose standard, the result is the same. The Defendant's alleged violation of a California health law prohibiting him from exposing a partner to herpes was *incidental* to the trip. There is no proof in this record that demonstrates that Defendant's motivating purpose in transporting Jane to California was to expose her to herpes. In fact, the government cannot even show that the

motivating purpose of the trip had anything to do with Jane. As Jane herself testified when asked:

      Q.    And while you were 17, did you take additional trips to California with the defendant?

      A.    Yes, I did.

      Q.    And do you remember where you traveled to?

      A.    I do not.

      Q.    Do you remember what the purpose of your travel was for?

      A.    He had shows. (R. 888)

In short, no rational juror could find that the government proved that Defendant's intent to "transport" Jane to California was to infect with her herpes.

### ii.    Violation of Cal. Health Safety Code § 120290

Second, the government did not prove beyond a reasonable doubt that Defendant committed a violation of the Cal. Health and Safety Code § 120290, because the government charged Defendant with a repealed version of the statute no longer in effect, a version that reduced the government's burden of proof. Prior to the jury charge in this case, Defendant notified the court that the jury instructions did not reflect the elements of Cal. Health and Safety Code § 120290. The government acknowledged as much but argued that it charged Defendant under the statute that was in effect in 2015. The government had no authority to charge Defendant with a statute that was repealed or inoperative at the time of prosecution. *United States v. Chambers,* 291 U.S. 217, 223 (1934) ("In case a statute is repealed or rendered inoperative, no further proceedings can be had to enforce it in pending prosecutions unless competent authority has kept the statute alive for that purpose.")

In 2015, § 120290 of the California Health and Safety Code provided:

Except in provided in Section 120291 or in the case of the removal of an afflicted person in a manner the least dangerous to the public health, any person afflicted with any contagious, infectious, or communicable disease who willfully exposes himself or herself to another person, and any person who willfully exposes another person afflicted with the disease to someone else, is guilty of a misdemeanor.

The statute was overhauled entirely in 2018 after the California Legislature determined that it was antiquated, having been passed during an era of discrimination toward those afflicted with HIV.[2] The current statue bears little to no resemblance to the repealed 2015 version, least of all because it now requires a showing of a specific intent to transmit the disease.

Although repealed or inoperative, the government proposed a jury instruction that attempted to reflect the elements of the 2015 statute. Apparently recognizing that the 2015 statute was unconstitutionally vague in any event, the government stepped into the shoes of the legislature and rewrote the statute to save it from a constitutional challenge. Thus, the government not only charged Defendant with a repealed statute but rewrote it in clear violation of various constitutional provisions, including the separations of power clause and principles of comity. Defendant's jury was instructed pursuant to a statute that never existed. A California court has no authority to rewrite a California statute and neither does a district court sitting in New York.

Even if the government had the authority to charge Defendant under the 2015 version of § 120290 of the California Health and Safety Code, the statute does not pass constitutional muster. Most obviously, the statute is void for vagueness both on its face and as applied to the

---

[2] The Bill Analysis for the 2018 Enactment sets forth the legislative history and rationale for repealing the version under which Defendant was prosecuted.
https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB239

Defendant. The doctrine of vagueness "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya,* 138 S. Ct. 1204, 1212 (2017). As written, the 2015 law fails to provide adequate definitions that put individuals with *any* chronic and potentially contagious diseases on notice of what amounts to criminal conduct, including communicable diseases that are not sexually transmitted.

By way of example, nearly 50% of the population has Herpes Simplex I – a communicable disease. Under the 2015 statute, anyone with Herpes Simplex I (also known as cold sores) who kisses another person without disclosing that they have Herpes Simplex I, is guilty of a misdemeanor. Even if the afflicted person has no active infection, outbreak, and does not pass the disease along to the recipient of the kiss. Under this statute, parents with Herpes Simplex I (again 50% of the population) would be prohibited from kissing their own children. One cannot imagine how many arbitrary prosecutions could take place in this current era of a pandemic if this law was in effect today.

Even if the elements of the statute were as the government alleged, insufficient evidence existed to sustain the charge. The government did not prove that Defendant was contagious, infected, or had the capacity to transmit herpes during the sexual encounter he had with Jane in May 2015. Additionally, the government cannot show that Defendant acted willfully *with knowledge of the consequences.* Presumably, the government assumes that the consequences is transmitting the disease to the person exposed. But effective treatments exist for herpes that significantly reduce outbreaks and the likelihood of transmission. If Defendant was consistently taking Valtrex in April 2015, it cannot be

said that he willfully exposed Jane "with knowledge of the consequences," particularly since Jane was not infected with herpes in April 2015.

This racketeering act cannot be sustained where it was based on a repealed law; was rewritten and was facially unconstitutional in any event.

