UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

                                     19 CR 286 (S-3) (AMD)

ROBERT SYLVESTER KELLY,
    also known as "R. Kelly,"

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# THE GOVERNMENTS RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Elizabeth A. Geddes
Nadia I. Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
(Of Counsel)

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

I.             Applicable Law ..................................................................................... 1

II. The Defendant Was Not Denied Effective Assistance of Counsel During *Voir Dire* ........ 1

     A.            Relevant Background ........................................................................... 1

     B.            Legal Standard .................................................................................... 3

         1. Deficient Performance ................................................................... 4

         2. Prejudice ......................................................................................... 6

     C.            Analysis ................................................................................................ 8

         1. Juror No. 3 (Formerly Prospective Juror No. 25) .................... 11

         2. Juror No. 4 (Formerly Prospective Juror No. 52) .................... 14

         3. Juror No. 5 (Formerly Prospective Juror 87) ........................... 16

         4. Juror No. 7 (Formerly Prospective Juror No. 145) .................. 19

         5. Juror No. 8 (Formerly Prospective Juror No. 147) .................. 20

         6. Juror No. 9 (Formerly Prospective Juror No. 156) .................. 21

         7. Juror No. 11 (Formerly Prospective Juror No. 153) ................ 22

         8. Juror No. 12 (Formerly Prospective Juror No. 163) ................ 23

         9. Alternate Juror No. 4 (Formerly Prospective Juror 179) ........ 25

III.            The Defendant Was Not Denied Conflict-Free Counsel ............... 27

     A.            Relevant Background ......................................................................... 27

     B.            Legal Standard .................................................................................. 30

     C.            Analysis .............................................................................................. 34

CONCLUSION ..................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

Beard v. Unger, 2009 WL 5042696  (W.D.N.Y. Dec. 15, 2009) ........................................... 11, 18

Cardoza v. Rock, 731 F.3d 169 (2d Cir. 2013) ............................................................. 31

Castro v. United States, 993 F. Supp. 2d 332 (E.D.N.Y. 2014)  ................................................. 6

Ciaprazi v. Senkowski, 151 F. App'x 62 (2d Cir. 2005) ..................................................... 5

Cordova v. Johnson, 993 F. Supp. 473 (W.D. Tex. 1998) ................................................... 5

Curkendall v. Mazzuca, 2008 WL 3851820 (W.D.N.Y. Aug. 15, 2008) ....................................... 5

Diaz v. Conway, 2008 WL 2461742 (S.D.N.Y. June 17, 2008)............................... 7,10, 11,12,18

Eley v. Ercole, 2010 WL 2695522 (E.D.N.Y. May 6, 2010) ...................................................... 14

Eze v. Senkowski, 321 F.3d 110 (2d Cir. 2003) .......................................................... 4

Figueroa v. Ercole, 2013 WL 3655903 (S.D.N.Y. July 15, 2013) .............................................. 26

Figueroa v. Heath, 2011 WL 1838781 (E.D.N.Y. May 13, 2011) .......................................... 9, 14

Greiner v. Wells, 417 F.3d 305 (2d Cir. 2005) ............................................................. 5

Grenier v. Wells, 417 F.3d 305 (2d Cir. 2005) ............................................................. 5

Guerrero v. Payant, 2010 WL 2545818 (E.D.N.Y. June 21, 2010)........................................ 9, 18

Hemstreet v. Greiner, 491 F.3d 84 (2d Cir. 2007)............................................................. 6

Henry v. Poole, 409 F.3d 48 (2d Cir.2005) ................................................................. 4

Hernandez v. United States, 202 F.3d 486 (2d Cir. 2000)............................................................. 3

Lindstadt v. Keane, 239 F.3d 191 (2d Cir. 2001) ............................................................. 6

Mayo v. Henderson, 13 F.3d 528 (2d Cir. 1994)............................................................. 6

McHerrin v. Poole, 2009 WL 4575393 (W.D.N.Y. Dec. 1, 2009)........................................ 7

Michel v. Louisiana, 350 U.S. 91 (1955)............................................................. 4

Mitchell v. Herbert, 2008 WL 342975 (W.D.N.Y. Feb. 6, 2008) ............................................. 6, 7

Murphy v. Florida, 421 U.S. 794 (1975) ................................................................................. 10

Nova v. Ercole, 2007 WL 1280635 (S.D.N.Y. Apr. 30, 2007) ..................................................... 9

Patton v. Yount, 467 U.S. 1025 (1984) ...................................................................................... 7

Ptak v. Superintendent, 2009 WL 2496607 (W.D.N.Y. Aug.13, 2009)......................................... 5

Reynolds v. United States, 98 U.S. 145 (1878) ......................................................................... 10

Rodriguez v. Breslin, 2009 WL 424738 (E.D.N.Y. Feb. 20, 2009) ......................................... 9, 18

Rompilla v. Beard, 545 U.S. 374 (2005) ................................................................................... 4

Strickland v. Washington, 466 U.S. 668 (1984) ................................................................. passim

Torrez v. Sabourin, 2001 WL 401444 (April 19, 2001) ............................................................. 6

United Stated v. Ayala, 64 F. Supp. 3d 446 (E.D.N.Y. 2014)..................................................... 10

United States ex rel. Reid v. Richmond, 295 F.2d 83 (2d Cir. 1961) .......................................... 6

United States v. Cain, 671 F.3d 271 (2d Cir. 2012) .................................................................. 31

United States v. Cunningham, 672 F.2d 1064 (2d Cir. 1982) ............................................... 32, 33

United States v. Curcio, 680 F.2d 881 (2d Cir. 1982) .......................................................... passim

United States v. Daugerdas, 735 F. Supp. 2d 113, 117 (S.D.N.Y. 2010) ................................... 35

United States v. Fulton, 5 F.3d 605 (2d Cir. 1993)............................................................. passim

United States v. Gambino, 59 F.3d 353 (2d Cir. 1995) ............................................................... 1

United States v. Iorizzo, 786 F.2d 52 (2d Cir. 1986)........................................................... 34, 37

United States v. James, 708 F.2d 40 (2d Cir. 1983) ................................................................. 32

United States v. Jiang, 140 F. 3d 124, 127 (2d Cir. 1998)......................................................... 35

United States v. Jones, 381 F.3d 114 (2d Cir. 2004) ................................................................ 33

United States v. Levy, 25 F.3d 146 (2d Cir. 1994)......................................................... 31, 33, 34

United States v. Oberoi, 331 F.3d 44 (2d Cir. 2003) ................................................... 32

United States v. Perez, 325 F.3d 115 (2d Cir. 2003) ........................................ *passim*

United States v. Ploof, 464 F.2d 116 (2d Cir. 1972) ................................................. 19

United States v. Rahman, 861 F. Supp. 266 (S.D.N.Y. 1994)..................................... 32

United States v. Sanchez, 969 F.2d 1409 (2d Cir. 1992).............................................. 1

United States v. Scali, 2018 WL 3536082 (S.D.N.Y. Jul. 23, 2018)............................ 4

United States v. Schwarz, 283 F.3d 76 (2d Cir. 2002) .................................... 31, 33, 36

United States v. Stein, 410 F. Supp. 2d 316 (S.D.N.Y. 2006)................................. 34, 35, 36, 37

United States v. Torres, 128 F.3d 38 (2d Cir. 1997)...................................................... 7

United States v. Towne, 870 F.2d 880 (2d Cir. 1989) ................................... 7, 15, 19, 25

United States v. Udogwu, 2003 WL 21344749 (S.D.N.Y. June 9, 2003) ................... 14

United States v. Yannotti, 358 F. Supp. 2d 289 (S.D.N.Y. 2004) ............................... 32

Wallace v. Artus, 2011 WL 1302228 (N.D.N.Y. March 31, 2011)............................. 19

Warrick v. McLaughlin, 2004 WL 1656579 (S.D.N.Y. July 22, 2004) ........................ 9

Wheat v. United States, 486 U.S. 153 (1988).............................................................. 31

Wood v. Georgia, 450 U.S. 261 (1981) ...................................................................... 31

**Statutes**

Fed. R. Crim. P. 33 …………………………………………………………………….1

<u>INTRODUCTION</u>

The defendant seeks a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33"), as a result of his conviction on September 27, 2021, of nine counts, charging racketeering and multiple violations of the Mann Act. In his motion and supporting memorandum ("Mem."), the defendant argues that he (1) was denied effective assistance of counsel because his trial attorneys failed to conduct a meaningful <u>voir dire</u> of potential jurors and challenge unqualified jurors; and (2) was denied conflict-free counsel under the Sixth Amendment because one of his attorneys "simultaneously represent[ed]" the victim who testified at trial under the pseudonym "Jane". (<u>See generally</u>, Mem.; ECF Dkt. Entry No. 270). For the reasons set forth below, the Court should deny the motion in its entirety.

I.      <u>Applicable Law</u>

Rule 33 provides that the Court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, "motions for a new trial are disfavored in this Circuit" and "the standard for granting such a motion is strict . . . ." <u>United States v. Gambino</u>, 59 F.3d 353, 364 (2d Cir. 1995). Accordingly, courts must exercise their Rule 33 authority "sparingly" and only in "the most extraordinary circumstances." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992).

II.     <u>The Defendant Was Not Denied Effective Assistance of Counsel During *Voir Dire*</u>

The defendant asserts that he "is entitled to a new trial where his trial team conducted no meaningful <u>voir dire</u> and acquiesced to the seating of jurors who were unqualified to serve on this jury." (Mem. at 1). This claim lacks all merit.

