EAG/NS/MCM
F. #2019R00029

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                Docket No. <u>19–CR-286 (S-3) (AMD)</u>

ROBERT SYLVESTER KELLY,

         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - -X


## THE GOVERNMENT'S MEMORANDUM OF LAW IN <u>OPPOSITION TO THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL</u>


BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Elizabeth Geddes
Nadia Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
    (Of Counsel)

# **Table of Contents**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 2

    I.    Kelly and the Enterprise .................................................................................. 2

    II.   Kelly's Genital Herpes Diagnosis .................................................................. 7

    III.  Angela .............................................................................................................. 7

    IV.  Aaliyah ............................................................................................................ 9

    V.    Stephanie ....................................................................................................... 13

    VI.  Addie .............................................................................................................. 19

    VII.  Kate ................................................................................................................ 20

    VIII.  Sonja .............................................................................................................. 21

    IX.   Alexis ............................................................................................................. 23

    X.    Louis and Alex .............................................................................................. 24

    XI.   Jerhonda ......................................................................................................... 26

    XII.  Anna ............................................................................................................... 29

    XIII.  Jane ................................................................................................................ 33

    XIV.  Faith ............................................................................................................... 39

DISCUSSION ............................................................................................................. 46

    I.    Legal Standard ............................................................................................... 46

    II.   The Racketeering Conviction Was Sound .................................................... 47

        A.   The Government Adduced Sufficient Evidence of An Enterprise ............ 47

            1.    Applicable Law .................................................................................. 47

            2.    Members of the Enterprise Shared A Common Purpose to Engage in a Course of Conduct .................................................................................................. 48

            3.    The Enterprise Was Distinct from Its Racketeering Activities ........ 51

            4.    The Enterprise Was Distinct from Kelly .......................................... 52

B. The Enterprise Affected Interstate and Foreign Commerce ........................................ 53

C. There Was Sufficient Evidence of a Pattern of Racketeering Activity ..................... 55

    1. Bribery ............................................................................................................. 56

    2. Production of Sexually Explicit Material ......................................................... 62

    3. Mann Act Violations – Exposure to a Sexually Transmitted Disease ............. 67

        a. Racketeering Acts 8A and 12A: Intent ...................................... 67

        b. Racketeering Acts 8B and 12B: Persuasion, Inducement, Enticement, or Coercion ...................................................................................... 75

            i. Jane ............................................................................ 75

            ii. Faith .......................................................................... 77

        c. New York Penal Law § 120.20 .................................................. 77

        d. New York Public Health Law Section 2307 .............................. 84

        e. California Health and Safety Code Section 120290 .................... 86

D. Mann Act Violations – Sexual Activity with Minors ................................................. 91

    1. Racketeering Act Five ...................................................................................... 92

    2. Racketeering Act Nine ..................................................................................... 94

E. Forced Labor .............................................................................................................. 97

    1. Racketeering Act Six ....................................................................................... 98

    2. Racketeering Act Eleven ................................................................................ 100

    3. Racketeering Act Thirteen .............................................................................. 102

III. There Was Sufficient Evidence Establishing Counts Two through Nine .................... 103

CONCLUSION .................................................................................................................. 104

# TABLE OF AUTHORITIES

Blumenfield v. United States, 284 F.2d 46 (8th Cir. 1960) .................................................... 93, 96

Boyle v. United States, 556 U.S. 938 (2009) .................................................................. 47, 48, 51

Doe v. Roe, 2013 WL 1787175 (D. Nev. Apr. 25, 2013) ............................................................ 88

First Capital Asset Mgmt., Inc., v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004) ...................... 49

H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240 (1989) ............................................................ 61

Harms v. United States, 272 F.2d 478, 481 (4th Cir. 1959) .................................................. 76, 96

Hathaway v. Coughlin, 99 F.3d 550 (2d Cir. 1996) ..................................................................... 65

Maynard v. Cartwright, 486 U.S. 356 (1988) ............................................................................. 89

Moll v. US Life Title Ins. Co. of New York, 654 F. Supp. 1012 (S.D.N.Y. 1987) ..................... 49

Moss v. BMO Harris Bank, N.A., 258 F. Supp. 3d 289 (E.D.N.Y. 2017) .................................. 50

Nwozuzu v. Holder, 726 F.3d 323 (2d Cir. 2013) ....................................................................... 85

Ortiz-Graulau v. United States, 756 F.3d 12 (1st Cir. 2014) ...................................................... 63

People v. Atkins, 25 Cal. 4th 76 (2000) ....................................................................................... 87

People v. Galatro, 84 NY.2d 160 (N.Y. 1994) ........................................................................... 78

People v. Valdez, 27 Cal. 4th 778 (2002) .................................................................................... 87

Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339 (2d Cir. 1994) ....... 52

United States v. Al Kassar, 660 F.3d 108 (2d Cir. 2011) ............................................................ 65

United States v. Aleskerova, 300 F.3d 286 (2d Cir. 2002) .......................................................... 59

United States v. Am. Bldg. Maint. Indus., 422 U.S. 271 (1975) ................................................. 54

United States v. Atcheson, 94 F.3d 1237 (9th Cir. 1996) ............................................................ 54

United States v. Bandrich, 2014 WL 7330434 (S.D.N.Y. Sept. 22, 2014) ................................. 60

United States v. Bonanno Organized Crime Family of La Cosa Nostra, 695 F. Supp. 1426
    (E.D.N.Y. 1988) ...................................................................................................................... 86

United States v. Botti, 711 F.3d 299 (2d Cir. 2013) .............................................................. 55, 92

United States v. Brand, 467 F.3d 179 (2d Cir. 2006) .................................................................. 92

United States v. Broxmeyer, 616 F.3d 120 (2d Cir. 2010) .......................................................... 62

United States v. Cabrera, 13 F.4th 140 (2d Cir. 2021) ............................................................... 92

United States v. Chambers, 441 F.3d 438 (6th Cir. 2006) ........................................................... 66

United States v. Chang An-Lo, 851 F.2d 547 (2d. Cir. 1988) ..................................................... 60

United States v. Coonan, 938 F.2d 1553 (2d Cir. 1991) ............................................................. 48

United States v. Cryar, 232 F.3d 1318 (10th Cir. 2000) ............................................................. 68

United States v. D'Souza, 2012 WL 487638 (E.D. Ca. Feb. 7, 2012) ........................................ 97

United States v. Daidone, 471 F.3d 371 (2d Cir. 2006) .............................................................. 60

United States v. Davila, 461 F.3d 298, 306 (2d Cir. 2006) ......................................................... 53

United States v. Davis, 576 F.2d 106 (3d Cir. 1978) .................................................................. 86

United States v. Dawkins, 2019 WL 2461722 (S.D.N.Y. May 23, 2019) .................................. 90

United States v. Dunlap, 180 Fed. Appx. 636 (8th Cir. 2006) .................................................... 66

United States v. Eldridge, 2017 WL 3699312 (W.D.N.Y. Aug. 28, 2017) ................................ 58

United States v. Engle, 646 F.3d 405 (4th Cir. 2012) ................................................................. 63

United States v. Errico, 635 F.2d 152 (2d Cir. 1980) ................................................................. 48

United States v. Evans, 476 F.3d 1176 (11th Cir. 2007) ............................................................. 93

United States v. Farhane, 634 F.3d 127 (2d Cir. 2011) .............................................................. 90

United States v. Giordano, 442 F.3d 31 (2d Cir. 2006) .............................................................. 92

United States v. Halloran, 821 F.3d 321 (2d Cir. 2016) ............................................................. 89

United States v. Hawkins, 547 F.3d 66 (2d Cir. 2008) .................................................. 47

United States v. Hayward, 359 F.3d 631 (3d Cir. 2004) ................................................ 68

United States v. Jackson, 335 F.3d 170 (2d Cir. 2003) ................................................. 59

United States v. Joubert, 778 F.3d 247 (1st Cir. 2015).................................................. 66

United States v. Keltner, 147 F.3d 662 (8th Cir. 1998) ................................................. 51

United States v. Kinslow, 860 F.2d 963 (9th Cir. 1988) ............................................... 68

United States v. Kozeny, 667 F.3d 122 (2d Cir. 2011)................................................... 47

United States v. Kozeny, 667 F.3d 122, 139 (2d Cir. 2011)........................................... 47

United States v. Krasniqi, 555 Fed. App'x 14 (2d Cir. 2014) ....................................... 48

United States v. Lopez, 514 U.S. 549 (1995) .......................................................... 53, 55

United States v. Lukashov, 694 F.3d 1107 (9th Cir. 2012) ........................................... 68

United States v. Mauro, 80 F.3d 73 (2d Cir. 1996) ....................................................... 48

United States v. Maxwell, 2021 WL 5999410 (S.D.N.Y. Dec. 19, 2021)...................... 68

United States v. McCloud, 590 F.3d 560 (8th Cir. 2009) .............................................. 63

United States v. Mejia, 545 F.3d 179 (2d Cir. 2008).............................................. 53, 54

United States v. Middendorf, 2019 WL 4254025 (Sept. 9, 2019) ................................. 59

United States v. Miller, 116 F.3d 641 (2d Cir. 1997) ............................................. 53, 55

United States v. Muskovsky, 863 F.2d 1319 (7th Cir. 1988) ........................................ 54

United States v. Orena, 32 F.3d 704 (2d Cir. 1994) ..................................................... 48

United States v. Pahl, 2015 WL 7312898 (D. Utah Nov. 19, 2015).............................. 67

United States v. Payne, 591 F.3d 46 (2d Cir. 2010) ............................................. 47, 103

United States v. Payton, 159 F.3d 49 (2d Cir. 1998) .................................................... 58

United States v. Pelton, 578 F.2d 701 (8th Cir. 1978)................................................... 77

United States v. Perez, 414 F.3d 302 (2d Cir. 2005) .................................................... 92

United States v. Persico, 832 F.2d 705 (2d Cir. 1987) ................................................. 61

United States v. Pierce, 785 F.3d 832 (2d Cir. 2015) ................................................... 48

United States v. Rashkovski, 301 F.3d 1133 (9th Cir. 2002) ........................................ 77

United States v. Robertson, 514 U.S. 669 (1995)................................................... 53, 54

United States v. Sabhnani, 599 F.3d 215 (2d Cir. 2010) ........................................ 46, 94

United States v. Salerno, 481 U.S. 739 (1987) ............................................................. 89

United States v. Scott, 979 F.3d 986 (2d Cir. 2020)...................................................... 89

United States v. Sirois, 87 F.3d 34 (2d Cir. 1996)................................................... 63, 64

United States v. Smith, 413 F.3d 1253 (10th Cir. 2005) ............................................... 51

United States v. Torres, 129 F.3d 710 (2d Cir. 1997) ................................................... 55

United States v. Toviave, 761 F.3d 623 (6th Cir. 2014) ................................................ 99

United States v. Turkette, 452 U.S. 576 (1981) ...................................................... 50, 51

United States v. Vargas-Cordon, 733 F.3d 366 (2d Cir. 2013) .................................... 69

United States v. Vickers, 708 Fed. Appx. 732 (2d Cir. 2017) ...................................... 93

United States v. Waqar, 997 F.3d 481 (2d Cir. 2021) .................................................. 76

United States v. Winningham, 953 F. Supp. 1068 (D. Minn. 1996)............................... 67

United States v. Wright, 774 F.3d 1085 (6th Cir. 2014)................................................ 63

United States v. Zupnik, 989 F.3d 649 (8th Cir. 2021) ................................................. 76

<u>INTRODUCTION</u>

The government respectfully submits this memorandum of law in opposition to the defendant Robert Sylvester Kelly's motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. <u>See</u> Def. Mem. of Law in Supp. of a Judgment of Acquittal, ECF Docket Entry No. 269 ("Mot.").

On September 27, 2021, Kelly was convicted, following a six-week jury trial, of racketeering, in violation of Title 18, United States Code, Section 1962(c) (Count One); transportation of "Jane" for the purpose of illegal sexual activity, in violation of Title 18, United States Code, Section 2421(a) (Count Two); coercion of Jane for the purpose of illegal sexual activity, in violation of Title 18, United States Code, Section 2422(a) (Count Three); coercion of Jane, as a minor, for the purpose of illegal sexual activity, in violation of Title 18, United States Code, Section 2422(b) (Count Four); transportation of Jane, as a minor, for the purpose of illegal sexual activity, in violation of Title 18, United States Code, Section 2423(a) (Count Five); transportation of "Faith" for the purpose of illegal sexual activity, in violation of Title 18, United States Code, Section 2421(a) (Count Six); coercion of Faith for the purpose of illegal sexual activity, in violation of Title 18, United States Code, Section 2422(a) (Count Seven); transportation of Faith for the purpose of illegal sexual activity, in violation of Title 18, United States Code, Section 2421(a) (Count Eight); and coercion of Faith for the purpose of illegal sexual activity, in violation of Title 18, United States Code, Section 2422(a) (Count Nine).

Kelly now moves to set aside his convictions. He argues that the Court should reverse his convictions because, he asserts, no rational juror could have found the evidence sufficient to support his convictions. For the reasons set forth below, his motion is without merit and should be denied.

<u>FACTUAL BACKGROUND</u>

The evidence adduced at trial consisted of testimony from 50 witnesses, including 45 witnesses called by the government and five called by the defendant, and hundreds of exhibits admitted at trial. A summary of the evidence supporting each of the counts of which the defendant was convicted is set forth below.

I.      <u>Kelly and the Enterprise</u>

Since the 1990s, Robert Kelly has recorded and performed as a professional musician, touring across the United States and beyond. (T. 672, 674 (Smith)). Kelly primarily resided and recorded his music in Chicago. In the 1990s, he resided at an apartment in downtown Chicago and later at 1010 George Street in Chicago, Illinois (T. 4053 (Hood), 1336 (K Williams), 1644-45 (Stephanie); GX 501(a), GX 501(b)), and recorded music at CRC Recording Company, a recording studio in Chicago. (T. 684 (Smith), 3285 (Angela)). In approximately 2003, Kelly used a recording studio located at 865 North Larabee Street in Chicago, which was formerly named Chicago Trax. (T. 1421 (Arnold)). In or about 2004, Kelly stopped using that studio and began to use one in the basement of his residence in Olympia Fields, Illinois ("Olympia Fields").[1] (T. 1465 (Arnold)). Kelly eventually moved out of Olympia Fields and resided in an apartment at the Trump Towers in Chicago and for a period of time, and maintained multiple houses in Johns Creek, a suburb of Atlanta, Georgia. (T. 3143 (Copeland)). Kelly also used recording studios across the country, including New York, Florida, Georgia and California. (T. 1780-81 (Stephens), 1655 (Stephanie); GX 925, 945(a), 945(b)).

---

[1]      Both the studios on North Larabee and in Olympia Fields were called the "Chocolate Factory." (T. 1421, 1424 (Arnold)).

Kelly surrounded himself with an inner circle, which included a business manager, an accountant, recording engineers, personal assistants, runners, drivers, security personnel and members of his entourage. For example, Demetrius Smith worked for Kelly, including as a personal assistant and tour manager, between 1984 and 1994 and then for a second stint until 1996. (T. 667, 668, 674 (Smith)). Kelly's inner circle in those early years also included his manager Barry Hankerson, as well as Larry Hood, Bruce Kelly and Tyree Jameson. (T. 670-71, 677 (Smith)). After Hankerson, Derrel McDavid served as Kelly's manager and as his accountant (T. 707 (Smith), 3137 (Copeland)). Donnie Lyle served as Kelly's musical director. (T. 1495 (Arnold)). At various times between 2003 and 2011, Tom Arnold served as Kelly's studio manager, road manager and as a personal assistant. (T. 1422, 1424 (Arnold)). Diana Copeland served as Kelly's personal assistant and later, executive assistant, beginning in approximately 2004 and staying for approximately 15 years. (T. 3132, 3134 (Copeland)). Kelly also employed many runners, including Nicholas Williams and later, Anthony Navarro. (T. 556 (Navarro), 3511 (Williams)). Another close associate was Jermaine Maxey, also known as "Bubba." (T. 1518 (Arnold), 2819 (Anna), 114 (Jerhonda), 1949 (S Mayweather)). During the later years, his personal assistants included Milton "June" Brown, George "June Bug" Kelly, Van Pullen, Cheryl Mack, Suzette Mayweather, Alesiette Mayweather, "LeeLee" and "Cassandra." (T. 959 (Jane), 1942 (S Mayweather), 1946 (S Mayweather), 1950 (S Mayweather), 3138 (Copeland), 3388 (A Mayweather), 3391 (A Mayweather), 3795 (Mack)).

Kelly and his inner circle worked to promote Kelly's music and brand, as well as to meet Kelly's demands in his personal life. His inner circle managed the studio and tour buses, ensuring that they were clean and stocked with food and other supplies. (T. 489 (Navarro), 1424 (Arnold)). His assistants arranged for nightly basketball games, both in Chicago and while Kelly

was on tour.  (T. 1506, 1530 (Arnold)).  His runners served as receptionists, answering phones and recording messages.  (T. 491 (Navarro), 1437 (Arnold); see also, e.g., GX 415(a), 417(a), 432(b), 432(c), 433(a), 466).  At times, his runners required visitors to sign non-disclosure agreements and made copies of their identification documents.  (T. 549 (Navarro), 1433-36 (Arnold)).  His runners escorted visitors, including his female guests, to rooms within his residence or his studio.  (T. 1436 (Arnold)).  His inner circle ensured that Kelly attended business meetings.  (T. 3137 (Copeland)).  His inner circle carried Kelly's backpack, which contained, among other items, iPads that he used to record sexual activity.  (T. 971-72 (Jane); 3581 (Chabot), 792 (Jane), 845 (Jane), 971-72 (Jane), 2165 (Faith), 2887-88 (Anna); GX 328(a) (depicting Kelly removing an iPad from his backpack)).

Kelly's inner circle also assisted Kelly in his personal life.  For example, Kelly's inner circle distributed slips of paper with Kelly's telephone number to women and girls. (GX 401; T. 1507-08, 1510 (Arnold)).  Kelly's inner circle selected women and girls to join him backstage and at afterparties.  (T. 771 (Jane), 2130 (Faith), 2552 (Alexis), 2819 (Anna)).  When Kelly used the Chicago Trax studio and when his studio was housed in the basement of his residence in Olympia Fields, his runners regularly picked up his female guests from their homes, nearby train stations and airports.  (T. 1427-28 (Arnold), 499-500 (Navarro)).  One of Kelly's drivers drove one of Kelly's female guests – a 16-year-old girl – from a mall in Jacksonville to meet Kelly in Miami, a five and half hour trip.  (T. 1534 (Arnold), 2559-60 (Alexis), 3666 (Special Agent Chabot); GX 810).  Kelly's inner circle ordered food for Kelly's female guests. (T. 1437 (Arnold)).  Kelly's inner circle also assisted Kelly's female guests in arranging air travel and hotel rooms for Kelly's female guests, allowing his guests to visit Kelly in Chicago and across the United States.  (T. 3158 (Copeland), 3401 (A Mayweather), 1506 (Arnold);

GX 468).  Kelly's inner circle accompanied his female guests to Kelly's basketball games, the mall and the salon.  (T. 973 (Jane), 3150 (Copeland), 3413-14 (A Mayweather)).  Kelly's inner circle picked up medication to treat Kelly's genital herpes.  (T. 510 (Navarro)).  Kelly's inner circle stood guard when Kelly required them to stay on a bus, as punishment.  (T. 3418-35 (A Mayweather); GX 240(c), 240(f), 240(g)).

Kelly's inner circle was required to abide by several rules.  For example, they were required to sign non-disclosure agreements (T. 1594 (Arnold)) and not permitted to take photographs.  (T. 488 (Navarro)).  They were required to knock before entering any rooms. (T. 3213 (Copeland), 3401 (A Mayweather)).  They were required to obtain approval before carrying out even the most mundane of tasks, such as allowing a guest to go to the bathroom. (T. 1439-40 (Arnold) ("We would try to call Rob to get permission")).  There were prohibited from looking at or speaking with any of Kelly's female guests.  (T. 1430-31 (Arnold), 501 (Navarro), 3553 (Williams)).  His female assistants were not permitted to speak with his male assistants in front of Kelly's female guests and girlfriends.  (T. 3401 (A Mayweather)).

Kelly required his inner circle to carry out his demands and to be fiercely loyal. For example, in the middle of one night, Kelly told Suzette Mayweather that she needed to "bring him a sweet potato pie," causing her to travel to a Walmart store open 24 hours a day to purchase him a Patty Labelle sweet potato pie.  (T. 2024-25 (S Mayweather)).  On another occasion, Kelly told Cheryl Mack that "Precious," an aspiring singer whom Mack had introduced to Kelly when Precious was just 17 years old, had filed a lawsuit against Kelly and that Mack needed to travel from Atlanta to Chicago and "pick a team"; before she made her decision, Kelly threatened Mack that "in these types of situations people come up missing."  (T. 3774-75, 3784 (Mack)).  Many members of his inner circle were paid a weekly salary for their efforts, although

when members did not meet Kelly's expectations, Kelly "fined" members of his inner circle by withholding funds owed to them. (T. 524 (Navarro), 1537-39, 1450-41 (Arnold), 3167-69 (Copeland), 2037-38 (S Mayweather)). In addition, Kelly required several members of his inner circle to write letters, falsely confessing to bad conduct, and provide those letters to Kelly so that Kelly could use it for his protection. (T. 3198-3201 (Copeland), 3826-29 (Mack); GX 3500-DC2-8, GX 424-426).

Finally, Kelly expected his inner circle to make sure that his female guests and girlfriends abided by Kelly's rules. For example, when one of Kelly's girlfriends, "Anna," left Kelly on one occasion, Kelly confronted Diana Copeland about how she had "let Anna escape." (T. 3164 (Copeland)). Another time, Kelly directed Copeland to "pay close attention" to his female guests' use of their cellular telephones. See GX 497(a) (text message forwarded by Kelly to Copeland that said, "You should pay close attention to the girls phones I would say ESPECIALLY [Jane] and what exactly they do on them"). On another occasion, Kelly confronted Suzette Mayweather after he learned that several months earlier, she had let a girlfriend, "Dominique," off the tour bus when they were in New Orleans without first obtaining Kelly's permission. (T. 2029-31 (S Mayweather)). When Kelly learned that, on another occasion, Dominique had shared personal information with his assistant Suzette Mayweather, Kelly confronted Suzette Mayweather, leading Suzette Mayweather to falsely tell Kelly that she (Suzette Mayweather) had brought up the conversation that led to Dominique sharing those details because Suzette Mayweather feared what Kelly might do to Dominique. (T. 2032-34 (S Mayweather)).

## II.    Kelly's Genital Herpes Diagnosis

Dr. Kris McGrath was Kelly's primary care physician for over 25 years, beginning in September 1994 until sometime in 2019.  (T. 384, 387, 392, 430-31; GX 237).  At some point after June 2000 and before March 19, 2007, Dr. McGrath concluded that Kelly had contracted genital herpes, a sexually transmitted disease (STD).  (T. 407, 410-11, 421, 462; GX 402).  As was his regular practice, following his diagnosis, Dr. McGrath told Kelly that he had genital herpes and advised Kelly to inform his sexual partners of this fact "so they could make a decision whether or not to have sex with you or not."  (T. 405, 463).  Dr. McGrath further advised Kelly to use a condom during sex and specifically recalled Kelly indicating he understood the doctor's advice when Kelly stated "[t]hen I should not put it in raw, I should put a hood on it" and Dr. McGrath confirmed to Kelly that he should use a condom during sex.  (T. 406, 463).

