UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X
                                                 :

UNITED STATES OF AMERICA,      :

                                                 :          19 Cr 286 (AMD)

                                                 :

-vs-                                             :

                                                 :

                                                 :

ROBERT SYLVESTER KELLY,    :
       also known as "R. Kelly,"    :

                                                 :

                     Defendant.      :
-----------------------------------------------------X

**DEFENDANT ROBERT KELLY'S REPLY IN RESPONSE TO THE GOVERNMENT'S
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR
<u>A JUDGMENT OF ACQUITTAL</u>**

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

*Attorney for Robert Kelly*

## <u>TABLE OF CONTENTS</u>

**<u>TABLE OF AUTHORITIES</u>**............................................................................... ii

**<u>ARGUMENT</u>**

I.   **THE GOVERNMENT FAILED TO PROVE DEFENDANT GUILTY OF THE OFFENSE OF RACKETEERING (COUNT ONE)**.................................... 1

    A. Where There Was No Common Purpose To Carry Out a Fraudulent Course of Conduct, the Government Did Not Establish an Enterprise....................... 1

    B. The Government's Evidence of an Enterprise Distinct from the Defendant Was Wanting................................................................................................ 5

    C. The Government Failed to Prove that the So-Called Enterprise's Activities Affected Interstate Commerce..................................................................... 6

    D. The Government's Proof Did not Establish a Pattern of Racketeering.......... 6

        1. Production of Sexually Explicit Material (Racketeering Acts Two, Seven, and Ten)................................................................................... 6

        2. Mann-Act Violations - Exposure to STDs......................................... 8

            a. Racketeering Acts 8A and 12A: Intent................................... 8

            b. Racketeering Acts 8B and 12B: Persuasion, Inducement, Enticement, or Coercion........................................................... 9

            c. New York Penal Law § 120.20.............................................. 11

            d. New York Public Health Law § 2307.................................... 12

            e. Violation of Cal. Health Safety Code § 120290.................... 12

        3. Racketeering Act Five (Mann Act Violation – Jerhonda)................. 13

        4. Racketeering Act Nine – Jane............................................................ 15

        5. Forced Labor Racketeering Acts........................................................ 17

**CONCLUSION**................................................................................................. 18

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, n.13 (2004)......................................7

*Anctil v. Ally Fin., Inc.,* 998 F. Supp. 2d 127 (S.D.N.Y. 2014) ......................................3

*Babb v. Capitalsource., Inc.,* 588 F. App'x 66 (2d Cir. 2015) ......................................3

*Blumenfield v. United States,* 284 F. 2d 46 (8th Cir. 1960)......................................14

*Cruz v. FXDirectDealer, LLC.,* 720 F. 3d 115 (2d Cir. 2013)......................................3

*Discon, Inc. v. NYNEX Corp.,* 93 F. 3d 1055 (2d Cir. 1996)......................................6

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F. 3d 159 (2d Cir 2004) ......................2

*First Nationwide Bank v. Gelt Funding, Corp.,* 820 F. Supp. 89 (S.D.N.Y. 1993)
27 F. 3d 763 (2d Cir. 1994)......................................3

*Gonzalez v. Raich,* 545 U.S. 1 (2005)......................................13

*Harms v. United States,* 272 F. 2d 478 (4th Cir. 1959) ......................................10, 15, 16

*Moss v. BMO Harris Bank, N.A.,* 258 F. Supp. 3d 289 (E.D.N.Y. 2017) ......................2, 3, 4

*New York v. United Parcel Serv., Inc.,* No. 15-CV-1136 (KBF), 2016
U.S. Dist. LEXIS 105038 (S.D.N.Y. Aug. 9, 2016) ......................................2

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F. 3d 339 (2d Cir. 1994) ........6

*Trusted Media Brands v. United States,* 2017 U.S. Dist. LEXIS 160046 (S.D.N.Y. 2017)...........7

*United States v. Bonanno,* 695 F. Supp. 1426 (E.D.N.Y. 1988)......................................12

*United States v. Chambers,* 291 U.S. 217 (1934) ......................................13

*United States v. Gagliardi,* 506 F. 3d 140 (2d Cir. 2007)......................................10, 14

*United States v. Sirois,* 87 F. 3d 34 (2d Cir. 1996)......................................7

