

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG/NIS/MCM          *271 Cadman Plaza East*
F. #2019R00029         *Brooklyn, New York 11201*

June 8, 2022

<u>By ECF</u>

The Honorable Ann M. Donnelly
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

         Re:     United States v. Robert Sylvester Kelly
                <u>Criminal Docket No. 19-286 (S-3) (AMD)</u>

Dear Judge Donnelly:

         The government respectfully submits this letter in connection with the sentencing of the defendant Robert Sylvester Kelly, scheduled for June 29, 2022. In light of the seriousness of the offenses, the need for specific deterrence and the need to protect the public from further crimes of the defendant, as well as the other factors set forth in 18 U.S.C. § 3553(a), the government respectfully submits that a sentence in excess of 25 years is warranted.

BACKGROUND

         The evidence adduced at trial consisted of testimony from 50 witnesses—45 witnesses called by the government and five called by the defendant—and hundreds of exhibits admitted at trial. A complete summary of the evidence (including the enterprise, its purposes and methods) supporting each of the counts of which the defendant was convicted was included in the government's opposition to the defendant's motion for a judgment of acquittal (Gov't Mem. of Law in Opp. to the Def't's Mot. for a Judgment of Acquittal, dated March 21, 2022 (ECF Dkt. Entry No. 278)), which detailed factual summary is incorporated herein by reference.

         As established at trial and set forth in the Pre-Sentence Investigation Report ("PSR") and its addendum, with the aid of his inner circle and over a period of decades, the defendant preyed upon children and young women for his own sexual gratification. In order to carry out his many crimes, the defendant relied upon his fame, money and popularity as an R&B recording star and used the large network of people his status afforded him – including his business managers, security guards and bouncers, runners, lawyers, accountants, and assistants –

to both carry out and conceal his crimes. He continued his crimes and avoided punishment for them for almost 30 years and must now be held to account.

Generally speaking, the conduct underlying the defendant's crimes of conviction falls within the following four categories: (1) enticement of children; (2) the sexual exploitation of children through the production of child pornography; (3) forced labor; and (4) exposure of others through unprotected sexual intercourse to an incurable communicable disease, namely genital herpes, without first informing his sexual partners and obtaining consent to sexual intercourse in these circumstances.

I.    Enticement of Children

As established at trial, the defendant has a long and pervasive history of enticing children to engage in sexual activity, including when they were too young to legally consent to sexual activity. His career as a recording artist and performer took him all over the United States (and the world) for concert tours, other performances and events starting in the early 1990s and he quickly took advantage of his access to adoring fans and musical hopefuls who jumped at the chance to meet him. He lured young girls and boys into his orbit, often through empty or conditioned promises of assistance in developing a career in the entertainment industry or simply by playing into the minors' understandable desire to meet and spend time with a popular celebrity. Notably, believing (rightly, for a period of time) that his fame and role as leader of the enterprise made him untouchable, the defendant often engaged in this criminal conduct in plain sight, doing so around and/or with the assistance of others.

In the early 1990s, the defendant sexually abused Jane Doe #7, who testified at trial using the pseudonym "Angela," beginning when she was 14 or 15 years old. The sexual abuse began immediately after the defendant met Angela for the first time at his small two-bedroom apartment along with at least two other girls who were also in high school and with whom the defendant also engaged in illegal sexual activity. The defendant sexually abused Angela and the other girls in his bedroom while members of his inner circle were in the living area directly outside. As would become a pattern, the defendant made clear to Angela and the other girls, who the defendant later formed into a "girl group" and, in the case of Angela, employed as a background dancer for his tours, that sexual activity with him was the price of admission to be around him and get access to any opportunities he could provide them within the music industry. As Angela testified, the defendant made clear to her and other girls in no uncertain terms that they had to "pay [their] dues" and engage in sexual activity with the defendant at his direction and, at times, for violating his rules. (T. 3288-89, 3302-03).

In 1992 or 1993, the defendant met Aaliyah Haughton, an aspiring singer who subsequently became his musical protégé, and began to sexually abuse her when she was just 12 or 13 years old. The defendant used his access to young Aaliyah – claiming to need extra time alone with her for rehearsal and bringing her on tours to show her the ropes – to carry out his abuse of her, one time even shamelessly sexually abusing her by giving her oral sex in the back of his tour bus while others were in the vicinity. Faced with the possibility that his abuse of Aaliyah would be made public after she believed that she was pregnant at just 15 years old, in August 1994 the defendant gathered members of his enterprise to help him carry out the bribery of a government official so that he could fraudulently and surreptitiously marry Aaliyah in an

attempt to conceal the abuse and avoid punishment. Not only did the defendant abuse Aaliyah—who because of her untimely death in a 2001 airplane crash could not testify at trial—but he made her party to his criminal coverup scheme, having her fraudulently sign a marriage application using the illegally-obtained identification to falsely claim she was 18 years old.

In September 1994, just days after secretly marrying 15-year-old Aaliyah, the defendant sexually assaulted a 17-year-old girl, identified in the PSR as Jane Doe #8 and who testified at trial as "Addie," after two of the defendant's associates approached her and brought her and a friend backstage to get the defendant's autograph after a performance. Because Addie was just 17, she was not old enough to consent to such sexual conduct in Florida. Addie was brought to the defendant's dressing room which was filled with press and other men where she spoke briefly to the defendant—who not only provided his autograph on her concert program, but also wrote down his hotel room number—about the fact that she was an aspiring dancer. True to form, the defendant mentioned the possibility of an audition and, after learning from Addie that she was 17, had his associate clear the room of everyone except for him, Addie and her friend. Within minutes, in that locked dressing room, the defendant began kissing Addie (and her friend), became aggressive, moved Addie to one side of the room, held her wrists, pulled down her shorts and penetrated her vagina from behind with his penis. When the defendant was finished—shocked and scared—Addie ran from the room with her friend.

In or about 1995, the defendant met Jane Doe #9, a 17-year-old girl, at a Florida mall and thereafter commenced a sexual relationship with her, in violation of Florida law. Notably, Jane Doe #9 contracted herpes during her relationship with the defendant and disclosed her diagnosis to the defendant. At the time of her diagnosis, Jane Doe #9 was only sexually active with the defendant.

In or about 1998, the defendant noticed Stephanie[1] at the Rock and Roll McDonalds in Chicago and had one of his associates approach her, point the defendant out and give Stephanie the defendant's telephone number, notwithstanding that Stephanie had informed the associate she was only 16 years old at the time. Stephanie discarded the telephone number and did not contact the defendant at that time. Approximately a year later, when Stephanie was 17 years old, she approached the defendant after learning that he was at a nearby Nike store to see if he was willing to listen to her friend, an aspiring vocalist, sing and potentially help that friend with her career. The defendant told Stephanie that "he thought we could arrange that, but he'd like to get to know [Stephanie] and he also said that he likes to cuddle and would [Stephanie] be okay with that," to which Stephanie responded yes. (T. 1630). The defendant then gave Stephanie his telephone number and told Stephanie to call him, which she ultimately did. Thereafter, the defendant invited Stephanie to his Chicago studio and the two ultimately engaged in sexual intercourse.[2] Notably, the defendant was aware of Stephanie's age, as Stephanie told him she was 17 on either the first or second occasion she visited the defendant's studio. They continued to have sex over the next approximately six months. Stephanie's sexual

---

[1]     Stephanie is identified as Jane Doe #2 in the third superseding indictment and the PSR.

[2]     The sexual contact between Stephanie and the defendant did not violate Illinois law.

interactions with the defendant were "humiliating." (T. 1638). Stephanie described those interactions as follows:

> He would be very specific in how he wanted me to be. He would put me in positions that he wanted me to be in. He would tell me that he wanted me – he'd tell me to get undressed and then he would position my body in a way and he would then say, all right, I'm going to go and when I come back I want you to be just like this. So I would just be completely naked with my butt in the air and just like waiting there for him to come have his way . . . . Sometimes hours.

(T. 1638). When the defendant returned to the room and Stephanie was not in the position he had told her to be in, the defendant became very disappointed and angry, yelling at her. At some point after Stephanie had told the defendant she was 17 (and while she remained 17), the defendant took Stephanie to his townhouse and directed her to participate in his creation of child pornography, videotaping her naked and as he engaged in sexual activity with her. On another occasion, in approximately October 1999,[3] Stephanie traveled to see the defendant in Orlando, Florida. While there, the defendant took Stephanie to a recording studio and used a handheld video camera to record Stephanie's face as his penis was in her mouth and she was giving him oral sex. In yet another act of humiliation, the defendant ejaculated on Stephanie's face and did not let her wipe it off, instead telling Stephanie she had to walk down the hall (in a more public area of the studio) to another bathroom to wipe her face.

During the course of her time with the defendant, he made clear to Stephanie that she was not permitted to speak to other men. On one occasion, she was at a Houston's restaurant in Chicago with the defendant and two rappers. Stephanie was not allowed to speak to the rappers during the meal, but heard the defendant tell them "that he likes young girls and that people make such a big deal of it but it really isn't a big deal because, even, look at Jerry Lee Lewis, he's a genius and I'm a genius and we should be allowed to do whatever we want because of what we give to this world," (T. 1648-49), thus evincing his clear belief that he could act with impunity in committing crimes involving minors because of his self-proclaimed musical "genius" status, which – in his mind –constituted a free pass to do as he pleased without consequence.

