

750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

June 13, 2022

**VIA ECF:**
The Honorable Ann M. Donnelly
United States District Court Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:    *United States v. Kelly,* 19 CR 286 (AMD)

Dear Judge Donnelly:

      Defendant respectfully submits this letter in connection with Defendant's sentencing hearing, currently scheduled for June 29, 2022. Defendant has already submitted a sentencing memorandum that addresses Defendant's position that the guidelines range for his convictions is 168-210 months. Upon consideration of all factors set forth in 18 U.S.C. § 3553(a), Defendant contends that a sentence that exceeds 10 years' imprisonment would be greater than necessary to address the purposes of sentencing in this unique case.

## BACKGROUND

      The government argues for a sentence that exceeds 25 years' imprisonment. A 25-year sentence is tantamount to a life sentence for Defendant who is 55 years-old. Although Defendant has been convicted of serious offenses, there is far more to the picture than the government allows. Defendant's convictions involve four victims who describe conduct that is simply not deserving of a *de facto* life sentence. Importantly, Defendant presents significant mitigating evidence detailed in two reports prepared by Dr. Park Dietz and Dr. Renee Sorrentino and supported further by collateral sources and supporting letters. The reports explore, *inter alia,* Defendant's traumatic childhood, including evidence of a severe history of sexual abuse by family and non-family members. Defendant's history and characteristics weigh in favor of a more lenient sentence than proposed by the government. Because a 10-year sentence would serve the legitimate purpose of sentencing, Defendant urges this Court to impose a sentence not to exceed 10 years' imprisonment.



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

## **ARGUMENT**

**A Sentence In Excess of 10 Years' Imprisonment Is More Than Is Necessary to Comply With the Purpose of Sentencing.**

Defendant respectfully asks this Court to sentence Defendant to a term of less than 10 years' imprisonment in light of all relevant factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, to afford adequate deterrence and to protect the public from future crimes by the Defendant.

### A. Legal Standard

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007). After a proper calculation, a sentencing judge considers the seven factors set forth in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant;" the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available;" the applicable Guidelines range itself; and relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants;" and "the need to provide restitution to any victims." 18 U.S.C. § 3553 (a)(1)-(7); *see also, Gall,* 552 U.S. at 50, n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553 (a)(2).



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

### B. Analysis

#### 1. The Nature and Circumstances of the Offenses

While it is true that Defendant has been convicted of serious offenses, Defendant rejects the government's contention that he committed these crimes as part of a calculated and methodical enterprise, "using his platform as a larger-than-life musical persona and his deep network to gain access to teenagers." Notwithstanding the government's successful effort at overwhelming the jury with excessive bad character evidence, disguised as evidence relevant to the "means and methods" of a non-existent enterprise, Defendant was convicted of abusing four young women, Stephanie (17), Jerhonda (16), Jane (18), and Faith (19). The conduct was unrelated, sporadic, and dispersed over the course of two decades. While it is undebatable that the jury found Defendant guilty of serious crimes, the government's portrait of Defendant as a monster, preying on young teenagers is neither accurate nor fair.

First, Defendant was convicted of a single count of sexual exploitation of Stephanie stemming from an isolated occurrence in 1999. The conviction was based entirely on her uncorroborated claim that she was 17 years old when Defendant video-recorded her in a consensual sexual encounter. Although the government emphasizes that Defendant provided his phone number to Stephanie when she was 16 years old at a McDonald's in Chicago, there is nothing in this record that reflects that Defendant spoke to Stephanie, knew Stephanie's age, or pursued her. Indeed, it was Stephanie who later sought out the Defendant, eventually contacting him and agreeing to engage in a consensual sexual relationship with him. Any claim that Defendant enticed Stephanie or lured her into a relationship is unsupported by the record. Although young, Stephanie was not a minor under Illinois law and her sexual acts with the Defendant were legal, even if she now regrets them and has a better understanding of her own vulnerabilities as a young woman. The offense of recording a sex act with a consenting 17-year-old is a serious one, but on the continuum of production of child pornography offenses, the unique circumstances of this offense are not particularly egregious, as it did not involve an act of child sexual abuse or an act of coercion or violence.

