UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                     :

**UNITED STATES OF AMERICA**,          :

                                 :

         – against –         :   **MEMORANDUM DECISION AND ORDER**

                                 :

**ROBERT SYLVESTER KELLY**,     :   19-CR-286 (AMD)

                      Defendant.   :

------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

      The defendant, an international music star, was charged with using his fame and organization to lure young people into abusive sexual relationships—a racketeering enterprise that the government alleged spanned about 25 years. Over the course of a six-week trial, the government presented the testimony of 45 witnesses and introduced hundreds of exhibits, including written, videotaped and audiotaped evidence of the abuse to which the defendant, enabled by his employees and associates, subjected his victims. On September 27, 2021, a jury convicted the defendant for that conduct.[1]

      Before the Court are the defendant's motions pursuant to Federal Rules of Criminal Procedure 29 and 33 for a judgment of acquittal, or, in the alternative, for a new trial. (ECF Nos. 270, 273, 276, 282, 283.) In seeking this relief, the defendant attacks almost every aspect of his trial—the sufficiency of the evidence, the credibility of the witnesses, his trial lawyers'

---

[1] The defendant is charged in the Northern District of Illinois with participating in a conspiracy to obstruct justice and receive child pornography. *See United States v. Kelly et al.*, No. 19-CR-567 (N.D. Ill.) The trial in that case is set to commence on August 15, 2022. The defendant also faces charges in Illinois and Minnesota state court.

competence and the Court's evidentiary rulings.  The government opposes.  (ECF Nos. 277, 278,

288.)  For the reasons explained below, I deny the defendant's motions in their entirety.

## BACKGROUND

### I.    Indictment

The defendant was charged in a third superseding indictment with racketeering in

violation of 18 U.S.C. § 1962(c) (Count 1); transportation of Jane for the purpose of illegal

sexual activity in violation of 18 U.S.C. § 2421(a) (Count 2); coercion of Jane for the purpose of

illegal sexual activity in violation of 18 U.S.C. § 2422(a) (Count 3); coercion of Jane, as a minor,

for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2422(b) (Count 4);

transportation of Jane, as a minor, for the purpose of illegal sexual activity in violation of 18

U.S.C. § 2423(a) (Count 5); transportation of Faith for the purpose of illegal sexual activity in

violation of 18 U.S.C. § 2421(a) (Count 6); coercion of Faith for the purpose of illegal sexual

activity in violation of 18 U.S.C. § 2422(a) (Count 7); transportation of Faith for the purpose of

illegal sexual activity in violation of 18 U.S.C. § 2421(a) (Count 8); and coercion of Faith for the

purpose of illegal sexual activity in violation of 18 U.S.C. § 2422(a) (Count 9).  (ECF No. 43.)

### II.   *Curcio* Hearing

On June 14 and 24, 2021, the government advised the Court that Nicole Blank Becker,

one of the four attorneys who represented the defendant at trial, had potential conflicts of interest

in representing the defendant.[2]  (*See* ECF Nos. 107, 114.)  The government asserted that, in the

summer of 2019, Ms. Blank Becker may have entered into an attorney-client relationship with

---

[2] Two other lawyers—Steven Greenberg and Michael Leonard—represented the defendant from the time
of his indictment until they moved to withdraw in June of 2021.  (ECF No. 99.)  Thomas Farinella and
Nicole Blank Becker also represented the defendant beginning in August of 2019 and April of 2021,
respectively.  (ECF Nos. 20, 95.)  Devereaux Cannick joined the defense team in June of 2021, and
Calvin Scholar joined shortly thereafter in July of 2021.  (ECF Nos. 113, 130.)

someone who was then represented by Gloria Rodriguez in Chicago, and who ultimately testified as a government witness.[3]  (*See* ECF No. 114.)  The Court appointed independent counsel— Ilana Haramati—to advise the defendant.  (*See* ECF No. 112.)  The Court conducted a *Curcio* hearing on June 17 and July 15, 2021.  Ms. Blank Becker and Ms. Rodriguez made written submissions, and both answered a series of questions posed by the Court.  (*See* ECF Nos. 108, 110, 125, 126.)[4]

After considering the submissions and the attorneys' representations, the Court concluded that Ms. Blank Becker had potential conflicts in representing the defendant, but that the conflicts were waivable.  (*Curcio* Tr. 32.)[5]  In particular, the Court found that Ms. Blank Becker "had substantial contacts with potential witnesses," including Jane, "and may have developed a relationship of trust with them even though she [was] never formally retained as their lawyer." (*Id.*)  Due to Ms. Blank Becker's "confidentiality obligations to them," and "given the nature and extent of those communications and the content of them, she would have a conflict if she were to cross-examine either one of them."  (*Id.*)  The Court also determined that Ms. Blank Becker's communications with both women, knowing that they were represented by another attorney, could raise ethical concerns.  (*Id.* at 33.)  That, too, created potential a conflict because "a person would be motivated to defend himself or herself from the accusation in a way that might keep the lawyer from asking certain questions or calling certain witnesses."  (*Id.*)

Addressing the defendant, the Court explained in detail the risks of being represented by a lawyer who had the potential conflicts that the Court identified.  (*Id.* at 34-39.)  The Court also

---

[3] The government raised other potential conflicts of interest that are not relevant to this decision.

[4] The Court conducted a portion of the inquiry of Ms. Rodriguez *in camera*, because it implicated confidential communications between Ms. Rodriguez and her clients.  Those portions are not relevant to the defendant's claims.

[5] "*Curcio* Tr." refers to the July 15, 2021 proceeding.

explained that if the Court determined that the defendant's waiver was knowing and voluntary, the defendant would not be able to cite Ms. Blank Becker's conflict as a reason to overturn a conviction.  (*Id.* at 46.)  The defendant responded that he understood the risks, including his waiver of the right to use the conflict as the basis for a challenge to a conviction, and, at the Court's request, explained his understanding of the potential conflicts.  (*Id.* at 34-46.)  Ms. Haramati, *Curcio* counsel, confirmed that she had sufficient time to meet with the defendant, that she explained the conflicts to him, that he understood them and that he was capable of making an informed waiver of his right to conflict-free counsel.[6]  (*Id.* at 29-31, 37-38.)  The defendant explained that he wanted to continue with Ms. Blank Becker as one of his lawyers, and waived the conflicts.  (*Id.* at 46.)  Based on the record, the Court accepted the defendant's knowing and intelligent waiver.  (*Id.* at 47.)

## III.    Pre-Trial Motions

In February and March 2020, the defendant moved to dismiss Count 1 of the indictment and the counts of the indictment incorporating New York Public Health Law Section 2307. (ECF Nos. 41, 42.)   In moving to dismiss the Count 1, the defendant claimed that the indictment did not allege a legally cognizable enterprise within the meaning of RICO.  (ECF No. 41 at 5-10.)  In the second motion, the defendant moved to strike the charges that cite Section 2307 on the theory that the law is unconstitutionally overbroad and vague.  (ECF No. 42.)  The Court denied both motions in a written decision on May 22, 2020.  (ECF No. 69.)  On the morning that the oral portion of jury selection was set to begin, the defendant moved to dismiss the indictment on other grounds (ECF Nos. 159, 169); the Court denied that motion also, issuing a subsequent written decision.  (ECF No. 252.)  Before the final pre-trial conference on August 3, 2021, both

---

[6] The Court gave the defendant time to consult with Ms. Haramati, first during the period between June 17 and July 15, 2021, and again on July 15, 2021 for approximately a half hour.  (*Curcio* Tr. 28.)

parties filed motions *in limine*.  (ECF Nos. 121, 133, 135, 136, 137.)  As relevant here, the government sought to admit certain uncharged conduct.  (ECF No. 133.)  The defendant responded.  (ECF No. 146.)  At the August 3, 2021 pre-trial conference and prior to opening statements on August 18, 2021, the Court ruled on most of the parties' requests, except for those on which the Court reserved decision pending hearing the trial evidence.  On November 4, 2021, the Court issued a written opinion explaining the rationale for its rulings.  (ECF No. 255.)

## IV.   Jury Selection

The Court employed the following system for jury selection.  At the Court's direction, the parties submitted a joint proposed jury questionnaire.  (*See* ECF No. 54.)  Subsequently, both the government and the defense submitted requests for additions and changes to the questionnaire (*see, e.g.*, ECF Nos. 96, 105); the Court reviewed the submissions and modified the questionnaire accordingly.  (*See* ECF No. 115.)[7]  The end result was a 28-page questionnaire with 108 questions.  Approximately 575 prospective jurors completed the questionnaire.  Next, the parties reviewed the completed questionnaires, and agreed that 251 jurors should be stricken for cause.[8]  (ECF Nos. 152, 157.)  The Court directed the remaining prospective jurors, whom neither party had challenged, to appear for an in-person *voir dire*.  In addition, the Court directed the parties to submit any questions that they wanted the Court to put to the prospective jurors. The parties filed those questions before the oral *voir dire*.

On August 9 and August 10, 2021, the prospective jurors appeared for questioning.  The Court addressed them as a group, and explained the rules that they must follow and the principles

---

[7] In an October 8, 2020 written order, the Court granted the government's motion for an anonymous and partially sequestered jury.  (ECF No. 79.)  The defendant does not challenge that decision.

[8] The government submitted 34 additional names that it challenged, and the defendant submitted 145 additional names that he challenged.  This group of prospective jurors was not in the final group that participated in the *voir dire*.

of law that applied, including that the defendant was presumed to be innocent, and that the government had the burden of proving the defendant's guilt beyond a reasonable doubt.  (J.S. Tr. 17-21, 197-200.)  The Court questioned the prospective jurors individually and asked the written questions the parties submitted.  The Court also asked the parties whether they had additional questions for jurors and put those questions to the jurors.  Following the in-person *voir dire*, the parties exercised their challenges, both peremptory and for cause.[9]  At the end of jury selection, which took place over the course of three days, the Court empaneled 12 jurors and six alternate jurors.[10]

## V.    Trial

The evidence at trial established the following facts.  From the early 1990s until his arrest in 2019, the defendant, a famous recording artist and professional singer and performer, was the head of an organization comprised of employees and associates, including managers, engineers, accountants, personal assistants and so-called "runners," who promoted the defendant's music and brand, but also catered to his personal needs and demands.  For nearly 25 years, the defendant used his fame and his enterprise to lure young victims—girls, boys, young women and men—into abusive sexual relationships, often promising to advance their musical careers.  The defendant exerted control over his victims by limiting their access to family and friends, requiring them to engage in degrading sexual acts with him and with multiple partners while he recorded them, forcing them to write and record false and degrading things about themselves or their families for the defendant to use as "insurance," among other things.  He also exacted punishments for violations of his rules; he spanked them, beat them, forced them to have sex

---

[9] Both sides exercised all their peremptory challenges.

[10] The Court excused one of the six alternate jurors due to a financial hardship.  (T. Tr. 144, 464-65.)

with him and recorded them during forced sexual encounters and performing other humiliating acts.  His underlings enabled him by recruiting victims, transporting them, and enforcing the defendant's rules.

The defendant lived in various residences in Chicago from the early 1990s until his arrest.  (T. Tr. 4053 (40 East 9th Street), 1336 (1010 George Street), 3143 (Olympia Fields and Trump Towers).)  He recorded music at CRC Recording Company in the 1990s, 865 North Larabee Street (formerly known as Chicago Trax) from 2003 to 2004, and the basement of his Olympia Fields residence beginning in 2004—the Larabee Street and Olympia Fields studios were called the "Chocolate Factory."  (T. Tr. 684, 1420-22, 1424-26, 1464.)

The defendant had many employees who worked for him in various capacities at different times, seeing to his professional and personal needs.  These employees and associates included Demetrius Smith, the defendant's personal assistant and tour manager (T. Tr. 667-68, 673); Barry Hankerson, another manager (T. Tr. 673); Derrel McDavid, an accountant and manager (T. Tr. 707); Donnie Lyle, a musical director (T. Tr. 1518); Tom Arnold, a studio manager and road manager (T. Tr. 1422-24); and Diana Copeland, the defendant's personal assistant, and then executive assistant.  (T. Tr. 3132-34.)  The defendant also hired "runners" including Nicholas Williams and Anthony Navarro.  (T. Tr. 556, 3511, 3514-15.)  Jermaine Maxey, nicknamed "Bubba," was the defendant's close friend and a member of his entourage.  (T. Tr. 1518, 1949.)  Cynthia Oliphant ("Candy") handled security.  (T. Tr. 3140.)  "Top Gun" was one of the defendant's drivers.  (T. Tr. 3142.)  The defendant's numerous personal assistants included Suzette Mayweather, her twin sister Alesiette Mayweather, Diana Copeland, Bruce Kelly, George Kelly ("June Bug"), Milton Brown ("June"), Cheryl Mack and Van Pullen.  (T. Tr. 1942, 1946, 1950, 3139, 3341, 3388.)

These people and the defendant's other employees helped the defendant with all aspects of his life.  For example, Arnold "looked after the building," made sure there were runners available, provided cash for supplies and helped engineers with documentation.  (T. Tr. 1422-23.)  He was responsible for stocking the tour buses and coordinating travel and accommodation.  (T. Tr. 1424.)  The runners answered phones, took messages in the studio, transported "guests" and ran errands, among other tasks.  (T. Tr. 488-91, 3514-15.)  Copeland handled "household responsibilities," and made sure the defendant attended meetings on time.  (T. Tr. 3135-36.)

The defendant's employees were also charged with contacting young women and girls for him, including those that he selected at his concerts or saw at other locations.  For example, members of the defendant's staff routinely handed out the defendant's phone number to young women and girls in the audiences at his concerts (T. Tr. 1507-10), and invited them backstage or to afterparties.  (T. Tr. 771, 2130, 2552, 2819.)  In addition, these employees would look for women and girls at local malls and other places, and would give them the defendant's contact information.  When the defendant wanted a young woman or girl—referred to at the trial as his "girlfriends" or "female guests"—to travel to meet him, the assistants arranged their flights and hotels.  (T. Tr. 3158, 3401.)  The employees were also charged with escorting these "guests" when they went out in public—to shopping malls, to nail salons and to the defendant's basketball games.  (T. Tr. 972-73, 3150, 3413-14.)  The runners drove the defendant's "guests" to and from the Larabee studio and the Olympia Fields residence, and ordered food for young women and girls.  (T. Tr. 495-96, 499-500, 1426-28, 1437.)  In addition, the employees made sure that the defendant had his backpack, which contained his iPads and the other devices that he used to record his sexual encounters and his "guests."  (T. Tr. 792, 845, 971-72, 2165, 2887-88, 3581.)

8

The defendant relied on his employees to enforce his various rules and to report any transgressions. For example, if a young woman or girl needed to use the bathroom or wanted to leave the defendant's home or studio, she was required to ask an employee, who then had to get the defendant's permission. (T. Tr. 821-22, 1439-40, 2003-05, 2029-31, 2209-2210, 2830-33.) If the "guest" wanted something to eat or drink, she had to ask an employee. (T. Tr. 2829-33.) The defendant required his underlings to report any "guest" who left her room without permission. (T. Tr. 506-07.)

When the defendant punished young women or girls for breaking his rules, including, for example, by forcing them to stay in a room or on a tour bus, sometimes for days, the defendant's assistants were required to monitor them. (T. Tr. 2220, 2222-27, 2229-32.) If the defendant believed that his employees had been insufficiently watchful or had permitted one of the women to break his rules, he confronted them and often punished them, including by docking their pay. (T. Tr. 3167-69.)

### a. The Defendant's Herpes Diagnoses

Dr. Kris McGrath, the defendant's primary care physician from 1994 until 2019, treated the defendant for herpes, beginning after June 5, 2000, and before March 19, 2007. (T. Tr. 400-05, 421.) Dr. McGrath advised the defendant to inform his sexual partners that he had herpes and to use a condom during sex, prompting the defendant to acknowledge that he should use a condom when he had sex. (T. Tr. 406, 463.) Dr. McGrath prescribed Valtrex for the defendant, which his underlings often picked up from the pharmacy. (T. Tr. 407-09.)

### b. The Charged Crimes and the Victims

#### i. Angela

"Angela" met the defendant in 1991 when she was 14 or 15 years old, through her friend Tiffany. (T. Tr. 3274-76.) Angela wanted to be a singer and dancer, and Tiffany, who was also

in high school, was an aspiring singer.  (*Id.*)  Tiffany told Angela about the defendant, and

brought her to his apartment in Chicago, along with two other girls who were also in high school.

(T. Tr. 3276-77.)  The defendant and members of his entourage—Bruce Kelly, Demetrius Smith

and Larry Hood—were in the apartment when the girls arrived.  (T. Tr. 3278-80.)

   The girls followed the defendant into another room "one by one."  (T. Tr. 3281-82.)

There were already three girls in the room when Angela walked in: one girl was removing her

clothes, another was "standing there," and the third was "taking off her shirt."  (T. Tr. 3282).

The defendant asked Angela "to climb on top of him" and to "straddle [] and [] ride him."  (T.

Tr. 3282-83.)  Angela was "a little startled," but did as the defendant asked.  (T. Tr. 3283.)  She

asked if the defendant had "protection;" he did not, so she got a condom, put it on him, and they

had sexual intercourse in front of the three girls.  (T. Tr. 3284.)  The defendant had intercourse

with at least one other girl in the room, and engaged in sexual contact with all of them.  (*Id.*)

When Angela left the room, Demetrius Smith, Bruce Kelly and Larry Hood were still in the

apartment.  (T. Tr. 3284-85.)

   For the next few years, Angela saw the defendant with Tiffany and "a different

assortment of young ladies on a regular basis."  (T. Tr. 3286.)  At some point in 1991, the

defendant told her to choose between going to school or a singing career.  She stopped going to

school, and she, Tiffany and another girl formed a group that the defendant called "Second

Chapter."  (T. Tr. 3286-87, 3293-96.)

   From the time she was 15 until she was 17, Angela had sexual intercourse with the

defendant at his apartment, at his recording studio in Chicago, and while they were "on the

road."  (T. Tr. 3287-88.)  She did not want to have sex with him, but the defendant told her and

other girls that they had to "pay [their] dues."  (T. Tr. 3288-89.)

    *ii.*  *Aaliyah (Count 1: Racketeering Act 1)*

  In 1992, the defendant and Demetrius Smith met Aaliyah Haughton, Barry Hankerson's niece, in Detroit, Michigan.  (T. Tr. 676-78.)  On Aaliyah's 12th birthday, the defendant introduced her as "the next up and coming artist" to Angela and the other girls in the group.  (T. Tr. 3292-94, 3296.)  The defendant told Aaliyah that the three girls would be her friends and her background vocalists and dancers.  (T. Tr. 3295-96.)  Angela saw Aaliyah regularly in Chicago while Aaliyah worked on her first album, "Age Ain't Nothing But a Number," which the defendant wrote and produced.  (T. Tr. 3296-97.)  Demetrius Smith was concerned that the defendant was "messing with" or "seducing" Aaliyah.  (T. Tr. 687-92.)  In 1992 or 1993, Aaliyah joined the defendant on tour.  (T. Tr. 3298-99.)  During a stop in Washington, D.C., Angela saw the defendant performing oral sex on Aaliyah in the tour bus.  (T. Tr. 3306.)

  In the middle of a 1994 tour, the defendant told Smith, "Aaliyah's in trouble, man, we need to get home."  (T. Tr. 692-93.)  There were still other shows on the tour, but Smith made travel arrangements, and they flew to Chicago after the show.  (T. Tr. 693, 697.)  During the flight, the defendant cried, and told Smith that Aaliyah believed she was pregnant (T. Tr. 703, 708), and that Derrel McDavid said he had to marry Aaliyah to avoid going to jail.  (T. Tr. 704, 706.)  When Smith said that Aaliyah was too young, the defendant asked "whose side [he] was on."  (T. Tr. 710.)

  The defendant, Smith, McDavid and Tyree Jameson met Aaliyah in a hotel room.  (T. Tr. 711.)  The defendant and the other men talked about the marriage, including the fact that they would have to get false identification for Aaliyah, who was only 15 years old and too young to get a marriage license.  (T. Tr. 712-14.)  Smith said that he could pay someone at the local "welfare office" to create a fake identification card for Aaliyah.  (T. Tr. 714.)  Smith got $500 from McDavid, and the group drove to the "welfare office."  (T. Tr. 715-18.)  Smith went inside

and offered $500 to an employee, who agreed to create the false identification card. (T. Tr. 718-19.) The defendant waited in the car while Aaliyah went inside the office. The employee photographed her, gave her the card and she returned to the car. (T. Tr. 720-21.) The defendant knew someone at a local FedEx, where they got a fake work identification card for Aaliyah. (T. Tr. 722-24.)

Smith, McDavid, the defendant and Aaliyah went to the Maywood City Hall, where the defendant and Aaliyah applied for a marriage license. (T. Tr. 724-25.) The defendant, June and Smith asked Keith Williams to find a minister for the wedding; Williams recommended Nathan Edmond. (T. Tr. 1344-45.) Edmond officiated the ceremony, which was at most 10 minutes long in the hotel room, and, about an hour later, Smith, the defendant and Jameson flew back to the concert venue. (T. Tr. 746-47, 2418-19, 2422-23.) Aaliyah stayed behind. (T. Tr. 747.) Shortly after the wedding, the marriage was annulled. (GX 804.)[11]

### iii. Stephanie (Count 1: Racketeering Act 2)

Stephanie was born on October 16, 1981, and grew up in Chicago; she graduated from the Chicago Academy for the Arts in 1999. (T. Tr. 1620.) She met the defendant when she was 16 years old, at the Rock 'N Roll McDonald's in downtown Chicago. (T. Tr. 1622.) A man approached her and asked for her age; she responded that she was 16. (T. Tr. 1623.) He asked if she knew R. Kelly, and she said she did; he gestured to the defendant, who was seated at a booth, and said that the defendant wanted her to call him. (T. Tr. 1623-24.) He handed her a note with a phone number. (*Id.*) Stephanie threw the note away because she did not intend to call the defendant. (T. Tr. 1624.)

---

[11] Aaliyah died in an August 25, 2001 airplane crash. (T. Tr. 3291-92.)

12

She saw the defendant about a year later, in the summer of 1999, when she was 17.  (T. Tr. 1625-26.)  She asked if he would listen to her friend, an aspiring singer.  (T. Tr. 1628-29.)  The defendant agreed to meet Stephanie's friend and perhaps help her with her career but wanted to "get to know" Stephanie and asked her if she would "cuddle" with him; Stephanie replied that she would, and the defendant gave her his number.  (T. Tr. 1630.)

Stephanie went to the defendant's recording studio a week or two later.  (T. Tr. 1630-31.)  An employee took her to a second floor waiting room and told her to wait for the defendant.  (T. Tr. 1632-33.)  The defendant arrived a few hours later.  (T. Tr. 1633.)  He told her that he wanted her to call him "daddy," and they had sexual intercourse.  (*Id*.)

