1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,      : 19-CR-00286(AMD)
4                                   :
                                    :
5                                   :
         -against-                  : United States Courthouse
6                                   : Brooklyn, New York
                                    :
7                                   :
                                    : Wednesday, September 28, 2022
8    ROBERT SYLVESTER KELLY,        : 11:00 a.m.
                                    :
9            Defendant.             :
                                    :
10   - - - - - - - - - - - - - - - - X

11                TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
12              BEFORE THE HONORABLE ANN M. DONNELLY
                      UNITED STATES DISTRICT JUDGE
13

14                      A P P E A R A N C E S:

15   For the Government:   BREON S. PEACE, ESQ.
                              United States Attorney
16                            Eastern District of New York
                              271 Cadman Plaza East
17                            Brooklyn, New York 11201
                        BY:  LAUREN HOWARD ELBERT, ESQ.
18                            Assistant United States Attorney

19
     For the Defendant:    BONJEAN LAW GROUP, PLLC
20                            750 Lexington Avenue
                              9th Floor
21                            New York, New York 10022
                        BY:  JENNIFER ANN BONJEAN, ESQ.
22                            ASHLEY COHEN, ESQ.

23
     Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
24                       Official Court Reporter
                         E-mail:  SMaceRPR@gmail.com
25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

```
                    Proceedings                    2
```

1                    (In open court.)

2          THE COURTROOM DEPUTY:  All rise.

3          (Judge ANN M. DONNELLY entered the courtroom.)

4          (Defendant present via videoconference.)

5          THE COURT:  Hi, everybody can have a seat.

6          THE COURTROOM DEPUTY:  This is criminal cause for a

7    hearing, docket number 19-CR-286, USA versus Robert Kelly.

8          Counsel state your appearance, Government first.

9          MS. ELBERT:  Good morning, Your Honor.

10         Lauren Elbert for the United States.

11         THE COURT:  I am just going to ask you to have a

12   microphone handy so we can hear you.

13         MS. ELBERT:  Sure.

14         MS. BONJEAN:  Good morning, Your Honor.

15         Jennifer Bonjean and Ashley Cohen on behalf of

16   Mr. Kelly, who is present via Zoom.

17         THE COURT:  All right.

18         Good morning.

19         Good morning, Mr. Kelly.

20         THE DEFENDANT:  Good morning.

21         THE COURT:  Can you hear?

22         THE DEFENDANT:  Yes, ma'am, I can hear you.

23         THE COURT:  Okay, just to clarify, I think the

24   request that Mr. Kelly appear by Zoom was made by defense

25   counsel because I think he suffered some injury.

Proceedings                                                    3

1          Is that right?

2          MS. BONJEAN:  Yes, Your Honor.  He has, I don't want

3    to get in too much detail, but it would have been

4    uncomfortable.  And he, I think, was waiting for some medical

5    services there at the MCC.

6          THE COURT:  That's completely fine.  I just wanted

7    to establish that it was a defense request and he's consenting

8    to appear by video.

9          Is that right?

10          MS. BONJEAN:  That's right, Your Honor.

11          THE COURT:  Okay.

12          So, just a little bit of background.  When the

13   defendant was sentenced, in addition to the prison sentence, I

14   also ordered a 100-thousand-dollar fine, the $900 mandatory

15   special assessment, as well as $40,000 under the Justice For

16   Trafficking Victims Act, but I deferred ruling on the question

17   of restitution until I got further information from the

18   parties.

19          I am going to go over the submissions because there

20   have been quite a few of them, and I just want to make sure I

21   haven't missed anything.

22          At this point, just to recap, and I'll have the

23   Government correct me if I'm wrong, but the restitution

24   requests are for three of the victims.  I think I am correct

25   that the only victim for whom restitution is sought pursuant

Proceedings                                              4

1    to U.S.C. Section 2429 is Jane.

2              Is that right?

3              MS. ELBERT:  That's right, Your Honor.

4              THE COURT:  All right.  And the other two victims,

5    restitution is being sought pursuant to 18 U.S.C. 3663(a).

6              So let me just go over the submissions that I've

7    gotten.

8              There was an initial restitution letter from the

9    Government, and I am not going to go into the detail, but it

10   made some requests for Jane Doe Number 5, Sonja, and there was

11   a reference to Jane Doe Number 9.

12             On June 24th, Probation filed a letter in which it

13   stated that Faith and Faith's mother returned victim impact

14   statements and affidavits of loss.

15             There was an objection filed by the defense on June

16   27th.

17             Then on September 9th there was another submission

18   by the Government, this time advising the Court that Kelly

19   withdrew her claim, I don't know which Jane Doe that was, and

20   that the Government was not seeking restitution for Faith, but

21   was continuing to seek restitution for the other victims.

22             On September 21st the defense filed a letter

23   opposing the Government's request.

24             The Government replied on the 23rd.

25             On the 27th, the Government clarified the

Proceedings                                                          5

1  calculations with respect to Stephanie and defense counsel

2  filed a response.

3          And at the outset I think there was a typographical

4  error in your submission of the 27th in terms of the years

5  that we're talking about.

6          MS. ELBERT:  That's correct, Your Honor.

7          THE COURT:  You wrote 2009, but you meant 1999.

8          MS. ELBERT:  1999, that's right, Your Honor.

9          THE COURT:  All right.

10         The Government is seeking with respect to Jane Doe

11 Number 5 a total amount of $357,218.18, which covers herpes

12 treatment expenses, projected therapy expenses for

13 three-and-three-quarters years, and lost income.

14         Restitution for Stephanie for herpes treatment

15 expenses and for, is it three years of therapy expenses?

16         MS. ELBERT:  I believe that's right, Your Honor, but

17 let me just double-check.

