

750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

October 12, 2022

**VIA ECF and EMAIL:**
The Honorable Ann M. Donnelly
United States District Court Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re: *United States v. Kelly,* 19 CR 286 (AMD)

Dear Judge Donnelly:

  Please accept this letter in response to the Government's October 5, 2022, letter.

**I.**  **This Court Should Modify Its Judgment Fining Mr. Kelly $100,000 In Light of Inaccuracies Regarding His Receipt and/or Entitlement to $5 Million for the Sale of So-Called Royalty Rights.**

  The Government concedes that Mr. Kelly has *not* received $5 million in exchange for the sale of certain royalty rights as previously suggested. However, the Government continues to mislead this Court by suggesting that he currently has an enforceable agreement with a company called Music Royalty Consulting ("MRCI") that entitles him to $5 million. Mr. Kelly now moves this Court to modify the portion of its sentencing judgment assessing court fines in the amount of $100,000 since that decision was based on the Government's representation that Mr. Kelly received or is due to receive $5 million in connection with his sale of royalty rights.[1]

  During Mr. Kelly's sentencing hearing, AUSA Geddes told this Court (without proper notice to defense counsel):

---

[1] The reckless assertions of the Government have caused real harm to Mr. Kelly. For example, numerous articles quoted AUSA Geddes, reporting that Mr. Kelly "secretly had access to millions of dollars from the sale of his music royalties and funneled them through a childhood friend." https://www.insider.com/r-kelly-5-million-selling-royalties-friend-prosecutors-allege-2022-6. Just last week, Mr. Kelly was sued in an Illinois state court by the Plaintiff in the default judgment case who alleged that Mr. Kelly made a fraudulent transfer of funds to which she had a right when he received the "$5 million" referenced by AUSA Geddes. Counsel for the Plaintiff there advised undersigned counsel that his good faith basis for making the assertion of a transfer of $5 million was AUSA Geddes' representations to this Court.



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

> [I]n August of 2001[2] [sic], the Government understands that the Defendant sold those rights to a third-party for $5 million. The Government's position is that the Defendant has not received that money pursuant to the contract -- and we provided a copy of that to the Defendant -- but he's entitled to receive it, and with the combination of the money that defendant will receive from Sony as well as the $5 million, that the Defendant is in a position, at least in the future, to pay a fine. Therefore, we think that the PSR should reflect the defendant's ability to pay a fine." (Sentencing Transcript, R. 29)

Later during those arguments, AUSA Geddes again represented:

> And so the objection is whether he has an ability in the future to pay a fine and it's the Government's position, given these substantial earnings that the Defendant will receive either from this $5 million judgment [sic] or from royalties coming in through Sony, that frankly he does have the ability in the future. (*Id.* at pg. 31)

AUSA Geddes even accused Mr. Kelly of not being candid with the Court or with the Probation Department about his financial status, stating "[n]owhere in there does he mention that there was this contract for $5 million to sell these rights." (*Id.* at 32) In reality, it was AUSA Geddes who failed to show candor to this Court.

The reason Mr. Kelly never disclosed a $5 million agreement with a company known MRCI to the Court or probation is because he never entered into that agreement. Although draft paperwork suggests that Mr. Kelly's friend negotiated a deal for the sale of certain royalties to satisfy his default judgments, the deal was abandoned after Mr. Kelly never ratified the agreement. Indeed, Mr. Kelly's signature is entirely absent from all required paperwork that was necessary to consummate this deal. Put differently, no money was paid, and the deal never closed, because Mr. Kelly was never a signatory to the deal.

In a letter filed under seal on October 5, 2022, AUSA Elbert admits that no conveyance of funds was ever made to Mr. Kelly (or to any designee), but she contends that the agreement remains "in full force." Not so. According to Mr. Calbert he never had

---

[2] Although the transcript reflects 2001, undersigned assumes that this should reflect 2021 since the AUSA later referenced the year 2021 in her argument to the Court. (Sentencing Transcript, R. 31)



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

the authority to unilaterally bind Mr. Kelly in the deal with MRCI. Undersigned counsel has obtained the unsigned paperwork that was presented for Mr. Kelly's signature; she has provided a copy of that paperwork to AUSA Elbert. Mr. Kelly's signature appears nowhere on the agreement. Mr. Kelly never received $5 million and is not due to receive $5 million from MRCI.