### b. Racketeering Act 8B – Coercion or Enticement

The government alternatively argues that Defendant is guilty of the Mann Act stemming from his April trip to California, because Defendant knowingly "persuaded, induced, enticed, or coerced" Jane to travel to California. Insufficient evidence exists to prove that Defendant took any action to induce, persuade, entice, or coerce Jane into traveling to California in April – May 2015. Quite the opposite, the record shows that Jane's mother purposefully and strategically *enticed* Defendant with her 17-year-old daughter, comparing her to Aaliyah at various points. (GX233) The government takes great umbrage to this characterization, but the record speaks for itself.

Although defense counsel did not make much use out of it, Government's Exhibit 233 offers powerful evidence showing that Defendant had no reason to "induce, persuade, entice, or coerce" Jane into going to California with him. Text messages introduced by the government show that Jane, with the guidance of her mother, enticed Defendant, who reasonably believed Jane was 18 years old, to bring her to California. In short, when Jane traveled to meet Defendant in California in April-May, she required no enticement, persuasion, or encouragement of any kind.

On April 11, 2015, Jane attended one of Defendant's concerts in Orlando, Florida. After the show, someone provided Jane with Defendant's phone number. (R 775) Jane attempted to text the number on the phone and gave the paper to her mother. *Id.* Although

34

Jane did not reach Defendant, Jane's mother began texting the Defendant posing as her 17-year-old daughter. (R. 778-779) Jane eventually communicated directly with the Defendant via Facetime and told the Defendant she was 18 years of age. (R. 781)

On April 20, 2015, Jane's mother, still posing as Jane, initiated text messages with Defendant and arranged for Jane to meet the Defendant at a hotel in Orlando. Government's Exhibit 233 shows that Jane and her mother knew from the start that Defendant was interested in Jane sexually – believing that she was of legally consenting age. Before Jane's first meeting with Defendant, Jane's mother texted Jane, stating, "This man trying to screw but I'm trying to make it business; He knows you're a singer but he ain't playing he want to ft (fuck tonight)" (GX 233)

Despite that Jane and her mother were on notice that Defendant was interested in Jane sexually, Jane's mother encouraged Jane to meet Defendant. She told Jane to keep Defendant's "curiosity piqued." And advised her about what she should wear to effectively entice him. *Id.* During her in-court testimony, Jane testified that she went to meet Defendant solely to audition for him, but her contemporaneous text messages reveal that Jane was more interested in Defendant for personal and romantic reasons. Jane texted her mother, "Ahhhhhh he so fine." *Id.* When Jane's mother told her to be ready to sing something, Jane said "Igh [Ugh]" suggesting that she did not actually want to audition for Defendant.

Jane's mother encouraged Jane to tease Defendant but not to do anything sexual with him since he would then lose interest in her. Believing that he was speaking to an 18-year-old Jane, Defendant texted Jane's mother that he was staying on the tour bus but was going to get a hotel room for their privacy. Jane's mother then shared that message

with Jane, texting. "Yep he said he staying on the tour bus but he wants to get a hotel

room for just y'all so y'all can get away from security and mgrs. etc." (GX 233)

      Jane's mother gave Jane some final advice before she sent daughter to meet

Defendant, who believed Jane to be 18 years old.

> Be prepared to sing 3 songs he said he will meet you and listen to your
> song…please have your glasses off hair to side…mama knows best pretty hurts
> and third your choice don't yell…put on a show..dance grab his hand shimmy
> wiggle sit on his lap *entice* him…while singing its all bout performance…this
> your chance and opportunity don't blow it.  Jane's mother even told Jane not to
> look "grown." (emphasis added)

> Take off that ugly ass lipstick I told you he don't want you to be grown I told you
> to keep hair curly that shit look a mess you need some jeans or shorts you trying
> to look grown he wanted you cuz you look young and innocent that's what he
> want not a lil girl trying to be grown you're a damn fool

      Defying her mother's advice to merely tease Defendant, Jane engaged in sexual

conduct with Defendant in the hotel room. Jane stripped down to her undergarments and

walked back and forth for Defendant. (R. 791) She later acquiesced to removing her

clothes, testifying that she "got on top of him backwards and he did lick my butt." (R.

793)

      After the sexual encounter, officers arrived at the hotel room and knocked on the

door. (R. 793) After arranging for Jane to meet Defendant in his hotel, Jane's parents

apparently called the police.[3] (R. 793) Jane described Defendant as nervous and anxious

asking her to confirm that she was 18 years old as she had represented. Jane testified at

trial, "[a]fter he [Defendant] looked through the peephole, he made me go into the

restroom immediately and told me to get dressed. And he said, "Are you 18?" And I said,

"Yes." And he said, "Don't lie to me." And I said, "Yes." *Id.*  Defendant opened the door

---

[3] Although defense counsel sought to present evidence that Jane's parents intended to set Defendant up and extort
him, the Court precluded that testimony.

and the police checked Jane's identification to confirm her age before leaving. (R. 794)
Defendant was present when police officers checked Jane's identification. Rather than
calling it night, Jane again removed her clothes and got on top of Defendant to continue
their sexual activities. (R. 795)