A.      <u>Relevant Background</u>

In order to facilitate jury selection in this case, approximately 575 prospective

jurors completed a comprehensive, 28-page questionnaire comprised of 108 questions.  (See ECF Dkt. Entry No. 115).  The Court then invited the parties to submit challenges to any prospective jurors based on their questionnaire responses.  The parties thereafter submitted a joint list of 251 prospective jurors they agreed should be stricken for cause.  (ECF Dkt. Entry Nos. 152, 157).  In addition to the agreed upon for-cause challenges, the government submitted a list of 34 additional prospective jurors it challenged for cause for various reasons; and the defendant submitted a list of 145 additional prospective jurors he challenged for cause for various reasons.  (Id.).  The Court then directed the remaining prospective jurors who were not challenged for cause by either party based on their questionnaires to appear for an in-person voir dire.

Over the course of two days, the Court conducted in-person voir dire in two phases.  During the first phase, the Court addressed the prospective jurors in a group setting, advising them of multiple principles of law, including the burden of proof, the defendant's presumption of innocence and the need to follow the Court's instructions.  (VD Tr. 17-18, 21, 189, 197-98, 200-01).[1]  During the second phase, the Court spoke with the remaining prospective jurors individually, outside the presence of the other prospective jurors, making further inquiries of each prospective juror, including posing additional follow-up questions submitted by the parties in writing and orally during voir dire.  During in-person voir dire , the Court excluded approximately 34 prospective jurors for cause for various reasons, including scheduling conflicts, English comprehension issues, financial hardship and concerns about the prospective juror's impartiality.  (VD Tr. 22-23, 26, 50-51, 65, 81, 103, 126, 134, 136, 139, 184, 204, 211, 220, 249, 255, 305, 323, 340, 363, 380, 388-89, 419, 421-22, 429, 431).  After voir dire was

---

[1]        References to the transcript of jury voir dire in this case are cited at "VD Tr. __".

complete, the parties exercised their peremptory challenges from the pool of qualified prospective jurors and the Court subsequently seated and swore 12 jurors and five alternate jurors to hear the case.[2]  (VD Tr. 434-457, 459).

Following the close of evidence and the Court's final instructions, the 12 jurors deliberated, ultimately finding the defendant guilty on all nine counts in the third superseding indictment.  With respect to Count One, which charged the defendant with racketeering, the jury found that all racketeering acts, except Racketeering Acts Three and Four, had been proven by the government.  None of the alternate jurors was called on to deliberate.

B.      Legal Standard

A defendant who attacks his conviction based on claims of ineffective assistance of counsel must: (1) show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice," i.e., demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688, 693–94 (1984).  Accord Hernandez v. United States, 202 F.3d 486, 488 (2d Cir. 2000) ("Under the Strickland standard, a petitioner must establish both (1) that counsel made errors so serious that defendant was deprived of reasonably competent representation and (2) that counsel's deficient performance prejudiced the defense.").  Both prongs must be satisfied to succeed on an ineffective assistance claim and the court need not address both components if a defendant fails to establish either one, as a failure on either showing is dispositive.  Strickland, 466 U.S. at 687, 697, 700.

---

[2]      Prior to swearing in the jury, one of the alternate jurors was excused for reasons related to financial hardship.  (T. 144, 358-59, 464-65).

1. <u>Deficient Performance</u>

With respect to the first prong, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The [C]ourt must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." <u>Strickland</u>, 466 U.S. at 690. "Judicial scrutiny of counsel's performance must be highly deferential," <u>id.</u> at 689, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" <u>Id.</u> at 690; <u>see also</u> <u>Henry v. Poole</u>, 409 F.3d 48, 63 (2d Cir.2005) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotations omitted). Moreover "evaluating counsel's performance . . . must not serve as an opportunity to act as a Monday morning quarterback." <u>United States v. Scali</u>, 2018 WL 3536082, at *4 (S.D.N.Y. Jul. 23, 2018) (citing <u>Strickland</u>, 466 U.S. at 689); <u>Eze v. Senkowski</u>, 321 F.3d 110, 132 (2d Cir. 2003) (a court must not use "perfect hindsight to criticize unsuccessful . . . strategies"); <u>Greiner v. Wells</u>, 417 F.3d 305, 319 (2d Cir. 2005), 417 F.3d at 319  (finding that the performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.") (quoting <u>Rompilla v. Beard</u>, 545 U.S. 374, 389 (2005)). Rather, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound [ ] strategy.'" <u>Strickland</u>, 466 U.S. at 689 (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)). The Second Circuit has defined a "strategic decision" as a "'conscious, reasonably informed decision made by an attorney with an

eye to benefitting his client[.]'"  Grenier v. Wells, 417 F.3d 305, 325 (2d Cir. 2005) (internal

citation and quotation marks omitted).

When examining an ineffective assistance claim in the context of jury selection,

consistent with Strickland, an attorney's actions in conducting voir dire are also afforded

deference.  Ciaprazi v. Senkowski, 151 F. App'x 62, 63–64 (2d Cir. 2005) (holding that trial

counsel's decision not to seek an alternate juror is "paradigmatically strategic").  Indeed, "courts

are loathe to second-guess the decisions of counsel during jury selection."  Ptak v.

Superintendent, 2009 WL 2496607, at *8 (W.D.N.Y. Aug.13, 2009) (citing Doleo v. Reynolds,

2002 WL 922260, at *5 (S.D.N.Y. May 7, 2002).  "Strategies as to the exercise of peremptories

are matters of counsel's intuition, and do not rise to the level of constitutional violation.  It is not

the role of the court to second-guess counsel's reasonable strategic decisions at jury selection,

especially considering that 'counsel is strongly presumed to have rendered adequate assistance

and made all significant decisions in the exercise of reasonable professional judgment.'"  Doleo,

2002 WL 922260, at *4–5 (quoting Strickland, 466 U.S. at 688).  See also Cordova v. Johnson,

993 F. Supp. 473, 528 (W.D. Tex. 1998) ("An attorney's actions during voir dire are considered

to be a matter of trial strategy and cannot form the basis for an ineffective assistance claim unless

counsel's tactical decisions are so ill chosen that they 'permeate the entire trial with obvious

unfairness.'").

Additionally, if a defendant fails to demonstrate that he requested that his attorney

exercise a peremptory challenge for particular jurors, the petitioner is deemed to have acquiesced

to the attorney's decision not to do so.  See, e.g., Curkendall v. Mazzuca, 2008 WL 3851820, at

*27 (W.D.N.Y. Aug. 15, 2008) ("Petitioner has failed to demonstrate he requested [trial counsel]

exercise any challenges as to the[] jurors and, as such, Petitioner is deemed to have acquiesced in

[trial counsel's] decision not to do so.") (citing United States ex rel. Reid v. Richmond, 295 F.2d 83, 89-90 (2d Cir. 1961) (holding that defendant's acquiescence of trial counsel's strategic decision amounted to forfeiture of defendant's right to assert constitutional infirmities)).

2.    Prejudice

With respect to the second prong, "'[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'"  Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 691).  Thus, to establish prejudice under Strickland, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.

A court must review the prejudicial effect of counsel's errors in the aggregate. See Lindstadt, 239 F.3d at 199.  Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of Strickland, the determination of prejudice 'may be made with the benefit of hindsight.'"  Hemstreet v. Greiner, 491 F.3d 84, 91 (2d Cir. 2007) (quoting Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994)).

To establish prejudice stemming from trial counsel's failure to challenge a prospective juror for cause during voir dire, a defendant must establish actual bias.  See Castro v. United States, 993 F. Supp. 2d 332 (E.D.N.Y. 2014) ("However, to maintain a claim of ineffective assistance of counsel based on the failure to object to a biased juror, the Petitioner must show that the juror was actually biased against him."); accord Mitchell v. Herbert, 2008 WL 342975, at *21 (W.D.N.Y. Feb. 6, 2008); Torrez v. Sabourin, 2001 WL 401444, at *7 (Apr. 19, 2001) ("Based on the lack of actual or presumed bias of the jurors, the petitioner has not

6

demonstrated that he was prejudiced by his Counsel's failure to strike these jurors and has, therefore, failed to establish ineffective assistance of counsel."). "'Actual bias is 'bias in fact'-- the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" McHerrin v. Poole, 2009 WL 4575393, *4 (W.D.N.Y. Dec. 1, 2009) (quoting United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997)). Actual bias can be found where a prospective juror admits partiality, or where the same can be inferred from his or her answers to voir dire questions. Id.

  Significantly, even where a juror expressly doubts his or her impartiality on voir dire, a finding of actual bias is not automatically mandated. Patton v. Yount, 467 U.S. 1025, 1029–30, 1032 (1984) (holding that ambiguous and contradictory testimony of three jurors was insufficient to overcome presumption of correctness owed to trial court's findings that the jurors would be impartial). The test for determining juror bias is well-established:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Diaz v. Conway, 2008 WL 2461742, at *27 (S.D.N.Y. June 17, 2008) (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)). Even where a juror previously expressed some reservations about his ability to be fair and impartial, if the juror later expresses during voir dire that he will try to decide the case based on the evidence presented, that assurance is generally sufficient. United States v. Towne, 870 F.2d 880, 885 (2d Cir. 1989). Therefore, to prevail on a claim that defense counsel was ineffective in failing to remove or challenge a juror during voir dire, a defendant must show that the juror was actually biased against him. See, e.g., Mitchell, 2008 WL 342975,

at *20 ("Without a finding that [the juror] was actually biased against Petitioner, prejudice under Strickland is not presumed.").

C.     Analysis

The defendant's ineffective assistance claims are wholly without merit. He cannot establish either prong under Strickland and his motion should be denied.