## III.    Angela

"Angela" first met Kelly in 1991, through her friend Tiffany, during the break between her freshman and sophomore year in high school.  (T. 3274, 3275-76).  Angela was 14 or 15 and, at the time, aspired to be an entertainer; she wanted to sing and dance.  (T. 3274).  Tiffany was also in high school, attending Kenwood Academy in Chicago, and an aspiring singer.  (T. 3276).  Tiffany invited Angela to go to Kelly's apartment in the South Loop of Chicago, telling Angela that Kelly was a singer who had recently released a single.  (T. 3275-76).  Tiffany and Angela went to Kelly's apartment with two other girls who were also in high school.  (T. 3276-77).  When they arrived at the apartment, Bruce Kelly, Demetrius Smith and Larry Hood were at the apartment with the defendant.  (T. 3278-80).  Everyone in the apartment joked around for about an hour in the communal space across from the kitchen, after

which Kelly went into another room and each of the high school girls, including Angela, followed him into the same room "one by one" at different intervals. (T. 3281-82). Either Tiffany or the Kelly invited Angela into the room. (T. 3282). When she entered, Angela observed the three other high school girls in different areas of the room: one was taking off her clothes, another was "standing there," and the third was "taking off her shirt." (T. 3282). Kelly asked Angela "to climb on top of him." (T. 3282-83). Startled, Angela paused for a moment, but then did exactly what Kelly asked her to do. (T. 3283). Kelly then asked Angela "to straddle him and to ride him" and she asked Kelly if she could "grab a condom." (T. 3283). Kelly said he did not have any and Angela told him she did and obtained it. (T. 3283-84). Angela then put the condom on Kelly and the two had sexual intercourse in the presence of the three other high school girls. (T. 3284). In the room, Kelly also had sexual intercourse with at least one other high school girl and "sexual contact" with all of them, including by caressing and suckling their breasts and "fingering" one of the girls. (T. 3284). When Angela and the others left the room, Angela observed that Demetrius Smith, Bruce Kelly and Larry Hood were all still in the apartment. (T. 3284-85). Before Angela and the three other high school girls left the apartment, Kelly invited them to return the following day, which they did. (T. 3285).

For the next few years, Angela saw Kelly almost every day, either at his apartment or at CRC Recording Company, a recording studio in Chicago. (T. 3285). Angela saw Kelly, along with Tiffany and "a different assortment of young ladies on a regular basis." (T. 3286). At some point in 1991, Angela stopped attending high school, after Kelly gave her the option to either "go to school" or "sing." (T. 3286-87). At the time, Angela, Tiffany and another girl were singing together as a group, which Kelly later named "Second Chapter." (T. 3293-96; GX 964).

Kelly continued to have sexual intercourse with Angela while she was between the ages of approximately 15 through 17 on multiple occasions at his apartment, the recording studio, and while they were "on the road." (T. 3287-88). Angela did not want to have sexual intercourse with Kelly but did so because he told her and other girls that they had to "pay [their] dues." (T. 3288-89). Kelly also asked Angela to bring other girls around, telling her to "[g]et [him] some girls or bring [him] some new talent." (T. 3290). Towards the end of 1992 and into early 1993, Kelly's sexual interactions with Angela became less frequent, though they still occurred. (T. 3290).

IV.  Aaliyah

In approximately 1992, in Detroit, Michigan, Kelly and his tour manager, Demetrius Smith, met Aaliyah Haughton ("Aaliyah") and her family; Aaliyah was the niece of Kelly's manager at the time, Barry Hankerson. (T. 673, 677-78, 751; GX 948(c), 1014). In approximately January 1992, Kelly introduced Angela, Tiffany and the third girl in their singing group to Aaliyah. (T. 3292-94). Prior to meeting Aaliyah, Kelly told Angela that Aaliyah "was the next up and coming artist, the next hottest wave coming out of Detroit." (T. 3292). At the meeting, which took place on Aaliyah's birthday, Kelly told Aaliyah that Angela, Tiffany and the third girl were going to be her "background," like the singing group Public Announcement was for him, and would give Aaliyah "her street vibe" and that they would also "be there to be her friends." (T. 3295-96). Aaliyah was 12 years old at the time. (T. 3296). Thereafter, Angela saw Aaliyah regularly while Aaliyah was in Chicago working on her first album, "Age Ain't Nothing But a Number," which was written and produced by Kelly. (T. 3296-97, 684; GX 901).

Kelly, fully aware of Aaliyah's age (GX 902), engaged in inappropriate behavior with Aaliyah, "seducing" her and sometimes spending hours alone with Aaliyah in his

apartment. (T. 689-92, 686-88). Kelly began sexually abusing Aaliyah beginning from at least 1992 or 1993 when she was 13 or 14 years old. (T. 3302-03, 3306). In 1992 or 1993, Aaliyah accompanied Kelly on tour, including in Washington, D.C. (T. 3299). On at least one occasion during the tour, Kelly performed oral sex on Aaliyah inside of the tour bus, which was witnessed by Angela. (T. 3306). Also, during this tour, as punishment for Angela, Aaliyah and the other girls disobeying his orders to stay in the hotel, Kelly told the girls that "it was dues time," and they "would have to put out that night," a reference to sexual intercourse or other sexual contact as punishment. (T. 3288-89, 3302-03).

In August 1994, while on tour in or around Macon, Georgia (T. 692; GX 1014), just before taking the stage, Kelly approached Smith and told him that "Aaliyah was in trouble." (T. 692). Despite having additional performances on the tour (T. 697), Kelly instructed Smith to get make flight reservations for him because they "need[ed] to get home" immediately after the show to Chicago. (T. 693, 695). Smith advised Kelly to call Hankerson, Aaliyah's uncle and Kelly's business manager, but Kelly refused, saying "'Don't call Barry . . . it's deeper than you think.'" (T. 693). Based on Kelly's instruction, Smith arranged round trip airline tickets for Kelly, Smith and his security guard, Tyree Jameson. (T. 695, 697). On the plane ride back to Chicago, Kelly, who was concerned and "crying a lot," explained to Smith that Aaliyah believed she was pregnant. (T. 703-04, 707-08). Kelly also told Smith that, after speaking with his accountant and manager, Darrell McDavid, he had devised a plan to marry Aaliyah so that he could avoid jail. (T. 706-07). At some point after landing in Chicago early in the morning (T. 709), Kelly and Smith made a stop at Kelly's apartment where Smith raised reservations about the Kelly's plan to marry Aaliyah and Kelly responded "whose side was [Smith] on." (T. 710). Kelly, Smith, McDavid and Jameson then gathered at a Sheraton hotel suite where Aaliyah was

waiting. (T. 711). At the hotel suite, the group discussed Kelly's plan to marry Aaliyah. (T. 712). Aaliyah, who was a minor and only had a school identification card (T. 714), did not have identification showing she was 18 years old (T. 713), and therefore was not old enough to get a marriage license (T. 615, 616). Smith suggested to the group, which included Kelly, that he could get an identification card for Aaliyah from a local welfare office if he paid an employee cash. (T. 712-14, 743-44). The group also discussed getting another piece of identification for Aaliyah from a friend of Kelly's who worked at a courier service facility. (T. 713-14).

After these discussions, Smith obtained $500 cash from McDavid and the group headed out to obtain the identification. (T. 715, 716, 719). Smith, Aaliyah and Kelly drove to the public aid office (T. 716), after which Smith went inside and offered $500 cash to a public aid office employee to obtain a fraudulent ID for Aaliyah. (T. 718, 719-20). The public aid office employee, who was a state government employee and not permitted by law to accept cash in exchange for creating the identification (T. 3700-01, 3708-09), took the cash and agreed to create an identification card for Aaliyah. (T. 718-19). Kelly waited in the car (T. 721), while Aaliyah went inside where the employee took Aaliyah's photograph and gave them the fraudulent identification card (T. 719-20), a card for which Aaliyah provided none of the requisite documentation (T. 722), was not eligible to receive (T. 3701-04, 3708) and, even if eligible, would have taken approximately 30 days to be issued by the public aid office (T. 3702, 3708). No record of any legitimate identification card for Aaliyah was saved in the public aid office's files. (T. 3712-13; GX 904, 905). Smith and Aaliyah returned to the car where Kelly was waiting, after which Kelly, Smith, Aaliyah and the others went to a Federal Express, a courier company, to obtain another fake identification card for Aaliyah. (T. 721-23). After

going inside of the Federal Express with Smith, Aaliyah had her picture taken and was given a fake employment card.  (T. 723).

After obtaining the fraudulent identification cards, Kelly, Aaliyah, Smith and McDavid went to the Illinois County Clerk's Office to obtain a marriage license for Kelly and Aaliyah.  (T. 724).  Individuals seeking a marriage license were required to present two forms of identification, i.e., a state identification card, driver's license or domestic or foreign passport, birth certificate, consular card, or baptism records (T. 615-16).  Illinois Department of Public Aid identification cards were not among the regularly accepted forms of identification.  (T. 629).  Initially, the clerk hesitated to accept the fraudulent identifications presented by Aaliyah.  (T. 726).  However, McDavid intervened and convinced the clerk to accept the identifications.  (T. 726-27).  Kelly and Aaliyah, thereafter, filled out and signed an application for marriage, which was not a publicly available document (T. 727, 630, 641), on which Kelly listed his driver's license number ("IL DL K400 7776 7008") and Aaliyah listed an Illinois Department of Public Aid identification number ("IL IDPA B212 096115"), as their forms of identification. (GX 803(a), 828(a), 828(b); T. 628-29).  The marriage application also falsely listed Aaliyah's date of birth as January 16, 1976 and age as 18 years old—despite Aaliyah's true date of birth being in January 1979 (GX 802)—and her occupation as "Messenger Ser.".  (GX 803(a)).  Based on the information provided, the Clerk's Office issued a marriage license to Robert S. Kelly and Aaliyah D. Haughton.  (GX 803(b); T. 631-32).  Kelly, Smith and the others also visited a friend of Kelly's, Keith Williams, in order to find someone to officiate the wedding.  (T. 727, 1344-45).  Williams recommended a friend Nathan Edmond, a church elder and licensed minister, who agreed to officiate the wedding.  (T. 1345, 2415-16, 2418; GX 803(b)).

After obtaining what they needed to effectuate the wedding, Kelly, Aaliyah, Smith and the others returned to the Sheraton hotel suite. (T. 727). When Edmond arrived at the hotel suite, he was asked to sign a confidentiality agreement. (T. 2420-21). Edmond refused but promised not to speak to anyone about the wedding. (T. 2421). Edmond, who had never before met Kelly or Aaliyah, then conducted a hasty ten-minute ceremony in the hotel suite where he married Kelly and Aaliyah, who were each dressed in jogging suits. (T. 746, 2418, 2422-23). The marriage license, signed by Edmond, was filed with the Cook County Clerk's Office and a certification of marriage, stating that Kelly and Aaliyah were married on August 31, 1994, was issued. (GX 803(b), 803(c); T. 637, 640-41, 2416, 2423). A few minutes after the ceremony, Kelly, Smith and Jameson left to fly back to the concert venue to continue the defendant's tour. (T. 747). Aaliyah did not leave with them. (T. 747). Shortly after the secret wedding, the marriage was annulled. (GX 804). Subsequently, on August 25, 2001, Aaliyah died in an airplane crash. (T. 677, 3291-92; GX 805).

V.      Stephanie

"Stephanie" was born in mid-October 1981. (T. 1620, GX 807). She grew up in Chicago and ultimately finished high school at the Chicago Academy of the Arts, where she graduated in approximately June 1999. (T. 1620). During the summer of 1998, when Stephanie was 16 years old, she was at the Rock 'N Roll McDonald's in downtown Chicago with her then-boyfriend and two other friends on a double date. (T. 1622, 1625, GX 520). While standing by herself at the register, a man approached Stephanie and asked her age; she responded that she was 16. (T. 1623). The man then asked if she knew who R. Kelly was; and she responded she did. (T. 1623). The man gestured over to Kelly, who was seated in a nearby booth looking at Stephanie, and told Stephanie that Kelly wanted her to call him and then gave Stephanie a

handwritten note with Kelly's phone number on it. (T. 1623-24). Thereafter, Stephanie talked to her friends at the McDonald's about what had occurred and then threw the phone number away, as she did not intend to call Kelly at that time. (T. 1624).

Approximately one year later, in the summer of 1999, when Stephanie was 17 years old, she met Kelly. (T. 1624-26). During that summer, Stephanie worked as a barista at a coffee shop located in a hotel in downtown Chicago on a 5 a.m. to 2 p.m. shift. (T. 1626-27). During a shift, a co-worker informed Stephanie that R. Kelly was at the Nike store just around the corner from the hotel, on Michigan Avenue (also known as the "Magnificent Mile"). (T. 1628-29, 1673). Stephanie decided to go to the Nike store to see if Kelly would remember her and to ask him if he would listen to her friend, Katherine, sing. (T. 1629). Katherine was Stephanie's classmate at the Chicago Academy of the Arts, specializing in music, and was an aspiring singer at the time. (T. 1628, 2898-2900). When Stephanie arrived at the Nike store and was walking in, Kelly was walking out. (T. 1629). Stephanie asked Kelly if he remembered her and he indicated he did. (T. 1629). Stephanie told Kelly she wanted to ask him a question and he invited her to walk with him to his car, which Stephanie did, and Kelly invited Stephanie inside his car. (T. 1629-30). Inside the car, Stephanie asked Kelly if he would meet her friend Katherine, who "had a great voice" and potentially help Katherine with her career. (T. 1630). Kelly told Stephanie "he thought we could arrange that, but he'd like to get to know me and he also said that he likes to cuddle and would I be okay with that," to which Stephanie responded yes. (T. 1630). Kelly then gave Stephanie his phone number and told Stephanie to call him, which she ultimately did. (T. 1630).

Approximately a week or two later, Stephanie saw Kelly again at his recording studio just off of Chicago Avenue on the edge of the Cabrini-Green neighborhood. (T. 1630-31,

14

1634; GX 525(u)).  Stephanie was buzzed into the studio and one of Kelly's employees brought her up to a room on the second floor, told Stephanie to stay there and wait for Kelly, and then left.  (T. 1632-33, 1634-35; GX 525(p), 525(k)).  Stephanie waited for Kelly alone in the room for several hours, until he came into the room.  (T. 1633).  The two conversed for a period of time and ultimately had sexual intercourse in the room that day.  (T. 1633).  During their conversation, among other things, Kelly told Stephanie he wanted her to call him "daddy." (T. 1633).

Following this encounter, Stephanie continued to see Kelly for approximately six months, mostly at his studio.  (T. 1634-35).  Kelly had sexual intercourse with Stephanie essentially every time they saw each other.  (T. 1637-38).  At various times, Stephanie would be picked up and driven to the studio by one of Kelly's employees and driven home by an employee.  (T. 1635-36; GX 23).  During their interactions, Kelly "was one of two ways.  He was either very nice and charming, jovial, or he was very controlling, intimidating.  He'd raise his voice at [Stephanie] and he could . . . put the fear of God in [her] very quickly."  (T. 1637). Stephanie's sexual interactions with Kelly were "humiliating."  (T. 1638).  Stephanie described those interactions as follows:

> He would be very specific in how he wanted me to be. He would put me in positions that he wanted me to be in. He would tell me that he wanted me – he'd tell me to get undressed and then he would position my body in a way and he would then say, all right, I'm going to go and when I come back I want you to be just like this. So I would just be completely naked with my butt in the air and just like waiting there for him to come have his way. . . . Sometimes hours.

(T. 1638).  When Kelly returned to the room and Stephanie was not in the position he had told her to be in, Kelly became very disappointed and angry, yelling at her.  (T. 1638).  Kelly also often ejaculated on Stephanie's face and instructed her on what sounds she should make during

sex. (T. 1638-39). On one occasion, after watching the defendant play a basketball game, Stephanie and Kelly went inside the passenger portion of an SUV. (T. 1651). The front driver and passenger seats were occupied by the Kelly's employees. (T. 1651, 1705). While inside, Kelly told Stephanie to give him oral sex. (T. 1651). Stephanie did so, but it "was really disgusting because he had just played basketball for an hour and, so [she] was really ashamed while [she] was doing it" and tried "to do it quietly and get it done." (T. 1651-52). Kelly stopped her and said that she "need[ed] to make noises while [she] was performing oral sex on him" because he wanted the other people in the car to know that she was giving him oral sex. (T. 1652).

Within the first month or two of Stephanie having met Kelly, Stephanie again asked Kelly if he would meet her friend Katherine. (T. 1639). Kelly agreed and Katherine, Stephanie and Stephanie's mom went to his studio for this purpose. (T. 1639-40, 2900-01). At the studio, Katherine performed a song for Kelly. (T. 1640-41, 2901). Kelly indicated that Katherine could sing, but seemed unimpressed and quickly dismissed the three of them as he was not thrilled about Stephanie's mom being there. (T. 1641, 2901).

On either the first or second occasion that Stephanie visited Kelly's studio, Kelly asked Stephanie how old she was and Stephanie responded that she was 17. (T. 1642-43). At some point after this conversation, while Stephanie was still 17, Kelly videotaped Stephanie engaging in sexual contact with him. (T. 1643). Stephanie had agreed to meet Kelly at his recording studio and was waiting for him in a room at the studio when he called her and told her he was on his way to pick her up and wanted to make a video of them having sex. (T. 1643). Thereafter, Kelly drove Stephanie to his house in the Lincoln Park neighborhood of Chicago on George Street. (T. 1644; GX 501(b)).

16

Upon their arrival at the house, Kelly "quickly got a video camera" and instructed Stephanie to come around the walkway at the entrance and began filming as she entered the frame, instructing Stephanie to undress and walk over to the sofa. (T. 1645). At this point, Kelly was holding the video camera, which was a large VHS video camera. (T. 1645, 1647). After Stephanie walked over to the sofa, as Kelly instructed, Kelly came up behind her and started having sex with her. (T. 1645). At that point, Kelly had placed the video camera on the table in front of Stephanie. (T. 1645-46). Stephanie was completely naked and the video camera was facing her and was recording. (T. 1646). Kelly was penetrating Stephanie vaginally from behind. (T. 1646). Kelly then indicated he would retrieve a dildo and wanted Stephanie to put the dildo in her mouth as he had sex with her. (T. 1646). Kelly did so and then put the dildo inside Stephanie's mouth and continued to have sexual intercourse with her from behind. (T. 1646-47). While this occurred, the VHS video camera remained "right in front of [Stephanie]" – facing Stephanie and her private areas, while she was completely naked – and was still recording. (T. 1647).

In approximately October 1999,[2] Stephanie travelled to Orlando, Florida for a long weekend to see Kelly with her friend Katherine. (T. 1652-57, 2902-03). Kelly was recording music in Orlando and had previously asked Stephanie to meet him in Orlando and said she could bring her friend Katherine. (T. 1653). Kelly paid for their travel and one of his employees made their travel arrangements. (T. 1653-54, 2903). Upon their arrival in Orlando, Stephanie and Katherine were taken to a furnished rental house in a cul-de-sac. (T. 1654). They stayed there "for a long time . . . a few days" without any contact from Kelly and just "sat in the

---

[2]      Stephanie turned 18 in mid-October 1999. She could not recall whether this trip occurred before or after her 18th birthday. (T. 1653; see also GX 1007).

house alone" and did not leave the house at all.  (T. 1655).  On the last day of their trip, Kelly showed up at the house and took Stephanie to a recording studio.  (T. 1655).  At the studio, Kelly told Stephanie that he wanted to record her giving him oral sex and then he proceeded to do just that.  (T. 1656).  This time, Kelly used a handheld video camera, smaller than the one he had used to video-record Stephanie at his residence in Lincoln Park, to record Stephanie's face as Kelly's penis was in her mouth and she was giving him oral sex.  (T. 1656).  Kelly ejaculated on Stephanie's face and did not let her wipe it off, instead telling Stephanie she had to walk down the hall to another bathroom to wipe her face.  (T. 2910).  Stephanie felt "humiliated."  (T. 1657).  Thereafter, Kelly drove Stephanie back to the house as she cried in the car.  (T. 1657).  She and Katherine then returned to Chicago.  (T. 1657).

Following this trip, Stephanie did not want to see Kelly anymore.  (T. 1657).  She "felt used and humiliated and degraded and [she] just didn't want to be abused anymore."  (T. 1657).  Stephanie did, however, see Kelly again, to stay in his good graces because she wanted Kelly to give her the sex tapes he had made of her.  (T. 1657-58).  She discussed getting the videotapes from Kelly or having him destroy them in person with Kelly on two occasions, but Kelly did not do so.  (T. 1705).  Thereafter, Stephanie called Kelly and asked him again to give her the tapes or destroy them; Kelly suggested he would consider it if she came to see him, however, Stephanie concluded from the two previous in-person discussions that Kelly had no intention of doing so she did not go to see him.  (T. 1658, 1705).  That was the last time Stephanie spoke with Kelly.  (T. 1658).

During the course of her time with Kelly, Kelly made clear to Stephanie that she was not permitted to speak to other men.  (T. 1648).  On one occasion, she was at a Houston's restaurant in Chicago with Kelly and two rappers, whom Kelly referred to as Boo and Gotti.

(T. 1648). Stephanie was not allowed to speak to Boo and Gotti during the meal, but heard Kelly

tell them "that he likes young girls and that people make such a big deal of it but it really isn't a

big deal because, even, look at Jerry Lee Lewis, he's a genius and I'm a genius and we should be

allowed to do whatever we want because of what we give to this world." (T. 1648-49).

VI.    Addie

On September 2, 1994, "Addie," a 17-year-old girl, attended the Budweiser

SuperFest II concert at the Miami Arena in Miami Florida, with a friend. (T. 1730, 1732-33;

GX 201, 1014). At the end of the concert, Kelly made an announcement that women over the

age of 18 could go backstage. (T. 1735, 1737-38). Given the announcement, Addie did not

intend to go backstage despite having all-access passes because she was under the age of 18.

(T. 1736, 1737). However, a few minutes after the concert ended, two African American men

who appeared to be Kelly's associates, approached Addie and her friend and asked them if they

wanted to go backstage to get Kelly's autograph. (T. 1735-36, 1767). The men, who did not ask

Addie or her friend whether they were over 18, escorted Addie and her friend backstage to

Kelly's dressing room. (T. 1738). At no point while they were backstage did anyone check

Addie or her friend's identification. (T. 1738).

Addie and her friend were brought to a dressing room where Kelly was present,

along with what appeared to be members of the media interviewing Kelly. (T. 1738-39).

Shortly after arriving, Addie approached Kelly and asked if he would autograph her program.

Kelly asked Addie her name and signed the program "To Addie" with his signature. (T. 173-40;

GX 201). Addie, who was a trained dancer who ultimately attended a performing arts

conservatory (T. 1727-28), also mentioned to Kelly that she was an aspiring artist, in response to

which Kelly told Addie the name of his hotel, suggested that Addie come by his hotel room for

an audition and wrote down a hotel number, "Room # 1301," on her program. (T. 1740-41; GX 201). Towards the end of their discussion, Addie told Kelly that she was not sure she was allowed to be in the dressing room because she was only 17 years old. (T. 1740, 1742). Kelly then spoke to two of his bouncers, and quickly thereafter, the bouncers escorted everyone from the dressing room except Addie and her friend, who the bouncers told to stay. (T. 1742). As a result, Addie and her friend were left alone in the dressing room with Kelly. (T. 1742-43).

Once alone in the room, Kelly began talking about a song he was working on for a movie soundtrack, which he then played for them. (T. 1743). Kelly then asked Addie and her friend to play a game with him to see which girl could kiss better. (T. 1743-44). Kelly kissed Addie's friend, and then Addie. (T. 1744). Addie initially kissed Kelly back and then began pulling away, but Kelly became more aggressive, holding Addie's wrists, and moved her towards the dressing area where he unzippered her shorts, pulled them down and penetrated her vagina from behind with his penis. (T. 1744-46). Kelly also attempted to get Addie's friend to participate by grabbing Addie's friend's hands, but her friend refused. (T. 1746). After Kelly finished having intercourse with Addie, Addie, who was in a state of shock, pulled up her shorts, opened the door, which they had to unlock, and ran out of the room with her friend. (T. 1746-47).

VII.  <u>Kate</u>

"Kate" met Kelly in 2001 when she was 27 years old and living in Chicago. (T. 2627-28). Kate had a sexual relationship with Kelly and at times, with other women at Kelly's direction. (T. 2632-36). Because Kate knew Kelly had multiple sexual partners, she expressed to him that she was concerned that she might contract an STD and asked him whether he would use protection, but he said he would not. (T. 2636-37). Kate also asked Kelly if he

was "okay," referring to whether he had any STDS, and he did not disclose to her that he had any. (T. 2637). While she was still in a sexual relationship with Kelly and not in a sexual relationship with anyone else, Kate contracted genital herpes. (T. 2638). Kate told Kelly that she believed that he had transmitted an STD to her, but Kelly did not respond. (T. 2639). In 2004, Kate retained Susan Loggans, a lawyer, to assist her with a possible legal action against Kelly; she ultimately reached a settlement whereby Kelly paid her $200,000 and she released Kelly and others, including Derrel McDavid, from any further liability for giving her genital herpes and agreed to not make any public statements about their relationship. (T. 2639-41; GX 930). As a result of Kate's genital herpes diagnosis, she has told potential future sexual partners about her diagnosis and many of those relationships have not come to fruition as a result of that disclosure. (T. 9646).