*United States v. Vickers,* 708 Fed. Appx. 732 (2d Cir. 2017)......................................14

*United States v. Waqar,* 997 F. 3d 481 (2d Cir. 2021) ......................................10, 14

**STATUTES**

18 U.S.C. § 1961(4) ........................................................................... 1

18 U.S.C. § 2242(a) .......................................................................... 14

18 U.S.C. § 2242(b). ........................................................................ 14

18 U.S.C. § 2251(a) ....................................................................... 6, 7

18 U.S.C. § 2422 .............................................................................. 16

## I. THE GOVERNMENT FAILED TO PROVE DEFENDANT GUILTY OF THE OFFENSE OF RACKETEERING (COUNT ONE)

### A. Where There Was No Common Purpose To Carry Out a Fraudulent Course of Conduct, the Government Did Not Establish an Enterprise.

The government concedes that its evidence did *not* prove that Defendant's employees shared a "common purpose of criminality" but contends that to demonstrate a RICO enterprise, it was only required to show that Defendant's employees shared a common purpose to promote his music and "meet his personal needs." (Gov. Resp. at 49) Despite authority to the contrary, the government insists that to prove a RICO enterprise, the members of the enterprise need not have a connection to any unlawful conduct. (Gov. Resp. at 50) According to the government, so long as the persons associated-in-fact share *a* common purpose, a RICO enterprise may exist - even if those persons do not have a common understanding that the purpose of the enterprise is to carry out *illegal or fraudulent* conduct. Under the government's theory, an enterprise exists when any individual is engaged in a pattern of unlawful conduct (racketeering activities) and merely uses his employees to unwittingly facilitate that conduct. The government's argument is belied by the law and common sense.

At the outset, the government is unable to provide a single case that supports its expansive view of a RICO "enterprise" nor is it able to identify any factually similar authority. Instead, the government repeats the refrain that an enterprise may constitute a "legal entity." But this point is not in dispute. An enterprise can be either a formal or informal organization that conducts purely illegal activity *or* conducts largely legal activity; any union or group of individuals associated in fact can constitute an enterprise. 18 U.S.C. § 1961(4). However, to sustain a charge of RICO, the members of the enterprise must share a purpose of carrying out some course of unlawful conduct. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F. 3d

159, 173 (2d Cir 2004) If this was not the case, a RICO enterprise could be established by one bad actor using his employees, his neighbors, or even his friends, to unwittingly facilitate that misconduct. The framers of the RICO statute did not intend this absurd result and courts have not hesitated to reject this expansive view of a RICO enterprise.

Strangely, the government cites *Moss v. BMO Harris Bank, N.A.,* 258 F. Supp. 3d 289 (E.D.N.Y. 2017) to support its argument, but *Moss* strongly supports Defendant's position. There, the plaintiff brought a putative class action against First Premier Bank ("FPB") alleging RICO violations. *Id* at 293. Specifically, the plaintiff charged that FPB, a formal legal entity, belonged to the Automated Clearing House ("ACH") Network, a payment processing system, that processed unlawful ACH transactions on behalf of payday lenders. *Id.* at 295. The plaintiff argued, *inter alia,* that the ACH Network constituted an enterprise consisting of "originators," various depository financial institutions that received ACH transaction instructions, ACH operators, and third-party service providers – all of which shared the common lawful purpose of facilitating batch processing of electronic payments for and between participating depository financial institutions. *Id.* at 299.

The court concluded that the ACH Network described by plaintiff did *not* constitute an enterprise for RICO purposes. The court held that to satisfy the first prong of the *Boyle* test, the participants in an association-in-fact enterprise "must share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." (emphasis in the original) *Id. citing New York v. United Parcel Serv., Inc.,* No. 15-CV-1136 (KBF), 2016 U.S. Dist. LEXIS 105038 (S.D.N.Y. Aug. 9, 2016) *quoting First Capital Mgmt.,* 385 F. 3d at. 174. The court dismissed plaintiff's § 1962(a) claim, finding that plaintiff's failure to plead an association-in-fact enterprise that "shared a wrongful intent to violate RICO" was fatal to the