In 2005, the defendant spotted Alexis[4] – then just 15 years old – after one of his concerts and thereafter began a years-long sexual relationship with her. That same year, the defendant met a teenage boy, who testified at trial using the pseudonym "Louis,"[5] then 17 years

---

[3] Stephanie turned 18 in mid-October 1999. She could not recall whether this trip occurred before or after her 18th birthday. (T. 1653).

[4] Alexis is identified as Jane Doe #13 in the PSR and the government's in limine motions.

[5] Louis is identified as John Doe #1 in the PSR and the government's in limine motions.

old, while he was working at a McDonalds close to where the defendant played basketball at the time. After first meeting Louis, the defendant again used his status in the music industry to induce Louis to meet with him again. The defendant also groomed Louis and his family, inviting them to a party at his home and having Louis meet him at his home studio in Olympia Fields. When the defendant had Louis alone, he asked Louis, who had dreams of making it as a rapper, what Louis was willing to do to make it in the business, after which the defendant gave Louis, still just 17 years old, oral sex and video-recorded their sexual encounter. On another occasion, the defendant also directed a female, who Louis did not know, to give Louis oral sex while the defendant watched. Louis testified that the defendant made clear to Louis that sexual contact with him was a prerequisite if Louis wanted the defendant to help him in the music business. Like others, the defendant's promises to help Louis in the music industry were empty and instead just a ploy to entice a 17-year-old boy to have sexual contact with the defendant and others at his direction, and, on certain occasions, to film that conduct.

In 2009 and continuing for a six-month period into 2010, the defendant sexually abused Jerhonda,[6] who was then 16 years old, and a big fan of the defendant's music. The defendant invited Jerhonda to his home, and once alone with her directed Jerhonda to remove her clothing and walk back and forth naked before him. The defendant thereafter engaged in sexual contact with Jerhonda and then had sexual intercourse with her, at times, as described further below, making sexually explicit videos of Jerhonda while she was 16. That same year, the defendant began to have sexual contact with Dominique, who was just 17 years old.[7] To meet Dominique, the defendant relied upon the 16-year-old Jerhonda to introduce him to Dominique, one of her friends.

In 2015, the defendant met another young girl who testified under the pseudonym "Jane" at trial, who was 17 years old, after spotting her at one of his concerts and using members of his entourage to ensure Jane received his telephone number. Shortly thereafter, the defendant engaged in sexual contact with Jane under the guise of an audition in his hotel room and soon convinced Jane to travel across the country with him and ultimately to spend her senior year of high school living with him. In April 2015, the defendant arranged for Jane to travel from Orlando to Los Angeles to see him. Again, the defendant promised to help Jane with her musical aspirations, a false promise he used to entice her to remain with him. Notably, when Jane disclosed to the defendant that she was 17 years old, rather than end his relationship with Jane, the defendant arranged for the mother of another of his girlfriends, "Juice," to serve on paper as Jane's purported legal guardian, while the defendant continued to travel, live and have sex with Jane.[8]

_____

[6]     Jerhonda is identified in the third superseding indictment and the PSR as Jane Doe #4.

[7]     Dominique is identified in the PSR and the government's <u>in limine</u> motions as Jane Doe #17.

[8]     Notably, in 2017, the defendant revealed to Faith that "there is some females that I'm raising. I have a group of women that I raised. He said some women have been with me for

During the course of time Jane was with the defendant and as described in more detail below, he prescribed a number of rules for Jane and his other girlfriends to follow, exercising coercive control over them.[9] The defendant began enforcing these rules shortly after Jane met him by punishing her when she did not follow his prescribed rules or comply with the established protocols. Those punishments included spankings, which the defendant called "chastisements," vicious physical assaults, and confinement of Jane to a room or a bus for prolonged periods of time.

## II.    The Production of Child Pornography

For decades, the defendant also created and maintained child pornography. Several witnesses testified that the defendant recorded their engaging in sexual activity with the defendant and others at the defendant's direction. Witness after witness described how the defendant scripted every aspect of the sexual activity, acting as the writer, producer and director of each encounter. As described above, in 1999, the defendant sexually exploited Stephanie. He summoned her to his house, where he filmed her engaging in sexually explicit behavior and them having sex. Fearful that the recording might be distributed, Stephanie begged the defendant to return or destroy the recording, but he never did. To this day, Stephanie fears that the recording still exists. In later years, the defendant also recorded Jerhonda and Jane[10] also engaging in sexually explicit conduct while they were each under 18 years old.

## III.    Forced Labor

The defendant methodically groomed the women and girls in his orbit to meet all of his sexual needs. First, he promulgated an extensive set of rules. He had the women and girls call him, "Daddy," and directed them to wear sweats or other baggy clothing. When he entered a room, he expected the women and girls to immediately stand and greet him with a kiss. In more recent years, including the entirety of the time Jane spent with him, the defendant's coercive tactics grew even more brazen. The defendant did not permit the women and girls to speak with or even look at other men. In an elevator, they were expected to turn to face the back. While walking through hallways, they were expected to look to the floor. In commercial establishments, they had to direct their inquiries to a female employee or leave the establishment.

As part of his grooming process, the defendant severely isolated the women and girls. The defendant discouraged communication with their family members and friends and prohibited the use of social media. They were also not permitted to exchange personal information with the other women who lived with the defendant.

five years, some women have been with me for a year, some women have been with me for 15 years." (T. 2197).

[9]    At trial, Dr. Dawn Hughes testified that isolation, indoctrination, intimidation, subjugation, surveillance, secrecy, humiliation and collateral all may be used as a means of coercive control. (T. 3928-33).

[10]    Jane is identified in the third superseding indictment and the PSR as Jane Doe #5.

When the defendant arranged for women and girls to visit him, the defendant required them to spend their time waiting for him in a location that he dictated. Within a few weeks of meeting the defendant and traveling to Las Vegas with him, Jane tried to go to the mall, but an assistant made clear to her that she would need to first get the defendant's permission. Jane told her mom, "Everyone [was] having fun," but the defendant told her "do not leave that room." (GX 233(i)). Faith testified that she spent hours on a Sprinter van waiting for the defendant, only leaving to go to the bathroom and only when she had the defendant's permission. (T. 2208-10, 2223-26). More generally, witnesses advised that they often accompanied the defendant to meetings, social gatherings at restaurants and bars and other events, but the defendant often directed them to stay on the Sprinter van while he went to the meeting, gathering or event; if they needed a bathroom and could not obtain permission from the defendant to leave the van, they had to urinate in a cup. When the defendant learned that one woman had left the bus at a pitstop during a long-distance drive without first obtaining the defendant's permission, he became enraged. An assistant testified that when the defendant learned of this transgression, she had never seen the defendant "so upset." (T. 2025-34).

The defendant required the women and girls to regularly write letters, purportedly confessing to generally false criminal activity and other embarrassing conduct. In these letters, they falsely confessed to stealing money and jewelry; they falsely admitted concocting elaborate robberies; one falsely claimed that she seduced the defendant when she was underage and threatened to claim he raped her if he would not engage in sexual activity with her. For safekeeping, the defendant kept certain of these letters in a document protector and in a locked safe.

The defendant also had certain women record videos in which they falsely claimed that family members had abused them. To make the allegations in these recordings appear genuine, the defendant directed the women to make their confessions shortly after he had physically assaulted them and had caused them to shed real tears of pain. The defendant also directed certain women to make videos depicting themselves engaging in humiliating behavior. At least three women made videos of themselves eating feces and rubbing it over their bodies. He filmed another young woman walking back and forth, naked, making derogatory comments about herself (which he directed her to repeat), over and over and over, after first spanking her multiple times.

The defendant required the women and girls to abide by all of his rules and punished anyone who violated those rules. He once sent a message to Jane, "I knew you were young. But that is no excuse to disobey me or not do what I tell you to do[.]" (GX 481). Significantly, the defendant also required women and girls to report any perceived violations by others.

The consequences for disobeying the defendant included violent spankings, other physical assaults, physical restraint and threats. He imposed these spankings on a regular basis. Jane recalled their occurring multiple times a week for a period of years. The spankings were painful, as made clear by one such incident video recorded by the defendant and played for the Court and the jury. (GX 382(a), GX328(b))). For what he perceived as greater violations, the

defendant physically assaulted the women and girls, using shoes, extension cords and other objects in his grasp. On other occasions, he required the woman or girl to remain in her room or on a bus for prolonged periods of time. On one occasion, he told one young woman who he perceived had disobeyed him that people are "murdered for doing shit like this." (GX 485(b)). He then told that same woman that she needed to be on his "team" or else. (GX 485(b) ("If you bullshit me now, then I'm going to look at you like you're not on my team at all[.]")).

The physical abuse by the defendant was severe. For example, Jane testified that, on one occasion, the defendant spanked Jane and two other women who then lived with the defendant 15 times after they "paired off" and spoke openly about their relationships with the defendant in violation of the defendant's rules. (T. 1035-41). On another occasion, when Jane was just 17 years old, stood 4'11" and weighed a mere 98 pounds, the defendant beat Jane all over her body with his fists and with his shoe. (T. 914-15). Jane also testified that she saw the defendant physically abuse his live-in girlfriends. (T. 925 ("I have seen him slap his other [live-in] girlfriends, open palm, I have seen him drag them by their hair, I have seen him punch them in their face and all over their bodies, and I have also seen him hit them with objects . . . . I've seen the defendant also use shoes and also once I did see him use a cord of some sort.")).