Second, Defendant was convicted of separate racketeering acts related to Jerhonda who claims she was 16 years old when she commenced a sexual relationship with Defendant. Defendant's convictions for conduct directed at Jerhonda are serious and carry severe penalties as they do involve claims of child sexual abuse. That said, Defendant's forced labor conviction related to Jerhonda is highly tenuous – as argued extensively in Defendant's Rule 29 motion. The fact that a jury returned a verdict in the



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

government's favor on this count is likely the result of being overwhelmed by excessive bad act evidence and not because the government's evidence of an isolated act of oral sex followed by a physical assault is compelling evidence of forced labor. As far as forced labor offenses go, this is simply not a serious one (primarily because it is not forced labor). Unlike true forced labor victims, Jerhonda was not living in a condition of servitude or threatened with physical violence to keep her in a position of prostitution or domestic service. Having nonetheless been convicted of forced labor, Defendant faces the severe penalties of the offense, but the conduct cannot be squared with paradigmatic forced labor cases.

Third, Defendant was convicted of several offenses related to Jane, including a Mann Act violation in early 2015, a Mann Act Violation and related child exploitation charge in late 2015, and a forced labor offense. The offenses, while serious, contain mitigating circumstances that this Court should consider when deciding the nature and circumstances of the offense. First, it is undisputed that at the encouragement of her mother, Jane falsely told Defendant she was 18 years when she met him at a hotel in Florida in early 2015. Indeed, the meeting was engineered by Jane's parents. Contrary to the government's contention in fn. 15 of its sentencing letter, Defendant was *not* on notice of Jane's age when they met at the hotel. Jane expressly testified that she lied to Defendant about her age and that when the police arrived at the hotel, Defendant confronted her about her age. Jane reassured him that she was 18. Defendant invited the police officers into the hotel room who proceeded to check Jane's identification. Either Jane possessed a fraudulent identification, or the police could not do math. Either way, the police went about their business after confirming that Jane was 18 years of age and Defendant was none the wiser. It is difficult to follow the government's contention that this incident put Defendant on notice that Jane was 17 years of age when police officers came to his room, checked Jane's ID, and then left her there apologizing for the intrusion. As argued extensively in his Rule 29 motion, Defendant invited Jane to California with him under the mistaken belief that she was 18 years of age. There was no inducement of any kind on the part of the Defendant. Rather, it was Jane's parents who shamelessly (and illegally) pushed their daughter into a sexual relationship with Defendant. Defendant maintains that his conduct violated no laws. The jury said otherwise, but the nature and characteristics of this offense are mitigating given that Defendant was duped into believing that Jane was a consenting adult and there was no hint that Defendant used coercion or force in connection with this Mann Act violation.

As to the Mann Act violations and child pornography offense related to Jane and Defendant's second trip to California in 2015, the nature and circumstances of the offense are mitigating. In late 2015, Jane and Defendant were in a legal relationship in Illinois, a



relationship her parents condoned. When Jane was a month or two shy of her 18th birthday, the couple traveled to California in connection with Defendant's performance schedule where they engaged in consensual sexual activities: Defendant apparently video-recorded one of those sex acts. The sexual activity, while legal in Illinois, was illegal because in California the age of consent is 18. The filming of the sex act was illegal under federal law because Jane was not yet 18. Defendant faces severe penalties for these offenses, but the circumstances are not overly aggravating where they did not involve coercion, violence, threats of violence, or a particularly young child.

Fourth, Defendant was convicted of several offenses related to isolated sex acts with Faith who was not a minor. As argued extensively in Defendant's Rule 29 motion, the government's evidence of Mann Act violations and forced labor as to Faith was wanting. Even if this Court disagrees, the nature and circumstances of the offenses pertaining to Faith were mitigating, even by Faith's own accounts. In connection with racketeering acts 12 and 14, Faith's testimony reflects that Defendant *invited* her to New York for his performances and she accepted. Although the Mann Act violations are predicated on Faith's claim that Defendant exposed her to herpes, Faith never contracted genital herpes, a mitigating fact.

Turning to the forced labor offense related to Faith, as argued, *supra,* isolated sexual acts even unpleasant ones, are not forced labor. In its best light, the government's evidence showed that Defendant directed Faith to give him oral sex and grabbed her neck before placing his penis inside her mouth. Faith later testified that she did not "want" to do it; she never claimed that she was forced or felt threatened to comply. The forced labor statute was not enacted to remedy isolated occurrences like the one described by Faith. Notably, even Faith refuses to call herself a victim and characterizes her interactions with Defendant as her choice.