Stephanie continued to see the defendant for the next six months, mostly at his studio, and they had sexual intercourse every time she saw him.  (T. Tr. 1634, 1637-38.)  Occasionally, one of the defendant's employees picked her up and dropped her off at the studio.  (T. Tr. 1635-36.)  The defendant "was one of two ways.  He was either very nice and charming, jovial, or he was very controlling, intimidating.  He'd raise his voice at me and he could . . . put the fear of God in me very quickly."  (T. Tr. 1637.)  Sex with the defendant was "humiliating."  (T. Tr. 1638.)  He told her what sounds to make and often ejaculated on her face.  (T. Tr. 1638-39.)  The defendant also "position[ed]" Stephanie's body in "very specific" ways, and sometimes would leave her "completely naked with [her] butt in the air" for "hours."  (T. Tr. 1638.)  If she was not in the same position when the defendant returned, he got "very angry" and yelled at her.  (*Id.*)  He did not allow her to speak to other men.  (T. Tr. 1648.)[12]  Following one of his basketball games, he directed her to perform oral sex on him, even though there were two other people in

[12] During a dinner with two rappers, the defendant said that he "like[d] young girls and that people make such a big deal of it but it really isn't a big deal because even, look at Jerry Lee Lewis, he's a genius and I'm a genius and we should be allowed to do whatever we want because of what we give to this world."  (T. Tr. 1648-49.)

13

the car; he told her to "make noises" because "he wanted the people in the car to know."  (T. Tr. 1652.)

While Stephanie was still 17, the defendant videotaped their sexual encounters.  On one occasion, he gave her instructions about what she should do, including when to undress.  (T. Tr. 1645.)  He placed his video camera in front of Stephanie, who was completely naked, had sex with her from behind and put a dildo in her mouth.  (T. Tr. 1645-47.)

Following a trip to Florida, during which the defendant used a small, hand-held camera to record her performing oral sex on him, she decided to end the relationship because she "felt used and humiliated and degraded."  (T. Tr. 1657.)  She also wanted him to destroy the "sex tapes," so she saw him one or two more times, but he did not destroy the tapes.  (T. Tr. 1657-58.)  When she called and asked if she could get the videotapes, or if they could destroy them together, he said it was possible if she came to the studio.  (T. Tr. 1658.)  She realized that he did not intend to destroy the tapes, and she never spoke to him again.  (*Id*.)

       *iv.*    *Addie*

"Addie" met the defendant at a Miami concert on September 2, 1994 when she was 17 years old.  (T. Tr. 1730; GX 201.)  The defendant announced from the stage that women over 18 could go backstage.  (T. Tr. 1735, 1737-38.)  Addie did not go because she was only 17.  (T. Tr. 1736-37.)  Minutes later, however, two "bouncers" asked Addie and her friend if they wanted the defendant's autograph.  (T. Tr. 1735-36, 1767.)  The men did not ask the girls their age, and led them to the defendant's dressing room.  (T. Tr. 1738.)

The defendant autographed Addie's program.  (T. Tr. 1738-39; GX 201.)  When Addie said that she was an aspiring artist, the defendant wrote his hotel room number on her program and suggested that she come to his room for an "audition."  (T. Tr. 1740-41; GX 201.)  Addie also told the defendant that she was 17.  (T. Tr. 1740, 1742.)  The defendant said something to

14

his bouncers, who escorted everyone else out of the dressing room; they told Addie and her friend to "stay." (T. Tr. 1742-43.)

The defendant played a song from an upcoming movie, and told the girls that he wanted to play a "game" to determine which girl was the better kisser. (T. Tr. 1743-44.) The defendant kissed Addie's friend, and then kissed Addie; when she tried to pull away, the defendant held her wrists, pulled down her shorts and had unprotected sex with her from behind. (T. Tr. 1744-46.) Addie was in "complete shock," and her mind "just basically went blank." (T. Tr. 1746.) When the defendant finished, Addie pulled up her shorts, opened the door, which had been locked, and ran out of the room with her friend. (T. Tr. 1746-47.)

    v.    *Kate*

"Kate" started a sexual relationship with the defendant in 2001 when she was 27. (T. Tr. 2627-28.) Before she had sex with him for the first time, Kate asked if he was "okay," and if he was going to use protection. (T. Tr. 2636-37.) The defendant said that he was not going to use protection. (*Id.*) He did not tell her that he had herpes. (*Id.*)

Kate, who was not sexually active with anyone else at the time, subsequently contracted genital herpes. (T. Tr. 2638.) The defendant did not respond or ask any questions when she said, "I think you gave me something." (T. Tr. 2638-39.) In 2004, Kate retained a lawyer; the defendant paid her $200,000 to release her claims and to refrain from making public statements about her relationship with the defendant. (T. Tr. 2639-44; GX 930.)

    vi.    *Sonja (Count 1: Racketeering Acts 3 and 4)*

The jury heard testimony from Sonja, a 21 year-old intern at a local radio station, who met the defendant at a shopping mall in West Valley City, Utah in August 2003 and wanted to interview him. (T. Tr. 2744, 2748.) He invited her to Chicago for the interview. (T. Tr. 2753-54.) Once she arrived at the studio, she was detained in a room for days. (T. Tr. 2759-68.)

15

When an employee brought her something to eat, she passed out after only a few bites.  (T. Tr. 2769.)  She awoke to find that her underwear had been removed, that her vaginal area and thighs were wet, and saw the defendant pulling up his pants.  (T. Tr. 2770.)  The jury found that Racketeering Acts 3 and 4, which charged the defendant with kidnapping and Mann Act violations, were not proven beyond a reasonable doubt.  Nevertheless, the government maintains that the evidence "also constituted evidence of the existence of the enterprise, the means and methods of the enterprise and the defendant's pattern of racketeering."  (ECF No. 278 at 26 n.33.)

> ### vii.    Alexis

Alexis met the defendant in Jacksonville, Florida on March 26, 2006, when she was 15 years old.  (T. Tr. 2589; GX 212.)  A man told Alexis and her friend that the defendant wanted to meet them backstage.  (T. Tr. 2552.)  The defendant gave Alexis his number, and they met the next day on the defendant's tour bus in a mall parking lot, where he made her sign a nondisclosure agreement.  (T. Tr. 2555-57.)  Alexis "may" have told the defendant that she was only 15 years old; "his general response was just there's nothing wrong with platonic friendship at that time and then if it turns into something over time, then so be it.'  (T. Tr. 2557.)

Alexis saw the defendant repeatedly for the next few years, including in Jacksonville, Miami and Chicago.  (T. Tr. 2557-59.)  She first had sex with the defendant when she was in her "teens," but not before she was 18.  (T. Tr. 2558-59.)  The defendant did not use protection and did not tell her that he had herpes.  (T. Tr. 2559.)

> ### viii.    Louis

"Louis" was born on February of 1989.  (GX 811.)  He met the defendant in 2006, when he was 17 and working at a McDonald's in Markham, Illinois.  (T. Tr. 1804-06; GX 154.)  The defendant asked Louis if he could "hook it up" for the defendant and Louis's manager.  (T. Tr.

1807.)[13]  The defendant then handed Louis and the manager his phone number, and told Louis to

call.  (T. Tr. 1807-08.)  Louis gave the number to his mother.  She called the defendant and said

that Louis was an aspiring rapper and a "big fan" of the defendant's music.  (T. Tr. 1810.)  Louis

and his parents attended a Christmas party at Olympia Fields.  (T. Tr. 1810-11.)  At one point,

the defendant whispered to Louis that "it would be best" if he came to see the defendant by

himself.  (T. Tr. 1815.)

Louis's mother called the defendant again about Louis's interest in music, and the

defendant invited Louis to his studio.  (T. Tr. 1815-16.)  Louis rapped for the defendant and

another man; they told him he had "potential," and the defendant invited him to come back the

next day.  (T. Tr. 1816-21.)  Louis returned and recorded a song.  (T. Tr. 1821.)  The defendant

listened for only a few seconds but said he did not like it.  (T. Tr. 1821-23.)  Louis left the studio

feeling "discouraged."  (T. Tr. 1823.)

Shortly thereafter, the defendant invited Louis back to the studio.  (T. Tr. 1823-26.)  He

took Louis into a garage, and asked what Louis was "willing to do for the music."  (T. Tr. 1828.)

As Louis started to explain how hard he would work, the defendant interrupted and asked if

Louis had "any fantasies."  (T. Tr. 1828.)  The defendant got onto his knees, unzipped Louis's

pants and performed oral sex on him.  (T. Tr. 1829.)  In the ensuing months, Louis and the

defendant had additional sexual encounters, which the defendant recorded on a "camcorder

tripod or an iPad."  (T. Tr. 1843-44.)  The defendant asked Louis to call him "Daddy," and called

Louis his "little brother."  (T. Tr. 1844.)

The defendant also instructed Louis to have sex with women, which the defendant

recorded.  On one occasion, the defendant took Louis to the garage, and when the defendant

---

[13] The manager did not know who the defendant was.  (T. Tr. 1807.)

"snapped his fingers three times," a naked, "very petite" "young lady" crawled out from under a boxing ring.  (T. Tr. 1844-47.)  When the defendant ordered her to "come here," she crawled over to him, and performed oral sex on him.  (T. Tr. 1846.)  The defendant told Louis to pull down his pants, and directed the young woman to "do" Louis "the same way she did him."  (*Id.*) She complied, and the defendant told her to say Louis's name and tell him that she liked him. (T. Tr. 1844-46.)

The defendant also met one of Louis's friends, "Alex," who was a year younger than Louis.  On one occasion, the defendant directed Louis and Alex to kiss and "touch" each other. (T. Tr. 1862-63.)  Neither wanted to do it, so the defendant told Alex, "[L]et's show him how it's supposed to be done," and Alex and the defendant had sex.  (T. Tr. 1863-64.)

One of the defendant's "girlfriends," Dominique, went to Louis's high school, and was a few years younger than Louis.  (T. Tr. 1851-53.)  The defendant found out that Louis was talking with Dominique on the phone.  (T. Tr. 1853-56.)  He directed her not to talk to Louis, and "didn't want anything to do" with Louis after that.  (T. Tr. 1856-57.)

In 2019, Louis met the defendant at the Trump Towers in Chicago.  (T. Tr. 1875.)  The defendant dictated a letter, which Louis wrote, to the effect that "some people" wanted to pay Louis to say that he had a sexual relationship with the defendant.  (T. Tr. 1875-79.)  The defendant told Louis that the letter was for their "protection."  (T. Tr. 1878.)

ix.    *Alex*

As explained above, the defendant met Alex through Louis.  Alex had multiple sexual encounters with the defendant, in the defendant's home, studio and tour bus.  (T. Tr. 3345-62, 2883-84.)  The defendant called Alex "Nephew," and told Alex to call him "Daddy."  (T. Tr. 3349, 3352.)  The defendant also directed Alex to have sex with different women while the defendant recorded the encounters; sometimes the defendant participated, and other times he

18

masturbated.   (T. Tr. 3345-51.)  The defendant was "in charge" during these encounters, and gave instructions to Alex and whichever woman was involved, including to "do it like [you] mean it."  (T. Tr. 3445-46, 3448, 3552-56.)  During these encounters, the women appeared "zombie-ish."  (T. Tr. 3358.)[14]

> x.    *Jerhonda (Count 1: Racketeering Acts 5, 6 and 7)*

Jerhonda Pace, born on April 19, 1993 (T. Tr. 105), admired the defendant and his music, and was a member of his "fan club."  She met him in April 2008 outside a Chicago courthouse when she was 14 years old.  She spoke to him occasionally during the next two months.  (T. Tr. 110-13.)  In May 2009, when she was 16 years old, the defendant's employee "Bubba" invited her to a party at the defendant's house in Olympia Fields, which she attended.  (T. Tr. 114.)  The defendant said he remembered her "from court."  (T. Tr. 118.)  She said she was 19, and they exchanged phone numbers.  (T. Tr. 119.)

The defendant invited her to his house a few days later and told her to bring her bathing suit.  (T. Tr. 119, 121.)  A runner named Anthony picked her up from the train station.  (T. Tr. 120.)  Once at the house, Anthony walked Jerhonda to a room with a swimming pool, and she put on her bathing suit.  (T. Tr. 121-22.)  The defendant arrived and told to take off her bathing suit and to walk back and forth.  (T. Tr. 122.)  After Jerhonda complied, the defendant walked her to another room and performed oral sex on her.  (T. Tr. 123.)  Jerhonda "felt uncomfortable," told him she was 16 years old, and showed him her state ID.  (*Id*.)  The defendant responded that she should "continue to tell everyone that [she] was 19 and to act 21," and then had sexual intercourse with her.  (T. Tr. 124-25.)  The defendant did not use protection and did not tell her that he had herpes.  (T. Tr. 125-26.)  Jerhonda had a drink and felt ill, so the defendant took her

---

[14] The government introduced video and photographic evidence of some of these encounters.  (GX 341, 342, 343.)

to the "mirror room" to rest.  (T. Tr. 126-27.)  The next morning, she texted the defendant that she was leaving; a runner brought her $50, and dropped her off at the train station.  (T. Tr. 128-30.)

The defendant also suggested that she bring a friend to his house; she introduced him to Dominique, who was 17 at the time and another member of "the fan club."  (T. Tr. 130-31, 138-39.)  Jerhonda learned that Dominique was visiting the defendant's house, but did not see her there because, according to the defendant's rules, they were not permitted to leave their rooms. (T. Tr. 131-32.)  One night, the police came to the house looking for Dominique.  (T. Tr. 139.) The defendant, using the speaker phone, told his lawyer that the police were at his house.  (T. Tr. 139-40.)[15]

Jerhonda continued to see the defendant over the next six months.  They had sex each time she was there, and the defendant recorded their sexual activities with his Apple iPhone and a Canon camera on a tripod.  (T. Tr. 168-69.)  Jerhonda contracted herpes while she was seeing the defendant.  (T. Tr. 173.)  He arranged for her to see a doctor.  (T. Tr. 173-74.)

The defendant required Jerhonda to follow his rules.  For example, she had to wear baggy clothing and was not permitted to leave a room without the defendant's permission.  (T. Tr. 154, 163.)  If she needed to use the bathroom, she had to text him or call one of his employees.  (T. Tr. 163-64.)  She had to call the defendant "Daddy," and "acknowledge[]" him when he came into the room.  (T. Tr. 164.)  On one occasion, the defendant called her and directed Jerhonda to come outside to his tour bus, which was parked next to the house.  (T. Tr. 165.)  When she arrived, the defendant was there with a naked young woman named "Juice," who the defendant said had been with him since she was 15 years old.  (*Id.*)  He told Jerhonda that he was going to

---

[15] Officer Garrick Amschl went to the defendant's house, looking for "a missing juvenile" on June 13, 2009.  (T. Tr. 370-71.)

"train" her "on how to sexually please him," and then ordered her and Juice to perform oral sex on him. (T. Tr. 165-66.)

The defendant made Jerhonda sign a non-disclosure agreement. (T. Tr. 149-50.) He also directed her to write a letter in which she falsely said that she stole $100,000 in jewelry and cash, that her sister forced her to say that the defendant gave her herpes, that she was the defendant's employee and that he fired her. (T. Tr. 149-52.)

The defendant punished Jerhonda when she broke his rules. He slapped her when she disagreed with him. (T. Tr. 166-68.) In January 2010, Jerhonda did not greet him appropriately because she was texting with a friend. (T. Tr. 175-76.) He slapped her and choked her until she passed out. (*Id.*) He "spit in [her] face and told [her] to put [her] head down in shame." (T. Tr. 176-77.) The defendant ordered her to perform oral sex on him and ejaculated on her face. (T. Tr. 177.) She used her t-shirt to wipe her face. (T. Tr. 177-78.)

Jerhonda hired a lawyer to bring a civil suit against the defendant. (T. Tr. 180.) She gave the firm the t-shirt she used to wipe her face, and her cell phone.[16] (T. Tr. 183.) The lawyer settled the case for $1.5 million. (T. Tr. 190-91.)

> xi.   *Anna*

Anna went to one of the defendant's concerts in 2016 when she was 19 or 20 years old, and afterwards Bubba told her that the defendant wanted to meet her. (T. Tr. 2818-19.) Anna met the defendant in his dressing room, and they exchanged contact information. Shortly thereafter, they began a sexual relationship. (T. Tr. 2820-21.) Anna lived in the defendant's Trump Towers apartment in Chicago, and traveled with him in his Sprinter van to his concerts

---

[16] DNA testing confirmed that the defendant's semen was on the t-shirt. (T. Tr. 1373-74, 2469.)

around the country.  (T. Tr. 2822-23.)  The defendant paid for Anna's travel and hotel, which his assistants arranged.  (T. Tr. 2822.)

The defendant became "more controlling" during the course of their relationship and required Anna to follow his rules.  (T. Tr. 2821, 2828.)  She had to call him "Daddy" (T. Tr. 2889), could not talk to or look at other men (T. Tr. 2840), and had to get the defendant's permission go anywhere, even to the bathroom or to get food.  (T. Tr. 2828-29, 2831-33.)  The defendant required her to wear baggy clothing and a baseball cap when she went out in public.  (T. Tr. 2835.)  He also controlled her use of social media and the internet (T. Tr. 2838-40), and monitored her conversations.  (T. Tr. 2834.)

The defendant administered "punishments," which he frequently recorded, when he believed that Anna broke a rule.  (T. Tr. 2857-62, 2840-44; 3018-19.)  He spanked her so hard that he left bruises, and then demanded that Anna send him text messages that she enjoyed the beatings.  (T. Tr. 2842-44.)  On one occasion, he forced Anna, who was crying, to walk back and forth, wearing only high heels, and to repeat, over and over, that she was a "slut" and "stupid," while the defendant slapped her.  (T. Tr. 2836-38, 2845-46, 2852-54; GX 328(a).)  The defendant recorded these "punishments."

The defendant ordered Anna to write letters, which he dictated, in which she made false and embarrassing statements about herself and her family; he kept these letters for "protection" in the event that "down the line . . . something were to happen."  (T. Tr. 2863-65, 3653; GX 420(a), 430(b), 430(c), 430(d), 449.)[17]  The defendant would not let Anna see her mother until the mother wrote a letter falsely admitting to a blackmail scheme against the defendant, in the

---

[17] The defendant ordered his other victims to write similar letters.  (T. Tr. 149-52, 985-99, 2197-99; GX 302, 444, 445, 455, 456, 461.)  Anna found one from Dominique at the defendant's guesthouse.  (T. Tr. 2877-79.)

event that Anna's mother "were to come against him in any type of way." (T. Tr. 2879-80.) The defendant told Anna to give the letter to Copeland. (T. Tr. 2880.)

The defendant also forced Anna to do "embarrassing" and dehumanizing things, which he recorded. (T. Tr. 2876.) For example, he ordered her to be "sexual and seductive with bodily fluids"—covering herself with urine and feces, while the defendant told her what to say. (T. Tr. 2876-77.)[18]

Also at the defendant's direction, Anna had sex with him and others, including Jane, Dominique, Joy and Alex, while the defendant recorded the encounters on his iPad. (T. Tr. 2881-86; GX 68.) The defendant never used a condom. (T. Tr. 2886.) Anna was tested for sexually transmitted diseases but did not see the results because the doctor sent them directly to Copeland. (T. Tr. 2825-26.) Anna's relationship with the defendant ended some time in 2018. (T. Tr. 2821, 2888.)

> xii.    *Jane (Count 1: Racketeering Acts 8, 9, 10 and 11; Counts 2, 3, 4 and 5)*

Jane was born on December 30, 1997. (T. Tr. 770.) She met the defendant at an Orlando concert in April 2015, when she was 17 years old. (T. Tr. 769-70.) Jane, a high school junior, was active in varsity sports and in her school choir and hoped to be a professional singer. (T. Tr. 776-77.) During the concert, a member of the defendant's entourage handed Jane a sheet of paper with the defendant's phone number. (T. Tr. 773.) Jane texted with the defendant and spoke with him by video call. (T. Tr. 779.) She told him that she was a musician and that she was 18 years old. (T. Tr. 781.) The defendant invited her to "audition" at his hotel room. (T. Tr. 781-82.) When she arrived, the defendant was in a Sprinter van; he asked her to sit on his lap and give him a kiss, which she did. (T. Tr. 786-88.) They went to his hotel room, and the

---

[18] The government introduced a portion of this recording at trial. (GX 329(a).)

defendant told her that he needed to ejaculate before Jane sang. (T. Tr. 788-89.)  Jane did not

want to have intercourse with him, but at the defendant's direction, took off her clothes, and the

defendant "lick[ed] [her] butt."  (T. Tr. 791-92.)  Meanwhile, Jane's parents were trying to find

her, and security officers arrived.  (T. Tr. 793-94.)  Jane told them that she was 18 and handed

them her identification, which showed that she was only 17, but they left.  (T. Tr. 794-95.)  The

defendant continued the sexual contact, ejaculated, and then told Jane to sing.  (*Id*.)  He praised

her, and said he wanted to "see [her] again and teach [her] a few techniques."  (T. Tr. 795-96.)

The defendant invited Jane travel to Los Angeles, one of the next stops on his tour.  (T.

Tr. 798-99.)  His assistant, Cheryl Mack, made Jane's travel arrangements, and Jane flew to

California.  (T. Tr. 800.)  The defendant had sexual contact with her at a hotel.  (T. Tr. 804-05.)

He also told her about some of his "rules:" that she must wear "loose and baggy" clothing, call

him "Daddy," and get his permission to leave the hotel room.  (T. Tr. 810-11.)[19]  Jane traveled to

Stockton, California, where she and the defendant had sexual intercourse for the first time.  (T.

Tr. 818-19.)  The defendant did not use a condom and did not tell her that he had genital herpes.

(T. Tr. 819-20.)

Jane stayed with the defendant in Chicago during the summer of 2015.  (T. Tr. 837-38.)

The defendant would not permit her to leave her room without calling him or an assistant first.

(T. Tr. 838-40.)  If she had to use the bathroom and could not reach the defendant or one of his

---

[19] During the time she was with the defendant, Jane kept notes to remind herself of the defendant's rules. In one note, she wrote: "Do not be goofy, extra, or act young when told something in private or around others.  Do not play games when on phone with daddy.  Just say I love you before I hang up. . . .  Trust daddy and do whatever he says, [whenever] he says, with no rebuttal, disrespect or rebellion."  (T. Tr. 858-59; GX 325.)  She also wrote other reminders, including, "Tell daddy one thing that I appreciate about him and continue to lift him up," and, "Stop defending myself.  Anything daddy says is to help me.  Thank him and be happy and fix the problem."  (T. Tr. 859-60; GX 331.)

employees, she had to urinate in a cup.  (T. Tr. 841.)[20]  She and the defendant had "sex almost every day," which the defendant frequently recorded using iPads that he kept in a backpack.  (T. Tr. 843-46.)  Jane, still 17 years old, contracted genital herpes, with pain so severe that she could not walk.  (T. Tr. 851-52.)  Juice booked a doctor's appointment for Jane.  (T. Tr. 852.)  When the doctor told her that she had herpes, Jane was "devasted."  (T. Tr. 853.)  She told the defendant, who was "agitated" and told her that she "could have gotten that from anyone."  (T. Tr. 853.)  Jane responded that she had "only been intimate with him."  (*Id.*)  From that point on, Jane got herpes medication either from the defendant or his doctor.  (T. Tr. 853-54.)  The defendant told her that "everyone has it," and that "it was no big deal."  (T. Tr. 854.)