18         THE COURT:  I believe that's correct.  I think

19 that's right.  If it's not --

20         MS. ELBERT:  Yes, I think that's right, Your Honor.

21         THE COURT:  -- you'll let me know.

22         MS. ELBERT:  Yes.

23         THE COURT:  And then for Sonja the request is for

24 $5,200, and that's for therapy expenses for a year.

25         First of all, have I missed anything?  Is there any

Proceedings                                                      6

1    submission that I haven't covered?

2                MS. ELBERT:  I don't believe so, Your Honor.

3                MS. BONJEAN:  No, I believe that's correct.

4                THE COURT:  All right.

5                And just sort of some basic principles.  With

6    respect to Section 2429 that applies to Mann Act convictions

7    and applies to Jane Doe Number 5.  It's mandatory restitution

8    for defendants convicted of Mann Act violations in the full

9    amount of victim's losses.

10                The reimbursements must be for costs that are

11   incurred or reasonably projected to be incurred in the future

12   as a proximate result of offenses involving the victim.  And

13   the costs include medical services, including physical,

14   psychiatric or psychological care as relevant here, lost

15   income, and any other relevant losses that the victim incurs.

16                There are some other ones as well, but I don't think

17   they apply here.

18                With respect to the restitution that's covered by

19   3663, Section 3663 of 18 U.S.C., the sentencing court may

20   require restitution if there is bodily injury to a victim.

21   And in those cases, the Court can award restitution to cover

22   the costs of necessary medical and related professional

23   services and devices related to physical, psychiatric and

24   psychological care, including non-medical care and treatment

25   that's rendered in accordance with a method of healing

Proceedings                                                      7

1   recognized by the law in the place of treatment.

2          The restitution only has to be a reasonable estimate

3   of the losses, but the Court cannot base a restitution award

4   on speculation.  But the law is also clear that any

5   uncertainties with respect to the amount in question must be

6   resolved in the victim's favor because of the statutory focus

7   on making the victim whole.

8          The Government's burden is to establish the loss

9   amount under these statutes, and any dispute about the amount,

10  the Court has to resolve by a preponderance.

11         So, I think the best thing to do here is to start

12  with Jane.  And, again, this would be based on the Mann Act

13  violations, in particular, Racketeering Acts 8, 9, 10 and 11

14  under Count One and Counts Two, Three, Four and Five, which

15  charged Mann Act violations based on sexual activity that

16  exposed Jane to herpes, and based on sexual activity with a

17  minor, sexual exploitation of a child, and forced labor.

18         I also think that it is probably, because I think

19  this discussion will come up, is probably not a bad idea to

20  mention that under 18 U.S.C. 3663, what the definition of a

21  victim is.  And that's a person who is directly and

22  proximately harmed as a result of the commission of an offense

23  for which restitution may be ordered, including in the case of

24  an offense that involves as an element, a scheme, conspiracy

25  or pattern of criminal activity, any person directly harmed by

SAM      OCR      RMR      CRR      RPR

Proceedings                                        8

1    the defendant's criminal conduct in the course of the scheme,

2    conspiracy or pattern.

3             Also, Judge Amon, who wrote a very comprehensive

4    opinion on the topic of restitution, observed that the

5    definition of victim is broad.

6             So, let me hear from the Government.  I mean I will

7    say that the submissions are pretty thorough, and I think I

8    understand everybody's argument, but the Government's position

9    with respect to the cost, we'll start with treating the

10   herpes, the Government calculates that amount as $281,168.18.

11   And I think the Government reached that determination by

12   calculating how much it costs a year to take Valtrex without

13   insurance and an annual gynecological exam, which the

14   Government calculates as $5,255.48, and multiplying that by

15   the average life expectancy for a woman in the United States,

16   which is 82.  And so, the Government's multiplied those

17   amounts by 53-and-a-half years.

18            And then citing the website, public website, the

19   Government assumes that a thirty-day supply of 500-gram

20   Valtrex tablets costs $421.29, and that an annual

21   gynecological exam costs $200.

22            Do I have those figures correct?

23            MS. ELBERT:  Yes, Your Honor.

24            THE COURT:  Now, Ms. Bonjean, I understand you to be

25   saying that Jane's herpes isn't causally linked to the Mann

SAM      OCR      RMR      CRR      RPR

Proceedings                                                            9

1   Act violations because there's no connection between her

2   contracting herpes and the encounters in California that are

3   the basis of the Mann Act violations.

4          And so, your position is she's not a victim, is that

5   right?

6          MS. BONJEAN:  No, my position --

7          THE COURT:  Turn on your microphone, if you could.

8   Thanks.

9          MS. BONJEAN:  I think the question of what

10  constitutes a victim is not the same question of whether or

11  not the specific conduct that is the basis of the offense is

12  proximately and directly related to the harm for which the

13  victim is seeking restitution.

14         So, I don't quarrel with the Court or Judge Amon's

15  or anyone's definition of victim.  And I think for restitution

16  purposes Jane Doe qualifies as a victim.  That doesn't obviate

17  the need to make a proximate and direct causal link to the

18  specific offenses for which the victim is seeking restitution.

19  And that there has to be actual --

20         THE COURT:  The only reason I am going to just stop

21  you for a moment --

22         MS. BONJEAN:  Yes.

23         THE COURT:  -- I just want to make sure I understand

24  that your position is that the Government would have to

25  establish that she actually got herpes from those two

SAM      OCR      RMR      CRR      RPR

Proceedings                                          10

1   encounters in California?

2          MS. BONJEAN:  Yes, for the purposes of certainly

3   under 2429.  And then if you were considering it pursuant to

4   18 U.S.C. 3663(a), it would still have to be connected to some

5   criminal activity or pattern of criminal activity.