This Court should modify its judgment to strike the Court fine or significantly reduce it, because there is no good faith basis for the claim that Mr. Kelly has access to $5 million from MRCI or that he will ever access such money from MRCI or any future royalties from Sony. As the Court knows, any royalty income available from Sony is encumbered by two significant default judgments that far exceed his current and future income from Sony. Furthermore, Probation reported that numerous liens against Mr. Kelly exist which presumably encumber his Sony royalty income.

Lastly, the Government and this Court are certainly cognizant of the fact that R.Kelly has been "cancelled" - as they say. His music is not played on the radio and most streaming platforms, like Spotify, do not carry or promote his music. The Government's reference to an article that *claims* that after Mr. Kelly's EDNY convictions, his music experienced a brief surge in public interest is nothing more than the natural consequence of the unrelenting news coverage around his conviction and 30-year sentence. It is obvious that while Mr. Kelly remains in prison, which absent a reversal of his conviction by the Second Circuit is likely to be the rest of his life, he will not produce music and the media's interest in him will dissipate once his criminal cases finally conclude (assuming, of course, the Government stops piece-meal indicting him). It is simply a fiction that his royalty income will somehow increase with the passage of time. The Government should be required to provide evidence of Mr. Kelly's monthly royalty income from Sony (to which he has no access in any event) if it intends to make a claim of his future income-earning abilities.

II.     **This Government Did Not Prove (By Any Standard) that Jane's Actual Future Expenses for Herpes Medication Amounts to $421.29 Per Month For the Remainder of Her Life.**

Mr. Kelly will not rehash the arguments presented in his prior letters related to appropriate restitution in this case. However, Kelly maintains that this Court abused its discretion when it ordered restitution for Jane in the amount of $421.29 per month for the rest of her life to cover the cost of the brand version of valacyclovir, known as Valtrex. The Defendant maintains that the Court's restitution order was unreasonable where the Government presented no evidence that: (1) Jane takes Valtrex rather than its generic



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

counterpart (or at all); (2) will take Valtrex for the rest of her life; or (3) has any medical need whatsoever for a brand version of the drug when an exact replica of the drug is available in generic form. To be clear, if Jane had insurance, her insurance would not cover Valtrex.

The Government estimated the cost of monthly medication of Valtrex (30 days of 500mg tablets) for Jane by googling the drug on the website www.drugs.com. (Exhibit A) Although the Court seemed to challenge Defendant's contention that the same website showed that the generic version of the drug cost less than 5% of the estimate provided by the Government, Defendant stands by his assertion as reflected in Exhibit B which shows that the projected cost of a monthly supply of valacyclovir (30 days of 500 mg tablets) is $15.31 without insurance. (Exhibit B) As supported by the attached exhibits, numerous on-line pharmacies place the cost of a monthly supply of valacyclovir at roughly $15 with one outlet advertising a cost as low as $9 per month. (Exhibit C)

Defendant maintains that this Court should reconsider its decision to award Jane more than $250,000 for brand-name valacyclovir that even *she* has not asserted she needs or has previously taken. Frankly, this arguable windfall of money that is *not* an actual cost that Jane has incurred created *Brady* obligations for the government. Defense counsel surely should have had the opportunity to cross-examine Jane about her expectation of receiving a quarter-million dollars in future payments for a drug she may not ever take and can actually obtain for a tiny fraction of the monies this Court has ordered she receive.

### III.     Schedule of Restitution

As argued extensively, *supra,* the Government overstates Mr. Kelly's future financial prospects. Furthermore, Mr. Kelly has zero ability to provide annual financial affidavits. He is not in control of his finances to the extent they exist and he cannot read, write, or do basic math above a first to third grade level. If this Court is going to place a condition on Mr. Kelly, it should ensure that he can, as a practical matter, comply with the condition.

Defendant further objects to the proposed Orders, including the issuance of monies prematurely seized from his commissary account without authority or a Court order. This Court's Order sanctioning this premature seizure is currently being appealed to the Second Circuit Court of Appeals.



750 Lexington Avenue, 9th Floor
New York, New York 10022

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

Respectfully Submitted,


/s/JENNIFER BONJEAN

cc:     AUSA Lauren Elbert (via ECF)