After her first encounter with Defendant, Jane told her mother that Defendant had
asked whether he could fly her to meet him. Jane told her mother, "I said duuuuuh." Jane
continued to communicate with the Defendant via text message and by phone and
continued to spend time with Defendant in Orlando doing normal dating activities such as
seeing movies and eating out. (GX233)

At one point, Jane's mother got frustrated with Jane for not prioritizing her music
with Defendant. On April 23, 2015, Jane's mother texted her, "You need to let him hear
your songs. Let him see your video. **You trying to date the man you need to let him see
your shit** . . ." (emphasis added) Jane's mother also continued to encourage Jane's
relationship with Defendant, telling her to be a little "feisty," stating "He married aliyah
cuz she was feisty she didn't let him run over her. You need to be different than the rest "
Later that evening, Jane's mother texted Jane, "You are silly that man ain't trying to do
nothing with you musically he want to fuck period cuz he like young girls." Jane
reassured her mother that Defendant was willing to look at her performances and was
"patiently waiting" to look at some of her videos that her mother had emailed her.

On April 24, 2015, after Defendant had left Orlando, Jane's mother instructed
Jane "you better be texting him so you will stay on his mind." Later that day, Jane texted
her mother about flying out to see Defendant in California.

Jane:   And I talked to r Kelly

Mom:  Yeah bout what

Jane:  **Lmao bout flying me out**

Mom:  Oh really, when

Jane:  **Yeah, whenever I tell him he can. Tomorrow if I choose**

Mom:  Oh yeah

On April 28, 2015, Jane traveled to Los Angeles, California to meet Defendant
with the knowledge and consent of her parents. (R. 799; 814; GX 233) Jane continued to
text with her mother once in Los Angeles. At one point her mother told her "He going to
be in your room butt naked with one of his songs playing lol." Government's Exhibit 233
reflects that Jane and her mother texted incessantly while Jane was in Los Angeles with
Defendant. Jane tells her mother at one point, "Crazy this Aaliyah movie just came on
and I just got off the phone with r." Mom responded, "Really crazy."

Jane testified that she had oral sex with Defendant in Los Angeles, but she did not
share that information with her mother via text. (R. 804-805) At no point did Jane express
any apprehensions about being with Defendant or ask her mother to arrange for her to
come home. When Jane excitedly told her mother that she was riding Defendant's tour
bus to Stockton to attend his concert, Jane's mother responded, "Omg exciting you riding
on the tour bus." (GX233)

On May 1, 2015, Jane's mother urged Jane to take advantage of Defendant,
texting her "It won't be star lifestyle if you don't get serious bout your music and show
this man you want to be famous like him..once he tired of you you'll be like everybody
else. You better use this as your opportunity while you got him in spell." Jane's mother

then said, "You should text him and be like you know you gonna be my boo and see what he say." To which Jane responded, "Lmaooo."

Jane traveled independently to meet Defendant in Stockton, California where he was performing on May 1, 2015. (R. 818) She stayed in contact with her mother the entire time. At one point, Jane explained to her mother how she ended up going to Stockton to see Defendant's performance: "I told you. **he asked me did I wanna come to his show I said of course and he said okay then. let's pack this stuff up. he was even putting his stuff in my bag."**

Jane and her mother remained in constant communication before Defendant's show. Jane's mother instructed her about what to wear and made suggestions about how she should behave at Defendant's show: "I would blow him lil kisses and wink at him and bite the tip of my finger mess with him real good. Do something seductive then make a silly face . . .lol." Jane and her mother continued to text throughout Defendant's performance. At one point, Jane and her mother exchanged the following texts:

Jane:   He singing this whole show to me

Mom:  Lol to funny

Jane:   Frrrrrrr

Jane:   Lmaooo

Jane:   This man in love

Mom:  Omg you gonna marry him and have his babies

Mom:  Lol my son in law gonna be older than me

Mom:  To dang funny

Jane:   Lmaooo

Mom:  Well you better get signed first then married 2nd.

**

Mom:  He gonna seduce you tonight

Jane:  Lol

Mom:  You have to give him a massage before he go to bed.

Jane:  Lmaoooooooo no I doubt it.

Mom:  Girl you better or he will get someone else to.

Jane's mother continued to encourage her to seduce Defendant. At one point, Jane told

her mother that she "caught feelings"[4] for the Defendant.