The defendant first makes (1) generalized assertions that "trial counsel failed to conduct any meaningful voir dire of prospective jurors to ensure they were free of bias or prejudice" (Mem. at 11); and (2) unfounded and vague claims that trial counsel should have, for example, "probe[d] more deeply" (Mem. 7), "inquire[d] further" (Mem. at 9), or "completely questioned" (Mem. at 12) certain jurors. These claims are wholly belied by the record, which shows that trial counsel actively participated throughout the voir dire process, submitting additional questions and asserting challenges for cause, both in writing and orally, in some cases successfully, as to various prospective jurors including those prospective jurors whose impartiality may have been in question. In addition to the defendant's written for-cause challenges, with respect to the approximately 50 prospective jurors initially qualified after the first two days of in-person voir dire, the defendant requested that the Court make further inquiries of approximately 19 prospective jurors, including additional questions related to the prospective jurors' opinions on the "Me Too" movement and related topics, as well as their knowledge of the defendant and the nature of the charges. (See, e.g., VD Tr. 41, 46, 55-56-57, 128-29, 168, 180, 215, 223, 242, 261, 270, 282, 296, 300-01, 309, 315-18, 327, 397, 424-25, 430). On various occasions, after hearing certain prospective jurors' responses to the follow-up questions, trial counsel did not challenge them; however, with respect to certain other prospective jurors (for example Prospective Juror Nos. 120 and 182), defense counsel

challenged, and the Court ultimately excused, the prospective jurors for cause based on their responses to inquiries related to the "Me Too" movement.  (VD Tr. 128-29, 134, 282-83, 424-25, 429).  Trial counsel's inquiries on these topics clearly reflect that they considered the very issues now raised by the defendant when making for-cause and peremptory challenges and made strategic decisions in certain instances not to challenge a particular prospective juror based on their responses to inquiries from the Court and the parties.  Guerrero v. Payant, 2010 WL 2545818, at *21 (E.D.N.Y. June 21, 2010) (reasoning that the fact that trial counsel's decision not to challenge a juror for cause was strategic may be evidenced by trial counsel's use of for-cause challenges on other prospective jurors); Figueroa v. Heath, 2011 WL 1838781, at *9-11 (E.D.N.Y. May 13, 2011) (finding that counsel's active participation in voir dire indicates that any decisions to challenge (or not to challenge) jurors were made as part of a reasonable trial strategy, rather than as a result of counsel's failure to provide effective assistance); Warrick v. McLaughlin, 2004 WL 1656579, at *4 (S.D.N.Y. July 22, 2004) (rejecting ineffective assistance of counsel claim regarding voir dire because "the record reflect[ed] that defense counsel was actively engaged in the voir dire process [and] [a]n attorney's determination to 'accept or strike' a prospective juror [wa]s a strategic or tactical decision" (internal citation omitted)); Rodriguez v. Breslin, 2009 WL 424738, at *9 (E.D.N.Y. Feb. 20, 2009) (finding that counsel's decision to peremptorily challenge eight jurors lent support to conclusion that decision not to challenge allegedly biased juror was part of trial strategy); Nova v. Ercole, 2007 WL 1280635, at *8 (S.D.N.Y. Apr. 30, 2007) ("Counsel exercised two peremptory challenges for other prospective jurors during voir dire . . . .  This suggests that counsel deliberately chose not to challenge [another juror] as part of trial strategy that might be considered sound." (internal quotation marks and citations omitted)).

Nor has the defendant shown that he suffered any prejudice. He provides no tangible evidence of actual bias, relying only on speculation based on the challenged jurors' responses during voir dire as purported evidence of bias. See, e.g., Diaz, 2008 WL 2461742, at *27-28 (S.D.N.Y. June 17, 2008) (finding jurors were not actually biased against petitioner and, therefore, he was not prejudiced by trial counsel's failure to challenge them, where "Petitioner offer[ed] no evidence beyond the voir dire testimony of . . . three individuals as to how the[] jurors were biased" "other than speculation regarding these jurors ability to be impartial," given that each of the jurors at issue asserted their impartiality and that they could fairly decide the case). Indeed, the very fact that the defendant asserts that trial counsel should have uncovered some additional imagined information – but produces no actual information supporting the claimed bias - emphasizes the speculative nature of these claims.

In addition, the defendant's claims regarding trial counsel's failure to challenge prospective jurors who (1) had some knowledge of the defendant and/or the allegations against him, including through affirmative responses to Question 31 indicating they had "watched or heard . . . interviews of Robert Kelly, . . . TV shows featuring him, or . . . specials or documentaries about him" (Mem. at 4-12); or (2) knew of the "Me Too" movement (Mem. at 5, 8) also lack merit. As the Supreme Court has made clear, "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved" in a case. Murphy v. Florida, 421 U.S. 794, 799–800 (1975). See also Reynolds v. United States, 98 U.S. 145, 155–56 (1878) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits"); United Stated v. Ayala, 64 F. Supp. 3d 446, 450 (E.D.N.Y. 2014) (stating that "[i]n

most cases, 'pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial'" (internal citations omitted)); Beard v. Unger, 2009 WL 5042696, at *5 (W.D.N.Y. Dec. 15, 2009) (rejecting ineffective assistance claim, finding that defense counsel's "decision not to challenge [a] juror was within the realm of sound trial strategy" and that defendant could not establish actual bias where police officer juror advised he could have had personal knowledge of the facts of the case in his employment but did not recall any such knowledge and could remain impartial).

Further, the defendant's unsupported assertion that the jurors' "own subjective assurances that they could be fair was not sufficient to ensure that they did not harbor beliefs or preconceived ideas about Defendant's guilt" (Mem. at 11) flies in the face of both the record and binding legal precedent that "'[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court'" Diaz, 2008 WL 2461742, at *27 (quoting Irvin, 366 U.S. at 723).

As set forth in further detail below, the defendant has abjectly failed to prove that trial counsel did not act strategically in deciding not to challenge certain jurors for cause or use peremptory strikes to prevent their selection; he also fails to show that any of these jurors bore actual bias against the defendant. He therefore cannot show deficient performance or prejudice.

1.  Juror No. 3 (Formerly Prospective Juror No. 25)

The defendant asserts that trial counsel was ineffective in failing to challenge Juror No. 3 given his responses that he had "seen a documentary about [the defendant] and his legal troubles" and "heard that he has been sleeping with underage girls". (Mem. at 5). As noted above, the mere fact that a juror has knowledge regarding the defendant or aspects of the charges does not automatically create a presumption of bias, particularly where, as here, the juror has

indicated that he can set aside his prior knowledge and decide the case based solely on the evidence presented at trial.  See, e.g., Diaz, 2008 WL 2461742, at *27.

Indeed, the defendant completely ignores—as he does with each juror's affirmation of impartiality—Juror No. 3's unequivocal statements both in response to the questionnaire and during in-person voir dire, which reflect a total lack of bias and a clear ability to be impartial.  For example, in response to Question 31, Juror No. 3 advised that he had seen a documentary about the defendant, but added "I don't know the full story, so I have no feelings about it.  I remain impartial."  (Question 31 (emphasis added)).  Moreover, in response to Question 32, which asked whether he had an impression of the defendant based on what he had seen or heard, Juror No. 3 advised that his impression was "Neutral," adding that "[t]he media tends to demonize people.  I deal with facts."  (Question 32).  Juror No. 3 also advised that he had not overheard discussion about the case, nor had he discussed the case with anyone or online (see Questions 33, 34, 35).  Juror No. 3 further responded that neither the defendant's celebrity nor anything about the nature of the case would interfere with his ability to decide the case fairly and impartially in accordance with the Court's instructions.  (See Questions 36, 37, 94).  With respect to questions regarding the so-called "Me Too" movement, Juror No. 3 indicated that he was aware that the movement "seeks justice for rape victims 25-30 years after the fact," and also stated that he had not participated in the "Me Too" movement.  (See Questions 91, 92).  Juror No. 3 also indicated he had no reason to believe he could not apply the law that the defendant is innocent until proven guilty and the government bears the burden of proof.  (See Question 65).

During in-person voir dire, Juror No. 3 further affirmed his ability to be fair and impartial.  When asked whether there was any reason he could not follow the Court's instructions regarding the burden of proof and the fact that the defendant was innocent until

proven guilty, Juror No. 3 responded "No reason at all." (VD Tr. 63). When asked by the Court whether there was any reason why he would not be able to follow the Court's instructions on the law,[3] Juror No. 3 responded: "No, I'm a stickler for the law on my job. I'm the rule guy." (VD Tr. 63). Moreover, Juror No. 3 answered that "[t]here's no reason at all" why he could not follow the Court's instruction not to research the facts, law or people involved in the case and, when asked by the Court "[i]s there any reason at all why you wouldn't be able to give both sides a fair trial?", Juror No. 3 again unequivocally answered "No." (VD Tr. 63). In these circumstances, the defendant cannot show deficient performance in counsel's decision not to challenge Juror No. 3 and also fails to prove any actual bias on Juror No. 3's part that would result in prejudice, failing both <u>Strickland</u> prongs.