VIII.  Sonja

On August 12, 2003, Sonja, who was working as a radio station intern met Kelly while he was at a mall in Utah when she was approximately 21 years old.[3] (T. 2744, 2748; GX 202, 203, 809). Sonja, hoping to get an interview with Kelly to kickstart her career at the radio station, spoke to Kelly's manager. (T. 2747-49). Kelly did not agree to an interview at the time (T. 2749-50), but at some point during the interaction, Kelly or a member of his entourage gave Sonja a ripped off piece of paper with "Rob" and Kelly's telephone number written on it. (T. 2751-52). Sonja, who was with a friend at the time, also took a photograph with Kelly and her friend in front of his tour bus. (T. 2750-51; GX 202, 203). Sonja told her boss at the radio

---

[33]     While the jury ultimately found Racketeering Acts Three and Four—which alleged certain crimes related to Sonja—not proven, the evidence presented at trial concerning Sonja also constituted evidence of the existence of the enterprise, the means and methods of the enterprise and the defendant's pattern of racketeering.

station about meeting Kelly and, still hoping to get an interview with him, contacted Kelly at the number she had been given. (T. 2752). Kelly did not agree to a telephone interview, but subsequently invited Sonja to travel to his studio referred to as the Chocolate Factory in Chicago, Illinois, purportedly to conduct an interview of him. (T. 2752-54). One of Kelly's associates arranged Sonja's airplane tickets, which Kelly paid for . (T. 2753-54, 2756). Following her arrival in Chicago in March 2004, Sonja was directed to go to the Chocolate Factory recording studio. (T. 2757; GX 156). In the reception area, one of Kelly's associates asked Sonja if she needed "protection," which he explained, after Sonja asked for clarification because she did not understand his question, meant condoms. (T. 2758-59). Sonja, surprised by the question, responded "No, I'm not here for that." (T. 2759). She was then escorted to a small, poorly-lit, windowless room with a couch and table within the studio by one of Kelly's associates, who also took and searched her suitcase without her consent. (T. 2759-61, 2763, 2776).

Shortly thereafter, while in the room, another associate entered, took and made a copy of Sonja's driver's license, searched through her cellular telephone and made a list of her telephone contacts, directed her to sign what she believed to be a nondisclosure agreement, advised her of rules that she had to abide by, including that she was not allowed to look up, talk to anyone or do anything, told her that Kelly would come in soon, and then left the room, closing the door behind him. (T. 2759-62). Sonja was thereafter kept against her will for approximately three to four days in the room, which was locked from the outside, without sustenance. (T. 2762, 2768, 2775). After realizing she was locked in the room, scared, Sonja banged on the door and repeatedly contacted the front desk of the studio using a telephone located in the room, asking to be let out, for food and water, and to use the restroom. (T. 2764-66). She was told, however, by Kelly's associates, that these requests would need to be approved by Kelly. (T. 2765-66). On a

few limited occasions, Sonja was allowed to use the restroom, but was generally escorted back and forth by one of Kelly's associates, during which time she was able to hear sounds consistent with people have sex in other rooms. (T. 2766-68). Finally, one of Kelly's associates brought her food and a beverage in a cup. (T. 2768-69). Almost immediately after taking a few bites of food and a few sips of the drink, she became extremely tired. (T. 2769-70). She awoke some time thereafter, confused, to find that her underwear—which she had previously been wearing—had been removed and placed on the arm of the couch, a "wetness" in her vaginal area and on her thighs, and Kelly in the corner of the room "doing up" his pants and belt. (T. 2770-72). All of these circumstances made it apparent that Kelly had sexually assaulted Sonja while she was unconscious. (T. 2772, 2811). After Sonja rose from the couch, Kelly hugged her, grabbed her buttocks, told her he would return shortly, and left the room. (T. 2772-73). Shortly thereafter, one of Kelly's associates entered the room, told Sonja that Kelly would not be returning, told her not to tell anyone about her time at the studio, made her sign another confidentiality agreement and said "don't fuck with Mr. Kelly," which she took as a threat. (T. 2773-74). Sonja, who did not previously have, and could not have afforded her own return ticket home, signed the agreement and was then allowed to fly home. (T. 2774-75).

IX.    Alexis

Alexis was born in early July 1990. (GX 810). On March 26, 2006, when Alexis was 15 years old, Alexis met Kelly after one of Kelly's concerts in Jacksonville, Florida. (T. 2589; GX 212). A member of Kelly's inner circle told Alexis and her friend that Kelly wanted to meet Alexis. (T. 2552). Kelly arranged to meet Alexis at a Jacksonville mall the following day and they met on his tour bus, where Alexis signed a nondisclosure agreement; a friend drove Alexis to the mall because Alexis was just 15 years old and did not yet have a

driver's permit. (T. 2554-55). Thereafter, Kelly arranged for his bus driver, Terry Allen, to transport Alexis by bus from Jacksonville to Miami to meet Kelly in Miami; his runners arranged for Alexis to travel by airplane to meet Kelly in Chicago, including when she was 16 and 17 years old.[4] (T. 2558-60, 2664-65; GX 260, 468-72). Alexis first had sexual contact with Kelly in Chicago and again on most occasions that she saw him, and Kelly did not use protection and never told her that he had contracted an STD.[5] (T. 2558-59).

X.     Louis and Alex

       "Louis" was born on February 1989. (GX 811). In 2006, When Louis, an aspiring musical artist, was 17 years old and in his senior year of high school, Kelly gave Louis his telephone number after Louis helped him at a McDonalds in Markham, Illinois, a suburb of Chicago, where Louis was working. (T. 1806-08, 1811-12; GX 154). Louis told his mom about meeting Kelly and his mom later called the telephone number Kelly gave Louis and told Kelly that Louis was an aspiring musician; Kelly invited Louis and his family to a Christmas party at Olympia Fields, which they attended. (T. 1808-11). Kelly also invited Louis to meet him in his

---

    [4]     Alexis did not recall the dates of her travel, but she recalled that when she traveled to Miami, Kelly ruptured his appendix (T. 2561); other evidence established that Kelly ruptured his appendix while he was in Miami for the Super Bowl in February 2007. (T. 1534, 3666; GX 810). Alexis testified that when she was under 18 years old, she only traveled by airplane to see Kelly and recalled that on one such trip to Chicago, she lost her luggage. (T. 2565, 2568). Phone records established that while her cell phone was in Chicago, Alexis called American Airlines' telephone number for lost baggage on March 25 and 27, 2007, when Alexis was just 16 years old. (GX 145, 1003). A boarding pass Alexis provided to the government showed that another trip occurred in late July 2007, a few weeks after Alexis turned 17 years old. (GX 215).

    [5]     Alexis testified that when she met Kelly, she "may" have told Kelly that she was just 15 years old and that Kelly's "general response was just there's nothing wrong with platonic friendship." (T. 2557). Alexis conceded she ultimately had sexual contact with Kelly, including in her teens, but refused to admit that it occurred prior to turning 18 years old (despite that she saw Kelly on multiple occasions in Miami, Jacksonville and Chicago while she was under 18 years old). (T. 2557-58).

recording studio, ostensibly so that Kelly could help Louis as a musician. (T. 1814-16). Instead, Kelly gave Louis, still just 17 years old, oral sex, and recorded their sexual encounters. (T. 1828-29, 1843-44). On another occasion, Kelly directed a female to give Louis oral sex. (T. 1844-45).

While Louis was still in high school, Louis introduced Kelly to his best friend "Alex," who was a year younger than Louis, and Kelly gave Alex a piece of paper with his phone number. (T. 1837, 3331, 3335). Kelly began to communicate by phone with Alex when he was still 17 years old and eventually began a sexual relationship with Alex. (T. 3343-44, 3337; GX 153). At Kelly's direction, Alex engaged in sexual activity, including intercourse, with other women in Kelly's presence. (T. 3345-62, 2883-84). Kelly regularly recorded Alex's sexual encounters with Kelly and other women. (T. 3445-46, 3348, 3352, 3554-56). Kelly was always in charge, directing the participants as to precisely what to do sexually, and the women, at times, appeared zombie-ish. (T. 3558). Government Exhibits 341, 342 and 343 depicted one such example where Kelly, naked from the waist down, directed Alex and another woman (not Jane) to engage in oral and vaginal sex. Throughout, Alex and the woman do not smile and otherwise appear wholly unengaged, and Kelly directs every action, including by positioning the woman and Alex into various sexual positions and records the encounter. See, e.g., GX 342(c) (still image showing Kelly position Alex's penis inside the woman's vagina); GX 342(b) (still image showing Kelly holding the woman's hair and pushing her mouth back and forth onto Alex's penis).

In 2019, Kelly directed both Louis and Alex to handwrite statements falsely denying that they ever had sexual contact with Kelly. (T. 1875-79).

XI.    Jerhonda

        Jerhonda was born in April 1993.[6]  (GX 813).  Jerhonda first encountered Kelly

when she attended a court proceeding in Chicago, Illinois, in April 2008, when Jerhonda was just

14 years old.  (T. 111).  In May of 2009, shortly after Pace turned 16 years old, a close associate,

"Bubba" (Jermaine Maxey), invited Jerhonda to attend a party at Kelly's residence in Olympia

Fields, Illinois.  (T. 114).  At the party, Jerhonda told Kelly that she was 19 years old when she

was in fact 16 years old.  Kelly and Jerhonda exchanged telephone numbers, and thereafter, they

began communicating on the telephone.  (T. 118-19).  Within a few days, Kelly invited Jerhonda

back to his residence in Olympia Fields and directed her to bring a swim suit.  One of Kelly's

runners, "Anthony," who Jerhonda identified through a photograph as Anthony Navarro, picked

up Jerhonda at a nearby train station and transported her to Kelly's residence.  (T. 120-21, 155-

56).  When she arrived, Jerhonda was escorted to the pool area where she changed into her suit.

(T. 121-22).  Kelly met her there, and directed her to walk back and forth and to remove her

bathing suit, which she did.  (T. 122).  Kelly thereafter engaged in sexual contact with Jerhonda

and then had sexual intercourse with her.  (T. 123).  Jerhonda then told Kelly that she was in fact

16 years old – not 19 years old as she had initially told him; Kelly's response was nonchalant and

he instructed her to act 21 years old and tell others that she was 19 years old.  (T. 123).  He did

not use any protection and never disclosed to her that he had contracted an STD.  Kelly took

Jerhonda to the "mirror room" where she rested.  When she was ready to leave, Jerhonda texted

---

        [6]        Because many of the government's witnesses testified using a pseudonym or their
first name only, the government will refer to all of the government's victim witnesses by their
pseudonym or their first name even where, as Jerhonda Pace did, they testified using their full
name.

Kelly and a runner then brought her an envelope with $50 and took her to a nearby train station. (T. 128-30).

During the six months that Jerhonda spent with Kelly, Kelly continued to engage in sexual intercourse with her and Jerhonda contracted genital herpes. (T. 173-75). Jerhonda told Kelly and he arranged for a doctor to examine her and give her medication. (T. 173-74).

At Kelly's request, Jerhonda put Kelly in touch with Dominique, who was then 17 years old and who Jerhonda met through a fan group supporting Kelly. (T. 130-32; GX 817). Dominique began to also spend time with Kelly at Olympia Fields. (T. 131-32; GX 473, 106(a), 817). On one occasion, while Jerhonda was inside of Kelly's residence, Jerhonda learned that police officers arrived at the residence looking for the 17-year-old Dominique. (T. 139-40, 145-46). Jerhonda learned about this when Kelly put a telephone conversation between him and his lawyer on speaker phone in Jerhonda's presence. (T. 139-40, 145-46). Police Officer Garrick Amschl responded to Kelly's Olympia Fields residence on June 13, 2009. (T. 370-71). Once there, he spoke with Derrel McDavid. (T. 373; GX 152(a) (subscriber record showing that (312) 659-1040 belonged to Derrel McDavid).

Jerhonda was in regular telephone communication with Kelly between June 2009 and January 2010. (GX 149). Jerhonda went to Olympia Fields to meet Kelly on several occasions, on each of which she had sexual contact with Kelly. (T. 168). At Olympia Fields, Jerhonda also learned about certain rules that Kelly had promulgated, including that she was not permitted to leave the room in Olympia Fields where she was staying. (T. 132). When Jerhonda broke one of Kelly's rules or otherwise failed to meet his desires, Kelly physically assaulted her and told her that she would be on "punishment." (T. 148-49, 166-68).

Kelly regularly recorded Jerhonda engaging in sexually explicit activity. He used a Canon camera set up on a tripod, as well as his Apple iPhone. (T. 168-69). After he created the recordings, Kelly watched them and instructed Jerhonda on how to improve her sexual techniques with Kelly. (T. 169). Kelly also had Jerhonda sign a confidentiality agreement and write letters that falsely claimed (1) Jerhonda had stolen money and jewelry from Kelly, (2) her sister had arranged for her to falsely claim that Kelly gave her genital herpes, and (3) she worked for Kelly and was fired by Kelly. (T. 149-52).

In January 2010, when Jerhonda was still 16 years old, Jerhonda met Kelly at his Olympia Fields residence, for the last time. (T. 175-76). When Kelly entered the room where Jerhonda had been waiting for Kelly, Jerhonda was using her cellular telephone and did not stand up and greet Kelly as his rules required, angering Kelly. (T. 176). Kelly then slapped her, choked her until she passed out, spit on her and told her to "put down [her] head in shame." (T. 176-77). When she got up off the floor, Kelly and Jerhonda walked to a different room, sat down and Kelly "instructed [her] to perform oral sex on him." (T. 177). Jerhonda complied with Kelly's instruction, and when she finished, Kelly ejaculated on Jerhonda's face. (T. 177). Jerhonda used her T-shirt to wipe off Kelly's semen. (T. 177). Biological testing on the T-shirt later revealed the presence of sperm on the T-Shirt and that the presence of a DNA profile for the recovered sperm matched Kelly's DNA profile. (T. 1373-74, 2469). A DNA expert testified that the probability of randomly finding that DNA profile was one in 11 decillion, far smaller than the population of the earth. (T. 2474-76).

Shortly after, Jerhonda retained Susan Loggans to represent Jerhonda. In connection with that representation, Jerhonda gave Loggans' firm the T-shirt she had when she last saw Kelly and her cell phone. (T. 183). Loggans thereafter negotiated a settlement with

Kelly, the terms of which required Kelly to pay $1.5 million, split between Loggans and Jerhonda. Jerhonda later retained another lawyer, David Fish, Esq., who obtained the T-shirt and cell phone from Ms. Loggans' office. (GX 1015). Fish retained the T-shirt and cell phone until Jerhonda requested their return on November 17, 2017. (GX 1015; T. 201-02). The following day, Jerhonda provided the T-shirt and cell phone to a detective with the Olympia Fields Police Department, where the items were retained until they were provided to other law enforcement agencies, including the Illinois State Police laboratory, which conducted DNA testing on the T-shirt. (T. 201-02; GX 1015).

XII.   Anna

In approximately 2016, Anna met Kelly backstage at one of his concerts when she was approximately 20 years old after Bubba (Maxey) approached her and told her that Kelly wanted to meet her. (T. 2818-19). After Kelly and Anna exchanged contact information at a meet-and-greet event in Kelly's dressing room immediately after the concert, Kelly and Anna began to communicate. (T. 2820). In or about 2016, Kelly started a sexual relationship with Anna, during which time she regularly traveled to visit Kelly at his home in Johns Creek, Georgia, at various concert venues throughout the country and at his Trump Towers apartment and studio in Chicago, Illinois. (T. 2820-21, 2822-25). Anna's travel and hotel accommodations, which were paid for by Kelly, were generally arranged by one of Kelly's assistants. (T. 2822). A few weeks into their relationship, Anna moved in with Kelly and began traveling with him to his performances around the country in his Sprinter van. (T. 2822-23).

During the course of the relationship, Kelly became increasingly controlling and promulgated several rules that he expected Anna to follow. (T. 2821, 2828, 2928-29, 2973, 2875). These rules included: (1) calling Kelly "daddy" (T. 2889); (2) not speaking to or looking

at other men (T. 2840); (3) obtaining approval from Kelly before doing anything, including using the bathroom, moving about the studio, obtaining food, leaving a room or the Sprinter, or going outside (T. 2829, 2831-33); (4) not wearing makeup and wearing only baggy clothes and a baseball cap unless otherwise allowed by Kelly (T. 2835); (5) not having or using social media or the internet (T. 2837); and (6) not conversing with Kelly's other girlfriends or assistants about personal matters (T. 2834-35, 3013). As a result of these rules, if Kelly was not present, Anna was required to ask one of his assistants to obtain authorization from Kelly for food or permission to go to the restroom and, on the occasions Kelly did not provide permission to use the restroom, Anna was forced to urinate in a cup. (T. 2830-33). Kelly's other girlfriends, including Jane, "Joycelyn" (also known as "Joy"), "Vee," "Juice," and Dominique (also known as Nicq), were also required to follow these rules. (T. 2826-28, 2829). Kelly also monitored Anna's telephone use and personal communications with others. (T. 2828, 2834-35, 2876). On one occasion, when he discovered Anna still had a social media application on her cellular telephone, Kelly had his assistant LeeLee watch Anna to make sure she deactivated the account. (T. 2838-40). Kelly also recorded Anna using an iPad while she was in the Sprinter in order to document what she was doing and ensure she did not break his rules. (T. 2832).

Kelly regularly violently punished Anna in various ways when she violated his rules. (T. 2836, 2855-56, 2875, 2953, 2973, 3012-14, 3018-19). For example, Kelly, who is 6'2", became enraged with Anna after one of his concerts because he suspected she had been using her cellular telephone, began yelling, grabbed Anna, who is 5'4" and 125 pounds, and broke her necklace, cutting her chest. (T. 2857-59, 3006-09). After Anna snuck away to the airport without Kelly's knowledge, she attempted to fly home, but did not have the funds to book a flight and so headed back to the hotel where they were staying. (T. 2859-60). Kelly told Anna

he would provide her with a flight home if she wrote a note stating that she had attacked Kelly. (T. 2860). Anna wrote the note as directed, the contents of which were dictated to her by him, so that he could use it as protection in the future. (T. 2860-61, 3011). On another occasion, Kelly smacked Anna in the face at his studio in Chicago for communicating with another man, which he discovered after searching through Anna's cellular telephone. (T. 2856-57, 3013). On yet another occasion, Kelly smacked Anna in the face in the lobby of a Miami hotel because he believed she was looking in the direction of an area where men were standing, a violation of one of his rules. (T. 2862, 3012).

Kelly also violently spanked Anna on multiple occasions, which he recorded on his iPad, as punishment for violating his rules. (T. 2840-42, 2843-44). During these spankings, Kelly would hit Anna so hard that he caused her pain, bruised her body and caused her to cry so hard "snot" came out of her nose. (T. 2840-42, 3015). At times, Kelly also instructed Anna to text him that she liked being spanked—which was not true—after administering the spankings as punishment. (T. 2842-43). In addition to the spankings, as a punishment, Kelly ordered Anna to walk back and forth while nude in high heels for up to approximately 30 minutes, instructing her to call herself denigrating and demeaning names. (T. 2845-46, 2852-54, 3018-19). During these punishments, which Kelly would record using an iPad, Anna would become visibly upset and cry. (T. 2845-46, 2852-54). At times, during these punishments, Kelly would masturbate or have Anna engage in sex acts with him, which she did not want to do. (T. 2855). As punishment for violating his rules, Kelly would also confiscate Anna's cellular telephone for upwards of a few months. (T. 2836-38).

In addition, at Kelly's direction, Anna signed documents provided by Kelly's assistants that were "for his protection" that appeared to be non-disclosure agreements.

(T. 2862-63).  Kelly also instructed Anna to write letters, dictated by him, in which she wrote

embarrassing falsehoods about herself and her family and untrue blackmail schemes against the

defendant (T. 2863-64, 2867-76; GX 430(a), 430(b), 430(c), 430(d), 449), that Kelly safeguarded

in his storage facility (T. 3653) "for him to hold against or down the line if something were to

happen or come about."  (T. 2865).  On one occasion, Anna attempted to film herself writing one

of these false letters ordered by Kelly to document that she was "not wanting to write this" and it

was not truthful, but Kelly discovered the recording after searching through her cellular

telephone and deleted it.  (T. 2864-66).  Kelly also instructed Anna to video record herself on an

iPad doing embarrassing and demeaning things, including things involving bodily fluids that

caused her "humiliation."  (T. 2876-77, 2880).  Anna also witnessed Kelly instruct others to

write similar types of letters, including Jane and Jocelyn, and came across a similar type of letter

written by Dominique in a drawer in Kelly's guesthouse.   (T. 2877-79).  Kelly also instructed

Anna to have her mother relinquish her cellular telephone, remove her clothing, enter his sauna

and write a similar type of false letter claiming to have blackmailed Kelly in case Anna's mother

"were to come against him in any type of way" and as a condition of her visiting Anna.

(T. 2879-81).  After her mother finished writing the letter, which she did so she could see her

daughter, Anna gave it to Kelly's assistant Diana Copeland.  (T. 2880).

   At Kelly's direction, Anna also engaged in sex with Kelly and others, including

on multiple occasions with Jane, Dominique, and Joy, and two occasions with Alex, who she

knew only as "Nephew," an individual otherwise unknown to her, which Anna did not want to

do and which Kelly recorded on an iPad.  (T. 2881-86; GX 68).  During these encounters, Kelly

was in charge, directing the participant's conduct, and he admonished Anna if she did not appear

enthusiastic.  (T. 2882-83).  Kelly, whether engaged in sexual activity with just Anna or with

multiple partners, never used a condom. (T. 2886). At one point, Anna obtained a test for STDs; however, she never received her results because the doctor provided them directly to Kelly's assistant Diana Copeland. (T. 2825-26). Anna ended the relationship with Kelly in approximately December 2018 after deciding she "can't do this anymore." (T. 2821, 3024).

XIII.    Jane

Jane was born on at the end of December 1997. (GX 815). Jane first encountered Kelly at a concert in Orlando, Florida, where Kelly was performing, in April of 2015 when Jane was 17 years old and a junior in high school. (T. 769-70). At the concert, Kelly arranged for one of his employees or a member of in his entourage to provide Jane with a piece of paper with his phone number, which number Jane thereafter called. (T. 773, 779). During their initial communications over the telephone, Jane told Kelly that she was an aspiring singer and Kelly invited Jane to audition for him at the hotel in Orlando where he was staying. (T. 781-82). Jane also falsely told Kelly that she was 18 years old, when she was in fact still 17 years old. (T. 781). Jane thereafter drove to Dolphin hotel in Orlando where Kelly was staying. (T. 784-86). When Jane arrived, Kelly engaged in oral sex with Jane and only after he was sexually satisfied, did he listen to her audition. (T. 787-96). While at the hotel, following a frantic search by Jane's parents, security personnel knocked on the hotel room door in search of a missing 17-year-old girl; Jane told the security personnel that she was 18 years old and presented the security personnel with her driver's license. (T. 793-95). The license provided that Jane was in fact just 17 years old, but the security personnel apparently did not confirm Jane's age and instead relied upon her oral representation. (T. 794-95).

Following their encounter at the hotel, Kelly arranged for Jane to travel across the country to meet him while he was on tour. (T. 796, 798). On April 29, 2015, Jane traveled from

her home in Orlando to Los Angeles. (T. 799, 803; GX 233(c)). Kelly's then assistant, Cheryl Mack, arranged for Jane's travel. (T. 800-02; GX 233(c), 233(e)). Kelly had sexual contact with Jane while they were in Los Angeles (T. 804-05), and there, Kelly began to teach the "rules" to Jane, including that Jane wear baggy clothing, that Jane call Kelly "daddy," and that Jane tell Kelly whenever she left the room. (T. 810-11; GX 233(d) (Jane texting her mother on April 29, 2015, "Be talking bout rules"), GX 233(e) (Jane texting her mother on April 29, 2015, "But he got me in Sweats … He ain't like my tights showing my figure"). GX 233(i) (Jane texting her mother on May 3, 2015, "Everyone having fund and Kelz said, 'do not leave that room'"). From Los Angeles, Jane traveled to Stockton, California, and then Las Vegas. (T. 817, 820). Jane and Kelly first had sexual intercourse at the hotel in Stockton; Kelly did not use a condom or other protection and did not tell Jane that he had previously contracted genital herpes. (T. 819-20). When she traveled to Las Vegas, Kelly introduced her to Juice. (T. 825-26). During that trip, Jane also tried to run some errands, but Mack told her that she could not go anywhere without Kelly's permission. (T. 821-22; GX 233(i)).