claim. *Moss,* 258 F. Supp. 3d at 299. *See also, Cruz v. FXDirectDealer, LLC.,* 720 F. 3d 115, 121 (2d Cir. 2013) (affirming dismissal of association-in-fact RICO claim where the amended complaint admitted that certain participants in the purported enterprise were not aware of deceptive practices at issue); *First Nationwide Bank v. Gelt Funding, Corp.,* 820 F. Supp. 89, 90 (S.D.N.Y. 1993) *aff'd* 27 F. 3d 763 (2d Cir. 1994). The *Moss* court expressly rejected the plaintiff's "enterprise" theory, finding it implausible that all of the institutions that allegedly made up the enterprise "possess[ed] the unlawful intent required to transform that cooperative into an association-in-fact enterprise for RICO purposes." *Id.* at 300. *See also, Anctil v. Ally Fin., Inc.,* 998 F. Supp. 2d 127 (S.D.N.Y. 2014), *aff'd in part, rev'd in part on other grounds sub nom. Babb v. Capitalsource., Inc.,* 588 F. App'x 66, (2d Cir. 2015) (dismissing RICO claims that alleged that defendants used the Mortgage Electronic Registration System ("MERS") to conceal unlawful mortgage transfers because plaintiff failed to show "coordinated activity to jointly achieve a *common fraudulent purpose.*") (emphasis in the original).

Critically, the plaintiff in *Moss* argued that the defendant bank shared a common purpose of the ACH Network and used the ACH Network to originate lawful and legitimate transactions, but *also* used its role within the ACH Network to participate in the collection of unlawful debts. Relying on *Anctil, supra,* the *Moss* court observed that at best, the defendant used a legitimate network to advance its own illegitimate business interests and that the alleged illicit ACH transactions did not render the ACH Network a RICO enterprise absent a common purpose among the other network participants to violate RICO. *Id.*

The *Moss* court's logic applies with full force here. The government's evidence showed that Defendant's so-called "inner circle," more aptly described as his employees, worked to promote Defendant's music and brand – a legitimate enterprise. At best, the government's

evidence showed that the Defendant used his role within his music-driven collective to participate in private sexual misconduct. As in *Moss,* Defendant's use of his otherwise legitimate music business to advance his allegedly illegitimate sexual needs does not render Defendant's business organization a RICO enterprise *absent* a common purpose among his employees to violate RICO. Thus, the government's RICO enterprise theory fails.

Courts have rejected the government's expansive theory of a RICO enterprise, because it would extend RICO liability to a vast marketplace based on one bad actor's mere association with the other members of that collective. *Moss,* 258 F. Supp. 3d at 300-301. By way of example, under the government's theory both FOX News and NBC News constitute RICO enterprises because of the bad conduct of Roger Ailes and Matt Lauer respectively. Roger Ailes, the former CEO of Fox News, allegedly sexually harassed, inappropriately touched and exposed himself to women, some as young as 16 years old while working at FOX News. Under the government's expansive interpretation of "enterprise," FOX news and its employees who worked for Ailes (his assistants, his secretaries, his drivers, etc.) constitute an enterprise for RICO purposes because they presumably shared a "common purpose" to promote FOX News and meet the needs of its CEO. By the government's logic, if Ailes' assistants carried out tasks, such as scheduling appointments, arranging transportation or making lunch reservations for Ailes and women he harassed or assaulted, those assistants constitute members of a RICO enterprise irrespective of their knowing involvement in Ailes' unlawful conduct. The same can be said for Matt Lauer, former NBC News anchor, who was accused of repeatedly harassing and assaulting his female colleagues, sometimes while traveling for work. Consistent with the government's theory, any of Lauer's assistants, handlers, drivers would qualify as members of an enterprise for RICO purposes if in the course of their duties they facilitated Lauer's illegal sexual conduct –

even unwittingly. Of course, the government has shown no willingness to use its aggressive RICO theory against powerful White men, but the fact remains that if its RICO enterprise theory in this case is sanctioned, the government will have virtually unlimited power to charge a single bad actor with RICO.

In sum, the government concedes that it failed to establish an enterprise when it offered *no* evidence that Defendant's various employees over the course of two decades engaged in "coordinated activity to jointly achieve a *common fraudulent purpose*." As summarized by the government in its opposition papers, the evidence at trial showed only that Defendant's employees generally engaged in a variety of tasks that supported Defendant's relationships – *not* that they performed activities with the purpose of supporting illegal conduct. Because the government failed to prove that the members of Defendant's so-called "inner circle" acted jointly to achieve a common fraudulent or illegal scheme, this Court must acquit Defendant of RICO.