Sometimes as punishment, the defendant confined women and girls to a particular location for a prolonged period of time. Jane testified that the defendant sometimes directed her to stay in a room until he determined that she had sufficiently apologized. (T. 938). Text messages from December 2015 to one of her close friends directly support Jane's account. She wrote, "I was like can I take a shower, can I take a shower. And he [the defendant] was like no, you're gonna stay in the room . . . ." (GX 935(b)). One of his assistants saw the defendant's abuse and contemporaneously commented that Jane had been "confined" since the day before. (GX 240(c)). On another occasion, an assistant saw that the defendant confined Jane again – this time for a two-day period – and relied on the assistant and another woman to alternately keep watch over Jane. (GX 240(f)).

Relying on the pattern of activity described above and much more, the defendant regularly required the women and girls to engage in sexual contact with him and others, upon his command, including upon threat of physical violence. For example, the defendant's sexual and physical abuse of Jerhonda culminated when the defendant slapped her, and choked her until she passed out, spit on her and told her to "put down [her] head in shame." (T. 176-77). When Jerhonda got up off the floor, the defendant "instructed [her] to perform oral sex on him" (T. 177), and after Jerhonda complied with his's instruction, he ejaculated on her face.

After regularly physically and psychologically abusing Jane and other women, he required them to have sex with other women and even men. The defendant directed when these encounters took place, who participated and the particular sexual acts performed during the encounters, and often recorded them. The defendant regularly required Jane to have sexual contact with other men and women at his direction, including the women living with him, his assistants "LeeLee" and "Cassandra," and a man he referred to as "Nephew," whom she had never even seen prior to the defendant directing her to have sex with him.

One such sexual encounter was vividly depicted in Government Exhibits 341, 342, 343, a video of a sexual encounter between the man Jane knew only as "Nephew" – who testified as "Alex" – and another of the defendant's live-in girlfriends. The video showed the defendant directing the woman to give Alex oral sex and then to have sexual intercourse with him. Specifically, the defendant physically positioned the woman so that she was in the precise sexual position the defendant wanted (GX 342(c)), and held onto the woman's hair, as he forcefully and repeatedly pushed her mouth onto Alex's penis. (GX 342(b)). The defendant maintained total control throughout the encounter. In fact, their facial expressions show two people who appear positively numb to what was happening; they just listened to the defendant and executed his commands.

On another occasion, upset that Faith had broken one of his rules, the defendant required her to give him oral sex after bringing her into a tiny room where a gun was present, grilling her with questions and telling her that there would be consequences if she lied. With his gun nearby, the defendant then placed a pillow on the floor, told Faith to get on her knees, pulled out his penis, grabbed the back of Faith's neck, told her to "suck [his] dick" and pushed her forward so her mouth made contact with his penis. (T. 2252). Scared and intimidated, Faith acquiesced. As Faith described it, she was "under [the defendant's] rules and he had a weapon so [she] wasn't even going to step out of line." (T. 2254).

In sum, the defendant used coercive control – exemplified by a pattern of isolation, rules, dependence, threats, intimidation tactics, physical abuse, and, on at least one occasion, the presence of a firearm – to force victims, including minors, to engage in sexual activity with the defendant and others at his direction and to become unwilling participants in his pornographic films he created.

## IV.    Exposure to Genital Herpes

The defendant also exposed multiple men, women, boys and girls to a sexually transmitted and incurable disease, genital herpes, without their knowledge or consent, notwithstanding that he had been explicitly told by his personal doctor to inform his sexual partners of his diagnosis and to use a condom when having sex. As early as 2004, the defendant had been diagnosed with genital herpes and exposed a woman who testified at trial using the pseudonym "Kate"[11] and another woman, Jane Doe #12, to herpes without their consent. Both sued him and received financial settlements in exchange for their silence, but the defendant nonetheless remained entirely undeterred by these financial consequences. Over the next 15 years, the defendant engaged in unprotected sexual intercourse with multiple partners, exposing each of them to his genital herpes. As proven at trial, the defendant never disclosed his diagnosis to Jane or Faith and never sought their consent to engage in unprotected sexual activity in these circumstances. As did many of the defendant's sexual partners before her (including Jerhonda), when she was just 17 years old, Jane contracted genital herpes from the defendant, a serious medical condition she will have to live with – and disclose to future partners – for the rest of her life. As Jane testified, she was "devastated" after receiving her diagnosis. (T. 853). She

---

[11]    Kate is identified in the PSR and the government's in limine motions as Jane Doe #11.

9

explained, "I felt that this man had purposely given me something he knew he had, a situation that he could have controlled." (T. 853). By contrast, when Jane told the defendant about her diagnosis, he appeared agitated and callously told her she could have contracted it from someone else. (T. 852-53). When she subsequently had herpes outbreaks, the defendant disparaged her, telling her "I think your pussy is broken." (T. 855).

DISCUSSION

I.    The Guidelines Calculation

In his sentencing memorandum, the defendant lodges several objections to the Guidelines calculations set forth in the PSR and PSR addendum. Additionally, the government objects to certain aspects of the Guidelines calculation in the PSR and PSR addendum. Each of those objections is addressed below.

A.    Racketeering Act One: Bribery related to Jane Doe #1 (Aaliyah)

As to Racketeering Act One, the defendant objects to the inclusion of a two-level enhancement under U.S.S.G. § 3B1.4 for the use of a person less than 18 years of age to commit the offense of bribery. (May 27, 2022 Sent. Mem. 4). While the government agrees with the Probation Department that the defendant used Aaliyah – then 15 years old – to perpetrate the marriage fraud, the government cannot say that he used her to perpetrate the bribery itself and therefore submits that the Court should not apply this enhancement.

B.    Racketeering Act Two: Sexual Exploitation of a Child (Jane Doe #2 – Stephanie)

As to Racketeering Act Two, the defendant objects to the two-level enhancement, pursuant to U.S.S.G. § 2G2.1(b)(2)(A), which applies if the "offense involved—(a) the commission of a sexual act or sexual contact." In the defendant's view, the enhancement is duplicative of the sexual conduct in the base offense level. (May 27, 2022 Sent. Mem. 4-5). He is wrong. Sexually explicit conduct does not require the commission of a sexual act or sexual contact. "Sexually explicit conduct," as defined by 18 U.S.C. § 2256(2) (see U.S.S.G. § 2G2.1, App. Note 1), includes, among other conduct, "lascivious exhibition of the anus, genitals, or pubic area of any person." By contrast, a sexual act or sexual contact, defined by 18 U.S.C. §§ 2246(2) and 2246(3), see U.S.S.G. § 2G2.1, App. Note 2, does not include, and goes well beyond, such conduct, instead covering contact between certain body parts and intentional touching of body parts. Accordingly, the enhancement is not duplicative. See United States v. Coates, 462 F. App'x 199, 204-05 (3d Cir. 2012) (rejecting a defendant's argument that where a defendant was convicted of a violation of 18 U.S.C. § 2251, the two-level enhancement under § 2G2.1(b)(2)(A) amounted to impermissible double counting).

C.    Racketeering Acts Three and Four: Kidnapping/Mann Act Violation
      (Jane Doe #3 – Sonja)

The defendant objects to the inclusion in the Guidelines calculation of the conduct related to Sonja, as alleged in Racketeering Acts Three and Four. (May 27, 2022 Sent. Mem. 5). The government submits that Sonja's testimony was credible and supported by other evidence

and therefore is properly included in the PSR. While the government submits that this conduct has been proven by a preponderance of the evidence and constitutes relevant conduct, pursuant to United States v. Ruggiero, 100 F.3d 284 (2d Cir. 1996), because the adjusted offense level associated with the offense conduct even absent conduct related to Sonja carries a life sentence, the additional conduct related to Sonja has no bearing on the adjusted offense level and the government respectfully submits that the Court need not make a finding as to whether it should be included in the Guidelines calculation. Cf. United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) ("Now that the duty to apply the applicable Guidelines range is not mandatory, situations may arise where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies. This leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters, for example, determination of monetary loss.").

> D.   Racketeering Act Five: Mann Act Violation (Jane Doe #4 – Jerhonda)

>> 1.   Grouping

As an initial matter, the government disagrees with the Probation Department's grouping of Racketeering Acts Five, Six and Seven. Section 3D1.2 of the United States Sentencing Guidelines ("U.S.S.G.") provides that counts "involving substantially the same harm shall be grouped into a single Group" and then sets forth four means through which conduct should be grouped, including "[w]hen counts involve the same victim and the same act or transaction." U.S.S.G. § 3D1.2(a). Application Note 3 explains:

> Under subsection (a), counts are to be grouped together when they represent essentially a single injury or are part of a single criminal episode or transaction involving the same victim.

> When one count charges an attempt to commit an offense and the other charges the commission of that offense, or when one count charges an offense based on a general prohibition and the other charges violation of a specific prohibition encompassed in the general prohibition, the counts will be grouped together under subsection (a).

> Examples: (1) The defendant is convicted of forging and uttering the same check. The counts are to be grouped together. (2) The defendant is convicted of kidnapping and assaulting the victim during the course of the kidnapping. The counts are to be grouped together. (3) The defendant is convicted of bid rigging (an antitrust offense) and of mail fraud for signing and mailing a false statement that the bid was competitive. The counts are to be grouped together. (4) The defendant is convicted of two counts of assault on a federal officer for shooting at the same officer twice while attempting to prevent apprehension as part of a single

criminal episode. The counts are to be grouped together. (5) The
defendant is convicted of three counts of unlawfully bringing
aliens into the United States, all counts arising out of a single
incident. The three counts are to be grouped together. But: (6)
The defendant is convicted of two counts of assault on a federal
officer for shooting at the officer on two separate days. The counts
are not to be grouped together.