On cross-examination, Faith admitted that she was not a victim and had made a *choice* to be with Defendant. (R. 2385)

> Q. In one of the podcasts we spoke about this morning, the Paper Route. On that show you said during that interview: **I don't like the word victim because I don't feel like I'm a victim. I'm a young woman. And let's be clear, let's be clear, I made a choice to be involved with that person. Do I feel like everything he did was right? Hell, no. But I had a choice. And that's why I walked away. I did not move in with him. I did not live with**



        **him. I did not take any money from him. There is a choice that you have to make.** You said that?

A.      Correct.

Q.      You made a choice.

A.      Correct.

Q.      And you're not a victim.

A.      Correct. (R. 2385)

    The government focuses primarily on the excessive other bad-act evidence that it placed before the jury to make its case that Defendant's conduct was exceptionally serious. The government places outsized emphasis on 30-year-old conduct that was never proved beyond a reasonable doubt, some of which was never shown to be the product of any coercion. More than one witness testified against Defendant reluctantly, clearly cooperating because of government pressure. At least one of the government's witnesses, an alleged victim, sent an unsolicited letter to Defendant apologizing for her testimony, suggesting that her testimony was strong-armed.[1]

---

[1] In a letter dated April 7, 2022, one government witness wrote:

    Rob,

    I have so much to say!!! Please let me know if you even want me to write. I know writing isn't your thing! Call me if it's easier for you! I hope you know I <u>NEVER</u> wanted anything to do with this!! I even paid a lawyer to try to avoid it but I was threatened! It kills me everyday!

                          Love your ride or die!!
                                 XXXXX

    P.S. I hope you know I would never want to do anything to hurt you! My hands were tied and they had me backed in a corner! I tried to send a birthday card, but it was returned because the envelope was purple! I hope to hear from you! I'm lost without my best friend!!



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

The government seeks to sentence Defendant to a sentence that would see him in prison until his 80s. As an African American man with diabetes and other health concerns, Defendant is unlikely to see a prison sentence through until his 80th birthday. A *de facto* sentence of life is unjustified here, notwithstanding the government's belated effort to prosecute Defendant for untimely offenses that the government only developed an interest in prosecuting after the airing of the docuseries "Surviving R. Kelly."

  2.  The History and Characteristics of the Defendant

Defendant is widely accepted as a musical genius with a rags-to-riches story. He is considered the greatest living R & B singer and has earned multiple Grammy awards. He has written and produced music for celebrated artists like Michael Jackson and Whitney Houston. Notwithstanding his legendary status, Robert Kelly is a man with a rich and complicated story that is highly relevant to this Court's goal of fashioning an appropriate sentence for him. Defendant has been portrayed by the government and the media as a one-dimensional villain, undeserving of any measure of humanity or dignity. This Court is charged with considering Defendant's unique history and characteristics in rendering an appropriate sentence. Defendant's history and characteristics reveal that he is is not an evil monster but a complex (unquestionably flawed) human-being who faced overwhelming challenges in childhood that shaped his adult life. This evidence is critical to understanding how and why Defendant finds himself in the current situation.

As acknowledged in the Presentencing Investigation Report and set out more fully in extensive reports prepared by Dr. Park Dietz, M.D., M.P.H., Ph.D., and Dr. Renee Sorrentino, M.D., Defendant experienced a traumatic childhood involving severe, prolonged childhood sexual abuse, poverty, and violence. His victimization continued into adulthood where, because of his literacy deficiencies, Defendant has been repeatedly defrauded and financially abused, often by the people he paid to protect him.

Dr. Dietz's report focuses on adverse childhood experiences, illiteracy, victimization during adulthood, the question of coercive control, the effects of stardom, and positive character traits. [Exhibit A – Report of Dr. Park Dietz] Incorporated into Dr. Dietz's report are findings of Dr. Daniel Martell, Ph.D. who conducted neuropsychological testing of Defendant. Dr. Sorrentino's report contains a complete history of the Defendant and focuses on Defendant's sexual and relationship history, including a detailed discussion of the sexual abuse he suffered as a child. [Exhibit B –



Report of Dr. Renee Sorrentino] Dr. Shawnte Alexander, Ed.D. conducted collateral interviews in connection with these reports. The reports are lengthy, and Defendant will not quote from them extensively but will highlight certain portions. [Ex. C – Expert CVs]

Critical to understanding the history and characteristics of the Defendant is understanding the traumatic childhood that shaped him. As Dr. Dietz writes:

> Traumatic childhood events such as abuse, neglect, and witnessing experiences like crime, parental conflict, mental illness, and substance abuse can result in long-term negative effects on learning, behavior and health. Often referred to as adverse childhood experiences (ACEs), these types of events create dangerous levels of stress that can derail healthy brain development, and increase risk for smoking, alcoholism, depression, heart disease, and dozens of other illnesses and unhealthy behaviors throughout life.