Before she went back to Orlando for her senior year of high school, Jane told the defendant she was only 17.  (T. Tr. 860-61.)  He slapped her face and walked away.  (T. Tr. 861.)  He returned and told her that they "would figure this out."  (T. Tr. 861-62.)  Jane went back to Orlando, but she and the defendant convinced her parents to let her live in Chicago and do "virtual online" homeschooling.  (T. Tr. 863-64.)  The defendant arranged for Juice's mother to act as Jane's legal guardian.  (T. Tr. 863-68.)  The defendant's assistant booked Jane's travel to Chicago, for which the defendant paid.  (T. Tr. 868.)  Afterwards, Jane joined the defendant on his tour, traveling on his tour bus from city to city.  (T. Tr. 869-70.)  At one point during the tour, Jane thought she was pregnant and asked the defendant what he would do; he said that "he would want [her] to get an abortion because he wanted [her] to keep [her] body tight," and that "if [she] was any other age, it wouldn't make a difference."  (T. Tr. 881-83.)

As Jane learned, the defendant had other so-called "live-in girlfriends"—Juice, V, Dominique and Joy.  (T. Tr. 969.)  And the defendant had more rules.  Jane had to kiss the

---

[20] The defendant did not allow Jane to leave his van without permission, either, to use the bathroom, so there were times when she had to use a cup.  (T. Tr. 974-75.)

defendant as soon as he came into a room.  (T. Tr. 856.)  He did not want Jane to talk to friends or to have access to social media.  (T. Tr. 856-57.)  She could not share personal information with the other "girlfriends."  (T. Tr. 908.)  He did not allow any of these young women to look at or be around other men; they had to turn away, leave the area and tell the defendant "immediately."  (T. Tr. 970-71.)  They attended the defendant's nightly basketball games but could look only at him.  (T. Tr. 972-75.)  The defendant required Jane to report any rule-breaking by the other young women, who in turn had to report Jane and one another.  (T. Tr. 975-76.)

The defendant often made Jane write letters with false admissions for his protection.  (T. Tr. 992, 995-97.)  Sometimes, he forced Jane to "make videos as punishments."  (T. Tr. 997-99.)  For example, he recorded her making a false claim that her father molested her.  (T. Tr. 995, 998.)  Another time, the defendant forced her to smear feces on her face and to "put it in [her] mouth and act like [she] liked" it, while he recorded her.  (T. Tr. 998-99.)

The defendant spanked Jane "nearly every two to three days," sometimes with such force that he bruised her and tore her skin.  (T. Tr. 911-12.)  On one occasion, the defendant confronted Jane about a conversation she had with a friend.  The defendant accused her of lying, and hit her "all over her body" first with his hand and then with a shoe, "until [she] finally broke."  (T. Tr. 913-16.)  He regularly kept her in a room as punishment, for example, when Juice reported that Jane bought overly "tight" sweatpants.  (T. Tr. 918-25.)  He also held her on his tour bus or in the studio, sometimes for more than a day.  (T. Tr. 931-32, 2010-11.)[21]  The defendant also assaulted the other young women, which Jane saw.  (T. Tr. 925.)  At times, the defendant compelled Jane to have sex with other women and men—the other "girlfriends," his

---

[21] The Mayweather sisters exchanged text messages in which they discussed the punishments.  In one exchange, they said that the defendant was "holding" Jane in the back room of the studio "all day." (T. Tr. 2014-19; GX 240(b).)  In another exchange, they wrote that the defendant kept Jane on the Sprinter van for days without "feed[ing] her." (T. Tr. 2053-55; GX 240(d).)

employees and Alex, whom Jane knew as "Nephew." (T. Tr. 955-61, 964-65, 1045-50.) In these encounters, which he recorded, the defendant "orchestrate[d] everything." (T. Tr. 965, 1046-47.)

> xiii.    *Faith (Count 1: Racketeering Acts 12, 13 and 14; Counts 6, 7, 8 and 9)*

Faith met the defendant when she was 19 years old, after a March 2017 concert in San Antonio, Texas. (T. Tr. 2125-26.) Two of the defendant's staff members invited Faith and her sister to an afterparty backstage. (T. Tr. 2130-31.) The defendant gave Faith a piece of paper with his phone number on it (T. Tr. 2133-34), and invited her and her sister to his dressing room. (T. Tr. 2136-38.) He asked Faith to text him her name with a picture of herself, which she did when she got home. (T. Tr. 2140-41.) After that, they communicated regularly. (T. Tr. 2141-44.) The defendant told her to call him "Daddy," and hung up on her when she did not. (T. Tr. 2143-44.) The defendant told Faith that he loved her and invited her to see him on tour; he told her that Diana Copeland would arrange her travel, and gave her Copeland's number. (T. Tr. 2145.)

In May 2017, Faith traveled to New York and went to the defendant's concert. (T. Tr. 2152-58.) The defendant went to Faith's hotel room early the next morning, and they had sexual intercourse, which the defendant recorded on his iPad. (T. Tr. 2163-66, 2169-74.) He did not wear a condom, nor did he tell Faith that he had herpes. (T. Tr. 2178.) He also said that she could tell "Daddy" if she was "really like 16." (T. Tr. 2174.)

Faith saw the defendant in Chicago in June 2017, and in Dallas in December 2017. (T. Tr. 2184, 2190.) They engaged in sexual activity on both trips. (T. Tr. 2187-88, 2193, 2195-96.) The defendant told Faith that her "legs should never be pointed to another man when [she's] in public with him." (T. Tr. 2192.) He said he had "a group of women that [he] raised," but the defendant dismissed her concerns, telling her that ultimately it was only his sexual gratification

that mattered.  (T. Tr. 2198.)  He also suggested that she sign "some papers" to "protect" him, and to write something about her family, even if it was untrue.  (T. Tr. 2197-99.)  He directed Faith to send him a text message that said, "Daddy I want to be with you and the girls."  (T. Tr. 2199.)  The defendant also told Faith that he had rules for his girlfriends, including a requirement that they greet him whenever he entered a room.  (T. Tr. 2200-01.)

When she went to Dallas, the defendant told Faith that they were going to a hookah bar. Faith, Joy and the defendant got into the back of the Sprinter van, while Diana Copeland got into the front passenger seat.  (T. Tr. 2206-07.)  When they arrived, the defendant and Copeland went inside the bar so that the defendant could see how many men were there, leaving Faith and Joy waiting for "hours."  (T. Tr. 2208.)  Faith had to use the bathroom and tried to open the door, but Joy told her that the door was broken and she had to "ask" to leave.  (T. Tr. 2208-09.)  Faith texted Copeland that she was "about to pass out."  (T. Tr. 2210.)  The defendant and Copeland finally returned, and drove Faith to an IHOP to use the bathroom.  (*Id*.)  Copeland followed her and Joy to the bathroom, and stood outside the stall but did not use the bathroom herself.  (T. Tr. 2210-11.)  They all returned to the hotel.  (T. Tr. 2213.)  Faith continued to communicate with the defendant after the Dallas trip.  He wanted her to get his permission to go out, to tell him where she was going, and who she saw.  (T. Tr. 2214-19.)

In January 2018, the defendant paid for, and Copeland arranged, Faith's travel to Los Angeles, California.  (T. Tr. 2220.)  When Faith arrived at the defendant's studio, Copeland told her to wait in the Sprinter, which was parked outside.  (T. Tr. 2222-23.)  After more than an hour, Faith texted Copeland that she needed to use the bathroom.  (T. Tr. 2224.)  Copeland escorted her to the restroom in the studio, then back to the Sprinter.  (T. Tr. 2224-26.)  Later, Copeland took Faith to a room in the studio.  (T. Tr. 2226.)  At one point, the defendant came

into the room, but left.  (T. Tr. 2229.)  Faith asked Copeland if she could go back to her hotel

room, or whether the defendant wanted her to wait; Copeland told her to wait.  (T. Tr. 2230-31.)

When the defendant showed up hours later, he told Faith that he would have come sooner if she

had shown any excitement when he saw her earlier.  (T. Tr. 2247-48.)  The defendant directed

her to take her clothes off and walk back and forth.  (T. Tr. 2248.)  Faith did not want to have sex

with him, and said she was "on [her] period."  (T. Tr. 2248.)  The defendant sighed, and said,

"Well, why did you come?"  (T. Tr. 2249.)  He then told Faith to take off her pants and walk

back and forth in her body suit.  (*Id*.)

When the defendant then took Faith to another room, she hesitated because she saw a gun

on the ottoman.  (T. Tr. 2249-50.)  The defendant told her, "Don't look at it."  (T. Tr. 2250.)  His

"demeanor changed," and "[h]e got real serious," sat in a chair and told her to "stand across from

him;" at this point he had "moved the gun by him."  (T. Tr. 2250-51.)  The defendant told Faith

to "pose" while he took pictures with his iPad, and was irritated because she was "not being sexy

enough."  (T. Tr. 2251.)  He started asking her questions: "How many men have seen you

naked?" "How many male friends do you have?"  (*Id*.)  Faith responded that none of her male

friends had seen her naked, and the defendant said, "You want to take that back?"  (*Id*.)  With a

"stern look on his face," the defendant claimed that he "would know if [Faith] was lying to him."

(T. Tr. 2251-52.)  The defendant then put a pillow on the floor, and told Faith to get on her

knees.  (T. Tr. 2252.)  He "grabbed the back of [her] neck forward," and instructed her to

perform oral sex on him.  (*Id*.)  Faith did not want to give the defendant oral sex but was

intimidated; the gun was now on the defendant's seat, and Faith felt that she could not leave

because she was "under his rules and he had a weapon."  (T. Tr. 2252-54.)

Faith traveled to see the defendant for the last time in New York in February 2018.  (T. Tr. 2261.)  He tried to have sexual intercourse with her, but she was "clenching on purpose."  (T. Tr. 2265.)  The defendant got his iPad that he had used to record them, and masturbated while he watched a video of himself and other women having sex.  (T. Tr. 2266.)

### c.      Other Evidence

The jury heard additional testimony and saw other evidence that corroborated the victims' testimony, including from the defendant's associates and employees.   In addition, the government introduced evidence from the defendant's storage facility, including an altered birth certificate for Jerhonda that changed her birth date from 1993 to 1990, multiple false confession letters from the victims and employees, and recordings including an audio recording in which the defendant, accompanied by George Kelly, accused "Kyla" (Jane Doe #20) of stealing one of the defendant's watches.  (GX 485.)  The defendant said, "You know how I am with cameras," and claimed to have "cameras everywhere," including in his studio, garage and van.  (*Id.*)  Kyla admitted that she took a watch, a t-shirt, earrings and "porno tapes," prompting the defendant to say the following:

> There's only one way you're gonna get rid of this.  For me to trust your ass again.  You're gonna do the fuck I tell you to do.  When you made the fuckin tape for me and I looked at that shit, you was hiding your fucking face all over that shit because you didn't want to be seen. . . .  And you ain't gonna hide your fucking face on me.  You're gonna do what the fuck I tell you to do and you're gonna do it fuckin right.  Then I'm gonna gain my fuckin trust back with your ass.  If I even detect you trying to hide on that shit, I'm gonna blow this shit the fuck up.  Do you hear this shit I'm telling you.  I fucking raised your ass.  I raised you. . . .  You better not ever in my mother fucking life take from me again or I will be in Florida and something will happen to you.

(*Id.*)  The defendant ordered Kyla to the garage and to stay there until he told her she could come out.  (*Id.*)  He added: "When I come and get you . . . you better be fucking like you're supposed to fuckin' be. . . .  You're not going to tape until I tell you.  When I tell you, I don't give a fuck if

you're coming out of your sleep.  You better be fucking ready.  Do you understand?  . . . You make no fucking calls except the studio or me."  (*Id.*)

### d.  Defense Case

The defense called five witnesses at trial: Dhanai Ramnaran, an aspiring rapper who worked with the defendant for approximately 15 years (T. Tr. 3990-91,4000, 4022);[22] Larry Hood, the defendant's childhood friend and a former Chicago police officer was on the defendant's security team (T. Tr. 4038-44); Jeffrey Meeks, who worked for the defendant for more than ten years, including as a "runner" (T. Tr. 4104-07, 4126); John Holder, the defendant's accountant from 2018 to 2019 (T. Tr. 4135, 4138); and Julius Darrington, a music consultant who worked with the defendant for about four years.  (T. Tr. 4214-15.)

The defense witnesses testified that they never saw the defendant "strike a woman," "lock a woman in a room," or prevent a woman from eating or using the bathroom.  (T. Tr. 3991, 3996, 4049, 4106, 4141, 4218-19.)  Some of them testified that the defendant permitted them to be around his "female guests," and that the "female guests" were not required to "look away" or "look at a wall."  (T. Tr. 3992, 4137, 4219-20.)  Hood, who regularly accompanied the defendant from the gym to White Castle or McDonald's and to the studio, did not hand out the defendant's phone number or "recruit women" for the defendant.  (T. Tr. 4046-47.)  He did not see the defendant with "underage women" during his time as the defendant's security guard.  (T. Tr. 4048-49.)[23]  Meeks, who checked IDs at the front desk of the defendant's studio, did not recall any women being "under age," although he was "not sure if [he] inspected every ID, you know,

---

[22] Ramnaran testified that his job was "to observe and to learn and to become."  (T. Tr. 4000.)

[23] Although Hood claimed that he never saw the defendant with a minor, he also said he was with the defendant "when he met Aaliyah in her living room," and that he never saw the defendant act "inappropriately with Aaliyah."  (T. Tr. 4040.)  He saw Angela, whom he described as one of "Aaliyah's little friends," but never saw the defendant act inappropriately with Angela.  (T. Tr. 4043.)

thoroughly[.]"  (T. Tr. 4105.)  Ramnaran never saw the defendant "verbally abuse a woman."
(T. Tr. 3991; *see also* T. Tr. 4137-38 (Holder never saw the defendant "abuse any of his
girlfriends")).)

## VI.    Verdict

On September 27, 2021, the jury convicted the defendant of all counts.  The jury found
that the government had proved all the predicate racketeering acts except Racketeering Acts 3
and 4 relating to Sonja.  (*See* ECF No. 238.)

## DISCUSSION

## I.    Motion for Acquittal

The defendant makes a Rule 29(c) challenge to the sufficiency of the evidence for every
count of the indictment—the racketeering count, and each predicate act, and all eight Mann Act
counts.[24]  These challenges are unavailing.

A court evaluating a Rule 29(c) motion views "the evidence in the light most favorable to
the prosecution" and will uphold the jury's verdict if it determines that "*any* rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt."  *United States
v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (emphasis in original) (citation omitted); *United
States v. Mahaffy*, 499 F. Supp. 2d 291, 294 (E.D.N.Y. 2007) ("To succeed, any Rule 29 motion
must demonstrate that, viewing the evidence in the light most favorable to the government, no
rational trier could have found the essential elements of the crime charged beyond a reasonable
doubt." (internal quotation marks and citation omitted)), a*ff'd*, 283 F. App'x 852 (2d Cir. 2008).
Viewing the evidence in the light most favorable to the prosecution means "drawing all

---

[24] As relevant here, a defendant may move for a judgment of acquittal pursuant to Rule 29(c) "within 14
days after a jury verdict."  Fed. R. Crim. P. 29(c).  "If the jury has returned a guilty verdict, the court
may set aside the verdict and enter an acquittal."  *Id.*

inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted). A court "must consider the Government's case in its totality rather than in its parts," and that the sufficiency test "may be satisfied by circumstantial evidence alone." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (internal citations omitted). Thus, a defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotation marks and citation omitted). The defendant has not sustained his burden.

### a. Racketeering

The RICO statute makes it unlawful for "any person employed by or associated with any enterprise" whose activities affect interstate or foreign commerce "to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The statute further defines "enterprise" to include "any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). As the Supreme Court has observed, the "enumeration of included enterprises is obviously broad," and "the term 'any' ensures that the definition has a wide reach." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted); *see also United States v. Gershman*, No. 20-30, 2022 WL 1086464, at *8 (2d Cir. Apr. 12, 2022) ("Congress defined 'enterprise' for purposes of RICO broadly."). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *United States v. Pierce*, 785 F.3d 832, 838

(2d Cir. 2015) ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." (quoting *Boyle*, 556 U.S. at 948)).

The Supreme Court has consistently rejected arguments aimed at narrowing the statute's broad reach.  Thus, an enterprise "need not have 'a hierarchical structure' or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Boyle*, 556 U.S. at 948.  Further, "[m]embers of the group need not have fixed roles," and "[t]he group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.*  "While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id. Boyle* also makes clear that the RICO statute is not "limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Id.*

Against this backdrop, I address the defendant's arguments that the government did not establish the existence of an enterprise, that the enterprise's activities affected interstate or foreign commerce, or a pattern of racketeering activity.

       *i.   Enterprise*

In challenging the existence of the enterprise, the defendant does not appear to contest the evidence that he was at the top of an organization, and that he had groups of employees—an inner circle—who worked to promote the defendant's music and brand, and to tend to his personal needs.  (ECF No. 273-1 at 12-20.)

Relying on *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004), the defendant insists that the government did not prove a RICO enterprise.  In *Satinwood*, the Second Circuit stated that "[f]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes."  *Satinwood*, 385 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993) *aff'd*, 27 F.3d 763 (2d Cir. 1994), and *Moll v. U.S. Life Title Ins. Co. of N.Y.*, 654 F. Supp. 1012, 1031 (S.D.N.Y. 1987)).  Citing this language, the defendant contends that the government had to establish that the "Defendant, his employees, and entourage came together with the common purpose of recruiting women and girls to engage in 'illegal sexual activity' and produce pornography—not merely the broader purpose of promoting Defendant's music or brand."  (ECF No. 273-1 at 12-14.)

To the extent that *Satinwood* imposes a more stringent standard for pleading the existence of an enterprise, it conflicts with binding Second Circuit and Supreme Court precedent, as several district courts in this circuit have found.[25]  *See World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006), *aff'd*, 328 F. App'x 695 (2d Cir. 2009); *JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, No. 06 CIV. 6095, 2007 WL 1159637, at *9 (S.D.N.Y. Apr. 18, 2007); *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 474 n.86 (E.D.N.Y. 2007).  In *Technostroyexport*, the Honorable John G. Koeltl explained that in *Turkette,* the Supreme Court distinguished the elements of enterprise and pattern of racketeering:

---

[25] While the Second Circuit has cited the *Satinwood* language in a published decision and a few summary orders, *see Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *Satinwood*, 385 F.3d at 174)); s*ee also, e.g.*, *Vidurek v. Koskinen*, 789 F. App'x 889, 894 (2d Cir. 2019), it did not discuss it extensively.  I agree with Judge Koeltl and the other judges who have discussed *Satinwood* that the language at issue conflicts with binding Second Circuit and Supreme Court precedent.

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose in engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.

452 U.S. at 583. "One element addresses group organization, while the other addresses conduct." *JSC Foreign Econ. Ass'n Technostroyexport*, 2007 WL 1159637, at *10. In *Turkette*, the Supreme Court held that individuals in an enterprise must share a common purpose to engage in a "course of conduct;" the Court did not say that the course of conduct must be "fraudulent." *Turkette*, 452 U.S. at 583; *see also Boyle*, 556 U.S. at 944. The *Satinwood* language conflicts with well-established precedent that RICO covers "both legitimate and illegitimate enterprises."[26] *Turkette*, 452 U.S. at 580; *see Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) ("The [United States Supreme] Court has held that RICO . . . protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.'" (internal citations omitted)); *see also United States v. Cianci*, 378 F.3d 71, 88 n.8 (1st Cir. 2004) ("It is true that members of an association-in-fact enterprise, such as is now charged, must be connected by a common thread of purpose; and one might often expect such a purpose to be of a criminal nature. But the ultimate question is whether an association-in-fact exists. For this, it is not required that each participant have a separate mens rea so long as each can reasonably be said to share in the common purpose." (citing *Turkette*, 452 U.S. at 578)).

---

[26] In *Turkette*, the Supreme Court assumed that RICO applied to legitimate enterprises; the issue in *Turkette* was whether "an enterprise consisting of a group of individuals was . . . covered by RICO if the purpose of the enterprise was exclusively criminal." *Turkette*, 452 U.S. at 581; *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994) (explaining that in *Turkette*, the Supreme Court addressed "whether 'enterprise' as used in § 1961(4) should be confined to 'legitimate' enterprises").

As Judge Koeltl explained, if *Satinwood* required that a plaintiff allege a "course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves, . . . the decision would appear to conflict with *United States v. Mazzei,* 700 F.2d 85 (2d Cir. 1983), in which the Court of Appeals held that proof of the separate elements of a RICO 'enterprise' and a 'pattern of racketeering activity' need not be "distinct and independent, as long as the proof offered is sufficient to satisfy both elements." *JSC Foreign Econ. Ass'n Technostroyexport*, 2007 WL 1159637, at *9 (citing *Mazzei,* 700 F.2d at 89); *see also World Wrestling Ent.*, 425 F. Supp. 2d at 499 ("[T]here also appears to be no doubt that these same statements are inconsistent with the holdings of *Mazzei* and its progeny."); *Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d at 474 ("This Court agrees with *World Wrestling Entertainment* on that point—the quoted portion of *First Capital* statement is not well-supported by Second Circuit precedent, as evidenced by the fact that *First Capital* cited only one district court opinion in support of it, and it is flatly inconsistent with *Mazzei* and *Turkette*."). And as the Honorable Kenneth M. Karas explained, "neither the Second Circuit nor the Supreme Court has expressly overruled *Mazzei*. This is critical because this Court cannot ignore binding Second Circuit precedent, unless it is expressly or implicitly overruled." *World Wrestling Ent.*, 425 F. Supp. 2d at 499.

Finally, Judge Koeltl noted that "the validity of the enterprise pleading requirement was not in fact squarely before the *Satinwood* court," and that it was "unclear why the Court of Appeals went on to discuss in dicta the adequacy of the complaint with respect to the RICO 'enterprise' element when that issue was not raised on appeal and not briefed by the parties." *JSC Foreign Econ. Ass'n Technostroyexport*, 2007 WL 1159637, at *9.

37

Accordingly, the government did not need to prove that every member of the enterprise shared a common criminal purpose.  *See Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 79-81 (E.D.N.Y. 2011) (determining whether the alleged members of the enterprise "shared a common purpose, lawful or unlawful").[27]

I also reject the defendant's claim that one of the enterprise's objectives—promoting the defendant's music—had "no nexus to the underlying racketeering activity."  (ECF No. 273-1 at 14.)  In this circuit, the "nexus between the RICO enterprise and the predicate racketeering acts may be established by evidence that the defendant was enabled to commit the predicate offenses *solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise*, or that the predicate offenses are related to the activities of that enterprise." *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) (internal quotation marks and emphasis omitted).