6          And our position, and it's the uniqueness of the

7   indictment and the uniqueness of the case and the uniqueness

8   of the underlying circumstances of these particular offenses,

9   that yes, they do have to demonstrate that the harm that Jane

10  suffered was causally linked to some specific criminal

11  activity that was either, again, under the Racketeering Act or

12  a Mann Act violation.  And the reason for that is, otherwise,

13  we're just saying we may as well just, you know, have a

14  sign-up list at the door for anyone that wants to allege that

15  they were mistreated by Mr. Kelly for, you know, the entirety

16  of the alleged RICO enterprise.

17         THE COURT:  Well, I don't think anybody is

18  suggesting that.  Maybe I am not making myself clear.

19         I just want to make sure that I understand that your

20  position is that the Government has to specifically connect

21  her actually contracting herpes to those two times in

22  California.

23         Is that right?

24         MS. BONJEAN:  Yes, or some other criminal activity

25  as part of the RICO enterprise at a minimum, yes.

Proceedings                                               11

1          THE COURT:  Well, because as I understand it, the

2     racketeering acts charged with respect to this victim, the

3     Mann Act offenses were engaging in sexual activity that

4     exposed someone to herpes in violation of public health

5     statutes.

6          MS. BONJEAN:  Correct, and they were -- it wasn't --

7     you know, they were together four years.  They weren't -- it

8     wasn't every time they had sex he committed a crime.

9          So, yes, I think the specific offense that was

10    charged that was -- for which he was convicted, there has to

11    be that causal link.

12         THE COURT:  All I'm saying is the statute doesn't

13    require that she actually contracted, it requires that he

14    exposed her to it.

15         MS. BONJEAN:  I know -- well, I know that -- well, I

16    know the Court's -- yes, I am aware what the Court's position

17    is on that, and I'm not even quarreling with that.

18         THE COURT:  I just read the statute, that's all.

19    That's what is says.

20         MS. BONJEAN:  I understand, but for restitution

21    purposes, for there to be harm, exposure wouldn't be enough.

22         THE COURT:  Well, are you disputing that she has it?

23         MS. BONJEAN:  No, I'm not disputing she has it.  I'm

24    disputing the fact that we don't know when she -- when she was

25    afflicted with it.  And we also don't know whether it was

Proceedings                                                    12

1    correlated with any criminal activity.

2         And while I understand maybe the Court and the

3    Government believes I'm splitting hairs here, I do think --

4         THE COURT:  You don't have to attribute any intent

5    to me.

6         MS. BONJEAN:  Yeah, I'm not.

7         THE COURT:  I'm not trying to trick you.  I'm just

8    asking a question, that's all.

9         MS. BONJEAN:  That's our position, yes.  I mean I

10   think it is technical and I think that this is not just, you

11   know, the spirit of, you know, whether she is entitled to

12   restitution.

13        I mean people sue for emotional damages and there's

14   other remedies.  This is a very specific type of remedial

15   purpose and, yes, our position is that it has to be correlated

16   to a specific activity that was charged in the Mann Act

17   violations, which put particular dates on those things; yes.

18        THE COURT:  Okay.

19        Can I hear your response to that?

20        MS. ELBERT:  Yes, Your Honor.

21        Obviously, the defendant exposed this victim to

22   herpes multiple times, including on the dates specifically

23   alleged, as well as other dates.

24        The causal link has to be established by a

25   preponderance of the evidence.  It's been proven that the

Proceedings                                                    13

1   defendant exposed this victim to herpes.  She now has herpes

2   and has to incur costs in order to treat that herpes.

3                We submit that the evidence that was presented at

4   trial was sufficient to establish the causal link between the

5   charged conduct and her costs, such that restitution is

6   appropriate.

7                THE COURT:  Okay.

8                Is there anything else that you wanted to say about

9   that?

10               MS. BONJEAN:  On the specific causal link issue, no.

11  I think the briefing is sufficient.

12               I do think it's an interesting question, and I don't

13  know that it is as well resolved as I would like it to be.

14  But I do -- I think -- I think our papers set forth our

15  position on it.

16               THE COURT:  I think so.  I think so, too.

17               So, I think this particular question can be analyzed

18  under both restitution statutes.  It has to be under 2429.

19  And in connection with making this determination, I,

20  obviously, presided over the trial and referred back to some

21  of the testimony to refresh my recollection about what

22  happened.

23               As I said, the racketeering acts and the Mann Act

24  defenses charged the defendant with engaging in schedule

25  activity that exposed a person to genital herpes in violation

Proceedings                                    14

1    of public health statutes.  But the evidence at the trial

2    established, as I recall it and as I reviewed in the

3    transcript, that Jane testified that she contracted genital

4    herpes in the summer of 2015 and that she saw a doctor in 2015

5    and the doctor diagnosed her with herpes and prescribed

6    medication.  She told the defendant about this and he told her

7    she could have gotten it from anyone.  And she responded that

8    she had only been intimate with him.

9           Medical records that were introduced at the trial

10   also reflect that at that point the defendant was her only

11   sexual partner.

12          Given that testimony and given the actual charges,

13   the Government has satisfied its burden of showing that Jane

14   contracted herpes from the defendant during the encounters

15   that were identified in the Indictment, even though I don't

16   think that's what they had to prove.  They had to prove that

17   he exposed her to it.

18          But she would also be entitled to restitution under

19   18 U.S.C. Section 3663.  As I said before, a victim includes

20   someone who has been harmed as the result of the commission of

21   an offense, in the case of an offense that involved as an

22   element a scheme, conspiracy or pattern of criminal activity.

23   And someone who's a participant in that kind of a conspiracy

24   or criminal activity can be ordered to pay restitution.

25          And my recollection is that the racketeering, one of

SAM      OCR      RMR      CRR      RPR

Proceedings                                      15

1    the means and methods was exposing sexual partners without

2    informing them that he had a sexually transmittable disease.