According to Jane, she and Defendant had sexual intercourse for the first time

after the concert. (R. 819) At no point during her travels with Defendant in California in

April and May 2015 did Jane disclose that she was 17 years of age or that she had lied to

him about her age. After the trip to California, Jane traveled to meet Defendant in Las

Vegas where he was performing. (R. 821)

No rational juror could conclude that Defendant "enticed, persuaded, induced, or

coerced" Jane to travel to California. Jane's contemporaneous conversations with her

mother show that Defendant invited Jane to join him, and she excitedly accepted. When

her mother asked her when he asked her to travel, Jane told her mother "whenever I tell

him I can. Tomorrow *if I choose*." (GX233) By her own admission, Jane *chose* to travel

with Defendant because she wanted to, and her mother encouraged her. While this court

concluded that Jane's parents' testimony was not relevant for the purpose defense counsel

sought to introduce it, Jane's text messages with her mother introduced as government's

---

[4] "Caught Feelings" is an expression that means "when you meet a girl/guy that you like and it starts to have an effect on you in an emotional way." https://www.urbandictionary.com/define.php?term=caught%20feelings

exhibit 233 were highly relevant evidence that Defendant took no action to "induce, persuade, or coerce" Jane to travel with him. Jane was eager to travel with Defendant and "caught feelings" for him as she admitted and concealed her age from Defendant so she could pursue a relationship with him. The government's evidence fails to show that Jane was "persuaded, induced, enticed, or coerced" into traveling to California.

### 7.      Racketeering Act Nine: (Mann Act Violations – Jane)

The government charged Defendant with four Mann Act violations, stemming from a trip with Jane to California between September 2015 and October 2015, two months before her 18th birthday. According to Jane, she disclosed her true age (17 years of age) prior to this trip. The government's evidence is insufficient as to these Mann Act Violations.

### a.      Racketeering Acts 9A – Transportation

For the same reasons argued in connection with Racketeering Act 8A, the government failed to prove beyond a reasonable doubt that Defendant (1) transported Jane with the *intent* of exposing her to herpes in September-October 2015; and (2) committed a violation of Cal. Health and Safety Code § 120290 by proof beyond a reasonable doubt. The arguments set forth, *supra,* are equally applicable Racketeering Act 9A.

### b.      Racketeering Acts 9B – Coercion or Enticement

Insufficient evidence exists to prove that Defendant committed Racketeering Act 9B. By all accounts, Defendant and Jane were in a serious (and legal) relationship based in Illinois where Defendant resided in fall 2015. Although Jane testified that she told Defendant her true age after the summer ended in 2015, the record does not reflect precisely when she told Defendant her true age. As such, the government failed to show that Defendant possessed the requisite *mens rea* to

sustain a charge of unlawful sexual intercourse with a person under 18 years old under the California penal code in September or October 2015.

Furthermore, the record is devoid of evidence that Defendant took any action to induce, persuade, entice, or coerce Jane into traveling to California between September and October 2015. Critically, when Defendant learned that Jane had lied about her age, he sent her home to Florida. Jane returned to Chicago with her parent's consent. Although it is true that Jane's parents did not have the authority to consent to any illegal sexual activity between Jane and the Defendant, their permission to allow her to stay with Defendant is reflective of Jane's desire to continue her relationship with Defendant. Jane offered no testimony to suggest that she was coerced or enticed into traveling to California in fall 2015. Jane's testimony about Defendant's "rules" and sexual proclivities during this time period are not sufficient evidence of coercion *to travel* even if Jane now believes with the benefit of hindsight that Defendant's conduct was controlling or constituted some type of "grooming."

### c.  Racketeering Act 9C – Coercion or Enticement

The government charged Defendant with a Mann Act violation under the separate theory that Defendant transported Jane to California in September or October 2015 with the intent to violate California Penal Law Sections 261.5(a) and 261.5(b), unlawful sexual intercourse with a person under 18. Preliminarily, for the reasons argued, *supra,* the government simply failed to prove that Defendant took any action to induce, persuade, entice, or coerce Jane into traveling to California. By late 2015, Defendant and Jane were in serious relationship based primarily in Illinois where Defendant resided. The age of consent in Illinois is 17; therefore, the Defendant and Jane's sexual relationship was not prohibited there. Jane traveled with Defendant to numerous states as one of his partners. She went consensually and voluntarily. Defendant did not

have to induce, persuade, entice, or coerce her to travel – even if the government is correct that Defendant had exerted some dominance or control in the relationship at the time.

Furthermore, as argued in connection with Racketeering Act Five, the government provided insufficient evidence that Defendant used any words to "induce, persuade, entice, or coerce" Jane to travel to California *via a facility of interstate commerce*. Under the plain reading of the statute, there must be a nexus between the use of the facility of interstate commerce (a cell phone, computer) and the words of persuasion, enticement, or coercion to satisfy a §2422(b) violation. The record is devoid of that proof. The mere fact that Defendant texted with Jane about any number of things does not satisfy the interstate commerce element of this Mann Act violation.