Indeed, it was clearly sound strategy on the part of trial counsel to not exercise a preemptory challenge. Juror No. 3 explained in his questionnaire that he had been arrested on two occasions, which resulted in charges being dismissed (Question 44), and during the colloquy with the Court emphatically expressed that he had previously had certain negative experiences with law enforcement and that, while he was "not biased against law enforcement" he was "biased against people in law enforcement that do these things" (VD Tr. 59). Thus, trial counsel likely made the strategic decision to keep Juror No. 3 because they believed the juror's past negative experiences with law enforcement (including being falsely arrested twice), coupled with his belief that the media "demonize[s] people" (Question 32) would make him more critical of the government's case. Trial counsel may also have reasonably believed that the government

---

[3]     The transcript reads: "Any reason why you wouldn't be able to follow my instruments on the law?" (VD Tr. 63). The word "instruments" in the transcript, however, is clearly a typographical error; rather it should read as "Any reason why you wouldn't be able to follow my <u>instructions</u> on the law?"

might use a peremptory strike on Juror No. 3 given the government's follow-up questions[4] (VD Tr. 61)—which trial counsel may have interpreted as concern regarding Juror No. 3 on the part of the government.  Cf. Eley v. Ercole, 2010 WL 2695522, at *6-7 (E.D.N.Y. May 6, 2010) (rejecting claim of ineffective assistance of counsel where defense counsel did not object during voir dire process because, among other possibilities, counsel, among other reasons, "failed to object so as to force the prosecution to expend an additional peremptory challenge" to strike the juror).

2.    Juror No. 4 (Formerly Prospective Juror No. 52)

The defendant next claims deficient performance due to trial counsel's failure to challenge Juror No. 4 based on the juror's questionnaire that the juror "'find[s] transmission of STDs in a nonconsensual act to be particularly repulsive'", has a close friend who was a victim of sexual assault, and listed the person he least admired as Jeffrey Epstein.  (Mem. 5-6).  Again, the defendant fails to carry his burden to establish either Strickland prong.

Juror No. 4's questionnaire and voir dire responses in no way amount to actual bias against the defendant.  A juror is not required to have entirely neutral feelings about the particular types of crimes charged.  See, e.g., Figueroa, 2011 WL 1838781, at *9-12 (denying post-conviction relief and finding trial counsel's decision not to challenge prospective juror in narcotics trial who expressed views about dangers of drug use given family history of drug abuse was not deficient performance where juror affirmed ability to be fair and impartial after court advised juror that "'[n]obody is asking you to walk in here totally blank. You will bring in your

---

[4]    For example, given Juror No. 3's statements during voir dire that he "was biased against people in law enforcement that do" the types of things leading to his own personal negative experiences with law enforcement (VD Tr. 59), the government requested that the Court ask Juror No. 3 whether his stated biases extended to prosecutors (VD Tr. 61).

life experiences'" and that the relevant question was only whether juror could "follow the law as I give it to you and will you be fair and impartial?"). Rather, the central issue is whether the juror can lay aside any preconceived notions. See, e.g., Towne, 870 F.2d at 885. Here, Juror No. 4 indicated that he could. (VD Tr. 78).

Nor was bias established on the ground that Juror No. 4 knew an individual who was a victim of sexual assault, notwithstanding that the charges against the defendant involved sexual assault. See United States v. Udogwu, 2003 WL 21344749, at *2 (S.D.N.Y. June 9, 2003) (finding that bias could not be inferred where juror advised the court that, among other things, his wife had been abused before they were married, in case involving prosecution of defendant for forced labor of two young girls). Importantly, in response to Question No. 37, which asked whether there was anything about the nature of the charges in and of themselves that would prevent the juror from deciding the case fairly and impartially in accordance with the Court's instructions, Juror No. 4 responded "No." (Question 37). Likewise, in response to Question 65, which asked if there was any reason why Juror No. 4 could not apply the law that the government bears the burden of proving the defendant guilty beyond a reasonable doubt on each charge, Juror No. 4 responded "No." (Question 65); (See also Question 94).

In fact, as was evident from Juror No. 4's questionnaire and in-person voir dire, Juror No. 4 had very little knowledge of who the defendant was, confusing the defendant's alias, "R. Kelly," with a famous cartoonist from decades earlier. (See, e.g., Question 30, 32; VD Tr. 74). Even upon clarification that the defendant was not the cartoonist, Juror No. 4 had very little knowledge of the defendant and had seen some news articles that did not appear to have made any impression on him. (Id. at 78). When asked whether there was anything that Juror No. 4 had read that would affect his ability to be fair and impartial in the case, he responded "Not that I

know of." (Id.). Moreover, when the Court spoke of the duty of jurors to decide the case based on the evidence at trial, Juror No. 4 added that the case was to be decided by "[t]he evidence, testimony and your instructions on the law," clearly demonstrating his understanding of his duty as a juror. (VD Tr. 78). When the Court advised Juror No. 4 that the government bore the burden of proving the defendant guilty beyond a reasonable doubt, Juror No. 4 responded "Right" and stated that he would have "[n]o problem" following the Court's instruction that the defendant is innocent until being proven guilty. (Id. at 78-79). Therefore, any potential concerns that may have arisen from Juror No. 4's questionnaire responses were alleviated by Juror No. 4's clear responses in the questionnaire and during voir dire that he could remain fair and impartial and decide the case according to the Court's instructions. In these circumstances, the defendant cannot show either deficient performance or actual bias, and his claim should be rejected.[5]

3.     Juror No. 5 (Formerly Prospective Juror 87)

The defendant claims that trial counsel should have challenged Juror No. 5 because she had some knowledge of the defendant and had a "Somewhat Negative" impression of him. (Mem. 6-7). In response to why Juror No. 5 had this impression, Juror No. 5 wrote that there "was [an] allegation that related he was sleeping with underage girls (minors)." (Question 32). Notably, Juror No. 5 specifically used the word "allegation" to describe whatever knowledge she may have had about the case. Despite being aware of this "allegation"—which is no more than was included in the summary of the case provided as part of the juror questionnaire—Juror No. 5 advised that she had not overheard any discussion about the case, discussed the case with anyone or posted any opinions online (see Questions 33, 34, 35). Juror

---

[5]     The defendant also cannot show the decision not to challenge Juror No. 4 was not strategic, as Juror No. 4 indicated he had negative interactions with law enforcement (Question 61) and his close friend was infected with HIV by police in a foreign country (Question 55).

No. 5 further responded that neither the defendant's celebrity nor anything about the nature of the case would interfere with her ability to decide the case fairly and impartially in accordance with the Court's instructions.  (See Questions 36, 37, 65, 94).

During the in-person colloquy, the Court asked Juror No. 5 whether, despite having "some familiarity with the case," Juror No. 5 was "able to put aside anything that [Juror No. 5 had] heard about the case and just judge it on the evidence that you hear in the courtroom?"  (VD Tr. 91).  Juror No. 5 responded "Yes."  (Id.).  The Court asked a second time, stating "Okay.  And put aside all those other things you might have heard", to which Juror No. 5 again stated, "Yes."  Shortly thereafter, the Court asked Juror No. 5 whether there was any reason she could not follow the Court's instruction that the defendant was innocent until proven guilty and that the government has the burden of proving the defendant guilty beyond a reasonable doubt.  (Id.).  Juror No. 5 again responded "No."  In response to the Court's inquiry as to whether the juror was hesitating a bit in her answer, Juror No. 5 stated: "No, there wouldn't be no reason that I wouldn't be able to.  Where I work, you have to . . . Where I work we have to follow the order."  (VD Tr. 92-93).  In response to the Court's further questions regarding whether Juror No. 5 would follow this important principle of law (regarding the burden of proof) and would follow the Court's instructions on the law, Juror No. 5 said "Yes" to both.  (VD Tr. 93).  During this portion of the questioning, Juror No. 5 initially responded "Well, as you mentioned, according to when you listen, whatever you hear.  So I think I'll give it a shot."  (VD Tr. 93).  As a result, a colloquy followed in which the Court explained to Juror No. 5 that regardless of her answer, Juror No. 5 needed to be positive in that response.  (See VD Tr. 93-95).  When asked if she was positive that she could give both sides a fair trial, Juror No. 5 said "Yes", that she could be positive in her belief that she would be fair and impartial.  (VD Tr. 95).

17

Importantly, Juror No. 5's use of the word "think" in her response to the Court's questions does not demonstrate implied or actual bias. See, e.g., Diaz, 2008 WL 2461742, at *24-28 (finding no bias when juror replied "No, I don't think so" after being asked whether she "'might favor the prosecution, the prosecution's argument, their evidence, their witnesses because you are a member of their office'" and confirmed that she could acquit the defendant if she found the prosecution had not proved its case); Beard, 2009 WL 5042696, at *5 (finding juror had no actual or implied bias warranting relief where "when asked whether his experience as a police officer would carry over into petitioner's trial, the juror responded, 'Well sir, I would certainly like to be able to say that it wouldn't and I would certainly do my best to see that it did not.'").

Moreover, even if Juror No. 5's response demonstrated some initial ambiguity about her impartiality, she affirmatively stated that she could be fair and impartial upon further questioning. Trial counsel's decision, therefore, not to challenge her was not deficient. See, e.g., Guerrero, 2010 WL 2545818, at *19-23 (rejecting claim of ineffective assistance of counsel based on trial counsel's decision not to make a for-cause challenge where juror expressed doubts about his ability to be fair and impartial given his employment as a police officer, but subsequently answered in the affirmative upon further questioning about whether he could base his decisions in the case solely on what he would see and hear in the courtroom, and where there was no evidence in record that the Court would have granted a challenge for cause even if defense counsel objected); Rodriguez v. Breslin, 2009 WL 424738, at *3, 9 (E.D.N.Y. Feb. 20, 2009) (holding that the decision not to challenge a juror for cause, when that juror expressed that she was "sensitive" to the issue but ultimately stated that she would "try" to remain fair and impartial, did not amount to ineffective assistance of counsel, particularly where based on the

juror's response to a hypothetical question posed during <u>voir dire</u>, the attorney may have reasonably inferred that the juror would be sympathetic to the defense strategy he planned to use at trial); <u>Wallace v. Artus</u>, 2011 WL 1302228, at \*9 (N.D.N.Y. March 31, 2011) (finding no actual bias where juror initially stated that he "could try" to be fair and impartial and then subsequently agreed that he would "'leave sympathy and emotions out of [his] deliberations and decide it from the facts on this witness stand'"); <u>see also</u> <u>Towne</u>, 870 F.2d at 885 (concluding that district court did not err in failing to remove prospective juror for cause where juror initially expressed reservations about ability to be impartial but later promised to try to decide the case based on the evidence presented); <u>United States v. Ploof</u>, 464 F.2d 116, 117–18 (2d Cir. 1972) (upholding the denial of challenge for cause where a juror indicated he would do his best to decide the case based on the evidence presented).  The defendant thus cannot show deficient performance or actual bias and fails both <u>Strickland</u> prongs.