After Jane finished her junior year, she spent the summer with Kelly, traveling to shows and staying at his studio in Chicago. In August of 2015, Jane was diagnosed with genital herpes, leaving her so she could not walk and she was devastated. (GX 909; T. 851-53). Before she sought medical attention, she told Kelly about the severe pain she felt. (T. 851). Kelly arranged for Juice to take Jane to a doctor's office in downtown Chicago, where a doctor prescribed medication for Jane. (T. 851-52; GX 911(a), 911(b)). When Jane told Kelly about her diagnosis, Kelly appeared agitated and told Jane she could have contracted it from someone else. (T. 852-53). When she subsequently had outbreaks of herpes, Kelly disparaged her. (T. 855).

At the end of the summer, when Jane was scheduled to return to Orlando to begin her senior year of high school, Jane told Kelly that she was in fact just 17 years old and still in high school. (T. 860-61). Kelly arranged for Juice's mother to serve as Jane's legal guardian until she turned 18 years old and for Jane's parents to enroll her in remote schooling. (T. 862-63; GX 475(a), 476(a)). Beginning in September 2015, Kelly paid for Jane to return to Chicago. (T. 868). When Kelly began a tour in Brooklyn, New York, Jane joined him, as he traveled from Brooklyn, to Washington DC, back to Manhattan and then to Oakland, California. (T. 869-70, 1966-67; GX 159(a)-(f)). In Oakland, Jane and Kelly continued to have sexual intercourse, and while in California, Jane believed Kelly had impregnated her; Kelly wanted her to have an abortion, an abortion she was petrified to have. (T. 880-82; GX 205(a); GX 205(d) (Jane texting her friend in October 2015, "He nutted in me today"; 'But he said we need to look into that abortion stuff because he wants to keep my body right and tight ." and "Now if I was 18 … He wouldn't care about the baby , speaking I'm 17")). Jane explained in text messages to her friend that Kelly wanted her to have an abortion because she was not yet 18 years old. (T. 882-83; GX 205(d)). In fact, Jane was not pregnant and was therefore not forced to undergo an abortion at 17 years old. (T. 887). While Jane was still 17 years old, Kelly, using Apple iPads, also recorded Jane engaged in sexual activity. (T. 872-73).

While Jane was with Kelly, Kelly also had several other women who lived with him and/or regularly had sexual contact with him. (T. 902, 907). Those women included Juice, Dominique, Joy and Vee. (T. 902-03).

Jane continued to live with Kelly until his arrest in July 2019. During the time that Jane spent with Kelly, Jane learned through Kelly and others, including Juice, that Kelly required Jane (and the other women who lived with Kelly) to comply with the rules he set and to comply

with his requests.  See, e.g., GX 325 (electronic note containing reminders as to how to act around Kelly, including "Trust daddy and what ever he says , whenever he says , with no rebuttal , disrespect or rebellion"); GX 331 (handwritten note containing reminders as to how to act around Kelly, including "STOP defending myself !!! anything daddy says is to help me, thank him and be happy and fix the problem"); GX 311 ("I know lately I have been forgetful of the protocols and rules you have … I am sorry for not being the image I am supposed to be … I know I have been all over the place messing up in multiple places, not following instructions, being goofy, being extra, being careless"); GX 481 (text message authored by Kelly to Jane, instructing Jane, "I need to be trusted by you 1,000,000,000 percent that when I say something you don't even hesitate you do it and go with it.  … I know you were young.  But that is no excuse to disobey me and not do what I tell you to do … Because I want to groom you and be bonded with you, 1 million percent before that.").

Kelly prescribed a number of rules for Jane and his other girlfriends to follow.[7] Jane was required to wear baggy clothing.  (T. 855-56).  Jane addressed Kelly as "daddy" and was expected to stand up when Kelly entered the room and give him a kiss.  (T. 856, 975).  Jane accompanied Kelly to his nightly basketball games and to other venues (although she often remained in the Sprinter van when Kelly went inside those venues).  (T. 973-74).  When Jane needed to use a restroom, she would urinate into a cup on the Sprinter van because she was not permitted to get off the van.[8]  (T. 974).  Jane was not permitted to look at or otherwise interact

---

[7]     Dr. Dawn Hughes testified that isolation, indoctrination, intimidation, subjugation, surveillance, secrecy, humiliation and collateral all may be used as a means of coercive control.  (T. 3928-33).

[8]     One of Kelly's employees saw Kelly's female guests and girlfriends urinate in cups on the Sprinter rather than finding a restroom.  (T. 3413 (A Mayweather)).  Another employee understood that Kelly required his female guests and girlfriends to obtain permission

with other men.  (T. 971, 1157, 1300).  For example, when Jane was in the elevator, she turned around so that she faced the back of the elevator and she relied on Kelly's assistants to interact with male employees at retail stores and salons.  (T. 971).  Jane had to seek permission before she left a hotel room where she was staying.  (T. 856).  Kelly discouraged communications with her friends and did not allow her to use social media.[9]  (T. 856).  (To enforce this rule, Kelly told Jane that his engineers could access her phone or her iCloud to see who with whom she had been communicating.  (T. 1027)).  Jane also was not permitted to exchange personal information with the other women who lived with Kelly.  (T. 908).  Jane was expected to regularly draft letters containing false and embarrassing statements, a process that was often overseen by Juice.[10]  (T.

---

before using the restroom.  (T. 2003-04 (S Mayweather)).  In addition, as noted <u>supra</u>, Kelly confronted Suzette Mayweather after he learned that several months earlier, she had let Dominique off the bus when they were in New Orleans without first obtaining Kelly's permission. (T. 2029-31 (S Mayweather)).

[9]     Jane's testimony about Kelly's directive that she and other women limit communications with others was corroborated by contemporaneous text messages she exchanged with her friends from high school.  <u>See</u> GX 205(j) (text message from Jane to her friend, saying "You know yall can't do that , cause he check my phone), 205(m) (text message from Jane to her friend, saying "Testing you will get me caught up").  In addition, her testimony was corroborated by testimony and other evidence establishing that Dominique too was not permitted to communicate with others.  Alesiette Mayweather testified that she purchased a cellular telephone for Dominique and that when Kelly found out, he became irate.  (T. 3435-41 (A Mayweather), 2023-34 (S Mayweather); GX 240(h)).  Letters seized from Kelly's storage facility also show that Dominique referenced not having a phone in several letters and/or notes with the defendant. <u>See</u> GX 420 (handwritten letter from Dominique to Kelly, asking "How do we gain trust if I cannot use the phone my father bought me to look-up things on my own in front of you"), 447 (handwritten letter asking, "Can I spend some time with my little brother and Mum before we leave.  I do not have a phone so I know I cannot go out to meet them"), 452 (handwritten note, saying, "I was wrong for asking my Mum to pick me up from the place you work and sleep.  The fact you gave me cab fare and permission to visit her was [word crossed out]").  Similarly, when Kelly learned that Dominique had shared personal information with Suzette Mayweather, Suzette Mayweather lied and told Kelly that she had brought up the conversation that led to Dominique sharing those details because she feared what Kelly might do to Dominique.  (T. 2032-34).

[10]     Several of these letters were recovered from Kelly's storage facility.  <u>See</u> GX 455 (handwritten letter by Jane, including claim that she had "done some things that I just know you

37

992, 995-97).  Jane also was expected to create videos containing false and embarrassing statements and doing humiliating things, including a video of her eating feces.  (T. 997-99).  Jane was also required to report to Kelly when she saw any one violating Kelly's rules.  (T. 975-76).

Shortly after Jane met Kelly, he began to punish her when she did not follow his prescribed rules or comply with the established protocols.  Punishments inflicted by Kelly including spankings, which Kelly called "chastisements," vicious physical assaults, and confining Jane to a room or a bus for prolonged periods of time.  (T. 901, 909-25, 931-38, 3418-35; GX 240(c), 240(f), 240(g); GX 935(b)).  The spankings occurred every two to three days.[11] (T. 911; GX 459 (handwritten letter by Jane to Kelly, including her saying, "I'm getting spankings nearly everyday")).  One of the first physical assaults by Kelly occurred on August 21, 2015, when Jane was still 17 years old and when Devyne Stephens sent a text message to Kelly with Jane's first name and a rat emoji.  (GX 255(b); T. 913-18 (Jane), 1788 (Stephens)).  Jane also saw Kelly spanking and otherwise physically assaulting the other women who lived with Kelly, when Kelly perceived that one had broken of his rules.  (T. 925).  The first time Kelly confined Jane to a room occurred after Juice reported to Kelly that Jane had purchased sweatpants that were not sufficiently baggy.  (T. 920-95).  Kelly told Jane that she could not

---

cannot forgive me for.  Ive been stealing money from the stash you told me about … I also was selling your jewelry too when I could because it was just a rush and fun"), 456 (handwritten letter by Jane, including, "I also did something bogus just in case you caught me stealing and let me go… I decided I would spank myself really hard until I had bruises on me"), 461 (handwritten letter by Jane, including, "I desperately wanted you to want me how I craved you.  I started to make threats to you and I'm sorry.  If you don't bring me that dick then Im going to tell everyone you raped me.  Im going to tell everyone you've been raping me since I've been a minor.").  See also GX 302, 444, 445, 430(a)-(d).

[11]    An iPad recovered from Kelly's residence on the day of his arrest depicted Kelly spanking another woman in apparent punishment.  See GX 328(b) (still image showing Kelly spank one of Kelly's female guests, while guest was naked, crying and visibly in pain).

leave the room until she admitted her transgression, and so she stayed in the room for several days in a row and would eat only when food was left outside the door. (T. 921-24). Another time occurred shortly after Christmas of 2015, also while Jane was still 17 years old, Kelly made Jane stay in a room at his recording studio because she told him that she wanted to celebrate holiday. (T. 935-40; GX 240(c)). She had her phone and she recounted to one of her friends that same day, "then I was like can I take a shower, can I take a shower. And he was like no, you're gonna stay in the room until you tell me why you [the remainder of the text message was not retained]." (GX 935(b)). When Kelly subjected Jane to confinement on a bus, his assistants typically stood nearby. (See, e.g., GX 250(f), GX 240(g)). Jane would not be permitted to leave the location where she had been confined until she apologized in a manner that Kelly deemed sufficient (T. 922); oftentimes Jane would write several letters apologizing to Kelly before he accepted one and allowed her to leave. (T. 939-40. See also, e.g., GX 457-60).

Kelly also required Jane to have sexual contact with other men and women at Kelly's direction, including the women living with Kelly, his assistants "LeeLee" and "Cassandra," and "Alex," a man she had never even seen prior to Kelly directing her to have sex with him. (T. 955-61,964-67, 1045-50). Kelly decided with whom she would have sexual contact and when it would occur. (T. 955-56). Kelly recorded most of these encounters and always remained in charge, directing each participant precisely what to do and when to do it. (T. 1046-47).

XIV.   Faith

Faith met Kelly in March 2017, when she was 19 years old, in San Antonio, Texas after attending his concert at the Tobin Center with her older half-sister. (T. 2125-26, 2128-) At the conclusion of the concert, two women wearing T-shirts with Kelly's face and the

word "Staff" on the back approached Faith and her sister and invited them to a back-stage afterparty that Kelly was having and gave them wristbands to attend.  (T. 2130-31).  When Faith arrived at the afterparty there was music playing and alcohol being served.  (T. 2132).  No one checked Faith's ID before entry.  (T. 2132).  Thereafter, Kelly arrived at the afterparty and, eventually, approached Faith and handed her a piece of paper with two of his phone numbers on it.  (T. 2133-34).  Kelly told Faith to text him later and to include a photograph of herself so he would know the text was from her.  (T. 2134).  Kelly also invited Faith and her sister to his dressing room for food and the two of them accompanied Kelly there.  (T. 2136-37).  Faith and her sister conversed with Kelly in his dressing room and Faith let Kelly know, among other things, that she was "in school."  (T. 2137).  Kelly did not ask Faith any questions about her schooling.  (T. 2138).  While in the dressing room, Kelly reminded Faith to send him a photograph of herself with her name.  (T. 2139).  When Faith got home to her parents' house, she texted Kelly a "selfie" and her name and went to sleep.  (T. 2139-41).  Several hours later, after she woke up, Faith noticed that Kelly had texted her back, complimenting her and inviting him to come see him while he was still in San Antonio.  (T. 2141-42).  Faith did not take Kelly up on his invitation, but she began communicating with him regularly by text, phone calls, and over FaceTime.  (T. 2142, 2144).  During her initial phone calls with Kelly, he referred to himself as "daddy" and told Faith to call him that.  (T. 2143).  When she did not do so, he hung up on her.  (T. 2143-44).  Within a week after meeting her, Kelly told Faith he loved her.  (T. 2145).  During their conversations, Kelly also invited Faith to come see him while he was on tour and told her that his assistant, Diana Copeland, would make the travel arrangements and provided Faith with her contact information.  (T. 2145).

Faith ultimately travelled from San Antonio to New York to see Kelly in May 2017. (T. 2152). Copeland made Faith's travel arrangements and Kelly paid for Faith's travel and hotel in Long Island, New York. (T. 2152-56; GX 208(a)). Faith attended Kelly's concert at the Theater at Westbury in Long Island and then returned to her hotel room and went to sleep. (T. 2157-63). At 6 a.m. the following morning, Kelly showed up at Faith's hotel room and ultimately had sexual intercourse with her while filming the sex using his Apple iPad. (T. 2163-66, 2169-74, 2178). Kelly did not use a condom and did not inform Faith that he had contracted genital herpes prior to engaging in sexual intercourse with her. (T. 2173, 2178). Afterwards, Kelly told Faith she had "a lot . . . to learn when it came to sex" and indicated that if she was "really like 16, [she] can tell daddy." (T. 2173-74). Thereafter, Kelly left the room. (T. 2174). At Kelly's direction, Faith stayed in her hotel room for the duration of her trip and did not leave the room. (T. 2179-83). Kelly also told Faith that she could order room service, but not to let the hotel employee delivering the food see her if that person was a man and not to let the hotel employee come inside the room, whatever their gender. (T. 2182). Faith did not see Kelly again on this trip before returning to San Antonio. (T. 2183).

In the months that followed, through his assistant Diana Copeland, Kelly arranged for Faith to travel to see him in various cities. (T.2184-96, 2220-32, 2242, 2245-69). Faith saw Kelly in Chicago in June 2017, in Dallas in December 2017, in Los Angeles in January 2018, and in New York City in February 2018. (T. 2184-96, 2220-32, 2242, 2245-69). In each of those locations, Kelly engaged in either sexual intercourse with Faith or had Faith give him oral sex on occasions where Faith told him she had her period. (T. 2187-96, 2220-32, 2242, 2245-69) Kelly did not use a condom or tell Faith he had contracted genital herpes prior to sexual contact

on any of these occasions, including prior to engaging in sexual intercourse with her at the Mondrian hotel in New York in February 2018.  (T. 2126-27).

In Dallas, Faith learned more of Kelly's rules, including that she should never sit with her "pointed at another man when [she's] in public with [the defendant]."  (T. 2192).  Kelly also had a conversation with Faith about "protecting" him and indicated that an attorney would bring some papers for Faith to sign, though ultimately the lawyer did not show up, and telling Faith that he needed her to write down something embarrassing about her family that she did not want anyone else to know.  (T. 2197-99).  When Faith indicated that she had nothing embarrassing to write, Kelly suggested that he could assist her in coming up with a lie about her parents if she could not think of anything on her own.  (T. 2199).  During the conversation, Kelly also divulged that he had a group of girlfriends that he "raised," some of whom had been with him for five years; others for 15 years.  (T. 2197, 2242).  He referred to them as his "family" and indicated that these girlfriends "protected him" and loved each other, telling Faith that she reminded him of "his girls."  (T. 2197-98).  Kelly further divulged that he and his girls "all sleep together."  (T. 2198).  When Faith indicated that she was not "into girls," Kelly responded, "well, if I want both of you [to] suck my dick, ultimately it's about pleasing me, so you're going to suck my dick with her."  (T. 2198).  Thereafter, he told Faith to send a text message to his various phone numbers, stating. "daddy I want to be with you and the girls," followed by a praying hands emoji, which she did.  (T. 2199-2200).  Kelly also told Faith that his girls had rules, which they all understood and followed, including how he should be greeted when he walked into a room and that his girls did not discuss personal matters with each other.  (T. 2200-01, 2203).

Kelly then took Faith to his hotel suite, where he introduced her to Joy, one of his girls. (T. 2201-03). Joy and Faith subsequently had a brief conversation in the hotel lobby while they waited before joining Kelly in his Sprinter van. (T. 2205-06). Joy appeared "very unkept;" her hair was not done and her nails were chipped. (T. 2205). Faith and Joy then joined Kelly in the back of his Sprinter, which was separated from the front of the Sprinter by a permanent divider; a driver and Diana Copeland were in the front seats and they all drove to a hookah bar. (T. 2206-07). Inside the Sprinter, Faith noticed multiple bras and panties, a toothbrush and hairbrushes. (T. 2206). During the drive, Faith observed Kelly and Joy interact in a "very unnatural" manner: when Kelly laughed, Joy laughed even louder; when he pulled out a cigar, she lit it; when he wanted to hear music, she played it; any demand he had, Joy was "just on it." (T. 2243). After they arrived at the location of the hookah bar, Kelly and Diana Copeland exited the Sprinter to go inside. (T. 2208). Kelly instructed Faith and Joy to remain inside the Sprinter, where they remained for hours. (T. 2208). At some point, Faith began to feel uncomfortable as she had to use the bathroom and was feeling hot from the vehicle's heating. (T. 2209). Faith tried to open the Sprinter door, but it was locked. (T. 2209, 2244). Joy told Faith that she "had to ask first." (T. 2209-2210, 2244). She contacted Diana Copeland to let her know, but did not hear back from her, and tried calling Kelly, but he did not answer. (T. 2209-10). After Faith texted Copeland that she was "about to pass out," Copeland and Kelly finally came back to the Sprinter and drove Faith to an IHOP to use the bathroom. (T. 2210). Once at the IHOP, Faith and Joy went to the bathroom and Copeland followed them there, though Copeland did not use the bathroom herself. (T. 2210-11). While Faith was in a bathroom stall, Copeland stood outside of it. (T. 2210). They all then returned to the hotel. (T. 2213).

Following the Dallas trip, Faith continued to communicate with Kelly, but he became more controlling in his communications with her. (T. 2214-15). Kelly wanted to know "literally everywhere [she] went" and directed Faith to always answer when he called her. (T. 2215). Faith followed these instructions, including seeking Kelly's permission before going out with family members, such as her older sister, because these were Kelly's "rules." (T. 2215-20, 2244; GX207(e)-(h)).

During her next trip to see Kelly in Los Angeles, Diana Copeland directed Faith to come to a recording studio (NRG Studios) and wait outside in Kelly's Sprinter van for hours. (T. 2222-25). While inside, Faith had to use the bathroom and texted Copeland. (T.2223; GX 208(b)). Copeland responded telling Faith to "standby." (T. 2223; GX 208(b)). After about 15 minutes, Copeland escorted Faith into the studio to use the bathroom and then back to the Sprinter. (T. 2223-26). At some point thereafter, Copeland eventually took Faith inside the studio again and left her in a recording room with two smaller rooms within it, telling her Kelly would be in soon. (T. 2226-29; GX946(d)). Approximately 15 minutes later, Kelly jogged into the room quickly, retrieved something and left. (T. 2229). Faith did not stand up and greet Kelly when he came into the room. (T. 2230). Several hours went by before Kelly returned to the room. (T. 2229). While waiting, Faith texted Copeland asking if Kelly wanted her to continue to wait or if she could go back to her hotel room. (T. 2230-31; GX 208(b)). She did so because Kelly required Faith to get his permission whenever she needed to go somewhere, including the bathroom. (T. 2244-47). Copeland responded approximately an hour later, stating, "please wait." (T. 2231, GX 208(b)). During the several hours Faith first spent inside the Sprinter and the several hours she waited inside the room in the studio, she was not given any food or water. (T. 2231).

When Kelly finally returned to the room, he told Faith that he would have returned sooner if she had greeted him properly when he came in earlier. (T. 2248). Kelly then directed Faith to take off her clothes and walk back and forth. (T. 2248). Faith told Kelly she had her period, even though she did not, because she did not want to have sex with him. (T. 2248). Kelly sighed and said "Well, why did you come?" (T. 2249). He then told Faith to take off her pants and she walked back and forth three times in a body suit. (T. 2249). Kelly then went inside one of the smaller rooms within the larger room and told Faith to come inside. (T. 2249). The room was the size of a walk-in closet. (T. 2250). When Faith entered the small room, she saw a gun on an ottoman in the room. (T. 2250). Kelly's demeanor changed and he "got real serious." (T. 2250). He moved the gun near him, sat down in a chair and told Faith to stand across from him. (T. 2250-51). He then told Faith to pose and took photos of her with his iPad, while complaining that she was not being "sexy enough" and became irritated. (T. 2251). Kelly then proceeded to ask Faith a series of questions, including asking her how many men had seen her naked and how many male friends she had. (T. 2251). Kelly told Faith there would be consequences if she did not answer truthfully. (T. 2253). When Faith responded in a manner he did not like, Kelly stated "do you want to take that back?" (T. 2251). Faith said no; Kelly then paused and got a stern look on his face, telling Faith that he and her father had the "same gift" of "spiritual discernment" and that he would know if she was lying to him. (T. 2251-52). Faith was taken aback. (T. 2252). Kelly then stood up and put a pillow on the floor and told Faith to get on her knees, which she did. (T. 2252). The defendant then pulled out his penis, grabbed the back of Faith's neck, told her to "suck [his] dick" and pushed her forward so her mouth made contact with his penis. (T. 2252). Kelly's gun remained nearby when this occurred. (T. 2252). Faith was "intimidated" and did not want to give Kelly oral sex, but she did so. (T. 2252-53).

Throughout, Kelly's hand remained on the back of her neck guiding her.  (T. 2253).  Faith did not feel like she could leave the room because she was "under [Kelly's] rules and he had a weapon so she wasn't even going to step out of line."  (T .2254).

Following her final trip to New York in February 2018, Faith stopped seeing Kelly and eventually filed a civil lawsuit against him in New York.  (T. 2285-86).  After she filed the lawsuit, Kelly arranged for compromising photos he had taken of Faith to be sent to her civil lawyer in Brooklyn, New York with a letter threatening, among other things, to release uncropped versions of the photos publicly if she did not abandon her lawsuit and stop speaking publicly about Kelly.  (T. 2286-97, 2299-2300; 2673-93; GX 231, GX 231(a), GX 345, GX 344(a)-(k), GX 348(a)-(b)).  Faith did not withdraw her lawsuit.  Thereafter, Kelly's associate, Donnell Russell, sent threatening texts to Faith and her mother and created a Facebook page using an alias, "Colon Dunn," called "Surviving Lies," where he ultimately followed through on those threats and publicly posted graphic photos of Faith, before Facebook took the photos down. (T. 2316-17, 2321, 2400-09; GX 230(a), GX 230(b), GX 919, GX 942).

DISCUSSION

Kelly challenges the sufficiency of the evidence as to each of the counts of conviction.  As set forth in detail below, there was more than sufficient evidence adduced at trial supporting each count of conviction, and as to the racketeering conviction (Count One), each racketeering act found proven by the jury.

I.    Legal Standard

In analyzing a defendant's Rule 29 motion, the Court must "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility."  United States v. Sabhnani, 599 F.3d 215, 241 (2d Cir. 2010).  See also United States v. Payne, 591 F.3d 46, 60 (2d Cir. 2010)

("[a]ssessments of witness credibility and choices between competing inferences lie solely within the province of the jury").  In undertaking this review, this Court "consider[s] the government's case in its totality rather than in its parts," mindful that the sufficiency test may be "satisfied by circumstantial evidence alone."  United States v. Hawkins, 547 F.3d 66, 70-71 (2d Cir. 2008).  Following this review, the Court "must affirm the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Kozeny, 667 F.3d 122, 139 (2d Cir. 2011) (internal quotation marks omitted).

II.     The Racketeering Conviction Was Sound

Kelly raises several challenges to the propriety of his RICO conviction.  He argues that the government did not prove (1) that an enterprise existed, (2) that the enterprise affected interstate or foreign commerce or (3) a pattern of racketeering activity.  He is wrong in all respects.

A.      The Government Adduced Sufficient Evidence of An Enterprise

Kelly argues that the government failed to prove an enterprise because (1) the enterprise proved by the government lacked a common purpose, (2) the enterprise was not distinct from its racketeering activities, and (3) the enterprise was not distinct from Kelly alone.  Each of those arguments is without merit.