**B.  The Government's Evidence of an Enterprise Distinct from the Defendant Was Wanting.**

The government insists that its proofs satisfied the person-enterprise rule, because the enterprise consisted of more than the Defendant. The government's summary conclusions are not backed up by the evidence. The government argues that the purpose of the enterprise was to promote Defendant, his music, and his brand, and to ensure that his needs were met. Illogically, the government argues that the enterprise was distinct from the Defendant but fails to identify evidence to support this contention. Frankly, the government seems to concede that Defendant *is* the enterprise, and that the enterprise simply does not exist without him – which explains why it failed to charge even one other person in connection with the alleged vast RICO enterprise.

The government offers only a feeble response to Defendant's discreteness challenge, citing no authority to support its contention or distinguishing the holdings of *Riverwoods*

*Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F. 3d 339, 344 (2d Cir. 1994) and *Discon, Inc. v. NYNEX Corp.,* 93 F. 3d 1055 (2d Cir. 1996). By alleging a RICO enterprise that consists of Defendant and his own employees/agents carrying on his affairs, namely promoting his brand, his music, and even facilitating his sexual needs, the government fails to satisfy the distinctness requirement. Put differently, because the government alleged that Defendant's employees associated together for no purpose other than to carry out Defendant's needs, including his sexual activity, the employees did not form an enterprise distinct from Defendant. Defendant and the alleged enterprise were one in the same.

    **B.**    **The Government Failed to Prove that the So-Called Enterprise's Activities Affected Interstate Commerce.**

The government's interstate commerce argument hinges on its theory that the purpose of the RICO enterprise was to promote Defendant's music and brand. As argued, *supra,* this RICO enterprise theory fails because there is simply no nexus between this collective of individuals who worked to promote Defendant's music and a course of fraudulent conduct or the racketeering activity in which the Defendant is alleged to have engaged. If Defendant's legitimate music collective constituted an enterprise for RICO purposes, the government's argument would be well taken. But for the reasons identified, *supra,* the government cannot prove a RICO enterprise based on individuals associated-in-fact for the *purpose* of promoting Defendant's music.

    **C.**    **The Government's Proof Did not Establish a Pattern of Racketeering**

        **1.**    **Production of Sexually Explicit Material (Racketeering Acts Two, Seven, and Ten)**

The government charged Defendant with three violations of 18 U.S.C. § 2251(a) for allegedly: (1) videotaping a consensual sex act with 17-year-old Stephanie; (2) videotaping a sex

act with 17-year-old Jane in the State of California where the age of consent is 18; and (3) videotaping a sex act with Jerhonda in Illinois before she turned 18 years of age. The government argues that it provided sufficient proof of these § 2251(a) violations because Defendant "used" the minors to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct. (Gov. Opp. at 62) The government argues that pursuant to authority in this circuit and others, proof that Defendant photographed or videotaped the minor without more is sufficient evidence of a § 2251(a) violation because videotaping the minor alone constitutes "use" of the minor. *United States v. Sirois,* 87 F. 3d 34, 41 (2d Cir. 1996). (Gov. Opp. at 63)

Although it is true that several circuits, including the Second Circuit, have held that the "use" element set forth in § 2251(a) is satisfied when a defendant intentionally films a minor's sexually explicit conduct, Defendant maintains that "use" requires more than a minor appearing in a photograph or video. To reach a different conclusion would render the remaining terms in the statute "persuade, induce, entice or coerce" superfluous. "It is . . . a cardinal principle of statutory construction that a statute ought, upon a whole, to be construed that, if it can be prevented, no clause, sentence or word shall be superfluous, or insignificant." *Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, 489 n.13 (2004). *See also, Trusted Media Brands v. United States,* 2017 U.S. Dist. LEXIS 160046, *21 (S.D.N.Y. 2017).

If, as the government argues, a § 2251(a) violation is established by nothing more than proving that a defendant photographed or videotaped a minor in sexually explicit conduct, the terms persuaded, induced, enticed, or coerced are entirely unnecessary. To accept the *Sirois* court's interpretation of the word "use" is to render the remainder of the sentence meaningless in direct contradiction to principles of statutory construction. To read the statute where each word

has significance requires a court to define "use" as something more than the act of filming/photographing the minor. Defendant acknowledges the authority to the contrary but maintains that the law is contrary to the intent of the framers of the statute.