U.S.S.G. § 3D1.2, App. Note 3. The government submits that the conduct that formed the basis
for each of the Racketeering Acts as to Jane Doe #4 (Jerhonda) did not involve the "same act and
transaction" and did not substantially involve the same harm, and therefore should not be
grouped. Rather, the conduct is most akin to the final example in Application Note 3, where a
defendant is convicted of two counts of assault for shooting at the officer on two separate days, a
scenario where grouping is not called for.

  Racketeering Acts Five, Six and Seven relate, respectively, to (1) the Mann Act
violation related to Jane Doe #4 (R.A. Five); (2) forced labor of Jane Doe #4 (R.A. Six); and (3)
the sexual exploitation of Jane Doe #4 (R.A. Seven). As Jane Doe #4 testified at trial, on several
occasions over the course of six months, the defendant, using his cellular telephone, induced
Jane Doe #4 to come to his residence and engage in sexual contact with him.[12] Separately, on
several occasions over a six-month period, the defendant video-recorded Jane Doe #4 engaging
in sexually explicit conduct. And finally, in January 2010, the defendant caused Jane Doe #4 to
engage in sex and oral sex with the defendant by means of force, threats of force, physical
restraint, or threats of physical restraint and a scheme, plan, or pattern intended to cause Jane
Doe #4 to believe that, if she did not perform such services, she would suffer serious harm or
physical restraint.[13] Even though the conduct overlapped in time, these three types of conduct
constitute separate acts or transactions and involve very different harm. See United States v.
Vasquez, 389 F.3d 65, 77 (2d Cir. 2004) ("two episodes of sexual misconduct that society has
legitimately criminalized occurring with the same person on different days are not 'substantially
the same harm' for purposes of section 3D1.2.").

  2. Undue Influence Enhancement (Section 2G1.3(b)(2))

  As to Racketeering Act Five, the defendant objects to the two-level enhancement,
pursuant to U.S.S.G. § 2G1.3(b)(2). (May 27, 2022 Sent. Mem. 5-6). Section 2G1.3(b)(2)(B)
provides that the enhancement is warranted when "a participant otherwise unduly influenced a
minor to engage in prohibited sexual conduct . . . ." Application Note 3(B) explains:

In determining whether subsection (b)(2)(B) applies, the court
should closely consider the facts of the case to determine whether a

---

[12] Jane Doe #4 did not testify that the defendant video recorded the sexual acts that
occurred on the first occasion that Jane Doe #4 went alone to the defendant's residence.

[13] Jane Doe #4 did not testify that the defendant video recorded the sexual acts that
occurred on the date in question when this conduct occurred in January 2010.

> participant's influence over the minor compromised the
> voluntariness of the minor's behavior. The voluntariness of the
> minor's behavior may be compromised without prohibited sexual
> conduct occurring . . . . In a case in which a participant is at least
> 10 years older than the minor, there shall be a rebuttable
> presumption that subsection (b)(2)(B) applies. In such a case,
> some degree of undue influence can be presumed because of the
> substantial difference in age between the participant and the minor.

U.S.S.G. § 2G1.3, App. Note 3(B). Here, the defendant was 26 years older than Jane Doe #4 (Jerhonda), thereby giving rise to a rebuttable presumption of § 2G1.3(b)(2)(B)'s application. The defendant's attempt to rebut this presumption by claiming that Jerhonda was "sophisticated" and "took great pains to get close to" the defendant (May 27, 2022 Sent. Mem. 5-6), is absurd. Jerhonda was a 16-year-old girl who was a devoted fan of the defendant's music, nothing about which amounts to sophistication. By contrast, the defendant, a famous and wealthy musician who was 26 years her senior, induced her to engage in sexual contact with him, including after he learned that she was just 16 years old. Moreover, the defendant promulgated various rules that Jerhonda was required to follow in an effort to control Jerhonda and directed her to have sexual contact with others, including another woman, further evidencing the undue influence he wielded over her. In these circumstances, the defendant has not rebutted – and cannot rebut – the presumption. The enhancement is therefore warranted.

### 3. Interactive Computer Service Enhancement (Section 2G1.3(b)(3))

The defendant objects to the two-level enhancement, pursuant to U.S.S.G. § 2G1.3(b)(3), for the use of a computer or interactive computer service to induce the travel of a minor. (May 27, 2022 Sent. Mem. 6-7). There is ample evidence in the trial record that the defendant relied upon cellular telephones to communicate with Jerhonda, including for the purpose of arranging her travel to Olympia Fields to meet with and have sexual contact with him. Among other things, such evidence included telephone records and a cellular telephone used by Jerhonda (both entered into evidence at trial as Government Exhibits 139 and 210) showing telephone contact between Jerhonda and the defendant. The defendant's argument that he did not use a cellular telephone to induce Jerhonda to travel to meet him was squarely rejected by the jury when it found Racketeering Act Five proven. The Court should therefore apply this enhancement.

### 4. Commission of a Sexual Act Enhancement (Section 2G1.3(b)(4))

The defendant objects to the two-level enhancement pursuant to U.S.S.G. § 2G1.3(b)(4). (May 27, 2022 Sent. Mem. 7). Section 2G1.3(b)(4) applies where the "offense involved—(a) the commission of a sexual act or sexual contact." The defendant argues that the enhancement is duplicative of the sexual conduct in the charged offense. He is wrong. A violation of 18 U.S.C. § 2422 – the statute that formed the basis for Racketeering Act Five – is based on coercion of a minor for the purpose of illegal sexual activity and does not require that the illegal sexual activity in fact occurred. Accordingly, the enhancement is not duplicative. See United States v. Watkins, 667 F.3d 254, 262 (2d Cir. 2012) (rejecting defendant's argument that two-level enhancement under § 2G1.3(b)(4)(A) amounted to impermissible double counting

because one could violate 18 U.S.C. § 2423 without committing a sex act). This enhancement is therefore applicable.

E.    Racketeering Act Six: Forced Labor (Jane Doe #4 – Jerhonda)

As to Racketeering Act Six, the defendant objects to the four-level enhancement pursuant to § 2A3.1(b)(1). (May 27, 2022 Sent. Mem. 8). As an initial matter, Section 2H4.1(b)(4) applies when "any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense . . . ." Application Note 2 provides that "'any other felony offense' means any conduct that constitutes a felony offense under federal, state, or local law (other than an offense that is itself covered by this subpart)." U.S.SG. § 2H4.1, App. Note 2. When Section 2H4.1(b)(4) applies, the Guidelines dictate that the offense level should be increased to the greater of (i) the adjusted offense level according to 2H4.1(a) to (b)(3) plus two levels, or (ii) the offense level form the offense guideline applicable to the other offense plus two levels, provided it is not greater than 43. U.S.SG. § 2H4.1(b)(4).

As noted above, the government submits that Racketeering Act Six should not been grouped with Racketeering Act Five or Racketeering Act Seven and that instead each act should be considered separately. As a result, the government also disagrees with the Probation Department's assessment that the other felony offense that was committed during the commission of, or in connection with, the forced labor offense was sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a). (PSR ⁋ 162; PSR Addendum ⁋ 162).

In the government's response to the defendant's objections to the PSR, the government argued that the conduct nonetheless amounted to a violation of 18 U.S.C. § 2241 (aggravated sexual abuse) or 2242 (sexual abuse) and therefore an enhancement under Section 2H4.1(b)(4) was warranted. However, upon further consideration, the government does not believe that the enhancement is warranted because the conduct did not take place in the territorial jurisdiction of the United States, a required element to establish a violation of 18 U.S.C. § 2241 (aggravated sexual abuse) or 2242 (sexual abuse). Accordingly, the government does not seek the application of an enhancement under § 2H4.1(b)(4). Although the government does not seek that enhancement, its submits that the adjusted offense level without the enhancement under § 2H4.1(b)(4) does not reflect the full nature of the conduct – i.e., criminal sexual abuse[14] – and the Court may apply an upward departure under U.S.S.G. § 5K2.0(a).

F.    Racketeering Act Seven: Sexual Exploitation of a Child (Jane Doe #4 – Jerhonda)

As to Racketeering Act Seven, the defendant objects to the application of a two-level enhancement for the use of a computer or interactive computer service to induce the minor

---

[14]    Jerhonda testified that immediately before the defendant instructed her to give him oral sex, the defendant choked her, causing her to pass out (T. 176-77), and thereafter caused Jerhonda to engage in a sexual act by placing her in fear that that she would be subjected to serious bodily injury, i.e., bodily injury that involves a substantial risk of unconsciousness.

to engage in sexually explicit conduct, pursuant to U.S.S.G. § 2G2.1(b)(6). (May 27, 2022 Sent. Mem. 9). Section 2G2.1(b)(6) provides that the two-level enhancement is warranted where:

> If, for the purpose of producing sexually explicit material . . . , the offense involved . . . the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct . . . .

U.S.S.G. § 2G2.1(b)(6). The government submits that the enhancement is properly applied. As described above, the defendant stayed in touch with Jerhonda by cellular telephone and regularly used a cellular telephone to communicate with Jerhonda in order to induce her to travel to see him and to instruct her to meet him in a location where he intended for Jerhonda to engage in sexually explicit conduct and to record such conduct.