Dr. Dietz opines that Defendant endorses a significantly high number of adverse childhood experiences ("ACEs") that cannot be overlooked when considering his history and characteristics. Dr. Dietz writes: "[m]any of Mr. Kelly's problems are now known to be adverse outcomes associated with cumulative ACEs, including but not limited to below average academic and literacy skills by kindergarten age, lower school engagement, learning/behavior problems, not complete high school, sexually transmitted disease, having 50 or more sexual partners, anxiety, panic disorder, and criminal conviction. Separately, there is now substantial evidence that a history of being sexual abused as a child is associated with subsequent conviction for sex offenses.

As set forth in detail in Dr. Dietz's report, Defendant grew up in poverty and experienced a chaotic home life. One of Defendant's long-time employees and friends aptly writes in a letter of support:

> Robert was born in poverty. But even as a kid he had a passion for music. He shared with me some of the abusive circumstances he grew up in. It was a horrible environment for any child and Robert is amazingly resilient to have even survived it. As a young adult, he was homeless and earning money as a street performer on the frigid streets of Chicago. Eventually his hard work and talent earned him a record deal, but that deal wouldn't take away his illiteracy or the traumatic experiences he endured. [Exhibit D – Letter of Diana Copeland]



Defendant never knew his father and was raised by his mother and stepfather who by all accounts were heavy drinkers and would sometimes violently fight. During one vivid fight, Defendant's stepfather pushed his mother and her dress got stuck in a car door before Defendant's step-father drove off, dragging his mother for a short while her sons threw bricks at his car. By objective accounts, Defendant and his two brothers suffered physical abuse at the hands of their mother who disciplined them with whippings with cords and switches. On one occasion, Defendant's mother grabbed a knife to threaten Defendant and his brothers and accidentally stabbed Defendant in the left arm. Neither the Defendant (nor his brothers) consider the punishments meted out by his mother as abusive. Indeed, Defendant's mother was beloved by her children.

Defendant lived in a violent neighborhood with significant gang and drug activity. Defendant steered clear of gang and drug pressures but still witnessed significant violence that made a lasting impact on him. For example, at the age of 14, Defendant was shot in the arm with a .22 round while riding his bike down the block.

Critically, Defendant experienced multiple sources of childhood sexual abuse and premature sexualization that sheds significant light on some of his behaviors. Dr. Sorrentino and Dr. Dietz write at length about how Defendant was sexually abused as a child for many years by his sister            Both of Defendant's brothers report being sexually abused by        . Defendant was also sexually abused by a landlord and family friend known as Mr.        .

When Defendant was only six or seven years old,           started molesting him. The abuse included oral sex and intercourse and persisted into middle school.           began dating their first cousin          and she would have Defendant take Polaroid photos of them having sex. Mr.         sexually abused Defendant on a weekly basis during the same general period of time. The abuse included oral and anal sex.

Dr. Sorrentino opines that Defendant's history of childhood sexual abuse should be considered a mitigating factor in his sentencing hearing. It is my opinion with reasonable medical certainty that Mr. Kelly's history of childhood sexual abuse is consistent with the definition of mitigating factors as any fact or circumstance that lessen the severity or culpability of the criminal act. The following evidence supports this opinion:
(1) Mr. Kelly's history of childhood sexual abuse represents a hardship or circumstance that was out of his control.
(2) This history has been described in scientific literature as contributing to adult hypersexual behaviors.



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

(3) Mr. Kelly's adult hypersexual behaviors were factors in his criminal convictions. [Ex. B. at pg. 22]

Defendant suffered other childhood trauma, including witnessing the drowning death of his first childhood girlfriend Lulu. When they were eight or nine years old, Defendant and Lulu lived in Chicago Heights and were walking near a "river" when another boy pushed Lulu into the river. Defendant did not know how to swim and began screaming as he watched his friend drown. Multiple sources confirm this traumatic event and opine that it had a significant impact on the Defendant.