The jury could rationally find both that the defendant was able to commit the predicate acts—predominantly illegal sexual activity with women and girls—because of his leadership position and control over the affairs of the enterprise, and that his underlings enabled his commission of the predicate acts.  *See United States v. White*, 621 F. App'x 889, 894 (9th Cir. 2015) ("The jury could rationally find that Hardiman was able to sell drugs by virtue of his rank within the gang and that his drug sales were related to the gang."); *United States v. Megale*, 363 F. Supp. 2d 359, 364 (D. Conn. 2005) ("The Government . . . will try to prove that defendants' debt collection was successful because of their positions within the Gambino Family

---

[27] For the same reasons, I reject the defendant's argument that "the government has failed to demonstrate that the purpose of the enterprise was distinct from the racketeering activities."  (ECF No 273-1 at 16.) As explained above, the government need not establish that the enterprise had a common illegal purpose.  Further, while the enterprise and the pattern of racketeering activity are separate and distinct elements, "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an . . . enterprise."  *Boyle*, 556 U.S. at 951; *see also Mazzei*, 700 F.2d at 89.

organization.  If so, such proof would satisfactorily connect the unlawful debt collection [with] the charged RICO enterprise.").  The defendant's employees recruited young women and girls, including by locating them in the audiences of the defendant's concerts and inviting them backstage or to parties, by passing them notes with the defendant's phone number, and by trolling shopping malls and places like McDonald's and handing out the defendant's contact information.  The defendant's employees arranged travel for his victims and enforced his rules. In turn, the defendant controlled his employees and ensured they implemented his rules.  He punished them when they did not enforce the rules, for example by withholding their pay (*e.g.*, T. Tr. 2037-39 (testimony by Suzette Mayweather about the defendant "fining" her for having discussions with his "girlfriends")), or by requiring them to write letters falsely incriminating themselves.  (*E.g.*, T. Tr. 3198-3201 (testimony by Copeland about the defendant ordering her to write a letter falsely stating that she had stolen from him).)

The defendant also argues that "the government failed to prove an enterprise distinct from the Defendant" because the members of the enterprise—the defendant's inner circle— "associated together for no purpose other than to carry out Defendant's needs."  (ECF No. 273-1 at 17-20.)  The cases on which he relies, however, are distinguishable, as they involve enterprises that "consist[ed] merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant."  *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) (bank and its employees); *see also Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996) (holding company and its wholly-owned subsidiaries), *vacated on other grounds*, 525 U.S. 128 (1998); *Atkinson v. Anadarko Bank & Tr. Co.*, 808 F.2d 438, 441 (5th Cir. 1987) (bank, its holding company, and its employees).  As the Second Circuit explained, "[b]ecause a corporation can only function through its employees

and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself."  *Riverwoods*, 30 F.3d at 344; *see also Palatkevich v. Choupak*, No. 12-CV-1681, 2014 WL 1509236, at *13 (S.D.N.Y. Jan. 24, 2014) ("In the Second Circuit, the distinctness requirement bars a corporate entity from being named as both the defendant 'person' and the 'enterprise' on its own.").

The defendant is not a corporate entity.  "[A]n individual defendant" who "acts through a corporation . . . may have formed an association-in-fact with an entity distinct from himself." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016); *see Cedric Kushner*, 533 U.S. at 163 (holding, in a case involving "a corporate employee . . . [who] allegedly conduct[ed] the corporation's affairs in a RICO-forbidden way," that a "corporate owner/employee, a natural person, is distinct from the corporation itself" (internal citation and quotation marks omitted)); *see also Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997) ("The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person."). The defendant is clearly distinct from his enterprise, which included the defendant and a group of other people.  The fact that the group associated to support the defendant and meet his needs does not make it indistinguishable from the defendant.  As the Supreme Court has held, there is "nothing in the statute that requires more 'separateness' than that."  *Cedric Kushner*, 533 U.S. at 163.

### ii.  *Interstate Commerce*

The defendant also disputes the interstate commerce aspect of the government's case.  To satisfy the RICO statute's interstate commerce element, the government must prove that the enterprise "engaged in" interstate or foreign commerce or that its "activities . . . affect[ed]"

40

interstate or foreign commerce.  18 U.S.C. § 1962(c).  However, "[o]nly a minimal effect on interstate commerce need be proven."  *United States v. Price*, 443 F. App'x 576, 579 (2d Cir. 2011); *see United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008) ("[A]ny . . . conduct having even a *de minimis* effect on interstate commerce suffices." (citing *United States v. Davila*, 461 F.3d 298, 306 (2d Cir. 2006))).  "Transporting goods . . . across state lines is a classic example of engaging in interstate commerce;" "[u]se of an instrumentality of commerce, such as telephone lines, is also generally viewed as an activity that affects interstate commerce."  *Mejia*, 545 F.3d at 203.[28]

At trial, the government established that members of the enterprise arranged travel across states and internationally for the defendant, other members of the enterprise, and the defendant's victims.  (*See, e.g.*, T. Tr. 1532-33, 1535, 3158.)  As explained in more detail below, multiple predicate acts allege that the enterprise members arranged the interstate transportation of the defendant's victims in violation of the Mann Act.  That evidence, which the jury credited, is sufficient to establish an effect on interstate commerce.  *See United States v. Carcione*, 272 F.3d 1297, 1301 (11th Cir. 2001) (finding that—in the context of a Hobbs Act violation, which "only requires a minimal effect on interstate commerce to support a conviction"—the defendant's travel across states as part of a robbery scheme "clearly demonstrates an effect on interstate commerce").  The government also presented evidence that the defendant used phones—an instrumentality of interstate commerce—to communicate with victims located in different states,

---

[28] The defendant takes an overly narrow view of the law, maintaining that if "the purpose of the enterprise was to promote Defendant's illegal sexual activities and create pornography," the government was required to prove that "those activities affected interstate commerce."  (ECF No. 273-1 at 22.)  As explained above, the purpose of the enterprise need not be criminal; on the contrary, a defendant may use a legitimate enterprise to commit crimes.  Indeed, the defendant concedes that "[i]f Defendant's legitimate music collective constituted an enterprise for RICO purposes"—which it does—"the government's argument would be well taken."  (ECF No. 282 at 10.)

41

and that enterprise members communicated by phone with the defendant's victims.  That, too, is

sufficient to establish an effect on interstate commerce.  *See Mejia*, 545 F.3d at 203; *United*

*States v. Muskovsky*, 863 F.2d 1319, 1325 (7th Cir. 1988) (finding effect on interstate commerce

based on the "use of the interstate phone system to get approval for credit card transactions").

> iii.   *Pattern of Racketeering*

A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one

of which occurred after the effective date of this [statute] and the last of which occurred within

ten years (excluding any period of imprisonment) after the commission of a prior act of

racketeering activity."  18 U.S.C. § 1961(5).  The government "must show that the racketeering

predicates are related, *and* that they amount to or pose a threat of continued criminal activity."

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).  These

requirements "protect defendants from RICO charges based on isolated or sporadic criminal

acts."  *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010).

"[P]redicate acts must be related to each other and to the enterprise."  *United States v.*

*Daidone*, 471 F.3d 371, 376 (2d Cir. 2006); *Minicone*, 960 F.2d at 1106 ("The racketeering acts

must be related to each other ('horizontal' relatedness), and they must be related to the enterprise

('vertical' relatedness).").  Continuity "is both a closed- and open-ended concept, referring either

to a closed period of repeated conduct, or to past conduct that by its nature projects into the

future with a threat of repetition."  *H.J. Inc.*, 492 U.S at 241.  The defendant disputes the

evidence on every predicate act, and the evidence of relatedness and continuity as to some acts.

> 1.   Bribery

Racketeering Act 1 charged the defendant with bribing a public official "with the intent

to influence . . . the creation of a fraudulent identification document for [Aaliyah]."  (ECF No. 43

¶ 13.)  The defendant argues that the evidence did not prove that he caused Demetrius Smith to

pay a public employee to secure identification for Aaliyah.  Specifically, the defendant contends that the record does not show that he knew of or facilitated the bribery.  He cites portions of Smith's testimony, including Smith's testimony that Derrel McDavid gave him the cash to pay the bribes, and that he was "not positive" whether he discussed the bribery with the defendant. (ECF No. 273-1 at 25; *see* T. Tr. 719, 758-59.)  The evidence, viewed as a whole, sufficiently tied the defendant to the bribery.

Indeed, there was ample evidence from which a rational jury could conclude that the defendant knew of and facilitated the bribery.  After all, the defendant was the only person who stood to gain from the bribery.  He feared that Aaliyah, then only fifteen years old, was pregnant, which would have revealed the defendant's sexual relationship with her.  As he told Smith, he "needed to marry Aaliyah to protect himself."  (T. Tr. 703-06.)  Smith, the defendant and McDavid discussed "how to . . . make the marriage happen," especially since Aaliyah was too young to be married without parental and judicial approval at the time.  Smith suggested that he could obtain fraudulent identification to enable the defendant to marry Aaliyah.  (T. Tr. 712-13.) The defendant was part of the group that drove to the welfare office and a FedEx office to get Aaliyah's fraudulent identification.  (T. Tr. 718, 722.)  Using those documents, the defendant and Aaliyah applied for and received a marriage license at the Maywood City Hall.  (T. Tr. 724-25.) An official, recommended by the defendant's friend, conducted the hasty ceremony that took place in the hotel room.  (T. Tr. 746, 1345, 2419-23.)

The jury was entitled to infer from this evidence, including the defendant's obvious interest in the protecting himself, that he knowingly participated in or facilitated the bribery.  *See United States v. Blackwood*, 366 F. App'x 207, 210 (2d Cir. 2010) ("[A] defendant's knowing and willing participation in a conspiracy . . . may be inferred from his presence at critical stages

of the conspiracy that could not be explained by happenstance, [and] . . . may also be established by evidence that the defendant participated in conversations directly related to the substance of the conspiracy, . . . or engaged in acts exhibiting a consciousness of guilt." (alterations, internal quotation marks and citations omitted)).

To be sure, Smith, a recalcitrant and combative witness, sometimes hedged about the extent of the defendant's role in the bribery.  (*See* T. Tr. 714 ("I actually didn't have any discussion with Robert, it was with Derrel."); T. Tr. 743 ("I'm not sure if Robert was there . . .")).  At other times he confirmed that the defendant was present during the bribery conversation.  (*See* T. Tr. 743 ("I don't remember precisely each time but I'm pretty sure [the defendant] was there."); T. Tr. 744 ("I'm pretty sure [the defendant] was there with me so I guess I could say yes.")).

In deciding a Rule 29 motion, "[w]here there are conflicts in the testimony, [the Court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011).  "A jury is entitled to believe part and disbelieve part of the testimony of any given witness." *United States v. Flores*, 945 F.3d 687, 711 (2d Cir. 2019).  Smith was explicit that he did not want to testify (T. Tr. 653 ("Yes, I don't want to be here, period.")), and that he was uncomfortable testifying about the defendant's marriage to Aaliyah.  (T. Tr. 726 ("I'm uncomfortable with this, Your honor.  I'm truly uncomfortable.  We're continuously talking about Aaliyah.  Her parents are not here and I don't understand why I got to do that.").)  Moreover, he was reluctant to incriminate the defendant, having known him since 1984 as "just like [his] brother."  (T. Tr. 759.)  A rational jury could credit the portions of Smith's testimony confirming the defendant's participation in the bribery, and reject his conflicting testimony.

The defendant's further argument that the predicate act of bribery lacks vertical and horizontal relatedness is also unpersuasive. As explained above, vertical relatedness "may be established by evidence that the defendant was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or that the predicate offenses are related to the activities of that enterprise." *Minicone*, 960 F.2d at 1106 (emphasis and internal quotation marks omitted). In this case, the defendant was able to commit bribery because of his position as the head of the enterprise, and his ability to direct the members of the enterprise to do his bidding. Further, the jury could reasonably find that the bribery was necessary to further the enterprise. The marriage to Aaliyah protected the defendant, his image and his career by shielding him from the consequences of having sex with a minor: prison, shame and disgrace. The evidence also established horizontal relatedness; the defendant and his associates committed the bribery as part of and in order to facilitate the defendant's sexual activity with women and young girls, including illegal sexual activity. *See H.J. Inc.*, 492 U.S. at 240 (predicate acts are horizontally related when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.").[29]

          2.       Production of Sexually Explicit Material

---

[29] The defendant also posits that "because the Act did not occur within 10 years of any other predicate Act that was sufficiently proven, the Act is time-barred." (ECF No. 273-1 at 27.) As explained below, the evidence was sufficient for the jury to conclude that the defendant was guilty of the charged offenses. As to the defendant's timing claim, the bribery took place in 1994, and the conduct alleged in Racketeering Act 2—sexual exploitation of a child, Stephanie—occurred five years later, in 1999, clearly less than 10 years apart. In any event, Section 1961(5) "requires only that the *last* predicate act happen within ten years of another predicate act." *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 329 (E.D.N.Y. 2012) (finding that predicate act that occurred more than 10 years before the next predicate act could still be considered part of a pattern of racketeering activity, where the last predicate act occurred within 10 years of a prior act).

Racketeering Acts 2 (Stephanie), 7 (Jerhonda) and 10 (Jane) charged the defendant with sexual exploitation of a child. *See* 18 U.S.C. § 2251(a). The government was required to prove that "(1) the victim was less than 18 years old; (2) the defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and (3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce." *United States v. Broxmeyer*, 616 F.3d 120, 124 (2d Cir. 2010).

The defendant does not deny the evidence that he taped his sexual encounters with these three victims; nor does he dispute that they were minors at the time he taped them. Instead, claiming that the government had to "prove that Defendant did something more than just film the sexually explicit conduct" (ECF No. 273-1 at 28), he contends that the government did not prove that he "did *anything* to persuade, induce, entice or coerce [Stephanie, Jerhonda or Jane] into the sexual activity that was recorded." (ECF No. 273-1 at 28, 35, 51 (emphasis in original).) The defendant misstates the applicable law and the facts established at trial.

"[A] defendant can be found to have 'used' a minor to produce child pornography if the minor serves as the subject of the illicit photographs taken by the defendant." *United States v. Sirois*, 87 F.3d 34, 43 (2d Cir. 1996); *see also Ortiz-Graulau v. United States*, 756 F.3d 12, 18 (1st Cir. 2014) (agreeing with the Second Circuit); *United States v. Fadl*, 498 F.3d 862, 866 (8th Cir. 2007) (same); *United States v. Wright*, 774 F.3d 1085, 1091 (6th Cir. 2014) (same); *United States v. Laursen*, 847 F.3d 1026, 1033 (9th Cir. 2017) (same). As the defendant concedes, "several circuits, including the Second Circuit, have held that the 'use' element set forth in § 2251(a) is satisfied when a defendant intentionally films a minor's sexually explicit conduct[.]" (ECF No. 282 at 11.) Nevertheless, the defendant argues that the Second Circuit's interpretation

46

would "render the remaining terms in the statute 'persuade, induce, entice or coerce' superfluous." (ECF No. 282 at 11-12.) But district courts are "bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed," *Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc.*, No. 08-CV-9710, 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009); thus, this Court is bound by the Second Circuit's holding in *Sirois*.

In any event, the defendant's challenge is meritless. Section 2251(a) requires "proof of active or coercive conduct by a defendant upon a minor." *United States v. Overton*, 573 F.3d 679, 692 (9th Cir. 2009). The broad interpretation of "use" applies when a defendant engages in active conduct—for example, if the defendant photographs or films a minor, or directs the photography or filming of a minor. *See Sirois*, 87 F.3d at 43 (finding that the "use" element was satisfied where the photographs were "taken by the defendant"); *Laursen*, 847 F.3d at 1032-33 (finding that the "use" element was satisfied where the defendant directed the minor's actions).[30] A defendant may engage in coercive conduct, and persuade, induce, entice or coerce a minor to produce child pornography, for example, by persuading a minor to take pornographic photographs of herself or himself. *Cf. Broxmeyer*, 616 F.3d at 126 (finding that the government had not adduced sufficient evidence that certain pornographic photos taken by a minor were "taken at [the defendant's] behest"). Accordingly, the words "persuade, induce, entice or coerce" in Section 2251(a) are not rendered meaningless by the Second Circuit's interpretation of "use."

---

[30] The Ninth Circuit in *Laursen* explained that though "application of the statute in these contexts may lead to harsh results," the court was mindful that "Congress may legitimately conclude that even a willing or deceitful minor is entitled to governmental protection from self-destructive decisions that would expose him or her to the harms of child pornography." 847 F.3d at 1033 (quoting *United States v. Fletcher*, 634 F.3d 395, 403 (7th Cir. 2011)).

In any case, the defense's argument is foreclosed by evidence showing that the defendant engaged in persuasive and coercive conduct with Stephanie, Jerhonda and Jane. They testified, as did other witnesses, about the punishments that the defendant exacted when they broke his rules, and the physical and emotional manipulation they endured to meet the defendant's sexual demands. (*See, e.g.,* T. Tr. 1637-38 (Stephanie); T. Tr. 121-22, 163-70, 173-78 (Jerhonda); T. Tr. 838-41; 858-62; 901; 911-25 (Jane).) Based on this testimony, a reasonable juror could find that the defendant similarly persuaded or coerced the victims to engage in the sexually explicit conduct.

The defendant also argues that the government did not prove that he acted with a purpose of "producing" a visual depiction, and that the jury charge on this element was wrong. (ECF No. 273-1 at 28.) An examination of the charge itself, to which the defendant did not object, refutes that claim. The Court explained that Racketeering Acts 2, 7 and 10 charged the defendant with using a minor "to engage in sexually explicit conduct for the purpose of producing one or more visual depictions of such conduct." (T. Tr. 4648, 4671, 4684-85.) The Court then quoted the relevant portion of 18 U.S.C. § 2251(a), which provides:

> A person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of that conduct, shall be punished . . . if such person knows or has a reason to know that the visual depiction will be transported in interstate or foreign commerce or mailed[,] if that visual depiction was produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if the visual depiction has actually been transported in interstate or foreign commerce or mailed.

(T. Tr. 4648-49.) Finally, the Court discussed the elements that the government had to prove:

> To prove that the defendant committed this racketeering act, the government must prove the following three elements beyond a reasonable doubt:
>
> First: That Stephanie was under the age of 18 at the time of the acts alleged in the indictment.

Second: That the defendant used, employed, persuaded, induced, or enticed Stephanie to take part in sexually explicit conduct for the purpose of producing or transmitting a visual depiction of that conduct.

Third: That the visual depiction was produced using materials that had been mailed, shipped, or transported in and affecting interstate and foreign commerce.

. . .

While the government must prove that the defendant acted with the purpose of producing a sexually explicit visual depiction, the government does not need to prove that a visual depiction of sexually explicit conduct was actually produced[.]

(T. Tr. 4649-51.)  The Court's charge, viewed in its entirety, made it clear that the jurors had to

determine whether the defendant's purpose was to produce a visual depiction.  Accordingly, the

jury instructions, "taken as a whole and viewed in light of the evidence, show no tendency to

confuse or mislead the jury as to principles of law which are applicable."  *Rippy-El v. Makram*,

210 F.3d 355, at *1 (2d Cir. 2000).

Finally, the defendant maintains that the government failed to prove the interstate

commerce element—that the visual depictions were produced using materials that had been

mailed, shipped, or transported in interstate or foreign commerce—for Racketeering Acts 2 and

7.  (ECF No. 273-1 at 29, 35.)  This claim is also unpersuasive.  Stephanie testified that the

defendant filmed her in Illinois using a video camera with VHS tape.  (T. Tr. 1645.)  The

defendant acknowledges that the parties stipulated that the type of film used in VHS tapes was

not produced in Illinois during the relevant time period.  (*See* ECF No. 273-1 at 29; GX 1006.)

That is sufficient to satisfy the interstate commerce element.  *See United States v. Culver*, 598

F.3d 740, 747 (11th Cir. 2010) (interstate commerce element met where component of videotape

at issue was manufactured out-of-state); *United States v. Joubert*, 778 F.3d 247, 255-56 (1st Cir.

2015) (interstate commerce element met where VHS tape was made out-of-state).

Jerhonda testified that the defendant made a recording of her in Illinois using an iPhone and a Canon camera.  (T. Tr. 168-69.)  Despite this testimony, the defendant claims that the government did not "establish what device, if any, was used to make these recordings," and therefore its "'affecting interstate' commerce evidence was insufficient."  (ECF No. 273-1 at 35.)  However, the jury was entitled to credit Jerhonda's testimony about the devices the defendant used, and the government's evidence that both devices were produced out of state.  (GX 1006, 957; T. Tr. 2431-32.)  Accordingly, there was sufficient evidence to convict the defendant of Racketeering Acts 2, 7 and 10.

### 3.      Exposure to a Sexually Transmitted Disease—Intent

Racketeering Acts 8A (Jane), 12A (Faith) and 14A (Faith)[31] charged the defendant with transporting a person in interstate commerce with the intent to engage in sexual activity that exposed the person to herpes, which violated certain state criminal and public health statutes.  *See* 18 U.S.C. § 2421(a) ("Whoever knowingly transports any individual in interstate or foreign commerce . . . with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be" punished).  The defendant claims that the government did not prove that he transported Jane or Faith "with the *intent* of exposing her to herpes."  (ECF No. 273-1 at 36, 54.)  Once again, the Court charged the jury on the element of intent, a charge to which the defendant did not object:

> In order to establish this element, it is not necessary that the Government prove that engaging in illegal sexual activity was the only purpose for crossing the state line. A person may have several different purposes or motives for such travel, and each may prompt in varying degrees the act of making the journey.  The Government must prove beyond a reasonable doubt, however, that a significant or motivating purpose of the travel across a state line was that the defendant would engage in illegal sexual activity with [the victim].  In other words, that illegal activity [] can't have been merely incidental to the trip.

---

[31] Racketeering Acts 12A and 14A correspond to Counts 6 and 8, respectively.

50

(T. Tr. 4658.)

The defendant maintains that the illegal sexual activity must be the "dominant purpose" of the travel, as opposed to "merely a 'significant' or 'motivating' purpose." (ECF No. 273-1 at 37.) That is not the standard in this circuit. The word "'dominant' . . . [does not] appear in the statutory language;" courts in this circuit have adopted the "significant or motivating purpose" standard. *United States v. An Soon Kim*, 471 F. App'x 82, 84 (2d Cir. 2012) (citing 18 U.S.C. § 2421) (approving "significant or motivating purpose" standard); *United States v. Maxwell*, No. 20-CR-330, 2021 WL 5999410, at *8 (S.D.N.Y. Dec. 19, 2021) (using "significant or motivating purpose" standard in jury charge for violation of 18 U.S.C. § 2423(a)—transportation of a minor with intent to engage in illegal sexual activity); *see also United States v. Hayward*, 359 F.3d 631, 638 (3d Cir. 2004) (approving same standard in 18 U.S.C. § 2423(a) case).