3              Now, there is also a question about the calculations

4    in terms of Valtrex instead of the generic version.  I am not

5    aware of any authority, but I will certainly hear from you,

6    Ms. Bonjean, if there is authority that requires a victim that

7    is looking at different courses of treatment to pursue the

8    less expensive option.

9              Do you have anything you want to add to that?

10             MS. BONJEAN:  I mean I don't -- I think that kind of

11   mischaracterizes the issue.

12             I don't think it's a matter of pursuing a less

13   expensive treatment.  It's the same drug.  One is just generic

14   brand, which is what insurance would pay for; and one is an

15   inflated brand version for which the Government has failed to

16   demonstrate any need or any expectation that she would opt for

17   Valtrex, rather than just pocket the quarter-million dollars,

18   which is what would happen.  I mean she could go pay $15 a

19   month for the generic brand, and then she would be left with

20   over 200-thousand dollars for -- I mean that's what we're

21   talking about here.  So, that's the concern.

22             THE COURT:  What's your basis for saying it's $15?

23             I looked at the website, or my law clerk more

24   accurately looked at the website, and it says that a

25   thirty-day supply of the generic version without insurance

Proceedings                                    16

1    costs $15.31 --

2              MS. BONJEAN:  Correct.

3              THE COURT:  -- to $60, depending on which pharmacy

4    you visit.  Is that wrong?

5              MS. BONJEAN:  No.  Well, the -- the same website

6    that the Government used demonstrates that the -- I mean

7    again, obviously, these are -- I think these websites kind of

8    give you an estimate of some type, but I didn't pull 15.31

9    from thin air.  That was what they indicated was for uninsured

10   people, $15.31 for a thirty-day supply of valacyclovir, which

11   is, again, just the generic version.

12             I don't know -- I put the cite there.  I don't know

13   if it didn't come up, but I could certainly Google it right

14   now.

15             THE COURT:  Well, I don't think it's necessary.  I

16   just wanted to make sure I understood what the source of

17   the --

18             MS. BONJEAN:  The same source as the Government's

19   $421.29.

20             THE COURT:  Okay.

21             Do you have any response you want to make to that in

22   terms of using a generic versus an non-generic drug?

23             MS. ELBERT:  I would just observe that the

24   requirement is that the amount be a reasonable estimate, and

25   that the requirement is that restitution reimburse victims for

Proceedings                                           17

1    the full amount of their losses.

2             And we submit that the data relating to the

3    out-of-pocket costs for Valtrex is a reasonable estimate.  As

4    your colloquy with defense counsel just pointed out, these

5    prices can vary depending on geographic location and over

6    time.

7             We submitted a receipt from the victim known as

8    Stephanie, who has insurance.  Her co-pay was more than $15.

9             There is some variation in how much it is truly

10   going to cost.  And given that the requirement is for

11   restitution to cover the full amount of the victim's losses,

12   we think using a conservative estimate of the brand name drug

13   would be reasonable under the circumstances.

14            THE COURT:  And your range, I think, was $35, 35.74?

15            MS. ELBERT:  That's the -- I think that's the co-pay

16   that Stephanie had to pay, that's right.

17            THE COURT:  All right.

18            The other question was this issue of reimbursement

19   for annual gynecological exams.

20            Is there anything more you want to say about that?

21            MS. BONJEAN:  No, Your Honor.

22            THE COURT:  All right.

23            I, again, keeping in mind that the defendant is

24   required to compensate the victim for the full amount of her

25   losses and given the variation in what these drugs can cost, I

Proceedings                                                    18

1  think the Government's estimate is reasonable and supported,

2  and they have met their burden.

3          That also goes for the annual gynecological visits.

4  That is a cost that is reasonably projected into the future,

5  and it is a reasonable foreseeable offense of being infected

6  with this disease.

7          Now, the next question is therapy.  And the

8  Government calculates that amount by assuming that Jane is

9  going to require therapy for three-and-three-quarters years at

10  a cost of a hundred-dollars per session.  And as I understand

11  it, the three-and-three-quarters years number represents the

12  period of the victimization.

13          Is that correct?

14          MS. ELBERT:  That's right, Your Honor.

15          THE COURT:  All right.  Is there anything that

16  anybody wants to say in addition to what you've already said

17  in your papers?

18          MS. BONJEAN:  No, but as to Jane, I'm just trying to

19  make sure I understand.

20          So, despite the fact that valacyclovir, at least

21  according to Drugs.com, has an estimated thirty-day supply

22  cost of $15.31, and according to the Government's reliance on

23  that same website that Valtrex has a monthly cost of $421.29,

24  the 421 is -- we are going to assume that that's the

25  reasonable estimate?

SAM     OCR     RMR     CRR     RPR

Proceedings                                    19

1          THE COURT:  First of all, I think you might be

2    misstating what your website said.  I think it said 15 to $60,

3    at least when we looked at it.

4          MS. BONJEAN:  Okay.

5          THE COURT:  But I think the Government, the request

6    that the Government has made is a reasonable request.  And I

7    understand you have an exception to it.

8          MS. BONJEAN:  I'm not -- I'm not -- I do have an

9    exception to it, but I'm just trying to get clarity that,

10   let's just say that the website says 15 to $60 for

11   valacyclovir, the Court is determining that the $421 for

12   Valtrex is a reasonable estimation?

13         THE COURT:  I am determining that the Government's

14   estimate, which was a $35.74 figure -- do I have that right?

15         MS. BONJEAN:  No, Judge, you do not.

16         THE COURT:  I wasn't asking you, I was asking the

17   Government.

18         MS. ELBERT:  That is the amount that Stephanie had

19   to pay for her co-pay with insurance.