### d.       Racketeering Act 9D – Transportation

It is true that in the state of California the age of consent is 18. According to Jane, she had sexual relations with Defendant in California during this trip when she was still 17 years of age. However, the government failed to prove Defendant guilty of the Mann Act under this theory where Defendant's motivating purpose in traveling to California was not to have sex with Jane. Defendant and Jane had a consensual and legal sexual relationship in Illinois. Defendant's purpose in traveling to California was to perform and he arranged for his girlfriend to go with him. If Defendant had sexual relations with Jane in California in September and October, it was purely incidental to the purpose of the trip. As Jane herself testified when asked:

Q.       And while you were 17, did you take additional trips to California with the defendant?

A.       Yes, I did.

Q.       And do you remember where you traveled to?

43

A.     I do not.

Q.     Do you remember what the purpose of your travel was for?

A.     He had shows. (R. 888)

No rational juror could find that the government proved that Defendant's motivating purpose in "transporting" Jane to California was to have sexual intercourse with her, particularly where he had an ongoing legal and consensual sexual relationship with her in the state of Illinois where he resided. At bottom, no nexus exists between the transportation of Jane and the alleged illegal sexual activity.

### 8.      Racketeering Act 10: (Sexual Exploitation of Jane)

The government failed to prove Racketeering Act Ten, that is, sexual exploitation of Jane where it offered insufficient evidence that Defendant used, employed, persuaded, induced, or enticed Jane to take part in sexually explicit conduct for the purpose of producing a visual depiction between September 2015 and December 30. The government contends that prior to Jane's 18th birthday, Defendant recorded his sexual experiences with her in California.

To demonstrate that Defendant committed sexual exploitation of a child pursuant to 18 U.S.C. 2251(a), it is not enough for Jane to simply allege that Defendant recorded sexually explicit conduct. Jane offered no testimony that proved that Defendant "used, persuaded, induced, enticed or coerced" her into "sexually explicit" conduct during the relevant time-period. Jane had an ongoing sexual relationship with Defendant before the video-recording incident and after the video-recorded incident. Although Jane seems to regret those experiences, she did not offer sufficient evidence of enticement or coercion. The government must prove that Defendant did something more than just film the sexually explicit conduct. If the act of filming or recording

alone was sufficient to sustain the charge, Congress would not have included a requirement that the Defendant "employ, persuade, indue, entire, or coerce."

Furthermore, the government failed to prove that Defendant acted with a purpose of "producing" a visual depiction of that conduct. Although the jury was erroneously charged that the government could sustain the charge by proving that the purpose was "transmitting a visual depiction." The statute requires something different. Indeed, "producing" is defined by the statute as "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. 2256(3). While the statute also prohibits the transmission of *live* visual depictions, Defendant was not charged with transmitting a live visual depiction and there is no evidence that he did. Accordingly, the government failed to prove Racketeering Act Ten by proof beyond a reasonable doubt.

### 9.    Racketeering Act Eleven - Forced Labor of Jane

The government charged Defendant with forced labor of Jane under a theory that Defendant required Jane to participate in sex with other men and other women. (R. 4426) Although at trial, Jane claimed that she did not want to participate in those activities and that she did not enjoy those activities, that does not mean that Jane was *forced* to participate in those activities. If Jane refuses even now to allege that she was forced by threats of violence to engage in certain sex acts, it is unclear why the government believes she was. Again, belatedly acknowledging that one really did not want to participate in the conduct is not the equivalent of being forced. The record is devoid of any evidence that Jane was forced within the meaning of the statute to have sex with individuals other than the Defendant or that she was prohibited in any way from extricating herself from the relationship.

The government's evidence that Jane was "forced" to participate in these sexual acts consisted of Alex's ("nephew") testimony that some women he had sex with were "zombie-ish" and that Defendant had directed women, *other than Jane,* to participate in group sex. Rather than point the jury to specific evidence from Jane's testimony that reflected that she had been forced to participate in these activities through violence, restraint, or threat of violence, the government argued that Defendant had directed Dominique to have sexual intercourse with Alex. (R. 4426-4427) While the government was permitted to offer an extraordinary amount of uncharged bad act evidence for various purposes, such evidence cannot supplant the government's burden to show that Jane, herself, was forced to participate in group sex acts.

The evidence offered was insufficient proof of the offense of Forced Labor. As discussed in connection with Racketeering Act Six, the government cannot establish the offense of forced labor by simply showing that Defendant and Jane had a sexual relationship that some might consider abusive. The government was required to establish a causal link between the group sex acts and threats of physical violence. It failed to do so.

### 10.    Racketeering Act Twelve: (Mann Act Violations – Faith)

The government charged Defendant with two Mann Act violations in connection with Faith's trip to New York in May 2017, alleging that Defendant violated 18 U.S.C. § 2421(a) and § 2422(a). The government charged that Defendant either transported or "persuaded, induced, enticed, or coerced" Faith to travel to New York with the purpose of knowingly exposing her to an infectious venereal disease under New York Public Health Law Section 2307 and reckless endangerment pursuant to New York Penal Law Section 120.20. The government failed to prove Mann Act violations under § 2421(a) and § 2422(a) where it offered insufficient evidence that

Defendant: (1) transported Faith with the *intent* of exposing her to herpes; or (2) persuaded, induced, enticed, or coerced Faith to travel to New York with the intent of exposing her to herpes. Separately, the government failed to prove that Defendant committed the offense of reckless endangerment or a violation New York Public Health Law Section 2307 which is unconstitutional in any event both facially and as applied to the Defendant.