### 4.  Juror No. 7 (Formerly Prospective Juror No. 145)

The defendant asserts that trial counsel was deficient in failing to challenge Juror No. 7 because she had heard certain information about the defendant's alleged crimes.  (Def. Mem. 7-8).  The claim is baseless.  While Juror No. 7 advised that she was aware of who the defendant was and the existence of a case against him, Juror No. 7 stated that she had not seen any documentary about the defendant and that her impression of the defendant was "neutral" because "[m]ost of the information you hear about celebrities are not always true.  It's mainly either for or against the person."  (Questions 29-32).  Juror No. 7 also advised that she had not discussed the case with anyone or posted any opinions about the defendant online (Questions 33-35), and made clear that she would remain fair and impartial in deciding the case, indicating that there was no reason she could not follow the Court's instructions regarding the burden of proof

and the fact that the defendant is innocent until proven guilty. (See, e.g., Questions 36-39, 65, 93, 94).

During the in-person voir dire, when asked whether she could put aside the very little she had heard about the case and rely only on the evidence in court, Juror No. 7 answered "Sure." (VD Tr. 152-53). Moreover, when asked if she "promise[d] that [she] will be a fair and impartial juror to both sides, Juror No. 7 responded "Of course." (VD Tr. 155). In these circumstances, the defendant cannot show actual bias and his ineffective assistance claim must fail.

In addition, the defendant cannot show that trial counsel's decision not to strike Juror No. 7 was not strategic. During trial, defense counsel sought to emphasize the defendant's musical talents and popularity as part of its trial strategy. Thus, trial counsel may have believed that Juror No. 7's knowledge of the defendant's music (see Question 30) and her lack of knowledge of the "Me Too" movement (see Question 91) made Juror No. 7 an attractive juror. In any event, in light of the juror's unequivocal responses establishing her impartiality, the defendant cannot show actual bias or that the Court would have granted a motion to strike.

5.  Juror No. 8 (Formerly Prospective Juror No. 147)

The defendant claims that trial counsel was deficient in failing to challenge Juror No. 8 because he had heard about the crimes that the defendant allegedly committed. (Mem. at 8). Notwithstanding such knowledge, Juror No. 8 advised that he had a "neutral" impression of the defendant and that he had "no feeling toward the defendant." (Question 32). In response to other questions, Juror No. 8 made clear that he would judge the facts of the case fairly and impartially in accordance with the Court's instructions. (See, e.g., Questions 36-39, 65, 93, 94). During in-person voir dire, Juror No. 8 also answered each of the Court's questions in an

unequivocal manner consistent with his ability to put aside anything he knew about the case, hold the government to its burden to prove the defendant guilty beyond a reasonable doubt and judge it fairly and impartially. (VD Tr. 156-58). In these circumstances, the defendant cannot show actual bias.

Nor can the defendant show that trial counsel did not strike Juror No. 8 for strategic reasons. In the questionnaire, Juror No. 8 advised that he "listen[s] to [the defendant's] music and has no views of the cases." (Question 30). Given Juror No. 8's other responses indicating that he had no knowledge of the "Me Too" movement and could clearly be fair and impartial, trial counsel likely believed that Juror No. 8 was a fan of the defendant's music and thus would be a favorable juror for the defense. In any event, in light of the juror's unequivocal responses establishing his impartiality, the defendant cannot show actual bias or that the Court would have granted a motion to strike.

6.    Juror No. 9 (Formerly Prospective Juror No. 156)

The defendant claims that trial counsel was deficient in failing to challenge Juror No. 9 because she had heard that the defendant had unknown issues with the law and had knowledge of the "Me Too" movement. (Mem. at 8). In response to questions regarding whether Juror No. 9 was familiar with the defendant or any allegations against him, Juror No. 9 wrote: "Sounds familiar, but unsure" and that the defendant "had issues with the law before but couldn't tell you exactly what for." (Questions 29, 30). Juror No. 9 also indicated that she had a "neutral" impression of the defendant because "I know he's been arrested before but don't know if he was convicted or not. I don't watch entertainment news or follow gossip/influencer sites about celebrities." (Question 32). In response to a question concerning knowledge about the "Me Too" movement, Juror No. 9 described the movement as "the power structure of the male

dominated movie industry has been turned on its head" (Question 91) and indicated that she had not participated in the "Me Too" movement (Question 92). In response to other questions in the questionnaire, Juror No. 9 made clear that she would judge the facts of the case fairly and impartially in accordance with the Court's instructions. (See, e.g., Questions 36-39, 65, 93, 94).

During in-person voir dire, the Court asked Juror No. 9 whether she could put aside any prior knowledge that she may have had about the case and decide it only on the evidence presented in court, to which Juror No. 9 responded "Yes, I can." (VD Tr. 175). In response to questions regarding whether Juror No. 9 promised to follow the Court's instructions on the burden of proof, the defendant's presumption of innocence, the law and refraining from obtaining outside information about the case, Juror No. 9, as she did in the questionnaire, answered in the affirmative to all, promising to do her duty as a fair and impartial juror. (VD Tr. 176-77).

The defendant has offered no evidence to suggest that trial counsel's decision not to strike Juror No. 9 was anything but strategic. As an individual who had a neutral view of the defendant, did not follow gossip sites about celebrities and who had a relative who was convicted of a federal crime and served five years in prison (Question 53), trial counsel likely believed that Juror No. 9 would be a favorable juror for the defense. In these circumstances, the defendant cannot show actual bias or deficient performance and his ineffective assistance claim fails. In any event, in light of the juror's unequivocal responses establishing her impartiality, the defendant cannot show that the Court would have granted a motion to strike.

7.      Juror No. 11 (Formerly Prospective Juror No. 153)

The defendant claims that trial counsel was deficient in failing to challenge Juror No. 11 because she had heard and read about the alleged crimes on the news. (Mem. at 8).

Specifically, in response to questions regarding whether Juror No. 11 was familiar with the defendant or any allegations against him, Juror No. 11 wrote that she "[s]aw the case mentioned on the news when [the defendant] was first being investigated," knew that the defendant is a musician and that there were "allegations of misconduct lodged against him." (Questions 29, 30). Juror No. 11 also indicated that she had a "neutral" impression of the defendant because "I do not know enough information about the defendant or the case." (Question 32). In response to other questions in the questionnaire, Juror No. 11 made clear that she would judge the facts of the case fairly and impartially in accordance with the Court's instructions. (See, e.g., Questions 36-39, 65, 93, 94).

Similarly, during in-person voir dire, when asked by the Court whether she could put aside any prior knowledge that she may have had about the case and decide it only on the evidence presented in court, Juror No. 11 responded "Yes," (VD Tr. 220-21). In response to questions regarding whether Juror No. 11 promised to follow the Court's instructions on the burden of proof, the defendant's presumption of innocence, the law and refraining from obtaining outside information about the case, Juror No. 11 answered in the affirmative to all, promising to do her duty as a fair and impartial juror. (VD Tr. 224-25). In these circumstances, the defendant cannot show actual bias or deficient performance.

8. Juror No. 12 (Formerly Prospective Juror No. 163)

The defendant claims that trial counsel was deficient in failing to challenge Juror No. 12 because he had heard about the crimes that the defendant allegedly committed from various sources and had knowledge of the "Me Too" movement. (Mem. at 8-9). While Juror No. 12 indicated that his "somewhat negative" impression of the defendant was a result of an emotional response to the nature of the charges against the defendant, Juror No. 12 also advised

in that same response that he "really never cared one way or the other regarding the defendant." (Question 32).  In response to other questions in the questionnaire, Juror No. 12 made clear that he would judge the facts of the case fairly and impartially in accordance with the Court's instructions.  (See, e.g., Questions 36-39, 65, 93, 94).

During in-person voir dire, when the Court raised the fact that Juror No. 12 had indicated on the questionnaire that he had some information about the case, Juror No. 12 advised the Court that it was "[j]ust minor things in the press.  Nothing – I can't recall any specific details."  (VD Tr. 227).  Juror No. 12 added that, in fact, the summary and questions included in the questionnaire provided more information about the nature of the case than what he had previously been aware of through any media coverage.  (Id.).  When asked whether he could put that information aside and judge the case based on the evidence presented in court, Juror No. 12 responded, "Of course" (VD Tr. 227, 228), stating "[i]t most definitely is" when the Court referenced Juror No. 12's statement in his questionnaire that "trial by media is worse than trial by jury."  (VD Tr. 227).  Subsequently, in response to questions by the Court regarding whether Juror No. 11 promised to follow the Court's instructions on the burden of proof and the defendant's presumption of innocence, Juror No. 11 responded, "100 percent."  (VD Tr. 231).  Further, with respect to the Court's inquiries about whether he could follow the law as the Court instructed and refrain from obtaining outside information about the case, Juror No. 11 answered in the affirmative, promising to do his duty as a fair and impartial juror.  (VD Tr. 231).  The record thus clearly reflects that there was no actual bias on the part of Juror No. 12.