1.      Applicable Law

"[T]he RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'"  Boyle v. United States, 556 U.S. 938, 944 (2009) (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961).  Under the RICO statute, an "enterprise" is defined to include "any . . . union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  In Boyle, a 2009 case rejecting a challenge to

a substantive RICO conviction in this District, the Supreme Court held that to sustain a RICO conviction, an association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946; see also id. at 944 (observing that the statutory definition of "enterprise" in 18 U.S.C. § 1961(4) "does not specifically define the outer boundaries of the 'enterprise' concept," and that the definition is "obviously broad" and has a "wide reach"). An enterprise does not require a "hierarchy" or "regular meetings regarding enterprise affairs," id. at 948, or "a set membership" or "established rules," United States v. Krasniqi, 555 Fed. App'x 14, 17 (2d Cir. 2014) (summary order). An association-in-fact enterprise "is simply a continuing unit that functions with a common purpose." United States v. Pierce, 785 F.3d 832, 838 (2d Cir. 2015) (quoting Boyle, 556 U.S. at 948).

The enterprise may exist even if its membership changes over time. See United States v. Mauro, 80 F.3d 73, 77 (2d Cir. 1996) (existence of enterprise not defeated by "changes in membership"); United States v. Orena, 32 F.3d 704, 710 (2d Cir. 1994) (ruling that an internal dispute over control of the enterprise did "not signal the end of an enterprise"); United States v. Coonan, 938 F.2d 1553, 1560-61 (2d Cir. 1991) (an association-in-fact enterprise continues to exist even though it undergoes change in leadership); United States v. Errico, 635 F.2d 152, 155 (2d Cir. 1980) (upholding instruction that membership in an enterprise may change over time).

     2.    Members of the Enterprise Shared A Common Purpose to Engage in a Course of Conduct

Kelly argues that the government's proof at trial lacked a showing that members of the alleged enterprise shared a common purpose. (Mot. 6-9). He is wrong. As described above, the government elicited hours of testimony by members of Kelly's inner circle who told

48

the jury how they worked tirelessly to promote Kelly's music and to meet his personal needs. Tom Arnold and Diana Copeland each testified about the expansive duties Kelly expected each to perform. They variously testified that they set up business meetings for Kelly, arranged tour dates, shuttled Kelly's female guests, made travel reservations for Kelly's female guests and performed miscellaneous errands for Kelly. Anthony Navarro and Nicholas Williams testified about their roles as runners for Kelly in the mid to late 2000s, which included basic tasks around the studio and assisting the engineers who assisted in Kelly's music, as well as answering phone calls from Kelly's female guests, bringing food to his female guests and even picking up herpes medication for Kelly. Cheryl Mack, Alesiette Mayweather and Suzette Mayweather testified about their roles as personal assistants for Kelly in the 2010s, which variously included arranging travel for Kelly's female guests, ordering food for Kelly and his guests, and accompanying Kelly's female guests to malls, salons and Kelly's concerts. Many testified how Kelly "fined" them if they failed in Kelly's eyes.

To the extent that Kelly argues that proof of an enterprise requires that members of the enterprise shared a common purpose of <u>criminality</u>, rather than a common purpose of engaging in a particular course of conduct (Mot. at 7, 8), he is wrong. In support of his argument, Kelly cites to language in <u>First Capital Asset Mgmt., Inc., v. Satinwood, Inc.,</u> 385 F.3d 159 (2d Cir. 2004), that "the individuals [comprising an enterprise] must share a common purpose to engage in a particular <u>fraudulent</u> course of conduct and work together to achieve such purposes." <u>Id.</u> (emphasis added). Kelly uses this language out of context. The language in <u>Satinwood</u> was adopted from an opinion by a district court, <u>Moll v. US Life Title Ins. Co. of New York</u>, 654 F. Supp. 1012 (S.D.N.Y. 1987). A closer look at <u>Moll</u> and the cases cited by the district court in <u>Moll</u> shows that there, the defendants argued that the alleged enterprise

essentially overlapped with the pattern of racketeering. In Moll, the defendant argued that the plaintiff had not sufficiently proved that "an amorphous group of real estate attorneys and other individuals 'engaged in the real estate settlement industry in … New York'" constituted an enterprise or otherwise engaged in a common purpose beyond the alleged pattern of racketeering activity. Citing United States v. Turkette, 452 U.S. 576 (1981), the Moll court explained that to be an enterprise, the group must have "a common purpose of engaging in a course of conduct." That, of course, is the standard for an enterprise, and it does not require that the enterprise be grounded in criminality. But in Moll and the cases cited in Moll, the common purpose was the alleged course of fraud, leading the Moll court to use the language cited by Kelly.

Notwithstanding the language used in Moll and cited by Kelly, it is well-established that an enterprise may have a common purpose of engaging in a wholly legitimate course of conduct and there is no requirement whatsoever that the enterprise members have a common purpose of fraud or any other criminality. Indeed, although RICO "does not specifically define the outer boundaries of the 'enterprise' concept, it is clear that "any legal entity may qualify as a RICO enterprise." Moss v. BMO Harris Bank, N.A., 258 F. Supp. 3d 289, 298 (E.D.N.Y. 2017) (citation and internal quotation marks omitted).

The enterprise alleged by the government and found proven by the jury was one comprised of an inner circle who shared a common purpose of engaging in a course of conduct. That common purpose was largely not criminal. The inner circle worked together to promote Kelly's music and his brand and to meet his personal needs, which included recruiting women and girls. Viewing the evidence in the light most favorable to the government, as the Court must in evaluating a Rule 29 motion, the evidence of an enterprise, as required for a RICO violation, was more than sufficient.

3.      The Enterprise Was Distinct from Its Racketeering Activities

Kelly contends that the government failed to introduce evidence showing that "the enterprise was distinct from the racketeering activities." (Mot. at 9). In so arguing, Kelly again misconstrues what the government is required to prove. It is true that the government must prove both the enterprise <u>and</u> the pattern of racketeering activity, and that "proof of one does not necessarily establish the other." <u>Turkette</u>, 452 U.S. at 583. For example, if "several individuals, independently and without coordination, engaged in a pattern of RICO predicate offenses . . . [p]roof of these patterns would not be enough to show that the individuals were members of the enterprise." <u>Boyle</u>, 556 U.S. at 947 n.4. However, that they are separate elements does not mean that "the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." <u>Id.</u> at 947. On this point, the Court reiterated its conclusion that it "made in <u>Turkette</u> that proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." <u>Id.</u> at 951. In any event, as set forth above, the government adduced sufficient evidence of an enterprise and as set forth in great detail below, the government adduced sufficient evidence of the pattern of racketeering. Therefore, Kelly's argument fails.[12]

---

[12]      In support of his argument, Kelly cites without discussion two cases, <u>United States v. Smith</u>, 413 F.3d 1253 (10th Cir. 2005), and <u>United States v. Keltner</u>, 147 F.3d 662 (8th Cir. 1998). In <u>Smith</u>, the Tenth Circuit wrote, "it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses." In <u>Keltner</u>, the Eighth Circuit stated, "Our focus is to ensure that RICO's severe penalties are limited to 'enterprises consisting of more than simple conspiracies to perpetrate the predicate acts of racketeering." <u>Keltner</u>, 147 F.3d at 668 (citation and quotation marks omitted). Both of these cases were decided before the Supreme Court's decision in <u>Boyle</u> and to the extent that they are in conflict with <u>Boyle</u>, they are no longer good law.

51

4.       The Enterprise Was Distinct from Kelly

Kelly also asserts that the government's proof of an enterprise failed because it did not demonstrate that Kelly was "distinct from the enterprise." (Mot. at 10-13). Again, he is wrong. At trial, the government offered evidence that Kelly surrounded himself with his inner circle, and Kelly and his inner circle together worked to promote his brand and to meet his personal needs. Because the enterprise, comprised of Kelly and his inner circle, consisted of more than just Kelly, and even more than just Kelly's employees, it is sufficiently distinct.

Kelly's reliance on a series of cases where the defendant was a corporation is inapposite. For example, in Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994), the defendant was a corporation, Marine Midland Bank, N.A., and the enterprise was the "Restructuring Group," which consisted of bank employees acting in the course of their employment and on behalf of the corporation. The circuit court explained that "where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation." Id. The Second Circuit reasoned, "[b]ecause a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself." Id.

In any event, the mere fact that Kelly engages employees is not a shield against a RICO conviction, notwithstanding the fact that Kelly may use his employees to carry out some of the alleged conduct. At trial, the government adduced ample evidence that Kelly can and did, in fact, function separate and apart from his employees and agents.

B.     The Enterprise Affected Interstate and Foreign Commerce

Kelly claims the government did not adduce sufficient evidence of the interstate commerce element and asserts that "the government must offer proof beyond a reasonable doubt that the alleged racketeering activity affected interstate commerce." (Mot. at 13). In fact, based on the plain language of 18 U.S.C. § 1962(c), the government may prove the interstate commerce element by showing either that the enterprise engaged in interstate or foreign commerce or that its activities affected interstate commerce. See 18 U.S.C. § 1962(c); United States v. Robertson, 514 U.S. 669, 671 (1995) (an enterprise engaged in interstate commerce is sufficient to prove the interstate nexus). Furthermore, the effect on interstate commerce may be de minimis. See United States v. Miller, 116 F.3d 641, 673-74 (2d Cir. 1997) (upholding jury instruction that only a de minimis effect is needed and observing that Supreme Court's decision in United States v. Lopez, 514 U.S. 549 (1995), "did not alter the principle that where the type of activity at issue has been found by Congress to have a substantial connection with interstate commerce, the government need only prove that the individual subject transaction has a de minimis effect on interstate commerce"); United States v. Mejia, 545 F.3d 179, 203 (2d Cir. 2008) ("any other conduct having even a de minimis effect on interstate commerce suffices") (citing United States v. Davila, 461 F.3d 298, 306 (2d Cir. 2006)).

Although only one was required, the proof adduced at trial easily was sufficient to prove that the enterprise itself was engaged in interstate commerce and that its activities affected interstate commerce. Furthermore, although only a de minimis effect is required, the effect was much more here. For a period of years, members of the enterprise regularly arranged travel throughout the country and internationally for Kelly, other members of the enterprise, and Kelly's victims and other female guests. (T. 1532-33 (between 2003 and 2011, Kelly's

employee Tom Arnold arranged travel for Kelly's female guests using a travel company Preferred Travel and by booking flights on Orbitz); T. 1535 (Arnold traveled internationally with Kelly); T. 3158 (Kelly's employee Diana Copeland arranged travel for Kelly's female guests). That alone is more than sufficient to prove this element. Cf. United States v. Robertson, 514 U.S. 669, 672 (1995) ("[A] corporation is generally 'engaged in commerce' when it is itself 'directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce.'") (quoting United States v. Am. Bldg. Maint. Indus., 422 U.S. 271, 283 (1975)).

There was also evidence that Kelly used telephones to communicate with his victims who were located in different states, including Sonja, Alexis, Jane, Faith and Anna. Similarly, members of Kelly's inner circle, including Diana Copeland, Alesiette Mayweather, Suzette Mayweather and Cheryl Mack, communicated by telephone with Kelly's female guests. (T. 3159-60 (Copeland received text messages from Kelly's guests)). "Use of an instrumentality of commerce, such as telephone lines, is also generally viewed as an activity that affects interstate commerce." Mejia, 545 F.3d at 203 (citing United States v. Atcheson, 94 F.3d 1237, 1243 (9th Cir. 1996) (finding defendants' "placement of out-of-state phone calls" to be a "connection with interstate commerce" under Hobbs Act); United States v. Muskovsky, 863 F.2d 1319, 1325 (7th Cir. 1988) (finding effect on interstate commerce based on the use of interstate telephone calls to verify credit card transactions). Similarly, in Illinois (and around the country), Kelly regularly used iPads, Canon cameras and VHS tapes, all of which were manufactured outside of Illinois.

To the extent that Kelly intended to assert a constitutional challenge to RICO, one has not properly been presented. Kelly summarily writes, without citation to any case, "the de minimus [sic] effect approach here amounts to an unconstitutional extension of Congress's

commerce power and is contrary to RICO's distinctly economic legislative history." (Mot. at 15). That alone is not sufficient to raise a constitutional challenge. See United States v. Botti, 711 F.3d 299, 313 (2d Cir. 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). In any event, such a challenge would fail. RICO constitutes a valid exercise of Congress' Commerce Clause powers on its face and as applied here. See United States v. Miller, 116 F.3d 641, 673-74 (2d Cir. 1997) (that Supreme Court's decision in United States v. Lopez, 514 U.S. 549 (1995), "did not alter the principle that where the type of activity at issue has been found by Congress to have a substantial connection with interstate commerce, the government need only prove that the individual subject transaction has a de minimis effect on interstate commerce"); United States v. Torres, 129 F.3d 710, 717 (2d Cir. 1997) (upholding 18 U.S.C. § 1959, the statute criminalizing violent crimes in aid of racketeering, as a valid exercise of Congress's powers under the Commerce Clause).

    C.    <u>There Was Sufficient Evidence of a Pattern of Racketeering Activity</u>

Kelly challenges the sufficiency of the racketeering conviction by arguing that there was insufficient evidence of each of the predicate racketeering acts that the jury found proven. As described below, there was sufficient evidence of each predicate racketeering act. However, even assuming <u>arguendo</u> that there was not sufficient evidence of a particular racketeering act, the conviction would stand so long as there remained sufficient evidence of two predicate racketeering acts, including one within five years of the indictment (<u>i.e.</u>, Racketeering Acts Eight to Fourteen) and one within ten years of the most recent racketeering act (<u>i.e.</u>, Racketeering Acts Five to Thirteen). See 18 U.S.C. § 1961(5) (defining "pattern of racketeering activity" as requiring "at least two acts of racketeering activity, one of which occurred after the

effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity").

        1.    <u>Bribery</u>

        Kelly asserts that the government failed to prove that he committed the crime of bribery as alleged in Racketeering Act One. (Mot. at 18). Specifically, Kelly claims that the record lacked evidence of Kelly's knowledge of how Smith obtained the fraudulent identification Kelly and Aaliyah used to obtain a marriage license, <u>i.e.</u>, by bribing an employee at a public aid office. (<u>Id.</u> at 19). Kelly further contends that the government failed to meet the relatedness and statute of limitations standards under RICO. (<u>Id.</u> at 19-20). Kelly is wrong on each of these fronts.

        The government presented ample direct and circumstantial evidence to prove Racketeering Act One. As a preliminary matter, there can be no dispute, and Kelly appears to concede, that the government presented evidence beyond a reasonable doubt the charged bribery occurred, namely, that Smith, Kelly's then tour manager, tendered approximately $500 cash to an employee at a public aid office so that they would provide a fraudulent identification that Kelly and Aaliyah could use to obtain a marriage license. Kelly, instead, challenges the jury's determination regarding his knowledge of and intent with regard to the bribery. The government, however, presented sufficient evidence proving Kelly's complicity in, and promotion and facilitation of the bribery scheme. During trial, Smith testified that, after landing in Chicago, the, Kelly, his security guard Tyree Jameson, his accountant and manager McDavid and others gathered in a hotel suite where Aaliyah was staying to discuss Kelly's plan to marry Aaliyah. (T. 708-12, 743). During this discussion, Smith suggested to the group, which Smith testified included Kelly, that he could obtain a fraudulent identification. (<u>See, e.g.</u>, T. 712-14,

743-44).  While Smith, who, during his testimony had made clear his close relationship with Kelly and his strong aversion to being subpoenaed to testify, attempted to minimize Kelly's knowledge and involvement in the scheme (T. 716, 743), when asked directly if Kelly was present when Smith was "suggesting to the group that you could get an ID from the welfare office if you paid some cash" (T. 743), Smith initially responded "I don't remember precisely each time but I'm pretty sure he was there."  (T. 743).  After being confronted with his grand jury testimony (3500-DS1-4), Smith ultimately responded "Yes" to the question of whether Kelly was present for the conversation about bribing the welfare employee.  (T. 744).  This testimony alone was sufficient to prove Kelly's knowledge of "how Smith obtained the identification." (Mot. at 19).

Notwithstanding Kelly's claims to the contrary, the jury reasonably credited Smith's testimony when he stated that Kelly was present for the discussions regarding the plan to bribe the public aid employee.  In addition to the content of Smith's testimony, the jury was able to view Smith's demeanor, mannerisms and speech pattern during his testimony—information that is not readily apparent from the transcript.  A rational juror, viewing Smith's testimony in its entirety, could reasonably believe that, during the times when Smith attempted to backtrack from prior statements, he was doing so in an effort to protect Kelly when faced with him in open court.[13]  It is squarely within the province of the jury to assess the witness's credibility in this way and to make reasonable inferences from their evaluation of the witness during testimony.

---

[13]     This is particularly true given that Smith consistently voiced his reluctance to testify (see, e.g., T. at 653 ("Yes, I don't want to be here, period."); 655 ("I was told that [immunity] was given to me-- offered to me, but I didn't want to be here anyway"); 656 ("I don't feel like I did on the first prosecution for, so why do I have to testify here?")), and that he viewed the defendant to be "just like my brother" (T. 759-60).  In addition, the jury was also aware that Smith understood that his grant of immunity did not protect him against perjury or false statements at trial.  (T. 663).

See, e.g., United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998) ("Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility."); United States v. Eldridge, 2017 WL 3699312, at *3 (W.D.N.Y. Aug. 28, 2017) (stating that when deciding "a Rule 29 motion, a court must not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence) (internal citation omitted).

The jury's assessment of Smith's testimony was bolstered by the circumstantial evidence at trial. As the government's proof made clear, Kelly orchestrated and participated in every aspect of the scheme from beginning to end: Kelly engaged in an inappropriate relationship and sexually abused Aaliyah since she was at least approximately age 13 or 14 (T. 691-92, 3298, 3299-3304, 3306); Kelly, after learning that Aaliyah believed that she might be pregnant (T. 703), instructed Smith to arrange last-minute flight tickets to go back to Chicago (T. 692-95, 703); Kelly, distraught and crying, told Smith that the plan would be for Kelly to marry Aaliyah in order to avoid jail (T. 706, 709); Kelly was present for conversations in which Smith discussed bribing someone at the welfare office (T. 744); Kelly, after Smith expressed his reservations about the plan, asked Smith whose side he was on (T. 710); the money used to bribe the individual came from Kelly's accountant and manager who handled Kelly's coffers (T. 714-15); Kelly drove with Smith and Aaliyah to the welfare office and the courier office where Kelly's friend worked, staying behind in the car (T. 718, 722-23); Kelly, knowing that Aaliyah was a minor (GX 92) and had not previously had identification showing she was 18 (T. 713), filled out a marriage application that contained the fraudulent information (T. 724-25; GX 803(a)); Kelly was part of the group that went to speak with Kelly's friend at who put them in touch with the minister (T. 1343-44); and Kelly surreptitiously and illegally married Aaliyah in a

suite in the airport hotel (T. 746-47, 2422-23; GX 803(a)-(c), 804), the very reason Kelly needed the fraudulent identification document in the first place.  The jury's finding was further supported by the overwhelming evidence adduced at trial that Kelly controlled every aspect of his affairs and virtually no decision – no matter how miniscule - was made without Kelly's knowledge and approval.

Based on the direct and circumstantial evidence presented at trial the jury reasonably could have inferred that it was inconceivable that Kelly had participated in, facilitated and benefited from every aspect of the scheme but the decision to bribe the public aid office employee.  Such an inference was proper given all of the evidence presented and the Court's instructions.[14]  See, e.g., United States v. Aleskerova, 300 F.3d 286, 293 (2d Cir. 2002) ("A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, her presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others."); United States v. Middendorf, 2019 WL 4254025, at *4 (Sept. 9, 2019) (denying Rule 29 motion and noting that "[i]t was eminently reasonable for the jury to infer from the evidence that [the result of the conduct] was obvious to all of those involved in the conspiracy"); Cf., e.g., Middendorf, supra, at *4 (citing United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) ("Deference to a jury's verdict is 'especially important' in a conspiracy case because 'a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in

---

[14]    As the Court properly instructed, it was not necessary for Kelly to have been the one to physically bribe the government employee (T. 4647 ("Actual physical presence at the commission of a crime is not a requirement for legal responsibility.")), and "intent to promote or facilitate the commission of the offense may be shown by evidence that the defendant shared a criminal intent of the person who directly committed the offense or evidence that there was a common criminal design.  (T. 4647-48).

court with the precision of a surgeon's scalpel.'")); United States v. Bandrich, 2014 WL 7330434, at *3 (S.D.N.Y. Sept. 22, 2014) (denying Rule 29 and Rule 33 motions, stating that "'the prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt'") (internal citation omitted).[15]  Given all of the evidence, viewed in the light most favorable to the government, and deferring to the jury's assessment of witness credibility, a rational jury could—and did—find all the elements of Racketeering Act One proven.  This finding should not be second-guessed.

The bribery alleged as Racketeering Act One satisfied the vertical and horizontal relatedness elements, notwithstanding Kelly's conclusory assertion to the contrary.  (Mot. at 19-20).  In United States v. Daidone, the Second Circuit explained:

> This Court has further developed this requirement of "relatedness," holding that predicate acts "must be related to each other (horizontal relatedness), and they must be related to the enterprise (vertical relatedness).  To show that the predicate acts are vertically related to the RICO enterprise, the government must establish (1) that the defendant was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) that the predicate offenses are related to the activities of that enterprise.  One way to show that predicate acts are horizontally related to each other is to show that each predicate act is related to the RICO enterprise.  Accordingly, the requirements of horizontal relatedness can be established by linking each predicate act to the enterprise, although the same or similar proof may also establish vertical relatedness.

United States v. Daidone, 471 F.3d 371, 374 (2d Cir. 2006) (internal quotation marks and citations omitted).  The bribery easily satisfies the vertical and horizontal relatedness

---

[15]     The defendant's claim that "[a]s far as Defendant knew Smith obtained the identification from a friend who worked in the public aid office" (Mot. at 19) holds no weight given the evidence at trial; "[n]or is the Government required to preclude every reasonable hypothesis which is consistent with innocence," United States v. Chang An-Lo, 851 F.2d 547, 554 (2d. Cir. 1988) (internal citation omitted).

requirements. As set forth above, Kelly was able to commit the bribery solely by virtue of his position in the enterprise. Put another way, to commit the bribery, Kelly relied upon his inner circle, i.e., members of the charged enterprise, including his tour manager and accountant. In addition, the bribery was committed for the same purpose as the other racketeering acts, namely, to allow Kelly to sexually abuse women and girls and otherwise commit illegal sexual activity. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240 (1989) (relatedness prong may be satisfied by proof that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.").

Finally, Kelly's claim that Racketeering Act One is barred by the statute of limitations demonstrates a fundamental and continued misunderstanding of RICO.[16] (Mot. at 19-20). The statute of limitations for a substantive RICO offense, the offense charged in Count One, is five years from the date of the indictment. See 18 U.S.C. § 3282 ("no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found ... within five years next after such offense shall have been committed"). The statute of limitations is not measured, as the defendant suggests, from the date of the first racketeering act. This is so because the defendant is charged with committing a particular predicate act, but rather with committing racketeering through a pattern of racketeering acts. Under the law, in a substantive RICO charge under Section 1962(c), the defendant must have committed at least one predicate act within five years of the date of the indictment. United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987) ("to establish a defendant's violation of section 1962(c), the government must

---

[16]     The Court previously rejected a similar claim raised by the defendant in a pretrial motion to dismiss. See Mem Decision & Order, dated October 26, 2021, ECF Docket Entry No. 252, at 9-10.

prove that the defendant committed two or more predicate offenses, at least one of which occurred within the federal five-year statute of limitations for non-capital offenses") (citation omitted).  Because this Indictment was filed on June 20, 2019, at least one of the predicate racketeering acts charged against the defendant in the substantive RICO count must have occurred or continued past June 20, 2014.  In this case, Racketeering Acts Eight through Fourteen all occurred after that date, and there is thus no statute of limitations issue in this case.