### 2.     Mann-Act Violations – Exposure to STDs

### a.     Racketeering Acts 8A and 12A: Intent

In keeping with its dichotomous approach to statutory interpretation, the government argues that even though it charged Mann Act violations based on Defendant's violations of state public safety laws prohibiting knowing exposure to STDs, the government denies that it must prove that Defendant arranged the travel of Jane and Faith with the *intent* to violate those laws. With no authority, the government argues that it was sufficient to show only that one of Defendant's motivations in arranging for Jane and Faith to travel to meet him during his music tours was to have sex with them – not to violate the charged offenses. The government simply ignores its obligation to prove a nexus between the transportation and the alleged illegal conduct. This is a recurring pattern in the government's prosecution of this case.

 The "illegal sexual activity" that the government charged are specific offenses pursuant to the California and New York public health codes. The record is devoid of any evidence that a significant or motivating purpose in arranging for Jane and Faith's travel was to expose them to an STD. The government devotes six pages of its discussion to reviewing the copious amount of testimony it presented in connection with Defendant's alleged conduct of having unprotected sex with Jane and Faith (who never contracted genital herpes in any event). But none of this testimony demonstrates that Defendant's actions of arranging for Jane and Faith to travel to meet him was motivated by an intent to *expose* Jane and Faith to STDs. The government continues to ignore the salient argument here, namely that it failed to show that Defendant was motivated to

have Jane and Faith travel to meet him so that he could expose them to an STD rather than to simply have sex with them.

<h3>b.      Racketeering Acts 8B and 12B: Persuasion, Inducement, Enticement, or Coercion.</h3>

The government continues to push a narrative it knows to be false, namely that Defendant induced, enticed, coerced, or even persuaded Jane or Faith to travel to meet him in California and New York respectively to engage in illegal sexual conduct. The undisputed evidence shows nothing of the sort. In both scenarios, Defendant *asked* Jane and Faith to meet him at his concerts, and they accepted. Both young women were eager to meet Defendant and did so with a clear understanding that it would likely involve sex.

As set forth in detail in Defendant's opening papers, Jane's contemporaneous text messages with her mother show that Jane's mother engineered Jane's relationship with Defendant. The text messages reflect that Jane and her mother communicated incessantly about how *Jane* could "entice" Defendant into a relationship, a relationship that Jane's mother hoped would catapult her into stardom. Prior to traveling to California, Jane's mother demanded that she continue to text Defendant ("you better be texting him so you will stay on his mind.") Jane dutifully reported to her mother that she had spoken to Defendant about flying to California to meet him and that Defendant told her that she could meet him "whenever I tell him . . . Tomorrow if I choose." As the government concedes, Defendant had no idea that Jane was 17-years old since Jane and her parents actively misled Defendant about her age.

During her trip to California with Defendant, Jane and her mother were in constant communication; Jane *never* once complained that she had been enticed on false pretenses or that she felt misled. Quite the opposite. The text messages reflect that Jane was having the time of her life and thrilled to be romantically connected to the Defendant.

Similarly, Faith's testimony on this issue shows that Defendant *asked* her if she wanted to "hang out." Faith agreed and Defendant merely paid for her travel. The record is devoid of any evidence of persuasion, enticement, or inducement on the part of the Defendant. Faith may have decided to travel and "hang out" with Defendant because she sought to be near a celebrity. But this motivation *on her part* had nothing to do with Defendant's conduct. Defendant's *status* as a famous R & B singer does not amount to "enticement" notwithstanding the government's argument to the contrary.

The government suggests that Defendant's act of arranging for Jane's travel is sufficient to demonstrate that he "induced" her to travel to California, because he "caused" her to travel. The law says otherwise. The Second Circuit has made clear that the terms "persuade, induce, entice [and] coerce" are words of common usage that have plan ordinary meanings." *United States v. Waqar,* 997 F. 3d 481, 483 (2d Cir. 2021); *United States v. Gagliardi,* 506 F. 3d 140, 147 (2d Cir. 2007). The Court distinguishes this conduct from merely *asking* which is not sufficient to demonstrate criminality. *Id.* (recognizing that "there might be some uncertainty as to the precise demarcation between "persuading," which is criminalized, and "asking," which is not.")