G.     Racketeering Act Eight: Mann Act Violation (Jane Doe #5 – Jane)

1.     Application of Section 2G1.1 (versus Section 2G1.3)

The government respectfully disagrees with the Probation Department's determination that the applicable guideline for Racketeering Act Eight is § 2G1.3 and instead submits that the applicable guideline is § 2G1.1. (PSR ¶¶ 174-81; PSR Addendum ¶¶ 175-77). Because at the time that the defendant committed the conduct alleged in Racketeering Act Eight, Jane had told the defendant that she was 18 years old and had not yet told him that she was in fact 17 years old, the government submits that § 2G1.1 is the more applicable guideline.[15]

2.     Fraud Enhancement (Section 2G1.1(b)(1)

As to Racketeering Act Eight, the defendant objects to the four-level enhancement pursuant to U.S.S.G. § 2G1.1(b)(1) based on fraud. (May 27, 2022 Sent. Mem. 9-10). The government submits the enhancement applies because the defendant failed to disclose that he had contracted genital herpes and engaged in unprotected sexual intercourse with Jane without first disclosing to her his herpes diagnosis and obtaining her consent to sexual intercourse in these circumstances. Although "fraud" is not defined in the Guidelines, the defendant asserts that a "fraud" requires the victim to suffer harm, but then offers no support for such a contention. Moreover, no such requirement is included in the Merriam-Webster definition of fraud, which includes the "intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right" and an "act of deceiving or misrepresenting." Accordingly, the four-level enhancement is warranted.

---

[15]     Even though the government submits that Section 2G1.1 is the more applicable guideline, the government notes that the defendant was on notice of Jane's true age when the defendant first met Jane at the Dolphin Hotel in Florida in April 2015 and police officers showed up at his hotel room and told him that her parents could not get in touch with her. (T. 793-94).

Moreover, though not required, the defendant is incorrect that Jane suffered no harm as a result of her unknowing exposure to the defendant's genital herpes through sexual intercourse in California in April and May 2015. As Jane testified, that trip was the first time she and the defendant had sexual intercourse. Because she was unaware of his genital herpes diagnosis due to the defendant's failure to inform her of it, Jane continued to have <u>unprotected</u> sexual intercourse with the defendant, and thereafter contracted herpes from him (with which she was eventually diagnosed a few months later on August 14, 2015). Indeed, based on the evidence presented at trial, and the reasonable inferences to be drawn from it, there is no doubt that the defendant intended to deceive Jane (and all the other women and girls he had unprotected sexual intercourse without first disclosing his diagnosis). Years prior, he had been explicitly informed by his personal doctor to inform his sexual partners of his diagnosis and to use a condom during sex. He had also faced civil suits for infecting prior sexual partners with genital herpes. His preference for continued sexual intercourse without use of a condom clearly was more important to him than risking that a desired sexual partner would either decide not to have sexual intercourse with him at all or insist on the use of a condom if informed of his diagnosis. His decision not to disclose this material fact was clearly intentional, and not the result of any accident or mistake.

H.    Racketeering Act Nine: Mann Act Violation (Jane Doe #5 – Jane)

1.    Grouping

As an initial matter, the government disagrees with the Probation Department's grouping of Racketeering Acts Nine and Ten. Those acts relate to (1) the Mann Act violation related to Jane Doe #5 (R.A. Nine) and (2) the sexual exploitation of Jane Doe #5 (R.A. Ten). The Mann Act violation centered on the defendant's arranging for Jane Doe #5 to travel from New York to California for the purpose of sexual contact despite that Jane Doe #5 was too young to consent to sex. The sexual exploitation conduct related to the defendant's recording of Jane Doe #5 engaging in sexually explicit conduct over the course of a longer time period. Even though the conduct overlapped in time, the conduct underlying each of these racketeering acts constitute separate acts or transactions and involved very different harm. <u>See</u> <u>Vasquez</u>, 389 F.3d at 77 ("two episodes of sexual misconduct that society has legitimately criminalized occurring with the same person on different days are not 'substantially the same harm' for purposes of section 3D1.2.").

2.    Application of Cross-Reference in Section 2G1.3(c)(1)

As to Racketeering Act Nine, the defendant objects to the base offense level of 32, pursuant to U.S.S.G. §§ 2G1.3(c)(1) and 2G2.1(a), and submits that the proper base offense level is 24, pursuant to § 2G1.3(a)(4). (May 27, 2022 Sent. Mem. 10). According to the defendant, the applicable guideline for the offense charged in Racketeering Act Nine is § 2G1.3. The defendant ignores, however, that § 2G1.3 includes a cross-reference to § 2G2.1, where the offense level would be greater under § 2G1.2 and "the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." U.S.S.G. § 2G1.3(c)(1). Here, Jane testified that while she was in California, the defendant recorded sexual contact between Jane and the defendant. (T. 889). There is thus a preponderance of

evidence that "the offense involved causing . . . a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct."

### 3. Custody, Care or Supervising Enhancement (Section 2G2.1(b)(5))

The defendant objects to the two-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(5).[16] (May 27, 2022 Sent. Mem. 17). Section 2G2.1(b)(5) applies "if the minor was otherwise in the custody, care, or supervisory control of the defendant . . . ." The government submits that the evidence established that Jane's parents had entrusted Jane to the supervision of the defendant (purportedly to assist Jane with her musical career), after which Jane lived with the defendant. (See, e.g., GX 476(a) and 475(a) (note authorizing Juice's mother to have custody over Jane until she turned 18 years old); T. 862-65 (Jane testifying that after learning she was 17, the defendant told Jane that "she would need to be homeschooled and living with him in Chicago" so the defendant and Jane "convinced [her] parents to allow [her] to be homeschooled and be in Chicago so that I could learn more musically" and the defendant had her parents sign a document consenting for her "to be in Chicago under a woman that he had known"); T. 1279-80 (Jane testifying that she and her parents knew Juice's mother, the guardian chosen by the defendant, only through the defendant)). Therefore, the enhancement for Jane being in the custody, care, or supervisory control of the defendant applies. See U.S.S.G. § 2G2.1(b)(5).

### I. Racketeering Act Ten: Sexual Exploitation of a Child (Jane Doe #5 – Jane)

#### 1. Commission of a Sexual Act Enhancement (Section 2G2.1(b)(2)(A))

The defendant raises several objections as to the applicable guidelines calculation as to Racketeering Act Ten. First, the defendant objects to the two-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(2)(A), which applies where the "offense involved—(a) the commission of a sexual act or sexual contact." (May 27, 2022 Sent. Mem. 12-13). In the defendant's view, the offense is duplicative of the sexual conduct in the base offense level. As described above, he is wrong.[17] Sexually explicit conduct does not require a sexual act or sexual contact. "Sexually explicit conduct," defined by 18 U.S.C. 2256(2), see U.S.S.G. § 2G2.1, App. Note 1, includes, among other conduct, "lascivious exhibition of the anus, genitals, or pubic area of any person." By contrast, a sexual act or sexual contact, defined by 18 U.S.C. §§ 2246(2) and 2246(3) (see U.S.S.G. § 2G2.1, App. Note 2), does not include, and goes well beyond, such conduct, instead

---

[16] If the Court does not find that the cross reference to § 2G2.1 applies, the government respectfully submits that a similar enhancement under § 2G1.3(b)(2)(B) would apply.

[17] The defendant also suggests that the enhancement was wrongly applied because in Illinois, Jane could consent to sexual contact with the defendant at 17 years old. (May 27, 2022 Sent. Mem. 12). The government agrees that in Illinois, a 17-year-old could legally consent to sexual contact, but submits that the legality of sexual contact has no bearing on whether the enhancement amounts to double counting. Moreover, Jane testified that the defendant recorded her engaging in sexual contact in California, where there is no dispute that she was not legally able to consent to sexual contact with the defendant. (T. 889). Nor need the jury make a finding, as the defendant suggests (May 27, 2022 Sent. Mem. 12 n.1), that the conduct occurred in California.

covering contact between certain body parts and intentional touching of body parts. Accordingly, the enhancement is not duplicative.

2. <u>Use of an Interactive Computer Service Enhancement (Section 2G2.1(b)(6))</u>

The defendant objects to the application of a two-level enhancement for the use of a computer or interactive computer service to induce the minor to engage in sexually explicit conduct, pursuant to U.S.S.G. § 2G2.1(b)(6). (May 27, 2022 Sent. Mem. 13-14). Section 2G2.1(b)(6) provides that the two-level enhancement is warranted where:

> If, for the purpose of producing sexually explicit material . . . , the offense involved . . . the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct . . . .

U.S.S.G. § 2G2.1(b)(6). The government submits that the enhancement is properly applied. The defendant stayed in touch with Jane by cellular telephone and regularly used a cellular telephone to communicate with Jane, in order to induce her to travel to see him and to instruct her to meet him in a location where he intended to record sexual activity. Government Exhibit 157 shows the extensive communications via cellular telephone that the defendant had with Jane prior to her turning 18 years old.