Defendant is functionally illiterate. Defendant's inability to read and write as a child was a significant source of shame and embarrassment that persists to this day. Defendant was bullied as a child because he could not read or write and eventually dropped out of high school after being held back several times. Defendant spoke of the shame and fear he experienced later in life when accepting Grammy awards since he could not read the teleprompter.

Dr. Dan Martell recently examined Defendant and reported that he "had significant impairments in all areas of academic functioning, placing him in the bottom first to third percentiles and at the early elementary school level (i.e., first to third grade) overall." Dr. Martell's testing indicated that Mr. Kelly's "cognitive abilities are not evenly developed, such that his Full-Scale IQ, which fell in the borderline range (FSIQ=79), does not adequately reflect his overall level of intellectual ability which is more likely in the low average range," in part due to "his lack of school learning."

Defendant's literacy deficiencies have led to chronic victimization in adulthood. Defendant has been financially exploited his entire adult life. At one point in his career, he was told he was worth $900 million; he is now destitute.

Dr. Dietz also details a number of positive attributes of the Defendant as reported by collateral sources. Defendant is by all accounts a generous and forgiving person. Defendant has employed his family and friends and continually re-employed them after they stole from him. One of Defendant's friends' recounts:

> [H]e really has a good heart. He's not a bad person. He has a real forgiving heart you know. People that did things to him, people around him that sued him, and came back and, you know, he forgave them and gave them their jobs back. And, you know, he, you know, he's real. He's a real kind-hearted person. [Ex. A. at pg. 29]



Another friend described Defendant as follows:

> He is compassionate and empathetic. When Robert learned of a shooting that took place that claimed many lives and devastated a small community in Virginia, he stopped what he was doing and wrote a song called "Rise Up" which to this day is still played and every penny of the proceeds is shared by the families, the college and the community. [Ex. D – Letter from Alicia Evans]

> Another time I recall worth honorable mention was when Robert saw on the news that a horrific incident had taken place at the E2 nightclub in his hometown. There had been a stampede where 21 people were trampled to death. Robert gave 21 families whom he did not know, money towards funeral expenses. *Id.*

Defendant is also described as down-to-earth and someone who eschewed the celebrity life, more comfortable keeping close to the community of his childhood.

Reports from Dr. Dietz and Dr. Sorrentino and supporting letters provide additional and significant evidence of Defendant's history and characteristics.

### 3. <u>Reflecting the Seriousness of the Offense</u>

A sentence that does not exceed 10 years reflects the seriousness of the offense, promotes respect for the law and provides just punishment.

### 4. <u>Affording Deterrence and Protecting the Public</u>

The government has no basis to predict that Defendant would "offend again" at the age of 65 years old if sentenced to a reasonable sentence. Indeed, the lion's share of the conduct alleged by the Defendant is decades-old, demonstrating that Defendant is not currently a risk to the public. As Drs. Dietz and Sorrentino confirm, Defendant is neither a pedophile nor a sexual sadist.

Dr. Sorrentino opined:

> I considered the diagnosis of Pedophilia given Mr. Kelly's alleged history of sexual contact with minors. The diagnosis of Pedophilia is used to refer



to individual who experience recurrent, intense, sexually arousing fantasies or sexual urges involving sexual activity with prepubescent child or children (generally age 13 years of younger). I rejected the diagnosis because Mr. Kelly does not report a history of sexual arousal to prepubescent individual and his sexual behavior has never involved prepubescent individuals.

I considered the diagnosis of Sexual Sadism given the government's claim that Mr. Kelly's sexual behavior includes sadistic content. The diagnosis of Sexual Sadism requires the presence of recurrent and intense sexual arousal from the physical or psychological suffering of another person as manifested by fantasies, urges or behaviors. I rejected the diagnosis of Sexual Sadism because Mr. Kelly does not report a history of sexual arousal from physical or psychological suffering of another. None of Mr. Kelly's sexual behaviors include sexual gratification from the physical or psychological suffering of a sexual partner.

In light of the foregoing, the government lacks a basis to conclude that Defendant is a danger to the public and must be incapacitated until death.

## **CONCLUSION**

For the foregoing reasons, Defendant contends that any sentence that exceeds 10 years' imprisonment is unjustified.

Respectfully Submitted,

/s/JENNIFER BONJEAN

cc: AUSA Elizabeth Geddes (via ECF)
AUSA Maria Melendez Cruz (via ECF)
AUSA Nadia Shihata (via ECF)