The defendant does not challenge that the evidence at trial demonstrated he contracted genital herpes between 2000 and 2007, that his doctor, Dr. Kris McGrath, informed him of the diagnosis, and that Dr. McGrath told him to use a condom during sexual intercourse and to let his sexual partners know of his diagnosis. (T. Tr. 404-11, 421, 462-63.) Nor does he appear to challenge that the evidence showed that he never used a condom during sex with Jane and Faith, and that he never told Jane or Faith that he had been diagnosed with herpes. Rather, the defendant argues that there is no evidence that "Defendant's actions of arranging for Jane and Faith to travel to meet him was motivated by an intent to *expose* Jane and Faith to STDs[,] . . . rather than to simply have sex with them." (ECF No. 282 at 12-13 (emphasis in original); *see also* ECF No. 273-1 at 54 ("Because the Defendant's purported violation of a New York Public Health Law prohibiting him from exposing a partner to herpes was *incidental* to Faith's trip

51

rather than a motivating purpose in transporting Faith, the intent requirement of the statute cannot be sustained." (emphasis in original)).)

The plain language of 18 U.S.C. § 2421(a) requires that the defendant transported Jane and Faith with the "intent" that they "engage in . . . sexual activity for which any person can be charged with a criminal offense."  Thus, as the Court instructed the jury, the government was required to prove that the defendant transported Jane and Faith with the intent of engaging in sexual activity with them, and that the intended sexual activity was illegal.  The record established, and the defendant appears to concede, that his motivation in arranging for Jane and Faith to travel to meet him was to engage in sexual activity with them.  In light of Jane's and Faith's testimony, as well as other witnesses' testimony about their sexual experiences with the defendant, the jury could reasonably conclude that the defendant intended to have sex with them without a condom, and without informing them that he had herpes.  And as explained in Section I.a.iii.5 below, the defendant could be "charged with [] criminal offense[s]" for that sexual activity—because he exposed Jane and Faith to genital herpes, which violated state criminal and public health statutes in existence at the time.  Accordingly, the evidence was sufficient to prove the intent element.

> 4.     Exposure to a Sexually Transmitted Disease—Persuasion, Inducement, Enticement or Coercion

Racketeering Acts 8B (Jane), 12B (Faith) and 14B (Faith)[32] charged the defendant with persuading, inducing, enticing and coercing a person to travel in interstate commerce to engage in sexual activity that exposed the person to herpes, which violated certain state criminal and public health statutes.  *See* 18 U.S.C. § 2422(a) ("Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce . . . to engage in . . .

---

[32] Racketeering Acts 12B and 14B correspond to Counts 7 and 9, respectively.

any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be" punished).

The defendant asserts that there is no evidence that he "took any action to induce, persuade, entice, or coerce Jane into traveling to California in April – May 2015;" instead, he says, citing text messages between Jane and her mother, that "the record shows that Jane's mother purposefully and strategically *enticed* Defendant with her 17-year-old daughter."  (ECF No. 273-1 at 41 (emphasis in original); GX 233.)  According to the defendant, he merely "invited Jane to join him, and she excitedly accepted."  (ECF No. 273-1 at 47.)  In his challenge to the evidence about Faith, he maintains that he "invited a grown woman to meet him in New York, and she accepted."  (*Id.* at 55.)

The words "'persuade,' 'induce,' 'entice,' or 'coerce,' though not defined in the statute, are words of common usage that have plain and ordinary meanings."  *United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007).  Section 2242 "imposes no requirement that an individual endeavor to 'transform or overcome' the will of his intended victim;" in fact, the jury need only consider whether the defendant "intended to induce, persuade, and/or entice" the victim to travel to engage in sexual activity with him, "regardless of whether she expressed (or felt) reluctance, indifference, or, for that matter, enthusiasm at the prospect of doing so."  *United States v. Waqar*, 997 F.3d 481, 487-88 (2d Cir. 2021).  The jury was entitled to conclude from the evidence that the government proved the elements of these charges.

As Jane testified, the defendant made it clear from their first meeting, when she was a junior in high school, that his interest in her was sexual.  Thus, he persuaded her to engage in sexual contact with him, telling her he needed to ejaculate before she could "audition" for him. (T. Tr. 789-95.)  He also told Jane that he wanted to see her again, and "teach [her] a few

techniques." (T. Tr. 795-96.)  He proposed that she meet him in Los Angeles, California and gave her the number of his assistant Cheryl Mack, so that Mack could make the travel arrangements, for which he paid.  (T. Tr. 798-801.)

Similarly, it was clear that the defendant was interested in having sex with Faith when she met him after his San Antonio, Texas concert in March 2017.  (T. Tr. 2128-30.)  After the defendant gave Faith his contact information, they communicated regularly.  (T. Tr. 2133-35.) The defendant told Faith that he loved her, and invited her to meet him while he was on tour so that they could "hang out," which would "be fun."  (T. Tr. 2134, 2142, 2144-46, 2151.)   As he did with Jane, the defendant gave Faith Diana Copeland's number.  Faith contacted Copeland, who arranged her travel to New York in May 2017; the defendant paid for the flight.  (T. Tr. 2151-53.)  Copeland also booked and the defendant paid for her trip to New York in February 2018.  (T. Tr. 2261-62.)

A reasonable jury could find that the defendant did far more than simply "invite" Jane and Faith to meet him, and that he persuaded, induced, or enticed Jane to travel by offering "incentives"—suggesting that he would teach her singing techniques, *Waqar*, 997 F.3d at 487— and by offering to "make and pay for the necessary travel arrangements." *United States v. Rashkovski*, 301 F.3d 1133, 1137 (9th Cir. 2002).  The jury could also rationally find that the defendant persuaded, induced and enticed Faith to travel in May 2017 by telling her that he loved her, by assuring her that the trip would be "fun," and by arranging and paying for all of her travel.  The fact that Jane and Faith may have been willing or even eager to travel is not relevant. *Waqar*, 997 F.3d at 487 (holding that "it is the defendant's intent that forms the basis for his criminal liability, not the victims'"); *Rashkovski*, 301 F.3d at 1137 (holding that "it is not

significant that [the victims] had pre-existing wishes to" travel, when "they never acted upon those desires until [the defendant] made it attainable").

5.    Exposure to a Sexually Transmitted Disease—Criminal and Public Health Statutes

As discussed above, Racketeering Acts 8 (Jane) and 12 (Faith) charged the defendant with Mann Act violations based on violations of state criminal and public health statutes—specifically, New York Penal Law ("NYPL") § 120.20, New York Public Health Law ("NYPHL") 2307 and California Health and Safety Code ("CHSC") § 120290. The defendant argues that the evidence at trial was insufficient to establish a violation of NYPL § 120.20, and that NYPHL 2307 is unconstitutionally vague. (ECF No. 273-1 at 57-59.) He also asserts that the government improperly charged him with an older version of CHSC § 120290, and in any event that the evidence did not establish a violation of CHSC § 120290. (*Id.* at 38-41.) I address these arguments in turn.[33]

NYPL § 120.20 provides that a "person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." "Serious physical injury" is "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y.P.L. § 10.00. The defendant argues that "unprotected sex with someone who has genital herpes does not establish a substantial risk of serious physical injury" because "[h]erpes

---

[33] In connection with the defendant's Rule 29 motion, the Court directed the parties to submit supplemental letters on two issues: (1) whether the defendant's claims about NYPHL § 2307 and CHSC 120290 are the proper subjects of a motion for a judgment of acquittal under Rule 29, and (2) whether the defendant's arguments about CHSC 120290 are untimely because he did not assert them before trial, and if so, whether he waived them. (May 19, 2022 Order.) In response, the defendant conceded his claim about NYPHL § 2307, and that some of his claims about CHSC § 120290, are "constitutional" in nature (ECF No. 298), and thus exceed the permissible scope of a Rule 29 motion.

is not deadly and rarely causes any serious, protracted health impairments."  (ECF No. 273-1 at 57-58.)  He also claims that "there is no evidence that he was contagious or had an outbreak" when he was in New York.  (*Id*. at 58; *see* ECF No. 282 at 15.)

The defendant's claim that herpes "is not deadly and rarely causes any serious, protracted health impairments" (ECF No. 273-1 at 58), as an initial matter, ignores the entirety of the statutory definition, which includes not only causing death or creating a substantial risk of death, but also causing "serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  N.Y.P.L. § 10.00.  A rational jury could find from the trial evidence, expert and otherwise, that the defendant's exposure of his victims to an incurable disease met these definitions.  Dr. Iffath Hoskins, the Director of Patient Safety in the Obstetrics and Gynecology Department at New York University, explained that herpes is incurable, and a "very contagious, transmissible virus."  (T. Tr. 3027-30, 3035-36.) Once the virus enters the central nervous system, "it's going to stay there" and "it's always there so it can reactivate and when it reactivates, it can cause a result or an effect . . . [in] other parts of the body."  (T. Tr. 3037-39.)  Herpes manifests as "blisters, ulcers, pustules, vesicles," causing burning, tingling, . . . numbness . . . [and] [s]evere pain."  (T. Tr. 3040-42.)  Outbreaks can be triggered by various factors—"menstruation," "a common cold or cough," "sunlight," and "other illnesses" such as "asthma, cancer, hypertension, [and] diabetes"—and can "last anywhere from several days to several weeks."  (T. Tr. 3044, 3054.)  Herpes can cause other medical complications, including to the central nervous system, the brain or the bloodstream.  (T. Tr. 3049.)  While these complications are "rarer," they "always" remain a risk for someone with herpes.  (T. Tr. 3050.)  The jury could reasonably find based on Dr. Hoskins's expert testimony that transmission of genital herpes—a permanent and incurable disease that causes recurring

outbreaks with potentially life-threatening complications—constitutes a serious physical injury. *See United States v. James*, 957 F.2d 679, 680 (9th Cir. 1992) (finding that transmission of genital herpes constituted a permanent or life-threatening bodily injury); *see also Com. v. Kerrigan*, 920 A.2d 190, 201 (Pa. Super. Ct. 2007) (finding that transmission of HPV/genital warts constituted serious bodily injury, and collecting cases). Moreover, the defendant's victims testified about the intensity of their physical symptoms, as well as the psychological effects of being saddled with an incurable sexually transmitted disease.

As for the defendant's suggestion that he might not have been "symptomatic," Dr. Hoskins explained that someone with herpes can transmit the virus even if he is asymptomatic, because the virus can be "excreted" at a time when there is "no evidence that it has reactivated." (T. Tr. 3046.) While taking medications like Valtrex—which the defendant took—can reduce the risk of transmission, "there will never be a situation where there's a [one] hundred percent protection;" there will still be a "10 to 20 percent" possibility of transmitting the virus, and "a missed dose" or "a missed window of time" can add to that percentage. (T. Tr. 3059-61.) Similarly, the defendant's doctor, Dr. Kris McGrath, not only described the symptoms of herpes but also advised the defendant to use a condom during sex, prompting the defendant himself to acknowledge that he should use a condom when having sex. (T. Tr. 406.) Dr. McGrath also told the defendant to warn his partners that he had herpes, and repeatedly prescribed Valtrex for the defendant. (T. Tr. 406, 418-19, 463.) Moreover, Kate and Jane contracted herpes from the defendant in the early 2000s and 2015. (T. Tr. 851-53, 2636-39.) Given this evidence, a rational jury could find that there was a substantial risk of transmission that the defendant consciously ignored.

NYPHL § 2307 provides that "[a]ny person who, knowing himself . . . to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor."  The defendant repeats the arguments he made before trial in seeking dismissal of these counts: that the statute is "unconstitutionally vague."[34]  (ECF No. 273-1 at 59.)  In addition, he claims that the statute does not define the term "infected."  (*Id.*)

The defendant concedes that his constitutional claims regarding NYPHL § 2307 are not challenges to the sufficiency of the evidence (ECF No. 298 at 2), and thus not properly the subject of a Rule 29 motion.  *See United States v. al Ghazi*, No. 07-CR-354, 2009 WL 1605741, at *2 (S.D.N.Y. June 9, 2009) ("Rule 29 . . . only authorizes motions challenging the sufficiency of the evidence presented at trial." (citing Fed. R. Crim. P. 29 and *United States v. McDaniel*, No. 03-CR- 550, 2004 WL 1057627, at *1 (S.D.N.Y. May 10, 2004))); *United States v. Barret*, No. 10-CR-809, 2012 WL 3229291, at *20 (E.D.N.Y. Aug. 6, 2012) (noting that the defendant's vagueness challenge to a charge in the indictment was "not properly raised on a motion for judgment of acquittal pursuant to Rule 29"), *aff'd*, 677 F. App'x 21 (2d Cir. 2017).

The defendant argues that the government did not prove he violated CHSC § 120290, because "the government charged Defendant with a repealed version of the statute no longer in effect" and proposed jury instructions that "rewrote [the statute] in clear violation of various constitutional provisions."  (ECF No. 273-1 at 38-41.)  He also characterizes the statute as impermissibly vague and claims there was insufficient evidence to prove the charge in any event. (*Id.*)  Each of the defendant's arguments is unavailing.

---

[34] The Court incorporates by reference the portion of its May 22, 2020 Order that decided these issues.  (*See* ECF No. 69 at 8-18.)

The 1998 version of CHSC § 120290 was in effect at the time of the charged conduct in April and May of 2015.  (ECF No. 43 ¶¶ 23-24.)  That version of the statute, which remained effective through 2017, provided:

> Except as provided in Section 120291 or in the case of the removal of an afflicted person in a manner the least dangerous to the public health, any person afflicted with any contagious, infectious, or communicable disease who willfully exposes himself or herself to another person, and any person who willfully exposes another person afflicted with the disease to someone else, is guilty of a misdemeanor.

CHSC § 120290 (effective 1998).[35]  The current version of Section 120290, which did not take effect until January 1, 2018, makes it unlawful for someone to transmit an infectious or communicable disease, provided that he "knows that he . . . is afflicted with an infectious or communicable disease;" "acts with the specific intent to transmit . . . that disease to another person;" "engages in conduct that poses a substantial risk of transmission to that person;" and "transmits the infectious or communicable disease to the other person."  CHSC § 120290 (effective 2018).  Thus, while the 1998 version required, among other things, that a defendant act willfully in exposing himself to another person, the 2018 version requires that a defendant act with the specific intent to transmit the disease.

The indictment made it clear that the 1998 version of § 120290 formed the basis for the Mann Act violations charged in Racketeering Act 8A and 8B.  (*See* ECF No. 43 ¶ 23 ("[T]he defendant . . . together with others, did knowingly and intentionally transport an individual, to wit: [Jane], . . . in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of Cal. Health and

---

[35] The 1998 version of CHSC § 120290 included a reference to CHSC § 120291, which made it a felony for "[a]ny person who exposes another to the human immunodeficiency virus (HIV) by engaging in unprotected sexual activity when the infected person knows at the time of the unprotected sex that he or she is infected with HIV, has not disclosed his or her HIV-positive status, and acts with the specific intent to infect the other person with HIV."  CHSC § 120291.

Safety Code § 120290 (effective 1998) (willful exposure of a communicable disease), in that [the defendant] engaged in unprotected sexual intercourse with [Jane] without first informing [her] that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances."); *see also id.* ¶ 24.)  Similarly, when the Court instructed the jury regarding CHSC § 120290, it quoted the 1998 version of § 120290, and set forth the elements that the government was required to prove in order to establish a violation under that version:

> In this Racketeering Act, the illegal sexual activity that is charged is a violation of California law.  Specifically, California Health and Safety Code Section 120290. And under that law, any person who is afflicted with any contagious, infectious or communicable disease who willfully exposes himself or herself to another person shall be punished.  This is what the Government must prove beyond a reasonable doubt:
>
> First, that the defendant knew that he was afflicted with any contagious and infectious and communicable disease.
>
> Second, that the defendant exposed himself to Jane by engaging in unprotected sexual activity with her.
>
> Third, that the defendant acted willfully.
>
> And fourth, that the defendant did not inform Jane that he had a contagious, infectious or communicable disease and obtain her consent to expose himself in these circumstances prior to engaging in the exposure.  A communicable disease is any disease that was transferable through the exposure incident.  With respect to the third element, I have already defined this for you.  I think that's willfully, that means with knowledge of the consequences or purposefully.  It does not require that the defendant intended to expose another person to a contagious or infectious or communicable disease.

(T. Tr. 4674-75.)  The Court then instructed the jury about these same elements for the Mann Act coercion and enticement offense charged in Racketeering Act 8B.  (T. Tr. 4676.)

Federal Rule of Criminal Procedure 12 requires that certain objections to a prosecution or indictment "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b)(3).  "This requirement serves a number of purposes, including sparing the court, the

witnesses, and the parties, the burden and expense of a trial, and insuring that indictments are not routinely challenged (and dismissed) after the jury has been seated and sworn." *United States v. O'Brien*, 926 F.3d 57, 82 (2d Cir. 2019) (internal quotation marks and citations omitted).

While "[a] motion that the court lacks jurisdiction may be made at any time while the case is pending," a motion that asserts "a defect in instituting the prosecution," or "a defect in the indictment" must be made before trial if (i) "the basis for the motion is then reasonably available" and (ii) "the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(A)-(B); *United States v. Sampson*, No. 13-CR-269, 2016 WL 756565, at *9 (E.D.N.Y. Feb. 26, 2016). Rule 12(b)(3) includes a list of commonly raised claims under each category, including "failure to state an offense" and "lack of specificity" in an indictment, among others. Fed. R. Crim. P. 12(b)(3)(B)(iii) & (v). If a defendant does not make a motion that falls within Rule 12(b)(3) before trial, or by the deadline set for the court for such motions, "the motion is untimely" and is deemed waived absent a showing of "good cause." Fed. R. Crim. P. 12(c)(3); *O'Brien*, 926 F.3d at 83 ("If the motion is untimely, the court may nonetheless entertain it if the movant shows 'good cause' for his failure to make it prior to the deadline.").

The defendant's claims about the California statute should have been made in a Rule 12 motion, because he is claiming that there were "defect[s] in the indictment." Fed. R. Crim. P. 12(b)(3); *see, e.g.*, *O'Brien*, 926 F.3d at 82-84 (rejecting defendant's post-trial constitutional challenge to indictment charging unlawful conduct with respect to methylone, because the claim asserted a defect in the prosecution's institution or a failure to state an offense); *United States v. Muresanu*, 951 F.3d 833, 839 (7th Cir. 2020) (finding that defendant's post-trial challenge to an indictment charging attempted aggravated identity theft was a claim that the indictment was defective for failure to state an offense, not jurisdictional and therefore waived); *Sampson*, 2016

61

WL 756565, at *7-*11 (finding that the defendant waived his argument that he was improperly

convicted of witness tampering under 18 U.S.C. § 1503 because that argument raised a defect in

the indictment for failure to state an offense, which Rule 12 "treat[s] as a defect that must be

raised before trial").

The defendant has not adequately explained his failure to raise his current arguments

about CHSC § 120290 earlier.  His only justification is that "the government did not apprise the

defense of its intent to have the jury charged pursuant to a repealed version of the statute that it

also rewrote."  (ECF No. 298 at 2 & n.1.)  But the information supporting the defendant's

challenges to § 120290 was reasonably available to him as early as March 12, 2020 when the

superseding indictment was returned against him, making clear that the government charged the

1998 version of § 120290 rather than the 2018 version.  (*See* ECF No. 43 ¶¶ 23-24.)  On July 2,

2021, little more than a month before the trial, the government submitted proposed jury

instructions, which also alerted the defendant that the charge was based on the 1998 version of

the statute.  (ECF No. 117-1 at 57-61.)[36]  The information the defendant cites for his vagueness

argument was also available to him before trial.  *See Sampson*, 2016 WL 756565, at *7 ("The []

Indictment currently at issue is the same document Defendant reviewed before trial; so if that

document is vague now, then it was vague then, which is when Defendant should have voiced his

concerns." (citing *United States v. Crowley*, 236 F.3d 104, 108 (2d Cir. 2000))).  In fact, the

defendant raised vagueness arguments about NYPHL § 2307 in his pre-trial motion to dismiss

---

[36] Defense counsel pointed out that the jury instructions included an older version of the statute in a September 18, 2021 letter, copied the text of the current version of the statute and asked the Court to require the government to clarify whether the claim is that the defendant "intentionally exposed others," which is required under the current version of § 120290, or that he "willfully exposed others," which is required under the older version.  (ECF No. 219 at 5-6.)  But as explained above, the defense was on notice far earlier that the defendant was charged with violating the statute in existence when he committed the predicate act.

62

and to strike; he could have made similar challenges to CHSC § 120290, which he did not.  (ECF No. 69.)  The defendant has not established "good cause" for his failure to challenge CHSC § 120290 in a Rule 12 motion.  *See* Fed. R. Crim P. 12(c)(3).  Accordingly, not only are the defendant's constitutional claims about CHSC § 120290 beyond the scope of a Rule 29 motion, *see al Ghazi*, No. 07-CR-354, 2009 WL 1605741, at *2; *Barret*, No. 10-CR-809, 2012 WL 3229291, at *20, they are also untimely and, as a result, waived.[37]

In any event, the defendant's arguments are without merit.  He challenges the 1998 version of the statute on as-applied and facial grounds, arguing that it "fails to provide adequate definitions that put individuals with *any* chronic and potentially contagious diseases on notice of what amounts to criminal conduct, including communicable diseases that are not sexually transmitted."  (ECF No. 273-1 at 40 (emphasis in original).)  He theorizes that "anyone with Herpes Simplex I (also known as cold sores) who kisses another person without disclosing that they have Herpes Simplex I, is guilty of a misdemeanor."  (*Id.*)

The defendant is foreclosed from challenging CHSC § 120290 for vagueness, either on an as-applied or on a facial basis.  The Due Process Clause of the Fourteenth Amendment requires that every criminal statute "(1) give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, and (2) provide explicit standards for those who apply the statute."  *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (alterations and citation omitted)); *Johnson v. United States*, 576 U.S. 591, 595 (2015) (a criminal statute is unconstitutionally vague in violation of

---

[37] I address the defendant's constitutional claims in an excess of caution because, even though he conceded that they did not challenge the "sufficiency of the evidence" and "may not constitute a proper Rule 29 issue" (ECF No. 298 at 1), he suggested that the Court must "first decid[e] whether the jury was properly instructed pursuant to the applicable law" before it can decide the Rule 29 question, that is, whether there was sufficient proof at trial.  (*Id.* at 2.)

due process if "it fails to give ordinary people fair notice" or is "so standardless that it invites arbitrary enforcement" (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983))).  "Even if there is ambiguity as to the margins of what conduct is prohibited under the statute," *Dickerson*, 604 F.3d at 747, it is clear to an ordinary person that CHSC § 120290 would prohibit the defendant's conduct—having unprotected sex knowing he had herpes and without informing his partner.  Moreover, an "as-applied vagueness challenge" supported by a law's potential for arbitrary enforcement must fail if "the enforcement at issue is consistent with the 'core concerns' underlying [the statute]."  *Id.* at 749.  The defendant's conduct falls within § 120290's clear core—protecting the public from the spread of infectious venereal diseases.  *See Doe v. Roe*, No. 12-CV-01644, 2013 WL 1787175, at *5 (D. Nev. Apr. 25, 2013) (noting that the transmission of an infectious disease is the type of injury the statute was designed to prevent).  Accordingly, the defendant cannot show that the statute is vague as applied to him.