20         THE COURT:  Oh, I see.

21         MS. ELBERT:  We're seeking restitution in the amount

22   for the out-of-pocket expense as to Jane because she is

23   uninsured.

24         THE COURT:  Okay.  So, I think it is reasonable, as

25   the Government points out, given the fluctuations in cost to

Proceedings                                                20

1  allow her restitution for the non-generic version of the drug.

2  Nobody has cited anything to say that the defendant can

3  dictate the kind of medicine t -- hat the victim takes.

4           And so, I understand you disagree with me, and you

5  can appeal.

6           MS. BONJEAN:  Yeah, I intend to.

7           But my question is, are you -- I'm just trying to

8  get clarity because you said both the $35 and --

9           THE COURT:  Well, I was mistaken.

10          MS. BONJEAN:  Yeah, okay, I'm just trying to get

11  clarity.

12          Whenever the Court's ready, I just wanted to make

13  sure I understand.

14          THE COURT:  Well, just take it easy on the court

15  reporter, if you could.

16          MS. BONJEAN:  My apologies.

17          THE COURT:  I think I made myself clear in terms of

18  what the total amount was, and so that the herpes treatment

19  expenses, the total amount is $357,218.18.  And that total

20  amount includes herpes, the projected therapy expenses for

21  three-and-three-quarter years.  And I haven't gotten to the

22  question of lost income yet.

23          MS. BONJEAN:  May I just, Your Honor?

24          So, I -- and, again, I'm just going back to, and

25  that was premised on the $421 that the Government estimated,

SAM     OCR     RMR     CRR     RPR

Proceedings                                      21

1    is that correct?

2              THE COURT:  Yes, that's correct.

3              MS. BONJEAN:  Okay.

4              THE COURT:  Now, with respect to -- I also find that

5    she is entitled to therapy given the testimony at the trial.

6              And I know you disagree with the evidence at the

7    trial, Ms. Bonjean, but accepting the jury's verdict, there is

8    more than enough evidence that that could cause life-long

9    trauma.  And the Government's only asking for

10   three-and-three-quarter years.  The hundred-dollar per therapy

11   session is reasonable.

12             I know that you took issue with that number because

13   somebody else paid $75,000.  I think this is a reasonable

14   amount, and so your objection on that is overruled.

15             The question of lost income, the Court may require

16   restitution for lost income if an offense resulted in bodily

17   injury to a victim, but that cannot be based on speculation.

18             I think the Government's theory is that the forced

19   labor conduct, which is the subject of Racketeering Act 11,

20   caused bodily injury.

21             But I don't think the Government has met its burden

22   in showing that the defendant caused her to be unemployed by

23   three-and-three-quarters years.  So I think that's too

24   speculative, I am not going to include that in a restitution

25   award.

Proceedings                                        22

1        Is there anything anybody else wanted to say about

2   that?

3             MS. ELBERT:  No, Your Honor.

4             MS. BONJEAN:  No, Your Honor.

5             THE COURT:  All right.

6        Moving on to Stephanie.  The Government seeks two

7   categories of restitution for her:  Past and future expenses

8   for her herpes treatment totaling $70,581.72; and past therapy

9   totaling $8,400.

10        This falls under 18 U.S.C. Section 3663 since

11   Stephanie is not a Mann Act victim.  I think some of the

12   arguments are similar with respect to the propriety of

13   ordering restitution to Stephanie for both of these.  Let me

14   just make sure I'm right.  Well, with respect to the herpes,

15   certainly.

16        Is there anything additional that you want to say

17   about that, Ms. Bonjean, just with respect to that one item?

18             MS. BONJEAN:  Yes, just briefly.

19        I think the arguments are similar, but particularly

20   as to Stephanie, I think that there is -- and I think the

21   record is devoid, frankly, of any evidence that there is a

22   causal link between the charged offense or any criminal

23   activity that was allegedly part of the RICO enterprise that

24   can be linked to her -- her herpes diagnosis.  And that is

25   also bolstered by the fact that the defendant, himself, wasn't

Proceedings                                           23

1  diagnosed with herpes until spring of 2000.

2          THE COURT:  Was he diagnosed then or just treated

3  then?

4          MS. BONJEAN:  No, he was diagnosed.  But even

5  according to the medical records, he started presenting in

6  2000 with certain types of symptoms that was then being

7  treated, and then formally diagnosed, I think, in April of

8  2000.

9          There is just nothing in the medical records that

10 suggests that he was suffering from herpes prior to 2000.  I

11 think there were some other medical entries that suggested

12 other -- he was diagnosed, I think, with a different STI at

13 some point, but that's -- that's my recollection of the

14 record.

15         And we also have no testimony from Stephanie,

16 herself.  The Government wasn't shy about eliciting testimony

17 from witnesses who had alleged that they had been afflicted

18 with herpes during the course of the relationship with

19 Mr. Kelly.

20         So, the absence of that in her testimony, I think,

21 is, again, corroborative of -- and would suggest that there is

22 just insufficient evidence to make a correlation that he was

23 responsible for that.

24         And we're not talking about a disease that is very

25 rare.  I've cited it over and over, and I think we're doing a

Proceedings                                                    24

1    lot of stigmatization of herpes -- people who have herpes, but

2    one in six people have herpes.  So, it is not outside the

3    realm of possibility that this woman did not get herpes from

4    Mr. -- Mr. Kelly.  And the evidence just isn't there to

5    support it.

6              So -- and it certainly can't be correlated to

7    Racketeering Act 2, and there is just a dearth of evidence to

8    make the necessary causal link from our standpoint.

9              I know I just want for the record to be clear.  I

10   was a little confused by the Government's letter on

11   September 27th, the footnote which said 2009.  I kind of

12   assumed it meant 2000 because the 9 and the zero are next to

13   each other, but it sounds like what they meant to say was

14   1999.