### a.    Intent

Because there is no link connecting Defendant's transportation of Faith with an intent to expose her to herpes, Defendant cannot be guilty of a Mann Act violation. As discussed at length, *supra,* the government must prove that the illegal sexual activity is the "dominant, significant, or motivating purpose" behind the transportation. *see United States v. Kinslow,* 860 F. 2d 963 (9ᵗʰ Cir. 1988); *United States v. Lukashov,* 694 F. 3d 1107, 1110 (9ᵗʰ Cir. 2012); *United States v. Cryar,* 232 F. 3d 1318 (10ᵗʰ Cir. 2000); *United States v. Hayward,* 359 F. 3d 631 (3d Cir. 2004). Because the Defendant's purported violation of a New York Public Health Law prohibiting him from exposing a partner to herpes was *incidental* to Faith's trip rather than a motivating purpose in transporting Faith, the intent requirement of the statute cannot be sustained.

The government argued to the jury that it should find Defendant guilty of a Mann Act violation by merely finding that Defendant transported Faith to New York from her hometown in Texas "for the purpose of sex, the only remaining issue is whether the sexual activity that he brought her here for was illegal, and it was." (R. 4433) This argument is legally flawed. Transporting Faith to New York to have sex would not satisfy the elements of a violation under Section § 2421(a) since the sex act *itself* was perfectly legal as Faith was a consenting adult. The activity that was allegedly illegal in New York was exposing Faith to herpes. It is *that* act that

must be motivating purpose behind Defendant's transportation of Faith. Because the government cannot demonstrate a nexus between Defendant's motivation for transporting Faith to New York and the *illegal* sexual activity, Defendant must be acquitted of the § 2421(a) offense.

### b.     Coercion or Enticement

The government alternatively argues that Defendant is guilty of the Mann Act stemming from Faith's trip May 18, 2017, trip to New York because Defendant knowingly "persuaded, induced, enticed, or coerced" Jane to travel to New York for the purpose of exposing her to herpes. Insufficient evidence exists to prove that Defendant took any action to induce, persuade, entice, or coerce Jane into traveling to New York on May 18, 2017. The evidence shows that Defendant invited a grown woman to meet him in New York, and she accepted.

In March 2017, Faith attended one of Defendant's concerts in San Antonio, Texas with her sister. (R. 2130) Faith had an opportunity to meet Defendant at an after-party backstage along with other individuals. (R. 2131) Defendant and Faith had a conversation during the after-party and Defendant provided her with his phone number. (R. 2134; 2138) After that encounter, Faith and Defendant kept in touch via text and FaceTime. The conversations were normal, appropriate, and pleasant. Defendant complimented her appearance. (R. 2143-2144) Faith testified that Defendant referred to himself as "Daddy" during those conversations. (R. 2143) According to Faith, Defendant asked to be called by Daddy and she complied.[5] Faith did *not* testify that Defendant forced her to call him Daddy. Indeed, Defendant and Faith had met exactly one time when Faith began calling him "Daddy." (R.2144)

On the issue of travel, Faith had this to say:

---

[5] The government makes much of the fact that Defendant asked his girlfriends to call him "Daddy," so much so that the fact was pled in the indictment. There is nothing inherently criminal or even particularly unusual about the use of the moniker "Daddy," particularly in sexual relationships. https://www.vice.com/en/article/8qwze4/why-women-like-to-call-men-daddy-during-sex

48

Q.      In your communications with the defendant, how, if at all, did the topic of traveling to see him come up?

A.      He had informed me that he was on tour right now – or excuse me, at the time, he was on tour, so he was just saying his schedule was kind of crazy, but whenever I wanted to come see him, I could, and he just said that he could arrange the days or just let him know when I wanted to come hang out, but that it would be fun; I would get to see, you know, how – how it is, how he is on tour, things like that. (R. 2145)

Defendant told Faith that if she wanted to come to his shows, she could contact his assistant and he would arrange it for her. (R. 2146) Faith then contacted Defendant's assistant who made travel arrangements for her. (R. 2147) Originally, Faith was going to travel to Chicago but ultimately traveled to New York for one of Defendant's performances. According to Faith, Defendant informed her "that he was having a show in New York and that he would like for me to come, hang out, it was going to be fun, so I said yes." (R. 2151) Defendant's assistant arranged her travel and Faith traveled to New York to attend Defendant's performance and "hang out." (R. 2152)

No rational juror could conclude from Faith's testimony that Defendant coerced or enticed her to travel to New York (for the purpose of giving her herpes). By Faith's account, Defendant was polite, generous, and appropriate, leaving it entirely at her discretion to come to New York to attend a concert. Defendant's alleged bad behavior with other women is not sufficient evidence of his specific conduct in connection with Faith on May 18, 2017. The government routinely asked the jury to find that it had proven elements of the charged offense simply because Defendant had, from the government's perspective, been controlling and coercive to *other* women. Faith's testimony does not establish *any* conduct on the part of Defendant that shows that he did *anything* other than invite her to come to his concert in New York, an invitation she accepted.