Trial counsel's conduct with respect to this juror was also not deficient under Strickland.  First, counsel had a strategic reason not to strike this juror.  In the questionnaire, Juror No. 12 advised that he had a friend who was related to Bill Cosby, and as part of his

discussion of his opinion of Bill Cosby's sexual assault case, both in the questionnaire and during voir dire, indicated that "until the end of the case, I have no opinion," adding that "trial by media is scarier to me than a jury." (Question 62). Juror No 12's position regarding Bill Cosby's case not only reflected his ability to keep an open mind unless and until he had all the facts, but also likely formed the basis of trial counsel's strategic decision not to strike Juror No. 12 given the nature of the Bill Cosby allegations. In addition, Juror No. 12 had a family member who was sentenced to ten years in prison. A reasonable attorney could certainly have believed that Juror No. 12 would be a favorable juror for the defense notwithstanding his "somewhat negative" view of the defendant or knowledge of the "Me Too" movement for this reason. In any event, in light of the juror's unequivocal responses establishing his impartiality, any for-cause challenge would have been futile.

9.    Alternate Juror No. 4 (Formerly Prospective Juror 179)

Finally, the defendant claims that trial counsel was deficient for not challenging Alternate Juror No. 4 as a result of her knowledge that the defendant was married to Aaliyah, and, as he characterizes it, for making an untimely challenge to Alternate Juror No. 4 during trial for asking the Court's clerk whether the clerk could obtain an autograph from attorney Gloria Allred, who represented certain of the witnesses at trial, on her behalf. (Mem. at 10, 11-12).

Even assuming arguendo that Alternate Juror No. 4 should have been dismissed notwithstanding the Court's proper determination on the matter, given that this alternate juror did not deliberate—and thereby had no impact on the verdict—the defendant cannot show prejudice from her selection as an alternate. See, e.g., Towne, 870 F.2d at 885 ("More important, however, appellant cannot demonstrate that he was prejudiced by the trial judge's refusal to excuse this venireperson for cause, since [prospective juror] was never a member of the jury that convicted

[the defendant].").  Moreover, as the defendant concedes (Mem. at 12), trial counsel did, in fact,

seek Alternate Juror No 4's dismissal.  (Tr. 3265-66).[6]  As such, the defendant cannot show that

trial counsel engaged in deficient performance under <u>Strickland</u>.[7]

***

Finally, as reflected in the record, and set forth in great detail in the government

response to the defendant's motion for a judgement of acquittal (ECF Dkt. Entry No. 278), which

is incorporated herein by reference, the evidence against the defendant on all charges was

overwhelming and the defendant has presented no evidence to demonstrate that the jury's verdict

was based on anything other than the evidence presented at trial.[8]  <u>Cf., e.g.</u>, <u>Figueroa v. Ercole</u>,

2013 WL 3655903, at *25 (S.D.N.Y. July 15, 2013) (holding that defendant's ineffective

---

[6]     The defendant's claim that trial counsel's motion to exclude the juror was untimely is baseless.  While Alternate Juror No. 4 had left the courtroom at the time of the challenge and therefore it was made outside Alternate Juror No. 4's presence (which is entirely customary), trial counsel made the motion immediately following the colloquy on the matter. (<u>Id.</u>).

[7]     Notably, the defendant's claim that trial counsel should have pursued Alternate Juror No. 4's dismissal during <u>voir dire</u>, likewise fails <u>Strickland</u> given that trial counsel's performance was not deficient and there was no prejudice.  While Alternate Juror No. 4 referenced some knowledge of the defendant and possible rumors of her marriage to Aaliyah (Question 29-33), she advised that she was able to put any such knowledge aside and decide the case fairly and impartially (VD Tr. 266-67).  During <u>voir dire</u>, however, trial counsel requested that the Court inquire further regarding Alternate Juror No. 4's stated history and experience with sexual harassment (Question 46) and indicated that he was "going to challenge her (VD Tr. at 270), however, upon hearing her answers to the Court's additional questions on this topic, trial counsel made the strategic decision not to challenge this juror (VD Tr. 270-72).

[8]     Importantly, while the jury found the defendant guilty on all counts, they found that Racketeering Acts 3 and 4 of Count One had not been proven by the government, emphasizing that the jurors carefully reviewed the evidence in the case, honored their oath to find a racketeering act or count proven only if they believed the government had met its burden of proof and were not clouded by the purported bias that the defendant now baselessly claims permeated the jury.

assistance of counsel claim that trial counsel's failure to strike juror who was allegedly equivocal as to whether she could hold the prosecution to its burden and allegedly evinced a "'state of mind . . . likely to preclude [her] from rendering an impartial verdict'" lacked merit, finding that "in the absence of bias, Petitioner cannot satisfy the second prong of <u>Strickland</u>, because there is no basis to conclude that, had [the juror] <u>not</u> been seated as a juror, the result of Petitioner's trial would have been different.") (emphasis in original).

Accordingly, the defendant's claims that trial counsel provided ineffective assistance of counsel during <u>voir dire</u> should be denied.

III.    <u>The Defendant Was Not Denied Conflict-Free Counsel</u>

A.    <u>Relevant Background</u>

Pursuant to its obligations under <u>United States v. Curcio</u>, 680 F.2d 881, 888-90 (2d Cir. 1982), the government brought certain issues to the attention of the Court regarding potential conflicts held by one of the defendant's retained attorneys, Nicole Blank-Becker.  The potential conflicts raised by the government were set forth in detail in sealed written submissions dated June 14, 2021 (the "Sealed June 14, 2021 Letter) and June 24, 2021 (the "Sealed June 24, 2021 Letter"), collectively referred to herein as the "Sealed Letters" and incorporated herein by reference.[9]  (ECF Dkt. Entry Nos. 107, 114).  The defendant bases his motion on one of these issues, specifically regarding the possibility that Ms. Blank-Becker entered into an attorney-client relationship with certain individuals, including an individual referred to in the Sealed Letters as Jane Doe No. 5 and herein as "Jane."  (<u>See, e.g.</u>, Sealed June 24, 2021 Letter, Dkt. No. 114).  Another issue, also relevant to the instant motion related to the individual identified at trial

_____

[9]    Though incorporated herein, the Sealed Letters should remain under seal for the reasons set forth in the Sealed Letters.,

as Joy or Joycelyn and is detailed in the Sealed Letters. (See ECF Dkt. Entry No. 107, at 1-2; ECF Dkt. Entry No. 114, at 2-3, n. 2 and 3).

Following the government's filing of its Curcio letter, the Court appointed independent counsel to advise the defendant on the issues, and on June 17, 2021, the Court conducted a Curcio hearing, which was further adjourned to allow the defendant ample time to confer with independent counsel. (See ECF Dkt. Entry No. 112). On July 15, 2021, the Court continued the Curcio hearing to determine whether conflicts existed and whether the conflicts were waivable by the defendant. (See generally July 15, 2021 Curcio Tr.). In making its determination, the Court relied upon written submissions and exhibits by the government, Ms. Blank-Becker, and Ms. Gloria (Schmidt) Rodriguez, who formerly represented "Jane," as well as proffers of information by the government, Ms. Blank-Becker, and Ms. Gloria (Schmidt) Rodriguez. (Curcio Tr. at 4).[10]

Based on this information, the Court determined that potential or actual conflicts existed with respect to the issues raised by the government, but that all of the raised conflicts, including those related to "Jane," could be waived by the defendant. (Id. at 32). Based on its findings, the Court advised the defendant of each of the conflicts and the relevant implications of those conflicts. (Id. at 30-47). During the hearing, the Court also advised the defendant that he had the right to conflict-free representation, but under the circumstances could waive the conflicts if he so chose. (Id. at 32). Relevant to the instant motion, the Court advised, among other things, that

> [Ms. Blank-Becker] may have developed a relationship of
> trust with [certain individuals, including "Jane" and

---

[10]     References to the July 15, 2021 Curcio hearing transcript are cited as "Curcio Tr.
___."

28

> Joycelyn] even though she were (sic) never formally
> retained as their lawyer she has confidentiality obligations
> to them.  And given the nature and extent of those
> communications and the content of them, she would have a
> conflict if she were to cross-examine either one of them.
> So that's one of the conflicts.

(Id. at 32).  The Court also advised the defendant that Ms. Blank-Becker could not rely on or

share with the defendant or his other attorneys any privileged information she may have obtained

from these individuals.  (Id. at 34-35).  Also relevant to the instant motion, the Court advised the

defendant of the implications of a possible conflict related to an allegation regarding Joycelyn set

forth in the Sealed June 14, 2021 Letter, at pages 1-2, noting that there was not "much of a

foundation" for the allegation.  (Id. at 38-39).  While the Court did not make a specific finding as

to whether Ms. Blank-Becker had committed an ethical violation by contacting "Jane" while she

was represented by Ms. Rodriguez, the Court also advised the defendant regarding the

implications of such a violation as it related to Ms. Blank-Becker's representation of the

defendant.  (Id. at 32-33).  The defendant advised that he understood all of the conflicts.  (Id. at

30-41).  Independent Curcio counsel also advised the Court, and the defendant confirmed, that

she had thoroughly explained and discussed with the defendant each of the issues that was the

subject of the Curcio hearing.  (See, e.g., id. at 29, 35).