### 2.    Production of Sexually Explicit Material

Racketeering Acts Two, Seven and Ten charge Kelly with sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a), with respect to Stephanie, Jerhonda and Jane, respectively.  To convict a defendant of a violation of 18 U.S.C. § 2251(a), the government must prove three elements beyond a reasonable doubt: "(1) the victim was less than 18 years old; (2) the defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and (3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce."  United States v. Broxmeyer, 616 F.3d 120, 124 (2d Cir. 2010) (internal quotation marks and citation omitted).  Kelly focuses primarily on the second element, challenging the jury's findings as to Racketeering Acts Two, Seven and Ten by arguing that he did nothing "to persuade, induce, entice or coerce" the victim-witnesses "into the sexual activity that was recorded."  (Mot. at 21).  Notably, his argument conveniently omits any reference to the fact that the second element may be proven by showing that the defendant "used" or "employed" the minor "to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct."  As the Court properly instructed the jury:

> As to the second element, the words "used," "employed,"
> "persuaded," "induced," and "enticed" are words of common
> usage. You should interpret these words by using your
> own common sense. The words "persuade," "induce" and "entice"
> are, in effect, synonyms that convey the idea of leading or moving
> another person by persuasion as to some action, state of mind, et
> cetera, or to bring about, produce or cause.

(T. 4650). The Second Circuit has made clear that the word "used" in this context encompasses a scenario where "a child is photographed in order to create pornography." United States v. Sirois, 87 F.3d 34, 41 (2d Cir. 1996); see also Ortiz-Graulau v. United States, 756 F.3d 12, 18-19 (1st Cir. 2014) (holding that "the statutory definition of 'use' is met when a defendant makes a minor the subject of a visual depiction by intentionally photographing the minor engaging in sexually explicit conduct"); United States v. Wright, 774 F.3d 1085, 1091 (6th Cir. 2014) (same); United States v. McCloud, 590 F.3d 560, 566 (8th Cir. 2009) ("A defendant 'uses' a minor for purposes of § 2251(a) if he photographs the minor engaging in sexually explicit conduct to create a visual depiction of such conduct."); accord United States v. Engle, 646 F.3d 405, 418 n.9 (4th Cir. 2012) (quoting McCloud, 590 F.3d at 566). As a result, Kelly is simply wrong when he states – with no citation to any precedent – that "[t]he government must prove that Defendant did something more than just film the sexually explicit conduct" of a minor to meet the second element. (Mot. at 21). Indeed, as the Second Circuit has long held,

> there is no reason to assume that the "use" of a minor must occur
> *before* the filming or photographing of illicit sexual activity. No
> temporal limitation is implicit in any of the meanings that the word
> "use" ordinarily has, nor is one indicated in the surrounding statute
> or case law. Although some of the other actions listed in
> § 2251(a), such as "enticing, inducing, and persuading" will most
> often occur before the depicted activity, that is not so of the word
> "use." And we find no indication in the statute that Congress
> meant to import a temporal limitation into the term in this context.

Sirois, 87 F.3d at 41. Kelly clearly "used" Stephanie, Jerhonda and Jane "to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct." His arguments to the contrary should be summarily rejected.

Nor was the jury erroneously instructed by the Court with respect to these racketeering acts. (Mot. at 21). The Court correctly read each racketeering act to the jury, which language made clear that each act charged the defendant with using the relevant victim "to engage in sexually explicit conduct <u>for the purpose of producing</u> one or more visual depictions of such conduct" (T. 4648, 4671, 4684-85), and correctly told the jury that 18 U.S.C. § 2251(a) provides, in pertinent part, that:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished . . . [,] if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed[,] if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if the visual depiction has actually been transported in interstate or foreign commerce or mailed.

T. 4648-49. With respect to Racketeering Act Two, the Court then instructed the jury on the elements of this offense and various definitions of terms used within those elements, which it referred back to when instructing the jury on Racketeering Acts Seven and Ten. (T. 4649-52, 4672). With respect to the elements, the Court instructed the jury:

> To prove that the defendant committed this racketeering act, the government must prove the following three elements beyond a reasonable doubt: First: That Stephanie was under the age of 18 at the time of the acts alleged in the indictment. Second: That the defendant used, employed, persuaded, induced, or enticed Stephanie to take part in sexually explicit conduct for the purpose of producing or transmitting a visual depiction of that conduct. Third: That the visual depiction was produced using materials that

> had been mailed, shipped, or transported in and affecting interstate
> and foreign commerce.

(T. 4649).  While the Court included language here regarding "transmitting a visual depiction of that conduct" – which relates to a portion of § 2251(a) that was not charged in these racketeering acts – it did not do so to the exclusion of correctly instructing the jury as to the production purpose of the charged conduct, as apparently suggested by the defendant.  (Mot. at 21).  Given that, as Kelly himself concedes, the government presented no evidence regarding the transmission of live visual depictions at trial, see id., the Court's inclusion of the surplus "or transmitting" language did not mislead the jury or affect its verdict, particularly where – as here – both the language of the racketeering acts themselves and the relevant portion of the statute read by the Court to the jury made clear that the indictment only charged the production purpose of the visual depictions, and not any purpose to transmit such visual depictions.  Put another way, (1) the Court's jury instructions – though they contained irrelevant, additional language – were legally correct; and (2) the evidence at trial clearly established that Kelly used Stephanie, Jerhonda and Jane, respectively, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct.  Viewed as a whole, the Court's instructions thus included all the essential elements of the offense and adequately informed the jury of the law. See United States v. Al Kassar, 660 F.3d 108, 127-28 (2d Cir. 2011) ("Viewed as a whole, the jury instruction adequately instructed the jury as to all factual findings required to support conviction.  Therefore, the instruction did not mislead the jury and was not erroneous, let alone plainly so.") (internal quotation marks and citations omitted); Hathaway v. Coughlin, 99 F.3d 550, 552-53 (2d Cir. 1996) (jury instructions not erroneous if "taken as a whole and viewed in light of the evidence, [the charge] show[s] no tendency to confuse or mislead the jury as to principles of law which are applicable").

Finally, Kelly's argument that the government failed to prove the interstate commerce element of the offense – namely, that the visual depictions at issue were produced using materials that had been mailed, shipped, or transported in and affecting interstate and foreign commerce – lacks merit. (Mot. at 22). With respect to Stephanie, the government proved beyond a reasonable doubt that Kelly produced the visual depiction in Illinois by using a video camera to record the visual depiction on a VHS tape. The government further proved, by stipulation, that (1) a component part of all VHS tapes is polyester film; and (2) in and before 1999, all of the entities that manufactured the polyester film used in all VHS tapes were located outside the state of Illinois and manufactured polyester film outside the state of Illinois. (GX 1006). With respect to Jerhonda, the government proved that Kelly produced the visual depictions of Jerhonda in Illinois using an Apple iPhone and a Canon camera, both of which were manufactured outside of the state of Illinois. (GX 1006, 957; T. 2431). With respect to Jane, the government proved that Kelly produced visual depictions of Jane throughout the United States, including in Chicago, Atlanta and California, using an iPad, which was manufactured outside of the United States. (GX 957; T. 849, 889, 2430-31). Based on this evidence, a reasonable jury could find beyond a reasonable doubt that the sexually explicit visual depictions of Stephanie, Jerhonda and Jane were all produced using materials that had been transported in interstate commerce. Cf. United States v. Joubert, 778 F.3d 247, 255 (1st Cir. 2015) (VHS tape made out of state sufficient to satisfy interstate commerce element in possession of child pornography case); United States v. Dunlap, 180 Fed. Appx. 636 (8th Cir. 2006) (use of a camera and film that had traveled in interstate commerce satisfies interstate commerce element for production of child pornography); United States v. Chambers, 441 F.3d 438, 451 (6th Cir. 2006) (Polaroid film produced in either Massachusetts or the Netherlands provided sufficient

interstate/foreign commerce nexus in child pornography possession case); <u>United States v. Pahl</u>, 2015 WL 7312898, at *1-3 (D. Utah Nov. 19, 2015) (use of iPhone manufactured outside Utah to produce child pornography satisfies interstate commerce element); <u>United States v. Winningham</u>, 953 F. Supp. 1068, 1076 (D. Minn. 1996) (possession of photographs of child pornography taken using film manufactured in another state alone provides sufficient nexus to interstate commerce).

### 3. Mann Act Violations – Exposure to a Sexually Transmitted Disease

Kelly challenges the sufficiency of the evidence proving the violations of the Mann Act based on exposure to a sexually transmitted disease. Specifically, Kelly first argues that the government failed to prove Racketeering Acts 8A and 12A because, with respect to Jane and Faith respectively, there was insufficient evidence to prove that Kelly transported either of them with the <u>intent</u> of exposing them to herpes. (Mot. at 29, 47-48). He also similarly argues that there was insufficient proof on Racketeering Acts 8B and 12B that Kelly "persuaded, induced, enticed, or coerced Faith to travel to New York with the intent of exposing her to herpes," <u>id.</u> at 47-50, and that he did not persuade, induce, entice, or coerce Jane to travel to California in April and May 2015 at all. (<u>Id.</u> at 34-41). Finally, Kelly argues that the evidence was insufficient to prove that he committed violations of Cal. Health and Safety Code § 120290, New York Penal Law § 120.20, and New York Public Health Law § 2307 beyond a reasonable doubt. (<u>Id.</u> at 29, 47, 50-52).

### a. Racketeering Acts 8A and 12A: Intent

As the Court correctly instructed the jury, in order to establish the necessary intent for a violation of 18 U.S.C. § 2421(a),

> it is not necessary for the government to prove that engaging in
> illegal sexual activity was the only purpose for crossing the state

line. A person may have several different purposes or motives for
such travel, and each may prompt in varying degrees the act of
making the journey. The Government must prove beyond a
reasonable doubt, however, that a significant or motivating purpose
of the travel across a state line was that the defendant would
engage in illegal sexual activity with [the victim]. In other words,
that illegal activity must not have been merely incidental to the
trip.

(T. 4658); see also United States v. Hayward, 359 F.3d 631, 637-38 (3d Cir. 2004) (approving

virtually identical language in jury charge for violation of 18 U.S.C. § 2423(a), which

criminalizes transportation of a minor with intent to engage in illegal sexual activity and includes

identical intent language as § 2421(a)); see also United States v. Maxwell, 2021 WL 5999410, at

*10 (S.D.N.Y. Dec. 19, 2021) (using virtually identical language in jury charge for violation of

18 U.S.C. § 2423(a)).[17] Kelly argues that the illegal sexual activity alleged in these racketeering

---

[17] Notably, the defendant asserts – wrongly – that the Ninth and Tenth Circuits have
held that the government must prove "that the illegal sexual activity is **the** 'dominant, significant
or motivating purpose' behind the transportation" and misleadingly suggests that there is a
circuit split regarding this issue. (Mot. at 29-30 (emphasis added)). In fact, the cases cited by
the defendant for this proposition do not so hold. In United States v. Kinslow, the Ninth Circuit
explicitly recognized that a defendant may have more than one purpose for transporting an
individual and only "**one of** the dominant purposes" need be for illegal sexual activity. 860 F.2d
963, 967-69 (9th Cir. 1988) (emphasis added) (overruled on other grounds); see also United
States v. Lukashov, 694 F.3d 1107, 1118-19 (9th Cir. 2012) (holding that defendant's stated
purpose in traveling to New York and back to Oregon to pick up and deliver goods in his
capacity as a long-haul truck driver did not mean the requisite intent was not established at trial
because it "ignores the human ability and propensity to act in light of multiple motives and
purposes," only one of which need be "**a** dominant, significant, or motivating purpose" to engage
in illegal sexual activity; that the defendant "also had a commercial purpose for crossing state
lines does not negate the inference that he had a significant or motivating purpose to continue"
engaging in illegal sexual activity with the victim) (emphasis added). Similarly, in United States
v. Cryar, the Tenth Circuit made clear that transportation for the purpose of illegal sexual activity
"need not be the sole reason for transportation, not need it be the most important of defendant's
reasons when multiple purposes are present," it need only be "**a** motivating or dominant
purpose." 232 F.3d 1318, 1326 (10th Cir. 2000) (emphasis added). Thus, it is clear that the
Ninth and Tenth Circuit's decisions are in line with the Court's instructions here that the illegal
sexual activity need only be "a motivating or significant purpose" of the travel. Nor is the
defendant correct that "[t]he Second Circuit does not seem to have answered the intent question."
(Mot. at 30). In United States v. Vargas-Cordon, while discussing identical intent language in 18

acts was "incidental" to the trips. (Mot. at 30). While Kelly was certainly free to make such an argument to the jury – and in fact did so (T. 4494) – based on the evidence presented at trial, the jury was entitled to find otherwise.

In this regard, the relevant question is not, as suggested by Kelly, whether he travelled to California in the spring of 2015 to perform at shows or that he had the "intent to infect [Jane] with herpes." (Mot. at 31).[18] Rather, the relevant question is whether one of Kelly's moving purposes in transporting Jane to California was to engage in unprotected sex with Jane without first informing her that he had contracted herpes and obtaining her consent to sexual intercourse in those circumstances. As to that question, the government presented sufficient evidence for a reasonable juror to reach that conclusion.

Kelly's medical records and testimony from his personal doctor, Dr. Kris McGrath, among other things, established that the defendant had contracted genital herpes at some point after June 2000 and before March 19, 2007, and that Dr. McGrath had informed the defendant of this diagnosis, and unequivocally told the defendant to inform his sexual partners

_____

U.S.C. § 2423(a), the Second Circuit made clear that "the contemplated unlawful sexual activity need not be the defendant's sole purpose for transporting a minor in interstate or foreign commerce. Rather, it must only be **a** dominant purpose of the transportation. This can include being one of multiple dominant purposes. . . . [A] jury need only find that illegal sexual activity . . . was one of the dominant motives for the interstate transportation . . . and not merely an incident of the transportation." 733 F.3d 366 (2d Cir. 2013) (internal quotation marks and citations omitted; emphasis added).

[18]     The portion of the trial transcript cited by the defendant to assert that the purpose of the defendant's travel to California had nothing "to do with Jane" but rather was because the defendant "had shows" there (T. 888) refers to a California trip that took place <u>after</u> the conduct charged in Racketeering Act 8(A), which charges conduct in or about and between the end of April and May 2015. During the quoted portion of her testimony, Jane was testifying about trips to California that occurred <u>after</u> her initial trip there in the spring of 2015. (T. 888)

that he had herpes and to use a condom during intercourse.  (T. 405-07, 410-11, 421, 462-63; GX 402).

There was also overwhelming evidence showing that notwithstanding what Kelly told Jane, Kelly's motivating purpose in spending time with Jane was to engage in sexual activity with her.  Jane testified that the very first time she met Kelly in Florida at the Dolphin hotel, he told her that before she could audition for him, "he needed to cum," or ejaculate, and "continuously tr[ied] to peer pressure [her] to have sex with him."  (T. 789-90).  Ultimately, after Jane continued to decline, Kelly asked Jane "to at least just let him lick [her] butt," and in return, he promised "[t]o allow Jane to audition and to take care of [her] for life."  (T. 792).  Thereafter, Kelly "licked Jane's butt" before being interrupted by a knock at the door of his hotel room by officers.  (T. 792-93).  After the officers left, Kelly "made [Jane] get back on top of him backwards, and then he ejaculated."  (T. 795).  After he ejaculated, Kelly allowed Jane to sing for him.  (T. 795).  Thereafter, Kelly told Jane that he wanted her to travel to see him and that he would "teach [her] a few techniques."  (T. 796).  The two then continued to communicate by phone.  (T. 796).  A few days after their meeting at the Dolphin hotel, Kelly asked Jane to send him "a video of [her] singing in [her] underwear and bra," which she did.  (T. 797).  He also gave Jane the phone number for his assistant, Cheryl Mack, and told Jane to text Mack so that Mack could make travel arrangements for Jane to come see Kelly while he was on tour in California.  (T. 798-800).  On April 28, 2015, Jane sent a text message to Mack stating "Mr. Kelly said to get me to LA, an early flight.  My name is [Jane].  I'm in Orlando, Florida, currently" and provided Mack with her true date of birth, December 30, 1997.  (T. 802; GX 233(c)).  Mack then arranged for Jane to travel to Los Angeles the following day and Jane flew from Orlando, Florida to Los Angeles, which travel was paid for by Kelly.  (T. 801-03; GX 217).  After her arrival in Los

Angeles, Jane saw Kelly in his hotel room. (T. 803). Kelly told Jane that "he wanted to teach [Jane] a few [musical] techniques, however, he needed to ejaculate again before doing anything" and thereafter gave Jane oral sex. (T. 804-05). After Los Angeles, Cheryl Mack, arranged for Jane to travel to Stockton, California on May 1, 2015. (T. 816-17; GX 233(q)). After attending Kelly's concert in Stockton that evening, Jane saw Kelly at a hotel room in Stockton, where she had sexual intercourse (i.e., vaginal penetration) with him. (T. 819). Kelly did not use a condom and did not say anything to Jane about his having an STD. (T. 819-20). Thereafter, in the summer of 2015, Jane travelled and spent time with Kelly in Chicago and Atlanta and the two "had sex almost every day." (T. 838-44). While the two engaged in sexual contact, Kelly "would basically control exactly every single time [they] were intimate . . . Meaning that he would say everything specifically and [Jane] would have to follow exactly what he said." (T. 845). Kelly "never" told Jane that he had previously been diagnosed with herpes and he never used a condom during sex. (T. 853, 882).

From this evidence, the jury could reasonably conclude that one of Kelly's motivating reasons for arranging for Jane to travel to see him in California in April and May 2015 was so that he could have sexual intercourse with Jane and do so in the manner he always did with Jane and his other sexual partners who testified at trial– namely, without a condom and without first informing her that he had contracted herpes.

The same is true for Faith. Faith testified that after meeting Kelly at a concert in San Antonio in March 2017, she began communicating with him regularly and he arranged for her to travel to see him on various occasions between May 2017 and February 2018. (T. 2125-26). At no point during the time period from March 2017 through the last time Faith travelled to see the defendant in February 2018 did the defendant tell Faith that he had herpes

and at no point during his sexual interactions with Faith did he wear a condom, including during sexual intercourse. (T. 2126-27). In May 2017, after attending Kelly's concert the night before in Long Island, Kelly showed up at Faith's hotel room at 6 a.m. and almost immediately "strip[ped] down from [his] waist down" and told Faith to take her clothes off, asking her to "come rub on daddy," referring explicitly to his penis. (T. 2163-66). When Faith began massaging his shoulders, Kelly moved her hand onto his penis and told her to "rub there." (T. 2166). Faith told Kelly she was not ready for sex and Kelly responded that "he was at his best when he was wanted." (T. 2170). Thereafter, Kelly instructed Faith to get on the bed on her back, on all fours, and started "rubbing on [her]" and then stuck his fingers inside her vagina in a manner that Faith felt like she was being "examined by an OB/GYN." (T. 2171-72). Kelly then began to give Faith oral sex from behind and, after a brief pause, told Faith to flip over, which she did, and he continued to give her oral sex. (T. 2172-73). Thereafter, Kelly started to "get[ ] ready to penetrate" Faith and she asked him, "Are you going to use a condom?," to which Kelly replied, "We don't need a condom." (T. 2173). Kelly then penetrated Faith's vagina with his penis and directed Faith on what to say and how to moan while recording the encounter on a nearby Apple iPad. (T. 2173, 2178). There were a few times where Kelly paused because Faith "wasn't getting aroused and it was kind of like difficulties with him getting inside of" Faith. (T. 2173). After Kelly finished, he "let out a sigh of disappointment" and told Faith "there was a lot [she] had to learn when it came to sex." (T. 2173). After a brief conversation concerning Faith's age, Kelly "put on his clothes, got his backpack and he left." (T. 2174). Other than stay in her hotel room – at the defendant's direction – Faith did nothing else for the remainder of the trip and did not see the defendant again during the trip. (T. 2179-83)

In the months that followed, Kelly arranged for Faith to travel to see him in Chicago (June 2017), Dallas (December 2017), Los Angeles (January 2018), and then, finally, in New York City (February 2018). On each of those occasions, the defendant intended to engage in sexual intercourse with Faith. Indeed, in Chicago, within less than five minutes of first seeing her, Kelly told Faith to take off her clothes and pulled his penis out. (T. 2187). After Faith told Kelly she was "on her period," he told Faith to "suck on daddy," and "pulled [her] neck down to start giving him oral sex," which she did for approximately 30 minutes. (T. 2187). This encounter began about 10 minutes after Faith had arrived at Kelly's studio from the airport and, as discussed above, less than five minutes after the defendant first saw her in Chicago. (T. 2187). Kelly then sent Faith to buy lingerie at a local mall and did not see her again during his trip to Chicago (from which the jury could certainly infer that Kelly no longer had an interest in seeing again during this trip because she had told him she had her period and, given that, would not engage in sexual intercourse with her. (T. 2188-89).

In Dallas, Kelly engaged in sexual intercourse with Faith at the concert venue before his show, without a condom and without first informing her he had herpes. (T. 2193, 2125-27). After the concert and a period of time when Faith was backstage with Diana Copeland, Faith returned to her hotel and went to sleep. (T. 2195). Approximately two hours later, Faith was awoken by knocking on her door; Kelly came inside and engaged in sexual intercourse with Faith, again without a condom and without his informing her that he had herpes. (T. 2195, 2125-27). At the end of the trip, Kelly informed Faith, inter alia, that he was dismayed that when he had sex with her he had difficulty getting his penis fully inside her and told Faith she "needed to get a dildo that was the size of his penis and [she] needed to start using it so that he doesn't have any problems when [they]'re having sex." (T. 2214).

In Los Angeles, Faith first saw Kelly at a recording studio, after being told by Diana Copeland, to wait in a Sprinter van outside for hours and then in a room within the studio. (T. 2222-29). After about 15 minutes, Kelly jogged into the room, got something, said "hey" and left the room. (T. 2229). Faith then waited several hours in the room before Kelly returned again. (T. 2229-31, 2245). Shortly after his return, Kelly told Faith to take off her clothes and walk back and forth. (T. 2248). Faith again told Kelly she "was on her period," though this time she did not actually have her period. (T. 2248). Faith lied to Kelly about having her period because she did not want to have sex. (T. 2248). Upon learning that Faith had her period, Kelly "sigh[ed]" and said "Well, why did you come?" (T. 2249). Faith responded, "You wouldn't want me to come just because I was on my period?" and Kelly nodded his head. (T. 2249). He then told Faith to take off her pants and had her walk back and forth in the body suit she was wearing. (T. 2249). Later, as described infra, he forced Faith to give him oral sex.

Finally, when Faith travelled to New York City in February 2018, she arrived at the Mondrian hotel around 1 a.m. and stayed in Kelly's hotel suite. (T. 2263-64). The suite was empty when she arrived and Kelly knocked on the door around 8 am while Faith was sleeping. (T. 2264). Immediately after she opened the door to the suite, Kelly told Faith she was "going to have to get used to [his] schedule" and told her to take her clothes off, which she did. (T. 2264). Kelly then asked Faith to hug and kiss him and thereafter retrieved his iPad and told Faith to "pose," after which he complained that she wasn't "being sexy." (T. 2264-65). He then told Faith to "play with [her]self" and when she did not do so, he sighed with dissatisfaction. (T. 2265). Kelly then asked Faith to lie down on the bed on her back and, after the defendant masturbated briefly, he began to penetrate Faith, putting his penis into her vagina. (T. 2265, 2268). Faith clenched her body on purpose and Kelly became frustrated, started grunting, told

Faith to relax, and got upset when she did not do so. (T. 2265-66, 2268). Finally, frustrated and upset, Kelly got up, retrieved his iPad to watch sexual content on it, and began masturbating in a "high speed" manner. (T. 2266). When he finished, Kelly told Faith she needed to be like the two women in the sex video he had just watched on his iPad. (T. 2269). Kelly then ordered room service, asked Faith to rub his back, and subsequently fell asleep a few minutes later. (T. 2269). Thereafter, Diana Copeland entered the suite and informed the defendant that he had a meeting he was late for, and the defendant quickly got dressed. (T. 2277). Before leaving, however, Kelly gave Faith "constructive criticism" about her sexual "positions." (T. 2277). The defendant did not use a condom or inform Faith that he had herpes prior to having sexual intercourse with her in New York City. (T. 2269).

Given this course of events over five trips, including Kelly's reaction to learning that Faith purportedly had her period in Los Angeles, a reasonable jury could certainly conclude that a motivating purpose of having Faith travel to see him in Los Angeles and elsewhere, including her two trips to New York, was to have sexual intercourse with her in the manner he always did, without a condom and without first informing her that he had herpes.