Keeping with its pattern of rewriting statutes, the government suggests that it need only prove that Defendant "caused" Jane and Faith to travel to meet him to sustain the charge. The government relies on a 1959 case from the Fourth Circuit that interpreted the now defunct version of the Mann Act that was historically used by the government to persecute Black men who had relationships with White women. *Harms v. United States,* 272 F. 2d 478, 481 (4th Cir. 1959) The current iteration of the Mann Act does not contain the "caused" language like the 1958 version did. Moreover, as discussed in detail, *infra, Harms* actually stands for the

proposition that the government must provide specific proof of persuasion to sustain its burden. The government's reliance on *Harms* is misplaced. Contrary to the government's claim, it was required to prove beyond a reasonable doubt that Defendant persuaded, induced, or coerced Jane to travel to California – not merely asked. The government's evidence was wanting; the Court must acquit the Defendant of this Mann Act violation (and all others).

### c.    New York Penal Law § 120.20

The government charged Defendant with a violation of the Mann Act as to Faith based on the theory that he committed the offense of reckless endangerment when he had unprotected sex with her in New York without disclosing he suffered from genital herpes. The government again rehashes its excessive herpes testimony insisting that a "reasonable jury could easily conclude from the trial evidence" that Defendant created a "substantial risk of physical injury" when he had unprotected sex with Faith. Taking the government's evidence in its best light, it failed to prove that when Defendant had sex with Faith he created "substantial risk of physical injury."

First, because Faith was not afflicted with herpes and did not testify that she observed any evidence that Defendant had an active infection, the only reasonable inference to draw is that Defendant did not have any type of outbreak when he and Faith had sex in New York. The government insists that this fact is irrelevant, but whether Defendant was engaging in unprotected sex while suffering from an active infection or during a period when he had no symptoms is entirely relevant to his state of mind and relevant to the issue of whether he acted "recklessly." Surely, the government would argue that it is *more* reckless, and the risk of harm is *more* substantial if Defendant had unprotected sex with Faith *during* an active outbreak. Thus, the question of whether Faith was infected with herpes in New York *is* relevant to Defendant's state of mind and whether he acted with the requisite intent.

Furthermore, the government's evidence simply did not prove that there was a "substantial" risk of death or serious physical injury. As argued at great length in Defendant's opening memorandum of law, the government's herpes expert testified at length about rare complications of herpes that arguably would qualify as serious physical injury. But unless those risks were *substantial,* the government cannot meet its burden. Since the risk of "serious physical injury" associated with herpes is *low* rather than *substantial* risk, the government failed to prove reckless endangerment.

### d.      New York Public Health Law § 2307

For the reasons fleshed out in Defendant's opening memorandum, New York Public Health Law § 2307 is unconstitutional, *inter alia,* it fails to define "infected." While the government and this Court assumes that "infected" means carrying the virus rather than having the ability to transmit it, no authority supports this interpretation. Such an interpretation would lead to arbitrary and discriminatory enforcement as it did *in this case.* As a reminder, the government can point to *no* case in which an individual was charged with a violation of this public health law where the accused did not even transmit a disease to the alleged victim.

### e.      Violation of Cal. Health Safety Code § 120290

The government argues that it was permitted to charge Defendant with a repealed statute *and* rewrite it so that it would pass constitutional muster. Unsurprisingly, the government has no authority to support its view that it can take up the role of the California legislature. For unknown reasons, the government relies on a 1978 case out of the Third Circuit that fails to support its claim that it has the authority to charge and prosecute repealed statutes and to further step into the shoes of law makers and rewrite statutes to its liking. The government also inexplicably cites *United States v. Bonanno,* 695 F. Supp. 1426 (E.D.N.Y. 1988), which

considered whether a certain charge violated the *ex post facto* clause since the alleged conduct occurred prior to the enactment of the statute. The issue raised here is different. The question before this Court is whether the government was permitted to charge a version of the statute that did not exist at the time of the prosecution. The United States Supreme Court answers that question in the negative. The government points this Court to no competent authority demonstrating that the antiquated version of the California public health law may be kept alive. As such, the government had no authority to charge and prosecute Defendant under a repealed and inoperative statute. *United States v. Chambers,* 291 U.S. 217, 223 (1934).