3. <u>Sadistic Conduct Enhancement (Section 2G2.1(b)(4))</u>

The defendant objects to the application of a four-level enhancement, pursuant to U.S.S.G. § 2G2.1(b)(4). (May 27, 2022 Sent. Mem. 13). Section 2G2.1(b)(4) provides that the enhancement applies when the "offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence . . . ." U.S.S.G. § 2G2.1(b)(4). The government agrees that there was no evidence that the defendant produced visual depictions of Jane that included sadistic or masochistic conduct or other depictions of violence while she was under 18 years old, and therefore submits that this enhancement is not warranted. The government further disagrees with the Probation Department's contention in the PSR addendum that according to the principles of relevant conduct, the defendant's use of sadistic punishment as to Jane warrants this enhancement. (PSR Addendum at 13). As described above, the government submits that the conduct that forms the basis for the forced labor predicate (R.A. Eleven) – which the government agrees does involve sadistic conduct on the part of the defendant – should be treated as a separate offense from this predicate and therefore the four-level enhancement should not apply here.

4. <u>Custody, Care or Supervising Enhancement (Section 2G2.1(b)(5))</u>

The defendant objects to the two-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(5). (May 27, 2022 Sent. Mem. 17). For the reasons described in more detail above,

the enhancement for Jane being in the custody, care, or supervisory control of the defendant should apply.  See U.S.S.G. § 2G2.1(b)(5).

J.    Racketeering Act Eleven: Forced Labor (Jane Doe #5 – Jane)

As to Racketeering Act Eleven, the defendant argues that the government did not establish that the defendant used force or the threat of force to cause Jane to engage in sexual contact with others, but concedes that if there was such evidence, he agrees with the Probation Department's calculation as to the applicable guideline for this act.  (May 27, 2022 Sent. Mem. 14).  However, as set forth above with respect to Racketeering Act Six – forced labor as to Jerhonda – the government submits that because the conduct was not committed in the territorial jurisdiction of the United States, the defendant did not commit a violation of 18 U.S.C. § 2241 or 2242, and therefore the defendant did not commit that offense, as required for an enhancement under § 2H4.1(b)(4).  Nonetheless, there is a preponderance of evidence showing that the defendant did use the threat of force to cause Jane to engage in sexual acts with others.  As Jane testified at trial, which testimony was corroborated by, among other things, letters recovered from the defendant's residence and storage facility, the defendant regularly spanked – or "chastised" – and otherwise physically assaulted Jane when Jane broke any of the defendant's many rules.  Immediately before Jane first had sexual contact with Alex, also known as "Nephew," the defendant spanked Jane and two of his other girlfriends approximately 15 times each and then continued to hit Jane more.  (T. 1040-42).  Furthermore, Jane testified that she had sexual contact with others at the defendant's direction not because she wanted to, but rather because she feared consequences that would follow any refusal.  (T. 1050 (testifying that she had sexual contact with Nephew "[b]ecause I would have gotten chastised regardless, so it wouldn't have made a difference.")).  Accordingly, the Court may depart upwardly as to this particular racketeering act because the adjusted offense level does not take into account the defendant's commission of criminal sexual abuse.

K.    Racketeering Acts Twelve and Fourteen: Mann Act Violations
       (Jane Doe #6 – Faith)

As to Racketeering Acts Twelve and Fourteen, the defendant objects to the four-level enhancement, pursuant to U.S.S.G. § 2G1.1(b)(1).  (May 27, 2022 Sent. Mem. 14-15).  The four-level enhancement is warranted "[i]f (A) subsection (a)(2) applies; and (B) the offense involved fraud or coercion . . . ."  U.S.S.G. § 2G1.1(b)(1).  At issue is only whether the offense involved fraud or coercion.[18]  Here, a preponderance of the evidence supports that the offense involved fraud, i.e., that the defendant knowingly made a misstatement or omission of a material fact to entice the victim.  A material fact is one that a reasonable person would expect to rely on when making a decision.  Specifically, the defendant induced Faith to travel to New York and

---

[18]    Application Note 2 provides, "For purposes of subsection (b)(1), "coercion" includes any form of conduct that negates the voluntariness of the victim.  This enhancement would apply, for example, in a case in which the ability of the victim to appraise or control conduct was substantially impaired by drugs or alcohol.  This characteristic generally will not apply if the drug or alcohol was voluntarily taken."

engage in sexual intercourse, but intentionally concealed from her that he had contracted genital herpes.  As a result, the offense involved "fraud" and the Court should apply the enhancement.

L.     Racketeering Act Thirteen: Forced Labor of Faith (Jane Doe #6 - Faith)

As to Racketeering Act Thirteen, the defendant claims that there was no evidence that Faith was forced or threatened with physical harm to give the defendant oral sex and therefore objects to the application of U.S.S.G. § 2H4.1(b)(4).  (May 27, 2022 Sent. Mem. 5).  The government does not contend that the defendant used force or express threats of physical harm, but submits that § 2H4.1(b)(4) applies because his conduct still amounted to criminal sexual abuse.

As noted above, Section 2H4.1(b)(4) applies when "any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense…." U.S.S.G. § 2H4.1(b)(4).  Application Note 2 provides that "'any other felony offense' means any conduct that constitutes a felony offense under federal, state, or local law (other than an offense that is itself covered by this subpart)."  U.S.S.G. § 2H4.1, App. Note 2.  When § 2H4.1(b)(4) applies, the Guidelines dictate that the offense level should be increased to the greater of (i) the adjusted offense level according to § 2H4.1(a) to (b)(3) plus two levels, or (ii) the offense level form the offense guideline applicable to the other offense plus two levels, provided it is not greater than 43.  U.S.SG. § 2H4.1(b)(4).

The government respectfully submits that the defendant's conduct as to Faith included causing her to engage in a sexual act by placing her in fear, as found by the jury when it concluded that Racketeering Act Thirteen was proven, and that conduct would amount to a violation of California Penal Law § 518, which makes it a felony to obtain consideration – including sexual conduct – induced by a wrongful use of fear, and is akin to a violation of 18 U.S.C. § 2242.  Specifically, as Faith testified at trial, after essentially isolating her for several hours in his Sprinter van and then inside a recording room at a studio in Los Angeles, the defendant led Faith into a room the size of a walk-in closet, within the larger recording room.  (T. 2250).  When Faith entered, she saw a gun on an ottoman in the room; the defendant's demeanor changed and he "got real serious." (T. 2250).  He moved the gun near him, sat down in a chair and told Faith to stand across from him.  (T. 2250-51).  After taking photographs of Faith, and getting irritated with her for not being "sexy enough," the defendant asked Faith a series of intrusive questions, including asking her how many men had seen her naked and how many male friends she had, telling her there would be consequences if she did not answer truthfully.  (T. 2251, 2253).  When Faith responded in a manner he did not like, the defendant stated "do you want to take that back?" (T. 2251).  Faith said no; the defendant then paused and got a stern look on his face, telling Faith that he and her father had the "same gift" of "spiritual discernment" and that he would know if she was lying to him.  (T. 2251-52).  Faith was taken aback.  (T. 2252).  The defendant then stood up and put a pillow on the floor and told Faith to get on her knees, which she did.  (T. 2252).  With his gun nearby, the defendant then pulled out his penis, grabbed the back of Faith's neck, told her to "suck [his] dick" and pushed her forward so her mouth made contact with his penis.  (T. 2252).  Faith was "intimidated" and did not want to give Kelly oral sex, but she did so.  (T. 2252-53).  Throughout, Kelly's hand remained on the back of her neck guiding her.  (T. 2253).  Faith did not feel like she could leave the room because she was "under [Kelly's] rules and he had a weapon so [she] wasn't even going to step

out of line." (T .2254).  In these circumstances, it is clear that the defendant placed Faith in fear to cause her to engage in oral sex with him.  The enhancement is therefore warranted.  Under that analysis, the adjusted offense level would be 32 (i.e., the base offense level of 30, pursuant to U.S.S.G. § 2A3.1(b)(2), plus two levels pursuant to U.S.S.G. § 2H4.1(b)(4)(B)).

      M.    <u>Aggravating Role Enhancement (Section 3B1.1(a))</u>

      Finally, the government submits that notwithstanding the defendant's objection (May 27, 2022 Sent. Mem. 16), a four-level role enhancement under U.S.S.G. § 3B1.1(a) is warranted.  Section 3B1.1(a) provides for a four-level enhancement where a "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a).  The application notes explain that while "[a] 'participant' is a person who is criminally responsible for the commission of the offense[,] … [i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  U.S.S.G. § 3B1.1, App. Notes 1, 3.  Application Note 4 makes clear:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.  Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.  This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, App. Note 4.  Furthermore, in <u>United States v. Ivezaj</u>, the Second Circuit explained that in a RICO offense, "a defendant's role adjustment is to be made on the basis of the defendant's role in the overall RICO enterprise." 568 F.3d 88, 99 (2d Cir. 2009).  Viewed through that lens, it is clear that the defendant was the leader of the enterprise and that the four-level enhancement is warranted.

      In opposing the role enhancement, the defendant's argument is two-fold.  First, he challenges the existence of the enterprise, but the jury clearly and necessarily rejected that contention when it found him guilty of racketeering.  (May 27, 2022 Sent. Mem. 16).  Second, he suggests that a role enhancement is only warranted if the activity overseen by the defendant involved five or more individuals also engaged in criminal activity.  (Id.).  Even assuming <u>arguendo</u> that there were not five "participants" involved in the criminal activity – as that term is defined, the government submits that the criminal activity overseen by the defendant was "otherwise extensive."  The defendant oversaw dozens of his employees and associates – i.e., the inner circle – who, knowingly or not, were critical to his ability to carry out the offenses he

committed.  See United States v. Kent, 821 F.3d 362, 369 (2d Cir. 2016) ("In determining the number of participants, a district court considers: (1) the number of knowing participants in the criminal activity; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.").  Thus, the enhancement is warranted.