Nor is a facial challenge available to the defendant.  "[O]utside of the First Amendment context . . . [facial] challenges are permitted only when 'no set of circumstances exists under which the [law] would be valid,'" *Dickerson*, 604 F.3d at 743 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), or where the law infringes upon another constitutionally-protected right.  *Id.* at 744 ("*Morales* does suggest that facial challenges are permissible outside of the First Amendment context, but that case only permitted such a challenge in the presence of a constitutionally-protected right." (citing *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (Stevens, J., plurality))).  The defendant does not premise his vagueness challenge to § 120290 on the violation of some other constitutionally-protected right, let alone a First Amendment right.  As a result, the defendant cannot challenge § 120290 on facial grounds, unless he can show there is no set of circumstances under which the statute would be valid.  As explained above, § 120290

64

clearly proscribes his conduct and is not vague as applied to him.  *Id.* at 743-44 (noting that *Salerno* "effectively eliminates facial challenges outside of the First Amendment context that could not also be brought as an as-applied challenge, since any law that is unconstitutional in every set of circumstances is also necessarily unconstitutional when applied to any plaintiff"); *United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020) ("Outside of the First Amendment context, we look to whether the 'statute is vague as applied to the particular facts at issue.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010))).

Whether the indictment properly charged the 1998 version of CHSC § 120290 presents a closer question.  The conduct relevant to this question is the Mann Act conduct—transporting Jane in interstate commerce with the intent to engage in sexual activity criminalized by state law, and coercing or enticing her to travel in interstate commerce to engage in sexual activity criminalized by state law.  18 U.S.C. §§ 2421(a), 2422(a); (*see* ECF No. 43 ¶¶ 23-24.)  The defendant argues that "[t]he government had no authority to charge [him] with a statute that was repealed or inoperative at the time of prosecution."  (ECF Nos. 273-1 at 38, 282 at 16-17.)  The government responds that "[i]n the racketeering context, the relevant consideration is whether the predicate racketeering act was a violation of the relevant state or federal law at the time that the underlying conduct was committed."  (ECF No. 278 at 91.)

The RICO statute defines "racketeering activity" as, among other things, certain acts "chargeable" under state law, and certain acts "indictable" under federal law.  *See* 18 U.S.C. § 1961(1).  Neither party cites a case that addresses the issue in this case—whether the underlying sexual acts must violate state law at the time the defendant committed them, or at the time of the indictment.  (*See* ECF No. 273 at 38-39; ECF No. 278 at 91; ECF No. 282 at 16-17.)  Nevertheless, the case on which the government relies, *United States v. Davis*, 576 F.2d 1065 (3d

Cir. 1978), provides at least persuasive support for the notion that the indictment properly

charged the defendant with violating a state law that was in effect at the time he committed the

conduct.  In *Davis*, the Third Circuit held that the defendant's violation of a state bribery statute

could serve as a RICO predicate, despite the fact that the state law's statute of limitations had

expired by the time of the RICO indictment.  576 F.2d at 1066-67.  According to *Davis*, the time-

barred bribery properly served as a RICO predicate because the acts were chargeable under state

law at the time they were committed.  *Id.*  In so ruling, the court defined "chargeable under State

law" in 18 U.S.C. § 1961(1)(A) as "chargeable under State law at the time the offense was

committed."  *Id*. (rejecting the defendant's interpretation that "chargeable under State law"

meant "presently chargeable under State law"); *see also United States v. Castellano*, 610 F.

Supp. 1359, 1383 (S.D.N.Y. 1985) (applying *Davis* and holding that, for statute of limitations

purposes, "the relevant question is whether a charge of participating in the enterprise, and not

whether particular acts of racketeering could still be charged under applicable state or federal

law").[38]

Although *Davis* addressed a slightly different question—whether time-barred state acts

could nevertheless constitute racketeering acts in a RICO indictment—its reasoning is persuasive

in the context of this case.  Because the defendant's 2015 conduct was "chargeable under State

law at the time the offense was committed," *Davis*, 576 F.2d at 1066-67, and thus "indictable"

---

[38] This view also comports with the legislative purpose of RICO, which was not designed to punish the predicate state law violations themselves, but "to punish the impact on commerce caused by conduct which meets the statute's definition of racketeering activity."  *United States v. Forsythe*, 560 F.2d 1127, 1135 (3d Cir. 1977); *see also id.* (concluding that "[s]tate law offenses are not the gravamen of RICO offenses," and are incorporated into RICO for "definitional purpose[s]" only); *United States v. Licavoli*, 725 F.2d 1040, 1047 (6th Cir. 1984) ("The gravamen of section 1962 is a violation of federal law and reference to state law is necessary only to identify the type of unlawful activity in which the defendant intended to engage." (internal quotation marks and citation omitted)).

under the Mann Act at the time he engaged in the conduct, the government appropriately charged the 1998 version of CHSC § 120290.

Finally, the defendant argues that "[e]ven if the elements of the statute were as the government alleged, insufficient evidence existed to sustain the charge." (ECF No. 273-1 at 40-41.) The defendant makes the same claims he makes about Racketeering Act 12 (Faith)—that there was no evidence that he was "contagious, infected, or had the capacity to transmit herpes" when he had sexual contact with Jane in 2015, and that the government cannot show that he acted "willfully with knowledge of the consequences." (*Id.* at 40.) These claims—the only claims about this conduct that are cognizable in a Rule 29 motion—have no merit.

Jane testified that she contracted genital herpes after the defendant had unprotected sex with her in the summer of 2015. (T. Tr. 844-53.) She experienced "discomfort in [her] pelvis and in [her] lower abdomen," and saw a doctor in August 2015 when her symptoms got worse, "to the point where [she] couldn't physically even walk." (T. Tr. 852.) The doctor diagnosed her with herpes and prescribed her medication. (*Id.*) When the defendant told her that she "could have gotten that from anyone," she responded that she had been "intimate" only with him; Jane's medical records also reflect that the defendant was her only sexual partner. (T. Tr. 853.) Jane's testimony, as well as the evidence that the defendant infected multiple other victims with herpes, provided a reasonable basis for the jury to conclude that the defendant was infected with herpes when he had sex with Jane in 2015, and that his act in exposing Jane to the disease was willful or purposeful. *See People v. Valdez*, 27 Cal. 4th 778, 787-88 (2002) ("The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate [the] law, or to injure another, or to acquire any advantage." (internal

quotation marks and citation omitted)).  It was equally reasonable for the jury to find that the defendant acted "with knowledge of the consequences," in that he knew that unprotected sexual contact with Jane would expose her to herpes; the defendant knew he had herpes, his doctor warned him of the risk, and directed him to alert his sexual partners of his condition.

### 6.    Sexual Activity with Minors

Racketeering Acts 5 (Jerhonda) and 9 (Jane) charged the defendant with Mann Act violations based on sexual activity with minors.  *See* 18 U.S.C. § 2421(a); 18 U.S.C. § 2422(a); 18 U.S.C. § 2422(b) ("Whoever, using the mail or any facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be" punished.); 18 U.S.C. § 2423(a) ("A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, . . . with intent that the individual engage in . . . any sexual activity for which any person can be charged with a criminal offense, shall be" punished.).

To convict a defendant under Section 2422(b), the government had to prove that the defendant "(i) used a facility of interstate commerce; (ii) to knowingly persuade, induce or entice . . . ; (iii) any individual who is younger than eighteen-years old; (iv) to engage in sexual activity of a criminal nature."  *United States v. Brand*, 467 F.3d 179, 201-02 (2d Cir. 2006), *abrogated on other grounds by United States v. Cabrera*, 13 F.4th 140 (2d Cir. 2021).

With respect to Racketeering Act 5, the government charged the defendant with violating Illinois Criminal Code § 5/12-16(d), which provides that an individual "commits aggravated criminal sexual abuse if he or she commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 17 years of age and the accused was at least 5 years older than the victim."

The defendant contends that the government did not prove the first element—the use of a facility of interstate commerce—because purely intrastate use of cell phones does not constitute use of a facility of interstate commerce.  (ECF No. 273-1 at 29.)  However, the Second Circuit has interpreted use of a facility of interstate commerce to include intrastate use of that facility. *See United States v. Giordano*, 442 F.3d 30, 39 (2d Cir. 2006) ("[Section] 2425's prohibition on the transmission of the name of a minor 'using . . . any facility or means of interstate . . . commerce' for the specified purposes includes the *intrastate* use of such a facility or means."); *United States v. Perez*, 414 F.3d 302, 305 (2d Cir. 2005) (finding that "wholly intrastate communications" made using a national telephone network constituted use of a facility of interstate commerce).  Accordingly, intrastate cell phone calls satisfy the first element of Section 2422(b).

Next, the defendant asserts that the government did not show a nexus between the use of the interstate facility and the "persuasion, coercion, enticement or inducement."  (ECF No. 273-1 at 30.)  Jerhonda testified that she attended a party at the defendant's Olympia Fields residence in May 2009, and exchanged phone numbers with the defendant.  (T. Tr. 114, 118.)  They communicated by text messaging and phone calls.  (T. Tr. 119, 153.)  She went to his home "every time [she] was invited;" during the six-month period she spent with the defendant, she had sexual contact with him "[e]very time [she] was there."  (T. Tr. 154, 168.)  On one occasion, when Jerhonda was at the defendant's house, he called her and told her to get in his tour bus and directed her to have sex with him and Juice.  (T. Tr. 165-66.)  This evidence was sufficient to show that the defendant used interstate commerce to "persuade, induce or entice" Jerhonda

A rational jury could also find that the defendant did persuade, induce or entice Jerhonda to engage in sexual conduct.  Words like "persuade," "induce," and "entice" are "all words of

causation." *United States v. Naim*, No. 13-CR-660, 2015 WL 3440253, at *21 (E.D.N.Y. May

20, 2015) (internal quotation marks omitted), *aff'd*, 710 F. App'x 12 (2d Cir. 2017); *see also*

*United States v. Holley*, 819 F. App'x 745, 749 (11th Cir. 2020) (holding that "'induce' means

'to stimulate the occurrence of or to cause'"). The evidence from multiple witnesses—victims

and members of the defendant's enterprise—established that the defendant implemented strict

rules in and out of his home, that he expected that his victims and employees obey his

commands, and that he exacted punishment for perceived violations. A rational juror could infer

from the defendant's direction to Jerhonda to leave his house and go to his tour bus that he

induced or coerced her into having sex with the defendant and Juice. *Naim*, 2015 WL 3440253,

at *21 (finding inducement where the jury could have inferred that the defendant made a request

for an additional video of a minor "with the intent to cause, or bring about, the creation of that

video").

Equally unpersuasive is the defendant's argument that "no reasonable juror could

conclude that Defendant knew that Jerhonda was 16 years old when they allegedly engaged in

sexual activity between May 2009 and January 2010." (ECF No. 273-1 at 30.) Jerhonda

testified that she told the defendant the first time they engaged in sexual activity that she was 16

years old, and showed him her identification. (T. Tr. 123.) The jury was entitled to credit her

testimony, and find that the defendant did not believe that Jerhonda was 17 years or older when

he had sex with her.[39]

---

[39] Investigators searched the defendant's storage facility and found a forged birth certificate and state ID card in Jerhonda's name. (GX 413, 414.) Both stated that she was born in 1990 rather than in 1993, the actual year of her birth. (T. Tr. 3635-37.)

In Racketeering Act 9,[40] the government charged the defendant with Mann Act violations based on violations of California Penal Law ("CPL") §§ 261.5(a), (b), which provide that "[a]ny person who engages in an act of unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator is guilty," where "[u]nlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor," and "a 'minor' is a person under the age of 18 years."[41]

The defendant acknowledges Jane's testimony that she told the defendant her true age—17 years old—in 2015, but argues that the evidence was nevertheless insufficient because "the record does not reflect precisely when she told Defendant her true age." (ECF No. 273-1 at 48-49.) Jane testified that she told the defendant she was 17 years old in Chicago, when "[s]ummer ended and [she] had to go back to school for [her] senior year in high school." (T. Tr. 860.) She returned to Florida, but moved back to Chicago and then joined the defendant on his tour. (T. Tr. 860-62, 869.) Moreover, the letter from Jane's parents authorizing Juice's mother to be Jane's guardian until she turned 18 years old was dated September 19, 2015 (GX 475(a), 476(a)), and Suzette Mayweather testified that the defendant and his entourage left New York for California on September 29, 2015. (T. Tr. 1966.) Based on this evidence, a rational juror could conclude that the defendant knew Jane was less than 18 years old prior to their California trip.

With respect to Racketeering Acts 9B (18 U.S.C. § 2422(a)) and 9C (18 U.S.C. § 2422(b)), the defendant maintains that there is no evidence that he took any action to induce, persuade, entice or coerce Jane to travel to California between September and October 2015.

---

[40] Sub-predicate Racketeering Acts 9A, 9B, 9C and 9D correspond to Counts 2, 3, 4 and 5, respectively.

[41] In challenging the government's proof for Racketeering Act 9A, the defendant mistakenly incorporates by reference his arguments in connection with Racketeering Act 8A, which was based on a violation of CHSC § 120290 for willful exposure. (ECF No. 273-1 at 48.) Racketeering Act 9A, on the other hand, was based on violations of Sections 261.5(a) and 261.5(b) of the CPL. (ECF No. 43 ¶ 25.)

(ECF No. 273-1 at 49.)  As explained previously, the government did not need to prove that the defendant overcame Jane's resistance, or that Jane did not want to travel.  The evidence showed that the defendant arranged for Jane to enroll in virtual schooling, and for Juice's mother to serve as her legal guardian.  (T. Tr. 862-68.)  The defendant paid for Jane to travel back to Chicago. She subsequently traveled with the defendant from city to city for his shows.  (T. Tr. 868-70.) Accordingly, a reasonable jury could find that the defendant persuaded, coerced, induced or enticed Jane to travel to California.

In his challenge to Racketeering Act 9C, the defendant also asserts that there was no "nexus between the use of a facility of interstate commerce (a cell phone, computer) and the words of persuasion, entice, or coercion."  (ECF No. 273-1 at 50.)  However, when the defendant enticed Jane to travel from New York to California in October of 2015, she used interstate highways, including I-80, which courts recognize as a facility of interstate commerce.  (Tr. 2728); *see, e.g.*, *United States v. D'Souza*, No. 09-CR-131, 2012 WL 487638, at *2 (E.D. Cal. Feb. 7, 2012) (noting that an interstate highway is an example of an interstate commerce facility in a Mann Act case); *cf. United States v. Daley*, 564 F.2d 645, 649 (2d Cir. 1977) (noting that "an interstate highway, [] is an instrumentality of interstate commerce" for purposes of the Hobbs Act).  A reasonable juror could therefore conclude that the defendant used facilities of interstate commerce in the course of his criminal conduct involving Jane.

With respect to Racketeering Act 9D (18 U.S.C. § 2423(a)), the defendant argues that his "purpose in traveling to California was to perform and he arranged for his girlfriend to go with him," and any sexual activity was "purely incidental to the purpose of the trip."  (ECF No. 273-1 at 50.)  Jane testified that she and the defendant had "sex almost every day" in the summer of 2015, and that they had sexual contact while traveling on tour.  (T. Tr. 844, 872.)  The jury was

entitled to rely on Jane's testimony, as well as testimony from the defendant's other sexual partners, and conclude that sexual activity was the defendant's significant or motivating purpose when he arranged Jane's travel with him.

       7.     Forced Labor

Racketeering Acts 6 (Jerhonda), 11 (Jane) and 13 (Faith) charged the defendant with forced labor. *See* 18 U.S.C. § 1589(a) ("Whoever knowingly provides or obtains the labor or services of a person . . . (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished."). To convict the defendant of forced labor, the government must prove: "(1) the defendant obtained the labor or services of another person; (2) the defendant did so . . . (a) through threats of serious harm to, or physical restraint against that person or any other person; or (b) through a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to, or physical restraint against, that person or any other person; . . . and (3) that the defendant acted knowingly." *United States v. Sabhnani*, 539 F. Supp. 2d 617, 629 (E.D.N.Y. 2008), *aff'd*, 599 F.3d 215 (2d Cir. 2010). "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

The defendant makes multiple attacks on the evidence supporting the jury's verdict on Racketeering Acts 6 (Jerhonda), 11 (Jane) and 13 (Faith).  The theme of these attacks is that there was no evidence that the defendant coerced his victims to do what was charged in the forced labor racketeering acts.  In fact, victims' testimony provided a rational basis for the jury's conclusion that the defendant was guilty of the charges.  Moreover, the jurors had a larger context in which to place the testimony of the individual victims.  Not only did the victims support one another's testimony, the additional evidence that the jurors heard corroborated what the victims described.  Thus, they heard and saw vivid evidence of the defendant's means and methods of domination and control: a videotape in which he forced Anna to walk back and forth, completely naked, calling herself "slut" and "stupid," while the defendant smacked her (T. Tr. 2845-46, 2852-55, 3018-19; GX 328(a), 328(b)); an audiotape in which the defendant, convinced that Kyla had stolen from him, ordered her to describe what she had done, berated her for "holding back" on a videotape and then directed her to go to the closet in his garage and said, "When I come and get you this time, you better be fucking like you're supposed to fuckin' be." (GX 485.)  The defendant's employees, too, were well-aware of what the defendant did to his victims, as evidenced by the text exchanges between the Mayweather sisters, describing the defendant's treatment of Jane.  (T. Tr. 2014-19, 2053-55; GX 240(b), 240(d).)  In short, the evidence supporting the charges was more than sufficient to establish the defendant's guilt, and his attacks on that proof are nothing more than disagreements with the jury's resolution of the evidence.  Nevertheless, I address each claim in turn.

As to Racketeering Act 6, the defendant argues that the government "did not establish a causal link between the isolated act of oral sex" with Jerhonda "and any threat of physical violence."  (ECF No. 273-1 at 33.)  As explained multiple times in this opinion, Jerhonda, like

other witnesses, testified that the defendant required her to follow his rules (T. Tr. 132, 163-64), that he severely punished her when she broke them (T. Tr. 148-49), slapped her when she disagreed with him (T. Tr. 166-67), and when she questioned his direction to use a sex toy on him (T. Tr. 167-68), ordered her to write a letter to "gain[] his trust," in which she falsely admitted that she stole one hundred thousand dollars' worth of jewelry. (T. Tr. 150-51.)

And in January 2010, the defendant was "angry" that Jerhonda did not greet him. (T. Tr. 176.) He "slapped" her, choked her into unconsciousness, "spit" on her face and told her to "put [her] head down in shame." (*Id.*) Finally, he forced her to perform oral sex on him and ejaculated on her face. (T. Tr. 177.) The graphic testimony about the defendant's rules and the consequences of breaking them obviously gave the jury a reasonable basis to infer that Jerhonda complied with the defendant's orders because she feared that he would hurt her if she disobeyed. *See United States v. Toure*, 965 F.3d 393, 402 (5th Cir. 2020) (finding sufficient evidence that the defendant committed forced labor in part because he "employed violence as a consequence for [the victim's] noncompliance with . . . demands").

Citing *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), the defendant also contends that the forced labor statute does not encompass the conduct alleged in Racketeering Act 6 because it "bear[s] virtually no resemblance to those paradigmatic forced labor cases and their victims." (ECF No. 273-1 at 34.) *Toviave* is an entirely different case. There, the Sixth Circuit held that "forcing children to do household chores" was not "forced labor" within the meaning of the statute, because such an interpretation would "make a federal crime of the exercise of . . . widely accepted parental rights." *Toviave*, 761 F.3d at 625. The court described the defendants' conduct as more akin to child abuse, which is "traditionally regulated by the states," *id.* at 627, and noted the obvious distinction between household chores and

"paradigmatic forced labor, such as prostitution, forced sweatshop work, or forced domestic service." *Id.* at 626. The defendant had no similar "right" to order Jerhonda to engage in sexual activity, and his conduct—physical and psychological coercion intended to make her submit—is not traditionally addressed by state law.[42] Accordingly, the forced labor statute covers the defendant's conduct as alleged in Racketeering Act 6. *See Marcus v. United States*, No. 14-CV-5780, 2015 WL 3869689, at *20-21 (E.D.N.Y. June 22, 2015) (distinguishing *Toviave*, and finding that the forced labor statute applied where the defendant forced the victim, a former sexual partner, to work on a website and punished her with extreme sex acts).[43]

The defendant also attacks the proof that he committed the crimes charged in Racketeering Act 11, asserting that the "record is devoid of any evidence that Jane was forced within the meaning of the statute to have sex with individuals other than the Defendant." (ECF No. 273-1 at 52.) Jane testified about the defendant's rules—that he dictated the way she dressed, whether she could talk to or even look at other men, how she was required to greet him, whether she could use her phone, among other things. (T. Tr. 810, 840, 855-56.) Just as he did with other victims, the defendant exacted punishment or "chastisements," when 17 year-old Jane stepped out of line: trapping her for days inside a tour bus while his minions stood guard, spanking her so hard that he left bruises and torn skin, beating her with his shoe until she "broke," forcing her to repeat lies about her family, and degrading her in the most egregious

---

[42] Because the defendant exerted both physical and psychological control over Jerhonda, the fact that she was physically able to leave the defendant's house does not undermine the jury's findings. *See Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 439 (E.D.N.Y. 2017) (holding that forced labor does not require that victims "be kept under literal lock and key," and that the "fundamental purpose of § 1589 is to reach cases of servitude achieved through nonviolent coercion").

[43] The defendant also argues that the forced labor statute does not reach "isolated acts" of labor or service. (ECF No. 273-1 at 60.) But the plain language of the statute does not require multiple acts, and the Court declines to read that requirement into the statute. *See United States v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010) (holding that a single act was sufficient to support the defendant's conviction for conspiracy to commit forced labor).

ways, including forcing her to eat her own feces.  (T. Tr. 909-16, 931-32, 991-99.)  Jane

explained that the defendant "chastised" her "nearly every two to three days."  (T. Tr. 910-11.)

Jane was not the defendant's only victim.  She was witness to his assault on his other

"live-in girlfriends" (T. Tr. 970), and realized that she "needed to listen even more because that

could also happen to [her]."  (T. Tr. 925.)  Given the control—both physical and psychological—

that the defendant exerted over Jane, it would have been rational for the jury to conclude that the

defendant forced her into sexual contact with other women and men, even in the absence of

testimony.  (T. Tr. 955-65.)  But she did testify that the defendant forced her into these

encounters, testimony that the jury was entitled to credit.  She explained that when she resisted

the defendant's direction to have sex with women, the defendant "usually chastised" her by

spanking her.  (T. Tr. 966-67.)  She also testified that the defendant forced her to have sex with

"Nephew" as "punishment" for violating one of the defendant's rules—sharing personal

information with another victim living with the defendant—and that she did not resist because

she would "probably be left somewhere for a long time" or have "gotten chastised."  (T. Tr.