15             Again, I was hypothesizing at that point because I

16   didn't have clarity on what they really meant by that.  But in

17   any event, the analysis is the same from my perspective.

18   There isn't the sufficient correlation to the charged offenses

19   or any criminal activity charged in the racketeering

20   enterprise.

21             And then we also have, unlike in -- unlike in Jane's

22   situation, a fair amount of evidence that was received that

23   would contradict any claim that she actually did contract

24   herpes from Mr. Kelly.

25             So, that's what I would add to the argument, Your

1    Honor.

2              THE COURT:  Government want to be heard?

3              MS. ELBERT:  Your Honor, Stephanie had informed the

4    Government, and this is in the 3500 item that we cite in our

5    letter, that she had this sexual relationship with Mr. Kelly

6    and that after a couple of months she began to have symptoms,

7    was diagnosed.  And she specifically stated that she was

8    17 years old at the time of her diagnosis, which would put it

9    at 1999.

10             Given the correlation in time and the nature of her

11   relationship with Mr. Kelly and it falling within the scope of

12   the charged criminal conduct, the Government would then submit

13   that by a preponderance of the evidence, the cost of

14   Stephanie's herpes treatment is fairly attributable to the

15   defendant's criminal conduct and should fall within the scope

16   a restitution order.

17             THE COURT:  Okay, what is your position as to

18   Ms. Bonjean's point about that he wasn't -- I don't know when

19   he was diagnosed versus when he was treated?

20             MS. ELBERT:  Yes, Your Honor.

21             As we point out in our papers, herpes infections are

22   often asymptomatic.  So, it's not necessarily conclusive that

23   the fact that the defendant began to be treated for herpes

24   post-dated his relationship with Stephanie, doesn't

25   conclusively establish that he did not infect her with herpes.

Proceedings                                         26

1        And so, given, again, the correlation in time, the

2   fact that, per the victim, Mr. Kelly was her only partner

3   during this period in her life, and the standard of

4   preponderance, we think it's -- the evidence makes it

5   reasonable to conclude that these costs were the result of

6   Mr. Kelly's conduct.

7        THE COURT:  Counsel also points out that she didn't

8   testify about it at the trial.

9        Do you have a response to that?

10       MS. ELBERT:  I don't believe she was asked about it,

11  so it's not as though she testified to the contrary.

12       And she did prior to trial during an interview in

13  2019 state that she believed she had contracted herpes from

14  Mr. Kelly.

15       THE COURT:  All right, anything else you want to say

16  about that, Ms. Bonjean?

17       MS. BONJEAN:  Only to highlight, Your Honor, I think

18  the Government is now saying, well, he could have been

19  asymptomatic.

20       I mean it is such conjecture, and we are looking

21  back at an event from twenty years ago.  So -- and I think it

22  should require more than what the Government has established

23  to make the causal link.

24       They're not only not making a causal link to the

25  specific offense conduct, which they can't do, but they are

SAM      OCR      RMR      CRR      RPR

Proceedings                                                      27

1   not even making a link to, you know, that it happened in --

2   and that Mr. -- Mr. Kelly was responsible for that.

3           I mean, again, I think, you know, the record speaks

4   for itself on that.  I don't think we can just assume he was

5   asymptomatic.  Which, by the way, I think their own expert

6   indicated that in initial outbreak you're not asymptomatic.

7   You know when you first get it, that's why you go to the

8   doctor and that's how you get diagnosed.  It isn't like, you

9   know, a nagging thing that you don't, you know, notice.  I

10  think that's contrary to what their own expert testified to.

11          THE COURT:  Well, the expert's testimony was pretty

12  broad on the ways in which herpes can be treated, including

13  when people are not symptomatic.  So, I don't think that the

14  expert's testimony supports the position that he did not

15  transmit it.

16          And my recollection is also that he was treated for

17  it sometime after the relationship with Stephanie, but being

18  treated for it doesn't mean that he didn't have it before.

19          I find that the Government has shown by a

20  preponderance of the evidence that Stephanie's entitled to

21  restitution for treatment for herpes.  The circumstantial

22  evidence, which was she first had sex with the defendant when

23  she was 17 years old in 1999 and had a relationship that

24  lasted for six months.  There is support for that in the 3500

25  material, that he was her only partner, and that she was

1    diagnosed with herpes a few months after she got symptoms.

2          And so, I find that that satisfies the Government's

3    burden that she contracted it during the conduct that formed

4    the basis for Racketeering Act 2, but the overall purposes of

5    the racketeering enterprise, including the means and methods,

6    included precisely this kind of conduct.

7          There is a question that I have for the Government.

8    That exhibit that you submitted suggests that Stephanie is

9    taking the generic version.  I don't know what your evidence

10   is, is what she took from 1999 to 2015, but if she's taking

11   the generic version, I do think your calculations should be

12   adjusted.

13         MS. ELBERT:  Certainly, Your Honor.

14         For the period during which she's had insurance, I

15   believe the calculation reflects the actual cost submitted in

16   the exhibit.

17         I don't know that we have information historically

18   as to what version of the drug she was taking in the years

19   prior to her obtaining insurance.  But if the Court -- I also

20   don't know at what point the generic version of Valtrex became

21   available on the market, since we're going back quite a long

22   time.  So, I may want to look into that, but --

23         THE COURT:  I think you are going to have to revisit

24   your calculations on that.