Frankly, if this conduct proves "coercion or enticement" by proof beyond a reasonable doubt, the government is going to be very busy prosecuting Mann Act violations. Although it seems unlikely that the government has much of an intention of using this provision to prosecute influential, wealthy White men who invite women on fancy trips for the purpose of engaging in sexual activity that those women later decide was unpleasant.

### c.    New York Public Health Law Section 2307 and Penal Law 120.20

To sustain the Mann Act violations charged in connection with Faith's travel to visit Defendant in New York on February 2, 2018, the government must prove that Defendant intended to engage in a sexual activity for which he could be charged with a criminal offense. Pushing the boundaries of its prosecutorial discretion, the government alleged that Defendant *could* have been charged with a violation of New York Public Health Law § 2307 and/or reckless endangerment because he created a "substantial risk of serious physical injury" when he had unprotected sex with Faith, knowing that he had herpes.

At the outset, Faith did not contract genital herpes from Defendant despite her misleading testimony. After returning from New York, Faith claimed she was diagnosed with herpes type 1 after getting cold sores on her mouth. (R. 2279-2280) Nearly 50 % of the population has herpes type 1, and it can be contracted in any number of ways, including kissing, sharing a toothbrush, or eating utensils.[6] Cold sores caused by herpes type 1 does not cause a substantial risk of serious physical injury. Presumably even the government would concede this point.

Furthermore, as a matter of law, unprotected sex with someone who has genital herpes does not establish a substantial risk of serious physical injury. According to the City Health

---

[6] https://www.webmd.com/genital-herpes/pain-management-herpes#1

Department, one in four New Yorkers has genital herpes.[7] If sexual intercourse with individuals who merely carry the genital herpes virus carries the "substantial risk of serious physical injury" New York City would have an astronomical hospitalization and death rates from the transmission of herpes. Although the government's expert witness identified some serious, but unusual, health risks associated with the contraction of genital herpes, the offense of reckless endangerment requires a showing of a "substantial risk" of "serious physical injury." Serious physical injury is defined as a person's physical conditions that creates a substantial risk of death, or serious and protracted impairment of health.

The government did not satisfy this burden. The risk of Defendant transmitting genital herpes to Faith is unknown where he did *not* transmit it her, and there is no evidence that he was contagious or had an outbreak. If the government could show that Defendant had active symptoms of herpes when he had intercourse with Faith, their proofs might be on a better footing. But merely having unprotected sex with someone who carries the virus cannot as a matter of law create a substantial risk of serious physical injury. Notably, the government cannot point to a single case that supports the prosecution expansive reading of this statute.

Even *if* Defendant had given Faith genital herpes, the government's evidence would be insufficient to sustain a charge for reckless endangerment. Herpes is not deadly and rarely causes any serious, protracted health impairments.[8] Again, the government's expert witness identified rare complications from herpes that could perhaps meet the definition under the reckless endangerment statute, but since those complications carry a low, rather than "substantial" risk of serious physical injury as defined by the statute, the government cannot, as a matter of law, sustain this claim.

---

[7] https://www.nydailynews.com/new-york/one-fourth-city-residents-herpes-article-1.294915
[8] https://slate.com/technology/2019/12/genital-herpes-stigma-history-explained.html

Separately, New York Public Health Law § 2307 is unconstitutional, facially and as applied, for the reasons previously identified by Defendant in his "Motion to Strike Allegations from Count One of the Superseding Indictment and Dismiss the Remaining Counts" (Dkt. No. 42). Additionally, the statute is void for vagueness as it fails to put the public on notice of what conduct constitutes criminal behavior and authorizes arbitrary and discriminatory enforcement. *Sessions v. Dimaya,* 138 S. Ct. 1204, 1212 (2017).

One in six Americans (one in four New Yorkers) suffer from genital herpes (herpes simplex 2). Under the plain reading of this statute, even a person who carries the virus but has been asymptomatic for decades would commit a crime by having sexual intercourse with another. In the absence of a definition of "infected," the statute in unconstitutionally vague. While this court seems to assume that "infected" means having the virus rather than having the ability to transmit it, no authority supports this application, and such an interpretation would lead to arbitrary and discriminatory enforcement.