Subsequently, the defendant, at the Court's request, explained his understanding

of each of the conflicts on the record as explained to him by the Court and Curcio counsel.[11]  (Id.

at 41-47).  Notably, the Court also advised the defendant that he had two lawyers who were not

---

[11]     Given the sensitive nature of some of the issues raised, references were made to
certain of the facts proffered by the government in the Sealed Curcio Letters by page and
paragraph during the hearing.  To the extent a reference was made to one of the Sealed Curcio
Letters, Curcio counsel, who was seated beside the defendant, re-read and discussed the
paragraph with the defendant off the record.

conflicted (Deveraux Cannick and Thomas Farinella),[12] but that if he waived the conflicts, the defendant would be "giving up the right to have [Ms. Blank-Becker] represent [the defendant] without a conflict of interest . . . [a]nd that means that if [the defendant] were to be convicted at a trial, [the defendant] couldn't later claim that [the defendant's] lawyer, Ms. Becker, wasn't an effective lawyer because she had these conflicts or potential conflicts." (Id. at 46). When asked if he understood both of these implications, the defendant responded, "Yes, I do, Your Honor." (Id.). The defendant advised the Court that he waived the conflicts and would continue with Ms. Blank-Becker as one of his retained attorneys. (Id. at 32, 34, 46). At the conclusion of the colloquy with the defendant, the Court found that it had "established that Mr. Kelly is fully competent and capable of making an informed decision, that he has been advised by independent counsel, and that his waiver of these potential conflicts or conflicts is knowing and intelligent and so I accept the waiver[.]" (Id. at 47).

At trial, the defendant was represented by four retained attorneys: Mr. Cannick, Ms. Blank-Becker, Mr. Farinella, and Mr. Calvin Scholar. During trial, "Jane" testified during the government's case in chief,[13] and Mr. Cannick conducted the cross-examination of "Jane."

B.    Legal Standard

The Sixth Amendment right to effective assistance of counsel "generally ensures that an accused may be represented by any attorney who will agree to take his case." United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003). A defendant has a "'correlative right to

---

[12]    At the time, a fourth attorney—Calvin Scholar—had not yet entered a notice of appearance as counsel retained by the defendant.

[13]    The defendant's characterization of "Jane" as the government's "star witness" (Mem. at 18) is not only an exaggeration but a gross oversimplification of the government's proof at trial, which included the testimony of 50 witnesses and hundreds of exhibits.

representation that is free from conflicts of interest.'" Cardoza v. Rock, 731 F.3d 169, 183 (2d Cir. 2013) (quoting Wood v. Georgia, 450 U.S. 261, 271 (1981)). When a defendant's right to choose the counsel he wants "conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to the defendant." Perez, 325 F.3d at 125. District courts have an "independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." Wheat v. United States, 486 U.S. 153, 161 (1988). For that reason, "[w]hen a district court is sufficiently apprised of even the possibility of a conflict of interest"—as the Court was here—it has a threshold obligation to "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994); see Perez, 325 F.3d at 125.

Where defense counsel has an actual or potential conflict, the district court must determine whether the conflict is so severe as to require the attorney's disqualification or whether it is a lesser conflict that can be waived in a Curcio hearing. Levy, 25 F.3d at 153. In most cases where a defendant's attorney has a conflict, the defendant "may make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation." United States v. Cain, 671 F.3d 271, 293 (2d Cir. 2012). In only rare cases, an attorney's conflict is unwaivable because it is so serious that "no rational defendant . . . would have knowingly and intelligently desired" the conflicted attorney's representation, Perez, 325 F.3d at 127; see Cain, 671 F.3d at 293; Schwarz, 283 F.3d at 95–97; United States v. Fulton, 5 F.3d 605, 613 (2d Cir. 1993), or because the conflict is "so severe as to indicate per se that the rendering of effective assistance will be impeded," Perez, 325 F.3d at 125. Indeed, the Second Circuit has recognized only two categories of such "per se violation[s] of the Sixth Amendment"

that are unwaivable: where the defendant's "counsel was unlicensed, and when the attorney has engaged in the defendant's crimes." Fulton, 5 F.3d at 611.

An attorney's prior representation of a government witness presents a potential conflict of interest. This is because a lawyer owes an absolute duty of loyalty and confidentiality to both his current and former clients.[14] See, e.g., United States v. Yannotti, 358 F. Supp. 2d 289, 295 (S.D.N.Y. 2004); United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994). Notwithstanding the limitations presented by this continuing duty of loyalty, a defendant can generally waive potential conflicts arising from his attorney's prior representation of a government witness. Perez, 325 F.3d at 124 (citing Fulton, 5 F.3d at 613). The Second Circuit has recognized that "[o]ur cases . . . support allowing waiver of the conflict that arises when an attorney must cross examine a former client in order to effectively represent a current client." United States v. Oberoi, 331 F.3d 44, 50 (2d Cir. 2003). Such a waiver is allowed because:

> Although such a conflict might require a defendant to abandon a particular defense or line of questioning, he can be advised as to what he must forgo; he "can then seek the legal advice of independent counsel and make an informed judgment that balances the alteration in the trial strategy against the perceived effect of having to get a new and perhaps less effective defense counsel."

Perez, 325 F.3d at 124 (quoting Fulton, 5 F.3d at 613). Where an attorney suffers from a waivable potential or actual conflict, the district court must conduct a Curcio hearing to determine whether the defendant will knowingly and intelligently waive his right to conflict-free

---

[14] In representing a current client, a lawyer may not use privileged information obtained from another, former client. See United States v. James, 708 F.2d 40, 45-46 (2d Cir. 1983); United States v. Cunningham, 672 F.2d 1064, 1072-73 (2d Cir. 1982). Moreover, in representing a current client, a lawyer may not ethically attack other clients through cross-examination or argument to the jury. See, e.g., Rahman, 861 F. Supp. at 277.

representation.  <u>Curcio</u>, 680 F.2d at 881-91; <u>Levy</u>, 25 F.3d at 153.

The Second Circuit has considered a number of different factors in determining whether a conflict can be waived including, among other things, (1) whether disqualifying the defendant's chosen counsel would create "real prejudice" to the defendant based on the length of the representation and/or counsel's familiarity with the case, <u>Cunningham</u>, 672 F.2d at 1071; (2) whether there is a possibility that the attorney could be called as a witness at the defendant's trial or implicated in the defendant's alleged crimes, <u>id.</u> at 1075; (3) whether the continued representation would conflict with the attorney's own personal financial or liberty interests, as opposed to the interests of a current or former client, <u>United States v. Jones</u>, 381 F.3d 114, 120-21 (2d Cir. 2004); <u>Schwarz</u>, 283 F.3d at 96; <u>Fulton</u>, 5 F.3d 608; (4) whether, if the conflict concerns the interests of another client, the attorney's relationship with the other client is continuing or has been terminated, <u>Schwarz</u>, 283 F.3d at 96; <u>Perez</u>, 325 F.3d at 127; (5) whether any other current or former client affected by the conflict has initiated or joined in the motion to disqualify defendant's chosen counsel, <u>Cunningham</u>, 672 F.2d at 1072; and (6) the availability of measures that might limit the dangers posed by the conflict, such as restricting an attorney's cross-examination of a former client, <u>Cunningham</u>, 672 F.2d at 1073.

A defendant challenging his conviction on the ground that he was deprived of his Sixth Amendment right to effective assistance of counsel as the result of a conflict must demonstrate, first, that the conflict was either unwaivable or that his waiver was not knowing and intelligent, <u>see</u> <u>Schwarz</u>, 283 F.3d at 95, and second, that he was prejudiced by the conflict, <u>see</u> <u>Levy</u>, 25 F.3d at 152, in other words, that "but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>Fulton</u>, 5 F.3d at 609 (quotation marks omitted). Where a potential conflict exists, courts require that the defendant establish prejudice.  <u>Id.</u>

Where an actual conflict exists, however, prejudice is presumed and the defendant is required to show only that "a lapse in representation . . . resulted from the conflict." United States v. Iorizzo, 786 F.2d 52, 58 (2d Cir. 1986) (quotation marks omitted). A lapse in representation means that some "plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Levy, 25 F.3d at 157 (quotation marks omitted). In evaluating an actual or potential conflict of interest, while actions of any member of a law firm are imputed to every member of the firm, such conflicts are not imputed on independent trial counsel. See, e.g., United States v. Stein, 410 F. Supp. 2d 316, 329 (S.D.N.Y. 2006); Anwar v. United States, 648 F. Supp. 820, 827 (N.D.N.Y. 1986).

      C.     Analysis

      The defendant alleges that he was denied effective counsel because Ms. Blank-Becker purportedly "labored under a disabling conflict of interest . . . that was imputed to the entire defense team." (Mem. at 13). The defendant's argument is meritless. It is based on incorrect claims that this conflict was unwaivable and imputed to the entire defense team, which included three other independent counsel from different firms who represented him at trial.