> b. Racketeering Acts 8B and 12B: Persuasion, Inducement, Enticement, or Coercion

> i. Jane

Kelly argues that, with respect to Racketeering Act 8B, the record is devoid of evidence that Kelly "persuaded, induced, enticed or coerced" Jane to travel to California in April and May 2015. (Mot. at 34). As described above, however, the trial evidence showed that following their very first sexual encounter at the Dolphin Hotel in Florida, Kelly allowed Jane, an aspiring professional singer, to audition for him, and then Kelly told Jane he wanted her to travel to see him on tour, promising to teach her a few singing techniques. In subsequent phone

conversations, he provided Jane with contact information for his assistant, Cheryl Mack, so that

Mack could make arrangements for Jane to travel to see him in California. Jane did so and Mack

arranged for Jane to travel from Florida to Los Angeles and then other locations in California, all

of which travel – flights and hotels included – were paid for by Kelly.

As the Second Circuit has recognized, "persuade, induce, entice, [and] coerce . . .

are words of common usage that have plain and ordinary meanings." United States v. Waqar,

997 F.3d 481, 483 (2d Cir. 2021) (internal quotation marks omitted). Contrary to Kelly's

suggestion (Mot. at 34, 40-41), "[t]he ordinary meanings of those verbs do not include, as a

necessary element, the overbearing or transformation of another's will." Waqar, 997 F.3d at

483. Indeed, "[a] person may lead or move another by persuasion or influence to take an action

to which she is already predisposed or neutral." Id. at 486 (internal quotation marks and

alterations omitted). A jury applying the common and plain meanings of the statutory terms to

Kelly's conduct could thus readily conclude that Kelly persuaded, induced and enticed Jane to

travel to California with (false) promises of assisting her with her singing technique and by

arranging and paying for her travel, "regardless of whether she expressed (or felt) reluctance,

indifference, or, for that matter, enthusiasm at the prospect of doing so." Id. at 487; United

States v. Zupnik, 989 F.3d 649, 654 (8th Cir. 2021) (recognizing in the context of a violation of

18 U.S.C. § 2422(b) that "a defendant can be found to 'persuade' or 'entice' even a seemingly

'willing minor'") (quoted approvingly in Waqar, 997 F.3d at 488). At a minimum, such conduct

amounts to inducement, which simply means "to cause," which is all that is required of the

statute. See Harms v. United States, 272 F.2d 478, 481 (4th Cir. 1959) ("the requisite

inducement is any offer sufficient to cause the woman to respond, and that since the appellant

knowingly induced or persuaded [the victim] to make the trip then she 'knowingly caused' [the victim] to travel by interstate carrier within the meaning of the statute").

ii.    Faith

Kelly similarly argues that "[i]nsufficient evidence exists to prove that Defendant took any action to induce, persuade, entice or coerce" Faith into travelling to New York because the evidence shows that he "invited a grown woman to meet him in New York, and she accepted." (Mot. at 48). This argument fails for the same reasons. Based on the evidence set forth above, including that Kelly invited Faith to see him and arranged and paid for her travel, the jury could reasonably conclude that Kelly induced her to travel to New York to engage in sexual intercourse with her in the manner in which he always engaged in sexual intercourse with her (as well as his other sexual partners), i.e., without using a condom and without first informing her that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances. See United States v. Rashkovski, 301 F.3d 1133, 1137 (9th Cir. 2002) (finding that defendant's offer to make and pay for the necessary travel arrangements to allow his two victims to travel from Russia to the United States and fact that the victims accepted defendant's offer and thereafter traveled with his assistance was "sufficient evidence from which a rational jury could conclude that [the defendant] persuaded, induced or enticed them to travel"); United States v. Pelton, 578 F.2d 701, 713 (8th Cir. 1978) (concluding the defendant had induced a woman to travel by making her travel arrangements, even though the woman had been willing to travel to work as a prostitute).

c.    New York Penal Law § 120.20

Kelly argues that the evidence was insufficient to prove violations of New York Penal Law ("NYPL") § 120.20 because "unprotected sex with someone who has genital herpes

does not establish a substantial risk of serious physical injury."  (Mot. at 50-51).  Section 120.20

provides that "a person is guilty of reckless endangerment in the second degree when he

recklessly engages in conduct which creates a substantial risk of serious physical injury to

another person."  As the New York Court of Appeals has made clear, "the reckless

endangerment statutes seek to prevent the risk created by the actor's conduct, <u>not a particular</u>

<u>outcome</u>, and the risk of injury alone will sustain prosecution."[19]  <u>People v. Galatro</u>, 84 NY.2d

160, 164 (N.Y. 1994) (internal quotation marks omitted; emphasis added).

Each of the challenged Mann Act violations alleges that the defendant violated

New York Penal Law Section 120.20 (and New York Public Health Law Section 2307) "in that

[he] engaged in unprotected sexual intercourse with [Faith] without first informing [Faith] that

he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances."

The conduct alleged in the indictment and proven at trial clearly constitutes reckless

endangerment in the second degree.  As the Court properly instructed the jury,

> A person recklessly engages in conduct which creates a substantial
> risk of serious physical injury to another person: (i) when he
> engages in conduct which creates a substantial and unjustifiable
> risk of serious physical injury to another person, (ii) when he is
> aware of and consciously disregards that risk, and (iii) when that
> risk is of such nature and degree that disregard of it constitutes a
> gross deviation from the standard of conduct that a reasonable
> person would observe in the situation. The defendant's subjective
> intent is irrelevant.
>
> Serious physical injury means impairment of a person's physical
> condition that creates a substantial risk of death, or which causes
> death, or serious and protracted disfigurement, or protracted
> impairment of health or protracted loss or impairment of the
> function of any bodily organ.

(T. 4689-90).

---

[19]     As a result, the defendant's assertion that "Faith did not contract genital herpes
from Defendant," Mot. at 50, is irrelevant.

A reasonable jury could easily conclude from the trial evidence that the government met these elements. Testimony from Dr. Kris McGrath conclusively established that the defendant had been diagnosed with genital herpes, and informed of that diagnosis, years before having sexual intercourse with Faith. Dr. McGrath also made clear that he had specifically advised Kelly to tell his sexual partners he had herpes and to use a condom during sex. A reasonable jury could also conclude from the trial evidence that Kelly was aware of the substantial risk that he could infect Faith with genital herpes given, among other things, (1) the testimony from Kate that she had contracted genital herpes from the defendant in the early 2000s, told Kelly so, and pursued legal action against him on that basis in 2004; and (2) the testimony from Jane that she contracted genital herpes from Kelly and told Kelly of her diagnosis in August 2015. He nonetheless consciously chose to engage in unprotected sexual intercourse with Faith without first informing her he had contracted herpes. A jury could reasonably find that his conduct in this regard created "a substantial risk of . . . protracted impairment of health." NY Penal Law § 10.10.

As Dr. Iffath Hoskins' expert testimony established, herpes is a venereal, i.e., sexually transmitted, disease. (T. 3035-36). Once you have it, you have it for the rest of your life – there is no cure. (T. 3036, 3057). And, it is a "very contagious, transmissible virus that . . . lives in the human body, in various tissues in the human body." (T. 3036). Genital herpes enters the body from direct contact with the infected person's genital tract, including through sexual intercourse. (T. 3036-37). Once the herpes virus enters the body, it first stays in the local area where it entered and "creates a response from the body in that general area and, then, ultimately, over a window of time" goes to "its preferred location . . . which is the central nervous system." (T. 3037). The central nervous system "is the combination of the brain . . . and then [the] whole

rest of the nerves[,] which is the spinal cord and the rest of the nerves for the entire body."

(T. 3038; GX 962). The initial response, known as a "primary outbreak," for genital herpes

manifests itself through the appearance of "blisters, ulcers, pusules, vesicles. These are technical

terms but they basically mean raised areas filled with fluid. If the blister breaks open, then it's

red appearing because it's a denuded or raw area within that blister." (T. 3040). Wherever the

blister appears, it has "a lining," or "raw area within the base of it and then some weepiness of

the fluid coming out." (T. 3040). Primary outbreaks are particularly severe because the infected

body "has never seen the attack by the herpes virus . . . so the body is going to mount a very

strong response to this attack," with "various aspects of the human body . . . get[ting] involved

and react[ing] to this infection." (T. 3040-41).

Once the herpes virus goes to the central nervous system, it "stays there in a

specific unique portion of the central nervous system." (T. 3038). Once there, "it's always there

so it can reactivate" and "many parts [of the body] can then be affected." (T. 3039). "When

there's reactivation, there can be a resurgence of a pattern that [is] similar to the initial attack" or

outbreak. (T. 3039). Such reactivations are known as "secondary outbreak[s]" and can result in

"similar findings," such as "the blisters, the vesicles, the pustules, the broken areas, the scabs, the

denuded areas." (T. 3041). In addition, whether primary or secondary, such outbreaks result in

symptoms such as "burning, tingling, pain, a sensation of numbness sometimes. Severe pain is

. . . at the top of the list." (T. 3041-42). With respect to genital herpes, that severe pain

manifests itself as follows:

> [O]nce the vesicles, postules, blisters appear, there is pain in that
> general area. It could be before the actual blister has been seen but
> the pain is there. It can be during the time when the blister is
> present, when the blister breaks open and the fluid weeps out and
> then  subsequent to that, when it's crusting over. . . . [I]f it's a
> primary outbreak, the pain is very, very intense because you recall

that herpes is preferentially wanting to be with the nerves. So the nerves gets overactivated, overstimulated, so the intensity of the response of that nerve is very high and, therefore, the pain is very intense. The burning is very intense. Then that pain causes the individual to then have secondary complications or problems due to the actual existence of the pain. . . . [I]f . . . there's all these blisters in the genital area with the severe pain and burning and that sensation, then the individual might have severe pain just because that tissue is very, in deep pain and, therefore, the person may not be able to have even anything touching like a sheet or clothes, may not be able to walk, may not be able to lie down. Anything touching that area or even air sort of being exposed to that area might cause pain. It can also be when the individual needs to urinate, for example, because the area might be extra responsive and sensitive. So there may be a stinging, burning sensation actually during the act of, you know, urinating, therefore, the individual, the body tends to like avoid trying to do that. So because of the pain, because of the burning, there can be secondary situations such as the person won't move, the person may not urinate, the person may then retain the urine, the person may need to have a burning sensation which may mean that they cannot wear their clothes at that time because nothing can touch it. So that's what I'm trying to describe as the secondary. And it's all because it's a very severe, high level of intense pain and burning that occurs with the primary outbreak.

(T. 3042-44).

Secondary outbreaks can be either unpredictable or triggered by known factors.

(T. 3044). With respect to "the unknown and unpredictable, it could be everything was going along fine in the individual's life and suddenly there was an outbreak." (T. 3044). The "other end of the spectrum" consists of "known triggers" that occur commonly and regularly when a person is "just . . . living their lives," such as monthly menstruation, a common cold, cough or other infection attacking the individual's immunity, exposure to sunlight, as well as other illnesses, such as "asthma, cancer, hypertension, [and] diabetes." (T. 3044). "Anything which is already giving a burden to [a person's] immune system can also be a trigger for the herpes to get

reactivated." (T. 3044). Put simply, "very common, everyday things" – the types of things that cannot realistically be avoided – trigger secondary outbreaks. (T. 3045).

Whether primary or secondary, an outbreak can "last anywhere from several days to several weeks." (T. 3054). It can also result in further medical complications, such as blood infections (including, most seriously, sepsis[20]), brain infections, and central nervous system infections. (T. 3049-50). While sepsis and brain infections are less common than the bodily reactions previously described, they occur as a result of an outbreak and "always" remain a risk when someone has herpes.[21] (T. 3050).

Significantly, while a person can be "asymptomatic" for a period of time after an initial outbreak, he or she can still spread the herpes virus while asymptomatic. As Dr. Hoskins explained,

> Asymptomatic shedding . . . means that the virus is being excreted but it is coming at a time in the individual's life when he or she does not have evidence of the herpes itself. In other words they don't have a blister, they don't have the symptoms of tingling, the

---

[20] As Dr. Hoskins testified, sepsis is an "overarching term that just means that the infection is so intense that it is affecting the bloodstream and therefore the heart and lungs and the brain. Sepsis is a very serious, heavy term that denotes that the infection in the bloodstream is heavy enough that it is now beginning to have effects on the rest of the human body." (T. 3051).

[21] Having herpes can also complicate a woman's pregnancy. (T. 3096). Because a woman's immunity is suppressed during pregnancy, she is at increased risk for getting an infection and the degree of infection is worse with respect to "[d]epth of illness, longer duration of the illness, [and] more serious possibility of complications." (T. 3097). As a result, a primary herpes outbreak will be even more serious in a pregnant woman and a secondary infection is more likely to result in an outbreak with a "higher degree" of symptoms. (T. 3098). If the virus gets transmitted from the mother to the fetus through the placenta, "the fetus can get very sick even inside the uterus" because it does not have any inherent immunity. (T. 3098). Moreover, if there is direct contact through viral shedding during delivery in the birth canal, the newborn baby "can get very sick very quickly and has a higher likelihood that [the infection] would go to the brain and the infection in the brain would cause serious long-term damage," such as encephalitis resulting in "a cerebral palsy like picture." (T. 3098-99). As a result, these are other risks and complications for a woman of child-bearing age exposed to genital herpes.

> numbness, the burning, the paid so they might be thinking . . . my herpes is at rest right now but, in reality, it has reactivated because there's no evidence that it has reactivated by the shedding is occurring in the absence of any overt evidence of reactivation.

(T. 3046). Put simply, "herpes is chronic, it remains. There is the possibility of shedding even in the absence of any symptoms, et cetera, so it's always there." (T. 3060). Nor does prophylactic use of anti-viral medications like Valtrex completely negate the risk of transmission:

> [U]sing something like Valtrex is going to try to decrease that. That's the intention of giving the Valtrex or taking the Valtrex, but there will never be a situation where there's a hundred percent protection knowing or not knowing there is an actual lesion or an ulcer or an outbreak. So in general, we tell patients that you will never be [a] hundred percent protected even if you took the Valtrex all the time or whatever window of time, because there is a subset, and it varies in the range of 10 to 20 percent, usually, there is a subset of situations and people where there will still be the possibility of you transmitting it or shedding it because the Valtrex's usefulness is not anywhere close to a hundred percent.

(T. 3060). Moreover, these percentages are "based on a person who is actually following the directions of their doctor and taking the Valtrex as prescribed." (T. 3060). When a patient does not do so, that "adds to that 10 to 20 percent concern." (T. 3061). In any event, a reasonable jury could conclude from Dr. McGrath's testimony and the medical and prescription records in evidence that the defendant did <u>not</u> take Valtrex as prescribed given that Dr. McGrath often had to reissue prescriptions for the defendant notwithstanding his having prescribed months-worth of Valtrex to him at a time, further heightening that risk to Faith and others. (T. 418-19).

From all of these facts, a reasonable jury could find, as the trial jury did, that the defendant's conduct created "a substantial risk of . . . protracted impairment of health."

d.    New York Public Health Law Section 2307

With respect to New York Public Health Law ("NYPHL") Section 2307, Kelly

first argues that the law "is unconstitutional, facially and as applied, for the reasons previously

identified in his 'Motion to Strike Allegations from Count One of the Superseding Indictment

and Dismiss the Remaining Counts' (ECF Docket Entry No, 42)," without any further argument.

(Mot. at 52).  The government previously filed a comprehensive response to Kelly's referenced

motion, see ECF Docket Entry No. 47, which it incorporates herein by reference.  And, on May

22, 2020, the Court issued a detailed written decision on the matter.  See Order, dated May 22,

2020, ECF Docket Entry No. 69 ("May 22, 2020 Order") at 8-18.  Kelly's arguments in this

regard continue to fail for the reasons stated on the government's prior response and the Court's

written decision.

Kelly also argues that NYPHL Section 2307 is "void for vagueness as it fails to

put the public on notice of what conduct constitutes criminal behavior and authorizes arbitrary

and discriminatory enforcement."  (Mot. at 52).  As the Court previously recognized,

> The Due Process Clause of the Fourteenth Amendment requires
> that every criminal statute "(1) give the person of ordinary
> intelligence a reasonable opportunity to know what is prohibited,
> and (2) provide explicit standards for those who apply the statute."
> *Dickerson*, 604 F.3d at 741 (quoting *Grayned v. City of Rockford*,
> 408 U.S. 104, 108 (1972) (alterations and citation omitted)). "A
> plaintiff making an as-applied challenge must show that the statute
> in question provided insufficient notice that his or her behavior at
> issue was prohibited." *Id.* at 745 (citation omitted). The standard,
> however, is an objective one: "whether the law presents an
> ordinary person with sufficient notice of or the opportunity to
> understand what conduct is prohibited or proscribed, not whether a
> particular plaintiff actually received a warning that alerted him or
> her to the danger of being held to account for the behavior in
> question." *Id.* at 745-46 (internal citation and quotation marks
> omitted).

"Even if a person of ordinary intelligence has notice of what a statute prohibits, the statute nonetheless may be unconstitutionally vague 'if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Id.* at 747 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Nevertheless, a law need not "achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Id.* (citations and internal quotation marks omitted). "Moreover, a statute that provides what may be unconstitutionally broad discretion if subjected to a facial challenge may still be upheld as constitutional on an as-applied challenge if the particular enforcement at issue is consistent with the core concerns underlying the statute such that the enforcement did not represent an abuse of the discretion afforded under the statute." *Id.* at 748 (citation, alterations and internal quotation marks omitted).

Section 2307 of the New York Public Health Law provides that "[a]ny person who, knowing himself or herself to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor." A person of ordinary intelligence would understand that he could be charged under Section 2307 for engaging in sexual intercourse knowing himself to be infected with herpes.

May 22, 2020 Order at 15-17. Kelly previously argued that Section 2307 was vague because it does not define "sexual intercourse" or "what constitutes an STD," arguments the Court rightly rejected. Id. at 17. He now argues that the law is vague because it does not define "infected." (Mot. at 52). His argument similarly fails. First, the term "infected" is unambiguous and has a plain and ordinary meaning;[22] and second, its use here does not stand alone. The statute makes clear that it applies to a person who knows "himself or herself to be infected <u>with an infectious venereal disease</u>." As a result, Kelly's apparent claim that the statute applies simply to "having a virus rather than having the ability to transmit it," (Mot. at 52) is belied by the language of the statute itself when considered in its totality. The statute requires not only that a person be

---

[22]     <u>See</u> <u>Nwozuzu v. Holder</u>, 726 F.3d 323, 327 (2d Cir. 2013) ("When interpreting a statutory provision, we begin with the language of the statute. If the statutory terms are unambiguous, we construe the statute according to the plain meaning of its words.").

infected with a disease, but that the disease be "an infectious venereal disease," i.e., a disease that the person has the ability to transmit sexually. As the trial evidence described above showed, herpes is one such venereal disease.

<blockquote>e. California Health and Safety Code Section 120290</blockquote>

Kelly also argues that the government did not prove that he committed a violation of California Health and Safety Code Section 120290 "because the government charged Defendant with a repealed version of the statute no longer in effect, a version that reduced the government's burden of proof." (Mot. at 31-32). Racketeering Act Eight makes clear that the illegal sexual activity at issue in these Mann Act predicates was the version of § 120920 that became effective in 1998, and remained effective through the time of the charged conduct in April and May 2015. That the California statute "was overhauled" in 2018 (Mot. at 32) – three years after the defendant's charged conduct – does not render the government's charge, or the Court's instructions, improper. In the racketeering context, the relevant consideration is whether the predicate racketeering act was a violation of the relevant state or federal law at the time that the underlying conduct was committed. See United States v. Davis, 576 F.2d 1065, 1067 (3d Cir. 1978) ("[T]he words 'chargeable under State law' in [18 U.S.C.] § 1961(1)(A) mean 'chargeable under State law at the time the offense was committed.'"); United States v. Bonanno Organized Crime Family of La Cosa Nostra, 695 F. Supp. 1426 (E.D.N.Y. 1988) (RICO predicate alleging acts indictable under 18 U.S.C. § 1512 dismissed because the defendant's alleged conduct occurred before enactment of § 1512). The charged conduct was indictable under the Mann Act at the time it occurred and the Court properly instructed the jury as to the elements of underlying state law in effect at the time.

In 2015, the operative version of Section 120290 (titled "willful exposure of a communicable disease") provided, in its entirety, as follows:

> Except as provided in Section 120291[23] or in the case of the removal of an afflicted person in a manner the least dangerous to the public health, any person afflicted with any contagious, infectious, or communicable disease who willfully exposes himself or herself to another person, and any person who willfully exposes another person afflicted with the disease to someone else, is guilty of a misdemeanor.

Cal. Health & Safety Code § 120290 (effective 1998). As a result, the Court's jury charge regarding Section 120290 properly quotes the relevant portion of Section 120290 that was in effect at the time of the charged conduct and properly sets forth the elements of the charged conduct. Nor did the evidence adduced at trial fail to show that Kelly acted willfully, as that term is defined with respect to Section 120290. (See Mot. at 33-34). At the time of the charged conduct (and now), California law provided that "[t]he word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." Cal. Penal Law 7(1) (effective until 2016); see also People v. Valdez, 27 Cal. 4th 778, 787-788 (2002); cf. People v. Atkins, 25 Cal. 4th 76, 85 (2000) ("The terms willful or willfully, when applied in a penal statute, require only that the illegal act or omission occur intentionally, without regard to motive or ignorance of the act's prohibited character. Willfully implies no evil intent; it implies that the person knows what he is

---

[23]     As set forth in further detail below, the 1998 amendment to the statute added the reference to a new, separate provision in California's Health and Safety Code – namely, Section 120291. Specifically, section 120291 made it a felony and provided harsher penalties for individuals who exposed others to the HIV virus by engaging in unprotected sexual activity without first disclosing their HIV-positive status and acted with specific intent to infect the other person with HIV. This version of § 120291 was in effect at the time of the conduct charged in Racketeering Acts 8A and 8B.

doing, intends to do what he is doing and is a free agent.") (internal quotation marks and citations omitted).  As a result, the government had to prove only that Kelly purposely or willingly exposed himself to Jane in the specific circumstances charged in the indictment: i.e., that he purposely or willingly engaged in unprotected sexual intercourse with Jane without first informing her that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances.  A reasonable jury could certainly reach that conclusion based on the totality of the trial evidence as described herein.  Cf. Doe v. Roe, 2013 WL 1787175, at *5 (D. Nev. Apr. 25, 2013) (finding plaintiff had alleged sufficient facts showing that defendant violated California Health and Safety Code § 120290 where plaintiff alleged defendant knew he was infected with herpes while in a relationship with plaintiff and defendant had unprotected sexual intercourse with plaintiff).  Moreover, even assuming arguendo that Kelly must have acted "with knowledge of the consequences," the statute criminalizes willful exposure, not transmission, as the defendant appears to assert.  (Mot. at 33).  As a result, it does not matter whether Kelly actually transmitted genital herpes to Jane through sexual intercourse in April or May 2015.  A reasonable jury could certainly conclude he exposed her to it, particularly where, as here, Jane was diagnosed with genital herpes when she finally went to a doctor on August 14, 2015 after suffering a painful outbreak.[24]

     Finally, the defendant's challenge to Section 120290 on vagueness grounds also fails.  (Mot. at 32-33).  As the Court previously recognized, the standard set forth in United

---

[24] Notably, Jane began having "discomfort in [her] pelvis and in [her] lower abdomen" during sexual intercourse with the defendant and told the defendant about this pain during sex prior to seeing a physician about the pain.  (T. 851).  When her symptoms did not subside and got to the point where she could not physically walk, Jane went to see the doctor, who diagnosed her with herpes, suggesting that Jane contracted herpes from the defendant in the months prior to her ultimate diagnosis in August 2015.  (T. 851-53).

States v. Salerno, 481 U.S. 739, 746 (1987), "effectively eliminates facial challenges outside of the First Amendment context that could not also be brought as an as-applied challenge, since any law that is unconstitutional in every set of circumstances is also necessarily unconstitutional when applied to any plaintiff." May 22, 2020 Order at 11 (internal quotation marks omitted). Accordingly, Kelly cannot succeed on a facial challenge to § 120290 "unless he can establish that there is no set of circumstances under which it would be valid." Id. at 12. Kelly cannot do so because the statute is not unconstitutionally vague as applied here – namely, to a person's intentional exposure of a contagious, infectious, or communicable disease through unprotected sexual intercourse with another person without first disclosing that the person has such a disease. See Maynard v. Cartwright, 486 U.S. 356, 361 (1988) ("Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."); United States v. Scott, 979 F.3d 986, (2d Cir. 2020) ("Outside of the First Amendment context, we look to whether the statute is vague as applied to the particular facts at issue. As a result, one whose conduct is clearly proscribed by a statute cannot challenge it as void for vagueness.") (internal quotation marks and citations omitted).