### 3.     Racketeering Act Five (Mann Act Violation – Jerhonda)

The government expresses some confusion over Defendant's interstate commerce argument. To be clear, Defendant *did* expressly argue that "purely intrastate use of cell phones does not constitute use of a facility of interstate commerce." (Def. MOL at 22) Defendant did more than vaguely suggest this argument as the government contends in footnote 28. Defendant cited authority to support the proposition, namely *Gonzalez v. Raich,* 545 U.S. 1 (2005), and further acknowledged a Second Circuit case that arguably conflicts with *Gonzalez*. The issue is properly preserved and presented to this Court. If the Court would like additional briefing on this issue, or the many others raised in Defendant's Rule 29 motion, it certainly has the authority to order it.

If it wasn't clear enough, Defendant argued *in the alternative* that even if intrastate cell phone use does satisfy the commerce clause requirement in some circumstances, it did not do so here. The government showed *only* that Jerhonda and the Defendant sometimes communicated by cellphone. The date and nature of those communications are unknown. The government asked the jury to assume that Defendant "induced, persuaded, enticed or coerced" Jerhonda to engage

in prohibited sexual activity during their cell phone communications without providing the communications or even eliciting testimony from Jerhonda about what the communications reflected. The government routinely attempts to avoid nexus requirements and must be reminded that the government was required to show that Defendant used the cell phone to commit the specific prohibited act, namely to "induce, persuade, or coerce" Jerhonda to engage in unlawful sexual behavior. The government cannot satisfy that burden by generally showing that Defendant and Jerhonda sometimes communicated by cell phone and that on some unrelated occasion, they engaged in unlawful sexual activity. The language used in those communications, to the extent they existed, is important for determining whether the Defendant induced, persuaded, enticed or coerced or merely *asked* Jerhonda which would be insufficient to demonstrate criminality. *United States v. Waqar,* 997 F. 3d 481, 483 (2d Cir. 2021); *United States v. Gagliardi,* 506 F. 3d 140, 147 (2d Cir. 2007).

While the government cites some authority to support its contention that interstate commerce can be established by intrastate cellphone use, *none* of the cases cited by the government condone asking a jury to *assume* the content of those communications as the government did here. In *United States v. Vickers,* 708 Fed. Appx. 732 (2d Cir. 2017), the defendant was charged with a § 2242(a) violation, not a violation under §2242(b). The *Vickers* court was never faced with the question of whether the government can satisfy its burden of proof without ever introducing the communications that it claims constituted persuasion, inducement, or coercion, nor was the *Vickers* court faced with an interstate commerce question.

Acknowledging the problems with its proof, the government relies on *Blumenfield v. United States,* 284 F. 2d 46 (8th Cir. 1960), a sixty-year-old case out of the Eighth Circuit that interpreted the repealed and outdated Mann Act statute. That aside, *Blumenfield* involved a

defendant arranging for a prostitute, Ms. Tollefson, to cross state lines for the purpose of prostitution. Where the evidence showed that defendant telephoned Ms. Tollefson for the precise purpose of hiring her to cross state lines and engage in prostitution in exchange for money, it is no surprise that a jury concluded that the defendant used the telephone to *induce* Ms. Tollefson across state lines for prostitution.

In contrast here, Jerhonda testified that she had a sexual relationship with Defendant that was carried out entirely in the state of Illinois. She did not describe herself as a prostitute and admitted that she went to parties at Defendant's home; hung out there for extended periods of time; and even went to Defendant's home when he was not there. Although the government offered general evidence through Jerhonda's testimony that Jerhonda and Defendant sometimes communicated by cell phone, it simply failed to prove that Defendant used the phone "persuade, induce, or coerce" Jerhonda into unlawful sexual activity. The government's proofs were insufficient as to Racketeering Act Five.

### 4.      Racketeering Act Nine – Jane

In response to Defendant's claim that the government failed to prove that Defendant took any action to induce, persuade, entice, or coerce Jane to travel to California between September and October 2015. The government again relies on the pitiful 1959 Fourth Circuit case *Harm v. United States, supra,* claiming that inducement simply means to "cause." *Harms* does not stand for the proposition the government contends. Indeed, *Harms* supports Defendant's argument.