***

The government submits that the applicable Guidelines calculation is, as follows:

Racketeering Act One: Bribery (Jane Doe #1 – Aaliyah)

| | |
|---|---|
| Base Offense Level (§ 2C1.1(a)(2)) | <u>12</u> |
| Adjusted Offense Level: | 12 |

Racketeering Act Two: Sexual Exploitation of a Child (Jane Doe #2 – Stephanie)

| | | |
|---|---|---|
| Base Offense Level (§ 2G2.1(a)(1)) | | 32 |
| Plus: | Offense involved Sexual Act or Sexual Contact (§ 2G2.1(b)(2)(A)) | <u>+2</u> |
| Adjusted Offense Level: | | 34 |

Racketeering Act Five: Mann Act Violation (Jane Doe #4 – Jerhonda)

| | | |
|---|---|---|
| Base Offense Level (§ 2G1.3(a)(4)) | | 24 |
| Plus: | Participant Otherwise Unduly Influenced a Minor (§ 2G1.3(b)(2)(B)) | +2 |
| Plus: | Offense Involved Use of a Computer or Interactive Computer Service (§ 2G1.3(b)(3)) | +2 |
| Plus: | Offense involved Sexual Act or Sexual Contact (§ 2G2.1(b)(4)(A)) | <u>+2</u> |
| Adjusted Offense Level: | | 30 |

Racketeering Act Six: Forced Labor (Jane Doe #4 – Jerhonda)

| | |
|---|---|
| Base Offense Level (2H4.1(a)(1)) | 22 |
| Adjusted Offense Level | 22 |

Racketeering Act Seven: Sexual Exploitation of a Child (Jane Doe #4 – Jerhonda)

| | |
|---|---|
| Base Offense Level (§ 2G2.1(a)(1)) | 32 |

| | | |
|---|---|---|
| Plus: | Offense involved Sexual Act or Sexual Contact (§ 2G2.1(b)(2)(A)) | +2 |
| Plus: | Offense Involved Use of a Computer or Interactive Computer Service (§ 2G2.1(b)(6)) | +2 |
| | Adjusted Offense Level: | 36 |

### Racketeering Act Eight: Mann Act Violation (Jane Doe #5 - Jane)

| | | |
|---|---|---|
| | Base Offense Level (§ 2G1.1(a)(2)) | 14 |
| Plus: | Offense Involved Fraud (§ 2G1.1(b)(1)) | +4 |
| | Adjusted Offense Level | 18 |

### Racketeering Act Nine: Mann Act Violation (Jane Doe #5 – Jane)

| | | |
|---|---|---|
| | Base Offense Level (§ 2G1.3(a)(4)) | 24 |
| Plus: | Minor was otherwise in the custody, care, or supervisory control of the defendant (§ 2G1.3(b)(1)(B)) | +2 |
| Plus: | Participant Otherwise Unduly Influenced a Minor (§ 2G1.3(b)(2)(B)) | +2 |
| Plus: | Offense Involved Use of a Computer or Interactive Computer Service (§ 2G1.3(b)(3)) | +2 |
| Plus: | Offense involved Sexual Act or Sexual Contact (§ 2G2.1(b)(4)(A)) | +2 |
| | Adjusted Offense Level: | 32 |

### Racketeering Act Ten: Sexual Exploitation of a Child (Jane Doe #5 – Jane)

| | | |
|---|---|---|
| | Base Offense Level (§ 2G2.1(a)(1)) | 32 |
| Plus: | Offense involved Sexual Act or Sexual Contact (§ 2G2.1(b)(2)(A)) | +2 |
| Plus: | Offense Involved Use of a Computer or Interactive Computer Service (§ 2G2.1(b)(6)) | +2 |
| Plus: | Minor was otherwise in the custody, care, or supervisory control of the defendant (§ 2G1.1(b)(5)) | +2 |
| | Adjusted Offense Level: | 36 |

Racketeering Act Eleven: Forced Labor (Jane Doe #5 – Jane)

      Base Offense Level (§ 2H4.1(a)(1))              <u>22</u>

      Adjusted Offense Level              22

Racketeering Act Twelve: Mann Act Violation (Jane Doe #6 - Faith)

      Base Offense Level (§ 2G1.1(a)(2))          14

      Plus:   Offense Involved Fraud (§ 2G1.1(b)(1))    <u>+4</u>

      Adjusted Offense Level              18

Racketeering Act Thirteen: Forced Labor (Jane Doe #6 - Faith)

      Base Offense Level (§§ 2H4.1(a)(1), 2H4.1(b)(4), 2A3.1(a)(2))   30

      Plus:   Two-Level Increase (§ 2H4.1(b)(4)(B))    <u>+2</u>

      Adjusted Offense Level              32

Racketeering Act Fourteen: Mann Act Violation (Jane Doe #6 - Faith)

      Base Offense Level (§ 2G1.1(a)(2))          14

      Plus:   Offense Involved Fraud (§ 2G1.1(b)(1))    <u>+4</u>

      Adjusted Offense Level              18

Multiple Racketeering Act Analysis

| Racketeering Act One | 0 |
|---|---|
| Racketeering Act Two | 1 |
| Racketeering Act Five | ½ |
| Racketeering Act Six | 0 |
| Racketeering Act Seven | 1 |
| Racketeering Act Eight | 0 |
| Racketeering Act Nine | 1 |
| Racketeering Act Ten | 1 |
| Racketeering Act Eleven | 0 |

| | | |
|---|---|---|
| Racketeering Act Twelve | 0 | |
| Racketeering Act Thirteen | 1 | |
| Racketeering Act Fourteen | <u>0</u> | |
| Total Units: | 5½ | |

| | |
|---|---|
| Plus: Levels Added (§ 3D1.4) | +5 |
| Plus: Aggravated Role | <u>+4</u> |
| Total Offense Level | 45 |

Based on a total offense level of 45 and a criminal history category of I, the applicable Guidelines range is life imprisonment.

## II.    A Sentence in Excess of 25 Years is Warranted

The government respectfully submits that a sentence in excess of 25 years is appropriate in light of all relevant factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

### A.    Legal Standard

The Sentencing Guidelines are advisory, not mandatory.   United States v. Booker, 543 U.S. 220, 259-60 (2005).  However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence.  Id.  In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the district court] may not presume that the Guidelines range is reasonable.  [The district court] must make an individualized assessment based on the facts presented."  Id. at 49-50 (citation and footnote omitted).

B.     Analysis

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence in excess of 25 years is appropriate in this case.

1.     The Nature and Circumstances of the Offenses

Relying on his inner circle and his fame and wealth as a successful R&B singer, the defendant engaged in a conscious, repeated pattern of enticement of minors, sexual exploitation and sexual abuse, among other crimes, that spanned a period of decades.  Through his actions, the defendant exhibited a callous disregard for the very real effects that his crimes had on his victims and has shown no remorse for any of his conduct.  Indeed, the defendant's decades of crime appear to have been fueled by narcissism and a belief that his musical talent absolved him of any need to conform his conduct – no matter how predatory, harmful, humiliating or abusive to others – to the strictures of the law.

The nature and circumstances of the defendant's crimes are exceptionally serious. Racketeering – a crime that penalizes individuals like the defendant who commit a pattern of certain crimes backed by a network of others – is a serious crime that warrants a significant punishment, as are the crimes of bribery, enticement of minors, sexual exploitation and sexual abuse.  In many ways, however, the defendant's conduct was more nefarious than the typical cases involving such crimes because he committed these crimes using his fame and stardom as both a shield, which prevented close scrutiny or condemnation of his actions, and a sword, which gave him access to wealth and a network of enablers to facilitate his crimes, and an adoring fan-base from which to cull his victims.

Put simply, the defendant's crimes were calculated, methodical, and part a long-standing pattern of using his platform as a larger-than-life musical persona and his deep network to gain access to teenagers, many of whom were particularly vulnerable, and then to exploit them for his personal gain and sexual gratification.  Aaliyah was only 12 at the time the defendant's sexual abuse of her began and 15 when he secretly and fraudulently married her in an effort to protect himself from the consequences of that abuse.  Stephanie – 17 years old when the defendant sexually exploited her - testified that she was previously sexually abused and that she was "really scared" when the defendant told her that he was going to make a sexually-explicit video of her.  (T. 1631 ("[T]hat was definitely the hardest time of my life.  I had a very low self-esteem.  I had already been through sexual trauma and abuse within my family, by my first boss, by men on the street.  It was the hardest time of my life.  I was very vulnerable."); T. 1644).  The defendant's exploitation of Stephanie was exacerbated when the defendant refused to return or destroy the video recordings he made of her, despite her pleas for him to do so.  (T. 1658).  Sonja – then an aspiring radio disk jockey in her twenties – recounted in vivid detail how she awoke in the defendant's studio to find her underwear removed and the defendant fixing his pants, evidencing that he had sexually assaulted her while she slept.  Jerhonda – 16 years old when the defendant abused her – broke down in tears when she read from a journal entry about the last time the defendant abused her.  She read:

> I went to Rob's house and Rob called me a silly, a silly bitch. Rob slapped me three times. He said if I lie to him again it's not going to be an open hand next time. He spit in my face and in my mouth. And he slapped me in my face again for the fourth time. He choked me during an argument. I had sex with him. I had oral sex with him. And I became fed up with him and went home and confessed [to her mother].