1034-37, 1047-48, 1050.)  In short, this evidence, as well as the evidence of the defendant's

pattern of behavior with other victims, gave the jury ample reason to find that the defendant was

guilty of Racketeering Act 12.

Next, the defendant attacks the proof regarding Racketeering Act 13, which, according to

the defendant, did not establish "a causal link between the isolated act of oral sex" by Faith and

"any threat of physical violence."  (ECF No. 273-1 at 60.)  The jury found otherwise, and there

was a rational basis for its decision.  Just as he did with other victims, the defendant told Faith

about the "rules" that the "group of women that [he] raised" were required to follow, including

that the women needed to greet the defendant in a certain way upon entering a room.  (T. Tr.

2197-98, 2200-01.)  The defendant introduced Faith to one of these young women, Joy, who greeted the defendant by calling him "Daddy" and kissing him and repeatedly complimenting Faith, before the three of them went to the Sprinter van.  (T. Tr. 2202-06.)  When Faith tried to leave the van to use the bathroom, Joy told her, "You have to ask."  (T. Tr. 2208-10.)  She finally was permitted to use the bathroom, but the defendant's employee Copeland followed her and waited outside the stall.  (T. Tr. 2210-11.)

When Faith went to Los Angeles in January 2018, the defendant kept her waiting in a van and in his studio for hours without food or water because she did not greet him properly when he first saw her.  (T. Tr. 2220, 2230-32.)  After he finally arrived, he led Faith to a small room in the studio, where she saw a gun on an ottoman.  (T. Tr. 2249-50.)  The defendant's "demeanor changed," and he "got real serious," moving the gun so that it was next to him, ordering Faith to "pose" while he took pictures with his iPad, and becoming irritated because she was "not being sexy enough."  (T. Tr. 2250-51.)  He grilled her about her relationships with men, how many male friends she had, and how many had "seen [her] naked."  (T. Tr. 2251.)  The defendant moved the gun to his chair, ordered Faith to get on her knees, "grabbed the back of [her] neck forward," and instructed her to perform oral sex on him.  (T. Tr. 2252.)  Faith, "[i]ntimidated" because the defendant was "unpredictable," did not think she could leave because she "was under his rules and he had a weapon."  (T. Tr. 2252-54.)  The jurors were entitled to conclude from this evidence that the defendant obtained oral sex from Faith by means of an implied threat of force, or a pattern of conduct that was intended to cause her to believe that non-performance would result in serious harm.

### b.    Other Counts

The defendant challenges the sufficiency of the evidence as to Counts Two through Nine. As noted throughout this order, these counts correspond to certain predicate acts.  As explained

above, because there is sufficient evidence establishing each predicate act, there is also sufficient

evidence of Counts Two through Nine.

## II.     Motion for a New Trial

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any

judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  The

court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a

perceived miscarriage of justice," but that discretion should be exercised "sparingly and in the

most extraordinary circumstances."  *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir.

2001) (internal quotation marks and citation omitted); *see also United States v. Gambino*, 59

F.3d 353, 364 (2d Cir. 1995) ("Because motions for a new trial are disfavored in this Circuit the

standard for granting such a motion is strict.").  "In considering whether to grant a new trial, a

district court may itself weigh the evidence and the credibility of witnesses, but in doing so, it

must be careful not to usurp the role of the jury."  *United States v. Canova*, 412 F.3d 331, 348-49

(2d Cir. 2005).  The court should grant a Rule 33 motion only if "letting a guilty verdict stand

would be a manifest injustice," because of "a real concern that an innocent person may have

been convicted."  *Ferguson*, 246 F.3d at 134 (internal quotation marks and citation omitted).

The defendant's arguments provide no basis for this extraordinary relief.

### a.     Ineffective Assistance of Counsel: *Voir Dire*

The defendant attacks the performance of his trial lawyers during the *voir dire* process;

finding fault with eight of the 12 regular jurors, and with one alternate juror who did not

deliberate, the defendant claims that his counsel did not do a meaningful *voir dire* of potential

jurors, and should have "probe[d]" more by asking additional questions and challenging certain

jurors as unqualified.  (ECF No. 270-1 at 6-8.)  This argument fails for multiple reasons.

A defendant claiming that his lawyer was ineffective must meet the two-pronged test articulated in *Strickland v. Washington*: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. 668, 694 (1984).

Under the first prong of *Strickland*, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  "[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy."  *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)).

Selecting a jury and strategy are "inseparable."  *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002); *see also Ciaprazi v. Senkowski*, 151 F. App'x 62, 63-64 (2d Cir. 2005) (recognizing that whether to seat a particular juror is a "paradigmatically strategic" decision). Counsel has to evaluate not only the juror's words but must assess the juror's credibility by considering her demeanor, her reactions to questions, and other intangible factors that a cold record will not reflect.  In addition, counsel must make judicious use of peremptory challenges, as well as compare jurors with one another in an effort to select the best jurors for his client.  For these reasons, "courts are loathe to second-guess the decisions of counsel during jury selection." *Ptak v. Superintendent*, No. 08-CV-409, 2009 WL 2496607, at *8 (W.D.N.Y. Aug. 13, 2009) (citing *Doleo v. Reynolds*, No. 00-CV-7927, 2002 WL 922260, at *5 (S.D.N.Y. May 7, 2002)).

80

"It is not the role of the court to second-guess counsel's reasonable strategic decisions at jury

selection, especially considering that 'counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment.'" *Doleo*, 2002 WL 922260, at *5 (quoting *Strickland*, 466 U.S. at 690); *see also*

*Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) ("Counsel is . . . accorded particular

deference when conducting *voir dire*. An attorney's actions during *voir dire* are considered to be

matters of trial strategy."); *Bell v. United States*, 351 F. App'x 357, 360 (11th Cir. 2009)

("Review of counsel's performance is highly deferential in any case, but the case for deference is

even greater when counsel is evaluating credibility.").

To satisfy the prejudice prong of *Strickland*, the petitioner must establish "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland*, 466 U.S. at 694. "The level of prejudice the defendant need

demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more

likely than not altered the outcome in the case.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir.

2001) (quoting *Strickland*, 466 U.S. at 693). "The benchmark for judging any claim of

ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result."

*Strickland*, 466 U.S. at 686.

A defendant alleging ineffective assistance during *voir dire* "must show that the juror was

actually biased against him" in order to show prejudice. *Figueroa v. Heath*, No. 10-CV-121,

2011 WL 1838781, at *12 (E.D.N.Y. May 13, 2011); *see Beard v. Unger*, No. 06-CV-405, 2009

WL 5042696, at *4 (W.D.N.Y. Dec. 15, 2009) ("In order to establish that trial counsel was

ineffective for failing to challenge a prospective juror on *voir dire,* actual bias must be

established.").  "Actual bias is 'bias in fact,'" or "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres,* 128 F.3d 38, 43 (2d Cir. 1997).  Actual bias can be found where "the juror admits partiality," or where partiality can be inferred from "the juror's *voir dire* answers." *Id.*

The defendant falls far short of this exacting standard.  The record shows that the lawyer who conducted the *voir dire*—a lawyer with years of criminal trial experience in both state and federal courts—participated actively in the process.  Before the Court questioned the prospective jurors, counsel went through the questionnaires, and made decisions about which jurors were appropriate to question, and which to challenge for cause.  Once the oral *voir dire* began, counsel demonstrated a thorough knowledge of the information in questionnaires, and frequently asked that the Court pose additional questions to prospective jurors.  (*See, e.g.*, J.S. Tr. 41, 46, 54, 129, 169, 180, 215, 223, 242, 261, 270, 296, 301, 309, 315-17, 327, 397.)  He successfully challenged prospective jurors for cause over the government's objection (*see, e.g.*, J.S. Tr. 130-34, 282-83, 424-25, 429-30), and made *Batson* challenges to the government's use of peremptory challenges. (J.S. Tr. 435-47.)  He also exercised peremptory challenges when he deemed it appropriate.  (J.S. Tr. 434-57.)  This "active participation in *voir dire* indicates that any decisions to challenge (or not to challenge) jurors were made as part of a reasonable trial strategy, rather than as a result of counsel's failure to provide effective assistance." *Figueroa*, 2011 WL 1838781, at *11; *see Parsons v. Artus*, No. 06-CV-6462, 2020 WL 2572739, at *39 (W.D.N.Y. May 21, 2020) (finding that decision to seat juror was "part of a reasonable strategic approach to selecting a jury" where "counsel actively participated in *voir dire* and asserted a *Batson* challenge").

Not only does the record thoroughly refute the defendant's argument on ineffectiveness, it is also clear that the defendant has not established that any juror was actually biased, let alone all nine about whom the defendant complains.

The defendant claims, nevertheless, that counsel was obligated to challenge any juror who had watched "Surviving R. Kelly," a documentary about the defendant, or who had heard something about the defendant's prior criminal prosecution.  (ECF No. 270-1; ECF No. 283.)  But "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved," and "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *York v. Fischer*, No. 04-CV-1467, 2006 WL 6461993, at *9 (E.D.N.Y. July 21, 2006) (quoting *Murphy v. Florida,* 421 U.S. 794, 799-800 (1975)).  Each juror confirmed his or her ability to render a fair impartial verdict.

Moreover, none of the challenges the defendant asserts on appeal would have warranted granting a challenge for cause.  In an excess of caution, however, I address the defendant's complaints about individual jurors.

### i.   Juror No. 3 (Prospective Juror No. 25)

Citing just a portion of Juror No. 3's questionnaire, the defendant argues that counsel should have challenged the juror for cause because the juror said, in response to questions about whether he had heard of the defendant and his "impressions" of what he had heard, that he "heard that [the defendant] has been sleeping with underage girls," and that had "[seen] a documentary about him and his legal troubles."  (ECF No. 270-1 at 9; ECF No. 290-1 at 62.)  However, the juror also wrote the following: "I don't know the full story, so I have no feelings about it.  I remain impartial."  (ECF No. 290-1 at 62.)  The juror observed, "The media tends to demonize people.  I deal with facts."  (*Id.* at 63.)  During the in-person *voir dire*, he identified himself as "a stickler for the law," and a "rule guy" and confirmed that there was no reason why

83

he would not be able to give both sides a fair trial.  (J.S. Tr. 63.)  No experienced lawyer would have expected a challenge for cause to be successful—it would not; nor was there any nonstrategic reason to exercise a peremptory challenge.[44]

ii.     *Juror No. 4 (Prospective Juror No. 52)*

In the questionnaire, Juror No. 4 wrote that he "[found] transmission of STDs in a nonconsensual act to be particularly repulsive," and had a "close friend" who had been a victim of "sexual assault and infection with HIV from the police in a foreign country."  (ECF No. 290-1 at 120, 124.)  He also wrote, in response to a question, that Jeffrey Epstein was the person he least admired.  (*Id.* at 129.)  The defendant argues that his trial counsel should have "inquire[d] further," and questioned the juror about these responses on the theory that his statements reflected an aversion to "precisely" what the government charged.  (ECF No. 270-1 at 9-10.)

As an initial matter, a juror is not inherently biased simply because he finds "transmission of STDs in nonconsensual circumstances" objectionable.  Presumably, most normal jurors would feel the same way.  What counsel had to determine was whether the juror could evaluate the evidence fairly and dispassionately, and hold the government to its burden of proof.  In this case, the juror's answers were in the context of an attack on close friend by the police in another country.  (ECF No. 290-1 at 124.)  During the *voir dire*, at which counsel could evaluate the juror in person, the juror said that he understood that he must base his decision on the "evidence, testimony and [the Court's] instructions on the law," an assurance that counsel was entitled to credit.  (J.S. Tr. 78-79); *see Figueroa*, 2011 WL 1838781, at *9 (holding that trial counsel's decision not to challenge a juror in a drug case, who initially expressed concerns because of her family's history with drug addiction, was reasonable where she later affirmed her ability to be

---

[44] As the government points out, this juror also expressed negative feelings about law enforcement, stemming from two arrests.  (ECF No. 277 at 18.)

fair and impartial).  The juror did not seem to be familiar with the defendant—although he had

"heard the name" and "seen news articles," he initially thought the defendant might be a

cartoonist, and he had to "remind [himself] who it was."  (J.S. Tr. 74, 78.)  Under these

circumstances, counsel's strategic choice does not form the basis for a credible ineffective

assistance claim.[45]

> iii.   *Juror No. 5 (Prospective Juror No. 87)*

The defendant claims that trial counsel should have challenged Juror No. 5 because she

wrote that her "impression" of the defendant was that he "love[s] underage girls."  (ECF No.

270-1 at 10-11; ECF No. 290-1 at 146.)  This claim is based on an incomplete reading of the

record.  During the in-person *voir dire*, the Court asked the juror if she could "put aside anything

that [she'd] heard about the case," and "judge it on the evidence that [she] hear[s] in the

courtroom," the juror responded that she could, and promised to follow the law and the Court's

instructions.  (J.S. Tr. 91-93 (THE COURT: "And is there any reason that you can think of that

you couldn't give both sides a fair trial in this case?" JUROR #5: ". . . I think I'll give it a

shot.").)  (J.S. Tr. 93; ECF No. 270-1 at 11.)  The Court asked again, "Any reason why you can't

give both sides a fair trial?"  (J.S. Tr. 94.)  The juror responded, "I don't think so."  (J.S. Tr. 94.)

The Court clarified, "What I want to hear is how you actually feel about it," and the juror

responded, "Yeah, I think I can do that."  (J.S. Tr. 94-95.)  The Court asked if the juror was

"positive" she could give both sides a fair trial; she said that she could.  (*Id.*); *see Beard*, 2009

WL 5042696, at *5 (finding no actual bias where juror was asked whether his experience as a

police officer would carry over into the trial, and he responded, "I would certainly like to be able

to say that it wouldn't and I would certainly do my best to see that it did not").

---

[45] This juror, too, had negative views about law enforcement.

iv.   *Jurors No. 7 (Prospective Juror No. 145), No. 8 (Prospective Juror No. 147), No. 9 (Prospective Juror No. 156) and No. 11 (Prospective Juror No. 153)*

For other jurors who had heard about the case or about the defendant, the defendant criticizes counsel because he did not ask the Court to question them about what they had heard. (ECF No. 270-1 at 11-12.)  This simply is not a basis for a challenge to counsel's competence, especially given what the jurors said.  As explained above, jurors "need not . . . be totally ignorant of the facts and issues involved" as long as "the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court."  *York*, 2006 WL 6461993, at *9.  Like all the jurors whom the defendant criticizes, these jurors all confirmed that they could be fair.

Thus, Juror No. 7 had a "Neutral" impression of the defendant, and explained that "[m]ost of the information you hear about celebrities are not always true.  It's mainly either for or against the person."  (ECF No. 290-1 at 203.)  At the in-person *voir dire*, she confirmed that she could put aside what she had heard, and affirmed her fairness and impartiality.  (J.S. Tr. 152-55.)  Juror No. 8 had a "Neutral" impression of the defendant and "no feeling toward the defendant."  (ECF No. 290-1 at 231.)  He confirmed that he would put aside anything he heard, would follow the court's instructions, and be fair and impartial.  (J.S. Tr. 156-58.)  In any event, Court elicited some information about what Juror No. 8 had heard about the defendant.  (*See* J.S. Tr. 156-57.)

Although Juror No. 9 knew the defendant "had issues with the law before," she "couldn't tell [] exactly what for."  (ECF No. 290-1 at 286.)  She also had a "Neutral" impression of the defendant.  (*Id.* at 287.)  The defendant cites her answer about the effect of the "Me Too" movement—that "[t]he power structure of the male dominated movie industry has been turned on its head"—as something that warranted further inquiry.  (ECF No. 270-1 at 12; ECF No. 290-

86

1 at 298.)  The defendant's contention is unavailing for two reasons.  First, the juror had never

supported or participated in the movement.  (*Id*.)  Second, during in-person *voir dire*, the juror

assured the Court that she would put aside what she had heard about the defendant's prior legal

issues, and promised to be fair and impartial.  (J.S. Tr. 175-77.)[46]

       Juror No. 11 "saw the case mentioned on the news when [the defendant] was first being

investigated," and knew "there were allegations of misconduct lodged against him."  (ECF No.

290-1 at 258.)  However, she had a "Neutral" impression of the defendant and "[did] not know

enough information about the defendant or the case."  (*Id*. at 259.)  She promised to put aside

what she had heard, and affirmed that she would be fair and impartial.  (J.S. Tr. 220-25.)

       *v.*     *Juror No. 12 (Prospective Juror No. 163)*

       In answering what he had heard about the defendant, Juror No. 12 wrote in the

questionnaire that he had heard about "sex with minors, specific details do not come to mind,

parodies on TV regarding details of defendant's personal life (Saturday Night Live, Dave

Chapelle), was in jail prior then released."  (ECF No. 290-1 at 314.)  The defendant faults trial

counsel for not asking the Court to question the juror about these responses.  (ECF No. 270-1 at

12-13 ("It is beyond comprehension that trial counsel would not have sought to inquire further of

this juror about his prior knowledge about allegations against Defendant . . . .").)

       The juror had a "Somewhat Negative" impression of the defendant, which was "an

emotional one impacted by the nature of the charges against him."  (ECF No. 290-1 at 315.)  In

another part of the questionnaire, the juror stated that because his friend was related to Bill

Cosby, he had followed Cosby's case "closely."  (*Id*. at 321.)  The juror believed that "trial by

media is scarier to me than a jury."  (*Id.*)  During the in-person *voir dire*, the juror explained that

---

[46] Juror No. 9 had a relative who had been convicted of a crime.

he had heard "minor things in the press," and could not "recall any specific details;" in fact, he learned of some "accusations" through the questionnaire.  (J.S. Tr. 227.)  In any event, he promised to put aside whatever he had heard (J.S. Tr. 227-28), and to follow the Court's instructions and give both sides a fair trial.  (J.S. Tr. 231-32.)

> vi.    *Alternate Juror No. 4 (Prospective Juror No. 206)*

Since Alternate Juror 4 was precisely that—an alternate, whose "presence had no effect on the verdict" *United States v. Teman*, 465 F. Supp. 3d 277, 331 (S.D.N.Y. 2020)—there is no reason to address the particulars of the defendant's complaint, except to point out that counsel did ask the Court to excuse the juror after she told the Court's deputy that she wanted Gloria Allred's autograph.  (T. Tr. 3265-66); *see United States v. Hill*, 643 F.3d 807, 836 (11th Cir. 2011) (finding that the defendant "cannot prove that he was prejudiced by the district court's failure to exclude [the allegedly biased juror] because [she] was an alternate juror who never participated in the jury's deliberations").[47]

"There are countless ways to provide effective assistance in any given case."  *Strickland*, 466 U.S. at 689.  The defendant's criticisms of counsel, viewed collectively or independently, are precisely the kind of "Monday morning quarterbacking" that *Strickland* rejected.  *See DiMattina v. United States*, 949 F. Supp. 2d 387, 414 (E.D.N.Y. 2013) ("Perceptive Monday morning quarterbacking . . . does not trump well-reasoned, on-the-scene decision-making."); *United States v. Peterson*, 896 F. Supp. 2d 305, 315 n.7 (S.D.N.Y. 2012) ("In applying the

---

[47] In an effort to demonstrate that he did not acquiesce in counsel's strategic decisions, the defendant submits a declaration, in which he claims that counsel did not consult with him, that he expressed concerns that certain jurors watched "Surviving R. Kelly" (simultaneously claiming that he did not know they had seen the show), and that he was merely a "bystander" during *voir dire*.  (ECF No. 283 at 4; ECF No. 283-1.)  The defendant raised none of these concerns during jury selection, and does not include a declaration from any of the four lawyers who represented him.  In any event, counsel's decisions were well within the realm of sound trial strategy, and the defendant has not come close to establishing bias.

*Strickland* test . . . courts must resist a natural temptation to engage in 'Monday morning quarterbacking.'" (quoting *Mui v. United States*, 614 F.3d 50, 57 (2d Cir. 2010))).

### b.    Conflict of Interest

The defendant argues that he is entitled to a new trial because "he was denied his Sixth Amendment constitutional guarantee of conflict-free counsel." (ECF No. 270-1 at 17.) This claim has no merit. The Court held a *Curcio* hearing after the government advised the Court that Ms. Blank Becker might have a conflict. The defendant does not claim that the hearing was deficient. Nor does he deny that the Court appointed competent counsel to advise the defendant, that the evidence established that the defendant was capable of making a knowing and intelligent waiver, or that he waived the conflict. (*Curcio* Tr. 32-47.) The defendant also does not deny that, as part of that waiver, he acknowledged that he was "giving up the right to have [Ms. Blank Becker] represent [him] without a conflict of interest," and that he could not "later claim that [his] lawyer, Ms. [Blank] Becker, wasn't an effective lawyer because she had these conflicts or potential conflicts." (*Id*. at 46.) Nevertheless, the defendant now asserts that the conflict that he explicitly waived—Ms. Blank Becker's possible attorney-client relationship with Jane—was not waivable. According to the defendant, the supposedly unwaivable, *per se* conflict was Ms. Becker's "communicat[ion] about the case with the government's key witness, notwithstanding that the witness had her own counsel and did not consent to the communications," which subjected Ms. Becker to "accusations of misconduct."[48] (ECF No. 270-1 at 20.)

"The right to counsel under the Sixth Amendment encompasses 'a correlative right to representation that is free from conflicts of interest.'" *United States v. Lewis*, 850 F. App'x 81, 82 (2d Cir. 2021) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). "When a district court

---

[48] There is no basis for the defendant's claim that Ms. Blank Becker could have been accused of "an attempt to influence a government witness on behalf of her client." (ECF No. 270-1 at 20.)

is sufficiently apprised of even the possibility of a conflict of interest"—as the Court was here—
it "must investigate the facts and details of the attorney's interests to determine whether the
attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all."
*United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994).  If the Court finds that defense counsel
has a "genuine conflict, it has to determine whether the conflict is so severe as to require the
attorney's disqualification or whether it is a lesser conflict that can be waived in a *Curcio*
hearing."  *United States v. Arrington*, 941 F.3d 24, 40 (2d Cir. 2019).

The defendant may knowingly and intelligently waive his right to conflict-free counsel
"[i]n most cases where a defendant's attorney has a conflict;" only "[i]n rare cases" is "an
attorney's conflict . . . unwaivable."  *Id.*; *see also United States v. Perez*, 325 F.3d 115, 127 (2d
Cir. 2003) (recognizing that attorney's conflict is unwaivable if "no rational defendant . . . would
have knowingly and intelligently desired that attorney's representation" (alternations omitted)).
The Second Circuit has found "*per se*" conflicts of interest "only where trial counsel is not
authorized to practice law and where trial counsel is implicated in the same or closely related
criminal conduct for which the defendant is on trial."  *United States v. Williams*, 372 F.3d 96,
103 (2d Cir. 2004) (internal quotation marks omitted); *United States v. Marley*, No. 16-CR-374,
2022 WL 1210844, at *5 (S.D.N.Y. Apr. 25, 2022) ("A *per se* conflict exists only where trial
counsel is not authorized to practice law or is implicated in the very crime for which his client is
on trial.").