25         MS. ELBERT:  Understood.

Proceedings                                    29

1          THE COURT:  Then there is the question of therapy.
2    The request is for $8,200 to cover past therapy costs.  And I
3    think I understand the parties' relevant positions.
4          Is there something that you want to add to that,
5    Ms. Bonjean?
6          MS. BONJEAN:  No, Your Honor.
7          THE COURT:  All right, anything else that the
8    Government wants to say?
9          MS. ELBERT:  No, Your Honor.
10         THE COURT:  All right.
11         I find that those costs, $8,200, are reasonable and
12   supported by the evidence.  It is true that this relationship
13   was, I guess, relatively short, but the trial evidence was
14   that Stephanie was 17 at the time and that she testified that
15   she suffered and continues to suffer as a result of the nature
16   of that relationship, which included demeaning and degrading
17   conduct.
18         So, I find that she is entitled to compensation for
19   therapy that she went through to deal with that trauma.  And
20   so, that's a reasonable amount.
21         Now, the next question is Sonja.  The Government is
22   seeking $5,200 in future expenses.  Of course, the difference
23   here is that the jury found racketeering acts involving Sonja
24   were not proven.  Those were Racketeering Acts 3 and 4.
25         I mean the rule is that restitution can be given

Proceedings                                    30

1   even if there is an uncharged or acquitted count.

2          But does anyone have anything else they want to say

3   on this subject?

4          MS. ELBERT:  No, Your Honor.

5          MS. BONJEAN:  Your Honor, our position is, of

6   course, that even apart from the fact that he was acquitted of

7   the conduct, there just was -- is insufficient evidence to

8   support what exactly Sonja is seeking restitution for and in

9   connection to what offense.  Again, for which Mr. Kelly has

10  not been convicted.

11         And, of course, our position is the Government's,

12  you know, assertion that they still proved it by a

13  preponderance of the evidence is just that.  We don't have any

14  type of indication from the jury that it was proved by a

15  preponderance of the evidence, even that low standard.

16         So, I have nothing more to add.

17         THE COURT:  I agree with the defense on this one.

18  There is no way to determine, although I'm not sure it's

19  required, why the jury found that these facts were not proved,

20  but they did.

21         And I find that under these circumstances the

22  Government has not met its burden in establishing that these

23  acts are covered by the statute.  And so, I am denying

24  restitution as to Sonja.

25         The next question, and I think I am going to need

SAM     OCR     RMR     CRR     RPR

Proceedings                                            31

1    further submissions on this, at least unless the Government or

2    the defense has something else to say about it, because in

3    determining a schedule of payment, one thing I have to

4    consider is Mr. Kelly's resources, which continues in my mind

5    to be a sort of murky area.

6              I know when we discussed this at sentencing, it was

7    the defense position that he was indigent or nearly indigent,

8    at least with respect to the information that you had at the

9    time.  And since then, it emerged that he had this

10   approximately $28,000 in his commissary account.

11             The Government also represented at sentence that

12   there is a separate, I forget what it's called, but a separate

13   copyright that gives him access to additional money, but

14   nobody has really given me any clarity on this.

15             And so, on the question of scheduling, it's

16   difficult for me to determine how to set that schedule up

17   because, for example, I don't know if you know, I don't know

18   what the source of the $28,000 was.

19             MS. BONJEAN:  I do know.

20             THE COURT:  Okay.

21             MS. BONJEAN:  Fans --

22             THE COURT:  Okay.

23             MS. BONJEAN:  -- that were making deposits into his

24   commissary account.  So -- which they will not do anymore, of

25   course.  So, that's where that money was coming from.  They

Proceedings                                                    32

1  were people making, you know, a hundred dollars here, a

2  hundred dollars there.  I don't really know.  I don't have the

3  specific data of that, but that was not from any source of

4  income to the best of my knowledge or anything related to

5  Mr. Kelly's royalties or anything related to that.

6          Our position remains the same, or at least my

7  understanding is to the royalties, as I said at sentencing, it

8  is not that his -- that he does not have money generated as a

9  result of his body of work, he just has no access to it

10 because there are judgments against it.

11         THE COURT:  My recollection, and I'm sorry to

12 interrupt you, I just want to make sure that I don't forget.

13 I thought, the way I understood it, and I'm sure you all know

14 far more about this than I do, but that the royalties with

15 Sony were subject to some civil judgments.

16         MS. BONJEAN:  Two, correct.

17         THE COURT:  And then do you have any more insight

18 into the separate, I think it was $5 million that he might

19 have access to?

20         MS. BONJEAN:  I mean the Government has made that

21 claim.  I -- I have not been able to verify that.  And I'm

22 not -- I would be happy to look at any documents that the

23 Government wants to provide me.

24         Mr. Kelly has never in the history of his career

25 been, I would say, apprised really or even knowledgeable about

Proceedings                                          33

1    how his business deals work.

2              There's, again -- and that -- that -- that evidence

3    was presented in great detail at the Chicago case, but I will

4    represent that to the Court here, he is functionally

5    illiterate.  That was always deferred to managers.  So, he is

6    not the best source of that information.

7              If the Government with its subpoena power, which I

8    think it has exercised in a number of ways, has the ability to

9    clarify this for me, I will be happy to do my best to inquire

10   further to the extent I can, but I think they're actually in a

11   better position than me.

12             But I am -- I am -- I am unaware of this other pot

13   of money that the Government has referenced.

14             THE COURT:  What would you like to say about this?

15             MS. ELBERT:  I'll need to look into it further, Your

16   Honor, and would be happy to submit an additional letter on

17   the subject of a schedule for payment.

18             THE COURT:  And you are also going to have to submit

19   an order, a restitution order --

20             MS. ELBERT:  Correct, Your Honor.

21             THE COURT:  -- for me.  And keeping in mind that I

22   know some of it is probably going to be, I don't know how you

23   want to handle this sealed, not sealed portion, but I think

24   there's a method for doing that.

25             MS. ELBERT:  Yes, Your Honor.

Proceedings                                              34

1          THE COURT:  Hold on for just a minute.  Let me just

2    make sure I haven't missed anything.