### 11.    Racketeering Act Thirteen: (Forced Labor – Faith)

No rational juror could conclude based on the evidence adduced at trial that Defendant knowingly obtained, or agreed to obtain, any labor or services from Faith on January 13, 2018. A conviction of forced labor under 18 U.S.C. §1589 requires the government to prove beyond a reasonable doubt that: (1) the defendant obtained the labor or services of another person; (2) through, *inter alia,* threats of serious harm; and (3) the defendant acted knowingly. *United States v Marcus,* 487 F. Supp. 387, 310 (E.D.N.Y. 2007). The language "by means of" contained in the forced labor statute, 18 U.S.C. §1589(a), requires the government to establish a causal link between the labor and services provided by the person and the threat of "serious harm." *Id.* Section 1589 is "intended to address *serious* trafficking, or cases where traffickers threaten harm

to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." *Muchira v. Al-Rawaf,* 850 F. 3d 605, 618 (4th Cir. 2017). The harm or threat of harm, "considered from the vantage point of a reasonable person in the place of the victim, must be 'sufficiently serious' to *compel* that person to *remain"* in her condition of servitude when she otherwise would have left. *Id.*

According to the government, on January 13, 2018, Defendant violated the forced labor statute by using threats of violence to obtain labor, an act of oral sex, from Faith. The forced labor statute was not intended to reach isolated conduct like that described by Faith. Faith testified that she traveled to Los Angeles to see Defendant, presumably to continue her romantic/sexual relationship with the Defendant. She described an incident where she and Defendant were in a small room in the Los Angeles studio where he worked. According to Faith, there was a gun in the room that made Faith intimidated, but Defendant never touched the gun, threatened her with it, or made any gestures that he intended to use it. Faith was simply uncomfortable by its presence. After an intense conversation during which Faith described Defendant as being "serious" but not threatening, Defendant directed her to give him in oral sex and grabbed her neck before placing his penis inside her mouth. Without objection, Faith provided oral sex to Defendant although she testified that she did not want to.

The forced labor statute was not enacted to remedy isolated occurrences like the one described by Faith. Indeed, it is not even clear from Faith's testimony that she gave any indication to Defendant that she did not want to give him oral sex, although she claims she did not to want to give him oral. The record fails to reflect a causal link between the isolated act of oral sex and any threat of physical violence – even if Faith felt intimidated by being in the same room where a gun was located. This event did not amount to "forced labor." Furthermore, Faith

traveled to visit the Defendant against, even after this alleged act of forced labor where she now claims she did not want to participate in the act of oral sex.

### 12.     Racketeering Act Fourteen – (Mann Act Violations – Faith)

The government charged Defendant with a second set of Mann Act violations in relation to Faith's second trip to New York on February 2, 2018. The government's evidence was insufficient for the same reasons argued in connection with Racketeering Act Eleven. First, the government simply fails to demonstrate that Defendant transported Faith to New York on February 2, 2018, for the purpose of exposing her to herpes. Second, the record is devoid of any testimony that Defendant coerced or enticed Faith to come to New York for the purpose of exposing her to herpes.

Faith and Defendant's so-called "relationship" was conducted almost entirely over text. After meeting at Defendant's concert in San Antonio, Faith met the Defendant face-to-fact no more than five times. Faith always returned to her home in Texas after her short excursions to visit with Defendant. This was a grown woman who made decisions to travel with Defendant, not out of fear, coercion, or any type of enticement, but because she wanted to. Faith herself refuses to identify as someone who was forced to do anything. On cross-examination, Faith admitted that she was not a victim and had made a *choice* to be with Defendant. (R. 2385)

> Q.     In one of the podcasts we spoke about this morning, the Paper Route. On that show you said during that interview: **I don't like the word victim because I don't feel like I'm a victim. I'm a young woman. And let's be clear, let's be clear, I made a choice to be involved with that person. Do I feel like everything he did was right? Hell, no. But I had a choice. And that's why I walked away. I did not move in with him. I did not live with him. I did not take any money from him. There is a choice that you have to make.** You said that?

> A.     Correct.

Q.     You made a choice.

A.     Correct.
Q.     And you're not a victim.

A.     Correct. (R. 2385)

The record is devoid of evidence that proves that Defendant coerced or enticed Faith to travel to New York in February 2018. The government must point to *some* specific words or conduct by the Defendant that were coercive or enticing in respect to *Faith*. An invitation is simply not enough. Accordingly, the government failed to prove Racketeering Act 14.

In sum, the government failed to prove the Defendant guilty of RICO.

## II.     THE GOVERNMENT FAILED TO PROVE COUNTS TWO THROUH NINE OF THE INDICTMENT.

The government charged Defendant with four free-standing Mann Act charges that mirror Racketeering Acts Eight and Nine, related to Jane. For the reasons argued, *supra,* (pgs. 29-42), the government failed to prove Counts two through five of the indictment.

Similarly, the government charged Defendant with four free-standing Mann Act violations that mirror Racketeering Acts Twelve and Fourteen. For the reasons argued, *supra,*(pgs. 47-53; 55-56), the government failed to prove Counts six through nine of the indictment.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should enter an order acquitting Defendant of all offenses.

Respectfully submitted,

<u>/s/JENNIFER BONJEAN</u>

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

*Attorney for Robert Kelly*