      During the Curcio hearing, the Court determined that Ms. Blank-Becker "may have developed a relationship of trust with ["Jane" and Joycelyn]," resulting in certain possible conflicts, including creating, among other obligations, a duty of loyalty to them. (Curcio Tr. 32). Assuming that Ms. Blank-Becker's relationship with "Jane" amounted to an actual conflict, said conflict was clearly waivable. Several factors demonstrate that the conflict was waivable, including that: (1) the relationship was brief, limited in scope and terminated prior to "Jane's"

cooperation with the government;[15] (2) the relationship did not implicate Ms. Blank-Becker's

own personal financial or liberty interests; and (3) the defendant was represented by three other

unconflicted retained counsel who could—and one of whom in fact did—cross examine "Jane"

during trial.  See Stein, 410 F. Supp. 2d, at 328 (listing factors weighing in favor of finding a

waivable conflict) (internal citations omitted).  The defendant has proffered no facts from which

it could be concluded that Ms. Blank-Becker's potential conflict amounted to an actual conflict

of interest, nor do any of the cases cited by the defendant support the notion that Ms. Blank-

Becker's conflict was not waivable.[16]

Instead, the defendant incorrectly conflates the issue of whether an actual conflict

exists with the question of whether the defendant may waive said conflict.  As discussed above,

it is well-established, that an actual conflict is not synonymous with an unwaivable conflict.  See,

e.g., United States v. Arrington, 941 F.3d 24, 42 (2d Cir. 2019) ("But even though this second

---

[15]    The defendant's claim that "Jane" "may have obtained privileged information
from Becker that was adverse to the Defendant" (Mem. at 17) completely misconstrues the
government's representations on this point and the assertion that "Jane" "most certainly" passed
information subject to attorney-client privilege between Ms. Blank-Becker and the defendant
(Id.) is not only speculative, but patently false.  Likewise, there is no basis to suggest, as the
defendant does, that Ms. Blank-Becker's interactions with "Jane"—even if they amounted to an
attorney-client relationship—were "an attempt to influence a government witness on behalf of
her client" (Mem. at 16).

[16]    Notably, the cases cited by the defendant support only the principle that counsel's
representation of both the defendant and a witness generally creates an actual conflict; not that
such conflict is unwaivable.  In fact, the cases cited by the defendant demonstrate quite the
opposite.   (See Mem. at 18, citing United States v. Jiang, 140 F. 3d 124, 128-29 (2d Cir. 1998)
(noting that similar conflict may have been waivable and remanding case for determination as to
whether a conflict in fact existed); United States v. Daugerdas, 735 F. Supp. 2d 113, 117-18
(S.D.N.Y. 2010) (noting that one party refused to waive the conflict and disqualifying counsel
because his law firm sought "to simultaneously represent a defendant and a cooperating witness
with adverse interests in the same criminal proceeding"); Anwar, 648 F. Supp. at 828 (holding
that "Petitioner has failed to allege facts supporting a conclusion that any of the potential areas of
conflict arising when an attorney has previously represented an important witness for the
prosecution existed in this case")).

conflict was actual, it was also waivable." (citing Perez, 325 F.3d at 125)). Indeed, it is the rare

exception where an actual conflict cannot be waived by the defendant and even if the conflict

here was actual, it does not constitute one of those rare instances. Rather, the conflict represents

one of the "lesser conflicts, such as an attorney's representation of two or more defendants or his

prior representation of a trial witness [that is] generally waivable." Perez, 325 F.3d at 127, 128-

29 (holding that a defendant was entitled to waive a conflict created by his counsel's prior

representation of another defendant despite assertions that counsel "was blinded by his own

substantial self interest," and finding that counsel had nothing "approaching the sort of fiscal

self-interest that was present in [Schwarz]," considering that there was "no indication that

[counsel] had a continuing relationship with, or an exceptionally lucrative retainer from, [the

other defendant]"); see also Stein, 410 F. Supp. 2d at 329 (holding that conflicts arising from

trial counsel's prior representation of witnesses were waivable given defendant's willingness to

continue with current counsel despite their being barred from cross-examining counsel's former

clients at trial, and the defendant's "consent[] to measures that might limit the dangers posed by

conflicts, such as current counsel agreeing not to discuss his former clients with any independent

attorneys hired to cross-examine them on conflicted counsel's behalf); Arrington, 941 F.3d at 41

("Although [counsel's] conflict compromised his ability to be a zealous advocate for [the

defendant], it was nonetheless waivable . . . we have generally found that this type of conflict is

waivable.") (internal citations omitted).

   In addition, any conflict related to Ms. Blank-Becker's conflict arising from any

assumed attorney-client relationship with "Jane" was not imputed to the defendant's other

counsel. The defendant's reliance on United States v. Stein in support of its claim to the contrary

is misplaced. While Stein held that counsel's conflict was imputed to the other attorneys in

counsel's small firm, independent counsel had no such conflict.  See Stein, 410 F. Supp. 2d at

329 (holding attorney's conflict from prior representation of trial witness waivable because,

among other things, "independent attorneys [could be] hired to cross-examine those witnesses on

[conflicted counsel's] behalf").  Ms. Blank-Becker is a solo practitioner and the defendant's

other counsel each have their own independent practices.  Thus Messrs. Cannick, Farinella and

Scholar were not members of any "firm" with Ms. Blank-Becker and remained unconflicted.

See, e.g., Anwar, 648 F. Supp. at 827 (finding that conflict was not imputed to co-counsel given

that the record did "not indicate a general partnership relationship between the attorneys

extending beyond the representation of petitioner himself").  Given that Mr. Cannick, one of the

defendant's three independent, unconflicted counsel, conducted a vigorous cross-examination of

"Jane" at trial, the defendant has not shown that "a lapse in representation . . . resulted from the

conflict," Iorizzo, 786 F.2d at 58, even assuming the circumstances presented an actual conflict.

Nor can the defendant demonstrate that he was prejudiced in any way by Ms. Blank-Becker's

conflict if it was only a potential conflict.

There can also be no question that the defendant was fully advised of the

implications and consequences of the conflict related to Ms. Blank-Becker's purported

representation of "Jane".  After being so advised, the defendant knowingly and intentionally

waived the conflict and chose to keep Ms. Blank-Becker as one of his attorneys.  While Ms.

Blank-Becker's conflict prevented her from cross-examining "Jane" at trial (and from disclosing

any privileged information obtained, if any, from "Jane" to the defendant or the defendant's

other counsel), the defendant was advised of those consequences (Curcio Tr. at 46) and was well

within his constitutional rights to choose to continue to retain Ms. Blank-Becker.  See, e.g.,

Arrington, 941 F.3d at 42 ("A reasonable defendant may decide to retain a trusted attorney, even

at the risk of losing those advantages, after being properly informed of the risks and benefits" of the consequences of that decision).

Finally, with respect to the defendant's claim that Ms. Blank-Becker suffered from a conflict under <u>Fulton</u> (Mem. at 16), the defendant is wrong. Again, the defendant conflates two separate issues addressed by the Court during the <u>Curcio</u> hearing. As set forth in the June 14, 2021 Sealed Letter, in an abundance of caution, the government expeditiously alerted the Court to speculative information it had received from the defendant's former attorneys related to Joycelyn and Ms. Blank-Becker. (<u>See</u> ECF Dkt. Entry No. 107, at 1-2; ECF Dkt. Entry No. 114, at 2-3, n. 2 and 3). Joycelyn did not make any such allegations, nor did the government intend to—or ultimately call— Joycelyn as a witness at trial (<u>see id.</u>), thus even if there existed the possibility of a conflict under <u>Fulton</u>, no conflict was likely to or did, in fact, arise. None of the dangers outlined in <u>Fulton</u>, therefore, existed here. <u>See</u> <u>Fulton</u>, 5 F.3d at 613, (noting that "the allegations were by a witness who was testifying against the defendant at trial" making it "a different order of magnitude" from other conflicts).

Moreover, in the unlikely event that Joycelyn was to be called as a witness at trial by the government at the time, as set forth in <u>Fulton</u>, the <u>per se</u> rule advocated by the defendant applies only where the alleged criminal conduct is true, or of the nature that it should be treated as true, not where the allegation is false. <u>Id.</u> at 611. Therefore, in order to prevail on this claim, the defendant must show prejudice. Given the lack of evidence before the Court regarding the alleged conduct (<u>see</u> <u>Curcio</u> Tr. at 30; 38), there was no basis to treat the allegation as true.[17] <u>See</u> <u>id.</u> at 613 (stating that the "considerations [relating to the <u>per se</u> unwaivable conflict found in

---

[17] In any event, even if the allegations were deemed to be true, Joycelyn was not called as a witness at trial.

Fulton] do not apply if the allegations are clearly false. Thus, if a district court holds a full hearing and can definitively rule out the possibility that the allegations are true, a meaningful waiver is possible since the falsely accused attorney is conflicted only to the extent that she cannot cross-examine the witness regarding the false allegations"). As discussed above, the defendant had three other independent retained counsel, including Mr. Cannick, who acted as lead attorney at trial and could have cross-examined Joycelyn if she had been called as a witness. The defendant therefore has not—and cannot—provide any evidence that an actual conflict existed or, that, if a potential or actual conflict did exist, that a lapse in representation resulted from, or that he was prejudiced in any way by, the conflict.[18]

       Accordingly, this Court should deny the defendant's motion in its entirety.

---

[18]      To the extent the defendant's reference to "misconduct" implicating a so-called Fulton conflict (Mem. at 16) also concerns the potential ethical violation by Ms. Blank-Becker for contacting "Jane" and Joycelyn while they were represented by counsel, such a violation would not be the type of crime or misconduct "sufficiently related" to the crimes with which the defendant was charged as contemplated in Fulton. See Fulton, 5 F.3d at 610 ("Of course, the per se rule does not apply any time a court learns that an attorney may have committed a crime; the attorney's alleged criminal activity must be sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised).

<u>CONCLUSION</u>

Based on the foregoing, the defendant's motion for a new trial should be denied.


Respectfully submitted,
BREON PEACE
United States Attorney

By: /s/_____
   Elizabeth Geddes
   Nadia Shihata
   Maria Cruz Melendez
   Assistant U.S. Attorneys
   (718) 254-7000


cc: Defense Counsel (by ECF)
  Clerk of the Court (AMD) (by ECF)