The void-for-vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." United States v. Halloran, 821 F.3d 321, 338 (2d Cir. 2016). The doctrine "addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." Id. at 338. With respect to the "fair notice" prong, "a court must determine whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. With respect to the second prong, "[a]lthough a law must provide explicit

standards, it need not achieve meticulous specificity and . . . [e]ven in the absence of specific standards . . . a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of what the statute prohibits." United States v. Dawkins, 2019 WL 2461722, at *4 (S.D.N.Y. May 23, 2019) (quoting United States v. Farhane, 634 F.3d 127, 139-40 (2d Cir. 2011)) (internal quotation marks omitted).

Section 120290 is not vague as applied to Kelly. Significantly, the very first sentence of Section 120290 specifically references Section 120291 of the California Health and Safety Code, which subjects a subset of conduct that would otherwise be a misdemeanor under Section 120290 to harsher penalties and classification as a felony. At the time, Section 120191 provided, in relevant part, as follows:

> (a) Any person who exposes another to the human immunodeficiency virus (HIV) by engaging in unprotected sexual activity when the infected person knows at the time of the unprotected sex that he or she is infected with HIV, has not disclosed his or her HIV-positive status, and acts with the specific intent to infect the other person with HIV, is guilty of a felony punishable by imprisonment in the state prison for three, five, or eight years. Evidence that the person had knowledge of his or her HIV-positive status, without additional evidence, shall not be sufficient to prove specific intent.

> (b) As used in this section, the following definitions shall apply:
> (1) "Sexual activity" means insertive vaginal or anal intercourse on the part of an infected male, receptive consensual vaginal intercourse on the part of an infected woman with a male partner, or receptive consensual anal intercourse on the part of an infected man or woman with a male partner.
> (2) "Unprotected sexual activity" means sexual activity without the use of a condom.

California Health & Safety Code § 120191 (effective through Dec. 31, 2017). That reference to the felony conduct in Section 120191, which conduct would otherwise fall under Section 120190's misdemeanor prohibition, is important because its inclusion makes clear that (1) the

statute provides fair notice that it criminalizes the defendant's conduct; and (2) the defendant's conduct falls within the core of what the statute prohibits.  In this way, the statute makes clear that any person who exposes another person to a contagious, infectious, or communicable disease (like herpes or HIV, for that matter) by engaging in unprotected sexual activity (including sexual intercourse), when the person knows at the time of the unprotected sex that he is so infected and has not disclosed his infected status, is guilty of a misdemeanor.[25]  That is precisely the violation of Section 120290 that (1) the defendant engaged in; (2) the indictment charged;[26] (3) the Court instructed the jury on;[27] and (4) the evidence proved.  Kelly's void-for-vagueness challenge thus fails.

D.      Mann Act Violations – Sexual Activity with Minors

Kelly challenges the sufficiency of the evidence proving the violations of the Mann Act based on sexual activity with minors.  Specifically, Kelly challenges Racketeering Act Five (a violation of 18 U.S.C. § 2422(b) involving Jerhonda) and Nine (in sub-predicated racketeering acts, violations of 18 U.S.C. § 2421(a), 2422(a), 2422(b) and 2423(a) involving Jane).

---

[25]      It is clear that such conduct with respect to HIV also constitutes a misdemeanor under § 120290 as an additional element is required to make such conduct a felony under § 120291, namely that the person "acts with the specific intent to infect the other person with HIV."  Cal. Health & Safety Code§ 120291(a).

[26]      Racketeering Act Eight specifically alleges that the defendant violated California Health and Safety Code Section 120290 in that he "engaged in unprotected sexual intercourse with [Jane] without first informing [Jane] that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances."  Indictment at 10-11.

[27]      For this reason, the defendant's assertion that the government "rewrote [the statute] in clear violation of various constitutional provisions, including the separation of powers clause and principles of comity" (Mot. at 32), is also unavailing.

1.      Racketeering Act Five

To convict a defendant of a violation of 18 U.S.C. § 2422(b), the government

must prove four elements beyond a reasonable doubt: (1) the defendant used a facility of

interstate commerce; (2) the defendant knowingly persuaded or induced or enticed or coerced an

individual to engage in sexual activity; (3) this sexual activity would violate Illinois law; and

(4) the individual was less than eighteen years old at the time of the acts alleged.  United States

v. Brand, 467 F.3d 179, 201-02 (2d Cir. 2006), overruled on other grounds by United States v.

Cabrera, 13 F.4th 140 (2d Cir. 2021).

With respect to Racketeering Act Five, Kelly first argues that the government did

not prove that Kelly used a facility of interstate commerce.[28]  (Mot. at 22).  His argument lacks

merit, as the government proved that Kelly regularly communicated with Jerhonda by cellular

telephone and cellular telephones, even intrastate, constitute a facility of interstate commerce.

See United States v. Giordano, 442 F.3d 31, 40-41 (2d Cir. 2006) ("§ 2425's prohibition on the

transmission of the name of a minor 'using ... any facility or means of interstate ... commerce'

for the specified purposes includes the intrastate use of such a facility or means"); United States

v. Perez, 414 F.3d 302, 304 (2d Cir. 2005) (the national telephone network is a "facility of

---

[28]      By citing the Supreme Court's decisions in United States v. Lopez, 514 U.S. 549
(1995), and Gonzalez v. Raich, 545 U.S. 1 (2005), the defendant suggests but does not expressly
argue that use of an interstate facility based on an intrastate call exceeds Congress's authority
under the Commerce Clause.  (Mot. at 22).  First, the government respectfully submits that the
defendant has not sufficiently raised such a challenge to preserve it.  See Botti, 711 F.3d at 313
("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived." (internal quotation marks omitted)).  But even if made
sufficiently, his argument is without merit.  See United States v. Hornaday, 392 F.3d 1306, 1310-
11 (11th Cir. 2004) (18 U.S.C. § 2422(b) does not exceed Congress's commerce power and
noting, "Congress clearly has the power to regulate the internet, as it does other instrumentalities
and channels of interstate commerce, and to prohibit its use for harmful or immoral purposes
regardless of whether those purposes would have a primarily intrastate impact.").

interstate ... commerce" for purposes of the federal murder-for-hire statute, 18 U.S.C.

§ 1958(b)(2)); United States v. Evans, 476 F.3d 1176, 1180–81 (11th Cir. 2007) (holding that

defendant's use of telephones and cell phones alone, even without evidence that the calls were

routed through an interstate system, was sufficient to satisfy 18 U.S.C. § 2422(b)'s jurisdictional

element).

    Next, Kelly argues that the government did not prove that Kelly used a facility of

interstate commerce to knowingly induce, persuade, entice or coerce Jerhonda, who was then 16

years old, to meet Kelly, who was then 42 years old, at his residence in Olympia Fields for the

purpose of an illegal sexual activity. (Mot. at 23). Jerhonda, like other of Kelly's victims,

including Jane, testified that she had sexual contact with Kelly on every occasion that she saw

him at his residence. (T. 168 ("Q During that six-month period that you [Jerhonda] spent with

the defendant, how often did the defendant have sexual contact with you? A Every time I was

there.")); T. 844 ("Q How often would you [Jane] have sexual contact with the defendant during

that summer of 2015? A We had sex almost every day."). In these circumstances, and given

Jerhonda's age (16 years old), the age difference between Jerhonda and Kelly (more than 25

years) and the frequency with which they had sexual contact, the jury was free to draw the

inference, as it did, that Kelly used the telephone for the purpose of inducing Jerhonda to engage

in an illegal sexual activity. See United States v. Vickers, 708 Fed. Appx. 732, 737-38 (2d Cir.

2017) (holding there was sufficient evidence for the jury to infer that the dominant purpose for

the defendant's transportation of a young boy was for the purpose of sexual abuse, where

defendant took boy on multiple trips and sexually abused the boy on each of those trips);

Blumenfield v. United States, 284 F.2d 46, 53 (8th Cir. 1960) ("There was substantial evidence,

uncontradicted in fact, from which the jury reasonably and legitimately could infer that

Tollefson's May, 1956, trip was induced by Blumenfield, and for the purposes prohibited by the statute."). See also Sabhnani, 599 F.3d at 241 (Court must "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility.").

Finally, Kelly argues that there was insufficient evidence that Kelly did not subjectively believe that Jerhonda was 17 years or older when they engaged in sexual activity and that this belief was reasonable. (Mot. 23). Kelly's argument fails. Jerhonda testified that she told Kelly that on the first occasion where she had sexual contact with Kelly, she told him her true age of 16 years old. (T. 123). Notwithstanding Kelly's conclusory assertion to the contrary (Mot. at 23), the jury was thus free to credit Jerhonda testimony, as it did, that she told Kelly her true age and therefore that Kelly could not have reasonably believed Jerhonda was older than 16 years old.[29]

2.    Racketeering Act Nine

Next, Kelly argues that there was insufficient evidence that Kelly did not subjectively believe that Jane was 18 years old when she had sexual contact with him in California. (Mot. at 41-42). Again, the jury was free to credit Jane's testimony that she told

_____

[29]    As Kelly points out (Mot. at 24), the government introduced evidence recovered from Kelly's storage facility, which included copies of a state ID card with Jerhonda's photograph and her birth certificate (T. 3635), each of which had been obviously altered to reflect that she was 19 years old. Compare GX 70(a), with GX 414. Kelly argues that the "obvious conclusion" was that Jerhonda provided a false ID to Kelly's security team. (Mot. 24). Not so. Given that even Kelly was not in the business of collecting birth certificates, the fact that the state ID was altered in multiple places (even places that would not obviously be needed to alter (T. 3637)), Kelly's strong preference for having sexual contact with underage females and Kelly's preference for maintaining collateral, the far more likely conclusion is that Kelly obtained those copies during settlement negotiations and at some juncture, had the copies altered, in an attempt to use them in his defense one day. (Jerhonda testified that in connection with a potential civil lawsuit against Kelly, she gave her civil lawyer copies of her state ID card and her birth certificate. (T. 184).)

Kelly her true age of 17 years old when the summer of 2015 ended and she needed to return to Florida for her senior year of school, and that this occurred before she returned home to Florida and before she returned to Chicago and then New York and California. (T. 860-64, 868). While Jane's testimony on that matter is alone sufficient to justify the jury's verdict in that regard, there was additional evidence that supported Jane's testimony. In evidence was a letter dated September 19, 2015 and prepared by Jane's parents, authorizing Juice's mother to be Jane's guardian until she turned 18 years old. (GX 475(a), 476(a)). Suzette Mayweather testified that she met Jane in New York in connection with Kelly's concert at the Barclays Center on September 25, 2015 and that Kelly then traveled to Washington, DC, and then returned to New York on September 28, 2015. (T. 1957-58, 1962, 1964). The following day, on September 29, 2015, Kelly, Jane and members of his inner circle traveled form New York to California. (T. 1966-67; GX 159(a)-(f)). Based on text messages she wrote while she was in California in early October 2015, Jane recalled that she had sexual contact with Kelly during that trip, that she believed she was pregnant and that Kelly urged her to get an abortion because she was only 17 years old. (T. 880-83, 885-86; GX 205(a), 205(d)). Based on that evidence, the jury was free to conclude, as it did, that Kelly knew Jane's true age at the time of the October 2015 trip to California and that he did not reasonably believe she was 18 years of age or older.

Like he did as to Racketeering Act Eight, Kelly also argues that the record is devoid of evidence showing that Kelly induced, persuade, enticed or coerced Jane to travel to California. (Mot. 42). But as with Racketeering Act Eight, the jury was free to infer, as it did, that Kelly, who was 30 years Jane's junior, induced, persuaded, enticed or coerced Jane to travel with him from New York to California (and beyond), when he (i) arranged for her parents to enroll her in a virtual high school for her senior year, (ii) authorized Juice's mother to serve as

her guardian, (iii) paid for her return trip from Florida to Chicago, and (iv) arranged for Jane to accompany him and his entourage on travel by the Sprinter and/or a bus from Chicago to New York, from New York to Washington, D.C., and back, and from New York to California. At a minimum, it amounts to inducement, which simply means "to cause," which is all that is required of the statute. See Harms, 272 F.2d at 481 ("the requisite inducement is any offer sufficient to cause the woman to respond, and that since the appellant knowingly induced or persuaded [the victim] to make the trip then she 'knowingly caused' [the victim] to travel by interstate carrier within the meaning of the statute"). Put another way, it was certainly reasonable for the jury to infer from those actions, that Kelly sought to cause Jane's travel throughout the country with him, including from New York to Chicago. Finally, it is of no moment, as Kelly suggests, that Jane consented to traveling with Kelly or to sexual activity. (Mot. at 42). As the Eighth Circuit once wrote, "[t]he gravamen of the offense proscribed by Title 18, U.S.C.A. § 2422, is knowingly persuading, inducing, enticing or coercing any woman to go from one place to another in interstate commerce, for the purpose of [illegal sexual activity], whether with or without the consent of the woman." Blumenfield, 284 F.2d at 53 (8th Cir. 1960) (emphasis added).

Kelly contends that any sexual activity between Kelly and Jane in California was "incidental to the purpose of the trip." (Mot. at 43). Again, as with Racketeering Act Eight, Kelly was free to make such an argument to the jury, but it is not a winning one here, where the Court must of course view the evidence in the light most favorable to the government and drawing all inferences in the government's favor. As with Jerhonda, given Jane's testimony that she and Kelly regularly had sex, that Jane was just 17 years old, and the age difference of 30 years, the jury was free to conclude, as it did, that a dominating purpose for Kelly's

transportation of Jane was so that he could have sexual contact with her.  This inference is of course further buttressed by the testimony of Jerhonda, Faith and others, regarding the propensity as to which Kelly sought sexual activity.

Finally, Kelly suggests that the government did not prove that Jane's travel from New York to California in October 2015 involved a facility of interstate commerce and suggests that such a facility includes only a phone or a computer.  (Mot. at 43).  The facility of interstate commerce was the interstate highways between New York and California, including I-80. (T. 2728; GX 159(a)-(f)).  An interstate highway is certainly a facility of interstate commerce. See, e.g., United States v. D'Souza, 2012 WL 487638, at *2 (E.D. Ca. Feb. 7, 2012) (observing that interstate highways are facilities of interstate commerce).

E.    Forced Labor

Kelly challenges the sufficiency of the evidence proving the predicate acts alleging forced labor, in violation of 18 U.S.C. § 1589.  Specifically, Kelly challenges Racketeering Act Six (involving Jerhonda), Eleven (involving Jane) and Thirteen (involving Faith), all alleging violations of 18 U.S.C. § 1589.  To convict a defendant of a violation of 18 U.S.C. § 1589, the government must prove four elements beyond a reasonable doubt: (1) the defendant obtained the labor or services of an individual; (2) the defendant did so through one of the following prohibited means: (a) through threats of serious harm to, or physical restraint against, said individual or any other person; or (b) through a scheme, plan or pattern intended to cause said individual to believe that non-performance would result in serious harm to, or physical restraint against, said individual or any person; and (3) the defendant acted knowingly.  18 U.S.C. § 1589.

1.      <u>Racketeering Act Six</u>

Kelly argues that the government did not adduce sufficient evidence to establish the second element, a causal link between the oral sex by Jerhonda and any threats of physical violence.  (Mot. at 26).  Not true.  Jerhonda testified that over a six-month period, Kelly promulgated a number of rules that she was required to follow and that he punished her when she did not comply with his rules and demands.  For example, when Jerhonda ran through Kelly's gate, Kelly later told her that she would be "on punishment."  (T. 148-49).  On other occasions, when Jerhonda broke a rule by not agreeing with Kelly, which Kelly viewed as disrespectful, Kelly slapped her.  (T. 166-68).

In January 2010, on the final occasion that Jerhonda saw Kelly at his residence at Olympia Fields, Kelly reacted with anger when Jerhonda did not stand up and greet him when he entered the room where she was.  In response, Kelly slapped her, choked her until she passed out and spit on her.  He then "instructed" her to give him oral sex, an instruction with which she complied.  In light of the totality of Jerhonda's testimony, with the backdrop of the prior physical violence by Kelly and in combination with the testimony from many other victim witnesses showing a pattern of Kelly's <u>modus</u> <u>operandi</u>, the jury was free to conclude, as it did, that she gave him oral sex to avoid further physical violence by Kelly.  <u>See</u> <u>Payne</u>, 591 F.3d at 60 ("choices between competing inferences lie solely within the province of the jury").

Next, Kelly argues that Congress did not intend Section 1589 to apply to the instance of forced labor as alleged by Jerhonda.  (Mot. at 26).  He is wrong.  As described above, the conduct falls within the plain language of the statute.  After grooming Jerhonda over a period of approximately six months and punishing Jerhonda when she violated any of Kelly's rules, the

defendant obtained labor, i.e., oral and vaginal sex, from Jerhonda by implicitly threatening additional physical harm if she did not comply.

Kelly's citation to United States v. Toviave, 761 F.3d 623 (6th Cir. 2014), a case by which this Court is not even bound, does not compel a different conclusion. As Kelly notes, in Toviave, the Sixth Circuit wrote, "[p]art of a fair reading of statutory text is recognizing that 'Congress legislates against the backdrop' of certain unexpressed presumptions." Id. at 628. There, the Sixth Circuit recognized a parent's longstanding right to parent their children without interference from the government and declined to uphold a forced labor conviction of a guardian who obtained labor from children under his care. According to the circuit, it interfered with "widely accepted parental rights" and ran afoul of the Supreme Court's longstanding recognition that the Thirteenth Amendment "was not intended to apply to 'exceptional' cases well established in the common law at the time of the Thirteenth Amendment, such as 'the right of parents and guardians to the custody of their minor children or wards.'" Toviaive, 761 F.3d at 625-26 (citation omitted).

Additionally, unlike the cases cited in Toviave, application of the forced labor statute does not require a reading of the statute that criminalizes "traditionally local criminal conduct." Toviave, 761 F.3d at 627. Unlike a forcible rape, a crime which has long been reserved for the states to prosecute, Kelly used a variety of tactics over the course of time designed to cause his victims to serve him. That conduct falls squarely into the conduct proscribed by 18 U.S.C. § 1589 and does not interfere with the enforcement of criminal activity traditionally reserved for the states. There are also no "unexpressed presumptions" that caution against application of the forced labor statute here. Indeed, it would be perverse to argue that an

adult harbors a right over their intimate partner similar to a parent's right over one's child, even if, as with Jerhonda, the partner is underaged.

2.      Racketeering Act Eleven

Kelly argues that the government also failed to adduce evidence supporting a causal link between the threat of serious harm and Kelly's obtaining labor from Jane in the form of her having sexual contact with other women and men.  (Mot. 45-46).  Kelly's argument is not at all persuasive.

At trial, the government introduced ample evidence showing that Kelly used a combination of threats of force, threats of physical restraint and a scheme, plan and pattern intended to cause Jane that if she did not perform such labor, she would suffer physical harm and physical restraint.  At the outset, Kelly established a pattern whereby he punished Jane if she violated any of his rules or otherwise interfered with his desires.  She explained that beginning when she was 17 years old, Kelly spanked her if she violated a rule and that these spankings occurred every two to three days.  (T. 909, 911).  The spankings left her bruised and sometimes with broken skin.  (T. 912).  She testified:

> I remember him saying that he has protocols and rules that need to be followed and that a chastising [a spanking] was only to help me be better and remember the small things, just in case I was not remembering the things to do

(T. 910).  Jane's testimony about chastisements by Kelly was corroborated in large part by letters seized from Kelly's residence and storage facility after his arrest.  (GX 457-60).

Kelly also physically abused Jane when he perceived that she violated one of his rules or desires.  (T. 911-17).  Jane also saw Kelly physically abuse his other live-in girlfriends and believed that he could do the same thing to her if she did not "listen even more."  (T. 925).  On other occasions, Kelly left Jane in a room or on a bus for days at a time if she violated a rule.

(T. 909, 932, 3418-35; GX 935(b), 240(c), 240(f), 240(g)).  Kelly also had Jane regularly write a series of letters containing embarrassing falsehoods and on occasion, make videos containing embarrassing falsehoods and other humiliating activity.[30]  (T. 985-99).

The government also introduced evidence showing the labor Kelly obtained as a result of the coercive conduct described above.  First, Jane testified that as a "punishment," Kelly directed Jane to have sexual contact with "Alex," also known as "Nephew."  (T. 1035-48).  Jane explained that she did not want to have sexual contact with Alex and only did so because if she did not, she believed Kelly would have spanked her.  (T. 1050).  Jane also has sexual contact with other women at Kelly's direction.  (T. 955-62, 964-66).  She further explained she did not want to have sex with any of these women and only completed with Kelly's directions because he "force[d] [her] to do so," including as a punishment, and that when she did not comply, he "usually chastised" her.  (T. 966-67).

Based on Jane's testimony alone, in which she expressly stated that she engaged in sexual contact with another man and other women because she knew that Kelly would spank her if she did not, there was more than sufficient evidence for the jury to find, as it did, that Kelly used threats of force, threats of physical restraint and other tactics to obtain labor from Jane, including sexual contact with Alex and other women.  (While unnecessary to recount for the purpose of this motion, Jane's testimony was further supported by a litany of other evidence, including, among other evidence, Dr. Dawn Hughes's testimony about a series of coercive tactics used to control victims; Anna's testimony about coercive tactics Kelly used on her, Suzette and Alesiette Mayweather's testimony about information they learned from Dominque and Anna,

---

[30]     Another humiliating video was recovered from an iPad found in Kelly's residence on the day of his arrest.  See, e.g., GX 329(b) (still image showing one of Kelly's female guests rubbing feces all over her naked body)

letters written by Jane, Dominique and other women that were found in Kelly's residence and/or storage facility, and the video recordings introduced by the government.)

3.    Racketeering Act Thirteen

Kelly argues that the government also adduced insufficient evidence to show that Kelly obtained forced labor from Faith.  (Mot. 52-54).  Faith testified that in December 2017, Faith saw Kelly in Dallas, where (i) Kelly told Faith that he needed her to sign certain papers for his protection, (ii) Kelly had Faith send him a text message falsely claiming to want to be with Kelly "and the girls," (iii) Kelly told Faith that his girlfriends had a set of rules that they were required to follow, and (iv) Kelly introduced Faith to another of Kelly's girlfriends, Joy, with whom Faith stayed in a locked Sprinter van at Kelly's direction for "some hours" and who told Faith that she needed to get permission to even leave the van to use a restroom.  (T. 2190, 2197-2210).  When Faith returned to San Antonio, Kelly monitored her clothing and her whereabouts. (T. 2217-19; GX 207(e), 207(f), 207(g)).  Faith next saw Kelly in Los Angeles in January 2018, where Diana Copeland had Faith wait for hours in the Sprinter van and then had Faith wait in a room in a studio, without any food or water.  (T. 2220, 2222-24, 2231; GX 208(b)).  When Kelly finally arrived at the room in the studio where Faith was then waiting, Kelly immediately left, later telling her that he would have stayed if she had stood up or showed excitement when he entered.  (T. 2229).  After Faith waited for hours in that room (after Kelly briefly entered), Copeland told her she could not return to her hotel room and that she should continue to wait for Kelly; again, Faith was not given any food or water.  (T. 2230-31).  A while later, Kelly returned and brought Faith into a smaller closet-sized room, where Kelly's demeanor changed, growing more serious, and Faith saw a gun within his reach.  (T. 2247-51).  Using a serious tone, Kelly quizzed Faith about men in her life and made clear to her that he had done his own research

about Faith, including by identifying her father and his profession; he also told Faith that like her father, he had the spirit of discernment. (T. 2251-52). It was at this time, and with this backdrop, that Kelly directed Faith to give him oral sex. (T. 2252). Under those facts, the jury was free to conclude, as it did, that he obtained oral sex from Faith as result of a "scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." See Payne, 591 F.3d at 60 ("choices between competing inferences lie solely within the province of the jury").

III.     There Was Sufficient Evidence Establishing Counts Two through Nine

Kelly also challenges the sufficiency of the evidence as to Counts Two through Nine. Because each of Counts Two through Nine was a predicate racketeering act challenged by Kelly and there was sufficient evidence establishing each of those predicate racketeering acts, there was also sufficient evidence of Counts Two through Nine.

<u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion for a judgment of acquittal should be denied.

Dated:    Brooklyn, New York
           March 21, 2022

                            Respectfully submitted,

                            BREON PEACE
                            UNITED STATES ATTORNEY
                            Eastern District of New York
                            Attorney for Plaintiff
                            271 Cadman Plaza East
                            Brooklyn, New York 11201

By:      /s/
                            Elizabeth Geddes
                            Nadia Shihata
                            Maria Cruz Melendez
                            Assistant United States Attorneys
                            (718) 254-7000