In *Harms,* the question at issue was whether the government proved that the defendant directed or knew that the victim would travel by common carrier. The victim had previously worked for the defendant as a prostitute and after having a conversation with the defendant, she traveled across state lines by interstate airline carrier and thereafter engaged in acts of

prostitution in establishments maintained by the Defendant. *Id.* at 480. Evidence that the defendant had induced the victim to travel for the purpose of prostitution was ample.

However, the Defendant argued that the government's evidence was insufficient to show that the defendant either directed or knew that the victim would travel by common carrier. The Fourth Circuit concluded that it was not essential for the government to show that the Defendant directed or knew that the victim would travel by interstate carrier. The court reasoned that *because* the government proved inducement, the fact of the resultant trip by interstate carrier was sufficient to justify a conviction under § 2422. The court held, "[i]t was not necessary for the government to go further and attempt to show that Harms [the defendant] knowingly caused the victim to travel by common carrier either by direction or knowledge that the victim, Bruno, would use that mode of transportation. 'Cause" is a word of very broad import and its meaning is generally known. *The knowing persuasion to make the interstate trip, of course, must be shown with some degree of particularity*, but once the knowing persuasion has been shown, if the trip by interstate carrier follows, the offense is complete." *Id.* at 481. (emphasis added)

Contrary to the government's argument, *Harms* does not hold that indument or persuasion means "cause." Quite the contrary, *Harms* makes clear, the government *must* show persuasion to make the trip with some degree of particularity. The court merely noted that once the government proves persuasion, it is not required to separately show that the defendant knew *how* the victim would travel across state lines.

Here, the government did not demonstrate persuasion, inducement, or coercion. Jane offered no testimony to suggest that she was coerced or enticed into traveling to California in fall 2015. The record shows that Jane was desperate to return to Defendant after he sent her home and was eager to travel with him. Jane's testimony about Defendant's "rules" and sexual

proclivities during this time period are not sufficient evidence of coercion *to travel* even if Jane now believes with the benefit of hindsight that Defendant's conduct was controlling.

### 5. Forced Labor Racketeering Acts

The government contends that Jerhonda's act of giving oral sex to Defendant on one occasion in January 2010 was an act of forced labor. As set forth in detail in Defendant's opening memorandum of law, the forced labor statute was not intended to punish isolated acts of abuse. But even if it was, the government did not show a nexus between the physical assault and the sexual act. Taken in its best light, the government offered evidence that on one occasion Jerhonda threatened to "punish" Jerhonda for breaking into his home and physically assaulted her on a separate occasion because she failed to show him proper respect. Jerhonda did not testify that the physical assault was intended to force her to perform oral sex on Defendant. This evidence falls painfully short of proof of the offense of forced labor. Jerhonda *could* have testified that she gave Defendant oral sex because he threatened her or because she feared he might assault her. But those words never came out of her mouth. Random acts of violence plus a sex act does not equate to forced labor. The government should not be permitted to warp statutes beyond recognition simply because it seeks to punish isolated acts of abuse that occurred decades ago.

Similarly, the government did no prove that Jane engaged in group sex acts because she was forced to. Jane's hindsight testimony that she did not *want* to participate in that conduct is not proof that she was *forced* to. The government cannot establish the offense of forced labor by simply showing that Defendant and Jane had a sexual relationship that some might consider abusive. The government was required to establish a causal link between the group sex acts and threats of physical violence. It failed to do so.

Finally, no rational juror could conclude based on the evidence adduced at trial that Defendant knowingly obtained, or agreed to obtain, any labor or services from Faith on January 13, 2018. As discussed, *supra,* the forced labor statute was not intended to reach isolated conduct like that described by Faith. Faith *never* testified that she felt forced to perform oral sex on the Defendant. Not wanting to have oral sex is *not* the same as being forced to engage in it. Furthermore, Faith admitted proudly that she was not a "victim" and made a choice to be involved with Defendant. When she was displeased with the relationship, she walked away. The government's infantilization of Faith and quest to redefine her experience as forced labor is offensive to women who actually live in conditions of servitude, the harm that the forced labor statute was designed to address. For the foregoing reasons, this Court must acquit the Defendant of all forced labor convictions.

## **CONCLUSION**

For the foregoing reasons, this Court should enter an order acquitting Defendant of all offenses.

Respectfully submitted,


/s/JENNIFER BONJEAN

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY 10022
718-875-1850

*Attorney for Robert Kelly*