(T. 357-58). Jane – 17 years old when the defendant started to abuse her – testified that her abuse, which caused her to forego attending her senior year of high school in person, left her with an incurable sexually transmitted disease and caused her to endure physical abuse almost every two to three days during the entire four years that she spent with him. Faith – 19 years old when she first met the defendant – testified that he exposed her to genital herpes without her consent, became increasingly controlling, and forced her to give him oral sex after she broke one of his rules in Los Angeles. At his trial, many of the defendant's victims overcame immense fear and trepidation and relived some of the worst experiences of their lives in a public courtroom in front of the man who abused them and, in some cases, controlled every aspect of their lives – from when they could go to the bathroom to who they could look at and whether they could leave a room or a bus – for months or even years. The defendant likely believed that his very presence in the courtroom would intimidate and alter their testimony. But it did not. After years of the defendant having committed crimes with impunity – using his fame, money, power and network to intimidate, silence and threaten his victims – they were able to tell the jury and the Court what they experienced in the veritable "twilight zone" that the defendant created, and his inner circle sustained and helped protect. Many of those victims were subject to harassment and threats on social media and otherwise – both before and after the trial – from the defendant's supporters and loyal fanbase.

The testimony of such victims is all the more remarkable given the methods the defendant used to prevent his victims from coming forward in the first place. The defendant regularly required his victims to pen letters with embarrassing falsehoods, which letters he maintained at a storage facility under lock and key ready for use if anyone dared to "betray" him by exposing his crimes. In fact, when Jane testified, the defendant cross-examined her with the very letters containing embarrassing falsehoods that the defendant directed her to write and that he maintained in pristine condition using document protectors for his protection.

The defendant also entered into settlement agreements that prohibited the parties from ever speaking of the time they spent with the defendant and called for the entry of liquidated damages should they violate that provision. Indeed, his methods worked so well that some potential victim witnesses simply refused to meet with the government during the investigation, citing the extraordinary harm that would result from reliving that period of their lives and fearing that meeting with law enforcement would expose them to financial ruin. Those who did "betray" the defendant exposed themselves to full-scale retaliatory tactics by the defendant and the network backing him.

For example, after Faith filed a civil lawsuit against the defendant, the defendant, along with his one-time business manager, Donnell Russell, and Russell's mother, arranged for

compromising photographs the defendant had taken of Faith to be sent to her civil lawyer in Brooklyn, New York, with a letter threatening, among other things, to release uncropped versions of the photographs publicly if she did not abandon her lawsuit and stop speaking publicly about the defendant. Faith did not withdraw her lawsuit. Thereafter, Russell sent threatening texts to Faith and her mother, including the same cropped photographs with the ominous words "Pull the plug or you will be exposed" and "Criminal charges to follow!", and further created a Facebook page using an alias, "Colon Dunn," called "Surviving Lies," where he ultimately followed through on those threats and publicly posted graphic photographs of Faith, before Facebook took the photographs down.

The defendant also ensured the protection and continuation of his enterprise and his ability to engage in criminal conduct by demanding absolute loyalty and sometimes using threats against others – including those in his inner circle. For example, as he testified at trial, when Demetrius Smith expressed doubt about his plan to marry the 15-year-old Aaliyah to avoid exposure of the defendant's sexual abuse of Aaliyah, the defendant told him he needed to "pick a side." (T. 710). On another occasion, when the defendant faced another legal predicament involving another young female, he told Cheryl Mack that she needed to "pick a team" and that "in these types of situations people come up missing," which Mack clearly understood as a threat. (T. 3783-84). In the months before his arrest, the defendant told another woman, Jane Doe #19, that she needed to decide which team she was on, "Team Kellz" or the other one, and that she had a beautiful family and she did not want to be "handled," a comment that Jane Doe #19 construed as a threat.

The seriousness of the defendant's crimes and the harm he caused is also laid bare in the sheer number of his victims and the three decades over which these crimes spanned. The indictment alleged charges related to six victims and 12 victims testified at trial regarding the abuse the defendant committed.

Finally, the pattern of crimes committed by the defendant demonstrates an escalation in the brazenness with which he engaged in illegal conduct. As made clear through Jane's extensive testimony at trial, the defendant used physical violence and psychological manipulation to ensure that Jane and his other purported "girlfriends" afforded the defendant the adoration he demanded, obeyed every rule he promulgated, and complied with all of his demands, including having sexual contact with numerous other male and female partners on the defendant's command. A letter recovered showed the defendant would not allow one woman – then 26 years old – to use a telephone her father had bought her and required her to ask permission from him to see her mother. In another note that was recovered by law enforcement, Jane recounted the defendant's instructions: "Trust daddy and do what ever [sic] he says , whenever he says , with no rebuttal , disrespect or rebellion." (GX 325). A video recovered from the defendant's residence showed the defendant violently spanking one of his victims, imposing severe pain and leaving the victim in tears, and then requiring her to walk back and forth, naked, making humiliating and disparaging remarks about herself, over and over and over again. In doing so, the defendant severely physically and psychologically scarred all of his victims repeatedly and consistently. A sentence in excess of 25 years is necessary to reflect the profound seriousness of the crimes committed by the defendant.

2.     The Defendant's History and Characteristics

The defendant's history and characteristics also support a sentence in excess of 25 years. The defendant's crimes were not aberrational; they were his regular mode of operation, which he had no intention of ceasing. Over the course of years, numerous women and girls filed lawsuits against the defendant alleging various forms of sexual exploitation by him. Even assuming the defendant did not understand the harm he was causing to these women and girls before they filed those lawsuits, he certainly knew at the time he agreed to pay them hundreds of thousands of dollars. But these financial consequences did nothing to even curb, let alone stop, his pattern of abuse. Nor did the defendant's 2002 arrest and eventual state trial in 2008 stop the defendant from repeatedly committing crime. If anything, the defendant's acquittal after his state trial appears to have emboldened the defendant with a belief that he was untouchable and, over the next decade, the defendant's crimes continued unabated.

3.     Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offenses – racketeering involving a pattern of enticement of minors, sexual exploitation and sexual abuse – are serious. Again and again, the defendant has made clear that he believes he is above the law, thereby demonstrating an utter lack of respect for it.

4.     Affording Deterrence and Protecting the Public

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. Mar. 29, 2010).

Given the breadth of the defendant's conduct and its continuity over a period of decades, the government has little doubt that if afforded an opportunity to offend again, the defendant would do so. The instant offenses and the defendant's history demonstrate that he poses a serious danger to the public. His actions were brazen, manipulative, controlling and coercive. He has shown no remorse or respect for the law. As set forth above, more than a decade ago, several women and girls retained legal representation to pursue charges against the defendant as a result of harm he had caused them. The harms raised in these matters included the defendant's having sexual contact with minors who were too young to consent to such contact, exposing women and girls to genital herpes and physical assault. As a result of the defendant's wealth, he was able to resolve these matters without facing criminal charges and instead paid his victims to settle these cases. Notwithstanding this opportunity to reform his behavior a second, third and fourth time, the defendant was not deterred and he continued to engage in criminal conduct. In fact, his conduct escalated.

As noted above, the defendant also previously faced criminal prosecution in Cook County, Illinois, for sexually exploiting a minor by producing a videotape of her engaging in sexually explicit conduct. Putting aside his guilt as to those charges,[19] there can be no doubt that the defendant was then on notice as to the criminality of such behavior, its seriousness and the penalties he faced for engaging in any such conduct. But again, that experience did not deter the defendant from engaging in criminal activity, including the very type of conduct with which he was then charged. As a result, the government respectfully submits that the defendant is unlikely to be deterred from further sexually abusing and exploiting children and others, and the sentence should therefore incapacitate the defendant for a lengthy period of time to prevent him from further victimizing others.

The sentence sought by the government would incapacitate the defendant until he reaches his 70s. Given the need for specific deterrence and incapacitation, the government respectfully submits that a shorter sentence would be insufficient to adequately protect the public. See 18 U.S.C. § 3553(a)(2)(C).

A significant sentence is also necessary for general deterrence. While the government doubts that the defendant will be deterred, a lengthy sentence of imprisonment will serve to deter others—including those with wealth, fame and the outsized power such status brings—from engaging in similar crimes. This is particularly so given the high-profile nature of the defendant and the likelihood that the length of his sentence will be widely publicized.

5.      Avoiding Unwarranted Sentence Disparities

Finally, a sentence in excess of 25 years is necessary to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6).

IV.    A Fine Within the Guidelines Range Is Warranted

The government also asks the Court to impose a fine. Section 5E1.2(a) of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The defendant bears the burden of proving an inability to pay. United States v. Tocco, 135 F.3d 116, 133 (2d Cir. 1998). In this case, the defendant cannot sustain this burden. The government respectfully submits that the sentence in this case should include a fine within the advisory Guideline range of $50,000 to $250,000. U.S.S.G. § 5E1.2(c)(3).

_____

[19]      The defendant was acquitted of the charges in Cook County, but is now facing charges for that same conduct federally in the Northern District of Illinois. The government does not seek for the Court to rely upon that conduct in sentencing the defendant here.

## CONCLUSION

In this case, given all of the facts and circumstances discussed above, a sentence in excess of 25 years is necessary to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

BREON PEACE
United States Attorney

By: _____/s/_____

Elizabeth A. Geddes
Nadia I. Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of the Court (AMD) (by ECF)
       Jennifer Bonjean, Esq. (by ECF)
       Frank Nikolaidis (by e-mail)