The fact that Ms. Blank Becker's contact with the witness might have subjected her to
claims of professional misconduct—a subject that the Court explored thoroughly at the *Curcio*
hearing—does not make the conflict unwaivable.  As explained in *Fulton*, "[t]he *per se* rule
applies when an attorney is implicated in the crimes of his or her client since, in that event, the

attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993). But "the *per se* rule does not apply any time a court learns that an attorney may have committed a crime; the attorney's alleged criminal activity must be sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of [her] client will be compromised." *Id*. As the Court explained at the *Curcio* hearing, Ms. Blank Becker's communications with Jane in 2019, knowing she was represented by another attorney, could have been an ethical violation. But that is neither a crime nor sufficiently related to the crimes with which the defendant was charged—RICO and Mann Act violations committed in 2018 and earlier—to constitute a *per se* conflict.

Next, the defendant asserts that Ms. Blank Becker "suffered from an actual conflict of interest that could not be waived" because she had previously represented Jane, and "[t]hat conflict was imputed to her trial partners."[49] (ECF No. 270-1 at 21.) The defendant cites *United States v. Stein*, in which the court held that "an attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences." 410 F. Supp. 2d 316, 325 (S.D.N.Y. 2006) (alterations omitted). But the lawyers in that case were part of the same "small tax firm." *Id.* The lawyers in this case were not partners, they did not work in the same firm, and there is no evidence that Ms. Blank Becker shared any confidential information with the other lawyers. "[N]o presumption of confidence sharing arises between a law firm that received confidential information and a separate firm serving as co-counsel with it." *Benevida Foods, LLC v. Advance Mag. Publishers Inc.*, No. 15-CV-2729, 2016 WL

---

[49] The defendant's reference to Ms. Blank Becker's "simultaneous representation of Defendant and government witness, Jane" is inaccurate. (ECF No. 283 at 7.) As the Court found, Jane "never formally retained" Ms. Blank Becker (*Curcio* Tr. 32), and nothing in the record suggests she represented Jane at the time of the trial.

3453342, at *12 (S.D.N.Y. June 15, 2016) (internal quotation marks omitted); *see Anwar v. United States*, 648 F. Supp. 820, 827 (N.D.N.Y. 1986), *aff'd*, 823 F.2d 544 (2d Cir. 1987) (finding that conflict was not imputed to co-counsel where the evidence did not "indicate a general partnership relationship between [the attorneys] extending beyond the representation of petitioner himself").

The defendant was represented by four lawyers, three of whom had no conflict or potential conflict. Ms. Blank Becker's conflict related only to Jane, whom Ms. Blank Becker did not cross-examine. Mr. Cannick, lead trial counsel, cross-examined Jane. (T. Tr. 1073-1221.)

In short, to the extent that Ms. Blank Becker had an actual conflict of interest, that conflict was clearly waivable. *See Anwar*, 648 F. Supp. at 826 ("Whenever a defense attorney has previously represented an important government witness who testifies against [her] client, the possibility of a conflict of interest exists."); *Perez*, 325 F.3d at 127 ("[L]esser conflicts, such as an attorney's representation of two or more defendants or [her] prior representation of a trial witness, are generally waivable"); *United States v. Basciano*, 384 F. App'x 28, 34 (2d Cir. 2010) (affirming district court's refusal to order a new trial based on lead defense counsel's "conflict of interest arising from his previous representation of a cooperating witness for the government," where the defendant waived the conflict).

### c.    Evidentiary Rulings

The defendant also challenges the Court's evidentiary rulings, and claims that the Court permitted "irrelevant and excessive bad character evidence" that was minimally probative and unduly prejudicial. (ECF No. 276-1 at 2.) Specifically, the defendant challenges the Court's admission of (1) Angela's testimony that she saw the defendant perform oral sex on Aaliyah, (2) evidence that defendant exposed other women to herpes, (3) testimony by Addie, Alexis, Kate, Anna, Angela, Louis and Alex and (4) the defendant's video recordings of sexual activity

92

involving the defendant, Alex, Dominique and Anna.  (*Id.* at 4-11.)  The defendant also contends

that his lawyers did not adequately challenge the introduction of some of this evidence.  (*Id.* at 2-

3, 6, 8, 10-11.)  As explained below, none of the defendant's arguments has any merit, let alone

warrants a new trial.

Under the Federal Rules of Evidence, evidence is admissible only if it is relevant.  Fed.

R. Evid. 402.  Evidence is relevant if "it has any tendency to make a fact more or less probable

than it would be without the evidence," and "the fact is of consequence in determining the

action."  Fed. R. Evid. 401.  Under Rule 403, evidence that is relevant may nevertheless be

excluded "if its probative value is substantially outweighed by a danger of one or more of the

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  In applying Rule 403, the

court "conscientiously balance[s] the proffered evidence's probative value with the risk" of the

enumerated dangers.  *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006).

As a general matter, although evidence of "any other crime, wrong, or act" cannot be

used to show a person's bad character, it is admissible to prove other purposes, including motive,

opportunity and intent, among other things.  *See* Fed. R. Evid. 404(b)(1), (2); *United States v.

Cadet*, 664 F.3d 27, 32 (2d Cir. 2011).  Thus, the Second Circuit "follows the 'inclusionary'

approach to 'other crimes, wrongs, or acts' evidence, under which such evidence is admissible

unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it

is overly prejudicial under Fed. R. Evid. 403 or not relevant under Fed. R. Evid. 402."  *United

States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (internal citations omitted).

Moreover, evidence of other crimes or acts can be admitted without reference to Rule

404(b) if it is direct evidence of the existence of a RICO enterprise, if it is inextricably

intertwined with the evidence regarding the charged offense or if it provides necessary background to the charged offenses. *See United States v. Rivera*, No. 13-CR-149, 2015 WL 1875658, at *2 (E.D.N.Y. Apr. 22, 2015) ("When a defendant has been charged with racketeering offenses, it is well settled that 'the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise.'" (quoting *United States v. Baez*, 349 F.3d 115, 120 (2d Cir. 2007))); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under [Rule 404(b)] if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997))).  The admissibility of the evidence for these additional purposes must also meet the Rule 403 requirement that its probative value outweigh the danger of unfair prejudice.  *See United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012).

i.   *Angela's Testimony about Sexual Contact Between the Defendant and Aaliyah*

The defendant argues that the Court should have excluded Angela's testimony that she saw the defendant perform oral sex on Aaliyah in 1992 or 1993, when Aaliyah was 13 or 14 years old.  (ECF No. 276-1 at 8-9; T. Tr. 3298.)

Angela's testimony was relevant to the bribery charge in Racketeering Act 1 and was not barred by Rule 404(b).  *See* Fed. R. Evid. 403, 404(b).  In particular, evidence that the defendant had a sexual relationship with Aaliyah was evidence of his motive in connection with the bribery case.  The government asserted that the defendant concocted the plan to marry Aaliyah—which could only be accomplished by bribing the official—in order to keep secret his sexual relationship with a young teenager.  Thus, testimony from a witness who actually saw them having sex was relevant.  Nor was the testimony's probative value substantially outweighed by a

94

risk of unfair prejudice, as evidence of the defendant's sexual contact with Aaliyah was no more inflammatory than the charged offenses. *See* Fed. R. Evid. 403; *Rivera*, 2015 WL 1875658, at *3 ("Evidence shall be excluded as unfairly prejudicial when it is 'more inflammatory than the charged crime.'" (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999))).

The defendant contends that the government established the defendant's motive for bribery in other ways, including Demetrius Smith's testimony that "[the defendant] mentioned . . . that Aaliyah was in trouble" and thought she was pregnant. (T. Tr. 692, 702; ECF No. 276-1 at 8-9.)[50] But Smith, unlike Angela, did not see the defendant having sexual contact with Aaliyah while she was a minor. As the government points out, Angela's testimony was particularly probative in view of defense counsel's refusal to concede that the defendant and Aaliyah engaged in sexual activity before their marriage. (*See* ECF No. 288 at 3-4; Aug. 3, 2021 Pre-Trial Conf. Tr. 13-14.) Therefore, Angela's testimony was admissible.

## ii.  *Evidence that the Defendant Exposed Other Women to Herpes*

As discussed above, Racketeering Acts 8 (Jane), 12 (Faith) and 14 (Faith) charged the defendant with Mann Act violations based on the defendant's exposing Jane and Faith to herpes in violation of certain state criminal and public health statutes. The defendant asserts that other evidence about the other victims the defendant exposed to herpes was "unnecessary, cumulative, and unduly prejudicial," because the defendant's physician, Dr. McGrath, testified that the defendant had herpes and about the course of treatment. (ECF No. 276-1 at 7.) Specifically, the defendant objects to the testimony that (1) the defendant had herpes before his sexual relationship with Jane and Faith, (2) that he infected Jerhonda with herpes, (3) infected Kate with

---

[50] In his motion for acquittal, however, the defendant asserts that Smith's testimony was insufficient to prove the bribery. (ECF No. 273-1 at 25-26.)

herpes and (4) infected Anna with herpes.[51]  (*Id.*)  According to the defendant, this evidence was unsupported by other theories of admissibility and therefore amounted to "rank propensity evidence."  (*Id.* at 7-8.)  The defendant is wrong.

Jerhonda testified that she contracted genital herpes in 2009 or 2010, and told the defendant about it.  (T. Tr. 172-73.)  Similarly, Kate testified that she contracted genital herpes, and told the defendant that she believed he gave her a sexually transmitted disease.  (T. Tr. 2638-39.)  Evidence that Jerhonda and Kate conveyed this information to the defendant was probative of the defendant's knowledge that he had herpes, which the government was required to establish beyond a reasonable doubt to prove Racketeering Acts 8, 12 and 14, as well as Counts 6 through 9.  (ECF No. 43 ¶¶ 22-24, 32-34, 36-38, 43-46); Fed. R. Evid. 401.

Contrary to the defendant's assertions, the record does not reflect that the defendant conceded that he had genital herpes, knew he had the disease or knowingly exposed others to the disease.[52]  During the August 3, 2021 pretrial conference the Court asked the defense if it would stipulate that the defendant knew he had herpes; the defense did not stipulate.  (Aug. 3, 2021 Tr. at 16-17 ("I don't know to what extent the defense has considered stipulating to some of this evidence.  This is regarding the transmission of . . . herpes.  . . . [T]he government is saying that this is relevant to show the defendant's knowledge of the condition, but I think some of this, if there's a stipulation about that it becomes less relevant.").)  Moreover, the defense suggested in

---

[51] Anna did not, as the defendant claims, testify that the defendant gave her herpes.  Rather, she testified that the defendant did not use protection when he had sex with her and other people, and that a doctor tested her for STDs but she never saw the results because the doctor sent them directly to the defendant's assistant, Diana Copeland.  (T. Tr. 2825-26, 2886.)

[52] The defense appears to fault the Court for admitting the very evidence that he says the government did not establish.  In his motion for acquittal, the defendant asserts that there was insufficient evidence to establish that "he was contagious or had an outbreak" when he had intercourse with Faith, or that he was "contagious, infected, or had the capacity to transmit herpes" when he had sexual contact with Jane in 2015.  (ECF No. 273-1 at 40-41, 58.)

cross-examining Drs. McGrath and Hoskins that the defendant did not have herpes, because no one had given him a blood test.[53]  Kate and Jerhonda's testimony was relevant to show that the defendant knew he had herpes, which established his knowledge for the charged offenses involving Jane and Faith.  (T. Tr. 4-5; ECF No. 255 at 8-9.)

The testimony was relevant even if counsel had stipulated, as it corroborated other victims' testimony that the defendant's practice was to have unprotected sex without disclosing his sexually transmitted disease.  The testimony was thus admissible as probative of one of the enterprise's means and methods charged in the indictment—in particular, "engaging in and facilitating sexual activity without disclosing a sexually transmitted disease [the defendant] had contracted[.]"  (ECF No. 43 ¶ 9(a)); Fed. R. Evid. 401.

The defendant faults trial counsel for not challenging "the excessive amount of herpes evidence from numerous other witnesses" (ECF No. 276-1 at 8), but does not cite any specific piece of "herpes evidence" to which his trial counsel failed to make an objection.  To the extent that he means to complain about testimony discussed above, there were multiple grounds supporting the testimony's admissibility under the Federal Rules of Evidence.  Thus, trial counsel's decision not to object to the evidence was not objectively unreasonable.  Nor can the defendant claim that the result of the proceeding would have been any different if counsel had objected, since the evidence was admissible.  *See Strickland*, 466 U.S. at 694.

iii.    *Testimony by Addie, Alexis, Kate, Anna, Angela, Louis and Alex*

The defendant also argues that the Court improperly allowed testimony by "seven additional witnesses"—Addie, Alexis, Kate, Anna, Angela, Louis and Alex—"to testify about

---

[53] Counsel asked Dr. McGrath, "Is it fair to say, Dr. McGrath, that from your experience in treating Mr. Kelly, sitting here in court today you cannot say that 100 percent he has herpes?"  (T. Tr. 439.)  In a similar effort to suggest that the defendant might not have herpes, defense counsel asked Dr. Hoskins if a blood test was "the best way to determine if a person has herpes[.]"  (T. Tr. 3074.)

graphic uncharged bad act evidence[.]"  (ECF No. 276-1 at 9.)  The defendant challenges this

witness testimony as "cumulative and unduly prejudicial," and faults trial counsel for not

"competently" objecting to it.  (*Id.* at 10-11.)  The defendant's arguments do not warrant relief

under Rule 33.

As explained at the trial and in my earlier written decision, the testimony of Addie,

Alexis, Kate,[54] Anna, Angela, Louis and Alex was admissible to show either the existence of the

enterprise, "a purpose [and] relationships among those associated with the enterprise," *Boyle*,

556 U.S. at 946, or the enterprise's means and methods as charged in the indictment.  (*See* ECF

No. 255 at 7 (Addie's testimony about the defendant's sexual contact with her while she was a

minor was evidence of one of the purposes of the enterprise—to recruit girls to have sex with the

defendant—and thus "probative of the existence of the enterprise and the way it operated" (citing

ECF No. 43 ¶ 1-4)); *id.* at 10 (Alexis's testimony about the defendant's sexual contact with her

while she was a minor was "evidence of the enterprise, its purposes and its means and

methods");[55] *id.* at 11-12 (Anna's testimony that the defendant sexually abused her was

admissible under multiple theories, including as evidence of the enterprise's purposes and means

and methods, as it "showed the defendant's control over his associates and the victims of the

enterprise"); T. Tr. 2849-50 (Angela's testimony that the defendant had sexual contact with her

was relevant to the existence of the enterprise, including because it tended to show that the

defendant's associates knew what he was doing, and because it was inextricably intertwined with

her testimony about observing the sexual encounter between the defendant and Aaliyah); ECF

---

[54] The Court properly allowed Kate's testimony about contracting herpes from the defendant for the reasons explained above.  Accordingly, the Court need not repeat that rationale here.

[55] It is unclear why the defendant cites Alexis's testimony as unfairly prejudicial because while she testified that she had sex with the defendant when she was in her "teens," it was not before she was 18. (T. Tr. 2557-58.)

No. 255 at 5-6 (reiterating the Court's ruling regarding Angela's testimony); *id.* at 10 (Louis's testimony about the defendant's sexual contact with him while he was a minor was "evidence of the enterprise's purposes, as well as its means and methods," particularly because one of the enterprise's purposes was to produce pornography, including child pornography (citing ECF No. 43 ¶ 2)); Aug. 3, 2021 Tr. 27-28, 30-31 (finding testimony that the defendant required Alex to engage in sexual encounters with other women, and that the defendant filmed those encounters was "direct evidence of the enterprise's means and methods" and showed "the control that the defendant exercised over victims as alleged in the indictment")). In addition, I balanced the probative value of each piece of evidence against the potential for undue prejudice, as required by Rule 403, and concluded that the proffered testimony was not unduly prejudicial. Fed. R. Evid. 403; (*see* ECF No. 255 at 5-6, 7, 10-12; Aug. 3, 2021 Tr. 19, 21, 27-28, 30-31; T. Tr. 2850.)[56]

The defendant argues that his lawyers did not make adequate objections to the introduction of the bad act evidence at trial, and that they "affirmatively introduce[d] other prior bad act evidence." (ECF No. 276-1 at 10-11.) As a threshold matter, since the evidence was properly admitted, counsel cannot be ineffective, even if they did not challenge the evidence at all. In any event, counsel did object that the defense had not been given timely notice of the government's intent to offer the evidence, and argued that the Court should exclude the testimony regardless of the timeliness issue. (ECF No. 146 at 4.) Trial counsel filed a supplemental brief on August 6, 2021, objecting to the admission of uncharged crime evidence under Rule 404(b) and Rule 403. (ECF No. 156.) In addition, in an August 26, 2021 letter filed

---

[56] The victims' testimony about the defendant's uncharged acts was also admissible under Rule 413 because it was relevant to the charged sexual assaults of Jerhonda, Jane and Faith. *See* Fed. R. Evid. 413(a) ("In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault" so long as the evidence is relevant.).

under seal, the defendant's lawyers moved to preclude the testimony of Addie and Louis.  (ECF No. 180.)  Under these circumstances, there is simply no basis to find that trial counsel's representation fell outside "the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689).[57]

       *iv.*    *Video Exhibits*

The defendant also disagrees with the Court's decision to admit certain "graphic" video evidence.  (ECF No. 276-1 at 11.)  Government Exhibits 341 through 343 depict sexual encounters between Alex, Dominique and the defendant.  (GX 341, 342, 343.)  In one of these recordings, the defendant guided Dominique's head while she performed oral sex on Alex.  In Government Exhibit 328(a), the defendant spanked Anna, who was naked while she walked back and forth, crying and robotically repeating that she was a "slut" and "stupid".  (GX 328(a); T. Tr. 2845-46, 2852-55.)  In Government Exhibit 329(a), a nine-minute recording of which the jury saw only a few minutes (T. Tr. 3674), Anna spread feces on her naked body and called the defendant "Daddy."  (GX 329(a).)  The defendant objects that this evidence "was not relevant to any 'means and methods' of an enterprise since there was no enterprise," and "[w]hatever probative value it had, was substantially outweighed by its prejudicial effect."  (ECF No. 276-1 at 11.)

The video depictions of sexual activity between Alex, Dominique and the defendant were properly admitted into evidence.  First, the evidence showed the control that the defendant exerted over his victims, and therefore demonstrated the means and methods of the enterprise alleged in the indictment.  (ECF No. 43 ¶¶ 7-9.).  The defendant directed Alex and Dominique (whom Alex described as "zombie-ish" (T. Tr. 3358)) how to have sex, what to do to each other

---

[57] Nor was counsel ineffective because he "opened the door" to evidence that the defendant was the subject of a criminal case in Illinois, for the simple reason that the jury never heard that evidence.

and how to react.  Second, the videos were direct evidence of one of the purposes of the enterprise—to recruit women and girls to engage in sexual activity with the defendant as well as to produce pornography.  (ECF No. 43 ¶¶ 2-3.)  Third, the video evidence corroborated Alex's testimony and provided support for the testimony of other victims, including Jane and Louis, that the defendant required them to have sexual contact with others, which the defendant filmed. (*See* T. Tr. 956, 1034-50, 1844-47, 1865-72.)  The videos were admissible under Rule 403 because they were relevant and probative, and not unduly prejudicial.  The exhibits corroborated the trial testimony, and were "no more inflammatory than the offenses" with which the defendant was charged.  *See Rivera*, 2015 WL 1875658, at *19.

The video recording of the defendant's "punishing" Anna, while graphic and disturbing, was properly admitted under Rule 404(b), and its probative value was not substantially outweighed by any risk of unfair prejudice.  *See* Fed. R. Evid. 401, 403, 404(b).  The means and methods of the enterprise included, among other things, "[d]emanding absolute commitment to [the defendant] and not tolerating dissent;" "[o]btaining sensitive information about sexual partners and members and associates of the Enterprise to maintain control over them;" and "[c]reating embarrassing and degrading videos of sexual partners to maintain control over them." (ECF No. 43 ¶ 9.)  The video recording of Anna (Government Exhibit 328(a)) was direct evidence of the enterprise and the way it operated.  It was an "embarrassing and degrading video," which the defendant created, and demonstrated the force he used to control his victims— spanking them and ordering them to say degrading things about themselves.  The video also corroborated Anna's testimony as well as Jane's and Jerhonda's about the ways that the defendant punished them for breaking his rules.  (T. Tr. 148-49, 166-68, 901, 909-18, 973-78, 1053-57, 1318, 2840-46, 2852-55, 3015, 3018-3019.)

The second video exhibit—also explicit and horrifying—was similarly admissible as evidence of the ways in which the defendant used humiliation and punishment to control his victims.  The recording supported Anna's testimony that the defendant made her do dehumanizing, humiliating acts involving bodily fluids.  (T. Tr. 2876-77, 2880.)  The video also corroborated Jane's testimony that the defendant punished her by forcing to eat feces and spread it on her body.  (T. Tr. 998-1000.)  Because the recordings served these legitimate purposes, they were appropriately admitted.  The video recordings were awful, but the crimes charged were awful, involving (1) sexual exploitation of minors, (2) forced labor—the defendant's violent, degrading assault on Jerhonda to force her to perform oral sex on him (T. Tr. 176-79) and the defendant's threats, including the presence of gun, to force Faith into oral sex (T. Tr. 2249-55)— (3) kidnapping, and (4) aggravated criminal sexual abuse.  Therefore, the Court's decision to admit the foregoing video recordings does not warrant a new trial.[58]

Finally, the defendant faults trial counsel for challenging the videos "belatedly."  (ECF No. 276-1 at 11.)  As explained above, the evidence was admissible, so counsel could not have been ineffective, even if "making a belated objection" constituted ineffective assistance of counsel.  In any event, counsel moved *in limine* to exclude the evidence involving Alex and Dominique as "highly inflammatory, needlessly cumulative, and [because] the probative value, if any, of the material is outweighed by the danger of unfair prejudice to the defendant."  (ECF No. 203.)  The defense initially objected to the admission of Government Exhibit 329(a) (*see* T. Tr. 2518), objected to playing Government Exhibit 328(a) (*see* T. Tr. 3671-72), and successfully

---

[58] The government played only a "very short portion" of the video (T. Tr. 3669, 3674; *see also* T. Tr. 2254 ("[W]e are going to play very limited snippets.")), and did not play it again during summation.  (T. Tr. 4424 ("I'm not going to play [GX 329(a)] for you again.").)

challenged the admissibility of another video of Joy.[59]  In sum, the Court's evidentiary rulings
were appropriate exercises of discretion.

## CONCLUSION

For these reasons, the defendant's motions for a judgment of acquittal and for a new trial
are denied.


**SO ORDERED.**

s/ Ann M. Donnelly
ANN M. DONNELLY
United States District Judge


Dated:  Brooklyn, New York
        June 29, 2022

---

[59] The Court excluded the video of Joy with feces as "cumulative . . . unfairly prejudicial and [] not
related to anybody who [wa]s testifying."  (T. Tr. 2520-28.)

103