3          MS. BONJEAN:  If there's a way for the restitution

4    order to trump the default judgments, I'd be happy to sign

5    onto that so that that money can go towards the restitution

6    payments.

7          THE COURT:  Well, my understanding, and you will

8    correct me if I'm wrong, I think under the statute -- well, I

9    think doesn't the defense have the responsibility of showing

10   what the defendant's financial condition is?

11         I am not saying -- if you can't do it, you can't do

12   it.

13         MS. BONJEAN:  I mean, you know, we did do a -- a

14   affidavit of his financial status as part of -- with

15   Probation.

16         THE COURT:  Right.

17         MS. BONJEAN:  Again, I -- I don't think I can really

18   reiterate as best -- I mean I can continue to reiterate it.

19   It's just a little more challenging than it seems like it

20   should be, but --

21         THE COURT:  I think I understand your position.

22   It's just a slightly unusual situation.  So --

23         MS. BONJEAN:  Yes, and part of this is because Sony

24   doesn't cooperate with me.  They cooperate with the

25   Government.  I can't call Sony up and get that information.

SAM     OCR     RMR     CRR     RPR

Proceedings                                          35

1   They'll give it to the Government, but they won't give it to

2   me.

3           Now, maybe that's not how it should be.  I think

4   it's probably not, but that is just how it is.

5           THE COURT:  Do you have anything else you want to

6   say about that?

7           MS. ELBERT:  No, Your Honor.

8           THE COURT:  All right.  Hold on, I just want to

9   double-check here.

10          (Pause.)

11          THE COURT:  I will also confess that math is not my

12  strong suit, but ordinarily I would give you the breakdown,

13  but I think you've got some recalculation to do.  And I

14  haven't determined a schedule just because the Government is

15  asking for some additional time for that.

16          So, I can tell you the amounts with respect to Jane

17  that the total amount is, and I believe this is right,

18  $300,668.18.  But you are going to recalculate the medication

19  costs for Stephanie, and there is $8,400 in therapy.

20          The other thing to keep in mind, just in terms of

21  schedule of payments, I set a schedule based on the fines,

22  which is the typical, I think it's $25 a quarter and then

23  10 percent upon release of gross monthly income.  I think

24  that's right.  That was set, in part, because we hadn't

25  decided the restitution.

Proceedings                                    36

1          The other issue is that the $900 mandatory

2     assessment has to be paid first, I think.  Then the

3     restitution, and then the fines.  And there is also the

4     $40,000 amount, and I don't remember what order that comes in.

5          And just so I think I'm right, no payments have been

6     made at all yet, is that right?

7               MS. BONJEAN:  I don't believe so, Judge.

8          I just want -- no, the answer to your question is --

9               THE COURT:  I know you've had a few other things

10    going on.

11              MS. BONJEAN:  Just a few.

12         I don't believe there has been.  Mr. Kelly's been

13    pretty occupied, too, for the last five weeks.

14         But, I just -- the Court mentioned something, and I

15    wanted to make sure I wasn't missing something in your prior

16    order about the schedule of payments.  I did see the order

17    saying that a lump-sum payment of $900 was due immediately.

18              THE COURT:  Right.

19              MS. BONJEAN:  I didn't see the reference to the --

20    the schedule of payments in the order.

21              THE COURT:  It's not in the order, it's at the end

22    of the sentencing.

23         Did I not put it in the order?  I'm pretty sure we

24    did.

25         Did we not put the schedule in?

Proceedings                                        37

1          I'm not sure that it has to be in the order

2    actually, but --

3          THE COURTROOM DEPUTY:  I'm not sure either, Judge.

4          MS. BONJEAN:  It may not be, I just would like to

5    know what the Court said so I can write it down.

6          THE COURT:  It's also in the minutes of the

7    sentencing at the end.  I just have the rough copy.

8          MS. BONJEAN:  Was it?

9          THE COURT:  Then the other little wrinkle, which

10   occurs to me, is this question of the money from Mr. Kelly's

11   commissary account, which I think you've appealed that.

12         Is that an appealable order?

13         MS. BONJEAN:  I believe so.  The Second Circuit, I

14   think, joined it with the appeal from the substantive case.

15         THE COURT:  Right.  I think you're right.

16         So, the only thing I was saying was that the reason

17   that was seized was to cover what his obligations are.

18         So, that's going to be a source of, at least, some

19   of the restitution.  And I don't know which, the other thing

20   you are going to have to let me know is, I think because it's

21   mandatory, that the restitution for Jane would come first.

22         MS. BONJEAN:  That's my understanding of the law.

23         THE COURT:  So, all right, what's the timeline here

24   for your submissions?

25         MS. ELBERT:  Could I have a week, Your Honor?

```
                    Proceedings                    38
```

1           THE COURT:  Sure.

2           Do you have any additional submissions you want to

3    make or do you want to see what they say first?

4           MS. BONJEAN:  I don't want to promise I won't have

5    any additional submissions.

6           THE COURT:  I'm sure you will.  It's perfectly fine.

7    I mean if you want to have another week after that.

8           MS. BONJEAN:  Thank you, Your Honor, yes, just so I

9    can take a look.

10          THE COURT:  Okay.

11          MS. BONJEAN:  And I'll try to do some more due

12   diligence looking into the questions the Court raised about

13   his income.

14          THE COURT:  Okay, thanks so much.

15          Anything else anybody wants to put on the record?

16          MS. ELBERT:  Not for the Government, Your Honor.

17          MS. BONJEAN:  No thank you, Your Honor.

18          THE COURT:  Mr. Kelly, you heard all of that, right?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  Okay.

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  All right, everybody, thank you so much.

23          (Matter adjourned.)

24          (Judge ANN M. DONNELLY exited the courtroom.)

25